**Nos. 25-2575 & 25-2662**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY,

Plaintiffs-Appellees,

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA

Defendants-Appellants,

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

Intervenor-Defendant- Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

**JOINT APPENDIX**
**Vol. 2, pp. 62–670**

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

SHARON SWINGLE
DEREK WEISS
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
*Counsel for the Federal Appellants*

# TABLE OF CONTENTS

## Volume 1

Notice of Appeal filed by the Little Sisters of the Poor Saints
Peter and Paul Home (Dkt. 358) ................................................. JA1

Notice of Appeal filed by the Federal Government (Dkt. 361)............ JA3

Order (Dkt. 357) ...................................................................... JA5

Opinion (Dkt. 356).................................................................... JA7

## Volume 2

Docket Sheet.......................................................................... JA62

Amended Complaint (Dkt. 89) ....................................................... JA128

Declaration of Kathryn Kost, Acting Vice President for
Domestic Research at the Guttmacher Institute
(Dkt. 90-13)...................................................................... JA261

Declaration of Carol Weisman, Ph.D (Dkt. 90-15) .......................... JA299

Snyder, et al., The Impact of the Affordable Care Act on
Contraceptive Use and Costs among Privately Insured
Women, Women's Health Issues 28-3 (2018) (Dkt. 90-
16) ................................................................................. JA336

Declaration of Samantha Butts, M.D., MSCE (Dkt. 90-17) ............ JA342

Declaration of Dayle Steinberg, CEO of Planned Parenthood
Southeastern Pennsylvania (Dkt. 90-20)................................ JA377

Declaration of Philip Gennace, Assistant Commissioner of
Life and Health, New Jersey Department of Banking
and Insurance (Dkt. 90-22) ................................................ JA385

Declaration of Elizabeth Coulter, Deputy Director of the
Office of Women's Health, New Jersey Department of
Health (Dkt. 90-23) .......................................................... JA391

Supplemental Declaration of Kathryn Kost, Acting Vice
     President for Domestic Research at the Guttmacher
     Institute (Dkt. 118-3) ............................................................ JA399

Joint Appendix (Dkt. 253) ........................................................ JA403

Final Religious Exemption Rule, 83 Fed. Reg. 57, 536 (Nov.
     15, 2018) (Dkt. 253-1, Ex. 1) .................................................. JA410

Final Moral Exemption Rule, 83 Fed. Reg. 57,592 (Nov. 15,
     2018) (Dkt. 253-1, Ex. 2) ........................................................ JA465

2017 HRSA Guidelines, 83 Fed. Reg. 8487 (Feb. 27, 2018)
     (Dkt. 253-1, Ex. 3) ................................................................ JA505

IFR Religious Exemption, 82 Fed. Reg. 47,792 (Oct. 13,
     2017) (Dkt. 253-1, Ex. 4) ........................................................ JA507

IFR Moral Exemption, 82 Fed. Reg. 47,838 (Oct. 13, 2027)
     (Dkt. 253-1, Ex. 5) ................................................................ JA551

FAQs about ACA Implementation Part 36 (Jan. 9, 2017)
     (Dkt. 253-1, Ex. 7) ................................................................ JA576

2016 HRSA Guidelines, 81 Fed. Reg. 95,148 (Dec. 27, 2016)
     (Dkt. 253-1, Ex. 8) ................................................................ JA587

Final Rules, 80 Fed. Reg. 41,318 (July 14, 2015) (Dkt. 253-2,
     Ex. 10)................................................................................ JA590

NPRM, 79 Fed. Reg. 51,118 (Aug. 27, 2014) (Dkt. 253-2, Ex.
     11) ...................................................................................... JA620

IFR, 79 Fed. Reg. 51,092 (Aug. 27, 2014) (Dkt. 253-2, Ex. 12) ....... JA630

Final Rule, 78 Fed. Reg. 39,870 (July 2, 2013) (Dkt. 253-2,
     Ex. 13)................................................................................ JA640

## Volume 3

NPRM, 78 Fed. Reg. 8456 (Feb. 6, 2013) (Dkt. 253-2, Ex. 14) ........ JA671

ANPRM, 77 Fed. Reg. 16,501 (Mar. 21, 2012) (Dkt. 253-2, Ex. 15) ................................................................................... JA692

Final Rule, 77 Fed. Reg. 8725 (Feb. 15, 2012) (Dkt. 253-2, Ex. 16) ................................................................................... JA700

IFR, 76 Fed. Reg. 46,621 (Aug. 3, 2011) (Dkt. 253-2, Ex. 17) ......... JA706

2011 HRSA Guidelines (Dkt. 253-2, Ex. 18) .................................. JA712

2019 HRSA Guidelines (Dkt. 253-2, Ex. 18-A) ............................... JA715

Institute of Medicine, Clinical Preventive Services for Women (2011) (Dkt. 253-3, Ex. 19) ........................................ JA720

AccessMatters Comments (Dkt. 253-3, Ex. 21) .............................. JA969

American Academy of Family Physicians Comments (Dkt. 253-3, Ex. 23) ................................................................ JA981

American Academy of Nursing Comments (Dkt. 253-3, Ex. 24) ................................................................................... JA983

American College of Nurse-Midwives Comments (Dkt. 253-3, Ex. 25) ................................................................................... JA993

American College of Physicians Comments (Dkt. 253-4, Ex. 26) ................................................................................... JA996

American Congress of Obstetricians and Gynecologists, American Academy of Pediatrics, & Society for Adolescent Health and Medicine Comments (Dkt. 253-4, Ex. 27) ................................................................................... JA999

American Public Health Association Comments (Dkt. 253-4, Ex. 28) ................................................................................. JA1009

California Planned Parenthood Education Fund Comments (Dkt. 253-4, Ex. 34) ............................................................. JA1016

Center for American Progress, Autistic Self-Advocacy
     Network, Autism Women's Network, & National LGBT
     Task Force Comment (Dkt. 253-4, Ex. 38) ........................... JA1031

Colorado Consumer Health Initiative Comments (Dkt. 253-4,
     Ex. 41) ................................................................... JA1047

Colorado Health Foundation Comments (Dkt. 253-4, Ex. 42) ...... JA1054

County of Santa Clara Comments (Dkt. 253-4, Ex. 43) ............... JA1057

Center for Reproductive Rights Comments (Dkt. 253-4,
     Ex. 44) ................................................................... JA1070

Massachusetts Office of Health and Human Services
     Comments (Dkt. 253-5, Ex. 62) ............................... JA1096

National Council of Jewish Women Comments (Dkt. 253-6,
     Ex. 71) ................................................................... JA1099

National Health Law Program Comments (Dkt. 253-6,
     Ex. 74) ................................................................... JA1108

Planned Parenthood Federation of American & Planned
     Parenthood Action Fund Comments (Dkt. 253-7,
     Ex. 88) ................................................................... JA1129

Public health practitioners and members of faculty,
     Columbia University Mailman School of Public Health
     Comments (Dkt. 253-7, Ex. 90) ............................... JA1140

Public Health Solutions Comments (Dkt. 253-7, Ex. 91) .............. JA1146

Raising Women's Voices for the Health Care We Need
     Comments (Dkt. 253-7, Ex. 92) ............................... JA1157

Reproductive Rights and Justice Practicum at Yale Law
     School Comments (Dkt. 253-7, Ex. 94) ................................. JA1172

SisterLove Inc Comments (Dkt. 253-7, Ex. 95) ........................... JA1187

State Attorneys General Comments (Dkt. 253-7, Ex. 96) ............. JA1194

iv

Texas House Women's Health Caucus Comments (Dkt. 253-7, Ex. 97)................................................................. JA1203

Texas Women's Healthcare Coalition Comments (Dkt. 253-7, Ex. 99)................................................................. JA1208

URGE Unite for Reproductive and General Equality Comments (Dkt. 253-7, Ex. 100)........................................... JA1213

Wisconsin Alliance for Women's Health Comments (Dkt. 253-7, Ex. 102) ............................................. JA1232

Women's Health and Family Planning Association of Texas Comments (Dkt. 253-7, Ex. 103)........................................... JA1246

Women's Law Project Comments (Dkt. 253-7, Ex. 104)............... JA1258

## Volume 4

Yale Students for Reproductive Justice Comments (Dkt. 253-7, Ex. 105)................................................................. JA1273

Archdiocese of New Orleans Comments (Dkt. 253-7, Ex. 106) ............................................. JA1288

Archdiocese of St. Louis Comments (Dkt. 253-7, Ex. 107)............ JA1293

Association of Catholic Colleges and Universities Comments (Dkt. 253-8, Ex. 108) ............................................. JA1294

Christian Legal Society Comments (Dkt. 253-8, Ex. 109) ............ JA1299

Church Alliance Comments (Dkt. 253-8, Ex. 110) ........................ JA1301

The Ethics & Religious Commission of the Southern Baptist Convention Comments (Dkt. 253-8, Ex. 111) ....................... JA1305

Family Research Council Comments (Religious Exemption) (Dkt. 253-8, Ex. 112) ............................................. JA1312

Family Research Council Comments (Moral Exemption) (Dkt. 253-8, Ex. 113) ............................................. JA1318

Locke Lorde LLP Comments (Dkt. 253-8, Ex. 114)....................... JA1325

National Association of Catholic Nurses USA Comments
(Religious Exemption) (Dkt. 253-8, Ex. 115) ........................ JA1328

National Association of Catholic Nurses USA Comments
(Moral Exemption) (Dkt. 253-8, Ex. 116) ............................. JA1331

National Catholic Bioethics Center Comments (Dkt. 253-8,
Ex. 117) .................................................................................. JA1334

Solidarity HealthShare Comments (Dkt. 253-8, Ex. 118)............. JA1343

United States Conference of Catholic Bishops Comments
(Dkt. 253-8, Ex. 119) .............................................................. JA1346

Individual Comments Supporting Rules
(Dkt. 253-8, Ex. 120) .............................................................. JA1363

Conde-Aguledo, A., et al., Birth Spacing and Risk of Adverse
Perinatal Outcomes—A Meta-Analysis, Journal of the
American Medical Association (2006) (Dkt. 253-8, Ex.
128) .......................................................................................... JA1370

Fuentes-Afflick, E., & Hessol, N., Interpregnancy Interval
and the Risk of Premature Infants, Obstetrics &
Gynecology (2000) (Dkt. 253-9, Ex. 129).............................. JA1385

Gipson, J.D., et al., The Effects of Unintended Pregnancy on
Infant, Child and Parental Health: A Review of the
Literature, Studies on Family Planning (2008)
(Dkt. 253-9, Ex. 130) .............................................................. JA1393

Zhu, B., Effect of Interpregnancy Interval on Birth
Outcomes: Findings from Recent U.S. Studies,
International Journal of Gynecology & Obstetrics
(2005) (Dkt. 253-9, Ex. 136) ................................................... JA1414

Spreadsheet of Accommodated Entities (Dkt. 253-9, Ex. 139)...... JA1423

Spreadsheet of Litigating Entities (Final Rules) (Dkt. 253-9,
Ex. 140)................................................................................... JA1450

ESBA Form 700 Certification (Aug. 2014) (Dkt. 253-9,
Ex. 141)................................................................................... JA1457

Kaiser Family Foundation Employer Health Benefits (2017
        Annual Survey) (Dkt. 253-10, Ex. 142) ................................. JA1459

Declaration of Mother Superior Marie Vincente (Dkt. 253-10,
        Ex. 146) ................................................................................ JA1681

FDA, Birth Control (Mar. 6, 2018) (Dkt. 253-10, Ex. 147) ............ JA1741

FDA, Is It Really FDA Approved? (Jan. 17, 2017) (Dkt. 253-
        10, Ex. 148) ......................................................................... JA1761

Declaration of Seth A. Mendelsohn, Executive Deputy
        Insurance Commissioner, PA Department of Insurance
        (ECF No. 90-18) (Dkt. 253-10, Ex. 149) ............................. JA1765

HHS, Trends in Teen Pregnancy and Childbearing (May 14,
        2019) (Dkt. 253-10, Ex. 152) ............................................... JA1770

Supplemental Joint Appendix (index) (Dkt. 258) .......................... JA1778

Declaration of Seth Mendelsohn (Dkt. 258, Ex. 177) ................... JA1780

Declaration of Philip Gennace (Dkt. 258, Ex. 178) ...................... JA1784

Declaration of Cynthia H. Chuang (Dkt. 258, Ex. 179) ............... JA1789

Declaration of Leesa Allen (Dkt. 258, Ex. 181) ........................... JA1799

Declaration of Sarah Adelman (Dkt. 258, Ex. 182) ...................... JA1805

Luke Vander Bleek Comments on RFI (Dkt. 258, Ex. 183) ......... JA1810

Campaign Life Missouri Comments on RFI (Dkt. 258,
        Ex. 184) ............................................................................... JA1815

2025 HRSA Guidelines (Dkt. 258, Ex. 185) ................................. JA1833

Government's Notice of Withdrawal of NPRM (Dkt. 326) ............ JA1839

2025 HRSA Women's Preventive Service Guidelines
        (Dkt. 341-2) .......................................................................... JA1841

Declaration and Excerpts from Exhibit to Declaration of
Sharita Gruberg (Ex. 20 at preliminary-injunction hearing,
Dec. 14, 2017) ................................................................................ JA1850

STAYED,APPEAL,SPECIAL

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:17–cv–04540–WB

COMMONWEALTH OF PENNSYLVANIA v. TRUMP et al
Assigned to: CHIEF JUDGE WENDY BEETLESTONE
Case in other court:  USCA, 17–03679
      USCA, 17–03752
      USCA, 18–01253
      USCA, 19–01129
      USCA, 19–01189
      U.S. Court of Appeals for the Third Circuit, 25–02575
      United States Court of Appeals, 25–02662
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 10/11/2017
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**COMMONWEALTH OF PENNSYLVANIA**

represented by **AIMEE D. THOMSON**
Office of General Counsel
30 N. 3rd St.
Suite 200
Harrisburg, PA 17101
223–234–4986
Email: aimeethomson@pa.gov
*ATTORNEY TO BE NOTICED*

**JILL M. GRAZIANO**
Pennsylvania Office of Attorney General
1000 Madison Avenue
Suite 310
Norristown, PA 19403
484–460–1330
Email: jgraziano@attorneygeneral.gov
*ATTORNEY TO BE NOTICED*

**LISA EMILY EISENBERG**
PA OFFICE OF ATTORNEY GENERAL
1600 ARCH ST SUITE 300
PHILADELPHIA, PA 19103
267–940–6709
Email: leisenberg@attorneygeneral.gov
*ATTORNEY TO BE NOTICED*

**MICHAEL J. FISCHER**
Office of General Counsel
30 North Third Street
Suite 200
Harrisburg, PA 17101
717–831–2847
Email: mjfischer@pa.gov
*ATTORNEY TO BE NOTICED*

**NICOLE J. BOLAND**
PA OFFICE OF ATTORNEY GENERAL
15TH FLR, STRAWBERRY SQUARE
HARRISBURG, PA 17022
717–783–3146
Email: nboland@pa.gov
*ATTORNEY TO BE NOTICED*

**NIKOLE BROCK**
PA OFFICE OF ATTORNEY GENERAL
1600 STRAWBERRY SQUARE
HARRISBURG, PA 17120
717–705–5790
Email: nbrock@attorneygeneral.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**STATE OF NEW JERSEY**              represented by  **ELSPETH L.F. HANS**
STATE OF NJ DIV LAW SPEC LIT SECT
RJ HUGHES JUSTICE COMPLEX
25 MARKET ST
POBOX 112
TRENTON, NJ 08625
609–376–3232
Email: elspeth.hans@law.njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ANDREW H. YANG**
NEW JERSEY OFFICE OF THE
ATTORNEY GENERAL
124 HALSEY STREET
NEWARK, NJ 07101
Email: ANDREW.YANG@LAW.NJOAG.GOV
*ATTORNEY TO BE NOTICED*

**GLENN J. MORAMARCO**
STATE OF NEW JERSEY DIV OF LAW
RJ HUGHES JUSTICE COMPLES
25 MARKET ST
POBOX 112
TRENTON, NJ 08625
609–376–3235
Email: Glenn.Moramarco@law.njoag.gov
*ATTORNEY TO BE NOTICED*

**JACOB B. BOYER**
Office of General Counsel
30 North Third Street
Suite 200
Harrisburg, PA 17101
717–460–6786
Email: jacobboyer@pa.gov
*ATTORNEY TO BE NOTICED*

**Joshua Paul Bohn**
New Jersey Office of the Attorney General
Division of Law
25 Market Street
P.O. Box 112
Trenton, NJ 08625
609–376–3377
Email: joshua.bohn@law.njoag.gov
*ATTORNEY TO BE NOTICED*

**MARC ALAN KREFETZ**
NJ DIVISION OF LAW
JUSTICE COMPLEX, 25 MARKET
STREET
P.O. BOX 106
TRENTON, NJ 08625–0106
609–984–0183

Email: marc.krefetz@dol.lps.state.nj.us
*ATTORNEY TO BE NOTICED*

**MEGHAN K. MUSSO**
NEW JERSEY OFFICE AND THE
ATTORNEY GENERAL
124 HALSEY STREET
NEWARK, NJ 07101
Email: MEGHAN.MUSSO@LAW.NJOAG.GOV
*ATTORNEY TO BE NOTICED*

**SHIREEN FARAHANI**
New Jersey Division of Law
124 Halsey St.
P.O. Box 45029
Newark, NJ 07102
609–826–6763
Email: SHIREEN.FARAHANI@LAW.NJOAG.GOV
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*IN HIS OFFICIAL CAPACITY AS*
*PRESIDENT OF THE UNITED*
*STATES*

represented by **DANIEL RIESS**
U.S. DEPT OF JUSTICE
20 MASSACHUSETTS AVE NW
ROOM 6122
WASHINGTON, DC 20001
202–353–3098
Email: daniel.riess@usdoj.gov
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
U.S. ATTORNEY'S OFFICE
615 CHESTNUT ST.
SUITE 1250
PHILADELPHIA, PA 19106
215–861–8310
Email: susan.becker@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. WRIGHT**
*IN HIS OFFICIAL CAPACITY AS*
*ACTING SECRETARY OF HEALTH*
*AND HUMAN SERVICES*

represented by **DANIEL RIESS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT**
**OF HEALTH AND HUMAN**
**SERVICES**

represented by **DANIEL RIESS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEVEN T. MNUCHIN**
*IN HIS OFFICIAL CAPACITY AS*

represented by **DANIEL RIESS**
(See above for address)

*SECRETARY OF THE TREASURY*

*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF THE TREASURY**

represented by **DANIEL RIESS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RENE ALEXANDER ACOSTA**
*IN HIS OFFICIAL CAPACITY AS SECRETARY OF LABOR*

represented by **DANIEL RIESS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF LABOR**

represented by **DANIEL RIESS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALEX M. AZAR, II**
*IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN SERVICES*

represented by **DANIEL RIESS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**

represented by **DANIEL RIESS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SUSAN R. BECKER**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**STATE OF NEVADA**

represented by **JONATHAN B. MILLER**
OFFICE OF THE MA ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MA 02108
617–963–2073
Email: jonathan.miller@state.ma.us

*ATTORNEY TO BE NOTICED*

**Respondent**

**STATE OF MICHIGAN**                     represented by   **JONATHAN B. MILLER**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Respondent**

**U.S. WOMEN'S CHAMBER OF**                represented by   **JEFFREY S. FELDMAN**
**COMMERCE**                                               THE FELDMAN FIRM, LLC
                                                           600 West Germantown Pike
                                                           Suite 400
                                                           Plymouth Meeting
                                                           Plymouth Meeting, PA 19462
                                                           215–764–6364
                                                           Email: jeff@thefeldmanfirm.com
                                                           *ATTORNEY TO BE NOTICED*

                                                           **LEAH R. BRUNO**
                                                           DENTONS US LLP
                                                           233 S WACKER DR SUITE 5900
                                                           CHICAGO, IL 60606
                                                           312–876–8000
                                                           *ATTORNEY TO BE NOTICED*

**Respondent**

**NATIONAL ASSOCIATION FOR**               represented by   **JEFFREY S. FELDMAN**
**FEMALE EXECUTIVES**                                       (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **LEAH R. BRUNO**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**LITTLE SISTERS OF THE POOR**             represented by   **LORI H. WINDHAM**
**SAINTS PETER AND PAUL HOME**                             The Becket Fund for Religious Liberty
                                                           1919 Pennsylvania Ave. NW
                                                           Suite 400
                                                           Washington, DC 20006
                                                           202–955–0095
                                                           Email: lwindham@becketlaw.org
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **MARK L. RIENZI**
                                                           The Becket Fund for Religious Liberty
                                                           1919 Pennsylvania Ave. NW
                                                           Suite 400
                                                           Washington, DC 20006
                                                           202–955–0095
                                                           Email: mrienzi@becketfund.org
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **ADELE A KEIM**
                                                           1919 PENNSYLVANIA AVE. NW
                                                           SUITE 400
                                                           WASHINGTON, DC 20006
                                                           Email: AKEIM@BECKETFUND.ORG

*ATTORNEY TO BE NOTICED*

**BENJAMIN A FLESHMAN**
1919 PENNSYLVANIA AVE. NW
SUITE 400
WASHINGTON, DC 20006
Email: BFLESHMAN@BECKETFUND.ORG
*ATTORNEY TO BE NOTICED*

**DANIEL L CHEN**
1919 PENNSYLVANIA AVE. NW
WASHINGTON, DC 20006
Email: DCHEN@BECKETFUND.ORG
*ATTORNEY TO BE NOTICED*

**Diana Marie Verm Thomson**
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
202−955−0095
Email: dthomson@becketlaw.org
*ATTORNEY TO BE NOTICED*

**ERIC RASSBACH**
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
Suite 400
Washington, DC 20006
202−349−7214
Email: erassbach@becketfund.org
*ATTORNEY TO BE NOTICED*

**NICHOLAS M. CENTRELLA**
Clark Hill
2 Commerce Square
2001 Market St
Ste 2620
Philadelphia, PA 19103
215−864−8098
Email: ncentrella@clarkhill.com
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN**     represented by     **JAMIE A. LEVITT**
MORRISON & FOERSTER LLP
250 WEST 55TH STREET
NEW YORK, NY 10019
212−468−8000
Email: jlevitt@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
MORRISON & FOERSTER
707 WILSHIRE BLVD.
SUITE 6000
LOS ANGELES, CA 90071
213−892−5393
Email: jschulman@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

RHIANNON N. BATCHELDER
MORRISON & FOERSTER LLP
250 WEST 55TH STREET
NEW YORK, NY 10019
212–336–4155
Email: rbatchelder@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL–CIO)**

represented by **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE**

represented by **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**THE NATIONAL ASSOCIATION OF SOCIAL WORKERS**

represented by **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**THE NATIONAL ASSOCIATION OF WOMEN LAWYERS**

represented by **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**GIRLS INC.**                    represented by  **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**THE AMERICAN FEDERATION OF TEACHERS**    represented by  **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**SERVICE EMPLOYEES INTERNATIONAL UNION**    represented by  **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

represented by

JA69

**THE WOMENS BAR ASSOCIATION OF MASSACHUSETTS**

**JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**THE COLORADO WOMENS BAR ASSOCIATION**                represented by **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**AMERICAN CENTER FOR LAW AND JUSTICE**                represented by **FRANCIS J. MANION**
AMERICAN CENTER FOR LAW & JUSTICE
P.O. BOX 60
NEW HOPE, KY 40052
502–549–7020
Email: <u>fmanion@aclj.org</u>
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**COMMONWEALTH OF MASSACHUSETTS**                represented by **JONATHAN B. MILLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**COMMONWEALTH OF VIRGINIA**                represented by **JONATHAN B. MILLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**STATE OF CALIFORNIA**                represented by **JONATHAN B. MILLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**STATE OF CONNECTICUT**                represented by **JONATHAN B. MILLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF DELAWARE**                  represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF HAWAII**                    represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF ILLINOIS**                  represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF IOWA**                      represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF MAINE**                     represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF MARYLAND**                  represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF MINNESOTA**                 represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF NEW MEXICO**                represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF NEW YORK**                  represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF NORTH CAROLINA**            represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF OREGON**                    represented by  **JONATHAN B. MILLER**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF RHODE ISLAND**              represented by  **JONATHAN B. MILLER**
                                                        (See above for address)

*ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF VERMONT**                represented by   **JONATHAN B. MILLER**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**STATE OF WASHINGTON**             represented by   **JONATHAN B. MILLER**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**DISTRICT OF COLUMBIA**            represented by   **JONATHAN B. MILLER**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**CALIFORNIA WOMEN**                represented by   **JAMIE A. LEVITT**
**LAWYERS**                                          (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **JANIE F. SCHULMAN**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **RHIANNON N. BATCHELDER**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**LAWYERS CLUB OF SAN DIEGO**       represented by   **JAMIE A. LEVITT**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **JANIE F. SCHULMAN**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **RHIANNON N. BATCHELDER**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**THE WOMEN LAWYERS**               represented by   **JAMIE A. LEVITT**
**ASSOCIATION OF LOS ANGELES**                       (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **JANIE F. SCHULMAN**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **RHIANNON N. BATCHELDER**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**THE WOMEN'S BAR
ASSOCIATION OF THE DISTRICT
OF COLUMBIA**

represented by **JAMIE A. LEVITT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANIE F. SCHULMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RHIANNON N. BATCHELDER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN NURSES
ASSOCIATION**

represented by **LISA A. MATHEWSON**
Mathewson Law LLC
1617 John F. Kennedy Blvd.
Suite 2027
Philadelphia, PA 19103
215–399–9592
Email: lam@mathewson–law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN COLLEGE OF
OBSTETRICIANS &
GYNECOLOGISTS**

represented by **LISA A. MATHEWSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN ACADEMY OF
NURSING**

represented by **LISA A. MATHEWSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN ACADEMY OF
PEDIATRICS**

represented by **LISA A. MATHEWSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PHYSICIANS FOR
REPRODUCTIVE HEALTH**

represented by **LISA A. MATHEWSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PROGRAM FOR THE STUDY OF
REPRODUCTIVE JUSTICE AT
YALE LAW SCHOOL**

represented by **DAVID SAMUEL COHEN**
DREXEL UNIVERSITY COLLEGE OF
LAW
3320 MARKET ST., SUITE 232
PHILADELPHIA, PA 19104

215–571–4714
Email: dsc39@drexel.edu
*ATTORNEY TO BE NOTICED*

**PRISCILLA J. SMITH**
YALE LAW SCHOOL
RRJP CLINIC
319 STERLING PLACE
BROOKLYN, NY 11238
347–262–5177
*ATTORNEY TO BE NOTICED*

**Movant**

**PLANNED PARENTHOOD
FEDERATION OF AMERICA**

represented by **CARRIE Y. FLAXMAN**
PLANNED PARENTHOOD FED. OF
AMERICA
1110 VERMONT AVE, NW
SUITE 300
WASHINGTON, DC 20005
202–973–4830
Email: carrie.flaxman@ppfa.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SIERRA A.Y. ROBART**
PAUL WEISS RIFKIND WHARTON
GARRISON LLP
1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019
212–373–3915
*ATTORNEY TO BE NOTICED*

**Movant**

**THE NATIONAL HEALTH LAW
PROGRAM**

represented by **CARRIE Y. FLAXMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SIERRA A.Y. ROBART**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**THE NATIONAL FAMILY
PLANNING AND
REPRODUCTIVE HEALTH
ASSOCIATION**

represented by **CARRIE Y. FLAXMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SIERRA A.Y. ROBART**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE**

represented by **CARMEN N. GREEN**
AMERICANS UNITED FOR SEPARATION
OF CHURCH & STATE
1310 L STREET NW SUITE 200
WASHINGTON, DC 20005
202–466–3234
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**

JA74

AMERICANS UNITED FOR SEPARATION
OF CHURCH & STATE
1310 L STREET NW
SUITE 200
WASHINGTON, DC 20005
202–466–3234
*ATTORNEY TO BE NOTICED*

**Movant**

**BEND THE ARC: A JEWISH**
**PARTNERSHIP FOR JUSTICE**

represented by  **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**CENTRAL CONFERENCE OF**
**AMERICAN RABBIS**

represented by  **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**GLOBAL JUSTICE INSTITUTE,**
**METROPOLITAN COMMUNITY**
**CHURCHES**

represented by  **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**INTERFAITH ALLIANCE**
**FOUNDATION**

represented by  **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**JEWISH SOCIAL POLICY**
**ACTION NETWORK**

represented by  **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**MEN OF REFORM JUDAISM**

represented by  **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**METHODIST FEDERATION FOR SOCIAL ACTION**

represented by **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL COUNCIL OF JEWISH WOMEN, INC**

represented by **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**RECONSTRUCTIONIST RABBINICAL ASSOCIATION**

represented by **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE**

represented by **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**RELIGIOUS INSTITUTE**

represented by **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**THE SIKH COALITION**

represented by **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS**

represented by **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**UNION FOR REFORM JUDAISM**            represented by  **CARMEN N. GREEN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD B. KATSKEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**CHURCH–STATE SCHOLARS**            represented by  **TALIA NISSIMYAN**
KAPLAN HECKER & FINK LLP
350 FIFTH AVENUE SUITE 7110
NEW YORK, NY 10118
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/11/2017 | 1 | COMPLAINT against RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT ( Filing fee $ 400 receipt number 167178.), filed by COMMONWEALTH OF PENNSYLVANIA.(Attachments: # 1 Civil Cover Sheet, # 2 Designation Form, # 3 Case Management Track Form, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C)(ahf) (Entered: 10/12/2017) |
| 10/11/2017 | | Summons Issued as to RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT, U.S. Attorney and U.S. Attorney General. Eight Forwarded To: Counsel and One Given to AUSA on 10/12/2017.(ahf) (Entered: 10/12/2017) |
| 10/20/2017 | 2 | Acceptance of Service by U.S. Attorney Re: accepted summons and complaint on behalf of the United States Attorney (only). (aeg) (Entered: 10/23/2017) |
| 10/23/2017 | 3 | NOTICE of Appearance by MICHAEL J. FISCHER on behalf of COMMONWEALTH OF PENNSYLVANIA (FISCHER, MICHAEL) (Entered: 10/23/2017) |
| 10/23/2017 | 4 | NOTICE of Appearance by NICOLE J. BOLAND on behalf of COMMONWEALTH OF PENNSYLVANIA (BOLAND, NICOLE) (Entered: 10/23/2017) |
| 10/25/2017 | 5 | Praecipe to Re–Issue Summons by COMMONWEALTH OF PENNSYLVANIA. (BOLAND, NICOLE) (Entered: 10/25/2017) |
| 10/25/2017 | | Alias Summons Issued as to RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. 8 Given To: Counsel on 10/25/2017. (ahf) (Entered: 10/25/2017) |
| 10/27/2017 | 6 | NOTICE of Appearance by ELIZABETH L. KADE on behalf of RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT (KADE, ELIZABETH) (Entered: 10/27/2017) |
| 11/01/2017 | 7 | NOTICE of Appearance by SCOTT WEBSTER REID on behalf of RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED |

| | | |
|---|---|---|
| | | STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT with Certificate of Service(REID, SCOTT) (Entered: 11/01/2017) |
| 11/02/2017 | 8 | Consent MOTION for Leave to File Excess Pages *in Support of Motion for a Preliminary Injunction* filed by COMMONWEALTH OF PENNSYLVANIA.Certificate of Service. (Attachments: # 1 Text of Proposed Order, # 2 Memorandum Proposed Memorandum of Law)(FISCHER, MICHAEL) (Entered: 11/02/2017) |
| 11/02/2017 | 9 | MOTION for Preliminary Injunction filed by COMMONWEALTH OF PENNSYLVANIA.Certificate of Service. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O)(FISCHER, MICHAEL) (Entered: 11/02/2017) |
| 11/03/2017 | 10 | PAPERLESS ORDER GRANTING 8 MOTION FOR LEAVE TO FILE EXCESS PAGES BY HONORABLE WENDY BEETLESTONE ON 11/03/2017.11/03/2017 ENTERED AND COPIES MAILED, E–MAILED AND FAXED.(amw, ) (Entered: 11/03/2017) |
| 11/07/2017 | 11 | ORDER THAT DEFENDANTS' BRIEF IN RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION IS DUE NO LATER THAN 11/16/2017. PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION IS DUE NO LATER THAN 11/27/2017. A HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION SHALL COMMENCE ON 12/14/2017, AT 8:30 AM, IN COURTROOM 3B. FURTHER INFORMATION OUTLINED HEREIN. SIGNED BY HONORABLE WENDY BEETLESTONE ON 11/7/2017. 11/7/2017 ENTERED AND COPIES E–MAILED.(amas) (Entered: 11/07/2017) |
| 11/14/2017 | 12 | MOTION for Leave to File Excess Pages *and for Leave to File Reply in Support of Their Motion to Dismiss* filed by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(KADE, ELIZABETH) (Entered: 11/14/2017) |
| 11/15/2017 | 13 | RESPONSE to Motion re 12 MOTION for Leave to File Excess Pages *and for Leave to File Reply in Support of Their Motion to Dismiss* filed by COMMONWEALTH OF PENNSYLVANIA. (Attachments: # 1 Text of Proposed Order)(FISCHER, MICHAEL) (Entered: 11/15/2017) |
| 11/16/2017 | 14 | ORDER THAT DEFENDANTS MAY FILE A MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OF UP TO 55 PAGES. DEFENDANTS MAY ALSO FILE A SEPARATE MOTION TO DISMISS. DEFENDANTS REQUEST FOR LEAVE TO FILE A REPLY TO ANY AMICUS CURIAE BRIEFS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION IS DENIED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 11/15/17.11/16/17 ENTERED AND COPIES E–MAILED.(ti, ) (Entered: 11/16/2017) |
| 11/16/2017 | 15 | RESPONSE in Opposition re 9 MOTION for Preliminary Injunction filed by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(KADE, ELIZABETH) (Entered: 11/16/2017) |
| 11/16/2017 | 16 | MOTION to Dismiss filed by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT.Certificate of Service. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order, # 3 Exhibit A, # 4 Exhibit B)(KADE, ELIZABETH) (Entered: |

| | | |
|---|---|---|
| | | 11/16/2017) |
| 11/20/2017 | <u>17</u> | ORDER THAT DEFENDANTS' LETTER REQUEST TO FILE THE GOVERNMENTS' PRELIMINARY PARTIAL ADMINISTRATIVE RECORD BY CD RATHER THAN HARD COPIES WHICH IS IN EXCESS OF 500,000 PAGES IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 11/17/17. 11/20/17 ENTERED & E–MAILED.(fdc) (Entered: 11/20/2017) |
| 11/21/2017 | <u>18</u> | Preliminary Partial Administrative Record by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. (Attachments: # <u>1</u> Appendix Index to the Preliminary Partial Administrative Record)(KADE, ELIZABETH) (Entered: 11/21/2017) |
| 11/22/2017 | <u>19</u> | EMERGENCY MOTION TO INTERVENE FILED BY LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME, MEMORANDUM, DECLARATION, CERTIFICATE OF SERVICE.(Attachments: # <u>1</u> Memorandum, # <u>2</u> Declaration, # <u>3</u> Certificate of Service, # <u>4</u> Text of Proposed Order)(fdc) (Entered: 11/22/2017) |
| 11/22/2017 | <u>20</u> | Proposed Answer of Proposed Defendant–Intervenor LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.(fdc) (Entered: 11/22/2017) |
| 11/22/2017 | <u>21</u> | MOTION for Pro Hac Vice *of Lori Windham* ( Filing fee $ 40 receipt number 0313–12472728.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 11/22/2017) |
| 11/22/2017 | <u>22</u> | MOTION for Pro Hac Vice *Admission for Mark Rienzi* ( Filing fee $ 40 receipt number 0313–12472808.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 11/22/2017) |
| 11/22/2017 | <u>23</u> | Administrative Record. (nd) (Additional attachment(s) added on 11/22/2017: # <u>2</u> II. A. Studies and Articles Part 1, # <u>3</u> II. A Studies and Articles Part 2, # <u>4</u> II. A Studies and Articles Part 3, # <u>5</u> II. A Studies and Articles Part 4, # <u>6</u> II B. Regulatory Analysis Part 1, # <u>7</u> II B. Regulatory Analysis Part 2, # <u>8</u> II B. Regulatory Analysis Part 3, # <u>9</u> II B. Regulatory Analysis Part 4, # <u>10</u> II B. Regulatory Analysis Part 5) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>11</u> III Congressional Correspondence) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>12</u> IV. Public Comments Part 1) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>13</u> IV Public Comments Part 2) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>14</u> IV. Public Comments Part 3, # <u>15</u> IV. Public Comments Part 4, # <u>16</u> IV. Public Comments Part 5, # <u>17</u> IV. Public Comments Part 6, # <u>18</u> IV. Public Comments Part 7) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>19</u> HHS–OS–2011–0023–0001 – 2814_Part1, # <u>20</u> HHS–OS–2011–0023–0001 – 2814_Part2, # <u>21</u> HHS–OS–2011–0023–0001 – 2814_Part3, # <u>22</u> HHS–OS–2011–0023–0001 – 2814_Part4, # <u>23</u> HHS–OS–2011–0023–0001 – 2814_Part5, # <u>24</u> HHS–OS–2011–0023–0001 – 2814_Part6, # <u>25</u> HHS–OS–2011–0023–2814 Dft0003 – Dft84603_Part1, # <u>26</u> HHS–OS–2011–0023–2814 Dft0003 – Dft84603_Part2, # <u>27</u> HHS–OS–2011–0023–2814 Dft0003 – Dft84603_Part3, # <u>28</u> HHS–OS–2011–0023–2814 Dft0003 – Dft84603_Part4) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>29</u> HHS–OS–2011–0023–2815 – 3899_Part1, # <u>30</u> HHS–OS–2011–0023–2815 – 3899_Part2, # <u>31</u> HHS–OS–2011–0023–2815 – 3899_Part3, # <u>32</u> HHS–OS–2011–0023–3900 – 4999_Part1, # <u>33</u> HHS–OS–2011–0023–3900 – 4999_Part2, # <u>34</u> HHS–OS–2011–0023–5000 – 5999_Part1, # <u>35</u> HHS–OS–2011–0023–5000 – 5999_Part2) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>36</u> HHS–OS–2011–0023–7816 – 8999_Part1, # <u>37</u> HHS–OS–2011–0023–7816 – 8999_Part2, # <u>38</u> HHS–OS–2011–0023–7816 – 8999_Part3, # <u>39</u> HHS–OS–2011–0023–7816 – 8999_Part4, # <u>40</u> HHS–OS–2011–0023–7816 – 8999_Part5, # <u>41</u> HHS–OS–2011–0023–7816 – 8999_Part6, # <u>42</u> HHS–OS–2011–0023–7816 – 8999_Part7, # <u>43</u> HHS–OS–2011–0023–7816 – 8999_Part8, # <u>44</u> HHS–OS–2011–0023–7816 – 8999_Part9, # <u>45</u> HHS–OS–2011–0023–7816 – 8999_Part10, # <u>46</u> HHS–OS–2011–0023–7816 – 8999_Part11, # <u>47</u> HHS–OS–2011–0023–7816 – 8999_Part12, # <u>48</u> HHS–OS–2011–0023–7816 – 8999_Part13, # <u>49</u> |

HHS–OS–2011–0023–7816 – 8999_Part14, # <u>50</u> HHS–OS–2011–0023–7816 –
8999_Part15, # <u>51</u> HHS–OS–2011–0023–7816 – 8999_Part16, # <u>52</u>
HHS–OS–2011–0023–7816 – 8999_Part17, # <u>53</u> HHS–OS–2011–0023–7816 –
8999_Part18, # <u>54</u> HHS–OS–2011–0023–7816 – 8999_Part19, # <u>55</u>
HHS–OS–2011–0023–7816 – 8999_Part20, # <u>56</u> HHS–OS–2011–0023–7816 –
8999_Part21, # <u>57</u> HHS–OS–2011–0023–7816 – 8999_Part22, # <u>58</u>
HHS–OS–2011–0023–7816 – 8999_Part23, # <u>59</u> HHS–OS–2011–0023–7816 –
8999_Part24, # <u>60</u> HHS–OS–2011–0023–7816 – 8999_Part25, # <u>61</u>
HHS–OS–2011–0023–7816 – 8999_Part26) (nd, ). (Additional attachment(s) added
on 11/22/2017: # <u>62</u> HHS–OS–2011–0023–9000 – 9999, # <u>63</u>
HHS–OS–2011–0023–10000 – 10999, # <u>64</u> HHS–OS–2011–0023–11000 – 11999, #
<u>65</u> HHS–OS–2011–0023–12000 – 12816, # <u>66</u> HHS–OS–2011–0023–12817 –
13999) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>67</u>
HHS–OS–2011–0023–14000 – 14999_Part1, # <u>68</u> HHS–OS–2011–0023–14000 –
14999_Part2) (nd, ). (Additional attachment(s) added on 11/22/2017: # <u>69</u>
HHS–OS–2011–0023–15000 – 15999, # <u>70</u> HHS–OS–2011–0023–16000 – 16999, #
<u>71</u> HHS–OS–2011–0023–17000 – 17817) (nd, ). (Additional attachment(s) added on
11/22/2017: # <u>72</u> HHS–OS–2011–0023–17818 – 18999_Part1, # <u>73</u>
HHS–OS–2011–0023–17818 – 18999_Part2, # <u>74</u> HHS–OS–2011–0023–19000 –
19999_Part1, # <u>75</u> HHS–OS–2011–0023–19000 – 19999_Part2, # <u>76</u>
HHS–OS–2011–0023–20000 – 20999, # <u>77</u> HHS–OS–2011–0023–21000 – 21999.,
# <u>78</u> HHS–OS–2011–0023–22000 – 22818) (nd, ). (Additional attachment(s) added
on 11/24/2017: # <u>79</u> HHS–OS–2011–0023–22819 – 27819_Part1, # <u>80</u>
HHS–OS–2011–0023–22819 – 27819_Part2, # <u>81</u> HHS–OS–2011–0023–22819 –
27819_Part3, # <u>82</u> HHS–OS–2011–0023–22819 – 27819_Part4, # <u>83</u>
HHS–OS–2011–0023–22819 – 27819_Part5, # <u>84</u> HHS–OS–2011–0023–22819 –
27819_Part6, # <u>85</u> HHS–OS–2011–0023–22819 – 27819_Part7, # <u>86</u>
HHS–OS–2011–0023–22819 – 27819_Part8, # <u>87</u> HHS–OS–2011–0023–22819 –
27819_Part9, # <u>88</u> HHS–OS–2011–0023–27820 – 32820_Part1, # <u>89</u>
HHS–OS–2011–0023–27820 – 32820_Part2, # <u>90</u> HHS–OS–2011–0023–27820 –
32820_Part3, # <u>91</u> HHS–OS–2011–0023–27820 – 32820_Part4, # <u>92</u>
HHS–OS–2011–0023–27820 – 32820_Part5, # <u>93</u> HHS–OS–2011–0023–27820 –
32820_Part6, # <u>94</u> HHS–OS–2011–0023–27820 – 32820_Part7, # <u>95</u>
HHS–OS–2011–0023–27820 – 32820_Part8, # <u>96</u> HHS–OS–2011–0023–27820 –
32820_Part9) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>97</u>
HHS–OS–2011–0023–32821 – 33999_Part1, # <u>98</u> HHS–OS–2011–0023–32821 –
33999_Part2, # <u>99</u> HHS–OS–2011–0023–32821 – 33999_Part3, # <u>100</u>
HHS–OS–2011–0023–33555–A1, # <u>101</u> HHS–OS–2011–0023–34000 – 34999, #
<u>102</u> HHS–OS–2011–0023–35000 – 35999, # <u>103</u> HHS–OS–2011–0023–36000 –
36999., # <u>104</u> HHS–OS–2011–0023–37000 – 37821, # <u>105</u>
HHS–OS–2011–0023–37822 – 38899, # <u>106</u> HHS–OS–2011–0023–38900 – 39999.,
# <u>107</u> HHS–OS–2011–0023–40000 – 40999) (nd, ). (Additional attachment(s) added
on 11/24/2017: # <u>108</u> HHS–OS–2011–0023–41000 – 41999, # <u>109</u>
HHS–OS–2011–0023–42000 – 42822, # <u>110</u> HHS–OS–2011–0023–42823 – 43999,
# <u>111</u> HHS–OS–2011–0023–44000 – 44999_Part1, # <u>112</u>
HHS–OS–2011–0023–44000 – 44999_Part2, # <u>113</u> HHS–OS–2011–0023–44000 –
44999_Part3, # <u>114</u> HHS–OS–2011–0023–45000 – 45999, # <u>115</u>
HHS–OS–2011–0023–46000 – 46999, # <u>116</u> HHS–OS–2011–0023–47000 – 47823,
# <u>117</u> HHS–OS–2011–0023–47824 – 48999, # <u>118</u> HHS–OS–2011–0023–49000 –
49999., # <u>119</u> HHS–OS–2011–0023–50000 – 50999, # <u>120</u>
HHS–OS–2011–0023–51000 – 51999, # <u>121</u> HHS–OS–2011–0023–52000 – 52824,
# <u>122</u> HHS–OS–2011–0023–52825 – 53999, # <u>123</u> HHS–OS–2011–0023–54000 –
54999) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>124</u>
HHS–OS–2011–0023–55000 – 55999_Part1, # <u>125</u> HHS–OS–2011–0023–55000 –
55999_Part2, # <u>126</u> HHS–OS–2011–0023–55000 – 55999_Part3) (nd, ). (Additional
attachment(s) added on 11/24/2017: # <u>127</u> HHS–OS–2011–0023–56000 – 56999, #
<u>128</u> HHS–OS–2011–0023–57000 – 57825, # <u>129</u> \HHS–OS–2011–0023–57826 –
57999, # <u>130</u> HHS–OS–2011–0023–58000 – 58999, # <u>131</u>
\HHS–OS–2011–0023–59000 – 59999_Part1, # <u>132</u> \HHS–OS–2011–0023–59000 –
59999_Part2, # <u>133</u> \HHS–OS–2011–0023–59000 – 59999_Part3, # <u>134</u>
HHS–OS–2011–0023–60000 – 60999, # <u>135</u> HHS–OS–2011–0023–61000 –
61999_Part1, # <u>136</u> HHS–OS–2011–0023–61000 – 61999_Part2, # <u>137</u>
HHS–OS–2011–0023–61000 – 61999_Part3, # <u>138</u> HHS–OS–2011–0023–62000 –
62826, # <u>139</u> HHS–OS–2011–0023–62827 – 63999, # <u>140</u>

HHS–OS–2011–0023–64000 – 64999) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>141</u> HHS–OS–2011–0023–65000 – 65999_Part1, # <u>142</u> HHS–OS–2011–0023–65000 – 65999_Part2, # <u>143</u> HHS–OS–2011–0023–65000 – 65999_Part3, # <u>144</u> HHS–OS–2011–0023–66000 – 66999_Part1, # <u>145</u> HHS–OS–2011–0023–66000 – 66999_Part2, # <u>146</u> HHS–OS–2011–0023–66000 – 66999_Part3, # <u>147</u> HHS–OS–2011–0023–66000 – 66999_Part4, # <u>148</u> HHS–OS–2011–0023–67000 – 67827_Part1, # <u>149</u> HHS–OS–2011–0023–67000 – 67827_Part2, # <u>150</u> HHS–OS–2011–0023–67000 – 67827_Part3, # <u>151</u> HHS–OS–2011–0023–67828 – 68999_Part1, # <u>152</u> HHS–OS–2011–0023–67828 – 68999_Part2, # <u>153</u> HHS–OS–2011–0023–67828 – 68999_Part3, # <u>154</u> HHS–OS–2011–0023–69000 – 69999, # <u>155</u> HHS–OS–2011–0023–70000 – 70999, # <u>156</u> \HHS–OS–2011–0023–71000 – 71999, # <u>157</u> HHS–OS–2011–0023–72000 – 72828, # <u>158</u> HHS–OS–2011–0023–72829 – 73999_Part1, # <u>159</u> HHS–OS–2011–0023–72829 – 73999_Part2, # <u>160</u> HHS–OS–2011–0023–72829 – 73999_Part3, # <u>161</u> HHS–OS–2011–0023–74000 – 74999, # <u>162</u> HHS–OS–2011–0023–75000 – 75571) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>163</u> HHS–OS–2011–0023–75572_Part1, # <u>164</u> HHS–OS–2011–0023–75572_Part2, # <u>165</u> HHS–OS–2011–0023–75572_Part3, # <u>166</u> HHS–OS–2011–0023–75572_Part4, # <u>167</u> HHS–OS–2011–0023–75572_Part5, # <u>168</u> HHS–OS–2011–0023–75572_Part6, # <u>169</u> HHS–OS–2011–0023–75572_Part7, # <u>170</u> HHS–OS–2011–0023–75572_Part8, # <u>171</u> HHS–OS–2011–0023–75572_Part9, # <u>172</u> HHS–OS–2011–0023–75572_Part10, # <u>173</u> HHS–OS–2011–0023–75572_Part11, # <u>174</u> HHS–OS–2011–0023–75573 – 75999_Part1, # <u>175</u> HHS–OS–2011–0023–75573 – 75999_Part2, # <u>176</u> HHS–OS–2011–0023–75573 – 75999_Part3, # <u>177</u> HHS–OS–2011–0023–75573 – 75999_Part4, # <u>178</u> HHS–OS–2011–0023–75573 – 75999_Part5, # <u>179</u> HHS–OS–2011–0023–76000 – 76024_Part1, # <u>180</u> HHS–OS–2011–0023–76000 – 76024_Part2, # <u>181</u> HHS–OS–2011–0023–76000 – 76024_Part3, # <u>182</u> HHS–OS–2011–0023–76000 – 76024_Part4) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>183</u> HHS–OS–2011–0023–76025 – 76041_Part1, # <u>184</u> HHS–OS–2011–0023–76025 – 76041_Part2, # <u>185</u> HHS–OS–2011–0023–76025 – 76041_Part3, # <u>186</u> HHS–OS–2011–0023–76025 – 76041_Part4, # <u>187</u> HHS–OS–2011–0023–76042 – 76049_Part1, # <u>188</u> HHS–OS–2011–0023–76042 – 76049_Part2, # <u>189</u> HHS–OS–2011–0023–76042 – 76049_Part3, # <u>190</u> HHS–OS–2011–0023–76042 – 76049_Part4) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>191</u> HHS–OS–2011–0023–76050 – 76168_Part1, # <u>192</u> HHS–OS–2011–0023–76050 – 76168_Part2, # <u>193</u> HHS–OS–2011–0023–76050 – 76168_Part3, # <u>194</u> HHS–OS–2011–0023–76050 – 76168_Part4, # <u>195</u> HHS–OS–2011–0023–76169 – 76179_Part1, # <u>196</u> HHS–OS–2011–0023–76169 – 76179_Part2, # <u>197</u> HHS–OS–2011–0023–76169 – 76179_Part3, # <u>198</u> HHS–OS–2011–0023–76169 – 76179_Part4, # <u>199</u> HHS–OS–2011–0023–76180 – 76187_Part1, # <u>200</u> HHS–OS–2011–0023–76180 – 76187_Part2, # <u>201</u> HHS–OS–2011–0023–76180 – 76187_Part3, # <u>202</u> HHS–OS–2011–0023–76180 – 76187_Part4, # <u>203</u> HHS–OS–2011–0023–76188 – 76200_Part1, # <u>204</u> HHS–OS–2011–0023–76188 – 76200_Part2, # <u>205</u> HHS–OS–2011–0023–76188 – 76200_Part3, # <u>206</u> HHS–OS–2011–0023–76188 – 76200_Part4, # <u>207</u> HHS–OS–2011–0023–76201 – 76214_Part1, # <u>208</u> HHS–OS–2011–0023–76201 – 76214_Part2, # <u>209</u> HHS–OS–2011–0023–76201 – 76214_Part3, # <u>210</u> HHS–OS–2011–0023–76201 – 76214_Part4, # <u>211</u> \HHS–OS–2011–0023–76215 – 76245_Part1, # <u>212</u> \HHS–OS–2011–0023–76215 – 76245_Part2, # <u>213</u> \HHS–OS–2011–0023–76215 – 76245_Part3, # <u>214</u> \HHS–OS–2011–0023–76215 – 76245_Part4, # <u>215</u> HHS–OS–2011–0023–76246 – 76254_Part1, # <u>216</u> HHS–OS–2011–0023–76246 – 76254_Part2, # <u>217</u> HHS–OS–2011–0023–76246 – 76254_Part3, # <u>218</u> HHS–OS–2011–0023–76246 – 76254_Part4, # <u>219</u> HHS–OS–2011–0023–76255 – 76265_Part1, # <u>220</u> HHS–OS–2011–0023–76255 – 76265_Part2, # <u>221</u> HHS–OS–2011–0023–76255 – 76265_Part3, # <u>222</u> HHS–OS–2011–0023–76255 – 76265_Part4) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>223</u> HHS–OS–2011–0023–76266 – 76268_Part1, # <u>224</u> HHS–OS–2011–0023–76266 – 76268_Part2, # <u>225</u> HHS–OS–2011–0023–76266 – 76268_Part3, # <u>226</u> HHS–OS–2011–0023–76266 – 76268_Part4, # <u>227</u> HHS–OS–2011–0023–76304 –76348_Part1, # <u>228</u> HHS–OS–2011–0023–76304 –76348_Part2, # <u>229</u> HHS–OS–2011–0023–76304 –76348_Part3, # <u>230</u> HHS–OS–2011–0023–76304 –76348_Part4, # <u>231</u> HHS–OS–2011–0023–76349_Part1, # <u>232</u> HHS–OS–2011–0023–76349_Part2, #

233 HHS–OS–2011–0023–76349_Part3, # 234 HHS–OS–2011–0023–76349_Part4) (nd, ). (Additional attachment(s) added on 11/24/2017: # 235 HHS–OS–2011–0023–76350 – 76999_Part1, # 236 HHS–OS–2011–0023–76350 – 76999_Part2, # 237 HHS–OS–2011–0023–77000 – 77829, # 238 HHS–OS–2011–0023–77830 – 78999_Part1, # 239 HHS–OS–2011–0023–77830 – 78999_Part2, # 240 HHS–OS–2011–0023–77830 – 78999_Part3, # 241 HHS–OS–2011–0023–77830 – 78999_Part4, # 242 \HHS–OS–2011–0023–79000 – 79999_Part1, # 243 \HHS–OS–2011–0023–79000 – 79999_Part2, # 244 \HHS–OS–2011–0023–79000 – 79999_Part3, # 245 HHS–OS–2011–0023–80000 – 80999, # 246 HHS–OS–2011–0023–81000 – 81999, # 247 HHS–OS–2011–0023–82000 – 82515_Part1, # 248 HHS–OS–2011–0023–82000 – 82515_Part2, # 249 HHS–OS–2011–0023–82000 – 82515_Part3, # 250 HHS–OS–2011–0023–82000 – 82515_Part4, # 251 HHS–OS–2011–0023–82000 – 82515_Part5, # 252 HHS–OS–2011–0023–82000 – 82515_Part6, # 253 HHS–OS–2011–0023–82000 – 82515_Part7, # 254 HHS–OS–2011–0023–82000 – 82515_Part8, # 255 HHS–OS–2011–0023–82000 – 82515_Part9, # 256 HHS–OS–2011–0023–82000 – 82515_Part10, # 257 HHS–OS–2011–0023–82000 – 82515_Part11, # 258 HHS–OS–2011–0023–82000 – 82515_Part12, # 259 HHS–OS–2011–0023–82000 – 82515_Part13, # 260 HHS–OS–2011–0023–82000 – 82515_Part14, # 261 HHS–OS–2011–0023–82000 – 82515_Part15) (nd, ). (Additional attachment(s) added on 11/24/2017: # 262 2011 IFR AMENDMENT – 1–3000 combined_Part1, # 263 2011 IFR AMENDMENT – 1–3000 combined_Part2, # 264 2011 IFR AMENDMENT – 1–3000 combined_Part3, # 265 2011 IFR AMENDMENT – 1–3000 combined_Part4, # 266 2011 IFR AMENDMENT – 1–3000 combined_Part5, # 267 2011 IFR AMENDMENT – 1–3000 combined_Part6, # 268 2011 IFR AMENDMENT – 1–3000 combined_Part7, # 269 2011 IFR AMENDMENT – 1–3000 combined_Part8, # 270 2011 IFR AMENDMENT – 1–3000 combined_Part9, # 271 2011 IFR AMENDMENT – 1–3000 combined_Part10, # 272 2011 IFR AMENDMENT – 3001–6000 combined_Part1, # 273 2011 IFR AMENDMENT – 3001–6000 combined_Part2, # 274 2011 IFR AMENDMENT – 3001–6000 combined_Part3, # 275 2011 IFR AMENDMENT – 3001–6000 combined_Part4, # 276 2011 IFR AMENDMENT – 3001–6000 combined_Part5, # 277 2011 IFR AMENDMENT – 9001–12000 combined_Part1, # 278 2011 IFR AMENDMENT – 9001–12000 combined_Part2, # 279 2011 IFR AMENDMENT – 9001–12000 combined_Part3, # 280 2011 IFR AMENDMENT – 9001–12000 combined_Part4, # 281 2011 IFR AMENDMENT – 9001–12000 combined_Part5) (nd, ). (Additional attachment(s) added on 11/24/2017: # 282 2011 IFR AMENDMENT – 12001–14874 combined_Part1, # 283 2011 IFR AMENDMENT – 12001–14874 combined_Part2, # 284 2011 IFR AMENDMENT – 12001–14874 combined_Part3, # 285 2011 IFR AMENDMENT – 12001–14874 combined_Part4, # 286 2011 IFR AMENDMENT – 12001–14874 combined_Part5, # 287 2011 IFR AMENDMENT – 12001–14874 combined_Part6, # 288 2011 IFR AMENDMENT – 12001–14874 combined_Part7, # 289 2011 IFR AMENDMENT – 12001–14874 combined_Part8, # 290 2011 IFR AMENDMENT – 12001–14874 combined_Part9, # 291 2011 IFR AMENDMENT – 12001–14874 combined_Part10, # 292 2011 IFR AMENDMENT – 12001–14874 combined_Part11, # 293 2011 IFR AMENDMENT – 12001–14874 combined_Part12, # 294 IRS–2010–0017–0039 thru 1014_Part1, # 295 IRS–2010–0017–0039 thru 1014_Part2, # 296 IRS–2010–0017–0039 thru 1014_Part3, # 297 IRS–2010–0017–0039 thru 1014_Part4, # 298 IRS–2010–0017–0039 thru 1014_Part5, # 299 IRS–2010–0017–0039 thru 1014_Part6, # 300 IRS–2010–0017–0039 thru 1014_Part7, # 301 IRS–2010–0017–0039 thru 1014_Part8, # 302 IRS–2010–0017–0039 thru 1014_Part9, # 303 IRS–2010–0017–0039 thru 1014_Part10, # 304 IRS–2010–0017–0039 thru 1014_Part11, # 305 IRS–2010–0017–0039 thru 1014_Part12, # 306 IRS–2010–0017–0039 thru 1014_Part13, # 307 IRS–2010–0017–0039 thru 1014_Part14) (nd, ). (Additional attachment(s) added on 11/24/2017: # 308 IRS–2010–0040–0007 thru 0742_Part1, # 309 IRS–2010–0040–0007 thru 0742_Part2, # 310 IRS–2010–0040–0007 thru 0742_Part3, # 311 IRS–2010–0040–0007 thru 0742_Part4, # 312 IRS–2010–0040–0007 thru 0742_Part5, # 313 IRS–2010–0040–0007 thru 0742_Part6, # 314 IRS–2010–0040–0007 thru 0742_Part7, # 315 IRS–2010–0040–0007 thru 0742_Part8, # 316 IRS–2010–0040–0007 thru 0742_Part9, # 317 IRS–2010–0040–0007 thru 0742_Part10) (nd, ). (Additional attachment(s) added on 11/24/2017: # 318 2011 IFR AMENDMENT – 1–3000

combined_Part1, # <u>319</u> 2011 IFR AMENDMENT – 1–3000 combined_Part2) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>320</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part1, # <u>321</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part2, # <u>322</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part3, # <u>323</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part4, # <u>324</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part5, # <u>325</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part6, # <u>326</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part7, # <u>327</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part8, # <u>328</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part9, # <u>329</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part10, # <u>330</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part11, # <u>331</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part12, # <u>332</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part13, # <u>333</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part14, # <u>334</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part15, # <u>335</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part16, # <u>336</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part17, # <u>337</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part18, # <u>338</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part19, # <u>339</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part20, # <u>340</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part21, # <u>341</u> II. Supporting Documentation Materials for July 2013 Final Rule_Part22) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>342</u> Medical Loss Ratio Table 1, # <u>343</u> Medical Loss Ratio Table 2_Part1, # <u>344</u> Medical Loss Ratio Table 2_Part2, # <u>345</u> Medical Loss Ratio Table 2_Part3, # <u>346</u> Medical Loss Ratio Table 2_Part4, # <u>347</u> Medical Loss Ratio Table 3_Part1, # <u>348</u> Medical Loss Ratio Table 3_Part2, # <u>349</u> Medical Loss Ratio Table 3_Part3, # <u>350</u> Medical Loss Ratio Table 3_Part4, # <u>351</u> Medical Loss Ratio Table 3_Part5, # <u>352</u> Medical Loss Ratio Table 4_Part1., # <u>353</u> Medical Loss Ratio Table 4_Part2, # <u>354</u> Medical Loss Ratio Table 4_Part3, # <u>355</u> Medical Loss Ratio Table 4_Part4, # <u>356</u> Medical Loss Ratio Table 4_Part5, # <u>357</u> Medical Loss Ratio Table 5_Part1, # <u>358</u> Medical Loss Ratio Table 5_Part2, # <u>359</u> Medical Loss Ratio Table 5_Part3, # <u>360</u> Medical Loss Ratio Table 5_Part4, # <u>361</u> Medical Loss Ratio Table 6) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>362</u> CMS–2012–0031–0000_Part1, # <u>363</u> CMS–2012–0031–0000_Part2, # <u>364</u> CMS–2012–0031–0000_Part3, # <u>365</u> CMS–2012–0031–63162, # <u>366</u> CMS–2012–0031–63162–A1, # <u>367</u> CMS–2012–0031–63163, # <u>368</u> CMS–2012–0031–63164, # <u>369</u> CMS–2012–0031–63165, # <u>370</u> CMS–2012–0031–63166, # <u>371</u> CMS–2012–0031–63167, # <u>372</u> CMS–2012–0031–63168, # <u>373</u> CMS–2012–0031–63169, # <u>374</u> CMS–2012–0031–63170, # <u>375</u> CMS–2012–0031–63171, # <u>376</u> CMS–2012–0031–63172, # <u>377</u> CMS–2012–0031–63173, # <u>378</u> CMS–2012–0031–63174, # <u>379</u> CMS–2012–0031–63174–A1, # <u>380</u> CMS–2012–0031–63175, # <u>381</u> CMS–2012–0031–63176, # <u>382</u> CMS–2012–0031–63177, # <u>383</u> CMS–2012–0031–63178, # <u>384</u> CMS–2012–0031–63179) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>385</u> CMS–2012–0031–63280, # <u>386</u> CMS–2012–0031–63281, # <u>387</u> CMS–2012–0031–63282, # <u>388</u> CMS–2012–0031–63283, # <u>389</u> CMS–2012–0031–63284, # <u>390</u> CMS–2012–0031–63285, # <u>391</u> CMS–2012–0031–63286, # <u>392</u> CMS–2012–0031–63287, # <u>393</u> CMS–2012–0031–63188, # <u>394</u> CMS–2012–0031–63189, # <u>395</u> CMS–2012–0031–63190, # <u>396</u> CMS–2012–0031–63191, # <u>397</u> CMS–2012–0031–63192, # <u>398</u> CMS–2012–0031–63193, # <u>399</u> CMS–2012–0031–63194, # <u>400</u> CMS–2012–0031–63195, # <u>401</u> CMS–2012–0031–63196, # <u>402</u> CMS–2012–0031–63197, # <u>403</u> CMS–2012–0031–63198, # <u>404</u> CMS–2012–0031–63199) (nd, ). (Additional attachment(s) added on 11/24/2017: # <u>405</u> CMS–2012–0031–63200, # <u>407</u> CMS–2012–0031–63201, # <u>408</u> CMS–2012–0031–63202, # <u>409</u> CMS–2012–0031–63203, # <u>410</u> CMS–2012–0031–63204, # <u>411</u> CMS–2012–0031–63204–A1, # <u>412</u> CMS–2012–0031–63205, # <u>413</u> CMS–2012–0031–63206, # <u>414</u> CMS–2012–0031–63207, # <u>415</u> CMS–2012–0031–63208, # <u>416</u> CMS–2012–0031–63209, # <u>417</u> CMS–2012–0031–63210, # <u>418</u> CMS–2012–0031–63211, # <u>419</u>

CMS–2012–0031–63212, # 420 CMS–2012–0031–63213, # 421
CMS–2012–0031–63214, # 422 CMS–2012–0031–63215, # 423
CMS–2012–0031–63216, # 424 CMS–2012–0031–63217, # 425
CMS–2012–0031–63218, # 426 CMS–2012–0031–63219, # 427
CMS–2012–0031–63220, # 428 CMS–2012–0031–63221, # 429
CMS–2012–0031–63222, # 430 CMS–2012–0031–63223, # 431
CMS–2012–0031–63224, # 432 CMS–2012–0031–63225, # 433
CMS–2012–0031–63226, # 434 CMS–2012–0031–63227, # 435
CMS–2012–0031–63228, # 436 CMS–2012–0031–63229) (nd, ). (Additional
attachment(s) added on 11/24/2017: # 437 CMS–2012–0031–63230, # 438
CMS–2012–0031–63231, # 439 CMS–2012–0031–63232, # 440
CMS–2012–0031–63233, # 441 CMS–2012–0031–63234, # 442
CMS–2012–0031–63235, # 443 CMS–2012–0031–63236, # 444
CMS–2012–0031–63237, # 445 CMS–2012–0031–63238, # 446
CMS–2012–0031–63239, # 447 CMS–2012–0031–63240, # 448
CMS–2012–0031–63241, # 449 CMS–2012–0031–63242, # 450
CMS–2012–0031–63243, # 451 CMS–2012–0031–63244, # 452
CMS–2012–0031–63245, # 453 CMS–2012–0031–63246, # 454
CMS–2012–0031–63247, # 455 CMS–2012–0031–63248, # 456
CMS–2012–0031–63249, # 457 CMS–2012–0031–63250) (nd, ). (Additional
attachment(s) added on 11/24/2017: # 458 CMS–2012–0031–63251, # 459
CMS–2012–0031–63252, # 460 CMS–2012–0031–63253, # 461
CMS–2012–0031–63254, # 462 CMS–2012–0031–63255, # 463
CMS–2012–0031–63256, # 464 CMS–2012–0031–63257, # 465
CMS–2012–0031–63258, # 466 CMS–2012–0031–63259, # 467
CMS–2012–0031–63260, # 468 CMS–2012–0031–63261, # 469
CMS–2012–0031–63262, # 470 CMS–2012–0031–63263, # 471
CMS–2012–0031–63264, # 472 CMS–2012–0031–63265, # 473
CMS–2012–0031–63266, # 474 CMS–2012–0031–63267, # 475
CMS–2012–0031–63268, # 476 CMS–2012–0031–63269, # 477
CMS–2012–0031–63270, # 478 CMS–2012–0031–63271, # 479
CMS–2012–0031–63272, # 480 CMS–2012–0031–63273, # 481
CMS–2012–0031–63274, # 482 CMS–2012–0031–63275, # 483
CMS–2012–0031–63276, # 484 CMS–2012–0031–63277, # 485
CMS–2012–0031–63278, # 486 CMS–2012–0031–63279, # 487
CMS–2012–0031–63280, # 488 CMS–2012–0031–63281, # 489
CMS–2012–0031–63282, # 490 CMS–2012–0031–63283, # 491
CMS–2012–0031–63284, # 492 CMS–2012–0031–63285, # 493
CMS–2012–0031–63286, # 494 CMS–2012–0031–63287, # 495
CMS–2012–0031–63288, # 496 CMS–2012–0031–63289) (nd, ). (Additional
attachment(s) added on 11/24/2017: # 497 CMS–2012–0031–63290, # 498
CMS–2012–0031–63291, # 499 CMS–2012–0031–63292, # 500
CMS–2012–0031–63293, # 501 CMS–2012–0031–63294, # 502
CMS–2012–0031–63295, # 503 CMS–2012–0031–63296, # 504
CMS–2012–0031–63297, # 505 CMS–2012–0031–63298, # 506
CMS–2012–0031–63299) (nd, ). (Additional attachment(s) added on 11/24/2017: #
507 CMS–2012–0031–63300, # 508 CMS–2012–0031–63301, # 509
CMS–2012–0031–63302, # 510 CMS–2012–0031–63303, # 511
CMS–2012–0031–63304, # 512 CMS–2012–0031–63305, # 513
CMS–2012–0031–63306, # 514 CMS–2012–0031–63307, # 515
CMS–2012–0031–63308, # 516 CMS–2012–0031–63309, # 517
CMS–2012–0031–63310) (nd, ). (Additional attachment(s) added on 11/24/2017: #
518 CMS–2012–0031–63311, # 519 CMS–2012–0031–63312, # 520
CMS–2012–0031–63313, # 521 CMS–2012–0031–63314, # 522
CMS–2012–0031–63315, # 523 CMS–2012–0031–63316, # 524
CMS–2012–0031–63317, # 525 CMS–2012–0031–63318, # 526
CMS–2012–0031–63319, # 527 CMS–2012–0031–63320, # 528
CMS–2012–0031–63321, # 529 CMS–2012–0031–63322, # 530
CMS–2012–0031–63323, # 531 CMS–2012–0031–63324, # 532
CMS–2012–0031–63325, # 533 CMS–2012–0031–63326, # 534
CMS–2012–0031–63327, # 535 CMS–2012–0031–63328, # 536
CMS–2012–0031–63329, # 537 CMS–2012–0031–63330, # 538
CMS–2012–0031–63331, # 539 CMS–2012–0031–63332, # 540
CMS–2012–0031–63333, # 541 CMS–2012–0031–63334, # 542

CMS–2012–0031–63335, # 543 CMS–2012–0031–63336, # 544
CMS–2012–0031–63337, # 545 CMS–2012–0031–63338, # 546
CMS–2012–0031–63339, # 547 CMS–2012–0031–63340, # 548
CMS–2012–0031–63341, # 549 CMS–2012–0031–63343, # 550
CMS–2012–0031–63342, # 551 CMS–2012–0031–63344, # 552
CMS–2012–0031–63345, # 553 CMS–2012–0031–63346, # 554
CMS–2012–0031–63347, # 555 CMS–2012–0031–63348, # 556
CMS–2012–0031–63349) (nd, ). (Additional attachment(s) added on 11/24/2017: #
557 CMS–2012–0031–63350, # 558 CMS–2012–0031–63351, # 559
CMS–2012–0031–63352, # 560 CMS–2012–0031–63353, # 561
CMS–2012–0031–63354, # 562 CMS–2012–0031–63355, # 563
CMS–2012–0031–63356, # 564 CMS–2012–0031–63357, # 565
CMS–2012–0031–63358, # 566 CMS–2012–0031–63359, # 567
CMS–2012–0031–63360, # 568 CMS–2012–0031–63361, # 569
CMS–2012–0031–63362, # 570 CMS–2012–0031–63363, # 571
CMS–2012–0031–63364, # 572 CMS–2012–0031–63365, # 573
CMS–2012–0031–63366, # 574 CMS–2012–0031–63367, # 575
CMS–2012–0031–63368, # 576 CMS–2012–0031–63369, # 577
CMS–2012–0031–63370, # 578 CMS–2012–0031–63371, # 579
CMS–2012–0031–63372, # 580 CMS–2012–0031–63373, # 581
CMS–2012–0031–63374, # 582 CMS–2012–0031–63375, # 583
CMS–2012–0031–63376, # 584 CMS–2012–0031–63377, # 585
CMS–2012–0031–63378, # 586 CMS–2012–0031–63379, # 587
CMS–2012–0031–63380) (nd, ). (Additional attachment(s) added on 11/24/2017: #
588 CMS–2012–0031–63381, # 589 CMS–2012–0031–63382, # 590
CMS–2012–0031–63383, # 591 CMS–2012–0031–63384, # 592
CMS–2012–0031–63385, # 593 CMS–2012–0031–63386, # 594
CMS–2012–0031–63387, # 595 CMS–2012–0031–63388, # 596
CMS–2012–0031–63389, # 597 CMS–2012–0031–63390, # 598
CMS–2012–0031–63391, # 599 CMS–2012–0031–63392, # 600
CMS–2012–0031–63393, # 601 CMS–2012–0031–63394, # 602
CMS–2012–0031–63395, # 603 CMS–2012–0031–63396, # 604
CMS–2012–0031–63397, # 605 CMS–2012–0031–63398, # 606
CMS–2012–0031–63399) (nd, ). (Additional attachment(s) added on 11/27/2017: #
607 CMS–2012–0031–63400, # 608 CMS–2012–0031–63401, # 609
CMS–2012–0031–63402, # 610 CMS–2012–0031–63403, # 611
CMS–2012–0031–63404, # 612 CMS–2012–0031–63405, # 613
CMS–2012–0031–63406, # 614 CMS–2012–0031–63407, # 615
CMS–2012–0031–63408, # 616 CMS–2012–0031–63409, # 617
CMS–2012–0031–63410, # 618 CMS–2012–0031–63411, # 619
CMS–2012–0031–63412, # 620 CMS–2012–0031–63413, # 621
CMS–2012–0031–63414, # 622 CMS–2012–0031–63415, # 623
CMS–2012–0031–63416, # 624 CMS–2012–0031–63417, # 625
CMS–2012–0031–63418, # 626 CMS–2012–0031–63419, # 627
CMS–2012–0031–63420, # 628 CMS–2012–0031–63421, # 629
CMS–2012–0031–63422, # 630 CMS–2012–0031–63423, # 631
CMS–2012–0031–63424, # 632 CMS–2012–0031–63425, # 633
CMS–2012–0031–63426, # 634 CMS–2012–0031–63427, # 635
CMS–2012–0031–63428, # 636 CMS–2012–0031–63429, # 637
CMS–2012–0031–63430) (nd, ). (Additional attachment(s) added on 11/28/2017: #
638 CMS–2012–0031–63431, # 639 CMS–2012–0031–63432, # 640
CMS–2012–0031–63433, # 641 CMS–2012–0031–63434, # 642
CMS–2012–0031–63435, # 643 CMS–2012–0031–63436, # 644
CMS–2012–0031–63437, # 645 CMS–2012–0031–63438, # 646
CMS–2012–0031–63439, # 647 CMS–2012–0031–63440, # 648
CMS–2012–0031–63441, # 649 CMS–2012–0031–63442, # 650
CMS–2012–0031–63443, # 651 CMS–2012–0031–63444, # 652
CMS–2012–0031–63445, # 653 CMS–2012–0031–63446, # 654
CMS–2012–0031–63447, # 655 CMS–2012–0031–63448, # 656
CMS–2012–0031–63449, # 657 CMS–2012–0031–63450, # 658
CMS–2012–0031–63451, # 659 CMS–2012–0031–63452, # 660
CMS–2012–0031–63453, # 661 CMS–2012–0031–63454, # 662
CMS–2012–0031–63455, # 663 CMS–2012–0031–63456, # 664
CMS–2012–0031–63457, # 665 CMS–2012–0031–63458, # 666

CMS–2012–0031–63459) (nd, ). (Additional attachment(s) added on 11/28/2017: # 667 CMS–2012–0031–63460, # 668 CMS–2012–0031–63461, # 669 CMS–2012–0031–63462, # 670 CMS–2012–0031–63463, # 671 CMS–2012–0031–63464, # 672 CMS–2012–0031–63465, # 673 CMS–2012–0031–63466, # 674 CMS–2012–0031–63467, # 675 CMS–2012–0031–63468, # 676 CMS–2012–0031–63469, # 677 CMS–2012–0031–63470, # 678 CMS–2012–0031–63471, # 679 CMS–2012–0031–63472, # 680 CMS–2012–0031–63473, # 681 CMS–2012–0031–63474, # 682 CMS–2012–0031–63475, # 683 CMS–2012–0031–63476, # 684 CMS–2012–0031–63477, # 685 CMS–2012–0031–63478, # 686 CMS–2012–0031–63479, # 687 CMS–2012–0031–63480, # 688 CMS–2012–0031–63481, # 689 CMS–2012–0031–63482, # 690 CMS–2012–0031–63483, # 691 CMS–2012–0031–63484, # 692 CMS–2012–0031–63485, # 693 CMS–2012–0031–63486, # 694 CMS–2012–0031–63487, # 695 CMS–2012–0031–63488, # 696 CMS–2012–0031–63489, # 697 CMS–2012–0031–63490, # 698 CMS–2012–0031–63491, # 699 CMS–2012–0031–63492, # 700 CMS–2012–0031–63493, # 701 CMS–2012–0031–63494, # 702 CMS–2012–0031–63495, # 703 CMS–2012–0031–63496, # 704 CMS–2012–0031–63497, # 705 CMS–2012–0031–63498, # 706 CMS–2012–0031–63499) (nd, ). (Additional attachment(s) added on 11/28/2017: # 707 CMS–2012–0031–63500, # 708 CMS–2012–0031–63501, # 709 CMS–2012–0031–63502, # 710 CMS–2012–0031–63503, # 711 CMS–2012–0031–63504, # 712 CMS–2012–0031–63505, # 713 CMS–2012–0031–63506, # 714 CMS–2012–0031–63507, # 715 CMS–2012–0031–63508, # 716 CMS–2012–0031–63509, # 717 CMS–2012–0031–63510, # 718 CMS–2012–0031–63511, # 719 CMS–2012–0031–63512, # 720 CMS–2012–0031–63513, # 721 CMS–2012–0031–63514, # 722 CMS–2012–0031–63515, # 723 CMS–2012–0031–63516, # 724 CMS–2012–0031–63517, # 725 CMS–2012–0031–63518, # 726 CMS–2012–0031–63519, # 727 CMS–2012–0031–63520, # 728 CMS–2012–0031–63521, # 729 CMS–2012–0031–63522, # 730 CMS–2012–0031–63523, # 731 CMS–2012–0031–63524, # 732 CMS–2012–0031–63525, # 733 CMS–2012–0031–63526, # 734 CMS–2012–0031–63527, # 735 CMS–2012–0031–63528, # 736 CMS–2012–0031–63529, # 737 CMS–2012–0031–63530) (nd, ). (Additional attachment(s) added on 11/28/2017: # 738 CMS–2012–0031–63531, # 739 CMS–2012–0031–63532, # 740 CMS–2012–0031–63533, # 741 CMS–2012–0031–63534, # 742 CMS–2012–0031–63535, # 743 CMS–2012–0031–63536, # 744 CMS–2012–0031–63537, # 745 CMS–2012–0031–63538, # 746 CMS–2012–0031–63539) (nd, ). (Additional attachment(s) added on 12/5/2017: # 747 CMS–2012–0031–63540, # 748 CMS–2012–0031–63541, # 749 CMS–2012–0031–63542, # 750 CMS–2012–0031–63543, # 751 CMS–2012–0031–63544, # 752 CMS–2012–0031–63545, # 753 CMS–2012–0031–63546, # 754 CMS–2012–0031–63547, # 755 CMS–2012–0031–63548, # 756 CMS–2012–0031–63549, # 757 CMS–2012–0031–63550, # 758 CMS–2012–0031–63551, # 759 CMS–2012–0031–6355, # 760 CMS–2012–0031–63553, # 761 CMS–2012–0031–63554, # 762 CMS–2012–0031–63555, # 763 CMS–2012–0031–6355, # 764 CMS–2012–0031–63557, # 765 CMS–2012–0031–63558, # 766 CMS–2012–0031–63559, # 767 CMS–2012–0031–63560, # 768 CMS–2012–0031–63561, # 769 CMS–2012–0031–63562, # 770 CMS–2012–0031–63563, # 771 CMS–2012–0031–63564, # 772 CMS–2012–0031–63565, # 773 CMS–2012–0031–63566, # 774 CMS–2012–0031–63567, # 775 CMS–2012–0031–63568, # 776 CMS–2012–0031–63569) (nd, ). (Additional attachment(s) added on 12/5/2017: # 777 CMS–2012–0031–63570, # 778 CMS–2012–0031–63571, # 779 CMS–2012–0031–63572, # 780 CMS–2012–0031–63573, # 781 CMS–2012–0031–63574, # 782 CMS–2012–0031–63575, # 783 CMS–2012–0031–63576, # 784 CMS–2012–0031–63577, # 785 CMS–2012–0031–63579, # 786 CMS–2012–0031–63580, # 787 CMS–2012–0031–63581, # 788 CMS–2012–0031–63582, # 789

CMS–2012–0031–63583, # 790 CMS–2012–0031–63584, # 791
CMS–2012–0031–63585, # 792 CMS–2012–0031–63586, # 793
CMS–2012–0031–63587, # 794 CMS–2012–0031–63588, # 795
CMS–2012–0031–63589, # 796 CMS–2012–0031–63590, # 797
CMS–2012–0031–63591, # 798 CMS–2012–0031–63592, # 799
CMS–2012–0031–63593, # 800 CMS–2012–0031–63594, # 801
CMS–2012–0031–63595, # 802 CMS–2012–0031–63596, # 803
CMS–2012–0031–63597, # 804 CMS–2012–0031–63598, # 805
CMS–2012–0031–63599) (nd, ). (Additional attachment(s) added on 12/5/2017: # 806
CMS–2012–0031–63600, # 807 CMS–2012–0031–63601, # 808
CMS–2012–0031–63602, # 809 CMS–2012–0031–63603, # 810
CMS–2012–0031–63604, # 811 CMS–2012–0031–63605, # 812
CMS–2012–0031–63606, # 813 CMS–2012–0031–63607, # 814
CMS–2012–0031–63608, # 815 CMS–2012–0031–63609, # 816
CMS–2012–0031–63610, # 817 CMS–2012–0031–636114, # 818
CMS–2012–0031–63612, # 819 CMS–2012–0031–63613, # 820
CMS–2012–0031–63614, # 821 CMS–2012–0031–63615, # 822
CMS–2012–0031–63616, # 823 CMS–2012–0031–63617, # 824
CMS–2012–0031–63618, # 825 CMS–2012–0031–63619, # 826
CMS–2012–0031–63620, # 827 CMS–2012–0031–63621, # 828
CMS–2012–0031–63622, # 829 CMS–2012–0031–63623, # 830
CMS–2012–0031–63624, # 831 CMS–2012–0031–63625, # 832
CMS–2012–0031–63626, # 833 CMS–2012–0031–63627, # 834
CMS–2012–0031–63628, # 835 CMS–2012–0031–63629, # 836
CMS–2012–0031–63630, # 837 CMS–2012–0031–63631, # 838
CMS–2012–0031–63632, # 839 CMS–2012–0031–63633, # 840
CMS–2012–0031–63634) (nd, ). (Additional attachment(s) added on 12/5/2017: # 841
CMS–2012–0031–63635, # 842 CMS–2012–0031–63636, # 843
CMS–2012–0031–63637, # 844 CMS–2012–0031–63638, # 845
CMS–2012–0031–63639, # 846 CMS–2012–0031–63640, # 847
CMS–2012–0031–63641, # 848 CMS–2012–0031–63642, # 849
CMS–2012–0031–63643, # 850 CMS–2012–0031–63644, # 851
CMS–2012–0031–63645, # 852 CMS–2012–0031–63646, # 853
CMS–2012–0031–63647, # 854 CMS–2012–0031–63648, # 855
CMS–2012–0031–63649, # 856 CMS–2012–0031–63650, # 857
CMS–2012–0031–63651, # 858 CMS–2012–0031–63652, # 859
CMS–2012–0031–63653, # 860 CMS–2012–0031–63654, # 861
CMS–2012–0031–63655, # 862 CMS–2012–0031–63656, # 863
CMS–2012–0031–63657, # 864 CMS–2012–0031–63658, # 865
CMS–2012–0031–63659, # 866 CMS–2012–0031–63660, # 867
CMS–2012–0031–63661, # 868 CMS–2012–0031–63663, # 869
CMS–2012–0031–63664, # 870 CMS–2012–0031–63665, # 871
CMS–2012–0031–63666, # 872 CMS–2012–0031–63667, # 873
CMS–2012–0031–63668, # 874 CMS–2012–0031–63669, # 875
CMS–2012–0031–63670, # 876 CMS–2012–0031–63671, # 877
CMS–2012–0031–63672, # 878 CMS–2012–0031–63673, # 879
CMS–2012–0031–63674, # 880 CMS–2012–0031–63675, # 881
CMS–2012–0031–63676, # 882 CMS–2012–0031–63677, # 883
CMS–2012–0031–63678, # 884 CMS–2012–0031–63679, # 885
CMS–2012–0031–63681, # 886 CMS–2012–0031–63681, # 887
CMS–2012–0031–63682, # 888 CMS–2012–0031–63683, # 889
CMS–2012–0031–63684, # 890 CMS–2012–0031–63685, # 891
CMS–2012–0031–63686, # 892 CMS–2012–0031–63687, # 893
CMS–2012–0031–63688, # 894 CMS–2012–0031–63689, # 895
CMS–2012–0031–63690, # 896 CMS–2012–0031–63691, # 897
CMS–2012–0031–63692, # 898 CMS–2012–0031–63693, # 899
CMS–2012–0031–63694, # 900 CMS–2012–0031–63695, # 901
CMS–2012–0031–63696, # 902 CMS–2012–0031–63697, # 903
CMS–2012–0031–63698, # 904 CMS–2012–0031–63699) (nd, ). (Additional
attachment(s) added on 12/5/2017: # 905 CMS–2012–0031–63700, # 906
CMS–2012–0031–63701, # 907 CMS–2012–0031–63702, # 908
CMS–2012–0031–63703, # 909 CMS–2012–0031–63704, # 910
CMS–2012–0031–63705) (nd, ). (Additional attachment(s) added on 12/5/2017: # 911
CMS–2012–0031–63706, # 912 CMS–2012–0031–63707, # 913

CMS–2012–0031–63708, # 914 CMS–2012–0031–63709, # 915
CMS–2012–0031–63710, # 916 CMS–2012–0031–63711, # 917
CMS–2012–0031–63712, # 918 CMS–2012–0031–63713, # 919
CMS–2012–0031–63714) (nd, ). (Additional attachment(s) added on 12/13/2017: #
920 CMS–2012–0031–63715, # 921 CMS–2012–0031–63716, # 922
CMS–2012–0031–63717, # 923 CMS–2012–0031–63718, # 924
CMS–2012–0031–63719, # 925 CMS–2012–0031–63720, # 926
CMS–2012–0031–63721, # 927 CMS–2012–0031–63722, # 928
CMS–2012–0031–63723, # 929 CMS–2012–0031–63724, # 930
CMS–2012–0031–63725, # 931 CMS–2012–0031–63726, # 932
CMS–2012–0031–63727, # 933 CMS–2012–0031–63728, # 934
CMS–2012–0031–63729, # 935 CMS–2012–0031–63730, # 936
CMS–2012–0031–63731, # 937 CMS–2012–0031–63732, # 938
CMS–2012–0031–63733, # 939 CMS–2012–0031–63734, # 940
CMS–2012–0031–63735, # 941 CMS–2012–0031–63736, # 942
CMS–2012–0031–63737, # 943 CMS–2012–0031–63738, # 944
CMS–2012–0031–63739, # 945 CMS–2012–0031–63740, # 946
CMS–2012–0031–63741, # 947 CMS–2012–0031–63742, # 948
CMS–2012–0031–63743, # 949 CMS–2012–0031–63744, # 950
CMS–2012–0031–63745, # 951 CMS–2012–0031–63746, # 952
CMS–2012–0031–63747, # 953 CMS–2012–0031–63748, # 954
CMS–2012–0031–63749, # 955 CMS–2012–0031–63750, # 956
CMS–2012–0031–63751, # 957 CMS–2012–0031–63752, # 958
CMS–2012–0031–63753, # 959 CMS–2012–0031–63754, # 960
CMS–2012–0031–63755, # 961 CMS–2012–0031–63756, # 962
CMS–2012–0031–63757, # 963 CMS–2012–0031–63758, # 964
CMS–2012–0031–63760, # 965 CMS–2012–0031–63760, # 966
CMS–2012–0031–63761, # 967 CMS–2012–0031–63762, # 968
CMS–2012–0031–63763, # 969 CMS–2012–0031–63764, # 970
CMS–2012–0031–63765, # 971 CMS–2012–0031–63766, # 972
CMS–2012–0031–63767, # 973 CMS–2012–0031–63768, # 974
CMS–2012–0031–63769, # 975 CMS–2012–0031–63770, # 976
CMS–2012–0031–63771, # 977 CMS–2012–0031–63772, # 978
CMS–2012–0031–63774, # 979 CMS–2012–0031–63774, # 980
CMS–2012–0031–63775, # 981 CMS–2012–0031–63776, # 982
CMS–2012–0031–63777, # 983 CMS–2012–0031–63779, # 984
CMS–2012–0031–63779, # 985 CMS–2012–0031–63780, # 986
CMS–2012–0031–63781) (nd, ). (Additional attachment(s) added on 12/13/2017: #
987 CMS–2012–0031–63782', # 988 CMS–2012–0031–63783, # 989
CMS–2012–0031–63784, # 990 CMS–2012–0031–63785, # 991
CMS–2012–0031–63786, # 992 CMS–2012–0031–63787, # 993
CMS–2012–0031–63788, # 994 CMS–2012–0031–63789, # 995
CMS–2012–0031–63790, # 996 CMS–2012–0031–63791, # 997
CMS–2012–0031–63792, # 998 CMS–2012–0031–63793, # 999
CMS–2012–0031–63794, # 1000 CMS–2012–0031–63795, # 1001
CMS–2012–0031–63796, # 1002 CMS–2012–0031–63797, # 1003
CMS–2012–0031–63798, # 1004 CMS–2012–0031–63799, # 1005
CMS–2012–0031–63800, # 1006 CMS–2012–0031–63801, # 1007
CMS–2012–0031–63802, # 1008 CMS–2012–0031–63803, # 1009
CMS–2012–0031–63804, # 1010 CMS–2012–0031–63805, # 1011
CMS–2012–0031–63806, # 1012 CMS–2012–0031–63807, # 1013
CMS–2012–0031–63808, # 1014 CMS–2012–0031–63809, # 1015
CMS–2012–0031–63810, # 1016 CMS–2012–0031–63811, # 1017
CMS–2012–0031–63812, # 1018 CMS–2012–0031–63813, # 1019
CMS–2012–0031–63814, # 1020 CMS–2012–0031–63815, # 1021
CMS–2012–0031–63816, # 1022 CMS–2012–0031–63817, # 1023
CMS–2012–0031–63818, # 1024 CMS–2012–0031–63819, # 1025
CMS–2012–0031–63820, # 1026 CMS–2012–0031–63821, # 1027
CMS–2012–0031–63822, # 1028 CMS–2012–0031–63823, # 1029
CMS–2012–0031–63824, # 1030 CMS–2012–0031–63825, # 1031
CMS–2012–0031–63826, # 1032 CMS–2012–0031–63827, # 1033
CMS–2012–0031–63828, # 1034 CMS–2012–0031–63829, # 1035
CMS–2012–0031–63830, # 1036 CMS–2012–0031–638, # 1037
CMS–2012–0031–63832, # 1038 CMS–2012–0031–63834, # 1039

CMS–2012–0031–63834, # 1040 CMS–2012–0031–63835, # 1041
CMS–2012–0031–63836, # 1042 CMS–2012–0031–63837, # 1043
CMS–2012–0031–63838, # 1044 CMS–2012–0031–63839, # 1045
CMS–2012–0031–63840, # 1046 CMS–2012–0031–63841, # 1047
CMS–2012–0031–63842, # 1048 CMS–2012–0031–63843, # 1049
CMS–2012–0031–63844, # 1050 CMS–2012–0031–63845, # 1051
CMS–2012–0031–63846, # 1052 CMS–2012–0031–63847, # 1053
CMS–2012–0031–63848, # 1054 CMS–2012–0031–63849, # 1055
CMS–2012–0031–63850, # 1056 CMS–2012–0031–63851, # 1057
CMS–2012–0031–63852, # 1058 CMS–2012–0031–63853, # 1059
CMS–2012–0031–63854, # 1060 CMS–2012–0031–63855, # 1061
CMS–2012–0031–63856, # 1062 CMS–2012–0031–63857, # 1063
CMS–2012–0031–63858, # 1064 CMS–2012–0031–63859, # 1065
CMS–2012–0031–63860, # 1066 CMS–2012–0031–63861) (nd, ). (Additional
attachment(s) added on 12/13/2017: # 1067 CMS–2012–0031–63862, # 1068, # 1070
CMS–2012–0031–63864, # 1071 CMS–2012–0031–63865, # 1072
CMS–2012–0031–63866, # 1073 CMS–2012–0031–63867, # 1074
CMS–2012–0031–63868, # 1075 CMS–2012–0031–63869, # 1076
CMS–2012–0031–63870, # 1077 CMS–2012–0031–63871, # 1078
CMS–2012–0031–63872, # 1079 CMS–2012–0031–63873, # 1080
CMS–2012–0031–63874, # 1081 CMS–2012–0031–63875, # 1082
CMS–2012–0031–63876, # 1083 CMS–2012–0031–63877, # 1084
CMS–2012–0031–63878, # 1085 CMS–2012–0031–63879, # 1086
CMS–2012–0031–63880, # 1087 CMS–2012–0031–63881, # 1088
CMS–2012–0031–63882, # 1089 CMS–2012–0031–63883, # 1090
CMS–2012–0031–63884, # 1091 CMS–2012–0031–63885, # 1092
CMS–2012–0031–63886, # 1093 CMS–2012–0031–63887, # 1094
CMS–2012–0031–63888, # 1095 CMS–2012–0031–63889, # 1096
CMS–2012–0031–63890, # 1097 CMS–2012–0031–63891, # 1098
CMS–2012–0031–63892, # 1099 CMS–2012–0031–6389, # 1100
CMS–2012–0031–63894, # 1101 CMS–2012–0031–63895, # 1102
CMS–2012–0031–63896, # 1103 CMS–2012–0031–63897, # 1104
CMS–2012–0031–63898, # 1105 CMS–2012–0031–63899, # 1106
CMS–2012–0031–63900, # 1107 CMS–2012–0031–63901, # 1108
CMS–2012–0031–63902, # 1109 CMS–2012–0031–63903, # 1110
CMS–2012–0031–63904, # 1111 CMS–2012–0031–639005, # 1112
CMS–2012–0031–63906, # 1113 CMS–2012–0031–63907, # 1114
CMS–2012–0031–63908, # 1115 CMS–2012–0031–63909, # 1116
CMS–2012–0031–63910, # 1117 CMS–2012–0031–63911, # 1118
CMS–2012–0031–63912, # 1119 CMS–2012–0031–63913, # 1120
CMS–2012–0031–63914, # 1121 CMS–2012–0031–63915, # 1122
CMS–2012–0031–63916, # 1123 CMS–2012–0031–63917, # 1124
CMS–2012–0031–63918, # 1125 CMS–2012–0031–63919, # 1126
CMS–2012–0031–63920, # 1127 CMS–2012–0031–63921, # 1128
CMS–2012–0031–63922, # 1129 CMS–2012–0031–63923, # 1130
CMS–2012–0031–63924, # 1131 CMS–2012–0031–63925, # 1132
CMS–2012–0031–63926, # 1133 CMS–2012–0031–63927, # 1134
CMS–2012–0031–63928, # 1135 CMS–2012–0031–63929, # 1136
CMS–2012–0031–63930) (nd, ). (Additional attachment(s) added on 12/13/2017: #
1137 CMS–2012–0031–63931, # 1138 CMS–2012–0031–63932, # 1139
CMS–2012–0031–63933, # 1140 CMS–2012–0031–63934, # 1141
CMS–2012–0031–63935, # 1142 CMS–2012–0031–63936, # 1143
CMS–2012–0031–63937, # 1144 CMS–2012–0031–63938, # 1145
CMS–2012–0031–63939, # 1146 CMS–2012–0031–63940, # 1147
CMS–2012–0031–63941, # 1148 CMS–2012–0031–63942, # 1149
CMS–2012–0031–63943, # 1150 CMS–2012–0031–63944, # 1151
CMS–2012–0031–63945, # 1152 CMS–2012–0031–63946, # 1153
CMS–2012–0031–63947, # 1154 CMS–2012–0031–63948, # 1155
CMS–2012–0031–63949, # 1156 CMS–2012–0031–63950) (nd, ). (Additional
attachment(s) added on 12/13/2017: # 1157 CMS–2012–0031–63951, # 1158
CMS–2012–0031–63952, # 1159 CMS–2012–0031–63953, # 1160
CMS–2012–0031–63954, # 1161 CMS–2012–0031–63955, # 1162
CMS–2012–0031–63956, # 1163 CMS–2012–0031–63957, # 1164
CMS–2012–0031–63958, # 1165 CMS–2012–0031–63959, # 1166

|  |  |  |
|---|---|---|
|  |  | CMS–2012–0031–63960, # <u>1167</u> CMS–2012–0031–63961, # <u>1168</u> CMS–2012–0031–63962, # <u>1169</u> CMS–2012–0031–63963, # <u>1170</u> CMS–2012–0031–63964, # <u>1171</u> CMS–2012–0031–63965, # <u>1172</u> CMS–2012–0031–63966, # <u>1173</u> CMS–2012–0031–63967, # <u>1174</u> CMS–2012–0031–63968, # <u>1175</u> CMS–2012–0031–63969, # <u>1176</u> CMS–2012–0031–63970, # <u>1177</u> CMS–2012–0031–63971, # <u>1178</u> CMS–2012–0031–63972, # <u>1179</u> CMS–2012–0031–63973, # <u>1180</u> CMS–2012–0031–63974, # <u>1181</u> CMS–2012–0031–63975, # <u>1182</u> CMS–2012–0031–63976, # <u>1183</u> CMS–2012–0031–63977, # <u>1184</u> CMS–2012–0031–8, # <u>1185</u> CMS–2012–0031–63979, # <u>1186</u> CMS–2012–0031–63980, # <u>1187</u> CMS–2012–0031–63981, # <u>1188</u> CMS–2012–0031–63982, # <u>1189</u> CMS–2012–0031–63983, # <u>1190</u> CMS–2012–0031–63983, # <u>1191</u> CMS–2012–0031–63984, # <u>1192</u> CMS–2012–0031–63985, # <u>1193</u> CMS–2012–0031–63986, # <u>1194</u> CMS–2012–0031–63987, # <u>1195</u> CMS–2012–0031–63988, # <u>1196</u> CMS–2012–0031–63989, # <u>1197</u> CMS–2012–0031–63990, # <u>1198</u> CMS–2012–0031–63991, # <u>1199</u> CMS–2012–0031–63992, # <u>1200</u> CMS–2012–0031–63993, # <u>1201</u> CMS–2012–0031–63994, # <u>1202</u> CMS–2012–0031–63995, # <u>1203</u> CMS–2012–0031–63996, # <u>1204</u> CMS–2012–0031–63997, # <u>1205</u> CMS–2012–0031–63998, # <u>1206</u> CMS–2012–0031–63999) (nd, ). (Additional attachment(s) added on 12/13/2017: # <u>1207</u> CMS–2012–0031–64549–A1, # <u>1208</u> \CMS–2012–0031–64950–A1, # <u>1209</u> \CMS–2012–0031–65414–A1, # <u>1210</u> CMS–2012–0031–65733–A1) (nd, ). (Additional attachment(s) added on 12/13/2017: # <u>1211</u> CMS–2012–0031–65768–A1, # <u>1212</u> \CMS–2012–0031–65792–A1, # <u>1213</u> CMS–2012–0031–65861–A1, # <u>1214</u> CMS–2012–0031–66015–A1, # <u>1215</u> CMS–2012–0031–66015–A2, # <u>1216</u> CMS–2012–0031–66117–A1, # <u>1217</u> CMS–2012–0031–66118–A1, # <u>1218</u> CMS–2012–0031–66119–A1, # <u>1219</u> CMS–2012–0031–66168–A1, # <u>1220</u> CMS–2012–0031–66205–A1) (nd, ). (Additional attachment(s) added on 12/13/2017: # <u>1221</u> CMS–2012–0031–66211–A1, # <u>1222</u> CMS–2012–0031–66644–A1, # <u>1223</u> CMS–2012–0031–67194–A1, # <u>1224</u> CMS–2012–0031–68356–A1, # <u>1225</u> CMS–2012–0031–68667–A1, # <u>1226</u> CMS–2012–0031–68742–A1, # <u>1227</u> CMS–2012–0031–68978–A1) (nd, ). (Additional attachment(s) added on 12/13/2017: # <u>1228</u> CMS–2012–0031–69156–A1, # <u>1229</u> CMS–2012–0031–69919–A1) (nd, ). (Additional attachment(s) added on 12/13/2017: # <u>1230</u> CMS–2012–0031–71928–A1, # <u>1231</u> CMS–2012–0031–71958–A1) (nd, ). (Additional attachment(s) added on 12/13/2017: # <u>1232</u> CMS–2012–0031–71990–A1, # <u>1233</u> CMS–2012–0031–72412–A1, # <u>1234</u> CMS–2012–0031–72600–A1, # <u>1235</u> \CMS–2012–0031–73317–A1, # <u>1236</u> CMS–2012–0031–73635–A1) (nd, ). (Additional attachment(s) added on 12/13/2017: # <u>1237</u> CMS–2012–0031–73981–A1, # <u>1238</u> CMS–2012–0031–74003–A1) (nd, ). (Entered: 11/22/2017) |
| 11/22/2017 | <u>24</u> | ORDER THAT THE APPLICATION OF LORI H. WINDHAM, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 11/22/17. 11/22/17 ENTERED AND COPIES MAILED, E–MAILED.(fdc) (Entered: 11/22/2017) |
| 11/22/2017 | <u>25</u> | ORDER THAT THE APPLICATION OF MARK L. RIENZI, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 11/22/17. 11/22/17 ENTERED AND COPIES MAILED, E–MAILED.(fdc) (Entered: 11/22/2017) |
| 11/27/2017 | <u>26</u> | MOTION to File Amicus Brief filed by AMERICAN CENTER FOR LAW AND JUSTICE.Brief. (Attachments: # <u>1</u> Brief of Amicus Curiae American Center for Law & Justice in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, # <u>2</u> Text of Proposed Order, # <u>3</u> Disclosure Statement Form)(MANION, FRANCIS) (Entered: 11/27/2017) |
| 11/27/2017 | <u>27</u> | MOTION to File Amicus Brief filed by GIRLS INC., IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, SERVICE EMPLOYEES INTERNATIONAL UNION, THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL–CIO), THE AMERICAN FEDERATION OF TEACHERS, THE COLORADO WOMENS BAR ASSOCIATION, THE NATIONAL ASSOCIATION OF SOCIAL WORKERS, THE NATIONAL |

| | | |
|---|---|---|
| | | ASSOCIATION OF WOMEN LAWYERS, THE WOMENS BAR ASSOCIATION OF MASSACHUSETTS, CALIFORNIA WOMEN LAWYERS, LAWYERS CLUB OF SAN DIEGO, THE WOMEN LAWYERS ASSOCIATION OF LOS ANGELES,THE WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA .Brief, Certificate of Service. (Attachments: # 1 Brief, # 2 Exhibit A: Amicus Brief, # 3 Text of Proposed Order, # 4 Certificate of Service)(LEVITT, JAMIE) Modified on 11/28/2017 (nd, ). (Entered: 11/27/2017) |
| 11/27/2017 | 28 | NOTICE of Appearance by JANIE F. SCHULMAN on behalf of GIRLS INC., IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, SERVICE EMPLOYEES INTERNATIONAL UNION, THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL–CIO), THE AMERICAN FEDERATION OF TEACHERS, THE COLORADO WOMENS BAR ASSOCIATION, THE NATIONAL ASSOCIATION OF SOCIAL WORKERS, THE NATIONAL ASSOCIATION OF WOMEN LAWYERS, THE WOMENS BAR ASSOCIATION OF MASSACHUSETTS, CALIFORNIA WOMEN LAWYERS, LAWYERS CLUB OF SAN DIEGO, THE WOMEN LAWYERS ASSOCIATION OF LOS ANGELES,THE WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA with Certificate of Service(SCHULMAN, JANIE) Modified on 11/28/2017 (nd, ). (Entered: 11/27/2017) |
| 11/27/2017 | 29 | NOTICE of Appearance by RHIANNON N. BATCHELDER on behalf of GIRLS INC., IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, SERVICE EMPLOYEES INTERNATIONAL UNION, THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL–CIO), THE AMERICAN FEDERATION OF TEACHERS, THE COLORADO WOMENS BAR ASSOCIATION, THE NATIONAL ASSOCIATION OF SOCIAL WORKERS, THE NATIONAL ASSOCIATION OF WOMEN LAWYERS, THE WOMENS BAR ASSOCIATION OF MASSACHUSETTSM, CALIFORNIA WOMEN LAWYERS, LAWYERS CLUB OF SAN DIEGO, THE WOMEN LAWYERS ASSOCIATION OF LOS ANGELES,THE WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA with Certificate of Service(BATCHELDER, RHIANNON) Modified on 11/28/2017 (nd, ). (Entered: 11/27/2017) |
| 11/27/2017 | 30 | REPLY to Response to Motion re 9 MOTION for Preliminary Injunction filed by COMMONWEALTH OF PENNSYLVANIA. (FISCHER, MICHAEL) (Entered: 11/27/2017) |
| 11/28/2017 | 31 | NOTICE of Appearance by JONATHAN B. MILLER on behalf of COMMONWEALTH OF MASSACHUSETTS (MILLER, JONATHAN) (Entered: 11/28/2017) |
| 11/28/2017 | 32 | MOTION to File Amicus Brief *on behalf of Amici States Massachusetts, California, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Maine, Maryland, Minnesota, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, Washington* filed by COMMONWEALTH OF MASSACHUSETTS.Brief. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(MILLER, JONATHAN) (Entered: 11/28/2017) |
| 11/28/2017 | 33 | ORDER THAT THE MOTIONS FOR LEAVE TO FILE AMICUS BRIEFS [ECF NOS. 26, 27, AND 32] ARE GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 11/28/17.11/28/17 ENTERED AND COPIES MAILED, E–MAILED.(fdc) (Entered: 11/28/2017) |
| 11/28/2017 | 34 | Brief of Amicus Curiae, AMERICAN CENTER FOR LAW AND JUSTICE, in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction. (fdc) (Entered: 11/28/2017) |
| 11/28/2017 | 35 | Brief of Amicus Curiae filed by CALIFORNIA WOMEN LAWYERS, GIRLS INC., IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, LAWYERS CLUB OF SAN DIEGO, SERVICE EMPLOYEES INTERNATIONAL UNION, THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL–CIO), THE AMERICAN FEDERATION OF TEACHERS, THE COLORADO WOMENS BAR ASSOCIATION, THE NATIONAL ASSOCIATION OF SOCIAL |

| | | |
|---|---|---|
| | | WORKERS, THE NATIONAL ASSOCIATION OF WOMEN LAWYERS, THE WOMEN LAWYERS ASSOCIATION OF LOS ANGELES, THE WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA, THE WOMENS BAR ASSOCIATION OF MASSACHUSETTS in Support of Plaintiff's Motion 9 for a Preliminary Injunction. (fdc) (Entered: 11/28/2017) |
| 11/28/2017 | 36 | Amicus Curiae Brief of COMMONWEALTH OF MASSACHUSETTS, COMMONWEALTH OF VIRGINIA, DISTRICT OF COLUMBIA, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF IOWA, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON in Support of 9 Motion for Preliminary Injunction, Certificate of Service. (fdc) (Entered: 11/28/2017) |
| 11/30/2017 | 37 | RESPONSE in Opposition re 16 MOTION to Dismiss filed by COMMONWEALTH OF PENNSYLVANIA. (Attachments: # 1 Text of Proposed Order)(FISCHER, MICHAEL) (Entered: 11/30/2017) |
| 12/06/2017 | 38 | RESPONSE in Opposition re 19 MOTION to Intervene *by Little Sisters of the Poor* filed by COMMONWEALTH OF PENNSYLVANIA. (Attachments: # 1 Exhibit Press Release from Little Sisters' Counsel Becket Fund for Religious Liberty, # 2 Text of Proposed Order)(GOLDMAN, JONATHAN) (Entered: 12/06/2017) |
| 12/07/2017 | 39 | REPLY to Response to Motion re 16 MOTION to Dismiss filed by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. (KADE, ELIZABETH) (Entered: 12/07/2017) |
| 12/07/2017 | 40 | REPLY to Response to Motion re 19 MOTION to Intervene filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (RIENZI, MARK) (Entered: 12/07/2017) |
| 12/08/2017 | 41 | MEMORANDUM AND OPINION. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/8/17. 12/8/17 ENTERED & E–MAILED.(fdc) (VACATED PURSUANT TO JUDGE BEETLESTONE'S ORDER OF 5/10/18 77 ) Modified 5/10/18 (fdc). (Entered: 12/08/2017) |
| 12/08/2017 | 42 | MEMORANDUM AND ORDER THAT THE LITTLE SISTERS' MOTION TO INTERVENE IS DENIED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/8/17. 12/8/17 ENTERED & E–MAILED.(fdc) (VACATED PURSUANT TO JUDGE BEETLESTONE'S ORDER OF 5/10/18 77 ) Modified 5/10/18 (fdc). (Entered: 12/08/2017) |
| 12/08/2017 | 43 | NOTICE OF APPEAL as to 42 Order (Memorandum and/or Opinion) by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. Filing fee $ 505, receipt number 0313–12506386. Copies to Judge, Clerk USCA, Appeals Clerk and (RIENZI, MARK) (Entered: 12/08/2017) |
| 12/11/2017 | 44 | NOTICE of Appearance by JUSTIN MICHAEL SANDBERG on behalf of RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT (SANDBERG, JUSTIN) (Entered: 12/11/2017) |
| 12/11/2017 | 45 | NOTICE of Appearance by ETHAN PRICE DAVIS on behalf of RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT (DAVIS, ETHAN) (Entered: 12/11/2017) |
| 12/11/2017 | 46 | NOTICE of Appearance by REBECCA M. KOPPLIN on behalf of RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE |

| | | |
|---|---|---|
| | | TREASURY, DONALD J. WRIGHT with Certificate of Service(KOPPLIN, REBECCA) (Entered: 12/11/2017) |
| 12/11/2017 | 47 | Praecipe to file Additional Attachments to Administrative Record *ECF 23* by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. (Attachments: # 1 Certification, # 2 Index)(KADE, ELIZABETH) Modified on 12/12/2017 (lvj, ). Modified on 12/14/2017 (nd, ). (Entered: 12/11/2017) |
| 12/11/2017 | 48 | MOTION in Limine *TO LIMIT EVIDENCE AT PI HEARING* filed by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT.Brief. (Attachments: # 1 Text of Proposed Order)(KADE, ELIZABETH) (Entered: 12/11/2017) |
| 12/12/2017 | 49 | NOTICE of Appearance by CHRISTOPHER HEALY on behalf of RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT (HEALY, CHRISTOPHER) (Entered: 12/12/2017) |
| 12/13/2017 | 50 | RESPONSE in Opposition re 48 MOTION in Limine *TO LIMIT EVIDENCE AT PI HEARING* filed by COMMONWEALTH OF PENNSYLVANIA. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(FISCHER, MICHAEL) (Entered: 12/13/2017) |
| 12/13/2017 | 51 | NOTICE of Appearance by JOEL L. MCELVAIN on behalf of RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT (MCELVAIN, JOEL) (Entered: 12/13/2017) |
| 12/13/2017 | 52 | NOTICE of Appearance by LAUREN E. SULCOVE on behalf of COMMONWEALTH OF PENNSYLVANIA (SULCOVE, LAUREN) (Entered: 12/13/2017) |
| 12/13/2017 | 53 | NOTICE of Appearance by NIKOLE BROCK on behalf of COMMONWEALTH OF PENNSYLVANIA (BROCK, NIKOLE) (Entered: 12/13/2017) |
| 12/13/2017 | 54 | RESPONSE in Support re 48 MOTION in Limine *TO LIMIT EVIDENCE AT PI HEARING* filed by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. (HEALY, CHRISTOPHER) (Entered: 12/13/2017) |
| 12/13/2017 | 55 | Minute Entry for proceedings held before HONORABLE WENDY BEETLESTONE. A Conference Call was held on 12/12/17. (fdc) (Entered: 12/13/2017) |
| 12/13/2017 | 56 | ORDER THAT DEFENDANT'S 48 MOTION IN LIMINE IS DENIED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/13/17.12/13/17 ENTERED & E−MAILED.(fdc) (Entered: 12/13/2017) |
| 12/14/2017 | 57 | NOTICE of Docketing Record on Appeal from USCA re 43 Notice of Appeal (Credit Card Payment) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. USCA Case Number 17−3679 (dmc, ) (Entered: 12/14/2017) |
| 12/15/2017 | 58 | Minute Entry for proceedings held before HONORABLE WENDY BEETLESTONE. Preliminary Injunction Hearing held on 12/14/17. Court Reporter: S. White. (fdc) (Entered: 12/15/2017) |
| 12/15/2017 | 59 | MEMORANDUM AND OPINION. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/15/17. 12/15/17 ENTERED & E−MAILED.(fdc) (Entered: 12/15/2017) |

| | | |
|---|---|---|
| 12/15/2017 | 60 | MEMORANDUM AND ORDER THAT THE COMMONWEALTH OF PENNSYLVANIA'S MOTION FOR A PRELIMINARY INJUNCTION 9 IS GRANTED. IT IS FURTHER ORDERED THAT DEFENDANTS ERIC D. HARGAN, AS ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES (SUBSTITUTED PURSUANT TO RULE 25(D) OF THE FRCP); THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, AS SECRETARY OF THE U.S. DEPARTMENT OF TREASURY; THE U.S. DEPARTMENT OF TREASURY, RENE ALEXANDER ACOSTA, AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; AND THE U.S. DEPARTMENT OF LABOR; AND THEIR OFFICERS, AGENTS, SERVANTS, EMPLOYEES, ATTORNEYS, DESIGNEES, AND SUBORDINATES, AS WELL AS ANY PERSON ACTING IN CONCERT OR PARTICIPATION WITH THEM, ARE HEREBY ENJOINED FROM ENFORCING THE FOLLOWING INTERIM FINAL RULES PENDING FURTHER ORDER OF THIS COURT: 1. RELIGIOUS EXEMPTIONS AND ACCOMODATIONS FOR COVERAGE OF CERTAIN PREVENTIVE SERVICES UNDER THE AFFORDABLE CARE ACT DESCRIBED AT 82 FED. REG. 47792; AND 2. MORAL EXEMPTIONS AND ACCOMODATIONS FOR COVERAGE OF CERTAIN PREVENTIVE SERVICES UNDER THE AFFORDABLE CARE ACT DESCRIBED AT 82 FED. REG. 47838. THE COURT HAS CONSIDERED THE ISSUE OF SECURITY PURSUANT TO RULE 65(C) OF THE FRCP AND DETERMINES THAT DEFENDANTS WILL NOT SUFFER ANY FINANCIAL LOSS THAT WARRANTS THE NEED FOR THE PLAINTIFF TO POST SECURITY. AFTER CONSIDERING THE FACTS AND CIRCUMSTANCES OF THIS CASE, THE COURT FINDS THAT SECURITY IS UNNECESSARY AND EXERCISES ITS DISCRETION NOT TO REQUIRE THE POSTING OF SECURITY IN THIS SITUATION. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/15/17. 12/15/17 ENTERED & E–MAILED.(fdc) (Entered: 12/15/2017) |
| 12/15/2017 | 61 | NOTICE OF APPEAL as to 60 Order (Memorandum and/or Opinion), 59 Memorandum and/or Opinion by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. Filing fee $ 505, receipt number 0313–12521339. Copies to Judge, Clerk USCA, and Appeals Clerk. Certificate of Service. (RIENZI, MARK) Modified on 12/15/2017 (tjd). (Entered: 12/15/2017) |
| 12/21/2017 | 62 | NOTICE of Docketing Record on Appeal from USCA re 61 Notice of Appeal (Credit Card Payment), filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. USCA Case Number 17–3752 (dmc, ) (Entered: 12/21/2017) |
| 01/04/2018 | 63 | NOTICE by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME *[TRANSCRIPT ORDER FORM]*. (FILED IN ERROR; ATTORNEY MUST RE–FILE ORIGINAL HARD COPY WITH CLERK'S OFFICE). (RIENZI, MARK) Modified on 1/9/2018 (fb). (Entered: 01/04/2018) |
| 01/09/2018 | 64 | NOTICE OF CONFERENCE: PRETRIAL CONFERENCE SET FOR 2/15/2018 04:30 PM IN JUDGE'S CHAMBERS 3809 BEFORE HONORABLE WENDY BEETLESTONE. (Attachments: # 1 Electronic Discovery Order, # 2 Joint Report of Rule 26(f) Meeting and Proposed Discovery Plan)(amw, ) (Entered: 01/09/2018) |
| 01/11/2018 | 65 | Copy of TPO Form re 61 Notice of Appeal (Credit Card Payment), : (fdc, ) (Entered: 01/11/2018) |
| 01/22/2018 | 66 | NOTICE of Withdrawal of Appearance by ELIZABETH L. KADE on behalf of All Defendants (KADE, ELIZABETH) (Entered: 01/22/2018) |
| 02/05/2018 | 67 | NOTICE by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME *of Transcript Order for 12/14/2017 proceedings* (RIENZI, MARK) (Entered: 02/05/2018) |
| 02/06/2018 | 68 | NOTICE OF APPEAL as to 60 Order (Memorandum and/or Opinion),,,,,, 59 Memorandum and/or Opinion by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. Filing fee $ 505. Copies to Judge, Clerk USCA, Appeals Clerk and (SANDBERG, JUSTIN) (Entered: 02/06/2018) |

| 02/06/2018 | 69 | TRANSCRIPT of Preliminary Injunction Hearing held on 12/14/17, before Judge Beetlestone. Court Reporter/Transcriber Suzanne R. White, RPR, FCRR, CM. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 2/27/2018. Redacted Transcript Deadline set for 3/9/2018. Release of Transcript Restriction set for 5/7/2018. (fdc) (Entered: 02/07/2018) |
|---|---|---|
| 02/06/2018 | 70 | Notice of Filing of Official Transcript with Certificate of Service re 69 Transcript – PDF,, 2/7/18 Entered and Copies Emailed and Mailed. (fdc) (Entered: 02/07/2018) |
| 02/07/2018 | 71 | NOTICE – AT THE REQUEST OF COUNSEL FOR BOTH PARTIES IN CORRESPONDENCE DATED FEBRUARY 7, 2018 AND UPON REPRESENTATION THAT DEFENDANTS INTEND TO FILE SHORTLY A MOTION TO STAY DISTRICT COURT PROCEEDINGS IN THIS CASE, PENDING RESOLUTION OF THEIR APPEAL OF THE PRELIMINARY INJUNCTION IN THE THIRD CIRCUIT COURT OF APPEALS, THE RULE 16 CONFERENCE ON FEBRUARY 15, 2018 IS HEREBY CANCELLED AND THE JOINT RULE 26 (F) REPORT DEADLINE IS VACATED.(amw, ) (Entered: 02/07/2018) |
| 02/08/2018 | 72 | MOTION to Stay filed by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT.Brief. (Attachments: # 1 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 02/08/2018) |
| 02/09/2018 | 73 | ORDER THAT DEFENDANTS' 72 MOTION TO STAY IS GRANTED. THIS CIVIL ACTION SHALL BE MARKED STAYED PENDING DEFENDANT'S APPEAL OF THIS COURT'S ORDER ON PENNSYLVANIA'S MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 59 & 60) TO THE THIRD CIRCUIT COURT OF APPEALS. IT IS FURTHER ORDERED THAT THE CLERK OF COURT SHALL MARK THIS ACTION CLOSED FOR STATISTICAL PURPOSES AND PLACE THE MATTER IN THE CIVIL SUSPENSE FILE. SIGNED BY HONORABLE WENDY BEETLESTONE ON 2/8/18.2/9/18 ENTERED & E–MAILED.(fdc) (Entered: 02/09/2018) |
| 02/15/2018 | 74 | NOTICE of Docketing Record on Appeal from USCA re 68 Notice of Appeal, filed by DONALD J. TRUMP, RENE ALEXANDER ACOSTA, UNITED STATES DEPARTMENT OF LABOR, STEVEN T. MNUCHIN, DONALD J. WRIGHT, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES. USCA Case Number 18–1253 (dmc, ) (Entered: 02/15/2018) |
| 03/12/2018 | 75 | Request to File Supplemented Administrative Record by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. (Attachments: # 1 Exhibit, # 2 Exhibit)(SANDBERG, JUSTIN) (Additional attachment(s) added on 3/28/2018: # 3 Rulemaking Notices and Guidance., # 4 attachment, # 5 attachment, # 6 attachment, # 7 attachment, # 8 attachment, # 9 attachment, # 10 attachment, # 11 attachment, # 12 attachment, # 13 attachment, # 14 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 15 attachment, # 16 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 17 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 18 attachment, # 19 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 20 attachment, # 21 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 22 attachment, # 23 attachment, # 24 attachment, # 25 attachment, # 26 attachment, # 27 attachment, # 28 attachment, # 29 attachment, # 30 attachment, # 31 attachment, # 32 attachment, # 33 attachment, # 34 attachment, # 35 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 36 attachment, # 37 attachment, # 38 attachment, # 39 attachment, # 40 attachment, # 41 attachment, # 42 attachment, # 43 attachment, # 44 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 45 attachment, # 46 attachment, # 47 attachment, # 48 attachment, # 49 attachment, # 50 attachment, # 51 attachment, # 52 attachment, # 53 |

attachment, # 54 attachment, # 55 attachment, # 56 attachment, # 57 attachment, # 58 attachment, # 59 attachment, # 60 attachment, # 61 attachment, # 62 attachment, # 63 attachment, # 64 attachment, # 65 attachment, # 66 attachment, # 67 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 68 attachment, # 69 attachment, # 70 attachment, # 71 attachment, # 72 attachment, # 73 attachment, # 74 attachment, # 75 attachment, # 76 attachment, # 77 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 78 attachment, # 79 attachment, # 80 attachment, # 81 attachment, # 82 attachment, # 83 attachment, # 84 attachment, # 85 attachment, # 86 attachment, # 87 attachment, # 88 attachment, # 89 attachment, # 90 attachment, # 91 attachment, # 92 attachment, # 93 attachment, # 94 attachment, # 95 attachment, # 96 attachment, # 97 attachment, # 98 attachment, # 99 attachment, # 100 attachment, # 101 attachment, # 102 attachment, # 103 attachment, # 104 attachment, # 105 attachment, # 106 attachment, # 107 attachment, # 108 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 109 attachment, # 110 attachment, # 111 attachment, # 112 attachment, # 113 attachment, # 114 attachment, # 115 attachment, # 116 attachment, # 117 attachment, # 118 attachment, # 119 attachment, # 120 attachment, # 121 attachment, # 122 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 123 attachment, # 124 attachment, # 125 attachment, # 126 attachment, # 127 attachment, # 128 attachment, # 129 attachment, # 130 attachment, # 131 attachment, # 132 attachment, # 133 attachment, # 134 attachment, # 135 attachment, # 136 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 137 attachment, # 138 attachment, # 139 attachment, # 140 attachment, # 141 attachment, # 142 attachment, # 143 attachment, # 144 attachment, # 145 attachment, # 146 attachment, # 147 attachment, # 148 attachment, # 149 attachment, # 150 attachment, # 151 attachment, # 152 attachment, # 153 attachment, # 154 attachment, # 155 attachment, # 156 attachment, # 157 attachment, # 158 attachment, # 159 attachment, # 160 attachment, # 161 attachment, # 162 attachment, # 163 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 164 attachment, # 165 attachment, # 166 attachment, # 167 attachment, # 168 attachment, # 169 attachment, # 170 attachment, # 171 attachment, # 172 attachment, # 173 attachment, # 174 attachment, # 175 attachment, # 176 attachment, # 177 attachment, # 178 attachment, # 179 attachment, # 180 attachment, # 181 attachment, # 182 attachment, # 183 attachment, # 184 attachment, # 185 attachment, # 186 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 187 attachment, # 188 attachment, # 189 attachment, # 190 attachment, # 191 attachment, # 192 attachment, # 193 attachment, # 194 attachment, # 195 attachment, # 196 attachment, # 197 attachment, # 198 attachment, # 199 attachment, # 200 attachment, # 201 attachment, # 202 attachment, # 203 attachment, # 204 attachment, # 205 attachment, # 206 attachment, # 207 attachment, # 208 attachment, # 209 attachment, # 210 attachment, # 211 attachment, # 212 attachment, # 213 attachment, # 214 attachment, # 215 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 216 attachment, # 217 attachment, # 218 attachment, # 219 attachment, # 220 attachment, # 221 attachment, # 222 attachment, # 223 attachment, # 224 attachment, # 225 attachment, # 226 attachment, # 227 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 228 attachment, # 229 attachment, # 230 attachment, # 231 attachment, # 232 attachment, # 233 attachment, # 234 attachment, # 235 attachment, # 236 attachment, # 237 attachment, # 238 attachment, # 239 attachment, # 240 attachment, # 241 attachment, # 242 attachment, # 243 attachment, # 244 attachment, # 245 attachment, # 246 attachment, # 247 attachment, # 248 attachment, # 249 attachment, # 250 attachment, # 251 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 252 attachment, # 253 attachment, # 254 attachment, # 255 attachment, # 256 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 257 attachment, # 258 attachment, # 259 attachment, # 260 attachment, # 261 attachment, # 262 attachment, # 263 attachment, # 264 attachment, # 265 attachment, # 266 attachment, # 267 attachment, # 268 attachment, # 269 attachment, # 270 attachment, # 271 attachment, # 272 attachment, # 273 attachment, # 274 attachment, # 275 attachment, # 276 attachment, # 277 attachment, # 278 attachment, # 279 attachment, # 280 attachment, # 281 attachment, # 282 attachment, # 283 attachment, # 284 attachment, # 285 attachment, # 286 attachment, # 287 attachment, # 288 attachment, # 289 attachment, # 290 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 291 attachment, # 292 attachment, # 293 attachment, # 294 attachment, # 295 attachment, # 296 attachment, # 297 attachment, # 298 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 299 attachment, # 300 attachment, # 301 attachment, # 302 attachment, # 303 attachment, # 304 attachment, # 305 attachment,

# 306 attachment, # 307 attachment, # 308 attachment, # 309 attachment, # 310 attachment, # 311 attachment, # 312 attachment, # 313 attachment) (nd, ). (Additional attachment(s) added on 3/28/2018: # 314 attachment, # 315 attachment, # 316 attachment) (nd, ). (Additional attachment(s) added on 3/29/2018: # 317 attachment, # 318 attachment, # 319 attachment, # 320 attachment, # 321 attachment, # 322 attachment, # 323 attachment, # 324 attachment, # 325 attachment, # 326 attachment, # 327 attachment, # 328 attachment) (nd, ). (Additional attachment(s) added on 3/29/2018: # 329 attachment, # 330 attachment, # 331 attachment, # 332 attachment, # 333 attachment, # 334 attachment, # 335 attachment, # 336 attachment, # 337 attachment, # 338 attachment, # 339 attachment, # 340 attachment, # 341 attachment, # 342 attachment, # 343 attachment, # 344 attachment, # 345 attachment, # 346 attachment, # 347 attachment, # 348 attachment, # 349 attachment, # 350 attachment) (nd, ). (Additional attachment(s) added on 3/29/2018: # 351 attachment, # 352 attachment, # 353 attachment, # 354 attachment, # 355 attachment, # 356 attachment, # 357 attachment, # 358 attachment) (nd, ). (Additional attachment(s) added on 4/5/2018: # 359 attachment, # 360 attachment, # 361 attachment, # 362 attachment, # 363 attachment, # 364 attachment, # 365 attachment, # 366 attachment, # 367 attachment, # 368 attachment, # 369 attachment, # 370 attachment, # 371 attachment, # 372 attachment, # 373 attachment, # 374 attachment, # 375 attachment, # 376 attachment, # 377 attachment, # 378 attachment, # 379 attachment, # 380 attachment, # 381 attachment, # 382 attachment) (nd, ). (Additional attachment(s) added on 4/5/2018: # 383 attachment, # 384 attachment, # 385 attachment, # 386 attachment, # 387 attachment, # 388 attachment, # 389 attachment, # 390 attachment, # 391 attachment, # 392 attachment, # 393 attachment, # 394 attachment, # 395 attachment, # 396 attachment, # 397 attachment, # 398 attachment, # 399 attachment, # 400 attachment, # 401 attachment, # 402 attachment) (nd, ). (Additional attachment(s) added on 4/6/2018: # 403 attachment, # 404 attachment, # 405 attachment, # 406 attachment, # 407 attachment, # 408 attachment, # 409 attachment, # 410 attachment, # 411 attachment, # 412 attachment, # 413 attachment, # 414 attachment, # 415 attachment, # 416 attachment, # 417 attachment, # 418 attachment, # 419 attachment, # 420 attachment, # 421 attachment, # 422 attachment, # 423 attachment, # 424 attachment, # 425 attachment, # 426 attachment, # 427 attachment, # 428 attachment, # 429 attachment, # 430 attachment, # 431 attachment, # 432 attachment, # 433 attachment, # 434 attachment, # 435 attachment, # 436 attachment, # 437 attachment, # 438 attachment, # 439 attachment, # 440 attachment, # 441 attachment, # 442 attachment, # 443 attachment, # 444 attachment, # 445 attachment, # 446 attachment, # 447 attachment, # 448 attachment, # 449 attachment, # 450 attachment, # 451 attachment) (nd, ). (Additional attachment(s) added on 4/6/2018: # 452 attachment, # 453 attachment, # 454 attachment, # 455 attachment, # 456 attachment, # 457 attachment, # 458 attachment, # 459 attachment, # 460 attachment, # 461 attachment, # 462 attachment, # 463 attachment, # 464 attachment, # 465 attachment, # 466 attachment, # 467 attachment, # 468 attachment, # 469 attachment, # 470 attachment, # 471 attachment, # 472 attachment, # 473 attachment, # 474 attachment, # 475 attachment, # 476 attachment, # 477 attachment, # 478 attachment, # 479 attachment, # 480 attachment, # 481 attachment, # 482 attachment, # 483 attachment, # 484 attachment, # 485 attachment, # 486 attachment, # 487 attachment, # 488 attachment, # 489 attachment, # 490 attachment, # 491 attachment, # 492 attachment, # 493 attachment, # 494 attachment, # 495 attachment, # 496 attachment, # 497 attachment, # 498 attachment, # 499 attachment, # 500 attachment) (nd, ). (Additional attachment(s) added on 4/6/2018: # 501 attachment, # 502 attachment, # 503 attachment, # 504 attachment, # 505 attachment, # 506 attachment, # 507 attachment, # 508 attachment, # 509 attachment, # 510 attachment, # 511 attachment, # 512 attachment, # 513 attachment, # 514 attachment, # 515 attachment, # 516 attachment, # 517 attachment, # 518 attachment, # 519 attachment, # 520 attachment, # 521 attachment, # 522 attachment, # 523 attachment, # 524 attachment, # 525 attachment, # 526 attachment, # 527 attachment, # 528 attachment, # 529 attachment, # 530 attachment, # 531 attachment, # 532 attachment, # 533 attachment, # 534 attachment, # 535 attachment, # 536 attachment, # 537 attachment, # 538 attachment, # 539 attachment, # 540 attachment, # 541 attachment, # 542 attachment, # 543 attachment, # 544 attachment, # 545 attachment, # 546 attachment, # 547 attachment, # 548 attachment, # 549 attachment, # 550 attachment) (nd, ). (Additional attachment(s) added on 4/6/2018: # 551 attachment, # 552 attachment, # 553 attachment, # 554 attachment, # 555 attachment, # 556 attachment, # 557 attachment, # 558 attachment, # 559 attachment, # 560 attachment, # 561 attachment, # 562 attachment, # 563

attachment, # 564 attachment, # 565 attachment, # 566 attachment, # 567 attachment, # 568 attachment, # 569 attachment, # 570 attachment, # 571 attachment, # 572 attachment, # 573 attachment, # 574 attachment, # 575 attachment) (nd, ). (Additional attachment(s) added on 4/6/2018: # 576 attachment, # 577 attachment, # 578 attachment, # 579 attachment, # 580 attachment, # 581 attachment, # 582 attachment, # 583 attachment, # 584 attachment, # 585 attachment, # 586 attachment, # 587 attachment, # 588 attachment, # 589 attachment, # 590 attachment, # 591 attachment, # 592 attachment, # 593 attachment, # 594 attachment, # 595 attachment, # 596 attachment, # 597 attachment, # 598 attachment, # 599 attachment, # 600 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 601 attachment, # 602 attachment, # 603 attachment, # 604 attachment, # 605 attachment, # 606 attachment, # 607 attachment, # 608 attachment, # 609 attachment, # 610 attachment, # 611 attachment, # 612 attachment, # 613 attachment, # 614 attachment, # 615 attachment, # 616 attachment, # 617 attachment, # 618 attachment, # 619 attachment, # 620 attachment, # 621 attachment, # 622 attachment, # 623 attachment, # 624 attachment, # 625 attachment, # 626 attachment, # 627 attachment, # 628 attachment, # 629 attachment, # 630 attachment, # 631 attachment, # 632 attachment, # 633 attachment, # 634 attachment, # 635 attachment, # 636 attachment, # 637 attachment, # 638 attachment, # 639 attachment, # 640 attachment, # 641 attachment, # 642 attachment, # 643 attachment, # 644 attachment, # 645 attachment, # 646 attachment, # 647 attachment, # 648 attachment, # 649 attachment, # 650 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 651 attachment, # 652 attachment, # 653 attachment, # 654 attachment, # 655 attachment, # 656 attachment, # 657 attachment, # 658 attachment, # 659 attachment, # 660 attachment, # 661 attachment, # 662 attachment, # 663 attachment, # 664 attachment, # 665 attachment, # 666 attachment, # 667 attachment, # 668 attachment, # 669 attachment, # 670 attachment, # 671 attachment, # 672 attachment, # 673 attachment, # 674 attachment, # 675 attachment, # 676 attachment, # 677 attachment, # 678 attachment, # 679 attachment, # 680 attachment, # 681 attachment, # 682 attachment, # 683 attachment, # 684 attachment, # 685 attachment, # 686 attachment, # 687 attachment, # 688 attachment, # 689 attachment, # 690 attachment, # 691 attachment, # 692 attachment, # 693 attachment, # 694 attachment, # 695 attachment, # 696 attachment, # 697 attachment, # 698 attachment, # 699 attachment, # 700 attachment, # 701 attachment, # 702 attachment, # 703 attachment, # 704 attachment, # 705 attachment, # 706 attachment, # 707 attachment, # 708 attachment, # 709 attachment, # 710 attachment, # 711 attachment, # 712 attachment, # 713 attachment, # 714 attachment, # 715 attachment, # 716 attachment, # 717 attachment, # 718 attachment, # 719 attachment, # 720 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 721 attachment, # 722 attachment, # 723 attachment, # 724 attachment, # 725 attachment, # 726 attachment, # 727 attachment, # 728 attachment, # 729 attachment, # 730 attachment, # 731 attachment, # 732 attachment, # 733 attachment, # 734 attachment, # 735 attachment, # 736 attachment, # 737 attachment, # 738 attachment, # 739 attachment, # 740 attachment, # 741 attachment, # 742 attachment, # 743 attachment, # 744 attachment, # 745 attachment, # 746 attachment, # 747 attachment, # 748 attachment, # 749 attachment, # 750 attachment, # 751 attachment, # 752 attachment, # 753 attachment, # 754 attachment, # 755 attachment, # 756 attachment, # 757 attachment, # 758 attachment, # 759 attachment, # 760 attachment, # 761 attachment, # 762 attachment, # 763 attachment, # 764 attachment, # 765 attachment, # 766 attachment, # 767 attachment, # 768 attachment, # 769 attachment, # 770 attachment, # 771 attachment, # 772 attachment, # 773 attachment, # 774 attachment, # 775 attachment, # 776 attachment, # 777 attachment, # 778 attachment, # 779 attachment, # 780 attachment, # 781 attachment, # 782 attachment, # 783 attachment, # 784 attachment, # 785 attachment, # 786 attachment, # 787 attachment, # 788 attachment, # 789 attachment, # 790 attachment, # 791 attachment, # 792 attachment, # 793 attachment, # 794 attachment, # 795 attachment, # 796 attachment, # 797 attachment, # 798 attachment, # 799 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 800 attachment, # 801 attachment, # 802 attachment, # 803 attachment, # 804 attachment, # 805 attachment, # 806 attachment, # 807 attachment, # 808 attachment, # 809 attachment, # 810 attachment, # 811 attachment, # 812 attachment, # 813 attachment, # 814 attachment, # 815 attachment, # 816 attachment, # 817 attachment, # 818 attachment, # 819 attachment, # 820 attachment, # 821 attachment, # 822 attachment, # 823 attachment, # 824 attachment, # 825 attachment, # 826 attachment, # 827 attachment, # 828 attachment, # 829 attachment, # 830 attachment, # 831 attachment, # 832 attachment, # 833 attachment, # 834 attachment, # 835 attachment, # 836

attachment, # 837 attachment, # 838 attachment, # 839 attachment, # 840 attachment, # 841 attachment, # 842 attachment, # 843 attachment, # 844 attachment, # 845 attachment, # 846 attachment, # 847 attachment, # 848 attachment, # 849 attachment, # 850 attachment, # 851 attachment, # 852 attachment, # 853 attachment, # 854 attachment, # 855 attachment, # 856 attachment, # 857 attachment, # 858 attachment, # 859 attachment, # 860 attachment, # 861 attachment, # 862 attachment, # 863 attachment, # 864 attachment, # 865 attachment, # 866 attachment, # 867 attachment, # 868 attachment, # 869 attachment, # 870 attachment, # 871 attachment, # 872 attachment, # 873 attachment, # 874 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 875 attachment, # 876 attachment, # 877 attachment, # 878 attachment, # 879 attachment, # 880 attachment, # 881 attachment, # 882 attachment, # 883 attachment, # 884 attachment, # 885 attachment, # 886 attachment, # 887 attachment, # 888 attachment, # 889 attachment, # 890 attachment, # 891 attachment, # 892 attachment, # 893 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 894 attachment, # 895 attachment, # 896 attachment, # 897 attachment, # 898 attachment, # 899 attachment, # 900 attachment, # 901 attachment, # 902 attachment, # 903 attachment, # 904 attachment, # 905 attachment, # 906 attachment, # 907 attachment, # 908 attachment, # 909 attachment, # 910 attachment, # 911 attachment, # 912 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 913 attachment, # 914 attachment, # 915 attachment, # 916 attachment, # 917 attachment, # 918 attachment, # 919 attachment, # 920 attachment, # 921 attachment, # 922 attachment, # 923 attachment, # 924 attachment, # 925 attachment, # 926 attachment, # 927 attachment, # 928 attachment, # 929 attachment, # 930 attachment, # 931 attachment, # 932 attachment, # 933 attachment, # 934 attachment, # 935 attachment, # 936 attachment, # 937 attachment, # 938 attachment, # 939 attachment, # 940 attachment, # 941 attachment, # 942 attachment, # 943 attachment, # 944 attachment, # 945 attachment, # 946 attachment, # 947 attachment, # 948 attachment, # 949 attachment, # 950 attachment, # 951 attachment, # 952 attachment, # 953 attachment, # 954 attachment, # 955 attachment, # 956 attachment, # 957 attachment, # 958 attachment, # 959 attachment, # 960 attachment, # 961 attachment, # 962 attachment, # 963 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 964 attachment, # 965 attachment, # 966 attachment, # 967 attachment, # 968 attachment, # 969 attachment, # 970 attachment, # 971 attachment, # 972 attachment, # 973 attachment, # 974 attachment, # 975 attachment, # 976 attachment, # 977 attachment, # 978 attachment, # 979 attachment, # 980 attachment, # 981 attachment, # 982 attachment, # 983 attachment, # 984 attachment, # 985 attachment, # 986 attachment, # 987 attachment, # 988 attachment, # 989 attachment, # 990 attachment, # 991 attachment, # 992 attachment, # 993 attachment, # 994 attachment, # 995 attachment, # 996 attachment, # 997 attachment, # 998 attachment, # 999 attachment, # 1000 attachment, # 1001 attachment, # 1002 attachment, # 1003 attachment, # 1004 attachment, # 1005 attachment, # 1006 attachment, # 1007 attachment, # 1008 attachment, # 1009 attachment, # 1010 attachment, # 1011 attachment, # 1012 attachment, # 1013 attachment, # 1014 attachment, # 1015 attachment, # 1016 attachment, # 1017 attachment, # 1018 attachment, # 1019 attachment, # 1020 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 1021 attachment, # 1022 attachment, # 1023 attachment, # 1024 attachment, # 1025 attachment, # 1026 attachment, # 1027 attachment, # 1028 attachment, # 1029 attachment, # 1030 attachment, # 1031 attachment, # 1032 attachment, # 1033 attachment, # 1034 attachment, # 1035 attachment, # 1036 attachment, # 1037 attachment, # 1038 attachment, # 1039 attachment, # 1040 attachment, # 1041 attachment, # 1042 attachment, # 1043 attachment, # 1044 attachment, # 1045 attachment, # 1046 attachment, # 1047 attachment, # 1048 attachment, # 1049 attachment, # 1050 attachment, # 1051 attachment, # 1052 attachment, # 1053 attachment, # 1054 attachment, # 1055 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 1056 attachment, # 1057 attachment, # 1066 attachment, # 1067 attachment, # 1068 attachment, # 1069 attachment, # 1070 attachment, # 1071 attachment, # 1072 attachment, # 1073 attachment, # 1074 attachment, # 1075 attachment, # 1076 attachment, # 1077 attachment, # 1078 attachment, # 1079 attachment, # 1080 attachment, # 1081 attachment, # 1082 attachment, # 1083 attachment, # 1084 attachment, # 1085 attachment, # 1086 attachment, # 1087 attachment, # 1088 attachment, # 1089 attachment, # 1090 attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # 1091 attachment, # 1092 attachment, # 1093 attachment, # 1094 attachment, # 1095 attachment, # 1096 attachment, # 1097 attachment, # 1098 attachment, # 1099 attachment, # 1100 attachment, # 1101 attachment, # 1102

| | | |
|---|---|---|
| | | attachment, # <u>1103</u> attachment, # <u>1104</u> attachment, # <u>1105</u> attachment, # <u>1106</u> attachment, # <u>1107</u> attachment) (nd, ). (Additional attachment(s) added on 4/9/2018: # <u>1108</u> attachment, # <u>1109</u> attachment, # <u>1110</u> attachment, # <u>1111</u> attachment, # <u>1112</u> attachment, # <u>1113</u> attachment, # <u>1114</u> attachment, # <u>1115</u> attachment, # <u>1116</u> attachment, # <u>1117</u> attachment, # <u>1118</u> attachment, # <u>1119</u> attachment, # <u>1120</u> attachment, # <u>1121</u> attachment, # <u>1122</u> attachment, # <u>1123</u> attachment, # <u>1124</u> attachment, # <u>1125</u> attachment, # <u>1126</u> attachment) (nd, ). (Additional attachment(s) added on 4/30/2018: # <u>1127</u> attachment, # <u>1128</u>, # <u>1129</u>, # <u>1130</u> attachment, # <u>1131</u> attachment, # <u>1132</u> attachment, # <u>1133</u> attachment, # <u>1134</u> attachment, # <u>1135</u> attachment, # <u>1136</u> attachment, # <u>1137</u> attachment, # <u>1138</u> attachment, # <u>1139</u> attachment, # <u>1140</u> attachment, # <u>1141</u> attachment, # <u>1142</u> attachment, # <u>1143</u> attachment, # <u>1144</u> attachment, # <u>1145</u> attachment, # <u>1146</u> attachment, # <u>1147</u> attachment, # <u>1148</u> attachment, # <u>1149</u> attachment, # <u>1150</u> attachment, # <u>1151</u> attachment, # <u>1152</u> attachment, # <u>1153</u> attachment, # <u>1154</u> attachment, # <u>1155</u> attachment, # <u>1156</u> attachment, # <u>1157</u> attachment, # <u>1158</u> attachment, # <u>1159</u> attachment, # <u>1160</u> attachment, # <u>1161</u> attachment, # <u>1162</u> attachment, # <u>1163</u> attachment, # <u>1164</u> attachment, # <u>1165</u> attachment, # <u>1166</u> attachment, # <u>1167</u> attachment, # <u>1168</u> attachment, # <u>1169</u>, # <u>1170</u>, # <u>1171</u>, # <u>1172</u>, # <u>1173</u>, # <u>1174</u>, # <u>1175</u>, # <u>1176</u>, # <u>1177</u>, # <u>1178</u>, # <u>1179</u>) (nd, ). (Additional attachment(s) added on 4/30/2018: # <u>1180</u>, # <u>1181</u>, # <u>1182</u>, # <u>1183</u>, # <u>1184</u>, # <u>1185</u>, # <u>1186</u>, # <u>1187</u>, # <u>1188</u>, # <u>1189</u>, # <u>1190</u>, # <u>1191</u>, # <u>1192</u>, # <u>1193</u>, # <u>1194</u>, # <u>1195</u>, # <u>1196</u>, # <u>1197</u>, # <u>1198</u>, # <u>1199</u>, # <u>1200</u>, # <u>1201</u>, # <u>1202</u>, # <u>1203</u>, # <u>1204</u>, # <u>1205</u>, # <u>1206</u>, # <u>1207</u>, # <u>1208</u>, # <u>1209</u>, # <u>1210</u>, # <u>1211</u>, # <u>1212</u>, # <u>1213</u>) (nd, ). (Entered: 03/12/2018) |
| 04/24/2018 | <u>76</u> | MANDATE of USCA as to <u>43</u> Notice of Appeal (Credit Card Payment) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. RE: ORDERED THAT THE ORDER OF THE DISTRICT COURT IS HEREBY REVERSED AND REMANDED. (fdc) (Entered: 04/24/2018) |
| 05/10/2018 | <u>77</u> | ORDER THAT THIS COURT'S MEMORANDUM AND ORDER (ECF NOS. <u>41</u> <u>42</u> ) ARE VACATED, AND THE LITTLE SISTERS' MOTION TO INTERVENE (ECF NO. <u>19</u> ) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 5/9/18. 5/10/18 ENTERED & E–MAILED.(fdc) (Entered: 05/10/2018) |
| 07/02/2018 | <u>78</u> | NOTICE of Withdrawal of Appearance by JOEL L. MCELVAIN on behalf of All Defendants (MCELVAIN, JOEL) (Entered: 07/02/2018) |
| 07/11/2018 | <u>79</u> | NOTICE of Withdrawal of Appearance by ETHAN PRICE DAVIS on behalf of All Defendants (Attachments: # <u>1</u> Certificate of Service)(DAVIS, ETHAN) (Entered: 07/11/2018) |
| 11/26/2018 | <u>80</u> | NOTICE of Appearance by AIMEE D. THOMSON on behalf of COMMONWEALTH OF PENNSYLVANIA (THOMSON, AIMEE) (Entered: 11/26/2018) |
| 11/26/2018 | <u>81</u> | MOTION Lift Stay of Proceedings filed by COMMONWEALTH OF PENNSYLVANIA.Certificate of Service. (Attachments: # <u>1</u> Text of Proposed Order)(THOMSON, AIMEE) (Entered: 11/26/2018) |
| 12/07/2018 | <u>82</u> | RESPONSE to Motion re <u>81</u> MOTION Lift Stay of Proceedings filed by RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 12/07/2018) |
| 12/07/2018 | 83 | NOTICE OF STATUS CONFERENCE: STATUS CONFERENCE SET FOR 12/13/2018 03:30 PM IN COURTROOM 3B BEFORE THE HONORABLE WENDY BEETLESTONE.(amw, ) (Entered: 12/07/2018) |
| 12/10/2018 | <u>84</u> | MOTION Appear by Telephone filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Motion. (Attachments: # <u>1</u> Text of Proposed Order)(RIENZI, MARK) (Entered: 12/10/2018) |
| 12/10/2018 | <u>85</u> | RESPONSE in Opposition re <u>81</u> MOTION Lift Stay of Proceedings filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (Attachments: # <u>1</u> Exhibit Order, # <u>2</u> Exhibit Motion)(RIENZI, MARK) (Entered: 12/10/2018) |

| | | |
|---|---|---|
| 12/12/2018 | 86 | PAPERLESS ORDER DENYING 84 MOTION TO APPEAR BY TELEPHONE BY HONORABLE WENDY BEETLESTONE ON 12/12/2018.12/12/2018 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 12/12/2018) |
| 12/14/2018 | 87 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/14/18. 12/14/18 ENTERED AND COPIES E–MAILED.(mbh, ) (Entered: 12/14/2018) |
| 12/14/2018 | 88 | ORDER THAT PLAINTIFF'S MOTION TO LIFE STAY OF DISTRICT COURT PROCEEDINGS IS GRANTED AND THE CLERK SHALL TRANFER THIS CASE TO THE COURT'S ACTIVE DOCKET. IT IS FURTHER ORDERED THAT PLAINTIFF SHALL SUPPLEMENT OR AMEND ITS COMPLAINT AND FILE A MOTION FOR PRELIMINARY INJUNCTION NO LATER THAN 12/17/18. A HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION SHALL COMMENCE ON JANUARY 10, 2019 at 9:00 AM. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/14/18. 12/14/18 ENTERED AND COPIES E–MAILED.(mbh, ) . (Entered: 12/14/2018) |
| 12/14/2018 | 89 | AMENDED COMPLAINT for Declaratory and Injunctive Relief against RENE ALEXANDER ACOSTA, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, DONALD J. WRIGHT, ALEX M. AZAR, II, UNITED STATES OF AMERICA, filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (Attachments: # 1 Ex.A, # 2 Ex.B)(fdc) (Entered: 12/17/2018) |
| 12/14/2018 | | Three Summons Issued as to ALEX M. AZAR, II, UNITED STATES OF AMERICA, U.S. Attorney's Office. Forwarded To: Michael J. Fischer, PA Atty. General, U.S. Attorney's Office on 12/17/18. (fdc) (Entered: 12/17/2018) |
| 12/14/2018 | | MOTION HEARING SET FOR 1/10/2019 09:00 AM IN COURTROOM BEFORE HONORABLE WENDY BEETLESTONE. (mbh, ) (Entered: 12/18/2018) |
| 12/17/2018 | 90 | Second MOTION for Preliminary Injunction filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Index, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T, # 23 Exhibit U, # 24 Exhibit V, # 25 Exhibit W, # 26 Exhibit X)(FISCHER, MICHAEL) (Entered: 12/17/2018) |
| 12/17/2018 | 91 | MOTION for Leave to File Excess Pages filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.Memorandum. (Attachments: # 1 Text of Proposed Order, # 2 Memorandum)(FISCHER, MICHAEL) (Entered: 12/17/2018) |
| 12/18/2018 | 92 | APPLICATION for Admission Pro Hac Vice of Elspeth L.F. Hans by STATE OF NEW JERSEY. ( Filing fee $ 40 receipt number 0313–13234262.). (Attachments: # 1 Affidavit, # 2 Certificate of Service, # 3 Text of Proposed Order)(KREFETZ, MARC) (Entered: 12/18/2018) |
| 12/18/2018 | 93 | PAPERLESS ORDER GRANTING 91 MOTION FOR LEAVE TO FILE EXCESS PAGES BY HONORABLE WENDY BEETLESTONE ON 12/18/2018.12/18/2018 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 12/18/2018) |
| 12/19/2018 | 94 | Minute Entry for proceedings held before HONORABLE WENDY BEETLESTONEin Courtroom 3B. A Status Conference was held on 12/13/18. Court Reporter: Suzanne White/ESR. (fdc) (Entered: 12/19/2018) |
| 12/20/2018 | 95 | ORDER THAT ATTORNEY ELSPETH L.F. HANS APPLICATION FOR PRO HAC VICE FOR STATE OF NEW JERSEY IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/20/2018. 12/21/2018 ENTERED AND COPIES MAILED AND E–MAILED. ECF APP MAILED.(sg, ) (Entered: 12/21/2018) |
| 12/26/2018 | 96 | MOTION to Stay , MOTION for Extension of Time to File Answer filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE |

| | | TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Certificate of Service.(SANDBERG, JUSTIN) (Entered: 12/26/2018) |
|---|---|---|
| 12/26/2018 | 97 | MOTION for Extension of Time to File Answer filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Brief. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(RIENZI, MARK) (Entered: 12/26/2018) |
| 12/27/2018 | 98 | APPLICATION for Admission Pro Hac Vice of Glenn J Moramarco by STATE OF NEW JERSEY. ( Filing fee $ 40 receipt number 0313–13250752.). (KREFETZ, MARC) (Entered: 12/27/2018) |
| 12/27/2018 | 99 | RESPONSE in Opposition re 96 MOTION to Stay MOTION for Extension of Time to File Answer filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (FISCHER, MICHAEL) (Entered: 12/27/2018) |
| 12/27/2018 | 103 | ORDER THAT DEFTS' MOTION FOR STAY OF PROCEEDINGS OR IN THE ALTERNATIVE FOR EXTENSION OF THE ANSWER DEADLINE (ECF #96) IS GRANTED IN PART & DENIED IN PART. DEFTS' MOTION FOR EXTENSION OF THE ANSWER DEADLINE IS GRANTED. IT IS ORDERED THAT DEFTS HAVE UNTIL 2/28/2019 TO ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT. DEFTS' MOTION TO STAY IS DENIED. IT IS FURTHER ORDERED THAT INTERVENOR–DEFT'S MOTION TO EXTEND TIME TO RESPOND TO AMENDED COMPLAINT (ECF #97) IS GRANTED. INTERVENOR–DEFT HAS UNTIL 2/28/2019 TO ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT, ETC. SIGNED BY HONORABLE WENDY BEETLESTONE ON 12/27/18. 12/28/18 ENTERED AND COPIES E–MAILED.(kw, ) (Entered: 12/28/2018) |
| 12/28/2018 | 100 | REPLY to Response to Motion re 96 MOTION to Stay MOTION for Extension of Time to File Answer filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 12/28/2018) |
| 12/28/2018 | 101 | CERTIFICATE of Counsel *certifying motion as unopposed* by MARK L. RIENZI on behalf of LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME(RIENZI, MARK) (Entered: 12/28/2018) |
| 12/28/2018 | 102 | CERTIFICATE of Counsel re 97 MOTION for Extension of Time to File Answer *certifying motion as unopposed* by MARK L. RIENZI on behalf of LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME(RIENZI, MARK) (FILED IN ERROR BY ATTY; DUPLICATE ENTRY) Modified on 1/2/2019 (md). (Entered: 12/28/2018) |
| 12/31/2018 | 104 | MOTION for Leave to File Excess Pages filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.. (Attachments: # 1 Text of Proposed Order)(RIENZI, MARK) (Entered: 12/31/2018) |
| 01/02/2019 | 105 | PAPERLESS ORDER GRANTING 104 MOTION FOR LEAVE TO FILE EXCESS PAGES BY HONORABLE WENDY BEETLESTONE ON 01/02/2018.01/02/2018 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 01/02/2019) |
| 01/03/2019 | 106 | Acceptance of Service by U.S. Attorney Re: accepted summons and complaint on behalf of the United States Attorney (only). (fdc, ) (Entered: 01/03/2019) |
| 01/03/2019 | 107 | MOTION for Leave to File Excess Pages filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Certificate of Service. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 01/03/2019) |
| 01/03/2019 | 108 | RESPONSE in Opposition re 90 Second MOTION for Preliminary Injunction filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(RIENZI, MARK) (Entered: |

| | | |
|---|---|---|
| | | 01/03/2019) |
| 01/04/2019 | 109 | PAPERLESS ORDER GRANTING 107 MOTION FOR LEAVE TO FILE EXCESS PAGES BY HONORABLE WENDY BEETLESTONE ON 01/04/2019.01/04/2019 ENTERED AND COPIES MAILED AND E–MAILED.(amw,) (Entered: 01/04/2019) |
| 01/07/2019 | 110 | Consent MOTION to File Amicus Brief and to Appear Amici Curiae filed by PHYSICIANS FOR REPRODUCTIVE HEALTH, AMERICAN ACADEMY OF NURSING, AMERICAN ACADEMY OF PEDIATRICS, AMERICAN COLLEGE OF OBSTETRICIANS & GYNECOLOGISTS, AMERICAN NURSES ASSOCIATION, Certificate of Service. (Attachments: # 1 Memorandum in Support of Motion for Leave, # 2 Exhibit A, Brief Amici Curiae, # 3 Text of Proposed Order)(MATHEWSON, LISA) Modified on 1/8/2019 (md). (Entered: 01/07/2019) |
| 01/07/2019 | 111 | MOTION for Pro Hac Vice *of Leah R. Bruno* filed by NATIONAL ASSOCIATION FOR FEMALE EXECUTIVES, U.S. WOMEN'S CHAMBER OF COMMERCE.Certificate of Service. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(FELDMAN, JEFFREY) (Filing Fee Paid) Modified 1/8/19 (fdc). (Entered: 01/07/2019) |
| 01/07/2019 | 112 | Consent MOTION to File Amicus Brief *and to Appear as Amici Curiae* filed by NATIONAL ASSOCIATION FOR FEMALE EXECUTIVES, U.S. WOMEN'S CHAMBER OF COMMERCE.Certificate of Service. (Attachments: # 1 Memorandum in Support of Motion for Leave, # 2 Exhibit A to Memorandum (Brief of Amici Curiae), # 3 Text of Proposed Order)(FELDMAN, JEFFREY) (Entered: 01/07/2019) |
| 01/07/2019 | 113 | Consent MOTION to File Amicus Brief filed by COMMONWEALTH OF MASSACHUSETTS, COMMONWEALTH OF VIRGINIA, DISTRICT OF COLUMBIA, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF IOWA, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON.Brief. (Attachments: # 1 Brief Amici Curiae Brief of Massachusetts et al., # 2 Text of Proposed Order)(MILLER, JONATHAN) (Entered: 01/07/2019) |
| 01/07/2019 | 114 | Request to Manually File Supplemented Admin. Record by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (Attachments: # 1 Exhibit, # 2 Exhibit)(SANDBERG, JUSTIN) (Entered: 01/07/2019) |
| 01/07/2019 | 115 | MOTION to File Amicus Brief *on behalf of Amici Curiae the National Women's Law Center, the National Latina Institute for Reproductive Health, SisterLove, Inc., and the National Asian Pacific American Women's Forum in support of Plaintiffs' Motion for a Preliminary Injunction* filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.Brief, Certificate of Service. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Corporate Disclosure Statement)(KAPLAN, MICHAEL) (Entered: 01/07/2019) |
| 01/07/2019 | 116 | NOTICE of Appearance by MICHAEL A. KAPLAN on behalf of THE NATIONAL WOMEN'S LAW CENTER, THE NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH, SISTERLOVE, INC., AND THE NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM with Certificate of Service (Attachments: # 1 Certificate of Service)(KAPLAN, MICHAEL) Modified 2/15/19 (fdc). (Entered: 01/07/2019) |
| 01/07/2019 | 117 | Consent MOTION to File Amicus Brief filed by CALIFORNIA WOMEN LAWYERS, GIRLS INC., IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, LAWYERS CLUB OF SAN DIEGO, SERVICE EMPLOYEES INTERNATIONAL UNION, THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL–CIO), THE AMERICAN FEDERATION OF TEACHERS, THE COLORADO WOMENS BAR ASSOCIATION, THE NATIONAL ASSOCIATION OF SOCIAL WORKERS, THE NATIONAL |

| | | |
|---|---|---|
| | | ASSOCIATION OF WOMEN LAWYERS, THE WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA, THE WOMENS BAR ASSOCIATION OF MASSACHUSETTS.Memorandum, Proposed Brief, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Brief [Proposed] Brief of Amici Curiae, # 3 Text of Proposed Order)(LEVITT, JAMIE) (Entered: 01/07/2019) |
| 01/07/2019 | 118 | MOTION for Leave to File Excess Pages filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.. (Attachments: # 1 Text of Proposed Order, # 2 Memorandum, # 3 Exhibit)(FISCHER, MICHAEL) (Entered: 01/07/2019) |
| 01/07/2019 | 126 | Supplemental Administrative Record. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(fdc, ) (Additional attachment(s) added on 1/9/2019: # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit, # 60 Exhibit, # 61 Exhibit, # 62 Exhibit, # 63 Exhibit, # 64 Exhibit, # 65 Exhibit, # 66 Exhibit, # 67 Exhibit, # 68 Exhibit, # 69 Exhibit, # 70 Exhibit, # 71 Exhibit, # 72 Exhibit, # 73 Exhibit, # 74 Exhibit, # 75 Exhibit, # 76 Exhibit, # 77 Exhibit, # 78 Exhibit, # 79 Exhibit, # 80 Exhibit, # 81 Exhibit, # 82 Exhibit, # 83 Exhibit, # 84 Exhibit, # 85 Exhibit, # 86 Exhibit, # 87 Exhibit, # 88 Exhibit) (fdc, ). (Additional attachment(s) added on 1/9/2019: # 89 Exhibit, # 90 Exhibit, # 91 Exhibit, # 92 Exhibit) (fdc, ). (Additional attachment(s) added on 1/10/2019: # 93 Exhibit, # 94 Exhibit) (fdc, ). (Additional attachment(s) added on 1/10/2019: # 95 Exhibit, # 96 Exhibit, # 97 Exhibit, # 98 Exhibit, # 99 Exhibit, # 100 Exhibit, # 101 Exhibit, # 102 Exhibit, # 103 Exhibit, # 104 Exhibit) (fdc, ). (Additional attachment(s) added on 1/10/2019: # 105 Exhibit, # 106 Exhibit, # 107 Exhibit, # 108 Exhibit, # 109 Exhibit, # 110 Exhibit, # 111 Exhibit) (fdc, ). (Additional attachment(s) added on 1/10/2019: # 112 Exhibit, # 113 Exhibit, # 114 Exhibit, # 115 Exhibit, # 116 Exhibit, # 117 Exhibit, # 118 Exhibit, # 119 Exhibit, # 120 Exhibit, # 121 Exhibit, # 122 Exhibit, # 123 Exhibit, # 124 Exhibit, # 125 Exhibit, # 126 Exhibit, # 127 Exhibit, # 128 Exhibit, # 129 Exhibit, # 130 Exhibit, # 131 Exhibit, # 132 Exhibit, # 133 Exhibit, # 134 Exhibit, # 135 Exhibit, # 136 Exhibit, # 137 Exhibit, # 138 Exhibit, # 139 Exhibit, # 140 Exhibit, # 141 Exhibit, # 142 Exhibit, # 143 Exhibit, # 144 Exhibit, # 145 Exhibit, # 146 Exhibit, # 147 Exhibit, # 148 Exhibit, # 149 Exhibit, # 150 Exhibit, # 151 Exhibit, # 152 Exhibit, # 153 Exhibit, # 154 Exhibit, # 155 Exhibit, # 156 Exhibit, # 157 Exhibit, # 158 Exhibit, # 159 Exhibit, # 160 Exhibit, # 161 Exhibit, # 162 Exhibit, # 163 Exhibit, # 164 Exhibit, # 165 Exhibit, # 166 Exhibit, # 167 Exhibit, # 168 Exhibit) (fdc, ). (Additional attachment(s) added on 1/15/2019: # 169 Exhibit, # 170 Exhibit, # 171 Exhibit, # 172 Exhibit, # 173 Exhibit, # 174 Exhibit, # 175 Exhibit, # 176 Exhibit, # 177 Exhibit, # 178 Exhibit, # 179 Exhibit, # 180 Exhibit, # 181 Exhibit, # 182 Exhibit, # 183 Exhibit, # 184 Exhibit, # 185 Exhibit, # 186 Exhibit, # 187 Exhibit, # 188 Exhibit, # 189 Exhibit, # 190 Exhibit, # 191 Exhibit, # 192 Exhibit, # 193 Exhibit, # 194 Exhibit, # 195 Exhibit, # 196 Exhibit, # 197 Exhibit, # 198 Exhibit, # 199 Exhibit, # 200 Exhibit, # 201 Exhibit, # 202 Exhibit, # 203 Exhibit, # 204 Exhibit, # 205 Exhibit, # 206 Exhibit, # 207 Exhibit, # 208 Exhibit, # 209 Exhibit, # 210 Exhibit, # 211 Exhibit, # 212 Exhibit, # 213 Exhibit, # 214 Exhibit, # 215 Exhibit, # 216 Exhibit, # 217 Exhibit, # 218 Exhibit, # 219 Exhibit, # 220 Exhibit, # 221 Exhibit, # 222 Exhibit, # 223 Exhibit, # 224 Exhibit, # 225 Exhibit, # 226 Exhibit, # 227 Exhibit) (fdc, ). (Additional attachment(s) added on 1/16/2019: # 228 Exhibit, # 229 Exhibit, # 230 Exhibit, # 231 Exhibit, # 232 Exhibit, # 233 Exhibit, # 234 Exhibit, # 235 Exhibit, # 236 Exhibit, # 237 Exhibit, # 238 Exhibit, # 239 Exhibit, # 240 Exhibit, # 241 Exhibit, # 242 Exhibit, # 243 Exhibit, # 244 Exhibit, # 245 Exhibit, # 246 Exhibit, # 247 Exhibit, # 248 Exhibit, # 249 Exhibit, # 250 Exhibit, # 251 Exhibit, # 252 Exhibit, # 253 Exhibit, # 254 Exhibit, # 255 Exhibit, # 256 Exhibit, # 257 Exhibit, # 258 Exhibit, # 259 Exhibit, # 260 Exhibit, # 261 Exhibit, # 262 Exhibit, # 263 Exhibit, # 264 Exhibit, # 265 Exhibit, # 266 Exhibit, # 267 Exhibit, # 268 Exhibit, # 269 Exhibit, # 270 Exhibit, # 271 Exhibit, # 272 Exhibit, # 273 Exhibit, # 274 Exhibit, # 275 Exhibit, # 276 Exhibit, # 277 Exhibit, # 278 Exhibit, # 279 Exhibit, # 280 Exhibit, # 281 Exhibit, # 282 Exhibit, # 283 Exhibit, # 284 Exhibit, # 285 Exhibit, # 286 Exhibit, |

# 287 Exhibit) (fdc, ). (Additional attachment(s) added on 1/22/2019: # 288 Exhibit, # 289 Exhibit, # 290 Exhibit, # 291 Exhibit, # 292 Exhibit, # 293 Exhibit, # 294 Exhibit, # 295 Exhibit, # 296 Exhibit, # 297 Exhibit, # 298 Exhibit, # 299 Exhibit, # 300 Exhibit, # 301 Exhibit, # 302 Exhibit, # 303 Exhibit, # 304 Exhibit, # 305 Exhibit, # 306 Exhibit, # 307 Exhibit, # 308 Exhibit, # 309 Exhibit, # 310 Exhibit, # 311 Exhibit, # 312 Exhibit, # 313 Exhibit, # 314 Exhibit, # 315 Exhibit, # 316 Exhibit, # 317 Exhibit, # 318 Exhibit, # 319 Exhibit, # 320 Exhibit, # 321 Exhibit, # 322 Exhibit, # 323 Exhibit, # 324 Exhibit, # 325 Exhibit, # 326 Exhibit, # 327 Exhibit, # 328 Exhibit, # 329 Exhibit, # 330 Exhibit, # 331 Exhibit, # 332 Exhibit, # 333 Exhibit, # 334 Exhibit, # 335 Exhibit, # 336 Exhibit, # 337 Exhibit, # 338 Exhibit, # 339 Exhibit, # 340 Exhibit, # 341 Exhibit, # 342 Exhibit, # 343 Exhibit, # 344 Exhibit, # 345 Exhibit, # 346 Exhibit, # 347 Exhibit, # 348 Exhibit, # 349 Exhibit, # 350 Exhibit, # 351 Exhibit, # 352 Exhibit, # 353 Exhibit, # 354 Exhibit, # 355 Exhibit, # 356 Exhibit, # 357 Exhibit, # 358 Exhibit, # 359 Exhibit, # 360 Exhibit, # 361 Exhibit, # 362 Exhibit, # 363 Exhibit, # 364 Exhibit, # 365 Exhibit, # 366 Exhibit, # 367 Exhibit, # 368 Exhibit, # 369 Exhibit, # 370 Exhibit, # 371 Exhibit, # 372 Exhibit, # 373 Exhibit, # 374 Exhibit, # 375 Exhibit, # 376 Exhibit, # 377 Exhibit, # 378 Exhibit, # 379 Exhibit, # 380 Exhibit, # 381 Exhibit, # 382 Exhibit, # 383 Exhibit, # 384 Exhibit, # 385 Exhibit, # 386 Exhibit, # 387 Exhibit, # 388 Exhibit) (fdc, ). (Additional attachment(s) added on 1/29/2019: # 389 Exhibit, # 390 Exhibit, # 391 Exhibit, # 392 Exhibit, # 393 Exhibit, # 394 Exhibit, # 395 Exhibit, # 396 Exhibit, # 397 Exhibit, # 398 Exhibit, # 399 Exhibit, # 400 Exhibit, # 401 Exhibit, # 402 Exhibit, # 403 Exhibit, # 404 Exhibit, # 405 Exhibit) (fdc, ). (Additional attachment(s) added on 2/5/2019: # 406 Exhibit, # 407 Exhibit, # 408 Exhibit, # 409 Exhibit, # 410 Exhibit, # 411 Exhibit, # 412 Exhibit, # 413 Exhibit, # 414 Exhibit, # 415 Exhibit, # 416 Exhibit, # 417 Exhibit, # 418 Exhibit, # 419 Exhibit, # 420 Exhibit, # 421 Exhibit, # 422 Exhibit, # 423 Exhibit, # 424 Exhibit, # 425 Exhibit, # 426 Exhibit, # 427 Exhibit, # 428 Exhibit, # 429 Exhibit, # 430 Exhibit, # 431 Exhibit, # 432 Exhibit, # 433 Exhibit, # 434 Exhibit, # 435 Exhibit, # 436 Exhibit, # 437 Exhibit, # 438 Exhibit, # 439 Exhibit, # 440 Exhibit, # 441 Exhibit, # 442 Exhibit, # 443 Exhibit, # 444 Exhibit, # 445 Exhibit, # 446 Exhibit, # 447 Exhibit, # 448 Exhibit, # 449 Exhibit, # 450 Exhibit, # 451 Exhibit, # 452 Exhibit, # 453 Exhibit, # 454 Exhibit, # 455 Exhibit, # 456 Exhibit, # 457 Exhibit, # 458 Exhibit, # 459 Exhibit, # 460 Exhibit, # 461 Exhibit, # 462 Exhibit, # 463 Exhibit, # 464 Exhibit, # 465 Exhibit, # 466 Exhibit, # 467 Exhibit, # 468 Exhibit, # 469 Exhibit, # 470 Exhibit, # 471 Exhibit, # 472 Exhibit, # 473 Exhibit, # 474 Exhibit, # 475 Exhibit, # 476 Exhibit, # 477 Exhibit, # 478 Exhibit, # 479 Exhibit, # 480 Exhibit, # 481 Exhibit, # 482 Exhibit, # 483 Exhibit, # 484 Exhibit, # 485 Exhibit, # 486 Exhibit, # 487 Exhibit, # 488 Exhibit, # 489 Exhibit, # 490 Exhibit, # 491 Exhibit, # 492 Exhibit, # 493 Exhibit, # 494 Exhibit, # 495 Exhibit, # 496 Exhibit, # 497 Exhibit, # 498 Exhibit, # 499 Exhibit, # 500 Exhibit, # 501 Exhibit, # 502 Exhibit, # 503 Exhibit, # 504 Exhibit, # 505 Exhibit, # 506 Exhibit) (fdc, ). (Additional attachment(s) added on 2/27/2019: # 507 Exhibit, # 508 Exhibit, # 509 Exhibit, # 510 Exhibit, # 511 Exhibit, # 512 Exhibit, # 513 Exhibit, # 514 Exhibit, # 515 Exhibit, # 516 Exhibit, # 517 Exhibit, # 518 Exhibit, # 519 Exhibit, # 520 Exhibit, # 521 Exhibit, # 522 Exhibit, # 523 Exhibit, # 524 Exhibit, # 525 Exhibit, # 526 Exhibit, # 527 Exhibit, # 528 Exhibit, # 529 Exhibit, # 530 Exhibit, # 531 Exhibit, # 532 Exhibit, # 533 Exhibit, # 534 Exhibit, # 535 Exhibit, # 536 Exhibit, # 537 Exhibit, # 538 Exhibit, # 539 Exhibit, # 540 Exhibit, # 541 Exhibit, # 542 Exhibit, # 543 Exhibit, # 544 Exhibit, # 545 Exhibit, # 546 Exhibit, # 547 Exhibit, # 548 Exhibit, # 549 Exhibit, # 550 Exhibit, # 551 Exhibit, # 552 Exhibit, # 553 Exhibit, # 554 Exhibit, # 555 Exhibit, # 556 Exhibit, # 557 Exhibit, # 558 Exhibit) (fdc, ). (Additional attachment(s) added on 4/3/2019: # 559 Exhibit, # 560 Exhibit, # 561 Exhibit, # 562 Exhibit, # 563 Exhibit, # 564 Exhibit, # 565 Exhibit, # 566 Exhibit, # 567 Exhibit, # 568 Exhibit, # 569 Exhibit, # 570 Exhibit, # 571 Exhibit, # 572 Exhibit, # 573 Exhibit, # 574 Exhibit, # 575 Exhibit, # 576 Exhibit, # 577 Exhibit, # 578 Exhibit, # 579 Exhibit, # 580 Exhibit, # 581 Exhibit, # 582 Exhibit, # 583 Exhibit, # 584 Exhibit, # 585 Exhibit, # 586 Exhibit, # 587 Exhibit, # 588 Exhibit, # 589 Exhibit, # 590 Exhibit, # 591 Exhibit, # 592 Exhibit, # 593 Exhibit, # 594 Exhibit, # 595 Exhibit, # 596 Exhibit, # 597 Exhibit, # 598 Exhibit, # 599 Exhibit, # 600 Exhibit, # 601 Exhibit, # 602 Exhibit, # 603 Exhibit, # 604 Exhibit, # 605 Exhibit, # 606 Exhibit, # 607 Exhibit, # 608 Exhibit, # 609 Exhibit, # 610 Exhibit, # 611 Exhibit, # 612 Exhibit, # 613 Exhibit, # 614 Exhibit, # 615 Exhibit) (fdc, ). (Entered: 01/08/2019)

| | | |
|---|---|---|
| 01/08/2019 | 119 | ORDER THAT THE CONSENT 117 MOTION FOR LEAVE TO APPEAR AS AMICI CURIAE AND TO FILE A BRIEF AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION BY AMERICAN NURSES ASSOCIATION, AMERICAN COLLEGE OF OBSTETRICIANS & GYNECOLOGISTS, AMERICAN ACADEMY OF NURSING, AMERICAN ACADEMY OF PEDIATRICS, AND PHYSICIANS FOR REPRODUCTIVE HEALTH IS GRANTED. THE BRIEF AMICI CURIAE ATTACHED AS EXHIBIT A TO THE MEMORANDUM IN SUPPORT OF THE MOTION IS HEREBY ACCEPTED FOR FILING. SIGNED BY HONORABLE WENDY BEETLESTONE ON 1/7/19.1/8/19 ENTERED & E−MAILED.(fdc) (Entered: 01/08/2019) |
| 01/08/2019 | 120 | PAPERLESS ORDER GRANTING 110 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 01/08/2019.01/08/2019 ENTERED AND COPIES E−MAILED.(amw, ) (Entered: 01/08/2019) |
| 01/08/2019 | 121 | PAPERLESS ORDER GRANTING 112 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 01/08/2019.01/08/2019 ENTERED AND COPIES E−MAILED.(amw, ) (Entered: 01/08/2019) |
| 01/08/2019 | 122 | PAPERLESS ORDER GRANTING 113 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 01/08/2019.01/08/2019 ENTERED AND COPIES E−MAILED.(amw, ) (Entered: 01/08/2019) |
| 01/08/2019 | 123 | PAPERLESS ORDER GRANTING 115 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 01/08/2019.01/08/2019 ENTERED AND COPIES E−MAILED.(amw, ) (Entered: 01/08/2019) |
| 01/08/2019 | 124 | PAPERLESS ORDER granting 118 MOTION FOR LEAVE TO FILE EXCESS PAGES BY HONORABLE WENDY BEETLESTONE ON 01/08/2019.01/08/2019 ENTERED AND COPIES E−MAILED.(amw, ) (Entered: 01/08/2019) |
| 01/08/2019 | 125 | ORDER THAT THE APPLICATION OF LEAH R. BRUNO, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(b) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 1/8/19.1/8/19 ENTERED AND COPIES MAILED & E−MAILED. ECF APPLICATION MAILED TO BRUNO. (fdc) (Entered: 01/08/2019) |
| 01/09/2019 | 127 | Consent MOTION to File Amicus Brief *(Corrected Version of ECF No. 117)* filed by CALIFORNIA WOMEN LAWYERS, GIRLS INC., IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, LAWYERS CLUB OF SAN DIEGO, SERVICE EMPLOYEES INTERNATIONAL UNION, THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL−CIO), THE AMERICAN FEDERATION OF TEACHERS, THE COLORADO WOMENS BAR ASSOCIATION, THE NATIONAL ASSOCIATION OF SOCIAL WORKERS, THE NATIONAL ASSOCIATION OF WOMEN LAWYERS, THE WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA, THE WOMENS BAR ASSOCIATION OF MASSACHUSETTS.Memorandum, Amicus Brief, Certificate of Service. (Attachments: # 1 Memorandum (Corrected Memorandum in Support of Motion for Leave to Appear as Amici Curiae and to File an Amicus Brief), # 2 Brief (Corrected Brief of Amici Curiae), # 3 Text of Proposed Order)(LEVITT, JAMIE) (Entered: 01/09/2019) |
| 01/09/2019 | 128 | PAPERLESS ORDER granting 127 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 01/09/2019.01/09/2019 ENTERED AND COPIES E−MAILED.(amw, ) (Entered: 01/09/2019) |
| 01/10/2019 | 129 | ORDER THAT THE APPLICATION OF GLENN J. MORAMARCO, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 1/10/19. 1/10/19 ENTERED AND COPIES MAILED AND E−MAILED.(fdc) (Entered: 01/10/2019) |
| 01/10/2019 | 130 | Entry of Appearance by GLENN J. MORAMARCO on behalf of STATE OF NEW JERSEY. (fdc) (Entered: 01/10/2019) |
| 01/10/2019 | 131 | Minute Entry for proceedings held before HONORABLE WENDY BEETLESTONE. Preliminary Injunction Hearing held on 1/10/19. Court Reporter: K. Feldman/ESR. (fdc) (Entered: 01/10/2019) |

| | | |
|---|---|---|
| 01/10/2019 | 132 | Consent MOTION to Amend/Correct 108 Response in Opposition to Motion *Exhibit A* filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.. (Attachments: # 1 Errata Exhibit A, # 2 Text of Proposed Order)(RIENZI, MARK) (Entered: 01/10/2019) |
| 01/14/2019 | 133 | NOTICE by COMMONWEALTH OF PENNSYLVANIA *of decision in California, et al. v. HHS, et al. (No. 17−5783) (N.D.Cal.)* (Attachments: # 1 Exhibit Memorandum and Order (No. 17−5783) (N.D.Cal. Jan. 13, 2019))(THOMSON, AIMEE) (Entered: 01/14/2019) |
| 01/14/2019 | 134 | NOTICE of Withdrawal of Appearance by LAUREN E. SULCOVE on behalf of COMMONWEALTH OF PENNSYLVANIA(SULCOVE, LAUREN) (Entered: 01/14/2019) |
| 01/14/2019 | 135 | ORDER THAT PLAINTIFFS' SECOND MOTION FOR A PRELIMINARY INJUNCTION (ECF NO. 90 ) IS GRANTED AS OUTLINED HEREIN. SIGNED BY HONORABLE WENDY BEETLESTONE ON 01/14/2019. 01/14/2019 ENTERED AND COPIES MAILED AND E−MAILED.(nd, ) (Entered: 01/14/2019) |
| 01/14/2019 | 136 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE WENDY BEETLESTONE ON 01/14/2019. 01/14/2019 ENTERED AND COPIES MAILED AND E−MAILED.(nd, ) (Entered: 01/14/2019) |
| 01/14/2019 | 137 | PAPERLESS ORDER GRANTING 132 MOTION TO AMEND/CORRECT BY HONORABLE WENDY BEETLESTONE ON 01/14/2019.01/14/2019 ENTERED AND COPIES E−MAILED.(amw, ) (Entered: 01/14/2019) |
| 01/14/2019 | 138 | NOTICE OF APPEAL as to 135 Order (Memorandum and/or Opinion), 136 Memorandum and/or Opinion by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. . (No ifp or filing fee paid) Copies to Judge, Clerk USCA, Appeals Clerk (RIENZI, MARK) Modified on 1/16/2019 (lvj, ). (Entered: 01/14/2019) |
| 01/22/2019 | | USCA Appeal Fees received $ 505 receipt number 191199 re 138 Notice of Appeal, filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME (fdc, ) (Entered: 01/22/2019) |
| 01/23/2019 | 139 | NOTICE OF APPEAL as to 135 Order (Memorandum and/or Opinion), 136 Memorandum and/or Opinion by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, Copies to Judge, Clerk USCA, Appeals Clerk and (SANDBERG, JUSTIN) Modified on 1/23/2019 (lvj, ). Modified on 1/24/2019 (nd, ). (Entered: 01/23/2019) |
| 01/23/2019 | 140 | NOTICE of Docketing Record on Appeal from USCA re 138 Notice of Appeal, filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. USCA Case Number 19−1129 (dmc, ) (Entered: 01/23/2019) |
| 01/24/2019 | 141 | NOTICE of Docketing Record on Appeal from USCA re 139 Notice of Appeal, filed by RENE ALEXANDER ACOSTA, UNITED STATES DEPARTMENT OF LABOR, STEVEN T. MNUCHIN, ALEX M. AZAR, II, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES. USCA Case Number 19−1189 (dmc, ) (Entered: 01/24/2019) |
| 02/13/2019 | 142 | APPLICATION for Admission Pro Hac Vice of Jeffrey Blumenfeld by NATIONAL WOMEN'S LAW CENTER. (Attachments: # 1 Jeffrey Blumenfeld DC Bar Cert. of Good Standing)(KAPLAN, MICHAEL) (Filing Fee Not Paid/Letter Sent) Modified 2/15/19 (fdc). Modified 2/15/19 (fdc). (FILING FEE PAID) Modified 3/4/19 (fdc). (Entered: 02/13/2019) |
| 02/14/2019 | 143 | MOTION to Stay *Proceedings* filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Memorandum. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 02/14/2019) |

| | | |
|---|---|---|
| 02/14/2019 | 144 | MOTION for Extension of Time to File Answer filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 02/14/2019) |
| 02/15/2019 | 145 | MOTION for Pro Hac Vice *Admission of Eric C. Rassbach* ( Filing fee $ 40 receipt number 0313–13355878.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 02/15/2019) |
| 02/15/2019 | 146 | MOTION for Pro Hac Vice *Admission of Diana M. Verm* ( Filing fee $ 40 receipt number 0313–13355892.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 02/15/2019) |
| 02/22/2019 | 147 | ORDER THAT THE APPLICATION OF ERIC C. RASSBACH, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 2/22/19.2/22/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO RASSBACH. (fdc) (Entered: 02/22/2019) |
| 02/22/2019 | 148 | ORDER THAT THE APPLICATION OF JEFFREY BLUMENFELD, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 2/22/19. 2/25/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO BLUMENFELD. (fdc) (Entered: 02/25/2019) |
| 02/22/2019 | 149 | ORDER THAT THE APPLICATION OF DIANA M. VERM, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 2/22/19.2/25/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO VERM. (fdc) (Entered: 02/25/2019) |
| 02/26/2019 | 150 | Consent MOTION for Extension of Time to File Answer filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.. (Attachments: # 1 Text of Proposed Order)(RIENZI, MARK) Modified on 3/5/2019 (lvj, ). (Entered: 02/26/2019) |
| 02/28/2019 | 151 | ORDER THAT DEFENDANTS SHALL HAVE UNTIL 3/29/19 TO ANSWER OR OTHERWISE RESPOND TO PLAINTIFFS' AMENDED COMPLAINT. SIGNED BY HONORABLE WENDY BEETLESTONE ON 2/28/19. 2/28/19 ENTERED AND COPIES MAILED & E–MAILED.(fdc) (Entered: 02/28/2019) |
| 02/28/2019 | 152 | RESPONSE in Opposition re 143 MOTION to Stay *Proceedings* filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (Attachments: # 1 Exhibit)(FISCHER, MICHAEL) (Entered: 02/28/2019) |
| 03/06/2019 | 153 | ORDER THAT FEDERAL DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING APPEAL 143 IS DENIED. IT IS FURTHER ORDERED, IN LIGHT OF THE COURT'S 2/28/19 ORDER PROVIDING DEFENDANTS UNTIL 3/29/19 TO ANSWER OR OTHERWISE RESPOND TO PLAINTIFFS' AMENDED COMPLAINT, THAT FEDERAL DEFENDANTS' MOTION FOR AN EXTENSION OF THE DEADLINE TO ANSWER OR OTHERWISE RESPOND TO THE AMENDED COMPLAINT 144 IS DENIED AS MOOT. SIGNED BY HONORABLE WENDY BEETLESTONE ON 3/6/19.3/6/19 ENTERED AND COPIES MAILED & E–MAILED.(fdc) (Entered: 03/06/2019) |
| 03/07/2019 | 154 | TRANSCRIPT of Oral Argument held on 1/10/19, before Judge Beetlestone. Court Reporter/Transcriber: Kathleen Feldman. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 3/28/2019. Redacted Transcript Deadline set for 4/8/2019. Release of Transcript Restriction set for 6/5/2019. (fdc) (Entered: 03/07/2019) |

| 03/07/2019 | <u>155</u> | Notice of Filing of Official Transcript with Certificate of Service re <u>154</u> Transcript – PDF, 3/7/19 Entered and Copies Emailed and Mailed. (fdc) (Entered: 03/07/2019) |
| 03/13/2019 | <u>156</u> | NOTICE OF CONFERENCE: PRETRIAL CONFERENCE SET FOR 4/4/2019 10:00 AM IN COURTROOM 3B BEFORE HONORABLE WENDY BEETLESTONE. (Attachments: # <u>1</u> Electronic Discovery Order, # <u>2</u> Joint Report and Discovery Plan)(amw, ) (Entered: 03/13/2019) |
| 03/28/2019 | <u>157</u> | MOTION to Dismiss *for Lack of Jurisdiction and Improper Venue* filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Memorandum, Certificate of Service. (Attachments: # <u>1</u> Memorandum, # <u>2</u> Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 03/28/2019) |
| 03/28/2019 | <u>158</u> | Discovery Plan by COMMONWEALTH OF PENNSYLVANIA.(FISCHER, MICHAEL) (Entered: 03/28/2019) |
| 03/29/2019 | <u>159</u> | MOTION to Dismiss filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service. (Attachments: # <u>1</u> Memorandum, # <u>2</u> Exhibit, # <u>3</u> Text of Proposed Order)(RIENZI, MARK) (Entered: 03/29/2019) |
| 04/05/2019 | <u>160</u> | Minute Entry for proceedings held before HONORABLE WENDY BEETLESTONE. A Preliminary Pretrial Conference was held on 4/4/19. Court Reporter: ESR. (fdc) (Entered: 04/05/2019) |
| 04/05/2019 | <u>161</u> | SCHEDULING ORDER. ORDER THAT BY 5/1/19, PLAINTIFFS SHALL FILE EITHER A MOTION TO PERMIT DISCOVERY, OR A NOTIFICATION THAT NO DISCOVERY IS NEEDED. IF THE COURT GRANTS PLAINTIFFS' MOTION TO PERMIT DISCOVERY, THE PARTIES SHALL HAVE NINETY (90( DAYS TO ENGAGE IN DISCOVERY, TO COMMENCE FROM THE DATE OF THE COURT'S ORDER GRANTING DISCOVERY. SIGNED BY HONORABLE WENDY BEETLESTONE ON 4/4/19. 4/5/19 ENTERED & E–MAILED.(fdc) (Entered: 04/05/2019) |
| 04/12/2019 | <u>162</u> | RESPONSE in Opposition re <u>159</u> MOTION to Dismiss , <u>157</u> MOTION to Dismiss *for Lack of Jurisdiction and Improper Venue* filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (FISCHER, MICHAEL) (Entered: 04/12/2019) |
| 04/18/2019 | <u>163</u> | REPLY to Response to Motion re <u>159</u> MOTION to Dismiss filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (RIENZI, MARK) (Entered: 04/18/2019) |
| 04/19/2019 | <u>164</u> | REPLY to Response to Motion re <u>157</u> MOTION to Dismiss *for Lack of Jurisdiction and Improper Venue* filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 04/19/2019) |
| 05/02/2019 | <u>165</u> | NOTICE by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY *regarding discovery* (FISCHER, MICHAEL) (Entered: 05/02/2019) |
| 05/02/2019 | <u>166</u> | NOTICE by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY re <u>165</u> Notice (Other) *Corrected Notice Regarding Discovery* (FISCHER, MICHAEL) (Entered: 05/02/2019) |
| 05/09/2019 | <u>167</u> | TRANSCRIPT of Preliminary Pre–Trial Conference held on 4/4/19, before Judge Beetlestone. Court Reporter/Transcriber: Neal R. Gross. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/30/2019. Redacted Transcript Deadline set for 6/10/2019. Release of Transcript Restriction set for 8/7/2019. (fdc, ) (Entered: 05/09/2019) |

| 05/09/2019 | 168 | Notice of Filing of Official Transcript with Certificate of Service re 167 Transcript – PDF, 5/9/19 Entered and Copies Emailed and Mailed. (fdc) (Entered: 05/09/2019) |
|---|---|---|
| 05/15/2019 | 169 | Exhibit List *Index to Joint Appendix* by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.. (Attachments: # 1 Appendix Joint Appendix Part I, # 2 Appendix Joint Appendix Part II, # 3 Appendix Joint Appendix Part III, # 4 Appendix Joint Appendix Part IV, # 5 Appendix Joint Appendix Part V, # 6 Appendix Joint Appendix Part VI, # 7 Appendix Joint Appendix Part VII, # 8 Appendix Joint Appendix Part VIII, # 9 Appendix Joint Appendix Part IX, # 10 Appendix Joint Appendix Part X)(FISCHER, MICHAEL) (Entered: 05/15/2019) |
| 05/15/2019 | 170 | MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.Memorandum. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order, # 3 Statement of Facts)(FISCHER, MICHAEL) (Entered: 05/15/2019) |
| 05/16/2019 | 171 | NOTICE by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY re 162 Response in Opposition to Motion, 159 MOTION to Dismiss , 157 MOTION to Dismiss *for Lack of Jurisdiction and Improper Venue Notice of Supplemental Authority* (Attachments: # 1 Exhibit)(FISCHER, MICHAEL) (Entered: 05/16/2019) |
| 05/22/2019 | 172 | NOTICE of Withdrawal of Appearance by JONATHAN SCOTT GOLDMAN on behalf of COMMONWEALTH OF PENNSYLVANIA(GOLDMAN, JONATHAN) (Entered: 05/22/2019) |
| 06/07/2019 | 173 | MOTION to File Amicus Brief *with notice of motion* filed by PROGRAM FOR THE STUDY OF REPRODUCTIVE JUSTICE AT YALE LAW SCHOOL.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Exhibit, # 3 Text of Proposed Order, # 4 Certificate of Service)(COHEN, DAVID) (Entered: 06/07/2019) |
| 06/07/2019 | 174 | MOTION for Pro Hac Vice *Admission of Priscilla J. Smith* filed by PROGRAM FOR THE STUDY OF REPRODUCTIVE JUSTICE AT YALE LAW SCHOOL...(COHEN, DAVID) (FILING FEE NOT PAID/FEE LETTER SENT) Modified 6/7/19 (fdc). (Entered: 06/07/2019) |
| 06/07/2019 | 175 | Consent MOTION to File Amicus Brief *and to Appear Amici Curiae* filed by AMERICAN ACADEMY OF NURSING, AMERICAN ACADEMY OF PEDIATRICS, AMERICAN COLLEGE OF OBSTETRICIANS & GYNECOLOGISTS, AMERICAN NURSES ASSOCIATION, PHYSICIANS FOR REPRODUCTIVE HEALTH. Certificate of Service. (Attachments: # 1 Memorandum in Support of Motion for Leave, # 2 Exhibit A, Brief Amici Curiae, # 3 Text of Proposed Order)(MATHEWSON, LISA) (Entered: 06/07/2019) |
| 06/07/2019 | 176 | Consent MOTION to File Amicus Brief *in Support of Plaintiffs' Motion for Summary Judgment* filed by CALIFORNIA WOMEN LAWYERS, GIRLS INC., IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, LAWYERS CLUB OF SAN DIEGO, SERVICE EMPLOYEES INTERNATIONAL UNION, THE AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFL–CIO), THE COLORADO WOMENS BAR ASSOCIATION, THE NATIONAL ASSOCIATION OF SOCIAL WORKERS, THE WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA, THE WOMENS BAR ASSOCIATION OF MASSACHUSETTS.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit [Proposed] Brief of Amici Curiae, # 2 Text of Proposed Order)(LEVITT, JAMIE) (Entered: 06/07/2019) |
| 06/07/2019 | 177 | NOTICE of Appearance by AMAL MUNAS BASS on behalf of AMICI CURIAE THE CENTER FOR REPRODUCTIVE RIGHTS, ET AL with certificate of service(BASS, AMAL) (Entered: 06/07/2019) |
| 06/07/2019 | 178 | NOTICE by AMICI CURIAE THE CENTER FOR REPRODUCTIVE RIGHTS, ET AL *Notice of Appearance, Susan Frietsche* (BASS, AMAL) (Entered: 06/07/2019) |
| 06/07/2019 | 179 | MOTION to File Amicus Brief filed by AMICI CURIAE THE CENTER FOR REPRODUCTIVE RIGHTS, ET AL.Proposed Amicus Brief, Proposed Order, and Certificate of Service. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service)(BASS, AMAL) (Entered: 06/07/2019) |

| | | |
|---|---|---|
| 06/07/2019 | 180 | Disclosure Statement Form pursuant to FRCP 7.1 by AMICI CURIAE THE CENTER FOR REPRODUCTIVE RIGHTS, ET AL.(BASS, AMAL) (Entered: 06/07/2019) |
| 06/07/2019 | 181 | Disclosure Statement Form pursuant to FRCP 7.1 with certificate of service by AMERICAN ACADEMY OF NURSING, AMERICAN ACADEMY OF PEDIATRICS, AMERICAN COLLEGE OF OBSTETRICIANS & GYNECOLOGISTS, AMERICAN NURSES ASSOCIATION, PHYSICIANS FOR REPRODUCTIVE HEALTH.(MATHEWSON, LISA) (Entered: 06/07/2019) |
| 06/07/2019 | 182 | Consent MOTION to File Amicus Brief filed by NATIONAL ASSOCIATION FOR FEMALE EXECUTIVES, U.S. WOMEN'S CHAMBER OF COMMERCE.Memorandum of Law, Certificate of Service. (Attachments: # 1 Memorandum of Law in Support of Motion, # 2 Exhibit A (Proposed Brief of Amici Curiae), # 3 Text of Proposed Order)(FELDMAN, JEFFREY) (Entered: 06/07/2019) |
| 06/07/2019 | 183 | MOTION for Leave to File *Appear Amici Curiae and File an Amicus Brief in Support of Plaintiff's Motion for Summary Judgment* filed by AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE, CENTRAL CONFERENCE OF AMERICAN RABBIS, GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES, INTERFAITH ALLIANCE FOUNDATION, JEWISH SOCIAL POLICY ACTION NETWORK, MEN OF REFORM JUDAISM, METHODIST FEDERATION FOR SOCIAL ACTION, NATIONAL COUNCIL OF JEWISH WOMEN, INC, RECONSTRUCTIONIST RABBINICAL ASSOCIATION, RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE, RELIGIOUS INSTITUTE, T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS, THE SIKH COALITION, UNION FOR REFORM JUDAISM.Memorandum, Brief, Certificate of Service. (Attachments: # 1 Brief, # 2 Appendix, # 3 Memorandum, # 4 Text of Proposed Order, # 5 Certificate of Service)(PASEK, JEFFREY) (Entered: 06/07/2019) |
| 06/07/2019 | 184 | MOTION for Pro Hac Vice *Admission of Carmen N. Green* filed by AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE, CENTRAL CONFERENCE OF AMERICAN RABBIS, GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES, INTERFAITH ALLIANCE FOUNDATION, JEWISH SOCIAL POLICY ACTION NETWORK, MEN OF REFORM JUDAISM, METHODIST FEDERATION FOR SOCIAL ACTION, NATIONAL COUNCIL OF JEWISH WOMEN, INC, RECONSTRUCTIONIST RABBINICAL ASSOCIATION, RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE, RELIGIOUS INSTITUTE, T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS, THE SIKH COALITION, UNION FOR REFORM JUDAISM.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(PASEK, JEFFREY) (Filing Fee Paid) Modified 6/12/19 (fdc). (Entered: 06/07/2019) |
| 06/07/2019 | 185 | MOTION for Pro Hac Vice *Admission of Alison Tanner* filed by AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE, CENTRAL CONFERENCE OF AMERICAN RABBIS, GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES, INTERFAITH ALLIANCE FOUNDATION, JEWISH SOCIAL POLICY ACTION NETWORK, MEN OF REFORM JUDAISM, METHODIST FEDERATION FOR SOCIAL ACTION, NATIONAL COUNCIL OF JEWISH WOMEN, INC, RECONSTRUCTIONIST RABBINICAL ASSOCIATION, RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE, RELIGIOUS INSTITUTE, T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS, THE SIKH COALITION, UNION FOR REFORM JUDAISM.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(PASEK, JEFFREY) (Filing Fee Paid) Modified 6/12/19 (fdc). (Entered: 06/07/2019) |
| 06/07/2019 | 186 | MOTION for Pro Hac Vice *Admission of Richard B. Katskee* filed by AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE, CENTRAL CONFERENCE OF AMERICAN RABBIS, GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES, INTERFAITH ALLIANCE FOUNDATION, JEWISH SOCIAL POLICY ACTION NETWORK, MEN OF REFORM JUDAISM, METHODIST FEDERATION FOR SOCIAL ACTION, NATIONAL COUNCIL OF JEWISH WOMEN, INC, RECONSTRUCTIONIST RABBINICAL ASSOCIATION, |

| | | |
|---|---|---|
| | | RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE, RELIGIOUS INSTITUTE, T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS, THE SIKH COALITION, UNION FOR REFORM JUDAISM.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(PASEK, JEFFREY) (Filing Fee Paid) Modified 6/12/19 (fdc). (Entered: 06/07/2019) |
| 06/07/2019 | 187 | Consent MOTION to File Amicus Brief filed by PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM.Certificate of Service. (Attachments: # 1 Memorandum in Support of Motion for Leave, # 2 Exhibit A – Proposed Amici Curiae Brief, # 3 Text of Proposed Order)(FLAXMAN, CARRIE) (Entered: 06/07/2019) |
| 06/07/2019 | 188 | NOTICE of Appearance by NANCY B.G. LASSEN on behalf of CHURCH–STATE SCHOLARS with Certificate of Service(fdc, ) (Entered: 06/10/2019) |
| 06/07/2019 | 189 | MOTION FOR THE PRO HAC VICE ADMISSION OF JOSHUA A. MATZ, ESQ. FILED BY CHURCH–STATE SCHOLARS, CERTIFICATE OF SERVICE. (FILING FEE PAID)(fdc) (Entered: 06/10/2019) |
| 06/07/2019 | 190 | MOTION FOR THE PRO HAC VICE ADMISSION OF TALIA NISSIMYAN, ESQ. FILED BY CHURCH–STATE SCHOLARS, CERTIFICATE OF SERVICE. (FILING FEE PAID)(fdc) (Entered: 06/10/2019) |
| 06/07/2019 | 191 | MOTION FOR LEAVE TO APPEAR AS AMICI CURIAE AND FILE AN AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION MOTION FOR SUMMARY JUDGMENT FILED BY CHURCH–STATE SCHOLARS, MEMORANDUM. (Attachments: # 1 Text of Proposed Order, # 2 Memorandum, # 3 Exhibit)(fdc) (Entered: 06/10/2019) |
| 06/11/2019 | 192 | MOTION for Pro Hac Vice *for Allan J. Arffa* ( Filing fee $ 40 receipt number 0313–13600042.) filed by PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(FLAXMAN, CARRIE) (Entered: 06/11/2019) |
| 06/11/2019 | 193 | MOTION for Pro Hac Vice *for Sierra A. Y. Robart* ( Filing fee $ 40 receipt number 0313–13600045.) filed by PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(FLAXMAN, CARRIE) (Entered: 06/11/2019) |
| 06/11/2019 | 194 | MOTION for Pro Hac Vice *for Melina M. Meneguin Layerenza* ( Filing fee $ 40 receipt number 0313–13600047.) filed by PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(FLAXMAN, CARRIE) (Entered: 06/11/2019) |
| 06/11/2019 | 195 | MOTION for Pro Hac Vice *for Jessica B. Fuhrman* ( Filing fee $ 40 receipt number 0313–13600058.) filed by PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(FLAXMAN, CARRIE) (Entered: 06/11/2019) |
| 06/14/2019 | 196 | PAPERLESS ORDER GRANTING 173 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 06/14/2019.06/14/2019 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 06/14/2019) |
| 06/14/2019 | 197 | PAPERLESS ORDER 175 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 06/14/2019.06/14/2019 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 06/14/2019) |
| 06/14/2019 | 198 | PAPERLESS ORDER, 176 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 06/14/2019.06/14/2019 ENTERED AND COPIES |

| | | |
|---|---|---|
| | | MAILED AND E–MAILED.(amw, ) (Entered: 06/14/2019) |
| 06/14/2019 | 199 | PAPERLESS ORDER GRANTING 179 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 06/14/2019.06/14/2019 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 06/14/2019) |
| 06/14/2019 | 200 | PAPERLESS ORDER GRANTING 182 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 06/14/2019.06/14/2019 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 06/14/2019) |
| 06/14/2019 | 201 | PAPERLESS ORDER GRANTING 183 MOTION FOR LEAVE TO FILE BY HONORABLE WENDY BEETLESTONE ON 06/14/2019.06/14/2019 ENTERED AND COPIES MAILED AND E–MAILED.(amw, ) (Entered: 06/14/2019) |
| 06/14/2019 | 202 | Amended MOTION for Pro Hac Vice *for Priscilla Smith* ( Filing fee $ 40 receipt number 0313–13607850.) filed by PROGRAM FOR THE STUDY OF REPRODUCTIVE JUSTICE AT YALE LAW SCHOOL..(COHEN, DAVID) (Entered: 06/14/2019) |
| 06/14/2019 | 203 | ORDER THAT THE APPLICATION OF CARMEN N. GREEN, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/14/19.6/14/19 ENTERED AND COPIES MAILED & E–MAILED. ECF APPLICATION MAILED TO GREEN. (fdc) (Entered: 06/14/2019) |
| 06/14/2019 | 204 | ORDER THAT THE APPLICATION OF ALISON TANNER, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/14/19.6/14/19 ENTERED AND COPIES MAILED & E–MAILED. ECF APPLICATION MAILED TO TANNER. (fdc) (Entered: 06/14/2019) |
| 06/14/2019 | 205 | MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Exhibit Statement of Material Facts, # 3 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 06/14/2019) |
| 06/14/2019 | 206 | MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Memorandum. (Attachments: # 1 Memorandum, # 2 Exhibit Statement of Facts, # 3 Text of Proposed Order)(RIENZI, MARK) (Entered: 06/14/2019) |
| 06/14/2019 | 207 | Exhibit List *Part One* by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.. Certificat of Service (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(SANDBERG, JUSTIN) (Entered: 06/14/2019) |
| 06/14/2019 | 208 | RESPONSE in Opposition re 170 MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (Attachments: # 1 Exhibit Response to Statement of Material Facts)(RIENZI, MARK) (Entered: 06/14/2019) |
| 06/14/2019 | 209 | Exhibit List *Supplemental Joint Appendix* by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.. Certificate of Service (RIENZI, MARK) (Entered: 06/14/2019) |
| 06/14/2019 | 210 | Exhibit List *Part Two* by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 |

JA113

| | | Exhibit, # <u>10</u> Exhibit, # <u>11</u> Exhibit, # <u>12</u> Exhibit, # <u>13</u> Exhibit, # <u>14</u> Exhibit, # <u>15</u> Exhibit, # <u>16</u> Exhibit, # <u>17</u> Exhibit, # <u>18</u> Exhibit, # <u>19</u> Exhibit)(SANDBERG, JUSTIN) |
|---|---|---|
| 06/14/2019 | <u>211</u> | RESPONSE in Opposition re <u>170</u> MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA. (SANDBERG, JUSTIN) (Entered: 06/14/2019) |
| 06/18/2019 | 212 | PAPERLESS ORDER GRANTING <u>191</u> MOTION FOR LEAVE TO FILE BY HONORABLE WENDY BEETLESTONE ON 06/18/2019.06/18/2019 ENTERED AND COPIES MAILED AND E–MAILED.(amw, ) (Entered: 06/18/2019) |
| 06/19/2019 | <u>213</u> | ORDER THAT THE APPLICATION OF RICHARD B. KATSKEE, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/18/19.6/19/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO KATSKEE. (fdc) (Entered: 06/19/2019) |
| 06/19/2019 | <u>214</u> | ORDER THAT THE APPLICATION OF JOSHUA A. MATZ, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/18/19.6/19/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO MATZ.(fdc) (Entered: 06/19/2019) |
| 06/19/2019 | <u>215</u> | ORDER THAT THE APPLICATION OF TALIA NISSIMYAN, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/18/19.6/19/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO NISSIMYAN. (fdc) (Entered: 06/19/2019) |
| 06/19/2019 | <u>216</u> | ORDER THAT THE APPLICATION OF ALLAN J. ARFFA, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/18/19.6/19/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO ARFFA. (fdc) (Entered: 06/19/2019) |
| 06/19/2019 | <u>217</u> | ORDER THAT THE APPLICATION OF SIERRA A.Y. ROBART, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/18/19.6/19/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO ROBART. (fdc) (Entered: 06/19/2019) |
| 06/19/2019 | <u>218</u> | ORDER THAT THE APPLICATION OF MELINA M. MENEGUIN LAYERENZA, ESQ., TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/18/19.6/19/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO LAYERENZA. (fdc) (Entered: 06/19/2019) |
| 06/19/2019 | <u>219</u> | ORDER THAT THE APPLICATION OF JESSICA B. FUHRMAN, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED.. SIGNED BY HONORABLE WENDY BEETLESTONE ON 6/18/19.6/19/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO FUHRMAN. (fdc) (Entered: 06/19/2019) |
| 06/25/2019 | <u>220</u> | RESPONSE in Support re <u>170</u> MOTION for Summary Judgment *Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment* filed by CHURCH–STATE SCHOLARS. (Attachments: # <u>1</u> Certificate of Service)(LASSEN, NANCY) (Entered: 06/25/2019) |
| 06/27/2019 | <u>221</u> | APPLICATION for Admission Pro Hac Vice of Katherine Gregory by STATE OF NEW JERSEY. ( Filing fee $ 40 receipt number 0313–13635635.). (KREFETZ, MARC) (Entered: 06/27/2019) |
| 06/28/2019 | <u>222</u> | REPLY to Response to Motion re <u>170</u> MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit Corrected Statement of Undisputed Fact, # 2 Supplemental Exhibit Index, # 3 Supplemental Exhibits)(FISCHER, MICHAEL) (Entered: 06/28/2019) |
| 06/28/2019 | 223 | RESPONSE in Opposition re 205 MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (Attachments: # 1 Response to Statement of Undisputed Facts)(FISCHER, MICHAEL) (Entered: 06/28/2019) |
| 06/28/2019 | 224 | RESPONSE in Opposition re 206 MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (Attachments: # 1 Response to Statement of Undisputed Facts)(FISCHER, MICHAEL) (Entered: 06/28/2019) |
| 07/01/2019 | 225 | NOTICE by COMMONWEALTH OF PENNSYLVANIA re 222 Reply to Response to Motion, (Attachments: # 1 Corrected Supplemental Exhibits)(THOMSON, AIMEE) (Entered: 07/01/2019) |
| 07/12/2019 | 226 | REPLY in Support re 206 MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (Attachments: # 1 Exhibit Reply to Statement of Material Facts)(RIENZI, MARK) Modified on 7/15/2019 (fb). (Entered: 07/12/2019) |
| 07/12/2019 | 227 | REPLY Brief in Support re 205 MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) Modified on 7/15/2019 (fb). (Entered: 07/12/2019) |
| 07/19/2019 | 228 | NOTICE OF STATUS CONFERENCE CALL (FOLLOWING A THIRD CIRCUIT DECISION) – TUESDAY, JULY 23, 2019 AT 3:30 P.M. COUNSEL FOR PLAINTIFF SHALL INITIATE THE CALL AND ONCE ALL PARTIES ARE ON THE LINE CALL IN TO CHAMBERS AT 267–299–7450 TO CONNECT THE JUDGE. THANK YOU. (amw, ) (Entered: 07/19/2019) |
| 07/24/2019 | 229 | Minute Entry for proceedings held before HONORABLE WENDY BEETLESTONE. A Telephone Status Call was held on 7/23/19. Court Reporter: ESR. (fdc) (Entered: 07/24/2019) |
| 07/25/2019 | 230 | Statement *Regarding Further Proceedings in Light of Third Circuit Opinion* by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 07/25/2019) |
| 07/25/2019 | 231 | Statement *as to further proceedings* by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (FISCHER, MICHAEL) (Entered: 07/25/2019) |
| 07/31/2019 | 232 | ORDER THAT FURTHER PROCEEDINGS IN THIS MATTER ARE STAYED, AND THE PARTIES' PENDING MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT 157 159 205 206 ARE HELD IN ABEYANCE, PENDING RESOLUTION OF ANY APPEAL OF THE THIRD CIRCUIT'S DECISION IN TRUMP III BY DEFENDANTS AND DEFENDANT–INTERVENOR. SIGNED BY HONORABLE WENDY BEETLESTONE ON 7/30/19. 7/31/19 ENTERED AND COPIES MAILED & E–MAILED.(fdc) (Entered: 07/31/2019) |
| 07/31/2019 | 233 | PAPERLESS ORDER GRANTING 187 MOTION TO FILE AMICUS BRIEF BY HONORABLE WENDY BEETLESTONE ON 07/31/2019.07/31/2019 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 07/31/2019) |
| 07/31/2019 | 234 | PAPERLESS ORDER DENYING AS MOOT 174 MOTION FOR PRO HAC VICE BY HONORABLE WENDY BEETLESTONE ON 07/31/2019.07/31/2019 ENTERED AND COPIES E–MAILED.(amw, ) (Entered: 07/31/2019) |

| | | |
|---|---|---|
| 07/31/2019 | 235 | ORDER THAT THE APPLICATION OF PRISCILLA J. SMITH, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 7/31/19.7/31/19 ENTERED AND COPIES MAILED AND E–MAILED. ECF APPLICATION MAILED TO SMITH. (fdc) (Entered: 07/31/2019) |
| 07/31/2019 | 236 | ORDER THAT THE CLERK OF COURT SHALL TRANSFER THIS MATTER TO THE CIVIL SUSPENSE DOCKET. SIGNED BY HONORABLE WENDY BEETLESTONE ON 7/31/19. 7/31/19 ENTERED AND COPIES MAILED AND E–MAILED.(fdc, ) (Entered: 07/31/2019) |
| 08/01/2019 | 237 | NOTICE of Withdrawal of Appearance by JEFFREY I. PASEK on behalf of AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE, CENTRAL CONFERENCE OF AMERICAN RABBIS, GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES, INTERFAITH ALLIANCE FOUNDATION, JEWISH SOCIAL POLICY ACTION NETWORK, MEN OF REFORM JUDAISM, METHODIST FEDERATION FOR SOCIAL ACTION, NATIONAL COUNCIL OF JEWISH WOMEN, INC, RECONSTRUCTIONIST RABBINICAL ASSOCIATION, RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE, RELIGIOUS INSTITUTE, T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS, THE SIKH COALITION, UNION FOR REFORM JUDAISM(PASEK, JEFFREY) (Entered: 08/01/2019) |
| 08/01/2019 | 238 | NOTICE of Withdrawal of Appearance by ALISON TANNER on behalf of AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE, CENTRAL CONFERENCE OF AMERICAN RABBIS, GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES, INTERFAITH ALLIANCE FOUNDATION, JEWISH SOCIAL POLICY ACTION NETWORK, MEN OF REFORM JUDAISM, METHODIST FEDERATION FOR SOCIAL ACTION, NATIONAL COUNCIL OF JEWISH WOMEN, INC, RECONSTRUCTIONIST RABBINICAL ASSOCIATION, RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE, RELIGIOUS INSTITUTE, T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS, THE SIKH COALITION, UNION FOR REFORM JUDAISM(TANNER, ALISON) (Entered: 08/01/2019) |
| 09/03/2019 | 239 | ORDER of USCA as to 139 Notice of Appeal, filed by RENE ALEXANDER ACOSTA, UNITED STATES DEPARTMENT OF LABOR, STEVEN T. MNUCHIN, ALEX M. AZAR, II, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES. ORDERED and ADJUDGED that the orders of the District Court entered December 15, 2017 and January 14, 2018 is AFFIRMED. Costs will be taxed on Appellants. All of the above in accordance with the Opinion of this Court.(mbh, ) (Entered: 09/03/2019) |
| 10/16/2019 | 240 | NOTICE of Withdrawal of Appearance of JOSHUA MATZ by NANCY B.G. LASSEN on behalf of CHURCH–STATE SCHOLARS(LASSEN, NANCY) Modified on 10/25/2019 (lvj, ). (Entered: 10/16/2019) |
| 10/25/2019 | 241 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 10/25/2019) |
| 01/06/2020 | 242 | NOTICE of Withdrawal of Appearance by JONATHAN B. MILLER on behalf of COMMONWEALTH OF MASSACHUSETTS(MILLER, JONATHAN) (Entered: 01/06/2020) |
| 01/23/2020 | 243 | STATUS REPORT –*Joint Status Report* by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 01/23/2020) |

| | | |
|---|---|---|
| 03/16/2020 | 244 | Letter from UINTED STATES COURT OF APPEALS That the Clerk of The Supreme Court of the United States that a petition for writ of certiorari has been granted. In light of the above please forward the original District Court records directly to the Clerk of the Supreme Court, etc (afm, ) (Entered: 03/20/2020) |
| 04/22/2020 | 245 | STATUS REPORT *JOINT* by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 04/22/2020) |
| 07/17/2020 | 246 | STATUS REPORT – *Joint* by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 07/17/2020) |
| 07/29/2020 | 247 | NOTICE of Appearance by JACOB B. BOYER on behalf of COMMONWEALTH OF PENNSYLVANIA (BOYER, JACOB) (Entered: 07/29/2020) |
| 08/10/2020 | 248 | ORDER of USCA. Re: Order that the mandate issued on September 3, 2019 is hereby recalled in light of the U.S. Supreme Court's decision vacating the judgment of this Court and remanding the matter for further proceedings. (fdc) (Entered: 08/10/2020) |
| 08/21/2020 | 249 | ORDER of USCA as to 138 Notice of Appeal, filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME, 139 Notice of Appeal, filed by RENE ALEXANDER ACOSTA, UNITED STATES DEPARTMENT OF LABOR, STEVEN T. MNUCHIN, ALEX M. AZAR, II, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, 61 Notice of Appeal (Credit Card Payment), filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME, 68 Notice of Appeal, filed by DONALD J. TRUMP, RENE ALEXANDER ACOSTA, UNITED STATES DEPARTMENT OF LABOR, STEVEN T. MNUCHIN, DONALD J. WRIGHT, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES. RE: ORDERED AND ADJUDGED THAT THE JUDGMENT OF THE DISTRICT COURT IS REVERSED AND THE MATTER IS REMANDED TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS. THE CLERK IS DIRECTED TO ISSUE THE MANDATE. (fdc) (Entered: 08/21/2020) |
| 08/27/2020 | 250 | STATUS REPORT *Joint Status Report* by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (FISCHER, MICHAEL) (Entered: 08/27/2020) |
| 09/23/2020 | 251 | ORDER THAT NO LATER THAN 9/29/20, PLAINTIFFS MAY FILE A MOTION FOR SUMMARY JUDGMENT WHICH SHALL BE NO MORE THAN 45 PAGES. NO LATER THAN 10/23/20, DEFENDANTS AND INTERVENOR EACH MAY FILE A CROSS MOTION FOR SUMMARY JUDGMENT AND A COMBINED OPENING BRIEF AND OPPOSITION TO PLAINTIFF'S MOTION WHICH SHALL BE NO MORE THAN 45 PAGES EACH. SIGNED BY HONORABLE WENDY BEETLESTONE ON 9/23/20. 9/23/20 ENTERED AND COPIES NOT MAILED TO ATTYS AND E–MAILED.(mbh, ) (Entered: 09/23/2020) |
| 09/24/2020 | | PLEADING #251 MAILED TO COUNSEL (JL ) (Entered: 09/24/2020) |
| 09/29/2020 | 252 | MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.Memorandum. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(BOYER, JACOB) (Entered: 09/29/2020) |
| 09/29/2020 | 253 | Exhibit List by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.. (Attachments: # 1 Appendix Part I, # 2 Appendix Part II, # 3 Appendix Part III, # 4 Appendix Part IV, # 5 Appendix Part V, # 6 Appendix Part VI, # 7 Appendix Part VII, # 8 Appendix Part VIII, # 9 Appendix Part IX, # 10 Appendix Part X)(BOYER, JACOB) (Entered: 09/29/2020) |
| 10/23/2020 | 254 | MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES |

| | | |
|---|---|---|
| | | DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 10/23/2020) |
| 10/23/2020 | 255 | MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Memorandum. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(RIENZI, MARK) (Entered: 10/23/2020) |
| 10/23/2020 | 256 | Exhibit List *(Index to Supplement of Joint Appendix)* by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.. Certificate of Service (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit)(SANDBERG, JUSTIN) (Entered: 10/23/2020) |
| 10/23/2020 | 257 | RESPONSE to Motion re 252 MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 10/23/2020) |
| 10/23/2020 | 258 | Exhibit List *Index to Supplement of Joint Appendix* by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.. Certificate of Service (RIENZI, MARK) (Entered: 10/23/2020) |
| 10/23/2020 | 259 | RESPONSE in Opposition re 252 MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (RIENZI, MARK) (Entered: 10/23/2020) |
| 11/13/2020 | 260 | RESPONSE in Opposition re 254 MOTION for Summary Judgment , 255 MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (BOYER, JACOB) (Entered: 11/13/2020) |
| 11/13/2020 | 261 | RESPONSE in Support re 252 MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (BOYER, JACOB) (Entered: 11/13/2020) |
| 11/24/2020 | 262 | REPLY to Response to Motion re 254 MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 11/24/2020) |
| 11/24/2020 | 263 | REPLY to Response to Motion re 255 MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (RIENZI, MARK) (Entered: 11/24/2020) |
| 01/19/2021 | 264 | NOTICE by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA *of Supplemental Authority* (Attachments: # 1 Exhibit)(KOPPLIN, REBECCA) (Entered: 01/19/2021) |
| 02/05/2021 | 265 | APPLICATION for Admission Pro Hac Vice of Marie Soueid by STATE OF NEW JERSEY. ( Filing fee $ 40 receipt number 0313–14895190.). (THOMSON, AIMEE) (Entered: 02/05/2021) |
| 02/08/2021 | 266 | ORDER THAT THE APPLICATION OF MARIE SOUEID, ESQ. TO PRACTICE IN THIS COURT PURSUANT TO LRCP 83.5.2(B) IS GRANTED. SIGNED BY |

| | | |
|---|---|---|
| | | HONORABLE WENDY BEETLESTONE ON 2/8/21. 2/8/21 ENTERED & E–MAILED. NOT MAILED TO COUNSEL. (fdc) (Entered: 02/08/2021) |
| 02/11/2021 | | Document 266 mailed to counsel. (mac, ) (Entered: 02/11/2021) |
| 02/19/2021 | 267 | NOTICE OF STATUS CONFERENCE VIA ZOOM VIDEO SET FOR MONDAY, MARCH 15, 2021 AT 12:30 P.M. COUNSEL SHALL CONFER AS TO WHO WILL SCHEDULE AND CIRCULATE ZOOM DIAL IN INFORMATION TO CHAMBERS AT chambers_of_judge_beetlestone@paed.uscourts.gov (amw, ) (Entered: 02/19/2021) |
| 03/01/2021 | 268 | NOTICE OF STATUS CONFERENCE VIA ZOOM VIDEO RESET FOR THURSDAY, MARCH 11, 2021 AT 11:00 A.M. COUNSEL SHALL CONFER AS TO WHO WILL SCHEDULE AND CIRCULATE ZOOM DIAL IN INFORMATION TO CHAMBERS AT chambers_of_judge_beetlestone@paed.uscourts.gov (amw, ) (Entered: 03/01/2021) |
| 03/05/2021 | 269 | MOTION to Stay , MOTION Stay; Hold in Abeyance filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 03/05/2021) |
| 03/08/2021 | 270 | NOTICE OF CANCELLATION OF STATUS CONFERENCE VIA ZOOM VIDEO SET FOR THURSDAY, MARCH 11, 2021 AT 11:00 A.M.(amw, ) (Entered: 03/08/2021) |
| 03/08/2021 | 271 | ORDER THAT THE FEDERAL DEFENDANTS' 269 MOTION TO STAY PROCEEDINGS IN THIS CASE IS GRANTED AND STAYS THE CASE UNTIL APRIL 30, 2021. FEDERAL DEFENDANTS SHALL FILE A STATUS REPORT ON OR BEFORE APRIL 30, 2021. SIGNED BY HONORABLE WENDY BEETLESTONE ON 3/8/21.3/8/21 ENTERED & E–MAILED. NOT MAILED TO COUNSEL. (fdc) (Entered: 03/08/2021) |
| 03/09/2021 | | COPY OF DOC. NO. 271 HAS BEEN MAILED TO COUNSEL. (bw, ) (Entered: 03/09/2021) |
| 04/23/2021 | 272 | NOTICE by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME *of Supplemental Authority* (Attachments: # 1 Exhibit A)(RIENZI, MARK) (Entered: 04/23/2021) |
| 04/30/2021 | 273 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 04/30/2021) |
| 04/30/2021 | 274 | MOTION to Stay filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 04/30/2021) |
| 05/03/2021 | 275 | ORDER THAT THE FEDERAL DEFENDATS' 274 MOTION TO STAY PROCEEDINGS IN THIS CASE IS GRANTED AND THIS CASE IS STAYED UNTIL JULY 30, 2021. FEDERAL DEFENDANTS SHALL FILE A STATUS REPORT ON OR BEFORE JULY 30, 2021.SIGNED BY HONORABLE WENDY BEETLESTONE ON 5/3/21.5/3/21 ENTERED & E–MAILED. NOT MAILED TO NON–ECF COUNSEL. (fdc) (Entered: 05/03/2021) |
| 05/04/2021 | | COPY OF DOC. NO. 275 HAS BEEN MAILED TO COUNSEL. (bw, ) (Entered: 05/04/2021) |

| 07/06/2021 | 276 | NOTICE by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME re 255 MOTION for Summary Judgment *Supplemental Authority* (RIENZI, MARK) (Entered: 07/06/2021) |
| 07/08/2021 | 277 | NOTICE by CHURCH–STATE SCHOLARS *of Notice of Appearance of Joshua A. Matz* (Attachments: # 1 Certificate of Service Certificate of Service of Entry of Appearance of Joshua A. Matz)(LASSEN, NANCY) (Entered: 07/08/2021) |
| 07/08/2021 | 278 | NOTICE by CHURCH–STATE SCHOLARS *OF WITHDRAWAL OF APPEARANCE OF TALIA NISSIMYAN* (LASSEN, NANCY) (Entered: 07/08/2021) |
| 07/30/2021 | 279 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 07/30/2021) |
| 07/30/2021 | 280 | MOTION to Stay filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(SANDBERG, JUSTIN) (Entered: 07/30/2021) |
| 08/03/2021 | 281 | ORDER THAT THE FEDERAL DEFENDANTS' 280 MOTION TO STAY IS GRANTED. FEDERAL DEFENDANTS SHALL FILE A STATUS REPORT ON OR BEFORE OCTOBER 29, 2021, AND EVERY 90 DAYS THEREAFTER. SIGNED BY HONORABLE WENDY BEETLESTONE ON 8/2/21.8/3/21 ENTERED & E–MAILED.(fdc) (Entered: 08/03/2021) |
| 10/29/2021 | 282 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (Attachments: # 1 Exhibit)(SANDBERG, JUSTIN) (Entered: 10/29/2021) |
| 01/03/2022 | 283 | ORDER THAT THIS MATTER SHALL REMAIN STAYED AND THAT THE CLERK OF COURT SHALL PLACE IT INTO SUSPENSE. IT IS FURTHER ORDERED THAT FEDERAL DEFENDANTS SHALL FILE A STATUS REPORT ON OR BEFORE JANUARY 27, 2022, AND EVERY 90 DAYS THEREAFTER. SIGNED BY HONORABLE WENDY BEETLESTONE ON 1/3/22. 1/4/22 ENTERED & E–MAILED.(fdc) (Entered: 01/04/2022) |
| 01/27/2022 | 284 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 01/27/2022) |
| 04/27/2022 | 285 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (SANDBERG, JUSTIN) (Entered: 04/27/2022) |
| 05/19/2022 | 286 | NOTICE of Withdrawal of Appearance by JESSICA B. FUHRMAN on behalf of PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM(FUHRMAN, JESSICA) (Entered: 05/19/2022) |
| 07/01/2022 | 287 | NOTICE of Withdrawal of Appearance by AIMEE D. THOMSON on behalf of COMMONWEALTH OF PENNSYLVANIA(THOMSON, AIMEE) (Entered: 07/01/2022) |

| | | |
|---|---|---|
| 07/26/2022 | 288 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (HEALY, CHRISTOPHER) (Entered: 07/26/2022) |
| 08/12/2022 | 289 | NOTICE of Withdrawal of Appearance by MARIE SOUEID on behalf of STATE OF NEW JERSEY(SOUEID, MARIE) (Entered: 08/12/2022) |
| 08/26/2022 | 290 | NOTICE of Withdrawal of Appearance by JUSTIN MICHAEL SANDBERG on behalf of RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT(SANDBERG, JUSTIN) (Entered: 08/26/2022) |
| 08/26/2022 | 291 | NOTICE of Withdrawal of Appearance by NANCY B.G. LASSEN on behalf of CHURCH–STATE SCHOLARS(LASSEN, NANCY) (Entered: 08/26/2022) |
| 10/12/2022 | 292 | MOTION for Pro Hac Vice *Admission of Shireen A. Farahani* ( Filing fee $ 40 receipt number APAEDC–16238081.) filed by COMMONWEALTH OF PENNSYLVANIA..(FISCHER, MICHAEL) (Entered: 10/12/2022) |
| 10/13/2022 | 293 | ORDER THAT THE COMMONWEALTH OF PENNSYLVANIA'S 292 MOTION FOR THE PRO HAC VICE ADMISSION OF SHIREEN A. FARAHANI, ESQ. IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 10/13/22.10/13/22 ENTERED AND COPIES MAILED AND E–MAILED.(fdc) (Entered: 10/13/2022) |
| 10/24/2022 | 294 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (HEALY, CHRISTOPHER) (Entered: 10/24/2022) |
| 01/17/2023 | 295 | NOTICE of Appearance by Elizabeth Lester–Abdalla on behalf of COMMONWEALTH OF PENNSYLVANIA (Lester–Abdalla, Elizabeth) (Entered: 01/17/2023) |
| 01/17/2023 | 296 | NOTICE of Withdrawal of Appearance by MICHAEL J. FISCHER on behalf of COMMONWEALTH OF PENNSYLVANIA(FISCHER, MICHAEL) (Entered: 01/17/2023) |
| 01/23/2023 | 297 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (HEALY, CHRISTOPHER) (Entered: 01/23/2023) |
| 01/25/2023 | 298 | NOTICE of Withdrawal of Appearance by JACOB B. BOYER on behalf of COMMONWEALTH OF PENNSYLVANIA(BOYER, JACOB) (Entered: 01/25/2023) |
| 04/24/2023 | 299 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (HEALY, CHRISTOPHER) (Entered: 04/24/2023) |
| 06/30/2023 | 300 | NOTICE of Withdrawal of Appearance by MELINA M. MENEGUIN LAYERENZA on behalf of PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM(MENEGUIN |

| | | LAYERENZA, MELINA) (Entered: 06/30/2023) |
|---|---|---|
| 07/24/2023 | 301 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (KOPPLIN, REBECCA) (Entered: 07/24/2023) |
| 10/23/2023 | 302 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (KOPPLIN, REBECCA) (Entered: 10/23/2023) |
| 12/26/2023 | 303 | NOTICE OF ZOOM STATUS CONFERENCE SET FOR TUESDAY, JANUARY 9, 2024 AT 10:00 A.M. THE PARTIES SHALL CONFER AS TO WHO WILL SCHEDULE AND CIRCULAE ZOOM VIDEO INFORMATION TO CHAMBERS AT chambers_of_judge_beetlestone@paed.uscourts.gov NO LATER THAN 5 DAYS PRIOR TO CONFERENCE. (amw) (Entered: 12/26/2023) |
| 01/03/2024 | 304 | Consent MOTION to adjust time of January 9 conference by one hour filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(RIENZI, MARK) (Entered: 01/03/2024) |
| 01/03/2024 | 305 | NOTICE of Appearance by JILL M. GRAZIANO on behalf of COMMONWEALTH OF PENNSYLVANIA (GRAZIANO, JILL) (Entered: 01/03/2024) |
| 01/04/2024 | 306 | MOTION for Pro Hac Vice *Andrew H. Yang* ( Filing fee $ 75 receipt number APAEDC–17170417.) filed by COMMONWEALTH OF PENNSYLVANIA..(Lester–Abdalla, Elizabeth) (Entered: 01/04/2024) |
| 01/05/2024 | 307 | ORDER DENYING 304 Motion MISCELLANEOUS RELIEF BY HONORABLE WENDY BEETLESTONE ON 01/05/2024.01/05/2024 ENTERED AND COPIES E–MAILED.(amw) (Entered: 01/05/2024) |
| 01/05/2024 | 308 | ORDER THAT THE MOTION FOR PRO HAC VICE 306 IS GRANTED. SIGNED BY HONORABLE WENDY BEETLESTONE ON 1/5/24.1/5/24 ENTERED AND COPIES E–MAILED.(bw) (Entered: 01/05/2024) |
| 01/08/2024 | 309 | NOTICE of Appearance by DANIEL RIESS on behalf of RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT (RIESS, DANIEL) (Entered: 01/08/2024) |
| 01/08/2024 | 310 | NOTICE of Appearance by Joshua Paul Bohn on behalf of STATE OF NEW JERSEY (Bohn, Joshua) (Entered: 01/08/2024) |
| 01/09/2024 | 311 | ORDER THAT UPON CONSIDERATION OF THE PARTIES MOTIONS FOR SUMMARY JUDGMENT 252 , 254 , 255 , AND WITH THE CONSENT OF THE PARTIES, IT IS HEREBY ORDERED THAT THE MOTIONS ARE DENIED WITHOUT PREJUDICE. THIS MATTER SHALL REMAIN STAYED, PURSUANT TO THE COURTS ORDER DATED JANUARY 3, 2022 283 . SIGNED BY HONORABLE WENDY BEETLESTONE ON 1/9/24.1/9/24 ENTERED AND COPIES E–MAILED.(bw) (Entered: 01/09/2024) |
| 01/22/2024 | 312 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (RIESS, DANIEL) (Entered: 01/22/2024) |

| 01/23/2024 | 313 | NOTICE of Withdrawal of Appearance by ALLAN J. ARFFA on behalf of PLANNED PARENTHOOD FEDERATION OF AMERICA, THE NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION, THE NATIONAL HEALTH LAW PROGRAM(ARFFA, ALLAN) (Entered: 01/23/2024) |
|---|---|---|
| 02/09/2024 | 314 | NOTICE of Appearance by CHRISTOPHER HEALY on behalf of All Defendants (HEALY, CHRISTOPHER) (Entered: 02/09/2024) |
| 02/12/2024 | 315 | NOTICE by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT *to Withdraw former Assistant United States Attorney Scott Webster Reid, with permission* (BECKER, SUSAN) (Entered: 02/12/2024) |
| 02/12/2024 | 316 | NOTICE of Appearance by SUSAN R. BECKER on behalf of RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT with Certificate of Service(BECKER, SUSAN) (Entered: 02/12/2024) |
| 02/21/2024 | 317 | Notice to Withdraw as Attorney *for the State of New Jersey*, filed by STATE OF NEW JERSEY.Certificate of Counsel.(THOMSON, AIMEE) Modified on 2/22/2024 (lvj). Modified on 2/22/2024 (nd). (Entered: 02/21/2024) |
| 03/12/2024 | 318 | NOTICE of Appearance by Molly Pohlhaus on behalf of COMMONWEALTH OF PENNSYLVANIA (Pohlhaus, Molly) (Entered: 03/12/2024) |
| 03/18/2024 | 319 | NOTICE of Withdrawal of Appearance by Elizabeth Lester–Abdalla on behalf of COMMONWEALTH OF PENNSYLVANIA(Lester–Abdalla, Elizabeth) (Entered: 03/18/2024) |
| 03/19/2024 | 320 | NOTICE of Appearance by LISA EMILY EISENBERG on behalf of COMMONWEALTH OF PENNSYLVANIA (EISENBERG, LISA) (Entered: 03/19/2024) |
| 03/19/2024 | 321 | NOTICE of Withdrawal of Appearance by MICHAEL J. FISCHER on behalf of STATE OF NEW JERSEY(FISCHER, MICHAEL) (Entered: 03/19/2024) |
| 04/22/2024 | 322 | STATUS REPORT by ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (RIESS, DANIEL) (Entered: 04/22/2024) |
| 07/22/2024 | 323 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (RIESS, DANIEL) (Entered: 07/22/2024) |
| 08/29/2024 | 324 | NOTICE of Withdrawal of Appearance by AMAL MUNAS BASS on behalf of AMICI CURIAE THE CENTER FOR REPRODUCTIVE RIGHTS, ET AL(BASS, AMAL) (Entered: 08/29/2024) |
| 10/21/2024 | 325 | STATUS REPORT by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (RIESS, DANIEL) (Entered: 10/21/2024) |
| 12/23/2024 | 326 | NOTICE by DONALD J. TRUMP, ALEX M. AZAR, II, UNITED STATES OF AMERICA, DONALD J. WRIGHT, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, STEVEN T. MNUCHIN, UNITED STATES |

| | | DEPARTMENT OF THE TREASURY, RENE ALEXANDER ACOSTA, UNITED STATES DEPARTMENT OF LABOR *of Withdrawal of Notice of Proposed Rulemaking* (RIESS, DANIEL) (Entered: 12/23/2024) |
|---|---|---|
| 01/03/2025 | 327 | NOTICE of Hearing: STATUS CONFERENCE SET FOR 1/15/2025 02:00 PM via ZOOM THE PARTIES SHALL CONFER AND DECIDE WHO WILL CIRCULATE ZOOM VIDEO INFORMATION TO CHAMBERS at chambers_of_judge_beetlestone@paed.uscourts.gov NO LATER THAN MONDAY, January 13, 2025 BY 5:00 P.M BEFORE DISTRICT JUDGE WENDY BEETLESTONE.(mb) (Entered: 01/03/2025) |
| 01/09/2025 | 328 | NOTICE of Appearance by AIMEE D. THOMSON on behalf of COMMONWEALTH OF PENNSYLVANIA (THOMSON, AIMEE) (Entered: 01/09/2025) |
| 01/09/2025 | 329 | NOTICE of Withdrawal of Appearance by Molly Pohlhaus on behalf of COMMONWEALTH OF PENNSYLVANIA(Pohlhaus, Molly) (Entered: 01/09/2025) |
| 01/09/2025 | 330 | MOTION for Pro Hac Vice *of Meghan K. Musso* ( Filing fee $ 75 receipt number APAEDC–17989591.) filed by STATE OF NEW JERSEY..(Bohn, Joshua) (Entered: 01/09/2025) |
| 01/10/2025 | 331 | ORDER THAT THE MOTION FOR PRO HAC VICE FOR COUNSEL, MEGHAN K. MUSSO, 330 IS GRANTED. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 1/10/25.1/10/25 ENTERED AND COPIES E–MAILED.(bw) (Entered: 01/10/2025) |
| 01/15/2025 | 332 | NOTICE of Appearance by MICHAEL J. FISCHER on behalf of COMMONWEALTH OF PENNSYLVANIA (FISCHER, MICHAEL) (Entered: 01/15/2025) |
| 01/15/2025 | 333 | SCHEDULING ORDER: ORDER THAT THE PARTIES HAVE UNTIL MARCH 3, 2025 TO FILE MOTIONS FOR SUMMARY JUDGMENT, WHICH SHALL NOT EXCEED 45 PAGES. RESPONSES TO SAID MOTIONS SHALL BE FILED ON OR BEFORE APRIL 17, 2025 AND SHALL NOT EXCEED 45 PAGES. ANY REPLIES IN SUPPORT OF SAID MOTIONS SHALL BE FILED ON OR BEFORE MAY 19, 2025 AND SHALL NOT EXCEED 30 PAGES. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 1/15/25. 1/16/25 ENTERED AND COPIES E–MAILED.(bw) (Entered: 01/16/2025) |
| 01/17/2025 | 334 | Joint MOTION to Amend/Correct 333 Scheduling Order, filed by DONALD J. TRUMP, ALEX M. AZAR, II, UNITED STATES OF AMERICA, DONALD J. WRIGHT, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, STEVEN T. MNUCHIN, UNITED STATES DEPARTMENT OF THE TREASURY, RENE ALEXANDER ACOSTA, UNITED STATES DEPARTMENT OF LABOR.. (Attachments: # 1 Text of Proposed Order)(RIESS, DANIEL) (Entered: 01/17/2025) |
| 01/17/2025 | 335 | ORDER THAT UPON CONSIDERATION OF THE PARTIES JOINT MOTION TO AMEND (ECF NO. 334), IT IS HEREBY ORDERED AS FOLLOWS: PLAINTIFFS SHALL HAVE UNTIL FEBRUARY 25, 2025 TO FILE THEIR MOTION FOR SUMMARY JUDGMENT, WHICH SHALL NOT EXCEED 45 PAGES. FEDERAL DEFENDANTS AND INTERVENOR DEFENDANTS SHALL HAVE UNTIL MARCH 28, 2025 TO FILE THEIR RESPECTIVE COMBINED CROSS–MOTIONS FOR SUMMARY JUDGMENT AND RESPONSES TO PLAINTIFFS MOTION. NEITHER COMBINED BRIEF SHALL EXCEED 45 PAGES. PLAINTIFFS SHALL HAVE UNTIL APRIL 22, 2025 TO FILE A COMBINED RESPONSE TO DEFENDANTS CROSS–MOTIONS AND REPLY IN SUPPORT OF THEIR MOTION, WHICH SHALL NOT EXCEED 30 PAGES. FEDERAL DEFENDANTS AND INTERVENOR DEFENDANTS SHALL HAVE UNTIL MAY 19, 2025 TO FILE THEIR RESPECTIVE REPLIES IN SUPPORT OF THEIR CROSS–MOTIONS. NEITHER REPLY SHALL EXCEED 20 PAGES. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 1/17/25. 1/17/25 ENTERED AND COPIES E–MAILED.(bw) (Entered: 01/17/2025) |
| 02/21/2025 | 336 | Letter dated February 21, 2025, requesting extension on briefing dates by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (Bohn, |

| | | |
|---|---|---|
| | | Joshua) (Entered: 02/21/2025) |
| 02/24/2025 | 337 | AMENDED SCHEDULING ORDER. ORDER THAT 1. Plaintiffs shall have until March 11, 2025 to file their Motion for Summary Judgment, which shall not exceed 45 pages. 2. Federal Defendants and Intervenor Defendants shall have until April 18, 2025 to file their respective combined Cross–Motions for Summary Judgment and Responses to Plaintiffs Motion. Neither combined brief shall exceed 45 pages. 3. Plaintiffs shall have until May 19, 2025 to file a combined Response to Defendants' Cross–Motions and Reply in support of their Motion, which shall not exceed 30 pages. 4. Federal Defendants and Intervenor Defendants shall have until July 3, 2025 to file their respective Replies in Support of their Cross–Motions. Neither Reply shall exceed 20 pages. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 2/24/25. 2/24/25 ENTERED & E–MAILED.(fdc) (Entered: 02/24/2025) |
| 03/04/2025 | 338 | NOTICE of Withdrawal of Appearance by REBECCA M. KOPPLIN on behalf of RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT(KOPPLIN, REBECCA) (Entered: 03/04/2025) |
| 03/06/2025 | 339 | Joint MOTION to Amend/Correct 337 Scheduling Order,,, filed by STATE OF NEW JERSEY.. (Attachments: # 1 Text of Proposed Order)(Bohn, Joshua) (Entered: 03/06/2025) |
| 03/06/2025 | 340 | AMENDED SCHEDULING ORDER. ORDERED THAT THE PARTIES SHALL BE PERMITTED TO DISPENSE WITH THE REFILING OF THE PREVIOUS JOINT APPENDIX FILED AS ECF NO. 253 AND THE SUPPLEMENT OF JOINT APPENDIX FILED AS ECF NO. 256, AS REQUIRED BY THE COURTS POLICIES AND PROCEDURES, AND MAY INSTEAD CITE DIRECTLY TO THESE FILED APPENDICES WITHIN THEIR MOTION BRIEFS. THE PARTIES SHALL BE PERMITTED TO DISPENSE WITH THE FILING OF ANY ADDITIONAL SEPARATE STATEMENTS OF FACTS, AS REQUIRED BY THE COURTS POLICIES AND PROCEDURES. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 3/6/25. 3/6/25 ENTERED AND COPIES E–MAILED.(bw) (Entered: 03/06/2025) |
| 03/11/2025 | 341 | MOTION for Summary Judgment filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY.Memorandum. (Attachments: # 1 Memorandum, # 2 Exhibit 186, # 3 Text of Proposed Order)(THOMSON, AIMEE) (Attachments 1 and 2 replaced on 4/21/2025 as per Chambers.) (va) (Entered: 03/11/2025) |
| 04/17/2025 | 342 | MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Memorandum. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(RIENZI, MARK) (Entered: 04/17/2025) |
| 04/18/2025 | 343 | Cross MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT.. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(RIESS, DANIEL) (Entered: 04/18/2025) |
| 04/18/2025 | 344 | RESPONSE in Opposition re 341 MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (Attachments: # 1 Text of Proposed Order)(RIESS, DANIEL) (Entered: 04/18/2025) |
| 05/19/2025 | 345 | REPLY to Response to Motion re 341 MOTION for Summary Judgment , 343 Cross MOTION for Summary Judgment , 342 MOTION for Summary Judgment , RESPONSE in Opposition filed by COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW JERSEY. (THOMSON, AIMEE) (Entered: 05/19/2025) |

| | | |
|---|---|---|
| 06/24/2025 | 346 | MOTION for Pro Hac Vice *of Kelsey Baer Flores* ( Filing fee $ 75 receipt number APAEDC−18386818.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 06/24/2025) |
| 06/24/2025 | 347 | MOTION for Pro Hac Vice *of Daniel L. Chen* ( Filing fee $ 75 receipt number APAEDC−18386844.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 06/24/2025) |
| 06/24/2025 | 348 | MOTION for Pro Hac Vice *Benjamin A. Fleshman* ( Filing fee $ 75 receipt number APAEDC−18386850.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 06/24/2025) |
| 06/24/2025 | 349 | MOTION for Pro Hac Vice *Adele A. Keim* ( Filing fee $ 75 receipt number APAEDC−18386860.) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.Certificate of Service.(CENTRELLA, NICHOLAS) (Entered: 06/24/2025) |
| 06/25/2025 | 350 | ORDER THAT THE MOTION FOR PRO HAC VICE FOR ATTORNEY, KELSEY BAER FLORES 346 IS GRANTED. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 6/25/25.6/25/25 ENTERED AND COPIES E−MAILED.(bw) (Entered: 06/25/2025) |
| 06/25/2025 | 351 | ORDER THAT THE MOTION FOR PRO HAC VICE FOR ATTORNEY DANIEL L. CHEN 347 IS GRANTED. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 6/25/25.6/25/25 ENTERED AND COPIES E−MAILED.(bw) (Entered: 06/25/2025) |
| 06/25/2025 | 352 | ORDER THAT THE MOTION FOR PRO HAC VICE FOR ATTORNEY, BENJAMIN A. FLESHMAN 348 IS GRANTED BY DISTRICT JUDGE WENDY BEETLESTONE ON 6/25/25.6/25/25 ENTERED AND COPIES E−MAILED.(bw) (Entered: 06/25/2025) |
| 06/25/2025 | 353 | ORDER THAT THE MOTION FOR PRO HAC VICE FOR ATTORNEY ADELE A. KEIM 349 IS GRANTED. SIGNED BY DISTRICT JUDGE WENDY BEETLESTONE ON 6/25/25.6/25/25 ENTERED AND COPIES E−MAILED.(bw) (Entered: 06/25/2025) |
| 06/27/2025 | 354 | REPLY to Response to Motion re 341 MOTION for Summary Judgment , 343 Cross MOTION for Summary Judgment , 342 MOTION for Summary Judgment filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. (RIENZI, MARK) (Entered: 06/27/2025) |
| 07/03/2025 | 355 | REPLY to Response to Motion re 343 Cross MOTION for Summary Judgment filed by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. (RIESS, DANIEL) (Entered: 07/03/2025) |
| 08/13/2025 | 356 | MEMORANDUM AND/OR OPINION. SIGNED BY CHIEF JUDGE WENDY BEETLESTONE ON 8/13/25. 8/13/25 ENTERED AND COPIES E−MAILED.(bw) (Entered: 08/13/2025) |
| 08/13/2025 | 357 | ORDER THAT THE SUMMARY JUDGMENT IS GRANTED AND JUDGMENT IS ENTERED IN PLAINTIFFS FAVOR AS TO PLAINTIFFS CLAIMS THAT THE RULES ARE ARBITRARY AND CAPRICIOUS IN VIOLATION OF 5 U.S.C. § 706(2)(A). SUMMARY JUDGMENT IS GRANTED AND JUDGMENT IS ENTERED IN DEFENDANTS AND DEFENDANT−INTERVENORS FAVOR AS TO PLAINTIFFS CLAIMS THAT THE RULES WERE PROMULGATED IN EXCESS OF DEFENDANTS STATUTORY AUTHORITY AND IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACTS (APA), 5 U.S.C. § 551, ET SEQ., NOTICE−AND−COMMENT REQUIREMENT, ID. § 553. PLAINTIFFS CLAIMS PURSUANT TO THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT, U.S. CONST. AMEND. V; TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000E; AND, THE ESTABLISHMENT CLAUSE, U.S. |

| | | |
|---|---|---|
| | | CONST., AMEND. I ARE DISMISSED WITH PREJUDICE, UPON PLAINTIFFS REQUEST, PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(A). THE RELIGIOUS EXEMPTION RULE AND THE MORAL EXEMPTION RULE ARE VACATED. SIGNED BY CHIEF JUDGE WENDY BEETLESTONE ON 8/13/25. 8/13/25 ENTERED AND COPIES E–MAILED.(bw) (Entered: 08/13/2025) |
| 08/13/2025 | 358 | NOTICE OF APPEAL as to 357 Order (Memorandum and/or Opinion),,,, 356 Memorandum and/or Opinion by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. Filing fee $ 605, receipt number APAEDC–18508083. (RIENZI, MARK) (Entered: 08/13/2025) |
| 08/15/2025 | 359 | NOTICE of Withdrawal of Appearance by KELSEY BAER FLORES on behalf of LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME(FLORES, KELSEY) (Entered: 08/15/2025) |
| 08/20/2025 | 360 | NOTICE of Docketing Record on Appeal from USCA re 358 Notice of Appeal (Credit Card Payment) filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME. USCA Case Number 25–2575 (fdc) (Entered: 08/20/2025) |
| 08/26/2025 | 361 | NOTICE OF APPEAL as to 357 Order (Memorandum and/or Opinion),,,, 356 Memorandum and/or Opinion by RENE ALEXANDER ACOSTA, ALEX M. AZAR, II, STEVEN T. MNUCHIN, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, DONALD J. WRIGHT. Filing fee $ 605. (RIESS, DANIEL) (Entered: 08/26/2025) |
| 08/29/2025 | 362 | TPO Form re 358 Notice of Appeal (Credit Card Payment) : (RIENZI, MARK) (Entered: 08/29/2025) |
| 09/05/2025 | 363 | NOTICE of Docketing Record on Appeal from USCA. Notice of Appeal. USCA Case Number 25–2662 (bw) (Entered: 09/05/2025) |
| 09/22/2025 | 364 | Consent MOTION to Stay *Judgment Pending Appeal in Part* filed by LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME.. (Attachments: # 1 Proposed Order)(RIENZI, MARK) (Entered: 09/22/2025) |
| 10/15/2025 | 365 | ORDER THAT UPON CONSIDERATION OF DEFENDANT–INTERVENORS CONSENT MOTION FOR PARTIAL STAY OF JUDGMENT PENDING APPEAL (ECF NO. 364), IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED. THE PORTION OF THE COURTS JUDGMENT VACATING 82 FED. REG. 47,792 AND 83 FED. REG. 57,536 (ECF NO. 357) IS STAYED WITH RESPECT TO DEFENDANT–INTERVENOR ONLY. SIGNED BY CHIEF JUDGE WENDY BEETLESTONE ON 10/15/25.10/15/25 ENTERED AND COPIES E–MAILED.(bw) (Entered: 10/15/2025) |

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,<br><br>     Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; ALEX M. AZAR II, *in his official capacity as Secretary of Health and Human Services*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, *in his official capacity as Secretary of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA,<br><br>     Defendants. | **No. 2:17-cv-04540-WB** |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

  The Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro, and

the State of New Jersey, by and through Attorney General Gurbir S. Grewal, hereby file this

Amended Complaint against Defendants Donald J. Trump, in his official capacity as President of

the United States; Alex M. Azar II, in his official capacity as Secretary of Health and Human

Services; the United States Department of Health and Human Services (HHS); Steven T.

Mnuchin, in his official capacity as Secretary of the Treasury; the United States Department of

the Treasury; Rene Alexander Acosta, in his official capacity as Secretary of Labor; the United

States Department of Labor; and the United States of America (collectively, "Defendants") and, in support thereof, state the following:

1.      This lawsuit challenges Defendants' illegal and unjustified attempts to deny millions of women in Pennsylvania, New Jersey, and across the country access to necessary preventive healthcare. As set forth more fully below, Defendants' actions violate, among other provisions of law, the Administrative Procedure Act, the Affordable Care Act, the guarantee of equal protection enshrined in the Due Process Clause of the Fifth Amendment to the United States Constitution, Title VII of the Civil Rights Act, the Pregnancy Discrimination Act, and the Establishment Clause of the First Amendment. If Defendants are not blocked from implementing their unlawful rules, direct harm will result to the Commonwealth of Pennsylvania, the State of New Jersey, and the medical and economic health of their residents. Because these rules will cause irreparable harm and were issued in violation of law, the Commonwealth of Pennsylvania and the State of New Jersey seek declaratory and injunctive relief holding the rules unlawful and preventing their implementation.

## INTRODUCTION

2.      The Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18001 et seq. (2010), together with its implementing regulations, requires certain health plans to cover all FDA-approved methods of contraception without imposing cost-sharing requirements on the insured. This requirement is known as the Contraceptive Care Mandate.

3.      Because of the Contraceptive Care Mandate, over 55 million women have access to birth control without paying out-of-pocket costs, including 2.5 million women in Pennsylvania and 1.7 million in New Jersey. *See* Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women: Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* 84 (2016) (the "WPSI Report"); HHS,

2

*The Affordable Care Act is improving access to preventive services for millions of Americans* (2015).[1] American women and their families covered by private insurance have saved an estimated 70 percent on contraceptive costs as a result. WPSI Report at 84.

4.      Contraception approved by the U.S. Food and Drug Administration is medicine, and its use has been shown to reduce the rates of unintended pregnancies and abortions. *See* Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 105 (2011) (the "IOM Report") (ECF No. 9-4).

5.      Doctors prescribe contraception to their patients for many reasons, some not having to do with birth control at all. For example, doctors frequently prescribe contraception for treatment of various menstrual disorders, acne, abnormal growth of bodily hair, and pelvic pain. According to a 2011 report, more than 1.5 million women rely on oral "birth control" pills for medical reasons unrelated to preventing pregnancy, and 58 percent of all users of birth control pills—more than half—use them, at least in part, for purposes other than pregnancy prevention. *See* Rachel K. Jones, *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*, Guttmacher Institute 3 (2011).[2]

6.      For these and other reasons, "access to contraception improves the social and economic status of women." *Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act*, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012) (citations omitted).

---

[1] https://aspe.hhs.gov/sites/default/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.

[2] https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf.

3

7.      As a result of the Affordable Care Act, millions of American women enjoy a greater degree of control over their own medical health and can more fully participate in the workforce.

8.      Defendants, however, threaten to deny many of these women the contraceptive health coverage on which they have come to rely by making the Contraceptive Care Mandate effectively optional.

9.      Defendants have issued regulations that create broad exemptions from the ACA's Contraceptive Care Mandate, and they have done so in violation of the Administrative Procedure Act (APA), the ACA, the U.S. Constitution, and federal law.

10.     These regulations will allow individual employers, educational institutions, or other plan sponsors to decide whether women insured have access to contraception without out-of-pocket charges.

11.     Defendants first issued these regulations as Interim Final Rules (IFRs). *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (the "Religious Exemption IFR"); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (the "Moral Exemption IFR") (together, "the IFRs") (ECF Nos. 9-2 & 9-3).

12.     The IFRs went into effect immediately but were subsequently enjoined by this Court for violating the APA and the ACA (ECF Nos. 59 & 60).

13.     After accepting public comment, Defendants subsequently issued rules that "finalize" the religious and moral exemptions created in the IFRs. *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*,

4

83 Fed. Reg. 57,536 (Nov. 15, 2018) (the "final Religious Exemption Rule"); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (the "final Moral Exemption Rule") (together, the "final Exemption Rules"). The final Exemption Rules are attached respectively as Exhibits A and B.

14.     The final Exemption Rules are scheduled to go into effect on January 14, 2019.

15.     The final Exemption Rules were issued in direct violation of the substantive and procedural requirements of the APA.

16.     In issuing the IFRs, Defendants failed to engage in notice and comment rulemaking as required by the APA and failed to show good cause for not doing so.

17.     Because the final Exemption Rules "finalize" the IFRs, Defendants' subsequent acceptance of public comment does not cure the final rules of this procedural violation.

18.     Defendants also failed to respond to significant comments and failed to provide adequate statements of the final rules' bases and purposes, as required by the APA.

19.     The final Exemption Rules are also arbitrary and capricious, and their promulgation constitutes an abuse of discretion.

20.     In addition, the final Exemption Rules themselves violate the requirements of the Affordable Care Act.

21.     Furthermore, the final Exemption Rules apply only to one category of health services: contraception. And the preventative health benefits of contraception apply only to women.

5

22.     By singling out women for such negative, differential treatment, Defendants have violated the equal protection guarantee of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

23.     Pennsylvania and New Jersey will suffer direct, proprietary harm as a result of the final Exemption Rules. When employers refuse to allow their health insurance plans to cover access to contraception, women will be forced to turn to state-funded programs that provide contraceptive services. Pennsylvania and New Jersey will also be forced to bear additional healthcare costs due to an increase in unintended pregnancies.

24.     In addition, Pennsylvania and New Jersey possess strong interests in protecting the medical and economic health of their residents, minimizing unintended pregnancies and abortions, and ensuring that all of their residents—both men and women—are free and able to fully participate in the workforce, maximize their social and economic status, and contribute to their economies without facing discrimination on the basis of sex.

25.     These interested are enshrined in the Pennsylvania Constitution, which declares, "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." PA. CONST. art. I, § 28.

26.     Likewise, Article I, Paragraph 1 of the New Jersey Constitution guarantees equal protection rights to New Jersey residents, and New Jersey's Law Against Discrimination, N.J.S.A. 10:5-12, makes it unlawful to subject people to differential treatment based on sex.

27.     Defendants' actions directly undermine these vital state interests.

28.     Because Defendants have engaged in illegal conduct that will harm Pennsylvania, New Jersey, and their citizens in these and other ways, this Court should hold that the final Exemption Rules, like the IFRs, are unlawful and set them aside. Pennsylvania and New Jersey

6

also seek a preliminary injunction to maintain the status quo throughout all future proceedings in this matter.

## JURISDICTION AND VENUE

29.    This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701–06, and the United States Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

30.    In addition, this Court has the authority to issue the declaratory relief sought pursuant to 28 U.S.C. § 2201.

31.    Venue is proper in this Court because Plaintiff the Commonwealth of Pennsylvania resides in this district and because a substantial part of the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(e)(1).

## THE PARTIES

32.    Plaintiff, the Commonwealth of Pennsylvania, is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1.

33.    Plaintiff, the State of New Jersey, is a sovereign state of the United States of America.  This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

34.    In filing this action, the Attorneys General seek to protect the citizens and agencies of Pennsylvania and New Jersey from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to Pennsylvania and New Jersey by Defendants' actions. Those injuries include harm to Pennsylvania's and New Jersey's sovereign, quasi-sovereign, and proprietary interests.

35.     Defendant Donald J. Trump is the President of the United States of America and is sued in his official capacity. His principal address is 1600 Pennsylvania Avenue NW, Washington, D.C. 20201.

36.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services and is sued in his official capacity. His principal address is 200 Independence Avenue, SW, Washington, D.C. 20201

37.     Defendant the United States Department of Health and Humans Services is an executive agency of the United States of America. Its principal address is 200 Independence Avenue, SW, Washington, D.C. 20201

38.     Defendant Steven T. Mnuchin is the Secretary of the United States Department of the Treasury and is sued in his official capacity. His principal address is 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220.

39.     Defendant the United States Department of the Treasury is an executive agency of the United States of America. Its principal address is 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220.

40.     Defendant Rene Alexander Acosta is the Secretary of the United States Department of Labor and is sued in his official capacity. His principal address is 200 Constitution Avenue, NW, Washington DC 20210.

41.     Defendant the United States Department of Labor is an executive agency of the United States of America. Its principal address is 200 Constitution Avenue, NW, Washington DC 20210.

42.     Defendants the Department of Health and Humans Services, the Department of the Treasury, and the Department of Labor (together, the "Departments") are each responsible

for implementing various provisions of the ACA. The Departments jointly issued the IFRs and the final Exemption Rules, which gave rise to this action.

43.     Defendant the United States of America encompasses the government agencies and departments responsible for the implementation of the Affordable Care Act under the Constitution of the United States.

44.     Defendants Azar, Mnuchin, and Acosta are each responsible for carrying out the duties of their respective agencies under the Constitution of the United States of America and relevant statutes, including the Affordable Care Act.

45.     Defendant Trump is responsible for faithfully enforcing the laws of the United States of America pursuant to and in accordance with the Constitution of the United States.

## BACKGROUND

### Congress Passes the Affordable Care Act and Women's Health Amendment

46.     Access to preventive health services, including contraception, is essential for women to exercise control over their own healthcare and fully participate as members of society.

47.     Access to contraception, in particular, allows women greater control over their reproductive health choices so they can better pursue educational, career, and personal goals.

48.     Indeed, the expansion of preventive health services for women was a specific goal of the healthcare reform efforts that led to the passage of the Affordable Care Act.

49.     Recognizing this need to expand women's access to preventive health services and reduce gender disparities in out-of-pocket costs, the U.S. Senate passed the "Women's Health Amendment" during debate over the ACA. *See* S. Amdt. 2791, 111th Congress (2009–2010).

50.    This Amendment was included in the final version of the ACA, which was signed into law on March 23, 2010. *See* ACA § 1001; Public Health Service Act (as amended by the ACA) § 2713, 42 U.S.C. § 300gg-13(a)(4).

51.    The Women's Health Amendment mandated that group health plans and health insurance issuers offering group or individual health insurance cover preventive health services and screenings for women—and do so with no cost-sharing responsibilities. 42 U.S.C. § 300gg-13(a)(4). Some employer-sponsored plans that were in existence prior to passage were exempt from this requirement and most of the other requirements imposed by the ACA.  *See* 29 C.F.R. § 2590.715-1251 (2010).

52.    During Senate debate on the Women's Health Amendment, lead sponsor Senator Barbara Mikulski explained that the amendment "leaves the decision of which preventive services a patient will use between the doctor and the patient." 155 Cong. Rec. S11988 (Nov. 30, 2009) (statement of Sen. Barbara Mikulski). She further emphasized that the "decision about what is medically appropriate and medically necessary is between a woman and her doctor." *Id.*

53.    Senator Benjamin Cardin, who co-sponsored the Amendment, explained that it "extends the preventive services covered by the bill to those *evidence-based* services for women that are recommended by the Health Resources and Services Administration." 155 Cong. Rec. S12058–59 (Dec. 1, 2009) (statement of Sen. Benjamin Cardin) (emphasis added).

54.    Congress did not dictate which specific preventive services were to be covered by the Amendment. Rather, they were to be determined by guidelines issued by experts at the Health Resources and Services Administration (HRSA), an agency of Defendant the United States Department of Health and Human Services (HHS). *Id.*

**The Institute of Medicine Report on Clinical Preventive Services for Women**

55.    Following passage of the Affordable Care Act, HRSA complied with its legal responsibility to determine coverage guidelines by commissioning the then-named Institute of Medicine (IOM[3]) to issue recommendations identifying what specific preventive women's health services should be covered under the ACA's mandate. A private, nonprofit, and non-governmental institution, IOM is an "independent, evidence-based scientific advisor" operating under the 1863 congressional charter of the National Academy of Sciences. Nat'l Acad. Med., *About the National Academy of Medicine*.[4]

56.    IOM, in turn, convened a committee of sixteen members, including specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines, to formulate specific recommendations. *See* IOM Report.

57.    After conducting an extensive study, that committee issued a comprehensive report, which identified several evidence-based preventive health services, unique to women, that it recommended be included as part of the HRSA's comprehensive guidelines under the ACA. *See* IOM Report.

58.    As set forth in its Report, IOM found that contraceptives are a preventive service that should be covered under the ACA's mandate. *See* IOM Report at 109–10. In making this finding, IOM cited evidence that "contraception and contraceptive counseling" are "effective at reducing unintended pregnancies" and observed that "[n]umerous health professional

---

[3] IOM was renamed the National Academy of Medicine in 2015. Press Release, National Academies of Sciences, Engineering, and Medicine, Institute of Medicine to Become National Academy of Medicine (Apr. 28, 2015), http://www.nationalacademies.org/hmd/Global/News%20Announcements/IOM-to-become-NAM-Press-Release.aspx. Because the Report was issued in the name of IOM, this Complaint refers to IOM throughout.

[4] https://nam.edu/about-the-nam/.

associations recommend" that such family planning services be included as part of mandated preventive care for women. *See* IOM Report at 109.

59.     Relying, in part, on recommendations from the American Academy of Pediatrics, the Society of Adolescent Medicine, the American Medical Association, the American Public Health Association, and the Association of Women's Health, Obstetric and Neonatal Nurses, IOM recommended that all employer sponsored health plans cover the "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." IOM Report at 109–10.

60.     IOM based its recommendation on several important factors, including the prevalence of unintended pregnancy in the United States. As stated in its Report, in 2001, an estimated "49 percent of all pregnancies in the United States were unintended—defined as unwanted or mistimed at the time of conception." IOM Report at 102 (internal citations omitted).

61.     IOM found that these unintended pregnancies disproportionately impact the most vulnerable: Although one in every 20 American women has an unintended pregnancy each year, unintended pregnancy is "more likely among women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group." *Id.*

62.     Unintended pregnancies are more likely to result in abortions: "In 2001, 42 percent of … unintended pregnancies [in the United States] ended in abortion." *Id.*

63.     Moreover, women carrying babies to term are less likely to follow best health practices where those pregnancies are unintended. According to the IOM Committee on Unintended Pregnancy, "women with unintended pregnancies are more likely than those with

intended pregnancies to receive later or no prenatal care, to smoke and consume alcohol during
pregnancy." IOM Report at 103.

64.     Women facing unintended pregnancies are also more likely to be "depressed
during pregnancy, and to experience domestic violence during pregnancy." *Id.*

65.     IOM also found "significantly increased odds of preterm birth and low birth
weight among unintended pregnancies ending in live births compared with pregnancies that were
intended." *Id.*

66.     While all pregnancies carry inherent health risks, some women have serious
medical conditions for which pregnancy is strictly contraindicated. IOM specifically found that
"women with serious medical conditions such as pulmonary hypertension (etiologies can include
idiopathic pulmonary arterial hypertension and others) and cyanotic heart disease, and . . .
Marfan Syndrome," are advised against becoming pregnant. *Id.* For these women, contraception
can be necessary, lifesaving medical care.

67.     Use of contraceptives also promotes medically recommended "spacing" between
pregnancies. IOM found that such pregnancy spacing is important because of the "increased risk
of adverse pregnancy outcomes for pregnancies that are too closely spaced (within 18 months of
a prior pregnancy)" and that "[s]hort interpregnancy intervals in particular have been associated
with low birth weight, prematurity, and small for gestational age births." IOM Report at 103.

68.     IOM also found that contraceptives are effective in preventing unintended
pregnancies. As stated in the IOM Report, "greater use of contraception within the population
produces lower unintended pregnancy and abortion rates nationally." IOM Report at 105.

69.     IOM specifically highlighted a study showing that, as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, their rates of unintended pregnancy and abortion declined. *Id.*

70.     IOM reported other studies that showed increased rates of contraceptive use by adolescents from the early 1990s to the early 2000s was associated with a "decline in teen pregnancies" and, conversely, that "periodic increases in the teen pregnancy rate are associated with lower rates of contraceptive use." IOM Report at 105.

71.     IOM also found that contraception, as a method of preventing unintended pregnancy, is highly cost-effective, citing, among other things, savings in medical costs. It reported that "the direct medical cost of unintended pregnancy in the United States was estimated to be nearly $5 billion in 2002, with the cost savings due to contraceptive use estimated to be $19.3 billion." IOM Report at 107.

72.     In addition to preventing unintended pregnancies, IOM recognized that contraceptives have other significant health benefits unrelated to preventing unintended pregnancy. IOM stated in its Report that these "non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain." IOM Report at 104. Long-term use of oral contraceptives has also been shown to "reduce a woman's risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases." *Id.*

73.     Indeed, a leading research and policy organization committed to advancing sexual and reproductive health and rights in the United States and globally found in a 2011 report that more than 1.5 million women rely on oral contraceptive "birth control" pills for medical reasons unrelated to preventing pregnancy and that that 58 percent of all users of birth control pills—

14

more than half—use them, at least in part, for purposes other than pregnancy prevention. *See*

Jones, *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*, at 3.

74.    As of 2008, there were still "approximately 36 million U.S. women of

reproductive age (usually defined as ages 15 to 44 years)" who were "estimated to be in need of

family planning services because they were sexually active, able to get pregnant, and not trying

to get pregnant." IOM Report at 103.

75.    Importantly, IOM noted that cost is a meaningful barrier to contraceptive access,

stating that "[d]espite increases in private health insurance coverage of contraception since the

1990s, many women do not have insurance coverage or are in health plans in which copayments

for visits and for prescriptions have increased in recent years" and citing to a Kaiser Permanente

study that found "when out-of-pocket costs for contraceptives were eliminated or reduced,

women were more likely to rely on more effective long-acting contraceptive methods." IOM

Report at 109.

### The Health Resources and Services Administration Adopts the IOM Report and Promulgates Guidelines

76.    HRSA agreed with and adopted IOM's recommendation that contraceptive

services be covered under the Women's Health Amendment to the Affordable Care Act.

77.    In August 2011, pursuant to its responsibility under the ACA, HRSA promulgated

the Women's Preventive Service Guidelines (the "Guidelines"). *See* HRSA, *Women's Preventive*

*Services Guidelines* (2011).[5]

78.    These Guidelines required that, as part of their group health plans, plan sponsors

must cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization

---

[5] https://www.hrsa.gov/womens-guidelines/index.html#2.

procedures, and patient education and counseling for all women with reproductive capacity," without any cost-sharing or payment by the insureds. *Id.*

79.    As recently as December 2016, HRSA updated the Guidelines, following yet another review of relevant evidence, and determined that contraceptive care and services should remain mandated preventive services. *See* HRSA, *Women's Preventative Services Guidelines* (2016).[6]

**The Departments Grant Limited Exemptions and Accommodations to Religious Objectors**

80.    The Affordable Care Act does not contain a "conscience clause" that would allow employers to opt out of providing those preventive services required by the statute.

81.    Nevertheless, in 2011, the Departments undertook regulatory action to accommodate religious objectors.

82.    The Departments first issued regulations in 2011 that exempted "churches, their integrated auxiliaries, and conventions or associations of churches" from the ACA's requirement that employers cover contraceptive services, without cost-sharing requirements, under employee group healthcare plans—provided these conscientious objectors satisfied certain criteria.[7]

83.    To qualify, the purpose of the organization had to be "[t]he inculcation of religious values"; the organization had to primarily employ and serve "persons who share the religious tenets of the organization"; and the organization had to operate as a non-profit. 76 Fed. Reg. at 46,623.

---

[6] https://www.hrsa.gov/womens-guidelines-2016/index.html.

[7] *See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 76 Fed. Reg. 46,621 (Aug. 3, 2011); *Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 77 Fed. Reg. 8725 (Feb. 15, 2012).

84.    In addition, several Senators proposed amending the Affordable Care Act to allow health plans to refuse to provide coverage for certain services if doing so was "contrary to the religious beliefs or moral convictions of the sponsor, issuer, or other entity offering the plan." S. Amdt. 1520, 112th Congress (2011–2012).

85.    The proposed amendment was necessary, its sponsors argued, because the ACA "does not allow purchasers, plan sponsors, and other stakeholders with religious or moral objections to specific items or services to decline providing or obtaining coverage of such items or services, or allow health care providers with such objections to decline to provide them." *Id.*

86.    That proposed amendment was rejected and did not become law. 158 Cong. Rec. S1172-S1172 (Mar. 1, 2012).

87.    The following year, the Departments amended the original religious exemption. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870 (July 2, 2013) (the "Second Religious Exemption"). To claim the Second Religious Exemption, an organization must simply operate as a non-profit and be a church, its integrated auxiliary, or a convention or association of churches. *Id.* at 39,874.

88.    At the same time, the Departments established an "accommodation" for religious nonprofit organizations that did not qualify for the Second Religious Exemption but still wanted to avoid the ACA's mandate of having to provide contraceptive services to their employees (the "Accommodation"). *Id.* at 39,874–82.

89.    Under the Accommodation, an objecting employer could self-certify as an eligible organization. Once it self-certified, the health insurance issuer—not the objecting employer— would have to provide the necessary and required contraceptive services directly to women covered under the sponsor's plan. *Id.* In this way, women whose employers refused to pay for the

17

legally mandated contraceptive coverage under the Accommodation still had access to
contraceptive care.

90.    At that time, the Defendant Departments declined to create any broader
exceptions to the Contraceptive Care Mandate. Instead, they struck a balance by adhering to the
evidence-based approach to women's preventive health needs intended by Congress and
allowing only the Second Religious Exemption and the Accommodation, two reasonable
exceptions under which religious organizations and nonprofit employers with religious
objections, could opt out of the ACA's Contraceptive Care Mandate.

91.    Indeed, throughout this process, the government continued to recognize that
guaranteeing women's access to contraceptive services is an essential healthcare component to
allowing women to participate as full members of society.

92.    For example, even while trying to accommodate the views of religious objectors,
the Defendant Departments firmly articulated that barriers to contraceptive access "place[]
women in the workforce at a disadvantage compared to their male co-workers" and observed
that, "by reducing the number of unintended and potentially unhealthy pregnancies,
[contraceptive coverage] furthers the goal of eliminating this disparity by allowing women to
achieve equal status as healthy and productive members of the job force." 77 Fed. Reg. at 8728
(footnote omitted).

### Litigation Challenging the ACA's Contraceptive Care Mandate

93.    Following passage of the ACA and promulgation of the relevant implementing
regulations, several employers filed lawsuits to challenge the scope of the Contraceptive Care
Mandate, the Second Religious Exemption, and the Accommodation.

94.    In *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), the Supreme
Court concluded that applying the ACA's Contraceptive Care Mandate to closely held

corporations that objected on the basis of sincerely held religious beliefs but that were not eligible for the Accommodation violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1.

95.    That statute provides that the government may not "substantially burden a person's exercise of religion" unless it did so "in furtherance of a compelling governmental interest" and adopted "the least restrictive means of furthering that compelling governmental interest." *Id.*

96.    As a result of the ruling in *Hobby Lobby*, the Defendant Departments began allowing closely held for-profit entities to take advantage of the Accommodation process previously available only to nonprofit employers. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 80 Fed. Reg. 41,318 (July 14, 2015).

97.    In *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), the Supreme Court considered several consolidated challenges to the Accommodation itself. Following oral argument, the Court sought clarification from the parties as to whether a modified accommodation process that did not require the employer to formally notify its insurance company of its objection—but would still ensure that the employer's employees received contraceptive coverage—would accommodate both the government's interests and the objections of certain religious employers. *Id.* at 1559-60.

98.    After receiving clarification from the parties, the Supreme Court remanded to provide them with "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'" *Id.* at 1560 (citation omitted).

99.     On January 9, 2017, the Department of Labor announced that "no feasible approach has been identified . . . that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." Dep't of Labor, *FAQs about Affordable Care Act Implementation Part 36*, at 4 (Jan. 9, 2017).

100.     As such, the Department reaffirmed that the Accommodation "does not substantially burden [objecting employers'] exercise of religion." *Id.* at 4–5. Even if it did, the Department also reaffirmed that "the accommodation is the least restrictive means of furthering the government's compelling interest in ensuring that women receive full and equal health coverage, including contraceptive coverage." *Id.*

## President Trump's Executive Order "Promoting Free Speech and Religious Liberty"

101.     On May 4, 2017, President Donald Trump issued an Executive Order entitled "Promoting Free Speech and Religious Liberty."  Exec. Order No. 13798, 82 Fed. Reg. 21,675 (May 4, 2017).

102.     Among other provisions, this Executive Order directed the Defendant Departments to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4) of Title 42, United States Code."  *Id.* § 3.

103.     This Executive Order did not specifically mention the Contraceptive Care Mandate. Rather, the President directed the Defendant Departments to consider issuing amended regulations to address conscience-based objections to services provided under the Women's Health Amendment to the Affordable Care Act only.

20

104.     The President did not, for example, direct the Departments to consider regulations addressing objections to similar requirements to provide other preventive services. *See* 42 U.S. Code § 300gg-13(a)(1)-(3).

105.     President Trump's Executive Order did not identify any deficiencies with the existing regulations that addressed conscience-based objections (the Second Religious Exemption and the Accommodation) or provide any guidance whatsoever as to the amended regulations that the President had directed the Departments to consider issuing.

106.     The Executive Order did not direct the agencies to comply with *Zubik*'s command that any exemptions to the Contraceptive Care Mandate "ensur[e] that women covered by … health plans 'receive full and equal health coverage, including contraceptive coverage.'" 136 S. Ct. at 1560. It stated only that any amended regulations issued must be "consistent with applicable law."  *Id.* § 3.

### The Departments Issue the IFRs Without Engaging in Required Notice-and-Comment Rulemaking

107.     On October 6, 2017, the Defendant Departments issued the Moral Exemption and Religious Exemption IFRs without any advance public notice and without inviting or providing opportunity for comment.

108.     The Religious Exemption IFR significantly expanded the scope of the existing religious exemption. Specifically, it allowed all employers—including non-profits, closely held for-profits companies, and publicly traded corporations—to opt out of providing no-cost contraceptive coverage to their employees on the basis of the employer's "sincerely held religious beliefs." 82 Fed. Reg. at 47,808–12. It also extended the exemption to institutions of higher education, insurance issuers, and individuals. *Id.*

21

109.    The Religious Exemption IFR suggested that, if owners of a majority of a company's shares possess a religious objection to contraceptive coverage, the company can simply refuse to provide such coverage. The Religious Exemption IFR stated that "in a country as large as America comprised of a supermajority of religious persons . . . the majority of shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character." *Id.* at 47,810.

110.    The Moral Exemption IFR created a brand new exemption allowing employers to refuse to provide their employees with contraceptive coverage solely "based on sincerely held moral convictions" of the employer. 82 Fed. Reg. at 47,844.

111.    The Moral Exemption IFR could be claimed by nonprofit entities, for-profit entities whose shares are not publicly traded, institutions of higher education, health insurance issuers, and individuals. 82 Fed. Reg. at 47,850. Unlike the Religious Exemption IFR, the Moral Exemption IFR did not allow publicly traded companies to opt out of the Mandate.

112.    In the IFRs, the Departments admitted that employees of companies that objected under either IFR would lose access to the contraceptive coverage required under the ACA's Contraceptive Care Mandate. *See* 82 Fed. Reg. at 47,818-22.

113.    Both IFRs allowed objecting entities to utilize the Accommodation, but eliminated any requirement that they do so. 82 Fed. Reg. at 47,812–13; 82 Fed. Reg. at 47,854.

114.    Under the IFRs, objecting entities did "not need to file notices or certifications of their exemption." 82 Fed. Reg. at 47,808; 82 Fed. Reg. at 47,850.

115.    The Departments estimated that between 31,700 and 120,000 women would lose access to federally mandated contraceptive services when their employers claimed the Religious Exemption. 82 Fed. Reg. at 47,816–24.

**This Court Enjoins the IFRs**

116.    On October 11, 2017, the Commonwealth filed its original Complaint in this matter, alleging that the IFRs were unlawfully issued in violation of the APA and other statutory and constitutional provisions (ECF No. 1).

117.    The Commonwealth further alleged that many Pennsylvania women who were denied contraceptive coverage as a result of the IFRs would be forced to rely on government-funded programs, causing the Commonwealth irreparable harm.

118.    The Commonwealth moved for a preliminary injunction of the IFRs (ECF Nos. 8 & 9).

119.    On December 15, 2017, this Court granted the Commonwealth's motion and enjoined the federal defendants (with the exception of the President) from enforcing the IFRs (ECF Nos. 59 & 60).

120.    This Court found that Defendants had issued the IFRs without notice and comment in violation of the APA, and further found that the exemptions themselves were arbitrary, capricious, and contrary to the requirements of the ACA.

121.    On December 21, 2017, the U.S. District Court for the Northern District of California also entered a preliminary injunction against the IFRs. *California v. Health & Human Servs.*, 281 F. Supp. 3d 806 (N.D. Cal. 2017). This decision was recently affirmed. *California v. Azar*, No. 18-15155, Dkt. No. 136-1 (9th Cir. Dec. 13, 2018),

**The Departments Issue the Final Exemption Rules**

122.    On November 15, 2018, the Departments issued the final Religious and Moral Exemption Rules. They are scheduled to go into effect on January 14, 2019. 83 Fed. Reg. at 57,536; 83 Fed. Reg. at 57,592.

123.    The final Exemption Rules "finalize, with changes based on public comments," the broad exemptions originally created in the IFRs. 83 Fed. Reg. at 57,536; 83 Fed. Reg. at 57,592.

124.    Like the Religious Exemption IFR, the final Religious Exemption Rule will allow all employers—including non-profits, closely held for-profits companies, and publicly traded corporations—to opt out of providing no-cost contraceptive coverage to their employees on the basis of the employer's "sincerely held religious beliefs." 83 Fed. Reg. at 57,537. It will also extend the exemption to institutions of higher education, insurance issuers, and individuals. *Id.*

125.    Like the Moral Exemption IFR, the final Moral Exemption Rule will allow entities to avoid complying with the Contraceptive Care Mandate on the basis of the employer's "sincerely held moral convictions." 83 Fed. Reg. at 57,616. The final Moral Exemption can be claimed by nonprofit entities, for-profit entities whose shares are not publicly traded, institutions of higher education, health insurance issuers, and individuals.

126.    Unlike the IFRs, however, the final Religious Exemption Rule will allow any employer—even one that does not have a sincerely held religious objection to contraception—to avoid complying with the Contraceptive Care Mandate if it adopts a group health plan "established or maintained" by an objecting organization. 83 Fed. Reg. at 57,560, 57,563–64.

127.    The final Exemption Rules will also allow any covered entity to claim the exemption if they have a sincerely held religious or moral objection to "establishing, maintaining, providing, offering, or arranging for … a plan, issuer, or third party administrator that provides or arranges such coverage or payments [for some or all contraceptive services]." 83 Fed. Reg. at 57,537; 83 Fed. Reg. at 57,593.

128.     As with the IFRs, the Departments admit that employees of companies that object under either final Exemption Rule would lose access to the contraceptive coverage required under the ACA's Contraceptive Care Mandate.

129.     The Departments estimate that between 70,500 and 126,400 women will lose access to federally mandated contraceptive services when their employers claim the final Religious Exemption. 83 Fed. Reg. at 57,575–582.

130.     To explain the more than doubled lower bound of impacted women, the Departments admit that the analysis they conducted in the IFR failed to properly account for the number of employees working for entities that had claimed the Accommodation. 83 Fed. Reg. at 57,576.

131.     The final Exemption Rules undermine the balance struck under the prior regulatory scheme and run counter to the Affordable Care Act's mandate that evidence-based preventive services be provided.

132.     As a result, millions of women potentially will be subjected to increased financial hardship and the loss of necessary contraceptive care.

**Specific Harm to the Commonwealth of Pennsylvania and the State of New Jersey Caused by the final Exemption Rules**

133.     As a result of Defendants' final Exemption Rules, it is expected that many plan sponsors will claim the newly expanded exemptions and will deny their own employees and others medical coverage that is otherwise required under the Contraceptive Care Mandate.

134.     As a result, numerous insureds—and their female dependents—will lose the medical coverage for contraceptive care required by the Affordable Care Act.

135.     Upon information and belief, many of these employers operate in Pennsylvania and New Jersey.

136.    During the course of litigation against the IFRs, Defendants revealed that they calculated their estimates of impacted women based on the assumption that many litigating and accommodated entities would use the religious and moral exemptions. A number of these entities are based in Pennsylvania and New Jersey: Bingaman and Son Lumber Inc., Kreamer, PA (number of employees unknown); Conestoga Wood Specialties Corporation, East Earl, PA (950 employees); Cummins Allison, Philadelphia, PA and Elmwood Park, NJ (number of employees unknown); DAS Companies, Inc., Palmyra, PA (number of employees unknown); Earth Sun Moon Trading Company, Inc., Grove City, PA (number of employees unknown); Geneva College, Beaver Falls, PA (1,850 students, 350 employees); Hobby Lobby (13,240 total employees, at least 25 stores in Pennsylvania and New Jersey); and Holy Ghost Preparatory School, Bensalem, PA (number of employees unknown).

137.    Therefore, many of those losing legally-mandated coverage for contraceptive services will be Pennsylvania and New Jersey residents. All of the women affected will face an increased risk of medical harm or an increased economic burden if they choose to self-fund contraception

138.    This broad loss of formerly-mandated contraceptive care will result in significant, direct and proprietary harm to Pennsylvania and New Jersey, which will bear increased costs as a result of the final Exemption Rules.

139.    States are generally preempted from regulating self-insured plans. Such plans are, instead, governed by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829 (codified in part at 29 U.S.C. ch. 18), a federal law that establishes minimum standards for pension plans in private industry and provides for extensive rules on the federal income tax effects of transactions associated with employee benefit plans.

140.    As of 2010, approximately 80 percent of "large employers" (with over 1000

employees), and 50 percent of "mid-sized employers" (with 200-1000 employees), offered self-

insured plans. *See* Rand Corp., Employer Self-Insurance Decisions, at 17-18 (Mar. 2011)

(prepared for United States Department of Labor and HHS).

141.    New Jersey law requires employers who offer fully-insured plans to provide

coverage for expenses incurred in the purchase of prescription female contraceptives to the same

extent as any other outpatient prescription drug covered under the policy. *E.g.*, N.J. Stat. Ann.

§§ 17B:26-2.1y, 17B:27:46.1ee, 17B:27A-19.15 (West 2018).

142.    Unlike the Women's Health Amendment, New Jersey's contraceptive mandate

does not require insurers to offer women contraceptive services with zero out-of-pocket costs.  In

addition, New Jersey's mandate only requires coverage for prescription female contraceptives,

rather than all FDA-approved female contraceptive methods.  As a result, female employees of

objecting entities could lose coverage entirely for certain contraceptive methods and could be

forced to pay significantly higher out-of-pocket costs for those methods that are covered.

143.    These costs will impose an additional financial burden on women and will cause

some women to forgo contraception entirely or to forgo their preferred method of contraception.

144.    Approximately 3,434,000 New Jersey residents who have health insurance are

covered by self-insured plans. Due to ERISA's preemption provision, self-insured plans offered

by private employers are exempt from New Jersey's contraceptive mandate. As a result, New

Jersey residents who are employed by organizations with self-insured plans that take advantage

of the expanded exemption from the Contraceptive Care Mandate may lose all coverage for the

medical costs associated with contraceptive care.

145.    The complete loss of coverage (or partial loss of coverage and increased copays and deductibles for employees in non-ERISA plans) will be particularly problematic for women seeking to access long-acting reversible contraceptives, which are among the safest and most effective contraceptive methods available, but have very high initial costs, often in the range of $400 to $1,000 per person.

146.    Some women who lose their contraceptive benefits because of the expanded exemptions granted will turn to state-funded programs for their contraceptives, which will force Pennsylvania and New Jersey to absorb additional financial costs presently borne by private-insurers.

147.    In Pennsylvania, Medicaid (known as "Medical Assistance") provides contraceptive services to women in Pennsylvania with incomes up to 138 percent of the federal poverty level. The Commonwealth's Family Planning Services Program likewise provides contraceptive services to women with incomes up to 215 percent of the poverty level. The Commonwealth also funds Title X clinics, which have no income-based eligibility requirements. The additional financial burden from increased use of these programs will be borne by the Commonwealth.

148.    New Jersey's state- and federally-funded Medicaid and Children's Health Insurance Programs (collectively, known as "NJ FamilyCare") similarly provide contraceptive coverage to New Jersey women with incomes up to 138 percent of the federal poverty limit.  In addition, New Jersey's subsidized family planning clinics provide preventive screenings and contraceptives to all patients, regardless of income or insurance coverage, including financially vulnerable women who are not eligible for Medicaid. Increased use of these programs by women who lose coverage for contraceptive services under the final Exemption Rules will result in

28

additional costs to New Jersey, including the cost of providing services to low-income women who are eligible for free or reduced cost services, as well as the cost of expanding facilities to meet increased demand from all women, even those who due to their income level are required to pay fully or in part for the services they receive.

149.    Other women will forgo contraceptive health services altogether, because the loss of their employer-sponsored coverage will make their formerly-mandated care unaffordable or inaccessible. As a result of the affected women no longer receiving coverage, Pennsylvania and New Jersey will see an increase in unintended pregnancies and other negative health outcomes which, in addition to other personal, social and societal burdens, are associated with significant additional costs to state-funded programs that protect the health of women and infants.

150.    Nationally, a publicly funded birth in 2010 cost an average of $12,770 for prenatal and postnatal care, labor and delivery, and for the first year of infant care. In 2010, according to one study, New Jersey spent an estimated $186.1 million and Pennsylvania an estimated $248.2 million on unintended pregnancies. *See* Sonfield & Kathryn Kost, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care National and State Estimates for 2010*, at 13.

151.    Indeed, to date—before Defendants issued the IFRs and the final Exemption Rules—the Contraceptive Care Mandate had resulted in extraordinary savings for women.

152.    A recent study conducted by the University of Pennsylvania found, for example, that the ACA's Contraceptive Care Mandate "is saving the average [contraceptive] pill user $255 per year" and "the average woman receiving an IUD is saving $248." *See* Press Release, University of Pennsylvania School of Medicine, Affordable Care Act Results in Dramatic Drop

29

in Out-of-Pocket Prices for Prescription Contraceptives, Penn Medicine Study Finds (July 7, 2015).[8]

153.     Spread over an estimated 6.88 million privately insured oral contraceptive users in the United States, the University of Pennsylvania study estimates that, as a result of the ACA's Contraceptive Care Mandate, "consumer annual contribution to spending on the pill could be reduced by almost $1.5 billion annually." *Id.*

154.     In addition to the direct, proprietary harm set forth above, the final Exemption Rules impermissibly encroach on Pennsylvania's and New Jersey's quasi-sovereign interests in protecting the health, safety, and well-being of their residents, and in ensuring that they enjoy equal access to federal programs. As such, in addition to proprietary standing, Pennsylvania and New Jersey have *parens patriae* standing to vindicate these interests.

155.     By failing to follow the procedures set forth in the APA, Defendants further harmed Pennsylvania and New Jersey by denying them the right to participate meaningfully in the rulemaking process.

## CAUSES OF ACTION

## COUNT I

## Violation of Equal Protection of the Laws

156.     Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

---

[8] https://www.pennmedicine.org/news/news-releases/2015/july/affordable-care-act-results-in.

157.    Under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the federal government may not deny any person equal protection of the laws. U.S. Const. amend. V.

158.    Discrimination on the basis of sex violates this constitutional guarantee.

159.    The final Exemption Rules apply to only one category of preventive medical care, contraception, which is used predominantly by women.

160.    Because the final Exemption Rules are targeted at women and deny them needed preventive medical services, the Rules violate the Constitution's guarantee of equal protection under the laws.

## COUNT II

### Violation of Title VII of the Civil Rights Act and the Pregnancy Discrimination Act

161.    Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

162.    The Exemption Rules violate Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, which prohibits discrimination based on sex. *See* 42 U.S.C. § 2000e et seq. (Title VII).

163.    The Pregnancy Discrimination Act prohibits discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e. It therefore prevents employees from discrimination based on need for contraception.

164.    Classifying employees on the basis of their childbearing capacity, regardless of whether they are, in fact, pregnant, is prohibited sex discrimination under Title VII.

165.    The Exemption Rules violate Title VII because they discriminate against women on the basis of their capacity to get pregnant.

## COUNT III

### Violation of the Procedural Requirements of the Administrative Procedure Act

166.　Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

167.　Under the APA, a court shall "hold unlawful" and "set aside" any "agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

168.　In issuing substantive rules, federal agencies are required to follow the notice and comment process set forth in the APA unless the agency "for good cause" finds that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Any such findings must be incorporated into the rules along with "a brief statement of reasons therefor." *Id.*

169.　Specifically, before issuing any rule, the agency must publish a "[g]eneral notice of proposed rule making" in the Federal Register. 5 U.S.C. § 553(b).

170.　That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

171.　The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

172.　In issuing the IFRs, the Defendant Departments failed to follow these basic requirements.

173.　Furthermore, the justifications offered by the Departments for their failure to engage in notice and comment rulemaking did not satisfy the "good cause" standard required under section 553(b)(3)(B) of the APA.

174.    In issuing the final Exemption Rules, Defendants similarly did not follow the notice and comment procedures as set forth in the APA. Rather, Defendants accepted comments after the IFRs had already gone into effect, and purported to consider those comments in issuing the final Exemption Rules.

175.    The final Exemption Rules "finalize" the IFRs, and adopt without change most of the language in the IFRs.

176.    As a result, the final Exemption Rules are impermissibly tainted with the same procedural defects as the IFRs.

177.    In addition, when an agency does accept comments, it must respond to all significant comments and provide a statement of the "basis and purpose" of each final rule. 5 U.S.C. § 553(c).

178.    The responses to comments offered by Defendants in the final Exemption Rules are insufficient, and the statements of basis and purpose fail to satisfy APA requirements.

179.    Because the Departments failed to follow the procedural requirements of the APA, the final Exemption Rules should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(D).

## COUNT IV

### Violation of the Substantive Requirements of the Administrative Procedure Act

180.    Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

181.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

33

182.    Both the final Moral Exemption Rule and the final Religious Exemption Rule are inconsistent with the Affordable Care Act's requirement that group health plans and insurers provide women with preventive care as provided for in guidelines issued by HRSA, without any cost-sharing requirements.

183.    The Rules also violate the civil rights protections in the ACA prohibiting discrimination on the basis of sex and other protected categories in most healthcare programs and activities. *See* 42 U.S.C. § 18116.

184.    They also violate the provisions of the ACA that prohibit the promulgation of any regulation that "[c]reates any unreasonable barrier to the ability of individuals to obtain appropriate medical care," "[i]mpedes  timely access to health care services," or "[l]imits the availability of health care treatment for the  full duration of a patient's medical needs." 42 U.S.C. § 18114.

185.    In addition, the Departments abused their discretion and acted in a manner that was arbitrary and capricious in issuing the final Exemption Rules. 5 U.S.C. § 706(2)(A).

186.    Specifically, the Departments fail to provide an adequate rationale for concluding that the Accommodation violates the Religious Freedom Restoration Act. They also fail to provide adequate reasons for why the final Religious Exemption is required or permissible under the Religious Freedom Restoration Act.

187.    Indeed, when it passed the Affordable Care Act, Congress elected not to include a "conscientious objector" or other exemption for individuals or organizations who object to any portion of the ACA on religious or moral grounds.

188.    The Departments further rely on arbitrary and capricious explanations to justify their decision to issue the Final Exemptions Rules.

34

189.    Because the final Exemption Rules are arbitrary, capricious, an abuse of discretion, and contrary to law, they should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT V

## Violation of the Establishment Clause

190.    Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

191.    The final Exemption Rules violate the Establishment Clause of the First Amendment to the U.S. Constitution.

192.    The Departments have used their rulemaking authority for the primary purpose, and with the actual effect, of advancing and endorsing religious interests.

193.    The Departments have acted to promote employers' religious beliefs over the self-determination of women who may not share those beliefs and over the ACA's mandate that preventive care be provided.

194.    As a result, the final Exemption Rules violate the Establishment Clause.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commonwealth of Pennsylvania and the State of New Jersey

request that this Court enter judgment in their favor and grant the following relief:

a.    Declare the final Moral Exemption Rule and the final Religious Exemption Rule

      unlawful;

b.    Vacate the final Moral Exemption Rule and the final Religious Exemption Rule;

c.    Preliminarily and permanently enjoin the application of the final Moral

      Exemption Rule and the final Religious Exemption Rule;

d.    Award Plaintiffs reasonable costs, including attorneys' fees; and

e.    Grant such other and further relief as the Court deems just and proper.


December 14, 2018                              Respectfully submitted,

GURBIR S. GREWAL                              JOSH SHAPIRO
Attorney General of New Jersey                Attorney General
GLENN J. MORAMARCO                            Commonwealth of Pennsylvania
Assistant Attorney General
ELSEPTH FAIMAN HANS                           */s/ Michael J. Fischer*
Deputy Attorney General                       MICHAEL J. FISCHER
KIMBERLY A. CAHALL                            Chief Deputy Attorney General
Deputy Attorney General                       AIMEE D. THOMSON
New Jersey Attorney General's Office          Deputy Attorney General
Richard J. Hughes Justice Complex             Office of Attorney General
25 Market Street                              1600 Arch Street
Trenton, NJ 08625                             Suite 300
(609) 376-3235                                Philadelphia, PA 19103
Glenn.Moramarco@law.njoag.gov                 (215) 560-2171
                                              mfischer@attorneygeneral.gov

Case 2:17-cv-04540-WB   Document 89-1   Filed 12/14/18   Page 1 of 36

# EXHIBIT A

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9840]**

**RIN 1545–BN92**

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB83**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Part 147**

**[CMS–9940–F2]**

**RIN 0938–AT54**

**Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** These rules finalize, with changes based on public comments, interim final rules concerning religious exemptions and accommodations regarding coverage of certain preventive services issued in the **Federal Register** on October 13, 2017. These rules expand exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act. These rules do not alter the discretion of the Health Resources and Services Administration, a component of the U.S. Department of Health and Human Services, to maintain the guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also leave in place an ''accommodation'' process as an optional process for certain exempt entities that wish to use it voluntarily. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.

**DATES:** *Effective date:* These regulations are effective on January 14, 2019.

**FOR FURTHER INFORMATION CONTACT:** Jeff Wu, at (301) 492–4305 or *marketreform@cms.hhs.gov* for the Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS); Amber Rivers or Matthew Litton, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; William Fischer, Internal Revenue Service, Department of the Treasury, at (202) 317–5500.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline, 1–866–444–EBSA (3272) or visit the Department of Labor's website (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's website (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary and Background
  A. Executive Summary
  1. Purpose
  2. Summary of the Major Provisions
  a. Expanded Religious Exemptions to the Contraceptive Coverage Requirement
  b. Optional Accommodation
  3. Summary of Costs, Savings and Benefits of the Major Provisions
  B. Background
II. Overview, Analysis, and Response to Public Comments
  A. The Departments' Authority To Mandate Coverage and Provide Religious Exemptions
  B. Availability and Scope of Religious Exemptions
  C. The First Amendment and the Religious Freedom Restoration Act
  1. Discretion To Provide Religious Exemptions
  2. Requiring Entities To Choose Between Compliance With the Contraceptive Mandate or the Accommodation Violated RFRA in Many Instances
  a. Substantial Burden
  b. Compelling Interest
  D. Burdens on Third Parties
  E. Interim Final Rulemaking
  F. Health Effects of Contraception and Pregnancy
  G. Health and Equality Effects of Contraceptive Coverage Mandates
III. Description of the Text of the Regulations and Response to Additional Public Comments
  A. Restatement of Statutory Requirements of PHS Act Section 2713(a) and (a)(4) (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv))
  B. Prefatory Language of Religious Exemptions (45 CFR 147.132(a)(1))
  C. Scope of Religious Exemptions and Requirements for Exempt Entities (45 CFR 147.132)
  D. Plan Sponsors in General (45 CFR 147.132(a)(1)(i) prefatory text)
  E. Houses of Worship and Integrated Auxiliaries (45 CFR 147.132(a)(1)(i)(A))
  F. Nonprofit Organizations (45 CFR 147.132(a)(1)(i)(B))
  G. Closely Held For-Profit Entities (45 CFR 147.132(a)(1)(i)(C))
  H. For-Profit Entities That Are Not Closely Held (45 CFR 147.132(a)(1)(i)(D))
  I. Other Non-Governmental Employers (45 CFR 147.132(a)(1)(i)(E))
  J. Plans Established or Maintained by Objecting Nonprofit Entities (45 CFR 147.132(a)(1)(ii))
  K. Institutions of Higher Education (45 CFR 147.132(a)(1)(iii))
  L. Health Insurance Issuers (45 CFR 147.132(a)(1)(iv))
  M. Description of the Religious Objection (45 CFR 147.132(a)(2))
  N. Individuals (45 CFR 147.132(b))
  O. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)
  P. Definition of Contraceptives for the Purpose of These Final Rules
  Q. Severability
  R. Other Public Comments
  1. Items Approved as Contraceptives But Used To Treat Existing Conditions
  2. Comments Concerning Regulatory Impact
  3. Interaction With State Laws
IV. Economic Impact and Paperwork Burden
  A. Executive Orders 12866 and 13563—Department of HHS and Department of Labor
  1. Need for Regulatory Action
  2. Anticipated Effects
  a. Removal of Burdens on Religious Exercise
  b. Notices When Revoking Accommodated Status
  c. Impacts on Third Party Administrators and Issuers
  d. Impacts on Persons Covered by Newly Exempt Plans
  i. Unknown Factors Concerning Impact on Persons in Newly Exempt Plans
  ii. Public Comments Concerning Estimates in Religious IFC
  iii. Possible Sources of Information for Estimating Impact
  iv. Estimates Based on Litigating Entities That May Use Expanded Exemptions
  v. Estimates of Accommodated Entities That May Use Expanded Exemptions
  vi. Combined Estimates of Litigating and Accommodated Entities
  vii. Alternate Estimates Based on Consideration of Pre-ACA Plans
  viii. Final Estimates of Persons Affected by Expanded Exemptions
  B. Special Analyses—Department of the Treasury
  C. Regulatory Flexibility Act
  D. Paperwork Reduction Act—Department of Health and Human Services
  1. Wage Data
  2. ICRs Regarding Self-Certification or Notices to HHS (§ 147.131(c)(3))

3. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(e))
4. ICRs Regarding Notice of Revocation of Accommodation (§ 147.131(c)(4))
5. Submission of PRA-Related Comments
E. Paperwork Reduction Act—Department of Labor
F. Regulatory Reform Executive Orders 13765, 13771 and 13777
G. Unfunded Mandates Reform Act
H. Federalism
V. Statutory Authority

# I. Executive Summary and Background

## A. Executive Summary

### 1. Purpose

The primary purpose of this rule is to finalize, with changes in response to public comments, the interim final regulations with requests for comments (IFCs) published in the **Federal Register** on October 13, 2017 (82 FR 47792), "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (the Religious IFC). The rules are necessary to expand the protections for the sincerely held religious objections of certain entities and individuals. The rules, thus, minimize the burdens imposed on their exercise of religious beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing, a requirement that was created by HHS through guidance promulgated by the Health Resources and Services Administration (HRSA) (hereinafter "Guidelines"), pursuant to authority granted by the ACA in section 2713(a)(4) of the Public Health Service Act. In addition, the rules maintain a previously created accommodation process that permits entities with certain religious objections voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their health insurance issuers or third party administrators. The rules do not remove the contraceptive coverage requirement generally from HRSA's Guidelines. The changes being finalized to these rules will ensure that proper respect is afforded to sincerely held religious objections in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage.

### 2. Summary of the Major Provisions

#### a. Expanded Religious Exemptions to the Contraceptive Coverage Requirement

These rules finalize exemptions provided in the Religious IFC for the group health plans and health insurance coverage of various entities and individuals with sincerely held religious beliefs opposed to coverage of some or all contraceptive or sterilization methods encompassed by HRSA's Guidelines. The rules finalize exemptions to the same types of organizatons and individuals for which exemptions were provided in the Religious IFC: Non-governmental plan sponsors including a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order; a nonprofit organization; for-profit entities; an institution of higher education in arranging student health insurance coverage; and, in certain circumstances, issuers and individuals. The rules also finalize the regulatory restatement in the Religious IFC of language from section 2713(a) and (a)(4) of the Public Health Service Act.

In response to public comments, various changes are made to clarify the intended scope of the language in the Religious IFC. The prefatory language to the exemptions is clarified to ensure exemptions apply to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections. The Departments add language to clarify that, where an exemption encompasses a plan or coverage established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other non-governmental organization or association, the exemption applies to each employer, organization, or plan sponsor that adopts the plan. Language is also added to clarify that the exemptions apply to non-governmental entities, including as the exemptions apply to institutions of higher education. The Departments revise the exemption applicable to health insurance issuers to make clear that the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement. The Departments also restructure the

provision describing the religious objection for entities. That provision specifies that the entity objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for either: coverage or payments for some or all contraceptive services; or, a plan, issuer, or third party administrator that provides or arranges such coverage or payments.

The Departments also clarify language in the exemption applicable to plans of objecting individuals. The final rule specifies that the individual exemption ensures that the HRSA Guidelines do not prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs. The exemption adds that, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

#### b. Optional Accommodation

These rules also finalize provisions from the Religious IFC that maintain the accommodation process as an optional process for entities that qualify for the exemption. Under that process, entities can choose to use the accommodation process so that contraceptive coverage to which they object is omitted from their plan, but their issuer or third party administrator, as applicable, will arrange for the persons covered by their plan to receive contraceptive coverage or payments.

In response to public comments, these final rules make technical changes to the accommodation regulations maintained in parallel by HHS, the Department of Labor, and the Department of the Treasury. The Departments modify the regulations governing when an entity, that was using or will use the accommodation, can revoke the accommodation and operate under the exemption. The modifications set forth a transitional

rule as to when entities currently using the accommodation may revoke it and use the exemption by giving 60-days notice pursuant to Public Health Service Act section 2715(d)(4) and 45 CFR 147.200(b), 26 CFR 54.9815–2715(b), and 29 CFR 2590.715–2715(b). The modifications also express a general rule that, in plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an organization eligible for the accommodation may revoke its use of the accommodation process effective no

sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

The Departments also modify the Religious IFC by adding a provision that existed in rules prior to the Religious IFC, namely, that if an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable contraceptive coverage requirement from HRSA's Guidelines if the issuer complies with the obligations under this section applicable to such

issuer. Likewise, the rule adds pre-existing "reliance" language deeming an issuer serving an accommodated organization compliant with the contraceptive coverage requirement if the issuer relies reasonably and in good faith on a representation by an organization as to its eligibility for the accommodation and the issuer otherwise complies with the accommodation regulation, and likewise deeming a group health plan compliant with the contraceptive coverage requirement if it complies with the accommodation regulation.

3. Summary of Costs, Savings and Benefits of the Major Provisions

| Provision | Savings and benefits | Costs |
|---|---|---|
| Restatement of statutory language from section 2713(a) and (a)(4) of the Public Health Service Act. | The purpose of this provision is to ensure that the regulatory language that restates section 2713(a) and (a)(4) of the Public Health Service Act mirrors the language of the statute. We estimate no economic savings or benefit from finalizing this part of the rule, but consider it a deregulatory action to minimize the regulatory impact beyond the scope set forth in the statute. | We estimate no costs from finalizing this part of the rule. |
| Expanded religious exemptions. | Expanding religious exemptions to the contraceptive coverage requirement will relieve burdens that some entities and individuals experience from being forced to choose between, on the one hand, complying with their religious beliefs and facing penalties from failing to comply with the contraceptive coverage requirement, and on the other hand, providing (or, for individuals, obtaining) contraceptive coverage or using the accommodation in violation of their sincerely held religious beliefs. | We estimate there will be transfer costs where women previously receiving contraceptive coverage from employers will no longer receive that coverage where the employers use the expanded exemptions. Even after the public comment period, we have very limited data on what the scale of those transfer costs will be. We estimate that in no event will they be more than $68.9 million. We estimate that, where entities using the accommodation revoke it to use the exemption, the cost to industry of sending notices of revocation to their policy holders will be $112,163. |
| Optional accommodation regulations. | Maintaining the accommodation as an optional process will ensure that contraceptive coverage is made available to many women covered by plans of employers that object to contraceptive coverage but not to their issuers or third party administrators arranging for such coverage to be provided to their plan participants. | We estimate that, by expanding the types of organizations that may use the accommodation, some entities not currently using it will opt into it. When doing so they will incur costs of $677 to send a self-certification or notice to their issuer or third party administrator, or to HHS, to commence operation of the accommodation. We estimate that entities that newly make use of the accommodation as the result of these rules, or their issuers or third party administrators, will incur costs of $311,304 in providing their policy holders with notices indicating that contraceptive coverage or payments are available to them under the accommodation process. |

*B. Background*

Over many decades, Congress has protected conscientious objections, including those based on religious beliefs, in the context of health care and human services including health coverage, even as it has sought to promote and expand access to health services.[1] In 2010, Congress enacted the

individuals and entities that object to abortion); Consolidated Appropriations Act of 2018, Div. H, Sec. 507(d) (Departments of Labor, HHS, and Education, and Related Agencies Appropriations Act), Public Law 115–141, 132 Stat. 348, 764 (Mar. 23, 2018) (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion for any reason); *id.* at Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); *id.* at Div. E, Sec. 808 (regarding any requirement for "the provision of contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any

legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."); *id.* at Div. I, (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb–36 (prohibiting the statutory section from being construed to require suicide-related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 290kk–1 (protecting the religious character of organizations participating in certain programs and the religious freedom of beneficiaries of the programs); 42 U.S.C. 300x–65 (protecting the religious character of organizations

---

[1] *See, for example,* 42 U.S.C. 300a–7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting

Case: 25-2575    Document: 34-2    Page: 115    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB   Document 391   Filed 12/4/18   Page 5 of 55

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    57539

Patient Protection and Affordable Care Act (PPACA) (Pub. L. 111–148) (March 23, 2010). Congress enacted the Health Care and Education Reconciliation Act of 2010 (HCERA) (Pub. L. 111–152) on March 30, 2010, which, among other things, amended the PPACA. As amended by HCERA, the PPACA is known as the Affordable Care Act (ACA).

The ACA reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The ACA adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code), in order to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

In section 2713(a)(4) of the PHS Act (hereinafter "section 2713(a)(4)"), Congress provided administrative

discretion to require that certain group health plans and health insurance issuers cover certain women's preventive services, in addition to other preventive services required to be covered in section 2713. Congress granted that discretion to the Health Resources and Services Administration (HRSA), a component of the U.S. Department of Health and Human Services (HHS). Specifically, section 2713(a)(4) allows HRSA discretion to specify coverage requirements, "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by" HRSA's Guidelines.

Since 2011, HRSA has exercised that discretion to require coverage for, among other things, certain contraceptive services.[2] In the same time period, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, "the Departments")[3] have promulgated regulations to guide HRSA in exercising its discretion to allow exemptions to those requirements, including issuing and finalizing three interim final regulations prior to 2017.[4] In those

regulations, the Departments defined the scope of permissible exemptions and accommodations for certain religious objectors where the Guidelines require coverage of contraceptive services, changed the scope of those exemptions and accommodations, and solicited public comments on a number of occasions. Many individuals and entities brought legal challenges to the contraceptive coverage requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate") as being inconsistent with various legal protections, including the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 ("RFRA"). Several of those cases went to the Supreme Court. *See, for example, Burwell* v. *Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751 (2014); *Zubik* v. *Burwell,* 136 S. Ct. 1557 (2016).

The Departments most recently solicited public comments on these issues again in two interim final regulations with requests for comments (IFCs) published in the **Federal Register** on October 13, 2017: the regulations (82 FR 47792) that are being finalized with changes here, and regulations (82 FR 47838) concerning moral objections (the Moral IFC), which are being finalized with changes in companion final rules published elsewhere in today's **Federal Register**.

In the preamble to the Religious IFC, the Departments explained several reasons why it was appropriate to reevaluate the religious exemptions and accommodations for the contraceptive Mandate and to take into account the religious beliefs of certain employers concerning that Mandate. The Departments also sought public comment on those modifications. The Departments considered, among other things, Congress's history of providing protections for religious beliefs regarding certain health services (including contraception, sterilization, and items or services believed to involve abortion); the text, context, and intent of section 2713(a)(4) and the ACA; protection of the free exercise of religion in the First Amendment and, by Congress, in RFRA; Executive Order 13798, "Promoting Free Speech and Religious Liberty" (May 4, 2017); previously submitted public comments;

---

and the religious freedom of individuals involved in the use of government funds to provide substance abuse services); 42 U.S.C. 604a (protecting the religious character of organizations and the religious freedom of beneficiaries involved in the use of government assistance to needy families); 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare+Choice (now Medicare Advantage) managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal law does not infringe on "conscience" as protected in state law concerning advance directives); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 5106i (prohibiting certain Federal statutes from being construed to require that a parent or legal guardian provide a child any medical service or treatment against the religious beliefs of the parent or legal guardian); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide); see also 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require assistance in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/ AIDS funds contrary to their "religious or moral objection").

[2] The references in this document to "contraception," "contraceptive," "contraceptive coverage," or "contraceptive services" generally include all contraceptives, sterilization, and related patient education and counseling, required by the Women's Preventive Services Guidelines, unless otherwise indicated. The Guidelines issued in 2011 referred to "Contraceptive Methods and Counseling" as "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *https://www.hrsa.gov/ womens-guidelines/index.html.* The Guidelines as amended in December 2016 refer, under the header "Contraception," to: "the full range of female-controlled U.S. Food and Drug Administration-approved contraceptive methods, effective family planning practices, and sterilization procedures," "contraceptive counseling, initiation of contraceptive use, and follow-up care (for example, management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method)," and "instruction in fertility awareness-based methods, including the lactation amenorrhea method." *https://www.hrsa.gov/womens-guidelines-2016/index.html.*

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

[4] Interim final regulations on July 19, 2010, at 75 FR 41726 (July 2010 interim final regulations); interim final regulations amending the July 2010 interim final regulations on August 3, 2011, at 76 FR 46621; final regulations on February 15, 2012, at 77 FR 8725 (2012 final regulations); an advance notice of proposed rulemaking (ANPRM) on March 21, 2012, at 77 FR 16501; proposed regulations on February 6, 2013, at 78 FR 8456; final regulations on July 2, 2013, at 78 FR 39870 (July 2013 final regulations); interim final regulations on August 27, 2014, at 79 FR 51092 (August 2014 interim final regulations); proposed regulations on August 27, 2014, at 79 FR 51118 (August 2014 proposed regulations); final regulations on July 14, 2015, at

80 FR 41318 (July 2015 final regulations); and a request for information on July 26, 2016, at 81 FR 47741 (RFI), which was addressed in an FAQ document issued on January 9, 2017, available at: *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/ Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf.*

and the extensive litigation over the contraceptive Mandate.

After consideration of the comments and feedback received from stakeholders, the Departments are finalizing the Religious IFC, with changes based on comments as indicated herein.[5]

## II. Overview, Analysis, and Response to Public Comments

We provided a 60-day public comment period for the Religious IFC, which closed on December 5, 2017. The Departments received over 56,000 public comment submissions, which are posted at *www.regulations.gov*.[6] Below, the Departments provide an overview of the general comments on the final regulations, and address the issues raised by commenters.

These rules expand exemptions to protect religious beliefs for certain entities and individuals with religious objections to contraception whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the ACA. These rules do not alter the discretion of HRSA, a component of HHS, to maintain the Guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules finalize the accommodation process, which was previously established in response to objections of religious organizations that were not protected by the original exemption, as an optional process for any exempt entities. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives or related education and counseling for women at risk of unintended pregnancy.[7]

### A. The Departments' Authority To Mandate Coverage and Provide Religious Exemptions

The Departments received conflicting comments on their legal authority to provide the expanded exemptions and accommodation for religious beliefs. Some commenters agreed that the Departments are legally authorized to provide the expanded exemptions and accommodation, noting that there was no requirement of contraceptive coverage in the ACA and no prohibition on providing religious exemptions in Guidelines issued under section 2713(a)(4). Other commenters, however, asserted that the Departments have no legal authority to provide any exemptions to the contraceptive Mandate, contending, based on statements in the ACA's legislative history, that the ACA requires contraceptive coverage. Still other commenters contended that the Departments are legally authorized to provide the exemptions that existed prior to the Religious IFC, but not to expand them.

Some commenters who argued that section 2713(a)(4) does not allow for exemptions said that the previous exemptions for houses of worship and integrated auxiliaries, and the previous accommodation process, were set forth in the ACA itself, and therefore were acceptable while the expanded exemptions in the Religious IFC were not. This is incorrect. The ACA does not prescribe (or prohibit) the previous exemptions for house of worship and the accommodation processes that the Departments issued through regulations.[8] The Departments, therefore, find it appropriate to use the regulatory process to issue these expanded exemptions and accommodation, to better address concerns about religious exercise.

The Departments conclude that legal authority exists to provide the expanded exemptions and accommodation for religious beliefs set forth in these final rules. These rules concern section 2713 of the PHS Act, as also incorporated into ERISA and the Code. Congress has granted the Departments legal authority,

collectively, to administer these statutes.[9]

Where it applies, section 2713(a)(4) requires coverage without cost sharing for "such additional" women's preventive care and screenings "as provided for" and "supported by" Guidelines developed by HHS through HRSA. When Congress enacted this provision, those Guidelines did not exist. And nothing in the statute mandated that the Guidelines had to include contraception, let alone for all types of employers with covered plans. Instead, section 2713(a)(4) provided a positive grant of authority for HSRA to develop those Guidelines, thus delegating authority to HHS, as the administering agency of HRSA, and to all three agencies, as the administering agencies of the statutes by which the Guidelines are enforced, to shape that development. *See* 26 U.S.C. 9834; 29 U.S.C. 1191(c), 42 U.S.C. 300gg–92. That is especially true for HHS, as HRSA is a component of HHS that was unilaterally created by the agency and thus is subject to the agency's general supervision, *see* 47 FR 38,409 (August 31, 1982). Thus, nothing prevented HRSA from creating an exemption from otherwise-applicable Guidelines or prevented HHS and the other agencies from directing that HRSA create such an exemption.

Congress did not specify the extent to which HRSA must "provide for" and "support" the application of Guidelines that it chooses to adopt. HRSA's authority to support "comprehensive guidelines" involves determining both the types of coverage and scope of that coverage. Section 2714(a)(4) requires coverage for preventive services only "as provided for in comprehensive guidelines supported by [HRSA]." That is, services are required to be included in coverage only to the extent that the Guidelines supported by HRSA provide for them. Through use of the word "as" in the phrase "as provided for," it requires that HRSA support how those services apply—that is, the manner in which the support will happen, such as in the phrase "as you like it."[10] When Congress means to require certain activities to occur in a certain manner, instead of simply authorizing the agency to decide the manner in which they will occur, Congress knows how to do so. *See, e.g.,* 42 U.S.C. 1395x ("The Secretary shall establish procedures to make beneficiaries and providers aware

---

[5] The Department of the Treasury and the Internal Revenue Service (IRS) published proposed and temporary regulations as part of the joint rulemaking of the Religious IFC. The Departments of Labor and HHS published their respective rules as interim final rules with request for comments and are finalizing their interim final rules. The Department of the Treasury and IRS are finalizing their proposed regulations.

[6] *See Regulations.gov* at *https://www.regulations.gov/searchResults?rpp=25&so=DESC&sb=postedDate&po=0&cmd=12%7C05%7C17-12%7C05%7C17&dktid=CMS-2014-0115* and *https://www.regulations.gov/docket Browser?rpp=25&so=DESC&sb=commentDue Date&po=7525&dct=PS&D=IRS-2017-0016.* Some of those submissions included form letters or attachments that, while not separately tabulated at *regulations.gov*, together included comments from, or were signed by, hundreds of thousands of separate persons. The Departments reviewed all of the public comments and attachments.

[7] *See, for example,* Family Planning grants in 42 U.S.C. 300 *et seq.;* the Teenage Pregnancy Prevention Program, Public Law 112–74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c–8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal

and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b–12; Title XIX of the Social Security Act, 42 U.S.C. 1396, *et seq.;* the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), and 25 U.S.C. 1601, *et seq.;* Health center grants, 42 U.S.C. 254b(e), (g), (h), and (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

[8] The ACA also does not require that contraceptives be covered under the preventive services provisions.

[9] 26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92.

[10] See As (usage 2), *Oxford English Dictionary Online* (Feb. 2018) ("[u]sed to indicate by comparison the way something happens or is done").

Case: 25-2575    Document: 34-2    Page: 117    Date Filed: 12/12/2025
Case: 21-1760454 WB Document 399-1    Filed 12/14/18    Page 124 of 35

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57541**

of the requirement that a beneficiary complete a health risk assessment *prior to or at the same time as* receiving personalized prevention plan services.'') (emphasis added). Thus, the inclusion of ''as'' in section 300gg–13(a)(3), and its absence in similar neighboring provisions, shows that HRSA has been granted discretion in supporting how the preventive coverage mandate applies—it does not refer to the timing of the promulgation of the Guidelines.

Nor is it simply a textual aberration that the word ''as'' is missing from the other three provisions in PHS Act section 2713(a). Rather, this difference mirrors other distinctions within that section that demonstrate that Congress intended HRSA to have the discretion the Agencies invoke. For example, sections (a)(1) and (a)(3) require ''evidence-based'' or ''evidence-informed'' coverage, while section (a)(4) does not. This difference suggests that the Agencies have the leeway to incorporate policy-based concerns into their decision-making. This reading of section 2713(a)(4) also prevents the statute from being interpreted in a cramped way that allows no flexibility or tailoring, and that would force the Departments to choose between ignoring religious objections in violation of RFRA or else eliminating the contraceptive coverage requirement from the Guidelines altogether. The Departments instead interpret section 2713(a)(4) as authorizing HRSA's Guidelines to set forth both the kinds of items and services that will be covered, and the scope of entities to which the contraceptive coverage requirement in those Guidelines will apply.

The religious objections at issue here, and in regulations providing exemptions from the inception of the Mandate in 2011, are considerations that, consistent with the statutory provision, permissibly inform what HHS, through HRSA, decides to provide for and support in the Guidelines. Since the first rulemaking on this subject in 2011, the Departments have consistently interpreted the broad discretion granted to HRSA in section 2713(a)(4) as including the power to reconcile the ACA's preventive-services requirement with sincerely held views of conscience on the sensitive subject of contraceptive coverage—namely, by exempting churches and their integrated auxiliaries from the contraceptive Mandate. (*See* 76 FR at 46623.) As the Departments explained at that time, the HRSA Guidelines ''exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women,'' and ''it

is appropriate that HRSA . . . takes into account the effect on the religious beliefs of [employers] if coverage of contraceptive services were required in [their] group health plans.'' *Id.* Consistent with that longstanding view, Congress's grant of discretion in section 2713(a)(4), and the lack of a specific statutory mandate that contraceptives must be covered or that they be covered without any exemptions or exceptions, supports the conclusion that the Departments are legally authorized to exempt certain entities or plans from a contraceptive Mandate if HRSA decides to otherwise include contraceptives in its Guidelines.

The conclusions on which these final rules are based are consistent with the Departments' interpretation of section 2713 of the PHS Act since 2010, when the ACA was enacted, and since the Departments started to issue interim final regulations implementing that section. The Departments have consistently interpreted section 2713(a)(4)'s grant of authority to include broad discretion regarding the extent to which HRSA will provide for, and support, the coverage of additional women's preventive care and screenings, including the decision to exempt certain entities and plans, and not to provide for or support the application of the Guidelines with respect to those entities or plans. The Departments defined the scope of the exemption to the contraceptive Mandate when HRSA issued its Guidelines for contraceptive coverage in 2011, and then amended and expanded the exemption and added an accommodation process in multiple rulemakings thereafter. The accommodation process requires the provision of coverage or payments for contraceptives to participants in an eligible organization's health plan by the organization's insurer or third party administrator. However, the accommodation process itself, in some cases, failed to require contraceptive coverage for many women, because—as the Departments acknowledged at the time—the enforcement mechanism for that process, section 3(16) of ERISA, does not provide a means to impose an obligation to provide contraceptive coverage on the third party administrators of self-insured church plans. *See* 80 FR 41323. Non-exempt employers participate in many church plans. Therefore, in both the previous exemption, and in the previous accommodation's application to self-insured church plans, the Departments have been choosing not to require contraceptive coverage for certain kinds

of employers since the Guidelines were adopted. During prior rulemakings, the Departments also disagreed with commenters who contended the Departments had no authority to create exemptions under section 2713 of the PHS Act, or as incorporated into ERISA and the Code, and who contended instead that we must enforce the Guidelines on the broadest spectrum of group health plans as possible. *See, e.g.,* 2012 final regulations at 77 FR 8726.

The Departments' interpretation of section 2713(a)(4) is confirmed by the ACA's statutory structure. Congress did not intend to require coverage of preventive services for every type of plan that is subject to the ACA. *See, e.g.,* 76 FR 46623. On the contrary, Congress carved out an exemption from PHS Act section 2713 (and from several other provisions) for grandfathered plans. In contrast, grandfathered plans do have to comply with many of the other provisions in Title I of the ACA—provisions referred to by the previous Administration as providing ''particularly significant protections.'' (75 FR 34540). Those provisions include (from the PHS Act) section 2704, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708, which prohibits excessive waiting periods (as of January 1, 2014); section 2711, which relates to lifetime and annual dollar limits; section 2712, which generally prohibits rescission of health coverage; section 2714, which extends dependent child coverage until the child turns 26; and section 2718, which imposes a minimum medical loss ratio on health insurance issuers in the individual and group health insurance markets, and requires them to provide rebates to policyholders if that medical loss ratio is not met. (75 FR 34538, 34540, 34542). Consequently, of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not subject to section 2713.[11] Some commenters assert the exemptions for grandfathered plans are temporary, or were intended to be temporary, but as the Supreme Court observed, ''there is no legal requirement that grandfathered plans ever be phased out.'' *Hobby Lobby,* 134 S. Ct. at 2764 n.10.

Some commenters argue that Executive Order 13535's reference to

[11] Kaiser Family Foundation & Health Research & Educational Trust, ''Employer Health Benefits, 2017 Annual Survey,'' Henry J Kaiser Family Foundation (Sept. 2017), *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.*

implementing the ACA consistent with certain conscience laws does not justify creating exemptions to contraceptive coverage in the Guidelines, because those laws do not specifically require exemptions to the Mandate in the Guidelines. The Departments, however, believe these final regulations are consistent with Executive Order 13535. Issued upon the signing of the ACA, Executive Order 13535 specified that ''longstanding Federal laws to protect conscience . . . remain intact,'' including laws that protect holders of religious beliefs from certain requirements in health care contexts. While the Executive Order 13535 does not require the expanded exemptions in these rules, the expanded exemptions are, as explained below, consistent with longstanding federal laws that protect religious beliefs, and are consistent with the Executive Order's intent that the ACA would be implemented in accordance with the conscience protections set forth in those laws.

The extent to which RFRA provides authority for these final rules is discussed below in section II.C., The First Amendment and the Religious Freedom Restoration Act.

### B. Availability and Scope of Religious Exemptions

Some commenters supported the expanded exemptions and accommodation in the Religious IFC, and the entities and individuals to which they applied. They asserted the expanded exemptions and accommodation are appropriate exercises of discretion and are consistent with religious exemptions Congress has provided in many similar contexts. Some further commented that the expanded exemptions are necessary under the First Amendment or RFRA. Similarly, commenters stated that the accommodation was an inadequate means to resolve religious objections, and that the expanded exemptions are needed. They objected to the accommodation process because it was another method to require compliance with the Mandate. They contended its self-certification or notice involved triggering the very contraceptive coverage that organizations objected to, and that such coverage flowed in connection with the objecting organizations' health plans. The commenters contended that the seamlessness cited by the Departments between contraceptive coverage and an accommodated plan gives rise to the religious objections that organizations would not have with an expanded exemption.

Several other commenters asserted that the exemptions in the Religious IFC are too narrow and called for there to be no mandate of contraceptive coverage. Some of them contended that HRSA should not include contraceptives in their women's preventive services Guidelines because fertility and pregnancy are generally healthy conditions, not diseases that are appropriately the target of preventive health services. They also contended that contraceptives can pose medical risks for women and that studies do not show that contraceptive programs reduce abortion rates or rates of unintended pregnancies. Some commenters contended that, to the extent the Guidelines require coverage of certain drugs and devices that may prevent implantation of an embryo after fertilization, they require coverage of items that are abortifacient and, therefore, violate federal conscience protections such as the Weldon Amendment, *see* section 507(d) of Public Law 115–141.

Other commenters contended that the expanded exemptions are too broad. In general, these commenters supported the inclusion of contraceptives in the Guidelines, contending they are a necessary preventive service for women. Some said that the Departments should not exempt various kinds of entities such as businesses, health insurance issuers, or other plan sponsors that are not nonprofit entities. Other commenters contended the exemptions and accommodation should not be expanded, but should remain the same as they were in the July 2015 final regulations (80 FR 41318). Some commenters said the Departments should not expand the exemptions, but simply expand or adjust the accommodation process to resolve religious objections to the Mandate and accommodation. Some commenters contended that even the previous regulations allowing an exemption and accommodation were too broad, and said that no exemptions to the Mandate should exist, in order that contraceptive coverage would be provided to as many women as possible.

After consideration of the comments, the Departments are finalizing the provisions of the Religious IFC without contracting the scope of the exemptions and accommodation set forth in the Religious IFC. Since HRSA issued its Guidelines in 2011, the Departments have recognized that religious exemptions from the contraceptive Mandate are appropriate. The details of the scope of such exemptions are discussed in further detail below. In general, the Departments conclude it is

appropriate to maintain the exemptions created by the Religious IFC to avoid instances where the Mandate is applied in a way that violates the religious beliefs of certain plan sponsors, issuers, or individuals. The Departments do not believe the previous exemptions are adequate, because some religious objections by plan sponsors and individuals were not subjected to contraceptive coverage if they fell under the indirect exemption for certain self-insured church plans, and others had to choose between the Mandate and the accommodation even though they objected to both. The Departments wish to avoid inconsistency in respecting religious objections in connection with the provision of contraceptive coverage. The lack of a congressional mandate that contraceptives be covered, much less that they be covered without religious exemptions, has also informed the Departments' decision to expand the exemptions. And Congress's decision not to apply PHS Act section 2713 to grandfathered plans has likewise informed the Departments' decision whether exemptions to the contraceptive Mandate are appropriate.

Congress has also established a background rule against substantially burdening sincere religious beliefs except where consistent with the stringent requirements of the Religious Freedom Restoration Act. And Congress has consistently provided additional, specific exemptions for religious beliefs in statutes addressing federal requirements in the context of health care and specifically concerning issues such as abortion, sterilization, and contraception. Therefore, the Departments consider it appropriate, to the extent we impose a contraceptive coverage Mandate by the exercise of agency discretion, that we also include exemptions for the protection of religious beliefs in certain cases. The expanded exemptions finalized in these rules are generally consistent with the scope of exemptions that Congress has established in similar contexts. They are also consistent with the intent of Executive Order 13535 (March 24, 2010), which was issued upon the signing of the ACA and declared that, ''[u]nder the Act, longstanding federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7, and the Weldon Amendment, section 508(d)(1) of Public Law 111–8) remain intact'' and that ''[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the HHS.''

Some commenters argued that Congress's failure to explicitly include

Case: 25-2575 Document 34-2 Page: 119 Date Filed: 12/12/2025
Case 2:17-cv-04540-WB Document 39-1 Filed 12/14/18 Page 5 of 45

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations 57543

religious exemptions in PHS Act section 2713 itself is indicative of an intent that such exemptions not be included, but the Departments disagree. As noted above, Congress also failed to require contraceptive coverage in PHS Act section 2713. And the commenters' argument would negate not just these expanded exemptions, but the previous exemptions for houses of worship and integrated auxiliaries, and the indirect exemption for self-insured church plans that use the accommodation. Where Congress left so many matters concerning section 2713(a)(4) to agency discretion, the Departments consider it appropriate to implement these expanded exemptions in light of Congress's long history of respecting religious beliefs in the context of certain federal health care requirements.

If there is to be a federal contraceptive mandate that fails to include some—or, in the views of some commenters, any—religious exemptions, the Departments do not believe it is appropriate for us to impose such a regime through discretionary administrative measures. Instead, such a serious imposition on religious liberty should be created, if at all, by Congress, in response to citizens exercising their rights of political participation. Congress did not prohibit religious exemptions under this Mandate. It did not even require contraceptive coverage under the ACA. It left the ACA subject to RFRA, and it specified that additional women's preventive services will only be required coverage as provided for in Guidelines supported by HRSA. Moreover, Congress legislated in the context of the political consensus on conscientious exemptions for health care that has long been in place. Since *Roe* v. *Wade* in 1973, Congress and the states have consistently offered religious exemptions for health care providers and others concerning issues such as sterilization and abortion, which implicate deep disagreements on scientific, ethical, and religious (and moral) concerns. Indeed over the last 44 years, Congress has repeatedly expanded religious exemptions in similar cases, including to contraceptive coverage. Congress did not purport to deviate from that approach in the ACA. Thus, we conclude it is appropriate to specify in these final rules, that, if the Guidelines continue to maintain a contraceptive coverage requirement, the expanded exemptions will apply to those Guidelines and their enforcement.

Some commenters contended that, even though Executive Order 13535 refers to the Church Amendments, the intention of those statutes is narrow, should not be construed to extend to entities, and should not be construed to prohibit procedures. But those comments mistake the Departments' position. The Departments are not construing the Church Amendments to require these exemptions, nor do the exemptions prohibit any procedures. Instead, through longstanding federal conscience statutes, Congress has established consistent principles concerning respect for religious beliefs in the context of certain Federal health care requirements. Under those principles, and absent any contrary requirement of law, the Departments are offering exemptions for sincerely held religious beliefs to the extent the Guidelines otherwise include contraceptive coverage.[12] These exemptions do not prohibit any services, nor do they authorize employers to prohibit employees from obtaining any services. The Religious IFC and these final rules simply refrain from imposing the federal Mandate that employers and health insurance issuers cover contraceptives in their health plans where compliance with the Mandate would violate their sincerely held religious beliefs. And though not necessary to the Departments' decision here, the Departments note that the Church Amendments explicitly protect entities and that several subsequent federal conscience statutes have protected against federal mandates in health coverage.

The Departments note that their decision is also consistent with state practice. A significant majority of states either impose no contraceptive coverage requirement or offer broader exemptions than the exemption contained in the July 2015 final regulations.[13] Although the practice of states is not a limit on the discretion delegated to HRSA by the ACA, nor is it a statement about what the federal government may do consistent with RFRA or other limitations or protections embodied in federal law, such state practices can inform the Departments' view that it is appropriate to protect religious liberty as an exercise of agency discretion.

The Departments decline to adopt the suggestion of some commenters to use these final rules to revoke the contraceptive Mandate altogether, such as by declaring that HHS through HRSA shall not include contraceptives in the list of women's preventive services in Guidelines issued under section 2713(a)(4). Although previous regulations were used to authorize religious exemptions and accommodations to the imposition of the Guidelines' coverage of contraception, the issuance of the Guidelines themselves in 2011 describing what items constitute recommended women's preventive services, and the update to those recommendations in December 2016, did not occur through the regulations that preceded the 2017 Religious IFC and these final rules. The Guidelines' specification of which women's preventive services were recommended were issued, not by regulation, but directly by HRSA, after consultation with external organizations that operated under cooperative agreements with HRSA to consider the issue, solicit public comment, and provide recommendations. The Departments decline to accept the invitation of some commenters to use these rules to specify whether HRSA includes contraceptives in the Guidelines at all. Instead the Departments conclude it is appropriate for these rules to continue to focus on restating the statutory language of PHS Act section 2713 in regulatory form, and delineating what exemptions and accommodations apply if HRSA lists contraceptives in its Guidelines. Some commenters said that if contraceptives are not removed from the Guidelines entirely, some entities or individuals with religious objections might not qualify for the exemptions or accommodation. As discussed below, however, the exemptions in the Religious IFC and these final rules cover a broad range of entities and individuals. The Departments are not aware of specific groups or individuals whose religious beliefs would still be substantially burdened by the Mandate after the issuance of these final rules.

Some commenters asserted that HRSA should remove contraceptives from the Guidelines because the Guidelines have not been subject to the notice and comment process under the Administrative Procedure Act. Some commenters also contended that the Guidelines should be amended to omit items that may prevent (or possibly dislodge) the implantation of a human embryo after fertilization, in order to ensure consistency with conscience provisions that prohibit requiring plans to pay for or cover abortions.

---

[12] The Departments note that the Church Amendments are the subject of another, ongoing rulemaking process. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 FR 3880 (NPRM Jan. 26, 2018). Since the Departments are not construing the Amendments to require the religious exemptions, we defer issues regarding the scope, interpretation, and protections of the Amendments to HHS in that rulemaking.

[13] *See* Guttmacher Institute, ''Insurance Coverage of Contraceptives'', The Guttmacher Institute (June 11, 2018), *https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.*

Whether and to what extent the Guidelines continue to list contraceptives, or items considered to prevent implantation of an embryo, for entities not subject to exemptions and an accommodation, and what process is used to include those items in the Guidelines, is outside the scope of these final rules. These rules focus on what religious exemptions and accommodations shall apply if Guidelines issued under section 2713(a)(4) include contraceptives or items considered to be abortifacients.

Members of the public that support or oppose the inclusion of some or all contraceptives in the Guidelines, or wish to comment concerning the content of, and the process for developing and updating, the Guidelines, are welcome to communicate their views to HRSA, at *wellwomancare@hrsa.gov*.

The Departments conclude that it would be inadequate to merely attempt to amend or expand the accommodation process instead of expanding the exemption. In the past, the Departments had stated in our regulations and court briefs that the previous accommodation process required contraceptive coverage or payments in a way that is "seamless" with the coverage provided by the objecting employer. As a result, in significant respects, that previous accommodation process did not actually accommodate the objections of many entities, as many entities with religious objections have argued. The Departments have attempted to identify an accommodation process that would eliminate the religious objections of all plaintiffs, including seeking public comment through a Request For Information, 81 FR 47741 (July 26, 2016), but we stated in January 2017 that we were unable to develop such an approach at that time.[14] The Departments continue to believe that, because of the nature of the accommodation process, merely amending that accommodation process without expanding the exemptions would not adequately address religious objections to compliance with the Mandate. Instead, we conclude that the

most appropriate approach to resolve these concerns is to expand the exemptions as set forth in the Religious IFC and these final rules, while maintaining the accommodation as an option for providing contraceptive coverage, without forcing entities to choose between compliance with either the Mandate or the accommodation and their religious beliefs.

Comments considering the appropriateness of exempting certain specific kinds of entities or individuals are discussed in more detail below.

*C. The First Amendment and the Religious Freedom Restoration Act*

Some commenters said that the Supreme Court ruled that the exemptions to the contraceptive Mandate, which the Departments previously provided to houses of worship and integrated auxiliaries, were required by the First Amendment. From this, commenters concluded that the exemptions for houses of worship and integrated auxiliaries are legally authorized, but exemptions beyond those are not. But in *Hobby Lobby* and *Zubik*, the Supreme Court did not decide whether the exemptions previously provided to houses of worship and integrated auxiliaries were required by the First Amendment, and the Court did not say the Departments must apply the contraceptive Mandate to other organizations unless RFRA prohibits the Departments from doing so. Moreover, the previous church exemption, which applied automatically to all churches whether or not they had even asserted a religious objection to contraception, 45 CFR 147.141(a), is not tailored to any plausible free-exercise concerns. The Departments decline to adopt the view that RFRA does not apply to other religious organizations, and there is no logical explanation for how RFRA could require the church exemption but not this expanded religious exemption, given that the accommodation is no less an available alternative for the former than the latter.

Commenters disagreed about the scope of RFRA's protection in this context. Some commenters said that the expanded exemptions and accommodation are consistent with RFRA. Some also said that they are required by RFRA, as the Mandate imposes substantial burdens on religious exercise and fails to satisfy the compelling-interest and least-restrictive-means tests imposed by RFRA. Other commenters, however, contended that the expanded exemptions and accommodation are neither required by, nor consistent with, RFRA. In this vein, some argued that the Departments have

a compelling interest to deny religious exemptions, that there is no less restrictive means to achieve its goals, or that the Mandate or its accommodation process do not impose a substantial burden on religious exercise.

For the reasons discussed below, the Departments believe that agencies charged with administering a statute that imposes a substantial burden on the exercise of religion under RFRA have discretion in determining whether the appropriate response is to provide an exemption from the burdensome requirement, or to merely attempt to create an accommodation that would mitigate the burden. Here, after further consideration of these issues and review of the public comments, the Departments have determined that a broader exemption, rather than a mere accommodation, is the appropriate response.

In addition, with respect to religious employers, the Departments conclude that, without finalizing the expanded exemptions, and therefore requiring certain religiously objecting entities to choose between the Mandate, the accommodation, or penalties for noncompliance—or requiring objecting individuals to choose between purchasing insurance with coverage to which they object or going without insurance—the Departments would violate their rights under RFRA.

*1. Discretion To Provide Religious Exemptions*

In the Religious IFC, we explained that even if RFRA does not compel the Departments to provide the religious exemptions set forth in the IFC, the Departments believe the exemptions are the most appropriate administrative response to the religious objections that have been raised.

The Departments received conflicting comments on this issue. Some commenters agreed that the Departments have administrative discretion to address the religious objections even if the Mandate and accommodation did not violate RFRA. Other commenters expressed the view that RFRA does not provide such discretion, but only allows exemptions when RFRA requires exemptions. They contended that RFRA does not require exemptions for entities covered by the expanded exemptions of the Religious IFC, but that subjecting those entities to the accommodation satisfies RFRA, and therefore RFRA provides the Departments with no additional authority to exempt those entities. Those commenters further contended that because, in their view, section 2713(a)(4) does not authorize the

---

[14] *See* Departments of Labor, Health and Human Services, and the Treasury, "FAQs About Affordable Care Act Implementation Part 36," (Jan. 9, 2017), *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

Case: 25-2575    Document: 34-2    Page: 121    Date Filed: 12/12/2025
Case 2:25-cv-54540-WB   Document 699-1   Filed 12/14/18   Page 12 of 36

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    57545

expanded exemptions, no statutory authority exists for the Departments to finalize the expanded exemptions.

As discussed above, the Departments disagree with the suggestions of commenters that section 2713(a)(4) does not authorize the Departments to adopt the expanded exemptions. Nevertheless, the Departments note that the expanded exemptions for religious objectors also rest on an additional, independent ground: The Departments have determined that, in light of RFRA, an expanded exemption rather than the existing accommodation is the most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*. Indeed, with respect to at least some objecting entities, an expanded exemption, as opposed to the existing accommodation, is required by RFRA. The Departments disagree with commenters who contend RFRA does not give the Departments discretion to offer these expanded exemptions.

The Departments' determination about their authority under RFRA rests in part on the Departments' reassessment of the interests served by the application of the Mandate in this specific context. Although the Departments previously took the position that the application of the Mandate to objecting employers was narrowly tailored to serve a compelling governmental interest, as discussed below the Departments have now concluded, after reassessing the relevant interests and for the reasons stated below, that it does not. Particularly under those circumstances, the Departments believe that agencies charged with administering a statute that imposes a substantial burden on the exercise of religion under RFRA have discretion in determining whether the appropriate response is to provide an exemption from the burdensome requirement or instead to attempt to create an accommodation that would mitigate the burden. And here, the Departments have determined that a broader exemption rather than the existing accommodation is the appropriate response. That determination is informed by the Departments' reassessment of the relevant interests, as well as by their desire to bring to a close the more than five years of litigation over RFRA challenges to the Mandate.

Although RFRA prohibits the government from substantially burdening a person's religious exercise where doing so is not the least restrictive means of furthering a compelling interest—as is the case with the contraceptive Mandate, pursuant to

*Hobby Lobby*—neither RFRA nor the ACA *prescribes* the remedy by which the government must eliminate that burden, where any means of doing so will require departing from the ACA to some extent (on the view of some commenters, with which the Departments disagree, that section 2713(a)(4) does not itself authorize the Departments to recognize exceptions). The prior administration *chose* to do so through the complex accommodation it created, but nothing in RFRA or the ACA compelled that novel choice or prohibits the current administration from employing the more straightforward choice of an exemption—much like the existing and unchallenged exemption for churches. After all, on the theory that section 2713(a)(4) allows for no exemptions, the accommodation also departed from section 2713(a)(4) in the sense that employers were not themselves offering contraceptive coverage, and the ACA did not require the Departments to choose that departure rather than the expanded exemptions as the exclusive method to satisfy their obligations under RFRA to eliminate the substantial burden imposed by the Mandate. The agencies' choice to adopt an exemption in addition to the accommodation is particularly reasonable given the existing legal uncertainty as to whether the accommodation itself violates RFRA. *See* 82 FR at 47798; *see also Ricci* v. *DeStefano,* 557 U.S. 586, 585 (2009) (holding that an employer need only have a strong basis to believe that an employment practice violates Title VII's disparate impact ban in order to take certain types of remedial action that would otherwise violate Title VII's disparate-treatment ban). Indeed, if the Departments had simply adopted an expanded exemption from the outset—as they did for churches—no one could reasonably have argued that doing so was improper because they should have invented the accommodation instead. Neither RFRA nor the ACA compels a different result now based merely on path dependence.

Although the foregoing analysis is independently sufficient, additional support for this view is provided by the Departments' conclusion, as explained more fully below, that an expanded exemption is required by RFRA for at least some objectors. In the Religious IFC, the Departments reaffirmed their conclusion that there is not a way to satisfy all religious objections by amending the accommodation, (82 FR at 47800), a conclusion that was confirmed by some commenters (and the continued

litigation over the accommodation).[15] Some commenters agreed the religious objections could not be satisfied without expanding the exemptions, because if the accommodation requires an objecting entity's issuer or third party administrator to provide or arrange contraceptive coverage for persons covered by the plan because they are covered by the plan, this implicates the objection of entities to the coverage being provided through their own plan, issuer, or third party administrator. Other commenters contended the accommodation could be modified to satisfy RFRA concerns without extending exemptions to objecting entities, but they did not propose a method of modifying the accommodation that would, in the view of the Departments, actually address the religious objections to the accommodation.

In the Departments' view, after considering all the comments and the preceding years of contention over this issue, it is appropriate to finalize the expanded exemptions rather than merely attempt to change the accommodation to satisfy religious objections. This is because if the accommodation still delivers contraceptive coverage through use of the objecting employer's plan, issuer, or third party administrator, it does not address the religious objections. If the accommodation could deliver contraceptive coverage independent and separate from the objecting employer's plan, issuer, and third party administrator, it could possibly address the religious objections, but there are two problems with such an approach. First, it would effectively be an exemption, not the accommodation as it has existed, so it would not be a reason not to offer the expanded exemptions finalized in these rules. Second, although (as explained above) the Departments have authority to provide exemptions to the Mandate, the Departments are not aware of the authority, or of a practical mechanism, for using section 2713(a)(4) to require contraceptive coverage be provided

---

[15] *See* RFI, 81 FR 47741 (July 26, 2016); Departments of Labor, Health and Human Services, and the Treasury, "FAQs, About Affordable Care Act Implementation Part 36," (Jan. 9, 2017), *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

specifically to persons covered by an objecting employer, other than by using the employer's plan, issuer, or third party administrator, which would likely violate some entities' religious objections. The Departments are aware of ways in which certain persons covered by an objecting employer might obtain contraceptive coverage through other governmental programs or requirements, instead of through objecting employers' plans, issuers, or third party administrators, and we mention those elsewhere in this rule. But those approaches do not involve the accommodation, they involve the expanded exemptions, plus the access to contraceptives through separate means.

## 2. Requiring Entities To Choose Between Compliance With the Contraceptive Mandate or the Accommodation Violated RFRA in Many Instances

Before the Religious IFC, the Departments had previously contended that the Mandate did not impose a substantial burden on entities and individuals under RFRA; that it was supported by a compelling government interest; and that it was, in combination with the accommodation, the least restrictive means of advancing that interest. With respect to the coverage Mandate itself, apart from the accommodation, and as applied to entities with sincerely held religious objections, that argument was rejected in *Hobby Lobby,* which held that the Mandate imposes a substantial burden and was not the least restrictive means of achieving any compelling governmental interest. *See* 134 S. Ct. at 2775–79. In the Religious IFC, the Departments revisited its earlier conclusions and reached a different view, concluding that requiring compliance through the Mandate or accommodation constituted a substantial burden on the religious exercise of many entities or individuals with religious objections, did not serve a compelling interest, and was not the least restrictive means of serving a compelling interest, so that requiring such compliance led to the violation of RFRA in many instances. (82 FR at 47806).

In general, commenters disagreed about this issue. Some commenters agreed with the Departments, and with some courts, that requiring entities to choose between the contraceptive Mandate and its accommodation violated their rights under RFRA, because it imposed a substantial burden on their religious exercise, did not advance a compelling government

interest, and was not the least restrictive means of achieving such an interest. Other commenters contended that requiring compliance either with the Mandate or the accommodation did not violate RFRA, agreeing with some courts that have concluded the accommodation does not substantially burden the religious exercise of organizations since, in their view, it does not require organizations to facilitate contraceptive coverage except by submitting a self-certification form or notice, and requiring compliance was the least restrictive means of advancing the compelling interest of providing contraceptive access to women covered by objecting entities' plans.

The Departments have examined further, including in light of public comments, the issue of whether requiring compliance with the combination of the contraceptive Mandate and the accommodation process imposes a substantial burden on entities that object to both, and is the least restrictive means of advancing a compelling government interest. The Departments now reaffirm the conclusion set forth in the Religious IFC, that requiring certain religiously objecting entities or individuals to choose between the Mandate, the accommodation, or incurring penalties for noncompliance imposes a substantial burden on religious exercise under RFRA.

### a. Substantial Burden

The Departments concur with the description of substantial burdens expressed recently by the Department of Justice:

> A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.
>
> Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion.[16]

The Mandate and accommodation under the previous regulation forced

certain non-exempt religious entities to choose between complying with the Mandate, complying with the accommodation, or facing significant penalties. Various entities sincerely contended, in litigation or in public comments, that complying with either the Mandate or the accommodation was inconsistent with their religious observance or practice. The Departments have concluded that withholding an exemption from those entities would have imposed a substantial burden on their exercise of religion, either by compelling an act inconsistent with that observance or practice, or by substantially pressuring the adherents to modify such observance or practice. To this extent, the Departments believe that the Court's analysis in *Hobby Lobby* extends, for the purposes of analyzing substantial burden, to the burdens that an entity faces when it opposes, on the basis of its religious beliefs, complying with the Mandate or participating in the accommodation process, and is subject to penalties or disadvantages that would have applied in this context if it chose neither. *See also Sharpe Holdings,* 801 F.3d at 942. Likewise, reconsideration of these issues has also led the Departments to conclude that the Mandate imposes a substantial burden on the religious beliefs of an individual employee who opposes coverage of some (or all) contraceptives in his or her plan on the basis of his or her religious beliefs, and would be able to obtain a plan that omits contraception from a willing employer or issuer (as applicable), but cannot obtain one solely because the Mandate requires that employer or issuer to provide a plan that covers all FDA-approved contraceptives. The Departments disagree with commenters that contend the accommodation did not impose a substantial burden on religiously objecting entities, and agree with other commenters and some courts and judges that concluded the accommodation can be seen as imposing a substantial burden on religious exercise in many instances.

### b. Compelling Interest

Although the Departments previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest, the Departments have concluded, after reassessing the relevant interests and, in light of the public comments received, that it does not. This is based on several independent reasons.

First, as discussed above, the structure of section 2713(a)(4) and the ACA evince a desire by Congress to

---

[16] *See* Federal Law Protections for Religious Liberty, 82 FR 49668, 49669 (Oct. 26, 2017).

Case: 25-2575　　Document: 34-2　　Page: 123　　Date Filed: 12/12/2025
Case: 2:17-cv-05440-WB　Document 891-1　Filed 11/14/16　Page 13 of 56

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations　　**57547**

grant a great amount of discretion on the issue of whether, and to what extent, to require contraceptive coverage in health plans pursuant to section 2713(a)(4). This informs the Departments' assessment of whether the interest in mandating the coverage constitutes a compelling interest, as doing so imposes a substantial burden on religious exercise. As the Department of Justice has explained, "[t]he strict scrutiny standard applicable to RFRA is exceptionally demanding," and "[o]nly those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent." [17]

Second, since the day the contraceptive Mandate came into effect in 2011, the Mandate has not applied in many circumstances. To begin, the ACA does not apply the Mandate, or any part of the preventive services coverage requirements, to grandfathered plans. To continue, the Departments under the last Administration provided exemptions to the Mandate and expanded those exemptions through multiple rulemaking processes. Those rulemaking processes included an accommodation that effectively left employees of many non-exempt religious nonprofit entities without contraceptive coverage, in particular with respect to self-insured church plans exempt from ERISA. Under the previous accommodation, once a self-insured church plan filed a self-certification or notice, the accommodation relieved it of any further obligation with respect to contraceptive services coverage. Having done so, the accommodation process would generally have transferred the obligation to provide or arrange for contraceptive coverage to a self-insured plan's third party administrator (TPA). But the Departments recognized that they lack authority to compel church plan TPAs to provide contraceptive coverage or levy fines against those TPAs for failing to provide it. This is because church plans are exempt from ERISA pursuant to section 4(b)(2) of ERISA. Section 2761(a) of the PHS Act provides that States may enforce the provisions of title XXVII of the PHS Act as they pertain to health insurance issuers, but does not apply to church plans that do not provide coverage through a policy issued by a health insurance issuer. The combined result of PHS Act section 2713's authority to remove contraceptive coverage obligations from self-insured church

plans, and HHS's and DOL's lack of authority under the PHS Act or ERISA to require TPAs of those plans to provide such coverage, led to significant disparity in the requirement to provide contraceptive coverage among nonprofit organizations with religious objections to the coverage.

Third party administrators for some, but not all, religious nonprofit organizations were subject to enforcement for failure to provide contraceptive coverage under the accommodation, depending on whether they administer a self-insured church plan. Notably, many of those nonprofit organizations were not houses of worship or integrated auxiliaries. Under section 3(33)(C) of ERISA, organizations whose employees participate in self-insured church plans need not be churches so long as they are controlled by or "share[ ] common religious bonds and convictions with" a church or convention or association of churches. The effect is that many similar religious organizations were being treated differently with respect to their employees receiving contraceptive coverage based solely on whether organization employees participate in a church plan.

This arrangement encompassed potentially hundreds of religious non-profit organizations that were not covered by the exemption for houses of worship and integrated auxiliaries. For example, the Departments were sued by two large self-insured church plans—Guidestone and Christian Brothers.[18] Guidestone is a plan organized by the Southern Baptist convention that covers 38,000 employers, some of which are exempt as churches or integrated auxiliaries, and some of which are not. Christian Brothers is a plan that covers Catholic churches and integrated auxiliaries and has said in litigation that it covers about 500 additional entities that are not exempt as churches. In several other lawsuits challenging the Mandate, the previous Administration took the position that some plans established and maintained by houses of worship but that included entities that were not integrated auxiliaries, were church plans under section 3(33) of ERISA and, thus, the Government "has no authority to require the plaintiffs' TPAs to provide contraceptive coverage at this time." *Roman Catholic Archdiocese of N.Y.* v. *Sebelius*, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

Third, the Departments now believe the administrative record on which the Mandate rested was—and remains— insufficient to meet the high threshold to establish a compelling governmental interest in ensuring that women covered by plans of objecting organizations receive cost-free contraceptive coverage through those plans. The Mandate is not narrowly tailored to advance the government's interests and appears both overinclusive and underinclusive. It includes some entities where a contraceptive coverage requirement seems unlikely to be effective, such as religious organizations of certain faiths, which, according to commenters, primarily hire persons who agree with their religious views or make their dedication to their religious views known to potential employees who are expected to respect those views. The Mandate also does not apply to a significant number of entities encompassing many employees and for-profit businesses, such as grandfathered plans. And it does not appear to target the population defined, at the time the Guidelines were developed, as being the most at-risk of unintended pregnancy, that is, "women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority." [19] Rather than focusing on this group, the Mandate is a broad-sweeping requirement across employer-provided coverage and the individual and group health insurance markets.

The Department received conflicting comments on this issue. Some commenters agreed that the government does not have a compelling interest in applying the Mandate to objecting religious employers. They noted that the expanded exemptions will impact only a small fraction of women otherwise affected by the Mandate and argued that refusing to provide those exemptions would fail to satisfy the compelling interest test. Other commenters, however, argued that the government has a broader interest in the Mandate because all women should be considered at-risk of unintended pregnancy. But the Institute of Medicine (IOM), in discussing whether contraceptive coverage is needed, provided a very specific definition of the population of women most at-risk of unintended pregnancy.[20] The Departments believe it is appropriate to consider the government's interest in

---

[17] *Id.* at 49670.

[18] The Departments take no view on the status of particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.

[19] Institute of Medicine, "Clinical Preventive Services for Women: Closing the Gaps" at 102 (2011).

[20] Id.

Case: 25-2575   Document: 34-2   Page: 124   Date Filed: 12/12/2025
Case: 2:27-cv-545-WB-WB   Document 6991 · Filed 12/14/18   Page 1 of 96

57548    Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

the contraceptive coverage requirement using the definition that formed the basis of that requirement and the justifications the Departments have offered for it since 2011. The Mandate, by its own terms, applies not just to women most at-risk of unintended pregnancy as identified by the IOM, but applies to any non-grandfathered "group health plan and a health insurance issuer offering group or individual health insurance coverage." PHS Act section 2713(a). Similarly, the exemptions and accommodation in previous rules, and the expanded exemptions in these rules, do not apply only to coverage for women most at-risk of unintended pregnancy, but to plans where a qualifying objection exists based on sincerely held religious beliefs without regard to the types of women covered in those plans. Seen in this light, the Departments believe there is a serious question whether the administrative record supports the conclusion that the Mandate, as applied to religious objectors encompassed by the expanded exemptions, is narrowly tailored to achieve the interests previously identified by the government. Whether and to what extent it is certain that an interest in health is advanced by refraining from providing expanded religious exemptions is discussed in more detail below in section II.F., Health Effects of Contraception and Pregnancy.

Fourth, the availability of contraceptive coverage from other possible sources—including some objecting entities that are willing to provide some (but not all) contraceptives, or from other governmental programs for low-income women—detracts from the government's interest to refuse to expand exemptions to the Mandate. The Guttmacher Institute recently published a study that concluded, "[b]etween 2008 and 2014, there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy," and "there was no significant increase in the use of methods that would have been covered under the ACA (most or moderately effective methods) during the most recent time period (2012–2014) excepting small increases in implant use." [21] In discussing why they did not see such an effect from the Mandate, the authors suggested that "[p]rior to the

implementation of the ACA, many women were able to access contraceptive methods at low or no cost through publicly funded family planning centers and Medicaid; existence of these safety net programs may have dampened any impact that the ACA could have had on contraceptive use. In addition, cost is not the only barrier to accessing a full range of method options," and "[t]he fact that income is not associated with use of most other methods [besides male sterilization and withdrawal] obtained through health care settings may reflect broader access to affordable and/or free contraception made possible through programs such as Title X."

Fifth, the Departments previously created the accommodation, in part, as a way to provide for payments of contraceptives and sterilization in a way that is "seamless" with the coverage that eligible employers provide to their plan participants and their beneficiaries. (80 FR 41318). As noted above, some commenters contended that seamlessness between contraceptive coverage and employer sponsored insurance is important and is a compelling governmental interest, while other commenters disagreed. Neither Congress, nor the Departments in other contexts, have concluded that seamlessness, as such, is a compelling interest in the federal government's delivery of contraceptive coverage. For example, the preventive services Mandate itself does not require contraceptive coverage and does not apply to grandfathered plans, thereby failing to guarantee seamless contraceptive coverage. The exemption for houses of worship and integrated auxiliaries, and the application of the accommodation to certain self-insured church plans, also represents a failure to achieve seamless contraceptive coverage. HHS's Title X program provides contraceptive coverage in a way that is not necessarily seamless with beneficiaries' employer sponsored insurance plans. After reviewing the public comments and reconsidering this issue, the Departments no longer believe that if a woman working for an objecting religious employer receives contraceptive access in ways that are not seamless to her employer sponsored insurance, a compelling government interest has nevertheless been undermined. Therefore the Departments conclude that guaranteeing seamlessness between contraceptive access and employer sponsored insurance does not constitute a compelling interest that overrides

employers' religious objections to the contraceptive Mandate.

Some commenters contended that obtaining contraceptive coverage from other sources could be more difficult or more expensive for women than obtaining it from their group health plan or health insurance plan. The Departments do not believe that such differences rise to the level of a compelling interest or make it inappropriate for us to issue the expanded exemptions set forth in these final rules. Instead, after considering this issue, the Departments conclude that the religious liberty interests that would be infringed if we do not offer the expanded exemptions are not overridden by the impact on those who will no longer obtain contraceptives through their employer sponsored coverage as a result. This is discussed in more detail in following section, II.D., Burdens on Third Parties.

### D. Burdens on Third Parties

The Departments received a number of comments on the question of burdens that these rules might impose on third parties. Some commenters asserted that the expanded exemptions and accommodation do not impose an impermissible or unjustified burden on third parties, including on women who might not otherwise receive contraceptive coverage with no cost-sharing. These included commenters agreeing with the Departments' explanations in the Religious IFC, stating that unintended pregnancies were decreasing before the Mandate was implemented, and asserting that any benefit that third parties might receive in getting contraceptive coverage does not justify forcing religious persons to provide such products in violation of their beliefs. Other commenters disagreed, asserting that the expanded exemptions unacceptably burden women who might lose contraceptive coverage as a result. They contended the exemptions may remove contraceptive coverage, causing women to have higher contraceptive costs, fewer contraceptive options, less ability to use contraceptives more consistently, more unintended pregnancies,[22] births spaced more closely, and workplace, economic, or societal inequality. Still other commenters took the view that other laws or protections, such as those found in the First or Fifth Amendments, prohibit the expanded exemptions, which those commenters view as

---

[21] M.L. Kavanaugh et al., Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, 97 *Contraception* 14, 14–21 (2018), available at *http://www.contraceptionjournal.org/article/S0010-7824(17)30478-X/pdf.*

[22] Some commenters attempted to quantify the costs of unintended pregnancy, but failed to persuasively estimate the population of women that this exemption may affect.

prioritizing religious liberty of exempted entities over the religious liberty, conscience, or choices of women who would not receive contraceptive coverage where an exemption is used.

The Departments note that the exemptions in the Religious IFC and these final rules, like the exemptions created by the previous Administration, do not impermissibly burden third parties. Initially, the Departments observe that these final rules do not create a governmental burden; rather, they relieve a governmental burden. The ACA did not impose a contraceptive coverage requirement. HHS exercised discretion granted to HRSA by the Congress to include contraceptives in the Guidelines issued under section 2713(a)(4). That decision is what created and imposed a governmental burden. These rules simply relieve part of that governmental burden. If some third parties do not receive contraceptive coverage from private parties who the government chose not to coerce, that result exists in the absence of governmental action—it is not a result the government has imposed. Calling that result a governmental burden rests on an incorrect presumption: that the government has an obligation to force private parties to benefit those third parties and that the third parties have a right to those benefits. But Congress did not create a right to receive contraceptive coverage from other private citizens through PHS Act section 2713, other portions of the ACA, or any other statutes it has enacted. Although some commenters also contended such a right might exist under treaties the Senate has ratified or the Constitution, the Departments are not aware of any source demonstrating that the Constitution or a treaty ratified by the Senate creates a right to receive contraceptive coverage from other private citizens.

The fact that the government at one time exercised its administrative discretion to require private parties to provide coverage to benefit other private parties, does not prevent the government from relieving some or all of the burden of its Mandate. Otherwise, any governmental coverage requirement would be a one-way ratchet. In the Religious IFC and these rules, the government has simply restored a zone of freedom where it once existed. There is no statutory or constitutional obstacle to the government doing so, and the doctrine of third-party burdens should not be interpreted to impose such an obstacle. Such an interpretation would be especially problematic given the millions of women, in a variety of contexts, whom the Mandate does not

ultimately benefit, notwithstanding any expanded exemptions—including through grandfathering of plans, the previous religious exemptions, and the failure of the accommodation to require delivery of contraceptive coverage in various self-insured church plan contexts.

In addition, the Government is under no constitutional obligation to fund contraception. *Cf. Harris* v. *McRae,* 448 U.S. 297 (1980) (holding that, although the Supreme Court has recognized a constitutional right to abortion, there is no constitutional obligation for government to pay for abortions). Even more so may the Government refrain from requiring private citizens, in violation of their religious beliefs, to cover contraception for other citizens. *Cf. Rust* v. *Sullivan,* 500 U.S. 173, 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."). The constitutional rights of liberty and privacy do not require the government to force private parties to provide contraception to other citizens and do not prohibit the government from protecting religious objections to such governmental mandates, especially where, as here, the mandate is not an explicit statutory requirement.[23] The Departments do not believe that the Constitution prohibits offering the expanded exemptions in these final rules.

As the Department of Justice has observed, the fact that exemptions may relieve a religious adherent from conferring a benefit on a third party "does not categorically render an exemption unavailable," and RFRA still applies.[24] The Departments conclusion on this matter is consistent with the Supreme Court's observation that RFRA may require exemptions even from laws requiring claimants "to confer benefits on third parties." *See Hobby Lobby,* 134 S. Ct. at 2781 n.37. Here, no law contains such a requirement, but the Mandate is derived from an administrative exercise of discretion that Congress charged HRSA and the Departments with exercising. Burdens that may affect third parties as a result of revisiting the exercise of agency discretion may be relevant to the RFRA analysis, but they cannot be dispositive. "Otherwise, for example, the

Government could decide that all supermarkets must sell alcohol for the convenience of customers (and thereby exclude Muslims with religious objections from owning supermarkets), or it could decide that all restaurants must remain open on Saturdays to give employees an opportunity to earn tips (and thereby exclude Jews with religious objections from owning restaurants)." *Id.*

When government relieves burdens on religious exercise, it does not violate the Establishment Clause; rather, "it follows the best of our traditions." *Zorach* v. *Clauson,* 343 U.S. 306, 314 (1952). The Supreme Court's cases "leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Board of Educ. of Kiryas Joel Village Sch. Dist.* v. *Grumet,* 512 U.S. 687, 705 (1994). Rather, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *Amos,* 483 U.S. 327, 334 (1987) (quoting *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 144–45 (1987)). "[T]here is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter* v. *Wilkinson,* 544 U.S. 709, 713 (2005) (internal quotation omitted). Thus, the Supreme Court has upheld a broad range of accommodations against Establishment Clause challenges, including the exemption of religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion, *see Amos,* 483 U.S. at 335–39; a state property tax exemption for religious organizations, *see Walz* v. *Tax Comm'n of City of New York,* 397 U.S. 664, 672–80 (1970); and a state program releasing public school children during the school day to receive religious instruction at religious centers, *see Zorach,* 343 U.S. at 315.

Before 2012 (when HRSA's Guidelines went into effect), there was no federal women's preventive services coverage mandate imposed nationally on health insurance and group health plans. The ACA did not require contraceptives to be included in HRSA's Guidelines, and it did not require any preventive services required under PHS

---

[23] *See, for example, Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists,* 257 P.3d 181, 196 (Ariz. Ct. App. 2011) ("[A] woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

[24] See Federal Law Protections for Religious Liberty, 82 FR at 49670.

Act section 2713 to be covered by grandfathered plans. Many States do not impose contraceptive coverage mandates, or they offer religious exemptions to the requirements of such coverage mandates—exemptions that have not been invalidated by federal or State courts. The Departments, in previous regulations, exempted houses of worship and integrated auxiliaries from the Mandate. The Departments then issued a temporary enforcement safe harbor allowing religious nonprofit groups to not provide contraceptive coverage under the Mandate for almost two additional years. The Departments further expanded the houses of worship and integrated auxiliaries exemption through definitional changes. And the Departments created an accommodation process under which many women in self-insured church plans may not ultimately receive contraceptive coverage. In addition, many organizations have not been subject to the Mandate in practice because of injunctions they received through litigation, protecting them from federal imposition of the Mandate, including under several recently entered permanent injunctions that will apply regardless of the issuance of these final rules.

Commenters offered various assessments of the impact these rules might have on state or local governments. Some commenters said that the expanded exemptions will not burden state or local governments, or that such burdens should not prevent the Departments from offering those exemptions. Others said that if the Departments provide expanded exemptions, states or local jurisdictions may face higher costs in providing birth control to women through government programs. The Departments consider it appropriate to offer expanded exemptions, notwithstanding the objection of some state or local governments. The ACA did not require a contraceptive Mandate, and its discretionary creation by means of HRSA's Guidelines does not translate to a benefit that the federal government owes to states or local governments. We are not aware of instances where the various situations recited in the previous paragraph, in which the federal government has not imposed contraceptive coverage (other than through the Religious and Moral IFCs), have been determined to cause a cognizable injury to state or local governments. Some states that were opposed to the IFCs submitted comments objecting to the potential impacts on their programs resulting

from the expanded exemptions, but they did not adequately demonstrate that such impacts would occur, and they did not explain whether, or to what extent, they were impacted by the other kinds of instances mentioned above in which no federal mandate of contraceptive coverage has applied to certain plans. The Departments find no legal prohibition on finalizing these rules based on the speculative suggestion of an impact on state or local governments, and we disagree with the suggestion that once we have exercised our discretion to deny exemptions—no matter how recently or incompletely—we cannot change course if some state and local governments believe they are receiving indirect benefits from the previous decision.

In addition, these expanded exemptions apply only to a small fraction of entities to which the Mandate would otherwise apply—those with qualifying religious objections. Public comments did not provide reliable data on how many entities would use these expanded religious exemptions, in which states women in such plans would reside, how many of those women would qualify for or use state and local government subsidies of contraceptives as a result, or in which states such women, if they are low income, would go without contraceptives and potentially experience unintended pregnancies that state Medicaid programs would have to cover. As mentioned above, at least one study, published by the Guttmacher Institute, concluded the Mandate has caused no clear increase in contraceptive use; one explanation proposed by the authors of the study is that women eligible for family planning from safety net programs were already receiving free or subsidized contraceptive access through them, notwithstanding the Mandate's effects on the overall market. Some commenters who opposed the expanded exemptions admitted that this information is unclear at this stage; other commenters that estimated considerably more individuals and entities would seek an exemption also admitted the difficulty of quantifying estimates.

In the discussion below concerning estimated economic impacts of these rules, the Departments explain there is not reliable data available to accurately estimate the number of women who may lose contraceptive coverage under these rules, and the Departments set forth various reasons why it is difficult to know how many entities will use these exemptions or how many women will be impacted by those decisions.

Solely for the purposes of determining whether the rules have a significant economic impact under Executive Order 12,866, and in order to estimate the broadest possible impact so as to determine the applicability of the procedures set forth in that Executive Order, the Departments propose that the rules will affect no more than 126,400 women of childbearing age who use contraceptives covered by the Guidelines, and conclude the economic impact falls well below $100 million. As explained below, that estimate assumes that a certain percentage of employers which did not cover contraceptives before the ACA will use these exemptions based on sincerely held religious beliefs. The Departments do not actually know that such entities will do so, however, or that they operate based on sincerely held religious beliefs against contraceptive coverage. The Departments also explain that other exemptions unaffected by these rules may encompass many or most women potentially affected by the expanded exemptions. In other words, the houses of worship and integrated auxiliaries exemption, the accommodation's failure to require contraceptive coverage in certain self-insured church plans, the non-applicability of PHS Act section 2713 to grandfathered plans, and the permanent injunctive relief many religious litigants have received against section 2713(a)(4), may encompass a large percentage of women potentially affected by religious objections, and therefore many women in those plans may not be impacted by these rules at all. In addition, even if 126,400 women might be affected by these rules, that number constitutes less than 0.1% of all women in the United States.[25] This suggests that if these rules have any impact on state or local governments, it will be statistically de minimus. The Departments conclude that there is insufficient evidence of a potential negative impact of these rules on state and local governments to override the appropriateness of deciding to finalize these rules.

Some commenters contended that the expanded exemptions would constitute unlawful sex discrimination, such as under section 1557 of the Affordable Care Act, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, or the Fifth Amendment. Some commenters suggested the expanded exemptions

---

[25] U.S. Census Bureau, "Quick Facts: Population Estimates, July 1, 2017" (estimating 325,719,178 persons in the U.S., 50.8% of which are female), available at *https://www.census.gov/quickfacts/fact/table/US/PST045217.*

Case: 25-2575    Document: 34-2    Page: 127    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB   Document 6691-1   Filed 12/14/18   Page 17 of 66

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57551**

would discriminate on bases such as race, disability, or LGBT status, or that they would disproportionately burden certain persons in such categories.

But these final rules do not discriminate or draw any distinctions on the basis of sex, pregnancy, race, disability, socio-economic class, LGBT status, or otherwise, nor do they discriminate on any unlawful grounds. The expanded exemptions in these rules do not authorize entities to comply with the Mandate for one person, but not for another person, based on that person's status as a member of a protected class. Instead they allow entities that have sincerely held religious objections to providing some or all contraceptives included in the Mandate to not be forced to provide coverage of those items to anyone.

These commenters' contentions about discrimination are unpersuasive for still additional reasons. First, Title VII is applicable to discrimination committed by employers, and these rules have been issued in the government's capacity as a regulator of group health plans and group and individual health insurance, not an employer. *See also In Re Union Pac. R.R. Emp't Practices Litig.,* 479 F.3d 936, 940–42 & n.1 (8th Cir. 2007) (holding that Title VII ''does not require coverage of contraception because contraception is not a gender-specific term like potential pregnancy, but rather applies to both men and women''). Second, these rules create no disparate impact. The women's preventive services mandate under section 2713(a)(4), and the contraceptive Mandate promulgated under such preventive services mandate, already inures to the specific benefit of women—men are denied any benefit from that section. Both before and after these final rules, section 2713(a)(4) and the Guidelines issued under that section treat women's preventive services in general, and female contraceptives specifically, more favorably than they treat male preventive services or male contraceptives.

It is simply not the case that the government's implementation of section 2713(a)(4) is discriminatory against women because exemptions are expanded to encompass religious objections. The previous regulations, as discussed elsewhere herein, do not require contraceptive coverage in a host of plans, including grandfathered plans, plans of houses of worship, and—through inability to enforce the accommodation on certain third party administrators—plans of many religious non-profits in self-insured church plans. Below, the Departments estimate that few women of childbearing age in the

country will be affected by these expanded exemptions.[26] In this context, the Departments do not believe that an adjustment to discretionary Guidelines for women's preventive services concerning contraceptives constitutes unlawful sex discrimination. Otherwise, anytime the government exercises its discretion to provide a benefit that is specific to women (or specific to men), it would constitute sex discrimination for the government to reconsider that benefit. Under that theory, *Hobby Lobby* itself, and RFRA (on which *Hobby Lobby's* holding was based), which provided a religious exemption to this Mandate for many businesses, would be deemed discriminatory against women because the underlying women's preventive services requirement is a benefit for women, not for men. Such conclusions are not consistent with legal doctrines concerning sex discrimination.

It is not clear that these expanded exemptions will significantly burden women most at risk of unintended pregnancies. Some commenters observed that contraceptives are often readily accessible at relatively low cost. Other commenters disagreed. Some objected to the suggestion in the Religious IFC that many forms of contraceptives are available for around $50 per month and other forms, though they bear a higher one-time cost, cost a similar amount over the duration of use. But some of those commenters cited sources maintaining that birth control pills can cost up to $600 per year (that is, $50 per month), and said that IUDs, which can last three to six years or more,[27] can cost $1,100 (that is, less than $50 per month over the duration of use). Some commenters said that, for lower income women, contraceptives can be available at free or low cost through government programs (federal programs offering such services include, for example, Medicaid, Title X, community health center grants, and Temporary Assistance for Needy Families (TANF)). Other commenters contended that many women in employer-sponsored coverage might not qualify for those programs, although that sometimes occurs because their incomes are above certain thresholds or

because the programs were not intended to absorb privately insured individuals. Some commenters observed that contraceptives may be available through other sources, such as a plan of another family member and that the expanded exemptions will not likely encompass a very large segment of the population otherwise benefitting from the Mandate. Other commenters disagreed, pointing out that some government programs that provide family planning have income and eligibility thresholds, so that women earning certain amounts above those levels would need to pay full cost for contraceptives if they were no longer covered in their health plans.

The Departments do not believe that these general considerations make it inappropriate to issue the expanded exemptions set forth in these rules. In addition, the Departments note that the HHS Office of Population Affairs, within the Office of the Assistant Secretary for Health, has recently issued a proposed regulation to amend the regulations governing its Title X family planning program. The proposed regulation would amend the definition of ''low income family''—individuals eligible for free or low cost contraceptive services—to include women who are unable to obtain certain family planning services under their employer-sponsored health coverage due to their employers' religious beliefs or moral convictions (see 83 FR 25502). If that regulation is finalized as proposed, it could further reduce any potential effect of these final rules on women's access to contraceptives. That proposal also demonstrates that the government has other means available to it for increasing women's access to contraception. Some of those means are less restrictive of religious exercise than imposition of the contraceptive Mandate on employers with sincerely held religious objections to providing such coverage.

Some commenters stated that the expanded exemptions would violate section 1554 of the ACA. That section says the Secretary of HHS ''shall not promulgate any regulation'' that ''creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care,'' ''impedes timely access to health care services,'' ''interferes with communications regarding a full range of treatment options between the patient and the provider,'' ''restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions,'' ''violates the principles of informed consent and the ethical standards of health care professionals,'' or ''limits the

---

[26] Below, the Departments estimate that no more than 126,400 women of childbearing age will be affected by the expanded exemptions. As noted above, this is less than 0.1% of the over 165 million women in the United States. The Departments previously estimated that, at most 120,000 women of childbearing age would be affected by the expanded exemptions. *See* Religious IFC, 82 FR 47,823–84.

[27] *See, for example,* Planned Parenthood, ''IUD,'' *https://www.plannedparenthood.org/learn/birth-control/iud.*

Case: 25-2575    Document: 34-2    Page: 128    Date Filed: 12/12/2025
Case: 23-cv-05470-WJ Document 6391-1 Filed 12/11/19 Page 18 of 36

57552    Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. 18114. Such commenters urged, for example, that the Religious IFC created unreasonable barriers to the ability of individuals to obtain appropriate medical care, particularly in areas they said may have a disproportionately high number of entities likely to take advantage of the exemption.

The Departments disagree with these comments about section 1554. The Departments issued previous exemptions and accommodations that allowed various plans to not provide contraceptive coverage on the basis of religious objections. The Departments, which administer both ACA section 1554 and PHS Act section 2713, did not conclude that the exemptions or accommodations in those regulations violated section 1554. Moreover, the decision not to impose a governmental mandate is not the "creation" of a "barrier," especially when that mandate requires private citizens to provide services to other private citizens. Nor, in any event, are the exemptions from the Mandate unreasonable. Section 1554 of the ACA does not require the Departments to require coverage of, or to keep in place a requirement to cover, certain services, including contraceptives, that was issued pursuant to HHS's exercise of discretion under section 2713(a)(4). Nor does section 1554 prohibit the Departments from providing exemptions for burdens on religious exercise, or, as is the case here, from refraining to impose the Mandate in cases where religious exercise would be burdened by it. In light of RFRA and the First Amendment, providing religious exemptions is a reasonable administrative response in the context of this federally mandated burden, especially since the burden itself is a subregulatory creation that does not apply in various contexts. Religious exemptions from federal mandates in sensitive health contexts have existed in federal laws for decades, and President Obama referenced them when he issued Executive Order 13535 (March 24, 2010), declaring that, under the ACA, "longstanding Federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7, and the Weldon Amendment, section 508(d)(1) of Pub. L. 111–8) remain intact," and that "[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the HHS." While the text of Executive Order 13535 does not require the expanded exemptions issued in these rules, the expanded exemptions are, as explained

below, consistent with longstanding federal laws to protect religious beliefs.

In short, the Departments do not believe sections 1554 or 1557 of the ACA, other nondiscrimination statutes, or any constitutional doctrines, create an affirmative obligation to create, maintain, or impose a Mandate that forces covered entities to provide coverage of preventive contraceptive services in health plans. The ACA's grant of authority to HRSA to provide for, and support, the Guidelines is not transformed by any of the laws cited by commenters into a requirement that, once those Guidelines exist, they can never be reconsidered or amended because doing so would only affect women's coverage or would allegedly impact particular populations disparately.

Members of the public have widely divergent views on whether expanding the exemptions is good public policy. Some commenters said the exemptions would burden workers, families, and the economic and social stability of the country, and interfere with the physician-patient relationship. Other commenters disagreed, favoring the public policy behind expanding the exemptions and arguing that the exemptions would not interfere with the physician-patient relationship. For all the reasons explained at length in this preamble, the Departments have determined that these rules are good policy. Because of the importance of the religious liberty values being accommodated, the limited impact of these rules, and uncertainty about the impact of the Mandate overall according to some studies, the Departments do not believe these rules will have any of the drastic negative consequences on third parties or society that some opponents of these rules have suggested.

### E. Interim Final Rulemaking

The Departments received several comments about their decision to issue the Religious IFC as interim final rules with requests for comments, instead of as a notice of proposed rulemaking. Several commenters asserted that the Departments had the authority to issue the Religious IFC in that way, agreeing that the Departments had explicit statutory authority to do so, good cause under the Administrative Procedure Act (APA), or both. Other commenters held the opposite view, contending that there was neither statutory authority to issue the rules on an interim final basis, nor good cause under the APA to make the rules immediately effective.

The Departments continue to believe legal authority existed to issue the Religious IFC as interim final rules.

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include sections 2701 through 2728 of the PHS Act and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. The Religious and Moral IFCs fall under those statutory authorizations for the use of interim final rulemaking. Prior to the Religious IFC, the Departments issued three interim final rules implementing this section of the PHS Act because of the needs of covered entities for immediate guidance and the weighty matters implicated by the HRSA Guidelines, including issuance of new or revised exemptions or accommodations. (75 FR 41726; 76 FR 46621; 79 FR 51092). The Departments also had good cause to issue the Religious IFC as interim final rules, for the reasons discussed therein.

In any event, the objections of some commenters to the issuance of the Religious IFC as interim final rules with request for comments does not prevent the issuance of these final rules. These final rules are being issued after receiving and thoroughly considering public comments as requested in the Religious IFC. These final rules therefore comply with the APA's notice and comment requirements.

### F. Health Effects of Contraception and Pregnancy

The Departments received numerous comments on the health effects of contraception and pregnancy. As noted above, some commenters supported the expanded exemptions, and others urged that contraceptives be removed from the Guidelines entirely, based on the view that pregnancy and the unborn children resulting from conception are not diseases or unhealthy conditions that are properly the subject of preventive care coverage. Such commenters further contended that hormonal contraceptives may present health risks to women. For example, they contended that studies show certain contraceptives cause or are associated with an increased risk of depression,[28] venous thromboembolic

---

[28] Commenters cited Charlotte Wessel Skovlund et al., "Association of Hormonal Contraception with Depression," 73 JAMA Psychiatry 1154, 1154 (published online Sept. 28, 2016) ("Use of hormonal contraception, especially among adolescents, was associated with subsequent use of antidepressants and a first diagnosis of depression,

Case: 25-2575    Document: 34-2    Page: 129    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB   Document 89-1   Filed 12/14/18   Page 12 of 56

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57553**

disease,[29] fatal pulmonary embolism,[30] thrombotic stroke and myocardial infarction (particularly among women who smoke, are hypertensive, or are older),[31] hypertension,[32] HIV–1 acquisition and transmission,[33] and

breast, cervical, and liver cancers.[34] Some commenters also observed that fertility awareness based methods of birth spacing are free of similar health risks since they do not involve ingestion of chemicals. Some commenters contended that contraceptive access does not reduce unintended pregnancies or abortions.

Other commenters disagreed, citing a variety of studies they contend show health benefits caused by, or associated with, contraceptive use or the prevention of unintended pregnancy. Commenters cited, for example, the 2011 IOM Report's discussions of the negative effects associated with unintended pregnancies, as well as other studies. Such commenters contended that, by reducing unintended pregnancy, contraceptives reduce the risk of unaddressed health complications, low birth weight, preterm birth, infant mortality, and maternal mortality.[35] Commenters also said studies show contraceptives are associated with a reduced risk of conditions such as ovarian cancer, colorectal cancer, and endometrial cancer,[36] and that contraceptives treat such conditions as endometriosis, polycystic ovarian syndrome, migraines, pre-menstrual pain, menstrual regulation, and pelvic inflammatory

disease.[37] Some commenters said that pregnancy presents various health risks, such as blood clots, bleeding, anemia, high blood pressure, gestational diabetes, and death. Some commenters also contended that increased access to contraception reduces abortions.

Some commenters said that, in the Religious IFC, the Departments made incorrect statements concerning scientific studies. For example, some commenters argued there is no proven increased risk of breast cancer or other risks among contraceptive users. They criticized the Religious IFC for citing studies, including one previewed in the 2011 IOM Report itself (Agency for Healthcare Research and Quality Report No.: 13–E002–EF (June 2013) (cited above)), discussing an association between contraceptive use and increased risks of breast and cervical cancer, and concluding there are no net cancer-reducing benefits of contraceptive use. As described in the Religious IFC, 82 FR at 47804, the 2013 Agency for Healthcare Research and Quality study, and others, reach conclusions with which these commenters appear to disagree. The Departments consider it appropriate to take into account both of those studies, as well as the studies cited by commenters who disagree with those conclusions.

Some commenters further criticized the Departments for saying two studies cited by the 2011 IOM Report, which asserted an associative relationship between contraceptive use and decreases in unintended pregnancy, did not on their face establish a causal relationship between a broad coverage mandate and decreases in unintended pregnancy. In this respect, as noted in the Religious IFC,[38] the purpose for the Departments' reference to such studies was to highlight the difference between a causal relationship and an associative one, as well as the difference between saying contraceptive use has a certain effect and saying a contraceptive coverage mandate (or, more specifically, the part of that mandate affected by certain exemptions) will necessarily have (or negate, respectively) such an effect.

Commenters disagreed about the effects of some FDA-approved contraceptives on embryos. Some

suggesting depression as a potential adverse effect of hormonal contraceptive use.").

[29] Commenters cited the Practice Committee of the American Society for Reproductive Medicine, "Hormonal Contraception: Recent Advances and Controversies," 82 *Fertility and Sterility* S20, S26 (2004); V.A. Van Hylckama et al., "The Venous Thrombotic Risk of Oral Contraceptives, Effects of Estrogen Dose and Progestogen Type: Results of the MEGA Case-Control Study," 339 *Brit. Med. J.* 339b2921 (2009); Y. Vinogradova et al., "Use of Combined Oral Contraceptives and Risk of Venous Thromboembolism: Nested Case-Control Studies Using the QResearch and CPRD Databases," 350 *Brit. Med. J.* 350h2135 (2015) ("Current exposure to any combined oral contraceptive was associated with an increased risk of venous thromboembolism . . . compared with no exposure in the previous year."); Ø. Lidegaard et al., "Hormonal contraception and risk of venous thromboembolism: national follow-up study," 339 *Brit. Med. J.* b2890 (2009); M. de Bastos et al., "Combined oral contraceptives: venous thrombosis," Cochrane Database Syst. Rev. (no. 3, 2014). CD010813. doi: 10.1002/14651858.CD010813.pub2, available at *https://www.ncbi.nlm.nih.gov/ pubmed?term=24590565*; L.J Havrilesky et al., "Oral Contraceptive User for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/ findings/evidence-based-reports/ocusetp.html*; and Robert A. Hatcher et al., *Contraceptive Technology* 405–07 (Ardent Media 18th rev. ed. 2004).

[30] Commenters cited N.R. Poulter, "Risk of Fatal Pulmonary Embolism with Oral Contraceptives," 355 *Lancet* 2088 (2000).

[31] Commenters cited Ø. Lidegaard et al., "Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception," 366 *N. Eng. J. Med.* 2257, 2257 (2012) (risks "increased by a factor of 0.9 to 1.7 with oral contraceptives that included ethinyl estradiol at a dose of 20 µg and by a factor of 1.3 to 2.3 with those that included ethinyl estradiol at a dose of 30 to 40 µg"); Practice Committee of the American Society for Reproductive Medicine, "Hormonal Contraception"; M. Vessey et al., "Mortality in Relation to Oral Contraceptive Use and Cigarette Smoking," 362 *Lancet* 185, 185–91 (2003); WHO Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Acute Myocardial Infarction and Combined Oral Contraceptives: Results of an International Multicentre Case-Control Study," 349 *Lancet* 1202, 1202–09(1997); K.M. Curtis et al., Combined Oral Contraceptive Use Among Women With Hypertension: A Systematic Review, 73 Contraception 73179, 179–88 (2006); L.A. Gillum et al., "Ischemic stroke risk with oral contraceptives: A meta analysis," 284 *JAMA* 72, 72–78 (2000), available at *https://www.ncbi.nlm.nih.gov/pubmed/ 10872016*; and Robert A. Hatcher et al., *Contraceptive Technology* 404–05, 445 (Ardent Media 18th rev. ed. 2004).

[32] Commenters cited Robert A. Hatcher et al., *Contraceptive Technology* 407, 445 (Ardent Media 18th rev. ed. 2004).

[33] Commenters cited Renee Heffron et al., "Use of Hormonal Contraceptives and Risk of HIV–1 Transmission: A Prospective Cohort Study," 12 *Lancet Infectious Diseases 19, 24* (2012) ("Use of hormonal contraceptives was associated with a two-times increase in the risk of HIV–1 acquisition by women and HIV–1 transmission from women to men."); and "Hormonal Contraception Doubles HIV Risk, Study Suggests," *Science Daily* (Oct. 4, 2011),

*https://www.sciencedaily.com/releases/2011/10/ 111003195253.htm*.

[34] Commenters cited "Oral Contraceptives and Cancer Risk" (Mar. 21, 2012, National Cancer Institute (reviewed Feb. 22, 2018), *https:// www.cancer.gov/about-cancer/causes-prevention/ risk/hormones/oral-contraceptives-fact-sheet*; L.J Havrilesky et al., "Oral Contraceptive User for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality, Report No. 13– E002–EF (June 2013), available at *https:// archive.ahrq.gov/research/findings/evidence-based- reports/ocusetp.html*; S.N. Bhupathiraju et al., "Exogenous hormone use: Oral contraceptives, postmenopausal hormone therapy, and health outcomes in the Nurses' Health Study," 106 *Am. J. Pub. Health* 1631, 1631–37 (2016); The World Health Organization Department of Reproductive Health and Research, "The Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment", World Health Organization (Sept. 2005), *http://www.who.int/ reproductivehealth/topics/ageing/cocs_hrt_ statement.pdf*; and the American Cancer Society, "Known and Probably Human Carcinogens," American Cancer Society (rev. Nov. 3, 2016), *https://www.cancer.org/cancer/cancer-causes/ general-info/known-and-probable-human- carcinogens.html*.

[35] Citing, *e.g.*, Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23, and John Hopkins Bloomberg Public Health School of Health, Contraception Use Averts 272,000 Maternal Deaths Worldwide, *https://www.jhsph.edu/news/news-releases/2012/ ahmed-contraception.html*.

[36] Citing, *e.g.*, Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. International Journal of Endocrinology and Metabolism, 11 (1), 41–47.

[37] Citing, *e.g.*, id., and American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). Committee Opinion Number 615: Access to Contraception. As discussed below, to the extent that contraceptives are prescribed to treat existing health conditions, and not for preventive purposes, the Mandate would not be applicable.

[38] 82 FR at 47803–04.

commenters agreed with the quotation, in the Religious IFC, of FDA materials [39] that indicate that some items it has approved as contraceptives may prevent the implantation of an embryo after fertilization. Some of those commenters cited additional scientific sources to argue that certain approved contraceptives may prevent implantation, and that, in some cases, some contraceptive items may even dislodge an embryo shortly after implantation. Other commenters disagreed with the sources cited in the Religious IFC and cited additional studies on that issue. Some commenters further criticized the Departments for asserting in the Religious IFC that some persons believe those possible effects are "abortifacient."

The objection on this issue appears to be partially one of semantics. People disagree about whether to define "conception" or "pregnancy" to occur at fertilization, when the sperm and ovum unite, or days later at implantation, when that embryo has undergone further cellular development, travelled down the fallopian tube, and implanted in the uterine wall. This question is independent of the question of what mechanisms of action FDA-approved or cleared contraceptives may have. It is also a separate question from whether members of the public assert, or believe, that it is appropriate to consider the items "abortifacient"—that is, a kind of abortion, or a medical product that causes an abortion—because they believe abortion means to cause the demise of a post-fertilization embryo inside the mother's body. Commenters referenced scientific studies and sources on both sides of the issue of whether certain contraceptives prevent implantation. Commenters and litigants have positively stated that some of them view certain contraceptives as abortifacients, for this reason. *See also Hobby Lobby*, 134 U.S. at 2765 ("The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients.").

The Departments do not take a position on the scientific, religious, or moral debates on this issue by recognizing that some people have

sincere religious objections to providing contraception coverage on this basis. The Supreme Court has already recognized that such a view can form the basis of a sincerely held religious belief under RFRA.[40] Even though there is a plausible scientific argument against the view that certain contraceptives have mechanisms of action that may prevent implantation, there is also a plausible scientific argument in favor of it—as demonstrated, for example, by FDA's statement that some contraceptives may prevent implantation and by some scientific studies cited by commenters. The Departments believe in this context we have a sufficient rationale to offer expanded religious exemptions with respect to this Mandate.

The Departments also received comments about their discussion of the uncertain effects of the expanded exemptions on teen sexual activity. In this respect, the Departments stated, "With respect to teens, the Santelli and Melnikas study cited by IOM 2011 observes that, between 1960 and 1990, as contraceptive use increased, teen sexual activity outside of marriage likewise increased (although the study does not assert a causal relationship). Another study, which proposed an economic model for the decision to engage in sexual activity, stated that '[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run.' " [41] Some commenters agreed with

this discussion, while other commenters disagreed. Commenters who supported the expanded exemptions cited these and similar sources suggesting that denying expanded exemptions to the Mandate is not a narrowly tailored way to advance the Government's interests in reducing teen pregnancy, and suggesting there are means of doing so that are less restrictive of religious exercise.[42] Some commenters opposing the expanded exemptions stated that school-based health centers provide access to contraceptives, thus increasing use of contraceptives by sexually active students. They also cited studies concluding that certain decreases in teen pregnancy are attributable to increased contraceptive use.[43]

Many commenters opposing the Religious IFC misunderstood the Departments' discussion of this issue. Teens are a significant part, though not the entirety, of women the IOM identified as being most at risk of unintended pregnancy. The Departments do not take a position on the empirical question of whether contraception has caused certain reductions in teen pregnancy. Rather, we note that studies suggesting various causes of teen pregnancy and unintended pregnancy in general support the Departments' conclusion that it is difficult to establish causation between granting religious exemptions to the contraceptive Mandate and either an increase in teen pregnancies in particular, or unintended pregnancies in general. For example, a 2015 study investigating the decline in teen pregnancy since 1991 attributed it to multiple factors (including but not limited to reduced sexual activity, falling welfare benefit levels, and expansion of family planning services in Medicaid, with the latter accounting for less than 13 percent of the decline), and concluded "that none of the relatively easy, policy-based explanations for the recent decline in teen childbearing in the United States hold up very well to careful empirical scrutiny." [44] One

---

[39] FDA's guide "Birth Control: Medicines To Help You," specifies that various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work . . . by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization. Available at *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm.*

[40] "Although many of the required, FDA-approved methods of contraception work by preventing the fertilization of an egg, four of those methods (those specifically at issue in these cases) may have the effect of preventing an already fertilized egg from developing any further by inhibiting its attachment to the uterus. *See* Brief for HHS in No. 13–354, pp. 9–10, n. 4; FDA, Birth Control: Medicines to Help You." *Hobby Lobby*, 134 S. Ct. at 2762–63. "The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients. . . . Like the Hahns, the Greens believe that life begins at conception and that it would violate their religion to facilitate access to contraceptive drugs or devices that operate after that point." *Id.* at 2765–66.

[41] Citing J.S. Santelli & A.J. Melnikas, "Teen fertility in transition: recent and historic trends in the United States," 31 *Ann. Rev. Pub. Health* 371, 375–76 (2010), and Peter Arcidiacono et al., *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* (2005), available at *http://public.econ.duke.edu/~psarcidi/addicted13.pdf. See also* K. Buckles & D. Hungerman, "The Incidental Fertility Effects of School Condom Distribution Programs," *Nat'l Bureau of Econ. Research* Working Paper No. 22322 (June 2016), available at *http://www.nber.org/papers/w22322* ("access to condoms in schools increases teen fertility by about 10 percent" and increased sexually transmitted infections).

[42] *See* Helen Alvaré, "No Compelling Interest: The 'Birth Control' Mandate and Religious Freedom," 58 *Vill. L. Rev.* 379, 400–02 (2013) (discussing the Santelli & Melnikas study and the Arcidiacono study cited above, and other research that considers the extent to which reduction in teen pregnancy is attributable to sexual risk avoidance rather than to contraception access).

[43] *See, for example,* Lindberg L., Santelli J., "Understanding the Decline in Adolescent Fertility in the United States, 2007–2012," 59 *J. Adolescent Health* 577–83 (Nov. 2016), *https://doi.org/10.1016/j.jadohealth.2016.06.024; see also* Comment of The Colorado Health Foundation, submission ID CMS–2014–0115–19635, *www.regulations.gov* (discussing teen pregnancy data from Colorado).

[44] Kearney MS and Levine PB, "Investigating recent trends in the U.S. birth rate," 41 *J. Health*

Case: 25-2575 Document: 34-2 Page: 131 Date Filed: 12/12/2025
Case 2:17-cv-04540-WB Document 89-1 Filed 12/24/18 Page 24 of 36

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations **57555**

study found that during the teen pregnancy decline between 2007–2012, teen sexual activity was also decreasing.[45] One study concluded that falling unemployment rates in the 1990s accounted for 85% of the decrease in rates of first births among 18–19 year-old African Americans.[46] Another study found that the representation of African-American teachers was associated with a significant reduction in the African-American teen pregnancy rate.[47] One study concluded that an "increase in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy."[48] Similarly, one study from England found that, where funding for teen pregnancy prevention was reduced, there was no evidence that the reduction led to an increase in teen pregnancies.[49] Some commenters also cited studies, which are not limited to the issue of teen pregnancy, that have found many women who have abortions report that they were using contraceptives when they became pregnant.[50]

As the Departments stated in the Religious IFC, we do not take a position on the variety of empirical questions discussed above. Likewise, these rules do not address the substantive question of whether HRSA should include contraceptives in the women's preventive services Guidelines issued under section 2713(a)(4). Rather, reexamination of the record and review of the public comments has reinforced the Departments' conclusion that significantly more uncertainty and ambiguity exists on these issues than the Departments previously acknowledged when we declined to extend the exemption to certain objecting organizations and individuals. The uncertainty surrounding these weighty and important issues makes it appropriate to maintain the expanded exemptions and accommodation if and for as long as HRSA continues to include contraceptives in the Guidelines. The federal government has a long history, particularly in certain sensitive and multi-faceted health issues, of providing religious exemptions from governmental mandates. These final rules are consistent with that history and with the discretion Congress vested in the Departments for implementing the ACA.

### G. Health and Equality Effects of Contraceptive Coverage Mandates

The Departments also received comments about the health and equality effects of the Mandate more broadly. Some commenters contended that the contraceptive Mandate promotes the health and equality of women, especially low income women and promotes female participation and equality in the workforce. Other commenters contended that there was insufficient evidence that the expanded exemptions would harm those interests. Some of those commenters further questioned whether there was evidence that broad health coverage mandates of contraception lead to increased contraceptive use, reductions in unintended pregnancies, or reductions in negative effects said to be associated with unintended pregnancies. In particular, some commenters discussed the study quoted above, published and revised by the Guttmacher Institute in October 2017, concluding that through 2014 there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy, that there was no significant shift from less

effective to more effective methods, and that it was "unclear" whether this Mandate impacted contraceptive use because there was no significant increase in the use of contraceptive methods the Mandate covered.[51] These commenters also noted that, in the 29 States where contraceptive coverage mandates have been imposed statewide,[52] those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall.[53] Other commenters, however, disputed the significance of these state statistics, noting that of the 29 states with contraceptive coverage mandates, only four states have laws that match the federal requirements in scope. Some also observed that, even in states with state contraceptive coverage mandates, self-insured group health plans might escape those requirements, and some states do not mandate the contraceptives to be covered at no out-of-pocket cost to the beneficiary.

The Departments have considered these experiences as relevant to the effect the expanded exemptions in these rules might have on the Mandate more broadly. The state mandates apply to a very large number of plans and plan participants, notwithstanding ERISA preemption, and public commenters did not point to studies showing those state mandates reduced unintended pregnancies. The federal contraceptive Mandate, likewise, applies to a broad, but not entirely comprehensive, number of employers. For example, to the extent that houses of worship and integrated auxiliaries may have self-insured to avoid state health insurance contraceptive coverage mandates or for other reasons, those groups are, and have been, exempt from the federal Mandate prior to the Religious IFC. The exemptions as set forth in the Religious IFC and in these final rules leave the contraceptive Mandate in place for nearly all entities and plans to which the Mandate has applied. The Departments are not aware of data showing that these expanded exemptions would negate any reduction in unintended pregnancies that might

*Econ.* 15–29 (2015), available at *https://www.sciencedirect.com/science/article/abs/pii/S0167629615000041.*

[45] *See, for example,* K. Ethier et al., "Sexual Intercourse Among High School Students—29 States and United States Overall, 2005–2015," 66 *CDC Morb. Mortal. Wkly Report* 1393, 1393–97 (Jan. 5, 2018), available at *http://dx.doi.org/10.15585/mmwr.mm6651S2a1* ("Nationwide, the proportion of high school students who had ever had sexual intercourse decreased significantly overall. . . .").

[46] Colen CG, Geronimus AT, and Phipps MG, "Getting a piece of the pie? The economic boom of the 1990s and declining teen birth rates in the United States," 63 *Social Science & Med.* 1531–45 (Sept. 2006), available at *https://www.sciencedirect.com/science/article/pii/S027795360600205X.*

[47] Atkins DN and Wilkins VM, "Going Beyond Reading, Writing, and Arithmetic: The Effects of Teacher Representation on Teen Pregnancy Rates," 23 *J. Pub. Admin. Research & Theory* 771–90 (Oct. 1, 2013), available at *https://academic.oup.com/jpart/article-abstract/23/4/771/963674.*

[48] E. Collins & B. Herchbein, "The Impact of Subsidized Birth Control for College Women: Evidence from the Deficit Reduction Act," *U. Mich. Pop. Studies Ctr.* Report 11–737 (May 2011), available at *https://www.psc.isr.umich.edu/pubs/pdf/rr11-737.pdf* ("[I]ncrease in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy or sexually transmitted infections for most women").

[49] *See* D. Paton & L. Wright, "The effect of spending cuts on teen pregnancy," 54 *J. Health Econ.* 135, 135–46 (2017), available at *https://www.sciencedirect.com/science/article/pii/S0167629617304551* ("Contrary to predictions made at the time of the cuts, panel data estimates provide no evidence that areas which reduced expenditure the most have experienced relative increases in teenage pregnancy rates. Rather, expenditure cuts are associated with small reductions in teen pregnancy rates").

[50] Commenters cited, for example, Guttmacher Institute, "Fact Sheet: Induced Abortion in the United States" (Jan. 2018) ("Fifty-one percent of abortion patients in 2014 were using a contraceptive method in the month they became pregnant"), available at *https://*

*www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf.*

[51] Kavanaugh, 97 *Contraception* at 14–21.

[52] *See* Guttmacher Institute, "Insurance Coverage of Contraceptives" (June 11, 2018); Kaiser Family Foundation, "State Requirements for Insurance Coverage of Contraceptives," Henry J Kaiser Family Foundation (Jan. 1, 2018), *https://www.kff.org/other/state-indicator/state-requirements-for-insurance-coverage-of-contraceptives/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.*

[53] *See* Michael J. New, "Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes," 13 *Ave Maria L. Rev.* 345 (2015), available at *http://avemarialaw-law-review.avemarialaw.edu/Content/articles/vXIII.i2.new.final.0809.pdf.*

result from a broad contraceptive coverage mandate.

Some commenters expressed concern that providing exemptions to the Mandate that private parties provide contraception may lead to exemptions regarding other medications or services, like vaccines. The exemptions provided in these rules, however, do not apply beyond the contraceptive coverage requirement implemented through section 2713(a)(4). Specifically, PHS Act section 2713(a)(2) requires coverage of ''immunizations,'' and these exemptions do not encompass that requirement. The fact that the Departments have exempted houses of worship and integrated auxiliaries from the contraceptive Mandate since 2011 did not lead to those entities receiving exemptions under section 2713(a)(2) concerning vaccines. In addition, hundreds of entities have sued the Departments over the implementation of section 2713(a)(4), leading to two decisions of the U.S. Supreme Court, but no similar wave of lawsuits has challenged section 2713(a)(2). The expanded exemptions in these final rules are consistent with a long history of statutes protecting religious beliefs from certain health care mandates concerning issues such as sterilization, abortion and birth control.

Some commenters took issue with the conclusion set forth in the Religious IFC, which is similar to that asserted in the 2017 Guttmacher study, that ''[t]he role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA.'' They observed that more women have coverage of contraceptives and contraception counseling under the Mandate and that more contraceptives are provided without co-pays than before. Still other commenters argued that the Mandate, or other expansions of contraceptive coverage, have led women to increase their use of contraception in general, or to change from less effective, less expensive contraceptive methods to more effective, more expensive contraceptive methods. Some commenters lamented that exemptions would include exemption from the requirement to cover contraception counseling. Some commenters pointed to studies cited in the 2011 IOM Report recommending contraception be included in the Guidelines and argued that certain women will go without certain health care, or contraception specifically, because of cost. They contended that a smaller percentage of

women delay or forego health care overall under the ACA [54] and that, according to studies, coverage of contraceptives without cost-sharing has increased use of contraceptives in certain circumstances. Some commenters also argued that studies show that decreases in unintended pregnancies are due to broader access of contraceptives. Finally, some commenters argued that birth control access generally has led to social and economic equality for women.

The Departments have reviewed the comments, including studies submitted by commenters either supporting or opposing these expanded exemptions. Based on our review, it is not clear that merely expanding exemptions as done in these rules will have a significant effect on contraceptive use and health, or workplace equality, for the vast majority of women benefitting from the Mandate. There is conflicting evidence regarding whether the Mandate alone, as distinct from birth control access more generally, has caused increased contraceptive use, reduced unintended pregnancies, or eliminated workplace disparities, where all other women's preventive services were covered without cost sharing. Without taking a definitive position on those evidentiary issues, however, we conclude that the Religious IFC and these final rules—which merely withdraw the Mandate's requirement from what appears to be a small group of newly exempt entities and plans—are not likely to have negative effects on the health or equality of women nationwide. We also conclude that the expanded exemptions are an appropriate policy choice left to the agencies under the relevant statutes, and, thus, are an appropriate exercise of the Departments' discretion.

Moreover, we conclude that the best way to balance the various policy interests at stake in the Religious IFC and these final rules is to provide the expanded exemptions set forth herein, even if certain effects may occur among the populations actually affected by the employment of these exemptions. These rules will provide tangible protections for religious liberty, and impose fewer governmental burdens on various entities and individuals, some of whom have contended for several years that denying them an exemption from the contraceptive Mandate imposes a substantial burden on their religious exercise. The Departments view the

provision of those protections to preserve religious exercise in this health care context as an appropriate policy option, notwithstanding the widely divergent effects that public commenters have predicted based on different studies they cited. Providing the protections for religious exercise set forth in the Religious IFC and these final rules is not inconsistent with the ACA, and brings this Mandate into better alignment with various other federal conscience protections in health care, some of which have been in place for decades.

### III. Description of the Text of the Regulations and Response to Additional Public Comments

Here, the Departments describe the regulatory text set forth prior to the Religious IFC, the regulations from that IFC, public comments in response to the specific regulatory text set forth in the IFC, the Departments' response to those comments, and, in consideration of those comments, the regulatory text as finalized in this final rule. As noted above, various members of the public provided comments that were supportive, or critical, of the Religious IFC overall, or of significant policies pertaining to those regulations. To the extent those comments apply to the following regulatory text, the Departments have responded to them above. This section of the preamble responds to comments that pertain more specifically to particular regulatory text.

#### A. Restatement of Statutory Requirements of PHS Act Section 2713(a) and (a)(4) (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv))

The previous regulations restated the statutory requirements of section 2713(a) of the PHS Act, at 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). The Religious IFC modified these restatements to more closely align them with the text of PHS Act section 2713(a) and (a)(4).

Previous versions of these rules had varied from the statutory language. PHS Act section 2713(a) and (a)(4) require group health plans and health insurance issuers offering coverage to provide coverage without cost sharing for ''such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines'' supported by HRSA. In comparison, the previous version of regulatory restatements of this language (as drawn from 45 CFR 147.130(a)(1)

[54] Citing, for example, Adelle Simmons et al., ''The Affordable Care Act: Promoting Better Health for Women,'' Table 1, Assistant Secretary for Planning and Evaluation (June 14, 2016), *https:// aspe.hhs.gov/system/files/pdf/205066/ACAWomen HealthIssueBrief.pdf.*

and (a)(1)(iv) stated the coverage must include ''evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by'' HRSA. The Religious IFC amended this language to state, parallel to the language in section 2713(a)(4), that the coverage must include ''such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by'' HRSA.

These rules adopt as final, without change, the provisions in the Religious IFC amending 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). In this way, the regulatory text better conforms to the statutory language. In paragraph (a)(1) of the final regulations, instead of saying ''must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements . . . with respect to those items and services:'', the regulation now tracks the statutory language by saying ''must provide coverage for and must not impose any cost-sharing requirements . . . for—''. By eliminating the language ''coverage for all of the following items and services,'' and ''with respect to those items and services,'' the Departments do not intend that coverage for specified items and services will not be required, but we simply intend to simplify the text of the regulation to track the statute and avoid duplicative language.

By specifying that paragraph (a)(1)(iv) concerning the women's preventive services Guidelines encompasses ''such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to §§ 147.131 and 147.132,'' the regulatory text also better tracks the statutory language that the Guidelines are for ''such additional'' preventive services as HRSA may ''provide[ ] for'' and ''support[ ].'' This text also eliminates language, not found in the statute, that the Guidelines are ''evidence-informed'' and ''binding.'' Congress did not include the word ''binding'' in PHS Act section 2713, and did include the words ''evidence-based'' or ''evidence-informed'' in section 2713(a)(1) and (a)(3), but omitted such terms from section 2713(a)(4). In this way, the regulatory text better comports with the scope of the statutory text. This text of paragraph (a)(1)(iv) also

acknowledges that the Departments have decided Guidelines issued under section 2713(a)(4) will not be provided for or supported to the extent they exceed the exemptions and accommodation set forth in 45 CFR 147.131 and 147.132. Previous versions of the regulation placed that limit in 45 CFR 147.130(a)(1), but did not reiterate it in § 147.130(a)(1)(iv). To clearly set forth the applicability of the exemptions and accommodation, the Departments adopt as final the Religious IFC language, which included the language ''subject to §§ 147.131 and 147.132'' in both § 147.130(a)(1) and § 147.130(a)(1)(iv). Because these final rules adopt as final the Religious IFC language which includes the exemptions and accommodation in both §§ 147.131 and 147.132, and not just in § 147.131 as under the previous rules, the Departments correspondingly included references to both sections in this part.

Some commenters supported restoring the statutory language from PHS Act section 2713(a) and (a)(4) in the regulatory restatements of that language. Other commenters opposed doing so, asserting that Guidelines issued pursuant to section 2713(a)(4) must be ''evidence-informed'' and ''binding.'' The Departments disagree with the position that, even though Congress omitted those terms from section 2713(a)(4), their regulatory restatement of the statutory requirement should include those terms. Instead, the Departments conclude that it is more appropriate for the regulatory restatements of section 2713(a)(4) to track the statutory language in this regard, namely, ''as provided for in comprehensive guidelines supported by [HRSA] for purposes of'' that paragraph.

*B. Prefatory Language of Religious Exemptions (45 CFR 147.132(a)(1))*

These final rules adopt as final, with changes based on comments as set forth below, the regulatory provision in the Religious IFC that moved the religious exemption from 45 CFR 147.131(a) to 45 CFR 147.132.

In the previous regulations, the exemption stated, at § 147.131(a), that HRSA's Guidelines ''may establish an exemption'' for the health plan or coverage of a ''religious employer,'' defined as ''an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.'' The Religious IFC moved the exemption to a new § 147.132, in which paragraph (a) discussed objecting entities, paragraph (b) discussed objecting individuals,

paragraph (c) set forth a definition, and paragraph (d) discussed severability. The prefatory language to § 147.132(a)(1) stated that HRSA's Guidelines ''must not provide for or support the requirement of coverage or payments for contraceptive services'' for the health plan or coverage of an ''objecting organization,'' and thus that HRSA ''will exempt'' such an organization from the contraceptive coverage requirments of the Guidelines. The remainder of paragraph (a)(1), which is discussed in greater detail below, describes what entities are included as objecting organizations.

This language not only specifies that certain entities are ''exempt,'' but also explains that the Guidelines shall not support or provide for an imposition of the contraceptive coverage requirement to such exempt entities. This is an acknowledgement that section 2713(a)(4) requires women's preventive services coverage only ''as provided for in comprehensive guidelines supported by the Health Resources and Services Administration.'' To the extent the HRSA Guidelines do not provide for, or support, the application of such coverage to certain entities or plans, the Affordable Care Act does not require the coverage. Those entities or plans are ''exempt'' by not being subject to the requirements in the first instance. Therefore, in describing the entities or plans as ''exempt,'' and in referring to the ''exemption'' encompassing those entities or plans, the Departments also affirm the non-applicability of the Guidelines to them.

The Departments wish to make clear that the expanded exemption set forth in § 147.132(a) applies to several distinct entities involved in the provision of coverage to the objecting employer's employees. This explanation is consistent with how prior regulations have worked by means of similar language. When sections § 147.132(a)(1) and (a)(1)(i) specify that ''[a] group health plan,'' ''health insurance coverage provided in connection with a group health plan,'' and ''health insurance coverage offered or arranged by an objecting organization'' are exempt ''to the extent'' of the objections ''as specified in paragraph (a)(2),'' that language exempts the group health plans of the sponsors that object, and their health insurance issuers in providing the coverage in those plans (whether or not the issuers have their own objections). Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv) (and as referenced by the parallel provisions in 26 CFR 54.9815–2713(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv)), the plan

sponsor, issuer, and plan covered in the exemption of § 147.132(a)(1) and (a)(1)(i) would face no penalty as a result of omitting certain contraceptive coverage from the benefits of the plan participants and beneficiaries. However, while the objection of a plan sponsor (or entity that arranges coverage under the plan, as applicable) removes penalties from that plan's issuer, it only does so for that plan—it does not affect the issuer's coverage for other group health plans where the plan sponsor has no qualifying objection. More information on the effects of the objection of a health insurance issuer in § 147.132(a)(1)(iii) is included below.

The exemptions in § 147.132(a)(1) apply "to the extent" of the objecting entities' sincerely held religious convictions. Thus, entities that hold a requisite objection to covering some, but not all, contraceptive items would be exempt with respect to the items to which they object, but not with respect to the items to which they do not object. Some commenters said it was unclear whether the plans of entities or individuals that religiously object to some but not all contraceptives would be exempt from being required to cover just the contraceptive methods as to which there is an objection, or whether the objection to some contraceptives leads to an exemption from that plan being required to cover all contraceptives. The Departments intend that a requisite religious objection against some but not all contraceptives would lead to an exemption only to the extent of that objection: That is, the exemption would encompass only the items to which the relevant entity or individual objects, and would not encompass contraceptive methods to which the objection does not apply. To make this clearer, in these final rules, the Departments finalize the prefatory language of § 147.132(a) with the following change, so that the final rules state that an exemption shall be included, and the Guidelines must not provide for contraceptive coverage, "to the extent of the objections specified below."

The Departments have made corresponding changes to language throughout the regulatory text, to describe the exemptions as applying "to the extent" of the objection(s).

*C. Scope of Religious Exemptions and Requirements for Exempt Entities (45 CFR 147.132)*

In 45 CFR 147.132(a)(1)(i) through (iii) and (b), the Religious IFC expands the exemption to plans of additional entities and individuals not encompassed by the exemption set forth in the regulations

prior to the Religious IFC. Specific entities to which the expanded exemptions apply are discussed below.

The exemptions contained in previous regulations, at § 147.131(a), did not require exempt entities to submit any particular self-certification or notice, either to the government or to their issuer or third party administrator, in order to obtain or qualify for the exemption. Similarly, under the expanded exemptions in § 147.132, the Religious IFC did not require exempt entities to comply with a self-certification process. We finalize that approach in this respect without change. Although exempt entities do not need to file notices or certifications of their exemption, and these final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits. Under ERISA, the plan document identifies what benefits are provided to participants and beneficiaries under the plan; if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document. Moreover, if there is a reduction in a covered service or benefit, the plan has to disclose that change to plan participants.[55] Thus, where an exemption applies and all (or a subset of) contraceptive services are omitted from a plan's coverage, otherwise applicable ERISA disclosure documents must reflect the omission of coverage in ERISA plans. These existing disclosure requirements serve to help provide notice to participants and beneficiaries of what ERISA plans do and do not cover.

Some commenters supported the expanded exemption's approach which maintained the policy of the previous exemption in not requiring exempt entities to comply with a self-certification process. They suggested that self-certification forms for an exemption are not necessary, could add burdens to exempt entities beyond those imposed by the previous exemption, and could give rise to religious objections to the self-certification process itself. Commenters also stated that requiring an exemption form for

exempt entities could cause additional operational burdens for plans that have existing processes in place to handle exemptions. Other commenters, however, favored including a self-certification process for exempt entities. They suggested that entities might abuse the availability of an exemption or use exempt status insincerely if no self-certification process exists, and that the Mandate might be difficult to enforce without a self-certification process. Some commenters asked that the government publish a list of entities that claim the exemption.

The Departments believe it is appropriate to not require exempt entities to submit a self-certification or notice. The previous exemption did not require a self-certification or notice, and the Departments did not collect a list of all entities that used the exemption. The Departments believe the approach under the previous exemption is appropriate for the expanded exemption. Adding a self-certification or notice to the exemption process would impose an additional paperwork burden on exempt entities that the previous regulations did not impose, and would also involve additional public costs if those certifications or notices were to be reviewed or kept on file by the government.

The Departments are not aware of instances where the lack of a self-certification under the previous exemption led to abuses or to an inability to engage in enforcement. The Mandate is enforceable through various mechanisms in the PHS Act, the Code, and ERISA. Entities that insincerely or otherwise improperly operate as if they are exempt would do so at the risk of enforcement under such mechanisms. The Departments are not aware of sufficient reasons to believe those measures and mechanisms would fail to deter entities from improperly operating as if they are exempt. Moreover, as noted above, ERISA and other plan disclosure requirements governing group health plans require provision of a comprehensive summary of the benefits covered by the plan and disclosure of any reductions in covered services or benefits, so beneficiaries in plans that reduce or eliminate contraceptive benefits as a result of the exemption will know whether their health plan claims an exemption and will be able to raise appropriate challenges to such claims. As a consequence, the Departments believe it is an appropriate balance of various concerns expressed by commenters for these rules to continue to not require notices or self-certifications for using the exemption.

---

[55] See, for example, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102–2, 102–3, & 104b–3(d), and 29 CFR 2590.715–2715. *See also* 45 CFR 147.200 (requiring disclosure of the "exceptions, reductions, and limitations of the coverage," including group health plans and group and individual issuers).

Case: 25-2575    Document: 34-2    Page: 135    Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB    Document 8991    Filed 12/14/18    Page 28 of 86

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57559**

Some commenters asked the Departments to add language indicating that an exemption cannot be invoked in the middle of a plan year, nor should it be used to the extent inconsistent with laws that apply to, or state approval of, fully insured plans. None of the previous iterations of the exemption regulations included such provisions, and the Departments do not consider them necessary in these rules. The expanded exemptions in these rules only purport to exempt plans and entities from the application of the federal contraceptive coverage requirement of the Guidelines issued under section 2713(a)(4). They do not purport to exempt entities or plans from state laws concerning contraceptive coverage, or laws governing whether an entity can make a change (of whatever kind) during a plan year. The rules governing the accommodation likewise do not purport to obviate the need to follow otherwise applicable rules about making changes during a plan year. (Below, these rules discuss in more detail the accommodation and when an entity seeking to revoke it would be able to do so or to notify plan participants of the revocation.)

Commenters also asked that clauses be added to the regulatory text holding issuers harmless where exemptions are invoked by plan sponsors. As discussed above, the exemption rules already specify that, where an exemption applies to a group health plan, it encompasses both the group health plan and health insurance coverage provided in connection with the group health plan, and therefore encompasses any impact on the issuer of the contraceptive coverage requirement with respect to that plan. In addition, as discussed below, the Departments are including, in these final rules, language from the previous regulations protecting issuers that act in reliance on certain representations made in the accommodation process. To the extent that commenters seek language offering additional protections for other incidents that might occur in connection with the invocation of an exemption, the previous exemption regulations did not include such provisions, and the Departments do not consider them necessary in these final rules. As noted above, the expanded exemptions in these final rules simply remove or narrow the contraceptive Mandate contained in and derived from the Guidelines for certain plans. The previous regulations included a reliance clause in the accommodation provisions, but did not specify further details regarding the relationship between exempt entities and their issuers or third party administrators.

Regarding the Religious IFC's expansion of the exemption to other kinds of entities and individuals in general, commenters disagreed about the likely effects of the exemptions on the health coverage market. Some commenters said that expanding the exemptions would not cause complications in the market, while others said that it could, due to such causes as a lack of uniformity among plans or permitting multiple risk pools. The Departments note that the extent to which plans cover contraception under the prior regulations is already far from uniform. Congress did not require all entities to comply with section 2713 of the PHS Act (under which the Mandate was promulgated)—most notably by exempting grandfathered plans. Moreover, under the previous regulations, issuers were already able to offer plans that omit contraceptives—or offer only some contraceptives—to houses of worship and integrated auxiliaries; some commenters and litigants said that issuers were doing so. These cases where plans did not need to comply with the Mandate, and the Departments' previous accommodation process allowing coverage not to be provided in certain self-insured church plans, together show that the importance of a uniform health coverage system is not significantly harmed by allowing plans to omit contraception in some contexts.[56]

Concerning the prospect raised by commenters of different risk pools between men and women, PHS Act section 2713(a) itself provides for some preventive services coverage that applies to both men and women, and some that would apply only to women. With respect to the latter, it does not specify what, if anything, HRSA's Guidelines for women's preventives services would cover, or if contraceptive coverage would be required. These rules do not require issuers to offer products that satisfy religiously objecting entities or individuals; they simply make it legal to do so. The Mandate has been imposed only relatively recently, and the contours of its application to religious entities has been in continual

---

[56] See also Real Alternatives v. Sec'y, Dep't of Health & Human Servs., 867 F.3d 338, 389 (3d Cir. 2017) (Jordan, J., concurring in part and dissenting in part) ("Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market. . . . Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny." (citation and internal quotation marks omitted)).

flux, due to various rulemakings and court orders. Overall, concerns raised by some public commenters have not led the Departments to consider it likely that offering these expanded exemptions will cause any injury to the uniformity or operability of the health coverage market.

### D. Plan Sponsors in General (45 CFR 147.132(a)(1)(i) Prefatory Text)

With respect to employers and others that sponsor group health plans, in § 147.132(a)(1)(i), the Religious IFC provided exemptions for non-governmental plan sponsors that object to coverage of all, or a subset, of contraceptives or sterilization and related patient education and counseling based on sincerely held religious beliefs. The Departments finalize the prefatory text of § 147.132(a)(1)(i) without change.

The expanded exemptions covered any kind of non-governmental employer plan sponsor with the requisite objections, stating the exemption encompassed "[a] group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (a)(2) of this section." For the sake of clarity, the expanded exemptions also stated that "[s]uch non-governmental plan sponsors include, but are not limited to, the following entities," followed by an illustrative, non-exhaustive list of non-governmental organizations whose objections qualify the plans they sponsor for an exemption. Each type of such entities, and comments specifically concerning them, are discussed below.

The plans of governmental employers are not covered by the plan sponsor exemption in § 147.132(a)(1)(i). Some commenters suggested that the expanded religious exemptions should include government entities. Others disagreed. The Departments are not aware of reasons why it would be appropriate or necessary to offer a religious exemption to governmental employer plan sponsors with respect to the contraceptive Mandate. We are unaware of government entities that would attempt to assert a religious exemption to the Mandate, and it is not clear to us that a governmental entity could do so. Accordingly, we conclude that it is appropriate for us to not further expand the religious exemption to include governmental entities in the religious plan-sponsor exemption.

Nevertheless, as discussed below, governmental employers are permitted to respect an individual's objection under § 147.132(b) and, thus, to provide

health coverage without the objected-to contraceptive coverage to such individual. Where that exemption is operative, the Guidelines may not be construed to prevent a willing governmental plan sponsor of a group health plan from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

By the general extension of the exemption to the plans of plan sponsors in § 147.132(a)(1)(i), these final rules also exempt group health plans sponsored by an entity other than an employer (for example, a union, or a sponsor of a multiemployer plan) that objects based on sincerely held religious beliefs to coverage of contraceptives or sterilization. Some commenters objected to extending the exemption to such entities, arguing that they could not have the same kind of religious objection that a single employer might have. Other commenters supported the protection of any plan sponsor with the requisite religious objection. The Departments conclude that it is appropriate, where the plan sponsor of a union, multiemployer, or similar plan adopts a religious objection using the same procedures that such a plan sponsor might use to make other decisions, that the expanded exemptions should respect that decision by providing an exemption from the Mandate.

*E. Houses of Worship and Integrated Auxiliaries (45 CFR 147.132(a)(1)(i)(A))*

As noted above, the exemption in the previous regulations, found at § 147.131(a), included only "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." Section 6033(a)(3)(A)(i) or (iii) of the Code encompasses "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order."

The Religious IFC expanded the exemption to include, in § 147.132(a)(1)(i)(A), plans sponsored by "[a] church, an integrated auxiliary of a church, a convention or association of churches, or a religious order." Most commenters did not oppose the exemptions continuing to include these entities, although some contended that the Departments have no authority to exempt any entity or plan from the Mandate, an objection to which the

Departments respond above. Notably, this exemption expresses "a religious order," and not merely "the exclusively religious activities of any religious order." In addition, section 6033(a)(3)(A)(i) specifies that it covers churches, not merely "the exclusively religious activities" of a church. Some religious people might express their beliefs through a church, others might do so through a religious order, and still others might do so through religious bodies that take a different form, structure, or nomenclature based on a different cultural or historical tradition. *Cf. Hosanna-Tabor Evangelical Lutheran Church and School* v. *E.E.O.C.*, 565 U.S. 171, 198 (2012) (Alito and Kagan, JJ., concurring) ("The term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists."). For the purposes of respecting the exercise of religious beliefs, which the expanded exemptions in these rules concern, the Departments find it appropriate that this part of the exemption encompasses religious orders and churches similarly, without limiting the scope of the protection to the exclusively religious activities of either kind of entity. Based on all these considerations, the Departments finalize § 147.132(a)(1)(i)(A) without change.

Moreover, the Departments also finalize the regulatory text to exempt plans "established or maintained by" a house of worship or integrated auxiliary on a plan, not employer, basis. Under previous regulations, the Departments stated that "the availability of the exemption or accommodation [was to] be determined on *an employer by employer basis*, which the Departments . . . believe[d] best balance[d] the interests of religious employers and eligible organizations and those of employees and their dependents." (78 FR 39886 (emphasis added)). Therefore, under the prior exemption, if an employer participated in a house of worship's plan—perhaps because it was affiliated with a house of worship—but was not an integrated auxiliary or a house of worship itself, that employer was not covered by the exemption, even though it was, in the ordinary meaning of the text of the prior regulation, participating in a "plan established or maintained by a [house of worship]." Upon further consideration, in the Religious IFC, the Departments changed their view on this issue and expanded the exemption for houses of worship and integrated auxiliaries. Under these rules, the Departments intend that,

when this regulation text exempts a plan "established or maintained by" a house of worship or integrated auxiliary, such exemption will no longer "be determined on an employer by employer basis," but will be determined on a plan basis—that is, by whether the plan is a "plan established or maintained by" a house of worship or integrated auxiliary. This interpretation better conforms to the text of the regulation setting forth the exemption—in both the prior regulation and in the text set forth in these final rules. It also offers appropriate respect to houses of worship and their integrated auxiliaries not only in their internal employment practices, but in their choice of organizational form and/or in their activity of establishing or maintaining health plans for employees of associated employers that do not meet the requirement of being integrated auxiliaries. Under this interpretation, houses of worship would not be faced with the potential of having to include, in the plans that they have established and maintained, coverage for services to which they have a religious objection for employees of an affiliated employer participating in the plans.

The Departments do not believe there is a sufficient factual basis to exclude from this part of the exemption entities that are so closely associated with a house of worship or integrated auxiliary that they are permitted to participate in its health plan but are not themselves integrated auxiliaries. Additionally, this interpretation is not inconsistent with the operation of the accommodation under the prior regulation where with respect to self-insured church plans, hundreds of nonprofit religious entities participating in those plans were provided a mechanism by which their plan participants would not receive contraceptive coverage through the plan or third party administrator.[57]

Therefore, the Departments believe it is most appropriate to use a plan basis, not an employer by employer basis, to determine the scope of an exemption for a group health plan established or maintained by a house of worship or integrated auxiliary.

*F. Nonprofit Organizations (45 CFR 147.132(a)(1)(i)(B))*

The exemption under previous regulations did not encompass nonprofit religious organizations beyond one that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Code. The Religious IFC expanded the exemption to include plans sponsored by any other

---

[57] See supra at II.A.3.

''nonprofit organization,''
§ 147.132(a)(1)(i)(B), if it has the
requisite religious objection under
§ 147.132(a)(2) (see § 147.132(a)(1)(i)
introductory text). The Religious IFC
also specified in § 147.132(a)(1)(i)(A), as
under the prior exemption, that the
exemption covers ''a group health plan
established or maintained by . . . [a]
church, the integrated auxiliary of a
church, a convention or association of
churches, or a religious order.''
(Hereinafter ''houses of worship and
integrated auxiliaries.'') These rules
finalize, without change, the text of
§ 147.132(a)(1)(i)(A) and (B).

The Departments received comments
in support of, and in opposition to, this
expansion. Some commenters supported
the expansion of the exemptions beyond
houses of worship and integrated
auxiliaries to other nonprofit
organizations with religious objections
(referred to herein as ''religious
nonprofit'' organizations, groups or
employers). They said that religious
belief and exercise in American law has
not been limited to worship, that
religious people engage in service and
social engagement as part of their
religious exercise and, therefore, that
the Departments should respect the
religiosity of nonprofit groups even
when they are not houses of worship
and integrated auxiliaries. Some public
commenters and litigants have indicated
that various religious nonprofit groups
possess deep religious commitments
even if they are not houses of worship
or their integrated auxiliaries. Other
commenters did not support the
expansion of exemptions to nonprofit
organizations. Some of them described
churches as having a special status that
should not be extended to religious
nonprofit groups. Some others
contended that women at nonprofit
religious organizations may support or
wish to use contraceptives and that if
the exemptions are expanded, it would
deprive all or most of the employees of
various religious nonprofit
organizations of contraceptive coverage.

After evaluating the comments, the
Departments continue to believe that an
expanded exemption is the appropriate
administrative response to the
substantial burdens on sincere religious
beliefs imposed by the contraceptive
Mandate, as well as to the litigation
objecting to the same. We agree with the
comments that religious exercise in this
country has long been understood to
encompass actions outside of houses of
worship and their integrated auxiliaries.
The Departments' previous assertion
that the exemptions were intended to
respect a certain sphere of church
autonomy (80 FR 41325) is not, in itself,

grounds to refuse to extend the
exemptions to other nonprofit entities
with religious objections. Respect for
churches does not preclude respect for
other religious entities. Among religious
nonprofit organizations, the
Departments no longer adhere to our
previous assertion that ''[h]ouses of
worship and their integrated auxiliaries
that object to contraceptive coverage on
religious grounds are more likely than
other employers to employ people of the
same faith who share the same
objection.'' (78 FR 39874.) It is not clear
to the Departments that the percentage
of women who work at churches that
oppose contraception, but who support
contraception, is lower than the
percentage of woman who work at
nonprofit religious organizations that
oppose contraception on religious
grounds, but who support
contraception. In addition, public
comments and litigation reflect that
many nonprofit religious organizations
publicly describe their religiosity.
Government records and those groups'
websites also often reflect those groups'
religious character. If a person who
desires contraceptive coverage works at
a nonprofit religious organization, the
Departments believe it is sufficiently
likely that the person would know, or
would know to ask, whether the
organization offers such coverage. The
Departments are not aware of federal
laws that would require a nonprofit
religious organization that opposes
contraceptive coverage to hire a person
who the organization knows disagrees
with the organization's view on
contraceptive coverage. Instead,
nonprofit organizations generally have
access to a First Amendment right of
expressive association and religious free
exercise to choose to hire persons (or, in
the case of students, to admit them)
based on whether they share, or at least
will be respectful of, their beliefs.[58]

In addition, it is not at all clear to the
Departments that expanding the
exemptions would, as some commenters
asserted, remove contraceptive coverage
from employees of many large religious
nonprofit organizations. Many large
religious nonprofit employers, including
but not limited to some Catholic
hospitals, notified the Department
under the last Administration that they
had opted into the accommodation and
expressed no objections to doing so. We
also received public comments from
organizations of similar nonprofit

employers indicating that the
accommodation satisfied their religious
objections. These final rules leave the
accommodation in place as an optional
process. Thus, it is not clear to the
Departments that all or most of such
large nonprofit employers will choose to
use the expanded exemption instead of
the accommodation. If they continue to
use the accommodation, their insurers
or third party administrators would
continue to be required to provide
contraceptive coverage to the plan
sponsors' employees through such
accommodation.

Given the sincerely held religious
beliefs of many nonprofit religious
organizations, some commenters also
contended that continuing to impose the
contraceptive Mandate on certain
nonprofit religious objectors might also
undermine the Government's broader
interests in ensuring health coverage by
causing some entities to stop providing
health coverage entirely.[59] Although the
Departments do not know the extent to
which that effect would result from not
extending exemptions, we wish to avoid
that potential obstacle to the general
expansion of health coverage.

*G. Closely Held For-Profit Entities (45
CFR 147.132(a)(1)(i)(C))*

The previous regulations did not
exempt plans sponsored by closely
held for-profit entities; however, the
Religious IFC included in its list of
exempt plan sponsors, at
§ 147.132(a)(1)(i)(C), ''[a] closely held
for-profit entity.'' These rules finalize
§ 147.132(a)(1)(i)(C) without change.

Some commenters supported
including these entities in the
exemption, saying owners of such
entities exercise their religious beliefs
through their businesses and should not
be burdened by a federal governmental
contraceptive Mandate. Other
commenters opposed extending the
exemption to closely held for-profit
entities, saying the entities cannot
exercise religion or should not have
their religious opposition to
contraceptive coverage protected by the
exemption. Some said the entities
should not be able to impose their
beliefs about contraceptive coverage on
their employees, and that doing so
constitutes discrimination.

As set forth in the Religious IFC, the
Departments believe it is appropriate to
expand the exemptions to include
closely held for-profit employers in

---

[58] Notably, ''the First Amendment simply does
not require that every member of a group agree on
every issue in order for the group's policy to be
'expressive association.' '' *Boy Scouts of America* v.
*Dale*, 530 U.S. 640, 655 (2000).

[59] See, *e.g.,* Manya Brachear Pashman, ''Wheaton
College ends coverage amid fight against birth
control mandate,'' Chicago Tribune, July 29, 2015;
Laura Bassett, ''Franciscan University Drops Entire
Student Health Insurance Plan Over Birth Control
Mandate,'' HuffPost, May 15, 2012.

order to protect the religious exercise of those entities and their owners. The ACA did not apply the preventive services mandate to the many grandfathered health plans among closely held as well as publicly traded for-profit entities, encompassing tens of millions of women. As explained below, we are not aware of evidence showing that the expanded exemptions finalized here will impact such a large number of women. And, in the Departments' view, the decision by Congress to not apply the preventive services mandate to grandfathered plans did not constitute improper discrimination or an imposition of beliefs. We also do not believe RFRA or the large number of other statutory exemptions Congress has provided for religious beliefs (including those exercised for profit) in certain health contexts such as sterilization, contraception, or abortion have been improper.

Including closely held for-profit entities in the exemption is also consistent with the Supreme Court's ruling in *Hobby Lobby*, which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in *Hobby Lobby*, the pursuit of religious beliefs), regardless of whether the entity operates as a nonprofit organization, and rejected the previous Administration's argument to the contrary. 134 S. Ct. at 2768–75. Some reports and industry experts have indicated that few for-profit entities beyond those that had originally challenged the Mandate have sought relief from it after *Hobby Lobby*.[60]

### H. For-Profit Entities That Are Not Closely Held (45 CFR 147.132(a)(1)(i)(D))

The previous regulations did not exempt for-profit entities that are not closely held. However, the Religious IFC included in its list of exempt plan sponsors, at § 147.132(a)(1)(i)(D), "[a] for-profit entity that is not closely held." These rules finalize § 147.132(a)(1)(i)(D) without change.

Under § 147.132(a)(1)(i)(D), the rules extend the exemption to the plans of for-profit entities that are not closely held. Some commenters supported including such entities, including publicly traded businesses, in the scope of the exemption. Some of them said that publicly traded entities have historically taken various positions on important public concerns beyond merely (and exclusively) seeking the

company's own profits, and that nothing in principle would preclude them from using the same mechanisms of corporate decision-making to exercise religious views against contraceptive coverage. They also said that other protections for religious beliefs in federal health care conscience statutes do not preclude the application of such protections to certain entities on the basis that they are not closely held, and federal law defines "persons," protected under RFRA, to include corporations at 1 U.S.C. 1. Other commenters opposed including publicly traded companies in the expanded exemptions. Some of these commenters stated that such companies could not exercise religious beliefs, and opposed the effects on women if they could. These commenters also objected that including such employers, along with closely held businesses, would extend the exemptions to all or virtually all employers.

The Departments conclude it is appropriate to include entities that are not closely held within the expanded exemptions for entities with religious objection. RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion . . . ." unless it demonstrates that the application of the burden to the person" is the least restrictive means to achieve a compelling governmental interest. 42 U.S.C. 2000bb–1(a) & (b). As commenters noted, the definition of "person" applicable in RFRA is found at 1 U.S.C. 1, which defines "person" as including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." Accordingly, the Departments' decision to extend the religious exemption to publicly traded for profit corporations is supported by the text of RFRA. The mechanisms for determining whether a company has adopted and holds certain principles or views, such as sincerely held religious beliefs, is a matter of well-established State law with respect to corporate decision-making,[61] and the Departments expect that application of such laws would cabin the scope of this exemption.

As to the impact of so extending the religious exemption, the Departments are not aware of any publicly traded entities that have publicly objected to providing contraceptive coverage on the basis of religious belief. As noted above, before the ACA, a substantial majority of

employers covered contraceptives. Some commenters opposed to including publicly traded entities in these exemptions noted that there did not appear to be any known religiously motivated objections to the Mandate from publicly traded for-profit corporations. These comments support our estimates that including publicly traded entities in the exemptions will have little, if any effect, on contraceptive coverage for women. We likewise agree with the Supreme Court's statement in *Hobby Lobby* that it is unlikely that many publicly traded companies will adopt religious objections to offering women contraceptive coverage. *See* 134 S. Ct. at 2774. Some commenters contended that, because many closely held for-profit businesses expressed religious objections to the Mandate, or took advantage of the accommodation, it is likely that many publicly traded businesses will do so. The Departments agree it is possible that publicly traded businesses may use the expanded exemption. But while scores of closely held for-profit businesses filed suit against the Mandate, no publicly traded entities did so, even though they were not authorized to seek the accommodation. Based on these data points, we believe the impact of the extension of the exemption to publicly traded for-profit organizations will not be significant. Below, based on limited data, but on years of receiving public comments and defending litigation brought by organizations challenging the Mandate on the basis of their religious objections, our best estimate of the anticipated effects of these rules is that no publicly traded employers will invoke the religious exemption.

In the Departments' view, such estimate does not lead to the conclusion that the religious exemption should not be extended to publicly traded corporations. The Departments are generally aware that, in a country as large as the U.S., comprised of a supermajority of religious persons,[62] some publicly traded entities might claim a religious character for their company, or the majority of shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character.[63] Thus we consider

---

[60] *See* Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," *Politico* (Oct. 11, 2016), http://www.politico.com/story/2016/10/obamacare-birth-control-mandate-employers-229627.

[61] Although the Departments do not prescribe any form or notification, they would expect that such principles or views would have been adopted and documented in accordance with the laws of the jurisdiction under which the organization is incorporated or organized.

[62] For example, in 2017, 74 percent of Americans said that religion is fairly important or very important in their lives, and 87 percent of Americans said they believe in God. Gallup, "Religion," available at https://news.gallup.com/poll/1690/religion.aspx.

[63] *See, for example,* Kapitall, "4 Publicly Traded Religious Companies if You're Looking to Invest in

it possible that a publicly traded company might have religious objections to contraceptive coverage. Moreover, as noted, there are many closely held for-profit corporations that do have religious objections to covering some or all contraceptives. The Departments do not want to preclude such a closely held corporation from having to decide between relinquishing the exemption or financing future growth by sales of stock, which would be the effect of denying it the exemption if it changes its status and became a publicly traded entity. The Departments also find it relevant that other federal conscience statutes, such as those applying to hospitals or insurance companies, do not exclude publicly traded businesses from protection.[64] As a result, the Departments continue to consider it appropriate not to exclude such entities from these expanded exemptions.

## I. Other Non-Governmental Employers (45 CFR 147.132(a)(1)(i)(E))

As noted above, the exemption in the previous regulations, found at § 147.131(a), included only churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. The Religious IFC included, in its list of exempt plan sponsors at § 147.132(a)(1)(i)(E), "[a]ny other non-governmental employer." These rules finalize § 147.132(a)(1)(i)(E) without change.

Some commenters objected to extending the exemption to other nongovernmental employers, asserting that it is not clear such employers should be protected, nor that they can assert religious objections. The Departments, however, agree with other commenters that supported that provision of the Religious IFC. The Departments believe it is appropriate that any nongovernmental employer asserting the requisite religious objections should be protected from the Mandate in the same way as other plan sponsors. Such other employers could include, for example, association health plans.[65] The reasons discussed above for providing the exemption to various specific kinds of employers, and for their ability to assert sincerely held religious beliefs using ordinary mechanisms of corporate decision-

making, generally apply to other nongovernmental employers as well, if they have sincerely held religious beliefs opposed to contraceptive coverage and otherwise meet the requirements of these rules. We agree with commenters who contend there is not a sufficient basis to exclude other nongovernmental employers from the exemption.

## J. Plans Established or Maintained by Objecting Nonprofit Entities (45 CFR 147.132(a)(1)(ii))

Based on the expressed intent in the Religious IFC, as discussed above, to expand the exemption to encompass plans established or maintained by nonprofit organizations with religious objections, and on public comments received concerning those exemptions, these rules finalize new language in § 147.132(a)(1)(ii) to better clarify the scope and application of the exemptions.

The preamble to the Religious IFC contained several discussions about the Departments' intent to exempt plans established or maintained by certain religious organizations that have the requisite objection to contraceptive coverage, including instances in which the plans encompass multiple employers. For example, as noted above, the Departments intended that the exemption for houses of worship and integrated auxiliaries be interpreted to apply on a plan basis, instead of on an employer-by-employer basis. In addition, the Departments discussed at length the fact that, under the prior regulations, where an entity was enrolled in a self-insured church plan exempt from ERISA under ERISA section 3(33) and the accommodation in the previous regulations was used, that accommodation process provided no mechanism to impose, or enforce, the accommodation requirement of contraceptive coverage against a third party administrator of such a plan. As a result, the prior accommodation served, in effect, as an exemption from requirements of contraceptive coverage for all organizations and employers covered under a self-insured church plan.

In response to these discussions in the Religious IFC, some commenters, including some church plans, supported the apparent intent to exempt such plans on a plan basis, but suggested that additional clarification is needed in the text of the rule to effect this intent. They observed that some plans are established or maintained by religious nonprofit entities that might not be houses of worship or integrated auxiliaries, and that some employers

that adopt or participate in such plans may not be the "plan sponsors." They recommended, therefore, that the final rules specify that the exemption applies on a plan basis when plans are established or maintained by houses of worship, integrated auxiliaries, or religious nonprofits, so as to shield employers that adopt such plans from penalties for noncompliance with the Mandate.

The text of the prefatory language of § 147.132(a)(1), as set forth in the Religious IFC, declared that the Guidelines would not apply "with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization." We intended this language to exempt a plan and/or coverage where the entity that established or maintained a plan was an objecting organization, and not just to look at the views or status of individual employers (or other entities) participating in such plan. The Departments agree with commenters who stated that additional clarity is needed and appropriate in these final rules, in order to ensure that such plans are exempt on a plan basis, and that employers joining or adopting those plans are exempt by virtue of the plan itself being exempt. Doing so will make the application of the expanded exemption clearer, and protect employers (and other entities) participating in such plans from penalties for noncompliance with the Mandate. Clearer language will better realize the intent to exempt plans and coverage "established or maintained by an objecting organization," and make the operation of that exemption simpler by specifying that the exemption applies based on the objection of the entity that established or maintains the plan. Such language would also resolve the anomaly that, under the previous rules, only self-insured church plans (not insured church plans) under ERISA section 3(33) were, in effect, exempt— but only indirectly through the Departments' inability to impose, or enforce, the accommodation process against the third party administrators of such plans, instead of being specifically exempt in the rules.

We believe entities participating in plans established or maintained by an objecting organization usually share the views of those organizations. Multiple lawsuits were filed against the Departments by churches that established or maintained plans, or the church plans themselves, and they generally declared that the entities or individuals participating in their plans

Faith" (Feb. 7, 2014), *http://www.nasdaq.com/article/4-publicly-traded-religious-companies-if-youre-looking-to-invest-in-faith-cm324665*.

[64] *See, for example,* 42 U.S.C. 300a–7, 42 U.S.C. 238n, Consolidated Appropriations Act of 2018, Div. H, Sec. 507(d), Public Law 115–141, and *id.* at Div. E, Sec. 808.

[65] See 29 CFR 2510.3–5.

are usually required to share their religious affiliation or beliefs. In addition, because, as we have stated before, ''providing payments for contraceptive services is cost neutral for issuers'' (78 FR 39877), we do not believe this clarification would produce any financial incentive for entities that do not have religious objections to contraceptive coverage to enter into plans established or maintained by an organization that does have such objections.

Therefore, the Departments finalize the text of § 147.132(a)(1) of the Religious IFC with the following change: adding a provision that makes explicit this understanding, in a new paragraph at § 147.132(a)(1)(ii). This language now specifies that the exemptions encompassed by § 147.132(a)(1) include: ''[a] group health plan, and health insurance coverage provided in connection with a group health plan, where the plan or coverage is established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other organization or association, to the extent the plan sponsor responsible for establishing and/or maintaining the plan objects as specified in paragraph (a)(2) of this section. The exemption in this paragraph applies to each employer, organization, or plan sponsor that adopts the plan[.]''

*K. Institutions of Higher Education (45 CFR 147.132(a)(1)(iii))*

The previous regulations did not exempt student health plans arranged by institutions of higher education, although it did, for purposes of the accommodation, treat plans arranged by institutions of higher education similar to the way in which the regulations treated plans of nonprofit religious employers. *See* 80 FR at 41347. The Religious IFC included in its list of exemptions, at § 147.132(a)(1)(ii), ''[a]n institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to 'plan participants and beneficiaries' will be interpreted as references to student enrollees and their covered dependents.'' These rules

finalize this language with a change to clarify their application, as discussed below, and by redesignating the paragraph as § 147.132(a)(1)(iii).

These rules treat the plans of institutions of higher education that arrange student health insurance coverage similarly to the way in which the rules treat the plans of employers. These rules do so by making such student health plans eligible for the expanded exemptions, and by permitting them the option of electing to utilize the accommodation process. Thus, these rules specify, in § 147.132(a)(1)(iii), that the exemption is extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002) with objections to the Mandate based on sincerely held religious beliefs, to their arrangement of student health insurance coverage in a manner comparable to the applicability of the exemption for group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer.

Some commenters supported including, in the expanded exemptions, institutions of higher education that provide health coverage for students through student health plans but have religious objections to providing certain contraceptive coverage. They said that religious exemptions allow freedom for certain religious institutions of higher education to exist, and this in turn gives students the choice of institutions that hold different views on important issues such as contraceptives and abortifacients. Other commenters opposed including the exemption, asserting that expanding the exemptions would negatively impact female students because institutions of higher education might not cover contraceptives in student health plans, women enrolled in those plans would not receive access to birth control, and an increased number of unintended pregnancies would result among those women.

In the Departments' view, the reasons for extending the exemptions to institutions of higher education are similar to the reasons, discussed above, for extending the exemption to other nonprofit organizations. Only a minority of students in higher education receive health insurance coverage from plans arranged by their colleges or universities.[66] It is necessarily true that

an even smaller number receive such coverage from religious schools, and from religious or other private schools that object to arranging contraceptive coverage. Religious institutions of higher education are private entities with religious missions. Various commenters asserted the importance, to many of those institutions, of being able to adhere to their religious tenets. Indeed, many students who attend such institutions do so because of the institutions' religious tenets. No student is required to attend such an institution. At a minimum, students who attend private colleges and universities have the ability to ask those institutions in advance what religious tenets they follow, including whether the institutions will provide contraceptives in insurance plans they arrange. Some students wish to receive contraceptive coverage from a health plan arranged by an institution of higher education. But other students wish to attend an institution of higher education that adheres to its religious mission about contraceptives in health insurance. And still other students favor contraception, but are willing to attend a religious university without forcing it to violate its beliefs about contraceptive coverage. Exempting religious institutions that object to contraceptive coverage still allows contraceptive coverage to be provided by institutions of higher education more broadly. The exemption simply makes it legal under federal law for institutions to adhere to religious beliefs that oppose contraception, without facing penalties for non-compliance that could threaten their existence. This removes a possible barrier to diversity in the nation's higher education system, and makes it more possible for students to attend institutions of higher education that hold those views.

In addition, under the previous exemption and accommodation, it was possible for self-insured church plans exempt from ERISA that have religious objection to certain contraceptives to avoid any requirement that either they or their third party administrators provide contraceptive coverage. As seen

---

[66] The American College Health Association estimates that, in 2014, student health insurance plans at colleges and universities covered ''more than two million people nationwide.'' ''Do You Know Why Student Health Insurance Matters?'' available at *https://www.acha.org/*

documents/Networks/Coalitions/Why_SHIPs_Matter.pdf. We assume for the purposes of this estimate that those plans covered 2,100,000 million students. Data from the Department of Education shows that in 2014, there were 20,207,000 students enrolled in degree-granting postsecondary institutions. National Center for Education Statistics, Table 105.20, ''Enrollment in elementary, secondary, and degree-granting postsecondary institutions, by level and control of institution, enrollment level, and attendance status and sex of student: Selected years, fall 1990 through fall 2026,'' available at *https://nces.ed.gov/programs/digest/d16/tables/dt16_105.20.asp?current=yes.*

in some public comments and litigation statements, some such self-insured church plans provide health coverage for students at institutions of higher education covered by those church plans. In order to avoid the situation where some student health plans sponsored by institutions with religious objections are effectively exempt from the contraceptive Mandate, and other student health plans sponsored by other institutions with similar religious objections are required to comply with the Mandate, the Departments consider it appropriate to extend the exemption, so that religious colleges and universities with objections to the Mandate would not be treated differently in this regard.

The Departments also note that the ACA does not require institutions of higher education to provide student health insurance coverage. As a result, some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student health insurance plans, rather than comply with the Mandate or be subject to the accommodation.[67] Extending the exemption in these rules removes an obstacle to such entities deciding to offer student health insurance plans, thereby giving students another health insurance option.

As noted above, it is not clear that studies discussing various effects of birth control access clearly and specifically demonstrate a negative impact to students in higher education because of the expanded exemption in these final rules. The Departments consider these expanded exemptions to be an appropriate and permissible policy choice in light of various interests at stake and the lack of a statutory requirement for the Departments to impose the Mandate on entities and plans that qualify for these expanded exemptions.

Finally, the Religious IFC specified that the plan sponsor exemption applied to "non-governmental" plan sponsors (§ 147.132(a)(1)(i)), including "[a]ny other non-governmental employer" (§ 147.132(a)(1)(i)(E)). Then, in § 147.132(a)(1)(ii), the rule specified that the institution of higher education exemption applicable to the arrangement of student health insurance coverage applied "in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan

[67] See, *e.g.*, Manya Brachear Pashman, "Wheaton College ends coverage amid fight against birth control mandate," Chicago Tribune, July 29, 2015; Laura Bassett, "Franciscan University Drops Entire Student Health Insurance Plan Over Birth Control Mandate," HuffPost, May 15, 2012.

established or maintained by a plan sponsor that is an employer." Consequently, the Religious IFC's expanded exemptions only applied to non-governmental institutions of higher education, including for student health insurance coverage, not to governmental institutions of higher education. Nevertheless, the term "non-governmental," while appearing twice in § 147.132(a)(1)(i) concerning plan sponsors, was not repeated in in § 147.132(a)(1)(ii). To more clearly specify that this limitation was intended to apply to § 147.132(a)(1)(ii), we finalize this paragraph with a change by adding the phrase "which is non-governmental" after the phrase "An institution of higher education as defined in 20 U.S.C. 1002".

*L. Health Insurance Issuers (45 CFR 147.132(a)(1)(iv))*

The previous regulations did not exempt health insurance issuers. However, the Religious IFC included in its list of exemptions at § 147.132(a)(1)(iii), "[a] health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement[.]" These rules finalize this exemption with technical changes to clarify the language based on public comments, and redesignate the paragraph as § 147.132(a)(1)(iv).

The Religious IFC extends the exemption to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own religious objections to providing coverage for contraceptive services. Under this exemption, the only plan sponsors—or in the case of individual insurance coverage, individuals—who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services, are plan sponsors or individuals who themselves object and whose plans are otherwise exempt based on their objection. An exempt issuer can then offer an exempt health insurance product to an entity or individual that is exempt based on either the moral exemptions for entities and individuals, or the religious exemptions for entities and individuals. Thus, the issuer exemption specifies

that, where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii) of this section, the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv), unless it is also exempt from that requirement.

Under these rules, issuers that hold their own objections, based on sincerely held religious beliefs, could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on their religious beliefs, or on their moral convictions under the companion final rules published elsewhere in today's **Federal Register**. Likewise, issuers with sincerely held moral convictions, that are exempt under those companion final rules, could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on either their religious beliefs or their moral convictions.

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments provided a similar exemption for issuers in the context of moral objections, but we used slightly different operative language. There, in the second sentence, instead of saying "the plan remains subject to any requirement to provide coverage for contraceptive services," the exemption stated, "the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services." Some commenters took note of this difference, and asked the Departments to clarify which language applies, and whether the Departments intended any difference in the operation of the two paragraphs. The Departments did not intend the language to operate differently. The language in the Moral IFC accurately, and more clearly, expresses the intent set forth in the Religious IFC about how the issuer exemption applies. Consequently, these rules finalize the issuer exemption paragraph from the Religious IFC with minor technical changes so that the final language will mirror language from the Moral IFC, stating that the exemption encompasses: "[a] health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iv) of this section, the group health plan established or maintained by the plan sponsor with

which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement[.]"

Some commenters supported including this exemption for issuers in these rules, both to protect the religious exercise of issuers, and so that in the future religious issuers that may wish to specifically serve religious plan sponsors would be free to organize. Other commenters objected to including an exemption for issuers. Some objected that issuers cannot exercise religious beliefs, while others objected that exempting issuers would threaten contraceptive coverage for women. Some commenters said that it was arbitrary and capricious for the Departments to provide an exemption for issuers if we do not know that issuers with qualifying religious objections exist.

The Departments consider it appropriate to provide this exemption for issuers. Because the issuer exemption only applies where an independently exempt policyholder (entity or individual) is involved, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will it prevent other issuers from being required to provide contraceptive coverage in individual or group insurance coverage. The issuer exemption therefore serves several interests, even though the Departments are not currently aware of existing issuers that would use it. As noted by some commenters, allowing issuers to be exempt, at least with respect to plan sponsors and plans that independently qualify for an exemption, will remove a possible obstacle to religious issuers being organized in the future to serve entities and individuals that want plans that respect their religious beliefs or moral convictions. Furthermore, permitting issuers to object to offering contraceptive coverage based on sincerely held religious beliefs will allow issuers to continue to offer coverage to plan sponsors and individuals, without subjecting them to liability under section 2713(a)(4), or related provisions, for their failure to provide contraceptive coverage. In this way, the issuer exemption serves to protect objecting issuers from being required to issue policies that cover contraception in violation of the issuers' sincerely held religious beliefs, and from being required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus

subjecting the issuers to potential liability if those plans are not exempt from the Guidelines.

The Departments reject the proposition that issuers cannot exercise religious beliefs. First, since RFRA protects the religious exercise of corporations as persons, the religious exercise of health insurance issuers—which are generally organized as corporations—is protected by RFRA. In addition, many federal health care conscience laws and regulations specifically protect issuers or plans. For example, 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3) protect plans or managed care organizations in Medicaid or Medicare Advantage. The Weldon Amendment specifically protects, among other entities, provider-sponsored organizations, health maintenance organizations (HMOs), health insurance plans, and "any other kind of health care facilit[ies], organization[s], or plan[s]" as a "health care entity" from being required to pay for, or provide coverage of, abortions. *See for example,* Consolidated Appropriations Act of 2018, Public Law 115–141, Div. H, Sec. 507(d), 132 Stat. 348, 764 (Mar. 23, 2018).[68] Congress also declared this year that "it is the intent of Congress" to include a "conscience clause" which provides exceptions for religious beliefs if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans." *See id.* at Div. E, Sec. 808, 132 Stat. at 603. In light of the clearly expressed intent of Congress to protect religious liberty, particularly in certain health care contexts, along with the specific efforts to protect issuers, the Departments have concluded that an exemption for issuers is appropriate.

The issuer exemption does not specifically include third party administrators, although the optional accommodation process provided under these final rules specifies that third party administrators cannot be required to contract with an entity that invokes that process. Some religious third party administrators have brought suit in conjunction with suits brought by organizations enrolled in ERISA-exempt church plans. Such plans are now exempt under these final rules, and their third party administrators, as

claims processors, are under no obligation under section 2713(a)(4) to provide benefits for contraceptive services, as that section applies only to plans and issuers. In the case of ERISA-covered plans, plan administrators are obligated under ERISA to follow the plan terms, but it is the Departments' understanding that third party administrators are not typically designated as plan administrators, and, therefore, would not normally act as plan administrators, under section 3(16) of ERISA. Therefore, to the Departments' knowledge, it is only under the existing accommodation process that third party administrators are required to undertake any obligations to provide or arrange for contraceptive coverage to which they might object. These rules make the accommodation process optional for employers and other plan sponsors, and specify that third party administrators that have their own objection to complying with the accommodation process may decline to enter into, or decline to continue, contracts as third party administrators of such plans.

*M. Description of the Religious Objection (45 CFR 147.132(a)(2))*

The previous regulations did not specify what, if any, religious objection applied to this exemption; however, the Religious IFC set forth the scope of the religious objection of objecting entities in § 147.132(a)(2), as follows: "The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs." These rules finalize this description with technical changes to clarify the scope of the objection as intended in the Religious IFC, and based on public comments.

Throughout the exemptions for objecting entities, the rules specify that they apply where the entities object as specified in § 147.132(a)(2) of the Religious IFC. That paragraph describes the religious objection by specifying that exemptions for objecting entities will apply to the extent that an entity described in paragraph (a)(1) objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

---

[68] ACA section 1553 protects an identically defined group of "health care entities," including provider-sponsored organizations, HMOs, health insurance plans, and "any other kind of . . . plan," from being subject to discrimination on the basis that it does not provide any health care item or service furnishing for the purpose of assisted suicide, euthanasia, mercy killing, and the like. ACA section 1553, 42 U.S.C. 18113.

Case: 25-2575     Document: 34-2     Page: 143     Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB   Document 6991   Filed 12/14/18   Page 33 of 36

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57567**

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments, at § 147.133(a)(2), provided a similar description of the scope of the objection based on moral convictions rather than religious beliefs, but we used slightly different operative language. There, instead of saying the entity "objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services," the paragraph stated the entity "objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments." Some commenters took note of this difference, and asked the Departments to clarify which language applies, and whether the Departments intended any difference in the operation of the two paragraphs. The Departments did not intend the language to operate differently. The language in the Moral IFC accurately, and more clearly, expresses the intent set forth in the Religious IFC about how the issuer exemption applies. The Religious IFC explained that the intent of the expanded exemptions was to encompass entities that objected to providing or arranging for contraceptive coverage in their plans, and to encompass entities that objected to the previous accommodation process, by which their issuers or third party administrators were required to provide contraceptive coverage or payments in connection with their plans. In other words, an entity would be exempt from the Mandate if it objected to complying with the Mandate, or if it objected to complying with the accommodation. The language in the Religious IFC encompassed both circumstances by encompassing an objection to providing "coverage [or] payments" for contraceptive services, and by encompassing an objection to "a plan that provides" coverage or payments for contraceptive services. But the language describing the objection set forth in the Moral IFC does so more clearly, and restructuring the sentence could make it clearer still. Questions by commenters about the scope of the description suggests that we should restructure the description, in a non-substantive way, to provide more clarity. The Departments do this by breaking some of the text out into subparagraphs, and rearranging clauses so that it is clearer which words they modify. The new

structure specifies that it includes an objection to establishing, maintaining, providing, offering, or arranging for (as applicable) coverage or payments for contraceptive services, and it includes an objection to establishing, maintaining, providing, offering, or arranging for (as applicable) a plan, issuer, or third party administrator that provides contraceptive coverage. This more clearly encompasses objections to complying with either the Mandate or the accommodation. Consequently, these rules finalize the paragraph describing the religious objection in the Religious IFC with minor technical changes so that the final language will essentially mirror language from the Moral IFC. The introductory phrase of the religious objection set forth in paragraph (a)(2) is finalized to state the exemption "will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable)". The remainder of the paragraph is broken into two sub-paragraphs, regarding either "coverage or payments for some or all contraceptive services," or "a plan, issuer, or third party administrator that provides or arranges such coverage or payments."

Some commenters observed that by allowing exempt groups to object to "some or all" contraceptives, this might yield a cafeteria-style approach where different plan sponsors choose various combinations of contraceptives that they wish to cover. Some commenters further observed that this might create a burden on issuers or third party administrators. The Departments have concluded, however, that, just as the exemption under the previous regulations allowed entities to object to some or all contraceptives, it is appropriate to maintain that flexibility for entities covered by the expanded exemption. Notably, even where an entity or individual qualifies for an exemption under these rules, these rules do not require the issuer or third party administrator to contract with that entity or individual if the issuer or third party administrator does not wish to do so, including because the issuer or third party administrator does not wish to offer an unusual variation of a plan. These rules simply remove the federal Mandate that, in some cases, could have led to penalties for an employer, issuer, or third party administrator if they wished to sponsor, provide, or administer a plan that omits contraceptive coverage in the presence

of a qualifying religious objection. Similarly, under the previous exemption, the plans of houses of worship and integrated auxiliaries were exempt from offering some or all contraceptives, but the previous regulations did not require issuers and third party administrators to contract with those exempt entities if they chose not to do so.

### N. Individuals (45 CFR 147.132(b))

The previous regulations did not provide an exemption for objecting individuals. However, the Religious IFC expanded the exemptions to encompass objecting individuals (referred to here as the "individual exemption"), at § 147.132(b). These rules finalize the individual exemption from the Religious IFC with changes, which reflect both non-substantial technical revisions, and changes based on public comments to more clearly express the intent of the Religious IFC.

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments, at § 147.133(b), provided a similar individual exemption, but we used slightly different operative language. Where the Religious IFC described what may be offered to objecting individuals as "a separate benefit package option, or a separate policy, certificate or contract of insurance," the Moral IFC said a willing issuer and plan sponsor may offer "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects" under the individual exemption. Some commenters observed this difference and asked whether the language was intended to encompass the same options. The Departments intended these descriptions to include the same scope of options. Some commenters suggested that the individual exemption should not allow the offering of "a separate group health plan," as set forth in the version found in § 147.133(b), because doing so could cause various administrative burdens. The Departments disagree, since group health plan sponsors and group and individual health insurance issuers would be free to decline to provide that option, including because of administrative burdens. In addition, the Departments wish to clarify that, where an employee claims the exemption, a willing issuer and a willing employer may, where otherwise permitted, offer the employee participation in a group health insurance policy or benefit option that complies with the employee's objection. Consequently, these rules finalize the individual

exemption by making a technical change to the language to adopt the formulation, "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects" under the individual exemption.

Some commenters supported the individual exemption as providing appropriate protections for the religious beliefs of individuals who obtain their insurance coverage in such places as the individual market or exchanges, or who obtain coverage from a group health plan sponsor that does not object to contraceptive coverage but is willing (and, as applicable, the issuer is also willing) to provide coverage that is consistent with an individual's religious objections. Some commenters also observed that, by specifying that the individual exemption only operates where the plan sponsor and issuer, as applicable, are willing to provide coverage that is consistent with the objection, the exemption would not impose burdens on the insurance market because the possibility of such burdens would be factored into the willingness of an employer or issuer to offer such coverage. Other commenters disagreed and contended that allowing the individual exemption would cause burden and confusion in the insurance market. Some commenters also suggested that the individual exemption should not allow the offering of a separate group health plan because doing so could cause various administrative burdens.

The Departments agree with the commenters who suggested the individual exemption will not burden the insurance market, and, therefore, conclude that it is appropriate to provide the individual exemption where a plan sponsor and, as applicable, issuer are willing to cooperate in doing so. As discussed in the Religious IFC, the individual exemption only operates in the case where the group health plan sponsor or group or individual market health insurance issuer is willing to provide the separate option; in the case of coverage provided by a group health plan sponsor, where the plan sponsor is willing; or in the case where both a plan sponsor and issuer are involved, both are willing. The Departments conclude that it is appropriate to provide the individual exemption so that the Mandate will not serve as an obstacle among these various options. Practical difficulties that may be implicated by one option or another will likely be factored into whether plan sponsors and

issuers are willing to offer particular options in individual cases.

In addition, Congress has provided several protections for individuals who object to prescribing or providing contraceptives contrary to their religious beliefs. *See for example,* Consolidated Appropriations Act of 2018, Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act), Public Law 115–141, 132 Stat. 348, 593–94 (Mar. 23, 2018). While some commenters proposed to construe this provision narrowly, Congress likewise provided that, if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions". *Id.* at Div. E, Sec. 808, 132 Stat. at 603. A religious exemption for individuals would not be effective if the government simultaneously made it illegal for issuers and group health plans to provide individuals with policies that comply with the individual's religious beliefs.

The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan generally, or, as applicable, to any other individual policies the issuer offers.

This individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer religiously acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object. This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers.

By its terms, the individual exemption would also apply with respect to individuals in plans arranged by institutions of higher education, if the issuers offering those plans were willing to provide plans complying with the individuals' objections. Because federal law does not require institutions of higher education to arrange such plans, the institutions would not be required by these rules to arrange a plan compliant with an individual's

objection if the institution did not wish to do so.

As an example, in one lawsuit brought against the Departments, the State of Missouri enacted a law under which the State is not permitted to discriminate against insurance issuers that offer group health insurance policies without coverage for contraception based on employees' religious beliefs, or against the individual employees who accept such offers. *See Wieland,* 196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption of these final rules, employers sponsoring governmental plans would be free to honor the objections of individual employees by offering them plans that omit contraceptive coverage, even if those governmental entities do not object to offering contraceptive coverage in general.

This individual exemption cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of State law that requires coverage of such contraceptives or sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held religious objection. This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4), and does not affect any other federal or State law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these final rules do not affect such other laws or terms.

Some individuals commented that they welcomed the individual exemption so that their religious beliefs were not forced to be in tension with their desire for health coverage. The Departments believe the individual exemption may help to meet the ACA's goal of increasing health coverage because it will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held religious beliefs.[69] At the same time, this individual exemption "does not undermine the governmental interests furthered by the contraceptive

---

[69] See also, for example, *Wieland,* 196 F. Supp. 3d at 1017, and *March for Life,* 128 F. Supp. 3d at 130, where the courts noted that the individual employee plaintiffs indicated that they viewed the Mandate as pressuring them to "forgo health insurance altogether."

coverage requirement," [70] because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered.

Some commenters welcomed the ability of individuals covered by the individual exemption to be able to assert an objection to either some or all contraceptives. Other commenters expressed concern that there might be multiple variations in the kinds of contraceptive coverage to which individuals object, and this might make it difficult for willing plan sponsors and issuers to provide coverage that complies with the religious beliefs of an exempt individual. As discussed above, where the individual exemption applies, it only affects the coverage of an individual. If an individual only objects to some contraceptives, and the individual's issuer and, as applicable, plan sponsor are willing to provide the individual a package of benefits omitting such coverage, but for practical reasons they can only do so by providing the individual with coverage that omits all—not just some—contraceptives, the Departments believe that it favors individual freedom and market choice, and does not harm others, to allow the issuer and plan sponsor to provide, in that case, a plan omitting all contraceptives if the individual is willing to enroll in that plan. The language of the individual exemption set forth in the Religious IFC implied this conclusion, by specifying that the Guidelines requirement of contraceptive coverage did not apply where the individual objected to some or all contraceptives. Notably, this was different than the language applicable to the exemptions under § 147.132(a), which specifies that the exemptions apply "to the extent" of the religious objections, so that, as discussed above, the exemptions include only those contraceptive methods to which the objection applied. In response to comments suggesting the language of the individual exemption was not sufficiently clear on this distinction, however, the Departments in these rules finalize the individual exemption at § 147.133(b) with the following change, by adding the following sentence at the end of the paragraph: "Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer and, as applicable, plan sponsor, are willing to provide the individual with a separate policy, certificate or contract of insurance or a separate group health plan or benefit

package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services."

Some commenters asked for plain language guidance and examples about how the individual exemption might apply in the context of employer-sponsored insurance. Here is one such example. An employee is enrolled in group health coverage through her employer. The plan is fully insured. If the employee has sincerely held religious beliefs objecting to her plan including coverage for contraceptives, she could raise this with her employer. If the employer is willing to offer her a plan that omits contraceptives, the employer could discuss this with the insurance agent or issuer. If the issuer is also willing to offer the employer, with respect to this employee, a group health insurance policy that omits contraceptive coverage, the individual exemption would make it legal for the group health insurance issuer to omit contraceptives for her and her beneficiaries under a policy, for her employer to sponsor that plan for her, and for the issuer to issue such a plan to the employer, to cover that employee. This would not affect other employees' plans—those plans would still be subject to the Mandate and would continue to cover contraceptives. But if either the employer, or the issuer, is not willing (for whatever reason) to offer a plan or a policy for that employee that omits contraceptive coverage, these rules do not require them to. The employee would have the choice of staying enrolled in a plan with its coverage of contraceptives, not enrolling in that plan, seeking coverage elsewhere, or seeking employment elsewhere.

For all these reasons, these rules adopt the individual exemption language from the Religious IFC with clarifying changes to reflect the Departments' intent.

### O. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)

The previous regulations set forth an accommodation process at 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A, as an alternative method of compliance with the Mandate. Under the accommodation, if a religious nonprofit entity, or a religious closely held for-profit business, objected to coverage of some or all contraceptive services in its health plan, it could file a notice or fill out a form expressing this objection and describing its objection to its plan and

issuer or third party administrator. Upon doing so, the plan would not cover some or all contraceptive services, and the issuer or third party administrator would be responsible for providing or arranging for persons covered by the plan to receive coverage or payments of those services (except in the case of self-insured church plans exempt from ERISA, in which case no such obligation was imposed on the third party administrator). The accommodation was set forth in regulations of each of the Departments. Based on each Department's regulatory authority, HHS regulations applied to insured group health plans, and DOL and Treasury regulations applied to both insured group health plans and self-insured group health plans.

The Religious IFC maintained the accommodation process. Nevertheless, by virtue of expanding the exemptions to encompass all entities that were eligible for the accommodation process under the previous regulations, in addition to other newly exempt entities, the Religious IFC rendered the accommodation process optional. Entities could choose not just between the Mandate and the accommodation, but between the Mandate, the exemption, and the accommodation. These rules finalize the optional accommodation process and its location in the Code of Federal Regulations at 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A, but the Departments do so with several changes based on public comments.

Many commenters supported keeping the accommodation as an optional process, including some commenters who otherwise supported creating the expanded exemptions. Some commenters opposed making the accommodation optional, but asked the Departments to return to the previous regulations in which entities that did not meet the narrower exemption could only choose between the accommodation process or direct compliance with the Mandate. Some commenters believed there should be no exemptions and no accommodation process.

The Departments continue to consider it appropriate to make the accommodation process optional for entities that are otherwise also eligible for the expanded exemptions—that is, to keep it in place as an option that exempt entities can choose. The accommodation provides contraceptive access, which is a result many opponents of the expanded exemptions said they desire. The accommodation involves some regulation of issuers and third party administrators, but the previous

---

[70] 78 FR 39874.

regulations had already put that regulatory structure in place. These rules for the most part merely keep it in place and maintain the way it operates. The Religious IFC adds some additional paperwork burdens as a result of the new interaction between the accommodation and the expanded exemptions; those are discussed below.

Above, the Departments discussed public comments concerning whether we should have merely expanded the accommodation rather than expanding the exemptions. The Religious IFC and these final rules expand the kinds of entities that may use the optional accommodation, by expanding the exemptions and allowing any exempt entities to opt to make use of the accommodation. Consequently, under these rules, objecting employers may make use of the exemption or may choose to utilize the optional accommodation process. If an eligible organization uses the optional accommodation process through the EBSA Form 700 or other specified notice to HHS, it voluntarily shifts an obligation to provide separate but seamless contraceptive coverage to its issuer or third party administrator.

Some commenters asked that these final rules create an alternative payment mechanism to cover contraceptive services for third party administrators obligated to provide or arrange such coverage under the accommodation. These rules do not concern the payment mechanism, which is set forth in separate rules at 45 CFR 156.50. The Departments do not view an alternative payment mechanism as necessary. As discussed below, although the Departments do not know how many entities will use the accommodation, it is reasonably likely that some entities previously using it will continue to do so, while others will choose the expanded exemption, leading to an overall reduction in the use of the accommodation. The Departments have reason to believe that these final rules will not lead to a significant expansion of entities using the accommodation, since nearly all of the entities of which the Departments are aware that may be interested in doing so were already able to do so prior to the Religious IFC. Moreover, it is still the case under these rules that if an entity serving as a third party administrator does not wish to satisfy the obligations it would need to satisfy under an accommodation, it could choose not to contract with an entity that opts into the accommodation. This conflict is even less likely now that entities eligible for the accommodation are also eligible for the exemption. For these reasons, the Departments do not

find it necessary to add an additional payment mechanism for the accommodation process.

If an eligible organization wishes to revoke its use of the accommodation, it can do so under these rules, and operate under its exempt status. As part of its revocation, the issuer or third party administrator of the eligible organization must provide participants and beneficiaries written notice of such revocation. Some commenters suggested HHS has not yet issued guidance on the revocation process, but CCIIO provided guidance concerning this process on November 30, 2017.[71] These rules supersede that guidance, and adopt or modify its specific guidelines as explained below. As a result, these rules delete references, set forth in the Religious IFC's accommodation regulations, to ''guidance issued by the Secretary of the Department of Health and Human Services.''

The guidance stated that an entity that was using the accommodation under the previous rules, or an entity that adopts the accommodation maintained by the IFCs, could revoke its use of the accommodation and use the exemption. This guideline applies under the final rules. This revocation process applies both prospectively to eligible organizations that decide at a later date to avail themselves of the optional accommodation and then decide to revoke that accommodation, as well as to organizations that invoked the accommodation prior to the effective date of the Religious IFC either by their submission of an EBSA Form 700 or notification, or by some other means under which their third party administrator or issuer was notified by DOL or HHS that the accommodation applies.

The guidance stated that, when the accommodation is revoked by an entity using the exemption, the issuer of the eligible organization must provide participants and beneficiaries written notice of such revocation. These rules adopt that guideline. Consistent with other applicable laws, the issuer or third party administrator of an eligible organization must promptly notify plan participants and beneficiaries of the change of status to the extent such participants and beneficiaries are currently being offered contraceptive coverage at the time the accommodated organization invokes its exemption. The

guidance further stated that the notice may be provided by the organization itself, its group health plan, or its third party administrator, as applicable. The guidance stated that, under the regulation at 45 CFR 147.200(b), ''[t]he notice of modification must be provided in a form that is consistent with the rules of paragraph (a)(4) of this section,'' and (a)(4) has detailed rules on when electronic notice is permitted. These guidelines still apply under the final rules. These rules adopt those guidelines.

The guidance further specified that the revocation of the accommodation would be effective notice on the first day of the first plan year that begins on or after 30 days after the date of the revocation, or alternatively, whether or not the objecting entity's group health plan or issuer listed the contraceptive benefit in its Summary of Benefits of Coverage (SBC), the group health plan or issuer could revoke the accommodation by giving at least 60-days prior notice pursuant to section 2715(d)(4) of the PHS Act (incorporated into ERISA and the Code)[72] and applicable regulations thereunder to revoke the accommodation. The guidance noted that, unlike the SBC notification process, which can effectuate a modification of benefits in the middle of a plan year, provided it is allowed by State law and the contract of the policy, the 30 day notification process under the guidance can only effectuate a benefit modification at the beginning of a plan year. This part of the guidance is adopted in part and changed in part by these final rules, as follows, based on public comments on the issue.

Some commenters asked that revocations only be permitted to occur on the first day of the next plan year, or no sooner than January 2019, to avoid burdens on plans and because some states do not allow for mid-year plan changes. The Departments believe that providing 60-days notice pursuant to section 2715(d)(4) of the PHS Act, where applicable, is a mechanism that already exists for making changes in health benefits covered by a group health plan during a plan year; that process already takes into consideration any applicable state laws. However, in response to public comments, these rules change the accommodation provisions from the Religious IFC to indicate that, as a transitional rule, providing 60-days notice for revoking an accommodation is only available, if applicable, to plans that are using the accommodation at the time of the

---

[71] See Randy Pate, ''Notice by Issuer or Third Party Administrator for Employer/Plan Sponsor of Revocation of the Accommodation for Certain Preventive Services,'' CMS (Nov. 30, 2017), *https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Notice-Issuer-Third-Party-Employer-Preventive.pdf.*

[72] See also 26 CFR 54.9815–2715(b); 29 CFR 2590.715–2715(b); 45 CFR 147.200(b).

Case: 25-2575    Document: 34-2    Page: 147    Date Filed: 12/12/2025
Case 2:57-cv-045406-WB  Document 6991  Filed 12/14/18  Page 37 of 50

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57571**

publication of these final rules. As a general rule, for plans that use the accommodation in future plan years, the Departments believe it is appropriate to allow revocation of an accommodation only on the first day of the next plan year. Based on the objections of various litigants and public commenters, we believe that some entities already using the accommodation may have been doing so only because previous regulations denied them an exemption. For them, access to the transitional 60-days notice procedure (if applicable) is appropriate in the period immediately following the finalization of these rules. In future plan years, however—plan years that begin after the effective date of these final rules—plans and entities that qualify as exempt under these rules will have been on notice that they qualify for an exemption or the accommodation. If they have opted to enter or remain in the accommodation in those future plan years, when they could have chosen the exemption, the Departments believe it is appropriate for them to wait until the first day of the following plan year to change to exempt status.[73]

This change is implemented in the following manner. In the Religious IFC, the accommodation provisions addressing revocation were found at 45 CFR 147.131(c)(4), 26 CFR 54.9815–2713AT(a)(5),[74] and 29 CFR 2590.715–2713A(a)(5).

The provisions in the Religious IFC (with technical variations among the HHS, Labor, and Treasury rules) state that a written notice of revocation must be provided "as specified in guidance issued by the Secretary of the

Department of Health and Human Services." On November 30, 2017, HHS issued the guidance regarding revocation. These final rules incorporate this guidance, with certain clarifications, and state that the revocation notice must be provided "as specified herein." The final rule incorporates the two sets of directions for revoking the accommodation initially set forth in the interim guidance in the following manner. The first, designated as subparagrpah (1) as a "[t]ransitional rule," explains that if contraceptive coverage is being offered through the accommodation process on the date on which these final rules go into effect, 60-days notice may be provided to revoke the accommodation process, or they revocation may occur "on the first day of the first plan year that begins on or after 30 days after the date of the revocation" consistent with PHS Act section 2715(d)(4), 45 CFR 147.200(b), 26 CFR 54.9815–2715(b), or 29 CFR 2590.715–2715(b). The second direction, set forth in subparagraph (ii), explains the "[g]eneral rule" that, in plan years beginning after the date on which these final rules go into effect, revocation of the accommodation will be effective on "the first day of the first plan year that begins on or after 30 days after the date of the revocation."

The Religious IFC states that if an accommodated entity objects to some, but not all, contraceptives, an issuer for an insured group health plan that covers contraceptives under the accommodation may, at the issuer's option, choose to provide coverage or payments for all contraceptive services, instead of just for the narrower set of contraceptive services to which the entities object. Some commenters supported this provision, saying that it allows flexibility for issuers that might otherwise face unintended burdens from providing coverage under the accommodation for entities that object to only some contraceptive items. The Departments have maintained this provision in these final rules. Note that this provision is consistent with the other assertions in the rules saying that an entity's objection applies "to the extent" of the entity's religious beliefs, because in this instance, under the accommodation, the plan participant or beneficiary still receives coverage or payments for all contraceptives, and this provision simply allows issuers more flexibility in choosing how to help provide that coverage.

Some commenters asked that the Departments retain the "reliance" provision, contained in the previous accommodation regulations, under

which an issuer is deemed to have complied with the Mandate where the issuer relied reasonably and in good faith on a representation by an eligible organization as to its eligibility for the accommodation, even if that representation was later determined to be incorrect. The Departments omitted this provision from the Religious IFC, on the grounds that this provision was less necessary where any organization eligible for the optional accommodation is also exempt. Nevertheless, in order to respond to concerns in public comments, and to prevent any risk to issuers of a mistake or misrepresentation by an organization seeking the accommodation process, the Departments have finalized the Religious IFC with an additional change that restores this clause. The clause uses the same language that was in the regulations prior to the Religious IFC, and it is inserted at 45 CFR 147.131(f), 26 CFR 54.9815–2713A(e), and 29 CFR 2590.715–2713A(e). As a result, these rules renumber the subsequent paragraphs in each of those sections.

*P. Definition of Contraceptives for the Purpose of These Final Rules*

The previous regulations did not define contraceptive services. The Guidelines issued in 2011 included, under "Contraceptive methods and counseling," "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." The previous regulations concerning the exemption and the accommodation used the terms contraceptive services and contraceptive coverage as catch-all terms to encompass all of those Guidelines' requirements. The 2016 update to the Guidelines are similarly worded. Under "Contraception," they include the "full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration," "instruction in fertility awareness-based methods," and "[c]ontraceptive care" to "include contraceptive counseling, initiation of contraceptive use, and follow-up care (for example, management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method)."[75]

To more explicitly state that the exemption encompasses any of the contraceptive or sterilization services, items, or information that have been required under the Guidelines, the Religious IFC included a definition at 45

---

[73] These final rules go into effect 60 days after they are published in the **Federal Register**. Some entities currently using the accommodation may have a plan year that begins less than 30 days after the effective date of these final rules. In such cases, they may be unable, after the effective date of these final rules, to provide a revocation notice 30 days prior to the start of their next plan year. However, these final rules will be published at least 60 days prior to the start of that plan year. Therefore, entities exempt under these final rules that have been subject to the accommodation on the date these final rules are published, that wish to revoke the accommodation, and whose next plan years start after these final rules go into effect, but less than 30 days thereafter, may submit their 30 day revocation notices after these final rules are published, before these final rules are in effect, so that they will have submitted the revocation at least 30 days before their next plan year starts. In such cases, even though the revocation notice will be submitted before these final rules are in effect, the actual revocation will not occur until after these final rules are in effect, and plan participants will have been provided with 30 days' notice of the revocation.

[74] The Department of the Treasury's rule addressing the accommodation is being finalized at 26 CFR 54.9815–2713A, superseding its temporary regulation at 26 CFR 54.9815–2713AT.

[75] https://www.hrsa.gov/womens-guidelines-2016/index.html.

CFR 147.131(f) and 147.132(c), 26 CFR 54.9815–2713AT(e), and 29 CFR 2590.715–2713A(e). These rules finalize those definitions without change, but renumber them as 45 CFR 147.131(f) and 147.132(c), 26 CFR 54.9815–2713A(e), and 29 CFR 2590.715–2713A(e), respectively.

### Q. Severability

The Departments finalize without change (except for certain paragraph redesignations) the severability clauses in the interim final rules, namely, at paragraph (g) of 26 CFR 54.9815–2713A, the redesignated paragraph (g) of 29 CFR 2590.715–2713A, and 45 CFR 147.132(d).

### R. Other Public Comments

#### 1. Items Approved as Contraceptives But Used To Treat Existing Conditions

Some commenters noted that some drugs included in the preventive services contraceptive Mandate can also be useful for treating certain existing health conditions, and that women use them for non-contraceptive purposes. Certain commenters urged the Departments to clarify that the final rules do not permit employers to exclude from coverage medically necessary prescription drugs used for non-preventive services. Some commenters suggested that religious objections to the Mandate should not be permitted in cases where such methods are used to treat such conditions, even if those methods can also be used for contraceptive purposes.

Section 2713(a)(4) only applies to "preventive" care and screenings. The statute does not allow the Guidelines to mandate coverage of services provided solely for a non-preventive use, such as the treatment of an existing condition. The Guidelines implementing this section of the statute are consistent with that narrow authority. They state repeatedly that they apply to "preventive" services or care.[76] The requirement in the Guidelines concerning "contraception" specifies several times that it encompasses "contraceptives," that is, medical products, methods, and services applied for "contraceptive" uses. The Guidelines do not require coverage of care and screenings that are non-preventive, and the contraception portion of those Guidelines do not require coverage of medical products, methods, care, and screenings that are non-contraceptive in purpose or use. The Guidelines' inclusion of contraceptive services requires coverage

of contraceptive methods as a type of preventive service only when a drug that FDA has approved for contraceptive use is prescribed in whole or in part for such purpose or intended use. Section 2713(a)(4) does not authorize the Departments to require coverage, without cost-sharing, of drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.[77] The extent to which contraceptives are covered to treat non-preventive conditions would be determined by application of the requirement section 1302(b)(1)(F) of the ACA to cover prescription drugs (where applicable), implementing regulations at 45 CFR 156.122, and 156.125, and plans' decisions about the slate of medicines to cover for these conditions.

Some commenters observed that pharmacy claims do not include a medical diagnosis code, so plans may be unable to discern whether a drug approved by FDA for contraceptive uses is actually applied for a preventive or contraceptive use, or for another use. Section 2713(a)(4), however, draws a distinction between preventive care and screenings and other kinds of care and screenings. That subsection does not authorize the Departments to impose a coverage mandate of services that are not at least partly applied for a preventive use, and the Guidelines themselves do not require coverage of contraceptive methods or care unless such methods or care is contraceptive in purpose. These rules do not prohibit issuers from covering drugs and devices that are approved for contraceptive uses even when those drugs and devices are

prescribed for non-preventive, non-contraceptive purposes. As discussed above, these final rules also do not purport to delineate the items HRSA will include in the Guidelines, but only concern expanded exemptions and accommodations that apply to the extent the Guidelines require contraceptive coverage. Therefore, the Departments do not consider it appropriate to specify in these final rules that under section 2713(a)(4), exempt organizations must provide coverage for drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.

#### 2. Comments Concerning Regulatory Impact

Some commenters agreed with the Departments' statement in the Religious IFC that the expanded exemptions are likely to affect only a small percentage of women otherwise receiving coverage under the Mandate. Other commenters disagreed, stating that the expanded exemptions could take contraceptive coverage away from many or most women. Still others opposed expanding the exemptions and contended that accurately determining the number of women affected by the expanded exemptions is not possible.

After reviewing the public comments, the Departments agree with commenters who said that estimating the impact of these final rules is difficult based on the limited data available to us, and with commenters who agreed with the Religious IFC that the expanded exemptions are likely to affect only a small percentage of women. The Departments do not find the estimates of large impacts submitted by some commenters more reliable than the estimates set forth in the Religious and Moral IFCs. Even certain commenters asserted that "strongly oppos[ed]" the Religious IFC commented that merely "thousands" would be impacted, a number consistent with the Departments' estimate of the number of women who may be affected by the rule. The Departments' estimates of the impact of these final rules are discussed in more detail in the following section. Therefore, the Departments conclude that the estimates of regulatory impact made in the Religious IFC are still the best estimates available. Our estimates are discussed in more detail in the following section.

#### 3. Interaction With State Laws

Some commenters asked the Departments to discuss the interaction between these final rules and state laws that either require contraceptive

---

[76] *Id.*

[77] The Departments previously cited the IOM's listing of existing conditions that contraceptive drugs can be used to treat (menstrual disorders, acne, and pelvic pain), and said of those uses that "there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy." 77 FR 8727 & n.7. This was not, however, an assertion that PHS Act 2713(a)(4) or the Guidelines require coverage of "contraceptive" methods when prescribed for an exclusively *non-contraceptive, non-preventive* use. Instead, it was an observation that such drugs—generally referred to as "contraceptives"—also have some alternate beneficial uses to treat existing conditions. For the purposes of these final rules, the Departments clarify here that the reference prior to the Religious IFC to the benefits of using contraceptive drugs exclusively for some non-contraceptive and non-preventive uses to treat existing conditions did not mean that the Guidelines require coverage of such uses, and consequently is not a reason to refrain from offering the expanded exemptions provided here. Where a drug approved by the FDA for contraceptive use is prescribed for both a contraceptive use and a non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage for contraceptive use. Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines and the contraceptive Mandate.

Case: 25-2575    Document: 34-2    Page: 149    Date Filed: 12/12/2025
Case: 2:17-cv-05420-WB Document 6891- Filed 12/12/18 Page 33 of 66

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57573**

coverage or provide religious exemptions from those and other requirements. Some commenters argued that providing expanded exemptions in these rules would negate state contraceptive requirements or narrower state religious exemptions. Some commenters asked that the Departments specify that these exemptions do not apply to plans governed by state laws that require contraceptive coverage. The Department agrees that these rules concern only the applicability of the Federal contraceptive Mandate imposed pursuant to section 2713(a)(4). They do not regulate state contraceptive mandates or state religious exemptions. If a plan is exempt under the Religious IFC and these rules, that exemption does not necessarily exempt the plan or other insurance issuer from state laws that may apply to it. The previous regulations, which offered exemptions for houses of worship and integrated auxiliaries, did not include regulatory language negating the exemptions in states that require contraceptive coverage, although the Departments discussed the issue to some degree in various preambles of those previous regulations. The Departments do not consider it appropriate or necessary in the regulatory text of the religious exemptions to declare that the Federal contraceptive Mandate will still apply in states that have a state contraceptive mandate, since these rules do not purport to regulate the applicability of state contraceptive mandates.[78]

Some commenters observed that, through ERISA, some entities may avoid state laws that require contraceptive coverage by self-insuring. This is a result of the application of the preemption and savings clauses contained in ERISA to state insurance regulation. *See* 29 U.S.C. 1144(a) & (b)(1). These rules cannot change statutory ERISA provisions, and do not change the standards applicable to ERISA preemption. To the extent Congress has decided that ERISA preemption includes preemption of state laws requiring contraceptive coverage, that decision occurred before the ACA and was not negated by the ACA. Congress did not mandate in the ACA that any Guidelines issued under section 2713(a)(4) must include

contraceptives, nor that the Guidelines must force entities with religious objections to cover contraceptives.

## IV. Economic Impact and Paperwork Burden

The Departments have examined the impacts of the Religious IFC and the final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96 354), section 1102(b) of the Social Security Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2)), and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

### A. Executive Orders 12866 and 13563— Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with

economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). As discussed below regarding their anticipated effects, the Religious IFC and these rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866. However, OMB has determined that the actions are significant within the meaning of section 3(f)(4) of the Executive Order. Therefore, OMB has reviewed these final rules, and the Departments have provided the following assessment of their impact.

### 1. Need for Regulatory Action

These final rules adopt as final and further change the amendments made by the Religious IFC, which amended the Departments' July 2015 final regulations. The Religious IFC and these final rules expand the exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4) of the PHS Act, section 715(a)(1) of ERISA, and section 9815(a)(1) of the Code, to include certain entities and individuals with objections to compliance with the Mandate based on sincerely held religious beliefs, and they revise the accommodation process to make it optional for eligible organizations. The expanded exemption applies to certain individuals and entities that have religious objections to some (or all) of the contraceptive and/or sterilization services that would be covered under the Guidelines. Such action has been taken, among other reasons discussed above, to provide for participation in the health insurance market by certain entities or individuals, by freeing them from penalties they could incur if they follow their sincerely held religious beliefs against contraceptive coverage.

### 2. Anticipated Effects

#### a. Removal of Burdens on Religious Exercise

Regarding entities and individuals that are extended an exemption by the Religious IFC and these final rules, without that exemption the Guidelines would require many of them to either pay for coverage of contraceptive services that they find religiously objectionable; submit self-certifications that would result in their issuer or third party administrator paying for such services for their employees, which

---

[78] Some commenters also asked that these final rules specify that exempt entities must comply with other applicable laws concerning such things as notice to plan participants or collective bargaining agreements. These final rules relieve the application of the Federal contraceptive Mandate under section 2713(a)(4) to qualified exempt entities; they do not affect the applicability of other laws. Elsewhere in this preamble, the Departments provide guidance applicable to notices of revocation and changes that an entity may seek to make during its plan year.

Case: 25-2575    Document: 34-2    Page: 150    Date Filed: 12/18/2025
Case: 2:17-cv-04540-WB   Document 6991   Filed 12/14/18   Page 48 of 56

**57574**    **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

some entities also believe entangles them in the provision of such objectionable coverage; or pay tax penalties, or be subject to other adverse consequences, for non-compliance with these requirements. These final rules remove certain associated burdens imposed on these entities and individuals—that is, by recognizing their religious objections to, and exempting them on the basis of such objections from, the contraceptive and/ or sterilization coverage requirement of the HRSA Guidelines and making the accommodation process optional for eligible organizations.

b. Notices When Revoking Accommodated Status

To the extent that entities choose to revoke their accommodated status to make use of the expanded exemption, a notice will need to be sent to enrollees (either by the objecting entity or by the issuer or third party administrator) that their contraceptive coverage is changing, and guidance will reflect that such a notice requirement is imposed no more than is already required by preexisting rules that require notices to be sent to enrollees of changes to coverage during a plan year. If the entities wait until the start of their next plan year to change to exempt status, instead of doing so during the current plan year, those entities generally will also be able to avoid sending any supplementary notices in addition to what they would otherwise normally send prior to the start of a new plan year. Additionally, these final rules provide such entities with an offsetting regulatory benefit by the exemption itself and its relief of burdens on their religious beliefs. As discussed below, assuming that more than half of the entities that have been using the previous accommodation will seek immediate revocation of their accommodated status and notices will be sent to all their enrollees, the total estimated cost of sending those notices will be $302,036.

c. Impacts on Third Party Administrators and Issuers

The Departments estimate that these final rules will not result in any additional burdens or costs on issuers or third party administrators. As discussed below, the Departments believe that 109 of the 209 entities making use of the accommodation process will instead make use of their new exempt status. In contrast, the Departments expect that a much smaller number (which we assume to be 9) will make use of the accommodation to which they were not previously provided access. Reduced burdens for issuers and third party administrators due to reductions in use of the accommodation will more than offset increased obligations for serving the fewer number of entities that will now opt into the accommodation. This will lead to a net decrease in burdens and costs on issuers and third party administrators, who will no longer have continuing obligations imposed on them by the accommodation. While these rules make it legal for issuers to offer insurance coverage that omits contraceptives to exempt entities and individuals, these final rules do not require issuers to do so.

The Departments anticipate that the effect of these rules on adjustments made to the federally facilitated Exchange user fees under 45 CFR 156.50 will be that fewer overall adjustments will be made using the accommodation process, because there will be more entities who previously were reluctant users of the accommodation that will choose to operate under the newly expanded exemption than there will be entities not previously eligible to use the accommodation that will opt into it. The Departments' estimates of each number of those entities is set forth in more detail below.

d. Impacts on Persons Covered by Newly Exempt Plans

These final rules will result in some persons covered in plans of newly exempt entities not receiving coverage or payments for contraceptive services. As discussed in the Religious IFC, the Departments did not have sufficient data on a variety of relevant factors to precisely estimate how many women would be impacted by the expanded exemptions or any related costs they may incur for contraceptive coverage or the results associated with any unintended pregnancies.

i. Unknown Factors Concerning Impact on Persons in Newly Exempt Plans

As referenced above and for reasons explained here, there are multiple levels of uncertainty involved in measuring the effect of the expanded exemption, including but not limited to—

• How many entities will make use of their newly exempt status.

• How many entities will opt into the accommodation maintained by these rules, under which their plan participants will continue receiving contraceptive coverage.

• Which contraceptive methods some newly exempt entities will continue to provide without cost-sharing despite the entity objecting to other methods (for example, as reflected in *Hobby Lobby*, several objecting entities have still provided coverage for 14 of the 18 FDA-approved women's contraceptive or sterilization methods, 134 S. Ct. at 2766).

• How many women will be covered by plans of entities using their newly exempt status.

• Which of the women covered by those plans want and would have used contraceptive coverage or payments for contraceptive methods that are no longer covered by such plans.

• Whether, given the broad availability of contraceptives and their relatively low cost, such women will obtain and use contraception even if it is not covered.

• The degree to which such women are in the category of women identified by IOM as most at risk of unintended pregnancy.

• The degree to which unintended pregnancies may result among those women, which would be attributable as an effect of these rules only if the women did not otherwise use contraception or a particular contraceptive method due to their plan making use of its newly exempt status.

• The degree to which such unintended pregnancies may be associated with negative health effects, or whether such effects may be offset by other factors, such as the fact that those women will be otherwise enrolled in insurance coverage.

• The extent to which such women will qualify for alternative sources of contraceptive access, such as through a parent's or spouse's plan, or through one of the many governmental programs that subsidize contraceptive coverage to supplement their access.

ii. Public Comments Concerning Estimates in Religious IFC

In the public comments, some commenters agreed with the Departments' estimate that, at most, the economic impact would lead to a potential transfer cost, from employers (or other plan sponsors) to affected women, of $63.8 million. Some commenters said the impact would be much smaller. Other commenters disagreed, suggesting that the expanded exemptions risked removing contraceptive coverage from more than 55 million women receiving the benefits of the preventive services Guidelines, or even risked removing contraceptive coverage from over 100 million women. Some commenters cited studies indicating that, nationally, unintended pregnancies have large public costs, and the Mandate overall led to large out-of-pocket savings for women.

These general comments do not, however, substantially assist us in

Case: 25-2575　　Document: 34-2　　Page: 151　　Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB　Document 8991　Filed 12/12/18　Page 44 of 56

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations　　**57575**

estimating how many women would be affected by these expanded exemptions specifically, or among them, how many unintended pregnancies would result, or how many of the affected women would nevertheless use contraceptives not covered under the health plans of their objecting employers and, thus, be subject to the transfer costs the Departments estimate, or instead, how many women might avoid unintended pregnancies by changing their activities in other ways besides using contraceptives. The Departments conclude, therefore, that our estimates of the anticipated effect in the Religious IFC are still the best estimates we have based on the limited data available to make those estimates. We do not believe that the higher estimates submitted by various public commenters sufficiently took into consideration, or analyzed, the various factors that suggest the small percentage of entities that will now use the expanded exemptions out of the large number of entities subject to the Mandate overall. Instead, the Departments agree with various public commenters providing comment and analysis that, for a variety of reasons, the best estimate of the impact of the expanded exemptions finalized in these rules is that most women receiving contraceptive coverage under the Mandate will not be affected. We agree with such commenters that the number of women covered by entities likely to make use of the expanded exemptions in these rules is likely to be very small in comparison to the overall number of women receiving contraceptive coverage as a result of the Mandate.

### iii. Possible Sources of Information for Estimating Impact

The Departments have access to the following general sources of information that are relevant to this issue, but these sources do not provide a full picture of the impact of these final rules. First, the regulations prior to the Religious IFC already exempted certain houses of worship and their integrated auxiliaries and, as explained elsewhere, effectively did not apply contraceptive coverage requirements to various entities in self-insured church plans. The effect of those previous exemptions or limitations are not included as effects of these rules, which leave those impacts in place. Second, in the Departments' previous regulations creating or expanding exemptions and the accommodation process we concluded that no significant burden or costs would result. 76 FR 46625; 78 FR 39889. Third, some entities, including some for-profit entities, object to only some but not all contraceptives, and in some

cases will cover 14 of 18 FDA-approved women's contraceptive and sterilization methods.[79] *See Hobby Lobby,* 134 S. Ct. at 2766. The effects of the expanded exemptions will be mitigated to that extent. No publicly traded for-profit entities sued challenging the Mandate, and the public comments did not reveal any that specifically would seek to use the expanded exemptions. Consequently, the Departments agree with the estimate from the Religious IFC that publicly traded companies would not likely make use of these expanded exemptions.

Fourth, HHS previously estimated that 209 entities would make use of the accommodation process. To arrive at this number, the Departments used, as a placeholder, the approximately 122 nonprofit entities that brought litigation challenging the accommodation process, and the approximately 87 closely held for-profit entities that filed suit challenging the Mandate in general. The Departments' records indicate, as noted in the Religious IFC, that approximately 63 entities affirmatively submitted notices to HHS to use the accommodation,[80] and approximately 60 plans took advantage of the

---

[79] By reference to the FDA Birth Control Guide's list of 18 birth control methods for women and 2 for men, *https://www.fda.gov/downloads/forconsumers/byaudience/forwomen/freepublications/ucm517406.pdf,* Hobby Lobby and entities with similar beliefs were not willing to cover: IUD copper; IUD with progestin; emergency contraceptive (Levonorgestrel); and emergency contraceptive (Ulipristal Acetate). *See* 134 S. Ct. at 2765–66. Hobby Lobby was willing to cover: sterilization surgery for women; sterilization implant for women; implantable rod; shot/injection; oral contraceptives ("the Pill"—combined pill); oral contraceptives ("the Pill"—extended/continuous use/combined pill); oral contraceptives ("the Mini Pill"—progestin only); patch; vaginal contraceptive ring; diaphragm with spermicide; sponge with spermicide; cervical cap with spermicide; female condom; spermicide alone. *Id.* Among women using these 18 female contraceptive methods, 85 percent use the 14 methods that Hobby Lobby and entities with similar beliefs were willing to cover (22,446,000 out of 26,436,000), and "[t]he pill and female sterilization have been the two most commonly used methods since 1982." *See* Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[80] This includes some fully insured and some self-insured plans, but it does not include entities that may have used the accommodation by submitting an EBSA form 700 self-certification directly to their issuer or third party administrator. In addition, the Departments have deemed some other entities as being subject to the accommodation through their litigation filings, but that might not have led to contraceptive coverage being provided to persons covered in some of those plans, either because they are exempt as houses of worship or integrated auxiliaries, they are in self-insured church plans, or the Departments were not aware of their issuers or third party administrators so as to send them letters obligating them to provide such coverage.

contraceptive user fees adjustments, in the 2015 plan year, to obtain reimbursement for contraceptive service payments made for coverage of such services for women covered by self-insured plans that were accommodated. Overall, while recognizing the limited data available, the Departments assumed that, under an expanded exemption and accommodation, approximately 109 previously accommodated entities would use an expanded exemption, and about 100 would continue their accommodated status. We also estimated that another 9 entities would use the accommodation where the entities were not previously eligible to do so.

These sources of information were outlined in the Religious IFC. Some commenters agreed with the Departments' estimates based on those sources, and while others disagreed, the Departments conclude that commenters did not provide information that allows us to make better estimates.

### iv. Estimates Based on Litigating Entities That May Use Expanded Exemptions

Based on these and other factors, the Departments considered two approaches in the Religious IFC to estimate the number of women affected among entities using the expanded exemptions. First, following the use in previous regulations of litigating entities to estimate the effect of the exemption and accommodation, the Departments attempted to estimate the number of women covered by plans of litigating entities that could be affected by expanded exemptions. Based on papers filed in litigation, and public sources, the Departments estimated in the Religious IFC that approximately 8,700 women of childbearing age could have their contraception costs affected by plans of litigating entities using these expanded exemptions. The Departments believe that number is lower based upon the receipt, by many of those litigating entities, of permanent injunctions against the enforcement of section 2713(a)(4) to the extent it supports a contraceptive Mandate, which have been entered by federal district courts since the issuance of the Religious IFC.[81] As a result, these final rules will not affect whether such entities will be subject to the contraceptive Mandate. Subtracting those entities from the total, the Departments estimate that the remaining litigating entities employ

---

[81] *See, for example, Catholic Benefits Ass'n LCA* v. *Hargan,* No. 5:14–cv–00240–R (W.D. Okla. order filed Mar. 7, 2018), and *Dordt Coll.* v. *Burwell,* No. 5:13–cv–04100 (N.D. Iowa order filed June 12, 2018).

approximately 49,000 persons, male and female. The average percent of workers at firms offering health benefits that are actually covered by those benefits is 60 percent.[82] This amounts to approximately 29,000 employees covered under those plans. EBSA estimates that for each employee policyholder, there is approximately one dependent.[83] This amounts to approximately 58,000 covered persons. Census data indicate that women of childbearing age—that is, women aged 15 to 44—compose 20.2 percent of the general population.[84] Furthermore, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines.[85] Therefore, the Departments estimate that approximately 5,200 women of childbearing age that use contraception covered by the Guidelines are covered by employer sponsored plans of entities that might be affected by these final rules. The Departments also estimate that, for the educational institutions that brought litigation challenges objecting to the Mandate as applied to student coverage that they arranged—where (1) the institutions were not exempt under the prior rule, (2) their student plans were not self-insured, and (3) they have not received permanent injunctions preventing the application of the previous regulations—such student plans likely covered approximately 2,600 students. Thus, the Departments estimate the female members of those plans is 2,600 women.[86] Assuming, as

referenced above, that 43.6 percent of such women use contraception covered by the Guidelines, the Departments estimate that 1,150 of those women would be affected by these final rules.

Together, this leads the Departments to estimate that approximately 6,400 women of childbearing age may have their contraception costs affected by plans of litigating entities using these expanded exemptions. As noted previously, the Departments do not have data indicating how many of those women agree with their employers' or educational institutions' opposition to contraception (so that fewer of them than the national average might actually use contraception). Nor do the Departments know how many would have alternative contraceptive access from a parent's or spouse's plan, or from federal, state, or local governmental programs, nor how many of those women would fall in the category of being most at risk of unintended pregnancy, nor how many of those entities would provide some contraception in their plans while only objecting to certain contraceptives.

v. Estimates of Accommodated Entities That May Use Expanded Exemptions

In the Religious IFC, the Departments also examined data concerning user-fee reductions to estimate how many women might be affected by entities that are using the accommodation and would use the expanded exemptions under these final rules. Under the accommodation, HHS has received information from issuers that seek user fees adjustments under 45 CFR 156.50(d)(3)(ii), for providing contraceptive payments for self-insured plans that make use of the accommodation. HHS receives requests for fees adjustments both where Third Party Administrators (TPAs) for those self-insured accommodated plans are themselves issuers, and where the TPAs use separate issuers to provide the payments and those issuers seek fees

adjustments. Where the issuers seeking adjustments are separate from the TPAs, the TPAs are asked to report the number of persons covered by those plans. Some users do not enter all the requested data, and not all the data for the 2017 plan year is complete. Nevertheless, HHS has reviewed the user fees adjustment data received for the 2017 plan year. HHS's best estimate from the data is that there were $38.4 million in contraception claims sought as the basis for user fees adjustments for plans, and that those claims were for plans covering approximately 1,823,000 plan participants and beneficiaries of all ages, male and female.

This number fluctuates from year to year. It is larger than the estimate used in the Religious IFC because, on closer examination of the data, this number better accounts for plans where TPAs were also issuers seeking user fees adjustments, in addition to plans where the TPA is separate from the issuer seeking user fees adjustments. The number of employers using the accommodation where user fees adjustments were sought cannot be determined from HHS data, because not all users are required to submit that information, and HHS does not necessarily receive information about fully insured plans using the accommodation. Therefore, the Departments still consider our previous estimate of 209 entities using the accommodation as the best estimate available.

As noted in the Religious IFC, HHS's information indicates that religious nonprofit hospitals or health systems sponsored a significant minority of the accommodated self-insured plans that were using contraceptive user fees adjustments, yet those plans covered more than 80 percent of the persons covered in all plans using contraceptive user fees adjustments. Some of those plans cover nearly tens of thousands of persons each and are proportionately much larger than the plans provided by other entities using the contraceptive user fees adjustments.

The Departments continue to believe that a significant fraction of the persons covered by previously accommodated plans provided by religious nonprofit hospitals or health systems may not be affected by the expanded exemption. A broad range of religious hospitals or health systems have publicly indicated that they do not conscientiously oppose participating in the accommodation.[87]

---

[82] See Kaiser Family Foundation and Health Research and Educational Trust, "Employer Health Benefits: 2018 Annual Survey" at 62, available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018.*

[83] Employee Benefits Security Administration, "Health Insurance Coverage Bulletin" Table 4, page 21. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[84] United States Census Bureau, "Age and Sex Composition: 2010" (May 2011), available at *https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf.* The Guidelines' requirement of contraceptive coverage only applies "for all women with reproductive capacity." *https://www.hrsa.gov/womensguidelines/;* also, see 80 FR 40318. In addition, studies commonly consider the 15–44 age range to assess contraceptive use by women of childbearing age. See, for example, Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), available at *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[85] See *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states* (reporting that of 61,491,766 women aged 15–44, 26,809,5550 use women's contraceptive methods covered by the Guidelines).

[86] On average, the Departments expect that approximately half of those students (1,300) are

female. For the purposes of this estimate, we also assume that female policyholders covered by plans arranged by institutions of higher education are women of childbearing age. The Departments expect that they would have less than the average number of dependents per policyholder than exists in standard plans, but for the purposes of providing an upper bound to this estimate, the Departments assume that they would have an average of one dependent per policyholder, thus bringing the number of policyholders and dependents back up to 2,6,00. Many of those dependents are likely not to be women of childbearing age, but in order to provide an upper bound to this estimate, the Departments assume they are. Therefore, for the purposes of this estimate, the Departments assume that the effect of these expanded exemptions on student plans of litigating entities includes 2,600 women.

[87] See, *e.g., https://www.chausa.org/newsroom/women%27s-preventive-health-services-final-rule* ("HHS has now established an accommodation that will allow our ministries to continue offering health

Case: 25-2575    Document: 34-2    Page: 153    Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB    Document 3391    Filed 12/12/18    Page 43 of 56

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57577**

Of course, some of these religious hospitals or health systems may opt for the expanded exemption under these final rules, but others might not. In addition, among plans of religious nonprofit hospitals or health systems, some have indicated that they might be eligible for status as a self-insured church plan.[88] As discussed above, some litigants challenging the Mandate have appeared, after their complaints were filed, to make use of self-insured church plan status.[89] (The Departments take no view on the status of these particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.) Nevertheless, considering all these factors, it generally seems likely that many of the remaining religious hospital or health systems plans previously using the accommodation will continue to opt into the voluntary accommodation under these final rules, under which their employees will still receive contraceptive coverage. To the extent that plans of religious hospitals or health systems are able to make use of self-insured church plan status, the previous accommodation rule would already have allowed them to relieve themselves and their third party administrators of obligations to provide contraceptive coverage or payments. Therefore, in such situations, the Religious IFC and these final rules would not have an anticipated effect on the contraceptive coverage of women in those plans.

insurance plans for their employees as they have always done. . . . We are pleased that our members now have an accommodation that will not require them to contract, provide, pay or refer for contraceptive coverage. . . . We will work with our members to implement this accommodation."). In comments submitted in previous rules concerning this Mandate, the Catholic Health Association has stated it ''is the national leadership organization for the Catholic health ministry, consisting of more than 2,000 Catholic health care sponsors, systems, hospitals, long-term care facilities, and related organizations. Our ministry is represented in all 50 states and the District of Columbia.'' Comments on CMS–9968–ANPRM (dated June 15, 2012).

[88] See, for example, Brief of the Catholic Health Association of the United States as Amicus Curiae in Support of Petitioners, Advocate Health Care Network, Nos. 16–74, 16–86, 16–258, 2017 WL 371934 at *1 (U.S. filed Jan. 24, 2017) (''CHA members have relied for decades that the 'church plan' exemption contained in'' ERISA.).

[89] See *https://www.franciscanhealth.org/sites/default/files/2015%20employee%20benefit%20booklet.pdf;* see, for example, *Roman Catholic Archdiocese of N.Y.* v. *Sebelius,* 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

### vi. Combined Estimates of Litigating and Accommodated Entities

Considering all these data points and limitations, the Departments offer the following estimate of the number of women who will be impacted by the expanded exemption in these final rules. In addition to the estimate of 6,400 women of childbearing age that use contraception covered by the Guidelines, who will be affected by use of the expanded exemption among litigating entities, the Departments calculate the following number of women who we estimate to be affected by accommodated entities using the expanded exemption. As noted above, approximately 1,823,000 plan participants and beneficiaries were covered by self-insured plans that received contraceptive user fee adjustments in 2017. Although additional self-insured entities may have participated in the accommodation without making use of contraceptive user fees adjustments, the Departments do not know what number of entities did so. We consider it likely that self-insured entities with relatively larger numbers of covered persons had sufficient financial incentive to make use of the contraceptive user fees adjustments. Therefore, without better data available, the Departments assume that the number of persons covered by self-insured plans using contraceptive user fees adjustments approximates the number of persons covered by all self-insured plans using the accommodation.

An additional but unknown number of persons were likely covered in fully insured plans using the accommodation. The Departments do not have data on how many fully insured plans have been using the accommodation, nor on how many persons were covered by those plans. DOL estimates that, among persons covered by employer-sponsored insurance in the private sector, 62.7 percent are covered by self-insured plans and 37.3 percent are covered by fully insured plans.[90] Therefore, corresponding to the approximately 1,823,000 persons covered by self-insured plans using user fee adjustments, we estimate an additional 1,084,000 persons were covered by fully insured plans using the accommodation. This yields approximately 2,907,000 persons of all ages and sexes whom the Departments estimate were covered in

[90] ''Health Insurance Coverage Bulletin'' Table 3A, page 14. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

plans using the accommodation under the previous regulations.

Although recognizing the limited data available for our estimates, the Departments estimate that 100 of the 209 entities that were using the accommodation under the previous regulations will continue to opt into it under these final rules and that those entities will cover the substantial majority of persons previously covered in accommodated plans. The data concerning accommodated self-insured plans indicates that plans sponsored by religious hospitals and health systems and other entities likely to continue using the accommodation constitute over 60 percent of plans using the accommodation, and encompass more than 90 percent of the persons covered in accommodated plans.[91] In other words, plans sponsored by such entities appear to be a majority of plans using the accommodation, and also have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons. Moreover, as cited above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans, so that these final rules would not impact the contraceptive coverage their employees receive.

The Departments do not have specific data on which plans of which sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status. The Departments assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which the Departments lack representative data. Based on these assumptions and without better data available, the Departments assume that the 100 accommodated entities that will remain in the accommodation will account for 75 percent of all the persons previously covered in accommodated plans. In comparison, the Departments assume the 109 accommodated entities that will make use of the expanded exemption will encompass 25 percent of persons

[91] The data also reflects a religious university using the accommodation that has publicly affirmed the accommodation is consistent with its religious views, and two houses of worship that are using the accommodation despite already qualifying for the previous exemption. We assume for the purposes of this estimate these three entities will also continue using the accommodation instead of the expanded exemption.

previously covered in accommodated plans.

Applying these percentages to the estimated 2,907,000 persons covered in previously accommodated plans, the Departments estimate that approximately 727,000 persons will be covered in the 109 plans that use the expanded exemption, and 2,180,000 persons will be covered in the estimated 100 plans that continue to use the accommodation. According to the Census data cited above, women of childbearing age comprise 20.2 percent of the population, which means that approximately 147,000 women of childbearing age are covered in previously accommodated plans that the Departments estimate will use the expanded exemption. As noted above, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines, so that the Departments expect approximately 64,000 women that use contraception covered by the Guidelines will be affected by accommodated entities using the expanded exemption.

It is not clear the extent to which this number overlaps with the number estimated above of 6,400 women in plans of litigating entities that may be affected by these rules. In order to more broadly estimate the possible effects of these rules, the Departments assume there is no overlap between the two numbers, and therefore that these final rules would affect the contraceptive costs of approximately 70,500 women.

Under the assumptions just discussed, the number of women whose contraceptive costs will be impacted by the expanded exemption in these final rules is approximately 0.1 percent of the 55.6 million women in private plans that HHS's Office of the Assistant Secretary for Planning and Evaluation (ASPE) estimated in 2015 received preventive services coverage under the Guidelines.

In order to estimate the cost of contraception to women affected by the expanded exemption, the Departments are aware that, under the previous accommodation process, the total amount of contraceptive claims sought for self-insured plans for the 2017 benefit year was $38.5 million.[92] These adjustments covered the cost of contraceptive coverage provided to women. As also discussed above, the Departments estimate that amount corresponded to plans covering

1,823,000 persons. Among those persons, as cited above, approximately 20.2 percent on average were women of childbearing age, and of those, approximately 43.6 percent use women's contraceptive methods covered by the Guidelines. This amounts to approximately 161,000 women. Therefore, entities using contraceptive user fees adjustments received approximately $239 per year per woman of childbearing age that used contraception covered by the Guidelines and covered in their plans. But in the Religious IFC, we estimated that the average annual cost of contraception per woman per year is $584. As noted above, public commenters cited similar estimates of the annual cost of various contraceptive methods, if calculated for the life of the method's effectiveness. Therefore, to estimate the annual transfer effects of these final rules, the Departments will continue to use the estimate of $584 per woman per year. With an estimated impact of these final rules of 70,500 women per year, the financial transfer effects attributable to these final rules on those women would be approximately $41.2 million.

Some commenters suggested that the Departments' estimate of women affected among litigating entities was too low, but they did not support their proposed higher numbers with citations or specific data that could be verified as more reliable than the estimates in the Religious IFC. Their estimates appeared to be overinclusive, for example, by counting all litigating entities and not just those that may be affected by these rules because they are not in church plans, or by counting all plan participants and not just women of childbearing age that use contraception. Moreover, since the Religious IFC was issued, additional entities have received permanent injunctions against enforcement of any regulations implementing the contraceptive Mandate and so will not be affected by these final rules. Taking all of these factors into account, the Departments are not aware of a better method of estimating the number of women affected by these expanded exemptions.

### vii. Alternate Estimates Based on Consideration of Pre-ACA Plans

To account for uncertainty in the estimates above, the Departments conducted a second analysis using an alternative framework, in order to thoroughly consider the possible upper bound economic impact of these final rules.

In 2015, ASPE estimated that 55.6 million women aged 15 to 64 were covered by private insurance had

preventive services coverage under the Affordable Care Act.[93] The Religious IFC used this estimate in this second analysis of the possible impact of the expanded exemptions in the interim final rules. ASPE has not issued an update to its report. Some commenters noted that a private organization published a fact sheet in 2017 claiming to make similar estimates based on more recent data, in which it estimated that 62.4 million aged 15 to 64 were covered by private insurance had preventive services coverage under the Affordable Care Act.[94] The primary difference between these numbers appears to be a change in the number of persons covered by grandfathered plans.

The methodology of both reports do not fully correspond to the number the Departments seek to estimate here for the purposes of *Executive Orders 12866 and 13563.* These final rules will not affect all women aged 15 to 64 who are covered by private insurance and have coverage of preventive services under the Affordable Care Act. This is partly because the Departments do not have evidence to suggest that most employers will have sincerely held religious objections to contraceptive coverage and will use the expanded exemptions. In addition, both reports include women covered by plans that are not likely affected by the expanded exemptions for other reasons. For example, even though the estimates in those reports do not include enrollees in public plans such as Medicare or Medicaid, they do include enrollees in plans obtained on the health insurance marketplaces, purchased in the individual market, obtained by self-employed persons, or offered by government employers. Women who purchase plans in the marketplaces, the individual market, or as self-employed persons are not required to use the exemptions in these rules. Government employers are also not affected by the exemptions in these rules.

In response to public comments citing the more recent report, the Departments offer the following estimates based on more recent data than used in the Religious IFC. Data from the U.S. Census Bureau indicates that 167.6 million individuals, male and female, under 65 years of age, were covered by

---

[92] The amount of user fees adjustments provided was higher than this, since an additional administrative amount was added to the amount of contraceptive costs claimed.

[93] Available at *https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.*

[94] The commenters cited the National Women's Law Center's Fact Sheet from September 2017, available at *https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.*

Case: 25-2575    Document: 34-2    Page: 155    Date Filed: 12/12/2025
Case: 25-2575    Document: 34-2    Page: 155    Date Filed: 12/12/2025

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57579**

employment-based insurance in 2017.[95] Of those, 50.1 percent were female, that is, 84 million.[96] The most recent Health Insurance Coverage Bulletin from EBSA states that, within employer-sponsored insurance, 76.5% are covered by private sector employers.[97] As noted above, these expanded exemptions do not apply to public sector employers. Assuming the same percentage applies to the Census data for 2017, 64.2 million women under 65 years of age were covered by private sector employment based insurance. EBSA's bulletin also states that, among those covered by private sector employer sponsored insurance, 5% receive health insurance coverage from a different primary source.[98] We assume for the purposes of this estimate that an exemption claimed by an employer under these rules need not affect contraceptive coverage of a person who receives health insurance coverage from a different primary source. Again assuming this percentage applies to the 2017 coverage year, we estimate that 61 million women under 65 years of age received primary health coverage from private sector, employment-based insurance. In conducting this analysis, the Departments also observed that for 3.8 percent of those covered by private sector employment sponsored insurance, the plan was purchased by a self-employed person, not by a third party employer. Self-employed persons who direct firms are not required to use the exemptions in these final rules, but if they do, they would not be losing contraceptive coverage that they want to have, since they would be using the exemption based on their sincerely held religious beliefs. If those persons have employees, the employees would be included in this estimate in the number of people who receive employer sponsored insurance from a third party. Assuming this percentage applies to the 2017 coverage year, we estimate that 58.7 million women under 65 years of age received primary health coverage

from private sector insurance from a third party employer plan sponsor.

The Kaiser Family Foundation's Employer Health Benefits Annual Survey 2018 states that 16% of covered workers at all firms are enrolled in a plan grandfathered under the ACA (and thus not subject to the preventive services coverage requirements), but that only 14% of workers receiving coverage from state and local government employer plans are in grandfathered plans.[99] Using the data cited above in EBSA's bulletin concerning the number of persons covered in public and private sector employer sponsored insurance, this suggests 16.6% of persons covered by private sector employer sponsored plans are in grandfathered plans, and 83.4% in non-grandfathered plans.[100] Applying this percentage to the Census data, 49 million women under 65 years of age received primary health insurance coverage from private sector, third party employment-based, non-grandfathered plans. Census data indicates that among women under age 65, 46.7% are of childbearing age (aged 15 to 44).[101] Therefore, we estimate that 22.9 million women aged 15–44 received primary health insurance coverage from private sector, third party employment based, non-grandfathered insurance plans.

Prior to the implementation of the Affordable Care Act, approximately 6 percent of employer survey respondents did not offer contraceptive coverage, with 31 percent of respondents not knowing whether they offered such coverage.[102] The 6 percent may have included approximately 1.37 million of the women aged 15 to 44 primarily covered by employer-sponsored insurance plans in the private sector. And as noted above, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines. Therefore, the Departments estimate that 599,000

women of childbearing age that use contraceptives covered by the Guidelines were covered by plans that omitted contraceptive coverage prior to the Affordable Care Act.[103]

It is unknown what motivated those employers to omit contraceptive coverage—whether they did so for religious or other reasons. Despite the lack of information about their motives, the Departments attempt to make a reasonable estimate of the upper bound of the number of those employers that omitted contraception before the Affordable Care Act and that would make use of these expanded exemptions based on sincerely held religious beliefs.

To begin, the Departments estimate that publicly traded companies would not likely make use of these expanded exemptions. Even though the rule does not preclude publicly traded companies from dropping coverage based on a sincerely held religious belief, it is likely that attempts to object on religious grounds by publicly traded companies would be rare. The Departments take note of the Supreme Court's decision in *Hobby Lobby,* where the Court observed that ''HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and numerous practical restraints would likely prevent that from occurring. For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable.'' 134 S. Ct. at 2774. The Departments are aware of several federal health care conscience

---

[95] See U.S. Census Bureau Current Population Survey Table HI–01, ''Health Insurance Coverage in 2017: All Races,'' available at *https://www2.census.gov/programs-surveys/cps/tables/hi-01/2018/hi01_1.xls.*

[96] *Id.*

[97] Table 1A, page 5 (stating that in coverage year 2015, 177.5 million persons of all ages were covered by employer sponsored insurance, with 135.7 million of those being covered by private sector employers), available at *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[98] *Id.* at Table 1C, page 8 (168.7 million persons received health insurance coverage from employer sponsored insurance as their primary source, compared to 177.5 million persons covered by employer sponsored insurance overall).

[99] ''Employer Health Benefits: 2018 Annual Survey'' at 211, available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018.*

[100] Table 1A page 5 bulletin shows 168.7 million persons with primary coverage from employer sponsored insurance, with 131.6 million in the private sector and 37.1 million in the public sector. 16% of 168.7 million is 26.9 million. 14% of 37.1 million is 5.2 million. 26.9 million − 5.2 million is 21.8 million, which is 16.6% of the 131.6 million persons with primary coverage from private sector employer sponsored insurance.

[101] U.S. Census Bureau, Table S0101 ''Age and Sex'' (available at *https://data.census.gov/cedsci/results/tables?q=S0101:%20AGE%20AND%20SEX&ps=table*currentPage@1*).

[102] Kaiser Family Foundation & Health Research & Educational Trust, ''Employer Health Benefits, 2010 Annual Survey'' at 196, available at *https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf.*

[103] Some of the 31 percent of survey respondents that did not know about contraceptive coverage may not have offered such coverage. If it were possible to account for this non-coverage, the estimate of potentially affected covered women could increase. On the other hand, these employers' lack of knowledge about contraceptive coverage suggests that they lacked sincerely held religious beliefs specifically objecting to such coverage—beliefs without which they would not qualify for the expanded exemptions offered by these final rules. In that case, omission of such employers and covered women from this estimation approach would be appropriate. Correspondingly, the 6 percent of employers that had direct knowledge about the absence of coverage may be more likely to have omitted such coverage on the basis of religious beliefs than were the 31 percent of survey respondents who did not know whether the coverage was offered. Yet an entity's mere knowledge about its coverage status does not itself reflect its motive for omitting coverage. In responding to the survey, the entity may have simply examined its plan document to determine whether or not contraceptive coverage was offered. As will be relevant in a later portion of the analysis, we have no data indicating what portion of the entities that omitted contraceptive coverage pre-Affordable Care Act did so on the basis of sincerely held religious beliefs, as opposed to doing so for other reasons that would not qualify them for the expanded exemption offered in these final rules.

laws [104] that in some cases have existed for decades and that protect companies, including publicly traded companies, from discrimination if, for example, they decline to facilitate abortion, but the Departments are not aware of examples where publicly traded companies have made use of these exemptions. Thus, while the Departments consider it important to include publicly traded companies in the scope of these expanded exemptions for reasons similar to those reasons used by the Congress in RFRA and some health care conscience laws, in estimating the anticipated effects of the expanded exemptions, the Departments agree with the Supreme Court that it is improbable any will do so.

This assumption is significant because 31.3 percent of employees in the private sector work for publicly traded companies.[105] That means that only approximately 411,000 women aged 15 to 44 that use contraceptives covered by the Guidelines were covered by plans of non-publicly traded companies that did not provide contraceptive coverage pre-Affordable Care Act.

Moreover, because these final rules build on previous regulations that already exempted houses of worship and integrated auxiliaries and, as explained above, effectively eliminated obligations to provide contraceptive coverage within objecting self-insured church plans, the Departments attempt to estimate the number of such employers whose employees would not be affected by these rules. In attempting to estimate the number of such employers, the Departments consider the following information. Many Catholic dioceses have litigated or filed public comments opposing the Mandate, representing to the Departments and to courts around the country that official Catholic Church teaching opposes contraception. There are 17,651 Catholic parishes in the United States,[106] 197 Catholic dioceses,[107] 5,224 Catholic elementary schools, and 1,205 Catholic secondary schools.[108] Not all Catholic schools are integrated auxiliaries of Catholic churches, but there are other Catholic entities that are integrated auxiliaries that are not schools, so the Departments use the number of schools as an estimate of the number of integrated auxiliaries. Among self-insured church plans that oppose the Mandate, the Department has been sued by two—Guidestone and Christian Brothers. Guidestone is a plan organized by the Southern Baptist convention covering 38,000 employers, some of which are exempt as churches or integrated auxiliaries, and some of which are not.[109] Christian Brothers is a plan that covers Catholic organizations including Catholic churches and integrated auxiliaries, which are estimated above, but has also said in litigation that it covers about 500 additional entities that are not exempt as churches.[110] In total, therefore, without having certain data on the number of entities exempt under the previous rules, the Departments estimate that approximately 62,000 employers among houses of worship, integrated auxiliaries, and church plans, were exempt or relieved of contraceptive coverage obligations under the previous regulations. The Departments do not know how many persons are covered in the plans of those employers. Guidestone reports that among its 38,000 employers, its plan covers approximately 220,000 persons, and its employers include "churches, mission-sending agencies, hospitals, educational institutions and other related ministries." Using that ratio, the Departments estimate that the 62,000 church and church plan employers among Guidestone, Christian Brothers, and Catholic churches would include 359,000 persons. Among them, as referenced above, 72,500 women would be of childbearing age, and 32,100 may use contraceptives covered by the Guidelines.

Taking all of these factors into account, the Departments estimate that the private, non-publicly traded employers that did not cover contraception pre-Affordable Care Act, and that were not exempt by the previous regulations nor were participants in self-insured church plans that oppose contraceptive coverage, covered approximately 379,000 women aged 15 to 44 that use contraceptives covered by the Guidelines. But to estimate the likely actual transfer impact of these final rules, the Departments must estimate not just the number of such women covered by those entities, but how many of those entities would actually qualify for, and use, the expanded exemptions.

The Departments do not have data indicating how many of the entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held religious beliefs that might qualify them for exempt status under these final rules, as opposed to having done so for other reasons. Besides the entities that filed lawsuits or submitted public comments concerning previous regulations on this matter, the Departments are not aware of entities that omitted coverage of contraception pre-Affordable Care Act and then opposed the contraceptive coverage requirement after it was imposed by the Guidelines. For the following reasons, however, the Departments believe that a reasonable estimate is that no more than approximately one third of the persons covered by relevant entities—that is, no more than approximately 126,400 affected women—would likely be subject to potential transfer impacts under the expanded religious exemptions offered in these final rules. Consequently, as explained below, the Departments believe that the potential impact of these final rules falls substantially below the $100 million threshold for an economically significant major rule.

First, as mentioned, the Departments are not aware of information, or of data from public comments, that would lead us to estimate that all or most entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held conscientious objections in general or, specifically, religious beliefs, as opposed to having done so for other reasons. It would seem reasonable to assume that many of those entities did not do so based on sincerely held religious beliefs. According to a 2016 poll, only 4% of Americans believe that using contraceptives is morally wrong (including from a religious perspective).[111] In addition,

---

[104] For example, 42 U.S.C. 300a–7(b), 42 U.S.C. 238n, and Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d), Public Law 115–31.

[105] John Asker, et al., "Corporate Investment and Stock Market Listing: A Puzzle?" 28 *Review of Financial Studies* Issue 2, at 342–390 (Oct. 7, 2014), available at *https://doi.org/10.1093/rfs/hhu077*. This is true even though there are only about 4,300 publicly traded companies in the U.S. See Rayhanul Ibrahim, "The number of publicly-traded US companies is down 46% in the past two decades," *Yahoo! Finance* (Aug. 8, 2016), available at *https://finance.yahoo.com/news/jp-startup-public-companies-fewer-000000709.html*.

[106] Roman Catholic Diocese of Reno, "Diocese of Reno Directory: 2016–2017," available at *http://www.renodiocese.org/documents/2016/9/2016%202017%20directory.pdf*.

[107] Wikipedia, "List of Catholic dioceses in the United States," available at *https://en.wikipedia.org/wiki/List_of_Catholic_dioceses_in_the_United_States*.

[108] National Catholic Educational Association, "Catholic School Data," available at *http://www.ncea.org/NCEA/Proclaim/Catholic_School_Data/Catholic_School_Data.aspx*.

[109] Guidestone Financial Resources, "Who We Serve," available at *https://www.guidestone.org/AboutUs/WhoWeServe*.

[110] The Departments take no view on the status of particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.

[111] Pew Research Center, "Where the Public Stands on Religious Liberty vs. Nondiscrimination"

Case: 25-2575    Document: 34-2    Page: 157    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB    Document 6991    Filed 12/14/18    Page 47 of 86

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57581**

various reasons exist for some employers not to return to a pre-ACA situation in which they did not provide contraceptive coverage, such as avoiding negative publicity, the difficulty of taking away a fringe benefit that employees have become accustomed to having, and avoiding the administrative cost of renegotiating insurance contracts. Additionally, as discussed above, many employers with objections to contraception, including several of the largest litigants, only object to some contraceptives and cover as many as 14 of 18 of the contraceptive methods included in the Guidelines. This will reduce, and potentially eliminate, the contraceptive cost transfer for women covered in their plans.[112] Moreover, as suggested by the Guidestone data mentioned previously, employers with conscientious objections may tend to have relatively few employees and, among nonprofit entities that object to the Mandate, it is possible that a greater share of their employees oppose contraception than among the general population, which should lead to a reduction in the estimate of how many women in those plans actually use contraception.

It may not be the case that all entities that objected on religious grounds to contraceptive coverage before the ACA brought suit against the Mandate. However, it is worth noting that, while less than 100 for-profit entities challenged the Mandate in court (and an unknown number joined two newly formed associational organizations bringing suit on their behalf), there are more than 3 million for-profit private sector establishments in the United States that offer health insurance.[113] Six

percent of those would be 185,000, and one third of that number would be 62,000. The Departments consider it unlikely that tens or hundreds of thousands of for-profit private sector establishments omitted contraceptive coverage pre-ACA specifically because of sincerely held religious beliefs, when, after six years of litigation and multiple public comment periods, the Departments are aware of less than 100 such entities. The Departments do not know how many additional nonprofit entities would use the expanded exemptions, but as noted above, under the rules predating the Religious IFC, tens of thousands were already exempt as churches or integrated auxiliaries, or were covered by self-insured church plans that are not penalized if no contraceptive coverage is offered.

Finally, among entities that omitted contraceptive coverage based on sincerely held conscientious objections as opposed to other reasons, it is likely that some, albeit a minority, did so based on moral objections that are non-religious, and therefore would not be compassed by the expanded exemptions in these final rules.[114] Among the general public, polls vary about religious beliefs, but one prominent poll shows that 13 percent of Americans say they do not believe in God or have no opinion on the question.[115] Therefore, the Departments estimate that, of the entities that omitted contraception pre-Affordable Care Act based on sincerely held conscientious objections as opposed to other reasons, a small fraction did so based on sincerely held non-religious moral convictions, and therefore would not be affected by the expanded exemption provided by these final rules for religious beliefs.

For the reasons stated above, the Departments believe it would be incorrect to assume that all or even most of the plans that did not cover contraceptives before the ACA did so on the basis of religious objections. Instead, without data available on the reasons those plans omitted contraceptive coverage before the ACA, we assume that no more than one third of those plans omitted contraceptive coverage based on sincerely held religious beliefs. Thus, of the estimated 379,000 women aged 15 to 44 that use contraceptives

covered by the Guidelines, who received primary coverage from plans of private, non-publicly traded, third party employers that did not cover contraception pre-Affordable Care Act, and whose plans were neither exempt nor omitted from mandatory contraceptive coverage under the previous regulations, we estimate that no more than 126,400 women would be in plans that will use these expanded exemptions.

viii. Final Estimates of Persons Affected by Expanded Exemptions

Based on the estimate of an average annual expenditure on contraceptive products and services of $584 per user, the effect of the expanded exemptions on 126,400 women would give rise to approximately $73.8 million in potential transfer impact. It is possible, however, that premiums would adjust to reflect changes in coverage, thus partially offsetting the transfer experienced by women who use the affected contraceptives. As referenced elsewhere in this analysis, such women may make up approximately 8.8 percent of the covered population,[116] in which case the offset would also be approximately 8.8 percent, yielding a potential transfer of $67.3 million.

Thus, in their most expansive estimate, the Departments conclude that no more than approximately 126,400 women would likely be subject to potential transfer impacts under the expanded religious exemptions offered in these final rules. The Departments estimate this financial transfer to be approximately $67.3 million. This falls substantially below the $100 million threshold for an economically significant and major rule.

As noted above, the Departments view this alternative estimate as being the highest possible bound of the transfer effects of these rules, but believe the number of establishments that will actually exempt their plans as the result of these rules will be far fewer than contemplated by this estimate. The Departments make these estimates only for the purposes of determining whether the rules are economically significant under Executive Orders 12866 and 13563.

After reviewing public comments, both those supporting and those disagreeing with these estimates and similar estimates from the Religious IFC, and because the Departments do not have sufficient data to precisely

---

at page 26 (Sept. 28, 2016), available at *http://assets.pewresearch.org/wp-content/uploads/sites/11/2016/09/Religious-Liberty-full-for-web.pdf*.

[112] On the other hand, a key input in the approach that generated the one third threshold estimate was a survey indicating that six percent of employers did not provide contraceptive coverage pre-Affordable Care Act. Employers that covered some contraceptives pre-Affordable Care Act may have answered ''yes'' or ''don't know'' to the survey. In such cases, the potential transfer estimate has a tendency toward underestimation because the rule's effects on such women—causing their contraceptive coverage to be reduced from all 18 methods to some smaller subset—have been omitted from the calculation.

[113] Tables I.A.1 and I.A.2, Medical Expenditure Panel Survey, ''Private-Sector Data by Firm Size, Industry Group, Ownership, Age of Firm, and Other Characteristics: 2017,'' HHS Agency for Healthcare Research and Quality (indicating total number of for-profit incorporated, for-profit unincorporated, and non-profit establishments in the United States, and the percentage of each that offer health insurance), available at *https://meps.ahrq.gov/data_stats/summ_tables/insr/national/series_1/2017/tia1.htm* and *https://meps.ahrq.gov/data_stats/summ_tables/insr/national/series_1/2017/tia2.htm.* 2523.

[114] Such objections may be encompassed by companion final rules published elsewhere in today's **Federal Register**. Those final rules, however, are narrower in scope than these final rules. For example, in providing expanded exemptions for plan sponsors, they do not encompass companies with certain publicly traded ownership interests.

[115] Gallup, ''Religion,'' available at *https://news.gallup.com/poll/1690/religion.aspx.*

[116] As cited above, women of childbearing age are 20.2 percent of woman aged 15–65, and 43.6 percent of women of childbearing age use contraceptives covered by the Guidelines.

Case: 25-2575 Document: 34-2 Page: 158 Date Filed: 12/18/2025
Case: 2:17-cv-04540-WB Document 89-1 Filed 12/14/18 Page 48 of 56

57582 **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

estimate the amount by which these factors render our estimate too high, or too low, the Departments simply conclude that the financial transfer falls substantially below the $100 million threshold for an economically significant rule based on the calculations set forth above.

### B. Special Analyses—Department of the Treasury

These regulations are not subject to review under section 6(b) of Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Department of the Treasury and the Office of Management and Budget regarding review of tax regulations.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) (RFA) imposes certain requirements with respect to federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 *et seq.*) and that are likely to have a significant economic impact on a substantial number of small entities. The Religious IFC was an interim final rule with comment period, and in these final rules, the Departments adopt the Religious IFC as final with certain changes. These final rules are, thus, being issued after a notice and comment period.

The Departments also carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866 and do not expect that these final

rules will have a significant economic effect on a substantial number of small entities. These final rules will not result in any additional costs to affected entities, and, in many cases, may relieve burdens and costs from such entities. By exempting from the Mandate small businesses and nonprofit organizations with religious objections to some (or all) contraceptives and/or sterilization— businesses and organizations that would otherwise be faced with the dilemma of complying with the Mandate (and violating their religious beliefs) or following their beliefs (and incurring potentially significant financial penalties for noncompliance)—the Departments have reduced regulatory burden on such small entities. Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

### D. Paperwork Reduction Act— Department of Health and Human Services

Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), we are required to provide 30-day notice in the **Federal Register** and solicit public comment before a collection of information is submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 (PRA) requires

that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

Recommendations to minimize the information collection burden on the affected public, including automated collection techniques. In the October 13, 2017 (82 FR 47792) interim final rules, we solicited public comment on each of these issues for the following sections of the rule containing information collection requirements (ICRs). A description of the information collection provisions implicated in these final rules is given in the following section with an estimate of the annual burden. The burden related to these ICRs received emergency review and approval under OMB control number 0938–1344. They have been resubmitted to OMB in conjunction with these final rules and are pending re-approval. The Departments sought public comments on PRA estimates set forth in the Religious IFC, and are not aware of significant comments submitted that suggest there is a better way to estimate these burdens.

#### 1. Wage Data

Average labor costs (including 100 percent fringe benefits and overhead) used to estimate the costs are calculated using data available derived from the Bureau of Labor Statistics.[117]

#### TABLE 1—NATIONAL OCCUPATIONAL EMPLOYMENT AND WAGE ESTIMATES

| BLS occupation title | Occupational code | Mean hourly wage ($/hr) | Fringe benefits and overhead ($/hr) | Adjusted hourly wage ($/hr) |
|---|---|---|---|---|
| Executive Secretaries and Executive Administrative Assistants | 43–6011 | $27.84 | $27.84 | $55.68 |
| Compensation and Benefits Manager | 11–3111 | 61.01 | 61.01 | 122.02 |
| Legal Counsel | 23–1011 | 67.25 | 67.25 | 134.50 |
| Senior Executive | 11–1011 | 93.44 | 93.44 | 186.88 |
| General and Operations Managers | 11–1021 | 58.70 | 58.70 | 117.40 |

#### 2. ICRs Regarding Self-Certification or Notices to HHS (§ 147.131(c)(3))

Each organization seeking to be treated as an eligible organization that wishes to use the optional accommodation process offered under these final rules must either use the EBSA Form 700 method of self-certification or provide notice to HHS of its religious objection to coverage of all

or a subset of contraceptive services. Specifically, these final rules continue to allow eligible organizations to notify an issuer or third party administrator using EBSA Form 700, or to notify HHS, of their religious objection to coverage of all or a subset of contraceptive services, as set forth in the July 2015 final regulations (80 FR 41318).

Notably, however, entities that are participating in the previous accommodation process, where a self-certification or notice has already been submitted, and where the entities choose to continue their accommodated status under these final rules, generally do not need to file a new self-certification or notice (unless they change their issuer or third party

---

[117] May 2016 National Occupational Employment and Wage Estimates United States found at *https://www.bls.gov/oes/current/oes_nat.htm*.

Case: 25-2575    Document: 34-2    Page: 159    Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB    Document 691-1    Filed 12/14/18    Page 49 of 66

**Federal Register**/Vol. 83, No. 221/Thursday, November 15, 2018/Rules and Regulations    **57583**

administrator). As explained above, HHS assumes that, among the 209 entities the Departments estimated are using the previous accommodation, 109 will use the expanded exemption and 100 will continue under the voluntary accommodation. Those 100 entities will not need to file additional self-certifications or notices. HHS also assumes that an additional 9 entities that were not using the previous accommodation will opt into it. Those entities will be subject to the self-certification or notice requirement.

In order to estimate the cost for an entity that chooses to opt into the accommodation process, HHS assumes that clerical staff for each eligible organization will gather and enter the necessary information and send the self-certification to the issuer or third party administrator as appropriate, or send the notice to HHS.[118] HHS assumes that a compensation and benefits manager and inside legal counsel will review the self-certification or notice to HHS and a senior executive would execute it. HHS estimates that an eligible organization would spend approximately 50 minutes (30 minutes of clerical labor at a cost of $55.68 per hour, 10 minutes for a compensation and benefits manager at a cost of $122.02 per hour, 5 minutes for legal counsel at a cost of $134.50 per hour, and 5 minutes by a senior executive at a cost of $186.88 per hour) preparing and sending the self-certification or notice to HHS and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the information in the self-certification or notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost of approximately $74.96 for a total hour burden of approximately 7.5 hours and an associated equivalent cost of approximately $675 for 9 entities. As DOL and HHS share jurisdiction, they are splitting the hour burden so that each will account for approximately 3.75 burden hours with an equivalent cost of approximately $337.

HHS estimates that each self-certification or notice to HHS will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each self-certification or notice sent via mail will be $0.55. For purposes of this analysis, HHS assumes that 50 percent of self-certifications or notices to HHS will be mailed. The total cost for

sending the self-certifications or notices to HHS by mail is approximately $2.75 for 5 entities. As DOL and HHS share jurisdiction they are splitting the cost burden so that each will account for $1.38 of the cost burden.

3. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(e))

As required by the July 2015 final regulations (80 FR 41318), a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries in insured or self-insured group health plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from, but contemporaneous with (to the extent possible), any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers and third party administrators may, but are not required to, use the model language previously provided by HHS or substantially similar language.

As mentioned, HHS is anticipating that approximately 109 entities will use the optional accommodation (100 that used it previously, and 9 that will newly opt into it). It is unknown how many issuers or third party administrators provide health insurance coverage or services in connection with health plans of eligible organizations, but HHS will assume at least 109. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $55.68 per hour) and 15 minutes of management review (at $117.40 per hour) to prepare the notices. The total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an associated cost of approximately $85.03. The total burden for all 109 issuers or third party administrators will be 136 hours, with an associated cost of approximately $9,268. As DOL and HHS share jurisdiction, they are splitting the burden each will account for 68 burden hours with an associated cost of $4,634, with approximately 55 respondents.

The Departments estimate that approximately 2,180,000 plan participants and beneficiaries will be

covered in the plans of the 100 entities that previously used the accommodation and will continue doing so, and that an additional 9 entities will newly opt into the accommodation. We reach this estimate using calculations set forth above, in which we used 2017 data available to HHS for contraceptive user fees adjustments to estimate that approximately 2,907,000 plan participants and beneficiaries were covered by plans using the accommodation. We further estimated that the 100 entities that previously used the accommodation and will continue doing so will cover approximately 75 percent of the persons in all accommodated plans, based on HHS data concerning accommodated self-insured plans that indicates plans sponsored by religious hospitals and health systems encompass more than 80 percent of the persons covered in such plans. In other words, plans sponsored by such entities have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons. As noted above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans. The Departments do not have specific data on which plans of which employer sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status. The Departments assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which we lack representative data.

Based on these assumptions and without better data available, the Departments estimate that previously accommodated entities encompassed approximately 2,907,000 persons; the estimated 100 entities that previously used the accommodation and continue to use it will account for 75 percent of those persons (that is, approximately 2,180,000 persons); and the estimated 109 entities that previously used the accommodation and will now use their exempt status will account for 25 percent of those persons (that is, approximately 727,000 persons). It is not known how many persons will be covered in the plans of the 9 entities we estimate will newly use the accommodation. Assuming that those 9 entities will have a similar number of covered persons per entity as the 100 entities encompassing 2,180,000

---

[118] For purposes of this analysis, the Department assumes that the same amount of time will be required to prepare the self-certification and the notice to HHS.

persons, the Departments estimate that all 109 accommodated entities will encompass approximately 2,376,000 covered persons.

The Departments assume that sending one notice to each policyholder will satisfy the need to send the notices to all participants and dependents. Among persons covered by insurance plans sponsored by large employers in the private sector, approximately 50.1 percent are participants and 49.9 percent are dependents.[119] For 109 entities, the total number of notices will be 1,190,613. For purposes of this analysis, the Departments also assume that 53.7 percent of notices will be sent electronically, and 46.3 percent will be mailed.[120] Therefore, approximately 551,254 notices will be mailed. HHS estimates that each notice will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.55. The total cost for sending approximately 551,254 notices by mail will be approximately $303,190. As DOL and HHS share jurisdiction, they are splitting the cost burden so each will account for $151,595 of the cost burden.

4. ICRs Regarding Notice of Revocation of Accommodation (§ 147.131(c)(4))

An eligible organization that now wishes to take advantage of the expanded exemption may revoke its use of the accommodation process; its issuer or third party administrator must provide written notice of such revocation to participants and beneficiaries as soon as practicable. As discussed above, HHS estimates that 109 entities that are using the accommodation process will revoke their use of the accommodation, and will therefore be required to send the notification; the issuer or third party administrator can send the notice on behalf of the entity. For the purpose of calculating the ICRs associated with revocations of the accommodation, and for various reasons discussed above, HHS assumes that litigating entities that were previously using the accommodation and that will revoke their use of the accommodation fall within the estimated 109 entities that will revoke the accommodation overall.

As before, HHS assumes that, for each issuer or third party administrator, a manager and inside legal counsel and clerical staff will need approximately 2 hours to prepare and send the notification to participants and beneficiaries and maintain records (30 minutes for a manager at a cost of $117.40 per hour, 30 minutes for legal counsel at a cost of $134.50 per hour, 1 hour for clerical staff at a cost of $55.68 per hour). The burden per respondent will be 2 hours with an associated cost of approximately $182; for 109 entities, the total hour burden will be 218 hours with an associated cost of approximately $19,798. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 109 burden hours with an associated cost of approximately $9,899.

As discussed above, HHS estimates that there are approximately 727,000 covered persons in accommodated plans that will revoke their accommodated status and use the expanded exemption.[121] As before, the Departments use the average of 50.1 percent of covered persons who are policyholders, and estimate that an average of 53.7 percent of notices will be sent electronically and 46.3 percent by mail. Therefore, approximately 364,102 notices will be distributed, of which 168,579 notices will be mailed. HHS estimates that each mailed notice will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.55. The total cost for sending approximately 168,579 notices by mail is approximately $93,545. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 182,051 notices, with an associated cost of approximately $46,772.

TABLE 1—SUMMARY OF INFORMATION COLLECTION BURDENS

| Regulation section | OMB Control No. | Number of respondents | Responses | Burden per respondent (hours) | Total annual burden (hours) | Hourly labor cost of reporting ($) | Total labor cost of reporting ($) | Total cost ($) |
|---|---|---|---|---|---|---|---|---|
| Self-Certification or Notices to HHS ......... | 0938–1344 | *5 | 5 | 0.83 | 3.75 | $89.95 | $337 | $339 |
| Notice of Availability of Separate Payments for Contraceptive Services ......... | 0938–1344 | *55 | 595,307 | 1.25 | 68.13 | 68.02 | 4,634 | 156,229 |
| Notice of Revocation of Accommodation .. | 0938–1344 | *55 | 182,051 | 2.00 | 109 | 90.82 | 9,899 | 56,671 |
| Total ............ | .................... | *115 | 777,363 | .................... | 180.88 | .................... | 14,870 | 213,239 |

*The total number of respondents is 227 (= 9+109+109) for both HHS and DOL, but the summaries here and below exceed that total because of rounding up that occurs when sharing the burden between HHS and DOL.

**Note:** There are no capital/maintenance costs associated with the ICRs contained in this rule; therefore, we have removed the associated column from Table 1. Postage and material costs are included in Total Cost.

---

[119] "Health Insurance Coverage Bulletin" Table 4, page 21. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[120] According to data from the National Telecommunications and Information Agency (NTIA), 36.0 percent of individuals age 25 and over have access to the internet at work. According to a Greenwald & Associates survey, 84 percent of plan participants find it acceptable to make electronic delivery the default option, which is used as the proxy for the number of participants who will not opt out that are automatically enrolled (for a total of 30.2 percent receiving electronic disclosure at work). Additionally, the NTIA reports that 38.5 percent of individuals age 25 and over have access to the internet outside of work. According to a Pew Research Center survey, 61 percent of internet users use online banking, which is used as the proxy for the number of internet users who will opt in for electronic disclosure (for a total of 23.5 percent receiving electronic disclosure outside of work). Combining the 30.2 percent who receive electronic disclosure at work with the 23.5 percent who receive electronic disclosure outside of work produces a total of 53.7 percent who will receive electronic disclosure overall.

[121] In estimating the number of women that might have their contraceptive coverage affected by the expanded exemption, the Departments indicated that we do not know the extent to which the number of women in accommodated plans affected by these final rules overlap with the number of women in plans offered by litigating entities that will be affected by these final rules, though we assume there is significant overlap. That uncertainty should not affect the calculation of the ICRs for revocation notices, however. If the two numbers overlap, the estimates of plans revoking the accommodation and policyholders covered in those plans would already include plans and policyholders of litigating entities. If the numbers do not overlap, those litigating entity plans would not presently be enrolled in the accommodation, and therefore would not need to send notices concerning revocation of accommodated status.

5. Submission of PRA-Related Comments

We have submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

*E. Paperwork Reduction Act— Department of Labor*

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210–0150 and 1210–0152. A copy of the ICR may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW, Room N–5718, Washington, DC 20210. Telephone: 202–693–8410; Fax: 202–219–4745. These are not toll-free numbers.

The Religious final rules amended the ICR by changing the accommodation process to an optional process for exempt organizations and requiring a notice of revocation to be sent by the issuer or third party administrator to participants and beneficiaries in plans whose employer revokes their accommodation; these final rules confirm as final the Religious IFC provisions on the accommodation process. DOL submitted the ICRs to OMB in order to obtain OMB approval under the PRA for the regulatory revision. In an effort to consolidate the number of information collection requests, DOL is combining the ICR related to the OMB control number 1210–0152 with the ICR related to the OMB control number 1210–0150 and discontinuing OMB control number 1210–0152. Consistent with the analysis in the HHS PRA section above, the Departments expect that each of the estimated 9 eligible organizations newly opting into the accommodation will spend approximately 50 minutes in preparation time and incur $0.54 mailing cost to self-certify or notify HHS. Each of the 109 issuers or third party administrators for the 109 eligible organizations that make use of the accommodation overall will distribute Notices of Availability of Separate Payments for Contraceptive Services.

These issuers and third party administrators will spend approximately 1.25 hours in preparation time and incur $0.54 cost per mailed notice. Notices of Availability of Separate Payments for Contraceptive Services will need to be sent to 1,190,613 policyholders, and 53.7 percent of the notices will be sent electronically, while 46.3 percent will be mailed. Finally, 109 entities using the previous accommodation process will revoke their use of the accommodation (in favor of the expanded exemption) and will therefore be required to cause the Notice of Revocation of Accommodation to be sent, with the issuer or third party administrator able to send the notice on behalf of the entity. These entities will spend approximately two hours in preparation time and incur $0.54 cost per mailed notice. Notice of Revocation of Accommodation will need to be sent to an average of 364,102 policyholders and 53.7 percent of the notices will be sent electronically. The DOL information collections in this rule are found in 29 CFR 2510.3–16 and 2590.715–2713A and are summarized as follows:

*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.
*Title:* Coverage of Certain Preventive Services under the Affordable Care Act—Private Sector.
*OMB Numbers:* 1210–0150.
*Affected Public:* Private Sector—Not for profit and religious organizations; businesses or other for-profits.
*Total Respondents:* 114 [122] (combined with HHS total is 227).
*Total Responses:* 777,362 (combined with HHS total is 1,554,724).
*Frequency of Response:* On occasion.
*Estimated Total Annual Burden Hours:* 181 (combined with HHS total is 362 hours).
*Estimated Total Annual Burden Cost:* $197,955 (combined with HHS total is $395,911).
*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.

*F. Regulatory Reform Executive Orders 13765, 13771 and 13777*

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of the Department of Health and Human Services and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the Act shall

exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any state or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the states more flexibility and control to create a freer and open healthcare market." These final rules exercise the discretion provided to the Departments under the Affordable Care Act, RFRA, and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), the Departments have estimated the costs and cost savings attributable to these final rules. As discussed in more detail in the preceding analysis, these final rules lessen incremental reporting costs.[123] However, in order to avoid double-counting with the Religious IFC, which has already been tallied as an Executive Order 13771 deregulatory action, this finalization of the IFC's policy is not considered a deregulatory action under the Executive Order.

---

[122] Denotes that there is an overlap between jurisdiction shared by HHS and DOL over these respondents and therefore they are included only once in the total.

[123] Other noteworthy potential impacts encompass potential changes in medical expenditures, including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on E.O. 13771 implementation (Dominic J. Mancini, "Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs," Office of Mgmt. & Budget (Apr. 5, 2017), *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-21-OMB.pdf)* states that impacts should be categorized as consistently as possible within Departments. The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures are reduced, negative benefits if expenditures are raised). Following the FDA, OSHA and MSHA accounting convention leads to this final rule's medical expenditure impacts being categorized as (positive or negative) benefits, rather than as costs, thus placing them outside of consideration for E.O. 13771 designation purposes.

### G. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (section 202(a) of Pub. L. 104–4), requires the Departments to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing ''any rule that includes any federal mandate that may result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year.'' In 2018, that threshold after adjustment for inflation is $150 million. For purposes of the Unfunded Mandates Reform Act, the Religious IFC and these final rules do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $150 million, adjusted for inflation, or more on the private sector.

### H. Federalism

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have ''substantial direct effects'' on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

These final rules do not have any federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

### V. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code, and Public Law 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4).

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–

200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Pub. L. 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4); Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701); and Public Law 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4).

### List of Subjects

#### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

#### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

#### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

**Kirsten Wielobob,**

*Deputy Commissioner for Services and Enforcement.*

Approved: October 30, 2018.

**David J. Kautter,**

*Assistant Secretary for Tax Policy.*

Signed this 29th day of October 2018.

**Preston Rutledge,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: October 17, 2018.

**Seema Verma,**

*Administrator, Centers for Medicare & Medicaid Services.*

Dated: October 18, 2018.

**Alex M. Azar II,**

*Secretary, Department of Health and Human Services.*

### DEPARTMENT OF THE TREASURY

### Internal Revenue Service

Accordingly, 26 CFR part 54 is amended as follows:

### PART 54—PENSION EXCISE TAXES

■ 1. The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805. * * *

■ 2. Section 54.9815–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

#### § 54.9815–2713   Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

* * * * *

(iv) With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to 45 CFR 147.131 and 147.132.

* * * * *

■ 3. Section 54.9815–2713A is revised to read as follows:

#### § 54.9815–2713A   Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations for optional accommodation.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (4) of this section.

(1) The organization is an objecting entity described in 45 CFR 147.132(a)(1)(i) or (ii);

(2) Notwithstanding its status under paragraph (a)(1) of this section and under 45 CFR 147.132(a), the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (b) or (c) of this section as applicable; and

(3) [Reserved]

(4) The organization self-certifies in the form and manner specified by the

Secretary of Labor or provides notice to the Secretary of the Department of Health and Human Services as described in paragraph (b) or (c) of this section. To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on the date on which these final rules go into effect, by an issuer or third party administrator through the accommodation process, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and § 54.9815–2715(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(b) *Optional accommodation—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis may voluntarily elect an optional accommodation under which its third party administrator(s) will provide or arrange payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more third party administrators.

(ii) The eligible organization must provide either a copy of the self-certification to each third party administrator or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable), but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's third party administrators. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Labor (working with the Department of Health and Human Services) will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of the Department of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and is willing to enter into or remain in a contractual relationship with the eligible organization or its plan to provide

administrative services for the plan, then the third party administrator will provide or arrange payments for contraceptive services, using one of the following methods—

(i) Provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the federally facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(5) Where an otherwise eligible organization does not contract with a third party administrator and files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The plan administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, arrange for payments for contraceptive services from an issuer or other entity in accordance with paragraph (b)(2)(ii) of this section, and such issuer or other entity may receive reimbursements in accordance with paragraph (b)(3) of this section.

(6) Where an otherwise eligible organization is an ERISA-exempt church plan within the meaning of section 3(33) of ERISA and it files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not

apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The third party administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, provide or arrange payments for contraceptive services in accordance with paragraphs (b)(2)(i) or (ii) of this section, and receive reimbursements in accordance with paragraph (b)(3) of this section.

(c) *Optional accommodation— insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process—

(i) The eligible organization or its plan must contract with one or more health insurance issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815–2713.

(B) When a notice is provided to the Secretary of the Department Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's health insurance issuers. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of

Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of the Department Health and Human Services has received a notice under paragraph (c)(2)(ii) of this section and describing the obligations of the issuer under this section.

(2) If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (c)(2)(ii) of this section and does not have its own objection as described in 45 CFR 147.132 to providing the contraceptive services to which the eligible organization objects, then the issuer will provide payments for contraceptive services as follows—

(i) The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815 of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(3) A health insurance issuer may not require any documentation other than a copy of the self-certification from the

eligible organization or the notification from the Department of Health and Human Services described in paragraph (c)(1)(ii) of this section.

(d) *Notice of availability of separate payments for contraceptive services— self-insured and insured group health plans.* For each plan year to which the optional accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides or arranges separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be

incorrect, the issuer is considered to comply with any applicable requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

(f) *Definition.* For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 54.9815–2713(a)(1)(iv).

(g) *Severability.* Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

### § 54.9815–2713T [Removed]

■ 4. Section 54.9815–2713T is removed.

### § 54.9815–2713AT [Removed]

■ 5. Section 54.9815–2713AT is removed.

## DEPARTMENT OF LABOR

### Employee Benefits Security Administration

For the reasons set forth in the preamble, the Department of Labor adopts as final the interim final rules amending 29 CFR part 2590 published on October 13, 2017 (82 FR 47792) with the following changes:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 6. The authority citation for part 2590 continues to read, as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L.

110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Division M, Pub. L. 113–235, 128 Stat. 2130; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

■ 7. Section 2590.715–2713A is amended by:
■ a. Revising paragraph (a)(5);
■ b. Redesignating paragraphs (e) and (f) as paragraphs (f) and (g); and
■ c. Adding new paragraph (e).
The revision and addition read as follows:

### § 2590.715–2713A   Accommodations in connection with coverage of preventive health services.

(a) * * *

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on the date on which these final rules go into effect, by an issuer or third party administrator through the accommodation process, an eligible organization may give 60-days notice pursuant to PHS Act section 2715(d)(4) and § 2590.715–2715(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

* * * * *

(e) *Reliance*—*insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

* * * * *

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons set forth in the preamble, the Department of Health and Human Services adopts as final the interim final rules amending 45 CFR part 147 published on October 13, 2017 (82 FR 47792) with the following changes:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 8. The authority citation for part 147 is revised to read as follows:

**Authority:** 42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92, as amended.

■ 9. Section 147.131 is amended by:
■ a. Revising paragraph (c)(4);
■ b. Redesignating paragraphs (f) and (g) as (g) and (h); and
■ c. Adding new paragraph (f).
The revision and addition read as follows:

### § 147.131   Accommodations in connection with coverage of certain preventive health services.

* * * * *

(c) * * *

(4) An eligible organization may revoke its use of the accommodation process, and its issuer must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on January 14, 2019, by an issuer through the accommodation process, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and § 147.200(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after January 14, 2019, if

contraceptive coverage is being offered by an issuer through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

\*    \*    \*    \*    \*

(f) *Reliance*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (d) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (d) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

\*    \*    \*    \*    \*

■ 10. Section 147.132 is amended by:
■ a. Revising paragraph (a)(1) introductory text;
■ b. Redesignating paragraphs (a)(1)(ii) and (iii) as paragraphs (iii) and (iv);
■ c. Adding new paragraph (a)(1)(ii);
■ d. Revising newly designated paragraph (a)(1)(iii);
■ e. Revising newly designated paragraph (a)(1)(iv); and
■ f. Revising paragraphs (a)(2) and (b).
The revisions and addition read as follows:

**§ 147.132  Religious exemptions in connection with coverage of certain preventive health services.**

(a) \* \* \*

(1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or

maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections specified below. Thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

\*    \*    \*    \*    \*

(ii) A group health plan, and health insurance coverage provided in connection with a group health plan, where the plan or coverage is established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other non-governmental organization or association, to the extent the plan sponsor responsible for establishing and/or maintaining the plan objects as specified in paragraph (a)(2) of this section. The exemption in this paragraph applies to each employer, organization, or plan sponsor that adopts the plan;

(iii) An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

(iv) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under this subparagraph (iv), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide

coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement.

(2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable):

(i) Coverage or payments for some or all contraceptive services; or

(ii) A plan, issuer, or third party administrator that provides or arranges such coverage or payments.

(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs. Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

\*    \*    \*    \*    \*

[FR Doc. 2018–24512 Filed 11–7–18; 4:15 pm]

**BILLING CODE 4830–01–P; 4510–29–P; 4120–01–P**

# EXHIBIT B

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

[TD–9841]

RIN 1545–BN91

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

RIN 1210–AB84

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Part 147**

[CMS–9925–F]

RIN 0938–AT46

**Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** These rules finalize, with changes based on public comments, the interim final rules issued in the **Federal Register** on October 13, 2017 concerning moral exemptions and accommodations regarding coverage of certain preventive services. These rules finalize expanded exemptions to protect moral beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act. These rules do not alter the discretion of the Health Resources and Services Administration, a component of the U.S. Department of Health and Human Services, to maintain the guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also leave in place an optional ''accommodation'' process for certain exempt entities that wish to use it voluntarily. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.

**DATES:** *Effective date:* These regulations are effective on January 14, 2019.

**FOR FURTHER INFORMATION CONTACT:**
Jeff Wu at (301) 492–4305 or *marketreform@cms.hhs.gov* for the Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS).
Amber Rivers or Matthew Litton at (202) 693–8335 for Employee Benefits Security Administration (EBSA), Department of Labor (DOL).
William Fischer at (202) 317–5500 for Internal Revenue Service, Department of the Treasury.
*Customer Service Information:*
Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit DOL's website (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's website (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary and Background
  A. Executive Summary
  1. Purpose
  2. Summary of the Major Provisions
  3. Summary of Costs, Savings and Benefits of the Major Provisions
  B. Background
II. Overview of the Final Rules and Public Comments
  A. Moral Exemptions and Accommodation in General
  1. The Departments' Authority to Mandate Coverage or Provide Exemptions
  2. Congress's History of Protecting Moral Convictions
  a. The Church Amendments' Protection of Moral Convictions
  b. Court Precedents Relevant to These Expanded Exemptions
  c. Conscience Protections in Other Federal and State Contexts
  d. Founding Principles
  e. Executive Orders Relevant to These Expanded Exemptions
  f. Litigation Concerning the Mandate
  3. Whether Moral Exemptions Should Exist, and Whom They Should Cover
  4. The Departments' Rebalancing of Government Interests
  5. Burdens on Third Parties
  6. Interim Final Rulemaking
  7. Health Effects of Contraception and Pregnancy
  8. Health and Equality Effects of Contraceptive Coverage Mandates
  9. Other General Comments
  B. Text of the Final Rules
  1. Restatement of Statutory Requirements of Section 2713(a) and (a)(4) of the PHS Act (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv)).
  2. Exemption for Objecting Entities Based on Moral Convictions (45 CFR 147.133(a))
  3. Exemption for Certain Plan Sponsors (45 CFR 147.133(a)(1)(i))
  a. Plan sponsors in general (45 CFR 147.133(a)(1)(i) prefatory text)
  b. Nonprofit organizations (45 CFR 147.133(a)(1)(i)(A))
  c. For-Profit Entities (45 CFR 147.133(a)(1)(i)(B))
  4. Institutions of Higher Education (45 CFR 147.133(a)(1)(ii))
  5. Health Insurance Issuers (45 CFR 147.133(a)(1)(iii))
  6. Description of the Moral Objection (45 CFR 147.133(a)(2))
  7. Individuals (45 CFR 147.133(b))
  8. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)
  9. Definition of Contraceptives for the Purpose of These Final Rules
  10. Severability
  C. Other Public Comments
  1. Items Approved as Contraceptives But Used to Treat Existing Conditions
  2. Comments Concerning Regulatory Impact
III. Economic Impact and Paperwork Burden
  A. Executive Orders 12866 and 13563—Department of HHS and Department of Labor
  1. Need for Regulatory Action
  2. Anticipated Effects
  B. Special Analyses—Department of the Treasury
  C. Regulatory Flexibility Act
  D. Paperwork Reduction Act—Department of Health and Human Services
  E. Paperwork Reduction Act—Department of Labor
  F. Regulatory Reform Executive Orders 13765, 13771 and 13777
  G. Unfunded Mandates Reform Act
  H. Federalism
IV. Statutory Authority

## I. Executive Summary and Background

### A. Executive Summary

1. Purpose

The primary purpose of these final rules is to finalize, with changes in response to public comments, the interim final regulations with requests for comments (IFCs) published in the **Federal Register** on October 13, 2017 (82 FR 47838), ''Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act'' (the Moral IFC). The rules are necessary to protect sincerely held moral objections of certain entities and individuals. The rules, thus, minimize the burdens imposed on their moral beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing, which was created by HHS through guidance promulgated by the Health Resources and Services

Administration (HRSA), pursuant to authority granted by the ACA in section 2713(a)(4) of the Public Health Service Act. In addition, the rules finalize references to these moral exemptions in the previously created accommodation process that permit entities with certain objections voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their issuers or third party administrators. The rules do not remove the contraceptive coverage requirement generally from HRSA's guidelines. The changes to the rules being finalized will ensure clarity in implementation of the moral exemptions so that proper respect is afforded to sincerely held moral convictions in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage.

2. Summary of the Major Provisions

a. Moral Exemptions

These rules finalize exemptions provided in the Moral IFC for the group health plans and health insurance coverage of various entities and individuals with sincerely held moral convictions opposed to coverage of some or all contraceptive or sterilization methods encompassed by HRSA's guidelines. As in the Moral IFC, the exemptions include plan sponsors that are nonprofit organization plan sponsors or for-profit entities that have no publicly traded ownership interests (defined as any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934). The exemptions also continue to include institutions of higher education in their arrangement of student health insurance coverage; health insurance issuers (but only with respect to plans that are otherwise also exempt under the rules); and objecting

individuals with respect to their own coverage, where their health insurance issuer and plan sponsor, as applicable, are willing to provide coverage complying with the individual's moral objection. After considering public comments, the Departments have decided not to extend the moral exemptions to non-federal governmental entities at this time, although individuals receiving employer-sponsored insurance from a governmental entity may use the individual exemption if the other terms of the individual exemption apply, including that their employer is willing to offer them a plan consistent with their moral objection.

In response to public comments, various changes are made to clarify the intended scope of the language in the Moral IFC's exemptions. The prefatory exemption language is clarified to ensure exemptions apply to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections. The Departments add language to specify that the exemption for institutions of higher education applies to non-governmental entities. The Departments also modified language describing the moral objection applicable to the exemptions, to specify that the entity objects, based on its sincerely held moral convictions, to its establishing, maintaining, providing, offering, or arranging for (as applicable) either: Coverage or payments for some or all contraceptive services; or a plan, issuer, or third party administrator that provides or arranges such coverage or payments.

The Departments also clarify language in the exemption applicable to plans of objecting individuals. The clarification is made to ensure that the HRSA guidelines do not prevent a willing health insurance issuer offering group or

individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions. The exemption adds that, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

b. References to Moral Exemptions in Accommodation Regulations and in Regulatory Restatement of Statutory Language

These rules finalize without change the references to the moral exemptions that were inserted by the Moral IFC into the rules that regulatorily restate the statutory language from section 2713(a) and (a)(4) of the Public Health Service Act. Similarly, these rules finalize without change from the Moral IFC references to the moral exemptions that were inserted into the regulations governing the optional accommodation process. These references operationalize the effect of the moral exemptions rule, and they allow contraceptive services to be made available to women if any employers with non-religious moral objections to contraceptive coverage choose to use the optional accommodation process.

3. Summary of Costs, Savings and Benefits of the Major Provisions

| Provision | Savings and Benefits | Costs |
|---|---|---|
| Finalizing insertion of references to moral exemptions into restatement of statutory language from section 2713(a) and (a)(4) of the Public Health Service Act. | These provisions, finalized without change, are for the purpose of inserting references to the moral exemptions into the regulatory restatement of section 2713(a) and (a)(4) of the Public Health Service Act, which already references the religious exemptions. This operationalizes the moral exemptions in each of the tri-agencies' rules. We estimate no economic savings or benefit from finalizing this part of the rule, but consider it a deregulatory action to minimize the regulatory impact beyond the scope set forth in the statute. | We estimate no costs from finalizing this part of the rule. |

| Provision | Savings and Benefits | Costs |
|---|---|---|
| Finalized moral exemptions | The moral exemptions to the contraceptive coverage requirement are finalized with technical changes. Their purpose is to relieve burdens that some entities and individuals experience from being forced to choose between, on the one hand, complying with their moral beliefs and facing penalties from failing to comply with the contraceptive coverage requirement, and on the other hand, providing (or, for individuals, obtaining) contraceptive coverage in violation of their sincerely held moral beliefs. | We estimate there will be only a small amount of costs for these exemptions, because they will primarily be used by organizations and individuals that do not want contraceptive coverage. To the extent some other employers will use the exemption where there will be transfer costs for women previously receiving contraceptive coverage who will no longer receive that coverage, we expect those costs to be minimal due to the small number of entities expected to use the exemptions with non-religious moral objections. We estimate the transfer costs will amount to $8,760. |
| Finalizing insertion of references to moral exemptions into optional accommodation regulations. | These provisions, finalized without change, will allow organizations with moral objections to contraceptive coverage on the basis of sincerely held moral convictions to use the accommodation as an optional process. These provisions will allow contraceptive coverage to be made available to women covered by plans of employers that object to contraceptive coverage but do not object to their issuers or third party administrators arranging for such coverage to be provided to persons covered by their plans. | We do not estimate any entities with non-religious moral objections to use the accommodation process at this time. |

## B. Background

Over many decades, Congress has protected conscientious objections including based on moral convictions in the context of health care and human services, and including health coverage, even as it has sought to promote access to health services.[1] In 2010, Congress enacted the Patient Protection and Affordable Care Act (PPACA) (Pub. L. 111–148) (March 23, 2010). Congress enacted the Health Care and Education Reconciliation Act of 2010 (HCERA) (Pub. L. 111–152) on March 30, 2010, which, among other things, amended PPACA. As amended by HCERA, PPACA is known as the Affordable Care Act (ACA).

The ACA reorganized, amended, and added to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The ACA added section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code), in order to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

In section 2713(a)(4) of the PHS Act (hereinafter "section 2713(a)(4)"), Congress provided administrative discretion to require that certain group health plans and health insurance issuers cover certain women's preventive services, in addition to other preventive services required to be covered in section 2713. Congress granted that discretion to the Health Resources and Services Administration (HRSA), a component of the U.S. Department of Health and Human Services (HHS). Specifically, section 2713(a)(4) allows HRSA discretion to specify coverage requirements, "with respect to women, such additional preventive care and screenings as provided for in comprehensive guidelines supported" by HRSA (the "Guidelines").

Since 2011, HRSA has exercised that discretion to require coverage for, among other things, certain contraceptive services.[2] In the same

---

[1] *See, for example,* 42 U.S.C. 300a–7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting individuals and entities that object to abortion); Consolidated Appropriations Act, 2018, Div. H, Sec. 507(d) (Departments of Labor, HHS, and Education, and Related Agencies Appropriations Act), Public Law 115–141, 132 Stat. 348, 764 (Mar. 23, 2018) (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion for any reason); *Id.* at Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); *Id.* at Div. E, Sec. 808 (regarding any requirement of "the provision of contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."); *Id.* at Div. K, Title III (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb–36 (prohibiting the statutory section from being construed to require suicide related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare+Choice, now Medicare Advantage, managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal law does not infringe on "conscience" as protected in State law concerning advance directives); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide); *see also* 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require assistance in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/AIDS funds contrary to their "religious or moral objection").

[2] The references in this document to "contraception," "contraceptive," "contraceptive coverage," or "contraceptive services" generally include all contraceptives, sterilization, and related patient education and counseling, required by the Women's Preventive Guidelines, unless otherwise indicated. The Guidelines issued in 2011 referred to "Contraceptive Methods and Counseling" as "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *https://www.hrsa.gov/womens-guidelines/index.html.* The Guidelines as amended in December 2016 refer, under the header "Contraception," to: "the full range of female-controlled U.S. Food and Drug Administration-approved contraceptive methods, effective family

Case: 25-2575    Document: 34.2    Page: 171    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB  Document 392  Filed 12/14/18  Page 5 of 45

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57595**

time period, the administering agencies—HHS, the Department of Labor, and the Department of the Treasury (collectively, "the Departments" [3])—exercised discretion to allow exemptions to those requirements by issuing rulemaking various times, including issuing and finalizing three interim final regulations prior to 2017.[4] In those regulations, the Departments crafted exemptions and accommodations for certain religious objectors where the Guidelines require coverage of contraceptive services, changed the scope of those exemptions and accommodations, and solicited public comments on a number of occasions. Public comments were submitted on various iterations of the regulations issued before 2017, and some of those comments supported expanding the exemptions to include those who oppose the contraceptive coverage mandate for either religious "or moral" reasons, consistent with various state laws (such as in Connecticut or Missouri) that protect objections to contraceptive coverage based on moral convictions.[5]

planning practices, and sterilization procedures," "contraceptive counseling, initiation of contraceptive use, and follow-up care (e.g., management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method)," and "instruction in fertility awareness-based methods, including the lactation amenorrhea method." *https://www.hrsa.gov/womens-guidelines-2016/index.html*.

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

[4] Interim final regulations on July 19, 2010, at 75 FR 41726 (July 2010 interim final regulations); interim final regulations amending the July 2010 interim final regulations on August 3, 2011, at 76 FR 46621; final regulations on February 15, 2012, at 77 FR 8725 (2012 final regulations); an advance notice of proposed rulemaking (ANPRM) on March 21, 2012, at 77 FR 16501; proposed regulations on February 6, 2013, at 78 FR 8456; final regulations on July 2, 2013, at 78 FR 39870 (July 2013 final regulations); interim final regulations on August 27, 2014, at 79 FR 51092 (August 2014 interim final regulations); proposed regulations on August 27, 2014, at 79 FR 51118 (August 2014 proposed regulations); final regulations on July 14, 2015, at 80 FR 41318 (July 2015 final regulations); and a request for information on July 26, 2016, at 81 FR 47741 (RFI), which was addressed in an FAQ document issued on January 9, 2017, available at: *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf*.

[5] *See, for example,* Denise M. Burke, Re: file code CMS–9968–P, *Regulations.gov* (posted May 5, 2013), *http://www.regulations.gov/#!documentDetail;D=CMS-2012-0031-79115*; Comment, *Regulations.gov* (posted Oct. 26, 2016), *https://www.regulations.gov/document?D=CMS-2016-0123-54142*; David Sater, Re: CMS–9931–NC; Request for Information, *Regulations.gov* (posted Oct. 26, 2016), *https://www.regulations.gov/document?D=CMS-2016-0123-54218*; Comment, *Regulations.gov* (posted Oct. 26, 2016), *https://*

During the period when the Departments were publishing and modifying the regulations, organizations and individuals filed dozens of lawsuits challenging the contraceptive coverage requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate"). Plaintiffs included religious nonprofit organizations, businesses run by religious families, individuals, and others, including several non-religious organizations that opposed coverage of certain contraceptives under the Mandate on the basis of non-religious moral convictions. For-profit entities with religious objections won various court decisions leading to the Supreme Court's ruling in *Burwell* v. *Hobby Lobby Stores, Inc.* 134 S. Ct. 2751 (2014). The Supreme Court ruled against the Departments and held that, under the Religious Freedom Restoration Act of 1993 (RFRA), the Mandate could not be applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage.[6] Later, a second series of legal challenges were filed by religious nonprofit organizations that stated the accommodation impermissibly burdened their religious beliefs because it utilized their health plans to provide services to which they objected on religious grounds, and it required them to submit a self-certification or notice. On May 16, 2016, the Supreme Court issued a per curiam decision, vacating the judgments of the Courts of Appeals—most of which had ruled in the Departments' favor—and remanding the cases "in light of the substantial clarification and refinement in the positions of the parties" that had been filed in supplemental briefs. *Zubik* v. *Burwell,* 136 S. Ct. 1557, 1560 (2016). The Court stated that it anticipated that, on remand, the Courts of Appeals would "allow the parties sufficient time to resolve any outstanding issues between them." *Id.*

Beginning in 2015, lawsuits challenging the Mandate were also filed by various non-religious organizations with moral objections to contraceptive coverage. These organizations stated that they believe some methods classified by the Food and Drug Administration (FDA) as contraceptives may have an abortifacient effect and, therefore, in their view, are morally equivalent to abortion to which they

*www.regulations.gov/document?D=CMS-2016-0123-46220*.

[6] The Supreme Court did not decide whether RFRA would apply to publicly traded for-profit corporations. *See* 134 S. Ct. at 2774.

have a moral objection. Under regulations preceding October 2017, these organizations neither received an exemption from the Mandate nor qualified for the accommodation. For example, March for Life filed a complaint claiming that the Mandate violated the equal protection component of the Due Process Clause of the Fifth Amendment, and was arbitrary and capricious under the Administrative Procedure Act (APA). Citing, for example, 77 FR 8727, March for Life argued that the Departments' stated interests behind the Mandate were only advanced among women who "want" the coverage so as to prevent "unintended" pregnancy. March for Life contended that, because it only hires employees who publicly advocate against abortion, including what they regard as abortifacient contraceptive items, the Departments' interests were not rationally advanced by imposing the Mandate upon it and its employees. Accordingly, March for Life contended that applying the Mandate to it (and other similarly situated organizations) lacked a rational basis and, therefore, was arbitrary and capricious in violation of the APA. March for Life further contended that, because the Departments concluded the government's interests were not undermined by exempting houses of worship and integrated auxiliaries (based on the assumption that such entities are relatively more likely than other nonprofits with religious objections to have employees that share their views against certain contraceptives), applying the Mandate to March for Life or similar organizations that definitively hire only employees who oppose certain contraceptives lacked a rational basis and, therefore, violated their right of equal protection under the Due Process Clause.

March for Life's employees, who stated they were personally religious (although personal religiosity was not a condition of their employment), also sued as co-plaintiffs. They contended that the Mandate violated their rights under RFRA by making it impossible for them to obtain health coverage consistent with their religious beliefs, either from the plan March for Life wanted to offer them, or in the individual market, because the Departments offered no exemptions in either circumstance. Another non-religious nonprofit organization that opposed the Mandate's requirement to provide certain contraceptive coverage on moral grounds also filed a lawsuit challenging the Mandate. *Real*

*Alternatives, Inc.* v. *Burwell,* 150 F. Supp. 3d 419 (M.D. Pa. 2015).

Challenges by non-religious nonprofit organizations led to conflicting opinions among the federal courts. A district court agreed with the March for Life plaintiffs on the organization's equal protection claim and the employees' RFRA claims, while not specifically ruling on the APA claim, and issued a permanent injunction against the Departments that is still in place. *March for Life* v. *Burwell,* 128 F. Supp. 3d 116 (D.D.C. 2015). The appeal in *March for Life* is pending and has been stayed since early 2016. In another case, federal district and appellate courts in Pennsylvania disagreed with the reasoning in *March for Life,* and ruled against claims brought by a similarly non-religious nonprofit employer and its religious employees. *Real Alternatives,* 150 F. Supp. 3d 419, *affirmed by* 867 F.3d 338 (3d Cir. 2017). One member of the appeals court panel in *Real Alternatives* v. *Sec'y of HHS* dissented in part, stating he would have ruled in favor of the individual employee plaintiffs under RFRA. 867 F.3d 338, 367 (3d Cir. 2017) (Jordan, J., dissenting).

The Departments most recently solicited public comments on these issues again in two interim final regulations with request for comments published in the **Federal Register** on October 13, 2017: The regulations (82 FR 47838) (the Moral IFC) that are being finalized with changes here, and the regulations (82 FR 47792) (the Religious IFC) published on the same day as the Moral IFC, which are being finalized with changes in the companion final rules published elsewhere in today's **Federal Register**.

In the preamble to the Moral IFC, the Departments explained several reasons why, after exercising our discretion to reevaluate the exemptions and accommodations for the contraceptive Mandate, we sought public comment on whether to protect moral convictions in the Moral IFC and these final rules. The Departments noted that we considered, among other things, Congress's history of providing protections for moral convictions regarding certain health services (including contraception, sterilization, and items or services believed to involve abortion); the text, context, and intent of section 2713(a)(4) and the ACA; Executive Order 13798, "Promoting Free Speech and Religious Liberty" (May 4, 2017); previously submitted public comments; and the extensive litigation over the contraceptive Mandate. The Departments concluded that it was appropriate that HRSA take into account

the moral convictions of certain employers, individuals and health insurance issuers where the coverage of contraceptive services is concerned. Comments were requested on the interim final regulations.

After consideration of the comments and feedback received from stakeholders, the Departments are finalizing the Moral IFC, with changes based on comments as indicated herein.[7]

## II. Overview of the Final Rules and Public Comments

During the 60-day comment period for the Moral IFC, which closed on December 5, 2017, the Departments received over 54,000 public comment submissions, which are posted to *www.regulations.gov.*[8] Below, the Departments provide an overview of the final rules and address the issues raised in the comments we received.

### A. Moral Exemptions and Accommodation in General

These rules expand exemptions to protect certain entities and individuals with moral convictions that oppose contraception whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the ACA. These rules do not alter the discretion of HRSA, a component of HHS, to maintain the Guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also make available to exempt organizations the accommodation process, which was previously established in response to some objections of religious organizations, as an optional process for exempt entities that wish to use it voluntarily. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives or related education and

counseling for women at risk of unintended pregnancy.[9]

### 1. The Departments' Authority To Mandate Coverage or Provide Exemptions

The Departments received conflicting comments on their legal authority to provide exemptions and accommodations to the Mandate. Some commenters agreed that the Departments are legally authorized to provide expanded exemptions and an accommodation for moral convictions, noting that there was no requirement of contraceptive coverage in the ACA and no prohibition on providing moral exemptions in Guidelines issued under section 2713(a)(4). Other commenters, however, asserted that the Departments have no legal authority to provide any exemptions to the contraceptive Mandate, contending, based on statements in the ACA's legislative history, that the ACA requires contraceptive coverage. Still other commenters contended that the Departments are legally authorized to provide the religious exemptions that existed prior to the 2017 IFCs, but not to protect moral convictions.

The Departments conclude that we are legally authorized to provide the exemption and accommodation for moral convictions set forth in the Moral IFC and these final rules. These rules concern section 2713 of the PHS Act, as incorporated into ERISA and the Code. Congress has granted the Departments legal authority, collectively, to administer these statutes. (26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92).

Where it applies, section 2713(a)(4) requires coverage without cost sharing for "such additional" women's preventive care and screenings "as provided for" and "supported by" guidelines developed by HHS acting through HRSA. When Congress enacted this provision, those Guidelines did not exist. And nothing in the statute mandated that the Guidelines had to include contraception, let alone for all types of employers with covered plans. Instead, section 2713(a)(4) provided a

---

[7] The Department of the Treasury and Internal Revenue Service published proposed and temporary regulations as part of the joint rulemaking of the Moral IFC. The Departments of Labor and HHS published their respective rules as interim final rules with request for comments and are finalizing their interim final rules in these final rules. The Department of the Treasury and Internal Revenue Service are finalizing their regulations.

[8] *See Regulations.gov* at *https://www.regulations.gov/searchResults?rpp=25&so=DESC&sb=postedDate&po=0&cmd=12%7C05%7C17-12%7C05%7C17&dktid=CMS-2017-0133* and *https://www.regulations.gov/docketBrowser?rpp=25&so=ASC&sb=postedDate&po=100&D=IRS-2017-0015.* Some of those submissions included form letters or attachments that, while not separately tabulated as regulations.gov, together included comments from, or were signed by, possibly over a hundred thousand separate persons. The Departments reviewed all of the public comments and attachments.

[9] *See, for example,* Family Planning grants in 42 U.S.C. 300, *et seq.;* the Teenage Pregnancy Prevention Program, Public Law 112–74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c–8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b–12; Title XIX of the Social Security Act, 42 U.S.C. 1396, *et seq.;* the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), & 25 U.S.C. 1601, *et seq.;* Health center grants, 42 U.S.C. 254b(e), (g), (h), & (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

Case: 25-2575    Document: 34-2    Page: 173    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB   Document 392   Filed 12/14/18   Page 17 of 125

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57597**

positive grant of authority for HSRA to develop those Guidelines, thus delegating authority to HHS to shape that development, as the administering agency of HRSA, and to all three agencies as the administering agencies of the statutes by which the Guidelines are enforced. *See* 26 U.S.C. 9833; 29 U.S.C. 1191(c), 42 U.S.C. 300gg–92. That is especially true for HHS, as HRSA is a component of HHS that was unilaterally created by the agency and thus is subject to the agency's general supervision, *see* 47 FR 38409 (August 31, 1982). Thus, nothing prevented HRSA from creating an exemption from otherwise-applicable guidelines or prevented HHS and the other agencies from directing that HRSA create such an exemption.

Congress did not specify the extent to which HRSA must "provide for" and "support" the application of Guidelines that it chooses to adopt. HRSA's authority to support "comprehensive guidelines" involves determining both the types of coverage and scope of that coverage. Section 2714(a)(4) requires coverage for preventive services only "as provided for in comprehensive guidelines supported by [HRSA]." That is, services are required to be included in coverage only to the extent that the Guidelines supported by HRSA provide for them. Through use of the word "as" in the phrase "as provided for," it requires that HRSA support how those services apply—that is, the manner in which the support will happen, such as in the phrase "as you like it." [10] When Congress means to require certain activities to occur in a certain manner, instead of simply authorizing the agency to decide the manner in which they will occur, Congress knows how to do so. *See for example,* 42 U.S.C. 1395x ("The Secretary shall establish procedures to make beneficiaries and providers aware of the requirement that a beneficiary complete a health risk assessment *prior to or at the same time as* receiving personalized prevention plan services.") (emphasis added). Thus, the inclusion of "as" in section 300gg–13(a)(3), and its absence in similar neighboring provisions, shows that HRSA has discretion whether to support how the preventive coverage mandate applies—it does not refer to the timing of the promulgation of the Guidelines.

Nor is it simply a textual aberration that the word "as" is missing from the other three provisions in section 2713(a) of the PHS Act. Rather, this difference

mirrors other distinctions within that section that demonstrate that Congress intended HRSA to have the discretion the Agencies invoke. For example, sections (a)(1) and (a)(3) require "evidence-based" or "evidence-informed" coverage, while section (a)(4) does not. This difference suggests that the Agencies have the leeway to incorporate policy-based concerns into their decision-making. This reading of section 2713(a)(4) also prevents the statute from being interpreted in a cramped way that allows no flexibility or tailoring, and that would force the Departments to choose between ignoring religious objections in violation of RFRA or else eliminating the contraceptive coverage requirement from the Guidelines altogether. The Departments instead interpret section 2713(a)(4) as authorizing HRSA's Guidelines to set forth both the kinds of items and services that will be covered, and the scope of entities to which the contraceptive coverage requirement in those Guidelines will apply.

The moral objections at issue here, like the religious objections prompting exemptions dating back to the inception of the Mandate in 2011, may, consistent with the statutory provision, permissibly inform what HHS, through HRSA, decides to provide for and support in the Guidelines. Since the first rulemaking on this subject in 2011, the Departments have consistently interpreted the broad discretion granted to HRSA in section 2713(a)(4) as including the power to reconcile the ACA's preventive-services requirement with sincerely held views of conscience on the sensitive subject of contraceptive coverage—namely, by exempting churches and their integrated auxiliaries from the contraceptive-coverage Mandate. (*See* 76 FR at 46623.) As the Departments explained at that time, the HRSA Guidelines "exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women," and "it is appropriate that HRSA . . . takes into account the effect on the religious beliefs of [employers] if coverage of contraceptive services were required in [their] group health plans." *Id.* Consistent with that longstanding view, Congress's grant of discretion in section 2713(a)(4), and the lack of a mandate that contraceptives be covered or that they be covered without any exemptions or exceptions, lead the Departments to conclude that we are legally authorized to exempt certain entities or plans from a contraceptive

Mandate if HRSA decides to otherwise include contraceptives in its Guidelines.

The Departments' conclusions are consistent with our interpretation of section 2713 of the PHS Act since 2010, when the ACA was enacted, and since the Departments started to issue interim final regulations implementing that section. The Departments have consistently interpreted section 2713(a)(4) to grant broad discretion to decide the extent to which HRSA will provide for, and support, the coverage of additional women's preventive care and screenings, including the decision to exempt certain entities and plans, and not to provide for or support the application of the Guidelines with respect to those entities or plans. The Departments created an exemption to the contraceptive Mandate when that Mandate was announced in 2011, and then amended and expanded the exemption and added an accommodation process in multiple rulemakings thereafter. The accommodation process requires the provision of coverage or payments for contraceptives to plan participants in an eligible organization's health plan by the organization's insurer or third party administrator. However, the accommodation process itself, in some cases, failed to require contraceptive coverage for many women, because—as the Departments acknowledged at the time—the enforcement mechanism for that process, section 3(16) of ERISA, does not provide a means to impose an obligation to provide contraceptive coverage on the third party administrator of self-insured church plans (see 80 FR 41323). Non-exempt employers participate in many church plans. Therefore, in both the previous exemption, and in the previous accommodation's application to self-insured church plans, the Departments have been choosing not to require contraceptive coverage for certain kinds of employers since the Guidelines were adopted. In doing so, the Departments have been acting contrary to commenters who contended the Departments had no authority to create exemptions under section 2713 of the PHS Act, or its incorporation into ERISA and the Code, and who contended instead that the Departments must enforce Guidelines on the broadest spectrum of group health plans as possible, even including churches (see, for example, 2012 final regulations at 77 FR 8726).

The Departments' interpretation of section 2713(a)(4) is confirmed by the ACA's statutory structure. Congress did not intend to require entirely uniform coverage of preventive services (see for

---

[10] See As (usage 2), *Oxford English Dictionary Online* (Feb. 2018) ("[u]sed to indicate by comparison the way something happens or is done").

example, 76 FR 46623). On the contrary, Congress carved out an exemption from section 2713 of the PHS Act (and from several other provisions) for grandfathered plans. In contrast, the grandfathering exemption is not applicable to many of the other provisions in Title I of the ACA—provisions previously referred to by the Departments as providing ''particularly significant protections.'' (75 FR 34540). Those provisions include (from the PHS Act) section 2704, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708, which prohibits excessive waiting periods (as of January 1, 2014); section 2711, which relates to lifetime dollar limits; section 2712, which generally prohibits rescission of health coverage; section 2714, which extends dependent child coverage until the child turns 26; and section 2718, which imposes a minimum medical loss ratio on health insurance issuers in the individual and group markets (for insured coverage), and requires them to provide rebates to policyholders if that medical loss ratio is not met. (75 FR 34538, 34540, 34542). Consequently, of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not subject to section 2713.[11] Some commenters assert the exemptions for grandfathered plans are temporary, or were intended to be temporary, but as the Supreme Court observed, ''there is no legal requirement that grandfathered plans ever be phased out.'' *Burwell* v. *Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2764 n.10 (2014).

Some commenters argue that Executive Order 13535's reference to implementing the ACA consistent with certain conscience laws does not justify creating exemptions to contraceptive coverage in the Guidelines, because those laws do not specifically require exemptions in the Guidelines. The Departments, however, believe that they are acting consistent with Executive Order 13535 by creating exemptions using HRSA's authority under section 2713(a)(4), and the Departments' administrative authority over the implementation of section 2713(a) of the PHS Act. Executive Order 13535, issued upon the signing of the ACA, specified that ''longstanding Federal laws to protect conscience . . . remain intact,''

including laws that protect holders of religious beliefs or moral convictions from certain requirements in health care contexts. Although the text of Executive Order 13535 does not require the expanded exemptions confirmed in these final rules, the expanded exemptions are, as explained below, consistent with longstanding federal laws to protect conscience objections, based on religious beliefs or moral convictions regarding certain health matters, and is consistent with the intent that the ACA be implemented in accordance with the conscience protections set forth in those laws.

Some commenters contended that, even though Executive Order 13535 refers to the Church Amendments, the intention of those statutes is narrow, should not be construed to extend to entities instead of to individuals, and should not be construed to prohibit procedures. But those comments mistake the Departments' position. The Departments are not construing the Church Amendments to require these exemptions, nor do the exemptions prohibit any procedures. Instead, through longstanding federal conscience statutes, Congress has established consistent principles concerning respect for sincerely held moral convictions in sensitive healthcare contexts.[12] Under those principles, and absent any contrary requirement of law, the Departments are offering exemptions for sincerely held moral convictions to the extent the Departments otherwise impose a contraceptive Mandate. These exemptions do not prohibit any services, nor authorize employers to prohibit employees from obtaining any services. The exemptions in the Moral IFC and these final rules simply refrain from imposing a federal mandate that employers cover contraceptives in their health plans even if they have sincerely held moral convictions against doing so.

Some commenters stated that the Supreme Court ruled that the exemptions provided for houses of worship and integrated auxiliaries were required by the First Amendment. From this, commenters concluded that the exemptions for houses of worship and integrated auxiliaries are legally authorized, but that exemptions beyond those are not. But the Supreme Court did not rule on the question whether the

exemptions provided for houses of worship and integrated auxiliaries were required by the First Amendment, and the Court did not say the Departments must apply the contraceptive Mandate unless RFRA prohibits us from doing so.

The appropriateness of including exemptions to protect moral convictions is informed by Congress's long history of providing exemptions for moral convictions, especially in certain health care contexts.

2. Congress's History of Protecting Moral Convictions

The Department received numerous comments about its decision in the Moral IFC to exercise its discretion to provide moral exemptions to, and an accommodation under, the contraceptive Mandate. Some commenters agreed with the Departments' decision in the Moral IFC, arguing that it is appropriate to exercise the Departments' discretion to protect moral convictions in light of Congress's history of protecting moral convictions in various contexts, especially concerning health care. Other commenters disagreed, saying that existing conscience statutes protecting moral convictions do not require these exemptions and, therefore, the exemptions should not be offered. Some commenters stated that because Congress has provided conscience protections, but did not specifically provide them in section 2713(a)(4), conscience protections are inappropriate in the implementation of that section. Still other commenters went further, disagreeing with conscience protections regarding contraceptives, abortions, or health care in general.

In deciding the most appropriate way to exercise our discretion in this context, the Departments draw on the most recent statements of Congress, along with nearly 50 years of statutes and Supreme Court precedent discussing the protection of moral convictions in certain circumstances—particularly in the context of health care and health coverage. Most recently, Congress expressed its intent on the matter of Government-mandated contraceptive coverage when it declared, with respect to the possibility that the District of Columbia would require contraceptive coverage, that ''it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions.'' Consolidated Appropriations Act, 2018, Div. E, section 808, Public Law 115–141, 132 Stat. 348, 603 (Mar. 23, 2018); *see also*

---

[11] Kaiser Family Foundation & Health Research & Educational Trust, ''Employer Health Benefits, 2017 Annual Survey,'' Henry J Kaiser Family Foundation (Sept. 19, 2017), *http://files.kff.org/attachment/ Report-Employer-Health-Benefits-Annual-Survey-2017.*

[12] The Departments note that the Church Amendments are the subject of another, ongoing rulemaking process. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 FR 3880 (NPRM Jan. 26, 2018). Since the Departments are not construing the Amendments to require the religious exemptions, we defer issues regarding the scope, interpretation, and protections of the Amendments to HHS in that rulemaking.

Case: 25-2575    Document: 34-2    Page: 175    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB Document 392    Filed 12/4/19    Page 9 of 45

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57599**

Consolidated Appropriations Act, 2017, Div. C, section 808, Public Law 115–31 (May 5, 2017). The Departments consider it significant that Congress's most recent statements on the prospect of Government-mandated contraceptive coverage specifically intend that a conscience clause be included to protect moral convictions.

The Departments also consider significant the many statutes listed above, in section I—Background footnote 1, that show Congress's consistent protection of moral convictions alongside religious beliefs in the federal regulation of health care. These include laws such as the Church Amendments (dating back to 1973), which we discuss at length below, to the 2018 Consolidated Appropriations Act discussed above. Notably among those laws, and in addition to the Church Amendments, Congress has enacted protections for health plans or health care organizations in Medicaid or Medicare Advantage to object "on moral or religious grounds" to providing coverage of certain counseling or referral services. 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare + Choice (now Medicare Advantage) managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"). Congress has also protected individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions." Consolidated Appropriations Act, 2018, Public Law 115–141, Division E, section 726(c); *see also* Consolidated Appropriations Act of 2017, Division C, Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act), Public Law 115–31.[13]

The Departments disagree with commenters that suggested we should not consider Congress's history of protecting moral objections in certain health care contexts due to Congress's failure to explicitly include exemptions in section 2713(a)(4) itself. The argument by these commenters proves too much, since Congress also did not

specifically require contraceptive coverage in section 2713 of the PHS Act. This argument would also negate not just these expanded exemptions, but the previous exemptions provided for houses of worship and integrated auxiliaries, and the indirect exemption for self-insured church plans that use the accommodation. Where Congress left so many matters concerning section 2713(a)(4) to agency discretion, the Departments consider it appropriate to implement these expanded exemptions in light of Congress's long history of respecting moral convictions in the context of certain federal health care statutes.

*a. The Church Amendments' Protection of Moral Convictions*

One of the most important and well-established federal statutes respecting conscientious objections in specific health care contexts was enacted over the course of several years beginning in 1973, initially as a response to court decisions raising the prospect that entities or individuals might be required to facilitate abortions or sterilizations because they had received federal funds. These sections of the U.S. Code are known as the Church Amendments, named after their primary sponsor, Senator Frank Church (D-Idaho). The Church Amendments specifically provide conscience protections based on sincerely held moral convictions, not just religious beliefs. Among other things, the amendments protect the recipients of certain federal health funds from being required to perform, assist, or make their facilities available for abortions or sterilizations if they object "on the basis of religious beliefs or moral convictions," and they prohibit recipients of certain federal health funds from discriminating against any personnel "because he refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions" (42 U.S.C. 300a–7(b), (c)(1)). Later additions to the Church Amendments protect other conscientious objections, including some objections on the basis of moral conviction to "any lawful health service," or to "any part of a health service program." (42 U.S.C. 300a–7(c)(2), (d)). In contexts covered by those sections of the Church Amendments, the provision or coverage of certain contraceptives, depending on the circumstances, could constitute "any lawful health service" or a "part of a health service program." As such, the

protections provided by those provisions of the Church Amendments would encompass moral objections to contraceptive services or coverage.

The Church Amendments were enacted in the wake of the Supreme Court's decision in *Roe* v. *Wade,* 410 U.S. 113 (1973). Although the Court in *Roe* required abortion to be legal in certain circumstances, *Roe* did not include, within that right, the requirement that other citizens facilitate its exercise. Indeed, *Roe* favorably quoted the proceedings of the American Medical Association House of Delegates 220 (June 1970), which declared, "Neither physician, hospital, nor hospital personnel shall be required to perform any act violative of personally-held moral principles." 410 U.S. at 144 & n.38 (1973). Likewise, in *Roe*'s companion case, *Doe* v. *Bolton,* the Court observed that, under state law, "a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure." 410 U.S. 179, 197–98 (1973). The Court said that these conscience provisions "obviously . . . afford appropriate protection." *Id.* at 198. As an Arizona court later put it, "a woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either." *Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists,* 257 P.3d 181, 196 (Ariz. Ct. App. 2011).

The Congressional Record contains discussions that occurred when the protection for moral convictions was first proposed in the Church Amendments. When Senator Church introduced the first of those amendments in 1973, he cited not only *Roe* v. *Wade,* but also an instance where a federal court had ordered a Catholic hospital to perform sterilizations. 119 Congr. Rec. S5717–18 (Mar. 27, 1973). After his opening remarks, Senator Adlai Stevenson III (D–IL) rose to ask that the amendment be changed to specify that it also protects objections to abortion and sterilization based on moral convictions on the same terms as it protects objections based on religious beliefs. The following excerpt of the Congressional Record records this discussion:

Mr. STEVENSON. Mr. President, first of all I commend the Senator from Idaho for bringing this matter to the attention of the Senate. I ask the Senator a question.

One need not be of the Catholic faith or any other religious faith to feel deeply about the worth of human life. The protections afforded by this amendment run only to those whose religious beliefs would be offended by the necessity of performing or

Case: 25-2575    Document: 34-2    Page: 176    Date Filed: 12/12/2025
Case: 25-2575    Document: 6892    Filed: 12/11/18    Page: 16 of 41

**57600**    Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

participating in the performance of certain medical procedures; others, for moral reasons, not necessarily for any religious belief, can feel equally as strong about human life. They too can revere human life.

As mortals, we cannot with confidence say, when life begins. But whether it is life, or the potentiality of life, our moral convictions as well as our religious beliefs, warrant protection from this intrusion by the Government. Would, therefore, the Senator include moral convictions?

Would the Senator consider an amendment on page 2, line 18 which would add to religious beliefs, the words "or moral"?

Mr. CHURCH. I would suggest to the Senator that perhaps his objective could be more clearly stated if the words "or moral conviction" were added after "religious belief." I think that the Supreme Court in considering the protection we give religious beliefs has given comparable treatment to deeply held moral convictions. I would not be averse to amending the language of the amendment in such a manner. It is consistent with the general purpose. I see no reason why a deeply held moral conviction ought not be given the same treatment as a religious belief.

Mr. STEVENSON. The Senator's suggestion is well taken. I thank him.

### 119 Congr. Rec. S5717–18

As the debate proceeded, Senator Church went on to quote *Doe* v. *Bolton's* reliance on a Georgia statute that stated "a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure." 119 Congr. Rec. S5722 (quoting 410 U.S. at 197–98). Senator Church added, "I see no reason why the amendment ought not also to cover doctors and nurses who have strong moral convictions against these particular operations." *Id.* Considering the scope of the protections, Senator Gaylord Nelson (D–WI) asked whether, "if a hospital board, or whatever the ruling agency for the hospital was, a governing agency or otherwise, just capriciously—and not upon the religious or moral questions at all—simply said, 'We are not going to bother with this kind of procedure in this hospital,' would the pending amendment permit that?" 119 Congr. Rec. S5723. Senator Church responded that the amendment would not encompass such an objection. *Id.*

Senator James L. Buckley (C–NY), speaking in support of the amendment, added the following perspective:

Mr. BUCKLEY. Mr. President, I compliment the Senator from Idaho for proposing this most important and timely amendment. It is timely in the first instance because the attempt has already been made to compel the performance of abortion and sterilization operations on the part of those who are fundamentally opposed to such procedures. And it is timely also because the

recent Supreme Court decisions will likely unleash a series of court actions across the United States to try to impose the personal preferences of the majority of the Supreme Court on the totality of the Nation.

I believe it is ironic that we should have this debate at all. Who would have predicted a year or two ago that we would have to guard against even the possibility that someone might be free [sic] [14] to participate in an abortion or sterilization against his will? Such an idea is repugnant to our political tradition. This is a Nation which has always been concerned with the right of conscience. It is the right of conscience which is protected in our draft laws. It is the right of conscience which the Supreme Court has quite properly expanded not only to embrace those young men who, because of the tenets of a particular faith, believe they cannot kill another man, but also those who because of their own deepest moral convictions are so persuaded.

I am delighted that the Senator from Idaho has amended his language to include the words "moral conviction," because, of course, we know that this is not a matter of concern to any one religious body to the exclusion of all others, or even to men who believe in a God to the exclusion of all others. It has been a traditional concept in our society from the earliest times that the right of conscience, like the paramount right to life from which it is derived, is sacred.

### 119 Congr. Rec. S5723

In support of the same protections when they were debated in the U.S. House, Representative Margaret Heckler (R–MA) [15] likewise observed that "the right of conscience has long been recognized in the parallel situation in which the individual's right to conscientious objector status in our selective service system has been protected" and "expanded by the Supreme Court to include moral conviction as well as formal religious belief." 119 Congr. Rec. H4148–49 (May 31, 1973). Rep. Heckler added, "We are concerned here only with the right of moral conscience, which has always been a part of our national tradition." *Id.* at 4149.

These first sections of the Church Amendments, codified at 42 U.S.C. 300a–7(b) and (c)(1), passed the House 372–1, and were approved by the Senate 94–0. 119 Congr. Rec. at H4149; 119 Congr. Rec. S10405 (June 5, 1973). The subsequently adopted provisions that comprise the Church Amendments similarly extend protection to those organizations and individuals who object to the provision of certain services on the basis of their moral convictions, as well as those who object

to such services on the basis of religious beliefs. And, as noted above, subsequent statutes add protections for moral objections in many other situations. These include, for example:

• Protections for individuals and entities that object to abortion. *See* 42 U.S.C. 238n; 42 U.S.C. 18023; 42 U.S.C. 2996f(b); Consolidated Appropriations Act, 2018, Div. H, Sec. 507(d), Public Law 115–141.

• Protections for entities and individuals that object to providing or covering contraceptives. *See id.* at Div. E, Sec. 808; *id.* at Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act); *id.* at Div. K, Title III.

• Protections for entities and individuals that object to performing, assisting, counseling, or referring as pertains to suicide, assisted suicide, or advance directives. *See* 42 U.S.C. 290bb–36; 42 U.S.C. 1396a(w)(3); 42 U.S.C. 14406; 42 U.S.C. 18113 (adopted as part of the ACA).

The Departments believe that the intent behind Congress's protection of moral convictions in certain health care contexts, especially to protect entities and individuals from governmental coercion, supports the Departments' decision in the Moral IFC and these final rules to protect sincerely held moral convictions from governmental compulsion threatened by the contraceptive Mandate.

### b. Court Precedents Relevant to These Expanded Exemptions

As reflected in the legislative history of the first Church Amendments, the Supreme Court has long afforded protection to moral convictions alongside religious beliefs. Indeed, Senator Church cited *Doe* v. *Bolton,* 410 U.S. 179, as a parallel instance of conscience protection and spoke of the Supreme Court generally giving "comparable treatment to deeply held moral convictions." Both Senator Buckley and Rep. Heckler specifically cited the Supreme Court's protection of moral convictions in laws governing military service. Those legislators appear to have been referencing cases such as *Welsh* v. *United States,* 398 U.S. 333 (1970), which the Supreme Court had decided just three years earlier.

*Welsh* involved what is perhaps the Government's paradigmatic compelling interest—the need to defend the nation by military force. The Court stated that, where the Government protects objections to military service based on "religious training and belief," that protection would also extend to avowedly non-religious objections to war held with the same moral strength.

---

[14] The Senator might have meant "[forced] . . . against his will."

[15] Rep. Heckler later served as the 15th Secretary of HHS, from March 1983 to December 1985.

Case: 25-2575　Document: 34-2　Page: 177　Date Filed: 12/12/2025
Case 1:23-cv-04495-WMR　Document 89-12　Filed 12/14/18　Page 12 of 45

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations　　**57601**

*Id.* at 343. The Court declared, ''[i]f an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption . . . as is someone who derives his conscientious opposition to war from traditional religious convictions.''

In the context of this particular Mandate, it is also worth noting that, in *Hobby Lobby,* Justice Ginsburg (joined, in this part of the opinion, by Justices Breyer, Kagan, and Sotomayor), cited Justice Harlan's opinion in *Welsh,* 398 U.S. at 357–58, in support of her statement that ''[s]eparating moral convictions from religious beliefs would be of questionable legitimacy.'' 134 S. Ct. at 2789 n.6. In quoting this passage, the Departments do not mean to suggest that all laws protecting only religious beliefs constitute an illegitimate ''separat[ion]'' of moral convictions, nor do the Departments assert that moral convictions must always be protected alongside religious beliefs; we also do not agree with Justice Harlan that distinguishing between religious and moral objections would violate the Establishment Clause. Instead, the Departments believe that, in the specific health care context implicated here, providing respect for moral convictions parallel to the respect afforded to religious beliefs is appropriate, draws from long-standing Federal Government practice, and shares common ground with Congress's intent in the Church Amendments and in later federal statutes that provide protections for moral convictions alongside religious beliefs in other health care contexts.

c. Conscience Protections in Other Federal and State Contexts

The tradition of protecting moral convictions in certain health contexts is not limited to laws passed by Congress. Multiple federal statutes protect objections based on moral convictions in such contexts.[16] Other federal

regulations have also applied the principle of respecting moral convictions alongside religious beliefs in particular circumstances. The Equal Employment Opportunity Commission has consistently protected ''moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views'' alongside religious views under the ''standard [] developed in *United States* v. *Seeger,* 380 U.S. 163 (1965) and [*Welsh*].'' 29 CFR 1605.1. The Department of Justice has declared that, in cases of capital punishment, no officer or employee may be required to attend or participate if doing so ''is contrary to the moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such participation or attendance contrary to medical ethics.'' 28 CFR 26.5.[17]

Forty-five states have health care conscience protections covering objections to abortion; several of these also cover sterilization or contraception.[18] Most of those state laws protect objections based on ''moral,'' ''ethical,'' or ''conscientious'' grounds in addition to ''religious'' grounds. Particularly in the case of abortion, some federal and state conscience laws do not require any specified motive for the objection. 42 U.S.C. 238n; Consolidated Appropriations, 2018, Public Law 115–141, Div. H, section 507(d).

These various statutes and regulations reflect an important governmental interest in protecting moral convictions in appropriate health contexts. The contraceptive Mandate implicates that governmental interest. Many persons and entities object to the Mandate in part because they consider some forms of FDA-approved contraceptives to be

morally equivalent to abortion due to the possibility that such items may prevent the implantation of a human embryo after fertilization.[19] The Supreme Court, in describing family business owners with religious objections, explained that ''[t]he owners of the businesses have religious objections to abortion, and according to their religious beliefs the four contraceptive methods at issue are abortifacients. If the owners comply with the HHS mandate, they believe they will be facilitating abortions.'' *Hobby Lobby,* 134 S. Ct. at 2751. Based on pleadings in the litigation, all of the litigants challenging the Mandate and asserting purely non-religious objections share this view. And as Congress has implicitly recognized in providing health care conscience protections pertaining to sterilization, contraception, and other health care services and practices, individuals or entities may have additional moral objections to contraception.[20]

d. Founding Principles

The Departments also look to guidance from, and draw support for the Moral IFC and these final rules from, the broader history of respect for conscience in the laws and founding principles of the United States. Members of Congress specifically relied on the American tradition of respect for conscience when they decided to protect moral convictions in health care. In supporting the protection of conscience based on non-religious moral convictions, Senator Buckley declared ''[i]t has been a traditional concept in our society from the earliest times that the right of conscience, like the paramount right to life from which it is derived, is sacred.'' Representative Heckler similarly stated that ''the right of moral conscience . . . has always been a part of our national tradition.'' This tradition is reflected, for example, in a letter President George Washington wrote saying that ''[t]he Citizens of the United States of America have a right to applaud themselves for having given to mankind examples of an enlarged and liberal policy: A policy worthy of imitation. All possess alike liberty of conscience and immunities of

---

[16] *See, for example,* 42 CFR 422.206 (declaring that the general Medicare Advantage rule ''does not require the MA plan to cover, furnish, or pay for a particular counseling or referral service if the MA organization that offers the plan—(1) Objects to the provision of that service on moral or religious grounds.''); 42 CFR 438.102 (declaring that information requirements do not apply ''if the MCO, PIHP, or PAHP objects to the service on

moral or religious grounds''); 48 CFR 1609.7001 (''health plan sponsoring organizations are not required to discuss treatment options that they would not ordinarily discuss in their customary course of practice because such options are inconsistent with their professional judgment or ethical, moral or religious beliefs.''); 48 CFR 352.270–9 (''Non-Discrimination for Conscience'' clause for organizations receiving HIV or Malaria relief funds).

[17] *See also* 18 CFR 214.11 (where a law enforcement agency (LEA) seeks assistance in the investigation or prosecution of trafficking of persons, the reasonableness of the LEA's request will depend in part on ''[c]ultural, religious, or moral objections to the request'').

[18] According to the Guttmacher Institute, 45 states have conscience statutes pertaining to abortion (43 of which cover institutions), 18 have conscience statutes pertaining to sterilization (16 of which cover institutions), and 12 have conscience statutes pertaining to contraception (8 of which cover institutions). ''Refusing to Provide Health Services,'' The Guttmacher Institute (June 1, 2017), *https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services.*

[19] FDA, ''Birth Control,'' U.S. Food and Drug Administration (Mar. 6, 2018), *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm* (various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization, but ''may also work . . . by preventing attachment (implantation) to the womb (uterus)'' of a human embryo after fertilization).

[20] *See supra* note 1.

Case: 25-2575    Document: 34-2    Page: 178    Date Filed: 12/12/2025
Case: 25-2575 v-045 WG3 Document 8391 Filed 12/14/16 Page 12 of 41

**57602**    **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

citizenship." [21] Thomas Jefferson similarly declared that "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of the civil authority." [22] Although these statements by Presidents Washington and Jefferson were spoken to religious congregations, and although religious and moral conscience were tightly intertwined for the Founders, they both reflect a broad principle of respect for conscience against government coercion. James Madison likewise called conscience "the most sacred of all property," and proposed that the Bill of Rights should guarantee, in addition to protecting religious belief and worship, that "the full and equal rights of conscience [shall not] be in any manner, or on any pretext infringed." [23]

These Founding Era statements of general principle do not specify how they would be applied in a particular health care context, and the Departments do not suggest that the specific protections offered in the Moral IFC and these final rules would be required or necessarily appropriate in any other context that does not raise the specific concerns implicated by this Mandate. These final rules do not address in any way how the Government would balance its interests with respect to other health services not encompassed by the contraceptive Mandate.[24] Instead, the Departments highlight this tradition of respect for conscience from the Nation's Founding Era to provide background support for the Departments' decision to implement section 2713(a)(4), while protecting conscience in the exercise of moral convictions. The Departments believe that these final rules are consistent both with the American tradition of respect for conscience and with Congress's history of providing conscience protections in the kinds of health care matters involved in this Mandate.

---

[21] Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790) (available at *https://founders.archives.gov/documents/Washington/05-06-02-0135*).

[22] Letter to the Society of the Methodist Episcopal Church at New London, Connecticut (February 4, 1809) (available at *https://founders.archives.gov/documents/Jefferson/99-01-02-9714*).

[23] James Madison, "Essay on Property" (March 29, 1792); First draft of the First Amendment, 1 Annals of Congress 434 (June 8, 1789).

[24] As the Supreme Court stated in *Hobby Lobby*, the Court's decision concerns only the contraceptive Mandate, and should not be understood to hold that all insurance-coverage mandates, for example, for vaccinations or blood transfusions, must necessarily fail if they conflict with an employer's religious beliefs. Nor does the Court's opinion provide a shield for employers who might cloak illegal discrimination as a religious (or moral) practice. 134 S. Ct. at 2783.

e. Executive Orders Relevant to These Expanded Exemptions

Protecting moral convictions, as set forth in these expanded exemptions and accommodation in these final rules, is consistent with recent executive orders. President Trump's Executive Order concerning this Mandate directed the Departments to consider providing protections, not specifically for "religious" beliefs, but for "conscience." We interpret that term to include both religious beliefs and moral convictions. Moreover, President Trump's first Executive Order, E.O. 13765, declared that "the Secretary of Health and Human Services (Secretary) and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the [ACA] shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any state or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." The exemption and accommodation adopted in these final rules relieves a regulatory burden imposed on entities with moral convictions opposed to providing certain contraceptive coverage and is therefore consistent with both Executive Orders.

f. Litigation Concerning the Mandate

The Departments have further taken into consideration the litigation surrounding the Mandate in exercising their discretion to adopt the exemption in these final rules. Among the lawsuits challenging the Mandate, two have been filed based in part on non-religious moral convictions. In one case, the Departments are subject to a permanent injunction requiring us to respect the non-religious moral objections of an employer. *See March for Life* v. *Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015). In the other case, an appeals court affirmed a district court ruling that allows the previous regulations to be imposed in a way that affects the moral convictions of a small nonprofit pro-life organization and its employees. *See Real Alternatives* v. *Sec'y, Dep't of Health & Human Servs.*, 867 F.3d 338 (3d Cir. 2017). The Departments' litigation of these cases has thus led to inconsistent court rulings, consumed substantial governmental resources, and created uncertainty for objecting organizations,

issuers, third party administrators, and employees and beneficiaries. The organizations that have sued seeking a moral exemption have adopted longstanding moral tenets opposed to certain FDA-approved contraceptives, and hire only employees who share this view. As a result, it is reasonable to conclude that employees of these organizations would not benefit from the Mandate. Thus, subjecting this subset of organizations to the Mandate does not advance any governmental interest. The need to resolve this litigation and the potential concerns of similar entities, as well as the legal requirement to comply with permanent injunctive relief currently imposed in *March for Life*, provide substantial reasons for the Departments to protect moral convictions through these final rules. Although, as discussed below, the Departments assume the number of entities and individuals that may seek exemption from the Mandate on the basis of moral convictions, as these two sets of litigants did, will be small, the Departments know from the litigation that it will not be zero. As a result, the Departments have taken these types of objections into consideration in reviewing our regulations. Having done so, the Departments consider it appropriate to issue the protections set forth in these final rules. Just as Congress, in adopting the early provisions of the Church Amendments, viewed it as necessary and appropriate to protect those organizations and individuals with objections to certain health care services on the basis of moral convictions, so the Departments, too, believe that "our moral convictions as well as our religious beliefs, warrant protection from this intrusion by the Government" in this situation. *See* 119 Cong. Rec. S5717–18.

The litigation concerning the Mandate has also underscored how important it is for the Government to tread carefully when engaging in regulation concerning sensitive health care areas. As demonstrated by the litigation, as well as the public comments, various citizens sincerely hold moral convictions, which are not necessarily religious, against providing or participating in coverage of contraceptive items included in the Mandate, and some believe that certain contraceptive items may cause early abortions. Providing conscience protections advances the ACA's goal of expanding health coverage among entities and individuals that might otherwise be reluctant to participate in the market. For example, the Supreme Court in *Hobby Lobby* declared that, if HHS requires owners of businesses to

cover procedures that the owners "could not in good conscience" cover, such as abortion, "HHS would effectively exclude these people from full participation in the economic life of the Nation." 134 S. Ct. at 2783. That sort of outcome is one the Departments wish to avoid. The Departments wish to implement the contraceptive coverage Guidelines issued under section 2713(a)(4) in a way that respects the moral convictions of Americans so that they are freer to engage in "full participation in the economic life of the Nation." The exemptions in these final rules do so by removing an obstacle that might otherwise lead entities or individuals with moral objections to contraceptive coverage to choose not to sponsor or participate in health plans if they include such coverage.

3. Whether Moral Exemptions Should Exist, and Whom They Should Cover

As noted above, the Department received comments expressing diverse views as to whether exemptions based on moral convictions should exist and, if so, whom they should cover.

Some commenters supported the expanded exemptions and accommodation in the Moral IFC, and the choice of entities and individuals to which they applied. They stated the expanded exemptions and accommodation would be an appropriate exercise of discretion and would be consistent with moral exemptions Congress has provided in many similar contexts. Similarly, commenters stated that the accommodation would be an inadequate means to resolve moral objections and that the expanded exemptions are needed. They contended that the accommodation process was objectionable because it was another method of complying with the Mandate, its self-certification or notice involved triggering the very contraceptive coverage that organizations objected to, and the coverage for contraceptive services "hijacked" or flowed in connection with the objecting organizations' health plans. The commenters contended that the seamlessness cited by the Departments between contraceptive coverage and an accommodated plan gives rise to moral objections that organizations would not have with an unexpanded exemption. Commenters also stated that, with respect to non-profit organizations that have moral objections and only hire persons who agree with those objections, the Mandate serves no legitimate government interest because the mandated coverage is neither wanted nor used and, therefore, would

yield no benefits—it would only suppress the existence of non-profit organizations holding those views.

Several other commenters stated that the exemptions were still too narrow. They asked that the exemptions set forth in these final rules be as broad as the exemptions set forth in the Religious IFC concerning sincerely held religious beliefs. Some of these commenters also asked that HHS withdraw its Mandate of contraceptive coverage from the Guidelines entirely. They contended that fertility and pregnancy are generally healthy conditions, not diseases that are appropriately the target of a preventive health service; that contraceptives can pose medical risks for women; and that studies do not show that contraceptive programs reduce abortion rates or unintended pregnancies. Some commented that many women report that they sought an abortion because their contraception failed. Some other commenters contended that, to the extent the Guidelines require coverage of certain drugs and devices that may prevent implantation of an embryo after fertilization, they require coverage of items that are abortifacient and, therefore, violate federal conscience protections such as the Weldon Amendment, Consolidated Appropriations Act, 2017, Public Law 115–31, Div. H, § 507(d).

Other commenters contended that the exemptions in the Moral IFC were too broad. Some of these commenters expressed concern about the prospect of publicly traded for-profit entities also being afforded a moral exemption. One such commenter commented that allowing publicly traded for-profit entities a moral exemption could cause instability and confusion, as leadership changes at such a corporation may effectively change the corporation's eligibility for a moral exemption. Still others stated that the Departments should not exempt various kinds of entities such as businesses, issuers, or nonprofit entities, arguing that only individuals, not entities, can possess moral convictions. Some commenters were concerned that providing moral exemptions would contribute to population growth and related societal woes. Other commenters contended the exemptions and accommodation should not be expanded, but should remain the same as they were in the July 2015 final regulations (80 FR 41318), which did not encompass moral convictions. Other commenters stated that the Departments should not provide exemptions, but merely an accommodation process, to resolve moral objections to the Mandate.

Some commenters objected to providing any exemption or accommodation for moral objections at all. Some of these commenters contended that even the previous regulations allowing an exemption and accommodation were too broad and that no exemptions to the Mandate should exist, in order that contraceptive coverage would be provided to as many women as possible. Other commenters did not go that far, but rejected the idea of exemptions or an accommodation based on moral convictions, contending that such exemptions or accommodation would contribute to population growth and related social woes. Some of these commenters also contended that the exemption in the Moral IFC would constitute an exemption covering every business and non-profit organization.

After considering these comments, and although the previous Administration declined to afford any exemption based on moral convictions, the Departments have concluded that it is appropriate to provide moral exemptions and access to the accommodation, as set forth in these final rules. Congress did not mandate contraceptive coverage, nor provide any explicit guidance about incorporating conscience exemptions into the Guidelines. But as noted above, it is a long-standing Congressional practice to provide consistent exemptions for both religious beliefs and moral convictions in many federal statutes in the health care context, and specifically concerning issues such as abortion, sterilization, and contraception. It is not clear to the Departments that, if Congress had expressly mandated contraceptive coverage in the ACA, it would have done so without providing for similar exemptions. Therefore, the Departments consider it appropriate, to the extent we impose a contraceptive Mandate by the exercise of agency discretion, that we also include an exemption for the protection of moral convictions in certain cases. The exemptions finalized in these final rules are generally consistent with the scope of exemptions that Congress has established in similar contexts. As noted above, the Departments consider the exemptions in these final rules consistent with the intent of Executive Order 13535. The Departments also wish to avoid the stark disparity that may result from respecting religious objections to providing contraceptive coverage among certain entities and individuals, but not respecting parallel objections for moral convictions possessed by any entities and

individuals at all because those objections are not specifically religious.

In addition, the Departments note that a significant majority of states either impose no contraceptive coverage requirement or offer broader exemptions than the exemption contained in the July 2015 final regulations.[25] Although the practice of states is by no means a limit on the discretion delegated to HRSA by the ACA, nor a statement about what the Federal Government may do consistent with other limitations in federal law, such state practices can inform the Departments' view that it is appropriate to provide conscience protections when exercising agency discretion.

The Departments decline to use these final rules to remove the contraceptive Mandate altogether, such as by declaring that HHS acting through HRSA shall not include contraceptives in the list of women's preventive services in Guidelines issued under section 2713(a)(4). HRSA's Guidelines were not issued, ratified, or updated through the regulations that preceded the Moral IFC and these final rules. Those Guidelines were issued in separate processes in 2011 and 2016, directly by HRSA, after consultation with external organizations that operated under cooperative agreements with HRSA to consider the issue, solicit public comment, and provide recommendations. The regulations preceding these final rules attempted only to restate the statutory language of section 2713 in regulatory form, and delineate what exemptions and accommodations would apply if HRSA listed contraceptives in its Guidelines. We decline to use these final rules to direct the separate process that HRSA uses to determine what specific services are listed in the Guidelines generally. Some commenters stated that if contraceptives are not removed from the Guidelines entirely, entities or individuals with moral objections might not qualify for the exemptions or accommodation. As discussed below, however, the exemptions in these rules include a broad range of entities and individuals of whom we have notice may object based on moral convictions. The Departments are not aware of specific employers or individuals whose moral convictions would still be violated by compliance with the Mandate after the issuance of the Moral IFC and these final rules.

Some commenters stated that HRSA should remove contraceptives from the Guidelines because the Guidelines have not been subject to the notice and comment process under the Administrative Procedure Act. Some commenters also contended that the Guidelines should be amended to omit items that may prevent (or possibly dislodge) the implantation of a human embryo after fertilization, in order to ensure consistency with conscience provisions that prohibit requiring plans to pay for or cover abortions. Whether and to what extent the Guidelines continue to list contraceptives, or items considered to prevent implantation of an embryo, for entities not subject to exemptions and an accommodation, and what process is used to include those items in the Guidelines, is outside the scope of these final rules. These final rules focus on what moral exemptions and accommodation shall apply if Guidelines issued under section 2713(a)(4) include contraceptives or items considered to be abortifacient.

Members of the public that support or oppose the inclusion of some or all contraceptives in the Guidelines, or wish to comment concerning the content and process of developing and updating the Guidelines, are welcome to communicate their views to HRSA, at *wellwomancare@hrsa.gov.*

The Departments also conclude that it would be inadequate to merely attempt to amend or expand the accommodation process to account for moral objectors, instead of providing the exemptions. In the past, the Departments stated in our regulations and court briefs that the previous accommodation required contraceptive coverage in a way that is "seamless" with the coverage provided by the objecting employer. As a result, in significant respects, the accommodation process did not actually accommodate the objections of many entities, as indicated by many entities with religious objections. The Departments have attempted to identify an accommodation that would eliminate the religious plaintiffs' objections, including seeking public comment through a Request For Information, 81 FR 47741 (July 26, 2016), but stated in January 2017 that we were unable to develop such an approach at that time.[26]

Just as the Departments continue to believe merely amending the accommodation process would not adequately address religious objections to compliance with the Mandate, we do not believe doing so would adequately address similar moral objections. Furthermore, the few litigants raising non-religious moral objections have been non-profit organizations that assert they only hire persons who share the employers' objection to contraceptive coverage. Consequently, the Departments conclude that the most appropriate approach to resolve these concerns is to provide the exemptions set forth in the Moral IFC and these final rules. These final rules also finalize the modifications to the accommodation process to make it available to entities with moral objections, without forcing such entities to choose between compliance with either the Mandate or the accommodation.

Some commenters expressed concern over the lack of a definition of "moral convictions" in the Moral IFC, arguing that, without a definition, any objection could be encompassed by the exemptions even if it is not based on moral convictions. The Departments did not adopt a regulatory definition of "moral convictions" in the Moral IFC, and have decided not to adopt such a definition in response to public comments at this time. Nevertheless, the Departments look to the description of moral convictions in *Welsh* to help explain the scope of the protection provided in the Moral IFC and these final rules. Neither these final rules or the Moral IFC, nor the Church Amendments or other Federal health care conscience statutes, define "moral convictions" (nor do they define "religious beliefs"). But in issuing these final rules, we adopt the same background understanding of that term that is reflected in the Congressional Record in 1973, in which legislators referenced cases such as *Welsh* to support the addition of language protecting moral convictions. In protecting moral convictions in parallel to religious beliefs, *Welsh* describes moral convictions warranting such protection as ones: (1) That the "individual deeply and sincerely holds"; (2) "that are purely ethical or moral in source and content"; (3) "but that nevertheless impose upon him a duty"; (4) and that "certainly occupy in the life of that individual a place parallel to that filled by . . . God' in traditionally religious persons," such

---

[25] *See* "Insurance Coverage of Contraceptives," The Guttmacher Institute (June 11, 2018), *https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.*

[26] *See* Departments of Labor, Health and Human Services, and the Treasury, FAQs About Affordable Care Act Implementation Part 36, (Jan. 9, 2017), *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious

objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

that one could say "his beliefs function as a religion in his life." 398 U.S. at 339–40. As recited above, Senators Church and Nelson agreed that protections for such moral convictions would not encompass an objection that an individual or entity raises "capriciously." Instead, along with the requirement that protected moral convictions must be "sincerely held," this understanding cabins the protection of moral convictions in contexts where they occupy a place parallel to that filled by sincerely held religious beliefs in religious persons and organizations.

While moral convictions are the sort of principles that, in the life of an individual, occupy a place parallel to religion, sincerely held moral convictions can also be adopted by corporate bodies, not merely by individuals. Senators Church and Nelson, while discussing the fact that opposition to abortion or sterilization on the basis of "moral questions" does not include capricious opposition to abortion for no reason at all, were specifically talking about opposition to abortion by corporate entities: A "hospital board, or whatever the ruling agency for the hospital was, a governing agency or otherwise." [27] Corporate bodies operate by the decision-making actions of individuals. Thus, if individuals act in the governance of a corporate body so as to adopt a position for that body of adopting moral convictions against coverage of contraceptives, such an entity can be considered to have an objection to contraceptive coverage on the basis of sincerely held moral convictions.

### 4. The Departments' Rebalancing of Government Interests

The Departments also received comments on their rebalancing of interests as expressed and referenced in the Moral IFC. Some public commenters agreed with the Departments'

conclusion that our interest in ensuring contraceptive coverage does not preclude the Departments from offering exemptions and an accommodation for entities, plans, and individuals with a qualifying objection to contraceptive coverage based on moral convictions. Some public commenters pointed out that protecting moral convictions serves to respect not only the interests of certain persons to access contraceptives, but also the interests of other persons to participate in a health coverage market consistent with their moral convictions. Other commenters disagreed with this rebalancing, and contended that the interest of women in receiving contraceptive coverage without cost-sharing is so great that it overrides private interests to the contrary, such that the government should or must force private entities to provide this coverage to other private citizens.

The Departments agree with the commenters who stated that the governmental interest in requiring contraceptive coverage does not override the interest in protecting moral convictions and does not make these expanded exemptions inappropriate. For additional discussion of the Government's balance of interests as applicable to religious beliefs, see section II.C.2.b. of the companion final rules concerning religious exemptions published by the Departments contemporaneously with these final rules elsewhere in today's **Federal Register**. There, and in the Religious and Moral IFCs, the Departments acknowledged the reasons why the Departments have changed the policies and interpretations previously adopted with respect to the Mandate and the governmental interests underlying it. For parallel reasons, the Departments believe the Government's legitimate interests in providing for contraceptive coverage do not require the Departments to violate sincerely held moral convictions while implementing the Guidelines. The Departments likewise believe Congress did not set forth interests that require us to violate sincerely held moral convictions if we otherwise require contraceptive coverage in our discretionary implementation of the women's preventive services Guidelines under section 2713(a)(4).

The Departments acknowledge that coverage of contraception is an important and highly controversial issue, implicating many different views, as reflected for example in the public comments received on multiple rulemakings over the course of implementation of section 2713(a)(4), added to the PHS Act in 2010. The

Departments' expansion of conscience protections for moral convictions, similar to protections contained in numerous statutes governing health care regulation, is not taken lightly. However, after considering public comments on various sides of the issue, and reconsidering the interests served by the Mandate in this particular context, the objections raised, and the relevant federal law, the Departments have determined that affording the exemptions to protect moral convictions is a more appropriate administrative response than continuing to refuse to extend the exemptions and accommodations to certain entities and individuals for whom the Mandate violates their sincerely held moral convictions. Although the number of organizations and individuals that may seek to invoke these exemptions and accommodation may be small, the Departments believe that it is important to provide such protection, given the long-standing recognition of such protections in law and regulation in the health care and health insurance contexts. The Moral IFC and these final rules leave unchanged HRSA's authority to decide whether to include contraceptives in the women's preventive services Guidelines for entities that are not exempted by law, regulation, or the Guidelines. These rules also do not change the many other mechanisms by which the Government advances contraceptive coverage, particularly for low-income women, including through such programs as Medicaid and Title X. The Departments also note that the exemptions created here, like the exemptions created by the previous Administration, do not burden third parties to a degree that counsels against providing the exemptions, as discussed below.

### 5. Burdens on Third Parties

The Department received a variety of comments about the effect that the exemptions and accommodation based on moral convictions would have on third parties. Some commenters stated that the exemptions and accommodation do not impose an impermissible or unjustified burden on third parties, including on women who might otherwise receive contraceptive coverage with no cost sharing. Other commenters disagreed, asserting that the exemptions unacceptably burden women who might lose contraceptive coverage as a result. They contended the exemptions may remove contraceptive coverage, causing women to have higher contraceptive costs, fewer contraceptive options, less ability to use contraceptives more consistently, more

---

[27] Nor was this recognition of the need to protect organizations that object to performance of certain health care procedures on the basis of moral conviction limited to the Church Amendments' legislative history. The first of the Church Amendments provides, in part, that the receipt of certain federal funds "by any individual or entity does not authorize any court or any public official or other public authority to require— . . . (2) such entity to—(A) make its facilities available for the performance of any sterilization procedure or abortion if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions, or (B) provide any personnel for the performance or assistance in the performance of any sterilization procedure or abortion if the performance or assistance in the performance of such procedures or abortion by such personnel would be contrary to the religious beliefs or moral convictions of such personnel." 42 U.S.C. 300a–7(b).

unintended pregnancies,[28] births spaced more closely, and workplace, economic, or societal inequality. Still other commenters took the view that other laws or protections, such as in the First or Fifth Amendments, prohibit the expanded exemptions, which those commenters view as prioritizing conscientious objection of exempted entities over the conscience, choices, or religious liberty of women who would not receive contraceptive coverage where an exemption is used. Some commenters disagreed and said the exemptions do not violate laws and constitutional protections, nor do they inappropriately prioritize the conscience of exempted entities over those of third parties.

The Departments note that the exemptions in the Moral IFC and these final rules, like the exemptions created by the previous Administration, do not impermissibly burden third parties. Initially, the Departments observe that these rules do not create a governmental burden; rather, they relieve a governmental burden. The ACA did not impose a contraceptive coverage requirement. Agency discretion was exercised to include contraceptives in the Guidelines issued under section 2713(a)(4). That decision is what created and imposed a governmental burden. These rules simply relieve part of that governmental burden. If some third parties do not receive contraceptive coverage from private parties whom the government chooses not to coerce, that result exists in the absence of governmental action—it is not a result the government has imposed. Calling that result a governmental burden rests on an incorrect presumption: That the government has an obligation to force private parties to benefit those third parties, and that the third parties have a right to those benefits. Congress did not create a right to receive contraceptive coverage from other private citizens through section 2713 of the PHS Act, other portions of the ACA, or any other statutes it has enacted. Although some commenters also contended such a right might exist under treaties the Senate has ratified or the Constitution, the Departments are not aware of any source demonstrating that the Constitution or a treaty ratified by the Senate creates a right to receive contraceptive coverage from other private citizens.

The fact that the government at one time exercised its administrative

discretion to require private parties to provide coverage to which they morally object, to benefit other private parties, does not prevent the government from relieving some or all of the burden of that Mandate. Otherwise, any governmental coverage requirement would be a one-way ratchet. In the Moral IFC and these final rules, the government has simply restored a zone of freedom where it once existed. There is no statutory or constitutional obstacle to the government doing so, and the doctrine of third party burdens should not be interpreted to impose such an obstacle. Such an interpretation would be especially problematic given the millions of women, in a variety of contexts, whom the Mandate does not ultimately benefit, notwithstanding any expanded exemptions—including through the grandfathering of plans, the previous religious exemptions, and the failure of the accommodation to require delivery of contraceptive coverage in various self-insured church plan contexts.

In addition, the Government is under no constitutional obligation to fund contraception. *Cf. Harris* v. *McRae,* 448 U.S. 297 (1980) (holding that, although the Supreme Court has recognized a constitutional right to abortion, there is no constitutional obligation for government to pay for abortions). Even more so may the government refrain from requiring private citizens, in violation of their moral convictions, to cover contraception for other citizens. *Cf. Rust* v. *Sullivan,* 500 U.S. 173, 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."). The constitutional rights of liberty and privacy do not require the government to force private parties to provide contraception to other citizens and do not prohibit the government from protecting moral objections to such governmental mandates, especially where, as here, the Mandate is not an explicit statutory requirement.[29] The Departments do not believe that the Constitution prohibits offering the expanded exemptions in these rules.

Some commenters objected that the exemptions would violate the Establishment Clause of the First Amendment. The Moral IFC and these final rules create exemptions for moral convictions, not religious beliefs, and they do so for the same neutral purposes

for which Congress has created similar exemptions for over four decades. Not only do these final rules not violate the Establishment Clause, but the Departments' decision to provide the exemptions and accommodation for moral convictions, instead of limiting the exemptions to identical objections based on religious beliefs, further demonstrates that neither the purpose nor the effect of these exemptions is to establish religion. The Establishment Clause does not force the Department to impose a contraceptive Mandate in violation of the moral convictions of entities and individuals protected by these rules.

American governmental bodies have, in many instances, refrained from requiring certain private parties to cover contraceptive services for other private parties. From 1789 through 2012 (when HRSA's Guidelines went into effect), there was no federal women's preventive services coverage mandate imposed nationally on health insurance and group health plans. The ACA did not require contraceptives to be included in HRSA's Guidelines, and it did not require any preventive services required under section 2713 of the PHS Act to be covered by grandfathered plans. Many states do not impose contraceptive coverage mandates, or they offer religious, and in some cases moral, exemptions to the requirements of such coverage mandates—exemptions that have not been invalidated by federal or state courts. The Departments, in previous regulations, exempted houses of worship and integrated auxiliaries from the Mandate. The Departments then issued a temporary enforcement safe harbor allowing religious nonprofit groups to not provide contraceptive coverage under the Mandate for almost two additional years. The Departments further expanded the houses of worship and integrated auxiliaries exemption through definitional changes. And the Departments created an accommodation process under which many women in self-insured church plans may not ultimately receive contraceptive coverage. The Departments are not aware of federal courts declaring that the exemptions, safe harbor, or accommodations gave rise to third party burdens that required the government to mandate contraceptive coverage by entities eligible for an exemption or accommodation. In addition, many organizations have not been subject to the Mandate in practice because of injunctions they received through litigation, protecting them from federal imposition of the Mandate, including

---

[28] Some commenters attempted to quantify the costs of unintended pregnancy, but were unable to provide estimates with regard to the number of women that this exemption may affect.

[29] *See, for example, Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists,* 257 P.3d 181, 196 (Ariz. Ct. App. 2011) ("[A] woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

Case: 25-2575      Document: 34-2      Page: 183      Date Filed: 12/12/2025
Case: 2:2-cv-04540-WB  Document 6962  Filed 12/10/16  Page 17 of 45

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations      **57607**

under several recently entered permanent injunctions that will apply regardless of the issuance of these final rules.

Commenters offered various assessments of the impact these rules might have on state or local governments. Some commenters stated that the expanded exemptions will not burden state or local governments, or that such burdens should not prevent the Departments from offering those exemptions. Others commenters stated that if the Departments provide expanded exemptions, states or local jurisdictions may face higher costs in providing birth control to women through government programs. The Departments consider it appropriate to offer expanded exemptions, notwithstanding the objection of some state or local governments. Until 2012, there was no federal mandate of contraceptive coverage across health insurance and health plans nationwide. The ACA did not require a contraceptive Mandate, and its discretionary creation by means of HRSA's Guidelines does not translate to a benefit that the federal government owes to state or local governments. The various situations recited in the previous paragraph, in which the federal government has not imposed contraceptive coverage, have not been deemed to cause a cognizable injury to state or local governments. The Departments find no legal prohibition on finalizing these final rules based on the allegation of an impact on state or local governments, and disagree with the suggestion that once having exercised our discretion to deny exemptions—no matter how recently or incompletely—the Departments cannot change course if some state and local governments believe they are receiving indirect benefits from the previous decision.

In addition, the exemptions at issue here are available only to a tiny fraction of entities to which the Mandate would otherwise apply—those with qualifying moral objections. Public comments did not provide reliable data on how many entities would use these expanded moral exemptions, in which states women in those plans would reside, how many of those women would qualify for or use state and local government subsidies of contraceptives as a result, or in which states such women, if they are low income, would go without contraceptives and potentially experience unintended pregnancies that state Medicaid programs would potentially have to cover. As noted below, at least one

study[30] has concluded the Mandate caused no clear increase in contraceptive use; one explanation proposed by the authors of the study is that women eligible for family planning from safety net programs were already receiving free or subsidized contraceptive access through them, notwithstanding the Mandate's effects on the overall market. Some commenters who opposed the exemptions admitted that this information is unclear at this stage; other commenters that estimated considerably more individuals and entities would seek an exemption also admitted the difficulty of quantifying estimates. In addition, the only entities that have brought suit based on their moral objections to the Mandate are non-profit entities that have said they only hire persons who share their objections and do not use the contraceptives to which their employers object, so it is unlikely that exemptions for those entities would have any impact on safety net programs. Below, we predict that a small number of additional nonprofit and closely held for-profit entities will use the exemptions based on moral convictions. In light of the limited evidence of third party or state and local government impact of these final rules, the Departments consider it an appropriate policy option to provide the exemptions.

Some commenters contended that the exemptions would constitute unlawful sex discrimination, such as under section 1557 of the Affordable Care Act, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, or the Fifth Amendment. Some commenters suggested the expanded exemptions would discriminate on bases such as race, disability, or LGBT status, or that they would disproportionately burden certain persons in such categories.

But these rules do not discriminate or draw any distinctions on the basis of sex, pregnancy, race, disability, socio-economic class, LGBT status, or otherwise, nor do they discriminate on any unlawful grounds. The exemptions in these rules do not authorize entities to comply with the Mandate for one person, but not for another person, based on that person's status as a member of a protected class. Instead, they allow entities that have sincerely held moral objections to providing some

---

[30] M.L. Kavanaugh et al., "Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014," 97 *Contraception* 14, 14–21 (2018), available at *http://www.contraceptionjournal.org/article/S0010-7824(17)30478-X/pdf.*

or all contraceptives included in the Mandate to not be forced to provide coverage of those items to anyone.

Those commenters' contentions about discrimination are unpersuasive for still additional reasons. First, Title VII is applicable to discrimination committed by employers, and these final rules have been issued in the government's capacity as a regulator of group health plans and group and individual health insurance, not in its capacity as an employer. *See also In Re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 940–42 & n.1 (8th Cir. 2007) (holding that Title VII "does not require coverage of contraception because contraception is not a gender-specific term like potential pregnancy, but rather applies to both men and women"). Second, these rules create no disparate impact. The women's preventive service mandate under section 2713(a)(4), and the contraceptive Mandate promulgated under such preventive services mandate, already inure to the specific benefit of women—men are denied any benefit from section 2713(a)(4). Both before and after these rules are in effect, section 2713(a)(4) and the Guidelines issued under that section treat women's preventive services in general, and female contraceptives specifically, more favorably than they treat male preventive services or contraceptives.

It is simply not the case that the government's implementation of section 2713(a)(4) is discriminatory against women because exemptions encompass moral objections. The previous rules, as discussed elsewhere herein, do not require contraceptive coverage in a host of plans, including grandfathered plans, plans of houses of worship and integrated auxiliaries, and—through inability to enforce the accommodation on certain third party administrators—plans of many religious non-profits in self-insured church plans. Below, the Departments estimate that nearly all women of childbearing age in the country will be unaffected by these exemptions. In this context, the Departments do not believe that an adjustment to discretionary Guidelines for women's preventive services concerning contraceptives constitutes unlawful sex discrimination. Otherwise, anytime the government exercises its discretion to provide a benefit that is specific to women (or specific to men), it would constitute sex discrimination for the government to reconsider that benefit. Under that theory, *Hobby Lobby* itself, and RFRA (on which *Hobby Lobby*'s holding was based), which provided a religious exemption to this Mandate for many businesses, would be deemed discriminatory against women

because the underlying women's preventive services requirement is a benefit for women, not for men. Such conclusions are not consistent with legal doctrines concerning sex discrimination.

It is not clear that these expanded exemptions will significantly burden women most at risk of unintended pregnancies. Some commenters stated that contraceptives are often readily accessible at relatively low cost. Other commenters disagreed. Some commenters objected that the Moral IFC's estimate of a $584 yearly cost of contraceptives for women was too low. But some of those same commenters provided similar estimates, citing sources claiming that birth control pills can cost up to $600 per year, and stated that IUDs, which can last 3 to 6 years or more,[31] can cost $1,100 (that is, less than $50 per month over the duration of use). Some commenters stated that, for lower income women, contraceptives and related education and counseling can be available at free or low cost through government programs (federal programs offering such services include, for example, Medicaid, Title X, community health center grants, and Temporary Assistance for Needy Families (TANF)). Other commenters contended that many women in employer-sponsored coverage might not qualify for those programs, although that sometimes occurs because their incomes are above certain thresholds or because the programs were not intended to absorb privately covered individuals. Some commenters observed that contraceptives may be available through other sources, such as a plan of another family member, and that the expanded exemptions will not likely encompass a very large segment of the population otherwise benefitting from the Mandate. Other commenters disagreed, emphasizing that income and eligibility thresholds could prevent some women from receiving contraceptives through certain government programs if they were no longer covered in their group health plans or health insurance plans.

The Departments do not believe that such differences make it inappropriate to issue the expanded exemptions set forth in these rules. As explained more fully below, the Departments estimate that nearly all women of childbearing age in the country will be unaffected by these exemptions. Moreover, the Departments note that the HHS Office of Population Affairs, within the Office of the Assistant Secretary for Health, has recently issued a proposed rule to amend the regulations governing its Title X family planning program. The proposed rule would amend the definition of "low income family"—individuals eligible for free or low cost contraceptive services—to include women who are unable to obtain certain family planning services under their employer-sponsored health coverage due to their employers' religious beliefs or moral convictions. (83 FR 25502). If that rule is finalized as proposed, it would further reduce any potential effect of these final rules on women's access to contraceptives.

Some commenters stated that the expanded exemptions would violate section 1554 of the ACA. That section says the Secretary of HHS "shall not promulgate any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full range of treatment options between the patient and the provider," "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," "violates the principles of informed consent and the ethical standards of health care professionals," or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. 18114. Such commenters urged, for example, that the Moral IFC created unreasonable barriers to the ability of individuals to obtain appropriate medical care, particularly in areas they said may have a disproportionately high number of entities likely to take advantage of the exemption.

The Departments disagree with these comments about section 1554 of the ACA. The Departments issued previous exemptions and accommodations that allowed various plans to not provide contraceptive coverage on the basis of religious objections; multiple courts considered those regulations; and while many ruled that entities did not need to provide contraceptive coverage, none ruled that the exemptions or accommodations in the regulations violated section 1554 of the ACA. Moreover, the decision not to impose a governmental mandate is not the creation of a "barrier," especially when that mandate requires private citizens to provide services to other private citizens. This would turn the assumptions of the United States' system of government on its head. See, for example, U.S. Constitution, Ninth Amendment. Section 1554 of the ACA likewise does not require the Departments to require coverage of, or to keep in place a requirement to cover, certain services, including contraceptives, that was issued pursuant to HHS's exercise of discretion under section 2713(a)(4). Nor does section 1554 of the ACA prohibit the Departments from providing exemptions to relieve burdens on moral convictions, or as is the case here, from refraining to impose the Mandate in cases where moral convictions would be burdened by the Mandate. Moral exemptions from federal mandates in certain health contexts, including sterilization, contraception, or items believed to be abortifacient, have existed in federal laws for decades. Some of those laws were referenced by President Obama in signing Executive Order 13535. In light of that Executive Order and Congress's long history of providing exemptions for moral convictions in the health context, providing moral exemptions is a reasonable administrative response to this federally mandated burden, especially since the burden itself is a subregulatory creation that does not apply in various contexts.

In short, we do not believe sections 1554 or 1557 of the ACA, other nondiscrimination statutes, or any constitutional doctrines, create an affirmative obligation to create, maintain, or impose a Mandate that forces covered entities to provide coverage of preventive contraceptive services in health plans. The ACA's grant of authority to HRSA to provide for, and support, the Guidelines is not transformed by any of the laws cited by commenters into a requirement that, once those Guidelines exist, they can never be reconsidered, or amended because doing so would only affect women's coverage or would allegedly impact particular populations disparately.

In summary, members of the public have widely divergent views on whether the exemptions in the Moral IFC and these final rules are good public policy. Some commenters stated that the exemptions would burden workers, families, and the economic and social stability of the country, and interfere with the physician-patient relationship. Other commenters disagreed, favoring the public policy behind the exemption, and arguing that the exemption would not interfere with the physician-patient relationship. The Departments have determined that these final rules are an appropriate exercise of public policy discretion. Because of the importance of the moral convictions being accommodated, the limited impact of these final rules, and uncertainty about

---

[31] See, for example, "IUD," Planned Parenthood, https://www.plannedparenthood.org/learn/birth-control/iud.

Case: 25-2575    Document: 34-2    Page: 185    Date Filed: 12/12/2025
Case 2:??-cv-?4540-WB    Document 6902    Filed 12/13/15    Page 19 of 45

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57609**

the impact of the Mandate overall according to some studies, the Departments do not believe these final rules will have any of the drastic negative consequences on third parties or society that some opponents of these rules have suggested.

### 6. Interim Final Rulemaking

The Departments received several comments about the decision to issue the Moral IFC as interim final rules with request for comments, instead of as a notice of proposed rulemaking. Several commenters asserted that the Departments had the authority to issue the Moral IFC in that way, agreeing with the Departments that there was explicit statutory authority to do so, good cause under the APA, or both. Other commenters held the opposite view, contending that there was neither statutory authority to issue the rules on an interim final basis, nor good cause under the APA to make the rules immediately effective.

The Departments continue to believe authority existed to issue the Moral IFC as interim final rules. Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include sections 2701 through 2728 of that Act, and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. The Religious and Moral IFCs fall under those statutory authorizations for the use of interim final rulemaking. Prior to the Moral IFC, the Departments issued three interim final regulations implementing this section of the PHS Act because of the needs of covered entities for immediate guidance and the weighty matters implicated by the HRSA Guidelines, including issuance of new or revised exemptions or accommodations. (75 FR 41726; 76 FR 46621; 79 FR 51092). The Departments also had good cause to issue the Moral IFC as interim final rules, for the reasons discussed therein.

In any event, the objections of some commenters to the issuance of the Moral IFC as interim final rules with request for comments does not prevent the issuance of these final rules. These final rules were issued after receiving and thoroughly considering public comments as requested in the Moral IFC. These final rules therefore comply with the APA's notice and comment requirements.

### 7. Health Effects of Contraception and Pregnancy

The Departments received numerous comments on the health effects of contraception and pregnancy. As noted above, some commenters supported the expanded exemptions, and others urged that contraceptives be removed from the Guidelines entirely, based on the view that pregnancy and the unborn children resulting from conception are not diseases or unhealthy conditions that are properly the subject of preventive care coverage. Such commenters further contended that hormonal contraceptives may present health risks to women. For example, they contended that studies show certain contraceptives cause, or are associated with, an increased risk of depression,[32] venous thromboembolic disease,[33] fatal pulmonary embolism,[34] thrombotic stroke and myocardial infarction (particularly among women who smoke, are hypertensive, or are older),[35] hypertension,[36] HIV–1 acquisition and transmission,[37] and breast, cervical, and liver cancers.[38] Some commenters also stated that fertility awareness based methods of birth spacing are free of similar health risks since they do not involve ingestion of chemicals. Some commenters contended that it is not the case that contraceptive access reduces unintended pregnancies or abortions.

Other commenters disagreed, citing a variety of studies they contend show health benefits caused by, or associated

---

[32] Commenters cited Charlotte Wessel Skovlund, et al., "Association of Hormonal Contraception with Depression," *JAMA Psychiatry* 1154, 1154 (published online Sept. 28, 2016) ("Use of hormonal contraception, especially among adolescents, was associated with subsequent use of antidepressants and a first diagnosis of depression, suggesting depression as a potential adverse effect of hormonal contraceptive use.").

[33] Commenters cited the Practice Committee of the American Society for Reproductive Medicine, "Hormonal Contraception: Recent Advances and Controversies," 82 *Fertility and Sterility* S26, S30 (2004); V.A. Van Hylckama et al., "The Venous Thrombotic Risk of Oral Contraceptives, Effects of Estrogen Dose and Progestogen Type: Results of the MEGA Case-Control Study," 339 *Brit. Med. J.* b2921 (2009); Y. Vinogradova et al., "Use of Combined Oral Contraceptives and Risk of Venous Thromboembolism: Nested Case-Control Studies Using the QResearch and CPRD Databases," 350 *Brit. Med. J.* h2135 (2015) ("Current exposure to any combined oral contraceptive was associated with an increased risk of venous thromboembolism . . . compared with no exposure in the previous year."); Ø. Lidegaard et al., "Hormonal contraception and risk of venous thromboembolism: national follow-up study," 339 *Brit. Med. J.* b2890 (2009): M. de Bastos et al., "Combined oral contraceptives: venous thrombosis," Cochrane Database Syst. Rev., Mar. 3, 2014. doi: 10.1002/14651858.CD010813.pub2, available at *https://www.ncbi.nlm.nih.gov/pubmed?term=24590565*; L.J. Havrilesky et al., "Oral Contraceptive User for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html*; and Robert A. Hatcher et al., *Contraceptive Technology*, 405–07 (Ardent Media 18th rev. ed. 2004).

[34] Commenters cited N.R. Poulter, "Risk of Fatal Pulmonary Embolism with Oral Contraceptives," 355 *Lancet* 2088 (2000).

[35] Commenters cited Ø. Lidegaard et al., "Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception, 366 *N. Engl. J. Med.* 2257, 2257 (2012) (risks "increased by a factor of 0.9 to 1.7 with oral contraceptives that included ethinyl estradiol at a dose of 20 µg and by a factor of 1.3 to 2.3 with those that included ethinyl estradiol at a dose of 30 to 40 µg"); Practice Committee of the American Society for Reproductive Medicine, "Hormonal Contraception"; M. Vessey et al., "Mortality in Relation to Oral Contraceptive Use and Cigarette Smoking," 362 *Lancet* 185, 185–91 (2003); WHO Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Acute Myocardial Infarction and Combined Oral Contraceptives: Results of an International Multicentre Case-Control Study," 349 *Lancet* 1202, 1202–09 (1997); K.M. Curtis et al., "Combined Oral Contraceptive Use Among Women With Hypertension: A Systematic Review," 73 Contraception 179, 179–188 (2006); L.A. Gillum et al., "Ischemic stroke risk with oral contraceptives: A meta analysis," 284 *JAMA* 72, 72–78 (2000), available at *https://www.ncbi.nlm.nih.gov/pubmed/10872016*; and Robert A. Hatcher et al., *Contraceptive Technology*, 404–05, 445 (Ardent Media 18th rev. ed. 2004).

[36] Commenters cited Robert A. Hatcher et al., *Contraceptive Technology*, 407, 445 (Ardent Media 18th rev. ed. 2004).

[37] Commenters cited Renee Heffron et al., "Use of Hormonal Contraceptives and Risk of HIV–1 Transmission: A Prospective Cohort Study," 12 *Lancet Infectious Diseases* 19, 24 (2012) ("Use of hormonal contraceptives was associated with a two-time increase in the risk of HIV–1 acquisition by women and HIV–1 transmission from women to men."); and "Hormonal Contraception Doubles HIV Risk, Study Suggests," *Science Daily* (Oct. 4, 2011), *https://www.sciencedaily.com/releases/2011/10/111003195253.htm*.

[38] Commenters cited "Oral Contraceptives and Cancer Risk," National Cancer Institute (Mar. 21, 2012), *https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet*; L.J Havrilesky et al., "Oral Contraceptive User for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html*; S. N. Bhupathiraju et al., "Exogenous hormone use: Oral contraceptives, postmenopausal hormone therapy, and health outcomes in the Nurses' Health Study," 106 *Am. J. Pub. Health* 1631, 1631–37 (2016); The World Health Organization Department of Reproductive Health and Research, "Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment," (Sept. 2005), available at *http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf*; and the American Cancer Society, "Known and Probably Human Carcinogens," American Cancer Society (rev. Nov. 3, 2016), *https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html*.

with, contraceptive use or the prevention of unintended pregnancy. Commenters cited, for example, the 2011 Report of the Institute of Medicine (IOM), "Clinical Preventive Services for Women: Closing the Gaps," in its discussion of the negative effects associated with unintended pregnancies, as well as other studies. Such commenters contended that, by reducing unintended pregnancy, contraceptives reduce the risk of unaddressed health complications, low birth weight, preterm birth, infant mortality, and maternal mortality. Commenters also stated that studies show contraceptives are associated with a reduced risk of conditions such as ovarian cancer, colorectal cancer, and endometrial cancer, and that contraceptives treat such conditions as endometriosis, polycystic ovarian syndrome, migraines, pre-menstrual pain, menstrual regulation, and pelvic inflammatory disease.[39] Some commenters stated that pregnancy presents various health risks, such as blood clots, bleeding, anemia, high blood pressure, gestational diabetes, and death. Some commenters also contended that increased access to contraception reduces abortions.

Some commenters stated that, in the Moral IFC, the Departments relied on incorrect statements concerning scientific studies. For example, some commenters stated that there is no proven increased risk of breast cancer or other risks among contraceptive users. They criticized the Departments for citing studies, including one previewed in the 2011 IOM Report itself (Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013) (cited above)), discussing an association between contraceptive use and increased risks of breast and cervical cancer, and concluding there are no net cancer-reducing benefits of contraceptive use. As described in the Religious IFC, 82 FR 47804, the 2013 Agency for Healthcare Research and Quality study, and other sources, reach conclusions with which these commenters appear to disagree. The Departments consider it appropriate to consider these studies, as well as the studies cited by commenters who disagree with those conclusions.

Some commenters further criticized the Departments for saying two studies cited by the 2011 IOM Report, which asserted an associative relationship between contraceptive use and decreases in unintended pregnancy, did

not on their face establish a causal relationship between a broad coverage mandate and decreases in unintended pregnancy. In this respect, as noted in the Religious IFC,[40] the purpose for the Departments' reference to such studies was to highlight the difference between a causal relationship and an associative one, as well as the difference between saying contraceptive use has a certain effect and saying a contraceptive coverage mandate (or part of that mandate affected by certain exemptions) will necessarily have (or negate, respectively) such an effect.

Commenters disagreed about the effects of some FDA-approved contraceptives on embryos. Some commenters agreed with the quotation, in the Moral IFC, of FDA materials[41] that indicate that some items it has approved as contraceptives may prevent the implantation of an embryo after fertilization. Some of those commenters cited additional scientific sources to argue that certain approved contraceptives may prevent implantation, and that, in some cases, some contraceptive items may even dislodge an embryo shortly after implantation. Other commenters disagreed with the sources cited in the Moral IFC and cited additional studies on that issue. Some commenters further criticized the Departments for asserting in the Moral IFC that some persons believe those possible effects are "abortifacient."

This objection on this issue appears to be partially one of semantics. People disagree about whether to define "conception" or "pregnancy" to occur at fertilization, when the sperm and ovum unite, or days later at implantation, when that embryo has undergone further cellular development, travelled down the fallopian tube, and implanted in the uterine wall. This question is independent of the question of what mechanisms of action FDA-approved or cleared contraceptives may have. It is also a separate question from whether members of the public assert, or believe, that it is appropriate to consider the items "abortifacient"—that is, a kind of abortion, or a medical product that causes an abortion— because they believe abortion means to cause the demise of a post-fertilization

embryo inside the mother's body. Commenters referenced scientific studies and sources on both sides of the issue of whether certain contraceptives prevent implantation. Commenters and litigants have positively stated that some of them view certain contraceptives as abortifacients, for this reason. *See also Hobby Lobby,* 134 U.S. at 2765 ("The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients.").

The Departments do not take a position on the scientific, religious, or moral debates on this issue by recognizing that some people have sincere moral objections to providing contraception coverage on this basis. The Supreme Court has already recognized that such a view can form the basis of an objection based on sincerely held religious belief under RFRA.[42] Several litigants have separately raised non-religious moral objections to contraceptive coverage based on the same basic rationale. Even though there is a plausible scientific argument against the view that certain contraceptives have mechanisms of action that may prevent implantation, there is also a plausible scientific argument in favor of it—as demonstrated, for example, by FDA's statement that some contraceptives may prevent implantation and by some scientific studies cited by commenters. The Departments believe in this context we have a sufficient rationale to offer moral exemptions with respect to this Mandate.

The Departments also received comments about their discussion, located in the Religious IFC but partly relied upon in the Moral IFC, concerning uncertainty about the effects the Mandate's expanded exemptions might have on teen sexual activity. In this respect, the Departments stated, "With respect to teens, the Santelli and Melnikas study cited by IOM 2011

---

[39] To the extent that contraceptives are prescribed to treat health conditions, and not for preventive purposes, the Mandate would not be applicable.

[40] 82 FR at 47803–04.

[41] FDA's guide "Birth Control" specifies that various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work . . . by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization. Available at *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm*.

[42] "Although many of the required, FDA-approved methods of contraception work by preventing the fertilization of an egg, four of those methods (those specifically at issue in these cases) may have the effect of preventing an already fertilized egg from developing any further by inhibiting its attachment to the uterus. See Brief for HHS in No. 13–354, pp. 9–10, n. 4; FDA, Birth Control: Medicines to Help You." *Hobby Lobby,* 134 S. Ct. at 2762–63. "The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients. . . . Like the Hahns, the Greens believe that life begins at conception and that it would violate their religion to facilitate access to contraceptive drugs or devices that operate after that point." *Id.* at 2765–66.

Case: 25-2575  Document: 34-2  Page: 187  Date Filed: 12/12/2025
Case: 3:17-cv-04540-WHO  Document 69-2  Filed 12/12/2025  Page 14 of 45

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    57611

observes that, between 1960 and 1990, as contraceptive use increased, teen sexual activity outside of marriage likewise increased (although the study does not assert a causal relationship). Another study, which proposed an economic model for the decision to engage in sexual activity, stated that '[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run.' ''[43] Some commenters agreed with this discussion, while other commenters disagreed. Commenters who supported the expanded exemptions cited these and similar sources suggesting that limiting the exemptions to the Mandate to those that existed prior to the Religious and Moral IFCs is not tailored towards advancing the Government's interests in reducing teen pregnancy. Instead they suggested there are means of reducing teen pregnancy that are less burdensome on conscientious objections.[44] Some commenters opposing the expanded exemptions stated that school-based health centers provide access to contraceptives, thus increasing use of contraceptives by sexually active students. They also cited studies concluding that certain decreases in teen pregnancy are attributable to increased contraceptive use.[45]

Many commenters opposing the moral exemptions misunderstood the Departments' discussion of this issue. Teens are a significant part, though not the entirety, of women the IOM identified as being most at risk of unintended pregnancy. The

Departments do not take a position on the empirical question of whether contraception has caused certain reductions in teen pregnancy. Rather, the Departments note that studies suggesting various causes of teen pregnancy and unintended pregnancy in general make it difficult to establish causation between exemptions to the contraceptive Mandate, and an increase in teen pregnancies in particular, or unintended pregnancies in general. For example, a 2015 study investigating the decline in teen pregnancy since 1991 attributed it to multiple factors (including, but not limited to, reduced sexual activity, falling welfare benefit levels, and expansion of family planning services in Medicaid, with the latter accounting for less than 13 percent of the decline). It concluded that ''that none of the relatively easy, policy-based explanations for the recent decline in teen childbearing in the United States hold up very well to careful empirical scrutiny.'' [46] One study found that, during the teen pregnancy decline between 2007 through 2012, teen sexual activity was also decreasing.[47] One study concluded that falling unemployment rates in the 1990s accounted for 85 percent of the decrease in rates of first births among 18 to 19 year-old African Americans.[48] Another study found that the representation of African-American teachers was associated with a significant reduction in the African-American teen pregnancy rate.[49] One study concluded that an ''increase in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy.'' [50] Similarly,

one study from England found that, where funding for teen pregnancy prevention was reduced, there was no evidence that the reduction led to an increase in teen pregnancies.[51] Some commenters also cited studies—which are not limited to the issue of teen pregnancy—that have found that many women who have abortions report that they were using contraceptives when they became pregnant.[52]

As the Departments stated in the Religious IFC, we do not take a position on the variety of empirical questions discussed above. Likewise, these rules do not address the substantive question of whether HRSA should include contraceptives in the women's preventive services Guidelines issued under section 2713(a)(4). Rather, reexamination of the record and review of public comments has reinforced the Departments' view that the uncertainty surrounding these weighty and important issues makes it appropriate to provide the moral exemptions and accommodation if and for as long as HRSA continues to include contraceptives in the Guidelines. The federal government has a long history, particularly in certain sensitive and multi-faceted health issues, of providing moral exemptions from governmental mandates. These final rules are consistent with that history and with the discretion Congress vested in the Departments to implement the ACA.

## 8. Health and Equality Effects of Contraceptive Coverage Mandates

The Departments also received comments about the health and equality effects of the Mandate more broadly. Some commenters contended that the contraceptive Mandate promoted the health and equality of women, especially low income women, and promoted female participation and

[43] Citing J.S. Santelli & A.J. Melnikas, ''Teen fertility in transition: recent and historic trends in the United States,'' 31 *Ann. Rev. Pub. Health* 371, 375–76 (2010), and Peter Arcidiacono et al., *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* (2005), available at *http://public.econ.duke.edu/~psarcidi/addicted13.pdf. See also* K. Buckles & D. Hungerman, ''The Incidental Fertility Effects of School Condom Distribution Programs,'' *Nat'l Bureau of Econ. Research* Working Paper No. 22322 (June 2016), available at *http://www.nber.org/papers/w22322* (''access to condoms in schools increases teen fertility by about 10 percent'' and increased sexually transmitted infections).

[44] *See* Helen Alvaré, ''No Compelling Interest: The 'Birth Control' Mandate and Religious Freedom,'' 58 *Vill. L. Rev.* 379, 400–02 (2013) (discussing the Santelli & Melnikas study and the Arcidiacono study cited above, and other research that considers the extent to which reduction in teen pregnancy is attributable to sexual risk avoidance rather than to contraception access).

[45] *See, e.g.,* Lindberg L., Santelli J., ''Understanding the Decline in Adolescent Fertility in the United States, 2007–2012,'' 59 *J. Adolescent Health* 577–83 (Nov. 2016), *available at http://doi.org/10.1016/j.jadohealth.2016.06.024; see also* Comment of The Colorado Health Foundation, submission ID CMS–2014–0115–19635, *www.regulations.gov* (discussing teen pregnancy data from Colorado).

[46] Kearney MS and Levine PB, ''Investigating recent trends in the U.S. birth rate,'' 41 *J. Health Econ.* 15–29 (2015), available at *https://www.sciencedirect.com/science/article/abs/pii/S0167629615000041.*

[47] *See, e.g.,* K. Ethier et al., ''Sexual Intercourse Among High School Students—29 States and United States Overall, 2005–2015,'' 66 *CDC Morb. Mortal. Wkly Report* 1393, 1393–97 (Jan. 5, 2018), available at *http://dx.doi.org/10.15585/mmwr.mm665152a1* (''Nationwide, the proportion of high school students who had ever had sexual intercourse decreased significantly overall . . . .'').

[48] Colen CG, Geronimus AT, and Phipps MG, ''Getting a piece of the pie? The economic boom of the 1990s and declining teen birth rates in the United States,'' 63 *Social Science & Med.* 1531–45 (Sept. 2006), available at *https://www.sciencedirect.com/science/article/pii/S027795360600205X.*

[49] Atkins DN and Wilkins VM, ''Going Beyond Reading, Writing, and Arithmetic: The Effects of Teacher Representation on Teen Pregnancy Rates,'' 23 *J. Pub. Admin. Research & Theory* 771–90 (Oct. 1, 2013), available at *https://academic.oup.com/jpart/article-abstract/23/4/771/963674.*

[50] E. Collins & B. Herchbein, ''The Impact of Subsidized Birth Control for College Women: Evidence from the Deficit Reduction Act,'' *U. Mich. Pop. Studies Ctr.* Report 11–737 (May 2011),

available at *https://www.psc.isr.umich.edu/pubs/pdf/rr11-737.pdf* (''[I]ncrease in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy or sexually transmitted infections for most women'').

[51] *See* D. Paton & L. Wright, ''The effect of spending cuts on teen pregnancy,'' 54 *J. Health Econ.* 135, 135–46 (2017), available at *https://www.sciencedirect.com/science/article/abs/pii/S0167629617304551* (''Contrary to predictions made at the time of the cuts, panel data estimates provide no evidence that areas which reduced expenditure the most have experienced relative increases in teenage pregnancy rates. Rather, expenditure cuts are associated with small reductions in teen pregnancy rates'').

[52] Commenters cited, for example, Guttmacher Institute, ''Fact Sheet: Induced Abortion in the United States'' (Jan. 2018) (''Fifty-one percent of abortion patients in 2014 were using a contraceptive method in the month they became pregnant''), available at *https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf.*

equality in the workforce. Other commenters contended there was insufficient evidence showing that the expanded exemptions would harm those interests. Some of those commenters further questioned whether there was evidence to show that broad health coverage mandates of contraception lead to increased contraceptive use, reductions in unintended pregnancies, or reductions in negative effects said to be associated with unintended pregnancies. In particular, some commenters discussed a study published and revised by the Guttmacher Institute in October 2017, concluding that "[b]etween 2008 and 2014, there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy." [53] This timeframe includes the first two years of the contraceptive Mandate's implementation. Despite some changes in the use of various methods of contraceptives, the study concluded that, "[f]or the most part, women are changing method type within the group of most or moderately effective methods and not shifting from less effective to more effective methods." Regarding the effect of this Mandate in particular, the authors concluded that "[t]he role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA (most or moderately effective methods) during the most recent time period (2012–2014) excepting small increases in implant use." The authors observed that other "[s]tudies have produced mixed evidence regarding the relationship between the implementation of the ACA and contraceptive use patterns." In explaining some possible reasons or no clear effect on contraceptive use, the authors suggested that "existence of these safety net programs [publicly funded family planning centers and Medicaid] may have dampened any impact that the ACA could have had on contraceptive use," "cost is not the only barrier to accessing a full range of method options," and "access to affordable and/or free contraception made possible through programs such as Title X" may have led to income not being associated with the use of most

contraceptive methods.[54] In addition, commenters noted that in the 29 states where contraceptive coverage mandates have been imposed statewide,[55] those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall.[56]

Other commenters, however, disputed the significance of these state statistics, noting that, of the 29 states with contraceptive coverage mandates, only four states have laws that match the federal requirements in scope. Some also observed that, even in states with state contraceptive coverage mandates, self-insured group health plans might escape those requirements, and some states do not mandate the contraceptives to be covered at no out-of-pocket cost to the beneficiary.

The Departments have considered these experiences as relevant to the effect the exemption in these rules might have on the Mandate more broadly. The state mandates of contraceptive coverage still apply to a very large number of plans and plan participants notwithstanding ERISA preemption, and public commenters did not point to studies showing those state mandates reduced unintended pregnancies. The federal contraceptive Mandate, likewise, applies to a broad, but not entirely comprehensive, number of employers. For example, to the extent that houses of worship and integrated auxiliaries may have self-insured to avoid state health insurance contraceptive coverage mandates or for other reasons, those groups were already exempt from the federal Mandate prior to the 2017 Religious and Moral IFCs. The exemptions as set forth in the Moral IFC and in these final rules leave the contraceptive Mandate in place for nearly all entities and plans to which the Mandate has applied. The Departments are not aware of data showing that these expanded exemptions would negate any reduction in unintended pregnancies that might result from the contraceptive Mandate here.

Some commenters took a view that appears to disagree with the assertion in

the 2017 Guttmacher study, that "[t]he role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA." These commenters instead observed that, under the Mandate, more women have coverage of contraceptives and contraceptive counseling and that more contraceptives are provided without co-pays than before. Still others argued that the Mandate, or other expansions of contraceptive coverage, have led women to increase their use of contraception in general, or to change from less effective, less expensive contraceptive methods to more effective, more expensive contraceptive methods. Some commenters pointed to studies cited in the 2011 IOM Report recommending contraception be included in the Guidelines and argued that certain women will go without certain health care, or contraception specifically, because of cost. They contended that a smaller percentage of women delay or forego health care overall under the ACA [57] and that, according to studies, coverage of contraceptives without cost-sharing has increased use of contraceptives in certain circumstances. Some commenters also stated that studies show that decreases in unintended pregnancies are due to broader access to contraceptives. Finally, some commenters also stated that birth control access generally has led to social and economic equality for women.

The Departments have reviewed the comments, including studies submitted by commenters either supporting or opposing these expanded exemptions. Based on that review, it is not clear that merely offering the exemption in these rules will have a significant effect on contraceptive use and health, or workplace equality, for the vast majority of women benefitting from the Mandate. There is conflicting evidence regarding whether the Mandate alone, as distinct from contraceptive access more generally, has caused increased contraceptive use, reduced unintended pregnancies, or eliminated workplace disparities, where all other women's preventive services were covered without cost sharing. Without taking a definitive position on those evidentiary issues, however, the Departments

---

[53] M.L. Kavanaugh et al., "Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014," 97 *Contraception* 14, 14–21 (2018), available at *http:// www.contraceptionjournal.org/article/S0010-7824(17)30478-X/pdf.*

[54] Id.

[55] See Guttmacher Institute, "Insurance Coverage of Contraceptives" (June 11, 2018); "State Requirements for Insurance Coverage of Contraceptives," Henry J. Kaiser Family Foundation (Jan. 1, 2018), *https://www.kff.org/other/state-indicator/state-requirements-for-insurance-coverage-of-contraceptives/?currentTimeframe= 0&sortModel=%7B%22colId%22:%22Location%22, %22sort%22:%22asc%22%7D.*

[56] *See* Michael J. New, "Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes," 13 *Ave Maria L. Rev.* 345 (2015), available at *http://avemarialaw-law-review.avemarialaw.edu/Content/articles/vXIII.i2.new.final.0809.pdf.*

[57] Citing, for example, Adelle Simmons et al., "The Affordable Care Act: Promoting Better Health for Women," Table 1, ASPE (June 14, 2016), *https://aspe.hhs.gov/system/files/pdf/205066/ACAWomenHealthIssueBrief.pdf.*

conclude that the Moral IFC and these final rules—which merely withdraw the Mandate's requirement from what appears to be a small number of newly exempt entities and plans—are not likely to have negative effects on the health or equality of women nationwide. The Departments also conclude that the expanded exemptions are an appropriate policy choice left to the agencies under the relevant statutes, and, thus, an appropriate exercise of the Departments' discretion.

Moreover, the Departments conclude that the best way to balance the various policy interests at stake in the Moral IFC and these final rules is to provide the exemptions set forth herein, even if certain effects may occur among the populations actually affected by the employment of these exemptions. These rules provide tangible conscience protections for moral convictions, and impose fewer governmental burdens on various entities and individuals, some of whom have contended for several years that denying them an exemption from the contraceptive Mandate imposes a burden on their moral convictions. The Departments view the provision of those protections to preserve conscience in this health care context as an appropriate policy option, notwithstanding the widely divergent effects that public commenters have predicted based on different studies they cited. Providing the protections for moral convictions set forth in the Moral IFC and these final rules is not inconsistent with the ACA, and brings this Mandate into better alignment with various other federal conscience protections in health care, some of which have been in place for decades.

9. Other General Comments

Some commenters expressed the view that the exemptions afforded in the Moral IFC and herein violate the RFRA rights of women who might not receive contraceptive coverage as the result of these final rules, by allowing their employers to impose their moral convictions on them by removing contraceptive coverage through use of the exemption. Still other commenters stated that employer payment of insurance premiums is part of any employee's compensation package, the benefits of which employers should not be able to limit. In the Departments' view, the expanded exemptions in these final rules do not prohibit employers from providing contraceptive coverage. Instead, they lift a government burden that was imposed on some employers to provide contraceptive coverage to their employees in violation of those employers' moral convictions. The

Departments do not believe RFRA requires, or has ever required, the federal government to force employers to provide contraceptive coverage. The federal government's decision to exempt some entities from a requirement to provide no-cost-sharing services to private citizens does not constitute a federal government-imposed burden on the latter under RFRA.

Some commenters asked the Departments to discuss the interaction between these rules and state laws that either require contraceptive coverage or provide exemptions from those and other requirements. Some commenters argue that providing the exemptions in these rules would negate state contraceptive requirements or narrower state exemptions. Some commenters asked that the Departments specify that these exemptions do not apply to plans governed by state laws that require contraceptive coverage.

The Departments agree that these rules only concern the applicability of the federal contraceptive Mandate imposed pursuant to section 2713(a)(4). They do not regulate state contraceptive mandates or state exemptions. If a plan is exempt under the Moral IFC and these final rules, that exemption does not necessarily exempt the plan or other insurance issuer from state laws that may apply to it. The previous regulations, which offered exemptions for houses of worship and integrated auxiliaries, did not include regulatory language negating the exemptions in states that require contraceptive coverage, although the Departments discussed the issue to some degree in various preambles of those previous regulations. The Departments do not consider it appropriate or necessary in the regulatory text of the moral exemption to declare whether the federal contraceptive Mandate would still apply in states that have a state contraceptive mandate, since these rules do not purport to regulate the applicability of state contraceptive mandates.[58]

Some commenters observed that, through ERISA, some entities may avoid state laws that require contraceptive

coverage by self-insuring. This is a result of the application of the preemption and savings clauses contained in ERISA to state insurance regulation. *See* 29 U.S.C. 1144(a) & (b)(1).

These final rules cannot change statutory ERISA provisions, and do not change the standards applicable to ERISA preemption. To the extent Congress has decided that ERISA preemption includes preemption of state laws requiring contraceptive coverage, that decision occurred before the ACA and was not negated by the ACA. Congress did not mandate in the ACA that any Guidelines issued under section 2713(a)(4) must include contraceptives, nor that the Guidelines must force entities with moral objections to cover contraceptives.

Finally, some commenters expressed concern that providing moral exemptions to the mandate that private parties provide contraception may lead to exemptions regarding other medications or services, like vaccines. The exemptions provided in these rules, however, do not apply beyond the contraceptive coverage requirement implemented through section 2713(a)(4). Specifically, section 2713(a)(2) of the PHS Act requires coverage of "immunizations," and these exemptions do not encompass that requirement. The fact that the Departments have exempted houses of worship and integrated auxiliaries from the contraceptive Mandate since 2011 did not lead to those entities receiving exemptions under section 2713(a)(2) concerning vaccines. In addition, hundreds of entities have sued the Departments over the implementation of section 2713(a)(4), leading to two decisions of the U.S. Supreme Court, but no similar wave of lawsuits has challenged section 2713(a)(2). The expanded exemptions in these final rules are consistent with a long history of statutes protecting moral convictions from certain health care mandates concerning issues such as sterilization, abortion and birth control.

*B. Text of the Final Rules*

In this section, the Departments describe the regulations from the Moral IFC, public comments in response to the specific regulatory text set forth in the IFC, the Departments' response to those comments, and, in consideration of those comments, the regulatory text as finalized in this final rule. We also note the regulatory text as it existed prior to the Religious and Moral IFCs, as appropriate. The Departments consider the exemptions finalized here to be an appropriate and permissible policy

---

[58] Some commenters also asked that these final rules specify that exempt entities must comply with other applicable laws concerning such things as notice to plan participants or collective bargaining agreements. These final rules relieve the application of the federal contraceptive Mandate under section 2713(a)(4) to qualified exempt entities; they do not affect the applicability of other laws. In the preamble to the companion final rules concerning religious exemptions published elsewhere in today's **Federal Register**, the Departments provide guidance applicable to notices of revocation and changes that an entity may seek to make during its plan year.

choice in light of various interests at stake and the lack of a statutory requirement for the Departments to impose the Mandate on entities and plans that qualify for these exemptions.

As noted above, various members of the public provided comments that were supportive, or critical, of the regulations overall, or of significant policies pertaining to the regulations. To the extent those comments apply to the following regulatory text, the Departments have responded to them above. This section of the preamble responds to comments that pertain more specifically to particular regulatory text.

1. Restatement of Statutory Requirements of Section 2713(a) and (a)(4) of the PHS Act (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv))

The previous regulations restated the statutory requirements of section 2713(a) and (a)(4) of the PHS Act, at 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). The Religious IFC modified those restatements to more closely align them with the text of section 2713(a) and (a)(4) of the PHS Act. Those sections cross-reference the other sections of the Departments' rules that provide exemptions to the contraceptive Mandate. After the Religious IFC changed those sections, the Moral IFC inserted, within those cross-references, references to the new § 147.133, which contains the text of the moral exemptions. The insertions correspond to the cross-references to the religious exemptions added by the Religious IFC. The Departments finalize these parts of the Moral IFC without change.

2. Exemption for Objecting Entities Based on Moral Convictions (45 CFR 147.133(a))

The previous regulations contained no exemption concerning moral convictions, as distinct from religious beliefs. Instead, at 45 CFR 147.131(a), they offered an exemption for houses of worship and integrated auxiliaries. In the remaining part of § 147.131, the previous regulations described the accommodation process for organizations with religious objections. The Religious IFC moved the religious exemption to a new section 45 CFR 147.132, and expanded its scope. The Moral IFC created a new section 45 CFR 147.133, providing exemptions for moral convictions similar to, but not exactly the same as, the exemptions for religious beliefs set forth in § 147.132.

The prefatory language of § 147.133(a) not only specifies that certain entities are "exempt," but also explains that the Guidelines shall not support or provide for an imposition of the contraceptive coverage requirement to such exempt entities. This is an acknowledgement that section 2713(a)(4) requires women's preventive services coverage only "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." To the extent the HRSA Guidelines do not provide for, or support, the application of such coverage to certain entities or plans, the Affordable Care Act does not require the coverage. Those entities or plans are "exempt" by not being subject to the requirements in the first instance. Therefore, in describing the entities or plans as "exempt," and in referring to the "exemption" encompassing those entities or plans, the Departments also affirm the non-applicability of the Guidelines to them.

The Departments wish to make clear that the expanded exemption set forth in § 147.133(a) applies to several distinct entities involved in the provision of coverage to an objecting employer's employees. This explanation is consistent with how prior regulations have worked by means of similar language. When § 147.133(a)(1) and (a)(1)(i) specify that "[a] group health plan," "health insurance coverage provided in connection with a group health plan," and "health insurance coverage offered or arranged by an objecting organization" are exempt "to the extent" of the objections "as specified in paragraph (a)(2)," that language exempts the group health plans of the sponsors that object, and their health insurance issuers in providing the coverage in those plans (whether or not the issuers have their own objections). Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv) (and as referenced by the parallel provisions in 26 CFR 54.9815 through 2713(a)(1)(iv) and 29 CFR 2590.715 through 2713(a)(1)(v)), the plan sponsor, issuer, and plan covered in the exemption of that paragraph would face no penalty as a result of omitting contraceptive coverage from the benefits of the plan participants and beneficiaries. However, while a plan sponsor's or arranger's objection removes penalties from that group health plan's issuer, it only does so with respect to that group health plan—it does not affect the issuer's coverage for other group health plans where the plan sponsor has no qualifying objection. More information

on the effects of the objection of a health insurance issuer in § 147.133(a)(1)(iii) is included below.

The exemptions in § 147.133(a)(1) apply "to the extent" of the objecting entities' sincerely held moral convictions. Thus, entities that hold a requisite objection to covering some, but not all, contraceptive items would be exempt with respect to the items to which they object, but not with respect to the items to which they do not object. Some commenters stated it was unclear whether the plans of entities or individuals that morally object to some but not all contraceptives would be exempt from being required to cover just the contraceptive methods as to which there is an objection, or whether the objection to some contraceptives leads to an exemption from that plan being required to cover all contraceptives. The Departments intend that a requisite moral objection to some, but not all, contraceptives would lead to an exemption only to the extent of that objection: That is, the exemption would encompass only the items to which the relevant entity or individual objects and would not encompass contraceptive methods to which the objection does not apply. To make this clearer, in these final rules the Departments finalize the prefatory language of § 147.133(a) so that the first sentence of that paragraph states that an exemption shall be included, and the Guidelines must not provide for contraceptive coverage, "to the extent of the objections specified below." The Departments have made corresponding changes to language throughout the regulatory text, to describe the exemptions as applying "to the extent" of the objection(s).

The exemptions contained in previous regulations, at § 147.131(a), did not require an exempt entity to submit any particular self-certification or notice, either to the government or to the entity's issuer or third party administrator, in order to obtain or qualify for their exemption. Similarly, under the expanded exemptions in § 147.133, the Moral IFC did not require exempt entities to comply with a self-certification process. We finalize that approach without change. Although exempt entities do not need to file notices or certifications of their exemption, and these final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits. Under ERISA, the plan

document identifies what benefits are provided to participants and beneficiaries under the plan; if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document. Moreover, if there is a reduction in a covered service or benefit, the plan has to disclose that change to plan participants.[59] Thus, where an exemption applies and all (or a subset of) contraceptive services are omitted from a plan's coverage, otherwise applicable ERISA disclosures must reflect the omission of coverage in ERISA plans. These existing disclosure requirements serve to help provide notice to participants and beneficiaries of what ERISA plans do and do not cover.

Some commenters supported this approach, while others did not. Those in favor suggested that self-certification forms for an exemption are not necessary, could add burdens to exempt entities beyond those imposed by the previous exemption, and could give rise to objections to the self-certification process itself. Commenters also stated that requiring an exemption form for exempt entities could cause additional operational burdens for plans that have existing processes in place to handle exemptions. Other commenters favored including a self-certification process for exempt entities. They suggested that entities might abuse the availability of an exemption or use their exempt status insincerely if no self-certification process exists, and that the Mandate might be difficult to enforce without a self-certification process.

After considering the comments, the Departments continue to believe it is appropriate to not require exempt entities to submit a self-certification or notice. The previous exemption did not require a self-certification or notice, and the Departments did not collect a list of all entities that used the exemption, although there may have been thousands of houses of worship and integrated auxiliaries covered by the previous exemption and the Departments think it likely that only a small number of entities will use the moral exemption. Adding a self-certification or notice to the exemption would impose an additional paperwork burden on exempt entities that the previous regulations did not impose, and would also involve additional

public costs if those certifications or notices are to be reviewed or kept on file by the government.

The Departments are not aware of instances where the lack of a self-certification under the previous exemption led to abuses or to an inability to engage in enforcement. The Mandate is enforceable through various mechanisms in the PHS Act, the Code, and ERISA. Entities that insincerely or otherwise improperly operate as if they are exempt would do so at the risk of enforcement and accountability under such mechanisms. The Departments are not aware of sufficient reasons to believe those measures and mechanisms would fail to deter entities from improperly operating as if they are exempt. Moreover, as noted above, ERISA and other plan disclosure requirements governing group health plans require provision of a comprehensive summary of the benefits covered by the plan and disclosure of any reductions in covered services or benefits, so beneficiaries will know whether their health plan claims a contraceptive Mandate exemption and will be able to raise appropriate challenges to such claims. As a consequence, the Departments believe it is an appropriate balance of various concerns expressed by commenters for these final rules to continue to not require notices or self-certifications for using the exemption.

Some commenters asked the Departments to add language indicating that an exemption cannot be invoked in the middle of a plan year, nor should it be used to the extent inconsistent with laws that apply to, or state approval of, fully insured plans. None of the previous iterations of the exemption regulations included such provisions, and the Departments do not consider them necessary in these final rules. The exemptions in these final rules only purport to exempt plans and entities from the application of the federal contraceptive coverage requirement of the Guidelines issued under section 2713(a)(4). They do not purport to exempt entities or plans from state laws concerning contraceptive coverage, or laws governing whether an entity can make a change (of whatever kind) during a plan year. Final rules governing the accommodation likewise do not purport to obviate the need to follow otherwise applicable rules about making changes during a plan year. (In the companion rules concerning religious beliefs published elsewhere in today's **Federal Register**, the Departments discuss in more detail the accommodation and when an entity seeking to revoke it would be able to do

so or to notify plan participants of the revocation.)

Commenters also asked that clauses be added to the regulatory text holding issuers harmless where exemptions are invoked by plan sponsors. As discussed above, the exemption rules already specify that where an exemption applies to a group health plan, it encompasses both the group health plan and health insurance coverage provided in connection with the group health plan, and therefore encompasses any impact on the issuer of the contraceptive coverage requirement with respect to that plan. In addition, as discussed in the companion religious final rule published elsewhere in today's **Federal Register**, the Departments have added language from the previous regulations, in § 147.131(f), to protect issuers that act in reliance on certain representations made in the accommodation process. To the extent that commenters seek language offering additional protections for other incidents that might occur in connection with the invocation of an exemption, the previous exemption regulations did not include such provisions, and the Departments do not consider them necessary in these final rules. As noted above, the expanded exemptions in these final rules simply remove or narrow the contraceptive Mandate contained in, and derived from, the Guidelines for certain plans. The previous regulations included a reliance clause in the accommodation provisions, but did not specify further details regarding the relationship between exempt entities and their issuers or third party administrators. The Departments do not believe it necessary to do so in these final rules.

Commenters disagreed about the likely effects of the moral exemptions on the health coverage market. Some commenters stated that expanding the exemptions to encompass moral convictions would not cause complications in the market, while others said that it could, due to such causes as a lack of uniformity among plans, or permitting multiple risk pools. The Departments note that the extent to which plans cover contraception under the prior regulations is already far from uniform. Congress did not require all entities to comply with section 2713 of the PHS Act (under which the Mandate was promulgated)—most notably by exempting grandfathered plans. Moreover, under the previous regulations, issuers were already able to offer plans that omit contraceptives—or only some contraceptives—to houses of worship and integrated auxiliaries, and some commenters and litigants said that issuers were doing so. These cases

---

[59] See, for example, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102–2, 2520.102–3, & 2520.104b-3(d), and 29 CFR 2590.715–2715. See also 45 CFR 147.200 (requiring disclosure of the "exceptions, reductions, and limitations of the coverage," including group health plans and group & individual issuers).

where plans did not need to comply with the Mandate, and the Departments' previous accommodation process which had the effect of allowing coverage not to be provided in certain self-insured church plans, together show that the importance of a uniform health coverage system is not significantly harmed by allowing plans to omit contraception in some contexts.[60]

Concerning the prospect raised by some commenters of different risk pools between men and women, section 2713(a) of the PHS Act itself provides for some preventive services coverage that applies to both men and women, and some that would apply only to women. With respect to the latter, it does not specify what, if anything, HRSA's Guidelines for women's preventives services would cover, or if contraceptive coverage will be required. The Moral IFC and these final rules do not require issuers to offer health insurance products that satisfy morally objecting entities, they simply make it legal to do so. The Mandate has been imposed only relatively recently, and the contours of its application to objecting entities has been in continual flux, due to various rulemakings and court orders. Overall, concerns raised by some public commenters have not led the Departments to consider it likely that offering these expanded exemptions will cause any injury to the uniformity or operability of the health coverage market.

3. Exemption for Certain Plan Sponsors (45 CFR 147.133(a)(1)(i))

The exemption in § 147.133(a)(1)(i) of the Moral IFC covers a group health plan and health insurance coverage for non-governmental plan sponsors that object as specified in paragraph (a)(2), and that are either nonprofit organizations, or are for-profit entities that have no publicly traded ownership interests (defined as any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934). The Departments finalize this paragraph without change, and discuss each part of the paragraph in turn.

a. Plan Sponsors in General (45 CFR 147.132(a)(1)(i) Prefatory Text)

Under the plan sponsor exemption in § 147.132(a)(1)(i), the prefatory text in that paragraph specifies that it encompasses group health plans, and health insurance coverage provided in connection with such group health plans, that are sponsored by certain kinds of entities, namely, nonprofit organizations or for-profit entities that have no publicly traded ownership interests.

Such plan sponsors, if they are otherwise nonprofit organizations or for-profit entities that have no publicly traded ownership interests, can include entities that are not employers (for example, a union, or a sponsor of a multiemployer plan), where the plan sponsor objects based on sincerely held moral convictions to coverage of contraceptives or sterilization. Plan sponsors encompassed by the exemption can also include employers, and consistent with the definition of "employer" in 29 CFR 2510.3–5, can include association health plans, where the plan sponsor is a nonprofit organization or a for-profit entity that has no publicly traded ownership interests.

Some commenters objected to extending the exemption to plan sponsors that are not single employers, arguing that they could not have the same kind of moral objection that a single employer might have. Other commenters supported the protection of any plan sponsor with the requisite moral objection. The Departments conclude that it is appropriate, where a plan sponsor of a multiemployer plan or multiple employer plan adopts a moral objection using the same procedures that such a plan sponsor might use to make other decisions, to respect that decision by providing an exemption from the Mandate.

The plans of governmental employers are not covered by the plan sponsor exemption in § 147.133(a)(1)(i), which instead limits the moral exemptions to "non-governmental plan sponsors." As noted above, the Departments sought public comment on whether to extend the exemptions to non-federal governmental plan sponsors. Some commenters suggested that the moral exemptions should include government entities because other conscience laws can include government entities, such as when they oppose offering abortions. Others disagreed, contending that governmental entities should not or cannot object based on moral convictions, or that it would be unlawful for them to do so.

The Departments are sympathetic to the arguments of commenters that favor including government entities in the exemption for moral convictions. The protections outlined in the first paragraph of the Church Amendments for entities that object based on moral convictions to making their facilities or personnel available to assist in the performance of abortions or sterilizations do not turn on the nature of the entity, whether public, private, nonprofit, for-profit, or governmental. (42 U.S.C. 300a–7(b)). Both the Weldon and Coats-Snowe Amendments also protect state and local government entities from providing, promoting, or paying for abortions in particular ways.[61] Congress has generally not limited protections for conscience based on the nature of an entity—even in the case of governmental entities.

At the same time, the Departments do not at this time have information suggesting that an exemption for governmental entities is needed or desired. The Departments have not been sued by any governmental entities raising objections to the Mandate based on non-religious moral convictions. Although the Departments sought public comment on the issue, the Departments received no public comments identifying governmental entities that need or desire such an exemption. Rather, the Departments are aware of governmental entities that, despite not possessing their own objections to contraceptive coverage, have acted to protect their employees who have conscientious objections to receiving contraceptive coverage in their employer-provided health insurance plans. *See Wieland* v. *U.S. Dep't of Health & Human Servs.,* 196 F. Supp. 1010, 1015–16 (E.D. Mo. 2016) (quoting Mo. Rev. Stat. 191.724). The individual exemption adopted in these rules will ensure the Mandate is not an obstacle to those efforts.

Thus, in light of the balance of public comments, the Departments decline to extend the moral convictions exemption to governmental entities. As is the case with the Departments' decision not to extend the moral exemption to publicly traded for-profit entities, this decision does not reflect a disagreement with the various conscience statutes that provide exemptions for moral convictions

---

[60] *See also Real Alternatives,* 867 F.3d 338, 389 (3d Cir. 2017) (Jordan, J., concurring in part and dissenting in part) ("Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market. . . . Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny." (citation and internal quotation marks omitted)).

[61] Consolidated Appropriations Act, 2018, Div. H, Sec. 507(d), 132 Stat. at 764 (protecting any "hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion); 42 U.S.C. 238n (protecting entities that object to abortion, including, but not limited to, any "postgraduate physician training program").

Case: 25-2575    Document: 34-2    Page: 193    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB   Document 8392   Filed 12/14/18   Page 22 of 41

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57617**

without categorically excluding governmental entities. The Departments remain open to the possibility of future rulemaking on this issue if the Departments become aware of a governmental entity seeking to be exempt from the contraceptive Mandate.

### b. Nonprofit Organizations (45 CFR 147.133(a)(1)(i)(A))

As discussed above, some commenters opposed offering exemptions based on moral convictions to any plan sponsors, and/or objected to doing so for nonprofit organizations, on various grounds, including but not limited to arguments that the benefits of contraception access should override moral objections, entities cannot assert moral objections, and moral objections burden third parties. Other commenters supported the exemptions, generally defending the interest of nonprofit organizations not to be forced to violate their moral convictions, supporting the history of government protection of moral convictions in similar contexts, and disputing the claims of opponents of the exemptions.

The Departments are aware, through litigation, of only two non-religious nonprofit organizations with moral objections to the contraceptive Mandate. Many more nonprofit religious organizations have sued suggesting—as discussed below—that the effect of this exemption for non-religious nonprofit objections to the Mandate will be far less significant than commenters who oppose the exemption believe it will. The two non-religious nonprofit organizations that challenged the Mandate in court provide a good illustration of the reasons why the Department has decided to provide this exemption to nonprofit organizations. Both organizations have said in court they oppose certain contraceptives on non-religious moral grounds as being abortifacient and state that they only hire employees who share that view. Public comments and litigation reflect that many nonprofit organizations publicly describe their beliefs and convictions. Government records and many of those groups' websites also often reflect those groups' religious or moral character, as the case may be. If a person who desires contraceptive coverage works at a nonprofit organization, the Departments view it as sufficiently likely that the person would know, or would know to ask, whether the organization offers such coverage. The Departments are not aware of federal laws that would require a nonprofit organization that opposes contraceptive coverage to hire a person who disagrees with the organization's

view on contraceptive coverage. Instead, nonprofit organizations generally have access to a First Amendment right of expressive association to choose to hire persons (or, in the case of students, to admit them) based on whether they share, or at least will be respectful of, their beliefs.[62]

The Departments agree with commenters who support offering the exemption to nonprofit organizations and believe that doing so is an appropriate protection and is not likely to have a significant impact on women who want contraceptive coverage.

### c. For-Profit Entities (45 CFR 147.133(a)(1)(i)(B))

With respect to for-profit organizations addressed in § 147.133(a)(1)(i)(B), in the Moral IFC, the Departments did not limit the exemption to nonprofit organizations, but also included some for-profit entities. Some commenters supported including for-profit entities in the exemption, saying owners of such entities exercise their moral convictions through their businesses, and that such owners should not be burdened by a federal governmental contraceptive Mandate. Other commenters opposed extending the exemption to closely held for-profit entities, saying the entities cannot exercise moral convictions or should not have their moral opposition to contraceptive coverage protected by the exemption. Some commenters stated that the entities should not be able to impose their beliefs about contraceptive coverage on the employees and that doing so constitutes discrimination.

The Departments agree with commenters who support including some for-profit entities in the exemption. Many of the federal health care conscience statutes cited above offer protections for the moral convictions of entities, without regard to whether they operate as nonprofit organizations or for-profit entities. In addition, nearly half of the states either impose no contraceptive coverage requirement or offer "an almost unlimited" exemption encompassing both "religious and secular organizations."[63] States also generally protect moral convictions in other

health care conscience laws whether or not an entity operates as a nonprofit.[64]

Extending the exemption to certain for-profit entities is also consistent with the Supreme Court's ruling in *Hobby Lobby*, which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in *Hobby Lobby*, the pursuit of religious beliefs), regardless of whether the entity operates as a nonprofit organization and rejected the Departments' argument to the contrary. 134 S. Ct. at 2768–75. The mechanisms by which a for-profit company makes decisions of conscience, or resolves disputes on those issues among their owners, are problems that "state corporate law provides a ready means" of solving. *Id.* at 2774–75. Some reports and industry experts have indicated that few for-profit entities beyond those that had originally challenged the Mandate have sought relief from it after *Hobby Lobby*.[65] Because all of those appear to be informed by religious beliefs, extending the exemption to entities with non-religious moral convictions would seem to have an even smaller impact on access to contraceptive coverage.

The Moral IFC only extended the exemption covering for-profit entities to those that are closely held, not to for-profit entities that are publicly traded, but asked for comment on whether publicly traded entities should be included in the moral exemption. In this way the Moral IFC differed from the exemption provided to plan sponsors with objections based on sincerely held religious beliefs set forth in the Religious IFC, at § 147.132(a)(1), finalized in companion rules published elsewhere in today's **Federal Register**.

Some commenters supported including publicly traded entities in the moral exemption, contending that publicly traded entities have historically taken various positions on important public concerns beyond merely seeking the company's own profits, and that nothing in principle would preclude them from using the same mechanisms of corporate decision-making to establish and exercise moral convictions against contraceptive coverage. They observed that large publicly traded entities are exempt from the contraceptive Mandate by means of the grandfathering provision of the ACA, so

---

[62] Notably, "the First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.'" *Boy Scouts of America* v. *Dale*, 530 U.S. 640, 655 (2000).

[63] "Insurance Coverage of Contraceptives," The Guttmacher Institute (June 11, 2018), *https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives*.

[64] *See, e.g.,* "Refusing to Provide Health Services," The Guttmacher Institute (June 1, 2018), *https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services*.

[65] See Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," *Politico* (Oct. 11, 2016), *http://www.politico.com/story/2016/10/obamacare-birth-control-mandate-employers-229627*.

Case: 25-2575    Document: 34-2    Page: 194    Date Filed: 12/18/2025
Case: 2:17-cv-0454-WBS    Document 6992    Filed 12/04/15    Page 28 of 45

**57618**    **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

that it is inappropriate to refuse to exempt publicly traded entities that actually have sincerely held moral convictions against compliance with the Mandate. They further argued that in some instances there are closely held companies that are as large as publicly traded companies of significant size. They also stated that other protections for moral convictions in certain federal health care conscience statutes do not preclude the application of such protections to certain entities on the basis that they are not closely held, and federal law defines "persons" to include all forms of corporations, not just closely held corporations, at 1 U.S.C. 1. Additionally, some commenters were concerned that not providing a moral exemption for publicly traded for-profit entities but allowing a religious exemption for publicly traded for-profit entities (as was allowed in the Religious IFC, and as is allowed in the companion religious final rules published elsewhere in today's **Federal Register**), may raise Establishment Clause questions, may cause confusion to the public, and may make the exemptions more difficult for the Departments and enforcing agencies to administer. They stated that it is incongruous to include publicly traded entities in the exemption for religious beliefs, but exclude them from the exemption for moral convictions.

Other commenters opposed including publicly traded companies in these moral exemptions. Some stated that such companies could not exercise moral convictions and opposed the effects on women if they would. They also objected that including such companies, along with closely held businesses, would extend the exemptions to all or virtually all companies. Some commenters stated that many publicly traded companies would use a moral exemption if available to them, because many closely held for-profit businesses expressed religious objections to the Mandate, or availed themselves of the religious accommodation.

As is the case for non-federal governmental employers, the Departments are sympathetic to the arguments of commenters that favor including publicly traded entities in the exemption for moral convictions. In the case of particularly sensitive health care matters, several significant federal health care conscience statutes protect entities' moral objections without regard to their ownership status. For example, the first paragraph of the Church Amendments provides certain protections for entities that object based on moral convictions to making their facilities or personnel available to assist in the performance of abortions or sterilizations; the protections of the Church Amendments do not turn on the nature of the entity, whether public, private, nonprofit, for-profit, or governmental. (42 U.S.C. 300a–7(b)). Thus, under section 300a–7(b), a hospital in a publicly traded health system, or a local governmental hospital, could adopt sincerely held moral convictions by which it objects to providing facilities or personnel for abortions or sterilizations, and if the entity receives relevant funds from HHS specified by section 300a–7(b), the protections of that section would apply. Other federal conscience protections in the health sector apply in the same manner:

• The Coats-Snowe Amendment (42 U.S.C. 238n) provides certain protections for health care entities and postgraduate physician training programs that, among other things, choose not to perform, refer for, or provide training for, abortions.

• The Weldon Amendment [66] provides certain protections for health care entities, hospitals, provider-sponsored organizations, health maintenance organizations, and health insurance plans that do not provide, pay for, provide coverage of, or refer for abortions.

• The ACA provides certain protections for any institutional health care entity, hospital, provider-sponsored organization, health maintenance organization, health insurance plan, or any other kind of health care facility, that does not provide any health care item or service furnished for the purpose of causing or assisting in causing assisted suicide, euthanasia, or mercy killing. (42 U.S.C. 18113).[67]

• Social Security Act sections 1852(j)(3)(B) (Medicare) and 1932(b)(3)(B) (Medicaid), 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3)(B), provide protections so that the statutes cannot be construed to require organizations that offer Medicare Advantage and Medicaid managed care plans in certain contexts to provide, reimburse for, or provide coverage of a counseling or referral service if they object to doing so on moral grounds.

• Congress's most recent statement on contraceptive coverage specified that, if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions." Consolidated Appropriations Act, 2018, Public Law 115–141, Div. E, Sec. 808.

In all of these instances, Congress did not limit the protection for conscience based on the nature of the entity—and did not exclude publicly traded entities from protection.

At the same time, as stated in the Moral IFC, the Departments continue to lack significant information about whether there is a need to extend the expanded exemption to publicly traded entities. The Departments have been sued by nonprofit entities expressing objections to the Mandate based on non-religious moral convictions, as well as by closely held for-profit entities expressing religious objections, but not by any publicly traded entities. In addition, the Departments sought public comments on whether publicly traded entities might benefit from extending the moral exemption to them. No such entities were brought to the attention of the Department through the comment process. The Supreme Court concluded it is improbable that publicly traded companies with numerous "unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs." *Hobby Lobby,* 134 S. Ct. at 2774. It would appear to be even less probable that publicly traded entities would adopt that view based on non-religious moral convictions.

In light of the balance of public comments, the Departments decline to extend the moral convictions exemption to publicly traded entities. Because the Departments are aware of so many closely-held for-profit entities with religious objections to contraceptive coverage, and of some nonprofit entities with non-religious moral objections to contraceptive coverage, the Departments believe it is reasonably possible that closely held for-profit entities with non-religious moral objections to contraceptive coverage might exist or come into being. The Departments have also concluded that it is reasonably possible, even if improbable, that publicly traded entities with religious objections to contraceptive coverage might exist or come into being. But the Departments conclude there is not a similar probability that publicly traded for-profit entities with non-religious moral objections to contraceptive

---

[66] See Consolidated Appropriations Act, 2018, Public Law 115–141, Div. H, Sec. 507(d) (Mar. 2018).

[67] The lack of the limitation in this provision may be particularly relevant since it was enacted in the same statute, the ACA, as the provision under which the Mandate—and these exemptions to the Mandate—were promulgated.

Case: 25-2575    Document: 34-2    Page: 195    Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB    Document 689-2    Filed 12/14/18    Page 23 of 41

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57619**

coverage may exist and need to be included in these expanded exemptions. The decision to not extend the moral exemption to publicly traded for-profit entities in these rules does not reflect a disagreement with the various conscience statutes that provide exemptions for moral convictions without categorically excluding publicly traded entities. The Departments remain open to the possibility of future rulemaking on this issue, if we become aware of the need to expand the exemptions to publicly traded corporations with non-religious moral objections to all (or a subset of) contraceptives.

In contrast, the Departments finalize, without change, the Moral IFC's extension of the exemptions in these rules to closely held for-profit entities with moral convictions opposed to offering coverage of some or all contraceptives. The Departments conclude that it is sufficiently likely that closely held for-profit entities exist or may come into being and may maintain moral objections to certain contraceptives, so as to support including them in these expanded exemptions. The Departments seek to remove an obstacle that might prevent individuals with moral objections from forming or maintaining such small or closely held businesses and providing health coverage to their employees in accordance with their moral convictions.

In defining what constitutes a closely held for-profit entity to which these exemptions extend, the Moral IFC used language derived from the July 2015 final regulations. Those regulations, in offering the accommodation (not an exemption) to religious (not moral) closely held for-profit entities, did so by attempting to positively define what constitutes a closely held entity, formulating a multi-factor, and partially open-ended, definition for that purpose. (80 FR 41313). Any such positive definition runs up against the myriad state differences in defining such entities and potentially intrudes into a traditional area of state regulation of business organizations. Instead of attempting to positively define closely held businesses in the Moral IFC, however, the Departments considered it much clearer, effective, and preferable to define the category negatively, by reference to one element of the previous definition: that the entity has no publicly traded ownership interest (that is, any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934).

4. Institutions of Higher Education (45 CFR 147.133(a)(1)(ii))

The previous regulations did not exempt plans arranged by institutions of higher education, although they did include, in the accommodation, plans arranged by institutions of higher education similarly to the way in which the regulations provided the accommodation to plans of nonprofit religious employers. (See 80 FR 41347). The Moral IFC provided an exemption, in § 147.133(a)(1)(ii), encompassing institutions of higher education that arrange student health insurance coverage, and stating the exemption would operate in a manner comparable to the exemption for employers with respect to plans they sponsor. In these final rules, the Departments finalize § 147.133(a)(1)(ii) with one change.

These rules treat the health plans of institutions of higher education that arrange student health insurance coverage similarly to the way in which the rules treat the plans of employers. The rules do so by making such student health plans eligible for the expanded exemptions, and by permitting them the option of electing to utilize the accommodation process. Thus, these rules specify, in § 147.133(a)(1)(ii), that the exemption is extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002) with objections to the Mandate based on sincerely held moral convictions, to their arrangement of student health insurance coverage, in a manner comparable to the exemption for group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor.

Some commenters supported including, in the exemptions, institutions of higher education that provide health coverage for students through student health plans but have moral objections to providing certain contraceptive coverage. They stated that moral exemptions allow freedom for certain institutions of higher education to exist, and this in turn gives students the choice of institutions that hold different views on important issues such as contraceptives and abortifacients. Other commenters opposed including the exemption, asserting that expanding the exemption would negatively impact female students because institutions of higher education might not cover contraceptives in student health plans, women enrolled in those plans would not receive access to birth control, and an increased number of unintended pregnancies would result.

In the Departments' view, the reasons for extending the exemption to institutions of higher education are similar to the reasons, discussed above, for extending the exemption to other nonprofit organizations. The Departments are not aware of any institutions of higher education that arrange student health insurance coverage and object to the Mandate based on non-religious moral convictions. But because the Departments have been sued by several institutions of higher education that arrange student health insurance coverage and object to the Mandate based on religious beliefs and by several nonprofit organizations with moral objections, the Departments believe the existence of institutions of higher education with non-religious moral objections, or the possible formation of such entities in the future, is sufficiently possible to justify including protections for such entities in these final rules.

The Departments conclude that this aspect of the exemption is likely to have a minimal impact on contraceptive coverage for women at institutions of higher education. As noted above, the Departments are not aware of any institutions of higher education that would currently qualify for the objection. In addition, only a minority of students in higher education receive health insurance coverage from plans arranged by their colleges or universities, as opposed to from other sources, and an even smaller number receive such coverage from schools objecting to contraceptive coverage. Exempting institutions of higher education that object to contraceptive coverage based on moral convictions does not affect student health insurance contraceptive coverage at the vast majority of institutions of higher education. The exemption simply makes it legal under federal law for institutions to adhere to moral convictions that oppose contraception, without facing penalties for non-compliance that could threaten their existence. This removes a possible barrier to diversity in the nation's higher education system, because it makes it easier for students to attend institutions of higher education that hold those views, if the institutions exist or come into being and students choose to attend them. Moreover, because institutions of higher education have no legal obligation to sponsor student health insurance coverage, providing this moral exemption removes an obstacle to such institutions sponsoring student health insurance coverage, thus possibly encouraging

more widespread health insurance coverage.

As noted above, after seeking public comment on whether the final moral exemptions rules should be extended to include non-federal governmental entities, the Departments have concluded they should only include non-governmental entities. For the same reasons, the Departments are inserting a reference into § 147.133(a)(1)(ii) specifying that it includes an institution of higher education "which is non-governmental." This language is parallel to the same limiting phrase used in the religious exemptions rule governing institutions of higher education, at § 147.132(a)(1)(ii). Thus, the first sentence of § 147.133(a)(1)(ii) is finalized to read: "An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section." The remaining text of § 147.133(a)(1)(ii) is finalized without change.

5. Health Insurance Issuers (45 CFR 147.133(a)(1)(iii))

The Moral IFC extended the exemption, in § 147.133(a)(1)(iii), to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own moral convictions opposed to providing coverage for contraceptive services. The issuer exemption only applied to the group health plan if the plan itself was also exempt under an exemption for the plan sponsor or individuals. In these final rules, the Departments finalize § 147.133(a)(1)(iii) without change.

As discussed above, where the exemption for plan sponsors or institutions of higher education applies, issuers are exempt under those sections with respect to providing contraceptive coverage in those plans. The issuer exemption in § 147.133(a)(1)(iii) adds to that protection, but the additional protection operates in a different way than the plan sponsor exemption operates. The only plan sponsors—or in the case of individual insurance coverage, individuals—who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services, are plan sponsors or individuals who themselves object and whose plans are otherwise exempt based on that objection. An exempt issuer can then offer an exempt product to an entity or individual that is exempt based on either the moral exemptions for entities and individuals, or the religious exemptions for entities

and individuals. Thus, the issuer exemption specifies that, where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv), unless the plan is otherwise exempt from that requirement. Accordingly, the only plan sponsors, or in the case of individual insurance coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer under this paragraph (a)(1)(iii) that does not include some or all contraceptive services, are plan sponsors or individuals who themselves object and are exempt.

Under these rules, issuers that hold their own objections based on sincerely held moral convictions could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on their moral convictions, or if they are exempt based on their religious beliefs under the companion final rules published elsewhere in today's **Federal Register**. Likewise, issuers with sincerely held religious beliefs, that are exempt under those companion final rules, could likewise issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on either their religious beliefs or their moral convictions.

Some commenters supported including this exemption for issuers in these rules, both to protect the moral convictions of issuers, and so that, in the future, issuers would be free to organize that may wish to specifically serve plan sponsors and individuals that object to contraception based on religious or moral reasons. Other commenters objected to including an exemption for issuers. Some commenters stated that issuers cannot exercise moral convictions, while others stated that exempting issuers would threaten contraceptive coverage for women. Some commenters stated that it was arbitrary and capricious for the Departments to provide an exemption for issuers if they do not know that issuers with qualifying moral objections exist.

The Departments consider it appropriate to provide this exemption for issuers. Because the issuer exemption only applies where an independently exempt policyholder (entity or individual) is involved, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will

it prevent other issuers from being required to provide contraceptive coverage in individual or group insurance coverage.

The issuer exemption serves several interests, even though the Departments are not currently aware of existing issuers that would use it. As noted by some commenters, allowing issuers to be exempt, at least with respect to plan sponsors, plans, and individuals that independently qualify for an exemption, will remove a possible obstacle to issuers with moral convictions being organized in the future to serve entities and individuals that want plans that respect their religious beliefs or moral convictions. Furthermore, permitting issuers to object to offering contraceptive coverage based on sincerely held moral convictions will allow issuers to continue to offer coverage to plan sponsors and individuals, without subjecting them to liability under section 2713(a)(4), or related provisions, for their failure to provide contraceptive coverage. In this way, the issuer exemption serves to protect objecting issuers both from being required to issue policies that cover contraception in violation of the issuers' sincerely held moral convictions and from being asked or required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus subjecting the issuers to potential liability if those plans are not exempt from the Guidelines.

The Departments reject the proposition that issuers cannot exercise moral convictions. Many federal health care conscience laws and regulations protect issuers or plans specifically. For example, as discussed above, 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3) protect plans or managed care organizations in Medicare Advantage or Medicaid. The Weldon Amendment specifically protects, among other entities, HMOs, health insurance plans, and "any other kind of health care facility[ies], organization[s] or plan[s]" as a "health care entity" from being required to provide coverage of, or pay for, abortions. See, for example, Consolidated Appropriations Act, 2018, Public Law 115–141, Div. H, Sec. 507(d).[68] The most recently enacted Consolidated Appropriations Act declares that Congress supports a

---

[68] ACA section 1553 protects an identically defined group of "health care entities," including provider-sponsored organizations, HMOs, health insurance plans, and "any other kind of . . . plan," from being subject to discrimination on the basis that it does not provide any health care item or service furnishing for the purpose of assisted suicide, euthanasia, mercy killing, and the like. ACA section 1553, 42 U.S.C. 18113.

Case: 25-2575    Document: 34-2    Page: 197    Date Filed: 12/12/2025
Case: 2:21-cv-04540-W3  Document 6392  Filed 12/12/19  Page 31 of 45

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations       **57621**

"conscience clause" to protect moral convictions concerning "the provision of contraceptive coverage by health insurance plans." *See id.* at Div. E, Sec. 808.

The issuer exemption does not specifically include third party administrators, for the reasons discussed in the companion Religious IFC and final rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**.[69]

6. Description of the Moral Objection (45 CFR 147.133(a)(2))

The Moral IFC set forth the scope of the moral objection of objecting entities in § 147.133(a)(2), so that it applies to the extent an entity described in paragraph (a)(1), based on sincerely held moral convictions, objects to "establishing, maintaining, providing, offering, or arranging" either "coverage or payments" for contraceptives, or "for a plan, issuer, or third party administrator that provides or arranges such coverage or payments." The Departments are finalizing this exemption with structural changes separating the second half of the sentence into separate subparagraphs, so as to more clearly specify, as set forth in the Moral IFC text, that the objection may pertain either to coverage or payments for contraceptives, or to a plan, issuer, or third party administrator that provides or arranges such coverage or payments.

Some commenters observed that, by allowing exempt plan sponsors to object to "some or all" contraceptives, this might yield a cafeteria-style approach where different plan sponsors choose various combinations of contraceptives that they wish to cover. Some commenters further observed that this might create a burden on issuers or third party administrators.

The Departments have concluded, however, that just as the previous exemption rules allowed certain religious plan sponsors to object to some or all contraceptives, it is appropriate to maintain that flexibility for entities covered by the expanded exemption. These rules do not require any issuer or

third party administrator to contract with an exempt entity or individual if the issuer or third party administrator does not wish to do so, including because the issuer or third party administrator does not wish to offer an unusual plan variation. These rules simply remove the federal Mandate, in some cases, where it could have led to penalties on an employer, issuer, or third party administrator if they wished to sponsor, provide, or administer a plan that omits contraceptive coverage in the presence of a qualifying moral objection. That approach is consistent with the approach under the previous regulations, which did not require issuers and third party administrators to contract with exempt plans of houses of worship or integrated auxiliaries if they did not wish to do so.

The definition does not specify that the moral convictions that can support an exemption need to be non-religious moral convictions. We find it unnecessary to limit the definition in that way. Even though moral convictions need not be based on religious beliefs, religious beliefs can have a moral component. It is not always clear whether a moral conviction is based on religious tenets. As noted in *Welsh*, a moral conviction can be "purely ethical or moral in source and content but that nevertheless . . . occupy in the life of that individual a place parallel to that filled by God [and] function as a religion in his life." 398 U.S at 340. One reason for providing exemptions for moral convictions is so that the government need not engage in the potentially difficult task of parsing which convictions are religious and which are not. If sincerely held moral convictions supporting an exemption are religious, they will be encompassed by the exemption for sincerely held religious beliefs. If the moral convictions are not also religious, or if their religious quality is unclear but they are ethical or moral, they can qualify as sincerely held moral convictions under these rules if the other requirements of these rules are met.

The Departments are not aware of any entities that qualify for an exemption under the religious exemptions finalized elsewhere in today's **Federal Register**, but not under the moral exemptions finalized here, such as publicly traded entities. If publicly traded entities object to the Mandate, it seems unlikely their objection is based on moral convictions and not religious beliefs, given that many more objections to the Mandate have been based on religious beliefs. Thus, the Departments find it unlikely that they would be faced with a

situation where a publicly traded entity, for example, has an objection to the contraceptive Mandate, but it is not clear whether that objection is based on sincerely held religious beliefs or merely based on sincerely held moral convictions.

7. Individuals (45 CFR 147.133(b))

The previous regulations did not provide an exemption for objecting individuals. The Moral IFC provided such an exemption for objecting individuals (referred to here as the "individual exemption"), using the following language at § 147.133(b): "Objecting individuals". Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions."

The Departments finalize this language, with changes in response to public comments in some of the text and in a new sentence at the end of the paragraph that clarify how the exemption applies.

Section 147.133(b) sets forth a special rule pertaining to individuals (referred to here as the "individual exemption"). This rule exempts plans of certain individuals with moral objections to contraceptive coverage where the plan sponsor and, as applicable, issuer is willing to provide a plan compliant with the individuals' objections to such plan sponsors or individuals, as applicable.

Some commenters supported this exemption as providing appropriate protections for the moral convictions of individuals who obtain their insurance coverage in such places as the individual market or exchanges, or who obtain coverage from a group health plan sponsor that does not object to coverage of contraceptives but is willing (and, as applicable, the issuer is also willing) to provide coverage consistent with an individual's moral objections. They commented that this exemption

---

[69] The exemption for issuers, as outlined here, does not make a distinction among issuers based on whether they are publicly traded, unlike the plan sponsor exemption for employers. Because the issuer exemption operates more narrowly than the exemption for plan sponsors operates, in the ways described here (*i.e.,* the issuer exemption does not operate unless the plan sponsor or individual, as applicable, is also exempt), and exists in part to help preserve market options for objecting plan sponsors and individuals, the Departments consider it appropriate to not draw such a distinction among issuers.

would free individuals from having their moral convictions placed in tension with their desire for health coverage. They also contended that the individual exemption would not undermine any government interests behind the contraceptive Mandate, since the individuals would be choosing not to have the coverage. Some commenters also observed that, by specifying that the individual exemption only operates where the plan sponsor and issuer, as applicable, are willing to provide coverage that is consistent with the objection, the exemption would not impose burdens on the insurance market because the possibility of such burdens would be factored into the willingness of an employer or issuer to offer such coverage.

Other commenters disagreed and contended that allowing the individual exemption would cause burden and confusion in the insurance market. Some commenters also suggested that the individual exemption should not allow the offering of a separate group health plan because doing so could cause various administrative burdens.

The Departments agree with the commenters who suggested the individual exemption will not burden the insurance market, and, therefore, conclude that it is appropriate to provide the individual exemption where a plan sponsor and, as applicable, issuer are willing to cooperate in doing so. The Departments note that this individual exemption only operates in the case where the issuer is willing to provide the separate option; in the case of coverage provided by a group health plan sponsor, where the plan sponsor is willing; or in the case where both a plan sponsor and issuer are involved, both are willing. The Departments conclude that it is appropriate to provide the individual exemption so that the Mandate will not serve as an obstacle among these various options. Practical difficulties that may be implicated by one option or another will likely be factored into whether plan sponsors and issuers are willing to offer particular options in individual cases. But the Departments do not wish to pose an obstacle to the offering of such coverage.

The Departments note that their decision is consistent with the decision by Congress to provide protections in certain contexts for individuals who object to prescribing or providing contraceptives contrary to their moral convictions. *See, for example,* Consolidated Appropriations Act of 2018, Div. E, Sec. 726(c) (Mar. 23, 2018). While some commenters argued that such express protections are narrow, Congress likewise provided that, if the

District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions". *Id.* at Div. E, Sec. 808. A moral exemption for individuals would not be effective if the government did not, at the same time, permit issuers and group health plans to provide individuals with policies that comply with their moral convictions.

The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan generally, or, as applicable, to any other individual policies the issuer offers. Thus, this individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer morally acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object. The July 2013 regulations stated that, because employees of objecting houses of worship and integrated auxiliaries are relatively likely to oppose contraception, exempting those organizations "does not undermine the governmental interests furthered by the contraceptive coverage requirement." (78 FR 39874). For parallel reasons, as the Departments stated in the Moral IFC (83 FR at 47853 through 47854), this individual exemption does not undermine the governmental interests furthered by the contraceptive coverage requirement, because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered.

This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers. For example, in one case brought against the Departments, the State of Missouri enacted a law under which the state is not permitted to discriminate against insurance issuers that offer group health insurance policies without coverage for contraception based on employees' religious beliefs "or moral convictions," or against the individual employees who accept such offers. *See Wieland,*

196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption in these rules, employers sponsoring governmental plans would be free to honor the moral objections of individual employees by offering them plans that omit contraceptive coverage, even if those governmental entities do not object to offering contraceptive coverage in general.

In the separate companion IFC to the Moral IFC—the Religious IFC—the Departments, at § 147.133(b), provided a similar individual exemption, but we used slightly different operative language. Where the Moral IFC said a willing issuer and plan sponsor may offer "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects" under the individual exemption, the Religious IFC described what may be offered to objecting individuals as "a separate benefit package option, or a separate policy, certificate or contract of insurance." Some commenters observed this difference and asked whether the language was intended to encompass the same options. The Departments intended these descriptions to include the same scope of options. Some commenters suggested that the individual exemption should not allow the offering of "a separate group health plan," because doing so could cause various administrative burdens. The Departments disagree, since group health plan sponsors and group and individual health insurance issuers would be free to decline to provide that option, including because of administrative burdens. In addition, the Departments wish to clarify that, where an employee claims the exemption, a willing issuer and a willing employer may, where otherwise permitted, offer the employee participation in a group health insurance policy or benefit option that complies with the employee's objection. Consequently, these rules finalize the individual exemption by making a technical change to the language to adopt the formulation, "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects."

This individual exemption cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of state law that requires coverage of such contraceptives or

Case: 25-2575    Document: 34-2    Page: 199    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB    Document 8092    Filed 12/14/18    Page 33 of 41

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    57623

sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held moral objection. This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4), and does not affect any other federal or state law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these rules do not affect such other laws or terms.

The Departments received numerous comments about the administrative burden from the potential variations in moral convictions held by individuals. Some commenters welcomed the ability of individuals covered by the individual exemption to be able to assert an objection to either some or all contraceptives, while others expressed concern that the variations in the kinds of contraceptive coverage to which individuals object might make it difficult for willing plan sponsors and issuers to provide coverage that complies with the moral convictions of an exempt individual.

If an individual only objects to some contraceptives, and the individual's issuer and, as applicable, plan sponsor are willing to provide the individual a package of benefits omitting such coverage, but for practical reasons can only do so by providing the individual with coverage that omits all—not just some—contraceptives, the Departments believe that it favors individual freedom and market choice, and does not harm others, to allow the issuer and plan sponsor to provide, in that case, a plan omitting all contraceptives if the individual is willing to enroll in that plan. The language of the individual exemption set forth in the Moral IFC implied this conclusion by specifying that the Guidelines requirement of contraceptive coverage did not apply where the individual objected to some or all contraceptives. Notably, that language differed from the language applicable to the exemptions under § 147.133(a), which specifies that those exemptions apply "to the extent" of the moral objections, so that, as discussed above, they include only those contraceptive methods to which the objection applied. In response to comments suggesting the language of the individual exemption was not sufficiently clear on this distinction, however, the Departments in these rules finalize the individual exemption at § 147.133(b), with the following change, by adding the following sentence at the end of the paragraph: "Under this

exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services."

Some commenters asked for plain language guidance and examples about how the individual exemption might apply in the context of employer-sponsored insurance. Here is one such example. An employee is enrolled in group health coverage through her employer. The plan is fully insured. If the employee has sincerely held moral convictions objecting to her plan including coverage for contraceptives, she could raise this with her employer. If the employer is willing to offer her a plan that omits contraceptives, the employer could discuss this with the insurance agent or issuer. If the issuer is also willing to offer the employer, with respect to the employee, a group health insurance policy that omits contraceptive coverage, the individual exemption would make it legal for the group health insurance issuer to omit contraceptives for her and her beneficiaries under her policy, for her employer to sponsor that plan for her, and for the issuer to issue such a plan to the employer, to cover that employee. This would not affect other employees' plans—those plans would still be subject to the Mandate and would continue to cover contraceptives. But if either the employer, or the issuer, is not willing (for whatever reason) to offer a plan or a policy for that employee that omits contraceptive coverage, these rules do not require them to do so. The employee would have the choice of staying enrolled in a plan with its coverage of contraceptives, not enrolling in that plan, seeking coverage elsewhere, or seeking employment elsewhere.

For all these reasons, these rules adopt the individual exemption language from the Religious IFC with changes, to read as follows: "(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815– 2713(a)(1)(iv), or 29 CFR 2590.715– 2713(a)(1)(iv) may be construed to

prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions. Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services."

### 8. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715– 2713A)

The previous regulations did not offer the accommodation process to entities with moral non-religious objections. The Religious IFC amended the accommodation regulations to offer it to all entities that are exempt on the basis of religious beliefs under § 147.132, as an optional process in which such entities could participate voluntarily. The Moral IFC did not change that accommodation process, but inserted references in it to the new section § 147.133, alongside the references to section § 147.132. These changes made entities eligible for the voluntary accommodation process if they are exempt on the basis of moral convictions. The references were inserted in 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715– 2713A.

In these rules, the Departments finalize, without change, the Moral IFC's revisions of 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A. The operation of the accommodation process, changes made in the Religious IFC, and public comments concerning the accommodation, are more fully described in the Religious IFC, and in the companion final rules concerning the religious exemptions and accommodation, published elsewhere in today's **Federal Register**. Those descriptions are incorporated here by reference to the extent they apply to these rules.

Case: 25-2575    Document: 34-2    Page: 200    Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB    Document 6302    Filed 12/10/18    Page 34 of 45

**57624**    **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

Many commenters supported extending the accommodation process to entities with objections based on moral convictions. Others objected to doing so, raising arguments parallel to their objections to creating exemptions for group health plan sponsors with moral convictions. For much the same reasons discussed above concerning why the Departments find it appropriate to exempt entities with moral objections to contraceptive coverage, the Departments find it appropriate to extend the optional accommodation process to these entities. The Departments observe that, to the extent such entities wish to use the process, it will not be an obstacle to contraceptive coverage, but will instead help deliver contraceptive coverage to women who receive health coverage from such entities while respecting the moral convictions of the entities. The Departments are not aware of entities with non-religious moral convictions against contraceptive coverage that also consider the accommodation acceptable and would opt into it, but we are aware of a small number of entities with non-religious moral objections to the Mandate. The Departments, therefore, continue to consider it appropriate to extend the optional accommodation to such entities in case any wish to use it. Below, albeit based on very limited data, the Departments estimate that a small number of entities with non-religious moral objections may use the accommodation process.

### 9. Definition of Contraceptives for the Purpose of These Final Rules

The previous regulations did not define contraceptive services. The Guidelines issued in 2011 included, under "Contraceptive methods and counseling," "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." The previous regulations concerning the exemption and the accommodation used the terms "contraceptive services" and "contraceptive coverage" as catch-all terms to encompass all of those Guidelines requirements. The 2016 update to the Guidelines are similarly worded. Under "Contraception," they include the "full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration," "instruction in fertility awareness-based methods," and "[c]ontraceptive care" to "include contraceptive counseling, initiation of contraceptive use, and follow-up care (e.g., management, and evaluation as well as changes to and removal or

discontinuation of the contraceptive method)."[70]

To more explicitly state that the expanded exemptions encompass any of the contraceptive or sterilization services, items, procedures, or related patient education or information that have been required under the Guidelines, the Moral IFC included a definition of contraceptive services, benefits or coverage, at 45 CFR 147.133(c). These rules finalize that definition without change.

### 10. Severability

The Departments finalize, without change, the severability clause set forth at § 147.133(d).

### C. Other Public Comments

#### 1. Items Approved as Contraceptives But Used To Treat Existing Conditions

Some commenters noted that some drugs included in the preventive services contraceptive Mandate can also be useful for treating certain existing health conditions, and that women use them for non-contraceptive purposes. Certain commenters urged the Departments to clarify that the final rules do not permit employers to exclude from coverage medically necessary prescription drugs used for non-preventive services. Some commenters suggested that moral objections to the Mandate should not be permitted in cases where contraceptive methods are used to treat such existing medical conditions and not for preventive purposes, even if those contraceptive methods can also be used for contraceptive purposes.

Section 2713(a)(4) only applies to "preventive" care and screenings. The statute does not allow the Guidelines to mandate coverage of services provided solely for a non-preventive use, such as the treatment of an existing condition. The Guidelines implementing this section of the statute are consistent with that narrow authority. They state repeatedly that they apply to "preventive" services or care.[71] The requirement in the Guidelines concerning "contraception" specifies several times that it encompasses "contraceptives," that is, medical products, methods, and services applied for "contraceptive" uses. The Guidelines do not require coverage of care and screenings that are non-preventive, and the contraception portion of those Guidelines do not require coverage of medical products,

methods, care, and screenings that are non-contraceptive in purpose or use. The Guidelines' inclusion of contraceptive services requires coverage of contraceptive methods as a type of preventive service only when a drug that FDA has approved for contraceptive use is prescribed in whole or in part for such purpose or intended use. Section 2713(a)(4) does not authorize the Departments to require coverage of drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.[72] The extent to which contraceptives are covered to treat non-preventive conditions would be determined by application of the requirement section 1302(b)(1)(F) of the ACA to cover prescription drugs (where applicable), implementing regulations at 45 CFR 156.122, and 156.125, and plans' decisions about the basket of medicines to cover for these conditions.

Some commenters observed that pharmacy claims do not include a medical diagnosis code, so that plans may be unable to discern whether a drug approved by FDA for contraceptive uses is actually applied for a preventive or contraceptive use. Section 2713(a)(4), however, draws a distinction between preventive and other kinds of care and screenings. That subsection does not authorize the Departments to impose a coverage mandate of services that are not at least partly applied for a preventive use, and the Guidelines themselves do not require coverage of care unless it is contraceptive in purpose. These rules do not prohibit issuers from covering drugs and devices that are approved for contraceptive uses even when those drugs and devices are

---

[70] "Women's Preventive Services Guidelines," HRSA (last reviewed Oct. 2017), *https://www.hrsa.gov/womens-guidelines-2016/index.html.*

[71] *Id.*

[72] The Departments previously cited the IOM's listing of existing conditions that contraceptive drugs can be used to treat (menstrual disorders, acne, and pelvic pain), and said of those uses that "there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy." 77 FR 8727 & n.7. This was not, however, an assertion that section 2713(a)(4) or the Guidelines require coverage of "contraceptive" methods when prescribed for an exclusively *non-*contraceptive, *non-*preventive use. Instead, it was an observation that such drugs—generally referred to as "contraceptives"—also have some alternate beneficial uses to treat existing conditions. For the purposes of these final rules, the Departments clarify here that the previous reference to the benefits of using contraceptive drugs exclusively for some non-contraceptive and non-preventive uses to treat existing conditions did not mean that the Guidelines require coverage of such uses, and consequently is not a reason to refrain from offering the exemptions provided here. Where a drug approved by the FDA for contraceptive use is prescribed for both a contraceptive use and a non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage. Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines and the contraceptive Mandate.

Case: 25-2575　　Document: 34-2　　Page: 201　　Date Filed: 12/12/2025
Case: 2:7-cv-04540-WB　Document 892　Filed 12/14/18　Page 33 of 41

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations　　**57625**

prescribed for non-preventive, non-contraceptive purposes. As discussed above, these final rules do not purport to delineate the items HRSA will include in the Guidelines, but only concern expanded exemptions and accommodations that apply if the Guidelines require contraceptive coverage. Therefore, the Departments do not consider it appropriate to specify in these final rules that, under section 2713(a)(4), exempt organizations must provide coverage for drugs or items prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.

## 2. Comments Concerning Regulatory Impact

Some commenters agreed with the Departments' statement in the Moral IFC that the moral exemptions are likely to affect only a very small number of women otherwise receiving coverage under the Mandate. Other commenters disagreed, stating that the exemptions could take contraceptive coverage away from many or most women. Still others opposed establishing the exemptions, but contended that accurately determining the number of women affected by the exemptions is not possible. Public comments included various statements that these exemptions would impact coverage for a large number of women, while others stated they would affect only a very small number. But few, if any, public commenters provided data predicting a precise number of entities that would make use of the exemptions for moral convictions nor a precise number of employees that would potentially be affected.

After reviewing the public comments, the Departments do not find the suggestions of commenters who predicted a very large impact any more reliable than the estimates set forth in the Religious and Moral IFCs. Therefore, the Departments conclude that the estimates of regulatory impact made in the Religious and Moral IFCs are still the best estimates available. The Departments' estimates are discussed in more detail in the following section.

## III. Economic Impact and Paperwork Burden

The Departments have examined the impacts of these final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96–354, section1102(b) of the Social Security

Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2)) and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

### A. Executive Orders 12866 and 13563—Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any 1 year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any 1 year), and an "economically significant" regulatory action is subject to review by OMB. As discussed below regarding their anticipated effects, the these final rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866. However, OMB has determined that the actions are significant within the meaning of section 3(f)(4) of the Executive Order. Therefore, OMB has reviewed these final rules and the Departments have

provided the following assessment of their impact.

### 1. Need for Regulatory Action

The Religious IFC amended the Departments' July 2015 final regulations. The Moral IFC amended those regulations further, and added an additional rule at 45 CFR part 147.133. These final rules adopt as final, and further amend, the amendments made by the Moral IFC. The Departments do so in conjunction with the amendments made in the companion final rules concerning religious beliefs published elsewhere in today's **Federal Register**. These rules provide an exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4), section 715(a)(1) of the ERISA, and section 9815(a)(1) of the Code, for certain entities and individuals with objections to compliance with the Mandate based on sincerely held moral convictions, and they revise the accommodation process by making the accommodation applicable to organizations with such convictions as an option. The exemption applies to certain individuals, nonprofit entities, institutions of higher education, issuers, and for-profit entities that do not have publicly traded ownership interests, that have a moral objection to some (or all) of the contraceptive and/or sterilization services covered by the Guidelines. Such action has been taken to provide for participation in the health insurance market by certain entities or individuals in a manner free from penalties for violating sincerely held moral convictions opposed to providing or receiving coverage of contraceptive services, to ensure the preventive services coverage requirement is implemented in a way consistent with longstanding federal conscience statutes, to prevent lawsuits of the kind that were filed against the Departments when the expanded exemption in these final rules was not offered, and for the other reasons discussed above.

### 2. Anticipated Effects

The Departments acknowledge that expanding the exemption to include objections based on moral convictions might result in less insurance coverage of contraception for some women who may want the coverage. Although the Departments do not know the exact scope of that effect attributable to the moral exemption in these final rules, we believe it to be small.

With respect to the exemption for nonprofit organizations with objections based on moral convictions, as noted

Case: 25-2575    Document: 34-2    Page: 202    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB   Document 69-2   Filed 12/14/18   Page 36 of 41

**57626**    **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

above, the Departments are aware of two small nonprofit organizations that have filed lawsuits raising non-religious moral objections to coverage of some contraceptives. Both of those entities have fewer than five employees enrolled in health coverage, and both require all of their employees to agree with their opposition to the nature of certain contraceptives subject to coverage under the Mandate.[73] One of them has obtained a permanent injunction against any regulations implementing the contraceptive Mandate, and so will not be affected by these final rules. Based on comments submitted in response to rulemakings prior to the Moral and Religious IFCs, the Departments believe that at least one other similar entity exists.[74] However, the Departments do not know how many similar entities exist and are currently unable to estimate the number of such entities. Lacking other information, we assume that the number is small. The Departments estimate it to be less than 10 and assume the exemption will be used by nine nonprofit entities.

The Departments also assume that those nine entities will operate in a fashion similar to the two similar entities of which we are aware, so that their employees will likely share their views against coverage of certain contraceptives. This is consistent with the conclusion in previous regulations that no significant burden or costs would result from exempting houses of worship and integrated auxiliaries. (See 76 FR 46625 and 78 FR 39889). The Departments reached that conclusion without ultimately requiring that houses of worship and integrated auxiliaries only hire persons who agree with their views against contraception and without requiring that such entities actually oppose contraception in order to be exempt (in contrast, the exemption here requires the exempt entity to actually possess sincerely held moral convictions objecting to contraceptive coverage). In concluding that the exemption for houses of worship and integrated auxiliaries would result in no significant burden or costs, the

Departments relied on the assumption that the employees of exempt houses of worship and integrated auxiliaries likely share their employers' opposition to contraceptive coverage.

A similar assumption is appropriate with respect to the expanded exemption for nonprofit organizations with objections based on moral convictions. To the knowledge of the Departments, the vast majority of organizations objecting to the Mandate assert objections based on religious beliefs. The only nonprofit organizations of which they are aware that possess non-religious moral convictions against some or all contraceptive methods only hire persons who share their convictions. It is possible that the exemption for nonprofit organizations with moral convictions in these final rules could be used by a nonprofit organization that employs persons who do not share the organization's views on contraception, but it was also possible under the Departments' previous regulations that a house of worship or integrated auxiliary could employ persons who do not share their views on contraception.[75] Although the Departments are unable to find sufficient data on this issue, we believe that there are far fewer nonprofit organizations opposed to contraceptive coverage on the basis of moral convictions than there are houses of worship or integrated auxiliaries with religious objections to such coverage. Based on the limited data available, the Departments believe the most likely effect of the expanded exemption for nonprofit entities is that it will be used by entities similar to the two entities that have sought an exemption through litigation, and whose employees also oppose certain contraceptive coverage. Therefore, the Departments expect that the moral exemption for nonprofit entities will have a minimal effect of reducing contraceptive coverage with respect to employees who want such coverage.

These rules extend the exemption to include institutions of higher education that arrange student coverage and have non-religious moral objections to the Mandate, and make exempt entities with moral objections eligible to avail themselves of the accommodation. The Departments are not aware of any institutions of higher education with this kind of non-religious moral

convictions. Moreover, the Departments believe the overall number of entities that would object to the Mandate based on non-religious moral convictions is already very small. The only entities of which we are aware that have raised such objections are not institutions of higher education. Public comments did not reveal the existence of any institutions of higher education with such moral convictions. Therefore, for the purposes of estimating the anticipated effect of these final rules on contraceptive coverage of women who wish to receive such coverage, the Departments assume that—at this time—no entities with non-religious moral objections to the Mandate will be institutions of higher education that arrange student coverage, and no other entities with non-religious moral objections will opt into the accommodation. We wish to make the expanded exemption and accommodation available to such entities in case they do exist or might come into existence, based on reasons similar to those given above for why the exemptions and accommodations are extended to other entities.

The Departments believe that the exemption for issuers with objections based on moral convictions will not result in a distinct effect on contraceptive coverage for women who wish to receive it, because that exemption only applies in cases where plan sponsors or individuals are also otherwise exempt, and the effect of those exemptions is discussed elsewhere herein, or in the companion final rules concerning religious beliefs published elsewhere in today's **Federal Register**. The exemption for individuals that oppose contraceptive coverage based on sincerely held moral convictions will provide coverage that omits contraception for individuals that object to contraceptive coverage.

The moral exemption will also cover for-profit entities that do not have publicly traded ownership interests and that have non-religious moral objections to the Mandate, if such entities exist. Some commenters agreed that the impact of these final rules would be no more than the Departments estimated in the Moral IFC, and some commenters stated the impact would be much smaller. Other commenters disagreed, suggesting that the expanded exemptions risked removing contraceptive coverage from more than 55 million women receiving the benefits of the preventive services Guidelines, or even risked removing contraceptive coverage from over 100 million women. Some commenters cited studies indicating that, nationally, unintended

---

[73] Non-religious nonprofit organizations that engage in expressive activity generally have a First Amendment right to hire only people who share their moral convictions or will be respectful of them—including their convictions on whether the organization or others provide health coverage of contraception, or of certain items they view as being abortifacient.

[74] See, for example, Americans United for Life ("AUL") Comment on CMA-9992-IFC2 at 10 (Nov. 1, 2011), available at *http://www.regulations.gov/ #!documentDetail;D=HHS-OS-2011-0023-59496*, and AUL Comment on CMS-9968-P at 5 (Apr. 8, 2013), available at *http://www.regulations.gov/ #!documentDetail;D=CMS-2012-0031-79115*.

[75] *Cf., for example,* Frank Newport, "Americans, Including Catholics, Say Birth Control Is Morally OK," Gallup, (May 22, 2012), *http:// www.gallup.com/poll/154799/americans-including-catholics-say-birth-control-morally.aspx* ("Eighty-two percent of U.S. Catholics say birth control is morally acceptable").

Case: 25-2575    Document: 34-2    Page: 203    Date Filed: 12/12/2025
Case: 25-2575    Document: 6902    Filed: 12/12/2025    Page: 37 of 41

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57627**

pregnancies have large public costs, and the Mandate overall led to large out-of-pocket savings for women. These general comments did not, however, substantially assist the Departments in estimating the number of women that would potentially be affected by these exemptions for moral convictions specifically, or among them, how many unintended pregnancies would result, how many of the affected women would nevertheless use contraceptives not covered under the health plans of their objecting employers and, thus, be subject to the estimated transfer costs, or instead, how many women might avoid unintended pregnancies by changing their activities in other ways besides using contraceptives.

Some of the comments opposing these exemptions assert that they will lead to a large number of entities dropping contraceptive coverage. The Departments disagree; they are aware of only two entities that hold non-religious moral convictions against contraceptive coverage. Both only hire employees that share their beliefs, and one will not be affected by these final rules because it is protected by an injunction from any regulations implementing the contraceptive Mandate. Commenters cited no other specific entities that might assert these moral convictions, and did not provide better data to estimate how many entities might exist. Likewise, the Departments find it unlikely that any of the vast majority of entities that covered contraceptives before this Mandate was announced in 2011 would terminate such coverage because of these exemptions based on moral convictions. The Departments also find it unlikely that a significant number of for-profit entities, whose plans include a significant number of women, omitted contraceptive coverage before the ACA on the basis of objections grounded in non-religious moral convictions, and would claim an exemption under these final rules. No such entities, or data concerning such entities, were identified by public commenters, nor are the Departments aware of any involved in litigation over the Mandate.

Numerous for-profit entities claiming religious objections have filed suit challenging the Mandate. Among the over 200 entities that brought legal challenges, only two entities (less than 1 percent) raised non-religious moral objections—and both were nonprofit organizations. Among the general public, polls vary about religious beliefs, but one prominent poll shows that 89 percent of Americans say they believe in God.[76] Among non-religious persons, only a very small percentage of the population appears to hold moral objections to contraception. A recent study found that only 2 percent of religiously unaffiliated persons believed using contraceptives is morally wrong.[77] Combined, this suggests that 0.2 percent of Americans at most [78] might believe contraceptives are morally wrong based on moral convictions but not religious beliefs. The Departments have no information about how many of those persons run closely held businesses, offer employer sponsored health insurance, and would make use of the expanded exemption for moral convictions set forth in these final rules. Given the large number of closely held entities that challenged the Mandate based on religious objections, the Departments assume that some similar for-profit entities with non-religious moral objections exist. But the Departments expect that it will be a comparatively small number of entities, since among the nonprofit litigants, only two were non-religious. Without data available to estimate the actual number of entities that will make use of the expanded exemption for for-profit entities without publicly traded ownership interests and with sincere moral objections to the Mandate, the Departments expect that fewer than 10 entities, if any, will do so—so the Departments assume nine for-profit entities will use the exemption in these final rules.

The moral exemption encompassing certain for-profit entities could result in the removal of contraceptive coverage from women who do not share their employers' views. The Departments used data from the Current Population Survey (CPS) and the Medical Expenditure Panel Survey-Insurance Component (MEPS–IC) to obtain an estimate of the number of policyholders that will be covered by the plans of the nine for-profit entities we assume may make use of these expanded exemptions.[79] The average number of policyholders (9) in plans with under 100 employees was obtained. It is not known how many employees would be employed by the for-profit employers that might claim this exemption, but as discussed above these final rules do not include publicly traded companies, and both of the two nonprofit entities that challenged the Mandate based on moral objections included fewer than five policyholders in their group plans. Therefore, the Departments assume that the for-profit entities that may claim this expanded exemption will have fewer than 100 employees and an average of 9 policyholders. For 9 entities, the total number of policyholders would be approximately 81. DOL estimates that for each policyholder, there is approximately one dependent.[80] This amounts to approximately 162 covered persons. Census data indicate that women of childbearing age, *i.e.,* women aged 15 to 44, comprise 20.2 percent of the general population.[81] This amounts to approximately 33 women of childbearing age for this group of individuals covered by group plans sponsored by for-profit moral objectors. Approximately 44.3 percent of women currently use contraceptives covered by the Guidelines.[82] Thus, the Departments estimate that approximately 15 women may incur contraceptive costs due to for-profit entities using the expanded moral exemption provided for in these final rules.[83] In the companion final

---

[76] Frank Newport, "Most Americans Still Believe in God," Gallup (June 29, 2016), *http://www.gallup.com/poll/193271/americans-believe-god.aspx.*

[77] Pew Research Center, "Where the Public Stands on Religious Liberty vs. Nondiscrimination," Pew Research Center, 26 (Sept. 28, 2016), *http://assets.pewresearch.org/wp-content/uploads/sites/11/2016/09/Religious-Liberty-full-for-web.pdf.*

[78] The study defined religiously "unaffiliated" as agnostic, atheist or "nothing in particular", *id.* at 8, as distinct from several versions of Protestants, or Catholics. "Nothing in particular" might have included some theists.

[79] "Health Insurance Coverage Bulletin," Dept. of Labor (June 28, 2016), Table 4, page 21. Using March 2015 Annual Social and Economic

Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.* Estimates of the number of ERISA Plans based on 2015 Medical Expenditure Survey—Insurance.

[80] "Health Insurance Coverage Bulletin" Dept. of Labor" (June 28, 2016), Table 4, page 21. Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.*

[81] U.S. Census Bureau, "Age and Sex Composition: 2010" (May 2011), available at *https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf.* The Guidelines' requirement of contraceptive coverage only applies "for all women with reproductive capacity." Women's Preventive Services Guidelines, HRSA (last reviewed Oct. 2017), *https://www.hrsa.gov/womensguidelines/; see also* 80 FR 40318. In addition, studies commonly consider the 15–44 age range to assess contraceptive use by women of childbearing age. *See, e.g.,* "Contraceptive Use in the United States," The Guttmacher Institute (Sept. 2016), *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[82] *See* "Contraceptive Use in the United States," The Guttmacher Institute (Sept. 2016), *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[83] The Departments note that many non-religious for-profit entities which sued the Departments challenging the Mandate, including some of the largest employers, only objected to coverage of 4 of the 18 types of contraceptives required to be

Continued

Case: 25-2575    Document: 34-2    Page: 204    Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB    Document 6992    Filed 12/12/16    Page 38 of 45

**57628**    **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**, we estimate that the average cost of contraception per year per woman of childbearing age that use contraception covered by the Guidelines, in health plans that cover contraception, is $584. Consequently, the Departments estimate that the anticipated effects attributable to the cost of contraception from for-profit entities using the expanded moral exemption in these final rules is approximately $8,760.

The Departments estimate that these final rules will not result in any additional burden or costs on issuers or third party administrators. As discussed above, we assume that no entities with non-religious moral convictions will avail themselves of the accommodation, although the Departments wish to make it available in case an entity voluntarily opts into it in order to allow contraceptive coverage to be provided to its plan participants and beneficiaries. While these final rules make it legal for issuers to offer insurance coverage that omits contraceptives to/for exempt entities and individuals, these final rules do not require issuers to do so. Finally, because the accommodation process was not previously available to entities that possess non-religious moral objections to the Mandate, the Departments do not anticipate that these final rules will result in any burden from such entities acting to revoke their accommodated status.

The Departments believe the foregoing analysis represents a reasonable estimate of the likely impact under the exemptions finalized in these final rules. The Departments acknowledge uncertainty in the estimate and, therefore, conducted a second analysis using an alternative framework, which is set forth in the companion final rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**, with reference to the analysis conducted in the Religious IFC. Under either estimate, these final rules are not deemed to be economically significant.

---

covered by the Mandate—namely, those contraceptives which they viewed as abortifacients, and akin to abortion —and they were willing to provide coverage for other types of contraception. It is reasonable to assume that this would also be the case with respect to some for-profits that object to the Mandate on the basis of sincerely held moral convictions. Accordingly, it is possible that even fewer women beneficiaries under such plans would bear out-of-pocket expenses in order to obtain contraceptives, and that those who might do so would bear lower costs due to many contraceptive items being covered.

The Departments reiterate the rareness of instances in which we are aware that employers assert non-religious objections to contraceptive coverage based on sincerely held moral convictions, as discussed above, and also that in the few instances where such an objection has been raised, employees of such employers also opposed contraception.

*B. Special Analyses—Department of the Treasury*

These regulations are not subject to review under section 6(b) of Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Department of the Treasury and the Office of Management and Budget regarding review of tax regulations.

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) imposes certain requirements with respect to federal regulations that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 *et seq.*) and that are likely to have a significant economic impact on a substantial number of small entities. Under section 553(b) of the APA, a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The Moral IFC was a set of interim final rules with comment, and in these final rules, the Departments finalize the Moral IFC with certain changes based on public comments. The Moral IFC was exempt from the notice and comment requirements of the APA, both because the PHS Act, ERISA, and the Code contain specific provisions under which the Secretaries may adopt regulations by interim final rule and because the Departments have made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble. Therefore, the RFA did not apply to the Moral IFC. These final rules are, however, issued after a notice and comment period.

The Departments carefully considered the likely impact of the rules on small entities in connection with their assessment under Executive Order 12866. The Departments do not expect that these final rules will have a significant economic effect on a substantial number of small entities, because they will not result in any additional costs to affected entities. Instead, by exempting from the Mandate small businesses and nonprofit organizations with moral objections to

some or all contraceptives and/or sterilization—businesses and organizations which would otherwise be faced with the dilemma of complying with the Mandate (and violating their moral convictions), or of following their moral convictions and incurring potentially significant financial penalties for noncompliance—the Departments have reduced regulatory burden on small entities. Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

*D. Paperwork Reduction Act—Department of Health and Human Services*

Under the Paperwork Reduction Act of 1995 (the PRA), federal agencies are required to publish notice in the **Federal Register** and solicit public comment before a collection of information is submitted to the Office of Management and Budget (OMB) for review and approval. Interested persons are invited to send comments regarding our burden estimates or any other aspect of this collection of information, including any of the following subjects: (1) The necessity and utility of the proposed information collection for the proper performance of the agency's functions; (2) the accuracy of the estimated burden; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) the use of automated collection techniques or other forms of information technology to minimize the information collection burden.

The Departments estimate that these final rules will not result in additional burdens not accounted for as set forth in companion final rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**. As discussed there, rules covering the accommodation include provisions regarding self-certification or notices to HHS from eligible organizations (§ 147.131(c)(3)), notice of availability of separate payments for contraceptive services (§ 147.131(e)), and notice of revocation of accommodation (§ 147.131(c)(4)). The burden related to these information collection requirements (ICRs) received emergency review and approval under OMB Control Number 0938–1344. They have been resubmitted to OMB in conjunction with this final rule and are pending re-approval.

Case: 25-2575    Document: 34-2    Page: 205    Date Filed: 12/12/2025
Case: 2:17-cv-04540-WB Document 892-1 Filed 12/17/18 Page 38 of 41

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    **57629**

As discussed above, however, the Departments assume that no entities with non-religious moral objections to the Mandate will use the accommodation. The Departments know that no such entities were eligible for it until now, so that no entity possesses an accommodated status that would need to be revoked. Therefore, the Departments believe that the burden for these ICRs is accounted for in the collection approved under OMB Control Numbers 0938–1344, as described in the final rules concerning religious beliefs issued contemporaneously with these final rules.

### E. Paperwork Reduction Act— Department of Labor

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210–0150 and 1210–0152. In an effort to consolidate the number of information collections the Department is combining OMB control numbers 1210–0150 and 1210–0152 under OMB control number 1210–0150 and discontinuing OMB control number 1210–0152.

A copy of the ICR may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW, Room N–5718, Washington, DC 20210. Telephone: (202) 693–8410; Fax: (202) 219–4745. These are not toll-free numbers.

Consistent with the analysis in the HHS PRA section above, although these final rules make entities with certain moral convictions eligible for the accommodation, the Department assumes (1) that no entities will use the accommodation rather than the exemption, and (2) entities using the moral exemption would not have to revoke an accommodation, because they previously were not eligible for it. Therefore, the Department believes these final rules do not involve additional burden not accounted for under OMB control number 1210–0150, which is published elsewhere in today's issue of the **Federal Register** in connection with the companion Religious Exemption and Accommodation Preventive Health Service final rule. The Department will publish a notice informing the public of OMB's action with respect to the Department's submission of the ICRs under OMB control number 1210–0150.

### F. Regulatory Reform Executive Orders 13765, 13771 and 13777

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of Health and Human Services (Secretary) and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the [Affordable Care] Act shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any state or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the States more flexibility and control to create a more free and open healthcare market." The Moral IFC and these final rules exercise the discretion provided to the Departments under the Affordable Care Act and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), the Departments have estimated the costs and cost savings attributable to these rules. As discussed in more detail in the preceding analysis, these final rules lessen incremental reporting costs.[84] However, in order to avoid double-counting with the Moral IFC, which has already been tallied as an E.O. 13771 deregulatory action, this finalization of the IFC's policy is not considered a deregulatory action under the Executive Order.

### G. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (section 202(a) (Pub. L. 104–4), requires the Departments to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing "any rule that includes any federal mandate that may result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any 1 year." In 2018, that threshold is approximately $150 million. For purposes of the Unfunded Mandates Reform Act, the Moral IFC and these final rules do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $150 million or more on the private sector.

### H. Federalism

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

These rules do not have any Federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

### IV. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

---

[84] Other noteworthy potential impacts encompass potential changes in medical expenditures, including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on E.O. 13771 implementation (*https://www.whitehouse.gov/the-press-office/2017/04/05/memorandum-implementing-executive-order-13771-titled-reducing-regulation*) states that impacts should be categorized as consistently as possible within Departments. The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures are reduced, negative benefits if expenditures are raised). Following the FDA, OSHA and MSHA accounting convention leads to these final rules' medical expenditure impacts being categorized as (positive or negative) benefits, rather than as costs, thus placing them outside of consideration for E.O. 13771 designation purposes.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

### List of Subjects

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

**Kirsten Wielobob,**
*Deputy Commissioner for Services and Enforcement.*
Approved: October 30, 2018.
**David J. Kautter,**
*Assistant Secretary for Tax Policy.*
Signed this 29th day of October, 2018.
**Preston Rutledge,**
*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: October 17, 2018.
**Seema Verma,**
*Administrator, Centers for Medicare & Medicaid Services.*
Dated: October 18, 2018.
**Alex M. Azar II,**
*Secretary, Department of Health and Human Services.*

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

For the reasons set forth in this preamble, 26 CFR part 54 is amended as follows:

### PART 54—PENSION EXCISE TAXES

■ 1. The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805. * * *

### § 54.9815–2713 [Amended]

■ 2. Section 54.9815–2713, as amended elsewhere in this issue of the **Federal Register**, is further amended in paragraph (a)(1)(iv) by removing the reference ''147.131 and 147.132'' and adding in its place the reference ''147.131, 147.132, and 147.133''.

### § 54.9815–2713A [Amended]

■ 3. Section 54.9815–2713A, as amended elsewhere in this issue of the **Federal Register**, is further amended—
■ a. In paragraph (a)(1) by removing ''or (ii)'' and adding in its place ''or (ii), or 45 CFR 147.133(a)(1)(i) or (ii)'';
■ b. In paragraph (a)(2) by removing the reference ''147.132(a)'' and adding in its place the reference ''147.132(a) or 147.133(a)'';
■ c. In paragraph (b)(1)(ii) introductory text by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133'';
■ d. In paragraph (b)(1)(ii)(B) by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133'';
■ e. In paragraph (c)(1)(ii) introductory text by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133'';
■ f. In paragraph (c)(1)(ii)(B) by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133''; and
■ g. In paragraph (c)(2) by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133''.

## DEPARTMENT OF LABOR

### Employee Benefits Security Administration

### PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ For the reasons set forth in the preamble, the Department of Labor adopts, as final, the interim final rules amending 29 CFR part 2590, published October 13, 2017 (82 FR 47838), without change.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

■ For the reasons set forth in the preamble, the Department of Health and Human Services adopts as final the interim final rules amending 45 CFR part 147 published on October 13, 2017 (82 FR 47838) with the following changes:

### PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 4. The authority citation for part 147, as revised elsewhere in this issue of the **Federal Register**, continues to read as follows:

**Authority:** 42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92, as amended.

■ 5. Section 147.133 is amended by revising paragraph (a)(1) introductory text, (a)(1)(ii), (a)(2), and (b) to read as follow:

### § 147.133 Moral exemptions in connection with coverage of certain preventive health services.

(a) * * *
(1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections specified below. Thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

* * * * *

(ii) An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health

insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

\*        \*        \*        \*        \*

(2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held moral convictions, to its establishing, maintaining, providing, offering, or arranging for (as applicable):

(i) Coverage or payments for some or all contraceptive services; or

(ii) A plan, issuer, or third party administrator that provides or arranges such coverage or payments.

(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to

any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions. Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

\*        \*        \*        \*        \*

[FR Doc. 2018–24514 Filed 11–7–18; 4:15 pm]

**BILLING CODE 4830–01–P; 4510–29–P; 4120–01–P**

# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA et al.,<br><br>                         Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP et al.,<br><br>                      Defendants. | **No. 2:17-cv-04540-WB** |

**DECLARATION OF KATHRYN KOST**

I, Kathryn Kost, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by Plaintiffs in the above-captioned matter and, in support thereof, state as follows:

1.  I am the Acting Vice President for Domestic Research at the Guttmacher Institute. I have worked for the Guttmacher Institute in a full-time or consulting capacity for nearly 30 years since joining the Institute as a Senior Research Associate in 1989. I received my BA in sociology from Reed College and my PhD in sociology from Princeton University, where I specialized in demography at the Office of Population Research.

2.  The Guttmacher Institute is a private, independent, nonprofit, nonpartisan corporation that advances sexual and reproductive health and rights through an interrelated program of research, policy analysis, and public education. The Institute's overarching goal is to ensure quality sexual and reproductive health for all people worldwide by conducting research according to the highest standards of methodological rigor and promoting evidence-based policies. It produces a wide range of resources on topics pertaining to sexual and reproductive health and publishes two peer-reviewed journals. The information and analysis it generates on

1

reproductive health and rights issues are widely used and cited by researchers, policymakers, the media and advocates across the ideological spectrum.

3.  Over the course of more than 30 years, I have designed, executed, and analyzed numerous quantitative and qualitative research studies in the field of reproductive health care, including those on contraceptive use and failure, unintended pregnancy, maternal and child health, and the impact on public health and fisc associated with particular reproductive health care policies or trends. My peer-reviewed research has been published in dozens of articles, including first-authored work in *Demography*, *Perspectives on Sexual and Reproductive Health*, *Contraception*, *Studies in Family Planning* and other public health, medical and demographic journals. My education, training, responsibilities and publications are set forth in greater detail in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. I submit this declaration as an expert on reproductive health care, family planning, and unintended pregnancy, and the impact on individuals, families, and the public health from access to contraception and related care, or interference with that care, in the United States.

4.  I understand that this lawsuit involves a challenge to the federal government's Final Rules ("Final Rules") regarding the Affordable Care Act's ("ACA") contraceptive coverage mandate. In my expert opinion, the Final Rules would compromise women's ability to obtain contraceptive methods, services and counseling and, in particular, to consistently use the best methods for them, thus putting them at heightened risk of unintended pregnancy.

### Contraception Is Widely Used and the Majority of Women Rely on Numerous Contraceptive Methods for Decades of Their Lives

5.   More than 99% of women aged 15–44 who have ever had sexual intercourse have used at least one contraceptive method; this is true across a variety of religious affiliations.[1] Some 61% of all women of reproductive age are currently using a contraceptive method.[2] Among women at risk of an unintended pregnancy (i.e., women aged 15–44 who have had sexual intercourse in the past three months, are not pregnant or trying to conceive, and are not sterile for noncontraceptive reasons), 90% are currently using a contraceptive method.[3]

6.   A typical woman in the United States wishing to have two children will, on average, spend three decades—roughly 90% of her reproductive life—avoiding unintended pregnancy.[4]

7.   Women and couples rely on a wide range of contraceptive methods: In 2014, 25% of female contraceptive users relied on oral contraceptives and 15% on condoms as their most effective method. That means that six in 10 contraceptive users relied on other methods: female or male sterilization; hormonal or copper intrauterine devices (IUDs); other hormonal methods including the injectable, the ring, the patch and the implant; and behavioral methods, such as withdrawal and fertility awareness methods.[5]

---

[1] Daniels K, Mosher WD and Jones J, Contraceptive methods women have ever used: United States, 1982–2010, *National Health Statistics Reports*, 2013, No. 62, https://www.cdc.gov/nchs/products/nhsr.htm.
[2] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.
[3] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.
[4] Sonfield A, Hasstedt K and Gold RB, *Moving Forward: Family Planning in the Era of Health Reform*, New York: Guttmacher Institute, 2014, https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.
[5] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012

3

8.   Most women rely on multiple methods over the course of their reproductive lives, with 86% having used three or more methods by their early 40s.[6] Sometimes, women and couples may try out different methods to find one that they can use consistently or that minimizes side effects. Other times, they may switch from method to method—such as from condoms to oral contraceptives to sterilization—as their relationships, life circumstances and family goals evolve.

9.   Many people use two or more methods at once: 17% of female contraceptive users did so the last time they had sex.[7] For example, they may use condoms to prevent STIs and an IUD for the most reliable prevention of pregnancy. Or they may use multiple methods simultaneously— for instance, condoms, withdrawal and oral contraceptives—to provide extra pregnancy protection.

### Women Need Access to the Full Range of Contraceptive Options to Most Effectively Avoid Unintended Pregnancies

10. Using any method of contraception greatly reduces a woman's risk of unintended pregnancy. Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.[8,9]

---

[6] Daniels K, Mosher WD and Jones J, Contraceptive methods women have ever used: United States, 1982– 2010, *National Health Statistics Reports*, 2013, No. 62, https://www.cdc.gov/nchs/products/nhsr.htm.
[7] Kavanaugh ML and Jerman J, Concurrent multiple methods of contraception in the United States, poster presented at the North American Forum on Family Planning, Atlanta, Oct. 14–16, 2017.
[8] Sundaram A et al., Contraceptive failure in the United States: estimates from the 2006-2010 National Survey of Family Growth, *Perspectives on Sexual and Reproductive Health*, 2017, 49(1):7–16, https://www.guttmacher.org/journals/psrh/2017/02/contraceptive-failure-united-states-estimates-2006-2010-national-survey-family.
[9] Trussell J, Aiken A, "Contraceptive Efficacy" pp. 829–928. In Hatcher RA et al., eds., *Contraceptive Technology*, 21st ed., New York: Ayer Company Publishers, 2018.

11. All new contraceptive drugs and devices (just like other drugs and devices) must receive approval from the U.S. Food and Drug Administration (FDA) and must be shown to be safe and effective through rigorous scientific testing. Thus, the federal government itself provides the oversight to ensure that contraception is safe and effective in preventing pregnancy.

12. The government's effort to imply that there is doubt about whether contraception reduces the risk of unintended pregnancy is simply unfounded, as the data above illustrate. Though the Final Rules cite "conflicting evidence" for the effects of a contraceptive coverage requirement,[10] in the previous interim final rules, the government made positive arguments that contraceptive access did not reduce the risk of unintended pregnancy. This argument is flawed. For example, in the interim final rules the government argued, "In the longer term—from 1972 through 2002—while the percentage of sexually experienced women who had ever used some form of contraception rose to 98 percent, unintended pregnancy rates in the Unites States rose from 35.4 percent to 49 percent."[11]

13. However, the government's assertion in the interim final rules that unintended pregnancy rates rose between 1972 and 2002 was incorrect and based on faulty calculations and an inappropriate comparison. First, the numbers cited (35.4% and 49%) are the *percentage* of all pregnancies that were unintended, not the unintended pregnancy *rate*, which is the appropriate indicator for assessing trends in unintended pregnancy because it is not affected by changes in the incidence of *intended* pregnancy. Second, the 1972 figure includes only *births* (not all

---

[10] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 83(221):57536–57590, https://www.gpo.gov/fdsys/pkg/FR-2018-11-15/pdf/2018-24512.pdf
[11] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 82(197):47838–47862, https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.

5

pregnancies), and then only those births that were to married women.[12] Births to unmarried women and all abortions are excluded; the proportion of both of these that were unintended were significantly higher, so excluding them results in an artificially low percentage. The 2002 figure, on the other hand, includes all pregnancies to all women. An appropriate comparison of rates based on pregnancies and on all women in the population shows a clear decline in the rate: In 1971, there were an estimated 2.041 million unintended pregnancies (including births and abortions, but excluding miscarriages),[13] and 43.6 million women of reproductive age (15–44),[14] for an unintended pregnancy rate (excluding miscarriages) of 47 per 1,000 women. By contrast, in 2011, the unintended pregnancy rate *including* miscarriages was 45 per 1,000.[15] Even when including miscarriages in the later rate, it is lower than the earlier rate; because miscarriages typically represent about 14% of all pregnancies,[16] excluding them from the 2011 figure for comparability would result in a rate of about 38 per 1,000, substantially lower than the 1971 rate.

14. Although using any method of contraception is more effective in preventing pregnancy than not using a method at all, having access to a *limited* set of methods is far different than being able to choose from among the full range of methods to find the *best* methods for a given point in a woman's life.

---

[12] Weller RH and Heuser RL, Wanted and unwanted childbearing in the United States: 1968, 1969, and 1972 National Natality Surveys, *Vital and Health Statistics*, 1978, No. 32.

[13] Tietze C, Unintended pregnancies in the United States, 1970–1972, *Family Planning Perspectives,* 1979, 11(3):186–188.

[14] National Center for Health Statistics, Centers for Disease Control and Prevention, Population by age groups, race, and sex for 1960–1997, no date, https://www.cdc.gov/nchs/data/statab/pop6097.pdf.

[15] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

[16] Finer LB and Henshaw SK, Disparities in rates of unintended pregnancy in the United States, 1994 and 2001, *Perspectives on Sexual and Reproductive Health*, 2006, 38(2):90–96, https://www.guttmacher.org/journals/psrh/2006/disparities-rates-unintended-pregnancy-united-states-1994-and-2001.

15. One important consideration for most women in a choosing a contraceptive method is how well a method works for an individual woman to prevent pregnancy.[17] IUDs and implants, for example, are effective for years after they are inserted by a health care provider, and do not require women using them to think about contraception on a day-to-day basis.[18] By contrast, birth control pills must be taken every day, at approximately the same time. Nearly half of abortion patients who were users of birth control pills reported that they had forgotten to take their pills, and another quarter reported a lack of ready access to their pills (16% were away from their pills and 10% ran out).[19] Methods of contraception designed to be used during intercourse, such as condoms or spermicide, must be available, accessible, remembered, and used properly each time intercourse occurs.

16. Beyond effectiveness, there are many other features that people say are important to them when choosing a contraceptive method.[20] These include concerns about and past experience with side effects, drug interactions or hormones; affordability and accessibility; how frequently they expect to have sex; their perceived risk of HIV and other STIs; the ability to use the method confidentially or without needing to involve their partner; and potential effects on sexual enjoyment and spontaneity. For example, methods such as male condoms, fertility awareness and withdrawal require the active and effective participation of male partners. By contrast, methods

---

[17] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.
[18] Winner B et al., Effectiveness of long-acting reversible contraception, *New England Journal of Medicine*, 366(21):1998–2007.
[19] Jones RK, Darroch JE and Henshaw SK, Contraceptive use among U.S. women having abortions in 2000–2001, *Perspectives on Sexual and Reproductive Health*, 2002, 34(6): 294–303, https://www.guttmacher.org/journals/psrh/2002/11/contraceptive-use-among-us-women-having-abortions-2000-2001.
[20] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.

7

such as IUDs, implants, and oral contraceptives can be more reliably used by the woman alone in advance of intercourse.[21]

17. Being able to select the methods that best fulfill a woman's needs and priorities is an important way to ensure that she will be satisfied with her chosen methods. Women who are satisfied with their current contraceptive methods are more likely to use them consistently and correctly. For example, one study found that 30% of neutral or dissatisfied users had a temporal gap in use, compared with 12% of completely satisfied users.[22] Similarly, 35% of satisfied oral contraceptive users had skipped at least one pill in the past three months, compared with 48% of dissatisfied users.[23]

18. Consistent contraceptive in turn use helps women and couples prevent unwanted pregnancies and plan and space those they do want. The two-thirds of U.S. women (68%) at risk of unintended pregnancy who use contraceptives consistently and correctly throughout a year account for only 5% of all unintended pregnancies. In contrast, the 18% of women at risk who use contraceptives but do so inconsistently account for 41% of unintended pregnancies, and the 14% of women at risk who do not use contraceptives at all or have a gap in use of one month or longer account for 54% of unintended pregnancies.[24]

---

[21] Bailey MJ, More power to the pill: the impact of contraceptive freedom on women's life cycle labor supply, *Quarterly Journal of Economics*, 2006, 121(1): 289–320, https://academic.oup.com/qje/article-abstract/121/1/289/1849021?redirectedFrom=fulltext.

[22] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

[23] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

[24] Sonfield A, Hasstedt K and Gold RB, *Moving Forward: Family Planning in the Era of Health Reform*, New York: Guttmacher Institute, 2014, https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.

19. In summary, the ability to choose from among the full range of contraceptive methods encourages consistent and effective contraceptive use, thereby helping women to avoid unintended pregnancies and to time and space wanted pregnancies.

### Access to Contraception Does Not Increase Adolescent Sexual Activity

20. Adolescent pregnancy has declined dramatically over the past several decades: In 2013, the U.S. pregnancy rate among 15–19-year-olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.[25] The adolescent birthrate has continued to fall sharply from 2013–2016, suggesting that the underlying pregnancy rates have likely declined even further.[26] Over these decades, adolescents' sexual activity has not increased—in fact, it has declined—while their contraceptive use has increased.

21. National data limited to adolescents attending high school document long-term increases from 1991–2015 in the share of students using contraception, and decreases over the same time period in the share of students who are sexually active.[27] Several studies have validated that contraceptive access reduces adolescent pregnancy without increasing sexual activity: The vast majority (86%) of the decline in adolescent pregnancy between 1995 and 2002 was the result of improvements in contraceptive use; only 14% could be attributed to a decrease in sexual activity.[28] Further, when examining these same two factors, all of the decline in the more recent

---

[25] Kost K, Maddow-Zimet I and Arpaia A, Pregnancies, *Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity*, New York: Guttmacher Institute, 2017, https://www.guttmacher.org/report/us-adolescent-pregnancy-trends-2013.

[26] Martin JA, Hamilton BE and Osterman MJK, Births in the United States, 2016, *NCHS Data Brief*, 2017, No. 287, https://www.cdc.gov/nchs/products/databriefs.htm.

[27] National Center for HIV/AIDS, Viral Hepatitis, TD, and TB Prevention, Centers for Disease Control and Prevention (CDC), *Trends in the Prevalence of Sexual Behaviors and HIV Testing National YRBS: 1991–2015,* Atlanta: CDC, no date, https://www.cdc.gov/healthyyouth/data/yrbs/pdf/trends/2015_us_sexual_trend_yrbs.pdf.

[28] Santelli JS et al., Explaining recent declines in adolescent pregnancy in the United States: the contribution of abstinence and improved contraceptive use, *American Journal of Public Health*, 2007, 97(1): 150–156, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1716232/.

2007–2012 period was attributable to better contraceptive use: More adolescents were using contraception, they were using more effective methods, and they were using them more consistently, while adolescent sexual activity did not change.[29]

22. Recent trends in adolescent contraceptive use buttress this point: During 2011–2015, 81% of adolescent girls used contraception the first time they had sex, up from 75% in 2002; the share of adolescent girls who were sexually active stayed stable.[30,31] Similarly, use of emergency contraception among sexually active female adolescents increased from 8% in 2002 to 22% in 2011–2013; there was no significant change in sexual activity during this time.[32] And in a 2010 review of seven randomized trials of emergency contraception, there was no increase in sexual activity (e.g., reported number of sexual partners or number of episodes of unprotected intercourse) in adolescents given advanced access to emergency contraception.[33]

23. Along the same lines, studies of the availability of contraception in high schools provide evidence that it does not lead to more sexual activity. Rather, while several studies of school-based health care centers that provide contraceptive methods have shown contraceptives' availability increases students' use of contraception,[34,35] other studies have not found any

---

[29] Lindberg L, Santelli J and Desai S, Understanding the decline in adolescent fertility in the United States, 2007–2012, *Journal of Adolescent Health*, 2016, 59(5): 577–583, http://www.jahonline.org/article/S1054-139X(16)30172-0/fulltext.

[30] Martinez G, Copen CE and Abma JC, Teenagers in the United States: Sexual activity, contraceptive use, and childbearing, 2006–2010 National Survey of Family Growth, *Vital Health Statistics*, 2011, Series 23, No. 31, https://www.cdc.gov/nchs/products/series/series23.htm.

[31] Abma JC and Martinez G, Sexual activity and contraceptive use among teenagers in the United States, 2011–2015, *National Health Statistics Reports*, 2017, No. 104, https://www.cdc.gov/nchs/products/nhsr.htm.

[32] Martinez GM and Abma JC, Sexual activity, contraceptive use, and childbearing of teenagers aged 15–19 in the United States, *NCHS Data Brief*, 2015, No. 209, https://www.cdc.gov/nchs/products/databriefs.htm.

[33] Meyer JL, Gold MA and Haggerty CL, Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature, *Journal of Pediatric and Adolescent Gynecology*, 2011, 24(1):2–9, http://www.jpagonline.org/article/S1083-3188(10)00203-2/fulltext.

[34] Minguez M et al., Reproductive health impact of a school health center, *Journal of Adolescent Health*, 2015, 56(3): 338–344, https://www.ncbi.nlm.nih.gov/pubmed/25703321.

[35] Knopf FA et al., School-based health centers to advance health equity: a Community Guide systematic review, *American Journal of Preventive Medicine*, 2016, 51(1): 114-126, http://www.ajpmonline.org/article/S0749-3797(16)00035-0/fulltext.

associated increases in sexual activity.[36] And a recent review of studies of school-based condom availability programs found condom use increased the odds of students using condoms, while none increased sexual activity.[37]

### **Eliminating the Cost of Contraception Leads to Improved Contraceptive Use and Reduces Women's Risk of Unintended Pregnancy**

24. Extensive empirical evidence demonstrates what common sense would predict: eliminating costs leads to more effective and continuous use of contraception. That is because cost can be a substantial barrier to contraceptive choice. The contraceptive methods that can be purchased over the counter at a neighborhood drugstore for a comparatively low cost—male condoms and spermicide—are far less effective than methods that require a prescription and a visit to a health care provider,[38] which have higher up-front costs.[39]

25. The most effective methods of contraception are long-acting reversible contraceptives (LARC), such as implants and IUDs. Even with discounts for volume, the cost of these devices exceeds $500, exclusive of costs relating to the insertion procedure,[40] and the total cost of initiating one of these methods generally exceeds $1,000.[41] To put that cost in perspective, beginning to use one of these devices costs nearly a month's salary for a woman working full

---

[36] Kirby D, *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*, Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2007, https://thenationalcampaign.org/sites/default/files/resource-primary-download/EA2007_full_0.pdf.
[37] Wang T et al., The effects of school-based condom availability programs (CAPs) on condom acquisition, use and sexual behavior: a systematic review, *AIDS and Behavior*, 2017, https://www.ncbi.nlm.nih.gov/pubmed/28625012.
[38] Trussell J, Aiken A, "Contraceptive Efficacy" pp. 829–928. In Hatcher RA et al., eds., *Contraceptive Technology*, 21st ed., New York: Ayer Company Publishers, 2018.
[39] Trussell J et al., Cost effectiveness of contraceptives in the United States, *Contraception*, 2009, 79(1):5–14.
[40] Armstrong E et al., *Intrauterine Devices and Implants: A Guide to Reimbursement*, 2015, https://www.nationalfamilyplanning.org/file/documents----reports/LARC_Report_2014_R5_forWeb.pdf.
[41] Eisenberg D et al., Cost as a barrier to long-acting reversible contraceptive (LARC) use in adolescents, *Journal of Adolescent Health*, 2013, 52(4):S59–S63, http://www.jahonline.org/article/S1054-139X(13)00054-2/fulltext.

time at the federal minimum wage of $7.25 an hour.[42] These costs are dissuasive for many

women not covered by the contraceptive coverage guarantee; one pre-ACA study concluded that

women who faced high out-of-pocket IUD costs were significantly less likely to obtain an IUD

than women with access to the device at low or no out-of-pocket cost. And only 25% of women

who requested an IUD had one placed after learning the associated costs.[43] Even oral

contraceptives, which are twice as effective as condoms in practice, require a prescription and

have monthly costs. And although some stores offer certain pill formulations at steep discounts,

access to those cost savings can require a woman to change to a different formulation than the

one prescribed by her clinician and increases her risk of adverse health effects.

26. The government acknowledges that without coverage, many methods would cost women

$50 per month, or upwards of $600 per year, and in doing so, implies that such costs are a

minimal burden. This is not true. For example, a national study found that about one-third of

uninsured people and lower-income people in the United States would be unable to pay for

an unexpected $500 medical bill, and roughly another third would have to borrow money or put

it on a credit card and pay it back over time, with interest.[44]

27. Without insurance coverage to defray or eliminate the cost, the large up-front costs of the

more-effective contraceptive methods put them out of reach for many women who want them,

driving them to less expensive and less effective methods. In a study conducted prior to the

contraceptive coverage guarantee, almost one-third of women reported that they would change

---

[42] 29 U.S.C. § 206(a)(1)(C). At 40 hours a week, that amounts to $290 a week, before any taxes or deductions.
[43] Gariepy AM et al., The impact of out-of-pocket expense on IUD utilization among women
with private insurance, *Contraception*, 2011, 84(6):e39–e42, https://escholarship.org/uc/item/1dz6d3cx.
[44] DiJulio B et al., Data note: Americans' challenges with health care costs, 2017, https://www.kff.org/health-costs/poll-finding/data-note-americans-challenges-with-health-care-costs/?utm_campaign=KFF-2017-March-Polling-Beyond-The-ACA.

their contraceptive method if cost were not an issue.[45] This figure was particularly high among women relying on male condoms and other less effective methods such as withdrawal. A study conducted after the enactment of the ACA had similar findings: among women in the study who still lacked health insurance in 2015, 44% agreed that having insurance would help them to afford and use birth control and 44% agreed that it would allow them to choose a better method for them; 48% also agreed that it would be easier to use contraception consistently if they had coverage.[46] Among insured women who still had a copayment using a prescription method (e.g., those in grandfathered plans), 40% agreed that if the copayment were eliminated, they would be better able to afford and use birth control, 32% agreed this would help them choose a better method, and 30% agreed this would help them to use their methods of contraception more consistently. Other studies have found that uninsured women are less likely to use the most expensive (but most effective) contraceptive methods, such as IUDs, implants, and oral contraceptives,[47] and are more likely than insured women to report using no contraceptive method at all.[48,49]

28. Reducing financial barriers is critical to increasing access to effective contraception. Before the ACA provision went into effect, 28 states required private insurers that cover prescription drugs to provide coverage of most or all FDA-approved contraceptive drugs and

---

[45] Frost JJ and Darroch JE, Factors associated with contraceptive choice and inconsistent method use, United States, 2004, *Perspectives on Sexual and Reproductive Health,* 2008, 40(2):94–104, https://www.guttmacher.org/journals/psrh/2008/factors-associated-contraceptive-choice-and-inconsistent-method-use-united.

[46] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues,* 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[47] Culwell KR and Feinglass J, The association of health insurance with use of prescription contraceptives, *Perspectives on Sexual and Reproductive Health,* 2007, 39(4):226–230.

[48] Culwell KR and Feinglass J, The association of health insurance with use of prescription contraceptives, *Perspectives on Sexual and Reproductive Health,* 2007, 39(4):226–230.

[49] Culwell KR and Feinglass J, Changes in prescription contraceptive use, 1995–2002: the effect of insurance coverage, *Obstetrics & Gynecology,* 2007, 110(6):1371–1378, https://www.ncbi.nlm.nih.gov/pubmed/18055734.

devices.[50] These programs gave women access at lower prices than if contraception were not

covered, but (at the time) all states still allowed insurers to require cost-sharing. Experience from

these states demonstrates that having insurance coverage matters.[51] Privately insured women

living in states that required private insurers to cover prescription contraceptives were 64% more

likely to use some contraceptive method during each month a sexual encounter was reported than

women living in states with no such requirement, even after accounting for differences including

education and income.[52]

29. Although these state policies reduced women's up-front costs, other actions to eliminate

out-of-pocket costs entirely—which is what the federal contraceptive coverage guarantee does—

have even greater potential to increase women's ability to use methods effectively. For example,

when Kaiser Permanente Northern California eliminated patient cost-sharing requirements for

IUDs, implants, and injectables in 2002, the use of these devices increased substantially, with

IUD use more than doubling.[53] Another example comes from a study of more than 9,000 St.

Louis-region women who were offered the reversible contraceptive method of their choice (i.e.,

any method other than sterilization) at no cost for two to three years, and were "read a brief

---

[50] Guttmacher Institute, Insurance coverage of contraceptives, *State Policies in Brief (as of July 2012)*, 2012.

[51] The government argued in the interim final rules that the state mandates have not been effective, asserting that "Additional data indicates that, in 28 States where contraceptive coverage mandates have been imposed statewide, those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall." The study the government relied on for this assertion was published in a law review rather than in a peer-reviewed scientific journal. [See New MJ, Analyzing the impact of state level contraception mandates on public health outcomes, *Ave Maria Law Review,* 2015, 13(2):345–369.] One basic flaw in this article is that, at the time, none of the state contraceptive coverage mandates eliminated out-of-pocket costs entirely, which is the major advance from the federal guarantee and the issue in this case. In addition, over the course of the period the article evaluated, contraceptive coverage quickly became the norm in the insurance industry—even in states without mandates—thus minimizing potential differences between states with laws and states without them. [Sonfield et al. U.S. insurance coverage of contraceptives and impact of contraceptive coverage mandates, 2002, *Perspectives on Sexual and Reproductive Health,* 2004, 36(2):72–79, https://www.guttmacher.org/sites/default/files/pdfs/pubs/journals/3607204.pdf.]

[52] Magnusson BM et al., Contraceptive insurance mandates and consistent contraceptive use among privately insured women, *Medical Care*, 2012, 50(7):562–568.

[53] Postlethwaite D et al., A comparison of contraceptive procurement pre- and post-benefit change, *Contraception*, 2007, 76(5): 360–365

script informing them of the effectiveness and safety of" IUDs and implants.[54] Three-quarters of those women chose long-acting methods (i.e., IUDs or implants), a level far higher than in the general population. Likewise, a Colorado study found that use of long-acting reversible contraceptive methods quadrupled when offered with no out-of-pocket costs along with other efforts to improve access.[55]

30. Government-funded programs to help low-income people afford family planning services provide further evidence that reducing or eliminating cost barriers to women's contraceptive choices has a dramatic impact on women's ability to choose and use the most effective forms of contraception. Each year, among the women who obtain contraceptive services from publicly funded reproductive health providers, 57% select hormone-based contraceptive methods, 18% use implants or IUDs, and 7% receive a tubal ligation.[56] It is estimated that without publicly supported access to these methods at low or no cost, nearly half (47%) of those women would switch to male condoms or other nonprescription methods, and 28% would use no contraception at all.[57]

---

[54] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[55] Ricketts S, Klinger G and Schwalberg G, Game change in Colorado: widespread use of long-acting reversible contraceptives and rapid decline in births among young, low-income women, *Perspectives on Sexual and Reproductive Health,* 2014, 46(3):125–132.

[56] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

[57] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

## The ACA's Contraceptive Coverage Guarantee Has Had a Positive Impact

31. By ensuring coverage for a full range of contraceptive methods, services and counseling at no cost, the ACA's contraceptive coverage mandate has had its intended effect of removing cost barriers to obtaining contraception. Between fall 2012 and spring 2014 (during which time the coverage guarantee went into wide effect), the proportion of privately insured women who paid nothing out of pocket for the pill increased from 15% to 67%, with similar changes for injectable contraceptives, the vaginal ring and the IUD.[58] Similarly, another study found that since implementation of the ACA, the share of women of reproductive age (regardless of whether they were using contraception) who had out-of-pocket costs for oral contraceptives decreased from 21% in 2012 to just 4% in 2014.[59] These trends have translated into considerable savings for U.S. women: one study estimated that pill and IUD users saved an average of about $250 in copayments in 2013 alone because of the guarantee.[60]

32. Before the ACA, contraceptives accounted for between 30–44% of out-of-pocket health care spending for women.[61] Individual women themselves say that the ACA's contraceptive coverage guarantee is working for them. In a 2015 nationally representative survey of women aged 18–39, two-thirds of those who had health insurance and were using a hormonal contraceptive method reported having no copays; among those women, 80% agreed that paying nothing out of pocket helped them to afford and use their birth control, 71% agreed this helped

---

[58] Sonfield A et al. Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update, *Contraceptive*, 2015, 91(1):44–48.

[59] Sobel L, Salganicoff A and Rosenzweig C, *The Future of Contraceptive Coverage*, Kaiser Family Foundation (KFF) Issue Brief, Menlo Park, CA: KFF, 2017, https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[60] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing, *Health Affairs*, 2015, 34(7):1204–1211.

[61] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing, *Health Affairs*, 2015, 34(7):1204–1211.

them use their birth control consistently, and 60% agreed that having no copayment helped them choose a better method for them.[62]

33. Demonstrating the population-level impact of the ACA's coverage provision (e.g., a change in unintended pregnancy rates) is complicated, because the provision affects only a subset of U.S. women, and because there are so many additional variables that affect women's pregnancy intentions, contraceptive use and ultimately the unintended pregnancy rate in the population. The evidence on whether the ACA's provision has affected contraceptive use at the population level is not definitive, but some studies suggest the guarantee has had an impact on contraceptive use, among those benefiting from the provision.

34. A study using claims data from 30,000 privately insured women in the Midwest found that the ACA's reduction in cost sharing was tied to a significant increase in the use of prescription methods from 2008 through 2014 (before and after the ACA provision went into effect), particularly long-acting methods.[63] Another study of health insurance claims from 635,000 privately insured women nationwide showed that rates of discontinuation and inconsistent use of contraception declined from 2010 to 2013 (again, before and after the ACA provision went into effect) among women using generic oral contraceptive pills after the contraceptive guarantee's implementation (among women using brand-name oral contraceptives, only the discontinuation rate declined).[64]

---

[62] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[63] Carlin CS, Fertig AR and Down BE, Affordable Care Act's mandate eliminating contraceptive cost sharing influenced choices of women with employer coverage, *Health Affairs*, 2016, 35(9):1608–1615.

[64] Pace LE, Dusetzina SB and Keating NL, Early impact of the Affordable Care Act on oral contraceptive cost sharing, discontinuation, and nonadherence, *Health Affairs*, 2016, 35(9):1616–1624.

35. Two other studies, looking at the broader U.S. population, found no change in overall use of contraception or an overall switch from less-effective to more-effective methods among women at risk of unintended pregnancy before and after the guarantee's implementation.[65,66] However, both studies identified some positive trends among key groups. One of them found that between 2008 and 2014, among women aged 20–24 (the age group at highest risk for unintended pregnancy), LARC use more than doubled, from 7% to 19%, without a proportional decline in sterilization.[67] The other study showed that between 2012 and 2015, use of prescription contraceptive methods, and birth control pills in particular, increased among sexually inactive women, suggesting that more women were able to start a method before becoming sexually active or use a method such as the pill for noncontraceptive reasons after implementation of the contraceptive coverage guarantee.[68]

36. There is also considerable empirical data from controlled experiments to confirm that the concept of removing cost as a barrier to women's contraceptive use is a major factor in reducing their risk for unintended pregnancy, and the abortions and unplanned births that would otherwise follow. For example, a study of more than 9,000 St. Louis-region women who were offered the reversible contraceptive method of their choice at no cost found that the number of abortions performed at St. Louis Reproductive Health Services declined by 21%.[69] Study participants'

---

[65] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[66] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[67] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[68] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[69] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012,

18

abortion rate was significantly lower than the rate in the surrounding St. Louis region, and less than half the national average.[70] Similarly, when access to both contraception and abortion increased in Iowa, the abortion rates actually declined.[71] Starting in 2006, the state expanded access to low- or no-cost family planning services through a Medicaid expansion and a privately funded initiative serving low-income women. Despite a simultaneous increase in access to abortion—the number of clinics offering abortions in the state actually doubled during the study period—the abortion rate dropped by over 20%.

**Expanding Exemptions Would Harm Women**

37. The Final Rules would make it more difficult, once again, for those receiving insurance coverage through companies or schools that use the exemption (i.e., employees, students and dependents) to access the methods of contraception that are most acceptable and effective for them. That, in turn, would increase those women's risk of unintended pregnancy and interfere with their ability to plan and space wanted pregnancies. These barriers could therefore have considerable negative health, social and economic impacts for those women and their families.

38. Allowing employers or schools to exclude all contraceptive methods, services and counseling from insurance plans—or to cover some contraceptive methods, services and information but not others—would prevent women from selecting and obtaining the methods of contraception that will work best for them. For example, Hobby Lobby objected to providing

---

120(6):1291–1297.

[70] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[71] Biggs MA, Did increasing use of highly effective contraception contribute to declining abortions in Iowa? *Contraception*, 2015, 91(2):167–173.

four specific contraceptive methods, including copper and hormonal IUDs, which are among the most effective forms of pregnancy prevention and also have among the highest up-front costs.

39. Allowing employers to restrict access to the full range of contraceptive methods and to approve coverage only for those they deem acceptable would place inappropriate constraints on women who depend on insurance to obtain the methods best suited to their needs. Moreover, in the absence of coverage, the financial cost of obtaining a method, and the fact that some methods have higher costs than others, would incentivize women to select methods that are inexpensive, rather than methods that are best suited to their needs and that they are therefore most likely to use consistently and effectively (see 10–19, above).

40. Excluding coverage for some or all contraceptive methods, services and counseling could deny women the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care.[72,73] A woman going to her gynecologist for an annual examination, for example, may have to go to a different provider to be prescribed (or even discuss) contraception. This disjointed approach increases the time, effort and expense involved in getting needed contraception and interferes with her ability to obtain care from the provider of her choice.

41. Isolating contraceptive coverage in this way also would interfere with the ability of health care providers to treat women holistically. A woman's choice of contraception can be affected by her other medical conditions (e.g., diabetes, HIV, depression/mental health), and certain medications can significantly reduce the effectiveness of some methods of contraception, so a

---

[72] Leeman L, Medical barriers to effective contraception, *Obstetrics and Gynecology Clinics of North America,* 2007, 34(1):19–29.
[73] World Health Organization, Selected Practice Recommendations for Contraceptive Use, Third Ed., 2016, WHO: Geneva, Switzerland, http://apps.who.int/iris/bitstream/10665/252267/1/9789241565400-eng.pdf.

woman's chosen provider should be able to manage all health conditions and needs at the same time.[74,75]

42. To the extent that expanding the exemptions would burden women's contraceptive use in these ways, it would be harmful to women's health. Contraception allows women to avoid unintended pregnancies and to time and space wanted pregnancies, which has been demonstrated to improve women's health and that of their families. Specifically, pregnancies that occur too early in a woman's life or that are spaced too closely are associated with negative maternal health outcomes and/or adverse birth outcomes, including preterm birth, low birth weight, stillbirth, and early neonatal death.[76,77,78,79] Contraceptive use can also prevent preexisting health conditions from worsening and new health problems from occurring, because pregnancy can exacerbate existing health conditions such as diabetes, hypertension and heart disease.[80] Unintended pregnancy also affects women's mental health; notably, it is a risk factor for depression in adults.[81,82] For these reasons, the Centers for Disease Control and Prevention (CDC) included the development of and improved access to methods of family planning among

---

[74] Centers for Disease Control and Prevention, *US Medical Eligibility Criteria for Contraceptive Use, 2016,* https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.

[75] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use, 2010, *Morbidity and Mortality Weekly Report,* May 28, 2010, Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.

[76] Kavanaugh ML and Anderson RM, *Contraception and Beyond: The Health Benefits of Services Provided at Family Planning Centers,* New York: Guttmacher Institute, 2013, http://www.guttmacher.org/report/contraception-and-beyond-health-benefits-services-provided-family-planning-centers.

[77] Wendt A et al., Impact of increasing inter-pregnancy interval on maternal and infant health, Paediatric and Perinatal Epidemiology, 2012, 26(Suppl. 1):239–258.

[78] Conde-Agudelo A, Rosas-Bermúdez A and Kafury-Goeta AC, Birth spacing and risk of adverse perinatal outcomes: a meta-analysis, Journal of the American Medical Association, 2006, 295(15):1809–1823.

[79] Gipson JD, Koenig MA and Hindin MJ, The effects of unintended pregnancy on infant, child, and parental health: a review of the literature, *Studies in Family Planning,* 2008, 39(1):18–38.

[80] Lawrence HC, Testimony of American Congress of Obstetricians and Gynecologists, submitted to the Committee on Preventive Services for Women, Institute of Medicine, 2011, http://www.nationalacademies.org/hmd/~/media/8BA65BAF76894E9EB8C768C01C84380E.ashx.

[81] Herd P et al., The implications of unintended pregnancies for mental health in later life, *American Journal of Public Health,* 2016, 106(3):421–429.

[82] U.S. Preventive Services Task Force, Screening for depression in adults: recommendation statement, *American Family Physician,* 2016, 94(4):340A–340D, http://www.aafp.org/afp/2016/0815/od1.html.

the 10 great public health achievements of the 20th century.[83]

43. In the Final Rules, the government implies that there is debate about whether contraception may have negative health consequences that outweigh its benefits. In the previous interim final rules, the government implied that putative negative health consequences of contraception may outweigh its benefits. On the contrary, the government itself provides the oversight to ensure that the health benefits of contraception outweigh any potential negative consequences. Notably, the FDA's approval processes require that drugs and devices, including contraceptives, be proven safe and effective through rigorous controlled trials. In addition, the CDC publishes extensive recommendations to help clinicians and patients identify potential contraindications and decide which specific contraceptive methods are most appropriate for each patient's needs and health circumstances.[84,85] Medical experts, such as the American College of Obstetricians and Gynecologists, concur that contraception is safe and has clear health benefits that outweigh any potential risks.[86]

44. Expanding the exemptions to the contraceptive coverage requirement would also have negative social and economic consequences for women, families and society. By enabling them to reliably time and space wanted pregnancies, women's ability to obtain and effectively use contraception promotes their continued educational and professional advancement, contributing to the enhanced economic stability of women and their families.[87] Economic analyses have found

---

[83] Centers for Disease Control and Prevention, Achievements in public health, 1900–1999: family planning, *Morbidity and Mortality Weekly Report,* 1999, 48(47): 1073–1080.
[84] Centers for Disease Control and Prevention, *US Medical Eligibility Criteria for Contraceptive Use, 2016,* https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.
[85] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use, 2010, *Morbidity and Mortality Weekly Report,* May 28, 2010, Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.
[86] Brief of *Amici Curiae,* American College of Obstetricians and Gynecologists, Physicians for Reproductive Health, American Academy of Family Physicians, American Nurses Association, et al., *Zubik v. Burwell,* 2016, http://www.scotusblog.com/wp-content/uploads/2016/02/Docfoc.com-Amicus-Brief-Zubik-v.-Burwell.pdf.
[87] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children,* New York: Guttmacher Institute, 2013, https://www.guttmacher.org/report/social-and-economic-benefits-

positive associations between women's ability to obtain and use oral contraceptives and their education, labor force participation, average earnings and a narrowing of the gender-based wage gap.[88] Moreover, the primary reasons women give for why they use and value contraception are social and economic: In a 2011 study, a majority of women reported that access to contraception had enabled them to take better care of themselves or their families (63%), support themselves financially (56%), stay in school or complete their education (51%), or get or keep a job or pursue a career (50%).[89]

45. The government contends that expanding the exemption would not impose any real harm, suggesting that the women most at risk for unintended pregnancy are not likely to be covered by employer-based group health plans or by student insurance sponsored by a college or university. That argument is misleading. Low-income women, women of color and women aged 18–24 are at disproportionately high risk for unintended pregnancy,[90] and millions of these women rely on private insurance coverage—particularly following implementation of the ACA. In fact, from 2013 to 2017, the proportion of women overall and of women below the poverty level who were uninsured dropped by more than one-third nationwide, declines driven by substantial increases in both Medicaid and private insurance coverage.[91] In addition, the ACA specifically expanded coverage for people aged 26 and younger, allowing them to remain covered as dependents on

---

womens-ability-determine-whether-and-when-have-children.

[88] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children,* New York: Guttmacher Institute, 2013, https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.

[89] Frost JJ and Lindberg LD, Reasons for using contraception: perspectives of U.S. women seeking care at specialized family planning clinics, 2012, *Contraception,* http://www.guttmacher.org/pubs/journals/j.contraception.2012.08.012.pdf.

[90] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

[91] Guttmacher Institute, Gains in insurance coverage for reproductive-age women at a crossroads, *News in Context,* Dec. 4, 2018, https://www.guttmacher.org/article/2018/12/gains-insurance-coverage-reproductive-age-women-crossroads.

their parents' plans, regardless of whether the young woman is working herself or attending college or university.

### Medicaid, Title X and State Coverage Requirements Cannot Substitute for the Federal Contraceptive Coverage Guarantee

46. State and federal programs and laws—such as the Title X national family planning program, Medicaid, and state contraceptive coverage requirements—cannot replicate or replace the gains in access made by the contraceptive coverage guarantee. In the interim final rules, the government claimed that "[i]ndividuals who are unable to obtain contraception coverage through their employer-sponsored health plans because of the exemptions created in these interim final rules…have other avenues for obtaining contraception…."[92]

47. Many women who have the benefit of the ACA's contraceptive coverage mandate are not eligible for free or subsidized care under Title X. Title X provides no-cost family planning services to people living at or below 100% of the federal poverty level ($12,060 for a single person in 2017),[93] and provides services on a sliding fee scale between 100% and 250% of poverty; women above 250% of poverty must pay the full cost of care. By contrast, the federal contraceptive coverage guarantee eliminates out-of-pocket costs for contraception regardless of income.

48. Funding for Title X has not increased sufficiently for the program even to keep up with the increasing number of women in need of publicly funded care;[94] therefore, Title X cannot

---

[92] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 82(197):47838–47862, https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.
[93] Office of the Assistant Secretary for Planning and Evaluation, U.S. federal poverty guidelines used to determine financial eligibility for certain federal programs, 2017, https://aspe.hhs.gov/poverty-guidelines.
[94] Women in need of publicly funded contraceptive services are defined as those women who a) are younger than 20

sustain additional beneficiaries as a result of the Final Rules. From 2010 to 2014, even as the number of women in need of publicly funded contraceptive care grew by 5%, representing an additional one million women in need,[95] Congress cut funding for Title X by 10%.[96] With its current resources, Title X is able to serve only one-fifth of the nationwide need for publicly funded contraceptive care.[97] Still, the government has proposed diverting already insufficient Title X funding to help cover the cost of care for any women affected by the Final Rules,[98] an action that would inevitably hurt patients who rely on publicly funded services.

49. Similarly, many women who would lose private insurance coverage of contraception under the federal government's expanded exemption would not be eligible for Medicaid. Eligibility for Medicaid varies widely from state to state, particularly in states that have not expanded Medicaid eligibility under the ACA. In almost all of those states, nondisabled, nonelderly childless adults do not qualify for Medicaid at any income level, and eligibility for parents is as low as 18% of the federal poverty level in Alabama and Texas.[99] Several of these states have expanded eligibility specifically for family planning services to people otherwise

---

or are poor or low-income (i.e., have a family income less than 250% of the federal poverty level) and b) are sexually active and able to become pregnant but do not want to become pregnant. See Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[95] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[96] Department of Health and Human Services, Office of Population Affairs, Funding history, 2017, https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html.

[97] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[98] Department of Health and Human Services, Compliance with statutory program integrity requirements, *Federal Register,* 83(106):25502–25533, https://www.gpo.gov/fdsys/pkg/FR-2018-06-01/pdf/2018-11673.pdf.

[99] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

ineligible for full-benefit Medicaid; those income eligibility levels also vary considerably.[100,101] Again, by contrast, the federal contraceptive coverage guarantee applies regardless of income. And because the U.S. Supreme Court has ruled that states cannot be compelled by the federal government to expand Medicaid eligibility, the federal government cannot rely on Medicaid to fill in gaps in coverage that would result from expanding the exemption.

50. The federal government's assertion that Title X and Medicaid can replace or replicate the ACA's contraception coverage guarantee is additionally problematic given that the government itself is at the same time moving to undermine Title X and Medicaid. For example, the government's recent budget proposals have sought to exclude Planned Parenthood Federation of America and its affiliates from Title X, Medicaid and other federal programs,[102] and have called for massive cuts to Medicaid.[103] The Department of Health and Human Services has proposed sweeping changes to Title X regulations that would undermine quality of care and access to providers,[104] and it has encouraged states to revamp their Medicaid programs in ways that would restrict program eligibility (e.g., by imposing work requirements) and thereby interfere with coverage and care.[105] The administration has strongly backed similar congressional proposals for cutting and limiting access to Title X and Medicaid.

---

[100] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of December 2018),* 2018, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[101] Kaiser Family Foundation, Status of state action on the Medicaid expansion decision, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/.
[102] Hasstedt K, Beyond the rhetoric: the real-world impact of attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* 2017, 20:86–91, https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.
[103] Luhby T, Not even the White House knows how much it's cutting Medicaid, *CNN,* May 24, 2017, http://money.cnn.com/2017/05/24/news/economy/medicaid-budget-trump/index.html.
[104] Department of Health and Human Services, Compliance with statutory program integrity requirements, *Federal Register,* 83(106):25502–25533, https://www.gpo.gov/fdsys/pkg/FR-2018-06-01/pdf/2018-11673.pdf.
[105] Sonfield A, Efforts to transform the nature of Medicaid could undermine access to reproductive health care, *Guttmacher Policy Review,* 2017, 20:97–102, https://www.guttmacher.org/gpr/2017/10/efforts-transform-nature-medicaid-could-undermine-access-reproductive-health-care.

51. In addition, proposed changes to Title X would make it even more unsuitable as a substitute for contraceptive coverage under the ACA. The recent proposed rule for Title X removes the requirement that the contraceptive methods offered by a Title X provider be "medically approved."[106] At the same time, the proposed rule seemingly opens the door to allow Title X funding to go to antiabortion counseling centers (also called "crisis pregnancy centers"), which do not offer the broad range of FDA-approved methods of contraception and may offer only abstinence-until-marriage counseling and fertility awareness–based methods. These proposed changes, if implemented, would shift the Title X program away from its mission of offering access to a broad range of family planning methods.[107]

52. Policymakers in many states have also restricted publicly funded family planning programs and providers, further undermining the ability of these programs to serve those affected by the expanded exemption.[108]

53. Neither can state-specific contraceptive coverage laws replicate or replace the increase in access to contraception provided by the ACA's contraceptive coverage guarantee. Twenty-one have no such laws at all.[109] Of the 29 states and the District of Columbia that do have contraceptive coverage requirements, only 10 currently bar copayments and deductibles for contraception (and another four states have new requirements not yet in effect). Additionally, the federal requirement limits the use of formularies and other administrative restrictions on women's use of contraceptive services and supplies, by making it clear that health plans may

---

[106] Department of Health and Human Services, Compliance with statutory program integrity requirements, *Federal Register*, 83(106):25502–25533, https://www.gpo.gov/fdsys/pkg/FR-2018-06-01/pdf/2018-11673.pdf.

[107] Hasstedt K, A Domestic gag rule and more: the administration's proposed changes to Title X, *Health Affairs* Blog, June 18, 2018, https://www.guttmacher.org/article/2018/06/domestic-gag-rule-and-more-administrations-proposed-changes-title-x.

[108] Gold RB and Hasstedt K, Publicly funded family planning under unprecedented attack, *American Journal of Public Health*, 2017, 107(12):1895–1897, http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2017.304124.

[109] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of December 2018)*, 2018, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

seek to influence a patient's choice only within a specific contraceptive method category (e.g., to favor one hormonal IUD over another) and not across methods (e.g., to favor the pill over the ring).[110] Few of the state laws include similar protections. Similarly, most of the state requirements do not specifically require coverage of all the distinct methods that the federal requirement encompasses. For example, only eight states currently require coverage of female sterilization, and few state laws make explicit distinctions between methods that some insurance plans have attempted to treat as interchangeable (such as hormonal versus copper IUDs, or the contraceptive patch versus the contraceptive ring).[111] Finally, state laws cannot regulate self-insured employers at all, and those employers account for 60% of all workers with employer-sponsored health coverage.[112]

### State-Specific Impacts

54. The Final Rules would have public health and fiscal consequences in states across the country. If unable to access contraception coverage through their employer or university, some lower-income women who meet the strict income requirements of public programs would rely on publicly funded services to access this beneficial service. Many women who lose or lack contraceptive coverage because their employer or university objects, however, would not meet the strict income and eligibility requirements of public programs, and if as a result they are not using their preferred or the most effective methods for them, or if cost forces them to forgo

---

[110] Department of Labor, FAQs about Affordable Care Act implementation (part XXVI), May 11, 2015, https://www.dol.gov/sites/default/files/ebsa/our-activities/resource-center/faqs/aca-part-xxvi.pdf.

[111] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of December 2018),* 2018, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[112] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey,* Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

contraceptive use periodically or altogether, they would be at increased risk of unintended pregnancy. The costs of the resulting unintended pregnancies often then fall to the states because the federal government cannot or will not withstand these costs.

### Pennsylvania

55. In Pennsylvania, some women impacted by the Final Rules would not qualify for Medicaid or Title X because they would not meet the income eligibility requirements for coverage or subsidized care under these programs.

56. For example, in Pennsylvania, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level,[113] and individuals are eligible for coverage of family planning services specifically up to 220% of poverty.[114] This means that affected women who lose coverage as a result of the rules may not be eligible.

57. As a result, some women would be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost would force them to forgo contraception use entirely.

58. Other women would be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way would

---

[113] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.
[114] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of December 2018)*, 2018, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.

interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

59. The increase in the number of women relying on publicly funded services would increase the strain on the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 746,000 women were in need of publicly funded family planning in Pennsylvania, and the state's family planning network was able to only meet 29% of this need.[115]

60. Another indicator of the existing unmet need for contraception in Pennsylvania is that substantial numbers of state residents experience unintended pregnancy each year. In 2010, 115,000 unintended pregnancies occurred among Pennsylvania residents, a rate of 47 per 1,000 women aged 15–44.[116]

61. Of those unintended pregnancies that ended in birth, 54% were paid for by Medicaid and other public insurance programs.[117] Unintended pregnancies cost the state approximately $248 million and the federal government approximately $479 million in 2010. The Final Rules are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

---

[115] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[116] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[117] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

30

62. In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Pennsylvania or its residents.

## New Jersey

63. In New Jersey, some women impacted by the Final Rules would not qualify for Medicaid or Title X because they would not meet the income eligibility requirements for coverage or subsidized care under these programs.

64. For example, in New Jersey, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level.[118] (New Jersey has not expanded Medicaid eligibility specifically for family planning services.) This means that affected women who lose coverage as a result of the rules may not be eligible.

65. As a result, some women would be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost would force them to forgo contraception use entirely.

66. Other women would be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way would interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

---

[118] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

31

67. The increase in the number of women relying on publicly funded services would increase the strain on the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 455,000 women were in need of publicly funded family planning in New Jersey, and the state's family planning network was able to only meet 22% of this need.[119]

68. Another indicator of the existing unmet need for contraception in New Jersey is that substantial numbers of state residents experience unintended pregnancy each year. In 2010, 97,000 unintended pregnancies occurred among New Jersey residents, a rate of 56 per 1,000 women aged 15–44.[120]

69. Of those unintended pregnancies that ended in birth, 52% were paid for by Medicaid and other public insurance programs.[121] Unintended pregnancies cost the state approximately $186 million and the federal government approximately $291 million in 2010. The Final Rules are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

70. In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of New Jersey or its residents.

\*\*\*

---

[119] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.
[120] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.
[121] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

Ample evidence demonstrates that the Final Rules would interfere with women's ability to identify and consistently use the contraceptive methods that would work best for them, thus putting them at heightened risk of unintended pregnancy and the health, social and economic harms that would result.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: December 14, 2018

By: Kathryn Kost
Acting Vice President for Domestic Research
The Guttmacher Institute

# Kathryn Kost

The Guttmacher Institute · 125 Maiden Lane · New York, NY 10038
(212) 248-1111 · kkost@guttmacher.org

## EDUCATION

**Princeton University**, Princeton, New Jersey
Ph.D., Sociology, 1990; Area of Specialization: Demography

**Reed College,** Portland, Oregon
Bachelor of Arts, Sociology, 1982

## PROFESSIONAL EXPERIENCE

**The Guttmacher Institute, New York, New York**
Acting Vice President of Domestic Research 2018 - present
Director of Domestic Research 2016-2018
Principal Research Scientist 2015-2016
Senior Research Associate, 1989-1998, 2009-2014
Consultant, 2004-2009

**Gynuity Health Projects, New York, New York**
Consultant, 2009

**Princeton University, Princeton, New Jersey**
Teaching Assistant, Introductory Statistics (graduate-level), Woodrow Wilson School, 1986-1987

**East-West Population Institute, Population Research Division, University of Hawaii, Honolulu, HI**
Research Intern, 1987

**Princeton University, Princeton, New Jersey**
Teaching Assistant, Introductory Statistics (graduate-level), Woodrow Wilson School, 1986

**National Academy of Sciences, Institute of Medicine, Washington, D.C.**
Research Intern, Committee on Contraceptive Development, 1986

**Princeton University, Princeton, New Jersey**
NICHD Trainee, Office of Population Research, 1985-1989

**American Health Foundation, New York, New York**
Head of Data Management, Division of Child Health, 1983-1985

## AREAS OF SPECIALIZATION

Sexual and Reproductive Health; Unintended Pregnancy and Childbearing; Pregnancy Surveillance and
Statistics; Contraceptive Effectiveness.

Kathryn Kost                                                                                    12/4/2018

# PEER-REVIEWED PUBLICATIONS

Sundaram A, Vaughan B, Kost K, Bankole A, Finer LB, Singh S. (2017). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health, 49(1)*:7-16.

Kavanaugh MK, Kost K, Frohwirth L, Maddow-Zimet I. (2016). Parent's experience of unintended childbearing: A qualitative study of factors that mitigate or exacerbate effects. *Social Science and Medicine,* 174:133-141.

Lindberg LD, Kost K, Maddow-Zimet I. (2016). The role of men's childbearing intentions in father involvement. *Journal of Marriage and Family*, *79(1)*:44-59.

Maddow-Zimet I, Lindberg LD, Kost K, and Lincoln A. (2016).  Are pregnancy intentions associated with transitions into and out of marriage? *Perspectives on Sexual and Reproductive Health*, 48(1):35–43, DOI: 10.1363/ 48e8116

Vlassoff M, Diallo A, Philbin J, Kost K, Bankole A. (2016) Cost-effectiveness of two interventions for the prevention of postpartum hemorrhage in Senegal. *International Journal of Gynecology & Obstetrics* online, DOI:10.1016/ j.ijgo.2015.10.015

Lindberg LD, Maddow-Zimet I, Kost K, Lincoln A. (2015). Pregnancy intentions and maternal and child health: An analysis of longitudinal data in Oklahoma. *Maternal and Child Health Journal*, *19(5)*:1087-96.

Kost K and Lindberg LD. (2014). Pregnancy Intentions, Maternal Behaviors and Infant Health: Investigating Relationships with New Measures and Propensity Score Analysis. *Demography*, 52(1):83-111.

Lindberg LD and Kost K. (2014) Exploring U.S. men's birth intentions, *Maternal and Child Health Journal*, 18(3): 625-633.

Kost K, Finer LB, Singh S, (2012) Variation in State Unintended Pregnancy Rates in the United States, Perspectives in Sexual and Reproductive Health, 44(1):57-64.

Kavanaugh MK, Jerman J, Hubacher D, Kost K and Finer LB. (2011). Characteristics of women in the United States who use long-acting reversible contraceptive methods, *Obstetrics & Gynecology*, 117(6):1349-1357.

Finer LB and Kost K. (2011). Unintended pregnancy rates at the state level, *Perspectives on Sexual and Reproductive Health*, 43(2):78–87.

Sonfield A, Gold RB, Kost K and Finer LB. (2011). The public costs of births from unintended pregnancies: national and state-level estimates, *Perspectives on Sexual and Reproductive Health*, 43(2):94–102.

Jones RK, Kost K, Singh S, Henshaw SK and Finer LB. (2009). Trends in abortion in the United States, Clinical Obstetrics and Gynecology, 52 (2):119–129.

Vaughan, B, Trussell J, Kost K, Singh S and Jones R, Discontinuation and resumption of contraceptive use: results from the 2002 National Survey of Family Growth, *Contraception*, 2008, 78(4): 271-283. PMCID: PMC2800035

Santelli J, Lindberg L, Finer LB, Rickert V, Bensyl D, Posner S, Makleff S, Kost K and Singh, S. Comparability of contraceptive prevalence estimates for women from the 2002 Behavioral Risk Factor Surveillance System, *Public Health Reports*, 2008, 123(2):147–154.

Kost K, Singh S, Vaughan B, Trussell J and Bankole A, Estimates of Contraceptive Failure from the 2002 National Survey of Family Growth, *Contraception*, 2008, 77(1):10-21. PMCID: PMC2811396

Jones RK and Kost K, Underreporting of induced and spontaneous abortion in the United States: an analysis of the 2002 National Survey of Family Growth, *Studies in Family Planning*, 2007, 38(3):187-197.

Kathryn Kost                                                                          12/4/2018

Kost K, Landry DJ, and Darroch JE, The effects of pregnancy planning status on birth outcomes and infant care, *Family Planning Perspectives*, 1998, 30(5):223-30.

Kost K, Landry DJ, and Darroch JE, Predicting maternal behaviors during pregnancy: does intention status matter? *Family Planning Perspectives*, 1998, 30(2):79-88.

Henshaw SK and Kost K, Abortion patients in 1994-1995: characteristics and contraceptive use, *Family Planning Perspectives*, 1996, 28(4):140-7, 158.

Kost K and Forrest JD, Intention status of U.S. births in 1988: differences by mothers' socioeconomic and demographic characteristics, *Family Planning Perspectives*, 1995, 27(1):11-7.

Kost K, The dynamics of contraceptive use in Peru, *Studies in Family Planning*, 1993, 24(2):109-19.

Kost K and Forrest JD, American women's sexual behavior and exposure to risk of sexually transmitted diseases. *Family Planning Perspectives*, 1992, 24(6):244-54.

Henshaw SK and Kost K, Parental involvement in minors' abortion decisions, *Family Planning Perspectives*, 1992, 24(5):196-207, 213.

Kost K and Amin S. Reproductive and socioeconomic determinants of child survival: confounded, interactive, and age-dependent effects, *Social Biology*, 1992, 39(1-2):139-50.

Kost K, Using the DHS calendar history of events to study the dynamics of contraceptive use. In: Demographic and Health Surveys World Conference, August 5-7, 1991, Washington, D.C.: proceedings. Volume 2. 1991. pp:837-856, Institute for Resource Development/ Macro International, Demographic and Health Surveys [DHS]: Columbia, Maryland.

Trussell J, Hatcher RA, Cates W, Stewart FH, and Kost K, A guide to interpreting contraceptive efficacy studies, *Obstetrics and Gynecology*, 1990, 76(3):558-67.

Harlap S, Kost K, and Forrest JD, Preventing pregnancy, Protecting health: a new look at birth control choices in the United States. ISBN 0-939253-21-6. 1991. 129 pp. Alan Guttmacher Institute: New York, New York

Kost K, Forrest JD, and Harlap S, Comparing the health risks and benefits of contraceptive choices, *Family Planning Perspectives*, 1991, 23(2):54-61.

Kost K, Contraceptive discontinuation in Peru: patterns and demographic implications. Pub. Order No. DA9026411. 1990. 227 pp. University Microfilms International: Ann Arbor, Michigan.

Zablan Z, Choe MK, Palmore JA, Ahmed T, Alcantara A, and Kost K, Contraceptive method choice in the Philippines, 1973-83. In: Dynamics of Contraceptive Use, edited by Amy O. Tsui and M. A. Herbertson. Journal of Biosocial Science, Supplement, No. 11, 1989. 61-74 pp. Parkes Foundation: Cambridge, England.

Trussell J, Hatcher RA., Cates W, Stewart FH, and Kost K, Contraceptive failure in the United States: an update, *Studies in Family Planning*, 1990, 21(1):51-54.

Trussell J, and Kost K, Contraceptive failure in the United States: a critical review of the literature, *Studies in Family Planning*, 1987, 18(5):237-283.

Walter HJ, Hofman A, Barrett LT, Connelly PA, Kost K, Walk EH, and Rebecca Patterson, "Primary Prevention of Cardiovascular Disease Among Children: Three-Year Results of a Randomized Intervention Trial," in B. Hetzel and G. S. Berenson, eds., *Cardiovascular Risk Factors in Childhood: Epidemiology and Prevention*, New York, NY: Elsevier Science Publishers B.V. (Biomedical Division), 1987.

Walter HJ, Hofman A, Barrett LT, Connelly PA, and Kost K, Coronary Heart Disease Prevention in Childhood: One-Year Results of a Randomized Intervention Study, *American Journal of Preventive Medicine*, 1986, 2(4):239-245.

3

Kathryn Kost                                                                                    12/4/2018

## GUTTMACHER PAPERS

Kost K, Maddow-Zimet I, Arpaia A., Pregnancies, Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2017.

Kost K and Maddow-Zimet I, U.S. Teenage Pregnancies, Births and Abortions, 2011: National Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2016.

Kost K and Maddow-Zimet I, U.S. Teenage Pregnancies, Births and Abortions, 2011: State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2016.

Kost K, Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002, New York: Guttmacher Institute, 2015.

Kost K and Henshaw S, U.S. Teenage Pregnancies, Births and Abortions, 2010: National and State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2014.

Sonfield A and Kost K, Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy and Infant Care: Estimates for 2008, New York: Guttmacher Institute, 2013.

Kost K, Unintended Pregnancy Rates at the State Level: Estimates for 2002, 2004, 2006 and 2008, New York: Guttmacher Institute, 2013.

Kost K and Henshaw S, U.S. Teenage Pregnancies, Births and Abortions, 2008: State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2013.

Kost K and Henshaw S, U.S. Teenage Pregnancies, Births and Abortions, 2008: National Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2012.

Kost K, Henshaw S and Carlin L, U.S. Teenage Pregnancies, Births and Abortions: National and State Trends and Trends by Race and Ethnicity, New York: Guttmacher Institute, 2010.

Henshaw SK and Kost K, Trends in the Characteristics of Women Obtaining Abortions, 1974 to 2004, New York: Guttmacher Institute, 2008.

## OTHER PUBLICATONS

Curtin SC, Abma JC, Kost K. Pregnancy rates for U.S. women continue to drop: an update. NCHS Health E-stat, November 2015. Available at: http://www.cdc.gov/nchs/data/hestat/pregnancy/rates_1990_2010.

## HONORS, AWARDS AND FELLOWSHIPS

East-West Center, University of Hawaii, Summer Fellowship (1987)

## PROFESSIONAL ASSOCIATIONS

Population Association of America
American Sociological Association
PRAMS Steering Committee, New York City Department of Health & Mental Hygiene
Editorial Board, International Journal of Population Research
Full Fellow, Society of Family Planning
Member, Social Science and Population Studies Review Panel, National Institutes of Health (2012-2015)

4

# EXHIBIT M

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

　　　　　　　　Plaintiff,

　　v.

DONALD J. TRUMP, *et al.*,

　　　　　　　　Defendants.

**No. 2:17-cv-04540-WB**

## DECLARATION OF CAROL S. WEISMAN, Ph.D.[1]

I, Carol S. Weisman, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned matter and, in support thereof, I state as follows:

### I.　My Background and Experience

1.　I am originally from Pittsburgh, Pennsylvania and, since 2003, I have served as a Distinguished Professor of Public Health Sciences, Obstetrics and Gynecology, and Health Policy and Administration at the Pennsylvania State University College of Medicine. Since 2009, I have also served at the Associate Dean for Faculty Affairs at the College of Medicine. I am also a faculty associate at the Penn State Population Research Institute.

2.　My area of academic specialization is women's healthcare, with a focus on preventive services, including contraceptives and family planning.

3.　I earned a Bachelor of Arts degree, with High Honors, in Sociology and Anthropology from Wellesley College in 1969, and a Ph.D. in Social Relations (Sociology) from Johns Hopkins University in 1973.

---

[1] I attach a true and correct copy of my curriculum vitae hereto as Exhibit 1.

4.    Prior to working at the Penn State College of Medicine, I taught doctoral courses, conducted research, and authored scholarly articles at two schools of public health.

5.    From 1974 until 1997, I worked at Johns Hopkins University in Baltimore, Maryland, as an Assistant Professor at the School of Health Services (1974-1978), an Assistant Professor in the School of Hygiene and Public Health (1974-1981), an Associate Professor in the School of Hygiene and Public Health (1981-1988) and, from 1988 until 1997, as a Professor in the Department of Health Policy and Management in the School of Hygiene and Public Health.

6.    In my 23 years at Johns Hopkins, I held several leadership roles.  I served as the Director of the MHS Program in Health Finance and Management (1988-1992), the Director of the Doctoral Program in Health Care Organization and Financing (1992-1994) and the Associate Chair for Health Services Research (1997).

7.    From 1997 until 2002, I served as a Professor in the Department of Health Management and Policy at the University of Michigan School of Public Health.  I had a joint appointment in the Department of Obstetrics and Gynecology at the University of Michigan Medical School, and was the Founding Director of the Interdepartmental Concentration in Reproductive and Women's Health at the University of Michigan School of Public Health.

8.    Throughout my career, I have published over 175 scholarly articles, books, books chapters, monographs, and reports in the area of women's healthcare, including on the following topics:

    a.  access to health care services and systems for women of reproductive age;

    b.  contraceptive decision processes;

    c.  contraceptive counseling in managed care and preventing unintended pregnancy in adults;

2

JA301

     d.   contraceptive action planning among privately insured women; and

     e.   contraceptive choices and cost.

9.      In addition, I have been an investigator and lead investigator, on more than 40 studies and projects, many regarding women's healthcare. Most recently, I was a co-investigator on the project, "Reducing Unintended Pregnancies through Reproductive Life Planning and Contraceptive Action Planning," PCORI CD-1304-6117, 2013-2017.

10.     I have also lectured and made almost 75 presentations throughout the country, in connection with my academic work, at various schools and professional organizations.  My recent presentations include:

     a.   "The Affordable Care Act and Women's Preventive Services: The 2011 IOM Report," keynote lecture as Distinguished Professor in Women's Health, Society of General Internal Medicine 35th annual meeting, Orlando, FL, May 10, 2012;

     b.   "The Patient Protection and Affordable Care Act's Implications for Women's Health Care," invited seminar at the Pennsylvania Department of Health, Harrisburg PA, May 27, 2014; and

     c.   "Implications of Proposed Changes to the Affordable Care Act for Women's Reproductive Health Care," invited panelist for The Future of Reproductive Health Policy, Penn State College of Medicine, March 9, 2017.

11.     Throughout my career, I have received accolades and recognitions. For example, in 1997, I received the National Award for Excellence in Women's Health Research from the National Association of Professionals in Women's Health; in 2008, I received the Leader in the Field Award from the Family Health Council of Central Pennsylvania; and, in 2012, I received the award of Distinguished Professor in Women's Health from the Society of General Internal

JA302

Medicine.

12.    I also participate, and have participated, in a variety of professional activities. Among them, I have been on the Editorial Board of *Women's Health Issues* since 1990, serving as Editor-in-Chief (2003-2006) and Associate Editor (1995-2002 and 2007-present), and have been a Full Fellow of the Society of Family Planning since 2016. Since 1988, I have been a member of AcademyHealth, a professional organization dedicated to advancing the fields of health services research and health policy.

## II.    My Service on the Institute of Medicine Committee Convened by the U.S. Department of Health and Human Services, and the Committee's Report

13.    Throughout my career, I have been engaged as a consultant to numerous governmental and academic institutions.

### A.  *My Service on the Institute of Medicine Committee on Preventive Services for Women*

14.    From 2010 to 2011, I served as one of only sixteen invited members of the Institute of Medicine Committee on Preventive Services for Women (the "Committee").

15.    This Committee was convened at the request of the United States Department of Health and Human Services ("HHS") to identify existing gaps in women's preventive care and to recommend services and screenings that HHS should consider to fill those gaps.

16.    The sixteen experts on the Committee had backgrounds in preventive care, disease prevention, women's health issues, and other areas.

### B.  *Committee Recommends FDA-Approved Contraception, Sterilization Procedures, and Patient Education and Counseling as Part of Women's Preventive Care*

17.    In 2011 the Committee issued its report, titled, *Clinical Preventive Services for Women: Closing the Gaps* (National Academies Press, 2011) (the "Report").

18.    The   Report  made  specific  recommendations  to  the  Health  Resources  and

4

Services Administration ("HRSA"), a department of HHS, regarding evidence-based preventive services to be incorporated in the guidelines promulgated pursuant to the Affordable Care Act, 42 U.S.C. § 18001 *et seq.* (2010) (the "Affordable Care Act" or "ACA").

19.     The Committee found that contraceptives are preventive medical services because they prevent unintended pregnancies and that contraceptives should be included in the list of recommended preventive services for women under the ACA, specifically, the "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *See* Ex. B, Report at 109-10.

### i.     **Reducing Unintended Pregnancies**

20.     In making this finding, the Committee relied on evidence that "contraception and contraceptive counseling" are "effective at reducing unintended pregnancies" and observed that "[n]umerous health professional associations recommend" that such family planning services be included as part of standard preventive care for women. *Id.* at 109.

21.     In making this recommendation, the Committee considered recommendations from the American Academy of Pediatrics, the Society of Ado20lescent Medicine, the American Medical Association, the American Public Health Association, the American College of Obstetricians and Gynecologists, and the Association of Women's Health, Obstetric and Neonatal Nurses.  *Id.* at 109-10.

22.     But the Committee's recommendation was based on a review of the evidence, including the prevalence of unintended pregnancy in the United States.

23.     As the Committee stated in its Report, in 2001, an estimated "49 percent of all pregnancies in the United States were unintended—defined as unwanted or mistimed at the time

of conception." *Id.* at 102 (internal citations omitted).

24.     The Committee found that these "unintended" pregnancies disproportionately impact the most vulnerable: Although one in every 20 American women has an unintended pregnancy each year, unintended pregnancy is "more likely among women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group." *Id.*

25.     Furthermore, the Committee reported that unintended pregnancies are more likely than intended pregnancies to result in abortions; specifically, "[i]n 2001, 42 percent of [] unintended pregnancies [in the United States] ended in abortion." *Id.*

26.     The Committee also concluded that evidence proved that women carrying babies to term are less likely to follow best health practices when their pregnancies were unintended.

27.     According to the Institute Committee on Unintended Pregnancy, "women with unintended pregnancies are more likely than those with intended pregnancies to receive later or no prenatal care, to smoke and consume alcohol during pregnancy." *Id.* at 103.

28.     Women facing unintended pregnancies are also more likely to be "depressed during pregnancy, and to experience domestic violence during pregnancy." *Id.*

29.     The Committee also considered evidence that the "odds of preterm birth and low birth weight among unintended pregnancies ending in live births" was "significantly increased …. compared with pregnancies that were intended." *Id.*

30.     Importantly, the Committee determined that contraceptives are effective in preventing unintended pregnancies, citing evidence of contraceptive effectiveness from the Food and Drug Administration and from Contraceptive Technology. *Id.* at 105.

31.     The Committee also noted that "greater use of contraception within the population

6

is associated with lower unintended pregnancy and abortion rates nationally." *Id.* at 105.

32.     In making this determination, the Committee relied on a study showing that, as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, their rates of unintended pregnancy and abortion both declined. *Id.*

33.     The Committee also considered other studies that showed increased rates of contraceptive use by adolescents from the early 1990s to the early 2000s was associated with a "decline in teen pregnancies" and, conversely, that "periodic increases in the teen pregnancy rate are associated with lower rates of contraceptive use." *Id.*

   ii.   **Minimizing Health Risks, Promoting Recommended Spacing, and Recognizing Additional Health Benefits Unrelated to Preventing Unintended Pregnancy**

34.     While all pregnancies carry inherent health risks, the Committee also considered that some women have serious medical conditions for which pregnancy is strictly contraindicated or inadvisable.

35.     The Committee considered, for example, that "women with serious medical conditions such as pulmonary hypertension (etiologies can include idiopathic pulmonary arterial hypertension and others) and cyanotic heart disease, and … Marfan Syndrome," are advised against becoming pregnant. *Id.*

36.     The Committee also considered that the use of contraceptives also promotes medically recommended "spacing" between pregnancies. *Id.*

37.     The Committee found that such spacing is important because there is an "increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced (within 18 months of a prior pregnancy)" and "[s]hort interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small for gestational age births." *Id.*

38.     The Committee also considered the risks and benefits of contraception and

7

recognized that contraceptives have other significant health benefits unrelated to preventing unintended pregnancy, including "treatment of menstrual disorders, acne or hirsutism, and pelvic pain," and that long-term use of oral contraceptives has been shown to "reduce a woman's risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases." *Id.* at 105 and 107.

### iii. Recognizing the Need for Family Planning Services and that Cost is a Barrier

39.     The evidence reviewed by the Committee demonstrated that, as of 2008, there were still "approximately 36 million U.S. women of reproductive age (usually defined as ages 15 to 44 years)" who were "estimated to be in need of family planning services because they were sexually active, able to get pregnant, and not trying to get pregnant." *Id.* at 103.

40.     Citing a Kaiser Permanente study that found "when out-of-pocket costs for contraceptives were eliminated or reduced, women were more likely to rely on more effective long-acting contraceptive methods," the Committee recognized that cost is a meaningful barrier to contraceptive access and found that "[d]espite increases in private health insurance coverage of contraception since the 1990s, many women do not have insurance coverage or are in health plans in which copayments for visits and for prescriptions have increased in recent years." *Id.* at 109.

41.     For these and the other reasons set forth in the Report, the Committee recommended that "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity" be included in women's preventive care. *Id.* at 109-10.

42.     The Committee's recommendation was based upon reaching consensus following consideration of evidence presented by its members and a variety of professionals and

8

academics.

### III.   My Opinion on the final Religious Exemption Rule and final Moral Exemption Rule

43.   I have reviewed both the final Religious Exemption Rule and the final Moral Exemption Rule promulgated by the Defendants (the "final Exemption Rules"), as well as the amended Complaint filed by the Commonwealth of Pennsylvania in this matter that challenges them.

44.   In addition to my relevant background and experience set forth above, by virtue of being one of the sixteen members of the Institute of Medicine Committee on Preventive Services for Women, I have direct knowledge regarding the Report, promulgated by the HRSA pursuant to the Affordable Care Act, which gave rise to the ACA's original guidelines regarding contraceptives as a preventive service.

45.   Based upon my knowledge, education, training and experience, it is my professional opinion that the final Exemption Rules will cause immediate and irreversible harm because they will cause women to lose contraceptive care under their employer group health plans.

46.   As set forth above and credited by the Committee, cost to patients has been shown to be a barrier to access to contraceptive care. Women are more likely to use contraceptives – and use them properly and consistently – if they have no cost-sharing responsibilities.

47.   Conversely, when women are required to shoulder financial responsibility for preventive care, they are less likely to seek preventive care.

48.   Several studies conducted after the ACA went into effect have shown that women are paying less for contraception and that they are using more effective contraceptive methods as a result of having contraceptive coverage under ACA.

49.     A study we conducted at Penn State using national health claims data for privately insured women showed a post-ACA decrease in out-of-pocket contraceptive costs and an increase in uptake of long-acting reversible contraceptives, the most effective contraceptives on the market (Snyder AH, Weisman CS, Liu G, Leslie D, Chuang CH. The Impact of the Affordable Care Act on Contraceptive Use and Costs among Privately Insured Women. *Women's Health Issues* 28(3):219-223, 2018.

50.     For these reasons, some women who lose contraceptive coverage through their employers as a result of the final Exemption Rules, will choose a less effective contraceptive option for their medical needs, will use contraception inconsistently, or will discontinue using contraceptives entirely.

51.     This, in turn, will have irreparable negative physical and mental health impacts on women, including disruptions in ongoing medical treatment and/or unintended pregnancies.

52.     It is also my opinion that the new final Exemption Rules are not based upon sound scientific or empirical evidence.

53.     The final Exemption Rules indicate, among other things, that contraceptives are not effective in preventing unintended pregnancy, that they are harmful to women's health, and that they promote promiscuity.

54.     These representations conflict with peer-reviewed and medically-accepted data, and are not credible.

55.     For these reasons, I believe that an injunction of the final Exemption Rules is necessary to prevent immediate and irreparable harm to women in Pennsylvania and around the Country, who will lose ongoing preventive care coverage under their group health plan due to the final Exemption Rules.

I hereby affirm that the foregoing is true and correct based upon my knowledge, information and belief, and I make these statements subject to the penalty of perjury.

Date: 12/17/2018

By: _____
CAROL S. WEISMAN, Ph.D

# EXHIBIT 1

1

CURRICULUM VITAE

Carol S. Weisman, Ph.D.

OFFICE ADDRESS

Department of Public Health Sciences
Pennsylvania State University College of Medicine
90 Hope Drive, A210
Hershey, PA 17033-0855
Telephone: 717-531-6690
Fax: 717-531-0839
E-mail: cweisman@psu.edu

PLACE OF BIRTH

Pittsburgh, Pennsylvania

EDUCATION

B.A., Wellesley College, Sociology and Anthropology, 1969

Ph.D., Johns Hopkins University, Social Relations (Sociology), 1973

CURRENT POSITIONS

Distinguished Professor of Public Health Sciences, Obstetrics and Gynecology, and Health Policy and Administration, Pennsylvania State University College of Medicine, 2003 – present

Associate Dean for Faculty Affairs, Pennsylvania State University College of Medicine, 2009 – present

Faculty Associate, Penn State Population Research Institute

PREVIOUS POSITIONS

| 1997-2002 | Professor, Department of Health Management and Policy, Founding Director of the Interdepartmental Concentration in Reproductive and Women's Health, University of Michigan School of Public Health, Ann Arbor, MI; Joint appointment in Department of Obstetrics and Gynecology, University of Michigan Medical School |
|---|---|
| 1988-1997 | Professor, Department of Health Policy and Management, School of Hygiene and Public Health, Johns Hopkins University, Baltimore, MD<br>Associate Chair for Health Services Research, 1997<br>Director, Doctoral Program in Health Care Organization and Financing, 1992-1994<br>Director, MHS Program in Health Finance and Management, 1988-1992 |
| 1981-1988 | Associate Professor, School of Hygiene and Public Health, Johns Hopkins University |
| 1974-1981 | Assistant Professor, School of Hygiene and Public Health, Johns Hopkins University |
| 1974-1978 | Assistant Professor, School of Health Services, Johns Hopkins University |

2

| 1973-1974 | Assistant Professor, Department of Sociology, University of Maryland, College Park, MD |
| 1972-1973 | Associate Research Scientist, Office of Health Manpower Studies, School of Health Services, Johns Hopkins University |

<u>AWARDS AND HONORS</u>

B.A. with High Honors and Durant Scholar, Wellesley College, 1969

Woodrow Wilson Fellow, 1969

NIMH Pre-Doctoral Research Fellow, 1970-72

Delta Omega, 1988

Fellow of the Association for Health Services Research, 1997

National Award for Excellence in Women's Health Research, National Association of Professionals in Women's Health, 1997

Leader in the Field Award, Family Health Council of Central Pennsylvania, 2008

Distinguished Professor in Women's Health, Society of General Internal Medicine 35th annual meeting, 2012

<u>PROFESSIONAL ACTIVITIES</u>

Associate Editor, *Women's Health Issues*, 2007- present; Editor-in-Chief 2003 - 2006 (Associate Editor, 1995-2002; member of the Editorial Board since 1990)

Full Fellow, Society of Family Planning, 2016 – present

Member, Abortion Facility Standards Initiative Advisory Committee, Advancing New Standards in Reproductive Health (ANSIRH), University of California, San Francisco.  2015 - 2017

Member, Well Woman Visits Advisory Committee, National Women's Law Center and Brigham and Women's Hospital, 2013- 2015

Member, National Maternal Health Initiative, Women's Health Work Group, Maternal and Child Health Bureau, HRSA, 2012-2013

Member, Institute of Medicine (IOM) Committee on Preventive Services for Women, 2010 - 2011

Member, Research and Project Development Subcommittee, AAMC Group on Faculty Affairs, 2010 – 2012

Member, Women's Health Steering Committee, National Committee for Quality Assurance, 2009 – 2011

Co-chair, Maternity Care Measure Development Work Group, American Medical Association, 2009 - 2010

Member, AHRQ Expert Group on Women's Health, 2009 - 2010

Member, CDC Select Panel on Preconception Care, 2005 -2006

Member, The Standards of Care Project Advisory Board, National Health Law Program, 2005 – 2010

Case: 25-2575    Document: 34-2    Page: 261    Date Filed: 12/12/2025
Case 2:25-cv-04540-WB    Document 90-15    Filed 12/17/25    Page 16 of 37

3

Member, Advisory Committee, Jacobs Institute of Women's Health at George Washington University, 2006 - 2007

Chair, Board of Directors, AcademyHealth, 2007 (Board Member, 2004-2007; Vice-Chair, 2006)

Member, Women's Health Research Coalition Advisory Committee, Society for Women's Health Research, 2004 – 2006

Member, Board of Governors, Jacobs Institute of Women's Health, 1998-2004

Member, Advisory Board to Pfizer Women's Health, U.S. Pharmaceuticals, 1998-2003

Co-chair, Women's Health Measurement Advisory Panel, National Committee for Quality Assurance, 1997-2003

Family Planning Service Delivery Improvement Research, Technical Experts meetings, The Urban Institute, 2003

Association of Professors of Gynecology and Obstetrics, Women's Health Education Retreat invited panel to develop competencies for medical students, June 13-15, 2003

Member, Steering Committee, Women's Health Research Coalition, Society for Women's Health Research, 1999-2003

Co-Chair, Jacobs Institute of Women's Health Expert Panel on Menopause Counseling, 1999-2000

Chair, Advisory Committee on Academic Rank, University of Michigan School of Public Health, 1999-2001

Member, Advisory Committee on Labor Standards and Human Rights, University of Michigan, 1999-2000

Member, Advisory Panel on Cardiovascular Health for Women, Association of Women's Health, Obstetric and Neonatal Nurses (AWHONN), 2000-2002

Member, Women's Health Report Card National Advisory Committee, 1998-2003

Chair, Advisory Committee to "Women's Health and Managed Care" project of The Jacobs Institute of Women's Health, 1996-1998

Member, Advisory Committee to "Improving Women's Health: Mid-Life and Beyond" project of the Women's Research and Education Institute, 1997

Member of the Affiliate Medical Committee of Planned Parenthood of Maryland, 1993 - 1997

Member of the Council for Quality Health Care, Maryland Hospital Association, 1993 - 1996

Member, *Johns Hopkins Women's Health* Editorial Advisory Board, 1993-1995

President of the Faculty Senate and member of the Advisory Board, Johns Hopkins University School of Hygiene and Public Health, 1992-1995

Member of the Editorial Board, *American Sociological Review*, 1992-94

Case 25-2575, Document 34-2, Page: 262    Date Filed: 12/12/2025
Case 1:17-cv-04540-WB    Document 905-9    Filed 12/17/19    Page 12 of 37

4

Member, Interdivisional Collaboration and Restructuring strategic study group of the Committee for the 21st Century, Johns Hopkins University, 1993

Member, Scientific Advisory Board, Center for VDT and Health Research, Johns Hopkins University School of Hygiene and Public Health, 1992-1995

Member of the Norplant Consortium of the Baltimore City Health Department, 1992-1993

Member, Provost's Committee on the Status of Women, Johns Hopkins University, 1991- 1993; Co-Chair, Academic Issues Subcommittee, 1991- 1993

Associate Editor, *Journal of Health and Social Behavior*, l989-91

Member, Public Interest Investment Advisory Committee, Johns Hopkins University, l986-87

Reviewer, BOSTID Research Program of the National Research Council, Washington, D.C., 1987
Advisor, Maryland Hospital Association, Task Force on Nursing Issues, l986-87

Member, Advisory Committee to the National Survey of Worksite Health Promotion Activities, Office of Disease Prevention and Health Promotion, l985-86

Reviewer, Health Services Research and Development Service, Veterans Administration Central Office, Washington, D.C., 1984

Member, Review Panel, Health Care Financing Administration, Preventive Services Demonstrations, 1984-85

Member, Advisory Panel on Data Needs for the Institute of Medicine Study of Nursing, Institute of Medicine, Washington, D.C., April 1981

Member, Board of Directors, Planned Parenthood of Maryland, 1978-1984

PROFESSIONAL MEMBERSHIPS

AcademyHealth, 1988-present

SELECTED CONSULTING

Member, NCQA Maternal Health Measurement Advisory Panel, 2013-2014

Consultant, Women's Health, National Committee for Quality Assurance, 2009 – 2011

Consultant, RAND-Magee Women's Health Initiative, 2003

Consultant, Women's Health Program, AHRQ, 2001-2003

Consultant, Office on Women's Health, Department of Health and Human Services, 1999-2000

Consultant, Maternal and Child Health Bureau, HRSA, 1999-2000

Consultant on the National Survey of Women's Health, conducted by Louis Harris & Associates for The Commonwealth Fund, 1992-1993

Case: 25-2575    Document: 34-2    Page: 263    Date Filed: 12/12/2025
Case 2:15-cv-04540-WB    Document 90-15    Filed 12/17/19    Page 18 of 37

5

Consultant to the Panel on Screening for Alzheimer's Disease and Related Disorders, Agency for Health Care Policy and Research, 1992-1993

Consultant to the University of Rochester School of Nursing, Enhanced Professional Practice Model for Nursing Project, l989-1993

Member, Advisory Group for the 1990 Followup Survey of Young Men, The Urban Institute, 1990, 1994

Consultant to Robert Wood Johnson University Hospital, Robert Wood Johnson Foundation/Pew Trust project on strengthening hospital nursing, 1989

Consultant to the State of New Jersey Department of Higher Education on issues in nursing education, l988

Consultant to Survey Research Associates, Inc., Baltimore, Maryland, on NHLBI-funded survey of physicians' preventive practices related to lung disease, 1985-89

Consultant to Study of Anticipated Nursing Turnover, University of Arizona, College of Nursing, Tucson, Arizona, 1983-85

Member of Advisory Committee on Multi-Institutional Arrangements and Methodology Task Force, Joint Commission on Accreditation of Hospitals, Chicago, Illinois, 1982-84

Consultant to Sisters of Mercy Health Corporation, Farmington Hills, Michigan, 1982

SELECTED PROJECTS

Co-investigator, "Reducing Unintended Pregnancies through Reproductive Life Planning and Contraceptive Action Planning," PCORI CD-1304-6117, 2013-2017

Principal Investigator, "Career Development Program in Women's Health Research at Penn State," NIH BIRCWH (Building Interdisciplinary Research Careers in Women's Health) Program, Grant Number K12 HD055882, 2007-2017

Co-leader, Community Engagement and Research Core, Penn State CTSI, NIH UL1RR033184, 2011 - 2014

Principal Investigator, "National Children's Study," Subcontract with the University of Pittsburgh (Grant from NIH), 2007-2011

Principal Investigator, "Central Pennsylvania Center of Excellence for Research on Pregnancy Outcomes," Grant Number 4100020719 from the Pennsylvania Department of Health, 2004-2008

Co-investigator, "Single Home Visits to Improve Health Outcomes," HRSA Grant No. 1 R40MC06630-01-00, 2006-2009

Co-investigator, "Analysis of HEDIS Data to Investigate Gender Differences in Quality of Care for Cardiovascular Disease and Its Risk Factors," Subcontract with the National Committee for Quality Assurance (Grant from AHRQ), 2005-2007

Co-investigator, "Impact of Practice Structure on the Quality of Care for Women Veterans," Subcontract with the Greater Los Angeles VA (Grant from US Department of Veterans Affairs), 2005-2007

Case: 25-2575    Document: 34-2    Page: 264    Date Filed: 12/12/2025
Case 2:25-cv-04450-WB    Document 90-15    Filed 12/17/25    Page 19 of 37

6

Co-investigator, "Survival Strategies of Health Care Safety Net Providers," Grant from the Blue Cross Blue Shield of Michigan Foundation, 2001-2004

Principal Investigator, "Comparing the OWH National Centers of Excellence in Women's Health (CoE) Program to the VA Specialized Women's Health Centers," Contract No. 02TO2012301D, U.S. Department of Health and Human Services, Office on Women's Health, 2002-2003

Principal Investigator, "Developing a Short-form MoM Survey: Management of Menopause," Subcontract with the National Committee for Quality Assurance, 2002-2003

Principal Investigator, "Measurement of Women's Satisfaction with Primary Care," AHRQ Grant No. R01 HS10237, 2000-2002

Evaluation Director, "National Center of Excellence in Women's Health," Contract No. 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, U.S. Department of Health and Human Services, Office on Women's Health, 1997-2002

Principal Investigator, "Contraceptive Counseling in Managed Care," Project under the ASPH/CDC/ATSDR Cooperative Agreement, 1999-2001

Principal Investigator, "Women's Health Services Survey Development," Subcontract with Johns Hopkins Women's and Children's Health Policy Center, Maternal and Child Health Bureau, DHHS, 1998-2001

Co-investigator, "Gender Analysis of CAHPS," AHCPR Reference No. 99R302869 with Jacobs Institute of Women's Health, 1999-2000

Principal Investigator, Robert Wood Johnson Foundation Investigator Award in Health Policy Research, "Toward a Women's Health Policy: Exploring Gender Issues in U.S. Health Care," 1994-1998

Principal Investigator, "Catholic Health Systems and Reproductive Health Services," Grant No. 95-1810 from The Henry J. Kaiser Family Foundation, 1996-1997

Principal Investigator, "Study of Women's Health Centers," Grant No. 94-54 from The Commonwealth Fund, 1994-1995

Investigator, "Improving Cervical Cancer Screening in Hospital Settings," Grant No. 1 R03 CA59205 from the National Cancer Institute, 1993-1994

Investigator, "Accuracy of Substituted Judgments in Terminal Illness," Grant No. 1 R01 NR03045 from the National Center for Nursing Research, 1993-1995

Principal Investigator, "Evaluation of The Commonwealth Fund's Graduate Program in Nursing and Management," Grant No. 93-25 from The Commonwealth Fund, 1992-1993

Investigator, "Youth Mental Health Services Research Center," Grant No. 1 P50 MH50204 from the National Institute of Mental Health, 1992-1997

Co-Principal Investigator, "Trials to Promote Behavior Change to Prevent HIV Spread," Cooperative Agreement with the National Institute of Mental Health, 1990-1995

Co-Principal Investigator, "Condom Use to Prevent STDs Including AIDS in Baltimore," Grant No. 1 R01 AI29508 from the National Institute for Allergy and Infectious Diseases, 1989-l994

Case: 25-2575    Document: 34-2    Page: 265    Date Filed: 12/12/2025
Case 2:15-cv-04540-WB    Document 90-16    Filed 12/17/19    Page 20 of 37

7

Principal Investigator, "Adolescent Women's Contraceptive Decision Making," Grant No. 1 R01 HD22275 from the National Institute of Child Health and Human Development, l987-91

Co-Principal Investigator, "A Model for Reorganizing Nursing Resources," Grant No. NR02091 from the National Center for Nursing Research, l989-l992

Co-Investigator, "Comparison of Rates of Medicaid versus Non-Medicaid Malpractice Claims," Grant Number 14042 from the Robert Wood Johnson Foundation, l989

Co-Investigator, "Fertility-Related Behavior in STD Clinic Clients," Grant No. 1 R01 HD24802 from the National Institute of Child Health and Human Development, l988-91

Investigator, "Study of Barriers to Curriculum Change in Medical Education," Grant from the PEW Foundation to the University of Rochester and Johns Hopkins University, l987-89

Co-Principal Investigator, "Early Detection of Cervical Cancer Among Elderly Women," Grant No. 1 R01 CA36569 from the National Cancer Institute, 1984-87

Principal Investigator, "Fertility-Control Services: Provider Influences," Grant No. 1 R01 HD17135 from the National Institute of Child Health and Human Development, 1983-86

Investigator, "JHU/BCH Residency Training in General Internal Medicine," Grant No. 5D28PE13163 from the Division of Medicine, Bureau of Health Professions, HRA, 1978-84

Co-Investigator, "U.S. Health Personnel Abroad: Needs and Opportunities," Contract with U.S.A.I.D., 1981-82

Principal Investigator, "Gender and Physician Specialty Distribution," Grant No. 1 R03 HS04299 from the National Center for Health Services Research, OASH, 1981-1982

Investigator, "Modeling the Graduate Medical Education System," Contract No. HRA-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 with Division of Medicine, Bureau of Health Professions, HRA, 1979-80

Investigator, "Oncology Center Surveys of Consumers and Providers," Grant No. CA20333 from the National Cancer Institute, 1978-80

Principal Investigator, "Job Satisfaction and Turnover among Hospital Nurses," Grant No. 1 R01 NU00568 from the Division of Nursing, Bureau of Health Professions, HRA, 1977-79

Principal Investigator, "Organizational Determinants and Consequences of Job Satisfaction Among Hospital Nurses: A Pilot Study," American Nurses' Foundation Grant No. 2-76-067, 1976-77

Project Director, "Career Patterns of Unaccepted Applicants to Medical School," NIH Contract No. 72-4407, 1972-74


SELECTED PRESENTATIONS

Levine DM, Weisman CS. "Career Decisions of Unaccepted Applicants to Medical School," Paper presented at the Research in Medical Education Conference, Association of American Medical Colleges, Chicago, Illinois, November 1974.

Case 25-2575, Document 34-2, Page 266    Date Filed: 12/12/2025
Case 2:573:cv-04540-WB    Document 90-15    Filed 12/17/19    Page 21 of 37

8

Weisman CS, Morlock LL, Sack DG, Levine DM.  "Sex Differences in Response to a Blocked Career Pathway among Unaccepted Medical School Applicants," Paper presented at the 70th Annual Meeting of the American Sociological Association, San Francisco, CA, August 27, 1975.

Weisman CS, Alexander CS.  "Determinants of Hospital Staff Nurses' Job Satisfaction," Presentation at the University of Iowa Health Services Research and Development Center, April 1978.

Weisman CS, Levine DM, Steinwachs, DM. "Convergence of Male and Female Physician Career Patterns: Evidence of Specialty Choices and Graduate Experiences for Seven Cohorts," Paper presented at the Annual Meeting of the American Sociological Association, New York, August 31, 1980.

Steinwachs DM, Elzinga DJ, Levine DM, Parker R, Salkever D, Weisman C. "Changing Patterns of Graduate Medical Education: Analyzing Recent Trends and Projecting Their Impact," Paper presented at the Annual Meeting of the American Public Health Association, Medical Care Section, Detroit, Michigan, October 1980.

Celentano DD, Weisman CS, Shapiro S. "Cancer Preventive Screening Behavior Among Elderly Women," Paper presented at the Annual Meeting of the American Public Health Association, Gerontological Health Section, Detroit, Michigan, October 1980.

Weisman CS.  "Recruitment, Retention, and Responsibility: What Research Tells Us About Hospital Nursing," Keynote Address at the Seventh Annual Conference of the National Association of Nurse Recruiters, Philadelphia, PA, July 31, 1981.

Dear MR, Weisman CS, O'Keefe S. "Organization of Nursing for Staff Retention," Paper presented at the Health Administration Section at the Annual Meeting of the American Public Health Association, Montreal, Canada, 1982.

Weisman CS. "Managing Organizations in the Presence of Stress: Human Resource Problems," Presentation at the Public Health and Preventive Medicine Conference, Johns Hopkins University School of Hygiene and Public Health, April 18, 1983.

Celentano DD, Weisman CS, Rosenshein NB, Enterline JP, Klassen AC. "Case-Control Study of Risk Factors for Cervical Cancer," Presentation at the 113th Annual Meeting of the American Public Health Association, Epidemiology Contributed Papers Session, November 20, 1985.

Weisman CS. "Communication between Women and Their Health Care Providers:  Research Findings and Unanswered Questions," Invited paper presented at the National Conference on Women's Health, National Institutes of Health, June 18, 1986.

Weisman CS, Teitelbaum MA. "The Work-Family Role System and Physician Productivity," Paper presented at the 81st Annual Meeting of the American Sociological Association, New York, August 31, 1986.

Celentano DD, Weisman CS, Klassen AC. "Duration of Relative Protection of Pap Testing for Cervical Cancer," Paper presented at the 114th Annual Meeting of the American Public Health Association, Las Vegas, Nevada, October 1, 1986.

Weisman CS. "Research Linking Work Environment, Provider Satisfaction, and Quality of Care," Invited presentation at the Department of Psychology, University of Stockholm, Stockholm, Sweden, September 1, 1987.

Weisman CS, Teitelbaum MA, Celentano DD. "Physicians' Practice Changes in Response to Malpractice Litigation," Paper presented at the 115th Annual Meeting of the American Public Health Association, New Orleans, Louisiana, October 20, l987.

Case: 25-2575    Document: 34-2    Page: 267    Date Filed: 12/12/2025
Case 2:15-cv-04540-WB    Document 90-15    Filed 12/17/18    Page 22 of 37

9

Weisman CS. "The Requirement of Work Shifts in Job Redesign," Invited presentation at the State-of-the-Science Invitational Conference: Nursing Resources and the Delivery of Patient Care, National Institutes of Health, National Center for Nursing Research, February 19, 1988.

Weisman CS, Teitelbaum MA, Nathanson CA, Ensminger M. "AIDS Knowledge, Perceived Risk, and Prevention in Adolescent Clients of a Family Planning Clinic," Paper presented at the 116th Annual Meeting of the American Public Health Association, Boston, Massachusetts, November 14, 1988.

Weisman CS, Nathanson CA, Ensminger M, Robinson JC, Plichta S. "Consistency of Condom Use by Adolescent Clients of a Family Planning Clinic," Paper presented at the 118th Annual Meeting of the American Public Health Association, New York, New York, October 2, 1990.

Weisman CS, "Nursing Practice Models: Research on Patient Outcomes," Invited paper presented at the National Center for Nursing Research Conference on Patient Outcomes Research, Rockville, MD, September 11, 1991.

Weisman CS, "The Women's Health Agenda," Invited presentation at the Maryland ACE/NIP Annual Conference, Goucher College, June 12, 1992.

Weisman CS, Plichta SB, Tirado D, Dana KH. "Norplant Adoption: Comparison of Early Norplant Adopters and Oral Contraceptive Users in a Family Planning Clinic in Baltimore," Paper presented at the Annual Meeting of the American Public Health Association, Washington, D.C., November 11, 1992.

Weisman CS. "Contraceptive Decision Processes," Invited Paper presented at the NICHD Workshop on Negotiating the Paths to Parenthood, NIH, February 9, 1993.

Weisman CS and Cassard SD. "Health Consequences of Exclusion or Under-representation of Women in Clinical Studies," Workshop presentation to the Institute of Medicine Committee on the Legal and Ethical Issues Relating to the Inclusion of Women in Clinical Studies, Georgetown University, Washington, D.C., March 24, 1993.

Zenilman J and Weisman CS. "Condom Use to Prevent STDs Including AIDS in Baltimore," Presentation at the Behavioral Research on the Role of Condoms in Reproductive Health conference, NIH, May 10-12, 1993.

Weisman CS. "The Commonwealth Fund's Survey of Women's Health: Analysis of Health Care Utilization Patterns," Presented at the American Psychological Association's Conference on Psychosocial and Behavioral Factors in Women's Health: Creating an Agenda for the 21st Century, Washington, D.C., May 13, 1994.

Weisman CS and Cassard SD. "Women's Health Care: Physician Use Patterns," Presented at the 122nd Annual Meeting of The American Public Health Association, Washington, D.C., October 31, 1994.

Weisman CS, Curbow BC, Khoury AJ. "The National Survey of Women's Health Centers: Current Models of Women-Centered Care," Invited paper presented at the 12th Annual Meeting of the Association for Health Services Research and the Foundation for Health Services Research, Chicago, IL, June 5, 1995.

Conference Chair, "Women's Health and Managed Care: Balancing Cost, Access, and Quality," The Jacobs Institute of Women's Health, Washington, D.C., July 17, 1995.

Weisman CS. "Providers for Women's Health Care," A Woman's Journey, Johns Hopkins Medical Institutions, Baltimore, MD, October 14, 1995.

Weisman CS. "Women's Health Centers and Managed Care," Presented at the 123rd Annual Meeting of the American Public Health Association, San Diego, CA, October 31, 1995.

Case 25-2575   Document 34-2   Page 268   Date Filed 12/12/2025
Case 2:17-cv-04540-WB   Document 90-15   Filed 12/17/19   Page 23 of 37

10

Weisman CS.  "Women's Health Centers: Past, Present, and Prospects," Invited paper presented at "An Unfinished Revolution: Changes and Challenges in Women's Health Care," Mary Baldwin College, Staunton, Virginia, April 29, 1996.

Weisman CS.  "Women's Health Centers and Managed Care," Paper presented at A Women's Health Conference, American Psychological Association, Washington, D.C., September 19, 1996.

Weisman CS.  "Women's Care-Seeking Patterns: Preferences and Implications," Paper presented at A Women's Health Conference, American Psychological Association, Washington, D.C., September 19, 1996.

Weisman CS. "The Development of Women's Health Centers," Invited paper presented at the Fourth Annual Pitts Memorial Lectureship on Issues in Medical Ethics: "Women's Health Issues," Medical University of South Carolina, Charleston, S.C., November 8, 1996.

Weisman CS. "The Growth of Managed Care and Women's Health," Panel on Industry Investment in Women's Health, 25th Anniversary Meeting of the Society for Menstrual Cycle Research, Chicago, IL, June 7, 1997.

Weisman CS. "Multiple Pathways of Entry into the Health Care System for Women," Presented at the Scientific Advisory Meeting, "Toward a Women's Health Outcomes Research Agenda," Society for the Advancement of Women's Health Research," Washington, D.C., October 21, 1997.

Weisman CS.  "Women's Health Centers," Keynote address at the 6th Annual Primary Health Care of Women conference, University of Michigan Medical School, Ann Arbor, Michigan, December 4, 1997.

Weisman CS. "The Gap Between Quality Initiatives and Outcomes Measures," Capitol Hill Briefing Series on Women's Health, Healthcare Leadership Council and the Society for the Advancement of Women's Health Research, U.S. Capitol, Washington, D.C., March 19, 1998.

Weisman CS.  "Two Centuries of Women's Health Activism," invited presentation at The History and Future of Women's Health, PHS Office on Women's Health, Washington, D.C., June 11, 1998.

Weisman CS.  "The Health Care Delivery System and Perinatal and Women's Health," paper presented at the Fifth Women's Policy Research Conference, Institute for Women's Policy Research and George Washington University, Washington, D.C., June 13, 1998.

Weisman CS. "The History and Strategies of U.S. Women's Health Movements," lecture in the "Women's Health: Historical Perspectives and Policy Dilemmas" lecture series, University of Michigan, Ann Arbor, Michigan, November 4, 1998.

Weisman CS, et al. "Affiliations between Catholic and Non-Catholic Health Care Organizations and Availability of Reproductive Health Services," paper presented at the 126th annual meeting of the American Public Health Association, Washington, D.C., November 17, 1998.

Weisman CS, Henderson JT.  "Women's Health Plans and Patterns of Care: Access, Preventive Services, and Satisfaction," paper presented in the panel on "What's Next in Women's Health: Coverage, Access and Quality" at the 16th Annual Meeting of the Association for Health Services Research, Chicago, IL, June 28, 1999.

Weisman CS. "The Quality of Care for Women: Toward a Research Agenda," paper prepared for the Agency for Health Care Policy and Research meeting on Defining a Women's Health Services Research Agenda, Rockville, MD, September 24, 1999.

Case: 25-2575    Document: 34-2    Page: 269    Date Filed: 12/12/2025
Case 2:15-cv-04540-WB    Document 90-15    Filed 12/17/19    Page 24 of 37

11

Weisman CS. "Quality in Women's Health Care: Multiple Perspectives and Measurement Issues." Keynote address at the 12th Annual Executive Summit on Women's Health, National Association for Women's Health, Philadelphia, PA, October 25, 1999.

Weisman CS. "Quality in Women's Health Care: HEDIS Measures." Keynote presentation at the Fourth Annual Nurse-Midwifery Business Institute, Ann Arbor, MI, October 27, 1999.

Weisman CS. "Women's Health and Public Policy." Presentation to the Health Chairs Project of the National Conference of State Legislatures, Washington, D.C., December 3, 1999.

Weisman CS. "Disparities in Women's Health." Presentation at the Michigan State Medical Society Conference, "Women's Health: A Lifetime of Care," Novi, MI, April 14, 2000.

Weisman CS. "Women's Health Quality Measures in Managed Care." Presentation at the Jacobs Institute of Women's Health Breakfast Seminar, Capitol Hilton, Washington, D.C., June 21, 2000.

Henderson JT, Weisman CS. "Women's Patterns of Physician Use: A Life Stage Perspective." Paper presented at the annual meeting of the Population Association of America, Washington, D.C., March 29, 2001.

Weisman CS. "Consensus Guidelines for Menopause Counseling." Presentation at the 10th Annual Primary Health Care of Women Conference, University of Michigan Medical School, Ann Arbor, MI, November 30, 2001.

Weisman CS. "What's Hot in Women's Health Research and Policy?" Presentation at the Penn State Women's Leadership Conference, State College, PA, April 8-9, 2004.

Weisman CS. "The Status of Women's Health Research." Invited talk, Penn State College of Health and Human Development, State College, PA, March 28, 2005.

Weisman CS. "CePAWHS: Central Pennsylvania Women's Health Study." Invited talk, Expecting Something Better: A Conference to Optimize Maternal Health Care, Washington, D.C., May 18, 2005.

Hillemeier MM, Weisman CS, Chase GA et al. "Preconceptional Health and Health Care Use in the Central Pennsylvania Women's Health Study (CePAWHS):  Implications for Preconceptional Health Care," Annual Research Meeting of AcademyHealth, Seattle, WA, June 25, 2006.

Hillemeier MM, Weisman CS. "Predictors of Mental Health Status among Rural Women of Reproductive Age: Findings from the CePAWHS Study," National Rural Women's Health Conference, San Antonio, TX, November 17, 2006.

Weisman CS, Hillemeier MM, Botti J, Baker SA. "Improving Health and Wellness for Women and Their Families:  The Central Pennsylvania Women's Health Study," Invited talk, Regional Symposium on Health Care and Quality of Life, Penn State Harrisburg, March 2, 2007.

Weisman CS. Guest Panelist on "Research, Data, and Evaluation Panel," Central Region Health Equity Summit, Pennsylvania Department of Health, Harrisburg, PA, March 6, 2007.

Weisman CS.  "The Central Pennsylvania Women's Health Study," CDC Select Panel Meeting, Atlanta, GA, May 16, 2007.

Weisman CS. "CDC's 2006 Recommendations for Preconception Care: Changing the Paradigm from Prenatal Care to Preconception Care?" Policy Roundtable Moderator, AcademyHealth 2007 Annual Research Meeting, Orlando, FL, June 4, 2007.

Case: 25-2575    Document: 34-2    Page: 270    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB    Document 90-15    Filed 12/17/19    Page 25 of 37

12

Chuang CH, Weisman CS, Hillemeier MM, Baker SA. "Central Pennsylvania Women's Health Study: *Strong Healthy Women* Intervention," Webinar sponsored by HRSA and the CDC Preconception Health Initiative, November 18, 2010.

Weisman CS. "CePAWHS Prevention Intervention," Pennsylvania Department of Health Quarterly Epidemiology Meeting, Hershey, PA, April 5, 2011.

Weisman CS, Hillemeier MM. "Improving Women's Preconceptional Health:  Long-term Effects of the *Strong Healthy Women* Behavior Change Intervention in the Central Pennsylvania Women's Health Study," Invited presentation at the 3rd National Summit on Preconception Health and Health Care, Tampa/St. Petersburg, FL, June 14, 2011.

Weisman CS. "Women's Clinical Preventive Services: The 2011 IOM Report." Invited presentation at ParaGard® IOM Summit, Teva Pharmaceuticals, North Wales, PA, November 9, 2011.

Weisman CS. "The Affordable Care Act and Women's Preventive Services: The 2011 IOM Report." Keynote lecture as Distinguished Professor in Women's Health, Society of General Internal Medicine 35th annual meeting, Orlando, FL, May 10, 2012.

Weisman CS. "The Patient Protection and Affordable Care Act's Implications for Women's Health Care." Invited seminar at the Pennsylvania Department of Health, Harrisburg PA, May 27, 2014.

Weisman CS. "Research on Women's Health Care and Policy." Keynote address at 2nd Annual BIRCWH Northwest Women's Health and Sex/Gender Differences Research Conference, Oregon Health and Science University, Portland, OR, May 22, 2015.

Weisman CS. "Implications of Proposed Changes to the Affordable Care Act for Women's Reproductive Health Care." Invited panelist for The Future of Reproductive Health Policy, Penn State College of Medicine, March 9, 2017.

Weisman CS.  "Access to Reproductive Services."  Panelist for Women's Health Care: Do You Know What's at Stake?  Penn State College of Medicine, October 17, 2017.

TESTIMONY

Weisman CS. Testimony on behalf of the American Public Health Association before the Task Force on Opportunities for Research on Women's Health, National Institutes of Health, June 12, 1991.

Weisman CS. Expert Witness on contraceptive coverage.  United States District Court for the Eastern District of Pennsylvania, Commonwealth of Pennsylvania v. Donald J. Trump, et al., Case No. 2:17-cv-04540-WB, December 14, 2017.

REPORTS

Weisman CS. Organizational Determinants and Consequences of Job Satisfaction among Hospital Nurses: A Pilot Study. Report to the American Nurses' Foundation, May 1977.

Weisman CS, Alexander CS, Chase GA.  Job Satisfaction and Turnover among Hospital Nurses. Final Report to the Division of Nursing, Bureau of Health Professions, HRA, November 1979.

Weisman CS. Gender and Physician Specialty Distribution. Final Report to the National Center for Health Services Research, OASH, June 1982.

Case 25-2575    Document: 34-2    Page: 271    Date Filed: 12/12/2025
Case 2:15-cv-04540-WB    Document 90-15    Filed 12/17/19    Page 26 of 37

13

Beyers M and Weisman CS. Review of Nursing Standards for Multihospital Systems Project. Report to the Joint Commission on Accreditation of Hospitals, January 1984.

Weisman CS. Fertility-Control Services: Provider Influences. Final Report to the National Institute of Child Health and Human Development, March 1986.

Weisman CS. Shift Work and Nursing. Report prepared under contract for the Office of Technology Assessment, U.S. Congress, December 3, 1989.

Weisman CS. Evaluation of The Commonwealth Fund's Graduate Program in Nursing and Management. Final Report to The Commonwealth Fund, February 28, 1993.

Weisman CS, Curbow B, Khoury AJ. Study of Women's Health Centers. Final Report to The Commonwealth Fund, December 31, 1995.

Weisman CS, Curbow B, Khoury AJ. Case Studies of Women's Health Centers: Innovations and Issues in Women-Centered Care. Report to The Commonwealth Fund, August 1, 1996.

Weisman CS, Khoury AJ, Sharpe VA, Cassirer C, Morlock LL. Affiliations between Catholic and Non-Catholic Health Care Providers and the Availability of Reproductive Health Services: Is There a Common Ground? Report to The Henry J. Kaiser Family Foundation, Menlo Park, CA, 1997.

Jacobs Institute of Women's Health Expert Panel on Menopause Counseling. Guidelines for Counseling Women on the Management of Menopause. Jacobs Institute of Women's Health, Washington, D.C., 2000 (Panel co-chair).

Institute of Medicine Committee on Preventive Services for Women. *Clinical Preventive Services for Women: Closing the Gaps*. Washington, D.C.: National Academies Press, 2011.

<u>BOOKS, BOOK CHAPTERS, MONOGRAPHS</u>

Crain RL, **Weisman CS**. *Discrimination, Personality and Achievement: A Survey of Northern Blacks*. New York: Academic Press, 1972.
aLevine DM, **Weisman CS**. Career Patterns of Unaccepted Applicants to Medical School: A Case Study of
Levine DM, **Weisman CS**. Career Patterns of Unaccepted Applicants to Medical School: A Case Study of Reactions to a Blocked Career Pathway. DHEW Publication No. (HRA) 75-29, October 1974.

Amick BC, **Weisman CS**, Smith MJ.  The implications of technological change for worker health: the role of the job redesign model in public health.  In HW Hendrick and O Brown Jr. (Editors), *Human Factors in Organizational Design and Management*, North-Holland: Elsevier Science Publishers, 1984.

Longo DR, Chase GA, Ahlgren LA, Roberts JS, **Weisman CS**.  Compliance of multihospital systems with standards of the Joint Commission on Accreditation of Hospitals.  In Bradford H. Gray (Editor), *For-Profit Enterprise in Health Care*, Washington, D.C.:  National Academy of Sciences, 1986.

**Weisman CS**. Nursing practice models: research on patient outcomes. Pp. 112-120 in *Patient Outcomes Research: Examining the Effectiveness of Nursing Practice*, DHHS, NIH Publication No. 93-3411, 1992.

**Weisman CS**, Cassard SD. Health consequences of exclusion or underrepresentation of women in clinical studies. Pp. 35-40 in AC Mastrioianni, R Faden, and D Federman (Editors), *Women and Health Research: Ethical and Legal Issues of Including Women in Clinical Studies, Vol. 2*, Washington, D.C.: National Academy Press, 1994.

Case 25-2575  Document: 34-2  Page: 272  Date Filed: 12/12/2025
Case 2:17-cv-04540-WB  Document 90-15  Filed 12/17/19  Page 12 of 37

14

Gordon DL, **Weisman CS**, Cassard S, Wong R.  Reorganizing hospital nursing resources: a self-managed unit model. In Kathleen Kelly (Editor), *Health Care Work Redesign*, Series on Nursing Administration Vol. VII, Thousand Oaks, CA: Sage Publications, 1995.

**Weisman CS**. Women's use of health care. Chapter 1 in Marilyn M. Falik and Karen Scott Collins (Editors), *Women's Health: The Commonwealth Fund Survey*. Baltimore, MD: Johns Hopkins University Press, 1996.

**Weisman CS**, Curbow B, Khoury AJ. Case Studies of Women's Health Centers: Innovations and Issues in Women-Centered Care. The Commonwealth Fund, New York, N.Y., 1997.

**Weisman CS**. *Women's Health Care: Activist Traditions and Institutional Change*, Baltimore MD: Johns Hopkins University Press, 1998.

**Weisman CS**, Poole V. Health care services and systems for women of reproductive age.  Pp. 25-40 in H. Grason, J. Hutchins, and G. Silver (Editors), *Charting a Course for the Future of Women's and Perinatal Health, Volume II: Reviews of Key Issues*, Baltimore: Women's and Children's Health Policy Center, Johns Hopkins School of Public Health, 1999.

**Weisman CS**. Women's health in perspective.  Chapter 1 in Vicki L. Seltzer and Warren H. Pearse (Editors), *Women's Primary Care: Office Practice and Procedures*, 2nd edition, New York: Mc-Graw-Hill, 2000.

**Weisman CS**.  Breast cancer policymaking. PP. 213-243 in A.S. Kasper and S.J. Ferguson (Editors), *Breast Cancer: The Social Construction of an Illness*, New York: St. Martin's Press, 2000.

Hillemeier MM, **Weisman CS**, Chase GA, Romer M.  Preterm and low birthweight outcomes among rural women: the importance of preconception physical and mental health status. In Coward RT, Davis LA, Gold CH, et al. (Editors), *Rural Women's Health: Mental, Behavioral, and Physical Issues.*  New York: Springer Publishing, 2006.

<u>JOURNAL ARTICLES</u>

Levine DM, **Weisman CS**, Seidel HM.  Career decisions of unaccepted applicants to medical school. *Journal of the American Medical Association*, 232, June 15, 1975.

**Weisman CS**, Morlock LL, Sack DG, Levine DM.  Sex differences in response to a blocked career pathway among unaccepted medical school applicants. *Sociology of Work and Occupations* 3(2):187-208, 1976.

**Weisman CS**, Levine DM, Sack DG, Morlock LL.  Unaccepted applicants to medical school as a health resource. *Medical Care* 14(6):512-525, 1976.

**Weisman CS**, Levine DM, Steinwachs DM, Chase GA. Male and female physician career patterns: specialty choices and graduate training." *Journal of Medical Education* 55(Oct.):813-825, 1980.

**Weisman CS**, Alexander CS, Chase GA.  Job satisfaction among hospital nurses: a longitudinal study. *Health Services Research* 15(4):341-364, 1980.

Alexander CS, **Weisman CS**, Chase GA. Evaluating primary nursing in hospitals: examination of effects on nursing staff. *Medical Care* 19(1):80-89, 1981.

**Weisman CS**, Alexander CS, Chase GA.  Determinants of hospital staff nurse turnover. *Medical Care* 19(4):431-443, 1981.

Case: 25-2575　Document: 34-2　Page: 273　Date Filed: 12/12/2025
Case 2:15-cv-04540-WB　Document 903-9　Filed 12/17/19　Page 28 of 37

15

**Weisman CS**, Dear MR, Alexander CS, Chase GA. Employment patterns among newly hired hospital staff nurses: comparison of nursing graduates and experienced nurses." *Nursing Research* 30(3):188-191, 1981.

**Weisman CS**, Alexander CS, Morlock LL. Hospital decision making: what is nursing's role?" *Journal of Nursing Administration* 11(9):31-36, 1981.

Vaughn WP, Waalkes TP, Lundhal S, Shapiro S, White P, Celentano D, **Weisman CS**, Hughes R, Elwood T. The Frederick Cancer Project. *Maryland State Medical Journal*, March 1982.

Alexander CS, **Weisman CS**, Chase GA.  Determinants of staff nurses' perceptions of autonomy within different clinical contexts. *Nursing Research* 31(1):48-52, 1982.

**Weisman CS**. Recruit From within: hospital nurse retention in the 1980s. *Journal of Nursing Administration* 12(5):24-31, 1982.

Steinwachs DM, Levine DM, Elzinga DJ, Salkever DS, Parker RD, **Weisman CS**.  Changing patterns of graduate medical education: analyzing recent trends and projecting their impact. *New England Journal of Medicine* 306(1):10-14, 1982.

Dear MR, **Weisman CS**, Alexander CS, Chase GA.  The effect of the intensive care nursing role on job satisfaction and turnover. *Heart and Lung: The Journal of Critical Care* 11(6):560-565, 1982.

Dear MR, Celentano DD, **Weisman CS**, Keen MF. Evaluating a hospital nursing internship. *Journal of Nursing Administration* 12(11):16-20, 1982.

Celentano DD, Shapiro S, **Weisman CS**.  Cancer preventive screening behavior among elderly women. *Preventive Medicine* 11(4):454-463, 1982.

Baker TD, **Weisman CS**, Piwoz E.  U.S. physicians in international health: report of a current survey. *Journal of the American Medical Association* 251(4):502-504, 1984.

Dear MR, **Weisman CS**. ICU nurses aren't so stressed after all: what can we learn from them?  *Cardiothoracic Nurse*, January 1984.

**Weisman CS**.  Gender composition of medical schools and specialty choices of graduates. *Journal of Medical Education* 59(4):347-349, 1984.

Baker TD, **Weisman CS**, Piwoz E. United States health professionals in international health work. *American Journal of Public Health* 74(5):438-441, 1984.

Dear MR, **Weisman CS**, O'Keefe S. Evaluation of a contract model for professional nursing practice. *Health Care Management Review* 10(2):65-77, 1985.

**Weisman CS**, Teitelbaum MA. Physician gender and the physician-patient relationship: recent evidence and relevant questions. *Social Science and Medicine* 20(11):1119-1127, 1985.

**Weisman CS**, Nathanson CA. Professional satisfaction and client outcomes: a comparative organizational analysis. *Medical Care* 23(10):1179-1192, 1985.

**Weisman CS**, Nathanson CA, Teitelbaum MA, Chase GA, King TM. Abortion attitudes and performance among male and female obstetrician-gynecologists. *Family Planning Perspectives* 18(2):67-73, 1986.

Case 25-2575   Document: 34-2   Page: 274   Date Filed: 12/12/2025
Case 2:15-cv-04540-WB   Document 90-15   Filed 12/17/19   Page 29 of 37

16

**Weisman CS**, Teitelbaum MA, Nathanson CA, Chase GA, King TM, Levine DM. Sex differences in the practice patterns of recently trained obstetrician-gynecologists. *Obstetrics and Gynecology* 67(6):776-781, 1986.

**Weisman CS**, Celentano DD, Hill MN, Teitelbaum MA.  Pap testing: opinion and practice among young obstetrician-gynecologists. *Preventive Medicine* 15(4):342-351, 1986.

**Weisman CS**, Nathanson CA, Teitelbaum MA, Chase GA, King TM.  Delivery of fertility-Control services by male and female obstetrician-gynecologists. *American Journal of Obstetrics and Gynecology* 156:464-469, 1987.

**Weisman CS**, Nathanson CA. Professional satisfaction and client outcomes: reply to Hays and White. *Medical Care* 25(3):263-264, 1987.

**Weisman CS**. Communication between women and their health care providers: research findings and unanswered questions. *Public Health Reports* Special Supplement, July-August: 147-151, l987.

Celentano DD, Klassen AC, **Weisman CS**. The role of contraceptive use in cervical cancer: The Maryland Cervical Cancer Case-Control Study. *American Journal of Epidemiology* 126:592-604, 1987.

**Weisman CS**, Celentano DD, Klassen AC, Rosenshein NB. Utilization of obstetrician-gynecologists and prevention of cervical cancer. *Obstetrics and Gynecology* 70:373-377, 1987.

**Weisman CS**, Teitelbaum MA. The work-family role system and physician productivity. *Journal of Health and Social Behavior* 28(3):247-257, l987.

**Weisman CS**, Teitelbaum MA, Morlock LL.  Malpractice claims experience associated with fertility-control services among young obstetrician-gynecologists. *Medical Care* 26:298-306, l988.

Celentano DD, Klassen AC, **Weisman CS**, Rosenshein NB. Cervical cancer screening practices among older women: results from the Maryland Cervical Cancer Case-Control Study. *Journal of Clinical Epidemiology* 41:531-541, 1988.

Teitelbaum MA, **Weisman CS**, Klassen AC, Celentano DD. Pap testing intervals: specialty differences in physicians' recommendations in relation to women's Pap testing behavior. *Medical Care* 26(6):607-618, 1988.

**Weisman CS**, Morlock LL, Teitelbaum MA, Klassen AC, Celentano DD. Practice changes in response to the malpractice litigation climate: results of a Maryland physician survey. *Medical Care* 27(1):16-24, 1989.

**Weisman CS**, Celentano DD, Teitelbaum MA, Klassen AC.  Cancer screening services for the elderly. *Public Health Reports* 104(3):209-214, 1989.

**Weisman CS**, Teitelbaum MA. Women and health care communication. *Patient Education and Counseling* 13(2):183-199, 1989.

Celentano DD, Klassen AC, **Weisman CS**, and Rosenshein NB.  Duration of relative protection of screening for cervical cancer. *Preventive Medicine* 18:411-422, l989.

**Weisman CS**, Nathanson CA, Ensminger M, Teitelbaum MA, Robinson JC, and Plichta S.  AIDS knowledge, perceived risk, and prevention in adolescent clients of a family planning clinic. *Family Planning Perspectives* 21(5):213-217, 1989.

Case: 25-2575    Document: 34-2    Page: 275    Date Filed: 12/12/2025
Case 2:17-cv-04540-WB    Document 90-15    Filed 12/17/19    Page 30 of 37

17

Hill MN, **Weisman CS**. Physicians' perceptions of consensus reports. *International Journal of Technology Assessment in Health Care* 7(1):30-41, 1991.

Somerfield MR, **Weisman CS**, Ury W, Chase GA, and Folstein MF. Physician practices in the diagnosis of dementing disorders. *Journal of the American Geriatrics Society* 39:172-175, 1991.

**Weisman CS**, Plichta S, Nathanson CA, Chase GA, Ensminger ME, and Robinson JC. Adolescent women's contraceptive decision making. *Journal of Health and Social Behavior* 32(2):130-144, 1991.

**Weisman CS**, Plichta S, Nathanson CA, Ensminger M, and Robinson JC. Consistency of condom use for disease prevention among adolescent users of oral contraceptives. *Family Planning Perspectives* 23(2):71-74, 1991.

Mussman MG, Zawistowich L, **Weisman CS**, Malitz FE, and Morlock LL. Medical malpractice claims filed by Medicaid and non-Medicaid recipients: implications for access to care. *Journal of the American Medical Association* 265(22):2992-2994, 1991.

Upchurch DM, **Weisman CS**, Shepherd M, Brookmeyer R, Fox R, Celentano DD, Colletta L, and Hook EW. Inter-partner reliability of reporting of recent sexual behaviors. *American Journal of Epidemiology* 134(10):1159-1165, 1991.

Robinson JC, Plichta S, **Weisman CS**, Nathanson CA, and Ensminger M. Dysmenorrhea and use of oral contraceptives in adolescent women attending a family planning clinic. *American Journal of Obstetrics and Gynecology* 166(2):578-583, 1992.

Plichta SB, **Weisman CS**, Nathanson CA, Ensminger ME, and Robinson JC. Partner-specific condom use among adolescent women clients of a family planning clinic. *Journal of Adolescent Health* 13:506-511, 1992.

**Weisman CS**, Gordon DL, Cassard SD, Bergner M, Wong R. The effects of unit self-management on hospital nurses' work process, work satisfaction, and retention. *Medical Care* 31:381-393, 1993.

Klassen AC, Celentano DD, **Weisman CS**. Screening for cervical cancer in the inpatient setting: efficacy of the 1977 legislation in the state of Maryland. *American Journal of Public Health* 83:1316-1320, 1993.

**Weisman CS**, Plichta SB, Tirado DE, Dana KH. Comparison of contraceptive implant adopters and pill users in a family planning clinic in Baltimore. *Family Planning Perspectives* 25:224-226, 1993.

Wong R, Gordon DL, Cassard SD, **Weisman CS**, Bergner M. A cost analysis of a professional practice model for nursing. *Nursing Economics* 11:292-323, 1993.

Cassard SD, **Weisman CS**, Gordon DL, Wong R. The impact of unit-based self-management by nurses on patient outcomes. *Health Services Research* 29:415-433, 1994.

Cohen J, Dannefer EF, Seidel HM, **Weisman CS**, Wexler P, Brown TM, Brieger GH, Margolis S, Ross LR, Kunitz SJ. Medical education change: a detailed study of six medical schools. *Medical Education* 28:350-360, 1994.

Minnick A, **Weisman CS**, Curgian L. The acceptance and growth of MSN/MBA programs. *Journal of Nursing Administration* 24(11):63-68, 1994.

Plichta SB, **Weisman CS**. Spouse or partner abuse, use of health services, and unmet need for medical care in U.S. women. *Journal of Women's Health* 4(1):45-53, 1995.

Case: 25-2575    Document: 34-2    Page: 276    Date Filed: 12/12/2025
Case 2:25-cv-04540-WB    Document 90-15    Filed 12/11/15    Page 31 of 37

18

Zenilman JM, **Weisman CS**, Rompalo AM, Ellish N, Upchurch DM, Hook EW, Celentano D.  Condom use to prevent incident STDs: the validity of self-reported condom use. *Sexually Transmitted Diseases* 22(1):15-21, 1995.

**Weisman CS**, Minnick AF, Dienemann JA, Cassard SD.  Management education for nurses: hospital executives' opinions and hiring practices. *Hospital and Health Services Administration* 40(2):296-308, 1995.

**Weisman CS**, Cassard SD, Plichta SB. Types of physicians used by women for regular health care: implications for services received. *Journal of Women's Health* 4(4):407-416, 1995.

**Weisman CS**, Curbow B, Khoury A.  The National Survey of Women's Health Centers: current models of women-centered Care. *Women's Health Issues* 5(3):103-117, 1995.

**Weisman CS**.  Women's health and managed care: balancing cost, access, and quality--introduction to the proceedings." *Women's Health Issues* 6:1-4, 1996.

**Weisman CS**, Curbow B, Khoury AJ.  Women's health centers and managed care. *Women's Health Issues* 6:1-9, 1996.

Ellish NJ, **Weisman CS**, Celentano D, Zenilman JM.  Reliability of partner reports of sexual history in a heterosexual population at a sexually transmitted diseases clinic.  *Sexually Transmitted Diseases* 23:446-452, 1996.

Cassard SD, **Weisman CS**, Plichta SB, Johnson TL.  Physician gender and women's preventive services. *Journal of Women's Health* 6(2):199-207, 1997.

Khoury AJ, Summers, L, **Weisman CS**. Characteristics of current hospital-sponsored and non-hospital birth centers. *Maternal and Child Health Journal* 1(2):89-99, 1997.

Curbow B, Khoury AJ, **Weisman CS**. Provision of mental health services in women's health centers.  *Women's Health: Research on Gender, Behavior, and Policy* 4(1):71-91, 1998.

Sulmasy DP, Terry PB, **Weisman CS**, Miller DJ, Stallings RY, Vettese MA, Haller KB.  The accuracy of substituted judgments in patients with terminal diagnoses. *Annals of Internal Medicine* 128(8):621-629, 1998.

**Weisman CS**. Changing definitions of women's health: implications for health care and policy. *Maternal and Child Health Journal* 1:179-189, 1998.

**Weisman CS**, Khoury AJ, Cassirer C, Sharpe VA, Morlock LL. The implications of affiliations between Catholic and non-Catholic health care organizations for availability of reproductive health services. *Women's Health Issues* 9(3):121-134, 1999.

Scholle SH, **Weisman CS**, Anderson R, et al.  Women's satisfaction with primary care: a new measurement effort from the PHS National Centers of Excellence in Women's Health. *Women's Health Issues* 10(1):1-9, 2000.

**Weisman CS**. Advocating for gender-specific health care: a historical perspective. *Journal of Gender-Specific Medicine* 3:22-24, 2000.

**Weisman CS**, Rich DE, Rogers J, et al. Gender and patient satisfaction with primary care: tuning in to women in quality measurement. *Journal of Women's Health and Gender-Based Medicine* 9:657-665, 2000.

Case 25-2575  Document: 34-2  Page: 277  Date Filed: 12/12/2025
Case 2:15-cv-04540-WB  Document 90-15  Filed 12/17/18  Page 32 of 37

19

**Weisman CS**. Measuring quality in women's health care: issues and recent developments. *Quality Management in Health Care* 8:14-20, 2000.

**Weisman CS**, Squires GL.  Women's health centers: are the National Centers of Excellence in Women's Health a new model?  *Women's Health Issues* 10:248-255, 2000.

Misra DP, Grason H, **Weisman CS**. An intersection of women's and perinatal health: the role of chronic conditions. *Women's Health Issues* 10:256-267, 2000.

Klassen A, Hall A, Bowie J, **Weisman CS**.  Improving cervical cancer screening in hospital settings.  *Preventive Medicine* 31:538-546, 2000.

**Weisman CS**. The trends in health care delivery for women: challenges for medical education. *Academic Medicine* 75(11):1107-1113, 2000.

Poole, VH, **Weisman CS**. The delivery of primary care services among family planning centers: a response to managed care. *Women's Health Issues* 10(6):317-326, 2000.

Khoury AJ, **Weisman CS**, Jarjoura CM.  Ownership type and community benefits of women's health centers. *Medical Care Research and Review* 58(1):76-99, 2001.

**Weisman CS**, Henderson JT. Managed care and women's health: access, preventive services, and satisfaction. *Women's Health Issues* 11(3):201-215, 2001.

**Weisman CS**, Henderson JT, Schifrin E, Romans M, Clancy CM. Gender and patient satisfaction in managed care plans: analysis of the 1999 HEDIS/CAHPS™ 2.0H Adult Survey. *Women's Health Issues* 11:401-415, 2001.

Anderson RT, Barbara AM, **Weisman CS**, et al. A qualitative analysis of women's satisfaction with primary care from a panel of focus groups in the National Centers of Excellence in Women's Health. *Journal of Women's Health and Gender-Based Medicine* 10:637-647, 2001.

**Weisman CS**, Grason HA, Strobino DS.  Quality management in public and community health: examples from women's health. *Quality Management in Health Care* 10(1):54- 64, 2001.

Henderson JT, **Weisman CS**. Physician gender effects on preventive screening and counseling: an analysis of male and female patients' health care experiences. *Medical Care* 39(12):1281-1292, 2001.

McKinley ED, Thompson JW, Briefer-French J, Wilcox LS, **Weisman CS**, Andrews WC. Performance indicators in women's health: incorporating women's health in the Health Plan Employer Data and Information Set (HEDIS). *Women's Health Issues* 12(1):46-58, 2002.

**Weisman CS**, Maccannon DS, Henderson JT, et al. Contraceptive counseling in managed care: preventing unintended pregnancy in adults. *Women's Health Issues* 12(2):79-95, 2002.

Khoury AJ, **Weisman CS**. Thinking about women's health: the case for gender sensitivity. *Women's Health Issues* 12(2):61-65, 2002 (Commentary).

Henderson JT, **Weisman CS**, Grason H.  Are two doctors better than one?  women's physician use and appropriate care. *Women's Health Issues* 12(3): 138-149, 2002.

Case: 25-2575 Document: 34-2 Page: 278 Date Filed: 12/12/2025
Case 2:17-cv-04540-WB Document 90-15 Filed 12/17/19 Page 33 of 37

20

Johnson TR, **Weisman CS**. In support of shorter hospital stays for selected high-risk obstetric patients. *International Journal of Gynaecology and Obstetrics* 78(2):105-106, 2002 (Commentary)

Anderson RT, **Weisman CS**, Scholle SH, Henderson JT, Oldendick R, Camacho R. Evaluation of the quality of care in the clinical care centers of the National Centers of Excellence in Women's Health. *Women's Health Issues* 12(6):309-326, 2002.

Lantz PM, **Weisman CS**, Itani Z. A sociopolitical analysis of a disease-specific expansion of Medicaid: The Breast and Cervical Cancer Prevention and Treatment Act of 2000. *Women's Health Issues* 13(3):79-92, 2003.

Hayes SN, **Weisman CS**, Clark A. The Jacobs Institute of Women's Health report on the prevention of heart disease in women: findings and recommendations from the 'Women and Heart Disease: Putting Prevention into Primary Care' Conference. *Women's Health Issues* 13(4):115-121, 2003.

Scholle SH, **Weisman CS**, Anderson RT, Camacho F. The development and validation of the Primary Care Satisfaction Survey for Women (PCSSW). *Women's Health Issues* 14(2):35-50, 2004.

Henderson JT, Scholle SH, **Weisman CS**, Anderson RT. The role of physician gender in the evaluation of the National Centers of Excellence in Women's Health: test of an alternate hypothesis. *Women's Health Issues* 14(4):130-139, 2004.

Dziak K, Anderson R, Sevick MA, **Weisman CS**, Levine DW, Scholle SH. Variations among Institutional Review Board reviews in a multi-site health services research study. *Health Services Research* 40 (1):279-290, 2005.

Dalton VK, Jacobson PD, Berson-Grand J, **Weisman CS**. Threats to family planning services in Michigan: organizational responses to economic and political challenges. *Women's Health Issues* 15(3):117-125, 2005.

Jacobson PD, Dalton VK, Berson-Grand J, **Weisman CS**. Survival strategies for Michigan's health care safety net providers. *Health Services Research* 40(3): 923-940, 2005.

Henderson JT, **Weisman CS**, Women's patterns of provider use across the lifespan and satisfaction with primary care coordination and comprehensiveness. *Medical Care* 43(8):826-833, 2005.

Chuang CH, Chase GA, Bensyl DM, **Weisman CS**. Contraceptive use by diabetic and obese women. *Women's Health Issues* 15(4):167-173, 2005.

Hillemeier MM, **Weisman CS**, Baker K, Primavera K. Mental health services provided through the National Centers of Excellence in Women's Health: do they reach rural women? *Women's Health Issues* 15(5):224-229, 2005.

Hollenbeak CS, **Weisman CS**, Rossi M, Ettinger SM. Gender disparities in percutaneous coronary interventions for acute myocardial infarction in Pennsylvania. *Medical Care* 44(1):24-30, 2006.

Dalton VK, Harris L, **Weisman CS**, Guire K, Castleman L, Lebovic D. Patient preferences, satisfaction, and resource use in office evacuation of early pregnancy failure. *Obstetrics & Gynecology* 108(1):103-110, 2006.

**Weisman CS**, Hillemeier MM, Chase GA, Dyer AM, Baker SA, Feinberg M, Downs DS, Parrott RL, Cecil HK, Botti JJ, MacNeill C, Chuang CH, Yost B. Preconceptional health: risks of adverse pregnancy outcomes by reproductive life stage in the Central Pennsylvania Women's Health Study (CePAWHS). *Women's Health Issues* 16(4):216-224, 2006.

Case: 25-2575    Document: 34-2    Page: 279    Date Filed: 12/12/2025
Case 2:15-cv-04540-WB    Document 9035    Filed 12/17/19    Page 34 of 37

21

Hillemeier MM, **Weisman CS**, Chase GA, Dyer AM.  Individual and community predictors of preterm birth and low birthweight along the rural-urban continuum in central Pennsylvania. *Journal of Rural Health* 23(1):42-48, 2007.

Anderson RT, **Weisman CS,** Camacho F, Scholle SH, Henderson JT, Farmer DF.  Women's satisfaction with their on-going primary health care services: A consideration of visit-specific and period assessments. *Health Services Research* 42(2):663-681, 2007.

Miller K, Yost B, Flaherty S, Hillemeier MM, Chase GA, **Weisman CS**, Dyer AM. Health status, health conditions, and health behaviors among Amish women: results from the Central Pennsylvania Women's Health Study (CePAWHS). *Women's Health Issues* 17(3):162-171, 2007.

Chou AF, Scholle SH, **Weisman CS**, Bierman A, Correa-de-Araujo R, Mosca L. Gender disparities in the quality of cardiovascular disease care in private managed care plans. *Women's Health Issues* 17(3):120-130, 2007.

Chou  AF, Wong L, **Weisman CS**, Chan S, Bierman A, Correa-de-Araujo R, Scholle SH.  Gender disparities in cardiovascular disease care among commercial and Medicare managed care plans. *Women's Health Issues* 17(3):139-149, 2007.

**Weisman CS,** Grimley DM, Annang L, Hillemeier MM, Chase GA, Dyer AM. Vaginal douching and intimate partner violence: is there an association?  *Women's Health Issues* 17:310-315, 2007.

Bean-Mayberry B, Yano E, Bayliss N, Navratil J, **Weisman CS**, Scholle SH. Federally funded comprehensive women's health centers: leading innovation in women's health care delivery. *Journal of Women's Health* 16(9):1281-1290, 2007.

Hillemeier MM, **Weisman CS**, Chase GA, Dyer, AM, Shaffer, ML.  Women's preconceptional health and use of health services: implications for preconception care.  *Health Services Research* 43(1: Part I):54-75, 2008. PMCID: PMC2323151

**Weisman CS**, Hillemeier MM, Chase GA, Misra DP. Chuang CH, Parrott R, Dyer, AM. Women's perceived control of their birth outcomes in the Central Pennsylvania Women's Health Study (CePAWHS): implications for the use of preconception care.  *Women's Health Issues* 18(1):17-25, 2008. PMCID: PMC2696461

Velott DL, Baker SA, Hillemeier MM, **Weisman CS**. Participant recruitment to a randomized trial of a community-based behavioral intervention for pre- and interconceptional women: findings from the Central Pennsylvania Women's Health Study. *Women's Health Issues* 18(3):217-24, 2008.

Chuang CH, Green MJ, Chase GA, Dyer AM, Ural S, **Weisman CS**. Perceived risk of preterm and low birthweight birth in the Central Pennsylvania Women's Health Study.  *American Journal of Obstetrics and Gynecology* 199:64.e1-64.e7, 2008. PMCID: PMC2696487

Hillemeier MM, **Weisman CS**, Chase GA, Dyer AM. Mental health status among rural women of reproductive age: findings from the Central Pennsylvania Women's Health Study (CePAWHS). *American Journal of Public Health* 98(7):1271-9, 2008. PMCID: PMC2424076

Hillemeier MM, Downs DS, Feinberg ME, **Weisman CS**, Chuang CH, Parrott R, Velott D, Francis LA, Baker SA, Dyer AM, Chinchilli VM. Improving women's preconceptional health: findings from a randomized trial of the *Strong Healthy Women* Intervention in the Central Pennsylvania Women's Health Study.  *Women's Health Issues* 18S: S87-S96, 2008. PMCID: PMC2744213

Case 25-2575  Document: 34-2  Page: 280  Date Filed: 12/12/2025
Case 2:17-cv-04540-WB  Document 90-16  Filed 12/17/19  Page 35 of 37

22

Downs DS, Feinberg M, Hillemeier MM, **Weisman CS**, Chase GA, Chuang CH, Parrott R, Francis LA. Design of the Central Pennsylvania Women's Health Study (CePAWHS) *Strong Healthy Women* intervention: improving preconceptional health. *Maternal and Child Health Journal* 13(1):18-28, 2009. PMCID: PMC2696480

Chuang CH, **Weisman CS**, Hillemeier MM, Camacho FT, Dyer AM. Predicting pregnancy from pregnancy intentions: prospective findings from the Central Pennsylvania Women's Health Study (CePAWHS). *Women's Health Issues* 19:159-166, 2009. PMCID: PMC2758401

Parrott R, Volkman JE, Hillemeier MM, **Weisman CS**, Chase GA, Dyer AM. Pregnancy intentions and folic acid supplementation exemplars: findings from the Central Pennsylvania Women's Health Study. *Journal of Health Communication* 14(4):366-383, 2009.

**Weisman CS**, Misra DP, Hillemeier MM, Downs DS, Chuang CH, Camacho FT, Dyer AM. Preconception predictors of birth outcomes: prospective findings from the Central Pennsylvania Women's Health Study. *Maternal and Child Health Journal* 15:829-835, 2011 (Published online 2009). PMCID: PMC2939188

Chuang CH, Velott DL, **Weisman CS**. Exploring knowledge and attitudes related to pregnancy and preconception health in women with chronic medical conditions. *Maternal and Child Health Journal* 14(5):713-719, 2010. PMCID: PMC2924436

Chuang CH, **Weisman CS**, Hillemeier MM, Schwarz EB, Camacho FT, Dyer AM.  Pregnancy intention and health behaviors: results from the Central Pennsylvania Women's Health Study (CePAWHS) cohort. *Maternal and Child Health Journal* 14(4): 501-510, 2010. PMCID: PMC2896424

Evans L, **Weisman CS**. Folic acid supplementation in younger and older non-pregnant women of reproductive age:  findings from the Central Pennsylvania Women's Health Study (CePAWHS). *Women's Health Issues* 20(1):50-57, 2010.

**Weisman CS**, Hillemeier MM, Downs DS, Chuang CH, Dyer AM.  Preconception predictors of weight gain during pregnancy: prospective findings from the Central Pennsylvania Women's Health Study.  *Women's Health Issues* 20:126-132, 2010. PMCID: PMC2908005

**Weisman CS**, Chuang CH, Scholle SH. Still piecing it together: women's primary care. (Commentary) *Women's Health Issues* 20:228-230, 2010.

Carter RLM, Downs DS, Bascom R, Dyer AM, **Weisman CS**. The moderating influence of asthma diagnosis on biobehavioral health characteristics of women of reproductive age." *Maternal and Child Health Journal* 16(2):448-455, 2012. doi 10.1007/s10995-011-0749-1.

McCall-Hosenfeld JS, **Weisman CS**. Receipt of preventive counseling among reproductive-age women in rural and urban communities. *Rural and Remote Health* 11:1617, 2011. PMCID: PMC3638769

Chuang CH, Hillemeier MM, Dyer AM, **Weisman CS**. The relationship between pregnancy intention and preconception health behaviors.  *Preventive Medicine* 53:85-88, 2011.  PMCID: PMC3143280

Hillemeier MM, **Weisman CS**, Chuang C, Downs DS, McCall-Hosenfeld J, Camacho F. Transition to overweight or obesity among women of reproductive age. *Journal of Women's Health*, 20(5):703-710, 2011. PMCID: PMC3096512

Case 25-2575, Document 34-2, Page 281    Date Filed 12/12/2025
Case 2:17-cv-04540-WB    Document 90-15    Filed 12/17/19    Page 36 of 37

23

**Weisman CS**, Hillemeier MM, Downs DS, Feinberg ME, Chuang CH, Botti JJ, Dyer AM. Improving women's preconceptional health: long-term effects of the *Strong Healthy Women* behavior change intervention in the Central Pennsylvania Women's Health Study. *Women's Health Issues* 21(4):265-271, 2011. PMCID: PMC3707004

Domino SE, Bodurtha J, Nagel JD, **BIRCWH Program Leadership**. Interdisciplinary research career development: Building Interdisciplinary Research Careers in Women's Health Program best practices. *Journal of Women's Health* 20:1587-1601, 2011. PMCID: PMC3216063

Camacho FT, **Weisman CS**, Anderson RT, Hillemeier MM, Schaefer EW, Paul IM. Development and validation of a scale measuring satisfaction with maternal and newborn health care following childbirth. *Maternal and Child Health Journal* 16:997-1007, 2012.

Paul IM, Beiler JS, Schaefer EW, Hollenbeak CS, Alleman N, Sturgis SA, Yu SM, Camacho FT, **Weisman CS**. A randomized trial of single home nursing visits vs. office-based care after nursery/maternity discharge. *Archives of Pediatrics and Adolescent Medicine* 166(3):263-270, 2012.

McCall-Hosenfeld JS, **Weisman CS**, Camacho F, Hillemeier MM, Chuang CH. Multi-level analysis of the determinants of receipt of clinical preventive services among reproductive-age women. *Women's Health Issues* 22(3):e243-e251, 2012. PMCID: PMC3345071

Kraschnewski JL, McCall-Hosenfeld JS, **Weisman CS**. Prospective association between body mass index and receipt of preventive services: results from the Central Pennsylvania Women's Health Study (CePAWHS). *Preventive Medicine*, 54:302-305, 2012. PMCID: PMC3345091

Chuang CH, Hwang SW, McCall-Hosenfeld JS, Rosenwasser L, Hillemeier MM, **Weisman CS**. Primary care physicians' perceptions of barriers to preventive reproductive health care in rural communities. *Perspectives on Sexual and Reproductive Health* 44(2):78-83, 2012. PMCID: PMC3706998

Guise JM, Nagel JD, Regensteiner JG, and the **Building Interdisciplinary Research Careers in Women's Health Directors**. Best practices and pearls in interdisciplinary mentoring from Building Interdisciplinary Research Careers in Women's Health directors. *Journal of Women's Health* 21(11):1114-1127, 2012. PMCID: PMC3491631

Chuang CH, Cattoi AL, McCall-Hosenfeld JS, Camacho F, Dyer AM, **Weisman CS**. Longitudinal association of intimate partner violence and depressive symptoms. *Mental Health in Family Medicine* 9(2):107-114, 2012. PMCID: PMC3513703

Paul I, Downs D, Schaefer E, Beiler, J, **Weisman, CS**. Postpartum anxiety and maternal-infant health outcomes. *Pediatrics* 131(4):e1218-e1224, 2013.

Kraschnewski JL, Chuang CH, Downs DS, **Weisman CS**, McCamant EL, Baptiste-Roberts K, Zhu J, Kjerulff KH. Association of prenatal physical activity and gestational weight gain: results from the First Baby Study. *Women's Health Issues* 23(4):e233-e238, 2013. PMCID: PMC3742311

Sonnino RE, Reznik V, Thorndyke LA, Chatterjee A, Rios-Bedoya CF, Mylona E, Nelson KG, **Weisman CS**, Morahan PS, Wadland WC. Evolution of faculty affairs and faculty development offices in U.S. medical schools: a 10-year follow-up survey. *Academic Medicine* 88(9):1368-1375, 2013.

McCall-Hosenfeld JS, Chuang CH, **Weisman CS.** Prospective association of intimate partner violence (IPV) with receipt of clinical preventive services in women of reproductive age. *Women's Health Issues* 23(2):e109-e116, 2013. PMCID: PMC3770472

Kjerulff KH, Zhu J, **Weisman CS**, Ananth CV. First birth cesarean section and subsequent fertility:  A population-based study in the USA, 2000-2008. *Human Reproduction* 28(12):3349-3357, 2013.  PMCID: PMC3829579

Rosenwasser LA, McCall-Hosenfeld JS, **Weisman CS**, Hillemeier MM, Perry AN, Chuang CH.  Barriers to colorectal cancer screening among women in rural central Pennsylvania: Primary care physicians' perspective. *Rural and Remote Health* 13:2504, 2013.  PMCID: PMC4050077

Colon-Gonzalez MC, McCall-Hosenfeld JS, **Weisman CS**, Hillemeier MM, Perry AN, Chuang CH. "Someone's got to do it" – Primary care providers (PCPs) describe caring for rural women with mental health problems. *Mental Health in Family Medicine* 10:191-202, 2013.

McCall-Hosenfeld JS, **Weisman CS**, Perry AN, Hillemeier MM, Chuang CH.  "I just keep my antennae out" -- how rural primary care physicians respond to intimate partner violence.  *Journal of Interpersonal Violence* 29(14):2670-2694, 2014.  PMCID: PMC4121375

**Weisman CS**, Chuang CH.  Making the most of the Affordable Care Act's contraceptive coverage mandate for privately insured women (Commentary). *Women's Health Issues* 24(5):465-468, 2014.

**Weisman CS**, Lehman EB, Legro RS, Velott DL, Chuang CH. How do pregnancy intentions affect contraceptive choices when cost is not a factor? A study of privately insured women. *Contraception* 92(5):501-507, 2015.

Chuang CH, Velott DL, **Weisman CS**, Sciamanna CN, Legro RS, Chinchilli VM, Moos M-K, Francis EB, Confer LN, Lehman EB, Armitage CJ.  Reducing unintended pregnancies through web-based reproductive life planning and contraceptive action planning among privately insured women: Study protocol for the MyNewOptions randomized controlled trial.  *Women's Health Issues*, 25(6): 641-648, 2015.

Chuang CH, Mitchell JL, Velott DL, Legro RS, Lehman EB, Confer LN, **Weisman CS**.  Women's awareness of their contraceptive benefits after the Patient Protection and Affordable Care Act.  *American Journal of Public Health* 105(S5):S713-S715, 2015. PMCID: PMC4627528

Sekhar DL, Murray-Kolb LE, Kunselman AR, **Weisman CS,** Paul IM.  Differences in risk factors for anemia between adolescent and adult women.  *Journal of Women's Health* 25(5):505-513, 2016. PMCID: PMC4876539

Sekhar DL, Murray-Kolb LE, Kunselman AR, **Weisman CS,** Paul IM. Association between menarche and iron deficiency in non-anemic young women.  *PLoS ONE* 12(5):e0177183, 2017.  PMCID: PMC5423639

Snyder, AH, **Weisman CS**, Liu G, Leslie D, Chuang CH. The impact of the Affordable Care Act on contraceptive use and costs among privately insured women.  *Women's Health Issues* 28(3):219-223, 2018.

Hamidi OP, Deimling T, Lehman E, **Weisman CS**, Chuang CH. High Self-efficacy is associated with prescription contraception use.  *Women's Health Issues* 28(6):509-513, 2018.

Last updated: 10/2018

# EXHIBIT N

Women's Health Issues 28-3 (2018) 219–223







www.whijournal.com

Policy Matters

# The Impact of the Affordable Care Act on Contraceptive Use and Costs among Privately Insured Women

Ashley H. Snyder, MD, MSc [a,*], Carol S. Weisman, PhD [b,c], Guodong Liu, PhD [b], Douglas Leslie, PhD [b], Cynthia H. Chuang, MD, MSc [a,b]

[a] Division of General Internal Medicine, Penn State College of Medicine, Hershey, Pennsylvania
[b] Department of Public Health Sciences, Penn State College of Medicine, Hershey, Pennsylvania
[c] Department of Obstetrics and Gynecology, Penn State College of Medicine, Hershey, Pennsylvania

Article history: Received 20 September 2017; Received in revised form 19 January 2018; Accepted 22 January 2018

A B S T R A C T

*Objectives:* The Affordable Care Act (ACA) contraceptive coverage mandate issued in August 2012 requires most private health insurance plans to cover all U.S. Food and Drug Administration-approved contraceptive methods without cost sharing. We evaluate the impact of this policy on out-of-pocket costs and use of long-acting reversible contraceptives (LARCs) and other prescription methods through 2014.
*Methods:* Data from Truven Health MarketScan were used to examine out-of-pocket costs and contraceptive use patterns for all reversible prescription contraceptives before and after the implementation of the contraceptive mandate for privately insured women ages 13 to 45. Costs were estimated by combining copayment, coinsurance, and deductible payments for both contraception and insertion fees for LARCs. Contraceptive use rates were examined and multivariate logistic regression analysis of LARC insertions before and after the ACA was conducted.
*Results:* Out-of-pocket costs for all reversible contraceptives, including LARCs, decreased sharply after the ACA contraceptive mandate. The greatest proportion of women in each year was oral contraceptive users (24.3%–26.1%). Rates of new LARC insertions increased significantly after the ACA, when controlling for cohort year, age group, geographic region, and rural versus urban setting (adjusted odds ratio, 1.03; 95% confidence interval, 1.02–1.04).
*Conclusions:* Our study adds to the current literature with the inclusion of 2014 data and confirms previous findings of a post-ACA decrease in out-of-pocket contraceptive costs. In addition, there was a small but statistically significant increase in LARC insertions after the ACA. This finding indicates the importance of reduced cost sharing for increasing use of the most effective contraceptives.

© 2018 Jacobs Institute of Women's Health. Published by Elsevier Inc.

Long-acting reversible contraceptives (LARCs), which include the intrauterine device (IUD) and contraceptive implant, are highly effective forms of prescription contraception. LARCs have become more affordable to insured women as a result of the contraceptive coverage mandate of the Affordable Care Act (ACA), which took effect in August 2012. The mandate requires most private health insurance plans to cover all U.S. Food and Drug Administration-approved contraceptive methods without cost-sharing (Henry J. Kaiser Family Foundation, 2015; U.S. Department of Health and Human Services, 2016). Before the

ACA, the greater upfront out-of-pocket costs of LARCs likely discouraged women from choosing them over less effective prescription birth control methods with lower upfront costs (Chuang et al., 2015). Nevertheless, LARC use increased from 2.4% of all contraceptive users in 2002 to 14.3% in 2014, according to the National Survey of Family Growth (Daniels, Daugherty, Jones, & Mosher, 2015; Guttmacher Institute, 2014; Kavanaugh & Jerman, 2018; Xu, Macaluso, Ouyang, Kulczycki, & Grosse, 2012).

Several studies have examined the effect of the ACA contraceptive coverage mandate on out-of-pocket costs for contraception (Bearak, Finer, Jerman, & Kavanaugh, 2016; Becker & Polsky, 2015; Finer, Sonfield, & Jones, 2014; Sonfield, Tapales, Jones, & Finer, 2015), and all show decreasing out-of-pocket costs to women after 2012. Other studies have examined both out-of-pocket costs and types of contraception women use after

* Correspondence to: Ashley H. Snyder, MD, MSc, 500 University Drive, HO34; Division of General Internal Medicine; Hershey, PA 17033, USA. Phone: (717) 531-8161.

E-mail address: asnyder6@pennstatehealth.psu.edu (A.H. Snyder).

1049-3867/$ – see front matter © 2018 Jacobs Institute of Women's Health. Published by Elsevier Inc.
https://doi.org/10.1016/j.whi.2018.01.005

*A.H. Snyder et al / Women's Health Issues 28-3 (2018) 219–223*

the ACA. Using claims data from a regional health plan, Carlin, Fertig, and Dowd (2016) found that reduced cost sharing was associated with increased use of prescription contraceptives, including LARCs, among Midwestern women. Using a national health claims database, Law et al. (2016) found a steep decline in out-of-pocket costs for LARCs after the ACA contraceptive provision and an increase in IUD claims from 1.2% in 2011, to 1.3% in 2012, to 1.6% in 2013. Pace, Dusetzina, and Keating (2016) found that the proportion of claims without cost-sharing for IUDs and implants increased over time but found no significant increase in LARC uptake post-ACA implementation as of 2013. Using survey data, Bearak and Jones (2017) observed no changes in patterns of contraceptive use between two time points: fall of 2012 (pre-ACA) and spring of 2015 (post-ACA).

In this study, we examine the out-of-pocket costs for prescription contraception and contraceptive use patterns between 2006 and 2014 using a large national database of health claims for privately insured women. This is the first study, to our knowledge, with post-ACA claims data through 2014. We hypothesize that the post-ACA out-of-pocket costs for prescription contraception will be decreased and that the use of LARCs will increase.

## Materials and Methods

### Data Source and Inclusion Criteria

Data are from the Truven Health Analytics MarketScan database, which consists of reimbursed health care claims for employees, retirees, and their dependents from more than 250 employers and health plans from all 50 states and the District of Columbia. Individuals included in the database are covered under commercial (private) insurance plans. This large, national database includes an annual population of more than 50 million people and captures administrative claims with data from inpatient visits, outpatient visits, and pharmacy claims deidentified at the patient level. This study was approved by the Penn State College of Medicine Institutional Review Board.

We conducted a retrospective cohort analysis to examine claims and out-of-pocket costs for prescription contraceptive methods used by women before and after implementation of the ACA contraceptive mandate in August 2012. We consider 2013 as the first post-ACA year because it is the first benefits year in which contraceptive coverage without cost-sharing would have been implemented. Study cohorts were created for each calendar year between 2006 and 2014 (the most recent year for which data are available) that included women ages 13 to 45 who had continuous medical and pharmacy coverage during that year. We were unable to identify whether women belonged to employer groups that were exempt from the contraceptive mandate.

### Measures of Contraceptive Use

Contraceptive claims were identified using Healthcare Common Procedure Coding System (HCPCS), *National Classification of Diseases*, 9th edition (ICD-9), National Drug Code, and Current Procedural Terminology (CPT)-4 codes. IUD insertions were identified using ICD-9 codes V25.11 and 69.7, CPT-4 code 58300, or HCPCS codes J7300, J7301, J7302, S4981, and S4989. Implant insertions were identified using ICD-9 code V25.5, CPT-4 code 11981, and HCPCS codes J7306 and J7307. Because the CPT-4 code for implant insertion is not contraceptive specific, the CPT-4 code was combined with the

contraceptive-specific ICD-9 and HCPCS codes to ensure only the capture of contraceptive implant insertions. The LARC insertion rate was defined as the percent of women in each cohort year who had a LARC insertion claim. The LARC insertion rate does not represent the total proportion of contraceptors using LARC methods during that year, because some LARC users will have had their LARC inserted in previous years. The LARC insertion rate is not comparable with the LARC use rate reported based on surveys such as the National Survey of Family Growth, which include both insured and uninsured women and self-reported contraceptive use.

For non-LARC methods, pharmacy claims were searched for oral contraceptive pills, patches, injection, and the contraceptive ring. Injections were additionally identified using procedure codes. Women with pharmacy claims for more than one type of non-LARC method in a calendar year were coded as using the method that was in use for the longest period of time in that year. Use rates of non-LARC methods were defined as the percent of women using each of the contraceptive methods during each cohort year. Nonprescription contraceptive methods could not be accounted for because they do not generate claims.

### Measures of Contraceptive Costs

Individual out-of-pocket costs for each type of contraception were estimated by combining copayment, coinsurance, and deductible payments for both contraception and insertion fees (in the case of LARCs). Costs for LARCs are reported as out-of-pocket cost for insertion (including device and insertion fees). Oral contraceptives, patches, and rings are reported as cost per 28-day supply obtained (e.g., a pack of contraceptive pills). Injection is reported as cost per injection. All costs were adjusted for inflation to 2015 dollars using the Consumer Price Index.

### Measures of Covariates

Contraceptive choices are influenced by other variables in addition to cost (Weisman, Lehman, Legro, Velott, & Chuang, 2015), but covariates available for this analysis are limited. The MarketScan database includes limited information on the patient, and key sociodemographic variables such as educational level, race/ethnicity, and marital status are not available. We were able to control for age group, with age groups defined as 13 to 17, 18 to 25, 26 to 35, and 36 to 45 years. Geographic region was included as a covariate to account for possible variations in prescribing patterns; region is precoded in the dataset as northeast, north central, south, and west. Finally, urban versus rural residence, which is measured in the dataset based on the Metropolitan Statistical Area, was included because the availability of providers for LARCs is likely to be higher in urban areas.

### Statistical Analysis

For each study year, we report the mean and median out-of-pocket costs for each contraceptive method in 2015 dollars, using the medical care component of the Consumer Price Index. For method use, we report the IUD and implant insertion rates and percent of women using oral contraceptives, injections, ring, and patch in each study year. To test whether the trend in LARC use can be attributed to the ACA, we estimate the likelihood of LARC insertion post-ACA implementation compared with pre-ACA

A.H. Snyder et al. / Women's Health Issues 28-3 (2018) 219–223

**Table 1**
Characteristics of Sample of Privately Insured Reproductive-age Women, by Study Year (Percentages)

| Year | Base n (Millions) | Age (y) | | | | Region* | | | | Rural Residence† |
|------|-------------------|---------|-------|-------|-------|-----------|---------------|-------|------|------------------|
| | | 13-17 | 18-25 | 26-35 | 36-45 | Northeast | North Central | South | West | |
| 2006 | 3.88 | 17 | 18 | 27 | 38 | 12 | 23 | 48 | 17 | 16 |
| 2007 | 4.44 | 17 | 18 | 27 | 38 | 11 | 24 | 47 | 18 | 17 |
| 2008 | 5.68 | 17 | 18 | 28 | 37 | 14 | 26 | 43 | 16 | 15 |
| 2009 | 5.86 | 16 | 19 | 29 | 37 | 11 | 28 | 43 | 17 | 14 |
| 2010 | 6.31 | 16 | 19 | 29 | 36 | 14 | 26 | 40 | 20 | 14 |
| 2011 | 7.13 | 16 | 22 | 28 | 35 | 16 | 24 | 40 | 19 | 15 |
| 2012 | 7.32 | 15 | 23 | 28 | 34 | 16 | 24 | 38 | 20 | 15 |
| 2013 | 6.26 | 15 | 24 | 27 | 34 | 17 | 22 | 36 | 22 | 15 |
| 2014 | 6.47 | 15 | 24 | 27 | 34 | 19 | 20 | 40 | 18 | 15 |

Note: Percentages for each category may not sum to 100% owing to rounding.
Data Source: Truven Health Analytics MarketScan.
  * Region is a predefined variable in the database.
  † Urban versus rural residence is determined by the Metropolitan Statistical Area.

using multivariable logistic regression adjusting for covariates and year (to account for secular trends). Statistical analyses were performed using SAS version 9.4 (SAS, Inc, Cary, NC).

**Results**

Table 1 describes the characteristics of the study sample, which consists of more than 3 million women in each study year. The sample size changes year to year because of changes in the number of employers and health plans that contribute data to MarketScan, or because of changes in the number of enrollees. The sample distribution by age, region, and urban versus rural residence is similar over time, with one exception: the greater proportion of women ages 18 to 25 after 2010 could reflect increased dependent coverage under ACA.

Table 2 shows the mean and median out-of-pocket costs for each prescription contraceptive method in each study year. After the ACA contraceptive coverage mandate (2013-2014), the mean out-of-pocket cost for all types of contraception decreased sharply. Similarly, the median out-of-pocket cost for all types of prescription contraception decreased to $0. In 2014 (data not shown), 91.5% of IUD recipients and 87.1% of implant recipients paid $0 out of pocket.

Table 3 shows the trend in prescription contraceptive use over successive cohort years. Each year, the greatest proportion of women was oral contraceptive users (about 1 in 4 women each year). The IUD insertion rate was 0.6% in 2006 and increased steadily over time to 2.0% in 2014. The contraceptive implant

insertion rate was less than 0.1% in 2006 and increased to 0.4% in 2014.

Table 4 shows that there was a statistically significant increased odds of LARC insertion (adjusted odds ratio, 1.03; 95% confidence interval, 1.02-1.04) after the contraceptive mandate was implemented, when adjusting for covariates. There was a statistically significant 14% increased odds of LARC insertion with each subsequent year from 2006 to 2014. Compared with the oldest age group, girls 13 to 17 years old were significantly less likely to have a LARC insertion, whereas women aged 18 to 25 and 26 to 35 had increased odds of LARC insertions. Women living in the Northeast had decreased odds of LARC insertions, whereas women in the South and West had increased odds of LARC insertions compared with women living in the North central region. There was no difference in LARC insertion for women in rural versus urban areas.

**Discussion**

This study confirms prior studies showing a dramatic decrease in out-of-pocket costs for prescription contraceptive methods, including LARCs, after the ACA contraceptive coverage mandate was implemented. This study extends this finding using national claims data for privately insured women through 2014. Although most women had no out-of-pocket costs for LARCs after 2012, the mean cost for an IUD was still between $17 and $22. These post-2012 costs may be attributable to grandfathered plans, employers with religious exemptions to the contraceptive

**Table 2**
Mean and Median Out-of-Pocket Costs by Contraceptive Type, 2006-2014 (Dollars)

| Year | Oral Contraceptive | | Injection | | Ring | | IUD | | Implant | | Patch | |
|------|------|--------|------|--------|------|--------|------|--------|------|--------|------|--------|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| 2006 | 31 | 18 | 13 | 8 | 60 | 18 | 78 | 23 | 50 | 46 | 25 | 18 |
| 2007 | 24 | 16 | 13 | 9 | 62 | 29 | 79 | 29 | 107 | 72 | 24 | 16 |
| 2008 | 20 | 14 | 11 | 6 | 80 | 43 | 74 | 27 | 87 | 27 | 23 | 16 |
| 2009 | 19 | 13 | 11 | 6 | 70 | 39 | 80 | 26 | 91 | 26 | 20 | 15 |
| 2010 | 18 | 12 | 11 | 6 | 88 | 44 | 94 | 25 | 98 | 25 | 20 | 15 |
| 2011 | 17 | 12 | 12 | 6 | 64 | 35 | 101 | 23 | 103 | 23 | 19 | 13 |
| 2012 | 15 | 10 | 11 | 6 | 82 | 34 | 114 | 21 | 139 | 38 | 18 | 12 |
| 2013 | 6 | 0 | 5 | 1 | 35 | 0 | 22 | 0 | 31 | 0 | 9 | 0 |
| 2014 | 5 | 0 | 4 | 0 | 7 | 0 | 17 | 0 | 24 | 0 | 8 | 0 |

Note: Dollars are adjusted for inflation to 2015 dollars using the medical care component of the Consumer Price Index. Intrauterine device (IUD) and implant cost presented as out-of-pocket cost in dollars per insertion. Injection cost is presented as out-of-pocket cost in dollars per injection. Cost for other methods (oral contraceptive, ring, and patch) presented as out-of-pocket cost per 28-day supply obtained.

**Table 3**
Contraceptive Use by Year, 2006-2014 (Percent of Women Ages 13–45)

| Year | Oral Contraceptive | Injection | Ring | IUD Insertions | Implant Insertions | Patch |
|------|--------------------|-----------|------|----------------|--------------------|-------|
| 2006 | 24.8 | 2.3 | 1.3 | 0.6 | <0.1 | <0.1 |
| 2007 | 24.3 | 2.3 | 1.5 | 0.8 | <0.1 | <0.1 |
| 2008 | 25.2 | 2.3 | 1.7 | 1.2 | 0.1 | <0.1 |
| 2009 | 26.1 | 1.4 | 2.3 | 1.3 | 0.1 | <0.1 |
| 2010 | 25.3 | 1.4 | 2.4 | 1.3 | 0.1 | <0.1 |
| 2011 | 25.7 | 2.4 | 1.8 | 1.4 | 0.2 | <0.1 |
| 2012 | 25.6 | 2.5 | 1.8 | 1.5 | 0.2 | <0.1 |
| 2013 | 25.5 | 1.8 | 1.7 | 1.8 | 0.3 | <0.1 |
| 2014 | 26.1 | 1.9 | 1.7 | 2.0 | 0.4 | <0.1 |

*Abbreviation:* IUD, intrauterine device.

mandate, noncompliance with the ACA contraceptive mandate, or failure to cover all types of LARCs (Tschann & Soon, 2015). Currently, the future of contraceptive coverage without cost-sharing is uncertain. If more health plans were to become exempt from coverage, out-of-pocket spending for contraception would be expected to increase.

The rate of new LARC insertions increased over the study period, with a statistically significant 3% increased odds of insertion after implementation of the ACA contraceptive coverage requirement. A 3% increase across the millions of privately insured reproductive-age women nationally is highly significant from a population perspective. This finding is promising and suggests that the removal of the cost barrier to IUDs and implants has increased their rate of adoption after the ACA.

As noted, the 2013 plan year is the first year in which the ACA contraceptive coverage benefit would have been in effect for most privately insured women, and to date we have claims data only through 2014. Because many privately insured women were not aware of the ACA contraceptive coverage benefit during this timeframe (Chuang et al., 2015), their contraceptive choices might not yet have changed despite having no-cost coverage. Cost could be a leading indicator in that, once more women experience no-cost coverage for their contraceptive prescriptions, their behavior with regard to contraceptive choices could change.

A limitation of this study is that the MarketScan claims database does not include all private insurers, and it does not include those covered by Medicaid or the uninsured. This limitation made it difficult to make meaningful comparisons with

**Table 4**
Adjusted Odds of LARC (IUD or Implant) Insertion

| | Adjusted OR (95% CI) |
|---|---|
| Post-ACA | 1.03 (1.02–1.04) |
| Pre-ACA | Reference |
| Cohort year (1 year increments, 2006–2014) | 1.14 (1.13–1.14) |
| Age group (y) | |
| 13-17 | 0.37 (0.37–0.38) |
| 18-25 | 1.63 (1.62–1.64) |
| 26-35 | 2.24 (2.23–2.26) |
| 36-45 | Reference |
| U.S. region | |
| Northeast | 0.90 (0.89–0.90) |
| North Central | Reference |
| South | 1.04 (1.04–1.05) |
| West | 1.20 (1.19–1.21) |
| Urban residence | 1.00 (1.00–1.00) |
| Rural residence | Reference |

*Abbreviations:* ACA, Affordable Care Act; CI, confidence interval; IUD, intrauterine device; LARC, long-acting reversible contraceptive; OR, odds ratio.
Note: Hosmer and Lemeshow goodness-of-fit test $\chi^2$ statistic 3545.9 ($p < .0001$).

National Survey of Family Growth data, which are based on nationally representative surveys that include Medicaid patients and uninsured women. Because this is a claims database, we cannot account for all relevant covariates, or for the use of nonprescription contraceptive methods, or for prescription methods obtained for which a claim was not generated (e.g., in family planning or school-based clinics). In addition, we could not account for ongoing LARC use by women who obtained the method in a year outside of our period of observation. This limitation underestimates LARC use for each year. Strengths of this database include its large size and national scope over many years, including 2 full years after the ACA mandate implementation.

**Conclusions**

The ACA contraceptive mandate has dramatically reduced out-of-pocket costs for prescription contraceptives including LARCs. After the ACA, there was a small but statistically significant increase in LARC insertions.

**Implications for Practice and/or Policy**

Increased LARC insertions after the ACA in this database of privately insured women is an important finding that indicates the importance of reduced cost-sharing for increasing use of the most effective contraceptives and preventing unintended pregnancy.

**Acknowledgments**

This research was funded by the Robert E. Dye, MD, Professorship at the Penn State College of Medicine and by the Penn State Center for Women's Health Research.

**References**

Bearak, J. M., Finer, L. B., Jerman, J., & Kavanaugh, M. L. (2016). Changes in out-of-pocket costs for hormonal IUDs after implementation of the Affordable Care Act: An analysis of insurance benefit inquiries. *Contraception*, 93(2), 139–144.
Bearak, J. M., & Jones, R. K. (2017). Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis. *Women's Health Issues*, 27(3), 316–321.
Becker, N. V., & Polsky, D. (2015). Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing. *Health Affairs*, 34(7), 1204–1211.
Carlin, C. S., Fertig, A. R., & Dowd, B. E. (2016). Affordable Care Act's mandate eliminating contraceptive cost sharing influenced choices of women with employer coverage. *Health Affairs*, 35(9), 1608–1615.
Chuang, C. H., Mitchell, J. L., Velott, D. L., Legro, R. S., Lehman, E. B., Confer, L., & Weisman, C. S. (2015). Women's awareness of their contraceptive benefits under the Patient Protection and Affordable Care Act. *American Journal of Public Health*, 105(Supplement 5), 713–715.
Daniels, K., Daugherty, J., Jones, J., & Mosher, W. (2015). *Current contraceptive use and variation by selected characteristics among women aged 15-44: United States, 2011-2013*. Hyattsville, MD: National Center for Health Statistics. Available at: www.cdc.gov/nchs/data/nhsr/nhsr086.pdf. Accessed: April 5, 2016.
Finer, L. B., Sonfield, A., & Jones, R. K. (2014). Changes in out-of-pocket payments for contraception by privately insured women during implementation of the federal contraceptive coverage requirement. *Contraception*, 89(2), 97–102.
Guttmacher Institute (2014). Use of highly effective contraceptives in the U.S. continues to rise, with likely implications for declines in unintended pregnancy and abortion. Available at: www.guttmacher.org/article/2014/12/use-highly-effective-contraceptives-us-continues-rise-likely-implications-declines. Accessed: April 7, 2016.
Henry, J., & Kaiser Family Foundation. (2015). Preventive services covered by private health plans under the Affordable Care Act. Available at: http://files.kff.org/attachment/preventive-services-covered-by-private-health-plans-under-the-affordable-care-act-fact-sheet. Accessed: September 12, 2017.

*A.H. Snyder et al. / Women's Health Issues 28-3 (2018) 219–223*                                                                 223

Kavanaugh, M. L., & Jerman, J. (2018). Contraceptive method use in the United States: Trends and characteristics between 2008, 2012 and 2014. *Contraception*, 97, 14–21.

Law, A., Wen, L., Lin, J., Tangirala, M., Schwartz, J. S., & Zampaglione, E. (2016). Are women benefiting from the Affordable Care Act? A real-world evaluation of the impact of the Affordable Care Act on out-of-pocket costs for contraceptives. *Contraception*, 93(5), 392–397.

Pace, L. E., Dusetzina, S. B., & Keating, N. L. (2016). Early impact of the Affordable Care Act on uptake of long-acting reversible contraceptive methods. *Medical Care*, 54(9), 811–817.

Sonfield, A., Tapales, A., Jones, R. K., & Finer, L. B. (2015). Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update. *Contraception*, 91(1), 44–48.

Tschann, M., & Soon, R. (2015). Contraceptive coverage and the Affordable Care Act. *Obstetrics and Gynecology Clinics of North America*, 42(4), 605–617.

Weisman, C. S., Lehman, E. B., Legro, R. S., Velott, D. L., & Chuang, C. H. (2015). How do pregnancy intentions affect contraceptive choices when cost is not a factor? A study of privately insured women. *Contraception*, 92, 501–507.

U.S. Department of Health and Human Services. (2016). Women's preventive services guidelines. Available at: www.hrsa.gov/womensguidelines2016/index.html. Accessed: September 12, 2017.

Xu, X., Macaluso, M., Ouyang, L., Kulczycki, A., & Grosse, S. D. (2012). Revival of the intrauterine device: increased insertions among US women with employer-sponsored insurance, 2002-2008. *Contraception*, 85(2), 155–159.

**Author Descriptions**

Ashley H. Snyder, MD, MSc, is a general internist with a clinical focus in outpatient primary care and with research interests in reproductive women's health and health policy.

Carol S. Weisman, PhD, is a sociologist and health services researcher with principal interests in women's health and in the organization and quality of women's health care.

Guodong Liu, PhD, is a computer scientist and bioinformatician with extensive research experience in data mining and knowledge discovery over large electronic medical records and large administrative claims databases.

Douglas Leslie, PhD, is a health economist with considerable experience in the fields of health economics, health services research, and pharmacoeconomics who has worked extensively with large administrative claims databases.

Cynthia H. Chuang, MD, MSc, is Professor of Medicine and Public Health Sciences, and Chief of the Division of General Internal Medicine at Penn State College of Medicine. Her research focuses on reproductive health care for adult women.

# EXHIBIT O

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

Plaintiff,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

No. 2:17-cv-04540-WB

## DECLARATION OF SAMANTHA F. BUTTS, M.D., MSCE[1]

I, Samantha F. Butts, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned matter and, in support thereof, I state as follows:

### I.   My Background and Experience

1.   I am a doctor, teacher, and clinical researcher in the area of women's reproductive health. Of the time I spend working, I spend approximately 15% on education and administration, 10%-15% on clinical research, and 70%-75% on patient care.

#### A. *My Education, Licensure and Board Certifications*

2.   I earned a Bachelor of Arts degree, *cum laude*, from Harvard University, in 1994, and a Medical Degree from the Harvard University School of Medicine, in 1998.

3.   I completed both my residency in Obstetrics and Gynecology (1998-2002) and a Fellowship in Reproductive Endocrinology and Infertility (2002-2005) at the Hospital of the University of Pennsylvania.

4.   After that, I earned a Masters of Science in Epidemiology (MSCE) from the

---

[1] I attach a true and correct copy of my curriculum vitae hereto as Exhibit A.

University of Pennsylvania School of Medicine in 2006.

     5.     I have been licensed to practice medicine in Pennsylvania since 2001.

     6.     I have also been certified by the American Board of Obstetrics and Gynecology with a specialty in Obstetrics and Gynecology since 2006 and subspecialty in Reproductive Endocrinology & Infertility since 2009.

### B. *My Teaching, Research and Additional Qualifications*

     7.     I have held a faculty position at the University of Pennsylvania School of Medicine since 2005.

     8.     I started as an Assistant Professor and, since 2014, I have served as an Associate Professor of Obstetrics and Gynecology, in the Division of Reproductive Endocrinology and Infertility (REI). From 2014-2016, I was honored to serve as the Ombudsman for the Students at the University of Pennsylvania School of Medicine, Perelman School of Medicine.

     9.     As an AssociateProfessor of Obstetrics and Gynecology, I am actively involved in the clinical training of medical students, residents and fellows. I participate in didactic education programs and mentor resident-driven clinical research projects.

     10.     I also developed the first comprehensive reproductive endocrinology and infertility curriculum for trainees at the Hospital of the University of Pennsylvania and supervise resident training in reproductive endocrinology and infertility. In 2011, my achievements in resident education were recognized with a National Faculty Teaching Award from the American College of Obstetricians and Gynecologists and the Council on Resident Education in Obstetrics and Gynecology.

     11.     I also spend a meaningful amount of my time acting as a clinical researcher.

     12.     In this capacity, I serve and have served as an investigator and principal

2

investigator on a number of studies and projects regarding women's healthcare, many of which have been fully funded by grants. For example, I was one of the first people to receive a National Institute of Health training grant as part of the NIH's National Training Program in Reproduction (NIH T32 grant), and I was the inaugural recipient of the New Investigator Award from the Center of Excellence in Environmental Toxicology at the University of Pennsylvania.

13. I have published more than 100 scholarly articles, abstracts, research publications, reviews, book chapters, and committee reports related to women's reproductive healthcare. Among these, I have researched and written peer-reviewed articles about treating hormonal disorders, such as polycystic ovary syndrome, using contraceptives as a first-line medication. *See, e.g., Polycystic Ovary Syndrome: How Best to Manage?*, Consultant, 46:745-749, (2006) and *Abnormal Uterine Bleeding*, NMS Series for Independent Study: Obstetrics and Gynecology, Chap. 23, (6th. Ed. 2008).

14. I am often engaged to consult and collaborate with academic and private institutions. Recently, for example, as a member of the American College of Obstetricians and Gynecologists' Committee on Gynecologic Practice (ACOG Committee), I was asked to develop an opinion regarding treatment of Primary Ovarian Insufficiency. In connection with my work on this issue, the ACOG Committee published an opinion in May of 2017 recommending that contraceptives be considered among the options to provide as hormone replacement therapy to treat Primary Ovarian Insufficiency. *See* Opinion 698, *Hormone Therapy for Primary Ovarian Insufficiency*, Obstetrics and Gynecology, 129(5): 963-964 (May 2017).

15. In connection with my work, I have lectured throughout the country, by invitation, about reproductive health. For example, at the 2016 Women in Statistics Conference in Charlotte, North Carolina, I delivered a presentation called "Reproductive Decision Making

3

and Your Career: Embracing Biology, Debunking Myths, and Gaining Control."

16.    I have also organized and moderated multiple scientific meetings throughout my career, including annual meetings of the American Society of Reproductive Medicine.

17.    I have held various professional appointments, as well. Among these, I have been a Member of the Center for Research on Reproduction and Women's Health since 2005; an Associate Scholar for the Center for Clinical Epidemiology and Biostatistics at the University of Pennsylvania since 2006; and a Member of the Center for Excellence in Environmental Toxicology, Endocrine Disruptors Core, since 2008.

18.    I also maintain memberships in a number of professional, academic, and scientific societies, both nationally and internationally, including the American Society for Reproductive Medicine (since 2002), the Society for Reproductive Endocrinology and Infertility (since 2002), the American College of Obstetricians and Gynecologists (since 1998) and the Endocrine Society (since 2012). I have received many professional accolades, awards, and honor society memberships throughout my career.

### C. *My Medical Practice*

19.    In addition to my academic work, I maintain an active medical practice and, in 2017, was listed as one of *Philadelphia Magazine*'s "Top Doctors".

20.    Since 2005, I have served as an Attending Physician in the Department of Obstetrics and Gynecology, and also in the Reproductive Surgical Facility at the Hospital of the University of Pennsylvania.

21.    Last year I saw and treated approximately 1,500 to 2,000 patients.

22.    Some of my patients travel thousands of miles for the specialty medical treatment I can provide at Penn Medicine.

4

23.     But in many ways, my medical practice reflects the reality that the Hospital of the University of Pennsylvania is also the community hospital of West Philadelphia.

24.     In addition to specialty patients and residents of West Philadelphia, I also treat many members of the academic community at at the University of Pennsylvania.

25.     My clinical expertise includes reproductive endocrinology, with a focus on managing hormonal disorders such as polycystic ovary syndrome, primary ovarian insufficiency/premature ovarian failure, amenorrhea, dysmenorrhea/chronic pelvic pain, and abnormal uterine bleeding, as well as in infertility, in vitro fertilization, and reproductive surgery.

26.     Many of these medical conditions and disorders are common among women.

27.     As part of my practice, I regularly prescribe contraceptives for both contraceptive and non-contraceptive purposes.

## II.     Benefits of Contraceptive Use

### A. Contraceptives Are Effective and Approved for Uses Other Than Preventing Pregnancy

28.     Contraceptives are effective, and approved, to be used as medication for purposes other than preventing pregnancy. Indeed, I regularly use all kinds of contraceptives for non-contraceptive uses, including for the treatment of life-threatening problems.

29.     For example, contraceptives are the standard first-line of care for a number of hormonal, and other, disorders, including poly-cystic ovarian syndrome, primary ovarian insufficiency/premature ovarian failure, amenorrhea, dysmenorrhea/chronic pelvic pain, and abnormal uterine bleeding.

30.     These conditions greatly impact the quality of life of the many women who suffer from them. In fact, about 10% percent of all women have irregular periods caused by poly-cystic

5

ovarian syndrome or other hormonal disorders which can significantly harm well-being and quality of life. Extreme cases of heavy menstrual bleeding due to hormonal or anatomic problems of the uterus that I see and treat can at times be life-threatening.

31.    I frequently use contraceptives to treat these conditions in my own medical practice and, in fact, prescribe "birth control pills" more for these other purposes than to prevent pregnancy given the population of patients who make up my practice.

32.    Throughout my career, I have been required to perform non-operative blood transfusions for at least 50 women due to loss of blood caused by heavy periods and acute menstrual bleeding that can cause anemia.

33.    In 2009, the FDA approved use of the Mirena Inter-Uterine Device (IUD) to treat women with heavy bleeding and hemophilia. Among my patients who use the Mirena IUD, the vast majority (90%-95%) use it for purposes other than birth control.

34.    The hormonal and other disorders I treat inflict direct and indirect personal and financial costs upon the women who suffer from them; they prevent women from participating fully in the workplace and, more broadly in society.

35.    Contraceptives are a cost-effective and clinically proven way to treat these often debilitating disorders.

**B.  *Contraceptives Are Effective in Preventing Unintended and Ill-Advised Pregnancies, and Their Use Causes Other Long-Term Health Benefits***

36.    Contraceptives also play an important role in preventing unintended pregnancy.

37.    For some women, this treatment is not optional – it is necessary to prevent serious illness and even death.

38.    There are multiple high risk conditions for which pregnancy is relative or absolutely contraindicated. These conditions include cardiac problems and history of stroke.

6

39. For survivors of breast cancer, pregnancy hormones can cause serious medical harm until the patient is well into remission.

40. Contraceptives help patients avoid unintended pregnancies in such situations; they prevent medical harm and save lives.

41. Contraceptives use also carries long-term health benefits for women.

42. For instance, it has been shown that long-term users of the standard oral contraceptive pill (at least 5-10 years of usage) are 50-80% less likely to develop ovarian or uterine cancer.

## III. My Opinion on the "Religious Exemption Rule" and "Moral Exemption Rule"

43. I have reviewed both the "Religious Exemption Rule" and the "Moral Exemption Rule" (together, the "Rules"), as well as the Complaint filed by the Commonwealth of Pennsylvania in the above-captioned matter that challenges them.

44. Based upon my knowledge, education, training and experience, it is my professional opinion that the Rules will cause immediate and irreversible harm because they will cause women to lose preventive contraceptive care under their employer group health plans.

### A. Cost is a Barrier to Contraceptive Access

45. It is my understanding, and it has been my experience, that cost is a barrier to patient access to contraceptives.

46. Prior to passage of the Affordable Care Act (the "Affordable Care Act" or "ACA"), before preventative contraceptive care was provided at no additional cost under the ACA's contraceptive mandate, I regularly counseled my patients about the cost related to their recommended contraceptive choices.

47. I would estimate that, prior to the ACA, about 10-20% of the patients for whom I

7

had prescribed contraceptives would come back from the pharmacy without filling their prescriptions; they would, instead, request that I prescribe a less effective, but cheaper, method of contraception. Or they would forego use of contraception altogether.

48. Such requests were most frequent when I had prescribed an IUD because, pre-ACA, IUDs were one of the most expensive forms of contraception for patients. But they are also a much more effective method of contraceptive care than are birth control pills.

49. And, for therapeutic reasons, some patients cannot take estrogen birth control pills, at all.

50. After the ACA passed and the contraceptive mandate was instituted, however, I saw that my patients were free to make contraceptive choices on the basis of their medical needs and concerns, alone, without the burden of having to weigh the cost of the preferred medical choice. Post-ACA, the only concern has been what is best for the patient.

51. As a result, I have seen my patients making more medically informed contraceptive choices and have not had the experience of patients rejecting the contraceptives I prescribed due to their cost under private insurance plans.

### C. *Because Patients Will Lose Contraceptive Coverage under the New Rules, They Will Make Less Medically Sound Contraceptive Choices and, Therefore, Will Be Harmed*

52. It is apparent, however, that under the new Rules this post-ACA focus on what is best for the patient will change.

53. This is so because, as a result of the Rules, some women will lose insurance coverage for preventative contraceptive care.

54. As a result, their cost for contraceptive care will rise.

55. Based upon my own experience and existing scientific and empirical information that I have reviewed and am aware of, under the new Rules, cost will, again, become a barrier to

8

women's access to and use of the contraceptive that is medically recommended for them.

56.    Many of these women who will no longer receive contraceptive coverage will not only face financial harm, but will also face medical harm.

57.    This harm will manifest itself in the disruption of these patients' medical treatment, whether by substituting a less effective but cheaper method of contraception or by being forced to stop using contraceptives at all, due to financial reasons.

58.    Some of these women will face unintended pregnancy and other adverse medical consequences.

**D. *The New Rules Are Not Based Upon Sound Scientific or Empirical Evidence***

59.    It is also my opinion that the new Rules are not based upon sound scientific or empirical evidence.

60.    The Rules indicate, among other things, that contraceptives are not effective in preventing unintended pregnancy, that they are harmful to women's health, and that they promote promiscuity. This is false.

61.    These representations conflict with peer-reviewed and medically-accepted data, and are not credible.

62.    For these reasons, I believe that an injunction of the Rules is necessary to prevent immediate and irreparable harm to women in Pennsylvania and around the Country, who will otherwise lose ongoing preventive care coverage under their group health plans due to the Rules.

I hereby affirm that the foregoing is true and correct based upon my knowledge, information and belief, and I make these statements subject to the penalty of perjury.

Date: 10|25|17

By: _____

SAMANTHA F. BUTTS, M.D., MSCE

9

# EXHIBIT A

UNIVERSITY OF PENNSYLVANIA - PERELMAN SCHOOL OF MEDICINE
Curriculum Vitae

Samantha F. Butts, MD, MSCE

Address:          Penn Fertility Care
                  Center for Reproductive Medicine and Surgery
                  University of Pennsylvania Medical Center
                  3701 Market Street, 8th Floor
                  Philadelphia, PA 19104 US

Education:

| 1994 | BA | Harvard University, Cambridge MA (History and Science-cum laude) |
| 1998 | MD | Harvard University School of Medicine, Boston, MA |
| 2006 | MSCE | University of Pennsylvania School of Medicine, Philadelphia, PA |

Postgraduate Training and Fellowship Appointments:

| 1998-2002 | Resident in Obstetrics and Gynecology, The Hospital of the University of Pennsylvania, Philadelphia, Pennsylvania |
| 2002-2005 | Fellow in Reproductive Endocrinology and Infertility, The Hospital of the University of Pennsylvania, Philadelphia, PA |

Faculty Appointments:

| 2005-2014 | Assistant Professor of Obstetrics and Gynecology at the Hospital of the University of Pennsylvania, University of Pennsylvania School of Medicine |
| 2014-present | Associate Professor of Obstetrics and Gynecology at the Hospital of the University of Pennsylvania, University of Pennsylvania School of Medicine |

Hospital and/or Administrative Appointments:

| 2005-present | Attending Physician, Department of Obstetrics and Gynecology, Division of REI, Hospital of the University of Pennsylvania, Philadelphia, PA |
| 2005-present | Attending Physician, Reproductive Surgical Facility, Hospital of the University of Pennsylvania, Philadelphia, PA |
| 2014-2016 | Ombudsman for the Students at the University of Pennsylvania School of Medicine, Perelman School of Medicine |

Other Appointments:

Samantha F. Butts, MD, MSCE                                              Page 2

| | | |
|---|---|---|
| 2005-Present | Member, Center for Research on Reproduction and Women's Health |
| 2006-present | Associate Scholar, Center for Clinical Epidemiology and Biostatistics, University of Pennsylvania |
| 2008-present | Member, Center for Excellence in Environmental Toxicology, Endocrine Disruptors Core |

Specialty Certification:

| | |
|---|---|
| 2006 | American Board of Obstetrics and Gynecology |
| 2009 | American Board of Obstetrics and Gynecology, subspecialty board of Reproductive Endocrinology & Infertility |

Licensure:

| | |
|---|---|
| 2001-Present | Pennsylvania - MD074255-L |

Awards, Honors and Membership in Honorary Societies:

| | |
|---|---|
| 2003 | National Institutes of Health Post-Doctoral Research Training Grant (T32) |
| 2004-2006 | National Institutes of Health Contraception and Infertility Loan Repayment Program Award |
| 2004 | The Stewart Scholarship for Research in Public Health awarded by the Association of Reproductive Health Professionals |
| 2005 | The Emily B. Hartshorne Mudd Award for Contributions to Family Health |
| 2006 | AAMC Early Career Women Faculty Professional Development Seminar |
| 2009 | Philadelphia Magazine's Best Physicians Age 40 and Under |
| 2009 | Center for Excellence in Environmental Toxicology New Investigator Award |
| 2010-2012 | National Institutes of Health Contraception and Infertility Loan Repayment Program Award (renewal) |
| 2011 | National Faculty Award, The American College of Obstetricians and Gynecologists and The Council on Resident Education in Obstetrics and Gynecology |
| 2011 | Invitation to attend the White House Business Leaders' Briefing, sponsored by the White House Business Council and Business Forward, December 7th, 2011 |
| 2011 | American Association of Obstetricians and Gynecologists Foundation James W. Kennedy Award to attend The American Gynecological and Obstetrical Society Meeting |
| 2011 | Faculty Teaching Award for Excellence in Resident Education, Department of Obstetrics and Gynecology |
| 2012 | The Network Journal's "40 Under 40" Achievement Award |
| 2014 | SREI Strategic Planning Retreat |

Samantha F. Butts, MD, MSCE

| 2014 | Mentor to Dr. Nyia Noel, Recipient of 2014 Resident Research Award for Excellence in Research for *"Risk Factors for Hospital Readmissions for Patients Undergoing Benign Gynecologic Surgery"* |
| 2015 | ASRM Access to Care Reproductive Summit, Invited Participant |
| 2016 | NIH Study Section, Integrative and Clinical Endocrinology and Reproduction -- Ad Hoc Member |
| 2017 | Dr. Edward S. Cooper Wharton Leadership Training Program |
| 2017 | Philadelphia Magazine's Top Doctors |

<u>Memberships in Professional and Scientific Societies and Other Professional Activities:</u>

<u>International:</u>
2012-Present     The Endocrine Society
- Member, Advocacy and Public Outreach Core Committee, 2014-2016

<u>National:</u>
1998-Present     American College of Obstetricians and Gynecologists
- Fellow, 2006-present
- Chair, Gynecologic Practice Subcommittee on Reproductive Endocrinology, 2014-2017
- Member, Committee on Gynecologic Practice, Subcommittee on Reproductive Endocrinology, 2011-2017
- Ex-Officio Member, Committee on Gynecologic Practice, 2014-2017

2002-Present     American Society for Reproductive Medicine
- ASRM Practice Committee, ACOG Representative, 2014-2017
- Society for Assisted Reproductive Technologies-Clinical Outcomes Reporting System Research Committee, 2012-2016
- Health Disparities Special Interest Group, 2009-present
- Environment and Reproduction Special Interest Group, 2010-present
- Reviewer, E-learn Modules for Continuing Education Committee 2016
- Nutrition Special Interest Group, 2012-present
- Poster Prize Award Committee ASRM Annual Meeting 2011 and 2013

2002-Present     Society for Reproductive Endocrinology and Infertility

2007-2012     National Medical Association

2011-2014     Pacific Coast Reproductive Society

<u>Editorial Positions:</u>
| 2008-present | Ad Hoc Editorial Board/Abstract Grading Committee, American Society of Reproductive Medicine |
| 2008-Present | Peer Reviewer, Human Reproduction Journal |

Samantha F. Butts, MD, MSCE                                                    Page 4

| | |
|---|---|
| 2008-Present | Peer Reviewer, Fertility and Sterility Journal |
| 2008-Present | Peer Reviewer, Consultant Journal |
| 2011-Present | Peer Reviewer American Journal of Obstetrics and Gynecology |
| 2011-Present | Peer Reviewer, Journal of Clinical Endocrinology and Metabolism |
| 2013-Present | Peer Reviewer, Journal of the American Medical Association (JAMA) |
| 2017-present | Editorial Board, Journal of Clinical Endocrinology and Metabolism |

Academic and Institutional Committees:

| | |
|---|---|
| 2002-2003 | Mudd Professorship Suite for Women's Health Research |
| 2004-2005 | Advisor to the Obstetrics and Gynecology Resident Journal Club |
| 2006-present | Director, Research in Progress Meetings for Division of Infertility and Reproductive Endocrinology |
| 2007-2009 | Chair, Information Technology Committee -- Women's Health Clinical Research Center |
| 2012-2013 | Selection Committee, Medical Student Research Paper Prize Awards, Perelman School of Medicine |
| 2013-present | MSCE Comprehensive Exam Committee, Center for Clinical Epidemiology and Biostatistics |
| 2013 | Ad Hoc Reviewer, University Research Foundation Review Committee |
| 2014-present | Faculty Coordinator, Grand Rounds, Department of Obstetrics and Gynecology |
| 2014-2015 | Member of the Committee to Review the Department of Orthopedic Surgery, Hospital of the University of Pennsylvania |
| 2014-present | Member, University of Pennsylvania Provost's Academic Planning and Budget Committee – *This committee provides advice on academic policies and procedures, interdisciplinary and cross-school efforts, strategic planning issues, research support and regulations, budgetary issues, and such matters as faculty and minority gender equity, early retirement, and personnel benefits. It also advises the Provost on school and center external review recommendations and proposed new academic degrees and new research institutes* |
| 2017-present | Member, Search Committee for the Senior Vice Dean for Medical Education, Perelman School of Medicine |
| 2017-present | Ad Hoc Reviewer, Penn Presbyterian Harrison Award Committee |
| 2017-present | Unit Based Care Leadership Committee – This committee of physicians and nurses oversees quality initiatives for gynecologic surgical patients at the Hospital of the University of Pennsylvania |

Major Academic and Clinical Teaching Responsibilities:

| | |
|---|---|
| 2004 | Eritrean Fistula Project: United Nations Population Fund-Sponsored Clinical Mission to Eritrea to Treat Birth-Related Fistulas and Investigate Causes of Secondary Amenorrhea |

Samantha F. Butts, MD, MSCE                                    Page 5

| | |
|---|---|
| 2004-Present | Lecturer for BSTA 510 a course for the Biostatics Graduate School Curriculum, Center for Clinical Epidemiology and Biostatics, University of Pennsylvania |
| 2005-Present | Faculty in the Reproduction Module for First Year Medical Students |
| 2005-Present | Mentor, Residents and Fellows in Ob/Gyn Research |
| 2005-2008 | Advisor and Lecturer, Ob/Gyn Medical Student Interest Group, Eritrean Fistula Project, 2008 |
| 2005-Present | Clinical Instructor, Students, Resident, Fellows in Ambulatory, OR and In-Patient Settings |
| 2006-Present | Faculty in Reproductive Epidemiology Course, Center for Clinical Epidemiology and Biostatics |
| 2006-Present | Mentor, Clinical Epidemiology Master's Students with Theses in Reproduction |
| 2006-Present | Faculty, Obstetrics and Gynecology Core Clerkship Didactics -- Lecturer on Ectopic Pregnancy, Eight Lectures per Year |
| 2007-2008 | Faculty Advisor, Recipient of FOCUS Medical Student Fellowship in Women's Health |
| 2007-Present | Education Committee, Department of Obstetrics and Gynecology |
| 2007-Present | Director, Medical Student Elective in Reproductive Endocrinology and Infertility |
| 2007 | "Obesity, Weight Loss and Reproductive Outcomes: Characterizing the Impact on Adults and the Risks to their Offspring", Grand Rounds for the Division of Medical Endocrinology, University of Pennsylvania Medical School, Philadelphia, PA |
| 2009-2010 | "Maternal and Child Health and the Provision of Infertility Treatments: An Ethical Debate", Guest Faculty Lecture for Healthcare Ethics: Policy, Management and Law, Columbia University School of Public Health, New York, NY |
| 2009-present | Invited Faculty, Case Presentation Series for Underrepresented Minority Students in preparation for OB/Gyn Clerkship, Perelman School of Medicine |
| 2010-Present | Director, Resident Education in Infertility and Reproductive Endocrinology |
| 2010-Present | Faculty Coordinator, Resident Preoperative Conference |
| 2010-Present | Faculty, Penn Academy for Reproductive Science: An outreach program that educates female high school students in Philadelphia about reproductive science and women's health through workshops, lectures, and hands-on lab experience |
| 2010 | "Disparities in Assisted Reproductive Technologies: Do They Exist, and Could Endocrine Disruptors Play a Role?", Grand Rounds, Division of Endocrinology, Department of Internal Medicine, University of Pennsylvania Medical School, Philadelphia, PA |
| 2011, 2017 | Mentor, STEER Summer Undergraduate Environmental Health Scholar Program, Center for Excellence in Environmental Toxicology |

Samantha F. Butts, MD, MSCE                                                                   Page 6

| | |
|---|---|
| 2011 | Guest Faculty, Obstetrical Society of Philadelphia Annual Resident Education Day |
| 2011-Present | Didactic Lecturer, Department of Family Practice on Infertility and Reproductive Endocrine Topics |
| 2011 | Lecturer, "Polycystic Ovary Syndrome" Department of Student Health |
| 2012-2013 | Mentor, Research Rotation, Pharmacology Graduate Program |
| 2012-2013 | Invited Faculty, Roundtable Discussion with Students on Careers and Training in Obstetrics and Gynecology, Harvard Medical School |
| 2013 | Faculty Coordinator and Presenter at "Nutrition and Pregnancy", a Patient Oriented Educational Seminar Addressing Nutritional Guidelines before and Early in Pregnancy. Perelman School of Medicine, University of Pennsylvania |
| 2013 | "Primary Ovarian Insufficiency", Grand Rounds for the Division of Medical Endocrinology, University of Pennsylvania Medical School, Philadelphia, PA |
| 2013-present | Mentor, University of Pennsylvania Summer Pre-Med Enrichment Program for Minority Undergraduate Students sponsored by the Center of Excellence for Diversity in Health Education and Research (COE) and the School of Medicine |
| 2014 | Faculty, Center of Excellence for Diversity in Health Education and Research Annual Meeting, One on One mentoring of Junior Faculty, June 3, 2014 |
| 2014-present | Faculty Mentor for OB/Gyn Resident Research Projects of Nyia Noel, Joan Price, Lilli Zimmerman, Sevelle Holder |

Lectures by Invitation:

| | |
|---|---|
| Sep, 2004 | "Premature Ovarian Aging and Infertility", The Steward Award Presentation at the Association of Reproductive Health Professionals Annual Meeting, Washington, DC |
| Feb, 2005 | "Novel Approaches to the Understanding of Premature Ovarian Aging", Grand Rounds, department of Obstetrics and Gynecology, Meharry Medical College, Nashville, TN |
| Jul, 2005 | "Assisted Reproductive Technologies Update: Recent Trends in Success and Emerging Challenges Concerning Outcomes", National Medical Association Annual Convention and Scientific Assembly, New York, NY |
| Oct, 2005 | "Telomere Length and Telomerase Activity in Developing Follicles: Correlation with Premature Ovarian Aging and Outcomes in IVF", Special Research Presentations Session at the 61st Annual Meeting of the American Society for Reproductive Medicine, New Orleans, LA |
| Jan, 2008 | "The Obesity Epidemic and Reproduction: Insights on Maternal, Fetal and Childhood Risks", Grand Rounds, Department of Obstetrics and Gynecology, Emory University School of Medicine, Atlanta, GA |

Case 2:25-2575 Document 34-2 Page: 306 Filed 12/12/2025
Case 2:25-cv-04540-WB Document 9-9 Page: 1 Date Filed 12/12/2025

Samantha F. Butts, MD, MSCE                                    Page 7

| Aug, 2008 | "The Northeast Consortium for Minority Faculty Development: A Collaborative Approach among New Jersey Medical School, the University of Pennsylvania School of Medicine, Mount Sinai School of Medicine and Albert Einstein College of Medicine of Yeshiva University", AAMC Group on Faculty Affairs Professional Development Conference, Pittsburgh, PA |
|---|---|
| May, 2009 | "Early Ovarian Aging: Defining Populations at Risk", Annual Retreat, Center for Research on Reproduction and Women's Health, Philadelphia, PA |
| Jul, 2009 | "Environmental Reproductive Toxicants", National Medical Association Annual Convention and Scientific Assembly, Las Vegas, NV |
| Mar, 2010 | "Reproductive Aging Update: Investigating Novel Markers of Senescence and Threats to Ovarian Reserve", Grand Rounds, Department of Obstetrics and Gynecology, Lankenau Hospital/Main Line Health, Bryn Mawr, PA |
| May, 2010 | "Disparities in Assisted Reproductive Technology Outcomes and Access to Infertility Treatment", Grand Rounds, Department of Obstetrics and Gynecology and Women's Health, Albert Einstein College of Medicine of Yeshiva University and Montefiore Medical Center, Bronx, NY |
| Mar, 2011 | "Disparities in Reproductive Outcomes: Exploring the Impact of Nutrition", The Annual Hunger Conference in Delaware County, Chester PA |
| Apr, 2011 | "Reproductive Outcomes in ART: Exploring the Impact of Race and Ethnicity", Pacific Coast Reproductive Society Annual Meeting, Palm Springs, CA |
| Apr, 2011 | "Environmental Toxins and Gametes", Pacific Coast Reproductive Society Annual Meeting, Palm Springs, CA |
| Jul, 2011 | "Obstetrics and Gynecology: How I Got there and What's in Store for the Specialty", National Youth Leadership Forum on Medicine, Villanova University, Villanova, PA |
| Sep, 2011 | "From the First Nine Months to the Rest of Your Life: The Role of Maternal Nutrition and Environment on Fetal Growth and Adult Disease Risk", Grand Rounds Drexel University College of Medicine, Philadelphia, PA |
| Aug, 2012 | "Smoking and Genetic Variation in Metabolism of Environmental Chemicals: A Model for Environmental Reproductive Toxicology", The 45th Annual Meeting of the Society for the Study of Reproduction, Pennsylvania State University, State College, PA |
| Sep, 2012 | "In Vitro Fertilization (IVF): Methods to Prevent Multiple Births", OptumHealth Conference, Philadelphia, PA |
| Oct, 2012 | "Smoking, Genetic Variation, and Reproductive Aging: Exploring Links in a Population Based Cohort", Grand Rounds, Department of Obstetrics and Gynecology, Massachusetts General Hospital, Harvard Medical School, Boston, MA |

Samantha F. Butts, MD, MSCE                                           Page 8

| | |
|---|---|
| Oct, 2012 | "Infertility 2012: Current Evaluations, Treatments and Controversies", National Association of Nurse Practitioners in Women's Health Annual Conference, Orlando, Florida. |
| Oct, 2012 | "Premature Ovarian Insufficiency", Roundtable Discussion, Annual Meeting of the American Society for Reproductive Medicine, San Diego, CA |
| Feb, 2013 | "Ancestry, Geography, and Reproductive Health: How Race, Ethnicity, and Environment Impact Outcomes Across the Lifecourse", Grand Rounds, Department of Obstetrics and Gynecology, Lehigh Valley Hospital, Allentown, PA |
| Mar, 2013 | "Roe After 40: The Ethics of Fertility and Reproduction: A Fresh Look", Panel Discussion, University of Pennsylvania Law School, Philadelphia, PA |
| Mar, 2013 | "Reproductive Health, Nutrition, and the Environment: Exploring the Impact of Exposures Across the Female Lifecourse", Grand Rounds, Department of Obstetrics and Gynecology, University of Washington School of Medicine, Seattle, WA |
| Jul, 2013 | "State Mandated Coverage for Infertility: Current and Future Impact on Treatment Outcomes and Reproductive Potential", Grand Rounds, Department of Obstetrics and Gynecology, Beth Israel Deaconess Medical Center, Harvard Medical School, Boston, MA |
| Aug, 2013 | "Reproductive Functioning and Potential Across the Female Lifespan: Considering the Impact of Ethnicity and Race", Grand Rounds, Department of Obstetrics and Gynecology, Maimonides Medical Center, Brooklyn, NY |
| Oct, 2013 | "The Environment and Reproduction", The American Gynecological Club Annual Meeting, Philadelphia, PA |
| Oct, 2013 | "Ovarian Function after Gastric Bypass Surgery", Annual Meeting of the Androgen-Excess and Polycystic Ovary Syndrome Society, Newport, RI |
| Oct, 2013 | "Vasomotor Symptoms and Alternatives to Hormonal Therapy", Roundtable discussion at the IFFS/ASRM 2013 Conjoint Meeting, Boston, MA |
| Mar, 2014 | "Reproductive Aging and the Environment: Dissecting Interactions between Chemical Exposures, Race, and Genetic Background", Women's Health Research Seminar Series, Washington University, St. Louis, MO |
| Mar, 2014 | "The Environment and Human Reproductive Health", Web based lecture sponsored by The Health Resources and Services Administration/Maternal and Child Health Bureau, Philadelphia, PA |
| Apr, 2014 | "The Road Less Traveled: Triplets Reflect on Service, Mentorship, and their Professional Journeys", The Annual Helen O. Dickens Commemorative Lecture in Medicine, Perelman School of Medicine, University of Pennsylvania, Philadelphia, PA |

Samantha F. Butts, MD, MSCE                                                    Page 9

| | | |
|---|---|---|
| Mar, 2015 | "Female Fertility - The Reproductive Endocrinologist's Perspective", at Fertility and Family Building: Medical, Psychosocial, and Financial Issues sponsored by the Penn Forum for Women Faculty, Philadelphia, PA | |
| Oct, 2016 | "Reproductive Decision Making and Your Career: Embracing Biology, Debunking Myths, and Gaining Control", Women in Statistics Conference, Charlotte, NC | |
| Nov, 2016 | "Current Practice in Ambulatory Gynecologic Surgery: A Case Based Approach", 7th Annual Peri-operative Conference, Penn Presbyterian Medical Center, Philadelphia, Pennsylvania | |

Organizing Roles in Scientific Meetings:

| | |
|---|---|
| Oct, 2008 | Moderator, Oral Abstract Session, American Society of Reproductive Medicine Annual Meeting San Francisco, California |
| Mar, 2009 | Moderator, Reproductive Biology Oral Abstract Session, Society for Gynecologic Investigation Annual Meeting Glasgow, Scotland UK |
| Aug, 2010 | Program Co-Chair, Reproductive Endocrinology and Infertility Session, Obstetrics and Gynecology Section, National Medical Association Annual Convention and Scientific Assembly Orlando, FL |
| Jul, 2011 | Moderator, Abstract Session, Obstetrics and Gynecology Section, National Medical Association Annual Convention and Scientific Assembly Washington, DC |
| Jul, 2011 | Program Co-Chair, Reproductive Endocrinology and Infertility Session, Obstetrics and Gynecology Section, National Medical Association Annual Convention and Scientific Assembly Washington, DC |
| Oct, 2012 | Moderator, Reproductive Biology Oral Abstract Session, American Society of Reproductive Medicine Annual Meeting San Diego, CA |
| Sep, 2013 | Steering Committee, Mid-Atlantic Center for Children's Health and the Environment Conference on Environmental Health for Obstetricians and Gynecologists Washington, DC |
| Oct, 2013 | Moderator, Reproductive Endocrinology and Infertility Fellows Research Abstract Session, Conjoint Meeting of the International Federation of Fertility Societies and the American Society for Reproductive Medicine Boston, MA |
| Oct, 2014 | Moderator, Reproductive Biology Oral Abstract Session, American Society of Reproductive Medicine Annual Meeting Honolulu, HI |

| Oct, 2015 | Moderator, Oral Abstract Session, American Society of Reproductive Medicine Annual Meeting Baltimore, MD |
| Aug, 2016 | Faculty Representative for Perelman School of Medicine Office of Inclusion and Diversity at the National Medical Association Annual Meeting Los Angeles, CA |
| Apr, 2017 | Faculty Representative for Perelman School of Medicine Office of Inclusion and Diversity at the American Medical Women's Association Annual Meeting San Francisco, CA |

Grants:

Past:

Maternal Vitamin D Status and Outcomes in Pregnancy, Penn Presbyterian Harrison Fund, 7/2015-6/2016 (Samantha Butts, MD MSCE, PI: David Seifer MD, Andrea Kelly MD MSCE, Co-Investigator. The main goal of this investigation is to evaluate the association between preconception vitamin D status and fertility treatment outcomes in women with polycystic ovary syndrome and with unexplained infertility), $50,000/annual direct costs, 2% effort.

Prenatal Environmental Exposures and Reproductive Hormone Concentrations (PERCH), SEATTLE CHILDREN'S HOSPITAL RESEARCH INSTITUTE, R21-ES-023883-01, 4/2014-3/2016 (Sathyanarayana, PI: Butts, Co-Investigator), $11,842/annual direct costs, 5% effort (PERCH aims to examine the relationship between phthalate and BPA exposures in relation to hormone concentrations and subsequent infant reproductive outcomes.)

Basser Research Center for BRCA 1&2, University of Pennsylvania, 7/2012-6/2014 (Domchek, PI), $8,992/annual direct costs, 5% effort (Role in grant: investigator. The major goal of this project is to examine symptoms and risks in women after risk reducing bilateral salpingoophorectomy (BRCA1/2) carriers.)

Department of Health & Human Services, Center of Excellence for Diversity in Health Education and the Health Resources and Services Administration, D34-HP-24459, 7/2012-6/2013 (Jerry Johnson, PI), $45,048/annual direct costs, 5% effort (Role in grant: Scholar. The main goal of this project is to support scholarly activity related to research efforts and career development.)

Penn Center for Study of Epigenetics in Reproduction (Pilot Study), NIH/NICHD, U54-HD-068157, 5/2011-3/2015 (M.Bartolomei/C.Coutifaris, PI), $78,889/annual direct costs, 10% effort (Role in grant: Pilot Study PI. The major goal of this project is to test the association between preconception and mid-gestation levels of endocrine disruptors and micronutrients and reproductive outcomes.)

Center of Excellence in Environmental Toxicology (CEET)
NIH/NIEHS (ARRA), 3P30ES013508-04S1, 9/2009-3/2010 (Trevor Penning, PhD, PI),
$25,000/annual direct costs, 10% effort (Role in grant: Pilot PI)

Center of Excellence in Environmental Toxicology (CEET), NIH/NIEHS,
5P30ES013508-04 , 1/2008-12/2009 (Trevor Penning, PI), $22,616/annual direct costs,
15% effort (Role in grant: Pilot PI)

Macy Foundation Scholar Award, Macy Foundation, 8/2007-7/2008 (Samantha Butts,
MD MSCE, PI), $25,000/annual direct costs, 10% effort (Role in grant: PI)

Telomere Homeostasis in Granulosa Cells: A Novel Molecular Approach to
Reproductive Senescence, The McCabe Fund, 7/2007-6/2010 (Samantha Butts, MD
MSCE, PI), $23,416/annual direct costs, 10% effort (Role in grant: PI)

Improvements in Reproductive Status Following Bariatric Surgery, American Society for
Bariatric Surgery , 7/2007-6/2009 (Kelly Allison, PhD, PI), $25,000/annual direct costs,
10% effort (Role in grant: Co-Investigator)

Markers of Senescence in Granulosa Cells: Relationship to Ovarian Reserve and
Outcomes in In Vitro Fertilization, University Research Foundation , 3/2006-2/2007
(Samantha Butts, MD, PI), $25,000/annual direct costs, 10% effort (Role in grant:
Principal Investigator)

Building Interdisciplinary Research Careers In Women's Health (BIRCWH K12),
NIH/NICHD, K12 HD043459-, 1/2006-3/2008 (Strauss/Freeman, PI), $92,392/annual
direct costs, 75% effort (Role in grant: K12 Scholar)

Oxidative Stress and the Human Egg: Correlation of Telomere Length and Telomerase
Activity in Developing Follicles with Outcomes in IVF, NIH T32 Grant, 7/2004-6/2005
(Kurt Barnhart, MD, MSCE, PI), 70% effort (Role in grant: investigator)

Bibliography:

Research Publications, peer reviewed (print or other media):

1. Torigian DA, Siegelman ES, Terhune KP, **Butts SF**, Blasco L, Shlansky-Goldberg
   RD: Case report: MRI of uterine necrosis after uterine embolization for treatment
   of uterine leiomyomata. Amer J Roentgenology 184(2):555-59, 2005. PMCID:
   15671379

2. Wrotniak BH, Shults J, **Butts S**, Stettler N: Gestational weight gain and risk of
   overweight in the offspring at age seven years in a multicenter, multiethnic cohort
   study. Amer J Clin Nutrit 87(6):1818-24, June 2008. PMCID: 18541573

3. **Butts S**, Riethman HR, Ratcliffe S, Coutifaris C, Shaunik A, Barnhart K: Correlation of telomere length and telomerase activity with primary ovarian insufficiency. J Clin Endocrinol Metabol 94(12):4835-34, December 2009. PMCID: 19864453

4. **Butts SF**, Gibson E, Sammel SD, Shaunik A, Rudick B, Barnhart KT: Race, socioeconomic status and response to methotrexate treatment of ectopic pregnancy in an urban population. Fertil Steril 94(7):2789-92, December 2010. PMCID: 20674907

5. Shlansky-Goldberg R, Coryell L, Stavropoulos SW, Trerotola SO, Mondschein J, Beshara M, **Butts SF**, Sondheimer S, Tureck RW, Rosen M: Outcomes following fibroid expulsion after uterine artery embolization. J Vasc Interv Radiol  22: 1586-1593, 2011. PMCID: 22024118

6. **Butts SF**, Freeman EW, Sammel MD, Queen K, Lin H, Rebbeck T: The joint effect of smoking and gene variants involved in sex steroid metabolism on hot flashes in late reproductive age women. J Clin Endocrinol Metabol 97 (6): E1032-E1042, June 2012. PMCID: 22466345

7. **Butts SF**, Ratcliffe S, Dokras A, Seifer DB: Diagnosis and treatment of diminished ovarian reserve in ART cycles of women up to age 40: The role of insurance mandates. Fertil Steril 99:382-88, February 2013. PMCID: 409153

8. **Butts SF**, Shaunik A, Guo Wensheng, Cary MS, Chung K, Takacs P, Sammel MD, Barnhart KT: Predicting the decline in serum human chorionic gonadotropin in miscarriage: Redefining the normal curve in a diverse population Obstet Gynecol 122(2): 337-343, August 2013. PMCID: PMCID: PMC3752097

9. Sathyanarayana S, Barrett E, **Butts S**, Wang C, Swan S: Phthalate exposure and reproductive hormone concentrations in pregnancy. Reproduction 147: 401-409, April 2014. PMCID: 24196015

10. Roe A, Hillman J, **Butts S**, Smith M, Playford M, Rader D, Mehta NN, Dokras A: Decreased cholesterol efflux capacity and atherogenic lipid profile in young women with PCOS. J Clin Endocrinol Metab 99(5): E841-E847   May 2014. PMCID: 24512495

11. **Butts S**, Sammel MD, Greer C, Rebbeck TR, Boorman DW, Freeman EW: Cigarettes, genetic background and early menopause: The presence of single nucleotide polymorphisms in cytochrome P450 genes hastens the onset of natural menopause in European American Smokers. Menopause 21(7): 694-701, July 2014. PMCID: 24448104

12. McLaren JF, Barnhart KT, Sammel MD, Appleby DH, **Butts SF**: Success of the two-dose methotrexate protocol for treatment of ectopic pregnancy in women with a history of prior ectopic pregnancy. J Reprod Med 59(4): 379-384, August 2014. PMCID: 25098028

13. **Butts SF**, Owen C, Mainigi M, Senapati S, Seifer D, Dokras A: Assisted hatching and intracytoplasmic sperm injection are not associated with improved outcomes in ART cycles for diminished ovarian reserve: An Analysis of US Cycles from 2004-2011. Fertil Steril 102: 1041-1047, October 2014. PMCID: 617996

14. Wishall KM, Price J, Pereira N, **Butts S**, Della Badia C: Postablation risk factors for pain and subsequent hysterectomy. Obstet Gynecol 124(5): 904-910, 2014 Notes: Editors pick for November 2014 issue of Obstetrics and Gynecology   PMCID: 25437717

15. Hansen K, He ALW, Styer AK, Wild RA, **Butts S**, Engmann L, Diamond MP, Legro RS, Coutifaris C, Alvero R, Robinson RD, Casson P, Christman GM, Huang H, Santoro N, Eisenberg E, Zhang H: Predictors of pregnancy and live-birth in couples with unexplained infertility following ovarian stimulation-intrauterine insemination Fertil Steril 105(6): 1575-1583. 2016.

16. Senapati S, Sammel MD, **Butts SF**, Takacs P, Chung K, Barnhart KT: Predicting first trimester pregnancy outcome: Derivation of a multiple marker test. Fertility and Sterility 106: 1725-1732, 2016.

17. Feldman RA, O'Neill K, **Butts SF**, Dokras A: Antimullerian hormone levels and cardiometabolic risk in young women with polycystic ovary syndrome. Fertil Steril 107(1): 276-281, January 2017.

18. Garin M, **Butts SF**, Sarwer DB, Allison KC, Dokras A: Ghrelin is independently associated with Anti-Mullerian Hormone levels in overweight and obese but not lean women with polycystic ovary syndrome. Clinical Endocrinology 55(3): 907-913, March 2017.

19. Sathyanarayana S, **Butts S**, Wang C, Barrett E, Nguyen R, Schwartz SM, Haaland W, Swan S: Early pregnancy phthalate exposure in relation to sex steroid hormone concentrations and birth outcomes.   Journal of Clinical Endocrinology and Metabolism (102), March 2017.

20. Chan JL, Senapati S, Johnson LNC, DiGiovanni L, Voong C, **Butts SF**, Domchek SM: Risk factors for sexual dysfunction in BRCA mutation carriers following risk-reducing salpingo-oophorectomy. Menopause submitted.

21. Price JT, Zimmerman LD, Lee S, **Butts SF**: Social determinants of access to minimally invasive hysterectomy: Re-evaluating the relationship between race, SES, ethnicity, and route of hysterectomy for benign disease. American Journal of Obstetrics and Gynecology published online August 4, 2017.

Research Publications, peer-reviewed reviews:

1. Patrizio P, **Butts SF**, Caplan A: Ovarian tissue preservation and future fertility: Emerging technologies and ethical considerations. J Nat Cancer Inst Monogr 32:107-110, 2005. PMCID: 15784838

2. **Butts S**, Seifer D: 6 office tests to assess ovarian reserve, and what they tell you. OBG Management 20(11):29-40, November 2008.

3. **Butts SF**, Seifer DB: Racial and ethnic differences in reproductive potential across the lifecourse. Fertil Steril 93(3):681-690, February 2010. PMCID: 19939362

4. **Butts, SF**: Obesity, fertility and contraception: disparities among women, clinical practitioner perspective. Endocrine News 37(6):22-9, June 2012.

5. Meldrum DR, Fisher AR, **Butts SF**, Su HI, Sammel MD: Acupuncture - help, harm, or placebo? Fertil Steril 99(7):1821-24, Jun 2013. PMCID: 23357452

6. **Butts S**, Guidotti T: What are some potential reproductive hazards in the hospital environment? J Occupational Environ Med 56(12): e163-165, December 2014. PMCID: 24423700

Abstracts:

1. **Butts SF**, Shaunik A, Wei J, Barnhart KT, Reithman HC, Coutifaris C: Decreased telomerase activity in patients with diminished ovarian reserve: A novel theory of premature aging. Oral presentation, American Society for Reproductive Medicine Annual Meeting, Philadelphia, PA, 2004.

2. Lin K, Barnhart K, Shaunik A, **Butts S**, Fitzgerald GA, Coutifaris C: Follicular fluid F2-isoprostanes: A novel assessment of oxidative stress in IVF patients. Oral presentation, American Society for Reproductive Medicine Annual Meeting, Montreal, Quebec, 2005.

3. Su I, **Butts SF**, Ratcliffe S, Coutifaris C, Barnhart KT, Williams CJ: Plasma and follicular fluid taurine levels and granulosa cell taurine receptor mRNA expression in unexplained infertility. Poster presentation, Society for Gynecologic Investigation Annual Meeting, San Diego, CA, 2005.

4. **Butts S**, Shaunik A, Menon S, Coutifaris C, Riethman H, Barnhart K: Telomere length
   and the aging granulosa cell: Correlation with diminished ovarian reserve. Poster
   presentation, American Society for Reproductive Medicine Annual Meeting, New
   Orleans, LA, 2006.

5. Shaunik A, **Butts S**, Menon S, Coutifaris C, Barnhart KT: Discrepancies in diagnosis
   of infertility as perceived by the patient, physician and researcher in women
   undergoing in-vitro-fertilization. Poster presentation, American Society for
   Reproductive Medicine Annual Meeting, New Orleans, LA, 2006.

6. Stettler N, Wrotniak B, Shults J, **Butts S**: Fetal growth only partially explains the
   increased risk for obesity in children of women who gain excessive weight during
   pregnancy: A large multi-center, multi-ethnic cohort study. Experimental Biology
   Annual Meeting, San Francisco, CA, 2006.

7. Wrotniak B, Shults J, **Butts S**, Stettler N: Association of gestational weight gain with
   overweight in offspring at seven years of age in a multicenter cohort study.
   Annual Scientific Meeting of the Obesity Society, New Orleans, LA, 2007.

8. **Butts SF**, Gibson E, Sammel MD, Shaunik A, Rudick B, Barnhart KT: Racial
   differences in response to methotrexate: A health disparity reconsidered. Poster
   presentation, American Society of Reproductive Medicine Annual Meeting, San
   Francisco, CA, 2008.

9. **Butts S**, Mesaros C, Chavkin D, Barnhart K, Coutifaris C, Blair I: Biomarkers of
   premature ovarian insufficiency: Use of chiral lipidomic analysis of human
   follicular fluid to characterize intrafollicular oxidative stress. Poster presentation,
   NIEHS Environmental Health Science Core Centers Meeting, Milwaukee, WI,
   2009.

10. **Butts SF**, Mesaros C, Chavkin D, Barnhart K, Coutifaris C, Shaunik A, Blair I:
    Chiral lipidomic analysis of human follicular fluid: A novel approach to
    intrafollicular oxidative stress assessment and its association with diminished
    ovarian reserve. Poster presentation, Society for Gynecologic Investigation
    Annual Meeting, Glasgow, Scotland, 2009.

11. McLaren JF, Barnhart KT, Sammel M, Appleby D, Shaunik A, **Butts SF**:
    Methotrexate failure in women with prior ectopic: Our experience with the two-
    dose methotrexate protocol. Oral presentation, American Society for
    Reproductive Medicine Annual Meeting, Atlanta, GA, 2009.

12. Allison K, **Butts S**, Eisenberg M, Dokras A, Sarwar D: Examination of reproductive
    and psychosocial functioning: A comparative study of women seeking bariatric
    surgery and behavioral weight loss. Oral presentation at the American Society for
    Metabolic and Bariatric Surgery Annual Meeting, Las Vegas, NV, 2010.

13. **Butts SF**, Rebbeck T, Sammel MD, Lin H, Freeman E: Estrogen-metabolizing genes, smoking, and vasomotor symptoms - A putative model for gene-environment interactions in reproductive aging. Oral presentation, Society for Gynecologic Investigation Annual Meeting, Orlando, FL, 2010.

14. Kondopalli LA, Allison K, Sarwer D, Spitzer J, Dokras A, **Butts SF**: Ovarian reserve in extremely obese women undergoing weight loss intervention: Interplay between reproductive biomarkers, adipokines, and measures of adiposity. Oral presentation, American Society for Reproductive Medicine Annual Meeting, Denver, CO, 2010.

15. Kondopalli LA, Allison K, Sarwer DB, Spitzer JC, Dokras A, **Butts SF**: Reproductive functioning in extremely obese women after weight loss: Twelve month follow up after surgical versus non-surgical intervention. Poster presentation, Annual Meeting of the American Society for Reproductive Medicine, Orlando, FL, 2011.

16. Roe A, **Butts S**, Smith M, Rader D, Dokras A: Novel biomarkers of coronary artery disease in young women with PCOS. Poster presentation, American Society for Reproductive Medicine Annual Meeting, San Diego, CA, 2012.

17. Spitzer JC, Sarwer DB, Allison KC, **Butts S**, Dokras A, Coutifaris C: Changes in reproductive and psychosocial functioning in obese women following bariatric surgery or lifestyle modification. Oral presentation, American Society for Metabolic and Bariatric Surgery Annual Meeting, San Diego, CA, 2012.

18. Bachman E, Senapati S, Sammel MD, **Butts SF**, Mainigi M, Coutifaris C: The effect of in vitro oxygen tension and days in culture on human trophoblast differentiation. Oral presentation, Joint International Federation of Fertility Societies/American Society of Reproductive Medicine Meeting, Boston, MA, 2013.

19. **Butts S**, Purkiss D, Prabhu A, Jeffers S, Bartolomei M, Coutifaris C: Maternal awareness of BPA: Divergence of knowledge and avoidant behaviors depends on fertility status. Poster presentation, The Endocrine Society 95th Annual Meeting, San Francisco, CA, 2013.

20. **Butts S**, Sammel MD, Greer C, Rebbeck TR, Freeman EW: Anti-Mullerian Hormone decline in smokers is modified by genetic background in a race-specific fashion: Results from a population-based longitudinal study. Oral presentation, Joint International Federation of Fertility Societies/American Society of Reproductive Medicine Meeting, Boston, MA, 2013.

21. **Butts SF**, Sammel MD, Rebbeck T, Boorman D, Greer C, Freeman E: Gene environment interactions in time to menopause: Links between smoking and genetic variation in sex steroid metabolizing enzymes. Oral presentation, Society for Gynecologic Investigation Meeting, Orlando, FL, 2013.

22. Hillman JK, **Butts SF**, Playford MP, Meta NN, Dokras: Atherogenic lipoprotein profile and decreased HDL function support increased risk of cardiovascular disease (CVD) in young women with polycystic ovary syndrome (PCOS). Poster presentation, Joint International Federation of Fertility Societies/American Society of Reproductive Medicine Meeting, Boston, MA, 2013.

23. **Butts S**, Allison K, Spitzer J, Moore R, Dokras A, Sarwer D: Reproductive functioning after surgical and non-surgical weight loss: Stable ovarian reserve and improved sexual functioning at twelve-month follow up. Poster presentation, American Society for Reproductive Medicine Annual Meeting, Honolulu, HI, 2014.

24. **Butts S**, Johnson L, DiGiovanni L, Chan J, Senapati S, Voong C, Domchek S: Poor sleep quality after surgical menopause: Complex associations between mood, vasomotor symptoms and medications. Oral presentation, American Society for Reproductive Medicine Annual Meeting, Honolulu, HI, 2014.

25. Chan JL, Senapati S, Johnson LNC, DiGiovanni L, Voong C, **Butts SF**, Domchek S: Risk factors for sexual dysfunction in BRCA1 and BRCA2 (B1/2) mutation carriers following risk-reducing salpingo-oophorectomy, Oral presentation, American Society for Reproductive Medicine Annual Meeting, Honolulu, HI, 2014.

26. Johnson L, **Butts S**, DiGiovanni L, Voong C, Chan J, Senapati S, Domchek S.: Vasomotor symptoms after risk reducing bilateral salpingo-oophorectomy (RRSO) in BRCA mutation carriers: Impact of obesity, hormone replacement therapy (HRT) and depressed mood. Poster presentation, American Society for Reproductive Medicine Annual Meeting, Honolulu, HI, 2014.

27. Senapati S, Sammel MD, Coutifaris C, Bartolomei M, Adedji-Fajobi T, **Butts SF**: Peri-Conceptional Vitamin D Status and Serum hCG Concentration in the First Trimester of Pregnancy. Oral presentation, The Endocrine Society 97th Annual Meeting, San Diego, CA, March 2015.

28. **Butts S**, Holder S, Mostisser C, Mesaros C, Imbalzano M, Coutifaris C, Bartolomei M: BPA levels at implantation are associated with elevated miscarriage risk in IVF cycles. Oral presentation, American Society for Reproductive Medicine Annual Meeting, Baltimore, MD, October, 2015.

29. Feldman R, **Butts S**, Dokras A.: Anti-Mullerian Hormone (AMH) levels predict cardiovascular risk assessment in young women with polycystic ovary syndrome (PCOS). Poster presentation, American Society of Reproductive Medicine Annual Meeting, Baltimore, MD, October 2015.

30. Hansen KR, He AW, Styer AK, **Butts S**, Engmann T, et al.: Predictors of pregnancy and live birth in couples with unexplained infertility following superovulation-intrauterine insemination. Oral presentation, American Society for Reproductive Medicine Annual Meeting, Baltimore, MD, October 2015.

31. Senapati S, Sammel MD, Coutifaris C, Bartolomei M, Adedji-Fajobi T, **Butts SF**: Free, bioavailable and total 25 hydroxy vitamin D in viable pregnancies: Comparisons across race and over time. Oral presentation, American Society for Reproductive Medicine annual meeting, Baltimore, MD, October 2015.

32. **Butts S**, Senapati S, Coutifaris C, Bartolomei M: Adipocity and fetal follicular development: An association between leptin and cord blood AMH. Poster presentation, American Society for Reproductive Medicine annual meeting, Salt Lake City, UT, October 2016.

33. **Butts S**, Seifer D, Senapati S, Koelper NC, Legro R, Diamond MP: Vitamin D is associated with poor reproductive outcomes in PCOS but not unexplained infertility. Oral abstract accepted for presentation at American Society for Reproductive Medicine annual meeting, San Antonio TX, October 2017.

Editorials, Reviews, Chapters, including participation in committee reports (print or other media):

1. **Butts S**, Pfeifer SM: Pediatric and adolescent gynecology. NMS Series for Independent Study: Obstetrics and Gynecology, 5th ed. Morgan MA, Siddighi S (eds.). Lippincott Williams and Wilkins, 22:244-57, June 2004.

2. **Butts SF**: Dysfunctional uterine bleeding. NMS Series for Independent Study: Obstetrics and Gynecology, 5th ed. Morgan MA, Siddighi S (eds.). Lippincott Williams and Wilkins, 21:233-43, June 2004.

3. **Butts S**, Driscoll DA: Polycystic ovary syndrome: When to suspect? Consultant 46:765-769, 2006.

4. **Butts S**, Driscoll DA: Polycystic ovary syndrome: How best to manage? Consultant 46:745-749, 2006.

5. **Butts S**, Driscoll DA: Polycystic ovary syndrome: When to suspect? Consultant for Pediatricians 6(2):98-106, February 2007.

6. **Butts S**, Driscoll DA: Polycystic ovary syndrome: Update on pros and cons of treatment options. Consultant for Pediatricians 6(3):141-144, March 2007.

7. **Butts S**, Seifer D: Ectopic pregnancy. Operative Obstetrics, 2nd edition. O'Grady JP, Gimovsky ML (eds.). Cambridge University Press, Page: 69-88, August 2008.

8. **Butts S**, Pfeifer SM, Vichnin M: Pediatric and adolescent gynecology. NMS Series for Independent Study: Obstetrics and Gynecology, 6th ed. Pfeifer SM (eds.). Lippincott, Williams and Wilkins, Chpt 30, 2008.

9. **Butts S**: Abnormal uterine bleeding. NMS Series for Independent Study: Obstetrics and Gynecology, 6th Edition. Pfeifer SM, Ed (eds.). Lippincott Williams and Wilkins, Chpt 23, 2008.

10. Lin K, **Butts S**: Recurrent pregnancy loss. NMS Series for Independent Study: Obstetrics and Gynecology, 6th Edition. Pfeifer SM (eds.). Lippincott, Williams and Wilkins, Chpt 29, 2008.

11. **Butts, SF**: Telomere length regulation and reproduction: Current concepts and putative threats to ovarian reserve. The Jrnl Clin Metabol & Diab 1(2), Nov 2010 Notes: electronic journal: www.slm-jcmd.com/the-journal-of-clinical-metabolism-diabetes/details/article/telomere-length-regulation-and-reproduction-current-concepts-and-putative-threats-to-ovarian-reserv.

12. Chavkin D, **Butts S**: Recurrent Pregnancy Loss. NMS Obstetrics and Gynecology, 7th Edition. Pfeifer SM (eds.). Lippincott Williams & Wilkins, 29:350-58, 2012.

13. **Butts S**, Barnhart K: Ectopic Pregnancy. Conn's Current Therapy 2014. Bope ET, Kellerman RD. (eds.). Elsevier Saunders, Philadelphia, PA, Page: 1035-1038, December 2013.

14. Committee on Gynecologic Practice: American College of Obstetrics and Gynecology Committee Opinion No. 584: Oocyte Cryopreservation. Obstet Gynecol 123: 221-2, Jan 2014 Notes: **SFB lead author on this committee opinion**.

15. Practice Committee of the American Society for Reproductive Medicine: Treatment of pelvic pain associated with endometriosis: A committee opinion. Fertil Steril 101(4): 927-935, Apr 2014.

16. Practice Committee of the American Society for Reproductive Medicine: Ovarian tissue cryopreservation: A committee opinion. Fertil Steril 101(5): 1237-1243, May 2014.

17. Practice Committees of the American Society for Reproductive Medicine, Society for Assisted Reproductive Technology: Role of assisted hatching in in vitro fertilization: A guideline. Fertil Steril 102(2): 348-351, Aug 2014.

18. Practice Committees of the American Society for Reproductive Medicine Society of Reproductive Biology and Technology: Revised minimum standards for practices offering assisted reproductive technologies: A committee opinion. Fertil Steril 102(3): 682-686, Sept 2014.

19. Practice Committees of the American Society for Reproductive Medicine, Society for Assisted Reproductive Technology: Repetitive oocyte donation: A committee opinion. Fertil Steril 102(4): 964-966, Oct 2014.

20. Practice Committees of the American Society for Reproductive Medicine, Society for Assisted Reproductive Technology, Society of Reproductive Biologists and Technologists: Recommended practices for the management of embryology, andrology, and endocrinology laboratories: A committee opinion. Fertil Steril 102(4): 960-963, Oct 2014.

21. Practice Committees of the American Society for Reproductive Medicine and Society for Male Reproductive and Urology: Report on varicocele and infertility: A committee opinion. Fertil Steril 102(6): 1556-1560, Dec 2014.

22. Practice Committees of the American Society for Reproductive Medicine and Society for Assisted Reproductive Technology : Recommendations for practices utilizing gestational carriers: A committee opinion. Fertil Steril 103(1): e1-e8, Jan 2015.

23. Practice Committee of the American Society for Reproductive Medicine: Testing and interpreting measures of ovarian reserve: A committee opinion. Fertil Steril 103(3): e9-e17, Mar 2015.

24. Practice Committee of the American Society for Reproductive Medicine: Diagnostic evaluation of the infertile male: A committee opinion. Fertil Steril 103(3): e18-e25, Mar 2015.

25. Practice Committee of the American Society for Reproductive Medicine: Current clinical irrelevance of luteal phase deficiency: A committee opinion. Fertil Steril 103(4): e27-e32, Apr 2015.

26. Schon S, **Butts S**: Obesity, Reproductive Outcomes, and Access to Infertility Treatments: A Clinical and Ethical Debate Obesity and Fertility. Jungheim, E (eds.). Springer, May 2015.

27. Practice Committee of the American Society for Reproductive Medicine: Role of tubal surgery in the era of assisted reproductive technology: A committee opinion. Fertil Steril 103(6): e37-e43, June 2015.

28. Practice Committee of the American Society for Reproductive Medicine: Diagnostic evaluation of the infertile female: A committee opinion. Fertil Steril 103(6): e44-e50, June 2015.

29. Practice Committee of the American Society for Reproductive Medicine: Subclinical hypothyroidism in the infertile female population: A guideline. Fertil Steril 104(3): 545-553, Sept 2015.

30. Practice Committee of the American Society for Reproductive Medicine: Obesity and reproduction: A committee opinion  Fertil Steril 104(5): 1116-1126, Nov 2015.

31. Mainigi MA, Sapienza C, **Butts S**, Coutifaris C: A Molecular Perspective on Procedures and Outcomes with Assisted Reproductive Technologies.  Molecular Approaches to Reproductive and Newborn Medicine. Bianchi DW and Norwitz ER (eds.). Cold Spring Harbor Laboratory Press, Cold Spring Harbor, NY, Page: 77-91, 2015.

32. Practice Committee of the American Society for Reproductive Medicine; Society for Assisted Reproductive Technology: Position on reproductive donors and smallpox vaccine: A committee opinion. Fertil Steril 105(5): e14-e15, May 2016.

33. Practice Committees of the American Society for Reproductive Medicine and Society for Assisted Reproductive Technology: Position statement on West Nile Virus; A committee opinion. Fertil Steril  105(5): e9-e10, May 2016

34. Practice Committees of the American Society for Reproductive Medicine, Society for Assisted Reproductive Technology, Society of Reproductive Biologists and Technologists: Recommendations for development of an emergency plan for in vitro fertilization programs: A committee opinion. Fertil Steril 105(5): e11-e13, May 2016

35. Practice Committee of the American Society for Reproductive Medicine: Uterine septum: A guideline. Fertil Steril 106(3): 530-540, Sept 2016.

36. Practice Committee of the American Society for Reproductive Medicine: Fertility drugs and cancer: A guideline. Fertil Steril  106(7): 1617-1627, Dec 2016.

37. Practice Committee of the American Society for Reproductive Medicine: Prevention and treatment of moderate and severe ovarian hyperstimulation syndrome: A guideline. Fertil Steril 106(7): 1634-1647, Dec 2016.

38. Practice Committee of the American Society for Reproductive Medicine: Combined hormonal contraception and the risk of venous thromboembolism: A guideline. Fertil Steril 107(1): 43-51, Jan 2017.

39. Practice Committees of the American Society for Reproductive Medicine and Society for Reproductive Endocrinology and Infertility: Optimizing natural fertility: A committee opinion. Fertil Steril 107(1): 52-58, Jan 2017.

40. Practice Committees of the American Society for Reproductive Medicine and Society for Assisted Reproductive Technology: Recommendations for practices utilizing gestational carriers:   A committee opinion. Fertil Steril 107(2): e3-310, Feb 2017.

41. Penzias A, Bendikson K, Butts S, Coutifaris C, Falcone T, Fossum G, Gitlin S, Gracia C, Hansen K, Mersereau J, Odem R, Rebar R, Reindollar R, Rosen M, Sandlow J, Vernon M, for the Practice Committee of the American Society for Reproductive Medicine: ASRM standard embryo transfer protocol template: A committee opinion. Fertil Steril 107(4): 897-900, Apr 2017.

42. Practice Committee of the American Society of Reproductive Medicine: Performing the embryo transfer: A guideline. Fertil Steril 107(4): 882-896, Apr 2017.

43. Practice Committees of the American Society for Reproductive Medicine and Society for Assisted Reproductive Technology: Guidance on the limits to the number of embryos to transfer:   A Committee Opinion   Fertil Steril   107(4): 901-903, Apr 2017.

44. **This Committee Opinion was developed by the American College of Obstetricians and Gynecologists' Committee on Gynecologic Practice in collaboration with committee member Samantha F. Butts, MD, MSCE**: ACOG Committee Opinion 698, Hormone Therapy for Primary Ovarian Insufficiency.   Obstetrics and Gynecology 129(5): 963-964, May 2017.

45. **This Committee Opinion was developed by the American College of Obstetricians and Gynecologists' Committee on Gynecologic Practice in collaboration with committee members Kristen A. Matteson, MD, MPH and Samantha F. Butts, MD, MSCE**: ACOG Committee Opinion 701, Choosing the Route of Hysterectomy. Obstetrics and Gynecology 129(6): 1149-1150, June 2017.

46. **Butts S**: Polycystic Ovary Syndrome:   Update on the Pros and Cons of Treatment Options. Consultant for Pediatricians Epub September 19, 2013.

47. **Butts S**: Polycystic Ovary Syndrome:   Update on When to Suspect. Consultant for Pediatricians Epub September 22, 2013.

Alternative Media (selected media):

1. "Women's health update" Radio Interview on HealthQuest Live, WURD Radio April 2007.

2. "Only in America? The U.S. Health system and the California octuplets" <u>Radio interview on "The Takeaway" a co-production of WNYC Radio and Public Radio International, in collaboration with the BBC World Service, New York Times Radio and WGBH Boston</u> February 2009.

3. WPVI network: "The California octuplets" <u>Interview on "Visions" television program</u> February 2009.

4. "The next generation of great Philadelphia doctors" <u>Cover article in Philadelphia Magazine featuring 64 top doctors in the region age 40 or less</u>, Philadelphia Magazine,   April 2009.

5. "Think about your health men; Because making babies is men's work too" <u>The Plain Dealer Cleveland Newspaper</u> April 2009.

6. "When parents can't conceive" <u>Interview with MetroKids newspaper</u> January 2010.

7. "When to see a fertility specialist" <u>Interview for University of Pennsylvania Health System Women's Health Newsletter</u> December 2011.

8. "Menopause: Smokers have more hot flashes, genes can play an additional role too, study finds" <u>Interview with WebMD Health News</u> May 2012.

9. "Doctors' group sounds warning on freezing eggs to buy time on your biological clock" <u>Interview with NBC News Health/Today.com</u> December 2013.

10. "Smoking Can Speed Menopause for Some Women" <u>Interview with NBC News.com</u> February 2014.

11. Sister 2 Sister Magazine: "Motherhood on Reserve:   Why Some Women Have Decided to Freeze Their Eggs" <u>Interview with Sister 2 Sister Magazine</u> February 2014.

Samantha F. Butts, MD, MSCE                                    Page 24

      12. "The Age Your Fertility Really Begins To Decline -- And Why You Shouldn't Freak Out" <u>Interview with The Huffington Post,</u> February 2014.

      13. "Sisters, triplets, colleagues in medicine"   <u>Interview with WHYY (Philadelphia PBS affiliate),</u> June 2014.

      14. "How Fear Fuels the Business of Egg Freezing" <u>Interview with The Washington Post,</u> March 2015.

      15. "Three Steps to Freezing Your Eggs" <u>Interview on The Dr. Oz Show,</u> October 2015.

      16. "Should You Take an at-Home Fertility Test?" <u>Interview with New York Magazine.com,</u> April 2016.

      17.  "Age at Menopause: Do Chemical Exposures Play a Role?" <u>Expert interview with Environmental Health Perspectives,</u> July 2017 (Vol 125, issue 6, DOI:10.1289/EHP2093).

# EXHIBIT R

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

                Plaintiff,

    v.

DONALD J. TRUMP *et al.*

               Defendants.

**NO. 2:17-cv-04540-WB**

## DECLARATION OF DAYLE STEINBERG

I, Dayle Steinberg, hereby submit this declaration in support of the Motion for

Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned

matter and, in support thereof, state as follows:

1.      I am the CEO of Planned Parenthood Southeastern Pennsylvania. Planned

Parenthood is one of the nation's largest providers of health care to women, men, and teenagers.

2.      Nationwide, Planned Parenthood operates more than 600 health centers providing

a variety of health services, including family planning services. Each year, 2.4 million women,

men, and young people visit a Planned Parenthood health center to obtain services or

information. Approximately 75% of these patients seek services to prevent unintended

pregnancy.

3.      Planned Parenthood Southeastern Pennsylvania provides services in Chester,

Delaware, Montgomery, and Philadelphia Counties. We operate 8 health centers in the area and,

in fiscal year 2016, provided services to 36,779 women, men, and teens in these centers.

## I.    The Title X Program Provides Federal Grants for Family Planning Services

4.    Title X of the Public Health Service Act[1] provides grants to both public and private agencies for family planning services. Specifically, Title X authorizes grant money "to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."

5.    Title X grants are awarded through a competitive process. They fund services provided by state and local health departments, hospitals, university health centers, and non-profit agencies.  The Title X program is overseen by the Office of Population Affairs of the U.S. Department of Health and Human Services (HHS-OPA) oversees the Title X grant program.

6.    Since 2010, Title X funding has decreased by $31 million, nationally. In 2010, the nationwide program received $317.5 million; in 2017, it received $286.5 million.[2] In addition, there are frequent efforts by some in Congress to eliminate funding for the program entirely.

7.    In Pennsylvania, Title X grant money is provided directly to four private, non-profit, regional Family Health Councils. They are: AccessMatters (formerly the Family Planning Council) in Philadelphia; Adagio Health in Pittsburgh, Maternal and Family Health Services, Inc. in Wilkes Barre, and the Family Health Council of Central Pennsylvania in Camp Hill. The Alliance of Pennsylvania Councils supports and coordinates the efforts of the four Family Health Councils.

8.    These four Family Health Councils also receive funding from the Commonwealth of Pennsylvania as well as local sources. For instance, in the fiscal year ending June 30, 2016, AccessMatters received approximately $8.2 million in federal funding and $3.9 million in state

---

[1] 42 U.S.C. § 300 *et seq.*

[2] National Family Planning & Reproductive Health Association, Title X Budget & Appropriations, *available at* https://www.nationalfamilyplanning.org/title-x_budget-appropriations.

2

Case 2:17-cv-04540-WB     Document 90-20     Filed 12/17/18     Page 4 of 45

and local funding. The vast majority of this $3.9 million was provided by the Pennsylvania
Department of Health and the Pennsylvania Department of Human Services.[3]

## II.     Pennsylvania's Family Planning Clinics

9.      These four Family Health Councils in turn provide funding to a variety of
organizations in Pennsylvania. These organizations operate clinic-based health centers
throughout the Commonwealth.

10.      As of December 2016, there were 162 facilities in Pennsylvania receiving Title X
funding. Each county in Pennsylvania has at least one such clinic.

11.      These clinics provide women and men with access to a variety of family planning
services. These services include contraception, HIV and STD testing, counseling services,
pregnancy testing, certain infertility services, and breast and cancer screening.  They are
important to the citizens of Pennsylvania and to the overall health of Pennsylvania, as a whole.

12.      Although facilities that receive Title X grants are typically referred to as "Title X
clinics," they actually receive funding from a variety of sources and only a small part through
Title X. In fact, Title X accounts for less than one-fifth of their revenue.

13.      According to the 2016 Title X Family Planning Annual Report[4] (at ES-3), the top
three sources of revenue for Title X clinics nationwide were Medicaid and CHIP (the Children's
Health Insurance Program) (39% of revenue); Title X (19%); and state government funding
(10%).

---

[3] AccessMatters, *Consolidated Financial Statements and Supplemental Information, Years Ended June 30, 2016, and 2015*, at 4, *available at* http://www.govwiki.info/pdfs/Non-Profit/PA%20Accessmatters%202016.pdf.

[4] Department of Health and Human Services Office of Population Affairs, *Title X Family Planning Annual Report, 2016 National Summary* (August 2017), *available at* https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

3

Case 2:17-cv-04540-WB    Document 90-20    Filed 12/17/18    Page 5 of 25

14.     Title X acts as "the payer of last resort" for these clinics. In other words, each clinic can only use Title X funds to pay for services if no other source of funding is available. This includes funding from the Commonwealth or other federal funding. As a result, many of our patients receive services that are funded by multiple sources.

15.     For this reason – and to ensure that clinic patients can receive the best possible care – Title X clinics work to educate patients about available government health programs and help patients enroll in programs for which they are eligible.

16.     In Pennsylvania, these programs include Medical Assistance (Medicaid) and the Family Planning Service Program, both of which received Commonwealth funding. Title X clinics will assist patients who are eligible for (but not enrolled in) these programs with the necessary paperwork so that they can be enrolled. Doing so not only ensures that the patient has all the coverage for which she is eligible for, but it allows the clinic to save Title X and Commonwealth grant money.

17.     While the priority of the Family Health Councils is to assist low income families, each Title X clinic in Pennsylvania provides family planning services to any individual seeking *services*, regardless of income or insurance status. Family planning services are provided based on a sliding scale fee structure depending on the individual/family income level.

18.     According to the 2016 Annual Report (at B-3), in 2016, family planning services through Title X grants were provided to 198,825 Pennsylvania residents.

19.     Of these recipients of care, 73% had some form of insurance. Among this 73%, 46% had insurance through Medicaid or another government-funded program (vs. 37% nationwide) and 27% had private insurance (vs. 18% nationwide) (2016 Annual Report at B-7).

4

Case 2:17-cv-04540-WB   Document 98-20   Filed 12/17/18   Page 6 of 45

20.     Many Title X patients are currently employed or have a family member who is currently employed. Many of these patients receive insurance through their employer or their family member's employer.

21.     In some cases, Title X clinics are reimbursed by the insurance company; however, private insurance often does not provide sufficient coverage.  Thus, while 18% of all Title X users nationwide have private insurance, private sources of funding account for only 10% of clinic revenue (2016 National Report at B-7).

### III.     The Effects of the Contraceptive Care Mandate

22.     I understand that the Administration has issued new regulations that will make it easier for employers and others to opt out of the Affordable Care Act's contraceptive mandate.

23.     My colleagues at Planned Parenthood Southeastern Pennsylvania and I are very concerned that this action will lead to an increase in the number of employers in Pennsylvania that do not provide their employees with adequate insurance coverage for contraceptive care.

24.     Women who need contraceptive care but whose employers refuse to provide coverage for it will be forced to get care elsewhere. Many of these women will seek assistance from government programs.

25.     In fact, for many low-income women in this situation, a government-funded program will be the only viable option for obtaining contraceptive care.

26.     Therefore, we expect that many women in Pennsylvania who lose their contraceptive coverage will seek care from one of the 162 Title X clinics in the Commonwealth.

27.      Some of these women will likely be eligible for either Medical Assistance (Medicaid) or Pennsylvania's Family Planning Services program. If they seek care at a Title X clinic in Pennsylvania, the clinic will help them enroll in either program.

28.     Low-income women who seek services from a Title X clinic and are not eligible for these programs will receive contraceptive care funded by other sources. In most instances, their care will be funded through Title X and funding provided by the Commonwealth of Pennsylvania.

29.     We expect that the new exemptions from the Contraceptive Care Mandate will lead to an increase in the number of women who get contraception through Medicaid and Family Planning Services, as well as an increase in the number of women who obtain contraception from Title X clinics paid for by federal and state funding.

30.     We are also concerned that some women who lose their coverage will stop using contraception altogether. Women who stop using contraception are more likely to have unplanned pregnancies and to require additional medical attention. According to an analysis of 2010 data by the Guttmacher Institute, 68% of unplanned births are paid for by public insurance programs, including Medicaid, while 38% of planned births are paid for by these programs.[5]

31.     As I explained above, meeting this increased need will require additional state funds.

32.     For all these reasons, I believe that the new exemptions to the contraceptive mandate will have a negative effect on the health of Pennsylvania women; that they will increase the number of women who receive contraceptive coverage through Medical Assistance and Family Planning Services; and that they will impose additional economic and other burdens on Title X clinics across the Commonwealth.

-------------------

[5] Guttmacher Institute, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010* (Feb. 2015), *available at* https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 31, 2017

# EXHIBIT T

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, and STATE OF NEW JERSEY, | **Civil Action No: 2:17-cv-04540-WB** |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *et al.* | |
| Defendants. | |

## <u>DECLARATION OF PHILIP GENNACE</u>

I, Philip Gennace, declare and state as follows:

1.      I am the Assistant Commissioner of Life and Health in the New Jersey Department of Banking and Insurance ("DOBI"). In this capacity, I oversee, *inter alia*, the licensing and oversight of health insurance regulated by the State of New Jersey. I make this affidavit based on my personal knowledge and information provided to me in my official capacity.

2.      DOBI is the primary regulator for all fully-insured health insurance plans sold in the State of New Jersey.

3.      Insurance carriers are subject to a complex set of federal and state laws and regulations, and federal and state agencies have distinct but overlapping responsibilities in regulating these entities.

4.      For instance, the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), governs most employee benefit plans offered by private employers, including private employers' self-funded employee health benefit plans. ERISA

preempts most state laws relating to such plans.

5.      As a result of the preemption provisions of ERISA, DOBI does not regulate self-funded health coverage plans offered by private employers, which are plans established and maintained by an employer or by an employee organization for which the employer or employee organization bears the direct financial risk for the costs of claims for health care benefits. These plans are subject to ERISA and are regulated primarily by the U.S. Department of Labor, and are often colloquially referred to as "ERISA plans."

6.      DOBI does regulate fully-insured employer group health plans issued in the State. These are health plans that an employer group purchases from an insurer, for which the insurer assumes the direct financial risk for the cost of claims for health care benefits.

7.      In addition, DOBI regulates health insurance policies offered in the individual market.

8.      I am familiar with the Affordable Care Act's (ACA) requirement that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services, including FDA-approved methods of contraception, without any cost-sharing requirement (the "Contraceptive Care Mandate").

9.      The Contraceptive Care Mandate applies both to non-grandfathered ERISA-regulated plans, as well as almost all insured group and individual health insurance plans that are regulated by DOBI.

10.     In addition, New Jersey law requires employers who offer fully-insured plans to provide coverage for expenses incurred in the purchase of prescription female contraceptives to the same extent as any other outpatient prescription drug under the policy ("New Jersey

Mandate").[1]

11.    Unlike the ACA's Contraceptive Care Mandate, however, the New Jersey Mandate does not require insurers to cover women's contraceptive services without cost sharing. Also, the ACA contraceptive mandate covers all FDA-approved female contraceptive methods. By contrast, the New Jersey mandate covers only those methods which are obtained via prescription (not those that are available over the counter or through an inpatient or out-patient procedure).

12.    In addition, a religious employer (defined as a church, association or convention of churches, or an elementary or secondary school controlled, operated, or principally supported by a church) is statutorily entitled to an exclusion from the New Jersey Mandate if the required coverage conflicts with the employer's *bona fide* religious beliefs and practices. The exemption is not available for prescription drugs that may act as contraceptives but are prescribed for a particular user for medical reasons other than contraception. Also, the exemption is not available for prescription female contraceptives that are necessary to preserve the life or health of an insured.

13.    Approximately 3,434,000 New Jersey residents who have health coverage are covered by employer plans that are self-funded.[2]  Under ERISA, such plans offered by private employers are exempt from state regulation, including the New Jersey Mandate.

14.    Private employers offering self-funded plans that opt out of the Contraceptive Care

---

[1] *See* N.J.S.A. 17B:27A-7.12 (for individual health benefits plans); N.J.S.A. 17B:26-2.1y (for individual health insurers); N.J.S.A. 17:48A-7bb (for medical service corporations); N.J.S.A. 17:48-6ee (for hospital service corporations) and N.J.SA. 17:48E-35.29 (for health service corporations); N.J.S.A. 17:48F-13.2 (for prepaid prescription service organizations); N.J.S.A. 26:2J-4.30 (for health maintenance organizations); N.J.S.A. 17B:27A-19.15 (for small employer health benefits plans); N.J.S.A. 52:14-17.29j (for the State Health Benefits Plan); and N.J.S.A. 17B:27:46.1ee (for group health insurers).

[2] This includes residents covered under New Jersey's state health benefits programs, as well as self-funded plans offered by private employers.

3

Mandate under the newly expanded exemptions will not be subject to any federal or state requirement to provide contraception to their employees and beneficiaries. Thus, women in plans provided by these employers will not receive contraceptive coverage through these plans.

15. Upon information and belief, a number of these newly-exempted employers are expected to be New Jersey employers. As a result, those newly-exempted entities that offer self-funded plans, or that are church-affiliated schools eligible for New Jersey's religious exemption,[3] would no longer have an obligation to provide any contraceptive coverage for their employees and their employees' female dependents.

16. Moreover, because the ACA's Contraceptive Care Mandate is broader than the New Jersey Mandate and prohibits cost sharing, even employees and female dependents of newly-exempt employers who offer fully-insured plans subject to the New Jersey Mandate will lose coverage for certain contraceptive methods and be subject to cost sharing that was previously prohibited.

17. Therefore, many New Jersey women are likely to lose the medical coverage for contraceptive care to which they are otherwise entitled under the ACA.

18. DOBI anticipates that some women who lose contraceptive coverage through their employer's plans, particularly low-income women, will seek contraceptive coverage from other sources, including state-funded programs, such as the New Jersey Prescription Assistance Program, Medicaid, and Title X clinics. Women who do not seek outside funding or who seek it but do not qualify for financial assistance likely will face substantial additional costs. Among

---

[3] Churches and associations and conventions of churches have been exempted from the ACA's Contraceptive Care Mandate since 2011. *See* 76 Fed. Reg. 46621-01 (Aug. 3, 2011). However, unlike Defendants' broad new religious exemption, the 2011 exemption was not applicable to most church-affiliated schools.

these women, some likely will forgo regular contraceptive use or use cheaper, less effective contraceptive methods, resulting in more unintended pregnancies.

19.     Women who lose their contraceptive coverage obtained through their employers' plans, even if they are in plans that remain subject to the New Jersey Mandate, likely will in many cases face copays and deductibles when attempting to obtain necessary contraceptive coverage. These financial constraints likely will cause some women to change their preferred choice of contraceptive method, fail to consistently maintain their use of contraceptives, or forgo contraceptive use entirely, which will result in more unintended pregnancies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
PHILIP GENNACE

Dated: 12/12/18

# EXHIBIT U

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,<br><br>     Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, *et al.*<br><br>     Defendants. | **Civil Action No:<br>2:17-cv-04540-WB** |

## <u>DECLARATION OF ELIZABETH COULTER</u>

I, Elizabeth Coulter, declare and state as follows:

1.    I serve as Deputy Director of the Office of Women's Health ("OWH") within the New Jersey Department of Health ("DOH"). I make this affidavit based on my personal knowledge and information provided to me in my official capacity.

2.    DOH's priority is to strengthen New Jersey's health system by investing in population health, promoting equity, and achieving better health outcomes for all residents. DOH is committed to providing access to high quality, affordable, culturally competent, and trauma-informed care, as well as reducing and eliminating disparities in health outcomes across all healthcare services.

3.    OWH is charged with eradicating health disparities and fostering women's equity and equality in healthcare and health outcomes. The office works closely with local, state, and federal government agencies, as well as private-sector partners, to oversee programs and services that, among other things, provide family planning and reproductive healthcare and provide science-backed sexual and reproductive health information and education.

**I.    New Jersey's Family Planning Clinics**

1

Case 2:17-cv-04540-WB   Document 90-23   Filed 12/17/18   Page 3 of 25

4.      The non-profit New Jersey Family Planning League ("NJFPL") has ten sub-grantee agencies that provide health services, including family planning services, through 47 service sites ("Family Planning Clinics") covering all 21 counties in the state.

5.      New Jersey's Family Planning Clinics provide women and men with access to family planning services. These services include contraceptive services and counseling, HIV and STD testing, pregnancy testing, certain infertility services, and breast and cervical cancer screening. The Family Planning Clinics are integral to the family planning provider supply in New Jersey. Indeed, in 2017, NJFPL provided family planning and reproductive health care services to 99,844 New Jersey residents, including 89,945 female patients.

### a.      Funding to New Jersey's Family Planning Clinics

6.      DOH awards family planning funds within New Jersey. These funds are aggregated from the following sources: Social Services Block Grant ("SSBG") funds, Maternal and Child Health ("MCH") Block Grant funds (administered within DOH's Maternal and Child Health Division), the State of New Jersey's budgeted family planning funds. DOH has awarded these funds to NJFPL.

7.      OWH sets the programmatic, data reporting, and budget priorities with the NJFPL through the annual grant application process and oversees those priorities through quarterly reporting requirements.

8.      In addition to receiving DOH-awarded funding, NJFPL receives funds from patient service revenues (which include Medicaid, private insurance, and patient self-pay) and from federal Title X grants, as the sole New Jersey grantee.[1]

---

[1] Although the Family Planning Clinics are sometimes colloquially referred to as "Title X clinics," Title X accounts for only about one-quarter of NJFPL's funding.

2

Case 2:17-cv-04540-WB    Document 90-23    Filed 12/17/18    Page 4 of 25

9.      Title X of the Public Health Service Act[2] provides federal grants to both public and private agencies for family planning services. Specifically, Title X authorizes grant money "to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."

10.     Since 2010, Title X funding has decreased by $31 million, nationally. In 2010, the nationwide program received $317.5 million; in 2017, it received $286.5 million.[3] In addition, there are frequent efforts by some in Congress to eliminate funding for the program entirely.

11.     According to the 2016 Title X Family Planning Annual Report, the top three sources of revenue for Family Planning Clinics nationwide were Medicaid and CHIP (the Children's Health Insurance Program) (39% of revenue); Title X (19%); and state government funding (10%).[4]

12.     OWH is not involved with the application for or administration of federal Title X funds.

**b. Provision of Services and Payment at New Jersey's Family Planning Clinics**

13.     NJFPL's mission is to provide high quality comprehensive family planning and accompanying preventative reproductive health care to every person seeking services. All patients, regardless of income or insurance coverage, are offered a full range of contraceptive methods and services.

---

[2] 42 U.S.C. § 300, *et seq.*
[3] National Family Planning & Reproductive Health Association Title X Budget & Appropriations, *available at* https://www.nationalfamilyplanning.org/title-x_budget-appropriations.
[4] Department of Health and Human Services Office of Population Affairs, *Title X Family Planning Annual Report, 2016 National Summary* (August 2017), *available at* https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

3

14.    Family Planning Clinics bill private insurance or Medicaid if the patient presents such coverage. If the patient does not present coverage, family planning services are provided based on a sliding fee scale depending on the individual/family income level.

15.    In 2017, NJFPL provided family planning and reproductive health care services to 99,844 New Jersey residents, including 89,945 female patients.

16.    In 2017, approximately 51.9% of NJFPL patients had some form of insurance coverage (35.5% had insurance coverage through Medicaid or another government-funded program and 16.4% had private insurance coverage).

17.    Many Family Planning Clinic patients are currently employed or have a family member who is currently employed. Many of these patients receive insurance through their employer or as dependents on coverage provided by their family member's employer.

18.    In some cases, Family Planning Clinics are reimbursed by a patient's insurance plan, however, private insurance may not provide sufficient coverage. Thus, while 18% of all such clinic users nationwide have private insurance, private third-party sources of funding account for only 10% of clinic revenue (2016 National Report at B-7).

## II.    The Effects of the New Exemption Rules

19.    The Affordable Care Act ("ACA"), together with its implementing regulations, requires coverage for all FDA-approved methods of contraception. As a result, New Jersey women have enjoyed widespread contraceptive coverage beyond that required by New Jersey's state contraceptive coverage requirement

20.    I understand that the Trump Administration has issued new regulations ("Exemption Rules") that will make it easier for employers and others to opt out of the Affordable Care Act's contraceptive mandate.

4

JA395

Case 2:17-cv-04540-WB   Document 90-23   Filed 12/17/18   Page 6 of 45

21.     My colleagues at DOH and I are very concerned that the Exemption Rules will reduce access to family planning care for New Jerseyans because there will be an increase in the number of New Jersey employers that do not provide their employees with adequate insurance coverage for contraceptive care.

22.     Women whose employers opt out of providing contraceptive coverage face a dilemma:  forego using contraception or find a way to pay for contraception without insurance coverage. This decision will be most challenging for lower income women.  Without private insurance coverage and without the means to pay for contraception out of pocket, many such women will turn to assistance from government funded contraceptive care to prevent pregnancy.

23.     Women who lose coverage for contraceptive care and therefore seek publicly-funded services at a Family Planning Clinic, rather than pay out of pocket for contraceptives, are more likely to be high need, lower-income patients. Many such women would likely utilize the Family Planning Clinics' sliding fee scale, drawing more heavily on the limited public funds for reproductive services.

24.     In fact, for many low-income women in this situation, government-funded care will be the only viable option for obtaining contraceptive care.

25.     Therefore, we expect that many women in New Jersey who lose their contraceptive coverage will seek care from one of the 47 New Jersey Family Planning Clinics. In order to ensure continued access to the most effective (and most expensive) forms of contraception, limited public funds, *state funds in particular,* would need to be expended.

26.     Notably, the most effective methods of contraception are typically the most expensive.

5

27.     If the increased need for contraceptive care were to exceed capacity without accompanying increases to funding, service reductions would be likely -- with clinic closures, decreased clinic hours of operation, and staff reductions as potential outcomes.

28.     We are also concerned that New Jersey women who lose coverage (as a result of their employers opting out of the ACA's contraceptive mandate) will stop using contraception altogether. Women who stop using or never use contraception are more likely to have unplanned pregnancies and to require additional medical attention. According the Guttmacher Institute, 68% of unplanned births are paid for by public insurance programs, including Medicaid, while 38% of planned births are paid for by these programs. In New Jersey in 2010, the federal and state governments spent a combined $477.1 million on unintended births; of this, $186.1 million was paid by the State.[5]

29.     Because women experiencing unintended pregnancies are less likely to receive timely prenatal care (or any prenatal care at all), access to contraception is vital to New Jersey's efforts to reduce both infant and maternal mortality.  Lack of access to prenatal care yields poor outcomes for mother and baby.

30.     Pregnancy carries significant risk, especially in New Jersey.  Currently, New Jersey is ranked 45th worst nationally in maternal mortality, and the maternal mortality rate for black women is more than double the national average.[6] New Jersey women are more likely than women in other states to suffer injury and death related to pregnancy.  Many costs associated with New

---

[5] Guttmacher Institute, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010* (Feb. 2015), *available at* https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.
[6] United Health Foundation, America's Health Rankings, *2018 Health of Women and Children Report, New Jersey in 2018*, *available at* https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/overall_mch/state/NJ.

6

Jersey's high rate of maternal mortality are paid for using public funding. Planned pregnancies, through the use of contraception, are essential to curbing the tide of maternal mortality and morbidity in the State.

31.     Other negative outcomes associated with unintended pregnancy include reduced likelihood of breastfeeding, increased risk of maternal depression, and increased risk of physical violence during pregnancy, in addition to severe limitations on participation in the economy.

32.     Children born from unintended pregnancies are more likely to experience poor mental and physical health during childhood and, as teenagers, are more likely to experience lower rates of educational attainment and higher rates of behavioral issues.  Many of these outcomes lead to conditions and circumstances for which social supports are publicly funded.

33.     For all these reasons, I believe that the Exemption Rules to the contraceptive coverage mandate will have a negative effect on the health of New Jersey women; that they will increase the number of women who receive contraceptive coverage through NJFPL; and that they will impose additional economic and other burdens on the State.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Elizabeth Coulter

Dated: 12/12/2018

7

# SUPPLEMENTAL EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA et al., | |
| Plaintiffs, | |
| v. | No. 2:17-cv-04540-WB |
| DONALD J. TRUMP et al., | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF KATHRYN KOST**

I, Kathryn Kost, hereby submit this supplemental declaration in support of the Motion for Preliminary Injunction filed by Plaintiffs in the above-captioned matter and, in support thereof, state as follows:

1.   I am the Acting Vice President for Domestic Research at the Guttmacher Institute, a private, independent, nonprofit, nonpartisan research and policy organization committed to advancing sexual and reproductive health and rights in the United States and globally.

2.   On December 14, 2018, I submitted a declaration in support of the Motion for Preliminary Injunction in this matter as an expert on reproductive health care, family planning, and unintended pregnancy, and the impact on individuals, families, and the public health from access to contraception and related care, or interference with that care, in the United States.

3.   I understand that this lawsuit involves a challenge to the federal government's Final Rules ("Final Rules") regarding the Affordable Care Act's ("ACA") contraceptive coverage mandate. In my expert opinion, the Final Rules would compromise women's ability to obtain contraceptive methods, services and counseling and, in particular, to consistently use the best methods for them, thus putting them at heightened risk of unintended pregnancy.

1

4.   The Final Rules would have public health and fiscal consequences in states across the country. If unable to access contraceptive coverage through their employer or university, some lower-income women who meet the strict income requirements of public programs would rely on publicly funded services to access this beneficial service. Many women who lose or lack contraceptive coverage because their employer or university objects, however, would not meet the strict income and eligibility requirements of public programs, and if as a result they are not using their preferred or the most effective methods for them, or if cost forces them to forgo contraceptive use periodically or altogether, they would be at increased risk of unintended pregnancy. The costs of the resulting unintended pregnancies often then fall to the states because the federal government cannot or will not withstand these costs.

5.   Examples of this impact for the plaintiff states were included in my original declaration. In this supplemental declaration, I include data for all 50 states and the District of Columbia in a table as Exhibit A.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Date: January 7, 2019


By: Kathryn Kost
Acting Vice President for Domestic Research
The Guttmacher Institute

**Exhibit A: State-Specific Data on Impact**

| | Medicaid eligibility, as % of federal poverty level (as of January 2018) | | | Women needing publicly supported contraceptive services and supplies, 2014 | | Unintended pregnancies, 2010 | | % of unplanned births paid for by public insurance programs, 2010 | Public costs for unintended pregnancies, 2010 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Childless adults | Parents | Family planning specific | Number | % of need met by publicly supported providers | Number | Rate per 1,000 women 15–44 | | State (in millions) | Federal (in millions) |
| Alabama | — | 18% | 146% | 332,750 | 31% | 46,000 | 48 | 61.6% | $72.6 | $250.5 |
| Alaska | 138% | 139% | — | 41,200 | 63% | 8,000 | 54 | 64.3% | 42.9 | 70.8 |
| Arizona | 138% | 138% | — | 465,450 | 15% | 61,000 | 49 | 64.6% | 161.5 | 509.4 |
| Arkansas | 138% | 138% | — | 204,850 | 29% | 29,000 | 50 | 72.3% | 61.9 | 266.8 |
| California | 138% | 138% | 200% | 2,643,580 | 50% | 393,000 | 50 | 64.3% | 689.3 | 1,062.1 |
| Colorado | 138% | 138% | — | 326,490 | 38% | 43,000 | 42 | 63.8% | 91.1 | 146.1 |
| Connecticut | 138% | 138% | 263% | 183,070 | 38% | 32,000 | 46 | 60.8% | 80.1 | 128.4 |
| Delaware | 138% | 138% | — | 50,100 | 30% | 11,000 | 62 | 71.3% | 36.0 | 58.2 |
| District of Columbia | 215% | 221% | — | 44,910 | 84% | 10,000 | 58 | 84.6% | 13.3 | 50.9 |
| Florida | — | 33% | — | 1,216,520 | 17% | 207,000 | 58 | 70.6% | 427.1 | 892.8 |
| Georgia | — | 36% | 200% | 695,120 | 16% | 119,000 | 57 | 80.5% | 229.7 | 687.7 |
| Hawaii | 138% | 138% | — | 73,090 | 25% | 16,000 | 61 | 49.9% | 37.8 | 76.7 |
| Idaho | — | 26% | — | 113,020 | 21% | 12,000 | 38 | 60.4% | 18.5 | 70.2 |
| Illinois | 138% | 138% | — | 772,510 | 20% | 128,000 | 49 | 78.3% | 352.2 | 571.5 |
| Indiana | 139% | 139% | 146% | 446,230 | 19% | 55,000 | 43 | 64.6% | 91.4 | 284.6 |
| Iowa | 138% | 138% | — | 190,270 | 29% | 23,000 | 39 | 61.5% | 48.3 | 127.6 |
| Kansas | — | 38% | — | 188,100 | 17% | 24,000 | 43 | 47.2% | 50.4 | 115.7 |
| Kentucky | 138% | 138% | — | 284,530 | 24% | 34,000 | 40 | 66.8% | 75.0 | 302.8 |
| Louisiana | 138% | 138% | 138% | 321,480 | 15% | 53,000 | 57 | 78.7% | 120.6 | 530.4 |
| Maine | — | 105% | 214% | 78,880 | 33% | 9,000 | 37 | 74.7% | 14.6 | 43.6 |
| Maryland | 138% | 138% | 200% | 298,190 | 25% | 71,000 | 60 | 58.2% | 180.9 | 285.4 |
| Massachusetts | 138% | 138% | — | 373,060 | 25% | 54,000 | 40 | 56.4% | 138.3 | 219.6 |
| Michigan | 138% | 138% | — | 635,660 | 16% | 93,000 | 49 | 71.9% | 177.0 | 485.1 |
| Minnesota | 138% | 138% | 200% | 294,680 | 29% | 38,000 | 36 | 66.7% | 128.7 | 203.9 |
| Mississippi | — | 27% | 199% | 213,930 | 28% | 35,000 | 57 | 81.9% | 40.4 | 226.7 |
| Missouri | — | 22% | — | 391,510 | 18% | 54,000 | 46 | 72.2% | 132.6 | 385.9 |
| Montana | 138% | 138% | 216% | 66,380 | 41% | 7,000 | 42 | 47.8% | 9.1 | 31.7 |
| Nebraska | — | 63% | — | 118,170 | 20% | 14,000 | 41 | 63.1% | 41.7 | 91.9 |
| Nevada | 138% | 138% | — | 194,430 | 10% | 29,000 | 54 | 60.0% | 37.1 | 65.8 |
| New Hampshire | 138% | 138% | 201% | 65,530 | 29% | 8,000 | 32 | 52.7% | 10.3 | 16.5 |
| New Jersey | 138% | 138% | — | 455,260 | 22% | 97,000 | 56 | 52.4% | 186.1 | 291.0 |
| New Mexico | 138% | 138% | 255% | 151,950 | 28% | 22,000 | 56 | 77.1% | 47.9 | 191.2 |
| New York | 138% | 138% | 223% | 1,227,170 | 32% | 246,000 | 61 | 70.2% | 601.1 | 937.7 |
| North Carolina | — | 43% | 200% | 667,910 | 20% | 95,000 | 49 | 74.8% | 214.7 | 643.5 |
| North Dakota | 138% | 138% | — | 44,180 | 26% | 5,000 | 41 | 36.8% | 7.7 | 17.9 |
| Ohio | 138% | 138% | — | 730,110 | 14% | 109,000 | 49 | 68.7% | 218.8 | 605.8 |
| Oklahoma | — | 45% | 138% | 256,880 | 31% | 36,000 | 49 | 80.7% | 77.0 | 254.0 |
| Oregon | 138% | 138% | 250% | 270,990 | 39% | 31,000 | 41 | 69.9% | 47.2 | 122.7 |
| Pennsylvania | 138% | 138% | 220% | 745,550 | 29% | 115,000 | 47 | 53.5% | 248.2 | 478.6 |
| Rhode Island | 138% | 138% | — | 71,320 | 35% | 9,000 | 43 | 70.1% | 27.5 | 48.7 |
| South Carolina | — | 67% | 199% | 323,140 | 31% | 42,000 | 46 | 78.6% | 84.0 | 327.3 |
| South Dakota | — | 50% | — | 52,610 | 27% | 7,000 | 46 | 46.2% | 14.4 | 35.0 |
| Tennessee | — | 98% | — | 434,440 | 26% | 62,000 | 49 | 73.7% | 130.7 | 400.0 |
| Texas | — | 18% | — | 1,795,160 | 10% | 298,000 | 56 | 73.7% | 842.6 | 2,056.8 |
| Utah | — | 60% | — | 207,350 | 22% | 24,000 | 40 | 53.3% | 30.4 | 127.6 |
| Vermont | 138% | 138% | — | 35,810 | 59% | 4,000 | 36 | 73.5% | 9.6 | 21.8 |
| Virginia | — | 38% | 205% | 447,970 | 17% | 84,000 | 51 | 45.4% | 194.6 | 312.0 |
| Washington | 138% | 138% | 260% | 429,300 | 26% | 61,000 | 45 | 63.1% | 177.1 | 290.7 |
| West Virginia | 138% | 138% | — | 110,910 | 47% | 15,000 | 43 | 76.0% | 24.9 | 120.5 |
| Wisconsin | 100% | 100% | 306% | 353,620 | 22% | 42,000 | 38 | 62.0% | 92.1 | 221.4 |
| Wyoming | — | 55% | — | 34,630 | 30% | 4,000 | 42 | 67.4% | 21.3 | 34.1 |

*Sources:* References 113–117.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA and
STATE OF NEW JERSEY,

                Plaintiffs,

          v.

DONALD J. TRUMP, *in his official capacity as
President of the United States*; ALEX M. AZAR II, *in
his official capacity as Secretary of Health and Human
Services*; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; STEVEN T.
MNUCHIN, *in his official capacity as Secretary of the
Treasury*; UNITED STATES DEPARTMENT OF THE
TREASURY; EUGENE SCALIA, *in his official
capacity as Secretary of Labor*; UNITED STATES
DEPARTMENT OF LABOR; and UNITED STATES
OF AMERICA.

                Defendants.

No. 2:17-cv-04540-WB

## JOINT APPENDIX

| | | JOINT APPENDIX – INDEX | |
|---|---|---|---|
| **Exhibit Number** | **Begin Bates** | **End Bates** | **Description** |
| *Regulatory History* | | | |
| Exhibit 1 | JA-0000001 | JA-0000055 | Final Religious Exemption Rule, 83 Fed. Reg. 57,536 (Nov. 15, 2018) |
| Exhibit 2 | JA-0000056 | JA-0000095 | Final Moral Exemption Rule, 83 Fed. Reg. 57,592 (Nov. 15, 2018) |
| Exhibit 3 | JA-0000096 | JA-0000097 | 2017 HRSA Guidelines, 83 Fed. Reg. 8487 (Feb. 27, 2018) |
| Exhibit 4 | JA-0000098 | JA-0000141 | Religious Exemption IFR, 82 Fed. Reg. 47,792 (Oct. 13, 2017) |
| Exhibit 5 | JA-0000142 | JA-0000166 | Moral Exemption IFR, 82 Fed. Reg. 47,838 (Oct. 13, 2017) |
| Exhibit 6 | JA-0000167 | JA-0000168 | Executive Order 13798 (May 4, 2017) |
| Exhibit 7 | JA-0000169 | JA-0000179 | FAQs about ACA Implementation Part 36 (Jan. 9, 2017) |
| Exhibit 8 | JA-0000180 | JA-0000182 | 2016 HRSA Guidelines, 81 Fed. Reg. 95,148 (Dec. 27, 2016) |
| Exhibit 9 | JA-0000183 | JA-0000187 | Request for Infomation, 81 Fed. Reg. 47,741 (July 22, 2016) |
| Exhibit 10 | JA-0000188 | JA-0000217 | Final Rules, 80 Fed. Reg. 41,318 (July 14, 2015) |
| Exhibit 11 | JA-0000218 | JA-0000227 | NPRM, 79 Fed. Reg. 51,118 (Aug. 27, 2014) |
| Exhibit 12 | JA-0000228 | JA-0000237 | IFR, 79 Fed. Reg. 51,092 (Aug. 27, 2014) |
| Exhibit 13 | JA-0000238 | JA-0000268 | Final Rule, 78 Fed. Reg. 39,870 (July 2, 2013) |
| Exhibit 14 | JA-0000269 | JA-0000289 | NPRM, 78 Fed. Reg. 8456 (Feb. 6, 2013) |
| Exhibit 15 | JA-0000290 | JA-0000297 | ANPRM, 77 Fed. Reg. 16,501 (Mar. 21, 2012) |
| Exhibit 16 | JA-0000298 | JA-0000303 | Final Rule, 77 Fed. Reg. 8725 (Feb. 15, 2012) |
| Exhibit 17 | JA-0000304 | JA-0000309 | IFR, 76 Fed. Reg. 46,621 (Aug. 3, 2011) |
| Exhibit 18 | JA-0000310 | JA-0000312 | 2011 HRSA Guidelines |
| Exhibit 18-A | JA-000312-A | JA-000312-E | 2019 HRSA Guidelines |
| Exhibit 19 | JA-0000313 | JA-0000561 | Institute of Medicine, Clinical Preventive Services for Women (2011) |
| Exhibit 20 | JA-0000562 | JA-0000596 | IFR, 75 Fed. Reg. 41,726 (July 19, 2010) |
| *Selected Comments Opposing Rule* | | | |
| Exhibit 21 | JA-0000597 | JA-0000608 | AccessMatters Comments |
| Exhibit 22 | JA-0000609 | JA-0000627 | ACLU Comments |
| Exhibit 23 | JA-0000628 | JA-0000629 | American Academy of Family Physicians Comments |
| Exhibit 24 | JA-0000630 | JA-0000639 | American Academy of Nursing Comments |
| Exhibit 25 | JA-0000640 | JA-0000642 | American College of Nurse-Midwives Comments |
| Exhibit 26 | JA-0000643 | JA-0000645 | American College of Physicians Comments |

| Exhibit Number | Begin Bates | End Bates | Description |
|---|---|---|---|
| Exhibit 27 | JA-0000646 | JA-0000655 | American Congress of Obstetricians and Gynecologists, American Academy of Pediatrics, & Society for Adolescent Health and Medicine Comments |
| Exhibit 28 | JA-0000656 | JA-0000662 | American Public Health Association Comments |
| Exhibit 29 | JA-0000663 | JA-0000669 | American Society for Emergency Contraception Comments |
| Exhibit 30 | JA-0000670 | JA-0000677 | Americans United for Separation of Church and State Comments |
| Exhibit 31 | JA-0000678 | JA-0000689 | Asian & Pacific Islander American Health Forum Comments |
| Exhibit 32 | JA-0000690 | JA-0000699 | Black Women's Health Imperative Comments |
| Exhibit 33 | JA-0000700 | JA-0000705 | California Department of Insurance Comments |
| Exhibit 34 | JA-0000706 | JA-0000720 | California Planned Parenthood Education Fund Comments |
| Exhibit 35 | JA-0000721 | JA-0000728 | Catholics for Choice Comments |
| Exhibit 36 | JA-0000729 | JA-0000744 | Center for American Progress (General) Comments |
| Exhibit 37 | JA-0000745 | JA-0000762 | Center for American Progress (Women With Disabilities) Comments |
| Exhibit 38 | JA-0000763 | JA-0000778 | Center for American Progress, Autistic Self-Advocacy Network, Autism Women's Network, & National LGBT Task Force Comments |
| Exhibit 39 | JA-0000779 | JA-0000795 | Center for Inquiry & Secular Coalition for America Comments |
| Exhibit 40 | JA-0000796 | JA-0000798 | Coalition for Liberty & Justice Comments |
| Exhibit 41 | JA-0000799 | JA-0000805 | Colorado Consumer Health Initiative Comments |
| Exhibit 42 | JA-0000806 | JA-0000808 | Colorado Health Foundation Comments |
| Exhibit 43 | JA-0000809 | JA-0000821 | County of Santa Clara Comments |
| Exhibit 44 | JA-0000822 | JA-0000847 | Center for Reproductive Rights Comments |
| Exhibit 45 | JA-0000848 | JA-0000848 | District of Columbia Health Benefit Exchange Authority Comments |
| Exhibit 46 | JA-0000849 | JA-0000860 | Equality California Comments |
| Exhibit 47 | JA-0000861 | JA-0000863 | Equality North Carolina Comments |
| Exhibit 48 | JA-0000864 | JA-0000869 | Essential Access Health Comments |
| Exhibit 49 | JA-0000870 | JA-0000881 | Family Planning Councils of America Comments |
| Exhibit 50 | JA-0000882 | JA-0000888 | Feminist Majority Foundation Comments |
| Exhibit 51 | JA-0000889 | JA-0000926 | Guttmacher Institute Comments |
| Exhibit 52 | JA-0000927 | JA-0000937 | Human Rights Campaign Comments |
| Exhibit 53 | JA-0000938 | JA-0000943 | Human Rights Watch Comments |
| Exhibit 54 | JA-0000944 | JA-0000950 | Ibis Reproductive Health Comments |
| Exhibit 55 | JA-0000951 | JA-0000955 | Institute for Policy Integrity at NYU School of Law Comments |

| Exhibit Number | Begin Bates | End Bates | Description |
|---|---|---|---|
| Exhibit 56 | JA-0000956 | JA-0000966 | Jobs With Justice Comments |
| Exhibit 57 | JA-0000967 | JA-0000977 | Ten Labor, Worker Justice, Citizen Advocacy, Immigration, and Women's Organizations Comments |
| Exhibit 58 | JA-0000978 | JA-0000988 | Lambda Legal Comments |
| Exhibit 59 | JA-0000989 | JA-0001005 | The Leadership Conference on Civil and Human Rights Comments |
| Exhibit 60 | JA-0001006 | JA-0001014 | Legal Voice Comments |
| Exhibit 61 | JA-0001015 | JA-0001031 | Lift Louisiana Comments |
| Exhibit 62 | JA-0001032 | JA-0001034 | Massachusetts Office of Health and Human Services Comments |
| Exhibit 63 | JA-0001035 | JA-0001049 | Members of Congress Comments |
| Exhibit 64 | JA-0001050 | JA-0001053 | Three Members of Congress Comments |
| Exhibit 65 | JA-0001054 | JA-0001069 | NARAL Pro - Choice America Comments |
| Exhibit 66 | JA-0001070 | JA-0001077 | NARAL Pro - Choice Maryland Comments |
| Exhibit 67 | JA-0001078 | JA-0001093 | National Asian Pacific American Women's Forum Comments |
| Exhibit 68 | JA-0001094 | JA-0001096 | National Center for Health Research Comments |
| Exhibit 69 | JA-0001097 | JA-0001112 | National Center for Lesbian Rights Comments |
| Exhibit 70 | JA-0001113 | JA-0001118 | National Center for Transgender Equality Comments |
| Exhibit 71 | JA-0001119 | JA-0001127 | National Council of Jewish Women Comments |
| Exhibit 72 | JA-0001128 | JA-0001129 | National Council of Jewish Women, Greater New Orleans Section Comments |
| Exhibit 73 | JA-0001130 | JA-0001141 | National Family Planning & Reproductive Health Association Comments |
| Exhibit 74 | JA-0001142 | JA-0001162 | National Health Law Program Comments |
| Exhibit 75 | JA-0001163 | JA-0001179 | National Institute for Reproductive Health Comments |
| Exhibit 76 | JA-0001180 | JA-0001198 | National Latina Institute of Reproductive Health Comments |
| Exhibit 77 | JA-0001199 | JA-0001204 | National LGBTQ Task Force Comments |
| Exhibit 78 | JA-0001205 | JA-0001212 | National Network of Abortion Funds Comments |
| Exhibit 79 | JA-0001213 | JA-0001219 | National Partnership for Women & Families, Jacobs Institute of Women's Health, Union of Concerned Scientists Comments |
| Exhibit 80 | JA-0001220 | JA-0001240 | National Partnership for Women & Families Comments |
| Exhibit 81 | JA-0001241 | JA-0001247 | National Women's Health Network Comments |
| Exhibit 82 | JA-0001248 | JA-0001250 | New York State Department of Financial Services Comments |
| Exhibit 83 | JA-0001251 | JA-0001264 | NMAC Comments |
| Exhibit 84 | JA-0001265 | JA-0001281 | National Women's Law Center Comments |

| Exhibit Number | Begin Bates | End Bates | Description |
|---|---|---|---|
| Exhibit 85 | JA-0001282 | JA-0001286 | New York City Comments |
| Exhibit 86 | JA-0001287 | JA-0001302 | Physicians for Reproductive Health Comments |
| Exhibit 87 | JA-0001303 | JA-0001309 | Power to Decide Comments |
| Exhibit 88 | JA-0001310 | JA-0001320 | Planned Parenthood Federation of American & Planned Parenthood Action Fund Comments |
| Exhibit 89 | JA-0001321 | JA-0001327 | Professor James Trussell, Princeton University Comments |
| Exhibit 90 | JA-0001328 | JA-0001333 | Public health practitioners and members of faculty, Columbia University Mailman School of Public Health Comments |
| Exhibit 91 | JA-0001334 | JA-0001344 | Public Health Solutions Comments |
| Exhibit 92 | JA-0001345 | JA-0001359 | Raising Women's Voices for the Health Care We Need Comments |
| Exhibit 93 | JA-0001360 | JA-0001361 | Representatives of Education and Youth Development Communities Comments |
| Exhibit 94 | JA-0001362 | JA-0001376 | Reproductive Rights and Justice Practicum at Yale Law School Comments |
| Exhibit 95 | JA-0001377 | JA-0001383 | SisterLove Inc Comments |
| Exhibit 96 | JA-0001384 | JA-0001392 | State Attorneys General Comments |
| Exhibit 97 | JA-0001393 | JA-0001397 | Texas House Women's Health Caucus Comments |
| Exhibit 98 | JA-0001398 | JA-0001404 | Texas Policy Evaluation Project Comments |
| Exhibit 99 | JA-0001405 | JA-0001409 | Texas Women's Healthcare Coalition Comments |
| Exhibit 100 | JA-0001410 | JA-0001428 | URGE Unite for Reproductive and General Equality Comments |
| Exhibit 101 | JA-0001429 | JA-0001445 | Whitman-Walker Health Comments |
| Exhibit 102 | JA-0001446 | JA-0001459 | Wisconsin Alliance for Women's Health Comments |
| Exhibit 103 | JA-0001460 | JA-0001471 | Women's Health and Family Planning Association of Texas Comments |
| Exhibit 104 | JA-0001472 | JA-0001486 | Women's Law Project Comments |
| Exhibit 105 | JA-0001487 | JA-0001501 | Yale Students for Reproductive Justice Comments |
| *Comments Supporting Rules* | | | |
| Exhibit 106 | JA-0001502 | JA-0001505 | Archdiocese of New Orleans Comments |
| | *JA-0001506* | *JA-0001516* | *[intentionally omitted]* |
| Exhibit 107 | JA-0001517 | JA-0001517 | Archdiocese of St. Louis Comments |
| Exhibit 108 | JA-0001518 | JA-0001522 | Association of Catholic Colleges and Universities Comments |
| Exhibit 109 | JA-0001523 | JA-0001524 | Christian Legal Society Comments |
| Exhibit 110 | JA-0001525 | JA-0001528 | Church Alliance Comments |
| Exhibit 111 | JA-0001529 | JA-0001535 | The Ethics & Religious Commission of the Southern Baptist Convention Comments |
| Exhibit 112 | JA-0001536 | JA-0001541 | Family Research Council Comments (Religious Exemption) |

| Exhibit Number | Begin Bates | End Bates | Description |
|---|---|---|---|
| Exhibit 113 | JA-0001542 | JA-0001548 | Family Research Council Comments (Moral Exemption) |
| Exhibit 114 | JA-0001549 | JA-0001551 | Locke Lorde LLP Comments |
| Exhibit 115 | JA-0001552 | JA-0001554 | National Association of Catholic Nurses USA Comments (Religious Exemption) |
| Exhibit 116 | JA-0001555 | JA-0001557 | National Association of Catholic Nurses USA Comments (Moral Exemption) |
| Exhibit 117 | JA-0001558 | JA-0001566 | National Catholic Bioethics Center Comments |
| Exhibit 118 | JA-0001567 | JA-0001569 | Solidarity HealthShare Comments |
| Exhibit 119 | JA-0001570 | JA-0001586 | United States Conference of Catholic Bishops Comments |
| Exhibit 120 | JA-0001587 | JA-0001593 | Individual Comments Supporting Rules |
| *Other Comments* | | | |
| Exhibit 121 | JA-0001594 | JA-0001599 | America's Health Insurance Plans Comments |
| Exhibit 122 | JA-0001600 | JA-0001609 | Blue Cross Blue Shield Association Comments |
| Exhibit 123 | JA-0001610 | JA-0001612 | CVS Health Comments |
| Exhibit 124 | JA-0001613 | JA-0001616 | National Association of Health Underwriters Comments |
| Exhibit 125 | JA-0001617 | JA-0001619 | Pharmaceutical Care Management Association Comments |
| Exhibit 126 | JA-0001620 | JA-0001628 | Individual Comments Neither For Nor Against Rules |
| *Studies from Earlier Regulations* | | | |
| Exhibit 127 | JA-0001629 | JA-0001661 | Bailey MJ, More Power to the Pill: The Impact of Contraceptive Freedom on Women's Life Cycle Labor Supply, Quarterly Journal of Economics (2006) |
| Exhibit 128 | JA-0001662 | JA-0001676 | Conde-Aguledo, A., et al., Birth Spacing and Risk of Adverse Perinatal Outcomes—A Meta-Analysis, Journal of the American Medical Association (2006) |
| Exhibit 129 | JA-0001677 | JA-0001684 | Fuentes-Afflick, E., & Hessol, N., Interpregnancy Interval and the Risk of Premature Infants, Obstetrics & Gynecology (2000) |
| Exhibit 130 | JA-0001685 | JA-0001705 | Gipson, J.D., et al., The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature, Studies on Family Planning (2008) |
| Exhibit 131 | JA-0001706 | JA-0001710 | Goldin C & Katz L, Career and Marriage in the Age of the Pill, American Economic Review (2000) |
| Exhibit 132 | JA-0001711 | JA-0001752 | Goldin C and Katz LF, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, Journal of Political Economy (2002) |
| Exhibit 133 | JA-0001753 | JA-0001758 | Postlethwaite, D., et al., A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change, 76 Contraception 360 (2007) |
| Exhibit 134 | JA-0001759 | JA-0001763 | Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost Sharing, 14 Guttmacher Pol'y Rev. 10 (2011) |
| Exhibit 135 | JA-0001764 | JA-0001783 | Testimony of Guttmacher Inst., submitted to the Comm. on Preventive Servs. for Women, Inst. of Med. (Jan. 12, 2012) |
| Exhibit 136 | JA-0001784 | JA-0001792 | Zhu, B., Effect of Interpregnancy Interval on Birth Outcomes: Findings from Recent U.S. Studies, International Journal of Gynecology & Obstetrics (2005) |
| *Other Documents* | | | |
| Exhibit 137 | JA-0001793 | JA-0001929 | Preliminary Injunction Hearing Transcript (Dec. 14, 2017) (ECF No. 69) |
| Exhibit 138 | JA-0001930 | JA-0001936 | Spreadsheet of Litigating Entities (IFRs) |
| Exhibit 139 | JA-0001937 | JA-0001963 | Spreadsheed of Accommodated Entities |

| Exhibit Number | Begin Bates | End Bates | Description |
|---|---|---|---|
| Exhibit 140 | JA-0001964 | JA-0001970 | Spreadsheet of Litigating Entities (Final Rules) |
| Exhibit 141 | JA-0001971 | JA-0001972 | ESBA Form 700 Certification (Aug. 2014) |
| Exhibit 142 | JA-0001973 | JA-0002194 | Kaiser Family Foundation Employer Health Benefits (2017 Annual Survey) |
| Exhibit 143 | JA-0002195 | JA-0002199 | Jennifer Haberkorn, Two Years Later, Few Hobby Lobby Copycats Emerge, Politico (Oct. 11, 2016) |
| Exhibit 144 | JA-0002200 | JA-0002258 | Helen M. Alvare, No Compelling Interest The Birth Control Mandate and Religious Freedom (May 1, 2013) |
| Exhibit 145 | JA-0002259 | JA-0002283 | Michael J. New, Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes (2015) |
| Exhibit 146 | JA-0002284 | JA-0002343 | Declaration of Mother Superior Marie Vincente (ECF No. 19-2) |
| Exhibit 147 | JA-0002344 | JA-0002363 | FDA, Birth Control (Mar. 6, 2018) |
| Exhibit 148 | JA-0002364 | JA-0002367 | FDA, Is It Really FDA Approved? (Jan. 17, 2017) |
| Exhibit 149 | JA-0002368 | JA-0002372 | Declaration of Seth A. Mendelsohn, Executive Deputy Insurance Commissioner, PA Department of Insurance (ECF No. 90-18) |
| Exhibit 150 | JA-0002373 | JA-0002375 | HHS, Introduction: About HHS (last visited May 14, 2019) |
| Exhibit 151 | JA-0002376 | JA-0002555 | Congressional Record Excerpts (Nov. 30 - Dec. 3, 2009) |
| Exhibit 152 | JA-0002556 | JA-0002563 | HHS, Trends in Teen Pregnancy and Childbearing (May 14, 2019) |
| Exhibit 153 | JA-0002564 | JA-0002569 | HHS, Preventive Care Benefits for Children (last visited May 15, 2019) |
| Exhibit 154 | JA-0002570 | JA-0002647 | Title X Final Rules, 84 Fed. Reg. 7714 (Mar. 4, 2019) |
| Exhibit 155 | JA-0002648 | JA-0002649 | HRSA, About HRSA (Mar. 2019) |

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9840]**

**RIN 1545–BN92**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB83**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

**[CMS–9940–F2]**

**RIN 0938–AT54**

**Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury: Employee Benefits Security Administration, Department of Labor: and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** These rules finalize, with changes based on public comments, interim final rules concerning religious exemptions and accommodations regarding coverage of certain preventive services issued in the **Federal Register** on October 13, 2017. These rules expand exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act. These rules do not alter the discretion of the Health Resources and Services Administration, a component of the U.S. Department of Health and Human Services, to maintain the guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also leave in place an "accommodation" process as an optional process for certain exempt entities that wish to use it voluntarily. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.

**DATES:** *Effective date:* These regulations are effective on January 14. 2019.

**FOR FURTHER INFORMATION CONTACT:** Jeff Wu, at (301) 492–4305 or *marketreform@cms.hhs.gov* for the Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS); Amber Rivers or Matthew Litton, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; William Fischer, Internal Revenue Service, Department of the Treasury, at (202) 317–5500.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline, 1–866–444–EBSA (3272) or visit the Department of Labor's website (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's website (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary and Background
  A. Executive Summary
  1. Purpose
  2. Summary of the Major Provisions
  a. Expanded Religious Exemptions to the Contraceptive Coverage Requirement
  b. Optional Accommodation
  3. Summary of Costs, Savings and Benefits of the Major Provisions
  B. Background
II. Overview, Analysis, and Response to Public Comments
  A. The Departments' Authority To Mandate Coverage and Provide Religious Exemptions
  B. Availability and Scope of Religious Exemptions
  C. The First Amendment and the Religious Freedom Restoration Act
  1. Discretion To Provide Religious Exemptions
  2. Requiring Entities To Choose Between Compliance With the Contraceptive Mandate or the Accommodation Violated RFRA in Many Instances
  a. Substantial Burden
  b. Compelling Interest
  D. Burdens on Third Parties
  E. Interim Final Rulemaking
  F. Health Effects of Contraception and Pregnancy
  G. Health and Equality Effects of Contraceptive Coverage Mandates
III. Description of the Text of the Regulations and Response to Additional Public Comments
  A. Restatement of Statutory Requirements of PHS Act Section 2713(a) and (a)(4) (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv). and 45 CFR 147.130(a)(1) and (a)(1)(iv))
  B. Prefatory Language of Religious Exemptions (45 CFR 147.132(a)(1))

C. Scope of Religious Exemptions and Requirements for Exempt Entities (45 CFR 147.132)
  D. Plan Sponsors in General (45 CFR 147.132(a)(1)(i) prefatory text)
  E. Houses of Worship and Integrated Auxiliaries (45 CFR 147.132(a)(1)(i)(A))
  F. Nonprofit Organizations (45 CFR 147.132(a)(1)(i)(B))
  G. Closely Held For-Profit Entities (45 CFR 147.132(a)(1)(i)(C))
  H. For-Profit Entities That Are Not Closely Held (45 CFR 147.132(a)(1)(i)(D))
  I. Other Non-Governmental Employers (45 CFR 147.132(a)(1)(i)(E))
  J. Plans Established or Maintained by Objecting Nonprofit Entities (45 CFR 147.132(a)(1)(ii))
  K. Institutions of Higher Education (45 CFR 147.132(a)(1)(iii))
  L. Health Insurance Issuers (45 CFR 147.132(a)(1)(iv))
  M. Description of the Religious Objection (45 CFR 147.132(a)(2))
  N. Individuals (45 CFR 147.132(b))
  O. Accommodation (45 CFR 147.131. 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)
  P. Definition of Contraceptives for the Purpose of These Final Rules
  Q. Severability
  R. Other Public Comments
  1. Items Approved as Contraceptives But Used To Treat Existing Conditions
  2. Comments Concerning Regulatory Impact
  3. Interaction With State Laws
IV. Economic Impact and Paperwork Burden
  A. Executive Orders 12866 and 13563—Department of HHS and Department of Labor
  1. Need for Regulatory Action
  2. Anticipated Effects
  a. Removal of Burdens on Religious Exercise
  b. Notices When Revoking Accommodated Status
  c. Impacts on Third Party Administrators and Issuers
  d. Impacts on Persons Covered by Newly Exempt Plans
  i. Unknown Factors Concerning Impact on Persons in Newly Exempt Plans
  ii. Public Comments Concerning Estimates in Religious IFC
  iii. Possible Sources of Information for Estimating Impact
  iv. Estimates Based on Litigating Entities That May Use Expanded Exemptions
  v. Estimates of Accommodated Entities That May Use Expanded Exemptions
  vi. Combined Estimates of Litigating and Accommodated Entities
  vii. Alternate Estimates Based on Consideration of Pre-ACA Plans
  viii. Final Estimates of Persons Affected by Expanded Exemptions
  B. Special Analyses—Department of the Treasury
  C. Regulatory Flexibility Act
  D. Paperwork Reduction Act—Department of Health and Human Services
  1. Wage Data
  2. ICRs Regarding Self-Certification or Notices to HHS (§ 147.131(c)(3))

Exhibit 1
JA410
JA-0000001

3. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(e))
4. ICRs Regarding Notice of Revocation of Accommodation (§ 147.131(c)(4))
5. Submission of PRA-Related Comments
E. Paperwork Reduction Act—Department of Labor
F. Regulatory Reform Executive Orders 13765, 13771 and 13777
G. Unfunded Mandates Reform Act
H. Federalism
V. Statutory Authority

## I. Executive Summary and Background

### A. Executive Summary

#### 1. Purpose

The primary purpose of this rule is to finalize, with changes in response to public comments, the interim final regulations with requests for comments (IFCs) published in the **Federal Register** on October 13, 2017 (82 FR 47792), "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (the Religious IFC). The rules are necessary to expand the protections for the sincerely held religious objections of certain entities and individuals. The rules, thus, minimize the burdens imposed on their exercise of religious beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing, a requirement that was created by HHS through guidance promulgated by the Health Resources and Services Administration (HRSA) (hereinafter "Guidelines"), pursuant to authority granted by the ACA in section 2713(a)(4) of the Public Health Service Act. In addition, the rules maintain a previously created accommodation process that permits entities with certain religious objections voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their health insurance issuers or third party administrators. The rules do not remove the contraceptive coverage requirement generally from HRSA's Guidelines. The changes being finalized to these rules will ensure that proper respect is afforded to sincerely held religious objections in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage.

#### 2. Summary of the Major Provisions

##### a. Expanded Religious Exemptions to the Contraceptive Coverage Requirement

These rules finalize exemptions provided in the Religious IFC for the group health plans and health insurance coverage of various entities and individuals with sincerely held religious beliefs opposed to coverage of some or all contraceptive or sterilization methods encompassed by HRSA's Guidelines. The rules finalize exemptions to the same types of organizatons and individuals for which exemptions were provided in the Religious IFC: Non-governmental plan sponsors including a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order; a nonprofit organization; for-profit entities; an institution of higher education in arranging student health insurance coverage; and, in certain circumstances, issuers and individuals. The rules also finalize the regulatory restatement in the Religious IFC of language from section 2713(a) and (a)(4) of the Public Health Service Act.

In response to public comments, various changes are made to clarify the intended scope of the language in the Religious IFC. The prefatory language to the exemptions is clarified to ensure exemptions apply to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections. The Departments add language to clarify that, where an exemption encompasses a plan or coverage established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other non-governmental organization or association, the exemption applies to each employer, organization, or plan sponsor that adopts the plan. Language is also added to clarify that the exemptions apply to non-governmental entities, including as the exemptions apply to institutions of higher education. The Departments revise the exemption applicable to health insurance issuers to make clear that the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement. The Departments also restructure the

provision describing the religious objection for entities. That provision specifies that the entity objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for either: coverage or payments for some or all contraceptive services; or, a plan, issuer, or third party administrator that provides or arranges such coverage or payments.

The Departments also clarify language in the exemption applicable to plans of objecting individuals. The final rule specifies that the individual exemption ensures that the HRSA Guidelines do not prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs. The exemption adds that, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

##### b. Optional Accommodation

These rules also finalize provisions from the Religious IFC that maintain the accommodation process as an optional process for entities that qualify for the exemption. Under that process, entities can choose to use the accommodation process so that contraceptive coverage to which they object is omitted from their plan, but their issuer or third party administrator, as applicable, will arrange for the persons covered by their plan to receive contraceptive coverage or payments.

In response to public comments, these final rules make technical changes to the accommodation regulations maintained in parallel by HHS, the Department of Labor, and the Department of the Treasury. The Departments modify the regulations governing when an entity, that was using or will use the accommodation, can revoke the accommodation and operate under the exemption. The modifications set forth a transitional

Exhibit 1                                   JA411                                   JA-0000002

rule as to when entities currently using the accommodation may revoke it and use the exemption by giving 60-days notice pursuant to Public Health Service Act section 2715(d)(4) and 45 CFR 147.200(b), 26 CFR 54.9815–2715(b), and 29 CFR 2590.715–2715(b). The modifications also express a general rule that, in plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an organization eligible for the accommodation may revoke its use of the accommodation process effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

The Departments also modify the Religious IFC by adding a provision that existed in rules prior to the Religious IFC, namely, that if an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable contraceptive coverage requirement from HRSA's Guidelines if the issuer complies with the obligations under this section applicable to such issuer. Likewise, the rule adds pre-existing "reliance" language deeming an issuer serving an accommodated organization compliant with the contraceptive coverage requirement if the issuer relies reasonably and in good faith on a representation by an organization as to its eligibility for the accommodation and the issuer otherwise complies with the accommodation regulation, and likewise deeming a group health plan compliant with the contraceptive coverage requirement if it complies with the accommodation regulation.

3. Summary of Costs, Savings and Benefits of the Major Provisions

| Provision | Savings and benefits | Costs |
|---|---|---|
| Restatement of statutory language from section 2713(a) and (a)(4) of the Public Health Service Act. | The purpose of this provision is to ensure that the regulatory language that restates section 2713(a) and (a)(4) of the Public Health Service Act mirrors the language of the statute. We estimate no economic savings or benefit from finalizing this part of the rule, but consider it a deregulatory action to minimize the regulatory impact beyond the scope set forth in the statute. | We estimate no costs from finalizing this part of the rule. |
| Expanded religious exemptions. | Expanding religious exemptions to the contraceptive coverage requirement will relieve burdens that some entities and individuals experience from being forced to choose between, on the one hand, complying with their religious beliefs and facing penalties from failing to comply with the contraceptive coverage requirement, and on the other hand, providing (or, for individuals, obtaining) contraceptive coverage or using the accommodation in violation of their sincerely held religious beliefs. | We estimate there will be transfer costs where women previously receiving contraceptive coverage from employers will no longer receive that coverage where the employers use the expanded exemptions. Even after the public comment period, we have very limited data on what the scale of those transfer costs will be. We estimate that in no event will they be more than $68.9 million.<br>We estimate that, where entities using the accommodation revoke it to use the exemption, the cost to industry of sending notices of revocation to their policy holders will be $112,163. |
| Optional accommodation regulations. | Maintaining the accommodation as an optional process will ensure that contraceptive coverage is made available to many women covered by plans of employers that object to contraceptive coverage but not to their issuers or third party administrators arranging for such coverage to be provided to their plan participants. | We estimate that, by expanding the types of organizations that may use the accommodation, some entities not currently using it will opt into it. When doing so they will incur costs of $677 to send a self-certification or notice to their issuer or third party administrator, or to HHS, to commence operation of the accommodation.<br>We estimate that entities that newly make use of the accommodation as the result of these rules, or their issuers or third party administrators, will incur costs of $311,304 in providing their policy holders with notices indicating that contraceptive coverage or payments are available to them under the accommodation process. |

*B. Background*

Over many decades, Congress has protected conscientious objections, including those based on religious beliefs, in the context of health care and human services including health coverage, even as it has sought to promote and expand access to health services.[1] In 2010, Congress enacted the

[1] *See, for example,* 42 U.S.C. 300a–7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting

individuals and entities that object to abortion); Consolidated Appropriations Act of 2018, Div. H, Sec. 507(d) (Departments of Labor, HHS, and Education, and Related Agencies Appropriations Act), Public Law 115–141, 132 Stat. 348, 764 (Mar. 23, 2018) (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion for any reason); *id.* at Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); *id.* at Div. E, Sec. 808 (regarding any requirement for "the provision of contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any

legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."); *id.* at Div. I, (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb–36 (prohibiting the statutory section from being construed to require suicide-related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 290kk–1 (protecting the religious character of organizations participating in certain programs and the religious freedom of beneficiaries of the programs); 42 U.S.C. 300x–65 (protecting the religious character of organizations

Patient Protection and Affordable Care Act (PPACA) (Pub. L. 111–148) (March 23, 2010). Congress enacted the Health Care and Education Reconciliation Act of 2010 (HCERA) (Pub. L. 111–152) on March 30, 2010, which, among other things, amended the PPACA. As amended by HCERA, the PPACA is known as the Affordable Care Act (ACA).

The ACA reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The ACA adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code), in order to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

In section 2713(a)(4) of the PHS Act (hereinafter "section 2713(a)(4)"), Congress provided administrative

and the religious freedom of individuals involved in the use of government funds to provide substance abuse services); 42 U.S.C. 604a (protecting the religious character of organizations and the religious freedom of beneficiaries involved in the use of government assistance to needy families); 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare+Choice (now Medicare Advantage) managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal law does not infringe on "conscience" as protected in state law concerning advance directives); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 5106i (prohibiting certain Federal statutes from being construed to require that a parent or legal guardian provide a child any medical service or treatment against the religious beliefs of the parent or legal guardian); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide; see also 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require assistance in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/AIDS funds contrary to their "religious or moral objection").

discretion to require that certain group health plans and health insurance issuers cover certain women's preventive services, in addition to other preventive services required to be covered in section 2713. Congress granted that discretion to the Health Resources and Services Administration (HRSA), a component of the U.S. Department of Health and Human Services (HHS). Specifically, section 2713(a)(4) allows HRSA discretion to specify coverage requirements. "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by" HRSA's Guidelines.

Since 2011, HRSA has exercised that discretion to require coverage for, among other things, certain contraceptive services.[2] In the same time period, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, "the Departments")[3] have promulgated regulations to guide HRSA in exercising its discretion to allow exemptions to those requirements, including issuing and finalizing three interim final regulations prior to 2017.[4] In those

[2] The references in this document to "contraception," "contraceptive," "contraceptive coverage," or "contraceptive services" generally include all contraceptives, sterilization, and related patient education and counseling, required by the Women's Preventive Guidelines, unless otherwise indicated. The Guidelines issued in 2011 referred to "Contraceptive Methods and Counseling" as "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." https://www.hrsa.gov/womens-guidelines/index.html. The Guidelines as amended in December 2016 refer, under the header "Contraception," to: "the full range of female-controlled U.S. Food and Drug Administration-approved contraceptive methods, effective family planning practices, and sterilization procedures," "contraceptive counseling, initiation of contraceptive use, and follow-up care (for example, management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method)," and "instruction in fertility awareness-based methods, including the lactation amenorrhea method." https://www.hrsa.gov/womens-guidelines-2016/index.html.

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

[4] Interim final regulations on July 19, 2010, at 75 FR 41726 (July 2010 interim final regulations); interim final regulations amending the July 2010 interim final regulations on August 3, 2011, at 76 FR 46621; final regulations on February 15, 2012, at 77 FR 8725 (2012 final regulations); an advance notice of proposed rulemaking (ANPRM) on March 21, 2012, at 77 FR 16501; proposed regulations on February 6, 2013, at 78 FR 8456; final regulations on July 2, 2013, at 78 FR 39870 (July 2013 final regulations); interim final regulations on August 27, 2014, at 79 FR 51092 (August 2014 interim final regulations); proposed regulations on August 27, 2014, at 79 FR 51118 (August 2014 proposed regulations); final regulations on July 14, 2015, at

regulations, the Departments defined the scope of permissible exemptions and accommodations for certain religious objectors where the Guidelines require coverage of contraceptive services, changed the scope of those exemptions and accommodations, and solicited public comments on a number of occasions. Many individuals and entities brought legal challenges to the contraceptive coverage requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate") as being inconsistent with various legal protections, including the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 ("RFRA"). Several of those cases went to the Supreme Court. See, for example, Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014); Zubik v. Burwell, 136 S. Ct. 1557 (2016).

The Departments most recently solicited public comments on these issues again in two interim final regulations with requests for comments (IFCs) published in the Federal Register on October 13, 2017: the regulations (82 FR 47792) that are being finalized with changes here, and regulations (82 FR 47838) concerning moral objections (the Moral IFC), which are being finalized with changes in companion final rules published elsewhere in today's Federal Register.

In the preamble to the Religious IFC, the Departments explained several reasons why it was appropriate to reevaluate the religious exemptions and accommodations for the contraceptive Mandate and to take into account the religious beliefs of certain employers concerning that Mandate. The Departments also sought public comment on those modifications. The Departments considered, among other things, Congress's history of providing protections for religious beliefs regarding certain health services (including contraception, sterilization, and items or services believed to involve abortion); the text, context, and intent of section 2713(a)(4) and the ACA; protection of the free exercise of religion in the First Amendment and, by Congress, in RFRA; Executive Order 13798, "Promoting Free Speech and Religious Liberty" (May 4, 2017); previously submitted public comments;

[80] FR 41318 (July 2015 final regulations); and a request for information on July 26, 2016, at 81 FR 47741 (RFI). which was addressed in an FAQ document issued on January 9, 2017, available at: https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf and https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf.

Exhibit 1

and the extensive litigation over the contraceptive Mandate.

After consideration of the comments and feedback received from stakeholders, the Departments are finalizing the Religious IFC, with changes based on comments as indicated herein.[5]

## II. Overview, Analysis, and Response to Public Comments

We provided a 60-day public comment period for the Religious IFC, which closed on December 5, 2017. The Departments received over 56,000 public comment submissions, which are posted at *www.regulations.gov*.[6] Below, the Departments provide an overview of the general comments on the final regulations, and address the issues raised by commenters.

These rules expand protections to protect religious beliefs for certain entities and individuals with religious objections to contraception whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the ACA. These rules do not alter the discretion of HRSA, a component of HHS, to maintain the Guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules finalize the accommodation process, which was previously established in response to objections of religious organizations that were not protected by the original exemption, as an optional process for any exempt entities. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives or related education and counseling for women at risk of unintended pregnancy.[7]

### A. The Departments' Authority To Mandate Coverage and Provide Religious Exemptions

The Departments received conflicting comments on their legal authority to provide the expanded exemptions and accommodation for religious beliefs. Some commenters agreed that the Departments are legally authorized to provide the expanded exemptions and accommodation, noting that there was no requirement of contraceptive coverage in the ACA and no prohibition on providing religious exemptions in Guidelines issued under section 2713(a)(4). Other commenters, however, asserted that the Departments have no legal authority to provide any exemptions to the contraceptive Mandate, contending, based on statements in the ACA's legislative history, that the ACA requires contraceptive coverage. Still other commenters contended that the Departments are legally authorized to provide the exemptions that existed prior to the Religious IFC, but not to expand them.

Some commenters who argued that section 2713(a)(4) does not allow for exemptions said that the previous exemptions for houses of worship and integrated auxiliaries, and the previous accommodation process, were set forth in the ACA itself, and therefore were acceptable while the expanded exemptions in the Religious IFC were not. This is incorrect. The ACA does not prescribe (or prohibit) the previous exemptions for house of worship and the accommodation processes that the Departments issued through regulations.[8] The Departments, therefore, find it appropriate to use the regulatory process to issue these expanded exemptions and accommodation, to better address concerns about religious exercise.

The Departments conclude that legal authority exists to provide the expanded exemptions and accommodation for religious beliefs set forth in these final rules. These rules concern section 2713 of the PHS Act, as also incorporated into ERISA and the Code. Congress has granted the Departments legal authority.

collectively, to administer these statutes.[9]

Where it applies, section 2713(a)(4) requires coverage without cost sharing for "such additional" women's preventive care and screenings "as provided for" and "supported by" Guidelines developed by HHS through HRSA. When Congress enacted this provision, those Guidelines did not exist. And nothing in the statute mandated that the Guidelines had to include contraception, let alone for all types of employers with covered plans. Instead, section 2713(a)(4) provided a positive grant of authority for HSRA to develop those Guidelines, thus delegating authority to HHS, as the administering agency of HRSA, and to all three agencies, as the administering agencies of the statutes by which the Guidelines are enforced, to shape that development. *See* 26 U.S.C. 9834; 29 U.S.C. 1191(c), 42 U.S.C. 300gg–92. That is especially true for HHS, as HRSA is a component of HHS that was unilaterally created by the agency and thus is subject to the agency's general supervision, *see* 47 FR 38,409 (August 31, 1982). Thus, nothing prevented HRSA from creating an exemption from otherwise-applicable Guidelines or prevented HHS and the other agencies from directing that HRSA create such an exemption.

Congress did not specify the extent to which HRSA must "provide for" and "support" the application of Guidelines that it chooses to adopt. HRSA's authority to support "comprehensive guidelines" involves determining both the types of coverage and scope of that coverage. Section 2714(a)(4) requires coverage for preventive services only "as provided for in comprehensive guidelines supported by [HRSA]." That is, services are required to be included in coverage only to the extent that the Guidelines supported by HRSA provide for them. Through use of the word "as" in the phrase "as provided for," it requires that HRSA support how those services apply—that is, the manner in which the support will happen, such as in the phrase "as you like it."[10] When Congress means to require certain activities to occur in a certain manner, instead of simply authorizing the agency to decide the manner in which they will occur, Congress knows how to do so. *See, e.g.*, 42 U.S.C. 1395x ("The Secretary shall establish procedures to make beneficiaries and providers aware

---

[5] The Department of the Treasury and the Internal Revenue Service (IRS) published proposed and temporary regulations as part of the joint rulemaking of the Religious IFC. The Departments of Labor and HHS published their respective rules as interim final rules with request for comments and are finalizing their interim final rules. The Department of the Treasury and IRS are finalizing their proposed regulations.

[6] *See Regulations.gov* at *https://www.regulations.gov/searchResults?rpp=25&so=DESC&sb=postedDate&po=0&cmd=12%7C05%7C17-12%7C05%7C17&dktid=CMS-2014-0115* and *https://www.regulations.gov/docket Browser?rpp=25&so=DESC&sb=commentDue Date&po=7525&dct=PS&D=IRS-2017-0016*. Some of those submissions included form letters or attachments that, while not separately tabulated at *regulations.gov*, together included comments from, or were signed by, hundreds of thousands of separate persons. The Departments reviewed all of the public comments and attachments.

[7] *See, for example*, Family Planning grants in 42 U.S.C. 300 *et seq.*; the Teenage Pregnancy Prevention Program, Public Law 112–74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c–8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal

and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b–12; Title XIX of the Social Security Act, 42 U.S.C. 1396, *et seq.*; the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), and 25 U.S.C. 1601, *et seq.*; Health center grants, 42 U.S.C. 254b(e), (g), (h), and (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

[8] The ACA also does not require that contraceptives be covered under the preventive services provisions.

[9] 26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92.

[10] See As (usage 2), *Oxford English Dictionary Online* (Feb. 2018) ("[u]sed to indicate by comparison the way something happens or is done").

Exhibit 1

Case 1:25-cv-01340-RDM Document 34-2 Page: 362 Filed: Date Filed: 11/12/2025 87
Case 1:25-cv-01340-RDM Document 34-2 Page: 362 Filed: Date Filed: 11/12/2025 87

Federal Register / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations    57541

of the requirement that a beneficiary complete a health risk assessment *prior to or at the same time as* receiving personalized prevention plan services.'') (emphasis added). Thus, the inclusion of ''as'' in section 300gg–13(a)(3), and its absence in similar neighboring provisions, shows that HRSA has been granted discretion in supporting how the preventive coverage mandate applies—it does not refer to the timing of the promulgation of the Guidelines.

Nor is it simply a textual aberration that the word ''as'' is missing from the other three provisions in PHS Act section 2713(a). Rather, this difference mirrors other distinctions within that section that demonstrate that Congress intended HRSA to have the discretion the Agencies invoke. For example, sections (a)(1) and (a)(3) require ''evidence-based'' or ''evidence-informed'' coverage, while section (a)(4) does not. This difference suggests that the Agencies have the leeway to incorporate policy-based concerns into their decision-making. This reading of section 2713(a)(4) also prevents the statute from being interpreted in a cramped way that allows no flexibility or tailoring, and that would force the Departments to choose between ignoring religious objections in violation of RFRA or else eliminating the contraceptive coverage requirement from the Guidelines altogether. The Departments instead interpret section 2713(a)(4) as authorizing HRSA's Guidelines to set forth both the kinds of items and services that will be covered, and the scope of entities to which the contraceptive coverage requirement in those Guidelines will apply.

The religious objections at issue here, and in regulations providing exemptions from the inception of the Mandate in 2011, are considerations that, consistent with the statutory provision, permissibly inform what HHS, through HRSA, decides to provide for and support in the Guidelines. Since the first rulemaking on this subject in 2011, the Departments have consistently interpreted the broad discretion granted to HRSA in section 2713(a)(4) as including the power to reconcile the ACA's preventive-services requirement with sincerely held views of conscience on the sensitive subject of contraceptive coverage—namely, by exempting churches and their integrated auxiliaries from the contraceptive Mandate. (*See* 76 FR at 46623.) As the Departments explained at that time, the HRSA Guidelines ''exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women,'' and ''it

is appropriate that HRSA . . . takes into account the effect on the religious beliefs of [employers] if coverage of contraceptive services were required in [their] group health plans.'' *Id.* Consistent with that longstanding view, Congress's grant of discretion in section 2713(a)(4), and the lack of a specific statutory mandate that contraceptives must be covered or that they be covered without any exemptions or exceptions, supports the conclusion that the Departments are legally authorized to exempt certain entities or plans from a contraceptive Mandate if HRSA decides to otherwise include contraceptives in its Guidelines.

The conclusions on which these final rules are based are consistent with the Departments' interpretation of section 2713 of the PHS Act since 2010, when the ACA was enacted, and since the Departments started to issue interim final regulations implementing that section. The Departments have consistently interpreted section 2713(a)(4)'s grant of authority to include broad discretion regarding the extent to which HRSA will provide for, and support, the coverage of additional women's preventive care and screenings, including the decision to exempt certain entities and plans, and not to provide for or support the application of the Guidelines with respect to those entities or plans. The Departments defined the scope of the exemption to the contraceptive Mandate when HRSA issued its Guidelines for contraceptive coverage in 2011, and then amended and expanded the exemption and added an accommodation process in multiple rulemakings thereafter. The accommodation process requires the provision of coverage or payments for contraceptives to participants in an eligible organization's health plan by the organization's insurer or third party administrator. However, the accommodation process itself, in some cases, failed to require contraceptive coverage for many women, because—as the Departments acknowledged at the time—the enforcement mechanism for that process, section 3(16) of ERISA, does not provide a means to impose an obligation to provide contraceptive coverage on the third party administrators of self-insured church plans. *See* 80 FR 41323. Non-exempt employers participate in many church plans. Therefore, in both the previous exemption, and in the previous accommodation's application to self-insured church plans, the Departments have been choosing not to require contraceptive coverage for certain kinds

of employers since the Guidelines were adopted. During prior rulemakings, the Departments also disagreed with commenters who contended the Departments had no authority to create exemptions under section 2713 of the PHS Act, or as incorporated into ERISA and the Code, and who contended instead that we must enforce the Guidelines on the broadest spectrum of group health plans as possible. *See, e.g.,* 2012 final regulations at 77 FR 8726.

The Departments' interpretation of section 2713(a)(4) is confirmed by the ACA's statutory structure. Congress did not intend to require coverage of preventive services for every type of plan that is subject to the ACA. *See, e.g.,* 76 FR 46623. On the contrary, Congress carved out an exemption from PHS Act section 2713 (and from several other provisions) for grandfathered plans. In contrast, grandfathered plans do have to comply with many of the other provisions in Title I of the ACA— provisions referred to by the previous Administration as providing ''particularly significant protections.'' (75 FR 34540). Those provisions include (from the PHS Act) section 2704, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708, which prohibits excessive waiting periods (as of January 1, 2014); section 2711, which relates to lifetime and annual dollar limits; section 2712, which generally prohibits rescission of health coverage; section 2714, which extends dependent child coverage until the child turns 26; and section 2718, which imposes a minimum medical loss ratio on health insurance issuers in the individual and group health insurance markets, and requires them to provide rebates to policyholders if that medical loss ratio is not met. (75 FR 34538, 34540, 34542). Consequently, of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not subject to section 2713.[11] Some commenters assert the exemptions for grandfathered plans are temporary, or were intended to be temporary, but as the Supreme Court observed, ''there is no legal requirement that grandfathered plans ever be phased out.'' *Hobby Lobby,* 134 S. Ct. at 2764 n.10.

Some commenters argue that Executive Order 13535's reference to

---

[11] Kaiser Family Foundation & Health Research & Educational Trust, ''Employer Health Benefits, 2017 Annual Survey,'' Henry J Kaiser Family Foundation (Sept. 2017), *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.*

Exhibit 1                                        JA415                                        JA-0000006

implementing the ACA consistent with certain conscience laws does not justify creating exemptions to contraceptive coverage in the Guidelines, because those laws do not specifically require exemptions to the Mandate in the Guidelines. The Departments, however, believe these final regulations are consistent with Executive Order 13535. Issued upon the signing of the ACA, Executive Order 13535 specified that "longstanding Federal laws to protect conscience . . . remain intact," including laws that protect holders of religious beliefs from certain requirements in health care contexts. While the Executive Order 13535 does not require the expanded exemptions in these rules, the expanded exemptions are, as explained below, consistent with longstanding federal laws that protect religious beliefs, and are consistent with the Executive Order's intent that the ACA would be implemented in accordance with the conscience protections set forth in those laws.

The extent to which RFRA provides authority for these final rules is discussed below in section II.C., The First Amendment and the Religious Freedom Restoration Act.

*B. Availability and Scope of Religious Exemptions*

Some commenters supported the expanded exemptions and accommodation in the Religious IFC, and the entities and individuals to which they applied. They asserted the expanded exemptions and accommodation are appropriate exercises of discretion and are consistent with religious exemptions Congress has provided in many similar contexts. Some further commented that the expanded exemptions are necessary under the First Amendment or RFRA. Similarly, commenters stated that the accommodation was an inadequate means to resolve religious objections, and that the expanded exemptions are needed. They objected to the accommodation process because it was another method to require compliance with the Mandate. They contended its self-certification or notice involved triggering the very contraceptive coverage that organizations objected to, and that such coverage flowed in connection with the objecting organizations' health plans. The commenters contended that the seamlessness cited by the Departments between contraceptive coverage and an accommodated plan gives rise to the religious objections that organizations would not have with an expanded exemption.

Several other commenters asserted that the exemptions in the Religious IFC are too narrow and called for there to be no mandate of contraceptive coverage. Some of them contended that HRSA should not include contraceptives in their women's preventive services Guidelines because fertility and pregnancy are generally healthy conditions, not diseases that are appropriately the target of preventive health services. They also contended that contraceptives can pose medical risks for women and that studies do not show that contraceptive programs reduce abortion rates or rates of unintended pregnancies. Some commenters contended that, to the extent the Guidelines require coverage of certain drugs and devices that may prevent implantation of an embryo after fertilization, they require coverage of items that are abortifacients and, therefore, violate federal conscience protections such as the Weldon Amendment. *see* section 507(d) of Public Law 115–141.

Other commenters contended that the expanded exemptions are too broad. In general, these commenters supported the inclusion of contraceptives in the Guidelines, contending they are a necessary preventive service for women. Some said that the Departments should not exempt various kinds of entities such as businesses, health insurance issuers, or other plan sponsors that are not nonprofit entities. Other commenters contended the exemptions and accommodation should not be expanded, but should remain the same as they were in the July 2015 final regulations (80 FR 41318). Some commenters said the Departments should not expand the exemptions, but simply expand or adjust the accommodation process to resolve religious objections to the Mandate and accommodation. Some commenters contended that even the previous regulations allowing an exemption and accommodation were too broad and, and said that no exemptions to the Mandate should exist, in order that contraceptive coverage would be provided to as many women as possible.

After consideration of the comments, the Departments are finalizing the provisions of the Religious IFC without contracting the scope of the exemptions and accommodation set forth in the Religious IFC. Since HRSA issued its Guidelines in 2011, the Departments have recognized that religious exemptions from the contraceptive Mandate are appropriate. The details of the scope of such exemptions are discussed in further detail below. In general, the Departments conclude it is appropriate to maintain the exemptions created by the Religious IFC to avoid instances where the Mandate is applied in a way that violates the religious beliefs of certain plan sponsors, issuers, or individuals. The Departments do not believe the previous exemptions are adequate, because some religious objections by plan sponsors and individuals were favored with exemptions, some were not subjected to contraceptive coverage if they fell under the indirect exemption for certain self-insured church plans, and others had to choose between the Mandate and the accommodation even though they objected to both. The Departments wish to avoid inconsistency in respecting religious objections in connection with the provision of contraceptive coverage. The lack of a congressional mandate that contraceptives be covered, much less that they be covered without religious exemptions, has also informed the Departments' decision to expand the exemptions. And Congress's decision not to apply PHS Act section 2713 to grandfathered plans has likewise informed the Departments' decision whether exemptions to the contraceptive Mandate are appropriate.

Congress has also established a background rule against substantially burdening sincere religious beliefs except where consistent with the stringent requirements of the Religious Freedom Restoration Act. And Congress has consistently provided additional, specific exemptions for religious beliefs in statutes addressing federal requirements in the context of health care and specifically concerning issues such as abortion, sterilization, and contraception. Therefore, the Departments consider it appropriate, to the extent we impose a contraceptive coverage Mandate by the exercise of agency discretion, that we also include exemptions for the protection of religious beliefs in certain cases. The expanded exemptions finalized in these rules are generally consistent with the scope of exemptions that Congress has established in similar contexts. They are also consistent with the intent of Executive Order 13535 (March 24, 2010), which was issued upon the signing of the ACA and declared that, "[u]nder the Act, longstanding federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7, and the Weldon Amendment, section 508(d)(1) of Public Law 111–8) remain intact" and that "[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the HHS."

Some commenters argued that Congress's failure to explicitly include

religious exemptions in PHS Act section 2713 itself is indicative of an intent that such exemptions not be included, but the Departments disagree. As noted above, Congress also failed to require contraceptive coverage in PHS Act section 2713. And the commenters' argument would negate not just these expanded exemptions, but the previous exemptions for houses of worship and integrated auxiliaries, and the indirect exemption for self-insured church plans that use the accommodation. Where Congress left so many matters concerning section 2713(a)(4) to agency discretion, the Departments consider it appropriate to implement these expanded exemptions in light of Congress's long history of respecting religious beliefs in the context of certain federal health care requirements.

If there is to be a federal contraceptive mandate that fails to include some—or, in the views of some commenters, any—religious exemptions, the Departments do not believe it is appropriate for us to impose such a regime through discretionary administrative measures. Instead, such a serious imposition on religious liberty should be created, if at all, by Congress, in response to citizens exercising their rights of political participation. Congress did not prohibit religious exemptions under this Mandate. It did not even require contraceptive coverage under the ACA. It left the ACA subject to RFRA, and it specified that additional women's preventive services will only be required coverage as provided for in Guidelines supported by HRSA. Moreover, Congress legislated in the context of the political consensus on conscientious exemptions for health care that has long been in place. Since *Roe* v. *Wade* in 1973, Congress and the states have consistently offered religious exemptions for health care providers and others concerning issues such as sterilization and abortion, which implicate deep disagreements on scientific, ethical, and religious (and moral) concerns. Indeed over the last 44 years, Congress has repeatedly expanded religious exemptions in similar cases, including to contraceptive coverage. Congress did not purport to deviate from that approach in the ACA. Thus, we conclude it is appropriate to specify in these final rules, that, if the Guidelines continue to maintain a contraceptive coverage requirement, the expanded exemptions will apply to those Guidelines and their enforcement.

Some commenters contended that, even though Executive Order 13535 refers to the Church Amendments, the intention of those statutes is narrow, should not be construed to extend to entities, and should not be construed to prohibit procedures. But those comments mistake the Departments' position. The Departments are not construing the Church Amendments to require these exemptions, nor do the exemptions prohibit any procedures. Instead, through longstanding federal conscience statutes, Congress has established consistent principles concerning respect for religious beliefs in the context of certain Federal health care requirements. Under those principles, and absent any contrary requirement of law, the Departments are offering exemptions for sincerely held religious beliefs to the extent the Guidelines otherwise include contraceptive coverage.[12] These exemptions do not prohibit any services, nor do they authorize employers to prohibit employees from obtaining any services. The Religious IFC and these final rules simply refrain from imposing the federal Mandate that employers and health insurance issuers cover contraceptives in their health plans where compliance with the Mandate would violate their sincerely held religious beliefs. And though not necessary to the Departments' decision here, the Departments note that the Church Amendments explicitly protect entities and that several subsequent federal conscience statutes have protected against federal mandates in health coverage.

The Departments note that their decision is also consistent with state practice. A significant majority of states either impose no contraceptive coverage requirement or offer broader exemptions than the exemption contained in the July 2015 final regulations.[13] Although the practice of states is not a limit on the discretion delegated to HRSA by the ACA, nor is it a statement about what the federal government may do consistent with RFRA or other limitations or protections embodied in federal law, such state practices can inform the Departments' view that it is appropriate to protect religious liberty as an exercise of agency discretion.

The Departments decline to adopt the suggestion of some commenters to use these final rules to revoke the contraceptive Mandate altogether, such as by declaring that HHS through HRSA shall not include contraceptives in the list of women's preventive services in Guidelines issued under section 2713(a)(4). Although previous regulations were used to authorize religious exemptions and accommodations to the imposition of the Guidelines' coverage of contraception, the issuance of the Guidelines themselves in 2011 describing what items constitute recommended women's preventive services, and the update to those recommendations in December 2016, did not occur through the regulations that preceded the 2017 Religious IFC and these final rules. The Guidelines' specification of which women's preventive services were recommended were issued, not by regulation, but directly by HRSA, after consultation with external organizations that operated under cooperative agreements with HRSA to consider the issue, solicit public comment, and provide recommendations. The Departments decline to accept the invitation of some commenters to use these rules to specify whether HRSA includes contraceptives in the Guidelines at all. Instead the Departments conclude it is appropriate for these rules to continue to focus on restating the statutory language of PHS Act section 2713 in regulatory form, and delineating what exemptions and accommodations apply if HRSA lists contraceptives in its Guidelines. Some commenters said that if contraceptives are not removed from the Guidelines entirely, some entities or individuals with religious objections might not qualify for the exemptions or accommodation. As discussed below, however, the exemptions in the Religious IFC and these final rules cover a broad range of entities and individuals. The Departments are not aware of specific groups or individuals whose religious beliefs would still be substantially burdened by the Mandate after the issuance of these final rules.

Some commenters asserted that HRSA should remove contraceptives from the Guidelines because the Guidelines have not been subject to the notice and comment process under the Administrative Procedure Act. Some commenters also contended that the Guidelines should be amended to omit items that may prevent (or possibly dislodge) the implantation of a human embryo after fertilization, in order to ensure consistency with conscience provisions that prohibit requiring plans to pay for or cover abortions.

---

[12] The Departments note that the Church Amendments are the subject of another, ongoing rulemaking process. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 FR 3880 (NPRM Jan. 26, 2018). Since the Departments are not construing the Amendments to require the religious exemptions, we defer issues regarding the scope, interpretation, and protections of the Amendments to HHS in that rulemaking.

[13] *See* Guttmacher Institute, "Insurance Coverage of Contraceptives", The Guttmacher Institute (June 11, 2018). *https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives*.

Whether and to what extent the Guidelines continue to list contraceptives, or items considered to prevent implantation of an embryo, for entities not subject to exemptions and an accommodation, and what process is used to include those items in the Guidelines, is outside the scope of these final rules. These rules focus on what religious exemptions and accommodations shall apply if Guidelines issued under section 2713(a)(4) include contraceptives or items considered to be abortifacients.

Members of the public that support or oppose the inclusion of some or all contraceptives in the Guidelines, or wish to comment concerning the content of, and the process for developing and updating, the Guidelines, are welcome to communicate their views to HRSA, at *wellwomancare@hrsa.gov.*

The Departments conclude that it would be inadequate to merely attempt to amend or expand the accommodation process instead of expanding the exemption. In the past, the Departments had stated in our regulations and court briefs that the previous accommodation process required contraceptive coverage or payments in a way that is "seamless" with the coverage provided by the objecting employer. As a result, in significant respects, that previous accommodation process did not actually accommodate the objections of many entities, as many entities with religious objections have argued. The Departments have attempted to identify an accommodation process that would eliminate the religious objections of all plaintiffs, including seeking public comment through a Request For Information, 81 FR 47741 (July 26, 2016), but we stated in January 2017 that we were unable to develop such an approach at that time.[14] The Departments continue to believe that, because of the nature of the accommodation process, merely amending that accommodation process without expanding the exemptions would not adequately address religious objections to compliance with the Mandate. Instead, we conclude that the

most appropriate approach to resolve these concerns is to expand the exemptions as set forth in the Religious IFC and these final rules, while maintaining the accommodation as an option for providing contraceptive coverage, without forcing entities to choose between compliance with either the Mandate or the accommodation and their religious beliefs.

Comments considering the appropriateness of exempting certain specific kinds of entities or individuals are discussed in more detail below.

### C. The First Amendment and the Religious Freedom Restoration Act

Some commenters said that the Supreme Court ruled that the exemptions to the contraceptive Mandate, which the Departments previously provided to houses of worship and integrated auxiliaries, were required by the First Amendment. From this, commenters concluded that the exemptions for houses of worship and integrated auxiliaries are legally authorized, but exemptions beyond those are not. But in *Hobby Lobby* and *Zubik*, the Supreme Court did not decide whether the exemptions previously provided to houses of worship and integrated auxiliaries were required by the First Amendment, and the Court did not say the Departments must apply the contraceptive Mandate to other organizations unless RFRA prohibits the Departments from doing so. Moreover, the previous church exemption, which applied automatically to all churches whether or not they had even asserted a religious objection to contraception, 45 CFR 147.141(a), is not tailored to any plausible free-exercise concerns. The Departments decline to adopt the view that RFRA does not apply to other religious organizations, and there is no logical explanation for how RFRA could require the church exemption but not this expanded religious exemption, given that the accommodation is no less an available alternative for the former than the latter.

Commenters disagreed about the scope of RFRA's protection in this context. Some commenters said that the expanded exemptions and accommodation are consistent with RFRA. Some also said that they are required by RFRA, as the Mandate imposes substantial burdens on religious exercise and fails to satisfy the compelling-interest and least-restrictive-means tests imposed by RFRA. Other commenters, however, contended that the expanded exemptions and accommodation are neither required by, nor consistent with, RFRA. In this vein, some argued that the Departments have

a compelling interest to deny religious exemptions, that there is no less restrictive means to achieve its goals, or that the Mandate or its accommodation process do not impose a substantial burden on religious exercise.

For the reasons discussed below, the Departments believe that agencies charged with administering a statute that imposes a substantial burden on the exercise of religion under RFRA have discretion in determining whether the appropriate response is to provide an exemption from the burdensome requirement, or to merely attempt to create an accommodation that would mitigate the burden. Here, after further consideration of these issues and review of the public comments, the Departments have determined that a broader exemption, rather than a mere accommodation, is the appropriate response.

In addition, with respect to religious employers, the Departments conclude that, without finalizing the expanded exemptions, and therefore requiring certain religiously objecting entities to choose between the Mandate, the accommodation, or penalties for noncompliance—or requiring objecting individuals to choose between purchasing insurance with coverage to which they object or going without insurance—the Departments would violate their rights under RFRA.

#### 1. Discretion To Provide Religious Exemptions

In the Religious IFC, we explained that even if RFRA does not compel the Departments to provide the religious exemptions set forth in the IFC, the Departments believe the exemptions are the most appropriate administrative response to the religious objections that have been raised.

The Departments received conflicting comments on this issue. Some commenters agreed that the Departments have administrative discretion to address the religious objections even if the Mandate and accommodation did not violate RFRA. Other commenters expressed the view that RFRA does not provide such discretion, but only allows exemptions when RFRA requires exemptions. They contended that RFRA does not require exemptions for entities covered by the expanded exemptions of the Religious IFC, but that subjecting those entities to the accommodation satisfies RFRA, and therefore RFRA provides the Departments with no additional authority to exempt those entities. Those commenters further contended that because, in their view, section 2713(a)(4) does not authorize the

---

[14] *See* Departments of Labor, Health and Human Services, and the Treasury. "FAQs About Affordable Care Act Implementation Part 36," (Jan. 9, 2017), *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

Exhibit 1                    JA418                    JA-0000009

expanded exemptions, no statutory authority exists for the Departments to finalize the expanded exemptions.

As discussed above, the Departments disagree with the suggestions of commenters that section 2713(a)(4) does not authorize the Departments to adopt the expanded exemptions. Nevertheless, the Departments note that the expanded exemptions for religious objectors also rest on an additional, independent ground: The Departments have determined that, in light of RFRA, an expanded exemption rather than the existing accommodation is the most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*. Indeed, with respect to at least some objecting entities, an expanded exemption, as opposed to the existing accommodation, is required by RFRA. The Departments disagree with commenters who contend RFRA does not give the Departments discretion to offer these expanded exemptions.

The Departments' determination about their authority under RFRA rests in part on the Departments' reassessment of the interests served by the application of the Mandate in this specific context. Although the Departments previously took the position that the application of the Mandate to objecting employers was narrowly tailored to serve a compelling governmental interest, as discussed below the Departments have now concluded, after reassessing the relevant interests and for the reasons stated below, that it does not. Particularly under those circumstances, the Departments believe that agencies charged with administering a statute that imposes a substantial burden on the exercise of religion under RFRA have discretion in determining whether the appropriate response is to provide an exemption from the burdensome requirement or instead to attempt to create an accommodation that would mitigate the burden. And here, the Departments have determined that a broader exemption rather than the existing accommodation is the appropriate response. That determination is informed by the Departments' reassessment of the relevant interests, as well as by their desire to bring to a close the more than five years of litigation over RFRA challenges to the Mandate.

Although RFRA prohibits the government from substantially burdening a person's religious exercise where doing so is not the least restrictive means of furthering a compelling interest—as is the case with the contraceptive Mandate, pursuant to

*Hobby Lobby*—neither RFRA nor the ACA *prescribes* the remedy by which the government must eliminate that burden, where any means of doing so will require departing from the ACA to some extent (on the view of some commenters, with which the Departments disagree, that section 2713(a)(4) does not itself authorize the Departments to recognize exceptions). The prior administration *chose* to do so through the complex accommodation it created, but nothing in RFRA or the ACA compelled that novel choice or prohibits the current administration from employing the more straightforward choice of an exemption—much like the existing and unchallenged exemption for churches. After all, on the theory that section 2713(a)(4) allows for no exemptions, the accommodation also departed from section 2713(a)(4) in the sense that employers were not themselves offering contraceptive coverage, and the ACA did not require the Departments to choose that departure rather than the expanded exemptions as the exclusive method to satisfy their obligations under RFRA to eliminate the substantial burden imposed by the Mandate. The agencies' choice to adopt an exemption in addition to the accommodation is particularly reasonable given the existing legal uncertainty as to whether the accommodation itself violates RFRA. *See* 82 FR at 47798: *see also Ricci v. DeStefano*, 557 U.S. 586, 585 (2009) (holding that an employer need only have a strong basis to believe that an employment practice violates Title VII's disparate impact ban in order to take certain types of remedial action that would otherwise violate Title VII's disparate-treatment ban). Indeed, if the Departments had simply adopted an expanded exemption from the outset— as they did for churches—no one could reasonably have argued that doing so was improper because they should have invented the accommodation instead. Neither RFRA nor the ACA compels a different result now based merely on path dependence.

Although the foregoing analysis is independently sufficient, additional support for this view is provided by the Departments' conclusion, as explained more fully below, that an expanded exemption is required by RFRA for at least some objectors. In the Religious IFC, the Departments reaffirmed their conclusion that there is not a way to satisfy all religious objections by amending the accommodation, (82 FR at 47800), a conclusion that was confirmed by some commenters (and the continued

litigation over the accommodation).[15] Some commenters agreed the religious objections could not be satisfied by amending the accommodation without expanding the exemptions, because if the accommodation requires an objecting entity's issuer or third party administrator to provide or arrange contraceptive coverage for persons covered by the plan because they are covered by the plan, this implicates the objection of entities to the coverage being provided through their own plan, issuer, or third party administrator. Other commenters contended the accommodation could be modified to satisfy RFRA concerns without extending exemptions to objecting entities, but they did not propose a method of modifying the accommodation that would, in the view of the Departments, actually address the religious objections to the accommodation.

In the Departments' view, after considering all the comments and the preceding years of contention over this issue, it is appropriate to finalize the expanded exemptions rather than merely attempt to change the accommodation to satisfy religious objections. This is because if the accommodation still delivers contraceptive coverage through use of the objecting employer's plan, issuer, or third party administrator, it does not address the religious objections. If the accommodation could deliver contraceptive coverage independent and separate from the objecting employer's plan, issuer, and third party administrator, it could possibly address the religious objections, but there are two problems with such an approach. First, it would effectively be an exemption, not the accommodation as it has existed, so it would not be a reason not to offer the expanded exemptions finalized in these rules. Second, although (as explained above) the Departments have authority to provide exemptions to the Mandate, the Departments are not aware of the authority, or of a practical mechanism, for using section 2713(a)(4) to require contraceptive coverage be provided

---

[15] *See* RFI, 81 FR 47741 (July 26, 2016); Departments of Labor, Health and Human Services, and the Treasury, "FAQs, About Affordable Care Act Implementation Part 36," (Jan. 9, 2017), *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

Exhibit 1     JA419     JA-0000010

specifically to persons covered by an objecting employer, other than by using the employer's plan, issuer, or third party administrator, which would likely violate some entities' religious objections. The Departments are aware of ways in which certain persons covered by an objecting employer might obtain contraceptive coverage through other governmental programs or requirements, instead of through objecting employers' plans, issuers, or third party administrators, and we mention those elsewhere in this rule. But those approaches do not involve the accommodation, they involve the expanded exemptions, plus the access to contraceptives through separate means.

### 2. Requiring Entities To Choose Between Compliance With the Contraceptive Mandate or the Accommodation Violated RFRA in Many Instances

Before the Religious IFC, the Departments had previously contended that the Mandate did not impose a substantial burden on entities and individuals under RFRA; that it was supported by a compelling government interest; and that it was, in combination with the accommodation, the least restrictive means of advancing that interest. With respect to the coverage Mandate itself, apart from the accommodation, and as applied to entities with sincerely held religious objections, that argument was rejected in *Hobby Lobby*, which held that the Mandate imposes a substantial burden and was not the least restrictive means of achieving any compelling governmental interest. *See* 134 S. Ct. at 2775–79. In the Religious IFC, the Departments revisited its earlier conclusions and reached a different view, concluding that requiring compliance through the Mandate or accommodation constituted a substantial burden on the religious exercise of many entities or individuals with religious objections, did not serve a compelling interest, and was not the least restrictive means of serving a compelling interest, so that requiring such compliance led to the violation of RFRA in many instances. (82 FR at 47806).

In general, commenters disagreed about this issue. Some commenters agreed with the Departments, and with some courts, that requiring entities to choose between the contraceptive Mandate and its accommodation violated their rights under RFRA, because it imposed a substantial burden on their religious exercise, did not advance a compelling government

interest, and was not the least restrictive means of achieving such an interest. Other commenters contended that requiring compliance either with the Mandate or the accommodation did not violate RFRA, agreeing with some courts that have concluded the accommodation does not substantially burden the religious exercise of organizations since, in their view, it does not require organizations to facilitate contraceptive coverage except by submitting a self-certification form or notice, and requiring compliance was the least restrictive means of advancing the compelling interest of providing contraceptive access to women covered by objecting entities' plans.

The Departments have examined further, including in light of public comments, the issue of whether requiring compliance with the combination of the contraceptive Mandate and the accommodation process imposes a substantial burden on entities that object to both, and is the least restrictive means of advancing a compelling government interest. The Departments now reaffirm the conclusion set forth in the Religious IFC, that requiring certain religiously objecting entities or individuals to choose between the Mandate, the accommodation, or incurring penalties for noncompliance imposes a substantial burden on religious exercise under RFRA.

#### a. Substantial Burden

The Departments concur with the description of substantial burdens expressed recently by the Department of Justice:

> A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.
>
> Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion.[16]

The Mandate and accommodation under the previous regulation forced

certain non-exempt religious entities to choose between complying with the Mandate, complying with the accommodation, or facing significant penalties. Various entities sincerely contended, in litigation or in public comments, that complying with either the Mandate or the accommodation was inconsistent with their religious observance or practice. The Departments have concluded that withholding an exemption from those entities has imposed a substantial burden on their exercise of religion, either by compelling an act inconsistent with that observance or practice, or by substantially pressuring the adherents to modify such observance or practice. To this extent, the Departments believe that the Court's analysis in *Hobby Lobby* extends, for the purposes of analyzing substantial burden, to the burdens that an entity faces when it opposes, on the basis of its religious beliefs, complying with the Mandate or participating in the accommodation process, and is subject to penalties or disadvantages that would have applied in this context if it chose neither. *See also Sharpe Holdings,* 801 F.3d at 942. Likewise, reconsideration of these issues has also led the Departments to conclude that the Mandate imposes a substantial burden on the religious beliefs of an individual employee who opposes coverage of some (or all) contraceptives in his or her plan on the basis of his or her religious beliefs, and would be able to obtain a plan that omits contraception from a willing employer or issuer (as applicable), but cannot obtain one solely because the Mandate requires that employer or issuer to provide a plan that covers all FDA-approved contraceptives. The Departments disagree with commenters that contend the accommodation did not impose a substantial burden on religiously objecting entities, and agree with other commenters and some courts and judges that concluded the accommodation can be seen as imposing a substantial burden on religious exercise in many instances.

#### b. Compelling Interest

Although the Departments previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest, the Departments have concluded, after reassessing the relevant interests and, in light of the public comments received, that it does not. This is based on several independent reasons.

First, as discussed above, the structure of section 2713(a)(4) and the ACA evince a desire by Congress to

---

[16] *See* Federal Law Protections for Religious Liberty, 82 FR 49668, 49669 (Oct. 26, 2017).

Exhibit 1

JA420

JA-0000011

grant a great amount of discretion on the issue of whether, and to what extent, to require contraceptive coverage in health plans pursuant to section 2713(a)(4). This informs the Departments' assessment of whether the interest in mandating the coverage constitutes a compelling interest, as doing so imposes a substantial burden on religious exercise. As the Department of Justice has explained, "[t]he strict scrutiny standard applicable to RFRA is exceptionally demanding," and "[o]nly those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent." [17]

Second, since the day the contraceptive Mandate came into effect in 2011, the Mandate has not applied in many circumstances. To begin, the ACA does not apply the Mandate, or any part of the preventive services coverage requirements, to grandfathered plans. To continue, the Departments under the last Administration provided exemptions to the Mandate and expanded those exemptions through multiple rulemaking processes. Those rulemaking processes included an accommodation that effectively left employees of many non-exempt religious nonprofit entities without contraceptive coverage, in particular with respect to self-insured church plans exempt from ERISA. Under the previous accommodation, once a self-insured church plan filed a self-certification or notice, the accommodation relieved it of any further obligation with respect to contraceptive services coverage. Having done so, the accommodation process would generally have transferred the obligation to provide or arrange for contraceptive coverage to a self-insured plan's third party administrator (TPA). But the Departments recognized that they lack authority to compel church plan TPAs to provide contraceptive coverage or levy fines against those TPAs for failing to provide it. This is because church plans are exempt from ERISA pursuant to section 4(b)(2) of ERISA. Section 2761(a) of the PHS Act provides that States may enforce the provisions of title XXVII of the PHS Act as they pertain to health insurance issuers, but does not apply to church plans that do not provide coverage through a policy issued by a health insurance issuer. The combined result of PHS Act section 2713's authority to remove contraceptive coverage obligations from self-insured church

plans, and HHS's and DOL's lack of authority under the PHS Act or ERISA to require TPAs of those plans to provide such coverage, led to significant disparity in the requirement to provide contraceptive coverage among nonprofit organizations with religious objections to the coverage.

Third party administrators for some, but not all, religious nonprofit organizations were subject to enforcement for failure to provide contraceptive coverage under the accommodation, depending on whether they administer a self-insured church plan. Notably, many of those nonprofit organizations were not houses of worship or integrated auxiliaries. Under section 3(33)(C) of ERISA, organizations whose employees participate in self-insured church plans need not be churches so long as they are controlled by or "share[ ] common religious bonds and convictions with" a church or convention or association of churches. The effect is that many similar religious organizations were being treated differently with respect to their employees receiving contraceptive coverage based solely on whether organization employees participate in a church plan.

This arrangement encompassed potentially hundreds of religious non-profit organizations that were not covered by the exemption for houses of worship and integrated auxiliaries. For example, the Departments were sued by two large self-insured church plans—Guidestone and Christian Brothers.[18] Guidestone is a plan organized by the Southern Baptist convention that covers 38,000 employers, some of which are exempt as churches or integrated auxiliaries, and some of which are not. Christian Brothers is a plan that covers Catholic churches and integrated auxiliaries and has said in litigation that it covers about 500 additional entities that are not exempt as churches. In several other lawsuits challenging the Mandate, the previous Administration took the position that some plans established and maintained by houses of worship but that included entities that were not integrated auxiliaries, were church plans under section 3(33) of ERISA and, thus, the Government "has no authority to require the plaintiffs' TPAs to provide contraceptive coverage at this time." *Roman Catholic Archdiocese of N.Y.* v. *Sebelius,* 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

Third, the Departments now believe the administrative record on which the Mandate rested was—and remains—insufficient to meet the high threshold to establish a compelling governmental interest in ensuring that women covered by plans of objecting organizations receive cost-free contraceptive coverage through those plans. The Mandate is not narrowly tailored to advance the government's interests and appears both overinclusive and underinclusive. It includes some entities where a contraceptive coverage requirement seems unlikely to be effective, such as religious organizations of certain faiths, which, according to commenters, primarily hire persons who agree with their religious views or make their dedication to their religious views known to potential employees who are expected to respect those views. The Mandate also does not apply to a significant number of entities encompassing many employees and for-profit businesses, such as grandfathered plans. And it does not appear to target the population defined, at the time the Guidelines were developed, as being the most at-risk of unintended pregnancy, that is, "women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority." [19] Rather than focusing on this group, the Mandate is a broad-sweeping requirement across employer-provided coverage and the individual and group health insurance markets.

The Department received conflicting comments on this issue. Some commenters agreed that the government does not have a compelling interest in applying the Mandate to objecting religious employers. They noted that the expanded exemptions will impact only a small fraction of women otherwise affected by the Mandate and argued that refusing to provide those exemptions would fail to satisfy the compelling interest test. Other commenters, however, argued that the government has a broader interest in the Mandate because all women should be considered at-risk of unintended pregnancy. But the Institute of Medicine (IOM), in discussing whether contraceptive coverage is needed, provided a very specific definition of the population of women most at-risk of unintended pregnancy.[20] The Departments believe it is appropriate to consider the government's interest in

---

[17] *Id.* at 49670.

[18] The Departments take no view on the status of particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.

[19] Institute of Medicine, "Clinical Preventive Services for Women: Closing the Gaps" at 102 (2011).

[20] Id.

Exhibit 1                                    JA421                                    JA-0000012

the contraceptive coverage requirement using the definition that formed the basis of that requirement and the justifications the Departments have offered for it since 2011. The Mandate, by its own terms, applies not just to women most at-risk of unintended pregnancy as identified by the IOM, but applies to any non-grandfathered "group health plan and a health insurance issuer offering group or individual health insurance coverage." PHS Act section 2713(a). Similarly, the exemptions and accommodation in previous rules, and the expanded exemptions in these rules, do not apply only to coverage for women most at-risk of unintended pregnancy, but to plans where a qualifying objection exists based on sincerely held religious beliefs without regard to the types of women covered in those plans. Seen in this light, the Departments believe there is a serious question whether the administrative record supports the conclusion that the Mandate, as applied to religious objectors encompassed by the expanded exemptions, is narrowly tailored to achieve the interests previously identified by the government. Whether and to what extent it is certain that an interest in health is advanced by refraining from providing expanded religious exemptions is discussed in more detail below in section II.F., Health Effects of Contraception and Pregnancy.

Fourth, the availability of contraceptive coverage from other possible sources—including some objecting entities that are willing to provide some (but not all) contraceptives, or from other governmental programs for low-income women—detracts from the government's interest to refuse to expand exemptions to the Mandate. The Guttmacher Institute recently published a study that concluded, "[b]etween 2008 and 2014, there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy," and "there was no significant increase in the use of methods that would have been covered under the ACA (most or moderately effective methods) during the most recent time period (2012–2014) excepting small increases in implant use." [21] In discussing why they did not see such an effect from the Mandate, the authors suggested that "[p]rior to the

implementation of the ACA, many women were able to access contraceptive methods at low or no cost through publicly funded family planning centers and Medicaid; existence of these safety net programs may have dampened any impact that the ACA could have had on contraceptive use. In addition, cost is not the only barrier to accessing a full range of method options," and "[t]he fact that income is not associated with use of most other methods [besides male sterilization and withdrawal] obtained through health care settings may reflect broader access to affordable and/or free contraception made possible through programs such as Title X."

Fifth, the Departments previously created the accommodation, in part, as a way to provide for payments of contraceptives and sterilization in a way that is "seamless" with the coverage that eligible employers provide to their plan participants and their beneficiaries. (80 FR 41318). As noted above, some commenters contended that seamlessness between contraceptive coverage and employer sponsored insurance is important and is a compelling governmental interest, while other commenters disagreed. Neither Congress, nor the Departments in other contexts, have concluded that seamlessness, as such, is a compelling interest in the federal government's delivery of contraceptive coverage. For example, the preventive services Mandate itself does not require contraceptive coverage and does not apply to grandfathered plans, thereby failing to guarantee seamless contraceptive coverage. The exemption for houses of worship and integrated auxiliaries, and the application of the accommodation to certain self-insured church plans, also represents a failure to achieve seamless contraceptive coverage. HHS's Title X program provides contraceptive coverage in a way that is not necessarily seamless with beneficiaries' employer sponsored insurance plans. After reviewing the public comments and reconsidering this issue, the Departments no longer believe that if a woman working for an objecting religious employer receives contraceptive access in ways that are not seamless to her employer sponsored insurance, a compelling government interest has nevertheless been undermined. Therefore the Departments conclude that guaranteeing seamlessness between contraceptive access and employer sponsored insurance does not constitute a compelling interest that overrides

employers' religious objections to the contraceptive Mandate.

Some commenters contended that obtaining contraceptive coverage from other sources could be more difficult or more expensive for women than obtaining it from their group health plan or health insurance plan. The Departments do not believe that such differences rise to the level of a compelling interest or make it inappropriate for us to issue the expanded exemptions set forth in these final rules. Instead, after considering this issue, the Departments conclude that the religious liberty interests that would be infringed if we do not offer the expanded exemptions are not overridden by the impact on those who will no longer obtain contraceptives through their employer sponsored coverage as a result. This is discussed in more detail in following section, II.D., Burdens on Third Parties.

### D. Burdens on Third Parties

The Departments received a number of comments on the question of burdens that these rules might impose on third parties. Some commenters asserted that the expanded exemptions and accommodation do not impose an impermissible or unjustified burden on third parties, including on women who might not otherwise receive contraceptive coverage with no cost-sharing. These included commenters agreeing with the Departments' explanations in the Religious IFC, stating that unintended pregnancies were decreasing before the Mandate was implemented, and asserting that any benefit that third parties might receive in getting contraceptive coverage does not justify forcing religious persons to provide such products in violation of their beliefs. Other commenters disagreed, asserting that the expanded exemptions unacceptably burden women who might lose contraceptive coverage as a result. They contended the exemptions may remove contraceptive coverage, causing women to have higher contraceptive costs, fewer contraceptive options, less ability to use contraceptives more consistently, more unintended pregnancies,[22] births spaced more closely, and workplace, economic, or societal inequality. Still other commenters took the view that other laws or protections, such as those found in the First or Fifth Amendments, prohibit the expanded exemptions, which those commenters view as

---

[21] M.L. Kavanaugh et al., Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, 97 *Contraception* 14. 14–21 (2018), available at *http://www.contraceptionjournal.org/article/S0010-7824(17)30478-X/pdf*.

[22] Some commenters attempted to quantify the costs of unintended pregnancy, but failed to persuasively estimate the population of women that this exemption may affect.

prioritizing religious liberty of exempted entities over the religious liberty, conscience, or choices of women who would not receive contraceptive coverage where an exemption is used.

The Departments note that the exemptions in the Religious IFC and these final rules, like the exemptions created by the previous Administration, do not impermissibly burden third parties. Initially, the Departments observe that these final rules do not create a governmental burden; rather, they relieve a governmental burden. The ACA did not impose a contraceptive coverage requirement. HHS exercised discretion granted to HRSA by the Congress to include contraceptives in the Guidelines issued under section 2713(a)(4). That decision is what created and imposed a governmental burden. These rules simply relieve part of that governmental burden. If some third parties do not receive contraceptive coverage from private parties who the government chose not to coerce, that result exists in the absence of governmental action—it is not a result the government has imposed. Calling that result a governmental burden rests on an incorrect presumption: that the government has an obligation to force private parties to benefit those third parties and that the third parties have a right to those benefits. But Congress did not create a right to receive contraceptive coverage from other private citizens through PHS Act section 2713, other portions of the ACA, or any other statutes it has enacted. Although some commenters also contended such a right might exist under treaties the Senate has ratified or the Constitution, the Departments are not aware of any source demonstrating that the Constitution or a treaty ratified by the Senate creates a right to receive contraceptive coverage from other private citizens.

The fact that the government at one time exercised its administrative discretion to require private parties to provide coverage to benefit other private parties, does not prevent the government from relieving some or all of the burden of its Mandate. Otherwise, any governmental coverage requirement would be a one-way ratchet. In the Religious IFC and these rules, the government has simply restored a zone of freedom where it once existed. There is no statutory or constitutional obstacle to the government doing so, and the doctrine of third-party burdens should not be interpreted to impose such an obstacle. Such an interpretation would be especially problematic given the millions of women, in a variety of contexts, whom the Mandate does not

ultimately benefit, notwithstanding any expanded exemptions—including through grandfathering of plans, the previous religious exemptions, and the failure of the accommodation to require delivery of contraceptive coverage in various self-insured church plan contexts.

In addition, the Government is under no constitutional obligation to fund contraception. *Cf. Harris* v. *McRae*, 448 U.S. 297 (1980) (holding that, although the Supreme Court has recognized a constitutional right to abortion, there is no constitutional obligation for government to pay for abortions). Even more so may the Government refrain from requiring private citizens, in violation of their religious beliefs, to cover contraception for other citizens. *Cf. Rust* v. *Sullivan*, 500 U.S. 173, 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."). The constitutional rights of liberty and privacy do not require the government to force private parties to provide contraception to other citizens and do not prohibit the government from protecting religious objections to such governmental mandates, especially where, as here, the mandate is not an explicit statutory requirement.[23] The Departments do not believe that the Constitution prohibits offering the expanded exemptions in these final rules.

As the Department of Justice has observed, the fact that exemptions may relieve a religious adherent from conferring a benefit on a third party "does not categorically render an exemption unavailable," and RFRA still applies.[24] The Departments conclusion on this matter is consistent with the Supreme Court's observation that RFRA may require exemptions even from laws requiring claimants "to confer benefits on third parties." *See Hobby Lobby*, 134 S. Ct. at 2781 n.37. Here, no law contains such a requirement, but the Mandate is derived from an administrative exercise of discretion that Congress charged HRSA and the Departments with exercising. Burdens that may affect third parties as a result of revisiting the exercise of agency discretion may be relevant to the RFRA analysis, but they cannot be dispositive. "Otherwise, for example, the

[23] *See, for example, Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 196 (Ariz. Ct. App. 2011) ("[A] woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

[24] See Federal Law Protections for Religious Liberty, 82 FR at 49670.

Government could decide that all supermarkets must sell alcohol for the convenience of customers (and thereby exclude Muslims with religious objections from owning supermarkets), or it could decide that all restaurants must remain open on Saturdays to give employees an opportunity to earn tips (and thereby exclude Jews with religious objections from owning restaurants)." *Id.*

When government relieves burdens on religious exercise, it does not violate the Establishment Clause: rather, "it follows the best of our traditions." *Zorach* v. *Clauson*, 343 U.S. 306, 314 (1952). The Supreme Court's cases "leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Board of Educ. of Kiryas Joel Village Sch. Dist.* v. *Grumet*, 512 U.S. 687, 705 (1994). Rather, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *Amos*, 483 U.S. 327, 334 (1987) (quoting *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987)). "[T]here is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter* v. *Wilkinson*, 544 U.S. 709, 713 (2005) (internal quotation omitted). Thus, the Supreme Court has upheld a broad range of accommodations against Establishment Clause challenges, including the exemption of religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion, *see Amos*, 483 U.S. at 335–39; a state property tax exemption for religious organizations, *see Walz* v. *Tax Comm'n of City of New York*, 397 U.S. 664, 672–80 (1970); and a state program releasing public school children during the school day to receive religious instruction at religious centers, *see Zorach*, 343 U.S. at 315.

Before 2012 (when HRSA's Guidelines went into effect), there was no federal women's preventive services coverage mandate imposed nationally on health insurance and group health plans. The ACA did not require contraceptives to be included in HRSA's Guidelines, and it did not require any preventive services required under PHS

Act section 2713 to be covered by grandfathered plans. Many States do not impose contraceptive coverage mandates, or they offer religious exemptions to the requirements of such coverage mandates—exemptions that have not been invalidated by federal or State courts. The Departments, in previous regulations, exempted houses of worship and integrated auxiliaries from the Mandate. The Departments then issued a temporary enforcement safe harbor allowing religious nonprofit groups to not provide contraceptive coverage under the Mandate for almost two additional years. The Departments further expanded the houses of worship and integrated auxiliaries exemption through definitional changes. And the Departments created an accommodation process under which many women in self-insured church plans may not ultimately receive contraceptive coverage. In addition, many organizations have not been subject to the Mandate in practice because of injunctions they received through litigation, protecting them from federal imposition of the Mandate, including under several recently entered permanent injunctions that will apply regardless of the issuance of these final rules.

Commenters offered various assessments of the impact these rules might have on state or local governments. Some commenters said that the expanded exemptions will not burden state or local governments, or that such burdens should not prevent the Departments from offering those exemptions. Others said that if the Departments provide expanded exemptions, states or local jurisdictions may face higher costs in providing birth control to women through government programs. The Departments consider it appropriate to offer expanded exemptions, notwithstanding the objection of some state or local governments. The ACA did not require a contraceptive Mandate, and its discretionary creation by means of HRSA's Guidelines does not translate to a benefit that the federal government owes to states or local governments. We are not aware of instances where the various situations recited in the previous paragraph, in which the federal government has not imposed contraceptive coverage (other than through the Religious and Moral IFCs), have been determined to cause a cognizable injury to state or local governments. Some states that were opposed to the IFCs submitted comments objecting to the potential impacts on their programs resulting

from the expanded exemptions, but they did not adequately demonstrate that such impacts would occur, and they did not explain whether, or to what extent, they were impacted by the other kinds of instances mentioned above in which no federal mandate of contraceptive coverage has applied to certain plans. The Departments find no legal prohibition on finalizing these rules based on the speculative suggestion of an impact on state or local governments, and we disagree with the suggestion that once we have exercised our discretion to deny exemptions—no matter how recently or incompletely—we cannot change course if some state and local governments believe they are receiving indirect benefits from the previous decision.

In addition, these expanded exemptions apply only to a small fraction of entities to which the Mandate would otherwise apply—those with qualifying religious objections. Public comments did not provide reliable data on how many entities would use these expanded religious exemptions, in which states women in such plans would reside, how many of those women would qualify for or use state and local government subsidies of contraceptives as a result, or in which states such women, if they are low income, would go without contraceptives and potentially experience unintended pregnancies that state Medicaid programs would have to cover. As mentioned above, at least one study, published by the Guttmacher Institute, concluded the Mandate has caused no clear increase in contraceptive use; one explanation proposed by the authors of the study is that women eligible for family planning from safety net programs were already receiving free or subsidized contraceptive access through them, notwithstanding the Mandate's effects on the overall market. Some commenters who opposed the expanded exemptions admitted that this information is unclear at this stage; other commenters that estimated considerably more individuals and entities would seek an exemption also admitted the difficulty of quantifying estimates.

In the discussion below concerning estimated economic impacts of these rules, the Departments explain there is not reliable data available to accurately estimate the number of women who may lose contraceptive coverage under these rules, and the Departments set forth various reasons why it is difficult to know how many entities will use these exemptions or how many women will be impacted by those decisions.

Solely for the purposes of determining whether the rules have a significant economic impact under Executive Order 12,866, and in order to estimate the broadest possible impact so as to determine the applicability of the procedures set forth in that Executive Order, the Departments propose that the rules will affect no more than 126,400 women of childbearing age who use contraceptives covered by the Guidelines, and conclude the economic impact falls well below $100 million. As explained below, that estimate assumes that a certain percentage of employers which did not cover contraceptives before the ACA will use these exemptions based on sincerely held religious beliefs. The Departments do not actually know that such entities will do so, however, or that they operate based on sincerely held religious beliefs against contraceptive coverage. The Departments also explain that other exemptions unaffected by these rules may encompass many or most women potentially affected by the expanded exemptions. In other words, the houses of worship and integrated auxiliaries exemption, the accommodation's failure to require contraceptive coverage in certain self-insured church plans, the non-applicability of PHS Act section 2713 to grandfathered plans, and the permanent injunctive relief many religious litigants have received against section 2713(a)(4), may encompass a large percentage of women potentially affected by religious objections, and therefore many women in those plans may not be impacted by these rules at all. In addition, even if 126,400 women might be affected by these rules, that number constitutes less than 0.1% of all women in the United States.[25] This suggests that if these rules have any impact on state or local governments, it will be statistically de minimus. The Departments conclude that there is insufficient evidence of a potential negative impact of these rules on state and local governments to override the appropriateness of deciding to finalize these rules.

Some commenters contended that the expanded exemptions would constitute unlawful sex discrimination, such as under section 1557 of the Affordable Care Act, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, or the Fifth Amendment. Some commenters suggested the expanded exemptions

---

[25] U.S. Census Bureau, "Quick Facts: Population Estimates, July 1, 2017" (estimating 325,719,178 persons in the U.S., 50.8% of which are female), available at *https://www.census.gov/quickfacts/fact/table/US/PST045217.*

Exhibit 1 JA424 JA-0000015

would discriminate on bases such as race, disability, or LGBT status, or that they would disproportionately burden certain persons in such categories.

But these final rules do not discriminate or draw any distinctions on the basis of sex, pregnancy, race, disability, socio-economic class, LGBT status, or otherwise, nor do they discriminate on any unlawful grounds. The expanded exemptions in these rules do not authorize entities to comply with the Mandate for one person, but not for another person, based on that person's status as a member of a protected class. Instead they allow entities that have sincerely held religious objections to providing some or all contraceptives included in the Mandate to not be forced to provide coverage of those items to anyone.

These commenters' contentions about discrimination are unpersuasive for still additional reasons. First, Title VII is applicable to discrimination committed by employers, and these rules have been issued in the government's capacity as a regulator of group health plans and group and individual health insurance, not an employer. *See also In Re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 940–42 & n.1 (8th Cir. 2007) (holding that Title VII "does not require coverage of contraception because contraception is not a gender-specific term like potential pregnancy, but rather applies to both men and women"). Second, these rules create no disparate impact. The women's preventive services mandate under section 2713(a)(4), and the contraceptive Mandate promulgated under such preventive services mandate, already inures to the specific benefit of women—men are denied any benefit from that section. Both before and after these final rules, section 2713(a)(4) and the Guidelines issued under that section treat women's preventive services in general, and female contraceptives specifically, more favorably than they treat male preventive services or male contraceptives.

It is simply not the case that the government's implementation of section 2713(a)(4) is discriminatory against women because exemptions are expanded to encompass religious objections. The previous regulations, as discussed elsewhere herein, do not require contraceptive coverage in a host of plans, including grandfathered plans, plans of houses of worship, and— through inability to enforce the accommodation on certain third party administrators—plans of many religious non-profits in self-insured church plans. Below, the Departments estimate that few women of childbearing age in the

country will be affected by these expanded exemptions.[26] In this context, the Departments do not believe that an adjustment to discretionary Guidelines for women's preventive services concerning contraceptives constitutes unlawful sex discrimination. Otherwise, anytime the government exercises its discretion to provide a benefit that is specific to women (or specific to men), it would constitute sex discrimination for the government to reconsider that benefit. Under that theory, *Hobby Lobby* itself, and RFRA (on which *Hobby Lobby*'s holding was based), which provided a religious exemption to this Mandate for many businesses, would be deemed discriminatory against women because the underlying women's preventive services requirement is a benefit for women, not for men. Such conclusions are not consistent with legal doctrines concerning sex discrimination.

It is not clear that these expanded exemptions will significantly burden women most at risk of unintended pregnancies. Some commenters observed that contraceptives are often readily accessible at relatively low cost. Other commenters disagreed. Some objected to the suggestion in the Religious IFC that many forms of contraceptives are available for around $50 per month and other forms, though they bear a higher one-time cost, cost a similar amount over the duration of use. But some of those commenters cited sources maintaining that birth control pills can cost up to $600 per year (that is, $50 per month), and said that IUDs, which can last three to six years or more,[27] can cost $1,100 (that is, less than $50 per month over the duration of use). Some commenters said that, for lower income women, contraceptives can be available at free or low cost through government programs (federal programs offering such services include, for example, Medicaid, Title X, community health center grants, and Temporary Assistance for Needy Families (TANF)). Other commenters contended that many women in employer-sponsored coverage might not qualify for those programs, although that sometimes occurs because their incomes are above certain thresholds or

---

[26] Below, the Departments estimate that no more than 126,400 women of childbearing age will be affected by the expanded exemptions. As noted above, this is less than 0.1% of the over 165 million women in the United States. The Departments previously estimated that, at most 120,000 women of childbearing age would be affected by the expanded exemptions. *See* Religious IFC, 82 FR 47,823–84.

[27] *See, for example,* Planned Parenthood, "IUD," *https://www.plannedparenthood.org/learn/birth-control/iud.*

because the programs were not intended to absorb privately insured individuals. Some commenters observed that contraceptives may be available through other sources, such as a plan of another family member and that the expanded exemptions will not likely encompass a very large segment of the population otherwise benefitting from the Mandate. Other commenters disagreed, pointing out that some government programs that provide family planning have income and eligibility thresholds, so that women earning certain amounts above those levels would need to pay full cost for contraceptives if they were no longer covered in their health plans.

The Departments do not believe that these general considerations make it inappropriate to issue the expanded exemptions set forth in these rules. In addition, the Departments note that the HHS Office of Population Affairs, within the Office of the Assistant Secretary for Health, has recently issued a proposed regulation to amend the regulations governing its Title X family planning program. The proposed regulation would amend the definition of "low income family"—individuals eligible for free or low cost contraceptive services—to include women who are unable to obtain certain family planning services under their employer-sponsored health coverage due to their employers' religious beliefs or moral convictions (see 83 FR 25502). If that regulation is finalized as proposed, it could further reduce any potential effect of these final rules on women's access to contraceptives. That proposal also demonstrates that the government has other means available to it for increasing women's access to contraception. Some of those means are less restrictive of religious exercise than imposition of the contraceptive Mandate on employers with sincerely held religious objections to providing such coverage.

Some commenters stated that the expanded exemptions would violate section 1554 of the ACA. That section says the Secretary of HHS "shall not promulgate any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full range of treatment options between the patient and the provider," "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," "violates the principles of informed consent and the ethical standards of health care professionals," or "limits the

Exhibit 1                    JA425                    JA-0000016

availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. 18114. Such commenters urged, for example, that the Religious IFC created unreasonable barriers to the ability of individuals to obtain appropriate medical care, particularly in areas they said may have a disproportionately high number of entities likely to take advantage of the exemption.

The Departments disagree with these comments about section 1554. The Departments issued previous exemptions and accommodations that allowed various plans to not provide contraceptive coverage on the basis of religious objections. The Departments, which administer both ACA section 1554 and PHS Act section 2713, did not conclude that the exemptions or accommodations in those regulations violated section 1554. Moreover. the decision not to impose a governmental mandate is not the "creation" of a "barrier," especially when that mandate requires private citizens to provide services to other private citizens. Nor, in any event, are the exemptions from the Mandate unreasonable. Section 1554 of the ACA does not require the Departments to require coverage of, or to keep in place a requirement to cover, certain services, including contraceptives, that was issued pursuant to HHS's exercise of discretion under section 2713(a)(4). Nor does section 1554 prohibit the Departments from providing exemptions for burdens on religious exercise, or, as is the case here, from refraining to impose the Mandate in cases where religious exercise would be burdened by it. In light of RFRA and the First Amendment, providing religious exemptions is a reasonable administrative response in the context of this federally mandated burden, especially since the burden itself is a subregulatory creation that does not apply in various contexts. Religious exemptions from federal mandates in sensitive health contexts have existed in federal laws for decades, and President Obama referenced them when he issued Executive Order 13535 (March 24, 2010), declaring that. under the ACA, "longstanding Federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7. and the Weldon Amendment, section 508(d)(1) of Pub. L. 111–8) remain intact." and that "[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the HHS." While the text of Executive Order 13535 does not require the expanded exemptions issued in these rules, the expanded exemptions are. as explained below. consistent with longstanding federal laws to protect religious beliefs.

In short, the Departments do not believe sections 1554 or 1557 of the ACA, other nondiscrimination statutes, or any constitutional doctrines, create an affirmative obligation to create. maintain, or impose a Mandate that forces covered entities to provide coverage of preventive contraceptive services in health plans. The ACA's grant of authority to HRSA to provide for, and support, the Guidelines is not transformed by any of the laws cited by commenters into a requirement that, once those Guidelines exist, they can never be reconsidered or amended because doing so would only affect women's coverage or would allegedly impact particular populations disparately.

Members of the public have widely divergent views on whether expanding the exemptions is good public policy. Some commenters said the exemptions would burden workers, families. and the economic and social stability of the country, and interfere with the physician-patient relationship. Other commenters disagreed. favoring the public policy behind expanding the exemptions and arguing that the exemptions would not interfere with the physician-patient relationship. For all the reasons explained at length in this preamble, the Departments have determined that these rules are good policy. Because of the importance of the religious liberty values being accommodated, the limited impact of these rules, and uncertainty about the impact of the Mandate overall according to some studies, the Departments do not believe these rules will have any of the drastic negative consequences on third parties or society that some opponents of these rules have suggested.

### E. Interim Final Rulemaking

The Departments received several comments about their decision to issue the Religious IFC as interim final rules with requests for comments, instead of as a notice of proposed rulemaking. Several commenters asserted that the Departments had the authority to issue the Religious IFC in that way, agreeing that the Departments had explicit statutory authority to do so. good cause under the Administrative Procedure Act (APA), or both. Other commenters held the opposite view, contending that there was neither statutory authority to issue the rules on an interim final basis, nor good cause under the APA to make the rules immediately effective.

The Departments continue to believe legal authority existed to issue the Religious IFC as interim final rules.

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code. part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act. which include sections 2701 through 2728 of the PHS Act and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. The Religious and Moral IFCs fall under those statutory authorizations for the use of interim final rulemaking. Prior to the Religious IFC, the Departments issued three interim final rules implementing this section of the PHS Act because of the needs of covered entities for immediate guidance and the weighty matters implicated by the HRSA Guidelines, including issuance of new or revised exemptions or accommodations. (75 FR 41726; 76 FR 46621; 79 FR 51092). The Departments also had good cause to issue the Religious IFC as interim final rules, for the reasons discussed therein.

In any event, the objections of some commenters to the issuance of the Religious IFC as interim final rules with request for comments does not prevent the issuance of these final rules. These final rules are being issued after receiving and thoroughly considering public comments as requested in the Religious IFC. These final rules therefore comply with the APA's notice and comment requirements.

### F. Health Effects of Contraception and Pregnancy

The Departments received numerous comments on the health effects of contraception and pregnancy. As noted above, some commenters supported the expanded exemptions. and others urged that contraceptives be removed from the Guidelines entirely, based on the view that pregnancy and the unborn children resulting from conception are not diseases or unhealthy conditions that are properly the subject of preventive care coverage. Such commenters further contended that hormonal contraceptives may present health risks to women. For example, they contended that studies show certain contraceptives cause or are associated with an increased risk of depression,[28] venous thromboembolic

---

[28] Commenters cited Charlotte Wessel Skovlund et al., "Association of Hormonal Contraception with Depression," 73 *JAMA Psychiatry* 1154, 1154 (published online Sept. 28, 2016) ("Use of hormonal contraception, especially among adolescents, was associated with subsequent use of antidepressants and a first diagnosis of depression,

Exhibit 1                                    JA426                                    JA-0000017

disease,[29] fatal pulmonary embolism,[30] thrombotic stroke and myocardial infarction (particularly among women who smoke, are hypertensive, or are older),[31] hypertension,[32] HIV–1 acquisition and transmission,[33] and

suggesting depression as a potential adverse effect of hormonal contraceptive use.").

[29] Commenters cited the Practice Committee of the American Society for Reproductive Medicine. "Hormonal Contraception: Recent Advances and Controversies," 82 *Fertility and Sterility* S20, S26 (2004); V.A. Van Hylckama et al., "The Venous Thrombotic Risk of Oral Contraceptives, Effects of Estrogen Dose and Progestogen Type: Results of the MEGA Case-Control Study," 339 *Brit. Med. J.* 339b2921 (2009); Y. Vinogradova et al., "Use of Combined Oral Contraceptives and Risk of Venous Thromboembolism: Nested Case-Control Studies Using the QResearch and CPRD Databases," 350 *Brit. Med. J.* 350h2135 (2015) ("Current exposure to any combined oral contraceptive was associated with an increased risk of venous thromboembolism . . . compared with no exposure in the previous year."); Ø. Lidegaard et al., "Hormonal contraception and risk of venous thromboembolism: national follow-up study," 339 *Brit. Med. J.* b2890 (2009); M. de Bastos et al., "Combined oral contraceptives: venous thrombosis," Cochrane Database Syst. Rev. (no. 3, 2014). CD010813. doi: 10.1002/14651858.CD010813.pub2, available at *https://www.ncbi.nlm.nih.gov/pubmed?term=24590565*; LJ Havrilesky et al., "Oral Contraceptive Use for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html*; and Robert A. Hatcher et al., *Contraceptive Technology* 405–07 (Ardent Media 18th rev. ed. 2004).

[30] Commenters cited N.R. Poulter, "Risk of Fatal Pulmonary Embolism with Oral Contraceptives," 355 *Lancet* 2088 (2000).

[31] Commenters cited Ø. Lidegaard et al., "Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception," 366 *N. Eng. J. Med.* 2257, 2257 (2012) (risks "increased by a factor of 0.9 to 1.7 with oral contraceptives that included ethinyl estradiol at a dose of 20 μg and by a factor of 1.3 to 2.3 with those that included ethinyl estradiol at a dose of 30 to 40 μg"); Practice Committee of the American Society for Reproductive Medicine, "Hormonal Contraception"; M. Vessey et al., "Mortality in Relation to Oral Contraceptive Use and Cigarette Smoking," 362 *Lancet* 185, 185–91 (2003); WHO Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Acute Myocardial Infarction and Combined Oral Contraceptives: Results of an International Multicentre Case-Control Study," 349 *Lancet* 1202, 1202–09(1997); K.M. Curtis et al., Combined Oral Contraceptive Use Among Women With Hypertension: A Systematic Review, 73 Contraception 73179, 179–88 (2006); L.A. Gillum et al., "Ischemic stroke risk with oral contraceptives: A meta analysis," 284 *JAMA* 72, 72–78 (2000), available at *https://www.ncbi.nlm.nih.gov/pubmed/10872016*; and Robert A. Hatcher et al., *Contraceptive Technology* 404–05, 445 (Ardent Media 18th rev. ed. 2004).

[32] Commenters cited Robert A. Hatcher et al., *Contraceptive Technology* 407, 445 (Ardent Media 18th rev. ed. 2004).

[33] Commenters cited Renee Heffron et al., "Use of Hormonal Contraceptives and Risk of HIV–1 Transmission: A Prospective Cohort Study," 12 *Lancet Infectious Diseases* 19, 24 (2012) ("Use of hormonal contraceptives was associated with a two-times increase in the risk of HIV–1 acquisition by women and HIV–1 transmission from women to men."); and "Hormonal Contraception Doubles HIV Risk, Study Suggests," *Science Daily* (Oct. 4, 2011).

breast, cervical, and liver cancers.[34] Some commenters also observed that fertility awareness based methods of birth spacing are free of similar health risks since they do not involve ingestion of chemicals. Some commenters contended that contraceptive access does not reduce unintended pregnancies or abortions.

Other commenters disagreed, citing a variety of studies they contend show health benefits caused by, or associated with, contraceptive use or the prevention of unintended pregnancy. Commenters cited, for example, the 2011 IOM Report's discussions of the negative effects associated with unintended pregnancies, as well as other studies. Such commenters contended that, by reducing unintended pregnancy, contraceptives reduce the risk of unaddressed health complications, low birth weight, preterm birth, infant mortality, and maternal mortality.[35] Commenters also said studies show contraceptives are associated with a reduced risk of conditions such as ovarian cancer, colorectal cancer, and endometrial cancer,[36] and that contraceptives treat such conditions as endometriosis, polycystic ovarian syndrome, migraines, pre-menstrual pain, menstrual regulation, and pelvic inflammatory

*https://www.sciencedaily.com/releases/2011/10/111003191253.htm*.

[34] Commenters cited "Oral Contraceptives and Cancer Risk" (Mar. 21, 2012, National Cancer Institute (reviewed Feb. 22, 2018), *https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet*; LJ Havrilesky et al., "Oral Contraceptive User for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality. Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html*; S.N. Bhupathiraju et al., "Exogenous hormone use: Oral contraceptives, postmenopausal hormone therapy, and health outcomes in the Nurses' Health Study." 106 *Am. J. Pub. Health* 1631, 1631–37 (2016); The World Health Organization Department of Reproductive Health and Research, "The Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment", World Health Organization (Sept. 2005), *http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf*; and the American Cancer Society, "Known and Probably Human Carcinogens," American Cancer Society (rev. Nov. 3, 2016), *https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html*.

[35] Citing, *e.g.*, Conde-Agudelo A. Rosas-Bermudez A. Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23, and John Hopkins Bloomberg Public Health School of Health, Contraception Use Averts 272.000 Maternal Deaths Worldwide, *https://www.jhsph.edu/news/news-releases/2012/ahmed-contraception.html*.

[36] Citing, *e.g.*, Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. International Journal of Endocrinology and Metabolism. 11 (1). 41–47.

disease.[37] Some commenters said that pregnancy presents various health risks, such as blood clots, bleeding, anemia, high blood pressure, gestational diabetes, and death. Some commenters also contended that increased access to contraception reduces abortions.

Some commenters said that, in the Religious IFC, the Departments made incorrect statements concerning scientific studies. For example, some commenters argued there is no proven increased risk of breast cancer or other risks among contraceptive users. They criticized the Religious IFC for citing studies, including one previewed in the 2011 IOM Report itself (Agency for Healthcare Research and Quality Report No.: 13–E002–EF (June 2013) (cited above)), discussing an association between contraceptive use and increased risks of breast and cervical cancer, and concluding there are no net cancer-reducing benefits of contraceptive use. As described in the Religious IFC, 82 FR at 47804, the 2013 Agency for Healthcare Research and Quality study, and others, reach conclusions with which these commenters appear to disagree. The Departments consider it appropriate to take into account both of those studies, as well as the studies cited by commenters who disagree with those conclusions.

Some commenters further criticized the Departments for saying two studies cited by the 2011 IOM Report, which asserted an associative relationship between contraceptive use and decreases in unintended pregnancy, did not on their face establish a causal relationship between a broad coverage mandate and decreases in unintended pregnancy. In this respect, as noted in the Religious IFC,[38] the purpose for the Departments' reference to such studies was to highlight the difference between a causal relationship and an associative one, as well as the difference between saying contraceptive use has a certain effect and saying a contraceptive coverage mandate (or, more specifically, the part of that mandate affected by certain exemptions) will necessarily have (or negate, respectively) such an effect.

Commenters disagreed about the effects of some FDA-approved contraceptives on embryos. Some

[37] Citing, *e.g.*, id., and American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). Committee Opinion Number 615: Access to Contraception. As discussed below, to the extent that contraceptives are prescribed to treat existing health conditions, and not for preventive purposes, the Mandate would not be applicable.

[38] 82 FR at 47803–04.

Exhibit 1

JA427

JA-0000018

**57554** **Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations

commenters agreed with the quotation, in the Religious IFC, of FDA materials [39] that indicate that some items it has approved as contraceptives may prevent the implantation of an embryo after fertilization. Some of those commenters cited additional scientific sources to argue that certain approved contraceptives may prevent implantation, and that, in some cases, some contraceptive items may even dislodge an embryo shortly after implantation. Other commenters disagreed with the sources cited in the Religious IFC and cited additional studies on that issue. Some commenters further criticized the Departments for asserting in the Religious IFC that some persons believe those possible effects are "abortifacient."

The objection on this issue appears to be partially one of semantics. People disagree about whether to define "conception" or "pregnancy" to occur at fertilization, when the sperm and ovum unite, or days later at implantation, when that embryo has undergone further cellular development, travelled down the fallopian tube, and implanted in the uterine wall. This question is independent of the question of what mechanisms of action FDA-approved or cleared contraceptives may have. It is also a separate question from whether members of the public assert, or believe, that it is appropriate to consider the items "abortifacient"—that is, a kind of abortion, or a medical product that causes an abortion—because they believe abortion means to cause the demise of a post-fertilization embryo inside the mother's body. Commenters referenced scientific studies and sources on both sides of the issue of whether certain contraceptives prevent implantation. Commenters and litigants have positively stated that some of them view certain contraceptives as abortifacients, for this reason. *See also Hobby Lobby*, 134 U.S. at 2765 ("The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients.").

The Departments do not take a position on the scientific, religious, or moral debates on this issue by recognizing that some people have

sincere religious objections to providing contraception coverage on this basis. The Supreme Court has already recognized that such a view can form the basis of a sincerely held religious belief under RFRA.[40] Even though there is a plausible scientific argument against the view that certain contraceptives have mechanisms of action that may prevent implantation, there is also a plausible scientific argument in favor of it—as demonstrated, for example, by FDA's statement that some contraceptives may prevent implantation and by some scientific studies cited by commenters. The Departments believe in this context we have a sufficient rationale to offer expanded religious exemptions with respect to this Mandate.

The Departments also received comments about their discussion of the uncertain effects of the expanded exemptions on teen sexual activity. In this respect, the Departments stated, "With respect to teens, the Santelli and Melnikas study cited by IOM 2011 observes that, between 1960 and 1990, as contraceptive use increased, teen sexual activity outside of marriage likewise increased (although the study does not assert a causal relationship). Another study, which proposed an economic model for the decision to engage in sexual activity, stated that '[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run.'"[41] Some commenters agreed with

this discussion, while other commenters disagreed. Commenters who supported the expanded exemptions cited these and similar sources suggesting that denying expanded exemptions to the Mandate is not a narrowly tailored way to advance the Government's interests in reducing teen pregnancy, and suggesting there are means of doing so that are less restrictive of religious exercise.[42] Some commenters opposing the expanded exemptions stated that school-based health centers provide access to contraceptives, thus increasing use of contraceptives by sexually active students. They also cited studies concluding that certain decreases in teen pregnancy are attributable to increased contraceptive use.[43]

Many commenters opposing the Religious IFC misunderstood the Departments' discussion of this issue. Teens are a significant part, though not the entirety, of women the IOM identified as being most at risk of unintended pregnancy. The Departments do not take a position on the empirical question of whether contraception has caused certain reductions in teen pregnancy. Rather, we note that studies suggesting various causes of teen pregnancy and unintended pregnancy in general support the Departments' conclusion that it is difficult to establish causation between granting religious exemptions to the contraceptive Mandate and either an increase in teen pregnancies in particular, or unintended pregnancies in general. For example, a 2015 study investigating the decline in teen pregnancy since 1991 attributed it to multiple factors (including but not limited to reduced sexual activity, falling welfare benefit levels, and expansion of family planning services in Medicaid, with the latter accounting for less than 13 percent of the decline), and concluded "that none of the relatively easy, policy-based explanations for the recent decline in teen childbearing in the United States hold up very well to careful empirical scrutiny."[44] One

---

[39] FDA's guide "Birth Control: Medicines To Help You," specifies that various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work . . . by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization. Available at *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm*.

[40] "Although many of the required, FDA-approved methods of contraception work by preventing the fertilization of an egg, four of those methods (those specifically at issue in these cases) may have the effect of preventing an already fertilized egg from developing any further by inhibiting its attachment to the uterus. See Brief for HHS in No. 13–354, pp. 9–10, n. 4; FDA, Birth Control: Medicines to Help You." *Hobby Lobby*, 134 S. Ct. at 2762–63. "The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients. . . . Like the Hahns, the Greens believe that life begins at conception and that it would violate their religion to facilitate access to contraceptive drugs or devices that operate after that point." *Id.* at 2765–66.

[41] Citing J.S. Santelli & A.J. Melnikas, "Teen fertility in transition: recent and historic trends in the United States," 31 *Ann. Rev. Pub. Health* 371, 375–76 (2010), and Peter Arcidiacono et al., *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* (2005), available at *http://public.econ.duke.edu/~psarcidi/addicted13.pdf. See also* K. Buckles & D. Hungerman, "The Incidental Fertility Effects of School Condom Distribution Programs," *Nat'l Bureau of Econ. Research* Working Paper No. 22322 (June 2016), available at *http://www.nber.org/papers/w22322* ("access to condoms in schools increases teen fertility by about 10 percent" and increased sexually transmitted infections).

[42] *See* Helen Alvaré, "No Compelling Interest: The 'Birth Control' Mandate and Religious Freedom," 58 *Vill. L. Rev.* 379, 400–02 (2013) (discussing the Santelli & Melnikas study and the Arcidiacono study cited above, and other research that considers the extent to which reduction in teen pregnancy is attributable to sexual risk avoidance rather than to contraception access).

[43] *See, for example*, Lindberg L., Santelli J., "Understanding the Decline in Adolescent Fertility in the United States, 2007–2012," 59 *J. Adolescent Health* 577–83 (Nov. 2016), *https://doi.org/10.1016/j.jadohealth.2016.06.024; see also* Comment of The Colorado Health Foundation, submission ID CMS–2014–0115–19635, *www.regulations.gov* (discussing teen pregnancy data from Colorado).

[44] Kearney MS and Levine PB, "Investigating recent trends in the U.S. birth rate," 41 *J. Health*

study found that during the teen pregnancy decline between 2007–2012, teen sexual activity was also decreasing.[45] One study concluded that falling unemployment rates in the 1990s accounted for 85% of the decrease in rates of first births among 18–19 year-old African Americans.[46] Another study found that the representation of African-American teachers was associated with a significant reduction in the African-American teen pregnancy rate.[47] One study concluded that an "increase in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy." [48] Similarly, one study from England found that, where funding for teen pregnancy prevention was reduced, there was no evidence that the reduction led to an increase in teen pregnancies.[49] Some commenters also cited studies, which are not limited to the issue of teen pregnancy, that have found many women who have abortions report that they were using contraceptives when they became pregnant.[50]

[45] *See, for example,* K. Ethier et al., "Sexual Intercourse Among High School Students—29 States and United States Overall, 2005–2015," 66 *CDC Morb. Mortal. Wkly Report* 1393, 1393–97 (Jan. 5, 2018), available at *https://dx.doi.org/10.15585/mmwr.mm6615a1* ("Nationwide, the proportion of high school students who had ever had sexual intercourse decreased significantly overall. . . .").

[46] Colen CG, Geronimus AT, and Phipps MG, "Getting a piece of the pie? The economic boom of the 1990s and declining teen birth rates in the United States," 63 *Social Science & Med.* 1531–45 (Sept. 2006), available at *https://www.sciencedirect.com/science/article/pii/S027795360600205X.*

[47] Atkins DN and Wilkins VM, "Going Beyond Reading, Writing, and Arithmetic: The Effects of Teacher Representation on Teen Pregnancy Rates," 23 *J. Pub. Admin. Research & Theory* 771–90 (Oct. 1, 2013), available at *https://academic.oup.com/jpart/article-abstract/23/4/771/963674.*

[48] E. Collins & B. Herchbein, "The Impact of Subsidized Birth Control for College Women: Evidence from the Deficit Reduction Act," *U. Mich. Pop. Studies Ctr.* Report 11–737 (May 2011), available at *https://www.psc.isr.umich.edu/pubs/pdf/rr11-737.pdf* ("[I]ncrease in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy or sexually transmitted infections for most women").

[49] *See* D. Paton & L. Wright, "The effect of spending cuts on teen pregnancy," 54 *J. Health Econ.* 135, 135–46 (2017), available at *https://www.sciencedirect.com/science/article/pii/S0167629617304551* ("Contrary to predictions made at the time of the cuts, panel data estimates provide no evidence that areas which reduced expenditure the most have experienced relative increases in teenage pregnancy rates. Rather, expenditure cuts are associated with small reductions in teen pregnancy rates").

[50] Commenters cited, for example, Guttmacher Institute, "Fact Sheet: Induced Abortion in the United States" (Jan. 2018) ("Fifty-one percent of abortion patients in 2014 were using a contraceptive method in the month they became pregnant"), available at *https://*

As the Departments stated in the Religious IFC, we do not take a position on the variety of empirical questions discussed above. Likewise, these rules do not address the substantive question of whether HRSA should include contraceptives in the women's preventive services Guidelines issued under section 2713(a)(4). Rather, reexamination of the record and review of the public comments has reinforced the Departments' conclusion that significantly more uncertainty and ambiguity exists on these issues than the Departments previously acknowledged when we declined to extend the exemption to certain objecting organizations and individuals. The uncertainty surrounding these weighty and important issues makes it appropriate to maintain the expanded exemptions and accommodation if and for as long as HRSA continues to include contraceptives in the Guidelines. The federal government has a long history, particularly in certain sensitive and multi-faceted health issues, of providing religious exemptions from governmental mandates. These final rules are consistent with that history and with the discretion Congress vested in the Departments for implementing the ACA.

### G. Health and Equality Effects of Contraceptive Coverage Mandates

The Departments also received comments about the health and equality effects of the Mandate more broadly. Some commenters contended that the contraceptive Mandate promotes the health and equality of women, especially low income women and promotes female participation and equality in the workforce. Other commenters contended that there was insufficient evidence that the expanded exemptions would harm those interests. Some of those commenters further questioned whether there was evidence that broad health coverage mandates of contraception lead to increased contraceptive use, reductions in unintended pregnancies, or reductions in negative effects said to be associated with unintended pregnancies. In particular, some commenters discussed the study quoted above, published and revised by the Guttmacher Institute in October 2017, concluding that through 2014 there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy, that there was no significant shift from less

*www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf.*

effective to more effective methods, and that it was "unclear" whether this Mandate impacted contraceptive use because there was no significant increase in the use of contraceptive methods the Mandate covered.[51] These commenters also noted that, in the 29 States where contraceptive coverage mandates have been imposed statewide,[52] those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall.[53] Other commenters, however, disputed the significance of these state statistics, noting that of the 29 states with contraceptive coverage mandates, only four states have laws that match the federal requirements in scope. Some also observed that, even in states with state contraceptive coverage mandates, self-insured group health plans might escape those requirements, and some states do not mandate the contraceptives to be covered at no out-of-pocket cost to the beneficiary.

The Departments have considered these experiences as relevant to the effect the expanded exemptions in these rules might have on the Mandate more broadly. The state mandates apply to a very large number of plans and plan participants, notwithstanding ERISA preemption, and public commenters did not point to studies showing those state mandates reduced unintended pregnancies. The federal contraceptive Mandate, likewise, applies to a broad, but not entirely comprehensive, number of employers. For example, to the extent that houses of worship and integrated auxiliaries may have self-insured to avoid state health insurance contraceptive coverage mandates or for other reasons, those groups are, and have been, exempt from the federal Mandate prior to the Religious IFC. The exemptions as set forth in the Religious IFC and in these final rules leave the contraceptive Mandate in place for nearly all entities and plans to which the Mandate has applied. The Departments are not aware of data showing that these expanded exemptions would negate any reduction in unintended pregnancies that might

[51] Kavanaugh, 97 *Contraception* at 14–21.

[52] *See* Guttmacher Institute, "Insurance Coverage of Contraceptives" (June 11, 2018); Kaiser Family Foundation, "State Requirements for Insurance Coverage of Contraceptives," Henry J Kaiser Family Foundation (Jan. 1, 2018). *https://www.kff.org/other/state-indicator/state-requirements-for-insurance-coverage-of-contraceptives/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.*

[53] *See* Michael I. New, "Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes," 13 *Ave Maria L. Rev.* 345 (2015), available at *http://avemarialaw-law-review.avemarialaw.edu/Content/articles/vXIII.i2.new.final.0809.pdf.*

Exhibit 1  JA429  JA-0000020

result from a broad contraceptive coverage mandate.

Some commenters expressed concern that providing exemptions to the Mandate that private parties provide contraception may lead to exemptions regarding other medications or services, like vaccines. The exemptions provided in these rules, however, do not apply beyond the contraceptive coverage requirement implemented through section 2713(a)(4). Specifically, PHS Act section 2713(a)(2) requires coverage of "immunizations," and these exemptions do not encompass that requirement. The fact that the Departments have exempted houses of worship and integrated auxiliaries from the contraceptive Mandate since 2011 did not lead to those entities receiving exemptions under section 2713(a)(2) concerning vaccines. In addition, hundreds of entities have sued the Departments over the implementation of section 2713(a)(4), leading to two decisions of the U.S. Supreme Court, but no similar wave of lawsuits has challenged section 2713(a)(2). The expanded exemptions in these final rules are consistent with a long history of statutes protecting religious beliefs from certain health care mandates concerning issues such as sterilization, abortion and birth control.

Some commenters took issue with the conclusion set forth in the Religious IFC, which is similar to that asserted in the 2017 Guttmacher study, that "[t]he role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA." They observed that more women have coverage of contraceptives and contraception counseling under the Mandate and that more contraceptives are provided without co-pays than before. Still other commenters argued that the Mandate, or other expansions of contraceptive coverage, have led women to increase their use of contraception in general, or to change from less effective, less expensive contraceptive methods to more effective, more expensive contraceptive methods. Some commenters lamented that exemptions would include exemption from the requirement to cover contraception counseling. Some commenters pointed to studies cited in the 2011 IOM Report recommending contraception be included in the Guidelines and argued that certain women will go without certain health care, or contraception specifically, because of cost. They contended that a smaller percentage of women delay or forego health care overall under the ACA [54] and that, according to studies, coverage of contraceptives without cost-sharing has increased use of contraceptives in certain circumstances. Some commenters also argued that studies show that decreases in unintended pregnancies are due to broader access of contraceptives. Finally, some commenters argued that birth control access generally has led to social and economic equality for women.

The Departments have reviewed the comments, including studies submitted by commenters either supporting or opposing these expanded exemptions. Based on our review, it is not clear that merely expanding exemptions as done in these rules will have a significant effect on contraceptive use and health, or workplace equality, for the vast majority of women benefitting from the Mandate. There is conflicting evidence regarding whether the Mandate alone, as distinct from birth control access more generally, has caused increased contraceptive use, reduced unintended pregnancies, or eliminated workplace disparities, where all other women's preventive services were covered without cost sharing. Without taking a definitive position on those evidentiary issues, however, we conclude that the Religious IFC and these final rules—which merely withdraw the Mandate's requirement from what appears to be a small group of newly exempt entities and plans—are not likely to have negative effects on the health or equality of women nationwide. We also conclude that the expanded exemptions are an appropriate policy choice left to the agencies under the relevant statutes, and, thus, are an appropriate exercise of the Departments' discretion.

Moreover, we conclude that the best way to balance the various policy interests at stake in the Religious IFC and these final rules is to provide the expanded exemptions set forth herein, even if certain effects may occur among the populations actually affected by the employment of these exemptions. These rules will provide tangible protections for religious liberty, and impose fewer governmental burdens on various entities and individuals, some of whom have contended for several years that denying them an exemption from the contraceptive Mandate imposes a substantial burden on their religious exercise. The Departments view the provision of those protections to preserve religious exercise in this health care context as an appropriate policy option, notwithstanding the widely divergent effects that public commenters have predicted based on different studies they cited. Providing the protections for religious exercise set forth in the Religious IFC and these final rules is not inconsistent with the ACA, and brings this Mandate into better alignment with various other Federal conscience protections in health care, some of which have been in place for decades.

## III. Description of the Text of the Regulations and Response to Additional Public Comments

Here, the Departments describe the regulatory text set forth prior to the Religious IFC, the regulations from that IFC, public comments in response to the specific regulatory text set forth in the IFC, the Departments' response to those comments, and, in consideration of those comments, the regulatory text as finalized in this final rule. As noted above, various members of the public provided comments that were supportive, or critical, of the Religious IFC overall, or of significant policies pertaining to those regulations. To the extent those comments apply to the following regulatory text, the Departments have responded to them above. This section of the preamble responds to comments that pertain more specifically to particular regulatory text.

### A. Restatement of Statutory Requirements of PHS Act Section 2713(a) and (a)(4) (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv))

The previous regulations restated the statutory requirements of section 2713(a) of the PHS Act, at 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). The Religious IFC modified these restatements to more closely align with the text of PHS Act section 2713(a) and (a)(4).

Previous versions of these rules had varied from the statutory language. PHS Act section 2713(a) and (a)(4) require group health plans and health insurance issuers offering coverage to provide coverage without cost sharing for "such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines" supported by HRSA. In comparison, the previous version of regulatory restatements of this language (as drawn from 45 CFR 147.130(a)(1)

---

[54] Citing, for example, Adelle Simmons et al., "The Affordable Care Act: Promoting Better Health for Women," Table 1, Assistant Secretary for Planning and Evaluation (June 14, 2016). *https://aspe.hhs.gov/system/files/pdf/205066/ACAWomenHealthIssueBrief.pdf.*

Exhibit 1

and (a)(1)(iv) stated the coverage must include "evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by" HRSA. The Religious IFC amended this language to state, parallel to the language in section 2713(a)(4), that the coverage must include "such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by" HRSA.

These rules adopt as final, without change, the provisions in the Religious IFC amending 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). In this way, the regulatory text better conforms to the statutory language. In paragraph (a)(1) of the final regulations, instead of saying "must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements . . . with respect to those items and services:", the regulation now tracks the statutory language by saying "must provide coverage for and must not impose any cost-sharing requirements . . . for—". By eliminating the language "coverage for all of the following items and services," and "with respect to those items and services," the Departments do not intend that coverage for specified items and services will not be required, but we simply intend to simplify the text of the regulation to track the statute and avoid duplicative language.

By specifying that paragraph (a)(1)(iv) concerning the women's preventive services Guidelines encompasses "such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to §§ 147.131 and 147.132," the regulatory text also better tracks the statutory language that the Guidelines are for "such additional" preventive services as HRSA may "provide[ ] for" and "support[ ]." This text also eliminates language, not found in the statute, that the Guidelines are "evidence-informed" and "binding." Congress did not include the word "binding" in PHS Act section 2713, and did include the words "evidence-based" or "evidence-informed" in section 2713(a)(1) and (a)(3), but omitted such terms from section 2713(a)(4). In this way, the regulatory text better comports with the scope of the statutory text. This text of paragraph (a)(1)(iv) also

acknowledges that the Departments have decided Guidelines issued under section 2713(a)(4) will not be provided for or supported to the extent they exceed the exemptions and accommodation set forth in 45 CFR 147.131 and 147.132. Previous versions of the regulation placed that limit in 45 CFR 147.130(a)(1), but did not reiterate it in § 147.130(a)(1)(iv). To clearly set forth the applicability of the exemptions and accommodation, the Departments adopt as final the Religious IFC language, which included the language "subject to §§ 147.131 and 147.132" in both § 147.130(a)(1) and § 147.130(a)(1)(iv). Because these final rules adopt as final the Religious IFC language which includes the exemptions and accommodation in both §§ 147.131 and 147.132, and not just in § 147.131 as under the previous rules, the Departments correspondingly included references to both sections in this part.

Some commenters supported restoring the statutory language from PHS Act section 2713(a) and (a)(4) in the regulatory restatements of that language. Other commenters opposed doing so, asserting that Guidelines issued pursuant to section 2713(a)(4) must be "evidence-informed" and "binding." The Departments disagree with the position that, even though Congress omitted those terms from section 2713(a)(4), their regulatory restatement of the statutory requirement should include those terms. Instead, the Departments conclude that it is more appropriate for the regulatory restatements of section 2713(a)(4) to track the statutory language in this regard, namely, "as provided for in comprehensive guidelines supported by [HRSA] for purposes of" that paragraph.

### B. Prefatory Language of Religious Exemptions (45 CFR 147.132(a)(1))

These final rules adopt as final, with changes based on comments as set forth below, the regulatory provision in the Religious IFC that moved the religious exemption from 45 CFR 147.131(a) to 45 CFR 147.132.

In the previous regulations, the exemption stated, at § 147.131(a), that HRSA's Guidelines "may establish an exemption" for the health plan or coverage of a "religious employer," defined as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code." The Religious IFC moved the exemption to a new § 147.132, in which paragraph (a) discussed objecting entities, paragraph (b) discussed objecting individuals,

paragraph (c) set forth a definition, and paragraph (d) discussed severability. The prefatory language to § 147.132(a)(1) stated that HRSA's Guidelines "must not provide for or support the requirement of coverage or payments for contraceptive services" for the health plan or coverage of an "objecting organization," and thus that HRSA "will exempt" such an organization from the contraceptive coverage requirments of the Guidelines. The remainder of paragraph (a)(1), which is discussed in greater detail below, describes what entities are included as objecting organizations.

This language not only specifies that certain entities are "exempt," but also explains that the Guidelines shall not support or provide for an imposition of the contraceptive coverage requirement to such exempt entities. This is an acknowledgement that section 2713(a)(4) requires women's preventive services coverage only "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." To the extent the HRSA Guidelines do not provide for, or support, the application of such coverage to certain entities or plans, the Affordable Care Act does not require the coverage. Those entities or plans are "exempt" by not being subject to the requirements in the first instance. Therefore, in describing the entities or plans as "exempt," and in referring to the "exemption" encompassing those entities or plans, the Departments also affirm the non-applicability of the Guidelines to them.

The Departments wish to make clear that the expanded exemption set forth in § 147.132(a) applies to several distinct entities involved in the provision of coverage to the objecting employer's employees. This explanation is consistent with how prior regulations have worked by means of similar language. When sections § 147.132(a)(1) and (a)(1)(i) specify that "[a] group health plan," "health insurance coverage provided in connection with a group health plan," and "health insurance coverage offered or arranged by an objecting organization" are exempt "to the extent" of the objections "as specified in paragraph (a)(2)," that language exempts the group health plans of the sponsors that object, and their health insurance issuers in providing the coverage in those plans (whether or not the issuers have their own objections). Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv) (and as referenced by the parallel provisions in 26 CFR 54.9815–2713(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv)), the plan

Exhibit 1                                    JA431                                    JA-0000022

sponsor, issuer, and plan covered in the exemption of § 147.132(a)(1) and (a)(1)(i) would face no penalty as a result of omitting certain contraceptive coverage from the benefits of the plan participants and beneficiaries. However, while the objection of a plan sponsor (or entity that arranges coverage under the plan, as applicable) removes penalties from that plan's issuer, it only does so for that plan—it does not affect the issuer's coverage for other group health plans where the plan sponsor has no qualifying objection. More information on the effects of the objection of a health insurance issuer in § 147.132(a)(1)(iii) is included below.

The exemptions in § 147.132(a)(1) apply "to the extent" of the objecting entities' sincerely held religious convictions. Thus, entities that hold a requisite objection to covering some, but not all, contraceptive items would be exempt with respect to the items to which they object, but not with respect to the items to which they do not object. Some commenters said it was unclear whether the plans of entities or individuals that religiously object to some but not all contraceptives would be exempt from being required to cover just the contraceptive methods as to which there is an objection, or whether the objection to some contraceptives leads to an exemption from that plan being required to cover all contraceptives. The Departments intend that a requisite religious objection against some but not all contraceptives would lead to an exemption only to the extent of that objection: That is, the exemption would encompass only the items to which the relevant entity or individual objects, and would not encompass contraceptive methods to which the objection does not apply. To make this clearer, in these final rules, the Departments finalize the prefatory language of § 147.132(a) with the following change, so that the final rules state that an exemption shall be included, and the Guidelines must not provide for contraceptive coverage, "to the extent of the objections specified below."

The Departments have made corresponding changes to language throughout the regulatory text, to describe the exemptions as applying "to the extent" of the objection(s).

### C. Scope of Religious Exemptions and Requirements for Exempt Entities (45 CFR 147.132)

In 45 CFR 147.132(a)(1)(i) through (iii) and (b), the Religious IFC expands the exemption to plans of additional entities and individuals not encompassed by the exemption set forth in the regulations

prior to the Religious IFC. Specific entities to which the expanded exemptions apply are discussed below.

The exemptions contained in previous regulations, at § 147.131(a), did not require exempt entities to submit any particular self-certification or notice, either to the government or to their issuer or third party administrator, in order to obtain or qualify for the exemption. Similarly, under the expanded exemptions in § 147.132, the Religious IFC did not require exempt entities to comply with a self-certification process. We finalize that approach in this respect without change. Although exempt entities do not need to file notices or certifications of their exemption, and these final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits. Under ERISA, the plan document identifies what benefits are provided to participants and beneficiaries under the plan; if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document. Moreover, if there is a reduction in a covered service or benefit, the plan has to disclose that change to plan participants.[55] Thus, where an exemption applies and all (or a subset of) contraceptive services are omitted from a plan's coverage, otherwise applicable ERISA disclosure documents must reflect the omission of coverage in ERISA plans. These existing disclosure requirements serve to help provide notice to participants and beneficiaries of what ERISA plans do and do not cover.

Some commenters supported the expanded exemption's approach which maintained the policy of the previous exemption in not requiring exempt entities to comply with a self-certification process. They suggested that self-certification forms for an exemption are not necessary, could add burdens to exempt entities beyond those imposed by the previous exemption, and could give rise to religious objections to the self-certification process itself. Commenters also stated that requiring an exemption form for

exempt entities could cause additional operational burdens for plans that have existing processes in place to handle exemptions. Other commenters, however, favored including a self-certification process for exempt entities. They suggested that entities might abuse the availability of an exemption or use exempt status insincerely if no self-certification process exists, and that the Mandate might be difficult to enforce without a self-certification process. Some commenters asked that the government publish a list of entities that claim the exemption.

The Departments believe it is appropriate to not require exempt entities to submit a self-certification or notice. The previous exemption did not require a self-certification or notice, and the Departments did not collect a list of all entities that used the exemption. The Departments believe the approach under the previous exemption is appropriate for the expanded exemption. Adding a self-certification or notice to the exemption process would impose an additional paperwork burden on exempt entities that the previous regulations did not impose, and would also involve additional public costs if those certifications or notices were to be reviewed or kept on file by the government.

The Departments are not aware of instances where the lack of a self-certification under the previous exemption led to abuses or to an inability to engage in enforcement. The Mandate is enforceable through various mechanisms in the PHS Act, the Code, and ERISA. Entities that insincerely or otherwise improperly operate as if they are exempt would do so at the risk of enforcement under such mechanisms. The Departments are not aware of sufficient reasons to believe those measures and mechanisms would fail to deter entities from improperly operating as if they are exempt. Moreover, as noted above, ERISA and other plan disclosure requirements governing group health plans require provision of a comprehensive summary of the benefits covered by the plan and disclosure of any reductions in covered services or benefits, so beneficiaries in plans that reduce or eliminate contraceptive benefits as a result of the exemption will know whether their health plan claims an exemption and will be able to raise appropriate challenges to such claims. As a consequence, the Departments believe it is an appropriate balance of various concerns expressed by commenters for these rules to continue to not require notices or self-certifications for using the exemption.

---

[55] See, for example, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102–2, 102–3, & 104b–3(d), and 29 CFR 2590.715–2715. *See also* 45 CFR 147.200 (requiring disclosure of the "exceptions, reductions, and limitations of the coverage," including group health plans and group and individual issuers).

Some commenters asked the Departments to add language indicating that an exemption cannot be invoked in the middle of a plan year, nor should it be used to the extent inconsistent with laws that apply to, or state approval of, fully insured plans. None of the previous iterations of the exemption regulations included such provisions, and the Departments do not consider them necessary in these rules. The expanded exemptions in these rules only purport to exempt plans and entities from the application of the federal contraceptive coverage requirement of the Guidelines issued under section 2713(a)(4). They do not purport to exempt entities or plans from state laws concerning contraceptive coverage, or laws governing whether an entity can make a change (of whatever kind) during a plan year. The rules governing the accommodation likewise do not purport to obviate the need to follow otherwise applicable rules about making changes during a plan year. (Below, these rules discuss in more detail the accommodation and when an entity seeking to revoke it would be able to do so or to notify plan participants of the revocation.)

Commenters also asked that clauses be added to the regulatory text holding issuers harmless where exemptions are invoked by plan sponsors. As discussed above, the exemption rules already specify that, where an exemption applies to a group health plan, it encompasses both the group health plan and health insurance coverage provided in connection with the group health plan, and therefore encompasses any impact on the issuer of the contraceptive coverage requirement with respect to that plan. In addition, as discussed below, the Departments are including, in these final rules, language from the previous regulations protecting issuers that act in reliance on certain representations made in the accommodation process. To the extent that commenters seek language offering additional protections for other incidents that might occur in connection with the invocation of an exemption, the previous exemption regulations did not include such provisions, and the Departments do not consider them necessary in these final rules. As noted above, the expanded exemptions in these final rules simply remove or narrow the contraceptive Mandate contained in and derived from the Guidelines for certain plans. The previous regulations included a reliance clause in the accommodation provisions, but did not specify further details regarding the relationship

between exempt entities and their issuers or third party administrators.

Regarding the Religious IFC's expansion of the exemption to other kinds of entities and individuals in general, commenters disagreed about the likely effects of the exemptions on the health coverage market. Some commenters said that expanding the exemptions would not cause complications in the market, while others said that it could, due to such causes as a lack of uniformity among plans or permitting multiple risk pools. The Departments note that the extent to which plans cover contraception under the prior regulations is already far from uniform. Congress did not require all entities to comply with section 2713 of the PHS Act (under which the Mandate was promulgated)—most notably by exempting grandfathered plans. Moreover, under the previous regulations, issuers were already able to offer plans that omit contraceptives—or offer only some contraceptives—to houses of worship and integrated auxiliaries; some commenters and litigants said that issuers were doing so. These cases where plans did not need to comply with the Mandate, and the Departments' previous accommodation process allowing coverage not to be provided in certain self-insured church plans, together show that the importance of a uniform health coverage system is not significantly harmed by allowing plans to omit contraception in some contexts.[56]

Concerning the prospect raised by commenters of different risk pools between men and women. PHS Act section 2713(a) itself provides for some preventive services coverage that applies to both men and women, and some that would apply only to women. With respect to the latter, it does not specify what, if anything, HRSA's Guidelines for women's preventives services would cover, or if contraceptive coverage would be required. These rules do not require issuers to offer products that satisfy religiously objecting entities or individuals; they simply make it legal to do so. The Mandate has been imposed only relatively recently, and the contours of its application to religious entities has been in continual

flux, due to various rulemakings and court orders. Overall, concerns raised by some public commenters have not led the Departments to consider it likely that offering these expanded exemptions will cause any injury to the uniformity or operability of the health coverage market.

### D. Plan Sponsors in General (45 CFR 147.132(a)(1)(i) Prefatory Text)

With respect to employers and others that sponsor group health plans, in § 147.132(a)(1)(i), the Religious IFC provided exemptions for non-governmental plan sponsors that object to coverage of all, or a subset of, contraceptives or sterilization and related patient education and counseling based on sincerely held religious beliefs. The Departments finalize the prefatory text of § 147.132(a)(1)(i) without change.

The expanded exemptions covered any kind of non-governmental employer plan sponsor with the requisite objections, stating the exemption encompassed "[a] group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (a)(2) of this section." For the sake of clarity, the expanded exemptions also stated that "[s]uch non-governmental plan sponsors include, but are not limited to, the following entities," followed by an illustrative, non-exhaustive list of non-governmental organizations whose objections qualify the plans they sponsor for an exemption. Each type of such entities, and comments specifically concerning them, are discussed below.

The plans of governmental employers are not covered by the plan sponsor exemption in § 147.132(a)(1)(i). Some commenters suggested that the expanded religious exemptions should include government entities. Others disagreed. The Departments are not aware of reasons why it would be appropriate or necessary to offer a religious exemption to governmental employer plan sponsors with respect to the contraceptive Mandate. We are unaware of government entities that would attempt to assert a religious exemption to the Mandate, and it is not clear to us that a governmental entity could do so. Accordingly, we conclude that it is appropriate for us to not further expand the religious exemption to include governmental entities in the religious plan-sponsor exemption.

Nevertheless, as discussed below, governmental employers are permitted to respect an individual's objection under § 147.132(b) and, thus, to provide

---

[56] See also Real Alternatives v. Sec'y. Dep't of Health & Human Servs., 867 F.3d 338, 389 (3d Cir. 2017) (Jordan, J., concurring in part and dissenting in part) ("Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market. . . . Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny." (citation and internal quotation marks omitted)).

Exhibit 1                    JA433                    JA-0000024

health coverage without the objected-to contraceptive coverage to such individual. Where that exemption is operative, the Guidelines may not be construed to prevent a willing governmental plan sponsor of a group health plan from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

By the general extension of the exemption to the plans of plan sponsors in § 147.132(a)(1)(i), these final rules also exempt group health plans sponsored by an entity other than an employer (for example, a union, or a sponsor of a multiemployer plan) that objects based on sincerely held religious beliefs to coverage of contraceptives or sterilization. Some commenters objected to extending the exemption to such entities, arguing that they could not have the same kind of religious objection that a single employer might have. Other commenters supported the protection of any plan sponsor with the requisite religious objection. The Departments conclude that it is appropriate, where the plan sponsor of a union, multiemployer, or similar plan adopts a religious objection using the same procedures that such a plan sponsor might use to make other decisions, that the expanded exemptions should respect that decision by providing an exemption from the Mandate.

*E. Houses of Worship and Integrated Auxiliaries (45 CFR 147.132(a)(1)(i)(A))*

As noted above, the exemption in the previous regulations, found at § 147.131(a), included only "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." Section 6033(a)(3)(A)(i) or (iii) of the Code encompasses "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order."

The Religious IFC expanded the exemption to include, in § 147.132(a)(1)(i)(A), plans sponsored by "[a] church, an integrated auxiliary of a church, a convention or association of churches, or a religious order." Most commenters did not oppose the exemptions continuing to include these entities, although some contended that the Departments have no authority to exempt any entity or plan from the Mandate, an objection to which the

Departments respond above. Notably, this exemption exempts "a religious order," and not merely "the exclusively religious activities of any religious order." In addition, section 6033(a)(3)(A)(i) specifies that it covers churches, not merely "the exclusively religious activities" of a church. Some religious people might express their beliefs through a church, others might do so through a religious order, and still others might do so through religious bodies that take a different form, structure, or nomenclature based on a different cultural or historical tradition. *Cf. Hosanna-Tabor Evangelical Lutheran Church and School* v. *E.E.O.C.*, 565 U.S. 171, 198 (2012) (Alito and Kagan, JJ., concurring) ("The term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists."). For the purposes of respecting the exercise of religious beliefs, which the expanded exemptions in these rules concern, the Departments find it appropriate that this part of the exemption encompasses religious orders and churches similarly, without limiting the scope of the protection to the exclusively religious activities of either kind of entity. Based on all these considerations, the Departments finalize § 147.132(a)(1)(i)(A) without change.

Moreover, the Departments also finalize the regulatory text to exempt plans "established or maintained by" a house of worship or integrated auxiliary on a plan, not employer, basis. Under previous regulations, the Departments stated that "the availability of the exemption or accommodation [was to] be determined on *an employer by employer basis*, which the Departments . . . believe[d] best balance[d] the interests of religious employers and eligible organizations and those of employees and their dependents." (78 FR 39886 (emphasis added)). Therefore, under the prior exemption, if an employer participated in a house of worship's plan—perhaps because it was affiliated with a house of worship—but was not an integrated auxiliary or a house of worship itself, that employer was not covered by the exemption, even though it was, in the ordinary meaning of the text of the prior regulation, participating in a "plan established or maintained by a [house of worship]." Upon further consideration, in the Religious IFC, the Departments changed their view on this issue and expanded the exemption for houses of worship and integrated auxiliaries. Under these rules, the Departments intend that,

when this regulation text exempts a plan "established or maintained by" a house of worship or integrated auxiliary, such exemption will no longer "be determined on an employer by employer basis," but will be determined on a plan basis—that is, by whether the plan is a "plan established or maintained by" a house of worship or integrated auxiliary. This interpretation better conforms to the text of the regulation setting forth the exemption—in both the prior regulation and in the text set forth in these final rules. It also offers appropriate respect to houses of worship and their integrated auxiliaries not only in their internal employment practices, but in their choice of organizational form and/or in their activity of establishing or maintaining health plans for employees of associated employers that do not meet the requirement of being integrated auxiliaries. Under this interpretation, houses of worship would not be faced with the potential of having to include, in the plans that they have established and maintained, coverage for services to which they have a religious objection for employees of an affiliated employer participating in the plans.

The Departments do not believe there is a sufficient factual basis to exclude from this part of the exemption entities that are so closely associated with a house of worship or integrated auxiliary that they are permitted to participate in its health plan but are not themselves integrated auxiliaries. Additionally, this interpretation is not inconsistent with the operation of the accommodation under the prior regulation where with respect to self-insured church plans, hundreds of nonprofit religious entities participating in those plans were provided a mechanism by which their plan participants would not receive contraceptive coverage through the plan or third party administrator.[57]

Therefore, the Departments believe it is most appropriate to use a plan basis, not an employer by employer basis, to determine the scope of an exemption for a group health plan established or maintained by a house of worship or integrated auxiliary.

*F. Nonprofit Organizations (45 CFR 147.132(a)(1)(i)(B))*

The exemption under previous regulations did not encompass nonprofit religious organizations beyond one that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Code. The Religious IFC expanded the exemption to include plans sponsored by any other

---

[57] See supra at II.A.3.

Exhibit 1    JA434    JA-0000025

"nonprofit organization,"
§ 147.132(a)(1)(i)(B), if it has the requisite religious objection under § 147.132(a)(2) (see § 147.132(a)(1)(i) introductory text). The Religious IFC also specified in § 147.132(a)(1)(i)(A), as under the prior exemption, that the exemption covers "a group health plan established or maintained by . . . [a] church, the integrated auxiliary of a church, a convention or association of churches, or a religious order." (Hereinafter "houses of worship and integrated auxiliaries.") These rules finalize, without change, the text of § 147.132(a)(1)(i)(A) and (B).

The Departments received comments in support of, and in opposition to, this expansion. Some commenters supported the expansion of the exemptions beyond houses of worship and integrated auxiliaries to other nonprofit organizations with religious objections (referred to herein as "religious nonprofit" organizations, groups or employers). They said that religious belief and exercise in American law has not been limited to worship, that religious people engage in service and social engagement as part of their religious exercise, and, therefore, that the Departments should respect the religiosity of nonprofit groups even when they are not houses of worship and integrated auxiliaries. Some public commenters and litigants have indicated that various religious nonprofit groups possess deep religious commitments even if they are not houses of worship or their integrated auxiliaries. Other commenters did not support the expansion of exemptions to nonprofit organizations. Some of them described churches as having a special status that should not be extended to religious nonprofit groups. Some others contended that women at nonprofit religious organizations may support or wish to use contraceptives and that if the exemptions are expanded, it would deprive all or most of the employees of various religious nonprofit organizations of contraceptive coverage.

After evaluating the comments, the Departments continue to believe that an expanded exemption is the appropriate administrative response to the substantial burdens on sincere religious beliefs imposed by the contraceptive Mandate, as well as to the litigation objecting to the same. We agree with the comments that religious exercise in this country has long been understood to encompass actions outside of houses of worship and their integrated auxiliaries. The Departments' previous assertion that the exemptions were intended to respect a certain sphere of church autonomy (80 FR 41325) is not, in itself,

grounds to refuse to extend the exemptions to other nonprofit entities with religious objections. Respect for churches does not preclude respect for other religious entities. Among religious nonprofit organizations, the Departments no longer adhere to our previous assertion that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection." (78 FR 39874.) It is not clear to the Departments that the percentage of women who work at churches that oppose contraception, but who support contraception, is lower than the percentage of woman who work at nonprofit religious organizations that oppose contraception on religious grounds, but who support contraception. In addition, public comments and litigation reflect that many nonprofit religious organizations publicly describe their religiosity. Government records and those groups' websites also often reflect those groups' religious character. If a person who desires contraceptive coverage works at a nonprofit religious organization, the Departments believe it is sufficiently likely that the person would know, or would know to ask, whether the organization offers such coverage. The Departments are not aware of federal laws that would require a nonprofit religious organization that opposes contraceptive coverage to hire a person who the organization knows disagrees with the organization's view on contraceptive coverage. Instead, nonprofit organizations generally have access to a First Amendment right of expressive association and religious free exercise to choose to hire persons (or, in the case of students, to admit them) based on whether they share, or at least will be respectful of, their beliefs.[58]

In addition, it is not at all clear to the Departments that expanding the exemptions would, as some commenters asserted, remove contraceptive coverage from employees of many large religious nonprofit organizations. Many large religious nonprofit employers, including but not limited to some Catholic hospitals, notified the Department under the last Administration that they had opted into the accommodation and expressed no objections to doing so. We also received public comments from organizations of similar nonprofit

employers indicating that the accommodation satisfied their religious objections. These final rules leave the accommodation in place as an optional process. Thus, it is not clear to the Departments that all or most of such large nonprofit employers will choose to use the expanded exemption instead of the accommodation. If they continue to use the accommodation, their insurers or third party administrators would continue to be required to provide contraceptive coverage to the plan sponsors' employees through such accommodation.

Given the sincerely held religious beliefs of many nonprofit religious organizations, some commenters also contended that continuing to impose the contraceptive Mandate on certain nonprofit religious objectors might also undermine the Government's broader interests in ensuring health coverage by causing some entities to stop providing health coverage entirely.[59] Although the Departments do not know the extent to which that effect would result from not extending exemptions, we wish to avoid that potential obstacle to the general expansion of health coverage.

### G. Closely Held For-Profit Entities (45 CFR 147.132(a)(1)(i)(C))

The previous regulations did not exempt plans sponsored by closely held for-profit entities; however, the Religious IFC included in its list of exempt plan sponsors, at § 147.132(a)(1)(i)(C), "[a] closely held for-profit entity." These rules finalize § 147.132(a)(1)(i)(C) without change.

Some commenters supported including these entities in the exemption, saying owners of such entities exercise their religious beliefs through their businesses and should not be burdened by a federal governmental contraceptive Mandate. Other commenters opposed extending the exemption to closely held for-profit entities, saying the entities cannot exercise religion or should not have their religious opposition to contraceptive coverage protected by the exemption. Some said the entities should not be able to impose their beliefs about contraceptive coverage on their employees, and that doing so constitutes discrimination.

As set forth in the Religious IFC, the Departments believe it is appropriate to expand the exemptions to include closely held for-profit employers in

---

[58] Notably, "the First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.'" *Boy Scouts of America v. Dale,* 530 U.S. 640, 655 (2000).

[59] See, e.g., Manya Brachear Pashman, "Wheaton College ends coverage amid fight against birth control mandate," *Chicago Tribune,* July 29, 2015; Laura Bassett, "Franciscan University Drops Entire Student Health Insurance Plan Over Birth Control Mandate," HuffPost, May 15, 2012.

order to protect the religious exercise of those entities and their owners. The ACA did not apply the preventive services mandate to the many grandfathered health plans among closely held as well as publicly traded for-profit entities, encompassing tens of millions of women. As explained below, we are not aware of evidence showing that the expanded exemptions finalized here will impact such a large number of women. And, in the Departments' view, the decision by Congress to not apply the preventive services mandate to grandfathered plans did not constitute improper discrimination or an imposition of beliefs. We also do not believe RFRA or the large number of other statutory exemptions Congress has provided for religious beliefs (including those exercised for profit) in certain health contexts such as sterilization, contraception, or abortion have been improper.

Including closely held for-profit entities in the exemption is also consistent with the Supreme Court's ruling in *Hobby Lobby*, which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in *Hobby Lobby*, the pursuit of religious beliefs), regardless of whether the entity operates as a nonprofit organization, and rejected the previous Administration's argument to the contrary. 134 S. Ct. at 2768–75. Some reports and industry experts have indicated that few for-profit entities beyond those that had originally challenged the Mandate have sought relief from it after *Hobby Lobby*.[60]

*H. For-Profit Entities That Are Not Closely Held (45 CFR 147.132(a)(1)(i)(D))*

The previous regulations did not exempt for-profit entities that are not closely held. However, the Religious IFC included in its list of exempt plan sponsors, at § 147.132(a)(1)(i)(D), "[a] for-profit entity that is not closely held." These rules finalize § 147.132(a)(1)(i)(D) without change.

Under § 147.132(a)(1)(i)(D), the rules extend the exemption to the plans of for-profit entities that are not closely held. Some commenters supported including such entities, including publicly traded businesses, in the scope of the exemption. Some of them said that publicly traded entities have historically taken various positions on important public concerns beyond merely (and exclusively) seeking the

company's own profits, and that nothing in principle would preclude them from using the same mechanisms of corporate decision-making to exercise religious views against contraceptive coverage. They also said that other protections for religious beliefs in federal health care conscience statutes do not preclude the application of such protections to certain entities on the basis that they are not closely held, and federal law defines "persons," protected under RFRA, to include corporations at 1 U.S.C. 1. Other commenters opposed including publicly traded companies in the expanded exemptions. Some of these commenters stated that such companies could not exercise religious beliefs, and opposed the effects on women if they could. These commenters also objected that including such employers, along with closely held businesses, would extend the exemptions to all or virtually all employers.

The Departments conclude it is appropriate to include entities that are not closely held within the expanded exemptions for entities with religious objection. RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion . . . ." unless it demonstrates that the application of the burden to the person" is the least restrictive means to achieve a compelling governmental interest. 42 U.S.C. 2000bb–1(a) & (b). As commenters noted, the definition of "person" applicable in RFRA is found at 1 U.S.C. 1, which defines "person" as including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." Accordingly, the Departments' decision to extend the religious exemption to publicly traded for profit corporations is supported by the text of RFRA. The mechanisms for determining whether a company has adopted and holds certain principles or views, such as sincerely held religious beliefs, is a matter of well-established State law with respect to corporate decision-making,[61] and the Departments expect that application of such laws would cabin the scope of this exemption.

As to the impact of so extending the religious exemption, the Departments are not aware of any publicly traded entities that have publicly objected to providing contraceptive coverage on the basis of religious belief. As noted above, before the ACA, a substantial majority of

employers covered contraceptives. Some commenters opposed to including publicly traded entities in these exemptions noted that there did not appear to be any known religiously motivated objections to the Mandate from publicly traded for-profit corporations. These comments support our estimates that including publicly traded entities in the exemptions will have little, if any, effect, on contraceptive coverage for women. We likewise agree with the Supreme Court's statement in *Hobby Lobby* that it is unlikely that many publicly traded companies will adopt religious objections to offering women contraceptive coverage. *See* 134 S. Ct. at 2774. Some commenters contended that, because many closely held for-profit businesses expressed religious objections to the Mandate, or took advantage of the accommodation, it is likely that many publicly traded businesses will do so. The Departments agree it is possible that publicly traded businesses may use the expanded exemption. But while scores of closely held for-profit businesses filed suit against the Mandate, no publicly traded entities did so, even though they were not authorized to seek the accommodation. Based on these data points, we believe the impact of the extension of the exemption to publicly traded for-profit organizations will not be significant. Below, based on limited data, but on years of receiving public comments and defending litigation brought by organizations challenging the Mandate on the basis of their religious objections, our best estimate of the anticipated effects of this rules is that no publicly traded employers will invoke the religious exemption.

In the Departments' view, such estimate does not lead to the conclusion that the religious exemption should not be extended to publicly traded corporations. The Departments are generally aware that, in a country as large as the U.S., comprised of a supermajority of religious persons,[62] some publicly traded entities might claim a religious character for their company, or the majority of shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character.[63] Thus we consider

[60] *See* Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," *Politico* (Oct. 11. 2016), *http://www.politico.com/story/2016/10/obamacare-birth-control-mandate-employers-229627.*

[61] Although the Departments do not prescribe any form or notification, they would expect that such principles or views would have been adopted and documented in accordance with the laws of the jurisdiction under which the organization is incorporated or organized.

[62] For example, in 2017, 74 percent of Americans said that religion is fairly important or very important in their lives, and 87 percent of Americans said they believe in God. Gallup, "Religion," available at *https://news.gallup.com/poll/1690/religion.aspx.*

[63] *See, for example,* Kapitall, "4 Publicly Traded Religious Companies if You're Looking to Invest in

it possible that a publicly traded company might have religious objections to contraceptive coverage. Moreover, as noted, there are many closely held for-profit corporations that do have religious objections to covering some or all contraceptives. The Departments do not want to preclude such a closely held corporation from having to decide between relinquishing the exemption or financing future growth by sales of stock, which would be the effect of denying it the exemption if it changes its status and became a publicly traded entity. The Departments also find it relevant that other federal conscience statutes, such as those applying to hospitals or insurance companies, do not exclude publicly traded businesses from protection.[64] As a result, the Departments continue to consider it appropriate not to exclude such entities from these expanded exemptions.

*I. Other Non-Governmental Employers (45 CFR 147.132(a)(1)(i)(E))*

As noted above, the exemption in the previous regulations, found at § 147.131(a), included only churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. The Religious IFC included, in its list of exempt plan sponsors at § 147.132(a)(1)(i)(E), "[a]ny other non-governmental employer." These rules finalize § 147.132(a)(1)(i)(E) without change.

Some commenters objected to extending the exemption to other nongovernmental employers, asserting that it is not clear such employers should be protected, nor that they can assert religious objections. The Departments, however, agree with other commenters that supported that provision of the Religious IFC. The Departments believe it is appropriate that any nongovernmental employer asserting the requisite religious objections should be protected from the Mandate in the same way as other plan sponsors. Such other employers could include, for example, association health plans.[65] The reasons discussed above for providing the exemption to various specific kinds of employers, and for their ability to assert sincerely held religious beliefs using ordinary mechanisms of corporate decision-

making, generally apply to other nongovernmental employers as well, if they have sincerely held religious beliefs opposed to contraceptive coverage and otherwise meet the requirements of these rules. We agree with commenters who contend there is not a sufficient basis to exclude other nongovernmental employers from the exemption.

*J. Plans Established or Maintained by Objecting Nonprofit Entities (45 CFR 147.132(a)(1)(ii))*

Based on the expressed intent in the Religious IFC, as discussed above, to expand the exemption to encompass plans established or maintained by nonprofit organizations with religious objections, and on public comments received concerning those exemptions, these rules finalize new language in § 147.132(a)(1)(ii) to better clarify the scope and application of the exemptions.

The preamble to the Religious IFC contained several discussions about the Departments' intent to exempt plans established or maintained by certain religious organizations that have the requisite objection to contraceptive coverage, including instances in which the plans encompass multiple employers. For example, as noted above, the Departments intended that the exemption for houses of worship and integrated auxiliaries be interpreted to apply on a plan basis, instead of on an employer-by-employer basis. In addition, the Departments discussed at length the fact that, under the prior regulations, where an entity was enrolled in a self-insured church plan exempt from ERISA under ERISA section 3(33) and the accommodation in the previous regulations was used, that accommodation process provided no mechanism to impose, or enforce, the accommodation requirement of contraceptive coverage against a third party administrator of such a plan. As a result, the prior accommodation served, in effect, as an exemption from requirements of contraceptive coverage for all organizations and employers covered under a self-insured church plan.

In response to these discussions in the Religious IFC, some commenters, including some church plans, supported the apparent intent to exempt such plans on a plan basis, but suggested that additional clarification is needed in the text of the rule to effect this intent. They observed that some plans are established or maintained by religious nonprofit entities that might not be houses of worship or integrated auxiliaries, and that some employers

that adopt or participate in such plans may not be the "plan sponsors." They recommended, therefore, that the final rules specify that the exemption applies on a plan basis when plans are established or maintained by houses of worship, integrated auxiliaries, or religious nonprofits, so as to shield employers that adopt such plans from penalties for noncompliance with the Mandate.

The text of the prefatory language of § 147.132(a)(1), as set forth in the Religious IFC, declared that the Guidelines would not apply "with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization." We intended this language to exempt a plan and/or coverage where the entity that established or maintained a plan was an objecting organization, and not just to look at the views or status of individual employers (or other entities) participating in such plan. The Departments agree with commenters who stated that additional clarity is needed and appropriate in these final rules, in order to ensure that such plans are exempt on a plan basis, and that employers joining or adopting those plans are exempt by virtue of the plan itself being exempt. Doing so will make the application of the expanded exemption clearer, and protect employers (and other entities) participating in such plans from penalties for noncompliance with the Mandate. Clearer language will better realize the intent to exempt plans and coverage "established or maintained by an objecting organization," and make the operation of that exemption simpler by specifying that the exemption applies based on the objection of the entity that established or maintains the plan. Such language would also resolve the anomaly that, under the previous rules, only self-insured church plans (not insured church plans) under ERISA section 3(33) were, in effect, exempt—but only indirectly through the Departments' inability to impose, or enforce, the accommodation process against the third party administrators of such plans, instead of being specifically exempt in the rules.

We believe entities participating in plans established or maintained by an objecting organization usually share the views of those organizations. Multiple lawsuits were filed against the Departments by churches that established or maintained plans, or the church plans themselves, and they generally declared that the entities or individuals participating in their plans

---

Faith" (Feb. 7, 2014), *http://www.nasdaq.com/ article/4-publicly-traded-religious-companies-if-youre-looking-to-invest-in-faith-cm324665*.

[64] *See, for example,* 42 U.S.C. 300a–7, 42 U.S.C. 238n, Consolidated Appropriations Act of 2018, Div. H, Sec. 507(d), Public Law 115–141, and *id.* at Div. E, Sec. 808.

[65] See 29 CFR 2510.3–5.

Exhibit 1                                    JA437                                    JA-0000028

are usually required to share their religious affiliation or beliefs. In addition, because, as we have stated before, "providing payments for contraceptive services is cost neutral for issuers" (78 FR 39877), we do not believe this clarification would produce any financial incentive for entities that do not have religious objections to contraceptive coverage to enter into plans established or maintained by an organization that does have such objections.

Therefore. the Departments finalize the text of § 147.132(a)(1) of the Religious IFC with the following change: adding a provision that makes explicit this understanding, in a new paragraph at § 147.132(a)(1)(ii). This language now specifies that the exemptions encompassed by § 147.132(a)(1) include: "[a] group health plan, and health insurance coverage provided in connection with a group health plan, where the plan or coverage is established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other organization or association, to the extent the plan sponsor responsible for establishing and/or maintaining the plan objects as specified in paragraph (a)(2) of this section. The exemption in this paragraph applies to each employer, organization, or plan sponsor that adopts the plan[.]"

*K. Institutions of Higher Education (45 CFR 147.132(a)(1)(iii))*

The previous regulations did not exempt student health plans arranged by institutions of higher education, although it did. for purposes of the accommodation, treat plans arranged by institutions of higher education similar to the way in which the regulations treated plans of nonprofit religious employers. *See* 80 FR at 41347. The Religious IFC included in its list of exemptions, at § 147.132(a)(1)(ii). "[a]n institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to 'plan participants and beneficiaries' will be interpreted as references to student enrollees and their covered dependents." These rules

finalize this language with a change to clarify their application, as discussed below, and by redesignating the paragraph as § 147.132(a)(1)(iii).

These rules treat the plans of institutions of higher education that arrange student health insurance coverage similarly to the way in which the rules treat the plans of employers. These rules do so by making such student health plans eligible for the expanded exemptions. and by permitting them the option of electing to utilize the accommodation process. Thus, these rules specify, in § 147.132(a)(1)(iii), that the exemption is extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002) with objections to the Mandate based on sincerely held religious beliefs, to their arrangement of student health insurance coverage in a manner comparable to the applicability of the exemption for group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer.

Some commenters supported including, in the expanded exemptions, institutions of higher education that provide health coverage for students through student health plans but have religious objections to providing certain contraceptive coverage. They said that religious exemptions allow freedom for certain religious institutions of higher education to exist, and this in turn gives students the choice of institutions that hold different views on important issues such as contraceptives and abortifacients. Other commenters opposed including the exemption, asserting that expanding the exemptions would negatively impact female students because institutions of higher education might not cover contraceptives in student health plans, women enrolled in those plans would not receive access to birth control, and an increased number of unintended pregnancies would result among those women.

In the Departments' view, the reasons for extending the exemptions to institutions of higher education are similar to the reasons, discussed above, for extending the exemption to other nonprofit organizations. Only a minority of students in higher education receive health insurance coverage from plans arranged by their colleges or universities.[66] It is necessarily true that

an even smaller number receive such coverage from religious schools, and from religious or other private schools that object to arranging contraceptive coverage. Religious institutions of higher education are private entities with religious missions. Various commenters asserted the importance, to many of those institutions, of being able to adhere to their religious tenets. Indeed, many students who attend such institutions do so because of the institutions' religious tenets. No student is required to attend such an institution. At a minimum, students who attend private colleges and universities have the ability to ask those institutions in advance what religious tenets they follow, including whether the institutions will provide contraceptives in insurance plans they arrange. Some students wish to receive contraceptive coverage from a health plan arranged by an institution of higher education. But other students wish to attend an institution of higher education that adheres to its religious mission about contraceptives in health insurance. And still other students favor contraception. but are willing to attend a religious university without forcing it to violate its beliefs about contraceptive coverage. Exempting religious institutions that object to contraceptive coverage still allows contraceptive coverage to be provided by institutions of higher education more broadly. The exemption simply makes it legal under federal law for institutions to adhere to religious beliefs that oppose contraception. without facing penalties for non-compliance that could threaten their existence. This removes a possible barrier to diversity in the nation's higher education system, and makes it more possible for students to attend institutions of higher education that hold those views.

In addition, under the previous exemption and accommodation, it was possible for self-insured church plans exempt from ERISA that have religious objection to certain contraceptives to avoid any requirement that either they or their third party administrators provide contraceptive coverage. As seen

---

[66] The American College Health Association estimates that, in 2014. student health insurance plans at colleges and universities covered "more than two million college students nationwide." "Do You Know Why Student Health Insurance Matters?" available at *https://www.acha.org/*

*documents/Networks/Coalitions/Why_SHIPs_Matter.pdf.* We assume for the purposes of this estimate that those plans covered 2,100,000 million students. Data from the Department of Education shows that in 2014, there were 20.207,000 students enrolled in degree-granting postsecondary institutions. National Center for Education Statistics. Table 105.20, "Enrollment in elementary, secondary, and degree-granting postsecondary institutions, by level and control of institution, enrollment level, and attendance status and sex of student: Selected years, fall 1990 through fall 2026," available at *https://nces.ed.gov/programs/digest/d16/tables/dt16_105.20.asp?current=yes.*

Exhibit 1                                    JA438                                    JA-0000029

in some public comments and litigation statements, some such self-insured church plans provide health coverage for students at institutions of higher education covered by those church plans. In order to avoid the situation where some student health plans sponsored by institutions with religious objections are effectively exempt from the contraceptive Mandate, and other student health plans sponsored by other institutions with similar religious objections are required to comply with the Mandate, the Departments consider it appropriate to extend the exemption, so that religious colleges and universities with objections to the Mandate would not be treated differently in this regard.

The Departments also note that the ACA does not require institutions of higher education to provide student health insurance coverage. As a result, some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student health insurance plans, rather than comply with the Mandate or be subject to the accommodation.[67] Extending the exemption in these rules removes an obstacle to such entities deciding to offer student health insurance plans, thereby giving students another health insurance option.

As noted above, it is not clear that studies discussing various effects of birth control access clearly and specifically demonstrate a negative impact to students in higher education because of the expanded exemption in these final rules. The Departments consider these expanded exemptions to be an appropriate and permissible policy choice in light of various interests at stake and the lack of a statutory requirement for the Departments to impose the Mandate on entities and plans that qualify for these expanded exemptions.

Finally, the Religious IFC specified that the plan sponsor exemption applied to "non-governmental" plan sponsors (§ 147.132(a)(1)(i)), including "[a]ny other non-governmental employer" (§ 147.132(a)(1)(i)(E)). Then, in § 147.132(a)(1)(ii), the rule specified that the institution of higher education exemption applicable to the arrangement of student health insurance coverage applied "in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan

established or maintained by a plan sponsor that is an employer." Consequently, the Religious IFC's expanded exemptions only applied to non-governmental institutions of higher education, including for student health insurance coverage, not to governmental institutions of higher education. Nevertheless, the term "non-governmental," while appearing twice in § 147.132(a)(1)(i) concerning plan sponsors, was not repeated in in § 147.132(a)(1)(ii). To more clearly specify that this limitation was intended to apply to § 147.132(a)(1)(ii), we finalize this paragraph with a change by adding the phrase "which is non-governmental" after the phrase "An institution of higher education as defined in 20 U.S.C. 1002".

*L. Health Insurance Issuers (45 CFR 147.132(a)(1)(iv))*

The previous regulations did not exempt health insurance issuers. However, the Religious IFC included in its list of exemptions at § 147.132(a)(1)(iii), "[a] health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement[.]" These rules finalize this exemption with technical changes to clarify the language based on public comments, and redesignate the paragraph as § 147.132(a)(1)(iv).

The Religious IFC extends the exemption to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own religious objections to providing coverage for contraceptive services. Under this exemption, the only plan sponsors—or in the case of individual insurance coverage, individuals—who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services, are plan sponsors or individuals who themselves object and whose plans are otherwise exempt based on their objection. An exempt issuer can then offer an exempt health insurance product to an entity or individual that is exempt based on either the moral exemptions for entities and individuals, or the religious exemptions for entities and individuals. Thus, the issuer exemption specifies

that, where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii) of this section, the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv). unless it is also exempt from that requirement.

Under these rules, issuers that hold their own objections, based on sincerely held religious beliefs, could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on their religious beliefs, or on their moral convictions under the companion final rules published elsewhere in today's **Federal Register**. Likewise, issuers with sincerely held moral convictions, that are exempt under those companion final rules, could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on either their religious beliefs or their moral convictions.

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments provided a similar exemption for issuers in the context of moral objections, but we used slightly different operative language. There, in the second sentence, instead of saying "the plan remains subject to any requirement to provide coverage for contraceptive services," the exemption stated, "the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services." Some commenters took note of this difference, and asked the Departments to clarify which language applies, and whether the Departments intended any difference in the operation of the two paragraphs. The Departments did not intend the language to operate differently. The language in the Moral IFC accurately, and more clearly, expresses the intent set forth in the Religious IFC about how the issuer exemption applies. Consequently, these rules finalize the issuer exemption paragraph from the Religious IFC with minor technical changes so that the final language will mirror language from the Moral IFC, stating that the exemption encompasses: "[a] health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iv) of this section, the group health plan established or maintained by the plan sponsor with

---

[67] See, e.g., Manya Brachear Pashman, "Wheaton College ends coverage amid fight against birth control mandate," Chicago Tribune, July 29, 2015; Laura Bassett, "Franciscan University Drops Entire Student Health Insurance Plan Over Birth Control Mandate," HuffPost, May 15, 2012.

Exhibit 1    JA439    JA-0000030

which the health insurance contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement[.]"

Some commenters supported including this exemption for issuers in these rules, both to protect the religious exercise of issuers, and so that in the future religious issuers that may wish to specifically serve religious plan sponsors would be free to organize. Other commenters objected to including an exemption for issuers. Some objected that issuers cannot exercise religious beliefs, while others objected that exempting issuers would threaten contraceptive coverage for women. Some commenters said that it was arbitrary and capricious for the Departments to provide an exemption for issuers if we do not know that issuers with qualifying religious objections exist.

The Departments consider it appropriate to provide this exemption for issuers. Because the issuer exemption only applies where an independently exempt policyholder (entity or individual) is involved, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will it prevent other issuers from being required to provide contraceptive coverage in individual or group insurance coverage. The issuer exemption therefore serves several interests, even though the Departments are not currently aware of existing issuers that would use it. As noted by some commenters, allowing issuers to be exempt, at least with respect to plan sponsors and plans that independently qualify for an exemption, will remove a possible obstacle to religious issuers being organized in the future to serve entities and individuals that want plans that respect their religious beliefs or moral convictions. Furthermore, permitting issuers to object to offering contraceptive coverage based on sincerely held religious beliefs will allow issuers to continue to offer coverage to plan sponsors and individuals, without subjecting them to liability under section 2713(a)(4), or related provisions, for their failure to provide contraceptive coverage. In this way, the issuer exemption serves to protect objecting issuers from being required to issue policies that cover contraception in violation of the issuers' sincerely held religious beliefs, and from being required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus subjecting the issuers to potential liability if those plans are not exempt from the Guidelines.

The Departments reject the proposition that issuers cannot exercise religious beliefs. First, since RFRA protects the religious exercise of corporations as persons. the religious exercise of health insurance issuers—which are generally organized as corporations—is protected by RFRA. In addition, many federal health care conscience laws and regulations specifically protect issuers or plans. For example, 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3) protect plans or managed care organizations in Medicaid or Medicare Advantage. The Weldon Amendment specifically protects. among other entities, provider-sponsored organizations, health maintenance organizations (HMOs), health insurance plans, and "any other kind of health care facilit[ies], organization[s], or plan[s]" as a "health care entity" from being required to pay for, or provide coverage of, abortions. *See for example,* Consolidated Appropriations Act of 2018, Public Law 115–141, Div. H, Sec. 507(d), 132 Stat. 348, 764 (Mar. 23, 2018).[68] Congress also declared this year that "it is the intent of Congress" to include a "conscience clause" which provides exceptions for religious beliefs if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans." *See id.* at Div. E, Sec. 808, 132 Stat. at 603. In light of the clearly expressed intent of Congress to protect religious liberty, particularly in certain health care contexts. along with the specific efforts to protect issuers, the Departments have concluded that an exemption for issuers is appropriate.

The issuer exemption does not specifically include third party administrators, although the optional accommodation process provided under these final rules specifies that third party administrators cannot be required to contract with an entity that invokes that process. Some religious third party administrators have brought suit in conjunction with suits brought by organizations enrolled in ERISA-exempt church plans. Such plans are now exempt under these final rules, and their third party administrators, as claims processors. are under no obligation under section 2713(a)(4) to provide benefits for contraceptive services, as that section applies only to plans and issuers. In the case of ERISA-covered plans, plan administrators are obligated under ERISA to follow the plan terms, but it is the Departments' understanding that third party administrators are not typically designated as plan administrators, and, therefore, would not normally act as plan administrators, under section 3(16) of ERISA. Therefore, to the Departments' knowledge, it is only under the existing accommodation process that third party administrators are required to undertake any obligations to provide or arrange for contraceptive coverage to which they might object. These rules make the accommodation process optional for employers and other plan sponsors, and specify that third party administrators that have their own objection to complying with the accommodation process may decline to enter into, or decline to continue, contracts as third party administrators of such plans.

### M. Description of the Religious Objection (45 CFR 147.132(a)(2))

The previous regulations did not specify what, if any, religious objection applied to its exemption; however, the Religious IFC set forth the scope of the religious objection of objecting entities in § 147.132(a)(2), as follows: "The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage. payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs." These rules finalize this description with technical changes to clarify the scope of the objection as intended in the Religious IFC, and based on public comments.

Throughout the exemptions for objecting entities, the rules specify that they apply where the entities object as specified in § 147.132(a)(2) of the Religious IFC. That paragraph describes the religious objection by specifying that exemptions for objecting entities will apply to the extent that an entity described in paragraph (a)(1) objects to its establishing. maintaining. providing, offering. or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

---

[68] ACA section 1553 protects an identically defined group of "health care entities," including provider-sponsored organizations, HMOs, health insurance plans, and "any other kind of . . . plan," from being subject to discrimination on the basis that it does not provide any health care item or service furnishing for the purpose of assisted suicide, euthanasia, mercy killing, and the like. ACA section 1553, 42 U.S.C. 18113.

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments, at § 147.133(a)(2), provided a similar description of the scope of the objection based on moral convictions rather than religious beliefs, but we used slightly different operative language. There, instead of saying the entity "objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services," the paragraph stated the entity "objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments." Some commenters took note of this difference, and asked the Departments to clarify which language applies, and whether the Departments intended any difference in the operation of the two paragraphs. The Departments did not intend the language to operate differently. The language in the Moral IFC accurately, and more clearly, expresses the intent set forth in the Religious IFC about how the issuer exemption applies. The Religious IFC explained that the intent of the expanded exemptions was to encompass entities that objected to providing or arranging for contraceptive coverage in their plans, and to encompass entities that objected to the previous accommodation process, by which their issuers or third party administrators were required to provide contraceptive coverage or payments in connection with their plans. In other words, an entity would be exempt from the Mandate if it objected to complying with the Mandate, or if it objected to complying with the accommodation. The language in the Religious IFC encompassed both circumstances by encompassing an objection to providing "coverage [or] payments" for contraceptive services, and by encompassing an objection to "a plan that provides" coverage or payments for contraceptive services. But the language describing the objection set forth in the Moral IFC does more clearly, and restructuring the sentence could make it clearer still. Questions by commenters about the scope of the description suggests that we should restructure the description, in a non-substantive way, to provide more clarity. The Departments do this by breaking some of the text out into subparagraphs, and rearranging clauses so that it is clearer which words they modify. The new

structure specifies that it includes an objection to establishing, maintaining, providing, offering, or arranging for (as applicable) coverage or payments for contraceptive services, and it includes an objection to establishing, maintaining, providing, offering, or arranging for (as applicable) a plan, issuer, or third party administrator that provides contraceptive coverage. This more clearly encompasses objections to complying with either the Mandate or the accommodation. Consequently, these rules finalize the paragraph describing the religious objection in the Religious IFC with minor technical changes so that the final language will essentially mirror language from the Moral IFC. The introductory phrase of the religious objection set forth in paragraph (a)(2) is finalized to state the exemption "will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable)". The remainder of the paragraph is broken into two sub-paragraphs, regarding either "coverage or payments for some or all contraceptive services," or "a plan, issuer, or third party administrator that provides or arranges such coverage or payments."

Some commenters observed that by allowing exempt groups to object to "some or all" contraceptives, this might yield a cafeteria-style approach where different plan sponsors choose various combinations of contraceptives that they wish to cover. Some commenters further observed that this might create a burden on issuers or third party administrators. The Departments have concluded, however, that, just as the exemption under the previous regulations allowed entities to object to some or all contraceptives, it is appropriate to maintain that flexibility for entities covered by the expanded exemption. Notably, even where an entity or individual qualifies for an exemption under these rules, these rules do not require the issuer or third party administrator to contract with that entity or individual if the issuer or third party administrator does not wish to do so, including because the issuer or third party administrator does not wish to offer an unusual variation of a plan. These rules simply remove the federal Mandate that, in some cases, could have led to penalties for an employer, issuer, or third party administrator if they wished to sponsor, provide, or administer a plan that omits contraceptive coverage in the presence

of a qualifying religious objection. Similarly, under the previous exemption, the plans of houses of worship and integrated auxiliaries were exempt from offering some or all contraceptives, but the previous regulations did not require issuers and third party administrators to contract with those exempt entities if they chose not to do so.

### N. Individuals (45 CFR 147.132(b))

The previous regulations did not provide an exemption for objecting individuals. However, the Religious IFC expanded the exemptions to encompass objecting individuals (referred to here as the "individual exemption"), at § 147.132(b). These rules finalize the individual exemption from the Religious IFC with changes, which reflect both non-substantial technical revisions, and changes based on public comments to more clearly express the intent of the Religious IFC.

In the separate companion IFC to the Religious IFC—the Moral IFC—provided a similar individual exemption, but we used slightly different operative language. Where the Religious IFC described what may be offered to objecting individuals as "a separate benefit package option, or a separate policy, certificate or contract of insurance," the Moral IFC said a willing issuer and plan sponsor may offer "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects" under the individual exemption. Some commenters observed this difference and asked whether the language was intended to encompass the same options. The Departments intended these descriptions to include the same scope of options. Some commenters suggested that the individual exemption should not allow the offering of "a separate group health plan," as set forth in the version found in § 147.133(b), because doing so could cause various administrative burdens. The Departments disagree, since group health plan sponsors and group and individual health insurance issuers would be free to decline to provide that option, including because of administrative burdens. In addition, the Departments wish to clarify that, where an employee claims the exemption, a willing issuer and a willing employer may, where otherwise permitted, offer the employee participation in a group health insurance policy or benefit option that complies with the employee's objection. Consequently, these rules finalize the individual

exemption by making a technical change to the language to adopt the formulation, "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects" under the individual exemption.

Some commenters supported the individual exemption as providing appropriate protections for the religious beliefs of individuals who obtain their insurance coverage in such places as the individual market or exchanges, or who obtain coverage from a group health plan sponsor that does not object to contraceptive coverage but is willing (and, as applicable, the issuer is also willing) to provide coverage that is consistent with an individual's religious objections. Some commenters also observed that, by specifying that the individual exemption only operates where the plan sponsor and issuer, as applicable, are willing to provide coverage that is consistent with the objection, the exemption would not impose burdens on the insurance market because the possibility of such burdens would be factored into the willingness of an employer or issuer to offer such coverage. Other commenters disagreed and contended that allowing the individual exemption would cause burden and confusion in the insurance market. Some commenters also suggested that the individual exemption should not allow the offering of a separate group health plan because doing so could cause various administrative burdens.

The Departments agree with the commenters who suggested the individual exemption will not burden the insurance market, and, therefore, conclude that it is appropriate to provide the individual exemption where a plan sponsor and, as applicable, issuer are willing to cooperate in doing so. As discussed in the Religious IFC, the individual exemption only operates in the case where the group health plan sponsor or group or individual market health insurance issuer is willing to provide the separate option: in the case of coverage provided by a group health plan sponsor, where the plan sponsor is willing; or in the case where both a plan sponsor and issuer are involved, both are willing. The Departments conclude that it is appropriate to provide the individual exemption so that the Mandate will not serve as an obstacle among these various options. Practical difficulties that may be implicated by one option or another will likely be factored into whether plan sponsors and issuers are willing to offer particular options in individual cases.

In addition, Congress has provided several protections for individuals who object to prescribing or providing contraceptives contrary to their religious beliefs. *See for example,* Consolidated Appropriations Act of 2018, Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act). Public Law 115–141, 132 Stat. 348, 593–94 (Mar. 23, 2018). While some commenters proposed to construe this provision narrowly, Congress likewise provided that, if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions". *Id.* at Div. E, Sec. 808, 132 Stat. at 603. A religious exemption for individuals would not be effective if the government simultaneously made it illegal for issuers and group health plans to provide individuals with policies that comply with the individual's religious beliefs.

The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan generally, or, as applicable, to any other individual policies the issuer offers.

This individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer religiously acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object. This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers.

By its terms, the individual exemption would also apply with respect to individuals in plans arranged by institutions of higher education, if the issuers offering those plans were willing to provide plans complying with the individuals' objections. Because federal law does not require institutions of higher education to arrange such plans, the institutions would not be required by these rules to arrange a plan compliant with an individual's

objection if the institution did not wish to do so.

As an example, in one lawsuit brought against the Departments, the State of Missouri enacted a law under which the State is not permitted to discriminate against insurance issuers that offer group health insurance policies without coverage for contraception based on employees' religious beliefs, or against the individual employees who accept such offers. *See Wieland,* 196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption of these final rules, employers sponsoring governmental plans would be free to honor the objections of individual employees by offering them plans that omit contraceptive coverage, even if those governmental entities do not object to offering contraceptive coverage in general.

This individual exemption cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of State law that requires coverage of such contraceptives or sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held religious objection. This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4), and does not affect any other federal or State law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these final rules do not affect such other laws or terms.

Some individuals commented that they welcomed the individual exemption so that their religious beliefs were not forced to be in tension with their desire for health coverage. The Departments believe the individual exemption may help to meet the ACA's goal of increasing health coverage because it will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held religious beliefs.[69] At the same time, this individual exemption "does not undermine the governmental interests furthered by the contraceptive

---

[69] See also, for example, *Wieland,* 196 F. Supp. 3d at 1017, and *March for Life,* 128 F. Supp. 3d at 130, where the courts noted that the individual employee plaintiffs indicated that they viewed the Mandate as pressuring them to "forgo health insurance altogether."

Exhibit 1                     JA442                     JA-0000033

coverage requirement,'' [70] because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered.

Some commenters welcomed the ability of individuals covered by the individual exemption to be able to assert an objection to either some or all contraceptives. Other commenters expressed concern that there might be multiple variations in the kinds of contraceptive coverage to which individuals object, and this might make it difficult for willing plan sponsors and issuers to provide coverage that complies with the religious beliefs of an exempt individual. As discussed above, where the individual exemption applies, it only affects the coverage of an individual. If an individual only objects to some contraceptives, and the individual's issuer and, as applicable, plan sponsor are willing to provide the individual a package of benefits omitting such coverage, but for practical reasons they can only do so by providing the individual with coverage that omits all—not just some—contraceptives, the Departments believe that it favors individual freedom and market choice, and does not harm others, to allow the issuer and plan sponsor to provide, in that case, a plan omitting all contraceptives if the individual is willing to enroll in that plan. The language of the individual exemption set forth in the Religious IFC implied this conclusion, by specifying that the Guidelines requirement of contraceptive coverage did not apply where the individual objected to some or all contraceptives. Notably, this was different than the language applicable to the exemptions under § 147.132(a), which specified that the exemptions apply ''to the extent'' of the religious objections, so that, as discussed above, the exemptions include only those contraceptive methods to which the objection applied. In response to comments suggesting the language of the individual exemption was not sufficiently clear on this distinction, however, the Departments in these rules finalize the individual exemption at § 147.133(b) with the following change, by adding the following sentence at the end of the paragraph: ''Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer and, as applicable, plan sponsor, are willing to provide the individual with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.''

Some commenters asked for plain language guidance and examples about how the individual exemption might apply in the context of employer-sponsored insurance. Here is one such example. An employee is enrolled in group health coverage through her employer. The plan is fully insured. If the employee has sincerely held religious beliefs objecting to her plan including coverage for contraceptives, she could raise this with her employer. If the employer is willing to offer her a plan that omits contraceptives, the employer could discuss this with the insurance agent or issuer. If the issuer is also willing to offer the employer, with respect to this employee, a group health insurance policy that omits contraceptive coverage, the individual exemption would make it legal for the group health insurance issuer to omit contraceptives for her and her beneficiaries under a policy, for her employer to sponsor that plan for her, and for the issuer to issue such a plan to the employer, to cover that employee. This would not affect other employees' plans—those plans would still be subject to the Mandate and would continue to cover contraceptives. But if either the employer, or the issuer, is not willing (for whatever reason) to offer a plan or a policy for that employee that omits contraceptive coverage, these rules do not require them to. The employee would have the choice of staying enrolled in a plan with its coverage of contraceptives, not enrolling in that plan, seeking coverage elsewhere, or seeking employment elsewhere.

For all these reasons, these rules adopt the individual exemption language from the Religious IFC with clarifying changes to reflect the Departments' intent.

### O. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)

The previous regulations set forth an accommodation process at 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A, as an alternative method of compliance with the Mandate. Under the accommodation, if a religious nonprofit entity, or a religious closely held for-profit business, objected to coverage of some or all contraceptive services in its health plan, it could file a notice or fill out a form expressing this objection and describing its objection to its plan and issuer or third party administrator. Upon doing so, the plan would not cover some or all contraceptive services, and the issuer or third party administrator would be responsible for providing or arranging for persons covered by the plan to receive coverage or payments of those services (except in the case of self-insured church plans exempt from ERISA, in which case no such obligation was imposed on the third party administrator). The accommodation was set forth in regulations of each of the Departments. Based on each Department's regulatory authority, HHS regulations applied to insured group health plans, and DOL and Treasury regulations applied to both insured group health plans and self-insured group health plans.

The Religious IFC maintained the accommodation process. Nevertheless, by virtue of expanding the exemptions to encompass all entities that were eligible for the accommodation process under the previous regulations, in addition to other newly exempt entities, the Religious IFC rendered the accommodation process optional. Entities could choose not just between the Mandate and the accommodation, but between the Mandate, the exemption, and the accommodation. These rules finalize the optional accommodation process and its location in the Code of Federal Regulations at 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A, but the Departments do so with several changes based on public comments.

Many commenters supported keeping the accommodation as an optional process, including some commenters who otherwise supported creating the expanded exemptions. Some commenters opposed making the accommodation optional, but asked the Departments to return to the previous regulations in which entities that did not meet the narrower exemption could only choose between the accommodation process or direct compliance with the Mandate. Some commenters believed there should be no exemptions and no accommodation process.

The Departments continue to consider it appropriate to make the accommodation process optional for entities that are otherwise also eligible for the expanded exemptions—that is, to keep it in place as an option that exempt entities can choose. The accommodation provides contraceptive access, which is a result many opponents of the expanded exemptions said they desire. The accommodation involves some regulation of issuers and third party administrators, but the previous

---

[70] 78 FR 39874.

Exhibit 1                                    JA443                                    JA-0000034

regulations had already put that regulatory structure in place. These rules for the most part merely keep it in place and maintain the way it operates. The Religious IFC adds some additional paperwork burdens as a result of the new interaction between the accommodation and the expanded exemptions; those are discussed below.

Above, the Departments discussed public comments concerning whether we should have merely expanded the accommodation rather than expanding the exemptions. The Religious IFC and these final rules expand the kinds of entities that may use the optional accommodation, by expanding the exemptions and allowing any exempt entities to opt to make use of the accommodation. Consequently, under these rules, objecting employers may make use of the exemption or may choose to utilize the optional accommodation process. If an eligible organization uses the optional accommodation process through the EBSA Form 700 or other specified notice to HHS, it voluntarily shifts an obligation to provide separate but seamless contraceptive coverage to its issuer or third party administrator.

Some commenters asked that these final rules create an alternative payment mechanism to cover contraceptive services for third party administrators obligated to provide or arrange such coverage under the accommodation. These rules do not concern the payment mechanism, which is set forth in separate rules at 45 CFR 156.50. The Departments do not view an alternative payment mechanism as necessary. As discussed below, although the Departments do not know how many entities will use the accommodation, it is reasonably likely that some entities previously using it will continue to do so, while others will choose the expanded exemption, leading to an overall reduction in the use of the accommodation. The Departments have reason to believe that these final rules will not lead to a significant expansion of entities using the accommodation, since nearly all of the entities of which the Departments are aware that may be interested in doing so were already able to do so prior to the Religious IFC. Moreover, it is still the case under these rules that if an entity serving as a third party administrator does not wish to satisfy the obligations it would need to satisfy under an accommodation, it could choose not to contract with an entity that opts into the accommodation. This conflict is even less likely now that entities eligible for the accommodation are also eligible for the exemption. For these reasons, the Departments do not

find it necessary to add an additional payment mechanism for the accommodation process.

If an eligible organization wishes to revoke its use of the accommodation, it can do so under these rules, and operate under its exempt status. As part of its revocation, the issuer or third party administrator of the eligible organization must provide participants and beneficiaries written notice of such revocation. Some commenters suggested HHS has not yet issued guidance on the revocation process, but CCIIO provided guidance concerning this process on November 30, 2017.[71] These rules supersede that guidance, and adopt or modify its specific guidelines as explained below. As a result, these rules delete references, set forth in the Religious IFC's accommodation regulations, to "guidance issued by the Secretary of the Department of Health and Human Services."

The guidance stated that an entity that was using the accommodation under the previous rules, or an entity that adopts the accommodation maintained by the IFCs, could revoke its use of the accommodation and use the exemption. This guideline applies under the final rules. This revocation process applies both prospectively to eligible organizations that decide at a later date to avail themselves of the optional accommodation and then decide to revoke that accommodation, as well as to organizations that invoked the accommodation prior to the effective date of the Religious IFC either by their submission of an EBSA Form 700 or notification, or by some other means under which their third party administrator or issuer was notified by DOL or HHS that the accommodation applies.

The guidance stated that, when the accommodation is revoked by an entity using the exemption, the issuer of the eligible organization must provide participants and beneficiaries written notice of such revocation. These rules adopt that guideline. Consistent with other applicable laws, the issuer or third party administrator of an eligible organization must promptly notify plan participants and beneficiaries of the change of status to the extent such participants and beneficiaries are currently being offered contraceptive coverage at the time the accommodated organization invokes its exemption. The

guidance further stated that the notice may be provided by the organization itself, its group health plan, or its third party administrator, as applicable. The guidance stated that, under the regulation at 45 CFR 147.200(b), "[t]he notice of modification must be provided in a form that is consistent with the rules of paragraph (a)(4) of this section," and (a)(4) has detailed rules on when electronic notice is permitted. These guidelines still apply under the final rules. These rules adopt those guidelines.

The guidance further specified that the revocation of the accommodation would be effective notice on the first day of the first plan year that begins on or after 30 days after the date of the revocation, or alternatively, whether or not the objecting entity's group health plan or issuer listed the contraceptive benefit in its Summary of Benefits of Coverage (SBC), the group health plan or issuer could revoke the accommodation by giving at least 60-days prior notice pursuant to section 2715(d)(4) of the PHS Act (incorporated into ERISA and the Code)[72] and applicable regulations thereunder to revoke the accommodation. The guidance noted that, unlike the SBC notification process, which can effectuate a modification of benefits in the middle of a plan year, provided it is allowed by State law and the contract of the policy, the 30 day notification process under the guidance can only effectuate a benefit modification at the beginning of a plan year. This part of the guidance is adopted in part and changed in part by these final rules, as follows, based on public comments on the issue.

Some commenters asked that revocations only be permitted to occur on the first day of the next plan year, or no sooner than January 2019, to avoid burdens on plans and because some states do not allow for mid-year plan changes. The Departments believe that providing 60-days notice pursuant to section 2715(d)(4) of the PHS Act, where applicable, is a mechanism that already exists for making changes in health benefits covered by a group health plan during a plan year; that process already takes into consideration any applicable state laws. However, in response to public comments, these rules change the accommodation provisions from the Religious IFC to indicate that, as a transitional rule, providing 60-days notice for revoking an accommodation is only available, if applicable, to plans that are using the accommodation at the time of the

---

[71] See Randy Pate, "Notice by Issuer or Third Party Administrator for Employer/Plan Sponsor of Revocation of the Accommodation for Certain Preventive Services," CMS (Nov. 30, 2017), *https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Notice-Issuer-Third-Party-Employer-Preventive.pdf.*

[72] See also 26 CFR 54.9815–2715(b); 29 CFR 2590.715–2715(b); 45 CFR 147.200(b).

Exhibit 1                                    JA444                                    JA-0000035

publication of these final rules. As a general rule, for plans that use the accommodation in future plan years, the Departments believe it is appropriate to allow revocation of an accommodation only on the first day of the next plan year. Based on the objections of various litigants and public commenters, we believe that some entities already using the accommodation may have been doing so only because previous regulations denied them an exemption. For them, access to the transitional 60-days notice procedure (if applicable) is appropriate in the period immediately following the finalization of these rules. In future plan years, however—plan years that begin after the effective date of these final rules—plans and entities that qualify as exempt under these rules will have been on notice that they qualify for an exemption or the accommodation. If they have opted to enter or remain in the accommodation in those future plan years, when they could have chosen the exemption, the Departments believe it is appropriate for them to wait until the first day of the following plan year to change to exempt status.[73]

This change is implemented in the following manner. In the Religious IFC, the accommodation provisions addressing revocation were found at 45 CFR 147.131(c)(4), 26 CFR 54.9815–2713AT(a)(5),[74] and 29 CFR 2590.715–2713A(a)(5).

The provisions in the Religious IFC (with technical variations among the HHS, Labor, and Treasury rules) state that a written notice of revocation must be provided "as specified in guidance issued by the Secretary of the

Department of Health and Human Services." On November 30, 2017, HHS issued the guidance regarding revocation. These final rules incorporate this guidance, with certain clarifications, and state that the revocation notice must be provided "as specified herein." The final rule incorporates the two sets of directions for revoking the accommodation initially set forth in the interim guidance in the following manner. The first, designated as subparagraph (1) as a "[t]ransitional rule," explains that if contraceptive coverage is being offered through the accommodation process on the date on which these final rules go into effect, 60-days notice may be provided to revoke the accommodation process, or they revocation may occur "on the first day of the first plan year that begins on or after 30 days after the date of the revocation" consistent with PHS Act section 2715(d)(4). 45 CFR 147.200(b), 26 CFR 54.9815–2715(b), or 29 CFR 2590.715–2715(b). The second direction, set forth in subparagraph (ii), explains the "[g]eneral rule" that, in plan years beginning after the date on which these final rules go into effect, revocation of the accommodation will be effective on "the first day of the first plan year that begins on or after 30 days after the date of the revocation."

The Religious IFC states that if an accommodated entity objects to some, but not all, contraceptives, an issuer for an insured group health plan that covers contraceptives under the accommodation may, at the issuer's option, choose to provide coverage or payments for all contraceptive services, instead of just for the narrower set of contraceptive services to which the entities object. Some commenters supported this provision, saying that it allows flexibility for issuers that might otherwise face unintended burdens from providing coverage under the accommodation for entities that object to only some contraceptive items. The Departments have maintained this provision in these final rules. Note that this provision is consistent with the other assertions in the rules saying that an entity's objection applies "to the extent" of the entity's religious beliefs, because in this instance, under the accommodation, the plan participant or beneficiary still receives coverage or payments for all contraceptives, and this provision simply allows issuers more flexibility in choosing how to help provide that coverage.

Some commenters asked that the Departments retain the "reliance" provision, contained in the previous accommodation regulations, under

which an issuer is deemed to have complied with the Mandate where the issuer relied reasonably and in good faith on a representation by an eligible organization as to its eligibility for the accommodation, even if that representation was later determined to be incorrect. The Departments omitted this provision from the Religious IFC, on the grounds that this provision was less necessary where any organization eligible for the optional accommodation is also exempt. Nevertheless, in order to respond to concerns in public comments, and to prevent any risk to issuers of a mistake or misrepresentation by an organization seeking the accommodation process, the Departments have finalized the Religious IFC with an additional change that restores this clause. The clause uses the same language that was in the regulations prior to the Religious IFC, and it is inserted at 45 CFR 147.131(f), 26 CFR 54.9815–2713A(e), and 29 CFR 2590.715–2713A(e). As a result, these rules renumber the subsequent paragraphs in each of those sections.

### P. Definition of Contraceptives for the Purpose of These Final Rules

The previous regulations did not define contraceptive services. The Guidelines issued in 2011 included, under "Contraceptive methods and counseling," "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." The previous regulations concerning the exemption and the accommodation used the terms contraceptive services and contraceptive coverage as catch-all terms to encompass all of those Guidelines' requirements. The 2016 update to the Guidelines is similarly worded. Under "Contraception," they include the "full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration," "instruction in fertility awareness-based methods," and "[c]ontraceptive care" to "include contraceptive counseling, initiation of contraceptive use, and follow-up care (for example, management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method)."[75]

To more explicitly state that the exemption encompasses any of the contraceptive or sterilization services, items, or information that have been required under the Guidelines, the Religious IFC included a definition at 45

---

[73] These final rules go into effect 60 days after they are published in the **Federal Register**. Some entities currently using the accommodation may have a plan year that begins less than 30 days after the effective date of these final rules. In such cases, they may be unable, after the effective date of these final rules, to provide a revocation notice 30 days prior to the start of their next plan year. However, these final rules will be published at least 60 days prior to the start of that plan year. Therefore, entities exempt under these final rules that have been subject to the accommodation on the date these final rules are published, that wish to revoke the accommodation, and whose next plan years start after these final rules go into effect, but less than 30 days thereafter, may submit their 30 day revocation notices after these final rules are published, before these final rules are in effect, so that they will have submitted the revocation at least 30 days before their next plan year starts. In such cases, even though the revocation notice will be submitted before these final rules are in effect, the actual revocation will not occur until after these final rules are in effect, and plan participants will have been provided with 30 days' notice of the revocation.

[74] The Department of the Treasury's rule addressing the accommodation is being finalized at 26 CFR 54.9815–2713A, superseding its temporary regulation at 26 CFR 54.9815–2713AT.

[75] https://www.hrsa.gov/womens-guidelines-2016/index.html.

Exhibit 1

JA445

JA-0000036

CFR 147.131(f) and 147.132(c), 26 CFR 54.9815–2713AT(e), and 29 CFR 2590.715–2713A(e). These rules finalize those definitions without change, but renumber them as 45 CFR 147.131(f) and 147.132(c). 26 CFR 54.9815–2713A(e), and 29 CFR 2590.715–2713A(e), respectively.

*Q. Severability*

The Departments finalize without change (except for certain paragraph redesignations), the severability clauses in the interim final rules, namely, at paragraph (g) of 26 CFR 54.9815–2713A, the redesignated paragraph (g) of 29 CFR 2590.715–2713A, and 45 CFR 147.132(d).

*R. Other Public Comments*

1. Items Approved as Contraceptives But Used To Treat Existing Conditions

Some commenters noted that some drugs included in the preventive services contraceptive Mandate can also be useful for treating certain existing health conditions, and that women use them for non-contraceptive purposes. Certain commenters urged the Departments to clarify that the final rules do not permit employers to exclude from coverage medically necessary prescription drugs used for non-preventive services. Some commenters suggested that religious objections to the Mandate should not be permitted in cases where such methods are used to treat such conditions, even if those methods can also be used for contraceptive purposes.

Section 2713(a)(4) only applies to "preventive" care and screenings. The statute does not allow the Guidelines to mandate coverage of services provided solely for a non-preventive use, such as the treatment of an existing condition. The Guidelines implementing this section of the statute are consistent with that narrow authority. They state repeatedly that they apply to "preventive" services or care.[76] The requirement in the Guidelines concerning "contraception" specifies several times that it encompasses "contraceptives," that is, medical products, methods, and services applied for "contraceptive" uses. The Guidelines do not require coverage of care and screenings that are non-preventive, and the contraception portion of those Guidelines do not require coverage of medical products, methods, care, and screenings that are non-contraceptive in purpose or use. The Guidelines' inclusion of contraceptive services requires coverage

of contraceptive methods as a type of preventive service only when a drug that FDA has approved for contraceptive use is prescribed in whole or in part for such purpose or intended use. Section 2713(a)(4) does not authorize the Departments to require coverage, without cost-sharing, of drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.[77] The extent to which contraceptives are covered to treat non-preventive conditions would be determined by application of the requirement section 1302(b)(1)(F) of the ACA to cover prescription drugs (where applicable), implementing regulations at 45 CFR 156.122, and 156.125, and plans' decisions about the basket of medicines to cover for these conditions.

Some commenters observed that pharmacy claims do not include a medical diagnosis code, so plans may be unable to discern whether a drug approved by FDA for contraceptive uses is actually applied for a preventive or contraceptive use, or for another use. Section 2713(a)(4), however, draws a distinction between preventive care and screenings and other kinds of care and screenings. That subsection does not authorize the Departments to impose a coverage mandate of services that are not at least partly applied for a preventive use, and the Guidelines themselves do not require coverage of contraceptive methods or care unless such methods or care is contraceptive in purpose. These rules do not prohibit issuers from covering drugs and devices that are approved for contraceptive uses even when those drugs and devices are

prescribed for non-preventive, non-contraceptive purposes. As discussed above, these final rules also do not purport to delineate the items HRSA will include in the Guidelines, but only concern expanded exemptions and accommodations that apply to the extent the Guidelines require contraceptive coverage. Therefore, the Departments do not consider it appropriate to specify in these final rules that under section 2713(a)(4), exempt organizations must provide coverage for drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.

2. Comments Concerning Regulatory Impact

Some commenters agreed with the Departments' statement in the Religious IFC that the expanded exemptions are likely to affect only a small percentage of women otherwise receiving coverage under the Mandate. Other commenters disagreed, stating that the expanded exemptions could take contraceptive coverage away from many or most women. Still others opposed expanding the exemptions and contended that accurately determining the number of women affected by the expanded exemptions is not possible.

After reviewing the public comments, the Departments agree with commenters who said that estimating the impact of these final rules is difficult based on the limited data available to us, and with commenters who agreed with the Religious IFC that the expanded exemptions are likely to affect only a small percentage of women. The Departments do not find the estimates of large impacts submitted by some commenters more reliable than the estimates set forth in the Religious and Moral IFCs. Even certain commenters that "strongly oppos[ed]" the Religious IFC commented that merely "thousands" would be impacted, a number consistent with the Departments' estimate of the number of women who may be affected by the rule. The Departments' estimates of the impact of these final rules are discussed in more detail in the following section. Therefore, the Departments conclude that the estimates of regulatory impact made in the Religious IFC are still the best estimates available. Our estimates are discussed in more detail in the following section.

3. Interaction With State Laws

Some commenters asked the Departments to discuss the interaction between these final rules and state laws that either require contraceptive

---

[76] *Id.*

[77] The Departments previously cited the IOM's listing of existing conditions that contraceptive drugs can be used to treat (menstrual disorders, acne, and pelvic pain), and said of those uses that "there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy." 77 FR 8727 & n.7. This was not, however, an assertion that PHS Act 2713(a)(4) or the Guidelines require coverage of "contraceptive" methods when prescribed for an exclusively *non*-contraceptive, *non*-preventive use. Instead, it was an observation that such drugs—generally referred to as "contraceptives"—also have some alternate beneficial uses to treat existing conditions. For the purposes of these final rules, the Departments clarify here that the reference prior to the Religious IFC to the benefits of using contraceptive drugs exclusively for some non-contraceptive and non-preventive uses to treat existing conditions did not mean that the Guidelines require coverage of such uses, and consequently is not a reason to refrain from offering the expanded exemptions provided here. Where a drug approved by the FDA for contraceptive use is prescribed for both a contraceptive use and a non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage for contraceptive use. Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines and the contraceptive Mandate.

Exhibit 1 JA446 JA-0000037

coverage or provide religious exemptions from those and other requirements. Some commenters argued that providing expanded exemptions in these rules would negate state contraceptive requirements or narrower state religious exemptions. Some commenters asked that the Departments specify that these exemptions do not apply to plans governed by state laws that require contraceptive coverage. The Department agrees that these rules concern only the applicability of the Federal contraceptive Mandate imposed pursuant to section 2713(a)(4). They do not regulate state contraceptive mandates or state religious exemptions. If a plan is exempt under the Religious IFC and these rules, that exemption does not necessarily exempt the plan or other insurance issuer from state laws that may apply to it. The previous regulations, which offered exemptions for houses of worship and integrated auxiliaries, did not include regulatory language negating the exemptions in states that require contraceptive coverage, although the Departments discussed the issue to some degree in various preambles of those previous regulations. The Departments do not consider it appropriate or necessary in the regulatory text of the religious exemptions to declare that the Federal contraceptive Mandate will still apply in states that have a state contraceptive mandate, since these rules do not purport to regulate the applicability of state contraceptive mandates.[78]

Some commenters observed that, through ERISA, some entities may avoid state laws that require contraceptive coverage by self-insuring. This is a result of the application of the preemption and savings clauses contained in ERISA to state insurance regulation. *See* 29 U.S.C. 1144(a) & (b)(1). These rules cannot change statutory ERISA provisions, and do not change the standards applicable to ERISA preemption. To the extent Congress has decided that ERISA preemption includes preemption of state laws requiring contraceptive coverage, that decision occurred before the ACA and was not negated by the ACA. Congress did not mandate in the ACA that any Guidelines issued under section 2713(a)(4) must include

contraceptives, nor that the Guidelines must force entities with religious objections to cover contraceptives.

## IV. Economic Impact and Paperwork Burden

The Departments have examined the impacts of the Religious IFC and the final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96 354), section 1102(b) of the Social Security Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2)), and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

### A. Executive Orders 12866 and 13563— Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities (also referred to as "economically significant"): (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with

economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). As discussed below regarding their anticipated effects, the Religious IFC and these rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866. However, OMB has determined that the actions are significant within the meaning of section 3(f)(4) of the Executive Order. Therefore, OMB has reviewed these final rules, and the Departments have provided the following assessment of their impact.

### 1. Need for Regulatory Action

These final rules adopt as final and further change the amendments made by the Religious IFC, which amended the Departments' July 2015 final regulations. The Religious IFC and these final rules expand the exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4) of the PHS Act, section 715(a)(1) of ERISA, and section 9815(a)(1) of the Code, to include certain entities and individuals with objections to compliance with the Mandate based on sincerely held religious beliefs, and they revise the accommodation process to make it optional for eligible organizations. The expanded exemption applies to certain individuals and entities that have religious objections to some (or all) of the contraceptive and/or sterilization services that would be covered under the Guidelines. Such action has been taken, among other reasons discussed above, to provide for participation in the health insurance market by certain entities or individuals, by freeing them from penalties they could incur if they follow their sincerely held religious beliefs against contraceptive coverage.

### 2. Anticipated Effects

#### a. Removal of Burdens on Religious Exercise

Regarding entities and individuals that are extended an exemption by the Religious IFC and these final rules, without that exemption the Guidelines would require many of them to either pay for coverage of contraceptive services that they find religiously objectionable; submit self-certifications that would result in their issuer or third party administrator paying for such services for their employees, which

---

[78] Some commenters also asked that these final rules specify that exempt entities must comply with other applicable laws concerning such things as notice to plan participants or collective bargaining agreements. These final rules relieve the application of the Federal contraceptive Mandate under section 2713(a)(4) to qualified exempt entities; they do not affect the applicability of other laws. Elsewhere in this preamble, the Departments provide guidance applicable to notices of revocation and changes that an entity may seek to make during its plan year.

Exhibit 1                                   JA447                                   JA-0000038

some entities also believe entangles them in the provision of such objectionable coverage; or pay tax penalties, or be subject to other adverse consequences, for non-compliance with these requirements. These final rules remove certain associated burdens imposed on these entities and individuals—that is, by recognizing their religious objections to, and exempting them on the basis of such objections from, the contraceptive and/or sterilization coverage requirement of the HRSA Guidelines and making the accommodation process optional for eligible organizations.

b. Notices When Revoking Accommodated Status

To the extent that entities choose to revoke their accommodated status to make use of the expanded exemption, a notice will need to be sent to enrollees (either by the objecting entity or by the issuer or third party administrator) that their contraceptive coverage is changing, and guidance will reflect that such a notice requirement is imposed no more than is already required by preexisting rules that require notices to be sent to enrollees of changes to coverage during a plan year. If the entities wait until the start of their next plan year to change to exempt status, instead of doing so during the current plan year, those entities generally will also be able to avoid sending any supplementary notices in addition to what they would otherwise normally send prior to the start of a new plan year. Additionally, these final rules provide such entities with an offsetting regulatory benefit by the exemption itself and its relief of burdens on their religious beliefs. As discussed below, assuming that more than half of the entities that have been using the previous accommodation will seek immediate revocation of their accommodated status and notices will be sent to all their enrollees, the total estimated cost of sending those notices will be $302,036.

c. Impacts on Third Party Administrators and Issuers

The Departments estimate that these final rules will not result in any additional burdens or costs on issuers or third party administrators. As discussed below, the Departments believe that 109 of the 209 entities making use of the accommodation process will instead make use of their new exempt status. In contrast, the Departments expect that a much smaller number (which we assume to be 9) will make use of the accommodation to which they were not previously provided access. Reduced

burdens for issuers and third party administrators due to reductions in use of the accommodation will more than offset increased obligations for serving the fewer number of entities that will now opt into the accommodation. This will lead to a net decrease in burdens and costs on issuers and third party administrators, who will no longer have continuing obligations imposed on them by the accommodation. While these rules make it legal for issuers to offer insurance coverage that omits contraceptives to exempt entities and individuals, these final rules do not require issuers to do so.

The Departments anticipate that the effect of these rules on adjustments made to the federally facilitated Exchange user fees under 45 CFR 156.50 will be that fewer overall adjustments will be made using the accommodation process, because there will be more entities who previously were reluctant users of the accommodation that will choose to operate under the newly expanded exemption than there will be entities not previously eligible to use the accommodation that will opt into it. The Departments' estimates of each number of those entities is set forth in more detail below.

d. Impacts on Persons Covered by Newly Exempt Plans

These final rules will result in some persons covered in plans of newly exempt entities not receiving coverage or payments for contraceptive services. As discussed in the Religious IFC, the Departments did not have sufficient data on a variety of relevant factors to precisely estimate how many women would be impacted by the expanded exemptions or any related costs they may incur for contraceptive coverage or the results associated with any unintended pregnancies.

i. Unknown Factors Concerning Impact on Persons in Newly Exempt Plans

As referenced above and for reasons explained here, there are multiple levels of uncertainty involved in measuring the effect of the expanded exemption, including but not limited to—
• How many entities will make use of their newly exempt status.
• How many entities will opt into the accommodation maintained by these rules, under which their plan participants will continue receiving contraceptive coverage.
• Which contraceptive methods some newly exempt entities will continue to provide without cost-sharing despite the entity objecting to other methods (for example, as reflected in *Hobby Lobby*, several objecting entities have still

provided coverage for 14 of the 18 FDA-approved women's contraceptive or sterilization methods, 134 S. Ct. at 2766).
• How many women will be covered by plans of entities using their newly exempt status.
• Which of the women covered by those plans want and would have used contraceptive coverage or payments for contraceptive methods that are no longer covered by such plans.
• Whether, given the broad availability of contraceptives and their relatively low cost, such women will obtain and use contraception even if it is not covered.
• The degree to which such women are in the category of women identified by IOM as most at risk of unintended pregnancy.
• The degree to which unintended pregnancies may result among those women, which would be attributable as an effect of these rules only if the women did not otherwise use contraception or a particular contraceptive method due to their plan making use of its newly exempt status.
• The degree to which such unintended pregnancies may be associated with negative health effects, or whether such effects may be offset by other factors, such as the fact that those women will be otherwise enrolled in insurance coverage.
• The extent to which such women will qualify for alternative sources of contraceptive access, such as through a parent's or spouse's plan, or through one of the many governmental programs that subsidize contraceptive coverage to supplement their access.

ii. Public Comments Concerning Estimates in Religious IFC

In the public comments, some commenters agreed with the Departments' estimate that, at most, the economic impact would lead to a potential transfer cost, from employers (or other plan sponsors) to affected women, of $63.8 million. Some commenters said the impact would be much smaller. Other commenters disagreed, suggesting that the expanded exemptions risked removing contraceptive coverage from more than 55 million women receiving the benefits of the preventive services Guidelines, or even risked removing contraceptive coverage from over 100 million women. Some commenters cited studies indicating that, nationally, unintended pregnancies have large public costs, and the Mandate overall led to large out-of-pocket savings for women.

These general comments do not, however, substantially assist us in

Exhibit 1                                    JA448                                    JA-0000039

estimating how many women would be affected by these expanded exemptions specifically, or among them, how many unintended pregnancies would result. or how many of the affected women would nevertheless use contraceptives not covered under the health plans of their objecting employers and, thus, be subject to the transfer costs the Departments estimate, or instead, how many women might avoid unintended pregnancies by changing their activities in other ways besides using contraceptives. The Departments conclude, therefore, that our estimates of the anticipated effect in the Religious IFC are still the best estimates we have based on the limited data available to make those estimates. We do not believe that the higher estimates submitted by various public commenters sufficiently took into consideration, or analyzed, the various factors that suggest the small percentage of entities that will now use the expanded exemptions out of the large number of entities subject to the Mandate overall. Instead, the Departments agree with various public commenters providing comment and analysis that, for a variety of reasons, the best estimate of the impact of the expanded exemptions finalized in these rules is that most women receiving contraceptive coverage under the Mandate will not be affected. We agree with such commenters that the number of women covered by entities likely to make use of the expanded exemptions in these rules is likely to be very small in comparison to the overall number of women receiving contraceptive coverage as a result of the Mandate.

### iii. Possible Sources of Information for Estimating Impact

The Departments have access to the following general sources of information that are relevant to this issue, but these sources do not provide a full picture of the impact of these final rules. First, the regulations prior to the Religious IFC already exempted certain houses of worship and their integrated auxiliaries and, as explained elsewhere, effectively did not apply contraceptive coverage requirements to various entities in self-insured church plans. The effect of those previous exemptions or limitations are not included as effects of these rules, which leave those impacts in place. Second, in the Departments' previous regulations creating or expanding exemptions and the accommodation process we concluded that no significant burden or costs would result. 76 FR 46625; 78 FR 39889. Third, some entities, including some for-profit entities, object to only some but not all contraceptives, and in some

cases will cover 14 of 18 FDA-approved women's contraceptive and sterilization methods.[79] *See Hobby Lobby,* 134 S. Ct. at 2766. The effects of the expanded exemptions will be mitigated to that extent. No publicly traded for-profit entities sued challenging the Mandate, and the public comments did not reveal any that specifically would seek to use the expanded exemptions. Consequently. the Departments agree with the estimate from the Religious IFC that publicly traded companies would not likely make use of these expanded exemptions.

Fourth. HHS previously estimated that 209 entities would make use of the accommodation process. To arrive at this number, the Departments used, as a placeholder, the approximately 122 nonprofit entities that brought litigation challenging the accommodation process, and the approximately 87 closely held for-profit entities that filed suit challenging the Mandate in general. The Departments' records indicate, as noted in the Religious IFC, that approximately 63 entities affirmatively submitted notices to HHS to use the accommodation,[80] and approximately 60 plans took advantage of the

[79] By reference to the FDA Birth Control Guide's list of 18 birth control methods for women and 2 for men, *https://www.fda.gov/downloads/forconsumers/byaudience/forwomen/freepublications/ucm517406.pdf.* Hobby Lobby and entities with similar beliefs were not willing to cover: IUD copper; IUD with progestin: emergency contraceptive (Levonorgestrel); and emergency contraceptive (Ulipristal Acetate). *See* 134 S. Ct. at 2765–66. Hobby Lobby was willing to cover: sterilization surgery for women; sterilization implant for women; implantable rod; shot/injection; oral contraceptives ("the Pill"—combined pill); oral contraceptives ("the Pill"—extended/continuous use/combined pill); oral contraceptives ("the Mini Pill"—progestin only); patch; vaginal contraceptive ring; diaphragm with spermicide; sponge with spermicide; cervical cap with spermicide; female condom; spermicide alone. *Id.* Among women using these 18 female contraceptive methods, 85 percent use the 14 methods that Hobby Lobby and entities with similar beliefs were willing to cover (22.446,000 out of 26.436,000), and "[t]he pill and female sterilization have been the two most commonly used methods since 1982." *See* Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[80] This includes some fully insured and some self-insured plans, but it does not include entities that may have used the accommodation by submitting an EBSA form 700 self-certification directly to their issuer or third party administrator. In addition, the Departments have deemed some other entities as being subject to the accommodation through their litigation filings, but that might not have led to contraceptive coverage being provided to persons covered in some of those plans, either because they are exempt as houses of worship or integrated auxiliaries, they are in self-insured church plans, or the Departments were not aware of their issuers or third party administrators so as to send them letters obligating them to provide such coverage.

contraceptive user fees adjustments, in the 2015 plan year, to obtain reimbursement for contraceptive service payments made for coverage of such services for women covered by self-insured plans that were accommodated. Overall, while recognizing the limited data available, the Departments assumed that. under an expanded exemption and accommodation, approximately 109 previously accommodated entities would use an expanded exemption, and about 100 would continue their accommodated status. We also estimated that another 9 entities would use the accommodation where the entities were not previously eligible to do so.

These sources of information were outlined in the Religious IFC. Some commenters agreed with the Departments' estimates based on those sources, and while others disagreed, the Departments conclude that commenters did not provide information that allows us to make better estimates.

### iv. Estimates Based on Litigating Entities That May Use Expanded Exemptions

Based on these and other factors, the Departments considered two approaches in the Religious IFC to estimate the number of women affected among entities using the expanded exemptions. First, following the use in previous regulations of litigating entities to estimate the effect of the exemption and accommodation, the Departments attempted to estimate the number of women covered by plans of litigating entities that could be affected by expanded exemptions. Based on papers filed in litigation. and public sources, the Departments estimated in the Religious IFC that approximately 8,700 women of childbearing age could have their contraception costs affected by plans of litigating entities using these expanded exemptions. The Departments believe that number is lower based upon the receipt, by many of those litigating entities, of permanent injunctions against the enforcement of section 2713(a)(4) to the extent it supports a contraceptive Mandate, which have been entered by federal district courts since the issuance of the Religious IFC.[81] As a result, these final rules will not affect whether such entities will be subject to the contraceptive Mandate. Subtracting those entities from the total, the Departments estimate that the remaining litigating entities employ

[81] *See. for example. Catholic Benefits Ass'n LCA v. Hargan,* No. 5:14–cv–00240–R (W.D. Okla. order filed Mar. 7. 2018). and *Dordt Coll. v. Burwell,* No. 5:13–cv–04100 (N.D. Iowa order filed June 12, 2018).

Exhibit 1                    JA449                    JA-0000040

approximately 49,000 persons, male and female. The average percent of workers at firms offering health benefits that are actually covered by those benefits is 60 percent.[82] This amounts to approximately 29,000 employees covered under those plans. EBSA estimates that for each employee policyholder, there is approximately one dependent.[83] This amounts to approximately 58,000 covered persons. Census data indicate that women of childbearing age—that is, women aged 15 to 44—compose 20.2 percent of the general population.[84] Furthermore, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines.[85] Therefore, the Departments estimate that approximately 5,200 women of childbearing age that use contraception covered by the Guidelines are covered by employer sponsored plans of entities that might be affected by these final rules. The Departments also estimate that, for the educational institutions that brought litigation challenges objecting to the Mandate as applied to student coverage that they arranged—where (1) the institutions were not exempt under the prior rule, (2) their student plans were not self-insured, and (3) they have not received permanent injunctions preventing the application of the previous regulations—such student plans likely covered approximately 2,600 students. Thus, the Departments estimate the female members of those plans is 2,600 women.[86] Assuming, as

referenced above, that 43.6 percent of such women use contraception covered by the Guidelines, the Departments estimate that 1,150 of those women would be affected by these final rules.

Together, this leads the Departments to estimate that approximately 6,400 women of childbearing age may have their contraception costs affected by plans of litigating entities using these expanded exemptions. As noted previously, the Departments do not have data indicating how many of those women agree with their employers' or educational institutions' opposition to contraception (so that fewer of them than the national average might actually use contraception). Nor do the Departments know how many would have alternative contraceptive access from a parent's or spouse's plan, or from federal, state, or local governmental programs, nor how many of those women would fall in the category of being most at risk of unintended pregnancy, nor how many of those entities would provide some contraception in their plans while only objecting to certain contraceptives.

**v. Estimates of Accommodated Entities That May Use Expanded Exemptions**

In the Religious IFC, the Departments also examined data concerning user-fee reductions to estimate how many women might be affected by entities that are using the accommodation and would use the expanded exemptions under these final rules. Under the accommodation, HHS has received information from issuers that seek user fees adjustments under 45 CFR 156.50(d)(3)(ii), for providing contraceptive payments for self-insured plans that make use of the accommodation. HHS receives requests for fees adjustments both where Third Party Administrators (TPAs) for those self-insured accommodated plans are themselves issuers, and where the TPAs use separate issuers to provide the payments and those issuers seek fees

adjustments. Where the issuers seeking adjustments are separate from the TPAs, the TPAs are asked to report the number of persons covered by those plans. Some users do not enter all the requested data. and not all the data for the 2017 plan year is complete. Nevertheless, HHS has reviewed the user fees adjustment data received for the 2017 plan year. HHS's best estimate from the data is that there were $38.4 million in contraception claims sought as the basis for user fees adjustments for plans, and that these claims were for plans covering approximately 1,823,000 plan participants and beneficiaries of all ages, male and female.

This number fluctuates from year to year. It is larger than the estimate used in the Religious IFC because, on closer examination of the data, this number better accounts for plans where TPAs were also issuers seeking user fees adjustments, in addition to plans where the TPA is separate from the issuer seeking user fees adjustments. The number of employers using the accommodation where user fees adjustments were sought cannot be determined from HHS data, because not all users are required to submit that information, and HHS does not necessarily receive information about fully insured plans using the accommodation. Therefore, the Departments still consider our previous estimate of 209 entities using the accommodation as the best estimate available.

As noted in the Religious IFC, HHS's information indicates that religious nonprofit hospitals or health systems sponsored a significant minority of the accommodated self-insured plans that were using contraceptive user fees adjustments, yet those plans covered more than 80 percent of the persons covered in all plans using contraceptive user fees adjustments. Some of those plans cover nearly tens of thousands of persons each and are proportionately much larger than the plans provided by other entities using the contraceptive user fees adjustments.

The Departments continue to believe that a significant fraction of the persons covered by previously accommodated plans provided by religious nonprofit hospitals or health systems may not be affected by the expanded exemption. A broad range of religious hospitals or health systems have publicly indicated that they do not conscientiously oppose participating in the accommodation.[87]

---

[82] See Kaiser Family Foundation and Health Research and Educational Trust, "Employer Health Benefits: 2018 Annual Survey" at 62, available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018.*

[83] Employee Benefits Security Administration. "Health Insurance Coverage Bulletin," Table 4, page 21. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[84] United States Census Bureau. "Age and Sex Composition: 2010" (May 2011), available at *https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf.* The Guidelines' requirement of contraceptive coverage only applies "for all women with reproductive capacity." *https://www.hrsa.gov/womensguidelines/*; also, see 80 FR 40318. In addition, studies commonly consider the 15–44 age range to assess contraceptive use by women of childbearing age. See, for example, Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), available at *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[85] See *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states* (reporting that of 61,491,766 women aged 15–44, 26,809,5550 use women's contraceptive methods covered by the Guidelines).

[86] On average, the Departments expect that approximately half of those students (1,300) are

female. For the purposes of this estimate, we also assume that female policyholders covered by plans arranged by institutions of higher education are women of childbearing age. The Departments expect that they would have less than the average number of dependents per policyholder than exists in standard plans, but for the purposes of providing an upper bound to this estimate, the Departments assume that they would have an average of one dependent per policyholder, thus bringing the number of policyholders and dependents back up to 2,600. Many of those dependents are likely not to be women of childbearing age, but in order to provide an upper bound to this estimate, the Departments assume they are. Therefore, for the purposes of this estimate, the Departments assume that the effect of these expanded exemptions on student plans of litigating entities includes 2,600 women.

[87] See, e.g., *https://www.chausa.org/newsroom/women%27s-preventive-health-services-final-rule* ("HHS has now established an accommodation that will allow our ministries to continue offering health

Exhibit 1                                                                                                    JA450                                                                                    JA-0000041

Of course, some of these religious hospitals or health systems may opt for the expanded exemption under these final rules, but others might not. In addition, among plans of religious nonprofit hospitals or health systems, some have indicated that they might be eligible for status as a self-insured church plan.[88] As discussed above, some litigants challenging the Mandate have appeared, after their complaints were filed, to make use of self-insured church plan status.[89] (The Departments take no view on the status of these particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.) Nevertheless, considering all these factors, it generally seems likely that many of the remaining religious hospital or health systems plans previously using the accommodation will continue to opt into the voluntary accommodation under these final rules, under which their employees will still receive contraceptive coverage. To the extent that plans of religious hospitals or health systems are able to make use of self-insured church plan status, the previous accommodation rule would already have allowed them to relieve themselves and their third party administrators of obligations to provide contraceptive coverage or payments. Therefore, in such situations, the Religious IFC and these final rules would not have an anticipated effect on the contraceptive coverage of women in those plans.

### vi. Combined Estimates of Litigating and Accommodated Entities

Considering all these data points and limitations, the Departments offer the following estimate of the number of women who will be impacted by the expanded exemption in these final rules. In addition to the estimate of 6,400 women of childbearing age that use contraception covered by the Guidelines, who will be affected by use of the expanded exemption among litigating entities, the Departments calculate the following number of women who we estimate to be affected by accommodated entities using the expanded exemption. As noted above, approximately 1,823,000 plan participants and beneficiaries were covered by self-insured plans that received contraceptive user fee adjustments in 2017. Although additional self-insured entities may have participated in the accommodation without making use of contraceptive user fees adjustments, the Departments do not know what number of entities did so. We consider it likely that self-insured entities with relatively larger numbers of covered persons had sufficient financial incentive to make use of the contraceptive user fees adjustments. Therefore, without better data available, the Departments assume that the number of persons covered by self-insured plans using contraceptive user fees adjustments approximates the number of persons covered by all self-insured plans using the accommodation. An additional but unknown number of persons were likely covered in fully insured plans using the accommodation. The Departments do not have data on how many fully insured plans have been using the accommodation, nor on how many persons were covered by those plans. DOL estimates that, among persons covered by employer-sponsored insurance in the private sector, 62.7 percent are covered by self-insured plans and 37.3 percent are covered by fully insured plans.[90] Therefore, corresponding to the approximately 1,823,000 persons covered by self-insured plans using user fee adjustments, we estimate an additional 1,084,000 persons were covered by fully insured plans using the accommodation. This yields approximately 2,907,000 persons of all ages and sexes whom the Departments estimate were covered in

plans using the accommodation under the previous regulations.

Although recognizing the limited data available for our estimates, the Departments estimate that 100 of the 209 entities that were using the accommodation under the previous regulations will continue to opt into it under these final rules and that those entities will cover the substantial majority of persons previously covered in accommodated plans. The data concerning accommodated self-insured plans indicates that plans sponsored by religious hospitals and health systems and other entities likely to continue using the accommodation constitute over 60 percent of plans using the accommodation, and encompass more than 90 percent of the persons covered in accommodated plans.[91] In other words, plans sponsored by such entities appear to be a majority of plans using the accommodation, and also have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons. Moreover, as cited above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans, so that these final rules would not impact the contraceptive coverage their employees receive.

The Departments do not have specific data on which plans of which sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status. The Departments assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which the Departments lack representative data. Based on these assumptions and without better data available, the Departments assume that the 100 accommodated entities that will remain in the accommodation will account for 75 percent of all the persons previously covered in accommodated plans. In comparison, the Departments assume the 109 accommodated entities that will make use of the expanded exemption will encompass 25 percent of persons

---

insurance plans for their employees as they have always done. . . . We are pleased that our members now have an accommodation that will not require them to contract, provide, pay or refer for contraceptive coverage. . . . We will work with our members to implement this accommodation."). In comments submitted in previous rules concerning this Mandate, the Catholic Health Association has stated it "is the national leadership organization for the Catholic health ministry, consisting of more than 2,000 Catholic health care sponsors, systems, hospitals, long-term care facilities, and related organizations. Our ministry is represented in all 50 states and the District of Columbia." Comments on CMS–9968–ANPRM (dated June 15, 2012).

[88] See, for example, Brief of the Catholic Health Association of the United States as Amicus Curiae in Support of Petitioners, Advocate Health Care Network, Nos. 16–74, 16–86, 16–258, 2017 WL 371934 at *1 (U.S. filed Jan. 24, 2017) ("CHA members have relied for decades that the 'church plan' exemption contained in" ERISA.).

[89] See *https://www.franciscanhealth.org/sites/default/files/2015%20employee%20benefit%20booklet.pdf*; see, for example, *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

[90] "Health Insurance Coverage Bulletin" Table 3A, page 14. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf*.

[91] The data also reflects a religious university using the accommodation that has publicly affirmed the accommodation is consistent with its religious views, and two houses of worship that are using the accommodation despite already qualifying for the previous exemption. We assume for the purposes of this estimate these three entities will also continue using the accommodation instead of the expanded exemption.

Exhibit 1                                    JA451                                    JA-0000042

previously covered in accommodated plans.

Applying these percentages to the estimated 2,907,000 persons covered in previously accommodated plans, the Departments estimate that approximately 727,000 persons will be covered in the 109 plans that use the expanded exemption, and 2,180,000 persons will be covered in the estimated 100 plans that continue to use the accommodation. According to the Census data cited above, women of childbearing age comprise 20.2 percent of the population, which means that approximately 147,000 women of childbearing age are covered in previously accommodated plans that the Departments estimate will use the expanded exemption. As noted above, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines, so that the Departments expect approximately 64,000 women that use contraception covered by the Guidelines will be affected by accommodated entities using the expanded exemption.

It is not clear the extent to which this number overlaps with the number estimated above of 6,400 women in plans of litigating entities that may be affected by these rules. In order to more broadly estimate the possible effects of these rules, the Departments assume there is no overlap between the two numbers, and therefore that these final rules would affect the contraceptive costs of approximately 70,500 women.

Under the assumptions just discussed, the number of women whose contraceptive costs will be impacted by the expanded exemption in these final rules is approximately 0.1 percent of the 55.6 million women in private plans that HHS's Office of the Assistant Secretary for Planning and Evaluation (ASPE) estimated in 2015 received preventive services coverage under the Guidelines.

In order to estimate the cost of contraception to women affected by the expanded exemption, the Departments are aware that, under the previous accommodation process, the total amount of contraceptive claims sought for self-insured plans for the 2017 benefit year was $38.5 million.[92] These adjustments covered the cost of contraceptive coverage provided to women. As also discussed above, the Departments estimate that amount corresponded to plans covering

1,823,000 persons. Among those persons, as cited above, approximately 20.2 percent on average were women of childbearing age, and of those, approximately 43.6 percent use women's contraceptive methods covered by the Guidelines. This amounts to approximately 161,000 women. Therefore, entities using contraceptive user fees adjustments received approximately $239 per year per woman of childbearing age that used contraception covered by the Guidelines and covered in their plans. But in the Religious IFC, we estimated that the average annual cost of contraception per woman per year is $584. As noted above, public commenters cited similar estimates of the annual cost of various contraceptive methods, if calculated for the life of the method's effectiveness. Therefore, to estimate the annual transfer effects of these final rules, the Departments will continue to use the estimate of $584 per woman per year. With an estimated impact of these final rules of 70,500 women per year, the financial transfer effects attributable to these final rules on those women would be approximately $41.2 million.

Some commenters suggested that the Departments' estimate of women affected among litigating entities was too low, but they did not support their proposed higher numbers with citations or specific data that could be verified as more reliable than the estimates in the Religious IFC. Their estimates appeared to be overinclusive, for example, by counting all litigating entities and not just those that may be affected by these rules because they are not in church plans, or by counting all plan participants and not just women of childbearing age that use contraception. Moreover, since the Religious IFC was issued, additional entities have received permanent injunctions against enforcement of any regulations implementing the contraceptive Mandate and so will not be affected by these final rules. Taking all of these factors into account, the Departments are not aware of a better method of estimating the number of women affected by these expanded exemptions.

vii. Alternate Estimates Based on Consideration of Pre-ACA Plans

To account for uncertainty in the estimates above, the Departments conducted a second analysis using an alternative framework, in order to thoroughly consider the possible upper bound economic impact of these final rules.

In 2015, ASPE estimated that 55.6 million women aged 15 to 64 were covered by private insurance had

preventive services coverage under the Affordable Care Act.[93] The Religious IFC used this estimate in this second analysis of the possible impact of the expanded exemptions in the interim final rules. ASPE has not issued an update to its report. Some commenters noted that a private organization published a fact sheet in 2017 claiming to make similar estimates based on more recent data, in which it estimated that 62.4 million aged 15 to 64 were covered by private insurance had preventive services coverage under the Affordable Care Act.[94] The primary difference between these numbers appears to be a change in the number of persons covered by grandfathered plans.

The methodology of both reports do not fully correspond to the number the Departments seek to estimate here for the purposes of *Executive Orders 12866 and 13563*. These final rules will not affect all women aged 15 to 64 who are covered by private insurance and have coverage of preventive services under the Affordable Care Act. This is partly because the Departments do not have evidence to suggest that most employers will have sincerely held religious objections to contraceptive coverage and will use the expanded exemptions. In addition, both reports include women covered by plans that are not likely affected by the expanded exemptions for other reasons. For example, even though the estimates in those reports do not include enrollees in public plans such as Medicare or Medicaid, they do include enrollees in plans obtained on the health insurance marketplaces, purchased in the individual market, obtained by self-employed persons, or offered by government employers. Women who purchase plans in the marketplaces, the individual market, or as self-employed persons are not required to use the exemptions in these rules. Government employers are also not affected by the exemptions in these rules.

In response to public comments citing the more recent report, the Departments offer the following estimates based on more recent data than used in the Religious IFC. Data from the U.S. Census Bureau indicates that 167.6 million individuals, male and female, under 65 years of age, were covered by

---

[92] The amount of user fees adjustments provided was higher than this, since an additional administrative amount was added to the amount of contraceptive costs claimed.

[93] Available at *https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.*

[94] The commenters cited the National Women's Law Center's Fact Sheet from September 2017, available at *https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.*

---

Exhibit 1

JA-0000043

employment-based insurance in 2017.[95] Of those, 50.1 percent were female. that is, 84 million.[96] The most recent Health Insurance Coverage Bulletin from EBSA states that, within employer-sponsored insurance, 76.5% are covered by private sector employers.[97] As noted above, these expanded exemptions do not apply to public sector employers. Assuming the same percentage applies to the Census data for 2017, 64.2 million women under 65 years of age were covered by private sector employment based insurance. EBSA's bulletin also states that, among those covered by private sector employer sponsored insurance, 5% receive health insurance coverage from a different primary source.[98] We assume for the purposes of this estimate that an exemption claimed by an employer under these rules need not affect contraceptive coverage of a person who receives health insurance coverage from a different primary source. Again assuming this percentage applies to the 2017 coverage year, we estimate that 61 million women under 65 years of age received primary health coverage from private sector, employment-based insurance. In conducting this analysis, the Departments also observed that for 3.8 percent of those covered by private sector employment sponsored insurance, the plan was purchased by a self-employed person, not by a third party employer. Self-employed persons who direct firms are not required to use the exemptions in these final rules, but if they do, they would not be losing contraceptive coverage that they want to have, since they would be using the exemption based on their sincerely held religious beliefs. If those persons have employees, the employees would be included in this estimate in the number of people who receive employer sponsored insurance from a third party. Assuming this percentage applies to the 2017 coverage year, we estimate that 58.7 million women under 65 years of age received primary health coverage

from private sector insurance from a third party employer plan sponsor.

The Kaiser Family Foundation's Employer Health Benefits Annual Survey 2018 states that 16% of covered workers at all firms are enrolled in a plan grandfathered under the ACA (and thus not subject to the preventive services coverage requirements), but that only 14% of workers receiving coverage from state and local government employer plans are in grandfathered plans.[99] Using the data cited above in EBSA's bulletin concerning the number of persons covered in public and private sector employer sponsored insurance, this suggests 16.6% of persons covered by private sector employer sponsored plans are in grandfathered plans, and 83.4% in non-grandfathered plans.[100] Applying this percentage to the Census data, 49 million women under 65 years of age received primary health insurance coverage from private sector, third party employment-based, non-grandfathered plans. Census data indicates that among women under age 65, 46.7% are of childbearing age (aged 15 to 44).[101] Therefore, we estimate that 22.9 million women aged 15–44 received primary health insurance coverage from private sector, third party employment based, non-grandfathered insurance plans.

Prior to the implementation of the Affordable Care Act, approximately 6 percent of employer survey respondents did not offer contraceptive coverage, with 31 percent of respondents not knowing whether they offered such coverage.[102] The 6 percent may have included approximately 1.37 million of the women aged 15 to 44 primarily covered by employer-sponsored insurance plans in the private sector. And as noted above, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines. Therefore, the Departments estimate that 599,000

women of childbearing age that use contraceptives covered by the Guidelines were covered by plans that omitted contraceptive coverage prior to the Affordable Care Act.[103]

It is unknown what motivated those employers to omit contraceptive coverage—whether they did so for religious or other reasons. Despite the lack of information about their motives, the Departments attempt to make a reasonable estimate of the upper bound of the number of those employers that omitted contraceptive coverage before the Affordable Care Act and that would make use of these expanded exemptions based on sincerely held religious beliefs.

To begin, the Departments estimate that publicly traded companies would not likely make use of these expanded exemptions. Even though the rule does not preclude publicly traded companies from dropping coverage based on a sincerely held religious belief, it is likely that attempts to object on religious grounds by publicly traded companies would be rare. The Departments take note of the Supreme Court's decision in Hobby Lobby, where the Court observed that ''HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and numerous practical restraints would likely prevent that from occurring. For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable.'' 134 S. Ct. at 2774. The Departments are aware of several federal health care conscience

<hr/>

[95] See U.S. Census Bureau Current Population Survey Table HI–01, ''Health Insurance Coverage in 2017: All Races,'' available at https://www2.census.gov/programs-surveys/cps/tables/hi-01/2018/hi01_1.xls.

[96] Id.

[97] Table 1A, page 5 (stating that in coverage year 2015, 177.5 million persons of all ages were covered by employer sponsored insurance, with 135.7 million of those being covered by private sector employers), available at https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.

[98] Id. at Table 1C, page 8 (168.7 million persons received health insurance coverage from employer sponsored insurance as their primary source, compared to 177.5 million persons covered by employer sponsored insurance overall).

[99] ''Employer Health Benefits: 2018 Annual Survey'' at 211, available at http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018.

[100] EBSA's bulletin shows 168.7 million persons with primary coverage from employer sponsored insurance, with 131.6 million in the private sector and 37.1 million in the public sector. 16% of 168.7 million is 26.9 million. 14% of 37.1 million is 5.2 million. 26.9 million − 5.2 million is 21.8 million, which is 16.6% of the 131.6 million persons with primary coverage from private sector employer sponsored insurance.

[101] U.S. Census Bureau, Table S0101 ''Age and Sex'' (available at https://data.census.gov/cedsci/results/tables?q=S0101:%20AGE%20AND%20SEX&ps=table*currentPage@1).

[102] Kaiser Family Foundation & Health Research & Educational Trust, ''Employer Health Benefits, 2010 Annual Survey'' at 196, available at https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf.

[103] Some of the 31 percent of survey respondents that did not know about contraceptive coverage may not have offered such coverage. If it were possible to account for this non-coverage, the estimate of potentially affected covered women could increase. On the other hand, these employers' lack of knowledge about contraceptive coverage suggests that they lacked sincerely held religious beliefs specifically objecting to such coverage—beliefs without which they would not qualify for the expanded exemptions offered by these final rules. In that case, omission of such employees and covered women from this estimation approach would be appropriate. The 6 percent of employers that had direct knowledge about the absence of coverage may be more likely to have omitted such coverage on the basis of religious beliefs than were the 31 percent of survey respondents who did not know whether the coverage was offered. Yet an entity's mere knowledge about its coverage status does not itself reflect its motive for omitting coverage. In responding to the survey, the entity may have simply examined its plan document to determine whether or not contraceptive coverage was offered. As will be relevant in a later portion of the analysis, we have no data indicating what portion of the entities that omitted contraceptive coverage pre-Affordable Care Act did so on the basis of sincerely held religious beliefs, as opposed to doing so for other reasons that would not qualify them for the expanded exemption offered in these final rules.

Exhibit 1     JA453     JA-0000044

laws [104] that in some cases have existed for decades and that protect companies, including publicly traded companies, from discrimination if, for example, they decline to facilitate abortion, but the Departments are not aware of examples where publicly traded companies have made use of these exemptions. Thus, while the Departments consider it important to include publicly traded companies in the scope of these expanded exemptions for reasons similar to those reasons used by the Congress in RFRA and some health care conscience laws, in estimating the anticipated effects of the expanded exemptions, the Departments agree with the Supreme Court that it is improbable any will do so.

This assumption is significant because 31.3 percent of employees in the private sector work for publicly traded companies.[105] That means that only approximately 411,000 women aged 15 to 44 that use contraceptives covered by the Guidelines were covered by plans of non-publicly traded companies that did not provide contraceptive coverage pre-Affordable Care Act.

Moreover, because these final rules build on previous regulations that already exempted houses of worship and integrated auxiliaries and, as explained above, effectively eliminated obligations to provide contraceptive coverage within objecting self-insured church plans, the Departments attempt to estimate the number of such employers whose employees would not be affected by these rules. In attempting to estimate the number of such employers, the Departments consider the following information. Many Catholic dioceses have litigated or filed public comments opposing the Mandate, representing to the Departments and to courts around the country that official Catholic Church teaching opposes contraception. There are 17,651 Catholic parishes in the United States.[106] 197 Catholic dioceses.[107] 5,224 Catholic elementary schools, and 1,205 Catholic secondary schools.[108] Not all Catholic schools are integrated auxiliaries of Catholic churches, but there are other Catholic entities that are integrated auxiliaries that are not schools, so the Departments use the number of schools as an estimate of the number of integrated auxiliaries. Among self-insured church plans that oppose the Mandate, the Department has been sued by two—Guidestone and Christian Brothers. Guidestone is a plan organized by the Southern Baptist convention covering 38,000 employers, some of which are exempt as churches or integrated auxiliaries, and some of which are not.[109] Christian Brothers is a plan that covers Catholic organizations including Catholic churches and integrated auxiliaries, which are estimated above, but has also said in litigation that it covers about 500 additional entities that are not exempt as churches.[110] In total, therefore, without having certain data on the number of entities exempt under the previous rules, the Departments estimate that approximately 62,000 employers among houses of worship, integrated auxiliaries, and church plans, were exempt or relieved of contraceptive coverage obligations under the previous regulations. The Departments do not know how many persons are covered in the plans of those employers. Guidestone reports that among its 38,000 employers, its plan covers approximately 220,000 persons, and its employers include "churches, mission-sending agencies, hospitals, educational institutions and other related ministries." Using that ratio, the Departments estimate that the 62,000 church and church plan employers among Guidestone, Christian Brothers, and Catholic churches would include 359,000 persons. Among them, as referenced above, 72,500 women would be of childbearing age, and 32,100 may use contraceptives covered by the Guidelines.

Taking all of these factors into account, the Departments estimate that the private, non-publicly traded employers that did not cover contraception pre-Affordable Care Act, and that were not exempt by the previous regulations nor were participants in self-insured church plans that oppose contraceptive coverage, covered approximately 379,000 women aged 15 to 44 that use contraceptives covered by the Guidelines. But to estimate the likely actual transfer impact of these final rules, the Departments must estimate not just the number of such women covered by those entities, but how many of those entities would actually qualify for, and use, the expanded exemptions.

The Departments do not have data indicating how many of the entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held religious beliefs that might qualify them for exempt status under these final rules, as opposed to having done so for other reasons. Besides the entities that filed lawsuits or submitted public comments concerning previous regulations on this matter, the Departments are not aware of entities that omitted contraception pre-Affordable Care Act and then opposed the contraceptive coverage requirement after it was imposed by the Guidelines. For the following reasons, however, the Departments believe that a reasonable estimate is that no more than approximately one third of the persons covered by relevant entities—that is, no more than approximately 126,400 affected women—would likely be subject to potential transfer impacts under the expanded religious exemptions offered in these final rules. Consequently, as explained below, the Departments believe that the potential impact of these final rules falls substantially below the $100 million threshold for an economically significant major rule.

First, as mentioned, the Departments are not aware of information, or of data from public comments, that would lead us to estimate that all or most entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held conscientious objections in general or, specifically, religious beliefs, as opposed to having done so for other reasons. It would seem reasonable to assume that many of those entities did not do so based on sincerely held religious beliefs. According to a 2016 poll, only 4% of Americans believe that using contraceptives is morally wrong (including from a religious perspective).[111] In addition,

---

[104] For example, 42 U.S.C. 300a–7(b), 42 U.S.C. 238n, and Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d), Public Law 115–31.

[105] John Asker, et al., "Corporate Investment and Stock Market Listing: A Puzzle?" 28 *Review of Financial Studies* Issue 2, at 342–390 (Oct. 7, 2014), available at *https://doi.org/10.1093/rfs/hhu077*. This is true even though there are only about 4,300 publicly traded companies in the U.S. See Rayhanul Ibrahim, "The number of publicly-traded US companies is down 46% in the past two decades," *Yahoo! Finance* (Aug. 8, 2016), available at *https://finance.yahoo.com/news/jp-startup-public-companies-fewer-000000709.html*.

[106] Roman Catholic Diocese of Reno, "Diocese of Reno Directory: 2016–2017," available at *http://www.renodiocese.org/documents/2016/9/2016%202017%20directory.pdf*.

[107] Wikipedia, "List of Catholic dioceses in the United States," available at *https://en.wikipedia.org/wiki/List_of_Catholic_dioceses_in_the_United_States*.

[108] National Catholic Educational Association. "Catholic School Data," available at *http://www.ncea.org/NCEA/Proclaim/Catholic_School_Data/Catholic_School_Data.aspx*.

[109] Guidestone Financial Resources, "Who We Serve," available at *https://www.guidestone.org/AboutUs/WhoWeServe*.

[110] The Departments take no view on the status of particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.

[111] Pew Research Center, "Where the Public Stands on Religious Liberty vs. Nondiscrimination"

various reasons exist for some employers not to return to a pre-ACA situation in which they did not provide contraceptive coverage, such as avoiding negative publicity, the difficulty of taking away a fringe benefit that employees have become accustomed to having, and avoiding the administrative cost of renegotiating insurance contracts. Additionally, as discussed above, many employers with objections to contraception, including several of the largest litigants, only object to some contraceptives and cover as many as 14 of 18 of the contraceptive methods included in the Guidelines. This will reduce, and potentially eliminate, the contraceptive cost transfer for women covered in their plans.[112] Moreover, as suggested by the Guidestone data mentioned previously, employers with conscientious objections may tend to have relatively few employees and, among nonprofit entities that object to the Mandate, it is possible that a greater share of their employees oppose contraception than among the general population, which should lead to a reduction in the estimate of how many women in those plans actually use contraception.

It may not be the case that all entities that objected on religious grounds to contraceptive coverage before the ACA brought suit against the Mandate. However, it is worth noting that, while less than 100 for-profit entities challenged the Mandate in court (and an unknown number joined two newly formed associational organizations bringing suit on their behalf), there are more than 3 million for-profit private sector establishments in the United States that offer health insurance.[113] Six

percent of those would be 185,000, and one third of that number would be 62,000. The Departments consider it unlikely that tens or hundreds of thousands of for-profit private sector establishments omitted contraceptive coverage pre-ACA specifically because of sincerely held religious beliefs, when, after six years of litigation and multiple public comment periods, the Departments are aware of less than 100 such entities. The Departments do not know how many additional nonprofit entities would use the expanded exemptions, but as noted above, under the rules predating the Religious IFC, tens of thousands were already exempt as churches or integrated auxiliaries, or were covered by self-insured church plans that are not penalized if no contraceptive coverage is offered.

Finally, among entities that omitted contraceptive coverage based on sincerely held conscientious objections as opposed to other reasons, it is likely that some, albeit a minority, did so based on moral objections that are non-religious, and therefore would not be compassed by the expanded exemptions in these final rules.[114] Among the general public, polls vary about religious beliefs, but one prominent poll shows that 13 percent of Americans say they do not believe in God or have no opinion on the question.[115] Therefore, the Departments estimate that, of the entities that omitted contraception pre-Affordable Care Act based on sincerely held conscientious objections as opposed to other reasons, a small fraction did so based on sincerely held non-religious moral convictions, and therefore would not be affected by the expanded exemption provided by these final rules for religious beliefs.

For the reasons stated above, the Departments believe it would be incorrect to assume that all or even most of the plans that did not cover contraceptives before the ACA did so on the basis of religious objections. Instead, without data available on the reasons those plans omitted contraceptive coverage before the ACA, we assume that no more than one third of those plans omitted contraceptive coverage based on sincerely held religious beliefs. Thus, of the estimated 379,000 women aged 15 to 44 that use contraceptives

covered by the Guidelines, who received primary coverage from plans of private, non-publicly traded, third party employers that did not cover contraception pre-Affordable Care Act, and whose plans were neither exempt nor omitted from mandatory contraceptive coverage under the previous regulations, we estimate that no more than 126,400 women would be in plans that will use these expanded exemptions.

viii. Final Estimates of Persons Affected by Expanded Exemptions

Based on the estimate of an average annual expenditure on contraceptive products and services of $584 per user, the effect of the expanded exemptions on 126,400 women would give rise to approximately $73.8 million in potential transfer impact. It is possible, however, that premiums would adjust to reflect changes in coverage, thus partially offsetting the transfer experienced by women who use the affected contraceptives. As referenced elsewhere in this analysis, such women may make up approximately 8.8 percent of the covered population,[116] in which case the offset would also be approximately 8.8 percent, yielding a potential transfer of $67.3 million.

Thus, in their most expansive estimate, the Departments conclude that no more than approximately 126,400 women would likely be subject to potential transfer impacts under the expanded religious exemptions offered in these final rules. The Departments estimate this financial transfer to be approximately $67.3 million. This falls substantially below the $100 million threshold for an economically significant and major rule.

As noted above, the Departments view this alternative estimate as being the highest possible bound of the transfer effects of these rules, but believe the number of establishments that will actually exempt their plans as the result of these rules will be far fewer than contemplated by this estimate. The Departments make these estimates only for the purposes of determining whether the rules are economically significant under Executive Orders 12866 and 13563.

After reviewing public comments, both those supporting and those disagreeing with these estimates and similar estimates from the Religious IFC, and because the Departments do not have sufficient data to precisely

---

at page 26 (Sept. 28, 2016), available at *http://assets.pewresearch.org/wp-content/uploads/sites/11/2016/09/Religious-Liberty-full-for-web.pdf.*

[112] On the other hand, a key input in the approach that generated the one third threshold estimate was a survey indicating that six percent of employers did not provide contraceptive coverage pre-Affordable Care Act. Employers that covered some contraceptives pre-Affordable Care Act may have answered "yes" or "don't know" to the survey. In such cases, the potential transfer estimate has a tendency toward underestimation because the rule's effects on such women—causing their contraceptive coverage to be reduced from all 18 methods to some smaller subset—have been omitted from the calculation.

[113] Tables I.A.1 and I.A.2, Medical Expenditure Panel Survey, "Private-Sector Data by Firm Size, Industry Group, Ownership, Age of Firm, and Other Characteristics: 2017." HHS Agency for Healthcare Research and Quality (indicating total number of for-profit incorporated, for-profit unincorporated, and non-profit establishments in the United States, and the percentage of each that offer health insurance), available at *https://meps.ahrq.gov/data_stats/summ_tables/insr/national/series_1/2017/tia1.htm* and *https://meps.ahrq.gov/data_stats/summ_tables/insr/national/series_1/2017/tia2.htm.* 2523.

[114] Such objections may be encompassed by companion final rules published elsewhere in today's **Federal Register**. Those final rules, however, are narrower in scope than these final rules. For example, in providing expanded exemptions for plan sponsors, they do not encompass companies with certain publicly traded ownership interests.

[115] Gallup, "Religion," available at *https://news.gallup.com/poll/1690/religion.aspx.*

[116] As cited above, women of childbearing age are 20.2 percent of woman age 15–65, and 43.6 percent of women of childbearing age use contraceptives covered by the Guidelines.

Exhibit 1                    JA455                    JA-0000046

estimate the amount by which these factors render our estimate too high, or too low, the Departments simply conclude that the financial transfer falls substantially below the $100 million threshold for an economically significant rule based on the calculations set forth above.

### B. Special Analyses—Department of the Treasury

These regulations are not subject to review under section 6(b) of Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Department of the Treasury and the Office of Management and Budget regarding review of tax regulations.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) (RFA) imposes certain requirements with respect to federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 *et seq.*) and that are likely to have a significant economic impact on a substantial number of small entities. The Religious IFC was an interim final rule with comment period, and in these final rules, the Departments adopt the Religious IFC as final with certain changes. These final rules are, thus, being issued after a notice and comment period.

The Departments also carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866 and do not expect that these final rules will have a significant economic effect on a substantial number of small entities. These final rules will not result in any additional costs to affected entities, and, in many cases, may relieve burdens and costs from such entities. By exempting from the Mandate small businesses and nonprofit organizations with religious objections to some (or all) contraceptives and/or sterilization—businesses and organizations that would otherwise be faced with the dilemma of complying with the Mandate (and violating their religious beliefs) or following their beliefs (and incurring potentially significant financial penalties for noncompliance)—the Departments have reduced regulatory burden on such small entities. Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

### D. Paperwork Reduction Act—Department of Health and Human Services

Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), we are required to provide 30-day notice in the **Federal Register** and solicit public comment before a collection of information is submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 (PRA) requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

Recommendations to minimize the information collection burden on the affected public, including automated collection techniques. In the October 13, 2017 (82 FR 47792) interim final rules, we solicited public comment on each of these issues for the following sections of the rule containing information collection requirements (ICRs). A description of the information collection provisions implicated in these final rules is given in the following section with an estimate of the annual burden. The burden related to these ICRs received emergency review and approval under OMB control number 0938–1344. They have been resubmitted to OMB in conjunction with these final rules and are pending re-approval. The Departments sought public comments on PRA estimates set forth in the Religious IFC, and are not aware of significant comments submitted that suggest there is a better way to estimate these burdens.

#### 1. Wage Data

Average labor costs (including 100 percent fringe benefits and overhead) used to estimate the costs are calculated using data available derived from the Bureau of Labor Statistics.[117]

#### TABLE 1—NATIONAL OCCUPATIONAL EMPLOYMENT AND WAGE ESTIMATES

| BLS occupation title | Occupational code | Mean hourly wage ($/hr) | Fringe benefits and overhead ($/hr) | Adjusted hourly wage ($/hr) |
|---|---|---|---|---|
| Executive Secretaries and Executive Administrative Assistants | 43–6011 | $27.84 | $27.84 | $55.68 |
| Compensation and Benefits Manager | 11–3111 | 61.01 | 61.01 | 122.02 |
| Legal Counsel | 23–1011 | 67.25 | 67.25 | 134.50 |
| Senior Executive | 11–1011 | 93.44 | 93.44 | 186.88 |
| General and Operations Managers | 11–1021 | 58.70 | 58.70 | 117.40 |

#### 2. ICRs Regarding Self-Certification or Notices to HHS (§ 147.131(c)(3))

Each organization seeking to be treated as an eligible organization that wishes to use the optional accommodation process offered under these final rules must either use the EBSA Form 700 method of self-certification or provide notice to HHS of its religious objection to coverage of all or a subset of contraceptive services. Specifically, these final rules continue to allow eligible organizations to notify an issuer or third party administrator using EBSA Form 700, or to notify HHS, of their religious objection to coverage of all or a subset of contraceptive services, as set forth in the July 2015 final regulations (80 FR 41318).

Notably, however, entities that are participating in the previous accommodation process. where a self-certification or notice has already been submitted, and where the entities choose to continue their accommodated status under these final rules, generally do not need to file a new self-certification or notice (unless they change their issuer or third party

---

[117] May 2016 National Occupational Employment and Wage Estimates United States found at *https://www.bls.gov/oes/current/oes_nat.htm*.

Exhibit 1                     JA456                     JA-0000047

administrator). As explained above, HHS assumes that, among the 209 entities the Departments estimated are using the previous accommodation, 109 will use the expanded exemption and 100 will continue under the voluntary accommodation. Those 100 entities will not need to file additional self-certifications or notices. HHS also assumes that an additional 9 entities that were not using the previous accommodation will opt into it. Those entities will be subject to the self-certification or notice requirement.

In order to estimate the cost for an entity that chooses to opt into the accommodation process, HHS assumes that clerical staff for each eligible organization will gather and enter the necessary information and send the self-certification to the issuer or third party administrator as appropriate, or send the notice to HHS.[118] HHS assumes that a compensation and benefits manager and inside legal counsel will review the self-certification or notice to HHS and a senior executive would execute it. HHS estimates that an eligible organization would spend approximately 50 minutes (30 minutes of clerical labor at a cost of $55.68 per hour, 10 minutes for a compensation and benefits manager at a cost of $122.02 per hour, 5 minutes for legal counsel at a cost of $134.50 per hour, and 5 minutes by a senior executive at a cost of $186.88 per hour) preparing and sending the self-certification or notice to HHS and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the information in the self-certification or notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost of approximately $74.96 for a total hour burden of approximately 7.5 hours and an associated equivalent cost of approximately $675 for 9 entities. As DOL and HHS share jurisdiction, they are splitting the hour burden so that each will account for approximately 3.75 burden hours with an equivalent cost of approximately $337.

HHS estimates that each self-certification or notice to HHS will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each self-certification or notice sent via mail will be $0.55. For purposes of this analysis, HHS assumes that 50 percent of self-certifications or notices to HHS will be mailed. The total cost for

sending the self-certifications or notices to HHS by mail is approximately $2.75 for 5 entities. As DOL and HHS share jurisdiction they are splitting the cost burden so that each will account for $1.38 of the cost burden.

3. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(e))

As required by the July 2015 final regulations (80 FR 41318), a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries in insured or self-insured group health plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from, but contemporaneous with (to the extent possible), any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers and third party administrators may, but are not required to, use the model language previously provided by HHS or substantially similar language.

As mentioned, HHS is anticipating that approximately 109 entities will use the optional accommodation (100 that used it previously, and 9 that will newly opt into it). It is unknown how many issuers or third party administrators provide health insurance coverage or services in connection with health plans of eligible organizations, but HHS will assume at least 109. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $55.68 per hour) and 15 minutes of management review (at $117.40 per hour) to prepare the notices. The total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an associated cost of approximately $85.03. The total burden for all 109 issuers or third party administrators will be 136 hours, with an associated cost of approximately $9,268. As DOL and HHS share jurisdiction, they are splitting the burden each will account for 68 burden hours with an associated cost of $4,634, with approximately 55 respondents.

The Departments estimate that approximately 2,180,000 plan participants and beneficiaries will be

covered in the plans of the 100 entities that previously used the accommodation and will continue doing so, and that an additional 9 entities will newly opt into the accommodation. We reach this estimate using calculations set forth above, in which we used 2017 data available to HHS for contraceptive user fees adjustments to estimate that approximately 2,907,000 plan participants and beneficiaries were covered by plans using the accommodation. We further estimated that the 100 entities that previously used the accommodation and will continue doing so will cover approximately 75 percent of the persons in all accommodated plans, based on HHS data concerning accommodated self-insured plans that indicates plans sponsored by religious hospitals and health systems encompass more than 80 percent of the persons covered in such plans. In other words, plans sponsored by such entities have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons. As noted above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans. The Departments do not have specific data on which plans of which employer sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status. The Departments assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which we lack representative data.

Based on these assumptions and without better data available, the Departments estimate that previously accommodated entities encompassed approximately 2,907,000 persons; the estimated 100 entities that previously used the accommodation and continue to use it will account for 75 percent of those persons (that is, approximately 2,180,000 persons); and the estimated 109 entities that previously used the accommodation and will now use their exempt status will account for 25 percent of those persons (that is, approximately 727,000 persons). It is not known how many persons will be covered in the plans of the 9 entities we estimate will newly use the accommodation. Assuming that those 9 entities will have a similar number of covered persons per entity as the 100 entities encompassing 2,180,000

---

[118] For purposes of this analysis, the Department assumes that the same amount of time will be required to prepare the self-certification and the notice to HHS.

Exhibit 1                                                      JA457                                              JA-0000048

persons, the Departments estimate that all 109 accommodated entities will encompass approximately 2,376,000 covered persons.

The Departments assume that sending one notice to each policyholder will satisfy the need to send the notices to all participants and dependents. Among persons covered by insurance plans sponsored by large employers in the private sector, approximately 50.1 percent are participants and 49.9 percent are dependents.[119] For 109 entities, the total number of notices will be 1,190,613. For purposes of this analysis, the Departments also assume that 53.7 percent of notices will be sent electronically, and 46.3 percent will be mailed.[120] Therefore, approximately 551,254 notices will be mailed. HHS estimates that each notice will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.55. The total cost for sending approximately 551,254 notices by mail will be approximately $303,190. As DOL and HHS share jurisdiction, they are splitting the cost burden so each will account for $151,595 of the cost burden.

### 4. ICRs Regarding Notice of Revocation of Accommodation (§ 147.131(c)(4))

An eligible organization that now wishes to take advantage of the expanded exemption may revoke its use of the accommodation process; its issuer or third party administrator must provide written notice of such revocation to participants and beneficiaries as soon as practicable. As discussed above, HHS estimates that 109 entities that are using the accommodation process will revoke their use of the accommodation, and will therefore be required to send the notification; the issuer or third party administrator can send the notice on behalf of the entity. For the purpose of calculating the ICRs associated with revocations of the accommodation, and for various reasons discussed above, HHS assumes that litigating entities that were previously using the accommodation and that will revoke their use of the accommodation fall within the estimated 109 entities that will revoke the accommodation overall.

As before, HHS assumes that, for each issuer or third party administrator, a manager and inside legal counsel and clerical staff will need approximately 2 hours to prepare and send the notification to participants and beneficiaries and maintain records (30 minutes for a manager at a cost of $117.40 per hour, 30 minutes for legal counsel at a cost of $134.50 per hour, 1 hour for clerical staff at a cost of $55.68 per hour). The burden per respondent will be 2 hours with an associated cost of approximately $182; for 109 entities, the total hour burden will be 218 hours with an associated cost of approximately $19,798. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 109 burden hours with an associated cost of approximately $9,899.

As discussed above, HHS estimates that there are approximately 727,000 covered persons in accommodated plans that will revoke their accommodated status and use the expanded exemption.[121] As before, the Departments use the average of 50.1 percent of covered persons who are policyholders, and estimate that an average of 53.7 percent of notices will be sent electronically and 46.3 percent by mail. Therefore, approximately 364,102 notices will be distributed, of which 168,579 notices will be mailed. HHS estimates that each mailed notice will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.55. The total cost for sending approximately 168,579 notices by mail is approximately $93,545. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 182,051 notices, with an associated cost of approximately $46,772.

### TABLE 1—SUMMARY OF INFORMATION COLLECTION BURDENS

| Regulation section | OMB Control No. | Number of respondents | Responses | Burden per respondent (hours) | Total annual burden (hours) | Hourly labor cost of reporting ($) | Total labor cost of reporting ($) | Total cost ($) |
|---|---|---|---|---|---|---|---|---|
| Self-Certification or Notices to HHS .......... | 0938–1344 | * 5 | 5 | 0.83 | 3.75 | $89.95 | $337 | $339 |
| Notice of Availability of Separate Payments for Contraceptive Services .......... | 0938–1344 | * 55 | 595,307 | 1.25 | 68.13 | 68.02 | 4,634 | 156,229 |
| Notice of Revocation of Accommodation .. | 0938–1344 | * 55 | 182,051 | 2.00 | 109 | 90.82 | 9,899 | 56,671 |
| Total ................................................ | .................. | * 115 | 777,363 | .................. | 180.88 | ....................... | 14,870 | 213,239 |

* The total number of respondents is 227 (= 9+109+109) for both HHS and DOL, but the summaries here and below exceed that total because of rounding up that occurs when sharing the burden between HHS and DOL.

**Note:** There are no capital/maintenance costs associated with the ICRs contained in this rule; therefore, we have removed the associated column from Table 1. Postage and material costs are included in Total Cost.

---

[119] "Health Insurance Coverage Bulletin" Table 4, page 21. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[120] According to data from the National Telecommunications and Information Agency (NTIA), 26.0 percent of individuals age 25 and over have access to the internet at work. According to a Greenwald & Associates survey, 84 percent of plan participants find it acceptable to make electronic delivery the default option, which is used as the proxy for the number of participants who will not opt out that are automatically enrolled (for a total of 30.2 percent receiving electronic

disclosure at work). Additionally, the NTIA reports that 38.5 percent of individuals age 25 and over have access to the internet outside of work. According to a Pew Research Center survey, 61 percent of internet users use online banking, which is used as the proxy for the number of internet users who will opt in for electronic disclosure (for a total of 23.5 percent receiving electronic disclosure outside of work). Combining the 30.2 percent who receive electronic disclosure at work with the 23.5 percent who receive electronic disclosure outside of work produces a total of 53.7 percent who will receive electronic disclosure overall.

[121] In estimating the number of women that might have their contraceptive coverage affected by the expanded exemption, the Departments indicated that we do not know the extent to which the

number of women in accommodated plans affected by these final rules overlap with the number of women in plans offered by litigating entities that will be affected by these final rules, though we assume there is significant overlap. That uncertainty should not affect the calculation of the ICRs for revocation notices, however. If the two numbers overlap, the estimates of plans revoking the accommodation and policyholders covered in those plans would already include plans and policyholders of litigating entities. If the numbers do not overlap, those litigating entity plans would not presently be enrolled in the accommodation, and therefore would not need to send notices concerning revocation of accommodated status.

5. Submission of PRA-Related Comments

We have submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

*E. Paperwork Reduction Act—Department of Labor*

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210–0150 and 1210–0152. A copy of the ICR may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov*. PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW, Room N–5718, Washington, DC 20210. Telephone: 202–693–8410; Fax: 202–219–4745. These are not toll-free numbers.

The Religious final rules amended the ICR by changing the accommodation process to an optional process for exempt organizations and requiring a notice of revocation to be sent by the issuer or third party administrator to participants and beneficiaries in plans whose employer revokes their accommodation; these final rules confirm as final the Religious IFC provisions on the accommodation process. DOL submitted the ICRs to OMB in order to obtain OMB approval under the PRA for the regulatory revision. In an effort to consolidate the number of information collection requests, DOL is combining the ICR related to the OMB control number 1210–0152 with the ICR related to the OMB control number 1210–0150 and discontinuing OMB control number 1210–0152. Consistent with the analysis in the HHS PRA section above, the Departments expect that each of the estimated 9 eligible organizations newly opting into the accommodation will spend approximately 50 minutes in preparation time and $0.54 mailing cost to self-certify or notify HHS. Each of the 109 issuers or third party administrators for the 109 eligible organizations that make use of the accommodation overall will distribute Notices of Availability of Separate Payments for Contraceptive Services.

These issuers and third party administrators will spend approximately 1.25 hours in preparation time and incur $0.54 cost per mailed notice. Notices of Availability of Separate Payments for Contraceptive Services will need to be sent to 1,190,613 policyholders, and 53.7 percent of the notices will be sent electronically, while 46.3 percent will be mailed. Finally, 109 entities using the previous accommodation process will revoke their use of the accommodation (in favor of the expanded exemption) and will therefore be required to cause the Notice of Revocation of Accommodation to be sent, with the issuer or third party administrator able to send the notice on behalf of the entity. These entities will spend approximately two hours in preparation time and incur $0.54 cost per mailed notice. Notice of Revocation of Accommodation will need to be sent to an average of 364,102 policyholders and 53.7 percent of the notices will be sent electronically. The DOL information collections in this rule are found in 29 CFR 2510.3–16 and 2590.715–2713A and are summarized as follows:

*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.
*Title:* Coverage of Certain Preventive Services under the Affordable Care Act—Private Sector.
*OMB Numbers:* 1210–0150.
*Affected Public:* Private Sector—Not for profit and religious organizations; businesses or other for-profits.
*Total Respondents:* 114 [122] (combined with HHS total is 227).
*Total Responses:* 777,362 (combined with HHS total is 1,554,724).
*Frequency of Response:* On occasion.
*Estimated Total Annual Burden Hours:* 181 (combined with HHS total is 362 hours).
*Estimated Total Annual Burden Cost:* $197,955 (combined with HHS total is $395,911).
*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.

*F. Regulatory Reform Executive Orders 13765, 13771 and 13777*

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of the Department of Health and Human Services and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the Act shall

exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any state or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the states more flexibility and control to create a freer and open healthcare market." These final rules exercise the discretion provided to the Departments under the Affordable Care Act, RFRA, and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), the Departments have estimated the costs and cost savings attributable to these final rules. As discussed in more detail in the preceding analysis, these final rules lessen incremental reporting costs.[123] However, in order to avoid double-counting with the Religious IFC, which has already been tallied as an Executive Order 13771 deregulatory action, this finalization of the IFC's policy is not considered a deregulatory action under the Executive Order.

---

[122] Denotes that there is an overlap between jurisdiction shared by HHS and DOL over these respondents and therefore they are included only once in the total.

[123] Other noteworthy potential impacts encompass potential changes in medical expenditures, including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on E.O. 13771 implementation (Dominic J. Mancini, "Guidance Implementing Executive Order 13771, Titled 'Reducing Regulation and Controlling Regulatory Costs,'" Office of Mgmt. & Budget (Apr. 5, 2017), *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-21-OMB.pdf*) states that impacts should be categorized as consistently as possible within Departments. The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures are reduced, negative benefits if expenditures are raised). Following the FDA, OSHA and MSHA accounting convention leads to this final rule's medical expenditure impacts being categorized as (positive or negative) benefits, rather than as costs, thus placing them outside of consideration for E.O. 13771 designation purposes.

Exhibit 1                          JA459                          JA-0000050

*G. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (section 202(a) of Pub. L. 104–4), requires the Departments to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing ''any rule that includes any federal mandate that may result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year.'' In 2018, that threshold after adjustment for inflation is $150 million. For purposes of the Unfunded Mandates Reform Act, the Religious IFC and these final rules do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $150 million, adjusted for inflation, or more on the private sector.

*H. Federalism*

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have ''substantial direct effects'' on states. the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

These final rules do not have any federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

**V. Statutory Authority**

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code, and Public Law 103–141. 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4).

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135. 1161–1168, 1169. 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–

200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152. 124 Stat. 1029; Pub. L. 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4); Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763. 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63. 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act. sections 1301–1304, 1311–1312, 1321–1322, 1324. 1334, 1342–1343, 1401–1402, 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B. and 31 U.S.C. 9701); and Public Law 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4).

**List of Subjects**

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

**Kirsten Wielobob,**

*Deputy Commissioner for Services and Enforcement.*

Approved: October 30, 2018.

**David J. Kautter,**

*Assistant Secretary for Tax Policy.*

Signed this 29th day of October 2018.

**Preston Rutledge.**

*Assistant Secretary. Employee Benefits Security Administration. Department of Labor.*

Dated: October 17. 2018.

**Seema Verma.**

*Administrator. Centers for Medicare & Medicaid Services.*

Dated: October 18, 2018.

**Alex M. Azar II,**

*Secretary, Department of Health and Human Services.*

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

Accordingly, 26 CFR part 54 is amended as follows:

**PART 54—PENSION EXCISE TAXES**

■ 1. The authority citation for part 54 continues to read. in part, as follows:

Authority: 26 U.S.C. 7805. * * *

■ 2. Section 54.9815–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

**§ 54.9815–2713  Coverage of preventive health services.**

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

* * * * *

(iv) With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act. subject to 45 CFR 147.131 and 147.132.

* * * * *

■ 3. Section 54.9815–2713A is revised to read as follows:

**§ 54.9815–2713A  Accommodations in connection with coverage of preventive health services.**

(a) *Eligible organizations for optional accommodation.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (4) of this section.

(1) The organization is an objecting entity described in 45 CFR 147.132(a)(1)(i) or (ii);

(2) Notwithstanding its status under paragraph (a)(1) of this section and under 45 CFR 147.132(a), the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (b) or (c) of this section as applicable; and

(3) [Reserved]

(4) The organization self-certifies in the form and manner specified by the

Secretary of Labor or provides notice to the Secretary of the Department of Health and Human Services as described in paragraph (b) or (c) of this section. To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on the date on which these final rules go into effect, by an issuer or third party administrator through the accommodation process, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and § 54.9815–2715(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(b) *Optional accommodation—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis may voluntarily elect an optional accommodation under which its third party administrator(s) will provide or arrange payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more third party administrators.

(ii) The eligible organization must provide either a copy of the self-certification to each third party administrator or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable), but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's third party administrators. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Labor (working with the Department of Health and Human Services) will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of the Department of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and is willing to enter into or remain in a contractual relationship with the eligible organization or its plan to provide

administrative services for the plan, then the third party administrator will provide or arrange payments for contraceptive services, using one of the following methods—

(i) Provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the federally facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(5) Where an otherwise eligible organization does not contract with a third party administrator and files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The plan administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, arrange for payments for contraceptive services from an issuer or other entity in accordance with paragraph (b)(2)(ii) of this section, and such issuer or other entity may receive reimbursements in accordance with paragraph (b)(3) of this section.

(6) Where an otherwise eligible organization is an ERISA-exempt church plan within the meaning of section 3(33) of ERISA and it files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not

Exhibit 1

JA461

JA-0000052

apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The third party administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, provide or arrange payments for contraceptive services in accordance with paragraphs (b)(2)(i) or (ii) of this section, and receive reimbursements in accordance with paragraph (b)(3) of this section.

(c) *Optional accommodation— insured group health plans—*(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process—

(i) The eligible organization or its plan must contract with one or more health insurance issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815–2713.

(B) When a notice is provided to the Secretary of the Department Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's health insurance issuers. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of

Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of the Department Health and Human Services has received a notice under paragraph (c)(2)(ii) of this section and describing the obligations of the issuer under this section.

(2) If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (c)(2)(ii) of this section and does not have its own objection as described in 45 CFR 147.132 to providing the contraceptive services to which the eligible organization objects, then the issuer will provide payments for contraceptive services as follows—

(i) The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815 of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(3) A health insurance issuer may not require any documentation other than a copy of the self-certification from the

eligible organization or the notification from the Department of Health and Human Services described in paragraph (c)(1)(ii) of this section.

(d) *Notice of availability of separate payments for contraceptive services— self-insured and insured group health plans.* For each plan year to which the optional accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides or arranges separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

(e) *Reliance—insured group health plans—*(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be

Exhibit 1

JA462

JA-0000053

incorrect, the issuer is considered to comply with any applicable requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

(f) *Definition.* For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 54.9815–2713(a)(1)(iv).

(g) *Severability.* Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**§ 54.9815–2713T  [Removed]**

■ 4. Section 54.9815–2713T is removed.

**§ 54.9815–2713AT  [Removed]**

■ 5. Section 54.9815–2713AT is removed.

## DEPARTMENT OF LABOR

### Employee Benefits Security Administration

For the reasons set forth in the preamble, the Department of Labor adopts as final the interim final rules amending 29 CFR part 2590 published on October 13, 2017 (82 FR 47792) with the following changes:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 6. The authority citation for part 2590 continues to read, as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L.

110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Division M, Pub. L. 113–235, 128 Stat. 2130; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

■ 7. Section 2590.715–2713A is amended by:

■ a. Revising paragraph (a)(5);
■ b. Redesignating paragraphs (e) and (f) as paragraphs (f) and (g); and
■ c. Adding new paragraph (e).
The revision and addition read as follows:

**§ 2590.715–2713A  Accommodations in connection with coverage of preventive health services.**

(a) \* \* \*

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on the date on which these final rules go into effect, by an issuer or third party administrator through the accommodation process, an eligible organization may give 60-days notice pursuant to PHS Act section 2715(d)(4) and § 2590.715–2715(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

\* \* \* \* \*

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

\* \* \* \* \*

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons set forth in the preamble, the Department of Health and Human Services adopts as final the interim final rules amending 45 CFR part 147 published on October 13, 2017 (82 FR 47792) with the following changes:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 8. The authority citation for part 147 is revised to read as follows:

**Authority:** 42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92, as amended.

■ 9. Section 147.131 is amended by:
■ a. Revising paragraph (c)(4);
■ b. Redesignating paragraphs (f) and (g) as (g) and (h); and
■ c. Adding new paragraph (f).
The revision and addition read as follows:

**§ 147.131  Accommodations in connection with coverage of certain preventive health services.**

\* \* \* \* \*

(c) \* \* \*

(4) An eligible organization may revoke its use of the accommodation process, and its issuer must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on January 14, 2019, by an issuer through the accommodation process, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and § 147.200(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after January 14, 2019, if

contraceptive coverage is being offered by an issuer through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

\*    \*    \*    \*    \*

(f) *Reliance*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (d) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (d) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

\*    \*    \*    \*    \*

■ 10. Section 147.132 is amended by:
■ a. Revising paragraph (a)(1) introductory text;
■ b. Redesignating paragraphs (a)(1)(ii) and (iii) as paragraphs (iii) and (iv);
■ c. Adding new paragraph (a)(1)(ii);
■ d. Revising newly designated paragraph (a)(1)(iii);
■ e. Revising newly designated paragraph (a)(1)(iv); and
■ f. Revising paragraphs (a)(2) and (b).
The revisions and addition read as follows:

**§ 147.132  Religious exemptions in connection with coverage of certain preventive health services.**

(a) \*    \*    \*
(1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections specified below. Thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

\*    \*    \*    \*    \*

(ii) A group health plan, and health insurance coverage provided in connection with a group health plan, where the plan or coverage is established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other non-governmental organization or association, to the extent the plan sponsor responsible for establishing and/or maintaining the plan objects as specified in paragraph (a)(2) of this section. The exemption in this paragraph applies to each employer, organization, or plan sponsor that adopts the plan;

(iii) An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

(iv) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under this subparagraph (iv), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement.

(2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable):

(i) Coverage or payments for some or all contraceptive services; or

(ii) A plan, issuer, or third party administrator that provides or arranges such coverage or payments.

(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs. Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

\*    \*    \*    \*    \*

[FR Doc. 2018–24512 Filed 11–7–18; 4:15 pm]
**BILLING CODE 4830–01–P; 4510–29–P; 4120–01–P**

Exhibit 1                JA464                JA-0000055

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9841]**

**RIN 1545–BN91**

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB84**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Part 147**

**[CMS–9925–F]**

**RIN 0938–AT46**

**Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** These rules finalize, with changes based on public comments, the interim final rules issued in the **Federal Register** on October 13, 2017 concerning moral exemptions and accommodations regarding coverage of certain preventive services. These rules finalize expanded exemptions to protect moral beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act. These rules do not alter the discretion of the Health Resources and Services Administration, a component of the U.S. Department of Health and Human Services, to maintain the guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also leave in place an optional "accommodation" process for certain exempt entities that wish to use it voluntarily. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.

**DATES:** *Effective date:* These regulations are effective on January 14, 2019.

**FOR FURTHER INFORMATION CONTACT:**
Jeff Wu at (301) 492–4305 or *marketreform@cms.hhs.gov* for the Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS).
Amber Rivers or Matthew Litton at (202) 693–8335 for Employee Benefits Security Administration (EBSA), Department of Labor (DOL).
William Fischer at (202) 317–5500 for Internal Revenue Service, Department of the Treasury.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit DOL's website (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's website (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

Table of Contents

I. Executive Summary and Background
A. Executive Summary
1. Purpose
2. Summary of the Major Provisions
3. Summary of Costs, Savings and Benefits of the Major Provisions
B. Background
II. Overview of the Final Rules and Public Comments
A. Moral Exemptions and Accommodation in General
1. The Departments' Authority to Mandate Coverage or Provide Exemptions
2. Congress's History of Protecting Moral Convictions
a. The Church Amendments' Protection of Moral Convictions
b. Court Precedents Relevant to These Expanded Exemptions
c. Conscience Protections in Other Federal and State Contexts
d. Founding Principles
e. Executive Orders Relevant to These Expanded Exemptions
f. Litigation Concerning the Mandate
3. Whether Moral Exemptions Should Exist, and Whom They Should Cover
4. The Departments' Rebalancing of Government Interests
5. Burdens on Third Parties
6. Interim Final Rulemaking
7. Health Effects of Contraception and Pregnancy
8. Health and Equality Effects of Contraceptive Coverage Mandates
9. Other General Comments
B. Text of the Final Rules
1. Restatement of Statutory Requirements of Section 2713(a) and (a)(4) of the PHS Act (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv)).
2. Exemption for Objecting Entities Based on Moral Convictions (45 CFR 147.133(a))
3. Exemption for Certain Plan Sponsors (45 CFR 147.133(a)(1)(i))
a. Plan sponsors in general (45 CFR 147.133(a)(1)(i) prefatory text)
b. Nonprofit organizations (45 CFR 147.133(a)(1)(i)(A))
c. For-Profit Entities (45 CFR 147.133(a)(1)(i)(B))
4. Institutions of Higher Education (45 CFR 147.133(a)(1)(ii))
5. Health Insurance Issuers (45 CFR 147.133(a)(1)(iii))
6. Description of the Moral Objection (45 CFR 147.133(a)(2))
7. Individuals (45 CFR 147.133(b))
8. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)
9. Definition of Contraceptives for the Purpose of These Final Rules
10. Severability
C. Other Public Comments
1. Items Approved as Contraceptives But Used to Treat Existing Conditions
2. Comments Concerning Regulatory Impact
III. Economic Impact and Paperwork Burden
A. Executive Orders 12866 and 13563—Department of HHS and Department of Labor
1. Need for Regulatory Action
2. Anticipated Effects
B. Special Analyses—Department of the Treasury
C. Regulatory Flexibility Act
D. Paperwork Reduction Act—Department of Health and Human Services
E. Paperwork Reduction Act—Department of Labor
F. Regulatory Reform Executive Orders 13765, 13771 and 13777
G. Unfunded Mandates Reform Act
H. Federalism
IV. Statutory Authority

## I. Executive Summary and Background

*A. Executive Summary*

1. Purpose

The primary purpose of these final rules is to finalize, with changes in response to public comments, the interim final regulations with requests for comments (IFCs) published in the **Federal Register** on October 13, 2017 (82 FR 47838), "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (the Moral IFC). The rules are necessary to protect sincerely held moral objections of certain entities and individuals. The rules, thus, minimize the burdens imposed on their moral beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing, which was created by HHS through guidance promulgated by the Health Resources and Services

Exhibit 2    JA465    JA-0000056

Administration (HRSA), pursuant to authority granted by the ACA in section 2713(a)(4) of the Public Health Service Act. In addition, the rules finalize references to these moral exemptions in the previously created accommodation process that permit entities with certain objections voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their issuers or third party administrators. The rules do not remove the contraceptive coverage requirement generally from HRSA's guidelines. The changes to the rules being finalized will ensure clarity in implementation of the moral exemptions so that proper respect is afforded to sincerely held moral convictions in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage.

2. Summary of the Major Provisions

a. Moral Exemptions

These rules finalize exemptions provided in the Moral IFC for the group health plans and health insurance coverage of various entities and individuals with sincerely held moral convictions opposed to coverage of some or all contraceptive or sterilization methods encompassed by HRSA's guidelines. As in the Moral IFC, the exemptions include plan sponsors that are nonprofit organization plan sponsors or for-profit entities that have no publicly traded ownership interests (defined as any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934). The exemptions also continue to include institutions of higher education in their arrangement of student health insurance coverage: health insurance issuers (but only with respect to plans that are otherwise also exempt under the rules); and objecting

individuals with respect to their own coverage. where their health insurance issuer and plan sponsor. as applicable, are willing to provide coverage complying with the individual's moral objection. After considering public comments, the Departments have decided not to extend the moral exemptions to non-federal governmental entities at this time, although individuals receiving employer-sponsored insurance from a governmental entity may use the individual exemption if the other terms of the individual exemption apply, including that their employer is willing to offer them a plan consistent with their moral objection.

In response to public comments. various changes are made to clarify the intended scope of the language in the Moral IFC's exemptions. The prefatory exemption language is clarified to ensure exemptions apply to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections. The Departments add language to specify that the exemption for institutions of higher education applies to non-governmental entities. The Departments also modified language describing the moral objection applicable to the exemptions, to specify that the entity objects, based on its sincerely held moral convictions, to its establishing, maintaining, providing, offering, or arranging for (as applicable) either: Coverage or payments for some or all contraceptive services; or a plan, issuer, or third party administrator that provides or arranges such coverage or payments.

The Departments also clarify language in the exemption applicable to plans of objecting individuals. The clarification is made to ensure that the HRSA guidelines do not prevent a willing health insurance issuer offering group or

individual health insurance coverage. and as applicable. a willing plan sponsor of a group health plan, from offering a separate policy. certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions. The exemption adds that, if an individual objects to some but not all contraceptive services, but the issuer. and as applicable, plan sponsor. are willing to provide the plan sponsor or individual. as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives. and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

b. References to Moral Exemptions in Accommodation Regulations and in Regulatory Restatement of Statutory Language

These rules finalize without change the references to the moral exemptions that were inserted by the Moral IFC into the rules that regulatorily restate the statutory language from section 2713(a) and (a)(4) of the Public Health Service Act. Similarly, these rules finalize without change from the Moral IFC references to the moral exemptions that were inserted into the regulations governing the optional accommodation process. These references operationalize the effect of the moral exemptions rule. and they allow contraceptive services to be made available to women if any employers with non-religious moral objections to contraceptive coverage choose to use the optional accommodation process.

3. Summary of Costs, Savings and Benefits of the Major Provisions

| Provision | Savings and Benefits | Costs |
|---|---|---|
| Finalizing insertion of references to moral exemptions into restatement of statutory language from section 2713(a) and (a)(4) of the Public Health Service Act. | These provisions, finalized without change, are for the purpose of inserting references to the moral exemptions into the regulatory restatement of section 2713(a) and (a)(4) of the Public Health Service Act, which already references the religious exemptions. This operationalizes the moral exemptions in each of the tri-agencies' rules. We estimate no economic savings or benefit from finalizing this part of the rule, but consider it a deregulatory action to minimize the regulatory impact beyond the scope set forth in the statute. | We estimate no costs from finalizing this part of the rule. |

Exhibit 2　　　　　　　　　　　　　　JA466　　　　　　　　　　　　　　JA-0000057

| Provision | Savings and Benefits | Costs |
|---|---|---|
| Finalized moral exemptions | The moral exemptions to the contraceptive coverage requirement are finalized with technical changes. Their purpose is to relieve burdens that some entities and individuals experience from being forced to choose between, on the one hand, complying with their moral beliefs and facing penalties from failing to comply with the contraceptive coverage requirement, and on the other hand, providing (or, for individuals, obtaining) contraceptive coverage in violation of their sincerely held moral beliefs. | We estimate there will be only a small amount of costs for these exemptions, because they will primarily be used by organizations and individuals that do not want contraceptive coverage. To the extent some other employers will use the exemption where there will be transfer costs for women previously receiving contraceptive coverage who will no longer receive that coverage, we expect those costs to be minimal due to the small number of entities expected to use the exemptions with non-religious moral objections. We estimate the transfer costs will amount to $8,760. |
| Finalizing insertion of references to moral exemptions into optional accommodation regulations. | These provisions, finalized without change, will allow organizations with moral objections to contraceptive coverage on the basis of sincerely held moral convictions to use the accommodation as an optional process. These provisions will allow contraceptive coverage to be made available to women covered by plans of employers that object to contraceptive coverage but do not object to their issuers or third party administrators arranging for such coverage to be provided to persons covered by their plans. | We do not estimate any entities with non-religious moral objections to use the accommodation process at this time. |

## B. Background

Over many decades, Congress has protected conscientious objections including based on moral convictions in the context of health care and human services, and including health coverage, even as it has sought to promote access to health services.[1] In 2010, Congress

enacted the Patient Protection and Affordable Care Act (PPACA) (Pub. L. 111–148) (March 23, 2010). Congress enacted the Health Care and Education Reconciliation Act of 2010 (HCERA) (Pub. L. 111–152) on March 30, 2010, which, among other things, amended PPACA. As amended by HCERA, PPACA is known as the Affordable Care Act (ACA).

The ACA reorganized, amended, and added to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The ACA added section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code), in order to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and

health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

In section 2713(a)(4) of the PHS Act (hereinafter "section 2713(a)(4)"), Congress provided administrative discretion to require that certain group health plans and health insurance issuers cover certain women's preventive services, in addition to other preventive services required to be covered in section 2713. Congress granted that discretion to the Health Resources and Services Administration (HRSA), a component of the U.S. Department of Health and Human Services (HHS). Specifically, section 2713(a)(4) allows HRSA discretion to specify coverage requirements, "with respect to women, such additional preventive care and screenings as provided for in comprehensive guidelines supported" by HRSA (the "Guidelines").

Since 2011, HRSA has exercised that discretion to require coverage for, among other things, certain contraceptive services.[2] In the same

[1] *See, for example,* 42 U.S.C. 300a–7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting individuals and entities that object to abortion); Consolidated Appropriations Act, 2018, Div. H, Sec. 507(d) (Departments of Labor, HHS, and Education, and Related Agencies Appropriations Act), Public Law 115–141, 132 Stat. 348, 764 (Mar. 23, 2018) (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion for any reason); *Id.* at Div. E. Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); *Id.* at Div. E. Sec. 808 (regarding any requirement of "the provision of contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."); *Id.* at Div. K, Title III (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb–36 (prohibiting the statutory section from being construed to require suicide related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare+Choice, now Medicare Advantage, managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal law does not infringe on "conscience" as protected in State law concerning

advance directives); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide); *see also* 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require assistance in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/AIDS funds contrary to their "religious or moral objection").

[2] The references in this document to "contraception," "contraceptive," "contraceptive coverage," or "contraceptive services" generally include all contraceptives, sterilization, and related patient education and counseling, required by the Women's Preventive Guidelines, unless otherwise indicated. The Guidelines issued in 2011 referred to "Contraceptive Methods and Counseling" as "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *https://www.hrsa.gov/womens-guidelines/index.html.* The Guidelines as amended in December 2016 refer, under the header "Contraception," to: "the full range of female-controlled U.S. Food and Drug Administration-approved contraceptive methods, effective family

Exhibit 2                    JA467                    JA-0000058

time period, the administering agencies—HHS, the Department of Labor, and the Department of the Treasury (collectively, "the Departments" [3])—exercised discretion to allow exemptions to those requirements by issuing rulemaking various times, including issuing and finalizing three interim final regulations prior to 2017.[4] In those regulations, the Departments crafted exemptions and accommodations for certain religious objectors where the Guidelines require coverage of contraceptive services, changed the scope of those exemptions and accommodations, and solicited public comments on a number of occasions. Public comments were submitted on various iterations of the regulations issued before 2017, and some of those comments supported expanding the exemptions to include those who oppose the contraceptive coverage mandate for either religious "or moral" reasons, consistent with various state laws (such as in Connecticut or Missouri) that protect objections to contraceptive coverage based on moral convictions.[5]

During the period when the Departments were publishing and modifying the regulations, organizations and individuals filed dozens of lawsuits challenging the contraceptive coverage requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate"). Plaintiffs included religious nonprofit organizations, businesses run by religious families, individuals, and others, including several non-religious organizations that opposed coverage of certain contraceptives under the Mandate on the basis of non-religious moral convictions. For-profit entities with religious objections won various court decisions leading to the Supreme Court's ruling in *Burwell* v. *Hobby Lobby Stores, Inc.* 134 S. Ct. 2751 (2014). The Supreme Court ruled against the Departments and held that, under the Religious Freedom Restoration Act of 1993 (RFRA), the Mandate could not be applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage.[6] Later, a second series of legal challenges were filed by religious nonprofit organizations that stated the accommodation impermissibly burdened their religious beliefs because it utilized their health plans to provide services to which they objected on religious grounds, and it required them to submit a self-certification or notice. On May 16, 2016, the Supreme Court issued a per curiam decision, vacating the judgments of the Courts of Appeals—most of which had ruled in the Departments' favor—and remanding the cases "in light of the substantial clarification and refinement in the positions of the parties" that had been filed in supplemental briefs. *Zubik* v. *Burwell*, 136 S. Ct. 1557, 1560 (2016). The Court stated that it anticipated that, on remand, the Courts of Appeals would "allow the parties sufficient time to resolve any outstanding issues between them." *Id.*

Beginning in 2015, lawsuits challenging the Mandate were also filed by various non-religious organizations with moral objections to contraceptive coverage. These organizations stated that they believe some methods classified by the Food and Drug Administration (FDA) as contraceptives may have an abortifacient effect and, therefore, in their view, are morally equivalent to abortion to which they

have a moral objection. Under regulations preceding October 2017, these organizations neither received an exemption from the Mandate nor qualified for the accommodation. For example, March for Life filed a complaint claiming that the Mandate violated the equal protection component of the Due Process Clause of the Fifth Amendment, and was arbitrary and capricious under the Administrative Procedure Act (APA). Citing, for example, 77 FR 8727, March for Life argued that the Departments' stated interests behind the Mandate were only advanced among women who "want" the coverage so as to prevent "unintended" pregnancy. March for Life contended that, because it only hires employees who publicly advocate against abortion, including what they regard as abortifacient contraceptive items, the Departments' interests were not rationally advanced by imposing the Mandate upon it and its employees. Accordingly, March for Life contended that applying the Mandate to it (and other similarly situated organizations) lacked a rational basis and, therefore, was arbitrary and capricious in violation of the APA. March for Life further contended that, because the Departments concluded the government's interests were not undermined by exempting houses of worship and integrated auxiliaries (based on the assumption that such entities are relatively more likely than other nonprofits with religious objections to have employees that share their views against certain contraceptives), applying the Mandate to March for Life or similar organizations that definitively hire only employees who oppose certain contraceptives lacked a rational basis and, therefore, violated their right of equal protection under the Due Process Clause.

March for Life's employees, who stated they were personally religious (although personal religiosity was not a condition of their employment), also sued as co-plaintiffs. They contended that the Mandate violated their rights under RFRA by making it impossible for them to obtain health coverage consistent with their religious beliefs, either from the plan March for Life wanted to offer them, or in the individual market, because the Departments offered no exemptions in either circumstance. Another non-religious nonprofit organization that opposed the Mandate's requirement to provide certain contraceptive coverage on moral grounds also filed a lawsuit challenging the Mandate. *Real*

planning practices, and sterilization procedures," "contraceptive counseling, initiation of contraceptive use, and follow-up care [*e.g.,* management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method]," and "instruction in fertility awareness-based methods, including the lactation amenorrhea method." *https://www.hrsa.gov/womens-guidelines-2016/index.html.*

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

[4] Interim final regulations on July 19, 2010, at 75 FR 41726 (July 2010 interim final regulations); interim final regulations amending the July 2010 interim final regulations on August 3, 2011, at 76 FR 46621; final regulations on February 15, 2012, at 77 FR 8725 (2012 final regulations); an advance notice of proposed rulemaking (ANPRM) on March 21, 2012, at 77 FR 16501; proposed regulations on February 6, 2013, at 78 FR 8456; final regulations on July 2, 2013, at 78 FR 39870 (July 2013 final regulations); interim final regulations on August 27, 2014, at 79 FR 51092 (August 2014 interim final regulations); proposed regulations on August 27, 2014, at 79 FR 51118 (August 2014 proposed regulations); final regulations on July 14, 2015, at 80 FR 41318 (July 2015 final regulations); and a request for information on July 26, 2016, at 81 FR 47741 (RFI), which was addressed in an FAQ document issued on January 9, 2017, available at: *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf.*

[5] *See, for example,* Denise M. Burke, Re: file code CMS–9968–P, *Regulations.gov* (posted May 5, 2013), *http://www.regulations.gov/#!documentDetail;D=CMS-2012-0031-79115;* Comment, *Regulations.gov* (posted Oct. 26, 2016), *https://www.regulations.gov/document?D=CMS-2016-0123-54142;* David Sater, Re: CMS–9931–NC: Request for Information, *Regulations.gov* (posted Oct. 26, 2016), *https://www.regulations.gov/document?D=CMS-2016-0123-54218;* Comment, *Regulations.gov* (posted Oct. 26, 2016), *https://*

*www.regulations.gov/document?D=CMS-2016-0123-46220.*

[6] The Supreme Court did not decide whether RFRA would apply to publicly traded for-profit corporations. *See* 134 S. Ct. at 2774.

Exhibit 2                                JA468                                JA-0000059

*Alternatives, Inc.* v. *Burwell.* 150 F. Supp. 3d 419 (M.D. Pa. 2015).

Challenges by non-religious nonprofit organizations led to conflicting opinions among the federal courts. A district court agreed with the March for Life plaintiffs on the organization's equal protection claim and the employees' RFRA claims, while not specifically ruling on the APA claim, and issued a permanent injunction against the Departments that is still in place. *March for Life* v. *Burwell,* 128 F. Supp. 3d 116 (D.D.C. 2015). The appeal in *March for Life* is pending and has been stayed since early 2016. In another case, federal district and appellate courts in Pennsylvania disagreed with the reasoning in *March for Life,* and ruled against claims brought by a similarly non-religious nonprofit employer and its religious employees. *Real Alternatives,* 150 F. Supp. 3d 419, *affirmed by* 867 F.3d 338 (3d Cir. 2017). One member of the appeals court panel in *Real Alternatives* v. *Sec'y of HHS* dissented in part, stating he would have ruled in favor of the individual employee plaintiffs under RFRA. 867 F.3d 338, 367 (3d Cir. 2017) (Jordan. J., dissenting).

The Departments most recently solicited public comments on these issues again in two interim final regulations with request for comments published in the **Federal Register** on October 13, 2017: The regulations (82 FR 47838) (the Moral IFC) that are being finalized with changes here, and the regulations (82 FR 47792) (the Religious IFC) published on the same day as the Moral IFC, which are being finalized with changes in the companion final rules published elsewhere in today's **Federal Register.**

In the preamble to the Moral IFC, the Departments explained several reasons why, after exercising our discretion to reevaluate the exemptions and accommodations for the contraceptive Mandate, we sought public comment on whether to protect moral convictions in the Moral IFC and these final rules. The Departments noted that we considered, among other things, Congress's history of providing protections for moral convictions regarding certain health services (including contraception, sterilization, and items or services believed to involve abortion); the text, context, and intent of section 2713(a)(4) and the ACA; Executive Order 13798, "Promoting Free Speech and Religious Liberty" (May 4, 2017); previously submitted public comments; and the extensive litigation over the contraceptive Mandate. The Departments concluded that it was appropriate that HRSA take into account

the moral convictions of certain employers, individuals and health insurance issuers where the coverage of contraceptive services is concerned. Comments were requested on the interim final regulations.

After consideration of the comments and feedback received from stakeholders, the Departments are finalizing the Moral IFC, with changes based on comments as indicated herein.[7]

## II. Overview of the Final Rules and Public Comments

During the 60-day comment period for the Moral IFC, which closed on December 5, 2017, the Departments received over 54,000 public comment submissions, which are posted to *www.regulations.gov.*[8] Below, the Departments provide an overview of the final rules and address the issues raised in the comments we received.

### A. Moral Exemptions and Accommodation in General

These rules expand exemptions to protect certain entities and individuals with moral convictions that oppose contraception whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the ACA. These rules do not alter the discretion of HRSA, a component of HHS, to maintain the Guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also make available to exempt organizations the accommodation process, which was previously established in response to some objections of religious organizations, as an optional process for exempt entities that wish to use it voluntarily. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives or related education and

counseling for women at risk of unintended pregnancy.[9]

### 1. The Departments' Authority To Mandate Coverage or Provide Exemptions

The Departments received conflicting comments on their legal authority to provide exemptions and accommodations to the Mandate. Some commenters agreed that the Departments are legally authorized to provide expanded exemptions and an accommodation for moral convictions, noting that there was no requirement of contraceptive coverage in the ACA and no prohibition on providing moral exemptions in Guidelines issued under section 2713(a)(4). Other commenters, however, asserted that the Departments have no legal authority to provide any exemptions to the contraceptive Mandate, contending, based on statements in the ACA's legislative history, that the ACA requires contraceptive coverage. Still other commenters contended that the Departments are legally authorized to provide the religious exemptions that existed prior to the 2017 IFCs, but not to protect moral convictions.

The Departments conclude that we are legally authorized to provide the exemption and accommodation for moral convictions set forth in the Moral IFC and these final rules. These rules concern section 2713 of the PHS Act, as incorporated into ERISA and the Code. Congress has granted the Departments legal authority, collectively, to administer these statutes. (26 U.S.C. 9833; 29 U.S.C. 1191c: 42 U.S.C. 300gg–92).

Where it applies, section 2713(a)(4) requires coverage without cost sharing for "such additional" women's preventive care and screenings "as provided for" and "supported by" guidelines developed by HHS acting through HRSA. When Congress enacted this provision, those Guidelines did not exist. And nothing in the statute mandated that the Guidelines had to include contraception, let alone for all types of employers with covered plans. Instead, section 2713(a)(4) provided a

---

[7] The Department of the Treasury and Internal Revenue Service published proposed and temporary regulations as part of the joint rulemaking of the Moral IFC. The Departments of Labor and HHS published their respective rules as interim final rules with request for comments and are finalizing their interim final rules in these final rules. The Department of the Treasury and Internal Revenue Service are finalizing their regulations.

[8] See *Regulations.gov* at *https:// www.regulations.gov/searchResults?rpp=25&so= DESC&sb=postedDate&po=0&cmd= 12%7C05%7C17-12%7C05%7C17&dktid=CMS-2017-0133* and *https://www.regulations.gov/docketBrowser?rpp=25&so=ASC&sb=posted Date&po=100&D=IRS-2017-0015.* Some of those submissions included form letters or attachments that, while not separately tabulated at regulations.gov, together included comments from, or were signed by, possibly over a hundred thousand separate persons. The Departments reviewed all of the public comments and attachments.

[9] *See, for example,* Family Planning grants in 42 U.S.C. 300, *et seq.;* the Teenage Pregnancy Prevention Program, Public Law 112–74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c–8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b–12; Title XIX of the Social Security Act, 42 U.S.C. 1396, *et seq.;* the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), & 25 U.S.C. 1601, *et seq.;* Health center grants, 42 U.S.C. 254b(e), (g), (h), & (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

Exhibit 2

positive grant of authority for HSRA to develop those Guidelines, thus delegating authority to HHS to shape that development, as the administering agency of HRSA, and to all three agencies as the administering agencies of the statutes by which the Guidelines are enforced. *See* 26 U.S.C. 9833; 29 U.S.C. 1191(c), 42 U.S.C. 300gg–92. That is especially true for HHS, as HRSA is a component of HHS that was unilaterally created by the agency and thus is subject to the agency's general supervision, *see* 47 FR 38409 (August 31, 1982). Thus, nothing prevented HRSA from creating an exemption from otherwise-applicable guidelines or prevented HHS and the other agencies from directing that HRSA create such an exemption.

Congress did not specify the extent to which HRSA must ''provide for'' and ''support'' the application of Guidelines that it chooses to adopt. HRSA's authority to support ''comprehensive guidelines'' involves determining both the types of coverage and scope of that coverage. Section 2714(a)(4) requires coverage for preventive services only ''as provided for in comprehensive guidelines supported by [HRSA].'' That is, services are required to be included in coverage only to the extent that the Guidelines supported by HRSA provide for them. Through use of the word ''as'' in the phrase ''as provided for,'' it requires that HRSA support how those services apply—that is, the manner in which the support will happen, such as in the phrase ''as you like it.'' [10] When Congress means to require certain activities to occur in a certain manner, instead of simply authorizing the agency to decide the manner in which they will occur, Congress knows how to do so. *See for example,* 42 U.S.C. 1395x (''The Secretary shall establish procedures to make beneficiaries and providers aware of the requirement that a beneficiary complete a health risk assessment *prior to or at the same time as* receiving personalized prevention plan services.'') (emphasis added). Thus, the inclusion of ''as'' in section 300gg–13(a)(3), and its absence in similar neighboring provisions, shows that HRSA has discretion whether to support how the preventive coverage mandate applies—it does not refer to the timing of the promulgation of the Guidelines.

Nor is it simply a textual aberration that the word ''as'' is missing from the other three provisions in section 2713(a) of the PHS Act. Rather, this difference

mirrors other distinctions within that section that demonstrate that Congress intended HRSA to have the discretion the Agencies invoke. For example, sections (a)(1) and (a)(3) require ''evidence-based'' or ''evidence-informed'' coverage, while section (a)(4) does not. This difference suggests that the Agencies have the leeway to incorporate policy-based concerns into their decision-making. This reading of section 2713(a)(4) also prevents the statute from being interpreted in a cramped way that allows no flexibility or tailoring, and that would force the Departments to choose between ignoring religious objections in violation of RFRA or else eliminating the contraceptive coverage requirement from the Guidelines altogether. The Departments instead interpret section 2713(a)(4) as authorizing HRSA's Guidelines to set forth both the kinds of items and services that will be covered, and the scope of entities to which the contraceptive coverage requirement in those Guidelines will apply.

The moral objections at issue here, like the religious objections prompting exemptions dating back to the inception of the Mandate in 2011, may, consistent with the statutory provision, permissibly inform what HHS, through HRSA, decides to provide for and support in the Guidelines. Since the first rulemaking on this subject in 2011, the Departments have consistently interpreted the broad discretion granted to HRSA in section 2713(a)(4) as including the power to reconcile the ACA's preventive-services requirement with sincerely held views of conscience on the sensitive subject of contraceptive coverage—namely, by exempting churches and their integrated auxiliaries from the contraceptive-coverage Mandate. (*See* 76 FR at 46623.) As the Departments explained at that time, the HRSA Guidelines ''exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women,'' and ''it is appropriate that HRSA . . . takes into account the effect on the religious beliefs of [employers] if coverage of contraceptive services were required in [their] group health plans.'' *Id.* Consistent with that longstanding view, Congress's grant of discretion in section 2713(a)(4), and the lack of a mandate that contraceptives be covered or that they be covered without any exemptions or exceptions, lead the Departments to conclude that we are legally authorized to exempt certain entities or plans from a contraceptive

Mandate if HRSA decides to otherwise include contraceptives in its Guidelines.

The Departments' conclusions are consistent with our interpretation of section 2713 of the PHS Act since 2010, when the ACA was enacted, and since the Departments started to issue interim final regulations implementing that section. The Departments have consistently interpreted section 2713(a)(4) to grant broad discretion to decide the extent to which HRSA will provide for, and support, the coverage of additional women's preventive care and screenings, including the decision to exempt certain entities and plans, and not to provide for or support the application of the Guidelines with respect to those entities or plans. The Departments created an exemption to the contraceptive Mandate when that Mandate was announced in 2011, and then amended and expanded the exemption and added an accommodation process in multiple rulemakings thereafter. The accommodation process requires the provision of coverage or payments for contraceptives to plan participants in an eligible organization's health plan by the organization's insurer or third party administrator. However, the accommodation process itself, in some cases, failed to require contraceptive coverage for many women, because—as the Departments acknowledged at the time—the enforcement mechanism for that process, section 3(16) of ERISA, does not provide a means to impose an obligation to provide contraceptive coverage on the third party administrator of self-insured church plans (see 80 FR 41323). Non-exempt employers participate in many church plans. Therefore, in both the previous exemption, and in the previous accommodation's application to self-insured church plans, the Departments have been choosing not to require contraceptive coverage for certain kinds of employers since the Guidelines were adopted. In doing so, the Departments have been acting contrary to commenters who contended the Departments had no authority to create exemptions under section 2713 of the PHS Act, or its incorporation into ERISA and the Code, and who contended instead that the Departments must enforce Guidelines on the broadest spectrum of group health plans as possible, even including churches (see, for example, 2012 final regulations at 77 FR 8726).

The Departments' interpretation of section 2713(a)(4) is confirmed by the ACA's statutory structure. Congress did not intend to require entirely uniform coverage of preventive services (see for

---

[10] See As (usage 2), *Oxford English Dictionary Online* (Feb. 2018) [''[u]sed to indicate by comparison the way something happens or is done''].

Exhibit 2                                                                 JA470                                                        JA-0000061

example, 76 FR 46623). On the contrary, Congress carved out an exemption from section 2713 of the PHS Act (and from several other provisions) for grandfathering plans. In contrast. the grandfathering exemption is not applicable to many of the other provisions in Title I of the ACA— provisions previously referred to by the Departments as providing "particularly significant protections." (75 FR 34540). Those provisions include (from the PHS Act) section 2704, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708, which prohibits excessive waiting periods (as of January 1, 2014); section 2711, which relates to lifetime dollar limits: section 2712, which generally prohibits rescission of health coverage; section 2714, which extends dependent child coverage until the child turns 26; and section 2718, which imposes a minimum medical loss ratio on health insurance issuers in the individual and group markets (for insured coverage), and requires them to provide rebates to policyholders if that medical loss ratio is not met. (75 FR 34538, 34540, 34542). Consequently. of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not subject to section 2713.[11] Some commenters assert the exemptions for grandfathered plans are temporary, or were intended to be temporary, but as the Supreme Court observed, "there is no legal requirement that grandfathered plans ever be phased out." *Burwell* v. *Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2764 n.10 (2014).

Some commenters argue that Executive Order 13535's reference to implementing the ACA consistent with certain conscience laws does not justify creating exemptions to contraceptive coverage in the Guidelines, because those laws do not specifically require exemptions in the Guidelines. The Departments, however, believe that they are acting consistent with Executive Order 13535 by creating exemptions using HRSA's authority under section 2713(a)(4), and the Departments' administrative authority over the implementation of section 2713(a) of the PHS Act. Executive Order 13535, issued upon the signing of the ACA, specified that "longstanding Federal laws to protect conscience . . . remain intact,"

including laws that protect holders of religious beliefs or moral convictions from certain requirements in health care contexts. Although the text of Executive Order 13535 does not require the expanded exemptions confirmed in these final rules, the expanded exemptions are, as explained below, consistent with longstanding federal laws to protect conscience objections. based on religious beliefs or moral convictions regarding certain health matters, and are consistent with the intent that the ACA be implemented in accordance with the conscience protections set forth in those laws.

Some commenters contended that, even though Executive Order 13535 refers to the Church Amendments, the intention of those statutes is narrow, should not be construed to extend to entities instead of to individuals, and should not be construed to prohibit procedures. But those comments mistake the Departments' position. The Departments are not construing the Church Amendments to require these exemptions. nor do the exemptions prohibit any procedures. Instead, through longstanding federal conscience statutes, Congress has established consistent principles concerning respect for sincerely held moral convictions in sensitive healthcare contexts.[12] Under those principles. and absent any contrary requirement of law, the Departments are offering exemptions for sincerely held moral convictions to the extent the Departments otherwise impose a contraceptive Mandate. These exemptions do not prohibit any services, nor authorize employers to prohibit employees from obtaining any services. The exemptions in the Moral IFC and these final rules simply refrain from imposing a federal mandate that employers cover contraceptives in their health plans even if they have sincerely held moral convictions against doing so.

Some commenters stated that the Supreme Court ruled that the exemptions provided for houses of worship and integrated auxiliaries were required by the First Amendment. From this, commenters concluded that the exemptions for houses of worship and integrated auxiliaries are legally authorized, but that exemptions beyond those are not. But the Supreme Court did not rule on the question whether the

exemptions provided for houses of worship and integrated auxiliaries were required by the First Amendment, and the Court did not say the Departments must apply the contraceptive Mandate unless RFRA prohibits us from doing so.

The appropriateness of including exemptions to protect moral convictions is informed by Congress's long history of providing exemptions for moral convictions. especially in certain health care contexts.

### 2. Congress's History of Protecting Moral Convictions

The Department received numerous comments about its decision in the Moral IFC to exercise its discretion to provide moral exemptions to, and an accommodation under, the contraceptive Mandate. Some commenters agreed with the Departments' decision in the Moral IFC, arguing that it is appropriate to exercise the Departments' discretion to protect moral convictions in light of Congress's history of protecting moral convictions in various contexts, especially concerning health care. Other commenters disagreed, saying that existing conscience statutes protecting moral convictions do not require these exemptions and, therefore, the exemptions should not be offered. Some commenters stated that because Congress has provided conscience protections, but did not specifically provide them in section 2713(a)(4). conscience protections are inappropriate in the implementation of that section. Still other commenters went further. disagreeing with conscience protections regarding contraceptives, abortions, or health care in general.

In deciding the most appropriate way to exercise our discretion in this context, the Departments draw on the most recent statements of Congress, along with nearly 50 years of statutes and Supreme Court precedent discussing the protection of moral convictions in certain circumstances— particularly in the context of health care and health coverage. Most recently, Congress expressed its intent on the matter of Government-mandated contraceptive coverage when it declared. with respect to the possibility that the District of Columbia would require contraceptive coverage, that "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions." Consolidated Appropriations Act, 2018, Div. E, section 808, Public Law 115–141, 132 Stat. 348, 603 (Mar. 23, 2018); *see also*

---

[11] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2017 Annual Survey," Henry J Kaiser Family Foundation (Sept. 19. 2017), *http://files.kff.org/attachment/ Report-Employer-Health-Benefits-Annual-Survey-2017.*

[12] The Departments note that the Church Amendments are the subject of another, ongoing rulemaking process. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 FR 3880 (NPRM Jan. 26, 2018). Since the Departments are not construing the Amendments to require the religious exemptions, we defer issues regarding the scope, interpretation, and protections of the Amendments to HHS in that rulemaking.

Consolidated Appropriations Act, 2017, Div. C, section 808, Public Law 115–31 (May 5, 2017). The Departments consider it significant that Congress's most recent statements on the prospect of Government-mandated contraceptive coverage specifically intend that a conscience clause be included to protect moral convictions.

The Departments also consider significant the many statutes listed above, in section I—Background footnote 1, that show Congress's consistent protection of moral convictions alongside religious beliefs in the federal regulation of health care. These include laws such as the Church Amendments (dating back to 1973), which we discuss at length below, to the 2018 Consolidated Appropriations Act discussed above. Notably among those laws, and in addition to the Church Amendments, Congress has enacted protections for health plans or health care organizations in Medicaid or Medicare Advantage to object "on moral or religious grounds" to providing coverage of certain counseling or referral services. 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare + Choice (now Medicare Advantage) managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"). Congress has also protected individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions." Consolidated Appropriations Act, 2018, Public Law 115–141, Division E, section 726(c); *see also* Consolidated Appropriations Act of 2017, Division C. Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act). Public Law 115–31.[13]

The Departments disagree with commenters that suggested we should not consider Congress's history of protecting moral objections in certain health care contexts due to Congress's failure to explicitly include exemptions in section 2713(a)(4) itself. The argument by these commenters proves too much, since Congress also did not

specifically require contraceptive coverage in section 2713 of the PHS Act. This argument would also negate not just these expanded exemptions, but the previous exemptions provided for houses of worship and integrated auxiliaries, and the indirect exemption for self-insured church plans that use the accommodation. Where Congress left so many matters concerning section 2713(a)(4) to agency discretion. the Departments consider it appropriate to implement these expanded exemptions in light of Congress's long history of respecting moral convictions in the context of certain federal health care requirements.

a. The Church Amendments' Protection of Moral Convictions

One of the most important and well-established federal statutes respecting conscientious objections in specific health care contexts was enacted over the course of several years beginning in 1973. initially as a response to court decisions raising the prospect that entities or individuals might be required to facilitate abortions or sterilizations because they had received federal funds. These sections of the U.S. Code are known as the Church Amendments, named after their primary sponsor, Senator Frank Church (D-Idaho). The Church Amendments specifically provide conscience protections based on sincerely held moral convictions, not just religious beliefs. Among other things, the amendments protect the recipients of certain federal health funds from being required to perform. assist, or make their facilities available for abortions or sterilizations if they object "on the basis of religious beliefs or moral convictions," and they prohibit recipients of certain federal health funds from discriminating against any personnel "because he refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions" (42 U.S.C. 300a–7(b), (c)(1)). Later additions to the Church Amendments protect other conscientious objections, including some objections on the basis of moral conviction to "any lawful health service," or to "any part of a health service program." (42 U.S.C. 300a–7(c)(2), (d)). In contexts covered by those sections of the Church Amendments, the provision or coverage of certain contraceptives, depending on the circumstances, could constitute "any lawful health service" or a "part of a health service program." As such, the

protections provided by those provisions of the Church Amendments would encompass moral objections to contraceptive services or coverage.

The Church Amendments were enacted in the wake of the Supreme Court's decision in *Roe* v. *Wade*, 410 U.S. 113 (1973). Although the Court in *Roe* required abortion to be legal in certain circumstances, *Roe* did not include. within that right, the requirement that other citizens facilitate its exercise. Indeed, *Roe* favorably quoted the proceedings of the American Medical Association House of Delegates 220 (June 1970), which declared, "Neither physician, hospital, nor hospital personnel shall be required to perform any act violative of personally-held moral principles." 410 U.S. at 144 & n.38 (1973). Likewise, in *Roe's* companion case, *Doe* v. *Bolton*, the Court observed that, under state law, "a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure." 410 U.S. 179, 197–98 (1973). The Court said that these conscience provisions "obviously . . . afford appropriate protection." *Id.* at 198. As an Arizona court later put it, "a woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either." *Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists,* 257 P.3d 181, 196 (Ariz. Ct. App. 2011).

The Congressional Record contains discussions that occurred when the protection for moral convictions was first proposed in the Church Amendments. When Senator Church introduced the first of those amendments in 1973, he cited not only *Roe* v. *Wade.* but also an instance where a federal court had ordered a Catholic hospital to perform sterilizations. 119 Congr. Rec. S5717–18 (Mar. 27, 1973). After his opening remarks, Senator Adlai Stevenson III (D–IL) rose to ask that the amendment be changed to specify that it also protects objections to abortion and sterilization based on moral convictions on the same terms as it protects objections based on religious beliefs. The following excerpt of the Congressional Record records this discussion:

Mr. STEVENSON. Mr. President, first of all I commend the Senator from Idaho for bringing this matter to the attention of the Senate. I ask the Senator a question.

One need not be of the Catholic faith or any other religious faith to feel deeply about the worth of human life. The protections afforded by this amendment run only to those whose religious beliefs would be offended by the necessity of performing or

---

[13] The Departments also note that, in protecting those individual and institutional health care entities that object to certain abortion-related services and activities regardless of the basis for such objection, the Coats-Snowe Amendment, PHS Act section 245 (42 U.S.C. 238n), and the Weldon Amendment, Consolidated Appropriations Act, 2018, Div. H, Sec. 507(d), Public Law 115–141, protect those whose objection is based on moral conviction.

Exhibit 2                                   JA472                                   JA-0000063

participating in the performance of certain medical procedures; others. for moral reasons, not necessarily for any religious belief, can feel equally as strong about human life. They too can revere human life.

As mortals, we cannot with confidence say, when life begins. But whether it is life. or the potentiality of life. our moral convictions as well as our religious beliefs. warrant protection from this intrusion by the Government. Would, therefore, the Senator include moral convictions?

Would the Senator consider an amendment on page 2, line 18 which would add to religious beliefs, the words "or moral"?

Mr. CHURCH. I would suggest to the Senator that perhaps his objective could be more clearly stated if the words "or moral conviction" were added after "religious belief." I think that the Supreme Court in considering the protection we give religious beliefs has given comparable treatment to deeply held moral convictions. I would not be averse to amending the language of the amendment in such a manner. It is consistent with the general purpose. I see no reason why a deeply held moral conviction ought not be given the same treatment as a religious belief.

Mr. STEVENSON. The Senator's suggestion is well taken. I thank him.

### 119 Congr. Rec. S5717–18

As the debate proceeded, Senator Church went on to quote *Doe* v. *Bolton's* reliance on a Georgia statute that stated "a physician or any other employee has the right to refrain. for moral or religious reasons, from participating in the abortion procedure." 119 Congr. Rec. S5722 (quoting 410 U.S. at 197–98). Senator Church added, "I see no reason why the amendment ought not also to cover doctors and nurses who have strong moral convictions against these particular operations." *Id.* Considering the scope of the protections, Senator Gaylord Nelson (D–WI) asked whether, "if a hospital board, or whatever the ruling agency for the hospital was, a governing agency or otherwise, just capriciously—and not upon the religious or moral questions at all— simply said, 'We are not going to bother with this kind of procedure in this hospital,' would the pending amendment permit that?" 119 Congr. Rec. S5723. Senator Church responded that the amendment would not encompass such an objection. *Id.*

Senator James L. Buckley (C–NY), speaking in support of the amendment, added the following perspective:

Mr. BUCKLEY. Mr. President. I compliment the Senator from Idaho for proposing this most important and timely amendment. It is timely in the first instance because the attempt has already been made to compel the performance of abortion and sterilization operations on the part of those who are fundamentally opposed to such procedures. And it is timely also because the

recent Supreme Court decisions will likely unleash a series of court actions across the United States to try to impose the personal preferences of the majority of the Supreme Court on the totality of the Nation.

I believe it is ironic that we should have this debate at all. Who would have predicted a year or two ago that we would have to guard against even the possibility that someone might be free [sic] [14] to participate in an abortion or sterilization against his will? Such an idea is repugnant to our political tradition. This is a Nation which has always been concerned with the right of conscience. It is the right of conscience which is protected in our draft laws. It is the right of conscience which the Supreme Court has quite properly expanded not only to embrace those young men who, because of the tenets of a particular faith, believe they cannot kill another man, but also those who because of their own deepest moral convictions are so persuaded.

I am delighted that the Senator from Idaho has amended his language to include the words "moral conviction," because, of course, we know that this is not a matter of concern to any one religious body to the exclusion of all others, or even to men who believe in a God to the exclusion of all others. It has been a traditional concept in our society from the earliest times that the right of conscience, like the paramount right to life from which it is derived, is sacred.

### 119 Congr. Rec. S5723

In support of the same protections when they were debated in the U.S. House, Representative Margaret Heckler (R–MA) [15] likewise observed that "the right of conscience has long been recognized in the parallel situation in which the individual's right to conscientious objector status in our selective service system has been protected" and "expanded by the Supreme Court to include moral conviction as well as formal religious belief." 119 Congr. Rec. H4148–49 (May 31, 1973). Rep. Heckler added, "We are concerned here only with the right of moral conscience, which has always been a part of our national tradition." *Id.* at 4149.

These first sections of the Church Amendments, codified at 42 U.S.C. 300a–7(b) and (c)(1), passed the House 372–1. and were approved by the Senate 94–0. 119 Congr. Rec. at H4149: 119 Congr. Rec. S10405 (June 5, 1973). The subsequently adopted provisions that comprise the Church Amendments similarly extend protection to those organizations and individuals who object to the provision of certain services on the basis of their moral convictions. as well as those who object

to such services on the basis of religious beliefs. And. as noted above, subsequent statutes add protections for moral objections in many other situations. These include, for example:

• Protections for individuals and entities that object to abortion. *See* 42 U.S.C. 238n; 42 U.S.C. 18023; 42 U.S.C. 2996f(b); Consolidated Appropriations Act, 2018. Div. H. Sec. 507(d), Public Law 115–141.

• Protections for entities and individuals that object to providing or covering contraceptives. *See id.* at Div. E, Sec. 808; *id.* at Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act); *id.* at Div. K, Title III.

• Protections for entities and individuals that object to performing, assisting, counseling, or referring as pertains to suicide, assisted suicide, or advance directives. *See* 42 U.S.C. 290bb–36; 42 U.S.C. 1396a(w)(3); 42 U.S.C. 14406; 42 U.S.C. 18113 (adopted as part of the ACA).

The Departments believe that the intent behind Congress's protection of moral convictions in certain health care contexts, especially to protect entities and individuals from governmental coercion, supports the Departments' decision in the Moral IFC and these final rules to protect sincerely held moral convictions from governmental compulsion threatened by the contraceptive Mandate.

### b. Court Precedents Relevant to These Expanded Exemptions

As reflected in the legislative history of the first Church Amendments, the Supreme Court has long afforded protection to moral convictions alongside religious beliefs. Indeed, Senator Church cited *Doe* v. *Bolton*, 410 U.S. 179. as a parallel instance of conscience protection and spoke of the Supreme Court generally giving "comparable treatment to deeply held moral convictions." Both Senator Buckley and Rep. Heckler specifically cited the Supreme Court's protection of moral convictions in laws governing military service. Those legislators appear to have been referencing cases such as *Welsh* v. *United States,* 398 U.S. 333 (1970), which the Supreme Court had decided just three years earlier.

*Welsh* involved what is perhaps the Government's paradigmatic compelling interest—the need to defend the nation by military force. The Court stated that, where the Government protects objections to military service based on "religious training and belief," that protection would also extend to avowedly non-religious objections to war held with the same moral strength.

---

[14] The Senator might have meant "[forced] . . . against his will."

[15] Rep. Heckler later served as the 15th Secretary of HHS, from March 1983 to December 1985.

Exhibit 2                    JA473                    JA-0000064

*Id.* at 343. The Court declared, "[i]f an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption . . . as is someone who derives his conscientious opposition to war from traditional religious convictions."

In the context of this particular Mandate, it is also worth noting that, in *Hobby Lobby,* Justice Ginsburg (joined, in this part of the opinion, by Justices Breyer, Kagan, and Sotomayor), cited Justice Harlan's opinion in *Welsh,* 398 U.S. at 357–58, in support of her statement that "[s]eparating moral convictions from religious beliefs would be of questionable legitimacy." 134 S. Ct. at 2789 n.6. In quoting this passage, the Departments do not mean to suggest that all laws protecting only religious beliefs constitute an illegitimate "separat[ion]" of moral convictions, nor do the Departments assert that moral convictions must always be protected alongside religious beliefs; we also do not agree with Justice Harlan that distinguishing between religious and moral objections would violate the Establishment Clause. Instead, the Departments believe that, in the specific health care context implicated here, providing respect for moral convictions parallel to the respect afforded to religious beliefs is appropriate, draws from long-standing Federal Government practice, and shares common ground with Congress's intent in the Church Amendments and in later federal statutes that provide protections for moral convictions alongside religious beliefs in other health care contexts.

### c. Conscience Protections in Other Federal and State Contexts

The tradition of protecting moral convictions in certain health contexts is not limited to laws passed by Congress. Multiple federal regulations protect objections based on moral convictions in such contexts.[16] Other federal

regulations have also applied the principle of respecting moral convictions alongside religious beliefs in particular circumstances. The Equal Employment Opportunity Commission has consistently protected "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views" alongside religious views under the "standard [ ] developed in *United States* v. *Seeger,* 380 U.S. 163 (1965) and [*Welsh*]." 29 CFR 1605.1. The Department of Justice has declared that, in cases of capital punishment, no officer or employee may be required to attend or participate if doing so "is contrary to the moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such participation or attendance contrary to medical ethics." 28 CFR 26.5.[17]

Forty-five states have health care conscience protections covering objections to abortion; several of these also cover sterilization or contraception.[18] Most of those state laws protect objections based on "moral," "ethical," or "conscientious" grounds in addition to "religious" grounds. Particularly in the case of abortion, some federal and state conscience laws do not require any specified motive for the objection. 42 U.S.C. 238n; Consolidated Appropriations, 2018. Public Law 115–141, Div. H. section 507(d).

These various statutes and regulations reflect an important governmental interest in protecting moral convictions in appropriate health contexts. The contraceptive Mandate implicates that governmental interest. Many persons and entities object to the Mandate in part because they consider some forms of FDA-approved contraceptives to be

morally equivalent to abortion due to the possibility that such items may prevent the implantation of a human embryo after fertilization.[19] The Supreme Court, in describing family business owners with religious objections, explained that "[t]he owners of the businesses have religious objections to abortion, and according to their religious beliefs the four contraceptive methods at issue are abortifacients. If the owners comply with the HHS mandate, they believe they will be facilitating abortions." *Hobby Lobby,* 134 S. Ct. at 2751. Based on pleadings in the litigation, all of the litigants challenging the Mandate and asserting purely non-religious objections share this view. And as Congress has implicitly recognized in providing health care conscience protections pertaining to sterilization, contraception, and other health care services and practices, individuals or entities may have additional moral objections to contraception.[20]

### d. Founding Principles

The Departments also look to guidance from, and draw support for the Moral IFC and these final rules from, the broader history of respect for conscience in the laws and founding principles of the United States. Members of Congress specifically relied on the American tradition of respect for conscience when they decided to protect moral convictions in health care. In supporting the protection of conscience based on non-religious moral convictions, Senator Buckley declared "[i]t has been a traditional concept in our society from the earliest times that the right of conscience, like the paramount right to life from which it is derived, is sacred." Representative Heckler similarly stated that "the right of moral conscience . . . has always been a part of our national tradition." This tradition is reflected, for example, in a letter President George Washington wrote saying that "[t]he Citizens of the United States of America have a right to applaud themselves for having given to mankind examples of an enlarged and liberal policy: A policy worthy of imitation. All possess alike liberty of conscience and immunities of

---

[16] *See, for example,* 42 CFR 422.206 (declaring that the general Medicare Advantage rule "does not require the MA plan to cover, furnish, or pay for a particular counseling or referral service if the MA organization that offers the plan—(1) Objects to the provision of that service on moral or religious grounds." 42 CFR 438.102 (declaring that information requirements do not apply "if the MCO, PIHP, or PAHP objects to the service on

moral or religious grounds"); 48 CFR 1609.7001 ("health plan sponsoring organizations are not required to discuss treatment options that they would not ordinarily discuss in their customary course of practice because such options are inconsistent with their professional judgment or ethical, moral or religious beliefs."); 48 CFR 352.270–9 ("Non-Discrimination for Conscience" clause for organizations receiving HIV or Malaria relief funds).

[17] *See also* 18 CFR 214.11 (where a law enforcement agency (LEA) seeks assistance in the investigation or prosecution of trafficking of persons, the reasonableness of the LEA's request will depend in part on "[c]ultural, religious, or moral objections to the request").

[18] According to the Guttmacher Institute, 45 states have conscience statutes pertaining to abortion (43 of which cover institutions), 18 have conscience statutes pertaining to sterilization (16 of which cover institutions), and 12 have conscience statutes pertaining to contraception (8 of which cover institutions). "Refusing to Provide Health Services," The Guttmacher Institute (June 1, 2017), *https:// www.guttmacher.org/state-policy/explore/refusing- provide-health-services.*

[19] FDA, "Birth Control," U.S. Food and Drug Administration (Mar. 6, 2018), *https://www.fda.gov/ forconsumers/byaudience/forwomen/ freepublications/ucm313215.htm* (various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization, but "may also work . . . by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization).

[20] *See supra* note 1.

Exhibit 2                JA474                JA-0000065

citizenship." [21] Thomas Jefferson similarly declared that "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of the civil authority." [22] Although these statements by Presidents Washington and Jefferson were spoken to religious congregations, and although religious and moral conscience were tightly intertwined for the Founders, they both reflect a broad principle of respect for conscience against government coercion. James Madison likewise called conscience "the most sacred of all property," and proposed that the Bill of Rights should guarantee, in addition to protecting religious belief and worship, that "the full and equal rights of conscience [shall not] be in any manner, or on any pretext infringed." [23]

These Founding Era statements of general principle do not specify how they would be applied in a particular health care context, and the Departments do not suggest that the specific protections offered in the Moral IFC and these final rules would be required or necessarily appropriate in any other context that does not raise the specific concerns implicated by this Mandate. These final rules do not address in any way how the Government would balance its interests with respect to other health services not encompassed by the contraceptive Mandate.[24] Instead, the Departments highlight this tradition of respect for conscience from the Nation's Founding Era to provide background support for the Departments' decision to implement section 2713(a)(4), while protecting conscience in the exercise of moral convictions. The Departments believe that these final rules are consistent both with the American tradition of respect for conscience and with Congress's history of providing conscience protections in the kinds of health care matters involved in this Mandate.

---

[21] Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790) (available at *https://founders.archives.gov/documents/Washington/05-06-02-0135*).

[22] Letter to the Society of the Methodist Episcopal Church at New London, Connecticut (February 4, 1809) (available at *https://founders.archives.gov/documents/Jefferson/99-01-02-9714*).

[23] James Madison, "Essay on Property" (March 29, 1792); First draft of the First Amendment, 1 Annals of Congress 434 (June 8, 1789).

[24] As the Supreme Court stated in *Hobby Lobby*, the Court's decision concerns only the contraceptive Mandate, and should not be understood to hold that all insurance-coverage mandates, for example, for vaccinations or blood transfusions, must necessarily fail if they conflict with an employer's religious beliefs. Nor does the Court's opinion provide a shield for employers who might cloak illegal discrimination as a religious (or moral) practice. 134 S. Ct. at 2783.

### e. Executive Orders Relevant to These Expanded Exemptions

Protecting moral convictions, as set forth in these expanded exemptions and accommodation in these final rules, is consistent with recent executive orders. President Trump's Executive Order concerning this Mandate directed the Departments to consider providing protections, not specifically for "religious" beliefs, but for "conscience." We interpret that term to include both religious beliefs and moral convictions. Moreover, President Trump's first Executive Order, E.O. 13765, declared that "the Secretary of Health and Human Services (Secretary) and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the [ACA] shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any state or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." The exemption and accommodation adopted in these final rules relieves a regulatory burden imposed on entities with moral convictions opposed to providing certain contraceptive coverage and is therefore consistent with both Executive Orders.

### f. Litigation Concerning the Mandate

The Departments have further taken into consideration the litigation surrounding the Mandate in exercising their discretion to adopt the exemption in these final rules. Among the lawsuits challenging the Mandate, two have been filed based in part on non-religious moral convictions. In one case, the Departments are subject to a permanent injunction requiring us to respect the non-religious moral objections of an employer. *See March for Life* v. *Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015). In the other case, an appeals court affirmed a district court ruling that allows the previous regulations to be imposed in a way that affects the moral convictions of a small nonprofit pro-life organization and its employees. *See Real Alternatives* v. *Sec'y. Dep't of Health & Human Servs.*, 867 F.3d 338 (3d Cir. 2017). The Departments' litigation of these cases has thus led to inconsistent court rulings, consumed substantial governmental resources, and created uncertainty for objecting organizations,

issuers, third party administrators, and employees and beneficiaries. The organizations that have sued seeking a moral exemption have adopted longstanding moral tenets opposed to certain FDA-approved contraceptives, and hire only employees who share this view. As a result, it is reasonable to conclude that employees of these organizations would not benefit from the Mandate. Thus, subjecting this subset of organizations to the Mandate does not advance any governmental interest. The need to resolve this litigation and the potential concerns of similar entities, as well as the legal requirement to comply with permanent injunctive relief currently imposed in *March for Life*, provide substantial reasons for the Departments to protect moral convictions through these final rules. Although, as discussed below, the Departments assume the number of entities and individuals that may seek exemption from the Mandate on the basis of moral convictions, as these two sets of litigants did, will be small, the Departments know from the litigation that it will not be zero. As a result, the Departments have taken these types of objections into consideration in reviewing our regulations. Having done so, the Departments consider it appropriate to issue the protections set forth in these final rules. Just as Congress, in adopting the early provisions of the Church Amendments, viewed it as necessary and appropriate to protect those organizations and individuals with objections to certain health care services on the basis of moral convictions, so the Departments, too, believe that "our moral convictions as well as our religious beliefs, warrant protection from this intrusion by the Government" in this situation. *See* 119 Congr. Rec. S5717–18.

The litigation concerning the Mandate has also underscored how important it is for the Government to tread carefully when engaging in regulation concerning sensitive health care areas. As demonstrated by the litigation, as well as the public comments, various citizens sincerely hold moral convictions, which are not necessarily religious, against providing or participating in coverage of contraceptive items included in the Mandate, and some believe that certain contraceptive items may cause early abortions. Providing conscience protections advances the ACA's goal of expanding health coverage among entities and individuals that might otherwise be reluctant to participate in the market. For example, the Supreme Court in *Hobby Lobby* declared that, if HHS requires owners of businesses to

cover procedures that the owners "could not in good conscience" cover, such as abortion. "HHS would effectively exclude these people from full participation in the economic life of the Nation." 134 S. Ct. at 2783. That sort of outcome is one the Departments wish to avoid. The Departments wish to implement the contraceptive coverage Guidelines issued under section 2713(a)(4) in a way that respects the moral convictions of Americans so that they are freer to engage in "full participation in the economic life of the Nation." The exemptions in these final rules do so by removing an obstacle that might otherwise lead entities or individuals with moral objections to contraceptive coverage to choose not to sponsor or participate in health plans if they include such coverage.

3. Whether Moral Exemptions Should Exist, and Whom They Should Cover

As noted above, the Department received comments expressing diverse views as to whether exemptions based on moral convictions should exist and, if so, whom they should cover.

Some commenters supported the expanded exemptions and accommodation in the Moral IFC, and the choice of entities and individuals to which they applied. They stated the expanded exemptions and accommodation would be an appropriate exercise of discretion and would be consistent with moral exemptions Congress has provided in many similar contexts. Similarly, commenters stated that the accommodation would be an inadequate means to resolve moral objections and that the expanded exemptions are needed. They contended that the accommodation process was objectionable because it was another method of complying with the Mandate, its self-certification or notice involved triggering the very contraceptive coverage that organizations objected to, and the coverage for contraceptive services "hijacked" or flowed in connection with the objecting organizations' health plans. The commenters contended that the seamlessness cited by the Departments between contraceptive coverage and an accommodated plan gives rise to moral objections that organizations would not have with an expanded exemption. Commenters also stated that, with respect to non-profit organizations that have moral objections and only hire persons who agree with those objections, the Mandate serves no legitimate government interest because the mandated coverage is neither wanted nor used and, therefore, would

yield no benefits—it would only suppress the existence of non-profit organizations holding those views.

Several other commenters stated that the exemptions were still too narrow. They asked that the exemptions set forth in these final rules be as broad as the exemptions set forth in the Religious IFC concerning sincerely held religious beliefs. Some of these commenters also asked that HHS withdraw its Mandate of contraceptive coverage from the Guidelines entirely. They contended that fertility and pregnancy are generally healthy conditions, not diseases that are appropriately the target of a preventive health service; that contraceptives can pose medical risks for women; and that studies do not show that contraceptive programs reduce abortion rates or unintended pregnancies. Some commented that many women report that they sought an abortion because their contraception failed. Some other commenters contended that, to the extent the Guidelines require coverage of certain drugs and devices that may prevent implantation of an embryo after fertilization, they require coverage of items that are abortifacient and, therefore, violate federal conscience protections such as the Weldon Amendment. Consolidated Appropriations Act, 2017, Public Law 115–31, Div. H, § 507(d).

Other commenters contended that the exemptions in the Moral IFC were too broad. Some of these commenters expressed concern about the prospect of publicly traded for-profit entities also being afforded a moral exemption. One such commenter commented that allowing publicly traded for-profit entities a moral exemption could cause instability and confusion, as leadership changes at such a corporation may effectively change the corporation's eligibility for a moral exemption. Still others stated that the Departments should not exempt various kinds of entities such as businesses, issuers, or nonprofit entities, arguing that only individuals, not entities, can possess moral convictions. Some commenters were concerned that providing moral exemptions would contribute to population growth and related societal woes. Other commenters contended the exemptions and accommodation should not be expanded, but should remain the same as they were in the July 2015 final regulations (80 FR 41318), which did not encompass moral convictions. Other commenters stated that the Departments should not provide exemptions, but merely an accommodation process, to resolve moral objections to the Mandate.

Some commenters objected to providing any exemption or accommodation for moral objections at all. Some of these commenters contended that even the previous regulations allowing an exemption and accommodation were too broad and that no exemptions to the Mandate should exist, in order that contraceptive coverage would be provided to as many women as possible. Other commenters did not go that far, but rejected the idea of exemptions or an accommodation based on moral convictions, contending that such exemptions or accommodation would contribute to population growth and related social woes. Some of these commenters also contended that the exemption in the Moral IFC would constitute an exemption covering every business and non-profit organization.

After considering these comments, and although the previous Administration declined to afford any exemption based on moral convictions, the Departments have concluded that it is appropriate to provide moral exemptions and access to the accommodation, as set forth in these final rules. Congress did not mandate contraceptive coverage, nor provide any explicit guidance about incorporating conscience exemptions into the Guidelines. But as noted above, it is a long-standing Congressional practice to provide consistent exemptions for both religious beliefs and moral convictions in many federal statutes in the health care context, and specifically concerning issues such as abortion, sterilization, and contraception. It is not clear to the Departments that, if Congress had expressly mandated contraceptive coverage in the ACA, it would have done so without providing for similar exemptions. Therefore, the Departments consider it appropriate, to the extent we impose a contraceptive Mandate by the exercise of agency discretion, that we also include an exemption for the protection of moral convictions in certain cases. The exemptions finalized in these final rules are generally consistent with the scope of exemptions that Congress has established in similar contexts. As noted above, the Departments consider the exemptions in these final rules consistent with the intent of Executive Order 13535. The Departments also wish to avoid the stark disparity that may result from respecting religious objections to providing contraceptive coverage among certain entities and individuals, but not respecting parallel objections for moral convictions possessed by any entities and

Exhibit 2                                      JA476                                      JA-0000067

individuals at all because those objections are not specifically religious.

In addition, the Departments note that a significant majority of states either impose no contraceptive coverage requirement or offer broader exemptions than the exemption contained in the July 2015 final regulations.[25] Although the practice of states is by no means a limit on the discretion delegated to HRSA by the ACA, nor a statement about what the Federal Government may do consistent with other limitations in federal law, such state practices can inform the Departments' view that it is appropriate to provide conscience protections when exercising agency discretion.

The Departments decline to use these final rules to remove the contraceptive Mandate altogether, such as by declaring that HHS acting through HRSA shall not include contraceptives in the list of women's preventive services in Guidelines issued under section 2713(a)(4). HRSA's Guidelines were not issued, ratified, or updated through the regulations that preceded the Moral IFC and these final rules. Those Guidelines were issued in separate processes in 2011 and 2016, directly by HRSA, after consultation with external organizations that operated under cooperative agreements with HRSA to consider the issue, solicit public comment, and provide recommendations. The regulations preceding these final rules attempted only to restate the statutory language of section 2713 in regulatory form, and delineate what exemptions and accommodations would apply if HRSA listed contraceptives in its Guidelines. We decline to use these final rules to direct the separate process that HRSA uses to determine what specific services are listed in the Guidelines generally. Some commenters stated that if contraceptives are not removed from the Guidelines entirely, entities or individuals with moral objections might not qualify for the exemptions or accommodation. As discussed below, however, the exemptions in these rules include a broad range of entities and individuals of whom we have notice may object based on moral convictions. The Departments are not aware of specific employers or individuals whose moral convictions would still be violated by compliance with the Mandate after the issuance of the Moral IFC and these final rules.

Some commenters stated that HRSA should remove contraceptives from the Guidelines because the Guidelines have not been subject to the notice and comment process under the Administrative Procedure Act. Some commenters also contended that the Guidelines should be amended to omit items that may prevent (or possibly dislodge) the implantation of a human embryo after fertilization, in order to ensure consistency with conscience provisions that prohibit requiring plans to pay for or cover abortions. Whether and to what extent the Guidelines continue to list contraceptives, or items considered to prevent implantation of an embryo, for entities not subject to exemptions and an accommodation, and what process is used to include those items in the Guidelines, is outside the scope of these final rules. These final rules focus on what moral exemptions and accommodation shall apply if Guidelines issued under section 2713(a)(4) include contraceptives or items considered to be abortifacient.

Members of the public that support or oppose the inclusion of some or all contraceptives in the Guidelines, or wish to comment concerning the content and process of developing and updating the Guidelines, are welcome to communicate their views to HRSA, at *wellwomancare@hrsa.gov.*

The Departments also conclude that it would be inadequate to merely attempt to amend or expand the accommodation process to account for moral objectors, instead of providing the exemptions. In the past, the Departments stated in our regulations and court briefs that the previous accommodation required contraceptive coverage in a way that is "seamless" with the coverage provided by the objecting employer. As a result, in significant respects, the accommodation process did not actually accommodate the objections of many entities, as indicated by many entities with religious objections. The Departments have attempted to identify an accommodation that would eliminate the religious plaintiffs' objections, including seeking public comment through a Request For Information, 81 FR 47741 (July 26, 2016), but stated in January 2017 that we were unable to develop such an approach at that time.[26]

Just as the Departments continue to believe merely amending the accommodation process would not adequately address religious objections to compliance with the Mandate, we do not believe doing so would adequately address similar moral objections. Furthermore, the few litigants raising non-religious moral objections have been non-profit organizations that assert they only hire persons who share the employers' objection to contraceptive coverage. Consequently, the Departments conclude that the most appropriate approach to resolve these concerns is to provide the exemptions set forth in the Moral IFC and these final rules. These final rules also finalize the modifications to the accommodation process to make it available to entities with moral objections, without forcing such entities to choose between compliance with either the Mandate or the accommodation.

Some commenters expressed concern over the lack of a definition of "moral convictions" in the Moral IFC, arguing that, without a definition, any objection could be encompassed by the exemptions even if it is not based on moral convictions. The Departments did not adopt a regulatory definition of "moral convictions" in the Moral IFC, and have decided not to adopt such a definition in response to public comments at this time. Nevertheless, the Departments look to the description of moral convictions in *Welsh* to help explain the scope of the protection provided in the Moral IFC and these final rules. Neither these final rules or the Moral IFC, nor the Church Amendments or other Federal health care conscience statutes, define "moral convictions" (nor do they define "religious beliefs"). But in issuing these final rules, we adopt the same background understanding of that term that is reflected in the Congressional Record in 1973, in which legislators referenced cases such as *Welsh* to support the addition of language protecting moral convictions. In protecting moral convictions in parallel to religious beliefs, *Welsh* describes moral convictions warranting such protection as ones: (1) That the "individual deeply and sincerely holds"; (2) "that are purely ethical or moral in source and content"; (3) "but that nevertheless impose upon him a duty"; (4) and that "certainly occupy in the life of that individual a place parallel to that filled by . . . God" in traditionally religious persons," such

[25] *See* "Insurance Coverage of Contraceptives," The Guttmacher Institute (June 11, 2018), *https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.*

[26] *See* Departments of Labor, Health and Human Services, and the Treasury, FAQs About Affordable Care Act Implementation Part 36, (Jan. 9, 2017), *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious

objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

that one could say "his beliefs function as a religion in his life." 398 U.S. at 339–40. As recited above, Senators Church and Nelson agreed that protections for such moral convictions would not encompass an objection that an individual or entity raises "capriciously." Instead, along with the requirement that protected moral convictions must be "sincerely held," this understanding cabins the protection of moral convictions in contexts where they occupy a place parallel to that filled by sincerely held religious beliefs in religious persons and organizations.

While moral convictions are the sort of principles that, in the life of an individual, occupy a place parallel to religion, sincerely held moral convictions can also be adopted by corporate bodies, not merely by individuals. Senators Church and Nelson, while discussing the fact that opposition to abortion or sterilization on the basis of "moral questions" does not include capricious opposition to abortion for no reason at all, were specifically talking about opposition to abortion by corporate entities: A "hospital board, or whatever the ruling agency for the hospital was, a governing agency or otherwise." [27] Corporate bodies operate by the decision-making actions of individuals. Thus, if individuals act in the governance of a corporate body so as to adopt a position for that body of adopting moral convictions against coverage of contraceptives, such an entity can be considered to have an objection to contraceptive coverage on the basis of sincerely held moral convictions.

### 4. The Departments' Rebalancing of Government Interests

The Departments also received comments on their rebalancing of interests as expressed and referenced in the Moral IFC. Some public commenters agreed with the Departments'

---

[27] Nor was this recognition of the need to protect organizations that object to performance of certain health care procedures on the basis of moral conviction limited to the Church Amendments' legislative history. The first of the Church Amendments provides, in part, that the receipt of certain federal funds "by any individual or entity does not authorize any court or any public official or other public authority to require— . . . (2) such entity to—(A) make its facilities available for the performance of any sterilization procedure or abortion if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions, or (B) provide any personnel for the performance or assistance in the performance of any sterilization procedure or abortion if the performance or assistance in the performance of such procedures or abortion by such personnel would be contrary to the religious beliefs or moral convictions of such personnel." 42 U.S.C. 300a–7(b).

conclusion that our interest in ensuring contraceptive coverage does not preclude the Departments from offering exemptions and an accommodation for entities, plans, and individuals with a qualifying objection to contraceptive coverage based on moral convictions. Some public commenters pointed out that protecting moral convictions serves to respect not only the interests of certain persons to access contraceptives, but also the interests of other persons to participate in a health coverage market consistent with their moral convictions. Other commenters disagreed with this rebalancing, and contended that the interest of women in receiving contraceptive coverage without cost-sharing is so great that it overrides private interests to the contrary, such that the government should or must force private entities to provide this coverage to other private citizens.

The Departments agree with the commenters who stated that the governmental interest in requiring contraceptive coverage does not override the interest in protecting moral convictions and does not make these expanded exemptions inappropriate. For additional discussion of the Government's balance of interests as applicable to religious beliefs, see section II.C.2.b. of the companion final rules concerning religious exemptions published by the Departments contemporaneously with these final rules elsewhere in today's **Federal Register**. There, and in the Religious and Moral IFCs, the Departments acknowledged the reasons why the Departments have changed the policies and interpretations previously adopted with respect to the Mandate and the governmental interests underlying it. For parallel reasons, the Departments believe the Government's legitimate interests in providing for contraceptive coverage do not require the Departments to violate sincerely held moral convictions while implementing the Guidelines. The Departments likewise believe Congress did not set forth interests that require us to violate sincerely held moral convictions if we otherwise require contraceptive coverage in our discretionary implementation of the women's preventive services Guidelines under section 2713(a)(4).

The Departments acknowledge that coverage of contraception is an important and highly controversial issue, implicating many different views, as reflected for example in the public comments received on multiple rulemakings over the course of implementation of section 2713(a)(4), added to the PHS Act in 2010. The

Departments' expansion of conscience protections for moral convictions, similar to protections contained in numerous statutes governing health care regulation, is not taken lightly. However, after considering public comments on various sides of the issue, and reconsidering the interests served by the Mandate in this particular context, the objections raised, and the relevant federal law, the Departments have determined that affording the exemptions to protect moral convictions is a more appropriate administrative response than continuing to refuse to extend the exemptions and accommodations to certain entities and individuals for whom the Mandate violates their sincerely held moral convictions. Although the number of organizations and individuals that may seek to invoke these exemptions and accommodation may be small, the Departments believe that it is important to provide such protection, given the long-standing recognition of such protections in law and regulation in the health care and health insurance contexts. The Moral IFC and these final rules leave unchanged HRSA's authority to decide whether to include contraceptives in the women's preventive services Guidelines for entities that are not exempted by law, regulation, or the Guidelines. These rules also do not change the many other mechanisms by which the Government advances contraceptive coverage, particularly for low-income women, including through such programs as Medicaid and Title X. The Departments also note that the exemptions created here, like the exemptions created by the previous Administration, do not burden third parties to a degree that counsels against providing the exemptions, as discussed below.

### 5. Burdens on Third Parties

The Department received a variety of comments about the effect that the exemptions and accommodation based on moral convictions would have on third parties. Some commenters stated that the exemptions and accommodation do not impose an impermissible or unjustified burden on third parties, including on women who might otherwise receive contraceptive coverage with no cost sharing. Other commenters disagreed, asserting that the exemptions unacceptably burden women who might lose contraceptive coverage as a result. They contended the exemptions may remove contraceptive coverage, causing women to have higher contraceptive costs, fewer contraceptive options, less ability to use contraceptives more consistently, more

Exhibit 2  JA478  JA-0000069

unintended pregnancies.[28] births spaced more closely, and workplace, economic, or societal inequality. Still other commenters took the view that other laws or protections, such as in the First or Fifth Amendments, prohibit the expanded exemptions, which those commenters view as prioritizing conscientious objection of exempted entities over the conscience, choices, or religious liberty of women who would not receive contraceptive coverage where an exemption is used. Some commenters disagreed and said the exemptions do not violate laws and constitutional protections, nor do they inappropriately prioritize the conscience of exempted entities over those of third parties.

The Departments note that the exemptions in the Moral IFC and these final rules, like the exemptions created by the previous Administration, do not impermissibly burden third parties. Initially, the Departments observe that these rules do not create a governmental burden; rather, they relieve a governmental burden. The ACA did not impose a contraceptive coverage requirement. Agency discretion was exercised to include contraceptives in the Guidelines issued under section 2713(a)(4). That decision is what created and imposed a governmental burden. These rules simply relieve part of that governmental burden. If some third parties do not receive contraceptive coverage from private parties whom the government chooses not to coerce, that result exists in the absence of governmental action—it is not a result the government has imposed. Calling that result a governmental burden rests on an incorrect presumption: That the government has an obligation to force private parties to benefit those third parties, and that the third parties have a right to those benefits. Congress did not create a right to receive contraceptive coverage from other private citizens through section 2713 of the PHS Act, other portions of the ACA, or any other statutes it has enacted. Although some commenters also contended such a right might exist under treaties the Senate has ratified or the Constitution, the Departments are not aware of any source demonstrating that the Constitution or a treaty ratified by the Senate creates a right to receive contraceptive coverage from other private citizens.

The fact that the government at one time exercised its administrative discretion to require private parties to provide coverage to which they morally object, to benefit other private parties, does not prevent the government from relieving some or all of the burden of that Mandate. Otherwise, any governmental coverage requirement would be a one-way ratchet. In the Moral IFC and these final rules. the government has simply restored a zone of freedom where it once existed. There is no statutory or constitutional obstacle to the government doing so, and the doctrine of third party burdens should not be interpreted to impose such an obstacle. Such an interpretation would be especially problematic given the millions of women. in a variety of contexts, whom the Mandate does not ultimately benefit, notwithstanding any expanded exemptions—including through the grandfathering of plans, the previous religious exemptions, and the failure of the accommodation to require delivery of contraceptive coverage in various self-insured church plan contexts.

In addition, the Government is under no constitutional obligation to fund contraception. *Cf. Harris* v. *McRae.* 448 U.S. 297 (1980) (holding that, although the Supreme Court has recognized a constitutional right to abortion, there is no constitutional obligation for government to pay for abortions). Even more so may the government refrain from requiring private citizens, in violation of their moral convictions, to cover contraception for other citizens. *Cf. Rust* v. *Sullivan,* 500 U.S. 173. 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."). The constitutional rights of liberty and privacy do not require the government to force private parties to provide contraception to other citizens and do not prohibit the government from protecting moral objections to such governmental mandates, especially where, as here, the Mandate is not an explicit statutory requirement.[29] The Departments do not believe that the Constitution prohibits offering the expanded exemptions in these rules.

Some commenters objected that the exemptions would violate the Establishment Clause of the First Amendment. The Moral IFC and these final rules create exemptions for moral convictions, not religious beliefs, and they do so for the same neutral purposes for which Congress has created similar exemptions for over four decades. Not only do these final rules not violate the Establishment Clause, but the Departments' decision to provide the exemptions and accommodation for moral convictions. instead of limiting the exemptions to identical objections based on religious beliefs. further demonstrates that neither the purpose nor the effect of these exemptions is to establish religion. The Establishment Clause does not force the Department to impose a contraceptive Mandate in violation of the moral convictions of entities and individuals protected by these rules.

American governmental bodies have, in many instances, refrained from requiring certain private parties to cover contraceptive services for other private parties. From 1789 through 2012 (when HRSA's Guidelines went into effect), there was no federal women's preventive services coverage mandate imposed nationally on health insurance and group health plans. The ACA did not require contraceptives to be included in HRSA's Guidelines, and it did not require any preventive services required under section 2713 of the PHS Act to be covered by grandfathered plans. Many states do not impose contraceptive coverage mandates, or they offer religious, and in some cases moral, exemptions to the requirements of such coverage mandates—exemptions that have not been invalidated by federal or state courts. The Departments, in previous regulations, exempted houses of worship and integrated auxiliaries from the Mandate. The Departments then issued a temporary enforcement safe harbor allowing religious nonprofit groups to not provide contraceptive coverage under the Mandate for almost two additional years. The Departments further expanded the houses of worship and integrated auxiliaries exemption through definitional changes. And the Departments created an accommodation process under which many women in self-insured church plans may not ultimately receive contraceptive coverage. The Departments are not aware of federal courts declaring that the exemptions, safe harbor, or accommodations gave rise to third party burdens that required the government to mandate contraceptive coverage by entities eligible for an exemption or accommodation. In addition. many organizations have not been subject to the Mandate in practice because of the injunctions they received through litigation. protecting them from federal imposition of the Mandate, including

---

[28] Some commenters attempted to quantify the costs of unintended pregnancy. but were unable to provide estimates with regard to the number of women that this exemption may affect.

[29] *See, for example, Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists,* 257 P.3d 181, 196 (Ariz. Ct. App. 2011) ("[A] woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

Exhibit 2    JA479    JA-0000070

under several recently entered permanent injunctions that will apply regardless of the issuance of these final rules.

Commenters offered various assessments of the impact these rules might have on state or local governments. Some commenters stated that the expanded exemptions will not burden state or local governments, or that such burdens should not prevent the Departments from offering those exemptions. Others commenters stated that if the Departments provide expanded exemptions, states or local jurisdictions may face higher costs in providing birth control to women through government programs. The Departments consider it appropriate to offer expanded exemptions, notwithstanding the objection of some state or local governments. Until 2012, there was no federal mandate of contraceptive coverage across health insurance and health plans nationwide. The ACA did not require a contraceptive Mandate, and its discretionary creation by means of HRSA's Guidelines does not translate to a benefit that the federal government owes to state or local governments. The various situations recited in the previous paragraph, in which the federal government has not imposed contraceptive coverage, have not been deemed to cause a cognizable injury to state or local governments. The Departments find no legal prohibition on finalizing these final rules based on the allegation of an impact on state or local governments, and disagree with the suggestion that once having exercised our discretion to deny exemptions—no matter how recently or incompletely—the Departments cannot change course if some state and local governments believe they are receiving indirect benefits from the previous decision.

In addition, the exemptions at issue here are available only to a tiny fraction of entities to which the Mandate would otherwise apply—those with qualifying moral objections. Public comments did not provide reliable data on how many entities would use these expanded moral exemptions, in which states women in those plans would reside, how many of those women would qualify for or use state and local government subsidies of contraceptives as a result, or in which states such women, if they are low income, would go without contraceptives and potentially experience unintended pregnancies that state Medicaid programs would potentially have to cover. As noted below, at least one

study [30] has concluded the Mandate caused no clear increase in contraceptive use; one explanation proposed by the authors of the study is that women eligible for family planning from safety net programs were already receiving free or subsidized contraceptive access through them, notwithstanding the Mandate's effects on the overall market. Some commenters who opposed the exemptions admitted that this information is unclear at this stage; other commenters that estimated considerably more individuals and entities would seek an exemption also admitted the difficulty of quantifying estimates. In addition, the only entities that have brought suit based on their moral objections to the Mandate are non-profit entities that have said they only hire persons who share their objections and do not use the contraceptives to which their employers object, so it is unlikely that exemptions for those entities would have any impact on safety net programs. Below, we predict that a small number of additional nonprofit and closely held for-profit entities will use the exemptions based on moral convictions. In light of the limited evidence of third party or state and local government impact of these final rules, the Departments consider it an appropriate policy option to provide the exemptions.

Some commenters contended that the exemptions would constitute unlawful sex discrimination, such as under section 1557 of the Affordable Care Act, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, or the Fifth Amendment. Some commenters suggested the expanded exemptions would discriminate on bases such as race, disability, or LGBT status, or that they would disproportionately burden certain persons in such categories.

But these rules do not discriminate or draw any distinctions on the basis of sex, pregnancy, race, disability, socio-economic class, LGBT status, or otherwise, nor do they discriminate on any unlawful ground. The exemptions in these rules do not authorize entities to comply with the Mandate for one person, but not for another person, based on that person's status as a member of a protected class. Instead, they allow entities that have sincerely held moral objections to providing some

or all contraceptives included in the Mandate to not be forced to provide coverage of those items to anyone.

Those commenters' contentions about discrimination are unpersuasive for still additional reasons. First, Title VII is applicable to discrimination committed by employers, and these final rules have been issued in the government's capacity as a regulator of group health plans and group and individual health insurance, not in its capacity as an employer. *See also In Re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 940–42 & n.1 (8th Cir. 2007) (holding that Title VII "does not require coverage of contraception because contraception is not a gender-specific term like potential pregnancy, but rather applies to both men and women"). Second, these rules create no disparate impact. The women's preventive service mandate under section 2713(a)(4), and the contraceptive Mandate promulgated under such preventive services mandate, already inure to the specific benefit of women—men are denied any benefit from section 2713(a)(4). Both before and after these rules are in effect, section 2713(a)(4) and the Guidelines issued under that section treat women's preventive services in general, and female contraceptives specifically, more favorably than they treat male preventive services or contraceptives.

It is simply not the case that the government's implementation of section 2713(a)(4) is discriminatory against women because exemptions encompass moral objections. The previous rules, as discussed elsewhere herein, do not require contraceptive coverage in a host of plans, including grandfathered plans, plans of houses of worship and integrated auxiliaries, and—through inability to enforce the accommodation on certain third party administrators—plans of many religious non-profits in self-insured church plans. Below, the Departments estimate that nearly all women of childbearing age in the country will be unaffected by these exemptions. In this context, the Departments do not believe that an adjustment to discretionary Guidelines for women's preventive services concerning contraceptives constitutes unlawful sex discrimination. Otherwise, anytime the government exercises its discretion to provide a benefit that is specific to women (or specific to men), it would constitute sex discrimination for the government to reconsider that benefit. Under that theory, *Hobby Lobby* itself, and RFRA (on which *Hobby Lobby's* holding was based), which provided a religious exemption to this Mandate for many businesses, would be deemed discriminatory against women

---

[30] M.L. Kavanaugh et al., "Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014,", 97 *Contraception* 14, 14–21 (2018), available at *http://www.contraceptionjournal.org/article/S0010-7824(17)30478-X/pdf.*

Exhibit 2

JA480

JA-0000071

because the underlying women's preventive services requirement is a benefit for women, not for men. Such conclusions are not consistent with legal doctrines concerning sex discrimination.

It is not clear that these expanded exemptions will significantly burden women most at risk of unintended pregnancies. Some commenters stated that contraceptives are often readily accessible at relatively low cost. Other commenters disagreed. Some commenters objected that the Moral IFC's estimate of a $584 yearly cost of contraceptives for women was too low. But some of those same commenters provided similar estimates, citing sources claiming that birth control pills can cost up to $600 per year, and stated that IUDs, which can last 3 to 6 years or more,[31] can cost $1,100 (that is, less than $50 per month over the duration of use). Some commenters stated that, for lower income women, contraceptives and related education and counseling can be available at free or low cost through government programs (federal programs offering such services include, for example, Medicaid, Title X, community health center grants, and Temporary Assistance for Needy Families (TANF)). Other commenters contended that many women in employer-sponsored coverage might not qualify for those programs, although that sometimes occurs because their incomes are above certain thresholds or because the programs were not intended to absorb privately covered individuals. Some commenters observed that contraceptives may be available through other sources, such as a plan of another family member, and that the expanded exemptions will not likely encompass a very large segment of the population otherwise benefitting from the Mandate. Other commenters disagreed, emphasizing that income and eligibility thresholds could prevent some women from receiving contraceptives through certain government programs if they were no longer covered in their group health plans or health insurance plans.

The Departments do not believe that such differences make it inappropriate to issue the expanded exemptions set forth in these rules. As explained more fully below, the Departments estimate that nearly all women of childbearing age in the country will be unaffected by these exemptions. Moreover, the Departments note that the HHS Office of Population Affairs, within the Office of the Assistant Secretary for Health, has

recently issued a proposed rule to amend the regulations governing its Title X family planning program. The proposed rule would amend the definition of "low income family"—individuals eligible for free or low cost contraceptive services—to include women who are unable to obtain certain family planning services under their employer-sponsored health coverage due to their employers' religious beliefs or moral convictions. (83 FR 25502). If that rule is finalized as proposed, it would further reduce any potential effect of these final rules on women's access to contraceptives.

Some commenters stated that the expanded exemptions would violate section 1554 of the ACA. That section says the Secretary of HHS "shall not promulgate any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full range of treatment options between the patient and the provider," "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," "violates the principles of informed consent and the ethical standards of health care professionals," or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. 18114. Such commenters urged, for example, that the Moral IFC created unreasonable barriers to the ability of individuals to obtain appropriate medical care, particularly in areas they said may have a disproportionately high number of entities likely to take advantage of the exemption.

The Departments disagree with these comments about section 1554 of the ACA. The Departments issued previous exemptions and accommodations that allowed various plans to not provide contraceptive coverage on the basis of religious objections; multiple courts considered those regulations; and while many ruled that entities did not need to provide contraceptive coverage, none ruled that the exemptions or accommodations in the regulations violated section 1554 of the ACA. Moreover, the decision not to impose a governmental mandate is not the creation of a "barrier," especially when that mandate requires private citizens to provide services to other private citizens. This would turn the assumptions of the United States' system of government on its head. *See, for example,* U.S. Constitution, Ninth Amendment. Section 1554 of the ACA

likewise does not require the Departments to require coverage of, or to keep in place a requirement to cover, certain services, including contraceptives, that was issued pursuant to HHS's exercise of discretion under section 2713(a)(4). Nor does section 1554 of the ACA prohibit the Departments from providing exemptions to relieve burdens on moral convictions, or as is the case here, from refraining to impose the Mandate in cases where moral convictions would be burdened by the Mandate. Moral exemptions from federal mandates in certain health contexts, including sterilization, contraception, or items believed to violate abortifacient, have existed in federal laws for decades. Some of those laws were referenced by President Obama in signing Executive Order 13535. In light of that Executive Order and Congress's long history of providing exemptions for moral convictions in the health context, providing moral exemptions is a reasonable administrative response to this federally mandated burden, especially since the burden itself is a subregulatory creation that does not apply in various contexts.

In short, we do not believe sections 1554 or 1557 of the ACA, other nondiscrimination statutes, or any constitutional doctrines, create an affirmative obligation to create, maintain, or impose a Mandate that forces covered entities to provide coverage of preventive contraceptive services in health plans. The ACA's grant of authority to HRSA to provide for, and support, the Guidelines is not transformed by any of the laws cited by commenters into a requirement that, once those Guidelines exist, they can never be reconsidered, or amended because doing so would only affect women's coverage or would allegedly impact particular populations disparately.

In summary, members of the public have widely divergent views on whether the exemptions in the Moral IFC and these final rules are good public policy. Some commenters stated that the exemptions would burden workers, families, and the economic and social stability of the country, and interfere with the physician-patient relationship. Other commenters disagreed, favoring the public policy behind the exemption, and arguing that the exemption would not interfere with the physician-patient relationship. The Departments have determined that these final rules are an appropriate exercise of public policy discretion. Because of the importance of the moral convictions being accommodated, the limited impact of these final rules, and uncertainty about

---

[31] *See, for example,* "IUD," Planned Parenthood. *https://www.plannedparenthood.org/learn/birth-control/iud.*

Exhibit 2                                      JA481                                      JA-0000072

the impact of the Mandate overall according to some studies, the Departments do not believe these final rules will have any of the drastic negative consequences on third parties or society that some opponents of these rules have suggested.

### 6. Interim Final Rulemaking

The Departments received several comments about the decision to issue the Moral IFC as interim final rules with request for comments, instead of as a notice of proposed rulemaking. Several commenters asserted that the Departments had the authority to issue the Moral IFC in that way, agreeing with the Departments that there was explicit statutory authority to do so, good cause under the APA, or both. Other commenters held the opposite view, contending that there was neither statutory authority to issue the rules on an interim final basis, nor good cause under the APA to make the rules immediately effective.

The Departments continue to believe authority existed to issue the Moral IFC as interim final rules. Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include sections 2701 through 2728 of that Act, and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. The Religious and Moral IFCs fall under those statutory authorizations for the use of interim final rulemaking. Prior to the Moral IFC, the Departments issued three interim final regulations implementing this section of the PHS Act because of the needs of covered entities for immediate guidance and the weighty matters implicated by the HRSA Guidelines, including issuance of new or revised exemptions or accommodations. (75 FR 41726; 76 FR 46621; 79 FR 51092). The Departments also had good cause to issue the Moral IFC as interim final rules, for the reasons discussed therein.

In any event, the objections of some commenters to the issuance of the Moral IFC as interim final rules with request for comments does not prevent the issuance of these final rules. These final rules were issued after receiving and thoroughly considering public comments as requested in the Moral IFC. These final rules therefore comply with the APA's notice and comment requirements.

### 7. Health Effects of Contraception and Pregnancy

The Departments received numerous comments on the health effects of contraception and pregnancy. As noted above, some commenters supported the expanded exemptions, and others urged that contraceptives be removed from the Guidelines entirely, based on the view that pregnancy and the unborn children resulting from conception are not diseases or unhealthy conditions that are properly the subject of preventive care coverage. Such commenters further contended that hormonal contraceptives may present health risks to women. For example, they contended that studies show certain contraceptives cause, or are associated with, an increased risk of depression,[32] venous thromboembolic disease,[33] fatal pulmonary embolism,[34] thrombotic stroke and myocardial infarction (particularly among women who smoke, are hypertensive, or are

older),[35] hypertension,[36] HIV–1 acquisition and transmission,[37] and breast, cervical, and liver cancers.[38] Some commenters also stated that fertility awareness based methods of birth spacing are free of similar health risks since they do not involve ingestion of chemicals. Some commenters contended that it is not the case that contraceptive access reduces unintended pregnancies or abortions.

Other commenters disagreed, citing a variety of studies they contend show health benefits caused by, or associated

---

[32] Commenters cited Charlotte Wessel Skovlund, et al., "Association of Hormonal Contraception with Depression," *JAMA Psychiatry* 1154, 1154 (published online Sept. 28, 2016) ("Use of hormonal contraception, especially among adolescents, was associated with subsequent use of antidepressants and a first diagnosis of depression, suggesting depression as a potential adverse effect of hormonal contraceptive use.").

[33] Commenters cited the Practice Committee of the American Society for Reproductive Medicine, "Hormonal Contraception: Recent Advances and Controversies," 82 *Fertility and Sterility* S26, S30 (2004); V.A. Van Hylckama et al., "The Venous Thrombotic Risk of Oral Contraceptives, Effects of Estrogen Dose and Progestogen Type: Results of the MEGA Case-Control Study," 339 *Brit. Med. J.* b2921 (2009); Y. Vinogradova et al., "Use of Combined Oral Contraceptives and Risk of Venous Thromboembolism: Nested Case-Control Studies Using the QResearch and CPRD Databases," 350 *Brit. Med. J.* h2135 (2015) ("Current exposure to any combined oral contraceptive was associated with an increased risk of venous thromboembolism . . . compared with no exposure in the previous year."); Ø. Lidegaard et al., "Hormonal contraception and risk of venous thromboembolism: national follow-up study," 339 *Brit. Med. J.* b2890 (2009); M. de Bastos et al., "Combined oral contraceptives: venous thrombosis," Cochrane Database Syst. Rev., Mar. 3, 2014. doi: 10.1002/14651858.CD010813.pub2, available at *https://www.ncbi.nlm.nih.gov/pubmed?term=24590565;* L.J. Havrilesky et al., "Oral Contraceptive Use for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality. Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusefp.html;* and Robert A. Hatcher et al., *Contraceptive Technology,* 405–07 (Ardent Media 18th rev. ed. 2004).

[34] Commenters cited N.R. Poulter, "Risk of Fatal Pulmonary Embolism with Oral Contraceptives," 355 *Lancet* 2088 (2000).

[35] Commenters cited Ø. Lidegaard et al., "Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception, 366 *N. Engl. J. Med.* 2257, 2257 (2012) (risks "increased by a factor of 0.9 to 1.7 with oral contraceptives that included ethinyl estradiol at a dose of 20 µg and by a factor of 1.3 to 2.3 with those that included ethinyl estradiol at a dose of 30 to 40 µg"); Practice Committee of the American Society for Reproductive Medicine, "Hormonal Contraception"; M. Vessey et al., "Mortality in Relation to Oral Contraceptive Use and Cigarette Smoking," 362 *Lancet* 185, 185–91 (2003); WHO Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Acute Myocardial Infarction and Combined Oral Contraceptives: Results of an International Multicentre Case-Control Study," 349 *Lancet* 1202, 1202–09 (1997); K.M. Curtis et al., "Combined Oral Contraceptive Use Among Women With Hypertension: A Systematic Review," 73 *Contraception* 179, 179–188 (2006); L.A. Gillum et al., "Ischemic stroke risk with oral contraceptives: A meta analysis," 284 *JAMA* 72, 72–78 (2000), available at *https://www.ncbi.nlm.nih.gov/pubmed/10872016;* and Robert A. Hatcher et al., *Contraceptive Technology,* 404–05, 445 (Ardent Media 18th rev. ed. 2004).

[36] Commenters cited Robert A. Hatcher et al., *Contraceptive Technology,* 407, 445 (Ardent Media 18th rev. ed. 2004).

[37] Commenters cited Renee Heffron et al., "Use of Hormonal Contraceptives and Risk of HIV–1 Transmission: A Prospective Cohort Study," 12 *Lancet Infectious Diseases* 19, 24 (2012) ("Use of hormonal contraceptives was associated with a two-times increase in the risk of HIV–1 acquisition by women and HIV–1 transmission from women to men."); and "Hormonal Contraception Doubles HIV Risk, Study Suggests," *Science Daily* (Oct. 4, 2011). *https://www.sciencedaily.com/releases/2011/10/111003195253.htm.*

[38] Commenters cited "Oral Contraceptives and Cancer Risk," National Cancer Institute (Mar. 21, 2012). *https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet;* LJ Havrilesky et al., "Oral Contraceptive Use for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusefp.html;* S. N. Bhupathiraju et al., "Exogenous hormone use: Oral contraceptives, postmenopausal hormone therapy, and health outcomes in the Nurses' Health Study," 106 *Am. J. Pub. Health* 1631, 1631–37 (2016); The World Health Organization Department of Reproductive Health and Research, "Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment," (Sept. 2005), available at *http://who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf;* and the American Cancer Society, "Known and Probably Human Carcinogens," American Cancer Society (rev. Nov. 3, 2016), *https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html.*

Exhibit 2          JA482          JA-0000073

with, contraceptive use or the prevention of unintended pregnancy. Commenters cited, for example, the 2011 Report of the Institute of Medicine (IOM), "Clinical Preventive Services for Women: Closing the Gaps," in its discussion of the negative effects associated with unintended pregnancies, as well as other studies. Such commenters contended that, by reducing unintended pregnancy, contraceptives reduce the risk of unaddressed health complications, low birth weight, preterm birth, infant mortality, and maternal mortality. Commenters also stated that studies show contraceptives are associated with a reduced risk of conditions such as ovarian cancer, colorectal cancer, and endometrial cancer, and that contraceptives treat such conditions as endometriosis, polycystic ovarian syndrome, migraines, pre-menstrual pain, menstrual regulation, and pelvic inflammatory disease.[39] Some commenters stated that pregnancy presents various health risks, such as blood clots, bleeding, anemia, high blood pressure, gestational diabetes, and death. Some commenters also contended that increased access to contraception reduces abortions.

Some commenters stated that, in the Moral IFC, the Departments relied on incorrect statements concerning scientific studies. For example, some commenters stated that there is no proven increased risk of breast cancer or other risks among contraceptive users. They criticized the Departments for citing studies, including one previewed in the 2011 IOM Report itself (Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013) (cited above)), discussing an association between contraceptive use and increased risks of breast and cervical cancer, and concluding there are no net cancer-reducing benefits of contraceptive use. As described in the Religious IFC, 82 FR 47804, the 2013 Agency for Healthcare Research and Quality study, and other sources, reach conclusions with which these commenters appear to disagree. The Departments consider it appropriate to consider these studies, as well as the studies cited by commenters who disagree with these conclusions.

Some commenters further criticized the Departments for saying two studies cited by the 2011 IOM Report, which asserted an associative relationship between contraceptive use and decreases in unintended pregnancy, did not on their face establish a causal relationship between a broad coverage mandate and decreases in unintended pregnancy. In this respect, as noted in the Religious IFC.[40] the purpose for the Departments' reference to such studies was to highlight the difference between a causal relationship and an associative one, as well as the difference between saying contraceptive use has a certain effect and saying a contraceptive coverage mandate (or part of that mandate affected by certain exemptions) will necessarily have (or negate, respectively) such an effect.

Commenters disagreed about the effects of some FDA-approved contraceptives on embryos. Some commenters agreed with the quotation, in the Moral IFC, of FDA materials[41] that indicate that some items it has approved as contraceptives may prevent the implantation of an embryo after fertilization. Some of those commenters cited additional scientific sources to argue that certain approved contraceptives may prevent implantation, and that, in some cases, some contraceptive items may even dislodge an embryo shortly after implantation. Other commenters disagreed with the sources cited in the Moral IFC and cited additional studies on that issue. Some commenters further criticized the Departments for asserting in the Moral IFC that some persons believe those possible effects are "abortifacient."

This objection on this issue appears to be partially one of semantics. People disagree about whether to define "conception" or "pregnancy" to occur at fertilization, when the sperm and ovum unite, or days later at implantation, when that embryo has undergone further cellular development, travelled down the fallopian tube, and implanted in the uterine wall. This question is independent of the question of what mechanisms of action FDA-approved or cleared contraceptives may have. It is also a separate question from whether members of the public assert, or believe, that it is appropriate to consider the items "abortifacient"—that is, a kind of abortion, or a medical product that causes an abortion— because they believe abortion means to cause the demise of a post-fertilization embryo inside the mother's body. Commenters referenced scientific studies and sources on both sides of the issue of whether certain contraceptives prevent implantation. Commenters and litigants have positively stated that some of them view certain contraceptives as abortifacients, for this reason. *See also Hobby Lobby*, 134 U.S. at 2765 ("The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients.").

The Departments do not take a position on the scientific, religious, or moral debates on this issue by recognizing that some people have sincere moral objections to providing contraception coverage on this basis. The Supreme Court has already recognized that such a view can form the basis of an objection based on sincerely held religious belief under RFRA.[42] Several litigants have separately raised non-religious moral objections to contraceptive coverage based on the same basic rationale. Even though there is a plausible scientific argument against the view that certain contraceptives have mechanisms of action that may prevent implantation, there is also a plausible scientific argument in favor of it—as demonstrated, for example, by FDA's statement that some contraceptives may prevent implantation and by some scientific studies cited by commenters. The Departments believe in this context we have a sufficient rationale to offer moral exemptions with respect to this Mandate.

The Departments also received comments about their discussion, located in the Religious IFC but partly relied upon in the Moral IFC, concerning uncertainty about the effects the Mandate's expanded exemptions might have on teen sexual activity. In this respect, the Departments stated, "With respect to teens, the Santelli and Melnikas study cited by IOM 2011

---

[39] To the extent that contraceptives are prescribed to treat health conditions, and not for preventive purposes, the Mandate would not be applicable.

[40] 82 FR at 47803–04.

[41] FDA's guide "Birth Control" specifies that various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work . . . by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization. Available at *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm*.

[42] "Although many of the required, FDA-approved methods of contraception work by preventing the fertilization of an egg, four of those methods (those specifically at issue in these cases) may have the effect of preventing an already fertilized egg from developing any further by inhibiting its attachment to the uterus. See Brief for HHS in No. 13–354, pp. 9–10, n. 4; FDA, Birth Control: Medicines to Help You." *Hobby Lobby*, 134 S. Ct. at 2762–63. "The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients. . . . Like the Hahns, the Greens believe that life begins at conception and that it would violate their religion to facilitate access to contraceptive drugs or devices that operate after that point." *Id.* at 2765–66.

Exhibit 2                                    JA483                                    JA-0000074

observes that, between 1960 and 1990, as contraceptive use increased, teen sexual activity outside of marriage likewise increased (although the study does not assert a causal relationship). Another study, which proposed an economic model for the decision to engage in sexual activity, stated that '[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run.' '' [43] Some commenters agreed with this discussion, while other commenters disagreed. Commenters who supported the expanded exemptions cited these and similar sources suggesting that limiting the exemptions to the Mandate to those that existed prior to the Religious and Moral IFCs is not tailored towards advancing the Government's interests in reducing teen pregnancy. Instead they suggested there are means of reducing teen pregnancy that are less burdensome on conscientious objections.[44] Some commenters opposing the expanded exemptions stated that school-based health centers provide access to contraceptives, thus increasing use of contraceptives by sexually active students. They also cited studies concluding that certain decreases in teen pregnancy are attributable to increased contraceptive use.[45]

Many commenters opposing the moral exemptions misunderstood the Departments' discussion of this issue. Teens are a significant part, though not the entirety, of women the IOM identified as being most at risk of unintended pregnancy. The

Departments do not take a position on the empirical question of whether contraception has caused certain reductions in teen pregnancy. Rather, the Departments note that studies suggesting various causes of teen pregnancy and unintended pregnancy in general make it difficult to establish causation between exemptions to the contraceptive Mandate, and an increase in teen pregnancies in particular, or unintended pregnancies in general. For example, a 2015 study investigating the decline in teen pregnancy since 1991 attributed it to multiple factors (including, but not limited to, reduced sexual activity, falling welfare benefit levels, and expansion of family planning services in Medicaid, with the latter accounting for less than 13 percent of the decline). It concluded that ''that none of the relatively easy, policy-based explanations for the recent decline in teen childbearing in the United States hold up very well to careful empirical scrutiny.'' [46] One study found that, during the teen pregnancy decline between 2007 through 2012, teen sexual activity was also decreasing.[47] One study concluded that falling unemployment rates in the 1990s accounted for 85 percent of the decrease in rates of first births among 18 to 19 year-old African Americans.[48] Another study found that the representation of African-American teachers was associated with a significant reduction in the African-American teen pregnancy rate.[49] One study concluded that an ''increase in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy.'' [50] Similarly,

one study from England found that, where funding for teen pregnancy prevention was reduced, there was no evidence that the reduction led to an increase in teen pregnancies.[51] Some commenters also cited studies—which are not limited to the issue of teen pregnancy—that have found that many women who have abortions report that they were using contraceptives when they became pregnant.[52]

As the Departments stated in the Religious IFC, we do not take a position on the variety of empirical questions discussed above. Likewise, these rules do not address the substantive question of whether HRSA should include contraceptives in the women's preventive services Guidelines issued under section 2713(a)(4). Rather, reexamination of the record and review of public comments has reinforced the Departments' view that the uncertainty surrounding these weighty and important issues makes it appropriate to provide the moral exemptions and accommodation if and for as long as HRSA continues to include contraceptives in the Guidelines. The federal government has a long history, particularly in certain sensitive and multi-faceted health issues, of providing moral exemptions from governmental mandates. These final rules are consistent with that history and with the discretion Congress vested in the Departments to implement the ACA.

**8. Health and Equality Effects of Contraceptive Coverage Mandates**

The Departments also received comments about the health and equality effects of the Mandate more broadly. Some commenters contended that the contraceptive Mandate promoted the health and equality of women, especially low income women, and promoted female participation and

---

[43] Citing J.S. Santelli & A.J. Melnikas, ''Teen fertility in transition: recent and historic trends in the United States,'' 31 *Ann. Rev. Pub. Health* 371, 375–76 (2010), and Peter Arcidiacono et al., *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* (2005), available at *http://public.econ.duke.edu/~psarcidi/addicted13.pdf*. *See also* K. Buckles & D. Hungerman, ''The Incidental Fertility Effects of School Condom Distribution Programs,'' *Nat'l Bureau of Econ. Research* Working Paper No. 22322 (June 2016), available at *http://www.nber.org/papers/w22322* (''access to condoms in schools increase teen fertility by about 10 percent'' and increased sexually transmitted infections).

[44] *See* Helen Alvaré, ''No Compelling Interest: The 'Birth Control' Mandate and Religious Freedom,'' 58 *Vill. L. Rev.* 379, 400–02 (2013) (discussing the Santelli & Melnikas study and the Arcidiacono study cited above, and other research that considers the extent to which reduction in teen pregnancy is attributable to sexual risk avoidance rather than to contraception access).

[45] *See, e.g.,* Lindberg L., Santelli J., ''Understanding the Decline in Adolescent Fertility in the United States, 2007–2012,'' 59 *J. Adolescent Health* 577–83 (Nov. 2016), *https://doi.org/10.1016/j.jadohealth.2016.06.024*; *see also* Comment of The Colorado Health Foundation, submission ID CMS–2014–0115–19635, *www.regulations.gov* (discussing teen pregnancy data from Colorado).

[46] Kearney MS and Levine PB, ''Investigating recent trends in the U.S. birth rate,'' 41 *I. Health Econ.* 15–29 (2015), available at *https://www.sciencedirect.com/science/article/abs/pii/S0167629615000041*.

[47] *See. e.g.,* K. Ethier et al., ''Sexual Intercourse Among High School Students—29 States and United States Overall, 2005–2015,'' 66 *CDC Morb. Mortal. Wkly Report* 1393, 1393–97 (Jan. 5, 2018), available at *http://dx.doi.org/10.15585/mmwr.mm665152a1* (''Nationwide, the proportion of high school students who had ever had sexual intercourse decreased significantly overall . . . .'').

[48] Colen CG, Geronimus AT, and Phipps MG, ''Getting a piece of the pie? The economic boom of the 1990s and declining teen birth rates in the United States,'' 63 *Social Science & Med.* 1531–45 (Sept. 2006), available at *https://www.sciencedirect.com/science/article/pii/S027795360600205X*.

[49] Atkins DN and Wilkins VM, ''Going Beyond Reading, Writing, and Arithmetic: The Effects of Teacher Representation on Teen Pregnancy Rates,'' 23 *I. Pub. Admin. Research & Theory* 771–90 (Oct. 1, 2013), available at *https://academic.oup.com/jpart/article-abstract/23/4/771/963674*.

[50] Collins E. & B. Herchbein, ''The Impact of Subsidized Birth Control for College Women: Evidence from the Deficit Reduction Act,'' *U. Mich. Pop. Studies Ctr.* Report 11–737 (May 2011).

available at *https://www.psc.isr.umich.edu/pubs/pdf/rr11-737.pdf* (''[I]ncrease in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy or sexually transmitted infections for most women'').

[51] *See* D. Paton & L. Wright, ''The effect of spending cuts on teen pregnancy,'' 54 *I. Health Econ.* 135–46 (2017), available at *https://www.sciencedirect.com/science/article/abs/pii/S0167629617304551* (''Contrary to predictions made at the time of the cuts, panel data estimates provide no evidence that areas which reduced expenditure the most have experienced relative increases in teenage pregnancy rates. Rather, expenditure cuts are associated with small reductions in teen pregnancy rates'').

[52] Commenters cited, for example, Guttmacher Institute, ''Fact Sheet: Induced Abortion in the United States'' (Jan. 2018) (''Fifty-one percent of abortion patients in 2014 were using a contraceptive method in the month they became pregnant''), available at *https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf*.

equality in the workforce. Other commenters contended there was insufficient evidence showing that the expanded exemptions would harm those interests. Some of those commenters further questioned whether there was evidence to show that broad health coverage mandates of contraception lead to increased contraceptive use, reductions in unintended pregnancies, or reductions in negative effects said to be associated with unintended pregnancies. In particular, some commenters discussed a study published and revised by the Guttmacher Institute in October 2017, concluding that "[b]etween 2008 and 2014. there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy." [53] This timeframe includes the first two years of the contraceptive Mandate's implementation. Despite some changes in the use of various methods of contraceptives, the study concluded that, "[f]or the most part, women are changing method type within the group of most or moderately effective methods and not shifting from less effective to more effective methods." Regarding the effect of this Mandate in particular, the authors concluded that "[t]he role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA (most or moderately effective methods) during the most recent time period (2012–2014) excepting small increases in implant use." The authors observed that other "[s]tudies have produced mixed evidence regarding the relationship between the implementation of the ACA and contraceptive use patterns." In explaining some possible reasons or no clear effect on contraceptive use, the authors suggested that "existence of these safety net programs [publicly funded family planning centers and Medicaid] may have dampened any impact that the ACA could have had on contraceptive use," "cost is not the only barrier to accessing a full range of method options," and "access to affordable and/or free contraception made possible through programs such as Title X" may have led to income not being associated with the use of most

contraceptive methods.[54] In addition, commenters noted that in the 29 states where contraceptive coverage mandates have been imposed statewide,[55] those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall.[56]

Other commenters, however, disputed the significance of these state statistics, noting that, of the 29 states with contraceptive coverage mandates, only four states have laws that match the federal requirements in scope. Some also observed that, even in states with state contraceptive coverage mandates, self-insured group health plans might escape those requirements, and some states do not mandate the contraceptives to be covered at no out-of-pocket cost to the beneficiary.

The Departments have considered these experiences as relevant to the effect the exemption in these rules might have on the Mandate more broadly. The state mandates of contraceptive coverage still apply to a very large number of plans and plan participants notwithstanding ERISA preemption, and public commenters did not point to studies showing those state mandates reduced unintended pregnancies. The federal contraceptive Mandate, likewise, applies to a broad, but not entirely comprehensive, number of employers. For example, to the extent that houses of worship and integrated auxiliaries may have self-insured to avoid state health insurance contraceptive coverage mandates or for other reasons, those groups were already exempt from the federal Mandate prior to the 2017 Religious and Moral IFCs. The exemptions as set forth in the Moral IFC and in these final rules leave the contraceptive Mandate in place for nearly all entities and plans to which the Mandate has applied. The Departments are not aware of data showing that these expanded exemptions would negate any reduction in unintended pregnancies that might result from the contraceptive Mandate here.

Some commenters took a view that appears to disagree with the assertion in

the 2017 Guttmacher study, that "[t]he role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA." These commenters instead observed that, under the Mandate, more women have coverage of contraceptives and contraception counseling and that more contraceptives are provided without co-pays than before. Still others argued that the Mandate, or other expansions of contraceptive coverage, have led women to increase their use of contraception in general, or to change from less effective. less expensive contraceptive methods to more effective, more expensive contraceptive methods. Some commenters pointed to studies cited in the 2011 IOM Report recommending contraception be included in the Guidelines and argued that certain women will go without certain health care, or contraception specifically, because of cost. They contended that a smaller percentage of women delay or forego health care overall under the ACA [57] and that, according to studies, coverage of contraceptives without cost-sharing has increased use of contraceptives in certain circumstances. Some commenters also stated that studies show that decreases in unintended pregnancies are due to broader access to contraceptives. Finally, some commenters also stated that birth control access generally has led to social and economic equality for women.

The Departments have reviewed the comments, including studies submitted by commenters either supporting or opposing these expanded exemptions. Based on that review, it is not clear that merely offering the exemption in these rules will have a significant effect on contraceptive use and health, or workplace equality, for the vast majority of women benefitting from the Mandate. There is conflicting evidence regarding whether the Mandate alone, as distinct from contraceptive access more generally, has caused increased contraceptive use, reduced unintended pregnancies, or eliminated workplace disparities, where all other women's preventive services were covered without cost sharing. Without taking a definitive position on those evidentiary issues, however, the Departments

---

[53] M.L. Kavanaugh et al., "Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014," 97 *Contraception* 14, 14–21 (2018), available at *http://www.contraceptionjournal.org/article/S0010-7824(17)30478-X/pdf*.

[54] Id.

[55] See Guttmacher Institute, "Insurance Coverage of Contraceptives" (June 11. 2018); "State Requirements for Insurance Coverage of Contraceptives," Henry J. Kaiser Family Foundation (Jan. 1, 2018). *https://www.kff.org/other/state-indicator/state-requirements-for-insurance-coverage-of-contraceptives/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22.%22sort%22:%22asc%22%7D*.

[56] See Michael J. New, "Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes," 13 *Ave Maria L. Rev.* 345 (2015), available at *http://avemarialaw-law-review.avemarialaw.edu/Content/articles/vXIII.i2.new.final.0809.pdf*.

[57] Citing, for example, Adelle Simmons et al., "The Affordable Care Act: Promoting Better Health for Women," Table 1, ASPE (June 14, 2016). *https://aspe.hhs.gov/system/files/pdf/205066/ACAWomenHealthIssueBrief.pdf*.

conclude that the Moral IFC and these final rules—which merely withdraw the Mandate's requirement from what appears to be a small number of newly exempt entities and plans—are not likely to have negative effects on the health or equality of women nationwide. The Departments also conclude that the expanded exemptions are an appropriate policy choice left to the agencies under the relevant statutes. and, thus, an appropriate exercise of the Departments' discretion.

Moreover, the Departments conclude that the best way to balance the various policy interests at stake in the Moral IFC and these final rules is to provide the exemptions set forth herein, even if certain effects may occur among the populations actually affected by the employment of these exemptions. These rules provide tangible conscience protections for moral convictions, and impose fewer governmental burdens on various entities and individuals, some of whom have contended for several years that denying them an exemption from the contraceptive Mandate imposes a burden on their moral convictions. The Departments view the provision of those protections to preserve conscience in this health care context as an appropriate policy option, notwithstanding the widely divergent effects that public commenters have predicted based on different studies they cited. Providing the protections for moral convictions set forth in the Moral IFC and these final rules is not inconsistent with the ACA, and brings this Mandate into better alignment with various other federal conscience protections in health care, some of which have been in place for decades.

### 9. Other General Comments

Some commenters expressed the view that the exemptions afforded in the Moral IFC and herein violate the RFRA rights of women who might not receive contraceptive coverage as the result of these final rules, by allowing their employers to impose their moral convictions on them by removing contraceptive coverage through use of the exemption. Still other commenters stated that employer payment of insurance premiums is part of any employee's compensation package, the benefits of which employers should not be able to limit. In the Departments' view, the expanded exemptions in these final rules do not prohibit employers from providing contraceptive coverage. Instead, they lift a government burden that was imposed on some employers to provide contraceptive coverage to their employees in violation of those employers' moral convictions. The

Departments do not believe RFRA requires, or has ever required, the federal government to force employers to provide contraceptive coverage. The federal government's decision to exempt some entities from a requirement to provide no-cost-sharing services to private citizens does not constitute a federal government-imposed burden on the latter under RFRA.

Some commenters asked the Departments to discuss the interaction between these rules and state laws that either require contraceptive coverage or provide exemptions from those and other requirements. Some commenters argue that providing the exemptions in these rules would negate state contraceptive requirements or narrower state exemptions. Some commenters asked that the Departments specify that these exemptions do not apply to plans governed by state laws that require contraceptive coverage.

The Departments agree that these rules only concern the applicability of the federal contraceptive Mandate imposed pursuant to section 2713(a)(4). They do not regulate state contraceptive mandates or state exemptions. If a plan is exempt under the Moral IFC and these final rules, that exemption does not necessarily exempt the plan or other insurance issuer from state laws that may apply to it. The previous regulations, which offered exemptions for houses of worship and integrated auxiliaries, did not include regulatory language negating the exemptions in states that require contraceptive coverage, although the Departments discussed the issue to some degree in various preambles of those previous regulations. The Departments do not consider it appropriate or necessary in the regulatory text of the moral exemption rules to declare whether the federal contraceptive Mandate would still apply in states that have a state contraceptive mandate, since these rules do not purport to regulate the applicability of state contraceptive mandates.[58]

Some commenters observed that, through ERISA, some entities may avoid state laws that require contraceptive

coverage by self-insuring. This is a result of the application of the preemption and savings clauses contained in ERISA to state insurance regulation. *See* 29 U.S.C. 1144(a) & (b)(1).

These final rules cannot change statutory ERISA provisions, and do not change the standards applicable to ERISA preemption. To the extent Congress has decided that ERISA preemption includes preemption of state laws requiring contraceptive coverage, that decision occurred before the ACA and was not negated by the ACA. Congress did not mandate in the ACA that any Guidelines issued under section 2713(a)(4) must include contraceptives, nor that the Guidelines must force entities with moral objections to cover contraceptives.

Finally, some commenters expressed concern that providing moral exemptions to the mandate that private parties provide contraception may lead to exemptions regarding other medications or services, like vaccines. The exemptions provided in these rules, however, do not apply beyond the contraceptive coverage requirement implemented through section 2713(a)(4). Specifically, section 2713(a)(2) of the PHS Act requires coverage of "immunizations," and these exemptions do not encompass that requirement. The fact that the Departments have exempted houses of worship and integrated auxiliaries from the contraceptive Mandate since 2011 did not lead to those entities receiving exemptions under section 2713(a)(2) concerning vaccines. In addition, hundreds of entities have sued the Departments over the implementation of section 2713(a)(4), leading to two decisions of the U.S. Supreme Court, but no similar wave of lawsuits has challenged section 2713(a)(2). The expanded exemptions in these final rules are consistent with a long history of statutes protecting moral convictions from certain health care mandates concerning issues such as sterilization, abortion and birth control.

### B. Text of the Final Rules

In this section, the Departments describe the regulations from the Moral IFC, public comments in response to the specific regulatory text set forth in the IFC, the Departments' response to those comments, and, in consideration of those comments, the regulatory text as finalized in this final rule. We also note the regulatory text as it existed prior to the Religious and Moral IFCs, as appropriate. The Departments consider the exemptions finalized here to be an appropriate and permissible policy

---

[58] Some commenters also asked that these final rules specify that exempt entities must comply with other applicable laws concerning such things as notice to plan participants or collective bargaining agreements. These final rules relieve the application of the federal contraceptive Mandate under section 2713(a)(4) to qualified exempt entities; they do not affect the applicability of other laws. In the preamble to the companion final rules concerning religious exemptions published elsewhere in today's **Federal Register**, the Departments provide guidance applicable to notices of revocation and changes that an entity may seek to make during its plan year.

Exhibit 2                                   JA486                                   JA-0000077

choice in light of various interests at stake and the lack of a statutory requirement for the Departments to impose the Mandate on entities and plans that qualify for these exemptions.

As noted above, various members of the public provided comments that were supportive, or critical, of the regulations overall, or of significant policies pertaining to the regulations. To the extent those comments apply to the following regulatory text, the Departments have responded to them above. This section of the preamble responds to comments that pertain more specifically to particular regulatory text.

### 1. Restatement of Statutory Requirements of Section 2713(a) and (a)(4) of the PHS Act (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv))

The previous regulations restated the statutory requirements of section 2713(a) and (a)(4) of the PHS Act, at 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). The Religious IFC modified those restatements to more closely align them with the text of section 2713(a) and (a)(4) of the PHS Act. Those sections cross-reference the other sections of the Departments' rules that provide exemptions to the contraceptive Mandate. After the Religious IFC changed those sections, the Moral IFC inserted, within those cross-references, references to the new § 147.133, which contains the text of the moral exemptions. The insertions correspond to the cross-references to the religious exemptions added by the Religious IFC. The Departments finalize these parts of the Moral IFC without change.

### 2. Exemption for Objecting Entities Based on Moral Convictions (45 CFR 147.133(a))

The previous regulations contained no exemption concerning moral convictions, as distinct from religious beliefs. Instead, at 45 CFR 147.131(a), they offered an exemption for houses of worship and integrated auxiliaries. In the remaining part of § 147.131, the previous regulations described the accommodation process for organizations with religious objections. The Religious IFC moved the religious exemption to a new section 45 CFR 147.132, and expanded its scope. The Moral IFC created a new section 45 CFR 147.133, providing exemptions for moral convictions similar to, but not exactly the same as, the exemptions for religious beliefs set forth in § 147.132.

The prefatory language of § 147.133(a) not only specifies that certain entities are "exempt," but also explains that the Guidelines shall not support or provide for an imposition of the contraceptive coverage requirement to such exempt entities. This is an acknowledgement that section 2713(a)(4) requires women's preventive services coverage only "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." To the extent the HRSA Guidelines do not provide for, or support, the application of such coverage to certain entities or plans, the Affordable Care Act does not require the coverage. Those entities or plans are "exempt" by not being subject to the requirements in the first instance. Therefore, in describing the entities or plans as "exempt," and in referring to the "exemption" encompassing those entities or plans, the Departments also affirm the non-applicability of the Guidelines to them.

The Departments wish to make clear that the expanded exemption set forth in § 147.133(a) applies to several distinct entities involved in the provision of coverage to an objecting employer's employees. This explanation is consistent with how prior regulations have worked by means of similar language. When § 147.133(a)(1) and (a)(1)(i) specify that "[a] group health plan," "health insurance coverage provided in connection with a group health plan," and "health insurance coverage offered or arranged by an objecting organization" are exempt "to the extent" of the objections "as specified in paragraph (a)(2)," that language exempts the group health plans of the sponsors that object, and their health insurance issuers in providing the coverage in those plans (whether or not the issuers have their own objections). Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv) (and as referenced by the parallel provisions in 26 CFR 54.9815 through 2713(a)(1)(iv) and 29 CFR 2590.715 through 2713(a)(1)(v)), the plan sponsor, issuer, and plan covered in the exemption of that paragraph would face no penalty as a result of omitting contraceptive coverage from the benefits of the plan participants and beneficiaries. However, while a plan sponsor's or arranger's objection removes penalties from that group health plan's issuer, it only does so with respect to that group health plan—it does not affect the issuer's coverage for other group health plans where the plan sponsor has no qualifying objection. More information

on the effects of the objection of a health insurance issuer in § 147.133(a)(1)(iii) is included below.

The exemptions in § 147.133(a)(1) apply "to the extent" of the objecting entities' sincerely held moral convictions. Thus, entities that hold a requisite objection to covering some, but not all, contraceptive items would be exempt with respect to the items to which they object, but not with respect to the items to which they do not object. Some commenters stated it was unclear whether the plans of entities or individuals that morally object to some but not all contraceptives would be exempt from being required to cover just the contraceptive methods as to which there is an objection, or whether the objection to some contraceptives leads to an exemption from that plan being required to cover all contraceptives. The Departments intend that a requisite moral objection to some, but not all, contraceptives would lead to an exemption only to the extent of that objection: That is, the exemption would encompass only the items to which the relevant entity or individual objects and would not encompass contraceptive methods to which the objection does not apply. To make this clearer, in these final rules the Departments finalize the prefatory language of § 147.133(a) so that the first sentence of that paragraph states that an exemption shall be included, and the Guidelines must not provide for contraceptive coverage, "to the extent of the objections specified below." The Departments have made corresponding changes to language throughout the regulatory text, to describe the exemptions as applying "to the extent" of the objection(s).

The exemptions contained in previous regulations, at § 147.131(a), did not require an exempt entity to submit any particular self-certification or notice, either to the government or to the entity's issuer or third party administrator, in order to obtain or qualify for their exemption. Similarly, under the expanded exemptions in § 147.133, the Moral IFC did not require exempt entities to comply with a self-certification process. We finalize that approach without change. Although exempt entities do not need to file notices or certifications of their exemption, and these final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits. Under ERISA, the plan

document identifies what benefits are provided to participants and beneficiaries under the plan; if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document. Moreover, if there is a reduction in a covered service or benefit, the plan has to disclose that change to plan participants.[59] Thus, where an exemption applies and all (or a subset of) contraceptive services are omitted from a plan's coverage, otherwise applicable ERISA disclosures must reflect the omission of coverage in ERISA plans. These existing disclosure requirements serve to help provide notice to participants and beneficiaries of what ERISA plans do and do not cover.

Some commenters supported this approach, while others did not. Those in favor suggested that self-certification forms for an exemption are not necessary, could add burdens to exempt entities beyond those imposed by the previous exemption, and could give rise to objections to the self-certification process itself. Commenters also stated that requiring an exemption form for exempt entities could cause additional operational burdens for plans that have existing processes in place to handle exemptions. Other commenters favored including a self-certification process for exempt entities. They suggested that entities might abuse the availability of an exemption or use their exempt status insincerely if no self-certification process exists, and that the Mandate might be difficult to enforce without a self-certification process.

After considering the comments, the Departments continue to believe it is appropriate to not require exempt entities to submit a self-certification or notice. The previous exemption did not require a self-certification or notice, and the Departments did not collect a list of all entities that used the exemption, although there may have been thousands of houses of worship and integrated auxiliaries covered by the previous exemption and the Departments think it likely that only a small number of entities will use the moral exemption. Adding a self-certification or notice to the exemption would impose an additional paperwork burden on exempt entities that the previous regulations did not impose, and would also involve additional

public costs if those certifications or notices are to be reviewed or kept on file by the government.

The Departments are not aware of instances where the lack of a self-certification under the previous exemption led to abuses or to an inability to engage in enforcement. The Mandate is enforceable through various mechanisms in the PHS Act, the Code, and ERISA. Entities that insincerely or otherwise improperly operate as if they are exempt would do so at the risk of enforcement and accountability under such mechanisms. The Departments are not aware of sufficient reasons to believe those measures and mechanisms would fail to deter entities from improperly operating as if they are exempt. Moreover, as noted above, ERISA and other plan disclosure requirements governing group health plans require provision of a comprehensive summary of the benefits covered by the plan and disclosure of any reductions in covered services or benefits, so beneficiaries will know whether their health plan claims a contraceptive Mandate exemption and will be able to raise appropriate challenges to such claims. As a consequence, the Departments believe it is an appropriate balance of various concerns expressed by commenters for these final rules to continue to not require notices or self-certifications for using the exemption.

Some commenters asked the Departments to add language indicating that an exemption cannot be invoked in the middle of a plan year, nor should it be used to the extent inconsistent with laws that apply to, or state approval of. fully insured plans. None of the previous iterations of the exemption regulations included such provisions, and the Departments do not consider them necessary in these final rules. The exemptions in these final rules only purport to exempt plans and entities from the application of the federal contraceptive coverage requirement of the Guidelines issued under section 2713(a)(4). They do not purport to exempt entities or plans from state laws concerning contraceptive coverage, or laws governing whether an entity can make a change (of whatever kind) during a plan year. Final rules governing the accommodation likewise do not purport to obviate the need to follow otherwise applicable rules about making changes during a plan year. (In the companion rules concerning religious beliefs published elsewhere in today's **Federal Register**, the Departments discuss in more detail the accommodation and when an entity seeking to revoke it would be able to do

so or to notify plan participants of the revocation.)

Commenters also asked that clauses be added to the regulatory text holding issuers harmless where exemptions are invoked by plan sponsors. As discussed above, the exemption rules already specify that where an exemption applies to a group health plan, it encompasses both the group health plan and health insurance coverage provided in connection with the group health plan. and therefore encompasses any impact on the issuer of the contraceptive coverage requirement with respect to that plan. In addition, as discussed in the companion religious final rule published elsewhere in today's **Federal Register**, the Departments have added language from the previous regulations. in § 147.131(f). to protect issuers that act in reliance on certain representations made in the accommodation process. To the extent that commenters seek language offering additional protections for other incidents that might occur in connection with the invocation of an exemption, the previous exemption regulations did not include such provisions, and the Departments do not consider them necessary in these final rules. As noted above, the expanded exemptions in these final rules simply remove or narrow the contraceptive Mandate contained in, and derived from, the Guidelines for certain plans. The previous regulations included a reliance clause in the accommodation provisions. but did not specify further details regarding the relationship between exempt entities and their issuers or third party administrators. The Departments do not believe it necessary to do so in these final rules.

Commenters disagreed about the likely effects of the moral exemptions on the health coverage market. Some commenters stated that expanding the exemptions to encompass moral convictions would not cause complications in the market, while others said that it could, due to such causes as a lack of uniformity among plans, or permitting multiple risk pools. The Departments note that the extent to which plans cover contraception under the prior regulations is already far from uniform. Congress did not require all entities to comply with section 2713 of the PHS Act (under which the Mandate was promulgated)—most notably by exempting grandfathered plans. Moreover, under the previous regulations, issuers were already able to offer plans that omit contraceptives—or only some contraceptives—to houses of worship and integrated auxiliaries. and some commenters and litigants said that issuers were doing so. These cases

---

[59] See. for example, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102–2, 2520.102–3, & 2520.104b-3(d). and 29 CFR 2590.715–2715. See also 45 CFR 147.200 (requiring disclosure of the "exceptions, reductions, and limitations of the coverage." including group health plans and group & individual issuers).

Exhibit 2                    JA488                    JA-0000079

where plans did not need to comply with the Mandate, and the Departments' previous accommodation process which had the effect of allowing coverage not to be provided in certain self-insured church plans, together show that the importance of a uniform health coverage system is not significantly harmed by allowing plans to omit contraception in some contexts.[60]

Concerning the prospect raised by some commenters of different risk pools between men and women, section 2713(a) of the PHS Act itself provides for some preventive services coverage that applies to both men and women, and some that would apply only to women. With respect to the latter, it does not specify what, if anything, HRSA's Guidelines for women's preventives services would cover, or if contraceptive coverage will be required. The Moral IFC and these final rules do not require issuers to offer health insurance products that satisfy morally objecting entities, they simply make it legal to do so. The Mandate has been imposed only relatively recently, and the contours of its application to objecting entities has been in continual flux. due to various rulemakings and court orders. Overall. concerns raised by some public commenters have not led the Departments to consider it likely that offering these expanded exemptions will cause any injury to the uniformity or operability of the health coverage market.

### 3. Exemption for Certain Plan Sponsors (45 CFR 147.133(a)(1)(i))

The exemption in § 147.133(a)(1)(i) of the Moral IFC covers a group health plan and health insurance coverage for non-governmental plan sponsors that object as specified in paragraph (a)(2), and that are either nonprofit organizations, or are for-profit entities that have no publicly traded ownership interests (defined as any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934). The Departments finalize this paragraph without change, and discuss each part of the paragraph in turn.

### a. Plan Sponsors in General (45 CFR 147.133(a)(1)(i) Prefatory Text)

Under the plan sponsor exemption in § 147.132(a)(1)(i), the prefatory text in that paragraph specifies that it encompasses group health plans, and health insurance coverage provided in connection with such group health plans, that are sponsored by certain kinds of entities, namely, nonprofit organizations or for-profit entities that have no publicly traded ownership interests.

Such plan sponsors, if they are otherwise nonprofit organizations or for-profit entities that have no publicly traded ownership interests, can include entities that are not employers (for example, a union, or a sponsor of a multiemployer plan), where the plan sponsor objects based on sincerely held moral convictions to coverage of contraceptives or sterilization. Plan sponsors encompassed by the exemption can also include employers, and consistent with the definition of "employer" in 29 CFR 2510.3–5, can include association health plans, where the plan sponsor is a nonprofit organization or a for-profit entity that has no publicly traded ownership interests.

Some commenters objected to extending the exemption to plan sponsors that are not single employers, arguing that they could not have the same kind of moral objection that a single employer might have. Other commenters supported the protection of any plan sponsor with the requisite moral objection. The Departments conclude that it is appropriate, where a plan sponsor of a multiemployer plan or multiple employer plan adopts a moral objection using the same procedures that such a plan sponsor might use to make other decisions, to respect that decision by providing an exemption from the Mandate.

The plans of governmental employers are not covered by the plan sponsor exemption in § 147.133(a)(1)(i), which instead limits the moral exemptions to "non-governmental plan sponsors." As noted above, the Departments sought public comment on whether to extend the exemptions to non-federal governmental plan sponsors. Some commenters suggested that the moral exemptions should include government entities because other conscience laws can include government entities, such as when they oppose offering abortions. Others disagreed, contending that governmental entities should not or cannot object based on moral convictions, or that it would be unlawful for them to do so.

The Departments are sympathetic to the arguments of commenters that favor including government entities in the exemption for moral convictions. The protections outlined in the first paragraph of the Church Amendments for entities that object based on moral convictions to making their facilities or personnel available to assist in the performance of abortions or sterilizations do not turn on the nature of the entity, whether public, private, nonprofit, for-profit, or governmental. (42 U.S.C. 300a–7(b)). Both the Weldon and Coats-Snowe Amendments also protect state and local government entities from providing, promoting, or paying for abortions in particular ways.[61] Congress has generally not limited protections for conscience based on the nature of an entity—even in the case of governmental entities.

At the same time, the Departments do not at this time have information suggesting that an exemption for governmental entities is needed or desired. The Departments have not been sued by any governmental entities raising objections to the Mandate based on non-religious moral convictions. Although the Departments sought public comment on the issue, the Departments received no public comments identifying governmental entities that need or desire such an exemption. Rather, the Departments are aware of governmental entities that, despite not possessing their own objections to contraceptive coverage, have acted to protect their employees who have conscientious objections to receiving contraceptive coverage in their employer-provided health insurance plans. *See Wieland* v. *U.S. Dep't of Health & Human Servs.*, 196 F. Supp. 1010, 1015–16 (E.D. Mo. 2016) (quoting Mo. Rev. Stat. 191.724). The individual exemption adopted in these rules will ensure the Mandate is not an obstacle to those efforts.

Thus. in light of the balance of public comments, the Departments decline to extend the moral convictions exemption to governmental entities. As is the case with the Departments' decision not to extend the moral exemption to publicly traded for-profit entities, this decision does not reflect a disagreement with the various conscience statutes that provide exemptions for moral convictions

---

[60] *See also Real Alternatives.* 867 F.3d 338, 389 (3d Cir. 2017) (Jordan, J., concurring in part and dissenting in part) ("Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market. . . . Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny." (citation and internal quotation marks omitted)).

[61] Consolidated Appropriations Act, 2018. Div. H. Sec. 507(d), 132 Stat. at 764 (protecting any "hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion); 42 U.S.C. 238n (protecting entities that object to abortion, including, but not limited to, any "postgraduate physician training program").

Exhibit 2    JA489    JA-0000080

without categorically excluding governmental entities. The Departments remain open to the possibility of future rulemaking on this issue if the Departments become aware of a governmental entity seeking to be exempt from the contraceptive Mandate.

### b. Nonprofit Organizations (45 CFR 147.133(a)(1)(i)(A))

As discussed above, some commenters opposed offering exemptions based on moral convictions to any plan sponsors, and/or objected to doing so for nonprofit organizations, on various grounds, including but not limited to arguments that the benefits of contraceptive access should override moral objections, entities cannot assert moral objections, and moral objections burden third parties. Other commenters supported the exemptions, generally defending the interest of nonprofit organizations not to be forced to violate their moral convictions, supporting the history of government protection of moral convictions in similar contexts, and disputing the claims of opponents of the exemptions.

The Departments are aware, through litigation, of only two non-religious nonprofit organizations with moral objections to the contraceptive Mandate. Many more nonprofit religious organizations have sued suggesting—as discussed below—that the effect of this exemption for non-religious nonprofit objections to the Mandate will be far less significant than commenters who oppose the exemption believe it will. The two non-religious nonprofit organizations that challenged the Mandate in court provide a good illustration of the reasons why the Department has decided to provide this exemption to nonprofit organizations. Both organizations have said in court they oppose certain contraceptives on non-religious moral grounds as being abortifacient and state that they only hire employees who share that view. Public comments and litigation reflect that many nonprofit organizations publicly describe their beliefs and convictions. Government records and many of those groups' websites also often reflect those groups' religious or moral character, as the case may be. If a person who desires contraceptive coverage works at a nonprofit organization, the Departments view it as sufficiently likely that the person would know, or would know to ask, whether the organization offers such coverage. The Departments are not aware of federal laws that would require a nonprofit organization that opposes contraceptive coverage to hire a person who disagrees with the organization's

view on contraceptive coverage. Instead, nonprofit organizations generally have access to a First Amendment right of expressive association to choose to hire persons (or, in the case of students, to admit them) based on whether they share, or at least will be respectful of, their beliefs.[62]

The Departments agree with commenters who support offering the exemption to nonprofit organizations and believe that doing so is an appropriate protection and is not likely to have a significant impact on women who want contraceptive coverage.

### c. For-Profit Entities (45 CFR 147.133(a)(1)(i)(B))

With respect to for-profit organizations addressed in § 147.133(a)(1)(i)(B), in the Moral IFC, the Departments did not limit the exemption to nonprofit organizations, but also included some for-profit entities. Some commenters supported including for-profit entities in the exemption, saying owners of such entities exercise their moral convictions through their businesses, and that such owners should not be burdened by a federal governmental contraceptive Mandate. Other commenters opposed extending the exemption to closely held for-profit entities, saying the entities cannot exercise moral convictions or should not have their moral opposition to contraceptive coverage protected by the exemption. Some commenters stated that the entities should not be able to impose their beliefs about contraceptive coverage on their employees and that doing so constitutes discrimination.

The Departments agree with commenters who support including some for-profit entities in the exemption. Many of the federal health care conscience statutes cited above offer protections for the moral convictions of entities, without regard to whether they operate as nonprofit organizations or for-profit entities. In addition, nearly half of the states either impose no contraceptive coverage requirement or offer "an almost unlimited" exemption encompassing both "religious and secular organizations."[63] States also generally protect moral convictions in other

health care conscience laws whether or not an entity operates as a nonprofit.[64]

Extending the exemption to certain for-profit entities is also consistent with the Supreme Court's ruling in *Hobby Lobby*, which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in *Hobby Lobby*, the pursuit of religious beliefs), regardless of whether the entity operates as a nonprofit organization and rejected the Departments' argument to the contrary. 134 S. Ct. at 2768–75. The mechanisms by which a for-profit company makes decisions of conscience, or resolves disputes on those issues among their owners, are problems that "state corporate law provides a ready means" of solving. *Id.* at 2774–75. Some reports and industry experts have indicated that few for-profit entities beyond those that had originally challenged the Mandate have sought relief from it after *Hobby Lobby*.[65] Because all of those appear to be informed by religious beliefs, extending the exemption to entities with non-religious moral convictions would seem to have an even smaller impact on access to contraceptive coverage.

The Moral IFC only extended the exemption covering for-profit entities to those that are closely held, not to for-profit entities that are publicly traded, but asked for comment on whether publicly traded entities should be included in the moral exemption. In this way the Moral IFC differed from the exemption provided to plan sponsors with objections based on sincerely held religious beliefs set forth in the Religious IFC, at § 147.132(a)(1), finalized in companion rules published elsewhere in today's **Federal Register**.

Some commenters supported including publicly traded entities in the moral exemption, contending that publicly traded entities have historically taken various positions on important public concerns beyond merely seeking the company's own profits, and that nothing in principle would preclude them from using the same mechanisms of corporate decision-making to establish and exercise moral convictions against contraceptive coverage. They observed that large publicly traded entities are exempt from the contraceptive Mandate by means of the grandfathering provision of the ACA, so

---

[62] Notably, "the First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.'" *Boy Scouts of America v. Dale*, 530 U.S. 640, 655 (2000).

[63] "Insurance Coverage of Contraceptives," The Guttmacher Institute (June 11, 2018), *https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives*.

[64] *See, e.g.,* "Refusing to Provide Health Services," The Guttmacher Institute (June 1, 2018), *https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services*.

[65] See Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," *Politico* (Oct. 11, 2016), *http://www.politico.com/story/2016/10/obamacare-birth-control-mandate-employers-229627*.

Exhibit 2    JA490    JA-0000081

that it is inappropriate to refuse to exempt publicly traded entities that actually have sincerely held moral convictions against compliance with the Mandate. They further argued that in some instances there are closely held companies that are as large as publicly traded companies of significant size. They also stated that other protections for moral convictions in certain federal health care conscience statutes do not preclude the application of such protections to certain entities on the basis that they are not closely held, and federal law defines "persons" to include all forms of corporations, not just closely held corporations, at 1 U.S.C. 1. Additionally, some commenters were concerned that not providing a moral exemption for publicly traded for-profit entities but allowing a religious exemption for publicly traded for-profit entities (as was allowed in the Religious IFC, and as is allowed in the companion religious final rules published elsewhere in today's **Federal Register**), may raise Establishment Clause questions, may cause confusion to the public, and may make the exemptions more difficult for the Departments and enforcing agencies to administer. They stated that it is incongruous to include publicly traded entities in the exemption for religious beliefs, but exclude them from the exemption for moral convictions.

Other commenters opposed including publicly traded companies in these moral exemptions. Some stated that such companies could not exercise moral convictions and opposed the effects on women if they would. They also objected that including such companies, along with closely held businesses, would extend the exemptions to all or virtually all companies. Some commenters stated that many publicly traded companies would use a moral exemption if available to them. because many closely held for-profit businesses expressed religious objections to the Mandate, or availed themselves of the religious accommodation.

As is the case for non-federal governmental employers, the Departments are sympathetic to the arguments of commenters that favor including publicly traded entities in the exemption for moral convictions. In the case of particularly sensitive health care matters, several significant federal health care conscience statutes protect entities' moral objections without regard to their ownership status. For example, the first paragraph of the Church Amendments provides certain protections for entities that object based on moral convictions to making their

facilities or personnel available to assist in the performance of abortions or sterilizations: the protections of the Church Amendments do not turn on the nature of the entity, whether public, private, nonprofit, for-profit, or governmental. (42 U.S.C. 300a–7(b)). Thus, under section 300a–7(b), a hospital in a publicly traded health system, or a local governmental hospital, could adopt sincerely held moral convictions by which it objects to providing facilities or personnel for abortions or sterilizations, and if the entity receives relevant funds from HHS specified by section 300a–7(b), the protections of that section would apply. Other federal conscience protections in the health sector apply in the same manner:

• The Coats-Snowe Amendment (42 U.S.C. 238n) provides certain protections for health care entities and postgraduate physician training programs that, among other things, choose not to perform, refer for, or provide training for, abortions.

• The Weldon Amendment [66] provides certain protections for health care entities, hospitals, provider-sponsored organizations, health maintenance organizations, and health insurance plans that do not provide, pay for, provide coverage of, or refer for abortions.

• The ACA provides certain protections for any institutional health care entity, hospital, provider-sponsored organization, health maintenance organization, health insurance plan, or any other kind of health care facility, that does not provide any health care item or service furnished for the purpose of causing or assisting in causing assisted suicide, euthanasia, or mercy killing. (42 U.S.C. 18113).[67]

• Social Security Act sections 1852(j)(3)(B) (Medicare) and 1932(b)(3)(B) (Medicaid), 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3)(B), provide protections so that the statutes cannot be construed to require organizations that offer Medicare Advantage and Medicaid managed care plans in certain contexts to provide, reimburse for, or provide coverage of a counseling or referral service if they object to doing so on moral grounds.

• Congress's most recent statement on contraceptive coverage specified that, if the District of Columbia requires "the

provision of contraceptive coverage by health insurance plans." "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions." Consolidated Appropriations Act, 2018, Public Law 115–141, Div. E. Sec. 808.

In all of these instances, Congress did not limit the protection for conscience based on the nature of the entity—and did not exclude publicly traded entities from protection.

At the same time, as stated in the Moral IFC, the Departments continue to lack significant information about whether there is a need to extend the expanded exemption to publicly traded entities. The Departments have been sued by nonprofit entities expressing objections to the Mandate based on non-religious moral convictions, as well as by closely held for-profit entities expressing religious objections, but not by any publicly traded entities. In addition, the Departments sought public comments on whether publicly traded entities might benefit from extending the moral exemption to them. No such entities were brought to the attention of the Department through the comment process. The Supreme Court concluded it is improbable that publicly traded companies with numerous "unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs." *Hobby Lobby*, 134 S. Ct. at 2774. It would appear to be even less probable that publicly traded entities would adopt that view based on non-religious moral convictions.

In light of the balance of public comments, the Departments decline to extend the moral convictions exemption to publicly traded entities. Because the Departments are aware of so many closely-held for-profit entities with religious objections to contraceptive coverage, and of some nonprofit entities with non-religious moral objections to contraceptive coverage, the Departments believe it is reasonably possible that closely held for-profit entities with non-religious moral objections to contraceptive coverage might exist or come into being. The Departments have also concluded that it is reasonably possible, even if improbable, that publicly traded entities with religious objections to contraceptive coverage might exist or come into being. But the Departments conclude there is not a similar probability that publicly traded for-profit entities with non-religious moral objections to contraceptive

---

[66] See Consolidated Appropriations Act, 2018, Public Law 115–141, Div. H, Sec. 507(d) (Mar. 2018).

[67] The lack of the limitation in this provision may be particularly relevant since it was enacted in the same statute, the ACA, as the provision under which the Mandate—and these exemptions to the Mandate—were promulgated.

Exhibit 2

coverage may exist and need to be included in these expanded exemptions. The decision to not extend the moral exemption to publicly traded for-profit entities in these rules does not reflect a disagreement with the various conscience statutes that provide exemptions for moral convictions without categorically excluding publicly traded entities. The Departments remain open to the possibility of future rulemaking on this issue, if we become aware of the need to expand the exemptions to publicly traded corporations with non-religious moral objections to all (or a subset of) contraceptives.

In contrast, the Departments finalize, without change, the Moral IFC's extension of the exemptions in these rules to closely held for-profit entities with moral convictions opposed to offering coverage of some or all contraceptives. The Departments conclude that it is sufficiently likely that closely held for-profit entities exist or may come into being and may maintain moral objections to certain contraceptives, so as to support including them in these expanded exemptions. The Departments seek to remove an obstacle that might prevent individuals with moral objections from forming or maintaining such small or closely held businesses and providing health coverage to their employees in accordance with their moral convictions.

In defining what constitutes a closely held for-profit entity to which these exemptions extend, the Moral IFC used language derived from the July 2015 final regulations. Those regulations, in offering the accommodation (not an exemption) to religious (not moral) closely held for-profit entities, did so by attempting to positively define what constitutes a closely held entity, formulating a multi-factor, and partially open-ended, definition for that purpose. (80 FR 41313). Any such positive definition runs up against the myriad state differences in defining such entities and potentially intrudes into a traditional area of state regulation of business organizations. Instead of attempting to positively define closely held businesses in the Moral IFC, however, the Departments considered it much clearer, effective, and preferable to define the category negatively, by reference to one element of the previous definition: that the entity has no publicly traded ownership interest (that is, any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934).

## 4. Institutions of Higher Education (45 CFR 147.133(a)(1)(ii))

The previous regulations did not exempt plans arranged by institutions of higher education, although they did include, in the accommodation, plans arranged by institutions of higher education similarly to the way in which the regulations provided the accommodation to plans of nonprofit religious employers. (See 80 FR 41347). The Moral IFC provided an exemption, in § 147.133(a)(1)(ii), encompassing institutions of higher education that arrange student health insurance coverage, and stating the exemption would operate in a manner comparable to the exemption for employers with respect to plans they sponsor. In these final rules, the Departments finalize § 147.133(a)(1)(ii) with one change.

These rules treat the health plans of institutions of higher education that arrange student health insurance coverage similarly to the way in which the rules treat the plans of employers. The rules do so by making such student health plans eligible for the expanded exemptions, and by permitting them the option of electing to utilize the accommodation process. Thus, these rules specify, in § 147.133(a)(1)(ii), that the exemption is extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002) with objections to the Mandate based on sincerely held moral convictions, to their arrangement of student health insurance coverage, in a manner comparable to the exemption for group health insurance coverage provided in connection with a group health plan established and maintained by a plan sponsor.

Some commenters supported including, in the exemptions, institutions of higher education that provide health coverage for students through student health plans but have moral objections to providing certain contraceptive coverage. They stated that moral exemptions allow freedom for certain institutions of higher education to exist, and this in turn gives students the choice of institutions that hold different views on important issues such as contraceptives and abortifacients. Other commenters opposed including the exemption, asserting that expanding the exemption would negatively impact female students because institutions of higher education might not cover contraceptives in student health plans, women enrolled in those plans would not receive access to birth control, and an increased number of unintended pregnancies would result.

In the Departments' view, the reasons for extending the exemption to institutions of higher education are similar to the reasons, discussed above, for extending the exemption to other nonprofit organizations. The Departments are not aware of any institutions of higher education that arrange student health insurance coverage and object to the Mandate based on non-religious moral convictions. But because the Departments have been sued by several institutions of higher education that arrange student health insurance coverage and object to the Mandate based on religious beliefs and by several nonprofit organizations with moral objections, the Departments believe the existence of institutions of higher education with non-religious moral objections, or the possible formation of such entities in the future, is sufficiently possible to justify including protections for such entities in these final rules.

The Departments conclude that this aspect of the exemption is likely to have a minimal impact on contraceptive coverage for women at institutions of higher education. As noted above, the Departments are not aware of any institutions of higher education that would currently qualify for the objection. In addition, only a minority of students in higher education receive health insurance coverage from plans arranged by their colleges or universities, as opposed to from other sources, and an even smaller number receive such coverage from schools objecting to contraceptive coverage. Exempting institutions of higher education that object to contraceptive coverage based on moral convictions does not affect student health insurance contraceptive coverage at the vast majority of institutions of higher education. The exemption simply makes it legal under federal law for institutions to adhere to moral convictions that oppose contraception, without facing penalties for non-compliance that could threaten their existence. This removes a possible barrier to diversity in the nation's higher education system, because it makes it easier for students to attend institutions of higher education that hold those views, if the institutions exist or come into being and students choose to attend them. Moreover, because institutions of higher education have no legal obligation to sponsor student health insurance coverage, providing this moral exemption removes an obstacle to such institutions sponsoring student health insurance coverage, thus possibly encouraging

Exhibit 2                                    JA492                                    JA-0000083

more widespread health insurance coverage.

As noted above, after seeking public comment on whether the final moral exemptions rules should be extended to include non-federal governmental entities, the Departments have concluded they should only include non-governmental entities. For the same reasons, the Departments are inserting a reference into § 147.133(a)(1)(ii) specifying that it includes an institution of higher education "which is non-governmental." This language is parallel to the same limiting phrase used in the religious exemptions rule governing institutions of higher education, at § 147.132(a)(1)(ii). Thus, the first sentence of § 147.133(a)(1)(ii) is finalized to read: "An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section." The remaining text of § 147.133(a)(1)(ii) is finalized without change.

**5. Health Insurance Issuers (45 CFR 147.133(a)(1)(iii))**

The Moral IFC extended the exemption, in § 147.133(a)(1)(iii), to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own moral convictions opposed to providing coverage for contraceptive services. The issuer exemption only applied to the group health plan if the plan itself was also exempt under an exemption for the plan sponsor or individuals. In these final rules, the Departments finalize § 147.133(a)(1)(iii) without change.

As discussed above, where the exemption for plan sponsors or institutions of higher education applies, issuers are exempt under those sections with respect to providing contraceptive coverage in those plans. The issuer exemption in § 147.133(a)(1)(iii) adds to that protection, but the additional protection operates in a different way than the plan sponsor exemption operates. The only plan sponsors—or in the case of individual insurance coverage, individuals—who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services, are plan sponsors or individuals who themselves object and whose plans are otherwise exempt based on that objection. An exempt issuer can then offer an exempt product to an entity or individual that is exempt based on either the moral exemptions for entities and individuals, or the religious exemptions for entities

and individuals. Thus, the issuer exemption specifies that, where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv), unless the plan is otherwise exempt from that requirement. Accordingly, the only plan sponsors, or in the case of individual insurance coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer under this paragraph (a)(1)(iii) that does not include some or all contraceptive services, are plan sponsors or individuals who themselves object and are exempt.

Under these rules, issuers that hold their own objections based on sincerely held moral convictions could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on their moral convictions, or if they are exempt based on their religious beliefs under the companion final rules published elsewhere in today's **Federal Register**. Likewise, issuers with sincerely held religious beliefs, that are exempt under those companion final rules, could likewise issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on either their religious beliefs or their moral convictions.

Some commenters supported including this exemption for issuers in these rules, both to protect the moral convictions of issuers, and so that, in the future, issuers would be free to organize that may wish to specifically serve plan sponsors and individuals that object to contraception based on religious or moral reasons. Other commenters objected to including an exemption for issuers. Some commenters stated that issuers cannot exercise moral convictions, while others stated that exempting issuers would threaten contraceptive coverage for women. Some commenters stated that it was arbitrary and capricious for the Departments to provide an exemption for issuers if they do not know that issuers with qualifying moral objections exist.

The Departments consider it appropriate to provide this exemption for issuers. Because the issuer exemption only applies where an independently exempt policyholder (entity or individual) is involved, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will

it prevent other issuers from being required to provide contraceptive coverage in individual or group insurance coverage.

The issuer exemption serves several interests, even though the Departments are not currently aware of existing issuers that would use it. As noted by some commenters, allowing issuers to be exempt, at least with respect to plan sponsors, plans, and individuals that independently qualify for an exemption, will remove a possible obstacle to issuers with moral convictions being organized in the future to serve entities and individuals that want plans that respect their religious beliefs or moral convictions. Furthermore, permitting issuers to object to offering contraceptive coverage based on sincerely held moral convictions will allow issuers to continue to offer coverage to plan sponsors or individuals, without subjecting them to liability under section 2713(a)(4), or related provisions, for their failure to provide contraceptive coverage. In this way, the issuer exemption serves to protect objecting issuers both from being required to issue policies that cover contraception in violation of the issuers' sincerely held moral convictions and from being asked or required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus subjecting the issuers to potential liability if those plans are not exempt from the Guidelines.

The Departments reject the proposition that issuers cannot exercise moral convictions. Many federal health care conscience laws and regulations protect issuers or plans specifically. For example, as discussed above, 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3) protect plans or managed care organizations in Medicare Advantage or Medicaid. The Weldon Amendment specifically protects, among other entities, HMOs, health insurance plans, and "any other kind of health care facility[ies], organization[s] or plan[s]" as a "health care entity" from being required to provide coverage of, or pay for, abortions. See, for example, Consolidated Appropriations Act, 2018, Public Law 115–141, Div. H, Sec. 507(d).[68] The most recently enacted Consolidated Appropriations Act declares that Congress supports a

---

[68] ACA section 1553 protects an identically defined group of "health care entities," including provider-sponsored organizations, HMOs, health insurance plans, and "any other kind of . . . plan," from being subject to discrimination on the basis that it does not provide any health care item or service furnishing for the purpose of assisted suicide, euthanasia, mercy killing, and the like. ACA section 1553, 42 U.S.C. 18113.

Exhibit 2    JA493    JA-0000084

''conscience clause'' to protect moral convictions concerning ''the provision of contraceptive coverage by health insurance plans.'' *See id.* at Div. E. Sec. 808.

The issuer exemption does not specifically include third party administrators, for the reasons discussed in the companion Religious IFC and final rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**.[69]

### 6. Description of the Moral Objection (45 CFR 147.133(a)(2))

The Moral IFC set forth the scope of the moral objection of objecting entities in § 147.133(a)(2), so that it applies to the extent an entity described in paragraph (a)(1), based on sincerely held moral convictions, objects to ''establishing, maintaining, providing, offering, or arranging'' either ''coverage or payments'' for contraceptives, or ''for a plan, issuer, or third party administrator that provides or arranges such coverage or payments.'' The Departments are finalizing this exemption with structural changes separating the second half of the sentence into separate subparagraphs, so as to more clearly specify, as set forth in the Moral IFC text, that the objection may pertain either to coverage or payments for contraceptives, or to a plan, issuer, or third party administrator that provides or arranges such coverage or payments.

Some commenters observed that, by allowing exempt plan sponsors to object to ''some or all'' contraceptives, this might yield a cafeteria-style approach where different plan sponsors choose various combinations of contraceptives that they wish to cover. Some commenters further observed that this might create a burden on issuers or third party administrators.

The Departments have concluded, however, that just as the previous exemption rules allowed certain religious plan sponsors to object to some or all contraceptives, it is appropriate to maintain that flexibility for entities covered by the expanded exemption. These rules do not require any issuer or

third party administrator to contract with an exempt entity or individual if the issuer or third party administrator does not wish to do so, including because the issuer or third party administrator does not wish to offer an unusual plan variation. These rules simply remove the federal Mandate, in some cases, where it could have led to penalties on an employer, issuer, or third party administrator if they wished to sponsor, provide, or administer a plan that omits contraceptive coverage in the presence of a qualifying moral objection. That approach is consistent with the approach under the previous regulations, which did not require issuers and third party administrators to contract with exempt parties of houses of worship or integrated auxiliaries if they did not wish to do so.

The definition does not specify that the moral convictions that can support an exemption need to be non-religious moral convictions. We find it unnecessary to limit the definition in that way. Even though moral convictions need not be based on religious beliefs, religious beliefs can have a moral component. It is not always clear whether a moral conviction is based on religious tenets. As noted in *Welsh,* a moral conviction can be ''purely ethical or moral in source and content but that nevertheless . . . occupy in the life of that individual a place parallel to that filled by God [and] function as a religion in his life.'' 398 U.S at 340. One reason for providing exemptions for moral convictions is so that the government need not engage in the potentially difficult task of parsing which convictions are religious and which are not. If sincerely held moral convictions supporting an exemption are religious, they will be encompassed by the exemption for sincerely held religious beliefs. If the moral convictions are not also religious, or if their religious quality is unclear but they are ethical or moral, they can qualify as sincerely held moral convictions under these rules if the other requirements of these rules are met.

The Departments are not aware of any entities that qualify for an exemption under the religious exemptions finalized elsewhere in today's **Federal Register**, but not under the moral exemptions finalized here, such as publicly traded entities. If publicly traded entities object to the Mandate, it seems unlikely their objection is based on moral convictions and not religious beliefs, given that many more objections to the Mandate have been based on religious beliefs. Thus, the Departments find it unlikely that they would be faced with a

situation where a publicly traded entity, for example, has an objection to the contraceptive Mandate, but it is not clear whether that objection is based on sincerely held religious beliefs or merely based on sincerely held moral convictions.

### 7. Individuals (45 CFR 147.133(b))

The previous regulations did not provide an exemption for objecting individuals. The Moral IFC provided such an exemption for objecting individuals (referred to here as the ''individual exemption''), using the following language at § 147.133(b): ''Objecting individuals''. Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.''

The Departments finalize this language, with changes in response to public comments in some of the text and in a new sentence at the end of the paragraph that clarify how the exemption applies.

Section 147.133(b) sets forth a special rule pertaining to individuals (referred to here as the ''individual exemption''). This rule exempts plans of certain individuals with moral objections to contraceptive coverage where the plan sponsor and, as applicable, issuer is willing to provide a plan compliant with the individuals' objections to such plan sponsors or individuals, as applicable.

Some commenters supported this exemption as providing appropriate protections for the moral convictions of individuals who obtain their insurance coverage in such places as the individual market or exchanges, or who obtain coverage from a group health plan sponsor that does not object to coverage of contraceptives but is willing (and, as applicable, the issuer is also willing) to provide coverage consistent with an individual's moral objections. They commented that this exemption

---

[69] The exemption for issuers, as outlined here, does not make a distinction among issuers based on whether they are publicly traded, unlike the plan sponsor exemption for employers. Because the issuer exemption operates more narrowly than the exemption for plan sponsors operates, in the ways described here (*i.e.,* the issuer exemption does not operate unless the plan sponsor or individual, as applicable, is also exempt), and exists in part to help preserve market options for objecting plan sponsors and individuals, the Departments consider it appropriate to not draw such a distinction among issuers.

Exhibit 2

JA494

JA-0000085

would free individuals from having their moral convictions placed in tension with their desire for health coverage. They also contended that the individual exemption would not undermine any government interests behind the contraceptive Mandate, since the individuals would be choosing not to have the coverage. Some commenters also observed that, by specifying that the individual exemption only operates where the plan sponsor and issuer, as applicable, are willing to provide coverage that is consistent with the objection, the exemption would not impose burdens on the insurance market because the possibility of such burdens would be factored into the willingness of an employer or issuer to offer such coverage.

Other commenters disagreed and contended that allowing the individual exemption would cause burden and confusion in the insurance market. Some commenters also suggested that the individual exemption should not allow the offering of a separate group health plan because doing so could cause various administrative burdens.

The Departments agree with the commenters who suggested the individual exemption will not burden the insurance market, and, therefore, conclude that it is appropriate to provide the individual exemption where a plan sponsor and, as applicable, issuer are willing to cooperate in doing so. The Departments note that this individual exemption only operates in the case where the issuer is willing to provide the separate option; in the case of coverage provided by a group health plan sponsor, where the plan sponsor is willing; or in the case where both a plan sponsor and issuer are involved, both are willing. The Departments conclude that it is appropriate to provide the individual exemption so that the Mandate will not serve as an obstacle among these various options. Practical difficulties that may be implicated by one option or another will likely be factored into whether plan sponsors and issuers are willing to offer particular options in individual cases. But the Departments do not wish to pose an obstacle to the offering of such coverage.

The Departments note that their decision is consistent with the decision by Congress to provide protections in certain contexts for individuals who object to prescribing or providing contraceptives contrary to their moral convictions. *See, for example,* Consolidated Appropriations Act of 2018, Div. E, Sec. 726(c) (Mar. 23. 2018). While some commenters argued that such express protections are narrow, Congress likewise provided that, if the

District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions". *Id.* at Div. E, Sec. 808. A moral exemption for individuals would not be effective if the government did not, at the same time, permit issuers and group health plans to provide individuals with policies that comply with their moral convictions.

The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan generally, or, as applicable, to any other individual policies the issuer offers. Thus, this individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer morally acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object. The July 2013 regulations stated that, because employees of objecting houses of worship and integrated auxiliaries are relatively likely to oppose contraception, exempting those organizations "does not undermine the governmental interests furthered by the contraceptive coverage requirement." (78 FR 39874). For parallel reasons, as the Departments stated in the Moral IFC (83 FR at 47853 through 47854), this individual exemption does not undermine the governmental interests furthered by the contraceptive coverage requirement, because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered.

This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers. For example, in one case brought against the Departments, the State of Missouri enacted a law under which the state is not permitted to discriminate against insurance issuers that offer group health insurance policies without coverage for contraception based on employees' religious beliefs "or moral convictions," or against the individual employees who accept such offers. *See Wieland,*

196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption in these rules, employers sponsoring governmental plans would be free to honor the moral objections of individual employees by offering them plans that omit contraceptive coverage, even if those governmental entities do not object to offering contraceptive coverage in general.

In the separate companion IFC to the Moral IFC—the Religious IFC—the Departments, at § 147.133(b), provided a similar individual exemption, but we used slightly different operative language. Where the Moral IFC said a willing issuer and plan sponsor may offer "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects" under the individual exemption, the Religious IFC described what may be offered to objecting individuals as "a separate benefit package option, or a separate policy, certificate or contract of insurance." Some commenters observed this difference and asked whether the language was intended to encompass the same options. The Departments intended these descriptions to include the same scope of options. Some commenters suggested that the individual exemption should not allow the offering of "a separate group health plan," because doing so could cause various administrative burdens. The Departments disagree, since group health plan sponsors and group and individual health insurance issuers would be free to decline to provide that option, including because of administrative burdens. In addition, the Departments wish to clarify that, where an employee claims the exemption, a willing issuer and a willing employer may, where otherwise permitted, offer the employee participation in a group health insurance policy or benefit option that complies with the employee's objection. Consequently, these rules finalize the individual exemption by making a technical change to the language to adopt the formulation, "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects."

This individual exemption cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of state law that requires coverage of such contraceptives or

Exhibit 2

JA495

JA-0000086

sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held moral objection. This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4), and does not affect any other federal or state law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these rules do not affect such other laws or terms.

The Departments received numerous comments about the administrative burden from the potential variations in moral convictions held by individuals. Some commenters welcomed the ability of individuals covered by the individual exemption to be able to assert an objection to either some or all contraceptives, while others expressed concern that the variations in the kinds of contraceptive coverage to which individuals object might make it difficult for willing plan sponsors and issuers to provide coverage that complies with the moral convictions of an exempt individual.

If an individual only objects to some contraceptives, and the individual's issuer and, as applicable, plan sponsor are willing to provide the individual a package of benefits omitting such coverage, but for practical reasons can only do so by providing the individual with coverage that omits all—not just some—contraceptives, the Departments believe that it favors individual freedom and market choice, and does not harm others, to allow the issuer and plan sponsor to provide, in that case, a plan omitting all contraceptives if the individual is willing to enroll in that plan. The language of the individual exemption set forth in the Moral IFC implied this conclusion by specifying that the Guidelines requirement of contraceptive coverage did not apply where the individual objected to some or all contraceptives. Notably, that language differed from the language applicable to the exemptions under § 147.133(a), which specifies that those exemptions apply "to the extent" of the moral objections, so that, as discussed above, they include only those contraceptive methods to which the objection applied. In response to comments suggesting the language of the individual exemption was not sufficiently clear on this distinction, however, the Departments in these rules finalize the individual exemption at § 147.133(b), with the following change, by adding the following sentence at the end of the paragraph: "Under this

exemption, if an individual objects to some but not all contraceptive services, but the issuer and, as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services."

Some commenters asked for plain language guidance and examples about how the individual exemption might apply in the context of employer-sponsored insurance. Here is one such example. An employee is enrolled in group health coverage through her employer. The plan is fully insured. If the employee has sincerely held moral convictions objecting to her plan including coverage for contraceptives, she could raise this with her employer. If the employer is willing to offer her a plan that omits contraceptives, the employer could discuss this with the insurance agent or issuer. If the issuer is also willing to offer the employer, with respect to the employee, a group health insurance policy that omits contraceptive coverage, the individual exemption would make it legal for the group health insurance issuer to omit contraceptives for her and her beneficiaries under her policy, for her employer to sponsor that plan for her, and for the issuer to issue such a plan to the employer, to cover that employee. This would not affect other employees' plans—those plans would still be subject to the Mandate and would continue to cover contraceptives. But if either the employer, or the issuer, is not willing (for whatever reason) to offer a plan or a policy for that employee that omits contraceptive coverage, these rules do not require them to do so. The employee would have the choice of staying enrolled in a plan with its coverage of contraceptives, not enrolling in that plan, seeking coverage elsewhere, or seeking employment elsewhere.

For all these reasons, these rules adopt the individual exemption language from the Religious IFC with changes, to read as follows: "(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to

prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions. Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services."

**8. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)**

The previous regulations did not offer the accommodation process to entities with moral non-religious objections. The Religious IFC amended the accommodation regulations to offer it to all entities that are exempt on the basis of religious beliefs under § 147.132, as an optional process in which such entities could participate voluntarily. The Moral IFC did not change that accommodation process, but inserted references in it to the new section § 147.133, alongside the references to section § 147.132. These changes made entities eligible for the voluntary accommodation process if they are exempt on the basis of moral convictions. The references were inserted in 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A.

In these rules, the Departments finalize, without change, the Moral IFC's revisions of 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A. The operation of the accommodation process, changes made in the Religious IFC, and public comments concerning the accommodation, are more fully described in the Religious IFC, and in the companion final rules concerning the religious exemptions and accommodation, published elsewhere in today's **Federal Register**. Those descriptions are incorporated here by reference to the extent they apply to these rules.

Exhibit 2    JA496    JA-0000087

Many commenters supported extending the accommodation process to entities with objections based on moral convictions. Others objected to doing so, raising arguments parallel to their objections to creating exemptions for group health plan sponsors with moral convictions. For much the same reasons discussed above concerning why the Departments find it appropriate to exempt entities with moral objections to contraceptive coverage. the Departments find it appropriate to extend the optional accommodation process to these entities. The Departments observe that, to the extent such entities wish to use the process, it will not be an obstacle to contraceptive coverage, but will instead help deliver contraceptive coverage to women who receive health coverage from such entities while respecting the moral convictions of the entities. The Departments are not aware of entities with non-religious moral convictions against contraceptive coverage that also consider the accommodation acceptable and would opt into it, but we are aware of a small number of entities with non-religious moral objections to the Mandate. The Departments, therefore, continue to consider it appropriate to extend the optional accommodation to such entities in case any wish to use it. Below, albeit based on very limited data. the Departments estimate that a small number of entities with non-religious moral objections may use the accommodation process.

9. Definition of Contraceptives for the Purpose of These Final Rules

The previous regulations did not define contraceptive services. The Guidelines issued in 2011 included, under "Contraceptive methods and counseling," "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." The previous regulations concerning the exemption and the accommodation used the terms "contraceptive services" and "contraceptive coverage" as catch-all terms to encompass all of those Guidelines requirements. The 2016 update to the Guidelines is similarly worded. Under "Contraception," they include the "full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration," "instruction in fertility awareness-based methods," and "[c]ontraceptive care" to "include contraceptive counseling, initiation of contraceptive use, and follow-up care (e.g., management, and evaluation as well as changes to and removal or

discontinuation of the contraceptive method)." [70]

To more explicitly state that the expanded exemptions encompass any of the contraceptive or sterilization services, items, procedures, or related patient education or information that have been required under the Guidelines, the Moral IFC included a definition of contraceptive services, benefits or coverage. at 45 CFR 147.133(c). These rules finalize that definition without change.

10. Severability

The Departments finalize, without change, the severability clause set forth at § 147.133(d).

*C. Other Public Comments*

1. Items Approved as Contraceptives But Used To Treat Existing Conditions

Some commenters noted that some drugs included in the preventive services contraceptive Mandate can also be useful for treating certain existing health conditions, and that women use them for non-contraceptive purposes. Certain commenters urged the Departments to clarify that the final rules do not permit employers to exclude from coverage medically necessary prescription drugs used for non-preventive services. Some commenters suggested that moral objections to the Mandate should not be permitted in cases where contraceptive methods are used to treat such existing medical conditions and not for preventive purposes, even if those contraceptive methods can also be used for contraceptive purposes.

Section 2713(a)(4) only applies to "preventive" care and screenings. The statute does not allow the Guidelines to mandate coverage of services provided solely for a non-preventive use, such as the treatment of an existing condition. The Guidelines implementing this section of the statute are consistent with that narrow authority. They state repeatedly that they apply to "preventive" services or care. [71] The requirement in the Guidelines concerning "contraception" specifies several times that it encompasses "contraceptives," that is, medical products, methods, and services applied for "contraceptive" uses. The Guidelines do not require coverage of care and screenings that are non-preventive, and the contraception portion of those Guidelines do not require coverage of medical products,

methods, care, and screenings that are non-contraceptive in purpose or use. The Guidelines' inclusion of contraceptive services requires coverage of contraceptive methods as a type of preventive service only when a drug that FDA has approved for contraceptive use is prescribed in whole or in part for such purpose or intended use. Section 2713(a)(4) does not authorize the Departments to require coverage of drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition. [72] The extent to which contraceptives are covered to treat non-preventive conditions would be determined by application of the requirement section 1302(b)(1)(F) of the ACA to cover prescription drugs (where applicable), implementing regulations at 45 CFR 156.122, and 156.125, and plans' decisions about the basket of medicines to cover for these conditions.

Some commenters observed that pharmacy claims do not include a medical diagnosis code, so that plans may be unable to discern whether a drug approved by FDA for contraceptive uses is actually applied for a preventive or contraceptive use. Section 2713(a)(4), however, draws a distinction between preventive and other kinds of care and screenings. That subsection does not authorize the Departments to impose a coverage mandate of services that are not at least partly applied for a preventive use, and the Guidelines themselves do not require coverage of care unless it is contraceptive in purpose. These rules do not prohibit issuers from covering drugs and devices that are approved for contraceptive uses even when those drugs and devices are

---

[70] "Women's Preventive Services Guidelines," HRSA (last reviewed Oct. 2017), *https://www.hrsa.gov/womens-guidelines-2016/index.html.*
[71] *Id.*

[72] The Departments previously cited the IOM's listing of existing conditions that contraceptive drugs can be used to treat (menstrual disorders, acne, and pelvic pain), and said of those uses that "there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy." 77 FR 8727 & n.7. This was not, however, an assertion that section 2713(a)(4) or the Guidelines require coverage of "contraceptive" methods when prescribed for an exclusively *non*-contraceptive, *non*-preventive use. Instead, it was an observation that such drugs—generally referred to as "contraceptives"—also have some alternate beneficial uses to treat existing conditions. For the purposes of these final rules, the Departments clarify here that the previous reference to the benefits of using contraceptive drugs exclusively for some non-contraceptive and non-preventive uses to treat existing conditions did not mean that the Guidelines require coverage of such uses, and consequently is not a reason to refrain from offering the exemptions provided here. Where a drug approved by the FDA for contraceptive use is prescribed for both a contraceptive use and a non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage. Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines and the contraceptive Mandate.

prescribed for non-preventive, non-contraceptive purposes. As discussed above, these final rules do not purport to delineate the items HRSA will include in the Guidelines, but only concern expanded exemptions and accommodations that apply if the Guidelines require contraceptive coverage. Therefore, the Departments do not consider it appropriate to specify in these final rules that, under section 2713(a)(4), exempt organizations must provide coverage for drugs or items prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.

## 2. Comments Concerning Regulatory Impact

Some commenters agreed with the Departments' statement in the Moral IFC that the moral exemptions are likely to affect only a very small number of women otherwise receiving coverage under the Mandate. Other commenters disagreed, stating that the exemptions could take contraceptive coverage away from many or most women. Still others opposed establishing the exemptions, but contended that accurately determining the number of women affected by the exemptions is not possible. Public comments included various statements that these exemptions would impact coverage for a large number of women, while others stated they would affect only a very small number. But few, if any, public commenters provided data predicting a precise number of entities that would make use of the exemptions for moral convictions nor a precise number of employees that would potentially be affected.

After reviewing the public comments, the Departments do not find the suggestions of commenters who predicted a very large impact any more reliable than the estimates set forth in the Religious and Moral IFCs. Therefore, the Departments conclude that the estimates of regulatory impact made in the Religious and Moral IFCs are still the best estimates available. The Departments' estimates are discussed in more detail in the following section.

## III. Economic Impact and Paperwork Burden

The Departments have examined the impacts of these final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96–354, section1102(b) of the Social Security

Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2)) and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

### A. Executive Orders 12866 and 13563—Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any 1 year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any 1 year), and an "economically significant" regulatory action is subject to review by OMB. As discussed below regarding their anticipated effects, the these final rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866. However, OMB has determined that the actions are significant within the meaning of section 3(f)(4) of the Executive Order. Therefore, OMB has reviewed these final rules and the Departments have

provided the following assessment of their impact.

### 1. Need for Regulatory Action

The Religious IFC amended the Departments' July 2015 final regulations. The Moral IFC amended those regulations further, and added an additional rule at 45 CFR part 147.133. These final rules adopt as final, and further amend, the amendments made by the Moral IFC. The Departments do so in conjunction with the amendments made in the companion final rules concerning religious beliefs published elsewhere in today's **Federal Register**. These rules provide an exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4), section 715(a)(1) of the ERISA, and section 9815(a)(1) of the Code, for certain entities and individuals with objections to compliance with the Mandate based on sincerely held moral convictions, and they revise the accommodation process by making the accommodation applicable to organizations with such convictions as an option. The exemption applies to certain individuals, nonprofit entities, institutions of higher education, issuers, and for-profit entities that do not have publicly traded ownership interests, that have a moral objection to some (or all) of the contraceptive and/or sterilization services covered by the Guidelines. Such action has been taken to provide for participation in the health insurance market by certain entities or individuals in a manner free from penalties for violating sincerely held moral convictions opposed to providing or receiving coverage of contraceptive services, to ensure the preventive services coverage requirement is implemented in a way consistent with longstanding federal conscience statutes, to prevent lawsuits of the kind that were filed against the Departments when the expanded exemption in these final rules was not offered, and for the other reasons discussed above.

### 2. Anticipated Effects

The Departments acknowledge that expanding the exemption to include objections based on moral convictions might result in less insurance coverage of contraception for some women who may want the coverage. Although the Departments do not know the exact scope of that effect attributable to the moral exemption in these final rules, we believe it to be small.

With respect to the exemption for nonprofit organizations with objections based on moral convictions, as noted

Exhibit 2                                                    JA498                                              JA-0000089

above, the Departments are aware of two small nonprofit organizations that have filed lawsuits raising non-religious moral objections to coverage of some contraceptives. Both of those entities have fewer than five employees enrolled in health coverage, and both require all of their employees to agree with their opposition to the nature of certain contraceptives subject to coverage under the Mandate.[73] One of them has obtained a permanent injunction against any regulations implementing the contraceptive Mandate, and so will not be affected by these final rules. Based on comments submitted in response to rulemakings prior to the Moral and Religious IFCs, the Departments believe that at least one other similar entity exists.[74] However, the Departments do not know how many similar entities exist and are currently unable to estimate the number of such entities. Lacking other information, we assume that the number is small. The Departments estimate it to be less than 10 and assume the exemption will be used by nine nonprofit entities.

The Departments also assume that those nine entities will operate in a fashion similar to the two similar entities of which we are aware, so that their employees will likely share their views against coverage of certain contraceptives. This is consistent with the conclusion in previous regulations that no significant burden or costs would result from exempting houses of worship and integrated auxiliaries. (See 76 FR 46625 and 78 FR 39889). The Departments reached that conclusion without ultimately requiring that houses of worship and integrated auxiliaries only hire persons who agree with their views against contraception and without requiring that such entities actually oppose contraception in order to be exempt (in contrast, the exemption here requires the exempt entity to actually possess sincerely held moral convictions objecting to contraceptive coverage). In concluding that the exemption for houses of worship and integrated auxiliaries would result in no significant burden or costs, the

Departments relied on the assumption that the employees of exempt houses of worship and integrated auxiliaries likely share their employers' opposition to contraceptive coverage.

A similar assumption is appropriate with respect to the expanded exemption for nonprofit organizations with objections based on moral convictions. To the knowledge of the Departments, the vast majority of organizations objecting to the Mandate assert objections based on religious beliefs. The only nonprofit organizations of which they are aware that possess non-religious moral convictions against some or all contraceptive methods only hire persons who share their convictions. It is possible that the exemption for nonprofit organizations with moral convictions in these final rules could be used by a nonprofit organization that employs persons who do not share the organization's views on contraception, but it was also possible under the Departments' previous regulations that a house of worship or integrated auxiliary could employ persons who do not share their views on contraception.[75] Although the Departments are unable to find sufficient data on this issue, we believe that there are far fewer nonprofit organizations opposed to contraceptive coverage on the basis of moral convictions than there are houses of worship or integrated auxiliaries with religious objections to such coverage. Based on the limited data available, the Departments believe the most likely effect of the expanded exemption for nonprofit entities is that it will be used by entities similar to the two entities that have sought an exemption through litigation, and whose employees also oppose certain contraceptive coverage. Therefore, the Departments expect that the moral exemption for nonprofit entities will have a minimal effect of reducing contraceptive coverage with respect to employees who want such coverage.

These rules extend the exemption to include institutions of higher education that arrange student coverage and have non-religious moral objections to the Mandate, and make exempt entities with moral objections eligible to avail themselves of the accommodation. The Departments are not aware of any institutions of higher education with this kind of non-religious moral

convictions. Moreover, the Departments believe the overall number of entities that would object to the Mandate based on non-religious moral convictions is already very small. The only entities of which we are aware that have raised such objections are not institutions of higher education. Public comments did not reveal the existence of any institutions of higher education with such moral convictions. Therefore, for the purposes of estimating the anticipated effect of these final rules on contraceptive coverage of women who wish to receive such coverage, the Departments assume that—at this time—no entities with non-religious moral objections to the Mandate will be institutions of higher education that arrange student coverage, and no other entities with non-religious moral objections will opt into the accommodation. We wish to make the expanded exemption and accommodation available to such entities in case they do exist or might come into existence, based on reasons similar to those given above for why the exemptions and accommodations are extended to other entities.

The Departments believe that the exemption for issuers with objections based on moral convictions will not result in a distinct effect on contraceptive coverage for women who wish to receive it, because that exemption only applies in cases where plan sponsors or individuals are also otherwise exempt, and the effect of those exemptions is discussed elsewhere herein, or in the companion final rules concerning religious beliefs published elsewhere in today's **Federal Register**. The exemption for individuals that oppose contraceptive coverage based on sincerely held moral convictions will provide coverage that omits contraception for individuals that object to contraceptive coverage.

The moral exemption will also cover for-profit entities that do not have publicly traded ownership interests and that have non-religious moral objections to the Mandate, if such entities exist. Some commenters agreed that the impact of these final rules would be no more than the Departments estimated in the Moral IFC, and some commenters stated the impact would be much smaller. Other commenters disagreed, suggesting that the expanded exemptions risked removing contraceptive coverage from more than 55 million women receiving the benefits of the preventive services Guidelines, or even risked removing contraceptive coverage from over 100 million women. Some commenters cited studies indicating that, nationally, unintended

---

[73] Non-religious nonprofit organizations that engage in expressive activity generally have a First Amendment right to hire only people who share their moral convictions or will be respectful of them—including their convictions on whether the organization or others provide health coverage of contraception, or of certain items they view as being abortifacient.

[74] See, for example, Americans United for Life ("AUL") Comment on CMA-9992-IFC2 at 10 (Nov. 1, 2011), available at *http://www.regulations.gov/#!documentDetail;D=HHS-OS-2011-0023-59496*, and AUL Comment on CMS-9968-P at 5 (Apr. 8, 2013), available at *http://www.regulations.gov/#!documentDetail;D=CMS-2012-0031-79115*.

[75] *Cf., for example,* Frank Newport, "Americans, Including Catholics, Say Birth Control Is Morally OK," Gallup, (May 22, 2012), *http://www.gallup.com/poll/154799/americans-including-catholics-say-birth-control-morally.aspx* ("Eighty-two percent of U.S. Catholics say birth control is morally acceptable").

Exhibit 2                                             JA499                                          JA-0000090

pregnancies have large public costs, and the Mandate overall led to large out-of-pocket savings for women. These general comments did not, however, substantially assist the Departments in estimating the number of women that would potentially be affected by these exemptions for moral convictions specifically, or among them, how many unintended pregnancies would result, how many of the affected women would nevertheless use contraceptives not covered under the health plans of their objecting employers and, thus, be subject to the estimated transfer costs, or instead, how many women might avoid unintended pregnancies by changing their activities in other ways besides using contraceptives.

Some of the comments opposing these exemptions assert that they will lead to a large number of entities dropping contraceptive coverage. The Departments disagree; they are aware of only two entities that hold non-religious moral convictions against contraceptive coverage. Both only hire employees that share their beliefs, and one will not be affected by these final rules because it is protected by an injunction from any regulations implementing the contraceptive Mandate. Commenters cited no other specific entities that might assert these moral convictions, and did not provide better data to estimate how many entities might exist. Likewise, the Departments find it unlikely that any of the vast majority of entities that covered contraceptives before this Mandate was announced in 2011 would terminate such coverage because of these exemptions based on moral convictions. The Departments also find it unlikely that a significant number of for-profit entities, whose plans include a significant number of women, omitted contraceptive coverage before the ACA on the basis of objections grounded in non-religious moral convictions, and would claim an exemption under these final rules. No such entities, or data concerning such entities, were identified by public commenters, nor are the Departments aware of any involved in litigation over the Mandate.

Numerous for-profit entities claiming religious objections have filed suit challenging the Mandate. Among the over 200 entities that brought legal challenges, only two entities (less than 1 percent) raised non-religious moral objections—and both were nonprofit organizations. Among the general public, polls vary about religious beliefs, but one prominent poll shows that 89 percent of Americans say they

believe in God.[76] Among non-religious persons, only a very small percentage of the population appears to hold moral objections to contraception. A recent study found that only 2 percent of religiously unaffiliated persons believed using contraceptives is morally wrong.[77] Combined, this suggests that 0.2 percent of Americans at most[78] might believe contraceptives are morally wrong based on moral convictions but not religious beliefs. The Departments have no information about how many of those persons run closely held businesses, offer employer sponsored health insurance, and would make use of the expanded exemption for moral convictions set forth in these final rules. Given the large number of closely held entities that challenged the Mandate based on religious objections, the Departments assume that some similar for-profit entities with non-religious moral objections exist. But the Departments expect that it will be a comparatively small number of entities, since among the nonprofit litigants, only two were non-religious. Without data available to estimate the actual number of entities that will make use of the expanded exemption for for-profit entities without publicly traded ownership interests and with sincere moral objections to the Mandate, the Departments expect that fewer than 10 entities, if any, will do so—so the Departments assume nine for-profit entities will use the exemption in these final rules.

The moral exemption encompassing certain for-profit entities could result in the removal of contraceptive coverage from women who do not share their employers' views. The Departments used data from the Current Population Survey (CPS) and the Medical Expenditure Panel Survey-Insurance Component (MEPS–IC) to obtain an estimate of the number of policyholders that will be covered by the plans of the nine for-profit entities we assume may make use of these expanded exemptions.[79] The average number of

policyholders (9) in plans with under 100 employees was obtained. It is not known how many employees would be employed by the for-profit employers that might claim this exemption, but as discussed above these final rules do not include publicly traded companies, and both of the two nonprofit entities that challenged the Mandate based on moral objections included fewer than five policyholders in their group plans. Therefore, the Departments assume that the for-profit entities that may claim this expanded exemption will have fewer than 100 employees and an average of 9 policyholders. For 9 entities, the total number of policyholders would be approximately 81. DOL estimates that for each policyholder, there is approximately one dependent.[80] This amounts to approximately 162 covered persons. Census data indicate that women of childbearing age, *i.e.,* women aged 15 to 44, comprise 20.2 percent of the general population.[81] This amounts to approximately 33 women of childbearing age for this group of individuals covered by group plans sponsored by for-profit moral objectors. Approximately 44.3 percent of women currently use contraceptives covered by the Guidelines.[82] Thus, the Departments estimate that approximately 15 women may incur contraceptive costs due to for-profit entities using the expanded moral exemption provided for in these final rules.[83] In the companion final

Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/ researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.* Estimates of the number of ERISA Plans based on 2015 Medical Expenditure Survey—Insurance.

[80] "Health Insurance Coverage Bulletin" Dept. of Labor" (June 28, 2016), Table 4, page 21. Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/ researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.*

[81] U.S. Census Bureau, "Age and Sex Composition: 2010" (May 2011), available at *https://www.census.gov/prod/cen2010/briefs/ c2010br-03.pdf.* The Guidelines' requirement of contraceptive coverage only applies "for all women with reproductive capacity." Women's Preventive Services Guidelines, HRSA (last reviewed Oct. 2017), *https://www.hrsa.gov/womensguidelines/; see also* 80 FR 40318. In addition, studies commonly consider the 15–44 age range to assess contraceptive use by women of childbearing age. *See, e.g.,* "Contraceptive Use in the United States," The Guttmacher Institute (Sept. 2016), *https:// www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[82] *See* "Contraceptive Use in the United States," The Guttmacher Institute (Sept. 2016), *https:// www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[83] The Departments note that many non-religious for-profit entities which sued the Departments challenging the Mandate, including some of the largest employers, only objected to coverage of 4 of the 18 types of contraceptives required to be

Continued

[76] Frank Newport, "Most Americans Still Believe in God," Gallup (June 29, 2016), *http:// www.gallup.com/poll/193271/americans-believe-god.aspx.*

[77] Pew Research Center, "Where the Public Stands on Religious Liberty vs. Nondiscrimination." Pew Research Center, 26 (Sept. 28, 2016), *http://assets.pewresearch.org/wp-content/uploads/sites/11/2016/09/Religious-Liberty-full-for-web.pdf.*

[78] The study defined religiously "unaffiliated" as agnostic, atheist or "nothing in particular", *id.* at 8, as distinct from several versions of Protestants, or Catholics. "Nothing in particular" might have included some theists.

[79] "Health Insurance Coverage Bulletin," Dept. of Labor (June 28, 2016), Table 4, page 21. Using March 2015 Annual Social and Economic

Exhibit 2　　　　　　　　　　　　　JA500　　　　　　　　　　　　　JA-0000091

rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**. we estimate that the average cost of contraception per year per woman of childbearing age that use contraception covered by the Guidelines, in health plans that cover contraception. is $584. Consequently, the Departments estimate that the anticipated effects attributable to the cost of contraception from for-profit entities using the expanded moral exemption in these final rules is approximately $8,760.

The Departments estimate that these final rules will not result in any additional burden or costs on issuers or third party administrators. As discussed above, we assume that no entities with non-religious moral convictions will avail themselves of the accommodation, although the Departments wish to make it available in case an entity voluntarily opts into it in order to allow contraceptive coverage to be provided to its plan participants and beneficiaries. While these final rules make it legal for issuers to offer insurance coverage that omits contraceptives to/for exempt entities and individuals, these final rules do not require issuers to do so. Finally, because the accommodation process was not previously available to entities that possess non-religious moral objections to the Mandate, the Departments do not anticipate that these final rules will result in any burden from such entities acting to revoke their accommodated status.

The Departments believe the foregoing analysis represents a reasonable estimate of the likely impact under the exemptions finalized in these final rules. The Departments acknowledge uncertainty in the estimate and, therefore, conducted a second analysis using an alternative framework, which is set forth in the companion final rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**. with reference to the analysis included in the Religious IFC. Under either estimate, these final rules are not deemed to be economically significant.

---

covered by the Mandate—namely, those contraceptives which they viewed as abortifacients, and akin to abortion —and they were willing to provide coverage for other types of contraception. It is reasonable to assume that this would also be the case with respect to some for-profits that object to the Mandate on the basis of sincerely held moral convictions. Accordingly. it is possible that even fewer women beneficiaries under such plans would bear out-of-pocket expenses in order to obtain contraceptives, and that those who might do so would bear lower costs due to many contraceptive items being covered.

The Departments reiterate the rareness of instances in which we are aware that employers assert non-religious objections to contraceptive coverage based on sincerely held moral convictions. as discussed above, and also that in the few instances where such an objection has been raised, employees of such employers also opposed contraception.

### B. Special Analyses—Department of the Treasury

These regulations are not subject to review under section 6(b) of Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Department of the Treasury and the Office of Management and Budget regarding review of tax regulations.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.) imposes certain requirements with respect to federal regulations that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 et seq.) and that are likely to have a significant economic impact on a substantial number of small entities. Under section 553(b) of the APA, a general notice of proposed rulemaking is not required when an agency. for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The Moral IFC was a set of interim final rules with comment, and in these final rules, the Departments finalize the Moral IFC with certain changes based on public comments. The Moral IFC was exempt from the notice and comment requirements of the APA, both because the PHS Act, ERISA, and the Code contain specific provisions under which the Secretaries may adopt regulations by interim final rule and because the Departments have made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble. Therefore, the RFA did not apply to the Moral IFC. These final rules are, however, issued after a notice and comment period.

The Departments carefully considered the likely impact of the rules on small entities in connection with their assessment under Executive Order 12866. The Departments do not expect that these final rules will have a significant economic effect on a substantial number of small entities, because they will not result in any additional costs to affected entities. Instead. by exempting from the Mandate small businesses and nonprofit organizations with moral objections to

some or all contraceptives and/or sterilization—businesses and organizations which would otherwise be faced with the dilemma of complying with the Mandate (and violating their moral convictions), or of following their moral convictions and incurring potentially significant financial penalties for noncompliance—the Departments have reduced regulatory burden on small entities. Pursuant to section 7805(f) of the Code. the notice of proposed rulemaking preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

### D. Paperwork Reduction Act— Department of Health and Human Services

Under the Paperwork Reduction Act of 1995 (the PRA), federal agencies are required to publish notice in the **Federal Register** and solicit public comment before a collection of information is submitted to the Office of Management and Budget (OMB) for review and approval. Interested persons are invited to send comments regarding our burden estimates or any other aspect of this collection of information, including any of the following subjects: (1) The necessity and utility of the proposed information collection for the proper performance of the agency's functions; (2) the accuracy of the estimated burden; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) the use of automated collection techniques or other forms of information technology to minimize the information collection burden.

The Departments estimate that these final rules will not result in additional burdens not accounted for as set forth in companion final rules concerning religious beliefs issued contemporaneously with these final rules and published elsewhere in today's **Federal Register**. As discussed there, rules covering the accommodation include provisions regarding self-certification or notices to HHS from eligible organizations (§ 147.131(c)(3)), notice of availability of separate payments for contraceptive services (§ 147.131(e)), and notice of revocation of accommodation (§ 147.131(c)(4)). The burden related to these information collection requirements (ICRs) received emergency review and approval under OMB Control Number 0938–1344. They have been resubmitted to OMB in conjunction with this final rule and are pending re-approval.

Exhibit 2                                    JA501                                    JA-0000092

Case 1:25-cv-02740-LMM   Document 64-2 2   Page: 449   Date Filed: 12/19/2025   Filed: 12/19/2025
Case 1:25-cv-02740-LMM   Document 64-2   Page: 449   Filed: 12/19/2025

**Federal Register** / Vol. 83, No. 221 / Thursday, November 15, 2018 / Rules and Regulations **57629**

As discussed above, however, the Departments assume that no entities with non-religious moral objections to the Mandate will use the accommodation. The Departments know that no such entities were eligible for it until now, so that no entity possesses an accommodated status that would need to be revoked. Therefore, the Departments believe that the burden for these ICRs is accounted for in the collection approved under OMB Control Numbers 0938–1344, as described in the final rules concerning religious beliefs issued contemporaneously with these final rules.

*E. Paperwork Reduction Act—Department of Labor*

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210–0150 and 1210–0152. In an effort to consolidate the number of information collections the Department is combining OMB control numbers 1210–0150 and 1210–0152 under OMB control number 1210–0150 and discontinuing OMB control number 1210–0152.

A copy of the ICR may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW, Room N–5718, Washington, DC 20210. Telephone: (202) 693–8410; Fax: (202) 219–4745. These are not toll-free numbers.

Consistent with the analysis in the HHS PRA section above, although these final rules make entities with certain moral convictions eligible for the accommodation, the Department assumes (1) that no entities will use the accommodation rather than the exemption, and (2) entities using the moral exemption would not have to revoke an accommodation, because they previously were not eligible for it. Therefore, the Department believes these final rules do not involve additional burden not accounted for under OMB control number 1210–0150, which is published elsewhere in today's issue of the **Federal Register** in connection with the companion Religious Exemption and Accommodation Preventive Health Service final rule. The Department will

publish a notice informing the public of OMB's action with respect to the Department's submission of the ICRs under OMB control number 1210–0150.

*F. Regulatory Reform Executive Orders 13765, 13771 and 13777*

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of Health and Human Services (Secretary) and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the [Affordable Care] Act shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any state or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the States more flexibility and control to create a more free and open healthcare market." The Moral IFC and these final rules exercise the discretion provided to the Departments under the Affordable Care Act and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), the Departments have estimated the costs and cost savings attributable to these rules. As discussed in more detail in the preceding analysis, these final rules lessen incremental reporting costs.[84] However, in order to avoid

[84] Other noteworthy potential impacts encompass potential changes in medical expenditures, including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on E.O. 13771 implementation (*https://www.whitehouse.gov/the-press-office/2017/04/05/memorandum-implementing-executive-order-13771-titled-reducing-regulation*) states that impacts should be categorized as consistently as possible within Departments. The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures are reduced, negative benefits if expenditures are raised). Following the FDA, OSHA and MSHA accounting convention

double-counting with the Moral IFC, which has already been tallied as an E.O. 13771 deregulatory action, this finalization of the IFC's policy is not considered a deregulatory action under the Executive Order.

*G. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (section 202(a) (Pub. L. 104–4), requires the Departments to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing "any rule that may result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any 1 year." In 2018, that threshold is approximately $150 million. For purposes of the Unfunded Mandates Reform Act, the Moral IFC and these final rules do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $150 million or more on the private sector.

*H. Federalism*

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

These rules do not have any Federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

**IV. Statutory Authority**

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

leads to these final rules' medical expenditure impacts being categorized as (positive or negative) benefits, rather than as costs, thus placing them outside of consideration for E.O. 13771 designation purposes.

Exhibit 2

JA502

JA-0000093

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

## List of Subjects

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

**Kirsten Wielobob,**

*Deputy Commissioner for Services and Enforcement.*

Approved: October 30, 2018.

**David J. Kautter,**

*Assistant Secretary for Tax Policy.*

Signed this 29th day of October, 2018.

**Preston Rutledge,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: October 17, 2018.

**Seema Verma,**

*Administrator, Centers for Medicare & Medicaid Services.*

Dated: October 18, 2018.

**Alex M. Azar II,**

*Secretary, Department of Health and Human Services.*

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

For the reasons set forth in this preamble, 26 CFR part 54 is amended as follows:

## PART 54—PENSION EXCISE TAXES

■ 1. The authority citation for part 54 continues to read, in part, as follows:

Authority: 26 U.S.C. 7805. * * *

**§ 54.9815–2713  [Amended]**

■ 2. Section 54.9815–2713, as amended elsewhere in this issue of the **Federal Register**, is further amended in paragraph (a)(1)(iv) by removing the reference ''147.131 and 147.132'' and adding in its place the reference ''147.131, 147.132, and 147.133''.

**§ 54.9815–2713A  [Amended]**

■ 3. Section 54.9815–2713A, as amended elsewhere in this issue of the **Federal Register**, is further amended—

■ a. In paragraph (a)(1) by removing ''or (ii)'' and adding in its place ''or (ii), or 45 CFR 147.133(a)(1)(i) or (ii)'';

■ b. In paragraph (a)(2) by removing the reference ''147.132(a)'' and adding in its place the reference ''147.132(a) or 147.133(a)'';

■ c. In paragraph (b)(1)(ii) introductory text by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133'';

■ d. In paragraph (b)(1)(ii)(B) by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133'';

■ e. In paragraph (c)(1)(ii) introductory text by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133'';

■ f. In paragraph (c)(1)(ii)(B) by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133''; and

■ g. In paragraph (c)(2) by removing the reference ''147.132'' and adding in its place the reference ''147.132 or 147.133''.

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ For the reasons set forth in the preamble, the Department of Labor adopts, as final, the interim final rules amending 29 CFR part 2590, published October 13, 2017 (82 FR 47838), without change.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

■ For the reasons set forth in the preamble, the Department of Health and Human Services adopts as final the interim final rules amending 45 CFR part 147 published on October 13, 2017 (82 FR 47838) with the following changes:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 4. The authority citation for part 147, as revised elsewhere in this issue of the **Federal Register**, continues to read as follows:

Authority: 42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92, as amended.

■ 5. Section 147.133 is amended by revising paragraph (a)(1) introductory text, (a)(1)(ii), (a)(2), and (b) to read as follow:

**§ 147.133  Moral exemptions in connection with coverage of certain preventive health services.**

(a) * * *

(1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections specified below. Thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

* * * * *

(ii) An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health

Exhibit 2

JA503

JA-0000094

insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

\*    \*    \*    \*    \*

(2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held moral convictions, to its establishing, maintaining, providing, offering, or arranging for (as applicable):

(i) Coverage or payments for some or all contraceptive services; or

(ii) A plan, issuer, or third party administrator that provides or arranges such coverage or payments.

(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to

any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions. Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

\*    \*    \*    \*    \*

[FR Doc. 2018–24514 Filed 11–7–18; 4:15 pm]

**BILLING CODE 4830–01–P; 4510–29–P; 4120–01–P**

Exhibit 2                    JA504                    JA-0000095

*www.fda.gov/NewsEvents/Meetings ConferencesWorkshops/ ucm592778.htm.* Please provide complete contact information for each attendee, including name, title, affiliation, address, email, and telephone.

Registration is free and based on space availability, with priority given to early registrants. Persons interested in attending this public workshop must register by April 25, 2018, 5 p.m. Eastern Time. Early registration is recommended because seating is limited; therefore, FDA may limit the number of participants from each organization. Registrants will receive confirmation when their registration has been received. If time and space permit, onsite registration on the day of the public workshop will be provided beginning an hour prior to the start of the meeting.

If you need special accommodations due to a disability, please contact Nicole Wolanski, at 301–796–6570, or *OOPDOrphanEvents@fda.hhs.gov* no later than April 25, 2018.

An agenda for the workshop and any other background materials will be made available 5 days before the workshop at *https://www.fda.gov/News Events/MeetingsConferencesWorkshops/ ucm592778.htm.*

*Streaming Webcast of the Public Workshop:* For those unable to attend in person, FDA will provide a live webcast of the workshop. To register for the streaming webcast of the public workshop, please visit the following website by May 8, 2018: *https://www. fda.gov/NewsEvents/Meetings ConferencesWorkshops/ ucm592778.htm.*

If you have never attended a Connect Pro event before, test your connection at *https://collaboration.fda.gov/common/ help/en/support/meeting_test.htm.* To get a quick overview of the Connect Pro program, visit *https://www.adobe.com/ go/connectpro_overview.* FDA has verified the website addresses in this document, as of the date this document publishes in the **Federal Register**, but websites are subject to change over time.

*Transcripts:* Please be advised that as soon as a transcript of the public workshop is available, it will be accessible at *https:// www.regulations.gov.* It may be viewed at the Dockets Management Staff (see **ADDRESSES**). A link to the transcript will also be available on the internet at *https://www.fda.gov/NewsEvents/ MeetingsConferencesWorkshops/ ucm592778.htm.*

Dated: February 22, 2018.
**Leslie Kux,**
*Associate Commissioner for Policy.*
[FR Doc. 2018–03961 Filed 2–26–18; 8:45 am]
**BILLING CODE 4164–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Health Resources and Service Administration

### Women's Preventive Services Guidelines

**AGENCY:** Health Resources and Services Administration (HRSA), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** Applicable as of December 29, 2017, HRSA updated the HRSA-supported Women's Preventive Services Guidelines for purposes of health insurance coverage for preventive services that address health needs specific to women based on clinical recommendations from the Women's Preventive Services Initiative. This 2017 update adds two additional services— Screening for Diabetes Mellitus after Pregnancy and Screening for Urinary Incontinence—to the nine preventive services included in the 2016 update to the HRSA-supported Women's Preventive Services Guidelines. The nine services included in the 2016 update are as follows: Breast Cancer Screening for Average Risk Women, Breastfeeding Services and Supplies, Screening for Cervical Cancer, Contraception, Screening for Gestational Diabetes Mellitus, Screening for Human Immunodeficiency Virus Infection, Screening for Interpersonal and Domestic Violence, Counseling for Sexually Transmitted Infections, and Well-Woman Preventive Visits. This notice serves as an announcement of the decision to update the guidelines as listed below. Please see *https:// www.hrsa.gov/womens-guidelines/ index.html* for additional information.

**FOR FURTHER INFORMATION CONTACT:** Kimberly C. Sherman, Maternal and Child Health Bureau, HRSA at phone: (301) 443–0543; email: *wellwomancare@ hrsa.gov.*

**SUPPLEMENTARY INFORMATION:** The complete set of updated 2017 HRSA-supported Women's Preventive Services Guidelines includes those that were accepted by the Acting HRSA Administrator on December 20, 2016, as well as two new services, Screening for Diabetes Mellitus After Pregnancy and Screening for Urinary Incontinence. For a complete listing and detailed

information about the December 20, 2016, updates, please see *https:// www.federalregister.gov/documents/ 2016/12/27/2016-31129/updating-the-hrsa-supported-womens-preventive-services-guidelines.* In addition, the December 20, 2016, updates, including information related to coverage of contraceptive services and exemption for objecting organizations from requirements related to the provision of contraceptive services, can be found at *https://www.hrsa.gov/womens-guidelines-2016/index.html.* Information regarding the two new services that were accepted by the HRSA Administrator on December 29, 2017, is set out below:

### 1. Screening for Diabetes Mellitus After Pregnancy

The Women's Preventive Services Initiative recommends women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes mellitus should be screened for diabetes mellitus. Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum.

Women with a negative initial postpartum screening test result should be rescreened at least every 3 years for a minimum of 10 years after pregnancy. For women with a positive postpartum screening test result, testing to confirm the diagnosis of diabetes is indicated regardless of the initial test (*e.g.,* oral glucose tolerance test, fasting plasma glucose, or hemoglobin A1c). Repeat testing is indicated in women who were screened with hemoglobin A1c in the first six months postpartum regardless of the result (see Implementation Considerations below).

### 2. Screening for Urinary Incontinence

The Women's Preventive Services Initiative recommends screening women for urinary incontinence annually. Screening should ideally assess whether women experience urinary incontinence and whether it impacts their activities and quality of life. The Women's Preventive Services Initiative recommends referring women for further evaluation and treatment if indicated.

*HRSA-Supported Women's Preventive Services Guidelines*

The HRSA-supported Women's Preventive Services Guidelines were originally established in 2011 based on recommendations from an HHS commissioned study by the Institute of Medicine, now known as the National

Exhibit 3     JA505     JA-0000096

Academy of Medicine (NAM). Since then, there have been advancements in science and gaps identified in the existing guidelines, including a greater emphasis on practice-based clinical considerations. To address these, HRSA awarded a 5-year cooperative agreement in March 2016 to convene a coalition of clinician, academic and consumer-focused health professional organizations and conduct a scientifically rigorous review to develop recommendations for updated Women's Preventive Services Guidelines in accordance with the model created by the NAM *Clinical Practice Guidelines We Can Trust.* The American College of Obstetricians and Gynecologists was awarded the cooperative agreement and formed an expert panel called the Women's Preventive Services Initiative.

Under section 2713 of the Public Health Service Act, non-grandfathered group health plans and issuers of non-grandfathered group and individual health insurance coverage are required to cover specified preventive services without a copayment, coinsurance, deductible, or other cost sharing, including preventive care and screenings for women as provided for in comprehensive guidelines supported by HRSA for this purpose. Non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing for preventive services listed in the updated HRSA-supported guidelines (which include the nine preventive services set out in the 2016 update, as well as the two services added in this update) beginning with the first plan year (in the individual market, policy year) that begins on or after December 29, 2018.

Dated: February 20, 2018.

**George Sigounas,**

*Administrator.*

[FR Doc. 2018–03840 Filed 2–26–18; 8:45 am]

**BILLING CODE 4165–15–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### Center for Scientific Review; Notice of Closed Meetings

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meetings.

The meetings will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; PAR–16–366 Dual Purpose with Dual Benefit: Research in Biomedicine and Agriculture.

*Date:* March 21–22, 2018.

*Time:* 8:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892 (Virtual Meeting).

*Contact Person:* Tera Bounds, DVM, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3214, MSC 7808, Bethesda, MD 20892, 301–435–2306, *boundst@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Member Conflict.

*Date:* March 21, 2018.

*Time:* 11:00 a.m. to 3:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892 (Virtual Meeting).

*Contact Person:* Kate Fothergill, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3142, Bethesda, MD 20892, 301–435–2309, *fothergillke@mail.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Member Conflict: The Biostatistical Methods and Research Design.

*Date:* March 21, 2018.

*Time:* 1:00 p.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892 (Telephone Conference Call).

*Contact Person:* Ping Wu, Ph.D., Scientific Review Officer, HDM IRG, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3166, Bethesda, MD 20892, 301–451–8428, *wup4@ csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; PAR Panel: AIDS and Related Research.

*Date:* March 22, 2018.

*Time:* 8:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* The Fairmont Washington, DC, 2401 M Street NW, Washington, DC 20037.

*Contact Person:* Robert Freund, Ph.D., Scientific Review Officer, Center for

Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5216, MSC 7852, Bethesda, MD 20892, 301–435–1050, *freundr@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Fellowship: Infectious Diseases and Microbiology.

*Date:* March 22–23, 2018.

*Time:* 8:00 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Embassy Suites DC Convention Center, 900 10th Street NW, Washington, DC 20001.

*Contact Person:* Tamara Lyn McNealy, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3188, Bethesda, MD 20747, 301–827–2372, *tamara.mcnealy@nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; PAR Panel: Cancer Health Disparities.

*Date:* March 22, 2018.

*Time:* 8:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Hyatt Regency Bethesda, One Bethesda Metro Center, 7400 Wisconsin Avenue, Bethesda, MD 20814.

*Contact Person:* Janet M. Larkin, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5142, MSC 7840, Bethesda, MD 20892, 301–806–2765, *larkinja@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Small Business: Innovative Immunology.

*Date:* March 22, 2018.

*Time:* 8:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* The William F. Bolger Center, 9600 Newbridge Drive, Potomac, MD 20854.

*Contact Person:* Andrea Keane-Myers, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4218, Bethesda, MD 20892, 301–435–1221, *andrea.keane-myers@nih.gov.*

*Name of Committee:* AIDS and Related Research Integrated Review Group; AIDS Discovery and Development of Therapeutics Study Section.

*Date:* March 22, 2018.

*Time:* 8:00 a.m. to 6:30 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* The Fairmont Washington, DC, 2401 M Street NW, Washington, DC 20037.

*Contact Person:* Shiv A. Prasad, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5220, MSC 7852, Bethesda, MD 20892, 301–443–5779, *prasads@csr.nih.gov.*

*Name of Committee:* AIDS and Related Research Integrated Review Group; NeuroAIDS and other End-Organ Diseases Study Section.

*Date:* March 22, 2018.

*Time:* 8:00 a.m. to 6:30 p.m.

*Agenda:* To review and evaluate grant applications.

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

[TD–9827]

RIN 1545–BN92

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

RIN 1210–AB83

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

[CMS–9940–IFC]

RIN 0938–AT20

**Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Interim final rules with request for comments.

**SUMMARY:** The United States has a long history of providing conscience protections in the regulation of health care for entities and individuals with objections based on religious beliefs and moral convictions. These interim final rules expand exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act. These rules do not alter the discretion of the Health Resources and Services Administration (HRSA), a component of the United States Department of Health and Human Services (HHS), to maintain the guidelines requiring contraceptive coverage where no religiously recognized objection exists. These rules also leave the "accommodation" process in place as an optional process for certain exempt entities that wish to use it voluntarily. These rules do not alter multiple other Federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.

**DATES:** *Effective date:* These interim final rules and temporary regulations are effective on October 6, 2017.

*Comment date:* Written comments on these interim final rules are invited and must be received by December 5, 2017.

**ADDRESSES:** Written comments may be submitted to the Department of Health and Human Services as specified below. Any comment that is submitted will be shared with the Department of Labor and the Department of the Treasury, and will also be made available to the public.

**Warning:** Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments may be posted on the Internet and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously. Comments, identified by "Preventive Services," may be submitted one of four ways (please choose only one of the ways listed)

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9940–IFC. P.O. Box 8016. Baltimore, MD 21244–8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9940–IFC. Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier) your written comments ONLY to the following addresses prior to the close of the comment period:

a. For delivery in Washington, DC—Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD—Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Comments erroneously mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

Comments received will be posted without change to *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jeff Wu (310) 492–4305 or *marketreform@ cms.hhs.gov* for Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), Amber Rivers or Matthew Litton, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 317–5500.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Congress has consistently sought to protect religious beliefs in the context of health care and human services, including health insurance, even as it has sought to promote access to health services.[1] Against that backdrop.

---

[1] See, for example, 42 U.S.C. 300a–7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting individuals and entities that object to abortion); Consolidated Appropriations Act of 2017. Div. H. Title V, Sec. 507(d) (Departments of Labor, HHS, and Education, and Related Agencies Appropriations Act). Public Law 115–31 (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion for any reason); *Id.* at Div. C, Title VIII. Sec. 808 (regarding any requirement of "the provision of

Exhibit 4

JA507

JA-0000098

Congress granted the Health Resources and Services Administration (HRSA), a component of the United States Department of Health and Human Services (HHS), discretion under the Patient Protection and Affordable Care Act to specify that certain group health plans and health insurance issuers shall cover, "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by" by HRSA (the "Guidelines"). Public Health Service Act section 2713(a)(4).

HRSA exercised that discretion under the last Administration to require health coverage for, among other things, certain contraceptive services,[2] while the administering agencies—the Departments of Health and Human Services, Labor, and the Treasury (collectively, "the Departments"[3])—exercised the same discretion to allow exemptions to those requirements. Through rulemaking, including three interim final rules, the Departments allowed exemptions and accommodations for certain religious objectors where the Guidelines require coverage of contraceptive services. Many individuals and entities challenged the contraceptive coverage requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate") as being inconsistent with various legal protections, including the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1. Much of that litigation continues to this day.

The Departments have recently exercised our discretion to reevaluate these exemptions and accommodations. This evaluation includes consideration of various factors, such as the interests served by the existing Guidelines, regulations, and accommodation process;[4] the extensive litigation; Executive Order 13798, "Promoting Free Speech and Religious Liberty" (May 4, 2017); protection of the free exercise of religion in the First Amendment and by Congress in the Religious Freedom Restoration Act of 1993; Congress' history of providing protections for religious beliefs regarding certain health services (including contraception, sterilization, and items or services believed to involve abortion); the discretion afforded under section 2713(a)(4) of the PHS Act; the structure and intent of that provision in the broader context of section 2713 and the Patient Protection and Affordable Care Act; the regulatory process and comments submitted in various requests for public comments (including in the Departments' 2016 Request for Information).

In light of these factors, the Departments issue these new interim

final rules to better balance the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the Government's interests, including, as reflected throughout Federal law, to provide conscience protections for individuals and entities with sincerely held religious beliefs in certain health care contexts, and to minimize burdens in our regulation of the health insurance market.

*A. The Affordable Care Act*

Collectively, the Patient Protection and Affordable Care Act (Pub. L. 111–148), enacted on March 23, 2010, and the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152), enacted on March 30, 2010, are known as the Affordable Care Act. In signing the Affordable Care Act, President Obama issued Executive Order 13535 (March 24, 2010), which declared that, "[u]nder the Act, longstanding Federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7, and the Weldon Amendment, section 508(d)(1) of Pub. L. 111–8) remain intact" and that "[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the HHS."

The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. In addition, the Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and thereby make them applicable to certain group health plans regulated under ERISA or the Code. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728 of the PHS Act.

These interim final rules concern section 2713 of the PHS Act. Where it applies, section 2713(a)(4) of the PHS Act requires coverage without cost sharing for "such additional" women's preventive care and screenings "as provided for" and "supported by" guidelines developed by HRSA/HHS. The Congress did not specify any particular additional preventive care and screenings with respect to women that HRSA could or should include in its Guidelines, nor did Congress indicate whether the Guidelines should include contraception and sterilization.

---

contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."]; *Id.* at Div. C, Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); *Id.* at Div. I, Title III (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb–36 (prohibiting the statutory section from being construed to require suicide related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 290kk–1 (protecting the religious character of organizations participating in certain programs and the religious freedom of beneficiaries of the programs); 42 U.S.C. 300x–65 (protecting the religious character of organizations and the religious freedom of individuals involved in the use of government funds to provide substance abuse services); 42 U.S.C. 604a (protecting the religious character of organizations and the religious freedom of beneficiaries involved in the use of government assistance to needy families); 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare Choice, now Medicare Advantage, managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal law does not infringe on "conscience" as protected in State law concerning advance directives); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 5106i (prohibiting certain Federal statutes from being construed to require that a parent or legal guardian provide a child any medical service or treatment against the religious beliefs of the parent or legal guardian); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide); also, see 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require assistance in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/AIDS funds contrary to their "religious or moral objection").

[2] This document's references to "contraception," "contraceptive," "contraceptive coverage," or "contraceptive services" generally includes contraceptives, sterilization, and related patient education and counseling, unless otherwise indicated.

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

[4] In this document, we generally use "accommodation" and "accommodation process" interchangeably.

Exhibit 4                JA508                JA-0000099

The Departments have consistently interpreted section 2714(a)(4) PHS Act's grant of authority to include broad discretion to decide the extent to which HRSA will provide for and support the coverage of additional women's preventive care and screenings in the Guidelines. In turn, the Departments have interpreted that discretion to include the ability to exempt entities from coverage requirements announced in HRSA's Guidelines. That interpretation is rooted in the text of section 2713(a)(4) of the PHS Act, which allows HRSA to decide the extent to which the Guidelines will provide for and support the coverage of additional women's preventive care and screenings.

Accordingly, the Departments have consistently interpreted section 2713(a)(4) of the PHS Act's reference to "comprehensive guidelines supported by HRSA for purposes of this paragraph" to grant HRSA authority to develop such Guidelines. And because the text refers to Guidelines "supported by HRSA for purposes of this paragraph," the Departments have consistently interpreted that authority to afford HRSA broad discretion to consider the requirements of coverage and cost-sharing in determining the nature and extent of preventive care and screenings recommended in the guidelines. (76 FR 46623). As the Departments have noted, these Guidelines are different from "the other guidelines referenced in section 2713(a) of the PHS Act, which pre-dated the Affordable Care Act and were originally issued for purposes of identifying the non-binding recommended care that providers should provide to patients." Id. Guidelines developed as nonbinding recommendations for care implicate significantly different legal and policy concerns than guidelines developed for a mandatory coverage requirement. To guide HRSA in exercising the discretion afforded to it in section 2713(a)(4) of the PHS Act, the Departments have previously promulgated regulations defining the scope of permissible exemptions and accommodations for such guidelines. (45 CFR 147.131). The interim final rules set forth herein are a necessary and appropriate exercise of the authority of HHS, of which HRSA is a component, and of the authority delegated to the Departments collectively as administrators of the statutes. (26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92)

Our interpretation of section 2713(a)(4) of the PHS Act is confirmed by the Affordable Care Act's statutory structure. Congress did not intend to require entirely uniform coverage of preventive services (76 FR 46623). To the contrary, Congress carved out an exemption from section 2713 of the PHS Act for grandfathered plans. In contrast, this exemption is not applicable to many of the other provisions in Title I of the Affordable Care Act—provisions previously referred to by the Departments as providing "particularly significant protections." (75 FR 34540). Those provisions include: Section 2704 of the PHS Act, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708 of the PHS Act, which prohibits excessive waiting periods (as of January 1, 2014); section 2711 of the PHS Act, which relates to lifetime limits; section 2712 of the PHS Act, which prohibits rescission of health insurance coverage; section 2714 of the PHS Act, which extends dependent coverage until age 26; and section 2718 of the PHS Act, which imposes a medical loss ratio on health insurance issuers in the individual and group markets (for insured coverage), or requires them to provide rebates to policyholders. (75 FR 34538, 34540, 34542). Consequently, of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not subject to section 2713 of the PHS Act.[5] As the Supreme Court observed, "there is no legal requirement that grandfathered plans ever be phased out." *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2764 n.10 (2014).

The Departments' interpretation of section 2713(a)(4) of the PHS Act to permit HRSA to establish exemptions from the Guidelines, and of the Departments' own authority as administering agencies to guide HRSA in establishing such exemptions, is also consistent with Executive Order 13535. That order, issued upon the signing of the Affordable Care Act, specified that "longstanding Federal laws to protect conscience * * * remain intact," including laws that protect religious beliefs (and moral convictions) from certain requirements in the health care context. While the text of Executive Order 13535 does not require the expanded exemptions issued in these interim final rules, the expanded exemptions are, as explained below, consistent with longstanding Federal laws to protect religious beliefs regarding certain health matters, and are consistent with the intent that the Affordable Care Act would be implemented in accordance with the protections set forth in those laws.

*B. The Regulations Concerning Women's Preventive Services*

On July 19, 2010, the Departments issued interim final rules implementing section 2713 of the PHS Act (75 FR 41726). Those interim final rules charged HRSA with developing the Guidelines authorized by section 2713(a)(4) of the PHS.

1. The Institute of Medicine Report

In developing the Guidelines, HRSA relied on an independent report from the Institute of Medicine (IOM, now known as the National Academy of Medicine) on women's preventive services, issued on July 19, 2011, "Clinical Preventive Services for Women, Closing the Gaps" (IOM 2011). The IOM's report was funded by the HHS Office of the Assistant Secretary for Planning and Evaluation (ASPE), pursuant to a funding opportunity that charged the IOM to conduct a review of effective preventive services to ensure women's health and well-being.[6]

The IOM made a number of recommendations with respect to women's preventive services. As relevant here, the IOM recommended that the Guidelines cover the full range of Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity. Because FDA includes in the category of "contraceptives" certain drugs and devices that may not only prevent conception (fertilization), but may also prevent implantation of an embryo,[7] the IOM's recommendation included several contraceptive methods that many persons and organizations believe are abortifacient—that is, as causing early abortion—and which they conscientiously oppose for that reason

---

[5] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2017 Annual Survey," available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017*.

[6] Because section 2713(a)(4) of the PHS Act specifies that the HRSA Guidelines shall include preventive care and screenings "with respect to women," the Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[7] FDA's guide "Birth Control: Medicines To Help You," specifies that various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work * * * by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization. Available at *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm*.

Exhibit 4                    JA509                    JA-0000100

distinct from whether they also oppose contraception or sterilization.

One of the 16 members of the IOM committee, Dr. Anthony LoSasso, a Professor at the University of Illinois at Chicago School of Public Health, wrote a formal dissenting opinion. He argued that the IOM committee did not have sufficient time to evaluate fully the evidence on whether the use of preventive services beyond those encompassed by the United States Preventive Services Task Force (USPSTF), HRSA's Bright Futures Project, and the Advisory Committee on Immunization Practices (ACIP) leads to lower rates of disability or disease and increased rates of well-being. He further argued that "the recommendations were made without high quality, systematic evidence of the preventive nature of the services considered," and that "the committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy." Dr. LoSasso also raised concerns that the committee did not have time to develop a framework for determining whether coverage of any given preventive service leads to a reduction in healthcare expenditure.[8] (IOM 2011 at 231–32.) In its response to Dr. LoSasso, the other 15 committee members stated, in part, that "At the first committee meeting, it was agreed that cost considerations were outside the scope of the charge, and that the committee should not attempt to duplicate the disparate review processes used by other bodies, such as the USPSTF, ACIP, and Bright Futures. HHS, with input from this committee, may consider other factors including cost in its development of coverage decisions."

### 2. HRSA's 2011 Guidelines and the Departments' Second Interim Final Rules

On August 1, 2011, HRSA released onto its Web site its Guidelines for women's preventive services, adopting the recommendations of the IOM *https://www.hrsa.gov/ womensguidelines/*. The Guidelines included coverage for all FDA-approved contraceptives, sterilization procedures, and related patient education and counseling for women with reproductive capacity, as prescribed by a health care provider.

[8] The Departments do not relay these dissenting remarks as an endorsement of the remarks, but to describe the history of the Guidelines, which includes this part of the report that IOM provided to HRSA.

In administering this Mandate, on August 1, 2011, the Departments promulgated interim final rules amending our 2010 interim final rules (76 FR 46621) (2011 interim final rules). The 2011 interim final rules specify that HRSA has the authority to establish exemptions from the contraceptive coverage requirement for certain group health plans established or maintained by certain religious employers and for health insurance coverage provided in connection with such plans.[9] The 2011 interim final rules defined an exempt "religious employer" narrowly as one that: (1) Had the inculcation of religious values as its purpose; (2) primarily employed persons who shared its religious tenets; (3) primarily served persons who shared its religious tenets; and (4) was a nonprofit organization, as described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Those relevant sections of the Code include only churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of a religious order. The practical effect of the rules' definition of "religious employer" was to create potential uncertainty about whether employers, including many of those houses of worship or their integrated auxiliaries, would fail to qualify for the exemption if they engaged in outreach activities toward persons who did not share their religious tenets.[10] As the basis for adopting that limited definition of religious employer, the 2011 interim final rules stated that they relied on the laws of some "States that exempt certain religious employers from having to comply with State law requirements to cover contraceptive services." (76 FR 46623). That same day, HRSA exercised the discretion described in the 2011 interim final rules to provide the exemption.

### 3. The Departments' Subsequent Rulemaking on the Accommodation and Third Interim Final Rules

Final regulations issued on February 10, 2012, adopted the definition of "religious employer" in the 2011 interim final rules without modification (2012 final regulations).[11] (77 FR 8725). The exemption did not require religious

[9] The 2011 amended interim final rules were issued and effective on August 1, 2011, and published in the **Federal Register** on August 3, 2011 (76 FR 46621).

[10] See, for example, Comments of the United States Conference of Catholic Bishops on Interim Final Rules on Preventive Services, File Code CMS–9992–IFC2 (Aug. 31, 2011).

[11] The 2012 final regulations were published on February 15, 2012 (77 FR 8725).

employers to file any certification form or comply with any other information collection process.

Contemporaneous with the issuance of the 2012 final regulations, HHS—with the agreement of the Department of Labor (DOL) and the Department of the Treasury—issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments with respect to group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and the group health insurance coverage provided in connection with such plans).[12] The guidance provided that the temporary safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013. The temporary safe harbor did not apply to for-profit entities. The Departments stated that, during the temporary safe harbor, the Departments would engage in rulemaking to achieve "two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, nonprofit organizations' religious objections to covering contraceptive services." (77 FR 8727).

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described possible approaches to achieve those goals with respect to religious nonprofit organizations, and solicited public comments on the same. (77 FR 16501). Following review of the comments on the ANPRM, the Departments published proposed regulations on February 6, 2013 (2013 NPRM) (78 FR 8456).

The 2013 NPRM proposed to expand the definition of "religious employer" for purposes of the religious employer

[12] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012. Available at: *http:// www.lb7.uscourts.gov/documents/12cv3932.pdf*. The guidance, as reissued on August 15, 2012, clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to insured student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. See final rule entitled "Student Health Insurance Coverage" published March 21, 2012 (77 FR 16457).

exemption. Specifically, it proposed to require only that the religious employer be organized and operate as a nonprofit entity and be referred to in section 6033(a)(3)(A)(i) or (iii) of the Code, eliminating the requirements that a religious employer (1) have the inculcation of religious values as its purpose, (2) primarily employ persons who share its religious tenets, and (3) primarily serve persons who share its religious tenets.

The 2013 NPRM also proposed to create a compliance process, which it called an accommodation, for group health plans established, maintained, or arranged by certain eligible religious nonprofit organizations that fell outside the houses of worship and integrated auxiliaries covered by section 6033(a)(3)(A)(i) or (iii) of the Code (and, thus, outside of the religious employer exemption). The 2013 NPRM proposed to define such eligible organizations as nonprofit entities that hold themselves out as religious, oppose providing coverage for certain contraceptive items on account of religious objections, and maintain a certification to this effect in their records. The 2013 NPRM stated, without citing a supporting source, that employees of eligible organizations "may be less likely than" employees of exempt houses of worship and integrated auxiliaries to share their employer's faith and opposition to contraception on religious grounds. (78 FR 8461). The 2013 NPRM therefore proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries enrolled in the eligible organization's plan—and without any cost to the eligible organization.[13] In the case of a self-insured group health plan established or maintained by an eligible organization, the 2013 NPRM presented potential approaches under which the third party administrator of the plan would provide or arrange for contraceptive coverage to plan participants and beneficiaries.

On August 15, 2012, the Departments also extended our temporary safe harbor until the first plan year beginning on or after August 1, 2013.

The Departments published final regulations on July 2, 2013 (July 2013 final regulations) (78 FR 39869). The July 2013 final regulations finalized the expansion of the exemption for houses of worship and their integrated auxiliaries. Although some commenters had suggested that the exemption be further expanded, the Departments declined to adopt that approach. The July 2013 regulations stated that, because employees of objecting houses of worship and integrated auxiliaries are relatively likely to oppose contraception, exempting those organizations "does not undermine the governmental interests furthered by the contraceptive coverage requirement." (78 FR 39874). But, like the 2013 NPRM, the July 2013 regulations assumed that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection" to contraceptives (Id.).

The July 2013 regulations also finalized an accommodation for eligible organizations. Under the accommodation, an eligible organization was required to submit a self-certification to its group health insurance issuer or third party administrator, as applicable. Upon receiving that self-certification, the issuer or third party administrator would provide or arrange for payments for the contraceptive services to the plan participants and beneficiaries enrolled in the eligible organization's plan, without requiring any cost sharing on the part of plan participants and beneficiaries and without cost to the eligible organization. With respect to self-insured plans, the third party administrators (or issuers they contracted with) could receive reimbursements by reducing user fee payments (to Federally facilitated Exchanges) by the amounts paid out for contraceptive services under the accommodation, plus an allowance for certain administrative costs, as long as the Secretary of the Department of Health and Human Services requests and an authorizing exception under OMB Circular No. A–25R is in effect.[14] With respect to fully insured group health plans, the issuer was expected to

bear the cost of such payments,[15] and HHS intended to clarify in guidance that the issuer could treat those payments as an adjustment to claims costs for purposes of medical loss ratio and risk corridor program calculations.

With respect to self-insured group health plans, the July 2013 final regulations specified that the self-certification was an instrument under which the plan was operated and that it obligated the third party administrator to provide or arrange for contraceptive coverage by operation of section 3(16) of ERISA. The regulations stated that, by submitting the self-certification form, the eligible organization "complies" with the contraceptive coverage requirement and does not have to contract, arrange, pay, or refer for contraceptive coverage. See, for example, Id. at 39874, 39896. Consistent with these statements, the Departments, through the Department of Labor, issued a self-certification form, EBSA Form 700. The form stated, in indented text labeled as a "Notice to Third Party Administrators of Self-Insured Health Plans," that "[t]he obligations of the third party administrator are set forth in 26 CFR 54.9815–2713A, 29 CFR 2510.3–16, and 29 CFR 2590.715–2713A" and concluded, in unindented text, that "[t]his form is an instrument under which the plan is operated."

The Departments extended the temporary safe harbor again on June 20, 2013, to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. The guidance extending the safe harbor included a form to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary safe harbor if no prior form had been submitted.

### 4. Litigation Over the Mandate and the Accommodation Process

During the period when the Departments were publishing and modifying our regulations, organizations and individuals filed dozens of lawsuits challenging the Mandate. Plaintiffs included religious nonprofit organizations, businesses run by religious families, individuals, and others. Religious plaintiffs principally argued that the Mandate violated the Religious Freedom Restoration Act of 1993 (RFRA) by forcing them to provide coverage or payments for sterilization and contraceptive services, including what they viewed as early abortifacient items, contrary to their religious beliefs. Based on this claim, in July 2012 a

---

[13] The NPRM proposed to treat student health insurance coverage arranged by eligible organizations that are institutions of higher education in a similar manner.

[14] See also 45 CFR 156.50. Under the regulations, if the third party administrator does not participate in a Federally facilitated Exchange as an issuer, it is permitted to contract with an issuer which does so participate, in order to obtain such reimbursement. The total contraceptive user fee adjustment for the 2015 benefit year was $33 million.

[15] "[P]roviding payments for contraceptive services is cost neutral for issuers." (78 FR 39877).

Exhibit 4 — JA511 — JA-0000102

Federal district court issued a preliminary injunction barring the Departments from enforcing the Mandate against a family-owned business. *Newland* v. *Sebelius*, 881 F. Supp. 2d 1287 (D. Colo. 2012). Multiple other courts proceeded to issue similar injunctions against the Mandate, although a minority of courts ruled in the Departments' favor. *Compare Tyndale House Publishers, Inc.* v. *Sebelius*, 904 F. Supp. 2d 106 (D.D.C. 2012), and *The Seneca Hardwood Lumber Company, Inc.* v. *Sebelius* (sub nom *Geneva Coll.* v. *Sebelius*), 941 F. Supp. 2d 672 (W.D. Pa. 2013), with *O'Brien* v. *U.S. Dep't of Health & Human Servs.*, 894 F. Supp. 2d 1149 (E.D. Mo. 2012).

A circuit split swiftly developed in cases filed by religiously motivated for-profit businesses, to which neither the religious employer exemption nor the eligible organization accommodation (as then promulgated) applied. Several for-profit businesses won rulings against the Mandate before the Unites States Court of Appeals for the Tenth Circuit, sitting en banc, while similar rulings against the Departments were issued by the Seventh and District of Columbia (DC) Circuits. *Hobby Lobby Stores, Inc.* v. *Sebelius*, 723 F.3d 1114 (10th Cir. 2013); *Korte* v. *Sebelius*, 735 F.3d 654 (7th Cir. 2013); *Gilardi* v. *U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208 (D.C. Cir. 2013). The Third and Sixth Circuits disagreed with similar plaintiffs, and in November 2013 the U.S. Supreme Court granted certiorari in *Hobby Lobby* and *Conestoga Wood Specialties Corp.* v. *Secretary of U.S. Department of Health & Human Services*. 724 F.3d 377 (3d Cir. 2013), to resolve the circuit split.

On June 30, 2014, the Supreme Court ruled against the Departments and held that, under RFRA, the Mandate could not be applied to the closely held for-profit companies before the Court because their owners had religious objections to providing such coverage.[16] *Burwell* v. *Hobby Lobby Stores, Inc.* 134 S. Ct. 2751 (2014). The Court held that the "contraceptive mandate 'substantially burdens' the exercise of religion" as applied to employers that object to providing contraceptive coverage on religious grounds, and that the plaintiffs were therefore entitled to an exemption unless the Mandate was the least restrictive means of furthering a compelling governmental interest. *Id.* at 2775. The Court observed that, under

the compelling interest test of RFRA, the Departments could not rely on interests "couched in very broad terms, such as promoting 'public health' and 'gender equality,' but rather, had to demonstrate that a compelling interest was served by refusing an exemption to the "particular claimant[s]" seeking an exemption. *Id.* at 2779. Assuming without deciding that a compelling interest existed, the Court held that the Government's goal of guaranteeing coverage for contraceptive methods without cost sharing could be achieved in a less restrictive manner. The Court observed that "[t]he most straightforward way of doing this would be for the Government to assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Id.* at 2780. The Court also observed that the Departments had "not provided any estimate of the average cost per employee of providing access to these contraceptives," nor "any statistics regarding the number of employees who might be affected because they work for corporations like Hobby Lobby, Conestoga, and Mardel". *Id.* at 2780–81. But the Court ultimately concluded that it "need not rely on the option of a new, government-funded program in order to conclude that the HHS regulations fail the least-restrictive means test" because "HHS itself ha[d] demonstrated that it ha[d] at its disposal an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs." *Id.* at 2781–82. The Court explained that the "already established" accommodation process available to nonprofit organizations was a less-restrictive alternative that "serve[d] HHS's stated interests equally well," although the Court emphasized that its ruling did not decide whether the accommodation process "complie[d] with RFRA for purposes of all religious claims". *Id.* at 2788–82.

Meanwhile, another plaintiff obtained temporary relief from the Supreme Court in a case challenging the accommodation under RFRA. Wheaton College, a Christian liberal arts college in Illinois, objected that the accommodation was a compliance process that rendered it complicit in delivering payments for abortifacient contraceptive services to its employees. Wheaton College refused to execute the EBSA Form 700 required under the July 2013 final regulations. It was denied a preliminary injunction in the Federal district and appellate courts, and sought an emergency injunction pending

appeal from the Unites States Supreme Court on June 30, 2014. On July 3, 2014, the Supreme Court issued an interim order in favor of the College, stating that, "[i]f the [plaintiff] informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the [Departments of Labor, Health and Human Services, and the Treasury] are enjoined from enforcing [the Mandate] against the [plaintiff] . . . pending final disposition of appellate review." *Wheaton College* v. *Burwell*. 134 S. Ct. 2806, 2807 (2014). The order stated that Wheaton College did not need to use EBSA Form 700 or send a copy of the executed form to its health insurance issuers or third party administrators to meet the condition for injunctive relief. *Id.*

In response to this litigation, on August 27, 2014, the Departments simultaneously issued a third set of interim final rules (August 2014 interim final rules) (79 FR 51092), and a notice of proposed rulemaking (August 2014 proposed rules) (79 FR 51118). The August 2014 interim final rules changed the accommodation process so that it could be initiated either by self-certification using EBSA Form 700 or through a notice informing the Secretary of the Department of Health and Human Services that an eligible organization had religious objections to coverage of all or a subset of contraceptive services. (79 FR 51092). In response to *Hobby Lobby*, the August 2014 proposed rules extended the accommodation process to closely held for-profit entities with religious objections to contraceptive coverage, by including them in the definition of eligible organizations. (79 FR 51118). Neither the August 2014 interim final rules nor the August 2014 proposed rules extended the exemption, and neither added a certification requirement for exempt entities.

In October 2014, based on an interpretation of the Supreme Court's interim order, HHS deemed Wheaton College as having submitted a sufficient notice to HHS. HHS conveyed that interpretation to the DOL, so as to trigger the accommodation process.

On July 14, 2015, the Departments finalized both the August 2014 interim final rules and the August 2014 proposed rules in a set of final regulations (the July 2015 final regulations) (80 FR 41318). (The July 2015 final regulations also encompassed issues related to other preventive services coverage.) The preamble to the July 2015 final regulations stated that, through the accommodation, payments

---

[16] The Supreme Court did not decide whether RFRA would apply to publicly traded for-profit corporations. See 134 S. Ct. at 2774.

Exhibit 4

JA512

JA-0000103

for contraceptives and sterilization would be provided in a way that is "seamless" with the coverage that eligible employers provide to their plan participants and beneficiaries. *Id.* at 41328. The July 2015 final regulations allowed eligible organizations to submit a notice to HHS as an alternative to submitting the EBSA Form 700, but specified that such notice must include the eligible organization's name and an expression of its religious objection, along with the plan name, plan type, and name and contact information for any of the plan's third party administrators or health insurance issuers. The Departments indicated that such information represents the minimum information necessary for us to administer the accommodation process.

When an eligible organization maintains an insured group health plan or student health plan and provides the alternative notice, the July 2015 final regulations provide that HHS will inform the health insurance issuer of its obligations to cover contraceptive services to which the eligible organization objects. Where an eligible organization maintains a self-insured plan under ERISA and provides the alternative notice, the regulations provide that DOL will work with HHS to send a separate notification to the self-insured plan's third party administrator(s). The regulations further provide that such notification is an instrument under which the plan is operated for the purposes of section 3(16) of ERISA, and the instrument would designate the third party administrator as the entity obligated to provide or arrange for payments for contraceptives to which the eligible organization objects. The July 2015 final regulations continue to apply the amended notice requirement to eligible organizations that sponsor church plans exempt from ERISA pursuant to section 4(b)(2) of ERISA, but acknowledge that, with respect to the operation of the accommodation process, section 3(16) of ERISA does not provide a mechanism to impose an obligation to provide contraceptive coverage as a plan administrator on those eligible organizations' third party administrators. (80 FR 41323).

Meanwhile, a second split among Federal appeals courts had developed involving challenges to the Mandate's accommodation. Many religious nonprofit organizations argued that the accommodation impermissibly burdened their religious beliefs because it utilized the plans the organizations themselves sponsored to provide services to which they objected on religious grounds. They objected to the self-certification requirement on the same basis. Federal district courts split in the cases, granting preliminary injunction motions to religious groups in the majority of cases, but denying them to others. In most appellate cases, religious nonprofit organizations lost their challenges, where the courts often concluded that the accommodation imposed no substantial burden on their religious exercise under RFRA. For example, *Priests for Life* v. *U.S. Dep't of Health and Human Servs.,* 772 F. 3d 229 (D.C. Cir. 2014); *Little Sisters of the Poor Home for the Aged* v. *Burwell,* 794 F.3d 1151 (10th Cir. 2015); *Geneva Coll.* v. *Sec'y U.S. Dep't of Health & Human Servs.,* 778 F.3d 422 (3d Cir. 2015). But the Eighth Circuit disagreed and ruled in favor of religious nonprofit employers. *Dordt College* v. *Burwell,* 801 F.3d 946, 949–50 (8th Cir. 2015) (relying on *Sharpe Holdings, Inc.* v. *U.S. Dep't of Health & Human Servs.,* 801 F.3d 927 (8th Cir. 2015)).

On November 6, 2015, the U.S. Supreme Court granted certiorari in seven similar cases under the title of a filing from the Third Circuit, *Zubik* v. *Burwell.* The Court held oral argument on March 23, 2016, and, after the argument, asked the parties to submit supplemental briefs addressing "whether and how contraceptive coverage may be obtained by petitioners' employees through petitioners' insurance companies, but in a way that does not require any involvement of petitioners beyond their own decision to provide health insurance without contraceptive coverage to their employees". In a brief filed with the Supreme Court on April 12, 2016, the Government stated on behalf of the Departments that the accommodation process for eligible organizations with insured plans could operate without any self-certification or written notice being submitted by eligible organizations.

On May 16, 2016, the Supreme Court issued a per curiam opinion in *Zubik,* vacating the judgments of the Courts of Appeals and remanding the cases "in light of the substantial clarification and refinement in the positions of the parties" in their supplemental briefs. (136 S. Ct. 1557, 1560 (2016).) The Court stated that it anticipated that, on remand, the Courts of Appeals would "allow the parties sufficient time to resolve any outstanding issues between them." *Id.* The Court also specified that "the Government may not impose taxes or penalties on petitioners for failure to provide the relevant notice" while the cases remained pending. *Id.* at 1561.

After remand, as indicated by the Departments in court filings, some meetings were held between attorneys for the Government and for the plaintiffs in those cases. Separately, at various times after the Supreme Court's remand order, HHS and DOL sent letters to the issuers and third party administrators of certain plaintiffs in *Zubik* and other pending cases, directing the issuers and third party administrators to provide contraceptive coverage for participants in those plaintiffs' group health plans under the accommodation. The Departments also issued a Request for Information (RFI) on July 26, 2016, seeking public comment on options for modifying the accommodation process in light of the supplemental briefing in *Zubik* and the Supreme Court's remand order. (81 FR 47741). Public comments were submitted in response to the RFI during a comment period that closed on September 20, 2016.

On December 20, 2016, HRSA updated the Guidelines via its Web site, *https://www.hrsa.gov/ womensguidelines2016/index.html.* HRSA announced that, for plans subject to the Guidelines, the updated Guidelines would apply to the first plan year beginning after December 20, 2017. Among other changes, the updated Guidelines specified that the required contraceptive coverage includes follow-up care (for example, management and evaluation, as well as changes to, and removal or discontinuation of, the contraceptive method). They also specified that coverage would include instruction in fertility awareness-based methods for women desiring an alternative method of family planning. HRSA stated that, with the input of a committee operating under a cooperative agreement, HRSA would review and periodically update the Women's Preventive Services' Guidelines. The updated Guidelines did not alter the religious employer exemption or accommodation process.

On January 9, 2017, the Departments issued a document entitled, "FAQs About Affordable Care Act Implementation Part 36" (FAQ).[17] The FAQ stated that, after reviewing comments submitted in response to the 2016 RFI and considering various options, the Departments could not find a way at that time to amend the accommodation so as to satisfy objecting eligible organizations while pursuing the Departments' policy goals. Thus, the

---

[17] Available at: *https://www.dol.gov/sites/default/ files/ebsa/about-ebsa/our-activities/resource-center/ faqs/aca-part-36.pdf* and *https://www.cms.gov/ CCIIO/Resources/Fact-Sheets-and-FAQs/ Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf.*

Exhibit 4     JA513     JA-0000104

litigation on remand from the Supreme Court remains unresolved.

A separate category of unresolved litigation involved religious employees as plaintiffs. For example, in two cases, the plaintiff-employees work for a nonprofit organization that agrees with the employees (on moral grounds) in opposing coverage of certain contraceptives they believe to be abortifacient, and that is willing to offer them insurance coverage that omits such services. See *March for Life* v. *Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015); *Real Alternatives*, 150 F. Supp. 3d 419, *affirmed by* 867 F.3d 338 (3d Cir. 2017). In another case, the plaintiff-employees work for a State government entity that the employees claim is willing, under State law, to provide a plan omitting contraception consistent with the employees' religious beliefs. See *Wieland* v. *HHS*, 196 F. Supp. 3d 1010 (E.D. Mo. 2016). Those and similar employee-plaintiffs generally contend that the Mandate violates their rights under RFRA by making it impossible for them to obtain health insurance consistent with their religious beliefs, either from their willing employer or in the individual market, because the Departments offer no exemptions encompassing either circumstance. Such challenges have seen mixed success. Compare, for example, *Wieland*, 196 F. Supp. 3d at 1020 (concluding that the Mandate violates the employee plaintiffs' rights under RFRA and permanently enjoining the Departments) and *March for Life*, 128 F. Supp. 3d at 133–34 (same), with *Real Alternatives*, 2017 WL 3324690 at *18 (affirming dismissal of employee plaintiffs' RFRA claim).

On May 4, 2017, the President issued an "Executive Order Promoting Free Speech and Religious Liberty." Regarding "Conscience Protections with Respect to Preventive-Care Mandate," that order instructs "[t]he Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services [to] consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg–13(a)(4) of title 42, United States Code."

## II. RFRA and Government Interests Underlying the Mandate

RFRA provides that the Government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. 2000bb–1(a) and (b). In *Hobby Lobby*, the Supreme Court had "little trouble concluding" that, in the absence of an accommodation or exemption, "the HHS contraceptive mandate 'substantially burden[s]' the exercise of religion. 42 U.S.C. 2000bb–1(a)." 134 S. Ct. at 2775. And although the Supreme Court did not resolve the RFRA claims presented in *Zubik* on their merits, it instructed the parties to consider alternative accommodations for the objecting plaintiffs, after the Government suggested that such alternatives might be possible.

Despite multiple rounds of rulemaking, however, the Departments have not assuaged the sincere religious objections to contraceptive coverage of numerous organizations, nor have we resolved the pending litigation. To the contrary, the Departments have been litigating RFRA challenges to the Mandate and related regulations for more than 5 years, and dozens of those challenges remain pending today. That litigation, and the related modifications to the accommodation, have consumed substantial governmental resources while creating uncertainty for objecting organizations, issuers, third party administrators, employees, and beneficiaries. Consistent with the President's Executive Order and the Government's desire to resolve the pending litigation and prevent future litigation from similar plaintiffs, the Departments have concluded that it is appropriate to reexamine the exemption and accommodation scheme currently in place for the Mandate.

These interim final rules (and the companion interim final rules published elsewhere in this **Federal Register**) are the result of that reexamination. The Departments acknowledge that coverage of contraception is an important and highly sensitive issue, implicating many different views, as reflected in the comments received on multiple rulemakings over the course of implementation of section 2713(a)(4) of the PHS Act. After reconsidering the interests served by the Mandate in this particular context, the objections raised, and the applicable Federal law, the Departments have determined that an expanded exemption, rather than the existing accommodation, is the most appropriate administrative response to the religious objections raised by certain entities and organizations concerning the Mandate. The Departments have accordingly decided to revise the regulations channeling HRSA authority

under section 2713(a)(4) of the PHS to provide an exemption from the Mandate to a broader range of entities and individuals that object to contraceptive coverage on religious grounds, while continuing to offer the existing accommodation as an optional alternative. The Departments have also decided to create a process by which a willing employer and issuer may allow an objecting individual employee to obtain health coverage without contraceptive coverage. These interim final rules leave unchanged HRSA's authority to decide whether to include contraceptives in the women's preventive services Guidelines for entities that are not exempted by law, regulation, or the Guidelines. These rules also do not change the many other mechanisms by which the Government advances contraceptive coverage, particularly for low-income women.

In addition to relying on the text of section 2713(a)(4) of the PHS Act and the Departments' discretion to promulgate rules to carry out the provisions of the PHS Act, the Departments also draw on Congress' decision in the Affordable Care Act neither to specify that contraception must be covered nor to require inflexible across-the-board application of section 2713 of the PHS Act. The Departments further consider Congress' extensive history of protecting religious objections when certain matters in health care are specifically regulated—often specifically with respect to contraception, sterilization, abortion, and activities connected to abortion.

Notable among the many statutes (listed in footnote 1 in Section I-Background) that include protections for religious beliefs are, not only the Church Amendments, but also protections for health plans or health care organizations in Medicaid or Medicare Advantage to object "on moral or religious grounds" to providing coverage of certain counseling or referral services. (42 U.S.C. 1395w–22(j)(3)(B); 42 U.S.C. 1396u–2(b)(3)). In addition, Congress has protected individuals who object to prescribing or providing contraceptives contrary to their religious beliefs. Consolidated Appropriations Act of 2017, Division C, Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act), Public Law 115–31 (May 5, 2017). Congress likewise provided that, if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for

Exhibit 4

JA514

JA-0000105

religious beliefs and moral convictions''. *Id.* at Division C, Title VIII. Sec. 808. In light of the fact that Congress did not require HRSA to include contraception in Guidelines issued under section 2713 of the PHS Act. we consider it significant, in support of the implementation of those Guidelines by the expanded exemption in these interim final rules, that Congress' most recent statement on the prospect of Government mandated contraceptive coverage was to express the specific intent that a conscience clause be provided and that it should protect religious beliefs.

The Departments' authority to guide HRSA's discretion in determining the scope of any contraceptive coverage requirement under section 2713(a)(4) of the PHS Act includes the authority to provide exemptions and independently justifies this rulemaking. The Departments have also determined that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance violates their rights under RFRA.

### A. Elements of RFRA

#### 1. Substantial Burden

The Departments believe that agencies charged with administering a statute or associated regulations or guidance that imposes a substantial burden on the exercise of religion under RFRA have discretion in determining how to avoid the imposition of such burden. The Departments have previously contended that the Mandate does not impose a substantial burden on entities and individuals. With respect to the coverage Mandate itself, apart from the accommodation, and as applied to entities with religious objections, our argument was rejected in *Hobby Lobby*, which held that the Mandate imposes a substantial burden. (134 S. Ct. at 2775–79.) With respect to whether the Mandate imposes a substantial burden on entities that may choose the accommodation, but must choose between the accommodation, the Mandate, or penalties for noncompliance, a majority of Federal appeals courts have held that the accommodation does not impose a substantial burden on such entities (mostly religious nonprofit entities).

The Departments have reevaluated our position on this question, however, in light of all the arguments made in various cases, public comments that have been submitted, and the concerns discussed throughout these rules. We have concluded that requiring certain objecting entities or individuals to

choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA. We believe that the Court's analysis in *Hobby Lobby* extends, for the purposes of analyzing a substantial burden, to the burdens that an entity faces when it religiously opposes participating in the accommodation process or the straightforward Mandate, and is subject to penalties or disadvantages that apply in this context if it chooses neither. As the Eighth Circuit stated in *Sharpe Holdings*, "[i]n light of [nonprofit religious organizations'] sincerely held religious beliefs, we conclude that compelling their participation in the accommodation process by threat of severe monetary penalty is a substantial burden on their exercise of religion. . . . That they themselves do not have to arrange or pay for objectionable contraceptive coverage is not determinative of whether the required or forbidden act is or is not religiously offensive''. (801 F.3d at 942.)

Our reconsideration of these issues has also led us to conclude, consistent with the rulings in favor of religious employee plaintiffs in *Wieland* and *March for Life* cited above, that the Mandate imposes a substantial burden on the religious beliefs of individual employees who oppose contraceptive coverage and would be able to obtain a plan that omits contraception from a willing employer or issuer (as applicable), but cannot obtain one solely because of the Mandate's prohibition on that employer and/or issuer providing them with such a plan.

Consistent with our conclusion earlier this year after the remand of cases in *Zubik* and our reviewing of comments submitted in response to the 2016 RFI, the Departments believe there is not a way to satisfy all religious objections by amending the accommodation. Accordingly, the Departments have decided it is necessary and appropriate to provide the expanded exemptions set forth herein.

#### 2. Compelling Interest

Although the Departments previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest, the Departments have now concluded, after reassessing the relevant interests and for the reasons stated below, that it does not. Under such circumstances, the Departments are required by law to alleviate the substantial burden created by the Mandate. Here, informed by the Departments' reassessment of the

relevant interests. as well as by our desire to bring to a close the more than 5 years of litigation over RFRA challenges to the Mandate, the Departments have determined that the appropriate administrative response is to create a broader exemption, rather than simply adjusting the accommodation process.

RFRA requires the Government to respect religious beliefs under ''the most demanding test known to constitutional law'': Where the Government imposes a substantial burden on religious exercise. it must demonstrate a compelling governmental interest and show that the law or requirement is the least restrictive means of furthering that interest. *City of Boerne* v. *Flores,* 521 U.S. 507, 534 (1997). For an interest to be compelling, its rank must be of the ''highest order''. *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah,* 508 U.S. 520, 546 (1993); see also *Sherbert* v. *Verner.* 374 U.S. 398, 406–09 (1963); *Wisconsin* v. *Yoder,* 406 U.S. 205, 221–29 (1972). In applying RFRA, the Supreme Court has ''looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants.'' *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 431 (2006). To justify a substantial burden on religious exercise under RFRA, the Government must show it has a compelling interest in applying the requirement to the ''particular claimant[s] whose sincere exercise of religion is being substantially burdened.'' *Id.* at 430–31. Moreover, the Government must meet the ''exceptionally demanding'' least-restrictive-means standard. *Hobby Lobby.* 134 S. Ct. at 2780. Under that standard, the Government must establish that ''it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties.'' *Id.*

Upon further examination of the relevant provisions of the Affordable Care Act and the administrative record on which the Mandate was based, the Departments have concluded that the application of the Mandate to entities with sincerely held religious objections to it does not serve a compelling governmental interest. The Departments have reached that conclusion for multiple reasons, no one of which is dispositive.

First. Congress did not mandate that contraception be covered at all under the Affordable Care Act. Instead, Congress merely provided for coverage

of "such additional preventive care and screenings" for women "provided for in comprehensive guidelines supported by [HRSA]." Congress, thus, left the identification of any additional required preventive services for women to administrative discretion. The fact that Congress granted the Departments the authority to promulgate all rules appropriate and necessary for the administration of the relevant provisions of the Code, ERISA, and the PHS Act, including by channeling the discretion Congress afforded to HRSA to decide whether to require contraceptive coverage, indicates that the Departments' judgment should carry particular weight in considering the relative importance of the Government's interest in applying the Mandate to the narrow population of entities exempted in these rules.

Second, while Congress specified that many health insurance requirements added by the Affordable Care Act—including provisions adjacent to section 2713 of the PHS Act—were so important that they needed to be applied to all health plans immediately, the preventive services requirement in section 2713 of the PHS Act was not made applicable to "grandfathered plans." That feature of the Affordable Care Act is significant: As cited above, seven years after the Affordable Care Act's enactment, approximately 25.5 million people are estimated to be enrolled in grandfathered plans not subject to section 2713 of the PHS Act. We do not suggest that a requirement that is inapplicable to grandfathered plans or otherwise subject to exceptions could never qualify as a serving a compelling interest under RFRA. For example, "[e]ven a compelling interest may be outweighed in some circumstances by another even weightier consideration." *Hobby Lobby*, 134 S. Ct. at 2780. But Congress' decision not to apply section 2713 of the PHS Act to grandfathered plans, while deeming other requirements closely associated in the same statute as sufficiently important to impose immediately, is relevant to our assessment of the importance of the Government interests served by the Mandate. As the Departments observed in 2010, those immediately applicable requirements were "particularly significant." (75 FR 34540). Congress' decision to leave section 2713 out of that category informs the Departments' assessment of the weight of the Government's interest in applying the Guidelines issued pursuant to section 2713 of the PHS Act to religious objectors.

Third, various entities that brought legal challenges to the Mandate (including some of the largest employers) have been willing to provide coverage of some, though not all, contraceptives. For example, the plaintiffs in *Hobby Lobby* were willing to provide coverage with no cost sharing of 14 of 18 FDA-approved women's contraceptive and sterilization methods. (134 S. Ct. at 2766.) With respect to organizations and entities holding those beliefs, the fact that they are willing to provide coverage for various contraceptive methods significantly detracts from the government interest in requiring that they provide coverage for other contraceptive methods to which they object.

Fourth, the case for a compelling interest is undermined by the existing accommodation process, and how it applies to certain similarly situated entities based on whether or not they participate in certain self-insured group health plans, known as church plans, under applicable law. The Departments previously exempted eligible organizations from the contraceptive coverage requirement, and created an accommodation under which those organizations bore no obligation to provide for such coverage after submitting a self-certification or notice. Where a non-exempt religious organization uses an insured group health plan instead of a self-insured church plan, the health insurance issuer would be obliged to provide contraceptive coverage or payments to the plan's participants under the accommodation. Even in a self-insured church plan context, the preventive services requirement in section 2713(a)(4) of the PHS Act applies to the plan, and through the Code, to the religious organization that sponsors the plan. But under the accommodation, once a self-insured church plan files a self-certification or notice, the accommodation relieves it of any further obligation with respect to contraceptive services coverage. Having done so, the accommodation process would normally transfer the obligation to provide or arrange for contraceptive coverage to a self-insured plan's third party administrator (TPA). But the Departments lack authority to compel church plan TPAs to provide contraceptive coverage or levy fines against those TPAs for failing to provide it. This is because church plans are exempt from ERISA pursuant to section 4(b)(2) of ERISA. Section 2761(a) of the PHS Act provides that States may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers,

but not as they pertain to church plans that do not provide coverage through a policy issued by a health insurance issuer. The combined result of PHS Act section 2713's authority to remove contraceptive coverage obligations from self-insured church plans, and HHS's and DOL's lack of authority under the PHS Act or ERISA to require TPAs to become administrators of those plans to provide such coverage, has led to significant incongruity in the requirement to provide contraceptive coverage among nonprofit organizations with religious objections to the coverage.

More specifically, issuers and third party administrators for some, but not all, religious nonprofit organizations are subject to enforcement for failure to provide contraceptive coverage under the accommodation, depending on whether they participate in a self-insured church plan. Notably, many of those nonprofit organizations are not houses of worship or integrated auxiliaries. Under section 3(33)(C)(iv) of ERISA, many organizations in self-insured church plans need not be churches, but can merely "share[] common religious bonds and convictions with [a] church or convention or association of churches". The effect is that many similar religious organizations are being treated very differently with respect to their employees receiving contraceptive coverage—depending on whether the organization is part of a church plan—even though the Departments claimed a compelling interest to deny exemptions to all such organizations. In this context, the fact that the Mandate and the Departments' application thereof "leaves appreciable damage to [their] supposedly vital interest unprohibited" is strong evidence that the Mandate "cannot be regarded as protecting an interest 'of the highest order.'" *Lukumi*, 508 U.S. at 520 (citation and quotation marks omitted).

Fifth, the Departments' previous assertion that the exemption for houses of worship was offered to respect a certain sphere of church autonomy (80 FR 41325) does not adequately explain some of the disparate results of the existing rules. And the desire to respect church autonomy is not grounds to prevent the Departments from expanding the exemption to other religious entities. The Departments previously treated religious organizations that operate in a similar fashion very differently for the purposes of the Mandate. For example, the Departments exempted houses of worship and integrated auxiliaries that may conduct activities, such as the

Exhibit 4                    JA516                    JA-0000107

operating of schools, that are also conducted by non-exempt religious nonprofit organizations. Likewise, among religious nonprofit groups that were not exempt as houses of worship or integrated auxiliaries, many operate their religious activities similarly even if they differ in whether they participate in self-insured church plans. As another example, two religious colleges might have the same level of religiosity and commitment to defined ideals, but one might identify with a specific large denomination and choose to be in a self-insured church plan offered by that denomination, while another might not be so associated or might not have as ready access to a church plan and so might offer its employees a fully insured health plan. Under the accommodation, employees of the college using a fully insured plan (or a self-insured plan that is not a church plan) would receive coverage of contraceptive services without cost sharing, while employees of the college participating in the self-insured church plan would not receive the coverage where that plan required its third party administrator to not offer the coverage.

As the Supreme Court recently confirmed, a self-insured church plan exempt from ERISA through ERISA 3(33) can include a plan that is not actually established or maintained by a church or by a convention or association of churches, but is maintained by "an organization . . . the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches" (a so-called "principal-purpose organization"). See *Advocate Health Care Network* v. *Stapleton*, 137 S. Ct. 1652, 1656–57 (U.S. June 5, 2017); ERISA 3(33)(C). While the Departments take no view on the status of these particular plans, the Departments acknowledge that the church plan exemption not only includes some non-houses-of-worship as organizations whose employees can be covered by the plan, but also, in certain circumstances, may include plans that are not themselves established and maintained by houses of worship. Yet, such entities and plans—if they file a self-certification or notice through the existing accommodation—are relieved of obligations under the contraceptive Mandate and their third party administrators are not subject to a requirement that they provide contraceptive coverage to their plan participants and beneficiaries.

After considering the differential treatment of various religious nonprofit organizations under the previous accommodation, the Departments conclude that it is appropriate to expand the exemption to other religious nonprofit organizations with sincerely held religious beliefs opposed to contraceptive coverage. We also conclude that it is not appropriate to limit the scope of a religious exemption by relying upon a small minority of State laws that contain narrow exemptions that focus on houses of worship and integrated auxiliaries. (76 FR 46623.)

Sixth, the Government's interest in ensuring contraceptive coverage for employees of particular objecting employers is undermined by the characteristics of many of those employers, especially nonprofit employers. The plaintiffs challenging the existing accommodation include, among other organizations, religious colleges and universities, and religious orders that provide health care or other charitable services. Based in part on our experience litigating against such organizations, the Departments now disagree with our previous assertion that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection."[18] (78 FR 39874.) Although empirical data was not required to reach our previous conclusion, we note that the conclusion was not supported by any specific data or other source, but instead was intended to be a reasonable assumption. Nevertheless, in the litigation and in numerous public comments submitted throughout the regulatory processes described above, many religious nonprofit organizations have indicated that they possess deep religious commitments even if they are not houses of worship or their integrated auxiliaries. Some of the religious nonprofit groups challenging the accommodation claim that their employees are required to adhere to a statement of faith which includes the entities' views on certain contraceptive items.[19] The Departments recognize, of course, that not all of the plaintiffs challenging the accommodation require all of their employees (or covered students) to share their religious objections to contraceptives. At the same time, it has become apparent from public comments and from court filings in dozens of cases—encompassing hundreds of organizations—that many religious nonprofit organizations express their beliefs publicly and hold themselves out as organizations for whom their religious beliefs are vitally important. Employees of such organizations, even if not required to sign a statement of faith, often have access to, and knowledge of, the views of their employers on contraceptive coverage, whether through the organization's published mission statement or statement of beliefs, through employee benefits disclosures and other communications with employees and prospective employees, or through publicly filed lawsuits objecting to providing such coverage and attendant media coverage. In many cases, the employees of religious organizations will have chosen to work for those organizations with an understanding—explicit or implicit—that they were being employed to advance the organization's goals and to be respectful of the organization's beliefs even if they do not share all of those beliefs. Religious nonprofit organizations that engage in expressive activity generally have a First Amendment right of expressive association and religious free exercise to choose to hire persons (or, in the case of students, to admit them) based on whether they share, or at least will be respectful of, their beliefs.[20]

Given the sincerely held religious beliefs of many religious organizations, imposing the contraceptive-coverage requirement on those that object based on such beliefs might undermine the Government's broader interests in ensuring health coverage by causing the entities to stop providing health coverage. For example, because the Affordable Care Act does not require

---

[18] In changing its position, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy *are* better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[19] See, for example, *Geneva College* v. *Sebelius*, 929 F. Supp. 2d 402, 411 (W.D. Pa. 2013); *Grace Schools* v. *Sebelius*, 988 F. Supp. 2d 935, 943 (N.D. Ind. 2013); Comments of the Council for Christian Colleges & Universities, re: CMS–9968–P (filed Apr. 8, 2013) ("On behalf of [] 172 higher education institutions . . . a requirement for membership in the CCCU is that full-time administrators and faculty at our institutions share the Christian faith of the institution.").

[20] Notably, "the First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.'" *Boy Scouts of America* v. *Dale*, 530 U.S. 640, 655 (2000).

Exhibit 4

JA-0000108

institutions of higher education to arrange student coverage, some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student plans rather than comply with the Mandate or be subject to the accommodation with respect to such populations.[21]

Seventh, we now believe the administrative record on which the Mandate rests is insufficient to meet the high threshold to establish a compelling governmental interest in ensuring that women covered by plans of objecting organizations receive cost-free contraceptive coverage through those plans. To begin, in support of the IOM's recommendations, which HRSA adopted, the IOM identified several studies showing a preventive services gap because women require more preventive care than men. (IOM 2011 at 19–21). Those studies did not identify contraceptives or sterilization as composing a specific portion of that gap, and the IOM did not consider or establish in the report whether any cost associated with that gap remains after all other women's preventive services are covered without cost-sharing. *Id.* Even without knowing what the empirical data would show about that gap, the coverage of the other women's preventive services required under both the HRSA Guidelines and throughout section 2713(a) of the PHS Act— including annual well-woman visits and a variety of tests, screenings, and counseling services—serves at a minimum to diminish the cost gap identified by IOM for women whose employers decline to cover some or all contraceptives on religious grounds.[22]

Moreover, there are multiple Federal, State, and local programs that provide free or subsidized contraceptives for low-income women. Such Federal programs include, among others, Medicaid (with a 90 percent Federal match for family planning services), Title X, community health center grants, and Temporary Assistance for Needy Families. According to the Guttmacher Institute, government-subsidized family planning services are provided at 8,409 health centers overall.[23] The Title X program, for example, administered by the HHS Office of Population Affairs (OPA), provides a wide variety of voluntary family planning information and services for clients based on their ability to pay, through a network that includes nearly 4,000 family planning centers. *http://www.hhs.gov/opa/title-x-family-planning/* Individuals with family incomes at or below the HHS poverty guideline (for 2017, $24,600 for a family of four in the 48 contiguous States and the District of Columbia) receive services at no charge unless a third party (governmental or private) is authorized or obligated to pay for these services. Individuals with incomes in excess of 100 percent up to 250 percent of the poverty guideline are charged for services using a sliding fee scale based on family size and income. Unemancipated minors seeking confidential services are assessed fees based on their own income level rather than their family's income. The availability of such programs to serve the most at-risk women (as defined in the IOM report) diminishes the Government's interest in applying the Mandate to objecting employers. Many forms of contraception are available for around $50 per month, including long-acting methods such as the birth control shot and intrauterine devices (IUDs).[24] Other, more permanent forms of contraception like implantables bear a higher one-time cost, but when calculated over the duration of use, cost a similar amount.[25] Various State programs supplement the Federal programs referenced above, and 28 States have their own mandates of contraceptive coverage as a matter of State law. This existing inter-governmental structure for obtaining contraceptives significantly diminishes the Government's interest in applying the Mandate to employers over their sincerely held religious objections.

The record also does not reflect that the Mandate is tailored to the women most likely to experience unintended pregnancy, identified by the 2011 IOM report as "women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority". (IOM 2011 at 102). For example, with respect to religiously objecting organizations, the Mandate applies in employer-based group health plans and student insurance at private colleges and universities. It is not clear that applying the Mandate among those objecting entities is a narrowly tailored way to benefit the most at-risk population. The entities appear to encompass some such women, but also appear to omit many of them and to include a significantly larger cross-section of women as employees or plan participants. At the same time, the Mandate as applied to objecting employers appears to encompass a relatively small percentage of the number of women impacted by the Mandate overall, since most employers do not appear to have conscientious objections to the Mandate.[26] The Guttmacher Institute, on which the IOM relied, further reported that 89 percent of women who are at risk of unintended pregnancy and are living at 0 through 149 percent of the poverty line are already using contraceptives, as are 92 percent of those with incomes of 300 percent or more of the Federal poverty level.[27]

The rates of—and reasons for— unintended pregnancy are notoriously difficult to measure.[28] In particular, association and causality can be hard to disentangle, and the studies referred to by the 2011 IOM Report speak more to association than causality. For example, IOM 2011 references Boonstra, et al.

---

[21] See, for example, Manya Brachear Pashman, "Wheaton College ends coverage amid fight against birth control mandate," Chicago Tribune (July 29, 2015); Laura Bassett, "Franciscan University Drops Entire Student Health Insurance Plan Over Birth Control Mandate," HuffPost (May 15, 2012).

[22] The Departments are not aware of any objectors to the contraceptive Mandate that are unwilling to cover any of the other preventive services without cost sharing as required by PHS Act section 2713.

[23] "Facts on Publicly Funded Contraceptive Services in the United States," March 2016.

[24] See, for example, Caroline Cunningham, "How Much Will Your Birth Control Cost Once the Affordable Care Act Is Repealed?" Washingtonian (Jan. 17, 2017), available at *https://www.washingtonian.com/2017/01/17/how-much-will-your-birth-control-cost-once-the-affordable-care-act-is-repealed/*; also, see *https://www.plannedparenthood.org/learn/birth-control.*

[25] *Id.*

[26] Prior to the implementation of the Affordable Care Act approximately 6 percent of employer survey respondents did not offer contraceptive coverage, with 31 percent of respondents not knowing whether they offered such coverage Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2010 Annual Survey" at 196, available at *https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf.* It is not clear whether the minority of employers who did not cover contraception refrained from doing so for conscientious reasons or for other reasons. Estimates of the number of women who might be impacted by the exemptions offered in these rules, as compared to the total number of women who will likely continue to receive contraceptive coverage, is discussed in more detail below.

[27] "Contraceptive Use in the United States," September 2016.

[28] The IOM 2011 Report reflected this when it cited the IOM's own 1995 report on unintended pregnancy, "The Best Intentions" (IOM 1995). IOM 1995 identifies various methodological difficulties in demonstrating the interest in reducing unintended pregnancies by means of a coverage mandate in employer plans. These include: The ambiguity of intent as an evidence-based measure (does it refer to mistimed pregnancy or unwanted pregnancy, and do studies make that distinction?); "the problem of determining parental attitudes at conception" and inaccurate methods often used for that assessment, such as "to use the request for an abortion as a marker"; and the overarching problem of "association versus causality," that is, whether intent causes certain negative outcomes or is merely correlated with them. IOM 1995 at 64–66. See also IOM 1995 at 222 ("the largest public sector funding efforts, Title X and Medicaid, have not been well evaluated in terms of their net effectiveness, including their precise impact on unintended pregnancy").

(2006), as finding that, "as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, rates of unintended pregnancy and abortion for unmarried women also declined," [29] and Santelli and Melnikas as finding that "increased rates of contraceptive use by adolescents from the early 1990s to the early 2000s was associated with a decline in teen pregnancies and that periodic increases in the teen pregnancy rate are associated with lower rates of contraceptive use". IOM 2011 at 105.[30] In this respect, the report does not show that access to contraception causes decreased incidents of unintended pregnancy, because both of the assertions rely on association rather than causation, and they associate reduction in unintended pregnancy with increased use of contraception, not merely with increased access to such contraceptives.

Similarly, in a study involving over 8,000 women between 2012 and 2015, conducted to determine whether contraceptive coverage under the Mandate changed contraceptive use patterns, the Guttmacher Institute concluded that "[w]e observed no changes in contraceptive use patterns among sexually active women." [31] With respect to teens, the Santelli and Melnikas study cited by IOM 2011 observes that, between 1960 and 1990, as contraceptive use increased, teen sexual activity outside of marriage likewise increased (although the study does not assert a causal relationship).[32] Another study, which proposed an economic model for the decision to engage in sexual activity, stated that "[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run." [33] Regarding emergency contraception in particular, "[i]ncreased access to emergency contraceptive pills enhances use but has not been shown to reduce unintended pregnancy rates." [34]

In the longer term—from 1972 through 2002—while the percentage of sexually experienced women who had ever used some form of contraception rose to 98 percent,[35] unintended pregnancy rates in the Unites States rose from 35.4 percent[36] to 49 percent."[37] The Departments note these and other studies[38] to observe the complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy.

Contraception's association with positive health effects might also be partially offset by an association with negative health effects. In 2013 the National Institutes of Health indicated, in funding opportunity announcement for the development of new clinically useful female contraceptive products, that "hormonal contraceptives have the disadvantage of having many undesirable side effects[,] are associated with adverse events, and obese women are at higher risk for serious complications such as deep venous

thrombosis." [39] In addition, IOM 2011 stated that "[l]ong-term use of oral contraceptives has been shown to reduce a woman's risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases (PRB, 1998). The Agency for Healthcare Research and Quality (AHRQ) is currently undertaking a systematic evidence review to evaluate the effectiveness of oral contraceptives as primary prevention for ovarian cancer (AHRQ, 2011)." (IOM 2011 at 107). However, after IOM 2011 made this statement, AHRQ (a component of HHS) completed its systematic evidence review.[40] Based on its review, AHRQ stated that: "[o]varian cancer incidence was significantly reduced in OC [oral contraceptive] users"; "[b]reast cancer incidence was slightly but significantly increased in OC users"; "[t]he risk of cervical cancer was significantly increased in women with persistent human papillomavirus infection who used OCs, but heterogeneity prevented a formal meta-analysis"; "[i]ncidences of both colorectal cancer [] and endometrial cancer [] were significantly reduced by OC use"; "[t]he risk of vascular events was increased in current OC users compared with nonusers, although the increase in myocardial infarction was not statistically significant"; "[t]he overall strength of evidence for ovarian cancer prevention was moderate to low"; and "[t]he simulation model predicted that the combined increase in risk of breast and cervical cancers and vascular events was likely to be equivalent to or greater than the decreased risk in ovarian cancer." [41] Based on these findings, AHRQ concluded that "[t]here is insufficient evidence to recommend for or against the use of OCs solely for the primary prevention of ovarian cancer . . . . the harm/benefit ratio for ovarian cancer prevention alone is uncertain, particularly when the

[29] H. Boonstra, et al., "Abortion in Women's Lives" at 18. *Guttmacher Inst.* (2006).

[30] Citing John S. Santelli & Andrea J. Melnikas, "Teen Fertility in Transition: Recent and Historic Trends in the United States," 31 *Ann. Rev. Pub. Health* 371 (2010).

[31] Bearak, J.M. and Jones, R.K., "Did Contraceptive Use Patterns Change after the Affordable Care Act? A Descriptive Analysis," 27 *Women's Health Issues* 316 (Guttmacher Inst. May–June 2017). available at *http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext*.

[32] 31 *Ann. Rev. Pub. Health* at 375–76.

[33] Peter Arcidiacono, et al., "Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?" (2005), *available at http://public.econ.duke.edu/~psarcidi/teensex.pdf*.

[34] G. Raymond et al., "Population effect of increased access to emergency contraceptive pills:

a systematic review." 109 Obstet. Gynecol. 181 (2007).

[35] William D. Mosher & Jo Jones, U.S. Dep't of HHS, CDC, National Center for Health Statistics, "Use of Contraception in the United States: 1982–2008" at 5 fig. 1, 23 *Vital and Health Statistics* 29 (Aug. 2010), available at *https://www.cdc.gov/nchs/data/series/sr_23/sr23_029.pdf*.

[36] Helen M. Alvaré, "No Compelling Interest: The 'Birth Control' Mandate and Religious Freedom," 58 *Vill. L. Rev.* 379, 404–05 & n.128 (2013), available at *http://digitalcommons.law.villanova.edu/vlr/vol58/iss3/2* (quoting Christopher Tietze, "Unintended Pregnancies in the United States, 1970–1972," 11 *Fam. Plan. Persp.* 186, 186 n.* (1979) ("in 1972, 35.4 percent percent of all U.S. pregnancies were 'unwanted' or 'wanted later'")).

[37] *Id.* (citing Lawrence B. Finer & Stanley K. Henshaw, "Disparities in Rates of Unintended Pregnancy in the United States, 1994 and 2001" 38 *Persp. on Sexual Reprod. Health* 90 (2006) ("In 2001, 49 percent of pregnancies in the United States were unintended")).

[38] See, for example, J.L Dueñas, et al., "Trends in the Use of Contraceptive Methods and Voluntary Interruption of Pregnancy in the Spanish Population during 1997–2007," 83 *Contraception* 82 (2011) (as use of contraceptives increased from 49 percent to 80 percent, the elective abortion rate more than doubled); D. Paton, "The economics of family planning and underage conceptions," 21 *J. Health Econ.* 207 (2002) (data from the UK confirms an economic model which suggests improved family planning access for females under 16 increases underage sexual activity and has an ambiguous impact on underage conception rates); T. Raine et al., "Emergency contraception: advance provision in a young, high-risk clinic population," 96 *Obstet. Gynecol.* 1 (2000) (providing advance provision of emergency contraception at family planning clinics to women aged 16–24 was associated with the usage of less effective and less consistently used contraception by other methods); M. Belzer et al., "Advance supply of emergency contraception: a randomized trial in adolescent mothers," 1 *J. Pediatr. Adolesc. Gynecol.* 347 (2005) (advance provision of emergency contraception to mothers aged 13–20 was associated with increased unprotected sex at the 12-month follow up).

[39] NIH, "Female Contraceptive Development Program (U01)" (Nov. 5, 2013), available at *https://grants.nih.gov/grants/guide/rfa-files/RFA-HD-14-024.html*. Thirty six percent of women in the United States are obese. *https://www.niddk.nih.gov/health-information/health-statistics/overweight-obesity*. Also see "Does birth control raise my risk for health problems?" and "What are the health risks for smokers who use birth control?" HHS Office on Women's Health, available at *https://www.womenshealth.gov/a-z-topics/birth-control-methods*; Skovlund, CW, "Association of Hormonal Contraception with Depression." 73 *JAMA Psychiatry* 1154 (Nov. 1, 2016), available at *https://www.ncbi.nlm.nih.gov/pubmed/27680324*.

[40] Havrilesky, L.J. et al., "Oral Contraceptive Use for the Primary Prevention of Ovarian Cancer," Agency for Healthcare Research and Quality, Report No.: 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html*.

[41] *Id.*

potential quality-of-life impact of breast cancer and vascular events are considered."[42]

In addition, in relation to several studies cited above, imposing a coverage Mandate on objecting entities whose plans cover many enrollee families who may share objections to contraception could, among some populations, affect risky sexual behavior in a negative way. For example, it may not be a narrowly tailored way to advance the Government interests identified here to mandate contraceptive access to teenagers and young adults who are not already sexually active and at significant risk of unintended pregnancy.[43]

Finally, evidence from studies that post-date the Mandate is not inconsistent with the observations the Departments make here. In 2016, HRSA awarded a 5-year cooperative agreement to the American College of Obstetricians and Gynecologists to develop recommendations for updated Women's Preventive Services Guidelines. The awardee formed an expert panel called the Women's Preventive Services Initiative that issued a report (the WPSI report).[44] After observing that "[p]rivate companies are increasingly challenging the contraception provisions in the Affordable Care Act," the WPSI report cited studies through 2013 stating that application of HRSA Guidelines had applied preventive services coverage to 55.6 million women and had led to a 70 percent decrease in out-of-pocket expenses for contraceptive services among commercially insured women. *Id.* at 57–58. The WPSI report relied on a 2015 report of the HHS Office of the Assistant Secretary for Planning and Evaluation (ASPE), "The Affordable Care Act Is Improving Access to Preventive Services for Millions of Americans," which estimated that persons who have private insurance coverage of preventive services without cost sharing includes 55.6 million women.[45]

As discussed above and based on the Departments' knowledge of litigation challenging the Mandate, during the time ASPE estimated the scope of preventive services coverage (2011–2013), houses of worship and integrated auxiliaries were exempt from the Mandate, other objecting religious nonprofit organizations were protected by the temporary safe harbor, and hundreds of accommodated self-insured church plan entities were not subject to enforcement of the Mandate through their third party administrators. In addition, dozens of for-profit entities that had filed lawsuits challenging the Mandate were protected by court orders pending the Supreme Court's resolution of *Hobby Lobby* in June 2014. It would therefore appear that the benefits recorded by the report occurred even though most objecting entities were not in compliance.[46] Additional data indicates that, in 28 States where contraceptive coverage mandates have been imposed statewide, those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall.[47]

The Departments need not take a position on these empirical questions.

Our review is sufficient to lead us to conclude that significantly more uncertainty and ambiguity exists in the record than the Departments previously acknowledged when we declined to extend the exemption to certain objecting organizations and individuals as set forth herein, and that no compelling interest exists to counsel against us extending the exemption.

During public comment periods, some commenters noted that some drugs included in the preventive services contraceptive Mandate can also be useful for treating certain existing health conditions. The IOM similarly stated that "the non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain." IOM 2011 at 107. Consequently, some commenters suggested that religious objections to the Mandate should not be permitted in cases where such methods are used to treat such conditions, even if those methods can also be used for contraceptive purposes. Section 2713(a)(4) of the PHS Act does not, however, apply to non-preventive care provided solely for treatment of an existing condition. It applies only to "such additional preventive care and screenings . . . as provided for" by HRSA (Section 2713(a)(4) of the PHS Act). HRSA's Guidelines implementing this section state repeatedly that they apply to "preventive" services or care, and with respect to the coverage of contraception specifically, they declare that the methods covered are "contraceptive" methods as a "Type of Preventive Service," and that they are to be covered only "[a]s prescribed" by a physician or other health care provider. *https://www.hrsa.gov/womens guidelines/* The contraceptive coverage requirement in the Guidelines also only applies for "women with reproductive capacity." *https://www.hrsa.gov/womensguidelines/*; (80 FR 40318). Therefore, the Guidelines' inclusion of contraceptive services requires coverage of contraceptive methods as a type of preventive service only when a drug that the FDA has approved for contraceptive use is prescribed in whole or in part for such use. The Guidelines and section 2713(a)(4) of the PHS Act do not require coverage of such drugs where they are prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.[48] As discussed above, the last

---

[42] *Id.* Also, see Kelli Miller, "Birth Control & Cancer: Which Methods Raise, Lower Risk," *The Am. Cancer Society.* (Jan. 21, 2016), available at *http://www.cancer.org/cancer/news/features/birth-control-cancer-which-methods-raise-lower-risk.*

[43] For further discussion, see Alvaré, 58 *Vill. L. Rev.* at 400–02 (discussing the Santelli & Melnikas study and the Arcidiacono study cited above, and other research that considers the extent to which reduction in teen pregnancy is attributable to sexual risk avoidance rather than to contraception access).

[44] "WPSI 2016 Recommendations: Evidence Summaries and Appendices," at 54–64, *available at https://www.womenspreventivehealth.org/wp-content/uploads/2016/12/Evidence-Summaries-and-Appendices.pdf.*

[45] Available at *https://aspe.hhs.gov/pdf-report/affordable-care-act-improving-access-preventive-services-millions-americans;* also, see Abridged Report, available at *https://www.womenspreventive*

*health.org/wp-content/uploads/2017/01/WPSI_2016AbridgedReport.pdf.*

[46] In addition, as in IOM 2011, the WPSI report bases its evidentiary conclusions relating to contraceptive coverage, use, unintended pregnancy, and health benefits, on conclusions that the phenomena are "associated" with the intended outcomes, without showing there is a causal relationship. For example, the WPSI report states that "[c]ontraceptive counseling in primary care may increase the uptake of hormonal methods and [long-acting reversible contraceptives], although data on structured counseling in specialized reproductive health settings demonstrated no such effect." *Id.* at 63. The WPSI report also acknowledges that a large-scale study evaluating the effects of providing no-cost contraception had "no randomization or control group." *Id.* at 63.

The WPSI report also identifies the at-risk population as young, low-income, and/or minority women: "[u]nintended pregnancies disproportionately occur in women age 18 to 24 years, especially among those with low incomes or from racial/ethnic minorities." *Id.* at 58. The WPSI report acknowledges that many in this population are already served by Title X programs, which provide family planning services to "approximately 1 million teens each year." *Id.* at 58. The WPSI report observes that between 2008 and 2011—before the contraceptive coverage requirement was implemented—unintended pregnancy decreased to the lowest rate in 30 years. *Id.* at 58. The WPSI report does not address how to balance contraceptive coverage interests with religious objections, nor does it specify the extent to which applying the Mandate among commercially insured of objecting entities serves to deliver contraceptive coverage to women most at risk of unintended pregnancy.

[47] See Michael J. New, "Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes," 13 *Ave Maria L. Rev.* 345 (2015), available at *http://avemarialaw-law-review.avemarialaw.edu/Content/articles/vXIII.2.new.final.0809.pdf.*

[48] The Departments previously cited the IOM's listing of existing conditions that contraceptive drugs can be used to treat (menstrual disorders, acne, and pelvic pain), and said of those uses that "there are demonstrated preventive health benefits
Continued

Exhibit 4                                    JA520                                    JA-0000111

Administration decided to exempt houses of worship and their integrated auxiliaries from the Mandate, and to relieve hundreds of religious nonprofit organizations of their obligations under the Mandate and not further require contraceptive coverage to their employees. In several of the lawsuits challenging the Mandate, some religious plaintiffs stated that they do not object and are willing to cover drugs prescribed for the treatment of an existing condition and not for contraceptive purposes—even if those drugs are also approved by the FDA for contraceptive uses. Therefore, the Departments conclude that the fact that some drugs that are approved for preventive contraceptive purposes can also be used for exclusively non-preventive purposes to treat existing conditions is not a sufficient reason to refrain from expanding the exemption to the Mandate.

An additional consideration supporting the Departments' present view is that alternative approaches can further the interests the Departments previously identified behind the Mandate. As noted above, the Government already engages in dozens of programs that subsidize contraception for the low-income women identified by the IOM as the most at risk for unintended pregnancy. The Departments have also acknowledged in legal briefing that contraception access can be provided through means other than coverage offered by religious objectors, for example, through "a family member's employer," "an Exchange," or "another government program." [49]

Many employer plan sponsors, institutions of education arranging

from contraceptives relating to conditions other than pregnancy." 77 FR 8727 & n.7. This was not, however, an assertion that PHS Act section 2713(a)(4) or the Guidelines require coverage of "contraceptive" methods when prescribed for an exclusively *non-contraceptive, non-preventive* use. Instead it was an observation that such drugs—generally referred to as "contraceptives"—also have some alternate beneficial uses to treat existing conditions. For the purposes of these interim final rules, the Departments clarify here that our previous reference to the benefits of using contraceptive drugs exclusively for some non-contraceptive and non-preventive uses to treat existing conditions did not mean that the Guidelines require coverage of such uses, and consequently is not a reason to refrain from offering the expanded exemptions provided here. Where a drug approved by the FDA for contraceptive use is prescribed for both a contraceptive use and a non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage. Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines.

[49] Brief for the Respondents at 65, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14–1418).

student health coverage, and individuals enrolled in plans where their employers or issuers (as applicable) are willing to offer them a religiously acceptable plan, hold sincerely held religious beliefs against (respectively) providing, arranging, or participating in plans that comply with the Mandate either by providing contraceptive coverage or by using the accommodation. Because we have concluded that requiring such compliance through the Mandate or accommodation has constituted a substantial burden on the religious exercise of many such entities or individuals, and because we conclude requiring such compliance did not serve a compelling interest and was not the least restrictive means of serving a compelling interest, we now believe that requiring such compliance led to the violation of RFRA in many instances. We recognize that this is a change of position on this issue, and we make that change based on all the matters discussed in this preamble.

## B. Discretion To Provide Religious Exemptions

Even if RFRA does not compel the religious exemptions provided in these interim final rules, the Departments believe they are the most appropriate administrative response to the religious objections that have been raised. RFRA identifies certain circumstance under which government must accommodate religious exercise-when a government action imposes a substantial burden on the religious exercise of an adherent and imposition of that burden is not the least restrictive means of achieving a compelling government interest. RFRA does not, however, prescribe the accommodation that the government must adopt. Rather, agencies have discretion to fashion an appropriate and administrable response to respect religious liberty interests implicated by their own regulations. We know from *Hobby Lobby* that, in the absence of any accommodation, the contraceptive-coverage requirement imposes a substantial burden on certain objecting employers. We know from other lawsuits and public comments that many religious entities have objections to complying with the accommodation based on their sincerely held religious beliefs. Previously, the Departments attempted to develop an accommodation that would either alleviate the substantial burden imposed on religious exercise or satisfy RFRA's requirements for imposing that burden.

Now, however, the Departments have reassessed the relevant interests and determined that, even if exemptions are

not required by RFRA, they would exercise their discretion to address the substantial burden identified in *Hobby Lobby* by expanding the exemptions from the Mandate instead of revising accommodations previously offered. In the Departments' view, a broader exemption is a more direct, effective means of satisfying all bona fide religious objectors. This view is informed by the fact that the Departments' previous attempt to develop an appropriate accommodation did not satisfy all objectors. That previous accommodation consumed Departmental resources not only through the regulatory process, but in persistent litigation and negotiations. Offering exemptions as described in these interim final rules is a more workable way to respond to the substantial burden identified in *Hobby Lobby* and bring years of litigation concerning the Mandate to a close.

## C. General Scope of Expanded Religious Exemptions

1. Exemption and Accommodation for Religious Employers, Plan Sponsors, and Institutions of Higher Education

For all of these reasons, and as further explained below, the Departments now believe it is appropriate to modify the scope of the discretion afforded to HRSA in the July 2015 final regulations to direct HRSA to provide the expanded exemptions and change the accommodation to an optional process if HRSA continues to otherwise provide for contraceptive coverage in the Guidelines. As set forth below, the expanded exemption encompasses non-governmental plan sponsors that object based on sincerely held religious beliefs, and institutions of higher education in their arrangement of student health plans. The accommodation is also maintained as an optional process for exempt employers, and will provide contraceptive availability for persons covered by the plans of entities that use it (a legitimate program purpose).

The Departments believe this approach is sufficiently respectful of religious objections while still allowing the Government to advance other interests. Even with the expanded exemption, HRSA maintains the discretion to provide contraceptive coverage for nearly all entities to which the Mandate previously applied (since most plan sponsors do not appear to possess the requisite religious objections), and to reconsider those interests in the future where no covered objection exists. Other Government subsidies of contraception are likewise not affected by this rule.

## 2. Exemption for Objecting Individuals Covered by Willing Employers and Issuers

As noted above, some individuals have brought suit objecting to being covered under an insurance policy that includes coverage for contraceptives. See, for example, *Wieland* v. *HHS*, 196 F. Supp. 3d 1010 (E.D. Mo. 2016); *Soda* v. *McGettigan*, No. 15–cv–00898 (D. Md.). Just as the Departments have determined that the Government does not have a compelling interest in applying the Mandate to employers that object to contraceptive coverage on religious grounds, we have also concluded that the Government does not have a compelling interest in requiring individuals to be covered by policies that include contraceptive coverage when the individuals have sincerely held religious objections to that coverage. The Government does not have an interest in ensuring the provision of contraceptive coverage to individuals who do not wish to have such coverage. Especially relevant to this conclusion is the fact that the Departments have described their interests of health and gender equality as being advanced among women who "want" the coverage so as to prevent "unintended" pregnancy. (77 FR 8727).[50] No asserted interest is served by denying an exemption to individuals who object to it. No unintended pregnancies will be avoided or costs reduced by imposing the coverage on those individuals.

Although the Departments previously took the position that allowing individual religious exemptions would undermine the workability of the insurance system, the Departments now agree with those district courts that have concluded that an exemption that allows—but does not require—issuers and employers to omit contraceptives from coverage provided to objecting individuals does not undermine any compelling interest. See *Wieland*, 196 F. Supp. 3d at 1019–20; *March for Life*, 128 F. Supp. 3d at 132. The individual exemption will only apply where the employer and issuer (or, in the individual market, the issuer) are willing to offer a policy accommodating the objecting individual. As a result, the Departments consider it likely that where an individual exemption is invoked, it will impose no burdens on

the insurance market because such burdens may be factored into the willingness of an employer or issuer to offer such coverage. At the level of plan offerings, the extent to which plans cover contraception under the prior rules is already far from uniform. Congress did not require compliance with section 2713 of the PHS Act by all entities—in particular by grandfathered plans. The Departments' previous exemption for houses of worship and integrated auxiliaries, and our lack of authority to enforce the accommodation with respect to self-insured church plans, show that the importance of a uniform health insurance system is not significantly harmed by allowing plans to omit contraception in many contexts.[51] Furthermore, granting exemptions to individuals who do not wish to receive contraceptive coverage where the plan and, as applicable, issuer and plan sponsor are willing, does not undermine the Government's interest in ensuring the provision of such coverage to other individuals who wish to receive it. Nor do such exemptions undermine the operation of the many other programs subsidizing contraception. Rather, such exemptions serve the Government's interest in accommodating religious exercise. Accordingly, as further explained below, the Departments have provided an exemption to address the concerns of objecting individuals.

### D. Effects on Third Parties of Exemptions

The Departments note that the exemptions created here, like the exemptions created by the last Administration, do not burden third parties to a degree that counsels against providing the exemptions. Congress did not create a right to receive contraceptive coverage, and Congress explicitly chose not to impose the section 2713 of the PHS Act requirements on grandfathered plans that cover millions of people. Individuals who are unable to obtain contraceptive coverage through their employer-sponsored health plans because of the exemptions created in these interim final rules, or because of other exemptions to the Mandate, have

other avenues for obtaining contraception, including the various governmental programs discussed above. As the Government is under no constitutional obligation to fund contraception, *cf. Harris* v. *McRae*, 448 United States 297 (1980), even more so may the Government refrain from requiring private citizens to cover contraception for other citizens in violation of their religious beliefs. *Cf. Rust* v. *Sullivan*, 500 U.S. 173, 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity.").[52]

That conclusion is consistent with the Supreme Court's observation that RFRA may require exemptions even from laws requiring claimants "to confer benefits on third parties." *Hobby Lobby*, 134 S. Ct. at 2781 n.37. The burdens imposed on such third parties may be relevant to the RFRA analysis, but they cannot be dispositive. "Otherwise, for example, the Government could decide that all supermarkets must sell alcohol for the convenience of customers (and thereby exclude Muslims with religious objections from owning supermarkets), or it could decide that all restaurants must remain open on Saturdays to give employees an opportunity to earn tips (and thereby exclude Jews with religious objections from owning restaurants)." *Id.* Where, as here, contraceptives are readily accessible and, for many low income persons, are available at reduced cost or for free through various governmental programs, and contraceptive coverage may be available through State sources or family plans obtained through non-objecting employers, the Departments have determined that the expanded exemptions rather than accommodations are the appropriate response to the substantial burden that the Mandate has placed upon the religious exercise of many religious employers.

### III. Provisions of the Interim Final Rules With Comment Period

The Departments are issuing these interim final rules in light of the full history of relevant rulemaking (including prior interim final rules), public comments, and litigation throughout the Federal court system. The interim final rules seek to resolve this matter and the long-running litigation with respect to religious

---

[50] In this respect, the Government's interest in contraceptive coverage is different than its interest in persons receiving some other kinds of health coverage or coverage in general, which can lead to important benefits that are not necessarily conditional on the recipient's desire to use the coverage and the specific benefits that may result from their choice to use it.

[51] Also, see *Real Alternatives*, 2017 WL 3324690 at *36 (3d Cir. Aug. 4, 2017) (Jordan, J., concurring in part and dissenting in part) ("Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market. . . . Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the Affordable Care Act) would be unworkable, it has not satisfied strict scrutiny." (citation and internal quotation marks omitted)).

[52] *Cf. also Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 196 (Ariz. Ct. App. 2011) ("a woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

Exhibit 4

JA522

JA-0000113

objections by extending the exemption under the HRSA Guidelines to encompass entities, and individuals, with sincerely held religious beliefs objecting to contraceptive or sterilization coverage, and by making the accommodation process optional for eligible organizations.

The Departments acknowledge that the foregoing analysis represents a change from the policies and interpretations we previously adopted with respect to the Mandate and the governmental interests that underlie the Mandate. These changes in policy are within the Departments' authority. As the Supreme Court has acknowledged, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117, 2125 (2016). This "reasoned analysis" requirement does not demand that an agency "demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates". *United Student Aid Funds, Inc.* v. *King*, 200 F. Supp. 3d 163, 169–70 (D.D.C. 2016) (citing *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); also, see *New Edge Network, Inc.* v. *FCC*, 461 F.3d 1105, 1112–13 (9th Cir. 2006) (rejecting an argument that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance").

Here, for all of the reasons discussed above, the Departments have determined that the Government's interest in the application of contraceptive coverage requirements in this specific context to the plans of certain entities and individuals does not outweigh the sincerely held religious objections of those entities and individuals based on the analyses set forth above. Thus, these interim final rules amend the Departments' July 2015 final regulations to expand the exemption to include additional entities and persons that object based on sincerely held religious beliefs. These rules leave in place HRSA's discretion to continue to require contraceptive and sterilization coverage where no such objection exists, and to the extent that section 2713 of the PHS Act applies. These interim final rules also maintain the existence of an accommodation process, but consistent with our expansion of the exemption, we make the process optional for eligible organizations. HRSA is simultaneously updating its Guidelines to reflect the requirements of these interim final rules.[53]

*A. Regulatory Restatements of Section 2713(a) and (a)(4) of the PHS Act*

These interim final rules modify the restatements of the requirements of section 2713(a) and (a)(4) of the PHS Act, contained in 26 CFR 54.9815–2713(a)(1) introductory text and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) introductory text and (a)(1)(iv), and 45 CFR 147.130(a)(1) introductory text and (a)(1)(iv), so that they conform to the statutory text of section 2713 of the PHS Act.

*B. Prefatory Language of the Exemption in 45 CFR 147.132*

These interim final rules move the religious exemption from 45 CFR 147.131 to a new § 147.132 and expand it as follows. In the prefatory language of § 147.132, these interim final rules specify that not only are certain entities "exempt," but the Guidelines shall not support or provide for an imposition of the contraceptive coverage requirement to such entities. This is an acknowledgement that section 2713(a)(4) of the PHS Act requires women's preventive services coverage only "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." To the extent the HRSA Guidelines do not provide for or support the application of such coverage to exempt entities, the Affordable Care Act does not require the coverage. Section 147.132 not only describes the exemption of certain entities and plans, but does so by specifying that the HRSA Guidelines do not provide for, or support the application of, such coverage to exempt entities and plans.

*C. General Scope of Exemption for Objecting Entities*

In the new 45 CFR 147.132 as created by these interim final rules, these rules expand the exemption that was previously located in § 147.131(a). With respect to employers that sponsor group health plans, the new language of § 147.132(a)(1) introductory text and (a)(1)(i) provides exemptions for employers that object to coverage of all or a subset of contraceptives or sterilization and related patient education and counseling based on sincerely held religious beliefs.

For avoidance of doubt, the Departments wish to make clear that the expanded exemption created in § 147.132(a) applies to several distinct entities involved in the provision of coverage to the objecting employer's employees. This explanation is consistent with how prior rules have worked by means of similar language. Section 147.132(a)(1) introductory text and (a)(1)(i), by specifying that "[a] group health plan and health insurance coverage provided in connection with a group health plan" is exempt "to the extent the plan sponsor objects as specified in paragraph (a)(2)," exempt the group health plans the sponsors of which object, and exempt their health insurance issuers from providing the coverage in those plans (whether or not the issuers have their own objections). Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv), or the parallel provisions in 26 CFR 54.9815–2713(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv), the plan sponsor, issuer, and plan covered in the exemption of that paragraph would face no penalty as a result of omitting contraceptive coverage from the benefits of the plan participants and beneficiaries.

Consistent with the restated exemption, exempt entities will not be required to comply with a self-certification process. Although exempt entities do not need to file notices or certifications of their exemption, and these interim final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits. Under ERISA, the plan document provides what benefits are provided to participants and beneficiaries under the plan and, therefore, if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document. Moreover, if there is a reduction in a covered service or benefit, the plan has to disclose that change to plan participants.[54] Thus, where an exemption applies and all or a subset of contraceptive services are omitted from a plan's coverage,

---

[53] See *https://www.hrsa.gov/womensguidelines/* and *https://www.hrsa.gov/womensguidelines2016/index.html*.

[54] See, for example, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102–2, 2520.102–3, & 2520.104b–3(d), and 29 CFR 2590.715–2715. Also, see 45 CFR 147.200 (requiring disclosure of the "exceptions, reductions, and limitations of the coverage," including group health plans and group & individual issuers).

Exhibit 4 JA523 JA-0000114

otherwise applicable ERISA disclosures must reflect the omission of coverage in ERISA plans. These existing disclosure requirements serve to help provide notice to participants and beneficiaries of what ERISA plans do and do not cover. The Departments invite public comment on whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption, or in otherwise receiving guidance on a way to document their exemption.

The exemptions in § 147.132(a) apply "to the extent" of the objecting entities' sincerely held religious beliefs. Thus, entities that hold a requisite objection to covering some, but not all, contraceptive items would be exempt with respect to the items to which they object, but not with respect to the items to which they do not object. Likewise, the requisite objection of a plan sponsor or institution of higher education in § 147.132(a)(1)(i) and (ii) exempts its group health plan, health insurance coverage offered by a health insurance issuer in connection with such plan, and its issuer in its offering of such coverage, but that exemption does not extend to coverage provided by that issuer to other group health plans where the plan sponsor has no qualifying objection. The objection of a health insurance issuer in § 147.132(a)(1)(iii) similarly operates only to the extent of its objection, and as otherwise limited as described below.

*D. Exemption of Employers and Institutions of Higher Education*

The scope of the exemption is expanded for non-governmental plan sponsors and certain entities that arrange health coverage under these interim final rules. The Departments have consistently taken the position that section 2713(a)(4) of the PHS Act grants HRSA authority to issue Guidelines that provide for and support exemptions from a contraceptive coverage requirement. Since the beginning of rulemaking concerning the Mandate, HRSA and the Departments have repeatedly exercised their discretion to create and modify various exemptions within the Guidelines.[55]

The Departments believe the approach of these interim final rules better aligns our implementation of section 2713(a)(4) of the PHS Act with Congress' intent in the Affordable Care Act and throughout other Federal health care laws. As discussed above, many Federal health care laws and regulations provide exemptions for objections based on religious beliefs, and RFRA applies to the Affordable Care Act. Expanding the exemption removes religious obstacles that entities and certain individuals may face when they otherwise wish to participate in the health care market. This advances the Affordable Care Acts goal of expanding health coverage among entities and individuals that might otherwise be reluctant to participate. These rules also leave in place many Federal programs that subsidize contraceptives for women who are most at risk of unintended pregnancy and who may have more limited access to contraceptives.[56] These interim final rules achieve greater uniformity and simplicity in the regulation of health insurance by expanding the exemptions to include entities that object to the Mandate based on their sincerely held religious beliefs.

The Departments further conclude that it would be inadequate to merely attempt to amend the accommodation process instead of expand the exemption. The Departments have stated in our regulations and court briefings that the existing accommodation with respect to self-insured plans requires contraceptive coverage as part of the same plan as the coverage provided by the employer, and operates in a way "seamless" to those plans. As a result, in significant respects, the accommodation process does not actually accommodate the objections of many entities. The Departments have engaged in an effort to attempt to identify an accommodation that would eliminate the plaintiffs' religious objections, including seeking public comment through an RFI, but we stated in January 2017 that we were unable to develop such an approach at that time.

*1. Plan Sponsors Generally*

The expanded exemptions in these interim final rules cover any kind of non-governmental employer plan sponsor with the requisite objections but, for the sake of clarity, they include an illustrative, non-exhaustive list of employers whose objections qualify the plans they sponsor for an exemption.

Under these interim final rules, the Departments do not limit the Guidelines exemption with reference to nonprofit status or to sections 6033(a)(3)(A)(i) or (iii) of the Code, as previous rules have done. A significant majority of States either impose no contraceptive coverage requirement or offer broader exemptions than the exemption contained in the July 2015 final regulations.[57] Although the practice of States is by no means a limit on the discretion delegated to HRSA by the Affordable Care Act, nor a statement about what the Federal Government may do consistent with RFRA or other limitations in federal law, such State practice can be informative as to the viability of broad protections for religious liberty. In this case, such practice supports the Departments' decision to expand the federal exemption, bringing the Federal Government's practice into greater alignment with the practices of the majority of the States.

*2. Section 147.132(a)(1)(i)(A)*

Despite not limiting the exemption to certain organizations referred to in section 6033(a)(3)(A)(i) or (iii) of the Code, the exemption in these rules includes such organizations. Section 147.132(a)(1)(i)(A) specifies, as under the prior exemption, that the exemption covers "a group health plan established or maintained by . . . [a] church, the integrated auxiliary of a church, a convention or association of churches, or a religious order." In the preamble to rules setting forth the prior exemption at § 147.132(a), the Departments interpreted this same language used in those rules by declaring that "[t]he final regulations continue to provide that the availability of the exemption or accommodation be determined on an employer by employer basis, which the Departments continue to believe best balances the interests of religious employers and eligible organizations and those of employees and their dependents." (78 FR 39886). Therefore, under the prior exemption, if an employer participated in a house of worship's plan—perhaps because it was affiliated with a house of worship—but was not an integrated auxiliary or a house of worship itself, that employer was not considered to be covered by the

---

[55] "The fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863–64 (1984).

[56] See, for example, Family Planning grants in 42 U.S.C. 300, *et seq.*; the Teenage Pregnancy Prevention Program, Public Law 112–74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c–8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b–12; Title XIX of the Social Security Act, 42 U.S.C. 1396, *et seq.*; the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), & 25 U.S.C. 1601, *et seq.*; Health center grants, 42 U.S.C. 254b(e), (g), (h), & (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

[57] See Guttmacher Institute, "Insurance Coverage of Contraceptives" available at *https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.*

exemption, even though it was, in the ordinary meaning of the text of the prior regulation, participating in a "plan established or maintained by a [house of worship]."

Under these interim final rules, however, the Departments intend that, when this regulation text exempts a plan "established or maintained by" a house of worship or integrated auxiliary, such exemption will no longer "be determined on an employer by employer basis," but will be determined on a plan basis—that is, by whether the plan is a "plan established or maintained by" a house of worship or integrated auxiliary. This interpretation better conforms to the text of the regulation setting forth the exemption—in both the prior regulation and in the text set forth in these interim final rules. It also offers appropriate respect to houses of worship and their integrated auxiliaries not only in their internal employment practices but in their choice of organizational form and/or in their activity of establishing or maintaining health plans for employees of associated employers that do not meet the threshold of being integrated auxiliaries. Moreover, under this interpretation, houses of worship would not be faced with the potential prospect of services to which they have a religious objection being covered for employees of an associated employer participating in a plan they have established and maintain.

The Departments do not believe there is a sufficient factual basis to exclude from this part of the exemption entities that are so closely associated with a house of worship or integrated auxiliary that they are permitted participation in its health plan, but are not themselves integrated auxiliaries. Additionally, this interpretation is not inconsistent with the operation of the accommodation under the prior rule, to the extent that, in practice and as discussed elsewhere herein, it does not force contraceptive coverage to be provided on behalf of the plan participants of many religious organizations in a self-insured church plan exempt from ERISA—which are exempt in part because the plans are established and maintained by a church. (Section 3(33)(A) of ERISA) In several lawsuits challenging the Mandate, the Departments took the position that some plans established and maintained by houses of worship, but that included entities that were not integrated auxiliaries, were church plans under section 3(33) of ERISA and, thus, the Government "has no authority to require the plaintiffs' TPAs to provide contraceptive coverage at this time." *Roman Catholic Archdiocese of N.Y. v.*

*Sebelius,* 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013). Therefore the Departments believe it is most appropriate to use a plan basis, not an employer by employer basis, to determine the scope of an exemption for a group health plan established or maintained by a house of worship or integrated auxiliary.

**3. Section 147.132(a)(1)(i)(B)**

Section 147.132(a)(1)(i)(B) of the rules specifies that the exemption includes the plans of plan sponsors that are nonprofit organizations.

**4. Section 147.132(a)(1)(i)(C)**

Under § 147.132(a)(1)(i)(C), the rules extend the exemption to the plans of closely held for-profit entities. This is consistent with the Supreme Court's ruling in *Hobby Lobby,* which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in *Hobby Lobby,* religion), regardless of whether the entity operates as a nonprofit organization, and rejecting the Departments' argument to the contrary. (134 S. Ct. 2768–75) Some reports and industry experts have indicated that not many for-profit entities beyond those that had originally brought suit have sought relief from the Mandate after *Hobby Lobby.*[58]

**5. Section 147.132(a)(1)(i)(D)**

Under § 147.132(a)(1)(i)(D), the rules extend the exemption to the plans of for-profit entities that are not closely held. The July 2015 final regulations extended the accommodation to for-profit entities only if they are closely held, by positively defining what constitutes a closely held entity. The Departments implicitly recognized the difficulty of providing an affirmative definition of closely held entities in the July 2015 final regulations when we adopted a definition that included entities that are merely "substantially similar" to certain specified parameters, and we allowed entities that were not sure if they met the definition to inquire with HHS; HHS was permitted to decline to answer the inquiry, at which time the entity would be deemed to qualify as an eligible organization. The exemptions in these interim final rules do not need to address this difficulty because they include both for-profit entities that are closely held and for-profit entities that are not closely held.[59]

The mechanisms for determining whether a company has adopted and holds such principles or views is a matter of well-established State law with respect to corporate decision-making,[60] and the Departments expect that application of such laws would cabin the scope of this exemption.

In including entities in the exemption that are not closely held, these interim final rules provide for the possibility that some publicly traded entities may use the exemption. Even though the Supreme Court did not extend its holding in *Hobby Lobby* to publicly traded corporations (the matter could be resolved without deciding that question), the Court did instruct that RFRA applies to corporations because they are "persons" as that term is defined in 1 U.S.C. 1. Given that the definition under 1 U.S.C. 1 applies to any corporation, the Departments consider it appropriate to extend the exemption set forth in these interim final rules to for-profit corporations whether or not they are closely held. The Departments are generally aware that in a country as large as America comprised of a supermajority of religious persons, some publicly traded entities might claim a religious character for their company, or that the majority of shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character.[61] The fact that such a company is religious does not mean that it will have an objection to contraceptive coverage, and there are many fewer publicly traded companies than there are closely held ones. But our experience with closely held companies is that some, albeit a small minority, do have religious objections to contraceptive coverage. Thus we consider it possible, though very unlikely, that a religious publicly

<hr/>

[58] See Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," *Politico* (Oct. 11, 2016), available at *http://www.politico.com/story/2016/10/obamacare-birth-control-mandate-employers-229627.*

[59] In the companion interim final rules published elsewhere in this **Federal Register**, the Departments

provide an exemption on an interim final basis to closely held entities by using a negative definition: entities that do not have publicly traded ownership interests as defined by certain securities required to be registered under section 12 of the Securities Exchange Act of 1934. Although this is a more workable definition than set forth in our previous rules, we have determined that it is appropriate to offer the expanded religious exemptions to certain entities whether or not they have publicly traded ownership interests.

[60] Although the Departments do not prescribe any form or notification, they would expect that such principles or views would have been adopted and documented in accordance with the laws of the jurisdiction under which they are incorporated or organized.

[61] *See, e.g., Nasdaq.com,* "4 Publicly Traded Religious Companies if You're Looking to Invest in Faith" (Feb. 7, 2014), available at *http://www.nasdaq.com/article/4-publicly-traded-religious-companies-if-youre-looking-to-invest-in-faith-cm324665.*

traded company might have objections to contraceptive coverage. At the same time, we are not aware of any publicly traded entities that challenged the Mandate specifically either publicly or in court. The Departments agree with the Supreme Court that it is improbable that many publicly traded companies with numerous ''unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs'' and thereby qualify for the exemption. (134 S. Ct. at 2774)

### 6. Section 147.132(a)(1)(i)(E)

Under § 147.132(a)(1)(i)(E), the rules extend the exemption to the plans of any other non-governmental employer. The plans of governmental employers are not covered by the plan sponsor exemption of § 147.132(a)(1)(i). The Departments are not aware of reasons why it would be appropriate or necessary to offer religious exemptions to governmental employer plan sponsors in the United States with respect to the contraceptive Mandate. But, as discussed below, governmental employers are permitted to respect an individual's objection under § 147.132(b) and thus to provide health insurance coverage without the objected-to contraceptive coverage to such individual. Where that exemption is operative, the Guidelines may not be construed to prevent a willing governmental health plan sponsor of a group health plan from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

By the general extension of the exemption to the plans of plan sponsors in § 147.132(a)(1)(i), these interim final rules also exempt group health plans sponsored by an entity other than an employer (for example, a union) that objects based on sincerely held religious beliefs to coverage of contraceptives or sterilization.

### 7. Section 147.132(a)(1)(ii)

As in the previous rules, the plans of institutions of higher education that arrange student health insurance coverage will continue to be treated similarly to the way in which the plans of employers are treated, but for the purposes of such plans being exempt or electing the optional accommodation, rather than merely being eligible for the accommodation as in the previous rule. These interim final rules specify, in § 147.132(a)(1)(ii), that the exemption is

extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002), to their arrangement of student health insurance coverage, in a manner comparable to the applicability of the exemption for group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor. As mentioned above, because the Affordable Care Act does not require institutions of higher education to arrange student coverage, some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student plans rather than comply with the Mandate or use the accommodation. Extending the exemption in these interim final rules may remove an obstacle to such entities deciding to offer student plans, thereby giving students another health insurance option.

### E. Exemption for Issuers

These interim final rules extend the exemption, in § 147.132(a)(1)(iii), to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own religious objections to providing coverage for contraceptive services.

The Departments are not currently aware of health insurance issuers that possess their own religious objections to offering contraceptive coverage. Nevertheless, many Federal health care conscience laws and regulations protect issuers or plans specifically. For example, 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3) protect plans or managed care organizations in Medicaid or Medicare Advantage. The Weldon Amendment protects HMOs, health insurance plans, and any other health care organizations that are protected from being required to provide coverage or pay for abortions. See, for example, Consolidated Appropriations Act of 2017, Public Law 115–31, Div. H, Title V, Sec. 507(d). Congress also declared this year that ''it is the intent of Congress'' to include a ''conscience clause'' which provides exceptions for religious beliefs if the District of Columbia requires ''the provision of contraceptive coverage by health insurance plans.'' See *Id.* at Div. C, Title VIII, Sec. 808. In light of the clearly expressed intent of Congress to protect religious liberty, particularly in certain health care contexts, along with the specific efforts to protect issuers, the Departments have concluded that an exemption for issuers is appropriate.

As discussed above, where the exemption for plan sponsors or institutions of higher education applies, issuers are exempt under those sections

with respect to providing coverage in those plans. The issuer exemption in § 147.132(a)(1)(iii) adds to that protection, but the additional protection operates in a different way than the plan sponsor exemption operates. As set forth in these interim final rules, the only plan sponsors, or in the case of individual insurance coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services are plan sponsors or individuals who themselves object and are otherwise exempt based on their objection. Thus, the issuer exemption specifies that where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under 42 CFR 147.130(a)(1)(iv) unless the plan is otherwise exempt from that requirement. Accordingly, the only plan sponsors, or in the case of individual insurance coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an issuer that is exempt under this paragraph (a)(1)(iii) that does not include coverage for some or all contraceptive services are plan sponsors or individuals who themselves object and are exempt. Issuers that hold religious objections should identify to plan sponsors the lack of contraceptive coverage in any health insurance coverage being offered that is based on the issuer's exemption, and communicate the group health plan's independent obligation to provide contraceptive coverage, unless the group health plan itself is exempt under regulations governing the Mandate.

In this way, the issuer exemption serves to protect objecting issuers both from being asked or required to issue policies that cover contraception in violation of the issuers' sincerely held religious beliefs, and from being asked or required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus subjecting the issuers to potential liability if those plans are not exempt from the Guidelines. At the same time, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will it prevent other issuers from being required to provide contraceptive coverage in individual insurance coverage. Permitting issuers to object to offering contraceptive coverage based on sincerely held religious beliefs will allow issuers to

Exhibit 4    JA526    JA-0000117

continue to offer coverage to plan sponsors and individuals, without subjecting them to liability under section 2713(a)(4) of the PHS Act or related provisions for their failure to provide contraceptive coverage.

The issuer exemption does not specifically include third party administrators, although the optional accommodation process provided under these interim final rules specifies that third party administrators cannot be required to contract with an entity that invokes that process. Some religious third party administrators have brought suit in conjunction with suits brought by organizations enrolled in ERISA-exempt church plans. Such plans are now exempt under these interim final rules, and their third party administrators, as claims processors, are under no obligation under section 2713(a)(4) of the PHS Act to provide benefits for contraceptive services, as that section applies only to plans and issuers. In the case of ERISA-covered plans, plan administrators are obligated under ERISA to follow the plan terms, but it is the Departments' understanding that third party administrators are not typically designated as plan administrators under section 3(16) of ERISA and, therefore, would not normally act as plan administrators under section 3(16) of ERISA. Therefore, to the Departments' knowledge, it is only under the existing accommodation process that third party administrators are required to undertake any obligations to provide or arrange for contraceptive coverage to which they might object. These interim final rules make the accommodation process optional for employers and other plan sponsors, and specify that third party administrators that have their own objection to complying with the accommodation process may decline to enter into, or continue, contracts as third party administrators of such plans. For these reasons, these interim final rules do not otherwise exempt third party administrators. The Departments solicit public comment, however, on whether there are situations where there may be an additional need to provide distinct protections for third party administrators that may have religious beliefs implicated by the Mandate.

### F. Scope of Objections Needed for the Objecting Entity Exemption

Exemptions for objecting entities specify that they apply where the entities object as specified in § 147.132(a)(2). That paragraph specifies that exemptions for objecting entities will apply to the extent that an entity described in § 147.132(a)(1) objects to its

establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

### G. Individual Exemption

These interim final rules include a special rule pertaining to individuals (referred to here as the "individual exemption"). Section 147.132(b) provides that nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv), may be construed to prevent a willing plan sponsor of a group health plan or a willing health insurance issuer offering group or individual health insurance coverage, from offering a separate benefit package option, or a separate policy, certificate, or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on the individual's sincerely held religious beliefs. The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan at large or, as applicable, to any other individual policies the issuer offers.

This individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer religiously acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object. This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers. For example, in one case brought against the Departments, the State of Missouri enacted a law under which the State is not permitted to discriminate against insurance issuers that offer health plans without coverage for contraception based on employees' religious beliefs, or against the individual employees who accept such offers. See *Wieland*, 196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption of these interim final rules, employers sponsoring governmental plans would be free to honor the objections of individual employees by offering them plans that omit

contraceptive coverage, even if those governmental entities do not object to offering contraceptive coverage in general.

This "individual exemption" cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of State law that requires coverage of such contraceptives or sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held religious objection. This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4) of the PHS Act, and does not affect any other Federal or State law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these interim final rules do not affect such other laws or terms.

The Departments believe the individual exemption will help to meet the Affordable Care Act's goal of increasing health coverage because it will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held religious beliefs.[62] At the same time, this individual exemption "does not undermine the governmental interests furthered by the contraceptive coverage requirement," [63] because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered.

### H. Optional Accommodation

Despite expanding the scope of the exemption, these rules also keep the accommodation process, but revise it so as to make it optional. In this way, objecting employers are no longer required to choose between direct compliance or compliance through the accommodation. These rules maintain the location of the accommodation process in the Code of Federal Regulations at 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A. These rules, by virtue of expanding the plan sponsor exemption beyond houses of worship and integrated auxiliaries that were

---

[62] See, for example, *Wieland*, 196 F. Supp. 3d at 1017, and *March for Life*, 128 F. Supp. 3d at 130, where the courts noted that the individual employee plaintiffs indicated that they viewed the Mandate as pressuring them to "forgo health insurance altogether."

[63] 78 FR 39874.

previously exempt, and beyond religious nonprofit groups that were previously accommodated, and by defining eligible organizations for the accommodation with reference to those covered by the exemption, likewise expand the kinds of entities that may use the optional accommodation. This includes plan sponsors with sincerely held religious beliefs for the reasons described above. Consequently, under these interim final rules, objecting employers may make use of the exemption, or may choose to pursue the optional accommodation process. If an eligible organization pursues the optional accommodation process through the EBSA Form 700 or other specified notice to HHS, it voluntarily shifts an obligation to provide separate but seamless contraceptive coverage to its issuer or third party administrator.

The fees adjustment process for qualifying health issuers or third party administrators pursuant to 45 CFR 156.50 is not modified, and (as specified therein) requires for its applicability that an exception under OMB Circular No. A–25R be in effect as the Secretary of the Department of Health and Human Services requests.

If an eligible organization wishes to revoke its use of the accommodation, it can do so under these interim final rules and operate under its exempt status. As part of its revocation, the issuer or third party administrator of the eligible organization must provide participants and beneficiaries written notice of such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services. This revocation process applies both prospectively to eligible organizations who decide at a later date to avail themselves of the optional accommodation and then decide to revoke that accommodation, as well as to organizations that were included in the accommodation prior to the effective date of these interim final rules either by their submission of an EBSA Form 700 or notification, or by some other means under which their third party administrator or issuer was notified by DOL or HHS that the accommodation applies. Consistent with other applicable laws, the issuer or third party administrator of an eligible organization must promptly notify plan participants and beneficiaries of the change of status to the extent such participants and beneficiaries are currently being offered contraceptive coverage at the time the accommodated organization invokes its exemption. If contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, the revocation

will be effective on the 1st day of the 1st plan year that begins on or after 30 days after the date of the revocation (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act,[64] if applicable, to revoke its use of the accommodation process.

The Departments have eliminated the provision in the previous accommodation under which an issuer is deemed to have complied with the Mandate where the issuer relied reasonably and in good faith on a representation by an eligible organization as to its eligibility for the accommodation, even if that representation was later determined to be incorrect. Because any organization with a sincerely held religious objection to contraceptive coverage is now eligible for the optional accommodation under these interim final rules and is also exempt, the Departments believe there is minimal opportunity for mistake or misrepresentation by the organization, and the reliance provision is no longer necessary.

### I. Definition of Contraceptive Services for the Purpose of These Rules

The interim final rules specify that when the rules refer to "contraceptive" services, benefits, or coverage, such terms include contraceptive or sterilization items, services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv). This was the case under the previous rules, as expressed in the preamble text of the various iterations of the regulations, but the Departments wish to make the scope clear by specifying it in the regulatory text.

### J. Conclusion

The Departments believe that the Guidelines and the exemptions expanded herein will advance the limited purposes for which Congress imposed section 2713 of the PHS Act, while acting consistently with Congress' well-established record of allowing for religious exemptions with respect to especially sensitive health care and health insurance requirements. These interim final rules leave fully in place over a dozen Federal programs that provide, or subsidize, contraceptives for women, including for low income women based on financial need. These interim final rules also maintain HRSA's

discretion to decide whether to continue to require contraceptive coverage under the Guidelines (in plans where Congress applied section 2713 of the PHS Act) if no objection exists. The Departments believe this array of programs and requirements better serves the interest of providing contraceptive coverage while protecting the conscience rights of entities that have sincerely held religious objections to some or all contraceptive or sterilization services.

The Departments request and encourage public comments on all matters addressed in these interim final rules.

### V. Interim Final Rules, Request for Comments and Waiver of Delay of Effective Date

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include sections 2701 through 2728 of the PHS Act and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. These interim final rules fall under those statutory authorized justifications, as did previous rules on this matter (75 FR 41726; 76 FR 46621; 79 FR 51092).

Section 553(b) of the Administrative Procedure Act (APA) requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. These provisions of the APA do not apply here because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act.

Even if these provisions of the APA applied, they would be satisfied: The Departments have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed. As discussed earlier, the Departments have issued three interim final rules implementing this section of the PHS Act because of the immediate needs of covered entities and the weighty matters implicated by the HRSA Guidelines. As recently as December 20, 2016, HRSA updated

---

[64] See also 26 CFR 54.9815–2715(b); 29 CFR 2590.715–2715(b); 45 CFR 147.200(b).

Exhibit 4                                   JA528                                   JA-0000119

those Guidelines without engaging in the regulatory process (because doing so is not a legal requirement), and announced that it plans to continue to update the Guidelines.

Dozens of lawsuits over the Mandate have been pending for nearly 5 years. The Supreme Court remanded several of those cases more than a year ago, stating that on remand "[w]e anticipate that the Courts of Appeals will allow the parties sufficient time to resolve any outstanding issues between them". *Zubik,* 136 S. Ct. at 1560. During that time, Courts of Appeals have been asking the parties in those cases to submit status reports every 30 through 90 days. Those status reports have informed the courts that the parties were in discussions, and about the RFI issued in late 2016 and its subsequent comment process and the FAQ the Departments issued indicating that we could not find a way at that time to amend the accommodation process so as to satisfy objecting eligible organizations while pursuing the Departments' policy goals. Since then, several courts have issued orders setting more pressing deadlines. For example, on March 10, 2017, the United States Court of Appeals for the Seventh Circuit ordered that, by May 1, 2017, "the court expects to see either a report of an agreement to resolve the case or detailed reports on the parties' respective positions. In the event no agreement is reported on or before May 1, 2017, the court will plan to schedule oral argument on the merits of the case on short notice after that date". The Departments submitted a status report but were unable to set forth their specific position because this interim final rule was not yet on public display. Instead, the Departments informed the Court that we "are now considering whether further administrative action would be appropriate". In response, the court extended the deadline to June 1, 2017, again declaring the court expected "to see either a report of an agreement to resolve the case or detailed reports on the parties' respective positions". The Departments were again unable to set forth their position in that status report, but were able to state that the "Departments of Health and Human Services, Labor, and the Treasury are engaged in rulemaking to reconsider the regulations at issue here," citing *https://www.reginfo.gov/public/do/eoDetails?rrid=127381.*

As discussed above, the Departments have concluded that, in many instances, requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncomplaince has

violated RFRA. Good cause exists to issue the expanded exemption in these interim final rules in order to cure such violations (whether among litigants or among similarly situated parties that have not litigated), to help settle or resolve cases, and to ensure, moving forward, that our regulations are consistent with any approach we have taken in resolving certain litigation matters.

The Departments have also been subject to temporary injunctions protecting many religious nonprofit organizations from being subject to the accommodation process against their wishes, while many other organizations are fully exempt, have permanent court orders blocking the contraceptive coverage requirement, or are not subject to section 2713 of the PHS Act and its enforcement due to Congress' limited application of that requirement. Good cause exists to change the Departments' previous rules to direct HRSA to bring its Guidelines in accord with the legal realities and remove the threat of a future violation of religious beliefs, including where such violations are contrary to Federal law.

Other objecting entities similarly have not had the protection of court injunctions. This includes some nonprofit entities that have sued the Departments, but it also includes some organizations that do not have lawsuits pending against us. For example, many of the closely held for-profit companies that brought the array of lawsuits challenging the Mandate leading up to the decision in *Hobby Lobby* are not protected by injunctions from the current rules, including the requirement that they either fully comply with the Mandate or subject themselves to the accommodation. Continuing to apply the Mandate's regulatory burden on individuals and organizations with religious beliefs against it could serve as a deterrent for citizens who might consider forming new entities—nonprofit or for-profit—and to offering health insurance in employer-sponsored plans or plans arranged by institutions of higher education. Delaying the protection afforded by these interim final rules would be contrary to the public interest because it would serve to extend for many months the harm caused to all entities and individuals with religious objections to the Mandate. Good cause exists to provide immediate resolution to this myriad of situations rather than leaving them to continued uncertainty, inconsistency, and cost during litigation challenging the previous rules.

These interim final rules provide a specific policy resolution that courts

have been waiting to receive from the Departments for more than a year. If the Departments were to publish a notice of proposed rulemaking instead of these interim final rules, many more months could pass before the current Mandate is lifted from the entities receiving the expanded exemption, during which time those entities would be deprived of the relief clearly set forth in these interim final rules. In response to several of the previous rules on this issue—including three issued as interim final rules under the statutory authority cited above—the Departments received more than 100,000 public comments on multiple occasions. Those comments included extensive discussion about whether and by what extent to expand the exemption. Most recently, on July 26, 2016, the Departments issued a request for information (81 FR 47741) and received over 54,000 public comments about different possible ways to resolve these issues. In connection with past regulations, the Departments have offered or expanded a temporary safe harbor allowing organizations that were not exempt from the HRSA Guidelines to operate out of compliance with the Guidelines. The Departments will fully consider comments submitted in response to these interim final rules, but believe that good cause exists to issue the rules on an interim final basis before the comments are submitted and reviewed.

As the United States Court of Appeals for the D.C. Circuit stated with respect to an earlier interim final rule promulgated with respect to this issue in *Priests for Life* v. *U.S. Department of Health and Human Services,* 772 F.3d 229, 276 (D.C. Cir. 2014), vacated on other grounds, *Zubik* v. *Burwell,* 136 S. Ct. 1557 (2016), "[S]everal reasons support HHS's decision not to engage in notice and comment here". Among other things, the Court noted that "the agency made a good cause finding in the rule it issued"; that "the regulations the interim final rule modifies were recently enacted pursuant to notice and comment rulemaking, and presented virtually identical issues"; that "HHS will expose its interim rule to notice and comment before its permanent implementation"; and that "delay in implementation of the rule would interfere with the prompt availability of contraceptive coverage and delay the implementation of the alternative opt-out for religious objectors". *Id.* at 277.

Delaying the availability of the expanded exemption would delay the ability of those organizations and individuals to avail themselves of the relief afforded by these interim final rules. Good cause is supported by

Exhibit 4

providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis. Good cause is also supported by the effect of these interim final rules in bringing to a close the uncertainty caused by years of litigation and regulatory changes made under section 2713(a)(4) of the PHS Act. Issuing interim final rules with a comment period provides the public with an opportunity to comment on whether these regulations expanding the exemption should be made permanent or subject to modification without delaying the effective date of the regulations.

Delaying the availability of the expanded exemption would also increase the costs of health insurance. As reflected in litigation pertaining to the Mandate, some entities are in grandfathered health plans that do not cover contraception. They wish to make changes to their health plans that will reduce the costs of insurance coverage for their beneficiaries or policyholders, but which would cause the plans to lose grandfathered status. They are refraining from making those changes—and therefore are continuing to incur and pass on higher insurance costs—to prevent the Mandate from applying to their plans in violation of their consciences. Issuing these rules on an interim final basis is necessary in order to help reduce the costs of health insurance for such entities and their plan participants.

These interim final rules also set forth an optional accommodation process, and expand eligibility for that process to a broader category of entities. Delaying the availability of the optional accommodation process would delay the ability of organizations that do not now qualify for the accommodation, but wish to opt into it, to be able to do so and therefore to provide a mechanism for contraceptive coverage to be provided to their employees while the organization's religious objections are accommodated.

For the foregoing reasons, the Departments have determined that it would be impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these interim final rules into effect, and that it is in the public interest to promulgate interim final rules. For the same reasons, the Departments have determined, consistent with section 553(d) of the APA (5 U.S.C. 553(d)), that there is good cause to make these

interim final rules effective immediately upon filing at the Office of the Federal Register.

## VI. Economic Impact and Paperwork Burden

We have examined the impacts of the interim final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96 354), section 1102(b) of the Social Security Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2) and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

### A. Executive Orders 12866 and 13563— Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with

economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). As discussed below regarding anticipated effects of these rules and the Paperwork Reduction Act, these interim final rules are not likely to have economic impacts of $100 million or more in any 1 year, and therefore do not meet the definition of "economically significant" under Executive Order 12866. However, OMB has determined that the actions are significant within the meaning of section 3(f)(4) of the Executive Order. Therefore, OMB has reviewed these final regulations, and the Departments have provided the following assessment of their impact.

### 1. Need for Regulatory Action

These interim final rules amend the Departments' July 2015 final regulations to expand the exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4) of the PHS Act, section 715(a)(1) of the ERISA, and section 9815(a)(1) of the Code, and to revise the accommodation process to make it optional for eligible organizations. The expanded exemption would apply to individuals and entities that have religious objections to some (or all) of the contraceptive and/or sterilization services that would be covered under the Guidelines. Such action is taken, among other reasons, to provide for participation in the health insurance market by certain entities or individuals free from penalties for violating sincerely held religious beliefs opposed to providing or receiving coverage of contraceptive services, and to resolve many of the lawsuits that have been filed against the Departments.

### 2. Anticipated Effects

The Departments assess this interim final rule together with a companion interim final rule concerning moral but non-religious conscientious objections to contraception, published elsewhere in this **Federal Register**. Regarding entities that are extended an exemption, absent expansion of the exemption the Guidelines would require many of these entities and individuals to either: Pay for coverage of contraceptive services that they find religiously objectionable; submit self-certifications that would result in their issuer or third party administrator paying for such services for their employees, which some entities also believe entangles them in the provision of such objectionable coverage; or, pay tax penalties or be

Exhibit 4                          JA530                          JA-0000121

subject to other adverse consequences for non-compliance with these requirements. These interim final rules remove certain associated burdens imposed on these entities and individuals—that is, by recognizing their religious objections and exempting them—on the basis of such objections—from the contraceptive and/or sterilization coverage requirement of the HRSA Guidelines and making the accommodation process optional for eligible organizations.

To the extent that entities choose to revoke their accommodated status to make use of the expanded exemption immediately, a notice will need to be sent to enrollees (either by the entity or by the issuer or third party administrator) that their contraceptive coverage is changing, and guidance will reflect that such a notice requirement is imposed no more than is already required by preexisting rules that require notices to be sent to enrollees of changes to coverage during a plan year. If the entities wait until the start of their next plan year to change to exempt status, instead of doing so during a plan year, those entities generally will also be able to avoid sending any supplementary notices in addition to what they would otherwise normally send prior to the start of a new plan year. Additionally, these interim final rules provide such entities with an offsetting regulatory benefit by the exemption itself and its relief of burdens on their religious beliefs. As discussed below, assuming that more than half of entities that have been using the previous accommodation will seek immediate revocation of their accommodated status and notices will be sent to all their enrollees, the total estimated cost of sending those notices will be $51,990.

The Departments estimate that these interim final rules will not result in any additional burdens or costs on issuers or third party administrators. As discussed below, the Departments believe that 109 of the 209 entities making use of the accommodation process will instead make use of their newly exempt status. In contrast, the Departments expect that a much smaller number (which we assume to be 9) will make use of the accommodation that were not provided access to it previously. Reduced burdens for issuers and third party administrators due to reductions in use of the accommodation will more than offset increased obligations on issuers and third party administrators serving the fewer number of entities that will newly opt into the accommodation. This will lead to a net decrease in burdens and costs on issuers and third party

administrators, who will no longer have continuing obligations imposed on them by the accommodation.

These interim final rules will result in some persons covered in plans of newly exempt entities not receiving coverage or payments for contraceptive services. The Departments do not have sufficient data to determine the actual effect of these rules on plan participants and beneficiaries, including for costs they may incur for contraceptive coverage, nor of unintended pregnancies that may occur. As discussed above and for reasons explained here, there are multiple levels of uncertainty involved in measuring the effect of the expanded exemption, including but not limited to—

- How many entities will make use of their newly exempt status.
- how many entities will opt into the accommodation maintained by these rules, under which their plan participants will continue receiving contraceptive coverage.
- which contraceptive methods some newly exempt entities will continue to provide without cost-sharing despite the entity objecting to other methods (for example, as reflected in *Hobby Lobby*, several objecting entities still provide coverage for 14 of the 18 women's contraceptive or sterilization methods, 134 S. Ct. at 2766).
- how many women will be covered by plans of entities using their newly exempt status.
- which of the women covered by those plans want and would have used contraceptive coverage or payments for contraceptive methods that are no longer covered by such plans.
- whether, given the broad availability of contraceptives and their relatively low cost, such women will obtain and use contraception even if it is not covered.
- the degree to which such women are in the category of women identified by IOM as most at risk of unintended pregnancy.
- the degree to which unintended pregnancies may result among those women, which would be attributable as an effect of these rules only if the women did not otherwise use contraception or a particular contraceptive method due to their plan making use of its newly exempt status.
- the degree to which such unintended pregnancies may be associated with negative health effects, or whether such effects may be offset by other factors, such as the fact that those women will be otherwise enrolled in insurance coverage.
- the extent to which such women will qualify for alternative sources of

contraceptive access, such as through a parent's or spouse's plan, or through one of the many governmental programs that subsidize contraceptive coverage to supplement their access.

The Departments have access to sources of information discussed in the following paragraphs that are relevant to this issue, but those sources do not provide a full picture of the impact of these interim final rules.

First, the prior rules already exempted certain houses of worship and their integrated auxiliaries. Further, as discussed above, the prior accommodation process allows hundreds of additional religious nonprofit organizations in self-insured church plans that are exempt from ERISA to file a self-certification or notice that relieves not only themselves but, in effect, their third party administrators of any obligation to provide contraceptive coverage or payments. Although in the latter case, third party administrators are legally permitted to provide the coverage, several self-insured church plans themselves have expressed an objection in litigation to allowing such contraceptive coverage to be provided, and according to information received during litigation, it appears that such contraceptive coverage has not been provided. In addition, a significant portion of the lawsuits challenging the Mandate were brought by a single firm representing Catholic dioceses and related entities covered by their diocese-sponsored plans. In that litigation, the Departments took the position that, where those diocese-sponsored plans are self-insured, those plans are likely church plans exempt from ERISA.[65] For the purposes of considering whether the expanded exemption in these rules affects the persons covered by such diocese-sponsored plans, the Departments continue to assume that such plans are similar to other objecting entities using self-insured church plans with respect to their third party administrators being unlikely to provide contraceptive coverage to plan participants and beneficiaries under the previous rule. Therefore the

---

[65] See, for example, Brief in Opp. To Pls.' Mot. for Prelim. Inj., *Brandt v. Burwell*, No. 2:14–cv–681–AJS, doc. #23 (W.D. Pa. filed June 10, 2014) (arguing that "plaintiffs have not established an injury in fact to the degree plaintiffs here has suggested in another similar case that all 'Catholic entities like the Archdiocese participate in "church plans." '"); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013) ("because plaintiffs' self-insured plans are church plans, their third party administrators would not be required to provide contraceptive coverage").

Exhibit 4                    JA531                    JA-0000122

Departments estimate that these interim final rules have no significant effect on the contraceptive coverage of women covered by plans of houses of worship and their integrated auxiliaries, entities using a self-insured church plan, or church dioceses sponsoring self-insured plans.

It is possible that an even greater number of litigating or accommodated plans might have made use of self-insured church plan status under the previous accommodation. Notably, one of the largest nonprofit employers that had filed suit challenging the Mandate had, under these prior rules, shifted most of their employees into self-insured church plans, and the Departments have taken the position that various other employers that filed suit were eligible to assume self-insured church plan status.[66] The Supreme Court's recent decision in *Advocate Health Care Network*, while not involving this Mandate, also clarifies certain circumstances under which religious hospitals may be eligible for self-insured church plan status. See 137 S. Ct. at 1656–57, 1663 (holding that a church plan under ERISA can be a plan not established and maintained by a church, if it is maintained by a principal-purpose organization).

Second, when the Departments previously created the exemption, expanded its application, and provided an accommodation (which, as mentioned, can lift obligations on self-insured church plans for hundreds of nonprofit organizations), we concluded that no significant burden or costs would result at all. (76 FR 46625; 78 FR 39889.) We reached this conclusion despite the impact, just described, whereby the previous rule apparently lead to women not receiving contraceptive coverage through hundreds of nonprofit entities using self-insured church plans. We also reached this conclusion without counting any significant burden or cost to some women covered in the plans of houses of worship or integrated auxiliaries that might want contraceptive coverage. This conclusion was based in part on the assertion, set forth in previous regulations, that employees of houses of worship and integrated auxiliaries likely share their employers' opposition to contraception. Many other religious nonprofit entities, however, both adopt and implement religious principles with similar

fervency. For the reasons discussed above, the Departments no longer believe we can distinguish many of the women covered in the plans of religious nonprofit entities from the women covered in the plans of houses of worship and integrated auxiliaries regarding which the Departments assumed share their employers' objection to contraception, nor from women covered in the plans of religious entities using self-insured church plans regarding which we chose not to calculate any anticipated effect even though we conceded we were not requiring their third party administrators to provide contraceptive coverage. In the estimates and assumptions below, we include the potential effect of these interim rules on women covered by such entities, in order to capture all of the anticipated effects of these rules.

Third, these interim final rules extend the exemption to for-profit entities. Among the for-profit employers that filed suit challenging the Mandate, the one with the most employees was *Hobby Lobby*.[67] As noted above, and like some similar entities, the plaintiffs in *Hobby Lobby* were willing to provide coverage with no cost sharing of various contraceptive services: 14 of 18 FDA-approved women's contraceptive and sterilization methods.[68] (134 S. Ct. at 2766.) The effect of expanding the exemption to for-profit entities is therefore mitigated to the extent many of the persons covered by such entities' plans may receive coverage for at least some contraceptive services. No publicly traded for-profit entities have

filed lawsuits challenging the Mandate. The Departments agree with the Supreme Court's expectation in this regard: "it seems unlikely that the sort of corporate giants to which HHS refers will often assert RFRA claims. HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and numerous practical restraints would likely prevent that from occurring. For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable". *Hobby Lobby*, 134 S. Ct. at 2774. Therefore, although publicly traded entities could make use of exempt status under these interim final rules, the Departments do not expect that very many will do so, as compared to the 87 religious closely held for-profit entities that brought litigation challenging the Mandate (some of which might be content with the accommodation).

Fourth, the Departments have a limited amount of information about entities that have made use of the accommodation process as set forth in the previous rules. HHS previously estimated that 209 entities would make use of the accommodation process. That estimate was based on HHS's observation in its August 2014 interim final rules and July 2015 final regulations that there were 122 eligible entities that had filed litigation challenging the accommodation process, and 87 closely held for-profit entities that had filed suit challenging the Mandate in general. (79 FR 51096; 80 FR 41336). The Departments acknowledged that entities that had not litigated might make use of the accommodation, but we stated we did not have better data to estimate how many might use the accommodation overall.

After issuing those rules, the Departments have not received complete data on the number of entities actually using the accommodation, because the accommodation does not require many accommodated entities to submit information to us. Our limited records indicate that approximately 63 entities have affirmatively submitted notices to HHS to use the accommodation. This includes some fully insured and some self-insured plans, but it does not include entities that may have used the accommodation by submitting an EBSA form 700 self-certification directly to their issuer or third party administrator. We have deemed some other entities as being subject to the accommodation through their litigation filings, but that might not have led to contraceptive coverage being

---

[66] See *https://www.franciscanhealth.org/sites/default/files/2015%20employee%20benefit%20booklet.pdf*; see, for example, *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

[67] Verified Complaint ¶ 34, *Hobby Lobby Stores, Inc., et al. v. Sebelius*, No. 5:12–cv–01000–HE (Sept. 12, 2012 W.D. Okla.) (13,240 employees).

[68] By reference to the FDA Birth Control Guide's list of 18 birth control methods for women and 2 for men, *https://www.fda.gov/downloads/forconsumers/byaudience/forwomen/freepublications/ucm517406.pdf*, Hobby Lobby and entities with similar beliefs were not willing to cover: IUD copper; IUD with progestin; emergency contraceptive (Levonorgestrel); and emergency contraceptive (Ulipristal Acetate). See 134 S. Ct. at 2765–66. Hobby Lobby was willing to cover: Sterilization surgery for women; sterilization implant for women; implantable rod; shot/injection; oral contraceptives ("the Pill"—combined pill); oral contraceptives ("the Pill"—extended/continuous use/combined pill); oral contraceptives ("the Mini Pill"—progestin only); patch; vaginal contraceptive ring; diaphragm with spermicide; sponge with spermicide; cervical cap with spermicide; female condom; spermicide alone. *Id.* Among women using these 18 female contraceptive methods, 85 percent use the 14 methods that Hobby Lobby and entities with similar beliefs were willing to cover (22,446,000 out of 26,436,000), and "[t]he pill and female sterilization have been the two most commonly used methods since 1982." See Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), available at *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states*.

Exhibit 4    JA532    JA-0000123

provided to persons covered in some of those plans, either because they are exempt as houses of worship or integrated auxiliaries, they are in self-insured church plans, or we were not aware of their issuers or third party administrators so as to send them letters obligating them to provide such coverage. Our records also indicate that 60 plans used the contraceptive user fees adjustments in the 2015 plan year, the last year for which we have data. This includes only self-insured plans, and it includes some plans that self-certified through submitting notices and other plans that, presumably, self-certified through the EBSA form 700.

These sets of data are not inconsistent with our previous estimate that 209 entities would use the accommodation, but they indicate that some non-litigating entities used the accommodation, and some litigating entities did not, possibly amounting to a similar number. For this reason, and because we do not have more complete data available, we believe the previous estimate of 209 accommodated entities is still the best estimate available for how many entities have used the accommodation under the previous rule. This assumes that the number of litigating entities that did not use the accommodation is approximately the same as the number of non-litigating entities that did use it.

In considering how many entities will use the voluntary accommodation moving forward—and how many will use the expanded exemption—we also do not have specific data. We expect the 122 nonprofit entities that specifically challenged the accommodation in court to use the expanded exemption. But, as noted above, we believe a significant number of them are not presently participating in the accommodation, and that some nonprofit entities in self-insured church plans are not providing contraceptive coverage through their third party administrators even if they are using the accommodation. Among the 87 for-profit entities that filed suit challenging the Mandate in general, few if any filed suit challenging the accommodation. We do not know how many of those entities are using the accommodation, how many may be complying with the Mandate fully, how many may be relying on court injunctions to do neither, or how many will use the expanded exemption moving forward. Among entities that never litigated but used the accommodation, we expect many but not all of them to continue using the accommodation, and we do not have data to estimate how many such entities

there are or how many will choose either option.

Overall, therefore, without sufficient data to estimate what the estimated 209 previously accommodated entities will do under these interim final rules, we assume that just over half of them will use the expanded exemption, and just under half will continue their accommodated status under the voluntary process set forth in these rules. Specifically, we assume that 109 previously accommodated entities will make use of their exempt status, and 100 will continue using the accommodation. This estimate is based in part on our view that most litigating nonprofit entities would prefer the exemption to the accommodation, but that many of either have not been using the accommodation or, if they have been using it, it is not providing contraceptive coverage for women in their plans where they participate in self-insured church plans. This estimate is also consistent with our lack of knowledge of how many for-profit entities were using the accommodation and will choose the exemption or the accommodation, given that many of them did not bring legal challenges against the accommodation after *Hobby Lobby*. This estimate is further consistent with our view, explained in more detail below, that some entities that are using the accommodation and did not bring litigation will use the exemption, but many accommodated, non-litigating entities—including the ones with the largest relative workforces among accommodated entities—will continue using the accommodation. The Departments recognize that we do not have better data to estimate the effects of these interim final rules on such entities.

In addition to these factors, we recognize that the expanded exemption and accommodation are newly available to religious for-profit entities that are not closely held and some other plan sponsors. As explained above, the Departments believe religious for-profit entities that are not closely held may exist, or may wish to come into being. HHS does not anticipate that there will be significant number of such entities, and among those, we believe that very few if any will use the accommodation. All of the for-profit entities that have challenged the Mandate have been religious closely held entities.

It is also possible that religious nonprofit or closely held for-profit entities that were already eligible for the accommodation but did not previously use it will opt into it moving forward, but because they could have done so under the previous rules, their opting

into the accommodation is not caused by these rules.

Without any data to estimate how many of any entities newly eligible for and interested in using the accommodation might exist, HHS assumes for the purposes of estimating the anticipated effect of these rules that less than 10 entities (9) will do so. Therefore, we estimate that 109 entities will use the voluntary accommodation moving forward, 100 of which are already using the previous accommodation, and that 109 entities that have been using the previous accommodation will use the expanded exemption instead.

Fifth, in attempting to estimate the anticipated effect of these interim final rules on women receiving contraceptive coverage, the Departments have limited information about the entities that have filed suit challenging the Mandate. Approximately 209 entities have brought suit challenging the Mandate over more than 5 years. They have included a broad range of nonprofit entities and closely held for-profit entities. We discuss a number of potentially relevant points:

First, the Departments do not believe that out-of-pocket litigation costs have been a significant barrier to entities choosing to file suit. Based on the Departments' knowledge of these cases through public sources and litigation, nearly all the entities were represented pro bono and were subject to little or no discovery during the cases, and multiple public interest law firms publicly provided legal services for entities willing to challenge the Mandate.[69] (It is noteworthy, however, that such pro bono arrangements and minimization of discovery do not eliminate 100 percent of the time costs of participating in litigation or, as discussed in more detail below, the potential for negative

---

[69] See, for example, Catholic Diocese of Pittsburgh, "Award-winning attorney 'humbled' by recognition," *Pittsburgh Catholic* ("Jones Day is doing the cases 'pro bono,' or voluntarily and without payment.") (quoting Paul M. Pohl, Partner, Jones Day), available at *http://diepitt.org/pittsburgh-catholic/award-winning-attorney-humbled-recognition;* "Little Sisters Fight for Religious Freedom," *National Review* (Oct. 2, 2013) ("the Becket Fund for Religious Liberty is representing us pro bono, as they do all their clients.") (quoting Sister Constance Veit, L.S.P., communications director for the Little Sisters of the Poor), available at *http://www.nationalreview.com/article/360103/little-sisters-fight-religious-freedom-interview;* Suzanne Cassidy, "Meet the major legal players in the Conestoga Wood Specialties Supreme Court case," *LancasterOnline* (Mar. 25, 2014) ("Cortman and the other lawyers arguing on behalf of Conestoga Wood Specialties and Hobby Lobby are offering their services pro bono."), available at *http://lancasteronline.com/news/local/meet-the-major-legal-players-in-the-conestoga-wood-specialties/article_302bc8e2-b379-11e3-b669-001a4bcf6878.html.*

Exhibit 4                                      JA533                                      JA-0000124

publicity. Both concerns could have dissuaded participation in lawsuits, and the potential for negative publicity may also dissuade participation in the expanded exemptions.)

Second, prior to the Affordable Care Act, the vast majority of entities already covered contraception, albeit not always without cost-sharing The Departments do not have data to indicate why entities that did not cover contraception prior to the Affordable Care Act chose not to cover it. As noted above, however, the Departments have maintained that compliance with the contraceptive Mandate is cost-neutral to issuers, which indicates that no significant financial incentive exists to omit contraceptive coverage. As indicated by the report by HHS ASPE discussed above, we have assumed that millions of women received preventive services after the Mandate went into effect because nearly all entities complied with the Guidelines. We are not aware of expressions from most of those entities indicating that they would have sincerely held religious objections to complying with the Mandate, and therefore that they would make use of the expanded exemption provided here.

Third, omitting contraceptive coverage has subjected some entities to serious public criticism and in some cases organized boycotts or opposition campaigns that have been reported in various media and online outlets regarding entities that have filed suit. The Departments expect that even if some entities might not receive such criticism, many entities will be reluctant to use the expanded exemption unless they are committed to their views to a significant degree.

Overall, the Departments do not know how many entities will use the expanded exemption. We expect that some non-litigating entities will use it, but given the aforementioned considerations, we believe it might not be very many more. Moreover, many litigating entities are already exempt or are not providing contraceptive coverage to women in their plans due to their participating in self-insured church plans, so the effect of the expanded exemption among litigating entities is significantly lower than it would be if all the women in their plans were already receiving the coverage.

To calculate the anticipated effects of this rule on contraceptive coverage among women covered by plans provided by litigating entities, we start by examining court documents and other public sources.[70] These sources

provide some information, albeit incomplete, about how many people are employed by these entities. As noted above, however, contraceptive coverage among the employees of many litigating entities will not be affected by these rules because some litigating entities were exempt under the prior rule, while others were or appeared to be in self-insured church plans so that women covered in their plans were already not receiving contraceptive coverage.

Among litigating entities that were neither exempt nor likely using self-insured church plans, our best estimate based on court documents and public sources is that such entities employed approximately 65,000 persons, male and female.[71] The average number of workers at firms offering health benefits that are actually covered by those benefits is 62 percent.[72] This amounts to approximately 34,000 employees covered under those plans. DOL estimates that for each employee policyholder, there is approximately one dependent.[73] This amounts to approximately 68,000 covered persons. Census data indicate that women of childbearing age—that is, women aged 15–44—compose 20.2 percent of the general population.[74] In addition,

approximately 44.3 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines.[75] Therefore, we estimate that approximately 7,221 women of childbearing age that use contraception covered by the Guidelines are covered by employer sponsored plans of entities that have filed lawsuits challenging the Mandate, where those plans are neither exempt under the prior rule nor are self-insured church plans.

We also estimate that for the educational institutions objecting to the Mandate as applied to student coverage that they arranged, where the entities were neither exempt under the prior rule nor were their student plans self-insured, such student plans likely covered approximately 3,300 students. On average, we expect that approximately half of those students (1,650) are female. For the purposes of this estimate, we also assume that female policyholders covered by plans arranged by institutions of higher education are women of childbearing age. We expect that they would have less than the average number of dependents per policyholder than exists in standard plans, but for the purposes of providing an upper bound to this estimate, we assume that they would have an average of one dependent per policyholder, thus bringing the number of policyholders and dependents back up to 3,300. Many of those dependents are likely not to be women of childbearing age, but in order to provide an upper bound to this estimate, we assume they are. Therefore, for the purposes of this estimate, we assume that the effect of these expanded exemptions on student plans of litigating entities includes 3,300 women. Assuming that 44.3 percent of such women use contraception covered by the Guidelines,[76] we estimate that

---

[70] Where complaints, affidavits, or other documents filed in court did not indicate the

number of employees that work for an entity, and that entity was not apparently exempt as a house of worship or integrated auxiliary, and it was not using the kind of plan that we have stated in litigation qualifies for self-insured church plan status (see, for example, *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013)), we examined employment data contained in some IRS form W–3's that are publicly available online for certain nonprofit groups, and looked at other Web sites discussing the number of people employed at certain entities.

[71] In a small number of lawsuits, named plaintiffs include organizations claiming to have members that seek an exemption. We have very little information about the number, size, and types of entities those members. Based on limited information from those cases, however, their membership appears to consist mainly, although not entirely, of houses of worship, integrated auxiliaries, and participants in self-insured plans of churches. As explained above, the contraceptive coverage of women covered by such plans is not likely to be affected by the expanded exemption in these rules. However, to account for plans subject to contraceptive coverage obligations among those members we have added 10,000 to our estimate of the number of persons among litigants that may be impacted by these rules.

[72] See Kaiser Family Foundation and Health Research and Educational Trust, "Employer Health Benefits: 2017 Annual Survey" at 57, available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017*.

[73] "Health Insurance Coverage Bulletin" Table 4, page 21. Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf*.

[74] United States Census Bureau, "Age and Sex Composition: 2010" (May 2011), available at *https://www.census.gov/prod/cen2010/briefs/*

*c2010br-03.pdf*. The Guidelines' requirement of contraceptive coverage only applies "for all women with reproductive capacity." *https://www.hrsa.gov/womensguidelines/*; also, see 80 FR 40318. In addition, studies commonly consider the 15–44 age range to assess contraceptive use by women of childbearing age. See, for example, Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), available at *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states*.

[75] See *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states* (reporting that of 60,887,000 women aged 15–44, 26,945,000 use women's contraceptive methods covered by the Guidelines).

[76] It would appear that a smaller percentage of college-aged women use contraception—and use more expensive methods such as long acting methods or sterilization—than among other women of childbearing age. See NCHS Data Brief, "Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013" (Dec. 2014), available at

Continued

Exhibit 4

JA534

JA-0000125

1,462 of those women would be affected by these rules.

Together, this leads the Departments to estimate that approximately 8,700 women of childbearing age may have their contraception costs affected by plans of litigating entities using these expanded exemptions. As noted above, the Departments do not have data indicating how many of those women agree with their employers' or educational institutions' opposition to contraception (so that fewer of them than the national average might actually use contraception). Nor do we know how many would have alternative contraceptive access from a parent's or spouse's plan, or from Federal, State, or local governmental programs, nor how many of those women would fall in the category of being most at risk of unintended pregnancy, nor how many of those entities would provide some contraception in their plans while only objecting to certain contraceptives.

Sixth, in a brief filed in the *Zubik* litigation, the Departments stated that "in 2014, [HHS] provided user-fee reductions to compensate TPAs for making contraceptive coverage available to more than 600,000 employees and beneficiaries," and that "[t]hat figure includes both men and women covered under the relevant plans." [77] HHS has reviewed the information giving rise to that estimate, and has received updated information for 2015. In 2014, 612,000 persons were covered by plans claiming contraceptive user fees adjustments, and in 2015, 576,000 persons were covered by such plans. These numbers include all persons in such plans, not just women of childbearing age.

HHS's information indicates that religious nonprofit hospitals or health systems sponsored a significant minority of the accommodated self-insured plans that were using contraceptive user fees adjustments, yet those plans covered more than 80 percent of the persons covered in all plans using contraceptive user fees adjustments. Some of those plans cover nearly 100,000 persons each, and several others cover approximately 40,000 persons each. In other words, these plans were proportionately much larger than the plans provided by other entities using the contraceptive user fees adjustments.

There are two reasons to believe that a significant fraction of the persons covered by previously accommodated

*https://www.cdc.gov/nchs/data/databriefs/db173.pdf.*

[77] Brief of Respondents at 18–19 & n.7, *Zubik v. Burwell*, No. 14–1418, et al. (U.S. filed Feb. 10, 2016). The actual number is 612,487.

plans provided by religious nonprofit hospitals or health systems may not be affected by the expanded exemption. A broad range of religious hospitals or health systems have publicly indicated that they do not conscientiously oppose participating in the accommodation.[78] Of course, some of these religious hospitals or health systems may opt for the expanded exemption under these interim final rules, but others might not. In addition, among plans of religious nonprofit hospitals or health systems, some have indicated that they might be eligible for status as a self-insured church plan.[79] As discussed above, some litigants challenging the Mandate have appeared, after their complaints were filed, to make use of self-insured church plan status.[80] (The Departments take no view on the status of these particular plans under ERISA, but simply make this observation for the purpose of seeking to estimate the impact of these interim final rules.) Nevertheless, overall it seems likely that many of the remaining religious hospital or health systems plans previously using the accommodation will continue to opt into the voluntary accommodation under these interim final rules, under which their employees will still receive contraceptive coverage. To the extent that plans of religious hospitals or health systems are able to make use of self-insured church plan status, the previous accommodation rule would already have allowed them to relieve themselves and their third party administrators of obligations to provide contraceptive coverage or payments. Therefore, in such situations these interim final rules would not have an

[78] See, for example, *https://www.chausa.org/newsroom/women%27s-preventive-health-services-final-rule* ("HHS has now established an accommodation that will allow our ministries to continue offering health insurance plans for their employees as they have always done. . . . We are pleased that our members now have an accommodation that will not require them to contract, provide, pay or refer for contraceptive coverage. . . . We will work with our members to implement this accommodation.") In comments submitted in previous rules concerning this Mandate, the Catholic Health Association has stated it "is the national leadership organization for the Catholic health ministry, consisting of more than 2,000 Catholic health care sponsors, systems, hospitals, long-term care facilities, and related organizations. Our ministry is represented in all 50 states and the District of Columbia." Comments on CMS–9968–ANPRM (dated June 15, 2012).

[79] See, for example, Brief of the Catholic Health Association of the United States as Amicus Curiae in Support of Petitioners, *Advocate Health Care Network*, Nos. 16–74, 16–86, 16–258, 2017 WL 371934 at *1 (U.S. filed Jan. 24, 2017) ("CHA members have relied for decades that the 'church plan' exemption contained in" ERISA.).

[80] See supra note 66.

anticipated effect on the contraceptive coverage of women in those plans.

Considering all these data points and limitations, the Departments offer the following estimate of the number of women who will be impacted by the expanded exemption in these interim final rules. The Departments begin with the 8,700 women of childbearing age that use contraception who we estimate will be affected by use of the expanded exemption among litigating entities. In addition to that number, we calculate the following number of women affected by accommodated entities using the expanded exemption. As noted above, approximately 576,000 plan participants and beneficiaries were covered by self-insured plans that received contraceptive user fee adjustments in 2014. Although additional self-insured entities may have participated in the accommodation without making use of contraceptive user fees adjustments, we do not know what number of entities did so. We consider it likely that self-insured entities with relatively larger numbers of covered persons had sufficient financial incentive to make use of the contraceptive user fees adjustments. Therefore, without better data available, we assume that the number of persons covered by self-insured plans using contraceptive user fees adjustments approximates the number of persons covered by all self-insured plans using the accommodation.

An additional but unknown number of persons were likely covered in fully insured plans using the accommodation. The Departments do not have data on how many fully insured plans have been using the accommodation, nor on how many persons were covered by those plans. DOL estimates that, among persons covered by employer sponsored insurance, 56.1 percent are covered by self-insured plans and 43.9 percent are covered by fully insured plans.[81] Therefore, corresponding to the 576,000 persons covered by self-insured plans using user fee adjustments, we estimate an additional 451,000 persons were covered by fully insured plans using the accommodation. This yields an estimate of 1,027,000 covered persons of all ages and sexes in plans using the previous accommodation.

As discussed below, and recognizing the limited data available for our estimates, the Departments estimate that 100 of the 209 entities that were using the accommodation under the prior rule

[81] "Health Insurance Coverage Bulletin" Table 3A, page 15. Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.*

Exhibit 4                                        JA535                                        JA-0000126

will continue to opt into it under these interim final rules. Notably, however, the data concerning accommodated self-insured plans indicates that plans sponsored by religious hospitals and health systems encompass more than 80 percent of the persons covered in such plans. In other words, plans sponsored by such entities have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons. As also cited above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans, so that these interim final rules would not impact the contraceptive coverage their employees receive. We do not have specific data on which plans of what sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status. We assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which we lack representative data. Based on these assumptions and without better data available, we assume that the 100 accommodated entities that will remain in the accommodation will account for 75 percent of all the persons previously covered in accommodated plans. In comparison, we assume the 109 accommodated entities that will make use of the expanded exemption will encompass 25 percent of persons previously covered in accommodated plans.

Applying these percentages to the total number of 1,027,000 persons we estimate are covered in accommodated plans, we estimate that approximately 257,000 persons previously covered in accommodated plans will be covered in the 109 plans that use the expanded exemption, and 770,000 persons will be covered in the estimated 100 plans that continue to use the accommodation. According to the Census data cited above, 20.2 percent of these persons are women of childbearing age, which amounts to approximately 51,900 women of childbearing age in previously accommodated plans that we estimate will use the expanded exemption. As noted above, approximately 44.3 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines, so that we expect approximately 23,000 women that use contraception covered by the Guidelines

to be affected by accommodated entities using the expanded exemption.

It is not clear the extent to which this number overlaps with the number estimated above of 8,700 women in plans of litigating entities that may be affected by these rules. Based on our limited information from the litigation and accommodation notices, we expect that the overlap is significant. Nevertheless, in order to estimate the possible effects of these rules, we assume there is no overlap between these two numbers, and therefore that these interim final rules would affect the contraceptive costs of approximately 31,700 women.

Under the assumptions just discussed, the number of women whose contraceptive costs will be impacted by the expanded exemption in these interim final rules is less than 0.1 percent of the 55.6 million women in private plans that HHS ASPE estimated[82] receive preventive services coverage under the Guidelines.

In order to estimate the cost of contraception to women affected by the expanded exemption, the Departments are aware that, under the prior accommodation process, the total user fee adjustment amount for self-insured plans for the 2015 benefit year was $33 million. These adjustments covered the cost of contraceptive coverage provided to women participants and beneficiaries in self-insured plans where the employer objected and made use of the accommodation, and where an authorizing exception under OMB Circular No. A–25R was in effect as the Secretary of the Department of Health and Human Services requests. Nine percent of that amount was attributable to administrative costs and margin, according to the provisions of 45 CFR 156.50(d)(3)(ii). Thus the amount of the adjustments attributable to the cost of contraceptive services was about $30 million. As discussed above, in 2015 that amount corresponded to 576,000 persons covered by such plans. Among those persons, as cited above, approximately 20.2 percent on average were women of childbearing age—that is, approximately 116,000 women. As noted above, approximately 44.3 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines, which includes 51,400 women in those plans. Therefore, entities using contraceptive user fees adjustments received

approximately $584 per year per woman of childbearing age that use contraception covered by the Guidelines and are covered in their plans.

As discussed above, the Departments estimate that the expanded exemptions will impact the contraceptive costs of approximately 31,700 women of childbearing age that use contraception covered by the Guidelines. At an average of $584 per year, the financial transfer effects attributable to the interim final rules on those women would be approximately $18.5 million.[83][84]

To account for uncertainty in the estimate, we conducted a second analysis using an alternative framework, in order to thoroughly consider the possible upper bound economic impact of these interim final rules.

As noted above, the HHS ASPE report estimated that 55.6 million women aged 15 to 64 and covered by private insurance had preventive services coverage under the Affordable Care Act. Approximately 16.2 percent of those women were enrolled in plans on exchanges or were otherwise not covered by employer sponsored insurance, so only 46.6 million women aged 15 to 64 received the coverage through employer sponsored private insurance plans.[85] In addition, some of those private insurance plans were offered by government employers, encompassing approximately 10.5 million of those women aged 15 to 64.[86]

---

[83] As noted above, the Departments have taken the position that providing contraceptive coverage is cost neutral to issuers. (78 FR 39877). At the same time, because of the up-front costs of some contraceptive or sterilization methods, and because some entities did not cover contraception prior to the Affordable Care Act, premiums may be expected to adjust to reflect changes in coverage, thus partially offsetting the transfer experienced by women who use the affected contraceptives. As discussed elsewhere in this analysis, such women may make up approximately 8.9 percent (= 20.2 percent × 44.3 percent) of the covered population, in which case the offset would also be approximately 8.9 percent.

[84] Describing this impact as a transfer reflects an implicit assumption that the same products and services would be used with or without the rule. Such an assumption is somewhat oversimplified because the interim final rules shift cost burden to consumption decision-makers (that is, the women who choose whether or not to use the relevant contraceptives) and thus can be expected to lead to some decrease in use of the affected drugs and devices and a potential increase in pregnancy—thus leading to a decrease and an increase, respectively, in medical expenditures.

[85] Available at https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.

[86] The ASPE study relied on Census data of private health insurance plans, which included plans sponsored by either private or public sector
Continued

[82] Available at https://aspe.hhs.gov/pdf-report/affordable-care-act-improving-access-preventive-services-millions-americans; also, see Abridged Report, available at https://www.womenspreventivehealth.org/wp-content/uploads/2017/01/WPSI_2016AbridgedReport.pdf.

Exhibit 4                    JA536                    JA-0000127

The expanded exemption in these interim final rules does not apply to government plan sponsors. Thus we estimate that the number of women aged 15 to 64 covered by private sector employer sponsored insurance who receive preventive services coverage under the Affordable Care Act is approximately 36 million.

Prior to the implementation of the Affordable Care Act, approximately 6 percent of employer survey respondents did not offer contraceptive coverage, with 31 percent of respondents not knowing whether they offered such coverage.[87] The 6 percent may have included approximately 2.16 million of the women aged 15–64 covered by employer sponsored insurance plans in the private sector. According to Census data, 59.9 percent of women aged 15 to 64 are of childbearing age (aged 15 to 44), in this case, 1.3 million. And as noted above, approximately 44.3 percent of women of childbearing age

use women's contraceptive methods covered by the Guidelines. Therefore we estimate that 574,000 women of childbearing age that use contraceptives covered by plans that omitted contraceptive coverage prior to the Affordable Care Act.[88]

It is unknown what motivated those employers to omit contraceptive coverage—whether they did so for conscientious reasons, or for other reasons. Despite our lack of information about their motives, we attempt to make a reasonable estimate of the upper bound of the number of those employers that omitted contraception before the Affordable Care Act and that would make use of these expanded exemptions based on sincerely held religious beliefs.

To begin, we estimate that publicly traded companies would not likely make use of these expanded exemptions. Even though the rule does not preclude publicly traded companies from dropping coverage based on a sincerely held religious belief, it is likely that attempts to object on religious grounds by publicly traded companies would be rare. The Departments take note of the Supreme Court's decision in *Hobby Lobby*, where the Court observed that "HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and numerous practical restraints would likely prevent that from occurring. For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run

a corporation under the same religious beliefs seems improbable". 134 S. Ct. at 2774. The Departments are aware of several Federal health care conscience laws [89] that in some cases have existed for decades and that protect companies, including publicly traded companies, from discrimination if, for example, they decline to facilitate abortion, but we are not aware of examples where publicly traded companies have made use of these exemptions. Thus, while we consider it important to include publicly traded companies in the scope of these expanded exemptions for reasons similar to those used by the Congress in RFRA and some health care conscience laws, in estimating the anticipated effects of the expanded exemptions we agree with the Supreme Court that it is improbable any will do so.

This assumption is significant because 31.3 percent of employees in the private sector work for publicly traded companies.[90] That means that only approximately 394,000 women aged 15 to 44 that use contraceptives covered by the Guidelines were covered by plans of non-publicly traded companies that did not provide contraceptive coverage pre-Affordable Care Act.

Moreover, these interim final rules build on existing rules that already exempt houses of worship and integrated auxiliaries and, as explained above, effectively remove obligations to provide contraceptive coverage within objecting self-insured church plans. These rules will therefore not effect transfers to women in the plans of such employers. In attempting to estimate the number of such employers, we consider the following information. Many Catholic dioceses have litigated or filed public comments opposing the Mandate, representing to the Departments and to courts around the country that official Catholic Church teaching opposes contraception. There are 17,651 Catholic parishes in the

---

employers. See Table 2, notes 2 & 3 (explaining the scope of private plans and government plans for purposes of Table 2), available at *https://www.census.gov/content/dam/Census/library/publications/2014/demo/p60-250.pdf.*

According to data tables from the Medical Expenditure Panel Survey (MEPS) of the Agency for Healthcare Research and Quality of HHS (*https://meps.ahrq.gov/mepsweb/*), State and local governments employ 19,297,960 persons; 99.2 percent of those employers offer health insurance; and 67.4 percent of employees that work at such entities where insurance is offered are enrolled in those plans, amounting to 12.9 million persons enrolled. DOL estimates that in the public sector, for each policyholder there is an average of slightly less than one dependent. "Health Insurance Coverage Bulletin" Table 4, page 21. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.* Therefore, State and local government employer plans cover approximately 24.8 million persons of all ages. Census data indicates that on average, 12 percent of persons covered by private insurance plans are aged 65 and older. Using these numbers, we estimate that State and local government employer plans cover approximately 21.9 million persons under age 65.

The Federal Government has approximately 8.2 million persons covered in its employee health plans. According to information we received from the Office of Personnel Management, this includes 2.1 million employees having 3.2 million dependents, and 1.9 million retirees (annuitants) having 1 million dependents. We do not have information about the ages of these policyholders and dependents, but for the purposes of this estimate we assume the annuitants and their dependents are aged 65 or older and the employees and their dependents are under age 65, so that the Federal Government's employee health plans cover 5.3 million persons under age 65.

Thus, overall we estimate there are 27.2 million persons under age 65 enrolled in private health insurance sponsored by government employers. Of those, 38.3 percent are women aged 15–64, that is, 10.5 million.

[87] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2010 Annual Survey" at 196, available at *https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf.*

---

[88] Some of the 31 percent of survey respondents that did not know about contraceptive coverage may not have offered such coverage. If it were possible to account for this non-coverage, the estimate of potentially affected covered women could increase. On the other hand, these employers' lack of knowledge about contraceptive coverage suggests that they lacked sincerely held religious beliefs specifically objecting to such coverage—beliefs without which they would not qualify for the expanded exemptions offered by these rules. In that case, omission of such employers and covered women from this estimation approach would be appropriate. Correspondingly, the 6 percent of employers that had direct knowledge about the absence of coverage may be more likely to have omitted such coverage on the basis of religious beliefs than were the 31 percent of survey respondents who did not know whether the coverage was offered. Yet an entity's mere knowledge about its coverage status does not itself reflect its motive for omitting coverage. In responding to the survey, the entity may have simply examined its plan document to determine whether or not contraceptive coverage was offered. As will be relevant in a later portion of the analysis, we have no data indicating what portion of the entities that omitted contraceptive coverage pre-Affordable Care Act did so on the basis of sincerely held religious beliefs, as opposed to doing so for other reasons that would not qualify them for the expanded exemption offered in these interim final rules.

---

[89] For example, 42 U.S.C. 300a–7(b), 42 U.S.C. 238n, and Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d), Public Law 115–31.

[90] John Asker, et al., "Corporate Investment and Stock Market Listing: A Puzzle?" 28 *Review of Financial Studies* Issue 2, at 342–390 (Oct. 7, 2014), available at *https://doi.org/10.1093/rfs/hhu077.* This is true even though there are only about 4,300 publicly traded companies in the U.S. See Rayhanul Ibrahim, "The number of publicly-traded US companies is down 46% in the past two decades," *Yahoo! Finance* (Aug. 8, 2016), available at *https://finance.yahoo.com/news/ip-startup-public-companies-fewer-000000709.html.*

---

Exhibit 4

JA-0000128

United States,[91] 197 Catholic dioceses,[92] 5,224 Catholic elementary schools, and 1,205 Catholic secondary schools.[93] Not all Catholic schools are integrated auxiliaries of Catholic churches, but there are other Catholic entities that are integrated auxiliaries that are not schools, so we use the number of schools to estimate of the number of integrated auxiliaries. Among self-insured church plans that oppose the Mandate, the Department has been sued by two—Guidestone and Christian Brothers. Guidestone is a plan organized by the Southern Baptist convention. It covers 38,000 employers, some of which are exempt as churches or integrated auxiliaries, and some of which are not.[94] Christian Brothers is a plan that covers Catholic organizations. It covers Catholic churches and integrated auxiliaries, which are estimated above, but also it has said in litigation that it also covers about 500 additional entities that are not exempt as churches. In total, therefore, we estimate that approximately 62,000 employers among houses of worship, integrated auxiliaries, and church plans, were exempt or relieved of contraceptive coverage obligations under the previous rules. We do not know how many persons are covered in the plans of those employers. Guidestone reports that among its 38,000 employers, its plan covers approximately 220,000 persons, and its employers include "churches, mission-sending agencies, hospitals, educational institutions and other related ministries." Using that ratio, we estimate that the 62,000 church and church plan employers among Guidestone, Christian Brothers, and Catholic churches would include 359,000 persons. Among them, as referenced above, 72,500 would be of childbearing age, and 32,100 would use contraceptives covered by the Guidelines. Therefore, we estimate that the private, non-publicly traded employers that did not cover contraception pre-Affordable Care Act, and that were not exempt by the previous rules nor were participants in self-insured church plans that oppose

contraceptive coverage, covered 362,100 women aged 15 to 44 that use contraceptives covered by the Guidelines. As noted above, we estimate an average annual expenditure on contraceptive products and services of $584 per user. That would amount to $211.5 million in potential transfer impact among entities that did not cover contraception pre-Affordable Care Act for any reason.

We do not have data indicating how many of the entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held religious beliefs that might qualify them for exempt status under these interim final rules, as opposed to having done so for other reasons. Besides the entities that filed lawsuits or submitted public comments concerning previous rules on this matter, we are not aware of entities that omitted contraception pre-Affordable Care Act and then opposed the contraceptive coverage requirement after it was imposed by the Guidelines. For the following reasons, however, we believe that a reasonable estimate is that no more than approximately one third of the persons covered by relevant entities—that is, no more than approximately 120,000 affected women—would likely be subject to potential transfer impacts under the expanded religious exemptions offered in these interim final rules. Consequently, as explained below, we believe that the potential impact of these interim final rules falls substantially below the $100 million threshold for economically significant and major rules.

First, as mentioned, we are not aware of information that would lead us to estimate that all or most entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held conscientious objections in general or religious beliefs specifically, as opposed to having done so for other reasons. Moreover, as suggested by the Guidestone data mentioned previously, employers with conscientious objections may tend to have relatively few employees. Also, avoiding negative publicity, the difficulty of taking away a fringe benefit that employees have become accustomed to having, and avoiding the administrative cost of renegotiating insurance contracts, all provide reasons for some employers not to return to pre-Affordable Care Act lack of contraceptive coverage. Additionally, as discussed above, many employers with objections to contraception, including several of the largest litigants, only object to some contraceptives and cover

as many as 14 of 18 of the contraceptive methods included in the Guidelines. This will reduce, and potentially eliminate, the contraceptive cost transfer for women covered in their plans.[95] Furthermore, among nonprofit entities that object to the Mandate, it is possible that a greater share of their employees oppose contraception than among the general population, which should lead to a reduction in the estimate of how many women in those plans actually use contraception.

In addition, not all sincerely held conscientious objections to contraceptive coverage are likely to be held by persons with religious beliefs as distinct from persons with sincerely held non-religious moral convictions, whose objections would not be encompassed by these interim final rules.[96] We do not have data to indicate, among entities that did not cover contraception pre-Affordable Care Act based on sincerely held conscientious objections as opposed to other reasons, which ones did so based on religious beliefs and which ones did so instead based on non-religious moral convictions. Among the general public, polls vary about religious beliefs but one prominent poll shows that 89 percent of Americans say they believe in God, while 11 percent say they do not or are agnostic.[97] Therefore, we estimate that for every ten entities that omitted contraception pre-Affordable Care Act based on sincerely held conscientious objections as opposed to other reasons, one did so based on sincerely held non-religious moral convictions, and therefore are not affected by the expanded exemption provided by these interim final rules for religious beliefs.

Based on our estimate of an average annual expenditure on contraceptive products and services of $584 per user,

---

[91] Roman Catholic Diocese of Reno, "Diocese of Reno Directory: 2016–2017," available at *http://www.renodiocese.org/documents/2016/9/2016%202017%20directory.pdf*.

[92] Wikipedia, "List of Catholic dioceses in the United States," available at *https://en.wikipedia.org/wiki/List_of_Catholic_dioceses_in_the_United_States*.

[93] National Catholic Educational Association, "Catholic School Data," available at *http://www.ncea.org/NCEA/Proclaim/Catholic_School_Data/Catholic_School_Data.aspx*.

[94] Guidestone Financial Resources, "Who We Serve," available at *https://www.guidestone.org/AboutUs/WhoWeServe*.

---

[95] On the other hand, a key input in the approach that generated the one third threshold estimate was a survey indicating that six percent of employers did not provide contraceptive coverage pre-Affordable Care Act. Employers that covered some contraceptives pre-Affordable Care Act may have answered "yes" or "don't know" to the survey. In such cases, the potential transfer estimate has a tendency toward underestimation because the rule's effects on such women—causing their contraceptive coverage to be reduced from all 18 methods to some smaller subset—have been omitted from the calculation.

[96] Such objections may be encompassed by companion interim final rules published elsewhere in this **Federal Register**. Those rules, however, as an interim final matter, are more narrow in scope than these rules. For example, in providing expanded exemptions for plan sponsors, they do not encompass companies with certain publicly traded ownership interests.

[97] Gallup, "Most Americans Still Believe in God" (June 14–23, 2016), available at *http://www.gallup.com/poll/193271/americans-believe-god.aspx*.

Exhibit 4                    JA538                    JA-0000129

the effect of the expanded exemptions on 120,000 women would give rise to approximately $70.1 million in potential transfer impact. This falls substantially below the $100 million threshold for economically significant and major rules. In addition, as noted above, premiums may be expected to adjust to reflect changes in coverage, thus partially offsetting the transfer experienced by women who use the affected contraceptives. As discussed elsewhere in this analysis, such women may make up approximately 8.9 percent (= 20.2 percent × 44.3 percent) of the covered population, in which case the offset would also be approximately 8.9 percent, yielding a potential transfer of $63.8 million.

We request comment on all aspects of the preceding regulatory impact analysis, as well as on how to attribute impacts to this interim final rule and the companion interim final rule concerning exemptions provided based on sincerely held (non-religious) moral convictions published elsewhere in this **Federal Register**.

### B. Special Analyses—Department of the Treasury

For purposes of the Department of the Treasury, certain Internal Revenue Service (IRS) regulations, including this one, are exempt from the requirements in Executive Order 12866, as supplemented by Executive Order 13563. The Departments anticipate that there will be more entities reluctantly using the existing accommodation that will choose to operate under the newly expanded exemption, than entities that are not currently eligible to use the accommodation that will opt into it. The effect of this rule will therefore be that fewer overall adjustments are made to the Federally facilitated Exchange user fees for entities using the accommodation process, as long as the Secretary of the Department of Health and Human Services requests and an authorizing exception under OMB Circular No. A–25R is in effect, than would have occurred under the previous rule if this rule were not finalized. Therefore, a regulatory assessment is not required.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) (RFA) imposes certain requirements with respect to Federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 *et seq.*) and that are likely to have a significant economic impact on a substantial number of small entities. Under Section 553(b) of the APA, a

general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The interim final rules are exempt from the APA, both because the PHS Act, ERISA, and the Code contain specific provisions under which the Secretaries may adopt regulations by interim final rule and because the Departments have made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble. Therefore, the RFA does not apply and the Departments are not required to either certify that the regulations or this amendment would not have a significant economic impact on a substantial number of small entities or conduct a regulatory flexibility analysis.

Nevertheless, the Departments carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866. The Departments do not expect that these interim final rules will have a significant economic effect on a substantial number of small entities, because they will not result in any additional costs to affected entities, and in many cases will relieve burdens and costs from such entities. By exempting from the Mandate small businesses and nonprofit organizations with religious objections to some (or all) contraceptives and/or sterilization, the Departments have reduced regulatory burden on such small entities. Pursuant to section 7805(f) of the Code, these regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

### D. Paperwork Reduction Act— Department of Health and Human Services

Under the Paperwork Reduction Act of 1995 (the PRA), Federal agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information. Interested persons are invited to send comments regarding our burden estimates or any other aspect of this collection of information, including any of the following subjects: (1) The necessity and utility of the proposed information collection for the proper performance of the agency's functions; (2) the accuracy of the estimated burden; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) the use of automated collection techniques or other forms of information technology to

minimize the information collection burden.

However, we are requesting an emergency review of the information collection referenced later in this section. In compliance with the requirement of section 3506(c)(2)(A) of the PRA, we have submitted the following for emergency review to the Office of Management and Budget (OMB). We are requesting an emergency review and approval under both 5 CFR 1320.13(a)(2)(i) and (iii) of the implementing regulations of the PRA in order to implement provisions regarding self-certification or notices to HHS from eligible organizations (§ 147.131(c)(3)), notice of availability of separate payments for contraceptive services (§ 147.131(f)), and notice of revocation of accommodation (§ 147.131(c)(4)). In accordance with 5 CFR 1320.13(a)(2)(i), we believe public harm is reasonably likely to ensue if the normal clearance procedures are followed. The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information. Similarly, in accordance with 5 CFR 1320.13(a)(2)(iii), we believe the use of normal clearance procedures is reasonably likely to cause a statutory or court ordered deadline to be missed. Many cases have been on remand for over a year from the Supreme Court, asking the Departments and the parties to resolve this matter. These interim final rules extend exemptions to entities, which involves no collection of information and which the Departments have statutory authority to do by the use of interim final rules. If the information collection involved in the amended accommodation process is not approved on an emergency basis, newly exempt entities that wish to opt into the amended accommodation process might not be able to do so until normal clearance procedures are completed.

A description of the information collection provisions implicated in these interim final rules is given in the following section with an estimate of the annual burden. Average labor costs (including 100 percent fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.[98]

#### a. ICRs Regarding Self-Certification or Notices to HHS (§ 147.131(c)(3))

Each organization seeking to be treated as an eligible organization that wishes to use the optional accommodation process offered under

---

[98] May 2016 National Occupational Employment and Wage Estimates United States found at *https://www.bls.gov/oes/current/oes_nat.htm*.

Exhibit 4

JA-0000130

Case 1:25-cv-02534-VEC Document 34-2 Page: 487 Date Filed 09/12/2025
Case 1:25-cv-02534-VEC Document 34-2 Filed 09/12/2025 Page 487 of 617

Federal Register / Vol. 82, No. 197 / Friday, October 13, 2017 / Rules and Regulations 47825

these interim final rules must either use the EBSA Form 700 method of self-certification or provide notice to HHS of its religious objection to coverage of all or a subset of contraceptive services. Specifically, these interim final rules continue to allow eligible organizations to notify an issuer or third party administrator using EBSA Form 700, or to notify HHS, of their religious objection to coverage of all or a subset of contraceptive services, as set forth in the July 2015 final regulations. The burden related to the notice to HHS is currently approved under OMB Control Number 0938–1248 and the burden related to the self-certification (EBSA Form 700) is currently approved under OMB control number 0938–1292.

Notably, however, entities that are participating in the previous accommodation process, where a self-certification or notice has already been submitted, and where the entities choose to continue their accommodated status under these interim final rules, generally do not need to file a new self-certification or notice (unless they change their issuer or third party administrator). As explained above, HHS assumes that, among the 209 entities we estimated are using the previous accommodation, 109 will use the expanded exemption and 100 will continue under the voluntary accommodation. Those 100 entities will not need to file additional self-certifications or notices. HHS also assumes that an additional 9 entities that were not using the previous accommodation will opt into it. Those entities will be subject to the self-certification or notice requirement.

In order to estimate the cost for an entity that chooses to opt into the accommodation process, HHS assumes, as it did in its August 2014 interim final rules, that clerical staff for each eligible organization will gather and enter the necessary information and send the self-certification to the issuer or third party administrator as appropriate, or send the notice to HHS.[99] HHS assumes that a compensation and benefits manager and inside legal counsel will review the self-certification or notice to HHS and a senior executive would execute it. HHS estimates that an eligible organization would spend approximately 50 minutes (30 minutes of clerical labor at a cost of $55.68 per hour,[100] 10 minutes for a

compensation and benefits manager at a cost of $122.02 per hour,[101] 5 minutes for legal counsel at a cost of $134.50 per hour,[102] and 5 minutes by a senior executive at a cost of $186.88 per hour[103]) preparing and sending the self-certification or notice to HHS and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the information in the self-certification or notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $74.96 for a total hour burden of approximately 7.5 hours with an equivalent cost of approximately $675 for 9 entities. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for approximately 3.75 burden hours with an equivalent cost of approximately $337.

HHS estimates that each self-certification or notice to HHS will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each self-certification or notice sent via mail will be $0.54. For purposes of this analysis, HHS assumes that 50 percent of self-certifications or notices to HHS will be mailed. The total cost for sending the self-certifications or notices to HHS by mail is approximately $2.70 for 5 entities. As DOL and HHS share jurisdiction they are splitting the cost burden so each will account for $1.35 of the cost burden.

b. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(e))

As required by the July 2015 final regulations, a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries in insured or self-insured group health plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from, but

contemporaneous with (to the extent possible), any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers and third party administrators may, but are not required to, use the model language set forth previously by HHS or substantially similar language. The burden for this ICR is currently approved under OMB control number 0938–1292.

As mentioned, HHS is anticipating that approximately 109 entities will use the optional accommodation (100 that used it previously, and 9 that will newly opt into it). It is unknown how many issuers or third party administrators provide health insurance coverage or services in connection with health plans of eligible organizations, but HHS will assume at least 109. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $55.68 per hour)[104] and 15 minutes of management review (at $117.40 per hour)[105] to prepare the notices. The total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an equivalent cost of approximately $85.03. The total burden for all issuers or third party administrators is 136 hours, with an equivalent cost of $9,268. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 68 burden hours with an equivalent cost of $4,634, with approximately 55 respondents.

As discussed above, the Departments estimate that 770,000 persons will be covered in the plans of the 100 entities that previously used the accommodation and will continue doing so, and that an additional 9 entities will newly opt into the accommodation. It is not known how many persons will be covered in the plans of the 9 entities newly using the accommodation. Assuming that those 9 entities will have a similar number of covered persons per entity, we estimate that all 109 accommodated entities will encompass 839,300 covered persons. We assume that sending one notice to each participant will satisfy the need to send the notices to all participants and dependents. Among persons covered by plans, approximately 50.1 percent are participants and 49.9 percent are

---

[99] For purposes of this analysis, the Department assumes that the same amount of time will be required to prepare the self-certification and the notice to HHS.

[100] Occupation code 43–6011 for Executive Secretaries and Executive Administrative Assistants with mean hourly wage $27.84. https://www.bls.gov/oes/current/oes436011.htm.

[101] Occupation code 11–3111 for Compensation and Benefits Managers with mean hourly wage $61.01, https://www.bls.gov/oes/current/oes113111.htm.

[102] Occupation code 23–1011 for Lawyers with mean hourly wage $67.25, https://www.bls.gov/oes/current/oes231011.htm.

[103] Occupation code 11–1011 for Chief Executives with mean hourly wage $93.44. https://www.bls.gov/oes/current/oes111011.htm.

[104] Occupation code 43–6011 for Executive Secretaries and Executive Administrative Assistants with mean hourly wage $27.84.

[105] Occupation code 11–1021 General and Operations Managers with mean hourly wage $58.70.

Exhibit 4

JA540

JA-0000131

dependents.[106] For 109 entities, the total number of notices will be 420,490. For purposes of this analysis, the Departments also assume that 53.7 percent of notices will be sent electronically, and 46.3 percent will be mailed.[107] Therefore, approximately 194,687 notices will be mailed. HHS estimates that each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.54. The total cost for sending approximately 194,687 notices by mail is approximately $105,131. As DOL and HHS share jurisdiction, they are splitting the cost burden so each will account for $52,565 of the cost burden.

c. ICRs Regarding Notice of Revocation of Accommodation (§ 147.131(c)(4))

An eligible organization may revoke its use of the accommodation process; its issuer or third party administrator must provide written notice of such revocation to participants and beneficiaries as soon as practicable. As discussed above, HHS estimates that 109 entities that are using the accommodation process will revoke their use of the accommodation, and will therefore be required to cause the notification to be sent (the issuer or third party administrator can send the notice on behalf of the entity). For the purpose of calculating ICRs associated with revocations of the accommodation, and for various reasons discussed above, HHS assumes that litigating entities that were previously using the accommodation and that will revoke it fall within the estimated 109 entities that will revoke the accommodation overall.

As before, HHS assumes that, for each issuer or third party administrator, a manager and inside legal counsel and clerical staff will need approximately 2 hours to prepare and send the notification to participants and beneficiaries and maintain records (30 minutes for a manager at a cost of $117.40 per hour.[108] 30 minutes for legal counsel at a cost of $134.50 per hour [109], 1 hour for clerical labor at a cost of $55.68 per hour [110]). The burden per respondent will be 2 hours with an equivalent cost of $181.63; for 109 entities, the total burden will be 218 hours with an equivalent cost of

approximately $19,798. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 109 burden hours with an equivalent cost of approximately $9,899.

As discussed above, HHS estimates that there are 257,000 covered persons in accommodated plans that will revoke their accommodated status and use the expanded exemption.[111] As before, we use the average of 50.1 percent of covered persons who are policyholders, and estimate that an average of 53.7 percent of notices will be sent electronically and 46.3 percent by mail. Therefore, approximately 128,757 notices will be sent, of which 59,615 notices will be mailed. HHS estimates that each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.54. The total cost for sending approximately 59,615 notices by mail is approximately $32,192. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 64,379 notices, with an equivalent cost of approximately $16,096.

TABLE 1—SUMMARY OF INFORMATION COLLECTION BURDENS

| Regulation section | OMB control No. | Number of respondents | Responses | Burden per respondent (hours) | Total annual burden (hours) | Hourly labor cost of reporting ($) | Total labor cost of reporting ($) | Total cost ($) |
|---|---|---|---|---|---|---|---|---|
| Self-Certification or Notices to HHS ....... | 0938—NEW ... | *5 | 5 | 0.83 | 3.75 | $89.95 | $337.31 | $338.66 |
| Notice of Availability of Separate Payments for Contraceptive Services. | 0938—NEW ... | *55 | 210,245 | 1.25 | 68.13 | 68.02 | 4,634.14 | 57,199.59 |
| Notice of Revocation of Accommodation | 0938—NEW ... | *55 | 64,379 | 2.00 | 109 | 90.82 | 9,898.84 | 25,994.75 |
| Total .............................................. | | *115 | 274,629 | 4.08 | 180.88 | ...................... | 14,870.29 | 83,533.00 |

* The total number of respondents is 227 (= 9+109+109) for both HHS and DOL, but the summaries here and below exceed that total because of rounding up that occurs when sharing the burden between HHS and DOL.
**Note:** There are no capital/maintenance costs associated with the ICRs contained in this rule; therefore, we have removed the associated column from Table 1. Postage and material costs are included in Total Cost.

We are soliciting comments on all of the information collection requirements contained in these interim final rules. In addition, we are also soliciting

comments on all of the related information collection requirements currently approved under 0938—1292 and 0938—1248. HHS is requesting a

new OMB control number that will ultimately contain the approval for the new information collection requirements contained in these interim

[106] "Health Insurance Coverage Bulletin" Table 4, page 21. Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.*

[107] According to data from the National Telecommunications and Information Agency (NTIA), 36.0 percent of individuals age 25 and over have access to the Internet at work. According to a Greenwald & Associates survey, 84 percent of plan participants find it acceptable to make electronic delivery the default option, which is used as the proxy for the number of participants who will not opt out that are automatically enrolled (for a total of 30.2 percent receiving electronic disclosure at work). Additionally, the NTIA reports that 38.5 percent of individuals age 25 and over have access to the Internet outside of work. According to a Pew Research Center survey, 61

percent of Internet users use online banking, which is used as the proxy for the number of Internet users who will opt in for electronic disclosure (for a total of 23.5 percent receiving electronic disclosure outside of work). Combining the 30.2 percent who receive electronic disclosure at work with the 23.5 percent who receive electronic disclosure outside of work produces a total of 53.7 percent who will receive electronic disclosure overall.

[108] Occupation code 11–1021 for General and Operations Managers with mean hourly wage $58.70. *https://www.bls.gov/oes/current/oes111021.htm.*

[109] Occupation code 23–1011 for Lawyers with mean hourly wage $67.25. *https://www.bls.gov/oes/current/oes231011.htm.*

[110] Occupation code 43–6011 for Executive Secretaries and Executive Administrative Assistants with mean hourly wage $27.84. *https://www.bls.gov/oes/current/oes436011.htm.*

[111] In estimating the number of women that might have their contraceptive coverage affected by the expanded exemption, we indicated that we do not know the extent to which the number of women in accommodated plans affected by these rules overlap with the number of women in plans offered by litigating entities that will be affected by these rules, though we assume there is significant overlap. That uncertainty should not affect the calculation of the ICRs for revocation notices, however. If the two numbers overlap, the estimates of plans revoking the accommodation and policyholders covered in those plans would already include plans and policyholders of litigating entities. If the numbers do not overlap, those litigating entity plans would not presently be enrolled in the accommodation, and therefore would not need to send notices concerning revocation of accommodated status.

Exhibit 4    JA541    JA-0000132

final rules as well as the related requirements currently approved under 0938–1292 and 0938–1248. In an effort to consolidate the number of information collection requests, we will formally discontinue the control numbers 0938–1292 and 0938–1248 once the new information collection request associated with these interim final rules is approved.

To obtain copies of a supporting statement and any related forms for the proposed collection(s) summarized in this notice, you may make your request using one of following:

1. Access CMS' Web site address at *https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.html.*

2. Email your request, including your address, phone number, OMB number, and CMS document identifier, to *Paperwork@cms.hhs.gov.*

3. Call the Reports Clearance Office at (410) 786–1326.

If you comment on these information collections, that is, reporting, recordkeeping or third-party disclosure requirements, please submit your comments electronically as specified in the **ADDRESSES** section of these interim final rules with comment period.

## E. Paperwork Reduction Act— Department of Labor

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210–0150 and 1210–0152. A copy of the ICR may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N–5718, Washington, DC 20210. Telephone: 202–693–8410; Fax: 202–219–4745. These are not toll-free numbers.

These interim final rules amend the ICR by changing the accommodation process to an optional process for exempt organizations and requiring a notice of revocation to be sent by the issuer or third party administrator to participants and beneficiaries in plans whose employer who revokes their accommodation. DOL submitted the ICRs in order to obtain OMB approval under the PRA for the regulatory

revision. The request was made under emergency clearance procedures specified in regulations at 5 CFR 1320.13. In an effort to consolidate the number of information collection requests, DOL will combine the ICR related to the OMB control number 1210–0152 with the ICR related to the OMB control number 1210–0150. Once the ICR is approved DOL will discontinue 1210–0152. A copy of the information collection request may be obtained free of charge on the *RegInfo.gov* Web site at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201705-1210-001.* This approval will allow respondents to temporarily utilize the additional flexibility these interim final regulations provide, while DOL seeks public comment on the collection methods— including their utility and burden.

Consistent with the analysis in the HHS PRA section above, the Departments expect that each of the estimated 9 eligible organizations newly opting into the accommodation will spend approximately 50 minutes in preparation time and incur $0.54 mailing cost to self-certify or notify HHS. Each of the 109 issuers or third party administrators for the 109 eligible organizations that make use of the accommodation overall will distribute Notices of Availability of Separate Payments for Contraceptive Services. These issuers and third party administrators will spend approximately 1.25 hours in preparation time and incur $0.54 cost per mailed notice. Notices of Availability of Separate Payments for Contraceptive Services will need to be sent to 420,489 policyholders, and 53.7 percent of the notices will be sent electronically, while 46.3 percent will be mailed. Finally, 109 entities using the previous accommodation process will revoke its use and will therefore be required to cause the Notice of Revocation of Accommodation to be sent (the issuer or third party administrator can send the notice on behalf of the entity). These entities will spend approximately two hours in preparation time and incur $0.54 cost per mailed notice. Notice of Revocation of Accommodation will need to be sent to an average of 128,757 policyholders and 53.7 percent of the notices will be sent electronically. The DOL information collections in this rule are found in 29 CFR 2510.3–16 and 2590.715–2713A and are summarized as follows:

*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.
*Title:* Coverage of Certain Preventive Services under the Affordable Care Act—Private Sector.

*OMB Numbers:* 1210–0150.
*Affected Public:* Private Sector—Not for profit and religious organizations; businesses or other for-profits.
*Total Respondents:* 114 [112] (combined with HHS total is 227).
*Total Responses:* 274,628 (combined with HHS total is 549,255).
*Frequency of Response:* On occasion.
*Estimated Total Annual Burden Hours:* 181 (combined with HHS total is 362 hours).
*Estimated Total Annual Burden Cost:* $68,662 (combined with HHS total is $137,325).
*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.

## F. Regulatory Reform Executive Orders 13765, 13771 and 13777

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of the Department of Health and Human Services and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the Act shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any State or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the States more flexibility and control to create a more free and open healthcare market." These interim final rules exercise the discretion provided to the Departments under the Affordable Care Act, RFRA, and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated the costs and cost savings attributable to this interim final rule. As discussed in more detail in the preceding analysis, this interim final rule lessens incremental reporting

---

[112] Denotes that there is an overlap between jurisdiction shared by HHS and DOL over these respondents and therefore they are included only once in the total.

Exhibit 4

JA542

JA-0000133

costs.[113] Therefore, this interim final rule is considered an Executive Order 13771 deregulatory action.

### F. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (section 202(a) of Pub. L. 104–4), requires the Departments to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing ''any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year.'' The current threshold after adjustment for inflation is $148 million, using the most current (2016) Implicit Price Deflater for the Gross Domestic Product. For purposes of the Unfunded Mandates Reform Act, these interim final rules do not include any Federal mandate that may result in expenditures by State, local, or tribal governments, nor do they include any Federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.

### G. Federalism

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by Federal agencies in the process of their formulation and implementation of policies that have ''substantial direct effects'' on States, the relationship between the Federal Government and States, or the distribution of power and responsibilities among the various levels of Government. Federal agencies promulgating regulations that have these federalism implications must consult with State and local officials,

and describe the extent of their consultation and the nature of the concerns of State and local officials in the preamble to the regulation.

These interim final rules do not have any Federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

### VII. Statutory Authority

The Department of the Treasury temporary regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c: sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200. 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881: sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011. 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act. sections 1301–1304, 1311–1312, 1321–1322, 1324. 1334, 1342–1343, 1401–1402, and 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024. 18031–18032, 18041–18042, 18044, 18054. 18061. 18063, 18071, 18082, 26 U.S.C. 36B. and 31 U.S.C. 9701).

### List of Subjects

#### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

#### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

#### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping

requirements. State regulation of health insurance.

**Kirsten B. Wielobob.**

*Deputy Commissioner for Services and Enforcement.*

Approved: October 2. 2017.

**David J. Kautter.**

*Assistant Secretary for Tax Policy.*

Signed this 4th day of October, 2017.

**Timothy D. Hauser,**

*Deputy Assistant Secretary for Program Operations. Employee Benefits Security Administration. Department of Labor.*

Dated: October 4, 2017.

**Seema Verma,**

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: October 4. 2017.

**Donald Wright,**

*Acting Secretary, Department of Health and Human Services.*

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

For the reasons set forth in this preamble, 26 CFR part 54 is amended as follows:

### PART 54—PENSION EXCISE TAXES

■ 1. The authority citation for part 54 continues to read in part as follows:

 **Authority:** 26 U.S.C. 7805 * * *

■ 2. Section 54.9815–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 54.9815–2713  Coverage of preventive health services.

(a) * * *

(1) *In general.* [Reserved]. For further guidance, see § 54.9815–2713T(a)(1) introductory text.

*       *       *       *       *

(iv) [Reserved]. For further guidance, see § 54.9815–2713T(a)(1)(iv).

*       *       *       *       *

■ 3. Section 54.9815–2713T is added to read as follows:

### § 54.9815–2713T  Coverage of preventive health services (temporary).

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of § 54.9815–2713 and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

(i)–(iii) [Reserved]. For further guidance, see § 54.9815–2713(a)(1)(i) through (iii).

---

[113] Other noteworthy potential impacts encompass potential changes in medical expenditures, including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on E.O. 13771 implementation (*https://www.whitehouse.gov/the-press-office/2017/04/05/memorandum-implementing-executive-order-13771-titled-reducing-regulation*) states that impacts should be categorized as consistently as possible within Departments. The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures are reduced, negative benefits if expenditures are raised). Following the FDA, OSHA and MSHA accounting convention leads to this interim final rule's medical expenditure impacts being categorized as (positive or negative) benefits, rather than as costs, thus placing them outside of consideration for E.O. 13771 designation purposes.

Exhibit 4                    JA543                    JA-0000134

(iv) With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of § 54.9815–2713 as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to 45 CFR 147.131 and 147.132.

(2)–(c) [Reserved]. For further guidance, see § 54.9815–2713(a)(2) through (c).

(d) *Effective/Applicability date.* (1) Paragraphs (a) through (c) of this section are applicable beginning on April 16, 2012, except—

(2) Paragraphs (a)(1) introductory text and (a)(1)(iv) of this section are effective on October 6, 2017.

(e) *Expiration date.* This section expires on October 6, 2020.

■ 4. Section 54.9815–2713A is revised to read as follows:

**§ 54.9815–2713A Accommodations in connection with coverage of preventive health services.**

(a) through (f) [Reserved]. For further guidance, see § 54.9815–2713AT.

(b)

■ 5. Section 54.9815–2713AT is added to read as follows:

**§ 54.9815–2713AT Accommodations in connection with coverage of preventive health services (temporary).**

(a) *Eligible organizations for optional accommodation.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (4) of this section.

(1) The organization is an objecting entity described in 45 CFR 147.132(a)(1)(i) or (ii);

(2) Notwithstanding its status under paragraph (a)(1) of this section and under 45 CFR 147.132(a), the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (b) or (c) of this section as applicable; and

(3) [Reserved]

(4) The organization self-certifies in the form and manner specified by the Secretary of Labor or provides notice to the Secretary of the Department of Health and Human Services as described in paragraph (b) or (c) of this section. To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to

make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services. If contraceptive coverage is currently being offered by an issuer or third party administrator through the accommodation process, the revocation will be effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, an eligible organization may give sixty-days notice pursuant to section 2715(d)(4) of the PHS Act and § 54.9815–2715(b), if applicable, to revoke its use of the accommodation process.

(b) *Optional accommodation—self-insured group health plans.* (1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis may voluntarily elect an optional accommodation under which its third party administrator(s) will provide or arrange payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more third party administrators.

(ii) The eligible organization must provide either a copy of the self-certification to each third party administrator or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an

identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable), but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's third party administrators. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of the Department of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and is willing to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, then the third party administrator will provide or arrange payments for contraceptive services, using one of the following methods—

(i) Provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

Exhibit 4                                    JA544                                    JA-0000135

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(5) Where an otherwise eligible organization does not contract with a third party administrator and files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The plan administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, arrange for payments for contraceptive services from an issuer or other entity in accordance with paragraph (b)(2)(ii) of this section, and such issuer or other entity may receive reimbursements in accordance with paragraph (b)(3) of this section.

(6) Where an otherwise eligible organization is an ERISA-exempt church plan within the meaning of section 3(33) of ERISA and it files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The third party administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, provide or arrange payments for contraceptive services in accordance with paragraphs (b)(2)(i) or (ii) of this section, and receive reimbursements in accordance with paragraph (b)(3) of this section.

(c) *Optional accommodation— insured group health plans—*(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process—

(i) The eligible organization or its plan must contract with one or more health insurance issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with §54.9815–2713.

(B) When a notice is provided to the Secretary of the Department Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's health insurance issuers. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of the Department Health and Human Services has received a notice under paragraph (c)(2)(ii) of this section and describing the obligations of the issuer under this section.

(2) If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (c)(2)(ii) of this section and does not have its own objection as described in 45 CFR 147.132 to providing the contraceptive services to which the eligible organization objects, then the issuer will provide payments for contraceptive services as follows—

(i) The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under §54.9815–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815 of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under §54.9815–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(3) A health insurance issuer may not require any documentation other than a copy of the self-certification from the eligible organization or the notification from the Department of Health and Human Services described in paragraph (c)(1)(ii) of this section.

(d) *Notice of availability of separate payments for contraceptive services— self-insured and insured group health plans.* For each plan year to which the optional accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group

health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides or arranges separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your employer has certified that your group health plan qualifies for an accommodation with respect to the Federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

(e) *Definition.* For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 54.9815–2713(a)(1)(iv).

(f) *Severability.* Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

(g) *Expiration date.* This section expires on October 6, 2020.

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

For the reasons set forth in the preamble, the Department of Labor amends 29 CFR part 2590 as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 6. The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a. 1191b, and 1191c: sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Division M, Pub. L. 113–235, 128 Stat. 2130; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

■ 7. Section 2590.715–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 2590.715–2713   Coverage of preventive health services.

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 2590.715–2713A. a group health plan, or a health insurance issuer offering group health insurance coverage. must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

\*    \*    \*    \*    \*

(iv) With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to 45 CFR 147.131 and 147.132.

\*    \*    \*    \*    \*

■ 8. Section 2590.715–2713A is revised to read as follows:

### § 2590.715–2713A   Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations for optional accommodation.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (4) of this section.

(1) The organization is an objecting entity described in 45 CFR 147.132(a)(1)(i) or (ii);

(2) Notwithstanding its exempt status under 45 CFR 147.132(a). the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (b) or (c) of this section as applicable; and

(3) [Reserved]

(4) The organization self-certifies in the form and manner specified by the Secretary or provides notice to the Secretary of the Department of Health and Human Services as described in paragraph (b) or (c) of this section. To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services. If contraceptive coverage is currently being offered by an issuer or third party administrator through the accommodation process, the revocation will be effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, an eligible organization may give 60-days notice pursuant to PHS Act section 2715(d)(4) and § 2590.715–2715(b), if applicable, to revoke its use of the accommodation process.

(b) *Optional accommodation—self-insured group health plans.* (1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis may voluntarily elect an optional accommodation under which its third party administrator(s) will provide or arrange payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more third party administrators.

(ii) The eligible organization must provide either a copy of the self-certification to each third party administrator or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage of all or a subset of contraceptive services.

Exhibit 4                                    JA546                                    JA-0000137

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in § 2510.3–16 of this chapter and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable), but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's third party administrators. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of the Department of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under § 2510.3–16 of this chapter and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and is willing to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, then the third party administrator will provide or arrange payments for contraceptive services, using one of the following methods—

(i) Provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(5) Where an otherwise eligible organization does not contract with a third party administrator and it files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The plan administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, arrange for payments for contraceptive services from an issuer or other entity in accordance with paragraph (b)(2)(ii) of this section, and such issuer or other entity may receive reimbursements in accordance with paragraph (b)(3) of this section.

(c) *Optional accommodation— insured group health plans—*(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more health insurance issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 2590.715–2713.

(B) When a notice is provided to the Secretary of the Department of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's health insurance issuers. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of Department Health and Human Services for the optional accommodation process to remain in effect. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(2)(ii) of this section and describing the obligations of the issuer under this section.

(2) If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (c)(2)(ii) of this section and does not have its own objection as described in 45 CFR 147.132 to providing the contraceptive services to which the eligible organization objects, then the issuer will provide payments for contraceptive services as follows—

(i) The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) for plan participants and beneficiaries

Exhibit 4    JA547    JA-0000138

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 715 of ERISA. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(3) A health insurance issuer may not require any documentation other than a copy of the self-certification from the eligible organization or the notification from the Department of Health and Human Services described in paragraph (c)(1)(ii) of this section.

(d) *Notice of availability of separate payments for contraceptive services—self-insured and insured group health plans.* For each plan year to which the optional accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible) but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides or arranges

separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your employer has certified that your group health plan qualifies for an accommodation with respect to the Federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

(e) *Definition.* For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 2590.715–2713(a)(1)(iv).

(f) *Severability.* If any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons set forth in the preamble, the Department of Health and Human Services amends 45 CFR part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 9. The authority citation for part 147 continues to read as follows:

**Authority:** Secs 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42

U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 10. Section 147.130 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 147.130 Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to §§ 147.131 and 147.132, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

* * * * *

(iv) With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to §§ 147.131 and 147.132.

* * * * *

■ 11. Section 147.131 is revised to read as follows:

### § 147.131 Accommodations in connection with coverage of certain preventive health services.

(a)–(b) [Reserved]

(c) *Eligible organizations for optional accommodation.* An eligible organization is an organization that meets the criteria of paragraphs (c)(1) through (3) of this section.

(1) The organization is an objecting entity described in § 147.132(a)(1)(i) or (ii).

(2) Notwithstanding its exempt status under § 147.132(a), the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (d) of this section; and

(3) The organization self-certifies in the form and manner specified by the Secretary or provides notice to the Secretary as described in paragraph (d) of this section. To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (d) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) An eligible organization may revoke its use of the accommodation process, and its issuer must provide participants and beneficiaries written notice of such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services. If contraceptive coverage is currently being offered by an issuer through the accommodation process, the revocation will be effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and § 147.200(b), if applicable, to revoke its use of the accommodation process.

(d) *Optional accommodation—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more health insurance issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in § 147.132 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 147.130(a)(iv).

(B) When a notice is provided to the Secretary of the Department of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in § 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of § 147.145(a) or a church

plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's health insurance issuers. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation to remain in effect. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of the Deparement of Health and Human Services has received a notice under paragraph (d)(1)(ii) of this section and describing the obligations of the issuer under this section.

(2) If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (d)(1)(ii) of this section and does not have an objection as described in § 147.132 to providing the contraceptive services identified in the self-certification or the notification from the Department of Health and Human Services, then the issuer will provide payments for contraceptive services as follows—

(i) The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 141.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 147.130(a)(1)(iv), the issuer is required to provide payments

only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(3) A health insurance issuer may not require any documentation other than a copy of the self-certification from the eligible organization or the notification from the Department of Health and Human Services described in paragraph (d)(1)(ii) of this section.

(e) *Notice of availability of separate payments for contraceptive services—insured group health plans and student health insurance coverage.* For each plan year to which the optional accommodation in paragraph (d) of this section is to apply, an issuer required to provide payments for contraceptive services pursuant to paragraph (d) of this section must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (e) "Your [employer/institution of higher education] has certified that your [group health plan/student health insurance coverage] qualifies for an accommodation with respect to the Federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your [employer/institution of higher education] will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of health insurance issuer] will provide separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your [group health plan/student health insurance coverage]. Your [employer/institution of higher education] will not administer or fund these payments . If you have any questions about this notice, contact [contact information for health insurance issuer]."

(f) *Definition.* For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).

(g) *Severability.* Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

■ 12. Add § 147.132 to read as follows:

**§ 147.132  Religious exemptions in connection with coverage of certain preventive health services.**

(a) *Objecting entities.* (1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (a)(2) of this section. Such non-governmental plan sponsors include, but are not limited to, the following entities—

(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order.

(B) A nonprofit organization.

(C) A closely held for-profit entity.

(D) A for-profit entity that is not closely held.

(E) Any other non-governmental employer.

(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement.

(2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

(c) *Definition.* For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).

(d) *Severability.* Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

[FR Doc. 2017–21851 Filed 10–6–17; 11:15 am]

**BILLING CODE 4830–01–P; 4510–29–P; 4120–01–P; 6325–64–P**

Exhibit 4

JA550

JA-0000141

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9828]**

**RIN 1545–BN91**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB84**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

**[CMS–9925–IFC]**

**RIN 0938–AT46**

**Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Interim final rules with request for comments.

**SUMMARY:** The United States has a long history of providing conscience protections in the regulation of health care for entities and individuals with objections based on religious beliefs or moral convictions. These interim final rules expand exemptions to protect moral convictions for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act. These rules do not alter the discretion of the Health Resources and Services Administration, a component of the United States Department of Health and Human Services, to maintain the guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also provide certain morally objecting entities access to the voluntary "accommodation" process regarding such coverage. These rules do not alter multiple other Federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.

**DATES:**

*Effective date:* These interim final rules are effective on October 6, 2017.

*Comment date:* Written comments on these interim final rules are invited and must be received by December 5, 2017.

**ADDRESSES:** Written comments may be submitted to the Department of Health and Human Services as specified below. Any comment that is submitted will be shared with the Department of Labor and the Department of the Treasury, and will also be made available to the public.

*Warning:* Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments may be posted on the Internet and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously. Comments, identified by "Preventive Services," may be submitted one of four ways (please choose only one of the ways listed)

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9925–IFC, P.O. Box 8016, Baltimore, MD 21244–8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9925–IFC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier) your written comments ONLY to the following addresses prior to the close of the comment period:

a. For delivery in Washington, DC—Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave

their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD—Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Comments erroneously mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

Comments received will be posted without change to *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jeff Wu (310) 492–4305 or *marketreform@cms.hhs.gov* for Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), Amber Rivers or Matthew Litton, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 317–5500.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In the context of legal requirements touching on certain sensitive health care issues—including health coverage of contraceptives—Congress has a consistent history of supporting conscience protections for moral convictions alongside protections for religious beliefs, including as part of its efforts to promote access to health services.[1] Against that backdrop.

---

[1] *See, for example,* 42 U.S.C. 300a–7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting individuals and entities that object to abortion); Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d) (Departments of Labor, HHS,

Exhibit 5 JA551 JA-0000142

Congress granted the Health Resources and Services Administration (HRSA), a component of the United States Department of Health and Human Services (HHS), discretion under the Patient Protection and Affordable Care Act to specify that certain group health plans and health insurance issuers shall cover, "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by" HRSA (the "Guidelines"). Public Health Service Act section 2713(a)(4). HRSA exercised that discretion under the last Administration to require health coverage for, among other things, certain contraceptive services,[2] while the

administering agencies—the Departments of Health and Human Services, Labor, and the Treasury (collectively, "the Departments").[3] exercised both the discretion granted to HHS through HRSA, its component, in PHS Act section 2713(a)(4), and the authority granted to the Departments as administering agencies (26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92) to issue regulations to guide HRSA in carrying out that provision. Through rulemaking, including three interim final rules, the Departments exempted and accommodated certain religious objectors, but did not offer an exemption or accommodation to any group possessing non-religious moral objections to providing coverage for some or all contraceptives. Many individuals and entities challenged the contraceptive coverage requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate") as being inconsistent with various legal protections. These challenges included lawsuits brought by some non-religious organizations with sincerely held moral convictions inconsistent with providing coverage for some or all contraceptive services, and those cases continue to this day. Various public comments were also submitted asking the Departments to protect objections based on moral convictions.

The Departments have recently exercised our discretion to reevaluate these exemptions and accommodations. This evaluation includes consideration of various factors, such as: The interests served by the existing Guidelines, regulations, and accommodation process:[4] the extensive litigation; Executive Order 13798, "Promoting Free Speech and Religious Liberty" (May 4, 2017); Congress' history of providing protections for moral convictions alongside religious beliefs regarding certain health services (including contraception, sterilization, and items or services believed to involve abortion); the discretion afforded under PHS Act section 2713(a)(4); the structure and intent of that provision in the broader context of section 2713 and the Patient Protection and Affordable Care Act; and the history of the regulatory process and comments submitted in various requests for public comments (including in the

Departments' 2016 Request for Information). Elsewhere in this issue of the **Federal Register**. the Departments published, contemporaneously with these interim final rules, companion interim final rules expanding exemptions to protect sincerely held religious beliefs in the context of the contraceptive Mandate.

In light of these considerations, the Departments issue these interim final rules to better balance the Government's interest in promoting coverage for contraceptive and sterilization services with the Government's interests in providing conscience protections for individuals and entities with sincerely held moral convictions in certain health care contexts, and in minimizing burdens imposed by our regulation of the health insurance market.

### A. The Affordable Care Act

Collectively, the Patient Protection and Affordable Care Act (Pub. L. 111–148). enacted on March 23, 2010, and the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152), enacted on March 30, 2010, are known as the Affordable Care Act. In signing the Affordable Care Act, President Obama issued Executive Order 13535 (March 24, 2010), which declared that, "[u]nder the Act, longstanding Federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7, and the Weldon Amendment, section 508(d)(1) of Pub. L. 111–8) remain intact" and that "[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the Department of Health and Human Services (HHS)." Those laws protect objections based on moral convictions in addition to religious beliefs.

The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. In addition, the Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and thereby make them applicable to certain group health plans regulated under ERISA or the Code. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728 of the PHS Act.

These interim final rules concern section 2713 of the PHS Act. Where it applies, section 2713(a)(4) of the PHS

---

and Education, and Related Agencies Appropriations Act). Public Law 115–31 (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan. or any other kind of health care facility. organization, or plan" in objecting to abortion for any reason); *Id.* at Div. C. Title VIII, Sec. 808 (regarding any requirement of "the provision of contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."); *Id.* at Div. C. Title VII. Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); *Id.* at Div. I, Title III (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb–36 (prohibiting the statutory section from being construed to require suicide related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare Choice, now Medicare Advantage, managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal law does not infringe on "conscience" as protected in State law concerning advance directives); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide); *see also* 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require assistance in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/AIDS funds contrary to their "religious or moral objection").

[2] This document's references to "contraception," "contraceptive," "contraceptive coverage," or

"contraceptive services" generally includes contraceptives, sterilization, and related patient education and counseling, unless otherwise indicated.

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

[4] In this IFR, we generally use "accommodation" and "accommodation process" interchangeably.

Exhibit 5                                   JA552                                   JA-0000143

Act requires coverage without cost sharing for "such additional" women's preventive care and screenings "as provided for" and "supported by" guidelines developed by HRSA/HHS. The Congress did not specify any particular additional preventive care and screenings with respect to women that HRSA could or should include in its Guidelines, nor did Congress indicate whether the Guidelines should include contraception and sterilization.

The Departments have consistently interpreted section 2713(a)(4)'s of the PHS Act grant of authority to include broad discretion to decide the extent to which HRSA will provide for and support the coverage of additional women's preventive care and screenings in the Guidelines. In turn, the Departments have interpreted that discretion to include the ability to exempt entities from coverage requirements announced in HRSA's Guidelines. That interpretation is rooted in the text of section 2713(a)(4) of the PHS Act, which allows HRSA to decide the extent to which the Guidelines will provide for and support the coverage of additional women's preventive care and screenings.

Accordingly, the Departments have consistently interpreted section 2713(a)(4) of the PHS Act reference to "comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph" to grant HRSA authority to develop such Guidelines. And because the text refers to Guidelines "supported by the Health Resources and Services Administration for purposes of this paragraph," the Departments have consistently interpreted that authority to afford HRSA broad discretion to consider the requirements of coverage and cost-sharing in determining the nature and extent of preventive care and screenings recommended in the guidelines. (76 FR 46623). As the Departments have noted, these Guidelines are different from "the other guidelines referenced in section 2713(a), which pre-dated the Affordable Care Act and were originally issued for purposes of identifying the non-binding recommended care that providers should provide to patients." *Id.* Guidelines developed as nonbinding recommendations for care implicate significantly different legal and policy concerns than guidelines developed for a mandatory coverage requirement. To guide HRSA in exercising the discretion afforded to it in section 2713(a)(4), the Departments have previously promulgated regulations defining the scope of permissible religious exemptions and accommodations for

such guidelines. (45 CFR 147.131). The interim final rules set forth herein are a necessary and appropriate exercise of the authority delegated to the Departments as administrators of the statutes. (26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92).

Our interpretation of section 2713(a)(4) of the PHS Act is confirmed by the Affordable Care Act's statutory structure. The Congress did not intend to require entirely uniform coverage of preventive services. (76 FR 46623). To the contrary, Congress carved out an exemption from section 2713 for grandfathered plans. This exemption is not applicable to many of the other provisions in Title I of the Affordable Care Act—provisions previously referred to by the Departments as providing "particularly significant protections." (75 FR 34540). Those provisions include: Section 2704, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708, which prohibits excessive waiting periods (as of January 1, 2014); section 2711, which relates to lifetime limits; section 2712, which prohibits rescissions of health insurance coverage; section 2714, which extends dependent coverage until age 26; and section 2718, which imposes a medical loss ratio on health insurance issuers in the individual and group markets (for insured coverage), or requires them to provide rebates to policyholders. (75 FR 34538, 34540, 34542). Consequently, of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not subject to section 2713 of the PHS Act.[5] As the Supreme Court observed, "there is no legal requirement that grandfathered plans ever be phased out." *Burwell* v. *Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2764 n.10 (2014).

The Departments' interpretation of section 2713(a)(4) of the PHS Act to permit HRSA to establish exemptions from the Guidelines, and of the Departments' own authority as administering agencies to guide HRSA in establishing such exemptions, is also consistent with Executive Order 13535. That order, issued upon the signing of the Affordable Care Act, specified that "longstanding Federal laws to protect conscience . . . remain intact," including laws that protect religious beliefs and moral convictions from

certain requirements in the health care context. Although the text of Executive Order 13535 does not require the expanded exemptions issued in these interim final rules, the expanded exemptions are, as explained below, consistent with longstanding Federal laws to protect conscience regarding certain health matters, and are consistent with the intent that the Affordable Care Act would be implemented in consideration of the protections set forth in those laws.

### B. The Regulations Concerning Women's Preventive Services

On July 19, 2010, the Departments issued interim final rules implementing section 2713 of the PHS Act (75 FR 41726). Those interim final rules charged HRSA with developing the Guidelines authorized by section 2713(a)(4) of the PHS Act.

### 1. The Institute of Medicine Report

In developing the Guidelines, HRSA relied on an independent report from the Institute of Medicine (IOM, now known as the National Academy of Medicine) on women's preventive services, issued on July 19, 2011, "Clinical Preventive Services for Women, Closing the Gaps" (IOM 2011). The IOM's report was funded by the HHS Office of the Assistant Secretary for Planning and Evaluation, pursuant to a funding opportunity that charged the IOM to conduct a review of effective preventive services to ensure women's health and well-being.[6]

The IOM made a number of recommendations with respect to women's preventive services. As relevant here, the IOM recommended that the Guidelines cover the full range of Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity. Because FDA includes in the category of "contraceptives" certain drugs and devices that may not only prevent conception (fertilization), but may also prevent implantation of an embryo,[7] the IOM's recommendation included

---

[5] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2017 Annual Survey," available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.*

[6] Because section 2713(a)(4) of the PHS Act specifies that the HRSA Guidelines shall include preventive care and screenings "with respect to women," the Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[7] FDA's guide "Birth Control: Medicines To Help You," specifies that various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work . . . by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization. Available at *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm.*

Exhibit 5

several contraceptive methods that many persons and organizations believe are abortifacient—that is, as causing early abortion—and which they conscientiously oppose for that reason distinct from whether they also oppose contraception or sterilization. One of the 16 members of the IOM committee, Dr. Anthony LoSasso, a Professor at the University of Illinois at Chicago School of Public Health, wrote a formal dissenting opinion. He stated that the IOM committee did not have sufficient time to evaluate fully the evidence on whether the use of preventive services beyond those encompassed by section 2713(a)(1) through (3) of the PHS Act leads to lower rates of disability or disease and increased rates of well-being, such that the IOM should recommend additional services to be included under Guidelines issued under section 2713(a)(4) of the PHS Act. He further stated that ''the recommendations were made without high quality, systematic evidence of the preventive nature of the services considered,'' and that ''the committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy.'' He also raised concerns that the committee did not have time to develop a framework for determining whether coverage of any given preventive service leads to a reduction in healthcare expenditure.[8] IOM 2011 at 231–32. In its response to Dr. LoSasso, the other 15 committee members stated in part that ''At the first committee meeting, it was agreed that cost considerations were outside the scope of the charge, and that the committee should not attempt to duplicate the disparate review processes used by other bodies, such as the USPSTF, ACIP, and Bright Futures. HHS, with input from this committee, may consider other factors including cost in its development of coverage decisions.''

## 2. HRSA's 2011 Guidelines and the Departments' Second Interim Final Rules

On August 1, 2011, HRSA released onto its Web site its Guidelines for women's preventive services, adopting the recommendations of the IOM. *https://www.hrsa.gov/womensguidelines/* The Guidelines

included coverage for all FDA-approved contraceptives, sterilization procedures, and related patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (hereinafter ''the Mandate'').

In administering this Mandate, on August 1, 2011, the Departments promulgated interim final rules amending our 2010 interim final rules. (76 FR 46621) (2011 interim final rules). The 2011 interim final rules specified that HRSA has the authority to establish exemptions from the contraceptive coverage requirement for certain group health plans established or maintained by certain religious employers and for health insurance coverage provided in connection with such plans.[9] The 2011 interim final rules only offered the exemption to a narrow scope of employers, and only if they were religious. As the basis for adopting that limited definition of religious employer, the 2011 interim final rules stated that they relied on the laws of some ''States that exempt certain religious employers from having to comply with State law requirements to cover contraceptive services.'' (76 FR 46623). Several comments were submitted asking that the exemption include those who object to contraceptive coverage based on non-religious moral convictions, including pro-life, non-profit advocacy organizations.[10]

## 3. The Departments' Subsequent Rulemaking on the Accommodation and Third Interim Final Rules

Final regulations issued on February 10, 2012, adopted the definition of ''religious employer'' in the 2011 interim final rules without modification (2012 final regulations).[11] (77 FR 8725). The exemption did not require exempt employers to file any certification form or comply with any other information collection process.

Contemporaneously with the issuance of the 2012 final regulations, HHS—with the agreement of the Department of Labor (DOL) and the Department of the Treasury—issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments with respect to group

health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and the group health insurance coverage provided in connection with such plans).[12] The temporary safe harbor did not include nonprofit organizations that had an objection to contraceptives based on moral convictions but not religious beliefs, nor did it include for-profit entities of any kind. The Departments stated that, during the temporary safe harbor, the Departments would engage in rulemaking to achieve ''two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, nonprofit organizations' religious objections to covering contraceptive services.'' (77 FR 8727).

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described possible approaches to achieve those goals with respect to religious nonprofit organizations, and solicited public comments on the same. (77 FR 16501). Following review of the comments on the ANPRM, the Departments published proposed regulations on February 6, 2013 (2013 NPRM) (78 FR 8456).

The 2013 NPRM proposed to expand the definition of ''religious employer'' for purposes of the religious employer exemption. Specifically, it proposed to require only that the religious employer be organized and operate as a nonprofit entity and be referred to in section 6033(a)(3)(A)(i) or (iii) of the Code, eliminating the requirements that a religious employer—(1) have the inculcation of religious values as its purpose; (2) primarily employ persons who share its religious tenets; and (3) primarily serve persons who share its religious tenets. The proposed expanded

---

[8] The Departments do not relay these dissenting remarks as an endorsement of the remarks, but to describe the history of the Guidelines, which includes this part of the report that IOM provided to HRSA.

[9] The 2011 amended interim final rules were issued and effective on August 1, 2011 and published in the **Federal Register** on August 3, 2011. (76 FR 46621).

[10] *See, for example,* Americans United for Life (''AUL'') Comment on CMA–9992–IFC2 at 10 (Nov. 1, 2011), available at *http://www.regulations.gov/#!documentDetail:D=HHS-OS-2011-0023-59496.*

[11] The 2012 final regulations were published on February 15, 2012 (77 FR 8725).

[12] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012. Available at: *http://www.lb7.uscourts.gov/documents/12cv3932.pdf.* The guidance, as reissued on August 15, 2012, clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to insured student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. See final rule entitled ''Student Health Insurance Coverage'' published March 21, 2012 (77 FR 16457).

Exhibit 5                    JA554                    JA-0000145

definition still encompassed only religious entities.

The 2013 NPRM also proposed to create a compliance process, which it called an accommodation, for group health plans established, maintained, or arranged by certain eligible nonprofit organizations that fell outside the houses of worship and integrated auxiliaries covered by section 6033(a)(3)(A)(i) or (iii) of the Code (and, thus, outside of the religious employer exemption). The 2013 NPRM proposed to define such eligible organizations as nonprofit entities that hold themselves out as religious, oppose providing coverage for certain contraceptive items on account of religious objections, and maintain a certification to this effect in their records. The 2013 NPRM stated, without citing a supporting source, that employees of eligible organizations "may be less likely than" employees of exempt houses of worship and integrated auxiliaries to share their employer's faith and opposition to contraception on religious grounds. (78 FR 8461). The 2013 NPRM therefore proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries enrolled in the eligible organization's plan—and without any cost to the eligible organization.[13] In the case of a self-insured group health plan established or maintained by an eligible organization, the 2013 NPRM presented potential approaches under which the third party administrator of the plan would provide or arrange for contraceptive coverage to plan participants and beneficiaries. The proposed accommodation process was not to be offered to non-religious nonprofit organizations, nor to any for-profit entities. Public comments again included the request than exemptions encompass objections to contraceptive coverage based on moral convictions and not just based on religious beliefs.[14] On August 15, 2012, the Departments extended our temporary safe harbor

until the first plan year beginning on or after August 1, 2013.

The Departments published final regulations on July 2, 2013 (July 2013 final regulations) (78 FR 39869). The July 2013 final regulations finalized the expansion of the exemption for houses of worship and their integrated auxiliaries. Although some commenters had suggested that the exemption be further expanded, the Departments declined to adopt that approach. The July 2013 regulations stated that, because employees of objecting houses of worship and integrated auxiliaries are relatively likely to oppose contraception, exempting those organizations "does not undermine the governmental interests furthered by the contraceptive coverage requirement." (78 FR 39874). However, like the 2013 NPRM, the July 2013 regulations assumed that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection" to contraceptives. *Id.*

The July 2013 regulation also finalized an accommodation for eligible organizations, which were then defined to include solely organizations that are religious. Under the accommodation, an eligible organization was required to submit a self-certification to its group health insurance issuer or third party administrator, as applicable. Upon receiving that self-certification, the issuer or third party administrator would provide or arrange for payments for the contraceptive services to the plan participants and beneficiaries enrolled in the eligible organization's plan, without requiring any cost sharing on the part of plan participants and beneficiaries and without cost to the eligible organization. With respect to self-insured plans, the third party administrators (or issuers they contracted with) could receive reimbursements by reducing user fee payments (to Federally facilitated Exchanges) by the amounts paid out for contraceptive services under the accommodation, plus an allowance for certain administrative costs, as long as the HHS Secretary requests and an authorizing exception under OMB Circular No. A–25R is in effect.[15] With respect to fully insured group health

plans, the issuer was expected to bear the cost of such payments,[16] and HHS intended to clarify in guidance that the issuer could treat those payments as an adjustment to claims costs for purposes of medical loss ratio and risk corridor program calculations. The Departments extended the temporary safe harbor again on June 20, 2013, to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014.

### 4. Litigation Over the Mandate and the Accommodation Process

During the period when the Departments were publishing and modifying our regulations, organizations and individuals filed dozens of lawsuits challenging the Mandate. Plaintiffs included religious nonprofit organizations, businesses run by religious families, individuals, and others, including several non-religious organizations that opposed coverage of certain contraceptives under the Mandate on the basis of non-religious moral convictions. Religious for-profit entities won various court decisions leading to the Supreme Court's ruling in *Burwell v. Hobby Lobby Stores, Inc.* 134 S. Ct. 2751 (2014). The Supreme Court ruled against the Departments and held that, under the Religious Freedom Restoration Act of 1993 (RFRA), the Mandate could not be applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage.[17]

On August 27, 2014, the Departments simultaneously issued a third set of interim final rules (August 2014 interim final rules) (79 FR 51092), and a notice of proposed rulemaking (August 2014 proposed rules) (79 FR 51118). The August 2014 interim final rules changed the accommodation process so that it could be initiated either by self-certification using EBSA Form 700 or through a notice informing the Secretary of HHS that an eligible organization had religious objections to coverage of all or a subset of contraceptive services (79 FR 51092). In response to *Hobby Lobby*, the August 2014 proposed rules extended the accommodation process to closely held for-profit entities with religious objections to contraceptive coverage, by including them in the definition of eligible organizations (79 FR 51118). Neither the August 2014 interim final rules nor the August 2014 proposed rules extended the exemption; neither added a certification requirement for

[13] The NPRM proposed to treat student health insurance coverage arranged by eligible organizations that are institutions of higher education in a similar manner.

[14] *See, for example,* AUL Comment on CMS–9968–P at 5 (Apr. 8, 2013), available at *http://www.regulations.gov/#!documentDetail;D=CMS-2012-0031-79115.*

[15] *See also* 45 CFR 156.50. Under the regulations, if the third party administrator does not participate in a Federally-facilitated Exchange as an issuer, it is permitted to contract with an insurer which does so participate, in order to obtain such reimbursement. The total contraceptive user fee adjustment for the 2015 benefit year was $33 million.

[16] "[P]roviding payments for contraceptive services is cost neutral for issuers." (78 FR 39877).

[17] The Supreme Court did not decide whether RFRA would apply to publicly traded for-profit corporations. *See* 134 S. Ct. at 2774.

Exhibit 5    JA555    JA-0000146

exempt entities; and neither encompassed objections based on non-religious moral convictions.

On July 14, 2015, the Departments finalized both the August 2014 interim final rules and the August 2014 proposed rules in a set of final regulations (the July 2015 final regulations) (80 FR 41318). (The July 2015 final regulations also encompassed issues related to other preventive services coverage.) The July 2015 final regulations allowed eligible organizations to submit a notice to HHS as an alternative to submitting the EBSA Form 700, but specified that such notice must include the eligible organization's name and an expression of its religious objection, along with the plan name, plan type, and name and contact information for any of the plan's third party administrators or health insurance issuers. The Departments indicated that such information represents the minimum information necessary for us to administer the accommodation process.

Meanwhile, a second series of legal challenges were filed by religious nonprofit organizations that stated the accommodation impermissibly burdened their religious beliefs because it utilized their health plans to provide services to which they objected on religious grounds, and it required them to submit a self-certification or notice. On November 6, 2015, the U.S. Supreme Court granted certiorari in seven similar cases under the title of a filing from the Third Circuit, *Zubik* v. *Burwell*. On May 16, 2016, the Supreme Court issued a per curiam opinion in *Zubik*, vacating the judgments of the Courts of Appeals—most of which had ruled in the Departments' favor—and remanding the cases ''in light of the substantial clarification and refinement in the positions of the parties'' that had been filed in supplemental briefs. 136 S. Ct. 1557, 1560 (2016). The Court stated that it anticipated that, on remand, the Courts of Appeals would ''allow the parties sufficient time to resolve any outstanding issues between them.'' *Id.* The Court also specified that ''the Government may not impose taxes or penalties on petitioners for failure to provide the relevant notice'' while the cases remained pending. *Id.* at 1561.

After remand, as indicated by the Departments in court filings, meetings were held between attorneys for the Government and for the plaintiffs in those cases. The Departments also issued a Request for Information (''RFI'') on July 26, 2016, seeking public comment on options for modifying the accommodation process in light of the supplemental briefing in *Zubik* and the

Supreme Court's remand order. (81 FR 47741). Public comments were submitted in response to the RFI, during a comment period that closed on September 20, 2016. Those comments included the request that the exemption be expanded to include those who oppose the Mandate for either religious ''or moral'' reasons, consistent with various state laws (such as in Connecticut or Missouri) that protect objections to contraceptive coverage based on moral convictions.[18]

Beginning in 2015, lawsuits challenging the Mandate were also filed by various non-religious organizations with moral objections to contraceptive coverage. These organizations asserted that they believe some methods classified by FDA as contraceptives may have an abortifacient effect and therefore, in their view, are morally equivalent to abortion. These organizations have neither received an exemption from the Mandate nor do they qualify for the accommodation. For example, the organization that since 1974 has sponsored the annual March for Life in Washington, DC (March for Life), filed a complaint claiming that the Mandate violated the equal protection component of the Due Process Clause of the Fifth Amendment, and was arbitrary and capricious under the Administrative Procedure Act (APA). Citing, for example, (77 FR 8727), March for Life argued that the Departments' stated interests behind the Mandate were only advanced among women who ''want'' the coverage so as to prevent ''unintended'' pregnancy. March for Life contended that because it only hires employees who publicly advocate against abortion, including what they regard as abortifacient contraceptive items, the Departments' interests are not rationally advanced by imposing the Mandate upon it and its employees. Accordingly, March for Life contended that applying the Mandate to it (and other similarly situated organizations) lacked a rational basis and therefore doing so was arbitrary and capricious in violation of the APA. March for Life further contended that because the government's interests were not undermined by exempting houses of worship and integrated auxiliaries (based on our assumption that such entities are relatively more likely than other religious nonprofits to have employees that share their views against

contraception), applying the Mandate to March for Life or similar organizations that definitively hire only employees who oppose certain contraceptives lacked a rational basis and therefore violated their right of equal protection under the Due Process Clause.

March for Life's employees, who stated they were personally religious (although personal religiosity was not a condition of their employment), also sued as co-plaintiffs. They contended that the Mandate violates their rights under RFRA by making it impossible for them to obtain health insurance consistent with their religious beliefs, either from the plan March for Life wanted to offer them, or in the individual market, because the Departments offered no exemptions in either circumstance. Another non-religious nonprofit organization that opposed the Mandate's requirement to provide certain contraceptive coverage on moral grounds also filed a lawsuit challenging the Mandate. *Real Alternatives, Inc.* v. *Burwell,* 150 F. Supp. 3d 419 (M.D. Pa. 2015).

Challenges by non-religious nonprofit organizations led to conflicting opinions among the Federal courts. A district court agreed with the March for Life plaintiffs on the organization's equal protection claim and the employees' RFRA claims (not specifically ruling on the APA claim), and issued a permanent injunction against the Departments that is still in place. *March for Life* v. *Burwell.* 128 F. Supp. 3d 116 (D.D.C. 2015). The appeal in *March for Life* is pending and has been stayed since early 2016. In another case, Federal district and appellate courts in Pennsylvania disagreed with the reasoning from *March for Life* and ruled against claims brought by a similarly non-religious nonprofit employer and its religious employees. *Real Alternatives,* 150 F. Supp. 3d 419, *affirmed by* 867 F.3d 338 (3d Cir. 2017). One member of the appeals court panel in *Real Alternatives* dissented in part, stating he would have ruled in favor of the individual employee plaintiffs under RFRA. *Id.* at *18.

On December 20, 2016, HRSA updated the Guidelines via its Web site, *https://www.hrsa.gov/ womensguidelines2016/index.html.* HRSA announced that, for plans subject to the Guidelines, the updated Guidelines would apply to the first plan year beginning after December 20, 2017. Among other changes, the updated Guidelines specified that the required contraceptive coverage includes follow-up care (for example, management and evaluation, as well as changes to, and removal or discontinuation of, the

---

[18] *See, for example, https://www.regulations.gov/ document?D=CMS-2016-0123-54142; see also https://www.regulations.gov/document?D=CMS-2016-0123-54218 and https://www.regulations.gov/ document?D=CMS-2016-0123-46220.*

Exhibit 5

JA556

JA-0000147

contraceptive method). They also specified, for the first time, that coverage should include instruction in fertility awareness-based methods for women desiring an alternative method of family planning. HRSA stated that, with the input of a committee operating under a cooperative agreement, HRSA would review and periodically update the Women's Preventive Services' Guidelines. The updated Guidelines did not alter the religious employer exemption or accommodation process, nor did they extend the exemption or accommodation process to organizations or individuals that oppose certain forms of contraception (and coverage thereof) on moral grounds.

On January 9, 2017, the Departments issued a document entitled, "FAQs About Affordable Care Act Implementation Part 36." [19] The FAQ stated that, after reviewing comments submitted in response to the 2016 RFI and considering various options, the Departments could not find a way at that time to amend the accommodation so as to satisfy objecting eligible organizations while pursuing the Departments' policy goals. The Departments did not adopt the approach requested by certain commenters, cited above, to expand the exemption to include those who oppose the Mandate for moral reasons.

On May 4, 2017, the President issued Executive Order 13798, "Promoting Free Speech and Religious Liberty." Section 3 of that order declares, "Conscience Protections with Respect to Preventive-Care Mandate. The Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services shall consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg–13(a)(4) of title 42, United States Code."

## II. Expanded Exemptions and Accommodations for Moral Convictions

These interim final rules incorporate conscience protections into the contraceptive Mandate. They do so in part to bring the Mandate into conformity with Congress's long history of providing or supporting conscience protections in the regulation of sensitive health-care issues, cognizant that Congress neither required the Departments to impose the Mandate nor prohibited them from providing

conscience protections if they did so. Specifically, these interim final rules expand exemptions to the contraceptive Mandate to protect certain entities and individuals that object to coverage of some or all contraceptives based on sincerely held moral convictions but not religious beliefs, and these rules make those exempt entities eligible for accommodations concerning the same Mandate.

### A. Discretion To Provide Exemptions Under Section 2713(a)(4) of the PHS Act and the Affordable Care Act

The Departments have consistently interpreted HRSA's authority under section 2713(a)(4) of the PHS Act to allow for exemptions and accommodations to the contraceptive Mandate for certain objecting organizations. Section 2713(a)(4) of the PHS Act gives HRSA discretion to decide whether and in what circumstances it will support Guidelines providing for additional women's preventive services coverage. That authority includes HRSA's discretion to include contraceptive coverage in those Guidelines, but the Congress did not specify whether or to what extent HRSA should do so. Therefore, section 2713(a)(4) of the PHS Act allows HRSA to not apply the Guidelines to certain plans of entities or individuals with religious or moral objections to contraceptive coverage, and by not applying the Guidelines to them, to exempt those entities from the Mandate. These rules are a necessary and appropriate exercise of the authority of HHS, of which HRSA is a component, and of the authority delegated to the Departments collectively as administrators of the statutes. (26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92).

Our protection of conscience in these interim final rules is consistent with the structure and intent of the Affordable Care Act. The Affordable Care Act refrains from applying section 2713(a)(4) of the PHS Act to millions of women in grandfathered plans. In contrast, we anticipate that conscientious exemptions to the Mandate will impact a much smaller number of women. President Obama emphasized in signing the Affordable Care Act that "longstanding Federal law to protect conscience"—laws with conscience protections encompassing moral (as well as religious) objections—specifically including (but not limited to) the Church Amendments (42 U.S.C. 300a–7), "remain intact." Executive Order 13535. Nothing in the Affordable Care Act suggests Congress' intent to deviate from its long history, discussed

below, of protecting moral convictions in particular health care contexts. The Departments' implementation of section 2713(a)(4) of the PHS Act with respect to contraceptive coverage is a context similar to those encompassed by many other health care conscience protections provided or supported by Congress. This Mandate concerns contraception and sterilization services, including items believed by some citizens to have an abortifacient effect—that is, to cause the destruction of a human life at an early stage of embryonic development. These are highly sensitive issues in the history of health care regulation and have long been shielded by conscience protections in the laws of the United States.

### B. Congress' History of Providing Exemptions for Moral Convictions

In deciding the most appropriate way to exercise our discretion in this context, the Departments draw on nearly 50 years of statutory law and Supreme Court precedent discussing the protection of moral convictions in certain circumstances—particularly in the context of health care and health insurance coverage. Congress very recently expressed its intent on the matter of Government-mandated contraceptive coverage when it declared, with respect to the possibility that the District of Columbia would require contraceptive coverage, that "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions." Consolidated Appropriations Act of 2017, Division C, Title VIII, Sec. 808, Public Law 115–31 (May 5, 2017). In support of these interim final rules, we consider it significant that Congress' most recent statement on the prospect of Government mandated contraceptive coverage specifically intends that a conscience clause be included to protect moral convictions.

The many statutes listed in Section I-Background under footnote 1, which show Congress' consistent protection of moral convictions alongside religious beliefs in the Federal regulation of health care, includes laws such as the 1973 Church Amendments, which we discuss at length below, all the way to the 2017 Consolidated Appropriations Act discussed above. Notably among those laws, the Congress has enacted protections for health plans or health care organizations in Medicaid or Medicare Advantage to object "on moral or religious grounds" to providing coverage of certain counseling or referral services. 42 U.S.C. 1395w–

---

[19] Available at: *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf.*

22(j)(3)(B) (protecting against forced counseling or referrals in Medicare Choice, now Medicare Advantage, managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"). The Congress has also protected individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions." Consolidated Appropriations Act of 2017, Division C, Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act), Public Law 115–31.

### C. The Church Amendments' Protection of Moral Convictions

One of the most important and well-established federal statutes respecting conscientious objections in specific health care contexts was enacted over the course of several years beginning in 1973, initially as a response to court decisions raising the prospect that entities or individuals might be required to facilitate abortions or sterilizations. These sections of the United States Code are known as the Church Amendments, named after their primary sponsor Senator Frank Church (D–Idaho). The Church Amendments specifically provide conscience protections based on sincerely held moral convictions. Among other things, the amendments protect the recipients of certain Federal health funds from being required to perform, assist, or make their facilities available for abortions or sterilizations if they object "on the basis of religious beliefs or moral convictions," and they prohibit recipients of certain Federal health funds from discriminating against any personnel "because he refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions" (42 U.S.C. 300a–7(b), (c)(1)). Later additions to the Church Amendments protect other conscientious objections, including some objections on the basis of moral conviction to "any lawful health service," or to "any part of a health service program." (42 U.S.C. 300a–7(c)(2), (d)). In contexts covered by those sections of the Church Amendments, the provision or coverage of certain contraceptives, depending on the circumstances, could constitute "any lawful health service" or a "part of a health service program." As such, the

protections provided by those provisions of the Church Amendments would encompass moral objections to contraceptive services or coverage.

The Church Amendments were enacted in the wake of the Supreme Court's decision in *Roe* v. *Wade*, 410 U.S. 113 (1973). Even though the Court in *Roe* required abortion to be legal in certain circumstances, *Roe* did not include, within that right, the requirement that other citizens must facilitate its exercise. Thus, *Roe* favorably quoted the proceedings of the American Medical Association House of Delegates 220 (June 1970), which declared "Neither physician, hospital, nor hospital personnel shall be required to perform any act violative of personally-held moral principles." 410 U.S. at 144 & n.38 (1973). Likewise in *Roe*'s companion case, *Doe* v. *Bolton*, the Court observed that, under State law, "a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure." 410 U.S. 179, 197–98 (1973). The Court said that these conscience provisions "obviously . . . afford appropriate protection." *Id.* at 198. As an Arizona court later put it, "a woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either." *Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 196 (Ariz. Ct. App. 2011).

The Congressional Record contains relevant discussions that occurred when the protection for moral convictions was first proposed in the Church Amendments. When Senator Church introduced the first of these amendments in 1973, he cited not only *Roe* v. *Wade* but also an instance where a Federal court had ordered a Catholic hospital to perform sterilizations. 119 Congr. Rec. S5717–18 (Mar. 27, 1973). After his opening remarks, Senator Adlai Stevenson III (D–IL) rose to ask that the amendment be changed to specify that it also protects objections to abortion and sterilization based on moral convictions on the same terms as it protects objections based on religious beliefs. The following excerpt of the Congressional Record is particularly relevant to this discussion:

Mr. STEVENSON. Mr. President, first of all I commend the Senator from Idaho for bringing this matter to the attention of the Senate. I ask the Senator a question.

One need not be of the Catholic faith or any other religious faith to feel deeply about the worth of human life. The protections afforded by this amendment run only to those whose religious beliefs would be offended by the necessity of performing or

participating in the performance of certain medical procedures; others, for moral reasons, not necessarily for any religious belief, can feel equally as strong about human life. They too can revere human life.

As mortals, we cannot say with confidence say, when life begins. But whether it is life, or the potentiality of life, our moral convictions as well as our religious beliefs, warrant protection from this intrusion by the Government. Would, therefore, the Senator include moral convictions?

Would the Senator consider an amendment on page 2, line 18 which would add to religious beliefs, the words "or moral"?

Mr. CHURCH. I would suggest to the Senator that perhaps his objective could be more clearly stated if the words "or moral conviction" were added after "religious belief." I think that the Supreme Court in considering the protection we give religious beliefs has given comparable treatment to deeply held moral convictions. I would not be averse to amending the language of the amendment in such a manner. It is consistent with the general purpose. I see no reason why a deeply held moral conviction ought not be given the same treatment as a religious belief.

Mr. STEVENSON. The Senator's suggestion is well taken. I thank him.

119 Congr. Rec. S5717–18.

As the debate proceeded, Senator Church went on to quote *Doe* v. *Bolton*'s reliance on a Georgia statute that stated "a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure." 119 Congr. Rec. at S5722 (quoting 410 U.S. at 197–98). Senator Church added, "I see no reason why the amendment ought not also to cover doctors and nurses who have strong moral convictions against these particular operations." *Id.* Considering the scope of the protections, Senator Gaylord Nelson (D–WI) asked whether, "if a hospital board, or whatever the ruling agency for the hospital was, a governing agency or otherwise, just capriciously—and not upon the religious or moral questions at all— simply said, 'We are not going to bother with this kind of procedure in this hospital,' would the pending amendment permit that?" 119 Congr. Rec. at S5723. Senator Church responded that the amendment would not encompass such an objection. *Id.*

Senator James L. Buckley (C–NY), speaking in support of the amendment, added the following perspective:

Mr. BUCKLEY. Mr. President, I compliment the Senator from Idaho for proposing this most important and timely amendment. It is timely in the first instance because the attempt has already been made to compel the performance of abortion and sterilization operations on the part of those who are fundamentally opposed to such procedures. And it is timely also because the

Exhibit 5 JA558 JA-0000149

recent Supreme Court decisions will likely unleash a series of court actions across the United States to try to impose the personal preferences of the majority of the Supreme Court on the totality of the Nation.

I believe it is ironic that we should have this debate at all. Who would have predicted a year or two ago that we would have to guard against even the possibility that someone might be free [sic] [20] to participate in an abortion or sterilization against his will? Such an idea is repugnant to our political tradition. This is a Nation which has always been concerned with the right of conscience. It is the right of conscience which is protected in our draft laws. It is the right of conscience which the Supreme Court has quite properly expanded not only to embrace those young men who, because of the tenets of a particular faith, believe they cannot kill another man, but also those who because of their own deepest moral convictions are so persuaded.

I am delighted that the Senator from Idaho has amended his language to include the words "moral conviction," because, of course, we know that this is not a matter of concern to any one religious body to the exclusion of all others, or even to men who believe in a God to the exclusion of all others. It has been a traditional concept in our society from the earliest times that the right of conscience, like the paramount right to life from which it is derived, is sacred.

119 Congr. Rec. at S5723.

In support of the same protections when they were debated in the U.S. House, Representative Margaret Heckler (R–MA) [21] likewise observed that "the right of conscience has long been recognized in the parallel situation in which the individual's right to conscientious objector status in our selective service system has been protected" and "expanded by the Supreme Court to include moral conviction as well as formal religious belief." 119 Congr. Rec. H4148–49 (May 31, 1973). Rep. Heckler added, "We are concerned here only with the right of moral conscience, which has always been a part of our national tradition." *Id.* at 4149.

These first of the Church Amendments, codified at 42 U.S.C. 300a–7(b) and (c)(1), passed the House 372–1, and were approved by the Senate 94–0. 119 Congr. Rec. at H4149; 119 Congr. Rec. S10405 (June 5. 1973). The subsequently adopted provisions that comprise the Church Amendments similarly extend protection to those organizations and individuals who object to the provision of certain services on the basis of their moral convictions. And, as noted above, subsequent statutes add protections for moral objections in many other situations. These include, for example:

• Protections for individuals and entities that object to abortion: See 42 U.S.C. 238n; 42 U.S.C. 18023; 42 U.S.C. 2996f(b); and Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d), Public Law 115–31;

• Protections for entities and individuals that object to providing or covering contraceptives: See id. at Div. C, Title VIII, Sec. 808; id. at Div. C, Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act); and id. at Div. I, Title III; and

• Protections for entities and individuals that object to performing, assisting, counseling, or referring as pertains to suicide, assisted suicide, or advance directives: See 42 U.S.C. 290bb–36; 42 U.S.C. 14406; 42 U.S.C. 18113; and 42 U.S.C. 1396a(w)(3).

The Departments believe that the intent behind Congress' protection of moral convictions in certain health care contexts, especially to protect entities and individuals from governmental coercion, supports our decision in these interim final rules to protect sincerely held moral convictions from governmental compulsion threatened by the contraceptive Mandate.

## D. Court Precedents Relevant to These Expanded Exemptions

The legislative history of the protection of moral convictions in the first Church Amendments shows that Members of Congress saw the protection as being consistent with Supreme Court decisions. Not only did Senator Church cite the abortion case *Doe* v. *Bolton* as a parallel instance of conscience protection, but he also spoke of the Supreme Court generally giving "comparable treatment to deeply held moral convictions." Both Senator Buckley and Rep. Heckler specifically cited the Supreme Court's protection of moral convictions in laws governing military service. Those legislators appear to have been referencing cases such as *Welsh* v. *United States,* 398 U.S. 333 (1970), which the Supreme Court decided just 3 years earlier.

*Welsh* involved what is perhaps the Government's paradigmatic compelling interest—the need to defend the nation by military force. The Court stated that, where the Government protects objections to military service based on "religious training and belief," that protection would also extend to avowedly non-religious objections to war held with the same moral strength. *Id.* at 343. The Court declared, "[i]f an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption . . . as is someone who derives his conscientious opposition to war from traditional religious convictions."

The Departments look to the description of moral convictions in *Welsh* to help explain the scope of the protection provided in these interim final rules. Neither these interim final rules, nor the Church Amendments or other Federal health care conscience statutes, define "moral convictions" (nor do they define "religious beliefs"). But in issuing these interim final rules, we seek to use the same background understanding of that term that is reflected in the Congressional Record in 1973, in which legislators referenced cases such as *Welsh* to support the addition of language protecting moral convictions. In protecting moral convictions parallel to religious beliefs, *Welsh* describes moral convictions warranting such protection as ones: (1) That the "individual deeply and sincerely holds"; (2) "that are purely ethical or moral in source and content; (3) "but that nevertheless impose upon him a duty"; (4) and that "certainly occupy in the life of that individual a place parallel to that filled by . . . God' in traditionally religious persons," such that one could say "his beliefs function as a religion in his life." (398 U.S. at 339–40). As recited above, Senators Church and Nelson agreed that protections for such moral convictions would not encompass an objection that an individual or entity raises "capriciously." Instead, along with the requirement that protected moral convictions must be "sincerely held," this understanding cabins the protection of moral convictions in contexts where they occupy a place parallel to that filled by sincerely held religious beliefs in religious persons and organizations.

In the context of this particular Mandate, it is also worth noting that, in *Hobby Lobby,* Justice Ginsburg (joined, in this part of the opinion, by Justices Breyer, Kagan, and Sotomayor), cited Justice Harlan's opinion in *Welsh,* 398 U.S. at 357–58, in support of her statement that "[s]eparating moral convictions from religious beliefs would be of questionable legitimacy." 134 S. Ct. at 2789 n.6. In quoting this passage, the Departments do not mean to suggest that all laws protecting only religious

---

[20] The Senator might have meant "[forced] . . . against his will."

[21] Rep. Heckler later served as the 15th Secretary of HHS, from March 1983 to December 1985.

beliefs constitute an illegitimate "separat[ion]" of moral convictions, nor do we assert that moral convictions must always be protected alongside religious beliefs; we also do not agree with Justice Harlan that distinguishing between religious and moral objections would violate the Establishment Clause. Instead, the Departments believe that, in the specific health care context implicated here, providing respect for moral convictions parallel to the respect afforded to religious beliefs is appropriate, draws from long-standing Federal Government practice, and shares common ground with Congress' intent in the Church Amendments and in later Federal conscience statutes that provide protections for moral convictions alongside religious beliefs in other health care contexts.

*E. Conscience Protections in Regulations and Among the States*

The tradition of protecting moral convictions in certain health contexts is not limited to Congress. Multiple federal regulations protect objections based on moral convictions in such contexts.[22] Other federal regulations have also applied the principle of respecting moral convictions alongside religious beliefs when they have determined that it is appropriate to do so in particular circumstances. The Equal Employment Opportunity Commission has consistently protected "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views" alongside religious views under the "standard [] developed in *United States* v. *Seeger*, 380 U.S. 163 (1965) and [*Welsh*]." (29 CFR 1605.1). The Department of Justice has declared that, in cases of capital punishment, no officer or employee may be required to attend or participate if doing so "is contrary to the moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such

participation or attendance contrary to medical ethics." (28 CFR 26.5).[23]

Forty-five States have health care conscience protections covering objections to abortion, and several of those also cover sterilization or contraception.[24] Most of those State laws protect objections based on "moral," "ethical," or "conscientious" grounds in addition to "religious" grounds. Particularly in the case of abortion, some Federal and State conscience laws do not require any specified motive for the objection. (42 U.S.C. 238n). These various statutes and regulations reflect an important governmental interest in protecting moral convictions in appropriate health contexts.

The contraceptive Mandate implicates that governmental interest. Many persons and entities object to this Mandate in part because they consider some forms of FDA-approved contraceptives to be abortifacients and morally equivalent to abortion due to the possibility that some of the items may have the effect of preventing the implantation of a human embryo after fertilization. Based on our knowledge from the litigation, all of the current litigants asserting purely non-religious objections share this view, and most of the religious litigants do as well. The Supreme Court, in describing family business owners with religious objections, explained that "[t]he owners of the businesses have religious objections to abortion, and according to their religious beliefs the four contraceptive methods at issue are abortifacients. If the owners comply with the HHS mandate, they believe they will be facilitating abortions." *Hobby Lobby*, 134 S. Ct. at 2751. Outside of the context of abortion, as cited above, Congress has also provided health care conscience protections pertaining to sterilization, contraception, and other health care services and practices.

*F. Founding Principles*

The Departments also look to guidance from the broader history of

respect for conscience in the laws and founding principles of the United States. Members of Congress specifically relied on the American tradition of respect for conscience when they decided to protect moral convictions in health care. As quoted above, in supporting protecting conscience based on non-religious moral convictions, Senator Buckley declared "[i]t has been a traditional concept in our society from the earliest times that the right of conscience, like the paramount right to life from which it is derived, is sacred." Rep. Heckler similarly stated that "the right of moral conscience . . . has always been a part of our national tradition." This tradition is reflected, for example, in a letter President George Washington wrote saying that "[t]he Citizens of the United States of America have a right to applaud themselves for having given to mankind examples of an enlarged and liberal policy: A policy worthy of imitation. All possess alike liberty of conscience and immunities of citizenship."[25] Thomas Jefferson similarly declared that "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of the civil authority."[26] Although these statements by Presidents Washington and Jefferson were spoken to religious congregations, and although religious and moral conscience were tightly intertwined for the Founders, they both reflect a broad principle of respect for conscience against government coercion. James Madison likewise called conscience "the most sacred of all property," and proposed that the Bill of Rights should guarantee, in addition to protecting religious belief and worship, that "the full and equal rights of conscience [shall not] be in any manner, or on any pretext infringed."[27]

These Founding Era statements of general principle do not specify how they would be applied in a particular health care context. We do not suggest that the specific protections offered in this rule would also be required or necessarily appropriate in any other context that does not raise the specific concerns implicated by this Mandate. These interim final rules do not address in any way how the Government would balance its interests with respect to

---

[22] *See, for example,* 42 CFR 422.206 (declaring that the general Medicare Advantage rule "does not require the MA plan to cover, furnish, or pay for a particular counseling or referral service if the MA organization that offers the plan—(1) Objects to the provision of that service on moral or religious grounds."); 42 CFR 438.102 (declaring that information requirements do not apply "if the MCO, PIHP, or PAHP objects to the service on moral or religious grounds"); 48 CFR 1609.7001 ("health plan sponsoring organizations are not required to discuss in their customary course of practice options that they would not ordinarily discuss in their customary course of practice because such options are inconsistent with their professional judgment or ethical, moral or religious beliefs."); 48 CFR 352.270–9 ("Non-Discrimination for Conscience" clause for organizations receiving HIV or Malaria relief funds).

[23] *See also* 18 CFR 214.11 (where a law enforcement agency (LEA) seeks assistance in the investigation or prosecution of trafficking of persons, the reasonableness of the LEA's request will depend in part on "[c]ultural, religious, or moral objections to the request").

[24] According to the Guttmacher Institute, 45 states have conscience statutes pertaining to abortion (43 of which cover institutions), 18 have conscience statutes pertaining to sterilization (16 of which cover institutions), and 12 have conscience statutes pertaining to contraception (8 of which cover institutions). "Refusing to Provide Health Services" (June 1, 2017), available at *https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services.*

[25] From George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), available at *https://founders.archives.gov/documents/Washington/05-06-02-0135.*

[26] Letter to the Society of the Methodist Episcopal Church at New London, Connecticut (February 4, 1809), available at *https://founders.archives.gov/documents/Jefferson/99-01-02-9714.*

[27] James Madison, "Essay on Property" (March 29, 1792); First draft of the First Amendment, 1 Annals of Congress 434 (June 8, 1789).

Exhibit 5                JA560                JA-0000151

other health services not encompassed by the contraceptive Mandate.[28] Instead we highlight this tradition of respect for conscience from our Founding Era to provide background support for the Departments' decision to implement section 2713(a)(4) of the PHS Act, while protecting conscience in the exercise of moral convictions. We believe that these interim final rules are consistent both with the American tradition of respect for conscience and with Congress' history of providing conscience protections in the kinds of health care matters involved in this Mandate.

*G. Executive Orders Relevant to These Expanded Exemptions*

Protecting moral convictions, as set forth in the expanded exemptions and accommodations of these rules, is consistent with recent executive orders. President Trump's Executive Order concerning this Mandate directed the Departments to consider providing protections, not specifically for "religious" beliefs, but for "conscience." We interpret that term to include moral convictions and not just religious beliefs. Likewise, President Trump's first Executive Order, EO 13765, declared that "the Secretary of Health and Human Services (Secretary) and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the [ACA] shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any State or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." This Mandate imposes both a cost, fee, tax, or penalty, and a regulatory burden, on individuals and purchasers of health insurance that have moral convictions opposed to providing contraceptive coverage. These interim final rules exercise the Departments' discretion to grant exemptions from the Mandate to reduce and relieve regulatory burdens and promote freedom in the health care market.

*H. Litigation Concerning the Mandate*

The sensitivity of certain health care matters makes it particularly important for the Government to tread carefully when engaging in regulation concerning those areas, and to respect individuals and organizations whose moral convictions are burdened by Government regulations. Providing conscience protections advances the Affordable Care Act's goal of expanding health coverage among entities and individuals that might otherwise be reluctant to participate in the market. For example, the Supreme Court in *Hobby Lobby* declared that, if HHS requires owners of businesses to cover procedures that the owners "could not in good conscience" cover, such as abortion, "HHS would effectively exclude these people from full participation in the economic life of the Nation." 134 S. Ct. at 2783. That would be a serious outcome. As demonstrated by litigation and public comments, various citizens sincerely hold moral convictions, which are not necessarily religious, against providing or participating in coverage of contraceptive items included in the Mandate, and some believe that some of those items may cause early abortions. The Departments wish to implement the contraceptive coverage Guidelines issued under section 2713(a)(4) of the PHS Act in a way that respects the moral convictions of our citizens so that they are more free to engage in "full participation in the economic life of the Nation." These expanded exemptions do so by removing an obstacle that might otherwise lead entities or individuals with moral objections to contraceptive coverage to choose not to sponsor or participate in health plans if they include such coverage.

Among the lawsuits challenging the Mandate, two have been filed based in part on non-religious moral convictions. In one case, the Departments are subject to a permanent injunction requiring us to respect the non-religious moral objections of an employer. *See March for Life* v. *Burwell,* 128 F. Supp. 3d 116 (D.D.C. 2015). In the other case, an appeals court recently affirmed a district court ruling that allows the previous regulations to be imposed in a way that violates the moral convictions of a small nonprofit pro-life organization and its employees. *See Real Alternatives,* 2017 WL 3324690. Our litigation of these cases has led to inconsistent court rulings, consumed substantial governmental resources, and created uncertainty for objecting organizations, issuers, third party administrators, and employees and beneficiaries. The

organizations that have sued seeking a moral exemption have all adopted moral tenets opposed to contraception and hire only employees who share this view. It is reasonable to conclude that employees of these organizations would therefore not benefit from the Mandate. As a result, subjecting this subset of organizations to the Mandate does not advance any governmental interest. The need to resolve this litigation and the potential concerns of similar entities, and our requirement to comply with permanent injunctive relief currently imposed in *March for Life,* provide substantial reasons for the Departments to protect moral convictions through these interim final rules. Even though, as discussed below, we assume the number of entities and individuals that may seek exemption from the Mandate on the basis of moral convictions, as these two sets of litigants did, will be small, we know from the litigation that it will not be zero. As a result, the Departments have taken these types of objections into consideration in reviewing our regulations. Having done so, we consider it appropriate to issue the protections set forth in these interim final rules. Just as Congress, in adopting the early provisions of the Church Amendments, viewed it as necessary and appropriate to protect those organizations and individuals with objections to certain health care services on the basis of moral convictions, so we, too, believe that "our moral convictions as well as our religious beliefs, warrant protection from this intrusion by the Government" in this situation.

*I. The Departments' Rebalancing of Government Interests*

For additional discussion of the Government's balance of interests concerning religious beliefs issued contemporaneously with these interim final rules, see the related document published by the Department elsewhere in this issue of the **Federal Register**. There, we acknowledge that the Departments have changed the policies and interpretations we previously adopted with respect to the Mandate and the governmental interests that underlying it, and we assert that we now believe the Government's legitimate interests in providing for contraceptive coverage do not require us to violate sincerely held religious beliefs while implementing the Guidelines. For parallel reasons, the Departments believe Congress did not set forth—and we do not possess—interests that require us to violate sincerely held moral convictions in the course of generally requiring contraceptive coverage. These changes in policy are

---

[28] As the Supreme Court stated in *Hobby Lobby,* the Court's decision concerns only the contraceptive Mandate, and should not be understood to hold that all insurance-coverage mandates, for example, for vaccinations or blood transfusions, must necessarily fail if they conflict with an employer's religious beliefs. Nor does the Court's opinion provide a shield for employers who might cloak illegal discrimination as a religious (or moral) practice. 134 S. Ct. at 2783.

Exhibit 5

JA-0000152

within the Departments' authority. As the Supreme Court has acknowledged, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC* v. *Navarro,* 136 S. Ct. 2117, 2125 (2016). This "reasoned analysis" requirement does not demand that an agency "demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one: it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *United Student Aid Funds, Inc.* v. *King,* 200 F. Supp. 3d 163, 169–70 (D.D.C. 2016) (citing *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)); *see also New Edge Network, Inc.* v. *FCC,* 461 F.3d 1105, 1112–13 (9th Cir. 2006) (rejecting an argument that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance").[29]

The Departments note that the exemptions created here, like the exemptions created by the last Administration, do not burden third parties to a degree that counsels against providing the exemptions. In addition to the apparent fact that many entities with non-religious moral objections to the Mandate appear to only hire persons that share those objections, Congress did not create a right to receive contraceptive coverage, and Congress explicitly chose not to impose the section 2713 requirements on grandfathered plans benefitting millions of people. Individuals who are unable to obtain contraceptive coverage through their employer-sponsored health plans because of the exemptions created in these interim final rules, or because of other exemptions to the Mandate, have other avenues for obtaining contraception, including through various other mechanisms by which the Government advances contraceptive coverage, particularly for low-income women, and which these interim final rules leave unchanged.[30] As the

Government is under no constitutional obligation to fund contraception, *cf. Harris* v. *McRae,* 448 U.S. 297 (1980), even more so may the Government refrain from requiring private citizens to cover contraception for other citizens in violation of their moral convictions. *Cf. Rust* v. *Sullivan.* 500 U.S. 173, 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity.").

The Departments acknowledge that coverage of contraception is an important and highly controversial issue, implicating many different views, as reflected for example in the public comments received on multiple rulemakings over the course of implementation of section 2713(a)(4) of the PHS Act. Our expansion of conscience protections for moral convictions, similar to protections contained in numerous statutes governing health care regulation, is not taken lightly. However, after reconsidering the interests served by the Mandate in this particular context, the objections raised, and the relevant Federal law, the Departments have determined that expanding the exemptions to include protections for moral convictions is a more appropriate administrative response than continuing to refuse to extend the exemptions and accommodations to certain entities and individuals for whom the Mandate violates their sincerely held moral convictions. Although the number of organizations and individuals that may seek to take advantage of these exemptions and accommodations may be small, we believe that it is important formally to codify such protections for objections based on moral conviction, given the long-standing recognition of such protections in health care and health insurance context in law and regulation and the particularly sensitive nature of these issues in the health care context. These interim final rules leave unchanged HRSA's authority to decide whether to include contraceptives in the women's preventive services Guidelines for entities that are not exempted by law, regulation, or the Guidelines. These rules also do not change the many other mechanisms by which the Government advances contraceptive coverage, particularly for low-income women.

## III. Provisions of the Interim Final Rules With Comment Period

The Departments are issuing these interim final rules in light of the full history of relevant rulemaking (including 3 previous interim final rules), public comments, and the long-running litigation from non-religious moral objectors to the Mandate, as well as the information contained in the companion interim final rules issued elsewhere in this issue of the **Federal Register**. These interim final rules seek to resolve these matters by directing HRSA, to the extent it requires coverage for certain contraceptive services in its Guidelines, to afford an exemption to certain entities and individuals with sincerely held moral convictions by which they object to contraceptive or sterilization coverage, and by making the accommodation process available for certain organizations with such convictions.

For all of the reasons discussed and referenced above, the Departments have determined that the Government's interest in applying contraceptive coverage requirements to the plans of certain entities and individuals does not outweigh the sincerely held moral objections of those entities and individuals. Thus, these interim final rules amend the regulations amended in both the Departments' July 2015 final regulations and in the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**.

These interim final rules expand those exemptions to include additional entities and persons that object based on sincerely held moral convictions. These rules leave in place HRSA's discretion to continue to require contraceptive and sterilization coverage where no objection specified in the regulations exists, and if section 2713 of the PHS Act otherwise applies. These interim final rules also maintain the existence of an accommodation process as a voluntary option for organizations with moral objections to contraceptive coverage, but consistent with our expansion of the exemption, we expand eligibility for the accommodation to include organizations with sincerely held moral convictions concerning contraceptive coverage. HRSA is simultaneously updating its Guidelines to reflect the requirements of these interim final rules.[31]

---

[29] *See also Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863–64 (1984) ("The fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.")

[30] *See, for example,* Family Planning grants in 42 U.S.C. 300, *et seq.;* the Teenage Pregnancy Prevention Program, Public Law 112–74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c–8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal

and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b–12; Title XIX of the Social Security Act, 42 U.S.C. 1396, *et seq.;* the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), & 25 U.S.C. 1601, *et seq.;* Health center grants, 42 U.S.C. 254b(e), (g), (h), & (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

[31] *See https://www.hrsa.gov/womensguidelines/* and *https://www.hrsa.gov/womensguidelines2016/ index.html.*

Exhibit 5                                   JA562                                   JA-0000153

1. Exemption for Objecting Entities Based on Moral Convictions

In the new 45 CFR 147.133 as created by these interim final rules, we expand the exemption that was previously located in § 147.131(a), and that was expanded in § 147.132 by the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**.

With respect to employers that sponsor group health plans, § 147.133(a)(1) and (a)(1)(i) provide exemptions for certain employers that object to coverage of all or a subset of contraceptives or sterilization and related patient education and counseling based on sincerely held moral convictions.

For avoidance of doubt, the Departments wish to make clear that the expanded exemption in § 147.133(a) applies to several distinct entities involved in the provision of coverage to the objecting employer's employees. This explanation is consistent with how prior rules have worked by means of similar language. Section 147.133(a)(1) and (a)(1)(i), by specifying that "[a] group health plan and health insurance coverage provided in connection with a group health plan" is exempt "to the extent the plan sponsor objects as specified in paragraph (a)(2)," exempt the group health plans the sponsors of which object, and exempt their health insurance issuers in providing the coverage in those plans (whether or not the issuers have their own objections). Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv), or the parallel provisions in 26 CFR 54.9815–2713T(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv), the plan sponsor, issuer, and plan covered in the exemption of that paragraph would face no penalty as a result of omitting contraceptive coverage from the benefits of the plan participants and beneficiaries.

Consistent with the restated exemption, exempt entities will not be required to comply with a self-certification process. Although exempt entities do not need to file notices or certifications of their exemption, and these interim final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits. Under ERISA, the plan

document provides what benefits are provided to participants and beneficiaries under the plan and, therefore, if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document. Moreover, if there is a reduction in a covered service or benefit, the plan has to disclose that change to plan participants.[32] Thus, where an exemption applies and all or a subset of contraceptive services are omitted from a plan's coverage, otherwise applicable ERISA disclosures should reflect the omission of coverage in ERISA plans. These existing disclosure requirements serve to help provide notice to participants and beneficiaries of what ERISA plans do and do not cover. The Departments invite public comment on whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption, or in otherwise receiving guidance on a way to document their exemption.

The exemptions in § 147.133(a) apply "to the extent" of the objecting entities' sincerely held moral convictions. Thus, entities that hold a requisite objection to covering some, but not all, contraceptive items would be exempt with respect to the items to which they object, but not with respect to the items to which they do not object. Likewise, the requisite objection of a plan sponsor or institution of higher education in § 147.133(a)(1)(i) and (ii) exempts its group health plan, health insurance coverage offered by a health insurance issuer in connection with such plan, and its issuer in its offering of such coverage, but that exemption does not extend to coverage provided by that issuer to other group health plans where the plan sponsors have no qualifying objection. The objection of a health insurance issuer in § 147.133(a)(1)(iii) similarly operates only to the extent of its objection, and as otherwise limited as described below.

2. Exemption of Certain Plan Sponsors

The rules cover certain kinds of non-governmental employer plan sponsors with the requisite objections, and the rules specify which kinds of entities qualify for the exemption.

Under these interim final rules, the Departments do not limit the analysis

with reference to nonprofit status as previous rules have done. Many of the federal health care conscience statutes cited above offer protections for the moral convictions of entities without regard to whether they operate as nonprofits or for-profit entities. In addition, a significant majority of states either impose no contraceptive coverage requirement, or offer broader exemptions than the exemption contained in the July 2015 final regulations.[33] States also generally protect moral convictions in health care conscience laws, and they often offer those protections whether or not an entity operates as a nonprofit.[34] Although the practice of states is by no means a limit on the discretion delegated to HRSA by the Affordable Care Act, nor is it a statement about what the Federal Government may do consistent with other protections or limitations in federal law, such state practice can be informative as to the viability of offering protections for conscientious objections in particularly sensitive health care contexts. In this case, the existence of many instances where conscience protections are offered, or no underlying mandate of this kind exists that could violate moral convictions, supports the Departments' decision to expand the Federal exemption concerning this Mandate as set forth in these interim final rules.

Section 147.133(a)(1)(i)(A) of the rules specifies that the exemption includes the plans of a plan sponsor that is a nonprofit organization with sincerely held moral convictions.

Section 147.133(a)(1)(i)(B) of the rules specifies that the exemption includes the plans of a plan sponsor that is a for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934).

Extending the exemption to certain for-profit entities is consistent with the Supreme Court's ruling in *Hobby Lobby*, which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in *Hobby Lobby*, religion), regardless of whether the entity operates as a nonprofit organization, and rejecting the

---

[32] *See, for example*, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102–2, 2520.102–3, & 2520.104b–3(d), and 29 CFR 2590.715–2715. *See also* 45 CFR 147.200 (requiring disclosure of the "exceptions, reductions, and limitations of the coverage," including group health plans and group & individual issuers).

[33] *See* Guttmacher Institute, "Insurance Coverage of Contraceptives" (Aug. 1, 2017), available at *https://www.guttmacher.org/state-policy/explore/ insurance-coverage-contraceptives*.

[34] *See, for example*, Guttmacher Institute, "Refusing to Provide Health Services" (Aug. 1, 2017), available at *https://www.guttmacher.org/ state-policy/explore/refusing-provide-health-services*.

Exhibit 5                     JA563                     JA-0000154

Departments' argument to the contrary. 134 S. Ct. 2768–75. Some reports and industry experts have indicated that not many for-profit entities beyond those that had originally brought suit have sought relief from the Mandate after *Hobby Lobby*.[35] The mechanisms for determining whether a company has adopted and holds certain principles or views, such as sincerely held moral convictions, is a matter of well-established State law with respect to corporate decision-making,[36] and the Departments expect that application of such laws would cabin the scope of this exemption.

The July 2015 final regulations extended the accommodation to for-profit entities only if they are closely held, by positively defining what constitutes a closely held entity. Any such positive definition runs up against the myriad state differences in defining such entities, and potentially intrudes into a traditional area of state regulation of business organizations. The Departments implicitly recognized the difficulty of defining closely held entities in the July 2015 final regulations when we adopted a definition that included entities that are merely "substantially similar" to certain specified parameters, and we allowed entities that were not sure if they met the definition to inquire with HHS: HHS was permitted to decline to answer the inquiry, at which time the entity would be deemed to qualify as an eligible organization. Instead of attempting to positively define closely held businesses for the purpose of this rule, the Departments consider it much more clear, effective, and preferable to define the category negatively by reference to one element of our previous definition, namely, that the entity has no publicly traded ownership interest (that is, any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934).

In this way, these interim final rules differ from the exemption provided to plan sponsors with objections based on sincerely held religious beliefs set forth in § 147.132(a)(1)—those extend to for-profit entities whether or not they are closely held or publicly traded. The Departments seek public comment on whether the exemption in § 147.133(a)(1)(i) for plan sponsors with moral objections to the Mandate should be finalized to encompass all of the types of plan sponsors covered by § 147.132(a)(1)(i), including publicly traded corporations with objections based on sincerely held moral convictions, and also non-federal governmental plan sponsors that may have objections based on sincerely held moral convictions.

In the case of particularly sensitive health care matters, several significant federal health care conscience statutes protect entities' moral objections without precluding publicly traded and governmental entities from using those protections. For example, the first paragraph of the Church Amendments provides certain protections for entities that object based on moral convictions to making their facilities or personnel available to assist in the performance of abortions or sterilizations, and the statute does not limit those protections based on whether the entities are publicly traded or governmental. (42 U.S.C. 300a–7(b)). Thus, under section 300a–7(b), a hospital in a publicly traded health system, or a local governmental hospital, could adopt sincerely held moral convictions by which it objects to providing facilities or personnel for abortions or sterilizations, and if the entity receives relevant funds from HHS specified by section 300a–7(b), the protections of that section would apply. The Coats-Snowe Amendment likewise provides certain protections for health care entities and postgraduate physician training programs that choose not to perform, refer for, or provide training for abortions, and the statute does not limit those protections based on whether the entities are publicly traded or governmental. (42 U.S.C. 238n).

The Weldon Amendment [37] provides certain protections for health care entities, hospitals, provider-sponsored organizations, health maintenance organizations, and health insurance plans that do not provide, pay for, provide coverage of, or refer for abortions, and the statute does not limit those protections based on whether the entity is publicly traded or governmental. The Affordable Care Act provides certain protections for any institutional health care entity, hospital, provider-sponsored organization, health maintenance organization, health insurance plan, or any other kind of health care facility, that does not provide any health care item or service furnished for the purpose of causing or assisting in causing assisted suicide, euthanasia, or mercy killing, and the statute similarly does not limit those protections based on whether the entity is publicly traded or governmental. (42 U.S.C. 18113).[38]

Sections 1395w–22(j)(3)(B) and 1396u–2(b)(3) of 42 U.S.C. protect organizations that offer Medicaid and Medicare Advantage managed care plans from being required to provide, reimburse for, or provide coverage of a counseling or referral service if they object to doing so on moral grounds, and those paragraphs do not further specify that publicly traded entities do not qualify for the protections. Congress' most recent statement on Government requirements of contraceptive coverage specified that, if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions." Consolidated Appropriations Act of 2017, Division C, Title VIII, Sec. 808. Congress expressed no intent that such a conscience should be limited based on whether the entity is publicly traded.

At the same time, the Departments lack significant information about the need to extend the expanded exemption further. We have been subjected to litigation by nonprofit entities expressing objections to the Mandate based on non-religious moral convictions, and we have been sued by closely held for-profit entities expressing religious objections. This combination of different types of plaintiffs leads us to believe that there may be a small number of closely held for-profit entities that would seek to use an exemption to the contraceptive Mandate based on moral convictions. The fact that many closely held for-profit entities brought challenges to the Mandate has led us to offer protections that would include publicly traded entities with religious objections to the Mandate if such entities exist. But the combined lack of any lawsuits challenging the Mandate by for-profit entities with non-religious moral convictions, and of any lawsuits by any kind of publicly traded entity, leads us to not extend the expanded exemption in these interim final rules to publicly traded entities, but rather to invite public comment on whether to do so in

---

[35] See Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," *Politico* (Oct. 11, 2016), available at *http://www.politico.com/story/ 2016/10/obamacare-birth-control-mandate-employers-229627*.

[36] Although the Departments do not prescribe any form or notification, they would expect that such principles or views would have been adopted and documented in accordance with the laws of the jurisdiction under which they are incorporated or organized.

[37] Consolidated Appropriations Act of 2017, Div. H. Title V, Sec. 507(d), Pub. L. 115–31.

[38] The lack of the limitation in this provision may be particularly relevant since it is contained in the same statute, the ACA, as the provision under which the Mandate—and these exemptions to the Mandate—are promulgated.

Exhibit 5                                    JA564                                    JA-0000155

a way parallel to the protections set forth in § 147.132(a)(1)(i). We agree with the Supreme Court that it is improbable that many publicly traded companies with numerous "unrelated shareholders—including institutional investors with their own set of stakeholders"—would agree to run a corporation under the same religious beliefs" (or moral convictions) and thereby qualify for the exemption. *Hobby Lobby*, 134 S. Ct. at 2774. We are also not aware of other types of plan sponsors (such as non-Federal governmental entities) that might possess moral objections to compliance with the Mandate, including whether some might consider certain contraceptive methods as having a possible abortifacient effect. Nevertheless, we would welcome any comments on whether such corporations or other plan sponsors exist and would benefit from such an exemption.

Despite our a lack of complete information, the Departments know that nonprofit entities have challenged the Mandate, and we assume that a closely held business might wish to assert non-religious moral convictions in objecting to the Mandate (although we anticipate very few if any will do so). Thus we have chosen in these interim final rules to include them in the expanded exemption and thereby remove an obstacle preventing such entities from claiming an exemption based on non-religious moral convictions. But we are less certain that we need to use these interim final rules to extend the expanded exemption for moral convictions to encompass other kinds of plan sponsors not included in the protections of these interim final rules. Therefore, with respect to plan sponsors not included in the expanded exemptions of § 147.133(a)(1)(i), and non-federal governmental plan sponsors that might have moral objections to the Mandate, we invite public comment on whether to include such entities when we finalize these rules at a later date.

The Departments further conclude that it would be inadequate to merely provide entities access to the accommodation process instead of to the exemption where those entities object to the Mandate based on sincerely held moral convictions. The Departments have stated in our regulations and court briefings that the existing accommodation with respect to self-insured plans requires contraceptive coverage as part of the same plan as the coverage provided by the employer, and operates in a way "seamless" to those plans. As a result, in significant respects, the

accommodation process does not actually accommodate the objections of many entities. This has led many religious groups to challenge the accommodation in court, and we expect similar challenges would come from organizations objecting to the accommodation based on moral convictions if we offered them the accommodation but not an exemption. When we took that narrow approach with religious nonprofit entities it led to multiple cases in many courts that we needed to litigate to the Supreme Court various times. Although attention to the accommodation were not specifically litigated in the two cases brought by nonprofit non-religious organizations (because we have not even made them eligible for the accommodation), those organizations made it clear that they and their employees strongly oppose coverage of certain contraceptives in their plans and in connection with their plans.

## 3. Exemption for Institutions of Higher Education

The plans of institutions of higher education that arrange student health insurance coverage will be treated similarly to the way that plans of employers are treated for the purposes of such plans being exempt or accommodated based on moral convictions. These interim final rules specify, in § 147.133(a)(1)(ii), that the exemption is extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002), to their arrangement of student health insurance coverage, in a manner comparable to the applicability of the exemption for group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor.

The Departments are not aware of institutions of higher education that arrange student coverage and object to the Mandate based on non-religious moral convictions. We have been sued by several institutions of higher education that arrange student coverage and object to the Mandate based on religious beliefs. We believe the existence of such entities with non-religious moral objections, or the possible formation of such entities in the future, is sufficiently possible so that we should provide protections for them in these interim final rules. But based on a lack of information about such entities, we assume that none will use the exemption concerning student coverage at this time.

## 4. Exemption for Issuers

These interim final rules extend the exemption, in § 147.133(a)(1)(iii), to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own moral convictions opposed to providing coverage for contraceptive services.

As discussed above, where the exemption for plan sponsors or institutions of higher education applies, issuers are exempt under those sections with respect to providing coverage in those plans. The issuer exemption in § 147.133(a)(1)(iii) adds to that protection, but the additional protection operates in a different way than the plan sponsor exemption operates. The only plan sponsors, or in the case of individual insurance coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services are plan sponsors or individuals who themselves object and are otherwise exempt based on their objection (whether the objection is based on moral convictions, as set forth in these rules, or on religious beliefs, as set forth in exemptions created by the companion interim final rules published elsewhere in this issue of the **Federal Register**). Thus, the issuer exemption specifies that where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless the plan is otherwise exempt from that requirement. Accordingly, the only plan sponsors, or in the case of individual insurance coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an issuer that is exempt under this paragraph (a)(1)(iii) that does not include some or all contraceptive services are plan sponsors or individuals who themselves object and are exempt.

Under the rules as amended, issuers with objections based on sincerely held moral convictions could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on either their religious beliefs or their moral convictions, and issuers with sincerely held religious beliefs could likewise issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on either their religious beliefs or their moral convictions.

Issuers that hold moral objections should identify to plan sponsors the

lack of contraceptive coverage in any health insurance coverage being offered that is based on the issuer's exemption, and communicate the group health plan's independent obligation to provide contraceptive coverage, unless the group health plan itself is exempt under regulations governing the Mandate.

In this way, the issuer exemption serves to protect objecting issuers both from being asked or required to issue policies that cover contraception in violation of the issuers' sincerely held moral convictions, and from being asked or required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus subjecting the issuers to potential liability if those plans are not exempt from the Guidelines. At the same time, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will it prevent other issuers from being required to provide contraceptive coverage in individual insurance coverage. Protecting issuers that object to offering contraceptive coverage based on sincerely held moral convictions will help preserve space in the health insurance market for certain issuers so that exempt plan sponsors and individuals will be able to obtain coverage.

The Departments are not currently aware of health insurance issuers that possess their own religious or moral objections to offering contraceptive coverage. Nevertheless, many Federal health care conscience laws and regulations protect issuers or plans specifically. For example, as discussed above, 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3) protect plans or managed care organizations in Medicaid or Medicare Advantage. The Weldon Amendment protects HMOs, health insurance plans, and any other health care organizations from being required to provide coverage or pay for abortions. *See, for example,* Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d), Public Law 115–31. The most recently enacted Consolidated Appropriations Act declares that Congress supports a "conscience clause" to protect moral convictions concerning "the provision of contraceptive coverage by health insurance plans." *See id.* at Div. C, Title VIII, Sec. 808.

The issuer exemption does not specifically include third party administrators, for the reasons discussed in the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published

elsewhere in this issue of the **Federal Register**. The Departments solicit public comment; however, on whether there are situations where there may be an additional need to provide distinct protections for third party administrators that may have moral convictions implicated by the Mandate.[39]

### 5. Scope of Objections Needed for the Objecting Entity Exemption

Exemptions for objecting entities specify that they apply where the entities object as specified in § 147.133(a)(2). That section specifies that exemptions for objecting entities will apply to the extent that an entity described in § 147.133(a)(1) objects to its establishing, maintaining, providing, offering, or arranging (as applicable) for coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held moral convictions.

### 6. Individual Exemption

These interim final rules include a special rule pertaining to individuals (referred to here as the "individual exemption"). Section 147.133(b) provides that nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713T(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv), may be construed to prevent a willing plan sponsor of a group health plan and/or a willing health insurance issuer offering group or individual health insurance coverage, from offering a separate benefit package option, or a separate policy, certificate, or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on the individual's sincerely held moral convictions. The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan at large or, as applicable, to any other individual policies the issuer offers.

This individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer morally acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object. This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers. For example, in one case brought against the Departments, the State of Missouri enacted a law under which the State is not permitted to discriminate against insurance issuers that offer health plans without coverage for contraception based on employees' moral convictions, or against the individual employees who accept such offers. *See Wieland,* 196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption of these interim final rules, employers sponsoring governmental plans would be free to honor the sincerely held moral objections of individual employees by offering them plans that omit contraception, even if those governmental entities do not object to offering contraceptive coverage in general.

This "individual exemption" cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of state law that requires coverage of such contraceptives or sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held moral objection. This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4) of the PHS Act, and does not affect any other federal or state law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these interim final rules do not affect such other laws or terms.

The Departments believe the individual exemption will help to meet the Affordable Care Act's goal of increasing health coverage because it will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held moral convictions.[40] At the same

---

[39] The exemption for issuers, as outlined here, does not make a distinction among issuers based on whether they are publicly traded, unlike the plan sponsor exemption for business entities. Because the issuer exemption operates more narrowly than the exemption for business plan sponsors operates, in the ways described here, and exists in part to help preserve market options for objecting plan sponsors, the Departments consider it appropriate to not draw such a distinction among issuers.

[40] This prospect has been raised in cases of religious individuals—see, for example, *Wieland,*
Continued

Exhibit 5                          JA566                          JA-0000157

time, this individual exemption "does not undermine the governmental interests furthered by the contraceptive coverage requirement," [41] because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered. In addition, because the individual exemption only operates when the employer and/or issuer, as applicable, are willing, the exemption will not undermine any governmental interest in the workability of the insurance market, because we expect that any workability concerns will be taken into account in the decision of whether to be willing to offer the individual morally acceptable coverage.

For similar reasons, and now believe the individual exemption will not undermine any Government interest in uniformity in the health insurance market. At the level of plan offerings, the extent to which plans cover contraception under the prior rules is already far from uniform. The Congress did not require compliance with section 2713 of the PHS Act by all entities—in particular by grandfathered plans. The Departments' previous exemption for houses of worship and integrated auxiliaries, and our accommodation of self-insured church plans, show that the importance of a uniform health insurance system is not significantly harmed by allowing plans to omit contraception in many contexts.[42]

With respect to operationalizing this provision of these rules, as well as the similar provision protecting individuals with religious objections to purchasing insurance that covers some or all contraceptives, in the interim final rules published elsewhere in this issue of the **Federal Register**, the Departments note that a plan sponsor or health insurance issuer is not required to offer separate and different benefit package options, or separate and different forms of policy, certificate, or contract of insurance with respect to those individuals who object

on moral bases from those who object on religious bases. That is, a willing employer or issuer may offer the same benefit package option or policy, certificate, or contract of insurance—which excludes the same scope of some or all contraceptive coverage—to individuals who are exempt from the Mandate because of their moral convictions (under these rules) or their religious beliefs (under the regulations as amended by the interim final rules pertaining to religious beliefs).

### 7. Optional Accommodation

In addition to expanding the exemption to those with sincerely held moral convictions, these rules also expand eligibility for the optional accommodation process to include employers with objections based on sincerely held moral convictions. This is accomplished by inserting references to the newly added exemption for moral convictions, 45 CFR 147.133, into the regulatory sections where the accommodation process is codified, 45 CFR 147.131, 26 CFR 54.9815–2713AT, and 29 CFR 2590.715–2713A. In all other respects the accommodation process works the same as it does for entities with objections based on sincerely held religious beliefs, as described in the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**.

The Departments are not aware of entities with objections to the Mandate based on sincerely held moral convictions that wish to make use of the optional accommodation, and our present assumption is that no such entities will seek to use the accommodation rather than the exemption. But if such entities do wish to use the accommodation, making it available to them will both provide contraceptive coverage to their plan participants and respect those entities' objections. Because entities with objections to the Mandate based on sincerely held non-religious moral convictions have not previously had access to the accommodation, they would not be in a position to revoke their use of the accommodation at the time these interim final rules are issued, but could do so in the future under the same parameters set forth in the accommodation regulations.

### 8. Regulatory Restatements of Section 2713(a) and (a)(4) of the PHS Act

These interim final rules insert references to 45 CFR 147.133 into the restatements of the requirements of

section 2713(a) and (a)(4) of the PHS Act, contained in 26 CFR 54.9815–2713T(a)(1) introductory text and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) introductory text and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv).

### 9. Conclusion

The Departments believe that the Guidelines, and the expanded exemptions and accommodations set forth in these interim final rules, will advance the legitimate but limited purposes for which Congress imposed section 2713 of the PHS Act, while acting consistently with Congress' well-established record of allowing for moral exemptions with respect to various health care matters. These interim final rules maintain HRSA's discretion to decide whether to continue to require contraceptive coverage under the Guidelines if no regulatorily recognized exemption exists (and in plans where Congress applied section 2713 of the PHS Act). As cited above, these interim final rules also leave fully in place over a dozen Federal programs that provide, or subsidize, contraceptives for women, including for low income women based on financial need. The Departments believe this array of programs and requirements better serves the interests of providing contraceptive coverage while protecting the moral convictions of entities and individuals concerning coverage of some or all contraceptive or sterilization services.

The Departments request and encourage public comments on all matters addressed in these interim final rules.

### IV. Interim Final Rules, Request for Comments and Waiver of Delay of Effective Date

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include sections 2701 through 2728 of the PHS Act and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. These interim final rules fall under those statutory authorized justifications, as did previous rules on this matter (75 FR 41726; 76 FR 46621; and 79 FR 51092).

Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior

---

196 F. Supp. 3d at 1017, and *March for Life*, 128 F. Supp. 3d at 130—where the courts noted that the individual employee plaintiffs indicated that they viewed the Mandate as pressuring them to "forgo health insurance altogether."

[41] 78 FR 39874.

[42] *See also Real Alternatives*, 2017 WL 3324690 at *36 (3d Cir. Aug. 4, 2017) (Jordan, J., concurring in part and dissenting in part) ("Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market. . . . Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny." (citation and internal quotation marks omitted)).

to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. These provisions of the APA do not apply here because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act.

Even if these provisions of the APA applied, they would be satisfied: The Departments have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed. As discussed earlier, the Departments have issued three interim final rules implementing this section of the PHS Act because of the immediate needs of covered entities and the weighty matters implicated by the HRSA Guidelines. As recently as December 20, 2016, HRSA updated those Guidelines without engaging in the regulatory process (because doing so is not a legal requirement), and announced that it plans to so continue to update the Guidelines.

Two lawsuits have been pending for several years by entities raising non-religious moral objections to the Mandate.[43] In one of those cases, the Departments are subject to a permanent injunction and the appeal of that case has been stayed since February 2016. In the other case, Federal district and appeals courts ruled in favor of the Departments, denying injunctive relief to the plaintiffs, and that case is also still pending. Based on the public comments the Departments have received, we have reason to believe that some similar nonprofit entities might exist, even if it is likely a small number.[44]

For entities and individuals facing a burden on their sincerely held moral convictions, providing them relief from Government regulations that impose such a burden is an important and urgent matter, and delay in doing so injures those entities in ways that cannot be repaired retroactively. The burdens of the existing rules undermine these entities' and individuals' participation in the health care market because they provide them with a serious disincentive—indeed a crisis of conscience—between participating in or providing quality and affordable health insurance coverage and being forced to violate their sincerely held moral convictions. The existence of inconsistent court rulings in multiple proceedings has also caused confusion and uncertainty that has extended for several years, with different federal courts taking different positions on whether entities with moral objections are entitled to relief from the Mandate. Delaying the availability of the expanded exemption would require entities to bear these burdens for many more months. Continuing to apply the Mandate's regulatory burden on individuals and organizations with moral convictions objecting to compliance with the Mandate also serves as a deterrent for citizens who might consider forming new entities consistent with their moral convictions and offering health insurance through those entities.

Moreover, we separately expanded exemptions to protect religious beliefs in the companion interim final rules issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**. Because Congress has provided many statutes that protect religious beliefs and moral convictions similarly in certain health care contexts, it is important not to delay the expansion of exemptions for moral convictions set forth in these rules, since the companion rules provide protections for religious beliefs on an interim final basis. Otherwise, our regulations would simultaneously provide and deny relief to entities and individuals that are, in the Departments' view, similarly deserving of exemptions and accommodations consistent, with similar protections in other federal laws. This could cause similarly situated entities and individuals to be burdened unequally.

In response to several of the previous rules on this issue—including three issued as interim final rules under the statutory authority cited above—the Departments received more than 100,000 public comments on multiple occasions. Those comments included extensive discussion about whether and to what extent to expand the exemption. Most recently, on July 26, 2016, the Departments issued a request for information (81 FR 47741) and received over 54,000 public comments about different possible ways to resolve these issues. As noted above, the public comments in response to both the RFI and various prior rulemaking proceedings included specific requests that the exemptions be expanded to include those who oppose the Mandate for either religious or "moral" reasons.[45] In connection with past regulations, the Departments have offered or expanded a temporary safe harbor allowing organizations that were not exempt from the HRSA Guidelines to operate out of compliance with the Guidelines. The Departments will fully consider comments submitted in response to these interim final rules, but believe that good cause exists to issue the rules on an interim final basis before the comments are submitted and reviewed. Issuing interim final rules with a comment period provides the public with an opportunity to comment on whether these regulations expanding the exemption should be made permanent or subject to modification without delaying the effective date of the regulations.

As the U.S. Court of Appeals for the D.C. Circuit stated with respect to an earlier IFR promulgated with respect to this issue in *Priests for Life* v. *U.S. Department of Health and Human Services,* 772 F.3d 229, 276 (D.C. Cir. 2014), *vacated on other grounds, Zubik* v. *Burwell,* 136 S. Ct. 1557 (2016), "[S]everal reasons support HHS's decision not to engage in notice and comment here." Among other things, the Court noted that "the agency made a good cause finding in the rule it issued"; that "the regulations the interim final rule modifies were recently enacted pursuant to notice and comment rulemaking, and presented virtually identical issues"; that "HHS will expose its interim rule to notice and comment before its permanent implementation"; and that not proceeding under interim final rules would "delay the implementation of the alternative opt-out for religious objectors." *Id.* at 277. Similarly, not proceeding with exemptions and accommodations for moral objectors here would delay the implementation of those alternative opt-outs for moral objectors.

Delaying the availability of the expanded exemption could also increase the costs of health insurance for some entities. As reflected in litigation pertaining to the Mandate, some entities are in grandfathered health plans that do not cover

---

[43] *March for Life,* 128 F. Supp. 3d 116; *Real Alternatives,* 867 F.3d 338.

[44] *See, for example,* Americans United for Life ("AUL") Comment on CMA–9992–IFC2 at 10 (Nov. 1, 2011), available at *http://www.regulations.gov/ #!documentDetail;D=HHS-OS-2011-0023-59496,* and AUL Comment on CMS–9968–P at 5 (Apr. 8, 2013), available at *http://www.regulations.gov/ #!documentDetail;D=CMS-2012-0031-79115.*

[45] *See, for example, http://www.regulations.gov/ #!documentDetail;D=HHS-OS-2011-0023-59496, http://www.regulations.gov/ #!documentDetail;D=CMS-2012-0031-79115, https://www.regulations.gov/document?D=CMS-2016-0123-54142, https://www.regulations.gov/ document?D=CMS-2016-0123-54218,* and *https:// www.regulations.gov/document?D=CMS-2016-0123-46220.*

contraception. As such, they may wish to make changes to their health plans that will reduce the costs of insurance coverage for their beneficiaries or policyholders, but which would cause the plans to lose grandfathered status. To the extent that entities with objections to the Mandate based on moral convictions but not religious beliefs fall into this category, they may be refraining from making those changes—and therefore may be continuing to incur and pass on higher insurance costs—to prevent the Mandate from applying to their plans in violation of their consciences. We are not aware of the extent to which such entities exist, but 17 percent of all covered workers are in grandfathered health plans, encompassing tens of millions of people.[46] Issuing these rules on an interim final basis reduces the costs of health insurance and regulatory burdens for such entities and their plan participants.

These interim final rules also expand access to the optional accommodation process for certain entities with objections to the Mandate based on moral convictions. If entities exist that wish to use that process, the Departments believe they should be able to do so without the delay that would be involved by not offering them the optional accommodation process by use of interim final rules. Proceeding otherwise could delay the provision of contraceptive coverage to those entities' employees.

For the foregoing reasons, the Departments have determined that it would be impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these interim final rules into effect, and that it is in the public interest to promulgate interim final rules. For the same reasons, the Departments have determined, consistent with section 553(d) of the APA (5 U.S.C. 553(d)), that there is good cause to make these interim final rules effective immediately upon filing for public inspection at the Office of the Federal Register.

## V. Economic Impact and Paperwork Burden

We have examined the impacts of the interim final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the

Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96–354, section 1102(b) of the Social Security Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2) and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

### A. Executive Orders 12866 and 13563— Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any 1 year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). As discussed below regarding anticipated effects of these rules and the Paperwork Reduction Act, these interim final rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under

Executive Order 12866. However, OMB has determined that the actions are significant within the meaning of section 3(f)(4) of the Executive Order. Therefore, OMB has reviewed these final regulations and the Departments have provided the following assessment of their impact.

#### 1. Need for Regulatory Action

These interim final rules amend the Departments' July 2015 final regulations and do so in conjunction with the amendments made in the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**. These interim final rules expand the exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4) of the PHS Act, section 715(a)(1) of the ERISA, and section 9815(a)(1) of the Code, to include certain entities and individuals with objections to compliance with the Mandate based on sincerely held moral convictions, and they revise the accommodation process to make entities with such convictions eligible to use it. The expanded exemption would apply to certain individuals, nonprofit entities, institutions of higher education, issuers, and for-profit entities that do not have publicly traded ownership interests, that have a moral objection to providing coverage for some (or all) of the contraceptive and/or sterilization services covered by the Guidelines. Such action is taken, among other reasons, to provide for conscientious participation in the health insurance market free from penalties for violating sincerely held moral convictions opposed to providing or receiving coverage of contraceptive services, to resolve lawsuits that have been filed against the Departments by some such entities, and to avoid similar legal challenges.

#### 2. Anticipated Effects

The Departments acknowledge that expanding the exemption to include objections based on moral convictions might result in less insurance coverage of contraception for some women who may want the coverage. Although the Departments do not know the exact scope of that effect attributable to the moral exemption in these interim final rules, they believe it to be small.

With respect to the expanded exemption for nonprofit organizations, as noted above the Departments are aware of two small nonprofit

---

[46] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2017 Annual Survey," available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.*

Exhibit 5　　　　　　　　　　　　JA569　　　　　　　　　　　　JA-0000160

organizations that have filed lawsuits raising non-religious moral objections to coverage of some contraceptives. Both of those entities have fewer than five employees enrolled in health coverage, and both require all of their employees to agree with their opposition to the coverage.[47] Based on comments submitted in response to prior rulemakings on this subject, we believe that at least one other similar entity exists. However, we do not know how many similar entities exist. Lacking other information we assume that the number is small. Without data to estimate the number of such entities, we believe it to be less than 10, and assume the exemption will be used by nine nonprofit entities.

We also assume that those nine entities will operate in a fashion similar to the two similar entities of which we are aware, so that their employees will likely share their views against coverage of certain contraceptives. This is consistent with our conclusion in previous rules that no significant burden or costs would result from exempting houses of worship and integrated auxiliaries. (*See* 76 FR 46625 and 78 FR 39889). We reached that conclusion without ultimately requiring that houses of worship and integrated auxiliaries only hire persons who agree with their views against contraception, and without even requiring that such entities actually oppose contraception in order to be exempt (in contrast, the expanded exemption here requires the exempt entity to actually possess sincerely held moral convictions objecting to the coverage). In concluding that the exemption for houses of worship and integrated auxiliaries would result in no significant burden or costs, we relied on our assumption that the employees of exempt houses of worship and integrated auxiliaries likely share their employers' opposition to contraceptive coverage.

A similar assumption is supported with respect to the expanded exemption for nonprofit organizations. To our knowledge, the vast majority of organizations objecting to the Mandate assert religious beliefs. The only nonprofit organizations of which we are aware that possess non-religious moral convictions against some or all contraceptive methods only hire persons who share their convictions. It

is possible that the exemption for nonprofit organizations with moral convictions in these interim final rules could be used by a nonprofit organization that employs persons who do not share the organization's views on contraception, but it was also possible under our previous rules that a house of worship or integrated auxiliary could employ persons who do not share their views on contraception.[48] Although we are unable to find sufficient data on this issue, we believe that there are far fewer non-religious moral nonprofit organizations opposed to contraceptive coverage than there are churches with religious objections to such coverage. Based on our limited data, we believe the most likely effect of the expanded exemption for nonprofit entities is that it will be used by entities similar to the two entities that have sought an exemption through litigation, and whose employees also oppose the coverage. Therefore, we expect that the expanded exemption for nonprofit entities will have no effect of reducing contraceptive coverage to employees who want that coverage.

These interim final rules expand the exemption to include institutions of higher education that arrange student coverage and have non-religious moral objections to the Mandate, and they make exempt entities with moral objections eligible to use the accommodation. The Departments are not aware of either kind of entity. We believe the number of entities that object to the Mandate based on non-religious moral convictions is already very small. The only entities of which we are aware that have raised such objections are not institutions of higher education, and appear to hold objections that we assume would likely lead them to reject the accommodation process. Therefore, for the purposes of estimating the anticipated effect of these interim final rules on contraceptive coverage of women who wish to receive such coverage, we assume that—at this time—no entities with non-religious moral objections to the Mandate will be institutions of higher education that arrange student coverage, and no entities with non-religious moral objections will opt into the accommodation. We wish to make the expanded exemption and accommodation available to such entities in case they do exist or might

come into existence, based on similar reasons to those given above for why the exemptions and accommodations are extended to other entities. We invite public comment on whether and how many such entities will make use of these interim final rules.

The expanded exemption for issuers will not result in a distinct effect on contraceptive coverage for women who wish to receive it because that exemption only applies in cases where plan sponsors or individuals are also otherwise exempt, and the effect of those exemptions is discussed elsewhere herein. The expanded exemption for individuals that oppose contraceptive coverage based on sincerely held moral convictions will provide coverage that omits contraception for individuals that object to contraceptive coverage.

The expanded moral exemption would also cover for-profit entities that do not have publicly traded ownership interests, and that have non-religious moral objections to the Mandate. The Departments are not aware of any for-profit entities that possess non-religious moral objections to the Mandate. However, scores of for-profit entities have filed suit challenging the Mandate. Among the over 200 entities that brought legal challenges, only two entities (less than 1 percent) raised non-religious moral objections—both were nonprofit. Among the general public polls vary about religious beliefs, but one prominent poll shows that 89 percent of Americans say they believe in God.[49] Among non-religious persons, only a very small percentage appears to hold moral objections to contraception. A recent study found that only 2 percent of religiously unaffiliated persons believed using contraceptives is morally wrong.[50] Combined, this suggests that 0.2 percent of Americans at most[51] might believe contraceptives are morally wrong based on moral convictions but not religious beliefs. We have no information about how many of those persons run closely held businesses, offer employer sponsored health insurance, and would make use of the expanded exemption for moral

---

[47] Non-religious nonprofit organizations that engage in expressive activity generally have a First Amendment right to hire only people who share their moral convictions or will be respectful of them—including their convictions on whether the organization or others provide health coverage of contraception, or of certain items they view as being abortifacient.

[48] *Cf., for example,* Gallup, "Americans, Including Catholics, Say Birth Control Is Morally OK," (May 22, 2012) ("Eighty-two percent of U.S. Catholics say birth control is morally acceptable"), available at *http://www.gallup.com/poll/154799/americans-including-catholics-say-birth-control-morally.aspx.*

[49] Gallup, "Most Americans Still Believe in God" (June 14–23, 2016), available at *http://www.gallup.com/poll/193271/americans-believe-god.aspx.*

[50] Pew Research Center, "Where the Public Stands on Religious Liberty vs. Nondiscrimination" at page 26 (Sept. 28, 2016), available at *http://assets.pewresearch.org/wp-content/uploads/sites/11/2016/09/Religious-Liberty-full-for-web.pdf.*

[51] The study defined religiously "unaffiliated" as agnostic, atheist or "nothing in particular" (*id.* at 8), as distinct from several versions of Protestants, or Catholics. "Nothing in particular" might have included some theists.

Exhibit 5                    JA570                    JA-0000161

convictions set forth in these interim final rules. Given the large number of closely held entities that challenged the Mandate based on religious objections, we assume that some similar for-profit entities with non-religious moral objections exist. But we expect that it will be a comparatively small number of entities, since among the nonprofit litigants, only two were non-religious. Without data available to estimate the actual number of entities that will make use of the expanded exemption for for-profit entities that do not have publicly traded ownership interests and that have objections to the Mandate based on sincerely held moral convictions, we expect that fewer than 10 entities, if any, will so do so—we assume nine for-profit entities will use the exemption in these interim final rules.

The expanded exemption encompassing certain for-profit entities could result in the removal of contraceptive coverage from women who do not share their employers' views. The Departments used data from the Current Population Survey (CPS) and the Medical Expenditure Panel Survey-Insurance Component (MEPS–IC) to obtain an estimate of the number of policyholders that will be covered by the plans of the for-profit entities we assume may make use of these expanded exemptions.[52] The average number of policyholders (9) in plans with under 100 employees was obtained. It is not known what size the for-profit employers will be that might claim this exemption, but as discussed above these interim final rules do not include publicly traded companies (and we invite public comments on whether to do so in the final rules), and both of the two nonprofit entities that challenged the Mandate included fewer than five policyholders in each entity. Therefore we assume the for-profit entities that may claim this expanded exemption will have fewer than 100 employees and an average of 9 policyholders. For nine entities, the total number of policyholders would be 81. DOL estimates that for each policyholder, there is approximately one dependent.[53] This amounts to 162

covered persons. Census data indicate that women of childbearing age—that is, women aged 15–44—comprise 20.2 percent of the general population.[54] This amounts to approximately 33 women of childbearing age for this group of individuals covered by group plans sponsored by for-profit moral objectors. Approximately 44.3 percent of women currently use contraceptives covered by the Guidelines.[55] Thus we estimate that 15 women may incur contraceptive costs due to for-profit entities using the expanded exemption provided in these interim final rules.[56] In the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**, we estimate that the average cost of contraception per year per woman of childbearing age that use contraception covered by the Guidelines, within health plans that cover contraception, is $584. Consequently, we estimate that the anticipated effects attributable to the cost of contraception from for-profit entities using the expanded exemption in these interim final rules is approximately $8,760.

The Departments estimate that these interim final rules will not result in any additional burden or costs on issuers or third party administrators. As discussed above, we assume that no entities with non-religious moral convictions will use the accommodation, although we wish to make it available in case an entity voluntarily opts into it in order to allow contraceptive coverage to be provided to

its plan participants and beneficiaries. Finally, because the accommodation process was not previously available to entities that possess non-religious moral objections to the Mandate, we do not anticipate that these interim final rules will result in any burden from such entities revoking their accommodated status.

The Departments believe the foregoing analysis represents a reasonable estimate of the likely impact under the rules expanded exemptions. The Departments acknowledge uncertainty in the estimate and therefore conducted a second analysis using an alternative framework, which is set forth in the companion interim final rule concerning religious beliefs issued contemporaneously with this interim final rule and published elsewhere in this issue of the **Federal Register**. Under either estimate, this interim final rule is not economically significant.

We reiterate the rareness of instances in which we are aware that employers assert non-religious objections to contraceptive coverage based on sincerely held moral convictions, as discussed above, and also that in the few instances where such an objection has been raised, employees of such employers also opposed contraception.

We request comment on all aspects of the preceding regulatory impact analysis.

### B. Special Analyses—Department of the Treasury

For purposes of the Department of the Treasury, certain Internal Revenue Service (IRS) regulations, including this one, are exempt from the requirements in Executive Order 12866, as supplemented by Executive Order 13563. The Departments estimate that the likely effect of these interim final rules will be that entities will use the exemption and not the accommodation. Therefore, a regulatory assessment is not required.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 et seq.) (RFA) imposes certain requirements with respect to Federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 et seq.) and that are likely to have a significant economic impact on a substantial number of small entities. Under Section 553(b) of the APA, a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public

---

[52] "Health Insurance Coverage Bulletin" Table 4, page 21. Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf/Estimates of the number of ERISA Plans based on 2015 Medical Expenditure Survey—Insurance

[53] "Health Insurance Coverage Bulletin" Table 4, page 21. Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.

[54] U.S. Census Bureau, "Age and Sex Composition: 2010" (May 2011), available at https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf. The Guidelines' requirement of contraceptive coverage only applies "for all women with reproductive capacity." https://www.hrsa.gov/womensguidelines/; see also 80 FR 40318. In addition, studies commonly consider the 15–44 age range to assess contraceptive use by women of childbearing age. See, Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), available at https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[55] See https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[56] We note that many non-religious for-profit entities which sued the Departments challenging the Mandate, including some of the largest employers, only objected to coverage of 4 of the 18 types of contraceptives required to be covered by the Mandate—namely, those contraceptives which they viewed as abortifacients, and akin to abortion—and they were willing to provide coverage for other types of contraception. It is reasonable to assume that this would also be the case with respect to some for-profits that object to the Mandate on the basis of sincerely held moral convictions. Accordingly, it is possible that even fewer women beneficiaries under such plans would bear out-of-pocket expenses in order to obtain contraceptives, and that those who might do so would bear lower costs due to many contraceptive items being covered.

Exhibit 5     JA571     JA-0000162

interest. The interim final rules are exempt from the APA, both because the PHS Act, ERISA, and the Code contain specific provisions under which the Secretaries may adopt regulations by interim final rule and because the Departments have made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble. Therefore, the RFA does not apply and the Departments are not required to either certify that the regulations or this amendment would not have a significant economic impact on a substantial number of small entities or conduct a regulatory flexibility analysis.

Nevertheless, the Departments carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866. The Departments do not expect that these interim final rules will have a significant economic effect on a substantial number of small entities, because they will not result in any additional costs to affected entities. Instead, by exempting from the Mandate small businesses and nonprofit organizations with moral objections to some or all contraceptives and/or sterilization, the Departments have reduced regulatory burden on small entities. Pursuant to section 7805(f) of the Code, these regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

*D. Paperwork Reduction Act—Department of Health and Human Services*

Under the Paperwork Reduction Act of 1995 (the PRA), federal agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information. Interested persons are invited to send comments regarding our burden estimates or any other aspect of this collection of information, including any of the following subjects: (1) The necessity and utility of the proposed information collection for the proper performance of the agency's functions; (2) the accuracy of the estimated burden; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) the use of automated collection techniques or other forms of information technology to minimize the information collection burden.

We estimate that these interim final rules will not result in additional burdens not accounted for as set forth in the companion interim final rules concerning religious beliefs issued

contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**. As discussed there, regulations covering the accommodation include provisions regarding self-certification or notices to HHS from eligible organizations (§ 147.131(c)(3)), notice of availability of separate payments for contraceptive services (§ 147.131(f)), and notice of revocation of accommodation (§ 147.131(c)(4)). The burdens related to those ICRs are currently approved under OMB Control Numbers 0938–1248 and 0938–1292. These interim final rules amend the accommodation regulations to make entities with moral objections to the Mandate eligible to use the same accommodation processes. The Departments will update the forms and model notices regarding these processes to reflect that entities with sincerely held moral convictions are eligible organizations.

As discussed above, however, we assume that no entities with non-religious moral objections to the Mandate will use the accommodation, and we know that no such entities were eligible for it until now, so that they do not possess accommodated status to revoke. Therefore we believe that the burden for these ICRs is accounted for in the collection approved under OMB Control Numbers 0938–1248 and 0938–1292, as described in the interim final rules concerning religious beliefs issued contemporaneously with these interim final rules.

We are soliciting comments on all of the possible information collection requirements contained in these interim final rules, including those discussed in the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**, for which these interim final rules provide eligibility to entities with objections based on moral convictions. In addition, we are also soliciting comments on all of the related information collection requirements currently approved under 0938–1292 and 0938–1248.

To obtain copies of a supporting statement and any related forms for the proposed collection(s) summarized in this notice, you may make your request using one of following:

1. Access CMS' Web site address at *https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.html.*

2. Email your request, including your address, phone number, OMB number, and CMS document identifier, to *Paperwork@cms.hhs.gov.*

3. Call the Reports Clearance Office at (410) 786–1326.

If you comment on these information collections, that is, reporting, recordkeeping or third-party disclosure requirements, please submit your comments electronically as specified in the **ADDRESSES** section of these interim final rules with comment period.

*E. Paperwork Reduction Act—Department of Labor*

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210–0150 and 1210–0152. A copy of the ICR may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N–5718, Washington, DC 20210. Telephone: 202–693–8410; Fax: 202–219–4745. These are not toll-free numbers.

Consistent with the analysis in the HHS PRA section above, although these interim final rules make entities with certain moral convictions eligible for the accommodation, we assume that no entities will use it rather than the exemption, and such entities were not previously eligible for the accommodation so as to revoke it. Therefore we believe these interim final rules do not involve additional burden not accounted for under OMB control number 1210–0150.

Regarding the ICRs discussed in the companion interim final rules concerning religious beliefs issued contemporaneously with these interim final rules and published elsewhere in this issue of the **Federal Register**, the forms for which would be used if any entities with moral objections used the accommodation process in the future, DOL submitted those ICRs in order to obtain OMB approval under the PRA for the regulatory revision. The request was made under emergency clearance procedures specified in regulations at 5 CFR 1320.13. OMB approved the ICRs under the emergency clearance process. In an effort to consolidate the number of information collection requests, DOL indicated it will combine the ICR related to the OMB control number 1210–0152 with the ICR related to the OMB control number 1210–0150. Once

Exhibit 5                JA572                JA-0000163

the ICR is approved, DOL indicated it will discontinue 1210–0152. OMB approved the ICR under control number 1210–0150 through [DATE]. A copy of the information collection request may be obtained free of charge on the *RegInfo.gov* Web site at *http:// www.reginfo.gov/public/do/ PRAViewICR?ref_nbr=201705-1210-001.* This approval allows respondents temporarily to utilize the additional flexibility these interim final regulations provide, while DOL seeks public comment on the collection methods— including their utility and burden. Contemporaneously with the publication of these interim final rules, DOL will publish a notice in the **Federal Register** informing the public of its intention to extend the OMB approval.

### F. Regulatory Reform Executive Orders 13765, 13771 and 13777

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of Health and Human Services (Secretary) and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the Act shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any State or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the States more flexibility and control to create a more free and open healthcare market." These interim final rules exercise the discretion provided to the Departments under the Affordable Care Act and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated the costs and cost savings attributable to this interim final rule. As discussed in more detail in the preceding analysis, this interim final rule lessens incremental reporting costs.[57] Therefore, this interim final rule

is considered an EO 13771 deregulatory action.

### G. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (section 202(a) of Pub. L. 104– 4), requires the Departments to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing "any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year." The current threshold after adjustment for inflation is $148 million, using the most current (2016) Implicit Price Deflator for the Gross Domestic Product. For purposes of the Unfunded Mandates Reform Act, these interim final rules do not include any Federal mandate that may result in expenditures by State, local, or tribal governments, nor do they include any Federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.

### H. Federalism

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by Federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on States, the relationship between the Federal Government and States, or the distribution of power and responsibilities among the various levels of Government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the

concerns of state and local officials in the preamble to the regulation.

These interim final rules do not have any Federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

### VI. Statutory Authority

The Department of the Treasury temporary regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059. 1135, 1161–1168. 1169, 1181– 1183, 1181 note, 1185. 1185a. 1185b, 1185d, 1191, 1191a, 1191b. and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105– 200. 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1– 2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301– 1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

### List of Subjects

#### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

#### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

#### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping

---

including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on EO 13771 implementation (*https://www.whitehouse.gov/the- press-office/2017/04/05/memorandum- implementing-executive-order-13771-titled- reducing-regulation*) states that impacts should be categorized as consistently as possible within Departments. The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures are reduced, negative benefits if expenditures are raised). Following the FDA. OSHA and MSHA accounting convention leads to this interim final rule's medical expenditure impacts being categorized as (positive or negative) benefits, rather than as costs, thus placing them outside of consideration for E.O. 13771 designation purposes.

---

[57] Other noteworthy potential impacts encompass potential changes in medical expenditures.

Exhibit 5                          JA573                          JA-0000164

requirements, State regulation of health insurance.

**Kirsten B. Wielobob,**

*Deputy Commissioner for Services and Enforcement.*

Approved: October 2, 2017.

**David J. Kautter,**

*Assistant Secretary for Tax Policy.*

Signed this 4th day of October, 2017.

**Timothy D. Hauser,**

*Deputy Assistant Secretary for Program Operations, Employee Benefits Security Administration, Department of Labor.*

Dated: October 4, 2017.

**Seema Verma,**

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: October 4, 2017.

**Donald Wright,**

*Acting Secretary, Department of Health and Human Services.*

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

For the reasons set forth in this preamble, 26 CFR part 54 is amended as follows:

## PART 54—PENSION EXCISE TAXES

■ 1. The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805. * * *

### § 54.9815–2713T   [Amended]

■ 2. Section 54.9815–2713T, as added elsewhere in this issue of the **Federal Register**, is amended in paragraph (a)(1)(iv) by removing the reference "147.131 and 147.132" and adding in its place the reference "147.131, 147.132, and 147.133".

### § 54.9815–2713AT   [Amended]

■ 3. Section 54.9815–2713AT, as added elsewhere in this issue of the **Federal Register**, is amended—

■ a. In paragraph (a)(1) by removing "or (ii)" and adding in its place "or (ii), or 45 CFR 147.133(a)(1)(i) or (ii)";

■ b. In paragraph (a)(2) by removing the reference "147.132(a)" and adding in its place the reference "147.132(a) or 147.133(a)";

■ c. In paragraph (b)(1)(ii) introductory text by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133";

■ d. In paragraph (b)(1)(ii)(B) by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133";

■ e. In paragraph (c)(1)(ii) introductory text by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133";

■ f. In paragraph (c)(1)(ii)(B) by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133"; and

■ g. In paragraph (c)(2) introductory text by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133".

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

For the reasons set forth in the preamble, the Department of Labor amends 29 CFR part 2590 as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 3. The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Division M, Pub. L. 113–235, 128 Stat. 2130; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

### § 2590.715–2713   [Amended]

■ 4. Section 2590.715–2713, as amended elsewhere in this issue of the **Federal Register**], is further amended in paragraph (a)(1)(iv) by removing the reference "147.131 and 147.132" and adding in its place the reference "147.131, 147.132, and 147.133".

### § 2590.715–2713A   [Amended]

■ 5. Section 2590.715–2713A, as revised elsewhere in this issue of the **Federal Register**], is further amended—

■ a. In paragraph (a)(1) by removing "(ii)" and adding in its place "(ii), or 45 CFR 147.133(a)(1)(i) or (ii)";

■ b. In paragraph (a)(2) by removing the reference "147.132(a)" and adding in its place the reference "147.132(a) or 147.133(a)";

■ c. In paragraph (b)(1)(ii) introductory text by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133";

■ d. In paragraph (b)(1)(ii)(B) by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133";

■ e. In paragraph (c)(1)(ii) introductory text by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133";

■ f. In paragraph (c)(1)(ii)(B) by removing the reference "147.132" and

adding in its place the reference "147.132 or 147.133"; and

■ g. In paragraph (c)(2) introductory text by removing the reference "147.132" and adding in its place the reference "147.132 or 147.133".

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons set forth in the preamble, the Department of Health and Human Services amends 45 CFR part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 6. The authority citation for part 147 continues to read as follows:

**Authority:** Secs 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

### § 147.130   [Amended]

■ 7. Section 147.130, as amended elsewhere in this issue of the **Federal Register**, is further amended in paragraphs (a)(1) introductory text and (a)(1)(iv) by removing the reference "§§ 147.131 and 147.132" and adding in its place the reference "§§ 147.131, 147.132, and 147.133".

### § 147.131   [Amended]

■ 8. Section 147.131, as revised elsewhere in this issue of the **Federal Register**, is further amended—

■ a. In paragraph (c)(1) by removing the reference "(ii)" and adding in its place the reference "(ii), or 45 CFR 147.133(a)(1)(i) or (ii)".

■ b. In paragraph (c)(2) by removing the reference "§ 147.132(a)" and adding in its place the reference "§ 147.132(a) or 147.133"; and

■ c. In paragraphs (d)(1)(ii) introductory text, (d)(1)(ii)(B) and (d)(2) by removing the reference "§ 147.132" and to adding in its place the reference "§ 147.132 or 147.133".

■ 9. Add § 147.133 to read as follows:

### § 147.133   Moral exemptions in connection with coverage of certain preventive health services.

(a) *Objecting entities.* (1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus

Exhibit 5                                    JA574                                    JA-0000165

the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent one of the following non-governmental plan sponsors object as specified in paragraph (a)(2) of this section:

(A) A nonprofit organization; or

(B) A for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934);

(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii) of this section, the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement.

(2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.

(b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.

(c) *Definition.* For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).

(d) *Severability.* Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

[FR Doc. 2017–21852 Filed 10–6–17; 11:15 am]

**BILLING CODE 4830–01–P; 4510–029–P; 4120–01–P; 6325–64–P**

Exhibit 5                                    JA575                                    JA-0000166

# FAQS ABOUT AFFORDABLE CARE ACT IMPLEMENTATION PART 36



U.S. Department of Labor
Employee Benefits Security Administration
January 9, 2017

Set out below is an additional Frequently Asked Question (FAQ) regarding implementation of the Affordable Care Act. This FAQ has been prepared jointly by the Departments of Labor (DOL), Health and Human Services (HHS), and the Treasury (collectively, the Departments). Like previously issued FAQs (available at **www.dol.gov/ebsa/healthreform/index.html** and **www.cms.gov/cciio/resources/fact-sheets-and-faqs/index.html**), this FAQ answers a question from stakeholders to help people understand the law and benefit from it, as intended.

## COVERAGE OF PREVENTIVE SERVICES

Section 2713 of the Public Health Service Act (PHS Act), as added by the Affordable Care Act and incorporated into the Employee Retirement Income Security Act (ERISA) and the Internal Revenue Code (the Code), requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing.

As originally drafted, the bill that became the Affordable Care Act would not have covered additional preventive services that "many women's health advocates and medical professionals believe are critically important" to meeting women's unique health needs. 155 Cong. Rec. 28,841 (2009) (Sen. Boxer). To address that concern, the Senate adopted a "Women's Health Amendment," adding a new category of preventive services specific to women's health. This provision requires coverage without cost sharing of preventive care and screenings for women provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). Supporters of the Women's Health Amendment emphasized that it would reduce unintended pregnancies by ensuring that women receive coverage for "contraceptive services" without cost-sharing. 155 Cong. Rec. at 29,768 (Sen. Durbin).[1]

On August 1, 2011, the Departments issued amended regulations requiring coverage of women's preventive services provided for in the HRSA guidelines,[2] and HRSA adopted and released such guidelines, which were based on recommendations of the independent organization, the National Academy of Medicine (formerly Institute of Medicine).[3] The preventive services identified in the HRSA guidelines include all Food and Drug Administration (FDA)-approved contraceptives, sterilization

---

[1] *See also*, *e.g.*, 155 Cong. Rec. at 28,841 (Sen. Boxer) ("family planning services"); *id.* at 28,843 (Sen. Gillibrand) ("family planning"); *id.* at 28,844 (Sen. Mikulski) (same); *id.* at 28,869 (Sen. Franken) ("contraception"); *id.* at 29,070 (Sen. Feinstein) ("family planning services"); id. at 29,307 (Sen. Murray) (same).

[2] 26 CFR 54.9815-2713, 29 CFR 2590.715-2713, 45 CFR 147.130.

[3] The 2011 amended regulations were issued and effective on August 1, 2011, and published on August 3, 2011 (76 FR 46621).

Exhibit 7     JA576     JA-0000169

procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[4]  Under the regulations issued in August 2011 and the contemporaneously issued HRSA guidelines, group health plans of "religious employers" (organizations that are organized and operate as nonprofit entities and are referred to in section 6033(a)(3)(A)(i) or (iii) of the Code) are exempt from the requirement to provide contraceptive coverage.  That exemption reflects "the longstanding governmental recognition of a particular sphere of autonomy for houses of worship."  80 FR 41318, 41325 (July 15, 2015); see 26 U.S.C.  6033(a)(3)(A)(i) or (iii) (referring to "churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order").

Subsequently, on July 2, 2013, the Departments published regulations that provide an accommodation for eligible organizations[5] that object on religious grounds to providing coverage for contraceptive services, but are not eligible for the exemption for religious employers (78 FR 39870).[6]  Under the accommodation, an eligible organization is not required to contract, arrange, pay, or provide a referral for contraceptive coverage.  At the same time, the accommodation generally ensures that women enrolled in the health plan established by the eligible organization, like women enrolled in health plans maintained by other employers, receive contraceptive coverage seamlessly— that is, through the same issuers or third party administrators that provide or administer the health coverage furnished by the eligible organization, and without financial, logistical, or administrative obstacles.[7]  Minimizing such obstacles is essential to achieving the purpose of the Affordable Care Act's preventive services provision, which seeks to remove barriers to the use of preventive services and to ensure that women receive full and equal health coverage appropriate to their medical needs.

In Burwell v.  Hobby Lobby Stores, Inc., 134 S.  Ct.  2751 (2014), which addressed claims brought under the Religious Freedom Restoration Act (RFRA), the Supreme Court held that the contraceptive-coverage requirement substantially burdened the religious exercise of the closely held for-profit corporations that had religious objections to providing contraceptive coverage, and that the accommodation was a less restrictive means of providing coverage to their employees.  In light of the Hobby Lobby decision, the Departments extended the accommodation to closely held for-profit entities.[8]

---

[4]  On December 20, 2016, HRSA updated the women's preventive services guidelines, which go into effect for non-grandfathered group health plans and health insurance coverage for plan years (in the individual market, policy years) beginning on or after December 20, 2017.  The HRSA guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and male condoms.

[5]  An eligible organization, which may seek the accommodation based on its sincerely held religious objection to providing contraceptive coverage, is defined at 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a), and 45 CFR 147.131(b),

[6]  26 CFR 54.9815-2713A, 29 CFR 2590.715-2713A, 45 CFR 147.131.

[7]  An accommodation is also available with respect to student health insurance coverage arranged by eligible organizations that are institutions of higher education. 45 CFR 147.131(f).  For ease of use, this FAQ refers only to "employers" with religious objections to the contraceptive-coverage requirement, but references to employers with respect to insured group health plans should also be considered to include institutions of higher education that are eligible organizations with respect to student health insurance coverage.

[8]  26 CFR 54.9815-2713A(b)(2)(ii); 29 CFR 2590.715-2713A(b)(2)(ii); 45 CFR. 147.131(b)(2)(ii).

Exhibit 7                                               JA577                                          JA-0000170

3

Under the accommodation, an eligible organization that objects to providing contraceptive coverage for religious reasons may either:

(1) self-certify its objection to its health insurance issuer (to the extent it has an insured plan) or third party administrator (to the extent it has a self-insured plan) using a form provided by the Department of Labor (EBSA Form 700);[9] or

(2) self-certify its objection and provide certain information to HHS without using any particular form.[10]

In *Zubik* v. Burwell, 136 S. Ct. 1557 (2016), the Supreme Court considered claims by a number of employers that, even with the accommodation provided in the regulations, the contraceptive-coverage requirement violates RFRA. Following oral argument, the Court issued an order requesting supplemental briefing from the parties. The Court's order noted that under the existing regulations, an objecting employer with an insured plan that seeks to invoke the accommodation by contacting its issuer must use a form of written notice stating that the employer objects on religious grounds to providing contraceptive coverage.[11] The Court directed the parties to file supplemental briefs addressing "whether contraceptive coverage could be provided to [the objecting employers'] employees, through [the employers'] insurance companies, without any such notice."[12] After consideration of the supplemental briefing, the Supreme Court vacated the judgments of the lower courts and remanded *Zubik* and several other cases raising parallel RFRA challenges to the accommodation. 136 S. Ct. at 1560-1561. The Court emphasized that it "expresse[d] no view on the merits of the cases" and, in particular, that it did not "decide whether [the employers'] religious exercise has been substantially burdened, whether the Government has a compelling interest, or whether the current regulations are the least restrictive means of serving that interest." Id. at 1560. The Court, however, stated that in light of what it viewed as "the substantial clarification and refinement in the positions of the parties" in their supplemental briefs, the parties "should be afforded an opportunity to arrive at an approach going forward that accommodates [the objecting employers'] religious exercise while at the same time ensuring that women covered by [the employers'] health plans 'receive full and equal health coverage, including contraceptive coverage.'" Id. (citation omitted).[13]

---

[9] The EBSA Form 700 serves as a certification that the organization is an "eligible organization" (as described in 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a), and 45 CFR 147.131(b)) that has a religious objection to providing coverage for some or all of any contraceptive services that would otherwise be required to be covered. The EBSA Form 700 is available at: **https://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf**.

[10] A model notice to HHS that eligible organizations may use, but are not required to use, is available at: **http://www.cms.gov/cciio/resources/Regulations-and-Guidance/index.html#Prevention**.

[11] *Zubik v. Burwell*, Nos. 14-1418 et al., 2016 WL 1203818, at *2 (Mar. 29, 2016).

[12] Id.

[13] The Supreme Court specified that, while the RFRA litigation remains pending, "the Government may not impose taxes or penalties on [the plaintiffs] for failure to provide the ... notice" required under the existing accommodation regulations. *Zubik*, 136 S. Ct. at 1561. At the same time, the Court also emphasized that "[n]othing in [its] opinion, or in the opinions or orders of the courts below, is to affect the ability of the Government to ensure that women covered by [plaintiffs'] health plans 'obtain, without cost, the full range of FDA approved contraceptives.'" Id. at 1560-1561 (quoting *Wheaton College v. Burwell*, 134 S. Ct. 2806, 2807 (2014)).

Exhibit 7                                    JA578                                    JA-0000171

On July 22, 2016, the Departments published a request for information (RFI) (81 FR 47741) seeking input from interested parties to determine, as contemplated by the Supreme Court's opinion in *Zubik*, whether modifications to the existing accommodation procedure could resolve the objections asserted by the plaintiffs in the pending RFRA cases, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage.

The Departments explained that they were using the RFI procedure because the issues addressed in the supplemental briefing in *Zubik* affect a wide variety of stakeholders, including many who are not parties to the cases that were before the Supreme Court. Other employers also have brought RFRA challenges to the accommodation, and their views may differ from the views held by the employers in *Zubik* and the consolidated cases. In addition, any change to the accommodation could have implications for the rights and obligations of issuers, group health plans, third party administrators, and women enrolled in health plans established by objecting employers. The RFI was intended to assist the Departments in determining whether there are modifications to the accommodation that would be available under current law and that could resolve the pending RFRA claims brought by objecting organizations. The Departments sought feedback from all interested stakeholders, including objecting organizations, and specifically requested that such organizations address the particular issues outlined in the RFI.

In response to the RFI, the Departments received over 54,000 public comments by the comment closing date of September 20, 2016. Commenters included the plaintiffs in *Zubik* and other religiously affiliated organizations, consumer advocacy groups, women's organizations, health insurance issuers, third party administrators and pharmaceutical benefit managers, other industry representatives, employers, members of the public, and other interested stakeholders.[14] The Departments are issuing this FAQ after consideration of comments submitted by a broad array of stakeholders, including the *Zubik* plaintiffs and similar religious organizations, issuers or third party administrators, and commenters representing women's and consumer advocacy organizations.

### Q: ARE THE DEPARTMENTS MAKING CHANGES TO THE ACCOMMODATION AT THIS TIME?

No. As described in more detail below, the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage. The comments demonstrate that a process like the one described in the Court's supplemental briefing order would not be acceptable to those with religious objections to the contraceptive-coverage requirement. Further, a number of comments illustrate that the administrative and operational challenges to a process like the one described in the Court's order are more significant than the Departments had previously understood and would potentially undermine women's access to full and equal coverage. For these reasons, the Departments are not modifying the accommodation regulations at this time.

As the government explained in its briefs in *Zubik*, the Departments continue to believe that the existing accommodation regulations are consistent with RFRA for two independent reasons. First, as eight of the nine courts of appeals to consider the issue have held, by virtue of objecting employers'

---

[14] The public comments are accessible at **https://www.regulations.gov/docket?D=CMS-2016-0123**.

Exhibit 7                                    JA579                                    JA-0000172

5

ability to avail themselves of the accommodation, the contraceptive-coverage requirement does not substantially burden their exercise of religion. Second, as some of those courts have also held, the accommodation is the least restrictive means of furthering the government's compelling interest in ensuring that women receive full and equal health coverage, including contraceptive coverage.

### NOTIFICATION TO ISSUERS WITHOUT SELF-CERTIFICATION

In its request for supplemental briefing in *Zubik*, the Supreme Court asked the parties to address "whether and how contraceptive coverage may be obtained by [objecting employers'] employees through [the employers'] insurance companies, but in a way that does not require any involvement of [the employers] beyond their own decision to provide health insurance without contraceptive coverage to their employees."[15] Specifically, the Court described—

> a situation in which [objecting employers] would contract to provide health insurance for their employees, and in the course of obtaining such insurance, inform their insurance company that they do not want their health plan to include contraceptive coverage of the type to which they object on religious grounds. [The employers] would have no legal obligation to provide such contraceptive coverage, would not pay for such coverage, and would not be required to submit any separate notice to their insurer, to the Federal government, or to their employees. At the same time, [the employers'] insurance compan[ies]—aware that [the employers] are not providing certain contraceptive coverage on religious grounds— would separately notify [the employers'] employees that the insurance company will provide cost-free contraceptive coverage, and that such coverage is not paid for by [the employers] and is not provided through [the employers'] health plan[s].[16]

The Departments sought comments on whether this alternative would be acceptable to objecting organizations, and if not, whether further procedures or systems could resolve their RFRA concerns. The Departments asked if organizations specifically object on RFRA grounds to informing their issuers that they object to contraceptive coverage "on religious grounds," or to a requirement that the request by an eligible organization to its issuer be made in writing or through use of a particular form. The Departments also sought comments on whether it would be feasible for issuers to implement the accommodation without the written notification requirement and what effect this alternative procedure would have on the access of women to seamless contraceptive coverage.

In light of the comments received, the Departments have determined not to amend the regulations at this time. On the one hand, comments from parties before the Supreme Court (and other objecting employers) do not suggest that the change identified by the Supreme Court would resolve their concerns. On the other hand, the Departments received comments stating that eliminating written notification would create significant administrative problems and potential legal liabilities for issuers, and would hinder women's access to care. As described in greater detail below, these comments

---

[15] *Zubik*, 2016 WL 1203818, at *2.
[16] *Id.*

Exhibit 7                                                        JA580                                                        JA-0000173

have shown that the elimination of the written notification requirement would raise complications that would undermine the statute's goal of ensuring full and equal health coverage for women, the extent of which were not known to the Departments at the time the government filed its supplemental briefs in *Zubik*.

First, comments on behalf of issuers stated that eliminating written notifications would impose administrative costs by forcing them to create new systems to distinguish and track different employers, employees, and the coverage to be provided.[17] For example, commenters stated that issuers currently rely on the written notifications to track the differences between eligible organizations that are seeking an accommodation due to their religious objections -- organizations that the Supreme Court has said are "effectively exempt" from the contraceptive-coverage requirement -- and religious employers that are automatically exempt under the HRSA guidelines. These comments asserted that eliminating written notifications would burden issuers with creating new systems to distinguish and track these two categories of employers.

Given the different ways in which issuers must treat and respond to these two types of entities, the Departments understand that issuers must be able to easily and separately track the coverage issued to the plans sponsored by these different organizations. With respect to exempt organizations, issuers merely need to eliminate contraceptive benefits from the group health insurance policy. However, with respect to eligible organizations that avail themselves of the accommodation, issuers must take the additional step of making separate payments for contraceptive services, along with providing notice of the availability of such payments. Furthermore, some eligible organizations may object to covering all forms of contraceptive services in their group health coverage while others may object only to certain types of contraceptive services. The Departments conclude therefore that written notification from employers significantly improves issuers' ability to appropriately identify and administer coverage for each of these two categories of employers. The commenters also said that issuers might be subject to legal risks if written notification were eliminated, because they would have no written record to demonstrate compliance with applicable law and regulations to the extent they relied on an organization's oral representation of its eligibility for the accommodation that was later determined to be incorrect. Such legal risks would be magnified, according to the commenters, in circumstances in which issuers would have to rely on agents and brokers to verify eligibility.

Based on these concerns, comments indicated that, even without a legal requirement to use a required form, issuers would likely seek written documentation, such as an attestation, from objecting employers to confirm the employer's eligibility as a condition of administering the accommodation. For example, an issuer might demand written documentation as a pre-condition for entering into a contract with an organization seeking the accommodation. The commenters indicated that if the written notification requirement were eliminated, employers might object to providing this type of verification, which is currently commonplace for certain purposes, such as communicating grandfathered status. The Departments note that, under the current accommodation,

---

[17] Related to these comments with respect to the administrative costs of distinguishing and tracking different coverage to be provided, the Departments note that an eligible organization may seek an accommodation so that it need not contract, arrange, pay, or provide a referral for *all* otherwise required contraceptive services, or any subset of such services. Thus, there could be many different combinations of contraceptive services that an issuer must cover, and within each such combination, some such benefits must be provided by the group health insurance policy, and others for which the issuer must make separate payments.

7

once an issuer has been provided the documentation specified in the accommodation regulations, it may not require any further documentation from an eligible organization regarding its status as such.[18]

Second, several commenters suggested that the lack of written notice would create confusion and miscommunication, which in turn would lead to disputes between the parties, billing problems, and reduced access to care for women. For example, comments from women's advocacy organizations stated that lack of written notice could have repercussions for processing payments to a provider. This could disrupt continuity of care and burden women seeking to resolve any miscommunication between the objecting entity and the issuer. Further, according to these commenters, it could also impose the additional burden of affected women having to affirmatively assert their eligibility in situations where an employer has not timely provided its oral objection.

One commenter stated that, without a written notification, an eligible employer's representative may misstate an employer's wishes or incorrectly assert eligibility for the accommodation, resulting in a dispute that delays the process of arranging contraceptive coverage for women.

Several commenters representing women's and consumer advocacy organizations stressed the importance of written documentation for verifying compliance and ensuring that women are able to obtain direct, continuous access to the full range of contraceptive methods without cost. These commenters also suggested that eliminating written documentation could hamper the Departments' oversight and enforcement efforts.

Third, as noted above, the Departments have not identified any comments from objecting employers, including any of the *Zubik* plaintiffs, stating that eliminating the written notification requirement would be sufficient to satisfy their RFRA concerns. For example, one comment indicate that employers would object to "any requirement . . . that has the purpose or effect of providing access to or increasing the use of contraceptive services."

The Departments agree that written documentation establishing that a given employer requested the accommodation, and that it satisfies the definition of an eligible organization, is of value to document the legal responsibilities and rights of employees, issuers, and beneficiaries, as well as to minimize the number of disputes between employers and issuers regarding the accommodation. In turn, the Departments conclude that, by minimizing such disputes and providing certainty regarding which organizations have and have not requested the accommodation, the written notice requirement minimizes the potential number of employers that will be in violation of the contraceptive-coverage requirement. By helping to define which organizations have and have not availed themselves of the accommodation, written documentation also ensures that women receive timely access to contraceptive coverage, as it will help issuers to quickly and effectively determine the appropriate source of payment for such services, i.e., payment through the group health insurance policy, or separate payment for contraceptive services. And as the government explained in its Supreme Court briefs, the regulatory requirement for eligible organizations to provide written notification of their objection is consistent with RFRA.

---

[18] 26 CFR 54.8815-2713A(c)(1)(i), 29 CFR 2590.715-2713A(c)(1)(i), 45 CFR 147.131(c)(1)(i).

Exhibit 7                                        JA582                                        JA-0000175

## OTHER APPROACHES WITH RESPECT TO INSURED PLANS DESCRIBED IN THE SUPPLEMENTAL BRIEFING

The *Zubik* plaintiffs proposed that when an eligible employer with an insured plan requests insurance coverage that excludes contraceptive coverage to which it objects on religious grounds, the employer's issuer should be required to provide the required coverage through separate insurance policies that cover only contraceptives and in which women should have to affirmatively enroll. Pet. Supp. Br. 3-12.[19]  The Departments sought comments on whether this alternative procedure would resolve the RFRA claims of objecting organizations; whether it would be feasible for health insurance issuers and consistent with State insurance laws; what effect this approach would have on the ability of women enrolled in group health plans established by objecting employers to obtain seamless coverage for contraceptive services; and whether there might be alternatives other than contraceptive-only policies or affirmative enrollment requirements that would resolve the RFRA objections of objecting organizations.

In response to the RFI, objecting employers argued that to be truly independent, contraceptive coverage must be provided to women enrolled in health plans of objecting employers through separate insurance policies. The Departments identified no comments indicating that eliminating written notification by itself would be sufficient. In fact, several commenters stated that, even if the government were to eliminate the written notice requirement, the accommodation would have to be modified in other ways to satisfy their concerns. One commenter, quoting from the petitioners' brief in *Zubik*, stated that there must be an enrollment process that is distinct from (and not an automatic consequence of) enrolling in the employer's plan. Another commenter stated that the issuer or third party administrator should be required to provide eligible participants and beneficiaries with a separate enrollment card for contraceptive coverage that would require activation by each participant or beneficiary. The commenter stated that this should replace the current requirement that participants automatically receive coverage for contraceptive services. (For further discussion of this issue, see section below titled "Separate Enrollment Cards and Activation.")

A number of commenters emphasized the significant problems posed by requiring separate contraceptive-only coverage. Commenters identified several obstacles under State contract and insurance law. Comments submitted on behalf of issuers asserted that some State insurance regulators do not have authority under State law to approve single-benefit policies (other than dental or vision). The commenters also explained that cost-free contraception policies would not satisfy laws conditioning policy approval on a "reasonable premium" or constitute valid contracts because the prospective policyholder would not provide consideration. In addition, they commented that under State licensure laws, issuers that sell group coverage could not offer contraceptive-only policies to individual women because they are not licensed to offer coverage in the individual market and that State laws would prevent issuers licensed to issue group coverage in one State from issuing individual policies to employees of an eligible organization residing in other States.

---

[19] As of the date of publication of this FAQ, petitioners' supplemental brief is available at **http://www.scotusblog.com/wp-content/uploads/2016/04/Non-profits-response-to-Zubik-order-4-12-16.pdf**. Petitioners' supplemental reply brief is available at **http://www.scotusblog.com/wp-content/uploads/2016/04/Zubik-order-non-profits-reply-brief-4-20-161.pdf**.

Exhibit 7                                            JA583                                            JA-0000176

In addition, several commenters stated that separate contraceptive coverage policies may have a different provider network from that of the group health plan that provides the women's other health benefits, which would mean that the separate contraceptive policies would not necessarily include women's regular doctors. One commenter stated that it would be costly and administratively burdensome for issuers to develop and implement new eligibility, enrollment, and claims-adjudication systems for contraception-only coverage, as they would differ from their existing systems. Several commenters also maintained that requiring women to seek out separate contraceptive coverage would create the same barriers in access that the Affordable Care Act's preventive services provision was designed to eliminate. The Departments agree these approaches would potentially undermine women's access to full and equal coverage, contrary to the statutory objective of reducing barriers to the use of important preventive services.

## <u>SELF-INSURED PLANS</u>

The Supreme Court's supplemental briefing order in *Zubik* addressed only employers with "insured plans."[20] In its supplemental brief, the government described the operation of the accommodation for self-insured plans and explained that an alternative process like the one the Court posited for insured plans could not work for the many employers with self-insured plans:

> If an employer has a self-insured plan, the statutory obligation to provide contraceptive coverage falls only on the plan—there is no insurer with a preexisting duty to provide coverage. Accordingly, to relieve self-insured employers of any obligation to provide contraceptive coverage while still ensuring that the affected women receive coverage without the employer's involvement, the accommodation establishes a mechanism for the government to designate the employer's TPA [third party administrator] as a 'plan administrator' responsible for separately providing the required coverage under [ERISA]. That designation is made by the government, not the employer, and the employer does not fund, control, or have any other involvement with the separate portion of the ERISA plan administered by the TPA.
>
> The government's designation of the TPA must be reflected in a written plan instrument. To satisfy that requirement, the accommodation relies on either (1) a written designation sent by the government to the TPA, which requires the government to know the TPA's identity, or (2) the self-certification form, which the regulations treat as a plan instrument in which the government designates the TPA as a plan administrator. There is no mechanism for requiring TPAs to provide separate contraceptive coverage without a plan instrument; self-insured employers could not opt out of the contraceptive-coverage requirement by simply informing their TPAs that they do not want to provide coverage for contraceptives. Gov't Supp. Br. 16-17 (citations omitted).

---

[20] *Zubik*, 2016 WL 1203818, at *2.

The *Zubik* plaintiffs also stated that an arrangement like the one posited in the Supreme Court's briefing order for insured plans could not work for self-insured plans. See Pet. Supp. Br. 16-17.

The RFI sought comment on any possible modifications to the current accommodation for self-insured plans, including self-insured church plans, which would resolve objecting organizations' RFRA objections while still providing women full and equal access to coverage. Specifically, the RFI asked whether there are any reasonable alternative means available under existing law by which the Departments could ensure that women enrolled in self-insured plans maintained by objecting employers receive separate contraceptive coverage that is not contracted, arranged, paid, or referred for by the objecting organization but that is provided through the same third party administrators that administer the rest of their health benefits.

The Departments did not identify any comments in response to the RFI that described a feasible pathway for oral notification to third party administrators with respect to self-insured plans to allow full and equal provision of contraceptive services to the women enrolled in those plans.

Some commenters noted that third party administrators often do not require separate notification, written or oral, that a self-insured plan will not be providing contraceptive coverage because other documentation, such as summary plan descriptions or provider contracts, will indicate that such coverage is not provided under the plan. However, without a written plan instrument, which is provided for in the current accommodation, there is no mechanism to designate a third party administrator as the ERISA plan administrator for purposes of arranging or providing separate payments for contraceptive services.

Many commenters suggested that cost-free contraception should be provided by the federal government through mechanisms that differ substantially from the procedure for insured plans described in the Supreme Court's supplemental briefing order. For example, some commenters suggested that for those self-insured plans that have third party administrators that are not able to provide separate cost-free contraceptive coverage to covered employees, the objecting employer could simply inform such third party administrators of the employer's objection and the government would "exempt" such self-insured plans and third party administrators from the requirement to provide separate cost-free contraceptive coverage. In those cases, commenters proposed that the government could provide coverage by having the employer notify HHS that the employer will not provide coverage and HHS would then coordinate with IRS to determine the identity of that employer's employees through W-2 or other tax information otherwise supplied by the objecting employer. These commenters suggest that such a program could be paid for by using credits against Federally-facilitated Exchange (FFE) user fees (which are already being used for the existing accommodation).

One commenter asserted that the federal government could directly subsidize the cost of purchasing contraceptive items and services for those employees who participate in an eligible organization's group health plan. However, as the Departments have previously indicated in rulemaking in response to comments suggesting that the government reimburse plan participants for the costs of contraceptive services,[21] and in its briefs to the Supreme Court, this approach raises legal and

---

[21] 80 FR 41317, 41328 (July 14, 2015).

Exhibit 7

practical obstacles to access to seamless coverage. Consistent with the statutory objective of promoting access to preventive services, such as contraceptive coverage, without cost-sharing, plan participants and beneficiaries should not be required to incur additional costs or burdens to receive access. Therefore, they should not be required to enroll in new programs or to surmount other hurdles to receive access to coverage.

## SEPARATE ENROLLMENT CARDS AND ACTIVATION

As stated above, several objecting organizations have suggested that some of their objections to the accommodation could be alleviated by providing a separate enrollment card for contraceptive coverage. Under this approach, women would not enroll in a separate insurance policy for contraceptive coverage, but would receive a separate enrollment card that would be automatically activated only when a woman who is enrolled in the group health plan attempts to obtain contraceptive benefits.

If objecting employers prefer the use of a separate enrollment card for contraceptive coverage, the Departments note that under the current accommodation regulations, issuers or third party administrators could provide a separate enrollment card for contraceptive coverage. The current regulations do not specify the manner in which an issuer or third party administrator provides "enrollment cards" or other means of providing similar, relevant information to enrollees, as long as the manner in which the card or other information is provided does not unduly inhibit or hamper access to the benefit. See 29 CFR 2560.503-1, which is applicable to ERISA plans and incorporated in 26 CFR 54.9815-2719(b)(2)(i), 29 CFR 2590.715-2719(b)(2)(i), and 45 CFR 147.136(b)(2)(i), which are applicable to non-grandfathered health plans and coverage. As stated above, under current rules, the issuer or third party administrator could provide a separate enrollment card for contraceptive coverage.[22] The card could bear a different design to distinguish it from enrollment cards used to access services covered by the employer's group health plan, and could omit the name of the employer and/or the plan as well. The card could use the same identification number as is used on the enrollment card for services covered by the group health plan, or could have a different number provided there is a mechanism in place (such as by linking the two numbers in the issuer's or third party administrator's processing systems) that enables the issuer or third party administrator to easily identify enrollees. The foregoing arrangements are permissible if they are not used as an impediment to obtaining benefits and do not unduly inhibit or hamper a plan participant or beneficiary from accessing benefits provided pursuant to the accommodation (e.g., a plan procedure providing for the denial of benefits based on failure to present or "activate" the enrollment card or "opt in," even when the provider has otherwise verified participant status).

---

[22] *Id.*

*Abstract:* Currently HRSA is cleared to use the National Institutes of Health's (NIH) Biographical Sketch and Public Health Service (PHS) Inclusion Enrollment forms (0925–0001) for HRSA's SF424 Research & Related (R&R) application package research grants. However, both of these documents contain NIH-specific references. To use the forms, HRSA plans to remove the NIH-specific references and obtain its own OMB control number for the collection of this information.

The current Statement of Appointment (form PHS–2271) is also tailored to NIH programs. HRSA plans to remove references to NIH and where appropriate replace them with references to HRSA for use in the SF424 R&R application package.

*Need and Proposed Use of the Information:* Currently, there are two Bureaus within HRSA, the Maternal and Child Health Bureau (MCHB) and the Bureau of Health Workforce (BHW), that use the Biographical Sketch. In addition to the Biographical Sketch, MCHB also uses the PHS Inclusion Enrollment form, and BHW uses the Statement of Appointment form as required elements of the SF424 Research & Related application package. These Bureaus plan to modify these forms in slightly different ways to meet the needs of their own research and training grant programs.

In MCHB's research grant programs, the modified Biographical Sketch form will be used by applicants to summarize the qualifications of key personnel on their proposed research team; the grant reviewers will use this information to assess the capabilities of the research team to carry out the research project. MCHB's modified PHS Inclusion Enrollment form will be used by applicants to summarize their expected population of research study participants at the time of submission of their proposal; it will also be used for Enrollment Reporting during the annual Noncompeting Continuation Award. Monitoring Inclusion Enrollment is one important component of ensuring statistically meaningful demographics (race, ethnicity, and gender) among research study participants in MCHB's research grant portfolio. MCHB does not use the Statement of Appointment form, as it does not pertain to the MCHB research program.

Similarly, in BHW the modified Biographical Sketch form will be used by applicants to summarize the qualifications of key personnel proposed as project staff; the grant reviewers will use this information to assess the capabilities of the applicant organization to carry out the proposed

project. The modified Statement of Appointment form is used to document the appointment of individuals supported by the award to applicable institutional research and training programs. BHW does not use the PHS Inclusion Enrollment form, as it does not pertain to the BHW training and research programs.

*Likely Respondents:* Respondents are applicants to HRSA's research programs in MCHB and research and training programs in BHW.

*Burden Statement:* Burden in this context means the time expended by persons to generate, maintain, retain, disclose or provide the information requested. This includes the time needed to review instructions; to develop, acquire, install, and utilize technology and systems for the purpose of collecting, validating and verifying information, processing and maintaining information, and disclosing and providing information; to train personnel and be able to respond to a collection of information; to search data sources; to complete and review the collection of information; and to transmit or otherwise disclose the information. The total annual burden hours estimated for this Information Collection Request are summarized in the table below.

TOTAL ESTIMATED ANNUALIZED BURDEN HOURS

| Form name | Number of respondents | Number of responses per respondent | Total responses | Average burden per response (in hours) | Total burden hours |
|---|---|---|---|---|---|
| Biographical Sketch for MCHB research grant applicants .. | 200 | 5 | 1000 | 2 | 2000 |
| PHS Inclusion Enrollment form for MCHB research grant applications ........................................................... | 200 | 1 | 200 | .5 | 100 |
| Biographical Sketch for BHW training and research grant applicants ........................................................... | 1000 | 5 | 5000 | 2 | 10,000 |
| Statement of Appointment form for BHW training grantees | 800 | 7 | 5600 | .5 | 2,800 |
| Total ........................................................... | 2200 | ...................... | 11,800 | ...................... | 14,900 |

HRSA specifically requests comments on (1) the necessity and utility of the proposed information collection for the proper performance of the agency's functions; (2) the accuracy of the estimated burden; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) the use of automated collection techniques or other forms of information technology to minimize the information collection burden.

**Jason E. Bennett,**

*Director, Division of the Executive Secretariat.*

[FR Doc. 2016–31080 Filed 12–23–16; 8:45 am]

**BILLING CODE 4165–15–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Resources and Services Administration**

**Updating the HRSA-Supported Women's Preventive Services Guidelines**

**AGENCY:** Health Resources and Services Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** Effective December 20, 2016, the Health Resources and Services Administration (HRSA) updated the HRSA-supported Women's Preventive

Services Guidelines for purposes of health insurance coverage for preventive services that address health needs specific to women based on clinical recommendations from the Women's Preventive Services Initiative. This notice serves as an announcement of the decision to update the guidelines as listed below. Please see *https://www.hrsa.gov/womensguidelines2016* for additional information.

**FOR FURTHER INFORMATION CONTACT:** HRSA, Maternal and Child Health Bureau at email: *wellwomancare@hrsa.gov.*

**SUPPLEMENTARY INFORMATION:**

Exhibit 8    JA587    JA-0000180

**Breast Cancer Screening for Average-Risk Women**

The Women's Preventive Services Initiative recommends that average-risk women initiate mammography screening no earlier than age 40 and no later than age 50. Screening mammography should occur at least biennially and as frequently as annually. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening.

These screening recommendations are for women at average risk of breast cancer. Women at increased risk should also undergo periodic mammography screening, however, recommendations for additional services are beyond the scope of this recommendation.

**Breastfeeding Services and Supplies**

The Women's Preventive Services Initiative recommends comprehensive lactation support services (including counseling, education, and breastfeeding equipment and supplies) during the antenatal, perinatal, and postpartum periods to ensure the successful initiation and maintenance of breastfeeding.

**Screening for Cervical Cancer**

The Women's Preventive Services Initiative recommends cervical cancer screening for average-risk women aged 21 to 65 years. For women aged 21 to 29 years, the Women's Preventive Services Initiative recommends cervical cancer screening using cervical cytology (Pap test) every 3 years. Cotesting with cytology and human papillomavirus testing is not recommended for women younger than 30 years. Women aged 30 to 65 years should be screened with cytology and human papillomavirus testing every 5 years or cytology alone every 3 years. Women who are at average risk should not be screened more than once every 3 years.

**Contraception**

The Women's Preventive Services Initiative recommends that adolescent and adult women have access to the full range of female-controlled contraceptives to prevent unintended pregnancy and improve birth outcomes. Contraceptive care should include contraceptive counseling, initiation of contraceptive use, and follow-up care (*e.g.,* management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method). The Women's Preventive Services Initiative recommends that the full range of female-controlled U.S. Food and Drug Administration-approved contraceptive methods,

effective family planning practices, and sterilization procedures be available as part of contraceptive care.

The full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration include: (1) Sterilization surgery for women, (2) surgical sterilization via implant for women, (3) implantable rods, (4) copper intrauterine devices, (5) intrauterine devices with progestin (all durations and doses), (6) the shot or injection, (7) oral contraceptives (combined pill), 8) oral contraceptives (progestin only, and), (9) oral contraceptives (extended or continuous use), (10) the contraceptive patch, (11) vaginal contraceptive rings, (12) diaphragms, (13) contraceptive sponges, (14) cervical caps, (15) female condoms, (16) spermicides, and (17) emergency contraception (levonorgestrel), and (18) emergency contraception (ulipristal acetate), and additional methods as identified by the FDA. Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method.

**Screening for Gestational Diabetes Mellitus**

The Women's Preventive Services Initiative recommends screening pregnant women for gestational diabetes mellitus after 24 weeks of gestation (preferably between 24 and 28 weeks of gestation) in order to prevent adverse birth outcomes. Screening with a 50-g oral glucose challenge test (followed by a 3-hour 100-g oral glucose tolerance test if results on the initial oral glucose challenge test are abnormal) is preferred because of its high sensitivity and specificity.

The Women's Preventive Services Initiative suggests that women with risk factors for diabetes mellitus be screened for preexisting diabetes before 24 weeks of gestation—ideally at the first prenatal visit, based on current clinical best practices.

**Screening for Human Immunodeficiency Virus Infection**

The Women's Preventive Services Initiative recommends prevention education and risk assessment for human immunodeficiency virus (HIV) infection in adolescents and women at least annually throughout the lifespan. All women should be tested for HIV at least once during their lifetime. Additional screening should be based on risk, and screening annually or more often may be appropriate for adolescents

and women with an increased risk of HIV infection.

Screening for HIV is recommended for all pregnant women upon initiation of prenatal care with retesting during pregnancy based on risk factors. Rapid HIV testing is recommended for pregnant women when present in active labor with an undocumented HIV status. Screening during pregnancy enables prevention of vertical transmission.

**Screening for Interpersonal and Domestic Violence**

The Women's Preventive Services Initiative recommends screening adolescents and women for interpersonal and domestic violence, at least annually, and, when needed, providing or referring for initial intervention services. Interpersonal and domestic violence includes physical violence, sexual violence, stalking and psychological aggression (including coercion), reproductive coercion, neglect, and the threat of violence, abuse, or both. Intervention services include, but are not limited to, counseling, education, harm reduction strategies, and referral to appropriate supportive services.

**Counseling for Sexually Transmitted Infections**

The Women's Preventive Services Initiative recommends directed behavioral counseling by a health care provider or other appropriately trained individual for sexually active adolescent and adult women at an increased risk for sexually transmitted infections (STIs).

The Women's Preventive Services Initiative recommends that health care providers use a woman's sexual history and risk factors to help identify those at an increased risk of STIs. Risk factors may include age younger than 25, a recent history of an STI, a new sex partner, multiple partners, a partner with concurrent partners, a partner with an STI, and a lack of or inconsistent condom use. For adolescents and women not identified as high risk, counseling to reduce the risk of STIs should be considered, as determined by clinical judgement.

**Well-Woman Preventive Visits**

The Women's Preventive Services Initiative recommends that women receive at least one preventive care visit per year beginning in adolescence and continuing across the lifespan to ensure that the recommended preventive services including preconception, and many services necessary for prenatal and interconception care are obtained. The primary purpose of these visits

Exhibit 8　　　　　　JA588　　　　　　JA-0000181

should be the delivery and coordination of recommended preventive services as determined by age and risk factors.

The HRSA-supported Women's Preventive Services Guidelines were originally established in 2011 based on recommendations from a Department of Health and Human Services' commissioned study by the Institute of Medicine (IOM), now known as the National Academy of Medicine (NAM). Since then, there have been advancements in science and gaps identified in the existing guidelines, including a greater emphasis on practice-based clinical considerations. To address these, HRSA awarded a 5-year cooperative agreement in March 2016 to convene a coalition of clinician, academic, and consumer-focused health professional organizations and conduct a scientifically rigorous review to develop recommendations for updated Women's Preventive Services Guidelines in accordance with the model created by the NAM *Clinical Practice Guidelines We Can Trust.* The American College of Obstetricians and Gynecologists was awarded the cooperative agreement and formed an expert panel called the Women's Preventive Services Initiative.

Under section 2713 of the Public Health Service Act, non-grandfathered group health plans and issuers of non-grandfathered group and individual health insurance coverage are required to cover specified preventive services without a copayment, coinsurance, deductible, or other cost sharing, including preventive care and screenings for women as provided for in comprehensive guidelines supported by HRSA for this purpose. Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market, policy year) that begins on or after December 20, 2017.

The guidelines concerning contraceptive methods and counseling do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers. Effective August 1, 2013, a religious employer is defined as an employer that is organized and operates as a non-profit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. HRSA notes that, as of August 1, 2013, group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the requirement to cover contraceptive services under section 2713 of the Public Health Service Act, as incorporated into the Employee Retirement Income Security Act and the Internal Revenue Code. HRSA also notes that, as of January 1, 2014, accommodations are available to group health plans established or maintained by certain eligible organizations (and group health insurance coverage provided in connection with such plans), as well as student health insurance coverage arranged by eligible organizations, with respect to the contraceptive coverage requirement. See Coverage of Certain Preventive Services Under the Affordable Care Act (78 FR 39870, July 2, 2013).

**James Macrae,**

*Acting Administrator.*

[FR Doc. 2016–31129 Filed 12–23–16; 8:45 am]

BILLING CODE 4165–15–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of Inspector General

### Announcement of Updated Requirements and Registration for "The Simple Extensible Sampling Tool Challenge"

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice.

**SUMMARY:** On September 29, 2016, OIG announced ''The Simple Extensible Sampling Tool Challenge''. This notice serves as an update to the original notice which stated that upon receipt of an updated submission the previous submission would be excluded in its entirety from the competition. This updated notice removes this restriction for entries from teams that have been previously identified as finalists. Any finalist may update their entry without losing their finalist designation. Updates from the finalists will be accepted until 5:00 p.m. EST on the fourteenth day after the fifth finalist has been identified or May 15, 2017, 5:00 p.m. EST, whichever comes first. The newest entry from each team will be used for all judging purposes unless otherwise requested by the team. Other than the above change, all rules and requirements outlined in the September 29, 2016, **Federal Register** notice remain in effect.

Dated: December 21, 2016.

**Daniel R. Levinson,**

*Inspector General.*

[FR Doc. 2016–31182 Filed 12–23–16; 8:45 am]

BILLING CODE 4152–01–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### Office of the Director, National Institutes of Health; Notice of Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. Appendix 2), notice is hereby given of the meeting of the Council of Councils.

The meeting will be open to the public as indicated below, with attendance limited to space available. Individuals who plan to attend and need special assistance, such as sign language interpretation or other reasonable accommodations, should notify the Contact Person listed below in advance of the meeting. The open session will be videocast and can be accessed from the NIH Videocasting and Podcasting Web site (*http://videocast.nih.gov*).

A portion of the meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4), and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Council of Councils.

*Open:* January 27, 2017.

*Time:* 8:15 a.m. to 11:30 a.m.

*Agenda:* Call to Order and Introductions; Announcements and Updates; Tracking Utility of Common Fund Data Sets; Small Molecules from the Human Microbiota; Invited Speaker; NIH Update; Discussion; 2017 Biennial Advisory Council Report—Compliance with the NIH Policy on the Inclusion of Women and Minorities in Clinical Research.

*Place:* National Institutes of Health, 9000 Rockville Pike, Building 31, C Wing, 6th Floor, Conference Room 10, Bethesda, MD 20892.

Closed: January 27, 2017.

*Time:* 12:00 p.m. to 1:00 p.m.

*Agenda:* Review of grant applications.

*Place:* National Institutes of Health, 9000 Rockville Pike, Building 31, C Wing, 6th Floor, Conference Room 10, Bethesda, MD 20892.

*Open:* January 27, 2017.

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9726]**

**RIN 1545–BJ58, 1545–BM37, 1545–BM39**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Parts 2510 and 2590**

**RIN 1210–AB67**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

**[CMS–9940–F]**

**RIN 0938–AS50**

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** This document contains final regulations regarding coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. These regulations finalize provisions from three rulemaking actions: Interim final regulations issued in July 2010 related to coverage of preventive services, interim final regulations issued in August 2014 related to the process an eligible organization uses to provide notice of its religious objection to the coverage of contraceptive services, and proposed regulations issued in August 2014 related to the definition of ''eligible organization'' which would expand the set of entities that may avail themselves of an accommodation with respect to the coverage of contraceptive services.

**DATES:** *Effective Date:* These final regulations are effective on September 14, 2015.

*Applicability Date:* These final regulations are applicable beginning on the first day of the first plan year (or, for individual health insurance coverage, the first day of the first policy year) that begins on or after September 14, 2015.

**FOR FURTHER INFORMATION CONTACT:** David Mlawsky, Centers for Medicare & Medicaid Services, Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Elizabeth Schumacher, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; or Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing. These preventive services include:

• Evidence-based items or services that have in effect a rating of ''A'' or ''B'' in the current recommendations of the United States Preventive Services Task Force (Task Force) with respect to the individual involved.

• Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (Advisory Committee) with respect to the individual involved. A recommendation of the Advisory Committee is considered to be ''in effect'' after it has been adopted by the Director of the Centers for Disease Control and Prevention (CDC). A recommendation is considered to be for ''routine use'' if it appears on the Immunization Schedules of the CDC.

• With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

• With respect to women, preventive care and screenings provided for in comprehensive guidelines supported by HRSA (not otherwise addressed by the recommendations of the Task Force), including all Food and Drug Administration (FDA)-approved contraceptives, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1]

The complete list of recommendations and guidelines that are required to be covered under these final regulations can be found at: *https://www.healthcare.gov/preventive-care-benefits*. Together, the items and services described in these recommendations and guidelines are referred to in this preamble as ''recommended preventive services.''

The Departments of Labor, Health and Human Services, and the Treasury (the Departments)[2] have issued rulemaking to implement these requirements:

---

[1] The HRSA Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[2] Note, however, that in sections under headings listing only two of the three Departments, the term ''Departments'' generally refers only to the two Departments listed in the heading.

Exhibit 10

• Interim final regulations on July 19, 2010, at 75 FR 41726 (July 2010 interim final regulations), implemented the preventive services requirements of PHS Act section 2713;

• Interim final regulations amending the July 2010 interim final regulations on August 3, 2011, at 76 FR 46621, provided HRSA with the authority to exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with those plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines;[3]

• Final regulations on February 15, 2012, at 77 FR 8725 (2012 final regulations), finalized the definition of religious employer in the 2011 amended interim final regulations without modification;[4]

• An advance notice of proposed rulemaking (ANPRM) on March 21, 2012, at 77 FR 16501, solicited comments on how to provide for coverage of recommended preventive services, including contraceptive services, without cost sharing, while simultaneously ensuring that certain nonprofit organizations with religious objections to contraceptive coverage would not be required to contract, arrange, pay, or refer for that coverage;

• Proposed regulations on February 6, 2013, at 78 FR 8456, proposed to simplify and clarify the definition of ''religious employer'' for purposes of the religious employer exemption, and proposed accommodations for group health plans established or maintained by certain nonprofit religious organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with those plans) and for insured student plans arranged by certain nonprofit religious organizations that are institutions of higher education with religious objections to contraceptive coverage;

• Final regulations on July 2, 2013, at 78 FR 39870 (July 2013 final regulations), simplified and clarified the definition of religious employer for purposes of the religious employer exemption and established accommodations for health coverage established or maintained or arranged by eligible organizations;[5]

• Interim final regulations on August 27, 2014, at 79 FR 51092 (August 2014 interim final regulations), amended the July 2013 final regulations in light of the United States Supreme Court's interim order in connection with an application for an injunction in *Wheaton College* v. *Burwell* (Wheaton interim order),[6] and provided an alternative process that an eligible organization may use to provide notice of its religious objection to the coverage of contraceptive services; and

• Proposed regulations on August 27, 2014, at 79 FR 51118 (August 2014 proposed regulations), proposed potential changes to the definition of ''eligible organization'' in light of the United States Supreme Court's decision in *Burwell* v. *Hobby Lobby Stores, Inc.*[7]

In addition to these regulations, the Departments released six sets of Frequently Asked Questions (FAQs) regarding the preventive services coverage requirements. The Departments released FAQs about Affordable Care Act Implementation Parts II, V, XII, XIX, XX, and XXVI to answer outstanding questions, including questions related to the coverage of preventive services. These FAQs provided guidance related to compliance with the 2010 and 2014 interim final regulations, and addressed issues related to specific services required to be covered without cost sharing, subject to reasonable medical management, under recommendations and guidelines specified in section 2713 of the PHS Act. Information on related safe harbors, forms, and model notices is available at *http://www.dol.gov/ebsa/ healthreform* and *http://www.cms.gov/ cciio/resources/regulations-and-guidance/index.html.*

After consideration of the comments and feedback received from stakeholders, the Departments are publishing these final regulations,[8] which finalize the July 2010 interim final regulations related to coverage of recommended preventive services, the August 2014 interim final regulations related to the process an eligible organization uses to provide notice of its religious objection to the coverage of contraceptive services, and the August 2014 proposed regulations related to the definition of eligible organization.

## II. Overview of the Final Regulations

*A. Coverage of Recommended Preventive Services Under 26 CFR 54.9815–2713, 29 CFR 2590.715–2713, and 45 CFR 147.130*

(i) Scope of Recommended Preventive Services

Section 2713 of the PHS Act, as added by the Affordable Care Act, requires that a non-grandfathered group health plan or a health insurance issuer offering non-grandfathered group or individual health insurance coverage provide, without cost sharing, coverage for recommended preventive services, as outlined above. The July 2013 final regulations finalized the requirement to provide coverage without cost sharing with respect to those preventive services provided for in the HRSA Guidelines for women. These regulations finalize the requirement to provide coverage without cost sharing with respect to the other three categories of recommendations and guidelines specified in section 2713 of the PHS Act: Evidence-based items or services that have in effect a rating of ''A'' or ''B''

---

[3] On the same date, HRSA exercised this authority in the HRSA Guidelines to exempt group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) from the HRSA Guidelines with respect to contraceptive services.

[4] Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans) originally issued on February 10, 2012, and reissued on August 15, 2012, and June 28, 2013; available at: *http://www.cms.gov/CCIIO/Resources/ Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf.* The guidance clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. *See* Student Health Insurance Coverage, 77 FR 16457 (Mar. 21, 2012).

[5] A contemporaneously re-issued HHS guidance document extended the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance included a form to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary enforcement safe harbor. In addition, HHS and the Department of Labor (DOL) issued a self-certification form, EBSA Form 700, to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under the July 2013 final regulations. This self-certification form was provided for use with the accommodation under the July 2013 final regulations, after the expiration of the temporary enforcement safe harbor (that is, for plan years beginning on or after January 1, 2014). *See http://www.cms.gov/CCIIO/Resources/ Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf.*

[6] 134 S. Ct. 2806 (2014).

[7] 134 S. Ct. 2751 (2014).

[8] The Department of the Treasury/Internal Revenue Service published temporary regulations and proposed regulations with the text of the temporary regulations serving as the text of the proposed regulations as part of each of the joint rulemaking interim final rules listed above. The Departments of Labor and HHS published their rules as interim final rules and are finalizing their interim final rules. The Department of the Treasury/Internal Revenue Service is finalizing its proposed rules.

Exhibit 10                    JA591                    JA-0000189

in the current recommendations of the Task Force, immunizations for routine use that have in effect a recommendation from the Advisory Committee, and evidence-informed preventive care and screenings for infants, children, and adolescents, provided for in guidelines supported by HRSA. The complete list of recommendations and guidelines can be found at: *https://www.healthcare.gov/ preventive-care-benefits.*

Commenters requested additional clarity on the specific items and services required to be covered without cost sharing. The Departments previously released FAQs about Affordable Care Act Implementation Parts XII[9] and XIX[10] to provide guidance related to the scope of coverage required under the recommendations and guidelines, including coverage of aspirin and other over-the-counter medication, colonoscopies, BRCA testing, well-woman visits, screening and counseling for interpersonal and domestic violence, HIV and HPV testing, contraception, breastfeeding and lactation counseling, and tobacco cessation interventions. Moreover, on May 11, 2015, the Departments issued FAQs about Affordable Care Act Implementation[11] to address specific coverage questions related to BRCA testing, contraception, sex-specific recommended preventive services, services for dependents covered under the plan or policy, and colonoscopies. If additional questions arise regarding the application of the preventive services coverage requirements, the Departments may issue additional subregulatory guidance.

(ii) Office Visits

The July 2010 interim final regulations clarified the cost-sharing requirements applicable when a recommended preventive service is provided during an office visit through the use of the "primary purpose" test: First, if a recommended preventive service is billed separately (or is tracked as individual encounter data separately) from an office visit, a plan or issuer may impose cost sharing with respect to the

office visit. Second, if a recommended preventive service is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of the recommended preventive service, a plan or issuer may not impose cost sharing with respect to the office visit. Finally, if a recommended preventive service is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of the recommended preventive service, a plan or issuer may impose cost sharing with respect to the office visit. The reference to tracking individual encounter data was included to provide guidance with respect to plans and issuers that use capitation or similar payment arrangements that do not bill individually for items and services.

Several commenters supported the primary purpose test, while other commenters were concerned that the test provides too much discretion to providers or issuers to determine the primary purpose of the visit. Some commenters stated that many individuals only seek medical care from their physician when they are sick, and physicians must be able to provide preventive services, along with other treatment, in a single office visit. Other commenters recommended that the Departments eliminate the primary purpose test. Some of these commenters recommended that cost sharing be prohibited if any recommended preventive service is provided during the visit.

These final regulations continue to provide that when a recommended preventive service is not billed separately (or is not tracked as individual encounter data separately) from an office visit, plans and issuers must look to the primary purpose of the office visit when determining whether they may impose cost sharing with respect to the office visit. Nothing in these requirements precludes a health care provider from providing preventive services, along with other treatment, in a single office visit. These rules only establish the circumstances under which an office visit that includes a recommended preventive service may be subject to cost sharing. The Departments anticipate that the determination of the primary purpose of the visit will be resolved through normal billing and coding activities, as they are for other services. If questions arise regarding the application of this rule to common medical scenarios, the

Departments may issue additional subregulatory guidance.

(iii) Out-of-Network Providers

With respect to a plan or health insurance coverage that maintains a network of providers, the July 2010 interim final regulations provided that the plan or issuer is not required to provide coverage for recommended preventive services delivered by an out-of-network provider. The plan or issuer may also impose cost sharing for recommended preventive services delivered by an out-of-network provider.

Several commenters requested the rule be amended to require that preventive services be provided without cost sharing when services are provided out-of-network in all instances. Other commenters suggested that the rule be amended to require out-of-network coverage if an in-network provider is not available to the individual, or if the services are not available to a material segment of the plan's population. One commenter asked that, in a situation where preventive services are obtained from a network provider with the assistance of medical professionals who are out-of-network, all of the services be treated as in-network services, and thus not subject to cost sharing. Several commenters stated that cost sharing for recommended preventive services received from out-of-network providers should not be higher than cost sharing for other ambulatory health services provided on an out-of-network basis.

In response to comments, the Departments issued an FAQ clarifying that, if a plan or issuer does not have in its network a provider who can provide a particular recommended preventive service, then, consistent with the statute and July 2010 interim final regulations, the plan or issuer must cover, without cost sharing, the item or service when performed by an out-of-network provider.[12] These final regulations adopt the rule of the July 2010 interim final regulations with respect to out-of-network providers, with one clarification. These final regulations incorporate the clarification that a plan or issuer that does not have in its network a provider who can provide a particular recommended preventive service is required to cover the preventive service when performed by an out-of-network provider, and may

---

[9] *See* FAQs about Affordable Care Act Implementation Part XII, available at *http://www. dol.gov/ebsa/faqs/faq-aca12.html* and *http://www. cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ aca_implementation_faqs12.html.*

[10] *See* FAQs about Affordable Care Act Implementation Part XIX, available at *http://www. dol.gov/ebsa/faqs/faq-aca19.html* and *http://www. cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ aca_implementation_faqs19.html.*

[11] *See* FAQs about Affordable Care Act Implementation Part XXVI, available at *www.dol.gov/ebsa/faqs/faq-FAQs/Downloads/aca_ implementaton_faqs26.pdf,* and *http://www.cms. gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ Downloads/aca_implementation_faqs26.pdf.*

[12] *See* FAQ about Affordable Care Act Implementation Part XII, Q3 at *http://www.dol.gov/ ebsa/faqs/faq-aca12.html* and *http://www.cms.gov/ CCIIO/Resources/Fact-Sheets-and-FAQs/aca_ implementation_faqs12.html.*

Exhibit 10

JA592

JA-0000190

not impose cost sharing with respect to the preventive service.

(iv) Reasonable Medical Management

The July 2010 interim final regulations included a provision on reasonable medical management. Specifically, if a recommendation or guideline for a recommended preventive service does not specify the frequency, method, treatment, or setting for the provision of that service, the plan or issuer may use reasonable medical management techniques to determine any coverage limitations.

The Departments received a number of comments related to the use of reasonable medical management techniques. Some commenters were concerned that the July 2010 interim final regulations did not clearly outline what constitutes reasonable medical management techniques, and requested that the Departments provide greater clarity, particularly with respect to a situation where a patient's attending provider determines that the frequency, method, treatment, or setting of a particular item or service is medically appropriate for a particular patient. The Departments issued an FAQ clarifying that, under the July 2010 interim final regulations, to the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant evidence base and established reasonable medical management techniques to determine the frequency, method, treatment, or setting for the provision of a recommended preventive service.[13] These final regulations incorporate the clarification of the July 2010 interim final regulations set forth in the FAQ.

On May 11, 2015, the Departments issued FAQs to provide further guidance on the extent to which plans and issuers may utilize reasonable medical management when providing coverage for recommended women's contraception services in the HRSA guidelines.[14] If further questions arise regarding the permissible application of reasonable medical management techniques, the Departments may issue additional subregulatory guidance.

Other commenters cited the importance of flexibility to permit plans and issuers to maintain programs that are cost-effective, negotiate treatments

with high-quality providers at reduced costs, and reduce fraud and abuse. Commenters requested guidance on how plans and issuers may employ value-based insurance designs (VBID) in a manner that complies with the preventive services coverage requirements.[15] Some commenters requested that the final regulations permit plans and issuers to impose cost sharing on non-preferred network tiers for VBIDs. Another commenter requested the Departments permit cost sharing for preventive care delivered at centers of excellence. On December 22, 2010, the Departments issued an FAQ to provide guidance regarding VBID related to the coverage of preventive services.[16] If questions arise regarding VBID and the preventive services coverage requirements, the Departments may issue additional subregulatory guidance. Several commenters stated that plans and issuers should be required to use and identify credible references or sources supporting their medical management techniques. The Departments recognize the importance of having access to information relating to medical management techniques that a plan or issuer may apply. Several provisions applicable to plans and issuers address these concerns. ERISA section 104 and the Department of Labor's implementing regulations[17] provide that, for plans subject to ERISA, the plan documents and other instruments under which the plan is established or operated must generally be furnished by the plan administrator to plan participants[18] upon request. In addition, the Department of Labor's claims procedure regulations[19] (applicable to ERISA plans), as well as the Departments' internal claims and appeals and external review regulations under the Affordable Care Act

(applicable to all non-grandfathered group health plans and health insurance issuers in the group and individual markets),[20] set forth rules regarding claims and appeals, including the right of claimants (or their authorized representatives), upon appeal of an adverse benefit determination (or a final internal adverse benefit determination), to be provided by the plan or issuer, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the claimant's claim for benefits. Other Federal and State law requirements may also apply, as applicable.

(v) Services Not Described

The July 2010 interim final regulations clarified that a plan or issuer may cover preventive services in addition to those required to be covered by PHS Act section 2713. These final regulations continue to provide that for the additional preventive services, a plan or issuer may impose cost sharing at its discretion, consistent with applicable law. Moreover, a plan or issuer may impose cost sharing for a treatment that is not a recommended preventive service, even if the treatment results from a recommended preventive service.

(vi) Timing

The July 2010 interim final regulations provided that plans and issuers must provide coverage for new recommended preventive services for plan years (in the individual market, policy years) beginning on or after the date that is one year after the date the relevant recommendation or guideline under PHS Act section 2713 is issued. Some commenters encouraged the Departments to adopt a shorter implementation timeframe. With respect to the Advisory Committee recommendations, one commenter requested that the effective date for any new recommendation be either the publication of the committee's provisional recommendations or the publication of the official CDC immunization schedules, whichever occurs first. Other commenters expressed support for the implementation timeframe set forth in the July 2010 interim final regulations. The statute requires the Departments to establish an interval of not less than one year between when recommendations or guidelines under PHS Act section

---

[13] *See* FAQs about Affordable Care Act Implementation Part II, Q8 available at *http://www.dol.gov/ebsa/faqs/faq-aca2.html* and *http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs2.html*.

[14] *See* FAQs about Affordable Care Act Implementation Part XXVI, available at *www.dol.gov/ebsa/faqs/faq-aca26.html* and *http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/aca_implementation_faqs26.pdf*.

[15] The Departments first solicited comments on value-based insurance designs in the July 2010 interim final regulations. 75 FR 41726, 41729. Subsequently, the Departments published a request for information (RFI) related to value-based insurance design on December 28, 2010. 75 FR 81544.

[16] *See* FAQs about Affordable Care Act Implementation Part V, Q1, available at *http://www.dol.gov/ebsa/faqs/faq-aca5.html* and *http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs5.html*.

[17] 29 CFR 2520.104b–1.

[18] ERISA section 3(7) defines a "participant" to include any employee or former employee who is or may become eligible to receive a benefit of any type from an employee benefit plan or whose beneficiaries may be eligible to receive any such benefit. Accordingly, employees who are not enrolled but are, for example, in a waiting period for coverage, or who are otherwise shopping among benefit package options during open season, generally are considered plan participants for this purpose.

[19] 29 CFR 2560.503–1(h)(2)(iii).

[20] 29 CFR 2590.715–2719(b)(2)(i) and 45 CFR 147.136(b)(2)(i).

Exhibit 10     JA593     JA-0000191

2713(a) [21] are issued, and the plan year (in the individual market, policy year) for which coverage of the services addressed in the recommendations or guidelines must be in effect.

To provide plans and issuers adequate time to incorporate changes or updates to recommendations and guidelines, as provided in the July 2010 interim final regulations, these final regulations continue to provide that a recommendation or guideline of the Task Force is considered to be issued on the last day of the month on which the Task Force publishes or otherwise releases the recommendation; a recommendation or guideline of the Advisory Committee is considered to be issued on the date on which it is adopted by the Director of the CDC; and a recommendation or guideline in the comprehensive guidelines supported by HRSA is considered to be issued on the date on which it is accepted by the Administrator of HRSA or, if applicable, adopted by the Secretary of HHS.

Several commenters supported the policy that plans and issuers should not need to check the recommendations or guidelines for changes during the plan or policy year in order to determine coverage requirements and should not be required to implement changes during the plan or policy year. The Departments adopted this approach in the July 2010 interim final regulations with respect to new recommendations or guidelines that impose additional preventive services coverage requirements, but adopted a different standard for changes in recommendations or guidelines, allowing plans and issuers to eliminate coverage for preventive services that are no longer recommended during the plan or policy year, consistent with other

applicable federal and state law. We agree with those commenters who stated that changes in coverage should not occur during the plan or policy year, and are implementing an approach with respect to changes in recommendations or guidelines that narrow or eliminate coverage requirements for previously recommended services that is similar to the one adopted in the July 2010 interim final regulations for new recommendations or guidelines. Furthermore, participants and beneficiaries of group health plans (and enrollees and dependents in individual market coverage) may make coverage choices based on the benefits offered at the beginning of the plan or policy year. Plan years (and individual market policy years) vary and recommendations and guidelines may be issued at any time during a plan or policy year. These final regulations protect against disruption and provide certainty in coverage (including cost-sharing requirements) for the duration of the plan or policy year. Accordingly, these final regulations state that a plan or issuer that is required to provide coverage for any recommended preventive service on the first day of a plan or policy year under a particular recommendation or guideline must generally provide that coverage through the last day of the plan or policy year, even if the recommendation or guideline changes or is eliminated during the plan or policy year.

However, there are limited circumstances under which it may be inadvisable for a plan or issuer to continue to cover preventive items or services associated with a recommendation or guideline that was in effect on the first day of a plan year or policy year (for example, due to safety concerns). Therefore, these final regulations establish that if, during a plan or policy year, (1) an "A" or "B" recommendation or guideline of the Task Force that was in effect on the first day of a plan or policy year is downgraded to a "D" rating (meaning that the Task Force has determined that there is strong evidence that there is no net benefit, or that the harms outweigh the benefits, and therefore discourages the use of this service), or (2) any item or service associated with any preventive service recommendation or guideline specified in 26 CFR 54.9815–2713(a)(1) or 29 CFR. 2590.715–2713(a)(1) or 45 CFR 147.130(a)(1) that was in effect on the first day of a plan or policy year is the subject of a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate

that item or service, there is no requirement under this section to cover these items and services through the last day of the plan or policy year. Should such circumstances arise, the Departments expect to issue subregulatory guidance to this effect with respect to such preventive item or service.

Other requirements of federal or state law may apply in connection with ceasing to provide coverage or changing cost-sharing requirements for any item or service. For example, PHS Act section 2715(d)(4) and its implementing regulations state that if a group health plan or health insurance issuer makes any material modification in any of the terms of the plan or coverage involved that would affect the content of the Summary of Benefits and Coverage (SBC), that is not reflected in the most recently provided SBC, and that occurs other than in connection with a renewal or reissuance of coverage, the plan or issuer must provide notice of the modification to enrollees not later than 60 days prior to the date on which the notification will become effective.

A list of the recommended preventive services is available at *https://www.healthcare.gov/preventive-care-benefits*. We intend to update this list to include the date on which the recommendation or guideline was accepted or adopted. New recommendations and guidelines will also be reflected on this site. Plans and issuers need not make changes to coverage and cost-sharing requirements based on a new recommendation or guideline until the first plan year (in the individual market, policy year) beginning on or after the date that is one year after the new recommendation or guideline goes into effect. Therefore, by visiting this site once per year, plans or issuers should have access to all the information necessary to identify any additional items or services that must be covered without cost sharing, or to identify any items or services that are no longer required to be covered.

*B. Accommodations in Connection With Coverage of Preventive Health Services—26 CFR 54.9815–2713A, 29 CFR 2510.3–16 and 2590.715–2713A, and 45 CFR 147.131.*

(i) The Process an Eligible Organization Uses To Provide Notice of Its Religious Objection to the Coverage of Contraceptive Services

After issuing the July 2013 final regulations, the Departments issued August 2014 interim final regulations in light of the Supreme Court's *Wheaton* interim order concerning notice to the federal government that an eligible

---

[21] Section 2713(b)(1) refers to an interval between "the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline." While the first part of this statement does not mention guidelines under subsection (a)(4), it is the Departments' view that it would not be reasonable to treat the services covered under subsection (a)(4) any differently than those in subsections (a)(1), (a)(2), and (a)(3). First, the statement refers to "the requirement described in subsection (a)," which would include a requirement under subsection (a)(4). Secondly, the guidelines under subsection (a)(4) are from the same source as those under subsection (a)(3), except with respect to women, rather than infants, children and adolescents; and other preventive services involving women are addressed in subsection (a)(1), so it is reasonable to treat the guidelines under subsection (a)(4) similarly. Third, without this clarification, it would be unclear when such services would have to be covered. The July 2010 interim final regulations and these final regulations accordingly apply the intervals established therein to services under section 2713(a)(4).

organization has a religious objection to providing contraceptive coverage, as an alternative to the EBSA Form 700 method of self-certification, and to preserve participants' and beneficiaries' (and, in the case of student health insurance coverage, enrollees' and dependents') access to coverage for the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing.

These final regulations continue to allow eligible organizations to choose between using EBSA Form 700 or the alternative process consistent with the *Wheaton* interim order. The alternative process provides that an eligible organization may notify HHS in writing of its religious objection to covering all or a subset of contraceptive services. The notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to covering some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.[22] A model notice to HHS that eligible organizations may, but are not required to, use is available at: *http://www.cms.gov/cciio/resources/ Regulations-and-Guidance/ index.html#Prevention.* If there is a change in any of the information required to be included, the organization must provide updated information to HHS.

The content required for the notice represents the minimum information necessary for the Departments to determine which entities are covered by the accommodation, to administer the accommodation, and to implement the policies in the July 2013 final regulations.[23] Comments on the August

2014 interim final regulations did not identify any way to administer the accommodation without this information, or any alternative means the Departments can use to obtain the required information. Nothing in this alternative notice process (or in the EBSA Form 700 notice process) provides for a government assessment of the sincerity of the religious belief underlying the eligible organization's objection. The notice to HHS, and any subsequent updates, should be sent electronically to: *marketreform@ cms.hhs.gov*, or by regular mail to: Centers for Medicare & Medicaid Services, Center for Consumer Information and Insurance Oversight, 200 Independence Avenue SW., Washington, DC 20201, Room 739H.

When an eligible organization that establishes or maintains a self-insured plan subject to ERISA provides a notice to HHS, the Department of Labor (DOL) (working with HHS) will send a separate notification to each third party administrator of the ERISA plan. The DOL notification will inform each third party administrator of the eligible organization's religious objection to funding or administering some or all contraceptive coverage, will list the contraceptive services to which the employer objects, will describe the obligations of the third party administrator(s) under 29 CFR 2590.715–2713A and 26 CFR 54.9815– 2713A, and will designate the relevant third party administrator(s) as plan administrator under section 3(16) of ERISA for those contraceptive benefits that the third party administrator would otherwise manage on behalf of the eligible organization. The DOL notification will be an instrument under which the plan is operated, and will supersede any earlier designation. In establishing and implementing this alternative process, DOL is exercising its broad rulemaking authority under title I of ERISA, which includes the ability to interpret and apply the definition of a plan administrator under ERISA section 3(16)(A).

If an eligible organization that establishes or maintains an insured group health plan or insured student health plan provides a notice to HHS under this alternative process, HHS will send a separate notification to each health insurance issuer of the plan. HHS's notification will inform each health insurance issuer of the eligible organization's religious objection to

funding or administering some or all contraceptive coverage, will list the contraceptive services to which the organization objects, and will describe the obligations of the issuer(s) under 26 CFR 54.9815–2713A, 29 CFR 2590.715– 2713A, and 45 CFR 147.131. Issuers remain responsible for compliance with the statutory and regulatory requirement to provide coverage for contraceptive services without cost sharing to participants and beneficiaries of insured group health plans, and to enrollees and dependents of insured student health plans, notwithstanding that the policyholder is an eligible organization with a religious objection to contraceptive coverage that will not have to contract, arrange, pay, or refer for the coverage.

Several comments addressed oversight and enforcement to monitor the accommodation. The Departments will use their established oversight processes, applicable to all the Affordable Care Act market reforms of PHS Act title XXVII, part A to monitor compliance with the requirement to arrange for or provide separate payments for contraceptive services without cost sharing.[24]

**(ii) Definition of a Closely Held for-Profit Entity**

**(a) General Structure of a Closely Held for-Profit Entity**

After issuing the July 2013 final regulations, the Departments issued August 2014 proposed regulations in light of the Supreme Court's ruling in *Hobby Lobby*, that, under the Religious Freedom Restoration Act of 1993 (RFRA),[25] the requirement to provide contraceptive coverage could not be applied to certain closely held for-profit entities that had a religious objection to providing coverage for some or all the FDA-approved contraceptive methods. The proposed regulations solicited comments on a number of different approaches for defining a closely held for-profit entity for purposes of qualifying as an eligible organization that can avail itself of an accommodation, and solicited comments on a number of other related issues.

---

[22] Church plans are exempt from ERISA pursuant to ERISA section 4(b)(2). As such, a third party administrator of a self-insured church plan established or maintained by an eligible organization does not become the plan administrator by operation of 29 CFR 2510.3–16, although such third party administrators may voluntarily provide or arrange separate payments for contraceptive services and seek reimbursement for associated expenses under the process set forth in 45 CFR 156.50.

[23] An accommodation cannot be effectuated until all of the necessary information is submitted. If HHS receives a notice that does not include all of

the required information, HHS will attempt to notify the organization of the incompleteness, so the organization can submit additional information to make its notice complete.

[24] The Departments' oversight and enforcement role with respect to the market reforms under the Affordable Care Act builds upon their respective roles with respect to the market reforms under title I of HIPAA. For a description of the latter, *see* Notice of Signing of a Memorandum of Understanding among the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services at 64 FR 70165 (Dec. 15, 1999).

[25] 42 U.S.C. 2000bb *et. seq.*

The Departments received more than 75,000 comments in response to the August 2014 proposed regulations. Numerous comments addressed matters outside the scope of the proposed regulations (for example, many comments expressed support for or disagreement with the Supreme Court's *Hobby Lobby* decision, contraception in general, or different methods of contraception), and are not addressed in this preamble. To the extent comments addressed matters that were within the scope of the proposed regulations, those portions of the comments were considered, and all significant comments related to matters within the scope of the proposed regulations are discussed in this preamble. Many commenters expressed support for or disagreement with the general requirement to provide coverage for contraceptive services without cost sharing. Some commenters expressed support for the notion that any employer that has religious objections to covering contraceptive services should either be exempt from doing so, or should be able to avail itself of the accommodation. Other commenters stated that women should have access to contraceptive services without cost sharing, regardless of where they work, and that employers should not be permitted to deny them coverage, whether the employer's decision is for religious or other reasons. Many commenters suggested that the set of closely held for-profit entities eligible for the accommodation be defined as narrowly as possible.

The August 2014 proposed regulations would extend the availability of the accommodation to closely held for-profit entities. The preamble proposed two possible approaches to defining a closely held for-profit entity. Under the first proposed approach, a qualifying closely held for-profit entity would be a for-profit entity where none of the ownership interests in the entity are publicly traded, and where the entity has fewer than a specified number of shareholders or owners (the Departments did not propose a specific number, but solicited comment on what the number should be). As explained in the preamble to the August 2014 proposed regulations, there is precedent in other areas of federal law for limiting the definition of closely held entities to those with a relatively small number of owners.[26] Under the second proposed approach, a qualifying closely held entity would be a for-profit entity in which the ownership interests are not publicly traded, and in which a specified fraction of the ownership interest is concentrated in a limited and specified number of owners (the Departments did not propose a specific level of ownership concentration but solicited comment on what that level should be). As explained in the preamble to the August 2014 proposed regulations, this approach also has precedent in federal law, which limits certain tax treatment to entities that are more than 50 percent owned by or for not more than five individuals.[27] The Departments invited comments on the appropriate scope of the definition of a qualifying closely held for-profit entity.

As explained in more detail below, these final regulations extend the accommodation to a for-profit entity that is not publicly traded, is majority-owned by a relatively small number of individuals, and objects to providing contraceptive coverage based on its owners' religious beliefs. This definition includes for-profit entities that are controlled and operated by individual owners who are likely to have associational ties, are personally identified with the entity, and can be regarded as conducting personal business affairs through the entity. Those entities appear to be the types of closely held for-profit entities contemplated by *Hobby Lobby*, which involved two family-owned corporations that were operated in accordance with their owners' shared religious beliefs.[28] The Departments also believe that the definition adopted in these regulations includes the for-profit entities that are likely to have religious objections to providing contraceptive coverage. That assessment is supported by the comments received on the proposed regulation. As explained below, the Departments sought comment on a definition similar to the one adopted here, and we believe that no commenter identified an entity that would want to avail itself of the accommodation but that would be excluded by the definition. In addition, based on the available information, it appears that the definition adopted in these final regulations includes all of the for-profit entities that have as of the date of issuance of these regulations challenged the contraceptive coverage requirement in court.

The Departments believe that the definition adopted in these regulations complies with and goes beyond what is required by RFRA and *Hobby Lobby*. The Departments have extended the accommodations to the specified class of for-profit entities in order to provide additional protection to entities that may have religious objections to providing contraceptive coverage, and because the Departments believe that eligibility for the accommodations should be based on a rule that has origins in existing law.

Under the August 2014 proposed regulations and these final regulations, the first prong that an eligible organization (whether it be a nonprofit entity or a closely held for-profit entity) must meet in order to avail itself of the accommodation is that the entity must oppose providing coverage for some or all of any contraceptive item or service required to be covered, on account of religious objections. This requirement remains unchanged in these final regulations. (In the case of a for-profit entity, the entity must be opposed to providing these services on account of its owners' religious objections).

Many commenters supported excluding publicly traded entities from the definition of a closely held for-profit entity. However, a few commenters stated that a publicly traded entity should not be disqualified from the accommodation. Although the entities in *Hobby Lobby* were not publicly traded, one commenter noted that the Court did not expressly preclude publicly traded corporations from the protections of RFRA. Another commenter stated that if a publicly traded corporation could provide evidence of a sincere religious objection to providing contraceptive coverage, it should not be precluded from the accommodation.

These final regulations exclude publicly traded entities from the definition of an eligible organization. *Hobby Lobby* did not involve RFRA's application to publicly traded companies, and the Supreme Court emphasized that "the idea that unrelated shareholders—including institutional investors with their own sets of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable."[29]

Many commenters favored limiting the number of owners to "a handful," without specifying a maximum number. One commenter urged the Departments to establish a limit on the maximum number of shareholders for closely held entities of 999.

One commenter favored limiting the number of owners, but stated that any particular limit could lead to anomalous

---

[26] *See* discussion of definition of S corporations under section 1361 of the Tax Code, at 79 FR 51122.

[27] See discussion of several Tax code provisions, including 26 U.S.C. 856(h), 542(a)(2), and 469(j)(1), at 79 FR 51122.

[28] *See* 134 S. Ct. at 2764–2768.

[29] 134 S. Ct. at 2744.

Exhibit 10

JA596

JA-0000194

results for entities with more than the permitted number of owners that seek the accommodation. The commenter noted, for example, that if the maximum number of shareholders or owners is ten, non-publicly traded companies with eleven shareholders would have to provide contraceptive coverage, no matter how sincerely held the religious objections of the owners. Another commenter who favored the approach stated that the definition should be limited to entities that have ten or fewer shareholders, and that shareholders should be counted based upon the definitions under subchapter S—that is, individuals should be counted along with certain trusts and estates. This would account for Qualified Subchapter S Trusts, but would not allow for other partnerships or corporations to be shareholders. This commenter also urged that members of the same family be counted as separate shareholders. Another commenter explained that a closely held company is commonly understood to be one that chooses S-corporation status or has fewer than 100 shareholders, and that many are privately held and owned by family members. Beyond these characteristics, the commenter urged, the size of the company should not matter. One commenter suggested following the close corporation definition from the applicable state or, in the absence of a corporate form, following the definition of a close corporation under Delaware law.

A few commenters supported a test that would be aligned with one of the federal tax law's definitions of a "closely held corporation." For example, commenters supported a definition that provides that the corporation may not have ownership interests that are publicly traded, that more than 50 percent of the outstanding ownership interests in the corporation must be owned (directly or indirectly) by five or fewer individuals at any time during the last half of the tax year, and that the corporation may not be a personal service corporation. The commenters favored identifying closely held entities through an approach based on this definition because such an approach would be easy to apply and already familiar to corporations that apply similar concepts under the Code.

Other commenters were generally opposed to a limited ownership-concentration test. One commenter observed that under this approach, a corporation would be able to concentrate a fraction of ownership, for example 50 percent, in a specified number of owners, such as ten people. The commenter observed that those ten individuals, who might comprise fewer than half of the total number of owners, would be able to direct the corporation to seek the accommodation, potentially against the wishes of the minority shareholders.

Several commenters suggested that basing the definition either on the number of owners, or upon a concentration of ownership, would be inappropriate. One commenter stated that there is no basis in the *Hobby Lobby* decision to restrict the definition based on measures such as shareholder numbers, fractions of ownership, or tax rules. Another commenter stated that each of the proposed definitions of a "closely held corporation" is based on an arbitrary metric unrelated to the religious beliefs of the owners of the corporation. Another commenter stated that any rule that defines "closely held" in a narrow manner, such as by limiting the number, kind, or percentage control of a share of its owners, or by adopting definitions used in the Code, will violate RFRA and the *Hobby Lobby* decision. One commenter stated that a numerical test of shareholders will be both under- and over-inclusive, capturing corporations that meet the numerical test but whose shareholders are not expressing a religious belief through the corporation, and failing to capture corporations with a relatively large number of shareholders united in their religious interests. Another commenter believed that basing the definition of "closely held entity" solely on the number of owners would not limit eligibility to those types of entities addressed in the *Hobby Lobby* case.

One commenter believed that, for purposes of qualifying for the accommodation, an entity should only employ individuals who adhere to the owners' religious beliefs. The Departments do not believe this is a necessary characteristic for an entity to qualify as an eligible organization that can avail itself of the accommodation, and in *Hobby Lobby* the court granted relief to companies that did not possess this feature. Additionally, while the Departments have noted that exempting churches and their integrated auxiliaries (which the regulations refer to as "religious employers") from the requirement to provide contraceptive coverage does not impermissibly undermine the government's compelling interests in promoting public health and ensuring that women have equal access to health care because churches are more likely to hire co-religionists,[30] the exemption to the contraceptive coverage requirement was provided against the

backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship, such as the special treatment given to those organizations in the Code.[31] This exemption for churches and houses of worship is consistent with their special status under longstanding tradition in our society and under federal law, and is not a mere product of the likelihood that these institutions hire coreligionists. Hiring coreligionists is not itself a determinative factor as to whether an organization should be accommodated or exempted from the contraceptive requirements.

Another commenter stated that ownership of the entity should be limited to family members. The Departments do not believe that ownership of a closely held for-profit entity eligible for the accommodation should be limited to members of one family. Although many closely held corporations are family-owned, existing state and federal definitions of closely held or close corporations do not typically include this requirement. As stated below, however, for purposes of these final regulations, an individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family, meaning brothers and sisters (including half-brothers and half-sisters), spouses, ancestors, and lineal descendants. The Departments agree with the commenters who urged us to define a closely held entity, for purposes of these regulations, based on an existing federal definition. The Departments believe that this approach will minimize confusion for entities seeking the accommodation.

At the same time, the Departments also recognize the need for flexibility in the definition for purposes of the accommodation. Therefore, the Departments are adopting in these regulations a definition that is generally based on—but is more flexible than—the definition of a closely held corporation found in the Code [32] (which we refer to as the tax-law definition). Under the tax-law definition, a closely

---

[30] 78 FR 39887.

[31] 26 U.S.C. 6033(a)(3)(A).

[32] Code section 469(j)(1) states the "term 'closely held C corporation' means any C corporation described in section 465(a)(1)(B)." Section 465(a)(1)(B) provides "a C corporation with respect to which the stock ownership requirement of paragraph (2) of section 542(a) is met." Section 542(a)(2) provides that the applicable stock ownership requirement is met if "[a]t any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals." Similarly, section 856(h)(1)(A) provides "a corporation, trust, or association is closely held if the stock ownership requirement of section 542(a)(2) is met."

held corporation is a corporation that has more than 50 percent of the value of its outstanding stock owned (directly or indirectly) by five or fewer individuals at any time during the last half of the tax year, and is not a personal service corporation.[33] The definitions for closely held corporation in various Code provisions reference the ownership test for personal holding companies contained in Code section 542(a)(2), which generally has the effect of identifying those corporations that are controlled by a small group of individuals and closely affiliated with their owners.

Drawing on the tax-law definition, with appropriate modifications to reflect the context here, these regulations establish that to be eligible for the accommodation, a closely held, for-profit entity must, among other criteria, be an entity that is not a nonprofit entity, and have more than 50 percent of the value of its ownership interests owned directly or indirectly by five or fewer individuals, or must have an ownership structure that is substantially similar.

As previously stated, for purposes of defining a closely held for-profit entity in these regulations, the Departments are using a definition that is more flexible than the tax-law definition of closely held corporation. Because the Departments believe that the tax-law definition might exclude some entities that should be considered to be closely held for purposes of the accommodation, and because some for-profit entities may have unusual or non-traditional ownership structures not readily analyzed under the 5/50 test, the definition under these final regulations also includes, as stated above, entities with ownership structures that are "substantially similar" to structures that satisfy the 5-owner/50-percent requirement.

For example, an entity where 49 percent of the value of the outstanding ownership interests are owned directly by six individuals could also qualify as a closely held for-profit entity because it has an ownership structure that is substantially similar to one in which five or fewer individuals hold at least 50 percent of the value of the outstanding ownership interests.

As another example, an entity owned by a series of corporate parents, where among the ultimate stockholders are a nonprofit entity and a for-profit corporation with three individual owners, who collectively own 45 percent of the outstanding ownership interests, also has a substantially similar ownership structure.

We note, however, that a publicly traded entity would not qualify as having a substantially similar ownership structure.

For purposes of the accommodation, the value of the ownership interests in the entity, whether the total ownership interests or those owned by five or fewer individuals, should be calculated based on all ownership interests, regardless of whether they have associated voting rights or any other privileges. This is consistent with how the tax-law definition of a closely held corporation is applied.

Because the accommodation will be sought on a prospective basis, the Departments do not believe it appropriate to incorporate, from the tax-law definition, the time interval over which the test is measured—that the given ownership structure be in place during the last half of the tax year—and instead adopt a test that is measured as of the date of the entity's self-certification or notice of its objection to provide contraceptive services on account of religious objections.

The tax-law definition of "closely held corporation" excludes certain "personal services corporations," such as accounting firms, actuarial science firms, architecture firms, and law firms. Although there are legitimate reasons for excluding personal service firms from the definition of "closely held corporation" for purposes of taxation, the Departments do not believe the distinction is necessary in this context. Therefore, a personal services corporation may qualify as a closely held for-profit entity under these final regulations, provided it satisfies the other criteria.

Following the tax-law definition, to determine if more than 50 percent of the value of the ownership interests is owned by five or fewer individuals, the following rules apply:

• Ownership interests owned by or for a corporation, partnership, estate, or trust are considered owned proportionately by the entity's shareholders, partners, or beneficiaries. For example, if a for-profit entity is 100 percent owned by a partnership, and the partnership is owned 100 percent by four individuals, the for-profit entity, for purposes of these regulations, is considered to be owned 100 percent by those four individuals.

• An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. The "family" includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants. Accordingly, the family members count as a single owner for purposes of these final regulations.

• If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

To assist potentially eligible for-profit entities seeking further information regarding whether they qualify for the accommodation, an entity may send a letter describing its ownership structure to HHS at *accommodation@ cms.hhs.gov*. If the entity does not receive a response from HHS to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure, it will be considered to meet the requirement set forth in 26 CFR 54.9815– 2713A(a)(4)(iii), 29 U.S.C. 2590.715– 2713A(a)(4)(iii), and 45 CFR 147.131(b)(4)(iii). However, an entity is not required to avail itself of this process in order to qualify as a closely held for-profit entity.

Based on the information available, it appears that the definition of closely held for-profit entity set forth in these final regulations includes all the for-profit corporations that have filed lawsuits alleging that the contraceptive coverage requirement, absent an accommodation, violates RFRA.

One commenter stated that the definition should include any for-profit entity that is controlled directly or indirectly by a nonprofit eligible organization. The Departments agree, because in this case the nonprofit entity will represent one shareholder that owns more than 50 percent of the ownership interests in the for-profit entity.[34] The same facts and circumstances that are considered in determining whether a given for-profit entity qualifies as an eligible for-profit organization under these final regulations will also apply when one or more of its owners is a nonprofit organization. For purposes of the ownership concentration test set forth in these final regulations that applies to for-profit entities, a nonprofit organization that has an ownership interest in a for-profit entity will be considered one individual owner of the for-profit entity, and the non-profit organization's percentage ownership in the for-profit entity will be attributed to that nonprofit organization.

---

[33] See http://www.irs.gov/Help-&-Resources/ Tools-&-FAQs/FAQs-for-Individuals/Frequently-Asked-Tax-Questions-&-Answers/Small-Business,-Self-Employed,-Other-Business-Entities/Entities-5.

[34] See EBSA Form 700.

Exhibit 10 JA598 JA-0000196

**(b) The Process for Making the Decision To Object To Covering Contraceptive Services**

The August 2014 proposed regulations proposed that a closely held for-profit entity's objection to covering some or all of the contraceptive services otherwise required to be covered on account of its owners' sincerely held religious beliefs must be made in accordance with the organization's applicable rules of governance, consistent with state law. Some comments proposed alternative or additional criteria for how the decision must be made. One criterion suggested by many commenters was unanimity among all owners regarding opposition to contraception. However, one commenter objected to this requirement, stating that the regulations should not require unanimous shareholder consent because neither the *Hobby Lobby* decision nor state corporate law imposes such a requirement.

Some commenters favored requiring each equity holder to certify, under penalty of perjury, that he or she has a religious objection to the entity providing contraceptive coverage. These final regulations do not adopt a requirement that the owners unanimously decide that the entity will not offer contraceptive coverage based on a religious objection, or that any equity holder certify under penalty of perjury that he or she has a religious objection to the entity providing the coverage. The Departments believe that either requirement would be unduly restrictive, and would unnecessarily interfere with for-profit entities' decision-making processes. Instead, these final regulations provide that the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by the owners) must adopt a resolution (or take other similar action consistent with the organization's applicable rules of governance and with state law) establishing that the organization objects to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs.

**(c) Documentation of the Decision To Assert a Religious Objection to Contraceptive Coverage**

In the August 2014 proposed regulations, the Departments sought comments on whether a for-profit entity seeking the accommodation should be required to document its decision-making process for objecting to coverage for some or all contraceptive services on account of religious objections (as opposed to merely disclosing the fact

that it made such a decision). Many comments supported a requirement that the decision-making process be documented, and that the entity submit, to its third party administrator or health insurance issuer, as applicable, and to the federal government, documentation of the entity's decision. These final regulations require that a for-profit entity seeking the accommodation must make the decision pursuant to a resolution (or other similar action), as described above. However, the Departments are not requiring that this resolution be provided as a matter of course to the federal government or any other party. Generally, the Departments believe it is sufficient that the fact of the decision itself, as opposed to documentation of the decision, be communicated as set forth in August 2014 interim final regulations and these final regulations. However, with respect to documentation of the decision, record retention requirements under section 107 of ERISA apply directly to ERISA-covered plans and, with respect to other plans or coverage subject to these final regulations, by operation of these final regulations, which incorporate the record retention requirements under ERISA section 107 by reference. This approach is consistent with document standards for nonprofit entities seeking the accommodation.

**(d) Disclosure of the Decision To Assert a Religious Objection to Contraceptive Services**

In the August 2014 proposed regulations, the Departments sought comments on whether a for-profit entity seeking the accommodation should be required to disclose publicly or to its employees the decision not to cover some or all contraceptive services on account of religious objections. This requirement would be in addition to the requirement that an eligible organization that is a for-profit entity that seeks the accommodation make its self-certification or notice of objection to providing contraceptive coverage on account of religious objections available for examination upon request by the first day of the plan year to which the accommodation applies, and be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

Many commenters suggested that the entity should be required to notify HHS of its decision to object (even if it chooses to self-certify and send the self-certification to its issuer or third party administrator). A few commenters stated that all employees and prospective employees (or student enrollees and their covered dependents)

must be made aware of their employer's (or educational institution's) refusal to offer contraceptive coverage. One commenter stated that a closely held for-profit entity should disclose the following to its shareholders and employees: (A) The reasons the decision was made, (B) the changes that will take place as a result of the decision, and (C) the number of people that will be affected by the decision. Another commenter stated that entities availing themselves of the accommodation should be required to publicize their justifications for denying women access to coverage of medications that serve purposes other than contraception. One commenter noted the need of employees to know by the employer's annual open enrollment period whether the employer is availing itself of the accommodation.

These final regulations do not establish any additional requirements to disclose the decision. The Departments believe that the current notice and disclosure standards afford individuals eligible for or enrolled in group health plans (and students eligible for or enrolled in student health insurance) with an accommodation adequate opportunity to know that the employer (or educational institution) has elected the accommodation for its group health plan (or insurance coverage), and that they are entitled to separate payment for contraceptive services from another source without cost sharing. Those standards require that, for each plan year to which the accommodation applies, a third party administrator that is required to provide or arrange payments for contraceptive services, and a health insurance issuer required to provide payment for these services, provide to plan participants and beneficiaries (or student enrollees and their covered dependents) written notice of the availability of separate payments for these services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment or re-enrollment in health coverage. Model language for this notice is provided in the regulations.

**(e) Sincerity of the Owners' Religious Beliefs**

Many commenters suggested that, for a closely held for-profit entity to be eligible for an accommodation, it should not be sufficient that the entity's owners object to providing contraceptive coverage. Rather, the commenters proposed that owners should also be required to agree to operate the entity in a manner consistent with religious

Exhibit 10                                    JA599                                    JA-0000197

principles, and in fact to so operate the entity. Some commenters pointed out that the July 2013 final regulations require non-profit religious organizations that avail themselves of the accommodation to "hold themselves out" as religious organizations.

The Departments have not adopted such a criterion for for-profit entities. The Supreme Court's decision in *Hobby Lobby* discussed the application of RFRA in connection with the religious beliefs of the owners of a closely held corporation.[35] These final regulations similarly focus on the religious exercise of the owners of the closely held entity and provide that the entity, in advancing the religious objection, represent that it does so on the basis of the religious beliefs of the owners. The Departments do not believe it is also necessary that the entity itself demonstrate by its bylaws, mission statement, or other documents or practices that it has a religious character. Non-profit entities ordinarily do not have owners in the same way as do for-profit entities, and thus the religious character of a non-profit entity would be reflected in how it holds itself out.

(f) Other Steps the Departments Should Take To Ensure Contraceptive Coverage With No Cost Sharing

The August 2014 proposed regulations solicited comments on other steps the Departments should take to help ensure that participants and beneficiaries (in the case of student health insurance coverage, enrollees and dependents) in plans subject to an accommodation are able to obtain, without cost, the full range of FDA-approved contraceptives without cost sharing. Many commenters stated that a government enforcement body should be established to monitor compliance by plan sponsors, third party administrators, and health insurance issuers, of their respective obligations associated with the accommodation. At this time, the Departments do not believe that an independent body need be established, although as stated above, the Departments will use their established oversight processes, applicable to all the Affordable Care Act market reforms of title XXVII of the PHS Act to monitor compliance with the requirement to provide contraceptive services without cost sharing. As part of those processes, the Departments will work with non-compliant parties to bring them into compliance, and will take enforcement action as appropriate.

Other commenters stated that the federal government should ensure that no barriers to contraceptive coverage exist due to an enrollee's cultural background, English proficiency, disability, or sexual orientation. The Departments agree that no barriers should exist. The same federal and applicable state laws that would prohibit discrimination by employers, group health plans, third party administrators, and health insurance issuers generally would also apply with respect to the entities arranging for or providing separate payments for contraceptive services for women in group health plans and student health insurance subject to an accommodation.

Other commenters urged that the separate payments for contraceptive services be provided in the same manner in which the group health plan or student health insurance would have otherwise covered these services had they not had an accommodation, or in the same manner in which the plan or coverage subject to an accommodation covers other, non-contraceptive benefits. The Departments, however, maintain the view that reasonable differences in the way services are paid for or provided would not necessarily be inappropriate, provided those differences do not create barriers to accessing payments for contraceptive services. Another commenter stated that health insurance issuers of plans subject to an accommodation should not be permitted to require enrollees to have two insurance cards, one for contraceptive benefits, and one for other benefits. The Departments do not believe that this practice, in of itself, would constitute a barrier to accessing separate payments for contraceptive services.

(g) Other Comments That Relate to the July 2013 Final Regulations

In the August 2014 proposed regulations and interim final regulations, the Departments sought comment on other potential changes to the July 2013 final regulations in light of the proposed change to the definition of eligible organization. In particular, the Departments sought comment on applying the approach set forth in the July 2013 final regulations in the context of the expanded definition of eligible organization. The July 2013 final regulations provide for separate payments for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations in a manner that enables these organizations to completely separate themselves from administration and payment for contraceptive coverage.

Specifically, the third party administrator must provide or arrange the payments, and the third party administrator can seek reimbursement for the costs (including an allowance for administrative costs and margin) by making an arrangement with a participating issuer—that is, an issuer offering coverage through a Federally-facilitated Exchange (FFE). The participating issuer can receive an adjustment to its FFE user fees to finance these costs.

One commenter suggested that the federal government set up a program to dispense these services using contractors. Another commenter suggested that pharmaceutical companies could provide certain contraceptives directly by mail to persons who are told at a dispensing pharmacy that their plan has denied coverage. Additionally, the pharmaceutical companies could directly supply doctors who prescribe birth control, who in turn could dispense directly to patients who are not covered under their employer-sponsored group health plan or student health insurance coverage. One commenter suggested making contraception available for any woman free of charge through a doctor. One commenter suggested providing contraceptive care through Medicaid.

The Departments have not adopted the proposals advanced by these comments for two reasons. First, the Departments do not have the legal authority to require pharmaceutical companies or doctors to provide contraceptives directly, nor do they have the authority to implement the other alternative arrangements proposed by these commenters. Second, these alternatives raise obstacles to access to seamless coverage. Consistent with the statutory objective of promoting access to contraceptive coverage and other preventive services without cost sharing, plan beneficiaries and enrollees should not be required to incur additional costs—financial or otherwise—to receive access and thus should not be required to enroll in new programs or to surmount other hurdles to receive access to coverage. The Departments believe that the third party administrators and health insurance issuers already paying for other medical and pharmacy services on behalf of the women seeking the contraceptive services are better placed to provide seamless coverage of the contraceptive services, than are other providers that may not be in the insurance coverage network, and that lack the coverage administration infrastructure to verify the identity of women in accommodated

---

[35] *See* 134 S. Ct. at 2768.

Exhibit 10    JA600    JA-0000198

health plans and provide formatted claims data for government reimbursement.

Some commenters suggested other changes to the July 2013 regulations. with respect to how separate payments for contraceptive services provided under the accommodation are funded. One commenter expressed concern that the August 2014 proposed regulations are silent as to possible funds for reimbursement of costs incurred for contraception services where there is no FFE operating in the state. This commenter also noted that the regulations do not consider the possibility that the cost for contraceptive services may exceed the issuer's FFE user fee, nor do they address how a third party administrator would be reimbursed if the issuer is no longer a participating issuer in the FFE. The commenter suggested the Departments consider several different financing options: The user fee for the risk adjustment program; the CMS program management fund; the user fee for the Medicare Part D program; the Prevention and Public Health Fund; medical loss ratio rebates; CMS innovation funding; and the health insurance provider fee.

Another commenter recommended that HHS provide for an expedited process of adjusting FFE user fees in case the volume of contraceptive claims is greater than expected. This commenter also suggested that the Departments also consider alternative means of generating funding for this purpose, such as allowing an issuer to charge a premium of at least an amount equal to the pro rata share of the rate the eligible organization would have paid had it not elected the accommodation, or directly subsidize the cost of contraception using funding provided by the Prevention and Public Health Fund.

One commenter stated that the Departments should evaluate the limitations of current funding arrangements with respect to the current accommodation for eligible non-profit entities, given the additional demands of the proposal to expand the accommodation to certain for-profit entities. The commenter suggested allowing a separate government funded reimbursement mechanism for enrollees in both insured and self-funded plans as an alternative approach to funding the program. If the current funding approach is continued, the commenter recommended a reassessment of the limitations of the approach for third party administrators. If third party administrators remain responsible for providing or arranging separate

payments for contraceptive services, the commenter recommended a broadening of the pool available for reimbursement beyond individually negotiated arrangements with issuers participating in the FFE, including potentially establishing a single pool for reimbursement or finding an alternative, simpler financing mechanism for third party administrators, including offsets from federal income taxes, and offsets to amounts due from other lines of business operated by the third party administrator.

At this time, the Departments are not adopting an alternative approach to funding separate payments for contraceptive services with respect to costs incurred for women in plans subject to an accommodation, although the Departments will continue to explore the feasibility of different ideas, including those proposed in the comments.

One commenter suggested that issuers should be permitted to treat the cost of providing separate payments for contraceptive services for women in plans subject to an accommodation as an adjustment to claims costs for purposes of calculating their medical loss ratios, while still being allowed to treat such payments as an administrative cost spread across the issuer's entire risk pool.[36] With respect to calculating medical loss ratios, HHS has previously stated in rulemaking that an insurer of an accommodated insured group health or student plan may include the cost of the actual payments it makes for contraceptive services in the numerator of its medical loss ratio.[37]

Several commenters asked whether, in light of the fact that the accommodation was proposed to be expanded to a new set of entities, if the Department's discussion in the preamble to the July 2013 final regulations about the extent to which the accommodation has an effect on other laws, continues to apply.[38] The Departments explained in that discussion that state insurance laws that provide greater access to contraceptive coverage than federal standards are unlikely to be preempted, and that, in states with broader religious exemptions and accommodations with respect to health insurance issuers than those in the regulations, plans are still required

to comply with the federal standard. These principles continue to apply.

One commenter stated that the *Hobby Lobby* decision applies to every form of medical care, not just contraception, and that the regulations should reflect that. However, in *Hobby Lobby*, the Court stated:

> In any event, our decision in these cases is concerned solely with the contraceptive mandate. Our decision should not be understood to hold that an insurance-coverage mandate must necessarily fail if it conflicts with an employer's religious beliefs. Other coverage requirements, such as immunizations, may be supported by different interests (for example, the need to combat the spread of infectious diseases) and may involve different arguments about the least restrictive means of providing them.[39]

Regarding fully insured plans, one commenter noted that the July 2013 final regulations permit issuers that are providing separate payments for contraceptive services under the accommodation, to pay for all FDA-approved contraceptive services, or only for those services to which the eligible organization objects to covering on religious grounds. The commenter noted that this approach simplifies the operational issues associated with implementing the accommodation across multiple employers, and sought clarification that this approach is available to third party administrators as well. The Departments clarify that this option is available to third party administrators with respect to self-insured plans.

One commenter requested that notices of objection to covering contraceptive services on religious grounds be provided with at least 60 days' advance notice, and that any change in objection status based on change of ownership of the employer not be implemented until the next plan year or policy year. The Departments do not adopt this suggestion. Instead, the Departments are extending, to closely held for-profit entities, the same timeframes that have been in effect for non-profit eligible organizations, that is, a plan sponsor can provide such notice, and implement plan benefit changes associated with the accommodation, at any time. For group health plans subject to ERISA, existing notice and timeframe requirements under ERISA apply.

Another commenter stated that health insurance issuers and third party administrators should only be required to provide or arrange for separate payments for contraceptive services for eligible organizations that have invoked an accommodation no earlier than the

---

[36] *See* Discussion of how an issuer may achieve cost neutrality in the preamble to the July 2013 final regulations. at 78 FR 39878.

[37] *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015 (Mar. 11, 2014), at 79 FR 13809.

[38] 78 FR 39888.

[39] 134 S. Ct. at 2783.

Exhibit 10                                    JA601                                    JA-0000199

first day of the first plan year that follows publication of these final regulations. To provide employers, institutions of higher education, third party administrators, and health insurance issuers adequate time to comply, these final regulations apply beginning on the first day of the first plan year (or, in the individual market, the first policy year) after these regulations are effective. Accordingly these final regulations are effective beginning on the first day of the first plan year (or, in the individual market, the first policy year) that begins on or after September 14, 2015.

Several commenters stated that the decision to not cover some or all contraceptives on religious grounds should be made annually. The Departments do not believe such a requirement is appropriate or necessary.

One commenter asked for clarification as to how a notice of objection would be provided by employers purchasing coverage through the Small Business Health Options Program (SHOP) and whether there will be a mechanism in place that permits an eligible organization to select a small group plan and provide a notice of objection. With respect to employers purchasing coverage through the SHOP, health insurance issuers selling policies through it, and participants and beneficiaries in such plans, all of the rights and obligations that are associated with these regulations apply no differently than if the employer were to purchase coverage outside of the SHOP.

One commenter stated that providing separate payments for contraceptive services is not cost-neutral for an issuer, and that it is not appropriate for an issuer of a student health insurance plan to be required to make separate payments for contraceptive services for enrollees in student health plans subject to an accommodation, and suggested that the Marketplaces should instead offer free individual market policies covering contraception to those who desire such coverage, or that such individuals get such services through existing clinics. In the alternative, the commenter proposed an "above the line" deduction on their federal income taxes for all costs incurred for separate payments made for contraceptive services for enrollees in a student health plan subject to an accommodation. The Departments do not adopt the comment. For the reasons stated in the July 2013 final regulations, the Departments believe that covering contraceptive services is cost-neutral for an issuer at risk for the enrollees in a plan subject to an accommodation. With respect to student health insurance plans, these

regulations finalize a clarification proposed in the August 2014 proposed regulations under which a reference to the definition of "institution of higher education" found in 20 U.S.C. 1002 is added to 45 CFR 147.131(f), to clarify that both nonprofit and closely held for-profit institutions of higher education, with respect to their insured student health plans, may qualify as eligible organizations.

## III. Economic Impact and Paperwork Burden

### A. Executive Orders 12866 and 13563—Department of Health and Human Services and Department of Labor

Executive Order 12866 (58 FR 51735) directs agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects; distributive impacts; and equity). Executive Order 13563 (76 FR 3821, January 21, 2011) is supplemental to and reaffirms the principles, structures, and definitions governing regulatory review as established in Executive Order 12866.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a proposed rule—(1) having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis (RIA) must be prepared for major rules with economically significant effects ($100 million or more in any 1 year), and a "significant" regulatory action is subject to review by the Office of Management and Budget (OMB). As discussed below, the Departments anticipate that these regulations—most notably the policies first established in the 2010 interim final rule—are likely to have economic impacts of $100 million or more in any

one year, and therefore meet the definition of "significant rule" under Executive Order 12866. Therefore, the Departments have provided an assessment of the potential costs, benefits, and transfers associated with these final regulations. In accordance with the provisions of Executive Order 12866, these final regulations were reviewed by the OMB.

### 1. Need for Regulatory Action

These final regulations finalize the July 2010 interim final regulations related to coverage of recommended preventive services, the August 2014 interim final regulations related to the process an eligible organization uses to provide notice of its religious objections to the coverage of contraceptive services, and the August 2014 proposed regulations related to the definition of eligible organization.

As discussed later in the RIA, historically there has been an underutilization of preventive services, as health insurance issuers have had little incentive to cover these services. Currently, there is still an underutilization of some preventive services due to a number of barriers, including costs, ethnic/gender disparities,[40] and a general lack of knowledge by those with medical coverage.[41] While many of these factors are being addressed through the Affordable Care Act and these final regulations, the current underutilization of preventive services stems from three main factors. First, due to turnover in the health insurance market, health insurance issuers have historically lacked incentives to cover preventive services, whose benefits may only be realized in the future when an individual may no longer be enrolled with that issuer. Second, many preventive services generate benefits that do not accrue immediately to the individual that receives the services, making the individual less likely to avail themselves of the services, especially in the face of direct, immediate costs. Third, some of the benefits of preventive services accrue to society as a whole, and thus do not get factored into an individual's decision making over whether to obtain such services.

---

[40] Call, K. T., McAlpine, D. D., Garcia, C. M., Shippee, N., Beebe, T., Adeniyi, T. C., & Shippee, T. (2014). Barriers to Care in an Ethnically Diverse Publicly Insured Population. *Medical Care*.

[41] Reed, M. E., Graetz, I., Fung, V., Newhouse, J. P., & Hsu, J. (2012). In consumer-driven health plans, a majority of patients were unaware of free or low-cost preventive care. *Health Affairs*, 31(12), 2641–2648.

Exhibit 10

Case 1:25-cv-02640-DLC Document 34-2 Filed 03/28/25 Page 2 of 130

The July 2010 interim final regulations and these final regulations address these market failures through two avenues. First, the regulations require coverage of recommended preventive services by non-grandfathered group health plans and health insurance issuers in the group and individual markets, thereby overcoming plans' lack of incentive to invest in these services. Second, the regulations eliminate cost-sharing requirements, thereby removing a barrier that could otherwise lead an individual to not obtain such services, given the long-term and partially external nature of these benefits.

The August 2014 interim final regulations provided an alternate process that eligible organizations can use to provide notice of their religious objections to providing coverage for some or all of the contraceptive services to HHS, instead of providing the EBSA Form 700 to the issuers or third party administrators of their group health plan. The provisions of those interim final regulations are being finalized without any changes.

These final regulations also amend the definition of an eligible organization to include a closely held for-profit entity that has a religious objection to providing coverage for some or all of the contraceptive services otherwise required to be covered by the group health plan or student health insurance plan established, maintained, or arranged by the organization.

These final regulations are necessary in order to provide rules that plan sponsors and issuers can continue to use to determine how to provide coverage for certain recommended preventive services without the imposition of cost sharing, to ensure women's ability to receive those services, and to respect the religious beliefs of qualifying eligible organizations with respect to their objection to covering contraceptive services.

2. Summary of Impacts

In accordance with OMB Circular A–4, Table III.1 below depicts an accounting statement summarizing the Departments' assessment of the benefits, costs, and transfers associated with this regulatory action. It is expected that all non-grandfathered plans are already complying with the provisions of the July 2010 and August 2014 interim final regulations. Therefore, benefits related to those regulations have been experienced and costs have already been incurred. The Departments are providing an assessment of the impacts of existing provisions already experienced and expected in the future, in addition to the anticipated impacts of new provisions in these final regulations.

TABLE III.1—ACCOUNTING TABLE

Benefits:

Qualitative:
* Increased access to and utilization of recommended preventive services, leading to the following benefits:
  (1) Prevention and reduction in transmission of illnesses as a result of immunization and screening of transmissible diseases;
  (2) delayed onset, earlier treatment, and reduction in morbidity and mortality as a result of early detection, screening, and counseling;
  (3) increased productivity and reduced absenteeism; and
  (4) savings from lower health care costs.
* Benefits to eligible for-profit entities from not being required to facilitate access to or pay for services that contradict their owners' religious beliefs.

Costs:

Qualitative:
* New costs to the health care system when individuals increase their use of preventive services in response to the changes in coverage and cost-sharing requirements of preventive services. The magnitude of this effect on utilization depends on the price elasticity of demand and the percentage change in prices facing those with reduced cost sharing or newly gaining coverage.
* Administrative cost to eligible for-profit entities to provide self-certification to issuers or third party administrators or notice to HHS.
* Administrative cost to issuers and third party administrators for plans sponsored by eligible closely held for-profit entities to provide notice to enrollees.

Transfers:

* Costs previously paid out-of-pocket for certain preventive services are now covered by group health plans and issuers.
* Risk pooling in the group market will result in sharing expected cost increases across an entire plan or employee group as higher average premiums for all enrollee. However, not all of those covered will utilize preventive services to an equivalent extent. As a result, these final regulations create a small transfer from those paying premiums in the group market utilizing less than the average volume of preventive services in their risk pool to those whose utilization is greater than average. To the extent there is risk pooling in the individual market, a similar transfer will occur.
* Transfer of costs related to certain preventive services from eligible self-funded closely held for-profit entities to third party administrators and issuers that provide (or arrange) separate payments for contraceptive services. Third party administrators can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for its costs, and the issuer offering coverage through the FFE can receive an adjustment to the FFE user fee.

3. Estimated Number of Affected Entities

For purposes of this analysis, the Departments have defined a large group health plan as an employer plan with 100 or more workers and a small group plan as an employer plan with less than 100 workers. The Departments estimate that there are approximately 140,000 large and 2.2 million small ERISA-covered group health plans with an estimated 93.2 million participants in large group plans and 36 million participants in small group plans. The Departments estimate that there are approximately 128,000 governmental plans with 39 million participants in large plans and 2.8 million participants in small plans.[42] In 2013, approximately

---

[42] All participant counts and the estimates of individual policies are from the U.S. Department of *Continued*

12.26 million participants were covered by individual health insurance policies.[43]

Group health plans and health insurance issuers offering group and individual health insurance coverage that are not grandfathered health plans will be affected by these regulations. There are an estimated 500 issuers offering group and individual health insurance coverage.[44] The number of employer-sponsored grandfathered plans has been decreasing steadily since 2010. Thirty-seven percent of employers offering health benefits offered at least one grandfathered health plan in 2014, compared to 54 percent in 2013 and 72 percent in 2011. Therefore, more and more enrollees in employer-sponsored plans have gained access to preventive services without cost sharing. Twenty-six percent of covered workers were enrolled in a grandfathered health plan in 2014, as compared to 36 percent in 2013 and 56 percent in 2011.[45] In the individual market, it is expected that a large proportion of individual policies are not grandfathered. In addition, enrollees in qualified health plans purchased through the Marketplaces have non-grandfathered policies. At the end of the second enrollment period, nearly 11.7 million individuals selected or were automatically reenrolled into a 2015 health insurance plan through the Marketplaces.[46]

It is uncertain how many closely held for-profit entities have religious objections to providing coverage for some or all of the contraceptive services otherwise required to be covered. Based on litigation and communication received by HHS, the Departments estimate that at least 87 closely held for-profit eligible organizations will seek the religious accommodation provided in these final regulations. Health insurance issuers (or third party administrators for self-insured plans) for the group health plans established or maintained by these eligible organizations (and health insurance issuers of closely held for-profit institutions of higher education) will assume sole responsibility for providing (or arranging) separate payments for contraceptive services directly for plan participants and beneficiaries (and for student enrollees and dependents), without cost sharing, premium, fee, or other charge to plan participants or beneficiaries (or student enrollees and dependents) or to the eligible organization or its plan. In addition, based on litigation, the Departments estimate that at least 122 non-profit eligible organizations will have the option to provide notice of their religious objections to HHS, instead of providing the EBSA Form 700 to the issuer or third party administrator of their group health plan. These numbers are likely to underestimate the number of eligible organizations that will seek the accommodation. However, these are the best estimates available to the Departments at this time.

### 4. Benefits

In the July 2010 interim final regulations, the Departments anticipated several types of benefits that will result from expanding coverage and eliminating cost sharing for recommended preventive services. First, individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease. Second, healthier workers and children will be more productive with fewer missed days of work or school. Third, some of the recommended preventive services will result in savings due to lower health care costs.

As stated in the July 2010 interim final regulations, preventive service coverage is limited to those recommended by the Task Force (grade of A or B), an applicable Advisory Committee, and HRSA.[47] These final regulations can be expected to continue to increase access to and utilization of these services, which have been historically underutilized. For example, 27.7 percent of adults aged 50 to 75 have never been screened for colorectal cancer (such as sigmoidoscopy and/or colonoscopy).[48] In 2012, the median percentage of women over the age of 18 that have not had a pap test in the past 3 years was 22 percent.[49] The CDC recently found that in adults over 50, fewer than 30 percent are up-to-date with core preventive services.[50]

As explained in the July 2010 interim final regulations, numerous studies have shown that improved coverage, or reduced costs, of preventive services results in higher utilization of these services[51] leading to potentially substantial benefits. Research suggests there are significant health benefits associated with a number of newly covered preventive services required under the statute and these final regulations. The National Council on Preventive Priorities (NCPP) has estimated that achieving a utilization rate of 90 percent for eight clinical preventive services would save more than 150,000 lives each year in the U.S., including 42,000 if smokers were offered medication or other cessation assistance (Table III.2).[52] From an economic viewpoint, many preventive services offer high economic value[53] resulting in an estimated savings of $3.7 billion.[54] Even if a rate of 90 percent utilization is not achieved due to a variety of barriers, including financial, service accessibility, and socioeconomic disparities, the Departments expect that utilization will increase among those individuals in plans subject to the regulations because the provisions eliminate cost sharing and require coverage for these services. It is expected that the increased utilization

Labor, EBSA calculations using the March 2013 Current Population Survey Annual Social and Economic Supplement and the 2012 Medical Expenditure Panel Survey and the 2012 Census of Government.

[43] This estimate includes enrollment in student health insurance plans. Source: Data from Medical Loss Ratio submissions for 2013 reporting year, available at *http://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html*.

[44] Source: Data from Medical Loss Ratio submissions for 2013 reporting year.

[45] See Kaiser Family Foundation and Health Research and Education Trust, Employer Health Benefits 2014 Annual Survey (2014), available at *http://kff.org/private-insurance/report/2014-employer-health-benefits-survey/*; and Employer Health Benefits 2011 Annual Survey (2011) available at *http://kff.org/health-costs/report/employer-health-benefits-annual-survey-archives/*.

[46] This estimate represents the number of individuals who have selected, or been automatically reenrolled into a 2015 plan through the Marketplaces, with or without payment of premium. See ASPE, Health Insurance Marketplaces 2015 Open Enrollment Period: March Enrollment Report, available at *http://aspe.hhs.gov/health/reports/2015/MarketPlaceEnrollment/Mar2015/ib_2015mar_enrollment.pdf*.

[47] See *http://www.ahrq.gov/research/findings/final-reports/uspstf/uspstfeval.pdf* for details of the Task Force grading and *http://www.uspreventiveservicestaskforce.org/Page/Name/uspstf-a-and-b-recommendations/* for current recommendations.

[48] CDC. Vital Signs: colorectal cancer screening test use—United States. 2012. MMWR 2013;62:881–888.

[49] Behavioral Risk Factor Surveillance System Numbers (2012), *http://apps.nccd.cdc.gov/BRFSS/page.asp?cat=CC&yr=2012&state=All#CC*.

[50] CDC Focuses on Need For Older Adults To Receive Clinical Preventive Services, brief released by CDC (2012). *http://www.cdc.gov/aging/pdf/cps-clinical-preventive-services.pdf*.

[51] See e.g., Meeker D, Joyce GF, Malkin I, et al. Coverage and preventive screening. Health Serv Res. 2011; 46:173–184. Study found that patients responded to the exclusion of preventive services from deductibles and reducing cost sharing resulted in increased utilization of lipid screening, pap smears, and other services. See e.g., Jill Bernstein, Deborah Chollet, and G. Gregory Peterson. Encouraging Appropriate Use of Preventive Health Services, Issue Brief Mathematica Policy Research Inc., Princeton, NJ (May 2010) Number 2.

[52] National Commission on Prevention Priorities. *Preventive Care: A National Profile on Use, Disparities, and Health Benefits.* Partnership for Prevention. August 2007. *http://www.prevent.org/data/files/initiatives/ncpppreventivecarereport.pdf*.

[53] Woolf, Steven. A Closer Look at the Economic Argument for Disease Prevention. *JAMA* 2009; 301(5):536–538.

[54] Maciosek, Michael V., Coffield, Ashley B., Flottemesch, et al., Use of Preventive Services In U.S. Health Care Could Save Lives At Little Or No Cost. *Health Affairs* 2010, 29(9) 1656–1660.

Exhibit 10

of these services will lead providers to increase their use of these services knowing that they will be covered without cost sharing.

### TABLE III.2—LIVES SAVED FROM INCREASING UTILIZATION OF SELECTED PREVENTIVE SERVICES

| Preventive service | Population group | Percent utilization (2005) | Lives saved annually if 90 percent utilization |
|---|---|---|---|
| Regular aspirin use | Men 40+/Women 50+ | 40 | 45,000 |
| Smoking cessation (medication and advice) | All adult smokers | 28 | 42,000 |
| Colorectal cancer screening | Adults 50+ | 48 | 14,000 |
| Influenza vaccination | Adults 50+ | 37 | 12,000 |
| Cervical cancer screening (in past 3 years) | Women 18–64 | 83 | 620 |
| Cholesterol screening | Men 35+/Women 45+ | 79 | 2,450 |
| Breast cancer screening (in past 2 years) | Women 40+ | 67 | 3,700 |
| Chlamydia screening | Women 16–25 | 40 | 30,000 |

**Source:** National Commission on Prevention Priorities, 2007.

Studies comparing the utilization of preventive services among adults show utilization rates range from as high as 89 percent for blood pressure checks to only 40 percent for annual flu vaccinations.[55] Under the Affordable Care Act, there have been significantly higher usage rates of several preventive services in young adults and women, including blood pressure tests, cholesterol screening, and contraceptive services.[56] Numerous studies have shown that improved coverage, or reduced costs, of preventive services results in higher utilization of these services [57] leading to potentially substantial benefits. The Departments expect that utilization of preventive services will continue to increase over time among those individuals in plans affected by these regulations because the provisions eliminate cost sharing and require coverage for these services.

Some recommended preventive services have both individual and public health value. Vaccines have reduced or eliminated serious diseases that, prior to vaccination, routinely caused serious illnesses or deaths.

Maintaining high levels of immunization in the general population protects the un-immunized from exposure so that individuals who cannot receive, or who do not have a sufficient immune response to the vaccine, are indirectly protected.[58]

A second type of benefit of these final regulations is improved workplace productivity and decreased absenteeism for school children. A study by Gallup has found that among workers working at least 30 hours a week, those considered overweight or obese with one or more chronic condition will miss one to 3.5 days of work a month.[59] With an estimated 450 million days lost to absenteeism, the cost of lost productivity due to personal health or the inability to concentrate due to their own or a family member's illness is estimated to be between $153 and $260 billion annually.[60]

Illness and poorly controlled chronic disease also contribute to increased absenteeism among school children. Recent data indicates that in the 2011–2012 academic year, 6.2 percent of children aged 6 through 17 missed 11 or more days of school.[61] Studies have shown that student health and well-

being have been positively linked to students' academic outcomes, including attendance, grades, test scores, and high school graduation.[62] As discussed in the July 2010 interim final rules, studies show that reduced cost sharing and increased access to care can improve productivity in both schools and the labor market. Thus, it is expected that these final regulations can have a substantial benefit to the children in the nation's education system and the labor market, both current and future.

A third type of benefit from some preventive services is cost savings. Increasing the provision of preventive services is expected to reduce the incidence or severity of illness, and, as a result, reduce expenditures on treatment of illness. As discussed in the July 2010 interim final regulations and elsewhere,[63] childhood vaccinations have been found to generate considerable benefit and savings to both individuals and society. Employing a decision analysis cohort model of U.S. children born during 1994–2013, researchers at CDC analyzed the economic impact of DTaP (diphtheria and tetanus toxoids and acellular Pertussis), Hib (Haemophilus influenza type b), Polio (OPV then IPV), MMR (measles, mumps and rubella), Hepatitis B, varicella, pneumococcal disease (PCV, 7-valent and 13-valent), and rotavirus vaccines in children aged ≤6

[55] The Commonwealth Fund. "Current Trends in Health Coverage and the Effects of Implementing the Affordable Care Act" (2013). http://www.commonwealthfund.org/~/media/files/publications/fund-report/2013/apr/1681_collins_insuring_future_biennial_survey_2012_final.pdf.

[56] See. e.g., Lau JS, Adams SH, Park MJ, Boscardin WJ, Irwin CE. Improvement in preventive care of young adults after the affordable care act: the affordable care act is helping. JAMA Pediatr. 2014; 168(12):1101–1106. See e.g., Sonfield, A., Tapales, A., Jones RK., Finer, LB. Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update. Contraception. 2015: 91(1): 44–48.

[57] See e.g., Meeker D, Joyce GF, Malkin J, et al. Coverage and preventive screening. Health Serv Res. 2011; 46:173–184. Study found exclusion of deductibles from, and reduced cost sharing of preventive services resulted in increased utilization of lipid screening, pap smears, and other services. See e.g., Jill Bernstein, Deborah Chollet, and G. Gregory Peterson, Issue Brief Mathematica Policy Inc., Princeton, NJ (May 2010) Number 2.

[58] See Modern Infectious Disease Epidemiology by Johan Giesecke 1994. Chapter 18, The Epidemiology of Vaccination.

[59] Unhealthy U.S. Workers' Absenteeism Costs $153 Billion. Well-Being. Gallop October 17, 2011 at http://www.gallup.com/poll/150026/Unhealthy-Workers-Absenteeism-Costs-153-Billion.aspx.

[60] Ibid, see e.g. Health and Productivity Among U.S. Workers, Karen Davis, Ph.D., Sara R. Collins. Ph.D., Michelle M. Doty, Ph.D., Alice Ho, and Alyssa L. Holmgren, The Commonwealth Fund, August 2005. http://www.commonwealthfund.org/publications/issue-briefs/2005/aug/health-and-productivity-among-u-s-workers.

[61] Children Who Missed 11 or More Days of School per Year Due to Illness or Injury, Kids Count Data Center at http://datacenter.kidscount.org/data/tables/5202-children-who-missed-11-or-more-days-of-school-per-year-due-to-illness-or-injury?loc=1&loct=2#detailed/1/any/false/1021,18,14/691,30,18/11683.

[62] Vaughn, B., Princiotta, D., Barry, M., Fish, H., & Schmitz, H. (2013). Safe Supportive Living Brief: Schools and The Affordable Care Act. https://safesupportivelearning.ed.gov/sites/default/files/1953_Schools%20Affordable%20Care%20Brief_d3%20lvr.pdf.

[63] See e.g. Maciosek, Michael V., Coffield, Ashley B., Flottemesch, et al., Use of Preventive Services In U.S. Health Care Could Save Lives At Little Or No Cost. Health Affairs 2010 29(9) 1656–1660. See eg. Zhou F, Santoli J, Messonnier ML, et al. Economic Evaluation of the 7-Vaccine Routine Childhood Immunization Schedule in the United States, 2001. Arch Pediatr Adolesc Med. 2005; 159(12):1136–1144.

Exhibit 10　　　　　JA605　　　　　JA-0000203

years. The study estimates that among the 78.6 million children born during this period, these routine immunizations will prevent 322 million illnesses and 21 million hospitalizations, averting 732,000 premature deaths over their lifetime. Furthermore, it was estimated that these routine vaccinations will potentially avert $402 billion in direct costs and $1.5 trillion in societal costs and a net savings of $295 billion and $1.38 trillion for payers and society, respectively (in 2013 dollars).[64]

As with immunizations, other preventive services have been estimated to have cost-savings benefits. As discussed in the July 2010 interim final regulations, aspirin use with high risk adults and tobacco cessation and screening can both yield net savings. For example, in Massachusetts, the availability of tobacco cessation treatments combined with promotional campaigns resulted in a ten percent decline in Medicaid enrolled smokers, a $3.12 savings for every dollar spent on the benefit.[65] As discussed in more detail in the July 2010 interim final regulations, another area where prevention can achieve savings is obesity prevention and reduction. Based on recent guidelines, up to 116.1 million American adults are candidates for both pharmaceutical and behavioral treatments for weight loss, and up to 32 million are eligible for bariatric surgery.[66] According to the CDC, from 2011–2012, 16.9 percent of children 2 through 19 years of age and 34.9 percent of adults aged 20 and over were obese (defined as having a body mass index (BMI) greater than or equal to the age and sex-specific 95th percentiles of the 200 CDC growth charts).[67] One study used the number of obese and overweight twelve-year olds in 2005 to simulate a cohort over their lifetimes, indicating that a sustained one-percentage-point decrease in the prevalence of obesity over the lifetime of this cohort would result in an estimated savings of $260.4 million in total medical expenditures.[68] These

final regulations are expected to increase the take-up rate of preventative services counseling for obesity and other conditions among patients, and lead physicians to increase appropriate referrals for such services. The effect of these final regulations is expected to be magnified due to the numerous public and private sector initiatives dedicated to combating the obesity epidemic and smoking cessation.

Eligible closely held for-profit entities that seek the accommodation to exclude coverage for contraceptive services from health coverage offered to their employees and students, and eligible organizations that opt to provide notice to HHS, will benefit from not being required to facilitate access to or pay for coverage that are contrary to their owners' religious beliefs. Women enrolled in plans under this accommodation will have continued access to contraceptive services without cost sharing.

5. Costs and Transfers

The changes in how plans and issuers continue to cover the recommended preventive services resulting from these final regulations will result in changes in covered benefits and premiums for individuals in plans and health insurance coverage subject to these final regulations. New costs to the health system result when individuals increase their use of preventive services in response to the changes in coverage of those services. Cost sharing, including coinsurance, deductibles, and copayments, divides the costs of health services between the plan or issuer and the enrollees. The removal of cost sharing increases the quantity of services demanded by lowering the direct cost of the service to consumers. Therefore, the Departments expect that the statute and these final regulations will continue to increase utilization of the covered preventive services. The magnitude of this effect on utilization depends on the price elasticity of demand.

Several studies have found that individuals are sensitive to prices for health services.[69] CDC researchers who studied out-of pocket costs of

immunizations for privately insured children up to age 5 (in families in Georgia in 2003) found that a one percent increase in out-of-pocket costs for routine immunizations (DTaP, IPV, MMR, Hib, and Hep B) was associated with a 0.07 percent decrease in utilization.[70]

Eligible closely held for-profit entities that seek the accommodation for contraceptive services will incur administrative costs to provide self-certifications to issuers or third party administrators or notices to HHS. Issuers and third party administrators for health plans sponsored by these eligible organizations will also incur administrative costs to provide notifications to enrollees. The costs related to these information collection requirements are estimated in section D below.

Along with new costs of induced utilization, there are transfers associated with these final regulations. A transfer is a change in who pays for the services, where there is not an actual change in the level of resources used. For example, costs that were previously paid out-of-pocket for certain preventive services will now be covered by plans and issuers under these final regulations. Such a transfer of costs could be expected to lead to an increase in premiums.

In the July 2010 interim final regulations, the Departments analyzed the impact of eliminating cost sharing, increases in services covered, and induced utilization on the average insurance premium using a model to evaluate private health insurance plans against a nationally representative population. In the July 2010 interim final regulations, the Departments analyzed Medical Expenditure Panel Survey (MEPS) data and determined the average person with employer-sponsored insurance (ESI) would have $264 in covered preventive service expenses, of which $240 would be paid by insurance and $24 paid out-of-pocket.[71] When preventive services are covered with zero copayment, the Departments estimated the average preventive benefit (holding utilization constant) would increase by $24, or a 0.6 percent increase in insurance benefits and premiums for plans that have relinquished their grandfather

[64] Whitney, CG., Zhou, F., Singleton, J., Schuchat, A. Benefits from Immunization During the Vaccines of Children Program Era—United States, 1994–2013. MMWR 2014;63(16):352–355.

[65] McAfee, T., Babb, S., McNabb. S., Fiore, MC. *N Engl J Med* 2015; 372:5–7.

[66] Stevens. J., Oakkar, EE., Cui, Z., Cai. J., Truesdale, KP. US adults recommended for weight reduction by 1998 and 2013 obesity guidelines, NHANES 2007–2012. 2015 *Obesity* 23(3) 527–531.

[67] Ogden CL, Carroll MD, Kit BK, Flegal KM. Prevalence of Childhood and Adult Obesity in the United States, 2011–2012. *JAMA*. 2014; 311(8):806–814.

[68] Trasande. L., 2010, How Much Should We Invest in Preventing Childhood Obesity? Health Affairs, 29, no. 3:372–378.

[69] Liu, S., and Chollet, D., Price and Income Elasticity of the Demand for Health Insurance and Health Care Services: A Critical Review of the Literature, *Mathematica Policy Research Inc.,* (March 2006) *http://www.mathematica-mpr.com/~/media/publications/PDFs/priceincome.pdf. See e.g.,* Ringel, JS., Hosek, SD., Vollaard, BA., and S. Mahnovski (2002), The elasticity of demand for health care; A review of the literature and its application to the military health system, National Defense Research Institute, RAND Health. *http://www.rand.org/content/dam/rand/pubs/monograph_reports/2005/MR1355.pdf.*

[70] *See e.g.,* Noelle-Angelique Molinari et al., "Out-of-Pocket Costs of Childhood Immunizations: A Comparison by Type of Insurance Plan," Pediatrics, 120(5) pp. e1148–e1156 (2007).

[71] The model does not distinguish between recommended and non-recommended preventive services, and so this likely represents an overestimate of the insurance benefits for preventive services.

Exhibit 10                                                    JA606                                                    JA-0000204

status. Furthermore, in the July 2010 interim final regulations, the Departments estimated that additional coverage for genetic screening, depression screening, lead testing, autism testing, and oral health screening would result in a total average increase in insurance benefits on these services to be 0.12 percent, or just over $4 per insured person. This increase represented a mixture of new costs and transfers, dependent on whether beneficiaries previously purchased these services on their own. Impacts were expected to vary depending on baseline benefit levels, and grandfathered health plans were not expected to experience any impact from those interim final regulations.

As discussed in the July 2010 interim final regulations, the Departments used the standard actuarial "induction formula" $1/(1+\text{alpha}*P)$, where alpha is the "induction parameter" and P is the average fraction of the cost of services paid by consumers to estimate behavioral changes to estimate the induced demand for preventive services.[72] Removing cost sharing for preventive services lowers the direct cost to consumers of using preventive services, which induces additional utilization, estimated with the model above to increase covered expenses and benefits by approximately $17, or 0.44 percent in insurance benefits in group health plans. A similar, but larger, effect was anticipated in the individual market because individual health insurance policies generally had less generous benefits for preventive services than group health plans.

When eligible closely held for-profit entities seek the accommodation, health insurance issuers (or third party administrators for self-insured plans) for the group health plans established or maintained by the eligible organizations (and health insurance issuers of student health plans arranged by eligible organizations that are institutions of higher education) will assume sole responsibility for providing (or arranging) separate payments for contraceptive services directly for plan participants and beneficiaries (or student enrollees and dependents), without cost sharing, premium, fee, or other charge to plan participants or beneficiaries (or student enrollees and dependents) or to the eligible organization or its plan. The Departments continue to believe that issuers will find that providing

contraceptive coverage is at least cost neutral because they will be insuring the same set of individuals under both the group or student health insurance policies for whom they will also be making the separate payments for contraceptive services and, as a result, will experience lower costs from improvements in women's health, healthier timing and spacing of pregnancies, and fewer unplanned pregnancies. Several studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health.[73] A third party administrator can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for its costs (including an allowance for administrative costs and margin). The issuer offering coverage through the FFE can receive an adjustment to the FFE user fee, and the issuer is expected to pass on a portion of that adjustment to the third party administrator to account for the costs of providing or arranging payments for contraceptive services.

## B. Regulatory Alternatives

Several provisions in these final regulations involved policy choices. One was whether to allow a plan or issuer to impose cost sharing for an office visit when a recommended preventive service is provided in that visit. Sometimes a recommended preventive service is billed separately from the office visit; sometimes it is not. The Departments decided that the cost-sharing prohibition of these final regulations applies to the specific preventive service as recommended by the guidelines. Therefore, if the preventive service is billed separately (or is tracked as individual encounter data separately) from the office visit, it is the preventive service that has cost sharing waived, not the entire office visit.

A second policy choice was, if the preventive service is not billed

separately (or is not tracked as individual encounter data separately) from the office visit, whether these final regulations should prohibit cost sharing for any office visit in which any recommended preventive service was administered, or whether cost sharing should be prohibited only when the preventive service is the primary purpose of the office visit. Prohibiting cost sharing for office visits when any recommended preventive service is provided, regardless of the primary purpose of the visit, could lead to an overly broad application of these final regulations; for example, a person who sees a specialist for a particular condition could end up with a zero copayment simply because his or her blood pressure was taken as part of the office visit. This could create financial incentives for consumers to request preventive services at office visits that are intended for other purposes in order to avoid copayments and deductibles. The increased prevalence of the application of zero cost sharing would lead to increased premiums compared with the chosen option, without a meaningful additional gain in access to preventive services.

A third issue involves health plans that have differential cost sharing for services provided by in-network vs. out-of-network providers. These final regulations provide that a plan or issuer generally is not required to provide coverage for recommended preventive services delivered by an out-of-network provider. The plan or issuer generally may also impose cost sharing for recommended preventive services delivered by an out-of-network provider. However, if the plan or issuer does not have in its network a provider who can provide the recommended preventive service, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service. The Departments considered that requiring coverage by out-of-network providers with no cost sharing would result in higher premiums. Plans and issuers negotiate allowed charges with in-network providers as a way to promote effective, efficient health care, and allowing differences in cost sharing in- and out-of-network enables plans to encourage use of in-network providers. Allowing zero cost sharing for out-of-network providers could reduce providers' incentives to participate in insurer networks. The Departments decided that permitting cost sharing for recommended preventive services provided by out-of-network providers

---

[72] Standard formula best described in "Quantity-Price Relationships in Health Insurance", Charles L Trowbridge, Chief Actuary, Social Security Administration (DHEW Publication No. (SSA) 73–11507, November 1972).

[73] Bertko, J., Glied, S., et al. The Cost of Covering Contraceptives Through Health Insurance (February 9, 2012), http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml; Washington Business Group on Health, Promoting Healthy Pregnancies: Counseling and Contraception as the First Step, Report of a Consultation with Business and Health Leader (September 20, 2000), Campbell, K.P., Investing in Maternal and Child Health: An Employer's Toolkit, National Business Group on Health (2007) http://www.businessgrouphealth.org/healthtopics/maternalchild/investing/docs/mch toolkit.pdf; Trussell, J., et al. The Economic Value of Contraception: A Comparison of 15 Methods, American Journal Public Health, 1995: 85(4):494–503, Revenues of H.R. 3162, the Children's Health and Medicare Protection Act, for the Rules Committee (August 1, 2007).

Exhibit 10　　　JA607　　　JA-0000205

(except in cases where the recommended service is only available from an out-of-network provider) is the appropriate option to preserve a choice of providers for individuals, while avoiding potentially larger increases in costs and transfers as well as potentially lower quality care.

As discussed previously in the preamble, the Departments also considered different ways to define a closely held for-profit entity. Under one approach, a qualifying closely held for-profit entity would have been defined as a for-profit entity where none of the ownership interests in the entity is publicly traded and where the entity has fewer than a specified number of shareholders or owners.

Under the second approach, a qualifying closely held for-profit entity would have been defined as a for-profit entity in which the ownership interests are not publicly traded, and in which a specified fraction of the ownership interest is concentrated in a limited and specified number of owners. Within the second approach, the Departments considered adopting the IRS test to define a closely held corporation. The definition adopted in these final rules, although based on the IRS test, is more flexible and ensures that it does not exclude some entities that should be considered to be closely held for the purposes of these final regulations.

Under a third approach, the Departments considered a test under which none of the ownership interests in the entity is publicly traded, without any other restrictions on the number of owners or on ownership concentration. The Departments believe, however, that such a test would be excessively broad.

### C. Special Analyses—Department of Treasury

For purposes of the Department of the Treasury, it has been determined that this rule is not a significant regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this rule. Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that this rule will not have a significant economic impact on a substantial number of small entities. This certification is based on the fact that the regulations merely modify the definition of eligible organization to include certain closely held for-profit entities. This modification, as adopted, will not increase costs to or burdens on the affected organizations. Pursuant to

section 7805(f) of the Code, the proposed rule preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business and no comments were received.

### D. Paperwork Reduction Act—Department of Health and Human Services

These final regulations contain information collection requirements that are subject to review by OMB. A description of these provisions is given in the following paragraphs with an estimate of the annual burden. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

1. Wage Estimates

To derive average costs, we used data from the U.S. Bureau of Labor Statistics' May 2014 National Occupational Employment and Wage Estimates for all salary estimates (*http://www.bls.gov/oes/current/oes_nat.htm*).

2. Information Collection Requirements (ICRs)

a. ICRs Regarding Self-Certification (§ 147.131(b)(3))

All eligible organizations will have the option of either providing a self-certification (EBSA Form 700) to the issuers or third party administrators of the plans that would otherwise arrange for or provide coverage for the contraceptive services, or providing a notice to HHS. For the purpose of estimating burdens, HHS is assigning the burden of the self-certification to eligible for-profit entities and the burden of notice to HHS to eligible non-profit organizations.

The July 2013 final regulations require an eligible organization that seeks an accommodation to self-certify that it meets the definition of an eligible organization using the EBSA Form 700 and provide it directly to each third party administrator or issuer of the plan that would otherwise arrange for or provide coverage for the contraceptive

services. These final regulations continue to allow eligible organizations to use EBSA Form 700 to notify their third party administrators and issuers, as set forth in the July 2013 final regulations and guidance.

The Departments received comments that HHS underestimated the number of closely held for-profit eligible organizations that may seek the accommodation. Some commenters noted that it would be difficult to estimate this number. One commenter estimated that about 1.3 million S-corporations offer health insurance to their employees and, based on this data, objection rates of 1 percent of S-corporations would result in 13,000 objecting firms, an objection rate of 2 percent would result in 26,000 objecting firms and an objection rate of 5 percent would result in 65,000 objecting firms. However, the Departments have no indication that such large numbers of closely held for-profit entities would seek the accommodation. The Departments also note that the definition of a qualifying closely held for-profit entity adopted in these final regulations differs from the definition of an S-corporation. In the proposed rules, based on the number of plaintiffs that are for-profit employers in recent litigation objecting on religious grounds to the provision of contraceptive services, HHS estimated that 71 closely held for-profit entities would seek the accommodation. In the final regulations, based on updated information, HHS is revising the estimate to 87. Even though this may underestimate the number of eligible closely held for-profit entities that will seek the accommodation, this is the best estimate available to the Departments at this time.

For each eligible organization, it is assumed that clerical staff will gather and enter the necessary information, send the self-certification to the issuer(s) or third party administrator(s) or the notice to HHS, and retain a copy for recordkeeping. A manager and legal counsel will subsequently review the information, and a senior executive will execute it. It is estimated that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per hour, 10 minutes for a manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127 per hour, and 5 minutes for a senior executive at a cost of $121 per hour) to execute the self-certification. Therefore, the total one-time burden for preparing and providing the information in the self-certification is estimated to be approximately $53 for each eligible organization. The certification may be electronically transmitted to the issuer

Exhibit 10                                  JA608                                  JA-0000206

or third party administrator at minimal cost or mailed. For purposes of this analysis, HHS assumes that all notices will be mailed. It is estimated that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.54.

Based on this estimate of 87 affected entities and the individual burden estimates of 50 minutes and a cost of $53, we estimate the total hour burden to be 72.5 hours with an equivalent cost of $4,611. The total paper filing cost burden for the notices is approximately $47. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 36.25 burden hours at an equivalent cost of approximately $2,306 and a paper filing cost burden of approximately $23, with approximately 44 respondents.

b. ICRs Regarding Notice to HHS (§ 147.131(b)(3))

These final regulations provide an organization seeking to be treated as an eligible organization under the August 2014 interim final regulations an alternative process, consistent with the Supreme Court's interim order in *Wheaton College*, under which an eligible organization may notify HHS of its religious objection to coverage of all or a subset of contraceptive services. The eligible organization must maintain the notice to HHS in its records. The burden related to this alternate notice is currently approved under OMB Control Number 0938–1248.

Based on litigation, HHS believes that at least 122 eligible non-profit organizations will have the option to provide the alternative notice to HHS rather than their third party administrators or issuers. Even though this likely underestimates the number of eligible non-profit organizations that will seek the accommodation, this is the best estimate available to the Departments at this time. In order to complete this task, HHS assumes that clerical staff for each eligible organization will gather and enter the necessary information and send the notice. HHS assumes that a compensation and benefits manager and inside legal counsel will review the notice and a senior executive will execute it. HHS estimates that an eligible organization will spend approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per

hour, 10 minutes for a compensation and benefits manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127 per hour, and 5 minutes by a senior executive at a cost of $121 per hour) preparing and sending the notice and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $53 for a total hour burden of 102 hours with an equivalent cost of $6,425. As HHS and DOL share jurisdiction, they are splitting the hour burden so each will account for 51 burden hours with an equivalent cost of $3,213, with a total of 61 respondents.

Notices to HHS may be sent electronically at minimal cost or by mail. For purposes of this analysis, HHS assumes that all notices will be mailed. It is estimated that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) with a total postage and materials cost for each notice sent via mail of $0.54. The total cost burden for the notices is approximately $66. As DOL and HHS share jurisdiction, they are splitting the cost burden so each will account for $33 of the cost burden.

c. Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(d))

As required by the July 2013 final regulations, a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries in insured plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers may, but are not required to, use the model language set forth in the July 2013 final

regulations or substantially similar language.

As mentioned, HHS is anticipating that at least 122 non-profit and 87 closely held for-profit entities will seek an accommodation. It is unknown how many issuers or third party administrators provide health insurance coverage or services in connection with health plans of eligible organizations, but HHS will assume at least 209. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $30 per hour) and 15 minutes of management review (at $102 per hour) to prepare the notices. The total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an equivalent cost of approximately $56. The total burden for all issuers or third party administrators will be 261.25 hours, with an equivalent cost of $11,600. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 130.63 burden hours with an equivalent cost of $5,800, with approximately 105 respondents.

d. Letter to HHS Regarding Ownership Structure (§ 147.131(b)(4)(v))

To assist potentially eligible for-profit entities seeking further information regarding whether they qualify for the accommodation, an entity may send a letter describing its ownership structure to HHS at *accommodation@cms. hhs.gov*. However, an entity is not required to avail itself of this process in order to qualify as a closely held for-profit entity.

As stated earlier in the preamble, the Departments believe that the definition adopted in these regulations includes the for-profit entities that are likely to have religious objections to providing contraceptive coverage. In addition, it appears based on available information that the definition adopted in these final regulations includes all of the for-profit entities that have, as of the date of issuance of these regulations, challenged the contraceptive coverage requirement in court. Therefore, the Departments anticipate that fewer than 10 entities will submit a letter to HHS. Under 5 CFR 1320.3(c)(4), this provision is not subject to the PRA as it will affect fewer than 10 entities in a 12-month period.

3. Summary of Proposed Annual Burden Estimates

Exhibit 10

JA609

JA-0000207

TABLE III.3—ANNUAL RECORDKEEPING AND REPORTING REQUIREMENTS

| Regulation section(s) | OMB Control No. | Respondents | Total responses | Burden per response (hours) | Total annual burden (hours) | Burden cost per respondent ($) | Total labor cost of reporting ($) | Total capital/ maintenance costs ($) | Total cost ($) |
|---|---|---|---|---|---|---|---|---|---|
| Self-Certification (§ 147.131(b)(3)). | New ......... | 44 | 44 | 0.83 | 36.25 | $53 | $2,306 | $23 | $2,329 |
| Notice to HHS (§ 147.131(b)(3)). | 0938–1248 | 61 | 61 | 0.83 | 51 | 53 | 3,213 | 33 | 3,246 |
| Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(d)). | New ......... | 105 | 105 | 1.25 | 130.63 | 56 | 5,800 | 0 | 5,800 |
| Total ..................... | ................. | 210 | 210 | ................. | 217.88 | ................. | $11,319 | $56 | $11,375 |

4. Submission of PRA-Related Comments

We have submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

*E. Paperwork Reduction Act—Department of Labor*

In accordance with the requirements of the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)), the Department submitted an information collection request (ICR) to OMB in accordance with 44 U.S.C. 3507(d), contemporaneously with the publication of the interim final regulation, for OMB's review under the emergency PRA procedures.[74] OMB approved the ICR on August 27, 2014 under OMB Control Number 1210–0150 through February 28, 2015. Contemporaneously with the publication of the emergency ICR, the Department published a separate **Federal Register** notice informing the public that it intends to expose OMB to extend the approval for 3 years and soliciting comments on the ICR.[75] The Department submitted the extension request to OMB on February 27, 2015. OMB approved the ICR extension on April 14, 2015, which currently is scheduled to expire on April 30, 2018.

The Department also submitted an ICR to OMB in accordance with 44 U.S.C. 3507(d), for the ICR contained in the August 2014 proposed regulations contemporaneously with the publication of the proposal that solicited public comments on the ICR. OMB filed a comment regarding the proposed ICR on October 16, 2014, stating that it was not approving the ICR

associated with the proposed rule at the proposed rule stage and requesting the Department to resubmit the ICR at the final rule stage after taking into account public comments. OMB assigned OMB Control Number 1210–0152 to the proposed ICR.

Although no public comments were received in response to the ICRs contained in the August 2014 interim final and proposed regulations that specifically addressed the paperwork burden analysis of the information collections, the comments that were submitted, and which are described earlier in this preamble, contained information relevant to the costs and administrative burdens attendant to the proposals. The Department took into account the public comments in connection with making changes to the proposal, analyzing the economic impact of the proposals, and developing the revised paperwork burden analysis summarized below.

In connection with publication of this final rule, the Department submitted ICRs to OMB as a revision to OMB Control Number 1210–0150 for eligible non-profit organizations and under new OMB Control Number 1210–0152 for eligible for-profit organizations and received OMB approval for both ICRs.

A copy of the ICRs may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N–5718, Washington, DC 20210. Telephone: 202–693–8410; Fax: 202–219–4745. These are not toll-free numbers.

1. ICRs Regarding Self-Certification (29 CFR 2590.2713A(b) or (c))

Under these final regulations, all eligible organizations will have the option of either providing (1) a self-certification (EBSA Form 700) to the issuers or third party administrators of the plans that would otherwise arrange for or provide coverage for the contraceptive services or (2) a notice to HHS. For the purpose of estimating burdens, the Department is assigning the burden of the self-certification to eligible for-profit entities and the burden of notice to HHS to eligible non-profit organizations.

The July 2013 final regulations require an eligible organization that seeks an accommodation to self-certify that it meets the definition of an eligible organization using the EBSA Form 700 and provide it directly to each third party administrator or issuer of the plan that would otherwise arrange for or provide coverage for the contraceptive services. These final regulations continue to allow eligible organizations to use EBSA Form 700 to notify their third party administrators and issuers, as set forth in the July 2013 final regulations and guidance.

In response to the public comment solicitation for the ICRs in the August 2014 proposed regulations, the Departments received comments that they underestimated the number of closely held for-profit eligible organizations that may seek the accommodation. Some commenters noted that it would be difficult to estimate this number. One commenter estimated that about 1.3 million S-corporations offer health insurance to their employees and, based on this data, objection rates of 1 percent of S-corporations would result in 13,000 objecting firms, an objection rate of 2 percent would result in 26,000 objecting firms and an objection rate of 5 percent

---

[74] 5 CFR 1320.13.
[75] 79 FR 51197 (Aug. 27, 2014).

Exhibit 10

JA-0000208

would result in 65,000 objecting firms. However, the Departments have no indication that such large numbers of closely held for-profit entities would seek the accommodation. The Departments also note that the definition of a qualifying closely held for-profit entity adopted in these final regulations differs from the definition of an S-corporation. In the proposed rules, based on the number of plaintiffs that are for-profit employers in recent litigation objecting on religious grounds to the provision of contraceptive services, the Departments estimated that 71 closely held for-profit entities would seek the accommodation. In these final regulations, based on updated information, the Departments are revising the estimate to 87. Even though this may underestimate of the number of eligible closely held for-profit entities that will seek the accommodation, this is the best estimate available to the Departments at this time.

For each eligible organization, the Departments assume that clerical staff will gather and enter the necessary information, send the self-certification to its issuer(s) or third party administrator(s) or the notice to HHS, and retain a copy for recordkeeping. A manager and legal counsel will subsequently review the information, and a senior executive will execute it. It is estimated that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per hour,[76] 10 minutes for a manager at a cost of $102 per hour,[77] 5 minutes for legal counsel at a cost of $127 per hour.[78] and 5 minutes for a senior executive at a cost of $121 per hour [79]) to execute the self-certification. Therefore, the Departments estimate that the total one-time burden for preparing and providing the information in the self-certification is estimated to be approximately $53 for each eligible organization. The certification may be electronically transmitted to the issuer or third party administrator at minimal cost or mailed. For purposes of this analysis, the Departments assume that

all notices will be mailed. The Departments estimate that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.54.

Based on this estimate of 87 affected entities and the individual burden estimates of 50 minutes and a cost of $53, the Departments estimate the total hour burden associated with the ICR to be 72.5 hours with an equivalent cost of $4,611. The total paper filing cost burden for the notices is approximately $47. The hour burden associated with the ICR is allocated equally between DOL and HHS, because the agencies share jurisdiction of preventive health services resulting in an hour burden for each agency of 36.25 burden hours at an equivalent cost of approximately $2,306 and a paper filing cost burden of approximately $23, with approximately 44 respondents.

**2. ICRs Regarding Notice to HHS (29 CFR 2590.2713A(b) or (c))**

These final regulations provide an organization seeking to be treated as an eligible organization under the August 2014 interim final regulations with an alternative process, consistent with the Supreme Court's interim order in *Wheaton College*, under which an eligible organization may notify HHS of its religious objection to coverage of all or a subset of contraceptive services. The eligible organization must maintain the notice to HHS in its records. The burden related to this alternate notice is currently approved under OMB Control Number 1210–0150.

Based on litigation, the Departments estimate that at least 122 eligible non-profit organizations will have the option to provide the alternative notice to HHS rather than their third party administrators or issuers. Even though this may underestimate the number of eligible non-profit organizations that will seek the accommodation, it is the best estimate available to the Departments at this time. In order to complete this task, the Departments assume that clerical staff for each eligible organization will gather and enter the necessary information and send the notice. The Departments assume that a compensation and benefits manager and inside legal counsel will review the notice and a senior executive will execute it. The Departments estimate that an eligible organization will spend approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per hour, 10 minutes for a compensation and benefits manager at a cost of $102 per hour, 5 minutes for

legal counsel at a cost of $127 per hour, and 5 minutes by a senior executive at a cost of $121 per hour) preparing and sending the notice and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $53 for a total hour burden of 102 hours with an equivalent cost of $6,425. As HHS and DOL share jurisdiction, they are splitting the hour burden so each will account for 51 burden hours with an equivalent cost of $3,213, with a total of 61 respondents.

Notices to HHS may be sent electronically at minimal cost or by mail. For purposes of this analysis, the Departments assume that all notices will be mailed. It is estimated that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) with a total postage and materials cost for each notice sent via mail of $0.54. The total cost burden for the notices is approximately $66. As DOL and HHS share jurisdiction, they are sharing the cost burden equally and each is attributed $33 of the cost burden.

**3. Notice of Availability of Separate Payments for Contraceptive Services (29 CFR 2590.2713A(d))**

As required by the July 2013 final regulations, a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries (or student enrollees and covered dependents) in insured plans of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers may, but are not required to, use the model language set forth in the July 2013 final regulations or substantially similar language.

As mentioned, the Departments anticipate that at least 122 non-profit and 87 closely held for-profit entities will seek an accommodation. It is unknown how many issuers or third party administrators provide health

---

[76] Secretaries, Except Legal, Medical, and Executive (43–6014): $16.13(2012 BLS Wage rate)/ 0.670(ECEC ratio) *1.2(Overhead Load Factor) *1.019(Inflation rate) – 2(Inflated 2 years from base year) = $29.60

[77] Compensation and Benefits Manager (11–3041): $50.92(2012 BLS Wage rate)/0.697(ECEC ratio) *1.35(Overhead Load Factor) *1.019(Inflation rate) – 2(Inflated 2 years from base year) = $102.41

[78] Legal Professional (23–1011): $62.93(2012 BLS Wage rate)/0.697(ECEC ratio) *1.35(Overhead Load Factor) *1.019(Inflation rate) – 2(Inflated 2 years from base year) = $126.56

[79] Financial Managers (11–3031): $59.26(2012 BLS Wage rate)/0.689(ECEC ratio) *1.35(Overhead Load Factor) *1.019(Inflation rate) – 2(Inflated 2 years from base year) = $120.57

Exhibit 10                    JA611                    JA-0000209

insurance coverage or services in connection with health plans of eligible organizations, but that for the purposes of the analysis, the Departments assume at least 209 do. The Departments assume that each issuer or third party administrator will need approximately one hour of clerical labor (at $30 per hour) and 15 minutes of management review (at $102 per hour) to prepare the notices. Therefore, the Departments estimate that the total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an equivalent cost of approximately $56. The total burden for all issuers or third party administrators will be 261.25 hours, with an equivalent cost of $11,600. The cost burden associated with this ICR is allocated equally between DOL and HHS, because the agencies share jurisdiction under the provision. Therefore, the hour burden for each is 130.63 burden hours with an equivalent cost of $5,800 for approximately 105 respondents.

### 4. Letter to HHS Regarding Ownership Structure (29 CFR 2590.2713A(a)(4)(v))

To assist potentially eligible for-profit entities seeking further information regarding whether they qualify for the accommodation, an entity may send a letter describing its ownership structure to HHS at *accommodation@ cms.hhs.gov.* However, an entity is not required to avail itself of this process in order to qualify as a closely held for-profit entity.

As stated earlier in the preamble, the Departments believe that the definition adopted in these regulations includes the for-profit entities that are likely to have religious objections to providing contraceptive coverage. In addition, it appears based on available information that the definition adopted in these final regulations includes all of the for-profit entities that have, as of the date of issuance of these regulations, challenged the contraceptive coverage requirement in court. Therefore, the Departments anticipate that fewer than 10 entities will submit a letter to HHS. Under 5 CFR 1320.3(c)(4), this provision is not subject to the PRA as it will affect fewer than 10 entities in a 12-month period.

### F. Regulatory Flexibility Act— Department of Labor and Department of Health and Human Services

The Regulatory Flexibility Act (RFA) requires agencies that issue a rule to analyze options for regulatory relief of small businesses if a rule has a significant impact on a substantial number of small entities. The RFA generally defines a "small entity" as—

(1) a proprietary firm meeting the size standards of the Small Business Administration (SBA), (2) a non-profit organization that is not dominant in its field, or (3) a small government jurisdiction with a population of less than 50,000 (states and individuals are not included in the definition of "small entity"). The Departments use as their measure of significant economic impact on a substantial number of small entities a change in revenues of more than 3 percent to 5 percent.

As discussed in the Web Portal interim final rule with comment period published on May 5, 2010 (75 FR 24481), HHS examined the health insurance industry in depth in the Regulatory Impact Analysis we prepared for the proposed rule on establishment of the Medicare Advantage program (69 FR 46866, August 3, 2004). In that analysis it was determined that there were few, if any, insurance firms underwriting comprehensive health insurance policies (in contrast, for example, to travel insurance policies or dental discount policies) that fell below the size thresholds for "small" business established by the SBA (currently $38.5 million in annual receipts for health insurance issuers).[80] In addition, analysis of data from Medical Loss Ratio annual report submissions for the 2013 reporting year was used to develop an estimate of the number of small entities that offer comprehensive major medical coverage. It is estimated that 141 out of 500 issuers of health insurance coverage nationwide had total premium revenue of $38.5 million or less. This estimate may overstate the actual number of small health insurance companies that would be affected, since 77 percent of these small companies belong to larger holding groups, and many if not all of these small companies are likely to have non-health lines of business that would result in their revenues exceeding $38.5 million. For these reasons, the Departments expect that these final regulations will not affect a significant number of small issuers.

The provisions of these final regulations affect small employers with self-insured group health plans by requiring them to include coverage under their group health plans for recommended preventive services without cost sharing. However, small employers also benefit from having healthier employees and reduced absenteeism. Small employers are less likely to be self-insured compared to

large employers: only about 13.3 percent of employers with less than 100 employees that offer a group health plan have a self-funded plan.[81]

With respect to contraceptive coverage, some eligible organizations that seek the accommodation may be small entities and will incur costs to provide the self-certification to issuers or third party administrators or notice to HHS. However, the related administrative costs are expected to be minimal.

Third party administrators for self-insured group health plans established or maintained by eligible organizations will incur administrative costs to send notices to enrollees and arrange for separate payments for contraceptive services. It is unknown how many third party administrators impacted by this requirement have revenues below the size thresholds for "small" business established by the SBA (currently $32.5 million for third party administrators). However, a third party administrator can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for the third party administrator's costs.

### G. Federalism Statement—Department of Labor and Department of Health and Human Services

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on the states, the relationship between the national government and states, or on the distribution of power and responsibilities among the various levels of government. In the Departments' view, these final regulations have federalism implications, but the federalism implications are substantially mitigated because, with respect to health insurance issuers, 45 states are either enforcing the requirements related to coverage of specified preventive services (including contraception) without cost sharing pursuant to state law or otherwise are working collaboratively with HHS to ensure that issuers meet these standards. In five states, HHS ensures that issuers comply with these requirements. Therefore, the final regulations are not likely to require substantial additional oversight of states by HHS.

---

[80] "Table of Small Business Size Standards Matched To North American Industry Classification System Codes," effective July 14, 2014, U.S. Small Business Administration, available at *http:// www.sba.gov.*

[81] Source: Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends. 2013 Medical Expenditure Panel Survey-Insurance Component.

Exhibit 10　　　　　JA612　　　　　JA-0000210

In general, section 514 of ERISA provides that state laws are superseded to the extent that they relate to any covered employee benefit plan, and preserves state laws that regulate insurance, banking, or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements on group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with certain group health plans (or student health insurance issuers) provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent than the federal requirement are unlikely to "prevent the application of" the preventive services coverage provision, and therefore are unlikely to be preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904) and December 30, 2004 (69 FR 78720), and these final regulations implement the preventive services coverage provision's minimum standards and do not significantly reduce the discretion given to states under the statutory scheme.

The PHS Act provides that states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state to address the state's concerns and avoid conflicts with the state's exercise of its authority. HHS has developed procedures to implement its enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement

that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states, the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion, throughout the process of developing these final regulations, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health insurance coverage and health insurance issuers, and the rights of individuals intended to be protected in the PHS Act, ERISA, and the Code.

*H. Unfunded Mandates Reform Act*

Section 202 of the Unfunded Mandates Reform Act (UMRA) of 1995 requires that agencies assess anticipated costs and benefits before issuing any final rule that includes a Federal mandate that could result in expenditure in any one year by state, local or tribal governments, in the aggregate, or by the private sector, of $100 million in 1995 dollars, updated annually for inflation. In 2015, that threshold level is approximately $144 million.

UMRA does not address the total cost of a regulatory action. Rather, it focuses on certain categories of cost, mainly those "Federal mandate" costs resulting from—(1) imposing enforceable duties on state, local, or tribal governments, or on the private sector; or (2) increasing the stringency of conditions in, or decreasing the funding of, state, local, or tribal governments under entitlement programs. These final regulations include no mandates on state, local, or tribal governments. Health insurance issuers, third party administrators and eligible organizations would incur costs to comply with the provisions of these final regulations. However, consistent with policy embodied in UMRA, these final regulations have been designed to be the least burdensome alternative while achieving the objectives of the Affordable Care Act.

*I. Congressional Review Act*

These final rules are subject to the Congressional Review Act provisions of the Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801 *et seq.*), which specifies that before a rule can take effect, the federal agency promulgating the rule shall submit to each House of the Congress and to the Comptroller General a report containing a copy of the rule along with other specified information, and have

been transmitted to Congress and the Comptroller General for review.

**IV. Statutory Authority**

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg-63, 300gg-91, and 300gg-92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

**List of Subjects**

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2510*

Employee benefit plans, Pensions.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

Exhibit 10

JA613

JA-0000211

Approved: July 8, 2015.

John Dalrymple.

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Approved: July 8, 2015.

Mark J. Mazur.

*Assistant Secretary of the Treasury (Tax Policy).*

Signed this 7th day of May 2015.

Phyllis C. Borzi.

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: May 7, 2015.

Andrew M. Slavitt.

*Acting Administrator, Centers for Medicare & Medicaid Services.*

Approved: May 20, 2015.

Sylvia M. Burwell.

*Secretary, Department of Health and Human Services.*

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

### 26 CFR Chapter I

Accordingly, 26 CFR part 54 is amended as follows:

### PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

* * * * *

Section 54.9815–2713 also issued under 26 U.S.C. 9833;

■ **Par. 2.** Section 54.9815–2713 is amended by adding paragraphs (a)(1)(i), (ii), and (iii), and revising paragraphs (a)(2), (3), (4), and (5), (b), and (c) to read as follows:

### § 54.9815–2713 Coverage of preventive health services.

(a) * * *

(1) * * *

(i) Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii) Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been adopted by the Director of the Centers

for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii) With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

* * * * *

(2) *Office visits*—(i) If an item or service described in paragraph (a)(1) of this section is billed separately (or is tracked as individual encounter data separately) from an office visit, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(ii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of such an item or service, then a plan or issuer may not impose cost-sharing requirements with respect to the office visit.

(iii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of such an item or service, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(iv) The rules of this paragraph (a)(2) are illustrated by the following examples:

*Example 1.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider. While visiting the provider, the individual is screened for cholesterol abnormalities, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit and for the laboratory work of the cholesterol screening test.

(ii) *Conclusion.* In this *Example 1*, the plan may not impose any cost-sharing requirements with respect to the separately-billed laboratory work of the cholesterol screening test. Because the office visit is billed separately from the cholesterol screening test, the plan may impose cost-sharing requirements for the office visit.

*Example 2.* (i) *Facts.* Same facts as *Example 1* of this section. As the result of the screening, the individual is diagnosed with hyperlipidemia and is prescribed a course of treatment that is not included in the recommendations under paragraph (a)(1) of this section.

(ii) *Conclusion.* In this *Example 2*, because the treatment is not included in the

recommendations under paragraph (a)(1) of this section, the plan is not prohibited from imposing cost-sharing requirements with respect to the treatment.

*Example 3.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider to discuss recurring abdominal pain. During the visit, the individual has a blood pressure screening, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 3*, the blood pressure screening is provided as part of an office visit for which the primary purpose was not to deliver items or services described in paragraph (a)(1) of this section. Therefore, the plan may impose a cost-sharing requirement for the office visit charge.

*Example 4.* (i) *Facts.* A child covered by a group health plan visits an in-network pediatrician to receive an annual physical exam described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. During the office visit, the child receives additional items and services that are not described in the comprehensive guidelines supported by the Health Resources and Services Administration, nor otherwise described in paragraph (a)(1) of this section. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 4*, the service was not billed as a separate charge and was billed as part of an office visit. Moreover, the primary purpose for the visit was to deliver items and services described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. Therefore, the plan may not impose a cost-sharing requirement with respect to the office visit.

(3) *Out-of-network providers.* (i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost-sharing with respect to the item or service.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency,

Exhibit 10     JA614     JA-0000212

method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the relevant recommendation or guideline. To the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant clinical evidence base and established reasonable medical management techniques to determine the frequency, method, treatment, or setting for coverage of a recommended preventive health service.

(5) *Services not described.* Nothing in this section prohibits a plan or issuer from providing coverage for items and services in addition to those recommended by the United States Preventive Services Task Force or the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention, or provided for by guidelines supported by the Health Resources and Services Administration, or from denying coverage for items and services that are not recommended by that task force or that advisory committee, or under those guidelines. A plan or issuer may impose cost-sharing requirements for a treatment not described in paragraph (a)(1) of this section, even if the treatment results from an item or service described in paragraph (a)(1) of this section.

(b) *Timing*—(1) *In general.* A plan or issuer must provide coverage pursuant to paragraph (a)(1) of this section for plan years that begin on or after September 23, 2010, or, if later, for plan years that begin on or after the date that is one year after the date the recommendation or guideline is issued.

(2) *Changes in recommendations or guidelines.* (i) A plan or issuer that is required to provide coverage for any items and services specified in any recommendation or guideline described in paragraph (a)(1) of this section on the first day of a plan year must provide coverage through the last day of the plan year, even if the recommendation or guideline changes or is no longer described in paragraph (a)(1) of this section, during the plan year.

(ii) Notwithstanding paragraph (b)(2)(i) of this section, to the extent a recommendation or guideline described in paragraph (a)(1)(i) of this section that was in effect on the first day of a plan year is downgraded to a "D" rating, or any item or service associated with any recommendation or guideline specified in paragraph (a)(1) of this section is subject to a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate the item or service during a plan year, there is no requirement under this section to cover these items and services through the last day of the plan year.

(c) *Recommendations not current.* For purposes of paragraph (a)(1)(i) of this section, and for purposes of any other provision of law, recommendations of the United States Preventive Services Task Force regarding breast cancer screening, mammography, and prevention issued in or around November 2009 are not considered to be current.

■ *Par. 3.* Section 54.9815–2713A is amended by revising paragraphs (a), (b), (c)(1), and (c)(2)(i) introductory text to read as follows:

### § 54.9815–2713A  Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owner's sincerely held religious beliefs.

(3) The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) A closely held for-profit entity is an entity that—

(i) Is not a nonprofit entity;

(ii) Has no publicly traded ownership interests, (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

(iii) Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv) For the purpose of the calculation in paragraph (a)(4)(iii) of this section, the following rules apply:

(A) Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries. Ownership interests owned by a nonprofit entity are considered owned by a single owner.

(B) An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

(C) If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

(v) A for-profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services. An entity must submit the letter in the manner described by the Department of Health and Human Services. If the entity does not receive a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (a)(4)(iii) of this section.

(b) *Contraceptive coverage—self-insured group health plans.* (1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

Exhibit 10                                    JA615                                    JA-0000213

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(c) * * *

(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815–2713. An issuer may not require any further documentation from the eligible organization regarding its status as such.

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and

the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) * * *

(i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 54.9815–2713(a)(1)(iv) must—

* * * * *

### § 54.9815–2713AT [REMOVED]

■ Par. 4. Section 54.9815–2713AT is removed.

### § 54.9815–2713T [REMOVED]

■ Par. 5. Section 54.9815–2713T is removed.

## DEPARTMENT OF LABOR

## Employee Benefits Security Administration

For the reasons stated in the preamble, under the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012)

the Department of Labor adopts as final the interim rules amending 29 CFR part 2590 published on July 19, 2010 (75 FR 41726) and amending 29 CFR parts 2510 and 2590 published August 27, 2014 (79 FR 51092) and further amends 29 CFR part 2590 as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 6. The authority citation for part 2590 continues to read as follows:

   **Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 12(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 7. Section 2590.715–2713 is amended by revising paragraphs (a)(3) and (4) and (b)(2) to read as follows:

### § 2590.715–2713   Coverage of preventive health services

   (a) * * *

   (3) *Out-of-network providers*—(i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

   (ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service.

   (4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the relevant recommendation or guideline. To the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant clinical evidence base and established reasonable medical management techniques to determine the frequency,

method, treatment, or setting for coverage of a recommended preventive health service.

   *     *     *     *     *

   (b) * * *

   (2) *Changes in recommendations or guidelines.* (i) A plan or issuer that is required to provide coverage for any items and services specified in any recommendation or guideline described in paragraph (a)(1) of this section on the first day of a plan year must provide coverage through the last day of the plan year, even if the recommendation or guideline changes or is no longer described in paragraph (a)(1) of this section, during the plan year.

   (ii) Notwithstanding paragraph (b)(2)(i) of this section, to the extent a recommendation or guideline described in paragraph (a)(1)(i) of this section that was in effect on the first day of a plan year is downgraded to a ''D'' rating, or any item or service associated with any recommendation or guideline specified in paragraph (a)(1) of this section is subject to a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate the item or service during a plan year, there is no requirement under this section to cover these items and services through the last day of the plan year.

   *     *     *     *     *

■ 8. Section 2590.715–2713A is amended by revising paragraph (a) to read as follows:

### § 2590.715–2713A   Accommodations in connection with coverage of preventive health services.

   (a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (3) of this section.

   (1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 2590.715–2713(a)(1)(iv) on account of religious objections.

   (2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

   (ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of

the contraceptive services on account of the owners' sincerely held religious beliefs.

   (3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

   (4) A closely held for-profit entity is an entity that—

   (i) Is not a nonprofit entity;

   (ii) Has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

   (iii) Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

   (iv) For the purpose of the calculation in paragraph (a)(4)(iii) of this section, the following rules apply:

   (A) Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries. Ownership interests owned by a nonprofit entity are considered owned by a single owner.

   (B) An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

   (C) If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

   (v) A for-profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services. An entity must submit the letter in the manner described by the Department of Health and Human Services. If the entity does not receive

Exhibit 10                     JA617                     JA-0000215

a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (a)(4)(iii) of this section.

\* \* \* \* \*

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

For the reasons stated in the preamble, under the authority contained in Secs. 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92, as amended), the Department of Health and Human Services adopts as final the interim rules amending 45 CFR part 147 published on July 19, 2010 (75 FR 41726) and amending 45 CFR part 147 published August 27, 2014 (79 FR 51092) and further amends 45 CFR part 147 as follows:

**PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS**

■ 9. The authority citation for part 147 continues to read as follows:

**Authority:** Secs. 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 10. Section 147.130 is amended by revising paragraphs (a)(3) and (4) and (b)(2) to read as follows:

**§ 147.130  Coverage of preventive health services**

(a) \* \* \*

(3) *Out-of-network providers*—(i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost

sharing with respect to the item or service.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the relevant recommendation or guideline. To the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant clinical evidence base and established reasonable medical management techniques to determine the frequency, method, treatment, or setting for coverage of a recommended preventive health service.

\* \* \* \* \*

(b) \* \* \*

(2) *Changes in recommendations or guidelines.* (i) A plan or issuer that is required to provide coverage for any items and services described in any recommendation or guideline described in paragraph (a)(1) of this section on the first day of a plan year (in the individual market, policy year) must provide coverage through the last day of the plan or policy year, even if the recommendation or guideline changes or is no longer described in paragraph (a)(1) of this section, during the plan or policy year.

(ii) Notwithstanding paragraph (b)(2)(i) of this section, to the extent a recommendation or guideline described in paragraph (a)(1)(i) of this section that was in effect on the first day of a plan year (in the individual market, policy year) is downgraded to a ''D'' rating, or any item or service associated with any recommendation or guideline specified in paragraph (a)(1) of this section is subject to a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate the item or service during a plan or policy year, there is no requirement under this section to cover these items and services through the last day of the plan or policy year.

\* \* \* \* \*

■ 11. Section 147.131 is amended by revising paragraphs (b) and (f) to read as follows:

**§ 147.131  Exemption and accommodations in connection with coverage of preventive health services.**

\* \* \* \* \*

(b) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraphs (b)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of

any contraceptive items or services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs.

(3) The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Department of Health and Human Services as described in paragraph (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) A closely held for-profit entity is an entity that—

(i) Is not a nonprofit entity;

(ii) Has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

(iii) Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv) For the purpose of the calculation in paragraph (b)(4)(iii) of this section, the following rules apply:

(A) Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries. Ownership interests owned by a nonprofit entity are considered owned by a single owner.

Exhibit 10　　　　　　　　　　JA618　　　　　　　　　　JA-0000216

(B) An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. Family includes only brothers and sisters (including half-brothers and half-sisters). a spouse, ancestors, and lineal descendants.

(C) If a person holds an option to purchase ownership interests. he or she is considered to be the owner of those ownership interests.

(v) A for-profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services. An entity must submit the letter in the manner described by the Department of Health and Human Services. If the entity does not receive a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days. as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (b)(4)(iii) of this section.

\*    \*    \*    \*    \*

(f) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education as defined in 20 U.S.C. 1002 in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.

[FR Doc. 2015–17076 Filed 7–10–15; 11:15 am]

**BILLING CODE 6325–64–P; 4150–28–P; 4120–01–P**

Exhibit 10                                    JA619                                    JA-0000217

certified that the collection of information contained in this notice of proposed rulemaking will not have a significant impact on a substantial number of small entities. Accordingly, a regulatory flexibility analysis is not required. The temporary regulations will not result in any additional costs to affected entities but will provide an alternative means for eligible organizations to provide notice of their religious objection to all, or a subset of, contraceptive services. For this reason, the information collection requirement will not impose a significant impact on a substantial number of small entities. For further information and for analyses relating to the joint rulemaking, see the preamble to the joint rulemaking. Pursuant to section 7805(f) of the Internal Revenue Code, this regulation has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

**Comments and Requests for a Public Hearing**

Before these proposed regulations are adopted as final regulations, consideration will be given to any written comments (a signed original and eight (8) copies) or electronic comments that are submitted timely to the IRS. Comments are specifically requested on the clarity of the proposed regulations and how they may be made easier to understand. All comments will be available for public inspection and copying. A public hearing may be scheduled if requested in writing by a person that timely submits written comments. If a public hearing is scheduled, notice of the date, time, and place for the hearing will be published in the **Federal Register**.

**Drafting Information**

The principal author of these proposed regulations is Karen Levin, Office of the Division Counsel/Associate Chief Counsel (Tax Exempt and Government Entities), IRS. The proposed regulations, as well as the temporary regulations, have been developed in coordination with personnel from the U.S. Department of Labor and the U.S. Department of Health and Human Services.

**List of Subjects in 26 CFR Part 54**

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 54 is proposed to be amended as follows:

**PART 54—PENSION EXCISE TAXES**

■ **Paragraph 1.** The authority citation for part 54 continues to read, in part, as follows:

Authority: 26 U.S.C. 7805 * * *

■ **Par. 2.** Section 54.9815–2713A is revised to read as follows:

**§ 54.9815–2713A   Accommodations in connection with coverage of preventive health services.**

[The text of proposed § 54.9815–2713A is the same as the text of § 54.9815–2713AT published elsewhere in this issue of the **Federal Register**].

John Dalrymple,
*Deputy Commissioner for Services and Enforcement.*

[FR Doc. 2014–20256 Filed 8–22–14; 3:30 pm]
**BILLING CODE 4830–01–P**

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

[REG 129786–14]

RIN 1545–BM39

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

RIN 1210–AB67

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

[CMS–9940–P]

RIN 0938–AS50

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Proposed rules.

**SUMMARY:** This document proposes a change to the definition of an eligible organization that can avail itself of an accommodation with respect to coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code.

Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. Among these services are women's preventive health services, as specified in guidelines supported by the Health Resources and Services Administration (HRSA). As authorized by the current regulations, and consistent with the HRSA Guidelines, group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the otherwise applicable requirement to cover certain contraceptive services. Additionally. under current regulations, accommodations are available with respect to the contraceptive coverage requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), and student health insurance coverage arranged by eligible organizations that are institutions of higher education. that effectively exempt them from this requirement. The regulations establish a mechanism for separately furnishing payments for contraceptive services on behalf of participants and beneficiaries of the group health plans of eligible organizations that avail themselves of an accommodation, and enrollees and dependents of student health insurance coverage arranged by eligible organizations that are institutions of higher education that avail themselves of an accommodation.

These rules propose and seek comments on potential changes to the definition of "eligible organization" in the Departments' regulations in light of the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), to ensure that participants and beneficiaries in group health plans (and enrollees and dependents in student health insurance coverage arranged by institutions of higher education) obtain, without additional cost. coverage of the full range of Food and Drug Administration (FDA) approved contraceptive services, as prescribed by a health care provider, while respecting certain closely held for-profit entities' religion-based objections to contraceptive coverage. These proposed rules also seek comments on any additional steps the

Exhibit 11

JA-0000218

government should take to help ensure coverage of the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing, for participants and beneficiaries in group health plans of such entities (and enrollees and dependents in student health insurance coverage arranged by such entities that are institutions of higher education).

**DATES:** To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on October 21, 2014.

**ADDRESSES:** In commenting, please refer to file code CMS–9940–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on these regulations to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9940–P, P.O. Box 8010, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9940–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier) your written comments ONLY to any of the following addresses prior to the close of the comment period:

a. For delivery in Washington, DC—

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of

filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD—

Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Comments erroneously mailed to an address indicated as appropriate for hand or courier delivery may be delayed and received after the close of the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** David Mlawsky, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

*Inspection of Public Comments:* All comments received before the close of the comment period will be available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http://www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244. Monday

through Friday of each week from 8:30 a.m. to 4 p.m. To schedule an appointment to view public comments, phone 1–800–743–3951.

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing, including under paragraph (a)(4), benefits for certain women's preventive health services as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). On August 1, 2011, HRSA adopted and released guidelines for women's preventive health services (HRSA Guidelines) based on recommendations of the independent Institute of Medicine. As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptives, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1] Except as discussed later in this section, non-grandfathered group health plans

---

[1] The HRSA Guidelines for Women's Preventive Services do not include services relating to a man's reproductive capacity, such as vasectomies and condoms.

Exhibit 11

JA621

JA-0000219

and health insurance coverage are required to provide coverage consistent with the HRSA Guidelines, without cost sharing, for plan years (or, in the individual market, policy years) beginning on or after August 1, 2012.[2]

Interim final regulations implementing 2713 of the PHS Act were published on July 19, 2010 (75 FR 41726) (2010 interim final regulations). On August 1, 2011, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) amended the 2010 interim final regulations to provide HRSA with authority to exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines (76 FR 46621) (2011 amended interim final regulations).[3] On the same date, HRSA exercised this authority in the HRSA Guidelines to exempt group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) from the HRSA Guidelines with respect to contraceptive services.[4] The 2011 amended interim final regulations specified that, for purposes of this exemption, a religious employer was one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. Final regulations issued on February 10, 2012, adopted the definition of religious employer in the 2011 amended interim final

regulations without modification (2012 final regulations).[5]

Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans).[6] The guidance provided that the temporary enforcement safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013. At the same time, the Departments committed to rulemaking to achieve the goals of providing coverage of recommended preventive services, including contraceptive services, without cost sharing, while simultaneously ensuring that certain additional nonprofit organizations with religious objections to contraceptive coverage would not have to contract, arrange, pay, or refer for such coverage.

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described and solicited comments on possible approaches to achieve these goals (77 FR 16501).

On February 6, 2013, following review of the comments on the ANPRM, the Departments published proposed regulations at 78 FR 8456 (proposed regulations). The regulations proposed to simplify and clarify the definition of "religious employer" for purposes of the religious employer exemption. The regulations also proposed accommodations for group health plans established or maintained or arranged

by certain nonprofit religious organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans). These organizations were referred to as "eligible organizations."

The regulations proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would be required to assume sole responsibility for providing contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The Departments proposed a comparable accommodation with respect to student health insurance coverage arranged by eligible organizations that are institutions of higher education.

In the case of a self-insured group health plan established or maintained by an eligible organization, the proposed regulations presented potential approaches under which the third party administrator of the plan would provide or arrange for a third party to provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. An issuer (or its affiliate) would be able to offset the costs incurred by the third party administrator and the issuer in the course of arranging and providing such coverage by claiming an adjustment in the Federally-facilitated Exchange (FFE) user fee.

The Departments received over 400,000 comments (many of them standardized form letters) in response to the proposed regulations. After consideration of the comments, the Departments published final regulations on July 2, 2013 at 78 FR 39870 (July 2013 final regulations). The July 2013 final regulations simplified and clarified the definition of religious employer for purposes of the religious employer exemption and established accommodations for health coverage established or maintained or arranged by eligible organizations. A contemporaneously re-issued HHS guidance document extended the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance included a form

---

[2] Interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[3] The 2011 amended interim final regulations were issued and effective on August 1, 2011, and published in the **Federal Register** on August 3, 2011 (76 FR 46621).

[4] HRSA subsequently amended the HRSA Guidelines to reflect the simplified definition of "religious employer" contained in the July 2013 final regulations. 78 FR 39870 (July 2, 2013) (discussed below), effective August 1, 2013.

[5] The 2012 final regulations were published in the **Federal Register** on February 15, 2012 (77 FR 8725).

[6] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code (originally issued on February 10, 2012, and reissued on August 15, 2012 and June 28, 2013). *available at: http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf.* The guidance clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. *See* "Student Health Insurance Coverage," 77 FR16457 (Mar. 21, 2012).

Exhibit 11                    JA622                    JA-0000220

to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary enforcement safe harbor. In addition, HHS and the Department of Labor (DOL) issued a self-certification form, EBSA Form 700, to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under the July 2013 final regulations. This self-certification form was provided for use with the accommodation under the July 2013 final regulations, after the expiration of the temporary enforcement safe harbor (that is, for plan years beginning on or after January 1, 2014).

On June 30, 2014, the Supreme Court ruled in the case of *Burwell v. Hobby Lobby Stores, Inc.* that, under the Religious Freedom Restoration Act of 1993 (RFRA), the requirement to provide contraceptive coverage could not be applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage, and because the Government's goal of guaranteeing coverage for contraceptive methods without cost sharing could be achieved in a less restrictive manner by offering such closely held for-profit entities the accommodation the Government already provided to religious nonprofit organizations with religious objections to contraceptive coverage. After describing this accommodation, the Court concluded that the accommodation "does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS' stated interests equally well."

On July 3, 2014, the Supreme Court issued an interim order in connection with an application for an injunction pending appeal in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014) (the *Wheaton* order), in which Wheaton College challenged under RFRA the requirement in the July 2013 final regulations that an eligible organization invoking the accommodation send EBSA Form 700 to the insurance issuer or third party administrator. The Court's order stated that, "[i]f [Wheaton College] informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the [Departments of Labor, Health and Human Services, and the Treasury] are enjoined from enforcing against [Wheaton College]" certain provisions of the Affordable Care Act and related regulations requiring coverage without cost sharing of certain

contraceptive services "pending final disposition of appellate review." 134 S. Ct. at 2807. The order stated that Wheaton College need not use EBSA Form 700 or send a copy of the executed form to its health insurance issuers or third party administrators to meet the condition for this injunctive relief. Id. The Court also stated that its interim order neither affected "the ability of [Wheaton College's] employees and students to obtain, without cost, the full range of FDA approved contraceptives," nor precluded the Government from relying on the notice by Wheaton College "to facilitate the provision of full contraceptive coverage under the Act." Id. The Court's order further stated that it "should not be construed as an expression of the Court's views on the merits" of Wheaton College's challenge to the accommodations. Id.

This notice of proposed rulemaking proposes and invites comments on changes to the definition of an eligible organization in the Departments' regulations in light of the Supreme Court's decision in *Hobby Lobby*. It also solicits comments on any other steps the Government should take to help ensure that participants and beneficiaries in group health plans or enrollees and dependents in student health insurance coverage arranged by institutions of higher education are able to obtain, without cost, the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing, if enrolled in a group health plan or insurance coverage sponsored or arranged by a closely held for-profit entity that objects on religious grounds to covering contraceptive services. Given the importance of this coverage, initiating this proposed rulemaking now allows for public input and a pathway toward helping to ensure access to contraceptive coverage.

The Departments are publishing contemporaneously with this notice of proposed rulemaking interim final regulations in light of the Supreme Court's interim order in connection with the application for an injunction in the pending case of *Wheaton College v. Burwell*. The interim final regulations are published elsewhere in this edition of the **Federal Register**.

## II. Provisions of the Proposed Regulations

As stated above, on June 30, 2014, the Supreme Court ruled in *Burwell v. Hobby Lobby Stores, Inc.* that, under RFRA, the requirement to provide contraceptive coverage could not be applied to certain closely held for-profit organizations. The individual plaintiffs in *Hobby Lobby* and the associated case

*Conestoga Wood Specialties Corp. v. Burwell* run closely held businesses that are family-owned and operated and that have adopted statements of mission or purpose to conduct the companies' affairs in accordance with the owners' shared religious beliefs and values. See 134 S. Ct. at 2764–2766.

In light of the Court's decision in *Hobby Lobby*, the Departments propose to amend the definition of an eligible organization under the July 2013 final regulations to include a closely held for-profit entity that has a religious objection to providing coverage for some or all of the contraceptive services otherwise required to be covered. Under these proposed rules, a qualifying closely held for-profit entity that has a religious objection to providing coverage for some or all of the contraceptive services otherwise required to be covered would not be required to contract, arrange, pay or refer for contraceptive coverage; instead, payments for contraceptive services provided to participants and beneficiaries in the eligible organization's plan would be provided separately by an issuer (if the qualifying entity sponsors an insured group health plan, or if the qualifying entity is an institution of higher education that arranges student health insurance coverage) or arranged separately by a third party administrator (if the qualifying entity is self-insured), consistent with the July 2013 final regulations as amended by interim final regulations published in this same edition of the **Federal Register**. This proposed change would extend to participants and beneficiaries in group health plans established or maintained by certain closely held for-profit entities with religious objections to contraceptive coverage, and to enrollees and dependents enrolled in student health insurance coverage arranged by certain closely held for-profit entities that are institutions of higher education with religious objections to contraceptive coverage, the same, separate payments for contraceptive services provided to participants and beneficiaries of group health plans (and enrollees and dependents in student health insurance) established or maintained by certain nonprofit religious entities with such objections, while similarly respecting the religious objections of the closely held for-profit entities.

### Defining a Closely Held For-Profit Entity

In considering inclusion of certain closely held for-profit entities among the eligible organizations that may avail themselves of the accommodations, the

Exhibit 11　　　　　　　　　　　　　　　　　JA623　　　　　　　　　　　　　　　　JA-0000221

Departments are considering and seek comment on how to define a qualifying closely held for-profit entity. In *Hobby Lobby,* the Supreme Court noted that the companies at issue in the cases were not publicly traded and were owned and controlled by members of a single family and that the companies were operated in accordance with the owners' shared religious beliefs and values. 134 S. Ct. at 2764–2766.

In light of the Supreme Court's decision, the Departments are proposing for comment two possible approaches to defining a qualifying closely held for-profit entity, although the Departments invite comments on other approaches as well. In common understanding, a closely held corporation—a term often used interchangeably with a "close" or "closed" corporation—is a corporation the stock of which is owned by a small number of persons and for which no active trading market exists. See, for example, American Law Institute, Principles of Corporate Governances section 1.06; Black's Law Dictionary (9th ed. 2009) ("close corporation"): Del. Code Tit. 8, Ch.1, Sub. Ch. 14 ("close corporation"). The examples below are by way of illustration, and the maximum number of shareholders specified in particular examples would not necessarily be borrowed as the standard in this context.

Under the first proposed approach, a qualifying closely held for-profit entity would be an entity where none of the ownership interests in the entity is publicly traded and where the entity has fewer than a specified number of shareholders or owners.

There is precedent in other areas of federal law for limiting the definition of closely held entities in this context to those with a relatively small number of owners. For example, subchapter S treatment under section 1361 of the Code is currently limited to corporations with 100 or fewer shareholders who are generally individuals and has in the past been limited to corporations with 10 or fewer shareholders. Similarly, certain favorable estate tax treatment is limited to businesses with 45 or fewer partners or shareholders under section 6166 of the Code.

Under a second, alternative approach, a qualifying closely held entity would be a for-profit entity in which the ownership interests are not publicly traded, and in which a specified fraction of the ownership interest is concentrated in a limited and specified number of owners. This approach also has precedent in federal law. For example, certain rules governing the taxation of real estate investment trusts,

passive activity losses, and certain income from foreign entities are limited to organizations that are more than 50 percent owned by or for not more than five individuals. See, for example, sections 856(h), 542(a)(2), and 469(j)(1) of the Code and regulations under these sections.

These approaches might serve to identify for-profit entities controlled and operated by individual owners who likely have associational ties, are personally identified with the entity, and can be regarded as conducting personal business affairs through the entity. These appear to be the types of entities the Court sought to accommodate in *Hobby Lobby.* There may also be useful definitions or principles in state laws governing close corporations, or other areas of law.

The Departments invite comments on the appropriate scope of the definition of a qualifying closely held for-profit entity, including but not limited to whether a closely held for-profit entity should be defined with reference to a maximum number of owners (and, if so, what that maximum number should be) or a minimum concentration of ownership (and if so, what that concentration should be) or with reference to additional or other criteria.

It would be helpful for comments to address how the selection of a particular approach can be informed by the purposes of the Affordable Care Act and the contraceptive coverage requirement; the range of business structures in the Nation's economy; background principles of federal and state law applicable to business entities and the relationship of the entities' owners to the entities; other related or analogous areas of the law; experience regarding accommodations of religion and religious beliefs in various contexts and the rationales for the scope and operation of such accommodations: *Hobby Lobby* and other court decisions that shed light on these issues; and any other relevant matters.

### Religious Objection To Providing Coverage for Some or All of the Contraceptive Services Required To Be Covered.

In *Hobby Lobby,* the Supreme Court held that the closely held for-profit corporations at issue in that case could opt not to provide otherwise required contraceptive coverage if doing so runs counter to their owners' sincerely held religious beliefs. These proposed regulations would require that the qualifying closely held for-profit entity's objection, based on its owners' sincerely held religious beliefs, to covering some or all of the contraceptive services

otherwise required to be covered, be made in accordance with the entity's applicable rules of governance. As discussed by the Court in *Hobby Lobby,* state corporate law dictates how a corporation may establish its governing structure.[7]

Under the Departments' proposal, valid corporate action (or similar action by a business that is not organized as a corporation) taken in accordance with the entity's governing structure in accordance with state law, stating its owners' religious objection to providing some or all contraceptive coverage otherwise required to be covered, can serve to establish that a closely held for-profit entity has religious objections to providing such coverage. In determining whether a closely held for-profit entity's decision-making process followed the necessary rules and procedures, the laws of the state in which the entity is incorporated, or, for non-corporate entities, organized, would govern. The Departments invite comments on whether to require documentation of the decision-making process and disclosure of the decision.

The Departments seek comment on this approach to determining that a closely held for-profit entity opposes providing coverage for some or all of the contraceptive services otherwise required to be covered on account of the owners' religious objections.

### Other Potential Changes

The Departments seek comment on other potential changes to the July 2013 final regulations in light of the proposed change to the definition of eligible organization. In particular, the Departments seek comment on applying the approach set forth in the July 2013 final regulations in the context of the expanded definition of eligible organization. The July 2013 final regulations provide for separate payments for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations in a manner that enables these organizations to completely separate themselves from administration and payment for contraceptive coverage. Specifically, the third party administrator must provide or arrange such payments, and can seek reimbursement for such costs (including an allowance for administrative costs and margin) by making an arrangement with a participating issuer—that is, an issuer offering coverage through a Federally-facilitated Exchange (FFE). The participating issuer can receive an

---

[7] 134 S. Ct. at 2774–2775.

Exhibit 11

JA-0000222

adjustment to its FFE user fees to finance such costs.

The Departments seek comment on the likely number of closely held for-profit entities that would seek an accommodation, the number of participants and beneficiaries (or in the case of student health insurance coverage, enrollees and dependents) in the plans of such entities, and the number of issuers and third-party administrators affected by the proposed rules. Finally, the Departments seek comment on whether any other aspects of the accommodations in the July 2013 final regulations, including relevant definitions, should be modified in light of the proposed addition of closely held for-profit entities with religious objections to contraceptive coverage to the definition of eligible organization.

These proposed regulations, if finalized as proposed, would require a small number of conforming changes to cross-references in the regulations. Any such necessary conforming changes would be incorporated into final regulations.

### III. Response to Comments

Because of the large number of public comments we normally receive on **Federal Register** documents, we are not able to acknowledge or respond to them individually. The Departments will consider all comments we receive by the date and time specified in the "DATES" section of this preamble, and, when we proceed with a subsequent document, we will respond to the comments in the preamble to that document.

### IV. Economic Impact and Paperwork Burden

*A. Executive Orders 12866 and 13563—Department of Health and Human Services and Department of Labor*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any 1 year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any 1 year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). The Departments anticipate that these proposed regulations are not likely to have economic impacts of $100 million or more in any 1 year, and therefore, do not meet the definition of "economically significant" under Executive Order 12866.

#### 1. Need for Regulatory Action

The proposed rules would modify the July 2013 final regulations in light of the Supreme Court's decision in *Hobby Lobby*. That decision held that a closely held for-profit corporation is exempt from the requirement to provide contraceptive coverage if its owners have religious objections to such coverage, because there is a less restrictive means of furthering the law's interests, namely the accommodation the Government already provided to nonprofit religious organizations with such objections. Contraceptive coverage is crucial to women's health and equality for a number of reasons, including but not limited to the psychological toll and compromised financial position, and adverse health consequences, that can result from unplanned or unwanted pregnancies. As documented in a report of the Institute of Medicine, women experiencing an unintended pregnancy may not immediately be aware that they are pregnant, and thus delay prenatal care. They also may not be as motivated to discontinue behaviors that pose pregnancy-related risks (for example, smoking, consumption of alcohol).[8] Studies show a greater risk of preterm birth and low birth weight among unintended pregnancies compared with pregnancies that were planned.[9] Contraceptives also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy.[10] In addition, there are significant cost savings to employers from the coverage of contraceptives.[11] Providing this coverage to participants and beneficiaries affected by the Supreme Court decision is a priority.

#### 2. Anticipated Effects

The Departments expect that these proposed regulations would not result in any additional significant burden on or costs to the affected entities.

*B. Special Analyses—Department of the Treasury*

For purposes of the Department of the Treasury, it has been determined that this proposed rule is not a significant regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this proposed rule. Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that this proposed rule will not have a significant economic impact on a substantial number of small entities. This certification is based on the fact that the regulations merely propose to modify the definition of eligible organization to include certain closely held for-profit entities. This modification, if adopted, would not increase costs to or burdens on the affected organizations. Pursuant to section 7805(f) of the Code, these regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

*C. Paperwork Reduction Act—Department of Health and Human Services*

Under the Paperwork Reduction Act of 1995, we are required to provide 60-day notice in the **Federal Register** and solicit public comment before a collection of information requirement is

---

[8] Inst. Of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 16.

[9] Gipson, J.D. et al., The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature, *Studies on Family Planning*, 2008, 39(1):18–38.

[10] Inst. Of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 107.

[11] See discussion at 77 FR 8727.

Exhibit 11                                    JA625                                    JA-0000223

submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

We are soliciting public comment on each of these issues for the following sections of this document that contain information collection requirements (ICRs):

The 2013 final regulations require an eligible organization that seeks an accommodation to self-certify that it meets the definition of an eligible organization using the EBSA Form 700 and providing it directly to each third party administrator or issuer under the plan that would otherwise arrange for or provide the covered contraceptive services. The interim final regulations being published contemporaneously with these proposed regulations continue to allow such eligible organizations to use EBSA Form 700, as set forth in the 2013 final regulations and guidance. In addition, the interim final regulations permit an alternative process, consistent with the Supreme Court's interim order in *Wheaton College*, under which an eligible organization may notify HHS in writing of its religious objection to coverage of all or a subset of contraceptive services.

These proposed regulations do not change the requirement that an eligible organization that seeks accommodation self-certifies that it meets the definition of an eligible organization, either using the EBSA Form 700 method of self-certification or the alternative notice to HHS process.

HHS is anticipating that 71 for-profit organizations will seek an accommodation. This is based on the number of plaintiffs that are for-profit employers in recent litigation objecting on religious grounds to the provision of contraceptive services. We seek comments on this estimate and welcome any data that may assist us in estimating the number of entities affected by this provision. For each eligible organization it is assumed that, clerical staff will gather and enter the necessary information, send the self-certification

or the notice to its issuer(s) or third party administrator(s) or to HHS electronically and retain a copy for recordkeeping, a manager and legal counsel will review it, and a senior executive will execute it. It is estimated that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30.00 per hour, 10 minutes for a manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127 per hour, and 5 minutes for a senior executive at a cost of $121 per hour) to execute the self-certification. The certification may be electronically transmitted to the issuer or to HHS at minimal cost, but a cost burden of $38.34 is estimated for a paper filing calculated with 5 cents per page printing and material costs and 49 cents postage costs. Therefore, the total one-time burden for preparing and providing the information in the self-certification is estimated to be approximately $53 for each eligible organization.

Based on this estimate of 71 affected entities and the individual burden estimate of $53, we estimate the hour burden to be 59.2 hours with an equivalent cost of $3736 and a paper filing cost burden of $38.34. As the Department of Labor and the Department of Health and Human Services share jurisdiction they are splitting the hour burden so each will account for 29.6 burden hours and a cost burden of $19.17. We welcome comments on any aspect of this burden estimate.

If you comment on these information collection and recordkeeping requirements, please submit your comments electronically as specified in the **ADDRESSES** section of this proposed rule.

Comments must be received on/by October 27, 2014.

*D. Paperwork Reduction Act—Department of Labor*

As discussed above, the proposed regulations would revise the definition of eligible organization to include qualifying closely held for-profit entities. This action would amend the EBSA Form 700 information collection request (ICR), which is approved under OMB Control number 1210–NEW to allow qualified closely held for-profit entities to avail themselves of the accommodation by self-certifying that they meet the definition of an eligible organization, either using the EBSA Form 700 method of self-certification or the alternative notice to HHS process under the contemporaneous interim final regulations.

• Consistent with the HHS analysis presented above, DOL estimates that there will be 71 additional entities that would utilize the accommodation. The Departments are soliciting comments for 60 days regarding the likely number of additional entities seeking an accommodation, the number of participants and beneficiaries in the plans of such organizations, and the number of issuers and third party administrators impacted by the proposed regulations. The Departments will submit a copy of these proposed rules to OMB in accordance with 44 U.S.C. 3507(d) for review of the proposed ICRs. The Departments and OMB are particularly interested in comments that:

• Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, by permitting electronic submission of responses.

Comments should be sent to the Office of Information and Regulatory Affairs, Attention: Desk Officer for the Employee Benefits Security Administration either by Fax to (202) 395–5806 or by email to *oira_submission@omb.eop.gov*. A copy of the proposed ICRs may be obtained by contacting the PRA addressee: G. Christopher Cosby, Office of Policy and Research, Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N–5718, Washington, DC 20210; telephone: (202) 693–8410; Fax: (202) 219–4745 (please note that these numbers are not toll-free numbers); email: *ebsa.opr@dol.gov*. Proposed ICRs submitted to OMB also are available at *www.reginfo.gov (http://www.reginfo.gov/public/do/PRAMain)*.

The Departments expect that qualified closely held for-profit entities will spend the same time (and incur the same cost) to prepare and send the EBSA Form 700 or the notification to the Secretary of HHS as other eligible

Exhibit 11 JA626 JA-0000224

organizations under the existing ICR (approximately 50 minutes in preparation time and $0.54 mailing costs). The Departments note that persons are not required to respond to, and generally are not subject to any penalty for failing to comply with, an ICR unless the ICR has a valid OMB control number. The paperwork burden estimates are summarized as follows:

*Type of Review:* Revised Collection.
*Agencies:* Employee Benefits Security Administration, Department of Labor.
*Title:* EBSA Form 700.
*OMB Number:* 1210–NEW.
*Affected Public:* Business or other for profit entity.
*Total Respondents:* 71.
*Total Responses:* 71.
*Frequency of Response:* Once, Variable.
*Estimated Total Annual Burden Hours:* 59 hours (DOL 29.5 hours, HHS 29.5 hours).
*Estimated Total Annual Burden Cost:* $38 (DOL $19, HHS $19).

## V. Unfunded Mandates Reform Act

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these proposed regulations do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[12]

## VI. Federalism—Department of Health and Human Services and Department of Labor

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have ''substantial direct effects'' on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

In the Departments' view, these proposed regulations have federalism implications, but the federalism implications are substantially mitigated because, with respect to health insurance issuers, 45 states are either enforcing the requirements related to coverage of specified preventive services (including contraception) without cost sharing pursuant to state law or otherwise are working collaboratively with HHS to ensure that issuers meet these standards. In five states, HHS ensures that issuers comply with these requirements. Therefore, the proposed regulations are not likely to require substantial additional oversight of states by HHS.

In general, section 514 of ERISA provides that state laws are superseded to the extent that they relate to any covered employee benefit plan, and preserves state laws that regulate insurance, banking, or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements on group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with certain group health plans provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent than the federal requirement are unlikely to ''prevent the application of'' the preventive services coverage provision, and therefore are unlikely to be preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904) and December 30, 2004 (69 FR 78720), and these proposed regulations implement the preventive services coverage provision's minimum standards and do not significantly reduce the discretion given to states under the statutory scheme.

The PHS Act provides that states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state to address the state's concerns and avoid conflicts with the state's exercise of its authority. HHS has developed procedures to implement its enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states, the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion, throughout the process of developing these proposed regulations, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health coverage and health insurance issuers, and the rights of those individuals intended to be protected in the PHS Act, ERISA, and the Code.

## VII. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

---

[12] In 2014, that threshold level is approximately $141 million.

Signed this 20th day of August 2014.

**John Dalrymple,**

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Signed this 20th day of August 2014.

**Phyllis C. Borzi,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: August 19, 2014.

**Marilyn Tavenner,**

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: August 20, 2014.

**Sylvia M. Burwell,**

*Secretary, Department of Health and Human Services.*

## List of Subjects

### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

## DEPARTMENT OF THE TREASURY

*Internal Revenue Service*

Accordingly, 26 CFR part 54 is proposed to be amended as follows:

## PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805 * * *

■ **Par. 2.** Section 54.9815–2713A is amended by revising paragraph (a) to read as follows:

### § 54.9815–2713A Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraph (a)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and

holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the entity's objection to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs is made in accordance with the organization's applicable rules of governance, consistent with state law.

(3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) [Reserved]

* * * * *

## DEPARTMENT OF LABOR

*Employee Benefits Security Administration*

For the reasons stated in the preamble, the Department of Labor proposes to amend 29 CFR part 2590 as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 1. The authority citation for part 2590 is revised to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 11–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 2. Section 2590.715–2713A is amended by revising paragraph (a) to read as follows:

### § 2590.715–2713A Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraph (a)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 2590.715–2713(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the entity's objection to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs is made in accordance with the organization's applicable rules of governance, consistent with state law.

(3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) [Reserved]

* * * * *

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons stated in the preamble, the Department of Health and Human Services proposes to amend 45 CFR subtitle A, part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSRUANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** Secs 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.131 is amended by revising paragraphs (b) and (f) to read as follows:

### § 147.131 Exemption and accommodation in connection with coverage of preventive health services.

* * * * *

(b) *Eligible organizations.* An eligible organization is an organization that

Exhibit 11

JA628

JA-0000226

Case 1:25-cv-02540-DLB   Document 64-2   Page: 576   Filed: 07/25/25   Page 142 of 2025130

**Federal Register** / Vol. 79, No. 166 / Wednesday. August 27, 2014 / Proposed Rules 51127

meets the criteria of paragraph (b)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section. and the entity's objection to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs is made in accordance with the organization's applicable rules of governance, consistent with state law.

(3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification on behalf of the organization. and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) [Reserved]

\* \* \* \* \*

(f) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education as defined in 20 U.S.C. 1002 in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.

[FR Doc. 2014–20254 Filed 8–22–14; 3:30 pm]

**BILLING CODE 4830–01–P; 4510–029–P; 4120–01–P; 6325–64**

# DEPARTMENT OF DEFENSE

**Office of the Secretary**

**32 CFR Part 199**

**[DOD–2006–HA–0207]**

**RIN 0720–AB15**

## Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); TRICARE Reserve Select; TRICARE Dental Program; Early Eligibility for TRICARE for Certain Reserve Component Members

**AGENCY:** Office of the Secretary, DoD.

**ACTION:** Proposed rule.

**SUMMARY:** TRICARE Reserve Select (TRS) is a premium-based TRICARE health plan available for purchase worldwide by qualified members of the Ready Reserve and by qualified survivors of TRS members. TRICARE Dental Program (TDP) is a premium-based TRICARE dental plan available for purchase worldwide by qualified Service members. This proposed rule revises requirements and procedures for the TRS program to specify the appropriate actuarial basis for calculating premiums in addition to other minor clarifying administrative changes. For a member who is involuntarily separated from the Selected Reserve under other than adverse conditions this proposed rule provides a time-limited exception that allows TRS coverage in effect to continue for up to 180 days after the date on which the member is separated from the Selected Reserve and TDP coverage in effect to continue for no less than 180 days after the separation date. It also expands early TRICARE eligibility for certain Reserve Component members from a maximum of 90 days to a maximum of 180 days prior to activation in support of a contingency for more than 30 days.

**DATES:** Submit comments on or before October 27, 2014.

**ADDRESSES:** You may submit comments, identified by docket number or Regulation Identifier Number (RIN) number and title, by any of the following methods:

*Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

*Mail:* Federal Docket Management System Office, 4800 Mark Center Drive, East Tower, Suite 02G09, Alexandria, VA 22350–3100.

*Instructions:* All submissions received must include the agency name and docket number or RIN for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the Internet at *http:// www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** Jody Donehoo, Defense Health Agency. TRICARE Health Plan Division. telephone (703) 681–0039.

Questions regarding payment of specific claims under the TRICARE allowable charge method should be addressed to the appropriate TRICARE contractor.

**SUPPLEMENTARY INFORMATION:**

### I. Introduction and Background

This proposed rule addresses provisions of the National Defense Authorization Act for Fiscal Year 2009 (NDAA–09) (Pub. L. 110–417), the National Defense Authorization Act for Fiscal Year 2010 (NDAA–10) (Pub. L. 111–84), and the National Defense Authorization Act for Fiscal Year 2013 (NDAA–13) (Pub. L. 112–239). First, section 704 of NDAA–09 specifies that the appropriate actuarial basis for calculating premiums for TRS shall utilize the actual cost of providing benefits to members and their dependents during preceding calendar years. Second, section 702 of NDAA–10 expands early eligibility for Reserve Component members issued delayed-effective-date active duty orders from a maximum of 90 days to a maximum of 180 days prior to activation in support of a contingency for more than 30 days. Third, for a member who is involuntarily separated from the Selected Reserve under other than adverse conditions as characterized by the Secretary concerned, section 701 of NDAA–13 provides a time-limited exception that allows TRS coverage already in effect at time of separation to continue for up to 180 days after the date on which the member is separated from the Selected Reserve and TDP coverage already in effect at time of separation to continue for no less than 180 days after the separation date. This exception expires December 31, 2018. Finally, additional administrative clarifications have been made to 32 CFR 199.24, which implements TRS.

### II. Provisions of the Rule Regarding Early TRICARE Eligibility

Section 199.3(b)(5) implements section 702 of NDAA–10, which specifies that, Reserve Component members issued delayed-effective-date orders for service in support of a

Exhibit 11                                    JA629                                    JA-0000227

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9690]**

**RIN 1545–BM38**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Parts 2510 and 2590**

**RIN 1210–AB67**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Parts 147**

**[CMS–9939–IFC]**

**RIN 0938–AR42**

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Interim final rules.

**SUMMARY:** This document contains interim final regulations regarding coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. Among these services are women's preventive health services, as specified in guidelines supported by the Health Resources and Services Administration (HRSA). As authorized by the current regulations, and consistent with the HRSA Guidelines, group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the otherwise applicable requirement to cover certain contraceptive services. Additionally, under current regulations, accommodations are available with respect to the contraceptive coverage

requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), and student health insurance coverage arranged by eligible organizations that are institutions of higher education, that effectively exempt them from this requirement. The regulations establish a mechanism for separately furnishing payments for contraceptive services on behalf of participants and beneficiaries of the group health plans of eligible organizations that avail themselves of an accommodation, and enrollees and dependents of student health coverage arranged by eligible organizations that are institutions of higher education that avail themselves of an accommodation. These interim final regulations augment current regulations in light of the Supreme Court's interim order in connection with an application for an injunction in *Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014) (*Wheaton* order). These interim final regulations provide an alternative process that an eligible organization may use to provide notice of its religious objections to providing contraceptive coverage, while preserving participants' and beneficiaries' (and enrollees' and dependents') access to coverage for the full range of Food and Drug Administration (FDA)-approved contraceptives, as prescribed by a health care provider, without cost sharing.

**DATES:** *Effective date:* These interim final regulations are effective on August 27, 2014.

*Comments:* Written comments on these interim final regulations are invited and must be received by October 27, 2014.

**ADDRESSES:** Written comments may be submitted to the Department of Labor as specified below. Any comment that is submitted will be shared with the Department of Health and Human Services and the Department of the Treasury, and will also be made available to the public. Warning: Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments may be posted on the Internet and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

Comments, identified by "Preventive Services," may be submitted by one of the following methods:

*Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

*Mail or Hand Delivery:* Office of Health Plan Standards and Compliance Assistance, Employee Benefits Security Administration, Room N–5653, U.S. Department of Labor, 200 Constitution Avenue NW., Washington, DC 20210, Attention: Preventive Services.

Comments received will be posted without change to *www.regulations.gov* and available for public inspection at the Public Disclosure Room, N–1513, Employee Benefits Security Administration, 200 Constitution Avenue NW., Washington, DC 20210, including any personal information provided.

**FOR FURTHER INFORMATION CONTACT:** David Mlawsky, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of

title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing, including under paragraph (a)(4), benefits for certain women's preventive health services as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). On August 1, 2011, HRSA adopted and released guidelines for women's preventive health services (HRSA Guidelines) based on recommendations of the independent Institute of Medicine. As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptives, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1] Except as discussed later in this section, non-grandfathered group health plans and health insurance coverage are required to provide coverage consistent with the HRSA Guidelines without cost sharing for plan years (or, in the individual market, policy years) beginning on or after August 1, 2012.[2]

Interim final regulations implementing section 2713 of the PHS Act were published on July 19, 2010 (75 FR 41726) (2010 interim final regulations). On August 1, 2011, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) amended the 2010 interim final regulations to provide HRSA with authority to exempt group health plans established or maintained by certain religious employers (and group health insurance

coverage provided in connection with such plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines (76 FR 46621) (2011 amended interim final regulations).[3] On the same date, HRSA exercised this authority in the HRSA Guidelines to exempt group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) from the HRSA Guidelines with respect to contraceptive services.[4] The 2011 amended interim final regulations specified that, for purposes of this exemption, a religious employer was one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. Final regulations issued on February 10, 2012, adopted the definition of religious employer in the 2011 amended interim final regulations without modification (2012 final regulations).[5]

Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans).[6] The guidance provided that the

temporary enforcement safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013. At the same time, the Departments committed to rulemaking to achieve the goals of providing coverage of recommended preventive services, including contraceptive services, without cost sharing, while simultaneously ensuring that certain additional nonprofit organizations with religious objections to contraceptive coverage would not have to contract, arrange, pay, or refer for such coverage.

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described and solicited comments on possible approaches to achieve these goals (77 FR 16501).

On February 6, 2013, following review of the comments on the ANPRM, the Departments published proposed regulations at 78 FR 8456 (proposed regulations). The regulations proposed to simplify and clarify the definition of "religious employer" for purposes of the religious employer exemption. The regulations also proposed accommodations for group health plans established or maintained or arranged by certain nonprofit religious organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans). These organizations were referred to as "eligible organizations."

The regulations proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would be required to assume sole responsibility for providing contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The Departments proposed a comparable accommodation with respect to student health insurance coverage arranged by

---

[1] The HRSA Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[2] Interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[3] The 2011 amended interim final regulations were issued and effective on August 1, 2011, and published in the **Federal Register** on August 3, 2011 (76 FR 46621).

[4] HRSA subsequently amended the HRSA Guidelines to reflect the simplified definition of "religious employer" contained in the July 2013 final regulations. 78 FR 39870 (July 2, 2013) (discussed below), effective August 1, 2013.

[5] The 2012 final regulations were published in the **Federal Register** on February 15, 2012 (77 FR 8725).

[6] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code; originally issued on February 10, 2012, and reissued on August 15, 2012 and June 28, 2013;

*available at: http://www.cms.gov/CCIIO/Resources/ Regulations-and-Guidance/Downloads/preventive- services-guidance-6-28-2013.pdf.* The guidance clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. *See* Student Health Insurance Coverage, 77 FR 16457 (Mar. 21, 2012).

Exhibit 12

JA631

JA-0000229

eligible organizations that are institutions of higher education.

In the case of a self-insured group health plan established or maintained by an eligible organization, the proposed regulations presented potential approaches under which the third party administrator of the plan would provide or arrange for a third party to provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. An issuer (or its affiliate) would be able to offset the costs incurred by the third party administrator and the issuer in the course of arranging and providing such coverage by claiming an adjustment in the Federally-facilitated Exchange (FFE) user fee.

The Departments received over 400,000 comments (many of them standardized form letters) in response to the proposed regulations. After consideration of the comments, the Departments published final regulations on July 2, 2013 at 78 FR 39870 (July 2013 final regulations). The July 2013 final regulations simplified and clarified the definition of religious employer for purposes of the religious employer exemption and established accommodations for health coverage established or maintained or arranged by eligible organizations. A contemporaneously re-issued HHS guidance document extended the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance included a form to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary enforcement safe harbor. In addition, HHS and the Department of Labor (DOL) issued a self-certification form, EBSA Form 700, to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under the July 2013 final regulations. This self-certification form was provided for use with the accommodation under the July 2013 final regulations, after the expiration of the temporary enforcement safe harbor (that is, for plan years beginning on or after January 1, 2014).

On June 30, 2014, the Supreme Court ruled in the case of *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), that, under the Religious Freedom Restoration Act of 1993 (RFRA), the requirement to provide contraceptive coverage could not be

applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage, and because the Government's goal of guaranteeing coverage for contraceptive methods without cost sharing could be achieved in a less restrictive manner by offering such closely held for-profit entities the accommodation the Government already provided to religious nonprofit organizations with religious objections to contraceptive coverage. After describing this accommodation, the Court concluded that the accommodation "does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS' stated interests equally well." *134 S. Ct. at 2782.* The Departments are publishing elsewhere in this edition of the **Federal Register** a notice of proposed rulemaking (NPRM) that proposes possible amendments to the definition of the term "eligible organization" to include closely held for-profit entities with religious objections to contraceptive coverage, in light of the *Hobby Lobby* decision.

On July 3, 2014, the Supreme Court issued an interim order in connection with an application for an injunction pending appeal in *Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014), in which the plaintiff challenged under RFRA the requirement in the July 2013 final regulations that an eligible organization invoking the accommodation send EBSA Form 700 to the insurance issuer or third party administrator. The Court's order stated that, "[i]f the [plaintiff] informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the [Departments of Labor, Health and Human Services, and the Treasury] are enjoined from enforcing against the [plaintiff]" certain provisions of the Affordable Care Act and related regulations requiring coverage without cost sharing of certain contraceptive services "pending final disposition of appellate review." 134 S.Ct. at 2807. The order stated that Wheaton College need not use EBSA Form 700 or send a copy of the executed form to its health insurance issuers or third party administrators to meet the condition for this injunctive relief. *Id.* The Court also stated that its interim order neither affected "the ability of the [plaintiff's] employees and students to obtain, without cost, the full range of

FDA approved contraceptives," nor precluded the Government from relying on the notice by the plaintiff "to facilitate the provision of full contraceptive coverage under the Act." *Id.* The Court's order further stated that it "should not be construed as an expression of the Court's views on the merits" of the plaintiff's challenge to the accommodations. *Id.*

The Departments are issuing these interim final regulations in light of the Supreme Court's interim order in *Wheaton* concerning notice to the Federal government that an eligible organization has a religious objection to providing contraceptive coverage, as an alternative to the EBSA Form 700 method of self-certification, and to preserve participants' and beneficiaries' (and, in the case of student health insurance coverage, enrollees' and dependents') access to coverage for the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing.

## II. Overview of the Interim Final Regulations

These interim final regulations amend the Departments' July 2013 final regulations to provide an alternative process for the sponsor of a group health plan or an institution of higher education to provide notice of its religious objection to coverage of all or a subset of contraceptive services, as an alternative to the EBSA Form 700 method of self-certification. These interim final regulations continue to allow eligible organizations to use EBSA Form 700, as set forth in the July 2013 final regulations and guidance.[7]

The alternative process permitted by these interim final regulations is consistent with the *Wheaton* order. It provides that an eligible organization may notify HHS in writing of its religious objection to coverage of all or a subset of contraceptive services. The notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to providing coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the

---

[7] The EBSA Form 700 is available at: *http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf.* When using the EBSA 700, the self-certification form is provided directly to each third party administrator or issuer of the plan.

Exhibit 12     JA632     JA-0000230

meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.[8] A model notice to HHS that eligible organizations may, but are not required to, use is available at: *http://www.cms.gov/cciio/resources/ Regulations-and-Guidance/index.html#Prevention*. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to HHS.

As with the process established in the July 2013 final regulations, nothing in this alternative notice process requires a government assessment of the sincerity of the religious belief underlying the eligible organization's objection. The notice to HHS, and any subsequent updates, should be sent electronically to: *marketreform@cms.hhs.gov*, or by regular mail to: Centers for Medicare & Medicaid Services, Center for Consumer Information and Insurance Oversight, 200 Independence Avenue SW., Washington, DC 20201, Room 739H. The content required for the notice represents the minimum information necessary for the Departments to determine which entities are covered by the accommodation, to administer the accommodation, and to implement the policies in the July 2013 final regulations.

When an eligible organization that establishes or maintains or arranges a self-insured plan subject to ERISA provides such a notice to HHS, DOL (working with HHS) will send a separate notification to each third party administrator of the ERISA plan. DOL's notification will inform each third party administrator of the eligible organization's religious objection to funding or administering some or all contraceptive coverage and will designate the relevant third party administrator(s) as plan administrator under section 3(16) of ERISA for those contraceptive benefits that the third party administrator would otherwise manage. The DOL notification will be an instrument under which the plan is operated and shall supersede any earlier designation. In establishing and implementing this alternative process, DOL is exercising its broad rulemaking

authority under Title I of ERISA, which includes the ability to interpret and apply the definition of a plan administrator under ERISA section 3(16)(A).

If an eligible organization that establishes or maintains an insured health plan provides a notice to HHS under this alternative process, HHS will send a separate notification to the plan's health insurance issuer(s) informing the issuer(s) that HHS has received a notice under § 2590.715–2713A(c)(1) and describing the obligations of the issuer(s) under § 2590.715–2713A. Issuers remain responsible for compliance with the statutory and regulatory requirement to provide coverage for contraceptive services to participants and beneficiaries, and to enrollees and dependents of student health plans, notwithstanding that the policyholder is an eligible organization with a religious objection to contraceptive coverage that will not have to contract, arrange, pay, or refer for such coverage.

Other questions have arisen regarding the requirement to provide coverage for contraceptive services without cost sharing and the accommodations for eligible organizations. In what has been described as the "non-interference provision," the July 2013 final regulations provided that eligible organizations that establish or maintain self-insured group health plans "must not, directly or indirectly seek to interfere with a third party administrator's arrangements to provide or arrange for separate payments for contraceptive services" and "must not, directly or indirectly, seek to influence a third party administrator's decision to make any such arrangements." 26 CFR 54.9815–2713A(b)(1)(iii); 29 CFR 2590.715–2713A(b)(1)(iii). The Departments interpret the July 2013 final regulations solely as prohibiting the use of bribery, threats, or other forms of economic coercion in an attempt to prevent a third party administrator from fulfilling its independent legal obligations to provide or arrange separate payments for contraceptive services. Because such conduct is presumably unlawful and is prohibited under other state and federal laws, and to reduce unnecessary confusion, these interim final regulations delete the language prohibiting an eligible organization from interfering with or seeking to influence a third party administrator's decision or efforts to provide separate payments for contraceptive services.

## III. Interim Final Regulations and Request for Comments

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include PHS Act sections 2701 through 2728 and the incorporation of those sections into ERISA section 715 and Code section 9815.

In addition, under Section 553(b) of the Administrative Procedure Act (APA) (5 U.S.C. 551 et seq.), a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The provisions of the APA that ordinarily require a notice of proposed rulemaking do not apply here because of the specific authority granted by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act. However, even if these provisions of the APA were applicable, the Secretaries have determined that it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and comment process is completed.

As discussed earlier, the Departments are issuing these interim final regulations in light of the Supreme Court's order in *Wheaton College* concerning notice to the Federal government that an eligible organization has a religious objection to providing contraceptive coverage, as an alternative to the EBSA Form 700, and to preserve participants' and beneficiaries' (and, in the case of student health insurance coverage, enrollees' and dependents') access to coverage for the full range of FDA-approved contraceptive services, as prescribed by a health care provider, without cost sharing. That order was issued and was effective on July 3, 2014.

In order to provide other eligible organizations with an option equivalent to the one the Supreme Court provided to Wheaton College on an interim basis, regulations must be published and available to the public as soon as possible. Delaying the availability of the alternative process in order to allow for a full notice and comment period would delay the ability of eligible organizations to avail themselves of this alternative process and could delay women's access to contraceptive

---

[8] Church plans are exempt from ERISA pursuant to ERISA section 4(b)(2). As such, a third party administrator of a self-insured church plan cannot become the plan administrator by operation of 29 CFR 2510.3–16, although such third party administrators may voluntarily provide or arrange separate payments for contraceptive services and seek reimbursement for associated expenses under the process set forth in 45 CFR 156.50.

Exhibit 12

JA633

JA-0000231

coverage without cost sharing, thereby compromising their access to necessary contraceptive services. Issuing interim final regulations provides the public with an opportunity to comment on whether these regulations affording this alternative should be made permanent or subject to modification without delaying the effective date of the regulations.

For the foregoing reasons, the Departments have determined that it would be impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these interim final regulations into effect, and that it is in the public interest to promulgate interim final regulations. For the same reasons, the Departments have determined, consistent with section 553(d) of the APA (5 U.S.C. 553(d)), that there is good cause to make these interim final regulations effective immediately upon publication in the Federal Register.

## IV. Economic Impact and Paperwork Burden

### A. Executive Orders 12866 and 13563—Department of Health and Human Services and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or

the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). These interim final regulations are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866.

#### 1. Need for Regulatory Action

These interim final regulations amend the Departments' July 2013 final regulations to provide an alternative process for an eligible organization to provide notice of its religious objection to coverage of all or a subset of contraceptive services.

#### 2. Anticipated Effects

The Departments expect that these interim final regulations will not result in any additional burden on or costs to the affected entities. These interim final regulations do not change the fundamental ability of an eligible organization to exempt itself from contracting, arranging, paying, or referring for contraceptive coverage. Instead, the regulations merely provide alternative means for eligible organizations to provide notice of their religious objection to coverage of all, or a subset of, contraceptive services.

### B. Special Analyses—Department of the Treasury

For purposes of the Department of the Treasury, it has been determined that this rule is not a significant regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the APA does not apply to these regulations. Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that this rule will not have a significant economic impact on a substantial number of small entities This certification is based on the fact that the temporary regulations will not result in any additional costs to affected entities but will provide an alternative means for eligible organizations to provide notice of their religious objection to providing coverage of all, or a subset of, contraceptive services. Pursuant to section 7805(f) of the Code, these temporary regulations have been submitted to the Chief Counsel for Advocacy of the Small Business

Administration for comment on their impact on small business.

### C. Paperwork Reduction Act—Department of Health and Human Services

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. These interim final regulations contain an information collection request (ICR) that is subject to review by the Office of Management and Budget (OMB). A description of these provisions is given in the following section with an estimate of the annual burden. Average labor costs (including fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.

Each organization seeking to be treated as an eligible organization under these interim final regulations must either use the EBSA Form 700 method of self-certification or provide notice to HHS of its religious objection to coverage of all or a subset of contraceptive services. Specifically, these interim final regulations continue to allow eligible organizations to notify an issuer or third party administrator using EBSA Form 700, as set forth in the July 2013 regulations. In addition, these interim final regulations permit an alternative process, consistent with the Supreme Court's interim order in *Wheaton College*, by which an eligible organization may notify HHS of its religious objection to coverage of all or a subset of contraceptive services. HHS is aware, based on litigation, that there are approximately 122 eligible organizations that would now have the option to provide notice to HHS, rather than provide a self-certification to TPAs and/or issuers.

In order to complete this task, HHS assumes that clerical staff for each eligible organization will gather and enter the necessary information and send the self-certification to the issuer or third party administrator as appropriate, or send the notice to HHS.[9] HHS assumes that a compensation and benefits manager and inside legal counsel will review the self-certification or notice to HHS and a senior executive would execute it. HHS estimates that an eligible organization would spend approximately 45 minutes (30 minutes of clerical labor at a cost of $30 per hour, 10 minutes for a compensation

---

[9] For purposes of this analysis, the Department assumes that the same amount of time will be required to prepare the self-certification and the notice to HHS.

and benefits manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127, and 5 minutes by a senior executive at a cost of $121) preparing and sending the self-certification or notice to HHS and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the information in the self-certification or notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $53 for a total hour burden of 102 hours with an equivalent cost of $6,430.

As the Department of Labor and the Department of Health and Human Services share jurisdiction they are splitting the hour burden so each will account for 51 burden hours. HHS estimates that each self-certification or notice to HHS will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each self-certification or notice sent via mail will be $0.54. For purposes of this analysis, HHS assumes that all self-certifications or notices to HHS will be mailed. The total cost burden for the self-certifications or notices to HHS is approximately $66.

As the Department of Labor and the Department of Health and Human Services share jurisdiction they are splitting the cost burden so each will account for $33 of the cost burden.

*D. Paperwork Reduction Act—Department of Labor and Department of the Treasury*

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the EBSA Form 700 ICR has been approved by OMB under control number 1210–0150. These interim final regulations amend the ICR by providing an alternative process consistent with the *Wheaton* order, as discussed earlier in this preamble. The Department of Labor submitted an ICR in order to obtain OMB approval under the PRA for the regulatory revision. The request was made under emergency clearance procedures specified in regulations at 5 CFR 1320.13. In response, OMB approved the ICR under control number 1210–0150 through January 31, 2015. A copy of the information collection request may be obtained free of charge on the RegInfo.gov Web site at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201408-1210-001.*

This approval allows respondents temporarily to utilize the additional flexibility these final regulations provide, while the Department seeks public comment on the collection methods—including their utility and burden. Contemporaneously with the publication of these interim final regulations, the Department of Labor published a notice elsewhere in today's issue of the **Federal Register** informing the public of their intention to extend the OMB approval.

Consistent with the analysis in the HHS PRA section above the Department expects that each of the estimated 122 organizations will spend approximately 50 minutes in preparation time and incur $0.54 mailing cost to satisfy the requirements. The DOL information collections in this rule are found in 29 CFR 2510.3–16 and 2590.715–2713A and are summarized as follows:

*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.
*Title:* Coverage of Certain Preventive Services Under the Affordable Care Act.
*OMB Numbers:* 1210–0150.
*Affected Public:* Private Sector—businesses or other for profits.
*Total Respondents:* 61 (combined with HHS total is 122).
*Total Responses:* 61 (combined with HHS total is 122).
*Frequency of Response:* On occasion.
*Estimated Total Annual Burden Hours:* 51 (combined with HHS total is 102 hours.
*Estimated Total Annual Burden Cost:* $33 (combined with HHS total is 66).

*E. Regulatory Flexibility Act—Department of Labor and Department of Health and Human Services*

The Regulatory Flexibility Act (5 U.S.C. 601 et seq.) (RFA) imposes certain requirements with respect to Federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 et seq.) and that are likely to have a significant economic impact on a substantial number of small entities. Under Section 553(b) of the APA, a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. These interim final regulations are exempt from APA's prior notice and comment requirement because the Departments made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble. Therefore, the RFA does not apply and the Departments are not required to either certify that the rule would not have a significant economic

impact on a substantial number of small entities or conduct a regulatory flexibility analysis.

Nevertheless, the Departments carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866. The Departments do not expect that these interim final regulations will have a significant economic effect on a substantial number of small entities, because they will not result in any additional costs to affected entities. Instead, the regulations merely provide an alternative means for eligible organizations to provide notice of their religious objection to coverage of all, or a subset of, contraceptive services.

*F. Unfunded Mandates Reform Act*

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these interim final regulations do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[10]

*G. Federalism—Department of Health and Human Services and Department of Labor*

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

These interim final regulations do not have any Federalism implications, since they only provide an eligible organization with an alternative process to provide notice of its religious objection to coverage of all or a subset of contraceptive services.

**V. Statutory Authority**

The Department of the Treasury temporary regulations are adopted

---

[10] In 2014, that threshold level is approximately $141 million.

Exhibit 12                          JA635                          JA-0000233

pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note. 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B. and 31 U.S.C. 9701).

**List of Subjects**

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2510*

Employee benefit plans, Pensions.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance. Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance. Reporting and recordkeeping requirements, State regulation of health insurance.

Signed this 20th day of August 2014.
**John Dalrymple.**
*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

**Mark J. Mazur.**
*Assistant Secretary of the Treasury (Tax Policy).*

Signed this 20th day of August 2014.
**Phyllis C. Borzi.**
*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: August 19, 2014.
**Marilyn Tavenner.**
*Administrator, Centers for Medicare & Medicaid Services.*

Approved: August 20, 2014.
**Sylvia M. Burwell.**
*Secretary, Department of Health and Human Services.*

**DEPARTMENT OF THE TREASURY**

*Internal Revenue Service*

Accordingly. 26 CFR part 54 is amended as follows:

**PART 54—PENSION EXCISE TAXES**

■ **Paragraph 1.** The authority citation for part 54 continues to read. in part, as follows:

Authority: 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9815–2713A is amended by revising paragraphs (b), (c)(1). and (c)(2)(i) introductory text, and adding paragraph (f), to read as follows:

**§ 54.9815–2713A  Accommodations in connection with coverage of preventive health services.**

* * * * *

(b) [Reserved]. For further guidance, see § 54.9815–2713AT(b).

(c) *Contraceptive coverage—insured group health plans.* (1) [Reserved]. For further guidance, see § 54.9815–2713AT(c)(1).

(2) * * *

(i) [Reserved]. For further guidance, see § 54.9815–2713AT(c)(2)(i) introductory text.

* * * * *

(f) [Reserved]. For further guidance, see § 54.9815–2713AT(f).

■ **Par. 3.** Section 54.9815–2713AT is added to read as follows:

**§ 54.9815–2713AT   Accommodations in connection with coverage of preventive health services (temporary).**

(a) [Reserved]. For further guidance, see § 54.9815–2713A(a).

(b) *Contraceptive coverage—self-insured group health plans.* (1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies

for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section and under § 54.9815–2713A.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.,* whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section and under § 54.9815–2713A.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter into or remain in a contractual relationship with the eligible

Exhibit 12

JA636

JA-0000234

organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815–2713. An issuer may not require any further

documentation from the eligible organization regarding its status as such.

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section and under § 54.9815–2713A.

(2) *Payments for contraceptive services.* (i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (b)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 54.9815–2713(a)(1)(iv) must—

(ii) [Reserved]. For further guidance, see § 54.9815–2713(c)(2)(ii).

(d) [Reserved]. For further guidance, see § 54.9815–2713(d).

(e) [Reserved]. For further guidance, see § 54.9815–2713(e).

(f) *Expiration date.* This section expires on August 22, 2017 or on such earlier date as may be provided in final regulations or other action published in the **Federal Register**.

## DEPARTMENT OF LABOR

*Employee Benefits Security Administration*

For the reasons stated in the preamble, the Department of Labor amends 29 CFR parts 2510 and 2590 as follows:

## PART 2510—DEFINITION OF TERMS USED IN SUBCHAPTERS C, D, E, F, G, AND L OF THIS CHAPTER

■ 4. The authority citation for part 2510 is revised to read as follows:

**Authority:** 29 U.S.C. 1002(2), 1002(16), 1002(21),1002(37), 1002(38), 1002(40), 1031, and 1135; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012); Sec. 2510.3–101 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108, 44 FR 1065, 3 CFR, 1978 Comp., p. 275. Sec. 2510.3–102 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108, 44 FR 1065, 3 CFR, 1978 Comp., p. 275. Sec. 2510.3–38 is also issued under sec. 1, Pub. L. 105–72, 111 Stat. 1457.

■ 5. Revise the heading for part 2510 to read as set forth above.

■ 6. Section 2510.3–16 is amended by revising paragraph (b) and adding a new paragraph (c) to read as follows:

### § 2510.3–16  Definition of "plan administrator."

\*    \*    \*    \*    \*

(b) In the case of a self-insured group health plan established or maintained by an eligible organization, as defined in § 2590.715–2713A(a) of this chapter, if the eligible organization provides a copy of the self-certification of its objection to administering or funding any contraceptive benefits in accordance with § 2590.715–2713A(b)(1)(ii) of this chapter to a third party administrator, the self-certification shall be an instrument under which the plan is operated, shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, and shall supersede any earlier designation. If, instead, the eligible organization notifies the Secretary of Health and Human Services of its objection to administering or funding any contraceptive benefits with § 2590.715–2713A(b)(1)(ii) of this chapter, the Department of Labor, working with the Department of Health and Human Services, shall separately provide notification to each third party administrator that such third party administrator shall be the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, with

Exhibit 12    JA637    JA-0000235

respect to benefits for contraceptive services that the third party administrator would otherwise manage. Such notification from the Department of Labor shall be an instrument under which the plan is operated and shall supersede any earlier designation.

(c) A third party administrator that becomes a plan administrator pursuant to this section shall be responsible for—

(1) Complying with section 2713 of the Public Health Service Act (42 U.S.C. 300gg–13) (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to coverage of contraceptive services. To the extent the plan contracts with different third party administrators for different classifications of benefits (such as prescription drug benefits versus inpatient and outpatient benefits), each third party administrator is responsible for providing contraceptive coverage that complies with section 2713 of the Public Health Service Act (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to the classification or classifications of benefits subject to its contract.

(2) Establishing and operating a procedure for determining such claims for contraceptive services in accordance with § 2560.503–1 of this chapter.

(3) Complying with disclosure and other requirements applicable to group health plans under Title I of ERISA with respect to such benefits.

**PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS**

■ 7. The authority citation for part 2590 is revised to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 12(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 8. Section 2590.715–2713A is amended by revising paragraphs (b), (c)(1), and (c)(2)(i) introductory text to read as follows:

**§ 2590.715–2713A   Accommodations in connection with coverage of preventive health services.**

\*      \*      \*      \*      \*

(b) *Contraceptive coverage—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in § 2510.3–16 of this chapter and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.,* whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Labor (working with the Department of Health and Human Services), shall send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under § 2510.3–16 of this chapter and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(c) \*  \*  \*(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 2590.715–2713. An issuer may not require any further documentation from the eligible organization regarding its status as such.

Exhibit 12

JA-0000236

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) * * * (i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 2590.715–2713(a)(1)(iv) must—

* * * * *

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 9. The authority citation for part 147 continues to read as follows:

**Authority:** Secs 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 10. Section 147.131 is amended by revising paragraphs (c)(1) and (c)(2)(i) introductory text to read as follows:

## § 147.131 Exemption and accommodations in connection with coverage of preventive health services.

* * * * *

(c) * * * (1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 147.130. An issuer may not require any further documentation from the eligible organization regarding its status as such.

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of § 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) * * * (i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 147.130(a)(1)(iv) must—

* * * * *

[FR Doc. 2014–20252 Filed 8–22–14; 3:30 pm]
BILLING CODE 4830–01– 4510–29–P; 4120–01–P; 6325–64–P

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 100

[Docket No. USCG–2014–0686]

### Annual Marine Events in the Eighth Coast Guard District, Sabine River; Orange, TX

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of enforcement of regulation.

**SUMMARY:** The Coast Guard will enforce Special Local Regulations for the Southern Professional Outboard Racing Tour (S.P.O.R.T.) boat races to be held on the Sabine River in Orange, TX from 3 p.m. on September 19, 2014, through 6 p.m. on September 21, 2014. This action is necessary to provide for the safety of the participants, crew, spectators, participating vessels, non-participating vessels and other users of the waterway. During the enforcement period, the Coast Guard Patrol Commander will enforce restrictions upon, and control the movement of, vessels in the zone established by the Special Local Regulation.

**DATES:** The regulation in 33 CFR 100.801 will be enforced from 3 p.m. to 6 p.m. on September 19, 2014; and from 9 a.m. to 6 p.m. on September 20 and 21, 2014.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this notice of enforcement, call or email Mr. Scott Whalen, U.S. Coast Guard Marine Safety Unit Port Arthur, TX; telephone 409–719–5086, email *scott.k.whalen@uscg.mil.*

**SUPPLEMENTARY INFORMATION:** The Coast Guard will enforce Special Local Regulation for the annual S.P.O.R.T. boat races in 33 CFR 100.801 (Table 3, Line 5) on September 19, 2014, from 3 p.m. to 6 p.m. and on September 20 and 21, 2014, from 9 a.m. to 6 p.m.

This Special Local Regulation encompasses all waters of the Sabine River south of latitude 30°05′33″ N and waters north of latitude 30°05′45″ N North American Datun (NAD 83).

Under the provisions of 33 CFR 100.801, a vessel may not enter the



# FEDERAL REGISTER

| Vol. 78 | Tuesday, |
|---|---|
| No. 127 | July 2, 2013 |

---

Part III

## Department of the Treasury

Internal Revenue Service
26 CFR Part 54

## Department of Labor

Employee Benefits Security Administration
29 CFR Parts 2510 and 2590

## Department of Health and Human Services

45 CFR Parts 147 and 156
Coverage of Certain Preventive Services Under the Affordable Care Act;
Final Rules

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9624]**

**RIN 1545–BJ60**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Parts 2510 and 2590**

**RIN 1210–AB44**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Parts 147 and 156**

**[CMS–9968–F]**

**RIN 0938–AR42**

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** This document contains final regulations regarding coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. Among these services are women's preventive health services, as specified in guidelines supported by the Health Resources and Services Administration (HRSA). As authorized by the current regulations, and consistent with the HRSA guidelines, group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the otherwise applicable requirement to cover certain contraceptive services. These final regulations simplify and clarify the religious employer exemption. These final regulations also establish accommodations with respect to the contraceptive coverage requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), as well as student health insurance coverage arranged by eligible organizations that are institutions of higher education. These regulations also finalize related amendments to regulations concerning Affordable Insurance Exchanges.

**DATES:** *Effective date:* These final regulations are effective on August 1, 2013. *Applicability date:* With the exception of the amendments to the religious employer exemption, which apply to group health plans and health insurance issuers for plan years beginning on or after August 1, 2013, these final regulations apply to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014.

**FOR FURTHER INFORMATION CONTACT:** For inquiries related to the religious employer exemption and eligible organization accommodations: Jacob Ackerman, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

For matters related to the Federally-facilitated Exchange user fee adjustment: Ariel Novick, CMS, HHS, at (301) 492–4309.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713(a)(4) of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide benefits for certain women's preventive health services without cost sharing, as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). On August 1, 2011, HRSA adopted and released guidelines for women's preventive health services (HRSA Guidelines) based on recommendations of the independent Institute of Medicine. As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1] Except as discussed later in this section, non-grandfathered group health plans and health insurance coverage are required to provide coverage consistent with the HRSA Guidelines without cost sharing for plan years (in the individual market, policy years) beginning on or after August 1, 2012.[2]

Interim final regulations implementing section 2713 of the PHS Act were published on July 19, 2010 (75 FR 41726) (2010 interim final

---

[1] The HRSA Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[2] Interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

Exhibit 13     JA641     JA-0000239

regulations). On August 1, 2011, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) amended the 2010 interim final regulations to provide HRSA with authority that would effectively exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines (76 FR 46621) (2011 amended interim final regulations), and, on the same date, HRSA exercised this authority in the HRSA Guidelines such that group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the requirement to cover contraceptive services.[3] The 2011 amended interim final regulations specified that, for purposes of this exemption, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. Final regulations issued on February 10, 2012, adopted the definition of religious employer in the 2011 amended interim final regulations without modification (2012 final regulations).[4]

Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans).[5] The guidance provided that the temporary enforcement safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013. The Departments committed to rulemaking during the 1-year safe harbor period to ensure more women broad access to recommended preventive services, including contraceptive services, without cost sharing, while simultaneously protecting certain additional nonprofit religious organizations with religious objections to contraceptive coverage from having to contract, arrange, pay, or refer for such coverage.

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described and solicited comments on possible approaches to achieve these goals (77 FR 16501).

On February 6, 2013, following review of the comments on the ANPRM, the Departments published proposed regulations at 78 FR 8456 (proposed regulations). The regulations proposed to simplify and clarify the definition of religious employer for purposes of the religious employer exemption. The regulations also proposed accommodations for health coverage established or maintained or arranged by certain nonprofit religious organizations with religious objections to contraceptive coverage. These organizations were referred to as eligible organizations.

The regulations proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would be required to assume sole responsibility, independent of the eligible organization and its plan, for providing contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The Departments proposed a comparable accommodation with respect to insured student health insurance coverage arranged by eligible organizations that are institutions of higher education.

In the case of a self-insured group health plan established or maintained by an eligible organization, the proposed regulations presented potential approaches under which the third party administrator of the plan would arrange for a health insurance issuer to provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. An issuer (or its affiliate) would be able to offset the costs incurred by the third party administrator and the issuer in the course of arranging and providing such coverage by claiming an adjustment in the Federally-facilitated Exchange (FFE) user fee.

The Departments received over 400,000 comments (many of them standardized form letters) in response to the proposed regulations. After consideration of the comments, the Departments are publishing these final regulations. With the exception of the amendments to the religious employer exemption, which apply to group health plans and group health insurance issuers for plan years beginning on or after August 1, 2013, these final regulations apply to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014, which is when the majority of plan years begin.[6][7] Contemporaneously issued amendments to the HRSA Guidelines implementing the simplified and clarified religious employer exemption authorized by 45 CFR 147.131(a) of these final regulations will be effective on August 1, 2013.

---

[3] The 2011 amended interim final regulations were issued and effective on August 1, 2011, and published on August 3, 2011(76 FR 46621).

[4] The 2012 final regulations were published on February 15, 2012 (77 FR 8725).

[5] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012. Available at *http://www.cms.gov/CCIIO/Resources/Files/Downloads/prev-services-guidance-08152012.pdf.* The guidance, as reissued on August 15, 2012, clarifies, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage are not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor is also available to insured student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that meet the conditions set forth in the guidance. *See* final rule entitled "Student Health Insurance Coverage" published March 21, 2012 (77 FR 16457).

[6] Section 2713(b) of the PHS Act and the companion provisions of ERISA and the Code provide that the Secretary shall establish an interval of not less than one year between when new recommendations or guidelines under PHS Act section 2713(a) are issued and the first plan year (in the individual market, policy year) for which coverage of services addressed in such recommendations or guidelines must be in effect. Under the 2010 interim final regulations, the requirement on a non-exempt, non-grandfathered group health plan or group or individual health insurance policy to cover a newly recommended preventive service without cost sharing takes effect starting with the first plan year (in the individual market, policy year) that begins on or after the date that is one year after the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1). In the case of contraceptive services, this 1-year period ended on August 1, 2012, because the HRSA Guidelines including such services were issued on August 1, 2011. These final regulations do not alter this effective date.

[7] This estimate is based on the Department of Labor's analysis of Form 5500 data.

Exhibit 13

JA642

JA-0000240

Two additional guidance documents are being issued contemporaneously with these final regulations. First, HHS is issuing guidance extending the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance continues to include a form to be used by an organization during this temporary period to self-certify that its plan qualifies for the temporary enforcement safe harbor. Second, as described in more detail later in this preamble, HHS and DOL are also issuing a self-certification form to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under these final regulations. This self-certification form is applicable in conjunction with the accommodations under these final regulations (that is, for plan years beginning on or after January 1, 2014), after the expiration of the temporary enforcement safe harbor.

## II. Overview of the Final Regulations

These final regulations promote two important policy goals. First, the regulations provide women with access to contraceptive coverage without cost sharing, thereby advancing the compelling government interests in safeguarding public health and ensuring that women have equal access to health care. Second, the regulations advance these interests in a narrowly tailored fashion that protects certain nonprofit religious organizations with religious objections to providing contraceptive coverage from having to contract, arrange, pay, or refer for such coverage. The regulations finalize the general approach described in the proposed regulations, with modifications in response to comments that are intended primarily to simplify administration of the policy.

Section 2713 of the PHS Act reflects a determination by Congress that coverage of recommended preventive services without cost sharing by non-grandfathered group health plans and health insurance coverage is necessary to achieve access to basic health care for more Americans. Individuals are more likely to use preventive services if they do not have to satisfy cost-sharing requirements (such as a copayment, coinsurance, or a deductible). Use of preventive services results in a healthier population and reduces health care costs by helping individuals avoid preventable conditions and receive

treatment earlier.[8] Further, Congress, by amending the Affordable Care Act during Senate consideration of the bill to ensure that recommended preventive services for women would be covered adequately by non-grandfathered group health plans and health insurance coverage, recognized that women have unique health care needs.[9] Such needs include contraceptive services.[10]

Some commenters asserted that contraceptive services should not be considered preventive health services, arguing that they do not prevent disease and have been shown by some studies to be harmful to women's health. The HRSA Guidelines are based on recommendations of the independent Institute of Medicine (IOM), which undertook a review of the scientific and medical evidence on women's preventive services. As documented in the IOM report, "Clinical Preventive Services for Women: Closing the Gaps," women experiencing an unintended pregnancy may not immediately be aware that they are pregnant, and thus delay prenatal care. They also may be less motivated to cease behaviors during pregnancy, such as smoking and consumption of alcohol, that pose pregnancy-related risks. Studies show a greater risk of preterm birth and low birth weight among unintended pregnancies.[11] In addition, contraceptive use helps women improve birth spacing and therefore avoid the increased risk of adverse pregnancy outcomes that comes with pregnancies that are too closely spaced. Short interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small-for-gestational age births.[12] Contraceptives

also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy (for example, prevention of certain cancers, menstrual disorders, and acne).[13] In addition, by reducing the number of unintended pregnancies, contraceptives reduce the number of women seeking abortions.[14] It is for a woman and her health care provider in each particular case to weigh any risks against the benefits in deciding whether to use contraceptive services in general or any particular contraceptive service.

Covering contraceptives also yields significant cost savings. A 2000 study estimated that it would cost 15 to 17 percent more not to provide contraceptive coverage in employee health plans than to provide such coverage, after accounting for both the direct medical costs of pregnancy and the indirect costs, such as employee absence.[15] Consistent with this finding, when contraceptive coverage was added to the Federal Employees Health Benefits Program, premiums did not increase because there was no resulting net health care cost increase.[16] Specific to public financing of contraceptive services, a 2010 analysis projected that expanding access to family planning services under Medicaid saves $4.26 for every $1 spent.[17] Additional research

[8] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, Washington, DC: National Academy Press, 2011, at p. 16.

[9] S.Amdt. 2791 to S.Amdt. 2786 to H.R. 3590 (Service Members Home Ownership Tax Act of 2009), December 3, 2009.

[10] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, Washington, DC: National Academy Press, 2011, at p. 9; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost Sharing, 14 *Guttmacher Policy Review*, 10 (2011), available at www.guttmacher.org/pubs/gpr/14/1/gpr140107.html. *See also Congressional Record*, S12025 (Dec. 1, 2009), S12114, S12271, S12277 (December 3, 2009) (statements of Senators B. Boxer, D. Feinstein, A. Franken, and B. Nelson, respectively).

[11] Gipson, J.D., *et al.*, The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature, *Studies on Family Planning*, 2008, 39(1):18–38.

[12] Conde-Agudelo, A., *et al.*, Birth Spacing and Risk of Adverse Perinatal Outcomes—A Meta-Analysis, *Journal of the American Medical Association*, 295(15):1809–1823 (2006); *see also* Zhu, B., Effect of Interpregnancy Interval on Birth Outcomes: Findings from Recent U.S. Studies, *International Journal of Gynecology & Obstetrics*,

89:S25–S33 (2005); Fuentes-Afflick, E., & Hessol, N., Interpregnancy Interval and the Risk of Premature Infants, *Obstetrics & Gynecology*. 95(3):383–390 (2000).

[13] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy Press, 2011, at p. 107.

[14] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy Press, 2011, at p. 105. *See also*, Peipert, J., *et al.*, Preventing Unintended Pregnancies by Providing No-Cost Contraception, *Obstetrics & Gynecology*, 120(6): 1291–1297 (2012); *see also* Bongaarts, J., & Westoff, C., The Potential Role of Contraception in Reducing Abortion, *Studies in Family Planning*, 31(3): 193–202 (2000).

[15] Testimony of Guttmacher Inst., submitted to the Comm. on Preventive Servs. for Women, Institute of Medicine, January 12, 2012, p. 11, citing Bonoan, R. & Conen, J.S., Promoting Healthy Pregnancies: Counseling and Contraception as the First Step. Washington Business Group on Health, Family Health in Brief, Issue No. 3, August 2000; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost Sharing, 14 *Guttmacher Pol'y Rev*. 10 (2011); Mavranezouli, I., Health Economics of Contraception, 23 *Best Practice & Res. Clinical Obstetrics & Gynecology* 187–198 (2009); Trussell, I., *et al.*, Cost Effectiveness of Contraceptives in the United States, 79 *Contraception* 5–14 (2009); Trussell, I., The Cost of Unintended Pregnancy in the United States, 75 *Contraception* 168–170 (2007).

[16] Dailard, C., Special Analysis: The Cost of Contraceptive Insurance Coverage, *Guttmacher Rep. on Public Policy* (March 2003).

[17] Sawhill, R., *et al.*, An Ounce of Prevention: Policy Prescriptions to Reduce the Prevalence of Fragile Families, *Future of Children*. 20(2):133–155.

Exhibit 13                JA643                JA-0000241

arrived at a similar conclusion and found that, in total, services provided at publicly funded family planning centers saved $5.1 billion in 2008.[18]

Further, the importance of covering contraceptive services has been recognized by many states, issuers, and employers. Twenty-eight states now have laws requiring health insurance issuers to cover contraceptives.[19] A 2002 study found that more than 89 percent of insured plans covered contraceptives.[20] And a 2010 survey of employers revealed that 85 percent of large employers and 62 percent of small employers offered coverage of FDA-approved contraceptives, with another 32 percent of small employers reporting that they did not know whether they did so.[21]

Furthermore, in directing non-grandfathered group health plans and health insurance coverage to cover preventive services and screenings for women described in HRSA Guidelines without cost sharing, the statute acknowledges that both existing health coverage and existing preventive services recommendations often did not adequately serve the unique health needs of women. This disparity placed women in the workforce at a disadvantage compared to their male coworkers. Research shows that access to contraception improves the social and economic status of women.[22]

Research also shows that cost sharing can be a significant barrier to access to contraception.[23] As IOM noted, women use preventive services more than men, generating significant out-of-pocket expenses for women.[24] Thus, eliminating cost sharing is particularly critical to addressing the gender disparity of concern here.

The Departments aim to advance these compelling public health and gender equity interests by providing more women broad access to recommended preventive services, including contraceptive services, without cost sharing, while simultaneously protecting certain nonprofit religious organizations with religious objections to contraceptive coverage from having to contract, arrange, pay, or refer for such coverage, as described in these final regulations. Moreover, through these final regulations, the Departments seek to achieve these goals in ways that take into account the responsibilities imposed on health insurance issuers and third party administrators.

*A. Amendments to Coverage of Recommended Preventive Health Services—26 CFR 54.9815–2713, 29 CFR 2590.715–2713, 45 CFR 147.130*

These sections of the final regulations finalize technical amendments to the existing preventive services coverage regulations as proposed. The final regulations amend paragraph (a) of the existing regulations so that the general requirement to provide coverage for recommended preventive services without cost sharing is subject to the religious employer exemption and eligible organization accommodations discussed later in this section.

The regulations also finalize proposed amendments to paragraph (a)(1)(iv) of the existing regulations. As amended, the authorization for HRSA to exempt religious employers from the contraceptive coverage requirement and the definition of religious employer are now located in new 45 CFR 147.131(a) of the HHS regulation and incorporated by reference in the regulations of the Departments of Labor and the Treasury.

There are no other changes to the provisions of the 2010 interim final regulations related to providing

coverage for recommended preventive services without cost sharing. Accordingly, consistent with the general rules for the provision of coverage for recommended preventive services without cost sharing set forth in the 2010 interim final regulations, nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service to the extent not specified in a recommendation or guideline and nothing requires a plan or issuer that has a network of health care providers to provide benefits or eliminate cost sharing for items or services that are delivered out-of-network.[25]

*B. Religious Employer Exemption and Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations—26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A, 45 CFR 147.131*

These sections of the final regulations simplify and clarify the criteria for the religious employer exemption from the contraceptive coverage requirement. These sections also establish accommodations with respect to the contraceptive coverage requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), as well as student health insurance coverage arranged by eligible organizations that are institutions of higher education.

1. Religious Employer Exemption

Under the 2012 final regulations, HRSA has the authority to issue guidelines in a manner that exempts group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) from any requirement to cover contraceptive services consistent with the HRSA Guidelines that would otherwise apply. A religious employer was defined for this purpose as one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who

[18] Frost, J., et al., Contraceptive Needs and Services, National and State Data, 2008 Update. New York: Guttmacher Institute (2010).

[19] Sonfield, A., et al., U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates, *Perspectives on Sexual and Reproductive Health* 36(2):72–79, 2002.

[20] Sonfield. A., et al., U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates, *Perspectives on Sexual and Reproductive Health* 36(2):72–79, 2002.

[21] Claxton, G., et al., *Employer Health Benefits: 2010 Annual Survey.* Menlo Park, Cal.: Kaiser Family Found. & Chicago, Illinois: Health Research & Education Trust, 2010. While many employers included contraceptive coverage in their group health plans prior to the Affordable Care Act, the Departments note that the contraceptive coverage requirement promotes the government's interests with respect to even these plans' participants and beneficiaries by ensuring that these plans cover contraceptive services without cost sharing, a significant financial barrier to such services that was prevalent before the contraceptive coverage requirement. Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps.* Washington, DC: National Academy Press, 2011. at p. 107. *See also* Postlethwaite, D., *et al.,* A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change, 76 *Contraception* 360 (2007).

[22] Testimony of Guttmacher Institute, submitted to the Comm. on Preventive Services for Women, Institute of Medicine, January 12, 2012, p. 6, citing Goldin, C. & Katz. L., Career and Marriage in the Age of the Pill, *American Economic Review,* 2000, 90(2):461–465; Goldin, C. & Katz, L.F., The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, *Journal of Political Economy,* 2002, 110(4):730–770; Bailey, M.J., More

Power to the Pill: The Impact of Contraceptive Freedom on Women's Life Cycle Labor Supply, *Quarterly Journal of Economics,* 2006, 121(1):289–320.

[23] Postlethwaite, D., *et al.,* A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change, 76 *Contraception* 360 (2007).

[24] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps.* Washington, DC: National Academy Press, 2011, p. 19.

[25] *See* 26 CFR 54.9815–2713T(a)(3) and (4); 29 CFR 2590.715–2713(a)(3) and (4); 45 CFR 147.130(a)(3) and (4). Note, however, if a plan or issuer does not have in its network a provider who can provide the particular service, then the plan or issuer must cover the item or service when performed by an out-of-network provider and not impose cost sharing with respect to the item or service. *See* FAQs About Affordable Care Act Implementation (Part XII), Q3 (February 20, 2013), available at: *http://www.dol.gov/ebsa/faqs/faq-aca12.html.*

Exhibit 13                          JA644                          JA-0000242

share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order.

The Departments proposed to simplify and clarify the definition of religious employer by eliminating the first three prongs and clarifying the fourth prong of the definition. Under this proposal, an employer that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Code would be considered a religious employer for purposes of the religious employer exemption. These proposed amendments were intended to eliminate any question as to whether group health plans of houses of worship that provide educational, charitable, or social services to their communities qualify for the exemption. Specifically, they were intended to ensure that an otherwise exempt plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer hires or serves people of different religious faiths. The Departments also proposed to clarify that, for purposes of the religious employer exemption, an employer that is organized and operates as a nonprofit entity is not limited to any particular form of entity under state law. The Departments reiterate that, under this standard, it is not necessary to determine the federal tax-exempt status of the nonprofit entity in determining whether the religious employer exemption applies.[26]

The Departments received numerous comments addressing the definition of religious employer. Some commenters stated that the proposed definition of religious employer was too narrow and should be broadened to include all employers, both nonprofit and for-profit, that have a religious objection to providing contraceptive coverage in their group health plan. Some commenters requested that the definition of religious employer be expanded to exempt not only churches and other houses of worship, but also religiously affiliated hospitals and other health care organizations and other religiously affiliated ministries using the concepts of Code section 414(e). Other

commenters recommended that the requirement to cover contraceptive services be rescinded altogether.

Some commenters stated that the exemption for religious employers should be eliminated and that religious employers should instead be subject to the accommodations for eligible organizations so that their employees may also receive alternative contraceptive coverage without cost sharing. Other commenters opposed eliminating the first three prongs of the definition of religious employer, stating that only churches and other houses of worship that meet the criteria of all of the prongs should be subject to the exemption. Many commenters agreed with the Departments that the proposed definition of religious employer would not materially expand the universe of religious employers, but others felt that the proposed definition would unduly broaden it.

Based on their review of these comments, the Departments are finalizing without change the definition of religious employer in the proposed regulations. As indicated in the preamble to the proposed regulations (78 FR 8461), the simplified and clarified definition of religious employer does not expand the universe of religious employers that qualify for the exemption beyond that which was intended in the 2012 final regulations, but only eliminates any perceived potential disincentive for religious employers to provide educational, charitable, and social services to their communities. The Departments believe that the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement. Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.

Contemporaneous with the issuance of these final regulations, HRSA is issuing amended guidelines implementing the simplified and clarified religious employer exemption authorized by 45 CFR 147.131(a) of these final regulations (and incorporated by reference in 26 CFR 54.9815–2713(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv)). The amendments to the

guidelines will become effective beginning August 1, 2013.

2. Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations

In addition to simplifying and clarifying the definition of religious employer, these final regulations establish accommodations with respect to the contraceptive coverage requirement for health coverage established or maintained or arranged by eligible organizations, as defined in these final regulations. After meeting a self-certification standard, as described in more detail in this preamble, nonprofit religious organizations that qualify for these accommodations are not required to contract, arrange, pay, or refer for contraceptive coverage; however, plan participants and beneficiaries (or student enrollees and their covered dependents) will still benefit from separate payments for contraceptive services without cost sharing or other charge in accordance with section 2713 of the PHS Act and the companion provisions of ERISA and the Code. As discussed later in this section, the accommodations established under these final regulations do not require the issuance of a separate excepted benefits individual health insurance policy covering contraceptive services, as set forth in the proposed regulations, but instead require a simpler method of providing direct payments for contraceptive services.

a. Definition of Eligible Organization

The final regulations retain the definition of eligible organization set forth in the proposed regulations. Accordingly, under these final regulations, an eligible organization is an organization that: (1) Opposes providing coverage for some or all of the contraceptive services required to be covered under section 2713 of the PHS Act and the companion provisions of ERISA and the Code on account of religious objections; (2) is organized and operates as a nonprofit entity; (3) holds itself out as a religious organization; and (4) self-certifies that it satisfies the first three criteria (as discussed in more detail later in this section).

Some commenters requested that the definition of eligible organization be broadened to include nonprofit secular employers and for-profit employers with religious objections to contraceptive coverage. Other commenters urged that the definition not be extended to for-profit employers, arguing that for-profit employers should not be accommodated because their purposes are commercial, not religious. Additionally, several

---

[26] Similarly, whether a nonprofit entity is a religious employer is determined under this definition without regard to whether the entity files Form 990 with the IRS.

Exhibit 13                    JA645                    JA-0000243

commenters recommended clarifying how an eligible organization would show that it holds itself out as a religious organization. Specifically, commenters suggested clarifying that only organizations that prominently and consistently hold themselves out to the public as religious organizations may qualify for an accommodation.

The Departments decline to adopt these suggestions. The definition of eligible organization in these final regulations is the same as that in the proposed regulations, and is intended to allow health coverage established or maintained by various types of nonprofit religious organizations with religious objections to contraceptive coverage to qualify for an accommodation. Consistent with religious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, the definition of eligible organization in these final regulations does not extend to for-profit organizations. The Departments are unaware of any court granting a religious exemption to a for-profit organization, and decline to expand the definition of eligible organization to include for-profit organizations.

b. Self-Certification

Each organization seeking to be treated as an eligible organization under the final regulations, to avoid contracting, arranging, paying, or referring for contraceptive coverage, is required to self-certify, prior to the beginning of the first plan year to which an accommodation is to apply, that it meets the definition of an eligible organization.[27] The self-certification (as described in these final regulations) needs to be executed once. A copy of the self-certification needs to be provided to a new health insurance issuer or a new third party administrator if the eligible organization changes issuers or third party administrators. Comments addressing this topic generally approved of the approach proposed by the Departments, but some commenters suggested that stronger protections were needed to promote oversight, enforcement, and transparency and to prevent abuse. For example, some commenters recommended requiring eligible organizations to file their self-certifications with the Departments and

making such records available to the public. Other commenters argued that the act of self-certification would infringe on the First Amendment right of free speech.

The final regulations do not require the self-certification to be submitted to any of the Departments. An eligible organization must simply maintain the self-certification (executed by an authorized representative of the organization) in its records, in a manner consistent with the record retention requirements under section 107 of ERISA, and make the self-certification available for examination upon request. The Departments believe that the requirement to make the self-certification available for examination upon request appropriately balances regulators', issuers', third party administrators', and plan participants and beneficiaries' (and student enrollees and their covered dependents') interest in verifying compliance and eligible organizations' interest in avoiding undue inquiry into their character, mission, or practices. Further, the Departments do not believe that the self-certification standard infringes on freedom of speech.

The proposed regulations provided that the self-certification would specify the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The final regulations eliminate this requirement, pursuant to the standard exclusion policy discussed later in this section. Further, the final regulations provide that, if an organization seeks to be treated as an eligible organization under the final regulations, an issuer or third party administrator may not require any documentation from the organization beyond its self-certification as to its status as an eligible organization. The form to be used for the self-certification is being finalized contemporaneous with the issuance of these final regulations through the process provided for under the Paperwork Reduction Act of 1995.

As discussed previously, the self-certification form is applicable in conjunction with the accommodations under these final regulations (that is, for plan years beginning on or after January 1, 2014), after the expiration of the temporary enforcement safe harbor. The self-certification standard referenced in these final regulations (and the form to be executed by an eligible organization to make such self-certification, which is being issued contemporaneously with these final regulations) are different from the standard (and the form) associated with the guidance regarding the extension of the temporary

enforcement safe harbor, which is also being issued contemporaneously with these final regulations.

c. Separate Payments for Contraceptive Services for Participants and Beneficiaries in Insured Group Health Plans

The proposed regulations provided, in the case of an insured group health plan established or maintained by an eligible organization, that the health insurance issuer providing group coverage in connection with the plan be required to assume sole responsibility, independent of the eligible organization and its plan, for providing separate individual health insurance policies covering contraceptive services for plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. Under this proposal, an organization seeking to be treated as an eligible organization would need only to meet the self-certification standard. The issuer, in turn, would automatically enroll plan participants and beneficiaries in separate individual health insurance policies that cover contraceptive services (and notify them of such enrollment) without the imposition of any cost-sharing requirement (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge on plan participants or beneficiaries or on the eligible organization or its plan.

Some commenters stated that the Departments should not provide a tailored accommodation for an eligible organization that objects to only some types of contraceptive services. These commenters said that customizing individual contraceptive policies for participants and beneficiaries (or students enrollees and their covered dependents) in plans of eligible organizations based on the differing religious objections to contraceptive coverage of each eligible organization would create an administrative burden for issuers and confuse plan participants and beneficiaries (or student enrollees and their covered dependents). Some commenters also noted that requiring coordination of benefits might not be feasible, because many states prohibit coordination between individual and group health insurance coverage.

In response to these comments, the final regulations provide that an issuer providing payments for contraceptive services in accordance with these final regulations may use a standard exclusion from a group health insurance policy that encompasses all recommended contraceptive services

---

[27] Although not required to do so by these final regulations, nothing in these final regulations prevents a religious employer from drafting and executing a self-certification regarding its status as a religious employer and sharing the self-certification with issuers, plan service providers, plan participants or beneficiaries, or others.

Exhibit 13

JA646

JA-0000244

and not violate PHS Act section 2713 and the companion provisions of ERISA and the Code with respect to the requirement to cover contraceptive services. While issuers may, at their option, choose to offer customized exclusions from group health insurance policies based on the differing religious objections to contraceptive coverage of each eligible organization (or offer several different but standardized exclusions from group health insurance policies from which eligible organizations may choose), they are not required to do so under these final regulations. Regardless of whether an issuer uses a standard or customized exclusion from a group health insurance policy, plan participants and beneficiaries (and student enrollees and their covered dependents) are assured that the issuer will make payments for any recommended contraceptive services excluded from the group health insurance policy (or student health insurance coverage).

Some commenters noted that the proposed individual health insurance policies covering contraceptive services might not be viewed as enforceable contracts under state contract law because there would be no premium associated with the coverage and no ability for an individual to decline coverage. Commenters suggested that states would need to develop new regulatory processes for reviewing forms and rates for such policies, and noted that the inability to charge a premium for such policies could raise actuarial soundness and financial reserve concerns. Commenters also noted that state laws would prevent issuers licensed to issue group health insurance policies in one state from issuing individual health insurance policies to employees of an eligible organization residing in other states, and expressed concern about the cost and administrative complexity of issuing and administering individual contraceptive coverage policies.

These final regulations achieve the same end by requiring that a health insurance issuer providing group health insurance coverage in connection with a group health plan established or maintained by an eligible organization assume sole responsibility for providing separate payments for contraceptive services directly for plan participants and beneficiaries, without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The requirement that, for plan participants and beneficiaries, issuers provide payments for contraceptive services, in lieu of individual health insurance

policies that cover contraceptive services, represents a simpler approach and responds to concerns raised by commenters, while still ensuring that eligible organizations and their plans do not contract, arrange, pay, or refer for such coverage, and that contraceptive coverage is expressly excluded from the group health insurance coverage.

Under these final regulations, as under the proposed regulations, the eligible organization need only meet the self-certification standard and provide to the issuer a copy of its self-certification. The issuer that receives the copy of the self-certification from the eligible organization must expressly exclude contraceptive coverage—either all contraceptive coverage or coverage of specific contraceptive services if the issuer chooses to customize the exclusion—from the group health insurance coverage of the eligible organization. The issuer must also notify plan participants and beneficiaries, contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year, that the issuer provides payments for contraceptive services at no cost separate from the group health plan for so long as the participant or beneficiary remains enrolled in the plan, as discussed later in this section. Unlike under the proposed regulations, the issuer is not required to issue to plan participants and beneficiaries individual health insurance policies covering contraceptive services, and, thus, there is no need to consider such coverage excepted benefits, as proposed. Instead, under these final regulations, the issuer must, as a federal regulatory requirement, provide payments for contraceptive services for plan participants and beneficiaries, separate from the group health plan, without the imposition of cost sharing, premium, fee, or other charge on plan participants or beneficiaries or on the eligible organization or its plan. Under this simplified approach to the accommodation, issuers will not incur the associated administrative costs of issuing individual contraceptive coverage policies.

This simpler approach to the accommodation for insured coverage does not trigger certain aspects of state insurance law. As the payments at issue derive solely from a federal regulatory requirement, not a health insurance policy, they do not implicate issues such as issuer licensing and product approval requirements under state law, and they minimize cost and

administrative complexity for issuers. At the same time, because the payments for contraceptive services are not a group health plan benefit under this approach, this policy ensures that eligible organizations and their plans do not contract, arrange, pay, or refer for contraceptive coverage, and that such coverage is expressly excluded from their group health insurance policies. This approach also minimizes barriers in access to care because plan participants and beneficiaries (and their health care providers) do not have to have two separate health insurance policies (that is, the group health insurance policy and the individual contraceptive coverage policy). Furthermore, Small Business Health Insurance Options Programs (SHOPs) (the small group market Exchanges) do not need to make operational changes as a result of the accommodation. Small employers that are eligible organizations purchasing coverage through a SHOP can simply provide a copy of their self-certification to the issuer (rather than provide it to the SHOP) to ensure that their small group market policy is provided in a manner consistent with these final regulations.

Although these payments for contraceptive services are not benefits under a health insurance policy, to fulfill an issuer's responsibilities under section 2713 of the PHS Act and the companion provisions of ERISA and the Code and consistent with the proposed regulations, an issuer must make them available in a way that meets minimum standards for consumer protection, which would ordinarily accompany coverage of recommended preventive health services without cost sharing under section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Thus, issuers, in order to satisfy their regulatory obligations under these final regulations, must make these payments for contraceptive services in a manner consistent with the requirements under the following provisions of the PHS Act and the companion provisions of ERISA and the Code (and their implementing regulations): PHS Act sections 2706 (non-discrimination in health care), 2709 (coverage for individuals participating in approved clinical trials), 2711 (no lifetime or annual limits), 2713 (coverage of preventive health services), 2719 (appeals process), and 2719A (patient protections), as incorporated by reference into ERISA section 715 and Code section 9815.[28] Consistent with

---

[28] With respect to the accommodation for self-insured coverage of eligible organizations under these final regulations, a comparable requirement to

Exhibit 13                               JA647                               JA-0000245

these standards and as described in the 2010 interim final regulations, an issuer may apply reasonable medical management techniques and may require that contraceptive services be obtained in-network (if an issuer has a network of providers) in order for plan participants and beneficiaries to obtain such services without cost sharing.[29]

Issuers are prohibited from charging any premium, fee, or other charge to eligible organizations or their plans, or to plan participants or beneficiaries, for making payments for contraceptive services, and must segregate the premium revenue collected from eligible organizations from the monies they use to make such payments. In making such payments, the issuer must ensure that it does not use any premiums collected from eligible organizations. Issuers have flexibility in how to structure these payments, provided that the payments in no way involve the eligible organization, and provided that issuers are able to account for this segregation of funds in accordance with applicable, generally accepted accounting and auditing standards.

The Departments stated in the preamble of the proposed regulations that issuers would find that providing contraceptive coverage is at least cost neutral because they would be insuring the same set of individuals under both the group health insurance policies and the separate individual contraceptive coverage policies and, as a result, would experience lower costs from improvements in women's health, healthier timing and spacing of pregnancies, and fewer unplanned pregnancies. The Departments continue to believe, and have evidence to support, that, with respect to the accommodation for insured coverage established under these final regulations, providing payments for contraceptive services is cost neutral for issuers. Several studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's

health.[30][31] The Departments are unaware of any studies to the contrary.[32]

Some commenters raised specific premium rating and accounting issues related to the proposed regulations' approach to the cost neutrality of issuers providing contraceptive coverage. These commenters generally asserted that the cost savings due to lower pregnancy-related costs and improvements in women's health would flow to employers through reduced premiums, thereby leaving issuers uncompensated for the cost of providing contraceptive coverage. Further, commenters stated that, in the case of a group health insurance policy in the small group market, the small employer's reduced claims experience attributable to contraceptive coverage (not including the issuer's direct costs of contraceptive coverage) would be spread across the issuer's single risk pool for the entire small group market in a state and result in a lower index rate for pricing all of the issuer's small group market products. Thus, according to these commenters, in both the large and small group markets, issuers would not reap the cost savings attributable to contraceptive coverage, and would need to fund the costs of a free-standing contraceptive coverage policy from some other source.

One commenter suggested that it would be possible to view the provision of contraceptive coverage as cost neutral if an issuer were to set the premium otherwise charged to an eligible organization as though plan participants and beneficiaries did not have separate contraceptive coverage. Other commenters argued that the rationale for providing Federally-facilitated Exchange (FFE) user fee adjustments in connection with the accommodation for self-insured group health plans of eligible organizations was equally applicable in the context of insured group health plans of eligible organizations and recommended that issuers be permitted to charge a premium or otherwise be compensated for providing contraceptive coverage.

In response to these comments, the Departments continue to believe that issuers have various options for achieving cost neutrality, notwithstanding that they must make payments for contraceptive services without cost sharing, premium, fee, or other charge to the eligible organization, the group health plan, or plan participants or beneficiaries.

Issuers of large group insured products have an option by which they can ensure that they accrue the cost savings from reduced pregnancy-related expenses and other health care costs. For large group market products, issuers base premiums on an employer's prior year claims cost (that is, experience rating) and other factors.[33] Some commenters asserted that this rating practice means that any cost savings from fewer pregnancies and childbirths and improvements in women's health will be passed to the employer in the large group insured market. Given that there appears to be no legal requirement that issuers use this particular rating practice, and that this practice often entails adding costs to premiums that are not based solely on the experience of the employer's group.[34] issuers reasonably could set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants and beneficiaries—reflecting the actual terms of the group policy, which expressly excludes contraceptive coverage. This approach would be consistent with pricing methodologies currently used in the health insurance industry.

---

provide separate payments for contraceptive services consistent with these consumer protections is not explicitly placed on the third party administrator. This is because, as the plan administrator for contraceptive coverage, the third party administrator is already required to comply with these consumer protections, as well as all other provisions of ERISA that are applicable to group health plans, including ERISA sections 104 and 503, and the requirements of Part 7 of ERISA.

[29] See 26 CFR 54.9815–2713T(a)(3) and (4); 29 CFR 2590.715–2713(a)(3) and (4); 45 CFR 147.130(a)(3) and (4).

[30] Bertko, J., Glied, S., et al. The Cost of Covering Contraceptives Through Health Insurance (February 9, 2012). *http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml*; Washington Business Group on Health, Promoting Healthy Pregnancies: Counseling and Contraception as the First Step, Report of a Consultation with Business and Health Leader (September 20, 2000). *http://www.businessgrouphealth.org/pdfs/healthpregnancy.pdf*; Campbell, K.P., Investing in Maternal and Child Health: An Employer's Toolkit. National Business Group on Health. *http://www.businessgrouphealth.org/healthtopics/maternalchild/investing/docs/mch_toolkit.pdf*; Trussell, J., et al. The Economic Value of Contraception: A Comparison of 15 Methods. American Journal Public Health, 1995; 85(4):494–503. Revenues of H.R. 3162. the Children's Health and Medicare Protection Act. for the Rules Committee (August 1, 2007) *http://www.cbo.gov/ftpdocs/85xx/doc8519/HR3162.pdf*.

[31] The Departments believe that these same cost savings found by issuers of group health insurance would also be found by issuers of student health insurance coverage.

[32] One commenter cited two studies disputing the cost effectiveness of preventive health services, but these studies are not specific to contraceptive services. Further, these studies find that preventive care is not cost effective when a large population receives the preventive service but only a small fraction of that population would have developed the condition being prevented, a circumstance not presented here. See Cohen, J., et al. New England Journal of Medicine. 2008. 358:661–663 (February 14, 2008) *http://www.nejm.org/toc/nejm/358/7*; CBO Letter to Congressman Nathan Deal, (August 7, 2009). *http://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/104xx/doc10492/08-07-prevention.pdf*.

[33] *http://www.nahu.org/consumer/GroupInsurance.cfm*.

[34] *http://www.actuary.org/files/Draft_Large_Group_Medical_Business_Practice_Note_Jan_2013.pdf*.

Exhibit 13

JA648

JA-0000246

Another option is to treat the cost of payments for contraceptive services for women enrolled in insured group health plans established or maintained by eligible organizations as an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations given that issuers are prohibited from charging any premium, fee, or other charge to eligible organizations or their plans for providing payments for contraceptive services. In the small group market, issuers are required beginning in 2014 to treat all of their non-grandfathered business within a state as a single risk pool, and administrative costs may be spread evenly across all plans in the single risk pool (although issuers are permitted to apply them on a plan basis). In the large group market, while there is no single risk pool requirement, issuers generally spread administrative costs across their entire book of business.[35] In 2011, health insurance issuers earned approximately $290 billion in premiums in the insured small and large group markets.[36] If the cost of providing payments for contraceptive services for participants and beneficiaries in insured group health plans established or maintained by eligible organizations were treated as an administrative cost spread across an issuer's entire book of business (excluding plans established or maintained by eligible organizations), the cost of providing such payments would result in an imperceptible increase in administrative load.[37] These changes in premiums would be negligible and effectively cost neutral to issuers, even before considering any reductions in claims costs that accrue to the issuer.

Under either option, after meeting the self-certification standard, the eligible organization would not contract, arrange, pay, or refer for contraceptive coverage.

HHS intends to clarify in guidance that an issuer of group health insurance coverage that makes payments for contraceptive services under these final regulations may treat those payments as an adjustment to claims costs for purposes of medical loss ratio and risk

corridor program calculations.[38] This adjustment compensates for any increase in incurred claims associated with making payments for contraceptive services.

Several commenters expressed concern that participants and beneficiaries in plans of eligible organizations would be automatically enrolled in individual contraceptive coverage policies and recommended providing an opt-out for plan participants and beneficiaries who object to contraceptive coverage on religious grounds. Other commenters stated that allowing participants and beneficiaries to opt out of such contraceptive coverage would create an administrative burden on issuers and privacy concerns for individuals because the issuers would know which individuals opted in or opted out of such coverage. The simplified approach described in these final regulations eliminates this issue altogether, because issuers are not required to issue individual contraceptive coverage policies at all.[39] Rather, they are required only to provide payments for contraceptive services for those plan participants and beneficiaries who opt to use such services. Nothing in these final regulations compels any plan participant or beneficiary to use such services, and nothing causes participants or beneficiaries to be automatically enrolled in contraceptive coverage; therefore, these concerns are addressed without the need for an opt-out mechanism. Moreover, nothing in these final regulations precludes employers or others from expressing any opposition to the use of contraceptives or requires health care providers to prescribe or provide contraceptives, if doing so is against their religious beliefs.

The Departments explained in the preamble of the proposed regulations that a health insurance issuer providing group health insurance coverage in connection with a group health plan established or maintained by an eligible organization would be held harmless if the issuer relied in good faith on a representation by the organization as to its eligibility for the accommodation and such representation was later determined to be incorrect. The Departments also explained that an

eligible organization and its plan would be held harmless if the issuer were to fail to comply with the requirement to provide separate payments for contraceptive services for plan participants and beneficiaries at no cost. Some commenters requested that the Departments codify this policy in regulation text. Accordingly, this policy is now codified in paragraph (e) of 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A, and 45 CFR 147.131 of these final regulations.

To summarize, the following are the key elements of the accommodation that is being made for eligible organizations with insured group health plans:

• An organization seeking to be treated as an eligible organization needs only to self-certify that it is an eligible organization, provide the issuer with a copy of the self-certification, and satisfy the recordkeeping and inspection requirements of the self-certification standard.

• The issuer that receives a self-certification must then expressly exclude contraceptive coverage from the eligible organization's group health insurance coverage.

• The issuer must, contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year, notify plan participants and beneficiaries that the issuer provides separate payments for contraceptive services at no cost for so long as the participant or beneficiary remains enrolled in the plan.

• The issuer must segregate premium revenue collected from the eligible organization from the monies used to make payments for contraceptive services. When it makes payments for contraceptive services used by plan participants and beneficiaries, the issuer must do so without imposing any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, its group health plan, or its plan participants or beneficiaries. In making such payments, the issuer must ensure that it does not use any premiums collected from eligible organizations. Issuers have flexibility in how to structure these payments, but must be able to account for this segregation of funds, subject to applicable, generally accepted accounting and auditing standards. Thus, an eligible organization need not contract, arrange, pay or refer for contraceptive coverage.

---

[35] Bluhm. W., ed., Group Insurance. 5th Ed. 2007), 459–460.

[36] 2011 MLR–A data, submitted to CMS in July 2012.

[37] Office of Assistant Secretary for Planning and Evaluation. U.S. Department of Health and Human Services, "Cost-Neutrality of Contraceptive Coverage."

[38] See 45 CFR Part 158 for standards related to the medical loss ratio and 45 CFR Part 153 Subpart F for standards related to the risk corridor program.

[39] The same is true with respect to the accommodation for self-insured coverage of eligible organizations under these final regulations, given that third party administrators similarly are not required to arrange for individual contraceptive coverage policies at all.

Exhibit 13 JA649 JA-0000247

• Plan participants and beneficiaries may refuse to use contraceptive services.

• An eligible organization and its group health plan are considered to comply with the contraceptive coverage requirement even if the issuer fails to comply with the requirement to provide separate payments for contraceptive services for plan participants and beneficiaries at no cost.

**d. Separate Payments for Contraceptive Services for Participants and Beneficiaries in Self-Insured Group Health Plans**

Comments varied as to which of the three proposed approaches to providing separate contraceptive coverage without cost sharing for participants and beneficiaries in self-insured plans of eligible organizations should be finalized. Some commenters suggested that none of the proposed approaches would enable objecting employers to separate themselves completely from the administration of contraceptive coverage. These commenters requested an unqualified exemption from the contraceptive coverage requirement for such employers. Other commenters stated that none of the proposed approaches would sufficiently ensure that participants and beneficiaries in self-insured plans of eligible organizations would receive separate contraceptive coverage without cost sharing. These commenters requested that the final regulations require that objecting employers retain legal responsibility for any failure on the part of issuers or third party administrators to provide such coverage.

A number of commenters expressed concern about the responsibilities that one or more of the proposed approaches would impose on third party administrators. Some of these commenters suggested that the proposed requirement that third party administrators arrange for separate contraceptive-only coverage through an issuer would convert third party administrators into health insurance brokers. Others suggested that third party administrators would not be willing to assume the responsibility of arranging for separate contraceptive-only coverage. These commenters also suggested that, even if a third party administrator were willing to assume such responsibility, it would pass along the resultant increase in its administrative costs to the employer.

Other commenters expressed concern about an approach that would require third party administrators to become plan administrators and fiduciaries under section 3(16) of ERISA for the sole purpose of arranging contraceptive coverage. These commenters suggested that requiring third party administrators to serve as fiduciaries would increase their exposure to legal liability and also create conflicts of interest with their plan sponsor clients given that many agreements between third party administrators and plan sponsors prohibit third party administrators from serving as fiduciaries.

A number of commenters questioned the Department of Labor's legal authority to designate a third party administrator as the plan administrator for contraceptive coverage by virtue of the eligible organization providing a copy of its self-certification to the third party administrator. These commenters suggested that the self-certification of the eligibility of the organization for the accommodation would be insufficient to act as a designation under ERISA section 3(16)(A)(i), and questioned whether the self-certification could be defined as an instrument under which the plan is operated.

After reviewing the comments on the three proposed approaches, the Departments are finalizing the third approach under which the third party administrator becomes an ERISA section 3(16) plan administrator and claims administrator solely for the purpose of providing payments for contraceptive services for participants and beneficiaries in a self-insured plan of an eligible organization at no cost to plan participants or beneficiaries or to the eligible organization. The Departments have determined that the ERISA section 3(16) approach most effectively enables eligible organizations to avoid contracting, arranging, paying, or referring for contraceptive coverage after meeting the self-certification standard, while also creating the fewest barriers to or delays in plan participants and beneficiaries obtaining contraceptive services without cost sharing.

Under this approach, as set forth in these final regulations, with respect to the contraceptive coverage requirement, an eligible organization is considered to comply with section 2713 of the PHS Act and the companion provisions in ERISA and the Code if it provides to all third party administrators with which it or its plan has contracted a copy of its self-certification, consistent with the requirements of these final regulations.[40] The self-certification

must: (1) State that the eligible organization will not act as the plan administrator or claims administrator with respect to contraceptive services or contribute to the funding of contraceptive services; and (2) cite 29 CFR 2510.3–16 and 26 CFR 54.9815–2713A and 29 CFR 2590.715–2713A, which explain the obligations of the third party administrator. Upon receipt of the copy of the self-certification, the third party administrator may decide not to enter into, or remain in, a contractual relationship with the eligible organization to provide administrative services for the plan.

As relevant here, a plan administrator is defined in ERISA section 3(16)(A)(i) as "the person specifically so designated by the terms of the instrument under which the plan is operated." As a document notifying the third party administrator(s) that the eligible organization will not provide, fund, or administer payments for contraceptive services, the self-certification is one of the instruments under which the employer's plan is operated under ERISA section 3(16)(A)(i). The self-certification will afford the third party administrator notice of obligations set forth in these final regulations, and will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA. Additional conditions the eligible organization must meet in order to be considered to comply with PHS Act section 2713 and the companion provisions in ERISA and the Code include prohibitions on: (1) Directly or indirectly interfering with a third party administrator's efforts to provide or arrange separate payments for contraceptive services for participants or beneficiaries in the plan and (2) directly or indirectly seeking to influence a third party administrator's

---

[40] Third party administrators are hired by plan sponsors to process claims and administer other administrative aspects of employee benefit plans. In some cases, a plan hires different third party administrator to administer claims for different classifications of benefits. (For example, one plan may contract with a pharmacy benefit manager (PBM) to handle claims administration for prescription drugs and another third party administrator to handle claims for inpatient and outpatient medical/surgical benefits.) To the extent the plan hires more than one third party administrator, each third party administrator would become the section 3(16) plan administrator with respect to the types of claims it normally processes (that is, the PBM would continue to handle claims for prescription drugs and the other third party administrator would continue to handle claims for inpatient and outpatient medical/surgical benefits); each would do so in accordance with section 2713 of the PHS Act and the companion provisions of ERISA and the Code (even if plan terms might otherwise provide differently) as plan administration that may be funded in accordance with 45 CFR 156.50(d).

Exhibit 13                                  JA650                                  JA-0000248

decision to provide or arrange such payments.[41]

A third party administrator that receives a copy of the self-certification and that agrees to enter into or remain in a contractual relationship with the eligible organization to provide administrative services for the plan must provide or arrange separate payments for contraceptive services for participants and beneficiaries in the plan without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan. The third party administrator can provide such payments on its own, or it can arrange for an issuer or other entity to provide such payments. In either case, like the payments for contraceptive services under the accommodation for insured plans of eligible organizations discussed previously, the payments are not health insurance policies. Moreover, in either case, the third party administrator can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for its costs (including an allowance for administrative costs and margin). As discussed later in this section, the issuer offering coverage through the FFE can receive an adjustment to the FFE user fee, and the issuer is required to pass on a portion of that adjustment to the third party administrator to account for the costs of providing or arranging payments for contraceptive services. A third party administrator that provides or arranges the payments is entitled to retain reimbursement for its costs for the period during which it reasonably and in good faith relied on a representation by the eligible organization that it was eligible for the accommodation. This is so even if the organization's representation was later determined to be incorrect.

The third party administrator must provide plan participants and beneficiaries with notice of the availability of the separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in coverage that is effective beginning on the first day of each applicable plan year (as discussed in more detail later in this section). Third party administrators must also take on the statutory responsibilities of a plan administrator under ERISA, including setting up and operating a claims procedure under

ERISA section 503, providing plan participants and beneficiaries with disclosures required under ERISA section 104, and complying with the requirements of Part 7 of ERISA. The Departments note that there is no obligation for a third party administrator to enter into or remain in a contract with the eligible organization if it objects to any of these responsibilities.

The Departments believe that this approach most successfully addresses both the desire of some commenters for plan participants and beneficiaries to receive contraceptive coverage without cost sharing without delays or other barriers, and the desire of other commenters for objecting employers to be separated from contracting, arranging, paying, or referring for contraceptive coverage. The third party administrator serving as the plan administrator for contraceptive benefits ensures that there is a party with legal authority to arrange for payments for contraceptive services and administer claims in accordance with ERISA's protections for plan participants and beneficiaries. At the same time, the approach enables objecting employers, after providing third party administrators with a copy of the self-certification (as described previously), to separate themselves from contracting, arranging, paying, or referring for contraceptive coverage. Additionally, by substituting payments for contraceptive services for health insurance policies, this approach avoids the complications that would be presented by requiring the creation of a contraceptive-only health insurance product, and allows third party administrators to avoid potentially becoming health insurance brokers. Accordingly, while the Departments appreciate commenters' concerns about the responsibilities that third party administrators must assume under this accommodation, they believe that this approach best ensures that plan participants and beneficiaries receive contraceptive coverage without cost sharing, and without the objecting employers paying for or administering such coverage.

Moreover, none of the comments changed the Department of Labor's view that it has legal authority to require the third party administrator to become the plan administrator under ERISA section 3(16) for the sole purpose of providing payments for contraceptive services if the third party administrator agrees to enter into or remain in a contractual relationship with the eligible organization to provide administrative services for the plan. The Department of Labor has broad rulemaking authority under Title I of ERISA, which includes

the ability to interpret the definition of plan administrator under ERISA section 3(16)(A)(i). The Department of Labor's interpretation of the self-certification described herein as one of the "instruments under which the plan is operated" is consistent with the plain meaning of the term because it identifies the limited set of plan benefits (that is, contraceptive coverage) that the employer refuses to provide and that the third party administrator must therefore provide or arrange for an issuer or another entity to provide.

e. Self-Insured Group Health Plans Without Third Party Administrators

Although some commenters addressed the solicitation for comments on whether and how to provide an accommodation for self-insured group health plans established or maintained by eligible organizations that do not use the services of a third party administrator, no comments indicated that such plans actually exist. Accordingly, the Departments continue to believe that there are no self-insured group health plans in this circumstance. However, to allow for the possibility that such a self-insured group health plan does exist, the Departments will provide any such plan with a safe harbor from enforcement of the contraceptive coverage requirement, contingent on: (1) the plan submitting to HHS information (as described later in this section) showing that it does not use the services of a third party administrator; and (2) if HHS agrees that the plan does not use the services of a third party administrator, the plan providing notice to plan participants and beneficiaries in any application materials distributed in connection with enrollment (or re-enrollment) in coverage that is effective beginning on the first day of each applicable plan year, indicating that it does not provide benefits for contraceptive services.

Such plans must submit to HHS at least 60 days prior to the first day of the first applicable plan year all of the following information:

• Identifying information for the plan, the eligible organization that acts as the plan sponsor, and an authorized representative of the organization, along with the authorized representative's telephone number and email address.

• A listing of the five most highly compensated non-clinical plan service providers (other than employees of the plan or plan sponsor), including contact information for each plan service provider, a concise description of the nature of the services provided by each service provider to the plan, and the annual amount of compensation paid to

---

[41] Nothing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives.

Exhibit 13     JA651     JA-0000249

each plan service provider (examples of plan services include claims processing and adjudication, appeals management, provider network development, and pharmacy benefit management).

• An attestation (executed by an authorized representative of the organization) that the plan is established or maintained by an eligible organization, and is operated in compliance with all applicable requirements of part A of title XXVII of the PHS Act, as incorporated into ERISA and the Code.

Such information must be submitted electronically to *marketreform@cms.hhs.gov*.

If any such submission demonstrates that a self-insured group health plan established or maintained by an eligible organization does not use the services of a third party administrator, the Departments will provide a safe harbor from enforcement of the contraceptive coverage requirement while an additional accommodation is considered. If the Departments discover through any such submission that a self-insured group health plan established or maintained by an eligible organization does in fact use the services of a third party administrator, the eligible organization must either follow the procedures described in these final regulations to obtain an accommodation or otherwise comply with the contraceptive coverage requirement.

**f. Notice of Availability of Separate Payments for Contraceptive Services**

Consistent with the proposed regulations, the final regulations direct that, for any plan year to which an accommodation is to apply, a health insurance issuer providing separate payments for contraceptive services pursuant to the accommodation, or a third party administrator arranging or providing such payments (or its agent), must provide timely written notice about this fact to plan participants and beneficiaries in insured or self-insured group health plans (or student enrollees and their covered dependents in student health insurance coverage) of eligible organizations.

Under the proposed regulations, this notice would be provided by the issuer contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in health coverage established or maintained or arranged by the eligible organization. Commenters noted that employers, not issuers, typically distribute plan enrollment (or re-enrollment) materials to employees and that providing this

notice contemporaneous with plan enrollment (or re-enrollment) materials would not be possible because issuers typically do not receive enrollee information prior to enrollment.

Consistent with the simplified approach described previously, these final regulations provide that this notice must be provided by either the issuer providing separate payments for contraceptive services under the accommodation, or a third party administrator arranging or providing such payments (or its agent). The notice must be provided contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in coverage that is effective beginning on the first day of each plan year to which the accommodation applies, and it must indicate that the eligible organization does not fund or administer contraceptive benefits, but that the issuer or third party administrator will provide separate payments for contraceptive services at no cost. The Departments believe that the direction that the notice be provided contemporaneous with application materials "to the extent possible" provides sufficient flexibility to address the concerns raised by commenters about the timing of the notice.

The final regulations continue to provide model language that may be used to satisfy this notice requirement. Substantially similar language may also be used to satisfy the notice requirement. Some commenters suggested additions or modifications to the model language. Other commenters stated that the Departments should not allow the use of substantially similar language. Additionally, some commenters recommended the Departments set standards to ensure that the notice is accessible to persons with limited English proficiency and person with disabilities. The Departments believe that the model language in the final regulations, along with existing guidance concerning civil rights obligations, provide sufficient notice. The Departments also believe that the flexibility afforded by the final regulations to use substantially similar language is generally consistent with other federal notice requirements.

The notice must include contact information for the issuer or third party administrator in the event plan participants and beneficiaries (or student enrollees and their covered dependents) have questions or complaints. The Departments note that issuers and third party administrators may find it useful to provide additional

written information concerning how to obtain reimbursement for contraceptive services, appeals procedures, provider and pharmacy networks, prescription drug formularies, medical management procedures, and similar issues.[42]

**g. Student Health Insurance Coverage**

Consistent with the HHS proposed regulation, paragraph (f) of the HHS final regulation provides that an accommodation applies to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which it applies to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. For this purpose, any reference to plan participants and beneficiaries is a reference to student enrollees and their covered dependents.

Several commenters supported treating student health insurance like employer-sponsored group health insurance for purposes of these final regulations. Other commenters suggested that an accommodation should not extend to institutions of higher education that arrange student health insurance coverage, because student health insurance coverage is considered a type of individual rather than group health insurance coverage under federal law.[43] One commenter recommended that issuers offering coverage through the Exchanges be required to provide separate contraceptive coverage at no cost to students enrolled in nonprofit religious institutions of higher education with religious objections to contraceptive coverage (and their dependents).

Student health insurance coverage is administered differently than other individual health insurance coverage. Whereas most individual health insurance coverage is issued under a contract between an individual policyholder and a health insurance issuer, student health insurance coverage is available to student enrollees and their covered dependents pursuant to a written agreement between an institution of higher education and a health insurance issuer. Some religiously affiliated colleges and universities object to signing a written agreement or providing financial

---

[42] Furthermore, as discussed previously, with respect to self-insured coverage, third party administrators that are plan administrators must operate in accordance with Part 1 of ERISA, including ERISA section 104, which generally requires certain disclosures regarding plan benefits and limitations.

[43] 45 CFR 147.147 (77 FR 16453).

Exhibit 13

assistance for student health insurance coverage that provides benefits for contraceptive services. For these reasons, HHS believes that it is appropriate to take into account religious objections to contraceptive coverage of eligible organizations that are institutions of higher education and is finalizing the provision applicable to student health insurance coverage as proposed. HHS notes that it does not have the authority to require issuers offering coverage through the Exchanges to provide separate contraceptive coverage at no cost to students (and their dependents).

The Departments note that any accommodation specific to a nonprofit religious institution of higher education is intended to accommodate the nonprofit religious institution of higher education only with respect to its arrangement of student health insurance coverage for its students and their covered dependents. With respect to the establishment or maintenance of a group health plan by a nonprofit religious institution of higher education for its employees and their dependents, the nonprofit religious institution of higher education is intended to be accommodated in the same manner as that in which any other eligible organization that has established or maintained a group health plan for its employees and their dependents is to be accommodated.

*C. Adjustments of Federally-Facilitated Exchange User Fees—45 CFR 156.50(d) and 156.80(d)*

These sections of the final HHS regulation set forth processes and standards to fund the payments for the contraceptive services that are provided for participants and beneficiaries in self-insured plans of eligible organizations under the accommodation described previously, at no cost to plan participants or beneficiaries, eligible organizations, third party administrators, or issuers, through an adjustment in the FFE user fee payable by an issuer participating in an FFE.[44]

In response to the proposed regulations, some commenters questioned HHS's authority to establish the FFE user fee adjustment. Commenters also recommended that HHS ensure that the adjustments to user fee collections not undermine FFE operations. Commenters stated that the FFE user fee should not be increased to offset the user fee adjustment.

Commenters further stated that the FFE user fee adjustment must be adequate to provide financial incentives to ensure that women in self-insured plans of eligible organizations receive contraceptive coverage at no cost. Commenters suggested that the FFE user fee adjustment may not be an adequate long-term funding source as more states establish Exchanges over time, reducing the number of FFEs and therefore available FFE user fee revenue.

Office of Management and Budget (OMB) Circular No. A–25R establishes federal policy regarding these types of user fees. Consistent with that Circular, the revised FFE user fee calculation (which will result in an adjustment of the FFE user fee) will facilitate the accommodation of self-insured plans established or maintained by eligible organizations by ensuring that plan participants and beneficiaries are provided contraceptive coverage at no cost so that eligible organizations are not required to administer or fund such coverage. By financing the accommodation for self-insured plans of eligible organizations through the FFE user fee adjustment, participants and beneficiaries in such plans can retain their existing coverage, while gaining access to separate payments for contraceptive services at no cost. HHS does not believe that the adjustment to FFE user fee collections, as contemplated under this final regulation, will materially undermine FFE operations.

HHS notes that it is not raising the FFE user fee finalized in the 2014 Payment Notice to offset the FFE user fee adjustments, and estimates that payments for contraceptive services will represent only a small portion of total FFE user fees.

The FFE user fee adjustments support many of the goals of the Affordable Care Act, including improving the health of the population, reducing health care costs, providing access to health coverage, encouraging eligible organizations to continue to offer health coverage, and ensuring access to affordable qualified health plans (QHPs) via efficiently operated Exchanges. Moreover, as described earlier in these final regulations, there are significant benefits associated with contraceptive coverage without cost sharing. Such coverage significantly furthers the governmental interests in promoting public health and gender equality, and promotes the underlying goals of the Exchanges and the Affordable Care Act more generally.

In § 156.50(d) of the proposed regulations, HHS specified that, if an issuer were to provide contraceptive

coverage to participants and beneficiaries in self-insured plans of eligible organizations at no cost, and the issuer offers coverage through an FFE, the issuer would be able to seek an adjustment to the FFE user fee for the estimated cost of the contraceptive coverage. Moreover, HHS proposed that, if the issuer providing the contraceptive coverage did not offer coverage through an FFE—either because it was not a QHP issuer, or because it was a QHP issuer but operated in a state without an FFE—an issuer in the same issuer group that offered coverage through an FFE would have been able to seek an adjustment to the FFE user fee on behalf of the issuer providing the contraceptive coverage. HHS proposed to use the definition of issuer group in 45 CFR 156.20, that is, all entities treated under subsection (a) or (b) of section 52 of the Code as a member of the same controlled group of corporations as (or under common control with) a health insurance issuer, or issuers affiliated by the common use of a nationally licensed service mark. Several commenters expressed concern that not every issuer seeking to provide contraceptive coverage to participants and beneficiaries in self-insured plans of eligible organizations would be in the same issuer group as an issuer that offers coverage through an FFE. Commenters further noted that, even if the issuer providing the contraceptive coverage and the issuer offering coverage through an FFE were in the same issuer group, the issuers might incur significant administrative costs in establishing the necessary arrangements.

In response to these comments, and to account for the payments for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations under the accommodation described previously, HHS is finalizing a modification of the proposed policy. In § 156.50(d)(1), a participating issuer (defined at 45 CFR 156.50(a)[45]) offering a plan through an FFE may qualify for an adjustment to the FFE user fee to the extent that the participating issuer either: (i) made payments for contraceptive services on behalf of a third party administrator pursuant to 26 CFR 54.9815–2713A(b)(2)(ii) or 29 CFR 2590.715–2713A(b)(2)(ii); or (ii) seeks an adjustment to the FFE user fee with respect to a third party administrator

---

[44] The FFE user fee was established in the March 11, 2013 final rule entitled "Patient Protection and Affordable Care Act: HHS Notice of Benefit and Payment Parameters for 2014" (78 FR 15410) (2014 Payment Notice).

[45] Under 45 CFR 156.50(a), a participating issuer includes QHP issuers, issuers of multi-state plans, and issuers of stand-alone dental plans. We note that an issuer of a Consumer Operated and Oriented Plan (CO–OP) offered on an FFE is also considered to be a participating issuer for the purpose of the FFE user fee adjustment.

Exhibit 13

JA-0000251

that, following receipt of a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4). made or arranged for payments for contraceptive services pursuant to 26 CFR 54.9815–2713A(b)(2)(i) or (ii) or 29 CFR 2590.715–2713A(b)(2)(i) or (ii). Under the final regulation, neither the third party administrator, nor the participating issuer, nor any entity providing payments for contraceptive services (if neither the third party administrator nor the participating issuer is providing such payments) is required to be part of the same issuer group or otherwise affiliated. This modification allows greater flexibility in the arrangements among third party administrators, issuers, and other entities, while still ensuring that eligible organizations are not required to contract, arrange, pay, or refer for contraceptive coverage. Consistent with the proposed regulations, an allowance for administrative costs and margin in the FFE user fee adjustment accounts for the costs of arrangements among the third party administrator, the participating issuer, and any other entity providing payments for contraceptive services (if neither the third party administrator nor the participating issuer is providing such payments).

In § 156.50(d)(1) through (4) of the proposed regulations, HHS set forth a process through which an issuer seeking an FFE user fee adjustment would submit information to HHS to demonstrate the provision of contraceptive coverage and estimate the cost of such coverage. HHS further proposed that it would review this information and provide an adjustment to the issuer's monthly obligation to pay the FFE user fee in an amount equal to the approved estimated cost of the contraceptive coverage. HHS suggested that the cost of the contraceptive coverage. including administrative costs and margin, could be estimated on a per capita basis by either the issuer or HHS using either actuarial principles and methodologies or, for 2016 and beyond, previous experience. The per capita rate would then be multiplied by the monthly enrollment in the contraceptive coverage in order to calculate the total FFE user fee adjustment.

HHS sought comments on this proposed process for collecting information, calculating the cost of the contraceptive coverage, and applying the FFE user fee adjustment. HHS received several comments suggesting that issuers should be required to submit information only on an annual basis, rather than on a monthly basis. to

reduce the administrative burden. Commenters also noted that it would likely be difficult to estimate the cost of the contraceptive coverage accurately, particularly in the initial years, given that the prohibition on cost sharing could affect utilization. In addition, commenters noted that costs would likely vary considerably based on differences in utilization patterns and administrative processes.

In response to these comments, HHS is making certain modifications to the process described previously. Rather than using a monthly process, the final regulation at § 156.50(d)(2) requires a participating issuer seeking an FFE user fee adjustment to submit to HHS, in the year following the calendar year in which the contraceptive services for which payments were made under the accommodation described previously were provided, for each self-insured plan, the total dollar amount of the payments for contraceptive services that were provided during the applicable calendar year. The issuer will then receive an adjustment to its obligation to pay the FFE user fee equal to the cost of the contraceptive services that were provided during the previous year, plus an allowance, as specified by HHS, for administrative costs and margin. For example, HHS expects that issuers seeking an FFE user fee adjustment for payments for contraceptive services that were provided in calendar year 2014 will be required to submit to HHS by July 15, 2015, the total dollar amount of the payments. This timing will allow adequate time for claims run-out and data collection. The FFE user fee adjustment will be applied starting in October 2015. Although this approach delays the application of the FFE user fee adjustment, it significantly reduces the administrative burden on issuers, third party administrators, and HHS. HHS believes that tying the FFE user fee adjustment to the actual costs of payments for contraceptive services, plus an allowance for administrative costs and margin, will provide reasonable assurance that the adjustment is adequate to cover the full costs of the payments for contraceptive services, furthering the goal of providing contraceptive coverage without cost sharing, as required by PHS Act section 2713 and the companion provisions in ERISA and the Code.

As discussed later in this section, HHS is also directing third party administrators to submit to HHS a notification that the third party administrator intends for a participating issuer to seek an FFE user fee adjustment. This notification must be provided by the later of January 1, 2014.

or the 60th calendar day following the date on which the third party administrator receives a copy of a self-certification from an eligible organization. The notification must be provided whether it is intended that the participating issuer will provide payments for contraceptive services on behalf of the third party administrator, or whether it is intended that the participating issuer will seek an adjustment to the FFE user fee with respect to such payments made or arranged for by the third party administrator. HHS will provide guidance on the manner of submission of the notification, as well as guidance on the application for the FFE user fee adjustment, through the process provided for under the Paperwork Reduction Act of 1995.

HHS is also modifying the standards proposed at § 156.50(d) to align with the final regulations regarding the accommodation for self-insured group health plans of eligible organizations. As discussed previously, under these final regulations. the third party administrator may make the payments for contraceptive services itself, or it may arrange for an issuer (including an issuer that does not offer coverage through an FFE) or another entity to make the payments on its behalf. Under either scenario, a third party administrator that seeks to offset the costs of such payments through an FFE user fee adjustment must enter into an arrangement with a participating issuer offering coverage through an FFE. The participating issuer and the third party administrator must each submit information to HHS, as described in § 156.50(d)(2) of the final regulation, to verify that the payments for contraceptive services were provided in accordance with these final regulations.

Specifically. in § 156.50(d)(2)(i). HHS finalizes submission standards for a participating issuer to receive the FFE user fee adjustment. The participating issuer must submit to HHS, in the manner and timeframe specified by HHS, in the year following the calendar year in which the contraceptive services were provided: (A) Identifying information for the participating issuer and each third party administrator that received a copy of the self-certification with respect to which the participating issuer seeks an adjustment in the FFE user fee (whether or not the participating issuer was the entity that made the payments for contraceptive services); (B) identifying information for each self-insured group health plan with respect to which a copy of the self-certification was received by a third party administrator and with respect to

Exhibit 13                                    JA654                                    JA-0000252

which the participating issuer seeks an adjustment in the FFE user fee; and (C) for each such self-insured group health plan, the total dollar amount of the payments for contraceptive services that were provided during the applicable calendar year under the accommodation described previously. If such payments were made by the participating issuer directly, the total dollar amount should reflect the amount of the payments made by the participating issuer; if the third party administrator made or arranged for such payments, the total dollar amount should reflect the amount reported to the participating issuer by the third party administrator. Similarly, in § 156.50(d)(2)(ii) and (iii), HHS finalizes submission standards for the third party administrator with respect to which the participating issuer seeks an adjustment in the FFE user fee. In paragraph (d)(2)(ii), HHS finalizes a standard under which the third party administrator must notify HHS, by the later of January 1, 2014, or the 60th calendar day following the date on which it receives the applicable copy of the self-certification, that it intends to arrange for a participating issuer to seek an FFE user fee adjustment. HHS will provide guidance on the manner of this submission through the process provided for under the Paperwork Reduction Act of 1995. This notification is necessary to allow HHS to coordinate the development of the systems for administering the FFE user fee adjustment. In paragraphs (d)(2)(iii)(A) through (E), HHS specifies several other standards under which the third party administrator must submit to HHS, in the year following the calendar year in which the contraceptive services for which payments were made under the accommodation described previously were provided, the following information: (A) Identifying information for the third party administrator and the participating issuer; (B) identifying information for each self-insured group health plan with respect to which the participating issuer seeks an adjustment in the FFE user fee; (C) the total number of participants and beneficiaries in each self-insured group health plan during the applicable calendar year; [46] (D) for each self-insured group health plan with respect to which the third party administrator made payments for contraceptive services, the total dollar amount of such payments that were provided during the applicable calendar year under the accommodation described previously (if such payments

were made by the participating issuer directly, the total dollar amount should reflect the amount reported to the third party administrator by the participating issuer; if the third party administrator made or arranged for such payments, the total dollar amount should reflect the amount of the payments made by or on behalf of the third party administrator); and (E) an attestation that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2). If the third party administrator does not meet these standards, the participating issuer may not receive an FFE user fee adjustment to offset the costs of the payments for contraceptive services incurred by or on behalf of the third party administrator. HHS believes that it is necessary to collect this information directly from the third party administrator that has the duty to ensure that the payments for contraceptive services are made to ensure the accuracy of the data provided, without requiring the participating issuer to attest to information to which it may not have access or over which it has little control.

In § 156.50(d)(3), HHS establishes the process by which a participating issuer will be provided a reduction in its obligation to pay the FFE user fee. As long as an authorizing exception under OMB Circular No. A–25R is in effect, the reduction will be calculated as the sum of the total dollar amount of the payments for contraceptive services submitted by the applicable third party administrators, as described in paragraph (d)(2)(iii)(D), and an allowance, specified by HHS, for administrative costs and margin. In the proposed regulations, HHS requested comments on the appropriate method for determining the administrative costs associated with providing the contraceptive coverage, as well as a margin to ensure that issuers receive appropriate compensation for providing the contraceptive coverage. Commenters agreed with the proposal to reimburse for administrative costs and to provide a margin. Commenters noted that administrative costs would be incurred because of the complexities inherent in arrangements between entities seeking the FFE user fee adjustment and entities providing the contraceptive coverage, particularly when the entities operate in different states. In addition, commenters stated that administrative costs incurred by the third party administrators could vary because of variations in billing processes.

As finalized in this regulation, for the initial years of this policy, HHS will specify an allowance for administrative

costs and margin, which will be incorporated into the FFE user fee adjustment, rather than request the third party administrator or the participating issuer to submit to HHS an estimate of the third party administrator and the participating issuer's administrative costs. This approach is consistent with the general approach in these final regulations to simplify administration of the accommodations for eligible organizations, while still ensuring that no eligible organization is required to contract, arrange, pay, or refer for contraceptive coverage. HHS notes that it intends to review the methodology for determining reimbursement for administrative costs and margin in future years to ensure that HHS is accurately capturing these costs. HHS will establish the allowance as a percentage of the cost of the payments for contraceptive services because HHS believes that the majority of administrative costs will be related to processing of payments to providers for contraceptive services, and because HHS believes that it is reasonable to measure margin on this business as a percentage of the cost of the contraceptive services. HHS will establish the allowance at no less than ten percent of such cost, and will specify the allowance for a particular calendar year in the annual HHS notice of benefit and payment parameters. The specific allowance for the 2014 calendar year will be proposed for public comment in the HHS Notice of Payment and Benefit Parameters for 2015 (which is scheduled to be published in the fall of 2013). This approach will allow HHS to provide for a reasonable allowance for administrative expenses for the third party administrator, the participating issuer, and any other entity providing the payments for contraceptive services on behalf of the third party administrator, as well as a margin for each entity. HHS welcomes feedback from third party administrators, participating issuers, and other relevant stakeholders on the allowance for administrative costs and margin, including the appropriate percentage and alternative methods for future determination of the allowance for administrative costs and margin.

Section 156.50(d)(4) is similar to the corresponding proposed provision, and specifies that, as long as an exception under OMB Circular No. A–25R is in effect, if the amount of the reduction under paragraph (d)(3) is greater than the amount of the obligation to pay the FFE user fee in a particular month, the participating issuer will be provided a credit in succeeding months in the

---

[46] No personally identifiable information will be collected from participating issuers or third party administrators pursuant to § 156.50(d)(2).

Exhibit 13

JA655

JA-0000253

Case: 25-2542 Document: 54-2 Page: 608 Date Filed: 12/22/2025
Case: 25-2540 Document: 64-2 Page: 608 Date Filed: 12/22/2025

**Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations     **39885**

amount of the excess. HHS notes that the likelihood of this occurring will depend on the relative magnitudes of the cost of payments for contraceptive services and the FFE user fee, the number of participants and beneficiaries in self-insured plans with respect to which the participating issuer seeks an adjustment in the FFE user fee, and the number of individuals enrolled in coverage offered by the issuer through the FFE. HHS also notes that it intends to provide a monthly report, for the initial month in which the FFE user fee adjustment for a particular calendar year is applied, and for succeeding months until the credit is fully applied, to issuers that receive an FFE user fee adjustment. HHS contemplates that this monthly report will include information on the issuer's user fee obligation for the month, its total adjustment for the applicable calendar year, the user fee adjustment applied to date, and the value of the adjustment to be credited to future months (so long as the exception under OMB Circular No. A–25R is in effect). Additionally, HHS intends to provide a monthly report to each applicable third party administrator detailing any FFE user fee adjustment that will be provided to a participating issuer with respect to the costs for contraceptive services incurred by or on behalf of the third party administrator, as well as the portion of the user fee adjustment applied to date.

Section 156.50(d)(5) specifies that, within 60 calendar days of receipt of any adjustment in the FFE user fee, a participating issuer must pay each third party administrator with respect to which it received any portion of such adjustment an amount no less than the portion of the adjustment attributable to the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D). HHS expects that the participating issuer will also agree to pay each third party administrator a portion of such allowance (and that the apportionment will be negotiated between the entities); HHS does not specify such payment in this final regulation, as HHS expects the entities to work out an arrangement that best fits their situation. Finally, HHS notes that this provision does not apply if the participating issuer made the payments for contraceptive services on behalf of the third party administrator, as described in paragraph (d)(1)(i), or is in the same issuer group (as defined in 45 CFR 156.20) as the third party administrator.

In § 156.50(d)(6) and (7), HHS establishes standards relating to documentation and program integrity,

similar to those proposed in § 156.50(d)(5), but modified slightly to align with the other changes in this final regulation. In paragraph (d)(6), HHS specifies that a participating issuer receiving an adjustment in the FFE user fee under this section for a particular calendar year must maintain for 10 years following that year, and make available upon request to HHS, the HHS Office of the Inspector General, the Comptroller General, and their designees, documentation demonstrating that it timely paid each third party administrator, with respect to which it received such adjustment, any amount required under paragraph (d)(5). In paragraph (d)(7), HHS specifies documentation standards for third party administrators with respect to whom an FFE user fee adjustment is received under this section for a particular calendar year. Third party administrators must maintain for 10 years following the applicable calendar year, and make available upon request to HHS, the HHS Office of the Inspector General, the Comptroller General, and their designees, all of the following: (i) A copy of the self-certification provided by the eligible organization for each self-insured plan with respect to which an adjustment is received; (ii) documentation demonstrating that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2); and (iii) documentation supporting the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D). Although a commenter argued that the documentation retention standards should be shortened from 10 years to 6 years, to align with ERISA standards, we believe that the finalized standard is appropriate as it aligns with timeframes under the False Claims Act, 31 U.S.C. 3729–3733, and standards used for other Exchange programs. HHS notes that a participating issuer or a third party administrator may satisfy these standards by archiving these records and ensuring that they are accessible if needed in the event of an investigation, audit, or other review.

To summarize, costs of payments made for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations under the accommodation described previously will be reimbursed through an adjustment in FFE user fees as follows:

• The adjustment will be made to the FFE user fees of a participating issuer, if that participating issuer made the

payments for the contraceptive services under the accommodation on behalf of the third party administrator, or if it seeks the adjustment with respect to such payments made or arranged for by the third party administrator.

• A third party administrator must notify HHS that it intends to have a participating issuer seek the adjustment by the later of January 1, 2014, or the 60th calendar day following the date on which it received the copy of the applicable self-certification.

• For the participating issuer to receive the adjustment, the third party administrator and the participating issuer must notify HHS of the total amount of the payments made for the contraceptive services under the accommodation, and provide certain other information and documentation, including an attestation by the third party administrator that the payments for the contraceptive services were provided in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2), by July 15 of the year following the calendar year in which the contraceptive services were provided.

• If the necessary conditions are met, and if an exception under OMB Circular No. A–25R is in effect, the participating issuer will receive an adjustment to its FFE user fee obligation equal to the total amount of the payments for the contraceptive services provided under the accommodation, plus an allowance for administrative costs and margin. If the adjustment exceeds the FFE user fees owed in the month of the initial adjustment, any excess adjustment will be carried over to later months, for so long as the exception under OMB Circular No. A–25R is in effect.

• The allowance, which will be at least ten percent of the costs of the payments for the contraceptive services under the accommodation, will be specified by HHS in the annual HHS notice of benefit and payment parameters.

• Within 60 days of receipt of any adjustment, the participating issuer must pay the third party administrator the portion of the adjustment attributable to payments for contraceptive services made by the third party administrator. No payment is required with respect to the allowance for administrative costs and margin, although it is expected that the participating issuer will agree to pay each third party administrator a portion of such allowance. In addition, no payment is required if the participating issuer made the payments for the contraceptive services under the accommodation on behalf of the third

party administrator, or if the participating issuer and third party administrator are in the same issuer group.

Lastly, in response to comments received, HHS is finalizing a provision clarifying that participating issuers may add any amounts paid out to a third party administrator or incurred by or for the participating issuer in contraceptive claims costs under the accommodation for self-insured group health plans of eligible organizations provided in these final regulations, plus the allowance for administrative costs and margin provided under 45 CFR 156.50(d)(3)(ii), to their net FFE user fee paid to HHS, in calculations relating to the index rate for the single risk pool under 45 CFR 156.80(d), the medical loss ratio under 45 CFR part 158, and the risk corridors program under 45 CFR 153 subpart F. Several commenters noted that improperly incorporating the FFE user fee adjustment provided for under the final regulation into these calculations could lead to unintended consequences. For example, if a participating issuer were required to incorporate the FFE user fee adjustment into the calculation of the medical loss ratio, but not allowed to incorporate the cost of the accommodation for self-insured group health plans of eligible organizations, the adjustment would reduce the amount reported as licensing and regulatory fees (as described in 45 CFR 158.161(a)). This would result in a lower medical loss ratio. HHS agrees that such a result would not accurately reflect the ratio of claims to premiums, as estimated by the medical loss ratio, for the participating issuer's insurance business, because the FFE user fee adjustment occurs due to activity not directly related to the participating issuer's insurance business. Indeed, under § 156.50(d)(5), the participating issuer is required in many circumstances to pay out the greater share of the FFE user fee adjustments to third party administrators responsible for making (or arranging for another entity to make) the payments for contraceptive services. Therefore, HHS clarifies that, for purposes of the medical loss ratio and the risk corridors program, participating issuers should report the sum of: (1) The net FFE user fee paid to HHS; (2) any amounts paid out to a third party administrator or incurred by or for the participating issuer in contraceptive claims costs under the accommodation for self-insured group health plans of eligible organizations provided in these final regulations; and (3) the allowance for administrative costs and margin

provided under 45 CFR 156.50(d)(3)(ii), as licensing and regulatory fees referenced in 45 CFR 158.161(a), or taxes and regulatory fees in the case of the risk corridors program. For similar reasons, HHS is modifying the provision at 45 CFR 156.80(d) to clarify that, for the purpose of establishing a single risk pool index rate for a state market, any market-wide adjustments to the index rate for expected Exchange user fees should include: (1) The expected net FFE user fee to be paid to HHS; (2) any amounts paid out to a third party administrator or incurred by or for the participating issuer in contraceptive claims costs under the accommodation for self-insured group health plans of eligible organizations expected to be credited against user fees payable for that state market; and (3) the allowance for administrative costs and margin provided under 45 CFR 156.50(d)(3)(ii) expected to be credited against user fees payable for that state market.

HHS clarifies that, if an issuer provides payments for contraceptive services on behalf of a third party administrator, such payments are not directly linked to any of the health insurance coverage provided by the issuer, and the issuer should not incorporate the cost of such payments into their calculations for the numerator with respect to the medical loss ratio or the risk corridors program.

### D. Treatment of Multiple Employer Group Health Plans

In the case of several employers offering coverage through a single group health plan, the Departments proposed that each employer be required to independently meet the definition of religious employer or eligible organization in order to avail itself of the exemption or an accommodation with respect to its employees and their covered dependents. Several commenters supported the proposed approach of applying the exemption and the accommodation on an employer-by-employer basis. Other commenters favored a plan-based approach, allowing any employer offering coverage through the same group health plan as a religious employer or eligible organization to qualify for the exemption or the accommodation, citing administrative challenges to an employer-by-employer approach. A few commenters recommended criteria for determining whether an employer is affiliated with a religious employer or eligible organization with which it offers coverage through a single group health plan, such as the control standards in Code section 52(a) and (b),

and therefore qualified for the exemption or an accommodation.[47]

The final regulations continue to provide that the availability of the exemption or an accommodation be determined on an employer-by-employer basis, which the Departments continue to believe best balances the interests of religious employers and eligible organizations and those of employees and their dependents. The Departments are clarifying that, for purposes of these final regulations, any nonprofit organization with religious objections to contraceptive coverage that is part of the same controlled group of corporations or part of the same group of trades or businesses under common control (each within the meaning of section 52(a) or (b) of the Code) with a religious employer and/or an eligible organization, and that offers coverage through the same group health plan as such religious employer and/or eligible organization, is considered to hold itself out as a religious organization and therefore qualifies for an accommodation under these final regulations. Each such organization must independently satisfy the self-certification standard.

### E. Religious Freedom Restoration Act and Other Federal Law

Some commenters expressed concerns about the proposed accommodations for eligible organizations under the Religious Freedom Restoration Act (RFRA) (Pub. L. 103–141) 107 Stat. 1488 (1993) (codified at 42 U.S.C. 2000bb-1).[48] All such concerns were considered. But the accommodations for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), or student health insurance coverage arranged by eligible organizations that are institutions of higher education, are not required under RFRA. In addition, the accommodations for eligible organizations under these final regulations do not violate RFRA because

---

[47] Code section 52(a) generally provides that all employees of all corporations that are members of the same controlled group of corporations, including corporations that are at least 50 percent controlled by a common parent corporation, are treated as employed by a single employer. Code section 52(b) generally provides that all employees of trades or businesses (whether or not incorporated) that are under common control are treated as employed by a single employer.

[48] RFRA provides that the federal government generally may not "substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability," unless the burden: "(1) Is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," 42 U.S.C. 2000bb–1.

they do not substantially burden religious exercise, and they serve compelling government interests and moreover are the least restrictive means to achieve those interests.

First, some commenters asserted that the proposed accommodations would substantially burden their exercise of religion by requiring their involvement in providing coverage of medical services to which they object on religious grounds. These final regulations do not require eligible organizations that provide self-certifications to their issuers or third party administrators to provide health coverage that includes benefits for contraceptive services, or to contract, arrange, pay, or refer for such coverage or services. Issuers and third party administrators cannot pass along the costs because these final regulations specifically prohibit an issuer or third party administrator from charging any premium or otherwise passing on any cost relating to payments for contraceptive services to an eligible organization. Thus, there is no burden on any religious exercise of the eligible organization. And even if the accommodations were found to impose some minimal burden on eligible organizations, any such burden would not be substantial for the purposes of RFRA because a third party pays for the contraceptive services and there are multiple degrees of separation between the eligible organization and any individual's choice to use contraceptive services.

One commenter contended that the mere act of self-certification would facilitate access to contraception, resulting in violation of its religious beliefs. But the self-certification under these final regulations simply confirms that an eligible organization is a nonprofit religious organization with religious objections to contraceptive coverage and so informs the issuer or third party administrator. Even prior to the proposed regulations, because contraceptive benefits are typically in standard product designs, many eligible organizations directed their issuers and third party administrators not to make payments for claims for medical services to which they object on religious grounds. In any event, in order for a burden on religious exercise to be "substantial" under RFRA, its effects on the objecting person cannot be as indirect and attenuated as they are here. Under these final regulations, third parties, not eligible organizations, provide the payments for contraceptive services, at no cost to eligible organizations. And whether such services will be utilized is the result of

independent choices by employees or students and their dependents, who have distinct interests and may have their own religious views that differ from those of the eligible organization.

Second, some commenters claimed that the proposed accommodations would force them to fund or subsidize contraceptive coverage because issuers or third party administrators would pass on the costs of such coverage to eligible organizations. Again, however, these final regulations specifically prohibit an issuer or third party administrator from charging any premium, or otherwise passing on any cost, to an eligible organization with respect to the payments for contraceptive services.

Third, some commenters asserted that the contraceptive coverage requirement fails to serve any compelling government interest. As noted previously, however, the contraceptive coverage requirement serves two compelling governmental interests. The contraceptive coverage requirement furthers the government's compelling interest in safeguarding public health by expanding access to and utilization of recommended preventive services for women. HHS tasked IOM with conducting an independent, science-based review of the available literature to determine what preventive services are necessary for women's health and well-being. IOM included in its recommendations for comprehensive guidelines for women's preventive services all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity. IOM determined that lack of access to contraceptive services has proven in many cases to have serious negative health consequences for women and newborn children.

The government also has a compelling interest in assuring that women have equal access to health care services. Women would be denied the full benefits of preventive care if their unique health care needs were not considered and addressed. For example, prior to the implementation of the preventive services coverage provision, women of childbearing age spent 68 percent more on out-of-pocket health care costs than men, and these costs resulted in women often forgoing preventive care. The IOM found that this disproportionate burden on women imposed financial barriers that prevented women from achieving health outcomes on an equal basis with men. The contraceptive coverage requirement helps remedy this problem by helping to equalize the provision of preventive health care services to women and, as a

result, helping women contribute to society to the same degree as men.

Fourth, some commenters suggested that certain provisions of the Affordable Care Act that, in their view, leave some women without contraceptive coverage with no cost sharing demonstrate that the government interests in providing such coverage cannot be truly compelling. But these commenters misunderstand the effect of these provisions.[49]

Nor do the exemption for religious employers and the accommodations for eligible organizations undermine the government's compelling interests. With respect to the religious employer exemption, houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people who are of the same faith and/or adhere to the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan. Under the eligible organization accommodations, individuals in plans of eligible organizations, who are less likely than individuals in plans of religious employers to share their employer's (or institution of higher education's) faith and objection to contraceptive coverage on religious grounds, will still benefit from payments for contraceptive services, even though such payments will not be provided, funded, or subsidized by their employer (or institution of higher education).

<hr/>

[49] For example, the Affordable Care Act's grandfathering provision is only transitional in effect, and it is expected that a majority of plans will lose their grandfathered status by the end of 2013. [75 FR 34540; June 17, 2010]; *see also* Kaiser Family Found. & Health Res. & Ed. Trust, Employer Health Benefits 2012 Annual Survey at 7–8, 190, available at *http://ehbs.kff.org/pdf/2012/8345.pdf*. Moreover, small employers that elect to offer non-grandfathered health coverage to their employees are not exempt from the requirement under the preventive health services coverage regulations to provide coverage for recommended preventive health services, including contraceptive services, without cost sharing (subject to the religious employer exemption and eligible organization accommodations in these final regulations). While the Affordable Care Act excludes small employers from the possibility of tax liability under the employer shared responsibility provision at Code section 4980H, it encourages such employers to offer health coverage to their employees by establishing new group health insurance options through the SHOPs, as well as new tax incentives to exercise such options. With respect to employees of small employers that do not offer health coverage to their employees, the Affordable Care Act establishes new individual health insurance options through the Exchanges, as well as new tax credits to assist the purchase of such insurance; such insurance will cover recommended preventive services, including contraceptive services, without cost sharing.

Exhibit 13                    JA658                    JA-0000256

Fifth, some commenters asserted that the contraceptive coverage requirement is not the least restrictive means of advancing these compelling interests, and proposed various alternatives to these regulations. All of these proposals were considered, and it was determined that they were not feasible and/or would not advance the government's compelling interests as effectively as the mechanisms established in these final regulations and the preventive services coverage regulations more generally. For example, some commenters suggested that the government could provide contraceptive services to all women free of charge (through Medicaid or another program), establish a government-funded health benefits program for contraceptive services, or force drug and device manufacturers to provide contraceptive drugs and devices to women for free. The Departments lack the statutory authority and funding to implement these proposals. Moreover, the Affordable Care Act contemplates providing coverage of recommended preventive services through the existing employer-based system of health coverage so that women face minimal logistical and administrative obstacles. Imposing additional barriers to women receiving the intended coverage (and its attendant benefits), by requiring them to take steps to learn about, and to sign up for, a new health benefit, would make that coverage accessible to fewer women. The same concern undermines the effectiveness of other commenters' suggestion that the government require the multi-state plans on the Exchanges to offer a stand-alone, contraceptive-only benefit to all women without charge.

For another example, some commenters suggested that the government should establish tax incentives for women to use contraceptive services. Again, the Departments lack the statutory authority to implement such proposal. Reliance only on tax incentives would also depart from the existing employer-based system of health coverage, would require women to pay out of pocket for their care in the first instance, and would not benefit women who do not have sufficient income to be required to file a tax return. Such barriers would make a tax incentive structure less effective than the employer-based system of health coverage in advancing the government's compelling interests.

Finally, some commenters expressed concern that the final regulations violate the Religion Clauses of the First Amendment or certain federal restrictions relating to abortion. The regulations do not violate the Free Exercise Clause because they are neutral and generally applicable. The regulations do not target religiously motivated conduct, but rather, are intended to improve women's access to preventive health care and lessen the disparity between men's and women's health care costs. And the regulations are generally applicable because they do not pursue their purpose only against conduct motivated by religious belief. The exemption and accommodations set forth in the regulations serve to accommodate religion, not to disfavor it.

The final regulations also do not violate the Establishment Clause. The exemption and accommodations set forth in the regulations are not restricted to organizations of a particular denomination or denominations. Instead, they are available on an equal basis to religious organizations affiliated with any and all religions.

Finally, the regulations do not violate federal restrictions relating to abortion because FDA-approved contraceptive methods, including Plan B, Ella, and IUDs, are not abortifacients within the meaning of federal law. (62 FR 8611; February 25, 1997) ("Emergency contraceptive pills are not effective if the woman is pregnant[.]"); 45 CFR 46.202(f) ("Pregnancy encompasses the period of time from implantation until delivery."). Further, these regulations do not require nonprofit religious organizations that object to such contraceptive methods to contract, arrange, pay, or refer for such services.

### F. No Effect on Other Law

The religious employer exemption and eligible organization accommodations under these final regulations are intended to have meaning solely with respect to the contraceptive coverage requirement under section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Whether an employer or organization (including an institution of higher education) is designated as religious for this purpose is not intended as a judgment about the mission, sincerity, or commitment of the employer or organization (including an institution of higher education), or intended to differentiate among the religious merits, mission, sincerity, commitment, or public or private standing of religious entities. The use of such designation is limited solely to defining the class of employers or organizations (including institutions of higher education) that qualify for the religious employer exemption and eligible organization accommodations under these final regulations. The definition of religious employer or eligible organization in these final regulations should not be construed to apply with respect to, or relied upon for the interpretation of, any other provision of the PHS Act, ERISA, the Code, or any other provision of federal law, nor is it intended to set a precedent for any other purpose. For example, nothing in these final regulations should be construed as affecting the interpretation of federal or state civil rights statutes, such as Title VII of the Civil Rights Act of 1964 or Title IX of the Education Amendments of 1972.

Furthermore, nothing in these final regulations precludes employers or others from expressing any opposition to the use of contraceptives; requires anyone to use contraceptives; or requires health care providers to prescribe or provide contraceptives if doing so is against their religious beliefs.

The Departments received several comments requesting clarification about whether the religious employer exemption and eligible organization accommodations in these final regulations supersede state laws that require health insurance issuers to provide contraceptive coverage. The preemption provisions of section 731 of ERISA and section 2724 of the PHS Act (implemented at 29 CFR 2590.731(a) and 45 CFR 146.143(a)) apply such that the requirements of part 7 of ERISA and title XXVII of the PHS Act are not to be "construed to supersede any provision of state law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group or individual health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement" of federal law. With respect to issuers subject to state law, insurance laws that provide greater access to contraceptive coverage than federal standards are unlikely to "prevent the application of" the preventive services coverage provision, and therefore are unlikely to be preempted by these final regulations. On the other hand, in states with broader religious exemptions and accommodations with respect to health insurance issuers than those in the final regulations, the exemptions and accommodations will be narrowed to align with those in the final regulations. This is consistent with the application of other federal health insurance standards.

Exhibit 13     JA659     JA-0000257

*G. Applicability Dates and Transitional Enforcement Safe Harbor*

These final regulations generally apply to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014, except the amendments to the religious employer exemption apply to group health plans and health insurance issuers for plan years beginning on or after August 1, 2013.

The Departments are extending the current safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This transitional enforcement safe harbor is intended to maintain the status quo with respect to organizations that qualify for the current safe harbor during the period that exists between the expiration of the current safe harbor [50] and the applicability date of the accommodations under these final regulations. This period is designed to provide issuers and third party administrators with sufficient time to prepare to implement the accommodations under these final regulations. Organizations that qualify under the current safe harbor are not required to execute another self-certification if one has already been executed, but are required to provide another notice to plan participants and beneficiaries in connection with plan years beginning on or after August 1, 2013, and before January 1, 2014. The guidance extending the current safe harbor can be found at: *www.cms.gov/cciio* and *www.dol.gov/healthreform*.

**IV. Economic Impact and Paperwork Burden**

*A. Executive Orders 12866 and 13563—Department of Health and Human Services and Department of Labor*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of

quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"): (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency: (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). The Departments have concluded that these final regulations are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866.

**1. Need for Regulatory Action**

As stated earlier in this preamble, the Departments previously issued amended interim final regulations authorizing an exemption for group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) from certain coverage requirements under section 2713 of the PHS Act (76 FR 46621, August 3, 2011). The amended interim final regulations were finalized on February 15, 2012 (77 FR 8725). In these final regulations, the Departments are amending the definition of religious employer in the HHS regulation at 45 CFR 147.131(a) (incorporated by reference in the regulations of the Departments of Labor and the Treasury) by eliminating the first three prongs of the definition of religious employer that was established in the 2012 final regulations and clarifying the fourth prong. Accordingly, an employer that is organized and operates as a nonprofit entity and is referred to in section

6033(a)(3)(A)(i) or (iii) of the Code is a religious employer, and its group health plan qualifies for the exemption from the requirement to cover contraceptive services. In addition, the final regulations establish accommodations that provide women with access to such services, without cost sharing, while simultaneously protecting certain nonprofit religious organizations with religious objections to contraceptive coverage from having to contract, arrange, pay, or refer for such coverage (as detailed herein).

**2. Anticipated Effects**

The Departments expect that these final regulations will not result in any additional significant burden on or costs to the affected entities.

*B. Special Analyses—Department of the Treasury*

For purposes of the Department of the Treasury, it has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 13563. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this final regulation. It is hereby certified that the collections of information contained in this final regulation do not have a significant impact on a substantial number of small entities. Accordingly, a regulatory flexibility analysis under the Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required.

These final regulations require each organization seeking to be treated as an eligible organization under the final regulations to self-certify that it meets the definition of eligible organization in the final regulations. The self-certification must be executed by an authorized representative of the organization. The organization must maintain the self-certification in its records in a manner consistent with ERISA section 107 and make it available for examination upon request. The final regulations also direct each eligible organization to provide a copy of its self-certification to the group health insurance issuer or third party administrator (as applicable) to avail itself of an accommodation. The Departments are unable to estimate the number of organizations that will seek to be treated as eligible organizations. Of the eligible organizations, some will likely be small entities. It is estimated that each eligible organization will need only approximately 50 minutes of labor to prepare and provide the information

---

[50] *See* Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012.

Exhibit 13                    JA660                    JA-0000258

in the self-certification. This will not be a significant economic impact. For these reasons, this information collection requirement will not have a significant impact on a substantial number of small entities.

These final regulations also require health insurance issuers providing payments for contraceptive services, or third party administrators arranging or providing such payments (or their agents), to provide written notice to plan participants and beneficiaries regarding the availability of such payments. The notice will be provided contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in health coverage established, maintained, or arranged by the eligible organization in any plan year to which the accommodation is to apply. The final regulations contain model language for issuers and third party administrators to use to satisfy the notice requirement. It is unknown how many issuers provide health insurance coverage in connection with insured plans of eligible organizations or how many third party administrators provide plan services to self-insured plans of eligible organizations. However, the cost of preparation and distribution of the notices will not be significant. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It is estimated that each notice will require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.51. For these reasons, these information collection requirements will not have a significant impact on a substantial number of small entities.

Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding this final regulation was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small businesses.

*C. Paperwork Reduction Act—Department of Health and Human Services*

These final regulations contain information collection requirements (ICRs) that are subject to review by the Office of Management and Budget (OMB). A description of these provisions is given in the following paragraphs with an estimate of the annual burden. Average labor costs

(including fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.

HHS sought comments in the proposed regulations, but did not receive any information that would allow for an estimate of the number of organizations that would seek to be treated as eligible organizations, or an estimate of the number of health insurance issuers that would provide separate payments for contraceptive services. HHS is, nevertheless, seeking OMB approval for the following ICRs consistent with the Paperwork Reduction Act of 1995. The burden estimates will be updated in the future when more information is available.

1. Self-Certification (§§ 147.131(b)(4) and 147.131(c)(1))

Each organization seeking to be treated as an eligible organization under the final regulations must self-certify that it meets the definition of an eligible organization. The self-certification must be executed by an authorized representative of the organization. The self-certification will not be submitted to any of the Departments. The form that will be used by organizations for their self-certification was made available during the comment period for the proposed regulations at *http:// www.cms.gov/Regulations-and-Guidance/Legislation/ PaperworkReductionActof1995/PRA-Listing.html*. HHS is finalizing this form with updated instructions and notes, and eliminating the proposed field for listing the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The organization must maintain the self-certification in its records in a manner consistent with ERISA section 107 and make it available for examination upon request. The eligible organization must provide a copy of its self-certification to a health insurance issuer for insured group health plans or student health insurance coverage.

HHS is unable to estimate the number of organizations that will seek to be treated as eligible organizations under the final regulations. Therefore, the burden for only one eligible organization, as opposed to all eligible organizations in total, is estimated. It is assumed that, for each eligible organization, clerical staff will gather and enter the necessary information, send the self-certification electronically to the issuer, and retain a copy for record-keeping; a manager and legal counsel will review it; and a senior executive will execute it. HHS estimates

that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30.64 per hour, 10 minutes for a manager at a cost of $55.22 per hour, 5 minutes for legal counsel at a cost of $83.10 per hour, and 5 minutes for a senior executive at a cost of $112.43 per hour) to execute the self-certification. The certification may be electronically transmitted to the issuer at minimal cost. Therefore, the total annual burden for preparing and providing the information in the self-certification is estimated to be approximately $41 for each eligible organization.

2. Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(d))

The proposed regulations sought comment on a notice of availability of contraceptive coverage. The final regulations instead direct a health insurance issuer providing payments for contraceptive services for participants and beneficiaries in insured plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations to provide a written notice to such plan participants and beneficiaries (or such student enrollees and covered dependents) informing them of the availability of such payments. The notice must be provided contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective on the first day of each applicable plan year, and must specify that contraceptive coverage will not be funded or administered by the eligible organization but that the issuer provides separate payments for contraceptive services. The notice must also provide contact information for the issuer for questions and complaints. To satisfy the notice requirement, issuers may use the model language set forth in the final regulations or substantially similar language.

It is unknown how many issuers provide health insurance coverage in connection with insured plans of eligible organizations. In the proposed regulations, HHS estimated that each issuer would need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It was estimated that each notice would require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail would be $0.51.

One commenter stated that the cost of preparing and sending these notices may be greater than estimated, but did not provide an estimate. HHS believes that using the model language provided in the final regulations will help minimize costs and declines to revise the estimate.

### 3. Collections for FFE User Fee Adjustment (§ 156.50(d))

The final HHS regulation describes information collections with respect to the FFE user fee adjustment under § 156.50(d). The information collection instruments are under development, and HHS will seek public comments and OMB approval on the instruments at a later date, consistent with the Paperwork Reduction Act of 1995.

### 4. Collections for Self-Insured Group Health Plans Without Third Party Administrators

The final regulations provide that a self-insured group health plan established or maintained by an eligible organization that does not use the services of a third party administrator will be provided a safe harbor from enforcement of the contraceptive coverage requirement by the Departments contingent on, among other things: (1) the plan providing certain information to HHS; and (2) the plan providing participants and beneficiaries with notice that it does not provide benefits for contraceptive services. As noted earlier in these final regulations, the Departments believe that there are no self-insured group health plans in this circumstance. Therefore, because the number of respondents is likely to be fewer than 10, HHS is not seeking OMB approval for this collection.

### D. Paperwork Reduction Act— Department of Labor and Department of the Treasury

As noted previously, as under the proposed regulations, each organization seeking to be treated as an eligible organization under the final regulations must self-certify that it meets the definition of an eligible organization. This requirement is set out at 26 CFR 54.9815–2713A(a)(4) and 29 CFR 2590.715–2713A(a)(4) of the final regulations of the Departments of Labor and the Treasury.

In addition, the final regulations include a notice of availability of separate payments for contraceptive services. This notice requirement is identical to that set forth in 45 CFR 147.131(d), but it applies to third party administrators in connection with disclosures to participants and

beneficiaries in self-insured group health plans of eligible organizations, instead of applying to health insurance issuers in connection with disclosures to participants and beneficiaries in insured group health plans of eligible organizations. Therefore, we are seeking OMB approval for this notice, relying on the same estimates noted previously.

### V. Unfunded Mandates Reform Act

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these final regulations do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[51]

### VI. Federalism—Department of Health and Human Services and Department of Labor

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

In the Departments' view, these final regulations have federalism implications, but the federal implications are substantially mitigated because, with respect to health insurance issuers, 15 states have enacted specific laws, regulations, or bulletins that meet or exceed the federal standards requiring coverage of specified preventive services without cost sharing. The remaining states, which provide oversight for these federal law requirements, do so using their general authority to enforce these federal standards. Therefore, the final regulations are not likely to require substantial additional oversight of states by HHS.

In general, section 514 of ERISA provides that state laws are superseded to the extent that they relate to any

covered employee benefit plan, and preserves state laws that regulate insurance, banking, or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements on group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with group health plans provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent than the federal requirement are unlikely to "prevent the application of" the preventive services coverage provision, and therefore are unlikely to be preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904) and December 30, 2004 (69 FR 78720), and these final regulations implement the preventive services coverage provision's minimum standards and do not significantly reduce the discretion given to states under the statutory scheme.

The PHS Act provides that states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state to address the state's concerns and avoid conflicts with the state's exercise of its authority.[52] HHS has developed procedures to implement its

---

[51] In 2013, that threshold level is approximately $141 million.

[52] This authority applies to insurance issued with respect to group health plans generally, including plans covering employees of church organizations. Thus, this discussion of federalism applies to all group health insurance coverage that is subject to the PHS Act, including those church plans that provide coverage through a health insurance issuer (but not to church plans that do not provide coverage through a health insurance issuer).

Exhibit 13

JA662

JA-0000260

enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states, the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion, throughout the process of developing these final regulations, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health coverage and health insurance issuers, and the rights of those individuals whom Congress intended to protect in the PHS Act, ERISA, and the Code.

## VII. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16). 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191. 110 Stat. 1936: sec. 401(b), Public Law 105–200. 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152. 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042. 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B. and 31 U.S.C. 9701).

## List of Subjects

### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

### 29 CFR Part 2510

Employee benefit plans. Pensions.

### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

### 45 CFR Part 156

Administrative practice and procedure, Advertising. Advisory committees, Brokers, Conflict of interest, Consumer protection, Grant programs—health, Grants administration, Health care, Health insurance, Health maintenance organization (HMO), Health records, Hospitals, American Indian/Alaska Natives, Individuals with disabilities, Loan programs—health. Organization and functions (Government agencies), Medicaid, Public assistance programs, Reporting and recordkeeping requirements, State and local governments, Sunshine Act, Technical assistance, Women, and Youth.

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

Accordingly, 26 CFR part 54 is amended as follows:

## PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9815–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 54.9815–2713 Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

* * * * *

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings

provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

* * * * *

■ **Par. 3.** Section 54.9815–2713A is added to read as follows:

### § 54.9815–2713A Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretaries of Health and Human Services and Labor, that it satisfies the criteria in paragraphs (a)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(b) *Contraceptive coverage—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) of this section are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides each third party administrator that will process claims for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section, which shall include notice that—

(A) The eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to

Exhibit 13

JA663

JA-0000261

the funding of contraceptive services; and

(B) Obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and 26 CFR 54.9815–2713A.

(iii) The eligible organization must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements.

(2) If a third party administrator receives a copy of the self-certification described in paragraph (a)(4) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or

more group health insurance issuers complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan furnishes a copy of the self-certification described in paragraph (a)(4) of this section to each issuer that would otherwise provide such coverage in connection with the group health plan. An issuer may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 54.9815–2713(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d) *Notice of availability of separate payments for contraceptive services— self-insured and insured group health plans.* For each plan year to which the accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): ''Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/ health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer].''

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the issuer

Exhibit 13                                    JA664                                    JA-0000262

complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

For the reasons stated in the preamble, the Department of Labor amends 29 CFR parts 2510 and 2590 as follows:

## PART 2510—DEFINITION OF TERMS USED IN SUBCHAPTERS C, D, E, F, G AND L OF THIS CHAPTER

■ 1. The authority citation for part 2510 is revised to read as follows:

**Authority:** 29 U.S.C. 1002(2), 1002(16), 1002(21),1002(37), 1002(38), 1002(40), 1031, and 1135; Secretary of Labor's Order 1–2003, 68 FR 5374; Sec. 2510.3–101 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108, 44 FR 1065, 3 CFR, 1978 Comp., p. 275, and 29 U.S.C. 1135 note. Sec. 2510.3–102 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108, 44 FR 1065, 3 CFR, 1978 Comp., p. 275. Sec. 2510.3–38 is also issued under sec. 1, Pub. L. 105–72, 111 Stat. 1457.

■ 2. Section 2510.3–16 is added to read as follows:

### § 2510.3–16 Definition of "plan administrator."

(a) *In general.* The term "plan administrator" or "administrator" means the person specifically so designated by the terms of the instrument under which the plan is operated. If an administrator is not so designated, the plan administrator is the plan sponsor, as defined in section 3(16)(B) of ERISA.

(b) In the case of a self-insured group health plan established or maintained by an eligible organization, as defined in § 2590.715–2713A(a) of this chapter, the copy of the self-certification provided by the eligible organization to a third party administrator (including notice of the eligible organization's refusal to administer or fund contraceptive benefits) in accordance with § 2590.715–2713A(b)(1)(ii) of this chapter shall be an instrument under which the plan is operated, shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of

ERISA for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, and shall supersede any earlier designation. A third party administrator that becomes a plan administrator pursuant to this section shall be responsible for—

(1) The plan's compliance with section 2713 of the Public Health Service Act (42 U.S.C. 300gg–13) (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to coverage of contraceptive services. To the extent that the plan contracts with different third party administrators for different classifications of benefits (such as prescription drug benefits versus inpatient and outpatient benefits), each third party administrator is responsible for providing contraceptive coverage that complies with section 2713 of the Public Health Service Act (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to the classification or classifications of benefits subject to its contract.

(2) Establishing and operating a procedure for determining such claims for contraceptive services in accordance with § 2560.503–1 of this chapter.

(3) Complying with disclosure and other requirements applicable to group health plans under Title I of ERISA with respect to such benefits.

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 3. The authority citation for part 2590 is revised to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 12(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 4. Section 2590.715–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 2590.715–2713 Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 2590.715–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide

coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\* \* \* \* \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

\* \* \* \* \*

■ 5. Section 2590.715–2713A is added to read as follows:

### § 2590.715–2713A Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (a)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(b) *Contraceptive coverage—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides each third party administrator that will

process claims for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section, which shall include notice that—

(A) The eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and

(B) Obligations of the third party administrator are set forth in § 2510.3–16 of this chapter and § 2590.715–2713A.

(iii) The eligible organization must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements.

(2) If a third party administrator receives a copy of the self-certification described in paragraph (a)(4) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user

fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan furnishes a copy of the self-certification described in paragraph (a)(4) of this section to each issuer that would otherwise provide such coverage in connection with the group health plan. An issuer may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 2590.715–2713(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 715 of ERISA.

If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d) *Notice of availability of separate payments for contraceptive services—self-insured and insured group health plans.* For each plan year to which the accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): ''Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/ health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer].''

Exhibit 13    JA666    JA-0000264

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR Subtitle A parts 147 and 156 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** Secs. 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.130 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 147.130  Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 147.131, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\*　　\*　　\*　　\*　　\*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines

supported by the Health Resources and Services Administration.

\*　　\*　　\*　　\*　　\*

■ 3. Section 147.131 is added to read as follows:

### § 147.131  Exemption and accommodations in connection with coverage of preventive health services.

(a) *Religious employers.* In issuing guidelines under § 147.130(a)(1)(iv), the Health Resources and Services Administration may establish an exemption from such guidelines with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines. For purposes of this paragraph (a), a "religious employer" is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

(b) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the eligible

organization or group health plan furnishes a copy of the self-certification described in paragraph (b)(4) of this section to each issuer that would otherwise provide such coverage in connection with the group health plan. An issuer may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification described in paragraph (b)(4) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 147.130(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 147.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 147.130(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d) *Notice of availability of separate payments for contraceptive services— insured group health plans and student health insurance coverage.* For each plan year to which the accommodation in paragraph (c) of this section is to apply, an issuer required to provide

Exhibit 13　　　　　JA667　　　　　JA-0000265

payments for contraceptive services pursuant to paragraph (c) of this section must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): ''Your [employer/ institution of higher education] has certified that your [group health plan/ student health insurance coverage] qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your [employer/institution of higher education] will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of health insurance issuer] will provide separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your [group health plan/student health insurance coverage]. Your [employer/ institution of higher education] will not administer or fund these payments. If you have any questions about this notice, contact [contact information for health insurance issuer].''

(e) *Reliance*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies

with the obligations under this section applicable to such issuer.

(f) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to ''plan participants and beneficiaries'' is a reference to student enrollees and their covered dependents.

## PART 156—HEALTH INSURANCE ISSUER STANDARDS UNDER THE AFFORDABLE CARE ACT, INCLUDING STANDARDS RELATED TO EXCHANGES

■ 4. The authority citation for part 156 continues to read as follows:

**Authority:** Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321– 1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041– 18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

■ 5. Section 156.50 is amended by adding paragraph (d) to read as follows:

### § 156.50  Financial support.
\*     \*     \*     \*     \*

(d) *Adjustment of Federally-facilitated Exchange user fee*—(1) A participating issuer offering a plan through a Federally-facilitated Exchange may qualify for an adjustment in the Federally-facilitated Exchange user fee specified in paragraph (c) of this section to the extent that the participating issuer—

(i) Made payments for contraceptive services on behalf of a third party administrator pursuant to 26 CFR 54.9815–2713A(b)(2)(ii) or 29 CFR 2590.715–2713A(b)(2)(ii); or

(ii) Seeks an adjustment in the Federally-facilitated Exchange user fee with respect to a third party administrator that, following receipt of a copy of the self-certification referenced in 26 CFR 54.9815– 2713A(a)(4) or 29 CFR 2590.715– 2713A(a)(4), made or arranged for payments for contraceptive services pursuant to 26 CFR 54.9815– 2713A(b)(2)(i) or (ii) or 29 CFR 2590.715–2713A(b)(2)(i) or (ii).

(2) For a participating issuer described in paragraph (d)(1) of this section to receive the Federally-

facilitated Exchange user fee adjustment—

(i) The participating issuer must submit to HHS, in the manner and timeframe specified by HHS, in the year following the calendar year in which the contraceptive services for which payments were made pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) were provided —

(A) Identifying information for the participating issuer and each third party administrator that received a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) with respect to which the participating issuer seeks an adjustment in the Federally-facilitated Exchange user fee, whether or not the participating issuer was the entity that made the payments for contraceptive services;

(B) Identifying information for each self-insured group health plan with respect to which a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) was received by a third party administrator and with respect to which the participating issuer seeks an adjustment in the Federally-facilitated Exchange user fee; and

(C) For each such self-insured group health plan, the total dollar amount of the payments that were made pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) for contraceptive services that were provided during the applicable calendar year. If such payments were made by the participating issuer directly as described in paragraph (d)(1)(i) of this section, the total dollar amount should reflect the amount of the payments made by the participating issuer; if the third party administrator made or arranged for such payments, as described in paragraph (d)(1)(ii) of this section, the total dollar amount should reflect the amount reported to the participating issuer by the third party administrator.

(ii) Each third party administrator that intends for a participating issuer to seek an adjustment in the Federally-facilitated Exchange user fee with respect to the third party administrator for payments for contraceptive services must submit to HHS a notification of such intent, in a manner specified by HHS, by the later of January 1, 2014, or the 60th calendar day following the date on which the third party administrator receives the applicable copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4).

(iii) Each third party administrator identified in paragraph (d)(2)(i)(A) of

Exhibit 13                                     JA668                                     JA-0000266

this section must submit to HHS, in the manner and timeframe specified by HHS, in the year following the calendar year in which the contraceptive services for which payments were made pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) were provided—

(A) Identifying information for the third party administrator and the participating issuer;

(B) Identifying information for each self-insured group health plan with respect to which a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) was received by the third party administrator and with respect to which the participating issuer seeks an adjustment in the Federally-facilitated Exchange user fee;

(C) The total number of participants and beneficiaries in each such self-insured group health plan during the applicable calendar year;

(D) For each such self-insured group health plan with respect to which the third party administrator made payments pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) for contraceptive services, the total dollar amount of such payments that were provided during the applicable calendar year. If such payments were made by the participating issuer directly as described in paragraph (d)(1)(i) of this section, the total dollar amount should reflect the amount reported to the third party administrator by the participating issuer; if the third party administrator made or arranged for such payments, as described in paragraph (d)(1)(ii) of this section, the total dollar amount should reflect the amount of the payments made by or on behalf of the third party administrator; and

(E) An attestation that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2).

(3) If the requirements set forth in paragraph (d)(2) of this section are met, and as long as an authorizing exception under OMB Circular No. A–25R is in effect, the participating issuer will be provided a reduction in its obligation to pay the Federally-facilitated Exchange user fee specified in paragraph (c) of this section equal in value to the sum of the following:

(i) The total dollar amount of the payments for contraceptive services submitted by the applicable third party administrators, as described in paragraph (d)(2)(iii)(D) of this section.

(ii) An allowance for administrative costs and margin. The allowance will be no less than 10 percent of the total dollar amount of the payments for contraceptive services specified in paragraph (d)(3)(i) of this section. HHS will specify the allowance for a particular calendar year in the annual HHS notice of benefit and payment parameters.

(4) As long as an exception under OMB Circular No. A–25R is in effect, if the amount of the adjustment under paragraph (d)(3) of this section is greater than the amount of the participating issuer's obligation to pay the Federally-facilitated Exchange user fee in a particular month, the participating issuer will be provided a credit in succeeding months in the amount of the excess.

(5) Within 60 days of receipt of any adjustment in the Federally-facilitated Exchange user fee under this section, a participating issuer must pay each third party administrator with respect to which it received any portion of such adjustment an amount no less than the portion of the adjustment attributable to the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D) of this section. No such payment is required with respect to the allowance for administrative costs and margin described in paragraph (d)(3)(ii) of this section. This paragraph does not apply if the participating issuer made the payments for contraceptive services on behalf of the third party administrator, as described in paragraph (d)(1)(i) of this section, or is in the same issuer group as the third party administrator.

(6) A participating issuer receiving an adjustment in the Federally-facilitated Exchange user fee under this section for a particular calendar year must maintain for 10 years following that year, and make available upon request to HHS, the Office of the Inspector General, the Comptroller General, and their designees, documentation demonstrating that it timely paid each third party administrator with respect to which it received any such adjustment any amount required to be paid to the third party administrator under paragraph (d)(5) of this section.

(7) A third party administrator with respect to which an adjustment in the Federally-facilitated Exchange user fee is received under this section for a particular calendar year must maintain for 10 years following that year, and make available upon request to HHS, the Office of the Inspector General, the Comptroller General, and their designees, all of the following documentation:

(i) A copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) for each self-insured plan with respect to which an adjustment is received.

(ii) Documentation demonstrating that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2).

(iii) Documentation supporting the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D) of this section.

■ 6. Section 156.80 is amended by revising paragraph (d)(1) to read as follows:

**§ 156.80   Single risk pool.**

\*   \*   \*   \*   \*

(d) \* \* \*

(1) *In general.* Each plan year or policy year, as applicable, a health insurance issuer must establish an index rate for a state market described in paragraphs (a) through (c) of this section based on the total combined claims costs for providing essential health benefits within the single risk pool of that state market. The index rate must be adjusted on a market-wide basis for the state based on the total expected market-wide payments and charges under the risk adjustment and reinsurance programs, and Exchange user fees (expected to be remitted under § 156.50(b) or § 156.50(c) and (d) of this subchapter as applicable plus the dollar amount under § 156.50(d)(3)(i) and (ii) of this subchapter expected to be credited against user fees payable for that state market). The premium rate for all of the health insurance issuer's plans in the relevant state market must use the applicable market-wide adjusted index rate, subject only to the plan-level adjustments permitted in paragraph (d)(2) of this section.

\*   \*   \*   \*   \*

Exhibit 13                                    JA669                                    JA-0000267

Signed this 27th day of June 2013.

**Beth Tucker,**

*Deputy Commissioner for Operations Support, Internal Revenue Service.*

**Mark J. Mazur,**

*Assistant Secretary of the Treasury (Tax Policy).*

Signed this 26th day of June 2013.

**Phyllis C. Borzi,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: June 20, 2013

**Marilyn Tavenner,**

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: June 25, 2013.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2013–15866 Filed 6–28–13; 11:15 am]

**BILLING CODE 4830–01–P; 4510–029–P; 4120–01–P; 6325–64–P**

Exhibit 13                    JA670                    JA-0000268