**Nos. 25-2575 & 25-2662**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY,

Plaintiffs-Appellees,

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA

Defendants-Appellants,

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

Intervenor-Defendant- Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

### JOINT APPENDIX
### Vol. 3, pp. 671–1272

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

SHARON SWINGLE
DEREK WEISS
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
*Counsel for the Federal Appellants*

# TABLE OF CONTENTS

## Volume 1

Notice of Appeal filed by the Little Sisters of the Poor Saints Peter and Paul Home (Dkt. 358) ................................................ JA1

Notice of Appeal filed by the Federal Government (Dkt. 361) ............ JA3

Order (Dkt. 357) ................................................................. JA5

Opinion (Dkt. 356) .............................................................. JA7

## Volume 2

Docket Sheet ....................................................................... JA62

Amended Complaint (Dkt. 89) ............................................... JA128

Declaration of Kathryn Kost, Acting Vice President for Domestic Research at the Guttmacher Institute (Dkt. 90-13) .................................................................. JA261

Declaration of Carol Weisman, Ph.D (Dkt. 90-15) .......................... JA299

Snyder, et al., The Impact of the Affordable Care Act on Contraceptive Use and Costs among Privately Insured Women, Women's Health Issues 28-3 (2018) (Dkt. 90-16) .................................................................. JA336

Declaration of Samantha Butts, M.D., MSCE (Dkt. 90-17) ............ JA342

Declaration of Dayle Steinberg, CEO of Planned Parenthood Southeastern Pennsylvania (Dkt. 90-20) ............................... JA377

Declaration of Philip Gennace, Assistant Commissioner of Life and Health, New Jersey Department of Banking and Insurance (Dkt. 90-22) ...................................... JA385

Declaration of Elizabeth Coulter, Deputy Director of the Office of Women's Health, New Jersey Department of Health (Dkt. 90-23) ............................................... JA391

Supplemental Declaration of Kathryn Kost, Acting Vice President for Domestic Research at the Guttmacher Institute (Dkt. 118-3) ............................................................ JA399

Joint Appendix (Dkt. 253) ........................................................ JA403

Final Religious Exemption Rule, 83 Fed. Reg. 57, 536 (Nov. 15, 2018) (Dkt. 253-1, Ex. 1) ................................................ JA410

Final Moral Exemption Rule, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (Dkt. 253-1, Ex. 2) ........................................................ JA465

2017 HRSA Guidelines, 83 Fed. Reg. 8487 (Feb. 27, 2018) (Dkt. 253-1, Ex. 3) ............................................................... JA505

IFR Religious Exemption, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (Dkt. 253-1, Ex. 4) ........................................................ JA507

IFR Moral Exemption, 82 Fed. Reg. 47,838 (Oct. 13, 2027) (Dkt. 253-1, Ex. 5) ............................................................... JA551

FAQs about ACA Implementation Part 36 (Jan. 9, 2017) (Dkt. 253-1, Ex. 7) ................................................................. JA576

2016 HRSA Guidelines, 81 Fed. Reg. 95,148 (Dec. 27, 2016) (Dkt. 253-1, Ex. 8) ............................................................... JA587

Final Rules, 80 Fed. Reg. 41,318 (July 14, 2015) (Dkt. 253-2, Ex. 10)................................................................................. JA590

NPRM, 79 Fed. Reg. 51,118 (Aug. 27, 2014) (Dkt. 253-2, Ex. 11) ..................................................................................... JA620

IFR, 79 Fed. Reg. 51,092 (Aug. 27, 2014) (Dkt. 253-2, Ex. 12) ....... JA630

Final Rule, 78 Fed. Reg. 39,870 (July 2, 2013) (Dkt. 253-2, Ex. 13)................................................................................. JA640

# Volume 3

NPRM, 78 Fed. Reg. 8456 (Feb. 6, 2013) (Dkt. 253-2, Ex. 14) ........ JA671

ANPRM, 77 Fed. Reg. 16,501 (Mar. 21, 2012) (Dkt. 253-2, Ex. 15) .................................................................................... JA692

Final Rule, 77 Fed. Reg. 8725 (Feb. 15, 2012) (Dkt. 253-2, Ex. 16) .................................................................................... JA700

IFR, 76 Fed. Reg. 46,621 (Aug. 3, 2011) (Dkt. 253-2, Ex. 17) ......... JA706

2011 HRSA Guidelines (Dkt. 253-2, Ex. 18) .................................... JA712

2019 HRSA Guidelines (Dkt. 253-2, Ex. 18-A) ............................... JA715

Institute of Medicine, Clinical Preventive Services for Women (2011) (Dkt. 253-3, Ex. 19) ........................................ JA720

AccessMatters Comments (Dkt. 253-3, Ex. 21) ............................. JA969

American Academy of Family Physicians Comments (Dkt. 253-3, Ex. 23) ................................................................ JA981

American Academy of Nursing Comments (Dkt. 253-3, Ex. 24) .................................................................................... JA983

American College of Nurse-Midwives Comments (Dkt. 253-3, Ex. 25) .................................................................................... JA993

American College of Physicians Comments (Dkt. 253-4, Ex. 26) .................................................................................... JA996

American Congress of Obstetricians and Gynecologists, American Academy of Pediatrics, & Society for Adolescent Health and Medicine Comments (Dkt. 253-4, Ex. 27) .................................................................................... JA999

American Public Health Association Comments (Dkt. 253-4, Ex. 28) .................................................................................. JA1009

California Planned Parenthood Education Fund Comments (Dkt. 253-4, Ex. 34) .......................................................... JA1016

iii

Center for American Progress, Autistic Self-Advocacy
    Network, Autism Women's Network, & National LGBT
    Task Force Comment (Dkt. 253-4, Ex. 38) ........................... JA1031

Colorado Consumer Health Initiative Comments (Dkt. 253-4,
    Ex. 41) ................................................................. JA1047

Colorado Health Foundation Comments (Dkt. 253-4, Ex. 42) ...... JA1054

County of Santa Clara Comments (Dkt. 253-4, Ex. 43) ............... JA1057

Center for Reproductive Rights Comments (Dkt. 253-4,
    Ex. 44) ................................................................. JA1070

Massachusetts Office of Health and Human Services
    Comments (Dkt. 253-5, Ex. 62) ............................................. JA1096

National Council of Jewish Women Comments (Dkt. 253-6,
    Ex. 71) ................................................................. JA1099

National Health Law Program Comments (Dkt. 253-6,
    Ex. 74) ................................................................. JA1108

Planned Parenthood Federation of American & Planned
    Parenthood Action Fund Comments (Dkt. 253-7,
    Ex. 88) ................................................................. JA1129

Public health practitioners and members of faculty,
    Columbia University Mailman School of Public Health
    Comments (Dkt. 253-7, Ex. 90) ............................................. JA1140

Public Health Solutions Comments (Dkt. 253-7, Ex. 91) .............. JA1146

Raising Women's Voices for the Health Care We Need
    Comments (Dkt. 253-7, Ex. 92) ............................................. JA1157

Reproductive Rights and Justice Practicum at Yale Law
    School Comments (Dkt. 253-7, Ex. 94) ................................. JA1172

SisterLove Inc Comments (Dkt. 253-7, Ex. 95) ............................ JA1187

State Attorneys General Comments (Dkt. 253-7, Ex. 96) ............. JA1194

iv

Texas House Women's Health Caucus Comments (Dkt. 253-7, Ex. 97)............................................................... JA1203

Texas Women's Healthcare Coalition Comments (Dkt. 253-7, Ex. 99)............................................................. JA1208

URGE Unite for Reproductive and General Equality Comments (Dkt. 253-7, Ex. 100)........................................ JA1213

Wisconsin Alliance for Women's Health Comments (Dkt. 253-7, Ex. 102) .............................................. JA1232

Women's Health and Family Planning Association of Texas Comments (Dkt. 253-7, Ex. 103)........................... JA1246

Women's Law Project Comments (Dkt. 253-7, Ex. 104)............... JA1258

## Volume 4

Yale Students for Reproductive Justice Comments (Dkt. 253-7, Ex. 105)............................................................ JA1273

Archdiocese of New Orleans Comments (Dkt. 253-7, Ex. 106) ........................................................... JA1288

Archdiocese of St. Louis Comments (Dkt. 253-7, Ex. 107)............ JA1293

Association of Catholic Colleges and Universities Comments (Dkt. 253-8, Ex. 108) .............................................. JA1294

Christian Legal Society Comments (Dkt. 253-8, Ex. 109) ............ JA1299

Church Alliance Comments (Dkt. 253-8, Ex. 110) ........................ JA1301

The Ethics & Religious Commission of the Southern Baptist Convention Comments (Dkt. 253-8, Ex. 111) ...................... JA1305

Family Research Council Comments (Religious Exemption) (Dkt. 253-8, Ex. 112) .............................................. JA1312

Family Research Council Comments (Moral Exemption) (Dkt. 253-8, Ex. 113) .............................................. JA1318

Locke Lorde LLP Comments (Dkt. 253-8, Ex. 114)...................... JA1325

National Association of Catholic Nurses USA Comments
(Religious Exemption) (Dkt. 253-8, Ex. 115) ........................ JA1328

National Association of Catholic Nurses USA Comments
(Moral Exemption) (Dkt. 253-8, Ex. 116) ............................ JA1331

National Catholic Bioethics Center Comments (Dkt. 253-8,
Ex. 117) .................................................................... JA1334

Solidarity HealthShare Comments (Dkt. 253-8, Ex. 118) ............. JA1343

United States Conference of Catholic Bishops Comments
(Dkt. 253-8, Ex. 119) .................................................... JA1346

Individual Comments Supporting Rules
(Dkt. 253-8, Ex. 120) .................................................... JA1363

Conde-Aguledo, A., et al., Birth Spacing and Risk of Adverse
Perinatal Outcomes—A Meta-Analysis, Journal of the
American Medical Association (2006) (Dkt. 253-8, Ex.
128) ....................................................................... JA1370

Fuentes-Afflick, E., & Hessol, N., Interpregnancy Interval
and the Risk of Premature Infants, Obstetrics &
Gynecology (2000) (Dkt. 253-9, Ex. 129)............................ JA1385

Gipson, J.D., et al., The Effects of Unintended Pregnancy on
Infant, Child and Parental Health: A Review of the
Literature, Studies on Family Planning (2008)
(Dkt. 253-9, Ex. 130) .................................................... JA1393

Zhu, B., Effect of Interpregnancy Interval on Birth
Outcomes: Findings from Recent U.S. Studies,
International Journal of Gynecology & Obstetrics
(2005) (Dkt. 253-9, Ex. 136) .............................................. JA1414

Spreadsheet of Accommodated Entities (Dkt. 253-9, Ex. 139)...... JA1423

Spreadsheet of Litigating Entities (Final Rules) (Dkt. 253-9,
Ex. 140).................................................................... JA1450

ESBA Form 700 Certification (Aug. 2014) (Dkt. 253-9,
Ex. 141).................................................................... JA1457

Kaiser Family Foundation Employer Health Benefits (2017 Annual Survey) (Dkt. 253-10, Ex. 142)................................. JA1459

Declaration of Mother Superior Marie Vincente (Dkt. 253-10, Ex. 146)................................................................. JA1681

FDA, Birth Control (Mar. 6, 2018) (Dkt. 253-10, Ex. 147)............ JA1741

FDA, Is It Really FDA Approved? (Jan. 17, 2017) (Dkt. 253-10, Ex. 148)................................................................. JA1761

Declaration of Seth A. Mendelsohn, Executive Deputy Insurance Commissioner, PA Department of Insurance (ECF No. 90-18) (Dkt. 253-10, Ex. 149)................................ JA1765

HHS, Trends in Teen Pregnancy and Childbearing (May 14, 2019) (Dkt. 253-10, Ex. 152) ................................................ JA1770

Supplemental Joint Appendix (index) (Dkt. 258).......................... JA1778

Declaration of Seth Mendelsohn (Dkt. 258, Ex. 177) .................... JA1780

Declaration of Philip Gennace (Dkt. 258, Ex. 178) ...................... JA1784

Declaration of Cynthia H. Chuang (Dkt. 258, Ex. 179) ............... JA1789

Declaration of Leesa Allen (Dkt. 258, Ex. 181) ........................... JA1799

Declaration of Sarah Adelman (Dkt. 258, Ex. 182) ...................... JA1805

Luke Vander Bleek Comments on RFI (Dkt. 258, Ex. 183) ......... JA1810

Campaign Life Missouri Comments on RFI (Dkt. 258, Ex. 184) ................................................................................ JA1815

2025 HRSA Guidelines (Dkt. 258, Ex. 185) ................................. JA1833

Government's Notice of Withdrawal of NPRM (Dkt. 326) ............ JA1839

2025 HRSA Women's Preventive Service Guidelines (Dkt. 341-2) .............................................................................. JA1841

Declaration and Excerpts from Exhibit to Declaration of Sharita Gruberg (Ex. 20 at preliminary-injunction hearing, Dec. 14, 2017) ................................................................. JA1850

*24 CFR Part 203*

Hawaiian natives, Home improvement, Indians—lands, Loan programs—housing and community development, Mortgage insurance, Reporting and recordkeeping requirements, Solar energy.

Accordingly, for the reasons discussed in the preamble, HUD proposes to amend 24 CFR parts 200 and 203 to read as follows:

## PART 200—INTRODUCTION TO FHA PROGRAMS

■ 1. The authority citation for part 200 continues to read as follows:

**Authority:** 12 U.S.C. 1702–1715–z–21; 42 U.S.C. 3535(d).

■ 2. In § 200.145, add paragraph (c) to read as follows:

### § 200.145 Property and mortgage assessment.

\*    \*    \*    \*    \*

(c) For all new construction as well as structural repairs and/or renovations of existing properties, to the extent that an inspection is required to determine if construction quality of a one- to four-unit property is acceptable as security for an FHA-insured loan, the following requirements apply:

(1)(i) In areas where local jurisdictions provide building code enforcement and the requisite documentation, the lender shall provide a copy of:

(A) The building permit, or its equivalent, and a copy of the certificate of occupancy, or its equivalent; or

(B) A satisfactory inspection notice for work completed, or its equivalent.

(ii) The documentation provided under paragraph (c)(1)(i) of this section shall be considered satisfactory evidence of completion of the work.

(2) In jurisdictions that do not provide building code enforcement and requisite documentation, three inspections are required for new construction. For existing construction, only one inspection and certification of work completed for repairs and renovations is required. For both new and existing construction, the lender shall, in order to ensure compliance with FHA requirements:

(i) Select a Residential Combination Inspector (or its successor designation) certified by the International Code Council (or its successor organization) who is licensed or certified as a home inspector in accordance with the applicable State and local requirements governing the licensing or certification of those jurisdictions that license or certify such inspectors in the respective jurisdiction. The lender shall provide a

certification from such inspector that the new construction and/or structural repair or renovation work is completed satisfactorily and in compliance with any applicable building code.

(ii) In the absence of such Residential Combination Inspector, the lender shall obtain an inspection performed by a third party, who is a registered architect, a professional engineer, or a tradesman or contractor, and who has met the licensing and bonding requirements of the State in which the property is located. The lender shall provide a certification from such inspector that the inspector is licensed and bonded under applicable State law, and that the new construction and/or structural repair or renovation work is completed satisfactorily and in compliance with any applicable building code.

■ 3. Remove the undesignated center heading ''FHA Inspector Roster'' and §§ 200.170–172.

## PART 203—SINGLE FAMILY MORTGAGE INSURANCE

■ 4. The authority citation for part 203 continues to read as follows:

**Authority:** 12 U.S.C. 1709, 1710, 1715b, 1715z–16, and 1715u; 42 U.S.C. 3535(d).

### § 203.18   [Amended]

■ 5. In § 203.18, remove paragraph (a)(3) and redesignate paragraph (a)(4) as paragraph (a)(3).

■ 6. In § 203.50, revise paragraph (f)(1) to read as follows:

### § 203.50   Eligibility of rehabilitation loans.

\*    \*    \*    \*    \*

(f) \* \* \*

(1)(i) The limits prescribed in § 203.18(a)(1) (in the case of a dwelling to be occupied as a principal residence, as defined in § 203.18(f)(1));

(ii) The limits prescribed in § 203.18(a)(1) and (3) (in the case of a dwelling to be occupied as a secondary residence, as defined in § 203.18(f)(2));

(iii) 85 percent of the limits prescribed in § 203.18(c), or such higher limit, not to exceed the limits set forth in § 203.18(a)(1), as Commissioner may prescribe (in the case of an eligible nonoccupant mortgagor as defined in § 203.18(f)(3));

(iv) The limits prescribed in § 203.18a, based upon the sum of the estimated cost of rehabilitation and the Commissioner's estimate of the value of the property before rehabilitation; or

\*    \*    \*    \*    \*

### §§ 203.200   through 203.209 [Removed]

■ 7. Remove the undesignated center heading ''Insured Ten-Year Protection Plans (Plan)'' and §§ 203.200 through 203.209.

Dated: January 8, 2013.

**Carol J. Galante**
*Assistant Secretary for Housing–Federal Housing Commissioner.*

[FR Doc. 2013–02668 Filed 2–5–13; 8:45 am]

**BILLING CODE 4210–67–P**

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

### 26 CFR Part 54

[REG–120391]

RIN 1545–BJ60

## DEPARTMENT OF LABOR

### Employee Benefits Security Administration

### 29 CFR Part 2590

RIN 1210–AB44

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### 45 CFR Parts 147, 148, and 156

[CMS–9968–P]

RIN 0938–AR42

### Coverage of Certain Preventive Services Under the Affordable Care Act

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Proposed rules.

**SUMMARY:** This document proposes amendments to rules regarding coverage for certain preventive services under section 2713 of the Public Health Service Act, as added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the Public Health Service Act requires coverage without cost sharing of certain preventive health services, including certain contraceptive services, in non-exempt, group health plans and health insurance coverage. The proposed rules would amend the authorization to exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) with respect to the requirement to cover

Exhibit 14                                   JA671                                   JA-0000269

contraceptive services. The proposed rules would also establish accommodations for group health plans established or maintained by eligible organizations (and group health insurance coverage offered in connection with such plans), including student health insurance coverage arranged by eligible organizations that are religious institutions of higher education. This document also proposes related amendments to regulations concerning excepted benefits and Affordable Insurance Exchanges.

**DATES:** Comments are due on or before April 8, 2013.

**ADDRESSES:** In commenting, please refer to file code CMS–9968–P. Because of staff and resource limitations, the Departments cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By Regular Mail.* You may mail written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968–P, P.O. Box 8013, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By Express or Overnight Mail.* You may send written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By Hand or Courier.* You may deliver (by hand or courier) your written comments to the following addresses only:

a. For delivery in Washington, DC— Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without federal government identification, commenters are encouraged to leave their comments in the Centers for Medicare & Medicaid Services drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.

b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Do not mail comments to the addresses indicated as appropriate for hand or courier delivery because they may be delayed and received after the close of the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Jacob Ackerman, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565. Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335.

Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). In addition, information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cciio.cms.gov*), and information on health care reform can be found at *www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. The Departments post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4:00 p.m. To schedule

an appointment to view public comments, call (800) 743–3951.

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010, and amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) on March 30, 2010. These statutes are referred to collectively as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans. The PHS Act sections incorporated by these references are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screenings as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

The Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) published interim final rules with a request for comments implementing section 2713 of the PHS Act in the July 19, 2010 **Federal Register** (75 FR 41726) (2010 interim final rules). Among other things, the 2010 interim final rules provide that a plan or issuer must provide coverage, without cost sharing, for certain newly recommended preventive health services starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the recommendation or guideline is issued.[1]

On August 1, 2011, HRSA adopted and released guidelines for women's preventive services based on

[1] 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

Exhibit 14

JA672

JA-0000270

recommendations of the independent Institute of Medicine, which had undertaken a review of the scientific and medical evidence on women's preventive services (Women's Preventive Services: Required Health Plan Coverage Guidelines, or HRSA Guidelines).[2] As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[3] Accordingly, under section 2713 of the PHS Act and the 2010 interim final rules, non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage are required to provide coverage without cost sharing of women's preventive health services, including contraceptive services, consistent with the HRSA Guidelines in plan years (or, in the individual market, policy years) beginning on or after August 1, 2012, except as discussed later in this section.

Contemporaneous with the issuance of the HRSA Guidelines, the Departments amended the 2010 interim final rules (76 FR 46621) (2011 amended interim final rules). The amendment provided HRSA with the authority to exempt group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) from the requirement to cover contraceptive services pursuant to the HRSA Guidelines.[4] The 2011 amended interim final rules specified that, for purposes of this exemption, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. HRSA exercised this authority in the HRSA Guidelines such that group health plans established or

maintained by these religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the requirement to cover contraceptive services.

On February 10, 2012, the Departments issued final rules that adopted the definition of religious employer in the 2011 amended interim final rules for purposes of the exemption from the requirement to cover contraceptive services (2012 final rules).[5] Contemporaneous with the issuance of the 2012 final rules, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary enforcement safe harbor for group health plans established or maintained by certain nonprofit organizations that have religious objections to contraceptive coverage (and any group health insurance coverage provided in connection with such plans).[6]

The guidance provides that, under the temporary enforcement safe harbor, the Departments will not take any enforcement action against an employer, group health plan, or health insurance issuer for failing to cover some or all recommended contraceptive services in a non-grandfathered group health plan (or any group health insurance coverage provided in connection with such a plan) where the plan is established or maintained by an organization meeting all of the following criteria:

• The organization is organized and operates as a nonprofit entity.

• From February 10, 2012, onward, the group health plan established or maintained by the organization has consistently not covered all or the same subset of recommended contraceptive services, consistent with any applicable state law, because of the religious beliefs of the organization.

• The group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third party administrator) provides to

participants a notice indicating that some or all contraceptive services will not be covered under the plan for the first plan year beginning on or after August 1, 2012, as set forth in the guidance.

• The organization self-certifies that it satisfies the foregoing three criteria and documents its self-certification, as set forth in the guidance.

The temporary enforcement safe harbor is also available for insured student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that similarly meet the four criteria.[7]

The temporary enforcement safe harbor is in effect until the first plan year that begins on or after August 1, 2013. The Departments committed to rulemaking during this 1-year safe harbor period to provide women with contraceptive coverage without cost sharing as required by section 2713 of the PHS Act, while protecting certain additional organizations from having to contract, arrange, pay, or refer for any contraceptive coverage to which they object on religious grounds.

The first step toward realizing these policy goals was an advance notice of proposed rulemaking (ANPRM) published on March 21, 2012 (77 FR 16501). The ANPRM presented potential approaches and solicited comments on alternative ways to fulfill the requirements of section 2713 of the PHS Act when health coverage is established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education,[8] with religious objections to contraceptive coverage. The 90-day comment period on the ANPRM closed on June 19, 2012.

These proposed rules mark the next step in the process. The proposed rules would make two principal changes to the preventive services coverage rules to provide women contraceptive coverage without cost sharing, while taking into account religious objections to contraceptive services of eligible organizations, including eligible

---

[2] The HRSA Guidelines are available at: *http://www.hrsa.gov/womensguidelines*.

[3] This excludes services relating to a man's reproductive capacity, such as vasectomies and condoms.

[4] The 2011 amended interim final rules were issued and effective on August 1, 2011, and published on August 3, 2011.

---

[5] The 2012 final rules were published on February 15, 2012 (77 FR 8725).

[6] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012. Available at: *http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf*. The guidance, as reissued on August 15, 2012, clarifies, among other things, that group health plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage are not precluded from eligibility for the safe harbor.

---

[7] *See* final rule on student health insurance coverage published by HHS on March 21, 2012 (77 FR 16456 and 16457).

[8] In these proposed rules, any proposed accommodation specific to a religious institution of higher education is intended to accommodate the religious institution of higher education only with respect to its arrangement of student health insurance coverage. With respect to the establishment or maintenance of a group health plan by a religious institution of higher education, the religious institution of higher education is intended to be accommodated the same way as any other religious organization that has established or maintained a group health plan.

Exhibit 14

JA-0000271

organizations that are religious institutions of higher education, that establish or maintain or arrange health coverage. First, the proposed rules would amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths. Second, the proposed rules would establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage. The proposed rules also propose related amendments to other rules, consistent with the proposed accommodations. The Departments intend to finalize all such proposed amendments before the end of the temporary enforcement safe harbor.

Comments are welcome on any aspect of the proposed rules, including on how best to provide women with contraceptive coverage without cost sharing as required by section 2713 of the PHS Act, while protecting eligible organizations from having to contract, arrange, pay, or refer for any contraceptive coverage to which they object on religious grounds.

## II. Overview of the Public Comments on the Advance Notice of Proposed Rulemaking

The Departments received approximately 200,000 comments in response to the ANPRM. Commenters represented a wide variety of stakeholders, including religious groups; religiously affiliated educational institutions, health care organizations, charities, and associations; civil rights organizations; consumer groups; group health plan sponsors and administrators; third party administrators and other plan service providers; health insurance issuers; law and public policy organizations; states; secular organizations; private citizens; and women's rights and reproductive health advocacy organizations.

Comments addressed both the religious employer exemption and the suggested accommodations, among other issues. Although the Departments do not separately address each comment received, the significant issues raised in the comments are summarized in this section. The Departments considered these comments in developing the policies in these proposed rules.

### A. Comments on the Religious Employer Exemption

Some commenters asserted that the definition of religious employer as formulated in the 2012 final rules is too narrow. Some of these commenters expressed concern that the group health plans of a number of religious employers, including houses of worship, do not qualify for the exemption because the employers' purposes extend beyond the inculcation of religious values or because the employers serve or hire people of different religious faiths. Commenters noted that employers may not know the religious beliefs of those they serve or hire, and that employment discrimination laws may prohibit them from inquiring about the religious beliefs of their employees. Other commenters expressed concern that the definition of religious employer is not broad enough to allow them to continue their current exclusion of contraceptive services from coverage under their group health plans and warned that, if the definition of religious employer is not broadened, they could cease to offer health coverage to their employees in order to avoid having to offer coverage to which they object on religious grounds.

Commenters also asserted that federal laws, including the Affordable Care Act, provide for conscience clauses and religious exemptions broader than the religious employer exemption provided for in the 2012 final rules. Other commenters asserted that the narrow scope of the exemption raises concerns under the First Amendment and the Religious Freedom Restoration Act (RFRA). Some commenters asserted that the criteria for the religious employer exemption could result in excessive government entanglement in religion. Several commenters expressed concern that the definition of religious employer sets a precedent for use in other areas of federal and state law. These commenters urged that the definition of religious employer be broadened such that more group health plans may qualify for the exemption.

Other commenters, however, disputed claims that the contraceptive coverage requirement infringes on rights protected by the First Amendment or RFRA, noting that the requirement is neutral and generally applicable. They also explained that the requirement does not substantially burden religious exercise and, in any event, serves compelling governmental interests and is the least restrictive means to achieve those interests.

Some commenters supported the inclusion of contraceptive services in the HRSA Guidelines and urged that the Departments not broaden the religious employer exemption. These commenters asserted that the definition of religious employer is appropriately targeted at houses of worship and argued that making contraceptive coverage available to as many women as possible would enhance access to important preventive health care services and would significantly reduce long-term health care costs and consequences associated with unplanned pregnancies. These commenters asserted that expanding the exemption would undermine the benefits of the law. Some commenters believed that the exemption should be eliminated entirely due to the importance of extending these benefits to as many women as possible.

Several commenters requested clarification as to whether, if employees of multiple employers are covered under a single group health plan, each employer must independently meet the definition of religious employer for the plan to qualify for the exemption.

### B. Comments on the Suggested Accommodations for Health Coverage Established or Maintained by Religious Organizations or Arranged by Religious Institutions of Higher Education

Several commenters asserted that the suggested accommodations described in the ANPRM would fail to adequately accommodate religious objections to contraceptive coverage. These commenters emphasized that, in their view, religious organizations would continue to be involved, whether directly or indirectly, in providing coverage for services that they find religiously objectionable. For example, with respect to insured group health plans, these commenters disputed the claim that contraceptive coverage is at least cost neutral and argued that plan sponsors would end up funding the coverage in the form of higher premiums or fees. These commenters generally argued that, in order to provide adequate relief, the Departments would need to rescind the contraceptive coverage requirement in its entirety, provide an exemption for the group health plan of any organization with a religious or moral objection to contraceptive coverage, or provide government funding for provision of contraceptive services.

Other commenters recommended that the Departments expand the suggested accommodations to encompass the group health plans of a broader class of religiously affiliated organizations. Several commenters stated that the rules

Exhibit 14                                    JA674                              JA-0000272

should accommodate all organizations with a religious or moral objection to contraceptive coverage, whether the organization is religious or secular, or nonprofit or for-profit, among other potential distinctions. These commenters also argued that an accommodation should be available without regard to whether an organization has covered contraceptive services in its group health plan in the past.

Some commenters recommended using criteria in other federal laws, such as the National Labor Relations Act, for determining whether the group health plan of an organization qualifies for an accommodation. Some commenters suggested accommodating the group health plans of religiously affiliated organizations recognized as tax-exempt under an IRS group ruling.

In contrast, other commenters urged that any accommodation apply only to health coverage established or maintained by a limited class of religiously affiliated organizations or arranged by a limited class of religiously affiliated institutions of higher education. For example, several commenters suggested limiting any accommodation to only health coverage established or maintained by nonprofit organizations owned or controlled by a church, association of churches, or religious order, or arranged by nonprofit institutions of higher education owned or controlled by a religious organization as defined for purposes of Title IX of the Education Amendments of 1972. These commenters also generally argued that health coverage established or maintained by for-profit organizations or arranged by for-profit institutions of higher education, or health coverage established or maintained by organizations, or arranged by institutions of higher education, that object to only some types of contraceptive services, should not qualify for an accommodation.

A number of commenters supported a self-certification process, similar to that used for the temporary enforcement safe harbor, for religious organizations seeking to avail themselves of an accommodation. Some commenters urged that the Departments adopt appropriate oversight and enforcement mechanisms to monitor compliance with the criteria for any accommodation and recommended self-certification as a tool to promote transparency and support compliance and enforcement. Other commenters suggested that the Departments consider any such self-certification to be conclusive to avoid inquiry into a religious organization's character, mission, or practices.

Comments were quite varied regarding the ANPRM's suggested approaches with respect to the provision of contraceptive coverage to participants and beneficiaries enrolled in self-insured group health plans established or maintained by religious organizations with religious objections to such coverage. Many commenters supported the general approach suggested in the ANPRM of ensuring that participants and beneficiaries enrolled in such self-insured plans receive contraceptive coverage without cost sharing. These commenters stated that any accommodation should not create delays in or barriers to contraceptive benefits, and that these benefits should be provided without participants and beneficiaries having to specifically elect such benefits.

Concerns were raised by some commenters about an objecting organization's ability to not administer, facilitate, or otherwise involve itself in the provision of contraceptive coverage to such participants and beneficiaries. Many commenters were concerned about how third party administrators would be able to fund these benefits. They noted that drug rebates, one suggested source of funds, often belong to another entity (such as the plan sponsor and/or the plan participants and beneficiaries), not the third party administrator, and stated that, in their view, costs incurred by third party administrators would ultimately be passed on to plan sponsors and/or plan participants and beneficiaries unless a separate source of funding could be found, such as some form of public funding or stand-alone contraceptive coverage with no premium or cost sharing. Others raised questions about the responsibility for communications regarding contraceptive coverage. Some third party administrators were concerned about becoming surrogate insurers, which might subject them to the application of state insurance laws. At the same time, other commenters believed that, with funding, notice, and adequate claims information, contraceptive coverage could be administered effectively by third party administrators.

### III. Provisions of the Proposed Rules

*A. Overview*

The Departments aim to secure the protections under section 2713 of the PHS Act that are designed to enhance coverage of important preventive services for women without cost sharing while accommodating the religious objections to contraceptive coverage of eligible organizations.

The Departments propose two key changes to the preventive services coverage rules codified in 26 CFR 54.9815–2713T, 29 CFR 2590.715–2713, and 45 CFR 147.130 to meet these goals. First, the proposed rules would amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths. Second, the proposed rules would establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage.

Amendments to rules concerning excepted benefits and Affordable Insurance Exchanges (Exchanges) are also proposed in connection with the proposed accommodations.

*B. Explanation of Terms*

In these proposed rules, all references to "contraceptive coverage" are references to coverage of the contraceptive services that are required to be covered without cost sharing in accordance with the HRSA Guidelines (that is, all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity, as prescribed by a health care provider).

All references to "accommodation" are references to an arrangement under which contraceptive coverage is provided without cost sharing to plan participants and beneficiaries (or, in the case of student health insurance coverage, student enrollees and their covered dependents) independent of health coverage established or maintained or arranged by an objecting religious organization, including an objecting religious institution of higher education.

Finally, all references to "religious organization" and "religious institution of higher education" are references to the class of organizations and institutions of higher education that establish or maintain or arrange health coverage that qualifies for an accommodation. These organizations are collectively referred to as "eligible organizations" in these proposed rules.

Exhibit 14
JA-0000273

### C. Religious Employer Exemption and Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations

For purposes of organization and clarity, proposed 45 CFR 147.130(a)[9] would provide that the requirement to provide coverage for recommended preventive services without cost sharing is subject to a new 45 CFR 147.131, which would establish standards and processes related to both the religious employer exemption and the accommodations for health coverage established or maintained or arranged by eligible organizations, as discussed in more detail later in this section.

Accordingly, the proposed rules would move to new 45 CFR 147.131[10] the language currently in 45 CFR 147.130(a)(1)(iv)(A) and (B) (incorporated by reference in the rules of the Departments of Labor and the Treasury) that authorizes HRSA to exempt group health plans of religious employers (and group health insurance coverage provided in connection with such plans) from the contraceptive coverage requirement and that defines religious employer for this purpose, and would amend the authorization and definition as discussed later in this section.

#### 1. Religious Employer Exemption

Currently, under the 2012 final rules, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. The Departments explained in the 2011 amended interim final rules that this definition was intended to focus the religious employer exemption on "the unique relationship between a house of worship and its employees in ministerial positions."[11]

Some commenters brought to the Departments' attention that the group health plans of certain religious entities that meet the fourth prong of the definition of religious employer (providing that a religious employer is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code) may not qualify for the exemption because those entities provide benevolent services to their communities. For example, if a church maintains a soup kitchen that provides free meals to low-income individuals irrespective of their religious faiths, it could fail to satisfy the third prong of the definition of religious employer (providing that a religious employer primarily serves persons who share its religious tenets). The same question could arise if a church runs a parochial school that employs people of different religious faiths.

The Departments agree that the exemption should not exclude group health plans of religious entities that would qualify for the exemption but for the fact that, for example, they provide charitable social services to persons of different religious faiths or employ persons of different religious faiths when running a parochial school. Indeed, this was never the Departments' intention in connection with the 2011 amended interim final rules or the 2012 final rules. Accordingly, in 45 CFR 147.131(a) (and the related rules of the Departments of Labor and the Treasury), the Departments propose to amend the definition of religious employer that was adopted in the 2012 final rules by eliminating the first three prongs of the definition and clarifying the application of the fourth. Under this proposal, an employer that is organized and operates as a nonprofit entity and referred to in section 6033(a)(3)(A)(i) or (iii) of the Code would be considered a religious employer for purposes of the religious employer exemption. For this purpose, an organization that is organized and operates as a nonprofit entity is not limited to any particular form of entity under state law, but may include organizations such as trusts and unincorporated associations, as well as nonprofit, not-for-profit, non-stock, public benefit, and similar types of corporations. However, for this purpose, an organization is not considered to be organized and operated as a nonprofit entity if its assets or income accrue to the benefit of private individuals or shareholders. Under this standard, it is not necessary to determine the federal tax-exempt status of the nonprofit entity in determining whether the religious employer exemption applies. The Departments note that eliminating the first three prongs would avoid any inquiry into an employer's purposes, as well as any inquiry into the religious beliefs of its employees and the religious beliefs of those it serves.

The Departments believe that this proposal would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules. As previously noted, when the Departments first defined religious employer, the primary goal was to exempt the group health plans of houses of worship. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. By restricting the exemption primarily to group health plans established or maintained by churches, synagogues, mosques, and other houses of worship, and religious orders, the fourth prong of the current definition of religious employer would alone suffice to meet the goal. By eliminating the first three prongs of the current definition, there no longer would be any question as to whether group health plans of houses of worship that provide educational, charitable, or social services to their communities qualify for the exemption.

The Departments welcome comments on this proposal, including whether it would unduly expand the universe of employer plans that would qualify for the exemption and whether additional or different language is needed to clarify the scope of the exemption.

#### 2. Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations

In proposed 45 CFR 147.131(b) through (e) (and the related rules of the Departments of Labor and the Treasury) and as discussed later in this section, the Departments propose policies relating to the accommodation of certain group health plans and group health insurance coverage with respect to the contraceptive coverage requirement. The Departments propose a comparable accommodation with respect to student health insurance coverage arranged by eligible organizations that are religious institutions of higher education. The Departments believe these proposed accommodations, as opposed to the exemption that is provided to religious employers, are warranted given that participants and beneficiaries in group health plans established or maintained by eligible organizations, as well as student enrollees and their covered dependents in student health insurance coverage arranged by eligible organizations, may be less likely than participants and beneficiaries in group health plans established or maintained

---

[9] For simplicity, this preamble refers only to provisions of 45 CFR 147.130. Parallel provisions to 45 CFR 147.130 are contained in 26 CFR 54.9815–2713T and 29 CFR 2590.715–2713.

[10] For simplicity, this preamble refers only to provisions of 45 CFR 147.131. Parallel provisions to 45 CFR 147.131 are contained in 26 CFR 54.9815–2713A and 29 CFR 2590.715–2713A.

[11] 76 FR 46623.

Exhibit 14     JA676     JA-0000274

by religious employers to share such religious objections of the eligible organizations. The proposed accommodations would provide such plan participants and beneficiaries contraceptive coverage without cost sharing while insulating their employers or institutions of higher education from contracting, arranging, paying, or referring for such coverage.

### a. Definition of Eligible Organization

These proposed rules would provide that group health plans established or maintained by eligible organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans), and student health insurance coverage arranged by eligible organizations that are religious institutions of higher education with such objections, comply with the requirement to provide coverage for contraceptive services under section 2713 of the PHS Act if the conditions of the accommodation are satisfied.

For purposes of these proposed rules only, the Departments propose to define an eligible organization as an organization that meets all of the following criteria:

• The organization opposes providing coverage for some or all of the contraceptive services required to be covered under section 2713 of the PHS Act on account of religious objections.

• The organization is organized and operates as a nonprofit entity.

• The organization holds itself out as a religious organization.

• The organization self-certifies that it satisfies the first three criteria, as described later in this section.

This proposed definition of eligible organization is intended to allow health coverage established or maintained or arranged by nonprofit religious organizations, including nonprofit religious institutional health care providers, educational institutions, and charities, with religious objections to contraceptive coverage to qualify for an accommodation. For this purpose, an organization that is organized and operated as a nonprofit entity is not limited to any particular form of entity under state law, but may include organizations such as trusts and unincorporated associations, as well as nonprofit, not-for-profit, non-stock, public benefit, and similar types of corporations. However, for this purpose an organization is not considered to be organized and operated as a nonprofit entity if its assets or income accrue to the benefit of private individuals or shareholders.

The Departments believe that the proposed definition of eligible organization would strike an appropriate balance because it would limit any accommodation to nonprofit organizations that hold themselves out as religious. The Departments solicit comments on whether the proposed definition of eligible organization would allow an appropriate universe of nonprofit religious organizations and institutions of higher education establishing or maintaining or arranging health coverage to qualify for an accommodation, including comments on whether it would be too broad or too narrow.

The Departments do not propose that the definition of eligible organization extend to for-profit secular employers. Religious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, are available to nonprofit religious organizations but not to for-profit secular organizations. Accordingly, the Departments believe it would be appropriate to define eligible organization to include nonprofit religious organizations, but not to include for-profit secular organizations.

### b. Self-Certification

Each organization seeking accommodation under the proposed rules would be required to self-certify that it meets the definition of eligible organization, following a self-certification process similar to that under the temporary enforcement safe harbor. The self-certification would also specify the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The organization would not be required to submit the self-certification to any of the Departments. The organization would maintain the self-certification (executed by an authorized representative of the organization) in its records for each plan year to which the accommodation applies and make the self-certification available for examination upon request so that regulators, issuers, third party administrators, and plan participants and beneficiaries may verify that an organization has qualified for an accommodation, while avoiding any inquiry into the organization's character, mission, or practices. The Departments intend to specify in guidance the form to be used for the self-certification.

### c. Separate Contraceptive Coverage Without Cost Sharing for Plan Participants and Beneficiaries

These proposed rules aim to provide women with contraceptive coverage without cost sharing and to protect eligible organizations from having to contract, arrange, pay, or refer for contraceptive coverage to which they object on religious grounds.

### 1. Insured Plans

To achieve these goals, under HHS's authority in section 2792 of the PHS Act to promulgate rules "necessary or appropriate" to carry out the provisions of title XXVII of the PHS Act, and the parallel authorities of the Department of Labor in section 734 of ERISA and the Department of the Treasury in section 9833 of the Code, these proposed rules would provide that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group coverage in connection with the plan would assume sole responsibility, independent of the eligible organization and its plan, for providing contraceptive coverage without cost sharing, premium, fee, or other charge to plan participants and beneficiaries.

The eligible organization would provide the issuer with a copy of its self-certification. If the plan uses a separate issuer for certain coverage, such as prescription drug coverage, the eligible organization may also need to provide a copy of its self-certification to the separate issuer. Nothing more would be required of the eligible organization to qualify for the accommodation.

The proposed rules would direct the issuer receiving the copy of the self-certification to ensure that the coverage for those contraceptive services identified in the self-certification is not included in the group policy, certificate, or contract of insurance; that such coverage is not reflected in the group health insurance premium; and that no fee or other charge in connection with such coverage is imposed on the eligible organization or its plan.

The proposed rules would further direct the issuer receiving the copy of the self-certification to provide contraceptive coverage under individual policies, certificates, or contracts of insurance (hereinafter referred to as individual health insurance policies) for plan participants and beneficiaries without cost sharing, premium, fee, or other charge. The coverage would not be offered by or through a group health plan. (As discussed later in this section, the Departments propose that this type

Exhibit 14    JA677    JA-0000275

of individual health insurance policy is a new category of excepted benefits.)

The issuer would automatically enroll plan participants and beneficiaries in a separate individual health insurance policy that covers recommended contraceptive services. The Departments envision that the issuer would ensure that contraceptive coverage for plan participants and beneficiaries is effective at the beginning of the plan year of their group health plan, to the extent possible, to prevent a delay or gap in contraceptive coverage. The eligible organization would have no role in contracting, arranging, paying, or referring for this separate contraceptive coverage. Such coverage would be offered at no charge to plan participants and beneficiaries, that is, the issuer would provide benefits for such contraceptive services without the imposition of any cost sharing requirement (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, consistent with section 2713 of the PHS Act. The requirements of section 2713 of the PHS Act, its implementing regulations, and other applicable federal and state law (as well as their enforcement mechanisms) would continue to apply with respect to such coverage. For example, an issuer providing such coverage could use reasonable medical management techniques consistent with 45 CFR 147.130(a)(4).

The Departments believe that, in the case of insured group health plans, this proposed arrangement would alleviate the need for the eligible organization to contract, arrange, pay, or refer for contraceptive coverage while providing contraceptive coverage to plan participants and beneficiaries at no additional cost. Actuaries, economists, and insurers estimate that providing contraceptive coverage is at least cost neutral, and may result in cost-savings when taking into account all costs and benefits for the insurer.[12] In this instance, contraceptive coverage without cost sharing would be provided to plan participants and beneficiaries through individual health insurance policies, separate from the group policy through which all other coverage would be provided to plan participants and beneficiaries. The Departments believe that issuers generally would find that

providing such contraceptive coverage is cost neutral because they would be they would be insuring the same set of individuals under both policies and would experience lower costs from improvements in women's health and fewer childbirths.

The Departments note that a health insurance issuer providing coverage in connection with a plan established or maintained by an eligible organization would be held harmless under the accommodation if a representation by the organization to the issuer that the organization is an eligible organization on which the issuer relied in good faith were determined later to be incorrect. Conversely, the eligible organization and its plan would be held harmless if the issuer were to fail to comply with the requirement that it provide separate contraceptive coverage for plan participants and beneficiaries at no charge.

The Departments request comments on this proposed arrangement.

## 2. Self-Insured Plans

The Departments are considering alternative approaches for providing participants and beneficiaries in self-insured group health plans established or maintained by eligible organizations with contraceptive coverage at no additional cost, while protecting the eligible organizations from having to contract, arrange, pay, or refer for such coverage. Under each of these approaches, a health insurance issuer that provides individual health insurance policies for contraceptive coverage for plan participants and beneficiaries at no additional cost would be able to offset the costs of providing such coverage by claiming an adjustment in Federally-facilitated Exchange (FFE) user fees that would reduce the amount of the such fees for the issuer (or an affiliated issuer), as discussed later in this section. The Departments envision that the issuer would ensure that contraceptive coverage for plan participants and beneficiaries is effective at the beginning of the plan year of their group health plans, to the extent possible, to prevent a delay or gap in contraceptive coverage. Under each of these approaches, HHS would assist in identifying issuers offering the separate individual health insurance policies for contraceptive coverage.

Under all approaches, if there is a third party administrator for the self-insured group health plan of the eligible organization, the eligible organization would provide the third party administrator with a copy of its self-certification. If the plan uses a separate

third party administrator for certain coverage, such as prescription drug coverage, the eligible organization would also provide a copy of its self-certification to the separate third party administrator if the coverage administered by the separate third party administrator includes coverage of any contraceptive service listed in the self-certification.

Further, under all approaches, a third party administrator receiving a copy of the self-certification would automatically arrange separate individual health insurance policies for contraceptive coverage from an issuer providing such polices, as described above. The issuer providing the coverage (or an affiliated issuer) would receive an additional adjustment in the user fees that otherwise would be charged by an FFE in an amount that would offset a reasonable charge by the third party administrator for performing this service. In turn, the issuer would be required to pass the amount of this additional adjustment in FFE user fees on to the third party administrator as a condition of receiving any FFE user fee adjustment, and would be required to attest to HHS that it has in fact passed the amount of this additional adjustment on to the third party administrator. As a condition of payment of this amount by the issuer, the third party administrator would not be permitted to charge any amount to the eligible organization, its plan, or to plan participants or beneficiaries for performing the service. The Departments note that the issuer could either be affiliated with or be independent of the third party administrator.

The Departments solicit comment on which of the proposed approaches below would best provide participants and beneficiaries in self-insured group health plans established or maintained by eligible organizations with contraceptive coverage at no additional cost, while protecting eligible organizations from having to contract, arrange, pay, or refer for such coverage. The Departments also request comment on whether there are other approaches that should be considered that would achieve the same goals.

Under the first approach, a third party administrator receiving the copy of the self-certification would have an economic incentive to voluntarily arrange for the separate individual health insurance policies for contraceptive coverage for plan participants and beneficiaries because it would be compensated for a reasonable charge for automatically arranging for the contraceptive coverage through

---

[12] Bertko, John, F.S.A., M.A.A.A., Director of Special Initiatives and Pricing, Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Glied, Sherry, Ph.D., Assistant Secretary for Planning and Evaluation, Department of Health and Human Services (ASPE/HHS), *et al.*, "The Cost of Covering Contraceptives Through Health Insurance," (February 9, 2012), available at: *http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml.*

Exhibit 14                        JA678                        JA-0000276

payment by the issuer of the contraceptive coverage. Under this approach, in automatically arranging for the contraceptive coverage, the third party administrator would be acting, not as the third party administrator to the self-insured plan of the eligible organization, but rather in its independent capacity apart from its capacity as the agent of the plan. Under this approach, the self-insured plan of the eligible organization would be treated as complying with the requirement to provide contraceptive coverage based on the third party administrator's receipt of the copy of the self-certification.

Under the second approach, coverage under the plan of the eligible organization would comply with the requirement to provide contraceptive coverage without cost sharing only if the third party administrator administering coverage in connection with the plan automatically arranges for an issuer to assume sole responsibility for providing separate individual health insurance policies offering contraceptive coverage without cost sharing, premium, fee, or other charge to plan participants and beneficiaries, the eligible organization, or its plan. As discussed above, any reasonable administrative costs of the third party administrator in performing this service would be covered through payment by the issuer of the contraceptive coverage. If the third party administrator performs the services, coverage under the plan of the eligible organization would comply with 45 CFR 147.130. While the third party administrator would not be directly responsible for assuring compliance with section 2713 of the PHS Act, the Departments expect that third party administrators would seek to assist eligible organizations such that eligible organizations would be able to avail themselves of the proposed accommodation.

Under the third approach, the third party administrator receiving the copy of the self-certification would be directly responsible for automatically arranging for contraceptive coverage for plan participants and beneficiaries. Specifically, the self-certification would have the effect of designating the third party administrator [13] as the plan

administrator under section 3(16) of ERISA solely for the purpose of fulfilling the requirement that the plan provide contraceptive coverage without cost sharing. The third party administrator would satisfy its responsibility to automatically arrange for contraceptive coverage for plan participants and beneficiaries by arranging for an issuer to assume sole responsibility for providing separate individual health insurance policies offering contraceptive coverage without cost sharing, premium, fee, or other charge to plan participants and beneficiaries, the eligible organization, or its plan. The Departments note that there would be no obligation on a third party administrator to enter into or continue a third party administration contract with an eligible organization if the third party administrator were to object to having to carry out this responsibility. Although this approach would place the legal responsibility for assuring compliance with section 2713 of the PHS Act solely on the third party administrator, it would have legal implications under ERISA's reporting, disclosure, claims processing, and fiduciary provisions for both the third party administrator and the eligible organization. The Departments seek comment specifically on potential issues arising under ERISA if the third party administrator were to become the designated plan administrator under section 3(16) of ERISA, and therefore a plan fiduciary, even for the limited purposes contemplated.

The Departments also seek comment on whether there is a need to provide an accommodation for self-insured plans of eligible organizations without third party administrators, and, if so, how best to ensure that participants and beneficiaries in such plans receive separate contraception coverage without cost sharing. No comments were submitted in response to the request in the ANPRM on the extent to which there are such plans without a third party administrator. The Departments continue to believe that there are very few, if any, self-insured plans of eligible organizations in this circumstance.

The Departments solicit comment on these alternative approaches.

*3. Notice of Availability of Contraceptive Coverage and Coordination of Benefits*

The proposed rules would direct a health insurance issuer providing separate individual health insurance policies for contraceptive coverage at no additional cost to participants and beneficiaries in plans of eligible organizations to provide a written notice to plan participants and beneficiaries regarding the availability of the separate contraceptive coverage. Issuers providing such contraceptive coverage would be responsible for providing the notice of availability of such coverage to participants and beneficiaries in both insured and self-insured group health plans of eligible organizations. The notice would be provided directly to plan participants and beneficiaries by the issuer, separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group coverage established, maintained, or arranged by the eligible organization in any plan year to which the accommodation is to apply. As such, this notice generally would be provided annually. To satisfy the proposed notice requirement, issuers could use the model language set forth in the proposed rules or substantially similar language. The Departments request comments on the proposed notice requirement, including ways to improve the proposed model language, the timing and delivery (including electronically) of the notice to plan participants and beneficiaries, and whether this notice requirement could be combined with other existing notice requirements to simplify administration for issuers.

The Departments also seek comment on whether there are efficient ways to limit the benefits provided under the separate individual health insurance policies for contraceptive coverage to match the contraceptive benefits identified in the self-certification or whether the separate individual health insurances policies for contraceptive coverage should simply cover the full set of recommended contraceptive services. One option would be to require coordination of benefits such that the contraceptive coverage is secondary to the coverage provided by the group health plan established or maintained by the eligible organization (and any group health insurance coverage provided in connection with the plan). The Departments solicit comment on this issue.

---

[13] To the extent the plan uses more than one third party administrator (for example, one pharmacy benefit manager (PBM) to handle claims administration for prescription drugs and another entity to handle claims for inpatient and outpatient medical/surgical benefits), each third party administrator would become the plan administrator upon receiving the copy of the self-certification with respect to the types of claims that it normally processes (that is, the PBM would continue to handle claims for prescription drugs and the other

entity would continue to handle claims for inpatient and outpatient medical/surgical benefits), and each would do so in accordance with section 2713 of the PHS Act (even if plan terms might otherwise provide differently) as plan administration with an independent funding source.

Exhibit 14

JA679

JA-0000277

### d. Adjustments of Federally-Facilitated Exchange (FFE) User Fees

To fund contraceptive coverage for participants and beneficiaries in self-insured plans established or maintained by eligible organizations at no cost to plan participants or beneficiaries, HHS proposes that the existing proposed FFE user fee calculation, set forth in the December 7, 2012 proposed rule titled "Patient Protection and Affordable Care Act: HHS Notice of Benefit and Payment Parameters for 2014" (77 FR 73213), take into account that an issuer that offers a qualified health plan (QHP) through an FFE (or an affiliated issuer in a state without an FFE) provides such contraceptive coverage by reducing the amount of the user fee.

Consistent with Office of Management and Budget (OMB) Circular No. A25–R, the proposed revised FFE user fee calculation (which would result in an adjustment of the FFE user fee) would facilitate the proposed accommodation of self-insured plans established or maintained by eligible organizations by ensuring that plan participants and beneficiaries have separate individual health insurance policies for contraceptive coverage at no additional cost such that eligible organizations are not required to administer or fund such coverage. It would thereby support many of the goals of the Affordable Care Act, including improving the health of the population, reducing health care costs, providing access to health coverage, encouraging eligible organizations to continue to offer health coverage, and ensuring access to affordable QHPs via efficiently operated Exchanges. Moreover, as described in the 2012 final rules and the ANPRM, there are significant benefits associated with contraceptive coverage without cost sharing. Such contraceptive coverage significantly furthers the governmental interests in promoting public health and in promoting gender equality.

Under this proposal, the FFE user fee calculation would take into account contraceptive coverage that is provided by an issuer in a state without an FFE so long as the issuer is affiliated with an issuer that offers a QHP through an FFE.[14] The affiliated issuer would not be required to be a QHP issuer. An issuer that provides contraceptive coverage in a state without an FFE could offset the estimated cost of such

coverage through an affiliated QHP issuer in a state with an FFE. This would encourage issuers to provide this type of coverage widely, to meet the goal of providing all plan participants and beneficiaries of self-insured plans established or maintained by eligible organizations with separate contraceptive coverage without cost sharing.

HHS proposes that, in order for the FFE user fee calculation to take into account that a QHP issuer (or an affiliated issuer) provides contraceptive coverage, the issuer providing coverage for contraceptive services for the plan participants and beneficiaries of a self-insured plan established or maintained by an eligible organization must provide coverage for all recommended contraceptive services identified in the self-certification of the eligible organization, and do so without cost sharing, premiums, fees, or other costs to the plan participants and beneficiaries. It also must pay the reasonable charge of third party administrators. The contraceptive coverage would be subject to all applicable federal and state laws, including state filing and rate review requirements. HHS seeks comment on ways to streamline the regulatory processes for, and minimize the costs of, obtaining approval of such coverage in all states.

HHS further proposes that, if an issuer provides contraceptive coverage to plan participants and beneficiaries of self-insured plans of eligible organizations at no additional cost, and it, or another issuer in the same issuer group, is required to pay an FFE user fee, an adjustment in the FFE user fee may be sought for the estimated cost of the contraceptive coverage. HHS would use the definition of issuer group proposed at 45 CFR 156.20 for this purpose. That section proposes that issuer group means all entities treated under section 52(a) or (b) of the Code as a member of the same controlled group of corporations as (or under common control with) a health insurance issuer, or issuers affiliated by the common use of a nationally licensed service mark. HHS seeks comment on whether this definition would provide the appropriate amount of flexibility in calculating the FFE user fee to correctly reflect the costs of issuers in states without an FFE, and on the advantages and disadvantages of permitting an adjustment in the FFE user fee with respect to unaffiliated issuers.

Under this proposal, the issuer providing the contraceptive coverage would provide certain information and documentation (jointly with the

affiliated QHP issuer if applicable) to HHS. First, monthly data on the number of individuals for whom the contraceptive coverage is being provided would be submitted, along with an attestation that a copy of the self-certification of the eligible organization was provided by the third party administrator that arranged for the coverage for the plan participants and beneficiaries. Second, the issuer(s) would be required to provide an attestation that coverage for all recommended contraceptive services identified in the self-certification of the eligible organization is being provided, and being provided without cost sharing, premiums, fee, or other costs to the plan participants or beneficiaries. The issuer also would attest to HHS that it passed the portion of its adjustment attributable to reasonable charges by third party administrators on to those parties. Third, the issuer(s) would be required to identify the QHP(s) being offered through an FFE with respect to which the FFE user fee adjustment is to be made. In addition, if the issuer providing the contraceptive coverage is not the QHP issuer for which the adjustment in the FFE user fee is being sought, HHS proposes to require an attestation that the issuers are from the same issuer group. Finally, the issuer(s) would be required to submit to HHS an estimate of the cost of the contraceptive coverage, along with data or documentation supporting that estimate. HHS approval of the cost estimate would be required before a QHP issuer could receive an FFE user fee adjustment. HHS solicits comment on whether additional information or attestations should be required of issuers, for example, whether issuers should be required to attest that they provided the required notice of availability of contraceptive coverage to plan participants and beneficiaries.

HHS is considering two approaches to ensuring that the cost estimate reasonably reflects the cost of the contraceptive coverage. One approach would require the issuer(s) to submit to HHS the estimated per capita cost of the contraceptive coverage, as well as an actuarial memorandum prepared by a member of the American Academy of Actuaries in accordance with generally accepted actuarial principles and methodologies validating the estimate. HHS seeks comment on appropriate standards to guide such calculations. Under this approach, HHS expects that, in 2016 and beyond, the estimated cost of providing the contraceptive coverage would be based on the issuer's experience in previous years.

---

[14] For simplicity, the discussion that follows uses the shorthand "contraceptive coverage" to refer to contraceptive coverage for participants and beneficiaries in self-insured plans established or maintained by eligible organizations at no cost to plan participants or beneficiaries.

HHS also proposes that the estimate of the cost of the contraceptive coverage could include a reasonable charge for the issuer's administrative costs, including the costs of obtaining regulatory approval of the contraceptive coverage policy in the applicable state as well as a third party administrator's charge. HHS seeks comment on the magnitude of a reasonable administrative charge. HHS recognizes that the contraceptive coverage that issuers would provide under this proposed accommodation could see limited enrollment in a particular state. Given the potentially narrow markets available to the issuers of the contraceptive coverage, the per capita cost of administering this type of coverage may be higher than that for major medical coverage or other excepted benefits. On the other hand, given that a third party administrator would be connecting the plan participants and beneficiaries with the issuer, and there would therefore be reduced marketing costs, the administrative costs could be lessened. HHS seeks comment on the appropriate magnitude of these administrative costs generally, as well as ways of minimizing the administrative costs. In particular, HHS notes the issues associated with reimbursing for fixed costs, including the cost of obtaining regulatory approval for the policy in the applicable state. Fixed administrative costs could be amortized across the expected life of the policy, or could be reimbursed in the first year of operation. HHS seeks comment on the appropriate manner of compensating for such costs.

HHS also seeks comment on whether HHS should limit the number of issuers providing the contraceptive coverage in each state with respect to which an FFE user fee adjustment may be made. If HHS were to modify its proposal in this way, HHS would add that an issuer must be willing and have the ability to offer the contraceptive coverage to any participant or beneficiary in a self-insured plan of an eligible organization who resides in the state.

HHS notes that the estimate of the cost of the contraceptive coverage could include a reasonable margin. HHS seeks comment on the magnitude of a reasonable margin, and notes that the proposed HHS Notice of Benefit and Payment Parameters for 2014 proposes a presumed margin of 3 percent within allowable administrative costs for the risk corridors program.

The proposed inclusion of reasonable administrative costs and margin in the estimate of the cost of the contraceptive coverage is intended to ensure that issuers receive reasonable compensation for providing the contraceptive coverage, as they would expect to receive in their other commercial businesses. HHS would review the submission by the issuer(s) to ensure that the cost estimate reflects reasonable assumptions and was calculated in accordance with applicable standards and generally accepted actuarial principles and methodologies. HHS would multiply the estimated per capita cost of the contraceptive coverage by the number of individuals being provided the contraceptive coverage each month in order to determine the magnitude of the FFE user fee adjustment. The amount should also take into account the reasonable administrative charges of third party administrators.

Alternatively, HHS could provide a national per capita estimate for the cost of the contraceptive coverage, which would also include adjustments for reasonable administrative costs and margin. This estimate could then be multiplied by the monthly enrollment in the contraceptive coverage in order to determine the magnitude of the FFE user fee adjustment for each QHP issuer concerned. This latter approach would provide for a more standardized approach, but could result in FFE user fee adjustments that do not fund the entire cost of the contraceptive coverage for some issuers, or that overcompensate other issuers. The former approach, however, would place a greater administrative burden on issuers, and would require a more in-depth review by HHS. HHS seeks comment on these two approaches, as well as alternative approaches for determining the estimated cost of the contraceptive coverage.

In both approaches to establishing an estimated cost of providing the contraceptive coverage described above, HHS seeks comment on the appropriate manner of accounting for a third party administrator's administrative costs of arranging for the contraceptive coverage in the issuer's estimated cost of the contraceptive coverage. For example, a flat administrative fee approved by HHS could be included in that estimated cost—with that flat administrative fee including an appropriate margin for the third party administrator. However, such an approach risks providing over- or under-incentives to the third party administrator for arranging for the contraceptive coverage, if the flat administrative fee is too high or too low. Alternatively, the third party administrator's actual reasonable charge, or actual reasonable administrative costs, for arranging the contraceptive coverage could be included in the estimated cost of the contraceptive coverage. HHS seeks comment on these and other approaches to estimating the third party administrator's administrative costs, and how HHS may ensure that they reflect reasonable administrative costs.

HHS proposes that, if the information described previously is provided and the cost estimate is approved, the FFE user fee will be reduced for the issuer of the identified QHP(s) by the amount of the approved estimate of the cost of the contraceptive coverage (multiplied by enrollment in the coverage for the month). While a highly unlikely occurrence given the relatively small population under consideration, HHS proposes that, if the amount of the adjustment is greater than the amount of the obligation to pay the FFE user fee in a particular month, the issuer of the identified QHP(s) will be provided a credit for the FFE user fee charged in succeeding months in the amount of the excess, consistent with OMB Circular No. A25–R. HHS seeks comment on whether a QHP issuer's FFE user fee should be adjusted for any excess in succeeding months at all; whether, if a QHP issuer's FFE user fee is adjusted for any excess in succeeding months, any time limit should be placed on how much later the adjustment should take place; and alternative methods of compensating an issuer with greater contraceptive coverage costs than its (or its affiliated QHP issuer's) FFE user fees.

HHS also proposes that an issuer providing contraceptive coverage for which the FFE user fee has been adjusted (whether the adjustment was provided to the issuer or an affiliated QHP issuer) must maintain for 10 years and make available to HHS upon request: documentation demonstrating that the contraceptive coverage was provided to participants or beneficiaries in a self-insured plan of an eligible organization, as evidenced by the copy of the self-certification that was provided by the third party administrator that arranged for such coverage; documentation demonstrating that the contraceptive coverage was provided without the imposition of any cost sharing, premium, fee, or other charge; documentation or data supporting the estimate of the cost of the contraceptive coverage; and documentation or data on the actual cost of providing the contraceptive coverage. This record-keeping requirement is consistent with timeframes under the False Claims Act, 31 U.S.C. 3729–3733. HHS is considering mechanisms for ensuring program integrity with respect to the provision of the contraceptive coverage under this proposed accommodation.

Exhibit 14　　　　　JA681　　　　　JA-0000279

These mechanisms may include requiring cooperation with audits and investigations, and requiring corrective action. HHS seeks comment on the oversight requirements that should be implemented with respect to the contraceptive coverage under this proposal.

Finally, HHS is proposing that a QHP issuer that is to receive an FFE user fee adjustment as described above prior to January 1, 2014, will be provided a credit in the amount of the adjustment beginning in January 2014. HHS seeks comment on issuers' ability to fund the contraceptive coverage under the proposal between the end of the temporary enforcement safe harbor and December 31, 2013, if HHS is not able to provide the FFE user fee adjustment until January 2014.

The Departments also seek comment on alternative ways to finance separate contraceptive coverage without cost sharing with respect to participants and beneficiaries in self-insured plans of eligible organizations.

*e. Treatment of Multiple Employer Group Health Plans*

The Departments recognize that, in some instances, several affiliated employers—only some of which are eligible organizations or religious employers—offer health coverage to their employees and their covered dependents through a single group health plan. The Departments considered allowing all employers in such instances to qualify for an accommodation or the religious employer exemption if any single employer met the definition of eligible organization or religious employer. Alternatively, the Departments considered precluding all employers in such instances from qualifying for an accommodation or the religious employer exemption if any single employer failed to meet the definition of eligible organization or religious employer.

The Departments propose to make the accommodation or the religious employer exemption available on an employer-by-employer basis. That is, each employer would have to independently meet the definition of eligible organization or religious employer in order to take advantage of the accommodation or the religious employer exemption with respect to its employees and their covered dependents. Conversely, an employer that did not meet the definition of eligible organization or religious employer could not take advantage of the accommodation or the religious employer exemption with respect to its

employees and their covered dependents. This approach would prevent what could be viewed as a potential way for employers that are not eligible for the accommodation or the religious employer exemption to avoid the contraceptive coverage requirement by offering coverage in conjunction with an eligible organization or religious employer through a common plan. The Departments seek comment on this approach, including comments on the extent to which an employer-by-employer approach would pose administrative challenges for plans and issuers, as well as comments on alternative approaches.

*f. Student Health Insurance Coverage*

Many institutions of higher education administer programs that provide students and their dependents with access to health coverage. Some institutions of higher education sponsor self-insured student health plans, but the vast majority of student health plans are insured, meaning that a health insurance issuer contracts with the institution of higher education to issue a blanket health insurance policy, from which students can buy coverage. Under final rules published by HHS on March 21, 2012, student health insurance coverage is a type of individual health insurance coverage offered to students and their covered dependents under a written agreement between an institution of higher education and an issuer.[15]

Some religiously affiliated colleges and universities object to signing a written agreement for student health insurance coverage that provides benefits for contraceptive services. Such colleges and universities sometimes include funding for student health plans in their student financial aid packages and object to funding student health plans that include coverage for contraceptive services.

The proposed rules would provide for an accommodation for student health insurance coverage arranged by a nonprofit religious institution of higher education with religious objections to contraceptive coverage comparable to the proposed accommodation for group health insurance coverage provided in connection with a group health plan established or maintained by a nonprofit religious organization with religious

objections to contraceptive coverage. Accordingly, among other things, upon receiving a copy of the self-certification from an institution of higher education that meets the criteria for being an eligible organization, an issuer offering student health insurance coverage would provide contraceptive coverage, without cost sharing or additional premium, fee, or other charge, directly to student enrollees and their covered dependents, independent of the issuer's written agreement with the institution of higher education to offer the student health plan. The Departments solicit comments on this proposal.

*g. Contraceptive-Only Excepted Benefits*

In order to implement the proposed accommodations, it would be necessary and appropriate to establish a new contraceptive-only excepted benefits category. Sections 2722(c)(2) and 2763(b) of the PHS Act provide that the requirements of parts A and B of title XXVII of the PHS Act do not apply to any individual health insurance coverage in relation to its provision of excepted benefits described in section 2791(c)(2) of the PHS Act if the benefits are provided under a separate policy, certificate, or contract of insurance. Section 2791(c)(2) of the PHS Act provides that this category of excepted benefits includes limited scope dental or vision benefits, as well as benefits for long-term care, nursing home care, home health care, or community-based care, or any combination thereof. The law authorizes similar limited benefits to be specified in rule as excepted benefits. Additionally, section 2792 of the PHS Act authorizes HHS to promulgate such rules as may be necessary or appropriate to carry out the provisions of title XXVII of the PHS Act. Parallel provisions in section 734 of ERISA and section 9833 of the Code do the same with respect to the Departments of Labor and the Treasury.

Pursuant to the authority in section 2791(c)(2) of the PHS Act (and companion provisions in ERISA and the Code), the proposed rules would provide that benefits for contraceptive services only, when provided under a separate individual market health insurance policy, certificate, or contract of insurance constitute excepted benefits (subject to the conditions discussed later in this section). The Departments propose to establish this new category of excepted benefits to ensure that individual health insurance policies providing contraceptive coverage offered by an issuer pursuant to the proposed accommodations are not subject to certain generally applicable PHS Act and Affordable Care Act

---

[15] Because student health plans are not employment-based, they are not group health plans under federal law. Section 2791(a)(1) of the PHS Act defines "group health plan" as an employee welfare benefit plan as defined in section 3(1) of ERISA to the extent that the plan provides medical care to employees and their dependents directly or through insurance, reimbursement, or otherwise.

Exhibit 14                JA682                JA-0000280

requirements, such as guaranteed availability (section 2702 of the PHS Act) given the unique nature of this coverage. Thus, for example, while issuers would offer this coverage to plan participants and beneficiaries in plans established or maintained by eligible organizations, issuers would not be required to make this coverage available to all other individuals in a state. These proposed amendments are reflected in proposed 45 CFR 148.220(b).

Notwithstanding this proposed excepted benefits status, the Departments believe that a core set of basic consumer protection requirements should apply to individual health insurance policies providing contraceptive-only coverage. This core set of consumer protection requirements would be drawn from the broader set of requirements applicable to individual health insurance coverage under the PHS Act. This core set would include the requirements regarding guaranteed renewability of coverage (section 2703 of the PHS Act), the prohibition against lifetime and annual dollar limits on benefits (section 2711 of the PHS Act), the prohibition against rescissions of coverage (section 2712 of the PHS Act), and internal appeals and external review rights (section 2719 of the PHS Act). Accordingly, pursuant to the authority in section 2792 of the PHS Act to promulgate rules that are "necessary or appropriate" to carry out section 2713 of the PHS Act (and companion provisions in ERISA and the Code), the proposed rules would require compliance with these provisions of federal law as a condition of excepted benefits status. The Departments welcome comments on which requirements of the PHS Act, ERISA, and the Code should or should not apply to individual health insurance policies that provide contraceptive-only coverage. We also seek comments on how to simplify the establishment of these products and how best to ensure their availability in all states, including alternatives to excepted benefits in any state without any such product.

*D. No Effect on Other Law*

The religious employer exemption and accommodations in these proposed rules are intended to have meaning solely with respect to the contraceptive coverage requirement under section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Whether an employer or organization (including an institution of higher education) is designated as "religious" for these purposes is not intended as a judgment about the mission, sincerity, or commitment of the employer or organization (including an institution of higher education), or intended to differentiate among the religious merits, commitment, mission, or public or private standing of religious entities. The use of such designation is limited solely to defining the class of employers or organizations (including institutions of higher education) that would qualify for the religious employer exemption and accommodations under these proposed rules. The definition of religious employer or eligible organization in these proposed rules is not being proposed to apply with respect to, or relied upon for the interpretation of, any other provision of the PHS Act, ERISA, the Code, or any other provision of federal law, nor is it intended to set a precedent for any other purpose. For example, nothing in these proposed rules should be construed as affecting the interpretation of federal or state civil rights statutes, such as Title VII of the Civil Rights Act of 1964 or Title IX of the Education Amendments of 1972.

Furthermore, nothing in these proposed rules would preclude employers or others from expressing their opposition, if any, to the use of contraceptives; require anyone to use contraceptives; or require health care providers to prescribe contraceptives if doing so is against their religious beliefs.

Finally, the provisions of these proposed rules would not prevent states from enacting stronger consumer protections than these minimum standards. Federal health insurance regulation generally establishes a federal floor to ensure that individuals in every state have certain basic protections. State health insurance laws requiring coverage for contraceptive services that provide more access to contraceptive coverage than the federal standards would therefore continue under the proposed rules. The Departments solicit comment on the interaction between state law and these proposed rules.

**IV. Economic Impact and Paperwork Burden**

*A. Executive Orders 12866 and 13563— Department of Health and Human Services and Department of Labor*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a rule: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). The Departments have concluded that these proposed rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866.

1. Need for Regulatory Action

As stated earlier in this preamble, the Departments previously issued amended interim final rules authorizing an exemption for group health plans established or maintained by religious employers (and any group health insurance coverage provided in connection with such plans) from certain coverage requirements under section 2713 of the PHS Act (76 FR 46621, August 3, 2011). The amended interim final rules were finalized on February 15, 2012 (77 FR 8725). The Departments are proposing in these proposed rules to amend the definition of religious employer in the HHS rule at 45 CFR 147.130(a)(1)(iv)(B) (incorporated by reference in the rules of the Departments of Labor and the Treasury) by eliminating the first three prongs of the definition of religious employer that was established in the 2012 final rules and clarifying the fourth prong. Under this proposal, an employer that is an organization that is organized and operates as a nonprofit entity and

Exhibit 14

is referred to in section 6033(a)(3)(A)(i) or (iii) of the Code would be considered a religious employer and its group health plan would qualify for the exemption from the requirement to cover contraceptive services. In addition, the proposed rules would establish accommodations for health coverage established or maintained or arranged by eligible organizations, which have religious objections to contraceptive coverage, while providing women contraceptive coverage without cost sharing.

### 2. Anticipated Effects

The Departments expect that these proposed rules would not result in any additional significant burden on or costs to the affected entities.

### B. Special Analyses—Department of the Treasury

For purposes of the Department of the Treasury, it has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 13563. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this proposed rule. It is hereby certified that the collections of information contained in this notice of proposed rulemaking would not have a significant impact on a substantial number of small entities. Accordingly, a regulatory flexibility analysis under the Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required.

The proposed rules would require each organization seeking accommodation under the proposed rules to self-certify that it meets the definition of eligible organization in the proposed rules. Each organization must self-certify that: (1) On account of religious objections, it opposes providing coverage for some or all of the contraceptive items or services that it would otherwise be required to provide; (2) it is organized and operates as a nonprofit entity; and (3) it holds itself out as a religious organization. The self-certification must be executed by an authorized representative of the organization. The organization must maintain the self-certification in its records for each plan year to which the accommodation is to apply and make it available for examination upon request. The proposed rules would also require each eligible organization that establishes or maintains an insured group health plan to provide a copy of its self-certification to the group health insurance issuer. If the group health

plan of the eligible organization is self-insured, the proposed rules would direct the eligible organization to provide a copy of its self-certification to the third party administrator.

The Departments intend to specify in guidance the form to be used for the self-certification, similar to the form previously prescribed in guidance for the temporary enforcement safe harbor. The Departments are unable to estimate the number of eligible organizations that would seek an accommodation. The Departments seek comment on the likely number of eligible organizations seeking an accommodation. Of the eligible organizations, some would likely be small entities. It is estimated that each eligible organization would need only approximately 50 minutes of labor (30 minutes of clerical labor at a cost of $30.64 per hour, 10 minutes for a manager at a cost of $55.22 per hour, 5 minutes for legal counsel at a cost of $83.10 per hour, and 5 minutes for a senior executive at a cost of $112.43 per hour) each year to prepare and provide the information in the self-certification. This would not be a significant economic impact. For these reasons, this information collection requirement would not have a significant impact on a substantial number of small entities.

The proposed rules also would require health insurance issuers providing separate contraceptive coverage to provide written notice to plan participants and beneficiaries regarding the availability of the contraceptive coverage. The notice would be provided separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group coverage established, maintained, or arranged by the eligible organization in any plan year to which the accommodation is to apply. The proposed rules contain model language for issuers to use to satisfy the notice requirement. There are 446 issuers in the individual and group markets. It is believed that very few, if any, of them are small entities. Moreover, the cost for preparation and distribution of the notice would not be significant. It is estimated that each issuer would need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It is estimated that each notice would require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail would be $0.51. For these reasons, these information collection

requirements would not have a significant impact on a substantial number of small entities.

HHS is soliciting public comment on each of these issues for purposes of the following section as well.

Pursuant to section 7805(f) of the Code, this proposed rule has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

### C. Paperwork Reduction Act— Department of Health and Human Services

Under the Paperwork Reduction Act of 1995, HHS is required to provide 60-day notice in the **Federal Register** and solicit public comment before an information collection requirement (ICR) is submitted to the Office of Management and Budget (OMB) for review and approval. These proposed rules contain proposed ICRs that are subject to review by OMB. A description of these provisions is given in the following paragraphs with an estimate of the annual burden. In order to fairly evaluate whether an ICR should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that HHS solicit public comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of HHS.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

HHS is soliciting public comment on each of these issues for the following sections of these proposed rules that contain proposed ICRs. Average labor costs (including fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.

### 1. Self-Certification (§§ 147.131(b)(4), 147.131(c)(1), 147.131(c)(2))

Each organization seeking accommodation under the proposed rules would be required to self-certify that it meets the definition of an eligible organization. The self-certification would be executed by an authorized representative of the organization and would also specify the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The self-certification would not be submitted to any of the Departments. The form that would be

used by organizations for their self-certification would be specified. This form is available for inspection at *http://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.html.* The organization would maintain the self-certification in its records for each plan year to which the accommodation is to apply. The eligible organization would need to provide a copy of its self-certification to a health insurance issuer (for insured group health plans or student health insurance coverage) or to a third party administrator (for self-insured group health plans).

HHS does not have an estimate for how many organizations would seek an accommodation. HHS seeks comment on the likely number of organizations seeking an accommodation or the number of participants and beneficiaries in the plans of such organizations. Therefore, the burden for only one eligible organization. as opposed to all eligible organizations in total, is estimated. It is assumed that, for each eligible organization, clerical staff would gather and enter the necessary information, send the self-certification electronically to the issuer or third party administrator, and retain a copy for record-keeping. a manager and legal counsel would review it, and a senior executive would execute it. HHS estimates that an organization would need approximately 50 minutes (30 minutes of clerical labor at a cost of $30.64 per hour, 10 minutes for a manager at a cost of $55.22 per hour, 5 minutes for legal counsel at a cost of $83.10 per hour, and 5 minutes for a senior executive at a cost of $112.43 per hour) to execute the self-certification. Therefore, the total annual burden for preparing and providing the information in the self-certification would be approximately $41 for each eligible organization.

With respect to self-insured plans of eligible organizations. the third party administrator would provide a health insurance issuer a copy of the self-certification of the eligible organization. The third party administrator would be able to provide a copy of the self-certification to the issuer electronically at minimal cost.

### 2. Notice of Availability of Contraceptive Coverage (§ 147.131(d))

The proposed rules would direct a health insurance issuer providing separate individual contraceptive coverage at no additional cost to participants and beneficiaries in insured plans of eligible organizations (or to student enrollees and covered

dependents in student health insurance coverage arranged by eligible organizations) and to participants and beneficiaries in self-insured plans of eligible organizations whose coverage is automatically arranged for them by a third party administrator to provide a written notice to such plan participants and beneficiaries (or to such student enrollees and covered dependents) regarding the separate contraceptive coverage. The notice would be separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization in any plan year to which the accommodation is to apply and would be provided annually. To satisfy the proposed notice requirement, issuers could use the model language set forth in the proposed rules or substantially similar language.

It is unknown how many issuers provide health insurance coverage in connection with insured plans of eligible organizations or how many third party administrators provide services to self-insured plans of eligible organizations or how many issuers would provide separate individual contraceptive coverage to plan participants and beneficiaries of self-insured plans of eligible organizations. Therefore, the burden for only one issuer, as opposed to all issuers in total, is estimated. It is estimated that each issuer would need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It is estimated that each notice would require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail would be $0.51.

### 3. FFE User Fee Adjustments (§ 156.50(d))

In order for a QHP issuer to be eligible for the proposed FFE user fee adjustment, the proposed rules would provide that the issuer providing the contraceptive coverage would provide certain information and documentation (jointly with the affiliated QHP issuer for which the reduction in the FFE user fee is being sought, if the issuers are not the same) to HHS. First, monthly data on the number of individuals for whom the contraceptive coverage is being provided would be required, along with an attestation that a copy of the self-certification of the eligible organization was provided by the third party administrator that arranged for the coverage for the plan participants and

beneficiaries. Second, the issuer would provide an attestation that coverage for all recommended contraceptive services identified in the self-certification of the eligible organization is being provided, and being provided without cost sharing. premiums, fee, or other costs to the plan participants or beneficiaries. The issuer also would attest to HHS that it passed the portion of its adjustment attributable to reasonable charges by third party administrators on to those parties. Third, the issuer(s) would identify the QHP(s) being offered through an FFE with respect to which the FFE user fee reduction is to be applied. In addition, where the issuer providing the contraceptive coverage is not the QHP issuer for which the reduction in the FFE user fee is being sought, an attestation that the issuers are from the same issuer group would be submitted. Finally, the issuer(s) would submit to HHS an estimate of the cost of the contraceptive coverage, along with data or documentation supporting that estimate. HHS approval of the cost estimate would be required before a QHP issuer could receive an FFE user fee adjustment.

Although the number of QHP issuers that would seek an FFE user fee adjustment is unknown at this point, HHS anticipates that a small number of issuer groups would provide such contraceptive coverage nationwide, and that, for purposes of efficiency, those issuer groups would consolidate their applications for FFE user fee adjustments with fewer than 9 issuers of QHPs on FFEs. Collections from fewer than 10 persons are exempt from the Paperwork Reduction Act under 44 U.S.C. 3502(3)(A)(i). Therefore, HHS does not plan to seek OMB approval for this proposed ICR. However, in the event that, by the time of the issuance of the final rules. HHS believes that the number of QHP issuers that would seek an FFE user fee adjustment would be greater than 9. HHS would seek OMB approval for this proposed ICR.

To obtain copies of the supporting statement and any related forms for the proposed ICRs referenced above, access CMS's web site at *http://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.html* or email your request, including your address, phone number, OMB number, and CMS document identifier, to *paperwork@cms.hhs.gov,* or call the Reports Clearance Office at (410) 786–1326.

If you comment on these proposed ICRs, please do either of the following:

1. Submit your comments electronically as specified in the

**ADDRESSES** section of these proposed rules; or

2. Submit your comments to the Office of Information and Regulatory Affairs, Office of Management and Budget, Attention: CMS Desk Officer, 9968–P, FAX: (202) 395–5806, or email: *OIRA_submission@omb.eop.gov.*

*D. Paperwork Reduction Act— Department of Labor and Department of the Treasury*

As noted above, each organization seeking accommodation under the proposed rules would be required to self-certify that it meets the definition of an eligible organization. This proposed requirement, which is the same in all three sets of proposed rules, is set out in proposed 26 CFR 54.9815– 2713A(b)(4) and proposed 29 CFR 2590.715–2713A(b)(4). The Departments are soliciting public comments for 60 days concerning this record-keeping requirement. The Departments will submit a copy of these proposed rules to OMB in accordance with 44 U.S.C. 3507(d) for review of the proposed ICRs. The Departments and OMB are particularly interested in comments that:

• Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, by permitting electronic submission of responses.

Comments should be sent to the Office of Information and Regulatory Affairs, Attention: Desk Officer for the Employee Benefits Security Administration either by Fax to (202) 395–5806 or by email to *oira_submission@omb.eop.gov.* A copy of the proposed ICRs may be obtained by contacting the PRA addressee: G. Christopher Cosby, Office of Policy and Research, Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N–5718, Washington, DC 20210; telephone: (202) 693–8410; Fax: (202) 219–4745 (please

note that these numbers are not toll-free numbers): email: *ebsa.opr@dol.gov.* Proposed ICRs submitted to OMB also are available at *www.reginfo.gov* (*http:// www.reginfo.gov/public/do/PRAMain*).

Consistent with the HHS analysis presented above, the Departments do not have an estimate for how many organizations would seek an accommodation. The Departments seek comment on the likely number of organizations seeking an accommodation and the number of participants and beneficiaries in the plans of such organizations. The Departments rely on the same estimates noted above: 50 minutes per organization to execute the self-certification (*i.e.,* approximately $41 for each eligible organization).

With respect to self-insured plans of eligible organizations, the third party administrator would provide a health insurance issuer a copy of the self-certification of the eligible organization. The third party administrator would be able to provide a copy of the self-certification to the issuer electronically at minimal cost.

The Departments note that persons are not required to respond to, and generally are not subject to any penalty for failing to comply with, an ICR unless the ICR has a valid OMB control number. The paperwork burden estimates are summarized as follows:

*Type of Review:* New collection.
*Agencies:* Employee Benefits Security Administration, Department of Labor; Internal Revenue Service, Department of the Treasury.
*Title:* Self-Certification; Preventive Services Coverage.
*OMB Number:* XXXX–XXXX; XXXX– XXXX.
*Affected Public:* Business or other for-profit; not-for-profit institutions.
*Total Respondents:* Unknown.
*Total Responses:* Unknown.
*Frequency of Response:* Once.
*Estimated Total Annual Burden Hours:* 50 minutes per respondent.
*Estimated Total Annual Burden Cost:* Unknown.

**V. Unfunded Mandates Reform Act**

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these proposed rules do not include any proposed federal mandate that may result in expenditures by state, local, or tribal governments, nor does it include any proposed federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[16]

**VI. Federalism—Department of Health and Human Services and Department of Labor**

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating rules that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the rules.

In the Departments' view, these proposed rules have federalism implications, but the federal implications are substantially mitigated because, with respect to health insurance issuers, 15 states have enacted specific laws, rules, or bulletins that meet or exceed the federal standards requiring coverage of specified preventive services without cost sharing. The remaining states which provide oversight for these federal law requirements are doing so using their general authority to enforce these federal standards. Therefore, the proposed rules are not likely to require substantial additional oversight of states by HHS.

In general, section 514 of ERISA provides that state laws are superseded to the extent that they relate to any covered employee benefit plan, and preserves state laws that regulate insurance, banking, or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. HIPAA added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements for group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with group health plans provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent

---

[16] In early 2013, that threshold level is approximately $139 million.

Exhibit 14                JA686                JA-0000284

than the federal requirement are unlikely to "prevent the application of" the preventive services coverage provision, and therefore are not preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904), and December 30, 2004 (69 FR 78720), and these proposed rules would clarify and implement the statute's minimum standards and would not significantly reduce the discretion given the states by the statute.

The PHS Act provides that the states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state for the purpose of addressing the state's concerns and avoiding conflicts with the exercise of state authority.[17] HHS has developed procedures to implement its enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states, the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion, throughout the process of developing these proposed rules, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health plans and health insurance issuers, and the rights of those individuals that Congress intended to protect in the PHS Act.

## VII. Statutory Authority

The Department of the Treasury regulations are proposed to be adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are proposed to be adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services regulations are proposed to be adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

## List of Subjects

### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

### 45 CFR Part 148

Administrative practice and procedure, Health care, Health insurance, Penalties, and Reporting and recordkeeping requirements.

### 45 CFR Part 156

Administrative practice and procedure, Advertising, Advisory committees, Brokers, Conflict of interest, Consumer protection, Grant programs—health, Grants administration, Health care, Health insurance, Health maintenance organization (HMO), Health records, Hospitals, American Indian/Alaska Natives, Individuals with disabilities, Loan programs—health, Organization

and functions (Government agencies), Medicaid, Public assistance programs, Reporting and recordkeeping requirements, State and local governments, Sunshine Act, Technical assistance, Women, and Youth.

## Department of the Treasury

## Internal Revenue Service

Accordingly, 26 CFR part 54 is proposed to be amended as follows:

## PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read in part as follows:

**Authority:** 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9801–2 is amended by revising the definition of *excepted benefits* as follows:

### § 54.9801–2 Definitions.

\* \* \* \* \*

*Excepted benefits* means the benefits described as excepted in § 54.9831(c), or 45 CFR § 148.220 (describing when individual health insurance policies constitute excepted benefits).

\* \* \* \* \*

■ **Par. 3.** Section 54.9815–2713 is amended by adding paragraph (a)(1) introductory text and revising paragraph (a)(1)(iv) to read as follows:

### § 54.9815–2713 Coverage of preventive health services.

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\* \* \* \* \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

\* \* \* \* \*

■ **Par. 4.** Section 54.9815–2713A is added to read as follows:

### § 54.9815–2713A Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that

---

[17] This authority applies to insurance issued with respect to group health plans generally, including plans covering employees of church organizations. Thus, this discussion of federalism applies to all group health insurance coverage that is subject to the PHS Act, including those church plans that provide coverage through a health insurance issuer (but not to church plans that do not provide coverage through a health insurance issuer).

satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization maintains in its records a self-certification, made in the manner and form specified by the Secretary of Health and Human Services, for each plan year to which the accommodation is to apply, executed by a person authorized to make the certification on behalf of the organization, indicating that the organization satisfies the criteria in paragraphs (a)(1) through (3) of this section, and, specifying those contraceptive services for which the organization will not establish, maintain, administer, or fund coverage, and makes such certification available for examination upon request.

(b) *Contraceptive coverage—self-insured group health plan coverage.* [Reserved.]

(c) *Contraceptive coverage—insured group health plan coverage*—(1) A group health plan established or maintained by an eligible organization and that provides benefits through one or more issuers complies with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or plan administrator furnishes each issuer that would otherwise provide coverage for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section.

(2) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a plan for which the issuer would otherwise provide coverage for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) must automatically provide health insurance coverage for any contraceptive services required to be covered by § 54.9815–2713(a)(1)(iv) and identified in the self-certification, through a separate health insurance policy that is excepted under 45 CFR 148.220(b)(7), for each plan participant and beneficiary. The issuer providing the individual market excepted benefits policy may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with

respect to coverage of those services, or impose any premium, fee, or other charge, or portion thereof, directly or indirectly, on the eligible organization, its group health plan, or plan participants or beneficiaries with respect to coverage of those services.

(d) *Notice of availability of contraceptive coverage.* An issuer providing contraceptive coverage arranged pursuant to paragraph (b) or (c) of this section must provide to plan participants and beneficiaries written notice of the availability of the contraceptive coverage, separate from but contemporaneous with (to the extent possible) application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization for any plan year to which this paragraph applies. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph: ''The organization that establishes and maintains, or arranges, your health coverage has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your health coverage will not cover the following contraceptive services: [contraceptive services specified in self-certification]. Instead, these contraceptive services will be covered through a separate individual health insurance policy, which is not administered or funded by, or connected in any way to, your health coverage. You and any covered dependents will be enrolled in this separate individual health insurance policy at no additional cost to you. If you have any questions about this notice, contact [contact information for health insurance issuer].''

**Department of Labor**

**Employee Benefits Security Administration**

For the reasons stated in the preamble, the Department of Labor proposes to amend 29 CFR part 2590 as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 1. The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public

Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

■ 2. Section 2590.701–2 is amended by revising the definition of *Excepted benefits* as follows:

**§ 2590.701–2 Definitions.**

\* \* \* \* \*

*Excepted benefits* means the benefits described as excepted in § 2590.732(c), or 45 CFR § 148.220 (describing when individual health insurance policies constitute excepted benefits).

\* \* \* \* \*

■ 3. Section 2590.715–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

**§ 2590.715–2713 Coverage of preventive health services.**

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 2590.715–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\* \* \* \* \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

\* \* \* \* \*

■ 4. A new § 2590.715–2713A is added to read as follows:

**§ 2590.715–2713A Accommodations in connection with coverage of preventive health services.**

(a) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 2590.715–713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

Exhibit 14

JA688

JA-0000286

(4) The organization maintains in its records a self-certification, made in the manner and form specified by the Secretary of Health and Human Services, for each plan year to which the accommodation is to apply, executed by a person authorized to make the certification on behalf of the organization, indicating that the organization satisfies the criteria in paragraphs (a)(1) through (3) of this section, and, specifying those contraceptive services for which the organization will not establish, maintain, administer, or fund coverage, and makes such certification available for examination upon request.

(b) *Contraceptive coverage—self-insured group health plan coverage.* [Reserved.]

(c) *Contraceptive coverage—insured group health plan coverage.* (1) A group health plan established or maintained by an eligible organization and that provides benefits through one or more issuers complies with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or plan administrator furnishes each issuer that would otherwise provide coverage for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section.

(2) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a plan for which the issuer would otherwise provide coverage for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) must automatically provide health insurance coverage for any contraceptive services required to be covered by § 2590.715–2713(a)(1)(iv) and identified in the self-certification, through a separate health insurance policy that is excepted under 45 CFR 148.220(b)(7), for each plan participant and beneficiary. The issuer providing the individual market excepted benefits policy may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to coverage of those services, or impose any premium, fee, or other charge, or portion thereof, directly or indirectly, on the eligible organization, its group health plan, or plan participants or beneficiaries with respect to coverage of those services.

(d) *Notice of availability of contraceptive coverage.* An issuer providing contraceptive coverage arranged pursuant to paragraph (b) or (c) of this section must provide to plan participants and beneficiaries written notice of the availability of the contraceptive coverage, separate from but contemporaneous with (to the extent possible) application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization for any plan year to which this paragraph applies. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph: ''The organization that establishes and maintains, or arranges, your health coverage has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your health coverage will not cover the following contraceptive services: [contraceptive services specified in self-certification]. Instead, these contraceptive services will be covered through a separate individual health insurance policy, which is not administered or funded by, or connected in any way to, your health coverage. You and any covered dependents will be enrolled in this separate individual health insurance policy at no additional cost to you. If you have any questions about this notice, contact [contact information for health insurance issuer].''

**Department of Health and Human Services**

For the reasons stated in the preamble, the Department of Health and Human Services proposes to amend 45 CFR Subtitle A parts 147, 148, and 156 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.130 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 147.130 Coverage of preventive health services.

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 147.131, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\*   \*   \*   \*   \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration.

\*   \*   \*   \*   \*

■ 2. A new § 147.131 is added to read as follows:

### § 147.131 Exemption and accommodations in connection with coverage of preventive health services.

(a) *Religious employers.* In issuing guidelines under § 147.130(a)(1)(iv), the Health Resources and Services Administration may establish an exemption from such guidelines with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines. For purposes of this paragraph (a), a ''religious employer'' is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended.

(b) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization maintains in its records a self-certification, made in the manner and form specified by the Secretary of Health and Human Services, for each plan year to which the accommodation is to apply, executed by a person authorized to make the certification on behalf of the organization, indicating that the organization satisfies the criteria in paragraphs (b)(1) through (3) of this section, and, specifying those contraceptive services for which the

organization will not establish, maintain, administer, or fund coverage, and makes such certification available for examination upon request.

(c) *Contraceptive coverage—insured group health plan coverage.* (1) A group health plan established or maintained by an eligible organization and that provides benefits through one or more issuers complies with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the eligible organization or plan administrator furnishes each issuer that would otherwise provide coverage for any contraceptive services to be covered under § 147.130(a)(1)(iv) with a copy of the self-certification described in paragraph (b)(4) of this section.

(2) A group health insurance issuer that receives a copy of the self-certification described in paragraph (b)(4) of this section with respect to a plan for which the issuer would otherwise provide coverage for any contraceptive services required to be covered under § 147.130(a)(1)(iv) must automatically provide health insurance coverage for any contraceptive services required to be covered by § 147.130(a)(1)(iv) and identified in the self-certification, through a separate health insurance policy that is excepted under § 148.220(b)(7) of this subtitle, for each plan participant and beneficiary. The issuer providing the individual market excepted benefits policy may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to coverage of those services, or impose any premium, fee, or other charge, or portion thereof, directly or indirectly, on the eligible organization, its group health plan, or plan participants or beneficiaries with respect to coverage of those services.

(d) *Notice of availability of contraceptive coverage.* An issuer providing contraceptive coverage arranged pursuant to paragraph (c) of this section must provide to plan participants and beneficiaries written notice of the availability of the contraceptive coverage, separate from but contemporaneous with (to the extent possible) application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization for any plan year to which this paragraph applies. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph: "The organization that establishes and maintains, or arranges, your health coverage has certified that your [group health plan/ student health insurance coverage] qualifies for an accommodation with

respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your health coverage will not cover the following contraceptive services: [contraceptive services specified in self-certification]. Instead, these contraceptive services will be covered through a separate individual health insurance policy, which is not administered or funded by, or connected in any way to, your health coverage. You and any covered dependents will be enrolled in this separate individual health insurance policy at no additional cost to you. If you have any questions about this notice, contact [contact information for health insurance issuer]."

(e) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.

## PART 148—REQUIREMENTS FOR THE INDIVIDUAL HEALTH INSURANCE MARKET

■ 3. The authority citation for part 148 continues to read as follows:

**Authority:** Secs. 2741 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg–41 through 300gg–63, 300gg–91, and 300gg–92).

■ 4. Section 148.220 is amended as follows:

■ a. In the introductory text of paragraph (b), the reference "(b)(6)" is removed and the reference "(b)(7)" is added in its place.

■ b. Adding paragraph (b)(7).
The addition reads as follows:

### § 148.220 Excepted benefits.

\* \* \* \* \*

(b) \* \* \*

(7) Individual health insurance coverage that provides coverage only for contraceptive services pursuant to § 147.131(c) of this subtitle, 26 CFR 54.9815–2713A(b) or (c), or 29 CFR 2590.715–2713A(b) or (c), but only if such coverage complies with the requirements in the following provisions:

(i) Section 2703 of the PHS Act (relating to guaranteed renewability of coverage).

(ii) Section 2711 of the PHS Act (relating to the prohibition on lifetime and annual dollar limits on benefits).

(iii) Section 2712 of the PHS Act (relating to the prohibition on rescissions of coverage).

(iv) Section 2719 of the PHS Act (relating to internal appeals and external review).

## PART 156—HEALTH INSURANCE ISSUER STANDARDS UNDER THE AFFORDABLE CARE ACT, INCLUDING STANDARDS RELATED TO EXCHANGES

■ 5. The authority citation for part 156 continues to read as follows:

**Authority:** Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

■ 6. Section 156.150 is amended by adding paragraph (d) to read as follows:

### § 156.50  Financial support.

\* \* \* \* \*

(d) *Adjustment of Federally-facilitated Exchange user fee.* If a QHP issuer (or another issuer in the same issuer group) provides individual health insurance coverage consisting of coverage for any contraceptive services required to be covered under § 147.130(a)(1)(iv) of this subchapter, and identified in the self-certification referenced in § 147.131(b)(4) of this subchapter, to any plan participant or beneficiary with respect to whom the QHP issuer receives the written notice referenced in 26 CFR 54.9815–2713A(b) or 29 CFR 2590.715–2713A(b), the QHP issuer may qualify for a reduction in the user fee for a Federally-facilitated Exchange specified in paragraph (c) as described in this paragraph (d).

(1) In order for a QHP issuer to be eligible for the Federally-facilitated Exchange user fee reduction, in providing such contraceptive coverage to such individuals, the QHP issuer (or another issuer in the same issuer group) may not impose any cost-sharing requirement (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, directly or indirectly, with respect to such contraceptive coverage, and must satisfy the other conditions set forth in this section.

(2) If an issuer provides such contraceptive coverage to such individuals, and it, or another issuer in the same issuer group, is required to pay

Exhibit 14 — JA690 — JA-0000288

the Federally-facilitated Exchange user fee, a reduction in that user fee may be sought for the HHS-approved estimated cost of such contraceptive coverage.

(3) In order for a QHP issuer to be eligible for the Federally-facilitated Exchange user fee reduction, the issuer of such contraceptive coverage to such individuals must (jointly with the issuer seeking the reduction in the Federally-facilitated Exchange user fee, if not the same issuers) do all of the following:

(i) Provide monthly data on the number of individuals to whom the contraceptive coverage is being provided, and provide an attestation by the issuer providing the contraceptive coverage that the issuer received a copy of the written notice referenced in 26 CFR 54.9815–2713A(b) or 29 CFR 2590.715–2713A(b) with respect to each plan participant or beneficiary.

(ii) Provide an attestation by the issuer providing the contraceptive coverage that the issuer provided contraceptive coverage in accordance with paragraph (d) of this section and that the issuer passed the portion of the reduction in the Federally-facilitated Exchange user fee attributable to reasonable charges by third party administrators on to the third party administrators.

(iii) Identify the QHP(s) being offered through a Federally-facilitated Exchange with respect to which the user fee reduction is to be applied, and, if the issuer providing the contraceptive coverage is not the issuer seeking the user fee reduction, provide an attestation by the issuer providing the contraceptive coverage that both the issuer providing the contraceptive coverage and the issuer seeking the user fee reduction belong to the same issuer group.

(iv) Submit an estimate of the cost of the contraceptive coverage to HHS for approval, in the manner and timeframe specified by HHS, concurrent with documentation or data supporting that estimate.

(4) If the information specified under paragraphs (d)(3)(i) through (iii) of this section is provided and the estimate specified under paragraph (d)(3)(iv) of this section is submitted and approved by HHS, the issuer of the identified QHP(s) will be provided a reduction in its obligation to pay the Federally-facilitated Exchange user fee specified in paragraph (c) in an amount equal in value to the approved estimated cost of the contraceptive coverage, as long as an exception from OMB Circular No. A–25 is in effect. If the amount of the reduction is greater than the amount of the obligation to pay the Federally-facilitated Exchange user fee in a

particular month, the issuer of the identified QHP(s) will be provided a credit in succeeding months in the amount of the excess. An issuer that is eligible for a user fee reduction in accordance with this paragraph (d) prior to January 1, 2014, will be provided a credit in the amount of the user fee reduction beginning January 2014.

(5) An issuer providing contraceptive coverage for which a reduction in the Federally-facilitated Exchange user fee has been provided under paragraph (d)(4) of this section (whether the reduction was provided to the issuer or another issuer in the same issuer group) must maintain for 10 years and make available to HHS upon request all of the following:

(i) Documentation demonstrating that the contraceptive coverage was provided to plan participants or beneficiaries with respect to whom the issuer received a copy of the written notice referenced in 26 CFR 54.9815–2713A(b) or 29 CFR 2590.715–2713A(b).

(ii) Documentation demonstrating that the contraceptive coverage was provided in accordance with paragraph (d) of this section.

(iii) Documentation or data supporting the estimate of the cost of the contraceptive coverage.

(iv) Documentation or data on the actual cost of providing the contraceptive coverage.

Signed this 30th day of January 2013.

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Signed this 30th day of January 2013.

**Phyllis C. Borzi.**

*Assistant Secretary. Employee Benefits Security Administration. Department of Labor.*

Dated: January 29, 2013.

**Marilyn Tavenner.**

*Acting Administrator. Centers for Medicare & Medicaid Services.*

Approved: January 29, 2013.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2013–02420 Filed 2–1–13; 11:15 am]

**BILLING CODE 4830–01; 4510–029; 4120–01; 6325–64–P**

## SAINT LAWRENCE SEAWAY DEVELOPMENT CORPORATION

### 33 CFR Part 401

**[Docket No. SLSDC–2013–0001; 2135–AA31]**

### Seaway Regulations and Rules: Periodic Update, Various Categories

**AGENCY:** Saint Lawrence Seaway Development Corporation, DOT.

**ACTION:** Notice of Proposed Rulemaking.

**SUMMARY:** The Saint Lawrence Seaway Development Corporation (SLSDC) and the St. Lawrence Seaway Management Corporation (SLSMC) of Canada, under international agreement, jointly publish and presently administer the St. Lawrence Seaway Regulations and Rules (Practices and Procedures in Canada) in their respective jurisdictions. Under agreement with the SLSMC, the SLSDC is amending the joint regulations by updating the Seaway Regulations and Rules in various categories. The proposed changes will update the following sections of the Regulations and Rules: Condition of Vessels; Seaway Navigation; Dangerous Cargo; and, Information and Reports. These proposed amendments are necessary to take account of updated procedures and will enhance the safety of transits through the Seaway. Several of the proposed amendments are merely editorial or for clarification of existing requirements.

**DATES:** Any party wishing to present views on the proposed amendment may file comments with the Corporation on or before March 8, 2013.

**ADDRESSES:** You may submit comments identified by Docket Number SLSDC 2013–0001 by any of the following methods:

• *Web Site: http:// www.Regulations.gov* . Follow the online instructions for submitting comments/submissions.

• *Fax:* 1–202–493–2251.

• *Mail:* Docket Management Facility; U.S. Department of Transportation, 1200 New Jersey Avenue SE., West Building Ground Floor, Room W12–140, Washington, DC 20590–001.

• *Hand Delivery:* Documents may be submitted by hand delivery or courier to West Building Ground Floor, Room W12–140. 1200 New Jersey Avenue, SE., Washington, DC 20590–001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal Holidays.

*Instructions:* All submissions must include the agency name and docket number or Regulatory Identification Number (RIN) for this rulemaking. Note

Exhibit 14   JA691   JA-0000289

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**RIN 1545–BJ60**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

**[CMS–9968–ANPRM]**

**RIN 0938–AR42**

**Certain Preventive Services Under the Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Advance notice of proposed rulemaking (ANPRM).

**SUMMARY:** This advance notice of proposed rulemaking announces the intention of the Departments of Health and Human Services, Labor, and the Treasury to propose amendments to regulations regarding certain preventive health services under provisions of the Patient Protection and Affordable Care Act (Affordable Care Act). The proposed amendments would establish alternative ways to fulfill the requirements of section 2713 of the Public Health Service Act and companion provisions under the Employee Retirement Income Security Act and the Internal Revenue Code when health coverage is sponsored or arranged by a religious organization that objects to the coverage of contraceptive services for religious reasons and that is not exempt under the final regulations published February 15, 2012. This document serves as a request for comments in advance of proposed rulemaking on the potential means of accommodating such organizations while ensuring contraceptive coverage for plan participants and beneficiaries covered under their plans (or, in the case of student health insurance plans, student enrollees and their dependents) without cost sharing.

**DATES:** Comments are due on or before June 19, 2012.

**ADDRESSES:** Written comments may be submitted as specified below. Any comment that is submitted will be shared with the other Departments. Please do not submit duplicate comments.

All comments will be made available to the public. **Please Note:** Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments are posted on the Internet exactly as received, and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

In commenting, please refer to file code CMS–9968–ANPRM. Because of staff and resource limitations, the Departments cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this ANPRM to *http://www.regulations.gov.* Follow the instructions under the "More Search Options" tab.

2. *By regular mail.* You may mail written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968–ANPRM, P.O. Box 8016, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968– ANPRM, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments before the close of the comment period to either of the following addresses:

a. For delivery in Washington, DC— Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not

readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call (410) 786–9994 in advance to schedule your arrival with one of our staff members.

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. The Departments post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http:// www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. EST. To schedule an appointment to view public comments, call 1–800–743–3951.

**FOR FURTHER INFORMATION CONTACT:** Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 927–9639; Jacob Ackerman, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*http://www.dol.gov/ebsa*). In

addition, information from HHS on private health insurance for consumers can be found on the CMS Web site (*www.cciio.cms.gov*), and information on health reform can be found at *http://www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Patient Protection and Affordable Care Act, Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act of 2010, Public Law 111–152, was enacted on March 30, 2010 (collectively, the Affordable Care Act). The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and make them applicable to group health plans.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screening provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA) that were issued on August 1, 2011 (HRSA Guidelines).[1] As relevant here, the HRSA Guidelines require coverage, without cost sharing, for "[a]ll Food and Drug Administration [(FDA)] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a provider.[2] Except as discussed below, non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage are required to provide coverage consistent with the HRSA Guidelines, without cost sharing, in plan years (or, in the individual market, policy years) beginning on or after

August 1, 2012.[3] These guidelines were based on recommendations of the independent Institute of Medicine, which undertook a review of the scientific and medical evidence on women's preventive services.

The Departments of Health and Human Services (HHS), Labor, and the Treasury (the Departments) published interim final regulations implementing section 2713 of the PHS Act on July 19, 2010 (75 FR 41726). In response to comments, the Departments amended the interim final regulations on August 1, 2011.[4] The amendment provided HRSA with discretion to establish an exemption for group health plans established or maintained by certain religious employers (and any group health insurance coverage provided in connection with such plans) with respect to any contraceptive services that they would otherwise be required to cover consistent with the HRSA Guidelines. The amended interim final regulations further specified that, for purposes of this exemption only, a religious employer is one that—(1) has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. This religious exemption is consistent with the policies in some States that currently both require contraceptive coverage and provide for some type of religious exemption from their contraceptive coverage requirement.

In the HRSA Guidelines, HRSA exercised its discretion under the amended interim final regulations such that group health plans established or maintained by these religious employers (and any group health insurance coverage provided in connection with such plans) are not required to cover any contraceptive services. In the final regulations published on February 15, 2012 (77 FR 8725), the Departments

adopted the definition of religious employer in the amended interim final regulations.

The Departments emphasize that this religious exemption is intended *solely* for purposes of the contraceptive coverage requirement pursuant to section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Whether an employer is designated as "religious" for these purposes is not intended as a judgment about the mission, sincerity, or commitment of the employer, and the use of such designation is limited to defining the class that qualifies for this specific exemption. The designation will not be applied with respect to any other provision of the PHS Act, ERISA, or the Code, nor is it intended to set a precedent for any other purpose.

In addition, we note that this exemption is available to religious employers in a variety of arrangements. For example, a Catholic elementary school may be a distinct common-law employer from the Catholic diocese with which it is affiliated. If the school's employees receive health coverage through a plan established or maintained by the school, and the school meets the definition of a religious employer in the final regulations, then the religious employer exemption applies. If, instead, the same school provides health coverage for its employees through the same plan under which the diocese provides coverage for its employees, and the diocese is exempt from the requirement to cover contraceptive services, then neither the diocese nor the school is required to offer contraceptive coverage to its employees.

On February 10, 2012, when the final regulations concerning the exemption were posted, HHS issued a bulletin entitled "Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code."[5] The bulletin established a temporary enforcement safe harbor for group health plans sponsored by non-profit organizations that, on and after February 10, 2012, do not provide some or all of the contraceptive coverage otherwise required, consistent with any

---

[1] The HRSA Guidelines are available at: *http://www.hrsa.gov/womensguidelines*.

[2] **Note:** This excludes items and services such as vasectomies and condoms.

[3] The interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation or guideline is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[4] The amendment to the interim final rules was published on August 3, 2011, at 76 FR 46621.

[5] The bulletin can be found at: *http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf*.

Exhibit 15

JA-0000291

applicable State law, because of the religious beliefs of the organization (and any group health insurance coverage provided in connection with such plans). The temporary enforcement safe harbor is in effect until the first plan year that begins on or after August 1, 2013. The bulletin confirmed that all three Departments will not take any enforcement action against an employer, group health plan, or health insurance issuer that complies with the conditions of the temporary enforcement safe harbor described in the bulletin.

At the same time, the Departments announced plans to expeditiously develop and propose changes to the final regulations implementing section 2713 of the PHS Act that would meet two goals—accommodating non-exempt, non-profit religious organizations' religious objections to covering contraceptive services and assuring that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing. The Departments intend to finalize these amendments to the final regulations such that they are effective by the end of the temporary enforcement safe harbor; that is, the amended final regulations would apply to plan years starting on or after August 1, 2013. This advance notice of proposed rulemaking (ANPRM) is the first step toward promulgating these amended final regulations. Following the receipt of public comment, a notice of proposed rulemaking (NPRM) will be published, which will permit additional public comment, followed by amended final regulations.

## II. Overview of Intended Regulations

On February 10, 2012, the Departments committed to working with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing in order to accommodate non-exempt, non-profit religious organizations with religious objections to such coverage. Specifically, the Departments indicated their plans for a rulemaking to require issuers to offer group health insurance coverage without contraceptive coverage to such an organization (or its plan sponsor) and simultaneously to provide contraceptive coverage directly to the participants and beneficiaries covered under the organization's plan with no cost sharing. Under this approach, the Departments would require that, in this circumstance, there be no premium charge for the separate contraceptive coverage. Actuaries and experts have found that coverage of contraceptives is at least cost neutral, and may save money, when taking into account all

costs and benefits for the issuer.[6] If the cost of coverage is reduced, savings may accrue to employers, plan participants and beneficiaries, and the health care system. The Departments indicated their intent to develop policies to achieve the same goals with respect to self-insured group health plans sponsored by non-exempt, non-profit religious organizations with religious objections to contraceptive coverage.

In the time since this announcement, the Departments have met with representatives of religious organizations, insurers, women's groups, insurance experts, and other interested stakeholders. These initial meetings were used to help identify issues relating to the accommodation to be developed with respect to non-exempt, non-profit religious organizations with religious objections to contraceptive coverage. These consultations also began to provide more detailed information on how health coverage arrangements are currently structured, how religious accommodations work in States with contraceptive coverage requirements, and the landscape with respect to religious organizations that offer health benefits today. These discussions have informed this ANPRM.

As the consultations with interested parties continue, this ANPRM presents questions and ideas to help shape these discussions as well as an early opportunity for any interested stakeholder to provide advice and input into the policy development relating to the accommodation to be made with respect to non-exempted, non-profit religious organizations with religious objections to contraceptive coverage. The Departments welcome all points of view on how to provide women access to the important preventive services at issue without cost sharing while accommodating religious liberty interests.

The starting point for this policy development includes two goals and several ideas about how to achieve them. First, the Departments aim to maintain the provision of contraceptive coverage without cost sharing to individuals who receive coverage through non-exempt, non-profit

religious organizations with religious objections to contraceptive coverage in the simplest way possible. Second, the Departments aim to protect such religious organizations from having to contract, arrange, or pay for contraceptive coverage. As described below, the Departments intend to propose a requirement that health insurance issuers providing coverage for insured group health plans sponsored by such religious organizations assume the responsibility for the provision of contraceptive coverage without cost sharing to participants and beneficiaries covered under the plan, independent of the religious organization, as a means of meeting these goals. HHS also intends to propose a comparable requirement with respect to student health insurance plans arranged by such religious organizations. For such religious organizations that sponsor self-insured plans, the Departments intend to propose that a third-party administrator of the group health plan or some other independent entity assume this responsibility. The Departments suggest multiple options for how contraceptive coverage in this circumstance could be arranged and financed in recognition of the variation in how such self-insured plans are structured and different religious organizations' perspectives on what constitutes objectionable cooperation with the provision of contraceptive coverage. The Departments seek input on these options, particularly how to enable religious organizations to avoid such objectionable cooperation when it comes to the funding of contraceptive coverage, as well as new ideas to inform the next stage of the rulemaking process.

The following sections set forth questions the Departments believe will help inform the development of proposed regulations, including the policy options the Departments are considering and potential language related to such options. Throughout this ANPRM, the term "accommodation" is used to refer to an arrangement under which contraceptive coverage is provided without cost sharing to participants and beneficiaries covered under a plan independent of the objecting religious organization that sponsors the plan, which would effectively exempt the religious organization from the requirement to cover contraceptive services. The term "religious organization" is used to describe the class of organizations that qualifies for the accommodation. An "independent entity" is an issuer, third-party administrator, or other provider of contraceptive coverage that is not a

---

[6] Bertko, John, F.S.A., M.A.A.A., Director of Special Initiatives and Pricing, Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Glied, Sherry, Ph.D., Assistant Secretary for Planning and Evaluation, Department of Health and Human Services (ASPE/HHS), Miller, Erin, MPH, ASPE/HHS, Wilson, Lee, ASPE/HHS, Simmons, Adelle, ASPE/HHS, "The Cost of Covering Contraceptives Through Health Insurance," (February 9, 2012), available at: *http:// aspe.hhs.gov/health/reports/2012/contraceptives/ ib.shtml*.

religious organization. And "contraceptive coverage" means the contraceptive coverage required under the HRSA Guidelines.

The Departments note that a number of questions have been raised about the scope and application of the contraceptive coverage requirement more generally (that is, questions apart from the religious accommodation). The Departments' interim final regulations implementing section 2713 of the PHS Act provide that "[n]othing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service * * * to the extent not specified in the recommendation or guideline."[7] The preamble to the interim final regulations further provides:

"The use of reasonable medical management techniques allows plans and issuers to adapt these recommendations and guidelines to coverage of specific items and services where cost sharing must be waived. Thus, under these interim final regulations, a plan or issuer may rely on established techniques and the relevant evidence base to determine the frequency, method, treatment, or setting for which a recommended preventive service will be available without cost sharing requirements to the extent not specified in a recommendation or guideline." (75 FR 41728–29).[8]

This policy applies to contraceptive coverage. The Departments plan to issue further guidance on section 2713 of the PHS Act more generally.

*A. Who qualifies for the accommodation?*

As previously described, group health plans sponsored by certain religious employers (and any group health insurance coverage provided in connection with such plans) are exempt from the requirement to offer coverage of contraceptive services that would otherwise be required under the HRSA Guidelines for plan years beginning on or after August 1, 2012. A second set of organizations qualifies for a temporary enforcement safe harbor: group health plans sponsored by non-exempt, non-profit organizations that, consistent with any applicable State law, do not, on or after February 10, 2012 (the date of the posting of the final regulations), cover some or all forms of contraceptives due to the organization's religious objections to them (and any group health insurance coverage

provided in connection with such plans). The temporary enforcement safe harbor also applies to student health insurance plans arranged by non-profit institutions of higher education that meet comparable criteria. The temporary enforcement safe harbor applies for plan years beginning on or after August 1, 2012, and before August 1, 2013.

On February 10, 2012, the Departments also announced their intention to provide an accommodation with respect to non-exempt, non-profit religious organizations with religious objections to contraceptive coverage. The final regulation concerning student health insurance plans, published elsewhere in this issue of the **Federal Register**, states that this intention extends to student health insurance plans arranged by non-profit religious institutions of higher education with such objections. This accommodation would apply to some or all organizations that qualify for the temporary enforcement safe harbor, and possibly to additional organizations. Thus, a question for purposes of the intended regulations is: What entities should be eligible for the new accommodation (that is, what is a "religious organization")?[9]

One approach would be to adopt the definition of religious organization used in another statute or regulation. For example, the definition used in one or more State laws to afford a religious exemption from a contraceptive coverage requirement could be adopted. Alternatively, the intended regulations could base their definition on another Federal law, such as section 414(e) the Code and section 3(33) of ERISA, which set forth definitions for purposes of "church plans." A definition based on these provisions may include organizations such as hospitals, universities, and charities that are exempt from taxation under section 501 of the Code and that are controlled by or associated with a church or a convention or association of churches. In developing a definition of religious organization, we are cognizant of the important role of ministries of churches and, as such, seek to accommodate their religious objections to contraceptive coverage. The Departments seek comment on which religious organizations should be eligible for the accommodation and whether, as some religious stakeholders have suggested,

for-profit religious employers with such objections should be considered as well.

The Departments underscore, as we did with respect to the definition of religious employer in the final regulations, that whatever definition of religious organization is adopted will not be applied with respect to any other provision of the PHS Act, ERISA, or the Code, nor is it intended to set a precedent for any other purpose. And, while the participants and beneficiaries covered under the health plans offered by a "religious employer" compared to those covered under the health plans offered by a "religious organization" will have differential access to contraceptive coverage, nothing in the final regulations or the forthcoming regulations is intended to differentiate among the religious merits, commitment, mission, or public or private standing of the organizations themselves.

Regardless of the definition of religious organization that is proposed, the Departments are considering proposing the same or a similar process for self-certification that will be used for the temporary enforcement safe harbor referenced in the final regulations. Under that process, an individual authorized by the organization certifies that the organization satisfies the eligibility criteria, and the self-certification is made available for examination. The Departments expect that, for purposes of the proposed accommodation, religious organizations would make a similar self-certification, and similarly make the self-certification available for examination. The self-certification would be used to put the independent entity responsible for providing contraceptive coverage on notice that the religious organization has invoked the accommodation. The future rulemaking would require that the independent entity be responsible for providing the contraceptive coverage in this case.

Under the temporary enforcement safe harbor, an organization that self-certifies must also provide (or arrange to provide) notice to plan participants and beneficiaries that its plan qualifies for the one-year enforcement safe harbor. As the Departments noted in the bulletin establishing the temporary enforcement safe harbor, nothing precludes any organization or individual from expressing opposition, if any, to the regulations or to the use of contraceptives. The Departments do not anticipate that religious organizations would be required to provide such notice to plan participants and beneficiaries beyond the one-year transition period because the

---

[7] 26 CFR 54.9815–2713T(a)(4), 29 CFR 2590.715–2713(a)(4), and 45 CFR 147.130(a)(4).

[8] See also the Departments' guidance in FAQ–8 at *http://www.dol.gov/ebsa/pdf/faq-aca2.pdf* and FAQ–1 at *http://www.dol.gov/ebsa/pdf/faq-aca5.pdf*.

[9] Note that, even if the definition of religious organization for purposes of the accommodation were to include religious employers eligible for the exemption, nothing in the proposed regulations would limit eligibility of religious employers for the exemption.

Exhibit 15 JA695 JA-0000293

responsibility to provide notice to plan participants and beneficiaries about the contraceptive coverage would be assumed by the independent entity. The Departments seek comment on how this notice should be provided.

The Departments also intend to propose an accommodation for religious organizations that are non-profit institutions of higher education with religious objections to contraceptive coverage with respect to the student health insurance plans that they arrange. In the final regulation published elsewhere in this issue of the **Federal Register**, "student health insurance coverage" is defined as a type of individual market health insurance coverage offered to students and their dependents under a written agreement between an institution of higher education and an issuer. Some non-profit religious colleges and universities object to signing a written agreement providing for student health insurance coverage that includes contraceptive coverage. Some non-profit religious colleges and universities include funding for their student health insurance plans in their student aid packages and would object if contraceptive coverage were included in the student health insurance plan. The preamble to the final regulation on student health insurance plans provides that the temporary enforcement safe harbor announced on February 10, 2012, with respect to certain non-exempt, non-profit organizations with religious objections to contraceptive coverage extends on comparable terms to student health insurance plans if offered through non-profit institutions of higher education with such objections. After the one-year transition period, the Departments would propose to treat student health insurance plans arranged by non-profit religious institutions of higher education that object to contraceptive coverage on religious grounds in a manner comparable to that in which insured group health plans sponsored by religious organizations eligible for the accommodation are treated. This means that the issuer of the student health insurance plan would, independent of the agreement with the institution of higher education, provide student enrollees and their dependents with contraceptive coverage without cost sharing and without charge.

The Departments seek comment on whether the definition of religious organization should include religious organizations that provide coverage for some, but not all, FDA-approved contraceptives consistent with their religious beliefs. That is, under the forthcoming proposed regulations, the

Departments could allow religious organizations to continue to provide coverage for some forms of contraceptives without cost sharing, and allow them to qualify for the accommodation with respect to other forms of contraceptives consistent with their religious beliefs.

### B. Who administers the accommodation?

The accommodation aims to simultaneously fulfill the requirement that plan participants and beneficiaries be offered contraceptive coverage without cost sharing and without charge, and protect a non-profit religious organization that objects on religious grounds from having to provide contraceptive coverage. To achieve these goals, an independent entity is needed to assume certain functions. This entity would, separate from the religious organization and as directed by regulations and guidance, notify plan participants and beneficiaries of the availability of separate contraceptive coverage, provide this coverage automatically to participants and beneficiaries covered under the organization's plan (for example, without an application or enrollment process), and protect the privacy of participants and beneficiaries covered under the plan who use contraceptive services.

Today, in most instances, an independent entity either provides or administers health coverage for group health plans. Such group coverage falls into two categories: Insured coverage and self-insured coverage. A group that buys insured coverage pays a premium to a State-licensed and State-regulated health insurance issuer which bears the risk of claims for that coverage. A group that self-insures its coverage does not pay premiums to a health insurance issuer; instead, employer and/or employee contributions fund the health claims of participants and beneficiaries covered under the plan. Typically, self-insured plans contract with a third-party administrator, under a fee arrangement, for administrative services, such as network contracting, managed care services, and payment of claims. Insured group health plans and self-insured group health plans that are not church plans or governmental plans are generally subject to Title I of ERISA. Because there is no insurance provided by a health insurance issuer, self-insured plans are not subject to State insurance laws.

The Departments intend to propose that, when offering insured coverage to a religious organization that self-certifies as qualifying for the

accommodation, a health insurance issuer may not include contraceptive coverage in that organization's insured coverage. This means that contraceptive coverage would not be included in the plan document, contract, or premium charged to the religious organization. Instead, the issuer would be required to provide participants and beneficiaries covered under the plan separate coverage for contraceptive services, potentially as excepted benefits, without cost sharing, and notify plan participants and beneficiaries of its availability. The issuer could not charge a premium to the religious organization or plan participants or beneficiaries for the contraceptive coverage. To incorporate this proposal into regulations with respect to insured group health plans (comparable regulatory language would be developed with respect to student health insurance plans), the Departments are considering proposing new language in the existing preventive services regulations at 45 CFR 147.130, 29 CFR 2590.715–2713 and 26 CFR 54.9815–2713 providing: "In the case of an insured group health plan established or maintained by a religious organization—

• The group health plan established or maintained by the religious organization (and the group health insurance coverage provided in connection with the plan) need not comply with any requirement under this section to provide coverage for contraceptive services with respect to the insured group coverage if all of the following conditions are satisfied:

○ The organization provides the issuer with written notice that the organization is a religious organization, and will not act as the designated plan administrator or claims administrator with respect to claims for contraceptive benefits.

○ The issuer has access to information necessary to communicate with the plan's participants and beneficiaries and to act as a claims administrator and plan administrator with respect to contraceptive benefits.

• An issuer that receives the notice described above must offer to the religious organization group health insurance coverage that does not include coverage for contraceptive services otherwise required to be covered under this section. The issuer must additionally provide to the participants and beneficiaries covered under the plan separate health insurance coverage consisting solely of coverage for contraceptive services required to be covered under this section. The issuer must make such health insurance coverage for

Exhibit 15

JA696

JA-0000294

contraceptive services available without any charge to the organization, group health plan, or plan participants or beneficiaries. The issuer must notify plan participants and beneficiaries of the availability of such coverage for contraceptive services in accordance with guidance issued by the Secretary. The issuer must not impose any cost sharing requirements (such as a copayment, coinsurance, or a deductible) on such coverage for contraceptive services and must comply with all other requirements of this section with respect to coverage for contraceptive services.''

Additionally, to ensure that contraceptive coverage offered by a health insurance issuer under these circumstances does not confront obstacles due to other Federal requirements (such as the guaranteed issue requirement under section 2702 of the PHS Act, the single risk pool requirement under section 1312(c) of the Affordable Care Act, and the essential health benefits requirement under section 2707 of the PHS Act), the Departments are considering adding by regulation contraceptive coverage to the types of excepted benefits in the individual market at 45 CFR 148.220(b). In so doing, the Departments would consider preserving certain PHS Act protections such as appeals and grievances rights while ensuring relief from others such as the requirement to provide essential health benefits. The Departments seek comment on whether and how to structure such a change to the excepted benefits regulations, and what PHS Act protections should (or should not) continue to apply. In addition, the Departments seek comment on ways to structure the contraceptive-only benefit as a benefit separate from the insured group coverage other than as an excepted benefit.

Issuers would pay for contraceptive coverage from the estimated savings from the elimination of the need to pay for services that would otherwise be used if contraceptives were not covered. Typically, issuers build into their premiums projected costs and savings from a set of services. Premiums from multiple organizations are pooled in a "book of business" from which the issuer pays for services. To the extent that contraceptive coverage lowers the draw-down for other health care services from the pool, funds would be available to pay for contraceptive services without an additional premium charged to the religious organization or plan participants or beneficiaries. Actuaries, insurers, and economists

estimate that covering contraceptive services is at least cost neutral.

For a religious organization that sponsors a self-insured group health plan, the Departments aim to similarly shield it from contracting, arranging, paying, or referring for contraceptive coverage. The Departments intend to propose, and invite comments on, having the third-party administrator of an objecting religious organization fulfill such responsibility. For ERISA plans,[10] the Departments are considering proposing that the self-certification of the religious organization, described above, would serve as a notice to the third-party administrator that the requirement to provide contraceptive coverage will not be fulfilled by the religious organization. The proposed regulations, in this circumstance, would set forth the circumstances and criteria under which the third-party administrator would be designated as the plan administrator for ERISA plans solely for the purpose of fulfilling the requirement to provide contraceptive coverage. As prescribed by the proposed regulations, the third-party administrator would provide or arrange for such coverage in such circumstances. The third-party administrator would notify plan participants and beneficiaries of this coverage. The religious organization would take no action other than self-certification.

To incorporate this proposal into regulations with respect to self-insured group health plans, the Departments are considering proposing new language in the existing preventive services regulations at 29 CFR 2590.715–2713 and 26 CFR 54.9815–2713 providing that: "A religious organization maintaining a self-insured group health plan is not responsible for compliance with any requirement under this section to provide coverage for contraceptive services if all of the following conditions are satisfied:

• The plan contracts with one or more third parties for processing of benefit claims,

• Before entering into each such contract, the employer provides each third party administrator (TPA) with written notice that the employer: (1) Is a religious organization, (2) will not act as the designated plan administrator or claims administrator with respect to claims for contraceptive services, (3) will not contribute to the funding of

contraceptive services, and (4) will not participate in claims processing with respect to claims for contraceptive services.

• With respect to contraceptive benefits, the TPAs have authority and control over the funds available to pay the benefit, authority to act as a claims administrator and plan administrator, and access to information necessary to communicate with the plan's participants and beneficiaries.''

In addition, with respect to ERISA plans, the Department of Labor is considering proposing a new regulation at 29 CFR 2510.3–16 providing: "In the case of a group health plan established or maintained by a religious organization that is not responsible for compliance with any requirement under § 2590.715–2713 of this part to provide coverage for contraceptive services, the required notice from the religious organization provided to a third party administrator (TPA) of the religious organization's refusal to provide and fund such benefits shall be an instrument under which the plan is operated and shall have the effect of designating such TPA as the plan administrator under section 3(16) of ERISA for those contraceptive benefits for which that TPA processes claims in its normal course of business. A TPA that becomes a plan administrator pursuant to this section shall be responsible for—

• The plan's compliance with section 2713 of the Public Health Service Act (as incorporated into section 715 of ERISA and § 2590.715–2713 of this part) as to those categories of contraceptive benefits for which the TPA processes claims in its normal course of business (*for example,* surgical procedures, non-surgical procedures, patient education and counseling, prescription benefits and non-prescription benefits).

• Establishing and operating a procedure for determining such claims for contraceptive benefits in accordance with § 2560.503–1 of this title.

• Complying with disclosure requirements and other requirements under Title I of ERISA for such benefits to participants and beneficiaries.''

We note that there is no obligation for a TPA to enter into such a contract if it objects to these terms.

Providing for an independent entity to assume responsibility for plan-related functions when other plan sponsors or officials fail or refuse to do so would not be unique to the instant context. For example, where certain retirement savings plans have been abandoned by their sponsors, Department of Labor regulations authorize asset custodians to

---

[10] A church plan as defined under section 3(33) of ERISA is exempt from ERISA's requirements under section 4(b) of ERISA, and, therefore, any proposed ERISA regulations would not apply to church plans. Comments are sought on potential options for church plans.

Exhibit 15    JA697    JA-0000295

distribute plan benefits and wind up the plan's affairs. 29 CFR 2578.1.

The Departments seek comment on the following possible approaches that a third-party administrator could use to fund the contraceptive coverage without using funds provided by the religious organization. The third-party administrator could use revenue that is not already obligated to plan sponsors such as drug rebates, service fees, disease management program fees, or other sources. These funds may inure to the third-party administrator rather than the plan or its sponsor and drug rebates, for example, could be larger if contraceptive coverage were provided. Additionally, nothing precludes a third-party administrator from receiving funds from a private, non-profit organization to pay for contraceptive services for the participants and beneficiaries covered under the plan of a religious organization. Comments should address the ways in which third-party administrators generally receive funding to pay benefits, other flows of funds, the extent to which funding from other sources may be available for payment of claims, and the monitoring responsibilities and oversight that would be associated with such arrangements.

Another option under consideration would be to have the third-party administrator receive a credit or rebate on the amount that it pays under the reinsurance program under Affordable Care Act section 1341 to fund contraceptive coverage for participants and beneficiaries covered under the plan of a religious organization that sponsors a self-insured plan. Section 1341 of the Affordable Care Act creates a reinsurance program to balance out risk selection from 2014 through 2016. Payments from health insurance issuers and third-party administrators on behalf of group health plans will be made to a reinsurance entity. Payments are used, among other things, to offset the cost of reinsurance for health insurance issuers. While the reinsurance program does not provide payments to group health plans, it collects payments from third-party administrators to support the program. Under this proposal, a third-party administrator that funds contraceptive coverage separate from a religious organization could offset the amount of this cost with a credit or rebate against its assessments under the reinsurance program. Such a policy could help advance the goals of the reinsurance program, which is one of many in the Act designed to make health insurance affordable, accessible, meaningful, and stable. The Departments seek comments on such an interpretation of Affordable

Care Act section 1341 and on ideas of alternative sources of funding once this temporary program ends.

An additional option would have the third-party administrator separately arrange for contraceptive coverage. In this case, an additional independent entity other than a third-party administrator would be needed. The Departments are considering having the Office of Personnel Management (OPM) identify a private insurer to provide this coverage. Under section 1334 of the Affordable Care Act, OPM is responsible for contracting with at least two insurers to offer multi-State plans in each Exchange in each State to promote choice, competition, and access to health services. The OPM Director, in consultation with the HHS Secretary, has the authority to impose appropriate requirements on the insurers that offer multi-State plans. Accordingly, OPM could incentivize or require one or more of the insurers offering a multi-State plan also to provide, at no additional charge, contraceptive coverage to participants and beneficiaries covered under religious organizations' self-insured plans. The third-party administrator would send a copy of the religious organization's self-certification to OPM along with information on plan participants and beneficiaries. One option for covering the cost of the contraceptive coverage would be a credit against any user fees such an insurer would be required to pay in order to offer coverage on the Exchanges. The Departments seek comment on the impact of this proposal on the multi-State plan program, ways to administer it, and additional funding ideas.

If adopted, the reinsurance program and multi-State plan options may require amendments to the regulations and guidance governing those programs. In addition, these programs start on January 1, 2014. There may be some religious organizations with plan years that begin on or after August 1, 2013, but before those programs begin, so, should the Departments propose these options, we would also propose a means of resolving this gap in relief. The Departments seek input on such means as well as how many religious organizations have plan years that start between August 1 and December 31.

The Departments welcome ideas on other options for the source of funds for contraceptive coverage. Some religious stakeholders have suggested, for example, the use of tax-preferred accounts that employees may in their discretion use for a range of medical services that neither precludes nor obligates funds to be used for

contraceptive services. A number of religious stakeholders have also suggested that public funding to support coverage of contraceptive services is not objectionable. The Departments seek comment on these and other proposals. Comments are also requested on additional considerations that should be taken into account with respect to these and other proposals and on suggestions for structuring the implementation of the proposals in light of these considerations.

The Departments expect that the third-party administrator could use these sources of funds individually or in combination. The Departments also note that nothing precludes a religious organization from switching from a self-insured plan to an insured plan such that a health insurance issuer rather than a third-party administrator is responsible for providing the contraceptive coverage.

The Departments also seek information on coordination when there are multiple third-party administrators and on the prevalence of multi-year contracts as well as options for addressing the application of these proposals in such instances. The Departments invite comment on the extent to which there are self-insured health plans without a third-party administrator as well as options for how the accommodation would work in these rare circumstances. One option would be to have a religious organization send its self-certification to OPM, which would be directed to independently arrange for contraceptive coverage through a private insurer. The Departments seek comment on the prevalence and number of participants and beneficiaries of health plans sponsored by religious organizations without a third-party administrator.

*C. Additional Questions*

To inform the notice of proposed rulemaking, the Departments seek information on several additional questions. One question that has arisen from religious stakeholders is whether an exemption or accommodation should be made for certain religious health insurance issuers or third-party administrators with respect to contraceptive coverage. The Departments have little information about the number and location of such issuers and administrators and whether and how such issuers operate in the 28 States with contraceptive coverage requirements.

The Departments also recognize that various denominations may offer coverage to institutions affiliated with those denominations. For example, their

Exhibit 15

plans may be offered as "church plans" (described above) to individual churches as a means of pooling their risk. The Departments seek comment on whether different accommodations are needed for such plans.

In addition, the Departments are aware that 28 States have adopted laws requiring that certain health insurance issuers provide contraceptive coverage. Some of these laws contain exemptions related to religious organizations, but the scope of the exemptions varies among the States. Generally, Federal health insurance coverage regulation creates a floor to which States may add consumer protections, but may not subtract. This means that, in States with broader religious exemptions than that in the final regulations, the exemptions will be narrowed to align with that in the final regulations because this will help more consumers. Organizations that qualify for an exemption under State law but do not qualify for the exemption under the final regulations may be eligible for the temporary enforcement safe harbor. During this transition period, State laws that require contraceptive coverage with narrower or no religious exemptions will continue. The Departments seek comment on the interaction between these State laws and the intended regulations on which we are seeking comment in this notice and on the extent to which there is a need for consistency between any Federal regulations and these State laws. Similarly, the Departments solicit comment on what other Federal or State laws or accounting rules governing funding and accounting could affect the proposed options described herein.

In addition, the Departments solicit information on the number of potentially affected issuers and religious organizations as well as their plan participants and beneficiaries; the administrative cost of providing separate contraceptive coverage, including details regarding the nature of the costs (for example, one-time systems changes or ongoing administrative costs); and the average costs and savings to health plans, plan participants and beneficiaries, and the public of providing contraceptive coverage.

*D. Additional Input*

The 90-day comment period is designed to encourage maximum input into the development of an accommodation for religious organizations with religious objections to providing contraceptive coverage while ensuring the availability of contraceptive coverage without cost sharing for plan participants and beneficiaries. The Departments seek

comments on the ideas and questions outlined in this ANPRM as well as new suggestions to achieve its goals. The Departments also intend to hold listening sessions to ensure all voices are heard. This will not be the only opportunity for comment. The subsequent notice of proposed rulemaking will also include a public comment period. The Departments aim to ensure that the final accommodation is fully vetted and published in advance of the expiration of the temporary enforcement safe harbor.

**Steven T. Miller,**
*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*
Signed this day of March 14, 2012.
**Phyllis C. Borzi.**
*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*
Dated: March 15, 2012.
**Marilyn Tavenner,**
*Acting Administrator, Centers for Medicare & Medicaid Services.*
Approved: March 15, 2012.
**Kathleen Sebelius,**
*Secretary, Department of Health and Human Services.*
[FR Doc. 2012–6689 Filed 3–16–12; 4:15 pm]
**BILLING CODE 4120–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 63**

**[EPA–HQ–OAR–2011–0435; FRL–9650–3]**

**RIN 2060–AR02**

**National Emission Standards for Hazardous Air Pollutant Emissions: Group IV Polymers and Resins; Pesticide Active Ingredient Production; and Polyether Polyols Production**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Reopening of public comment period.

**SUMMARY:** On January 9, 2012, the EPA proposed amendments to three national emission standards for hazardous air pollutants: National Emission Standards for Hazardous Air Pollutant Emissions: Group IV Polymers and Resins; National Emission Standards for Hazardous Air Pollutants for Pesticide Active Ingredient Production; and National Emission Standards for Hazardous Air Pollutants for Polyether Polyols Production. The EPA is reopening the comment period until March 30, 2012. The EPA received a request for this reopening from the Sierra Club. The

Sierra Club requested the reopening in order to analyze data and review the proposed amendments. EPA finds this request to be reasonable due to the multiple source categories involved in this action.

**DATES:** Comments must be received on or before March 30, 2012.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2011–0435, by one of the following methods:

• *www.regulations.gov:* Follow the on-line instructions for submitting comments.

• *Email: a-and-r-docket@epa.gov.* Attention Docket ID No. EPA–HQ–OAR–2011–0435.

• *Fax:* (202) 566–9744. Attention Docket ID No. EPA–HQ–OAR–2011–0435.

• *Mail:* U.S. Postal Service, send comments to: EPA Docket Center, EPA West (Air Docket), Attention Docket ID No. EPA–HQ–OAR–2011–0435, U.S. Environmental Protection Agency, Mailcode: 2822T, 1200 Pennsylvania Ave. NW., Washington, DC 20460. Please include a total of two copies. In addition, please mail a copy of your comments on the information collection provisions to the Office of Information and Regulatory Affairs, Office of Management and Budget (OMB), Attn: Desk Officer for EPA, 725 17th Street NW., Washington, DC 20503.

• *Hand Delivery:* U.S. Environmental Protection Agency, EPA West (Air Docket), Room 3334, 1301 Constitution Ave. NW., Washington, DC 20004. Attention Docket ID No. EPA–HQ–OAR–2011–0435. Such deliveries are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information.

*Instructions.* Direct your comments to Docket ID No. EPA–HQ–OAR–2011–0435. The EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be confidential business information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *www.regulations.gov* or email. The *www.regulations.gov* Web site is an "anonymous access" system, which means the EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to the EPA without

Exhibit 15　　　　　　　　　　　　　JA699　　　　　　　　　　　　　JA-0000297

TABLE I—Continued

| Year | Limit | |
|---|---|---|
| | Auto. proj. cost limit (Col. 1) | Prior notice proj. cost limit (Col. 2) |
| 2003 .. | 7,600,000 | 21,200,000 |
| 2004 .. | 7,800,000 | 21,600,000 |
| 2005 .. | 8,000,000 | 22,000,000 |
| 2006 .. | 9,600,000 | 27,400,000 |
| 2007 .. | 9,900,000 | 28,200,000 |
| 2008 .. | 10,200,000 | 29,000,000 |
| 2009 .. | 10,400,000 | 29,600,000 |
| 2010 .. | 10,500,000 | 29,900,000 |
| 2011 .. | 10,600,000 | 30,200,000 |
| 2012 .. | 10,800,000 | 30,800,000 |

\*      \*      \*      \*      \*

■ 3. Table II in § 157.215(a)(5) is revised to read as follows:

**§ 157.215   Underground storage testing and development.**

(a) \* \* \*

(5) \* \* \*

TABLE II

| Year | Limit |
|---|---|
| 1982 .................................. | $2,700,000 |
| 1983 .................................. | 2,900,000 |
| 1984 .................................. | 3,000,000 |
| 1985 .................................. | 3,100,000 |
| 1986 .................................. | 3,200,000 |
| 1987 .................................. | 3,300,000 |
| 1988 .................................. | 3,400,000 |
| 1989 .................................. | 3,500,000 |
| 1990 .................................. | 3,600,000 |
| 1991 .................................. | 3,800,000 |
| 1992 .................................. | 3,900,000 |
| 1993 .................................. | 4,000,000 |
| 1994 .................................. | 4,100,000 |
| 1995 .................................. | 4,200,000 |
| 1996 .................................. | 4,300,000 |
| 1997 .................................. | 4,400,000 |
| 1998 .................................. | 4,500,000 |
| 1999 .................................. | 4,550,000 |
| 2000 .................................. | 4,650,000 |
| 2001 .................................. | 4,750,000 |
| 2002 .................................. | 4,850,000 |
| 2003 .................................. | 4,900,000 |
| 2004 .................................. | 5,000,000 |
| 2005 .................................. | 5,100,000 |
| 2006 .................................. | 5,250,000 |
| 2007 .................................. | 5,400,000 |
| 2008 .................................. | 5,550,000 |
| 2009 .................................. | 5,600,000 |
| 2010 .................................. | 5,700,000 |
| 2011 .................................. | 5,750,000 |
| 2012 .................................. | 5,850,000 |

\*      \*      \*      \*      \*

[FR Doc. 2012–3488 Filed 2–14–12; 8:45 am]

**BILLING CODE 6717–01–P**

# DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

[TD 9578]

**RIN 1545–BJ60**

# DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Part 147**

[CMS–9992–F]

**RIN 0938–AQ74**

**Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** These regulations finalize, without change, interim final regulations authorizing the exemption of group health plans and group health insurance coverage sponsored by certain religious employers from having to cover certain preventive health services under provisions of the Patient Protection and Affordable Care Act.

**DATES:** *Effective date.* These final regulations are effective on April 16, 2012.

*Applicability dates.* These final regulations generally apply to group health plans and group health insurance issuers on April 16, 2012.

**FOR FURTHER INFORMATION CONTACT:** Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 622–6080; Robert Imes, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*http://www.dol.gov/ebsa*). In addition, information from HHS on private health insurance for consumers can be found on the CMS Web site (*http://cciio.cms.gov*), and on health reform can be found at *http://www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act, Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act of 2010, Public Law 111–152, was enacted on March 30, 2010 (collectively, the Affordable Care Act). The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and make them applicable to group health plans.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screening provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA) that were issued on August 1, 2011 (HRSA Guidelines).[1] As relevant here, the HRSA Guidelines require coverage, without cost sharing, for "[a]ll Food and Drug Administration [(FDA)] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a provider. Except as discussed below, non-grandfathered group health plans and health insurance issuers are required to provide coverage consistent with the HRSA Guidelines, without cost sharing, in plan years (or,

---

[1] The HRSA Guidelines can be found at: *http://www.hrsa.gov/womensguidelines.*

Exhibit 16                                    JA700                                    JA-0000298

in the individual market, policy years) beginning on or after August 1, 2012.[2] These guidelines were based on recommendations of the independent Institute of Medicine, which undertook a review of the evidence on women's preventive services.

The Departments of Health and Human Services, Labor, and the Treasury (the Departments) published interim final regulations implementing PHS Act section 2713 on July 19, 2010 (75 FR 41726). In the preamble to the interim final regulations, the Departments explained that HRSA was developing guidelines related to preventive care and screening for women that would be covered without cost sharing pursuant to PHS Act section 2713(a)(4), and that these guidelines were expected to be issued no later than August 1, 2011. Although comments on the anticipated guidelines were not requested in the interim final regulations, the Departments received considerable feedback regarding which preventive services for women should be covered without cost sharing. Some commenters, including some religiously-affiliated employers, recommended that these guidelines include contraceptive services among the recommended women's preventive services and that the attendant coverage requirement apply to all group health plans and health insurance issuers. Other commenters, however, recommended that group health plans sponsored by religiously-affiliated employers be allowed to exclude contraceptive services from coverage under their plans if the employers deem such services contrary to their religious tenets, noting that some group health plans sponsored by organizations with a religious objection to contraceptives currently contain such exclusions for that reason.

In response to these comments, the Departments amended the interim final regulations to provide HRSA with discretion to establish an exemption for group health plans established or maintained by certain religious employers (and any group health insurance coverage provided in connection with such plans) with respect to any requirement to cover contraceptive services that they would otherwise be required to cover without

cost sharing consistent with the HRSA Guidelines. The amended interim final regulations were issued and effective on August 1, 2011.[3] The amended interim final regulations specified that, for purposes of this exemption, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. In the HRSA Guidelines, HRSA exercised its discretion under the amended interim final regulations such that group health plans established and maintained by these religious employers (and any group health insurance coverage provided in connection with such plans) are not required to cover contraceptive services.

In the preamble to the amended interim final regulations, the Departments explained that it was appropriate that HRSA take into account the religious beliefs of certain religious employers where coverage of contraceptive services is concerned. The Departments noted that a religious exemption is consistent with the policies in some States that currently both require contraceptive services coverage under State law and provide for some type of religious exemption from their contraceptive services coverage requirement. Comments were requested on the amended interim final regulations, specifically with respect to the definition of religious employer, as well as alternative definitions.

## II. Overview of the Public Comments on the Amended Interim Final Regulations

The Departments received over 200,000 responses to the request for comments on the amended interim final regulations. Commenters included concerned citizens, civil rights organizations, consumer groups, health care providers, health insurance issuers, sponsors of group health plans, religiously-affiliated charities, religiously-affiliated educational institutions, religiously-affiliated health care organizations, other religiously-affiliated organizations, secular organizations, sponsors of group health

plans, women's religious orders, and women's rights organizations.

Some commenters recommended that the exemption for the group health plans of a limited group of religious organizations as formulated in the amended interim final regulations be maintained. Other commenters urged that the definition of religious employer be broadened so that more sponsors of group health plans would qualify for the exemption. Others urged that the exemption be rescinded in its entirety. The Departments summarize below the major issues raised in the comments that were received.

Some commenters supported the inclusion of contraceptive services in the HRSA Guidelines and urged that the religious employer exemption be rescinded in its entirety due to the importance of extending these benefits to as many women as possible. For example, one provider association commented that all group health plans and group health insurance issuers should offer the same benefits to plan participants, without a religious exemption for some plans, and that religious beliefs are more appropriately taken into account by individuals when making personal health care decisions. Others urged that the exemption be eliminated because making contraceptive services available to all women would satisfy a basic health care need and would significantly reduce long-term health care costs associated with unplanned pregnancies.

Some of the commenters supporting the elimination of the exemption argued that section 2713 of the PHS Act does not provide any explicit basis for exempting a subset of group health plans. One commenter asserted that Congress's incorporation of section 2713 of the PHS Act into ERISA and the Code indicates its intent to require coverage of recommended preventive services under section 2713 of the PHS Act in the broadest spectrum of group health plans possible.

Many commenters that opposed the exemption asked that, at a minimum, the Departments not expand the definition of religious employer. Alternatively, they asked that, if the Departments decided to base the relevant portion of the definition of religious employer on a Code section other than section 6033, the other portions of the definition of religious employer be retained to limit the exemption largely to houses of worship.

Some commenters urged the Departments not to modify the definition of religious employer. For example, some commenters asserted that the exemption is appropriately

---

[2] The interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation or guideline is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[3] The amendment to the interim final regulations was published on August 3, 2011, at 76 FR 46621.

targeted at houses of worship, rather than a larger set of religiously-affiliated organizations. Others argued that, while the exemption addresses legitimate religious concerns, its scope is already broader than necessary and should not be expanded.

Commenters opposing any exemption stated that, if the exemption were to be retained, clear notice should be provided to the affected plan participants that their group health plans do not include benefits for contraceptive services. In addition, they urged the Departments to monitor plans to ensure that the exemption is not claimed more broadly than permitted.

On the other hand, a number of comments asserted that the religious employer exemption is too narrow. These commenters included some religiously-affiliated educational institutions, health care organizations, and charities. Some of these commenters expressed concern that the exemption for religious employers will not allow them to continue their current exclusion of contraceptive services from coverage under their group health plans. Others expressed concerns about paying for such services and stated that doing so would be contrary to their religious beliefs.

Commenters also claimed that Federal laws, including the Affordable Care Act, have provided for conscience clauses and religious exemptions broader than that provided for in the amended interim final regulations. Some commenters asserted that the narrower scope of the exemption raises concerns under the First Amendment and the Religious Freedom Restoration Act.

Other commenters, however, disputed claims that the contraceptive coverage requirement infringes on rights protected by the First Amendment or the Religious Freedom Restoration Act. These commenters noted that the requirement is neutral and generally applicable. They also explained that the requirement does not substantially burden religious exercise and, in any event, serves compelling governmental interests and is the least restrictive means to achieve those interests.

Some religiously-affiliated employers warned that, if the definition of religious employer is not broadened, they could cease to offer health coverage to their employees in order to avoid having to offer coverage to which they object on religious grounds.

Commenters supporting a broadening of the definition of religious employer proposed a number of options, generally intended to expand the scope of the exemption to include religiously-affiliated educational institutions,

health care organizations, and charities. In some instances, in place of the definition that was adopted in the amended interim final regulations, commenters suggested other State insurance law definitions of religious employer. In other instances, commenters referenced alternative standards, such as tying the exemption to the definition of "church plan" under section 414(e) of the Code or to status as a nonprofit organization under section 501(c)(3) of the Code.

### III. Overview of the Final Regulations

In response to these comments, the Departments carefully considered whether to eliminate the religious employer exemption or to adopt an alternative definition of religious employer, including whether the exemption should be extended to a broader set of religiously-affiliated sponsors of group health plans and group health insurance coverage. For the reasons discussed below, the Departments are adopting the definition in the amended interim final regulations for purposes of these final regulations while also creating a temporary enforcement safe harbor, discussed below. During the temporary enforcement safe harbor, the Departments plan to develop and propose changes to these final regulations that would meet two goals— providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services as also discussed below.

PHS Act section 2713 reflects a determination by Congress that coverage of recommended preventive services by non-grandfathered group health plans and health insurance issuers without cost sharing is necessary to achieve basic health care coverage for more Americans. Individuals are more likely to use preventive services if they do not have to satisfy cost sharing requirements (such as a copayment, coinsurance, or a deductible). Use of preventive services results in a healthier population and reduces health care costs by helping individuals avoid preventable conditions and receive treatment earlier.[4] Further, Congress, by amending the Affordable Care Act during the Senate debate to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and

[4] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 16.

group health insurance coverage, recognized that women have unique health care needs and burdens. Such needs include contraceptive services.[5]

As documented in a report of the Institute of Medicine, "Clinical Preventive Services for Women, Closing the Gaps," women experiencing an unintended pregnancy may not immediately be aware that they are pregnant, and thus delay prenatal care. They also may not be as motivated to discontinue behaviors that pose pregnancy-related risks (e.g., smoking, consumption of alcohol). Studies show a greater risk of preterm birth and low birth weight among unintended pregnancies compared with pregnancies that were planned.[6] Contraceptives also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy (e.g., treatment of menstrual disorders, acne, and pelvic pain).[7]

In addition, there are significant cost savings to employers from the coverage of contraceptives. A 2000 study estimated that it would cost employers 15 to17 percent more not to provide contraceptive coverage in employee health plans than to provide such coverage, after accounting for both the direct medical costs of pregnancy and the indirect costs such as employee absence and reduced productivity.[8] In fact, when contraceptive coverage was added to the Federal Employees Health Benefits Program, premiums did not increase because there was no resulting

[5] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash. DC: Nat'l Acad. Press, 2011, at p. 9; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost Sharing, 14 *Guttmacher Pol'y Rev.* 10 (2011), available at *http:// www.guttmacher.org/pubs/gpr/14/1/ gpr140107.html.*

[6] Gipson, J.D., et al., The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature, *Studies on Family Planning*, 2008, 39(1):18–38.

[7] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 107.

[8] Testimony of Guttmacher Inst., submitted to the Comm. on Preventive Servs. for Women, Inst. of Med., Jan. 12, 2012, p. 11 citing Bonoan, R + Gonen, JS, "Promoting Healthy Pregnancies: Counseling and Contraception as the First Step'", Washington Business Group on Health, Family Health in Brief, Issue No. 3. August 2000; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies without Cost Sharing, 14 *Guttmacher Pol'y Rev.* 10 (2011); Mavranezouli, I., Health Economics of Contraception, 23 *Best Practice & Res. Clinical Obstetrics & Gynaecology* 187–198 (2009); Trussell, J., et al., Cost Effectiveness of Contraceptives in the United States, 79 *Contraception* 5–14 (2009); Trussell, J., The Cost of Unintended Pregnancy in the United States, 75 *Contraception* 168–170 (2007).

Exhibit 16                        JA702                        JA-0000300

health care cost increase.[9] Further, the cost savings of covering contraceptive services have already been recognized by States and also within the health insurance industry. Twenty-eight States now have laws requiring health insurance issuers to cover contraceptives. A 2002 study found that more than 89 percent of insured plans cover contraceptives.[10] A 2010 survey of employers revealed that 85 percent of large employers and 62 percent of small employers offered coverage of FDA-approved contraceptives.[11]

Furthermore, in directing non-grandfathered group health plans and health insurance issuers to cover preventive services and screenings for women described in HRSA-supported guidelines without cost sharing, Congress determined that both existing health coverage and existing preventive services recommendations often did not adequately serve the unique health needs of women. This disparity places women in the workforce at a disadvantage compared to their male co-workers. Researchers have shown that access to contraception improves the social and economic status of women.[12] Contraceptive coverage, by reducing the number of unintended and potentially unhealthy pregnancies, furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force. Research also shows that cost sharing can be a significant barrier to effective contraception.[13] As the Institute of Medicine noted, owing to reproductive and sex-specific conditions, women use preventive services more than men, generating significant out-of-pocket expenses for

women.[14] These Departments aim to reduce these disparities by providing women broad access to preventive services, including contraceptive services.

The religious employer exemption in the final regulations does not undermine the overall benefits described above. A group health plan (and health insurance coverage provided in connection with such a plan) qualifies for the exemption if, among other qualifications, the plan is established and maintained by an employer that primarily employs persons who share the religious tenets of the organization. As such, the employees of employers availing themselves of the exemption would be less likely to use contraceptives even if contraceptives were covered under their health plans.

A broader exemption, as urged by some commenters, would lead to more employees having to pay out of pocket for contraceptive services, thus making it less likely that they would use contraceptives, which would undermine the benefits described above. Employers that do not primarily employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives. Including these employers within the scope of the exemption would subject their employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care.

The Departments note that this religious exemption is intended solely for purposes of the contraceptive services coverage requirement pursuant to PHS Act section 2713 and the companion provisions of ERISA and the Code.

The Departments also note that some group health plans sponsored by employers that do not satisfy the definition of religious employer in these final regulations may be grandfathered health plans [15] and thus are not subject to any of the preventive services coverage requirements of section 2713 of the PHS Act, including the contraceptive coverage requirement.

With respect to certain non-exempted, non-profit organizations with religious objections to covering contraceptive

services whose group health plans are not grandfathered health plans, guidance is being issued contemporaneous with these final regulations that provides a one-year safe harbor from enforcement by the Departments.

Before the end of the temporary enforcement safe harbor, the Departments will work with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing with respect to non-exempted, non-profit religious organizations with religious objections to such coverage. Specifically, the Departments plan to initiate a rulemaking to require issuers to offer insurance without contraception coverage to such an employer (or plan sponsor) and simultaneously to offer contraceptive coverage directly to the employer's plan participants (and their beneficiaries) who desire it, with no cost-sharing. Under this approach, the Departments will also require that, in this circumstance, there be no charge for the contraceptive coverage. Actuaries and experts have found that coverage of contraceptives is at least cost neutral when taking into account all costs and benefits in the health plan.[16] The Departments intend to develop policies to achieve the same goals for self-insured group health plans sponsored by non-exempted, non-profit religious organizations with religious objections to contraceptive coverage.

A future rulemaking would be informed by the existing practices of some issuers and religious organizations in the 28 States where contraception coverage requirements already exist, including Hawaii. There, State health insurance law requires issuers to offer plan participants in group health plans sponsored by religious employers that are exempt from the State contraception coverage requirement the option to purchase this coverage in a way that religious employers are not obligated to fund it. It is our understanding that, in practice, rather than charging employees a separate fee, some issuers in Hawaii offer this coverage to plan participants at no charge. The Departments will work with stakeholders to propose and

---

[9] Dailard, C., Special Analysis: The Cost of Contraceptive Insurance Coverage, *Guttmacher Rep. on Public Pol'y* (March 2003).

[10] Sonfield, A., et al., U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates, *Perspectives on Sexual and Reproductive Health* 36(2):72–79, 2002.

[11] Claxton, G., et al., *Employer Health Benefits: 2010 Annual Survey*, Menlo Park, Cal.: Kaiser Family Found. and Chi., Ill.: Health Research & Educ. Trust, 2010.

[12] Testimony of Guttmacher Inst., submitted to the Comm. on Preventive Servs. for Women, Inst. of Med., Jan. 12, 2012, p.6, citing Goldin C and Katz L, Career and marriage in the age of the pill, *American Economic Review*, 2000, 90(2):461–465; Goldin C and Katz LF, The power of the pill: oral contraceptives and women's career and marriage decisions, *Journal of Political Economy*, 2002, 110(4):730–770; and Bailey MJ, More power to the pill: the impact of contraceptive freedom on women's life cycle labor supply, *Quarterly Journal of Economics*, 2006, 121(1):289–320.

[13] Postlethwaite, D., et al., A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change, 76 *Contraception* 360 (2007).

[14] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, p.19.

[15] See section 1251 of the Affordable Care Act and its implementing regulations at 26 CFR 54.9815–1251T; 29 CFR 2590.715–1251; 45 CFR 147.140.

[16] Bertko, John, F.S.A., M.A.A.A., Director of Special Initiatives and Pricing in the Center for Consumer Information and Insurance Oversight at the Centers for Medicare and Medicaid Services, Glied, Sherry, Ph.D., Assistant Secretary for Planning and Evaluation, U.S. Department of Health & Human Services (ASPE/HHS), Miller, Erin, MPH, (ASPE/HHS), Wilson, Lee, (ASPE/HHS), Simmons, Adelle, (ASPE/HHS), "The Cost of Covering Contraceptives through Health Insurance," (9 February 2012), available at: *http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml*.

Exhibit 16

JA-0000301

finalize this policy before the end of the temporary enforcement safe harbor.

Nothing in these final regulations precludes employers or others from expressing their opposition, if any, to the use of contraceptives, requires anyone to use contraceptives, or requires health care providers to prescribe contraceptives if doing so is against their religious beliefs. These final regulations do not undermine the important protections that exist under conscience clauses and other religious exemptions in other areas of Federal law. Conscience protections will continue to be respected and strongly enforced.

This approach is consistent with the First Amendment and Religious Freedom Restoration Act. The Supreme Court has held that the First Amendment right to free exercise of religion is not violated by a law that is not specifically targeted at religiously motivated conduct and that applies equally to conduct without regard to whether it is religiously motivated—a so-called neutral law of general applicability. The contraceptive coverage requirement is generally applicable and designed to serve the compelling public health and gender equity goals described above, and is in no way specially targeted at religion or religious practices. Likewise, this approach complies with the Religious Freedom Restoration Act, which generally requires a federal law to not substantially burden religious exercise, or, if it does substantially burden religious exercise, to be the least restrictive means to further a compelling government interest.

### III. Economic Impact and Paperwork Burden

#### A. Executive Orders 13563 and 12866—Department of Labor and Department of Health and Human Services

Executive Orders 13563 and 12866, among other things, direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. Executive Order 13563 also states that where "appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify, including

equity, human dignity, fairness, and distributive impacts." These final regulations have been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, these final regulations have been reviewed by the Office of Management and Budget.

#### 1. Need for Regulatory Action

As stated earlier in this preamble, the Departments previously issued amended interim final regulations authorizing an exemption for group health plans and health insurance coverage sponsored by certain religious employers from certain coverage requirements under PHS Act section 2713 (76 FR 46621, August 3, 2011). The Departments have determined that it is appropriate to finalize, without change, these amended interim final regulations authorizing the exemption of group health plans and health insurance coverage sponsored by certain religious employers from having to cover certain preventive health services under the Patient Protection and Affordable Care Act.

#### 2. Anticipated Effects

The Departments expect that these final regulations will not result in any additional significant burden or costs to the affected entities.

#### B. Special Analyses—Department of the Treasury

For purposes of the Department of the Treasury, it has been determined that this Treasury decision is not a significant regulatory action for purposes of Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the APA (5 U.S.C. chapter 5) does not apply to these final regulations, and, because these regulations do not impose a collection of information on small entities, a Regulatory Flexibility Analysis under the Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required.

#### C. Paperwork Reduction Act

These final regulations are not subject to the requirements of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*) because they do not contain a "collection of information" as defined in 44 U.S.C. 3502(11).

### IV. Statutory Authority

The Department of the Treasury final regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor final regulations are adopted pursuant to the authority contained in 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services final regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 USC 300gg through 300gg-63, 300gg-91, and 300gg-92), as amended.

### List of Subjects

#### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

#### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

#### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

### DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Chapter I**

Accordingly, 26 CFR part 54 is amended as follows:

### PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 is amended by adding an entry for § 54.9815–2713 in numerical order to read in part as follows:

**Authority:** 26 U.S.C. 7805. * * *
Section 54.9815–2713 also issued under 26 U.S.C. 9833. * * *

■ **Par. 2.** Section 54.9815–2713T is amended in paragraph (a)(1)(iii) by removing "; and" and adding a period in its place, and by removing paragraph (a)(1)(iv).

■ **Par. 3.** Section 54.9815–2713 is added to read as follows:

**§ 54.9815–2713  Coverage of preventive health services.**

(a) *Services*—(1) *In general.* [Reserved]

(i) [Reserved]

(ii) [Reserved]

(iii) [Reserved]

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of § 54.9815–2713T, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration and developed in accordance with 45 CFR 147.130(a)(1)(iv).

(2) *Office visits.* [Reserved]

(3) *Out-of-network providers.* [Reserved]

(4) *Reasonable medical management.* [Reserved]

(5) *Services not described.* [Reserved]

(b) *Timing.* [Reserved]

(c) *Recommendations not current.* [Reserved]

(d) *Effective/applicability date.* April 16, 2012.

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Chapter XXV**

29 CFR part 2590 is amended as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 1. The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

■ 2. Accordingly, the amendment to the interim final rule with comment period amending 29 CFR 2590.715–2713(a)(1)(iv) which was published in the **Federal Register** at 76 FR 46621–46626 on August 3, 2011, is adopted as a final rule without change.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Subtitle A**

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Accordingly, the amendment to the interim final rule with comment period amending 45 CFR 147.130(a)(1)(iv) which was published in the **Federal Register** at 76 FR 46621–46626 on August 3, 2011, is adopted as a final rule without change.

**Steven T. Miller,**
*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*
Approved: February 10, 2012.

**Emily S. McMahon,**
*Acting Assistant Secretary of the Treasury (Tax Policy).*
Signed this 10th day, of February 2012.

**Phyllis C. Borzi,**
*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*
Dated: February 10, 2012.

**Marilyn Tavenner,**
*Acting Administrator, Centers for Medicare & Medicaid Services.*
Dated: February 10, 2012.

**Kathleen Sebelius,**
*Secretary, Department of Health and Human Services.*
[FR Doc. 2012–3547 Filed 2–10–12; 3:45 pm]
**BILLING CODE 4120–01–P**

## PENSION BENEFIT GUARANTY CORPORATION

**29 CFR Part 4022**

**Benefits Payable in Terminated Single-Employer Plans; Interest Assumptions for Paying Benefits**

**AGENCY:** Pension Benefit Guaranty Corporation.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Pension Benefit Guaranty Corporation's regulation on Benefits Payable in Terminated Single-Employer Plans to prescribe interest assumptions under the regulation for valuation dates in March 2012. The interest assumptions are used for paying benefits under

terminating single-employer plans covered by the pension insurance system administered by PBGC.

**DATES:** Effective March 1, 2012.

**FOR FURTHER INFORMATION CONTACT:** Catherine B. Klion (*Klion.Catherine@pbgc.gov*), Manager, Regulatory and Policy Division, Legislative and Regulatory Department, Pension Benefit Guaranty Corporation, 1200 K Street NW., Washington, DC 20005, 202–326–4024. (TTY/TDD users may call the Federal relay service toll-free at 1–800–877–8339 and ask to be connected to 202–326–4024.)

**SUPPLEMENTARY INFORMATION:** PBGC's regulation on Benefits Payable in Terminated Single-Employer Plans (29 CFR part 4022) prescribes actuarial assumptions—including interest assumptions—for paying plan benefits under terminating single-employer plans covered by title IV of the Employee Retirement Income Security Act of 1974. The interest assumptions in the regulation are also published on PBGC's Web site (*http://www.pbgc.gov*).

PBGC uses the interest assumptions in Appendix B to Part 4022 to determine whether a benefit is payable as a lump sum and to determine the amount to pay. Appendix C to Part 4022 contains interest assumptions for private-sector pension practitioners to refer to if they wish to use lump-sum interest rates determined using PBGC's historical methodology. Currently, the rates in Appendices B and C of the benefit payment regulation are the same.

The interest assumptions are intended to reflect current conditions in the financial and annuity markets. Assumptions under the benefit payments regulation are updated monthly. This final rule updates the benefit payments interest assumptions for March 2012.[1]

The March 2012 interest assumptions under the benefit payments regulation will be 1.25 percent for the period during which a benefit is in pay status and 4.00 percent during any years preceding the benefit's placement in pay status. In comparison with the interest assumptions in effect for February 2012, these interest assumptions are unchanged.

PBGC has determined that notice and public comment on this amendment are impracticable and contrary to the public interest. This finding is based on the

---

[1] Appendix B to PBGC's regulation on Allocation of Assets in Single-Employer Plans (29 CFR part 4044) prescribes interest assumptions for valuing benefits under terminating covered single-employer plans for purposes of allocation of assets under ERISA section 4044. Those assumptions are updated quarterly.

Exhibit 16    JA705    JA-0000303

*however,* no market value threshold need be satisfied in connection with non-convertible securities eligible for registration on Form F–9 (§ 239.39 of this chapter)''.

■ 34. Effective December 31, 2012, amend Form 40–F (referenced in 17 CFR 249.240f) by:

■ a. In General Instruction A.(i), removing "F–9";

■ b. Removing from paragraph (2)(iv) of General Instruction A. the phrase ''; provided, however, that no market value threshold need be satisfied in connection with non-convertible securities eligible for registration on Form F–9" and adding in its place the phrase ''or the Registrant filed a Form F–9 with the Commission on or before December 30, 2012''; and

■ c. Revising paragraph (2) of General Instruction C. to read as follows:

(2) Any financial statements, other than interim financial statements, included in this Form by registrants registering securities pursuant to Section 12 of the Exchange Act or reporting pursuant to the provisions of Section 13(a) or 15(d) of the Exchange Act must be reconciled to U.S. GAAP as required by Item 17 of Form 20–F under the Exchange Act, unless this Form is filed with respect to a reporting obligation under Section 15(d) that arose solely as a result of a filing made on Form F–7, F–8, F–9 or F–80, in which case no such reconciliation is required.

**Note:** The text of Form 40–F does not, and this amendment will not, appear in the Code of Federal Regulations.

Dated: July 27, 2011.

By the Commission.

**Elizabeth M. Murphy,**

*Secretary.*

[FR Doc. 2011–19421 Filed 8–2–11; 8:45 am]

**BILLING CODE 8011–01–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

**[TD 9541]**

**RIN 1545–BJ60**

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**[CMS–9992–IFC2]**

**45 CFR Part 147**

**RIN 0938–AQ07**

## Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Interim final rules with request for comments.

**SUMMARY:** This document contains amendments to the interim final regulations implementing the rules for group health plans and health insurance coverage in the group and individual markets under provisions of the Patient Protection and Affordable Care Act regarding preventive health services.

**DATES:** *Effective date.* These interim final regulations are effective on August 1, 2011.

*Comment date.* Comments are due on or before September 30, 2011.

*Applicability dates.* These interim final regulations generally apply to group health plans and group health insurance issuers on August 1, 2011.

**ADDRESSES:** Written comments may be submitted to any of the addresses specified below. Any comment that is submitted to any Department will be shared with the other Departments. Please do not submit duplicates.

All comments will be made available to the public. *WARNING:* Do not include any personally identifiable information (such as name, address, or other contact information) or

confidential business information that you do not want publicly disclosed. All comments are posted on the Internet exactly as received, and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

*Department of Labor.* Comments to the Department of Labor, identified by RIN 1210–AB44, by one of the following methods:

• *Federal eRulemaking Portal*: *http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail:* E-OHPSCA2713.EBSA@dol.gov.

• *Mail or Hand Delivery*: Office of Health Plan Standards and Compliance Assistance, Employee Benefits Security Administration, Room N–5653, U.S. Department of Labor, 200 Constitution Avenue, NW., Washington, DC 20210, *Attention:* RIN 1210–AB44.

Comments received by the Department of Labor will be posted without change to *http:// www.regulations.gov* and *http:// www.dol.gov/ebsa*, and available for public inspection at the Public Disclosure Room, N–1513, Employee Benefits Security Administration, 200 Constitution Avenue, NW., Washington, DC 20210.

*Department of Health and Human Services.* In commenting, please refer to file code CMS–9992–IFC2. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the ''Submit a comment'' instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, *Attention:* CMS–9992–IFC2, P.O. Box 8010, Baltimore, MD 21244–8010.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, *Attention:* CMS–9992–IFC2, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier) your written comments ONLY to the

Exhibit 17    JA706    JA-0000304

following addresses prior to the close of the comment period: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–4492 in advance to schedule your arrival with one of our staff members.

Comments received as appropriate for hand or courier delivery may be delayed and received after the comment period.

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http:// www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. EST. To schedule an appointment to view public comments, phone 1–800–743–3951.

*Internal Revenue Service.* Comments to the IRS, identified by REG–120391– 10, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* CC:PA:LPD:PR (REG–120391– 10), room 5205, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044.

• *Hand or courier delivery:* Monday through Friday between the hours of 8 a.m. and 4 p.m. to: CC:PA:LPD:PR (REG–120391–10), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington DC 20224.

All submissions to the IRS will be open to public inspection and copying in room 1621, 1111 Constitution Avenue, NW., Washington, DC from 9 a.m. to 4 p.m.

**FOR FURTHER INFORMATION CONTACT:** Amy Turner or Beth Baum, Employee Benefits Security Administration, Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 622–6080; Robert Imes, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services, at (410) 786–1565.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*http://www.dol.gov/ebsa*). In addition, information from HHS on private health insurance for consumers can be found on the Centers for Medicare & Medicaid Services (CMS) Web site (*http://cciio.cms.gov*) and information on health reform can be found at *http://www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act, Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act (the Reconciliation Act), Public Law 111–152, was enacted on March 30, 2010 (collectively known as the "Affordable Care Act"). The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The term "group health plan" includes both insured and self-insured group health plans.[1] The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act (ERISA) and section 9815(a)(1) to the Internal Revenue Code (the Code) to incorporate the provisions of part A of title XXVII

of the PHS Act into ERISA and the Code, and make them applicable to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans. The PHS Act sections incorporated by this reference are sections 2701 through 2728. PHS Act sections 2701 through 2719A are substantially new, though they incorporate some provisions of prior law. PHS Act sections 2722 through 2728 are sections of prior law renumbered, with some, mostly minor, changes.

Subtitles A and C of title I of the Affordable Care Act amend the requirements of title XXVII of the PHS Act (changes to which are incorporated into ERISA section 715). The preemption provisions of ERISA section 731 and PHS Act section 2724[2] (implemented in 29 CFR 2590.731(a) and 45 CFR 146.143(a)) apply so that the requirements of part 7 of ERISA and title XXVII of the PHS Act, as amended by the Affordable Care Act, are not to be "construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group or individual health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement" of the Affordable Care Act. Accordingly, State laws that impose requirements on health insurance issuers that are stricter than the requirements imposed by the Affordable Care Act are not superseded by the Affordable Care Act.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated under section 715(a)(1) of ERISA and section 9815(a)(1) of the Code, specifies that a group health plan and a health insurance issuer offering group or individual health insurance coverage provide benefits for and prohibit the imposition of cost-sharing with respect to:

• Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force (Task Force) with respect to the individual involved.[3]

---

[1] The term "group health plan" is used in title XXVII of the PHS Act, part 7 of ERISA, and chapter 100 of the Code, and is distinct from the term "health plan," as used in other provisions of title I of the Affordable Care Act. The term "health plan" does not include self-insured group health plans.

[2] Code section 9815 incorporates the preemption provisions of PHS Act section 2724. Prior to the Affordable Care Act, there were no express preemption provisions in chapter 100 of the Code.

[3] Under PHS Act section 2713(a)(5), the Task Force recommendations regarding breast cancer screening, mammography, and prevention issued in or around November of 2009 are not to be considered current recommendations on this subject for purposes of PHS Act section 2713(a)(1).

Exhibit 17

JA707

JA-0000305

• Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (Advisory Committee) with respect to the individual involved. A recommendation of the Advisory Committee is considered to be "in effect" after it has been adopted by the Director of the Centers for Disease Control and Prevention. A recommendation is considered to be for routine use if it appears on the Immunization Schedules of the Centers for Disease Control and Prevention.

• With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

• With respect to women, preventive care and screening provided for in comprehensive guidelines supported by HRSA (not otherwise addressed by the recommendations of the Task Force), which will be commonly known as HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines.

The requirements to cover recommended preventive services without any cost-sharing do not apply to grandfathered health plans.[4] The Departments previously issued interim final regulations implementing PHS Act section 2713; these interim final rules were published in the **Federal Register** on July 19, 2010 (75 FR 41726). For the reasons explained below, the Departments are now issuing an amendment to these interim final rules.

## II. Overview of the Amendment to the Interim Final Regulations

The interim final regulations provided that a group health plan or health insurance issuer must cover certain items and services, without cost-sharing, as recommended by the U.S. Preventive Services Task Force, the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention, and the Health Resources and Services Administration. Notably, to the extent not described in the U.S. Preventive Services Task Force recommendations, HRSA was charged with developing comprehensive guidelines for preventive care and screenings with respect to women (*i.e.*, the Women's Preventive Services: Required Health Plan Coverage Guidelines or "HRSA Guidelines"). The interim final regulations also require that changes in the required items and services be implemented no later than plan years (in the individual market, policy years) beginning on or after the date that is one year from when the new recommendation or guideline is issued.

In response to the request for comments on the interim final regulations, the Departments received considerable feedback regarding which preventive services for women should be considered for coverage under PHS Act section 2713(a)(4). Most commenters, including some religious organizations, recommended that HRSA Guidelines include contraceptive services for all women and that this requirement be binding on all group health plans and health insurance issuers with no religious exemption. However, several commenters asserted that requiring group health plans sponsored by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom. One commenter noted that some religious employers do not currently cover such benefits under their group health plan due to their religious beliefs.

The Departments note that PHS Act section 2713(a)(4) gives HRSA the authority to develop comprehensive guidelines for additional preventive care and screenings for women "for purposes of this paragraph." In other words, the statute contemplated HRSA Guidelines that would be developed with the knowledge that certain group health plans and health insurance issuers would be required to cover the services recommended without cost-sharing, unlike the other guidelines referenced in section 2713(a), which pre-dated the Affordable Care Act and were originally issued for purposes of identifying the non-binding recommended care that providers should provide to patients. These HRSA Guidelines exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women. In the Departments' view, it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate. Specifically, the Departments seek to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions. Such an accommodation would be consistent with the policies of States that require contraceptive services coverage, the majority of which simultaneously provide for a religious accommodation.

In light of the above, the Departments are amending the interim final rules to provide HRSA additional discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned. The amendment to the interim final rules provides HRSA with the discretion to establish this exemption. Consistent with most States that have such exemptions, as described below, the amended regulations specify that, for purposes of this policy, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) refer to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. The definition of religious employer, as set forth in the amended regulations, is based on existing definitions used by most States that exempt certain religious employers from having to comply with State law requirements to cover contraceptive services. We will be accepting comments on this definition as well as alternative definitions, such as those that have been developed under Title 26 of the United States Code. The definition set forth here is intended to reasonably balance the extension of any coverage of contraceptive services under the HRSA Guidelines to as many women as possible, while respecting the unique relationship between certain religious employers and their employees in certain religious positions. The change in policy effected by this amendment to these interim final rules is intended solely for purposes of PHS Act section 2713 and the companion provisions of ERISA and the Internal Revenue Code.

Because HRSA's discretion to establish an exemption applies only to group health plans sponsored by certain

---

Thus, the recommendations regarding breast cancer screening, mammography, and prevention issued by the Task Force prior to those issued in or around November of 2009 (that is, those issued in 2002) will be considered current until new recommendations in this area are issued by the Task Force or appear in comprehensive guidelines supported by HRSA concerning preventive care and screenings for women, which will be commonly known as HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines.

[4] See 26 CFR 54.9815–1251T, 29 CFR 2590.715–1251 and 45 CFR 147.140 (75 FR 34538, June 17, 2010).

Exhibit 17    JA708    JA-0000306

religious employers and group health insurance offered in connection with such plans, health insurance issuers in the individual health insurance market would not be covered under any such exemption.

## III. Interim Final Regulations and Waiver of Delay of Effective Date

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include PHS Act sections 2701 through 2728 and the incorporation of those sections into ERISA section 715 and Code section 9815. The amendments promulgated in this rulemaking carry out the provisions of these statutes. Therefore, the foregoing interim final rule authority applies to these amendments.

Under the Administrative Procedure Act (APA) (5 U.S.C. 551, et seq.), while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations, an exception is made when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The provisions of the APA that ordinarily require a notice of proposed rulemaking do not apply here because of the specific authority to issue interim final rules granted by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act.

Even if the APA requirements for notice and comment were applicable to these regulations, they have been satisfied. This is because the Secretaries find that providing for an additional opportunity for public comment is unnecessary, as the July 19, 2010 interim final rules implementing section 2713 of the PHS Act provided the public with an opportunity to comment on the implementation of the preventive services requirements in this provision, and the amendments made in these interim final rules in fact are based on such public comments. Specifically, commenters expressed concerns that HRSA-supported guidelines issued under section 2713(a)(4) that included coverage of contraceptive services could impinge upon the religious freedom of certain religious employers. The flexibility that is afforded under these amendments is being provided to HRSA in order to allow HRSA the discretion

to accommodate, in a balanced way, as discussed above, these commenter concerns.

In addition, the Departments have determined that an additional opportunity for public comment would be impractical and contrary to the public interest. The requirement in section 2713(a)(4) that preventive services supported by HRSA be provided without cost-sharing took effect at the beginning of the first plan or policy year beginning on or after September 23, 2010. At that time, however, HRSA had not issued any such guidelines. Under the July 19, 2010 interim final rules, group health plans and insurance issuers do not have to begin covering preventive services supported in HRSA guidelines until the first plan or policy year that begins one year after the guidelines are issued. Thus, while the law requiring coverage of recommended women's preventive health services was enacted on March 23, 2010, and has been in effect since September 23, 2010, no such guidelines have yet been issued, and it will be at least a full year after they are issued before group health plans and issuers will be required to start covering preventive services recommended in the guidelines without cost sharing.

The July 19, 2010 interim final rules indicated that HRSA expected to issue guidelines by August 1, 2011. After considering public comments raising the issue addressed in these amendments, however, the Departments determined that HRSA should be granted the discretion to address the commenter concerns at issue prior to issuing guidelines under section 2713(a)(4). Many college student policy years begin in August and an estimated 1.5 million young adults are estimated to be covered by such policies.[5] Providing an opportunity for public comment as described above would mean that the guidelines could not be issued until after August of 2011. This delay would mean that many students could not benefit from the new prevention coverage without cost-sharing following from the issuance of the guidelines until the 2013–14 school year, as opposed to the 2012–13 school year. Similarly, 2008 data from the Department of Labor indicate that over 4 million Americans have ERISA group health plan coverage that starts in August or September; they too would experience over a year's delay in the receipt of the new benefit if the public

comment period delayed the issuance of the guidance for over a month. The Departments have determined that such a delay in implementation of the statutory requirement that women receive vital preventive services without cost-sharing would be contrary to the public interest because it could result in adverse health consequences that may not otherwise have occurred.

While the Departments have determined that, even if the APA were applicable, issuing these regulations in proposed form, so they would not become effective until after public comment, would be contrary to the public interest in the case of these amendments, the Departments are issuing these amendments as interim final rules so as to provide the public with an opportunity for public comment on these amendments.

The APA also generally requires that a final rule be effective no sooner than 30 days after the date of publication in the **Federal Register**. This 30-day delay in effective date can be waived, however, if an agency finds good cause why the effective date should not be delayed, and the agency incorporates a statement of the findings and its reasons in the rule issued.

As indicated above, many college student policy years begin in August. Delaying the effective date of this amendment by 30 days would mean that the HRSA guidelines could not be issued until after August of 2011. This delay would mean many students could not benefit from the new prevention coverage without cost-sharing following from the issuance of the guidelines until the 2013–14 school year, as opposed to the 2012–13 school year. As discussed above, all other participants, beneficiaries and enrollees in plans or policies with a plan or a policy year beginning in the months between August 1 and whenever a final rule would be published should the Departments provide a pre-promulgation opportunity for public comment would face a similar one-year delay in receiving these important health benefits. The Departments have determined that such a delay in implementation of the statutory requirement that women receive vital preventive services without cost-sharing would be impracticable and contrary to the public interest because it could result in adverse health consequences that may not otherwise have occurred. Therefore, the Departments are waiving the 30-day delay in effective date of these amendments.

---

[5] Department of Health and Human Services, Notice of Proposed Rulemaking on Student Health Insurance Coverage (76 FR 7767, February 22, 2011).

Exhibit 17

## IV. Economic Impact and Paperwork Burden

### A. Executive Orders 13563 and 12866—Department of Labor and Department of Health and Human Services

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

#### 1. Need for Regulatory Action

As stated earlier in this preamble, the Departments previously issued interim final regulations implementing PHS Act section 2713 that were published in the **Federal Register** on July 19, 2010 (75 FR 41726). Comments received in response to the interim final regulations raised the issue of imposing on certain religious employers through binding guidelines the requirement to cover contraceptive services that would be in conflict with the religious tenets of the employer. The Departments have determined that it is appropriate to amend the interim final rules to provide HRSA the discretion to exempt from its guidelines group health plans maintained by certain religious employers where contraceptive services are concerned.

#### 2. Anticipated Effects

The Departments expect that this amendment will not result in any additional significant burden or costs to the affected entities.

### B. Special Analyses—Department of the Treasury

Notwithstanding the determinations of the Department of Labor and Department of Health and Human Services, for purposes of the Department of the Treasury, it has been determined that this Treasury decision is not a significant regulatory action for purposes of Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the APA (5 U.S.C.

chapter 5) does not apply to these interim final regulations. For the applicability of the RFA, refer to the Special Analyses section in the preamble to the cross-referencing notice of proposed rulemaking published elsewhere in this issue of the **Federal Register**. Pursuant to section 7805(f) of the Code, these temporary regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small businesses.

### C. Paperwork Reduction Act

As stated in the previously issued interim final regulations, this rule is not subject to the requirements of the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 *et seq.*) because it does not contain a "collection of information" as defined in 44 U.S.C. 3502 (11).

## V. Statutory Authority

The Department of the Treasury temporary regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor interim final regulations are adopted pursuant to the authority contained in 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services interim final regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

## List of Subjects

### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

## Department of the Treasury

*Internal Revenue Service*

### 26 CFR Chapter 1

Accordingly, 26 CFR part 54 is amended as follows:

## PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read as follows:

**Authority:** 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9815–2713T is amended by revising paragraph (a)(1)(iv) to read as follows:

### § 54.9815–2713T Coverage of preventive health services (temporary).

(a) * * *

(1) * * *

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration and developed in accordance with 45 CFR 147.130(a)(1)(iv).

* * * * *

## Department of Labor

*Employee Benefits Security Administration*

### 29 CFR Chapter XXV

29 CFR part 2590 is amended as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ **1.** The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

### Subpart C—Other Requirements

■ **2.** Section 2590.715–2713 is amended by revising paragraph (a)(1)(iv) to read as follows:

### § 2590.715–2713 Coverage of preventive health services.

(a) * * *

(1) * * *

(iv) With respect to women, to the extent not described in paragraph

(a)(1)(i) of this section, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration and developed in accordance with 45 CFR 147.130(a)(1)(iv).

\* \* \* \* \*

**Department of Health and Human Services**

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.130 is amended by revising paragraph (a)(1)(iv) to read as follows:

**§ 147.130 Coverage of preventive health services.**

(a) \* \* \*

(1) \* \* \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration.

(A) In developing the binding health plan coverage guidelines specified in this paragraph (a)(1)(iv), the Health Resources and Services Administration shall be informed by evidence and may establish exemptions from such guidelines with respect to group health plans established or maintained by religious employers and health insurance coverage provided in connection with group health plans established or maintained by religious employers with respect to any requirement to cover contraceptive services under such guidelines.

(B) For purposes of this subsection, a "religious employer" is an organization that meets all of the following criteria:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

\* \* \* \* \*

**Steven T. Miller,**
*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*
Approved: July 28, 2011.

**Emily S. McMahon,**
*Acting Assistant Secretary of the Treasury (Tax Policy).*
Signed this 29th day of July 2011.

**Phyllis C. Borzi,**
*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*
OCIIO–9992–IFC2

(Catalog of Federal Domestic Assistance Program No. 93.773, Medicare—Hospital Insurance; and Program No. 93.774, Medicare—Supplementary Medical Insurance Program)

Dated: July 28, 2011.

**Donald M. Berwick,**
*Administrator, Centers for Medicare & Medicaid Services.*
Approved: July 28, 2011.

**Kathleen Sebelius,**
*Secretary, Department of Health and Human Services.*

[FR Doc. 2011–19684 Filed 8–1–11; 8:45 am]

**BILLING CODE 4120–01–P**

## DEPARTMENT OF HOMELAND SECURITY

**Coast Guard**

**33 CFR Part 165**

**[Docket No. USCG–2011–0717]**

**RIN 1625–AA00**

**Safety Zone; Discovery World Private Wedding Firework Displays, Milwaukee, WI**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing a temporary safety zone on the waters of Milwaukee Harbor in Milwaukee, Wisconsin. This zone is intended to restrict vessels from a portion of Milwaukee Harbor during two separate firework displays on July 31, 2011 and August 26, 2011. This temporary safety zone is necessary to protect spectators and vessels from the hazards associated with these firework displays.

**DATES:** This rule is in the CFR on August 3, 2011 through 10:30 p.m. on August 26, 2011. This rule is effective with actual notice for purposes of enforcement at 9:30 p.m. on July 31, 2011.

**ADDRESSES:** Documents indicated in this preamble as being available in the docket are part of docket USCG–2011–0717 and are available online by going to *http://www.regulations.gov*, inserting USCG–2011–0717 in the Docket ID box, and then clicking "search." They are also available for inspection or copying at the Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this temporary rule, contact or e-mail BM1 Adam Kraft, U.S. Coast Guard Sector Lake Michigan, at 414–747–7148 or *Adam.D.Kraft@uscg.mil*. If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:**

**Regulatory Information**

The Coast Guard is issuing this temporary final rule without prior notice and opportunity to comment pursuant to authority under section 4(a) of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)). This provision authorizes an agency to issue a rule without prior notice and opportunity to comment when the agency for good cause finds that those procedures are "impracticable, unnecessary, or contrary to the public interest." Under 5 U.S.C. 553(b)(B), the Coast Guard finds that good cause exists for not publishing a notice of proposed rulemaking (NPRM) with respect to this rule because waiting for a notice and comment period to run would be impracticable and contrary to the public interest. Notice of this fireworks display was not received in sufficient time for the Coast Guard to solicit public comments before the start of the event. Thus, waiting for a notice and comment period to run would be impracticable and contrary to the public interest because it would inhibit the Coast Guard's ability to protect the public from the hazards associated with these maritime fireworks displays.

Under 5 U.S.C. 553(d)(3), the Coast Guard finds that good cause exists for making this rule effective less than 30-days after publication in the **Federal Register**. For the same reasons discussed in the preceding paragraph, waiting for a 30 day notice period to run



Health Resources & Services Administration

Explore +

Advanced Search

Grants    Loans & Scholarships    Data Warehouse    About HRSA

⊕ share | 🖨 ✉ f 𝕏

Home > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines



On December 20, 2016, HRSA updated the HRSA-supported Women's Preventive Services Guidelines. Read the most current version.

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 20, 2017. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the 2011 guidelines.*

## Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing for those services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

### Women's Preventive Services Guidelines Supported by the Health Resources and Services Administration

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – generally must be covered with no cost sharing. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Health Resources and Services Administration Women's Preventive Services Guidelines

*Non-grandfathered plans (plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) generally are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health | Frequency |
|---|---|---|

### Learn More

- Women's Preventive Services Initiative report 🗗
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps* 🗗
- US Preventive Services Task Force 🗗
- Bright Futures 🗗
- Advisory Committee on Immunization Practices 🗗
- Previous Preventive Services Guidelines (August 2011)

### For Further Information

Contact
wellwomancare@hrsa.gov.

Exhibit 18          JA712          JA-0000310

| | | Insurance Coverage |
|---|---|---|
| **Well-woman visits.** | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception care and many services necessary for prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors.* (see note) |
| **Screening for gestational diabetes.** | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| **Human papillomavirus testing.** | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| **Counseling for sexually transmitted infections.** | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| **Counseling and screening for human immune-deficiency virus.** | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual |
| **Contraceptive methods and counseling. ** (see note)** | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed |
| **Breastfeeding support, supplies, and counseling.** | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth |
| **Screening and counseling for interpersonal and domestic violence.** | Screening and counseling for interpersonal and domestic violence. | |

*Refer to guidance issued by the Center for Consumer Information and Insurance Oversight entitled Affordable Care Act Implementation FAQs, Set 12, Q10.*

Exhibit 18

 ** The guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers. Effective August 1, 2013, a religious employer is defined as an employer that is organized and operates as a non-profit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. HRSA notes that, as of August 1, 2013, group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the requirement to cover contraceptive services under section 2713 of the Public Health Service Act, as incorporated into the Employee Retirement Income Security Act and the Internal Revenue Code. HRSA also notes that, as of January 1, 2014,  accommodations are available to group health plans established or maintained by certain eligible organizations (and group health insurance coverage provided in connection with such plans), as well as student health insurance coverage arranged by eligible organizations, with respect to the contraceptive coverage requirement. See Federal Register Notice: *Coverage of Certain Preventive Services Under the Affordable Care Act* (PDF - 327 KB)

HRSA, in concert with an external review committee, will review, and continually update, the *Women's Preventive Services' Guidelines*.

*Date Last Reviewed:  May 2017*

 About HRSA

 Stay Connected

 Find Health Services

- **Leadership & Org Chart**
- **Budget**
- **Strategic Plan**
- **Working at HRSA**
- **About HRSA**

   

Health Center

HIV Medical Care and Treatment

Sign up for email updates

 Locate other health services

Contact Us   |   Viewers & Players   |   Privacy Policy   |   Disclaimers   |   Accessibility   |   Freedom of Information Act   |   No Fear Act
U.S. Department of Health and Human Services   |   USA.gov   |   Whitehouse.gov

### Language Assistance Available

| | | | |
|---|---|---|---|
| Español | 繁體中文 | Tiếng Việt | 한국어 |
| Tagalog | Русский | العربية | Kreyòl Ayisyen |
| Français | Polski | Português | Italiano |
| Deutsch | 日本語 | فارسی | English |

Case: 25-2550 Document: 34-3 Page: 53 Date Filed: 12/12/2025

Case 2:20-cv-05339-MMB Document 64-8 Filed 05/01/20 Page 2 of 6 Guidelines



Health Resources & Services Administration

Explore

**Get reimbursed for COVID-19 testing and treatment of uninsured individuals.** **Learn more »**



Advanced Search

Home > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines



On December 17, 2019, HRSA updated the HRSA-supported Women's Preventive Services Guidelines. Read the most current version.

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 17, 2020. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the previously issued guidelines.*

In 2018, the HRSA-supported Women's Preventive Services Initiative released the Well Woman Chart, a resource that includes age-based preventive service recommendations for women from adolescence to maturity. The chart does not include updates to the HRSA-supported comprehensive guidelines, but provides additional clarity for patients and providers, with the goal of improving women's health across the life span.

## Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing for those services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

## Women's Preventive Services Guidelines Supported by the Health Resources and Services Administration

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – generally must be covered with no cost sharing. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Health Resources and Services Administration Women's Preventive Services Guidelines

### Learn More

- Women's Preventive Services Initiative report
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps*
- 2016 Guidelines
- US Preventive Services Task Force
- Bright Futures
- Advisory Committee on Immunization Practices

### For Further Information

Contact
wellwomancare@hrsa.gov.

*Non-grandfathered plans (plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) generally are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health Insurance Coverage | Frequency |
|---|---|---|
| Well-woman visits. | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception care and many services necessary for prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors.* (see note) |
| Screening for gestational diabetes. | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| Human papillomavirus testing. | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| Counseling for sexually transmitted infections. | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| Counseling and screening for human immune-deficiency virus. | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual. |
| Contraceptive methods and counseling. **, *** (see note) | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed. |
| Breastfeeding support, supplies, and counseling. | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth. |
| Screening and counseling for interpersonal and domestic | Screening and counseling for interpersonal and | Annual. |

| | | |
|---|---|---|
| violence. | domestic violence. | |
| Screening for anxiety. | Screening for anxiety in adolescent and adult women, including those who are pregnant or postpartum. Optimal screening intervals are unknown and clinical judgement should be used to determine screening frequency. | As prescribed. |
| Screening for breast cancer. | Screening for breast cancer by mammography in average-risk women no earlier than age 40 and no later than age 50. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening. | Screening mammography should occur at least biennially and as frequently as annually. |
| Screening for diabetes mellitus after pregnancy. | Screening for diabetes mellitus in women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes mellitus . | Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum. |
| Screening for urinary incontinence. | Screening for urinary incontinence. | Annual. |

_* Refer to guidance issued by the Center for Consumer Information and Insurance Oversight entitled *Affordable Care Act Implementation FAQs, Set 12, Q10*.

**(I)(a) Objecting entities—religious beliefs.

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*
*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (I)(a)(2) of this note. Such non-governmental plan sponsors include, but are not limited to, the following entities:*
*(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order;*
*(B) A nonprofit organization;*
*(C) A closely held for-profit entity;*
*(D) A for-profit entity that is not closely held; or*
*(E) Any other non-governmental employer;*
*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (I)(a) (2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*
*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the*

issuer objects as specified in paragraph (I)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (I)(a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.

(2) The exemption of this paragraph (I)(a) will apply to the extent that an entity described in paragraph (I)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

(b) Objecting individuals—religious beliefs. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (I)(b), and nothing in 45 CFR 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

(II)(a) Objecting entities—moral convictions.

(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:

(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent one of the following non-governmental plan sponsors object as specified in paragraph (II)(a)(2) of this note:

(A) A nonprofit organization; or

(B) A for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934);

(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (II)(a) (2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (II)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (II)(a)(1)(iii), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.

(2) The exemption of this paragraph (II)(a) will apply to the extent that an entity described in paragraph (II)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.

(b) Objecting individuals—moral convictions. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (II)(b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815– 2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.

(III) Definition. For the purposes of this note, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of these Guidelines.

Exhibit 18-A                                                    JA-000312-D

Case: 20-35780, Document 34-3, Filed: 12/11/2020, Page: 57 of 610

See Federal Register Notice: *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act* (PDF - 488 kb).

HRSA, in concert with an external review committee, will review, and continually update, the *Women's Preventive Services' Guidelines*.

_*** General Notice_

*As a result of court decisions, the final rules (83 FR 57536 (Nov. 15, 2018); 83 FR 57592 (Nov. 15, 2018)) and the interim final rules (82 FR 47792 (Oct. 13, 2017); 82 FR 47808 (Oct. 13, 2017)) regarding exemptions for certain plans and issuers from covering certain contraceptive items and services based on religious and moral objections are not in effect. See Pennsylvania v. Trump, 351 F. Supp. 3d 791 (E.D. Pa. 2019), aff'd 930 F. Supp. 3d 543 (3d Cir. 2019); see also California v. Azar, 351 F. Supp. 3d 1267 (N.D. Cal. 2019) (enjoining the final rules with respect to plaintiff states).*

*On July 29, 2019, in a case in the Northern District of Texas, DeOtte v. Azar, No. 4:18-CV-00825-O, 2019 WL 3786545 (N.D. Tex. July 29, 2019) the court determined that the "Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), violates the Religious Freedom Restoration Act" with respect to individuals and entities with religious objections to contraceptive coverage and thus enjoined enforcement of those provisions against such individuals and entities.*

*The Departments of Labor, Health and Human Services, and the Treasury are working with the Department of Justice in these on-going suits.*

*Date Last Reviewed:  December 2019*

 **About HRSA**

- **Bureaus & Offices**
- **Budget**
- **Strategic Plan**
- **Working at HRSA**
- **About HRSA**

 **Connect with HRSA**

    

 **Find Health Services**

Health Center

HIV Medical Care and Treatment

 Sign up for email updates

 **Locate other health services**

Contact Us | Viewers & Players | Privacy Policy | Disclaimers | Accessibility | Freedom of Information Act | EEO/No Fear Act
U.S. Department of Health and Human Services | USA.gov | Whitehouse.gov

## Language Assistance Available

| | | | |
|---|---|---|---|
| Español | 繁體中文 | Tiếng Việt | 한국어 |
| Tagalog | Русский | العربية | Kreyòl Ayisyen |
| Français | Polski | Português | Italiano |
| Deutsch | 日本語 | فارسی | English |

# Clinical Preventive Services for Women

## Closing the Gaps

Committee on Preventive Services for Women

Board on Population Health and Public Health Practice

INSTITUTE OF MEDICINE
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19     JA720     JA-0000313

THE NATIONAL ACADEMIES PRESS    500 Fifth Street, N.W.    Washington, DC 20001

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This study was supported by Contract HHSP23337013T between the National Academy of Sciences and the U.S. Department of Health and Human Services. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the authors and do not necessarily reflect the view of the organizations or agencies that provided support for this project.

International Standard Book Number-13:  978-0-309-21538-1
International Standard Book Number-10:  0-309-21538-2

Additional copies of this report are available from the National Academies Press, 500 Fifth Street NW, Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

For more information about the Institute of Medicine, visit the IOM home page at: www.iom.edu.

Copyright 2011 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

The serpent has been a symbol of long life, healing, and knowledge among almost all cultures and religions since the beginning of recorded history. The serpent adopted as a logotype by the Institute of Medicine is a relief carving from ancient Greece, now held by the Staatliche Museen in Berlin.

Cover credit: The cover painting is reprinted with permission from the artist, Alberto Schunk.

Suggested citation: IOM (Institute of Medicine). 2011. *Clinical Preventive Services for Women: Closing the Gaps.* Washington, DC: The National Academies Press.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA721                                    JA-0000314

*"Knowing is not enough; we must apply.*
*Willing is not enough; we must do."*
—Goethe

# INSTITUTE OF MEDICINE
## OF THE NATIONAL ACADEMIES

**Advising the Nation. Improving Health.**

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                JA722                JA-0000315

# THE NATIONAL ACADEMIES

*Advisers to the Nation on Science, Engineering, and Medicine*

The National Academy of Sciences is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The National Academy of Engineering was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The Institute of Medicine was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The National Research Council was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19   JA723   JA-0000316

## COMMITTEE ON PREVENTIVE SERVICES FOR WOMEN

**Linda Rosenstock** (*Chair*), Dean, School of Public Health, University of California, Los Angeles

**Alfred O. Berg**, Professor, Department of Family Medicine, University of Washington School of Medicine, Seattle

**Claire D. Brindis**, Professor of Pediatrics and Health Policy, Department of Pediatrics and Department of Obstetrics, Gynecology and Reproductive Health Services, and Director, Philip R. Lee Institute for Health Policy Studies, School of Medicine, University of California, San Francisco

**Angela Diaz**, Jean C. and James W. Crystal Professor of Adolescent Health, Department of Pediatrics and Community Preventative Medicine, Mount Sinai Medical Center, New York, New York

**Francisco Garcia**, Distinguished Outreach Professor of Public Health, Obstetrics and Gynecology; Director, University of Arizona Center of Excellence in Women's Health; and Codirector, Cancer Disparities Institute, University of Arizona, Tucson

**Kimberly Gregory**, Vice Chair, Women's Healthcare Quality and Performance Improvement, Department of Obstetrics and Gynecology, Cedars-Sinai Medical Center, Los Angeles, California

**Paula A. Johnson**, Executive Director, Connors Center for Women's Health and Gender Biology, and Chief, Division of Women's Health, Brigham and Women's Hospital, Boston, Massachusetts

**Anthony Lo Sasso**, Professor and Senior Research Scientist, Division of Health Policy and Administration, University of Illinois at Chicago School of Public Health

**Jeanette H. Magnus**, Cecile Usdin Professor in Women's Health and Chair, Department of Community Health Sciences, School of Public Health and Tropical Medicine, Tulane University, New Orleans, Louisiana

**Heidi D. Nelson**, Research Professor of Medical Informatics and Clinical Epidemiology and Medicine, Oregon Health and Science University, and Medical Director for Cancer Prevention and Screening, Providence Cancer Center, Providence Health & Services, Portland, Oregon

**Roberta B. Ness**, Dean and M. David Low Chair in Public Health, School of Public Health, University of Texas, Houston

**Magda G. Peck**, Professor of Public Health and Pediatrics and Associate Dean for Community Engagement and Public Health Practice, College of Public Health, University of Nebraska Medical Centers, Omaha, Nebraska

*v*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA724
JA-0000317

E. Albert Reece, Vice President for Medical Affairs, University of
   Maryland, and John Z. and Akiko K. Bowers Distinguished Professor
   and Dean, University of Maryland School of Medicine, Baltimore
Alina Salganicoff, Vice President and Director, Women's Health Policy,
   Henry J. Kaiser Family Foundation, Menlo Park, California
Sally W. Vernon, Division Director, Health Promotion and Behavioral
   Sciences, Blair Justice, Ph.D. Professorship in Mind-Body Medicine
   and Public Health, and Professor of Epidemiology and Behavioral
   Sciences, University of Texas School of Public Health, Houston
Carol S. Weisman, Distinguished Professor of Public Health Sciences and
   Obstetrics and Gynecology and Associate Dean for Faculty Affairs,
   Pennsylvania State University College of Medicine, Hershey

*Study Staff*

Karen Helsing, Study Director
Jesse Flynn, Associate Program Officer
Suzanne Landi, Research Assistant
Chelsea Frakes, Senior Program Assistant
Rebekah E. Gee, Institute of Medicine Anniversary Fellow
Amy Pryzbocki, Financial Associate
Rose Marie Martinez, Senior Director, Board on Population Health and
   Public Health Practice

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                JA725                JA-0000318

# Reviewers

This report has been reviewed in draft form by persons chosen for their diverse perspectives and technical expertise in accordance with procedures approved by the National Research Council's Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards of objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process. We thank the following for their review of this report:

Eli Y. Adashi, Professor of Medical Science, The Warren Alpert Medical School, Brown University

Wylie Burke, Professor and Chair, Department of Bioethics and Humanities, School of Medicine, University of Washington

Ned Calonge, President and Chief Executive Officer, The Colorado Trust

Carol A. Ford, Chief, Craig Dalsimer Division of Adolescent Medicine and Orton Jackson Endowed Chair in Adolescent Medicine, the Children's Hospital of Philadelphia

Paula M. Lantz, S.J. Axelrod Collegiate Professor of Health Management and Policy and Chair, Department of Health Management and Policy, School of Public Health, University of Michigan

JoAnn E. Manson, Chief, Division of Preventive Medicine, Brigham and Women's Hospital and Elizabeth F. Brigham Professor of Medicine and Women's Health, Harvard Medical School

*vii*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA726                    JA-0000319

**Gary E. Raskob,** Dean and Professor of Epidemiology and Medicine, College of Public Health, University of Oklahoma Health Sciences Center

**Rita Redberg,** Director, Women's Cardiovascular Services Medical Center, University of California, San Francisco

**Sara Rosenbaum,** Hirsh Professor and Chair, Department of Health Policy, School of Public Health and Health Services, The George Washington University Medical Center

**Donna Strobino,** Professor and Vice Chair of Education, Bloomberg School of Public Health, Johns Hopkins University

**Nancy Fugate Woods,** Dean Emeritus, School of Nursing, University of Washington

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations, nor did they see the final draft of the report before its release. The review of the report was overseen by **Nancy E. Adler,** Professor of Medical Psychology, Departments of Psychiatry and Pediatrics, and Director, Center for Health and Community, University of California, San Francisco and **Susan J. Curry,** Dean, College of Public Health, University of Iowa. Appointed by the National Research Council and Institute of Medicine, they were responsible for making certain that an independent examination of the report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of the report rests entirely with the author committee and the institution.

Copyright National Academy of Sciences. All rights reserved.

# Preface

As chair of the Committee on Preventive Services for Women, I want to personally thank my fellow committee members for their willingness to serve, for their hard work, and for contributing their remarkable expertise to this study. I have been honored to contribute to this effort. Each of us works in different domains relating to preventive health services, and although the short time frame provided to perform this study presented a challenge, my esteemed colleagues who comprised the committee worked as a team with great dedication and spirit to achieve consensus. It was a pleasure to work with each and every one of them.

The diverse committee involves an impressive array of researchers and practitioners, including two members who served on the United States Preventive Services Task Force (USPSTF) and one who leads USPSTF systematic evidence reviews. Although we could not conduct a USPSTF-style systematic review for any single preventable health condition or determinant of well-being, nor were we expected to do so, I believe that our end product is a study that has important, evidence-based recommendations that provide a road map to improved preventive services for women. Throughout the process we repeatedly asked ourselves whether the disease or condition that we were addressing was of significance to women and especially whether it was more common or more serious in women than in men or whether women experienced different outcomes or benefited from different interventions than men. I believe that the preventive services that we recommend for consideration in this report readily satisfy these questions.

The Patient Protection and Affordable Care Act of 2010 has afforded

Copyright National Academy of Sciences. All rights reserved.

us an historic occasion. For the first time, prevention plays a central role within the scope of new health insurance plans in the United States. Also, an ongoing focus on women's preventive services is expected to be included in these efforts. Given the history of inadequate attention to women's health research and preventive services noted by many (including previous Institute of Medicine [IOM] committees), I am truly optimistic that gains in women's health and well-being will ensue. With the multiple roles that women play in society, to invest in the health and well-being of women is to invest in progress for all.

I regret that we were unable to resolve to his satisfaction the issues raised by one committee member, Anthony Lo Sasso. In his statement of dissent, he identifies his main concerns, which are with the constraints of the study's charge and subsequent process. His statement, along with the committee's response, can be found in Appendix D of the report.

I thank the IOM staff, especially our senior project officer, Karen Helsing, and also Jesse Flynn, Suzanne Landi, Chelsea Frakes, and IOM Anniversary Fellow Rebekah Gee. All went above and beyond to support the committee throughout the process. We also are indebted to Rose Marie Martinez, senior director of the Board on Population Health and Public Health Practice, for her presence throughout and her invaluable guidance and support. I am grateful as well to those who presented and attended our committee's open sessions and those who submitted comments and informed our work with their research and opinion pieces. Without their dedicated work this report would not have been possible.

Linda Rosenstock, *Chair*
Committee on Preventive Services for Women

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA729 JA-0000322

# Contents

SUMMARY                                                                    1

1   INTRODUCTION                                                          15
    Specifics of the Legislation, 15
    Role of Prevention in Addressing Health and Well-Being, 16
    Why Women?, 18
    Preventive Services for Women, 20
    Committee on Preventive Services for Women, 20
    Committee Process, 22
    References, 26

2   PREVENTIVE SERVICES DEFINED BY THE ACA                               29
    United States Preventive Services Task Force, 29
    Bright Futures—American Academy of Pediatrics, 37
    Advisory Committee on Immunization Practices, 43
    References, 46

3   EXISTING COVERAGE PRACTICES OF NATIONAL,
    STATE, AND PRIVATE HEALTH PLANS                                      47
    Rules Governing Coverage Requirements Before and
       After the ACA, 48
    Discussion, 64
    References, 64

*xi*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA730                          JA-0000323

**4  COMMITTEE METHODOLOGY**                                    **67**
Review of USPSTF Recommendations, 67
Review of Bright Futures Recommendations, 72
Review of ACIP Recommendations, 73
Further Committee Considerations, 73
Recommendations on Preventive Services to Be Considered in
    Development of Comprehensive Guidelines, 77
References, 77

**5  RECOMMENDATIONS**                                          **79**
Diabetes and Gestational Diabetes, 79
Cervical Cancer, 88
Sexually Transmitted Infections, 94
Human Immunodeficiency Virus Infection, 98
Preventing Unintended Pregnancy and Promoting
    Healthy Birth Spacing, 102
Breastfeeding, 110
Interpersonal and Domestic Violence, 117
Well-Woman Preventive Visits, 123
References, 135

**6  PROCESS FOR REGULARLY UPDATING THE
    RECOMMENDATIONS**                                          **157**
Guiding Principles and Recommendations, 158
A Preventive Services Coverage Commission, 158
Role of Evidence-Based Review Bodies, 159
Discussion, 160
References, 162

**7  FINDINGS AND RECOMMENDATIONS FOR
    ADDRESSING IDENTIFIED GAPS IN PREVENTIVE
    SERVICES FOR WOMEN**                                       **163**
Concluding Observations from the Committee, 163
References, 168

**APPENDIXES**

**A  CLARIFICATIONS**                                          **171**
Cardiovascular Disease, 171
Bone/Skeletal Disease, 178
Breast Cancer, 182

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA731                          JA-0000324

Mental Health, 188
Tobacco Use, 193
Diet/Physical Activity, 198
References, 202

**B   AGENDAS OF PUBLIC MEETINGS HELD BY THE
     COMMITTEE ON PREVENTIVE SERVICES FOR WOMEN**     217

**C   COMMITTEE BIOGRAPHIES**                          223

**D   DISSENT AND RESPONSE**                           231

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA732                         JA-0000325

# Summary

## BACKGROUND

The Patient Protection and Affordable Care Act of 2010 (ACA) holds much promise—beyond the expansion of health care coverage—for millions of Americans. The preventive health care services and screenings specified in the legislation will be fully covered without requiring a patient copayment. These include the services with Grade A and B recommendations made by the United States Preventive Services Task Force (USPSTF), the Bright Futures recommendations for adolescents from the American Academy of Pediatrics (AAP) in cooperation with the U.S. Department of Health and Human Services (HHS), and vaccinations specified by the Centers for Disease Control and Prevention's (CDC's) Advisory Committee on Immunization Practices (ACIP). These three sets of guidelines provide a list of preventive services, such as blood pressure measurement, diabetes and cholesterol tests, and mammography and colonoscopy screenings. As part of the ACA, the list of preventive services specific to women's health was requested to be reviewed.

## CHARGE TO THE COMMITTEE

The Office of the Assistant Secretary for Planning and Evaluation (ASPE) of HHS provided funds for the Institute of Medicine (IOM) to conduct a review of effective preventive services to ensure women's health and well-being. The charge to the committee for the project is presented in Box S-1.

*1*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19     JA733     JA-0000326

---

**BOX S-1**
**Statement of Task to the Committee on**
**Preventive Services for Women**

The Institute of Medicine will convene an expert committee to review what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women. The committee will also provide guidance on a process for regularly updating the preventive screenings and services to be considered. In conducting its work, the committee will: conduct a series of meetings to examine existing prevention guidelines, obtain input from stakeholders, identify gaps that may exist in recommended preventive services for USPSTF Grade A and B preventive services guidelines for women and in Bright Futures and USPSTF Grade A and B guidelines for adolescents, and highlight specific services and screenings that could supplement currently recommended preventive services for women. Specifically, the committee will consider the following questions:

- What is the scope of preventive services for women not included in those graded A and B by the USPSTF?
- What additional screenings and preventive services have been shown to be effective for women? Consideration may be given to those services shown to be effective but not well utilized among women disproportionately affected by preventable chronic illnesses.
- What services and screenings are needed to fill gaps in recommended preventive services for women?
- What models could HHS and its agencies use to coordinate regular updates of the comprehensive guidelines for preventive services and screenings for women and adolescent girls?

The Office of the Assistant Secretary for Planning and Evaluation (ASPE) on behalf of the U.S. Department of Health and Human Services (HHS) has been charged to examine recommendations for women's preventive services. ASPE will use the information and recommendations from the committee's report to guide policy and program development related to provisions in the Affordable Care Act addressing preventive services for women.

---

In response, the IOM convened a committee of 16 members—including specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines—to develop a set of recommendations for consideration by the ASPE of HHS.

The committee sought clarification from ASPE on a number of issues regarding its charge. In summary:

- Preventive services were specified to be applicable to females aged 10 to 65 years;

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA734                              JA-0000327

- The mammography screenings specified in the ACA legislation used USPSTF guidelines from 2002, which specify that such screenings be performed every one to two years for women aged 40 years and older;
- The cost-effectiveness of screenings or services could not be a factor for the committee to consider in its analyses leading to its recommendations;
- The committee was not intended to duplicate the processes used by the USPSTF and thus should look to other bodies of evidence beyond systematic evidence-based reviews; and
- Preventive services were specified for clinical settings, and thus community-based prevention activities were considered beyond the scope of committee consideration.

## COMMITTEE'S APPROACH TO ITS CHARGE

The committee met five times within six months. The committee held three open information-gathering sessions at which the members heard from a diverse group of stakeholders, researchers, members of advocacy organizations, and the public. Box S-2 provides the committee definition of preventive health services.

---

**BOX S-2**
**Definition of Preventive Health Services**

For the purposes of this study, the Committee on Preventive Services for Women defines preventive health services to be measures—including medications, procedures, devices, tests, education and counseling—shown to improve well-being, and/or decrease the likelihood or delay the onset of a targeted disease or condition.

---

## COMMITTEE'S METHODOLOGY

The committee's methodology to identify preventive services necessary for women's health and well-being and to identify specific services that could supplement the current list of recommended preventive services for women under the ACA follows.

The committee's first step was to review and reach an understanding of existing guidelines. The second step was to assemble and assess additional evidence, including reviews of the literature, federal health priority goals

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA735
JA-0000328

and objectives, federal reimbursement policies, and the clinical guidelines of health care professional organizations. The committee also considered the public comments that it received. Finally, the committee formulated a list of recommendations to be considered by the Secretary of HHS in developing a comprehensive package of preventive services for women to be included under the ACA.

## USPSTF Recommendations

The USPSTF process for developing recommendations is a disease-focused one. The intent of its recommendations has been to provide guidance to primary care providers. The IOM committee's approach to identifying gaps in existing services accounts for contextual issues beyond traditional research evidence used by the USPSTF. The committee looked at women's preventive service needs more broadly to account for women's health and well-being. The committee found that its interpretation of the Grade A and B recommendations was important in those cases in which ambiguity was found regarding periodicity of screenings. Furthermore, the committee compared USPSTF guidelines with those of numerous health care professional organizations to identify potential gaps.

The committee recognized that USPSTF Grade C recommendations and I statements warranted further analysis because the USPSTF did not develop and has not used these grades as support to offer or deny coverage of a preventive service. The USPSTF Grade C recommendations are made when the balance of potential benefits and harms does not strongly favor the clinician recommending the preventive service to all patients, although it may be appropriate in some cases.

The USPSTF I statements identify services for which the evidence is insufficient to suggest the effectiveness of a service because evidence is lacking, of lower quality, or conflicting. The committee notes that from a coverage perspective, the evidence supporting many clinical interventions in common use, whether in prevention or in general medical practice, is insufficient or unclear, and coverage decisions may be or have been made on the basis of other factors.

For example, although physician knowledge of the evidence of the benefits associated with a counseling service will inform a physician's decision for each patient, in many instances, it is difficult for researchers to show or conclude that outcomes are positive. Many preventive interventions that are intended to be conducted early in the life span (e.g., skin cancer prevention) require decades to demonstrate effectiveness.

Thus, each of the USPSTF Grade C and I statement recommendations and the evidence supporting them were collected and reviewed. The committee's evaluation included reviewing relevant supporting USPSTF

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA736                          JA-0000329

publications, other peer-reviewed research and clinical articles, and clinician fact sheets. Additional literature searches were conducted to identify randomized control trials published after the USPSTF recommendation was released. Furthermore, the committee compared the Grade C and I statement guidelines with guidelines from other professional organizations. The committee did not reexamine the services with Grade D recommendations, because the USPSTF recommends against providing these services.

### Bright Futures Recommendations

The committee reviewed all Bright Futures guidelines and compared them with the USPSTF guidelines for adolescents. The committee noted that the methodology that Bright Futures uses is quite different from that which the USPSTF uses. Bright Futures makes decisions through a consensus-driven process; thus, expert opinion is at the core of its development of recommendations.

The committee interpreted the sample questions and advice suggested in the anticipatory guidance section of the *Bright Futures* report (AAP, 2008) to describe topics to be covered as preventive services under the ACA and addressed in an annual health care visit of sufficient length to cover age- and sex-appropriate topics in the health domain. The committee assumes that physicians will identify priorities from this section of the *Bright Futures* report on the basis of the unique circumstances of each patient.

### ACIP Recommendations

The committee reviewed ACIP General Recommendations on Immunizations, which include all of the Food and Drug Administration-approved immunizations recommended for the general population of adolescent and adult women. Although literature searches were conducted to identify areas where supplemental immunization recommendations might be warranted, the committee identified little evidence to clearly indicate deficiencies in existing ACIP recommendations.

### Further Committee Considerations

The committee reviewed oral and written comments submitted throughout the course of the study. The committee also invited researchers and leaders of organizations to deliver presentations in areas in which the committee believed that it could benefit from their expertise. In addition, the committee reviewed HHS documents relating to prevention priorities and reimbursement policies. It also reviewed the existing coverage practices of national, state, and private health plans. In some cases, current practice

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA737                          JA-0000330

Clinical Preventive Services for Women: Closing the Gaps

*CLINICAL PREVENTIVE SERVICES FOR WOMEN*

in clinical care was also identified. Finally, the committee used the 2011 IOM report *Leading Health Indicators for Healthy People 2020* as a tool to perform horizon scanning or examine priority goals and/or persistent trends relating to women's health and well-being to identify potential gaps (IOM, 2011).

## COMMITTEE ANALYSIS

The product of these reviews was an array of potential areas where supplemental preventive measures might be warranted. Some of these areas were identified on the basis of traditional indicators, such as morbidity and mortality, whereas others were identified as being more generally supportive of a woman's well-being. The committee focused on conditions unique to women or that affected women in some specific or disproportionate way. The committee moved forward using criteria adapted from the USPSTF that considered frequency, severity, morbidity, mortality, and quality of life to bring consistency to the analyses.

For each potential supplemental preventive measure considered, the committee conducted an extensive comparison of the guidelines of professional organizations to understand the development of the guidelines and the evidence that the organizations used to reach their conclusions. The committee also performed targeted literature searches. However, it should be noted that the committee did not have adequate time or resources to conduct its own meta-analyses or comprehensive systematic review of each preventive service.

### Supplemental Preventive Measures

The committee attempted to identify preventive measures that were aimed at filling the gaps that it had identified. In most cases, the committee found that measures had already been proposed in the guidelines of other professional organizations. The committee also eliminated preventive measures that, even at this early stage in the analysis, were clearly not developed, tested, or known well enough to have a measurable impact. The resulting product of this step was a series of preventive service areas with gaps in coverage and the accompanying preventive measure or measures that could be considered by HHS. The core of the committee's task was to assemble the evidence that would allow it to recommend consideration of a preventive service.

### Coverage Decisions

As noted above, the USPSTF, Bright Futures, and ACIP guidelines focus on guidance for primary care providers and patients. Coverage decisions

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                          JA-0000331

often consider a host of other issues, such as established practice; patient and clinician preferences; availability; ethical, legal, and social issues; and availability of alternatives. Further complicating matters, special population groups such as minority populations, disabled women, recent immigrants, lesbians, prisoners, and those employed in high-risk environments, may have different health needs or benefit from different preventive services. High-risk groups, population subsets, and special populations are unevenly identified and addressed to varying degrees in current guidelines. Finally, cost-effectiveness was explicitly excluded as a factor that the committee could use in developing recommendations, and so the committee process could not evaluate preventive services on this basis.

## Committee Approach

The committee developed a hybrid approach that collected relevant evidence for each measure. Four categories of evidence—posed in the form of questions—to be examined for each potential preventive measure were developed. The committee did not formally rank or assign weights to the categories, nor did it stipulate that evidence in any one category would automatically result in a recommendation for a measure or service to be considered. Instead, the queries and categories were used to consider the range of evidence and to ensure consistency in the committee's analysis and deliberations. Many of the recommendations are supported by more than one category of evidence.

Category I. Are high-quality systematic evidence reviews available indicating that the service is effective in women?

Category II. Are quality peer-reviewed studies available demonstrating effectiveness of the service in women?

Category III. Has the measure been identified as a federal priority to address in women's preventive services?

Category IV. Are there existing federal, state, or international practices, professional guidelines, or federal reimbursement policies that support the use of the measure?

## RECOMMENDATIONS

Subcommittees were formed, and each subcommittee reviewed the available evidence applicable to its identified potential preventive measure(s) and assigned the evidence to one or more of the above categories. Each subcommittee then brought its analysis of the range of evidence before the full committee for deliberation. The committee then combined the burden of the condition and its potential impact on health and well-being with the array of available evidence and support to reach a consensus regarding

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA739                          JA-0000332

whether to recommend a specific preventive measure for that condition. As is true in most analytical processes in decision making, evidence and expert judgment are inextricably linked; thus, the expert judgments of the committee members also played a role in decision making.

In general, the preventive measures recommended by the committee for consideration of coverage (see Table S-1) met the following criteria:

- The condition to be prevented affects a broad population;
- The condition to be prevented has a large potential impact on health and well-being; and
- The quality and strength of the evidence is supportive.

Ultimately, the decision to develop a recommendation for a preventive service to be considered was made after a thoughtful review and debate of each of the subcommittee reports and when the committee found the evidence to be compelling.

**TABLE S-1** Summary of the Committee's Recommendations on Preventive Services for Women

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Screening for gestational diabetes | I | The evidence provided to support a recommendation for screening for gestational diabetes is based on current federal practice policy from the U.S. Indian Health Service, the U.S. Department of Veterans Affairs, as well as current practice and clinical professional guidelines such as those set forth by the American Academy of Family Physicians and the American Congress of Obstetricians and Gynecologists. | Recommendation 5.1 The committee recommends for consideration as a preventive service for women: screening for gestational diabetes in pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                          JA740                                          JA-0000333

Case 725-25755-WB Document 34-3 25 Page: 79 Filed: 12/12/2025 330

## TABLE S-1 Continued

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Human papillomavirus testing (HPV) | I | The evidence provided to support a recommendation to support testing for HPV is based on federal practice policy from the U.S. Department of Defense. Peer-reviewed studies demonstrate that improved testing technologies, particularly combined screening using both conventional cytology and high-risk HPV DNA testing, may significantly improve the rate of detection of cervical cancer precursors and facilitate the safe lengthening of the interval for screening. | Recommendation 5.2 The committee recommends for consideration as a preventive service for women: the addition of high-risk human papillomavirus DNA testing in addition to cytology testing in women with normal cytology results. Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| Counseling for sexually transmitted infections (STIs) | I | The evidence provided to support a recommendation related to STI counseling is based on federal goals from the Centers for Disease Control and Prevention and *Healthy People 2020*, as well as recommendations from the American Medical Association and the American College of Obstetricians and Gynecologists. | Recommendation 5.3 The committee recommends for consideration as a preventive service for women: annual counseling on sexually transmitted infections for sexually active women. |

*continued*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA741 JA-0000334

**TABLE S-1** Continued

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Counseling and screening for human immuno-deficiency virus (HIV) | C | The evidence provided to support a recommendation for expanding screening for HIV is based on federal goals from the Centers for Disease Control and Prevention, as well as clinical professional guidelines, such as those from the American College of Physicians, the Infectious Diseases Society of America, the American Medical Association, and the American College of Obstetricians and Gynecologists. | Recommendation 5.4 The committee recommends for consideration as a preventive service for women: counseling and screening for human immunodeficiency virus infection on an annual basis for sexually active women. |
| Contraceptive methods and counseling | Not Addressed | The evidence provided to support a recommendation related to unintended pregnancy is based on systematic evidence reviews and other peer-reviewed studies, which indicate that contraception and contraceptive counseling are effective at reducing unintended pregnancies. Current federal reimbursement policies provide coverage for contraception and contraceptive counseling, and most private insurers also cover contraception in their health plans. Numerous health professional associations recommend family planning services as part of preventive care for women. Furthermore, a reduction in unintended pregnancies has been identified as a specific goal in *Healthy People 2010* and *Healthy People 2020*. | Recommendation 5.5 The committee recommends for consideration as a preventive service for women: the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity. |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA742                                JA-0000335

Clinical Preventive Services for Women: Closing the Gaps

## TABLE S-1 Continued

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Breastfeeding support, supplies, and counseling | B | The evidence provided to support a recommendation regarding the inclusion of breastfeeding services is based on systematic evidence reviews, federal and international goals (such as the U.S. Surgeon General, Health Resources and Services Administration [HRSA], *Healthy People 2020*, World Health Organization and UNICEF) and clinical professional guidelines such as those set forth by the American Academy of Family Physicians, the American Academy of Pediatrics, and the American College of Obstetricians and Gynecologists. | Recommendation 5.6 The committee recommends for consideration as a preventive service for women: comprehensive lactation support and counseling and costs of renting breastfeeding equipment. A trained provider should provide counseling services to all pregnant women and to those in the postpartum period to ensure the successful initiation and duration of breastfeeding. (The ACA ensures that breastfeeding counseling is covered; however, the committee recognizes that interpretation of this varies.) |
| Screening and counseling for interpersonal and domestic violence | I | The evidence provided to support a recommendation related to increasing detection of and counseling for domestic violence and abuse is based on peer-review studies and federal and international policies, in addition to clinical professional guidelines from organizations, such as the American Medical Association and the American College of Obstetricians and Gynecologists. | Recommendation 5.7 The committee recommends for consideration as a preventive service for women: screening and counseling for interpersonal and domestic violence. Screening and counseling involve elicitation of information from women and adolescents about current and past violence and abuse in a culturally sensitive and supportive manner to address current health concerns about safety and other current or future health problems. |

*continued*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA743                                    JA-0000336

**TABLE S-1** Continued

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Well-woman visits | Not Addressed | The evidence provided to support a recommendation for including well-woman visits is based on federal and state policies (such as included in Medicaid, Medicare and the state of Massachusetts), clinical professional guidelines (such as those of the American Medical Association and the American Academy of Family Practitioners), and private health plan policies (such as those of Kaiser Permanente). | Recommendation 5.8 The committee recommends for consideration as a preventive service for women: at least one well-woman preventive care visit annually for adult women to obtain the recommended preventive services, including preconception and prenatal care. The committee also recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors. |

## UPDATING GUIDELINES

Developing and maintaining a comprehensive list of covered preventive services for women is not currently under the specific purview of any HHS entity. Thus, the committee believes that it will be necessary to develop structures, accountability, and processes to ensure that preventive services meeting evidence-based standards are considered in the context of the general approach taken to identify and update preventive services for women.

The committee recommends a process supported by guiding principles that separates evidence assessment and coverage decisions.

**Recommendation 6.1: The committee recommends that the process for updating the preventive services for women be:**

- Independent;
- Free of conflict of interest;
- Evidence-based;
- Gender-specific;
- Life-course oriented;
- Transparent;
- Informed by systematic surveillance and monitoring;

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19          JA744          JA-0000337

Clinical Preventive Services for Women: Closing the Gaps

- Cognizant of the need to integrate clinical preventive services with effective interventions in public health, the community, work place, and environment; and
- Appropriately resourced to meet its mandate.

Recommendation 6.2: The committee recommends that the Secretary of HHS establish a commission to recommend coverage of new preventive services for women to be covered under the ACA.

In carrying out its work the commission should:

- Be independent of bodies conducting evidence reviews, free of conflict of interest, and transparent;
- Set goals for prevention (it may use available HHS reports and products or commission its own at its discretion);
- Design and implement a coverage decision making methodology to consider information from evidence review bodies (and other clinical guideline bodies) and coverage factors (e.g., cost, cost-effectiveness, legal, ethical);
- Conduct horizon scanning or examine priority goals and/or persistent trends relating to women's health and well-being to identify new information on significant health conditions, preventive interventions, new evidence regarding efficacy, effectiveness, periodicity, and safety;
- Focus on the general population, but also search for conditions that may differentially affect women and high-risk subpopulations of women;
- Assign evidence review topics and set review priorities for the bodies reviewing clinical effectiveness;
- Set timetables and processes for updating clinical practice guidelines and coverage recommendations; and
- Submit its coverage recommendations to the Secretary of HHS.

Recommendation 6.3: The committee recommends that the Secretary of HHS identify existing bodies or appoint new ones as needed to review the evidence and develop clinical practice guidelines to be reviewed by a preventive services coverage commission.

Bringing clinical preventive services into rational alignment with the coverage for other health care services under the ACA will be a major task. The committee notes that many of the individual components for review of the evidence are already managed within HHS but currently lack effective coordination for the purposes outlined in the ACA and that some functions are entirely new. The structure might be effectively built over time by using

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA745 JA-0000338

Clinical Preventive Services for Women. Closing the Gaps

*14*                    CLINICAL PREVENTIVE SERVICES FOR WOMEN



FIGURE S-1 Suggested structure for updating preventive services under the ACA.

some current bodies and adding new ones as resources permit. The committee does not believe that it has enough information to recommend which unit in HHS should implement the recommendations. Figure S-1 illustrates the committee's suggested structure.

In view of the critical importance of community-based preventive services in achieving clinical aims, the committee encourages the Secretary to consider widening the scope of authority to include public health efforts to more comprehensively address prevention. It will be critical for a preventive services coverage commission to coordinate with the new and existing committees that are charged with overseeing other elements of the ACA.

Finally, the committee notes that it would make the most sense to consider preventive services for women, men, children, and adolescents in the same way. Thus, although the committee's recommendations address women's preventive services, a parallel approach could be equally useful for determining covered preventive services for men, children, and male adolescents.

## REFERENCES

AAP (American Academy of Pediatrics). 2008. *Bright Futures: Guidelines for health supervision of infants, children and adolescents*, 3rd ed. (J. F. Hagan, J. S. Shaw, and P. M. Duncan, eds.). Elk Grove Village, IL: American Academy of Pediatrics.
IOM (Institute of Medicine). 2011. *Leading health indicators for Healthy People 2020 Report*. Washington, DC: The National Academies Press.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA746                    JA-0000339

# 1

# Introduction

The passage of the Patient Protection and Affordable Care Act of 2010 (ACA) provides the United States with an opportunity to offer an unprecedented level of population health care coverage and dramatically reduce existing health disparities. The expansion of coverage to millions of uninsured Americans and the new standards for coverage of preventive services that are included in the ACA have the potential to increase the use of preventive health care services and screenings and in turn improve the health and well-being of individuals across the United States.

## SPECIFICS OF THE LEGISLATION

The approaches to prevention and wellness offered within the Act are broad based and range from new coverage requirements and incentives to expand workplace wellness activities to new investments. Among these are prohibition of the imposition of cost-sharing requirements for recommended preventive services (an overview of the Act is provided in Box 1-1, and the preventive services are listed and described in detail in Chapter 2), the requirement to link health insurance premiums to participation in health promotion programs, public health workforce development (the ACA authorizes new training and placement programs for public health workers), and community-based prevention activities.

This report focuses on the preventive services for women specified in Section 2713 of the Public Health Service Act. These services were added by the ACA and are detailed in the last bulleted item in Box 1-1 (HHS, 2010; *Federal Register*, 2010).

*15*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19     JA747     JA-0000340

Clinical Preventive Services for Women: Closing the Gaps

---

**BOX 1-1**
**Overview of Regulations in Section 2713**
**of the Public Health Service Act**

Section 2713 of the Public Health Service Act, Coverage of Preventive Health Services, which was added by the Affordable Care Act, and the interim final regulations (26 CFR 54.9815–2713T, 29 CFR 2590.715–2713, 45 CFR 147.130) require that group health plans and health insurance issuers offering health insurance coverage for groups or individuals provide benefits and prohibit the imposition of cost-sharing requirements for

- Medical devices or services that are evidence based and that have, in effect, a rating of Grade A or B in the current recommendations of the United States Preventive Services Task Force (USPSTF) for the individual involved.
- Immunizations for routine use in children, adolescents, and adults that have, in effect, a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention (CDC) for the individual involved. A recommended ACIP immunization is considered to be "in effect" after it has been adopted by the CDC director. A recommended immunization is considered to be for routine use if it appears on the immunization schedules of the Centers for Disease Control and Prevention.
- Preventive health care and screenings for infants, children, and adolescents informed by scientific evidence and provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).
- Preventive health care and screenings for women informed by scientific evidence and provided for in comprehensive guidelines supported by HRSA (not otherwise addressed by the recommendations of the USPSTF). The U.S. Department of Health and Human Services is developing these guidelines and expects to issue them no later than August 1, 2011.

The complete list of recommendations and guidelines that these interim final regulations are required to cover can be found at http://www.HealthCare.gov/center/regulations/prevention.html.

---

## ROLE OF PREVENTION IN ADDRESSING HEALTH AND WELL-BEING

Prevention is a well-recognized, effective tool in improving health and well-being and has been shown to be cost-effective in addressing many conditions early (Maciosek et al., 2010). Prevention goes beyond the use of disease prevention measures. For example, interventions to prevent injuries and binge drinking can increase positive health outcomes and reduce harm.

Historically, the many disparate components of the U.S. health care system have relied more on responding to acute problems and the urgent

Copyright National Academy of Sciences. All rights reserved.

needs of patients than on prevention. Although these functions are appropriate for acute and episodic health problems, a notable disparity occurs when this model of care is applied to the prevention and management of chronic conditions. The provision of preventive health care services is thus inherently different from the treatment of acute problems, but the U.S. health care system has fallen short in the provision of such services. Compared with a system that prevents avoidable conditions early, a system that responds to the acute health care needs of patients can be inefficient and costly, and a focus on response instead of prevention is a major barrier to the achievement of optimal health and well-being by Americans.

Nearly half of all deaths in the United States are caused by modifiable health behaviors (McGinnis and Foege, 1993). Maciosek and colleagues found that an increase in the use of clinical preventive services in the United States could result in the saving of more than 2 million life-years annually (Maciosek et al., 2010). Because of the numbers of diseases and conditions that are preventable, inclusion of support for prevention has become more routine during clinical health care visits (Sussman et al., 2006). When patients are systematically provided with the tools and information that they need to reduce their health risks, the likelihood that they will take steps to, for example, reduce substance use, stop using tobacco products, practice safe sex, eat healthful foods, and engage in physical activity increases (WHO, 2002). Therefore, physicians who routinely educate patients on risk-reducing behaviors may reduce the long-term burden and health care demands of chronic conditions. Stimulating the commitment and action of patients, families, and health care teams is also necessary to promote prevention and improve overall population well-being.

Evidence-based testing, diagnosis, and relief of symptoms are also hallmarks of contemporary health care, but these services are often underutilized. A well-cited reason for this underutilization is, for example, the high cost of prescription copayments, with the result being that patients do not fill their prescribed medications, resulting in the loss of lives and dollars (Shrank et al., 2010). Moreover, a recent study by The Commonwealth Fund that analyzed the responses of U.S. adults to a questionnaire indicated that U.S. adults were significantly less likely than adults in all other countries studied to have confidence in their ability to afford health care (Schoen et al., 2009).

About 51 million Americans lacked health insurance in 2009 (DeNavas-Walt et al., 2010). This is in addition to the millions of underinsured Americans who lack access to the appropriate screenings and services needed to detect and address preventable health conditions and diseases. Furthermore, health care workers have often failed to seize patient interactions as opportunities to promote health and well-being and to inform patients about disease prevention strategies (WHO, 2002). This failure to

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA749                    JA-0000342

inform patients has been found to be due to time constraints in the clinical setting, a lack of reimbursement for provision of these services, and a lack of consensus and provider knowledge about what services to prioritize for their patients. The ACA intends to mitigate these issues.

## WHY WOMEN?

The ACA has the potential to transform the way in which the U.S. health care system addresses women's health issues in many ways. It expands access to coverage to millions of uninsured women, ends discriminatory practices such as gender rating in the insurance market, eliminates exclusions for preexisting conditions, and improves women's access to affordable, necessary care. The Women's Health Amendment (*Federal Register*, 2010), which was introduced by Senator Barbara Mikulski and which was added to the ACA, expands on these improvements by requiring that all private health plans cover—with no cost-sharing requirements—a newly identified set of preventive health care services for women. Defining appropriate preventive services for women and ensuring that those services can be accessed without cost sharing are important strategies to improve women's health and well-being (Bernstein et al., 2010; Blustein, 1995).

Many reasons exist for expanding the list of preventive care and screening services for women beyond those included in the guidelines of the United States Preventive Services Task Force (USPSTF) Grade A and B guidelines, the Advisory Committee on Immunization Practices (ACIP), and Bright Futures (for adolescents) stipulated in the ACA (USPSTF, ACIP, and Bright Futures and their guidelines are described in detail in Chapter 2). Even though women have longer life expectancies than men, women suffer from chronic disease and disability at rates disproportionate to those of men, with consequences for their own health and the health of their families (Wood et al., 2010). Furthermore, mounting evidence suggests that women not only have different health care needs than men (because of reproductive differences) but also manifest different symptoms and responses to treatment modalities (IOM, 2010). Behavioral factors that are shown to contribute to morbidity and mortality in women, include smoking, eating habits, physical activity, sexual risk-taking, and alcohol use (IOM, 2010). Pregnancy and childbirth also carry risks to women's health including maternal mortality (CDC, 2008). Figure 1-1 illustrates preventable mortality in women.

Health outcomes occur because of multiple factors including biology, behavior, and the social, cultural, and environmental contexts in which women live. Smoking, eating habits, physical activity, and other health-related behaviors are shaped by cultural and social contexts, including factors associated with social disadvantage. The marked differences in

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                        JA750                          JA-0000343

Clinical Preventive Services for Women: Closing the Gaps



FIGURE 1-1 Deaths in women attributable to total effects of individual risk factors (in thousands), by disease.
ABBREVIATIONS: BMI, body-mass index; LDL, low-density lipoproteins; NCD, non-communicable disease; PUFA, polyunsaturated fatty acid; SFA, saturated fatty acid.
SOURCE: Danaei et al. (2009).

condition prevalence and mortality in women who experience social disadvantage are associated with minority race/ethnicity, lower education, low income, and differential exposure to stressors such as domestic violence. Such exposures are related to outcomes as varied as injury and trauma, depression, asthma, heart disease, human immunodeficiency virus (HIV) infection, and other sexually transmitted infections (Campbell et al., 2002; Coker et al., 2000; Ozer and Weinstein, 2004; Tjaden and Thoennes, 1998).

On average, women need to use more preventive care than men (Asch et al., 2006; HHS, 2001), owing to reproductive and gender-specific conditions, causing significant out-of-pocket expenditures for women (Bertakis et al., 2000; Kjerulff et al., 2007). This creates a particular challenge to women, who typically earn less than men and who disproportionately have low incomes. Indeed, women are consistently more likely than men to report a wide range of cost-related barriers to receiving or delaying medical tests and treatments and to filling prescriptions for themselves and their families (KFF, 2010). For example, women have been shown to be more likely than men to forgo preventive services such as cancer screenings and dental examinations because of cost (Rustgi et al., 2009). Studies have also shown that even moderate copayments for preventive services such as mammograms and Pap smears deter patients from receiving those services (Solanki et al., 2000; Trivedi et al., 2010). A 2010 Commonwealth Fund

Copyright National Academy of Sciences. All rights reserved.

survey found that 44 percent of adult women (compared with 35 percent of adult men) either reported that they had a problem paying medical bills or indicated that they were paying off medical debt over time, an increase from 38 percent in 2005 (Robertson and Collins, 2011). The same survey indicated that less than half of women are up to date with recommended preventive care screenings and services (Robertson and Collins, 2011).

Most women and men in the United States are covered by insurance obtained through the workplace. However, women with employer-based insurance are almost twice as likely as men to be covered as dependents, increasing their vulnerability to losing their insurance if they divorce, their partners lose their jobs, or they become widowed (KFF, 2010). Even though results of studies indicate that evidence-based preventive care services lower the burden of disease, are often cost-effective, increase the efficiency of health care spending, and contribute to the creation of a more productive and prosperous America, many financial barriers exist that prevent women from achieving health and well-being for themselves and their families.

## PREVENTIVE SERVICES FOR WOMEN

Preventive services for women are services that prevent conditions harmful to women's health and well-being. "Conditions" are considered diseases, disabilities, injuries, behaviors, and functional states that have direct implications for women's health and well-being. These conditions may be specific to women, such as gynecologic infections and unintended pregnancy; they may be more common or more serious in women, such as autoimmune diseases and depression; they may have distinct causes or manifestations in women, such as alcohol abuse, obesity, and interpersonal violence-related posttraumatic stress disorder; or they may have different outcomes in women or different treatments, such as cardiovascular disease and diabetes (IOM, 2010). To "prevent" is to forestall the onset of a condition; detect a condition at an early stage, when it is more treatable; or slow the progress of a condition that may worsen or result in additional harm. Preventive services may therefore include the provision of immunizations, screening tests, counseling and education, Food and Drug Administration-approved medications and devices, procedures, and over-the-counter medications and devices.

## COMMITTEE ON PREVENTIVE SERVICES FOR WOMEN

The Office of the Assistant Secretary for Planning and Evaluation (ASPE) of the U.S. Department of Health and Human Services (HHS) asked the Institute of Medicine to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA752                              JA-0000345

Clinical Preventive Services for Women  Closing the Gaps

evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for HHS to consider in order to fill those gaps (Box 1-2). A 16-member committee was selected to complete the statement of task.

In subsequent guidance to the committee, HHS sponsors at ASPE directed the committee to limit its focus to females between the ages of 10 and 65 years.

---

**BOX 1-2**
**Statement of Task to the Committee on**
**Preventive Services for Women**

The Institute of Medicine will convene an expert committee to review what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women. The committee will also provide guidance on a process for regularly updating the preventive screenings and services to be considered. In conducting its work, the committee will: conduct a series of meetings to examine existing prevention guidelines, obtain input from stakeholders, identify gaps that may exist in recommended preventive services for USPSTF Grade A and B preventive services guidelines for women and in Bright Futures and USPSTF Grade A and B guidelines for adolescents, and highlight specific services and screenings that could supplement currently recommended preventive services for women. Specifically, the committee will consider the following questions:

- What is the scope of preventive services for women not included in those graded A and B by the USPSTF?
- What additional screenings and preventive services have been shown to be effective for women? Consideration may be given to those services shown to be effective but not well utilized among women disproportionately affected by preventable chronic illnesses.
- What services and screenings are needed to fill gaps in recommended preventive services for women?
- What models could HHS and its agencies use to coordinate regular updates of the comprehensive guidelines for preventive services and screenings for women and adolescent girls?

The Office of the Assistant Secretary for Planning and Evaluation (ASPE) on behalf of the U.S. Department of Health and Human Services (HHS) has been charged to examine recommendations for women's preventive services. ASPE will use the information and recommendations from the committee's report to guide policy and program development related to provisions in the Affordable Care Act addressing preventive services for women.

---

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19    JA753    JA-0000346

Clinical Preventive Services for Women. Closing the Gaps

Case 7:25-cv-25740-WB Document 34-3 Page: 92 Filed: 12/12/2025 330

The ACA defines the current USPSTF recommendations regarding breast cancer screening, mammography, and breast cancer prevention to be "the most current other than those issued in or around November 2009." Thus, coverage for screening mammography is guided by the 2002 USPSTF guideline, which specifies that such screenings be performed every one to two years for women aged 40 years and older.

Furthermore, for consistency in approach with the other three guidelines used by the ACA and given the time limitations for this study, the committee was restricted from considering cost-effectiveness in its process for identifying gaps in current recommendations. Finally, despite the potential health and well-being benefits to some women, abortion services were considered to be outside of the project's scope, given the restrictions contained in the ACA.

The committee received clarification from ASPE that its work was not intended to duplicate the processes used by the USPSTF or Bright Futures. Thus, the committee interpreted this guidance to indicate that evidence ranging from systematic reviews of the evidence to other bodies of evidence could be considered. This appears to be consistent with the process that led to the current preventive services within the ACA.

The committee was also directed to limit its work to identifying clinical preventive service coverage gaps and not to make recommendations regarding community-based prevention activities.

The committee recognizes that many factors that shape the health and well-being of women fall outside the realm of clinical services. These include, for example, changes to the environment and the workplace to promote health, changes in women's concept of self-efficacy to promote health, and changes in women's self-empowerment to address their own health and wellness. These factors and determinants of health are elements of models such as the Whitehead and Dahlgren (1991) determinants-of-health model and encompass biological, behavioral, and social factors. Nevertheless, evaluation of these factors and determinants of health were outside of the committee's purview.

HHS will consider the committee's recommendations as it develops guidelines to support the delivery of effective preventive services for women. If they are enacted, the recommendations from this study, along with the other coverage requirements in the ACA, will provide a comprehensive package of clinical preventive services for women.

## COMMITTEE PROCESS

To meet its charge, the committee held three information-gathering meetings on preventive services for women and reviewed the relevant literature. Before the first meeting and throughout the committee's delibera-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA754                                JA-0000347

Clinical Preventive Services for Women: Closing the Gaps

tions, the committee gathered extensive information on numerous topics related to health and health care services for women, including chronic and mental health conditions, cancers, sexually transmitted infections, bone diseases, breastfeeding, interpersonal violence, unintended pregnancy, and a variety of behavioral health issues. During the public forums, representatives from women's health organizations, national health interest groups, health coverage providers, employer interest groups, and other experts presented statements to the committee on the latest status and developments in their respective fields (see Appendix B for the meeting agendas). Committee members questioned the speakers to address additional concerns that they did not cover in their statements. The committee also invited comments (both written and oral) from the general public and representatives from numerous organizations with interest in women's preventive services.

The committee first met in November 2010 and held its last meeting in May 2011. Within that time frame, it should be noted that the committee did not have adequate time or resources to conduct its own meta-analyses or comprehensive systematic review for each preventive service or for every special population group that may have different health needs or benefit from different preventive services, such as minority populations, disabled women, recent immigrants, lesbians, prisoners, and those employed in high-risk environments.

Box 1-3 details the committee's definition of preventive health services, which was used as a starting point for the study.

This definition of preventive health services is primarily derived from a blend of definitions from multiple health care organizations and agencies, including the USPSTF and the World Health Organization, with the text regarding well-being possessing the most original phrasing by the committee and stems from the statement of task. In addition, other key definitions are included in Box 1-4. These definitions were adapted from the Five Major Steps to Intervention of the Agency for Healthcare Research

---

**BOX 1-3**
**Definition of Preventive Health Services**

For the purposes of this study, the Committee on Preventive Services for Women defines preventive health services to be measures—including medications, procedures, devices, tests, education, and counseling—shown to improve well-being and/or decrease the likelihood or delay the onset of a targeted disease or condition.

---

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA755                                    JA-0000348

---

**BOX 1-4**
**Key Definitions: Preventive Interventions**

Preventive interventions come in several forms: screening, testing, counseling, immunization, preventive medication, and preventive treatment.

- **Screening** is best described as tests that assess the likelihood of the presence of a disease or condition in an apparently healthy individual. Screening methods use, for example, laboratory analyses and X rays and similar technologies. Screening also includes questions from clinicians. Screening may be targeted to people at increased risk because of age, gender, family or personal history, and other factors. Each screening tool is different in design and method, affecting the sensitivity (ability to correctly identify those with the disease), specificity (ability to correctly identify those without the disease), and positive and negative predictive values of the tool. Ideally, screening tests are rapid, simple, and safe. Screening is not a definitive diagnostic test, and a positive result on a screening test merely indicates that the screened individual has a higher likelihood of having the disease or condition for which the individual is being screened. Individuals who screen positive on such tests should have confirmatory diagnostic tests to ensure an accurate diagnosis.
- **Testing** refers to any process used to determine whether a condition is present or to assess the status of a condition. Testing may involve questioning patients (e.g., asking a patient about tobacco use), physical examination (e.g., mammography screening to detect potential breast cancers), or examining blood, body fluids, or tissues (e.g., to see if a cancer is present in a biopsy sample). Testing may also require the use of sophisticated technology, such as computed tomography and magnetic resonance imaging scans and other X rays, or invasive procedures, such as heart catheterization to detect blockage of coronary arteries. Tests may be used to

  1. Screen individuals who have risk factors but no indication of having the condition,
  2. Diagnose a disease or condition in individuals who have symptoms and signs but for whom a test will add certainty about the diagnosis, or
  3. Monitor the progress of an individual who is being treated or being considered for treatment, such as monitoring blood pressure over time.

- **Counseling** refers to a discussion between a clinician and patient about ways that changes in personal behavior can reduce the risk of illness or injury. The goal of counseling is for clinicians to educate patients about their health risks as well as to provide them with the skills, motivation, and knowledge that they need to address their risk behaviors (e.g., the "5 A" framework for tobacco cessation: ask, advise, assess, assist, arrange). A special kind of counseling, informed decision making, recognizes that different people will make different decisions, even though their situations may seem to be similar. Informed decision making is structured to give an individual all the information needed

---

Copyright National Academy of Sciences. All rights reserved.

---

**BOX 1-4 Continued**

to choose from among different clinical options, such as whether to undergo genetic testing.

- **Immunization** protects an individual from a specific communicable disease (e.g., hepatitis) by exposing the individual to an antigen or a trace amount of an inactivated disease-causing agent, spurring the development of natural immunity.
- **Preventive medications** are used to prevent the onset of a disease or a condition (e.g., aspirin therapy to prevent cardiovascular events).
- **Preventive treatment** involves a procedure intended to prevent the occurrence of a disease or condition or to prevent the progression of a disease from one stage to another. Preventive treatments usually refer to the use of prescription or nonprescription (over-the-counter) medications, but they may also involve the use of prescriptions for lifestyle changes (e.g., exercise or diet change) or other interventions. Some surgical procedures may be considered preventive treatment, such as removal of polyps in the colon identified during a screening colonoscopy to prevent their progression to cancer lesions.

SOURCES: AHRQ, 2011; NBGH, 2005.

---

and Quality (AHRQ, 2011) and the National Business Group on Health's *Purchaser's Guide to Clinical Preventive Services: Moving Science into Coverage* (NBGH, 2005).

The report that follows is organized into seven chapters, summarized below.

- In Chapter 2, the report reviews the three existing guidelines used in the ACA to determine coverage.
- Chapter 3 details the existing practices of national, state, and selected private health plans.
- In Chapter 4, the committee discusses its framework for identifying gaps in existing preventive services and its process for selecting how to fill those gaps.
- Chapter 5 provides a description of the gaps identified through the committee's work.
- The committee's recommendations for updating guidelines for preventive services are proposed in Chapter 6.
- Chapter 7 includes committee conclusions and summarizes committee recommendations while identifying the limitations under which the committee performed its work.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA757  JA-0000350

- Appendix A includes a review of the conditions that the committee considered as part of its deliberations. Although no new recommendations were developed, the committee made clarifying statements or suggestions of ways to use preventive services to address these conditions.
- Appendix B provides agendas for the committee's three public meetings.
- Appendix C includes condensed biographies of committee members.
- Appendix D contains one committee member's statement of dissent and a response from all other committee members.

## REFERENCES

AHRQ (Agency for Healthcare Research and Quality). 2011. *Five major steps to intervention (the "5A's")*. Rockville, MD: Agency for Healthcare Research and Quality, U.S. Public Health Service. http://www.ahrq.gov/clinic/tobacco/5steps.htm (accessed June 3, 2011).

Asch, S. M., E. A. Kerr, J. Keesey, J. L. Adams, C. M. Setodji, S. Malik, and E. A. McGlynn. 2006. Who is at greatest risk for receiving poor-quality health care? *New England Journal of Medicine* 354(11):1147–1156.

Bernstein, J. L., D. Chollet, and G. G. Peterson. 2010. *Issue brief: Encouraging appropriate use of preventive health services*. Princeton, NJ: Mathematica Policy Research.

Bertakis, K. D., R. Azari, L. J. Helms, E. J. Callahan, and J. A. Robbins. 2000. Gender differences in the utilization of health care services. *Journal of Family Practice* 49(2):147–152.

Blustein, J. 1995. Medicare coverage, supplemental insurance, and the use of mammography by older women. *New England Journal of Medicine* 332(17):1138–1143.

Campbell, J., A. S. Jones, J. Dienemann, J. Kub, J. Schollenberger, P. O'Campo, A. C. Gielen, and C. Wynne. 2002. Intimate partner violence and physical health consequences. *Archives of Internal Medicine* 162(10):1157–1163.

CDC (Centers for Disease Control and Prevention). 2008. *Safe motherhood: Promoting health for women before, during, and after pregnancy 2008*. Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, Coordinating Center for Health Promotion.

Coker, A. L., P. H. Smith, L. Bethea, M. R. King, and R. E. McKeown. 2000. Physical health consequences of physical and psychological intimate partner violence. *Archives of Family Medicine* 9(5):451–457.

Danaei, G., E. L. Ding, D. Mozaffarian, B. Taylor, J. Rehm, C. J. Murray, and M. Ezzati. 2009. The preventable causes of death in the United States: Comparative risk assessment of dietary, lifestyle, and metabolic risk factors. *PLoS Med* 6(4):e1000058.

DeNavas-Walt, C., B. D. Proctor, and J. C. Smith. 2010. *Income, poverty, and health insurance coverage in the United States: 2009*. Washington, DC: Bureau of the Census.

*Federal Register*. 2010. Interim final rules for group health plans and health insurance issuers relating to coverage of preventive services under the Patient Protection and Affordable Care Act. *Federal Register* 75(137):41726–41756.

HHS (U.S. Department of Health and Human Services). 2001. Utilization of ambulatory medical care by women: United States, 1997–98. In *Vital and health statistics*. Atlanta, GA: National Center for Health Statistics, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services.

HHS. 2010. *Preventive regulations*. http://www.healthcare.gov/center/regulations/prevention/regs.html (accessed April 13, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA758                              JA-0000351

IOM (Institute of Medicine). 2010. *Women's health research: Progress, pitfalls, and promise.* Washington, DC: The National Academies Press.

KFF (Henry J. Kaiser Family Foundation). 2010. Impact of health reform on women's access to coverage and care. *Focus on Health Reform.* Washington, DC: Henry J. Kaiser Family Foundation. http://www.kff.org/womenshealth/upload/7987.pdf. (accessed April 13, 2011).

Kjerulff, K. H., K. D. Frick, J. A. Rhoades, and C. S. Hollenbeak. 2007. The cost of being a woman—a national study of health care utilization and expenditures for female-specific conditions. *Womens Health Issues* 17(1):13–21.

Maciosek, M. V., A. B. Coffield, T. J. Flottemesch, N. M. Edwards, and L. I. Solberg. 2010. Greater use of preventive services in U.S. health care could save lives at little or no cost. *Health Affairs* 29(9):1656–1660.

McGinnis, J. M., and W. H. Foege. 1993. Actual causes of death in the United States. *Journal of the American Medical Association* 270(18):2207–2212.

NBGH (National Business Group on Health). 2005. *A purchaser's guide to clinical preventive services: moving science into coverage.* Washington, DC: National Business Group on Health.

Ozer, E. J., and R. S. Weinstein. 2004. Urban adolescents' exposure to community violence: The role of support, school safety, and social constraints in a school-based sample of boys and girls. *Journal of Clinical Child and Adolescent Psychology* 33(3):463–476.

Robertson, R., and S. R. Collins. 2011. Women at risk: Why increasing numbers of women are failing to get the health care they need and how the Affordable Care Act will help. In *Realizing Health Reform's Potential.* New York: The Commonwealth Fund.

Rustgi, S. D., M. M. Doty, and S. R. Collins. 2009. *Women at risk: Why many women are forgoing needed health care.* New York: The Commonwealth Fund.

Schoen, C., R. Osborn, M. M. Doty, D. Squires, J. Peugh, and S. Applebaum. 2009. A survey of primary care physicians in eleven countries, 2009: Perspectives on care, costs, and experiences. *Health Affairs* 28(6):W1171–W1183.

Shrank, W. H., N. K. Choudhry, M. A. Fischer, J. Avorn, M. Powell, S. Schneeweiss, J. N. Liberman, T. Dollear, T. A. Brennan, and M. A. Brookhart. 2010. The epidemiology of prescriptions abandoned at the pharmacy. *Annals of Internal Medicine* 153(10):633–640.

Solanki, G., H. H. Schauffler, and L. S. Miller. 2000. The direct and indirect effects of cost-sharing on the use of preventive services. *Health Services Research* 34(6):1331–1350.

Sussman, A. L., R. L. Williams, R. Leverence, P. W. Gloyd, Jr., and B. F. Crabtree. 2006. The art and complexity of primary care clinicians' preventive counseling decisions: Obesity as a case study. *Annals of Family Medicine* 4(4):327–333.

Tjaden, P. G., and N. Thoennes. 1998. *Prevalence, incidence, and consequences of violence against women: Findings from the national violence against women survey, research in brief.* Washington, DC: US Department of Justice, Office of Justice Programs, National Institute of Justice.

Trivedi, A. N., H. Moloo, and V. Mor. 2010. Increased ambulatory care copayments and hospitalizations among the elderly. *New England Journal of Medicine* 362(4):320–328.

Whitehead, M., and G. Dahlgren. 1991. What can be done about inequalities in health? *Lancet* 338(8774):1059–1063.

WHO (World Health Organization). 2002. *Integrating prevention into health care.* Geneva, Switzerland: World Health Organization. http://www.who.int/mediacentre/factsheets/fs172/en/index.html. (accessed April 13, 2011).

Wood, S. F., A. Dor, R. E. Gee, A. Harms, R. Maurery, and S. Rosenbaum. 2010. *Women's health and health reform: The economic burden of disease in women.* Washington, DC: The Jacob's Institute of Women's Health, The George Washington University School of Public Health and Health Services.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                        JA759                                        JA-0000352

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA760

JA-0000353

# 2

# Preventive Services Defined by the ACA

The Patient Protection and Affordable Care Act of 2010 (ACA) defined covered preventive health services for all patient populations to be those with Grade A and B recommendations made by the United States Preventive Services Task Force (USPSTF or the Task Force); for adolescents, the Bright Futures recommendations from the American Academy of Pediatrics (AAP) in cooperation with the U.S. Department of Health and Human Services (HHS), and for all patient populations, recommendations from the Advisory Committee on Immunization Practices (ACIP). The USPSTF, AAP, and ACIP are national authorities on health with defined processes for generating clinical recommendations. A summary of the methods that these entities use to arrive at recommendations and the actual recommendations follows.

## UNITED STATES PREVENTIVE SERVICES TASK FORCE

The Task Force is an independent panel composed of nonfederal primary care clinicians, health behavior specialists, and methodologists. Its mission is twofold: (1) assess the benefits and harms of preventive services for people asymptomatic for the target condition on the basis of age, gender, and risk factors for disease; and (2) make recommendations about which preventive services should be incorporated into routine primary care practice. The USPSTF is now entering its 27th year of existence, and the medical community considers its methodologies and resulting recommendations to be the "gold standard" for evidence-based clinical practice in preventive services (USPSTF, 2008b).

29

Copyright National Academy of Sciences. All rights reserved.

**TABLE 2-1** USPSTF Grade Definitions

| Grade | Definition | Suggestions for Practice |
|---|---|---|
| A | The USPSTF recommends the service. There is high certainty that the net benefit is substantial. | Offer or provide this service. |
| B | The USPSTF recommends the service. There is high certainty that the net benefit is moderate or there is moderate degree of certainty that the net benefit is moderate to substantial. | Offer or provide this service. |
| C | The USPSTF recommends against routinely providing the service. There may be considerations that support providing the service in an individual patient. There is at least moderate certainty that the net benefit is small. | Offer or provide this service only if other considerations support the offering or providing the service in an individual patient. |
| D | The USPSTF recommends against the service. There is moderate or high certainty that the service has no net benefit or that the harms outweigh the benefits. | Discourage the use of this service. |
| I Statement | The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of the service. Evidence is lacking, of poor quality, or conflicting; and the balance of benefits and harms cannot be determined. | Read the clinical considerations section of USPSTF Recommendation Statement. If the service is offered, patients should understand the uncertainty about the balance of benefits and harms. |

SOURCE: USPSTF, 2008a.

The charge of the Task Force is limited in scope: "its recommendations address primary or secondary preventive services targeting conditions that represent a substantial burden in the United States and that are provided in primary care settings or available through primary care referral" (USPSTF, 2008b). These recommendations are intended to inform primary care providers as they care for individual patients in primary care practice. They are not intended to determine which preventive health care services health insurers should be required to cover. The methodology used in developing Task Force clinical recommendations does not take into consideration many nonclinical issues related to health care coverage (USPSTF, 2011). USPSTF uses a grade system, which is described in Table 2-1.

## USPSTF Methodology

Task Force recommendations and their accompanying evidence reports are produced through the collaborative efforts of the USPSTF, the Agency

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA762                    JA-0000355

Case 1:25-cv-04540-DLC   Document 34-3   Page: 101   Date Filed: 12/24/2025

for Healthcare Research and Quality (AHRQ), Evidence-based Practice Centers (EPCs), and partner organizations. AHRQ provides methodological, technical, scientific, and administrative support to the Task Force. EPCs aid the USPSTF by developing technical reports, evidence summaries and reports, and systematic reviews that target new topics under consideration by the Task Force or that update ones addressed previously. The USPSTF uses systematic evidence reviews produced primarily by the Oregon EPC (under contract by AHRQ) and occasionally uses reviews and other analyses conducted by other groups, depending on the topic under consideration. Partner organizations consist of federal partners (examples include the Centers for Disease Control and Prevention [CDC], the U.S. Department of Defense, Centers for Medicare and Medicaid Services, and the Food and Drug Administration [FDA]) and organizations representing primary care professionals (examples include the American Academy of Family Physicians [AAFP], the American College of Obstetricians and Gynecologists [ACOG], the American Medical Association [AMA], and AAP). They contribute expertise to the evaluation process and comment on preliminary drafts of Task Force recommendation statements and the accompanying evidence reports. A step-by-step overview of the process of recommendation development, from topic selection to recommendation dissemination, follows. The average amount of time required to complete this process is 21 months (USPSTF, 2011).

### 1. Topic Selection—USPSTF

EPCs, Task Force members, organizations, and individuals can nominate topics through a publicly accessible website, as well as through solicitations to partner organizations and the *Federal Register*. On the basis of these submissions, the Task Force Topic Prioritization Work Group periodically updates a prioritized list of topics to be addressed either for the first time or for updating during the year.

### 2. Work Plan Development—AHRQ, EPCs, USPSTF

Prioritized topics are appointed to "topic teams," consisting of USPSTF "leads," AHRQ staff (including a Medical Officer), and EPC members. The topic team develops preliminary work plans from the work assignment that AHRQ has issued to the team. The work plan includes the analytic framework, key questions, the literature search strategy, and a timeline for recommendation dissemination.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA763                    JA-0000356

Clinical Preventive Services for Women. Closing the Gaps

Case 1:25-cv-02540-DLC   Document 64-3   Page: 102   Date Filed: 12/12/2025

*32* *CLINICAL PREVENTIVE SERVICES FOR WOMEN*

### 3. External Work Plan Peer Review—Outside Experts

Work plans for new topics are sent to a limited number of outside experts in appropriate fields for their comments and review.

### 4. Approval of Work Plan—USPSTF

The topic team presents work plans for new topics to the entire Task Force. The Task Force then evaluates and requests any revisions to the work plan that it deems necessary. The work plan is then edited by the EPC in accordance with the Task Force's requests and is finalized.

### 5. Draft Evidence Report—EPC

The EPC next conducts a systematic evidence review addressing the key questions posed by the Task Force in the work plan, and generates a draft evidence report.

### 6. Peer-Review of Draft Evidence Report—USPSTF, Content Area Experts, Federal Partners

Draft evidence reports are sent to Task Force leads, content area experts, federal partners, and other partner organizations for review and comment.

### 7. Development of Draft Recommendation Statement—USPSTF, AHRQ

Concomitant with the draft evidence report review process, Task Force leads collaborate with the AHRQ Medical Officer to discuss and draft a preliminary recommendation statement.

### 8. Vote on Draft Recommendation Statement—USPSTF

The Task Force is presented with the peer-reviewed evidence report findings by the EPC and the preliminary recommendation statement by the Task Force leads at one of three annual meetings that include the USPSTF, AHRQ, the EPC, and representatives from the partner organizations. The entire Task Force, including the leads, discusses the evidence and debates the language of the recommendation statement until a consensus is reached and the statement passes a vote. The revised recommendation statement is then sent to Task Force leads for completion and editing prior to external review.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA764                                    JA-0000357

Clinical Preventive Services for Women  Closing the Gaps

### 9. Final Evidence Report—EPC

The EPC revises the evidence report in response to comments from the federal partners, content area experts, and Task Force leads. The EPC then sends a summary of the comments and how the comments were addressed to AHRQ. AHRQ staff then review, approve, and finalize the revised evidence report. The EPC then prepares the finalized evidence report for submission to a peer-reviewed journal for publication. The final technical report is also made available on the AHRQ website.

### 10. Review of Draft Recommendation Statement—Federal and Primary Care Professional Organization Partners and the Public

The newly revised and approved recommendation statement is sent to relevant federal and primary care professional organization partners for review and comment. The statement is also posted on the AHRQ website for one month for public comment.

### 11. Approval of Final Recommendation Statement—USPSTF

Task Force leads edit the recommendation statement on the basis of the comments received from the federal and primary care professional organization partners and the public after discussion with the AHRQ Medical Officer.

### 12. Release of Recommendation Statement and Evidence Report—Peer-Reviewed Journals

Recommendation statements and the accompanying EPC evidence report-derived manuscript are often published simultaneously in the professional journals *Annals of Internal Medicine* (adult topics) or *Pediatrics* (child/adolescent topics) and must go through the respective journal's peer-review process before publication. They are occasionally published in other journals (USPSTF, 2008b).

Preventive services relevant to women that have a grade of A or B from the USPSTF are listed in Table 2-2.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA765                    JA-0000358

Clinical Preventive Services for Women. Closing the Gaps

**TABLE 2-2** USPSTF Preventive Services Relevant to Women That Have a Grade of A or B

| Topic | Description | Grade |
|---|---|---|
| Alcohol misuse counseling | The USPSTF recommends screening and behavioral counseling interventions to reduce alcohol misuse by adults, including pregnant women, in primary care settings. | B |
| Anemia screening: pregnant women | The USPSTF recommends routine screening for iron deficiency anemia in asymptomatic pregnant women. | B |
| Aspirin to prevent cardiovascular disease (CVD): women | The USPSTF recommends the use of aspirin for women age 55 to 79 years when the potential benefit of a reduction in ischemic strokes outweighs the potential harm of an increase in gastrointestinal hemorrhage. | A |
| Bacteriuria screening: pregnant women | The USPSTF recommends screening for asymptomatic bacteriuria with urine culture for pregnant women at 12 to 16 weeks' gestation or at the first prenatal visit, if later. | A |
| Blood pressure screening | The USPSTF recommends screening for high blood pressure in adults aged 18 and older. | A |
| *BRCA* screening, counseling about | The USPSTF recommends that women whose family history is associated with an increased risk for deleterious mutations in *BRCA1* or *BRCA2* genes be referred for genetic counseling and evaluation for *BRCA* testing. | B |
| Breast cancer preventive medication | The USPSTF recommends that clinicians discuss chemoprevention with women at high risk for breast cancer and at low risk for adverse effects of chemoprevention. Clinicians should inform patients of the potential benefits and harms of chemoprevention. | B |
| Breast cancer screening[a] | The USPSTF recommends screening mammography for women, with or without clinical breast examination, every 1–2 years for women aged 40 and older. | B |
| Breastfeeding counseling | The USPSTF recommends interventions during pregnancy and after birth to promote and support breastfeeding. | B |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA766 JA-0000359

TABLE 2-2 Continued

| Topic | Description | Grade |
|-------|-------------|-------|
| Cervical cancer screening | The USPSTF strongly recommends screening for cervical cancer in women who have been sexually active and have a cervix. | A |
| Chlamydial infection screening: non-pregnant women | The USPSTF recommends screening for chlamydial infection for all sexually active non-pregnant young women aged 24 and younger and for older non-pregnant women who are at increased risk. | A |
| Chlamydial infection screening: pregnant women | The USPSTF recommends screening for chlamydial infection for all pregnant women aged 24 and younger and for older pregnant women who are at increased risk. | B |
| Cholesterol abnormalities screening: women 45 and older | The USPSTF strongly recommends screening women aged 45 and older for lipid disorders if they are at increased risk for coronary heart disease. | A |
| Cholesterol abnormalities screening: women younger than 45 | The USPSTF recommends screening women aged 20 to 45 for lipid disorders if they are at increased risk for coronary heart disease. | B |
| Colorectal cancer screening | The USPSTF recommends screening for colorectal cancer using fecal occult blood testing, sigmoidoscopy, or colonoscopy, in adults, beginning at age 50 years and continuing until age 75 years. The risks and benefits of these screening methods vary. | A |
| Depression screening: adolescents | The USPSTF recommends screening of adolescents (12–18 years of age) for major depressive disorder when systems are in place to ensure accurate diagnosis, psychotherapy (cognitive-behavioral or interpersonal), and follow-up. | B |
| Depression screening: adults | The USPSTF recommends screening adults for depression when staff-assisted depression care supports are in place to assure accurate diagnosis, effective treatment, and follow-up. | B |
| Diabetes screening | The USPSTF recommends screening for type 2 diabetes in asymptomatic adults with sustained blood pressure (either treated or untreated) greater than 135/80 mm Hg. | B |

*continued*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA767                          JA-0000360

36                    *CLINICAL PREVENTIVE SERVICES FOR WOMEN*

**TABLE 2-2** Continued

| Topic | Description | Grade |
|---|---|---|
| Folic acid supplementation | The USPSTF recommends that all women planning or capable of pregnancy take a daily supplement containing 0.4 to 0.8 mg (400 to 800 μg) of folic acid. | A |
| Gonorrhea screening: women | The USPSTF recommends that clinicians screen all sexually active women, including those who are pregnant, for gonorrhea infection if they are at increased risk for infection (that is, if they are young or have other individual or population risk factors). | B |
| Healthy diet counseling | The USPSTF recommends intensive behavioral dietary counseling for adult patients with hyperlipidemia and other known risk factors for cardiovascular and diet-related chronic disease. Intensive counseling can be delivered by primary care clinicians or by referral to other specialists, such as nutritionists or dietitians. | B |
| Hepatitis B screening: pregnant women | The USPSTF strongly recommends screening for hepatitis B virus infection in pregnant women at their first prenatal visit. | A |
| Human immunodeficiency virus (HIV) screening | The USPSTF strongly recommends that clinicians screen for HIV all adolescents and adults at increased risk for HIV infection. | A |
| Obesity screening and counseling: adults | The USPSTF recommends that clinicians screen all adult patients for obesity and offer intensive counseling and behavioral interventions to promote sustained weight loss for obese adults. | B |
| Osteoporosis screening: women | The USPSTF recommends screening for osteoporosis in women aged 65 years or older and in younger women whose fracture risk is equal to or greater than that of a 65-year-old white woman who has no additional risk factors. | B |
| Rh incompatibility screening: first pregnancy visit | The USPSTF strongly recommends Rh (D) blood typing and antibody testing for all pregnant women during their first visit for pregnancy-related care. | A |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                         JA768                         JA-0000361

Clinical Preventive Services for Women  Closing the Gaps

**TABLE 2-2** Continued

| Topic | Description | Grade |
|---|---|---|
| Rh incompatibility screening: 24–28 weeks gestation | The USPSTF recommends repeated Rh (D) antibody testing for all unsensitized Rh (D)-negative women at 24–28 weeks' gestation, unless the biological father is known to be Rh (D)-negative. | B |
| Sexually transmitted infections (STIs) counseling | The USPSTF recommends high-intensity behavioral counseling to prevent STIs for all sexually active adolescents and for adults at increased risk for STIs. | B |
| Tobacco use counseling and interventions: non-pregnant adults | The USPSTF recommends that clinicians ask all adults about tobacco use and provide tobacco cessation interventions for those who use tobacco products. | A |
| Tobacco use counseling: pregnant women | The USPSTF recommends that clinicians ask all pregnant women about tobacco use and provide augmented, pregnancy-tailored counseling to those who smoke. | A |
| Syphilis screening: non-pregnant persons | The USPSTF strongly recommends that clinicians screen persons at increased risk for syphilis infection. | A |
| Syphilis screening: pregnant women | The USPSTF recommends that clinicians screen all pregnant women for syphilis infection. | A |

[a] HHS, in implementing ACA under the standard that it sets out in revised Section 2713(a)(5) of the Public Health Service Act, uses the 2002 recommendation on breast cancer screening of the USPSTF.
SOURCE: USPSTF, 2010b.

## BRIGHT FUTURES—AMERICAN ACADEMY OF PEDIATRICS

The HHS Health Resources and Services Administration's Maternal and Child Health Bureau established the Bright Futures project in 1990 with the mission to "promote and improve the health, education, and well-being of infants, children, adolescents, families, and communities" (AAP, 2008). It is a "set of principles, strategies, and tools that are theory based and system oriented that can be used to improve the health and well-being of all children through culturally appropriate interventions that address the

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA769                    JA-0000362

current and emerging health promotion needs at the family, clinical practice, community, health system, and policy levels" (AAP, 2008). The most recent report, published in 2008, was developed through the collaborative efforts of four multidisciplinary panels consisting of experts in health during infancy, early childhood, middle childhood, and adolescence and was then reviewed by more than 1,000 educators, public health and health care professionals, child health advocates, and parents.

### Bright Futures Methodology

The Bright Futures Steering Committee used three approaches to develop its guidance and recommendations and described these approaches as follows:

1. "Multidisciplinary Expert Panels were convened to write recommendations for Bright Futures visit priorities, the physical examination, anticipatory guidance, immunizations, and universal and selective screening topics for each age and stage of development. In carrying out this task, the Expert Panels were charged with examining the evidence for each recommendation, and evidence was an important consideration in the guidance they provided. However, lack of evidence was sometimes problematic for the physical examination (the elements of which can be considered screening interventions) and for counseling interventions. For these components, the Expert Panels relied on an indirect approach buttressed by their expertise and clinical experience" (AAP, 2008).

2. A Bright Futures Evidence Panel, composed of consultants who are experts in finding and evaluating evidence from clinical studies, was convened to examine studies and systematic evidence reviews and to develop a method of informing readers about the strength of the evidence.

   The Evidence Panel conducted literature searches for key questions using the MEDLINE® database of the National Library of Medicine. Key themes were searched in the Medical Subject Headings (MeSH) database to determine the most appropriate search terms. Searches were limited to clinical trials, meta-analyses, and randomized controlled trials. Other limits included English language and designations for age, when appropriate. Standardized terms were used for counseling (i.e., counseling, primary prevention, health promotion, health education, and patient education) and for screening (i.e., mass screening and risk assessment). The Evidence Panel also used the systematic

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA770                          JA-0000363

Clinical Preventive Services for Women  Closing the Gaps

evidence reviews performed for the USPSTF and the Cochrane Collaboration [the publisher of *Cochrane Reviews* of primary research in human health care and health policy]. This approach was by no means exhaustive, but it did provide an assessment of the most relevant literature. (AAP, 2008)

3. "Throughout the Guidelines development process, the Project Advisory Committee and Expert Panels consulted with individuals and organizations with expertise and experience in a wide range of topic areas. The entire Guidelines document also underwent public review twice in 2004 and once in 2006. More than 1,000 reviewers, representing national organizations concerned with infant, child, and adolescent health and welfare, provided nearly 3,500 comments. The contributions of these reviewers provided an opportunity to refine the guidelines and strengthen the scientific base for the guidance provided" (AAP, 2008).

Bright Futures describes its guidelines as "evidence informed rather than fully evidence driven" (AAP, 2008) and takes a broader view of prevention that is less focused on specific conditions and more on general health guidance (e.g., aggregating services into health supervision visits and extensive anticipatory guidance). Like the USPSTF, Bright Futures does not directly comment on insurance coverage, but unlike the USPSTF, Bright Futures does not have categories regarding services comparable to "C" or "I" grades that do not definitively recommend for or against a particular service. Bright Futures intends to leave no gaps in its recommendations, supplementing the evidence where needed with experience and expert opinion so that clinical guidance is always provided. Figures 2-1, 2-2, and 2-3 present the Bright Futures recommendations for adolescents and outline the preventive services that are covered for adolescent women in the ACA. In addition to the information in the tables shown in Figures 2-1 to 2-3, Bright Futures also provides extensive anticipatory guidance on a range of health matters in the context of discussing health issues with adolescents. These measures do not provide action steps and are not suitable for summary in a structured format.

Copyright National Academy of Sciences. All rights reserved.
Exhibit 19                               JA771                               JA-0000364

## Physical Examination

**A complete physical examination is included as part of every health supervision visit.**

When performing a physical examination, the health care professional's attention is directed to the following components of the exam that are important for 11- to 14-year-olds:

- ■ **Measure:**
  - Blood pressure
- ■ **Measure and plot:**
  - Height
  - Weight
- ■ **Calculate and plot:**
  - BMI
- ■ **Skin**
  - Inspect for acne, acanthosis nigricans, atypical nevi, tattoos, piercings, and signs of abuse or self-inflicted injury
- ■ **Spine**
  - Examine back

- ■ **Breast**
  **Female**
  - Assess sexual maturity rating
  **Male**
  - Observe for gynecomastia
- ■ **Genitalia**
  **Female**
  - Perform visual inspection for sexual maturity rating and observation for signs of STIs (eg, warts, vesicles, vaginal discharge)
  - Perform pelvic exam, if clinically warranted, based on sexual activity (eg, for Pap smear within 3 years of onset of sexual activity) and/or specific problems (eg, pubertal aberrancy, abnormal bleeding, abdominal or pelvic pain)
  **Male**
  - Perform visual inspection for sexual maturity rating and observations for signs of STIs (ie, warts, vesicles)
  - Examine testicles for hydrocele, hernias, varicocele, or masses

## Screening

| UNIVERSAL SCREENING | ACTION | |
|---|---|---|
| Vision (once in early adolescence) | Snellen test | |
| **SELECTIVE SCREENING** | **RISK ASSESSMENT\*** | **ACTION IF RA +** |
| Vision at other ages | + on risk screening questions | Snellen test |
| Hearing | + on risk screening questions | Audiometry |
| Anemia | + on risk screening questions | Hemoglobin or hematocrit |
| Tuberculosis | + on risk screening questions | Tuberculin skin test |
| Dyslipidemia | + on risk screening questions and not previously screened with normal results | Lipid screen |
| STIs | Sexually active | Screen for chlamydia and gonorrhea, use tests appropriate to the patient population and clinical setting |
| | Sexually active and + on risk questions | Syphilis blood test<br>HIV† |
| Pregnancy | Sexually active without contraception, late menses, or amenorrhea | Urine hCG |
| Cervical dysplasia | Sexually active, within 3 years of onset of sexual activity | Pap smear, conventional slide or liquid-based |
| Alcohol or drug use | + on risk screening questions | Administer alcohol and drug screening tool |

\*See Rationale and Evidence chapter for the criteria on which risk screening questions are based

†The CDC has recently recommended universal voluntary HIV screening for all sexually active people, beginning at age 13. At the time of publication, the AAP and other groups had not yet commented on the CDC recommendation, nor recommended screening criteria or techniques. The health care professional's attention is drawn to the voluntary nature of screening and that the CDC allows an opt-out in communities where the HIV rate is <0.1%. The management of positives and false positives must be considered before testing.

FIGURE 2-1 Adolescence 11–14 year visits.
ABBREVIATIONS: AAP = American Academy of Pediatrics; BMI = body mass index; CDC = Centers for Disease Control and Prevention; hCG = human chorionic gonadotropin; HIV = human immunodeficiency virus; RA = risk assessment; STI = sexually transmitted infection.
SOURCE: AAP, 2008. Used with permission of the American Academy of Pediatrics, Bright Futures—Guidelines for Health Supervision of Infants, Children, and Adolescents, Third Edition, American Academy of Pediatrics, 2008.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA772                          JA-0000365

## Physical Examination

**A complete physical examination is included as part of every health supervision visit.**

When performing a physical examination, the health care professional's attention is directed to the following components of the exam that are important for 15- to 17-year-olds:

- **Measure:**
  - Blood pressure
- **Measure and plot:**
  - Height
  - Weight
- **Calculate and plot:**
  - BMI
- **Skin**
  - Inspect for acne, acanthosis nigricans, atypical nevi, tattoos, piercings, and signs of abuse or self-inflicted injury
- **Spine**
  - Examine back

- **Breast**
  - **Female**
    - Assess sexual maturity rating
  - **Male**
    - Observe for gynecomastia
- **Genitalia**
  - **Female**
    - Perform visual inspection for sexual maturity rating and observation for signs of STIs (eg, warts, vesicles, vaginal discharge)
    - Perform pelvic exam, if clinically warranted, based on sexual activity (eg, for Pap smear within 3 years of onset of sexual activity) and/or specific problems (eg, pubertal aberrancy, abnormal bleeding, abdominal or pelvic pain)
  - **Male**
    - Perform visual inspection for sexual maturity rating and observations for signs of STIs (ie, warts, vesicles)
    - Examine testicles for hydrocele, hernias, varicocele, or masses

## Screening

| UNIVERSAL SCREENING | ACTION | |
|---|---|---|
| Vision (once in middle adolescence) | Snellen test | |
| **SELECTIVE SCREENING** | **RISK ASSESSMENT\*** | **ACTION IF RA +** |
| Vision at other ages | + on risk screening questions | Snellen test |
| Hearing | + on risk screening questions | Audiometry |
| Anemia | + on risk screening questions | Hemoglobin or hematocrit |
| Tuberculosis | + on risk screening questions | Tuberculin skin test |
| Dyslipidemia | + on risk screening questions and not previously screened with normal results | Lipid screen |
| STIs | Sexually active | Screen for chlamydia and gonorrhea, use tests appropriate to the patient population and clinical setting |
| | Sexually active and + on risk questions | Syphilis blood test HIV† |
| Pregnancy | Sexually active without contraception, late menses, or amenorrhea | Urine hCG |
| Cervical dysplasia | Sexually active, within 3 years of onset of sexual activity | Pap smear, conventional slide or liquid-based |
| Alcohol or drug use | + on risk screening questions | Administer alcohol and drug screening tool |

\*See Rationale and Evidence chapter for the criteria on which risk screening questions are based.

† The CDC has recently recommended universal voluntary HIV screening for all sexually active people, beginning at age 13. At the time of publication, the AAP and other groups had not yet commented on the CDC recommendation, nor recommended screening criteria or techniques. The health care professional's attention is drawn to the voluntary nature of screening and that the CDC allows an opt out in communities where the HIV rate is <0.1%. The management of positives and false positives must be considered before testing.

**FIGURE 2-2** Adolescence 15–17 year visits.

ABBREVIATIONS: AAP = American Academy of Pediatrics; BMI = body mass index; CDC = Centers for Disease Control and Prevention; hCG = human chorionic gonadotropin; HIV = human immunodeficiency virus; RA = risk assessment; STI = sexually transmitted infection.

SOURCE: AAP, 2008. Used with permission of the American Academy of Pediatrics, Bright Futures—Guidelines for Health Supervision of Infants, Children, and Adolescents, Third Edition, American Academy of Pediatrics, 2008.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA773                          JA-0000366

*42*                                                    CLINICAL PREVENTIVE SERVICES FOR WOMEN

## Physical Examination

**A complete physical examination is included as part of every health supervision visit.**

When performing a physical examination, the health care professional's attention is directed to the following components of the exam that are important for 18- to 21-year-olds:

■ **Measure:**
  • Blood pressure
■ **Measure and plot:**
  • Height
  • Weight
■ **Calculate and plot:**
  • BMI
■ **Skin**
  • Inspect for acne, acanthosis nigricans, atypical nevi, tattoos, piercings, and signs of abuse or self-inflicted injury

■ **Breast**
**Female**
  • Clinical Breast Examination is considered routine after age 20.
■ **Genitalia**
**Female**
  • Inspect for signs of STIs (eg, warts, vesicles, vaginal discharge)
  • Perform pelvic exam by age 21 or if clinically warranted, based on sexual activity (eg, for Pap smear within 3 years of onset of sexual activity) and/or specific problems (eg. pubertal aberrancy, abnormal bleeding, abdominal or pelvic pain)
**Male**
  • Perform visual inspection for sexual maturity rating and observations for signs of STIs (ie, warts, vesicles)
  • Examine testicles for hydrocele, hernias, varicocele, or masses

## Screening

| UNIVERSAL SCREENING | ACTION | |
|---|---|---|
| Vision (once in late adolescence) | Snellen test | |
| Dyslipidemia (once in late adolescence) | A fasting lipoprotein profile (total cholesterol, LDL choesterol, high density lipoprotein (HCL). cholesterol. and triglyceride). If the testing opportunity is non-fasting, only total cholesterol and HDL cholesterol will be usable. | |
| **SELECTIVE SCREENING** | **RISK ASSESSMENT\*** | **ACTION IF RA +** |
| Vision at other ages | + on risk screening questions | Snellen test |
| Hearing | + on risk screening questions | Audiometry |
| Anemia | + on risk screening questions | Hemoglobin or hematocrit |
| Tuberculosis | + on risk screening questions | Tuberculin skin test |
| Dyslipidemia | If not age 20, + on risk screening questions and not previously screeened with normal resaults | Lipid screen |
| STIs | Sexually active | Screen  for chlamydia and gonorrhea; use tests appropriate to the patient population and clinical setting |
|  | Sexually active and + on risk questions | Syphilis blood test HIV† |
| Pregnancy | Sexually active without contraception, late or absent menses, or heavy or irregular bleeding | Urine hCG |
| Cervical dysplasia | Sexually active, within 3 years of onset of sexual activity | Pap smear, conventional slide or liquid-based |
| Alcohol or drug use | + on risk screening questions | Administer alcohol and drug screening tool |

\*See Rationale and Evidence chapter for the criteria on which risk screening questions are based

†The CDC has recently recommended universal voluntary HIV screening for all sexually active people, beginning at age 13. At the time of publication, the AAP and other groups had not yet commented on the CDC recommendation  nor recommended screening criteria or technique. The health care professional's attention is drawn to the voluntary nature of screening and that the CDC allows an opt out in communities where the HIV rate is <0.1%. The management of positives and false positives must be considered before testing

FIGURE 2-3 Adolescence 18–21 year visits.
ABBREVIATIONS: AAP = American Academy of Pediatrics; BMI = body mass index; CDC = Centers for Disease Control and Prevention; hCG = human chorionic gonadotropin; HDL = high-density lipoprotein; HIV = human immunodeficiency virus; LDL = low-density lipoprotein; RA = risk assessment; STI = sexually transmitted infection.
SOURCE: AAP, 2008.  Used with permission of the American Academy of Pediatrics, Bright Futures—Guidelines for Health Supervision of Infants, Children, and Adolescents, Third Edition, American Academy of Pediatrics, 2008.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA774                                         JA-0000367

Clinical Preventive Services for Women: Closing the Gaps

## ADVISORY COMMITTEE ON IMMUNIZATION PRACTICES

ACIP is the sole federal government entity that provides written recommendations for delivering vaccines to children and adults in the general population. It provides guidance and recommendations to HHS and the CDC on matters regarding the approval, administration, and safety of vaccines. Its goal is to reduce the prevalence of vaccine-preventable diseases in the United States and bolster the safe use of vaccines and other related biological products. ACIP is comprised of 15 voting immunization-related experts and 34 other representatives from liaison organizations and federal agencies that oversee national immunizations programs (CDC, 2011a).

### ACIP Methodology

The ACIP General Recommendations Work Group (GRWG) revises the *General Recommendations on Immunization* every 3 to 5 years. Relevant topics are those identified by ACIP to be topics that relate to all vaccines, including timing and spacing of doses, vaccine administration procedures, and vaccine storage and handling. New topics are often added when ACIP decides that previous ACIP statements on general issues, such as combination vaccines, adolescent vaccination, and adult vaccination, should be revised and combined with the *General Recommendations on Immunization* (CDC, 2011b).

The recommendations in the 2011 GRWG report are based not only on available scientific evidence but also on expertise that comes directly from a diverse group of health care providers and public health officials. GRWG includes "professionals from academic medicine (pediatrics, family practice, and pharmacy); international (Canada), federal, and state public health professionals; and a member of the nongovernmental Immunization Action Coalition" (CDC, 2011b).

ACIP committee work groups comprising an ACIP member chair, a CDC subject-matter expert, and at least two ACIP members meet during the year to perform analyses of vaccine-related data and generate potential policy recommendations to be presented to the committee. These analyses include review of the available scientific literature on the immunizing agent, morbidity and mortality from the disease in the U.S. population, recommendation statements issued by other professional organizations, results of clinical trials with the immunizing agent, cost-effectiveness projections, and the feasibility of incorporating the vaccine into preexisting U.S. immunization programs. Draft recommendations are then subjected to further review by the FDA, CDC, ACIP members, external expert consultants, and other relevant federal agencies. Work group findings and potential recommendations are presented to ACIP at one of three annual open meetings and

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19    JA775    JA-0000368

are deliberated upon by the committee. Public comments are heard at the meetings and taken into consideration during the deliberations. A majority vote is then conducted to pass a recommendation that includes guidance regarding the route of administration and dosing intervals, contraindications and precautions, and target groups for immunization. Recommendations are published on the ACIP website and in *Morbidity and Mortality Weekly Report* (Smith et al., 2009).

ACIP functions in a unique position because its recommendations are relevant to the general population and to some quite specific subpopulations, but its recommendations focus on efficacy and safety for intended populations. Some of its recommendations are not intended for general clinical use (e.g., recommendations for international travelers), are not intended for the entire population (e.g., recommendations for high-risk groups such as health care workers), or require specific guidance in footnotes for special circumstances (e.g., allergies and immunosuppression).

Table 2-3 lists the FDA-Licensed Combination Vaccines, and Table 2-4 lists ACIP-recommended vaccines that are covered without cost sharing as part of the ACA.

**TABLE 2-3** FDA-Licensed Combination Vaccines

| Vaccine | Trade Name (Year Licensed) | Age Range | Routinely Recommended Ages |
|---------|---------------------------|-----------|----------------------------|
| HepA-HepB | Twinrix (2001) | ≥18 years | Three doses on a schedule of 0, 1, and 6 months |
| MMRV | ProQuad (2005) | 12 months– 12 years | Two doses, the first at 12–15 months, the second at 4–6 years |

ABBREVIATIONS: HepA = hepatitis A; HepB = hepatitis B; MMRV = measles, mumps, rubella, and varicella.
SOURCES: AAP, 2009; CDC, 2011.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA776 JA-0000369

**TABLE 2-4** Recommended and Minimum Ages and Intervals Between Vaccine Doses

| Vaccine and Dose Number | Recommended Age for This Dose | Minimum Age for This Dose | Recommended Interval to Next Dose | Minimum Interval to Next Dose |
|---|---|---|---|---|
| LAIV (intranasal)[d] | 2–49 years | 2 years | 1 month | 4 weeks |
| MCV4-1[b] | 11–12 years | 2 years | 5 years | 8 weeks |
| MCV4-2 | 16 years | 11 years (+8 weeks) | | |
| HPV-1[c] | 11–12 years | 9 years | 2 months | 4 weeks |
| HPV-2 | 11–12 years (+2 months) | 9 years (+4 weeks) | 4 months | 12 weeks |
| HPV-3[d] | 11–12 years (+6 months) | 9 years (+24 weeks) | | |
| Td | 11–12 years | 7 years | 10 years | 5 years |
| Tdap | 11–12 years | 7 years | | |

NOTE: Combination vaccines are available. Use of licensed combination vaccines is generally preferred to separate injections of their equivalent component vaccines. When combination vaccines, the minimum age for administration is the oldest age for any of the individual components; the minimum interval between doses is equal to the greatest interval of any of the individual components. Information on traveler vaccines, including typhoid, Japanese encephalitis, and yellow fever, is available at http://www.cdc.gov/travel. Information on other vaccines that are licensed in the United States but not distributed, including anthrax and smallpox, is available at http://www.bt.cdc.gov.

ABBREVIATIONS: LAIV = live, attenuated influenza vaccine; MCV4 = quadrivalent meningo-coccal conjugate vaccine; HPV-1 to HPV-3 = human papillomavirus doses 1 to 3, respectively; Td = adult tetanus and diphtheria toxoids; Tdap = tetanus and reduced diphtheria toxoids and acellular pertussis vaccine (for adolescents and adults).

[d] One dose of influenza vaccine per season is recommended for most persons. Children aged < 9 years who are receiving influenza vaccine for the first time or who received only one dose the previous season (if it was their first vaccination season) should receive two doses this season.

[b] Revaccination with meningococcal vaccine is recommended for previously vaccinated persons who remain at high risk for meningococcal disease (CDC, 2009).

[c] Bivalent HPV vaccine is approved for females aged 10–25 years. Quadrivalent HPV vaccine is approved for males and females aged 9–26 years.

[d] The minimum age for HPV-3 is based on the baseline minimum age for the first dose (i.e., 108 months) and the minimum interval of 24 weeks between the first and third doses. Dose 3 need not be repeated if it is administered at least 16 weeks after the first dose.

SOURCES: AAP, 2009; CDC, 2011b.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA777                          JA-0000370

Clinical Preventive Services for Women. Closing the Gaps

Case 1:25-cv-02540-DLC Document 64-3 25Page: 1 Filed 09/20/File:Page 12/12/2025330

## REFERENCES

AAP (American Academy of Pediatrics). 2008. *Bright Futures: Guidelines for health supervision of infants, children and adolescents,* 3rd ed. (J. F. Hagan, J. S. Shaw, and P. M. Duncan, eds.). Elk Grove Village, IL: American Academy of Pediatrics.

AAP. 2009. Passive immunization. In *Red Book: 2009 Report of the Committee on Infectious Diseases,* 28th ed. (L. K. Pickering, C. J. Baker, D. W. Kimberlin, and S. S. Long, eds.). Elk Grove Village, IL: American Academy of Pediatrics.

CDC (Centers for Disease Control and Prevention). 2009. Updated recommendation from the Advisory Committee on Immunization Practices (ACIP) for revaccination of persons at prolonged increased risk for meningococcal disease. *MMWR Morbidity and Mortality Weekly Report* 58(37):1042–1043.

CDC. 2011a. *Advisory Committee on Immunization Practices.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/vaccines/recs/acip/#about (accessed June 2, 2011).

CDC. 2011b. General recommendations on immunization—recommendations of the Advisory Committee on Immunization Practices (ACIP). *MMWR Recommendations and Reports: Morbidity and Mortality Weekly Report* 60(2):1–64.

Smith, J. C., D. E. Snider, and L. K. Pickering. 2009. Immunization policy development in the United States: The role of the Advisory Committee on Immunization Practices. *Annals of Internal Medicine* 150(1):W45–W49.

USPSTF (United States Preventive Services Task Force). 2008a. *Grade definitions.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/grades.htm (accessed May 31, 2011).

USPSTF. 2008b. *U.S. Preventive Services Task Force procedure manual.* Rockville, MD: Agency for Healthcare Research and Quality. http://www.uspreventiveservicestaskforce.org/uspstf08/methods/procmanual.htm (accessed June 2, 2011).

USPSTF. 2010b. *USPSTF A and B recommendations.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm (accessed June 2, 2011).

USPSTF. 2011. *Methods and processes.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/methods.htm (accessed May 21, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA778                          JA-0000371

Case 1:25-cv-04540-DLC   Document 34-3   Page: 117   Date Filed: 12/12/2025

# 3

# Existing Coverage Practices of National, State, and Private Health Plans

Before passage of the Patient Protection and Affordable Care Act of 2010 (ACA), little standardization of the preventive services covered by both private and public payers existed. Historically, in the private sector, the extent of coverage for the preventive services that individuals receive and their exposure to out-of-pocket spending for these services have largely depended on the type of plan in which they are enrolled and the degree of cost sharing (including copayments and deductibles) that is part of the plan design. The passage of the ACA changed this variability by expanding federal requirements for plan benefits and limits on cost sharing for certain preventive services for private plans.

On September 23, 2010, the ACA preventive services requirements, detailed in Section 2713, went into effect. This section of the law adds to and amends the Public Health Services Act and the Employee Retirement Income Security Act and, as such, has jurisdiction over plans that are sold on the individual, small-group, and large-group markets by insurers as well as self-insured plans that are funded by employers.

These new rules require that private plans cover all United States Preventive Services Task Force (USPSTF) Grade A and B recommendations, all vaccinations recommended by the Advisory Committee for Immunization Practices (ACIP) of the Centers for Disease Control and Prevention, and Bright Futures recommendations for children from the American Academy of Pediatrics (see Chapter 2) and the preventive services for women that will be informed by the deliberations of this Institute of Medicine committee and subsequently identified by the U.S. Department of Health and Human Services (HHS).

*47*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA779
JA-0000372

Therefore, for the first time in U.S. history, federal rules stipulate the preventive services that private plans must cover and prohibit out-of-pocket payments for individuals who obtain these covered services from in-network providers (*Federal Register*, 2010a; HHS, 2010). Only new plans or those plans that change are affected by these new requirements.[1] Private plans that do not change their benefits or cost-sharing requirements are considered to be grandfathered and are not initially subject to the new requirements for the preventive services that must be covered.

HHS estimates that 78 million people enrolled in group plans and approximately 10 million people with individual policies will be subject to the prevention provisions in the ACA (HHS, 2010). These provisions will also apply to the plans that will be offered to consumers under the new state health insurance exchanges, although these exchanges and plans will not become operational until 2014.

This chapter reviews the policies and practices of private plans and publicly sponsored programs regarding the coverage before and after the enactment of the ACA of preventive services important to women. It describes the federal and state rules that are in effect today as well as identifies the types of plans or programs that will be affected by the new rules outlined in Section 2713 of the ACA.

## RULES GOVERNING COVERAGE REQUIREMENTS BEFORE AND AFTER THE ACA

The coverage of preventive care provided under the individual and group markets and through self-funded employer health plans has been highly variable, differing by employer, insurer, and plan type. The Federal Employee Retirement and Income Security Act of 1974 regulates the coverage offered by self-insured or self-funded employer health plans as well as health insurance plans. An estimated 59 percent of covered workers are enrolled in self-insured group health plans (Claxton et al., 2010).

### Federal Rules and Coverage Requirements

With few exceptions, federal rules do not specify what benefits plans must cover. The exceptions are that all self-funded employer health plans and health insurance issuers must offer coverage for a 48-hour hospital stay

---

[1] Plans will lose their "grandfather" status if, compared to March 23, 2010, they significantly cut or reduce benefits, raise co-insurance charges or significantly raise co-payment charges or deductibles, significantly reduce employer contributions, tighten annual limits on what insurers will pay, or change insurers. Plans that make any of these changes can be deemed to lose their grandfather status and will be required to follow the ACA preventive benefit coverage rules (*Federal Register*, 2010b).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA780                    JA-0000373

after a vaginal delivery or a 96-hour stay after a delivery by cesarean section if they cover maternity care; mental health parity, which affects mental health care benefits and benefits for the treatment of substance use disorders; and benefits for breast reconstruction after a mastectomy and treatment of surgical complications for health plans that cover mastectomies.

In addition, the Pregnancy Discrimination Act of 1978 (P.L. 95-555), which amended Title VII of the Civil Rights Act of 1964, requires that employers with 15 or more employees treat women who are pregnant or affected by pregnancy-related conditions in the same manner that employers treat other workers or applicants. It requires that "any health insurance provided by an employer must cover expenses for pregnancy-related conditions on the same basis as costs for other medical conditions." An employer is "not required to provide health insurance for expenses arising from abortion, except where the life of the mother is endangered" (95th U.S. Congress, 1978). These payments must be paid for exactly like other medical conditions; and no additional, increased, or larger deductible can be imposed. Moreover, employers must provide the same level of health benefits for spouses of male employees as they do for spouses of female employees (95th U.S. Congress, 1978).

In 2000, a ruling by Equal Employment Opportunity Commission (EEOC) found that employers that offered plans that provided coverage for drugs, devices, and preventive care but that did not include coverage for preventive contraceptives to be in violation of the Pregnancy Discrimination Act (EEOC, 2000). Although this ruling was upheld by a federal district court in the state of Washington (*Erickson v. Bartell Drug Co.*), the U.S. Court of Appeals for the 8th Circuit (No. 06-1706, 2007 WL 763842) ruled in a 2-to-1 decision that an employer may exclude contraception coverage from its health plan without violating the Pregnancy Discrimination Act because the employer also failed to cover condoms and vasectomies that affect men (2007). Despite this ruling, the EEOC finding still stands, and the vast majority of health plans cover contraceptives, and in 2002, more than 89 percent of insurance plans covered contraceptive methods (Sonfield et al., 2004). A more recent (2010) survey of employers found that 85 percent of large employers and 62 percent of small employers covered Food and Drug Administration-approved contraceptives (Claxton et al., 2010).

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 permits individuals enrolled in high-deductible health plans to make tax-favored contributions to health savings accounts (HSAs). These plans may provide preventive care benefits without a deductible or with a separate deductible below the minimum plan deductible. In 2010, 93 percent of high-deductible health plans with HSAs covered preventive services without having to meet the deductible (Claxton et al., 2010). In 2004, the Internal Revenue Service (IRS) issued a bulletin that identified certain

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA781 JA-0000374

50                              CLINICAL PREVENTIVE SERVICES FOR WOMEN

**TABLE 3-1** IRS-Defined Preventive Care Screening Services

| Preventive Care Screening Service | |
| --- | --- |
| Cancer | Metabolic, Nutritional, and Endocrine |
| *Breast cancer (e.g., mammogram)* |     Conditions |
| *Cervical cancer (e.g., Pap smear)* | *Anemia, iron deficiency* |
| Colorectal cancer | Dental and periodontal disease |
| Prostate cancer (e.g., prostate-specific | Diabetes mellitus |
|     antigen test) | Obesity in adults |
| Skin cancer | Thyroid disease |
| Oral cancer | Musculoskeletal Disorders |
| *Ovarian cancer* | *Osteoporosis* |
| Testicular cancer | Obstetric and Gynecologic Conditions |
| Thyroid cancer | *Bacterial vaginosis in pregnancy* |
| Heart and Vascular Diseases | *Gestational diabetes mellitus* |
| Abdominal aortic aneurysm | *Home uterine activity monitoring* |
| Carotid artery stenosis | *Neural tube defects* |
| Coronary heart disease | *Preeclampsia* |
| Hemoglobinopathies | *Rh incompatibility* |
| Hypertension | *Rubella* |
| Lipid disorders | *Ultrasonography in pregnancy* |
| Infectious Diseases | Pediatric Conditions |
| *Bacteriuria* | Child developmental delay |
| *Chlamydial infection* | Congenital hypothyroidism |
| *Gonorrhea* | *Lead levels in childhood and pregnancy* |
| *Hepatitis B virus infection* | Phenylketonuria |
| *Hepatitis C* | Scoliosis, adolescent idiopathic |
| *Human immunodeficiency virus (HIV)* | Vision and hearing disorders |
|     *infection* | Glaucoma |
| *Syphilis* | Hearing impairment in older adults |
| Tuberculosis | Newborn hearing |
| Mental Health Conditions and Substance Abuse | |
| Dementia | |
| *Depression* | |
| Drug abuse | |
| Problem drinking | |
| *Suicide risk* | |
| *Family violence* | |

NOTE: Services that are important to women as well as those that disproportionately or dif-
ferentially affect women are indicated by boldface italic type.
SOURCE: IRS, 2004.

preventive services that are allowed to be included in these plans, which
include, but are not limited to, the services listed in Table 3-1.

### State Coverage Requirements

The business of insurance is regulated at the state level, and state re-
quirements for the preventive services that health plans must cover vary

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                       JA782                       JA-0000375

*EXISTING COVERAGE PRACTICES OF HEALTH PLANS* 51



FIGURE 3-1 State-mandated preventive benefits of importance to adult women, 2010.
SOURCE: BlueCross BlueShield Association, 2010.

considerably (Figure 3-1).[2] In recent years, state lawmakers have enacted a wide range of mandates for different types of health care services. The reach of these benefit mandates is limited, however, as they apply only to insurance plans that are sold to employers and individuals in the state and do not apply to self-funded employer health plans, which are plans that provide coverage for the majority of the employer's workers and their dependents.

All states, with the exception of Utah, require plans to cover mammography screening, 29 states require coverage of cervical cancer, and 29 require coverage of contraception (Bluecross Blueshield Association, 2010). Far fewer states require bone density screening (16 states), maternity care (17 states in the case of the individual market), and screening for chlamydia infection (3 states). It also worth noting that some states require coverage for preventive services that do not yet exist, such as an AIDS vaccine and ovarian cancer screening.

---

[2] Many different organizations collect this information, including the BlueCross BlueShield Association, the National Association of Health Commissioners, the Council for Affordable Health Insurance, and the National Conference of State Legislatures. Figure 3-1 is presented to show the variability in coverage by state rather than an exact count of the laws that states currently have in place.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA783                                JA-0000376

Case 1:25-cv-02454-JDB  Document 34-3  Filed 09/30/25  Page 122 of 610

How these mandates are structured also differ substantially. For example, they can be legislated to affect the benefits that different types of insurance markets (small- or large-group plans or the individual market) must cover, what they must offer to sell (but not necessarily cover), the type of plan that is included (e.g., health maintenance organizations [HMOs]), the target populations for the service, and the periodicity of the service. Many, but not all, of these benefits are now covered under the new ACA preventive coverage rules without any cost sharing. Nevertheless, the ACA preventive care rules do not supersede state requirements. This means that for states that have coverage mandates for preventive services that are broader than the list of services required to be covered by Section 2713 of the ACA, insurance plans that sell policies in those states must still offer coverage for those services, in addition to the services required by the ACA.[3]

Although many states have coverage mandates or specific benefit requirements, 12 states have also required plans that sell on the individual and small-group markets to offer standardized benefit packages (KFF, 2009b). These standardized policies generally include a class of services and outline cost-sharing requirements. They were intended to facilitate the comparison of different plans for consumers and to make it harder for insurers to design benefit packages that are attractive to healthy individuals and avoid drawing those with health problems. In most states, insurers must offer the standardized plans but can also sell other types of plans (KFF, 2009b).

The benefit package that the commonwealth of Massachusetts requires, however, is a notable exception and does provide detailed coverage information. In 2006, the commonwealth of Massachusetts passed Chapter 58, the health reform law. This law combines the concept of individual responsibility through an individual mandate, which requires that individuals purchase health insurance that meets minimum standards developed by the state (creditable coverage). To ensure affordability, however, government subsidies are provided. This law created multiple public and private health insurance pathways and initiated a system of shared responsibility among the stakeholders in health care provision. Chapter 58 also created a health insurance exchange, known as the Commonwealth Connector, to make health coverage available to residents and to regulate the insurance products offered through the exchange to ensure that individuals have minimum creditable coverage. The reforms enacted by the commonwealth of Massachusetts served as a model for the ACA.

---

[3] When the federal subsidies for individuals to purchase coverage through the insurance exchanges become available, the costs of any benefits mandated by the states that exceed those specified in federal law will have to be funded by the states for those receiving subsidies. Given this new cost, it is possible that some states will eliminate these mandated benefits, at least in the individual market.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA784                          JA-0000377

Although the overall rate of insurance coverage in Massachusetts before passage of the legislation exceeded 90 percent, since enactment, numerous subgroups of women have experienced substantial gains in coverage. In particularly, ethnic and racial minorities, low-income women, women without dependent children, and nonelderly women aged 50 to 64 years have experienced substantial gains in coverage, such that coverage is nearly universal for these subgroups of women (Long et al., 2010).

The preventive services benefits for women that plans must offer to be considered to have minimum creditable coverage are based on the recommendations for adults issued by the Massachusetts Health Quality Partners (MHQP) and other nationally recognized guidelines (Hyams and Cohen, 2010; MHQP, 2007). MHQP recommendations closely mirror those of the USPSTF but also include the coverage of preventive services such as counseling for preconception and menopause management and treatment for menopause.

According to the ACA, the new coverage rules for private plans in Massachusetts will be subject to the requirements of Section 2713, although the coverage may be broader than that included in the state law.[4] In addition, the Chapter 58 rules state that plans must cover at least three preventive visits without applying the costs for those visits to the deductible (but copayments may exist) and require that contraceptive services and supplies be covered as preventive services without cost sharing.

## Private Insurance Coverage Practices

Detailed information on the coverage and benefits provided by private insurance plans and employers and on the scope of the preventive benefits that they cover is often proprietary and difficult to obtain. This information is enormously complex, and details about the coverage provided differ considerably from plan to plan and employer to employer. Although periodic surveys of employers of the health care benefits that they cover and reviews of documents that summarize the plans are performed, most surveys and reviews look at classes of services rather than the actual specific benefits provided.

In addition, research on this topic suffers from other limitations. The research is often conducted by researchers who are either funded by or who are employees of health plans or employer groups; the response rates for these surveys are usually low; and the respondents, who are typically employers, may not know the specific details about benefit coverage included

---

[4] Grandfathered plans, including those sold through the Commonwealth Connector, will not be subject to the new requirements unless and until they lose the grandfathered status discussed earlier.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA785                                    JA-0000378

in the plans that they have purchased. The following section highlights some of this research to provide some insights into the level of coverage and services provided by the private insurance sector but does not provide information on how plans and employers address cost sharing, copayments, and coinsurance for these specific services.

### Employer-Based Health Plans

The Bureau of Labor Statistics' ongoing National Compensation Survey (DOL, 2011) surveyed approximately 3,900 employers with the aim of providing comprehensive data on employment-based health care benefits. A supplemental analysis of approximately 3,200 plan documents, including summary descriptions of the plans and other short summaries or comparison charts, was conducted to look at the extent of coverage of certain health benefits. When coverage or exclusion of a specific benefit by a plan is specifically mentioned, it is noted. For many of the benefits reviewed, coverage for particular services was mentioned one way or the other, but it is possible that the services would be covered for the workers.

The data on preventive care are limited but indicate that 56 percent of participants were in plans that identified coverage for adult immunizations and inoculations, 80 percent were in plans that covered adult physical examinations, and 77 percent were in plans that covered well-baby care. Gynecological examinations and services, such as pelvic examinations and Pap smears were covered for 60 percent of participants of employer-based health plans, usually under headings such as "well-woman exams." However, these services were often subject to plan or separate limits, and copayments were commonly required. Plans often limited the number of examinations per year and the dollar amount on the services covered during examinations.

Sterilization was not mentioned in the coverage documents for the employer-based health plans of more than 70 percent of participants. However, when it was mentioned, approximately 90 percent of participants were in plans that cover sterilization. Coverage for maternity care was also not uniformly identified by the plans. Sixty-six percent of workers were in plans that explicitly covered maternity care, and only 6 percent of the workers in those plans had these benefits in full (virtually all of the remaining third of workers were in plans that did not specifically mention coverage for maternity care).

In 2001, Mercer Human Resource Consulting Inc. conducted the National Survey of Employer-Sponsored Health Plans, which had a special supplement on preventive care. More than 2,000 employers providing benefits to their employees completed the survey. The response rate was 21 percent. The survey uncovered significant differences in the preventive services covered. These differences were related to employer size, incentives, and extent of coverage (Bondi et al., 2006). Because only one-fifth of

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA786                    JA-0000379

employers offered their workers a choice of more than one plan, examination of the rates of coverage of clinical preventive services in the employer's primary plans provides the best summary of the ranges of rates of coverage for different services: 75 percent covered physical examinations, 74 percent covered gynecological examinations, 57 percent covered cholesterol screenings, and only 37 percent covered screening for *Chlamydia* infection.

For women, primary employer-based health plans covered breast cancer and cervical cancer screening at rates of 80 and 79 percent, respectively. Lifestyle modification services were covered at much lower rates, with nutritional counseling covered by 17 percent of primary plans, weight loss and management counseling was covered by 15 percent, physical activity counseling was covered by 13 percent, alcohol problem prevention was covered by 18 percent, and any kind of tobacco cessation service was covered by 20 percent.

Approximately half of all large employers required that their plans cover clinical preventive services, whereas only 17 percent of small employers had the same requirement. Small employers were also less likely to offer coverage of clinical preventive services and lifestyle modification services, although the differences were not large.

Large employers were far more likely than small employers to offer financial incentives to employees to use clinical preventive services. However, small employers offered flexible scheduling or time off to access preventive services much more often than large employers did. Lifestyle modification services, such as physical activity counseling and weight loss management, were covered the least often, regardless of employer size.

The National Business Group on Health conducted a comprehensive analysis and synthesis of a wide range of clinical preventive services and their impacts on disease prevention and early detection of health conditions and disease according to both health and economic measures (NBGH, 2009). On the basis of their analyses, they compiled a purchaser's guide that recommends 46 clinical preventive services that should be included in employer health benefit plans. Benefits directly relevant to women are summarized in Box 3-1.

*Individual Insurance Plans*

As with the small- and large-group insurance markets, the individual insurance market appears to have considerable variability in coverage of preventive services. In a 2006–2007 survey of individual insurance plans conducted by American's Health Insurance Plans, the trade association for health insurers in the United States (AHIP, 2007), coverage levels were found to vary considerably by type of plan, with all HMO plans responding to the survey indicating that they covered physical examinations for adults, annual visits to an obstetrician-gynecologist, and cancer screening; but far

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                JA787                JA-0000380

**BOX 3-1**
**National Business Group on Health's Recommended**
**Benefits Directly Relevant to Women**

*Breast Cancer:* Breast cancer screening should include clinical breast examina-
tion and an annual mammography (for women from ages 40 to 80 years and for
younger women, if it was deemed medically indicated), assessment of a woman's
genetic risk for breast cancer and testing for mutations in the *BRCA* breast
cancer-associated gene for women at high risk, counseling, and preventive medi-
cation and treatment (i.e., tamoxifen) for women with a high risk of breast cancer
or surgical removal of the breasts or ovaries.

*Cervical Cancer:* The purchaser's guide recommends coverage of conventional
Pap smears. Plans are to use their own discretion on coverage for newer screen-
ing methods, including liquid-based, thin-layer preparations, computer-assisted
screening, and tests for human papillomavirus infection for women beginning at
age 21 years or within 3 years of onset of sexual activity through age 65 years and
beyond for high-risk women. The guidelines recommends coverage for screening
services at least once every three years and not more than once a year.

*Contraceptive Use:* The guidelines recommend coverage for counseling on con-
traceptive use at least once a year and when emergency contraception is provided
for all beneficiaries aged 13 to 55 years. They also recommend coverage of the
full range of Food and Drug Administration-approved contraceptives, including all
hormonal medications, contraceptive devices, and voluntary sterilization.

*Osteoporosis:* The guidelines recommend screening and treatment for osteopo-
rosis starting at age 65 years for women with a normal risk. High-risk women are
eligible at age 60 years or earlier, if it is medically indicated, and not more than
once every two calendar years. The screening tools recommended for coverage
include the Osteoporosis Risk Assessment Instrument and the Simple Calculated
Osteoporosis Risk Estimation tool, dual-energy X-ray absorptiometry, peripheral
dual-energy X-ray absorptiometry, peripheral quantitative computed tomography,
radiographic absorptiometry, single-energy absorptiometry, and ultrasound. All
Food and Drug Administration-approved treatments for osteoporosis are covered
for beneficiaries age 60 years and older who meet medical necessity criteria.

*Pregnancy:* Pregnant women should receive screening and counseling (up to
eight interventions per calendar year) for alcohol misuse during pregnancy; urine
culture for asymptomatic bacteriuria at between 12 and 16 weeks of gestation
and subsequently as medically indicated; structured breastfeeding education and
behavioral counseling for all pregnant and lactating women (in office, in the hos-
pital, or at home after birth), without a limit on the number of sessions, provided
that care is medically necessary; folic acid counseling and supplements; screening
and medication for group B streptococcal disease; screening for hepatitis B virus
infection and immunizations against hepatitis B virus; screening, counseling, and
preventive medication for human immunodeficiency virus; influenza immuniza-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA788                          JA-0000381

---

**BOX 3-1 Continued**

tions; screening for preeclampsia; prenatal screening and testing for neural tube defects (for all women at elevated risk) and chromosomal abnormalities (for all women aged 35 years and older), including, but not limited to amniocentesis, chorionic villus sampling, and ultrasound; Rh (D) blood typing and antibody and immunoglobulin testing; screening for rubella and syphilis; tetanus immunization; screening and treatment (counseling) for tobacco use; and screening, counseling, and treatment for hypertension.

*Sexually Transmitted Infections:* The guidelines recommend coverage for counseling to prevent sexually transmitted infections for all adolescents and adults. They also recommend screening for chlamydia infection and gonorrhea for all women aged 25 years and younger (and for older women, if it is medically indicated); screening and counseling for human immunodeficiency virus infection for all people aged 13 to 64 years; and an annual screening (and screening more frequently, if needed) for syphilis for all beneficiaries at risk of infection.

SOURCE: NBGH, 2009.

---

fewer HMOs covered contraceptives (39 percent for HMO plans for single individuals and 59 percent for HMO plans for families).

Coverage rates were lower for preferred provider organizations (PPOs) and point-of-service (POS) plans as well as high-deductible plans with HSAs or medical savings accounts (MSAs). The rate of coverage for physical examinations for adults ranged from 66 percent for PPO or POS plans for single individuals to 75 percent of plans with HSAs or MSAs for families. The rate of coverage for annual visits to an obstetrician-gynecologist was higher, ranging from a low of 82 percent for plans with HSAs and MSAs for families to a high of 96 percent for PPOs and POS plans for single individuals. Rates of coverage for cancer screenings ranged from 81 percent for HSAs and MSAs for families to 94 percent for PPOs and POS plans for single individuals. Coverage rates for oral contraceptives were also lower, ranging from 39 percent for HMOs for single individuals to 79 percent for PPOs and POS plans for single individuals.

*Federal Employees Health Benefits Program*

Millions of federal workers and their dependents receive their health insurance coverage through the Federal Employee Health Benefits (FEHB) program. The FEHB program purchases health insurance coverage through private plans for federal workers and their dependents. The preventive ser-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19     JA789     JA-0000382

vices covered, provider networks, and out-of-pocket spending responsibilities for these private plans vary by state. According to the ACA, plans that are offered under the FEHB program either are or will be required to offer coverage of all services that are recommended by the USPSTF, the ACIP, and Bright Futures. The plans offered under the FEHB program either are or will be required to offer coverage for preventive services for women without cost sharing if the services are obtained from an in-network provider. In addition, since 1999, almost all FEHB program plans are required to cover all Food and Drug Administration-approved contraceptive supplies and devices (OPM, 1998).

### Public-Sector Programs

The federal and state governments provide health coverage to a sizable share of the U.S. population through a wide range of programs. Nearly all seniors have primary coverage through Medicare, the federal program for those aged 65 years and over and individuals with permanent disabilities. In 2010, more than 66 million low-income individuals were covered by Medicaid, the federal-state program for low-income parents, children, seniors, and people with disabilities (MACPAC, 2011). The U.S. Department of Veterans Affairs (VA) provided health care services to 5.3 million veterans and their families in 2008 (VA, 2011a); and TRICARE, the health care plan for the U.S. military, serves millions of individuals in active-duty military service and their dependents, military retirees and their families, and other beneficiaries from any of the seven services. The Indian Health Service (IHS) covers nearly 2 million American Indians and Alaska Natives (IHS, 2011).

Although the ACA contains new rules for Medicare coverage of preventive services for beneficiaries and incentives for Medicaid to cover preventive services without cost sharing, the preventive services requirements that are promulgated under Section 2−13 affect only private plans. The rules in Section 2−13 only amend and add to the Public Health Services Act and the Federal Employee Retirement and Income Security Act and therefore do not affect the coverage offered by military health care programs, such as TRICARE and VA program, or the IHS. It is useful, however, to understand how these different programs have handled policies for coverage of preventive services important to women. These policies are detailed in the following sections.

### Medicare

Medicare provides health care coverage for about 39 million seniors and 8 million people under age 65 years with permanent disabilities (KFF, 2010). About 56 percent of Medicare beneficiaries are women (KFF, 2009a).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA790                    JA-0000383

Sections of the ACA other than those related to Medicare make many changes to the covered preventive services that are important to female Medicare beneficiaries. Before passage of the ACA, many preventive benefits important to women's health, such as mammography, clinical breast examinations, bone density tests, Pap smears, and pelvic examinations, were covered but required a 20 percent copayment; that is, Medicare covered only 80 percent of the full cost of these tests. The ACA requires that all Medicare beneficiaries receive coverage without copayments for those services that receive Grade A or B recommendations from the USPSTF, as well as coverage for all vaccines recommended by ACIP (111th U.S. Congress, 2010). This rule became effective on January 1, 2011.

All new Medicare beneficiaries have been eligible to receive a "welcome to Medicare" visit that is similar in scope to a wellness visit. The ACA broadened this benefit for beneficiaries to include a new annual wellness examination for all beneficiaries with no copayment (111th U.S. Congress, 2010). At this visit, the medical and family health histories are reviewed, basic health measurements are taken, a screening for the preventive services required is performed, and risk factors and treatment options are identified.

Although Medicare is typically considered a program for seniors, a sizable share of Medicare beneficiaries are nonelderly and qualify on the basis of a permanent disability. In 2009, about 850,000 disabled women under age 45 years were enrolled in Medicare (CMS, 2010). Women Medicare beneficiaries in this age group have reproductive health care needs but do not get coverage for contraceptive services or devices through Medicare Part A or B. They may get coverage, however, for oral contraceptive pills through their Medicare Part D prescription drug coverage. The extent of their out-of-pocket costs and the scope of coverage for prescriptions are largely dependent on the type of Part D drug plan that they select.

A growing share of Medicare beneficiaries are enrolled in managed care arrangements through Medicare Advantage plans. These plans can be more flexible in the types of benefits that they cover. Some cover services that are not part of the traditional Medicare benefit package, such as contraceptives, although the federal government has no requirement to cover such things. Medicare does not cover sterilization when it is not part of a necessary treatment for an illness or injury, nor would any payment be made for sterilization as a preventive measure. This includes the case when a primary care provider believes that pregnancy would cause overall endangerment to a woman's health or psychological well-being (CMS, 2011).

## Medicaid

Medicaid, a program for certain low-income Americans jointly financed and operated by state and federal governments, offers coverage for many preventive services. Approximately 66 million individuals were covered by

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA791                    JA-0000384

Medicaid in 2010 (MACPAC, 2011). An estimated 30 million children in the United States are insured by Medicaid (KFF, 2011b), and it provides coverage for 40 percent of all births in the United States (Wier et al., 2010). With the exception of mandatory coverage for smoking cessation with no cost sharing for pregnant women (Section 4107), the ACA does not require that Medicaid cover preventive services with or without cost sharing. Rather, it includes an incentive for states to cover the services in the form of an increased 1 percent matching federal payment for these services to states that provide the recommended preventive services without cost sharing to their beneficiaries (Section 4106) (111th U.S. Congress, 2010). Figure 3-2 shows the numbers of states offering coverage for preventive services through Medicaid.

Today, Medicaid coverage of preventive services depends on the enrollees' age and state of residence. For children under age 21 years, the scope of coverage is comprehensive as a result of the Early Periodic Screening, Diagnostic, and Treatment Program. This mandatory program requires that



FIGURE 3-2 Number of state Medicaid programs that reported covering certain recommended preventive services for adults and health risk assessments or well-adult checkups. Although the USPSTF does not explicitly recommend well-adult checkups or health risk assessments for adults, such health care visits provide an opportunity to deliver recommended preventive services, such as blood pressure tests and obesity screenings. The data do not include the numbers for states that reported that a service is covered under the managed care program but not under the fee-for-service program.
SOURCE: Government Accountability Office analysis of survey of state Medicaid directors conducted between October 2008 and February 2009.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA792                          JA-0000385

state Medicaid programs cover screening and diagnostic services, as well as the treatments needed to correct or improve the problems identified by the screening and diagnostic services. For children, the screening and preventive services typically include well-child visits, vision and dental screenings, and immunizations (CMS, 2005). State Medicaid programs are not permitted to charge cost sharing for services provided to children and pregnant women but may charge other eligible populations a nominal fee (SSA, 2011c).

For adults participating in Medicaid, preventive services are generally covered according to the recommendations of each state, but the preventive services for adults that the states cover vary considerably (GAO, 2009). For example, services such as cervical cancer screening and mammography were covered by nearly all state Medicaid programs, but far fewer states covered well-adult checkups or cholesterol tests (GAO, 2009). Coverage of screening and treatment for sexually transmitted infections is also typically included in almost all state Medicaid programs (Ranji et al., 2009a).

Family planning services, in contrast, are federally required for all states that participate in Medicaid. Since 1972, state Medicaid programs have been required to cover "family planning services and supplies furnished (directly or under arrangements with others) to individuals of child-bearing age (including minors who can be considered to be sexually active), who are eligible under the State plan, and who desire such services and supplies" (SSA, 2011a). These services must be provided without cost sharing. In return, states receive a 90 percent federal match on the funds that they spend on these services (SSA, 2011b). All states provide coverage for family planning services and prescription contraceptive supplies, although coverage of nonprescription contraceptives, such as condoms and emergency contraceptives, and sterilization varies considerably from state to state (Ranji et al., 2009a).

Coverage of preconception counseling and other elements of preconception care are optional for state Medicaid programs and, as a result, are not as universally covered as contraceptives. Of the 44 states that responded to a 2008 Henry J. Kaiser Family Foundation survey, only 26 covered preconception counseling for women enrolled in Medicaid (Ranji et al., 2009a).

Medicaid is the largest payer of maternity services in the nation and provides coverage of a comprehensive range of pregnancy-related services for low-income women who qualify. These services, however, vary considerably from state to state. For example, in 2008, 24 out of 44 states responding to a national survey covered genetic counseling and 39 covered nutrition counseling and psychosocial counseling (Ranji et al., 2009b). Similarly, coverage of breastfeeding support services is also an optional Medicaid benefit and is more limited. Twenty-five of the 44 surveyed states covered breastfeeding education services, 15 states covered lactation con-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA793                    JA-0000386

sultations, and 31 states covered breast pump rentals. Eight states did not cover any breastfeeding support services for women enrolled in Medicaid (Ranji et al., 2009b).

### Children's Health Insurance Program

For low-income children whose family incomes exceed Medicaid eligibility levels, the Children's Health Insurance Program (CHIP) provides insurance coverage at generally affordable costs. Established in 1997, this federal block grant program to states provides state and federal funds to extend insurance coverage to low-income children. Each state may expand coverage by raising Medicaid income eligibility levels for families with children, establishing a separate state program, or designing a combination of the two approaches. In 2010, an estimated 7.7 million children and 347,000 parents and pregnant women who did not qualify for Medicaid were enrolled in CHIP at some point during the year (MACPAC, 2011).

CHIPs are prohibited from imposing cost sharing for well-baby and well-child care, including immunizations. Children who are covered through a CHIP Medicaid expansion option receive the same benefits as children who are covered through Medicaid. However, considerable variation in the scope of covered preventive services exists among the states, which operate separate programs. A 2001 review of CHIP coverage of reproductive health services conducted by the Guttmacher Institute found that of the 29 states that operated separate state programs, 16 specifically identified that family planning services and supplies were covered and most of the remaining plans covered these services through the general category "prenatal care and prepregnancy family planning services" (Gold and Sonfield, 2001). Most states also covered screening and treatment for sexually transmitted infections.

The 2008 CHIP Reauthorization Act made it easier for states to extend CHIP to cover pregnancy-related services through CHIP, and 18 states have done this either through extending eligibility to pregnant women or through a new option to extend eligibility to "unborn children" (KFF, 2011a). Like Medicaid, coverage for pregnant women under CHIP typically ends at 60 days postpartum. States that cover this group of women through the Medicaid expansion use Medicaid benefit rules.

### U.S. Department of Veterans Affairs Health Care Services

The rising enlistment of women in active-duty military services has led to the growth in the numbers of women receiving care through VA. According to VA, women make up approximately 1.8 million of the nation's

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                            JA794                              JA-0000387

23 million veterans and account for nearly 5.5 percent of veterans who use VA health care services (VA, 2011b).

The scope of care offered to women veterans is broad and includes the following preventive services important to women: health evaluation and counseling, disease prevention, nutrition counseling, weight control, smoking cessation, and substance abuse counseling and treatment, as well as gender-specific primary care, including Pap smears, mammogram, birth control, preconception counseling, human papillomavirus vaccine, and menopausal support (hormone replacement therapy). In addition, women receive coverage for "mental health, including evaluation and assistance for issues such as depression, mood, and anxiety disorders; intimate partner and domestic violence; sexual trauma; elder abuse or neglect; parenting and anger management; marital, caregiver, or family-related stress; and post-deployment adjustment or post-traumatic stress disorder (PTSD)" (VA, 2011b).

## TRICARE

The U.S. Department of Defense operates TRICARE, a managed health care program for active-duty members of the military, families of active-duty service members, retirees and their families, and other beneficiaries from any of the seven services (TRICARE, 2011). Depending on their level of service, enrollees can choose from different coverage plans that have the same benefits but different provider networks and out-of-pocket spending requirements. TRICARE covers a broad range of preventive services for women enrollees, including contraceptive supplies, services, and sterilization; mammograms and physical breast examinations; counseling; maternity care; Pap smears (including human papillomavirus testing); and genetic testing.

## *Indian Health Service*

American Indians and Alaska Natives who are members of federally recognized tribes are eligible to receive health care services without cost sharing though the IHS, which operates health care facilities on or near Indian reservations. Although a wide range of "health promotion and disease prevention services" (LII, 2010) are specified, the availability of the actual services for those using IHS services varies tremendously from region to region. Health promotion services whose provision is defined by Title 25 of the U.S. Code include smoking cessation, reduction in alcohol and drug misuse, improvement in nutrition, improvement in physical fitness, family planning, stress control, and pregnancy and infant care (including fetal alcohol syndrome prevention). The disease prevention services covered

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA795
JA-0000388

Case 1:25-cv-07540-DLC  Document 64-3  Page: 134  Date Filed: 12/12/2025

under Title 25 include immunizations, control of high blood pressure, control of sexually transmitted diseases, prevention and control of diabetes, control of toxic agents, occupational safety and health, accident prevention, fluoridation of water, and control of infectious agents (LII, 2010). Screening mammography is also included as a covered benefit for women.

## DISCUSSION

Growing attention to the importance of preventive care in both federal- and state-supported and private-sector plans has been seen in recent years. Despite this attention, coverage of preventive services in both the private and public sectors is uneven at best. Heavy reliance has been placed on the clinical guidance promulgated by the USPTSF, but adoption of the full range of services is still not the norm. Some programs and plans have provided more limited coverage, whereas others are broader in scope, providing coverage for preventive services like preconception counseling, contraceptive services and supplies, and well-woman visits, despite their absence from these recommendations. The ACA requirements will make important strides in ensuring that most Americans have coverage for the full range of recommended preventive services.

## REFERENCES

AHIP (America's Health Insurance Plans). 2007. *Individual health insurance 2006–2007: A comprehensive survey of premiums, availability and benefits.* Washington, DC: Center for Policy and Research, America's Health Insurance Plans.

BlueCross BlueShield Association. 2010. *State legislative healthcare and insurance issues: 2010 Survey of Plans.* Office of Policy and Representation, BlueCross Blue Shield Association.

Bondi, M. A., J. R. Harris, D. Atkins, M. E. French, and B. Umland. 2006. Employer coverage of clinical preventive services in the United States. *American Journal of Health Promotion* 20(3):214–222.

Claxton, C., B. DiJulio, B. Finder, J. Lundy, M. McHugh, A. Osei-Anto, H. Whitmore, J. Pickreign, and J. Gabel. 2010. *Employer health benefits 2010 annual survey, 2010.* Menlo Park, CA: Henry J. Kaiser Family Foundation/Health Research & Educational Trust http://ehbs.kff.org/pdf/2010/8085.pdf.

CMS (Centers for Medicare and Medicaid Services). 2005. Medicaid early and periodic screening and diagnostic treatment benefit. Baltimore, MD: Centers for Medicare and Medicaid Services. http://www.cms.gov/medicaidearlyperiodscrn/02_Benefits.asp#TopOfPage (accessed May 14, 2011).

CMS. 2010. 2010 CMS data compendium, Table IV.2. Baltimore, MD: Centers for Medicare and Medicaid Services. http://www.cms.gov/DataCompendium/14_2010_Data_Compendium.asp#TopOfPage (accessed May 11, 2011).

CMS. 2011 CMS coverage database. Baltimore, MD: Centers for Medicare and Medicaid Services. https://www.cms.gov/medicare-coverage-database/ (accessed May 11, 2011).

DOL (U.S. Department of Labor). 2011. *Selected medical benefits: A report from the Department of Labor to the Department of Health and Human Services.* Washington, DC: U.S. Department of Labor.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA796                          JA-0000389

Clinical Preventive Services for Women  Closing the Gaps

EEOC (U.S. Equal Employment Opportunity Commission). 2000. *Decision on coverage of contraception*. Washington, DC: Equal Employment Opportunity Commission.

*Federal Register*. 2010a. Interim final rules for group health plans and health insurance issuers relating to coverage of preventive services under the patient protection and affordable care act. *Federal Register* 75(137):41726–41730.

*Federal Register*. 2010b. Interim final rules for group health plans and health insurance coverage relating to status as a grandfathered health plan under the patient protection and affordable care act. *Federal Register* 75(116):34538–34570.

GAO (Government Accountability Office). 2009. *Medicaid preventive services: Concerted efforts needed to ensure beneficiaries receive services*. Washington, DC: Government Accountability Office.

Gold, R. B., and A. Sonfield. 2001. Reproductive health services for adolescents under the state children's health insurance program. *Family Planning Perspectives* 33(2):81–87.

HHS (U.S. Department of Health and Human Services). 2010. *Preventive regulations*. Washington, DC: U.S. Department of Health and Human Services. http://www.healthcare.gov/center/regulations/prevention/regs.html (accessed April 13, 2011).

Hyams, T., and L. Cohen. 2010. *Massachusetts health reform: Impact on women's health*. Boston, MA: Brigham and Women's Hospital.

IHS (Indian Health Services). 2011. *IHS Year 2011 Profile*. Washington, DC: Indian Health Service. http://www.ihs.gov/PublicAffairs/IHSBrochure/Profile2010.asp (accessed May 25, 2011).

IRS (Internal Revenue Service). 2004. *Health savings accounts—Preventive care*. Washington, DC: Internal Revenue Service.

KFF (Henry J. Kaiser Family Foundation). 2009a. *Medicare's role for women*. Washington, DC: Henry J. Kaiser Family Foundation. http://www.kff.org/womenshealth/upload/7913.pdf (accessed May 10, 2011).

KFF. 2009b. *Standardized plans in the individual market, as of March 2009*. Washington, DC: Henry J. Kaiser Family Foundation. http://www.statehealthfacts.org/comparereport.jsp?rep=6&cat=7 (accessed May 15, 2011).

KFF. 2010. *Medicare chartbook*, 4th ed. Washington, DC: Henry J. Kaiser Family Foundation. http://facts.kff.org/chart.aspx?ch=58&sctn=162&ch=1714 (accessed May 10, 2011).

KFF. 2011a. *Where are states today? Medicaid and CHIP eligibility levels for children and non-disabled adults*. Washington, DC: Henry J. Kaiser Family Foundation.

KFF. 2011b. *Health coverage of children: The role of Medicaid and CHIP*. Washington, DC: Henry J. Kaiser Family Foundation.

LII (Legal Information Institute). 2010. *U.S. Code, Title 25: Indians*. Ithaca, NY: Cornell University Law School. http://www.law.cornell.edu/uscode/uscode25/usc_sup_01_25.html (accessed May 10, 2011).

Long, S., K. Stockey, L. Birchfield, and S. Shulman. 2010. *The impact of health reform on health insurance coverage and health care access, use and affordability for women in Massachusetts*. Washington, DC: The Urban Institute and the Blue Cross Blue Shield of Massachusetts Foundation. http://masshealthpolicyforum.brandeis.edu/forums/Documents/Issue%20Brief_UrbanBCBSMAF.pdf (accessed May 10, 2011).

MACPAC (Medicaid and CHIP Payment and Access Commission). 2011. *Report to Congress on Medicaid and CHIP*. Washington, DC: Medicaid and CHIP Payment and Access Commission.

MHQP (Massachusetts Health Quality Partners). 2007. *Adult routine preventive care recommendations 2007/8*. Watertown, MA: Massachusetts Health Quality Partners.

NBGH (National Business Group on Health). 2009. *A purchaser's guide to clinical preventive services: Moving science into coverage*. Washington, DC: National Business Group on Health.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19    JA797    JA-0000390

OPM (Office of Personnel Management, Retirement and Insurance Service). 1998. Benefits administration letter 98-418. Washington, DC: Office of Personnel Management, Retirement and Insurance Service. http://www.opm.gov/retire/pubs/bals/1998/98-418.pdf (accessed May 10, 2011).

Ranji, U., A. Salganicoff, A. Stewart, M. Cox, and L. Doamekpor. 2009a. *State Medicaid coverage of family planning services: Summary of state survey findings.* Washington, DC: Henry J. Kaiser Family Foundation and George Washington University School of Public Health and Health Services. http://www.kff.org/womenshealth/upload/8015.pdf (accessed May 10, 2011).

Ranji, U., A. Salganicoff, A. Stewart, M. Cox, and L. Doamekpor. 2009b. *State Medicaid coverage of perinatal services: Summary of state findings.* Washington, DC: Henry J. Kaiser Family Foundation and George Washington University School of Public Health and Health Services. http://www.kff.org/womenshealth/upload/8014.pdf (accessed May 10, 2011).

SSA (U.S. Social Security Administration). 2011a. *Social Security Act—Definitions, Sec. 1905.* Baltimore, MD: U.S. Social Security Administration. http://www.ssa.gov/OP_Home/ssact/title19/1905.htm (accessed May 10, 2011).

SSA. 2011b. *Social Security Act—Definitions, Sec. 1903.* Baltimore, MD: U.S. Social Security Administration. http://www.ssa.gov/OP_Home/ssact/title19/1903.htm (accessed May 10, 2011).

SSA. 2011c. *Social Security Act—State option for alternative premiums and cost-sharing, Sec. 1916A.* Baltimore, MD: U.S. Social Security Administration. http://www.socialsecurity.gov/OP_Home/ssact/title19/1916A.htm (accessed May 10, 2011).

Sonfield, A., R. B. Gold, J. J. Frost, and J. E. Darroch. 2004. U.S. insurance coverage of contraceptives and the impact of contraceptive coverage mandates, 2002. *Perspectives on Sexual and Reproductive Health* 36(2):72–79.

TRICARE. 2011. *Covered services.* Falls Church, VA: U.S. Department of Defense. http://www.tricare.mil/mybenefit/jsp/Medical/IsItCovered.do?topic=Women)%20 (accessed May 10, 2011).

United States Court of Appeals for the Eighth Circuit. 2007. In re Union Pacific Railroad Employment Practices Litigation. No. 06-1706. 2007 WL 763842.

95th U.S. Congress. 1978. *Public Law 95-555.* Washington, DC: U.S. Congress.

111th U.S. Congress. 2010. *Patient Protection and Affordable Care Act health-related portions of the Health Care and Education Reconciliation Act of 2010.* Washington, DC: U.S. Congress.

VA (U.S. Department of Veterans Affairs). 2011a. *Number of veteran patients by healthcare priority group: FY 2000 to FY 2009.* Washington, DC: National Center for Veterans Analysis and Statistics, U.S. Department of Veterans Affairs.

VA. 2011b. *Women veterans health care.* Washington, DC: U.S. Department of Veterans Affairs. http://www.publichealth.va.gov/womenshealth/ (accessed April 15, 2011).

Wier, L. M., K. Levit, E. Stranges, K. Ryan, A. Pfuntner, R. Vandivort, P. Santora, P. Owens, C. Stocks, and A. Elixhauser. 2010. *HCUP facts and figures: Statistics on hospital-based care in the United States, 2008.* Rockville, MD: Agency for Healthcare Research and Quality. http://www.hcupdoc.net/reports/factsandfigures/2008/pdfs/FF_report_2008.pdf (accessed May 15, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA798                                    JA-0000391

# 4

# Committee Methodology

This chapter outlines the methodology that the Institute of Medicine Committee on Preventive Services for Women used to identify preventive services necessary for women's health and well-being that are not included in the United States Preventive Services Task Force (USPSTF) Grade A and B recommendations, Bright Futures' recommendations, or the Advisory Committee on Immunization Practices (ACIP) guidelines and to identify specific services that could supplement the current list of preventive services recommended for women under the Patient Protection and Affordable Care Act of 2010 (ACA). The committee's first step in this process was to review and reach an understanding of the guidelines of these analytic bodies. The second step was to assemble and assess additional evidence, including reviews of the literature, federal health priority goals and objectives, federal reimbursement policies, and professional clinical guidelines. The committee also considered comments submitted by the public. Finally, the committee recommended preventive services that the Secretary of the U.S. Department of Health and Human Services (HHS) should consider in developing a comprehensive package of preventive services for women to be included under the ACA.[1]

## REVIEW OF USPSTF RECOMMENDATIONS

The USPSTF process was developed to provide guidance to primary care providers. The committee's approach to identifying gaps in existing

---

[1] One committee member's dissenting comments regarding much of the study process are included in Appendix D.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                                                        JA-0000392

services accounts for contextual issues beyond traditional research evidence used by the USPSTF. The committee looked at women's preventive service needs more broadly to account for women's health and well-being.

The committee found that the USPSTF Grade A and B recommendations required close examination. The specificity of several recommendations is not clear in some cases, including such details as the periodicity of screenings or how the service is to be delivered. For example, the Grade B recommendation for screening for depression could be interpreted to be universal screening, under the assumption that the primary care provider offices offering the service have adequate staff in place to support the correct delivery of the service, or the USPSTF's recommendation could be interpreted narrowly to include screening only in those practices that have a certified depression screening quality assurance program in place. Thus, after a review of the supporting evidence that led to their recommendations, the committee decided that it was important to note its interpretation of the Grade A and B recommendations in those cases in which specific aspects of the recommendation were found to be ambiguous (see Table 5-1). The committee also compared the USPSTF guidelines with the guidelines of other professional organizations to identify potential gaps.

The USPSTF Grade C and I statements (Table 4-1) also required further analysis by the committee because in neither case had the USPSTF intended its conclusions to limit or preclude consideration for coverage. The USPSTF informally refers to Grade C recommendations as close calls in which the balance of potential benefits and harms does not strongly favor the clinician recommending the preventive service to all patients, although it may be appropriate in some cases. The USPSTF makes the point that either choosing or not choosing the service with a Grade C recommendation would be within the standard of care and assumes that the service would be covered if clinically appropriate (USPSTF, 2008). The USPSTF also considers decision making to be a shared activity of the patient and the provider based on the individual circumstances of the patient.

The Grade I statement is a conclusion that the evidence is "insufficient to conclude whether the service is effective or not because evidence is lacking, of poor quality, or conflicting, and the balance of benefits and harms cannot be determined" (USPSTF, 2008). The I statement simply means that important outcomes have not yet been adequately evaluated by current research. The committee notes that from a coverage perspective, the evidence supporting many clinical interventions in common use, whether in prevention or in general medical practice, is insufficient or unclear, and that coverage decisions may be made or have been made on the basis of other factors. For example, although knowledge of the evidence for the benefits and harms of services and screenings informs a primary care provider's

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA800                              JA-0000393

**TABLE 4-1** USPSTF Grade C Recommendations and I Statements

| Topic | Description | Grade |
|---|---|---|
| Additional risk factors for intermediate coronary heart disease (CHD) risk: screening | The U.S. Preventive Services Task Force (USPSTF) concludes that the evidence is insufficient to assess the balance of benefits and harms of using the nontraditional risk factors discussed in this statement to screen asymptomatic men and women with no history of CHD to prevent CHD events (select "Clinical Considerations" for suggestions for practice when evidence is insufficient). | I |
| Avoidance of alcohol use counseling | The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of routine counseling of all patients in the primary care setting to reduce driving while under the influence of alcohol or riding with drivers who are alcohol-impaired. | I |
| Back pain: counseling | The USPSTF concludes that the evidence is insufficient to recommend for or against the routine use of interventions to prevent low back pain in adults in primary care settings. | I |
| Bacterial vaginosis screening: pregnant women | The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of screening for bacterial vaginosis in asymptomatic pregnant women at high risk for preterm delivery. | I |
| Breast cancer screening | The USPSTF concludes that the evidence is insufficient to recommend for or against routine clinical breast examination alone to screen for breast cancer. | I |
| Cervical cancer screening | The USPSTF concludes that the evidence is insufficient to recommend for or against the routine use of new technologies to screen for cervical cancer. | I |
| Cervical cancer screening | The USPSTF concludes that the evidence is insufficient to recommend for or against the routine use of human papillomavirus (HPV) testing as a primary screening test for cervical cancer. | I |
| CHD risk assessment | The USPSTF concludes that the evidence is insufficient to assess the balance of benefits and harms of using the nontraditional risk factors discussed in this statement to screen asymptomatic men and women with no history of CHD to prevent CHD events | I |
| CHD screening | The USPSTF found insufficient evidence to recommend for or against routine screening with resting electrocardiography (ECG), exercise treadmill test (ETT), or electron-beam computerized tomography (EBCT) scanning for coronary calcium for either the presence of severe coronary artery stenosis (CAS) or the prediction of CHD events in adults at increased risk for CHD events. | I |
| Chlamydial infection screening: non-pregnant women | The USPSTF recommends against routinely providing screening for chlamydial infection for women aged 25 and older, whether or not they are pregnant, if they are not at increased risk. | C |

*continued*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA801                          JA-0000394

70                                        CLINICAL PREVENTIVE SERVICES FOR WOMEN

**TABLE 4-1** Continued

| Topic | Description | Grade |
|---|---|---|
| Cholesterol abnormalities screening | The USPSTF makes no recommendation for or against routine screening for lipid disorders in men aged 20 to 35, or in women aged 20 and older who are not at increased risk for coronary heart disease. | C |
| Colorectal cancer screening | The USPSTF concludes that the evidence is insufficient to assess the benefits and harms of computed tomographic colonography and fecal DNA testing as screening modalities for colorectal cancer. | I |
| Depression screening: adults | The USPTF recommends against routinely screening adults for depression when staff-assisted depression care supports are not in place. There may be considerations that support screening for depression in an individual patient. | C |
| Diabetes screening | The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of screening for type 2 diabetes in asymptomatic adults with blood pressure of 135/80 mm Hg or lower. | I |
| Diet counseling | The USPSTF concludes that the evidence is insufficient to recommend for or against routine behavioral counseling to promote a healthy diet in unselected patients in primary care settings. | I |
| Drug use screening | The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of screening adolescents, adults, and pregnant women for illicit drug use. | I |
| Family violence screening | The USPSTF found insufficient evidence to recommend for or against routine screening of parents or guardians for the physical abuse or neglect of children, of women for intimate partner violence, or of older adults or their caregivers for elder abuse. | I |
| Gestational diabetes screening | The USPSTF concludes that the evidence is insufficient to recommend for or against routine screening for gestational diabetes. | I |
| Glaucoma screening | The USPSTF found insufficient evidence to recommend for or against screening adults for glaucoma. | I |
| Gonorrhea screening: pregnant women | The USPSTF found insufficient evidence to recommend for or against routine screening for gonorrhea infection in pregnant women who are not at increased risk for infection. | I |
| Hepatitis B screening | The USPSTF recommends against routinely screening the general asymptomatic population for chronic hepatitis B virus infection. | I |
| Hepatitis C screening | The USPSTF found insufficient evidence to recommend for or against routine screening for HCV infection in adults at high risk for infection. | I |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                      JA802                      JA-0000395

TABLE 4-1 Continued

| Topic | Description | Grade |
|---|---|---|
| Human immuno-deficiency virus (HIV) screening | The USPSTF makes no recommendation for or against routinely screening for HIV adolescents and adults who are not at increased risk for HIV infection | C |
| Lung cancer screening | The USPSTF concludes that the evidence is insufficient to recommend for or against screening asymptomatic persons for lung cancer with either low dose computerized tomography (LDCT), chest X-ray (CXR), sputum cytology, or a combination of these tests. | I |
| Motor vehicle restraint counseling | The USPSTF concludes that the current evidence is insufficient to assess the incremental benefit, beyond the efficacy of legislation and community-based interventions, of counseling in the primary care setting, in improving rates of proper use of motor vehicle occupant restraints (child safety seats, booster seats, and lap-and-shoulder belts). | I |
| Obesity screening and counseling | The USPSTF concludes that the evidence is insufficient to recommend for or against the use of moderate- or low-intensity counseling together with behavioral interventions to promote sustained weight loss in obese adults. | I |
| Obesity screening and counseling | The USPSTF concludes that the evidence is insufficient to recommend for or against the use of counseling of any intensity and behavioral interventions to promote sustained weight loss in overweight adults. | I |
| Oral cancer screening | The USPSTF concludes that the evidence is insufficient to recommend for or against routinely screening adults for oral cancer. | I |
| Physical activity counseling | The USPSTF concludes that the evidence is insufficient to recommend for or against behavioral counseling in primary care settings to promote physical activity. | I |
| Sexually transmitted infections (STIs) counseling | The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of behavioral counseling to prevent STIs in nonsexually-active adolescents and in adults not at increased risk for STIs. | I |
| Skin cancer counseling | The USPSTF concludes that the evidence is insufficient to recommend for or against routine counseling by primary care clinicians to prevent skin cancer. | I |
| Skin cancer screening | The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of using a whole-body skin examination by a primary care clinician or patient skin self-examination for the early detection of cutaneous melanoma, basal cell cancer, or squamous cell skin cancer in the adult general population. | I |
| Suicide risk screening | The USPSTF concludes that the evidence is insufficient to recommend for or against routine screening by primary care clinicians to detect suicide risk in the general population. | I |

continued

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA803                                JA-0000396

**TABLE 4-1** Continued

| Topic | Description | Grade |
|---|---|---|
| Thyroid disease screening | The USPSTF concludes the evidence is insufficient to recommend for or against routine screening for thyroid disease in adults. | I |
| Vitamin supplementation for disease prevention | The USPSTF concludes that the evidence is insufficient to recommend for or against the use of supplements of vitamins A, C, or E; multivitamins with folic acid; or antioxidant combinations for the prevention of cancer or cardiovascular disease | I |

SOURCE: USPSTF, 2011.

decision for each patient, in many instances, research either is inconclusive or has not been conducted.

The Institute of Medicine (IOM) report on women's health research identified many areas in which research is needed (IOM, 2010). For example, the report indicated a lack of large-scale studies identifying effective gender- and age-specific interventions involving modification of lifestyle and other behaviors that affect health, such as alcohol abuse and obesity. Furthermore, determining the evidence for the value of certain services is challenging, because it is difficult to prove the effectiveness of an intervention across the life span. For example, prevention interventions that should be conducted early in the life span (e.g., skin cancer prevention) require decades to demonstrate effectiveness.

Each of the Grade C and I recommendation statements and the evidence supporting them were collected and reviewed. The committee's evaluation included reviewing relevant supporting USPSTF publications, other peer-reviewed research and clinical articles, and clinician fact sheets. The committee did not reassess the Grade D recommendations, given the evidence base driving the USPSTF to recommend against providing these services. Additional literature searches were conducted to identify randomized control trials that were conducted after the USPSTF recommendation was released for each of the Grade C and I recommendations. Furthermore, the committee compared the Grade C and I guidelines with guidelines from other professional groups.

## REVIEW OF BRIGHT FUTURES RECOMMENDATIONS

The committee reviewed all Bright Futures guidelines and compared them with the USPSTF guidelines for adolescents. The committee noted that the methodology that Bright Futures uses to develop recommendations is considered "evidence informed" and includes expert opinion. Bright

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA804                                    JA-0000397

Futures also uses a more comprehensive focus on health promotion and disease prevention, on the basis of its criteria for the burden of the condition (AAP, 2008).

For the committee, the principal challenge in identifying preventive services to supplement the guidance from Bright Futures was to disaggregate the health supervision visits recommended by Bright Futures and some of its anticipatory guidance into conditions and preventive measures fitting the committee's overall approach. The committee considered the sample questions and advice suggested in the anticipatory guidance section of the *Bright Futures* report to be preventive services to be covered under the ACA. According to the guidelines, these preventive services should be addressed in an annual visit of sufficient length to cover age- and sex-appropriate topics in the health domain. Thus, the topics of physical growth and development, social and academic competence, emotional well-being, risk reduction, and violence and injury prevention, as well as the sample questions and suggested guidance for both the parents and the adolescent, are expected to be addressed at each and every annual visit. The task of addressing each and every one of the suggested topics during a yearly visit seemed daunting to the committee. However, the committee assumes that primary care providers will identify priorities from this section on the basis of the unique circumstances of each patient.

## REVIEW OF ACIP RECOMMENDATIONS

The committee reviewed ACIP General Recommendations on Immunization, which include all Food and Drug Administration-approved immunizations recommended for the general population of adolescent and adult women (CDC, 2011; Smith et al., 2009). In addition, to assess potential supplemental immunizations, the committee reviewed the immunizations recommended for high-risk groups and for individuals in special circumstances to determine whether some substantial subpopulation of women, clearly defined, might warrant further attention. Although literature searches were conducted to identify areas where supplemental immunization recommendations might be warranted, the committee identified little evidence to indicate clear deficiencies in existing ACIP recommendations.

## FURTHER COMMITTEE CONSIDERATIONS

The committee reviewed both oral and written public comments submitted throughout the course of the study. Some of these comments were from experts, individuals expressing personal experiences with preventable conditions, and members of the U.S. Congress. All of these comments contained recommendations for the committee's consideration. Additionally,

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA805

several nongovernmental organizations submitted research studies, public statements, and recommended guidelines for preventive services for women. The committee reviewed all of this information.

The committee also invited researchers and leaders of organizations to deliver presentations in areas where the committee believed that it could benefit from their expertise. These included, for example, presentations on mental health, oral health, occupational health, and the perspectives of employers and health insurers. The committee invited speakers who requested the opportunity in addition to inviting individuals with expertise in potential gap areas or individuals identified as having a perspective that the committee should consider. Furthermore, the committee reviewed HHS documents relating to prevention priorities and reimbursement policies. It also reviewed the existing coverage practices of national, state, and private health plans (these are detailed in Chapter 3). In some cases, committee members also identified current practice in clinical care by using sources such as the British Medical Journal Best Evidence and UpToDate (BMJ Clinical Evidence, 2011; UpToDate Inc., 2011). Finally, the committee also used the 2011 IOM report *Leading Health Indicators for Healthy People 2020* as a tool to perform horizon scanning or examine priority goals and/ or persistent trends relating to women's health and well-being to identify potential gaps (IOM, 2011).

## Committee Analysis

The product of these reviews was an array of areas in which supplemental preventive measures might be warranted. Some of these areas were identified on the basis of traditional indicators such as morbidity and mortality, whereas others were more generally identified to be supportive of a woman's well-being. Adhering to the definitions described in Chapter 1, the committee focused on conditions unique to women or that affect women in some specific or disproportionate way. In general, the committee used criteria adapted from the USPSTF that consider frequency, severity, morbidity, mortality, and quality of life to bring consistency to the analyses.

For each potential supplemental preventive measure considered, an extensive comparison with the guidelines of professional organizations (e.g., American Academy of Family Physicians, American College of Physicians, American College of Obstetricians and Gynecologists, American Cancer Society, American Medical Association) was conducted to understand these guidelines development processes and the evidence that the organizations use to reach their conclusions. Many of these guidelines are posted in the Agency for Healthcare Research and Quality's National Guidelines Clearinghouse. The committee also performed targeted literature searches.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA806                              JA-0000399

### Identifying Potential Supplemental Preventive Measures

The committee then attempted to identify preventive measures that were aimed at filling the gaps that it had identified. In most cases, the committee found that measures had already been proposed by the other organizations mentioned above. The committee also eliminated preventive measures that, even at this early stage in the analysis, were clearly not developed, tested, or known well enough to have a measurable impact. The resulting product of this step was a series of areas with gaps, with the accompanying preventive measure or measures that could be considered by the Secretary for HHS for inclusion in guiding policy and program development relating to the ACA.

### Identifying Gap Areas and Measures with Adequate Evidence

The core of the committee's task was to assemble the evidence that would allow it to recommend consideration of a preventive service. The committee found that systematic reviews of clinical effectiveness were not available to address all the potential gaps and that a standard methodology addressing coverage of preventive services does not exist. These two issues are discussed below.

*Reviews of Clinical Effectiveness*

Assessment of the efficacy and effectiveness of preventive measures to provide clinical guidance was one of the topics of clinical focus that, more than 30 years ago, launched the change in the approach to health care delivery that is now called evidence-based medicine. The USPSTF and its Canadian sister organization, the Canadian Taskforce on Preventive Health Care, were active at the beginning of this movement, with a major focus being on developing the methodology. Since the 1980s, the standards for judging the effectiveness of preventive measures have matured, and the bar for determining the effectiveness of preventive measures has been set very high. Furthermore, for a number of reasons, including ethical constraints, the evidence bar is usually set higher for preventive services than for the services offered in many other areas of conventional medical care. It is generally assumed that a preventive service intended for the general population should have proven benefits and minimal harms, with the benefits clearly outweighing the harms. As noted below, the committee had neither the time and resources nor a charge to conduct its own systematic reviews, which, using the USPSTF as an example, often take 12 to 18 months for a single topic.

Copyright National Academy of Sciences. All rights reserved.

*Methodologies with a Coverage Decision as the Goal*

The USPSTF, Bright Futures, and ACIP focus on the provision of guidance to clinicians and patients, not on insurance coverage. Decision making about covering a preventive service may consider a host of other issues, such as established practice; patient and clinician preferences; availability; ethical, legal, and social issues; and availability of alternatives. Further complicating matters, special population groups, such as minority populations, recent immigrants, lesbians, prisoners, and those employed in high-risk environments, may have different health needs or benefit from different preventive services. In addition, high-risk groups, population subsets, and special populations are unevenly identified and are addressed at varying degrees in current guidelines. Finally, because cost was explicitly excluded as a factor that the committee could use in forming recommendations, the committee process could not evaluate preventive services on the basis of cost.

Against this background, the committee selected a hybrid approach that collected relevant evidence for each measure, and it determined that the question of a methodology to fully address insurance coverage was beyond its scope. Four categories of evidence—posed in the form of questions—were developed to systematically query support for each potential preventive measure. The committee neither formally ranked or assigned weights to the categories, nor did it stipulate that evidence in any one category would automatically result in a recommendation for a measure or service to be considered. Instead, the queries and categories were used to consider the range of evidence and to ensure consistency in the committee's analysis and deliberations. Many of the recommendations are supported by more than one category of evidence.

> Category I. Are high-quality systematic evidence reviews available indicating that the service is effective in women?
> Category II. Are quality peer-reviewed studies available demonstrating effectiveness of the service in women?
> Category III. Has the measure been identified as a federal priority to address in women's preventive services?
> Category IV. Are there existing federal, state, or international practices, professional guidelines, or federal reimbursement policies that support the use of the measure?

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA808                          JA-0000401

Clinical Preventive Services for Women: Closing the Gaps

## RECOMMENDATIONS ON PREVENTIVE SERVICES TO BE CONSIDERED IN DEVELOPMENT OF COMPREHENSIVE GUIDELINES

Subcommittees queried the available evidence applicable to potential preventive measures and assigned the evidence to one or more of the categories listed above. Each subcommittee then brought its analysis of the range of evidence before the full committee for deliberation. The committee combined the burden of the condition and its potential impact on health and well-being with the array of available evidence and support noted above to come to a consensus over whether to recommend that a specific preventive measure be considered by the Secretary. As is true in most analytical processes in decision making, evidence and expert judgment are inextricably linked; thus, the expert judgments of the committee members also played a role in decision making.

In general, preventive measures recommended by the committee met the following criteria:

- The condition to be prevented affects a broad population;
- The condition to be prevented has a large potential impact on health and well-being; and
- The quality and strength of the evidence is supportive.

Ultimately, the decision to develop a recommendation for a preventive measure or service was made after a thoughtful review and debate of each of the subcommittee's reports. Recommendations were made when the evidence was found compelling based on the committee's interpretation of the strength of the evidence. In Chapters 5, the committee describes the evidence that factored into its decision making for each supplemental preventive measure recommendation.

In some instances, a subcommittee's analysis resulted in the development of a clarifying statement (added to Table 5-1) on the committee's interpretation of current USPSTF guidelines. In other cases, the subcommittee's analysis suggested a service that could be considered part of a well-woman visit (Table 5-6). These are addressed in Appendix A of this report.

## REFERENCES

AAP (American Academy of Pediatrics). 2008. *Bright Futures: Guidelines for health supervision of infants, children and adolescents*, 3rd ed. (J. F. Hagan, J. S. Shaw, and P. M. Duncan, eds.). Elk Grove Village, IL: American Academy of Pediatrics.

BMJ Clinical Evidence. 2011. *Clinical evidence*. London, United Kingdom: BMJ Publishing Group.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA809                                    JA-0000402

CLINICAL PREVENTIVE SERVICES FOR WOMEN

CDC (Centers for Disease Control and Prevention). 2011. General recommendations on immunization—recommendations of the Advisory Committee on Immunization Practices (ACIP). *MMWR Recommendations and Reports: Morbidity and Mortality Weekly Report* 60(2):1–64.

IOM (Institute of Medicine). 2010. *Women's health research: Progress, pitfalls, and promise.* Washington, DC: The National Academies Press.

IOM. 2011. *Leading health indicators for Healthy People 2020.* Washington, DC: The National Academies Press.

Smith, J. C., D. E. Snider, and L. K. Pickering. 2009. Immunization policy development in the United States: The role of the Advisory Committee on Immunization Practices. *Annals of Internal Medicine* 150(1):W45–W49.

UpToDate Inc. 2011. *UpToDate.* Waltham, MA: UpToDate Inc.

USPSTF (United States Preventive Services Task Force). 2008. *Grade definitions.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/grades.htm (accessed May 31, 2011).

USPSTF. 2011. *A-Z topic guide.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstopics.htm (accessed May 31, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA810                                    JA-0000403

# 5

# Recommendations

This chapter describes the committee's recommendations for preventive services necessary for women's health and well-being that are not included in the United States Preventive Services Task Force (USPSTF) Grade A and B recommendations, Bright Futures, and Advisory Committee on Immunization Practices (ACIP) guidelines, and that could supplement the current list of preventive services for women recommended under the Patient Protection and Affordable Care Act of 2010 (ACA). The committee's recommendations regarding chronic diseases, sexual and reproductive health conditions, interpersonal and domestic violence, and well-woman visits follow.

The committee also provided interpretations for unclear USPSTF Grade A and B recommendations as described in Chapter 4; these are annotated in Table 5-1. Clarifying statements for osteoporosis screening and tobacco use have also been added. The rationale for including these two statements is presented in Appendix A.

## DIABETES AND GESTATIONAL DIABETES

Diabetes mellitus (DM) is a syndrome characterized by either an absolute or a relative deficiency of insulin in various organ systems of the body. The inability of these organ systems to utilize glucose thus exposes all tissues of the body to chronic excess glucose in the bloodstream, or hyperglycemia (ADA, 2011a). DM has three main types: type 1, type 2, and gestational DM. Only about 5 percent of people with diabetes in the United States have type 1 diabetes, which results from the body's failure to produce insulin (ADA, 2011a). Type 2 diabetes, which accounts for about

79

Copyright National Academy of Sciences. All rights reserved.

80 CLINICAL PREVENTIVE SERVICES FOR WOMEN

**TABLE 5-1** Grade A and B Recommendations with Committee Interpretations and Clarification Statements

| Topic | USPSTF Recommendation | USPSTF Grade | IOM Committee Interpretation |
|---|---|---|---|
| Alcohol misuse counseling | The USPSTF recommends screening and behavioral counseling interventions to reduce alcohol misuse by adults, including pregnant women, in primary care settings. | B | Annual screening with approved screening instrument. |
| Anemia screening: pregnant women | The USPSTF recommends routine screening for iron deficiency anemia in asymptomatic pregnant women. | B | Screening in each trimester. |
| Blood pressure screening | The USPSTF recommends screening for high blood pressure in adults aged 18 and older. | A | Annual screening. |
| BRCA screening, counseling about | The USPSTF recommends that women whose family history is associated with an increased risk for deleterious mutations in BRCA1 or BRCA2 genes be referred for genetic counseling and evaluation for BRCA testing. | B | Referral for genetic counseling and testing, if appropriate. |
| Breast cancer preventive medication | The USPSTF recommends that clinicians discuss chemoprevention with women at high risk for breast cancer and at low risk for adverse effects of chemoprevention. Clinicians should inform patients of the potential benefits and harms of chemoprevention. | B | Medication provided if indicated. |
| Depression screening: adolescents | The USPSTF recommends screening of adolescents (12–18 years of age) for major depressive disorder when systems are in place to ensure accurate diagnosis, psychotherapy (cognitive-behavioral or interpersonal), and follow-up. | B | Annual depression screening. |
| Depression screening: adults | The USPSTF recommends screening adults for depression when staff-assisted depression care supports are in place to assure accurate diagnosis, effective treatment, and follow-up. | B | Annual depression screening. |
| Diabetes screening | The USPSTF recommends screening for type 2 diabetes in asymptomatic adults with sustained blood pressure (either treated or untreated) greater than 135/80 mm Hg. | B | Annual screening. |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA812                                JA-0000405

## TABLE 5-1 Continued

| Topic | USPSTF Recommendation | USPSTF Grade | IOM Committee Interpretation |
|---|---|---|---|
| Human immuno-deficiency virus HIV screening | The USPSTF strongly recommends that clinicians screen for HIV all adolescents and adults at increased risk for HIV infection. | A | Annual screening. |
| Obesity screening and counseling: adults | The USPSTF recommends that clinicians screen all adult patients for obesity and offer intensive counseling and behavioral interventions to promote sustained weight loss for obese adults. | B | Annual screening. |
| Osteoporosis screening: women | The USPSTF recommends that women aged 65 and older be screened routinely for osteoporosis and in younger women whose fracture risk is equal to or greater than that of a 65-year-old white woman who has not additional risk. | B | Women with previous fractures and women with secondary causes of osteoporosis are suggested to be included (see Appendix A). |
| Tobacco use counseling and interventions: nonpregnant adults | The USPSTF recommends that clinicians ask all adults about tobacco use and provide tobacco cessation interventions for those who use tobacco products. | A | Annual screening. Counseling and Food and Drug Administration (FDA)-approved and over-the-counter medications are suggested (see Appendix A). |
| Tobacco use counseling: pregnant women | The USPSTF recommends that clinicians ask all pregnant women about tobacco use and provide augmented, pregnancy-tailored counseling to those who smoke. | A | Discussion at each prenatal visit. It is appropriate for pregnant women who smoke to receive counseling that is tailored to their needs. |
| Syphilis screening: non-pregnant persons | The USPSTF strongly recommends that clinicians screen persons at increased risk for syphilis infection. | A | Annual screening. |
| Syphilis screening: pregnant women | The USPSTF recommends that clinicians screen all pregnant women for syphilis infection. | A | Screening at first prenatal visit, and as indicated if at high risk. |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA813                    JA-0000406

90 to 95 percent of the cases of diabetes in the United States, results from the body's inability to produce sufficient amounts of insulin as well as its resistance to insulin, which means that the body does not use insulin effectively (NIDDK, 2008).

Gestational diabetes mellitus (GDM) is diabetes that arises or is diagnosed in pregnancy, typically during the second and third trimesters of pregnancy. It accounts for about 135,000 diabetic patients annually in the United States and occurs in approximately 2 to 10 percent of pregnant women (NIDDK, 2011). Although most women recover from GDM after giving birth, they have an increased risk of developing type 2 diabetes in the future (Turok et al., 2003). Furthermore, their offspring are at significantly increased risk of being overweight and insulin resistant throughout childhood (Boerschmann et al., 2010).

## Prevalence/Burden

Almost 25.8 million Americans, or 8.3 percent of the population, have diabetes, which is widely recognized as one of the leading causes of death and disability in the United States (CDC, 2011c). By 2050, it is estimated that the rate of adult diabetes in the United States will triple, from 1 in 10 now to 1 in 3 (Boyle et al., 2010).

No striking gender difference in the rates of diabetes exist between men and women in the United States (ADA, 2011b). However, a gender difference in the burden of this disease does appear to exist. Narayan and colleagues (2003) found that women have a significantly higher estimated lifetime risk of developing diabetes than men (38.5 percent for females versus 32.8 percent for males born in 2000). The authors further estimated that women diagnosed with diabetes at age 40 years will lose 14.3 life-years and 22 quality-adjusted life years, whereas the length of life lost for men diagnosed with diabetes at the same age are 11.6 life-years and 18.6 quality-adjusted life-years, respectively.

The consequences of diabetes appear to be more severe for women as well. In a study to assess whether trends in mortality rates among adults with diabetes had changed, Gregg and colleagues found that between the 1971 to 1986 and 1988 to 2000 survey periods for the National Health and Nutrition Examination Survey, the all-cause mortality rate for men with diabetes decreased by 18.2 deaths per 1,000 persons annually (from 42.6 to 24.4 deaths per 1,000 persons annually), whereas for diabetic women, the all-cause mortality rate more than doubled (from 8.3 to 18.2 deaths per 1,000 persons annually) (Gregg et al., 2007).

Furthermore, recent data indicate that women with diabetes are at high risk for developing cardiovascular disease. Women with diabetes were found to be four to six times more likely to develop cardiovascular disease

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA814                              JA-0000407

than women who do not have diabetes (Rivellese et al., 2010). Women with diabetes are more than three times more likely to have a stroke as women without diabetes but no prior history of a cardiovascular event. In fact, women with diabetes have a stroke risk profile similar to that of non-diabetic women who have had a prior stroke (Ho et al., 2003).

In addition to having one of the highest diabetes rates in the world (8.3 percent), the United States has the highest rates of GDM in the world, with as many as 2 to 10 percent of pregnancies being complicated by GDM each year (Danaei et al., 2011; NIDDK, 2011). This may be in part due to increased screening conducted in the United States. Although the incidence of preexisting diabetes in pregnancy has increased over the past decade, the incidence of GDM has remained relatively stable since the late 1990s because of better recognition of the disease and more aggressive intervention, according to a Southern California Kaiser Permanente study (Lawrence et al., 2008). This suggests that the complications of GDM for both mother and infant can be reduced even further by better detection and prevention and more aggressive management of this condition (Crowther et al., 2005; Langer et al., 2005).

Many women who are first diagnosed with diabetes during pregnancy are classified as having GDM. However, it is possible that many had pre-existing or pregestational type 2 diabetes. Indeed, the majority of women with GDM seem to have β-cell dysfunction that appears on a background of chronic insulin resistance already present before pregnancy (Buchanan, 2001).

If a woman who has had GDM is not tested after delivery, the diabetes may have persisted and her next pregnancy may be incorrectly classified as recurrent GDM instead of preexisting diabetes. This distinction is important, because preexisting diabetes could be associated with more serious consequences for the fetus, including cardiac, neurological, and vascular anomalies, than diabetes that arises in the second and third trimesters of pregnancy (Jenkins et al., 2007; Ornoy, 2005; Sivan et al., 2004).

Cases of GDM increase with maternal age and occur 7 to 10 times more often among pregnant women age 24 and older than among women younger than 24 years old (Reece, 2010), suggesting that universal screening may be the most effective in the latter group (Marquette et al., 1985). GDM is itself a risk factor for type 2 diabetes. Women who have GDM during pregnancy have a seven-fold increased risk for the development of type 2 diabetes after delivery, which persists for their lifetime (Reece et al., 2009). One large, population-based study of 659,000 women found that 20 percent of women with GDM progressed to type 2 diabetes within nine years of pregnancy (Feig et al., 2008). Furthermore, the children of women with a history of GDM are at an increased risk for obesity and diabetes compared to other children (Reece, 2010).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA815                          JA-0000408

Diabetes care costs the United States an estimated $174 billion annually, including both indirect and direct costs (ADA, 2011a). The United States spends more than half (54 percent) of the global expenditure on diabetes care and is expected to still be doing so by 2030, when it will spend an estimated $264 billion annually (Zhang et al., 2010).

### Risk Factors for Diabetes

The primary risk factors for type 1 diabetes are genetics and family history (ADA, 2011a), diseases of the pancreas (Buxbaum and Eloubeidi, 2010), and infections or illnesses (Hober and Sane, 2010). The number one risk factor for type 2 diabetes is obesity (Chan et al., 1994; Colditz et al., 1995). Besides obesity, other risk factors for developing type 2 diabetes include impaired glucose tolerance or impaired fasting glucose, insulin resistance, ethnic background, high blood pressure, a history of gestational diabetes, a sedentary lifestyle, family history, polycystic ovary syndrome, and older age (ADA, 2011a).

A number of risk factors have been consistently linked to the development of GDM during pregnancy, including a history of GDM in a prior pregnancy, previously having had a large for gestational age (LGA) infant, obesity, a strong immediate family history of type 2 diabetes or GDM and a history of unexplained fetal death (Mayo Clinic, 2011).

*Obesity*

Obesity is an excess amount of subcutaneous body fat in proportion to lean body mass. (CDC, 2010d). The most common measure of obesity is the body mass index (BMI). If BMI is 25 to 29.9, an individual is considered overweight; a person is considered obese when his/her BMI is greater than 30.

The rapid increase in diabetes in recent decades has closely paralleled the increase in obesity and overweight in the general population (Wang et al., 2008). The United States currently has the highest obesity rate in the world, with more than 30 percent of adults, or 77 million, considered obese. By 2030, if the secular rate of increase continues, it is estimated that nearly 90 percent of Americans will be overweight and 51 percent will be obese (Wang et al., 2008). Obesity recently passed smoking as America's greatest health threat, at least as measured by quality-adjusted life-years (QALYs) lost (Jia and Lubetkin, 2010). Obesity-related diseases account for nearly 10 percent of all medical spending in the United States (Finkelstein et al., 2009). Greater weight means a higher risk of insulin resistance, because fat interferes with the body's ability to use insulin.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA816                              JA-0000409

Clinical Preventive Services for Women. Closing the Gaps

RECOMMENDATIONS                                                            85

Overall there are a variety of factors that play a role in obesity. This makes it a complex health issue to address. The risk factors for obesity include overeating; lack of exercise; genetics; environment; and some diseases and drugs. However, experts have concluded that the two chief causes of obesity are a sedentary lifestyle and the overconsumption of high-calorie foods (Vainio and Bianchini, 2002). Thus, most obesity interventions are directed toward modifying these two lifestyle factors.

The USPSTF recommends screening for type 2 diabetes only in asymptomatic adults with a sustained blood pressure of greater than 135/80 mm Hg and found insufficient evidence to support screening in asymptomatic adults with lower blood pressure levels. Bright Futures does not specifically address screening for diabetes.

## Existing Guidelines and Recommendations

### USPSTF Recommendations

The USPSTF recommends screening for type 2 diabetes in asymptomatic adults with sustained blood pressure (either treated or untreated) greater than 135/80 mm Hg. Grade B Recommendation (USPSTF, 2008b).

The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of screening for type 2 diabetes in asymptomatic adults with blood pressure of 135/80 mm Hg or lower. Grade I Statement (USPSTF, 2008b).

The USPSTF concludes that the evidence is insufficient to recommend for or against routine screening for gestational diabetes. Grade I Statement (USPSTF, 2008a).

The USPSTF recommends that all clinicians screen all adult patients for obesity and offer intensive counseling and behavioral interventions to promote sustained weight loss for obese adults. Grade B Recommendation (USPSTF, 2003).

The U.S. Department of Veterans Affairs (VA) and the U.S. Department of Defense (DOD) Clinical Practice Guidelines recommend that physicians consider screening for diabetes and encourage aerobic exercise and diet to achieve weight loss and prevent the progression of pre-diabetes to diabetes (VA, 2010). Numerous health professional associations and other organizations recommend screening for diabetes as part of preventive care for women. The American Diabetes Association, for example, recommends

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA817                            JA-0000410

Case 1:25-cv-02540-DLC   Document 34-3   Page: 156   Date Filed: 12/12/2025

that physicians consider testing for diabetes in all adults who are overweight and who have additional risk factors and all adults 45 years and older not exhibiting these conditions (Zinman et al., 2010).

### Guidelines for GDM Screening

Little evidence indicates that screening for GDM improves health outcomes. For this reason, the USPSTF concluded that the evidence is insufficient to recommend for or against routine screening for gestational diabetes. However, according to the USPSTF, "clinicians should discuss screening for GDM with their patients and make case-by-case decisions. Discussions should include information about the uncertainty of benefits and harms as well as the frequency of positive screening test results." Women at increased risk include women who are obese, older than 25 years of age, have a family history of diabetes, have a history of previous GDM, or are of certain ethnic groups (Hispanic, American Indian, Asian, or African-American). There are no existing interventions to prevent GDM from occurring in pregnancy. However, some bodies have considered it important to screen pregnant women for GDM because these women are at increased risk for having infants with excessive birth weight and require operative delivery or infants with increased neonatal morbidity.

The U.S. Indian Health Service (IHS), VA, and the DOD Clinical Management Guideline for the Management of Pregnancy, for example, recommend routine screening of all pregnant women for GDM at 24 to 28 weeks of gestation (VA, 2009). While the American Academy of Family Physicians (AAFP) recognizes that more studies are needed to unequivocally support the benefit of universal screening for GDM, it also identifies that universal screening for GDM at 24 to 28 weeks of gestation is recommended by many experts. The recommendation is based on consensus, disease-oriented evidence, expert opinion, and case series (Serlin and Lash, 2009). In support of the recommendation, AAFP also notes that most obstetric practices employ this strategy. The American Congress of Obstetricians and Gynecologists (ACOG), in its Clinical Management Guidelines for Obstetrician-Gynecologists on gestational diabetes (ACOG, 2001), recommends screening for GDM at 24 to 28 weeks of gestation. Its recommendation is based on limited or inconsistent scientific evidence. Other organizations with guidelines include the National Collaborating Centre for Women's and Children's Health, the American Heart Association, the Endocrine Society, and the National Kidney Foundation.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                            JA818                          JA-0000411

## Effective Interventions

The value of early detection of diabetes, other than type 1 diabetes, remains controversial because of the lack of an established evidence base. Randomized trials have established the benefits of interventions to prevent or delay diabetes (Knowler et al., 2002; Tuomilehto et al., 2001) and to reduce diabetes-related complications (UKPDS, 1998). However, no randomized control trial has established the benefits of early detection of diabetes. Several major studies have demonstrated that delaying and/or aggressively managing diabetes can ameliorate many of its negative consequences for women and their children.

The Diabetes Control and Complications Trial (DCCT), an almost 10-year study sponsored by the National Institutes of Health found that maintaining blood glucose levels as close to normal as possible slowed the development and progression of the eye, kidney, and nerve damage caused by diabetes (Genuth, 2006). It also found that any sustained lowering of blood glucose was beneficial. The most significant side effect of intensive treatment in the DCCT was an increase in the risk for hypoglycemia, or low blood glucose, including episodes severe enough to require additional medical assistance (Genuth, 2006).

The Diabetes Prevention Program (DPP), another intervention study, was designed to assess whether modest weight reduction through dietary changes and increased physical activity or treatment with oral diabetes medication could prevent or delay the onset of type 2 diabetes. Results from this study showed that participants who were pre-diabetic could sharply reduce their risk of developing diabetes with a modest loss of weight through dietary changes and increased physical activity (The Diabetes Prevention Program Research Group, 2000). Taking oral diabetes medication could also reduce risk, although less dramatically.

Since the conclusion of the DPP study, additional data analyses continue to provide important insights into the value of lifestyle changes in helping people prevent type 2 diabetes and its complications. One analysis found that DPP participants with specific genetic profiles had a significantly increased risk of developing diabetes and selective responses to specific interventions (Florez et al., 2007). It is possible that subgroups of individuals will not respond well to standard interventions or that some responders may respond very well to a particular treatment on the basis of their genetic profile.

Nutritional support and exercise also can have a significant impact on the incidence and severity of diabetes. The DPP found that just 30 minutes of moderate physical activity a day, coupled with a 5 to 10 percent reduction in body weight, produced a 58 percent reduction in the incidence of diabetes (Knowler et al., 2002).

The current evidence of the efficacy of obesity prevention and interven-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA819                                    JA-0000412

tions is based on a very small number of studies (Lemmens et al., 2008). Some studies showed a positive impact of the intervention on BMI or weight status, but there is too much heterogeneity in terms of study design, theoretical underpinning, and target population to be able to draw firm conclusions about which intervention approaches are more effective than others (Lemmens et al., 2008). More research is urgently needed to extend the body of evidence in this area of prevention.

The only intervention for obesity that has been shown to have great benefit for preventing other complications of obesity is surgery (Valezi et al., 2010). Gastric bypass surgery has been shown to ameliorate diabetes (Gill et al., 2011) and cardiovascular morbidity and mortality (Pontiroli and Morabito, 2011). However, this is an invasive surgical intervention, and an estimated 5 percent or more of people have serious or life-threatening complications after gastric bypass surgery (Picot et al., 2009).

## Identified Gaps

The primary gaps in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) were screening for diabetes in all women and screening for gestational diabetes among pregnant women, especially those identified to be at high risk for developing gestational diabetes. The committee found insufficient evidence to support screening for diabetes in all women.

The evidence provided to support a recommendation for gestational diabetes is based on current federal practice policy from IHS and the VA as well as current practice and clinical professional guidelines such as those set forth by AAFP and ACOG.

> Recommendation 5.1: The committee recommends for consideration as a preventive service for women: screening for gestational diabetes in pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes.

## CERVICAL CANCER

Invasive cervical neoplasia is a low-prevalence cancer with a lengthy pre-invasive phase that is amenable to screening and early detection. Current USPSTF screening recommendations do not yet address the potential role of high-risk (oncogenic) human papillomavirus (HPV) DNA testing within practice of screening for invasive cervical neoplasia (USPSTF, 2003a). High-risk HPV DNA testing detects the viral types most commonly associated with the development of cancer.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                         JA820                         JA-0000413

Persistent infection with 1 of 20 high-risk HPV types is the necessary precursor for the development of squamous cell carcinoma and adenocarcinoma of the uterine cervix (Plummer et al., 2007; Walboomers et al., 1999; WHO, 2005). HPV infection is highly prevalent and is sexually acquired with the onset of sexual intercourse, typically resolving within 24 months (Insinga et al., 2007; Khan et al., 2005). Progression from persistent infection to precursor lesion (high-grade squamous intraepithelial lesion or cervical intraepithelial neoplasia [CIN] grade 2 [CIN2] or CIN3) can be a lengthy process, with the 10-year risk for the development of these lesions (even for the highest-risk viral types) being approximately 17 percent (Khan et al., 2005). Even after precursor lesions, the risk of progression to invasive disease is about 31 percent in 30 years (McCredie et al., 2008). On the basis of the current understanding of the natural history of HPV infection and cervical carcinogenesis, it is recommended that adult women with a history of sexual activity undergo periodic screening as part of their routine preventive care.

## Prevalence/Burden

In 2010, 12,200 cases of invasive cervical cancer were diagnosed and 4,210 deaths were estimated to have occurred in the United States (CDC, 2007a), and the incidence of cervical cancer has been steadily decreasing in the United States and Western Europe since the introduction of formal and informal cytological screening programs in the 1950s. By 2007, the rate of mortality in the United States has decreased from 10.2 and 18 per 100,000 among White and non-White women, respectively, to 2.2 and 4.3 per 100,000 for White and African-American women, respectively (CDC, 1953; NCI, 2011a). Despite these tremendous gains, women with poor access to health care services and specifically women from communities of color have lagged significantly behind and currently represent a disproportionate share of cervical cancer incidence and mortality (NCI, 2011b; Saslow et al., 2002).

Although the annual incidence of death from cervical cancer is less than that of other cancers (ACS, 2010), the fact that these deaths are almost entirely preventable through primary prevention, screening and early detection, treatment of precancerous lesions, and effective therapies for invasive disease, makes cervical cancer a high-impact public health priority. Because sexually acquired persistent high-risk HPV infection is the primary causal factor associated with the development of cervical cancer, regular screening of all adult women with a history of sexual activity has been the mainstay of prevention efforts (USPSTF, 2003a). Periodic exfoliative cervical cytology-based screening (with or without high-risk HPV DNA testing) detects pre-invasive and early-stage disease, contributing to reductions in

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA821                          JA-0000414

the rate of mortality from cervical cancer. This type of screening, in combination with prophylactic (bivalent or quadrivalent) HPV vaccination of young women and girls, has made the prevention of mortality from cervical cancer an attainable public health goal.

*Healthy People 2020*, which sets health goals for the United States, contains specific objectives for increasing the proportion of women who receive screening for cervical cancer (HHS, 2011a). The specific targets set for this objective are increasing the rate of screening among women aged 21 to 65 years who receive a cervical cancer screen (based on the most recent guidelines) by 10 percent so that 93 percent of women are screened.

## Existing Guidelines and Recommendations

---

### USPSTF Recommendations

The USPSTF strongly recommends screening for cervical cancer in women who have been sexually active and have a cervix. Grade A Recommendation (USPSTF, 2003a).

The USPSTF concludes that the evidence is insufficient to recommend for or against the routine use of new technologies to screen for cervical cancer. Grade I Statement (USPSTF, 2003a).

The USPSTF concludes that the evidence is insufficient to recommend for or against the routine use of human papillomavirus (HPV) testing as a primary screening test for cervical cancer. Grade I recommendation (USPSTF, 2003a).

---

Broad consensus exists about the need for periodic screening of adult women with a history of sexual activity. The American Cancer Society (ACS) and ACOG recommend the periodic screening of women beginning at 21 years of age (or three years after the onset of intercourse) (ACOG, 2005a, 2008, 2009; Saslow et al., 2002, 2007). Both entities also recommend the combined use of cytology with testing for high-risk HPV to improve detection and lengthen screening intervals in women 30 years of age and older. The discontinuation of cervical cancer screening in later life is also addressed by these recommendations, with ACS suggesting 70 years of age as the upper limit and ACOG mentioning 65 or 70 years as the upper limit. Both entities caution that discontinuation of screening should occur only when a woman has a documented history of negative screenings. Discontinuation is also recommended by both entities when a woman has had

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA822                          JA-0000415

a hysterectomy for benign disease. The DOD recently added the high-risk HPV DNA test to its list of covered preventive services (TRICARE, 2011).

The ACS and ACOG recommendations also largely agree with the 2003 recommendations of the USPSTF (USPSTF, 2003a). These call for the screening of all sexually active women with cervical cytology beginning at age 21 years or within years of the onset of sexual activity and at least every three years thereafter (Grade A). Like ACS and ACOG, the USPSTF recommends against the screening of women who have undergone hysterectomy for benign disease (Grade D), as well as women age 65 years and older in the setting of prior normal screening examinations (Grade D). In 2003, the USPSTF concluded that there was insufficient evidence to recommend for or against HPV testing in a routine screening setting.

## Effective Interventions

On the basis of the summary of observational data, it can be concluded that the use of cytology for cervical cancer screening has contributed significantly to the reduction in the incidence of and rate of mortality from invasive cervical cancer. This has been accomplished on the basis of the substantial uptake of screening for cervical cancer. In 2008, more than 80 percent of women, aged 18–44, reported that they had undergone cytological screening during the previous three years (CDC, 2011a). The rate of screening utilization, however, varies substantially by race and ethnicity, level of educational attainment, and age, with significantly lower rates of screening being seen for Asian and American Indian/Alaska Native women, those with a high-school education or less, and those older than 64 years of age (CDC, 2011a). These considerations are critical, because more than half of all invasive cervical cancers occur among un- and underscreened women, while nearly a third occur among women with screening failures and the remainder are due to inadequate postscreening follow-up or misreadings (Janerich et al., 1995; Kinney et al., 1998; Leyden et al., 2005; Sung et al., 2000).

Cytology has also evolved with liquid-based cytology platforms now largely replacing conventional dry slide cytology in the United States (Irwin et al., 2006). The quality of liquid-based cytology has arguably been proposed to be superior to that of conventional dry slide cytology on the basis of lower rates of unsatisfactory results (Ronco et al., 2007; Siebers et al., 2009), although they are otherwise comparable on the basis of test performance characteristics (Arbyn et al., 2008; Davey et al., 2006). The shift to liquid-based cytology has been driven by practical considerations, including the advent of automated high-throughput processing, an aging cytotechnology workforce, and the advent of molecular testing. It is, however, the ability to perform high-risk HPV DNA testing and cytology on a

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                      JA823                                      JA-0000416

single patient specimen that may represent the most important contribution of this technology to overall cancer prevention.

The identification of HPV infection as the requisite etiologic precursor to cervical carcinoma has led to the development of clinically useful assays. The high-risk HPV DNA hybrid capture (HC2) assay (de Cremoux et al., 2003) is the most widely used assay for HPV detection. The HC2 assay is a pooled probe assay that detects 13 different high-risk HPV types and is approved by the Food and Drug Administration (FDA) for use for the triage of a cytology result indicating an atypical squamous cell of undetermined significance as well as for primary screening in combination with cytology for primary screening in women 30 years of age and older (FDA, 2009b,c). More recently, another pooled test (Cervista; Hologic, Bedford, MA) was approved for the same indication as the HC2 assay, as was a related type-specific probe for the detection of HPV types 16 and 18 (FDA, 2009a; Ronco et al., 2010). Although they are not FDA approved, a variety of commercially available and laboratory-specific molecular assays are currently in use under laboratory-specific internal validation standards.

*Changing Screening Paradigms*

A number of European trials have examined the usefulness of primary screening using high-risk HPV DNA testing compared with that of cervical cytology for the detection of cervical cancer and its precursors. A large randomized controlled trial conducted within the Italian national screening program compared the performance of the HC2 assay to that of conventional cytology among 35,471 women 35 years of age or older (Ronco et al., 2007). After 3.5 years of follow-up, the cumulative rates of detection of CIN3 and above (CIN3+) were 55 and 35 percent for cervical intraepithelial neoplasm grade 2 (HC2 assay) and cytology, respectively (relative risk [RR] = 1.57, 95 percent confidence interval [CI] = 1.03 to 2.4), although no differences in the number of invasive cancers detected in the two groups were detected (four in the HC2 assay arm compared with five in the cytology arm). In another large population-based European trial of 7,908 women aged 30 years and older, the HC2 assay was significantly more sensitive than cytology for the detection of CIN3+: 97 percent (95 percent CI = 83 to 99 percent) and 46 percent (95 percent CI = 31 to 62 percent), respectively (Petry et al., 2003). The magnitude of these findings is even greater at the lower, yet still clinically relevant, treatment threshold of CIN2 or greater (Bigras and de Marval, 2005; Cardenas-Turanzas et al., 2008; Cochand-Priollet et al., 2001; de Cremoux et al., 2003; Mayrand et al., 2006, 2007; Petry et al., 2003).

Taking a slightly different approach, a large Finnish randomized controlled trial compared the HC2 assay (with cytology triage of abnormal)

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA824                              JA-0000417

with cytology alone among 61,149 women in the national screening pro-
gram (Kotaniemi-Talonen et al., 2008). On extended follow-up at 3.3 years,
the rates of detection of CIN3+ and cancer in the HC2 testing arm (59 cases
of CIN3+ and 11 invasive cancers) were significantly increased (RR = 1.77,
95 percent CI = 1.16 to 2.74) compared with those for the arm that used
cytology only (33 cases of CIN3+ and 6 invasive cancers) (Anttila et al.,
2010).

The impressive negative predictive value of the combination of cytology
and screening for high-risk HPV was first noted in large cross-sectional
studies (Cuzick et al., 2006; Kjaer et al., 2006). The combination has also
subsequently been assessed in various European trials, although none used
methods that reflect the current practice in the United States. In general,
these trials of the combination of cytology and screening for high-risk
HPV have consistently demonstrated the improved detection of cervical
cancer precursors (CIN2+) over that by cytology by itself, as well as ex-
tremely high negative predictive values (Mayrand et al., 2006, 2007; Petry
et al., 2003). It is this impressive predictive value of the combination of a
negative cytology result and a negative result for HPV, first identified in
cross-sectional studies that may permit further safe lengthening of screen-
ing intervals.

A recent U.S. study examined data from 331,818 women aged 30 and
older who received care in a Kaiser Permanente Northern California from
2003 to 2005. The authors found 7.5 cervical cancers per 100,000 women/
year for all women with a normal conventional cytology test, while the
rate of cervical cancer was 3.8 per 100,000 woman/years for all women
who were HPV-negative. The rate was lowest among women who were
HPV-negative and had a normal conventional cytology result, at 3.2 per
100,000 women/year. The study also found that HPV-positive women had
a 7.6 percent risk of developing a cancerous or pre-cancerous lesion over
five years, while women with an abnormal conventional test result had a
4.7 percent risk. Women with a negative HPV had a lower cancer risk than
women who had a normal conventional cytology test. When both cytology
and HPV were positive, women had twice the risk for cancer compared to
women with a positive HPV test and a normal conventional cytology test
(Katki et al., 2011).

## Identified Gaps

The primary gap in preventive services not already addressed by the
provisions set forth in the ACA (reviewed in this section) is that currently
there is an absence of coverage for co-testing with cytology and high-risk
HPV DNA testing among women 30 years of age and older as a strategy
to increase screening intervals to every three years. Cervical cancer is

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA825                                    JA-0000418

almost entirely preventable through early screening, detection, and treatment. Evidence to support high-risk HPV DNA testing is based on federal practice policy from the DOD. Peer-reviewed studies demonstrate that improved testing technologies, particularly combined screening using both conventional cytology and high-risk HPV DNA screening, may significantly improve the rate of detection of cervical cancer precursors and facilitate the safe lengthening of the interval for screening.

> **Recommendation 5.2: The committee recommends for consideration as a preventive service for women: the addition of high-risk HPV DNA testing to cytology testing in women with normal cytology results. Screening should begin at 30 years of age and should occur no more frequently than every 3 years.**

## SEXUALLY TRANSMITTED INFECTIONS

Sexually transmitted infections (STIs), or sexually transmitted diseases (STDs), are diseases transmitted primarily by sexual activity. In 1997, the Institute of Medicine (IOM) labeled STDs a hidden epidemic, reflecting the knowledge that this largely unrecognized public health threat had considerable scope (IOM, 1997). The discussion that follows focuses primarily on chlamydia, gonorrhea, and syphilis.

### Prevalence/Burden

For all STIs generally and for chlamydia, gonorrhea, and syphilis more specifically, the prevalence and number of reported cases are high among certain age groups, racial and ethnic groups and in certain geographic areas. Nevertheless, many STIs are asymptomatic and go undiagnosed; thus, current surveillance systems tend to underestimate the actual burden of disease. Significant short- and long-term morbidities are associated with these conditions, as is the risk for perinatal transmission, with its disease-specific attendant consequences. The services under consideration here include screening and counseling.

Women who contract STIs suffer from adverse reproductive health outcomes (Friedel and Lavoie, 2008). Infections in women, which are usually asymptomatic, can result in pelvic inflammatory disease, a major cause of infertility, ectopic pregnancy, and chronic pelvic pain. As with human immunodeficiency virus (HIV), women at risk for STIs often do not appreciate that they are at risk if they consider themselves in a monogamous relationship (Hodder et al., 2010).

In 2009, the overall rate of reported chlamydia infection among women (592 cases per 100,000 women) was almost three times higher than the

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                            JA826                            JA-0000419

rate among men. Although the rates of reported chlamydia infections have been rising for several years, this could be due at least in part to increased screening and improvements in detection methods. The highest age-specific rates of reported cases in 2009 were among those aged 15 to 19 years.

In 2009, the rates of gonorrhea were 105.5 cases per 100,000 women and 91.9 per 100,000 men. Rates continue to be the highest among adolescents and young adults (CDC, 2009b; Workowski and Berman, 2010). In addition, epidemiological and biological studies provide strong evidence that gonococcal infections facilitate the transmission of HIV infection (Fleming and Wasserheit, 1999).

Syphilis is a genital ulcerative disease that causes significant complications if it is left untreated, including perinatal death in up to 40 percent of pregnant women, and can lead to infection of the fetus in 80 percent of cases, even if the infection is acquired during the four years before pregnancy (CDC, 2009b). Syphilis is also shown to facilitate the transmission of HIV infection (Fleming and Wasserheit, 1999). In 2009, the rate of syphilis was 7.8 cases per 100,000 men and 1.4 cases per 100,000 women. Consistent with other STIs, the rates are the highest for women aged 20 to 24 years (5.6 cases per 100,000) (Workowski and Berman, 2010).

Although the absolute risk factors for each disease may vary, in general, populations at increased risk for one STI are at increased risk for all STIs. The prevalence of gonorrhea and syphilis is highly dependent on the geographic area and sociodemographic factors, with increased rates occurring among Hispanics, African Americans, and lower socioeconomic groups. However, in general, in addition to sexual activity and age, other risk factors for STIs include a history of a prior STI; new, bisexual, or multiple sexual partners; inconsistent condom use; exchanging sex for money or drugs; and incarceration in adult correctional facilities. Sexually active adolescents are at higher risk of acquiring STIs, for a combination of developmental, behavioral, and biological reasons (Friedel and Lavoie, 2008). The risk factors for pregnant women are the same as those for nonpregnant women.

A 2008 Henry J. Kaiser Family Foundation survey found that only 38 percent of women, aged 18 to 44 years reported that they had discussed their sexual history with a doctor or nurse within the past three years. Furthermore, only 28 percent reported that they had discussed STIs with a doctor or nurse. Nevertheless, many women assume that they are tested routinely for STIs (Ranji and Salganicoff, 2011).

### Existing Guidelines and Recommendations

The USPSTF recommends screening and counseling for STIs on the basis of the following risk factors listed in Table 5-2.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA827  JA-0000420

Clinical Preventive Services for Women. Closing the Gaps

**TABLE 5-2** Indicators of Increased Risk for STIs from USPSTF and Populations Excluded by the Guidelines

| Condition/ Intervention | Indicators of Increased Risk Defined by the USPSTF | Populations Excluded |
|---|---|---|
| Chlamydia | Sexually active women aged 24 and younger<br>History of STIs<br>New or multiple sexual partners<br>Inconsistent condom use<br>Exchanging sex for money or drugs<br>Incarcerated persons<br>Military recruits<br>Patients at public STI clinics<br>African-American women<br>Hispanic women | "Average risk" women older than 25 |
| Gonorrhea | Women aged younger than 25<br>History of previous gonorrhea infection<br>Other STIs<br>New or multiple sexual partners<br>Inconsistent condom use<br>Commercial sex workers<br>Drug use<br>African-American women<br>Individual risk depends on local epidemiology of disease | Sexually active and pregnant women not at increased risk |
| Syphilis | Commercial sex workers<br>Exchanging sex for drugs<br>Incarcerated persons | Sexually active women not at increased risk |
| STI counseling | Sexually active adolescents<br>Adults/married adolescents with current STIs or infections within the past year<br>Adults/married adolescents with multiple current sexual partners<br>Sexually active patients in nonmonogamous relationships in a location with a high rate of STIs | Nonsexually active adolescents<br>Sexually active women not at increased risk |

SOURCES: USPSTF, 2004b, 2005a, 2007, 2008a.

The USPSTF 2008 Clinical Guidelines for counseling to prevent STIs indicate that "clinicians should also consider the communities they serve. If the practice's population has a high rate of STIs, all sexually active patients in non-monogamous relationships may be considered to be at increased risk" (Calonge et al., 2008).

The National Institute for Health and Clinical Excellence in the United Kingdom recommends identifying individuals at high risk for STIs by obtaining a sexual history and conducting one-on-one structured discussions with those at high risk of STIs. Those at risk include people who come from or who have visited areas with a high prevalence of HIV infection. Other

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                  JA828                              JA-0000421

risk factors are misuse of alcohol or other substances, early onset of sexual activity, and unprotected sex or multiple sex partners (NICE, 2007).

The Centers for Disease Control and Prevention (CDC) recommends that all providers obtain a sexual history from each patient and engage in risk-reduction counseling. Evaluation of patients for the Five P's (partners, prevention of pregnancy, protection from STDs, practices, and past STDs) is considered an effective strategy for this purpose (Workowski and Berman, 2010). *Healthy People 2020* outlines a series of objectives for reducing STIs and STI complications, as well as addressing sexual risk behaviors (HHS, 2011a). The National Business Group on Health's (NBGH's) 2006 Evidence Statement also addresses the need for STI education and counseling (Campbell and Lantine, 2006). Furthermore, the Michigan Quality Improvement Consortium recommends that health maintenance exams include risk evaluation and counseling for STI prevention for all individuals aged 18 to 49 years (Michigan Quality Improvement Consortium, 2008). ACOG recommends counseling on STIs, including discussion of partner selection, barrier protection, and high-risk behaviors, as part of their recommended periodic assessments for women aged 13 and older (ACOG, 2007c). The American Medical Association (AMA) encourages physicians to educate their patients about STIs and condom use (AMA, 2003).

Bright Futures recommends that sexually active adolescents receive annual screenings for gonorrhea and chlamydia. In addition, Bright Futures provides anticipatory guidance for physicians to encourage adolescents to protect themselves from STIs and risky behaviors. Counseling on methods of safe sex and contraceptive use is recommended for sexually active adolescents (AAP, 2008).

## Effective Interventions

Although many studies have focused primarily on behavioral interventions for prevention of HIV infection, interventions for prevention of STI and HIV infection are interdependent, because the risk-taking behaviors that result in an STI or HIV infection are similar. Short counseling interventions were shown to reduce risky behavior in patients at risk for HIV infection. Project RESPECT, a multicenter randomized control trial of 5,758 heterosexual individuals with STIs, showed that brief, individualized counseling increased the frequency of self-reported condom use through six months and reduced the rate of STI acquisition by 30 percent through six months and 20 percent through 12 months. It was also shown that counseling for those who had ever used drugs was effective and could be effective for current drug users (Kamb et al., 1998). Drug use, past and present, is a risk factor for HIV infection, gonorrhea, and potentially syphilis (Semaan et al., 2010). A study by Kelly et al. provides

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA829                                JA-0000422

Case 7:25-cv-25740-WDB   Document 34-3   Page: 168   Filed 09/26/25   Page 12/12/2025 330

some of the strongest evidence for the success of behavioral interventions in heterosexual women (Kelly et al., 1994). Rates of condom use increased from 26 to 56 percent after a cognitive behavioral intervention aimed at high-risk women.

The USPSTF currently recommends that physicians offer high-intensity behavioral counseling to prevent STIs for all sexually active adolescents and adults at increased risk, defined by current STI status and multiple sexual partners. High-intensity interventions that were found to be effective were delivered in multiple sessions, most often in groups, with total durations being three to nine hours (USPSTF, 2008a).

In addition to a client-centered approach, the CDC recommends that comprehensive counseling includes addressing abstinence and condom use, reducing sex partners, and types of sex practiced (Friedel and Lavoie, 2008).

### Identified Gaps

The primary gap in preventive services not already addressed by the provisions set forth in the ACA is that STI counseling is limited to adults who currently have STIs or who identify themselves as having multiple sex partners. Additionally, screening for chlamydia for women aged 25 years and older is not defined by geographic risk factors.

The evidence provided to support a recommendation related to STI counseling is based on federal goals from CDC and *Healthy People 2020* (CDC, 2010e; HHS, 2011a), as well as recommendations from AMA and ACOG. The committee found insufficient evidence to support a new recommendation related to screening for chlamydia or gonorrhea; instead, the evidence supported by federal priorities and clinical professional guidelines led to a suggestion for those screenings to be addressed during a well-woman visit.

> Recommendation 5.3: The committee recommends for consideration as a preventive service for women: annual counseling on sexually transmitted infections for sexually active women.

### HUMAN IMMUNODEFICIENCY VIRUS INFECTION

HIV was addressed above in the section on STIs, as HIV infection frequently coexists with other STIs and the risk factors for HIV infection and STIs are much the same. HIV is a sexually transmitted virus that causes damage to an infected person's CD4+ T cells, which are crucial for helping

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                            JA830                            JA-0000423

Case: 25-2640-WP Document: 34-3 Page: 169 Date Filed: 12/11/2025

the body defend itself against diseases. HIV is the virus that causes AIDS, a condition in humans in which progressive failure of the immune system allows life-threatening opportunistic infections and cancers to thrive. HIV can develop into AIDS within just a few years if it is left untreated (CDC, 2010a). Currently, no vaccine for HIV infection/AIDS is available (Flexner, 2007). However, to date more than 30 anti-HIV drugs have been developed and licensed. In combinations of three or more, these medications have proved extremely effective in slowing the progression of HIV if it is detected and treated early (Fauci, 2011). New HIV infections in women are found at the highest rates between ages 13 and 39 years (KFF, 2011).

## Prevalence/Burden

Although HIV infection/AIDS is more prevalent in men, the rate of HIV infection/AIDS in women is increasing (IOM, 2010b). From 1999 to 2003, the CDC reported a 15 percent increase in AIDS cases among women but only a 1 percent increase in men (CDC, 2006). In 1985, women accounted for 8 percent of new AIDS cases, a proportion that grew to 25 percent in 2009 (CDC, 2011b; KFF, 2011). In 2009, 9,973 women were diagnosed with HIV infection.

The majority of HIV infection and AIDS cases in women are a result of high-risk heterosexual sex (CDC, 2010b; KFF, 2011). However, many women are unknowingly infected because of the risk behavior of their partners (Hader et al., 2001; IOM, 2010b; Varghese et al., 2002). In addition, an estimated 6,000 to 7,000 HIV-positive women in the United States give birth each year (Bulterys et al., 2002; CDC, 2007c; Lee and Fleming, 2001).

Women with HIV infection often have lower socioeconomic status. Family responsibilities and a lack of access to care have been identified as barriers to women managing their HIV infection and pursuing appropriate care (Bozzette et al., 1998; Cunningham et al., 1999; Fleishman et al., 2005; Shapiro et al., 1999). Although women share with men the complication of the progression of HIV infection to AIDS, they also experience gender-specific comorbidities, such as recurrent vaginal yeast infections, severe pelvic inflammatory disease, and increased risk of precancerous changes in the cervix (NIAID, 2008). In 2007, HIV infection was the fifth leading cause of death for women (aged 25 to 44 years), but it was the third leading cause of death for black women (CDC, 2011b; KFF, 2011). HIV infection was the number one cause of death for black women aged 25 to 34 years (CDC, 2008).

Women at risk for acquisition of HIV frequently do not appreciate that they are at risk (Hodder et al., 2010). Black women, in particular, report

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA831                              JA-0000424

not knowing their sexual partner's risks, such as injection drug use, having other current sex partners, or unknown HIV status (DeCarlo and Reznick, 2009). In 2005, 80 percent of HIV-positive black woman were infected through heterosexual sex (Rose et al., 2008).

## Existing Guidelines and Recommendations

<div style="border:1px solid black">

### USPSTF Recommendations

The USPSTF strongly recommends that clinicians screen for human immuno-deficiency virus (HIV) all adolescents and adults at increased risk for HIV infection. Grade A Recommendation (USPSTF, 2005b).

The USPSTF makes no recommendation for or against routinely screening for HIV adolescents and adults who are not at increased risk for HIV infection. Grade C Recommendation (USPSTF, 2005b).

</div>

Increased risk for HIV is defined by the following factors:

- Receives health care in a high-prevalence or high-risk clinical setting;
- Women having unprotected sex with multiple partners;
- Past or present injection drug users;
- Women who exchange sex for money or drugs or have sex partners who do;
- Individuals whose past or present sex partners were HIV-infected, bisexual, or injection drug users;
- Persons being treated for STDs;
- Persons with a history of blood transfusion between 1978 and 1985; and
- Persons who request an HIV test (USPSTF, 2005b).

The USPSTF also recommends that all pregnant women receive screening for HIV infection as part of prenatal care. Screening of adults and adolescent women who are not pregnant or who are not considered to be at increased risk for HIV infection is a USPSTF Grade C recommendation, implying that screening should not be routinely done but, rather, should be done on an individualized case-specific basis. Bright Futures recommends that all sexually active and at risk adolescents aged 11 to 21 years be screened for HIV infection annually (AAP, 2008).

The CDC, the American College of Physicians (ACP), the Infectious

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA832                              JA-0000425

Diseases Society of America (IDSA), AMA, ACOG, the American College of Nurse-Midwives, as well as the IOM recommend broader screening for HIV infection to include adolescents and sexually active adults to age 65 years (CDC, 2006; IOM, 2010a). The CDC qualifies its recommendation, stating that screening may not be warranted if the prevalence rate is <0.1 percent or the diagnostic yield is <1/1,000 screened. The CDC recommends opt-out screening and instructs physicians to offer counseling on HIV infection and test results before the patient is tested if the patient does not decline the screening. Preventive counseling regarding HIV infection is still recommended by the CDC, but the revised guidelines recommend separation of testing from screening for high-risk individuals as a way to eliminate one potential barrier to testing. For patients with a positive test result, the CDC recommends the provision of access to care, prevention counseling, and support services.

## Effective Interventions

Risk-based screening has been shown in large health care networks to be an ineffective means of identifying individuals with HIV infection. Identified risk factors such as a current sexually transmitted disease or substance abuse have not been shown to be reliably used by physicians as reasons to screen, even within a health care system in which access to care is not a barrier (Gandhi et al., 2007; Owens et al., 2007). A review of Medicaid claims from 1998 revealed that of all cohort patients diagnosed with a non-blood-borne STI (gonorrhea, chlamydia, or pelvic inflammatory disease, strong risk factors for co-infection with HIV), only 10 percent were subsequently screened for HIV infection, despite the evidence that these are known risk factors for HIV infection (Rust et al., 2003). Additionally, among people who tested positive for HIV, approximately 25 percent did not report high-risk behaviors that would have led a physician to perform risk-based screening (Chou et al., 2005). As referenced earlier, many women do not believe themselves to be at risk, so it is unlikely that they will ask to be tested.

Opt-out screening was shown to be very effective in prenatal screening for HIV. In a retrospective cohort study of 12,221 pregnancies resulting in delivery, only 221 women declined the screening (Breese et al., 2004). This type of screening has been accepted by women and is now widely implemented (Schuman et al., 2004).

Early screening for HIV infection is crucial to afford patients effective treatment and also for the benefit of the patients' sexual partners. In a recent worldwide clinical trial, researchers found that HIV-infected men and women who were able to start oral antiretroviral medicines early in

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                             JA833                              JA-0000426

the stage of HIV progression actually reduced their risk of transmitting the virus to their partners by 96 percent (NIAID, 2011).

### Identified Gaps

The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is that current screening recommendations by the USPSTF are limited in scope; that is, they are limited to pregnant women and high-risk adolescents and adults.

The evidence provided to support a recommendation for expanding screening is based on federal goals from the CDC, as well as clinical professional guidelines, such as those from the ACP, IDSA, AMA, and ACOG.

> **Recommendation 5.4: The committee recommends for consideration as a preventive service for women: counseling and screening for HIV infection on an annual basis for sexually active women.**

## PREVENTING UNINTENDED PREGNANCY AND PROMOTING HEALTHY BIRTH SPACING

Unintended pregnancy is defined as a pregnancy that is either unwanted or mistimed at the time of conception (Finer and Henshaw, 2006) and affects women with reproductive capacity, that is, from the time of menarche to menopause. Family planning services that are provided to prevent unintended pregnancies include contraception (i.e., all FDA-approved contraceptive drugs and devices, sterilization procedures) as well as patient education and counseling.

### Prevalence/Burden

Unintended pregnancy is highly prevalent in the United States. In 2001, an estimated 49 percent of all pregnancies in the United States were unintended—defined as unwanted or mistimed at the time of conception—according to the National Survey of Family Growth (Finer and Henshaw, 2006). The unintended pregnancy rate is much lower in other developed countries (Trussell and Wynn, 2008). In 2001, 42 percent of U.S. unintended pregnancies ended in abortion (Finer and Henshaw, 2006). Although 1 in 20 American women has an unintended pregnancy each year, unintended pregnancy is more likely among women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group (Finer and Henshaw, 2006).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA834                                    JA-0000427

The consequences of an unintended pregnancy for the mother and the baby have been documented, although for some outcomes, research is limited. Because women experiencing an unintended pregnancy may not immediately be aware that they are pregnant; their entry into prenatal care may be delayed, they may not be motivated to discontinue behaviors that present risks for the developing fetus; and they may experience depression, anxiety, or other conditions. According to the IOM Committee on Unintended Pregnancy, women with unintended pregnancies are more likely than those with intended pregnancies to receive later or no prenatal care, to smoke and consume alcohol during pregnancy, to be depressed during pregnancy, and to experience domestic violence during pregnancy (IOM, 1995).

A more recent literature review found that U.S. children born as the result of unintended pregnancies are less likely to be breastfed or are breastfed for a shorter duration than children born as the result of intended pregnancies and that mothers who have experienced any unwanted birth report higher levels of depression and lower levels of happiness (Gipson et al., 2008). Finally, a recent systematic literature review found significantly increased odds of preterm birth and low birth weight among unintended pregnancies ending in live births compared with pregnancies that were intended (Shah et al., 2008).

The risk factors for unintended pregnancy are female gender and reproductive capacity. Although certain subgroups of women are at greater risk for unintended pregnancy than others (e.g., women aged 18 to 24 years, unmarried women, women with low incomes, women who are not high school graduates, and women who are members of a racial or ethnic minority group), all sexually active women with reproductive capacity are at risk for unintended pregnancy. In 2008, approximately 36 million U.S. women of reproductive age (usually defined as ages 15 to 44 years) were estimated to be in need of family planning services because they were sexually active, able to get pregnant, and not trying to get pregnant (Frost et al., 2010). More than 99 percent of U.S. women aged 15 to 44 years who have ever had sexual intercourse with a male have used at least one contraceptive method (Mosher and Jones, 2010).

Pregnancy spacing is important because of the increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced (within 18 months of a prior pregnancy). Short interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small for gestational age births (Conde-Agudelo et al., 2006; Fuentes-Afflick and Hessol, 2000; Zhu, 2005). In addition, women with certain chronic medical conditions (e.g., diabetes and obesity) may need to postpone pregnancy until appropriate weight loss or glycemic control has been achieved (ADA, 2004; Johnson et al., 2006). Finally, pregnancy may be contraindicated for women with serious medical conditions such as pulmonary hyper-

Copyright National Academy of Sciences. All rights reserved.

tension (etiologies can include idiopathic pulmonary arterial hypertension and others) and cyanotic heart disease, and for women with the Marfan Syndrome (Meijboom et al., 2005; Regitz-Zagrosek et al., 2008; Warnes, 2004).

## Existing Guidelines and Recommendations

Numerous health care professional associations and other organizations recommend the use of family planning services as part of preventive care for women, including ACOG, AAFP, the American Academy of Pediatrics (AAP), the Society of Adolescent Medicine, the AMA, the American Public Health Association, the Association of Women's Health, Obstetric and Neonatal Nurses, and the March of Dimes. In addition, the CDC recommends family planning services as part of preventive visits for preconception health (Johnson et al., 2006).

The USPSTF does not address prevention of unintended pregnancy. Bright Futures recommends that information about contraception be offered to all sexually active adolescents and those who plan to become sexually active (AAP, 2008).

The IOM Committee on Women's Health Research recently identified unintended pregnancy to be a health condition of women for which little progress in prevention has been made, despite the availability of safe and effective preventive methods (IOM, 2010b). This report also found that progress in reducing the rate of unintended pregnancy would be possible by "making contraceptives more available, accessible, and acceptable through improved services (IOM, 2010b). Another IOM report on unintended pregnancy recommended that "all pregnancies should be intended" at the time of conception and set a goal to increase access to contraception in the United States (IOM, 1995). *Healthy People 2020* (HHS, 2011a), which sets health goals for the United States, includes a national objective of increasing the proportion of pregnancies that are intended from 51 to 56 percent. In addition, *Healthy People 2020* sets goals to increase the number of insurance plans that offer contraceptive supplies and services, to reduce the proportion of pregnancies conceived within 18 months of a previous birth, and to increase the proportion of females or their partners at risk of unintended pregnancy who used contraception during the most recent sexual intercourse (HHS, 2011a).

## Effective Interventions

Family planning services are preventive services that enable women and couples to avoid an unwanted pregnancy and to space their pregnancies to promote optimal birth outcomes. A wide array of safe and highly

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA836                    JA-0000429

effective FDA-approved methods of contraception is available, including barrier methods, hormonal methods, emergency contraception, and implanted devices; sterilization is also available for women and for men (FDA, 2010). This range of methods provides options for women depending upon their life stage, sexual practices, and health status. Some methods, such as condoms, spermicides, and emergency contraceptives, are available without a prescription, whereas the more effective hormonal and long-acting reversible methods, such as oral contraceptives and intrauterine devices, are available by prescription or require insertion by a medical professional. Sterilization is a surgical procedure. For women with certain medical conditions or risk factors, some contraceptive methods may be contraindicated. These can be assessed clinically so that an appropriate method can be selected for the individual (CDC, 2010; Dragoman et al., 2010).

The effectiveness of contraceptives is determined by studying the rate of failure (i.e., having an unintended pregnancy) in the first year of use (Table 5-3). The failure rates of all FDA-approved methods in both U.S. and international populations have been well documented and are negligible with proper use (Amy and Tripathi, 2009; Hatcher et al., 2007; Kost et al., 2008; Mansour et al., 2010). Female sterilization, the intrauterine device, and the contraceptive implant have failure rates of 1 percent or less in the first 12 months of use (Fu et al., 1999; Hatcher et al., 2007). Injectable and oral contraceptives have use failure rates of seven and 9 percent, respectively, because some women miss or delay an injection or pill (Kost et al., 2008). Failure rates for both male and female condoms and other barrier methods are higher (e.g., 15 percent for the male condom) (Amy and Tripathi, 2009). These rates compare with an 85 percent chance of an unintended pregnancy within 12 months among couples using no method of contraception (Hatcher et al., 2007; Trussell and Kost, 1987).

In addition to this evidence of method effectiveness, evidence exists that greater use of contraception within the population produces lower unintended pregnancy and abortion rates nationally. Studies show that as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, rates of unintended pregnancy and abortion for unmarried women also declined (Boonstra et al., 2006). Other studies show that increased rates of contraceptive use by adolescents from the early 1990s to the early 2000s was associated with a decline in teen pregnancies and that periodic increases in the teen pregnancy rate are associated with lower rates of contraceptive use (Santelli and Melnikas, 2010).

As with all pharmaceuticals and medical procedures, contraceptive methods have both risks and benefits. Side effects are generally considered minimal (ACOG, 2011a,b,c; Burkman et al., 2004). Death rates associated with contraceptive use are low and, except for oral contraceptive users who

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA837                                    JA-0000430

**TABLE 5-3** Percentage of U.S. Women Experiencing an Unintended Pregnancy During First Year of Typical Use and First Year of Perfect Use, by Contraceptive Method

| Method | % Experiencing Unintended Pregnancy in First Year of | |
| --- | --- | --- |
|  | Typical Use[a] | Perfect Use[b] |
| None | 85 | 85 |
| Spermicides (foams, creams, gels, vaginal suppositories, and vaginal film) | 29 | 18 |
| Withdrawal | 27 | 4 |
| Fertility awareness-based methods[c] | 25 | |
|   Standard days method | | 5 |
|   Two-day method | | 4 |
|   Ovulation method | | 3 |
| Sponge | | |
|   Parous women | 32 | 20 |
|   Nulliparous women | 16 | 9 |
| Diaphragm (with spermicidal cream or jelly) | 16 | 6 |
| Condom (without spermicides) | | |
|   Female | 21 | 5 |
|   Male | 15 | 2 |
| Combined pill and progestin-only pill | 8 | 0.30 |
| Evra patch | 8 | 0.30 |
| NuvaRing | 8 | 0.30 |
| Depro-Provera | 3 | 0.30 |
| Intrauterine Device | | |
|   ParaGard (copper T) | 0.80 | 0.60 |
|   Mirena (LNG-IUS) | 0.20 | 0.20 |
| Implanon | 0.05 | 0.05 |
| Female sterilization | 0.50 | 0.50 |
| Male sterilization | 0.15 | 0.10 |

[a] Among typical couples who initiate use of a method (not necessarily for the first time), the percentage who experience an accidental pregnancy during the first year if they do not stop use for any other reason.

[b] Among couples who initiate use of a method (not necessarily for the first time) and who use it perfectly (both consistently and correctly), the percentage who experience an accidental pregnancy during the first year if they do not stop use for any other reason.

[c] The ovulation and 2-day methods are based on evaluation of cervical mucus. The standard day method avoids intercourse on cycle days 8 through 19.

SOURCE: © 2007 by Contraceptive Technology Communications Reprinted by permission of Ardent Media, Inc.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                     JA838                     JA-0000431

smoke, lower than the U.S. maternal mortality rate (Hatcher et al., 1998). For example, the oral contraceptive death rate per 100,000 users under the age of 35 years who are nonsmokers was 1.5 per 100,000 live births (Hatcher et al., 1998), compared with 11.2 maternal deaths per 100,000 live births in 2006 (age adjusted) (CDC, 2010c).

Contraceptive methods often have benefits separate from the ability to plan one's family and attain optimal birth spacing. For example, the non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain (ACOG, 2010a). Long-term use of oral contraceptives has been shown to reduce a woman's risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases (PRB, 1998). The Agency for Healthcare Research and Quality (AHRQ) is currently undertaking a systematic evidence review to evaluate the effectiveness of oral contraceptives as primary prevention for ovarian cancer (AHRQ, 2011).

Education and counseling are important components of family planning services because they provide information about the availability of contraceptive options, elucidate method-specific risks and benefits for the individual woman, and provide instruction in effective use of the chosen method (NBGH, 2005; Shulman, 2006). Research on the effectiveness of structured contraceptive counseling is limited (Halpern et al., 2006; Lopez et al., 2010b; Moos et al., 2003). However, studies show that postpartum contraceptive counseling increases contraceptive use and decreases unplanned pregnancy (Lopez et al., 2010a), that counseling increases method use among adolescents in family planning clinics (Kirby, 2007), that counseling decreases nonuse of contraception in older women of reproductive age (35 to 44 years) who do not want a future baby (Upson et al., 2010), and that counseling of adult women in primary care settings is associated with greater contraceptive use and the use of more effective methods (Lee et al., 2011; Weisman et al., 2002).

Although it is beyond the scope of the committee's consideration, it should be noted that contraception is highly cost-effective. The direct medical cost of unintended pregnancy in the United States was estimated to be nearly $5 billion in 2002, with the cost savings due to contraceptive use estimated to be $19.3 billion (Trussell, 2007). The cost-effectiveness of family planning is also documented in an evaluation of FamilyPact, California's 1115 Medicaid Family Planning Waiver Program. The unintended pregnancies averted in this program in 2002 would have cost the state $1.1 billion within two years, and $2.2 billion within five years, for public-sector health and social services that otherwise would have been needed (Amaral et al., 2007).

In a study of the cost-effectiveness of specific contraceptive methods, all contraceptive methods were found to be more cost-effective than no

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA839
JA-0000432

method, and the most cost-effective methods were long-acting contraceptives that do not rely on user compliance (Trussell et al., 2009). The most common contraceptive methods used in the United States are the oral contraceptive pill and female sterilization. It is thought that greater use of long-acting, reversible contraceptive methods—including intrauterine devices and contraceptive implants that require less action by the woman and therefore have lower use failure rates—might help further reduce unintended pregnancy rates (Blumenthal et al., 2011). Cost barriers to use of the most effective contraceptive methods are important because long-acting, reversible contraceptive methods and sterilization have high up-front costs (Trussell et al., 2009).

Contraceptive coverage has become standard practice for most private insurance and federally funded insurance programs. For example, contraceptive services are covered for all federal employees and individuals who obtain their care through federally financed programs, such as VA, TRICARE for active-duty military and their dependents, and IHS. Federal programs provide funding for family planning services in community health centers through the Public Health Service Act, in family planning centers through Title X [Population Research and Voluntary Family Planning Programs (P.L. 91-572)], through the Maternal and Child Health Block Grant, and through the Medicaid program.

Since 1972, Medicaid, the state-federal program for certain low-income individuals, has required coverage for family planning in all state programs and has exempted family planning services and supplies from cost-sharing requirements. In addition, 26 states currently operate special Medicaid-funded family planning programs for low-income women who either no longer qualify for Medicaid or do not meet the program's categorical requirements. In Massachusetts, family planning services with no copayments will be included as part of the preventive benefits offered to members of Commonwealth Care, a program of subsidized health insurance for low- and moderate-income people (Personal communication, Stephanie Chrobak and Nancy Turnbull, Massachusetts Health Connector, May 10, 2011).

Private employers have also expanded their coverage of contraceptives as part of the basic benefits packages of most policies. This expansion has occurred in response to state and federal policies. Twenty-eight states now have regulations requiring private insurers to cover contraceptives, and 17 of these states also require that insurance cover the associated outpatient visit costs (Guttmacher Institute, 2011) (see Chapter 3). A federal court ruling issued in 2000 by the Equal Employment Opportunity Commission found an employer's failure to cover prescription contraceptive drugs and devices in a health plan that covers other drugs, devices, and preventive care to be discrimination against women in violation of Title VII of the Civil Rights Act (EEOC, 2000).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA840                              JA-0000433

In 2007, NBGH recommended that employer-sponsored health plans include coverage of family planning services, without cost sharing, as part of a minimum set of benefits for preventive care. The Guttmacher Institute also calls comprehensive coverage of contraceptive services and supplies "the current insurance industry standard," with more than 89 percent of insurance plans covering contraceptive methods in 2002 (Camp, 2011). A more recent 2010 survey of employers found that 85 percent of large employers and 62 of small employers offered coverage of FDA-approved contraceptives (Claxton et al., 2010).

Despite increases in private health insurance coverage of contraception since the 1990s, many women do not have insurance coverage or are in health plans in which copayments for visits and for prescriptions have increased in recent years. In fact, a review of the research on the impact of cost sharing on the use of health care services found that cost-sharing requirements, such as deductibles and copayments, can pose barriers to care and result in reduced use of preventive and primary care services, particularly for low-income populations (Hudman and O'Malley, 2003). Even small increments in cost sharing have been shown to reduce the use of preventive services, such as mammograms (Trivedi et al., 2008). The elimination of cost sharing for contraception therefore could greatly increase its use, including use of the more effective and longer-acting methods, especially among poor and low-income women most at risk for unintended pregnancy. A recent study conducted by Kaiser Permanente found that when out-of-pocket costs for contraceptives were eliminated or reduced, women were more likely to rely on more effective long-acting contraceptive methods (Postlethwaite et al., 2007).

### Identified Gaps

Contraception and contraceptive counseling are not currently in the array of preventive services available to women under the ACA.

Systematic evidence reviews and other peer-reviewed studies provide evidence that contraception and contraceptive counseling are effective at reducing unintended pregnancies. Current federal reimbursement policies provide coverage for contraception and contraceptive counseling and most private insurers also cover contraception in their health plans. Numerous health professional associations recommend family planning services as part of preventive care for women. Furthermore, a reduction in unintended pregnancies has been identified as a specific goal in *Healthy People 2010* and *Healthy People 2020* (HHS, 2000, 2011a).

**Recommendation 5.5: The committee recommends for consideration as a preventive service for women: the full range of Food and Drug**

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA841                                    JA-0000434

Clinical Preventive Services for Women. Closing the Gaps

Case: 7:25-2575-40-WDBocumentu84-3t 25Page: 180d 09/2e2FiledP12/12/225330

Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity.

## BREASTFEEDING

Breastfeeding benefits the mother, the child, and society. The challenge is to ensure that the majority of mothers initiate breastfeeding and exclusively breastfeed their children during the first six months, with breastfeeding continuing to a year or beyond for every child (Gartner et al., 1997).

### Prevalence/Burden

An AHRQ report from 2007 includes a summary of systematic reviews and meta-analyses on breastfeeding and maternal and infant health outcomes (Ip et al., 2007). The evidence is clear that breastfeeding reduces Sudden Infant Death Syndrome, gastrointestinal infections, upper and lower respiratory diseases, childhood leukemia, asthma, ear infections, childhood obesity, and diabetes mellitus type 2 risk for children, as well as rates of hospitalization (Table 5-4). They also concluded that sufficient results are available to be able to state that breastfeeding significantly lowers the maternal risk of breast and ovarian cancers (Table 5-4). Breastfeeding soon after birth may reduce the risk of maternal blood loss and enhance maternal-infant bonding (ACNM, 2004). A recent study concluded that if 90 percent of all children were exclusively breastfeed during the first six months of life, the United States would save $13 billion per year and prevent an excess of 911 deaths (Bartick and Reinhold, 2010). If only 80 percent of U.S. families complied, $10.5 billion would be saved and 741 deaths would be prevented each year.

In the United States, the majority of pregnant women plan to breastfeed (DiGirolamo et al., 2005), and yet there is a clear gap between the proportion of women who prenatally intend to breastfeed and those who actually do so by the time they are discharged after a brief hospital stay (California WIC Association and U.C. Davis Human Lactation Center, 2008; CDC, 2007b). The National Immunization Survey found that among the mothers of children born in 2007, 75 percent of mothers initiated breastfeeding, 43 percent were breastfeeding at six months, and 22 percent were breastfeeding at 12 months (CDC, 2007b). Although considerable progress has been made through overall promotion of breastfeeding in the United States, gains in breastfeeding rates have not been made equally across geographic, racial, and socioeconomic groups (Table 5-5).

Contrary to popular conception, breastfeeding appears to be a learned skill and the mother must be supported to be successful. Nevertheless,

Copyright National Academy of Sciences. All rights reserved.

**TABLE 5-4** Impact of Breastfeeding on Infant and Maternal Health Outcomes from the Surgeon General's Call to Action to Support Breastfeeding

| Outcome | Excess Risk (%) (95% CI) | Comparison Groups |
|---|---|---|
| *Among full-term infants* | | |
| Acute ear infections (otitis media) | 100 (56, 233) | EFF vs. EBF for 3 or 6 mos |
| Eczema (atopic dermatitis) | 47 (14, 92) | EBF <3 mos vs. EBF ≥3 mos |
| Diarrhea and vomiting (gastrointestinal infection) | 178 (144, 213) | Never BF vs. ever BF |
| Hospitalization for lower respiratory tract diseases in the first year | 257 (85, 614) | Never BF vs. EBF ≥4 mos |
| Asthma, with family history | 67 (22, 133) | BF <3 mos vs. ≥3 mos |
| Asthma, no family history | 35 (9, 67) | BF <3 mos vs. ≥3 mos |
| Childhood obesity | 32 (16, 49) | Never BF vs. ever BF |
| Type 2 diabetes mellitus | 64 (18, 127) | Never BF vs. ever BF |
| Acute lymphocytic leukemia | 23 (10, 41) | Never BF vs. >6 mos |
| Acute myelogenous leukemia | 18 (2, 37) | Never BF vs. >6 mos |
| Sudden infant death syndrome | 56 (23, 96) | Never BF vs. ever BF |
| *Among preterm infants* | | |
| Necrotizing enterocolitis | 138 (22, 2400) | Never BF vs. ever BF |
| *Among mothers* | | |
| Breast cancer | 4 (3, 6) | Never BF vs. ever BF (per year of breastfeeding) |
| Ovarian cancer | 27 (10, 47) | Never BF vs. ever BF |

ABBREVIATIONS: BF = breastfeeding; CI = confidence interval; EBF = exclusive breastfeeding; EFF = exclusive formula feeding.
SOURCE: HHS, 2011b.

a large gap exists in the area of providers discussing breastfeeding with patients prenatally and assisting with breastfeeding issues postnatally. Mothers' experiences as they receive this care have an influence on their intention to breastfeed (Howard et al., 1997), the establishment of breastfeeding (Dewey et al., 2003), and the duration of breastfeeding (DiGirolamo et al., 2003). The duration of breastfeeding is dependent on several factors. Two of these are confidence and commitment. Blyth et al. (2002) identified confidence to be a modifiable variable that may be "amenable to supportive interventions," rather than nonmodifiable demographic risk factors that are associated with feeding choices. Another review concluded that mothers often wean their babies before six months of age because of perceived difficulties with breastfeeding rather than because of choice, thus suggesting that a mother's lack of confidence in her ability to breastfeed may have a

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA843
JA-0000436

**TABLE 5-5** Provisional Breastfeeding Rates Among Children Born in 2007[a]

| Sociodemographic Factor | Ever Breastfed (%) | Breastfeeding at 6 Months (%) | Breastfeeding at 12 Months (%) |
|---|---|---|---|
| United States | 75.0 | 43.0 | 22.4 |
| *Race/ethnicity* | | | |
| American Indian or Alaska Native | 73.8 | 42.4 | 20.7 |
| Asian or Pacific Islander | 83.0 | 56.4 | 32.8 |
| Hispanic or Latino | 80.6 | 46.0 | 24.7 |
| Non-Hispanic Black or African American | 58.1 | 27.5 | 12.5 |
| Non-Hispanic White | 76.2 | 44.7 | 23.3 |
| *Receiving WIC* | | | |
| Yes | 67.5 | 33.7 | 17.5 |
| No, but eligible | 77.5 | 48.2 | 30.7 |
| Ineligible | 84.6 | 54.2 | 27.6 |
| *Maternal education* | | | |
| Not a high school graduate | 67.0 | 37.0 | 21.9 |
| High school graduate | 66.1 | 31.4 | 15.1 |
| Some college | 76.5 | 41.0 | 20.5 |
| College graduate | 88.3 | 59.9 | 31.1 |

[a] Survey limited to children aged 19–35 months at the time of data collection. The lag between birth and collection of data allows for tracking of breastfeeding initiation as well as calculating the duration of breastfeeding.

ABBREVIATION: WIC = Special Supplemental Nutrition Program for Women, Infants, and Children; U.S. Department of Agriculture.

SOURCE: From the Surgeon General's Call to Action to Support Breastfeeding (HHS, 2011b).

greater impact on breastfeeding success than her intent or desire to breast-feed (Dennis, 2002).

Mothers' experiences as patients during the maternity stay influence future feeding behaviors (Taveras et al., 2004); however, the quality of prenatal, postpartum, and pediatric medical care in the United States is inconsistent (DiGirolamo et al., 2008; Stark and Lannon, 2009). The CDC survey of Maternity Practices in Infant Nutrition and Care biannually assesses breastfeeding-related maternity practices in hospitals and birth centers across the United States. This survey discloses that policies and practices in U.S. maternity care facilities that are unsupportive and even harmful to breastfeeding, are pervasive throughout labor, delivery, and postpartum care, as well as in hospital discharge planning (CDC, 2011d).

Examples of these unsupportive policies and practices include placement of the stable, healthy, full-term newborn on an infant warmer immediately upon delivery rather than skin to skin with the mother, provision of infant formula or water to breastfed newborns without a medical indica-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA844                              JA-0000437

tion, removal of the newborn from the mother's room at night, inadequate assurance of postdischarge follow-up for lactation support, and provision of promotional samples of infant formula from manufacturers (Bystrova et al., 2007; Chung et al., 2008; Moore et al., 2007; Rosenberg et al., 2008; Wight et al., 2009). Studies have shown that practices such as these are associated with a shorter duration of breastfeeding (DiGirolamo et al., 2008; Fairbank et al., 2000).

After being discharged from the hospital, mothers may have no means of identifying or obtaining the skilled support needed to address their concerns about lactation and breastfeeding; furthermore, barriers to reimbursement for needed lactation support and services may exist (Salem-Schatz et al., 2004). In addition, limited communication between providers across health care settings (Cherouny et al., 2005) and between providers and mothers may also make mothers less likely to comply with recommended postpartum health care visits than they were during the prenatal period (Stark and Lannon, 2009).

Several studies have found gaps between providers' intentions surrounding breastfeeding counseling and their training, experience, and practice in supporting patients with breastfeeding. Taveras and colleagues (2004) found that clinicians' perceptions of the counseling they provided on breastfeeding did not match their patients' perceptions of the counseling received. When clinicians' and patients' reports on the counseling were linked, it was found that among mothers whose prenatal clinicians stated that they always or usually discussed breastfeeding with their patients, only 16 percent of mothers indicated that breastfeeding had been discussed during their prenatal visits.

Another factor affecting the duration of breastfeeding is whether the mother works. The percentage of women in the U.S. workforce has increased dramatically over the past century, particularly in the past 50 years. One outcome of this is that working mothers, particularly those who work full time, breastfeed for a shorter duration, but it has been found that longer maternity leave and part-time work increase the rates of breastfeeding initiation and duration. A breastfeeding support program in the workplace is also important in helping to increase the breastfeeding duration. By 2009, 15 U.S. states required that employers support breastfeeding employees when they return to work (CDC, 2009a). For the continuation of breastfeeding, it is important that mothers have access to breast pumps to maintain their milk supply (Meek, 2001). Buying or renting a pump without insurance coverage is out of the economic reach of many low-income women, leaving them with few options for maintaining breastfeeding. Further, Chamberlain and colleagues (Chamberlain et al., 2006) found that providing access to breast pumps increases overall breastfeeding rates. Despite the recognition of the importance of breastfeeding in improving

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA845 JA-0000438

women's and infant's health, coverage of breastfeeding support services differs significantly across the United States. In an analysis of state Medicaid provisions, the Henry J. Kaiser Family Foundation found that 25 states cover breastfeeding education services, 15 states cover individual lactation consultations, and 31 states cover equipment rentals, such as breast pumps (Ranji and Salganicoff, 2009).

### Existing Guidelines and Recommendations

---

**USPSTF Recommendations**

The USPSTF recommends interventions during pregnancy and after birth to promote and support breastfeeding. Grade B recommendation (USPSTF, 2008b).

---

The USPSTF gives a Grade B to promoting and supporting breastfeeding, and a systematic review of the published literature on the effectiveness of primary care-based interventions encouraging breastfeeding concluded that breastfeeding interventions are more effective than usual care in increasing short- and long-term breastfeeding rates. Specifically, combined pre- and postnatal interventions and inclusion of lay support (such as peer counseling) in a multicomponent intervention are most likely to be effective (Chung et al., 2010).

The USPSTF concluded that promotion and support of breastfeeding are effective when they are integrated into systems of care that include training of clinicians and other health care team members and policy development. The Task Force noted that breastfeeding interventions should be designed and implemented in ways that do not make women feel guilty when they make an informed choice not to breastfeed (Chung et al., 2010).

The AAP Bright Futures program provides a framework for breastfeeding support that covers topics from counseling to prevention of breastfeeding problems (AAP, 2008). In January 2011, the U.S. Surgeon General, Dr. Regina Benjamin, released *The Surgeon General's Call to Action to Support Breastfeeding,* a comprehensive report that identifies specific steps that can be taken at the micro- and macrolevels to support breastfeeding mothers (HHS, 2011b). Included among these steps are ensuring that maternity care practices throughout the United States are fully supportive of breastfeeding and including basic support for breastfeeding as a standard of care for obstetricians, family physicians, and pediatricians. The steps also include accelerating the implementation of the Baby-Friendly Hospital

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA846                          JA-0000439

Initiative (WHO and UNICEF, 1999), which was established by the World Health Organization (WHO) and the United Nations Children's Fund (UNICEF) in 1991 and which includes the use of evidence-based maternity practices, which are summarized in the Ten Steps to Successful Breastfeeding (Box 5-1).

The Joint Commission, the major accrediting organization for health care organizations in the United States, has identified the concept of bundles of care, such as those in the Ten Steps to Successful Breastfeeding (Box 5-1), as a promising strategy to improve the care provided to patients (Joint Commission on Accrediation of Healthcare Organizations, 2006). Researchers in California have found that hospitals that have attained a Baby-Friendly Hospital designation of Baby-Friendly Hospital Initiative do not have the disparities in the rates of exclusive breastfeeding that other hospitals in the same geographic region show (California WIC Association and U.C. Davis Human Lacation Center, 2008). Despite evidence of improved rates of breastfeeding, as of May 2011 only 110 hospitals in the United States were designated Baby-Friendly Hospitals (Kramer et al., 2001).

The Health Resources and Services Administration (HRSA) recently developed a model for implementing support for lactation and direct breastfeeding in the workplace, which is described in *The Business Case for*

---

**BOX 5-1**
**Baby-Friendly Hospital Initiative Ten Steps**

1. Have a written breastfeeding policy that is routinely communicated to all health care staff.
2. Train all health care staff in skills necessary to implement this policy.
3. Inform all pregnant women about the benefits and management of breastfeeding.
4. Help mothers initiate breastfeeding within a half hour of birth.
5. Show mothers how to breastfeed and how to maintain lactation, even if they should be separated from their infants.
6. Give newborn infants no food or drink other than breast milk, unless medically indicated.
7. Practice "rooming in"—allow mothers and infants to remain together 24 hours a day.
8. Encourage breastfeeding on demand.
9. Give no artificial teats or pacifiers (also called dummies or soothers) to breastfeeding infants.
10. Foster the establishment of breastfeeding support groups and refer mothers to them on discharge from the hospital or clinic.

SOURCE: WHO and UNICEF, 1989.

---

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA847                          JA-0000440

*Breastfeeding: Steps for Creating a Breastfeeding Friendly Worksite* (HHS, 2008). The program components outlined in the model include flexible breaks and work schedules, a sanitary and private place to express milk, education for pregnant and lactating women, and support from supervisors and coworkers. In addition, Section 4207 of the ACA amends the Fair Labor Standards Act of 1938 by requiring employers with more than 50 employees to provide reasonable break time for a mother to express milk and to provide a place, other than a restroom, that is private and clean where she can express her milk (111th U.S. Congress, 2010).

*Healthy People 2020* contains specific objectives for improving maternal, infant, and child health (HHS, 2011a). Among these objectives is increasing the proportion of infants who are breastfed. The specific targets set for this objective are increasing the proportions of infants ever breastfed to 81.9 percent, the proportions of infants breastfed at six months to 60.6 percent, and the proportions of infants breastfed at one year to 34.1 percent. It also sets targets for increasing the proportion of infants exclusively breastfed through three months to 46.2 percent and exclusively breastfed through six months to 25.5 percent (HHS, 2011a). One of the recommendations from the National Prevention Council's (NPC's) June 2011 National Prevention Strategy report includes the support of policies and programs that promote breastfeeding (National Prevention Council, 2011).

A number of professional organizations have guidance or supportive statements indicating that they find breastfeeding to be the preferred method of feeding newborns and infants. AAFP (2005) and AAP (2005) have developed guidelines and recommendations that mothers breastfeed their infants. In 2007, ACOG issued a committee opinion stating strong support for breastfeeding and urging obstetricians and gynecologists, other health care professionals, hospitals, and employers to support women in choosing to breastfeed their infants (ACOG, 2007a).

## Identified Gaps

Although the ACA ensures that counseling on breastfeeding is included, the committee recognizes that interpretation of this varies. The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is that comprehensive prenatal and postnatal lactation support, counseling, and supplies are not currently included.

The evidence provided to support the inclusion of these services is based on systematic evidence reviews, federal and international goals (such as the U.S. Surgeon General, HRSA, *Healthy People 2020* [HHS, 2011a], WHO and UNICEF), and clinical professional guidelines such as those set forth by AAFP, AAP, and ACOG.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA848                    JA-0000441

Recommendation 5.6: The committee recommends for consideration as a preventive service for women: comprehensive lactation support and counseling and costs of renting breastfeeding equipment. A trained provider should provide counseling services to all pregnant women and to those in the postpartum period to ensure the successful initiation and duration of breastfeeding. (The ACA ensures that breastfeeding counseling is covered; however, the committee recognizes that interpretation of this varies.)

## INTERPERSONAL AND DOMESTIC VIOLENCE

Interpersonal and domestic violence, including intimate partner violence and childhood abuse, is a pattern of coercive behaviors that may include progressive social isolation, deprivation, intimidation, psychological abuse, childhood physical abuse, childhood sexual abuse, sexual assault, and repeated battering and injury. These behaviors are perpetrated by someone who is or was involved in a familial or intimate relationship with the victim. Women and adolescent girls of all ages experience interpersonal and domestic violence.

### Prevalence/Burden

The CDC recognizes four categories of violence: physical violence, sexual violence, threat of physical or sexual violence, and psychological or emotional abuse (CDC, 2010c). Each year, as many as 1 million to 5 million women are physically, sexually, or emotionally abused by their intimate partners in the United States (Black and Breiding, 2008; The Commonwealth Fund, 1993; National Center for Injury Prevention and Control, 2003; Tjaden and Thoennes, 1998, 2000), and 39 percent of all women report intimate partner violence in their lifetimes (The Commonwealth Fund, 1999).

Prevalence rates of abuse measured in health care settings range from 4 to 44 percent within the year prior to being asked about abuse and from 21 to 55 percent over a lifetime (Abbott, 1995; Dearwater et al., 1998; Gin et al., 1991; Hamberger et al., 1992; Martins et al., 1992; Mccauley et al., 1995; Richardson et al., 2002). Approximately 20 percent of female public high school students in Massachusetts reported that they had been physically or sexually abused by a dating partner (Silverman et al., 2001). In the United States, approximately 35 percent of emergency room visits, 50 percent of all acute injuries, and 21 percent of all injuries in women requiring urgent surgery were the result of partner violence (Guth and Pachter, 2000).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA849                                JA-0000442

The CDC estimates that intimate partner rape, stalking, and assault cost the United States more than $5.8 billion yearly, of which $4.1 billion goes to direct medical and mental health care services (National Center for Injury Prevention and Control, 2003). Women experiencing intimate partner violence have medical care costs 60 percent higher than women not experiencing abuse (Ulrich et al., 2003).

The prevalence of childhood physical and sexual abuse is not known. Prevalence estimates from population-based studies of women reporting histories of childhood physical and sexual abuse range between 20 and 38 percent (Finkelhor, 1994; Schoen et al., 1997, 1998). For adolescents, an analysis of self-reported abuse and neglect from the National Longitudinal Study of Adolescent Health indicated that 28 percent of 15,197 respondents experienced physical assault, 12 percent experienced physical neglect, 5 percent experienced contact sexual abuse, and 42 percent experienced supervision neglect (Hussey et al., 2006). Variations in estimates across studies are due to differences in the methodologies used to assess prevalence, a lack of standardized and accepted research instruments, and gaps in knowledge about how abuse victims frame and define their experiences (Hulme, 2004).

Interpersonal and domestic violence committed against adolescent girls may also meet definitions of child abuse. The 2003 Keeping Children and Families Safe Act amendment to the 1996 Federal Child Abuse Prevention and Treatment Act (CAPTA; 42 U.S.C.A. §5106g) defines "child abuse and neglect" as any recent act or failure to act on the part of a parent or caretaker which results in death, serious physical or emotional harm, sexual abuse or exploitation; or an act or failure to act which presents an imminent risk of serious harm (104th U.S. Congress, 1996; HHS, 2003, 2010). Individual states are required to define child abuse and neglect using the minimum standards in the federal law according to CAPTA; however, state definitions vary (HHS, 2009).

The immediate health consequences of interpersonal and domestic violence include injuries (Corrigan et al., 2003) and death from sexual assault (Broch, 2003), as well as sexually transmitted infections, including HIV infection (Wingood et al., 2001), pelvic inflammatory disease (Letourneau et al., 1999), pregnancy (Hathaway et al., 2000), and adverse psychological responses. Several chronic mental health conditions are related to interpersonal and domestic violence (Campbell, 2002), including posttraumatic stress disorder, depression, anxiety disorders, substance abuse, and suicide (Campbell and Lewandowski, 1997; Golding, 1999; Lehmann, 2000). Long-term physical conditions include chronic pain; neurological disorders resulting from injuries; gastrointestinal disorders, such as irritable bowel syndrome; migraine headaches; and various disabilities (Campbell and Lewandowski, 1997; Coker et al., 2000, 2002).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA850  JA-0000443

Although childhood sexual abuse is predominantly a prepubertal phenomenon (Finkelhor et al., 2009), the impact and consequences of this form of abuse are usually expressed in adolescence and persist into adulthood (Trickett et al., 2005). These include disability, suffering, and limitations in the quality of life that can be serious and often severe (Sickel et al., 2002). Women with childhood sexual abuse histories report more problems during pregnancy (Lukasse et al., 2009). Physical and sexual abuse in adolescence and young adulthood have been associated with poor self-esteem, alcohol and drug abuse, eating disorders, obesity, risky sexual behaviors, teen pregnancy, depression, trauma, anxiety, suicidality, and other conditions (Sickel et al., 2002; Trickett et al., 2005).

Asking women and adolescent girls about their interpersonal and domestic violence experiences could identify abuse not otherwise detected, help prevent future abuse, lessen disability, and improve future functioning and success in life (Battaglia et al., 2003; Coker et al., 2009; Martin et al., 2008; National Center for Injury Prevention, 2003; Svavarsdottir and Orlygsdottir, 2009). Women may not disclose abuse unless directly questioned under safe and respectful conditions (Dienemann et al., 2005), although there is no consensus about the most acceptable approach (Feder et al., 2009). Surveys indicate that 43 to 85 percent of female respondents consider screening for abuse acceptable, although only one-third of physicians and approximately half of emergency department nurses favored screening (Ramsay et al., 2002). Most women who have been screened for abuse report no adverse effects from the screening process (MacMillan et al., 2009; Spangaro et al., 2010).

Victims of abuse have frequent encounters with clinicians and health care services because adult victims of childhood abuse have poorer health than nonvictims and higher rates of health services utilization (Felitti, 1991; Fillingim et al., 1999; Valente, 2005). Physicians are in a unique position to identify women and adolescents experiencing abuse or neglect, and many physicians consider screening for abuse to be one of their important roles (Flaherty and Stirling, 2010). In practice, however, physicians rarely screen their patients or screen only selected patients, such as patients who have physical injuries (Bair-Merritt et al., 2004; Borowsky and Ireland, 2002; Chamberlain and Perhma-Hester, 2000, 2002; Erickson et al., 2000; Glass et al., 2001; Lapidus et al., 2002; Rodriguez et al., 2001). Barriers to screening include a lack of experience, training, time, and confidence in handling abuse cases (Bair-Merritt et al., 2004; Flaherty et al., 2006; Lane and Dubowitz, 2009; Starling et al., 2009).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA851                              JA-0000444

Existing Guidelines and Recommendations

---

**USPSTF Recommendations**

The USPSTF found insufficient evidence to recommend for or against routine screening of parents or guardians for the physical abuse or neglect of children, of women for intimate partner violence, or of older adults or their caregivers for elder abuse. Grade I Statement (USPSTF, 2004b).

---

The USPSTF recommendation applies to women without apparent injuries or symptoms of abuse and is based on the lack of evidence that screening for intimate partner violence in primary care settings reduces adverse health outcomes, including premature death (USPSTF, 2004). The Canadian Task Force on Preventive Health Care also found insufficient evidence to recommend for or against screening women for intimate partner violence (Wathen and MacMillan, 2003). A report by the Health Technology Assessment Program in the United Kingdom also concluded that evidence is insufficient to implement a screening program for partner violence against women either in health services generally or in specific clinical settings (Feder et al., 2009).

WHO states that better awareness among health workers of violence and its consequences and wider knowledge of available resources for abused women can lessen the consequences of violence (WHO, 2010). AMA recommends that physicians regularly inquire about sexual, physical, and psychological abuse when taking a medical history. Furthermore, as interpersonal abuse or violence may adversely affect a patient's health status, physicians are advised to consider abuse to be a factor in the presentation of medical complaints (AMA, 2008). ACOG recommends that physicians screen all patients for intimate partner violence and that screening should occur during routine visits and over the course of pregnancy (ACOG, 2010b). AAP also recommends screening, stating that pediatricians are in a position to recognize abused women in pediatric settings (Thackeray et al., 2010). Other groups, such as the American Nurses Association (ANA, 2000) and the Futures Without Violence (formerly the Family Violence Prevention Fund) (Family Violence Prevention Fund, 2004), also recommend that health care providers screen patients for intimate partner violence. Finally, VA covers women for health services related to intimate partner violence.

Bright Futures guidelines for adolescents include the provision of anticipatory guidance through discussions about developing healthy dating

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA852  JA-0000445

relationships, managing conflict nonviolently, avoiding risky situations and people, and seeking help when in danger (AAP, 2008). Recommendations of other groups relevant to adolescents fall under more broadly defined statements about child abuse and neglect.

AAP advocates a prominent role for pediatricians in preventing child abuse and neglect and provides specific guidelines and information on specific risk factors and protective factors (Flaherty and Sterling, 2010). AMA recommends routine inquiry about child abuse or neglect (AMA, 2008). Other organizations do not specifically recommend universal screening but recommend that pediatricians and family practice clinicians remain alert for indications of abuse or neglect (AAFP, 2009; ENA, 2006).

All U.S. states have laws that require physicians and other health care workers, as well as other professionals who interact with children, to report suspected child abuse and neglect to Child Protective Services (CPS) (HHS, 2010b). In 2009, teachers, law enforcement and legal personnel, and social services staff made three-fifths of the reports to CPS, whereas anonymous sources, family members, friends, and neighbors made the remaining reports (HHS, 2010a). It is not clear how many reports originated from health care clinicians specifically. Some states also require physicians to report cases of adult intimate partner violence to legal authorities, and most states require reporting of injuries resulting from firearms, knives, or other weapons.

## Effective Interventions

Although numerous community-based programs to safeguard victims of interpersonal and domestic violence exist, including counseling, hotlines, shelters, and advocacy groups, they are usually not directly associated with health care delivery systems. Few studies have evaluated the effectiveness of screening for abuse in health care settings by demonstrating subsequent reductions in abuse or improvement in health as a result of screening (Feder et al., 2009; Ramsay et al., 2009; Trabold, 2007; Wathen and MacMillan, 2003). Existing research has been limited by many factors, including the lack of integration of screening with services such as counseling, inadequate definitions and measurement of outcomes, loss to follow-up, insufficient study designs, patient privacy, stigma and repercussions of disclosure, and variability of individual cases, among others (Feder, 2009; MacMillan, 2006, 2009; Nelson, 2004; Rabin, 2009; Ramsay et al., 2004 Wathen and MacMillan, 2003). The 2004 IOM study *Advancing the Federal Research Agenda on Violence Against Women* reiterated the importance of strengthening the data and research infrastructure, especially the need for better prevalence and longitudinal data to determine the causes of violent victimization of women and the impact of interventions (IOM, 2004).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA853                                JA-0000446

In the context of these issues, new research on screening and interventions for women identified with abuse in health care settings has been published since the previous 2004 USPSTF recommendation. These include evaluations of methods of identifying women who have been abused (Basile, et al. 2007; Feder et al., 2009; Rabin et al., 2009). Standardized questions and scales designed for screening purposes generally include from one to five items that may be scored in various ways to determine if abuse is present. The diagnostic accuracy of these questions varies, but five different sets of questions have been found to be suitably accurate (i.e., sensitivity and specificity >80 percent) (Chen et al., 2005 et al.; Ernst, 2004; Sohal, 2007; Thombs et al., 2007; Wathen et al., 2008; Weiss et al., 2003).

A large randomized trial compared women who were screened for abuse versus not screened in primary care and acute care settings in Canada. Results indicated improvements in rates of abuse and quality of life several months later, but there were no significant differences between screened and unscreened women (MacMillan et al., 2009). However, for ethical reasons, women randomized to the unscreened comparison group were also asked questions about abuse, received information about intimate partner violence, and were offered services if needed, reducing measureable differences between screened and unscreened women. This study also collected information on the potential harms of screening and reported no harms.

A randomized trial of counseling that included intimate partner violence as well as other health risks during pregnancy and postpartum reported less violence and better infant outcomes among women receiving counseling compared to those who did not (Kiely et al., 2010). Women in the counseling group had significantly fewer very preterm (<33 weeks) and very low birth weight (<1,500 grams) newborns, and increased gestational age (38.2 versus 36.9 weeks) (Kiely et al., 2010). Randomized trials of home visitation for new mothers at risk for abuse showed reduced measures of abuse compared to women not receiving these services (Bair-Merritt et al., 2010; Taft et al., 2011). In other trials, women reporting abuse who were randomized to counseling adopted more safety behaviors than women not receiving counseling (Gillum et al., 2009; McFarlane et al., 2002). Many additional observational and descriptive studies supporting screening and intervention have also been published, but the designs of these studies limit conclusions regarding their effectiveness.

### Identified Gaps

The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is that interpersonal and domestic violence detection and counseling are not included.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA854                              JA-0000447

The evidence provided to support a recommendation related to increasing detection of and counseling for interpersonal and domestic violence is based on peer-reviewed studies and federal and international policies, in addition to clinical professional guidelines from organizations, such as the AMA and ACOG.

Recommendation 5.7: The committee recommends for consideration as a preventive service for women: screening and counseling for interpersonal and domestic violence. Screening and counseling involve elicitation of information from women and adolescents about current and past violence and abuse in a culturally sensitive and supportive manner to address current health concerns about safety and other current or future health problems.

## WELL-WOMAN PREVENTIVE VISITS

### Provision of Preventive Services

The committee examined existing guidelines, available evidence, and current clinical best practices to identify effective provision of services that, when provided to women through dedicated clinical encounters, have been shown to promote optimal well-being. Primary care office visits that are dedicated to preventive care may facilitate increased access to health care services that are shown to identify chronic disease risk factors, promote well-being, and/or decrease the likelihood or delay the onset of a targeted disease or condition. Box 5-2 contains examples of terms that are commonly used to label the prevention-oriented clinical encounter; this report

---

**BOX 5-2
Common Terms Used for Well Visits**

Preventive pediatric health care visit (AAP/Bright Futures)
Well-child checkup (Early Periodic Screening, Diagnosis, and Treatment program and Medicaid)
Well-adult checkup (Medicaid)
Health risk assessment (Medicaid)
"Welcome to Medicare" visit (Medicare)
Annual wellness examination (Medicare)
Health maintenance visit (MHQP)

---

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                      JA855                              JA-0000448

uses the term "well-woman preventive visit" to describe the provision of prevention services in an office visit or clinical encounter.

## Target Populations

Well-woman preventive care visits apply to women of all ages (and according to the committee's charge, women from 10 through 64 years) and stages of life. Stages of womanhood are defined by age groupings, which are in general alignment with published frameworks and practice guidelines (AAP, 2008). These include adolescence (subdivided into two subgroups ages 10 to 14 years and 15 to 19 years), early adulthood (ages 20 to 24 years), middle adulthood (ages 25 to 49 years), and later adulthood (after age 50 years).

## Justification of Well-Woman Visits for Provision of Preventive Services

### *Women's Preventive Care Is Fragmented*

Although "well" visits for adults are not explicitly recommended by the USPSTF, they provide an opportunity for delivering prevention services recommended by a number of government and nongovernment health care agencies (GAO, 2009). In the U.S. health care system, for women, the tendency is to separate reproductive health care services from other components of primary care (Weisman, 1998). Because many preventive services for women are for reproductive health (e.g., screening for cervical cancer and sexually transmitted infections and contraception services), many women may see obstetrician-gynecologists for those services and a generalist physician (a family physician or a general internist) for other components of their routine health care. For example, a national survey of the U.S. female population in 1998 showed that 29 to 49 percent of women, depending of type of health plan, see both a generalist and an obstetrician-gynecologist for their regular health care (Weisman and Henderson, 2001). In another study of women aged 18 to 64 years, 58 percent of women in all stages of life saw an obstetrician-gynecologist in addition to a generalist physician (Henderson et al., 2002). In the 2008 Kaiser Women's Health Survey, 44 percent of women aged 18 to 64 years reported seeing two or more regular providers (Ranji and Salganicoff, 2011). Given these patterns of physician use, it is likely that women make more than one visit and use more than a single provider to attain needed preventive services in a given year. Thus, no single type of provider can be identified as the sole primary care provider for women.

Women have greater health care needs than men and require a broader array of health services, but not all providers are equipped or able to

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA856 JA-0000449

Clinical Preventive Services for Women. Closing the Gaps

Case 7:25-cv-05740-WCase 7:25-cv-05340-VB  Document 64-3  Page: 195  Filed 09/22/25  Date Filed 12/12/2025  Page 12 of 25  Page 330

provide the full range of preventive services for women. A consequence of women obtaining preventive health care from more than one provider is that women's primary care is often fragmented.

### Cost as a Major Barrier to Services and Visits

Although the preventive services detailed in Table 5-6 will be covered with no cost sharing under the ACA, insurance plans are permitted to require copayments for office visits (*Federal Register*, 2010). Increased health care costs, combined with the fact that most Americans have seen too little or no gains in income in recent years, can be seen as a threat to the health and financial status of women across the country (Collins et al., 2011). Furthermore, evidence suggests that these issues are adversely affecting women disproportionately compared to men. In 2010, for example, 44 percent of women but only 35 percent of men indicated that they were experiencing difficulty paying medical bills or were paying off medical debt. Furthermore, almost a third of women stated that they did not visit a doctor or clinic when they were faced with a medical problem because of cost, whereas less than a quarter of men reported the same experience (Robertson and Collins, 2011).

### Gaps in Well Visits for Women

Clinical guidelines and mandated coverage for well visits exist for children and adolescents (until age 21 years), for some adults, and into maturity (for individuals aged 65 years and older) in public-sector health plans (Medicaid and Medicare) as well as some private-sector health plans (see below and Chapter 3). However, public programs may be incomplete in providing coverage in early, middle, and later adulthood. According to a Government Accountability Office analysis of responses to a survey of state Medicaid directors conducted between October 2008 and February 2009, only 39 states cover health maintenance visits to adults under their Medicaid programs (GAO, 2009). This significant gap in coverage places a disproportionate burden on women of childbearing age, putting them at a greater risk for disease and illness in their most active reproductive years.

## Existing Guidelines and Recommendations

### Adolescence

Clinical preventive services guidelines for adolescents issued by governmental agencies and nonprofit medical organizations (e.g., HRSA, the Maternal and Child Health Bureau, AAP, AMA, and AAFP) have long

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA857                          JA-0000450

**TABLE 5-6** List of Preventive Services to Be Obtained During Well-Woman Preventive Visits Under Recommendation 8

| Topic | Description | Grade |
|---|---|---|
| **USPSTF Grade A and B Recommended Services** | | |
| Alcohol misuse counseling | The USPSTF recommends screening and behavioral counseling interventions to reduce alcohol misuse by adults, including pregnant women, in primary care settings. | B |
| Anemia screening: pregnant women | The USPSTF recommends routine screening for iron deficiency anemia in asymptomatic pregnant women. | B |
| Bacteriuria screening: pregnant women | The USPSTF recommends screening for asymptomatic bacteriuria with urine culture for pregnant women at 12 to 16 weeks' gestation or at the first prenatal visit, if later. | A |
| Blood pressure screening | The USPSTF recommends screening for high blood pressure in adults aged 18 and older. | A |
| BRCA screening, counseling about | The USPSTF recommends that women whose family history is associated with an increased risk for deleterious mutations in BRCA1 or BRCA2 genes be referred for genetic counseling and evaluation for BRCA testing. | B |
| Breast cancer preventive medication | The USPSTF recommends that clinicians discuss chemoprevention with women at high risk for breast cancer and at low risk for adverse effects of chemoprevention. Clinicians should inform patients of the potential benefits and harms of chemoprevention. | B |
| Breast cancer screening | The USPSTF recommends screening mammography for women, with or without clinical breast examination, every 1–2 years for women aged 40 and older. | B |
| Breastfeeding counseling | The USPSTF recommends interventions during pregnancy and after birth to promote and support breastfeeding. | B |
| Cervical cancer screening | The USPSTF strongly recommends screening for cervical cancer in women who have been sexually active and have a cervix. | A |
| Chlamydial infection screening: non-pregnant women | The USPSTF recommends screening for chlamydial infection for all sexually active nonpregnant young women aged 24 and younger and for older nonpregnant women who are at increased risk. | A |
| Chlamydial infection screening: pregnant women | The USPSTF recommends screening for chlamydial infection for all pregnant women aged 24 and younger and for older pregnant women who are at increased risk. | B |
| Cholesterol abnormalities screening: women 45 and older | The USPSTF strongly recommends screening women aged 45 and older for lipid disorders if they are at increased risk for coronary heart disease. | A |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA858                                    JA-0000451

## TABLE 5-6 Continued

| Topic | Description | Grade |
|---|---|---|
| Cholesterol abnormalities screening: women younger than 45 | The USPSTF recommends screening women aged 20 to 45 for lipid disorders if they are at increased risk for coronary heart disease. | B |
| Colorectal cancer screening | The USPSTF recommends screening for colorectal cancer using fecal occult blood testing, sigmoidoscopy, or colonoscopy, in adults, beginning at age 50 years and continuing until age 75 years. The risks and benefits of these screening methods vary. | A |
| Depression screening: adolescents | The USPSTF recommends screening of adolescents (12–18 years of age) for major depressive disorder when systems are in place to ensure accurate diagnosis, psychotherapy (cognitive-behavioral or interpersonal), and follow-up. | B |
| Depression screening: adults | The USPSTF recommends screening adults for depression when staff-assisted depression care supports are in place to assure accurate diagnosis, effective treatment, and follow-up. | B |
| Diabetes screening | The USPSTF recommends screening for type 2 diabetes in asymptomatic adults with sustained blood pressure (either treated or untreated) greater than 135/80 mm Hg. | B |
| Folic acid supplementation | The USPSTF recommends that all women planning or capable of pregnancy take a daily supplement containing 0.4 to 0.8 mg (400 to 800 μg) of folic acid. | A |
| Gonorrhea screening: women | The USPSTF recommends that clinicians screen all sexually active women, including those who are pregnant, for gonorrhea infection if they are at increased risk for infection (that is, if they are young or have other individual or population risk factors). | B |
| Healthy diet counseling | The USPSTF recommends intensive behavioral dietary counseling for adult patients with hyperlipidemia and other known risk factors for cardiovascular and diet-related chronic disease. Intensive counseling can be delivered by primary care clinicians or by referral to other specialists, such as nutritionists or dietitians. | B |
| Hepatitis B screening: pregnant women | The USPSTF strongly recommends screening for hepatitis B virus infection in pregnant women at their first prenatal visit. | A |
| Human immuno-deficiency virus (HIV) screening | The USPSTF strongly recommends that clinicians screen for HIV all adolescents and adults at increased risk for HIV infection. | A |

*continued*

Copyright National Academy of Sciences. All rights reserved.

Clinical Preventive Services for Women: Closing the Gaps

**TABLE 5-6** Continued

| Topic | Description | Grade |
|---|---|---|
| Obesity screening and counseling: adults | The USPSTF recommends that clinicians screen all adult patients for obesity and offer intensive counseling and behavioral interventions to promote sustained weight loss for obese adults. | B |
| Osteoporosis screening: women | The USPSTF recommends that women aged 65 and older be screened routinely for osteoporosis. The USPSTF recommends that routine screening begin at age 60 for women at increased risk for osteoporotic fractures. | B |
| Rh incompatibility screening: first pregnancy visit | The USPSTF strongly recommends Rh (D) blood typing and antibody testing for all pregnant women during their first visit for pregnancy-related care. | A |
| Rh incompatibility screening: 24–28 weeks gestation | The USPSTF recommends repeated Rh (D) antibody testing for all unsensitized Rh (D)-negative women at 24–28 weeks' gestation, unless the biological father is known to be Rh (D)-negative. | B |
| Sexually transmitted infections (STIs) counseling | The USPSTF recommends high-intensity behavioral counseling to prevent STIs for all sexually active adolescents and for adults at increased risk for STIs. | B |
| Syphilis screening: non-pregnant persons | The USPSTF strongly recommends that clinicians screen persons at increased risk for syphilis infection. | A |
| Syphilis screening: pregnant women | The USPSTF recommends that clinicians screen all pregnant women for syphilis infection. | A |
| Tobacco use counseling and interventions: non-pregnant adults | The USPSTF recommends that clinicians ask all adults about tobacco use and provide tobacco cessation interventions for those who use tobacco products. | A |
| Tobacco use counseling: pregnant women | The USPSTF recommends that clinicians ask all pregnant women about tobacco use and provide augmented, pregnancy-tailored counseling to those who smoke. | A |

Services Suggested by the Institute of Medicine[a]

| Topic | Description | Grade |
|---|---|---|
| Diet and physical activity | Determine current levels of physical activity and eating behaviors in all adolescent and adult women and make referrals to appropriate services. | |
| Establishing pregnancy history of CVD-related conditions | Obtain a history of pregnancy complications, including preeclampsia, gestational hypertension, and gestational diabetes mellitus, from all women who have had at least one pregnancy. | |
| Mental health | Screen for suicide ideation and postpartum depression in women who are pregnant or who have recently given birth. | |
| Metabolic syndrome | Obtain a waist circumference as an essential component of screening for metabolic syndrome. | |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA860

Clinical Preventive Services for Women: Closing the Gaps

TABLE 5-6 Continued

| Topic | Description | Grade |
|-------|-------------|-------|
| Preconception care | Provide evidence-based tests, procedures, and screening for nonpregnant women to optimize reproductive outcomes and prevent or optimize treatment for chronic conditions, as well as topics for counseling and guidance for preconception health. | |
| Prenatal care | Provide evidence-based tests, procedures, and screening for pregnant women to optimize birth outcomes and future chronic conditions, as well as topics for counseling and guidance for prenatal care. | |
| STIs | Screen for chlamydia and gonorrhea for women above age 25 years with risk factors outlined by the USPSTF or if local rates of infections are high. High-prevalence settings are defined by the Centers for Disease Control and Prevention as those known to have a one percent or greater prevalence of infection among the patient population being served. | |

[a] As suggested in Chapter 5 and Appendix A.

recommended annual well-child visits as part of a unified package of preventive health care services for children and adolescents (AAP, 1995; Elster, 1998; Elster and Kuznets, 1994).

Most recently, the Bright Futures Health Initiative, which was launched by HRSA's Maternal and Child Health Bureau in 1990, recommended a schedule of preventive services beginning in the prenatal period (for an initial history and anticipatory guidance) and running through 21 years of age for "children who are receiving competent parenting, have no manifestations of any important health problems, and are growing and developing in satisfactory fashion" (AAP, 1995, 2008). Bright Futures recommends preventive pediatric health care visits for children annually from ages 3 through age 21 years, including initial/interval medical histories, measurements, sensory screening, developmental/behavioral assessments, physical examination, age-appropriate procedures, oral health, and anticipatory guidance. Although the content of well care is tailored by gender to females and males, the recommended frequency or timing of well-care visits for girls and young women does not vary.

Under federal law, state Medicaid programs generally must cover a package of prevention services for children under age 21 years through the Early Periodic Screening, Diagnosis, and Treatment (EPSDT) program (GAO, 2009). A key component of the EPSDT services is that it entitles

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                        JA861                                        JA-0000454

children to coverage of well-child checkups, which include a comprehensive health and developmental history, a comprehensive unclothed physical examination, appropriate immunizations and laboratory tests, and health education. The EPSDT program also covers other preventive services for children, such as height and weight measurement, nutritional assessment and counseling, immunizations, blood pressure screening, and cholesterol and other appropriate laboratory tests. State Medicaid programs must provide EPSDT program services at intervals that meet reasonable standards of medical and dental practice, as determined by the state and as medically necessary to determine the existence of a suspected illness or condition. Accordingly, either states must develop their own periodicity schedules (i.e., age-specific timetables that identify when EPSDT well-child checkups and other EPSDT services should occur), or they may adopt a nationally recognized schedule, such as that of AAP, which recommends well-child checkups once each year or more frequently, depending on age. The Omnibus Budget Reconciliation Act of 1989 (OBRA 89) required the Secretary of HHS to set annual goals for children's receipt of EPSDT services, and the Centers for Medicare and Medicaid Services (CMS) established a yearly goal that each state must provide EPSDT well-child checkups to at least 80 percent of the children enrolled in the Medicaid program in their state.

*Adulthood*

For adults, the USPSTF clinical preventive services recommendations do not address how, when, where, or by whom prevention services are to be provided. For adolescents and adults, ACIP recommends age-specific timing of a full array of immunizations but does not explicitly mention their preferred provision in the context of the well-care office visit. As noted in Chapter 3, states and health insurance plans in the public and private sectors vary widely in the preventive services that they cover, including the payment for designated office visits and extended coverage for specific prevention services.

For persons 65 years and older, well visits are generally covered. All new Medicare beneficiaries have been eligible to receive a welcome to Medicare visit that is similar in scope to a wellness visit (GAO, 2009). The ACA broadens this benefit for beneficiaries to include a new annual wellness examination for all beneficiaries with no copayment. At this visit, medical and family health histories are reviewed, along with the collection of basic health measurements, screening for preventive services, and the identification of risk factors and treatment options.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                        JA862                        JA-0000455

### State Health Plan Example

In recent years, the Commonwealth of Massachusetts has been at the forefront in establishing a core set of clinical guidelines for the well care of average-risk adults 18 years of age and older from the general population (MHQP, 2007). These guidelines include health maintenance visits that were recommended annually for people age 18 to 21 years; every one to three years, depending on risk factors, from ages 22 to 49 years; and then annually for all adults 50 years of age and older. The health maintenance visit includes an individual and family history, an age-appropriate physical examination, indicated preventive screenings and counseling, and ACIP-based immunization updates. General counseling and guidance at every age include screening for alcohol and substance abuse, depression, physical activity, tobacco use, and violence or abuse in the home, as well as safety and injury and violence prevention

Statewide health care reform in Massachusetts established minimum creditable coverage regulations, which apply for purposes of the individual mandate and to all Commonwealth Care policies. These require that health plans cover at least three preventive care visits per year for an individual (six visits under a family policy) before any deductible is applied. However, preventive care visits require the normal copayment. After the enactment of the ACA, as of July 1, 2011, no copayments for preventive services, including both preventive service visits and the well office visit (Current Procedural Terminology Codes 99381 to 99397), will be charged for any patient (Personal communication, Stephanie Chrobak and Nancy Turnbull, Massachusetts Health Connector, May 10, 2011).

### Private-Sector Coverage of Well-Visits

Private health maintenance plans, such as Kaiser Permanente, cover and encourage the utilization of a wide array of prevention services in the context of ongoing primary care for beneficiaries of all ages. They do not, however, promote a specific periodicity of prevention visits (Kaiser Permanente, 2011). Although detailed coverage and benefit information about the scope of preventive services covered by insurance plans is difficult to obtain, Chapter 3 addresses more examples of current private insurance practices.

## Special Considerations for Reproductive Health Care

### Provision of Preconception Health Care

The preconception period (before the first pregnancy) and the inter-conception period (between all subsequent pregnancies) have been identi-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA863                          JA-0000456

fied as opportune times for the provision of focused well-woman preventive care visits to identify and modify biomedical, behavioral, and social risks to a woman's health and/or pregnancy outcomes. In 2006, the CDC developed recommendations for preconception care on the basis of a review of published research and the opinions of specialists from the CDC Agency for Toxic Substances and Disease Registry Preconception Care Work Group and the Select Panel on Preconception Care. The recommendations of the CDC were aimed at achieving four primary goals:

> 1) improving the knowledge and attitudes and behaviors of men and women related to preconception health; 2) assuring that all women of childbearing age in the United States receive preconception care services (i.e., evidence-based risk screening, health promotion, and interventions) that will enable them to enter pregnancy in optimal health; 3) reducing risks indicated by a previous adverse pregnancy outcome through interventions during the interconception period; and 4) reducing the racial disparities in adverse pregnancy outcomes. (Johnson et al., 2006)

However, the report did not recommend a specific suite of interventions to be included in routine preconception care. Strong evidence suggests that a number of components of preconception care are effective in improving health outcomes for women and children, in particular, screening of women who are seeking family planning services to identify and treat preconception risk conditions, the provision of nutrition services for women affected by particular metabolic conditions such as hyperphenylalanemia and diabetes, the use of dietary folate supplements by women of reproductive age who are sexually active (Korenbrot et al., 2002), and screening for depression. Furthermore, better pregnancy outcomes have been demonstrated as the result of preconception interventions for alcohol and smoking cessation (Lumley et al., 2004).

The CDC Select Panel on Preconception Care considers all women of reproductive age and potential presenting to primary care as candidates for preconception care. Its 2006 recommendations include the provision of a prepregnancy visit for couples and individuals planning a pregnancy and, as part of primary care preventive care visits, risk assessment and educational and health counseling for all women of childbearing age for improving reproductive outcomes and reducing the sequelae of future chronic diseases among women and their offspring. In 2011 the NPC issued the National Prevention Strategy. Recommendations include increasing use of preconception and prenatal care (National Prevention Council, 2011).

*Prenatal Care for the Provision of Preventive Services*

Another type of well-woman preventive care visit is the routine prenatal care visit for pregnant women. AAP and ACOG currently recommend

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA864 JA-0000457

the following visit schedule for women with an uncomplicated pregnancy: a visit every 4 weeks for the first 28 weeks of pregnancy, a visit every 2 weeks until 36 weeks of pregnancy, and weekly visits thereafter (ACOG, 2007c). Women with high-risk pregnancies may need more frequent visits. The recommended content of the visit includes specific tests and procedures (e.g., blood pressure, weight, urine test, uterine size and fetal heart rate assessment, glucose tolerance testing, and screening for specific sexually transmitted infections and genetic or developmental conditions), as well as topics for counseling and guidance (e.g., tobacco avoidance and nutrition). The U.S. Public Health Service Expert Panel on the Content of Prenatal Care (USPHS, 1989) recommends less frequent visits, and some studies have supported the safety and efficacy of visits at a reduced frequency for multiparous and low-risk women. Regardless of the periodicity, pregnant women are likely to make more well-woman preventive care visits than nonpregnant women.

## Additional Considerations to Assure Access to Well-Visits

### Adolescence and Early Adulthood

Although an array of clinical guidelines recommend an annual well-child visit through age 21 years for the provision of preventive services, evidence on the rates of compliance with the recommendations are mixed. Only 38 percent of adolescents received a preventive care visit in the previous year, and black, Hispanic, and lower-income adolescents were the least likely to have had a preventive care visit (Irwin, 2009). Evidence of the efficacy of preventive services delivered to adolescents is stronger for increasing knowledge and awareness than for changing risky behaviors (Ozer et al., 2004).

As the ACA expands access to private and public health insurance for adolescents and young adults, it may also raise challenges for ensuring that confidential care is delivered to a newly insured segment of the adolescent and young adult population. Adolescents and young adults are likely to forgo health care when they feel that they lack access to confidential care. Time alone with the provider can enhance the client's sense of confidentiality, and it has been shown that adolescents attending a preventive care visit are more likely to have time alone with their provider than with those with a non-preventive care visit (40 and 28 percent, respectively) (Edman et al., 2010). However, the overall proportion of young people accessing confidential care remains relatively low, particularly for adolescents from low-income and ethnically diverse populations.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA865                                    JA-0000458

*Other Barriers*

Children enrolled in Medicaid are generally eligible for a well-child check up at least once every one to two years, but according to Medical Expenditure Panel Survey data from 2003 to 2006, an estimated 41 percent of children in Medicaid aged 2 through 20 years had not received a well-child checkup during the previous 2-year period. The estimated proportions of privately insured children who had received a well-child checkup were generally similar. CMS collects data and reports from states on the provision of EPSDT services, and reports from fiscal years 2000 through 2007 show that most states are not achieving the yearly goal of CMS that each state provide EPSDT well-child visits to at least 80 percent of the children enrolled in Medicaid in their state who should receive such care. State reports for 2007 showed that, on average, 58 percent of children enrolled in Medicaid received at least one EPSDT well-child visit for which they were eligible; the rates in individual states varied from 25 to 79 percent (GAO, 2009). As noted earlier for adults, only 39 states cover health maintenance visits to adults under Medicaid (GAO, 2009). Additional outreach to foster optimal utilization of preventive services may be necessary to overcome nonclinical barriers (e.g., transportation, literacy, and translation services).

## Identified Gaps

The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is lack of inclusion of well-woman preventive visits for women 21 to 64 years of age, which are used for providing recommended preventive services.

The evidence provided to support the inclusion of this service is based on federal and state policies (such as included in Medicaid, Medicare, and the Commonwealth of Massachusetts), clinical professional guidelines (such as those of AMA and AAFP), and private health plan policies (such as those of Kaiser Permanente).

> Recommendation 5.8: The committee recommends for consideration as a preventive service for women: at least one well-woman preventive care visit annually for adult women to obtain the recommended preventive services, including preconception and prenatal care. The committee also recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA866                          JA-0000459

# REFERENCES

AAFP (American Academy of Family Physicians). 2005. *Breastfeeding (policy statement)*. Leawood, KS: American Academy of Family Physicians. http://www.aafp.org/online/en/home/policy/policies/b/breastfeedingpolicy.html (accessed June 6, 2011).

AAFP. 2009. *Family and intimate partner violence*. Leawood, KS: American Academy of Family Physicians. http://www.aafp.org/online/en/home/policy/policies/f/familyandintimatepartner-violenceandabuse.html (accessed June 6, 2011).

AAP (American Academy of Pediatrics). 1995. Recommendations for preventive pediatric health care. Committee on Practice and Ambulatory Medicine. *Pediatrics* 96(2 Pt 1):373–374.

AAP. 2008. *Bright Futures: Guidelines for health supervision of infants, children and adolescents*, 3rd ed. (J. F. Hagan, J. S. Shaw, and P. M. Duncan, eds.). Elk Grove Village, IL: American Academy of Pediatrics.

AAP. 2005. Policy statement—breastfeeding and the use of human milk. *Pediatrics* 115(2):496–506.

Abbott, J. 1995. Domestic violence against women—reply. *Journal of the American Medical Association* 274(19):1508.

ACNM (American College of Nurse-Midwives). 2004. *Position statement—breastfeeding*. http://www.midwife.org/index.asp?bid=59&cat=3&button=Search&rec=55 (accessed June 6, 2011).

ACOG (American Congress of Obstetricians and Gynecologists). 2001. ACOG Practice Bulletin. Clinical management guidelines for obstetrician-gynecologists. Number 30, September 2001 (replaces Technical Bulletin Number 200, December 1994). Gestational diabetes. *Obstetrics and Gynecology* 98(3):525–538.

ACOG. 2005. ACOG practice bulletin. Clinical management guidelines for obstetrician-gynecologists. Number 61, April 2005. Human papillomavirus. *Obstetrics and Gynecology* 105(4):905–918.

ACOG. 2007a. ACOG Committee Opinion Number 361, February 2007. Breastfeeding: Maternal and infant aspects. *Obstetrics and Gynecology* 109(2 Pt 1):479–480.

ACOG. 2007b. *Guidelines for women's health care*, 3rd ed. Washington, DC: American Congress of Obstetricians and Gynecologists.

ACOG. 2008. ACOG Practice Bulletin No. 99: Management of abnormal cervical cytology and histology. *Obstetrics and Gynecology* 112(6):1419–1444.

ACOG. 2009. ACOG Practice Bulletin No. 109: Cervical cytology screening. *Obstetrics and Gynecology* 114(6):1409–1420.

ACOG. 2010a. ACOG Practice Bulletin No. 110: Noncontraceptive uses of hormonal contraceptives. *Obstetrics and Gynecology* 115(1): 206–218.

ACOG. 2010b. *Screening tools—domestic violence*. Washington, DC: American Congress of Obstetricians and Gynecologists. http://www.acog.org/departments/dept_notice.cfm?recno=17&bulletin=585 (accessed May 9, 2011).

ACOG. 2011a. *ACOG education pamphlet AP021—birth control pills*. Washington, DC: American Congress of Obstetricians and Gynecologists. http://www.acog.org/publications/patient_education/bp021.cfm (accessed May 9, 2011).

ACOG. 2011b. *ACOG education pamphlet AP114—emergency contraception*. Washington, DC: American Congress of Obstetricians and Gynecologists. http://www.acog.org/publications/patient_education/bp114.cfm (accessed May 9, 2011).

ACOG. 2011c. *ACOG education pamphlet AP159—implants, injections, rings and patches*. Washington, DC: American Congress of Obstetricians and Gynecologists. http://www.acog.org/publications/patient_education/bp159.cfm (accessed May 9, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA867
JA-0000460

ACS (American Cancer Society). 2010. *Cancer facts & figures 2010.* Atlanta, GA: American Cancer Society.

ADA (American Diabetes Association). 2004. Preconception care of women with diabetes. *Diabetes Care* 27(Suppl. 1):S76–S78.

ADA. 2011a. *Diabetes basics.* Alexandria, VA: American Diabetes Association. http://www.diabetes.org/diabetes-basics/ (accessed May 12, 2011).

ADA. 2011b. *Diabetes statistics.* Alexandria, VA: American Diabetes Association. http://www.diabetes.org/diabetes-basics/diabetes-statistics/ (accessed June 1, 2011).

AHRQ (Agency for Healthcare Research and Quality). 2011. *Oral contraceptive use for the primary prevention of ovarian cancer.* Rockville, MD: Agency for Healthcare Research and Quality. http://www.ahrq.gov/clinic/tp/ovarcantp.htm (accessed May 9, 2011).

AMA (American Medication Association). 2003. *H-75.994 Contraception and sexually transmitted diseases.* Chicago, IL: American Medication Association. https://ssl3.ama-assn.org/apps/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=%2fresources%2fdoc%2fPolicyFinder%2fpolicyfiles%2fHnE%2fH-75.994.HTM (accessed May 9, 2011).

AMA. 2008. *H-515.965 Family and intimate partner violence.* Chicago, IL: American Medication Association. https://ssl3.ama-assn.org/apps/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=%2fresources%2fdoc%2fPolicyFinder%2fpolicyfiles%2fHnE%2fH-515.965.HTM (accessed May 9, 2011).

Amaral, G., D. G. Foster, M. A. Biggs, C. B. Jasik, S. Judd, and C. D. Brindis. 2007. Public savings from the prevention of unintended pregnancy: A cost analysis of family planning services in California. *Health Services Research* 42(5):1960–1980.

Amy, J. J., and V. Tripathi. 2009. Contraception for women: An evidence based overview. *British Medical Journal* 339:b2895.

ANA (American Nurses Association). 2000. *Social causes and health care.* Silver Spring, MD: American Nurses Association. http://www.nursingworld.org/SocialCausesHealthCare (accessed May 9, 2011).

Anttila, A., L. Kotaniemi-Talonen, M. Leinonen, M. Hakama, P. Laurila, J. Tarkkanen, N. Malila, and P. Nieminen. 2010. Rate of cervical cancer, severe intraepithelial neoplasia, and adenocarcinoma in situ in primary HPV DNA screening with cytology triage: Randomised study within organised screening programme. *British Medical Journal* 340:c1804.

Arbyn, M., C. Bergeron, P. Klinkhamer, P. Martin-Hirsch, A. G. Siebers, and J. Bulten. 2008. Liquid compared with conventional cervical cytology—a systematic review and meta-analysis. *Obstetrics and Gynecology* 111(1):167–177.

Baby-Friendly USA, Inc. 2011. *Baby-friendly hospital initiative in the U.S.* East Sandwich, MA: Baby-Friendly USA, Inc. http://www.babyfriendlyusa.org/eng/03.html (accessed April 5, 2011).

Bair-Merritt, M. H., A. P. Giardino, M. Turner, M. Ganetsky, and C. W. Christian. 2004. Pediatric residency training on domestic violence: A national survey. *Ambulatory Pediatrics* 4(1):24–27.

Bair-Merritt, M. H., J. M. Jennings, R. S. Chen, L. Burrell, E. McFarlane, L. Fuddy, and A. K. Duggan. 2010. Reducing maternal intimate partner violence after the birth of a child: A randomized controlled trial of the Hawaii Healthy Start Home Visitation Program. *Archives of Pediatrics & Adolescent Medicine* 164(1):16–23.

Bartick, M., and A. Reinhold. 2010. The burden of suboptimal breastfeeding in the United States: A pediatric cost analysis. *Pediatrics* 125(5):E1048–E1056.

Basile, K. C., M. F. Hertz, and S. E. Back. 2007. *Intimate partner violence and sexual violence victimization assessment instruments for use in healthcare settings: Version 1.* Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA868                              JA-0000461

Battaglia, T. A., E. Finley, and J. M. Liebschutz. 2003. Survivors of intimate partner violence speak out—Trust in the patient-provider relationship. *Journal of General Internal Medicine* 18(8):617–623.

Bigras, G., and F. de Marval. 2005. The probability for a Pap test to be abnormal is directly proportional to HPV viral load: Results from a Swiss study comparing HPV testing and liquid-based cytology to detect cervical cancer precursors in 13,842 women. *British Journal of Cancer* 93(5):575–581.

Black, M. C., and M. J. Breiding. 2008. Adverse health conditions and health risk behaviors associated with intimate partner violence—United States, 2005 (reprinted from MMWR, vol 57, pg 113–117, 2008). *Journal of the American Medical Association* 300(6):646–647.

Blumenthal, P. D., A. Voedisch, and K. Gemzell-Danielsson. 2011. Strategies to prevent unintended pregnancy: Increasing use of long-acting reversible contraception. *Human Reproduction Update* 17(1):121–137.

Blyth, R., D. K. Creedy, C. L. Dennis, W. Moyle, J. Pratt, and S. M. De Vries. 2002. Effect of maternal confidence on breastfeeding duration: An application of breastfeeding self-efficacy theory. *Birth-Issues in Perinatal Care* 29(4):278–284.

Boerschmann, H., M. Pfluger, L. Henneberger, A. G. Ziegler, and S. Hummel. 2010. Prevalence and predictors of overweight and insulin resistance in offspring of mothers with gestational diabetes mellitus. *Diabetes Care* 33(8):1845–1849.

Boonstra, H. D., R. B. Gold, C. L. Richards, and L. B. Finer. 2006. *Abortion in women's lives.* New York: The Guttmacher Institute.

Borowsky, I. W., and H. Ireland. 2002. Parental screening for intimate partner violence by pediatricians and family physicians. *Pediatrics* 110:509–516.

Boyle, J. P., T. J. Thompson, E. W. Gregg, L. E. Barker, and D. F. Williamson. 2010. Projection of the year 2050 burden of diabetes in the US adult population: Dynamic modeling of incidence, mortality, and prediabetes prevalence. *Population Health Metrics* 8:29.

Bozzette, S. A., S. H. Berry, N. J. Duan, M. R. Frankel, A. A. Leibowitz, D. Lefkowitz, C. A. Emmons, J. W. Senterfitt, M. L. Berk, S. C. Morton, M. F. Shapiro, R. M. Andersen, W. E. Cunningham, M. Marcus, N. S. Wenger, L. A. Athey, S. M. Smith, E. G. Bing, J. A. Brown, M. A. Burnham, D. P. Goldman, D. E. Kanouse, J. W. Keesey, D. F. McCaffrey, J. F. Perlman, M. A. Schuster, P. D. Cleary, J. A. Fleishman, R. D. Hays, J. A. McCutchan, and D. Richman. 1998. The care of HIV-infected adults in the United States. *New England Journal of Medicine* 339(26):1897–1904.

Breese, P., W. Burman, J. Shlay, and D. Guinn. 2004. The effectiveness of a verbal opt-out system for human immunodeficiency virus screening during pregnancy. *Obstetrics and Gynecology* 104(1):134–137.

Broch, K. 2003. *When men murder women: An analysis of 2000 homicide data.* Washington, DC: Violence Policy Center.

Buchanan, T. A. 2001. Pancreatic B-cell defects in gestational diabetes: Implications for the pathogenesis and prevention of type 2 diabetes. *Journal of Clinical Endocrinology and Metabolism* 86(3):989–993.

Bulterys, M., M. L. Nolan, D. J. Jamieson, K. Dominguez, and M. G. Fowler. 2002. Advances in the prevention of mother-to-child HIV-1 transmission: Current issues, future challenges. *AIDScience* 2(4):219–223.

Burkman, R., J. J. Schlesselman, and M. Zieman. 2004. Safety concerns and health benefits associated with oral contraception. *American Journal of Obstetrics and Gynecology* 190(4 Suppl. 1):S5–S22.

Buxbaum, J. L., and M. A. Eloubeidi. 2010. Molecular and clinical markers of pancreas cancer. *JOP* 11(6):536–544.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA869                                    JA-0000462

Bystrova, K., A. S. Matthiesen, I. Vorontsov, A. M. Widstrom, A. B. Ransjo-Arvidson, and K. Uvnas-Moberg. 2007. Maternal axillar and breast temperature after giving birth: Effects of delivery ward practices and relation to infant temperature. *Birth-Issues in Perinatal Care* 34(4):291–300.

California WIC Association and U.C. Davis Human Lactation Center. 2008. *Depends on where you are born: California hospitals must close the gap in exclusive breastfeeding rates.* Davis, CA: California WIC Association.

Calonge, N., D. B. Petitti, T. G. DeWitt, A. J. Dietrich, L. Gordis, K. D. Gregory, R. Harris, G. Isham, R. Leipzig, M. L. LeFevre, C. Loveland-Cherry, L. N. Marion, V. A. Moyer, J. K. Ockene, G. F. Sawaya, B. P. Yawn, and United States Preventive Services Task Force. 2008. Behavioral counseling to prevent sexually transmitted infections: U.S. Preventive Services Task Force recommendation statement. *Annals of Internal Medicine* 149(7):W491–W495.

Camp, S. 2011. Testimony submitted to the Committee on Preventive Services for Women. Presented at Meeting 2 of the Institute of Medicine Committee on Preventive Services for Women, January 12, 2011, Washington, DC.

Campbell, J. C. 2002. Health consequences of intimate partner violence. *Lancet* 359(9314):1331–1336.

Campbell, J. C., and M. A. Lewandowski. 1997. Mental and physical effects of intimate partner violence on women and children. *Psychiatric Clinics of North America* 20(2):353–374.

Campbell, K. P., and D. Lentine. 2006. *Sexually transmitted infections (STIs) evidence-statement: screening and counseling.* Washington, DC: Business Group on Health. http://www.businessgrouphealth.org/benefitstopics/topics/purchasers/condition_specific/evidencestatements/counseling_sti_es.pdf (accessed May 16, 2011).

Cardenas-Turanzas, M., G. M. Nogueras-Gonzalez, M. E. Scheurer, K. Adler-Storthz, J. L. Benedet, J. R. Beck, M. Follen, and S. B. Cantor. 2008. The performance of human papillomavirus high-risk DNA testing in the screening and diagnostic settings. *Cancer Epidemiology Biomarkers & Prevention* 17(10):2865–2871.

CDC (Centers for Disease Control and Prevention). 1953. *Vital statistics of the United States, 1950. Vol. iii. Mortality data.* Washington, DC: Centers for Disease Control and Prevention.

CDC. 2006. Twenty-five years of HIV/AIDS—United States, 1981–2006. *MMWR Morbidity and Mortality Weekly Report* 55(21):585–589.

CDC. 2007a. *Deaths: Final data for 2007.* Atlanta, GA: Centers for Disease Control and Prevention.

CDC. 2007b. *Provisional geographic-specific breastfeeding rates among children born in 2007.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/breastfeeding/data/NIS_data/2007/state_any.htm (accessed March 16, 2011).

CDC. 2007c. *Pregnancy and childbirth.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/hiv/topics/perinatal/index.htm (accessed June 2, 2011).

CDC. 2008. *CDC HIV/AIDS fact sheet: HIV/AIDS among women.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/hiv/topics/women/resources/factsheets/pdf/women.pdf (accessed June 29, 2009).

CDC. 2009a. *Breastfeeding report card—United States, 2009.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/Features/BreastFeedingData/ (accessed August 3, 2010).

CDC. 2009b. *Sexually transmitted diseases surveillance, 2008: Chlamydia.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/std/stats08/chlamydia.htm (accessed March 16, 2010).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19     JA870     JA-0000463

CDC. 2010a. *Basic information about HIV and AIDS.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/hiv/topics/basic/index.htm (accessed June 2, 2011).

CDC. 2010b. *Cases of HIV infection and AIDS in the United States and dependent areas, 2007.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/hiv/surveillance/resources/reports/2007report/ (accessed June 2, 2011).

CDC. 2010c. *Health, United States, 2009: With special feature on medical technology.* Hyattsville, MD: Centers for Disease Control and Prevention.

CDC. 2010d. *Overweight and obesity.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/obesity/defining.html (accessed May 31, 2011).

CDC. 2010e. *Sexually transmitted diseases treatment guidelines, 2010.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/std/treatment/2010/ (accessed May 31, 2011).

CDC. 2011a. *Cervical cancer screening rates.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/cancer/cervical/statistics/screening.htm (accessed April 8, 2011).

CDC. 2011b. *HIV mortality slide sets.* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/hiv/topics/surveillance/resources/slides/mortality/index.htm (accessed June 2, 2011).

CDC. 2011c. *National diabetes fact sheet,* 2011. Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/diabetes/pubs/pdf/ndfs_2011.pdf (accessed June 2, 2011).

CDC. 2011d. *National Survey of Maternity Practices in Infant Nutrition and Care (MPINC).* Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/breastfeeding/data/mpinc/index.htm (accessed May 4, 2011).

Chamberlain, L., and K. A. Perham-Hester. 2000. Physicians' screening practices for female partner abuse during prenatal visits. *Maternal Child Health Journal* 4(2):141–148.

Chamberlain, L., and K. A. Perham-Hester. 2002. The impact of perceived barriers on primary care physicians' screening practices for female partner abuse. *Women & Health* 35:55–69.

Chamberlain, L. B., M. McMahon, B. L. Philipp, and A. Merewood. 2006. Breast pump access in the inner city: A hospital-based initiative to provide breast pumps for low-income women. *Journal of Human Lactation* 22(1):94–98.

Chan, J. M., E. B. Rimm, G. A. Colditz, M. J. Stampfer, and W. C. Willett. 1994. Obesity, fat distribution, and weight gain as risk factors for clinical diabetes in men. *Diabetes Care* 17(9):961–969.

Chen, P.-H., S. Rovi, M. Bega, A. Jacobs, and M. S. Johnson. 2005. Screening for domestic violence in a predominantly Hispanic clinical setting. *Family Practice* 22:617–623.

Cherouny, P. H., F. A. Federico, C. Haraden, S. Leavitt Gullo, and R. Resar. 2005. *Idealized design of perinatal care.* IHI Innovation Series white paper. Cambridge, MA: Institute for Healthcare Improvement. http://www.ihi.org/IHI/Results/WhitePapers/IdealizedDesignofPerinatalCareWhitePaper.htm (accessed July 19, 2010).

Chou, R., L. H. Huffman, R. W. Fu, A. K. Smits, and P. T. Korthuis. 2005. Screening for HIV: A review of the evidence for the US Preventive Services Task Force. *Annals of Internal Medicine* 143(1):55–73.

Chung, M., G. Raman, T. Trikalinos, J. Lau, and S. Ip. 2008. Interventions in primary care to promote breastfeeding: An evidence review for the US Preventive Services Task Force. *Annals of Internal Medicine* 149(8):560–564.

Chung, M., G. Raman, T. Trikalinos, J. Lau, and S. Ip. 2010. Primary care interventions to promote breastfeeding: Recommendation statement. *American Family Physician* 81(10):1265–1267.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                           JA871                              JA-0000464

Claxton, G., B. DiJulio, B. Finder, J. Lundy, M. McHugh, A. Osei-Anto, H. Whitmore, J. D. Pickreign, and J. Gabel. 2010. *Employer health benefits—2010 Annual Survey.* Menlo Park, CA: The Kaiser Family Foundation and Health Research & Educational Trust.

Cochand-Priollet, B., C. Le Gales, P. de Cremoux, V. Molinie, X. Sastre-Garau, M. C. Vacher-Lavenu, P. Vielh, J. Coste, and M. F. S. C. Cyto. 2001. Cost-effectiveness of monolayers and human papillomavirus testing compared to that of conventional Papanicolaou smears for cervical cancer screening: Protocol of the study of the French Society of Clinical Cytology. *Diagnostic Cytopathology* 24(6):412–420.

Coker, A. L., P. H. Smith, L. Bethea, M. R. King, and R. E. McKeown. 2000. Physical health consequences of physical and psychological intimate partner violence. *Archives of Family Medicine* 9(5):451–457.

Coker, A. L., K. E. Davis, I. A. Arias, S. Desai, M. Sanderson, J. M. Brandt, and P.H. Smith. 2002. Physical and mental health effects of intimate partner violence for men and women. *American Journal of Preventive Medicine* 23(4):260–268.

Coker, A. L., C. Hopenhayn, C. P. DeSimone, H. M. Bush, and L. Crofford. 2009. Violence against women raises risk of cervical cancer. *Journal of Women's Health* 18(8):1179–1185.

Colditz, G. A., W. C. Willett, A. Rotnitzky, and J. E. Manson. 1995. Weight-gain as a risk factor for clinical diabetes-mellitus in women. *Annals of Internal Medicine* 122(7):481–486.

Collins, S. R., M. M. Doty, R. Robertson, and T. Garber. 2011. *Help on the horizon: How the recession has left millions of workers without health insurance, and how health reform will bring relief—findings from The Commonwealth Fund Biennial Health Insurance Survey of 2010.* New York: The Commonwealth Fund.

The Commonwealth Fund. 1993. *First comprehensive national health survey of American women.* New York: The Commonwealth Fund.

The Commonwealth Fund. 1999. *Health concerns across a woman's lifespan: The Commonwealth Fund 1998 Survey of Women's Health.* New York: The Commonwealth Fund.

Conde-Agudelo, A., A. Rosas-Bermudez, and A. C. Kafury-Goeta. 2006. Birth spacing and risk of adverse perinatal outcomes—a meta-analysis. *Journal of the American Medical Association* 295(15):1809–1823.

Corrigan, J. D., M. Wolfe, W. J. Mysiw, R. D Jackson, and J. Bogner. 2003. Early identification of mild traumatic brain injury in female victims of domestic violence. *American Journal of Obstetrics and Gynecology* 188(5 Suppl.):S71–S76.

Crowther, C. A., J. E. Hiller, J. R. Moss, A. J. McPhee, W. S. Jeffries, and J. S. Robinson. 2005. Effect of treatment of gestational diabetes mellitus on pregnancy outcomes. *New England Journal of Medicine* 352(24):2477–2486.

Cunningham, W. E., R. M. Andersen, M. H. Katz, M. D. Stein, B. J. Turner, S. Crystal, S. Zierler, K. Kuromiya, S. C. Morton, P. St. Clair, S. A. Bozzette, and M. F. Shapiro. 1999. The impact of competing subsistence needs and barriers on access to medical care for persons with human immunodeficiency virus receiving care in the United States. *Medical Care* 37(12):1270–1281.

Cuzick, J., C. Clavel, K. U. Petry, C. J. Meijer, H. Hoyer, S. Ratnam, A. Szarewski, P. Birembaut, S. Kulasingam, P. Sasieni, and T. Iftner. 2006. Overview of the European and North American studies on HPV testing in primary cervical cancer screening. *International Journal of Cancer* 119(5):1095–1101.

Danaei, G., M. M. Finucane, Y. Lu, G. M. Singh, M. J. Cowan, C. J. Paciorek, J. K. Lin, F. Farzadfar, Y. H. Khang, G. A. Stevens, M. Rao, M. K. Ali, L. M. Riley, C. A. Robinson, and M. Ezzati; on behalf of the Global Burden of Metabolic Risk Factors of Chronic Diseases Collaborating Group (Blood Glucose). 2011. National, regional, and global trends in fasting plasma glucose and diabetes prevalence since 1980: Systematic analysis of health examination surveys and epidemiological studies with 370 country-years and 2.7 million participants. *Lancet* Epub June 24.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                         JA872                              JA-0000465

Davey, E., A. Barratt, L. Irwig, S. F. Chan, P. Macaskill, P. Mannes, and A. M. Saville. 2006. Effect of study design and quality on unsatisfactory rates, cytology classifications, and accuracy in liquid-based versus conventional cervical cytology: A systematic review. *Lancet* 367(9505):122–132.

de Cremoux, P., J. Coste, X. Sastre-Garau, M. Thioux, C. Bouillac, S. Labbe, I. Cartier, M. Ziol, A. Dosda, C. Le Gales, V. Molinie, M. C. Vacher-Lavenu, B. Cochand-Priollet, P. Vielh, H. Magdelenat, and the French Society of Clinical Cytology Study Group. 2003. Efficiency of the Hybrid Capture 2 HPV DNA test in cervical cancer screening—a study by the French Society of Clinical Cytology. *American Journal of Clinical Pathology* 120(4):492–499.

Dearwater, S. R., J. H. Coben, J. C. Campbell, G. Nah, N. Glass, E. McLoughlin, and B. Bekemeier. 1998. Prevalence of intimate partner abuse in women treated at community hospital emergency departments. *Journal of the American Medical Association* 280(5):433–438.

DeCarlo, P., and O. G. Reznick. 2009. *What are black women's HIV prevention needs?* San Francisco, CA: University of California San Francisco Center for AIDS Prevention Studies. http://caps.ucsf.edu/uploads/pubs/FS/pdf/BlackwomenFS.pdf (accessed June 9, 2011).

Dennis, C. L. 2002. Breastfeeding initiation and duration: A 1990–2000 literature review. *Journal of Obstetric Gynecologic and Neonatal Nursing* 31(1):12–32.

Dewey, K. G., L. A. Nommsen-Rivers, M. J. Heinig, and R. J. Cohen. 2003. Risk factors for suboptimal infant breastfeeding behavior, delayed onset of lactation, and excess neonatal weight loss. *Pediatrics* 112(3):607–619.

The Diabetes Prevention Program Research Group. 2000. The Diabetes Prevention Program: Baseline characteristics of the randomized cohort. *Diabetes Care* 23(11):1619–1629.

Dienemann, J., N. Glass, and R. Hyman. 2005. Survivor preferences for response to IPV disclosure. *Clinical Nurse Research* 14(3):215–233; Discussion 234–217.

DiGirolamo, A. M., L. M. Grummer-Strawn, and S. B. Fein. 2003. Do perceived attitudes of physicians and hospital staff affect breastfeeding decisions? *Birth-Issues in Perinatal Care* 30(2):94–100.

DiGirolamo, A., N. Thompson, R. Martorell, S. Fein, and L. Grummer-Strawn. 2005. Intention or experience? Predictors of continued breastfeeding. *Health Education & Behavior* 32(2):208–226.

DiGirolamo, A. M., L. M. Grummer-Strawn, and S. B. Fein. 2008. Effect of maternity-care practices on breastfeeding. *Pediatrics* 122:S43–S49.

Dragoman, M., A. Davis, and E. Banks. 2010. Contraceptive options for women with preexisting medical conditions. *Journal of Women's Health* 19(3):575–580.

Edman, J. C., S. H. Adams, M. J. Park, and C. E. Irwin, Jr. 2010. Who gets confidential care? Disparities in a national sample of adolescents. *Journal of Adolescent Health* 46(4):393–395.

EEOC (Equal Employment Opportunity Commission). 2000. *Decision on coverage of contraception*. Washington, DC: Equal Employment Opportunity Commission.

Elster, A. B. 1998. Comparison of recommendations for adolescent clinical preventive services developed by national organizations. *Archives of Pediatrics and Adolescent Medicine* 152(2):193–198.

Elster, A. B., and N. J. Kuznets. 1994. AMA guidelines for adolescent preventive services (gaps): Recommendations and rationale. *Journal of the American Medical Association* 272(12):980–981.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19    JA873    JA-0000466

ENA (Emergency Nurses Association). 2006. *Emergency Nurses Association position statement: Intimate partner and family violence, maltreatment, and neglect.* Des Plaines, IL: Emergency Nurses Association. http://www.ena.org/SiteCollectionDocuments/Position-20Statements/Violence_-_Intimate_Partner_and_Family_-_ENA_PS.pdf (accessed May 15, 2011).

Ernst, A. M., S. J. Weiss, E. Cham, L. Hall, and G. Nick. 2004. Detecting ongoing intimate partner violence in the emergency department using a simple 4-question screen: The OVAT. *Violence and Victims* 19:375–384.

Fairbank, L., S. O'Meara, M. J. Renfrew, M. Woolridge, A. J. Sowden, and D. Lister-Sharp. 2000. A systematic review to evaluate the effectiveness of interventions to promote the initiation of breastfeeding. *Health Technology Assessment* 4(25):1–171.

Family Violence Prevention Fund, B. McAlister Groves, M. Augstyn, D. Lee, and P. Sawires. 2004. *Identifying and responding to domestic violence: Consensus recommendation for child and adolescent health.* San Francisco, CA: Family Violence Prevention Fund. http://www.endabuse.org/userfiles/file/HealthCare/pediatric.pdf (accessed May 11, 2011).

Fauci, A. 2011. After 30 years of HIV/AIDS, real progress and much left to do. Washington, DC: *The Washington Post.* http://www.washingtonpost.com/opinions/after-30-years-of-hivaids-real-progress-and-much-left-to-do/2011/05/27/AGbimyCH_story.html (accessed June 3, 2011)

FDA (Food and Drug Administration). 2009a. *Cervista™ HPV 16/18—P080015.* Rockville, MD: Food and Drug Administration. http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfTopic/pma/pma.cfm?num=P080015 (accessed May 31, 2011).

FDA. 2009b. *Cervista™ HPV HR and Genfind™ DNA extraction kit—P080014.* Rockville, MD: Food and Drug Administration. http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfTopic/pma/pma.cfm?num=P080014 (accessed May 31, 2011).

FDA. 2009c. *Digene hybrid capture 2 high-risk HPV DNA test—P890064 S009 A004.* Rockville, MD: Food and Drug Administration. http://www.fda.gov/medicaldevices/productsandmedicalprocedures/deviceapprovalsandclearances/recently-approveddevices/ucm082556.htm (accessed May 31, 2011).

FDA. 2010. *Birth control guide.* Rockville, MD: Food and Drug Administration. http://www.fda.gov/forconsumers/byaudience/forwomen/ucm118465.htm (accessed May 31, 2011).

Feder, G., J. Ramsay, D. Dunne, M. Rose, C. Arsene, R. Norman, S. Kuntze, A. Spencer, L. Bacchus, G. Hague, A. Warburton, and A. Taket. 2009. How far does screening women for domestic (partner) violence in different health-care settings meet criteria for a screening programme? Systematic reviews of nine UK National Screening Committee criteria. *Health Technology Assessment* 13(16):1–136.

*Federal Register.* 2010. Interim final rules for group health plans and health insurance issuers relating to coverage of preventive services under the Patient Protection and Affordable Care Act. *Federal Register* 75(137):41726–41730.

Feig, D. S., B. Zinman, X. Wang, and J. E. Hux. 2008. Risk of development of diabetes mellitus after diagnosis of gestational diabetes. *Canadian Medical Association Journal* 179(3):229–234.

Felitti, V. J. 1991. Long-term medical consequences of incest, rape, and molestation. *Southern Medical Journal* 84(3):328–331.

Fillingim, R. B., C. S. Wilkinson, and T. Powell. 1999. Self-reported abuse history and pain complaints among young adults. *Clinical Journal of Pain* 15(2):85–91.

Finer, L. B., and S. K. Henshaw. 2006. Disparities in rates of unintended pregnancy in the United States, 1994 and 2001. *Perspectives on Sexual and Reproductive Health* 38(2):90–96.

Finkelhor, D. 1994. Current information on the scope and nature of child sexual abuse. *The Future of Children* 4(2):31–53.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA874  JA-0000467

Finkelhor, D., R. K. Ormrod, and H. A. Turner. 2009. The developmental epidemiology of childhood victimization. *Journal of Interpersonal Violence* 24(5):711–731.

Finkelstein, E. A., J. G. Trogdon, J. W. Cohen, and W. Dietz. 2009. Annual medical spending attributable to obesity: Payer- and service-specific estimates. *Health Affairs* 28(5):W822–W831.

Flaherty, E. G., and J. Stirling, Jr. 2010. American Academy of Pediatrics, Committee on Child Abuse Neglect. Clinical report—the pediatrician's role in child maltreatment prevention. *Pediatrics* 126(4):833–841.

Flaherty, E. G., R. Sege, L. L. Price, K. K. Christoffel, D. P. Norton, and K. G. O'Connor. 2006. Pediatrician characteristics associated with child abuse identification and reporting: Results from a national survey of pediatricians. *Child Maltreatment* 11(4):361–369.

Fleishman, J. A., K. A. Gebo, E. D. Reilly, R. Conviser, W. C. Mathews, P. T. Korthuis, J. Hellinger, R. Rutstein, P. Keiser, H. Rubin, R. D. Moore, and the HIV Research Network. 2005. Hospital and outpatient health services utilization among HIV-infected adults in care 2000–2002. *Medical Care* 43(9):40–52.

Fleming, D. T., and J. N. Wasserheit. 1999. From epidemiological synergy to public health policy and practice: The contribution of other sexually transmitted diseases to sexual transmission of HIV infection. *Sexually Transmitted Infections* 75(1):3–17.

Flexner, C. 2007. HIV drug development: The next 25 years. *Nature Reviews. Drug Discovery* 6(12):959–966.

Florez, J. C., K. A. Jablonski, S. E. Kahn, P. W. Franks, D. Dabelea, R. F. Hamman, W. C. Knowler, D. M. Nathan, and D. Altshuler. 2007. Type 2 diabetes-associated missense polymorphisms kcnj11 e23k and abcc8 a1369s influence progression to diabetes and response to interventions in the Diabetes Prevention Program. *Diabetes* 56(2):531–536.

Friedel, D., and S. Lavoie. 2008. Epidemiology and trends in sexually transmitted diseases. In *Public health and preventive medicine*, 15th ed. (R. Wallace, N. Kohatsu and J. Last, ed.). New York: McGraw Hill Medical. Pp. 155–188.

Frost, J. J., S. K. Henshaw, and A. Sonfield. 2010. *Contraceptive needs and services: National and state data, 2008 update*. New York: The Guttmacher Institute.

Fu, H. S., J. E. Darroch, T. Haas, and N. Ranjit. 1999. Contraceptive failure rates: New estimates from the 1995 National Survey of Family Growth. *Family Planning Perspectives* 31(2):56–63.

Fuentes-Afflick, E., and N. A. Hessol. 2000. Interpregnancy interval and the risk of premature infants. *Obstetrics and Gynecology* 95(3):383–390.

Gandhi, N. R., M. Skanderson, K. S. Gordon, J. Concato, and A. C. Justice. 2007. Delayed presentation for human immunodeficiency virus (HIV) care among veterans—a problem of access or screening? *Medical Care* 45(11):1105–1109.

GAO (Government Accountability Office). 2009. *Medicaid preventive services: Concerted efforts needed to ensure beneficiaries receive services*. Washington, DC: Government Accountability Office.

Gartner, L. M., L. S. Black, A. P. Eaton, R. A. Lawrence, A. J. Naylor, M. E. Neifert, D. O'Hare, R. J. Schanler, M. Georgieff, Y. Piovanetti, and J. Queenan. 1997. Breastfeeding and the use of human milk. *Pediatrics* 100(6):1035–1039.

Genuth, S. 2006. Insights from the diabetes control and complications trial/epidemiology of diabetes interventions and complications study on the use of intensive glycemic treatment to reduce the risk of complications of type 1 diabetes. *Endocrinology Practice* 12(Suppl. 1):34–41.

Gill, R. S., A. M. Sharma, S. S. Gill, D. W. Birch, and S. Karmali. 2011. The impact of obesity on diabetes mellitus and the role of bariatric surgery. *Maturitas* 69(2):137–140.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA875                          JA-0000468

Gillum, T. L., C. J. Sun, and A. B. Woods. 2009. Can a health clinic-based intervention increase safety in abused women? Results from a pilot study. *Journal of Womens Health* 18(8):1259–1264.

Gin, N. E., L. Rucker, S. Frayne, R. Cygan, and F. A. Hubbell. 1991. Prevalence of domestic violence among patients in three ambulatory care internal-medicine clinics. *Journal of General Internal Medicine* 6(4):317–322.

Gipson, J. D., M. A. Koenig, and M. J. Hindin. 2008. The effects of unintended pregnancy on infant, child, and parental health: A review of the literature. *Studies in Family Planning* 39(1):18–38.

Glass, N., S. Dearwater, and J. Campbell. 2001. Intimate partner violence screening and intervention: Data from eleven Pennsylvania and California community hospital emergency departments. *Journal of Emergency Nursing* 27:141–149.

Golding, J. M. 1999. Intimate partner violence as a risk factor for mental disorders: A meta-analysis. *Journal of Family Violence* 14(2):99–132.

Gregg, E. W., Q. Gu, Y. J. Cheng, K. M. Narayan, and C. C. Cowie. 2007. Mortality trends in men and women with diabetes, 1971 to 2000. *Annals of Internal Medicine* 147(3):149–155.

Guth, A. A., and H. L. Pachter. 2000. Domestic violence and the trauma surgeon. *American Journal of Surgery* 179(2):134–140.

The Guttmacher Institute. 2011. *Insurance coverage of contraceptives.* New York: The Guttmacher Institute.

Hader, S. L., D. K. Smith, J. S. Moore, and S. D. Holmberg. 2001. HIV infection in women in the United States: Status at the millennium. *Journal of the American Medical Association* 285(9):1186–1192.

Halpern, V., D. A. Grimes, L. Lopez, and M. F. Gallo. 2006. Strategies to improve adherence and acceptability of hormonal methods for contraception. *Cochrane Database of Systematic Reviews* (4)CD004317.

Hamberger, L. K., D. G. Saunders, and M. Hovey. 1992. Prevalence of domestic violence in community practice and rate of physician inquiry. *Family Medicine* 24(4):283–287.

Hatcher, R., J. Trussell, F. Stewart, J. Willard Cates, G. K. Stewart, F. Guest, and D. Kowal. 1998. *Contraceptive technology,* 17th ed. New York: Ardent Media, Inc.

Hatcher, R. A., J. Trussell, A. L. Nelson, W. Cates, F. Stewart, and D. Kowal. 2007. *Contraceptive technology,* 19th revised ed. New York: Ardent Media, Inc.

Hathaway, J. E., L. A. Mucci, J. G. Silverman, D. R. Brooks, R. Mathews, and C. A. Pavlos. 2000. Health status and health care use of Massachusetts women reporting partner abuse. *American Journal of Preventive Medicine* 19(4):302–307.

Henderson, J. T., C. S. Weisman, and H. Grason. 2002. Are two doctors better than one? Women's physician use and appropriate care. *Womens Health Issues* 12(3):138–149.

HHS (U.S. Department of Health and Human Services). 2000. *Healthy People 2010: Understanding and improving health.* Washington, DC: U.S. Government Printing Office.

HHS. 2003. *Child Abuse and Prevention and Treatment Act as amended by the Keeping Children and Families Safe Act of 2003.* Washington, DC: Children's Bureau, Administration for Children and Families. http://www.acf.hhs.gov/programs/cb/laws_policies/cblaws/capta03/sec_I_106.htm (accessed May 15, 2011).

HHS. 2008. *The business case for breastfeeding: Steps for creating a breastfeeding friendly worksite: Bottom line benefits.* Rockville, MD: Health Resources and Services Administration, U.S. Department of Health and Human Services.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA876                          JA-0000469

Clinical Preventive Services for Women Closing the Gaps
Case 7:25-cv-26740-VB Document 64-3 25 Page: 215 d 09/20e2Filed P12/12/2025330

RECOMMENDATIONS                                                                     145

HHS. 2009. *Definitions of child abuse and neglect: Summary of state laws; 2009.* Washington, DC: Child Welfare Information Gateway, Administration for Children and Families, Administration on Children Youth and Families, Children's Bureau, U.S. Department of Health and Human Services. http://www.childwelfare.gov/systemwide/laws_policies/statutues/defineall.cfm (accessed May 15, 2011).

HHS. 2010a. *Child maltreatment, 2009.* Washington, DC: Children's Bureau, Administration for Children and Families, Administration on Children Youth and Families, Children's Bureau, U.S. Department of Health and Human Services. http://www.act.hhs.gov/programs/cb/stats_research/index.htm#can (accessed May 15, 2011).

HHS. 2010b. *Mandatory report of child abuse and neglect: Summary of state laws.* Washington, DC: Child Welfare Information Gateway, Administration for Children and Families, Administration on Children Youth and Families, Children's Bureau, U.S. Department of Health and Human Services.

HHS. 2011a. *Healthy People 2020: Topics & objectives.* Washington, DC: U.S. Department of Health and Human Services. http://www.healthypeople.gov/2020/topicsobjectives2020/default.aspx (accessed April 19, 2011).

HHS. 2011b. *The Surgeon General's call to action to support breastfeeding.* Washington, DC: Office of the Surgeon General, U.S. Public Health Service, U.S. Department of Health and Human Services.

Ho, J. E., F. Paultre, and L. Mosca. 2003. Is diabetes mellitus a cardiovascular disease risk equivalent for fatal stroke in women? Data from the Women's Pooling Project. *Stroke* 34:2812–2816.

Hober, D., and F. Sane. 2010. Enteroviral pathogenesis of type 1 diabetes. *Discovery Medicine* 10(51):151–160.

Hodder, S. L., J. Justman, D. E. Haley, A. A. Adimora, C. I. Fogel, C. E. Golin, A. O'Leary, L. Soto-Torres, G. Wingood, W. M. El-Sadr, and H. P. T. N. Dome. 2010. Challenges of a hidden epidemic: HIV prevention among women in the United States. *Journal of Acquired Immune Deficiency Syndromes* 55:S69–S73.

Howard, C. R., S. J. Schaffer, and R. A. Lawrence. 1997. Attitudes, practices, and recommendations by obstetricians about infant feeding. *Birth-Issues in Perinatal Care* 24(4):240–246.

Hudman, J., and M. O'Malley. 2003. *Health insurance premiums and cost-sharing: Findings from the research on low-income populations.* Washington, DC: The Henry J. Kaiser Family Foundation.

Hulme, P. A. 2004. Retrospective measurement of childhood sexual abuse: A review of instruments. *Child Maltreatment* 9(2):201–217.

Hussey, J. M., J. J. Chang, and J. B. Kotch. 2006. Child maltreatment in the United States: Prevalence, risk factors, and adolescent health consequences. *Pediatrics* 118(3):933–942.

Insinga, R. P., E. J. Dasbach, E. H. Elbasha, K. L. Liaw, and E. Barr. 2007. Incidence and duration of cervical human papillomavirus 6, 11, 16, and 18 infections in young women: An evaluation from multiple analytic perspectives. *Cancer Epidemiology Biomarkers & Prevention* 16(4):709–715.

IOM (Institute of Medicine). 1995. *The best intentions: Unintended pregnancy and the well-being of children and families.* Washington, DC: National Academy Press.

IOM. 1997. *The hidden epidemic: Confronting sexually transmitted diseases.* Washington, DC: National Academy Press.

IOM. 2004. *Advancing the federal research agenda on violence against women.* Washington, DC: The National Academies Press.

IOM. 2010a. *HIV screening and access to care: Exploring barriers and facilitators to expanded HIV testing.* Washington, DC: The National Academies Press.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA877                                    JA-0000470

IOM. 2010b. *Women's health research: Progress, pitfalls, and promise.* Washington, DC: The National Academies Press.

Ip, S., M. Chung, G. Raman, P. Chew, N. Magula, D. DeVine, T. Trikalinos, and J. Lau. 2007. *Breastfeeding and maternal and infant health outcomes in developed countries.* Rockville, MD: Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services.

Irwin, K., D. Montano, D. Kasprzyk, L. Carlin, C. Freeman, R. Barnes, N. Jain, J. Christian, and C. Wolters. 2006. Cervical cancer screening, abnormal cytology management, and counseling practices in the United States. *Obstetrics and Gynecology* 108(2):397–409.

Irwin, T. W. 2009. Violence and victimization among women with substance use disorders. In *Women and addiction: A comprehensive handbook* (K. Brady, S. E. Back, and S. F. Greenfield, eds.). New York: Guilford Press. Pp. 475–491.

Janerich, D. T., O. Hadjimichael, P. E. Schwartz, D. M. Lowell, J. W. Meigs, M. J. Merino, J. T. Flannery, and A. P. Polednak. 1995. The screening histories of women with invasive cervical cancer, Connecticut. *American Journal of Public Health* 85(6):791–794.

Jenkins, K. J., A. Correa, J. A. Feinstein, L. Botto, A. E. Britt, S. R. Daniels, M. Elixson, C. A. Warnes, and C. L. Webb. 2007. Noninherited risk factors and congenital cardiovascular defects: Current knowledge a scientific statement from the American Heart Association Council on Cardiovascular Disease in the Young. *Circulation* 115(23):2995–3014.

Jia, H. M., and E. I. Lubetkin. 2010. Trends in quality-adjusted life-years lost contributed by smoking and obesity. *American Journal of Preventive Medicine* 38(2):138–144.

Johnson, K., S. F. Posner, J. Biermann, J. F. Cordero, H. K. Atrash, C. S. Parker, S. Boulet, M. G. Curtis, CDC/ASTDR Preconception Care Work Group, and the Select Panel on Preconception Care. 2006. *Recommendations to improve preconception health and health care—United States.* A report of the CDC/ATSDR Preconception Care Work Group and the Select Panel on Preconception Care. *MMWR Morbidity and Mortality Weekly Report. Recommendations and Reports* 55(RR-6):1–23.

Joint Commission on Accrediation of Healthcare Organizations. 2006. Raising the bar with bundles: Treating patients with an all-or-nothing standard. *Joint Comission Perspectives on Patient Safety* 6(4):5–6.

Kaiser Permanente. 2011. *Summary of best selling commercial plans preventive services.* Oakland, CA: Kaiser Permanente.

Kamb, M. L., M. Fishbein, J. M. Douglas, F. Rhodes, J. Rogers, G. Bolan, J. Zenilman, T. Hoxworth, C. K. Malotte, M. Iatesta, C. Kent, A. Lentz, S. Graziano, R. H. Byers, and T. A. Peterman; for the Project RESPECT Study Group. 1998. Efficacy of risk-reduction counseling to prevent human immunodeficiency virus and sexually transmitted diseases. *Journal of the American Medical Association* 280(13):1161–1167.

Katki, H. A., W. K. Kinney, B. Fetterman, T. Lorey, N. E. Poitras, L. Cheung, F. Demuth, M. Schiffman, S. Wacholder, and P. E. Castle. 2011. Cervical cancer risk for women undergoing concurrent testing for human papillomavirus and cervical cytology: A population-based study in routine clinical practice. *Lancet Oncology.* doi:10.1016/S1470-2045(11)70145-0.

Kelly, J.A., D. A. Murphy, C. D. Washington, T. S. Wilson, J. J. Koob, D. R. Davis, G. Ledezma and B. Davantes. 1994. The effects of HIV/AIDS intervention groups for high-risk women in urban clinics. *American Journal of Public Health* 84(12):1918–1922.

KFF (Henry J. Kaiser Family Foundation). 2011. *Fact sheet: Women and HIV/AIDS in the United States.* Menlo Park, CA: Henry J. Kaiser Family Foundation. http://www.kff.org/hivaids/upload/6092-09.pdf (accessed April 27, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19   JA878   JA-0000471

Khan, M. J., P. E. Castle, A. T. Lorincz, S. Wacholder, M. Sherman, D. R. Scott, B. B. Rush, A. G. Glass, and M. Shiffman. 2005. The elevated 10-year risk of cervical precancer and cancer in women with human papillomavirus (HPV) type 16 or 18 and the possible utility of type-specific HPV testing in clinical practice. *Journal of the National Cancer Institute* 97(14):1072–1079.

Kiely, M., A. A. E. El-Mohandes, M. N. El-Khorazaty, and M. G. Gantz. 2010. An integrated intervention to reduce intimate partner violence in pregnancy a randomized controlled trial. *Obstetrics and Gynecology* 115(2):273-283.

Kinney, W., H. Y. Sung, K. A. Kearney, M. Miller, G. Sawaya, and R. A. Hiatt. 1998. Missed opportunities for cervical cancer screening of HMO members developing invasive cervical cancer (ICC). *Gynecologic Oncology* 71(3):428–430.

Kirby, D. 2007. *Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases.* Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy.

Kjaer, S., E. Hogdall, K. Frederiksen, C. Munk, A. van den Brule, E. Svare, C. Meijer, A. Lorincz, and T. Iftner. 2006. The absolute risk of cervical abnormalities in high-risk human papillomavirus-positive, cytologically normal women over a 10-year period. *Cancer Research* 66(21):10630–10636.

Knowler, W. C., E. Barrett-Connor, S. E. Fowler, R. F. Hamman, J. M. Lachin, E. A. Walker, and D. M. Nathan. 2002. Reduction in the incidence of type 2 diabetes with lifestyle intervention or metformin. *New England Journal of Medicine* 346(6):393–403.

Korenbrot, C. C., A. Steinberg, C. Bender, and S. Newberry. 2002. Preconception care: A systematic review. *Maternal and Child Health Journal* 6(2):75–88.

Kost, K., S. Singh, B. Vaughan, J. Trussell, and A. Bankole. 2008. Estimates of contraceptive failure from the 2002 National Survey of Family Growth. *Contraception* 77(1):10–21.

Kotaniemi-Talonen, L., A. Anttila, N. Malila, J. Tarkkanen, P. Laurila, M. Hakama, and P. Nieminen. 2008. Screening with a primary human papillomavirus test does not increase detection of cervical cancer and intraepithelial neoplasia 3. *European Journal of Cancer* 44(4):565–571.

Kramer, M. S., B. Chalmers, E. D. Hodnett, Z. Sevkovskaya, I. Dzikovich, S. Shapiro, J. P. Collet, I. Vanilovich, I. Mezen, T. Ducruet, G. Shishko, V. Zubovich, D. Mknuik, E. Gluchanina, V. Dombrovskiy, A. Ustinovitch, T. Kot, N. Bogdanovich, L. Ovchinikova, and E. Helsing. 2001. Promotion of breastfeeding intervention trial (probit): A randomized trial in the Republic of Belarus. *Journal of the American Medical Association* 285(4):413–420.

Lane, W. G., and H. Dubowitz. 2009. Primary care pediatricians' experience, comfort and competence in the evaluation and management of child maltreatment: Do we need child abuse experts? *Child Abuse & Neglect* 33(2):76–83.

Langer, O., Y. Yogev, O. Most, and E. M. J. Xenakis. 2005. Gestational diabetes: The consequences of not treating. *American Journal of Obstetrics and Gynecology* 192(4):989–997.

Lapidus, G., M. B. Cooke, E. Gelven, K. Sherman, M. Duncan, and L. Banco. 2002. A statewide survey of domestic violence screening behaviors among pediatricians and family physicians. *Archives of Pediatrics & Adolescent Medicine* 156(4):332–336.

Lawrence, J. M., R. Contreras, W. S. Chen, and D. A. Sacks. 2008. Trends in the prevalence of preexisting diabetes and gestational diabetes mellitus among a racially/ethnically diverse population of pregnant women, 1999–2005. *Diabetes Care* 31(5):899–904.

Lee, J., S. Parisi, A. Akers, S. Borrerro, and E. Schwarz. 2011. The impact of contraceptive counseling in primary care on contraceptive use. *Journal of General Internal Medicine* 26(7):1–6.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA879                                    JA-0000472

Lee, L. M., and P. L. Fleming. 2001. Trends in human immunodeficiency virus diagnoses among women in the United States, 1994–1998. *Journal of the American Medical Women's Association* 56(3):94–99.

Lehmann, P. 2000. Posttraumatic stress disorder (PTSD) and child witnesses to mother-assault: A summary and review. *Children and Youth Services Review* 22(3/4):275–306.

Lemmens, V. E. P. P., A. Oenema, K. I. Klepp, H. B. Henriksen, and J. Brug. 2008. A systematic review of the evidence regarding efficacy of obesity prevention interventions among adults. *Obesity Reviews* 9(5):446–455.

Letourneau, E. J., M. Holmes, and J. Chasedunn-Roark. 1999. Gynecologic health consequences to victims of interpersonal violence. *Womens Health Issues* 9(2):115–120.

Leyden, W. A., M. M. Manos, A. M. Geiger, S. Weinmann, J. Mouchawar, K. Bischoff, M. U. Yood, J. Gilbert, and S. H. Taplin. 2005. Cervical cancer in women with comprehensive health care access: Attributable factors in the screening process. *Journal of the National Cancer Institute* 97(9):675–683.

Lopez, L. M., J. E. Hiller, and D. A. Grimes. 2010a. Education for contraceptive use by women after childbirth. *Cochrane Database of Systematic Reviews* 1:CD001863.

Lopez, L. M., M. Steiner, D. A. Grimes, and K. F. Schulz. 2010b. Strategies for communicating contraceptive effectiveness. *Cochrane Database of Systematic Reviews* 2:C006964.

Lukasse, M., B. Schei, S. Vangen, and P. Oian. 2009. Childhood abuse and common complaints in pregnancy. *Birth-Issues in Perinatal Care* 36(3):190–199.

Lumley, J., S. S. Oliver, C. Chamberlain, and L. Oakley. 2004. Interventions for promoting smoking cessation during pregnancy. *Cochrane Database Systematic Reviews* 4:CD001055.

MacMillan, H. L., C. N. Wathen, E. Jamieson, M. Boyle, L. McNutt, A. Worster, B. Lent, and M. Webb. 2006. Approaches to screening for intimate partner violence in health care settings: A randomized trial. *Journal of the American Medical Association* 296:530–536.

MacMillan, H. L., C. N. Wathen, E. Jamieson, M. H. Boyle, H. S. Shannon, M. Ford-Gilboe, A. Worster, B. Lent, J. H. Coben, L. A. McNutt, and McMaster Violence Against Women Research Group. 2009. Screening for intimate partner violence in health care settings: A randomized trial. *Journal of the American Medical Association* 302(5):493–501.

Mansour, D., P. Inki, and K. Gemzell-Danielsson. 2010. Efficacy of contraceptive methods: A review of the literature. *European Journal of Contraception & Reproductive Health Care* 15(Suppl. 2):S19–S31.

Marquette, G. P., V. R. Klein, and J. R. Niebyl. 1985. Efficacy of screening for gestational diabetes. *American Journal of Perinatology* 2(1):7–9.

Martin, S. L., E. D. Rentz, R. L, Chan, J. Givens, C. P. Sanford, L. L. Kupper, M. Garrettson, and R. J. Macy. 2008. Physical and sexual violence among North Carolina women: Associations with physical health, mental health, and functional impairment. *Women's Health Issues* 18:130–140.

Martins, R., S. Holzapfel, and P. Baker. 1992. Wife abuse: Are we detecting it? *Journal of Women's Health* 1:77–80.

Mayo Clinic. 2011. *Gestational diabetes: Risk factors.* Rochester, MN: Mayo Clinic. http://www.mayoclinic.com/health/gestational-diabetes/DS00316/DSECTION=risk-factors (accessed June 1, 2011).

Mayrand, M. H., E. Duarte-Franco, F. Coutlee, I. Rodrigues, S. D. Walter, S. Ratnam, E. L. Franco, and C. S. Grp. 2006. Randomized controlled trial of human papillomavirus testing versus Pap cytology in the primary screening for cervical cancer precursors: Design, methods and preliminary accrual results of the Canadian Cervical Cancer Screening Trial (CCCAST). *International Journal of Cancer* 119(3):615–623.

Copyright National Academy of Sciences. All rights reserved.

Mayrand, M. H., E. Duarte-Franco, I. Rodrigues, S. D. Walter, J. Hanley, A. Ferenczy, S. Ratnam, F. Coutlee, and E. L. Franco. 2007. Human papillomavirus DNA versus Papanicolaou screening tests for cervical cancer. *New England Journal of Medicine* 357(16):1579–1588.

McCauley, J., D. E. Kern, K. Kolodner, L. Dill, A. F. Schroeder, H. K. Dechant, J. Ryden, E. B. Bass, and L. R. Derogatis. 1995. The battering syndrome—prevalence and clinical characteristics of domestic violence in primary-care internal-medicine practices. *Annals of Internal Medicine* 123(10):737–746.

McCredie, M. R. E., K. J. Sharples, C. Paul, J. Baranyai, G. Medley, R. W. Jones, and D. C. G. Skegg. 2008. Natural history of cervical neoplasia and risk of invasive cancer in women with cervical intraepithelial neoplasia 3: A retrospective cohort study. *Lancet Oncology* 9(5):425–434.

McFarlane, J., A. Malecha, J. Gist, K. Watson, E. Batten, I. Hall, and S. Smith. 2002. An intervention to increase safety behaviors of abused women—results of a randomized clinical trial. *Nursing Research* 51(6):347–354.

Meek, J. Y. 2001. Breastfeeding in the workplace. *Pediatric Clinics of North America* 48(2):461–474.

Meijboom, L. J., F. E. Vos, J. Timmermans, G. H. Boers, A. H. Zwinderman, and B. J. M. Mulder. 2005. Pregnancy and aortic root growth in the Marfan syndrome: A prospective study. *European Heart Journal* 26(9):914–920.

MHQP (Massachusetts Health Quality Partners). 2007. *Adult routine preventive care recommendations 2007/8.* Watertown, MA: Massachusetts Health Quality Partners.

Michigan Quality Improvement Consortium. 2008. *Adult preventive services (ages 18-49).* Southfield, MI: Michigan Quality Improvement Consortium. http://www.guideline.gov/content.aspx?id=13164 (accessed June 10, 2011).

Moore, E. R., G. C. Anderson, and N. Bergman. 2007. Early skin-to-skin contact for mothers and their healthy newborn infants. *Cochrane Database of Systematic Reviews* 3:Cd003519.

Moos, M. K., N. E. Bartholomew, and K. N. Lohr. 2003. Counseling in the clinical setting to prevent unintended pregnancy: An evidence-based research agenda. *Contraception* 67(2):115–132.

Mosher, W. D., and J. Jones. 2010. Use of contraception in the United States: 1982–2008. *Vital Health Statistics* 23(29):1–44.

Narayan, K. M., J. P. Boyle, T. J. Thompson, S. W. Sorensen, and D. F. Williamson. 2003. Lifetime risk for diabetes mellitus in the United States. *Journal of the American Medical Association* 290(14):1884–1890.

National Center for Injury Prevention and Control. 2003. *Costs of intimate partner violence against women in the United States.* Atlanta, GA: Centers for Disease Control and Prevention.

National Prevention Council. 2011. *National prevention strategy.* Washington, DC: U.S. Department of Health and Human Services, Office of the Surgeon General.

NBGH (National Business Group on Health). 2005. *A purchaser's guide to clinical preventive services: Moving science into coverage* (K. P. Campbell and A. Lanza, eds.). Washington, DC: National Business Group on Health. http://www.businessgrouphealth.org/benefitstopics/topics/purchasers/fullguide.pdf (accessed March 11, 2011).

NCI (National Cancer Institute). 2011a. *SEER cancer statistics review 1975–2008.* Bethesda, MD: National Cancer Institute. http://www.seer.cancer.gov/csr/1975_2008/index.html (accessed May 31, 2011).

NCI. 2011b. *SEER stat fact sheets: Cervix uteri.* Washington, DC: National Cancer Institute. http://www.seer.cancer.gov/statfacts/html/cervix.html (accessed May 31, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                        JA881                                        JA-0000474

Nelson, H. D., P. Nygren, Y. McInerney, and J. Klein. 2004. Screening women and elderly adults for family and intimate partner violence: A review of the evidence for the U.S. Preventive Services Task Force. *Annals of Internal Medicine* 140:387–396.

NIAID (National Institute of Allergy and Infectious Diseases). 2008. *HIV infection in women.* Bethesda, MD: National Institute of Allergy and Infectious Diseases. http://www.niaid.nih.gov/topics/hivaids/understanding/population20specific20information/pages/womenhiv.aspx (accessed May 3, 2011).

NIAID. 2011. *Treating HIV-infected people with antiretrovirals protects partners from infection: Findings result from NIH-funded international study.* Bethesda, MD: National Institute of Allergy and Infectious Diseases. http://www.niaid.nih.gov/news/newsreleases/2011/Pages/HPTN052.aspx (accessed May 20, 2011).

NICE (National Institute for Health and Clinical Excellence). 2007. *Prevention of sexually transmitted infections and under 18 conceptions.* Bethesda, MD: National Institute for Health and Clinical Excellence. http://www.nice.org.uk/PHI003 (accessed May 27, 2011).

NIDDK (National Institute of Diabetes and Digestive and Kidney Diseases). 2008. *The National Diabetes Information Clearinghouse: Diabetes overview.* Bethesda, MD: National Institute of Diabetes and Digestive and Kidney Diseases. http://diabetes.niddk.nih.gov/dm/pubs/overview/ (accessed June 1, 2011).

NIDDK. 2011. *National diabetes statistics, 2011.* Bethesda, MD: National Institute of Diabetes and Digestive and Kidney Diseases. http://diabetes.niddk.nih.gov/dm/pubs/statistics/ (accessed June 1, 2011).

Ornoy, A. 2005. Growth and neurodevelopmental outcome of children born to mothers with pregestational and gestational diabetes. *Pediatric Endocrinology Review* 3(2):104–113.

Owens, D. K., V. Sundaram, L. C. Lazzeroni, L. R. Douglass, P. Tempio, M. Holodniy, G. D. Sanders, V. M. Shadle, V. C. McWhorter, T. Agoncillo, N. Haren, D. Chavis, L. H. Borowsky, E. M. Yano, P. Jensen, M. S. Simberkoff, and S. A. Bozzette. 2007. HIV testing of at risk patients in a large integrated health care system. *Journal of General Internal Medicine* 22(3):315–320.

Ozer, E., S. Adams, J. Orrell-Valente, J. Lustig, S. Millstein, C. Wibbelsman, A. Elster, J. Makol, O. Ahsanuddin, and C. E. Irwin. 2004. Does screening and counseling adolescents influence their behavior? *Pediatric Research* 55(4):2A.

Petry, K. U., S. Menton, M. Menton, F. van Loenen-Frosch, H. D. Gomes, B. Holz, B. Schopp, S. Garbrecht-Buettner, P. Davies, G. Boehmer, E. van den Akker, and T. Iftner. 2003. Inclusion of HPV testing in routine cervical cancer screening for women above 29 years in Germany: Results for 8466 patients. *British Journal of Cancer* 88(10):1570–1577.

Picot, J., J. Jones, J. L. Colquitt, E. Gospodarevskaya, E. Loveman, L. Baxter, and A. J. Clegg. 2009. The clinical effectiveness and cost-effectiveness of bariatric (weight loss) surgery for obesity: a systematic review and economic evaluation. *Health Technology Assessment* 13(41):1–190, 215–357, iii–iv.

Plummer, M., M. Schiffman, P. E. Castle, D. Maucort-Boulch, and C. M. Wheeler. 2007. A 2-year prospective study of human papillomavirus persistence among women with a cytological diagnosis of atypical squamous cells of undetermined significance or low-grade squamous intraepithelial lesion. *Journal of Infectious Diseases* 195(11):1582–1589.

Pontiroli, A. E., and A. Morabito. 2011. Long-term prevention of mortality in morbid obesity through bariatric surgery. A systematic review and meta-analysis of trials performed with gastric banding and gastric bypass. *Annals of Surgery* 253(3):484–487.

Postlethwaite, D., J. Trussell, A. Zoolakis, R. Shabear, and D. Petitti. 2007. A comparison of contraceptive procurement pre- and post-benefit change. *Contraception* 76(5):360–365.

PRB (Population Reference Bureau). 1998. *Contraceptive safety: Rumors and realities.* Washington, DC: Population Reference Bureau.

Copyright National Academy of Sciences. All rights reserved.

Rabin, R. F., J. M. Jennings, J. C. Campbell, and M. H. Bair-Merritt. 2009. Intimate partner violence screening tools: A systematic review. *American Journal of Preventive Medicine* 36:439–444.

Ramsay, J., J. Richardson, Y. H. Carter, L. L. Davidson, and G. Feder. 2002. Should health professionals screen women for domestic violence? Systematic review. *British Medical Journal* 325:314.

Ramsay, J., Y. Carter, L. Davidson, D. Dunne, S. Eldridge, K. Hegarty, C. Rivas, A. Taft, A. Warburton, and G. Feder. 2009. Advocacy interventions to reduce or eliminate violence and promote the physical and psychosocial well-being of women who experience intimate partner abuse. *Cochrane Database of Systematic Reviews* 3:CD005043.

Ranji, U., and A. Salganicoff. 2009. *State Medicaid coverage of perinatal services: A summary of state survey findings.* Menlo Park, CA: The Henry J. Kaiser Family Foundation.

Ranji, U., and A. Salganicoff. 2011. *Women's health care chartbook.* Menlo Park, CA: The Henry J. Kaiser Family Foundation.

Reece, E. A. 2010. The fetal and maternal consequences of gestational diabetes mellitus. *Journal of Maternal-Fetal & Neonatal Medicine* 23(3):199–203.

Reece, E. A., G. Leguizamon, and A. Wiznitzer. 2009. Gestational diabetes: The need for a common ground. *Lancet* 373(9677):1789–1797.

Regitz-Zagrosek, V., C. Gohlke-Barwolf, A. Geibel-Zehender, M. Haass, H. Kaemmerer, I. Kruck, and C. Nienaber. 2008. Heart diseases during the period of childbearing. *Clinical Research in Cardiology* 97(9):630–665.

Richardson, J., J. Coid, A. Petruckevitch, W. S. Chung, S. Moorey, and G. Feder. 2002. Identifying domestic violence: Cross sectional study in primary care. *British Medical Journal* 324(7332):2–6.

Rivellese, A. A., G. Riccardi, and O. Vaccaro. 2010. Cardiovascular risk in women with diabetes. *Nutrition Metabolism and Cardiovascular Diseases* 20(6):474–480.

Robertson, R., and S. Collins. 2011. Realizing health reform's potential—women at risk: Why increasing numbers of women are failing to get the health care they need and how the Affordable Care Act will help. *The Commonwealth Fund* 3(1502):1–24.

Rodriguez, M. A., W. R. Sheldon, M. Bauer, and E. J. Perez-Stable. 2001. The factors associated with disclosure of intimate partner abuse to clinicians. *Journal of Family Practice* 50:338–344.

Ronco, G., J. Cuzick, P. Pierotti, M. P. Cariaggi, P. Dalla Palma, C. Naldoni, B. Ghiringhello, P. Giorgi-Rossi, D. Minucci, F. Parisio, A. Pojer, M. L. Schiboni, C. Sintoni, M. Zorzi, N. Segnan, and M. Confortini. 2007. Accuracy of liquid based versus conventional cytology: Overall results of new technologies for cervical cancer screening: randomised controlled trial. *British Medical Journal* 335(7609):28.

Ronco, G., P. Giorgi-Rossi, F. Carozzi, M. Confortini, P. Dalla Palma, A. Del Mistro, B. Ghiringhello, S. Girlando, A. Gillio-Tos, L. De Marco, C. Naldoni, P. Pierotti, R. Rizzolo, P. Schincaglia, M. Zorzi, M. Zappa, N. Segnan, J. Cuzick, and the New Technologies for Cervical Cancer Screening Working Group. 2010. Efficacy of human papillomavirus testing for the detection of invasive cervical cancers and cervical intraepithelial neoplasia: A randomised controlled trial. *Lancet Oncology* 11(3):249–257.

Rose, M. A., T. T. Sharpe, K. Raliegh, L. Reid, M. Foley, and J. Cleveland. 2008. An HIV/AIDS crisis among African American women: A summary for prevention and care in the 21st century. *Journal of Women's Health* 17(3):321–324.

Rosenberg, K. D., C. A. Eastham, L. J. Kasehagen, and A. P. Sandoval. 2008. Marketing infant formula through hospitals: The impact of commercial hospital discharge packs on breastfeeding. *American Journal of Public Health* 98(2):290–295.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA883  JA-0000476

Rust, G., P. Minor, N. Jordan, R. Mayberry, and D. Satcher. 2003. Do clinicians screen Medicaid patients for syphilis or HIV when they diagnose other sexually transmitted diseases? *Sexually Transmitted Diseases* 30(9):723–727.

Salem-Schatz, S., L. E. Peterson, R. H. Palmer, S. M. Clanton, S. Ezhuthachan, R. C. Luttrell, C. Newman, and R. Westbury. 2004. Barriers to first-week follow-up of newborns: Findings from parent and clinician focus groups. *Joint Commission Journal on Quality and Safety* 30(11):593–601.

Santelli, J. S., and A. J. Melnikas. 2010. Teen fertility in transition: Recent and historic trends in the United States. *Annual Review of Public Health* 31:371–383.

Saslow, D., C. D. Runowicz, D. Solomon, A. B. Moscicki, R. A. Smith, H. J. Eyre, and C. Cohen. 2002. American Cancer Society guideline for the early detection of cervical neoplasia and cancer. *CA: A Cancer Journal for Clinicians* 52(6):342–362.

Saslow, D., P. E. Castle, J. T. Cox, D. D. Davey, M. H. Einstein, D. G. Ferris, S. J. Goldie, D. M. Harper, W. Kinney, A. B. Moscicki, K. L. Noller, C. M. Wheeler, T. Ades, K. S. Andrews, M. K. Doroshenk, K. G. Kahn, C. Schmidt, O. Shafey, R. A. Smith, E. E. Partridge, and F. Garcia. 2007. American Cancer Society guideline for human papillomavirus (HPV) vaccine use to prevent cervical cancer and its precursors. *CA: A Cancer Journal for Clinicians* 57(1):7–28.

Schoen, C., K. Davis, K. S. Collins, L. Greenberg, C. DesRoches, and M. Abrams. 1997. *The Commonwealth Fund Survey of the Health of Adolescent Girls*. New York: The Commonwealth Fund.

Schoen, C., K. Davis, C. DesRoches, and A. Shekhdar. 1998. *The Health of Adolescent Boys: Commonwealth Fund Survey findings*. New York: The Commonwealth Fund.

Schuman, P., T. B. Jones, S. Ohmit, C. Marbury, and M. P. Laken. 2004. Voluntary HIV counseling and testing of pregnant women—an assessment of compliance with michigan public health statutes. *MedGenMed: Medscape General Medicine* 6(2):52.

Semaan, S., M. S. Neumann, K. Hutchins, L. H. D'Anna, and M. L. Kamb. 2010. Brief counseling for reducing sexual risk and bacterial stis among drug users—results from project respect. *Drug and Alcohol Dependence* 106(1):7–15.

Serlin, D. C., and R. W. Lash. 2009. Diagnosis and management of gestational diabetes mellitus. *American Family Physician* 80(1):57–62.

Shah, B. R., R. Retnakaran, and G. L. Booth. 2008. Increased risk of cardiovascular disease in young women following gestational diabetes mellitus. *Diabetes Care* 31(8):1668–1669.

Shapiro, M. F., S. C. Morton, D. F. McCaffrey, J. W. Senterfitt, J. A. Fleishman, J. F. Perlman, L. A. Athey, J. W. Keesey, D. P. Goldman, S. H. Berry, S. A. Bozzette, and H. Consortium. 1999. Variations in the care of HIV-infected adults in the United States—results from the HIV Cost and Services Utilization Study. *Journal of the American Medical Association* 281(24):2305–2315.

Shulman, L. P. 2006. New recommendations for the periodic well-woman visit: Impact on counseling. *Contraception* 73(4):319–324.

Sickel, A. E., J. G. Noll, P. J. Moore, F. W. Putnam, and P. K. Trickett. 2002. The long-term physical health and healthcare utilization of women who were sexually abused as children. *Journal of Health Psychology* 7:583–597.

Siebers, A. G., P. J. Klinkhamer, J. M. Grefte, L. F. Massuger, J. E. Vedder, A. Beijers-Broos, J. Bulten, and M. Arbyn. 2009. Comparison of liquid-based cytology with conventional cytology for detection of cervical cancer precursors: A randomized controlled trial. *Journal of the American Medical Association* 302(16):1757–1764.

Silverman, J. G., A. Raj, L. A. Mucci, and J. E. Hathaway. 2001. Dating violence against adolescent girls and associated substance use, unhealthy weight control, sexual risk behavior, pregnancy, and suicidality. *Journal of the American Medical Association* 286(5):572–579.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19   JA884   JA-0000477

Sivan, E., B. Weisz, N. Shteinman, E. Schiff, S. Lipitz, and R. Achiron. 2004. Alterations in segmentary branch pulmonary artery blood flow velocimetry in fetuses of diabetic mothers. *Journal of Ultrasound in Medicine* 23(3):339–345.

Sohal, H., S. Eldridge, and G. Feder. 2007. The sensitivity and specificity of four questions (HARK) to identify intimate partner violence: A diagnostic accuracy study in general practice. *BMC Family Practice* 8:49.

Spangaro, J. M., A. B. Zwi, R. G. Poulos, and W. Y. Man. 2010. Six months after routine screening for intimate partner violence: Attitude change, useful and adverse effects. *Women & Health* 50(2):125–143.

Stark, A. R., and C. M. Lannon. 2009. Systems changes to prevent severe hyperbilirubinemia and promote breastfeeding: Pilot approaches. *Journal of Perinatology* 29:S53–S57.

Starling, S. P., K. W. Heisler, J. F. Paulson, and E. Youmans. 2009. Child abuse training and knowledge: A national survey of emergency medicine, family medicine, and pediatric residents and program directors. *Pediatrics* 123(4):e595–e602.

Sung, H. Y., K. A. Kearney, M. Miller, W. Kinney, G. F. Sawaya, and R. A. Hiatt. 2000. Papanicolaou smear history and diagnosis of invasive cervical carcinoma among members of a large prepaid health plan. *Cancer* 88(10):2283–2289.

Svavarsdottir, E. K., and B. Orlygsdottir. 2009. Intimate partner abuse factors associated with women's health: A general population study. *Journal of Advanced Nursing* 65(7):1452–1462.

Taft, A. J., R. Small, K. L. Hegarty, L. F. Watson, L. Gold, and J. A. Lumley. 2011. Mothers' advocates in the community (MOSAIC)-non-professional mentor support to reduce intimate partner violence and depression in mothers: A cluster randomised trial in primary care. *BMC Public Health* 11.

Taveras, E. M., R. W. Li, L. Grummer-Strawn, M. Richardson, R. Marshall, V. H. Rego, I. Miroshnik, and T. A. Lieu. 2004. Mothers' and clinicians' perspectives on breastfeeding counseling during routine preventive visits. *Pediatrics* 113(5):E405–E411.

Thackeray, J. D., R. Hibbard, M. D. Dowd, the Committee on Child Abuse, Neglect, and the Committee on Injury, Violence and Poison Prevention. 2010. Intimate partner violence: The role of the pediatrician. *Pediatrics* 125(5):1094–1100.

Thombs, B. D., D. P. Bernstein, R. C. Ziegelstein, W. Bennett, and E. A. Walker. 2007. A brief two-item screener for detecting a history of physical or sexual abuse in childhood. *General Hospital Psychiatry* 29:8–13.

Tjaden, P. G., and N. Thoennes. 1998. *Prevalence, incidence, and consequences of violence against women: Findings from the National Violence against Women Survey.* Washington, DC: National Institute of Justice, Centers for Disease Control and Prevention.

Tjaden, P. G., and N. Thoennes. 2000. *Full report of the prevalence, incidence and consequences of violence against women: Research report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Centers for Disease Control and Prevention.

Trabold, N. 2007. Screening for intimate partner violence within a health care setting: A systematic review of the literature. *Social Work in Health Care* 45:1–18.

TRICARE. 2011. *Cancer of female reproductive organs (screening).* Falls Church, VA: TRICARE. http://www.tricare.mil/mybenefit/jsp/Medical/IsItCovered.do?kw=Cancer+of+Female+Reproductive+Organs+28Screening29 (accessed June 7, 2011).

Trickett, P., F. Putnam, and J. Noll. 2005. *Child Abuse Team/Mayerson Center: Longitudinal Study on Childhood Sexual Abuse Summary.* Cinncinati, OH: Cinncinati Children's Hospital Medical Center. http://www.cincinnatichildrens.org/svc/alpha/c/child-abuse/publications.htm#summary (accessed May 15, 2011).

Trivedi, A. N., W. Rakowski, and J. Z. Ayanian. 2008. Effect of cost sharing on screening mammography in Medicare health plans. *New England Journal of Medicine* 358(4):375–383.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA885 JA-0000478

Trussell, J. 2007. The cost of unintended pregnancy in the United States. *Contraception* 75(3):168–170.

Trussell, J., and K. Kost. 1987. Contraceptive failure in the United States—a critical review of the literature. *Studies in Family Planning* 18(5):237–283.

Trussell, J., and L. L. Wynn. 2008. Reducing unintended pregnancy in the United States. *Contraception* 77(1):1–5.

Trussell, J., A. M. Lalla, Q. V. Doan, E. Reyes, L. Pinto, and J. Gricar. 2009. Cost effectiveness of contraceptives in the United States. *Contraception* 79(1):5–14.

Tuomilehto, J., J. Lindstrom, J. G. Eriksson, T. T. Valle, H. Hamalainen, P. Ilanne-Parikka, S. Keinanen-Kiukaanniemi, M. Laakso, A. Louheranta, M. Rastas, V. Salminen, and M. Uusitupa. 2001. Prevention of type 2 diabetes mellitus by changes in lifestyle among subjects with impaired glucose tolerance. *New England Journal of Medicine* 344(18):1343–1350.

Turok, D. K., S. D. Ratcliffe, and E. G. Baxley. 2003. Management of gestational diabetes mellitus. *American Family Physician* 68(9):1767–1772.

UKPDS (United Kingdom Prospective Diabetes Study). 1998. Intensive blood-glucose control with sulphonylureas or insulin compared with conventional treatment and risk of complications in patients with type 2 diabetes (UKPDS 33). *Lancet* 352(9131):837–853.

Ulrich, Y. C., K. C. Cain, N. K. Sugg, F. P. Rivara, D. M. Rubanowice, and R. S. Thompson. 2003. Medical care utilization patterns in women with diagnosed domestic violence. *American Journal of Preventive Medicine* 24(1):9–15.

Upson, K., S. D. Reed, S. W. Prager, and M. A. Schiff. 2010. Factors associated with contraceptive nonuse among US women ages 35–44 years at risk of unwanted pregnancy. *Contraception* 81(5):427–434.

104th U.S. Congress. 1996. *Amendments to the Child Abuse and Protection Act.* Washington, DC: U.S. Congress. http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=104_cong_bills&docid=f:s919enr.txt.pdf (accessed May 18, 2011).

111th U.S. Congress. 2010. *Patient Protection and Affordable Care Act of 2010, H.R. 3590, 111th Cong., 2nd Sess.* Washington, DC: U.S. Congress. http://democrats.senate.gov/reform/patient-protection-affordable-care-act-as-passed.pdf (accessed February 18, 2011).

USPHS (U.S. Public Health Service). 1989. *Public Health Service: Caring for our future: The content of prenatal care.* Washington, DC: Expert Panel on the Content of Prenatal Care, U.S. Public Health Service.

USPSTF (United States Preventive Services Task Force). 2003a. *Screening for cervical cancer.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspscerv.htm (accessed May 20, 2011).

USPSTF. 2003b. *Screening for obesity in adults.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/ uspsobes.htm (accessed May 20, 2011).

USPSTF. 2004a. *Screening for family and intimate partner violence.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/ uspsfamv.htm (accessed May 20, 2011).

USPSTF. 2004b. *Screening for syphilis infection.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspssyph.htm (accessed May 20, 2011).

USPSTF. 2005a. *Screening for gonorrhea.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsgono.htm (accessed May 20, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                   JA886                                   JA-0000479

USPSTF. 2005b. *Screening for HIV.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspshivi.htm (accessed May 20, 2011).

USPSTF. 2008a. *Behavioral counseling to prevent sexually transmitted infections.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/ uspssrds.htm (accessed June 1, 2011).

USPSTF. 2008b. *Primary care interventions to promote breastfeeding.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/ uspstf/ uspsbrfd.htm (accessed June 1, 2011).

VA (U.S. Department of Veterans Affairs). 2009. *VA/DOD clinical practice guideline for management of pregnancy.* Washington, DC: U.S. Department of Veteran Affairs and U.S. Department of Defense.

VA. 2010. *Management of obesity and overweight (OBE).* Washington, DC: U.S. Department of Veterans Affairs. http://www.healthquality.va.gov/obesity_clinical_practice_guideline. asp (accessed May 20, 2011).

Vainio, H., and F. Bianchini. 2002. *Weight control and physical activity,* vol. 6. IARC Handbooks of Cancer Prevention. Lyon, France: International Agency for Research on Cancer.

Valente, S. M. 2005. Sexual abuse of boys. *Journal of Child Adolescent Psychiatric Nursing* 18 (1):10-6.

Valezi, A. C., J. Mali, M. A. de Menezes, E. M. de Brito, and S. A. F. de Souza. 2010. Weight loss outcome after silastic ring roux-en-y gastric bypass: 8 years of follow-up. *Obesity Surgery* 20(11):1491–1495.

Varghese, B., J. E. Maher, T. A. Peterman, B. M. Branson, and R. W. Steketee. 2002. Reducing the risk of sexual HIV transmission: Quantifying the per-act risk for HIV on the basis of choice of partner, sex act, and condom use. *Sexually Transmitted Diseases* 29(1):38–43.

Walboomers, J. M. M., M. V. Jacobs, M. M. Manos, F. X. Bosch, J. A. Kummer, K. V. Shah, P. J. F. Snijders, J. Peto, C. J. L. M. Meijer, and N. Munoz. 1999. Human papillomavirus is a necessary cause of invasive cervical cancer worldwide. *Journal of Pathology* 189(1):12–19.

Wang, Y. F., M. A. Beydoun, L. Liang, B. Caballero, and S. K. Kumanyika. 2008. Will all Americans become overweight or obese? Estimating the progression and cost of the US obesity epidemic. *Obesity* 16(10):2323–2330.

Warnes, C. A. 2004. Pregnancy and pulmonary hypertension. *International Journal of Cardiology* 97:11–13.

Wathen, C. N., and H. L. MacMillan. 2003. Interventions for violence against women: Scientific review. *Journal of the American Medical Association* 289:589–600.

Wathen, C. N., E. Jamieson, and H. L. MacMillan. 2008. Who is identified by screening for intimate partner violence? *Women's Health Issues* 18:423–432.

Weisman, C. S. 1998. *Women's health care: Activist traditions and institutional change.* Baltimore, MD: Johns Hopkins University Press.

Weisman, C. S., and J. T. Henderson. 2001. Managed care and women's health: Access, preventive services, and satisfaction. *Women's Health Issues* 11(3):201–215.

Weisman, C. S., D. S. Maccannon, J. T. Henderson, E. Shortridge, and C. L. Orso. 2002. Contraceptive counseling in managed care: Preventing unintended pregnancy in adults. *Womens Health Issues* 12(2):79–95.

Weiss, S. J., A. A. Ernst, E. Cham, and T. G. Nick. 2003. Development of a screen for ongoing intimate partner violence. *Violence and Victims* 18:131–141.

WHO (World Health Organization). 2005. *Human papillomaviruses.* Lyon, France: International Agency for Research on Cancer.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA887                                    JA-0000480

WHO. 2010. *Preventing intimate partner and sexual violence against women: Taking action and generating evidence.* Geneva, Switzerland: World Health Organization. http://whqlib-doc.who.int/publications/2010/9789241564007_eng.pdf (accessed May 15, 2011).

WHO and UNICEF (United Nations Children's Fund). 1989. *Protecting, promoting and supporting breast-feeding: the special role of maternity services.* Geneva, Switzerland: World Health Organization.

WHO and UNICEF. 1999. *The baby-friendly hospital initiative—Monitoring and reassessment: Tools to sustain progress.* Geneva, Switzerland: World Health Organization.

Wight, N. E., R. Cordes, C. J. Chantry, C. R. Howard, R. A. Lawrence, K. A. Marinelli, N. G. Powers, M. Bunik, and A. B. Med. 2009. ABM clinical protocol #3: Hospital guidelines for the use of supplementary feedings in the healthy term breastfed neonate, revised 2009. *Breastfeeding Medicine* 4(3):175–183.

Wingood, G. M., R. J. DiClemente, D. H. McCree, K. Harrington, and S. L. Davies. 2001. Dating violence and the sexual health of black adolescent females. *Pediatrics* 107(5):1–4.

Workowski, K. A., and S. Berman. 2010. Sexually transmitted diseases treatment guidelines, 2010. *MMWR Morbidity and Mortality Weekly Report. Recommendations and Reports* 59(RR–12):1–110.

Zhang, P., X. Zhang, J. Brown, D. Vistisen, R. Sicree, J. Shaw, G. Nichols. 2010. Global healthcare expenditure on diabetes 2010 and 2030. *Diabetes Research and Clinical Practice* 87:293–301.

Zhu, B. P. 2005. Effect of interpregnancy interval on birth outcomes: Findings from three recent US studies. *International Journal of Gynecology & Obstetrics* 89:S25–S33.

Zinman, B., J. Gerich, J. B. Buse, A. Lewin, S. Schwartz, P. Raskin, P. M. Hale, M. Zdravkovic, and L. Blonde. 2010. American Diabetes Association. Standards of medical care in diabetes—2010. *Diabetes Care* 33(3):692.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA888                                    JA-0000481

# 6

# Process for Regularly Updating
# the Recommendations

In this report, the Committee on Preventive Services for Women identifies a supplemental set of preventive health care services for women that should be considered by the U.S. Department of Health and Human Services (HHS). This task meets the first portion of the committee's charge, which was to identify services and screenings that could fill the identified gaps in women's preventive care not otherwise included in existing preventive services covered under the Patient Protection and Affordable Care Act of 2010 (ACA).

The second part of the committee's charge was to provide guidance on a process for updating the preventive services and screenings to be considered. Developing and maintaining a comprehensive list of covered preventive services for women is not currently under the specific purview of any advisory group, task force, committee, or agency within HHS. Thus, the committee believes that it will be necessary to develop structures, accountability, and processes to ensure that preventive services meeting evidence standards are considered for coverage in the context of the general approach taken to identify and update preventive services for women. Here, the committee recommends a process supported by guiding principles that separates assessment and coverage decisions. The co-mingling of evidence reviews and coverage decision making in one body could result in skewing scientific results and a decrease in transparency in the rationale for the coverage decision. Components for a comprehensive structure are discussed below.

157

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA889

## GUIDING PRINCIPLES AND RECOMMENDATIONS

**Recommendation 6.1:** The committee recommends that the process for updating the preventive services for women covered under the ACA be:

- Independent;
- Free of conflict of interest;
- Evidence-based;
- Gender specific;
- Life-course oriented;
- Transparent;
- Informed by systematic surveillance and monitoring;
- Cognizant of the need to integrate clinical preventive services with effective interventions in public health, the community, the workplace, and the environment; and
- Appropriately resourced to meet its mandate.

## A PREVENTIVE SERVICES COVERAGE COMMISSION

The committee notes that coverage decisions must take into consideration a more extensive list of factors—including medicolegal considerations, ethical considerations, patient and provider preferences, cost, and cost-effectiveness—and that these decisions must be made in the context of the coverage decisions made in other clinical domains. Existing evidence review bodies (such as the United States Preventive Services Task Force [USPSTF]) focus on clinical evidence; and other bodies that develop clinical guidelines (professional organizations) do not have the methods, the expertise, or the independence to make coverage recommendations. The committee believes that the review of the evidence and decision making about coverage are two separate activities and that there is value in preserving the separation. Thus, the committee does not recommend adding coverage decision making to the scope of work of existing evidence review bodies or bodies that develop clinical guidelines.

**Recommendation 6.2:** The committee recommends that the Secretary of HHS establish a commission to recommend coverage of new preventive services for women to be covered under the ACA.

In carrying out its work, the commission should:

- Be independent from bodies conducting evidence reviews, free of conflict of interest, and transparent;
- Set goals for prevention (it may use available HHS reports and products or commission its own at its discretion):

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA890                              JA-0000483

Clinical Preventive Services for Women: Closing the Gaps

Case: 25-2575-W0-WB Document 34-3t 25-3age: 220 d 09/a02FiledP1g/12/2025330

- Design and implement a methodology for making coverage decisions that considers information from bodies that review the available clinical evidence (and other bodies that establish clinical guidelines) and coverage factors (e.g., cost, cost-effectiveness, and legal and ethical factors);
- Conduct horizon scanning or examine priority goals and/or persistent trends relating to women's health and well-being to identify new information on significant health conditions; preventive interventions; and new evidence on efficacy, effectiveness, periodicity, and safety;
- Focus on the general population but also search for conditions that may differentially affect women and high-risk subpopulations of women;
- Assign topics and set priorities for evidence-based reviews for the bodies reviewing clinical effectiveness;
- Set timetables and processes for updating clinical practice guidelines and coverage recommendations; and
- Submit its coverage recommendations to the Secretary of HHS.

As noted in the guiding principles, suggested priorities are systematic surveillance and monitoring, as well as horizon scanning for new information on significant health conditions, preventive interventions, and new evidence on efficacy, effectiveness, periodicity, and safety. Similarly, setting agendas, timetables, and resources for developing the evidence reviews and guidelines will need to be recommended to the Secretary of HHS. A commission would not conduct its own systematic reviews of clinical effectiveness, relying instead on reviews completed by evidence review bodies under its direction. Recommendations will also need to be made by the commission regarding updates of evidence reviews and coverage decisions. Five years is a common benchmark for reevaluation of clinical practice guidelines and is the benchmark used by the National Guidelines Clearinghouse, but the committee notes that the process of scanning for new developments often uncovers issues that may require updates at other times.

## ROLE OF EVIDENCE-BASED REVIEW BODIES

The committee believes that bodies that review the evidence, such as USPSTF, Bright Futures, and the Advisory Committee on Immunization Practices (ACIP), should continue to focus on evidence of efficacy and effectiveness. These bodies have an important role to perform and to contribute to this process in responding to direction from the Secretary of HHS and addressing topics requested. If necessary, systematic reviews will be commissioned, meeting established standards (e.g., the standards outlined in

Copyright National Academy of Sciences. All rights reserved.

Case 7:25-cv-37540-WDC Document 64-3 Page: 230 of 610 Date Filed 12/12/2025

*Finding What Works in Health Care: Standards for Systematic Reviews*
[IOM, 2011b]). The evidence-review bodies should review the evidence
with a primary focus on efficacy and effectiveness and develop clinical prac-
tice guidelines meeting established standards (e.g., the standards outlined in
*Clinical Practice Guidelines We Can Trust* [IOM, 2011a]).

If the Secretary of HHS determines that existing evidence-review bodies
cannot support these activities, new bodies that review the evidence should
be created. Such bodies would best be populated with experts from within
and outside government who are free of conflicts of interest and who rep-
resent a wide range of health and related disciplines. These experts should
use standard, transparent, and accountable approaches to identify, assess,
and synthesize the relevant evidence.

> **Recommendation 6.3. The committee recommends that the Secretary
> of HHS identify existing bodies or appoint new ones as needed to
> review the evidence and develop clinical practice guidelines to be re-
> viewed by a preventive services coverage commission.**

## DISCUSSION

Bringing coverage for clinical preventive health care services into rational
alignment with coverage for other health care services provided under the
ACA will be a major task. The committee notes that many of the individual
components are already managed within HHS but currently lack effective
coordination for the purposes outlined in the ACA and that some functions
are entirely new. The structure might be effectively built over time by using
some current bodies and adding new ones as resources permit. The committee
does not believe that it has enough information to specifically recommend
which unit in HHS should implement the recommendations. Figure 6-1 illus-
trates the committee's suggested structure for updating preventive services
under the ACA.

Additionally, the 2011 Institute of Medicine (IOM) study *Finding What
Works in Health Care: Standards for Systematic Reviews* examines differ-
ent grading systems in use. One review mentioned in the study found that
there were more than 50 evidence-grading systems and 230 quality assess-
ment instruments in current use. The variation, complexity, and lack of
transparency in existing systems were identified (IOM, 2011b). In light of
this, the Preventive Services for Women Committee chose not to identify a
recommendation for HHS to consider for use in grading evidence. However,
many of these models may warrant consideration.

The committee is aware that the IOM Determination of Essential
Health Benefits Committee is developing recommendations regarding the
criteria and methods for determining and updating the essential health

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                        JA892                        JA-0000485

Clinical Preventive Services for Women. Closing the Gaps



FIGURE 6-1 Suggested structure for updating preventive services under the ACA.

benefits package. That committee is reviewing how insurers determine covered benefits and medical necessity and will provide guidance on the policy principles and criteria for the Secretary to take into account when examining qualified health plans for appropriate balance among categories of care and limits on patient cost sharing. The committee's recommendations are forthcoming.

Although the ACA's preventive coverage rules are clearly directed at clinical services, the committee recognizes that in view of the critical importance of community-based preventive services and the public health system in achieving clinical aims, the committee thus encourages the Secretary to consider widening the scope of authority to include public health efforts to more comprehensively address prevention (e.g., as discussed in *Healthy People 2020: Topics & Objectives* [HHS, 2011]). It will be critical for the proposed preventive services coverage commission to coordinate with the new and existing bodies that are involved with other elements of the ACA.

Finally, the committee notes that it would make the most sense to consider preventive services for women, men, children, and adolescents in the same way. Thus, although the committee's recommendations presented here address women's preventive services, the process could be equally useful for

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA893                    JA-0000486

determining preventive services for men, children, and male adolescents that should be covered by the ACA.

# REFERENCES

HHS (U.S. Department of Health and Human Services). 2011. *Healthy People 2020: Topics & objectives.* http://www.healthypeople.gov/2020/topicsobjectives2020/default.aspx (accessed April 19, 2011).

IOM. 2011a. *Clinical practice guidelines we can trust.* Washington, DC: The National Academies Press.

IOM. 2011b. *Finding what works in health care: Standards for systematic reviews.* Washington, DC: The National Academies Press.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA894                              JA-0000487

# 7

# Findings and Recommendations for Addressing Identified Gaps in Preventive Services for Women

The Committee on Preventive Services for Women reviewed a large body of evidence on conditions that are important to women's health and well-being (see Chapters 1 and 4), including health conditions that may be specific to women, are more common or more serious in women, have distinct causes or manifestations in women, or have different outcomes or treatments in women (IOM, 2010). The committee also reviewed evidence on effective preventive measures used to address those diseases and conditions. The committee developed a list of potential preventive measures for the Secretary of the U.S. Department of Health and Human Services (HHS) to consider for coverage without cost sharing as it develops policies and programs as part of the requirements of the Patient Protection and Affordable Care Act of 2010 (ACA). Finally, Chapter 6 outlined the committee's suggested process for updating the review of preventive services for making decisions about coverage with no cost sharing by health plans governed by the ACA.

Table 7-1 summarizes the committee's recommendations for preventive services that could supplement currently recommended preventive services.

## CONCLUDING OBSERVATIONS FROM THE COMMITTEE

The committee noted that a number of women's health-related research needs identified throughout the study process have been addressed more comprehensively in other Institute of Medicine (IOM) reports. Most recently, the IOM reports *Women's Health Research: Progress, Pitfalls, and Promise, Weight Gain During Pregnancy: Reexamining the Guidelines,*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                                                                                    JA-0000488

**TABLE 7-1** Summary of the Committee's Recommendations on Preventive Services for Women

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Screening for gestational diabetes | I | The evidence provided to support a recommendation for screening for gestational diabetes is based on current federal practice policy from the U.S. Indian Health Service, the U.S. Department of Veterans Affairs, as well as current practice and clinical professional guidelines such as those set forth by the American Academy of Family Physicians and the American Congress of Obstetricians and Gynecologists. | Recommendation 5.1 The committee recommends for consideration as a preventive service for women: screening for gestational diabetes in pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| Human papillomavirus testing (HPV) | I | The evidence provided to support a recommendation to support testing for HPV is based on federal practice policy from the U.S. Department of Defense. Peer-reviewed studies demonstrate that improved testing technologies, particularly combined screening using both conventional cytology and high-risk HPV DNA testing, may significantly improve the rate of detection of cervical cancer precursors and facilitate the safe lengthening of the interval for screening. | Recommendation 5.2 The committee recommends for consideration as a preventive service for women: the addition of high-risk human papillomavirus DNA testing in addition to cytology testing in women with normal cytology results. Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| Counseling for sexually transmitted infections (STI) | I | The evidence provided to support a recommendation related to STI counseling is based on federal goals from the Centers for Disease Control and Prevention and *Healthy People 2020*, as well as recommendations from the American Medical Association and the American College of Obstetricians and Gynecologists. | Recommendation 5.3 The committee recommends for consideration as a preventive service for women: annual counseling on sexually transmitted infections for sexually active women. |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA896

JA-0000489

**TABLE 7-1** Continued

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Counseling and screening for human immuno-deficiency virus (HIV) | C | The evidence provided to support a recommendation for expanding screening for HIV is based on federal goals from the Centers for Disease Control and Prevention, as well as clinical professional guidelines, such as those from the American College of Physicians, the Infectious Diseases Society of America, the American Medical Association, and the American College of Obstetricians and Gynecologists. | Recommendation 5.4 The committee recommends for consideration as a preventive service for women: counseling and screening for human immunodeficiency virus infection on an annual basis for sexually active women. |
| Contraceptive methods and counseling | Not Addressed | The evidence provided to support a recommendation related to unintended pregnancy is based on systematic evidence reviews and other peer-reviewed studies, which indicate that contraception and contraceptive counseling, are effective at reducing unintended pregnancies. Current federal reimbursement policies provide coverage for contraception and contraceptive counseling and most private insurers also cover contraception in their health plans. Numerous health professional associations recommend family planning services as part of preventive care for women. Furthermore, a reduction in unintended pregnancies has been identified as a specific goal in *Healthy People 2010* and *Healthy People 2020*. | Recommendation 5.5 The committee recommends for consideration as a preventive service for women: the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity. |

*continued*

Copyright National Academy of Sciences. All rights reserved.

**TABLE 7-1** Continued

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Breastfeeding support, supplies, and counseling | B | The evidence provided to support a recommendation regarding the inclusion of breastfeeding services is based on systematic evidence reviews, federal and international goals (such as the U.S. Surgeon General, Health Resources and Services [HRSA], *Healthy People 2020*, World Health Organization and UNICEF), and clinical professional guidelines such as those set forth by the American Academy of Family Physicians, the American Academy of Pediatrics, and the American College of Obstetricians and Gynecologists. | Recommendation 5.6 The committee recommends for consideration as a preventive service for women: comprehensive lactation support and counseling and costs of renting breastfeeding equipment. A trained provider should provide counseling services to all pregnant women and to those in the postpartum period to ensure the successful initiation and duration of breastfeeding. (The ACA ensures that breastfeeding counseling is covered; however, the committee recognizes that interpretation of this varies.) |
| Screening and counseling for interpersonal and domestic violence | I | The evidence provided to support a recommendation related to increasing detection of and counseling for domestic violence and abuse is based on peer-review studies and federal and international policies, in addition to clinical professional guidelines from organizations, such as the American Medical Association and the American College of Obstetricians and Gynecologists. | Recommendation 5.7 The committee recommends for consideration as a preventive service for women: screening and counseling for interpersonal and domestic violence. Screening and counseling involve elicitation of information from women and adolescents about current and past violence and abuse in a culturally sensitive and supportive manner to address current health concerns about safety and other current or future health problems. |

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19    JA898    JA-0000491

**TABLE 7-1** Continued

| Preventive Service | USPSTF Grade | Supporting Evidence | Recommendations |
|---|---|---|---|
| Well-woman visits | Not Addressed | The evidence provided to support a recommendation for including well-woman visits is based on federal and state policies (such as included in Medicaid, Medicare, and the commonwealth of Massachusetts), clinical professional guidelines (such as those of the American Medical Association and the American Academy of Family Practitioners), and private health plan policies (such as those of Kaiser Permanente). | Recommendation 5.8 The committee recommends for consideration as a preventive service for women: at least one well-woman preventive care visit annually for adult women to obtain the recommended preventive services, including preconception and prenatal care. The committee also recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors. |

and *Preterm Birth: Causes, Consequences, and Prevention* identified research priorities (IOM, 2007, 2009b, 2010). Additionally, the conditions described in Appendix A serve as examples for where additional high-quality research is needed to understand and better address preventive services specific to women.

The committee noted in its final deliberations that the United States Preventive Services Task Force (USPSTF) deserves much credit for identifying a nearly complete list of recommended preventive services for women. The USPSTF systematic evidence reviews were of great benefit during the committee's initial and follow-up examinations of the evidence. Additionally, the *Bright Futures* report (AAP, 2008) and the guidelines of the Advisory Committee on Immunization Practices filled several gaps not reviewed by the USPSTF. Although the committee started with an expansive look at a large number of diseases and conditions, the final recommendations summarized in this chapter are few.

Of note, during the course of the study process, the committee faced a number of difficult decisions. The committee decided that a strong case needed to be made regarding a disease or condition having a disproportionate effect on women. Although the committee upheld this standard, some of the recommendations made by the committee could also be considered for male populations.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA899

JA-0000492

Another factor that was difficult for the committee to fully ignore was the cost implications of the recommended services on the insurance market. Costs and cost-effectiveness are not easy to define or measure and differ depending upon priority perspectives—private insurer, government payer, patient, or society. The 2009 IOM study *Initial National Priorities for Comparative Effectiveness Research* examines priorities for considering cost-effectiveness in developing policy decisions (IOM, 2009a). Although the cost-effectiveness of services and examination of what the impact of new preventive health care services will have on health insurers were specifically excluded from committee's consideration, the committee notes that this sometimes made its task more difficult.

In addition, the committee deliberated on a number of interventions for reducing the incidence of diseases and conditions that were deemed effective but that were considered to be tertiary prevention, or interventions where a disease or condition had already been diagnosed. The committee determined that tertiary interventions involved treatment (and, potentially, prevention) decisions, which were outside of its scope.

Finally, questions rose as to what is common sense practice for a physician to discuss with patients. Does encouraging wearing a seat belt fall into this category? Is it the physician's responsibility to counsel patients with no clinical risk factors about healthful eating? To what extent should adolescents be afforded confidentiality? The gaps in gender analysis made this task even more difficult.

The ACA offers much promise in promoting prevention as an effective tool to improve health and well-being. When patients have health insurance coverage, a clear understanding of recommended services and screenings, and a usual source of care, it is the committee's belief that positive health outcomes will ensue. The ACA provides hope in efforts to eliminate health disparities and improve the health and well-being of women, children, and men across the United States.

# REFERENCES

AAP. 2008. *Bright futures: Guidelines for health supervision of infants, children and adolescents*, 3rd ed. (J. F. Hagan, J. S. Shaw, and P. M. Duncan, eds.). Elk Grove Village, IL: American Academy of Pediatrics.

IOM (Institute of Medicine). 2007. *Preterm birth: Causes, consequences, and prevention.* Washington, DC: The National Academies Press.

IOM. 2009a. *Initial national priorities for comparative effectiveness research.* Washington, DC: The National Academies Press.

IOM. 2009b. *Weight gain during pregnancy: Reexamining the guidelines.* Washington, DC: The National Academies Press.

IOM. 2010. *Women's health research: Progress, pitfalls, and promise.* Washington, DC: The National Academies Press.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                     JA900                          JA-0000493

# Appendixes

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA901

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA-0000495

# Appendix A

# Clarifications

This appendix describes several conditions that the Committee on Preventive Services for Women examined to determine if there may be gaps in preventive services necessary for women's health and well-being that are not included in the United States Preventive Services Task Force (USPSTF) Grade A and B recommendations, Bright Futures, and Advisory Committee on Immunization Practices (ACIP) guidelines. The committee conducted a full review of the following conditions and risk factors, including those relating to cardiovascular disease, osteoporosis, breast cancer, mental health, tobacco use, and diet and physical activity. For these conditions, the committee concluded that there was insufficient evidence to develop new recommendations. At the same time, evidence supported by peer-reviewed studies, federal goals, professional clinical guidelines, and existing federal practices led the committee to suggest a clarifying statement to existing USPSTF recommendations, or led to a suggestion that specific services should be addressed within the context of the well-woman preventive care visit recommended by the committee. Several of the committee descriptions that follow serve as examples of areas in which further high-quality research is needed to understand and better address preventive services for women.

## CARDIOVASCULAR DISEASE

Cardiovascular disease (CVD) is the class of diseases that involve the heart or blood vessels and includes high blood pressure, coronary heart disease (CHD), stroke, and heart failure (Bonow et al., 2011). Addressing cardiovascular disease across the life span in women, including during

*171*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA903                          JA-0000496

adolescence, the reproductive years, and maturity, is important. It has been shown that risk factors experienced during pregnancy, such as hypertension of pregnancy, gestational diabetes, and preeclampsia, place women at risk for the development of cardiovascular disease as they age.

### Prevalence/Burden

More women die annually from heart disease than men, but overall, men have a higher burden of CVD (Roger et al., 2011). Likely because of the obesity epidemic in the United States, rates of mortality from CHD (CVD affecting the coronary arteries) in women aged 35 to 54 years have increased in recent years.

CVD rates for American black females are significantly higher than those for their white counterparts (286.1/100,000 population and 205.7/100,000 population, respectively) (Mosca et al., 2011; Roger et al., 2011). The black female population also has a lower rate of awareness of heart disease than white women (Ferris et al., 2005; Kleindorfer et al., 2009; Mosca et al., 2010; Roger et al., 2011). More women die each year of stroke and stroke constitutes a higher proportion of CVD events in women, compared with a higher proportion of coronary heart disease in men. The majority of the research from which preventive care recommendations are derived is based on CHD and not stroke (Mosca et al., 2011).

Evidence shows differences in the pathology of CHD by sex, with women having a higher prevalence of disease of the small coronary vessels than men (Bairey Merz et al., 2006; Jacobs, 2006). Symptoms of CHD are more likely to be atypical, including dyspnea and epigastric discomfort (Canto et al., 2007). Lastly, premenopausal women who suffer sudden death are more likely to have pathologic findings of plaque erosion than plaque rupture, which is more common in men and postmenopausal women (Burke et al., 1998; Oparil, 1998). Older women who suffer a myocardial infarction are more likely than men to have plaque rupture with thrombus (Kruk et al., 2007). The relevance of these findings is unclear but points to biological differences in CHD in women, the full extent of which remains unknown.

### Risk Factors for CVD

Most modifiable risk factors for the primary prevention of CVD, such as hypertension, hyperlipidemia, diabetes mellitus, smoking, obesity, metabolic syndrome, and physical inactivity, are similar in women and men; but the prevalence and impact of certain risk factors may differ by sex. Risk factors in which there are sex differences in prevalence and impact or in

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA904 JA-0000497

which there are different criteria by sex are outlined below. Diabetes mellitus, obesity, smoking, and physical activity are addressed in other sections of this document.

*Lipids:* Elevated levels of low-density lipoprotein (LDL) present equivalent risks to women and men but a high-density lipoprotein (HDL) level of <50 mg/dL is considered a risk in women and an HDL level of <40 mg/dL is considered a risk in men (National Cholesterol Education Program Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults, 2002; Mosca et al., 2011). Currently, interventions to improve HDL mainly focus on lifestyle and control of traditional risk factors. No sex-specific interventions for increasing HDL levels currently exist.

*Metabolic Syndrome:* Metabolic syndrome is a constellation of risk factors that are associated with the development of CVD and type 2 diabetes mellitus. The diagnosis is made when three of the following five findings are present: (1) elevated waist circumference (≥40 in. [102 cm] in men and ≥35 in. [88 cm] in women), (2) elevated triglyceride levels (≥150 mg/dL [1.7 mmol/L]) or drug treatment for elevated triglyceride levels, (3) reduced HDL cholesterol levels (<40 mg/dL [1.03 mmol/L] in men and <50 mg/dL [1.3 mmol/L] in women or drug treatment for reduced HDL cholesterol levels, (4) elevated blood pressure (≥130 mm Hg systolic blood pressure or ≥85 mm Hg diastolic blood pressure) or antihypertensive drug treatment, and (5) elevated fasting glucose level of ≥100 mg/dL or drug treatment for elevated glucose levels (Grundy et al., 2005).

The prevalence of the metabolic syndrome is increasing and varies by age in women and men, with the prevalence being higher in men up to the age of 60 years, after which the rates are higher in women (51.5 percent in men versus 54.4 percent in women) (Ervin, 2009). Importantly, the rates of metabolic syndrome are significantly higher in non-Hispanic black and Mexican American women than in their male counterparts (38.8 and 25.3 percent, respectively, for non-Hispanic black women versus men and 40.6 and 33.2 percent, respectively, for Mexican American women versus men) (Ervin, 2009).

Meta-analyses of studies evaluating the metabolic syndrome showed an association of metabolic syndrome with an increased risk of developing CVD and death from CVD (relative risk = 1.78; 95 percent confidence interval = 1.58 to 2.00), with the association between metabolic syndrome and an increased risk of CVD being stronger in women than in men in the smaller number of studies that provide data by sex (relative risk = 2.63 versus 1.98, P = 0.09) (Gami et al., 2007).

Women with metabolic syndrome have a three times higher risk of dying from a heart attack or stroke than women who do not have it

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

(Cleveland Clinic, 2011), and they have a significantly elevated risk for developing type 2 diabetes (Lorenzo et al., 2007). Furthermore, women diagnosed with metabolic syndrome in early pregnancy have a significantly greater risk of developing gestational diabetes mellitus. An accurate measurement of the waist circumference must be obtained to make a diagnosis of metabolic syndrome.

*Pregnancy-Related Risk Factors:* Pregnancy-related risk factors such as preeclampsia, gestational hypertension, and gestational diabetes mellitus are specific to women and are risk factors for the development of CVD and CVD events in women as they age. These pregnancy-related disorders are highly prevalent, with approximately 5 percent of pregnancies complicated by preeclampsia. Gestational diabetes, which complicates 5 percent of pregnancies, is often seen in women who also have gestational hypertension.

Women who experience preeclampsia have twice the risk of heart disease, stroke, and venous thromboembolism as they age and are twice as likely to die of cardiovascular disease (Bellamy et al., 2007; McDonald et al., 2008; Rich-Edwards et al., 2010). In a Canadian population, women who have preeclampsia and preterm birth (<37 weeks of gestation) have been found to have an eight-fold higher risk of mortality from CVD than women who do not have preeclampsia and who give birth at term (Irgens et al., 2001).

Approximately 50 percent of the women who experience gestational diabetes mellitus will go on to develop type 2 diabetes mellitus and also experience a 70 percent increase in the risk of CVD, much of which can be attributed to the development of type 2 diabetes mellitus (Shah et al., 2008). Black women experience significantly higher rates of these pregnancy complications (Rich-Edwards et al., 2010).

Little is currently understood about the possible vascular abnormalities caused by these disorders or the time course of the increase in risk. Similarly, research on the etiology of these disorders and how best to prevent them before pregnancy, during pregnancy, or between pregnancies is lacking. Given the association of preeclampsia, gestational hypertension, and gestational diabetes with an increased risk of CVD in women as they age, the 2011 American Heart Association (AHA) guidelines for prevention of CVD in women recommends that a history of pregnancy complications be obtained as part of the evaluation of CVD risk in women (Mosca et al., 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                JA906                                JA-0000499

*Depression:* Depression is more common in women than men and disproportionately affects the outcomes of women who have experienced a myocardial infarction. Screening for depression is recommended for women with CVD, but no evidence suggests that screening affects the outcomes for these women. Research to understand the role of depression on the development of CVD and how sex and gender influence this relationship is emerging (Mosca et al., 2011).

*Social Determinants of Health:* Evidence shows that the risk for CVD is influenced by social determinants of health, such as socioeconomic status, geographic location, chronic stress, poverty, and racism. The intersection of race/ethnicity, gender, and economic status complicates the understanding of who is at risk for metabolic syndrome, but understanding this social patterning is important for the development of targeted interventions. In an analysis of data from the National Health and Nutrition Examination Survey III, economic status was found to have an impact on the incidence of metabolic syndrome for women but not for men. Women in the lowest economic group were more likely to be at risk than women in the highest economic group (Salsberry et al., 2007). Results such as these underscore the potential clinical significance of socioeconomic position, particularly for women (Loucks et al., 2007). Black women are at greater risk for CVD than white women of comparable socioeconomic status, and the age-adjusted rates of death from CVD for black women exceed those for white women (Hayes et al., 2006). Black women in the southern rural United States have among the highest rates of mortality from CVD, especially stroke (Casper et al., 2011).

These studies demonstrate that social determinants may have disproportionate impacts on the development of CVD in women, but more high-quality evidence is needed in this area.

*High-Sensitivity C-Reactive Protein:* High-sensitivity C-reactive protein is a nonspecific biomarker of increased risk for CVD. The role of the high-sensitivity C-reactive protein levels in the assessment of risk and in defining preventive strategies remains unclear. The Jupiter study, which is often cited as the rationale to use high-sensitivity C-reactive protein for screening, did not include women with low high-sensitivity C-reactive protein levels, and therefore, no definitive statement about the use of this biomarker to screen women in the general population can be made (Mosca et al., 2011; Ridker et al., 2010).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA907 JA-0000500

## Existing Guidelines and Recommendations

---

### USPSTF Recommendations

The USPSTF recommends the use of aspirin for women aged 55 to 79 years when the potential benefit of a reduction in ischemic strokes outweighs the potential harm of an increase in gastrointestinal hemorrhage. Grade A recommendation (USPSTF, 2009a).

The USPSTF recommends screening for high blood pressure in adults aged 18 and older. Grade A recommendation (USPSTF, 2007a).

The USPSTF strongly recommends screening women aged 45 and older for lipid disorders if they are at increased risk for coronary heart disease. Grade A recommendation (USPSTF, 2008).

The USPSTF recommends screening women aged 20 to 45 for lipid disorders if they are at increased risk for coronary heart disease. Grade B recommendation (USPSTF, 2008).

The USPSTF makes no recommendation for or against routine screening for lipid disorders in men aged 20 to 35 or in women aged 20 and older who are not at increased risk for CHD. Grade C recommendation (USPSTF, 2008).

The USPSTF concludes that the evidence is insufficient to recommend for or against routine screening for lipid disorders in infants, children, adolescents, or young adults (up to age 20). Grade I statement (USPSTF, 2007b).

The USPSTF recommends that clinicians ask all adults about tobacco use and provide tobacco cessation interventions for those who use tobacco products. Grade A recommendation (USPSTF, 2009b).

The USPSTF concludes that the evidence is insufficient to recommend for or against routine screening for tobacco use or interventions to prevent and treat tobacco use and dependence among children or adolescents. Grade I statement (USPSTF, 2003c).

---

Bright Futures recommends screening for high blood pressure throughout adolescence and annual screening for dyslipidemia. Otherwise, Bright Futures provides only anticipatory guidance on this subject (AAP, 2008).

Numerous organizations such as the AHA provide a wealth of expansive and specific guidelines for preventing CVD in women. The AHA alone recently published an updated list of more than 20 guidelines. These recommendations are commonly in agreement with those of the USPSTF.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19          JA908          JA-0000501

The Adult Treatment Panel III from the National Cholesterol Education Program recommends that lipids be treated according to the risk stratification obtained by use of the Framingham risk score. This system stratifies patients into three basic categories by 10-year risk (the percentage probability of experiencing an event in the next 10 years): >20 percent, 10 to 20 percent, and <10 percent. However, these recommendations do not differ by sex.

## Effective Interventions

A large body of evidence has been amassed to support prevention strategies for CVD in women and men. Even though CVD-related conditions are often grouped together, most evidence is based on trials that do not include stroke as the primary outcome, which is particularly important, given that stroke is more prevalent in women than men (Mosca et al., 2011). CVD is primarily prevented through adequate treatment of modifiable risk factors, including hypertension, diabetes mellitus, hyperlipidemia, and obesity, and achievement of a healthy lifestyle, including smoking cessation, physical activity, a healthy diet, and maintaining a healthy weight.

Metabolic syndrome is a significant risk factor for CVD in women, and the major focus is on preventing or treating the underlying modifiable risk factors, such as central obesity, hypertension, increased LDL and triglyceride levels, and diabetes mellitus. Lifestyle modification, including weight loss, physical activity, and a healthy diet, decreases all of the metabolic risk factors (Grundy et al., 2005). Although good data that link the modification of each risk factor that comprises metabolic syndrome to a decrease in cardiovascular risk are available, the data on preventing or treating metabolic syndrome are lacking. No data directly link screening for metabolic syndrome and prevention of CVD, although the syndrome must be recognized to accurately define women's risk.

Few data are available on effective interventions to prevent the complications of pregnancy, such as gestational hypertension and preeclampsia, which are risk factors for CVD. Achieving a healthy weight before pregnancy has been linked with decreased rates of these complications (IOM, 2009). Much remains to be learned about the mechanisms underlying these disorders, in particular, preeclampsia. Knowledge of these mechanisms might lead to effective preventive strategies (Rich-Edwards et al., 2010). Finally, identification of these disorders when a woman's medical history is obtained is important and will help to more accurately define overall risk for CVD.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                        JA909                        JA-0000502

Case 1:25-cv-25510-WDB  Document 64-3  Page: 248  Date Filed: 12/12/2025

## Identified Gaps

The primary gaps in preventive services not already addressed by the provisions set forth in the ACA are (1) there is no comprehensive mechanism for the prevention or screening of metabolic syndrome in all women, and (2) there is no comprehensive mechanism in place to collect pregnancy complication histories to better predict the risk level of a woman for developing cardiovascular disease in the future.

The committee found insufficient evidence to support a new recommendation; instead, evidence supported by professional clinical guidelines led to committee support for the reasonableness of including screening for metabolic syndrome in women and obtaining a history of pregnancy complications within the context of the well-woman preventive visit.

## BONE/SKELETAL DISEASE

The USPSTF recommends screening for osteoporosis using bone densitometry testing for women aged 65 years and older and in younger women whose fracture risk is equal to or greater than that of a 65-year-old white woman who has no additional risk factors (USPSTF Grade B recommendation). This recommendation was based on the age and personal risk factors of average-risk women with no previous fragility fractures and does not explicitly address women with secondary causes of osteoporosis or previous fractures (USPSTF, 2011d).

Osteoporosis is a systemic skeletal condition associated with aging that is characterized by low bone density and deterioration of bone tissue that weakens bones and leads to fractures (USDHS, 2004). Osteoporosis-related fragility fractures result from forces that would not normally cause fractures, such as hip or wrist fractures from falling from standing height or a spine fracture resulting from compression of the vertebra from gravity alone. Although some types of fractures are more commonly related to osteoporosis (e.g., spine, hip, and wrist fractures), osteoporotic fractures can occur at nearly all sites.

In the absence of a fracture, osteoporosis can also be diagnosed by measuring bone density, or the thickness of bone. Results are expressed as the T-score, which is the difference between an individual's bone density measurement and normal values. The World Health Organization developed definitions for levels of bone density based on T-scores (Kanis, 1994). T-scores identify only one aspect of the condition, however. Other important components, such as rate of bone loss and quality of bone, are not currently measured in clinical practice.

Women with previous osteoporosis-related fractures are at high risk

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA910                        JA-0000503

for subsequent fractures. Although most women can accurately recall having had a previous fracture that required medical attention and fractures are usually well documented in medical records, tracking of women for follow-up care is usually difficult. As a result, evaluations for osteoporosis are often missed, drug treatments are not prescribed, and rates of subsequent fractures are high. Fractures that do not require immediate medical attention are often not recognized, such as spine fractures with mild or no symptoms. Nonetheless, asymptomatic spine fractures are also important in establishing the diagnosis of osteoporosis and determining needs for drug therapy.

Osteoporosis may occur without a known cause (primary osteoporosis) or occur as the result of another condition (secondary osteoporosis). Common secondary causes include dietary deficiencies in calcium or vitamin D; use of certain medications (aluminum antacids, anticoagulants, anticonvulsants, aromatize inhibitors, barbiturates, cancer chemotherapeutic drugs, depo-medroxyprogesterone, glucocorticoids, gonadotropin-releasing hormone agonists, lithium, and others); and the presence of health conditions (rheumatoid arthritis, diabetes, hyperparathyroidism, gastric bypass and other gastrointestinal surgery, malabsorption, inflammatory bowel disease, hemophilia, lupus, rheumatoid arthritis, kidney disease, depression, multiple sclerosis, emphysema, and others).

Several additional risk factors for osteoporosis and fractures have been determined from large population studies. Risk factors that cannot be modified include age, menopause, low body mass index, and a family history of osteoporosis and fractures. Modifiable risk factors include immobility, falls, tobacco use, and excessive alcohol intake (three or more drinks daily).

## Prevalence/Burden

Low bone density, osteoporosis, and related fragility fractures are common in older adults. Estimates indicate that as many as 50 percent of Americans over age 50 years, or 14 million individuals by 2020, will be at risk for osteoporotic fractures during their lifetimes (USDHS, 2004). Fracture rates are higher and ages of incidence are younger for women than for men. Rates are highest in whites than in other racial groups, although osteoporosis is common in all groups (George et al., 2003; Looker et al., 1997; Nelson et al., 1995). Older individuals have much higher fracture rates than younger individuals with the same bone density because of increasing risks from other important contributors, such as falling (Heaney, 1998). All types of fractures are associated with higher rates of death (Bliuc et al., 2009; Center et al., 1999; Leibson et al., 2002). Nonfatal fractures at any site can impair function and quality of life, cause chronic pain and

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA911 JA-0000504

disability, and result in high costs for health care and lost productivity (HHS, 2004).

Bone densitometry measures the mass of bone and can be used to predict the risk of future fractures, although it is an imperfect measure. Among bone measurement tests at various sites, the result of dual-energy X-ray absorptiometry (DXA) of the hip is the strongest predictor of hip fracture (Marshall et al., 1996). Several peripheral bone measurement tests have also been developed, including quantitative ultrasound (QUS) of the calcaneus (heel), which can predict fractures, as well as DXA, although variation exists across studies (Nelson et al., 2010b). QUS measures bone qualities differently from DXA, and correlates only modestly. Therefore, it is not clear how the results of QUS can be used clinically to select individuals who should receive drug therapies that were proven effective in clinical trials on the basis of DXA criteria.

Measurement of the bone density of appropriate candidates is essential before initiation of drug therapy because all of the drugs approved by the Food and Drug Administration (FDA) to treat low bone density and osteoporosis work by increasing bone density. Obtaining a bone density measure before therapy also provides an opportunity to monitor a response to the drug, if needed.

Identification of secondary causes and modifiable risk factors can lead to decisions to treat the underlying cause or risk factor specifically; to monitor bone density and treat osteoporosis if bone density is low or a fracture occurs; or to treat osteoporosis, in addition to the secondary cause or risk factor. Actual management depends on the secondary cause or risk factor, the severity of osteoporosis, additional health considerations, and patient preferences.

### Existing Guidelines and Recommendations

---

**USPSTF Recommendations**

The USPSTF recommends screening for osteoporosis in women aged 65 years or older and in younger women whose fracture risk is equal to or greater than that of a 65-year-old white woman who has no additional risk factors. Grade B recommendation (USPSTF, 2011c).

---

Clinical guidelines from the National Osteoporosis Foundation recommend bone density testing for individuals with osteoporosis-related fractures

Copyright National Academy of Sciences. All rights reserved.

or secondary causes of osteoporosis, all women aged 65 years and older, and younger postmenopausal women with key risk factors (NOF, 2010).

Despite the increased awareness of osteoporosis and recommendations for screening and treatment from multiple groups, osteoporosis is underdetected and inappropriately treated in the United States (Kiebzak, 2002; Wilkins and Goldfeder, 2004). The reasons for this are unclear, although the different recommendations for identifying candidates for testing and treatment and confusion in interpreting the results of testing may be contributors (Morris et al., 2004). In addition, current medical practice in the United States is commonly fragmented for individuals experiencing osteoporosis-related fractures. The fracture itself is usually treated by an acute care team in hospital emergency departments and orthopedic services, whereas screening, prevention, and treatment are addressed in other contexts.

### Effective Interventions

Primary prevention of osteoporosis and fractures begins early in life, while bone undergoes development. Attainment of peak bone mass and its maintenance require optimal nutrition and physical activity throughout the life span and avoidance of tobacco, alcohol, and other exposures that contribute to osteoporosis. All women require adequate calcium (1,200 mg daily) and vitamin D (800 to 1,000 international units daily) intake to avoid deficiencies and prevent osteoporosis and fractures (Standing Committee, 1997). Those with secondary causes of osteoporosis may require treatment of their specific underlying conditions to reduce their risks for osteoporosis and fractures. Women using medications causing osteoporosis may require adjustments in their medications and serial measures of bone densitometry to monitor effects on their bones.

The FDA has approved several drugs for prevention or treatment of osteoporosis (FDA, 2011) that reduce the risk for osteoporosis-related fractures by increasing bone density. Women with the lowest levels of bone density or with previous osteoporosis-related fractures are the most likely to benefit (Cummings et al., 1998). These drugs differ by their mechanisms of action, effectiveness in reducing fractures, routes of administration, and adverse effects.

Drugs for prevention are intended for individuals who have no previous fractures and whose bone density levels are not in the osteoporotic range (i.e., T-score $\geq -2.5$). For women, these include four bisphosphonate drugs, alendronate (Fosamax), ibandronate (Boniva), risedronate (Actonel, Actonel with calcium), and zoledronic acid (Reclast); several forms of estrogen with or without a progestin hormone; and raloxifene (Evista). For

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                                                 JA-0000506

some of the drugs, such as alendronate, prevention doses are smaller than treatment doses. Alendronate, raloxifene, and estrogen significantly reduced the incidence of spine fractures in clinical trials of women without previous fractures (Nelson et al., 2010a,b).

Drugs approved for treatment purposes are intended for individuals who have had previous osteoporosis-related fractures or whose T-scores are low (≤−2.5). For women, these include four bisphosphonate drugs, alendronate (Fosamax, Fosamax Plus D), ibandronate (Boniva), risedronate (Actonel, Actonel with calcium), and zoledronic acid (Reclast); calcitonin (Fortical, Miacalcin); denosumab (Prolia); raloxifene (Evista); and teriparatide (Forteo). In clinical trials of women with previous fractures, all of these drugs significantly reduced spine fractures, and all except calcitonin and raloxifene reduced fractures at other sites (MacLean et al., 2008; Nelson et al., 2010b). Trials evaluating the effectiveness of non-drug interventions alone and in combination with drugs would be clinically useful but are lacking. These interventions include functional assessment and improvement, safety evaluations, vision examinations, and nutritional analyses, among others.

### Identified Gap

The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is the lack of bone densitometry testing explicitly for women below the age of 65 at high risk for osteoporosis, such as those with previous fractures and secondary causes of osteoporosis. Evidence supported by systematic evidence reviews and the National Osteoporosis Foundation guidelines support a clarification statement to the USPSTF recommendation.

### Clarification Statement

The committee interprets the current USPSTF recommendation regarding osteoporosis screening for women to include screening women with previous fractures and with secondary causes of osteoporosis.

### BREAST CANCER

Women at high risk for breast cancer may require additional screening and surveillance services that are not included in the USPSTF screening recommendations and current legislation intended for average-risk women (*Federal Register*, 2010; USPSTF, 2009f). Issues surrounding the prevention of breast cancer in high-risk women are technical in nature because of the complexity of the condition.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA914                    JA-0000507

Although several factors are associated with increased risk for breast cancer, few increase a woman's risk to levels that are clinically significant for screening purposes. Women at high risk include those with known mutations in breast cancer susceptibility genes one and two (*BRCA1* and *BRCA2*), with unknown mutation status but have a first-degree relative (parent, brother, sister, or child) with a *BRCA1* or *BRCA2* gene mutation, or have a family history of breast and related cancers regardless of mutation status. Also at increased risk are women who received radiation therapy to the chest, such as for treatment of Hodgkin's disease (Wahner-Roedler et al., 2003); have abnormal pathology results on a previous breast biopsy (Arpino et al., 2005); or have extremely dense breasts when viewed on mammography (Kerlikowske et al., 2010).

## Prevalence/Burden

Breast cancer is the most frequently diagnosed cancer after skin cancer and the second leading cause of cancer deaths after lung cancer among women in the United States (ACS, 2010). In 2010, an estimated 207,090 cases of invasive breast cancer and 54,010 cases of noninvasive breast cancer were diagnosed, and an estimated 39,840 women died of breast cancer (ACS, 2010). Periodic mammography screening detects early stages of breast cancer and reduces the rate of mortality from breast cancer in clinical trials, although the extent of these benefits varies by age (Nelson et al., 2009a). Because most women with breast cancer have no major risk factors and are considered to be at average risk, mammography screening is recommended for women at all levels of risk (Smith et al., 2003a; USPSTF, 2009f). However, several individual characteristics are associated with an increased risk for breast cancer in epidemiological studies. Identifying women with risk factors most strongly associated with breast cancer can lead to the use of additional screening measures to improve early breast cancer detection and reduce the burden of disease for these women.

Clinically significant *BRCA* mutations are associated with an approximately 60 percent lifetime risk of breast cancer and a 15–40 percent lifetime risk of ovarian cancer. The prevalence of deleterious *BRCA* mutations is estimated to be between 1 in 400 to 1 in 800 in the general population (Anglian Breast Cancer Study Group, 2000; Ford and Easton, 1995; Whittemore et al., 2004), although specific *BRCA* mutations are clustered among certain ethnic groups such as Ashkenazi Jews (1 in 40) (Struewing et al., 1997). Rare disease syndromes related to deleterious mutations located on different genes also increase breast cancer risk to high levels (Garber and Offit, 2005).

Women with high risk for breast cancer can also be identified by risk

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA915                          JA-0000508

Clinical Preventive Services for Women  Closing the Gaps
Case 1:25-cv-25540-WDP  Document 34-3  Page: 254  Filed 09/12/2025  Page 1/2/2025330

assessment instruments used in genetic counseling that are based mainly on family history information (Amir et al., 2003; Claus et al., 1994; Domchek et al., 2003; Gail et al., 1989; Tyrer et al., 2004). Approximately 10 percent of women have a first-degree relative (i.e., mother, sister, or daughter) with breast cancer, which doubles their risk of having breast cancer themselves (Collaborative Group, 2001; Pharoah et al., 1997). Risks are higher if more than one relative is affected and if breast cancer in relatives was diagnosed at younger ages, especially below age 50 years (Collaborative Group, 2001; Pharoah et al., 1997). Risk assessment considers all of these factors to provide an estimate of an individual's breast cancer risk.

Most women previously treated for breast cancer are closely monitored after treatment, and this type of surveillance generally falls outside of screening recommendations. Women who had previous biopsies that indicated abnormal lesions that were not cancer often re-enter screening programs after their biopsies. Some of these abnormal lesions can increase the breast cancer risk 4 to 10 times above average, depending on the type of lesion (Arpino et al., 2005). Approximately 16 biopsies are obtained for every 1,000 women undergoing mammography screening in the United States (Weaver et al., 2006). Of these biopsies, approximately 1 of the 16 has an abnormal lesion that increases the risk for breast cancer.

Women with extremely dense breasts when viewed by mammography have twice the five-year risk for breast cancer than women with normal breast density (Kerlikowske et al., 2010). Women with unevenly dense breasts also have elevated risks, but to a lesser degree (Kerlikowske et al., 2010). High breast density compromises the accuracy of mammography and increases susceptibility to breast cancer (Boyd et al., 2007; Kerlikowske et al., 1996; van Gils et al., 1998a,b). Women with extremely dense breasts, particularly younger women, are more likely to be diagnosed with advanced-stage disease than women with average breast density (Kerlikowske et al., 2010). A national study of mammography screening found that approximately 9 percent of women have extremely dense breasts and 37 percent have unevenly dense breasts, with the highest rates among younger women (Kerlikowske et al., 2010). The use of breast density as a risk factor in screening is currently limited, however, because it is not routinely provided with mammography results and interpretations vary widely in practice (Kerlikowske et al., 1998).

Determination of a woman's risk of breast cancer provides important clinical information to guide appropriate screening and prevention decisions. Women with family history information indicating high risk could adopt more intensive screening regimens that begin at younger ages that are more frequent and include additional clinical examinations and imaging technologies than women at average risk (Burke et al., 1997; Kriege et

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA916 JA-0000509

al., 2004; Lee et al., 2010; Saslow et al., 2007; Warner et al., 2004). Those with family histories suspicious for deleterious *BRCA* mutations could undergo genetic testing and inform their relatives of their status to benefit them as well. Women at high risk of breast cancer could consider the use of medications (i.e., tamoxifen or raloxifene) or surgeries (i.e., mastectomy or oophorectomy, or both) to reduce their risks (Nelson et al., 2005, 2009b). Conversely, women often overestimate their risk of breast cancer (Bowen et al., 1998; Lerman et al., 1991, 1996). Women initially suspected to be at high risk but determined to be at average risk after further evaluation could be spared unnecessary evaluations, procedures, and worry if they had that information available.

Screening recommendations target primary care practice as the appropriate context for initial identification of women at high risk for breast cancer; however, methods for accurately stratifying women into high-risk and average-risk groups in this setting have not been adequately demonstrated (Nelson et al., 2005, 2009c). The accuracy of family cancer history information is variable, although a report of breast cancer in a first-degree relative was reasonably accurate in one study (sensitivity = 82 percent, specificity = 91 percent) (Murff et al., 2004). The accuracy of information for a first-degree relative was better than for a second-degree relative.

Health maintenance organizations, professional organizations, cancer programs, and state and national health programs have developed referral guidelines to assist primary care clinicians with identifying women at potentially increased risk (Nelson et al., 2005). Although specific items vary, most include questions about personal and family histories of *BRCA* mutations and breast and ovarian cancer, age of diagnosis, bilateral breast cancer, and Ashkenazi Jewish heritage. Most guidelines are intended to lead to a referral for more extensive genetic evaluation and counseling. No consensus or gold standard about the use of guidelines currently exists, and the effectiveness of this approach has not been evaluated. Concerns about inappropriate referrals in current practice include not only too few referrals of high-risk women but also too many referrals of average-risk women (White et al., 2008).

Genetic counseling provides an assessment of risk using established risk calculation instruments and is an essential step in determining if a woman is at increased risk and requires enhanced screening and prevention services. Genetic counseling to determine cancer risk status for women without breast cancer is a new concept in practice. No study has yet determined how genetic counseling modifies cancer screening behaviors or if doing so improves early detection and mortality. Information to guide effective integration of shared decision making into this process is also lacking. Although enhanced screening is recommended by expert groups (Burke et al.,

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                      JA917                                      JA-0000510

1997) and is based on favorable results of programs designed for women with familial risk (Brekelmans et al., 2001; Burke et al., 1997; Gui et al., 2001; Kollias et al., 1998; Warner et al., 2004), no trials of its effectiveness have been conducted.

## Existing Guidelines and Recommendations

### USPSTF Recommendations

The USPSTF recommends biennial screening mammography for women aged 50 to 74 years. Grade B recommendation (USPSTF, 2009e).

The decision to start regular, biennial screening mammography before the age of 50 years should be an individual one and take patient context into account, including the patient's values regarding specific benefits and harms. Grade C recommendation (USPSTF, 2009e).

The USPSTF concludes that the current evidence is insufficient to assess the additional benefits and harms of screening mammography in women 75 years or older. Grade I Statement (USPSTF, 2009e).

The USPSTF concludes that the current evidence is insufficient to assess the additional benefits and harms of clinical breast examination (CBE) beyond screening mammography in women 40 years or older. Grade I statement (USPSTF, 2009e).

The USPSTF concludes that the current evidence is insufficient to assess the additional benefits and harms of either digital mammography or magnetic resonance imaging (MRI) instead of film mammography as screening modalities for breast cancer. Grade I statement (USPSTF, 2009e).

The USPSTF recommends that women whose family history is associated with an increased risk for deleterious mutations in *BRCA1* or *BRCA2* genes be referred for genetic counseling and evaluation for *BRCA* testing. Grade B recommendation (USPSTF, 2005a).

The USPSTF recommends that clinicians discuss chemoprevention with women at high risk for breast cancer and at low risk for adverse effects of chemoprevention. Clinicians should inform patients of the potential benefits and harms of chemoprevention. Grade B recommendation (USPSTF, 2002b).

The American Cancer Society recommends yearly magnetic resonance imaging (MRI) screening, in addition to mammography screening, and that clinicians consider starting screening at age 30 years for women with lifetime risks for breast cancer of >20 percent (ACS, 2011; Saslow et al., 2007). Expert groups also advise that women with *BRCA* mutations or with

Copyright National Academy of Sciences. All rights reserved.

strong family histories of early age of breast cancer onset begin screening at younger ages (e.g., five years younger than the age of diagnosis) (Burke et al., 1997). The Society of Breast Imaging and the American College of Radiology recently published guidelines on the use of mammography, breast MRI, breast ultrasound, and other technologies for the detection of clinically occult breast cancer, recommending for women at high risk earlier screening and additional technologies that vary depending on the risk factor (Lee et al., 2010).

Assessment of breast cancer risk status and use of enhanced screening services are highly variable in practice. Ideally, an initial risk assessment based on personal characteristics and family cancer history would occur for all women as part of routine prevention in primary care. Currently, referrals to risk and genetic counseling for women without existing breast cancer are most commonly offered to relatives of women diagnosed with cancer and with strong family histories. As a result, enhanced screening is being provided to only some women who have been appropriately identified to be at high risk, as well as to others whose risk status may have been inadequately determined.

## Effective Interventions

The efficacy of MRI in detecting breast cancer for screening purposes was demonstrated in a study of women with either deleterious *BRCA* mutations or a family history of breast cancer indicting a lifetime risk of 15 percent or greater (Kriege et al., 2004). Women were screened every six months by clinical breast examination and yearly by mammography and MRI. The sensitivity and specificity for detecting invasive breast cancer were 18 and 98 percent, respectively, for clinical breast examination; 33 and 95 percent, respectively, for mammography; and 79.5 and 90 percent, respectively, for MRI. The results were compared with those for two age-matched control groups undergoing usual screening (yearly mammography and clinical breast examination). One control group had a lifetime risk of 15 percent or greater, and the other had average risk. Women screened with clinical breast examination, mammography, and MRI had significantly smaller tumors at diagnosis and fewer cases of cancer spreading beyond the breast than women in either control group. Use of MRI also led to twice as many unneeded additional examinations as mammography and three times as many unneeded biopsies.

A comparison of four intensive screening approaches in *BRCA* mutation carriers included yearly MRI, mammography, and ultrasound and clinical breast examinations provided every 6 months (Warner et al., 2004). MRI was more sensitive in detecting breast cancers (sensitivity = 77 percent, specificity = 95 percent) than mammography (sensitivity = 36 percent, specificity = 99.8 percent), ultrasound (sensitivity = 33 percent, specificity = 96 percent), or clinical breast examination alone (sensitivity = 9 percent, speci-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA919                          JA-0000512

ficity = 99 percent). Use of MRI, ultrasound, clinical breast examination, and mammography together had a sensitivity of 95 percent. In this study, 14 percent of women had a biopsy that proved to be benign. Additional clinical outcomes, including mortality, were not reported in either study.

### Identified Gap

The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is the lack of enhanced breast cancer screening services for high-risk women who may require earlier and/or more frequent examinations and imaging, as well as additional imaging technologies beyond mammography.

The committee believes that the evidence is insufficient to recommend coverage for additional breast cancer screening services for high-risk women at this time. The committee recognizes the complexity of appropriately identifying women with high levels of breast cancer risk to determine eligibility for services and the limitations of research on the potential benefits of the services. Considerations for increasing use of screening services are coupled with the acknowledgment of the harms that can also occur, including increasing the rates of false-positive results and benign biopsies and the adverse impact these experiences have on women. Nonetheless, the committee feels that with rapidly evolving scientific inquiry, such consideration should be reevaluated given evidence that may alter this assessment.

## MENTAL HEALTH

Depression is a widespread mental disorder that affects approximately 121 million people worldwide and has been identified to be one of the top 10 leading causes of disease burden (Lopez et al., 2006; WHO, 2011). Symptoms include depressed mood, loss of interest or pleasure, feelings of guilt or low self-worth, fatigue, insomnia, and disturbed appetite. Depression may also lead to suicidal ideation and actions (NIMH, 2011b; WHO, 2011). In addition, postpartum depression is a condition specific to new mothers. Depression can occur throughout the life course, from childhood to late in life.

### Prevalence/Burden

Adolescence is perhaps the most critical time period for recognizing mental health issues. Half of all mental disorders diagnosed in adulthood develop in puberty, by age 14 years (Merikangas et al., 2010). Data from the Behavioral Risk Factor Surveillance System (BRFSS) survey from 2008 revealed that young adults aged 18 to 24 years experienced the highest rates of current depression at 10.9 percent. The 45- to 64-year-old adult age

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA920                    JA-0000513

group experienced the next highest rates at 10 percent (CDC, 2010a). Adolescents and young adults also have high rates of suicide, which accounts for 12.2 percent of deaths among 15- to 24-year-olds annually (CDC, 2010b). In 2009, one in seven U.S. high school students reported that he/she had seriously considered attempting suicide over the past 12 months, and 6.3 percent reported that they had made at least one attempt during this time period. Suicide rates in women are highest over the age range of 45 to 54 years (CDC, 2010b). Across the life course, women may develop depression more often or more prominently around the time of certain reproductive events, such as menstruation, pregnancy, loss of a baby, birth of a baby, infertility, and menopause (ACOG, 2008).

Women are consistently rated as a high-risk group for depression (Kessler, 2003; Kessler et al., 2003) because depression is significantly more prevalent in women than in men at almost twice the rate. According to data from the BRFSS survey from 2008, 4 percent of women currently fit the criteria for major depression, whereas the rate was 2.7 percent among the surveyed men (CDC, 2010a). This disproportionate ratio emerges in adolescence, between ages 10 and 15 years (Angold et al., 1998). A lifetime experience of abuse, which women experience at higher rates, contributes to the development of depression, as well as suicide ideation and suicide (NIMH, 2011a,b; Tjaden and Thoennes, 1998).

Although death rates by suicide are higher among men, women attempt suicide two to three times more often (WHO, 2002). Existing mental disorders, particularly mood disorders like depression, are often seen as a precursor to a suicide attempt (Bertolote et al., 2003; Henriksson et al., 1993; Mann et al., 2005; Robins et al., 1959). Data from psychological autopsy studies have revealed that diagnoses of clinical mental disorders were found in nearly all suicide victims. The most prevalent disorders were depression and alcohol dependence or abuse. A diagnosis of major depression was documented in 46 percent of female suicide victims (of 26 percent of male suicide victims) (Henriksson et al., 1993). Minority sexual orientation and disclosure of sexuality are associated with various rates of suicidal ideation in women. In a U.S. survey of women, lesbians and bisexual women who were not "out" were more likely to have attempted suicide than heterosexual women (Koh and Ross, 2006).

Between 10 and 20 percent of mothers experience postpartum depression within the first year after giving birth, which has significant consequences for both the child's development and the mother's well-being (Chaudron et al., 2004; Freeman et al., 2005; Mishina and Takayama, 2009). Although it is common for new mothers to experience feelings of sadness, anxiety, and mood swings after giving birth, these "baby blues" last for a short period of time and are not severe. Postpartum depression symptoms are markedly more severe, last longer than two weeks, and require treatment from a trained professional (womenshealth.gov). Women

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA921                    JA-0000514

with postpartum depression are at risk for future depression, including recurrent postpartum depression. Like other instances of depression, postpartum depression can lead to suicidal ideation. One in five postpartum maternal deaths is a result of suicide (Lindahl et al., 2005). Mothers with postpartum depression may have difficulty with mother-infant bonding or have thoughts of harming their infant. They may also have impaired attention to pediatric preventive practices, like the use of care safety seats and pediatric health care utilization (Chaudron et al., 2004).

Diagnosis of postpartum depression is challenging for a number of reasons. Women who did not receive their pregnancy care from a family physician may be confused about who to turn to, if they are not scheduled to visit their obstetrician-gynecologist until a year later or if they view their pediatrician as purely their child's doctor. Symptoms of postpartum depression such as sleep disturbance, loss of energy, weight loss, and diminished concentration may be seen as normal sequelae of childbirth and not recognized as a marker of illness (Epperson, 1999).

## Existing Guidelines and Recommendations

---

### USPSTF Recommendations

The USPSTF recommends screening adults for depression when staff-assisted depression care supports are in place to assure accurate diagnosis, effective treatment, and follow-up. Grade B recommendation (USPSTF, 2009g).

The USPSTF recommends against routinely screening adults for depression when staff-assisted depression care supports are not in place. There may be considerations that support screening for depression in an individual patient. Grade C recommendation (USPSTF, 2009g).

The USPSTF recommends screening of adolescents (12–18 years of age) for major depressive disorder (MDD) when systems are in place to ensure accurate diagnosis, psychotherapy (cognitive-behavioral or interpersonal), and follow-up. Grade B recommendation (USPSTF, 2009d).

The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of screening of children (7–11 years of age). Grade I statement (USPSTF, 2009d).

The USPSTF concludes that the evidence is insufficient to recommend for or against routine screening by primary care clinicians to detect suicide risk in the general population. Grade I Statement (USPSTF, 2004).

---

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA922                          JA-0000515

Bright Futures identifies emotional well-being and mental health to be priority screening areas for adolescents from ages 11 to 21 years and directs physicians to screen for depression and suicidal thoughts through the use of sample questions and anticipatory guidance. Bright Futures also recommends that mothers be screened for postpartum depression during the first- and second-month infant visits (AAP, 2008).

To help bring awareness to and combat the high rates of depression, the Institute of Medicine's (IOM's) report *Leading Health Indicators* recommended that *Healthy People 2020* (HHS, 2011) adopt a reduction in the proportion of people who experience major depressive episodes as one of its objectives (IOM, 2011). *Healthy People 2020* has already set a goal of increasing rates of screening for depression in primary care (HHS, 2011). In 1999, the U.S. Surgeon General identified suicide to be a major public health issue in the report *Call to Action to Prevent Suicide*, and current *Healthy People 2020* goals are to reduce the suicide rate overall, particularly for adolescents (HHS, 1999, 2011).

Professional organizations have also published guidelines on screening for suicide and postpartum depression, in addition to the depression screening that is already recommended by the USPSTF. The American College of Obstetricians and Gynecologists (ACOG) recommends a psychosocial evaluation that includes asking about suicide and depressive symptoms in patients aged 13 through 18 years (ACOG, 2007b). The American Medical Association (AMA) advises physicians with adolescent patients to ask about behaviors or emotions that indicate severe depression or suicidal thoughts on an annual basis (AMA, 1997). ACOG recommends that women be counseled about postpartum depression during the third trimester of pregnancy and that obstetricians-gynecologists consult with their patients about their risk of psychiatric illness during the postpartum period (ACOG, 2007a). ACOG also recommends that postpartum counseling take place as part of preconception care (ACOG, 2007b). In recognition of the underdiagnosis of postpartum depression, the U.S. Department of Veterans Affairs (VA) Clinical Practice Guideline for the Management of Major Depressive Disorder states that women receiving care through the VA be screened for depression at first contact with health care services in the antenatal and postnatal periods, separate from its guidelines on screening for depression in the general patient population (VA, 2009).

## Effective Interventions

Depression is a condition commonly encountered in primary care because people with major depression utilize health care at high rates. A review of the evidence of rates of primary care and mental health specialist contact rates in select developed countries revealed that 45 percent

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA923                    JA-0000516

Case 1:25-cv-25740-WB Document 34-3 25 Page: 262 d 09/202 Filed 12/12/2025 330

of suicide victims visit their primary care provider within one month of the suicide (Luoma et al., 2002). Moreover, increased rates of physician education and recognition of depression in primary care are associated with a reduction in the accompanying suicide rates (Mann et al., 2005). This evidence points to the utility of screening for depression in a primary care setting as a method of suicide prevention. However, the most recent systematic review of the evidence by the USPSTF, which was in 2004, found insufficient evidence to routinely screen for suicide risk in the general population (Gaynes et al., 2004).

Postpartum depression can be screened for and detected in the context of a well-child visit, as Bright Futures already recommends (AAP, 2008; Chaudron et al., 2004; Freeman et al., 2005; Mishina and Takayama, 2009). Six states (Illinois, Iowa, Kentucky, Pennsylvania, Louisiana, and Massachusetts) have implemented projects funded by the Health Resources and Services Administration to increase rates of screening for postpartum depression by increasing awareness, assessment, and treatment and joining the maternal and infant health care systems (Shade et al., 2011). The USPSTF recommendation for screening for depression does not address postpartum depression or denotes new mothers to be a high-risk group.

Mental health issues are increasingly becoming a part of primary care, in part because of increased physician education (Kessler et al., 2007). Although the numbers of patients who receive outpatient treatment for depression have increased, most individuals with depression receive inadequate care for their symptoms (Olfson et al., 2002). Among those receiving mental health services, more than one-fifth of patients received their treatment from a general medical provider (Wang et al., 2005). Psychotherapy treatment has decreased, whereas prescriptions for antidepressants have increased, including in children and adolescents, in part because of managed care plan support of pharmaceuticals over specialty care and also the challenges of providing psychotherapy in a physician's office, including but not limited to time constraints (Ma et al., 2005; Olfson et al., 2002; Pignone et al., 2002). Under the Mental Health Parity and Addiction Equity Act of 2008, group health plans and health insurance issuers must not place dollar limits on mental health benefits that are any lower than limits for medical and surgical benefits (DOL, 2011). Mental health benefits for depression would include ongoing psychotherapy and pharmacotherapy treatments.

## Identified Gap

The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is that the current

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                                                  JA-0000517

recommendation for depression screening and follow-up does not address suicide and postpartum depression as related conditions to be evaluated. The committee found insufficient evidence to support a new recommendation; instead, evidence supported by systematic reviews, federal agendas from *Healthy People 2020* (HHS, 2011), and the U.S. Surgeon General, as well as clinical professional guidelines and federal practice guidelines support the reasonableness of including screening for suicide ideation and postpartum depression in women who are pregnant and/or who have recently given birth during the context of a well-woman visit.

## TOBACCO USE

Tobacco use in the form of cigarette smoking is the leading cause of preventable morbidity and mortality in the United States. Quitting smoking with the help of cessation aids such as counseling and pharmacotherapy greatly improves a woman's health and well-being. Women of all ages should be encouraged and aided in their efforts to quit smoking, although pharmacotherapy is currently approved only for those over 18 years.

### Prevalence/Burden

From 2000 to 2004, there were approximately 270,000 smoking-attributable deaths annually among males and approximately 174,000 smoking-attributable deaths annually among females (CDC, 2008a). Approximately 90 percent of lung cancer deaths are due to smoking (Stewart et al., 2008). Almost all tobacco use in women consists of cigarette smoking (SAMHSA, 2004). Although trends in the prevalence of smoking show that it is lower among women than men, between 1955 and 1995 the prevalence of smoking decreased more rapidly among men (Chilcoat, 2009). After 1995, a gradual decrease in the incidence of cigarette smoking occurred for both men and women. Data from the 2009 National Health Interview Survey show that in 1997, 27.6 percent of men and 22.1 percent of women reported being current smokers (CDC, 1999), whereas in 2009, 23.5 percent of men and 17.9 percent of women reported being current smokers (CDC, 2010c). Although the gap in smoking prevalence between men and women has narrowed considerably over time, these trends differ across levels of educational attainment. Women with less education appear to be a group at particularly high risk (Chilcoat, 2009).

In addition to lung cancer, smoking increases women's risk of developing uterine, cervix, and other cancers, including cancers of the head and neck, pancreas, kidney, and bladder. Smoking doubles a woman's risk of developing coronary heart disease (HHS, 2001). Women who smoke and

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA925                                    JA-0000518

concurrently use oral contraceptives are at a 30-fold increased risk for myocardial infarction and a 3-fold increased risk of stroke compared with nonsmokers (Burkman et al., 2004). Postmenopausal women who smoke have lower bone density than women who never smoked, and they have an increased risk for hip fracture than woman who never smoked (HHS, 2001; Law et al., 1997). Cigarette smoking also increases the risk for infertility, and smoking during pregnancy may result in negative reproductive and developmental effects, including premature birth, stillbirth, low birth weight, intrauterine growth retardation, and sudden infant death syndrome (Ashford et al., 2010; Behm et al., 2011; IOM, 2011; Khader et al., 2011; Ye et al., 2010).

Smoking cessation may be more difficult for women for a number of reasons. Women metabolize nicotine faster than men, and oral contraceptives lead to an even faster rate of metabolization of nicotine (Benowitz, 2008; Benowitz et al., 2006). The faster rate of metabolism found in women may contribute to a higher level of nicotine addiction. In addition, smoking and depression are strongly linked, and women suffer higher rates of depression, which may make quitting smoking more difficult (Smith et al., 2003b). Women may be motivated to quit for different reasons than men, such as improving fertility and reproductive health, pregnancy outcomes, physical appearance, and health problems that occur predominantly in women, such as osteoporosis (Smith et al., 2003b).

Most cases of tobacco dependence begin during childhood and adolescence (Fiore et al., 2008). The younger that a person is when he or she starts smoking, the more likely it is that the person will become dependent on nicotine and the more difficult it will be to quit (IOM, 1994). Only about 4 percent of young smokers are successful in quitting each year. Between 1991 and 2009, the prevalence rates of current cigarette smoking in high school students were similar in males and females and have shown a gradual decline over the past decade (Latimer and Zur, 2010). During this period, the prevalence of smoking decreased from 27.3 to 19.1 percent in females and from 27.6 to 19.8 percent in males (Garrett et al., 2011). Among adolescents 12 to 17 years of age, the prevalence of tobacco use is 11.4 percent (CDC, 2010e), and it has been found that tobacco use during adolescence is associated with risky sexual behavior and use of alcohol and other drugs (Latimer and Zur, 2010).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                         JA926                              JA-0000519

## Existing Guidelines and Recommendations

> **USPSTF Recommendations**
>
> The USPSTF recommends that clinicians ask all adults about tobacco use and provide tobacco cessation interventions for those who use tobacco products. Grade A recommendation (USPSTF, 2009b).
>
> The USPSTF recommends that clinicians ask all pregnant women about tobacco use and provide augmented, pregnancy-tailored counseling for those who smoke. Grade A recommendation (USPSTF, 2009b).
>
> The USPSTF concludes that the evidence is insufficient to recommend for or against routine screening for tobacco use or interventions to prevent and treat tobacco use and dependence among children or adolescents. Grade I statement (USPSTF, 2003c).

The 2008 Public Health Service Guideline Update Panel (Fiore et al., 2008) made 10 recommendations regarding effective interventions delivered in health care settings. The updated guidelines were sponsored by eight federal government and private nonprofit organizations, including the Adolescent Health Research Program, the Centers for Disease Control and Prevention (CDC), the National Cancer Institute (NCI), the National Heart, Lung, and Blood Institute (NHLBI), the National Institute on Drug Abuse (NIDA), the American Legacy Foundation, the Robert Wood Johnson Foundation, and the University of Wisconsin Center for Tobacco Research and Intervention. These recommendations go beyond those of the USPSTF, in that they provide in detail the specific types of behavioral interventions and pharmacological treatments that clinicians can recommend to patients. The guideline panel noted that providing coverage for these treatments increased quit rates, and it recommended that all insurance plans include coverage for the strategies that it identified to be effective. The Partnership for Prevention supports the more detailed recommendations of the panel on the tobacco cessation services that should be covered by health insurance, including recognition that quitting often requires multiple or repeated interventions (Richland, 2011).

The panel emphasized that tobacco cessation interventions be interpreted to include both counseling and FDA-approved and over-the-counter medications. These recommendations have been echoed by numerous federal agencies and national medical and health associations and are consistent with the mandates of the Affordable Care Act (ACA) and the Centers

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                     JA927                                      JA-0000520

Clinical Preventive Services for Women. Closing the Gaps

Case: 25-2575-VDB Document: 34-3 Page: 266 Date Filed: 12/12/2025

for Medicare and Medicaid Services to provide expanded coverage for tobacco screening and cessation services delivered in health care settings (Morris et al., 2011).

A number of organizations have made recommendations regarding screening for and counseling about tobacco use in adolescents (ACOG, 2010; Binns et al., 2009; Fiore et al., 2008; Gostin et al., 1997; Marwick, 1997). The 2008 guideline panel made specific recommendations for children and adolescents. It recommended that clinicians (1) ask their pediatric and adolescent patients about tobacco use and provide a strong message about abstaining from tobacco use (strength of evidence C); (2) provide counseling interventions to facilitate cessation (strength of evidence B); and (3) ask parents about tobacco use and offer cessation advice and assistance to quit (strength of evidence B).

## Effective Interventions

A number of intervention strategies, including behavioral counseling and pharmacotherapies, have been shown to be effective for tobacco cessation when they are delivered in a primary care setting to nonpregnant adults aged 18 years and over (USPSTF, 2009c). The USPSTF concluded that a dose-response relation between quit rates and the intensity of counseling exists. Providing more sessions or increasing the length of sessions increased quit rates. Components of counseling strategies that were effective included instruction in problem solving and coping techniques, goal setting, developing a plan for quitting, motivational interviewing, telephone quit lines, and referrals. Combining counseling with pharmacotherapy was more effective than either approach alone. Although women appear to benefit from the same interventions as men, the data are inconsistent as to whether they benefit as much and what types of interventions are the most effective for women (Fiore et al., 2008; Munafo et al., 2004; Perkins and Scott, 2008). One meta-analysis found that the efficacy of nicotine replacement therapy was less effective in women than in men (Perkins and Scott, 2008); however, other meta-analyses have shown equivalent benefits in men and women (Baker et al., 2011; Killen et al., 2002). Behavioral interventions, such as tailored educational messages and self-help materials, were found to increase abstinence from smoking during pregnancy, but the USPSTF found inadequate evidence to evaluate the safety or efficacy of pharmacotherapy during pregnancy (USPSTF, 2009c).

In a systematic review conducted by the National Commission on Prevention Priorities for the Partnership for Prevention, screening for tobacco use and brief intervention counseling with an offer of pharmacotherapy ranked third of 25 clinical preventive services in terms of the most beneficial services to offer patients (Maciosek et al., 2009, 2010). The percent-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA928                    JA-0000521

age of adult smokers who visited a clinician within the past year and who reported that they received advice to quit was about 68 percent, but only about 35 percent of smokers received brief counseling in which medication and cessation strategies recommended by the USPSTF were discussed (CDC, 2003; NCQA, 2005). Likewise, identifying and counseling adolescent smokers are estimated to occur in only 33 to 42 percent of physician visits and about 20 percent of dental visits (Alfano et al., 2002; Shelley et al., 2005).

Most behavior change intervention studies of smoking cessation and prevention in youth and adolescents have been conducted in school or community settings. Scant data on intervention strategies delivered in clinical settings are available, and the existing data are inconsistent (Fiore et al., 2008; Grimshaw and Stanton, 2006). In an analysis of seven studies comparing counseling with usual care or no treatment, the long-term abstinence rate doubled for the groups receiving counseling; however, the absolute abstinence rate was low (Fiore et al., 2008). Effective strategies varied in content, format, and intensity and included brief advice, educational pamphlets, self-help materials, and/or referrals. No data were available on whether these strategies were equally effective in boys and girls when they were offered in clinical settings. An update of the Surgeon General's report on preventing tobacco use among young people is expected to be released by December 2011 (in press).

## Identified Gap

The primary gap in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) is that while tobacco cessation aids and counseling are recommended, the potential need for multiple interventions defined by the Public Health Service Guidelines, which include pharmacotherapy, in helping women to quit smoking are not addressed. The committee found insufficient evidence to develop a new recommendation; instead, the evidence supported by high-quality systematic reviews, supportive systematic reviews, federal agendas from the CDC, NCI, NHLBI, and NIDA, as well as clinical professional guidelines, led to a clarifying statement, which was added to the USPSTF recommendation.

## Clarification Statement

In recognizing that women may need more than one type of intervention for successful tobacco cessation, the committee interprets the current USPSTF recommendation regarding tobacco use screening and cessation to consider including both counseling and FDA-approved and over-the-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA929 JA-0000522

counter medications. Additionally, it is appropriate for pregnant women who smoke to receive counseling that is tailored to their needs.

## DIET/PHYSICAL ACTIVITY

An unhealthy diet and physical inactivity are associated with the leading causes of morbidity and mortality among women in the United States. Counseling patients in a clinical setting offers an opportunity to motivate women to adopt healthy dietary and physical activity behaviors. The target populations for diet and physical activity counseling are adult women 18 years of age and older, pregnant women of any age, and adolescent females.

### Prevalence/Burden

Physical inactivity is associated with increased risk of all-cause mortality, coronary heart disease, high blood pressure, stroke, type 2 diabetes, metabolic syndrome, colon cancer, breast cancer, osteoporotic fractures, falls, and depression. Regular physical activity during pregnancy may reduce the risk of preterm birth, low birth weight, early pregnancy loss, and chronic health problems in the offspring; and moderate-intensity physical activity may increase cardiorespiratory and metabolic fitness (Physical Activity Guidelines Advisory Committee, 2008).

The benefits of physical activity in children and adolescents have been less studied; however, data support the findings that important health and fitness benefits accrue to children and adolescents who participate in 60 or more minutes of moderate to vigorous physical activity daily. Regular exercise helps control weight and build and maintain strong bones and confers positive psychological benefits (CDC, 2008b; Physical Activity Guidelines Advisory Committee, 2008).

Data from the 2008 National Health Interview Survey show that women are less likely than men to be highly active and are more likely to be insufficiently active and inactive (Carlson et al., 2010). Every year from 1998 through 2008, women were less likely to be aerobically active, according to *Healthy People 2010* criteria (Carlson et al., 2010; HHS, 2011). In 2008, 33 percent of men but only 24 percent of women were highly active. Data from the BRFSS also show that women are less active than men for every measure of physical activity (e.g., recommended physical activity, insufficient physical activity, inactivity, and no leisure-time physical activity), and this pattern was consistent from 2001 through 2008 (CDC, 2008c).

As the prevalence of physical activity has decreased, the prevalence of

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA930                          JA-0000523

unhealthy eating behaviors has increased, contributing to an epidemic of obesity in the United States. Men and women appear to be equally at risk for obesity. In the 2009 BRFSS survey, 27.4 percent of men and 26 percent of women were obese, as measured from the body mass index (CDC, 2010d). Data from the first National Health and Nutrition Examination Survey (NHANES I) for the period from 1971 to 1975 compared with data from the 2005 and 2006 NHANES show that the percentage of overweight and obese men and women has increased substantially. For women, the proportion who were overweight or obese increased from 40.7 to 61.5 percent; for men, the increase was from 52.9 to 73.6 percent (Austin et al., 2011).

In contrast to the male-female differences in physical activity, women are more likely than men to report that they eat a healthier diet. In the 2009 BRFSS survey, 36.1 percent of women and 28.7 percent of men reported eating fruit two or more times a day (2010). Women were also more likely than men to report eating vegetables three or more times a day: 30.9 and 21.4 percent for women and men, respectively. This pattern has been consistent since 1996 (CDC, 1996; Serdula et al., 2004). Despite these differences, the average intake of carbohydrates, protein, total fat, and saturated fat as a percentage of total kilocalories was similar for men and women (Wright and Wang, 2010).

Healthy diet and physical activity during pregnancy have health benefits for the woman and her child (Physical Activity Guidelines Advisory Committee, 2008). Moreover, 20 percent of women are obese when they become pregnant (Van Horn, 2010), indicating that they may not be receiving appropriate nutrients or maintaining a healthy diet. Many women put on excess weight during pregnancy and have difficulty losing it afterwards, but during the postpartum period, physical activity alone will not produce weight loss unless it is coupled with dietary changes. The importance of proper nutritional intake and proper eating behavior during pregnancy was underscored by the 2010 Dietary Guidelines Advisory Committee, which recommended that future reports include dietary recommendations from birth (Van Horn, 2010).

Similar to the pattern for adult females, data from the Youth Risk Behavioral Surveillance System show that the self-reported prevalence of physical activity is substantially lower in girls than in boys and remained so from 1993 to 2009 (CDC, 2011). During that period, there was a marked decrease in the percentage of adolescents who met the recommended physical activity levels. In 1993, 75 percent of boys and 56 percent of girls met the recommended levels. In 2009, only 46 percent of boys and 28 percent of girls met the recommended activity levels (CDC, 2011).

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                           JA931                              JA-0000524

Existing Guidelines and Recommendations

**USPSTF Recommendations**

The USPSTF concludes that the evidence is insufficient to recommend for or against routine behavioral counseling to promote a healthy diet in unselected patients in primary care settings. Grade I statement (USPSTF, 2003a).

The USPSTF recommends intensive behavioral dietary counseling for adult patients with hyperlipidemia and other known risk factors for cardiovascular and diet-related chronic disease. Intensive counseling can be delivered by primary care clinicians or by referral to other specialists, such as nutritionists or dietitians. Grade B recommendation (USPSTF, 2003a).

The USPSTF concludes that the evidence is insufficient to recommend for or against behavioral counseling in primary care settings to promote physical activity. Grade I statement (USPSTF, 2002a).

The USPSTF is in the process of updating its 2002 recommendation on behavioral counseling to promote physical activity (Berg et al., 2002) and its 2003 recommendation on behavioral counseling to promote a healthy diet in adults (USPSTF, 2003b). The earlier systematic reviews found insufficient evidence to recommend for or against behavioral counseling in primary care settings to promote either physical activity or healthy dietary behaviors in adults without preexisting cardiovascular disease or its risk factors (2003; Berg et al., 2002). An updated draft recommendation statement was available for comment from February 22 to March 22, 2011 (USPSTF, 2011b). This recommendation (Lin et al., 2010) will replace the USPSTF's previous separate recommendations on behavioral counseling to promote a healthful diet (USPSTF, 2003b) and physical activity (Berg et al., 2002).

Although the 2003 recommendation on dietary counseling included a positive recommendation for counseling adults with risk factors for cardiovascular disease (Grade B recommendation) (USPSTF, 2003b), the updated statement does not include a recommendation for this subgroup (Lin et al., 2010). On the basis of the updated systematic review, the USPSTF concluded that "the average benefit of primary care behavioral counseling interventions to promote a healthful diet and/or physical activity for cardiovascular disease prevention is small. Clinicians may consider selectively providing or referring individual patients for medium- or high-intensity behavioral counseling interventions" (Grade C recommendation) (USPSTF, 2011b).

Bright Futures recommends that physicians calculate the body mass

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA932                    JA-0000525

Case 1:25-cv-03510-VM Document 34-3 Page: 271 Filed 09/02/25 Date Filed 12/12/2025

index for patients ages 10 to 21 years and discuss healthy diet and physical activity through the provision of anticipatory guidance (AAP, 2008). The AMA also advises physicians to provide adolescents with annual guidance about healthy dietary habits and the benefits of engaging in physical activity on a regular basis (Copperman, 1997).

### Effective Interventions

Counseling about diet and physical activity in the primary care setting provides an opportunity to mitigate the negative health outcomes associated with poor dietary behaviors and physical inactivity. The systematic review conducted for the USPSTF (Lin et al., 2010) identified 66 trials of counseling to promote physical activity, a healthy diet, or both. The outcomes measured in these trials included morbidity and mortality related to cardiovascular disease, risk factors for cardiovascular disease, and self-reported dietary and physical activity behaviors. High-intensity counseling about a healthy diet with or without counseling about physical activity resulted in positive changes in body mass index (adiposity), systolic and diastolic blood pressure, and total and low-density lipoprotein cholesterol levels. Medium- and high-intensity physical activity counseling interventions resulted in small increases in physical activity levels, although data for low-intensity interventions were inconsistent. Reductions in self-reported fat intake were observed at all levels of intervention intensity, but high-intensity interventions resulted in larger reductions. Increased fruit and vegetable consumption was observed at all levels of intervention intensity. Very few trials had periods of follow-up beyond 12 months, thus the long-term effects of the counseling interventions about dietary patterns is unknown.

Although all of the trials were conducted in health care settings or recruited participants from health care settings, the role of the primary care provider was minimal in some of the studies.

Virtually all of the trials included women; however, very few provided gender-specific comparisons of the impact of the interventions on health-related outcomes, and very few studies included women during pregnancy or the postpartum period (Lin et al., 2010). An earlier review examined diet and physical activity interventions delivered in health care settings only to women (Wilcox et al., 2001). Findings from these earlier studies were consistent with the positive results of the USPSTF review for body mass index; systolic and diastolic blood pressure; and total cholesterol, low-density lipoprotein cholesterol, dietary fat, and physical activity levels. Although effect size estimates, as measured by the mean correlation coefficient, were small, they were statistically significant. Results for dietary fiber, energy in-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA933                                    JA-0000526

202                              *CLINICAL PREVENTIVE SERVICES FOR WOMEN*

take, general dietary factors, and high-density lipoprotein cholesterol were not statistically significant (Wilcox et al., 2001).

The AHA recently reviewed interventions to promote physical activity and dietary changes and issued recommendations for counseling people to increase their levels of physical activity and make healthy dietary changes. Although the review was not limited to interventions delivered in a clinical setting, the group made recommendations about strategies that clinicians could use in primary care settings to assist adults in adopting and maintaining health dietary and physical activity behaviors, including the use of cognitive-behavioral strategies and modifying interventions to be appropriate to the patient's social and cultural context (Artinian et al., 2010).

Most intervention studies to promote a healthy diet or physical activity in children and adolescents have been conducted in school or community settings. Interventions conducted in clinical settings have targeted overweight and obese children (Summerbell et al., 2003; Whitlock et al., 2010). A 2006 report of the USPSTF on screening and interventions that targeted overweight children and adolescents found insufficient evidence for the effectiveness of behavioral counseling or other preventive interventions that could be conducted in primary care settings or to which primary care clinicians could make referrals. However, some reviews of interventions for preventing obesity in children and adolescents have been conducted (Summerbell et al., 2003; Whitlock et al., 2010).

### Identified Gaps

The primary gaps in preventive services not already addressed by the provisions set forth in the ACA (reviewed in this section) are the lack of interventions in primary care practice that address healthy diet and physical activity. The committee found insufficient evidence to develop a new recommendation; instead, the evidence supported by high-quality systematic evidence reviews and clinical practice guidelines, as well as the draft recommendation statement from the USPSTF (indicating that medium- to high-intensity interventions for diet and physical activity led to small benefits toward prevention of cardiovascular disease), led to support for the reasonableness of including diet and physical activity counseling during a well-woman visit.

### REFERENCES

AAP (American Academy of Pediatrics). 2008. *Bright Futures: Guidelines for health supervision of infants, children and adolescents*, 3rd ed. (J. F. Hagan, J. S. Shaw, and P. M. Duncan, eds.). Elk Grove Village, IL: American Academy of Pediatrics.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA934                              JA-0000527

ACOG (American College of Obstetricians and Gynecologists). 2007a. *Guidelines for perinatal care*, 6th ed. Washington, DC: American College of Obstetricians and Gynecologists.

ACOG. 2007b. *Guidelines for women's health care*, 3rd. ed. Washington, DC: American College of Obstetricians and Gynecologists.

ACOG. 2008. *ACOG education pamphlet AP106—Depression*. Washington, DC: American College of Obstetricians and Gynecologists. http://www.acog.org/publications/patient_education/bp106.cfm (accessed May 6, 2011).

ACOG. 2010. Committee Opinion No. 471: Smoking cessation during pregnancy. *Obstetrics and Gynecology* 116(5):1241–1244.

ACS (American Cancer Society). 2010. *Facts and figures 2010*. Atlanta, GA: American Cancer Society.

ACS. 2011. *Can breast cancer be found early?* Atlanta, GA: American Cancer Society. http://www.cancer.org/Cancer/BreastCancer/DetailedGuide/breast-cancer-detection.

Alfano, C. M., S. M. Zbikowski, L. A. Robinson, R. C. Klesges, and I. C. Scarinci. 2002. Adolescent reports of physician counseling for smoking. *Pediatrics* 109(3):E47.

AMA (American Medical Association). 1997. *Guidelines for adolescent preventive services (GAPS)*. Chicago, IL: American Medical Association.

Amir, E., D. G. Evans, A. Shenton, F. Lalloo, A. Moran, C. Boggis, M. Wilson, A. Howell. 2003. Evaluation of breast cancer risk assessment packages in the family history evaluation and screening programme. *Journal of Medical Genetics* 40:807–814.

Anglian Breast Cancer Study Group. 2000. Prevalence and penetrance of BRCA1 and BRCA2 mutations in a population-based series of breast cancer cases. *British Journal of Cancer* 83(10):1301–1308.

Angold, A., E. J. Costello, and C. M. Worthman. 1998. Puberty and depression: The roles of age, pubertal status and pubertal timing. *Psychological Medicine* 28(1):51–61.

Arpino, G., R. Laucirica, and R. M. Elledge. 2005. Premalignant and in situ breast disease: Biology and clinical implications. *Annals of Internal Medicine* 143:446–457.

Artinian, N. T., G. F. Fletcher, D. Mozaffarian, P. Kris-Etherton, L. Van Horn, A. H. Lichtenstein, S. Kumanyika, W. E. Kraus, J. L. Fleg, N. S. Redeker, J. C. Meininger, J. Banks, E. M. Stuart-Shor, B. J. Fletcher, T. D. Miller, S. Hughes, L. T. Braun, L. A. Kopin, K. Berra, L. L. Hayman, L. J. Ewing, P. A. Ades, J. L. Durstine, N. Houston-Miller, L. E. Burke, and American Heart Association Prevention Committee of the Council on Cardiovascular Nursing. 2010. Interventions to promote physical activity and dietary lifestyle changes for cardiovascular risk factor reduction in adults a scientific statement from the American Heart Association. *Circulation* 122(4):406–441.

Ashford, K. B., E. Hahn, L. Hall, M. K. Rayens, M. Noland, and J. E. Ferguson. 2010. The effects of prenatal secondhand smoke exposure on preterm birth and neonatal outcomes. *Journal of Obstetric, Gynecologic, and Neonatal Nursing* 39(5):525–535.

Austin, G. L., L. G. Ogden, and J. O. Hill. 2011. Trends in carbohydrate, fat, and protein intakes and association with energy intake in normal-weight, overweight, and obese individuals: 1971–2006. *American Journal of Clinical Nutrition* 93(4):836–843.

Bairey Merz, C. N., L. J. Shaw, S. E. Reis, V. Bittner, S. F. Kelsey, M. Olson, B. D. Johnson, C. J. Pepine, S. Mankad, B. L. Sharaf, W. J. Rogers, G. M. Pohost, A. Lerman, A. A. Quyyumi, and G. Sopko. 2006. Insights from the NHLBI-Sponsored Women's Ischemia Syndrome Evaluation (WISE) study. Part II. Gender differences in presentation, diagnosis, and outcome with regard to gender-based pathophysiology of atherosclerosis and macrovascular and microvascular coronary disease. *Journal of the American College of Cardiology* 47(3 Suppl.):S21–S29.

Baker, T. B., R. Mermelstein, L. M. Collins, M. E. Piper, D. E. Jorenby, S. S. Smith, B. A. Christiansen, T. R. Schlam, J. W. Cook, and M. C. Fiore. 2011. New methods for tobacco dependence treatment research. *Annals of Behavioral Medicine* 41(2):192–207.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA935                                    JA-0000528

Behm, I., Z. Kabir, G. N. Connolly, and H. R. Alpert. 2011. Increasing prevalence of smoke-free homes and decreasing rates of sudden infant death syndrome in the United States: An ecological association study. *Tobacco Control.* Epub Apr 7.

Bellamy, L., J. P. Casas, A. D. Hingorani, and D. J. Williams. 2007. Pre-eclampsia and risk of cardiovascular disease and cancer in later life: Systematic review and meta-analysis. *BMJ* 335 (7627):974.

Benowitz, N. L. 2008. Clinical pharmacology of nicotine: Implications for understanding, preventing, and treating tobacco addiction. *Clinical Pharmacology & Therapeutics* 83(4):531–541.

Benowitz, N. L., C. N. Lessov-Schlaggar, G. E. Swan, and P. Jacob. 2006. Female sex and oral contraceptive use accelerate nicotine metabolism. *Clinical Pharmacology & Therapeutics* 79(5):480–488.

Berg, A. O., J. D. Allan, P. Frame, C. J. Homer, M. S. Johnson, J. D. Klein, T. A. Lieu, C. D. Mulrow, T. C. Orleans, J. F. Peipert, N. J. Pender, A. L. Siu, S. M. Teutsch, C. Westhoff, S. H. Woolf, and United States Preventive Services Task Force. 2002. Behavioral counseling in primary care to promote physical activity: Recommendation and rationale. *Annals of Internal Medicine* 137(3):205–207.

Bertolote, J. M., A. Fleischmann, D. De Leo, and D. Wasserman. 2003. Suicide and mental disorders: Do we know enough? *British Journal of Psychiatry* 183:382–383.

Binns, H. J., J. A. Forman, C. J. Karr, J. A. Paulson, K. C. Osterhoudt, J. R. Roberts, M. T. Sandel, J. M. Seltzer, R. O. Wright, D. Best, E. Blackburn, M. Anderson, S. Savage, W. J. Rogan, P. Spire, J. F. Williams, M. Behnke, P. K. Kokotailo, S. J. Levy, T. H. Sims, M. J. Wunsch, D. Simkin, K. S. Smith, M. J. Blythe, M. S. Barratt, P. K. Braverman, P. J. Murray, D. S. Rosen, W. M. Seigel, C. J. Wibbelsman, L. L. Breech, J. L. Pinzon, B. Shain, K. S. Smith, K. R. Moore, J. T. Bell, R. A. Etzel, B. D. Hoffman, S. W. Ponder, M. M. Redding, D. Waldron, K. L. Dubray, K. J. Lund, K. Saylor, M. G. Storck, S. A. Holve, J. K. Thierry, S. Kim, and S. Kim. 2009. Policy statement-tobacco use: A pediatric disease. *Pediatrics* 124(5):1474–1487.

Bliuc, D., N. D. Nguyen, V. E. Milch, T. V. Nguyen, J. A. Eisman, and J. R. Center. 2009. Mortality risk associated with low-trauma osteoporotic fracture and subsequent fracture in men and women. *Journal of the American Medical Association* 301(5):513–521.

Bonow, R. O., D. L. Douglas, P. Z. Douglas, and P. Libby. 2011. *Braunwald's heart disease: A textbook of cardiovascular medicine.* 9th ed. Philadelphia, PA: Elsevier.

Bowen, D., C. Christensen, D. Powers, D. R. Graves, C. A. M. Anderson. 1998. Effects of counseling and ethnic identity on perceived risk and cancer worry in African American women. *Journal of Clinical Psychology in Medical Settings* 5:365–379.

Boyd, N. F., H. Guo, L. J. Martin, L. Sun, J. Stone, E. Fishell, R. A. Jong, G. Hislop, A. Chiarelli, S. Minkin, and M. J. Yaffe. 2007. Mammographic density and the risk and detection of breast cancer. *New England Journal of Medicine* 356:227–236.

Brekelmans, C. T., C. Seynaeve, C. C. Bartels, M. M. Tilanus-Linthorst, E. J. Meijers-Heijboer, C. M. Crepin, A. A. van Geel, M. Menke, L. C. Verhoog, A. van den Ouweland, I. M. Obdeijn, J. G. Klijn, and Rotterdam Committee for Medical and Genetic Counseling. 2001. Effectiveness of breast cancer surveillance in *BRCA1/2* gene mutation carriers and women with high familial risk. *Journal of Clinical Oncology* 19(4):924–930.

Burke, A. P., A. Farb, G. T. Malcom, Y. Liang, J. Smialek, and R. Virmani. 1998. Effect of risk factors on the mechanism of acute thrombosis and sudden coronary death in women. *Circulation* 97(21):2110–2116.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA936 JA-0000529

Burke, W., M. Daly, J. Garber, J. Botkin, M. J. Kahn, P. Lynch, A. McTiernan, K. Offit, J. Perlman, G. Peterson, E. Thomson, C. Varricchio. 1997. Recommendations for follow-up care of individuals with an inherited predisposition to cancer. II. *BRCA1* and *BRCA2*. Cancer Genetics Studies Consortium. *Journal of the American Medical Association* 277:997–1003.

Burkman, R., J. J. Schlesselman, and M. Zieman. 2004. Safety concerns and health benefits associated with oral contraception. *American Journal of Obstetrics and Gynecology* 190(4):S5–S22.

Canto, J. G., R. J. Goldberg, M. M. Hand, R. O. Bonow, G. Sopko, C. J. Pepine, and T. Long. 2007. Symptom presentation of women with acute coronary syndromes: myth vs reality. *Archives of Internal Medicine* 167(22):2405–2413.

Carlson, S. A., J. E. Fulton, C. A. Schoenborn, and F. Loustalot. 2010. Trend and prevalence estimates based on the 2008 physical activity guidelines for Americans. *American Journal of Preventive Medicine* 39(4):305–313.

Casper, M. L., E. Barnett, and G. I. Williams, Jr. 2011. *Atlas of stroke mortality: Racial, ethnic, and geographic disparities in the United States*. Atlanta, GA: Centers for Disease Control and Prevention. http://apps.nccd.cdc.gov/giscvh2/Selection.aspx (accessed May 18, 2011).

CDC (Centers for Disease Control and Prevention). 1996. *Behavioral Risk Factor Surveillance System Survey data*. Atlanta, GA: Centers for Disease Control and Prevention.

CDC. 1999. Cigarette smoking among adults—United States, 1997. *MMWR Morbidity Mortality Weekly Report* 48(43):993–996.

CDC. 2003. *National Health Interview Survey 2001*. Atlanta, GA: Centers for Disease Control and Prevention.

CDC. 2008a. Smoking-attributable mortality, years of potential life lost, and productivity losses—United States, 2000–2004. *MMWR Morbidity and Mortality Weekly Report* 57(45):1226–1228.

CDC. 2008b. *Physical activity and the health of young people*. Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/HealthyYouth/physicalactivity/pdf/facts.pdf (accessed May 20, 2011).

CDC. 2008c. *Behavioral Risk Factor Surveillance System Survey data*. Atlanta, GA: Centers for Disease Control and Prevention.

CDC. 2010a. Current depression among adults—United States, 2006 and 2008. *MMWR Morbidity and Mortality Weekly Report* 59(38):1229–1235.

CDC. 2010b. *Suicide: Facts at a glance*. Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/violenceprevention/pdf/Suicide_DataSheet-a.pdf (accessed April 27, 2011).

CDC. 2010c. Vital signs: Current cigarette smoking among adults aged >or=18 years United States, 2009. *MMWR Morbidity and Mortality Weekly Report* 59(35):1135–1140.

CDC. 2010d Vital signs: State-specific obesity prevalence among adults—United States, 2009. *MMWR Morbidity and Mortality Weekly Report* 59:1–5.

CDC. 2010e. Cigarette use among high school students—United States, 1991–2009. *MMWR Morbidity and Mortality Weekly Report* 59(26):797–801.

CDC. 2011. *YRBSS: Youth Risk Behavior Surveillance System*. Atlanta, GA: Centers for Disease Control and Prevention. http://www.cdc.gov/HealthyYouth/yrbs/ (accessed May 15, 2011).

Center, J. R., T. V. Nguyen, D. Schneider, P. N. Sambrook, and J. A. Eisman. 1999. Mortality after all major types of osteoporotic fracture in men and women: An observational study. *Lancet* 353(9156):878–882.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                   JA937                                   JA-0000530

Chaudron, L. H., P. G. Szilagyi, H. J. Kitzman, H. I. M. Wadkins, and Y. Conwell. 2004. Detection of postpartum depressive symptoms by screening at well-child visits. *Pediatrics* 113(3):551–558.

Chilcoat, H. D. 2009. An overview of the emergence of disparities in smoking prevalence, cessation, and adverse consequences among women. *Drug and Alcohol Dependence* 104(Suppl. 1):S17–23.

Claus, E. B., N. Risch, and W. D. Thompson. 1994. Autosomal dominant inheritance of early-onset breast cancer. Implications for risk prediction. *Cancer* 73:643–651.

Cleveland Clinic. 2011. *Metabolic syndrome.* Cleveland, OH. http://my.clevelandclinic.org/heart/women/metabolic.aspx.

Collaborative Group on Hormonal Factors in Breast Cancer. 2001. Familial breast cancer: Collaborative reanalysis of individual data from 52 epidemiological studies including 58,209 women with breast cancer and 101,986 women without the disease. *Lancet* 358:1389–1399.

Cummings, S. R., D. M. Black, D. E. Thompson, W. B. Applegate, E. Barrett-Connor, T. A. Musliner, L. Palermo, R. Prineas, S. M. Rubin, J. C. Scott, T. Vogt, R. Wallace, A. J. Yates, and A. Z. LaCroix. 1998. Effect of alendronate on risk of fracture in women with low bone density but without vertebral fractures: Results from the Fracture Intervention Trial. *Journal of the American Medical Association* 280(24):2077–2082.

DOL (U.S. Department of Labor). 2011. *Fact sheet: The Mental Health Parity Act.* Washington, DC: U.S. Department of Labor. http://www.dol.gov/ebsa/newsroom/fsmhparity.html (accessed May 26, 2011).

Domchek, S. M., A. Eisen, K. Calzone, J. Stopfer, A. Blackwood, B. L. Weber. 2003. Application of breast cancer risk prediction models in clinical practice. *Journal of Clinical Oncology* 21:593–601.

Epperson, C. N. 1999. Postpartum major depression: Detection and treatment. *American Family Physician* 59(8):2247–2254.

Ervin, R. B. 2009. Prevalence of metabolic syndrome among adults 20 years of age and over, by sex, age, race and ethnicity, and body mass index: United States, 2003–2006. *National Health Statistics Reports* 13:1–7.

*Federal Register.* 2010. Interim final rules for group health plans and health insurance issuers relating to coverage of preventive services under the patient protection and affordable care act. Federal Register 75(137):41726–41730.

Ferris, A., R. M. Robertson, R. Fabunmi, and L. Mosca. 2005. American Heart Association and American Stroke Association national survey of stroke risk awareness among women. *Circulation* 111(10):1321–1326.

Fiore, M. C., C. R. Jaen, T. B. Baker, W. C. Bailey, N. L. Benowitz, S. J. Curry, S. F. Dorfman, E. S. Froelicher, M. G. Goldstein, C. G. Healton, P. N. Henderson, R. B. Heyman, H. K. Koh, T. E. Kottke, H. A. Lando, R. E. Mecklenburg, R. J. Mermelstein, P. D. Mullen, C. T. Orleans, L. Robinson, M. L. Stitzer, A. C. Tommasello, L. Villejo, M. E. Wewers, E. W. Murray, G. Bennett, S. Heishman, C. Husten, G. Morgan, C. Williams, B. A. Christiansen, M. E. Piper, V. Hasselblad, D. Fraser, W. Theobald, M. Connell, and C. Leitzke. 2008. Treating tobacco use and dependence: 2008 update. U.S. Public Health Service clinical practice guideline executive summary. *Respiratory Care* 53(9):1217–1222.

FDA (Food and Drug Administration). 2011. *Drugs@FDA.* Silver Spring, MD: Food and Drug Administration. http://www.accessdata.fda.gov/scripts/cder/drugsatfda.

Ford, D., and D. F. Easton. 1995. The genetics of breast and ovarian cancer. *British Journal of Cancer* 72:805–812.

Freeman, M. P., R. Wright, M. Watchman, R. A. Wahl, D. J. Sisk, L. Fraleigh, and J. M. Weibrecht. 2005. Postpartum depression assessments at well-baby visits: Screening feasibility, prevalence, and risk factors. *Journal of Women's Health* 14(10):929–935.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA938                              JA-0000531

Gail, M. H., L. A. Brinton, D. P. Byar, D. K. Corle, S. B. Green, C. Schairer, and J. J. Mulvihill. 1989. Projecting individualized probabilities of developing breast cancer for white females who are being examined annually. *Journal of the National Cancer Institute* 81(24):1879–1886.

Gami, A. S., B. J. Witt, D. E. Howard, P. J. Erwin, L. A. Gami, V. K. Somers, and V. M. Montori. 2007. Metabolic syndrome and risk of incident cardiovascular events and death: A systematic review and meta-analysis of longitudinal studies. *Journal of the American College of Cardiology* 49(4):403–414.

Garber, J. E., and K. Offit. 2005. Hereditary cancer predisposition syndromes. *Journal of Clinical Oncology* 23:276–292.

Garrett, B. E., S. R. Dube, A. Trosclair, R. S. Caraballo, T. F. Pechacek, National Center for Chronic Disease Prevention and Health Promotion, CDC. 2011. Cigarette smoking—United States, 1965-2008. *MMWR Morbidity and Mortality Weekly Report* 60 (1):109–113.

Gaynes, B. N., S. L. West, C. Ford, P. Frame, J. D. Klein, and K. N. Lohr. 2004. *Screening for suicide risk: A systematic evidence review for the U.S. Preventive Services Task Force.* Rockville, MD: Agency for Healthcare Research and Quality.

George, A., J. K. Tracy, W. A. Meyer, R. H. Flores, P. D. Wilson, and M. C. Hochberg. 2003. Racial differences in bone mineral density in older men. *Journal of Bone Mineral Research* 18(12):2238–2244.

Gostin, L. O., P. S. Arno, and A. M. Brandt. 1997. FDA regulation of tobacco advertising and youth smoking—historical, social, and constitutional perspectives. *Journal of the American Medical Association* 277(5):410–418.

Grimshaw, G. M., and A. Stanton. 2006. Tobacco cessation interventions for young people. *Cochrane Database of Systematic Reviews* (4):1–58.

Grundy, S. M., J. I. Cleeman, S. R. Daniels, K. A. Donato, R. H. Eckel, B. A. Franklin, D. J. Gordon, R. M. Krauss, P. J. Savage, S. C. Smith, Jr., J. A. Spertus, and F. Costa. 2005. Diagnosis and management of the metabolic syndrome: An American Heart Association/National Heart, Lung, and Blood Institute Scientific Statement. *Circulation* 112(17):2735–2752.

Gui, G. P., R. K. Hogben, G. Walsh, R. A'Hern, and R. Eeles. 2001. The incidence of breast cancer from screening women according to predicted family history risk: Does annual clinical examination add to mammography? *European Journal of Cancer* 37(13):1668–1673.

Hayes, D. K., C. H. Denny, N. L. Keenan, J. B. Croft, A. A. Sundaram, and K. J. Greenlund. 2006. Racial/ethnic and socioeconomic differences in multiple risk factors for heart disease and stroke in women: Behavioral Risk Factor Surveillance System, 2003. *Journal of Women's Health (Larchmont)* 15(9):1000–1008.

Heaney, R. P. 1998. Bone mass, bone loss and osteoporosis prophylaxis. *Annals of Internal Medicine* 128:313–314.

Henriksson, M. M., H. M. Aro, M. J. Marttunen, M. E. Heikkinen, E. T. Isometsa, K. I. Kuoppasalmi, and J. K. Lonnqvist. 1993. Mental-disorders and comorbidity in suicide. *American Journal of Psychiatry* 150(6):935–940.

HHS (U.S. Department of Health and Human Services). 1999. *The Surgeon General's call to action to prevent suicide.* Washington, DC: U.S. Public Health Service.

HHS. 2001. *Women and smoking: A report of the Surgeon General.* Washington, DC: U.S. Department of Health and Human Services.

HHS. 2004. *Bone health and osteoporosis: A report of the Surgeon General.* Washington, DC: Office of the Surgeon General, U.S. Public Health Service, U.S. Department of Health and Human Services.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA939  JA-0000532

HHS. 2011. *Healthy People 2020: Topics & objectives.* Washington, DC: U.S. Department of Health and Human Services. http://www.healthypeople.gov/2020/topicsobjectives2020/default.aspx (accessed April 19, 2011).

IOM (Institute of Medicine). 1994. *Growing up tobacco free: Preventing nicotine addiction in children and youths.* Washington, DC: National Academy Press.

IOM. 2009. *Weight gain during pregnancy: Reexamining the guidelines.* Washington, DC: The National Academies Press.

IOM. 2011. *Leading health indicators for Healthy People 2020: Letter report.* Washington, DC: The National Academies Press.

Irgens, H. U., L. Reisaeter, L. M. Irgens, and R. T. Lie. 2001. Long term mortality of mothers and fathers after pre-eclampsia: Population based cohort study. *BMJ* 323(7323):1213–1217.

Jacobs, A. K. 2006. Women, ischemic heart disease, revascularization, and the gender gap: What are we missing? *Journal of the American College of Cardiology* 47(3 Suppl.):S63–S65.

Kanis, J. A. 1994. Assessment of fracture risk and its application to screening for post-menopausal osteoporosis. *Osteoporosis International* 4:368–381.

Kerlikowske, K., D. Grady, J. Barclay, E. A. Sickles, and V. Ernster. 1996. Effect of age, breast density, and family history on the sensitivity of first screening mammography. *Journal of the American Medical Association* 276:33–38.

Kerlikowske, K., D. Grady, J. Barclay, S. D. Frankel, S. H. Ominsky, E. A. Sickles, and V. Ernster. 1998. Variability and accuracy in mammographic interpretation using the American College of Radiology Breast Imaging Reporting and Data System. *Journal of the National Cancer Institute* 90:1801–1809.

Kerlikowske, K., A. J. Cook, D. S. M. Buist, S. R. Cummings, C. Vachon, P. Vacek, and D. L. Miglioretti. 2010. Breast cancer risk by breast density, menopause, and postmenopausal hormone therapy use. *Journal of Clinical Oncology* 28:3830–3837.

Kessler, R. C. 2003. Epidemiology of women and depression. *Journal of Affective Disorders* 74(1):5–13.

Kessler, R. C., P. Berglund, O. Demler, R. Jin, D. Koretz, K. R. Merikangas, A. J. Rush, E. E. Walters, and P. S. Wang. 2003. The epidemiology of major depressive disorder—results from the National Comorbidity Survey Replication (NCS-R). *Journal of the American Medical Association* 289(23):3095–3105.

Kessler, R. C., K. R. Merikangas, and P. S. Wang. 2007. Prevalence, comorbidity, and service utilization for mood disorders in the United States at the beginning of the twenty-first century. *Annual Review of Clinical Psychology* 3:137–158.

Khader, Y. S., N. Al-Akour, I. M. AlZubi, and I. Lataifeh. 2011. The association between second hand smoke and low birth weight and preterm delivery. *Maternal and Child Health Journal* 15(4):453–459.

Killen, J. D., S. P. Fortmann, A. Varady, and H. C. Kraemer. 2002. Do men outperform women in smoking cessation trials? Maybe, but not by much. *Experimental and Clinical Psychopharmacology* 10(3):295–301.

Kleindorfer, D., J. Khoury, J. P. Broderick, E. Rademacher, D. Woo, M. L. Flaherty, K. Alwell, C. J. Moomaw, A. Schneider, A. Panicoli, R. Miller, and B. M. Kissela. 2009. Temporal trends in public awareness of stroke: Warning signs, risk factors, and treatment. *Stroke* 40(7):2502–2506.

Koh, A. S., and L. K. Ross. 2006. Mental health issues: A comparison of lesbian, bisexual and heterosexual women. *Journal of Homosexuality* 51(1):33–57.

Kollias, J., D. M. Sibbering, R. W. Blamey, P. A. Holland, Z. Obuszko, A. R. Wilson, A. J. Evans, I. O. Ellis, and C. W. Elston. 1998. Screening women aged less than 50 years with a family history of breast cancer. *European Journal of Cancer* 34(6):878–883.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                              JA940                              JA-0000533

Kriege, M., C. T. M. Brekelmans, C. Boetes, P. E. Besnard, H. M. Zonderland, I. M. Obdeijn, R. A. Manoliu, T. Kok, H. Peterse, M. M. Tilanus-Linthorst, S. H. Muller, S. Meijer, J. C. Oosterwijk, L. V. Beex, R. A. Tollenaar, H. J. de Koning, E. J. Rutgers, J. G. Klijn, Magnetic Resonance Imaging Screening Study Group. 2004. Efficacy of MRI and mammography for breast-cancer in women with a familial or genetic predisposition. *New England Journal of Medicine* 351(5):427–437.

Kruk, M., J. Pregowski, G. S. Mintz, A. Maehara, P. Tyczynski, A. Witkowski, L. Kalinczuk, Y. J. Hong, A. D. Pichard, L. F. Satler, K. M. Kent, W. O. Suddath, R. Waksman, and N. J. Weissman. 2007. Intravascular ultrasonic study of gender differences in ruptured coronary plaque morphology and its associated clinical presentation. *American Journal of Cardiology* 100(2):185–189.

Latimer, W., and J. Zur. 2010. Epidemiologic trends of adolescent use of alcohol, tobacco, and other drugs. *Child and Adolescent Psychiatric Clinics of North America* 19(3):451–464.

Law, M. R., R. Cheng, A. K. Hackshaw, S. Allaway, and A. K. Hale. 1997. Cigarette smoking, sex hormones and bone density in women. *European Journal of Epidemiology* 13(5):553–558.

Lee, C. H., D. Dershaw, D. Kopans, P. Evans, B. Monsees, D. Monticciolo, R. J. Brenner, L. Bassett, W. Berg, S. Feig, E. Hendrick, E. Mendelson, C. D'Orsi, E. Sickles, L. W. Burhenne. 2010. Breast cancer screening with imaging: Recommendations from the Society of Breast Imaging and the ACR on the use of mammography, breast MRI, breast ultrasound, and other technologies for the detection of clinically occult breast cancer. *Journal of the American College of Cardiology* 7:18–27.

Leibson, C. L., A. N. A. Tosteson, S. E. Gabriel, J. E. Ransom, and L. J. Melton. 2002. Mortality, disability, and nursing home use for persons with and without hip fracture: A population-based study. *Journal of the American Geriatrics Society* 50(10):1644–1650.

Lerman, C., B. Trock, B. K. Rimer, C. Jepson, D. Brody, and A. Boyce. 1991. A psychological side effect of breast cancer screening. *Health Psychology* 10:259–267.

Lerman, C., M. D. Schwartz, S. M. Miller, M. Daly, C. Sands, and B. K. Rimer. 1996. A randomized trial of breast cancer risk counseling: Interacting effects of counseling, educational level, and coping style. *Health Psychology* 15(2):75–83.

Lin, J. S., E. O'Connor, E. P. Whitlock, and T. L. Beil. 2010. Behavioral counseling to promote physical activity and a healthful diet to prevent cardiovascular disease in adults: A systematic review for the U.S. Preventive Services Task Force. *Annals of Internal Medicine* 153(11):736–750.

Lindahl, V., J. L. Pearson, and L. Colpe. 2005. Prevalence of suicidality during pregnancy and the postpartum. *Archives of Women's Mental Health* 8(2):77–87.

Looker, A. C., E. S. Orwoll, C. C. Johnston Jr., R. L. Lindsay, H. W. Wahner, W. L. Dunn, M. S. Calvo, T. B. Harris, S. P. Heyse. 1997. Prevalence of low femoral bone density in older U.S. adults from NHANES III. *Journal of Bone Mineral Research* 12:1761–1768.

Lopez, A. D., C. D. Mathers, M. Ezzati, D. T. Jamison, and C. J. L. Murray. 2006. Global and regional burden of disease and risk factors, 2001: Systematic analysis of population health data. *Lancet* 367(9524):1747–1757.

Lorenzo, C., K. Williams, J. H. Hunt, S. M. Haffner. 2007. The National Cholesterol Education Program–Adult Treatment Panel III, International Diabetes Federation, and World Health Organization Definitions of the Metabolic Syndrome as predictors of incident cardiovascular disease and diabetes. *Diabetes Care* 30:8–13.

Loucks, E. B., D. H. Rehkopf, R. C. Thurston, and I. Kawachi. 2007. Socioeconomic disparities in metabolic syndrome differ by gender: Evidence from NHANES III. *Annals of Epidemiology* 17(1):19–26.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                          JA941                                          JA-0000534

Luoma, J. B., C. E. Martin, and J. L. Pearson. 2002. Contact with mental health and primary care providers before suicide: A review of the evidence. *American Journal of Psychiatry* 159(6):909–916.

Ma, J., K. V. Lee, and R. S. Stafford. 2005. Depression treatment during outpatient visits by US children and adolescents. *Journal of Adolescent Health* 37(6):434–442.

Maciosek, M. V., A. B. Coffield, N. M. Edwards, T. J. Flottemesch, and L. I. Solberg. 2009. Prioritizing clinical preventive services: A review and framework with implications for community preventive services. *Annual Review of Public Health* 30:341–355.

Maciosek, M. V., A. B. Coffield, T. J. Flottemesch, N. M. Edwards, and L. I. Solberg. 2010. Greater use of preventive services in U.S. health care could save lives at little or no cost. *Health Affairs* 29(9):1656–1660.

MacLean, C., S. Newberry, M. Maglione, M. McMahon, V. Ranganath, M. Suttorp, W. Mojica, M. Timmer, A. Alexander, M. McNamara, S. B. Desai, A. Zhou, S. Chen, J. Carter, C. Tringale, D. Valentine, B. Johnsen, and J. Grossman. 2008. Systematic review: Comparative effectiveness of treatments to prevent fractures in men and women with low bone density or osteoporosis. *Annals of Internal Medicine* 148(3):197–213.

Mann, J. J., A. Apter, J. Bertolote, A. Beautrais, D. Currier, A. Haas, U. Hegerl, J. Lonnqvist, K. Malone, A. Marusic, L. Mehlum, G. Patton, M. Phillips, W. Rutz, Z. Rihmer, A. Schmidtke, D. Shaffer, M. Silverman, Y. Takahashi, A. Varnik, D. Wasserman, P. Yip, and H. Hendin. 2005. Suicide prevention strategies—a systematic review. *Journal of the American Medical Association* 294(16):2064–2074.

Marshall, D., O. Johnell, and H. Wedel. 1996. Meta-analysis of how well measures of bone mineral density predict occurrence of osteoporotic fractures. *BMJ* 312(7041):1254–1259.

Marwick, C. 1997. FDA timetable set for reducing use of tobacco by children and adolescents. *Journal of the American Medical Association* 277(10):778.

McDonald, S. D., A. Malinowski, Q. Zhou, S. Yusuf, and P. J. Devereaux. 2008. Cardiovascular sequelae of preeclampsia/eclampsia: A systematic review and meta-analyses. *American Heart Journal* 156(5):918–930.

Merikangas, K. R., J. P. He, M. Burstein, S. A. Swanson, S. Avenevoli, L. H. Cui, C. Benjet, K. Georgiades, and J. Swendsen. 2010. Lifetime prevalence of mental disorders in U.S. adolescents: Results from the National Comorbidity Survey Replication-Adolescent Supplement (NCS-A). *Journal of the American Academy of Child and Adolescent Psychiatry* 49(10):980–989.

Mishina, H., and J. I. Takayama. 2009. Screening for maternal depression in primary care pediatrics. *Current Opinion in Pediatrics* 21(6):789–793.

Morris, C. A., D. Cabral, H. Cheng, J. N. Katz, J. S. Finkelstein, J. Avorn, D. H. Solomon. 2004. Patterns of bone mineral density testing: Current guidelines, testing rates, and interventions. *Journal of General Internal Medicine* 19(7):783–790.

Morris, C. D., B. F. Miller, and J. L. Mahalik. 2011. An expanded opportunity to provide tobacco cessation services in primary care. *Translational Behavioral Medicine* 1:31–34.

Mosca, L., H. Mochari-Greenberger, R. J. Dolor, L. K. Newby, and K. J. Robb. 2010. Twelve-year follow-up of American women's awareness of cardiovascular disease risk and barriers to heart health. Circulation. *Cardiovascular Quality Outcomes* 3(2):120–127.

Mosca, L., E. J. Benjamin, K. Berra, J. L. Bezanson, R. J. Dolor, D. M. Lloyd-Jones, L. K. Newby, I. L. Pina, V. L. Roger, L. J. Shaw, D. Zhao, T. M. Beckie, C. Bushnell, J. D'Armiento, P. M. Kris-Etherton, J. Fang, T. G. Ganiats, A. S. Gomes, C. R. Gracia, C. K. Haan, E. A. Jackson, D. R. Judelson, E. Kelepouris, C. J. Lavie, A. Moore, N. A. Nussmeier, E. Ofili, S. Oparil, P. Ouyang, V. W. Pinn, K. Sherif, S. C. Smith, Jr., G. Sopko, N. Chandra-Strobos, E. M. Urbina, V. Vaccarino, and N. K. Wenger. 2011. Effectiveness-based guidelines for the prevention of cardiovascular disease in women—2011 update: A guideline from the American Heart Association. *Circulation* 123(11):1243–1262.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                  JA942                                    JA-0000535

Munafo, M., M. Bradburn, L. Bowes, and S. David. 2004. Are there sex differences in transdermal nicotine replacement therapy patch efficacy? A meta-analysis. *Nicotine & Tobacco Research* 6(5):769–776.

Murff, H. J., D. R. Spigel, and S. Syngal. 2004. Does this patient have a family history of cancer? An evidence-based analysis of the accuracy of family cancer history. *Journal of the American Medical Association* 292:1480–1489.

National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). 2002. Third Report of the National Cholesterol Education Program Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III) final report. *Circulation* 106(25):3143–3421.

NCQA (National Committee for Quality Assurance). 2005. *The state of healthcare quality 2005*. Washington, DC: National Committee for Quality Assurance.

Nelson, D. A., G. Jacobsen, D. A. Barondess, and A. M. Parfitt. 1995. Ethnic differences in regional bone density, hip axis length, and lifestyle variables among healthy black and white men. *Journal of Bone Mineral Research* 10(5):782–787.

Nelson, H. D., L. H. Huffman, R. Fu, and E. L. Harris. 2005. Genetic risk assessment and *BRCA* mutation testing for breast and ovarian cancer susceptibility: Systematic evidence review for the U.S. Preventive Services Task Force. *Annals of Internal Medicine* 143:362–379.

Nelson, H. D., K. Tyne, A. Naik, C. Bougatsos, B. K. Chan, and L. Humphrey. 2009a. Screening for breast cancer: An update for the U.S. Preventive Services Task Force. *Annals of Internal Medicine* 151:727–737.

Nelson, H. D., R. Fu, J. C. Griffin, P. Nygren, M. E. B. Smith, and L. Humphrey. 2009b. Systematic review: Comparative effectiveness of medications to reduce risk for primary breast cancer. *Annals of Internal Medicine* 151:703–715.

Nelson, H. D., R. Fu, L. Humphrey, M. E. B. Smith, J. Griffin, and P. Nygren. 2009c. *Comparative effectiveness of medications to reduce risk of primary breast cancer in women*. Rockville, MD: Agency for Healthcare Research and Quality.

Nelson, H. D., E. M. Haney, T. Dana, C. Bougatsos, and R. Chou. 2010a. Screening for osteoporosis: An update for the U.S. Preventive Services Task Force. *Annals of Internal Medicine* 153:99–111.

Nelson, H. D., E. M. Haney, R. Chou, T. Dana, R. Fu, and C. Bougatsos. 2010b. *Screening for osteoporosis: Systematic review to update the 2002 U.S. Preventive Services Task Force recommendation*. Evidence Synthesis No. 77. AHRQ Publication 10-05145-EF-1. Rockville, MD: Agency for Healthcare Research and Quality.

NIMH (National Institute of Mental Health). 2011a. *Suicide in America: Frequently asked questions*. Bethesda, MD: National Institute of Mental Health. http://www.nimh.nih.gov/health/publications/suicide-in-america/suicide-in-america-frequently-asked-questions.shtml (accessed April 28, 2011).

NIMH. 2011b. *Women and depression: Discovering hope*. Bethesda, MD: National Institute of Mental Health. http://www.nimh.nih.gov/health/publications/women-and-depression-discovering-hope/complete-index.shtml (accessed April 29, 2011).

NOF (National Osteoporosis Foundation). 2010. *Clinician's guide to prevention and treatment of osteoporosis*. Washington, DC: National Osteoporosis Foundation.

Olfson, M., S. C. Marcus, B. Druss, L. Elinson, T. Tanielian, H. A. Pincus. 2002. National trends in the outpatient treatment of depression. *Journal of the American Medical Association* 287(2):203–209.

Oparil, S. 1998. Pathophysiology of sudden coronary death in women. Implications for prevention. *Circulation* 97(21):2103–2105.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA943  JA-0000536

Perkins, K. A., and J. Scott. 2008. Sex differences in long-term smoking cessation rates due to nicotine patch. *Nicotine & Tobacco Research* 10(7):1245–1251.

Pharoah, P. D., N. E. Day, S. Duffy, D. F. Easton, B. A. Ponder. 1997. Family history and the risk of breast cancer: A systematic review and meta-analysis. *International Journal of Cancer* 71(5):800–809.

Physical Activity Guidelines Advisory Committee. 2008. *Physical Activity Guidelines Advisory Committee report, 2008.* Washington, DC: U.S. Department of Health and Human Services.

Rich-Edwards, J. W., T. F. McElrath, S. A. Karumanchi, and E. W. Seely. 2010. Breathing life into the lifecourse approach: Pregnancy history and cardiovascular disease in women. *Hypertension* 56(3):331–334.

Richland, J. 2011. Letter to Linda Rosenstock, chair, Committee on Preventive Services for Women, Institute of Medicine, Washington, DC.

Ridker, P. M., J. G. MacFadyen, B. G. Nordestgaard, W. Koenig, J. J. P. Kastelein, J. Genest, and R. J. Glynn. 2010. Rosuvastatin for primary prevention among individuals with elevated high-sensitivity C-reactive protein and 5% to 10% and 10% to 20% 10-year risk implications of the primary prevention among individuals with elevated high-sensitivity C-reactive protein and 5% to 10% and 10% to 20% 10-year risk. Implications of the justification for use of statins in prevention: An intervention trial evaluating Rosuvastatin (JUPITER) trial for intermediate risk. Circulation. *Cardiovascular Quality and Outcomes* 3(5):447–452.

Robins, E., G. E. Murphy, R. H. Wilkinson, S. Gassner, and J. Kayes. 1959. Some clinical considerations in the prevention of suicide based on a study of 134 successful suicides. *American Journal of Public Health and the Nations Health* 49(7):888–899.

Roger, V. L., A. S. Go, D. M. Lloyd-Jones, R. J. Adams, J. D. Berry, T. M. Brown, M. R. Carnethon, S. Dai, G. de Simone, E. S. Ford, C. S. Fox, H. J. Fullerton, C. Gillespie, K. J. Greenlund, S. M. Hailpern, J. A. Heit, P. M. Ho, V. J. Howard, B. M. Kissela, S. J. Kittner, D. T. Lackland, J. H. Lichtman, L. D. Lisabeth, D. M. Makuc, G. M. Marcus, A. Marelli, D. B. Matchar, M. M. McDermott, J. B. Meigs, C. S. Moy, D. Mozaffarian, M. E. Mussolino, G. Nichol, N. P. Paynter, W. D. Rosamond, P. D. Sorlie, R. S. Stafford, T. N. Turan, M. B. Turner, N. D. Wong, and J. Wylie-Rosett. 2011. Heart disease and stroke statistics—2011 update: A report from the American Heart Association. *Circulation* 123(4):e18–e209.

Salsberry, P. J., E. Corwin, and P. B. Reagan. 2007. A complex web of risks for metabolic syndrome: Race/ethnicity, economics, and gender. *American Journal of Preventive Medicine* 33(2):114–120.

SAMHSA (Substance Abuse and Mental Health Services Administration). 2004. *Results from the 2002 Survey on Drug Use and Health: National findings.* Washington, DC: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration.

Saslow, D., C. Boetes, W. Burke, S. Harms, M. O. Leach, C. D. Lehman, E. Morris, E. Pisano, M. Schnall, S. Sener, R. A. Smith, E. Warner, M. Yaffe, K. S. Andrews, C. A. Russell, and American Cancer Society Breast Cancer Advisory Group. 2007. American Cancer Society guidelines for breast screening with MRI as an adjunct to mammography. *CA: A Cancer Journal for Clinicians* 57(2):75–89.

Serdula, M. K., C. Gillespie, L. Kettel-Khan, R. Farris, J. Seymour, and C. Denny. 2004. Trends in fruit and vegetable consumption among adults in the United States: Behavioral risk factor surveillance system, 1994-2000. *American Journal of Public Health* 94(6):1014–1018.

Shade, M., L. Miller, J. Borst, B. English, J. Valliere, K. Downs, R. Herceg-Baron, and I. Hare. 2011. Statewide innovations to improve services for women with perinatal depression. *Nursing for Women's Health* 15(2):126–136.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA944 JA-0000537

Shah, B. R., R. Retnakaran, and G. L. Booth. 2008. Increased risk of cardiovascular disease in young women following gestational diabetes mellitus. *Diabetes Care* 31(8):1668–1669.

Shelley, D., J. Cantrell, D. Faulkner, L. Haviland, C. Healton, and P. Messeri. 2005. Physician and dentist tobacco use counseling and adolescent smoking behavior: results from the 2000 National Youth Tobacco Survey. *Pediatrics* 115(3):719–725.

Smith, R. A., D. Saslow, K. A. Sawyer, W. Burke, M. E. Costanza, W. P. Evans, R. S. Foster Jr, E. Hendrick, H. J. Eyre, S. Sener, American Cancer Society High-Risk Work Group, American Cancer Society Screening Older Women Work Group, American Cancer Society Mammography Work Group, American Cancer Society Physical Examination Work Group, American Cancer Society New Technologies Work Group, and American Cancer Society Breast Cancer Advisory Group. 2003a. American Cancer Society guidelines for breast cancer screening: Update 2003. *CA: A Cancer Journal for Clinicians* 53(3):141–169.

Smith, S. S., D. E. Jorenby, S. J. Leischow, M. A. Nides, S. I. Rennard, J. A. Johnston, B. Jamerson, M. C. Fiore, and T. B. Baker. 2003b. Targeting smokers at increased risk for relapse: Treating women and those with a history of depression. *Nicotine & Tobacco Research* 5(1):99–109.

Standing Committee on the Scientific Evaluation of Dietary Reference Intakes. 1997. *Dietary reference intakes for calcium, phosphorus, magnesium, vitamin D, and fluoride.* Washington, DC: National Academy Press.

Stewart, S. L., C. J. Cardinez, L. C. Richardson, L. Norman, R. Kaufmann, T. F. Pechacek, T. D. Thompson, H. K. Weir, and S. A. Sabatino. 2008. Surveillance for cancers associated with tobacco use—United States, 1999–2004. *MMWR Morbidity and Mortality Weekly Report: Surveillance Summaries* 57(SS8):1–33.

Struewing, J. P., P. Hartge, S. Wacholder, S. M. Baker, M. Berlin, M. McAdams, M. M. Timmerman, L. C. Brody, and M. A. Tucker. 1997. The risk of cancer associated with specific mutations of *BRCA1* and *BRCA2* among Ashkenazi Jews. *New England Journal of Medicine* 336:1401–1408.

Summerbell, C. D., V. Ashton, K. J. Campbell, L. Edmunds, S. Kelly, and E. Waters. 2003. Interventions for treating obesity in children. *Cochrane Database of Systematic Reviews* 3:CD001872.

Tjaden, P. G., and N. Thoennes. 1998. *Prevalence, incidence, and consequences of violence against women: Findings from the National Violence Against Women Survey, research in brief.* Washington, DC: Office of Justice Programs, National Institute of Justice, U.S. Department of Justice.

Tyrer, J., S. W. Duffy, and J. Cuzick. 2004. A breast cancer prediction model incorporating familial and personal risk factors. *Statistics in Medicine* 23:1111–1130.

USPSTF (United States Preventive Services Task Force). 2002a. *Behavioral counseling in primary care to promote physical activity.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsphys.htm (accessed June 1, 2011).

USPSTF. 2002b. *Chemoprevention of breast cancer.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsbrpv.htm (accessed June 1, 2011).

USPSTF. 2003a. *Behavioral counseling in primary care to promote a healthy diet.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsdiet.htm (accessed June 1, 2011).

USPSTF. 2003b. Behavioral counseling in primary care to promote a healthy diet: Recommendations and rationale. *American Journal of Preventive Medicine* 24(1):93–100.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA945                          JA-0000538

USPSTF. 2003c. *Counseling to prevent tobacco use and tobacco-caused disease.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspstbac.htm (accessed June 1, 2011).

USPSTF. 2004. *Screening for suicide risk.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspssuic.htm (accessed June 1, 2011).

USPSTF. 2005a. *Genetic risk assessment and BRCA mutation testing for breast and ovarian cancer susceptibility.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsbrgen.htm (accessed June 1, 2011).

USPSTF. 2007a. *Screening for high blood pressure in adults.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspshype.htm (accessed June 1, 2011).

USPSTF. 2007b. *Screening for lipid disorders in children.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspschlip.htm (accessed June 1, 2011).

USPSTF. 2008. *Screening for lipid disorders in adults.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspschol.htm (accessed June 1, 2011).

USPSTF. 2009a. *Aspirin for the prevention of cardiovascular disease.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsasmi.htm (accessed June 1, 2011).

USPSTF. 2009b. *Counseling and interventions to prevent tobacco use and tobacco-caused disease in adults and pregnant women.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspstbac2.htm (accessed June 1, 2011).

USPSTF. 2009c. Counseling and interventions to prevent tobacco use and tobacco-caused disease in adults and pregnant women: U.S. Preventive Services Task Force reaffirmation recommendation statement. *Annals of Internal Medicine* 150(8):W551–W599.

USPSTF. 2009d. *Major depressive disorder in children and adolescents.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspschdepr.htm (accessed June 1, 2011).

USPSTF. 2009e. *Screening for breast cancer.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsbrca.htm (accessed June 1, 2011).

USPSTF. 2009f. Screening for breast cancer: U.S. Preventive Services Task Force recommendation statement. *Annals of Internal Medicine* 151:716–726.

USPSTF. 2009g. *Screening for depression in adults.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsaddepr.htm (accessed June 1, 2011).

USPSTF. 2011a. Draft recommendation statement: Behavioral counseling interventions to promote a healthful diet and physical activity for cardiovascular disease prevention in adults. [location]: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/draftrec.htm (accessed March 19, 2011).

USPSTF. 2011b. *Screening for osteoporosis.* Rockville, MD: United States Preventive Services Task Force. http://www.uspreventiveservicestaskforce.org/uspstf/uspsoste.htm (accessed June 1, 2011).

USPSTF. 2011c. Screening for osteoporosis: U.S. Preventive Services Task Force recommendation statement. *Annals of Internal Medicine* 154:356–364.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA946                          JA-0000539

VA (Veterans Administration). 2009. *VA/DOD clinical practice guideline for management of major depressive disorder (MDD).* Washington, DC: Department of Veterans Affairs, Department of Defense. van Gils, C. H., J. D. Otten, A. L. Verbeek, and J. H. Hendriks. 1998a. Mammographic breast density and risk of breast cancer: Masking bias or causality? *European Journal of Epidemiology* 14:315–320.

van Gils, C. H., J. D. Otten, A. L. Verbeek, J. H. Hendriks, and R. Holland. 1998b. Effect of mammographic breast density on breast cancer screening performance: A study in Nijmegen, The Netherlands. *Journal of Epidemiology and Community Health* 52:267–271.

Van Horn, L. 2010. Development of the 2010 U.S. Dietary Guidelines Advisory Committee Report: Perspectives from a registered dietitian. *Journal of the American Dietetic Association* 110(11):1638–1645.

Wahner-Roedler, D. L., D. F. Nelson, I. T. Croghan, S. J. Achenbach, C. S. Crowson, L. C. Hartmann, and W. M. O'Fallon. 2003. Risk of breast cancer and breast cancer characteristics in women treated with supradiaphragmatic radiation for Hodgkin lymphoma: Mayo Clinic experience. *Mayo Clinic Proceedings* 78:708–715.

Warner, E., D. B. Plewes, K. A. Hill, P. A. Causer, J. T. Zubovits, R. A. Jong, M. R. Cutrara, G. DeBoer, M. J. Yaffe, S. J. Messner, W. S. Meschino, C. A. Piron, and S. A. Narod. 2004. Surveillance of *BRCA1* and *BRCA2* mutation carriers with magnetic resonance imaging, ultrasound, mammography, and clinical breast examination. *Journal of the American Medical Association* 292(11):1317–1325.

Weaver, D. L., R. D. Rosenberg, E. Barlow, L. Ichikawa, P. A. Carney, K. Kerlikowske, D. S. Buist, B. M. Geller, C. R. Key, S. J. Maygarden, and R. Ballard-Barbash. 2006. Pathologic findings from the Breast Cancer Surveillance Consortium: Population-based outcomes in women undergoing biopsy after screening mammography. *Cancer* 106:732–742.

White, D. B., V. L. Bonham, J. Jenkins, N. Stevens, and C. M. McBride. 2008. Too many referrals of low-risk women for *BRCA1/2* genetic services by family physicians. *Cancer Epidemiology, Biomarkers & Prevention* 17:2980–2986.

Whitlock, E. P., E. A. O'Connor, S. B. Williams, T. L. Beil, and K. W. Lutz. 2010. Effectiveness of weight management interventions in children: A targeted systematic review for the USPSTF. *Pediatrics* 125(2):E396–E418.

Whittemore, A. S., G. Gong, E. M. John, V. McGuire, F. P. Li, K. L. Ostrow, R. Dicioccio, A. Felberg, and D. W. West. 2004. Prevalence of *BRCA1* mutation carriers among U.S. non-Hispanic whites. *Cancer Epidemiology, Biomarkers & Prevention* 13(12):2078–2083.

WHO (World Health Organization). 2002. *World report on violence and health.* Geneva, Switzerland: World Health Organization.

WHO. 2011. *Mental health: Depression.* Geneva, Switzerland: World Health Organization. http://www.who.int/mental_health/management/depression/definition/en/ (accessed May 6, 2011).

Wilcox, S., D. Parra-Medina, M. Thompson-Robinson, and J. Will. 2001. Nutrition and physical activity interventions to reduce cardiovascular disease risk in health care settings: A quantitative review with a focus on women. *Nutrition Reviews* 59(7):197–214.

Wilkins, C. H., and J. S. Goldfeder. 2004. Osteoporosis screening is unjustifiably low in older African-American women. *Journal of the National Medical Association* 96(4):461–467.

Wright, J. D., and C. Y. Wang. 2010. *Trends in intake of energy and macronutritnets in adults from 1999–2000 through 2007–2008.* Hyattsville, MD: National Center for Health Statistics.

Ye, X., R. Skjaerven, O. Basso, D. D. Baird, M. Eggesbo, L. A. Uicab, K. Haug, and M. P. Longnecker. 2010. In utero exposure to tobacco smoke and subsequent reduced fertility in females. *Human Reproduction* 25(11):2901–2906.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19  JA947  JA-0000540

Case 1:25-cv-25510-WB Document 34-3 Page: 286 09/26/25 Filed 12/12/2025

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA948

# Appendix B

# Agendas of Public Meetings Held by the Committee on Preventive Services for Women

**FIRST MEETING**
November 16, 2010
The Dupont Circle Hotel
Washington, DC

Welcome and Overview
  *Linda Rosenstock, M.D., M.P.H.*
  *Committee Chair*

Presentation of the Charge
  *Mona Shah, J.D., M.P.H.*
  *Professional Staff Member*
  *Office of Senator Barbara Mikulski (MD)*
  *Senate Committee on Health, Education, Labor, and Pensions*

  *Sherry Glied, Ph.D.*
  *Assistant Secretary for Planning and Evaluation*
  *Department of Health and Human Services*

  *Mary Wakefield, Ph.D., R.N.*
  *Administrator*
  *Health Resources and Services Administration*

Committee Discussion

*217*

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA949                    JA-0000542

Groups Interested in Women's Issues
> Judy Waxman, J.D.
> Vice President of Health and Reproductive Rights
>> National Women's Law Center
>
> Cynthia Pearson
> National Women's Health Network
> Women's Voices Are Raising Women's Voices for the Health Care
>> We Need
>
> Carolyn Westhoff, M.D., M.Sc.
> Planned Parenthood Federation of America
> Board Member and Immediate Past Chair of the National
>> Medical Advisory Committee
>
> Eleanor Hinton Hoytt
> Women of Color United for Health Reform
>
> Esta Soler
> President and Founder of the Family Violence Prevention Fund

Adolescent Issues
> Sarah S. Brown
> Cofounder and Chief Executive Officer
>> The National Campaign to Prevent Teen and Unplanned
>> Pregnancy
>
> John Santelli, M.D., M.P.H.
> Mailman School of Public Health
> Columbia University
> and Society for Adolescent Medicine

Methodological Approaches
> Mary Barton, M.D., M.P.P.
> Scientific Director of the United States Preventive Services Task
>> Force (USPSTF).
> Agency for Healthcare Research and Quality
>
> Ned Calonge, M.D., M.P.H. (via phone)
> Chair, USPSTF

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                         JA950                         JA-0000543

Joseph Hagan, M.D.
Paula Duncan, M.D. (via phone)
Authors
Bright Futures for Infants, Children, and Adolescents

Sarah Scholle, Dr.P.H., M.P.H.
Assistant Vice President of Research and Analysis
    National Committee on Quality Assurance
Quality for Well-Woman Care

Committee Discussion

Opportunity for Attendees to Comment

### SECOND MEETING
January 12, 2011
National Academies Keck Center
Washington, DC

Welcome and Overview
Linda Rosenstock, M.D., M.P.H.
Committee Chair

Women's Health Organizations
Sharon Camp, M.A., Ph.D.
President and Chief Executive Officer
The Guttmacher Institute

Hal Lawrence, M.D., F.A.C.O.G.
Incoming Executive Vice President
Vice President of Practice Activities
American Congress of Obstetricians and Gynecologists

Catherine Ruhl, C.N.M., M.S.
The Association of Women's Health, Obstetric and Neonatal
    Nurses

National Health Interest Groups
Sharon Moffatt, R.N., B.S.N., M.S.
Chief of Health Promotion and Disease Prevention
Association of State and Territorial Health Officials

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA951                    JA-0000544

*CLINICAL PREVENTIVE SERVICES FOR WOMEN*

*Jud Richland, M.P.H.*
*President and Chief Executive Officer*
*Partnership for Prevention*

*Margaret Blythe, M.D. F.A.A.P.*
*Chair, Committee on Adolescence*
*American Academy of Pediatrics*

Provider and Employer Perspectives
*George Isham, M.D., M.S.*
*Medical Director and Chief Health Officer*
*HealthPartners*

*Joanne Armstrong, M.D., M.P.H. (via phone)*
*Senior Medical Director and Head of Women's Health*
*Aetna*

*Helen Darling, M.A.*
*President*
*National Business Group on Health*

*Wayne Burton, M.D.*
*Global Corporate Medical Director*
*American Express Corporation*

Opportunity for Attendees to Comment

**THIRD MEETING**
March 9, 2011
National Academy of Public Administration
Washington, DC

Welcome and Overview
*Linda Rosenstock, M.D., M.P.H.*
*Committee Chair*

Guidelines Development and Use
*Doug Campos-Outcalt, M.D., M.P.A.*
*AAFP Liaison to United States Preventive Services Task Force*
*and Advisory Committee on Immunization Practices*
*Centers for Disease Control and Prevention*

Copyright National Academy of Sciences. All rights reserved.

*Melissa Starkey, Ph.D.*
*Clinical Guidelines Administrator*
*American College of Physicians*

*David Rind, M.D. (via phone)*
*Co-Executive Editor*
*UpToDate*
*GRADE Working Group*

Coverage Design and Decision Making
    *Sara Rosenbaum, J.D.*
    *Hirsh Professor and Chair*
    *Department of Health Policy*
    *School of Public Health and Health Services*
    *The George Washington University Medical Center*

Other Preventive Health Issues
    *Gwen Keita, Ph.D.*
    *Director, Women's Programs Office*
     *and Associate Executive Director*
    *Public Interest Directorate*
    *American Psychological Association*

    *Lauren Patton, D.D.S.*
    *Professor and Chair*
    *Department of Dental Ecology*
     *and Program Director*
    *General Practice Residency*
    *School of Dentistry*
    *University of North Carolina, Chapel Hill*

    *Melissa A. McDiarmid, M.D., M.P.H., D.A.B.T.*
    *Professor*
    *Departments of Medicine and Epidemiology and Public Health*
     *and Director*
    *Occupational Health Program*
    *University of Maryland School of Medicine*

Opportunity for Attendees to Comment

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA954

Case 1:25-cv-25410-WDB Document 34-3 Page: 293 09/20/25 Date Filed: 12/12/2025

# Appendix C

# Committee Biographies

**Linda Rosenstock, M.D., M.P.H.** (elected to the Institute of Medicine [IOM] in 1995), is dean of the School of Public Health, University of California at Los Angeles (UCLA). She is a recognized authority in occupational and environmental health as well as global public health and science policy. Prior to going to UCLA in 2000, Dr. Rosenstock served for seven years as the director of the National Institute for Occupational Safety and Health, where she led a staff of 1,500 at the only federal agency mandated to undertake research and prevention activities in occupational safety and health. In recognition of her efforts, Dr. Rosenstock received the Presidential Distinguished Executive Rank Award, the highest executive service award in the federal government. In 2003 she cochaired the IOM committee addressing public health workforce needs that authored the report *Who Will Keep the Public Healthy? Educating Public Health Professionals for the 21st Century*. Dr. Rosenstock is immediate past chair of the Association of Schools of Public Health and immediate past president of the Society of Medical Administrators.

**Alfred O. Berg, M.D., M.P.H.,** is professor in the Department of Family Medicine at the University of Washington School of Medicine, Seattle. Dr. Berg received his professional education in family medicine and in general preventive medicine and public health at Washington University in St. Louis, Missouri; the University of Missouri; and the University of Washington and is a member of the Institute of Medicine. Dr. Berg's research has focused on clinical epidemiology in primary care settings. He has been active on many expert panels using evidence-based methods to develop

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                                                 JA-0000548

clinical guidelines, including chair of the United States Preventive Services Task Force, cochair of the otitis media panel convened by the Agency for Health Care Policy and Research (now the Agency for Healthcare Research and Quality), chair and moderator of the STD Treatment Guidelines panel of the Centers for Disease Control and Prevention (CDC), member of the American Medical Association-CDC panel producing Guidelines for Adolescent Preventive Services, and chair of the CDC's Evaluation of Genetic Applications in Practice and Prevention working group. He has served on the Institute of Medicine's Immunization Safety Review Committee (member), the Committee on the Treatment of Post Traumatic Stress Disorder (chair), and the Committee on Standards for Systematic Reviews of Clinical Effectiveness Research (chair).

**Claire D. Brindis, Dr.P.H., M.P.H.,** is professor of pediatrics and health policy in the Department of Pediatrics and Department of Obstetrics, Gynecology, and Reproductive Health Sciences at the University of California, San Francisco. Dr. Brindis is director of the Philip R. Lee Institute for Health Policy Studies, executive director of National Adolescent Health Information and Innovation Center, and director of the Bixby Center for Global Reproductive Health. Dr. Brindis's research interests are in the area of developing and evaluating innovative, community-based, comprehensive, integrated services for children, youth, and women and in combining qualitative and quantitative approaches to program evaluation. Her research focuses on child and adolescent health policy and women's health, with a special focus on Latina health. Dr. Brindis's educational background includes a doctoral degree in public health and behavioral sciences from the University of California at Berkeley and a master's degree in public health from the University of California at Los Angeles.

**Angela Diaz, M.D., M.P.H.,** is the Jean C. and James W. Crystal Professor of Pediatrics and Community Medicine at Mount Sinai School of Medicine. After earning her medical degree in 1981 at the Columbia University College of Physicians and Surgeons, she completed her postdoctoral training at the Mount Sinai School of Medicine in 1985 and subsequently received a master's in public health from Harvard University. Dr. Diaz is the director of the Mount Sinai Adolescent Health Center, a unique program that provides comprehensive, integrated, interdisciplinary primary care, sexual and reproductive health, mental health, and health education services to teens. She has been a White House Fellow, a member of the Food and Drug Administration Pediatric Advisory Committee, and a member of the National Institutes of Health State of the Science Conference on Preventing Violence and Related Health Risk Social Behaviors in Adolescents. She serves on an advisory panel for the National Institutes of Health Reproductive Sciences

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19    **JA956**    JA-0000549

Clinical Preventive Services for Women. Closing the Gaps

Case 7:25-cv-25370-WD Document 64-3 25 Page: 295 d 09/20/25 Date Filed 12/12/2025 330

Branch. She is a frequent speaker at conferences throughout the country and around the world.

**Francisco Garcia, M.D., M.P.H.,** is the director of the University of Arizona Center of Excellence in Women's Health. Dr. Garcia is the Distinguished Professor of Public Health, Obstetrics and Gynecology, Pharmacy and Mexican-American Studies at the University of Arizona and Chair of Family and Child Health of the Mel and Enid Zuckerman College of Public Health. He also serves as the codirector of the Cancer Disparities Institute of the Arizona Cancer Center. He is the past director of the Arizona Hispanic Center of Excellence (until 2007), as well as former director of the Division of Gynecology (until 2006). Dr. Garcia has served as a consultant to and collaborator on a variety of domestic and international agencies and nongovernmental organizations concerned with cervical cancer prevention, including the Department of Health of the State of Sonora, Population Council, the Pan-American Health Organization, the Instituto Nacional de Enfermedades Neoplasicas (Peruvian National Cancer Institute), IMSS-Solidaridad, Programa de Salud Reproductiva (the Mexican Social Security Institute-Reproductive Health Program), JHPIEGO, and PATH.

**Kimberly Gregory, M.D., M.P.H.,** is vice chair of Women's Healthcare Quality and Performance Improvement, Department of Obstetrics and Gynecology at Cedars-Sinai Medical Center. She also serves as professor at the David Geffen School of Medicine at the University of California at Los Angeles (UCLA) and the UCLA School of Public Health. Dr. Gregory is board certified in obstetrics and gynecology and maternal-fetal medicine. Her research interests include obstetrical health care utilization, rates of delivery by cesarean section, and the management of complications of labor and delivery as it relates to patient safety and health care quality. Dr. Gregory served on the U.S. Public Health Service's Prevention Task Force (2006 to 2010). Dr. Gregory received her bachelor's degree from UCLA and her medical degree from the Charles Drew University School of Medicine and Science. She completed her internship and residency in obstetrics and gynecology at Beth Israel Hospital in Boston and her fellowship in maternal-fetal medicine at Los Angeles County, University of Southern California Medical Center. Dr. Gregory received her master's of public health from the Harvard University School of Public Health in 1991.

**Paula A. Johnson, M.D., M.P.H.,** an internationally recognized cardiologist, is the executive director of the Connors Center for Women's Health and Gender Biology and chief of the Division of Women's Health at Brigham and Women's Hospital, and associate professor of Medicine at Harvard Medical School. Dr. Johnson brings a broad range of experience as a phy-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

sician, researcher, and expert in public health and health policy to bear in the effort to transform the health of women. Central to the Connors Center's mission is discovering how disease is expressed differently in women and men, integrating leading-edge research about women's health into the delivery of care, influencing health policy, addressing the health of women globally, and training the next generation of leadership in the field. Dr. Johnson is a graduate of Harvard and Radcliffe Colleges, and received her M.D. and M.P.H. from Harvard. Dr. Johnson has been recognized with many awards for her contributions in women's and minority health and public health and is featured as a national leader in medicine by the National Library of Medicine.

**Anthony Lo Sasso, Ph.D.,** is a professor and senior research scientist in the Division of Health Policy and Administration at the University of Illinois at Chicago School of Public Health and the Institute of Government and Public Affairs at the University of Illinois. He joined the University of Illinois at Chicago faculty in 2004. Dr. Lo Sasso is an economist whose research spans several dimensions of health economics and health services research. Dr. Lo Sasso is keenly interested in how government policies affect private-sector decisions. Dr. Lo Sasso has studied the impact of the State Children's Health Insurance Program on uninsurance among children and the extent to which public coverage crowded out private coverage. In addition, he has examined how community rating provisions affected non-group health insurance coverage and uninsurance. Dr. Lo Sasso also studies the effects of health savings accounts and other high-deductible health insurance products on service use and spending. He is currently working with the Upstate Health Research Network in New York to calculate usual and customary reimbursement rates for the health insurance industry. Dr. Lo Sasso received his doctorate in economics in 1996 from Indiana University, Bloomington.

**Jeanette H. Magnus, M.D., Ph.D.,** is Cecile Usdin Professor in Women's Health; professor of public health and chair of the Department of Community Health Sciences at the Tulane University School of Public Health and Tropical Medicine; and a clinical professor in the Department of Medicine, Tulane University School of Medicine. She is also the director of the Tulane Xavier National Center of Excellence in Women's Health and the Mary Amelia Douglas-Whited Community Women's Health Education Center. Dr. Magnus's work bridges clinical medicine and science, epidemiology, public health, and community research. She has extensive experience in rheumatology and internal medicine. She developed and established the Tulane University Total Woman Health Care Clinic in 2000, providing primary and specialty care to women across the life span. Her research interests are in gender and race disparity in health and disease;

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA958                    JA-0000551

Clinical Preventive Services for Women. Closing the Gaps

Case: 725-25751-0-WPB cument u64-3t 25Page: 297d 09/2020 2 Filed P12/12/2005 330

the association between health behaviors, self-evaluated health or mental health, and chronic disease; cardiovascular disease; and osteoporosis. Dr. Magnus has more than 130 publications and extensive experience in network building and coordination of projects that involve research scientists and practitioners with different backgrounds. She is the associate editor for the Epidemiology and Population Health Section for *Gender Medicine* and a member of the editorial boards of the *Biology of Sex Differences* and the *Journal of Women's Health*. Dr. Magnus earned both her M.D. and Ph.D. from University of Tromsø in Norway.

**Heidi D. Nelson M.D., M.P.H.,** is a research professor of medical informatics and clinical epidemiology and medicine at the Oregon Health & Science University and medical director for cancer prevention and screening at Providence Health and Services, Portland, Oregon. Dr. Nelson received her M.D. and M.P.H. at the University of Minnesota and completed her internal medicine residency at the Oregon Health & Science University and fellowship in clinical epidemiology at the University of California, San Francisco. Since 1998, Dr. Nelson has conducted systematic evidence reviews and comparative effectiveness reviews for the United States Preventive Services Task Force, National Institutes of Health, Agency for Healthcare Research and Quality Effective Healthcare Program, and Drug Effectiveness Review Project, among others, at the Oregon Evidence-Based Practice Center. Her work has been used in developing clinical recommendations, practice guidelines, and consensus statements primarily in areas of women's health. At Providence, a not-for-profit, community-based, integrated health system in the western United States, she has developed patient data registries for quality improvement and research purposes, including a breast cancer screening and treatment registry. She has also led planning, implementation, and evaluation of health care programs and practices across the state to improve health care for women.

**Roberta B. Ness, M.D., M.P.H.,** is dean, M. David Low Chair in Public Health, and professor in epidemiology at The University of Texas School of Public Health. Dr. Ness was formerly chair of the Department of Epidemiology at the University of Pittsburgh Graduate School of Public Health and served as interim dean in 2005 and 2006. Dr. Ness received her M.D. from Cornell University and her M.P.H. from Columbia University. Dr. Ness was one of the first to propose the research paradigm now termed "gender-based biology" in her book titled *Health and Disease Among Women* (1999). Dr. Ness is also known for her work on teaching innovation. She recently authored *Innovation Generation*, an instructional program for innovative thinking (to be published in 2012 by Oxford University Press). Dr. Ness is a fellow of the American College of Physicians; member of the Academy

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA959                                    JA-0000552

Clinical Preventive Services for Women: Closing the Gaps

of Medicine, Engineering, and Science of Texas; and member of the Institute of Medicine of the National Academies. She is president-elect of the American Epidemiologic Society and past president of the American College of Epidemiology. She is an elected member of the prestigious American Society for Clinical Investigation, Delta Omega Honorary Society, and the American Epidemiologic Society. She was selected by the Society for General Internal Medicine to be the 2008 Distinguished Professor of Women's Health. In 2011 she was named a U.S. presidential appointee to the Mickey Leland Center for Environmental Air Toxicant Research.

**Magda G. Peck, Sc.D.,** professor of public health and pediatric at the University of Nebraska Medical Center (UNMC), in Omaha, is a national leader in maternal and child health. Dr. Peck's specific areas of expertise include prevention and public health for women and children, translating science into effective programs and policies, and leadership and workforce development. She received master's and doctoral degrees (1983, 1986) from the Harvard University School of Public Health, specializing in maternal and child health and social policy. For more than two decades, Dr. Peck has worked to build public health capacity to make a measurable difference for women and children. In 1988, Dr. Peck founded CityMatCH (www.citymatch.org), which has become the leading national public health organization dedicated to improving the health and well-being of women, children, and families in America's urban communities. While serving as CityMatCH's chief executive officer (until 2007), she lead the design and dissemination of innovative approaches to improving local understanding and action to address mother-to-baby transmission of human immunodeficiency virus and AIDS, reduce health disparities, and improve women and infant's health, including the perinatal periods of risk approach. She served as a member of the Select Panel for Preconception Care with the Centers for Disease Control and Prevention to shape national recommendations on the care of women prior to pregnancy, and co-led the Public Health Work Group of the National Preconception Health Steering Committee. Dr. Peck has been a pioneer for academic public health in Nebraska. She was founding director of the state's only master of public health program and helped establish the Great Plains Public Health Leadership Institute, which she has directed since 2005. As the new associate dean for community engagement and public health practice of the new UNMC College of Public Health, she ensures a dynamic, mutually beneficial interface between academe and community.

**E. Albert Reece, M.D., Ph.D., M.B.A.,** is currently vice president, University of Maryland, and dean of the School of Medicine. Previously, he was vice chancellor and dean of the University of Arkansas College of Medi-

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19    JA960    JA-0000553

cine. Dr. Reece received his undergraduate degree (B.S., magna cum laude) from Long Island University, his M.D. degree from New York University, his Ph.D. degree in biochemistry from the University of the West Indies, Kingston, Jamaica, and his M.B.A. degree from the Fox School of Business and Management of Temple University. He completed a residency in obstetrics and gynecology at Columbia University Medical Center and a fellowship in maternal-fetal medicine at Yale University School of Medicine. He served on the faculty at Yale for almost 10 years and was the Abraham Roth Professor and chair of the Department of Obstetrics, Gynecology, and Reproductive Sciences at Temple University. Dr. Reece has published more than 500 journal articles, book chapters, and abstracts, and 9 textbooks, with revisions. He is an associate editor for the *Journal of Maternal-Fetal Medicine* and a reviewer for several scientific journals. He directs a National Institutes of Health-funded laboratory studying the biomolecular mechanisms of diabetes-induced birth defects. Dr. Reece is a member of the Institute of Medicine.

**Alina Salganicoff, Ph.D.,** is vice president and director of Women's Health Policy at the Henry J. Kaiser Family Foundation. She directs the foundation's work on health coverage and access to care for women, with an emphasis on challenges facing underserved women. She also directs KaiserEDU.org, the foundation's educational website. Dr. Salganicoff has written and spoken extensively on a broad range of health policy concerns facing women, ranging from health disparities to long-term care. She was also an associate director of the Kaiser Commission on Medicaid and the Uninsured, specializing on the access challenges facing low-income families, Medicaid managed care, and state health reform. Prior to joining Kaiser, she worked on the program staff of the Pew Charitable Trusts. She has served on numerous federal, state, and nonprofit advisory committees, including the Institute of Medicine's Committee on Women's Health Research. Dr. Salganicoff received a B.S. from the Pennsylvania State University and holds a Ph.D. in health policy from The Johns Hopkins University School of Hygiene and Public Health.

**Sally W. Vernon, Ph.D.,** is director of the Division of Health Promotion and Behavioral Sciences, Blair Justice Professor in Mind-Body Medicine and Public Health, and professor of epidemiology and behavioral sciences at the University of Texas-Houston School of Public Health (UTSPH) and the Center for Health Promotion and Prevention Research. Dr. Vernon's training is in epidemiology and behavioral sciences. She received her B.A. in Spanish from the University of Oklahoma, her M.A. in sociology from New York University, and her Ph.D. in community health sciences from UTSPH. Dr. Vernon conducts interdisciplinary research in cancer prevention and control, with

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                    JA961                                    JA-0000554

Clinical Preventive Services for Women. Closing the Gaps

an emphasis on breast, cervical, and colorectal cancers. Her work has been conducted in community, work-site, and medical care settings, where she has developed and tested interventions to promote cancer screening behaviors. Dr. Vernon has published more than 150 scientific articles and book chapters and is currently a member of several editorial boards including those of the *Journal of National Cancer Institute, Cancer Epidemiology, Biomarkers & Prevention, Preventive Medicine*, and *Cancer Causes and Control*. She is a fellow and past president of the American College of Epidemiology.

**Carol S. Weisman, Ph.D.,** is distinguished professor of public health sciences and obstetrics and gynecology at the Pennsylvania State University College of Medicine, with a joint appointment in the Department of Health Policy and Administration, and associate dean for faculty affairs. Dr. Weisman is a sociologist and health services researcher with a principal interest in women's health care and policy. Her research focuses on improving access and quality in women's primary care and on how health care and health risks affect women's health. She is director of the Central Pennsylvania Center of Excellence for Research on Pregnancy Outcomes and of the Central Pennsylvania Women's Health Study (CePAWHS); Principal Investigator of the Penn State BIRCWH (Building Interdisciplinary Research Careers in Women's Health) K-12 Program; and Associate Editor of *Women's Health Issues*. She received her B.A. from Wellesley College with a major in sociology and anthropology and her Ph.D. in social relations (sociology) from the Johns Hopkins University.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                    JA962                    JA-0000555

# Appendix D

# Dissent and Response

This appendix has two parts. The first is a dissent statement from committee member Anthony Lo Sasso, and the second is a response from the chair and the other 14 members of the Committee on Preventive Services for Women.

## DISSENTING OPINION

*Anthony Lo Sasso*

### Summary

Given the combination of the unacceptably short time frame for the PSW committee to conduct or solicit meaningful reviews of the evidence associated with the preventive nature of the services considered, this dissent advocates that no additional preventive services beyond those explicitly stated in the Affordable Care Act (ACA) be recommended for consideration by the Secretary for first dollar coverage until such time as the evidence can be objectively and systematically evaluated and an appropriate framework can be developed. The long-run risks associated with making poorly informed decisions, and their likely irreversibility once codified, outweigh the ACA-mandated rapidity with which the committee was confronted.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19
JA-0000556

### Rationale

The ACA provided the impetus for the IOM to form a panel to make recommendations about screening and preventive services that "have been shown to be effective for women" that in turn will be considered by the Secretary for coverage on a first-dollar basis by all new private plans in operation in 2014. However, a remarkably short time frame was provided for the task of reviewing all evidence for preventive services beyond the services encompassed by the USPSTF, Bright Futures and ACIP: the final report from the committee was needed barely six months from the time the group was empanelled.

As the Report acknowledges, the lack of time prevented a serious and systematic review of evidence for preventive services. This should in no way reflect poorly on the tireless work of the committee and staff; it instead merely reflects the fact that the process set forth in the law was unrealistic in the time allocated to such an important and time-intensive undertaking. Where I believe the committee erred was with their zeal to recommend something despite the time constraints and a far from perfect methodology.

The Report posits four categories as the basis for the recommendations ranging from "high quality systematic evidence reviews" (Category I) to potentially self-serving guidelines put forth by professional organizations (Category IV). The categories alone on their face provide little basis to exclude many preventive services. For example, Category II asks whether there are any "quality" supportive peer-reviewed studies, but there is no clear benchmark for what quality means in this context; many studies published in peer-reviewed journals (even very well respected journals) are of low quality and are not generalizable. The problematic nature of the categories aside, the relative weights applied to each category vis-à-vis the recommendations were not specified, making it impossible to discern what factors were most important in the decision to recommend one service versus another. The categories were combined with expert judgment from members of the committee and supplemented with committee debate to arrive at the recommendations put forth in the Report. Readers of the Report should be clear on the fact that the recommendations were made without high quality, systematic evidence of the preventive nature of the services considered. Put differently, evidence that use of the services in question leads to lower rates of disability or disease and increased rates of well-being is generally absent.

The view of this dissent is that the committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy. An abiding principle in the evaluation of the evidence and the

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19 JA964 JA-0000557

Case 7:25-cv-25740-VB Document 34-3 25 Page: 303 09 Date Filed 12/12/2025 330

recommendations put forth as a consequence should be transparency and strict objectivity, but the committee failed to demonstrate these principles in the Report. This dissent views the evidence evaluation process as a fatal flaw of the Report particularly in light of the importance of the recommendations for public policy and the number of individuals, both men and women, that will be affected.

## Other Considerations

Another concerning aspect of the Report is the lack of a coherent framework to evaluate coverage apart from the evidence regarding clinical efficacy. Although coverage determinations were not explicitly part of the committee's charge, it is nevertheless difficult to ignore the fact that the committee's recommendations will have important implications for coverage considerations. Thus while the lack of a theoretical or conceptual framework to examine coverage decisions can perhaps be forgiven, it is clear that the "life course" model put forth in the Report does not lend itself to the consideration of coverage decisions. I describe one potential framework below that could inform such thinking around coverage determinations.

The ACA law requires coverage by private insurers of all USPSTF A and B recommendations. The USPSTF process of evidence review represents a "gold standard" based on a critical and scholarly review of all extant literature and therefore is the bar the committee should have aspired to in basing its recommendations to the Secretary. That said, the clinical recommendations from the USPSTF were never intended to provide a basis for insurance coverage determinations; they are intended as guides to physician practice. Given the previous role of the USPSTF it is worth noting that basing coverage decisions categorically on USPSTF recommendations has the potential to jeopardize the objectivity and scientific integrity of the USPSTF review process.

In contrast, while Bright Futures is a body aimed at influencing clinical practice, the evidence bar for its recommendations is considerably lower than that of the USPSTF. Recommendations are considered "evidence-informed" and rely heavily on expert opinion rather than systemic, critical reviews of the literature. This is troubling given the important public policy consequences that will now result from Bright Futures recommendations.

## Additions to the Update Recommendations

There are reasons to support the framework for future evaluation of preventive services in the Report (Chapter 6). The proposed framework crucially recognizes the importance of separating the scientific objective

Copyright National Academy of Sciences. All rights reserved.

of establishing the effectiveness and potentially the cost effectiveness of preventive services from the policy decision regarding coverage of services. This dissent advocates for a more concrete structure based on sound public policy principles to frame both the evidence review and coverage decision for specific preventive services for women.

A highly regarded framework to examine coverage decisions of preventive services in an insurance context was developed more than twenty years ago by Pauly and Held (1990). The authors consider coverage decisions for a hypothetical preventive service that is presumed to reduce the probability of a covered and potential costly healthcare treatment episode (for example, inpatient treatment of a preventable disease outcome). More formally, if one assumes a preventive service, $S$, that costs $P$ is available that when administered changes the probability from $p_n$ to $p_y$ of experiencing an inpatient event with cost $E$, the following can be observed:

1. If $p_n > p_y$ the service is effective in prevention as the treatment $S$ reduces the probability of experiencing the negative outcome; this represents the minimum necessary threshold for which "preventive" needs to be defined.
2. If $(p_n - p_y)E > P$ the service is "cost effective"[1] in that the cost associated with the relative reduction in the probability of the negative outcome exceeds the cost of the treatment S; this is a potentially high bar but an important one for a preventive service.

However, it is important to understand that point (1) and even point (2) do not necessarily imply that first-dollar coverage of preventive services leads to an overall reduction in insurer payments (and hence insurance premiums) as many might assume. Whether coverage of preventive service leads to a reduction in healthcare expenditure depends on the fraction of enrollees using the service before the service becomes covered and the magnitude of the response among enrollees who experience the reduction in out-of-pocket price. This latter point is what Pauly and Held term "benign moral hazard" and it points to a critical parameter of interest as the elasticity or responsiveness of preventive service utilization to the user price for the service. Knowing how elastic patient demand is to preventive services is a critical element to a coverage decision even if one already has good estimates of the effectiveness and cost-effectiveness. This is self-evidently a useful parameter to know for any preventive service because it highlights

---

[1] It is important to note that the statute rules out cost as a consideration by the committee. Cost is included in the example only to demonstrate that the hypothetical preventive service meets a high bar beyond effectiveness.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                          JA966                          JA-0000559

Clinical Preventive Services for Women. Closing the Gaps

the impact that first-dollar coverage of the service will have, perhaps in relation to other forms of outreach.

More recently, Pauly and Blavin (2008) incorporate some additional considerations in the wake of research on so-called value-based health insurance designs. First dollar coverage can be justified if enrollees lack information about the benefits of preventive services in order to make correct (or at least fully informed) decisions. Such a determination, however, would depend on the relative efficacy of information provision about the benefits of preventive services versus reducing (or eliminating) cost sharing.

## REFERENCES

Pauly, M. V., and F. E. Blavin. 2008. Moral hazard in insurance, value-based cost sharing, and the benefits of blissful ignorance. *Journal of Health Economics* 27:1407–1417.
Pauly, M. V., and P. J. Held. 1990. Benign moral hazard and the cost-effectiveness analysis of insurance coverage. *Journal of Health Economics* 9:447–461.

## RESPONSE TO DISSENTING STATEMENT

*Linda Rosenstock (Chair), Alfred O. Berg, Claire D. Brindis,
Angela Diaz, Francisco Garcia, Kimberly Gregory, Paula A. Johnson,
Jeanette H. Magnus, Heidi D. Nelson, Roberta B. Ness,
Magda G. Peck, E. Albert Reece, Alina Salganicoff,
Sally W. Vernon, and Carol S. Weisman*

The dissenting committee member wanted more time and the opportunity to incorporate cost-benefit analysis. At the first committee meeting, it was agreed that cost considerations were outside the scope of the charge, and that the committee should not attempt to duplicate the disparate review processes used by other bodies, such as the USPSTF, ACIP, and Bright Futures. HHS, with input from this committee, may consider other factors including cost in its development of coverage decisions. The dissent also includes inaccurate statements regarding the committee process and its approach to the committee charge. The committee members' expertise is diverse and while many have different perspectives, no other member shares the opinion that report recommendations were not soundly evidence based.

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19                                     JA967                                     JA-0000560

Copyright National Academy of Sciences. All rights reserved.

Exhibit 19

JA-0000561



## ACCESSMATTERS
TRANSFORMING ACCESS TO SEXUAL & REPRODUCTIVE HEALTH

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
US Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Re:    **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (CMS-9940-IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

AccessMatters is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. As a result, AccessMatters has strongly supported the nation's efforts to ensure individuals have robust insurance coverage of contraception without cost-sharing and unequivocally opposes the Departments of Health and Human Services, Labor and Treasury's (the Departments') recent efforts that undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this interim final rule (IFR).

AccessMatters innovates, empowers, and works to equalize access to sexual and reproductive health care for teens and adults in need. Through our unique abilities to engage and empower even the hardest-to-reach populations, we are closing the gap between those with access to sexual and reproductive health and those without.

AccessMatters has a proud 45-year history of providing comprehensive family planning and related preventive health services to individuals, families, and communities through our network of partner organizations. As the Title X Family Planning grantee for Southeastern Pennsylvania, and the largest Ryan White Part D grantee in Philadelphia, we are a critical part of the region's healthcare safety net. Serving individuals from low-income families and other hard-to-reach and vulnerable populations is a high priority for AccessMatters. A hallmark of

1700 MARKET STREET SUITE 1540 PHILADELPHIA PA 19103
215 985-2600 | 215 732 1252 FAX | WWW.ACCESSMATTERS.ORG

00372988

Exhibit 21                                        JA969                                        JA-0000597

the AccessMatters' service delivery model is to support integration of complimentary services such as HIV prevention, teen focused programs, health coverage enrollment assistance, maternal health, and pediatrics.

The women's preventive services requirement of the ACA was designed to promote preventive health care, reduce future medical costs, and improve the health, equality, and economic security of women and families.[1] More than 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, screening for sexually transmitted diseases, and contraception and contraceptive counseling.[2] By allowing virtually any employer or university to claim this religious exemption and deprive women of contraceptive coverage, this IFR will harm the health and well-being of women, their partners, and their families. Furthermore, the IFR is predicated upon a distorted picture of the of the federal programs that compose the family planning safety net, the Title X family planning program and Medicaid. **For these reasons, AccessMatters calls on the Departments to rescind the IFR and restore equal access to contraceptive coverage regardless of employer.**


## CONTRACEPTION IS CRITICAL TO HEALTH

Women face a unique set of health care challenges because they access more health services than men, yet earn less on average than men.[3] As a result, women face a high level of health care insecurity, which in turn leads many women to forgo necessary care due to prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on contraception alone.[5] As a result of the ACA and its contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on oral contraceptives in 2013 alone.[6]

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. *Available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] Ibid.

[6] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

00372989

Exhibit 21

JA-0000598

The goal of preventive health care is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of contraception is to prevent unintended pregnancy, control the timing of a desired pregnancy and spacing between pregnancies, in accordance with patient choice and to improve maternal, child, and family health.[7] In addition, contraception is particularly critical for women with underlying physical and psychological conditions, some of which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[8]

Unintended pregnancies have higher rates of long-term health complications for women and their infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and experiencing physical violence during pregnancy.[10]

Unintended pregnancy rates are higher in the US than in most other developed countries, with approximately 45% of pregnancies unintended.[11] In addition, the US has the highest rate of maternal mortality in the developed world.[12] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[13] Contraception is considered a major factor in reducing rates of maternal morbidity and mortality.

Beyond the well-established evidence that contraception is effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a

---

[7] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[8] *Id.* at 103–104.

[9] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[10] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews.* 2010;32(1):152–174. doi:10.1093/epirev/mxq012.

[11] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008-2011, *New England Journal of Medicine*, 2016, 374(9):843-852,

[12] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[13] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

00372990

Exhibit 21                    JA971                    JA-0000599

decreased risk of endometrial and ovarian cancer.[14] Non-contraceptive health benefits also include treatment for non-gynecologic conditions. [15,16]

The patient, in consultation with a trusted health care provider, should determine the right contraceptive method for her unique health care needs without interference from politicians. The IFR interferes with the patient–provider relationship, and conversations about if and when to become pregnant as well as which contraceptive method to use to avoid pregnancy.

## OTHER GOVERNMENT PROGRAMS CANNOT MEET THE NEED FOR CONTRACEPTIVE COVERAGE

The Department of Health and Human Services (HHS) asserts that existing government-sponsored programs, such as Medicaid and the Title X family planning program, can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost-sharing under their employer-sponsored or student health plans.[17] As discussed below, this assertion fails to recognize that: 1) programs such as Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals; 2) those programs do not have the capacity to meet the needs of current enrollees and those seeking care at Title X–funded health centers; and, 3) legislative and administrative proposals threaten the capacity and goals of these programs. Moreover, the claim that state coverage requirements are an alternative misconstrues the scope and protections provided by these requirements, which cannot fill in the gaps of coverage for many individuals who will lose contraceptive coverage.

### Medicaid and Title X are not designed to meet the needs of individuals who lose access to contraceptive coverage under their employer-sponsored or student health plans.

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services. [18] While Title X–funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[19] Low-income individuals receive services at low or no cost depending on their family income.[20] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate

---

[14] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41–7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125 250–5.

[15] Schindler AE. supra.

[16] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[17] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[18] See Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91–572, 84 Stat. 1504.

[19] 42 CFR § 59.5 (a)(6–9).

[20] 42 U.S.C. § 300a–4(c)(2); 42 C.F.R. § 59.5(a)(7)–(8).

00372991

Exhibit 21

JA-0000600

how Title X and third-party payers will work together to pay for care, directing Title X–funded agencies to seek payment from such third-party payers.[21]

      Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible for this coverage.[22] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[23] In many of these states, childless adults remain ineligible for the program.[24] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

**Medicaid and Title X do not have capacity to meet the increased need.**

      At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people. Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. Despite this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[25] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning and sexual health providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care plans had provider

---

[21] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[22] The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22%22Location%22,%22sort%22%22asc%22%7D (last updated Nov. 8, 2017).

[23] Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[24] Ibid.

[25] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

00372992

Exhibit 21

JA-0000601

shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[26]

The IFR argues that Title X–funded health centers could fill the gap in contraceptive coverage caused by employer exemptions and would have to provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would from the IFR. Since 2010, the reported annual number of clients served at Title X–funded health centers has dropped from approximately 5.2 million patients to just over 4 million.[27] This decline corresponds with over $30 million in cuts to Title X's annual appropriated amount over the same period.[28] A recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X–funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[29] Requiring otherwise higher-income, privately insured individuals to use Title X–funded health centers would deplete resources from an already overburdened and underfunded program. Thus, AccessMatters is unconvinced that Medicaid and Title X are plausible alternatives for the individuals affected by this IFR.

**Political assault on Medicaid, Title X, and Planned Parenthood health centers have already compounded the threat to women's access to contraceptive care.**

Medicaid is a vital source of coverage for family planning and sexual health care in the United States, but political threats to the program may undermine its ability to provide the coverage that meets the needs of individuals and families. In 2010, Medicaid covered nearly 45% of all births in the US, and in many states Medicaid covers well over half of births.[30]

---

[26] U.S. Department of Health and Human Services, supra at note 7.

[27] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[28] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[29] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

[30] Kathy Gifford et al., The Henry J. Kaiser Family Found., Medicaid Coverage of Pregnancy and Perinatal Benefits: Results from a State Survey, (2017), http://kff.org/womens-health/policy/report/medicaid-coverage-of-pregnancy-and-perinatal-benefits-results-from-a-state-survey/; *Births Financed by Medicaid*, The Henry J. Kaiser Family Found., http://kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22%2Location%22%2Csort%22%22asc%22%7D (last visited Nov. 6, 2017).

00372993

Exhibit 21

JA-0000602

Medicaid is also the single largest source of public funding for family planning services and supplies.[31]

Within the last year, policymakers have sought to radically alter the financial structure of Medicaid. The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars from the program over the next ten years.[32] The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per-capita cap, and permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve.[33]

The administration has also made moves that could radically alter the Medicaid program. Earlier this year, then-Secretary Tom Price and CMS Administrator Seema Verma issued a letter to governors announcing HHS' intent to use existing Section 1115 waiver authority to approve changes to state Medicaid programs that could undermine the ability of individuals qualified to enroll in Medicaid—particularly non-disabled, working-age adults—to receive the coverage and health care they need.[34]

In addition to these legislative and administrative efforts to alter the Medicaid program, Congress and the administration have threatened access to trusted family planning and sexual health providers by attempting to block Planned Parenthood from participating in Medicaid despite the dominant role Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57% of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[35]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks. Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly

---

[31] In 2010, Medicaid accounted for 75 percent of all public funds spent on contraceptive services and supplies. Kinsey Hasstedt et al., Guttmacher Institute, Public Funding for Family Planning and Abortion Services, FY 1980-2015 (2017), https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.

[32] Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf.

[33] Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIY.

[34] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

[35] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

00372994

Exhibit 21                    JA975                    JA-0000603

sought to defund or interfere with patients' access to care under the program. In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018.[36] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[37] For instance, the president's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[38] [39]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ+ individuals, communities of color, and young people.

**Most state coverage requirements fail to guarantee coverage of the full range of contraceptive methods, services, and counseling with no cost-sharing.**

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that 22 states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other 28 states.[40] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[41] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive

---

[36] *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[37] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017-09-05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018.

[38] Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[39] White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets_2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[40] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[41] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

00372995

Exhibit 21　　　　　　　JA976　　　　　　　JA-0000604

methods, services, and counseling that are included.[42] Additionally, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[43]

The Departments' assertion that other programs and legal requirements can meet the need for contraceptive coverage created by this rule is inaccurate.

## JUSTIFICATIONS FOR THE IFR DO NOT MEET BASIC SCIENTIFIC STANDARDS

As the nation's health policy center, HHS must adopt policies and activities firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the Institute of Medicine (IOM) and the Women's Preventive Services Initiative (WPSI), instead prioritizing religious objections over evidence-based medical recommendations. The Departments make several false and misleading statements in the IFR to undermine the contraceptive coverage benefit. AccessMatters fundamentally disagrees with the Departments' decision to promulgate this IFR based on the religious beliefs of individuals and entities rather than science and medicine.

### Contraception does not interfere with an existing pregnancy.

The IFR takes issue with the IOM-recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices...that many persons and organizations believe are abortifacient—that is, as causing early abortion."[44] FDA-approved contraceptive methods do not function as abortifacients. Every FDA-approved contraceptive method acts before implantation, does not interfere with an existing pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[45]

### Contraception is medication and carries risks like any medication.

The IFR raises concerns about the "negative health effects" of contraception.[46] As with any medication, some contraceptive methods may be contraindicated for patients with certain

---

[42] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[43] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

[44] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13–354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?

[46] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

00372996

Exhibit 21                    JA977                    JA-0000605

medical conditions, including high blood pressure, lupus, or a history of breast cancer.[47,48] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[49] The IFR also suggests contraception increases the risk of breast cancer, but there is no scientifically-proven increased risk of breast cancer among contraceptive users, particularly those under 40.[50]

**Contraception makes sex among adolescents healthier, not more likely to happen.**

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[51] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[52,53] In fact, research has shown that school-based health centers that provide access to contraception are proven to increase use of contraception by already sexually active students, not to increase onset of sexual activity.[54,55] On the other hand, young women who did not use contraception at first sexual intercourse were twice as likely to become teen mothers.[56] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[57]

**The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.**

**THE IFR UNDERMINES CONGRESSIONAL INTENT**

The Departments ignore Congress' clear intent that contraception be covered as a preventive service under the ACA. When Congress passed the Women's Health Amendment, it

---

[47] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[48] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[49] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239-42.

[50] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1-66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[51] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[52] Kirby D. Emerging answers 2007  Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[53] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2-9).

[54] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[55] Knopf JA, Finnie RKC, Peng Y, et al.  Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114-26.

[56] Ibid.

[57] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007-2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

00372997

Exhibit 21                                    JA978                                    JA-0000606

meant to "ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[58] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[59] In enacting the amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*... In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[60]

In considering the amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[61] Additional statements from Senators Boxer, Feinstein, Nelson, and Durbin prove that the intent to cover contraception was clear.[62]

To meet the amendment's objectives, HHS commissioned the IOM to convene a diverse committee of experts in disease prevention, women's health and adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and

---

[58] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8727 (Feb. 15, 2012).

[59] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[60] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[61] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[62] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

Page **11** of **12**

00372998

Exhibit 21     JA979     JA-0000607

recommend services and screenings for HHS to consider in order to fill those gaps.[63] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[64] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM report.[65] These were updated in 2016 based on recommendations from the WPSI as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These, too, were adopted by HRSA.

HHS, through the adoption of the IOM's recommendations and the subsequent adoption of the WPSI recommendations, carried out Congress' intent. **The Departments should rescind the IFR to continue reflecting that intent.**

***

AccessMatters appreciates the opportunity to provide comment on the religious exemptions and accommodations for coverage of certain preventive services interim final rule. This IFR will cause people to lose contraceptive coverage and harm their health and well-being. It ignores congressional intent that contraception be covered by the ACA, and is based on a distorted picture of the science supporting contraception and the federal programs supporting contraceptive access. **For all of these reasons, AccessMatters calls on the Departments to rescind the IFR.**

If you require additional information about the issues raised in this letter, please contact Melissa Weiler Gerber at 215-985-2655 or melissa.weilergerber@accessmatters.org.


Sincerely,


Melissa Weiler Gerber
President and CEO

---

[63] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
[64] *Id.* at 109-10.
[65] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

00372999

Exhibit 21



AMERICAN ACADEMY OF
FAMILY PHYSICIANS
STRONG MEDICINE FOR AMERICA

November 30, 2017

Seema Verma, Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–9940–IFC and CMS–9925–IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Dear Administrator Verma:

On behalf of the American Academy of Family Physicians (AAFP), which represents 129,000 family physicians and medical students across the country, I write in response to the two regulations titled "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (CMS–9940–IFC) and "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (CMS–9925–IFC) as published by the Centers for Medicare & Medicaid Services (CMS) in the October 13, 2017, *Federal Register*.

These interim final rules are designed to expand exemptions to protect religious or moral beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through the *Affordable Care Act* (ACA).

The AAFP strongly urges you to preserve guaranteed coverage of women's preventive services, including contraception, at no out-of-pocket cost in private insurance plans, and immediately withdraw these two interim final rules so that women do not lose coverage. Section 2713 of the ACA requires all non-grandfathered individual and group health plans to offer coverage with no cost sharing of women's preventive services. Over 62 million women with private insurance now have access to these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, contraception and contraceptive counseling. Coverage guidelines were developed based on the best clinical and scientific evidence, and contraception is a key piece of this comprehensive women's preventive services package.

Maintaining access to this existing coverage is critical to ensuring American women and families can access the care that they need. Contraception is an integral part of preventive care and a medical necessity for women during approximately 30 years of their lives. Access to no-copay contraception leads to healthier women and families. Any move to decrease access to these vital services would have damaging effects on public health. When women have unplanned pregnancies, they are more likely to delay prenatal care, resulting in a higher risk of birth defects, low birth weight, and poor mental and physical function in early childhood. No-copay coverage of contraception has improved the health of women and families and contributed to a dramatic decline in the unplanned pregnancy rate in the United States, including among teens, now at a 30-year low.

www.aafp.org

| President | President-elect | Board Chair | Directors | |
|---|---|---|---|---|
| Michael Munger, MD | John Cullen, MD | John Meigs, Jr., MD | John Bender, MD, *Fort Collins, CO* | Sterling Ransone, MD, *Deltaville, VA* |
| *Overland Park, KS* | *Valdez, AK* | *Brent, AL* | Gary LeRoy, MD, *Dayton, OH* | Windel Stracener, MD, *Richmond, IN* |
| | | | Carl Olden, MD, *Yakima, WA* | Erica Swegler MD, *Austin, TX* |
| Speaker | Vice Speaker | Executive Vice President | Robert Raspa, MD, *Orange Park, FL* | Benjamin F. Simmons, III, MD (New Physician Member), *Concord, NC* |
| Alan Schwartzstein, MD | Russell Kohl, MD | Douglas E. Henley, MD | Leonard Reeves, MD, *Rome, GA* | Alexa Mieses, MD (Resident Member), *Durham, NC* |
| *Oregon, WI* | *Stilwell, KS* | *Leawood, KS* | Ada Stewart, MD, *Columbia, SC* | John Heafner, MPH (Student Member), *St. Louis, MO* |

1133 Connecticut Ave., N.W., Ste. 1100  |  Washington, DC 20036-4305  |  (800) 794-7481  |  (202) 232-9033

00433447

Exhibit 23

JA981

JA-0000628

These rules will negatively impact access to preventive care for women nationwide, and will negatively impact our economy. No-copay coverage of contraception saves money for taxpayers and state and federal governments. Unplanned pregnancies cost approximately $21 billion in government expenditures in 2008. Per the Kaiser Family Foundation's issue brief on implications for women's access to coverage and care, before the ACA, women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control. After the ACA, women saved approximately $1.4 billion on out-of-pocket costs for contraception in one year.

Changes to our healthcare system come with very high stakes – impacting tens of millions of our patients. Access to contraception allows women to achieve their full potential and is key to healthier women becoming key drivers of our Nation's economic success. These rules would create a new standard whereby employers can deny their employees coverage based on their own moral objections. This interferes in the personal health care decisions of our patients, and inappropriately inserts a patient's employer into the physician-patient relationship. In addition, these rules open the door to moral exemptions for other essential physician-recommended preventive services, such as immunizations.

The AAFP supports policies that require public and private insurance plans to provide coverage and not impose cost sharing for all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women and men with reproductive capacity including those contraceptive methods for sale over-the-counter. We therefore urge you to immediately withdraw these harmful rules and instead focus on rules that improve access to care.

**About Family Medicine**
Family physicians are dedicated to treating the whole person. These residency-trained, primary care specialists provide a wide variety of clinical services including prenatal and maternity care, and gynecological services. Family physicians provide clinical care across the lifespan and treat babies with ear infections, adolescents with depression, adults with hypertension, and seniors with multiple chronic illnesses. With a focus on prevention, primary care, and overall care coordination, they treat illnesses early and, when necessary, refer their patients to the right specialist and advocate for their care.

One out of every five office visits in the United States are made with family physicians. More than 192 million office visits are made to family physicians each year. This is 66 million more than the next largest medical specialty. More Americans depend on family physicians than on any other medical specialty.

We appreciate the opportunity to provide these comments. Please contact Robert Bennett, Federal Regulatory Manager, at 202-232-9033 or rbennett@aafp.org with any questions or concerns.

Sincerely,

John Meigs, Jr., MD, FAAFP
Board Chair

00433448

Exhibit 23

JA-0000629

# AMERICAN ACADEMY OF NURSING
*transforming health policy and practice through nursing knowledge*

December 5, 2017

Acting Secretary Eric Hargan
U.S. Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G.
Washington, DC 20201

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. CMS-9940-IFC**

The American Academy of Nursing (Academy) submits the following comments in response to the Interim Final Rules ("the Rules") titled "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,"[1] published in the Federal Register on October 13, 2017, by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services ("the Departments").

The Academy unequivocally opposes the Departments' efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). We urge the Departments to withdraw this Rule (as well as the IFR") titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act".

The Academy is on record supporting evidence-based policies that 1) ensure that all people have full access to affordable, sexual and reproductive health services, 2) facilitate expansion of clinical knowledge and evidence-based women's preventive health services especially related to preventing unintended pregnancies, and 3) assure that all women's health care, including reproductive health services, is grounded in scientific knowledge and evidence-based policies and standards of care.

As a national nursing organization deeply committed to ensuring that all people have access to affordable health care, including contraceptive coverage as intended by the Affordable Care Act,[1] the Academy has a particular interest in this rule because nurses know and understand the importance of women having seamless contraception coverage to protect their health and ability to work, both of which are essential for the economic security of families across America.[2]

In this comment, we discuss how these Rules are at odds with science and research, have serious implications for women's health, and disregard the compelling interests furthered by the contraception coverage requirement and regulations included in the Affordable Care Act; as well as jeopardizing services to which some may object.[3]

---

[1] Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, amended by Pub. L. No. 111-152, 124 Stat. 1029.
[2] Berg JA. Taylor D, Woods NF (2013). Where we are today: Prioritizing women's health services and health policy. A report by the Women's Health Expert Panel of the American Academy of Nursing. Nursing Outlook **61**(1): 5-15, http://dx.doi.org/10.1016/j.outlook.2012.06.004
[3] Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act. 82 Fed. Reg. 47792 et seq.

1

1000 Vermont Avenue, NW · Suite 910 · Washington, DC 20005 · p: 202.777.1170 · f: 202.777.0107 · www.AANnet.org

00454729

Exhibit 24                    JA983                    JA-0000630

1. **The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health**

The Academy believes that health policy decision-making must be fully informed by scientific evidence and the best available data, and that the public has reliable access to independent scientific information and analysis produced and acquired by the federal government. The role of scientific evidence in public health decision-making is imperative, and we oppose any efforts to diminish the role of science in federal policymaking. Unfortunately, the Rules are a prime example of regulatory decision-making that ignores scientific evidence and the best available data. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence, and promoting unfounded doubt. Further, both Rules falsely assert certain types of FDA-approved contraceptive methods to abortifacients.

Contraceptive care is a vital service, as integral to a person's health as primary prevention of unintended pregnancy as well as prevention and treatment of common women's health problems. Indeed, nearly 60-percent of women use contraception to help treat several medical conditions specific to women.[4][5][6] There is no principled reason to separate contraceptive coverage from the range of services health insurance provides. Moreover, the current rationale justifying the IFR with respect to contraceptive care could be used in the future to justify denying any number of services. Therefore, it is not just contraceptive care that is at risk due to this IFR. Patients being refused care based on religious or moral beliefs of hospitals, clinics, and health professionals may suffer devastating health consequences.[7]

The Rules thus cause dual harm by undermining women's access to essential preventive health care and undermining the integrity of science in governance. Public health policy should be informed by the best available scientific evidence. Instead, the Departments use false claims about contraception that are contrary to medical and public health evidence, misstate or ignore research, and undermine the agencies' role as a source of accurate health information.

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the Departments enhance their credibility on issues of science and evidence, not undermine it. The Rules, however, show that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

2. **Contraceptive Care is Integral to Women's Health Care and Prevention of Unintended Pregnancy**

Contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[8] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The

---

[4] Jones, R.K. (2011). Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills. Retrieved from http://www.guttmacher.org/pubs/Beyond-Birth-Control.pdf
[5] Johnson-Mallard V, Kostas-Polston EA, Woods NF, Simmonds KE, Alexander IM, Taylor D (2017). Unintended pregnancy: a framework for prevention and options for midlife women in the U.S. Women's Midlife Health Journal, vol:pp, web access.
[6] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects adolescents and people who do not identify as women, including some gender non-conforming people and some transgender men.
[7] For documented instances where religious healthcare providers denied care to patients on the basis of religious beliefs, *see* Compl. 2, *ACLU of Mich. v. Trinity Health Corp.*, 2016 U.S. Dist. LEXIS 30690 (E.D. Mich. Mar. 10, 2016); Freedman et al., *When There's a Heartbeat: Miscarriage Management in Catholic-Owned Hospitals*, 98 AM. J. PUBLIC HEALTH 1774 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2636458; National Women's Law Center, *Refusals to Provide Health Care Threaten the Health and Lives of Patients Nationwide*, https://nwlc.org/resources/refusals-to-provide-health-care-threaten-the-health-and-lives-of-patients-nationwide/ (last visited Oct. 20, 2017).

2

00454730

Exhibit 24                                    JA984                                    JA-0000631

federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies. The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[iii] is false and does not reflect the weight of scientific and clinical evidence. In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[iv] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[v] and family planning is widely credited for contributing to women's societal, educational, and economic gains.[vi] The ACA's guarantee of no-copay coverage of contraception has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[vii] The teen pregnancy rate is also at the lowest point in at least 80 years.[viii]

Contraception improves health outcomes for women and children because unintended pregnancies have higher rates of short- and long-term health and social problems. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health problems unaddressed.[ix] They are also at increased risk of maternal mortality and morbidity, maternal depression, experiencing physical violence during pregnancy,[x] infant mortality, birth defects, low birth weight, and preterm birth.[xi] Unintended pregnancies are also associated with long-term negative physical and psychosocial effects on children.[xii] Contraception, by contrast, is considered a major factor in reducing rates of maternal mortality and morbidity.[xiii] The Departments' new Rules do not reflect this vast body of research and the clear health benefits of contraception.

### 3. HHS should focus on the promotion of the health of the public and the assurance that program beneficiaries have access to essential health services supported by science.

The focus of Departments' Rules are both flawed and misplaced. The IFR misses the mark in two important ways. First, the IFR ignores the reality that many faith-based organizations and employers have objections to essential health services that are the foundation of longstanding, critical HHS programs. In the arena of health care, and particularly family planning and sexual health, HHS-funded programs cannot achieve their fundamental objectives if the program contractors or grantees refuse to provide essential services, such as contraception, or discriminate against patient populations, including women, people of color and LGBT people.

Second, the IFR fails to consider the needs of program beneficiaries and the entities currently participating in already overburdened and underfunded HHS programs. HHS should be working to eliminate existing discrimination in HHS programs and activities, including refusals to provide reproductive health care or to serve certain populations. In addition, HHS must examine how to improve patient access to the essential health care services funded through HHS programs, which would include examining the barriers current health care providers face in meeting the needs of their patients through these programs.

One of the main benefits of the Affordable Care Act is its guarantee of certain basic minimum requirements for health care policies (to the extent those policies are not able to take advantage of a grandfather clause), no matter where one is employed. Although only one step towards truly seamless health care, the ACA nevertheless was supposed to make it easier, not more difficult, for people to live their lives and work where they wanted without worrying about what services may or may not be covered. With this IFR, that is no longer the case. By singling out those who work for employers or attend a university claiming a religious objection and deeming them not as important as others with respect to their reproductive rights, HHS is violating religious rights under the guise of protecting them.

3

00454731

Exhibit 24

JA-0000632

The Academy urges the Departments' to prioritize the needs of the beneficiaries of HHS programs and the health care providers that already serve them at the forefront of any consideration of achieving HHS' "mission of improving Americans' health and well-being."[8]

### 4. Religious Exemptions in Health Care Cause Harm

The Religious Exemptions IFR expands eligibility for the complete exemption—formerly reserved for houses of worship—to *all* nonprofit and for-profit employers. It also retains the accommodation, formerly available to non-profit and closely-held for-profit employers, as an optional alternative for any employer. Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision.

The Academy opposes the Religious Exemptions IFR for several reasons. Allowing restrictions on the availability of health care services based on the religious beliefs of others—already too prevalent in reproductive health care—sets a dangerous precedent for access to health care for many, including LGBT people. And the Rule is unlawful, in violation of the Administrative Procedure Act, the First Amendment, and the Fifth Amendment.

Furthermore, there is often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care. And given the nature of the services to which religious exemptions are most commonly applied, these refusal laws have a discriminatory impact on LGBTQ people and women seeking reproductive health care.

At the federal level, there are already numerous statutory protections for health care providers' religious beliefs. These laws include the Church,[9] Weldon,[10] and Coats[11] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church Amendment also reaches sterilization services.[12]

Most states have similar laws; forty-five allow individual healthcare providers, and forty-three allow institutions, to refuse to provide abortion services.[13] Provider conscience clauses at the state level apply not only to abortion services but also to contraceptive care. Twelve states permit some healthcare providers to refuse to provide contraception and related services (such as counseling).[14] Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies. Eighteen states allow providers to refuse to provide sterilization services.[15]

The ACA (and implementing regulations) require all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing requirements in order to protect women's health, ensure that women do not pay more for insurance coverage than men, and

---

[8] STRATEGIC PLAN FY 2014-2018, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS), *available at*: https://www.hhs.gov/about/strategic-plan/introduction/index.html#mission.
[9] 42 U.S.C. § 300a-7 et seq.
[10] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.
[11] 42 U.S.C. § 238(n).
[12] 42 U.S.C. § 300a-7 et seq.
[13] GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.
[14] *Id.*
[15] *Id.*

4

00454732

Exhibit 24                    JA986                    JA-0000633

advance women's equality and well-being.[16] In addition, section 1554 of the ACA prohibits the Departments from issuing regulations that "create [] any unreasonable barriers to the ability of individuals to obtain appropriate medical care"[17] and Section 1557 of the ACA, prohibits sex discrimination in certain health programs and activities.[18]

By permitting objecting institutions to deny no-cost contraceptive coverage, the Religious Exemptions IFR erects unreasonable barriers to medical care violating Section 1554 of the ACA. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Religious Exemptions IFR violates the ACA, this IFR also violates the APA and must be set aside on that basis.

### 5. The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[19] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

#### a. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[20] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[21] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[22]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are

---

[16] *See* 4 2 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

[17] 42 U.S.C. § 18114(1).

[18] 42 U.S.C. § 18116.

[19] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[20] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[21] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[22] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

5

00454733

Exhibit 24

JA-0000634

able to serve.[23] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[24] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[25] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[26] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[27] This is particularly true with respect to primary care, public health and specialty providers, including Nurse Practitioners, Nurse-Midwives, and OB/GYN physicians.[28] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

b. **The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.**

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[29] Policymakers continue to try to impose

---

[23] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[24] *See* Fowler, Cl, Lloyd, SW, Gable, J, Wang, J, and Krieger. K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.l, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[25] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[26] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid. (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[27] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[28] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[29] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017),

6

00454734

Exhibit 24     JA988     JA-0000635

steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[30]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[31] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[32] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[33]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as fail safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

---

https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzlV.

[30] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[31] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., Family Planning Annual Report: 2016 national summary, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[32] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[33] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, Guttmacher Policy Review, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

00454735

Exhibit 24

JA-0000636

### c. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[34] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[35] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[36] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[37]

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.


**Final Statements:**

The Academy urges HHS to remain religiously and morally neutral in its funding, policies, and activities to ensure that individuals do not feel proselytized by providers or receive a limited scope of services due to the moral or religious nature of an organization.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress' intent that birth control be covered by the ACA, and distorts both the science, as well as federal and state programs which support contraception. For these reasons, the American Academy of Nursing calls on the Departments to rescind the IFR.

Sincerely,

Cheryl G. Sullivan
Chief Executive Officer

---

[34] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[35] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/insurance-coverage-contraceptives.
[36] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[37] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section ehbs-2017-section-10-plan-funding/.

8

00454736

Exhibit 24    JA990    JA-0000637

[i] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[ii] See, e.g., Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, 83(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*, 49(1), 7–16); Peipert, J.F., Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology*, 120(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine*, 374(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomized trial. *The Lancet*, 386(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception*, 78(3), 197–200.

[iii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[iv] See, e.g., Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review*, 17(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health*, 59(5), 577–583.

[v] Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century*. Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

[vi] *See, e.g.*, Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*. Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

[vii] Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

[viii] Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017, August). *Pregnancies, Births and Abortions Among Adolescents and Young Women In the United States, 2013: National and State Trends by Age, Race and Ethnicity*. Retrieved 27 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[ix] Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth*, 24(4), 247–252. Hellerstedt, W.L., Pirie, P.L., Lando, H.A., Curry, S.J., McBride, C.M., Grothaus, L.C., & Nelson, J.C. (1998, April). Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies. *American Journal of Public Health*, 88(4), 663–666;

[x] *See* Tsui, A.O., McDonald-Mosley, R., & Burke A.E. (2010, April). Family planning and the burden of unintended pregnancies. *Epidemiologic Reviews*, 32(1), 152–174; Joyce, T.J., Kaestner, R., & Korenman, S. (2000, February). The effect of pregnancy intention on child development. *Demography*, 37(1), 83–94; Gazmararian, J.A., Adams, M.M., Saltzman, L.E., Johnson, C.H., Bruce, F.C., Marks, J.S., & Zahniser, S.C. (1995, June). The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group. *Obstetrics & Gynecology*, 85(6), 1031–1038; Goodwin, M.M., Gazmararian, J.A., Johnson, C.H., Gilbert, B.C., & Saltzman, L.E. (2000, June). Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996-1997. PRAMS Working Group. Pregnancy Risk Assessment Monitoring System. *Maternal and Child Health Journal*, 4(2), 85–92.

[xi] Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology*, 14(4), 309–313; Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth spacing and risk of adverse perinatal outcomes: A meta-analysis. *JAMA*, 295(15), 1809–1823. *See also* Goldthwaite, L.M., Duca, L., Johnson, R.K., Ostendorf, D., & Sheeder, J. (2015, September). Adverse birth outcomes in Colorado: Assessing the impact of a statewide initiative to prevent unintended pregnancy. *American Journal of Public Health*, 105(9), e60–e66 (establishing an association between use of long-acting reversible contraception and a lower risk of preterm birth).

[xii] See, e.g., Barber, J.S., Axinn, W.G., & Thornton, A. (1999, September). Unwanted childbearing, health, and mother-child relationships. *Journal of Health and Social Behavior*, 40(3), 231–257. C.f. Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of

9

00454737

Exhibit 24

prenatal care. *Birth, 24*(4), 247–252; Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313.

[xiii] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet, 380*(9837), 111–125.

10

00454738

Exhibit 24          JA992          JA-0000639



AMERICAN COLLEGE
*of* NURSE-MIDWIVES
With women, for a lifetime®

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious and Moral Exemptions and Accommodations for Coverage of Certain
Preventive Services (RIN 0938-AT20 and 0938-AT46)**

On behalf of the members of the American College of Nurse-Midwives (ACNM), I write to provide
comments regarding the Religious Exemptions and Accommodations for Coverage of Certain
Preventive Services Under the Affordable Care Act, an interim final rule ("Religious Exemptions
IFR") published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47792 *et seq.* as
permitted by the Internal Revenue Service, Department of the Treasury; Employee Benefits Security
Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department
of Health and Human Services (collectively, "the Departments"). ACNM urges the Departments to
support and build upon the significant gains made for women's health in the United States.

We strongly believe that the Religious Exemptions IFR will have a negative impact on the women
and families our members serve. Specifically, access to affordable preventative services, including
contraception for women. ACNM is opposed to further broadening of the existing exemption that
permits non-profit or closely held for-profit religious organizations to refuse coverage of Food and
Drug Administration (FDA) approved contraception coverage based on religious or moral
objections. ACNM opposes any regulation that impedes a woman's access to the contraceptive care
best suited for her personal and health needs. Therefore, we respectfully ask the Departments to
rescind the rules immediately.

ACNM is the professional association that represents certified nurse-midwives (CNMs) and certified
midwives (CMs) in the United States. With roots dating to 1929, ACNM sets the standard for
excellence in midwifery education and practice in the United States and strengthens the capacity of
midwives in developing countries. Our members are primary care providers for women throughout
the lifespan, with an emphasis on pregnancy, childbirth, and gynecologic and reproductive
healthcare.

00328181

Exhibit 25

Currently, there are some 12,000 CNMs/CMs throughout the U.S. These midwives attend over 330,000 deliveries of newborns in country annually. Nearly all midwifery births occur in the hospital, with some in birth centers and others in homes. Midwives promote healthy physiologic birth. By doing so, they help reduce the incidence of unnecessary caesarean sections and other interventions. Healthy physiologic birth means healthier moms and newborns, fewer complications and side-effects, and much lower healthcare costs.

The ACNM and its members stand for improving access to quality care and coverage for women and newborns. We support common-sense policy solutions that ensure women and newborns have guaranteed health coverage and access to a full range of preventative, reproductive and sexual health services under state Medicaid programs and coverage and access to essential health benefits (EHBs), including birth control coverage. As such, our membership has expressed concern with the Religious Exemptions IFR as currently drafted.

Under the Affordable Care Act (ACA) most health plans are required to cover, without cost sharing, all FDA approved contraceptives, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a healthcare provider. Religious houses of worship were the only entities to receive an exemption from the mandate. Since the passage of ACA various organizations without an express exemption to the mandate have raised religious objections and pursued legal challenges to providing coverage of contraceptive items and services resulting in regulatory action. In July 2015, the Centers for Medicare & Medicaid Services (CMS), the Internal Revenue Service (IRS) and the Employee Benefits Security Administration (EBSA) jointly published a final regulation regarding coverage of certain preventive and screening services, including contraceptive items and services, by non-grandfathered group health plans and health insurance coverage for individuals. Under the final regulation, a non-profit religious organization or closely held for-profit organization with religious objections to providing coverage for some, or all, of the contraceptive items and services otherwise required to be covered would be exempt from providing such coverage if the organization meets the designated eligibility criteria.

The Religious Exemptions IFR seeks to further broaden the aforesaid exemption. As drafted, the Religious Exemptions IFR would expand the specified types of employers that may refuse to include contraception in the benefit package offered to their employees by allowing any employer to request an exemption based on religious or moral objections. Thereby limiting access and coverage of reproductive health choices expanded upon in the ACA to the detriment of women.

The ACA has been instrumental in covering a wide-range of preventive services, ensuring that individuals have access to life-saving screenings and treatment and that women have access to effective and affordable contraception. The broadening of the existing religious exemption has the potential to deny many women access to contraception, a key component in promoting women's optimum health. ACNM strongly opposes any broadening of the existing exemption to other types of entities, as it would erect barriers for an even larger number of women. Access to family planning counseling and a full array of family planning services is vital for women's health and well-being, especially women who wish to avoid or post-pone pregnancy. By helping women control the timing,

8403 Colesville Road, Suite 1550, Silver Spring, MD 20910-6374  240.485.1800  fax: 240.485.1818  www.midwife.org

00328182

Exhibit 25

number, and spacing of births, family planning has many benefits for a woman and children she may have in the future. Planned pregnancies, which for most women require contraception, allow women to optimize their own health before pregnancy and childbirth. An unintended pregnancy may have significant implications for a woman's health, sometimes worsening a preexisting condition, such as diabetes or hypertension. Planned pregnancies improve the overall health and well-being of children as well. Adequate birth spacing lowers the risk of low birth weight, preterm birth, and small-for-gestational age babies.

ACNM supports the rights of individual healthcare professionals to be guided by their conscience in personal delivery of health services. We also support the right of a woman to self-determine healthcare choices that meet her personal needs, including cultural, spiritual or religious convictions. These are personal choices, not institutional choices. ACNM believes that broadening the existing exemption for employers contradicts our position on women's right to reproductive health choices. We support access to family planning counseling. A full array of family planning services is vital for women's health and well-being. Therefore, we believe that any changes to existing coverage should successfully provide a mechanism through which women potentially impacted by this change can still access the full range of FDA-approved contraceptive items and services, while simultaneously preserving the constitutional right to the free exercise of religion.

ACNM supports access to comprehensive contraceptive care and contraceptive methods as an integral component of women's healthcare and is committed to encouraging and upholding policies and actions that ensure the availability of affordable and accessible contraceptive care and contraceptive methods. These services are crucial for women, men and families, and sharing their costs and risks across all beneficiaries promotes health by reducing barriers to people obtaining the care that they need.

We look forward to working with the Trump Administration to prioritize the healthcare of women through improvement of programs that support access to affordable and excellent care midwives can provide. No reform of the current law should come at the expense of the health and well-being of women. Please don't hesitate to contact me at akohl@acnm.org or (240) 485-1806 with any questions regarding the impact of the Religious Exemptions IFR on midwives and the women and families they serve.

Sincerely,

Amy M. Kohl
Director, Advocacy and Government Affairs
American College of Nurse-Midwives

**8403 Colesville Road, Suite 1550, Silver Spring, MD 20910-6374  240.485.1800  fax: 240.485.1818  www.midwife.org**

00328183

Exhibit 25



**American College of Physicians**
Leading Internal Medicine, Improving Lives

December 5, 2017

Seema Verma
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building,
200 Independence Avenue SW,
Washington, DC 20201

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, CMS-9940-IFC, and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act.**

Dear Administrator Verma:

The American College of Physicians (ACP) appreciates the opportunity to submit comments regarding this interim final rule. The American College of Physicians is the largest medical specialty organization and the second-largest physician group in the United States. ACP members include 152,000 internal medicine physicians (internists), related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness.

ACP strongly opposes the interim final rules. The Affordable Care Act's requirement that non-grandfathered individual and group health plans and issuers provide coverage of preventive services without cost sharing has substantially broadened access to a suite of evidence-based services and items that prevent chronic illness, potentially improving the health of our patients and curbing health care costs. Contraception as a preventive service is supported by a large body of evidence demonstrating individual and public health benefits. Following a review of this evidence, the Heath Resources and Services Administration recommended that 18 Food and Drug Administration-approved female-controlled contraceptives be included in the set of women's health preventive services.

Contraception is an integral part of preventive care and a medical necessity for women during approximately 30 years of their lives. Any move to decrease access to these vital services would have damaging effects on public health. Access to no-copay contraception leads to healthier women and families. Women who can plan for pregnancy prior to conception or time their pregnancies are better positioned to address existing health problems that can adversely affect mothers and their babies such

25 Massachusetts Avenue, NW, Suite 700, Washington, DC 20001-7401 | 202-261-4500, 800-338-2746 | www.acponline.org
190 N Independence Mall West, Philadelphia, PA 19106-1572 | 215-351-2400, 800-523-1546 | www.acponline.org

00328178

Exhibit 26

JA-0000643

as obesity, cardiovascular disease, or diabetes (i). When women have unintended pregnancies, they are more likely to delay prenatal care, resulting in a higher risk of birth defects, low birth weight, and poor mental and physical function in early childhood (ii).No-copay coverage of contraception is also a contributing factor in the dramatic decline of the unintended pregnancy rate in the United States, including among teens, now at a 30-year low (iii).

The interim final rules threaten that access by allowing nearly any employer to request an exemption based on religious or moral grounds. As a result, many women will be forced to pay out-of-pocket or choose to go without their medication. Women have more interactions with the health care system than men and are more likely to be negatively impacted by the cost of care. Prior to 2012, when the no-copay contraception coverage requirement went into effect, nearly 23% of women had to pay out of pocket for oral contraceptives. In 2015, that number dropped to 3% (iv). Patients have saved an estimated $1.4 billion dollars per year in cost-sharing for oral contraceptive pills as a result of the contraceptive coverage requirement (v).

ACP is also concerned that the broad exemptions in the interim final rules create a precedent that could allow for employers to seek exemptions of other evidence-based medical care services including but not necessarily limited to vaccinations, screening and coverage of sexually transmitted infections, substance use disorder treatments, or blood transfusions. By allowing employers to selectively opt-out of certain benefits based on their own personal or moral beliefs, patients may not be able to receive appropriate medical care as recommended by their physician. These exemptions could also result in discrimination against some patients with chronic or acute conditions, such as those with HIV/AIDS, and may disproportionately affect low-income individuals who do not have the financial resources to purchase these services on their own.

The interim final rules represent threats to comprehensive health insurance coverage on which millions of families rely. By broadening the exemption and relieving certain entities of their responsibility to accommodate those with health care needs, the interim final rule could shift a heavy economic burden to our patients. We urge the Administration to reconsider this harmful rule and seek an alternative that will ensure our patients have access medically-necessary coverage that is based on scientific evidence, not the personal beliefs of their employer.

Sincerely,

Jack Ende, MD, MACP

25 Massachusetts Avenue, NW, Suite 700, Washington, DC 20001-7401 | 202-261-4500, 800-338-2746 | www.acponline.org
190 N Independence Mall West, Philadelphia, PA 19106-1572 | 215-351-2400, 800-523-1546 | www.acponline.org

00328179

Exhibit 26                                JA997                                JA-0000644

[i] Office on Women's Health, U.S. Department of Health and Human Services.  Accessed at
https://www.womenshealth.gov/pregnancy/youre-pregnant-now-what/pregnancy-complications
[ii] Guttmacher Institute.  Unintended Pregnancy in the United States.  September 2016.  Accessed at
https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states
[iii] Finer LB, Zolna MR.  Declines in Unintended Pregnancy in the United States, 2008-2011.  *N Engl J Med* 2016;
374:843-852. Doi: 10.1056/NEJMsa1506575
[iv] Kaiser Family Foundation.  Private Insurance Coverage of Contraception.  Accessed at
https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/
[v] Becker NV, Polsky D.  Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA
Mandate Removed Cost Sharing.  *Health Aff (Millwood)*. 2015 Jul;34(7):1204-11. doi: 10.1377/hlthaff.2015.0127.

25 Massachusetts Avenue, NW, Suite 700, Washington, DC 20001-7401 | 202-261-4500, 800-338-2746 | www.acponline.org
190 N Independence Mall West, Philadelphia, PA 19106-1572 | 215-351-2400, 800-523-1546 | www.acponline.org

00328180

December 5th, 2017

VIA ELECTRONIC SUBMISSION

Eric D. Hargan, JD
Acting Secretary
U.S. Department of Health and Human Services
Centers for Medicare and Medicaid Services
P.O. Box 8016
Baltimore, MD 21244-8016

**Re: CMS–9940–IFC; Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

Dear Acting Secretary Hargan:

The American Congress of Obstetricians and Gynecologists (ACOG), the American Academy of Pediatrics, and the Society for Adolescent Health and Medicine, write in response to the Interim Final Rule (IFR) with request for comments for Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47838 et seq. Section 2713 of the Public Health Service (PHS) Act, as passed by the Patient Protection and Affordable Care Act (ACA), requires all non-grandfathered individual and group health plans to offer coverage of women's preventive services with no cost-sharing. Contraception and contraceptive counseling are a cornerstone of effective prevention in women's health. Section 2713 of the PHS Act represents an agreement among policymakers and physicians that preventive care is critically important and helps avoid the use of costlier specialty care.

Our organizations are committed to increasing birth control access for all women, and we unequivocally oppose the Department of Health and Human Services (HHS), the Department of Labor, and the Department of the Treasury (collectively, the Departments) effort to undermine this contraception coverage requirement. The IFR interferes in the personal health care decisions of our patients, and inappropriately inserts a patient's employer into the patient-physician relationship. The IFR will result in reduced access to women's preventive health care services, and reverse the historic gains made in reducing unintended pregnancy rates. We urge the Departments to preserve guaranteed coverage of women's preventive services, including contraception, at no out-of-pocket cost in private insurance plans, and immediately withdraw the IFR. Instead, the Departments should focus their policymaking efforts on improving access to women's preventive services, including contraception, without barrier or delay.

We strongly believe that all women of reproductive age should continue to have access to affordable birth control and that insurance should cover all U.S. Food and Drug Administration (FDA)-approved female contraceptive methods with no cost-sharing – as an integral part of women's preventive care services. In their earlier efforts to implement the contraception benefit and accommodation, the Departments consistently kept women's access to care at the center of policymaking. This IFR is a dramatic departure from these earlier efforts and will jeopardize women's ability to access scientifically-based health care.

00328167

Exhibit 27                                   JA999                                   JA-0000646

The benefits of birth control have been well documented. The Centers for Disease Control and Prevention (CDC) named birth control one of the top ten public health achievements of the past century.[1] Birth control is also widely credited for contributing to women's societal, educational, and economic gains.  Under the ACA, the uninsured rate among women ages 18-64 decreased by nearly half, from 19.3% to 10.8%, and the uninsured rate for children and adolescents reached a historic low of 4.8%.[2,3] Over 62 million women with private insurance have since gained access to vital preventive health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[4] This provision was designed to promote preventive health care, reduce future medical costs, and improve the health of women, adolescents, and families.

The Departments acknowledge that the IFR will result in less insurance coverage for contraception for women who want the coverage. The IFR thus establishes a tiered system of insurance coverage wherein some women are not granted equal access to the coverage based on their employers' beliefs. This will necessarily result in women being unable to access the health care services that they, in consultation with their provider, decide they need. The IFR will impede women's access to preventive reproductive health care, including the full range of contraceptive choices.

Policies that affect individuals' access to health care should have a positive impact on public health, and be based on science, not on falsehoods that are not supported by medical evidence. FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[5] We oppose public policy that deviates from accepted science and public health evidence, as well as any non-scientific prohibitions on essential care.

### Women's Preventive Services Are Evidence-Based

Section 2713 of the PHS Act requires all non-grandfathered individual and group health plans to offer coverage of women's preventive services with no cost-sharing. Congress tasked the Health Resources and Services Administration (HRSA) with identifying "such additional preventive care and screenings" that should be provided. These coverage guidelines were initially identified by a panel of experts convened by the Institute of Medicine (IOM, now the National Academy of Medicine), and then updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI).

---

[1] Centers for Disease Control and Prevention. Achievements in public health, 1900–1999: Family planning. MMWR Weekly. 1999 Dec 3;48(47):1073-80. *Available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm.

[2] Simmons, A et. al. The Affordable Care Act: Promoting Better Health for Women. Office of the Assistant Secretary for Planning and Evaluation Issue Brief. Department of Health and Human Services. June 14, 2016, *available at* https://aspe.hhs.gov/sites/default/files/pdf/205066/ACAWomenHealthIssueBrief.pdf.

[3] Georgetown University Health Policy Institute Center for Children and Families. Children's Health Coverage Rate Now at Historic High of 95 Percent. October 2016. *Available at* https://ccf.georgetown.edu/wp-content/uploads/2016/11/Kids-ACS-update-11-02-1.pdf.

[4] National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. *Available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[5] Brief for American College of Obstetricians and Gynecologists, Physicians for Reproductive Health, American Academy of Pediatrics, American Nurses Association, et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX 2014:No. 13-354.

2

00328168

Exhibit 27

JA-0000647

ACOG launched the WPSI in 2016 as part of a cooperative agreement with HRSA to coordinate the development, review, and update of recommendations for the HRSA-sponsored Women's Preventive Services Guidelines. WPSI recommended the inclusion of nine preventive services, the culmination of a multidisciplinary effort that utilized the most current evidence available to identify needed services to improve the uptake of women's preventive services and contribute to overall improved health outcomes. Contraception is a key piece of this comprehensive women's preventive services package, and maintaining access to this existing coverage is critical to ensuring American women and families can access the care that they need.

### Contraceptive Coverage Has Health Benefits and Positive Societal Impacts

Contraception enables women to control the timing of a desired pregnancy and to prevent unintended pregnancy. The goal of prevention of unintended pregnancy is to allow women to achieve their pregnancy intentions and to improve maternal, child, and family health outcomes. This is reflected in both Healthy People 2020, a set of HHS-approved "science-based, 10-year national objectives for improving the health of all Americans," and the recent HHS Draft Strategic Plan 2018-2022, which lays out a dedication to improving pregnancy outcomes and maternal and child health.[6,7]

The lack of insurance coverage prevents many women from choosing a high-cost contraceptive, even if that method is best for her, and may result in her resorting to an alternative method that places her at greater risk for medical complications or improper or inconsistent use, with the attendant increased risk of unintended pregnancy.[8] Further, multiple studies have demonstrated that when financial and logistical barriers are removed, women overwhelmingly select the most effective forms of contraception.[9,10] In addition to consequences for individual women, unintended pregnancy has a public health impact. Unintended pregnancies have higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving health complications unaddressed and increasing the risk of infant mortality, birth defects, low birth weight, and preterm birth.[11] Other long-term health consequences of unintended pregnancy include the impact on health behaviors such as breastfeeding, and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[12]

Increased use of contraception has clear benefits to women and families and has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[13] Access

---

[6] Office of Disease Prevention and Health Promotion. *Healthy People 2020.* (2016) *Available at:* https://www.healthypeople.gov/2020/topics-objectives/topic/family-planning
[7] U.S. Department of Health and Human Services. *HHS Draft Strategic Plan FY 2018-2022.* (2017)
[8] Institute of Medicine. Clinical Preventive Services for Women: Closing the Gaps. Washington, DC: The National Academies Press. 2011. *Available at:* https://doi.org/10.17226/13181.
[9] Postlethwaite D, Trussell J, Zoolakis A, et al. A comparison of contraceptive procurement pre- and post-benefit change. Contraception. 2007;76:360–5. *Available at* https://www.ncbi.nlm.nih.gov/pubmed/17963860.
[10] Secura GM, Allsworth JE, Madden T, et al. The Contraceptive CHOICE Project: reducing barriers to long-acting reversible contraception. Am J Obstet Gynecol. 2010;203:115.e1–7. *Available at* https://www.ncbi.nlm.nih.gov/pubmed/20541171.
[11] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[12] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews.* 2010;32(1):152-174.
[13] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine,* 2016, 374(9):843–852.

00328169

Exhibit 27          JA1001                          JA-0000648

to contraception reduces unintended pregnancies and abortion rates, and saves federal and taxpayer dollars.[14, 15] Yet unintended pregnancy and abortion rates remain higher in the United States than in most other developed countries, and low-income women have disproportionately high rates.[16] Instead of limiting access, we be should working to expand all women's ability to obtain the contraceptive method of their choice.

Contraception is also considered an important tool in reducing rates of maternal mortality and morbidity. The U.S. has the highest rate of maternal mortality in the developed world. A study of 172 developing countries found that use of contraception is an effective primary prevention strategy to reduce maternal mortality.[17] The Departments should focus on public policy that utilizes proven strategies to reduce rates of maternal mortality, including coverage of contraception without cost-sharing.

There are high costs associated with unintended pregnancy for families, private insurers, state and federal governments, and employers. Before the ACA, private health plans spent as much as $4.6 billion annually in costs related to unintended pregnancies.[18] In 2010, unplanned pregnancies cost approximately $21 billion in government expenditures, but had publicly funded family planning services not existed, the public costs of unintended pregnancies might have been 75% higher for the same year.[19] In the pre-ACA years, women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[20] Thanks to coverage of contraception with no cost-sharing, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[21]

Our organizations recognize that contraceptive coverage without cost-sharing is not applicable to contraception for non-contraceptive use, however, most women who use birth control do so for both contraceptive and non-contraceptive purposes.[22] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception recognized in evidence include decreased bleeding and pain with menstrual periods, decreased premenstrual syndrome and premenstrual dysphoric disorder, and reduced risk of gynecologic disorders, including, myoma, pelvic inflammatory disease, and a decreased risk of

---

[14] Peipert JF, Madden T, Allsworth JE, Secura GM. Preventing unintended pregnancies by providing no-cost contraception. Obstet Gynecol 2012;120:1291–7.

[15] Frost JJ, Frohwirth L and Zolna MR, Contraceptive Needs and Services, 2014 Update, New York: Guttmacher Institute, 2016. *Available at* https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update

[16] Ibid.

[17] Ahmed, Saifuddin et al. Maternal deaths averted by contraceptive use: an analysis of 172 countries. 2012. The Lancet , V380: Issue 9837, 111 – 125.

[18] Canestaro, W et. al. Implications of employer coverage of contraception: Cost-effectiveness analysis of contraception coverage under an employer mandate. Contraception 2017 Jan;95(1):77-89.

[19] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, http://www.guttmacher.org/pubs/public-costs-of-UP-2010.pdf.

[20] Becker, N. V., & Polsky, D. (July 2015). Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs, 34(7), pp. 1204-1211. *Available at:* http://content.healthaffairs.org/content/34/7/1204.abstract.

[21] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[22] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

4

00328170

Exhibit 27                                JA1002                                JA-0000649

endometrial and ovarian cancer. [23,24] Non-contraceptive health benefits also include treatment for non-gynecologic conditions such as migraine, seborrhea, acne, hirsutism, and alopecia; decreased risk of rheumatoid arthritis and asthma; prevention of bone density loss; reduced risk of colon cancer; and potential reduced cervical cancer risk. [25,26]

### *The Departments' Policymaking Must Be Scientifically Valid and Firmly Rooted in Medical Evidence*

The Departments make several false and misleading statements in this IFR to undermine the well-established benefits of contraception and contraceptive coverage with no cost-sharing.

The IFR challenges the IOM recommendation that insurers cover the full range of FDA-approved female contraceptive methods because it includes "certain drugs and devices...that many persons and organizations believe are abortifacient—that is, as causing early abortion."[27] Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science. FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[28] Further, no credible research confirms the false statement that birth control causes miscarriages.[29]

The IFR cites the "formal dissenting opinion" of one IOM committee member who expressed concern with the process of evidence review used by the IOM in identifying recommendations, although this concern was disputed by all others on the panel.[30] A separate IOM 2011 report, *Clinical Practice Guidelines We Can Trust*, did note a perceived lack of transparency in some evidence review process used in the development of clinical recommendations overall, and recommended approaches to address this issue.[31] In acknowledgement of these concerns, and to avoid "provider uncertainty and patient uncertainty about needed preventive services," WPSI, which was established to develop, review, update, and disseminate recommendations for women's preventive health care services, established a process "designed to ensure a strong evidence foundation, transparency, and to minimize the impact of individual bias and conflicts of interest."[32] Both the IOM and WPSI recommend coverage of the full range of female-controlled FDA-approved female contraceptive methods, effective family planning practices, and sterilization procedures as part of contraceptive care.

---

[23] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7
[24] Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[25] Schindler AE. supra.
[26] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017
[27] The IFR, pg. 12
[28] Brief for American College of Obstetricians and Gynecologists, Physicians for Reproductive Health, American Academy of Pediatrics, American Nurses Association, et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354).
[29] Early pregnancy loss. FAQ No. 90. American College of Obstetricians and Gynecologists. August 2015.
[30] The IFR, pg. 12
[31] Institute of Medicine. Clinical Practice Guidelines We Can Trust. Washington, DC: National Academies Press; 2011.
[32] Women's Preventive Services Initiative. Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration: Recommendations for Preventive Services for Women. American College of Obstetricians and Gynecologists. 2016.

5

00328171

Exhibit 27
JA1003
JA-0000650

The IFR raises concerns about the "negative health effects" of contraception.[33] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[34,35] For these and many other reasons, patients and physicians, not politicians, should determine the right contraceptive for a patients' health care needs. The IFR suggests an increased risk of venous thromboembolism (VTE). VTE among oral contraceptive users is very low.[36] In fact, it is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[37] The IFR also incorrectly suggests contraception increases the risk of breast cancer. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, patients and physicians must consider both the risks of becoming pregnant at advanced reproductive age, as well as the risks of continuing contraception use until menopause.[38]

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[39] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[40,41] Research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[42,43] Overall, increased access to and use of contraception is associated with a dramatic decline in rates of adolescent pregnancy.[44] More females are using contraception the first time they have sex.[45]

Patients and physicians must weigh the harms and benefits of every medical intervention. The IFR greatly exaggerates the harms of contraception, and undermines the clear medical benefits, prioritizing employer's beliefs over evidence-based clinical recommendations. Access to the full range of FDA-approved contraceptive methods, with no cost-sharing or other restrictions, is critical to women's health. Every woman, regardless of her insurer, employer, state of residence, or income, should have easy, affordable access to the right form of contraception for her, free from political interference into the practice of medicine.

---

[33] The IFR, pg. 46

[34] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[35] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[36] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[37] Ibid.

[38] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. *Available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6504a1.htm.

[39] The IFR, pg. 48

[40] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[41] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[42] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[43] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[44] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583.

[45] Ibid.

6

00328172

Exhibit 27

JA-0000651

*The Previous Accommodation Maintains Access to Contraceptive Care*

Deciding on the best form of contraception for any specific patient should take place within the established patient-physician relationship. The current exemption and accommodation process satisfies the Religious Freedom Restoration Act while maintaining our patients' access to contraceptive care. The patient and the physician share responsibility for the patient's health, and the well-being of the patient depends upon their collaborative efforts.[46] This is particularly true given the highly personal nature of the reproductive health and family planning services, which can require sensitive conversations as well as pelvic exams. Women should be able to make these personal decisions — decisions that often require sharing intimate details of their sexual history and family planning—with their trusted physicians. These decisions should never involve or be influenced by a patient's employer.

By expanding the definition of religious employer to encompass any non-governmental plan sponsor and institution of higher education, and allowing individual employees and market participants to opt out of this coverage, the Departments threaten access to seamless care for a countless number of women. If an employee covered under a family plan opts out of contraception coverage, that would jeopardize contraception access for both adolescent and adult dependents covered under the same plan. Additionally, regardless of how organizations claim their exemption, making the current accommodation a voluntary option for employers with a religious objection to contraceptive coverage not only limits women's access to contraceptives without cost-sharing from their current health plan, but may restrict women's access to contraception coverage entirely. The IFR provides no additional accommodation or solution for women whose employer claims a religious objection to access contraception, aside from purchasing a separate contraceptive care plan on their own.

The expanded exemption and the modification to the current accommodation remove contraceptive care from a woman's routine health services and will require her to use a two-tiered system of access and coverage – one for her overall health needs, and one limited to contraceptive care. Access to contraception is an essential part of basic preventive health care for women, especially for the two-thirds of American women of reproductive age who wish to avoid or postpone pregnancy.[47] Access to the full array of FDA-approved contraception and contraceptive counseling is vital for women's health and well-being. The IFR ignores that reality and instead increases the regulatory burden on both individuals seeking this fundamental preventive care, and on physicians seeking to provide patients with the medically-appropriate care they need.

The ACA's contraceptive coverage requirement recognizes that women have unique health care needs and that contraception counseling and services are essential components of women's preventive health care. Decisions concerning contraception use, like all health care decisions, should be made by patients in consultation with their physicians based on the best interest of the patient. This is best accomplished when contraceptive coverage is provided within the same overall framework as a woman's other health care services and in consultation with a woman's chosen physician. The previous accommodation accomplishes this, while at the same time respecting an employer's sincerely-held religious objection to

---

[46] Am. Med. Ass'n, *Principles of Medical Ethics: I, IV, V, VII, IX*, 2016, *Available at:* https://www.ama-assn.org/sites/default/files/media-browser/code-of-medical-ethics-chapter-1.pdf. See also Elective surgery and patient choice. Committee Opinion No. 578. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;122:1134–8. ("The goal should be decisions reached in partnership between patient and physician.")

[47] Jones J, Mosher WD and Daniels K, Current contraceptive use in the United States, 2006–2010, and changes in patterns of use since 1995, National Health Statistics Reports, 2012, No. 60, *Available at* http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

7

00328173

Exhibit 27                          JA1005                          JA-0000652

contraception. The IFR makes no similar effort to ensure women have seamless access to the preventive health care they need, and instead undermines the purposes of Section 2713 of the PHS Act.

### *Other Government Programs Cannot Replace Universal Contraceptive Coverage*

The Departments argue in the IFR that there are "many other mechanisms by which the Government advances contraception coverage, particularly for low-income women."[48] While there are federal programs, including the Title X family planning program and Medicaid coverage of family planning services and supplies, that provide contraception coverage for low-income and adolescent women, the Title X program is consistently underfunded by Congress, and the Medicaid program has strict exclusionary eligibility standards. These programs do not have the capacity to, nor are they designed to, provide contraception for the approximately 57.9 million American women ages 19-64 who currently rely on employer-sponsored health coverage.[49]

Nearly all women will use contraception at some time in their reproductive lives.[50] In fact, 99% of U.S. women who have been sexually active report having used some form of contraception, and 87.5% report use of a highly effective reversible method.[51] Many of these women rely on employer-sponsored insurance plans to get their contraceptive coverage, and safety-net programs are not a viable alternative. The access to care that Title X clinics provide low-income and adolescent patients is critical to improving the health of these patients and to decreasing health care costs for all Americans, but it is not a replacement for universal coverage of contraception without cost-sharing. Further, the Departments have endeavored to limit the qualified providers who serve this population of low-income women, further reducing access to contraceptive coverage and counseling.

The IFR also falsely cites "over a dozen" Federal programs that provide or subsidize contraceptives for women.[52] Many of these programs, including the Teen Pregnancy Prevention Program (TPPP), Public Law 112-74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c-8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; and the Personal Responsibility Education Program, 42 U.S.C. 713; do not provide or subsidize coverage of the full range of FDA-approved methods of contraception or offer comprehensive contraception counseling. These federally-funded programs serve a very important purpose, and their funding and structure should be preserved, but they do not replace the need for universal coverage with no cost-sharing in the private insurance market.

### *Expanded Exemptions Threaten Other Essential Health Care Services*

The IFR could have concerning implications for access to other health care services that are essential to health and well-being. In offering expanded exemptions for any employer who claims a religious opposition, the Departments invite the possibility that employers may seek to opt out of offering coverage for other health care services to which they object, whether through litigation or other means.

---

[48] The IFR, pg. 29
[49] Kaiser Family Foundation. Women's Health Insurance Coverage. October 2017. *Available at:* http://files.kff.org/attachment/fact-sheet-womens-health-insurance-coverage.
[50] Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[51] Daniels K, Mosher WD. Contraceptive methods women have ever used: United States, 1982-2010. Natl Health Stat Report 2013;(62):1–15. *Available at* https://www.ncbi.nlm.nih.gov/pubmed/?term=Natl+Health+Stat+Report+2013%3B{62}%3A1%E2%80%9315.
[52] The IFR, pg. 79

8

00328174

Exhibit 27          JA1006          JA-0000653

Our organizations oppose any efforts that would limit patient access to medically-necessary health care services or impede the provision of those services within the established patient-physician relationship.

Many religious adherents object to medical services that are essential to the health and well-being of the public, including vaccination. Vaccines are vital to the public health and have been declared one of the ten great public health achievements of the 20th Century by the CDC.[53] For individuals born in the United States between 1999 and 2013, it is estimated that vaccination will prevent approximately 322 million illnesses, 21 million hospitalizations, and 732,000 deaths over the course of their lifetimes.[54] Maintaining high vaccination rates is critical for both individual health and population health, as a high vaccination rate confers herd immunity that prevents the spread of disease and confers the benefits of vaccination to those who are unable to receive vaccines.

Religious and moral opposition to health care services extends beyond vaccines. Gelatin, which is included in "capsule shells," is manufactured using animal tissue, the ingestion of which is inconsistent with several major world religions. Still other religions oppose blood transfusions, even in situations where such a procedure is needed to save a life.

While the First Amendment protects the sincerely-held religious beliefs of these groups, the religious beliefs of some should not obstruct crucial treatments for employees who do not share their employers' beliefs. It is therefore important to note that there is no principled basis on which to distinguish religious objections to contraceptive coverage from religious objections to coverage for other health care services. Broad religious and moral exemptions to contraceptive coverage would seem to require similar exemptions for other types of health care services, an untenable result.

Because there is a range of services to which religious organizations object beyond contraception, it is critical that in attempting to provide greater conscience protections for the religious and moral beliefs of employers the government not allow the coverage of vital health care services to be jeopardized. Our organizations believe that the top priority in any federal rulemaking be ensuring access to all preventive health care services for employees and their families. This includes ensuring that employees are able to access all medically-necessary health care services seamlessly through one plan, including preventive services such as vaccinations with no cost-sharing. Quality health care coverage for individuals must not be eroded.

Contraception is a key component of the comprehensive women's preventive services package, and maintaining access to this existing coverage is critical to ensuring American women and families can access the care that they need. The IFR interferes in the personal health care decisions of our patients, and inappropriately inserts a patient's employer into the patient-physician relationship. The IFR will result in reduced access to women's preventive health care services, and reverse the recent gains made in reducing unintended pregnancy rates. We urge the Departments to preserve guaranteed coverage of women's preventive services, including contraception, at no out-of-pocket cost in private insurance plans, and withdraw the IFR. Instead, the Departments should put Americans' needs first by working with physicians, who with their patients are the experts on patient care needs, to apply the best medical and public health evidence. We look forward to working with the Departments to fulfill the promise of

---

[53] CDC, supra.

[54] Centers for Disease Control and Prevention. Occupational Ladder Fall Injuries, 2011. MMWR Weekly. 2014 Apr 25;63(16):352-55. *Available at* https://www.cdc.gov/mmwr/pdf/wk/mm6316.pdf.

9

00328175

Exhibit 27                    JA1007                    JA-0000654

the ACA and increase women's access to preventive care. Thank you for the opportunity to provide these comments.

Sincerely,

Haywood L. Brown, MD, FACOG
President
American Congress of Obstetricians and Gynecologists

Fernando Stein, MD, FAAP
President
American Academy of Pediatrics

Tamera Coyne-Beasley, MD, MPH, FSAHM
President
Society for Adolescent Health and Medicine

10

00328176

Exhibit 27                    JA1008                    JA-0000655



AMERICAN PUBLIC HEALTH ASSOCIATION
*For science. For action. For health.*

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: [CMS-9940-IFC]

Dec. 5, 2017

Dear Acting Secretary Hargan,

The American Public Health Association, a diverse community of public health professionals that champions the health of all people and communities, appreciates the opportunity to provide comments in response to the proposed interim final rule. APHA is committed to ensuring all individuals have affordable coverage of birth control. APHA unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (Rule). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this Rule will harm women and their health and well-being. By discriminating against women, it is also a step back from achieving health equity. The Rule is also based on an incorrect view of science and the federal programs and state laws regarding contraception. For these reasons APHA calls on the Departments to rescind the Rule.

## I.   Birth Control is Vital to Women's Health

Women face a unique set of health care challenges because they use more health services than men yet earn less on average than men.[3] Before the ACA, one in seven women with private

---

[1] This comment uses the term "women" because women are targeted by the Rule. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf
[3] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.

health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[5] In fact, the gap between men and women who struggled to access needed care was widest among adults with moderate incomes.[6] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[7] Because of the contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[8]

A goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of preventing unintended pregnancy is to help women avert pregnancy, or time and space their pregnancies in accordance with their own desires.[9] Contraception enables women to prevent unintended pregnancy and improve maternal, child, and family health. In addition, access to birth control is vital for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[10]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving health complications unaddressed and increasing the risk of infant mortality, birth defects, low birth weight, and preterm birth.[11] Other long term health effects of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during

---

[4] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.

[5] Liang S. et al., Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006, 83 CONTRACEPTION 491, 531 (2010); see also Inst. of Med. of the Nat'l Acads., Clinical Preventive Services for Women: Closing the Gaps 19 (2011), available at https://www.nap.edu/read/13181/chapter/1. And Solanki G et al., The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; see also David Machledt D, Perkins J, Medicaid Premiums & Cost-Sharing 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[6] Sheila D. Rustgi et al., The Commonwealth Fund, Women at Risk: Why Many Women Are Forgoing Needed Health Care 4 (2009), available at http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf

[7] Sonfield A et al., Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update, 91 CONTRACEPTION 44, 45-47 (2014).

[8] Becker N, Polsky D, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211, available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html

[9] Women's Preventive Services Initiative, Recommendations for Preventive Services for Women 83 (2016), available at https://www.womenspreventivehealth.org/final-report/

[10] Id. at 103-104.

[11] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta A, Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

2

00435156

Exhibit 28

JA-0000657

pregnancy.[12] Contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Including contraception in insurance coverage is a priority for achieving health equity. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability or discrimination based on race, ethnicity, gender identity, or sexual orientation. The ACA's requirement on insurance plans to include contraceptive coverage with no cost sharing was an important step forward for health equity that should not be reversed.

Birth control is crucial in furthering equal opportunity for women, enabling them to be equal participants in the social, political, and economic life of the nation. Studies show that access to contraception has increased women's wages and lifetime earnings.[13] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-l940s to early 1950s.[14] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[15] which was followed by large increases in women's presence in law, medicine, and other professions.[16] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[17]

A woman and her health care providers, should determine the right course of prevention and treatment, including contraception, for her health care needs. The Rule not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

---

[12] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. Epidemiologic Reviews. 2010;32(1):152-174. doi:10.1093/epirev/mxq012
[13] See, e.g., Frost J. Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Sonfield A, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf
[14] See Bailey M et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), available at http://www.nber.org/ papers/w17922; Goldin C, Katz L, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[15] Hock H. The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).
[16] Goldin C, Katz L, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), available at https://dash.harvard.edu/handle/1/2624453
[17] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

3

00435157

Exhibit 28                    JA1011                    JA-0000658

## II. Justifications for the Rule do not Meet Basic Scientific Standards

As the nation's primary federal agency on health policy, HHS policies and activities must be firmly based on scientifically valid evidence. The Rule does not meet the high standard of scientific evidence required for effective health policy, instead prioritizing religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. APHA opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individuals' beliefs.

### A. Contraceptives do not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who believes them. The Rule takes issue with recommended coverage of the full range of Food and Drug Administration-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient."[18] However, the approved contraceptive methods are not abortifacients. Every approved contraceptive acts before implantation and does not interfere with pregnancy.[19]

### B. Contraceptives are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[20] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[21, 22] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[23] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[24]

---

[18] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[19] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354), available at acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf

[20] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[21] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[22] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[23] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[24] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: available at http://dx.doi.org/10.15585/mmwr.rr6504a1

4

00435158

### C. Contraceptives do not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[25] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[26,27] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[28,29] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[30] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[31]

### III. The Departments' Explanation That Other Programs Can Meet the Need for Birth Control Coverage is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this Rule.[32] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of privately insured individuals and are currently overburdened. Further, the existence of these programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this Rule.

### A. Medicaid and Title X Programs are not Designed to Meet the Needs of the Individuals who will Lose Contraceptive Coverage and do not Have Capacity to do so.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of privately insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[33] Low-income individuals

---

[25] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[26] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[27] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[28] Minguez M. Santelli JS, Gibson E. Orr M. & Samant. S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.

[29] Knopf JA. Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[30] Id.

[31] Lindberg L. Santelli J. Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[32] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147. pt. 147).

[33] See Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

5

00435159

Exhibit 28                                    JA1013                                    JA-0000660

receive services at these health centers at low or no cost depending on their family income.[34] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[35]

Further, the Rule argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Rule. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[36] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[37] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[38] Requiring otherwise privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. Two-thirds of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[39] This is particularly true with respect to specialty providers, including OB/GYNs.[40] Given this provider shortage and Medicaid's low-income and other eligibility requirements,[41] Medicaid does not have the capacity to serve individuals who lose coverage as a result of this Rule.

---

[34] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[35] 42 U.S.C. § 300a-4(c)(2); 42 CFR § 59.5(a)(7), (9).

[36] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," American Journal of Public Health (2016), available at http://doi.org/10.2105/AJPH.2015.302928

[37] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, Family Planning Annual Report: 2010 National Summary, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, Family Planning Annual Report: 2016 national summary, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[38] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[39] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012), available at http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014), available at http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[40] U.S. Department of Health and Human Services, supra at note 7.

[41] Garfield R, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), available at https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

6

00435160

Exhibit 28                                    JA1014                                    JA-0000661

**B. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With no Cost-Sharing.**

Similarly, the Rule suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[42] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[43] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[44] Additionally, no state has the authority to regulate plans offered by employers that self-insure.[45]

## IV. Conclusion

As the oldest and most diverse public health organization in the world, it is APHA's responsibility to oppose laws and policies that jeopardize the health of the public. This Rule will cause people to lose contraceptive coverage, and harm their health and well-being. It harms health equity and is based on incorrect views of science and the federal programs and state laws regarding contraception. For all of these reasons APHA calls on the Departments to rescind the Rule.

Sincerely,

Georges C. Benjamin, MD
Executive Director

---

[42] Guttmacher Institute. Insurance coverage of contraceptives. State Laws and Policies (as of October 2017). 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[43] See Guttmacher Institute. Insurance coverage of contraceptives. State Laws and Policies (as of October 2017). 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[44] See Guttmacher Institute. Insurance coverage of contraceptives. State Laws and Policies (as of October 2017). 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[45] Claxton G et al., Employer Health Benefits: 2017 Annual Survey. Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust. 2017, available at https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

7

00435161

Exhibit 28                    JA1015                    JA-0000662



Planned Parenthood Affiliates of California

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

Submitted online via http://www.regulations.gov

Re:    **Comments on Religious Exemptions and Accommodations for Coverage of Certain
       Preventive Services under the Affordable Care Act, CMS-9940-IFC [Docket ID
       CMS-2014-0115]**

Dear Administrator Verma:

The California Planned Parenthood Education Fund (CPPEF) and its sister organization, Planned
Parenthood Affiliates of California (collectively, PPAC), appreciate the opportunity to submit
comments on the interim final rules (IFRs) titled Religious Exemptions and Accommodations for
Coverage of Certain Preventive Services under the Affordable Care Act, CMS-9940-IFC
[Docket ID CMS-2014-0115] and issued by the U.S. Departments of Health and Human
Services, Labor, and Treasury (referred to as the tri-Departments) that were published in the
*Federal Register* on October 13, 2017.

CPPEF and PPAC represent California's seven separately incorporated Planned Parenthood
affiliates. The mission of the Planned Parenthood organizations in California is to provide
comprehensive reproductive health care services, to provide educational programs relating to
reproductive and sexual health and to advocate for public policies that ensure access to health
services, including safe, legal abortion. Collectively, the California affiliates operate 115 health
centers and serve about 800,000 patients each year. Eighty-seven percent (87%) of Planned
Parenthood's patients in California have annual incomes less than two hundred percent (200%)
of the Federal poverty line and, thus, are eligible to receive health care through government
subsidized programs.

00427844

Exhibit 34



Planned Parenthood Affiliates of California

Planned Parenthood Federation of America (PPFA) is separately submitting comments on the IFRs. This submission is intended to focus on the particular harm these IFRs have on the women of California.

The changes to the interim final rules will have devastating consequences and cause immediate, irreparable harm to the state of California, Medi-Cal, Planned Parenthood's patients, and public health. We strongly oppose extending a policy, such as the religious exemptions and optional accommodations described in the interim final rules, because these types of policies disrupt contraceptive coverage, limit a woman's choice of method, increase unintended pregnancy, and drastically increase state and Federal health care and social service spending.

The interim final rules should be rescinded immediately because these policies are an overreach of Federal government rulemaking authority, harm women and public health, falsely claim women will not lose access to contraception because of availability of Federal programs, will lead to a significant cost shift in the system, and are based on evidence that is not scientifically sound. Significantly, the overreach, adopted without public notice and an opportunity to comment, violates the Administrative Procedure Act. This federal overreach also violates the U.S. Constitution in multiple ways. By preferencing religious convictions of certain entities, including employers, over other compelling government interests, it violates the Establishment Clause of the First Amendment. By advancing policies that clearly discriminate against women, it violates the Equal Protection Clause. And, by compelling states to adopt policies in clear contravention of their own policies and constitutions, it violates the Spending Clause and Tenth Amendment.

**The immediate expansion of religious exemptions, the adoption of new moral exemptions and the elimination of the accommodation violate the Administrative Procedure Act (APA).**

*The Tri-Departments Provided Neither Public Notice Nor an Opportunity to be Heard.*

The tri-Departments violated the APA because, in adopting these rules effective immediately, they did not provide adequate public notice and comment to allow public participation in the rulemaking process. Without any notice, opportunity to comment, or change in the evidence-based preventive service guidelines, the tri-Departments adopted sweeping new policies under the interim final rules that would negatively affect women's access to contraception without cost sharing. The APA requires agencies to provide the public notice and an opportunity to comment

00427845

Exhibit 34



Planned Parenthood Affiliates of California

before promulgating regulations to allow for public participation in the rulemaking process.[1] If they do not, the rules are invalid.

Although these requirements may be waived where the agencies can show "good cause,"[2] those circumstances do not exist here. The burden is on the agency to demonstrate good cause, and courts have interpreted this exception narrowly.[3] The tri-Departments did not, and cannot, demonstrate "good cause" for failing to provide a notice and comment period. Instead, they justified this reckless regulatory action "in light of the full history of relevant rulemaking."[4] However, there was no previous rule-making that provided any opportunity to comment on the greatly expanded exemptions or the optional accommodation. For this reason alone, the IFRs should be invalidated.

*The IFRs are Invalid Because They are Arbitrary and Capricious.*

The rules are also invalid because they are arbitrary and capricious.[5] They constitute a complete reversal of prior agency policy without any detailed justification for the shift. Agencies must "articulate a 'rational connection between the facts found and the choice made.'"[6] An agency departing from a prior policy must at a minimum "demonstrate awareness that it is changing position."[7] A more "detailed justification" is necessary where the new policy "rests upon factual findings that contradicts those which underlay its prior policy."[8]

There is no dispute that the IFRs effect a significant change in policy. The prior regulations found a compelling interest in ensuring women have access to contraceptive coverage, a position confirmed by the Supreme Court.[9] The new IFRs say the direct opposite, yet provide no factual support for this complete reversal. The tri-Departments failed to justify the greatly expanded number of employers who could take advantage of the exemption or the addition of the moral

---

[1] 5 USC 553(b) and (c).

[2] 5 USC 553(b)(B).

[3] *See, e.g., Lake Carriers' Ass'n v. EPA,* 652 F.3d 1, 6 (D.C. Cir. 2011).

[4] 82 FR 47807.

[5] 5 USC 706(2)(A).

[6] *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285 (1974); 5 USC 553(c)(agency must provide a "concise general statement of [a regulation's] basis or purpose").

[7] *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).

[8] *Id.; Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48-51 (regulation rescinding prior regulation after change in presidential administration was arbitrary and capricious where agency failed to address prior fact findings).

[9] *Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2785-86 (2014)(Kennedy, J., concurring).

00427846

Exhibit 34

JA-0000708



exemption. Instead, they relied on information that was insufficient, grossly misconstrued, non-factual, and not scientifically sound (see discussion below). Basing a policy on false information and cherry-picked evidence is an inappropriate process for implementing public health policy, and should be rejected. Because the sweeping changes are not supported by any new facts, they are arbitrary and capricious and, for this reason too, invalid.[10]

**The tri-Departments erroneously rely on false and non-scientific assumptions to support the policy changes in the IFRs.**

The tri-Departments argue that there is no causal relationship between access to affordable contraception and reduction in unintended pregnancy.[11] This is false. Contraceptive use significantly reduces the risk of unintended pregnancy. As one of the top ten greatest public health achievements in the 20th century, contraception plays a vital role in advancing women's health as well as their educational and economic status.[12] Access to contraceptive methods and services directly decreases unintended pregnancy, which leads to fewer abortions, lower health care spending, and better outcomes for women and families.

The interim final rules cite an outdated study that included data from 1972 through 2002. More recent evidence demonstrates the strong link between increased access to contraception and reduced rates of unintended pregnancy.[13] This link has been strengthened with the introduction of more effective, long-acting reversible contraceptive methods.

Recent data finds the rate of unintended pregnancy is at the lowest rate in 30 years.[14] The research indicates there was no increase in risky sexual behavior, and explains that the decline is likely attributed to a change in the frequency and type of contraceptive use over time. The use of highly effective, long-acting reversible contraceptive methods, particularly intrauterine devices, among U.S. females who used contraception increased from 4% to 12% between 2007 and 2012.[15] Several peer-reviewed studies found that women and girls at high risk of unintended

---

[10] *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)(rejecting agency where it demonstrated awareness it was changing policy but provided insufficiently reasoned explanation for "why it deemed it necessary to overrule its previous position.").

[11] 82 FR 47803

[12] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm

[13] CHBRP Report, at 15, 22; Bixby Center for Global Reproductive Health, UCSF, *Cost Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, at 6-7, 20 (April 2010).

[14] Finer LB et al. Declines in unintended pregnancy in the United States, 2008-2011. N Eng J Med 2016; 374:843-852

[15] Use of highly effective contraceptives in the U.S. continues to rise, with likely implications for declines in unintended pregnancy and abortion. New York: Guttmacher Institute, 2014; *see also* Romero, et al. Trends in use of long-acting reversible

00427847

Exhibit 34                    JA1019                    JA-0000709



pregnancy who had free access to and used the most effective, reversible methods of contraception, such as intrauterine devices, had much lower rates of unintended pregnancy than those who used less effective methods, such as the oral contraceptive pill.[16]

The tri-Departments neglected to consider the evidence and support for contraception coverage under the Health Resources and Services Administration (HRSA) guidelines, including all U.S. Food and Drug Administration (FDA)-approved contraceptive methods and implied that all methods are equally effective.[17]  This is simply not true.  There is a wide range of effectiveness between methods, from 99.9% effective for implants and hormonal IUDs to 74% for vaginal spermicide.[18]  Freedom of choice for which contraceptive to use is paramount to a woman's choice of whether and when to become pregnant.

In addition, decreasing the rate of unintended pregnancy is directly related to decreases in abortion.  In fact, abortion rates are at the lowest levels since *Roe v. Wade*.[19]  Time and again, these declines have been largely attributed to greater access to more effective contraceptive methods.[20]  Most of these studies predated implementation of the contraceptive coverage mandate under the Affordable Care Act (ACA), and experts anticipated that the ACA provisions will lead to greater use of contraception overall and increased use of highly effective methods among those who want them.  As a consequence, the rates of unintended pregnancy and abortion should continue to decline.

Expanded access to contraception does not encourage risky behavior as the tri-Departments claim.[21]  The CHOICE Project study found little evidence to support concerns of increased

---

contraception among teens aged 15-19 years seeking contraceptive services – United States, 2005-2013. *MMWR*; 2015, Vol. 64(13), pp363-369.

[16] Winner B, Peipert JF, Zhao Q, et al. Effectiveness of long-acting reversible contraceptive. N Engl J Med 2012;366:1998-2007; Lindberg L et al. Understanding the decline in adolescent fertility in the United States, 2007-2012. Journal of Adolescent Health 2016; 59:577-583; Secura GM et al. Change in sexual behavior with provision of no-cost contraceptive. Obstet Gynecol 2014; 123(4):771-778.; Secura GM et al. Provision of no-cost, long-acting contraceptive and teenage pregnancy. N Engl J Med 2014; 37 :1316-1323.

[17] 82 FR 47801.

[18]  American Sexual Health Association, Birth Control Method Comparison Chart (2013), found at http://www.asexualhealth.org/pdfs/ContraceptiveOptions, last accessed Nov. 17, 2017.

[19] Jones RK et al. Abortion incidence and service availability in the United States, 2014. Pers on Sexual and Repro Health 2017; 49:17-27.

[20] Peipert JF, Madden T, Allsworth JE, et al. Preventing unintended pregnancies by providing no-cost contraceptive. Obstet Gynecol. 2012;120(6):1291-7;  Harper CC, Rocca CH, Thompson KM, et al. Reductions in pregnancy rates in the USA with long-acting reversible contraceptive: a cluster randomised trial. Lancet. 2015;386(9993):562-8.

[21] 83 FR 47804.

00427848

Exhibit 34   JA-0000710



Planned Parenthood Affiliates of California

sexual risk-taking behavior subsequent to greater access to no-cost contraception.[22]  Since the implementation of the contraceptive coverage without cost-sharing, the Centers for Disease Control and Prevention (CDC) has reported in the High School Youth Risk Behavior Survey that the proportion of teenagers who "ever had sex" dropped to 41 percent in 2015 from 47 percent in 2011.  In addition, the proportion who were "currently sexually active" dropped significantly.[23]

The tri-Departments incorrectly assert that women can afford and access contraceptives when coverage is not available.[24]  Effective, long-acting, reversible contraceptive methods can be expensive, and financial barriers limit access and exacerbate health disparities.  After the contraceptive coverage under the ACA became effective, fewer than 4% of women had to pay out-of-pocket for oral birth control, down from more than 20% before the law's passage.[25]  One survey found that before the ACA contraceptive coverage provision went into effect, one in three women voters struggled to afford prescription birth controls, including 57% of young women aged 18 to 34.[26]  Data from a 2016 study evaluating the impact of contraceptive coverage under the ACA demonstrated a 70% decrease in mean total out-of-pocket expenses for FDA-approved contraceptives for commercially insured women from 2011 to 2013.[27]

The tri-Departments provide unsubstantiated claims that contraceptive's health benefits are outweighed by its negative health effects.[28]  The evidence, however, strongly supports that the benefits of contraception greatly outweigh any negative effects – it's more than just preventing pregnancy.  The inclusion of contraception as a women's preventive service is linked to the CDC's Healthy People 2020 goal to promote healthy pregnancy and prevent unintended pregnancy.  The Women's Preventive Services Initiative describes contraceptives as a primary prevention that enables the routine screening of pregnancy intention and prevents unintended pregnancy.  Increasing the proportion of intended pregnancy lessens the burden of closely spaced

[22] Secura GM et al. Change in sexual behavior with provision of no-cost contraceptive. Obstet Gynecol 2014: 123(4):771-778.

[23] Centers for Disease Control and Prevention. High school youth risk behavior survey. Accessed on October 29, 2017 at https://nccd.cdc.gov/youthonline/App/Results.aspx?TT=B&OUT=0&SID=HS&QID=H60&LID=LL&YID=RY&LID2=&YID2=&COL=&ROW1=&ROW2=&HT=&LCT=&FS=&FR=&FG=&FI=&FP=&FSL=&FRL=&FGL=&FIL=&FPL=&PV=&TST=&C1=&C2=&QP=&DP=&VA=CI&CS=Y&SYID=&EYID=&SC=&SO=.

[24] 82 FR 47803.

[25] Kaiser Family Foundation. Private insurance coverage of contraceptive, 2016. Accessed on October 29, 2017 at https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraceptive/.

[26] Hart Research Poll, 2014. Survey: Nearly Three in Four Voters in America Support Fully Covering Prescription Birth Control

Accessed on October 29, 2017 at https://www.plannedparenthood.org/about-us/newsroom/press-releases/survey-nearly-three-four-voters-america-support-fully-covering-prescription-birth-control.

[27] Law A, Wen L, Lin J, et al. Are women benefiting from the Affordable Care Act? A real-world evaluation of the impact of the Affordable Care Act on out-of-pocket costs for contraceptives. Contraceptive. 2016;93(5):392-7.

[28]  82 FR 47804.

00427849

Exhibit 34



Planned Parenthood Affiliates of California

or unintended pregnancy. Unintended pregnancy is associated with poor health outcomes, including delayed prenatal care, premature birth, and negative physical and mental health for mother and child.[29]

Finally, the tri-Departments promote an unscientific claim that some forms of contraceptive methods are "abortifacients."[30] This unsubstantiated claim has been rejected by the medical and scientific community. Contraceptive is not abortion. ACOG and other professional medical associations have repeatedly stated that emergency contraception and intrauterine devices are not abortifacients and are safe, effective forms of contraception that prevent pregnancy from occurring.[31] The FDA agrees as it does not use either "abortifacient" or "abortion" to describe any form of contraception approved and included in the HRSA recommendation. The reason is plain. Pregnancy, as long established by the medical profession, begins at implantation, not at conception. Most notably, in 1965, the American Congress of Obstetricians and Gynecologists (ACOG) issued a statement that the establishment of a pregnancy takes several days and is not completed until a fertilized ovum is implanted in the lining of the woman's uterus.[32] Accordingly, the beginning of pregnancy occurs only *after* implantation of the fertilized egg to the uterine wall. The Federal government has long accepted this definition of pregnancy and, by extension, what constitutes its prevention. Since the 1970s, HHS has had an official definition of pregnancy for purposes of establishing certain safeguards when Federally-funded research involves pregnant women. For example, the rules promulgated by the Bush administration related to research involving human subjects, which remain in effect today, say that pregnancy "encompasses the period of time from implantation until delivery."[33]

---

[29] Women's Preventive Services Initiative. Final Report 2016. Accessed on October 29, 2017 at http://www.womenspreventivehealth.org/wp-content/uploads/2017/08/WPSI_2016FullReport.pdf.
[30] 82 FR 47794.
[31] American Congress of Obstetricians and Gynecologists. Facts are important: Emergency contraceptive and intrauterine devices are not abortifacients. Accessed on October 29, 2017 at https://www.acog.org/-/media/Departments/Government-Relations-and-Outreach/FactsAreImportantEC.pdf. ; Association of Reproductive Health Professionals. Health Matters Fact Sheet. Accessed on October 29, 2017 at https://www.acog.org/-/media/Departments/Government-Relations-and-Outreach/FactsAreImportantEC.pdf.; American College of Obstetricians and Gynecologists. (2001, accessed July 31, 2002). "Statement of the American College of Obstetricians and Gynecologists Supporting the Availability of Over-the-Counter Emergency Contraceptive." [Online]. http://www.acog.org/from_home/publications/press_ releases/nr02-14-02.htm.; American College of Obstetricians and Gynecologists. "ACOG Practice Bulletin #69: Emergency Contraceptive." *Obstetrics & Gynecology*. 106(6), 1443–5; American Medical Women's Association. (1996, accessed 2000, February 22). *Position Statement on Emergency Contraceptive*. [Online]. http:// www.amwa-doc.org/publications/Position_Papers/contraceptive.htm; Family Health International. (2005, accessed 2005, September 7). "Mechanisms of Action: Mechanisms of the Contraceptive Action of Hormonal Methods and Intrauterine Devices (IUDs)." [Online]. http://www.fhi.org/en/RH/ Pubs/factsheets/mechact.htm. 2012. Accessed on October 29, 2017 from http://www.aafp.org/dam/AAFP/documents/advocacy/prevention/women/LT-Sebelius-OTCAccessforPlanBOneStepEmergencyContraceptive-120712.pdf .
[32] American College of Obstetricians and Gynecologists Terminology Bulletin. Terms Used in Reference to the Fetus. No. 1. Philadelphia: Davis. September, 1965.
[33] 45 C.F.R. § 46.202(f) (2005)

00427850

Exhibit 34                                   JA1022                                   JA-0000712



Planned Parenthood Affiliates of California

**As a result of the interim final rules, women will lose access to contraceptive coverage, have increased health care costs, and are more likely to experience an unintended pregnancy that would affect their educational and economic advancement.**

Starting in 2012, as part of the ACA, most group health plans and health insurers were required to cover all FDA-approved contraceptive methods without cost-sharing.[34] This requirement has had tremendous benefits. Since the contraceptive coverage requirement took effect, 62.4 million women, including 7.4 million women in California, have benefitted from these reproductive services.[35] In 2013 alone, women saved $1.4 billion on birth control pills.[36]

In drafting and implementing the ACA, Congress and the previous Administration established narrow exemptions for certain organizations that objected to contraceptive coverage, including nonprofit religious organizations[37] and closely-held for-profit entities.[38] To maintain the spirit of providing coverage for preventive health services under the Public Health Service Act section 2713, the previous Administration established an accommodation so that women employed by exempt organizations could continue to have access to all FDA-approved contraceptive methods without cost sharing and at no cost to the employer.[39] Congress did not intend that a broader group of employers be exempt from ACA protections, other than an explicit exemption for grandfathered health plans. The original exemption and accommodation were limited to religious employers and closely-held private companies contemplated by Congress. Congress' intent was to strike a balance to preserve the ability of individuals to maintain their existing coverage while ensuring access to affordable essential coverage and improving the quality of coverage.[40] As the Supreme Court recognized, the accommodation process "seeks to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage."[41]

---

[34] 45 CFR 147.130(a)(1)(iv); 29 CFR 2590.715-2713(a)(1)(iv); 26 CFR 54.9815-2713(a)(1)(iv).

[35] National Women's Law Center. Accessed October 29, 2017 at https://nwlc.org/resources/new-data-estimate-62-4-million-women-have-coverage-of-birth-control-without-out-of-pocket-costs/.

[36] Nora v. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 health affairs 1204 (July 2015) *available at* http://content.healthaffairs.org/content/34/7/1204.abstract.

[37] 45 CFR 147.131; 29 CFR 2590.715-2713A; 26 CFR 54.9815-2713 (published July 2, 2013).

[38] 45 CFR 147.131; 29 CFR 2590.715-2713A; 26 CFR 54.9815-2713 (published July 14, 2014).

[39] 45 C.F.R. § 147.131(b) & (c)(2).

[40] 75 FR 34540.

[41] *Hobby Lobby Stores*, 134 S. Ct. at 2759.

00427851

Exhibit 34                                                JA1023                                                JA-0000713



Planned Parenthood Affiliates of California

The IFRs stand Congress' intent on its head. They put contraceptive coverage in the hands of women's employers, who may decide if contraceptive methods, or a subset of them, are covered. They also eliminate the accommodation. By so doing, they convert mandatory preventive benefits into optional ones.

Moreover, the tri-Departments noted in the interim final rules that they were not aware of how many employers might exempt coverage.[42] It is unfathomable that the tri-Departments would promulgate policy without understanding the impact of that policy on the economy or public health. In California, 250 employers are self-funded and, thus, able to elect these exemptions if they choose. Indeed, 26 employers in California, employing more than 52,000 people, participated in one of the *Zubik* cases, indicating their desire to take advantage of a religious exemption to deprive their employees of contraceptive coverage. Many of these employers do not fall within the previous categories of religious organizations or closely held private corporations. Thus, we can anticipate that far more women will be impacted than the tri-Departments anticipated.

Bottomline – Without access to contraception through insurance coverage, women will face out-of-pocket costs for contraception, which will lead to women going without or not being able to select the method that is appropriate for their health needs. As a result, women will incur more health care costs and other health and economic consequences, and the rates of unintended pregnancy and abortion will increase.

Losing access to affordable contraception will have a detrimental impact on women and families. Family planning, and the consistent use of contraception, is the most cost effective way to reduce unintended pregnancies.[43] For every 1,000 unintended pregnancies, 42% will result in live births, 13% in miscarriages, and 45% in abortion.[44] Thus, reducing unintended pregnancies reduces expenses due to fewer delivery, miscarriage, or abortion costs.

In addition, there is a well-established link between contraceptive access and improved health outcomes (for women and infants) as well as educational and economic attainment. Decreases in the rate of unintended pregnancies and abortion over the long-term result in a corresponding

---

[42] 82 FR 47816.

[43] *Id.* at 15, 22; Bixby Center for Global Reproductive Health, UCSF, *Cost-Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, at 6-7, 20 (April 2010).

[44] CHBRP Contraceptive Report, at 30, *citing* Kost K., *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends since 2002* (New York 2015).

00427852

Exhibit 34                    JA1024                    JA-0000714



Planned Parenthood Affiliates of California

decrease in the risk of maternal mortality, adverse child health outcomes, behavioral problems in children, and negative psychological outcomes associated with unintended pregnancies for both mothers and children. Avoiding unintended pregnancies also helps women to delay childbearing and pursue additional education, spend additional time in their careers, and have increased earning power over the long term.[45]

**Despite the tri-Departments' statement that the IFRs would not change Federally-funded family planning services, the Administration has indicated their intention to and has already taken actions to limit access in these programs.**

The interim final rules assume women will maintain access under existing State and Federal programs.[46] These program, however, are restricted to low-income patients and by definition will not be able to provide for all who would lose access to contraceptive care through their employers. One of these programs is the Family Planning, Access, Care, and Treatment (Family PACT) program, established by California in 1996. Family PACT provides family planning, including contraceptive services, to California residents who are uninsured and have incomes at or below 200% of the Federal Poverty Level. The great majority of employees who might lose access to contraceptive coverage from their employers will simply not qualify for Family PACT or other government-funded programs.

Even if employees did qualify for government funded programs, the need for publicly funded contraception is already far greater than the supply. Recent research shows that nearly 20 million American women currently live in contraception deserts—defined by their lack of reasonable access to public health care sites offering the full range of contraceptive methods.[47] Nearly 10.5 million women live in counties without any access to a single publicly funded clinic offering the full range of contraceptive methods.

The safety net family planning system, including Title X and Medicaid, is already overburdened and underfunded. Publicly-funded systems provide contraceptive services to those that meet certain income thresholds. They were not designed, nor are they currently funded, to absorb patients who should be getting private contraceptive coverage.

---

[45] California Health Benefits Review Program, *Analysis of California Senate Bill (SB) 999 Contraceptives: Annual Supply*, A Report to the 2015-2016 California State Legislature, at 1 (March 28, 2016, revised May 3, 2016) (hereinafter CHBRP Contraceptive Report).

[46] 82 FR 47803

[47] The National Campaign to Prevent Teen and Unplanned Pregnancy, Birth Control Access by County, Accessed on October 28, 2017 at https://thenationalcampaign.org/deserts.

00427853

Exhibit 34                     JA1025                     JA-0000715



Planned Parenthood Affiliates of California

Title X, for example, established in the Public Health Services Act in the 1970's with strong bipartisan support, supports the delivery of family planning and related services, including the full range of contraceptive methods and breast and cervical cancer screenings, to more than four million patients nationwide. Without Title X funding, the number of unintended pregnancies, unplanned births, and abortions each year in the United States would be 68% higher.[48] Title X would need at least $737 million allocated annually to provide care to all women in need of publicly funded family planning care.[49] This estimate was developed before the tri-Departments' gross expansion of exemptions for contraceptive coverage. The estimate would be much higher now that millions of women's contraceptive coverage could be eliminated.

And, to add insult to injury, the current Administration has targeted government-funded reproductive health services for reduction or elimination. Both the Administration and Congress are attempting to limit the scope of services as well as the network of providers who are eligible to offer them.

Earlier this year, Congress and the Administration took actions to undermine the Title X program. The Administration signed a law (H.J. Res. 43) that struck down a regulation that prohibited the discrimination of certain providers, including Planned Parenthood, in the Title X program and ensured women access to the full range of family planning providers and services in their communities. The Administration next changed the Title X grant period from a three-year term to a one-year term in anticipation of administrative changes to the program. Finally, it cut funding for existing Title X grants for research to improve service delivery, quality of care, and patient satisfaction. These destructive actions will put further strain on the family planning safety net and family planning programs that the tri-Departments misguidedly claim will provide women access who lose coverage through their employer.

As to providers, the President's FY 2018 Budget to Congress prohibited any funding to Planned Parenthood, including Title X and Medicaid.[50] Congress has made repeated attempts to prohibit Planned Parenthood from receiving Medicaid reimbursement for services provided via ACA repeal efforts and the appropriations process. In California, Planned Parenthood provides 40% of government-funded family planning services. Without Planned Parenthood, women without contraceptive coverage will have difficulty finding another source of contraception that is

---

[48] Frost JJ et al., *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update.

[49] August, EM et al., *Projecting the unmet need and costs for contraceptive services after the Affordable Care Act*. American Journal of Public Health. 2016 February: 106(2): 334-341.

[50] Office of Management and Budget. President's Budget Fiscal Year 2018. Appendix Budget of the U.S. Government. Accessed October 28, 2017 at https://www.gpo.gov/fdsys/pkg/BUDGET-2018-APP/pdf/BUDGET-2018-APP.pdf.

00427854

Exhibit 34     JA1026     JA-0000716



Planned Parenthood Affiliates of California

accessible and within a reasonable distance. Federally Qualified Health Centers (FQHCs) do not have the capacity or specialty care to fill the gap if Planned Parenthood is defunded. FQHCs in total provide less than half the number of contraceptive services than does Planned Parenthood, and individual FQHCs provide far fewer contraceptive services than does the typical Planned Parenthood clinic.[51]

Congress also has tried to block grant the Medicaid program, with the most recent effort slashing Federal funding by an estimated $61.6 billion.[52] This would significantly cut federal funding to Medi-Cal and access to affordable health insurance.

For all these reasons, the suggestion that women will be able to maintain access to contraceptive care by participating in government-funded programs if their employers elect the religious or moral exemption and refuse coverage is wrong and should be rejected.

**The interim final rules will increase use of Federal programs, shifting costs from employers to tax-payers, with a significant increase to Federal and State spending.**

The tri-Departments argue that women would not be harmed or denied access because publicly funded contraception is available to them.[53] Ironically, the interim final rules would shift the cost of providing contraceptive coverage from employers who refuse to provide it to taxpayers by increasing the costs of government-funded at both the Federal and State level. For example, California's Family PACT program delivers family planning services, including contraception, at no cost to over 1.68 million people each year in California.[54] Pursuant to California's State Medicaid Plan, the Federal government is responsible for covering a portion of the Family PACT and Medi-Cal managed care programs for reproductive health care services. The State of California covers the remainder. For every dollar spent on family planning services in California, the Federal government contributes 77.49 cents while the State spends 22.51 cents. If women who previously received contraceptive coverage through their employers were forced to seek coverage through Family PACT instead, the cost of that program to both the federal and state governments, and their taxpayers, would increase significantly.

---

[51] Congressional Research Service. Factors related to the use of Planned Parenthood affiliated health centers and Federally qualified health centers. Washington, DC: April 5, 2017.

[52] Garfield R et al. State-by-state estimates of changes in the Federal spending on health care under the Graham-Cassidy bill. Accessed on October 28, 2017 at https://www.kff.org/health-reform/issue-brief/state-by-state-estimates-of-changes-in-Federal-spending-on-health-care-under-the-graham-cassidy-bill/.

[53] 82 FR 47803.

[54] Bixby Center for Global Reproductive Health. University of California San Francisco. *Family PACT Program Report Fiscal Year 2013-2014*, at 5 (Bixby Annual Report).

00427855

Exhibit 34                    JA1027                    JA-0000717



Planned Parenthood Affiliates of California

For those women who lose employer coverage and have incomes greater than 200% of the federal poverty line, the cap for Family PACT participation, it can be expected that their rates of unintended pregnancy will increase dramatically. Research shows that the rate of unintended pregnancies for those who do not use contraception is 45%.[55] In the past twenty-five years, California's Family PACT Program has been responsible for causing: the rates of unintended pregnancy and unplanned births to decline 82%[56]; the teen birth rate to decline by 71%[57]; and the number of abortions to fall by 50%.

The decrease in unintended pregnancy and abortion has saved California, and both Federal and state taxpayers, enormous amounts of money. The IFRs, as published, will cause pregnancy rates to rise, and both California and the Federal government will be forced to pick up the attendant costs.[58] Sixty-four percent (64%) of all unintended births in California are paid for by public insurance through Medi-Cal, the Children's Health Insurance Program, and the Indian Health Service. California Health Benefits Review Program (CHBRP) recently estimated that each pregnancy averted saves California $15,364 in increased costs for delivery, abortion, and miscarriage management.[59] All told, unintended pregnancies cost California $689 million each year and the Federal government $1.062 billion.[60]

There are additional public sector costs stemming from unintended pregnancy. Low income pregnant women can qualify for several public health and social programs, which provide free or low-cost services before and after delivery for themselves and their children. One study, done over a decade ago, found that each unintended pregnancy cost the public sector $6,557 in medical, welfare, and other social service costs for a woman and child up to age two.[61] The savings were $14,111 from conception to age five.[62] The State's share of these costs is 33.1%,

---

[55] CHBRP Birth Control Report, at 22, *citing* Finer LB, Zolna MR, Declines in Unintended Pregnancy in the United States, 2008-2011. *New England Journal of Medicine* 2016; 374(9): 843-852.
[56] Guttmacher Institute, *State Facts on Publicly Funded Family Planning Services: California* (Sept. 2016), https://www.guttmacher.org/fact-sheet/state-facts-publicly-funded-family-planning-services-california
[57] *Id.*
[58] The Regulatory Impact Analysis and Federalism Analysis published with the interim final rules are insufficient in their analysis. A thorough analysis would have taken into consideration the cost shifting and increased spending as a result of these policies, both in how costs would shift to Federal government programs and the shift of costs or burden to States.
[59] California Health Benefits Review Program, *Analysis of California Senate Bill (SB) 999 Contraceptives: Annual Supply,* A Report to the 2015-2016 California State Legislature, at 10, 30 (March 28, 2016, revised May 3, 2016)("CHBRP Report").
[60] Guttmacher Institute, *Public costs from unintended pregnancies and the role of public insurance programs in paying for pregnancy-related care*, February 2015. Accessed on October 25, 2017 at https://www.guttmacher.org/sites/default/files/report_pdf/public-costs-of-up-2010.pdf.
[61] Bixby Center for Global Reproductive Health, UCSF, *Cost-Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, at 20 (April 2010).
[62] *Id.*

00427856



**Planned Parenthood Affiliates of California**

and the local government's share is 0.6% from conception to age two. For conception to age five, the State's share is 33.5% and local 0.3%.[63] It is with certainty that these interim final rules will increase the use of Federal programs, shifting costs from employers to tax-payers, with a significant increase to Federal and State spending.

<div style="text-align:center">*    *    *</div>

Family planning services, including contraception, is widely recognized as one of the greatest public health achievements in the 20th century.[64] California has a long history of protecting and expanding access to reproductive and sexual health care as well as individuals' reproductive health rights. We oppose any actions by HHS that would infringe on California's laws. A sample of some of these laws include the recently signed Freedom of Choice in Family Planning (SB 743) that protects access of Medi-Cal beneficiaries to their preferred providers; the Contraceptive Coverage Equity Act (SB 1053) that guaranteed access to the full range of FDA-approved birth control methods without out-of-pocket costs; the Reproductive Privacy Act that protects Californians' fundamental right to choose a safe and legal abortion; and a series of laws that ensure emergency contraception is accessible, including allowing pharmacists to dispense emergency contraception under statewide protocol approved by the Medical Board of California and the Board of Pharmacy.

We strongly oppose any policy, including these interim final rules, that would undermine California protections for access to sexual and reproductive health services. We believe that the tri-Departments interim final rules expanding exemptions from contraceptive coverage are dangerous and reckless to the health and well-being of women. An employer's religious beliefs should not be able to override a woman's own religious or moral views and her health care needs. Women deserve insurance coverage for birth control, no matter where they work. We encourage the tri-Departments to steer away from a pro-faith, anti-choice directive and return to implementing a vision for the Department that fosters its mission to "enhance the health and well-being of individuals by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services."

We submit these comments in support of our mission to create a personally and politically safe climate in which individuals have universal and unfettered access to sexual and reproductive

---

[63] *Id.* at 21.

[64] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm

00427857

Exhibit 34

JA-0000719



Planned Parenthood Affiliates of California

health service and are free to follow their own beliefs, values, and moral code when making decisions about these services.

We appreciate your consideration of our comments. If you have any questions, please contact Beth Parker at 916-233-3762 or beth.parker@ppacca.org.

Sincerely,

Beth H. Parker
Chief Legal Counsel
Planned Parenthood Affiliates of California

00427858

Exhibit 34

JA1030

JA-0000720

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT46; 1210-AB84; 1545-BN91)**

To whom it may concern:

    The Center for American Progress ("CAP") writes to provide comments in opposition to the Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, an interim final rule ("Moral Exemptions IFR") published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47838 *et seq.* as permitted by the Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services (collectively, "the Departments"). Additional organizations signing on to the comment include the Autistic Self-Advocacy Network, the Autism Women's Network, and the National LGBT Task Force.

    CAP is an independent, nonpartisan policy institute that is dedicated to improving the lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted action. CAP believes America should be a land of boundless opportunity, where people can climb the ladder of economic mobility. We believe an effective government can earn the trust of the American people, champion the common good over narrow self-interest, and harness the strength of our diversity.

    To meet these ends, we develop new policy ideas, challenge the media to cover the issues that truly matter, and shape the national debate. With policy teams in major issue areas including criminal justice, democracy and government, disability rights, economy, education, energy and environment, foreign policy and security, guns and crime, health care, immigration, LGBT, poverty, race and ethnicity, religion and values, and women's rights, CAP thinks creatively at the cross-section of traditional boundaries to develop ideas for policymakers that lead to real change. By employing an extensive communications and outreach effort that we adapt to a rapidly changing media landscape, we promote our ideas aggressively in the national policy debate. Although CAP is a multi-issue organization, we submit this comment today specifically to address the needs and concerns of the disabled community. We strongly believe that the Moral Exemptions IFR will have a negative impact on women, especially those in the disabled community. For these reasons, we submit this comment to bring to your attention the negative impact that the Moral Exemptions IFR will have on women in the disabled community.

    Women with disabilities deserve equal access to affordable and comprehensive health care, including access to all contraceptive methods approved by the U.S. Food and Drug

<div align="center">1</div>

00209083

Administration ("FDA"). However, the Moral Exemptions IFR will exacerbate the many barriers women with disabilities already face when accessing health care. These barriers include disproportionately higher rates of poverty and unemployment, and lower rates of health insurance. Thus, women with disabilities will be less able to afford contraception, less able to prevent unintended pregnancy or manage other health issues, and less able to select the contraception methods recommended for their particular disability and health status. For these reasons, set forth in more detail below, we urge the Departments to set aside the Moral Exemptions IFR. As an organization and community member, CAP is committed to obtaining economic security and equality for women with disabilities, including ensuring that they have full and equal health insurance coverage that encompasses contraceptive coverage without cost sharing, as guaranteed by the Affordable Care Act ("ACA"). We strongly oppose any regulation that impedes a woman's access to the contraceptive care best suited for her personal and health needs.

This comment will first discuss the impact of the ACA and how the ACA's contraceptive coverage helped increase access to and affordability of contraception. Next, this comment will illustrate the disabled community's concerns regarding contraception access and care, including poverty and access to health care for women with disabilities, the need that women with disabilities have for contraception, how limiting contraceptive choices is particularly harmful to women with disabilities, and the importance of eliminating cost sharing for contraceptive care to women with disabilities. Then, this comment will discuss the impact that the Moral Exemptions IFR will have on the disabled community and summarize why we strongly believe that this rule should be withdrawn. Finally, this comment will outline how the Moral Exemptions IFR violates the Administrative Procedures Act ("APA"), the First Amendment to the Constitution, and the Due Process Clause of the Fifth Amendment to the Constitution, all of which require the Departments to set aside the Moral Exemptions IFR.

## I. The Impact of the Affordable Care Act

The ACA is a critical source of health care coverage for America's traditionally underserved communities. The ACA reduced the number of individuals without insurance to historic lows, including a 39 percent decrease in the uninsured rate among the lowest income individuals.[1] The nation and our communities cannot afford to go back to a time without access to comprehensive, affordable coverage.

The ACA has reduced health care costs for individuals and employers while also reducing uncompensated care by more than $7.4 billion.[2] In addition, the ACA included critical provisions ensuring full and equitable access to essential services without discrimination. The ACA has also been instrumental in covering a wide range of preventive services, ensuring that

---

[1] Kelsey Avery, Kenneth Finegold and Amelia Whitman, *Affordable Care Act Has Led to Historic, Widespread Increase in Health Insurance Coverage*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ASPE ISSUE BRIEF, (Sep. 29, 2016) https://aspe.hhs.gov/system/files/pdf/207946/ACAHistoricIncrease Coverage.pdf.

[2] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, New Report Details Impact of the Affordable Care Act (Dec. 13, 2016), https://www.hhs.gov/about/news/2016/12/13/new-report-details-impact-affordable-careact.html available at http://wayback.archive-it.org/3926/20170127135924/https://www.hhs.gov/about/ news/2016/12/13/new-report-details-impact-affordable-care-act.html.

2

00209084

Exhibit 38

individuals have access to life-saving cancer screenings and treatment and women have access to effective and affordable contraception.

Under the ACA's preventive services coverage, most private health plans in the United States—whether provided by employers, schools, or through the exchanges—must cover dozens of preventive care services without any out-of-pocket costs to patients. That list of services includes a set of recommended preventive services for women,[3] and those recommendations, first established in 2011 by an Institute of Medicine committee and reaffirmed in 2016 by an expert panel led by the American College of Obstetricians and Gynecologists, include contraceptive methods and services.

More specifically, plans must cover all 18 distinct contraceptive methods used by women, and any new methods identified by the FDA.[4] These plans also must cover all related services, including contraceptive counseling, services needed to initiate and discontinue a contraceptive method, and follow-up care. Moreover, plans may not apply copayments, deductibles, or any other out-of-pocket costs to any of these methods or services. Similarly, plans are sharply limited in their ability to impose formularies, prior authorization requirements, and other administrative barriers to contraception. Federal guidance also makes it clear that plans may try to influence only a patient's choice within a specific contraceptive method (*e.g.*, to favor one hormonal intrauterine device (IUD) over another) and not across methods (*e.g.*, to favor oral contraceptives over an IUD or contraceptive ring).[5]

### A. The ACA's Contraceptive Coverage Helped Increase Access and Affordability

Access to contraception is an essential part of shaping women's health and well-being.[6] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[7] About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners fail to use a contraceptive method correctly and

---

[3] Health Resources & Services Administration, *Women's Preventive Services Guidelines*, (Oct. 2017) https://www.hrsa.gov/womens-guidelines-2016/index.html.

[4] "The full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration include: (1) sterilization surgery for women, (2) surgical sterilization via implant for women, (3) implantable rods, (4) copper intrauterine devices, (5) intrauterine devices with progestin (all durations and doses), (6) the shot or injection, (7) oral contraceptives (combined pill), 8) oral contraceptives (progestin only, and), (9) oral contraceptives (extended or continuous use), (10) the contraceptive patch, (11) vaginal contraceptive rings, (12) diaphragms, (13) contraceptive sponges, (14) cervical caps, (15) female condoms, (16) spermicides, and (17) emergency contraception (levonorgestrel), and (18) emergency contraception (ulipristal acetate). Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method." *Id.*

[5] U.S. DEPARTMENT OF LABOR, *FAQS About Affordable Care Act Implementation (Part XXVI)*, (May 11, 2015) https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxvi.pdf.

[6] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception,* (Dec. 7, 2016) https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[7] Kimberly Daniels, Ph.D., Jill Daugherty, Ph.D.; and Jo Jones, Ph.D., *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS, 173 (2014) http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

3

00209085

Exhibit 38                                                    JA1033                                          JA-0000765

consistently.[8] Couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[9] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[10]

Contraceptives make up an estimated 30–44% of out-of-pocket health care spending for women.[11] A year's worth of birth control can cost upwards of $600—the equivalent of 83 hours of work for someone earning the federal minimum wage of $7.25 an hour.[12] More permanent birth control methods, such as an IUD or contraceptive implant, would cost more than $1,000 out-of-pocket—almost one month's salary for an American earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.

The ACA has expanded contraceptive coverage without cost-sharing to millions of women across the nation.[13] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs covered by the contraceptive coverage provision of the ACA. Following implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[14] As a result, studies show that a majority of women tended to choose long-term contraceptives methods, such as an IUD or an implant, as the high upfront costs were removed.[15] These costs acted as a barrier for women who may have wanted access to these specific types of contraceptives.[16] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[17]

---

[8] Jo Jones, Ph.D., William Mosher, Ph.D., and Kimberly Daniels, Ph.D., *Current Contraceptive Use In The United States, 2006–2010, And Changes In Patterns Of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS, 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

[9] Trussell J, Contraceptive failure in the United States, Contraception, 2011, 83(5):397–404.

[10] The Alan Guttmacher Institute (AGI), Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics, New York: AGI, 2000.

[11] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[12] NATIONAL WOMEN'S LAW CENTER, *The Affordable Care Act's Birth Control Benefit: Too Important to Lose* (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/. *See* Elizabeth Celms, "How much do birth-control pills cost?" CLEAR HEALTH COSTS (Apr. 29, 2013) https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[13] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[14] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[15] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.

[16] *Id.*

[17] *Id.*

4

00209086

Exhibit 38    JA1034    JA-0000766

Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[18]

Contraceptive use does benefit women and families. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, contraindications, risk of sexually transmitted infections, desire for confidentiality and control, and many other considerations. Identifying the "right" method helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording women greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families. In short, contraceptive coverage matters, and taking away this coverage for any woman would be short-sighted and harmful.

## II. Women with Disabilities and Contraception

### A. Poverty and Access to Health Care for Women with Disabilities

#### 1. Care Can Be More Costly For Women with Disabilities

Pursuant to the ACA, Medicaid beneficiaries enrolled in Alternative Benefit Plans no longer have to pay cost sharing for preventive services including mammograms and Pap smears. But women with disabilities can face difficulties in locating and accessing reproductive health care providers who have the training and facilities to accommodate meet their needs.[19] Unfortunately, the Centers for Medicare and Medicaid Services do not conduct oversight of ADA compliance by states, health plans, or medical providers.[20] Barriers to providing women with disabilities access to care include "poor reimbursement for a health care provider's services."[21] One study found that, in general, individuals with disabilities have less access to care and worse health outcomes than individuals without disabilities.[22] Additionally, women with

---

[18] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit is Working for Women* (Dec. 16, 2016) https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.
[19] Individuals with Disabilities Education Improvement Act of 2004, Pub. L. 108-446, 20 U.S.C. 1400 (Dec. 3, 2004), http://nichcy.org/wp-content/uploads/docs/PL108-446.pdf [hereinafter Individuals with Disabilities Education Improvement Act].
[20] Association of State and Territorial Health Officials, Access to Preventive Healthcare Services for Women with Disabilities (2013), http://www.astho.org/Access-to-Preventive-Healthcare-Services-for-Women-with-Disabilities-Fact-Sheet/ [hereinafter Access to Preventive Healthcare Services].
[21] Stephanie J. Stockburger & Hatim A. Omar, *Women with Disabilities: Reproductive Care and Women's Health*, Int. J. Child Health Hum Dev., 429 (2015).
[22] Lisa Rapaport, *Disabilities Tied to Worse Access to Care, Poorer Health*, Reuters (Oct. 26, 2017), https://www.reuters.com/article/us-health-care-access-disabilities/disabilities-tied-to-worse-access-to-care-poorer-health-idUSKBN1CV39O; *see also* Henry P. Brehm & Robert H. Cormier, *Medical Care Costs of the Disabled* (July 2017).

5

00209087

disabilities were, "more than seven times more likely to have unmet health needs due to the cost of care or medication than men without disabilities."[23] This may be due in part to "women having lower incomes than men, or more hurdles like the lack of transportation or insufficient time to seek care due to responsibilities caring for kids or other relatives[.]"[24]

### 2. Women with Disabilities Are Less Likely To Be Able To Afford That Care Because They May Have Lower Incomes and Fewer Resources than Their Non-Disabled Counterparts

Persons with disabilities in the United States are more likely to live in poverty, including long-term poverty, than their non-disabled peers.[25] According to a 2009 survey by the Center for Economic and Policy Research, "About half of all working-age adults who experience income poverty have a disability, and . . . almost two-thirds of all such adults experiencing long-term income poverty have a disability." [26] Women with disabilities face significant barriers to employment in the United States. For instance, women with disabilities experience barriers to accessing higher education, thus lowering their employment rates and potential wages.[27] Under the Fair Labor Standards Act, employers are also permitted to pay workers with disabilities a wage that is lower than minimum wage. Furthermore, women with disabilities are less likely to receive supplemental income—such as Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI)—than men with disabilities, and even when they do receive these benefits, they receive less money than do men with disabilities. This is because the amount individuals receive under SSDI and SSI is dependent on work history and previous income, and women with disabilities are less likely to have worked and more likely to have had jobs that paid lower wages.

Furthermore, those living in poverty have a higher likelihood of acquiring a disability due to lack of access to health care, good nutrition, and safe living and working conditions, which in turn means they face increased barriers to education, employment, and public services that could help them escape poverty. Persons with intellectual and developmental disabilities are

---

[23] *Id.*

[24] *Id.*

[25] Amartya Sen. *Keynote Address at the World Bank's Conference on Disability and Inclusive Development* (2007), http://documents.worldbank.org/curated/en/930491468158381717/pdf/393850WP0Socia00Box 374323 B00PUBLIC0.pdf (The income-based measure of poverty does not take into account the higher cost of living with a disability in the United States, including medical care, accessible transportation, durable medical equipment, and personal assistance. As Amartya Sen, a professor and economist with a particular focus on poverty, stated in his address to the World Bank's Conference on Disability and Inclusive Development, the poverty line for persons with disabilities should take into account the extra expenses they incur in translating their income into the freedom to live well. Sen also noted that studies have shown that the poverty rate for disabled people doubles if these extra costs are taken in to account.)

[26] Shawn Fremstad, "Half in Ten: Why Taking Disability into Account is Essential to Reducing Income Poverty and Expanding Economic Inclusion," Center for Economic and Policy Research (2009), http://cepr.net/documents/publications/poverty-disability-2009-09.pdf.

[27] U.S. Dep't of Labor, Women's Bureau, "Issue Brief: Key Characteristics of Working Women with Disabilities," (July 2015), https://www.dol.gov/wb/resources/women_with_disability_issue_brief.pdf [hereinafter Dep't of Labor, "Issue Brief"]. (Women with disabilities are less likely to have achieved post-high school education, which can pose a barrier to employment. Only 21.5% of women with disabilities who have some college participate in the workforce, while only 5.9% of women with disabilities who have less than a high school education do.).

6

00209088

at particular risk of poverty, including food insecurity. Because women with disabilities have higher rates of unemployment and poverty than the general population, they are far less likely to have private insurance to cover reproductive health goods and services.[28]

The Moral Exemptions IFR suggests that there are multiple other Federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy. But the rule ignores the impact of this Administration's related health care policy decisions (*e.g.*, the cuts to Medicaid, Title X, and the defunding of Planned Parenthood), the result of which is that access to contraceptives for women has decreased greatly. Despite the common misconception that all low-income people could enroll in Medicaid, the Medicaid program has only been available to certain categories of individuals (*e.g.*, children, pregnant women, seniors, and people with disabilities) who have little to no savings or assets. Family planning services are "mandatory" benefits under Medicaid and must be provided to individuals of childbearing age free of cost-sharing.[29] However, even if women with disabilities are able to enroll in Medicaid, there is no formal federal definition of "family planning," which has given states considerable discretion to determine the specific services covered under their "family planning" coverage.[30] For example, in a survey conducted by the Henry J. Kaiser Family Foundation of 41 state's contraceptive offerings under Medicaid, researchers found five states that did not cover all methods approved by the FDA (two states did not cover one form of injectable and three of them did not cover an emergency contraceptive pill).[31] Researchers also found that a number of states apply utilization controls such as quantity limits on oral contraceptives and injectables.[32] In addition, a state may establish different coverage requirements for Medicaid funded family planning services for different eligibility pathways, meaning there is no guarantee that a woman's ideal contraception method would be covered without cost-sharing even as a Medicaid recipient.[33] Thus, the Department's reliance on other federal programs, like Medicaid, to close the coverage gap is unreliable.

### B. Women with Disabilities Are Equally as Dependent on Contraception as Women without Disabilities

Although women with disabilities are equally as dependent on access to affordable contraception as women without disabilities, women with disabilities face many misconceptions about their need for contraception and reproductive health care. Medical providers and policymakers often assume that women with disabilities are not interested in romantic

---

[28] Center for Research on Women with Disabilities, Health Insurance,

https://www.bcm.edu/research/centers/research-on-women-with-disabilities/topics/health-care/health-insurance (last visited October 3, 2017).

[29] Jenna Walls, Kathy Gifford, Usha Ranji, Alina Salganicoff, and Ivette Gomez, *Medicaid Coverage of Family Planning Benefits: Results from a State Survey*, THE HENRY J. KAISER FAMILY FOUNDATION, (Sept 2016) https://www.kff.org/womens-health-policy/report/medicaid-coverage-of-family-planning-benefits-results-from-a-state-survey/.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

7

00209089

Exhibit 38　　　　　　　　JA1037　　　　　　　　JA-0000769

relationships, not sexually active, or not interested in becoming sexually active.[34] Indeed, historically, women with disabilities were discouraged from having children.[35] As a result, the reproductive health needs of women with disabilities have been and remain often ignored.

The reality is that women with disabilities engage in meaningful relationships, are sexually active, and often hope to have children. Studies show that adolescent women with disabilities are just as likely to be sexually active as women without disabilities.[36] In addition, women with disabilities have similar rates of pregnancy as women without disabilities: 11% compared to 12%, respectively.[37] In recognition of this reality, the American Academy of Pediatrics recommends that medical providers discuss sexual and reproductive health—including contraception—with women with disabilities.[38]

Thus, women with disabilities are highly dependent on affordable access to contraception to maintain their general health and well-being. The Moral Exemptions IFR will harm all women by reducing access to affordable contraception, but it will impose particular harm on women with disabilities because women with disabilities already face other health issues and barriers to adequate health care.

### C. Limiting Contraceptive Choices is Particularly Harmful to Women with Disabilities

Limiting contraception options in this manner will be disproportionately harmful to women with disabilities. There are 15 million women with disabilities in the reproductive age groups (ages 16–50), in need of contraception.[39] They require the same options and ability to receive contraceptive care as all women.[40] As stated above, women with disabilities have a number of additional barriers than women without disabilities with respect to receiving health care, including barriers to access that are physical or structural (*e.g.*, no ramps to enter buildings, or exam tables do not lower to transfer a wheelchair user to the table),[41] socioeconomic factors, as well as educational gaps on the part of medical providers and on the part of disabled women themselves.[42] For example, women with intellectual disabilities may lack knowledge about methods of contraception and their usefulness, and clinicians may disregard achieving informed

---

[34] Willi Horner-Johnson, Blair G. Darney, Sheetal Kulkarni-Rajasekhara et al., *Pregnancy Among US Women : Differences by Presence, Type, and Complexity of Disability*, 529 AM. J. OBSTETRICS & GYNECOLOGY e1 (2016); Elisabeth H. Quint & Rebecca F. O'Brien, *Menstrual Management for Adolescents with Disabilities*, 138 AM. ACADEMY OF PEDIATRICS e1 (2016).

[35] Horner-Johnson, *supra* note 34.

[36] Quint, *supra* note 34.

[37] Horner-Johnson, *supra* note 34.

[38] Quint, *supra* note 34.

[39] Sandra L. Welner, *Contraceptive Choices for Women with Disabilities*, Sexuality and Disability, Vol. 17, No.3, Sept. 1999, at 209.

[40] *Id.*

[41] Clair Kaplan, *Special Issues in Contraception: Caring for Women with Disabilities*, J. Midwifery Women's Health, 2006;51(6):450-456; Anita Silvers et al., *Medicine and Society: Reproductive Rights and Access to Reproductive Services for Women with Disabilities*, 18 American Medical Association Journal of Ethics 430 (2016).

[42] Silvers, *supra* note 41.

8

00209090

Exhibit 38

JA-0000770

consent, "wrongly equating certain diagnoses with an inability to understand or communicate at the requisite level."[43]

Additionally, because the disabled community includes a wide variety of disabilities, it also requires a close assessment of different contraceptive needs. The term "disability" broadly includes those with physical, developmental, and/or intellectual disabilities. Some contraceptive methods help women with disabilities in unique and pertinent ways. For example, women with physical disabilities may have certain physical limitations in their ability to use some menstrual hygiene products or contraceptive methods such as female condoms.[44] Women with cognitive disabilities may have difficulty understanding how to take care of their menstrual hygiene and may need to utilize a contraceptive method such as an IUD or implant that helps diminish that need.[45] Additionally, some women with disabilities may be allergic to latex condoms, such as women with spina bifida, and can only rely on alternative contraceptive methods.[46]

There are other special considerations for women with mobility and cognitive issues. If mobility is an issue, oral contraceptive pills ("OCP") may not be the best option because it could increase their risk of deep vein thrombosis ("DVT").[47] Depo shots may not be the best option for these women because it may cause weight gain and decreased bone density.[48] Some disabled women may have difficulty swallowing, and OCPs may not be the best option; rather, the patch or vaginal ring may be a better option.[49] Women with pelvic issues should avoid using IUDs as they may not feel perforation.[50] If a woman has cognitive or memory issues, she would probably want to use the patch or vaginal ring rather than OCPs, which must be taken every day at around the same time.[51] Accordingly, women with disabilities depend on a full range of contraceptive methods to address the particular needs or challenges posed by individual disabilities.

Thus, the Moral Exemptions IFR could negatively impact these considerations within the disabled community. Not only would it widen the educational gap in recognizing that different kinds of disabilities require different kinds of contraceptive care between doctors and disabled women, but also it would increase the lack of comprehensive health care for disabled women.

### III. The Impact of the Moral Exemptions IFR on Women in the Disabled Community

The Moral Exemptions IFR vastly expands the universe of potential exemptions by including all but publicly traded employers (and government employers) with moral objections to contraception as exempt from the ACA's contraceptive coverage requirement.[52] The Moral Exemptions IFR creates a new category of employers who can now qualify for an exemption or can voluntarily chooses an accommodation, nonprofit and closely held for-profit employers who

---

[43] *Id.*
[44] Kaplan, *supra* note 41.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] 82 Fed. Reg. 47838 *et seq.*

9

00209091

Exhibit 38 JA1039 JA-0000771

have a moral objection to contraceptives.[53] There is now a considerably larger pool of employers than when the exemption was available only to those who were employees of a house of worship or who were eligible for an accommodation in the past. Under the Moral Exemptions IFR, if an employer decides to claim a moral exemption, the cost of contraceptives will be borne by women workers and female dependents. There will be no guarantee of contraceptive coverage for employees of an exempt organization. And the employer may choose to cover some methods, but has no obligation to cover all 18 FDA methods without cost sharing.

## IV. The Moral Exemptions IFR Should Be Set Aside

Women with disabilities deserve equal access to affordable and comprehensive health care, including access to all FDA-approved contraceptive methods. But the Moral Exemptions IFR will exacerbate the many barriers women with disabilities already face when accessing health care: disproportionately higher rates of poverty and unemployment, and lower rates of health insurance. As a result, women with disabilities will be less able to afford contraception, less able to prevent unintended pregnancy and manage other health issues, and less able to select the contraception methods recommended for their particular disability and health status.

## V. The Moral Exemptions IFR Violates the Administrative Procedure Act

The APA imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[54] The APA is applicable here because the Moral Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[55] By enacting the Moral Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

### A. Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the Administrative Procedure Act

The APA contains two procedural rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule that is at issue here.[56] This rule violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its reasoning, the Departments do not have good cause.

---

[53] *Id.*
[54] 5 U.S.C. § 551(5).
[55] *Id.*
[56] *Id.*

10

00209092

Exhibit 38                     JA1040                     JA-0000772

### 1. What is "Good Cause"?

The APA limits good cause to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[57] Courts have found good cause in cases that involve: (1) emergencies;[58] (2) context where prior notice would subvert the underlying statutory scheme;[59] and (3) situations where Congress intends to waive section 553's requirements.[60] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[61] This means that the Departments must have good cause to waive each requirement.

### 2. **Which of the APA's Procedural Requirements are at Issue Here?**

Section 553(b) of the Administrative Procedure Act (APA) requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[62] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[63] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[64]

### 3. **The Departments Have Not Satisfied the "Good Cause" Standard**

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[65] While these rules empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health

---

[57] 5 U.S.C. § 553(b).

[58] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004).

[59] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (The court reasoned that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made.).

[60] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (Here, the courts are finding that the APA is inapplicable, rather than that good cause is established.).

[61] *U.S. v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[62] 5 U.S.C. § 553(b).

[63] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[64] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[65] 82 Fed. Reg. at 47855.

11

00209093

Exhibit 38

Care Portability and Accountability Act of 1996,[66] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[67] This however is a declaratory argument that is conclusory in nature and does not rise to the levels described above when Courts have found that the circumstances surrounding a rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made conclusory claims of an emergency situation, unaccompanied by independent facts, which the courts determined are insufficient to constitute good cause.[68] Declaring that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that good cause is supported because they have already "issued three interim final rules implementing this section of the PHS Act because of the immediate needs of covered entities and the weighty matters implicated by the HRSA Guidelines"[69] and because "[t]wo lawsuits have been pending for several years by entities raising nonreligious moral objections to the Mandate."[70] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Moral Exemptions IFR and cease to offer contraception without cost-sharing. They will be forced to find alternative means for contraceptive coverage or to pay high prices out of pocket to maintain the contraception coverage they currently have.

As explained above, the Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and the APA's post-adoption publication requirements. They have not adequately established that the APA's procedural requirements don't apply or that they have good cause for disregarding the APA's procedural rulemaking requirements. Because the Moral Exemptions IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the

---

[66] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); and 42 U.S.C. § 300gg–92.

[67] 82 Fed. Reg. at 47855.

[68] *See, e.g.*, *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v.Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *United States v. Brewer*, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[69] 82 Fed. Reg. at 47855.

[70] *Id.*

12

00209094

Exhibit 38

JA-0000774

Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Moral Exemptions IFR should be set aside.

### B. Substantive Violations of the Administrative Procedure Act

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[71] The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[72] "contrary to a constitutional right,"[73] or "in excess of statutory jurisdiction."[74] The Moral Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts the Patient Protection and Affordable Care Act ("ACA").

The ACA (and implementing regulations) require all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing requirements in order to protect women's health, ensure that women do not pay more for insurance coverage than men, and advance women's equality and well-being.[75] In addition, section 1554 of the ACA prohibits the Departments from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care"[76] and Section 1557 of the ACA, prohibits sex discrimination in certain health programs and activities.[77]

By permitting objecting institutions to deny no-cost contraceptive coverage, the Moral Exemptions IFR erects unreasonable barriers to medical care violating Section 1554 of the ACA. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Moral Exemptions IFR violates the ACA, this IFR also violates the APA and must be set aside on that basis.

### VI. The Moral Exemptions IFR is Unconstitutional

This comment will now discuss how the Moral Exemptions IFR does not implicate the Religious Freedom Restoration Act ("RFRA") and how it is unconstitutional as it violates the Due Process clause of the Fifth Amendment.

---

[71] 5 U.S.C. § 551(5).
[72] 5 U.S.C. § 706(2)(A).
[73] 5 U.S.C. § 706(2)(B).
[74] 5 U.S.C. § 706(2)(C).
[75] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).
[76] 42 U.S.C. § 18114(1).
[77] 42 U.S.C. § 18116.

13

00209095

## A. The Moral Exemptions IFR Does Not RFRA

While the administration has asserted that the Religious Freedom Restoration Act allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, RFRA provides no authority to craft moral exemptions. The Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's moral convictions—which RFRA neither requires nor permits.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is no basis to distinguish between these federal statutory entitlements and the contraceptive coverage in the ACA. The Moral Exemptions IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find morally objectionable. Such a result would impermissibly shift the cost of moral objections to coverage onto the very people that the ACA was meant to protect.

## B. The Moral Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

The Fifth Amendment explicitly prohibits the federal government from depriving individuals of their "life, liberty, or property" without due process of the law.[78] Without any notice, the Moral Exemptions IFR removes contraceptive healthcare coverage from the insurance plans that employers are required to offer to their employees. This rule violates the Fifth Amendment on the basis that it constitutes sex discrimination, and deprives an individual of a liberty without due process of law.

Women have historically been subjected to illegal discrimination based on their gender in violation of the Fifth Amendment.[79] The ACA's contraception coverage was implemented to resolve the fact that women tend to pay more for insurance coverage than their male counterparts.[80] The Moral Exemptions IFR violates the Fifth Amendment because it interferes with women's access to contraception, which is part of their healthcare. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex.

This rule imposes a disparate impact on women because it primarily affects their right to reproductive freedom concerning contraceptive care. Many of the medical treatments that are typically associated with contraceptive care regulate procedures related to female reproductive

---

[78] U.S. CONST. amend. V; U.S. CONST. amend. XIV.
[79] *Gender Discrimination Lawsuit against KPMG Can Move Ahead*, LEEDS BROWN LAW P.C. (Feb. 25,     2013), http://www.lmblaw.com/blog/2013/gender-discrimination-lawsuit-against-kpmg-can-move-ahead.
[80] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).

14

00209096

Exhibit 38                                        JA1044                                        JA-0000776

system, which may or may not have anything to do with family planning decisions.[81] Furthermore, this rule is problematic because it allows employers and schools to deny preventive health benefits that only concern female anatomy, and thus discriminates based on sex.

The Supreme Court has ruled in several cases that facially neutral employment practices with an adverse impact on members of a protected class constitute discrimination.[82] The administration cites to current litigation, and its need to streamline this process in hopes to cut down on pending and future litigation.[83] However, the court ruled in *Frontiero v. Richardson* that administrative convenience, although not without some importance is not a 'shibboleth,' and any statute which draws a sharp line between sexes solely for the purpose of achieving administrative convenience is arbitrary, and violates the Due Process Clause of the Fifth Amendment.[84] Overall, by allowing objecting institutions to deny only certain women's preventative health coverage –namely, coverage for contraceptives—the rule has a greater impact on one gender solely based on one's anatomy.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[85] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[86] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[87] Under the Moral Exemptions IFR, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as organizations seek to decrease their own spending on employee healthcare.

---

[81] THE HENRY J. KAISER FAMILY FOUNDATION, *New Regulations Broadening Employer Exemptions to Contraceptive Coverage: Impact on Women* (Oct. 6, 2017), https://www.kff.org/womens-health-policy/issue-brief/new-regulations-broadening-employer-exemptions-to-contraceptive-coverage-impact-on-women/.

[82] *Griggs v. Duke Power Co.*, 401 U.S. 424, 435 (1971); *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977).

[83] "During the period when the Departments were publishing and modifying our regulations, organizations and individuals filed dozens of lawsuits challenging the Mandate. Plaintiffs included … several non-religious organizations that opposed coverage of certain contraceptives under the Mandate on the basis of non-religious moral convictions." *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act*, 82 F.R. 4738, 47842 (2017).

[84] *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973); Cook, John J., *Fifth Amendment – Due Process  Clause – Sex Discrimination – Sex: A Suspect Classification; Frontiero v. Richardson*, 7 AKRON L. REV. 11 (1974), http://ideaexchange.uakron.edu/cgi/viewcontent.cgi?article=2223&context=akronlawreview.

[85] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[86] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[87] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

15

00209097

Exhibit 38

JA-0000777

In *Board of Regents v. Roth*, the Court stated that a property interest arises whenever a person has a legitimate claim of entitlement.[88] The right to contraceptive coverage without cost sharing is a protected property interest that can only be infringed by an act of the legislature or through a properly issued rule found in the text of the statute. When the ACA was implemented, it established that women now have a legitimate claim of contraceptive coverage without cost sharing.[89] Under the new rule, without an opportunity of a notice and hearing, thousands of women will be prevented from obtaining the no cost contraceptive coverage to which they would otherwise be entitled to. The Moral Exemption IFR violates the Due Process clause since it does not give notice, provide for an opportunity to be heard at a meaningful time in a meaningful way, and does not give a decision that was supported by substantial evidence.[90]

For these reasons, the Departments should find that the Moral Exemptions IFR violates the APA, both procedurally and substantively, it does not implicate RFRA and it is unconstitutional as it violates the Due Process clause of the Fifth Amendment.

For all these reasons, we urge the Departments to set aside the Moral Exemptions IFR.

\*\*\*

CAP appreciates the opportunity to comment on this interim final rule. If you require additional information, please contact:

Sincerely,

The Center for American Progress

Autistic Self-Advocacy Network
Autism Women's Network
National LGBT Task Force

---

[88] *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).
[89] Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq. (2010).
[90] *Procedural Due Process*, EXPLORING CONSTITUTIONAL CONFLICTS (2011), http://law2.umkc.edu/faculty/ projects/ftrials/conlaw/proceduraldueprocess.html.

16

00209098

Exhibit 38                                    JA1046                                    JA-0000778


**Colorado Consumer Health Initiative**

December 5, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

Dear Acting Secretary Hargan.

The Colorado Consumer Health Initiative (CCHI) is submitting the following comments in response to the Departments of Health and Human Services, Labor, and Treasury's (the Departments') Interim Final Rule (IFR) regarding the Affordable Care and Patient Protection Act's contraceptive coverage requirement. CCHI is a state based nonprofit, nonpartisan membership organization dedicated to ensuring access to quality, affordable, and equitable health care for all Coloradans. To this point, CCHI is committed to ensuring all individuals have affordable coverage of preventative services, including contraceptive services for those who wish to receive them. CCHI opposes the Departments' efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement.

The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

Colorado has seen significant success in result of our state efforts to expand access to family planning services, which has included expanding access to long-acting reversible contraception (LARC) since 2008. With the cost barrier removed, more women are choosing

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017). *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

1420 Ogden St. Ste. A1        303 563 9108        cohealthinitiative.org        1

Denver, CO 80218        @cohealthaccess

00396708

Exhibit 41        JA1047        JA-0000799

long acting, more effective birth control methods. In Colorado's experience, expanding family planning services resulted in a reduction of birth rate, reduction of abortion rate and decreased dependence on government programs. Between 2009 and 2016, the birth rate for Colorado women ages 15 to 19 fell 54 percent, and the abortion rate for the same population fell by 64 percent. It is estimated that reductions in teen and unintended pregnancies helped the state avoid between $66,063,664 and $69,625,751 in entitlement program costs (2010-2014).[3]

We call on the Departments to rescind the IFR. By allowing virtually any employer and university to deprive women of contraceptive coverage, this rule will: (1) harm women and their health and well-being; (2) discriminate against women in violation of multiple federal laws and the Constitution; (3) legitimize a distorted picture of the science supporting contraception; and (4) place an unrealistic burden on other federal programs to support contraception services.

## I.      Birth Control Is Critical to Women's Health and Well-being

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[4] Many women choose to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[5] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[6] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[7]

Beyond alleviating discriminatory out of pocket spending for women, zero-cost coverage of contraception is critical to ensuring women can use it to live healthy lives.

---

[3] https://www.colorado.gov/pacific/sites/default/files/HPF_FP_2017-Family-Planning-Data-Report.pdf
[4] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.
[5] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.
[6] Id.
[7] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

1580 Logan St. Suite 340          303 563 9108          cohealthinitiative.org                    2
Denver, CO 802033
                                  @cohealthaccess

00396709

Exhibit 41                               JA1048                                    JA-0000800

Contraceptive efficacy in preventing unintended pregnancy is well supported in evidence.[8] Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[10] Unintended pregnancy rates are highest among those least able to afford contraception.

Moreover, most women who use birth control do so for both contraceptive and non-contraceptive purposes.[11] Non-contraceptive health benefits of contraception include decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[12]

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. Studies show that access to contraception has increased women's wages and lifetime earnings.[13] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[14]

---

[8] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[9] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[10] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. New England Journal of Medicine. 2016, 374(9):843–852.
[11] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute. 2011.
[12] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[13] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg. Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics. 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[14] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages. 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012). http://www.nber.org/ papers/w1 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz. The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions. 110 J. Pol. Econ. 730, 749 (2002).

1580 Logan St. Suite 340       303 563 9108       cohealthinitiative.org       3
Denver, CO 802033
                               @cohealthaccess

00396710

Exhibit 41       JA1049       JA-0000801

It is important to emphasize that birth control is critical to women's health and lives.

## II. The IFR Undermines Congress's Intent that Birth Control Be Covered As A Preventive Service; and Discriminates Against Care that Women Need

When Congress passed the Women's Health Amendment, it meant to ensure that recommended preventive services for women are covered adequately and to help end gender discrimination in the practices of private insurance companies.[15,16]

Like other civil rights laws, the birth control benefit was intended to address discrimination and ensure women equal access to preventive services that allow them to be full participants in society. In interfering with that access, the IFR results in health insurance that covers preventive care that men need, but not care that women need.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[17] Courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[18]

Freedom of religion is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious beliefs as an excuse to harm others. The Constitution commands that a religious accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[19] The IFR fails this constitutional do-no-harm test.

## III.  Justifications for the IFRs Are Faulty

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The Departments make several misleading statements in this Rule to undermine the contraceptive benefit. To this point:

---

[15] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").
[16] *Id.* at 8,727.
[17] https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf
[18] *Id.* at 24-27
[19] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

1580 Logan St. Suite 340          303 563 9108          cohealthinitiative.org
Denver, CO 802033
                                  @cohealthaccess

00396711

Exhibit 41                    JA1050                         JA-0000802

## A. Contraceptives Do Not Interfere with an Existing Pregnancy

The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[20] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[21]

## B. Contraceptives Are Medication and Carry Risks Like Any Other Medication

The Rule raises concerns about the "negative health effects" of contraception.[22] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions.[23, 24] The Rule suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[25] This kind of logic is not used to offer coverage exemptions for any other FDA-medication with the potential of unwanted side effects, and should not be used to undermine the many positive benefits of oral contraception.

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[26] Increased access to contraception is not associated with increased unsafe

---

[20] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[21] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents. Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[22] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[23] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[24] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[25] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use. 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.
[26] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

1580 Logan St. Suite 340          303 563 9108          cohealthinitiative.org          5
Denver, CO 802033
                                  @cohealthaccess

00396712

Exhibit 41                          JA1051                          JA-0000803

sexual behavior or increased sexual activity.[27,28] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[29,30] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[31]

## IV. The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[32] This assertion fails to recognize that Medicaid and Title X do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers.

With current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[33] Since 2010, the reported annual number of clients served at Title X sites has dropped by approximately 1.2 million

---

[27] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[28] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[29] Minguez M, Santelli JS, Gibson E, Orr M, & Samant. S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3). 338-344.
[30] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[31] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States. 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[32] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147. pt. 147).
[33] August, Euna M, et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act." *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

1580 Logan St. Suite 340          303 563 9108          cohealthinitiative org
Denver, CO 802033
                                 @cohealthaccess

00396713

Exhibit 41                    JA1052                    JA-0000804

patients.[34] This decline corresponds to over $30 million in cuts to Title X's annual appropriated funding.[35]

Furthermore, within the last year, as part of the numerous attempts to repeal the ACA, policymakers have continued to try to impose steep cuts to the Medicaid program, and have threatened to prohibit Planned Parenthood from receiving Medicaid payments, despite providing a porportionally greater percentage of family planning services to the counties within which it opperates.

The Departments insist Title X and Medicaid are resources for those who will lose coverage as a consequence of these IFRs, however the administration's actions relating to these programs make their future uncertain. Colorado has already begun to see the impact of federal cuts, with the end of one federal grant closing the doors to the highly regarded organization Colorado Youth Matter and its family planning and sexual health services.[36]

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting contraception. Contraception use should be a matter between the individual and her provider, not between politicians and employers. For all of these reasons CCHI calls on the Departments to rescind the IFR.

Sincerely,

Terrell Blei
Policy and Outreach Fellow
Colorado Consumer Health Initiative

---

[34] *See* Fowler, CI. Lloyd, SW. Gable, J. Wang, J. and Krieger, K. *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I. Gable, J., Wang, J., & Lasater, B. *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[35] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[36] http://www.coloradotrust.org/content/story/reproductive-health-care-access-increasingly-uncertain-colorado

00396714

Exhibit 41          JA1053          JA-0000805



The Colorado
Health Foundation™

1780 Pennsylvania St. • Denver, CO 80203 • phone: 303-953-3600 • fax: 303-322-4576

www.coloradohealth.org

November 13, 2017

DEPARTMENT OF THE TREASURY
Internal Revenue Service
Re: 26 CFR Part 54
[TD-9827]
RIN 1545-BN92

DEPARTMENT OF LABOR
Employee Benefits Security Administration
Re: 29 CFR Part 2590
RIN 1210-AB83

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Re: 45 CFR Part 147
[CMS-9940-IFC]
RIN 0938-AT20

**Religious Exemptions and Coverage of Certain Preventive Services Under the Affordable Care Act**

Thank you for the opportunity to comment on the interim final rules package regarding "Religious Exemptions and Coverage of Certain Preventive Services Under the Affordable Care Act." The Colorado Health Foundation is the state's largest private foundation and works to bring health in reach to all Coloradans. Our vision is that across Colorado each of us can say: "We have all we need to live healthy lives." We work to achieve this vision by engaging closely with communities across the state through investing, policy and advocacy, learning and capacity building.

After reviewing these interim final rules, we believe they would put health further out of reach for many Colorado women, their children and families if enacted, and we urge you to rescind the interim final rule package. The changes outlined in this proposal could reverse the tremendous progress Colorado has made in reducing both unintended pregnancies and abortions for Colorado teenagers and young women and create new barriers for women to access timely, affordable and comprehensive health care services.

Colorado has made significant improvements in the past decade to ensure affordable contraception and family planning services are within reach for more Colorado women. We have seen the benefits of this across the state: more babies are getting a healthy start in life, more women have access to the health



00326653

Exhibit 42                                  JA1054                                  JA-0000806



care services they need and more educational and economic opportunities are available for Colorado families as a result of these services. According to data from the Colorado Department of Public Health and Environment, since 2008, Colorado has seen significant benefits to expanding access to contraception and family planning services, including:

- The birth rate for young women ages 15-19 has been cut by more than half, falling 53 percent;
- A similar downward trend can be seen among women ages 20-24, with birth rates dropping 30 percent;
- The number of repeat teen births (teens giving birth for the second or third time) dropped by nearly two-thirds (63 percent);
- Births to women without a high school education fell 38 percent;
- The abortion rate among women ages 15-19 fell by 53 percent and among women ages 20-24 by 27 percent;
- The rate of rapid repeat births – which carries greater risk for women and their children – declined by 12 percent among all women;
- The average age for a first birth increase by 1.2 years among all women; and
- Other public health care costs avoided totaled more than \$66 million.

Current federal and state policies have contributed to these positive trends and continue to underpin any sustained progress we hope to realize. The interim final rules expanding exemptions for mandated contraceptive coverage would have a significant and negative impact on Colorado's progress to advancing women's health. If fewer women have access to the comprehensive coverage, data shows Colorado will experience increases in teenage and young adult birth rates and abortions.

The interim final rules expanding the exemption from the contraceptive coverage requirements to non-governmental plan sponsors, institutions of higher education, health plan issuers and individuals who object to the provision of contraceptive coverage on religious or moral grounds limit health care services accessed solely by women. As a result, the provisions in this interim final rule threaten to negatively impact the risk pool of the insurance market by permitting the creation of multiple, distinct risk pools that could make coverage more expensive for women. Distinct risk pools separating men and women, young and old, or healthy and sick works in the opposite direction of ensuring affordable access to care for all Americans.

Finally, the Colorado Health Foundation opposes the proposal to allow publicly traded corporations to claim an exemption to no-cost sharing contraceptive services for 'sincerely held moral convictions.' The

00326654

Exhibit 42                    JA1055                    JA-0000807



potential for abuse in use of this terminology is significant, and it could prevent women from having full access to the affordable comprehensive care they need to live healthy lives.

The Colorado Health Foundation works for all Coloradans, and the policy changes in this interim final rule would work against Colorado women and their families. As a state, Colorado has made impressive gains in reducing both teenage and young adult birthrates and abortions. This interim final rule would slow or reverse that progress. We encourage the Departments to maintain protections for the health of Colorado women by rejecting these proposed changes.

We appreciate your time and consideration. If you have any follow-up questions about these comments or the Colorado Health Foundation, please do not hesitate to contact Dustin Moyer, policy officer at the Colorado Health Foundation, at dmoyer@coloradohealth.org or 303-953-3600.

Sincerely,

*Kyle Legleiter*

Senior Director of Policy
The Colorado Health Foundation

00326655

Exhibit 42     JA1056     JA-0000808

# COMMENTS OF
## THE COUNTY OF SANTA CLARA, CALIFORNIA

in response to

*Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47792

and

*Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act*, 82 Fed. Reg. 47838

JAMES R. WILLIAMS, County Counsel
GRETA S. HANSEN, Chief Assistant County Counsel
LAURA TRICE, Lead Deputy County Counsel
LYNNETTE K. MINER, Fellow
OFFICE OF THE COUNTY COUNSEL
Attorneys for COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
Email: Lynnette.miner@cco.sccgov.org

December 5, 2017

00373530

Exhibit 43

## COMMENTS OF
## THE COUNTY OF SANTA CLARA, CALIFORNIA

The County of Santa Clara, California ("County"), submits these comments in opposition

to the *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services*

*Under the Affordable Care Act*, 82 Fed. Reg. 47792, and *Moral Exemptions and*

*Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act*,

82 Fed. Reg. 47838, interim final rules ("IFRs") published on October 13, 2017, by the U.S.

Department of the Treasury, the U.S. Department of Labor, and the U.S. Department of Health

and Human Services. In support of these comments, the County also submits a Resolution of the

Board of Supervisors of the County of Santa Clara Supporting Access to Contraceptives, adopted

on December 5, 2017.

### INTRODUCTION

Santa Clara County is located at the southern end of the San Francisco Bay and is home

to 1.9 million residents who rely on the County to provide essential services such as health care,

assistance for youth and the elderly, and a wide array of social services. The County also owns

and operates the Santa Clara Valley Medical Center ("SCVMC"), a comprehensive public

healthcare delivery system that provides critical healthcare services to county residents

regardless of their ability to pay. SCVMC is the only public safety-net healthcare provider in

Santa Clara County, and the second largest such provider in California. The County has a unique

interest in the IFRs informed by the role it plays as both a local government and safety-net

healthcare provider.

The County strongly opposes the IFRs' expanded exemptions to the contraceptive

coverage mandate under the Affordable Care Act ("ACA"). The IFRs contravene the ACA,

violate the Establishment Clause, and deny equal protection of the laws. The IFRs also ignore the

1

00373531

Exhibit 43                           JA1058                           JA-0000810

compelling governmental interests served by the mandate and are arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). The expanded exemptions established in the IFRs will significantly burden the County as a safety-net healthcare provider and threaten the public health of County residents, and they will have similar effects in communities nationwide.

## DISCUSSION

### I.     The IFRs Are Legally Flawed.

The IFRs' dramatic expansion of the employer exemptions to the contraceptive mandate is unsupported by law or fact. They violate the ACA, APA, and U.S. Constitution, and they rest on an improper disregard for the compelling governmental interests served by the broadly applicable mandate established in the ACA. The IFRs are legally flawed and should not be adopted as final rules.

#### A.     The IFRs Contravene the ACA.

The ACA mandates that health insurance plans cover preventive services, including "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]."[1] This provision, known as the Women's Health Amendment, was intended to provide coverage for preventive services unique to women, including contraceptive services, and to address gender-based disparities in out-of-pocket healthcare costs.[2] By including contraceptive services as preventive services subject to mandatory coverage, HRSA acted in accordance with the ACA's intent and purpose. The IFRs, by contrast, undermine the ACA's purpose and intent, and contravene its clear directive mandating coverage for preventive services identified by

---

[1] 42 U.S.C. § 300gg-13(a)(4).
[2] *See, e.g.*, 155 Cong. Rec. 28841 (2009) (Statement of Sen. Boxer); 155 Cong. Rec. 29070 (2009) (Statement of Sen. Feinstein); 155 Cong. Reg. 29302 (Statement of Sen. Mikulski); 155 Cong. Rec. 29768 (Statement of Sen. Durbin).

2

00373532

Exhibit 43                                      JA1059                                      JA-0000811

HRSA. The sweeping exemptions created by the IFRs will deny hundreds of thousands of women access to critical preventive care and disproportionately burden these women with the costs associated with contraception and family planning. The ACA does not authorize exemptions of this magnitude.

The IFRs are also inconsistent with the prohibition against sex discrimination under Section 1557 of the ACA.[3] The IFRs single out women for discriminatory treatment based on their gender, deny women access to medically necessary health care, and reinforce the gender-based healthcare cost disparities that the ACA sought to eliminate. For these reasons, among others, the IFRs violate the ACA and should be not be adopted as final rules.

### B. The IFRs Violate the Constitution.

The IFRs also violate the Establishment Clause of the First Amendment and deny equal protection in violation of the Fifth Amendment of the U.S. Constitution. The Establishment Clause prohibits laws "respecting an establishment of religion,"[4] and prohibits the government from "favor[ing] one religion over another, or religion over irreligion."[5] Yet the IFRs clearly favor the religious beliefs of certain employers and promote those beliefs over the competing beliefs of their employees and the rights and autonomy of women. Indeed, the IFRs not only vastly expand the exemption for employers with religious objections to contraception, but also allow these employers to control whether employees may access separate contraceptive coverage through the accommodation process. The IFRs go much too far, enabling employers to impose their religious beliefs on their employees and deny them critical healthcare services that the law would otherwise mandate. As such, the IFRs promote and favor certain religious beliefs over

---

[3] 42 U.S.C. § 18116.
[4] U.S. CONST., amend. I.
[5] *Larson v. Valente*, 456 U.S. 228, 244 (1982).

3

00373533

others, excessively entangle the government with religion, and violate the Establishment Clause of the U.S. Constitution.

The IFRs likewise violate the Due Process Clause of the Fifth Amendment, which guarantees equal protection of the laws. As discussed in Section I.A, the ACA's contraceptive mandate is intended to provide women access to critical healthcare services and reduce disparities between men and women. By targeting healthcare services for women and reinforcing the gender-based disparities the ACA sought to eliminate, the IFRs discriminate against women in violation of the Fifth Amendment.

### C. The IFRs Improperly Ignore the Compelling Governmental Interests Served by the Contraceptive Mandate.

The IFRs assert that broad application of the ACA's mandate to certain objecting employers does not serve a compelling governmental interest and therefore the expanded exemptions are appropriate, and even necessary, under the Religious Freedom Restoration Act. But this position ignores extensive evidence that insurance coverage for contraceptive services provides significant benefits to women and society as a whole. These benefits include:

- Reducing unplanned pregnancy and the associated interference with women and men's ability to pursue their education and employment goals, which leads to increased earning power for persons of all genders, and a reduction in the wage gap between women and men;[6]
- Easing the disproportionate burden that women face, as compared to men, in covering the costs of most contraceptives absent insurance coverage;
- Reducing reliance on public assistance stemming from unplanned pregnancy;
- Reducing the number of children born into poverty, who are more likely to "experience more health problems, live in more dangerous neighborhoods[,] . . . have higher rates of

---

[6] Adam Sonfield et al., *The Social and Economic Benefits of Women's Ability To Determine Whether and When to Have Children*, GUTTMACHER INSTITUTE (Mar. 2013), https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.

4

00373534

delayed academic development[,] . . . [and] are less likely to complete high school or college";[7]

- Reducing mental health concerns that are associated with unplanned pregnancies, such as depression and anxiety.

Expanding access to contraceptive coverage therefore furthers significant governmental interests in, among other things, increasing access to education and improved productivity, reducing gender disparities, and easing the financial burden on taxpayers associated with unplanned pregnancies. The government has a compelling interest in ensuring that these benefits accrue as broadly as possible. By dramatically expanding the exemptions for entities with religious and moral objections and allowing employers to eliminate contraceptive coverage without even having to certify their objections, the IFRs will deprive hundreds of thousands of people of these benefits and undermine these compelling governmental interests.

### D. The IFRs Violate the APA.

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[8] For the reasons set forth above, the IFRs are not in accordance with the ACA or the U.S. Constitution and are based on arbitrary and capricious conclusions about the governmental interests in a broadly applicable contraceptive mandate. The IFRs therefore violate the APA and should be withdrawn.

The IFRs are also arbitrary and capricious, in violation of the APA, because they reverse a prior agency decision without any reasoned explanation for the change. This policy reversal is unjustified, and cannot be justified, by any change in evidence or scientific knowledge and

---

[7] Jacoba Urist, *Social and Economic Benefits of Reliable Contraception*, THE ATLANTIC (July 2, 2014), https://www.theatlantic.com/health/archive/2014/07/the-broader-benefits-of-contraception/373856/ ("[N]ew evidence link[s] family planning programs of the 1960's and 70's with a decrease in the share of U.S. children and adults living in poverty today.").

[8] 5 U.S.C. § 706.

5

00373535

rejects scientific studies on which the Departments previously relied. By dramatically changing course without adequate factual or legal basis, the IFRs are arbitrary and capricious and constitute an abuse of discretion under the APA.

## II.   The IFRs Would Burden the County as a Safety-Net Provider and Exacerbate Public Health Concerns.

If allowed to stand, these flawed and unlawful IFRs would cause substantial harm to the County. Thousands of Santa Clara County residents are insured through health plans that may be affected by the IFRs.[9] Under the IFRs, employers offering self-funded health plans can drop contraceptive coverage with minimal or even no notice to employees and beneficiaries, potentially leaving thousands of county residents without coverage for necessary contraceptive services. This loss of coverage would strain the County's already thinly-stretched family planning resources, requiring the County (at significant expense) to both expand its no- and low-cost contraceptive and sexually transmitted disease ("STD") services, and also absorb many of the immediate and long-term costs of unintended pregnancies on county residents, their families, and communities.

The County operates a comprehensive public healthcare system that covers the full range of contraceptive services, including many no- and low-cost contraceptive and STD services for residents. The County provides contraceptive services to county residents regardless of their ability to pay through SCVMC and the Public Health Department. SCVMC's Ambulatory Care Clinics provide a range of contraceptive services, including family planning counseling, prescriptions for birth control pills, intrauterine device and birth control implant insertions,

---

[9] Because California law independently requires state-regulated health plans—but not self-funded employer health plans—to cover certain FDA-approved contraceptives without cost-sharing, the IFRs will only affect coverage requirements for self-funded employer health plans in California. Approximately 61 percent of insured California workers, amounting to over 6 million individuals, are covered by self-funded employer plans and may therefore be affected by the IFRs.

00373536

Exhibit 43                    JA1063                    JA-0000815

emergency contraceptives, and abortion services. In addition, SCVMC performs sterilization procedures by referral from the patient's provider. Free condoms are also available through the Crane Center, the County's STD Clinic operated by the Public Health Department. The IFRs will increase demand for the County's no- and low-cost contraception and STD services as employers take advantage of the expanded exemption to eliminate coverage for contraceptive care.

The County also provides safety-net services as a provider for California's Family Planning, Access, Care, and Treatment ("PACT") Program. Through the Family PACT Program, a network of 2,200 providers—including the County—offer comprehensive family planning services at no cost to low-income people.[10] These services include all FDA-approved forms of contraception, emergency contraception, pregnancy testing and counseling, preconception counseling, sterilization, certain infertility services, STD testing and treatment, cancer screening, HIV screening, and individualized reproductive health education and counseling.[11] Funding for Family PACT services is provided by California and the federal government as part of California's Medicaid program, but the reimbursements paid to Family PACT providers do not cover the full costs of providing these services. As more employers eliminate contraceptive coverage under the IFRs, more low-income people will seek these services through Family PACT, and the costs to the State, the County, and other Family PACT providers will increase.

The IFRs are also likely to increase demand for County programs offering no- and low-cost healthcare services. For example, the County's Ability to Pay Determination ("APD") Program, run through SCVMC, provides services to certain indigent County residents in accordance with their ability to pay. Patients who lack employer-provided insurance coverage for

---

[10] WELCOME TO FAMILY PACT, http://www.familypact.org/Home/home-page (last visited Nov. 20, 2017).
[11] *Family PACT Overview*, CAL. DEP'T OF HEALTH CARE SERVS. (2015), http://www.familypact.org/Providers/provider-resources/TipSheets/Overview6-15ADA.pdf.

00373537

Exhibit 43       JA1064       JA-0000816

contraceptives and who are not eligible for other insurance may apply for APD services, and more are likely to do so under the IFRs, at direct cost to the County.

The County's health system already operates at a significant deficit because of the volume of uncompensated costs it incurs in serving uninsured and under-insured patients. For example, during Fiscal Year 2016-17, SCVMC received a $98 million subsidy from the County's General Fund so it could continue to provide critical healthcare services to uninsured and under-insured patients.[12]

In addition to causing direct financial strain on state and local governments, non-profit health care providers, and scores of individuals, the IFRs will also exacerbate public health concerns in the County and nationwide. When people are less able to access contraceptive services, STD rates are likely to increase,[13] and the need for STD-related services rises. Thus, the IFRs are likely to increase the need for the County's free and low-cost services for STD prevention and treatment. Through the Crane Center, the County's Public Health Department provides a range of STD-related services, including sexual health counseling, STD prevention supplies, STD screening, STD treatment, and HIV pre-exposure and post-exposure prophylaxis. The fees the clinic collects do not cover the costs of providing STD-related services, and these costs are likely to increase due to the IFRs.

The prospect of reduced coverage for contraceptives is all the more concerning considering the rates of STDs nationwide and in the County. According to the Centers for Disease Control and Prevention, "[m]ore than two million cases of chlamydia, gonorrhea and

---

[12] County of Santa Clara, Fiscal Year 2017-2018 Recommended Budget at 524, https://www.sccgov.org/sites/scc/gov/Documents/recmnded_bdgt_v8-latest-vrsn.pdf.
[13] *Clinical Prevention Guidance*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 10, 2017), https://www.cdc.gov/std/tg2015/clinical.htm (explaining role of contraceptives in STD prevention).

8

00373538

Exhibit 43 JA1065 JA-0000817

syphilis were reported in the United States in 2016, the highest number ever."[14] The County has experienced a rise in chlamydia, gonorrhea, and syphilis as well. Between 2010 and 2016, cases of chlamydia increased by 34% and cases of gonorrhea increased more than twofold.[15] "Rates of early syphilis diagnoses nearly tripled from 6.2 cases per 100,000 people in 2010 to 18.4 cases in 2016, with a sharp 53% increase between 2015 and 2016."[16] HIV/AIDS is another serious public health concern; in 2015, there were 2,734 people living with HIV/AIDS in the County.[17] The IFRs are likely to exacerbate these serious public health problems and increase the burden on the County to address and prevent the spread of these diseases.

Decreased access to contraception under the IFRs is also likely to increase unintended pregnancies, triggering immediate and long-term costs to the County and communities nationwide. As the safety-net healthcare provider, the County funds many of the medical services associated with unintended pregnancies, which disproportionately affect young, low-income, minority women, without higher education[18] who are likely to rely on County-funded services if their employer eliminates contraceptive coverage. The County is also burdened by the long-term costs of unplanned pregnancies, which can limit individuals' ability to achieve in education and the workplace and to contribute as taxpayers and citizens.

## CONCLUSION

For all of the foregoing reasons, the County respectfully requests that the *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the*

---

[14] Press Release, Centers for Disease Control and Prevention, *STDs at record high, indicating urgent need for prevention* (Sept. 26, 2017), https://www.cdc.gov/media/releases/2017/p0926-std-prevention.html.
[15] SANTA CLARA CTY. PUBLIC HEALTH, Sexually Transmitted Diseases Annual Report 2 (2016).
[16] *Id.* at 3.
[17] *HIV/AIDS Epidemiology Santa Clara County*, SANTA CLARA CTY. PUBLIC HEALTH (2016), https://sccgov.iqm2.com/Citizens/FileOpen.aspx?Type=4&ID=149986.
[18] Lawrence Finer & Mia Zolna, *Declines in Unintended Pregnancy in the United States, 2008-2011*, NEW ENG. J. MED. 374, 843-52 (2016).

9

00373539

Exhibit 43     JA1066     JA-0000818

*Affordable Care Act* and *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act* not be adopted as final rules.

Failure to address any issue related to the IFRs other than those addressed herein should not be construed as agreement with or waiver of any position related to those issues.

Dated: December 5, 2017

Respectfully submitted,

JAMES R. WILLIAMS
County Counsel

By: _____
Lynnette Miner
Fellow

Attorneys for
COUNTY OF SANTA CLARA

Attachment: Resolution of the Board of Supervisors of the County of Santa Clara Supporting Access to Contraceptives

10

00373540

RESOLUTION NO. BOS-2017-143

## RESOLUTION OF THE BOARD OF SUPERVISORS
## OF THE COUNTY OF SANTA CLARA
## SUPPORTING ACCESS TO CONTRACEPTIVES

**Adopted: 12/05/2017**

**WHEREAS,** Santa Clara County is home to 1.9 million residents who rely on the County to provide essential services and to protect the public health of their communities; and

**WHEREAS,** the County of Santa Clara owns and operates Santa Clara Valley Medical Center ("SCVMC"), a comprehensive public healthcare delivery system and the only public safety-net healthcare provider in Santa Clara County; and

**WHEREAS,** SCVMC provides critical healthcare services to County residents regardless of their ability to pay, including family planning counseling and a wide range of contraceptive services; and

**WHEREAS,** the Santa Clara County Public Health Department provides a range of services related to sexually transmitted diseases ("STDs"), available to all patients regardless of insurance and income; and

**WHEREAS,** under the Affordable Care Act, most employer-provided health insurance plans are required to provide no-cost coverage for contraceptive services; and

**WHEREAS,** a broadly applicable requirement of contraceptive coverage serves compelling governmental interests in, among other things, enhancing the dignity and autonomy of individuals, reducing gender disparities, and easing financial burdens on governments and taxpayers associated with lack of access to comprehensive family planning and contraceptive services; and

**WHEREAS,** on October 13, 2017, the Federal Government issued two Interim Final Rules, *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47792, and *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act*, 82 Fed. Reg. 47838; and

**WHEREAS,** the Interim Final Rules vastly and unnecessarily expand the exemptions for employers with religious objections to contraceptive coverage and create an entirely new exemption for employers with moral objections to contraceptive coverage; and

**WHEREAS,** the Interim Final Rules will likely lead to a loss of coverage for contraceptive services for many County residents and an increase in STD rates and unplanned pregnancies; and

Resolution Supporting
Access to Contraceptive Services                    Page 1 of 2

89315

DEC 0 5 2017

00373541

Exhibit 43                    JA1068                    JA-0000820

**WHEREAS**, the Interim Final Rules will likely increase the need for the low- and no-cost contraceptive and STD-related services provided by the County, as well as health care and social services associated with unplanned pregnancies; and

**WHEREAS**, the Interim Final Rules will significantly burden the County as a safety-net healthcare provider and threaten the public health of Santa Clara County residents;

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Supervisors of the County of Santa Clara, State of California, that the County of Santa Clara opposes the Interim Final Rules and opposes similar efforts expanding religious exemptions and creating moral exemptions to the Affordable Care Act's contraceptive coverage mandate.

**BE IT FURTHER RESOLVED** that the County of Santa Clara is committed to supporting access to contraceptive services and providing no- and low-cost contraceptive services to people who need them.

**BE IT FURTHER RESOLVED** that the Board of Supervisors of the County of Santa Clara supports efforts to preserve broadly applicable requirements that health insurance plans provide no-cost contraceptive coverage.

**PASSED AND ADOPTED** by the Board of Supervisors of the County of Santa Clara, State of California, on _DEC 0 5 2017_ , by the following vote:

AYES: **CHAVEZ, CORTESE, SIMITIAN, WASSERMAN, YEAGER**

NOES: **NONE**

ABSENT: **NONE**

ABSTAIN: **NONE**

DAVE CORTESE, President
Board of Supervisors

ATTEST:

MEGAN DOYLE
Clerk of the Board of Supervisors

APPROVED AS TO FORM AND LEGALITY:

JAMES R. WILLIAMS
County Counsel

Resolution Supporting
Access to Contraceptive Services                    Page 2 of 2

00373542

Exhibit 43                    JA1069                    JA-0000821

December 5, 2017
Centers for Medicare & Medicaid Services,
Department of Health and Human Services,
Room 445-G,
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

**VIA ELECTRONIC SUBMISSION**

Re:    **Comments on the Interim Final Rule on Religious Exemptions and
Accommodations for Coverage of Certain Preventive Services Under the Affordable
Care Act** (IFR 2017-21851; CMS-9940-IFC)

We are writing to express our deep concern and full opposition to the Interim Final Rule ("IFR"
or "the rule") on Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act ("ACA"), published by the Departments of Health and
Human Services, Labor and Treasury ("the Departments") on October 13, 2017. This rule
grossly mischaracterizes the legislative history of the ACA and past rulemaking under the Act.
Moreover, the Departments blatantly disregard notice and comment requirements, misrepresent
the necessity for an Interim Final Rule, and distort the underlying legal premise for existing
religious refusals laws, including the Religious Freedom Restoration Act. These egregious
misinterpretations and mischaracterizations are used by the Departments to grant employers and
universities the ability to impose a harmful burden on their employees and students. We strongly
urge the Departments to rescind this rule in its entirety, as it represents a sudden and harmful
departure from past administrative precedent.

Since 1992, the Center for Reproductive Rights has worked towards securing the promise of
reproductive freedom enshrined in law in the United States and throughout the globe. Our
litigation and advocacy over the past twenty-five years have expanded access to reproductive
healthcare around the nation and the world. We have played a key role in securing legal victories
in the United States, Latin America, Sub-Saharan Africa, Asia, and Eastern Europe on issues
including access to life-saving obstetrics care, contraception, safe abortion services, and
comprehensive sexuality information. We envision a world in which every woman is free to
decide whether and when to have children; every woman has access to the best reproductive
healthcare available; and every woman can make medical decisions without coercion or
discrimination. In short, we envision a world in which every woman participates with full dignity
as an equal member of society.

**Comment**
*Background*

1

00373489

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[1] Moreover, contraceptive use is common among women of all religious denominations.[2] In terms of cost, contraceptives make up an estimated 30–44% of out-of-pocket healthcare spending for women.[3] A year's worth of birth control can cost upwards of $600—the equivalent of 83 hours of work for someone earning the federal minimum wage of $7.25 an hour.[4] More permanent birth control methods, such as an IUD or contraceptive implant, can cost more than $1,000 out of pocket— almost one month's salary for an American earning the federal minimum wage.

It is therefore unsurprising that access to no-cost contraception is one of the most popular and broadly beneficial provisions under the ACA—established through a scientific and non-partisan process, and benefitting over 62 million women since its implementation. Following implementation of no-copay contraceptive coverage, women experienced a dramatic decrease in out-of-pocket costs.[5] As a result, a majority of women no longer have to choose between paying for birth control and paying for other necessities, like groceries and utilities.[6] Studies show that decreases in cost-sharing has led to better adherence to and more consistent use of the pill, which has decreased the risk of unintended pregnancies.[7]

Having access to the full range of FDA-approved contraceptive methods has allowed women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, contraindications, risk of sexually transmitted infections, desire for confidentiality and control, and many other considerations. And identifying that "right" method has in turn helped women use contraception more consistently and correctly, reducing unwanted pregnancies and affording women greater control over family planning.[8]

No-cost contraceptive coverage is highly beneficial to women and their families, as it enables women to achieve their educational and employment goals and plan their families accordingly. Contraceptive coverage is also a tremendous benefit to American society and the American economy, as it allows women to participate equally in society, including as wage-earners.

---

[1] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016) https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[2] Rachel K. Jones & Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011), https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[3] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204, 1204-1211 (2015).

[4] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit: Too Important to Lose* (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *see also* Elizabeth Celms, *How Much Do Birth-Control Pills Cost?*, CLEAR HEALTH COSTS (Apr. 29, 2013) https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[5] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204, 1204-1211 (2015).

[6] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit is Working for Women* (Dec. 16, 2016) https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

[7] Henry J. Kaiser Family Foundation, *The Future of Contraceptive Coverage* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[8] *Id.*

2

00373490

Exhibit 44                    JA1071                    JA-0000823

Limiting this coverage, as the IFR does, will be burdensome and harmful to women and their families.

*The Interim Final Rule does not comport with the requirements of the Administrative Procedure Act*

The Departments' authority to promulgate rules is not limitless. Rulemaking must be guided by the underlying statute, the Administrative Procedure Act ("APA") and a balancing of interests. Despite the vast and well-documented benefits of no-cost contraceptive coverage, the Departments acted on October 6, 2017 to significantly reduce that coverage, and did so without following normal rulemaking procedures and allowing for public input beforehand. In so doing, the Departments upended the product of an exhaustive, nearly six-year deliberative process and violated the law.

Without proper procedure, the IFR made several dramatic changes to the contraceptive coverage rules. First, the IFR expands the exemption that previously applied to a narrow set of religious employers, such as churches and their integrated auxiliaries, to *all* non-profit and for-profit entities with religious objections, including publicly-held corporations. Employees and students who receive insurance through entities that invoke the broadened exemption will be denied seamless and cost-free access to contraceptive coverage. Second, the IFR makes the existing accommodation, which formerly applied to religiously-affiliated nonprofits and closely held for-profits, optional. Third, the IFR requires neither institutions that avail themselves of the exemption nor institutions availing themselves of this now-optional accommodation to self-certify their eligibility. Finally, the IFR permits insurers to make available insurance plans without contraceptive coverage to any individuals who object to contraception on religious grounds.

As a result of the sweeping exemption created by the IFR, many women may be left with no choice but to purchase a health insurance plan that excludes coverage for a service that is critical to their health and well-being. Thus, the IFR frustrates the ACA's underlying goals of improving health and increasing access to preventive care.

*Administrative Procedure Act*

The IFR violates the Administrative Procedure Act, both procedurally and substantively. The Departments argue that the APA does not apply here because of the specific authority granted to the Secretaries by section 9833 of the Code,
section 734 of ERISA, and section 2792 of the PHS Act. But these statutes merely confer to Secretaries the authority to promulgate interim final rules as necessary or appropriate; they do not exempt interim final rules from the rulemaking requirements imposed by the APA.

Under the APA, "agency action, findings, and conclusions found to be . . . without observance of procedure required by law" shall be held "unlawful and set aside."[9] Absent a showing of good cause, the APA requires an agency to follow notice and comment procedures which provide

---

[9] 5 U.S.C. § 706(2)(D).

3

00373491

Exhibit 44                                    JA1072                                    JA-0000824

"interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."[10] The good cause exception applies where notice and public comment are "impracticable, unnecessary, or contrary to the public interest."[11] The courts have made it clear that notice and comment may not be considered "unnecessary" under the APA's good cause exception except under very narrow circumstances, such as a minor rule change in which the public is not especially interested.[12] Further, the APA requires that a rule be published 30 days prior to its effective date.[13]

The IFR is final agency action and is a legislative rule within the meaning of the APA and accordingly must follow these procedural rules. However, the Departments disregarded each of these requirements. The Departments did not engage in notice and comment rulemaking before issuing the IFR, did not observe the 30-day period between publication and effective date, and had no authority to disregard the APA's rulemaking requirements. Because the IFR fails to meet the APA's procedural requirements—and the Departments have no good cause for ignoring these requirements—the Interim Final Rule violates 5 U.S.C. § 706(2), and is an unnecessary and inappropriate use of the Departments' rulemaking authority.[14]

In addition to the procedural violations, the IFR violates the APA on substantive grounds as well. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[15] "contrary to a constitutional right,"[16] or "in excess of statutory jurisdiction."[17] The IFR is in violation of 5 U.S.C. § 706(2) because it is supported by no valid justification, contradicts the ACA and the U.S. Constitution, and exceeds Defendants' statutory jurisdiction, authority, and limitations. In particular, the IFR is contrary to Section 1557 of the ACA, 42 U.S.C. § 18116, which prohibits sex discrimination in certain health programs and activities. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rule discriminate based on sex.

The IFR is also contrary to Section 1554 of the ACA, which prohibits HHS from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[18] By permitting objecting institutions to deny no-cost contraceptive

---

[10] 5 U.S.C. § 553(b)-(c).

[11] 5 U.S.C. § 553(b).

[12] *See, e.g.*, The Senate Report, No. 752, 79th Cong. 1st Sess. (1945) ("'Unnecessary' means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved."; *Utility Solid Waste Activities Group v. E.P.A.*, 236 F.3d 749, 755 (D.C. Cir. 2001) (finding that a notice and comment period is required where there is great public interest and the amendment makes significant changes to the rule); *Texaco, Inc. v. Federal Power Commission*, 412 F.2d 740, 743 (3d Cir. 1969) (finding that the rule at issue "does not fall within the 'unnecessary' exception relied on by the Commission since it cannot be classified as either minor or emergency in character.")

[13] 5 U.S.C. § 553(d).

[14] This approach not only upends the product of an exhaustive deliberative process that has been underway for roughly six years, but violates the Administration Procedures Act both procedurally and substantively.

[15] 5 U.S.C. § 706(2)(A).

[16] *Id.* § 706(2)(B).

[17] *Id.* § 706(2)(C).

[18] 42 U.S.C. § 18114(1).

00373492

Exhibit 44                                    JA1073                                    JA-0000825

coverage, the Rule erects unreasonable barriers to medical care. Therefore, the IFR is arbitrary and capricious and contrary to law.

*Specific objections*

In the IFR, the Departments attempt to justify the dramatic expansion of the contraceptive coverage exemption on a number of grounds but, as this comment will detail, these arguments are faulty and do not support the Departments' rulemaking here. Therefore, the IFR should be rescinded in its entirety.

Our specific objections to the IFR are as follows:

**I.    The Interim Final Rule deviates from Congress' express intent to provide cost-free contraception to women under the Affordable Care Act, and is therefore contrary to law.**

In the IFR, the Departments mischaracterize the intent and legislative history of the ACA to justify their rulemaking.  Specifically they argue that the IFR is a "necessary and appropriate exercise" of their authority, on the grounds that i) Congress gave no indication of the particular preventive services that they most prioritized or felt should be included in the Health Resources and Service Administration ("HRSA")'s regulatory guidelines, nor did Congress intend to require entirely uniform coverage of preventive services;[19] and ii) the new Interim Final Rule is consistent with existing federal laws and with the implementation intent of Executive Order 13535. However, as demonstrated below, each of these premises is false, and neither support nor justify the Departments' rulemaking.

        A.   Congressional intent and the ACA

According to the Centers for Disease Control and Prevention ("CDC"), the development of safe and effective contraception was one of the ten greatest public health achievements of the 20th century.[20] Access to birth control has been central to improving women's health and that of their families and has given women the ability to "participate equally in the economic and social life of the Nation."[21]

An analysis of the legislative record of the ACA clearly demonstrates that Congress viewed the women's preventive care benefits, including contraceptive coverage, as essential to fulfilling their goals of advancing public health and welfare by improving Americans' access to affordable healthcare, and ending gender discrimination by reducing inequalities for women in the healthcare system.

---

[19] 76 FR 46623.

[20] Centers for Disease Control and Prevention, *Achievements in Public Health, 1900-1999: Family Planning*, 48 MORBIDITY AND MORTALITY WEEKLY REPORT 1073-1080 (1999), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm.

[21] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2787 (2014) (Ginsburg, J., dissenting) (quoting *Planned Parenthood Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992)).

00373493

Exhibit 44                                   JA1074                                   JA-0000826

Early versions of the ACA included no specific provisions regarding women's health. To address this oversight, Congress adopted the Women's Health Amendment, which was intended to "expand the screening and preventive services available to women" and curtail the "punitive practices" of insurance companies "that charge women more and give [women] less in a benefit."[22] To achieve these goals, the Women's Health Amendment added a new category of preventive care to be covered at no cost-sharing, providing that "with respect to women," health plans must cover "such additional preventive care and screenings ... as provided for in comprehensive guidelines supported by HRSA for purposes of this paragraph."[23]

Congress therefore adopted the Women's Health Amendment ("WHA") to address its long-running concern that more than half of women delayed or avoided preventive healthcare due to cost[24] and that, due to discrimination, women paid substantially more in out-of-pocket costs for healthcare than men pay.[25] Increasing women's coverage would not only improve women's health but also ameliorate the disadvantages and discrimination that women have faced in obtaining healthcare and health insurance.

With respect to contraception and contraceptive services, Congress understood and intended for cost-free contraception and family planning services to be included as an integral and essential part of women's preventive care,[26] specifically passing the WHA to improve women's

---

[22] 155 CONG. REC. S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski).[22] The Amendment sought to ensure that women receive the essential benefits of early detection and preventive services, thereby reducing health impairments, "sav[ing] lives," and allowing women to, in the long run, "save[] money." 155 CONG. REC. S11,988 (daily ed. Nov. 30, 2009) (Amend. No. 2791).

[23] Id. at 11,986-87; see 42 U.S.C. 300-gg(13)(a)(4).

[24] Cf. Senator Tom Harkin (D-IA) ("far too many women are increasingly delaying or skipping preventive health care due to costs") (quoted in Senator Barbara Mikulski, Press Release: Senate Approves Mikulski Amendment Making Women's Preventive Care Affordable and Accessible, Dec. 3, 2009, http://mikulski. senate.gov/media/pressrelease/12-03-2009.cfm); Senator Barbara Mikulski (D-MD) ("Insurance companies have used every trick in the book to deny coverage to women. This amendment makes sure that the insurance companies must cover the basic preventive care that women need at no cost") (quoted in id.).

[25] According to WHA sponsor Barbara Mikulski, "[w]omen of childbearing age incur 68 percent more out of pocket health care costs than men." Senator Barbara Mikulski, Press Release: Mikulski Puts Women First in Health Care Debate (Nov. 30, 2009), http://mikulski.senate.gov/media/pressrelease/11-30-2009-2.cfm. The WHA finally addressed a concern that had been echoed for more than a decade. See, e.g., Senator Barbara Boxer (D-CA), CONG. REC. S9181-S9211 (July 29, 1998) ("[w]omen spend 68 percent more in out-of-pocket costs for health care than men. Much of this difference is due to reproductive health costs.").

[26] See 155 CONG. REC. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer)(noting the importance of reforming the health care system to "[i]ncrease[] health insurance coverage for women." and "require[] coverage of comprehensive reproductive health services."); see also 77 CONG. REC., E1199- 1200 (daily ed. May 19, 2009) (statement of former Rep. Moran) (noting an increase in women who no longer have money to pay for medical care and that "[t]hese women are literally choosing between a month of birth control and bus fare."); Coverage of Certain Preventive Services Under the Affordable Care Act. 78 Fed. Reg. at 39,887. Congress required that "all health plans cover comprehensive women's preventive care and screenings . . . at little or no cost to women." 155 CONG. REC., S12025 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer); see also 155 CONG. REC., S12114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[P]reventive care] may include mammograms, Pap smears, family planning, screenings to detect postpartum depression, and other annual women's health screenings.").

00373494

Exhibit 44
JA-0000827

healthcare by providing "affordable family planning services" to "enable women and families to make informed decisions about when and how they become parents."[27]

Congress's reliance on HHS and the use of the Institute of Medicine's expertise (discussed more completely below) to determine the specific services and contraceptive methods to be covered does not detract from Congress's clear intent to provide for contraceptive coverage. To the contrary, this process ensured that medical experts—rather than politics or ideology—would determine the necessary benefits and services to realize Congress's goals for all women.

Finally, the existence of the ACA's exemptions to the contraceptive coverage requirement in no way undermines the government's compelling interest in maximizing the number of women who have contraceptive coverage without cost-sharing. Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[28] For example, the exemption for qualifying grandfathered plans, which are not required to comply with some ACA requirements (including cost-free preventive care coverage), was only intended as a temporary means for employers transitioning their plans into full compliance.[29] Such plans lose their grandfathered status if their coverage as modified fails the ACA's specified minimum coverage requirements.[30] As a result, and quite in contrast with the widespread exemption that the Interim Final Rule will now allow in perpetuity, the number of employer-sponsored grandfathered plans has decreased steadily since 2010.[31] The Departments' reference to and reliance on the existence of ACA exemptions to justify the current IFR is therefore misplaced.

## B. Religious exemptions under federal law

The Departments argue more broadly that because religious exemptions have been permitted or contemplated by Congress for related statutes in the past, they are contemplated, and thus, appropriate, here. However, Congress' specific adoption of conscience objections elsewhere—and their deliberate refusal to attach the same to the ACA—shows that the Departments' extrapolation of the conscience objections in the Interim Final Rule is both unanticipated and inappropriate. Further, the Interim Final Rule goes far beyond the permitted limits of law protecting religious objections. The Departments do not have the authority to expand prior laws protecting religious exemptions; in fact, attempts to do so usurp Congress' lawmaking authority.

---

[27] 155 CONG. REC. S12052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken); see also, e.g., 155 CONG. REC. S12671 (daily ed. Dec. 8, 2009) (statement of Sen. Durbin) ("Today, there are 17 million women of reproductive age in America who are uninsured. This bill will expand health insurance coverage to the vast majority of them, which . . . will reduce unintended pregnancies and reduce abortions."); 156 CONG. REC. H1893 (daily ed. Mar. 21, 2010) (statement of Rep. Kaptur) ("This legislation will help millions of women obtain health coverage and thus reduce abortion by enhancing broad coverage options for women's and children's health.").

[28] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. at 2800 (Ginsburg, J., dissenting).

[29] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[30] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).

[31] Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,332 (July 14, 2015).

00373495

Exhibit 44                                                                        JA-0000828

A review of the legislative history of the ACA confirms that the ACA did not—contrary to the Departments' assertion—grant the agencies implicit authority to allow broad religious or moral exemptions at the cost of women's health. While Congress has, in the past, intentionally crafted explicit exemptions for religious objections, it specifically declined to do so for the ACA. In fact, the Senate considered and rejected a 2012 amendment to the ACA which would have allowed employers to refuse to provide coverage for contraceptive services and other medical services on the basis of religious or moral beliefs.[32] Thus, there is no basis in either the ACA itself or the legislative history of the ACA for the Departments' asserted authority to enact sweeping religious exemptions.

## II.     Congress' deference to the agencies to implement women's preventive services supports, rather than diminishes, the intent to make cost-free contraception available to all women.

Congress' express goal in relying on the expertise of the federal regulatory agencies in implementing the ACA and developing the Women's Preventive Services Guidelines was to "ensure that the coverage of women's preventive services is based on a set of guidelines developed by women's health experts."[33]

In subsequently implementing the ACA, the Departments acknowledged that the inclusion of cost-free contraception coverage in their implementation of the ACA was a Congressional priority, stating that "in directing non-grandfathered group health plans and health insurance coverage to cover preventive services and screenings for women described in HRSA Guidelines without cost sharing, the statute acknowledges that both existing health coverage and existing preventive services recommendations often did not adequately serve the unique health needs of women."[34]

Specifically, the Departments noted that "access to contraception improves the social and economic status of women" and that "cost sharing can be a significant barrier to access to contraception." Thus, the Departments found it necessary to "provid[e] more women broad access to recommended preventive services, including contraceptive services, without cost sharing" in order to implement the ACA in accordance with the statute and Congressional intent.[35]

---

[32] The Blunt Amendment would have allowed not only religious groups but any employer with moral objections to opt out of the coverage requirement. Further, it would have allowed such employers to do so in the case of not only contraception but any health service required by the 2010 health-care law. Congress considered and rejected this proposed law in 2012.

[33] 155 CONG. REC. at S12027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand); 155 CONG. REC. S12273 (daily ed. Dec. 3, 2009) (statement of Sen. Stabenow) (Sen. Mikulski's amendment "requires coverage of women's preventive services developed by women's health experts to meet the unique needs of women."); see also 155 CONG. REC. S12058-S12059 (daily ed. Dec. 1, 2009) (statement of Sen. Cardin) (noting that HRSA "focuses on maternal and child health . . . [and] strives to develop 'best practices' and create uniform standards of care . . . .").

[34] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,873.

[35] Id. at 39,872-39,873.

8

00373496

Exhibit 44                                      JA1077                                      JA-0000829

In subsequent rulemaking under the ACA, the Departments worked to protect Congressional intent to cover no-cost preventive services in the context of certain religious objections, through numerous opportunities for public engagement, including Requests for Information, extended notice and comment periods eliciting hundreds of thousands of individual public comments, advanced notices of proposed rulemaking, notices of proposed rulemaking, as well as three Interim Final Rules. These efforts stand in stark contrast to the Departments' haste and apparent lack of interest in public feedback in promulgating the current IFR.

Congress' reliance upon the federal regulatory agencies to determine the scope of preventive services to be covered cost-free in implementing the ACA[36] was meant to harness the expertise within the agencies, not act as a blank check. The Departments have plainly misconstrued and abused the intent behind that grant of authority here.

## A. The Institute of Medicine Report

The IOM Committee's thorough and transparent process of review, their exemplary panel of specialists, multiple tiers of draft review, and their scientifically-sound, evidence-based analysis speaks strongly of the quality of the final IOM Report, which was adopted in its entirety by HRSA. Further, the collective agreement of the fifteen majority members of the IOM Panel should be given greater weight than the single dissenting panelist.

HRSA commissioned the Institute of Medicine ("IOM"), an arm of the National Academy of Sciences, Engineering and Medicine, "to review what preventive services are necessary for women's health and well-being," "identify existing coverage gaps," and make recommendations "for HHS to consider in order to fill those gaps."[37] The IOM was further tasked with evaluating and recommending the specific preventive care and screening services that should be included in the minimum coverage requirement.[38]

To prepare these recommendations, the IOM convened a diverse panel of outside experts—the Committee on Preventive Services for Women. The members of the IOM panel were exemplary, including medicine and public health researchers and practitioners, as well as experts in disease prevention, women's health issues, adolescent health issues, and the development of evidence-based guidelines. Drafts of the Committee's work benefitted from a further review by yet another distinguished group of experts, eleven additional researchers and scientists based at institutions such as Harvard Medical School and the Bloomberg School of Public Health at Johns Hopkins University. These independent reviewers "provide[d] candid and critical comments ... to ensure that the report [met] institutional standards of objectivity, evidence, and responsiveness to the study charge."[39]

---

[36] *See* 155 CONG. REC. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski).
[37] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 21 (July 19, 2011), https://www.nap.edu/read/13181/chapter/1.
[38] *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,725-26 (Feb. 15, 2012).
[39] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 235 (July 19, 2011), https://www.nap.edu/read/13181/chapter/1.

9

00373497

Exhibit 44                    JA1078                    JA-0000830

The process of the IOM Committee was thorough and transparent. The Committee met five times over six months, and three open meetings were held to elicit testimony from stakeholders, researchers, advocates, and the public. To develop the eventual recommendations, the Committee collected existing guidelines for women's health services, and assembled additional evidence by reviewing medical literature, federal health priority goals and objectives, federal reimbursement policies, clinical guidelines of healthcare professional organizations, and public comments.

Based on its thorough review of policies, practices, and public health research, the IOM Committee recommended no-cost coverage for services that met three criteria: (1) the condition has a broad population impact; (2) the recommended service would have a substantial potential impact on health and wellbeing; and (3) the quality and strength of evidence is supportive. Based on these criteria, the IOM Committee concluded that HRSA should include the full range of contraceptives approved by the U.S. Food and Drug Administration ("FDA") as women's preventive care, and that "eliminat[ing] ... cost sharing for contraception could ... greatly increase its use, including the use of the more effective and longer-acting methods."[40] The resulting women's preventive service requirements provided a critical new public health protection by requiring all new group health plans to cover all FDA-approved methods of contraception for women (including birth-control pills and intrauterine devices/IUDs) without cost-sharing (i.e. no co-payments or deductibles).[41]

Contrary to both common sense and well-established best practices, the Departments now inappropriately rely upon the voice of the panel's lone dissenter, Dr. LoSasso, rather than upon the shared consensus of the fifteen other scientific and medical experts on the Committee, to push back against the IOM's recommendation to provide cost-free contraceptive coverage for all women. The shared majority opinion should plainly be given substantially greater weight than a lone dissenting voice.[42] Further, the IOM Committee addressed the dissent's inaccurate characterization of Committee members promoting both objective and subjective determinations in a non-transparent evaluation process[43] and additionally clarified that Dr. LoSasso was

---

[40] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 109 (July 19, 2011), https://www.nap.edu/read/13181/chapter/1

[41] Despite the Departments' deliberate misstatement in the IFR, the FDA's approved methods of contraception do not include any abortifacients. *See, e.g.*, U.S. Food & Drug Admin., *Birth Control: Medicines to Help You*, https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm (last visited Dec. 4, 2017); American Congress of Obstetricians and Gynecologists. *Facts are Important: Emergency Contraception and Intrauterine Devices are Not Abortifacients* (June 12, 2014). https://www.acog.org/-/media/Departments/Gov ernment-Relations-and-Outreach/FactsAreImportantEC.pdf; National Catholic Reporter Online. *What an Abortifacient is — and What it Isn't* (Feb. 20, 2012). https://www.ncronline.org/blogs/grace-margins/what-aborti facient-and-what-it-isnt.

[42] The National Academies explain that their expert committees strive for and most eventually achieve a unanimous report of their conclusions. Dissenting opinions are permitted so as to explain the rationale behind areas of disagreement and prevent unanimous reports that substantially weaken their analysis and conclusions. allowing the majority's report to retain the weight of authority. The National Academies. *Getting to Know the Committee Process*. revised 2005. http://www.nationalacademies.org/site_assets/groups/nasite/documents/webpage/na_ 069620.pdf

[43] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 235 (July 19, 2011). https://www.nap.edu/read/13181/chapter/1 ("The dissent also includes inaccurate statements regarding the committee process and its approach to the committee charge. The committee members' expertise is diverse and

00373498

Exhibit 44

JA-0000831

attempting to include considerations beyond the charge of the Committee, namely cost.[44] The Departments' abrupt decision to abandon the careful balancing approach previously taken is particularly troubling given that HRSA adopted the IOM's recommendations for women's preventive services (including all FDA-approved contraceptives) *in full*, and has not since rejected them. To the contrary, in December 2016, HRSA updated its women's preventive services guidelines and reaffirmed that women's preventive care should include the full range of FDA-approved contraceptives.

### B. HRSA's 2011 guidelines and department's subsequent rulemaking

In the IFR, the Departments attempt to highlight prior individual requests for expanded religious exemptions to support their current rulemaking. However, their description of the history of the regulatory process only shows the thorough and proper rulemaking procedures that the Departments had previously engaged in, which the Departments have decided to eschew in promulgating this Interim Final Rule.

The prior exemption and accommodation were at least the product of an extensive administrative process. The prior regulatory scheme was developed with the input of hundreds of thousands of public comments and ensured women's seamless and no-cost access to contraceptive services while respecting the beliefs of those who object to those services.[45]

In the August 2011 IFR, published under the good cause exception,[46] the Departments determined that a limited exemption for religious employers "reasonably balance[d] the extension of... coverage of contraceptive services under the HRSA Guidelines *to as many women as possible*, while respecting the unique relationship between certain religious employers and

---

while many have different perspectives, no other member shares the opinion that report recommendations were not soundly evidence based.").

[44] *Id.* ("The dissenting committee member wanted more time and the opportunity to incorporate cost-benefit analysis. At the first committee meeting, it was agreed that cost considerations were outside the scope of the charge, and that the committee should not attempt to duplicate the disparate review processes used by other bodies, such as the USPSTF, ACIP, and Bright Futures. HHS, with input from this committee, may consider other factors including cost in its development of coverage decisions.").

[45] Notice and comment are not required by the Administrative Procedure Act when the agency for good cause finds that notice and public comment are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. 553(b). Unlike the present IFR, previous interim final rules related to contraceptive coverage qualified for the good cause exception under the APA: Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act. 75 Fed. Reg. 41726 (July 19, 2010) (charging HRSA with developing the Preventive Services Guidelines; the interim final rule qualified for the good cause exception because of legislative deadlines that made notice and comment impracticable and contrary to the public interest); Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46621 (Aug. 3, 2011) (the interim final rule qualified for the good cause exception because of a finding that additional opportunities for public comment were unnecessary as the 2010 interim final rules provided an opportunity to comment on the implementation of the same requirements in this provision and the amendments are based on those public comments); Coverage of Certain Preventive Services Under the Affordable Care Act, 79 Fed. Reg. 51092 (August 27, 2014) (issued under the good cause exception in response to *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014)).

[46] *Id.*

00373499

Exhibit 44                           JA1080                           JA-0000832

their *employees in certain religious positions*."[47] Following publication, the Departments received more than 200,000 comments, including requests to broaden the range of employers, institutions and plan sponsors eligible for the exemption,[48] and chose *not* to expand the exemption on the grounds that any further expansion "would subject [] employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care."[49]

The Departments then proposed a rule establishing an accommodation for non-profit institutions that held themselves out as religious. Any entities claiming the accommodation were required to self-certify that they opposed, on religious grounds, provision of contraceptive coverage.[50]

This rule was finalized on July 2, 2013, after receiving more than 400,000 comments.[51] In establishing the accommodation, the Departments ensured that women who received coverage under those entities' plans continued to have access to contraceptives with no cost-sharing, "advancing the compelling government interests in safeguarding public health and ensuring that women have equal access to healthcare."[52] The Departments considered and once again rejected requests to expand the exemption.[53]

This deliberate and communicative rulemaking stands in deep contrast to how the Departments promulgated the current IFR. In issuing this IFR, the Departments made no effort to consider the burden of their expanded exemption—rather, without actual investigation into the IFR's impact, they estimate a minimal number of women whose coverage will abruptly be cancelled and then use this approximation to suggest that the impact of the IFR will likewise be minimal. Further, they offered no opportunities for stakeholder feedback, no notice of proposed rulemaking, no requests for information, no posted notice of an open comment period, no expert analysis or evidence-based scientific review of the Interim Final Rule's coverage changes, no public

---

[47] *Id.* (emphasis added).
[48] 77 Fed. Reg. at 8726.
[49] 77 Fed. Reg. at 8728.
[50] 78 Fed. Reg. at 8456, 8462 (Feb. 6, 2013).
[51] 78 Fed. Reg. 39,870 (July 2, 2013).
[52] *Id.* at 39,872.
[53] *See id.* at 39,874. ("The Departments received numerous comments addressing the definition of religious employer. Some commenters stated that the proposed definition of religious employer was too narrow and should be broadened to include all employers, both nonprofit and forprofit, that have a religious objection to providing contraceptive coverage in their group health plan. Some commenters requested that the definition of religious employer be expanded to exempt not only churches and other houses of worship, but also religiously affiliated hospitals and other health care organizations and other religiously affiliated ministries using the concepts of Code section 414(e). Other commenters recommended that the requirement to cover contraceptive services be rescinded altogether. Some commenters stated that the exemption for religious employers should be eliminated and that religious employers should instead be subject to the accommodations for eligible organizations so that their employees may also receive alternative contraceptive coverage without cost sharing. Other commenters opposed eliminating the first three prongs of the definition of religious employer, stating that only churches and other houses of worship that meet the criteria of all of the prongs should be subject to the exemption. Many commenters agreed with the Departments that the proposed definition of religious employer would not materially expand the universe of religious employers, but others felt that the proposed definition would unduly broaden it. Based on their review of these comments, the Departments are finalizing without change the definition of religious employer in the proposed regulations.")

12

00373500

Exhibit 44

JA-0000833

statistical accounting of the numbers of women who may lose coverage, no attempt to accommodate those women, and no reasoned explanation for why they engaged in this extremely harmful and inappropriate process. Instead, the Departments make a feeble attempt to rely on past comment periods to justify the IFR's expansive exemption. But for notice and comment to be meaningful, the public must be on notice of the specific policies being contemplated. At no time during the prior administrative rulemaking efforts on this regulation was this expanded exemption referred to or contemplated. It is therefore improper for the Departments to use prior rulemaking efforts to justify this IFR, especially without even a certification process or any workaround to guarantee women retain coverage.[54]

### C. Litigation over the Contraceptive Coverage Benefit and Accommodation Process

The Departments dramatically overstate the legal challenges to the ACA in an attempt to suggest that this IFR is necessary to resolve litigation resulting from their past rulemaking. To the contrary, the majority of challenges have already been resolved by Supreme Court orders, including those in *Hobby Lobby*[55] (extending the accommodation for non-profit organizations with religious objections to closely-held for-profit corporations) and *Wheaton College*[56] (establishing an alternative means for non-profits to notify the Departments of their objection), and subsequent related rulemaking by the Departments that incorporated those rulings. The accommodation process post-*Hobby Lobby* and -*Wheaton* resolved much of the litigation regarding the ACA's contraceptive coverage requirement, with many groups finding that the accommodation process—which allowed not only religiously-affiliated non-profits but also closely-held for profits with religious objections to opt out of covering contraception while still maintaining such coverage for their employees by filling out a simple two-page form—fulfilled their needs. Nonetheless, some non-profit organizations that were eligible for the accommodation filed additional challenges to the ACA, arguing that the accommodation's notification requirement unlawfully burdened their religious exercise. Eight of the nine U.S. Courts of Appeals that reviewed these challenges rejected them.[57] Even the *Zubik* orders, which reviewed alternative approaches to respecting religious objections while ensuring women maintain seamless coverage, direct the parties to resolve those cases in a way that ensured there would be *no* impact on women's access to seamless contraceptive coverage.[58] The IFR totally disregards that direction.

---

[54] And if the prior record were ever deemed relevant, it is worth noting that during the comment periods, the number of comments that objected broadly to any exemption or accommodation vastly outweighed those in favor.

[55] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)

[56] *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014)

[57] *Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016); *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015); *Mich. Catholic Conference v. Burwell*, 807 F.3d 738 (6th Cir. 2015); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015); *Geneva Coll. v. Sec'y US, Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 237 (D.C. Cir. 2014); *but see Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015).

[58] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016); *Catholic Health Care Sys. v. Burwell*, 195 L. Ed. 2d 260 (2016).

00373501

Exhibit 44    JA1082    JA-0000834

On May 16, 2016, the Supreme Court issued its *per curiam* opinion in *Zubik v. Burwell*, vacating and remanding all of the circuit court decisions to give the parties an opportunity to develop an approach that addressed the plaintiffs' objections "while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage."[59]

As a result, the Departments subsequently sought comment to determine whether these cases could be resolved by further modifying the accommodation.[60] After receiving over 54,000 comments, including from the plaintiffs in *Zubik* and other religiously-affiliated organizations, consumer groups, women's organizations, and health insurers, among others,[61] the Departments reasonably and justifiably concluded there was "no feasible approach [that] ... would resolve the concerns of religious objectors, while still ensuring that the affected women seamlessly receive full and equal health coverage, including contraceptive coverage." [62] Accordingly, they did not modify the accommodation. Given that the Departments reviewed the proposal to expand the exemption a year prior and decided that adopting that proposal could not feasibly be implemented, their apparent reversal is, at best, baseless.

Further, it is absurd to say that the rule is justified to resolve litigation, when it has in fact prompted even more litigation. To date, Americans United for Separation of Church and State and the National Women's Law Center (NWLC),[63] the American Civil Liberties Union (ACLU),[64] several states (including California, New York, Delaware, Maryland;[65] Pennsylvania;[66] Massachusetts;[67] and Washington[68]), and an individual from Colorado have all filed suit in opposition to the IFR, as has the Center for Reproductive Rights.[69]

Thus, this IFR deviates dramatically from Congress' express intent to provide cost-free contraception to women, and deliberately disregards past rule-making without explanation or a clear implementation plan. In promulgating the Rule, the departments have sowed confusion,

---

[59] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotation marks and citation omitted).

[60] *See* 81 Fed. Reg. 47,741 (July 22, 2016).

[61] Dep't of Labor, *FAQS About Affordable Care Act Implementation Part 36*, 5 (Jan. 9, 2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

[62] *Id.* at 4.

[63] *Shiraef v. Hargan*, No. 17-cv-00817 (D. Ind. filed Oct. 31, 2017), https://nwlc.org/wp-content/uploads/2017/10/2017-10-31-Birth-Control-Complaint.pdf.

[64] *ACLU v. Wright*, No. 17-cv-05772 (D. Cal. filed Oct. 6. 2017). https://www.aclu.org/legal-document/american-civil-liberties-union-et-al-v-wright-et-al-complaint.

[65] *California v. Wright*, No. 17-cv-05783 (D. Cal. filed Oct. 6. 2017). https://oag.ca.gov/system/files/attachments/press_releases/Dkt%20%2324%20-%20Amended%20Complaint.pdf.

[66] *Pennsylvania v. Trump*, No. 17-cv-04540-WB (D. Pa. filed Oct. 11, 2017). https://www.attorneygeneral.gov/uploadedFiles/MainSite/Content/Related_Content/PressReleases/ACA_Contraceptive_Mandate_Complaint.pdf.

[67] *Massachusetts v. U.S. Dep't of Health & Human Servs.*, No. 17-cv-11930 (D. Mass. filed Oct. 6, 2017). http://www.mass.gov/ago/docs/press/2017/contraception-rule-complaint.pdf.

[68] *Washington v. Trump*, No. 17-cv-01510 (D. Wash. filed Oct. 9, 2017). http://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/Washington%20v%20Trump%20Contraception.pdf.

[69] *Medical Students for Choice v. Wright*, No. 17-cv-02096-RBW (D.D.C. filed Oct. 10, 2017). https://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/Complaint-Medical-Students-for-Choice-v-s-Wright.pdf.

14

00373502

Exhibit 44    JA1083    JA-0000835

advanced no proposals to ensure coverage for women working at newly-designated exempt organizations, incurred several lawsuits, and thus increased the burden of their regulation unjustly.

### III.    The Interim Final Rule fails to meet each element of the Religious Freedom Restoration Act.

The IFR declares that the Departments have determined that an expanded exemption is the "most appropriate administrative response to the religious objections raised by certain entities and organizations concerning the benefit." The Departments make two main arguments in support of this expanded exemption: 1) Purported lack of Congressional intent to cover contraception; and 2) Congress's history of granting religious refusals for certain healthcare matters. However, the Departments' arguments are unpersuasive and a detailed examination of the legislative record does not support the action the Departments are taking through this IFR.

A.  <u>The Departments argue that there was no Congressional intent to cover contraception through the ACA, and that therefore the IFR is justified based "on Congress' decision in the Affordable Care Act neither to specify that contraception must be covered nor to require inflexible across-the-board application of section 2713 of the PHS Act."[70]</u>

This is a deliberate mischaracterization of Congressional intent, as discussed in detail in Section I(A) of this comment. As stated earlier, Congress *particularly* focused on the importance of women's preventive care, including contraception, through the passage of the Women's Health Amendment.[71]

B.  <u>As part of the Government's broad reasoning for expanded exemptions, the Departments cite "Congress' extensive history of protecting religious objections when certain matters in healthcare are specifically regulated—often specifically with respect to contraception, sterilization, abortion, and activities connected to abortion."</u>

Legislative history further contradicts the Departments' claim that Congress intended for the Departments to allow broad religious or moral exemptions at the cost of women's health. While Congress has crafted explicit exemptions for religious objections when it has intended to do so in the past, it specifically refused to do so for the ACA. In fact, the Senate in 2012 considered a proposed amendment to the ACA allowing employers to refuse to provide coverage for contraceptive services and other medical services on the basis of religious or moral beliefs, and the amendment was rejected.[72]

In the face of Congress' explicit rejection of religious and moral exemptions, the Departments' other citations to Congressional intent are inadequate. The Departments cite the fact that

---

[70] 82 Fed. Reg. at 47,799.
[71] *See infra* Section I; *see also* 155 CONG. REC. H1632 (daily ed. Mar. 18, 2010) (statement of Rep. Lee) ("So I stand today to be able to say to all of the moms and nurturers who happen to be women that we have listened to your call. We have actually recognized that it is important to provide for preventative care.").
[72] *See* 158 Cong. Rec. S1077-S1092 (daily ed. Feb. 28, 2012), https://www.congress.gov/congressional-record /2012/02/28/senate-section/article/S1077-1?.

15

Exhibit 44                                    JA1084                                 JA-0000836

00373503

organizations in Medicaid or Medicare Advantage are able to object on moral or religious grounds to providing coverage of certain counseling or referral services, according to 42 USC 1395w-22(j)(3)(B) and 42 USC 1396u-2(b)(3). Those provisions argue *against*, rather than in favor, of the exemption in the IFR. Plainly, if Congress had wanted to include this type of exemption in the ACA, they could have—but they did not. As explained above, Congress specifically rejected an explicit, specified moral objection with regards to the ACA contraceptive benefit.

The Departments also cite more recent Congressional measures protecting individuals who object to prescribing or providing contraceptives from discrimination, such as Pub. L. No. 115-31, Title VII Section 726(c). However, there Congress expressly sought to protect individuals, not corporations or institutions whose objections would directly impact thousands of others. In addition, the moral objection clause for individuals in Section 726(c) is situated within the broader frame of Section 726, which actually supports the contraceptive benefit. Section 726(a) states, "*None* of the funds appropriated by this Act may be used to enter into or renew a contract which includes a provision providing prescription drug coverage, *except where the contract also includes a provision for contraceptive coverage.*"[73]

Finally, the Departments state that there is "specific intent that a conscience clause be provided and it should protect religious beliefs" because Congress' recent appropriations included an intent of Congress to include a 'conscience clause' with exceptions for religious beliefs and moral convictions for the District of Columbia.[74] However, Congress' statement in Section 808 does not define what such a conscience clause should entail. Given the legislative history of ACA and the Women's Health Amendment, it is excessive for the Departments to assume that recent Congressional appropriations including a limited, undefined conscience clause would retroactively apply to the ACA to authorize the Departments to issue such overbroad exemptions, particularly when these types of exemptions were once in substance considered and rejected by a previous Congress in a proposed amendment to the ACA.

All in all, there is absolutely no statutory language from the ACA itself to support the Department's claims, while Congressional history and intent behind the ACA and Congress' past rejection of a religious and moral exemption amendment in fact highlight the importance of ensuring copay-free contraceptives as part of women's preventive services.

The Departments' IFR is not supported by the Religious Freedom Restoration Act of 1993 (RFRA). RFRA "prohibits the Federal Government from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest."[75] The Departments previously determined that the existing accommodation process complies with the requirements under RFRA, and now they are somehow arguing that the accommodation process fails each element of RFRA. The Departments' change in position is unsupported by actual RFRA jurisprudence, Congressional history, and it comprises non-scientific, ideological policymaking. It is also arbitrary and

---

[73] Pub. L. No. 115-31, Title VII Section 726(a). https://www.congress.gov/bill/115th-congress/house-bill/244/text (emphasis added).

[74] 82 Fed. Reg. at 47,799-47,800, citing Section 808 of Pub. L. No. 115-31.

[75] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759 (2014).

16

00373504

Exhibit 44    JA1085    JA-0000837

capricious because the Departments have failed to consider the relevant data and articulate a satisfactory explanation for the action they are taking in this IFR.

   C.   <u>The Departments have not shown that the current contraceptive coverage requirements substantially burden the free exercise of religion within the meaning of RFRA.</u>

As discussed above, the United States Supreme Court held in *Hobby Lobby* that requiring a closely-held corporation to provide the contraceptive coverage benefit when it does not wish to provide coverage of certain kinds of contraceptives to which it objects constitutes a substantial burden under RFRA. In his *Hobby Lobby* concurrence, Justice Kennedy signaled that the accommodation would withstand RFRA's substantial burden test by noting, "[The] accommodation equally furthers the Government's interest but does not impinge on the plaintiffs' religious beliefs."[76] The Departments in response established a scheme allowing closely-held religious non-profit organizations to opt out of arranging or paying for contraceptive coverage while at the same time ensuring seamless coverage for women.

Following implementation of the accommodation—and the implementation of an alternative accommodation process following *Wheaton*—a handful of organizations still claimed that even the process of notifying the government or a third-party administrator of the need for an accommodation constituted a substantial burden on their free exercise of religion. Eight out of nine Circuit courts disagreed, ruling that such a notification process did not impose a substantial burden on a non-profit religiously-affiliated organization's free exercise of religion under RFRA.[77] In the IFR, however, the Departments rely on the outlier Eighth Circuit's ruling that compelling an organization to submit a two-page notification document pursuant to the accommodation process is a substantial burden on the organization's exercise of religion. The Departments give no other reason for this change of position, concluding instead "that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA."[78] Therefore the Departments have not established that the current system substantially burdens the free exercise of religion. Moreover, although the question of whether the accommodation process constitutes a substantial burden for an objecting organization has not been resolved by the courts, the Departments simply assume that it does, and enact a scheme that plainly defies the Supreme Court's order in *Zubik* that the agencies must ensure "that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage."[79] This open disregard of the caselaw highlights the Departments' arbitrary and capricious action in issuing this IFR.

---

[76] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786 (2014) (Kennedy, J., concurring).
[77] *Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016); *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015); *Mich. Catholic Conference v. Burwell*, 807 F.3d 738 (6th Cir. 2015); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 237 (D.C. Cir. 2014); *but see Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015).
[78] 82 Fed. Reg. at 47,800.
[79] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotation marks and citation omitted).

17

00373505

D. The federal government plainly has a compelling interest in ensuring comprehensive coverage of contraception.

The reasons the Departments now offer for why comprehensive coverage of contraception fails to serve a compelling government interest are unsupported by, and in some cases directly contradicted by, the actual record.

   *i.   Statutory intent*

The Departments claim that Congress did not require that contraception be covered at all under the ACA, and that Congress "merely provided" for coverage of preventive care for women recommended by HRSA. Thus, the Departments argue that the contraceptive coverage benefit is not sufficiently important.

However, as explained in detail in Section I(A) of this comment, the Women's Health Amendment to the ACA was specifically intended, among other goals, to improve women's health by making sure they could access family planning services and enable them to make informed family planning and child spacing choices.[80] Thus, in enacting the Women's Health Amendment, Congress particularly focused on the importance of women's preventive care, including contraception, recognizing that it was essential to reform the healthcare system to "[i]ncrease[] health insurance coverage for women," and "require[] coverage of comprehensive reproductive health services."[81]

The Departments further argue that Congress did not make the preventive services requirement in Section 2713 of PHS Act applicable to "grandfathered plans" as opposed to other health insurance requirements that applied to all health plans immediately, and that this additionally signifies that Congress did not consider the preventive services requirement as sufficiently important.

However, as the Departments previously held, the existence of certain exemptions from the ACA's contraceptive coverage mandate does not diminish the government's compelling interest in maximizing the number of women who have cost-free access to contraception. Courts have already recognized that the existence of grandfathered plans do not undercut the government's argument for compelling interest in ensuring cost-free contraceptive coverage.[82] Furthermore, as

---

[80] 155 CONG. REC. S12052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken) ("Access to contraception is . . . a fundamental right of every adult American."); *see also, e.g.,* 155 CONG. REC. S12671 (daily ed. Dec. 8, 2009) (statement of Sen. Durbin) ("Today, there are 17 million women of reproductive age in America who are uninsured. This bill will expand health insurance coverage to the vast majority of them, which . . . will reduce unintended pregnancies and reduce abortions."); 156 CONG. REC. H1893 (daily ed. Mar. 21, 2010) (statement of Rep. Kaptur) ("This legislation will help millions of women obtain health coverage and thus reduce abortion by enhancing broad coverage options for women's and children's health.").

[81] 155 CONG. REC. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer). *See also* 77 CONG. REC. E1199-1200 (daily ed. May 19, 2009) (statement of former Rep. Moran) (noting an increase in women who no longer have money to pay for medical care and that "[t]hese women are literally choosing between a month of birth control and bus fare.").

[82] *See Priests for Life, v. U.S. Dep't of Health & Human Servs.,* 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for

18

00373506

Exhibit 44                        JA1087                        JA-0000839

discussed in Section I(A) of this comment, the "grandfathered plan" exemption is intended as a temporary means for transitioning employers to full compliance.[83] Accordingly, the number of employer-sponsored grandfathered plans has decreased steadily since 2010.[84]

Finally, the Departments argue that the ACA does not require coverage of contraceptives where they are prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition. "Therefore, the Departments conclude that the fact that some drugs that are approved for preventive contraceptive purposes can also be used for exclusively non-preventive purposes to treat existing conditions is not a sufficient reason to refrain from expanding the exemption to the Mandate."[85]

Here, the Departments neglect the fact that contraceptives treat a myriad of symptoms related to a woman's reproductive system. Ensuring copay-free contraceptives, whether it is used for contraceptive or non-contraceptive purposes, strengthens women's health and eliminates further cost burdens on women for many reproductive health problems.

*ii.    Regulatory scheme*

The Departments argue that the existing accommodation process undermines their own case for a compelling interest in the contraceptive coverage benefit, saying HHS lacks authority to compel church plan third-party administrators to provide contraceptive coverage (when self-insured church plans use the accommodation process) because church plans are exempt from ERISA. According to the Departments, this has led to significant incongruity in terms of which religious organizations must provide coverage, and the Departments' inability to enforce the benefit uniformly is "strong evidence that the Mandate 'cannot be regarded as protecting an interest 'of the highest order.'"[86]

However, the fact that HHS lacks the authority to compel some plans because they fall outside of ERISA does not mean the interest is not compelling. As stated above, the existence of certain exemptions from the ACA's contraceptive coverage requirement does not diminish the government's compelling interest in maximizing the number of women who have cost-free access to contraception. This interest was clearly outlined by Congress in its discussion around the passage of the Women's Health Amendment and in the explicit rejection of a proposed amendment granting religious and moral exemptions.

The Departments also argue that existing regulations differentiate between religious colleges that are in self-insured church plans (i.e. ERISA-exempt) versus religious colleges that are in bigger group health insurance plans, and because there may be differential treatment of various religious

---

religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").
[83] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[84] Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,332 (July 14, 2015).
[85] 82 Fed. Reg. at 47,806.
[86] *Id.* at 47,801.

00373507

Exhibit 44                                        JA1088                                        JA-0000840

nonprofit organizations under the accommodation, it is appropriate to widen the exemption to other kinds of religious nonprofits.[87]

The fact that some religious entities could use the church plan exemption and some religious entities had to use the accommodation does not justify the expanded exemptions allowing all religious organizations to deny contraceptive coverage in any way. The ACA and the contraceptive coverage benefit aim to ensure that as many women as possible receive copay-free contraceptives and make healthcare choices based on their consultation with their healthcare provider—without regard for what their employer or university is willing to cover based on their religious beliefs. It is inappropriate for the Departments to encourage discrimination when there is already an accommodation process that fulfills RFRA requirements.

### iii.   Current practice

The Departments argue that the fact that various entities have been willing to provide coverage of *some* but not all FDA-approved contraceptives detracts from the Departments' interest in requiring that they provide coverage for other contraceptive methods to which they object.

It is unclear why the fact that some health plan sponsors object to some but not all contraceptives is relevant to this IFR, which allows any objecting health plan sponsor or third-party administrator to categorically refuse to provide coverage for any FDA-approved contraceptive. The Departments do not argue that certain entities should be exempt from providing coverage for some forms of birth control but not others. Instead, the IFR exempts entities from covering any contraceptives at all, if the entities religiously object to any or all forms of contraceptives. Furthermore, selective coverage of some contraceptive methods and not others does not fulfill the aim of the contraceptive coverage benefit: that women receive the contraceptive option that is best for them as determined by their healthcare provider, not by their employer or insurance issuer.

The Departments also argue that many religious nonprofits only hire those with same beliefs or require their employees adhere to a statement of faith, and that employees choose to work for these organizations with the knowledge that their employers are unwilling to provide contraceptive coverage. The Departments argue that forcing the benefit on these entities may impede health coverage in general because these entities may not provide health coverage at all.

However, many nonprofits and for-profit corporations hire people who do not necessarily share the same beliefs as the employer. Likewise, students may attend a university that espouses beliefs with which they disagree. To take away essential benefits from these employees or students at the institutions' wishes is extremely dangerous. Whether a woman should use contraceptives and which kind should be a decision left solely up to a woman and her healthcare provider, and unimpeded by co-pay requirements.

### iv.   Other

---

[87] *Id.* at 47,801–47,802.

00373508

Exhibit 44                    JA1089                    JA-0000841

The Departments now argue that the administrative record was insufficient to support the Departments initial conclusion—reiterated consistently over a nearly six-year period—that cost-free contraceptive coverage constitutes a compelling government interest. The specific arguments on the change of position are discussed below:

The Departments argue that the Departments previously unduly relied on IOM recommendations, which did not specifically look at the cost of contraceptives when it acknowledged the preventive services gap between men and women. However, the IOM Committee did conclude that HRSA should include the full range of contraceptives as women's preventive care, and that "eliminat[ing] ... cost sharing for contraception could ... greatly increase its use, including the use of the more effective and longer-acting methods."[88] This was the shared consensus of the fifteen out of sixteen scientific and medical experts on the Committee. Furthermore, it is clear that contraceptives are a crucial component of women's preventive services and Congress clearly intended through the Women's Health Amendment to close an existing gap between men and women on cost disparities for preventive services.

The Departments argue that no-cost well-woman visits and other women's preventive services under the ACA make it easier for women to afford contraceptives when their health plan sponsor refuses to cover them due to religious reasons. However, the Departments do not offer any explanation for this reasoning, let alone any empirical data or a cost-benefit analysis to support its argument. Furthermore, allowing health plan sponsors to deny coverage for contraceptives still imposes a burden on women, especially the type of financial burden that Congress explicitly sought to prevent through the contraceptive coverage benefit.

The Departments argue that there are programs for low-income women that provide free or subsidized contraceptives. However, only a certain subset of low-income women qualifies for such programs. Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of comparatively higher-income, insured individuals. With current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rule. Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program. Similarly, Medicaid is a source of coverage designed to meet the unique healthcare needs of individuals who are low-income. The majority (two-thirds) of state Medicaid programs already face challenges to securing an adequate number of providers to furnish services to patients, including OB/GYNs. Furthermore, Medicaid eligibility for women with a higher income cutoff is for pregnant women, which is exactly what women who use contraception are trying to avoid. Thus, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR. Finally, the current administration has been attempting to cut these programs, including putting forth proposals to restrict access to publicly funded family planning under Title X.[89]

---

[88] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 109 (July 19, 2011), https://www.nap.edu/read/13181/chapter/1.
[89] The White House, *Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018* (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), https://www.whitehouse.gov/the-press-

21

00373509

Exhibit 44

JA-0000842

The Departments argue that many forms of contraception are available for just $50 a month. This obviously ignores the often-prohibitive up-front costs of contraceptives, especially long-acting reversible contraception (LARC) in particular. A study in the Journal of Adolescent Health found that "[t]he high up-front cost of contraception, and LARC methods in particular, is one of the most important barriers to use" and that "[p]rovision of no-cost contraception has been demonstrated to significantly reduce the teen birth rate, abortions, and repeat abortions."[90] The Departments' apparent dismissal of the inherent difference between paying $1,000 up front—as opposed to $50 per month—is merely one example of their failure to account for the actual impact the exemption will have on the women who are legally entitled to the contraceptive coverage benefit.

The Departments argue that the benefit does not meet its goals because women aged between 18-24 are most at risk for unplanned pregnancy and the benefit does not cover all of those women; they also argue that the benefit covers more women than just those at-risk women. But this is not a flaw; many more women are also at risk of unplanned pregnancy and the contraceptive benefit is a large step towards lowering incidences of unplanned pregnancies by ensuring cost-free access to contraceptives.

The Departments argue that rates of and reasons for unplanned pregnancy are hard to measure, and that, while contraceptive use correlates with fewer pregnancies, a causal effect has not been proven. The Departments' assertions are erroneous and irrelevant. First, all studies examining the effect of birth control rely on correlation because one *cannot* ethically do a causation-proving experiment on birth control. It would be unethical to randomly assign some women to use contraception while withholding it from the control group, and subject them to conditions inducing pregnancy. Second, multiple studies have consistently found that access and use of contraceptives are associated with a reduction in unintended pregnancies.[91] More recently, Washington University's CHOICE Project conducted a study where they gave out free contraceptives to local teenagers and observed them for up to three years. The study, published

office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health services, including Title X–funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, *Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X*, GUTTMACHER POLICY REVIEW, (Aug. 2017), https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, *The President's Fiscal Year 2018 Budget: Overview* (May 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).
[90] Eisenberg et al., *Cost as a Barrier to Long-Acting Reversible Contraceptive (LARC) Use in Adolescents*, 52 J. OF ADOLESCENT HEALTH S59-S63 (2013), http://www.jahonline.org/article/S1054-139X(13)00054-2/fulltext.
[91] Frost et al., *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update; Centers for Disease Control and Prevention, *Achievements in Public Health, 1900-1999: Family Planning*, 48 MORBIDITY AND MORTALITY WEEKLY REPORT 1073-1080 (1999), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm.

00373510

Exhibit 44                              JA1091                              JA-0000843

in the New England Journal of Medicine, found that women enrolled in CHOICE had birth rates, abortion rates, and pregnancy rates that were less than half that of the average American.[92]

The Departments argue that mandating cost-free contraceptive coverage means teen sexual activity outside of marriage may increase, and that contraceptives may increase unwanted risky sexual behavior in general. However, the percentage of teens who are having sex has declined significantly over the past 25 years.[93] School-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[94] Further, the CHOICE Project study (of more than 9,000 women) found that for women and teens given free contraception, the number of women who reported recent multiple sexual partners went down, not up. The study also found that that there were no increases in the rates of sexually transmitted infections.

The Departments argue that in states that impose a statewide coverage requirement, the contraceptive benefit have not necessarily lowered the rate of unintended pregnancy or abortion overall. However, to support this assertion, the Departments only cite a single law review article—which are not peer-reviewed, unlike articles and studies published in health and science journals.

The Departments argue that they do not have a compelling interest in requiring individuals to be covered by policies that include contraceptive coverage when individuals object. However, allowing individual exemptions will likely undermine the workability of the system at large.[95]

All in all, none of the Departments' listed reasons are sufficient to justify the Departments' reversed position on whether the contraceptive coverage benefit serves a compelling interest. In fact, the Departments' arguments are not grounded in Congressional history, relevant jurisprudence, nor even an evidence-based approach.

E. Effects of exemptions on third parties

In support of the IFR, the Departments argue that "the exemptions created here, like the exemptions created by the last Administration, do not burden third parties to a degree that counsels against providing the exemptions." The Departments hold out as analogous situations the examples of making all supermarkets sell alcohol for convenience against the Muslim faith, or making all restaurants stay open on Saturdays against the Jewish faith.

---

[92] Secura et al., *Provision of No-Cost, Long-Acting Contraception and Teenage Pregnancy*, 371 NEW ENGLAND J. MED. 1316-1323 (2014), http://www.nejm.org/doi/full/10.1056/NEJMoa1400506#t=article.
[93] Martinez and Abma, *Sexual activity, contraceptive use, and childbearing of teenagers aged 15–19 in the United States, NCHS Data Brief*, 2015, No. 209. Hyattsville, MD: National Center for Health Statistics. 2015.
[94] Minguez et al., *Reproductive health impact of a school health center*, 56 J. OF ADOLESCENT HEALTH 338, 338-344 (2015); Knopf et al., *Community Preventive Services Task Force. School-Based Health Centers to Advance Health Equity: A Community Guide Systematic Review*, 51 AM. J. OF PREVENTIVE MED. 114, 114–26 (2016).
[95] Insurance markets could not function—either administratively or financially—if insurers had to tailor each health plan to the specific needs and desires of each individual plan participant and beneficiary. If insurers started to in fact respond to every individual exemption request, it would hamper the functionality of the insurance market.

00373511

Exhibit 44                                          JA1092                                          JA-0000844

The exemptions created by this IFR burden third parties to an impermissible degree. The Departments' examples are not analogous to religious exemptions that deny individuals contraceptive coverage. Being able to obtain alcohol, or food from a restaurant, is not the same kind of benefit as being able to receive essential health benefits. Contraceptives are not a matter of convenience; contraception is health care—in fact, one of the ten greatest public health achievements of the 20th century according to the CDC—that has a tremendous impact on women's health, well-being and economic security. The woman who will now need to choose between paying a monthly utility bill and paying for contraception would argue that the burden is extreme and in fact does counsel against providing the exemptions

Furthermore, the expanded exemption includes institutions of higher education, which are especially likely to have women that are at risk of unintended pregnancies and do not hold the same religious views as the heads of the institution. Within the United States, there are over 200 Catholic colleges and universities that collectively educate more than 800,000 students, and provide insurance coverage to hundreds of thousands of employees and their families. It is estimated that 1.5 million graduate and undergraduate students are covered under university health insurance policies.[96] Thus, expanding the exemption to institutions of higher education will likely strip coverage from thousands of women aged between 18-24 that are most at risk for unplanned pregnancy but who can no longer afford necessary contraceptives due to their institutions' objection.

Finally, the Departments' argument that contraceptives are readily available and "for many low-income persons, are available at reduced cost or for free through various governmental programs," is inaccurate. As discussed extensively in Section III(D)(iv), *infra*, public programs such as Title X or Medicaid do not provide no-cost contraceptives to all women and are not designed to absorb the unmet needs of higher-income, insured individuals. The Departments cannot relegate their responsibility, or clear their conscience, by asserting that "contraceptive coverage may be available through State sources or family plans obtained through non-objecting employers"—in this IFR, the Departments are acting to withdraw healthcare coverage provided for women under the ACA, and it is not up to other agencies or entities to fill in the gap.

   *i.*   *RFRA jurisprudence on third-party burdens*

The Departments claim that any burdens imposed on third parties may be relevant to the RFRA analysis, but are not dispositive. The Departments are incorrect.

The Departments' actions here go against the intent and scope of RFRA. Congress enacted RFRA to act as a shield, not a sword. RFRA was intended as an important defense of religious liberties, but it does not permit employers to impose their religious beliefs on their employees and interfere with their employees' access to the important preventive care services required by the ACA.[97] When Congress enacted RFRA, Congress expected that courts would look to First Amendment cases decided prior to *Emp't Div., Dep't of Human Res. of Oregon v. Smith* to

---

[96] 76 Fed. Reg. 7767, 7768-69 (April 12, 2011).
[97] Brief of 123 Members of the U.S. Congress as Amici Curiae Supporting Respondents, Zubik v. Burwell, 136 S. Ct. 1557 (2016) (Nos. 14-1418 et al.) at 34.

24

00373512

Exhibit 44                     JA1093                     JA-0000845

determine whether exercise of religion has been burdened and the least restrictive means have been employed to further a compelling government interest.[98] Those prior cases consistently held that the government is *not* required to accommodate religious beliefs if doing so imposes significant burdens on third parties.[99]

When individuals have sought exemptions from government action or requirements based on their religious beliefs, the Court has recognized the importance of balancing those interests against the interests of the government in the efficient administration of its programs and the impact any exemption would have on the rights of third parties. For example, in *United States v. Lee*, an Amish business owner claimed that the payment of social security taxes interfered with his free exercise rights because the Amish have a religious responsibility to take care of their own elderly and needy.[100] The Court did not grant an exemption from paying the tax, holding that the government had a compelling interest in the efficient and consistent application of the social security system and that "[g]ranting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees."[101]

The ACA and its implementing regulations require insurance coverage for women's preventive services, whether that coverage is provided by the employer or the health insurance issuer or third-party administrator, and thereby ensure that contraceptive services are affordable and accessible for any woman who decides to use them. These provisions were intended to "preserve[] the freedoms of conscience and religion for every American" but also "protect[] the rights of the millions of Americans who do use contraceptives, who believe family planning is the right choice for them personally, and who do not deserve to have politics or an extreme minority's ideology prevent them from getting the coverage they deserve."[102] Indeed, in *Hobby Lobby* the Supreme Court considered the accommodation acceptable because it was clear that the impact on third parties was "precisely zero," as there was a way for employees to receive seamless contraception coverage even if their employer objected.[103]

    *ii.   Establishment Clause Violation*

Exemptions created under RFRA are subject to the constraints of the Constitution, including the Establishment Clause. Not only is the IFR not required by RFRA, as the Departments claim, but the exemptions it creates are impermissible because they run afoul of the Establishment Clause.

---

[98] S. REP. 103-111, at 8 (1993).

[99] *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 593 (1983) (rejecting university's claim that it was entitled to tax exempt status as a religious nonprofit since its policies on interracial dating were based on sincere religious beliefs because "racial discrimination in education violates deeply and widely accepted views of elementary justice"); *Braunfeld v. Brown*, 366 U.S. 599, 604 (1961) (recognizing that religious accommodations should be granted if "[t]he freedom asserted by [an objector] does not bring [the objector] into collision with rights asserted by any other individual").

[100] 455 U.S. at 254-55.

[101] 455 U.S. at 254-61 ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.").

[102] 158 CONG. REC. S376 (daily ed. Feb. 7, 2012) (statement of Sen. Murray).

[103] 134 S. Ct. at 2760; *see also id.* at 2781–82.

00373513

Exhibit 44

JA-0000846

The Establishment Clause prohibits the government from creating exemptions to neutral, generally applicable rules in a manner that imposes significant burdens on third parties. But that is precisely what the IFR does by shifting the burden of securing contraception, an essential healthcare service, onto the contraceptive coverage requirement's intended beneficiaries: namely, employees and students.

After repeatedly underscoring the need to balance the government's interest in advancing women's health and equality with the need to accommodate the religious beliefs of institutions that object to contraception,[104] the Departments now eschew that approach, instead choosing to privilege certain religious ideologies, and in so doing, impose significant harms on women. Shifting these burdens to third parties does not accommodate religion as the Departments claim, but rather unconstitutionally *establishes* it. The Supreme Court has repeatedly recognized and restated this principle, including in this specific context in *Hobby Lobby*.[105]

Instead of balancing the interests of religious entities and those entitled to the no-cost contraceptive benefit under the ACA, the IFR unconstitutionally promotes the religious beliefs of objecting institutions over the government's interest in eliminating discrimination, advancing women's equality, and promoting coverage for contraceptive services. By granting objecting institutions the power to deny their employees and students coverage for contraception and thereby imposing substantial harms on these third parties, the IFR violates the Establishment Clause of the U.S. Constitution and therefore should be rescinded.

## Conclusion

In conclusion, we strongly oppose this IFR. For all the reasons stated above, the Departments have plainly acted in an arbitrary and capricious manner in promulgating this IFR, and we urge the Departments to rescind this regulation in its entirety. Thank you for the opportunity to comment.

Sincerely,

The Center for Reproductive Rights

---

[104] *See, e.g.,* 77 Fed. Reg. 8725, 78 Fed. Reg. 39870, 80 Fed. Reg. 41,318.

[105] *See, e.g., Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005) (shifting unreasonable burdens onto third parties as the cost of accommodating objectors' beliefs "may devolve into 'an unlawful fostering of religion'"); *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 708-09 (1985) (striking down under Establishment Clause state law granting employees absolute right not to work on day they observed the Sabbath, "no matter what burden or inconvenience [it] impose[d] on the employer or fellow workers"); *see also* 134 S. Ct. at 2781 n.37 ("It is certainly true that in applying RFRA courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." (internal citation omitted)); *Id.* at 2786-87 (Kennedy, J., concurring) ("[N]either may that same exercise unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling."); *Id.* at 2759-60 (affirming religious exemption to contraceptive coverage benefit under RFRA only insofar as it would have "precisely zero" impact on objector's employees).

26

Exhibit 44                    JA1095                    JA-0000847

00373514





**The Commonwealth of Massachusetts**
**Executive Office of Health and Human Services**
**Office of Medicaid**
One Ashburton Place, Room 1109
Boston, Massachusetts 02108

CHARLES D. BAKER
Governor

KARYN E. POLITO
Lieutenant Governor

MARYLOU SUDDERS
Secretary

DANIEL TSAI
Assistant Secretary for
MassHealth

Tel: (617) 573-1600
Fax: (617) 573-1891
www.mass.gov/eohhs

November 22, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–9940–IFC
P.O. Box 8016
Baltimore, MD 21244–8016

Centers for Medicare & Medicaid Services,
Department of Health and Human Services
Attention: CMS–9925–IFC
P.O. Box 8016
Baltimore, MD 21244–8016

**Re:** **Comments on Interim Final Rules (IFRs) for Religious and Moral Exemptions and**
**Accommodations for Coverage of Certain Preventive Services under the**
**Affordable Care Act**

On behalf of the Massachusetts Executive Office of Health and Human Services (EOHHS), including the
Department of Public Health (DPH) and the Medicaid program (MassHealth), I am writing with regard to
the Interim Final Rules (IFRs) published on October 13, 2017. These rules allow employers to seek
exemption from providing contraceptive coverage to women under either moral or religious grounds.
Specifically, these rules, known as the "Moral Exemptions and Accommodations for Coverage of Certain
Preventive Services Under the Affordable Care Act"[1] and the "Religious Exemptions and
Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act"[2] would
expand the types of employers that may claim a religious or moral objection to providing contraceptive
services, allowing insurers and companies to refuse to pay for contraception coverage for their
employees.

EOHHS strongly objects for the following reasons to the restrictions on contraceptive access these rules
allow.

---

[1] Retrieved October 13, 2017 from: https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf
[2] Retrieved October 13, 2017 from: https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21851.pdf



00000001

Exhibit 62　　　　　　　　　　　JA1096　　　　　　　　　　JA-0001032

## Cost is an Important Factor in Contraceptive Access

Unintended pregnancies account for nearly half of the 6.1 million pregnancies annually in the U.S. and 75% of teenage pregnancies. All taxpayers carry the burden of these costs, as two-thirds (68%) of the 1.5 million unplanned births that occurred in 2010 were paid for by public insurance programs, primarily Medicaid. Reducing costs and increasing access to contraceptive methods, particularly the most effective methods, remains a critical component to increasing the use of contraception and reducing unintended pregnancy.

Contraceptives have historically comprised a significant proportion of health care costs for young women, but the ability of women to obtain contraception is cost sensitive. For instance, a Guttmacher Institute study of low and middle income women shows that 30% had put off a visit to a health care provider for birth control in order to save money. Another study showed that copays as little as $6 prevented consistent filling of oral contraceptives. Prior to the Affordable Care Act (ACA), contraceptives made up an estimated 30-44% of out-of-pocket health care spending for women. By 2013, most women had no out-of-pocket costs for their contraception.[3]

Importantly, these IFR restrictions will differentially limit access to the most effective types of contraception. The cost of contraceptive methods is an important factor in the method a woman chooses; in one study conducted prior to the ACA, 31% of women said that they would change methods if cost were of no concern.[4] Research indicates that when offered a full-range of contraceptive methods, women are more likely to choose a highly-effective method, known as long-acting reversible contraceptive methods (LARC), and to continue using these methods after two or three years.[5] This continuity reduces gaps in contraceptive use and reduces the risk of unintended pregnancy. While these methods are preferred by individuals and are more than 99% effective at preventing pregnancy, they have high out-of-pocket costs for those without insurance coverage, which makes them difficult to access in a setting of restricted coverage. The ACA's mandate to cover contraception has increased utilization of contraception, increased use of more effective methods, and decreased out-of-pocket costs for women.[6] Modifying or eliminating that mandate risks increased costs for those women and is likely to restrict the contraceptive choices available to them because of the cost. Similarly, restricting access to contraception will pose increased costs to employers and insurers. A 2007 report from the National Business Group on Health[7] recommended that employers cover a full range of contraceptives without cost sharing because the savings from this coverage would exceed the costs.

[3] Sonfield, A., Tapales, A., Jones, R.K., and Finer, L.B. (2015). Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update. *Contraception (91)*, 44-48. https://dx.doi.org/10.1016%2Fj.contraception.2014.09.006
[4] Frost, J.J. and Darroch, J.E. (2008). Factors Associated with Contraceptive Choice and Inconsistent Method Use, United States, 2004. *Perspectives on Sexual and Reproductive Health, (40)*2, 94-104. https://doi.org/10.1363/4009408
[5] Diedrich, J.T., Zhao, Q., Madden, T., Secura, G.M., and Peipert, J.F. (2015). Three-year Continuation of Reversible Contraception. *Am J Obstet Gynecol. (213)*5:662. https://doi.org/10.1016/j.ajog.2015.08.001
[6] Becker, N.V., Polsky, D. (2015). Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing. *Health Affairs, (34)*7, 1204-1211. https://dx.doi.org/10.1377/hlthaff.2015.0127
[7] Campbell KP, editor. (2007) Investing in Maternal and Child Health: An Employer's Toolkit. Washington, DC: Center for Prevention and Health Services, National Business Group on Health. Retrieved October 23, 2017 from: https://www.businessgrouphealth.org/pub/?id=f3004374-2354-d714-5186-b5bc1885758a

00000002

Exhibit 62    JA1097    JA-0001033

Access to Contraception Improves Health and Lowers Costs

Contraception also helps women and families attain optimal family planning. Closely spaced pregnancies (an inter-pregnancy interval of less than 18 months) are at greater risk for adverse birth outcomes, including preterm birth, low birth weight, and infants small for gestational age.[8] Preterm birth accounts for 75% of all stays in the neonatal intensive care unit. Such hospitalizations are expensive; a 2013 March of Dimes study reported that birth hospitalization costs for preterm infants average approximately $54,000 per infant. Much of these costs are carried by Medicaid, as expanded categories under the Social Security Act allow Medicaid eligibility for preterm infants and those with very low birth weight, even at higher income levels.

It should also be noted that while contraceptives are most often used for family planning purposes, they may also be prescribed to control symptoms from medical disorders such as severe pain or uncontrolled bleeding associated with menstruation, endometriosis and other women's obstetrical and gynecological issues. These IFRs would similarly interfere with that coverage.

MassHealth, the Commonwealth's Medicaid and CHIP program, currently provides healthcare coverage for just under 1.9 million, 28%, of our Massachusetts residents. In addition, MassHealth provides coverage to approximately 137,000 individuals who have alternative commercial coverage, including employer-sponsored insurance and student health insurance, and acts as a secondary payer for services not covered by commercial insurance carriers. If the number of employer-sponsored insurance programs that provide coverage for contraceptive care and services decreases as a result of these new IFRs, the number of MassHealth members without contraceptive coverage could increase, shifting to MassHealth costs that would otherwise be borne by the individuals' commercial insurer and employer.

Summary

When access to contraceptives is expanded, women choose better, more reliable methods of birth control. By allowing these IFRs that restrict this access, the risk to individuals is clear—poorer health outcomes and lower economic prospects that continue to impact future generations. The consequences are higher costs due to unintended pregnancy and adverse health outcomes, as well as cost shifting from private employers to the public sector and our already constrained Medicaid budgets.

For the reasons above, I respectfully ask you to withdraw these IFRs. Thank you for consideration of these comments.

Sincerely,

Marylou Sudders

cc: Monica Bharel, MD, Commissioner, Massachusetts Department of Public Health
    Daniel Tsai, Assistant Secretary of MassHealth

---

[8] Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth Spacing and Risk of Adverse Perinatal Outcomes: A Meta-analysis. JAMA, (295)15, 1809-1823. https://dx.doi.org/10.1001/jama.295.15.1809

00000003

Exhibit 62　　　　　　　JA1098　　　　　　　JA-0001034



National Council of Jewish Women

To whom it may concern:

I am writing on behalf of the National Council of Jewish Women (NCJW) in response to Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, an interim final rule ("IFR") published by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services (collectively, "the Departments") in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47792 et seq. Inspired by Jewish values, NCJW strives for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms.

For the reasons detailed below, we ask that the Departments set aside the Religious Exemption IFR as it egregiously increases the burdens all women face, especially women working for religious (and other objecting) institutions, in order to receive the contraceptive care they need. In addition, this rulemaking violates the United States Constitution, the Administrative Procedure Act ("APA"), and the Patient Protection and Affordable Care Act ("ACA").

As an organization, the National Council of Jewish Women is committed to the belief that every woman, regardless of her faith, has the right to follow her own conscience on reproductive health matters. To that end, NCJW works to ensure that all women have full and equal health coverage that encompasses contraceptive services without cost sharing, as guaranteed by the ACA. We oppose any regulation that impinges on a woman's access to and choice of the contraceptive care best-suited for her own beliefs and conscience.

This comment will first illustrate the concerns of the Jewish community and broader faith community in regards to contraception access and care, including the need that women of faith and their families have for equal access to contraception and reproductive coverage; how the IFR disrespects the religious freedom of the individual; and the impact that the Religious Exemptions IFR will have on the faith-based (and larger) community; and, thereafter summarize why we strongly believe that this rule should be repealed. Next, this comment will discuss the impact of the ACA and how the ACA's contraceptive coverage helped increase access and affordability. Finally, it outlines how this IFR is in clear violation of the Establishment Clause of the First Amendment.

**The Impact of the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Interim Final Rule**

Faith Communities, Including NCJW, Believe That All Women Deserve Equal Access to Contraceptive and Reproductive Care Regardless of Their Employer or the University They Attend.

1

00206516

Exhibit 71        JA1099        JA-0001119

A common thread running through different faiths is that we all strive for social justice and equal rights, including equal access to care.¹ Indeed, contraceptive use is commonplace among women of all religious denominations;² There is the fact that Judaism has no law preventing use of contraception, and — even in Orthodox communities — permits its use within marriage for couples who for financial, psychological or other reasons wish to delay having children, or having more children. When you deny couples birth control you are actively denying their religiously sanctioned obligation to make reproductive decisions for the sanctity of their marriage.

It should come as no surprise, then, that faith groups of many religions and denominations overwhelmingly support reproductive rights, even when in direct conflict with their faith leaders

For this reason, we are compelled to oppose this IFR, which intentionally singles out women with health insurance provided by an exempted institution for worse treatment, simply by virtue of their, their partners', or their guardians' place of employment or study. The IFR seems to justify this by assuming that women receiving insurance through an exempt institution are less likely than women in the general population to require such services, and that, as a result, the IFR will not affect many women. This assumption rests on two unfounded premises: (1) that women receiving insurance through organizations with a religious or faith-based component share that organization's faith and beliefs with regard to contraception, and will therefore not want to take advantage of the coverage;³ and (2) that women receiving insurance through the exempted institutions are less likely to be at risk of unintended pregnancy, so a lack of access will not affect them.⁴ Yet the IFR identifies no research (and, in fact, acknowledges that it has insufficient information) regarding the number of entities that will purport to have a religious objection to contraceptive coverage, or how many women in working for those entities will be affected. For example, the IFR acknowledges that it does not know the following:

- How many women want and would use contraceptive coverage that will be absent from now-exempt plans;
- Whether and how many women will be able to otherwise access contraceptive care now exempt;
- How many women covered by plans now exempt fall into the cohort of women at most risk of unintended pregnancy;
- How many unintended pregnancies will result from the expanded exemption; or
- How many of these unintended pregnancies could have negative health effects.⁵

More specifically, with regard to women working for objecting educational institutions, the IFR admits that it also does not know:

- How many women agree with the educational institutions' positions;
- How many women have alternate access to contraceptive care; or

---

¹ Interfaith Statement Opposing Restrictions on Women's Health Care Options, Jan. 2014.

² Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

³ Indeed, the IFR goes so far as to assert that "imposing" coverage on "families who may share objections to contraception could, among some populations, affect risky sexual behavior in a negative way." 82 Fed. Reg. at 47,805. Insurance can no more "impose" on anyone to use contraception he or she does not want than it can force someone to take a vitamin.

⁴ *See* 82 Fed. Reg. at 47,803.

⁵ 82 Fed. Reg. at 47,816.

2

00206517

Exhibit 71   JA1100

- How many of the women fall into the cohort most at risk of unintended pregnancy.[6]

The lack of support for these propositions is unsurprising for three reasons.

First, employees of faith-affiliated institutions do not necessarily share either the same faith or the same beliefs with regard to contraception as their employers. For example, at least one of the premier Catholic universities in the country has fewer than 50% Catholic faculty, some of those being Jewish (again, Judaism permits the use of contraceptives broadly).[7] At least one Catholic University — Marquette University in Milwaukee, Wisconsin — recognizes that contraceptive care is a decision left to one's own conscience, and that a significant percentage of the university's employees are not Catholic. Sensibly, the university spokesman reminded that "It is also important to point out that the availability of a benefit does not require that an employee make use of it."[8] This statement reflects that, in fact, no one's religious freedom is violated when another person does something that could be contrary to that faith tradition. And as discussed elsewhere in these comments, even if Catholic, the likelihood is that, if female, that faculty member will have used contraception at one point in her life. And yet, under this IFR, universities will be able to deny access to contraceptive care regardless of the beliefs of their employees. Additionally, approximately one in seven hospital staff in the country works for a Catholic hospital.[9] To deny 14% of the United States healthcare workforce and their families access to the full spectrum of required covered services violates the equal protection under the law every citizen deserves. Women whose mission it is to provide care to others should not be denied care themselves.

Second, the fact that other means may exist to obtain contraceptive coverage does not remedy the IFR's violation of the law. Indeed, while the IFR claims that the exception "does not affect any other Federal or State law governing the plan or coverage[,]"[10] women should not have to pursue an alternative path to obtain what should be required to be provided by every insurer. Further, the IFR's blithe commentary regarding the ability of low-income women to obtain free or subsidized contraceptives, "[m]any . . . . available for around $50 per month," 82 Fed. Reg. at 47,803, is callously ignorant of what $50 a month could mean for a low-income woman. For example, it could mean several weeks' worth of baby formula for a child she already has, a week's worth of groceries, or transportation to a job. It is also worth noting that IUDs, one of the forms of contraception the IFR mentions (but omitting cost information), is often a one-time cost that will be charged upon implementation, not monthly.[11] Moreover, the IFR exhibits no regard for the *time* involved in having to seek contraceptive care not provided through an employer, when an individual already has primary care through employer-based insurance. Additionally, the increasing costs of premiums and deductibles for the health care an employee is provided can be prohibitive in terms of seeking additional care elsewhere. Simply, no one should have to navigate two entirely different systems to accommodate another individual's or institutions religious beliefs.

Finally, whether or not a woman is at risk of an unintended pregnancy should have no bearing upon whether that woman is deserving of and receives free and full access to contraceptive and reproductive care. The right is not based on perceived risk or need; rather, contraceptive and reproductive preventive services were identified as being required by the non-partisan Institute of

---

[6] 82 Fed. Reg. at 47,820.
[7] Richard Conklin, "How Catholic the Faculty?", *Notre Dame Magazine*, Winter 2006–2007.
[8] Matthew DeLuca, "Cardinal Timothy Dolan's Belated Health-Care Conversion," *The Daily Beast*, https://www.thedailybeast.com/cardinal-timothy-dolans-belated-health-care-conversion, Feb. 22, 2012.
[9] *Id.*
[10] 82 Fed. Reg. at 47,812.
[11] An IUD can be over $1000.00. *See* https://www.washingtonian.com/2017/01/17/how-much-will-your-birth-control-cost-once-the-affordable-care-act-is-repealed/.

3

00206518

Exhibit 71

JA-0001121

Medicine because they are applicable to the vast majority of women at some point in their lives. Our Jewish faith, first and foremost, demands that equal respect and dignity be provided to every individual; to single out women with insurance from exempted institutions and to deny them basic care is simply wrong.

The Religious Exemption IFR Tramples Individuals' Religious Liberty

One key inherent principle of religious liberty in the United States is the freedom from others' religious beliefs. Specifically, the First Amendment to the Constitution reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."[12] The IFR turns that principle on its head, expressly allowing businesses to impose their purported values upon their employees, and implicitly allowing businesses to pass judgment on the choices their employees seek to make for their reproductive health and family planning. The parish gardener or the temple secretary should have the same rights to health coverage as a gardener or secretary at any other business — though now, not even "ordinary" employees are safe from an employer deciding that it has a religious or moral objection to contraceptive coverage.

Compounding the error is the IFR's extension of the exception to publicly traded companies, owned by potentially millions of shareholders; the presumption that such companies have one collective conscience defies belief. And yet, the IFR does not explain how it considers it to be "unlikely" that "a religious publicly traded company might have objections to contraceptive coverage." 82 Fed. Reg. at 47,810–11. Being forced to live by another person's beliefs — not to mention the "beliefs" of a corporate entity — eviscerates religious freedom. And Americans should not have to choose between working and living by their beliefs.

The Religious Exemption IFR Has Serious Implications for Women's Health and Could Jeopardize Other Services to Which Some May Object

Contraceptive care is a vital service, as integral to a person's health as preventive medicine. Indeed, nearly 60% of women use contraception to help treat several medical conditions specific to women.[13] There is no principled reason to separate contraceptive coverage from the range of services health insurance provides. Moreover, the current rationale justifying the IFR with respect to contraceptive care could be used in the future to justify denying any number of services. Therefore, it is not just contraceptive care that is at risk due to this IFR. Patients being refused care based on religious or moral beliefs of hospitals, clinics, and doctors may suffer devastating health consequences.[14] And yet, through taxes, fees, and other charges, these same citizens of the United States pay for all types of activities that they may object to, for example, the so-called War on Terror, or foreign aid. Providing contraceptive coverage is at least as much in the interests of United States citizens as those other initiatives.

---

[12] *See U.S. CONST. amend. I.*

[13] Jones, R.K. (2011). Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills. Retrieved from http://www.guttmacher.org/pubs/Beyond-Birth-Control.pdf

[14] For documented instances where religious healthcare providers denied care to patients on the basis of religious beliefs, *see* Compl. 2, *ACLU of Mich. v. Trinity Health Corp.*, 2016 U.S. Dist. LEXIS 30690 (E.D. Mich. Mar. 10, 2016); Freedman et al., *When There's a Heartbeat: Miscarriage Management in Catholic-Owned Hospitals*, 98 AM. J. PUBLIC HEALTH 1774 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2636458/; National Women's Law Center, *Refusals to Provide Health Care Threaten the Health and Lives of Patients Nationwide*, https://nwlc.org/resources/refusals-to-provide-health-care-threaten-the-health-and-lives-of-patients-nationwide/ (last visited Oct. 20, 2017).

4

00206519

Exhibit 71                    JA1102                    JA-0001122

Further, one of the main benefits of the Affordable Care Act is its guarantee of certain basic minimum requirements for health care policies (to the extent those policies are not able to take advantage of a grandfather clause), no matter where one is employed. Although only one step towards truly seamless health care, the ACA nevertheless was supposed to make it easier, not more difficult, for people to live their lives and work where they wanted without worrying about what services may or may not be covered. With this IFR, that is no longer the case. By singling out those who work for employers or attend a university claiming a religious objection and deeming them not as important as others with respect to their reproductive rights, HHS is violating religious rights under the guise of protecting them.

## The Impact of the Affordable Care Act

The impact of the ACA cannot be overstated. NCJW worked diligently to pass this landmark piece of legislation that helped expand health care access to tens of millions of Americans. To begin, the ACA has reduced health care costs for individuals and employers while at the same time reducing uncompensated care by more than $7.4 billion.[15] In addition, the ACA included critical provisions ensuring full and equitable access to essential services without discrimination. Indeed, the ACA is a critical source of healthcare coverage for America's traditionally underserved communities, which are the individuals and communities faith-based organizations represent and seek to lift up, including individuals and families living in poverty, people of color, women, immigrants, LGBTQ individuals, individuals with disabilities, seniors, and individuals with limited English proficiency. Moreover, the ACA reduced the number of individuals without insurance to historic lows, including a reduction of 39 percent of the lowest income individuals.[16] These gains are particularly noteworthy for Latinos, African Americans, and Native Americans. The nation and our communities cannot afford to go back to a time when they did not have access to comprehensive, affordable coverage.

Furthermore, the ACA has been instrumental in covering a wide range of preventive services, ensuring that individuals have access to life-saving cancer screenings and treatment, and that women have access to effective and affordable contraception. In this respect, under the ACA's preventive services coverage, most private health plans in the United States — whether provided by employers, schools, or through the exchanges — must cover dozens of preventive care services without any out-of-pocket costs to patients. That list of services includes a set of recommended preventive services for women,[17] and those recommendations, first established in 2011 by the non-partisan Institute of Medicine committee and reaffirmed in 2016 by an expert panel led by the American College of Obstetricians and Gynecologists, include contraceptive methods and services. More specifically, plans must cover all 18 distinct contraceptive methods used by women, and any new methods identified by the US Food and Drug Administration.[18] These plans must also cover all related services, including contraceptive

---

[15] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, New Report Details Impact of the Affordable Care Act (Dec. 13, 2016), https://www.hhs.gov/about/news/2016/12/13/new-report-details-impact-affordable-careact.html available at http://wayback.archive-it.org/3926/20170127135924/https://www.hhs.gov/about/ news/2016/12/13/new-report-details-impact-affordable-care-act.html.

[16] Kelsey Avery, Kenneth Finegold and Amelia Whitman, *Affordable Care Act Has Led to Historic, Widespread Increase in Health Insurance Coverage*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ASPE ISSUE BRIEF, (Sep. 29, 2016) https://aspe.hhs.gov/system/files/pdf/207946/ACAHistoricIncrease Coverage.pdf.

[17] Health Resources & Services Administration, *Women's Preventive Services Guidelines*, (Oct. 2017) https://www.hrsa.gov/womens-guidelines-2016/index.html.

[18] "The full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration include: (1) sterilization surgery for women, (2) surgical sterilization via implant for women, (3)

5

00206520

Exhibit 71

JA1103

counseling, services needed to initiate and discontinue a contraceptive method, and follow-up care. Moreover, plans may not apply copayments, deductibles, or any other out-of-pocket costs to any of these methods or services. Similarly, plans are sharply limited in their ability to impose formularies, prior authorization requirements, and other administrative barriers to contraception.

## The ACA's Contraceptive Coverage Helped Increase Access and Affordability

Access to contraception is an essential part of shaping women's health and well-being.[19] As of September 2016, there were approximately 61 million US women in their childbearing years (15–44).[20] About 43 million of those women (70%) are at risk of unintended pregnancy — that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners fail to use a contraceptive method correctly and consistently.[21] Couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[22] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[23] As a result, it is not surprising that contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[24]

Moreover, contraceptive use is common among women of all religious denominations.[25] In fact, eighty-nine percent of at-risk Catholics and 90% of at-risk Protestants currently use some method of contraception,[26] and, among sexually experienced religious women, 99% of Catholics and Protestants have used some form of contraception.[27] Additionally, some 68% of Catholics, 73% of Mainline Protestants, and 74% of Evangelicals who are at risk of unintended pregnancy use a highly effective method (e.g., sterilization, the pill or another hormonal method, or the IUD).[28]

---

implantable rods, (4) copper intrauterine devices, (5) intrauterine devices with progestin (all durations and doses), (6) the shot or injection, (7) oral contraceptives (combined pill), 8) oral contraceptives (progestin only, and), (9) oral contraceptives (extended or continuous use), (10) the contraceptive patch, (11) vaginal contraceptive rings, (12) diaphragms, (13) contraceptive sponges, (14) cervical caps, (15) female condoms, (16) spermicides, and (17) emergency contraception (levonorgestrel), and (18) emergency contraception (ulipristal acetate). Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method." HEALTH RESOURCES & SERVICES ADMINISTRATION, *Women's Preventive Services Guidelines*, (Oct. 2017) https://www.hrsa.gov/womens-guidelines-2016/index.html.
[19] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception*, (Dec. 7, 2016) https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[20] Kimberly Daniels, Ph.D., Jill Daugherty, Ph.D.; and Jo Jones, Ph.D., *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS, 173 (2014) http://www.cdc.gov/nchs/data/databriefs/db173.pdf.
[21] Jo Jones, Ph.D., William Mosher, Ph.D., and Kimberly Daniels, Ph.D., *Current Contraceptive Use In The United States, 2006–2010, And Changes In Patterns Of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS, 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.
[22] Trussell J, Contraceptive failure in the United States, Contraception, 2011, 83(5):397–404.
[23] The Alan Guttmacher Institute (AGI), Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics, New York: AGI, 2000.
[24] GUTTMACHER INSTITUTE, *Contraceptive Use in the United States,* (September 2016) https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.
[25] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.
[26] *Id.*
[27] *Id.*
[28] *Id.*

6

00206521

Exhibit 71                    JA1104

In terms of cost, contraceptives make up an estimated 30–44% of out-of-pocket health care spending for women.[29] A year's worth of birth control can cost upwards of $600 — the equivalent of 83 hours of work for someone earning the federal minimum wage of $7.25 an hour.[30] More permanent birth control methods, such as an IUD or contraceptive implant, would cost more than $1,000 out of pocket — almost one month's salary for an American earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.

The ACA has expanded contraceptive coverage without cost-sharing to millions of women across the nation.[31] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs covered by the contraceptive coverage provision of the ACA. Following the ACA's implementation, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[32] After the implementation of the ACA, studies show that majority of women tended to choose long-term contraceptives methods, such as an IUD or an implant, as the high upfront costs were removed.[33] These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[34] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[35] Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[36]

Stated simply, contraceptive use unquestionably benefits women and families. Indeed, having access to the full range of FDA-approved contraceptive methods allows women to choose the method that work best for them at a given point in their life — factoring in ease of use, side effects, contraindications, risk of sexually transmitted infections, desire for confidentiality and control, and many other considerations. Identifying the "right" methods helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording women greater control over family planning.

[29] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[30] NATIONAL WOMEN'S LAW CENTER, *The Affordable Care Act's Birth Control Benefit: Too Important to Lose* (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/. *See* Elizabeth Celms, "How much do birth-control pills cost?" CLEAR HEALTH COSTS (Apr. 29, 2013) https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[31] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[32] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[33] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.

[34] *Id.*

[35] *Id.*

[36] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit is Working for Women* (Dec. 16, 2016) https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

00206522

Exhibit 71                                              JA1105                                              JA-0001125

Reducing unwanted pregnancies and affording women greater control over family planning, has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families. In short, contraceptive coverage matters, and taking away this coverage for any woman would be short-sighted and harmful.

**Constitutional Violation**

The Establishment Clause of the First Amendment limits the reach of religious or moral exemptions the Departments may create, including under the Religious Freedom Restoration Act: "at some point, accommodation may devolve into [something] unlawful."[37] The Constitution commands that "an accommodation must be measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[38] In *Burwell* v. *Hobby Lobby Stores, Inc.*, the Supreme Court yet again acknowledged the Establishment Clause limits.[39] When women are denied coverage for contraception, which is basic and essential health care, they suffer discrimination and economic harm. The exemption in the IFRs clearly imposes burdens on others: it compels employees and students who need coverage for birth control to pay the substantial costs for the healthcare themselves if they are able, or else to forgo that essential healthcare. Thus, the IFRs violate the Establishment Clause.

**Conclusion**

Thank you for the opportunity to provide comments on the interim final rule Religious Exemptions and Accommodations for Coverage of Certain Preventive Services. We trust that these comments, along with the many others we expect the Departments will receive, will demonstrate to the Departments how vital no-cost contraceptive coverage is to women of all faiths, regardless of the views of faith leaders or faith-affiliated organizations. We hope that the Departments will come to understand that this IFR prioritizes the religious liberty of corporations over the religious liberty of individuals and their rights to make decisions based on their conscience, not based on the purported values of an employer, or whether or not they can afford coverage their employer's insurance no longer provides. In discriminating against the religious liberty of the individual, this IFR upends the protections the Constitution is supposed to provide. We believe the Departments have the ability and the duty to reverse this damaging rule and recognize once more that full access to health care should be available to all.

Respectfully submitted,

---

[37] *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 334-35 (1986) (internal quotation marks omitted).

[38] Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005). *See also Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985); *Texas Monthly, Inc. v. Bullock*, 480 U.S. 1, 18 n.8 (1989).

[39] 134 S. Ct. 2751, 2760 (2014) (explaining effect of an accommodation on others would be "precisely zero"); *id.* at 2781 n.37 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (no "detrimental effect on any third party"); *id.* at 2786–87 (Kennedy, J., concurring) (accommodation must not "unduly restrict other persons, such as employees, in protecting their own interests").

8

00206523

Exhibit 71

*Nancy K. Kaufman*

Nancy K. Kaufman
CEO
National Council of Jewish Women

9

00206524

Exhibit 71

JA1107

JA-0001127



Elizabeth G. Taylor
Executive Director

Board of Directors

Robert N. Weiner
Chair
Arnold & Porter, LLP

Ann Kappler
Vice Chair
Prudential Financial Inc

Miriam Harmatz
Secretary
Florida Legal Services

Nick Smirensky, CFA
Treasurer
New York State Health
Foundation

Robert B. Greifinger, MD
John Jay College of
Criminal Justice

John R. Hellow
Hooper Lundy & Bookman, PC

Michele Johnson
Tennessee Justice Center

Lourdes A. Rivera
Center for Reproductive Rights

Donald B. Verrilli, Jr.
Munger Tolles & Olson

Rep. Henry A. Waxman
Waxman Strategies

Ronald L. Wisor. Jr.
Hogan Lovells

General Counsel

Marc Fleischaker
Arent Fox LLP

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Centers for Medicare & Medicaid Services
Department of Health and Human Services
200 Independence Avenue, S.W.
Room 445-G, Hubert H. Humphrey Building
Washington, D.C. 20201

**Attn:       CMS-9940-IFC**
**Religious Exemptions and Accommodations for**
**Coverage of Certain Preventive Services Under the**
**Affordable Care Act**

Dear Acting Secretary Hargan:

The National Health Law Program (NHeLP) appreciates the opportunity to comment on the Interim Final Rule for Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (hereafter "IFR"), from the Department of the Treasury, Department of Labor, and Department of Health and Human Services ("HHS") (collectively "Departments") published October 13, 2017.[1] NHeLP protects and advances the health rights of low-income and underserved individuals. Founded in 1969, NHeLP advocates, litigates, and educates at the federal and state levels. Consistent with this mission, NHeLP works to ensure that all people in the United States – including women – have access to comprehensive preventive health services, including contraception. NHeLP unequivocally opposes the Departments' efforts to undermine the Affordable Care Act's ("ACA") contraceptive coverage requirement through this IFR.

1444 I Street NW, Suite 1105 · Washington, DC 20005 · (202) 289-7661 · Fax (202) 289-7724
3701 Wilshire Boulevard, Suite 750 · Los Angeles, CA 90010 · (310) 204-6010 · Fax (213) 368-0774
200 N. Greensboro Street, Suite D-13 · Carrboro, NC 27510 · (919) 968-6308 · Fax (919) 968-8855
www.healthlaw.org

00435088

Exhibit 74                           JA1108                           JA-0001142

## I. Introduction

The ACA seeks to address the lack of adequate and affordable health insurance coverage—and to remedy inadequate access to health care. In line with this goal, the ACA recognizes that preventive health services are critical to individual and community health and that cost is a barrier to access. The ACA builds upon existing federal laws and increases access to preventive health care services by requiring most group health plans and health insurance issuers to cover, without cost-sharing, women's preventive health care services identified in guidelines issued by the United States HHS' Health Resources and Services Administration ("HRSA").[2] These HRSA recommendations are based on an extensive evidence-based analysis by the Institutes of Medicine (IOM).[3] These guidelines were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.[4] The ACA's requirements ensure that all individuals, regardless of where they work, have seamless access to all Food and Drug Administration ("FDA")-approved methods of contraception without cost-sharing.

The IFR exempts all non-profit or for-profit employers (including publicly traded companies) and private institutions of higher education that issue student health plans from complying with the contraceptive care requirement of the ACA if these entities object on the basis of religious beliefs. In addition, the IFR gives exempted employers and institutions the authority to decide whether their employees and students receive independent contraceptive care coverage through the accommodation process. The expanded exemption applies only to the contraceptive care requirement.

We are very concerned that the IFR deprives individuals, particularly low-income women, of health care benefits that medical and health care experts recognize as critical to ensuring reproductive health and well-being. In broadly exempting universally all employers from contraceptive coverage policies, the IFR gravely threatens a person's ability to determine the contraceptive method that best suits their needs, and when and if to become pregnant. The exemption undermines the ACA's intention to ensure all women receive

---

[1] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017), https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21851.pdf (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[2] *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 2713(a)(4), 124 Stat. 119, 131 (codified at 42 U.S.C. § 300gg-13(a)(4)); U.S. Dep't of Health & Human Servs. (HHS), Health Res. & Servs. Admin., *Women's Preventive Services: Required Health Plan Coverage Guidelines*, https://www.hrsa.gov/womens-guidelines-2016/index.html (last visited Nov. 2. 2017).

[3] Inst. of Med. of the Nat'l Acads. (IOM), *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), http://www.nationalacademies.org/hmd/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx.

[4] HHS, *Women's Preventive Services*, supra note 2.

2



Exhibit 74

00435089

JA-0001143

comprehensive coverage of the full range of FDA-approved, contraceptive drugs and devices.

## II.     The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication. This violates the Administrative Procedure Act ("APA"). The APA requires an agency to follow notice and comment procedures unless the agency can establish good cause to skip that process. Good cause is narrowly construed and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." Good cause does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations and therefore has had an opportunity to engage. However, relying on comments submitted during prior comment periods on related regulations is insufficient to meet public notice requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation does not create urgency and certainly does not warrant ignoring basic requirements for broad public participation (even if a handful of employers and universities are advocating for the rule).

Further, the rule is in excess of statutory authority. It is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities. Contrary to the statute, the regulation sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[5] As discussed throughout this comment, the proposed rule introduces multiple, complicated, and confusing barriers to care for women whose employers cite religion to object to cover women's health services.

## III.     Contraception Is Critical to Women's Health and Improves Women's Economic and Social Status

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[6] As a result, women face a high level of

---

[5] 42 U.S.C. § 18114(1).

[6] In 2013, per capita health care spending for women remained higher than spending for men. HEALTH CARE COST INST., 2013 HEALTH CARE COST AND UTILIZATION REPORT, 1 (Oct. 2014), available at: http://www.healthcostinstitute.org/wp-content/uploads/2014/10/2013-HCCUR-12-17-14.pdf; U.S. CENSUS BUREAU. INCOME AND POVERTY IN THE UNITED STATES: CURRENT POPULATION REPORTS 2016, TABLE 1. 2017..



3

00435090

Exhibit 74                    JA1110                    JA-0001144

health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[7] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Access to contraception is a vital part in ensuring that individuals and families can make their own best decisions. Contraception and family planning are some of the most well-researched and proven effective methods of preventive care.[10] They are particularly important in achieving Healthy People 2020's goal to "improve pregnancy planning and spacing, and prevent unintended pregnancy."[11] Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] Contraception is considered a major factor in reducing rates of maternal mortality and morbidity. Barriers to post-partum contraception are strongly associated with poor health outcomes including very low birth weight, infant mortality, and maternal mortality when women cannot ensure safe intervals between pregnancies.[15]

Access to contraception and preventive care is vital to ending health disparities that women of color face, including high rates of cervical cancer incidence and mortality, and unintended pregnancy. Women of color, women between the ages of 18 and 24, and low-income women continue to face high rates of unintended pregnancy, underscoring the

---

[7] KAISER FAMILY FOUND. WOMEN'S HEALTH CARE CHARTBOOK. 2011.

[8] Id.

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, 34 HEALTH AFF., 1204-1211 (2015), available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] See IOM, Clinical Preventive Services for Women: Closing the Gaps, supra note 3.

[11] Healthy People 2020: Family Planning, OFFICE OF DISEASE PREVENTION AND HEALTH PROMOTION, https://www.healthypeople.gov/2020/topics-objectives/top 3/family-planning (last visited Dec. 3, 2017).

[12] Agustin Conde-Agudelo MD, MPH, et al. Birth Spacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis. 295 J. AM. MED. ASS'N 1809–23 (2006).

[13] AO Tsui et al. Family Planning and the Burden of Unintended Pregnancies. 32 EPIDEMIOLOGIC REVIEWS 152-74 (2010).

[14] Lawrence B. Finer and Mia R. Zolna, Declines in Unintended Pregnancy in the United States, 2008–2011, 374 N. ENG. J. MED. 843-852 (2016).

[15] Agustin Conde-Agudelo et al., Effects of Birth Spacing on Maternal, Perinatal, Infant, and Child Health: A Systematic Review of Causal Mechanisms, 43 STUD. FAM. PLAN. 93 (2012), https://www.k4health.org/sites/default/files/conde-agudelo_2012.pdf.

4



Exhibit 74

JA1111

00435091

JA-0001145

need for seamless access to contraception.[16] While birth rates for females aged 15-19 have declined eight percent overall, disparities persist for communities of color. In 2015, Latina teens (females ages 15 to 19) experienced birth at more than twice the rate of their non-Hispanic, white peers. For the same year, Alaska Native/American Indian teens experienced birth at more than one and a half times the rate of their non-Hispanic, white peers.[17] Unintended pregnancy is also a concern for those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation. Some studies show that, lesbian, gay, and bisexual youth are more likely to experience adolescent pregnancies than do youth who do not identify as a sexual minority.[18]

The medical and health-related standards of care for some women with chronic medical conditions or taking certain medications is to use contraception to prevent pregnancy until their conditions are under control to improve maternal health and birth outcomes. Millions of women live with chronic conditions such as cardiovascular disease, diabetes, lupus, and epilepsy, which if not properly controlled, can lead to health risks to the pregnant woman or even death during pregnancy. Denying these women access to contraceptive information and services violates medical standards that recommend pregnancy prevention for these medical conditions. For example, according to the guidelines of the American Diabetes Association, planned pregnancies greatly facilitate diabetes care.[19] Recommendations for women with diabetes of childbearing potential include the following: the incorporation of preconception counseling into routine diabetes care for all adolescents of childbearing potential, discussion of family planning, and the prescription and use of effective contraception by a woman until she is ready to become pregnant.[20]

There is also evidence that contraception provides health benefits for other medical conditions, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[21] Non-contraceptive health

---

[16] GUTTMACHER INST., UNINTENDED PREGNANCY IN THE UNITED STATES, (Sept. 2016), https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states#8.

[17] *Social Determinants and Eliminating Disparities in Teen Pregnancy*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/teenpregnancy/about-social-determinants-disparities-teen-pregnancy.htm (last updated Oct. 26, 2017).

[18] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us*, ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

[19] AM. DIABETES ASS'N, STANDARDS OF MEDICAL CARE IN DIABETES-2017, 40 DIABETES CARE S115, S117 (2017), available at: http://care.diabetesjournals.org/content/diacare/supp/2016/12/15/40.Supplement_1.DC1/DC_40_S1_fina.pdf

[20] *Id.* at S114.

[21] AE Schindler, *Non-Contraceptive Benefits of Oral Hormonal Contraceptives*, 11 Int. J. Endocrinol. Metab. 41-7 (2013); AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, ACCESS TO CONTRACEPTION. COMMITTEE OPINION NO. 615, 125 Obstet Gynecol 250-5 (2015), available at:

5



Exhibit 74

00435092

JA-0001146

benefits also include treatment for non-gynecologic conditions, such as acne.[22]

By improving women's social and economic status, access to contraception promotes equal opportunities far beyond the health care realm. Contraception allows women to decide if and when to become parents, creating more professional and educational opportunities. Indeed, the U.S. Supreme Court found that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives."[23] Increased control over reproductive decisions, in turn, provides women with educational and professional opportunities that have increased gender equality over the decades since birth control was introduced. Congress understood that the Women's Health Amendment would be "a huge step forward for justice and equality in our country."[24]

Studies show that access to contraception has increased women's wages and lifetime earnings.[25] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[26] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s, which was followed by large increases in women's presence in law, medicine, and other professions.[27] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[28] The significant impact that access to birth control has on women's educational and employment opportunities – and the significant

---

https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Access-to-Contraception.

[22] Schindler *supra* note 21.

[23] *Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 856 (1992); see also Erickson v. Bartell Drug Co.,* 141 F. Supp. 2d 1266, 1273 (W.D. Wash. 2001) ("[T]he adverse economic and social consequences of unintended pregnancies fall most harshly on women and interfere with their choice to participate fully and equally in the marketplace and the world of ideas.") (internal quotations omitted).

[24] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken).

[25] *See. e.g.,* Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[26] *See* Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in Wages,* 19, 26 (NAT'L BUREAU OF ECON. RESEARCH, Working Paper no. 17922, 2012), http://www.nber.org/papers/w17922.pdf (last visited Dec. 3, 2017).

[27] Heinrich H. Hock, *The Pill and the College Attainment of American Women and Men,* Fla. State Univ., 19, 2007; Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions,* 110 J. of Pol. Econ. 730, 749 (2002), https://dash.harvard.edu/handle/1 /2624453.

[28] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012).

6



00435093

impact on women's health that educational and employment achievement have as well – makes access to contraceptive coverage even more critical.

## IV. The IFR Imposes Financial and Nonfinancial Obstacles to Women Accessing Their Choice of Contraception

The exemptions put in place by the IFR erect significant barriers for employees and their dependents to obtain contraceptives (*e.g.*, identify and enroll in another health plan or health insurance program, receive contraceptive care from one provider and other primary and preventive care from a different provider, pay up-front costs, and hope to receive reimbursement later). The Departments dismiss the impact that these burdens would have on women. However, studies assessing the attitudes and behaviors associated with unintended pregnancy have found that women engaging in unprotected sex frequently report barriers—financial *and* nonfinancial—in accessing birth control.[29] For this reason, research recommends that policies not only make contraceptive methods affordable, but also "simple to . . . obtain."[30] The contraceptive coverage requirement is in accord with this research, and seeks to make contraception affordable and easy to access to enable women to decide when and whether to become pregnant. In contrast to the research, the IFR makes contraception unaffordable and inaccessible to many women, and creates major obstacles to avoiding unwanted pregnancy.

### a. In Allowing Cost-Sharing, the IFR Will Reduce Use of Preventive Services

Cost is a significant barrier to utilization of preventive services.[31] Prior to enactment of the ACA, individuals used preventive services at about half the rate recommended by medical standards of care.[32] Low-income individuals and people of color used fewer preventive care

---

[29] *See, e.g.*, Geraldine Oliva et al., *What High Risk Women are Telling Us about Access to Primary and Reproductive Health Care and HIV Prevention Services*, 11 AIDS PREVENTION PREVIEW 513, 515-21 (1999) (identifying barriers to care as including cost of health care, perceived poor quality of care and experiences of discrimination and stigmatization, geographic accessibility, fear of legal/social services punitive actions, misperceptions about the efficacy of birth control methods and condom usage); Adejoke Ayoola et al., *Reasons for Unprotected Intercourse in Adult Women*, 41 J. OF WOMEN'S HEALTH 271, 304-09 (2007) (discussing multiple reasons women have unprotected sex).

[30] Diana Greene Foster et al., *Attitudes Toward Unprotected Intercourse and Risk of Pregnancy Among Women Seeking Abortion*, 22 WOMEN'S HEALTH ISSUES e149, e154 (2011).

[31] *See, e.g.*, Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*. 34 HEALTH SERVS. RESEARCH 1331, 1347-48 (2000); Dahlia K. Remler & Jessica Greene, *Cost-Sharing: A Blunt Instrument*, 30 ANNUAL REV. PUB. HEALTH 293, 296 (2009) ("Even modest cost-sharing may dissuade people from preventive care that might provide great value in the future."); Andrew J. Karter, et al., *Out-of-Pocket Costs and Diabetes Preventive Services: The Translating Research Into Action for Diabetes (TRIAD) Study*, 26 DIABETES CARE 2294, 2296 (2003) (recommending plans and employers evaluate impact of cost-sharing on use of preventive care); KATHLEEN N. LOHR ET AL., RAND CORP., USE OF MEDICAL CARE IN THE RAND HEALTH INSURANCE EXPERIMENT: DIAGNOSIS- AND SERVICE-SPECIFIC ANALYSES IN A RANDOMIZED CONTROLLED TRIAL 30 (1986), https://www.rand.org/content/dam/rand/pubs/reports/2006/R3469.pdf (finding that cost-sharing is more likely to reduce visits for preventive care than chronic care).

[32] P'SHIP FOR PREVENTION, PREVENTIVE CARE: A NATIONAL PROFILE ON USE, DISPARITIES, AND HEALTH BENEFITS 8 (2007), http://www.rwjf.org/content/dam/farm/reports/reports/2007/rwjf13325 ("Among the 12 preventive services examined in this report, 7 are being used by about half or less of the people who should be using



7

00435094

Exhibit 74

JA-0001148

services than non-Hispanic whites.[33] Compared to men, women were "more likely to forgo needed care because of cost and to have problems paying their medical bills, accrue medical debt, or both."[34] The Departments claim that women who are unable to obtain no-cost coverage through their employer-sponsored health plans have other avenues for obtaining preventive services, particularly government sponsored programs for low-income people.[35] However, cost barriers to obtaining preventive services are prevalent not just for individuals that would meet eligibility requirements for such programs. The "[d]ifferences between men and women who reported problems accessing needed care persisted across all income groups, but were widest among adults with moderate incomes," according to a 2009 study.[36] That study found that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.[37]

Individuals pay for their health insurance through premiums and cost-sharing.[38] Cost-sharing is the portion of health care expenses not covered by the insurer that the insured must pay out-of-pocket.[39] Cost-sharing includes deductibles, which are the amounts a person must pay out-of-pocket before the insurer will cover any expenses during a given benefit period, as well as copayments and coinsurance that insureds must pay out-of-pocket when they use a service or purchase a product (*e.g.*, for a doctor visit or prescription drug).[40] The imposition of cost-sharing at the point of service is generally justified as a means of discouraging the use of non-essential services and reducing costs, though its efficacy at achieving these goals is not established.[41]

A large body of literature concludes that cost-sharing reduces use of medically necessary, valuable services, as opposed to merely discouraging overuse of unnecessary services.[42]

---

them. Racial and ethnic minorities are getting even less preventive care than the general U.S. population."); *see also* Elizabeth A. McGlynn et al., *The Quality of Health Care Delivered to Adults in the United States*, 348 NEW ENG. J. MED. 2635, 2641 (2003) (discussing a 2003 study of adults living in 12 metropolitan areas in United States and finding "46.5% of participants did not use recommended care").

[33] Lawrence O. Gostin, *Securing Health or Just Health Care? The Effect of the Health Care System on the Health of America*, 39 ST. LOUIS U. L. J. 7, 32 (1994); P'SHIP FOR PREVENTION, *supra* note 14, at 7.

[34] SHEILA D. RUSTGI ET AL., THE COMMONWEALTH FUND, WOMEN AT RISK: WHY MANY WOMEN ARE FORGOING NEEDED HEALTH CARE 1-2 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf.

[35] 82 Fed. Reg. 47,803.

[36] RUSTGI ET AL., *supra* note 34 at 4.

[37] *Id.*

[38] David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 1 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[39] Dahlia K. Remler & Jessica Greene, *Cost-Sharing: A Blunt Instrument*, 30 ANNUAL REV. PUB. HEALTH 293, 294 (2009).

[40] *Id.*

[41] Emmett B. Keeler, RAND Corp., *Effects of Cost Sharing on Use of Medical Services and Health*, 8 MED. PRAC. MGMT 317, 318-19 (1992), https://www.rand.org/pubs/reprints/RP1114.readonline.html.

[42] *See generally* Katherine Swartz, Robert Wood Johnson Found., *Cost-Sharing: Effects on Spending and Outcomes* (2010), http://www.rwjf.org/content/dam/farm/reports/issue_briefs/2010/rwjf402103/

8



00435095

Exhibit 74                    JA1115                    JA-0001149

According to the Institute of Medicine ("IOM"), a division of the National Academies of Sciences, Engineering, and Medicine, "[s]tudies have . . . shown that even moderate copayments for preventive services . . . deter patients from receiving those services."[43] The RAND Health Insurance Experiment ("HIE"), conducted from 1971 to 1986, remains the longest-term randomized experiment studying the impact of cost-sharing on medical service utilization and health outcomes.[44] The HIE found that although higher cost-sharing reduced overall use of services and total health care expenditures, it also reduced use of essential health care services and produced some negative health outcomes.[45] The reductions in utilization found by the HIE were more prevalent in the context of preventive care than chronic care and particularly prevalent in the rate of care sought by low-income people.[46]

A 2001 to 2004 study of 366,745 patients enrolled in 174 Medicare managed care plans found that the imposition of cost-sharing reduced mammography screening.[47] The study concluded that "[f]or cost-effective preventive services such as mammography, exempting elderly beneficiaries from cost-sharing may increase rates of appropriate use."[48] Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography.[49] Because the IFR allows employers to eliminate cost-sharing protections for their employees, it will have the effect of decreasing preventive care utilization.

### b. By Imposing Cost Barriers, the IFR Will Prevent Women from Accessing Contraception, Particularly the Most Effective Methods of Contraception

High out-of-pocket costs are one of the major barriers to consistent contraceptive use by women.[50] It is not surprising, then, that lower-income women are the least likely to have the

---

subassets/rwjf402103_1; Solanki et al., *supra* note 31, at 1347-48; Robert H. Brook et al., RAND Corp., *The Health Insurance Experiment: A Classic RAND Study Speaks to the Current Health Care Reform Debate* 3 (2006), http://www.rand.org/pubs/research_briefs/RB9174.html. For example, studies have shown increased adherence to key preventive medications, such as hypertensives, when cost-sharing was reduced or eliminated. *See* Niteesh K. Choudhry et al., *Full Coverage for Preventive Medications after Myocardial Infarction*, 365 NEW ENG. J. MED. 2088, 2091-96 (2011); Niteesh K. Choudhry et al., *At Pitney Bowes, Value-Based Insurance Design Cut Copayments and Increased Drug Adherence*, 29 HEALTH AFF. 1995, 1995 (2010). Such medications are among the most cost effective treatments available, and better adherence has been consistently associated with improved health outcomes. Michael T. Eaddy et al., *How Patient Cost-Sharing Trends Affect Adherence and Outcomes: A Literature Review*, 37 PHARMACY & THERAPEUTICS 45, 47 (2012).

[43] IOM, *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 3, at 19.
[44] Keeler, *supra* note 41, at 320.
[45] *Id.* at 318-19; Brook et al., *supra* note 42, at 2.
[46] Kathleen N. Lohr et al., *supra* note 31, at 29.
[47] Amal N. Trivedi et al., *Effect of Cost-sharing on Screening Mammography in Medicare Health Plans*, 358 NEW ENG.J. MED. 375, 381-82 (Jan. 24, 2008).
[48] *Id.*
[49] Solanki et al., *supra* note 31, 1342-43; *see also* Machledt & Perkins, *supra* note 38, at 2-3.
[50] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* IOM, *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 3, at 109.

9



00435096

Exhibit 74     JA1116     JA-0001150

resources to obtain reliable methods of family planning and are the most likely to be impacted negatively by unintended pregnancy.[51]

A 2010 study found that privately insured women with prescription drug coverage paid out-of-pocket on average $14 per oral contraceptive pill pack or approximately half of the cost of the pills.[52] Studies consistently find that "[e]ven small increments in cost-sharing have been shown to reduce the use of preventive services."[53] The IOM has accordingly recognized that the "elimination of cost-sharing for contraception therefore could greatly increase its use, including use of the more effective and longer-acting methods."[54]

In this regard, the California Kaiser Foundation Health Plan's experience is informative. In 2002, the California Kaiser Foundation Health Plan eliminated copayments for the most effective contraceptive methods (intrauterine devices, injectables, and implants).[55] Prior to the change, users paid up to $300 for a five-year contraceptive method; after elimination of the copayment, use of these methods increased by 137%.[56]

Similarly, the Contraceptive CHOICE Project—a large prospective cohort study of nearly 10,000 adolescents and women in the St. Louis, Missouri area—provided participants a choice of no-cost contraception and followed them for two to three years.[57] The study concluded that providing no-cost contraception significantly allowed young women to avoid unintended pregnancy.[58] The study participant teen birth rate was 6.3 per 1,000 teens compared to the national average of 34.1 per 1,000 teens.[59] The researchers concluded that providing access to no-cost contraception greatly increased the ability of adolescents and women in the St. Louis region to select the most effective methods of contraception, thereby allowing them to reduce unintended pregnancies and abortions.[60] Based on their findings, the researchers estimated that providing no-cost contraception to all women would allow them to avoid unintended pregnancy.[61] Because the IFR allows for contraceptive cost-sharing, it will reduce contraceptive use, particularly of the most effective methods.

---

[51] *See* Rustgi et al., *supra* note 34, at 4-5 (explaining that women's lower incomes and higher demands for health care, as compared to men, put them at increased risk for accruing medical debt and likelihood of putting off care); Lawrence B. Finer & Stanley K. Henshaw, *Disparities in Rates of Unintended Pregnancy in the United States, 1994 and 2001*, 38 PERSP. ON SEXUAL & REPROD. HEALTH 90, 92-94 (2006) (finding that women with lower incomes have higher rates of unintended pregnancy as compared to women with higher incomes).

[52] Liang et al., *supra* note 50, at 530-31.

[53] See IOM, *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 3, at 109.

[54] *Id.*

[55] Kelly Cleland et al., *Family Planning as Cost-Saving Preventive Health Service*, 364 NEW ENG. J. MED. e.37(1), e.37(2) (2011).

[56] *Id.*

[57] Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120(6) OBSTETRICS & GYNECOLOGY 1291, 1291-92 (2012).

[58] *Id.* at 1295-96.

[59] *Id.* The researchers "evaluated teenage birth . . . as a proxy for unintended pregnancy, as up to 80% of these births are unintended." *Id.*

[60] *Id.* at 1295-96.

[61] *Id.* at 1291-97.

10



Exhibit 74

00435097

JA-0001151

c. *By Eliminating Cost Barriers, the Preventive Services Coverage Requirement in the ACA Has Been Successful in Improving Access to Contraception*

The ACA reflects the well-documented body of research that out-of-pocket costs for health care services are a problematic barrier to medication adherence.[62] By removing cost barriers, the ACA is proving to be effective at achieving this compelling governmental interest in increasing access to contraception, and in impacting women's ability to decide when and if to become pregnant. In the Guttmacher Institute's Continuity and Change in Contraceptive Use study, researchers surveyed women aged eighteen to thirty-nine years about their contraceptive use before and after the contraceptive coverage requirement went into wide-scale effect.[63] The results show that the proportion of privately insured women with no out-of-pocket cost for their oral contraceptives increased from fifteen percent to sixty-seven percent; for injectable contraception, from twenty-seven percent to fifty-nine percent; for the vaginal ring, from twenty percent to seventy-four percent; and for the intrauterine device, from forty-five percent to sixty-two percent.[64] As rates of contraceptive coverage without cost-sharing increased, so did contraceptive access.[65] A report from the IMS Institute for Healthcare Informatics found that 24.4 million more prescriptions for oral contraceptives with no copayment were filled in 2013 than in 2012.[66] According to that report, oral contraceptives accounted for the largest increases in prescriptions dispensed without a copayment.[67] Reducing the cost barrier to contraception is resulting in greater access to contraception, just as the ACA intended.

## V. The IFR Is Inconsistent with Evidence-Based Preventive Care

Insurance coverage policies must be based on research, evidence, and medical and health-related facts, and must be responsive to individual patient and consumer needs and wishes. Consumers require medically accurate, evidence-based, unbiased comprehensive health care services so that they can use their own decision making capacity to choose health care services that comport with their individual morality and circumstances. Because the IFR promotes deviation from these scientific standards, it is inconsistent with promoting

---

[62] *See, e.g.,* Michael E. Chernew et al., *Impact of Decreasing Copayments on Medication Adherence Within a Disease Management Environment,* 27 HEALTH AFF. 103, 111 (2008) (finding that "increased cost sharing leads to decreased adherence to potentially life-saving medications, with likely serious deleterious health effects"); Niteesh K. Choudhry et al., *Should Patients Receive Secondary Prevention Medications for Free After a Myocardial Infarction? An Economic Analysis,* 26 HEALTH AFF. 186, 186 (2007) (finding that cost-sharing can cause medication underuse).

[63] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update,* 91 CONTRACEPTION 44, 44-45 (2014). The federal government phased in the contraceptive coverage requirement starting in August 2012, and it went into wide-scale effect in January 2013. *Id.* at 44.

[64] *Id.* at 45-47.

[65] *See* IMS Inst. for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* (2014).

[66] *Id.* at 16.

[67] *Id.* at 13.

11



00435098

Exhibit 74                                   JA1118                                   JA-0001152

preventive care and strengthening the economic and social well-being of individuals across the lifespan.

As the nation's health policy center, HHS' policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule discussed below that undermine the contraceptive coverage benefit. In the face of these facts, the IFR goes so far as to imply that birth control is not health care at all.

### a. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[68] Regardless of some personal beliefs, the evidence is clear. FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[69]

### b. Contraceptives Are Medication and Carry Risks Like Any Medication

The Rule raises concerns about the "negative health effects" of contraception.[70] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[71] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[72] The Rule also

---

[68] 82 Fed. Reg. 47,794.
[69] Brief for Physicians for Reproductive Health et al. as Amici Curiae Supporting Petitioners, Sebelius v. Hobby Lobby Stores, Inc., 573 U.S. _ 12-21 (2014) (No. 13-354), available at: https://www.scribd.com/document/187287249/Brief-of-Amici-Curiae-Physicians-for-Reproductive-Health-et-al-in-Support-of-Petitioners.
[70] 82 Fed. Reg. 47,804.
[71] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, PROGESTIN-ONLY HORMONAL BIRTH CONTROL: PILL AND INJECTION, FAQ NO. 86 (2014); AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, COMBINED HORMONAL BIRTH CONTROL: PILL, PATCH, AND RING, FAQ NO. 185 (2014).
[72] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, RISK OF VENOUS THROMBOEMBOLISM AMONG USERS OF DROSPIRENONE-CONTAINING ORAL CONTRACEPTIVE PILLS, COMM. OPINION NO. 540, 120 OBSTET GYNECOL 1239-42 (2012), available at https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20161007T0314567246.

12



Exhibit 74

00435099

JA-0001153

suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[73]

### c. Contraceptives Make Sex Among Adolescents Healthier, Not More Likely to Happen

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[74] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[75] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[76] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[77] More females are using contraception the first time they have sex.[78]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

## VI. The IFR Undermines Congress' Express Intent that Contraception Be Covered As a Preventive Service

The Departments ignore Congress's express intent that contraception be covered as a preventive service under the ACA.

### a. Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[79] Allowing more entities to deprive

---

[73] KATHRYN M. CURTIS ET AL., 65 MORBIDITY & MORTALITY WKLY REP. 1-66, U.S. SELECTED PRACTICE RECOMMENDATIONS FOR CONTRACEPTIVE USE, (2016), available at
https://www.cdc.gov/mmwr/volumes/65/rr/rr6504a1.htm.
[74] 82 Fed. Reg. 47,805.
[75] Sheila Desai et al., *Understanding the Decline in Adolescent Fertility in the United States*, 59 J. ADOLESCENT HEALTH, 2007-2012, 577, 577 (2016) available at: http://www.jahonline.org/article/S1054-139X(16)30172-0/fulltext; JL Meyer et al., *Advance Provision of Emergency Contraception Among Adolescent and Young Adult Women: A Systematic Review of Literature*. 24 J. PEDIATR ADOLESC GYNECOL. 2-9 (2011).
[76] M Minguez et al., *Reproductive Health Impact of a School Health Center*, 56 J. ADOLESCENT HEALTH, 338-44 (2015); JA Knopf et al., *Community Preventive Services Task Force. School-Based Health Centers to Advance Health Equity: A Community Guide Systematic Review*. 51 AM. J. PREVENTIVE MED. 114-26 (2016).
[77] *See* Desai *supra* note 75, at 577-83.
[78] *Id.*
[79] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,727 (Feb. 15, 2012).

13



00435100

Exhibit 74      JA1120      JA-0001154

women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, in enacting the Women's Health Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> "Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage. . . .* In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[80p] [emphasis added]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[81] Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[82] Congress did not add any exemption to the women's preventive services provision.

> *b. The Departments Cannot Point to Other "Exemptions" to Justify the Rule*

The Departments look to the mere existence of exemptions in *other* statutes as well as the ACA's "grandfathering" provision to justify the sweeping exemptions in the IFR. Neither justify the exemptions.

The Departments attempt to construct a foundation for the IFR's exemptions by reference to existing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the ACA, but the Departments' attempt to misconstrue these existing laws to create a justification

---

[80] 155 CONG. REC. S12,021. S12,027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand); *See also Id.* at S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski) (noting that the Women's Health Amendment was a response to "punitive practices of insurance companies that charge women more and give [them] less in a benefit.").
[81] 155 CONG. REC. S12,021. S12,027 (daily ed. Dec. 1, 2009).
[82] 155 CONG. REC. S12,033. S12,052 (daily ed. Dec. 1, 2009); *See also,* 155 CONG. REC. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").



14

00435101

Exhibit 74          JA1121          JA-0001155

only further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also point to "grandfathered" plans as further justification for its action. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[83] Grandfathered plans were always expected to be phased out over time, and research shows the number of employees enrolled in such plans have indeed decreased steadily since 2010.[84] Grandfathered plans are intended as a temporary means for transitioning employers to full-compliance plans.[85] The Administration acknowledges that grandfathered plans will likely cease to exist within a few years of the ACA's enactment, stating that grandfathering "minimiz[es] market disruption and put[s] us on a glide path toward the competitive, patient-centered market of the future."[86] As a result of the ACA's grandfathering provision, the grandfathering regulations, other ACA constraints, and market incentives, grandfathered plans are nearly impossible to abide with in the near and long term, and are continuously moving toward total disappearance.[87] Indeed the number of employer-sponsored grandfathered plans has decreased steadily since the ACA's enactment.[88] In 2017, 17% of covered workers are enrolled in a grandfathered plan, continuing a decline from 23% in 2016, 26% in 2014, 36% in 2013, and 48% in 2012.[89] Additionally, federal statutes "often include exemptions for small employers,

---

[83] *See Priests for Life, v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").
[84] Gary Claxton et al., Kaiser Family Foundation, Employer Health Benefits 2017 Annual Survey 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017. *See also* Sara R. Collins, *Grandfathered vs. Non-Grandfathered Health Plans Under the Affordable Care Act: Striking the Right Balance*, The Commonwealth Fund (June 22, 2010),
http://www.commonwealthfund.org/publications/blog/grandfathered-vs-non-grandfathered-plans; Larry Levitt et al., *Assessing ACA Marketplace Enrollment*, Kaiser Family Foundation (Mar. 4, 2016),
https://www.kff.org/health-reform/issue-brief/assessing-aca-marketplace-enrollment/; *Grandfathering Explained*, Kaiser Family Foundation (Sep. 8, 2011), https://www.kff.org/health-reform/perspective/grandfathering-explained/; Sarah Barr, *FAQ: Grandfathered Health Plans*, Kaiser Health News (Nov. 13, 2013), https://khn.org/news/grandfathered-plans-faq/; Elizabeth Weeks Leonard, *Can You Really Keep Your Health Care Plan? The Limits of Grandfathering under the Affordable Care Act*, 36 J. Corp. L. 753 (2011), http://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=1684&context=fac_artchop.
[85] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,887 n.49 (July 2, 2013), https://www.federalregister.gov/documents/2013/07/02/2013-15866/coverage-of-certain-preventive-services-under-the-affordable-care-act; *Hobby Lobby v. Burwell*, 134 S. Ct. 2751, 2800-01 (2014) (Ginsburg, J., dissenting). *See also Grandfathering Explained*, *supra* note 84; Collins, *supra* note 84; Levitt, *supra* note 84; Barr, *supra* note 84: Leonard, *supra* note 84.
[86] *Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans*, The Center for Consumer Information & Insurance Oversight (June 14, 2010),
https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/keeping-the-health-plan-you-have-grandfathered.html. *See also* Leonard, *supra* note 84.
[87] Leonard, *supra* note 84.
[88] Claxton et al., *supra* note 84.
[89] *Id.*

15



Exhibit 74 JA1122 JA-0001156

00435102

and such provisions have never been held to undermine the interests served by these statutes."[90]

## VII. The IFR Violates Other Statutory and Constitutional Protections for Women

By creating broad exemptions to the ACA's birth control benefit, the IFR singles out health insurance that is essential for women's health and equality.

Religious arguments have long been used to thwart women's equality, just as they have been used to thwart racial equality.[91] But those efforts have been rejected repeatedly. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[92] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[93]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. The IFR also violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[94]

## VIII. The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

---

[90] *Hobby Lobby*, 134 S. Ct. at 2800 (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).
[91] *See, e.g.*, Brief for American Civil Liberties Union et al. as Amici Curiae Supporting Respondents, Zubik v. Burwell, 578 U.S. _, 21 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, and 15-191), available at :
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf.
[92] *Id.* at 19.
[93] *Id.* at 24-27.
[94] 2 U.S.C. § 18116.

16



Exhibit 74
00435103
JA-0001157

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[95] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws, which cannot fill in the coverage gaps caused by this IFR.

    a. *Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage*

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[96] While Title X-funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[97] Low-income individuals receive services at low or no cost depending on their family income.[98] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[99]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while thirty-three states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible for this coverage.[100] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states

---

[95] 82 Fed. Reg. 47803.
[96] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.
[97] 42 CFR § 59.5 (a)(6-9).
[98] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).
[99] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 C.F.R § 59.5(a)(7), (9).
[100] Kaiser Family Found., Status of State Action on the Medicaid Expansion Decision, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last updated Nov. 8, 2017).

17



00435104

that have not expanded Medicaid, childless adults remain ineligible for this program.[101] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

> b. *Medicaid and Title X Programs Do Not Have Capacity to Meet The Increased Need for Contraceptive Care and Counseling That Will Result From the IFR*

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people who are enrolled in the program, including many women of color.[102] Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[103] This is particularly true with respect to specialty providers, including OB/GYNs. A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients.[104]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage by employer refusals, and would have to furnish care to more patients than are currently served by the program. However, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[105] This decline corresponds to over $30 million in cuts to Title X's annual

---

[101] RACHEL GARFIELD & ANTHONY DAMICO, KAISER FAMILY FOUND., THE COVERAGE GAP: UNINSURED POOR ADULTS IN STATES THAT DO NOT EXPAND MEDICAID, (2017), http://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[102] Thirty-one percent of Black women and twenty-seven percent of Latinas of reproductive age are enrolled in Medicaid. ADAM SONFIELD, GUTTMACHER INST., WHY PROTECTING MEDICAID MEANS PROTECTING SEXUAL AND REPRODUCTIVE HEALTH, 20 GUTTMACHER POL'Y REV. 39, 40 (2017), https://www.guttmacher.org/sites/default/files/article_files/gpr2003917.pdf. Nearly one-fifth (19 percent) of Asian American Pacific Islander women are enrolled in Medicaid, including women from Southeast Asian Communities. IN OUR OWN VOICE: NAT'L BLACK WOMEN'S REPROD. JUST. AGENDA ET AL., AMERICAN HEALTH CARE ACT THREATENS REPRODUCTIVE JUSTICE FOR WOMEN OF COLOR, 3 (2017), http://www.nationalpartnership.org/research-library/repro/the-house-republican-repeal-bill-threatens-reproductive-justice-for-women-of-color.pdf.

[103] U.S. GEN. ACCOUNTING OFFICE, STATES MADE MULTIPLE PROGRAM CHANGES, AND BENEFICIARIES GENERALLY ACCESS COMPARABLE TO PRIVATE INSURANCE, (Nov. 2012), available at: http://www.gao.gov/assets/650/649788.pdf; U.S. DEP'T OF HEALTH & HUMAN SERVS (HHS), OFFICE OF INSPECTOR GENERAL, ACCESS TO CARE: PROVIDER AVAILABILITY IN MEDICAID MANAGED CARE (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[104] HHS, Access to Care: Provider Availability in Medicaid Managed Care, *supra* note 103 at 21.

[105] *See* C FOWLER ET AL., RTI INTERNATIONAL. FAMILY PLANNING ANNUAL REPORT: 2010 NATIONAL SUMMARY, (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; CI FOWLER ET AL., RTI INTERNATIONAL, FAMILY PLANNING ANNUAL REPORT: 2016 NATIONAL SUMMARY, (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

18



00435105

Exhibit 74                                JA1125                                JA-0001159

appropriated amount over the same period.[106] A recent study published in the American Journal of Public Health confirms that reductions in funding for Title X limit the number of patients Title X-funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.[107] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Moreover, legislative and administrative proposals, if implemented, would weaken the capacity of the Title X and Medicaid programs to serve current enrollees and patients. The House has proposed to defund the Title X program once again for FY 2018.[108] The President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[109]

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid and continue to defund or interfere with patients' access to care under the Title X program.[110] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory and administrative measures. HHS has made clear its intent to approve waivers of existing Medicaid rules and standards.[111] These waivers may very well include provisions that undermine the ability of

---

[106] *Funding History HHS.Gov (2017)*, U.S. Dept. of Health and Human Servs., https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[107] Euna M. August et al., *Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act*, 107 J. PUB. HEALTH (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

[108] *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[109] KINSEY HASSTEDT, GUTTMACHER INST., BEYOND THE RHETORIC: THE REAL-WORLD IMPACT OF ATTACKS ON PLANNED PARENTHOOD AND TITLE X, GUTTMACHER POL'Y REV., (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.;OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, THE PRESIDENT'S FISCAL YEAR 2018 BUDGET: OVERVIEW (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[110] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. CONG. BUDGET OFFICE, PRELIMINARY ANALYSIS OF LEGISLATION THAT WOULD REPLACE SUBSIDIES FOR HEALTH CARE WITH BLOCK GRANTS, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. MARA YOUDELMAN & KIM LEWIS, NAT'L HEALTH LAW PROGRAM, TOP 10 CHANGES TO MEDICAID UNDER THE GRAHAM-CASSIDY BILL, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[111] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.nhs.gov/sites/default/files/sec-price-admr-verma-ltr.pdf; Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*,



19

00435106

Exhibit 74

JA-0001160

individuals qualified to enroll in Medicaid to receive the coverage and health care they need.

Regardless of the political proposals that would severely limit access to these programs, Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals. These programs are not and cannot serve as alternatives for securing contraceptive care and counseling for individuals who will lose access because of this IFR.

> ### c. State Contraceptive Parity Laws Are Insufficient to Fill in the Coverage Gaps Caused by This IFR

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that many states do not have any contraceptive parity laws and that the federal contraceptive coverage requirement made several important advances over state laws in terms of cost-sharing protections.[112]

The major reason that state laws are insufficient is that they are preempted as applied to employers that provide self-insured health coverage; under the Employee Retirement Income Security Act of 1974, only Congress can regulate these plans, as the ACA does. These self-insured plans are estimated to cover 60% of covered workers nationwide, leaving state protections wholly irrelevant to women who access health care using these plans.[113] Further, contraceptive parity laws, which are in effect in 24 states, require insurers to cover contraceptive services as they would any other medical or prescription drug service but do not eliminate copayments, deductibles and other out-of- pocket costs; 21 states and the District of Columbia have no coverage protections at all.[114] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included, making them inadequate to protect women from the harmful effects of losing contraceptive coverage as a result of the IFR.[115]

## VI.   Conclusion

---

WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.
[112] Guttmacher Inst., INSURANCE COVERAGE OF CONTRACEPTIVES: STATE LAWS AND POLICIES, (2017), http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[113] See Claxton et al., *supra* note 84.
[114] NAT'L WOMEN'S LAW CNTR., CONTRACEPTIVE EQUITY LAWS IN YOUR STATE: KNOW YOUR RIGHTS – USE YOUR RIGHTS, A CONSUMER GUIDE, (Aug. 27, 2012), https://nwlc.org/resources/contraceptive-equity-laws-your-state-know-your-rights-use-your-rights-consumer-guide/. Only four states, California, New York, Illinois, and Vermont, currently have laws in effect that are as extensive as the federal contraceptive coverage requirement.
[115] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. *See* Guttmacher Inst., INSURANCE COVERAGE OF CONTRACEPTIVES: STATE LAWS AND POLICIES, *supra* note 112.

20



00435107

Exhibit 74                    JA1127                    JA-0001161

Section 2713(a)(4) of the Public Health Service Act, and its implementing regulations, make access to contraception possible by ensuring that health plans in the individual and small group market adequately cover contraception without cost-sharing—cost-sharing that would otherwise reduce use of this necessary service. We strongly object to the Departments' efforts to undermine the ACA's contraceptive coverage requirement through this IFR and urge the Departments to strike the IFR in its entirety.

Thank you for your attention to our comments. If you have any questions or need any further information, please Susan Berke Fogel, Reproductive Health Director, at fogel@healthlaw.org.

Sincerely,

Elizabeth G. Taylor
Executive Director



00435108

Exhibit 74          JA1128          JA-0001162

December 5, 2017

**VIA ELECTRONIC TRANSMISSION**

Acting Secretary Eric D. Hargan
Centers for Medicare and Medicaid Services
U.S. Department of Health and Human Services
200 Independence Avenue, SW, Room 445-G
Hubert H. Humphrey Building
Washington, DC 20201

**Re: CMS-9940-IFC; Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

Dear Acting Secretary Hargan:

Planned Parenthood Federation of America (Planned Parenthood) and Planned Parenthood Action Fund (the Action Fund) submit these comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, released by the Department of Health and Human Services (HHS), the Department of Labor, and the Internal Revenue Service (Departments) on October 6, 2017 and published in the federal register on October 13, 2017 at 82 Fed. Reg. 47792 et. seq. Planned Parenthood seeks to ensure that all people have adequate access to health coverage and health care services, including contraception.

Planned Parenthood is the nation's leading women's health care provider and advocate and a trusted, nonprofit source of primary and preventive care for women, men, and young people in communities across the United States. Each year, Planned Parenthood's more than 600 health centers provide affordable birth control, lifesaving cancer screenings, testing and treatment for sexually transmitted diseases (STDs), and other essential care to over two million patients. We also provide abortion services and ensure that women have accurate information about all of their reproductive health care options. One in five women in the U.S. has visited a Planned Parenthood health center. The majority of Planned Parenthood patients have incomes at or below 150 percent of the Federal Poverty Level (FPL).

The importance of affordable birth control access cannot be overstated: Many of the gains women have made in recent decades — from education advancements to professional progress to improvements in health — are the direct result of increased access to birth control. Yet, instead of building on that progress, the Departments have issued two rules that will only take women backwards. These rules are especially harmful to women who already experience unfair barriers in accessing health care, including women with low-incomes, women of color, and immigrant women.

I

00373680

Exhibit 88                    JA1129                    JA-0001310

There is no question that the Departments' rules are designed to undermine women's access to birth control, and they therefore represent an abrogation of HHS' obligation to promote prevention and wellness. Furthermore, the Departments have a duty to implement the statutory requirements of the Affordable Care Act (ACA), including access to no copay birth control coverage as part of the women's preventive services provision. The interim final rule (IFR) allowing any employer or university to deny women access to birth control on the basis of religion takes direct aim at the ACA's coverage guarantee for women. The IFR also contravenes congressional intent and violates the requirements of the Administrative Procedure Act. Importantly, Americans oppose these rules; a recent poll demonstrated that the vast majority of Americans oppose allowing employers to deny birth control coverage because of their beliefs.[1] For all of these reasons, the Departments should withdraw the rules in their entirety.

## I.   The IFR Allows Employers and Universities and Colleges to Put Their Religious Beliefs ahead of Women's Health Care

People should not be denied access to basic health care and information — including sexual and reproductive health care — because of the religious objections of their employer, university, or college. The reality is that the previous rules already accommodated the religious beliefs of religious nonprofits and closely-held for profit companies, while still ensuring that women had the health coverage that they need and deserve. The IFR creates a new, expansive religious exemption that allows *all* universities, colleges, and employers — whether nonprofit, for-profit, or even publicly-traded — to refuse to provide birth control coverage because of their religious beliefs. The breadth and potential impact of this exemption is alarming — as is the enormous departure from existing coverage protections that people across the country rely on. Under this IFR, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations and companies. Indeed, the Departments focus solely on the alleged burden on employers' religious beliefs — putting them in the unilateral position of choosing whether their employees have access to birth control coverage, without any concern about the burden being placed on women's access to basic health are.

Birth control access is a central part of women's ability to stay healthy, allowing them to plan and space their pregnancies.[2] When women plan their pregnancies, they are more likely to seek prenatal care, which improves their own health and the health of their children. It is, thus, not surprising that women of all religious denominations use contraceptives.[3] In fact, nearly 9 in 10 women who have been sexually active have used birth control at some point in their lives.[4] It is the decision and needs of women that should guide policy decisions — not the beliefs of employers.

## II.   The Broad Exemption and Optional Accommodation created under the IFR Undermine Women's Access to Birth Control and Threaten the Progress Made under the ACA

---

[1] PerryUndem, Results from a National Survey of Voters. Views on Birth Control (Dec. 2017), https://view.publitas.com/perryundem-research-communication/views-on-birth-control-report-pdf/page/1.
[2] American Public Health Assoc.. Universal Access to Contraception (2015), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2015/12/17/09/14/universal-access-to-contraception.
[3] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, Guttmacher Institute (April 2011) https://www.guttmacher.org/sites/default/files/ report_pdf/religion-and-contraceptive-use.pdf.
[4] Guttmacher Institute, Contraceptive Use in the United States (Sept. 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

2

00373681

Exhibit 88                    JA1130                    JA-0001311

More than 62 million women gained access to fully covered women's preventive care — including birth control, cancer screenings, and well-woman exams — under the ACA, without copays or other out-of-pocket expenses.[5] Before the ACA, only one-third of privately insured women with individual policies had a plan that covered contraceptives.[6]

Because the ACA benefit removed barriers to coverage and cost, women have been better able to afford access to birth control. In fact, with cost barriers removed, more women have been able to newly access birth control or switch to more expensive methods that better meet their needs. Each year, a growing number of women have been able to access birth control without cost barriers.[7] In fact, when the birth control benefit went into effect, birth control pills accounted for the single largest growth among prescriptions without cost-sharing. Twenty-four million more prescriptions for oral contraceptives were filled without co-pay than the year before the benefit went into effect — indicating a significant surge of women newly able to afford birth control.[8] Related, while IUDs are the most effective form of birth control and many women prefer them over other methods, they are also very expensive, with costs as high as s $1100.[9] Because of the ACA's guarantee that women have coverage at no co-pay for the full range of contraceptive methods, more women have been able to access IUDs.[10] And as a result of improved access to birth control, our nation has seen steep declines in unintended pregnancy, with the U.S. unintended pregnancy rate at a 30-year low.[11]

Despite the essential role that birth control plays in promoting women's health, the Departments acknowledges that these rules have been promulgated without an understanding of the extent that women will be impacted. Specifically, the IFR notes that it does not have sufficient data to determine the number of organizations, and subsequently, the number of women whose health and financial security will be impacted by the newly created exemption and accommodation. However, the number of women that could be harmed by this policy could be significant and certainly the individual impact could be extremely harmful.

Allowing employers to deny their employees coverage for birth control also threatens women's financial security and ability to advance their careers. Birth control access has helped reduce economic disparities and increase financial security for women. One-third of the wage gains women have made since the 1960s are the result of access to oral contraceptives.[12] Allowing employers to deny women

---

[5] NWLC, New Data Estimate 62.4 Million Women Have Coverage of Birth Control without Out-of-Pocket Costs, https://nwlc.org/resources/new-data-estimate-62-4-million-women-have-coverage-of-birth-control-without-out-of-pocket-costs/.
[6] The Commonwealth Fund, How the Affordable Care Act has Helped Women Gain Insurance and Improved Their Ability to Get Health Care (2016), http://www.commonwealthfund.org/~/media/files/publications/issue-brief/2017/aug/gunja_women_hlt_coverage_care_biennial.pdf.
[7] Nora Becker & Daniel Polsky, Women Saw Large Decreases in Out of Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs (July 2015), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.
[8] Iqvia, Medicine Use and Spending in the U.S. (2016), https://www.iqvia.com/institute/reports/medicines-use-and-spending-in-the-us-a-review-of-2016
[9] Olivia Marcus, How much does an IUD cost?, Amino Blog, https://amino.com/blog/iud-cost/.
[10] Iqvia, Medicine Use and Spending in the U.S. (2016), https://www.iqvia.com/institute/reports/medicines-use-and-spending-in-the-us-a-review-of-2016.
[11] Guttmacher, U.S. Unintended Pregnancy Rate Falls to 30-Year Low: Declines Seen in Almost All Groups, but Disparities Remain (March 2016), https://www.guttmacher.org/news-release/2016/us-unintended-pregnancy-rate-falls-30-year-low-declines-seen-almost-all-groups.
[12] Bailey, Martha J., et al. (2012). "The Opt-In Revolution? Contraception and the Gender Gap in Wages," NBER Working Paper, No. 17922.

3

00373682

Exhibit 88                                 JA1131                                 JA-0001312

coverage for affordable birth control could roll back those gains. Related, allowing universities and colleges to deny birth control coverage will disproportionately impact young women, particularly students, who are most in need of affordable contraception. In fact, being able to access birth control before age 21 has been the most influential factor in enabling women already in college to stay in college.[13] When the birth control pill became more widely available, the school dropout rate among women with access to birth control was 35 percent lower than those without access.[14]

Women of color made up the majority of those who gained coverage for birth control and other preventive care without a copay under the ACA — and thus women of color are the community that is most impacted by attacks on birth control access. As of 2015, at least 17 million Latina women and 15 million African-American women gained access to no cost birth control as a result of the birth control benefit.[15] Despite those gains, there is still work to be done. Black and Latina women experience the most barriers to health care access generally and access to birth control specifically.[16] Access to a full range of contraceptive methods is necessary to addressing historic disparities in unintended pregnancy and the outcomes that are associated with it, including pregnancy complications. In particular, Black women are most at risk of dying during or from childbirth, and access to birth control can help women plan the healthiest time to become pregnant.[17] People of color already report less confidence in their ability to afford healthcare, so the reality is that undermining health coverage disproportionately impacts these communities and their families.[18] Eliminating access to care will undoubtedly add to existing health disparities given the deeply entrenched historical income inequalities for Black and Latina women.[19]

Also, barriers to contraception disproportionately impact rural communities. Even with the progress our nation has made in reducing unintended pregnancy, and with teen pregnancy at an all-time low, the unintended pregnancy rate among adolescents living in rural areas is higher, no matter the individual's race.[20] For this reason, the American College of Obstetricians and Gynecologists (ACOG) recommends increasing access to contraceptives in rural areas; there can be no doubt that rolling back women's access to birth control coverage would negatively impact rural women.[21]

---

[13] Bailey, Martha J., et al. (2012). "The Opt-In Revolution? Contraception and the Gender Gap in Wages," NBER Working Paper, No. 17922
[14] H. Hock, The Pill and the College Attainment of American Women and Men, Dep't of Economics Florida University, (2007), https://ideas.repec.org/p/fsu/wpaper/wp2007_10_01.html.
[15] ASPE, The Affordable Care Act is Improving Access to Preventive Services for Millions of Americans (May 2015), https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.
[16] Bixby Center for Global Reproductive Health, Women of Color Need Improved Information and Access to Effective Contraception, https://bixbycenter.ucsf.edu/news/women-color-need-improved-information-and-access-effective-contraception.
[17] Meaghan Winter, A Matter of Life and Death: Why are Black Women in the U.S. More Likely to Die During Childbirth, Essence Magazine, https://www.essence.com/news/black-women-mortality-rate-child-deaths-united-states.
[18] S. Artiga, Racial and Ethnic Disparities in Access to and Utilization of Care Among Insured Adults, Kaiser Fam. Found., https://www.kff.org/report-section/racial-and-ethnic-disparities-in-access-to-and-utilization-of-care-among-insured-adults-issue-brief/.
[19] National Partnership for Women and Families, America's Women and the Wage Gap (April 2017), http://www.nationalpartnership.org/research-library/workplace-fairness/fair-pay/americas-women-and-the-wage-gap.pdf.
[20] Guttmacher, U.S. Unintended Pregnancy Rate
[21] The American College of Obstetricians and Gynecologists, Committee Opinion: Health Disparities in Rural Women (Feb. 2014), https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Health-Disparities-in-Rural-Women.

4

00373683

Exhibit 88     JA1132     JA-0001313

The Departments have an obligation to fully evaluate the impact that policies have on people in this country before implementing them. The alternative options identified by the Departments for women to access birth control coverage are completely deficient, as discussed in detail below.

### III.    The Departments Try to Justify the IFR Based on False Science.

The IFR relies on outdated studies and erroneous statements that are not only inconsistent with the views of the vast majority of Americans, but are directly contradicted by current research available regarding the health implications of birth control and evidence-based medicine.

Shockingly, the IFR suggests that birth control access does not lead to reductions in unintended pregnancy. This notion defies logic, and relies on outdated studies regarding the unintended pregnancy rate. Specifically, the IFR cites to one report and states "the report does not show that access to contraception causes decreased incidents of unintended pregnancy." In fact, according to the CDC, "unintended pregnancy mainly results from not using contraception or inconsistent or incorrect use of effective contraceptive methods."[22] The reality is that unintended pregnancy rate is currently at a 30 year low in large part due to increased access to birth control. Indeed, experts agree that a main driver of this decline is the increased use of contraceptives, particularly the most effective methods such as a long-acting reversible contraceptives.[23]

The Departments' refusal to acknowledge the scientific evidence not only belies reality but will gravely harm women. Studies show that birth control access plays an essential role in helping women plan their pregnancies, which is associated with better health outcomes for both women and their children. Women who experience unplanned pregnancy are more likely to delay prenatal care and therefore are at greater risk of unaddressed health complications, low birth weight, preterm birth, and infant mortality.[24]

In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself.[25] These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term. In fact, according to a John Hopkins study, increasing contraceptive access is one of the most effective ways to reduce maternal mortality.[26] Unfortunately, unlike most developed countries, the maternal mortality rate in the U.S. is increasing. Black women, in particular, are dying at alarming rates from childbirth and pregnancy.[27] Women also use birth control for a whole host of other health care reasons, including endometriosis, migraines, pre-menstrual pain, menstrual regulation, and pelvic inflammatory disease. This only reinforces that policies need to

---

[22] Ctrs. for Disease Cont'l and Prevention, Unintended Pregnancy Prevention.
https://www.cdc.gov/reproductivehealth/contraception/unintendedpregnancy/index.htm.
[23] Guttmacher, U.S. Unintended Pregnancy Rate Falls to 30-Year Low; Declines Seen in Almost All Groups, but Disparities Remain (March 2016),
https://www.guttmacher.org/news-release/2016/us-unintended-pregnancy-rate-falls-30-year-low-declines-seen-almost-all-group s.
[24] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[25] ACOG, Final Report of the Women's Preventive Services Initiative, 103 - 104 (2016).
[26] John Hopkins Bloomberg Public Health School of Health, Contraception Use Averts 272,000 Maternal Deaths Worldwide, https://www.jhsph.edu/news/news-releases/2012/ahmed-contraception.html.
[27] Meghan Winter, A Matter of Life & Death: Why are Black Women in the U.S. More Likely to Die During or After Childbirth?, Essence Magazine, https://www.essence.com/news/black-women-mortality-rate-child-deaths-united-states.

5

00373684

Exhibit 88                                      JA1133                                      JA-0001314

increase, not decrease, access to contraceptives.[28]

The IFR also perpetuates anti-science myths about contraception that have been repeatedly refuted by medical experts. The rule states that, "IOM's recommendation included several contraceptive methods that many persons and organizations believe are abortifacient — that is, as causing early abortion — and which they conscientiously oppose for that reason distinct from whether they also oppose contraception or sterilization." FDA-approved contraceptive methods are not abortifacients. None of the FDA-approved contraceptives interferes with a pregnancy.[29]

The IFR makes a particularly irresponsible misrepresentation about the risks of breast and cervical cancer, without accurately reporting the substantial evidence of contraceptives' association with cancer prevention. There is no proven increased risk of breast cancer among contraceptive users, particularly for those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[30] Further, contraceptives are associated with a reduced risk of colorectal cancer and endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives. Oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent and 20 percent for every five years of additional use. Oral hormonal contraceptives can also lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations; and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis — who are typically at higher risk of developing ovarian cancer.[31]

Lastly, the rule relies on the false notion that access to birth control leads adolescents to have sex. This false correlation has been debunked repeatedly — over the span of decades. In fact, research has shown that school-based health centers providing access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[32] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[33] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of teen pregnancy.[34]

---

[28] Rachel Benson Gold, "Family Planning and Health Care Reform: The Benefits and Challenges of Prioritizing Prevention," *Guttmacher Policy Review.* Winter 2009, Volume 12, Number 1.

[29] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents. Sebelius v. Hobby Lobby, 134 S. Ct. 678 (2013,
acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?

[30] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata. L.B.. Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

[31] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[32] E.g. Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009; Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[33] Minguez M. Santelli JS. Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344; Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[34] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States. 2007–2012 J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

6

00373685

Exhibit 88     JA1134     JA-0001315

## IV.  The IFR is not based on Facts about Birth Control Affordability and Access

The Departments falsely claim that even if the rule causes women to lose access to birth control, birth control is otherwise affordable and available. Specifically, the IFR states, "many forms of contraception are available for around $50 per month, including long-acting methods such as the birth control shot and intrauterine devices (IUDs). Other, more permanent forms of contraception like implantables bear a higher one-time cost, but when calculated over the duration of use, cost a similar amount." With this, the Departments radically misrepresent the costs of birth control. Without insurance, an IUD could cost more than $1,100 out-of-pocket, and birth control pills could cost up to $600 per year.[35] Given the wage inequities in this country, women are less able to absorb additional costs. A recent survey found that 4 in 10 Black women of reproductive age reported that they could not afford more than $10 a month for birth control if they had to pay out of pocket.[36]

Eliminating birth control coverage has grave financial implications for women and their families. Under the ACA benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills per year since the benefit went into effect.[37] Compared to out-of-pocket costs in 2012, women using birth control pills saved an average of $255 per year, and women using IUDs have saved an average of $248 as a result of the birth control benefit.[38] From June 2012 to June 2013, average out-of-pocket spending for the pill declined by 38 percent, and women's average out-of-pocket spending for an IUD declined by 68 percent. After the Affordable Care Act's birth control provision took effect, fewer than 4 percent of American women had to pay out of pocket for oral birth control.[39] That number was more than 20 percent before the law's passage. The idea that most women can easily afford these costs is sorely out of touch with reality.

For women who the IFR acknowledges cannot afford those costs, the Departments point to Medicaid, Title X, and other federal programs as alternative sources that could fill the gap left by eliminating this benefit for some women. First, as a factual matter, most women covered under the ACA's birth control benefit would not be eligible for the above mentioned programs. Millions of women who are enrolled in employer sponsored insurance coverage (and have guaranteed birth control coverage under the benefit) simply would not qualify for these programs. Second, social safety net programs are not designed to serve as a substitute for employer-sponsored coverage.

It is especially surprising that the Departments' point to these programs, given that this administration has been on the forefront of working to drastically limit their reach and impact. Within the last year, the administration has pushed Congress to radically alter the Medicaid program, making clear that states are encouraged to limit access to Medicaid benefits — including through work requirements which would disproportionately harm women.[40] Similarly, the administration has signaled its support for restricting

---

[35] Amino, How much does an IUD cost? (July 2017), https://amino.com/blog/iud-cost/.
[36] PerryUndem, Black American Survey Report,
https://view.publitas.com/perryundem-research-communication/black-american-survey-report_final/page/51.
[37] S. Kliff. Report: Obamacare has saved women $1.4 billion on birth control pills, Vox,
https://www.vox.com/2015/7/7/8907389/obamacare-birth-control-savings.
[38] Nora Becker & Daniel Polsky, Women Saw Large Decreases in Out of Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs (July 2015), https://www.healthaffairs.org/do/abs/10.1377/hlthaff.2015.0127.
[39] L. Sobel, Private Insurance Coverage of Contraception, Kaiser Fam. Found. (Dec. 2016),
https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[40] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to*

7

00373686

Exhibit 88                    JA1135                    JA-0001316

access to publicly funded family planning under Title X.[41]Indeed, it belies reality that the Departments would specifically mention Title X and Medicaid as fail-safes for those who will lose coverage as a result of this rule — given the administration's clear record of hostility toward these programs. Likewise, the administration has made clear both through its own proposals and support for congressional proposals that it wants to eliminate federal funding for Planned Parenthood. Planned Parenthood plays an outsized role in the safety net that the Departments hold up as a backstop to the IFR. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[42]

Lastly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminishes the need for a federal requirement. First, state laws are not able to regulate all employers. The federal law Employee Retirement Income Security Act (ERISA) regulates plans offered by employers that self-insure, which covers 60 percent of workers nationwide.[43] Second, this suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement includes several important additional protections beyond those included in the state contraceptive coverage laws.[44] For instance, only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[45] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[46]

## V. The IFR Contravenes Congressional Intent to Increase Women's Access to Preventive Health Services, including Family Planning Care

---

*Impose Medicaid Work Requirements, Top Federal Official Says*, Wash. Post (Nov. 7, 2017). https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements -top-federal-official-says/?utm_term=.0513a6c28c8e.
[41] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-201 8. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Bu dget%20Overview.pdf (last visited Nov 3, 2017).
[42] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.
[43] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.
[44] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[45] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[46] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

8

00373687

Exhibit 88    JA1136    JA-0001317

Congress intended for contraception to be included among the required benefits that insurers had to cover without cost-sharing. In general, the U.S. healthcare system has historically been focused on treatment over prevention.[47] Under the ACA, Congress sought to shift this focus by requiring insurers to cover without cost-sharing five categories of preventive services: evidence-based items or services the United States Preventive Services Task Force (USPSTF) recommend with an A or B rating; immunizations that have a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; HRSA-supported, evidence-informed guidelines for infants, children, and adolescents; and HRSA-supported, comprehensive guidelines for women.[48]

Historically, too many American women were unable to access the preventive care they need because of cost. In fact, a May 2009 report by the Commonwealth Foundation found that more than half of women delayed or avoided preventive care because of its cost. While the USPSTF recommendations ensured access to some important women's health services, a limitation in their methodology fails to address other essential preventive care for women, including the yearly well-woman visits and family planning care. The Women's Health Amendment was drafted to address this limitation and called on the Health Resources and Services Administration (HRSA) to identify such "additional preventive care and screenings" that should be covered at no cost for women.

In adding via amendment the women's preventive benefit to the ACA, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and, in some instances, were unable to obtain this care at all because of cost barriers. Senator Gillibrand stated that "women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage. . .* In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*"[49]

The floor debate made clear that addressing this inequity included expanding access to birth control. In their floor statements during the debate on the Women's Health Amendment, Senators Patty Murray, and Kirsten Gillibrand — among others — affirmatively reference family planning care as services that would be covered at no cost-sharing under the Women's Health Amendment.[50] Senator Barbara Mikulski, when introducing her amendment, clearly stated for the record: "[M]y amendment would cover family planning services."[51]  Congress chose not to include a broad religious or moral exemption to this requirement.

Thus, HRSA did not arbitrarily include contraception in the women's preventive services as a required benefit; rather, the benefit both followed a clear record of congressional intent and was endorsed by the

---

[47] F. Marvasti & R. Stafford, From Sick Care to Health Care: Reengineering Prevention into the U.S. System, New England Journal of Medicine (2012), http://www.nejm.org/doi/full/10.1056/NEJMp1206230#t=article.
[48] 42 U.S.C. 300gg-13(a)(4).
[49] 155 Cong. Rec. S12,021.
[50] Floor Statement, Senator Patty Murray, Congressional Record S12274, December 3, 2009 (stating, "Senator Mikulski's amendment will make sure this bill provides coverage for important preventive services for women at no cost.  Women will have improved access to well-women visits, important for all women; family planning services ..."). Floor Statement, Senator Ben Nelson, Congressional Record S12277, December 3, 2009 (indicating that he "strongly supports the underlying goal [of Senator Mikulski's amendment] of furthering preventive care for women, including mammograms, screenings and family planning.").
[51] Press release, Mikulski Puts Women First in Health Care Reform Debate, November 30, 2009, *available at* http://mikulski.senate.gov/Newsroom/PressReleases/record.cfm?id=320304 (includes text from Senator Mikulski's prepared remarks on the introduction of her amendment).

9

00373688

Exhibit 88                                    JA1137                                    JA-0001318

medical and scientific communities. Indeed, the Obama Administration twice commissioned medical organizations (the Institute of Medicine in 2011, and the American College of Obstetricians and Gynecologists in 2016) to recommend which services should be covered by the benefit based on the public's health, medicine, and science. Both bodies identified the full-range of FDA-approved contraceptive methods and counseling among the services that should be covered as a part of promoting women's overall health and well-being.

## VI.  The IFR Violates the Administrative Procedure Act which Requires a Notice and Comment Period before a Rule Becomes Effective.

The Administrative Procedure Act (APA), Section 553(b), requires that federal agencies publish notice of proposed rulemaking in the federal register, and Section 553(c) of the APA requires that the agency "give interested persons an opportunity to participate in rulemaking through submission of written data, views, or arguments."[52] Federal agencies must base their final rules, including the reasonings and conclusions on "the rulemaking record, consisting of comments, scientific data, expert opinions, and facts accumulated during the pre-rule and proposed rule stages."[53] Further, the APA Section 553(d) requires a 30-day waiting period between publication of a rule and its effective date.[54] Federal agencies are only permitted to forgo the procedural requirements, and ultimately, forgo the opportunity to hear from public stakeholders, before issuing a final rule only in cases where the agency has a "good cause," which must be explained in the preamble of the rule.[55] Courts have found good cause in cases that involve: (1) emergencies;[56] (2) context where prior notice would subvert the underlying statutory scheme;[57] and (3) situations where Congress intends to waive section 553's requirements.[58] None of those situations exists in this case.

The Departments state that delaying the rule would increase the costs of health insurance because grandfathered plans are not making changes to their plans and that the rules have deterred individuals from forming non-profit and for-profit entities or offering health insurance to their employees. The Departments offers no evidence, either anecdotal or quantitative, for any of these scenarios. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. The existence of litigation alone does not create urgency and certainly does not warrant subjugating the rights of the public at large to weigh in on such a wide-reaching regulation.

---

[52] 5 U.S. Code § 553(b) & (c).

[53] Office of the Federal Register, A Guide to the Rulemaking Process. https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.

[54] 5 U.S.C. § 553(d).

[55] 5 U.S. Code § 553(b)(3)(B); Office of the Federal Register, A Guide to the Rulemaking Process, https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.

[56] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[57] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

[58] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

10

00373689

Exhibit 88                               JA1138                               JA-0001319

The Departments cannot waive the statutorily required notice and comment period because the agency wants to implement its agenda quicker. Notice and comment periods always result in a delay; however, Congress has through the APA stated that receiving input from the public and key stakeholders is worth the delay except in very limited circumstances - not found here.

<div align="center">***</div>

Planned Parenthood strongly urges the Departments to put the health and lives of all people in this country—including women, people of color, young people, and LGBTQ communities—first and foremost and to reverse plans to allow broad exemptions to the women's preventive services.

Sincerely,

*Dana Singiser*

Dana Singiser
Vice President of Public Policy and Government Relations
Planned Parenthood Action Fund
Planned Parenthood Federation of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005

11

00373690

Exhibit 88                JA1139                JA-0001320

**Public Comment on Interim Final Rules on Moral and Religious Exemptions for Coverage of Certain Preventive Services Under the Affordable Care Act (82 FR 47838, 82 FR 47792)**

Submitted December 5, 2017

We, the undersigned public health practitioners and members of the faculty of the Heilbrunn Department of Population and Family Health at Columbia University Mailman School of Public Health, respectfully submit the following comments on the interim final rules on moral and religious exemptions for coverage of contraceptive coverage. The decision to allow moral and religious objections to covering contraception under the preventive services requirement of the Affordable Care Act threatens to undo recent gains and stymie further progress. These rules roll back decades of public health progress and place the lives and well-being of women and all Americans at risk.

1. **Women have an established right to decide how, whether, and when they want to become pregnant.**

The struggle to protect women's rights to control whether, how, and when they become pregnant has a long history. The federal ban on birth control was lifted in 1938. In 1965, the Supreme Court, recognizing that couples have a right to privacy, ruled that married couples could use birth control in *Griswold v. Connecticut*. And finally, in the 1972 case *Baird v. Eisenstadt*, the Court legalized birth control for all citizens regardless of marital status. The Women's Health Amendment to the Patient Protection and Affordable Care Act of 2010 included a contraceptive mandate requiring employers to cover the cost of contraceptive methods with no cost-sharing for the patient. These interim rules threaten to dismantle this contraceptive mandate, depriving women of an established right to make decisions about whether, how, and when to become pregnant.

2. **Unintended pregnancy is prevalent, and it adversely affects women, children, and society.**

Nearly half (45%) of the estimated 6.1 million pregnancies in the US each year are unintended[1], with significant health, social, and economic costs.[2] Unintended pregnancies are significantly

---

[1] Finer LB, Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. New England Journal of Medicine. 2016 Mar 3;374(9):843-52.

[2] Gipson JD, Koenig MA, Hindin MJ. The effects of unintended pregnancy on infant, child, and parental health: a review of the literature. Studies in family planning. 2008 Mar 1;39(1):18-38.

00209066

Exhibit 90                    JA1140                    JA-0001328

more likely to result in adverse birth outcomes, including low birthweight and preterm birth.[3,4] The effects of unintended pregnancy persist after birth for both the mother and child. Mothers who carry unintended pregnancies to term are less likely to breastfeed their infants and more likely to suffer from postpartum depression.[5,6] Children and young adults whose births were the result of unintended pregnancies are more likely to have low self-esteem[7] and to have siblings with behavioral problems in school.[8] Unintended births contribute to a cycle of socioeconomic disadvantage for both mothers and children as a result of deferred educational and employment opportunities.[9,10]

### 3. Programs to make contraception available without cost have been demonstrated to reduce unintended pregnancy, abortion, and unintended and teen births

At the close of the 20th century, the Centers for Disease Control and Prevention (CDC) recognized the ability to achieve a desired family size and birth spacing made possible through contraception as a key achievement in public health.[11] In the last decade, one of the most positive public health trends has been a steep reduction in unintended pregnancy. The rate of unintended pregnancy fell by 18 percent in the time period 2008-2011 alone.[12] This decrease has been attributed to concurrent increases in contraceptive use.[13]

The cost of contraception is a barrier for many women, and the methods most effective at preventing unintended pregnancy are also the most expensive.[14] Even before the ACA expansion, numerous studies showed that when cost barriers are addressed, the use of the most

---

[3] Orr ST, Miller CA, James SA, Babones S. Unintended pregnancy and preterm birth. Paediatric and perinatal epidemiology. 2000 Oct 1;14(4):309-13.

[4] Shah PS, Balkhair T, Ohlsson A, Beyene J, Scott F, Frick C. Intention to become pregnant and low birth weight and preterm birth: a systematic review. Maternal and child health journal. 2011 Feb 1;15(2):205-16.

[5] Logan C, Holcombe E, Manlove J, Ryan S. The consequences of unintended childbearing. Washington, DC: Child Trends and National Campaign to Prevent Teen Pregnancy. 2007 May;28:142-51.

[6] Cheng D, Schwarz EB, Douglas E, Horon I. Unintended pregnancy and associated maternal preconception, prenatal and postpartum behaviors. Contraception. 2009 Mar 31;79(3):194-8.

[7] Axinn WG, Barber JS, Thornton A. The long-term impact of parents' childbearing decisions on children's self-esteem. Demography. 1998 Nov 1;35(4):435-43.

[8] Barber JS, East PL. Children's experiences after the unintended birth of a sibling. Demography. 2011 Feb 1;48(1):101-25.

[9] Allen RH. The role of family planning in poverty reduction. Obstetrics and Gynecology. 2007 Nov 1;110(5):999-1002.

[10] Sonfield A, Hasstedt K, Kavanaugh ML, Anderson R. The social and economic benefits of women's ability to determine whether and when to have children.

[11] Centers for Disease Control and Prevention. Achievements in public health, 1900–1999: Family planning. MMWR Weekly. 1999 Dec 3; 48 (47): 1073-80.

[12] Finer, L.B., and Zolna, M.R. (2016). Declines in Unintended Pregnancy in the United States, 2008-2011. *The New England Journal of Medicine*, 374(9), 843-852.

[13] Jones J, Mosher W, Daniels K. Current contraceptive use in the united states, 2006-2010, and changes in patterns of use since 1995. InSexual Statistics: Select Reports from the National Center for Health Statistics 2013. Nova Science Publishers, Inc..

[14] Pace LE, Dusetzina SB, Fendrick AM, Keating NL, Dalton VK. The impact of out-of-pocket costs on the use of intrauterine contraception among women with employer-sponsored insurance. Medical Care. 2013 Nov 1;51(11):959-63.

00209067

Exhibit 90                                    JA1141                                    JA-0001329

effective contraceptive methods increases,[15] and the rate of unplanned pregnancies decreases—a fact the Administration is disputing as rationale for allowing a roll-back of women's access to contraception.

Programs that reduce the cost barriers to contraception have been shown to significantly reduce unintended pregnancy and abortion rates. A large prospective study in St. Louis that removed cost barriers to contraception showed significant reductions in abortion.[16] When Colorado made long-acting reversible contraception available without cost, the unintended pregnancy rate among women age 20-24 dropped by 20% and the abortion rate by 18%.[17]

Reducing access to contraception therefore has the potential to increase unintended pregnancy rates.

4.      **Employers should not be able to impose scientifically unsound, personal beliefs that affect the health and well-being of women, no matter how sincerely held these beliefs are.**

Expanding the range of objections to providing coverage of contraception with no out-of-pocket cost to include moral objections can allow employers to impose their "sincerely held" beliefs, even when they are not scientifically sound. The phrasing "This Mandate concerns contraception and sterilization services, including items believed by some citizens to have an abortifacient effect—that is, to cause the destruction of a human life at an early stage of embryonic development." (Page 47844, II. A.) [underline added] exemplifies the extent to which this interim final rule would allow employers to restrict access to contraception based on unfounded views. It has been demonstrated and agreed upon by scientific experts, including in an amicus brief in the *Hobby Lobby* case (2013), that contraception, including emergency contraception (colloquially referred to as the "morning after pill") are not abortifacients.[18]

5.      **This rule is being implemented without regard for the potential adverse public health impact.**

As shown by the language above, the potential range of objections that individuals could cite as a rationale for denying covered entities access to contraception is very broad. Yet these rules are being implemented without an understanding of the extent to which these rules would deny access for women: "The Departments acknowledge that expanding the exemption to include objections based on moral convictions might result in less insurance coverage of contraception for some women who may want the coverage. Although the Departments do not know the exact

---

[15] Postlethwaite D, Trussell J, Zoolakis A, Shabear R, Petitti D. A comparison of contraceptive procurement pre-and post-benefit change. Contraception. 2007 Nov 30;76(5):360-5.

[16] Peipert, J.R., Madden, T., Allsworth, J.E., and Secura, G.M. (2012). Preventing Unintended Pregnancies by Providing No-Cost Contraception. Obstet. Gynecol., 120(6), 1291-1297.

[17] Ricketts S, Klingler G, Schwalberg R. Game Change in Colorado: Widespread Use Of Long-Acting Reversible Contraceptives and Rapid Decline in Births Among Young, Low-Income Women. Perspectives on Sexual and Reproductive Health. 2014 Sep 1;46(3):125-32.

[18] Dreweke J. GPR. Guttmacher Policy Review. 2014;17(2):3.

00209068

Exhibit 90

scope of that effect attributable to the moral exemption in these interim final rules, they believe it to be small." (Page 47856, V. 2.)

Given the demonstrated public health benefit of making contraception available without cost, and the potential for a broad range of objections to be cited by employers and universities covered under these rules, we urge the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services to rescind in their entirety these regulations.

**Samantha Garbers, PhD**
Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Terry McGovern, JD**
Professor and Chair
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Sara Casey, DrPH**
Director
RAISE Initiative
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Marina Catallozzi, MD, MSCE**
Assistant Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Wendy Chavkin, MD, MPH**
Professor
Department of Obstetrics and Gynecology
Columbia University College of Physicians and Surgeons

Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Joanne Csete, PhD, MPH**
Adjunct Associate Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

00209069

Exhibit 90

JA1143

JA-0001331

**Linda F. Cushman, PhD**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Associate Dean
Office of Field Practice
Columbia University Mailman School of Public Health

**Sally E. Findley, MURP, MA, PhD**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Professor
Department of Sociomedical Sciences
Columbia University Mailman School of Public Health

**Melanie A. Gold, DO, DABMA, DMQ**
Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Medical Director
School Based Health Centers
New York-Presbyterian Hospital

**Debra Kalmuss, PhD**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Latanya Mapp Frett, MPM, JD**
Adjunct Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Executive Director
Planned Parenthood Global

Vice President
Global PPFA

00209070

Exhibit 90

JA-0001332

**Maria Marti Castaner, PhD**
Postdoctoral Research Scientist
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Rachel T. Moresky, MD, MPH**
Associate Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Associate Professor
Department of Emergency Medicine
Columbia University College of Physicians and Surgeons

Director
sidHARTe - Strengthening Emergency Systems

Director
Columbia University International Emergency Medicine Fellowship

**Carmen Rodriguez, PhD**
Assistant Professor at Columbia University Medical Center
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**John Santelli, MD, MPH**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

**Melissa Stockwell, MD, MPH**
Associate Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

Associate Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

00209071

Exhibit 90    JA1145    JA-0001333



40 Worth Street      voice 646-619-6400
5th Floor            fax 646-619-6777
New York, NY 10013-2988   www.healthsolutions.org

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
US Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Re:    **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act (CMS-9940-IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

Public Health Solutions (PHS) is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. PHS has been the non-governmental Title X Family Planning Services Grantee for New York State for over 30 years, administering funding to five sub-recipient health centers, and providing sexual and reproductive health services at two centers in Brooklyn.  We know well the importance of the vital health services jeopardized by the Departments of Health and Human Services, Labor and Treasury's (the Departments') recent efforts that undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this interim final rule (IFR) and we can forecast the consequences of this roll-back. **We therefore unequivocally oppose the Departments' IFR.**

The impacts of the IFR will be acute in New York State. New York State has one of the highest rates of unintended pregnancy in the nation, and the risk of unintended pregnancy is greatest among the most vulnerable women: young, low-income, minority women, without high school or college education.  New York State law and regulations protect contraceptive access; in 2003, New York enacted the Women's Health and Wellness Act (WHWA), which requires plans governed by New York State law ("fully insured plans" or "state regulated plans") to cover contraceptives for female plan members.1 In January 2017, the New York State Department of Financial Services issued Regulation 62, requiring that state regulated plans not impose cost sharing for contraceptives on plan members. Nonetheless, WHWA and Regulation 62 do not apply to self-funded insurance plans, which are governed by federal law and regulated by the

---

1 N.Y. Pub. Health L. § 602 (2003).

00373562

Exhibit 91                          JA1146                          JA-0001334

federal government under the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sections 1001 *et seq.* Therefore, as a result of these new rules, the nearly 1.2 million New York women covered by self-funded employer plans may be forced to seek state-funded access (a cost that would be borne by the state), seek services at a Title X provider such as PHS, or forego contraceptive care altogether.

The women's preventive services requirement of the ACA was designed to promote preventive health care, reduce future medical costs, and improve the health, equality, and economic security of women and families.[2] Nationwide, more than 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, screening for sexually transmitted diseases, and contraception and contraceptive counseling.[3] By allowing virtually any employer or university to claim this religious exemption and deprive women of contraceptive coverage, this IFR will harm the health and well-being of women, their partners, and their families. Furthermore, the IFR is predicated upon an inaccurate picture of the of the federal programs that compose the family planning safety net, the Title X family planning program and Medicaid. **For these reasons, Public Health Solutions calls on the Departments to rescind the IFR and restore equal access to contraceptive coverage regardless of employer.**

## CONTRACEPTION IS CRITICAL TO HEALTH

Women face a unique set of health care challenges because they access more health services than men, yet earn less on average than men.[4] As a result, women face a high level of health care insecurity, which in turn leads many women to forgo necessary care due to prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services because they could not afford it.[5] Women were spending between 30% and 44% of their total out-of-pocket health costs on contraception alone.[6] As a result of the ACA and its contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on oral contraceptives in 2013 alone.[7]

The goal of preventive health care is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of contraception is to prevent unintended pregnancy, control the timing of a desired pregnancy and spacing between pregnancies, in accordance

---

2 This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

3 National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. *Available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf

4 U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

5 Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

6 Ibid.

7 Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

00373563

Exhibit 91

JA-0001335

with patient choice and to improve maternal, child, and family health.[8] In addition, contraception is particularly critical for women with underlying physical and psychological conditions, some of which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[9]

Unintended pregnancies have higher rates of long-term health complications for women and their infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[10] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and experiencing physical violence during pregnancy.[11]

Unintended pregnancy rates are higher in the US than in most other developed countries, with approximately 45% of pregnancies unintended.[12] In addition, the US has the highest rate of maternal mortality in the developed world.[13] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[14] Contraception is considered a major factor in reducing rates of maternal morbidity and mortality.

Beyond the well-established evidence that contraception is effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[15] Non-contraceptive health benefits also include treatment for non-gynecologic conditions. [16,17]

The patient, in consultation with a trusted health care provider, should determine the right contraceptive method for her unique health care needs without interference from politicians. The IFR interferes with the patient-provider relationship, and conversations about if and when to become pregnant as well as which contraceptive method to use to avoid pregnancy.

---

8 Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

9 *Id.* at 103–104.

10 Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes. a meta-analysis. JAMA 2006;295:1809–23.

11 Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews.* 2010;32(1):152–174. doi:10.1093/epirev.mxq012.

12 Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008-2011, *New England Journal of Medicine*, 2016, 374(9):843–852,

13 Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

14 Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397–404.

15 Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41–7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

16 Schindler AE. supra.

17 Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk, A Systematic Review and Meta-analysis Obstet Gynecol. 2017

3

00373564

Exhibit 91                    JA1148                    JA-0001336

## OTHER GOVERNMENT PROGRAMS CANNOT MEET THE NEED FOR CONTRACEPTIVE COVERAGE

The Department of Health and Human Services (HHS) asserts that existing government-sponsored programs, such as Medicaid and the Title X family planning program, can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost-sharing under their employer-sponsored or student health plans.[18] As discussed below, this assertion fails to recognize that: 1) programs such as Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals; 2) those programs do not have the capacity to meet the needs of current enrollees and those seeking care at Title X-funded health centers; and, 3) legislative and administrative proposals threaten the capacity and goals of these programs. Moreover, the claim that state coverage requirements are an alternative misconstrues the scope and protections provided by these requirements, which, as discussed earlier, cannot fill in the gaps of coverage for many individuals who will lose contraceptive coverage.

### Medicaid and Title X are not designed to meet the needs of individuals who lose access to contraceptive coverage under their employer-sponsored or student health plans.

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[19] While Title X-funded health centers, such as those administered by PHS, provide care to all patients, federal law requires them to give priority to "persons from low-income families."[20] Low-income individuals receive services at low or no cost depending on their family income.[21] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[22]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible

---

18 Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

19 *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

20 42 CFR § 59.5 (a)(6-9).

21 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

22 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

4

00373565

Exhibit 91

for this coverage.[23] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[24] In many of these states, childless adults remain ineligible for the program.[25] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

**Medicaid and Title X do not have capacity to meet the increased need.**

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people. Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. Despite this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[26] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning and sexual health providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care plans had provider shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[27]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage caused by employer exemptions and would have to provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would from the IFR. Since 2010, the reported annual number of clients served at Title X-funded health centers has dropped from approximately 5.2 million patients to just over 4 million.[28] This decline corresponds

---

23 The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last updated Nov. 8, 2017).

24 Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

25 Ibid.

26 U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

27 U.S. Department of Health and Human Services, supra at note 7.

28 See Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

00373566

Exhibit 91

JA-0001338

with over $30 million in cuts to Title X's annual appropriated amount over the same period.[29] A recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X-funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[30] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Thus, as a Title X Grantee, Public Health Solutions is unconvinced that Medicaid and Title X are plausible alternatives for the individuals affected by this IFR.

**Political assault on Medicaid, Title X, and Planned Parenthood health centers have already compounded the threat to women's access to contraceptive care.**

Medicaid is a vital source of coverage for family planning and sexual health care in the United States, but political threats to the program may undermine its ability to provide the coverage that meets the needs of individuals and families. In 2010, Medicaid covered nearly 45% of all births in the US, and in many states Medicaid covers well over half of births.[31] Medicaid is also the single largest source of public funding for family planning services and supplies.[32]

Within the last year, policymakers have sought to radically alter the financial structure of Medicaid. The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars from the program over the next ten years.[33] The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per-capita cap, and permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve.[34]

---

29 U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history-index.html (last visited Nov 3, 2017).

30 August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

31 Kathy Gifford et al., The Henry J. Kaiser Family Found., Medicaid Coverage of Pregnancy and Perinatal Benefits: Results from a State Survey, (2017), http://kff.org/womens-health-policy/report/medicaid-coverage-of-pregnancy-and-perinatal-benefits-results-from-a-state-survey/; *Births Financed by Medicaid*, The Henry J. Kaiser Family Found., http://kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22%22Location%22,%22sort%22%22asc%22%7D (last visited Nov. 6, 2017).

32 In 2010, Medicaid accounted for 75 percent of all public funds spent on contraceptive services and supplies. Kinsey Hasstedt et al., Guttmacher Institute, Public Funding for Family Planning and Abortion Services, FY 1980-2015 (2017), https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.

33 Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf.

34 Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-

00373567

Exhibit 91     JA1151     JA-0001339

The administration has also made moves that could radically alter the Medicaid program. Earlier this year, then-Secretary Tom Price and CMS Administrator Seema Verma issued a letter to governors announcing HHS' intent to use existing Section 1115 waiver authority to approve changes to state Medicaid programs that could undermine the ability of individuals qualified to enroll in Medicaid—particularly non-disabled, working-age adults—to receive the coverage and health care they need.[35]

In addition to these legislative and administrative efforts to alter the Medicaid program, Congress and the administration have threatened access to trusted family planning and sexual health providers by attempting to block Planned Parenthood from participating in Medicaid despite the dominant role Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57% of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[36]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks. Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program. In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018.[37] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[38] For instance, the president's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[39] [40]

---

cassidy-bill#.Wft9mmhSzIv.

35 Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

36 Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

37 Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

38 The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018.

39 Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, Guttmacher Policy Review, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

40 White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

7

00373568

Exhibit 91                     JA1152                     JA-0001340

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ+ individuals, communities of color, and young people.

## JUSTIFICATIONS FOR THE IFR DO NOT MEET BASIC SCIENTIFIC STANDARDS

As the nation's health policy center, HHS must adopt policies and activities firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and the Women's Preventive Services Initiative (WPSI), instead prioritizing religious objections over evidence-based medical recommendations. The Departments make several false and misleading statements in the IFR to undermine the contraceptive coverage benefit. [ORGANIZTION] fundamentally disagrees with the Departments' decision to promulgate this IFR based on the religious beliefs of individuals and entities rather than science and medicine.

### Contraception does not interfere with an existing pregnancy.

The IFR takes issue with the IOM-recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices...that many persons and organizations believe are abortifacient—that is, as causing early abortion."[41] FDA-approved contraceptive methods do not function as abortifacients. Every FDA-approved contraceptive method acts before implantation, does not interfere with an existing pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[42]

### Contraception is medication and carries risks like any medication.

The IFR raises concerns about the "negative health effects" of contraception.[43] As with any medication, some contraceptive methods may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[44,45] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[46] The IFR also suggests contraception increases the risk of breast cancer, but there is no scientifically-proven increased risk of breast cancer among contraceptive users, particularly those under 40.[47]

---

41 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

42 Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13–354). Available at:
acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?

43 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

44 Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

45 Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

46 Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239-42.

47 Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1-66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

8

00373569

Exhibit 91          JA1153          JA-0001341

**Contraception makes sex among adolescents healthier, not more likely to happen.**

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[48] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[49,50] In fact, research has shown that school-based health centers that provide access to contraception are proven to increase use of contraception by already sexually active students, not to increase onset of sexual activity.[51,52] On the other hand, young women who did not use contraception at first sexual intercourse were twice as likely to become teen mothers.[53] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[54]

**The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.**

**THE IFR UNDERMINES CONGRESSIONAL INTENT**

The Departments ignore Congress' clear intent that contraception be covered as a preventive service under the ACA. When Congress passed the Women's Health Amendment, it meant to "ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recognize[ing] that women have unique health care needs and burdens."[55] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[56] In enacting the amendment, Congress recognized that the failure to

---

48 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

49 Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

50 Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

51 Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338–344.

52 Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1).114–26.

53 Ibid.

54 Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577–583. DOI: 10.1016/j.jadohealth.2016.06.024.

55 Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8727 (Feb. 15, 2012).

56 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

9

00373570

Exhibit 91                    JA1154                    JA-0001342

cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage...* In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.[57]*

In considering the amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, New York State Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[58] Additional statements from Senators Boxer, Feinstein, Nelson, and Durbin prove that the intent to cover contraception was clear.[59]

To meet the amendment's objectives, HHS commissioned the Institute of Medicine (IOM) to convene a diverse committee of experts in disease prevention, women's health and adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for HHS to consider in order to fill those gaps.[60] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[61] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM report.[62] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These, too, were adopted by HRSA.

HHS, through the adoption of the IOM's recommendations and the subsequent adoption of the WPSI recommendations, carried out Congress' intent. **The Departments should rescind the IFR to continue reflecting that intent.**

---

57 *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).
58 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).
59 *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").
60 Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
61 *Id.* at 109-10.
62 *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

10

00373571

Exhibit 91                          JA1155                          JA-0001343

***

Public Health Solutions appreciates the opportunity to provide comment on the religious exemptions and accommodations for coverage of certain preventive services interim final rule. This IFR will cause people to lose contraceptive coverage and harm their health and well-being. It ignores congressional intent that contraception be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting contraceptive access. **For all of these reasons, Public Health Solutions calls on the Departments to rescind the IFR.**

If you require additional information about the issues raised in this letter, please contact Marla Tepper, General Counsel and Vice President for Legal Affairs at mtepper@healthsolutions.org (646.619.6495).

Sincerely,

Lisa David
President & CEO

Marla Tepper
Vice President/General Counsel

11

00373572

Exhibit 91



December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9940-IFC

*Submitted electronically at www.regulations.gov*

**Subject: Interim Final Rule on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act** [CMS-9940-IFC]

Raising Women's Voices for the Health Care We Need is a national initiative with 30 regional coordinator organizations in 29 states working to ensure that the health care needs of women and our families are addressed in federal and state health policies. We have a special mission of engaging women who are not often invited into health policy discussions: women of color, low-income women, immigrant women, young women, women with disabilities, and members of the LGBTQ community. We place a priority on asking women to share their experiences navigating the health care system.

We unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's ("the Departments") efforts to undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

1

00373590

Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons, Raising Women's Voices calls on the Departments to rescind the IFR.

## I.  Birth Control Is Critical to Women's Health

Women face a unique set of health care challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing

---

[3] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.
[4] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.
[5] *Id.*
[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342–43 (2000); 1342–43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNS/eQ.
[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

2

00373591

Exhibit 92  JA1158

of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

---

[11] *Id.* at 103-104.

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295;1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9);843–852.

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7. and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id.*

[20] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017

3

00373592

Exhibit 92  JA1159  JA-0001347

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in law, medicine, and other professions.[24] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.     The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

---

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[23] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).
[24] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.harvard.edu/handle/1 /2624453.
[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

4

00373593

Exhibit 92                    JA1160                    JA-0001348

## A. Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[26] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[29] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[30] That contraception would be covered was clear.[31]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based

---

[26] *Id.* at 8,727.
[27] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").
[28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).
[29] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).
[30] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").
[31] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

00373594

Exhibit 92

JA-0001349

guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[32] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[33] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[34] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

## B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exemptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[35] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[36] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans

---

[32] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[33] *Id.* at 109-10.

[34] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

[35] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[36] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

6

00373595

Exhibit 92

JA-0001350

lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[37] This exemption is intended as a temporary means for transitioning employers to full compliance.[38] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[39]

### III.     The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[40]  But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[41] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[42]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society.  In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[43]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it

---

[37] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[38] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[39] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[40] *See*, e.g., at 21 https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf
[41] *Id.* at 19.
[42] *Id.* at 24-27
[43] 2 U.S.C. § 18116.

7

Exhibit 92                    JA1163                    JA-0001351

00373596

does not override other significant interests" or "impose unjustified burdens on other[s]."[44] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[45] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[46] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[47] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they

---

[44] E.g., *Cutter v. Wilkinson*, 544 U.S. 709, 722, 726 (2005).

[45] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[46] 5 U.S.C. § 553(b), (c).

[47] 5 U.S.C. § 553(d).

8

00373597

Exhibit 92                                    JA1164                                    JA-0001352

did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[48]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[49] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[50]

For each of these reasons, the rule violates the APA and should be rescinded.

## V. Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. Raising Women's Voices unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[51] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts

---

[48] 5 U.S.C. § 706.
[49] 42 U.S.C. § 18114(1).
[50] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).
[51] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

9

00373598

Exhibit 92　　JA1165　　JA-0001353

before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[52]

### B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[53] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[54, 55] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). The risk of VTE among hormonal contraceptive users, while real, is also low, and much lower than the risk of VTE during pregnancy or in the immediate postpartum period. We believe that women should be informed of risks, but that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs. The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[56]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[57] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[58,59] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[60,61] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[62] More females are using contraception the first time they have sex.[63]

---

[52] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents. Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[53] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[54] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[55] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[56] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[57] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[58] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2009.

[59] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[60] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.

[61] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[62] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[63] *Id.*

10

Exhibit 92

00373599

JA-0001354

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

### VI. The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[64] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

#### A. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[65] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[66] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[67]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[68] Since 2010, the reported annual

---

[64] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[65] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[66] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[67] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"; 42 CFR § 59.5(a)(7), (9).

[68] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

11

00373600

Exhibit 92                                        JA1167                                        JA-0001355

number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[69] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[70] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[71] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[72] This is particularly true with respect to specialty providers, including OB/GYNs.[73] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

---

Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[69] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[70] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[71] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[72] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012), http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014), http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[73] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

00373601

Exhibit 92

JA-0001356

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[74] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[75] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[76]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[77] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[78] The administration has not only signaled its support for these

---

[74] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office. Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis. Nat'l Health Law Program. Top 10 Changes to Medicaid Under the Graham-Cassidy Bill. (Sept. 14, 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill# Wft9mmhSzIV.

[75] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC). https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*. WASH. POST (Nov. 7, 2017). https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[76] Kinsey Hasstedt. Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net. Guttmacher Policy Review. (2017). https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[77] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017). available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[78] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n. https://www.nationalfamilyplanning.org/title-x_budget-appropriations. (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

13

00373602

Exhibit 92                    JA1169                    JA-0001357

efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[79]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[80] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[81] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[82] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[83]

---

[79] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, Guttmacher Policy Review, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[80] Guttmacher Institute, Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[81] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[82] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[83] Claxton G et al., Employer Health Benefits: 2017 Annual Survey, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

14

00373603

Exhibit 92                    JA1170                    JA-0001358

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.


Thank you for your consideration of our comments. If you have any questions regarding these comments, please contact Sarah Christopherson, policy advocacy director for Raising Women's Voices and the National Women's Health Network (schristopherson@nwhn.org).

Sincerely,


Raising Women's Voices for the Health Care We Need

15

00373604

Exhibit 92                    JA1171                              JA-0001359

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9925-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan,

The Reproductive Rights and Justice Practicum at Yale Law School ("RRJP")[1] is a legal clinic working to protect reproductive rights and justice for our clients. The undersigned members of the RRJP unequivocally oppose the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer or university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. Finally, the IFR is predicated upon a distorted picture of the science supporting the safety and efficacy of contraception, as well as the federal programs and state laws that provide some people with access to contraception. For all of these reasons RRJP calls on the Departments to rescind the IFR.

### I.    Birth Control Is Critical to Women's Health

Women face a unique set of health care challenges because they use more health services than men, yet they are paid less on average than men.[3] As a result, women face a high level of health care insecurity, which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-

---

[1] The undersigned members of the RRJP submit these comments in their personal capacities and do not purport to represent the institutional views of Yale Law School.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

1

00207737

Exhibit 94                                     JA1172                                     JA-0001362

third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on birth control alone.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health and the health of their families. Similarly, prevention of unintended pregnancy helps women time and space their pregnancies or prevent pregnancy altogether, and it improves maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth

---

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] *Id.*

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[11] *Id.* at 103-104.

2

Exhibit 94
00207738
JA-0001363

defects, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] The U.S. also has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported by evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[17] Beyond the well-established evidence that contraceptives effectively prevent unintended pregnancy, contraception also has recognized benefits aside from family planning, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease,endometrial and ovarian cancer.[18] Contraception is also prescribed to treat non-gynecologic conditions.[19]

Insurance coverage for contraception is critical to ensuring women access. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services, including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty and equal protection of the law. Studies show that access to contraception has increased women's wages and lifetime earnings.[20] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for

---

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852,

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id.*; Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017.

[20] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

3

Exhibit 94

00207739

women born from the mid-l940s to early 1950s.[21] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[22] which was followed by large increases in women's presence in law, medicine, and other professions.[23] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[24]

A woman and her health care providers, not politicians and bureaucrats, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but it also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care providers and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives; it implies that birth control is not health care at all.

## II.     The IFR Undermines Congress's Express Intent that Birth Control Be Covered as a Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[25] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

---

[21] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[22] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[23] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.

[24] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

[25] Id. at 8,727.

4

00207740

Exhibit 94                                    JA1175                                    JA-0001365

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[26] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that, on average, women paid more in out-of-pocket costs than men for necessary preventive care and that in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act*.[27]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "[w]ith Senator Mikulski's amendment, even more preventive screening will be covered, including for . . . family planning."[28] Senator Franken also said in regards to the Women's Health Amendment, "affordable family planning services must be accessible to all women in our reformed health care system."[29] That contraception would be covered was clear.[30]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[31] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[32] On August 1, 2011, HRSA adopted the

---

[26] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[27] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[28] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[29] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[30] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[31] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[32] *Id.* at 109-10.

5

00207741

Exhibit 94

JA-0001366

recommendations set forth in the IOM Report.[33] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations— carried out Congress' direction.

### B. "Exemptions" in Other Legislation Do Not Justify the Rule

It is undisputed that Congress rejected an exemption to the women's preventive services provision of the type that the IFR now adopts. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the exemptions in *entirely distinct* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent to maximize the number of women who have cost-free contraceptive coverage.[34] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[35] Additionally, although qualifying grandfathered plans do not have to comply with certain requirements of the ACA, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[36] This exemption is intended as a temporary means for transitioning

---

[33] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

[34] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[35] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[36] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).

00207742

Exhibit 94

JA-0001367

employers to full compliance.[37] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[38]

## III.    The IFR Is Unconstitutional

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality. In so doing, it violates the equal protection and due process guarantees furnished by the Constitution and codified in the ACA.

Religious arguments have long been weaponized in attempts to thwart women's equality, just as they have been weaponized to undermine racial equality.[39] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[40] And, as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[41]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and to ensure women equal access to the preventive services that allow them to be full participants in society.  In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need but that does not cover care that women need. As a result, the IFR discriminates against women on the basis of sex in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. The IFR's interference with the right to contraception constitutes a separate violation of women's fundamental constitutional right to liberty, which also finds its roots in the Due Process Clause of the Fifth Amendment. Disparate treatment of women's preventive services additionally violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[42] Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women in ways not authorized under the First Amendment. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the

---

[37] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[38] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[39] *See*, e.g., Brief of the American Civil Liberties Union et al. as Amici Curiae Supporting Respondents at 21-27, Zubik v. Burwell, 578 U.S. __ (2016) (No. 14-1418), https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf.

[40] *Id.* at 19.

[41] *Id.* at 24-27

[42] 2 U.S.C. § 18116.

7

00207743

Exhibit 94                                    JA1178                                    JA-0001368

right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [43] In fact, in *Hobby Lobby*, which was decided under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [44] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments promulgated this rule as an interim final rule effective immediately upon publication. This violated the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in three key ways: (1) the Departments do not have good cause to skip notice and comment rulemaking; (2) issuing this IFR is arbitrary and capricious; and (3) the IFR exceeds the Departments' statutory authority.

The APA requires an agency to follow notice and comment procedures that provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation"[45] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest."[46] The APA further requires that a rule be published 30 days prior to its effective date.[47]  Good cause plainly did not exist here, and the Departments violated the law by promulgating this rule as an IFR effective immediately upon publication.[48]

Further, the Departments' action in issuing this interim final rule is arbitrary and capricious. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's constitutional right to  a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[49]

---

[43] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[44] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id.* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[45] 5 U.S.C. § 553(c).

[46] 5 U.S.C. § 553(b).

[47] 5 U.S.C. § 553(d).

[48] Nick Bagley, *The Trump Administration and Contraceptive Coverage*, TAKE CARE BLOG (Oct. 6, 2017), https://takecareblog.com/blog/the-trump-administration-and-contraception-coverage.

[49] 5 U.S.C. § 706.

8

00207744

Exhibit 94                                        JA1179                                        JA-0001369

Additionally, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[50] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[51]

For each of these reasons, the rule violates the APA and should be rescinded.

## V. Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious and moral beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. RRJP unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individuals' unfounded ideological beliefs.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion."[52] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts

---

[50] 42 U.S.C. § 18114(1).

[51] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[52] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

9

00207745

Exhibit 94    JA1180    JA-0001370

before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[53]

## B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[54] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[55, 56] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[57] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[58]

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[59] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[60,61] In fact, school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[62,63] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[64] Overall,

---

[53] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[54] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[55] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[56] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[57] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[58] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[59] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[60] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[61] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[62] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[63] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[64] *Id.*

10

Exhibit 94

00207746

JA-0001371

increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[65] More females are using contraception the first time they have sex.[66]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

## VI. The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[67] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of those programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws, which cannot fill in the coverage gaps caused by this IFR.

### A. Medicaid and Title X Programs Do Not Meet the Needs of Individuals Who Will Lose Contraceptive Coverage Under the IFR.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[68] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result

---

[65] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[66] *Id.*

[67] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[68] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

11

00207747

from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over \$30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income and is not equipped to address the gaps in coverage that this IFR will create. Unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Privately insured individuals are by definition not eligible for Medicaid, so Medicaid cannot serve as a safety net for those who lose access to contraception as a result of the IFR.

Even absent these eligibility barriers, Medicaid is plagued by provider shortages and lacks capacity to absorb those who lose covereage as a result of this IFR. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

---

[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over \$450 million to adequately address the existing need for publicly funded contraception.

[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of \$8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

12

00207748

Exhibit 94                    JA1183                    JA-0001373

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

## B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients'

---

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[78] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

13

00207749

Exhibit 94

JA-0001374

access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. It is at best perplexing and at worst profoundly disingenuous that the Department would specifically highlight Title X and Medicaid as fail-safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling with No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state

[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[81] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute,

has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments are flatly mistaken that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

### VII. The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit. Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded. As described in detail above, this assumption is incorrect. Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and it will harm their health and well-being. It is discriminatory, violates multiple federal statutes and constitutional provisions, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, as well as of the federal programs supporting and state laws regarding contraception. For all of these reasons RRJP calls on the Departments to rescind the IFR.

Sincerely,

Members of The Reproductive Rights and Justice Practicum at Yale Law School

Miriam Becker-Cohen
Dana Bolger
Rebecca Chan
D'Laney Gielow
Rachel Kogan
Rachel Luban
Laura McCready
Nora Niedzielsky-Eichner
Laura Portuondo
Samantha Schnell
Emma Stone
Faren Tang
Camila Vega

---

Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017,
http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

15

00207751

Exhibit 94     JA1186     JA-0001376

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
Centers for Medicare & Medicaid Services, Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**RE: *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act***

> Department of the Treasury
> Internal Revenue Service
> RIN 1545-BN92
>
> Department of Labor
> Employee Benefits and Security Administration
> RIN 1210-AB83
>
> Department of Health and Human Services
> Centers for Medicare and Medicaid Services
> RIN 0938-AT20

Dear Acting Secretary Hargan:

On behalf of SisterLove, Inc., an Atlanta-based sexual and reproductive justice advocacy organization dedicated to eradicating the impact of HIV, AIDS, and reproductive oppression upon all women and girls of color, including both transgender and cisgender women and girls, and their families, and the undersigned XX organizations and individuals, we write to provide detailed comments below in response to (1) Religious Exemptions and Accommodations for Coverage of Certain Preventive Services, an interim final rule published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47792 et seq., and (2) Moral Exemptions and Accommodations for Coverage of Certain Preventive Services, an interim final rule published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47838 et seq. However, we must also register our strong objection to this process of changing the rule before public input, which creates significant barriers to women's access to reproductive health services, particularly for low income women and women of color.

We at SisterLove face the crushing burden of addressing the many health inequities that disproportionately impact our communities. Georgia has higher rates of newly diagnosed cases of HIV and other STIs than most other states, which disproportionately affect low-income people of color and LGBTQ+ people. Affordable access to quality healthcare is paramount to our mission.

Because of the intersectional nature of our service provision model, we are dedicated to providing services to our communities in a manner that is respectful and upholds the autonomous decision-making power of every individual. Our community-based model allows us to interact with many folks living with and disproportionately affected by HIV and AIDs. Their experiences with barriers

1

00373665

Exhibit 95     JA1187     JA-0001377

to preventative care and treatment inform our position on the Departments' interim final rules that expand the religious and/or moral exemptions and accommodations for coverage of preventive services for people under the Affordable Care Act (ACA).

**We urge the Departments to revoke these interim final rules because they harm millions of people who previously benefitted from cost-free access to preventive services such as counseling for sexual health and reproductive care, contraceptive care, sterilization, IVF and other fertility services, and abortion.**

Many of the populations we serve have limited access to sexual and reproductive healthcare, and the government cannot condone further marginalizing of these populations through expanded exemptions for religiously- or morally-biased employers. Black women are three to four times more likely to die from pregnancy complications than white women, and HIV-related and pregnancy-related complications remain within the 10 leading causes of death for Black women aged 20-54 and 15-34 years, respectively.[1] Women and girls who live in rural areas, almost 4 million of whom are estimated to be women of color, also experience worse maternal and child health outcomes than those in urban areas because there is a shortage of family planning services, OB/GYN care, and HIV and AIDs related care.[2] Furthermore, the rate of unintended pregnancy is highest among young low-income women, who are disproportionately women of color, highlighting the need for reproductive health care that includes education, counseling, and contraception.[3]

Access to contraception is an essential part of shaping women's health and well-being. As of September 2016, there were approximately 61 million U.S. women in their childbearing years (15–44). About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners fail to use a contraceptive method correctly and consistently. The Patient Protection and Affordable Care Act ("ACA") has expanded contraceptive coverage without cost-sharing to millions of women across the nation. Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs covered by the contraceptive coverage provision of the ACA. Following the ACA's implementation, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women. After the implementation of the ACA, studies show that majority of women tended to choose long-term contraceptives methods, such as an IUD or an implant, as the high upfront costs were removed. These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives. Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies. Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities. Continued attempts to dismantle the impact

---

[1] Prather, C, Fuller, TR, Marshall, KJ, Jeffries IV, WL, The Impact of Racism on the Sexual and Reproductive Health of African American Women, J Womens Health. 2016 Jul; 25(7): 664-671
<https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4939479/>.

[2] Bennett, KJ, Lopes Jr., JE, Spencer, K, Van Hecke, S. National Rural Health Association Policy Brief: Rural Women's Health, 2013 <https://www.ruralhealthweb.org/getattachment/Advocate/Policy-Documents/RuralWomensHealth-(1).pdf.aspx>.

[3] Guttmacher Institute, September 2016 Fact Sheet: Unintended Pregnancy in the United States <https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states>.

00373666

Exhibit 95 JA1188 JA-0001378

and benefits associated with the ACA is an inefficient use of the Departments' resources and contrary to the Departments'' mission and purpose.

1. **Beyond entities eligible for a religious exemption under *Hobby Lobby*, corporations should not be granted religious or moral exemptions to the ACA mandate; and those seeking to claim religious exemptions should be required to demonstrate that they are qualified entities via written application to the Departments and meaningful notice to all potential plan holders.**

The Departments cannot eschew their responsibility to care for the American people under the guise of ensuring religious freedom. Requiring an application or other stringent means by which entities must prove they qualify for an exemption to the ACA mandate does not constitute a substantial burden on the exercise of religion under the Religious Freedom Restoration Act of 1994 (hereinafter referred to as "RFRA") or any other constitutionally-granted religious freedoms. Though freedom of religion is a fundamental right--protected by our Constitution and federal law, guaranteeing us all the right to believe (or not), it does not permit the use of religious or moral beliefs as a tool to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [4] In fact, in addressing the RFRA in *Hobby Lobby,* the Supreme Court described that the impact of the accommodation on third parties would be "precisely zero." [5] Prior to the Departments' interim final rules, HHS met this no-harm requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The interim final rules will burden people and their families by failing the constitutional do-no-harm test.

They harm more than half of our country that receives health insurance through their employers,[6] and the many students who use their schools' health insurance plans. The outcome of *Hobby Lobby,* granting closely-held for-profit corporations the ability to interfere with their employees' personal medical decisions, caused enough harm to people's affordable access to contraceptive and preventative reproductive care. Yet the Departments, through these interim final rules, expand upon and increase that harm. The result is that under these interim final rules, almost any corporation, including publicly traded for-profit entities, can claim a religious exemption. Further, any closely held for-profits and non-profits may obtain an exemption for moral objections. Religious, and especially moral exemptions, should not be granted to entities simply because the Departments' claim they cannot spend the time distinguishing between closely-held and publicly traded companies. Such due diligence is not a substantial burden on neither the institutions seeking exemptions nor the Departments.

Additionally, by creating broader exemptions to the ACA mandate these rules cause harm by singling out insurance that is essential for the health and equality of women, gender non-conforming

---

[4] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[5] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[6] Barnett, JC, Berchick, ER, Health Insurance Coverage in the United States: 2016, United States Census Bureau Report Number P60-260 < https://www.census.gov/library/publications/2017/demo/p60-260.html>.

3

00373667

Exhibit 95

JA-0001379

folks, many trans men, and their families. Religious arguments have long been used in attempts to thwart equality for women, racial minorities, and sexual minorities.[7] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[8] Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women, minority populations, and their families, equal access to the preventive services that allow them to be full participants in society.  In interfering with that access, these rules target one population for adverse treatment, resulting in health insurance that covers preventive care that many men need, but not care that most women, and many gender non-conforming and trans people, need.

Finally, these rules cause harm by interfering with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the Departments discriminate against people on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And they violate Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[9]

In an attempt to mitigate the extent of these harms, the Departments assume, based on dicta in the *Hobby Lobby* decision, that "it seems unlikely that . . . corporate giants . . . will often assert RFRA claims."[10] Outside of that bare assumption, the Departments have no way of knowing how many corporations, including "corporate giants," will take advantage of this exemption to avoid covering the cost of preventive reproductive healthcare. This assumption causes concern, considering requests for accommodations from for-profit companies continued to increase after the *Hobby Lobby* decision;[11] and it especially causes concern since the new exemption requires no self-certification process, and no filing of notice or certification to the government regarding the corporation's "sincerely held religious beliefs" or "moral objections." Thus, the exemption is meaningless. Under these rules, a corporation or educational institution can claim a sincerely held religious belief or moral objection in the interest of its bottom line (rather than an actual sincerely held religious or moral belief), and at the expense of its employees or students, and their families, who need preventive reproductive services such as contraception, fertility services, sterilization, and abortion. The Departments must revoke these rules.

**2. In the event the religious and moral exemption is maintained for limited organizations, the Departments must maintain that exempted entities be required to**

---

[7] *See, e.g.,* Brief *Amicus Curiae* of the American Civil Liberties Union, et al., *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), at 21

<https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf>.

[8] *Id.* at 19.

[9] 2 U.S.C. § 18116.

[10] *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2774 (2014).

[11] Durso, LE, Gruberg, S, Taylor, J, Chalhoub, T, Who Seeks Religious Accommodations to Providing Contraceptive Coverage?, Center for American Progress, Aug. 11 2017 < https://www.americanprogress.org/issues/lgbt/news/2017/08/11/437265/seeks-religious-accommodations-providing-contraceptive-coverage/>.

00373668

Exhibit 95                    JA1190                    JA-0001380

**enlist a third-party insurer to accommodate the insured policy holders have access to plans that fully cover preventative contraceptive services.**

Though the Departments leave in place the accommodations process by which entities who do not wish to cover certain contraceptives and other critical preventive care can pass the responsibility on to third party administrators, there is virtually no incentive for entities to seek or otherwise implement an accommodation. Given the voluntary nature of the accommodation process (as written in the interim final rules), this creates troubling consequences for employees or students, and their families, who were benefitting from the ACA's mandate and the previous rules. When contraception costs less (or nothing), adherence increases, and thus people using contraception and their families gain the many associated benefits including, but not limited to: reduced maternal mortality, health benefits of pregnancy spacing for maternal and child health, increased engagement in the work force, economic self-sufficiency for women and minorities, reduction of unintended pregnancy and abortion, reduced risk of gynecologic disorders and bleeding or pain with menstrual periods, and decreased risk of endometrial and ovarian cancer in some populations.[12] Despite the Departments' claim that the health risks associated with certain forms of contraception outweigh the benefits, they dangerously intrude on the doctor/provider-patient relationship. People who need contraceptive and preventive reproductive healthcare should be able to make their own medical choices after consulting with their provider, and without interference from their employer or educational institution.

These interim final rules impermissibly allow employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[13] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties[14]. While the administration has asserted that the Religious Freedom Restoration Act[15] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[16] Instead, the Rule, as issued, impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

---

[12] The American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women, Committee Opinion, 2017 <https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Access-to-Contraception>.

[13] 13 *See* U.S. CONST. amend. I.

[14] *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).

[15] 42 U.S.C. § 2000bb.

[16] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby,* 134 S. Ct. at 2786–87.

5

00373669

Exhibit 95

JA1191

JA-0001381

3. **The Departments have no exact estimate of how the proposed changes will impact the benefits of individuals whose employers currently claim a religious or moral exemption, or may seek to do so in the near or immediate future. This is an incorrect departure from the Departments previous position supporting the expansion of access to preventative services for all Americans, in line with congressional intent when the mandate was formed.**

The Departments contend that the people who lose their contraceptive benefits can seek free or subsidized contraceptives through Medicaid, Title X community health centers, and Temporary Assistance for Needy Families (TANF). The Departments are wrong. Such services are available only to a small section of low-income women. For example, free or subsidized care at a Title X clinic is restricted to people with incomes of less than 250 percent of the federal poverty level.[17] Because the federal poverty guidelines are unrealistically low, low-income folks above that percentage threshold likely cannot afford contraceptive and other preventive reproductive services without mandated employer or institutional coverage. Additionally, there are ongoing attempts from this administration to reduce or restructure funding for Medicaid, Title X grants, and TANF, forcing many family planning clinics to shut down, especially in rural and low-income areas where they are most needed.[18]

We demand that the Departments repeal the interim final rules expanding religious and moral exemptions to the ACA's contraception mandate. The consequences of the rules, which make the mandate virtually meaningless, will be felt hardest by low-income under-employed people—including Black women and other people of color, people living with HIV and AIDS, LGBTQ+ individuals, people facing language barriers, rural families, and low-income families. These rules further push such individuals to the margins, compromising their bodily autonomy to choose if, when, and how to create and raise their families. We cannot afford to be marginalized any further.

Sincerely,

Sequoia Ayala, Esq.
Policy and Advocacy Program Manager
SisterLove, Inc.

Carly Calhoun, Esq.
Policy Counsel
SisterLove, Inc.

Damaris Henderson, SisterLove, Inc.
Kwajelyn Jackson, Feminist Women's Health Center
Katie Mae Stewart, Feminist Women's Health Center

---

[17] NARAL Pro-Choice America, Title X Family-Planning Services: Fast Facts
<https://www.prochoiceamerica.org/wp-content/uploads/2017/01/2.-Title-X-Family-Planning-Services-Fast-Facts.pdf>.

[18] See e.g., Mohney, G., How Title X change could affect family planning in US, April 13, 2017
<http://abcnews.go.com/Health/title-change-affect-family-planning-us/story?id=46773631>; Boguhn, A., Medicaid Block Grants Could Do 'Irreparable Damage' to Safety Net of Family Planning Providers, March 3, 2017
<https://rewire.news/article/2017/03/03/medicaid-block-grants-could-do-irreparable-damage-to-safety-net-of-family-planning-providers/>.

6

00373670

Exhibit 95                                              JA1192                                              JA-0001382

Roula AbiSamra, National Asian Pacific American Women's Forum - Atlanta chapter
Jaclyn Dean, National Asian Pacific American Women's Forum (NAPAWF)
Nse Ufot, New Georgia Project Action Fund
Margaret D Bordeaux
Irvienne Goldson

7

00373671

Exhibit 95

JA1193

JA-0001383



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
HEALTH CARE BUREAU

\

December 5, 2017

**Via Federal eRulemaking Portal**
Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G
Washington, DC 20201

Re:   Comments on Interim Final Rules: Religious Exemptions and Accommodations
      for Coverage of Certain Preventive Services under the Affordable Care Act, and
      Moral Exemptions and Accommodations for Coverage of Certain Preventive
      Services under the Affordable Care Act
      **45 C.F.R §§ 147.130-147.133**

Dear Acting Secretary Hargan:

The undersigned State Attorneys General submit these comments in response to the
Departments of Health and Human Services, Labor, and Treasury's (the "Departments")
issuance of the proposed interim final rules ("IFRs"): the Religious Exemptions and
Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
(filed Oct. 6, 2017), and Moral Exemptions and Accommodations for Coverage of Certain
Preventive Services under the Affordable Care Act (filed Oct. 6, 2017). By creating broad new
exemptions from the Affordable Care Act's contraceptive mandate, thereby allowing employers
to deprive women of contraceptive health coverage, the IFRs will harm women and children, and
the public health in general, and result in significant financial and administrative burdens to the
States. As discussed more fully below, the IFRs violate the Administrative Procedure Act, the
equal protection guarantee of the Fifth Amendment, and the Establishment Clause of the First
Amendment, and as such, the undersigned Attorneys General urge that the IFRs be rescinded.[1]

---

[1] State Attorneys General have also filed lawsuits challenging the IFRs. *See* States' Notice Mot. & Mot. Prelim. Inj.,
with Mem. P. & A., § I.A.–E., at 11–27, California v. Eric D. Hargan, No. 4:17-cv-05783-HSG (N.D. Cal. filed
Nov. 9, 2017) (*"CA Br."*) (attached as Exhibit 1); Mem. Law Support Pls.' Mot. Prelim. Inj., § I.A., C.–D., at 18–

00373085

Exhibit 96                    JA1194                    JA-0001384

Eric Hargan, Acting Secretary
December 5, 2017
Page 2 of 9

## I.    Background

Before implementation of the Affordable Care Act ("ACA"), one in seven women with private health insurance, and nearly one-third of women covered by Medicaid, either postponed or went without needed health care because they could not afford it.[2]  With respect to birth control in particular, women were forced to spend between 30 percent and 44 percent of their total out-of-pocket health costs.[3]  These out-of-pocket costs prevented many women, not solely those with lower incomes, from accessing preventive services, including contraception.[4]

During this period before the ACA's passage, an estimated 49 percent of all pregnancies in the United States were unintended, and 42 percent of those unintended pregnancies ended in abortion.[5]  Unintended pregnancies are associated with increases in maternal and child morbidity, including increased odds of preterm birth, low birth weight, and the potentially life-long negative health effects of premature birth.[6]  Significantly, the risk of unintended pregnancy is greatest for the most vulnerable women: young, low-income, minority women, without high school or college education.[7]

Within this public health landscape, Congress passed the "Women's Health Amendment" ("WHA") to expand women's access to preventive health services through health plan coverage and no cost-sharing responsibilities.[8]  The Department of Health and Human Services ("HHS") commissioned the Institute of Medicine ("IOM") to issue recommendations identifying the

---

22, 32–38, Pennsylvania v. Donald J. Trump, No. 2:17-cv-04540-WB (E.D. Pa. filed Oct. 11, 2017) ("*PA Br.*") (attached as Exhibit 2); Complt. Declaratory & Injunctive Relief, Massachusetts v. U.S. Dept. of Health & Human Servs., No. 17-cv-11930-NMG (D. Mass. filed Oct. 6, 2017); Complt. Declaratory & Injunctive Relief, Washington v. Trump, No. 2:17-cv-01510-RBL (W.D. Wa. filed Oct. 9, 2017).  State Attorneys General have also submitted amicus briefs in support of plaintiffs in two lawsuits.  *See, e.g.,* Br. for Mass. & Cal. et al. as Amici Curiae in Support of Pls.' Mot. Prelim. Inj., § II, at 18–30, Pennsylvania v. Donald J. Trump, No. 2:17-cv-04540-WB (E.D. Pa. filed Oct. 11, 2017) ("*Amici Br.*") (attached as Exhibit 3).

[2] Usha Ranji & Alina Salganicoff, *Women's Health Care Chartbook: Key Findings from the Kaiser Women's Health Survey*, HENRY J. KAISER FAMILY FOUND.1, 4 (2011),
http://www.kaiserfamilyfoundation.files.wordpress.com/2013/01/8164.pdf.

[3] Laurie Sobel et al., *The Future of Contraceptive Coverage*, HENRY J. KAISER FAMILY FOUND. 1, 4 (2017),
http://www.files.kff.org/attachment/Issue-Brief-The-Future-of-Contraceptive-Coverage.

[4] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* COMM. ON PREVENTIVE SERVS. FOR WOMEN & BD. ON POPULATION HEALTH & PUB. HEALTH PRACTICE, INST. OF MED. OF THE NAT'L ACADS., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 19 (Nat'l Acad. Press, 2011), *available at* https://www.nap.edu/read/13181/chapter/1 ("IOM Report").  Another study of approximately 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography.  Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000), *available at* http://www.pubmedcentralcanada.ca/pmcc/articles/PMC1089084/pdf/hsresearch00023-0075.pdf; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing*, NAT'L HEALTH LAW PROGRAM 2-3 (2014), http://www.healthlaw.org/component/jsfsubmit/showAttachment?tmpl=raw&id=00Pd000000ANrCpEAL.

[5] IOM Report at 102.

[6] *Id.* at 103.

[7] *Id.*

[8] *See* S. Amdt. 2791, 111th Congress (2009-2010); Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq. (2010); Public Health Service Act (as amended by ACA) § 2713, 42 U.S.C. §300gg-13(a)(4).

00373086

Exhibit 96                                      JA1195                                    JA-0001385

Eric Hargan, Acting Secretary
December 5, 2017
Page 3 of 9

specific preventive women's health services that should be covered under the ACA. In 2011, the IOM recommended, and the Health Resources and Services Administration ("HRSA") adopted, a list that includes all FDA-approved contraceptives, sterilization procedures, and reproductive education and counseling.[9] In 2016, the Women's Preventive Services Initiative,[10] led by the American Congress of Obstetricians and Gynecologists ("ACOG"), updated the preventive services guidelines and continued to include coverage of all FDA-approved contraceptive methods, reiterating their importance to women.

The IOM, ACOG, and other experts based their decisions to include coverage of contraception on the considerable evidence that the use of contraception has contributed to lower unintended pregnancy and abortion rates in the United States.[11] With the decrease in unintended pregnancies, there has been a corresponding decrease in the risk of maternal mortality, adverse child outcomes, behavior problems in children, and negative psychological outcomes associated with unintended pregnancies for both mothers and children.[12] Contraceptive use contributes to longer spacing between pregnancies, which decreases the risk of adverse health outcomes for pregnancies that are too closely spaced, and is especially critical for the health of women with certain medical conditions.[13]

Significantly, access to contraceptive coverage has given women the option to delay childbearing and pursue additional education, spend additional time in their careers, and increase earning power over the long-term. One-third of the wage gains women have made since the 1960s have been attributed to access to oral contraceptives.[14] Access to birth control has helped narrow the wage gap between women and men. The decrease in the wage gap among 25 to 49-year-olds between men's and women's annual incomes would have been 10 percent smaller in the 1980s and 30 percent smaller in the 1990s in the absence of widespread legal birth control access for women.[15]

---

[9] *Women's Preventive Services Guidelines: Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being*, HEALTH RESOURCES & SERVS. ADMIN., http://www.hrsa.gov/womens-guidelines/index.html (last reviewed Oct. 2017).

[10] The Women's Preventive Services Initiative also included the American Academy of Family Physicians, the American College of Physicians, and the National Association of Nurse Practitioners in Women's Health.

[11] IOM Report at 104–05.

[12] *See* IOM Report 103–04.

[13] IOM Report at 103–04. There are additional benefits of contraceptive use for treating medical conditions, including menstrual disorders and pelvic pain, and long-term use of oral contraceptives has been shown to reduce women's risk of endometrial cancer, pelvic inflammatory disease, and some benign breast diseases. *Id.* at 107.

[14] *Birth Control Has Expanded Opportunity for Women–in Economic Advancement, Educational Attainment, and Health Outcomes*, PLANNED PARENTHOOD 1,1 (June 2015), http://www.plannedparenthood.org/files/1614/3275/8659/BC_factsheet_may2015_updated_1.pdf.

[15] *See* Martha J. Bailey et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages* 27 (Nat'l Bureau of Econ. Research, Working Paper No. 17322, 2012), http://www-personal.umich.edu/~baileymj/Opt_In_Revolution.pdf.

00373087

Exhibit 96    JA1196    JA-0001386

Eric Hargan, Acting Secretary
December 5, 2017
Page 4 of 9

Since the ACA's requirement that health plans cover contraception benefits and services, women with employer-sponsored coverage have had increased access to contraception,[16] and have saved $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[17] The share of women of reproductive age who had out-of-pocket spending on oral contraceptive pills fell sharply after the ACA's implementation; spending on oral contraceptive pills plummeted from 20.9 percent in 2012 to 3.6 percent in 2014, corresponding to the timing of the contraception provision.[18] Also during this time, the proportion of privately insured women who paid no out-of-pocket costs for oral contraception increased from 15 percent to 67 percent, with similar changes for injectable contraceptives, the vaginal ring and the intrauterine device.[19] To date, over 62.4 million women have benefited from ACA-mandated contraceptive coverage.[20]

Several of the undersigned States, in recognition that no-cost contraception is critical to women's health and autonomy, have enacted statutory schemes to require no-cost coverage for state-regulated plans.[21] However, the federal Employee Retirement Income Security Act of 1974 ("ERISA") preempts States from imposing coverage requirements on self-funded plans offered by employers.[22] Such plans cover about 58 percent of workers with employer-sponsored insurance.[23] The IFRs threaten this access by allowing virtually any employer with a self-insured plan to opt-out of the contraceptive-coverage requirement based on the employer's own religious or moral beliefs without offering any explanation or requiring any certification process

---

[16] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014), *available at* http://www.contraceptionjournal.org/article/S0010-7824(14)00687-8/pdf.

[17] *Reproductive Rights & Health: The Affordable Care Act's Birth Control Benefit Is Working for Women*, NAT'L WOMEN'S LAW CTR. (Dec. 2016), http://www.nwlc.org/wp-content/uploads/2016/06/The-ACAs-Birth-Control-Benefit-1.pdf.

[18] Laurie Sobel et al., *Private Insurance Coverage of Contraception*, HENRY J. KAISER FAMILY FOUND. (2016), http://www.files.kff.org/attachment/issue-brief-private-insurance-coverage-of-contraception.

[19] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTIVE 44, 45 (2015), *available at* http://www.contraceptionjournal.org/article/S0010-7824(14)00687-8/pdf.

[20] *Reproductive Rights & Health: New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs*, NAT'L WOMEN'S LAW CTR. 1, 2 (2017), http://www.nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[21] An overview of State laws and regulations is provided by Guttmacher Institute. *Insurance Coverage of Contraceptives*, GUTTMACHER INST., http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives (last updated Dec. 1, 2017). *See also* Cal. Ins. Code § 10123.196; Conn. Gen. Stat. § 38A-503e; Haw. Rev. Stat. § 432:1-604.5; 215 Ill. Comp. Stat. 5/356Z.4; Iowa Code § 514C.19; Me. Rev. Stat. tit. 24, § 2332-J, amended by Public Law, Chapter 190 (June 13, 2017); Md. Code, Ins. §§ 15-826, 15-826.1; Mass. Gen. Laws. ch. 175, § 47W, amended by Chapter 120 of the Acts of 2017; N.M. Stat. Ann. §§ 59A-22-42; 59A-46-44; N.Y. Ins. Law §§ 3216, 3221, and 4303; N.C. Gen. Stat. § 58-3-178; Or. Rev. Stat. § 743A.066; R.I. Gen. Laws §§ 27-19-48, 27-18-57, 27-20-43; Vt. Stat. tit. 8, § 4099c; Wash. Admin. Code § 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. State laws routinely include exemptions from mandatory coverage for prescription contraceptives for religious employers. *See, e.g.*, Conn. Gen. Stat. § 38A-503e; Mass. Gen. Laws. ch. 175, § 47W, amended by Chapter 120 of the Acts of 2017; N.Y. Insur. L. § 4303(cc).

[22] 29 U.S.C. § 1144(b).

[23] *Medical Expenditure Panel Survey: Percent of Private-Sector Enrollees That Are Enrolled in Self-Insured Plans at Establishments That Offer Health Insurance by Firm Size and State: United States, 2016*, U.S. DEPT. OF HEALTH & HUMAN SERVS., http://www.meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiib2b1.pdf (last visited Dec. 4, 2017) ("ARHQ Database").

00373088

Eric Hargan, Acting Secretary
December 5, 2017
Page 5 of 9

by regulators charged with enforcing the ACA's requirements. Moreover, some of the undersigned States do not have state laws requiring no-cost contraception coverage for state-regulated plans, and as such, the threatened harm of the IFRs extends to *all* employee insurance plans.

## II. The IFRs violate the Administrative Procedure Act

### (A) *The IFRs are contrary to law.*

The IFRs violate numerous requirements of the ACA. First, the IFRs stand in direct conflict with the WHA, which mandates that employers provide health plans that cover women's preventive care with no cost-sharing.[24] While the Religious Freedom Restoration Act (RFRA) requires protection of religious beliefs, the ACA already provides religious exemptions that satisfy RFRA's requirements.[25] The IFRs' vast exemptions go well beyond what is required to avoid a substantial religious burden by permitting a broad range of employers, including publicly-traded companies, to evade compliance with the contraceptive mandate, rather than the narrower class of churches, religious non-profits, and closely held for-profit corporations that the Supreme Court has held are protected by RFRA.[26] The IFRs also excuse these employers from undertaking any steps, however minimal, to ensure that their employees retain access to contraceptive coverage through other means, eviscerating any accommodation requirements.[27] As such, the IFRs allow for noncompliance with a mandatory statute so long as there is *any* religious burden, rather than a *substantial* one. Moreover, RFRA's protection of religious belief does not authorize the IFRs' exemptions for wholly expansive moral beliefs. (*See* further discussion in *CA Br.* § I.A.1.–2., at 11–14; *PA Br.* § I.A.2.i.–ii., at 23–27; *Amici Br.* § II.B.2., at 21–24.)

Second, the IFRs violate the ACA's nondiscrimination provision that prohibits an individual from being "excluded from participation in," "denied the benefits of," or "subjected to discrimination under, any health program or activity" receiving federal funds, to the extent that the grounds for such discrimination are otherwise unlawful under federal law.[28] The IFRs violate this nondiscrimination provision because they selectively authorize denial of coverage for women's preventive care benefits only. Indeed, the Equal Employment Opportunity Commission has previously held that an employer who offers coverage for preventive

---

[24] *See FAQs about Affordable Care Act Implementation Part 36*, EMPLOYEE BENEFITS SEC. ADMIN., U.S. DEPT, OF LABOR, 1, 1 (2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf (explaining the effects of the Women's Health Amendment on insurance coverage of women's preventive care).
[25] *Id.* at 4-5.
[26] *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768–69 (2014).
[27] The IFRs also eliminate the requirement for employers to notify the federal government if they choose to avail themselves of the exemption, thereby allowing for contraceptive coverage to be quietly eliminated without oversight or transparency.
[28] 42 U.S.C. § 18116.

00373089

Exhibit 96                                        JA1198                                        JA-0001388

Eric Hargan, Acting Secretary
December 5, 2017
Page 6 of 9

prescription drugs and services but does not offer coverage for contraception violates Title VII.[29]
(*See* further discussion in *CA Br.* § I.A.3., at 14; *PA Br.* § II.B., at 43–46; *Amici Br.* § II.B.2., at 21–24.)

Third, the ACA prohibits the Secretary of Health and Human Services from "promulgat[ing] any regulation that creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," or "impedes timely access to health care services."[30] The IFRs clearly violate this provision by preventing women from accessing important and often medically necessary contraceptive services. (*See* further discussion in *CA Br.* § I.A.3., at 14; *PA Br.* § I.A.2.iii., at 27–28; *Amici Br.* § I.A.1.–2., at 4–6.)

(B) *The IFRs are arbitrary and capricious.*

The IFRs radically depart from prior policy without adequate or reasonable justification, as required by law. First, the IFRs do not provide sufficient justification for discarding the prior regulations' finding of a compelling government interest in ensuring that women have contraceptive coverage even if their employers object to providing it. Five justices of the Supreme Court have expressly recognized such a compelling interest.[31] The IFRs cite scant evidence to support the assertion that access to contraception has little effect on unintended pregnancies, and indeed, the vast majority of studies have shown precisely the opposite.[32] Moreover, the IFRs ignore the other public health interests served by the contraceptive mandate—including the need for some women to avoid pregnancy, which can be hazardous or life-threatening to them due to a medical condition. (*See* further discussion in *CA Br.* § I.C., at 19–21; *PA Br.* § I.A.2.iii., at 27–28; *Amici Br.* § II.C., at 24–26.)

Second, the IFRs provide inadequate explanation for expanding the universe of employers who are exempt from compliance with the contraceptive mandate from churches, houses of worship, religious non-profits, and closely held for-profit corporations, to *any and all* non-governmental employers and *any and all* private universities. Relatedly, the IFRs fail to justify the creation of the broader religious employer exemption, rather than the narrower eligible organization accommodation, to these employers. The offered explanations for this approach is disagreement with the former Administration; but a disagreement with the previous approach is far from the reasoned and evidence-based explanation required for the evisceration of the relied-upon accommodation requirements, which balanced religious exercise and full and equal health coverage for women. (*See* further discussion in *CA Br.* § I.C., at 19–21; *PA Br.* § I.A.2.iii., at 27–28; *Amici Br.* § II.C., at 24–26.)

Third, the IFRs extend the applicability of the religious and moral exemption to insurance companies, without reasonable explanation for this entirely new expansion. In fact, the IFRs

---

[29] *See* Commission Decision on Coverage of Contraception, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM., 2000 WL 33407187 (Dec. 14, 2000), http://www.eeoc.gov/policy/docs/decision-contraception.html.
[30] 42 U.S.C. § 18114.
[31] *See Hobby Lobby*, 134 S. Ct. at 2785 (Kennedy, J., concurring); *id.* at 2799 (Ginsburg, J., dissenting).
[32] *See, e.g.*, IOM Report at 102–07 (collecting studies on effects of women's access to contraceptives).

00373090

Exhibit 96

Eric Hargan, Acting Secretary
December 5, 2017
Page 7 of 9

acknowledge that the Departments are not aware of any insurance company with such an objection—it is undoubtedly arbitrary to promulgate a rule with no intended use.

### III.    The IFRs Violate the Equal Protection Guarantee of the Fifth Amendment

Although the ACA requires coverage for many different types of preventive services, the IFRs single out only women's health benefits and services. The President's Executive Order directed the Departments to consider allowing additional "conscience-based objections" to services mandated by the WHA specifically.[33] The IFRs create vast exemptions for contraceptive coverage only, clearly targeting women's preventive services, while leaving preventive service coverage for male employees untouched. The IFRs include a gender-based classification[34] and are thus subject to heightened scrutiny.

The government interest motivating both IFRs is articulated as providing protections for "sincerely held ['religious beliefs' or 'moral convictions'] in certain health care contexts."[35] Even if an unbounded moral conviction is found to be a compelling interest, this gender-based classification does not have an "exceedingly persuasive justification" and is not "substantially related to the achievement of those objectives."[36] The IFRs fail any "means" test as the staggering breadth of the exemptions—to virtually *any* employer for virtually *any* religious or moral objection—lacks any tailoring whatsoever, and flies in the face of any reasonable interpretation of the "substantial relationship" standard. (*See* further discussion in *CA Br.* § I.E., at 25–28; *PA Br.* § I.C., at 32–34; *Amici Br.* § II.D.2., at 29–30.)

### IV.    The IFRs Violate the Establishment Clause

The IFRs violate the Establishment Clause because their purpose and effect is clearly the advancement of religious beliefs.[37] The Rules do not even bother to feign a non-religious purpose. The IFRs also violate the Establishment Clause because they allow employers to obtain religious exemptions in a manner that substantially burdens female employees who may not share the employers' faith.[38] The burdens here imposed go well beyond any justified by religious exercise—they result in the potentially dramatic loss of contraceptive coverage for millions of women, with no alternative structure to obtain care. The Supreme Court relied

---

[33] Exec. Order No. 13798, 82 Fed. Reg. 21,675 (May 4, 2017), http://www.gpo.gov/fdsys/pkg/FR-2017-05-09/pdf/2017-09574.pdf.

[34] The IFRs are also overtly discriminatory because they single out women's health care services, including benefits that are only used by women. Aside from the reference to only women's services, the IFRs are infused with overt references to purported "sensitive" areas of health, which all concern women's reproductive health and rely on overly-broad generalizations of women's health care. *See* 82 Fed. Reg. 47,838 (2017); 82 Fed. Reg. 47,813 (2017). The IFRs are also covertly discriminatory because they have a direct impact on women only. Women alone will be forced to struggle to pay for contraception themselves, forgo contraceptives, or to try to seek out services from some entity other than their employer.

[35] 82 Fed. Reg. 47,845 (2017); 82 Fed. Reg. 47,800 (2017).

[36] *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017).

[37] *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

[38] *See* 42 U.S.C. § 2000bb–1(a) (the "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability").

00373091

Exhibit 96                                    JA1200                                    JA-0001390

Eric Hargan, Acting Secretary
December 5, 2017
Page 8 of 9

heavily on the notification and accommodation mechanisms previously in place as necessary protections of women's ability to access contraception.[39] Without such accommodation, notice, and justification requirements, the burdens on women have grown dramatically, resulting in a clear violation of the Establishment Clause. (*See* further discussion in *CA Br.* § I.D., at 21–24; *PA Br.* § I.D., at 34–38; *Amici Br.* § II. D.1., at 27–28.)

## V.    Conclusion

The IFRs at issue will result in harms that are both direct and indirect, tangible and intangible. Access to contraception is fundamental to women's rights to bodily freedom and to emotional autonomy. It is a public health issue, with effects on unintended pregnancy, maternal health, and infant morbidity. It also implicates economic mobility and wage parity, educational opportunity and social equality. These far-reaching effects are too great to ignore, and are protected by the Constitution, our laws and regulations. Accordingly, we urge the Secretary to rescind the IFRs.

Respectfully submitted,
ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: */s/ Sara Haviva Mark*
SARA HAVIVA MARK
Special Counsel, Social Justice Division
LISA LANDAU
Chief, Health Care Bureau
SIKA YEBOAH-SAMPONG
Social Justice Fellow
New York State Office of the Attorney General
120 Broadway
New York, New York 10271-0332
(212) 416-8460

---

[39] In *Hobby Lobby*, for example, the Court explained that the accommodation sought by closely held for-profit corporations would not violate the Establishment Clause because it has "precisely zero" effect on the women employed by Hobby Lobby. The Court noted that "these women would still be entitled to all FDA-approved contraceptives without cost sharing." 134 S. Ct. at 2760. In his concurrence, Justice Kennedy underscored that an accommodation of religious exercise must not "unduly restrict other persons, such as employees, in protecting their own interests." *Id.* at 2786–87 (Kennedy, J., concurring). Similarly, the Court in *Wheaton College v. Burwell* expressly noted that its order allowing employers to notify the government rather than their insurer about a religious objection would not "affect[] the ability of [Wheaton's] employees and students to obtain, without cost, the full range of FDA approved contraceptives." 134 S. Ct. 2806, 2807 (2014).

00373092

Exhibit 96                    JA1201                    JA-0001391

Eric Hargan, Acting Secretary
December 5, 2017
Page 9 of 9

XAVIER BECERRA
Attorney General of California
1300 I Street
Sacramento, CA 95814

MATTHEW P. DENN
Attorney General of Delaware
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
Attorney General of the District of Columbia
One Judiciary Square
441 4th Street, N.W.
Washington, DC 20001

DOUGLAS S. CHIN
Attorney General of Hawaii
425 Queen Street
Honolulu, HI 96813

LISA MADIGAN
Attorney General of Illinois
100 West Randolph Street
Chicago, IL 60601

JANET T. MILLS
Attorney General of Maine
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202

MAURA HEALEY
Attorney General of Massachusetts
One Ashburton Place
Boston, MA 02108

LORI SWANSON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

PETER F. KILMARTIN
Attorney General of Rhode Island
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
109 State Street
Montpelier, VT 05609

MARK R. HERRING
Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219

ROBERT W. FERGUSON
Attorney General of Washington
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504

00373093

Exhibit 96     JA1202     JA-0001392



November 30, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue SW., Washington, DC 20201

RE:
Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the
Affordable Care Act. Federal Register Number: 2017-21851
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the
Affordable Care Act. Federal Register Number: 2017-21852

As members of the Texas House Women's Health Caucus, we have committed ourselves to supporting
and implementing policies and programs that will help to improve the health of Texas women and their
families. As such, we write to express strong concern with the two interim final rules (IFRs) published
on October 13, 2017 that roll back the Affordable Care Act's (ACA) contraceptive coverage, which has
ensured access to contraceptive coverage for millions of women across Texas.

The ACA was the first federal law to have contraceptive coverage requirements for most health plans
regulated by the federal government, including employer-sponsored plans. Before the implementation of
the ACA, insurers and employers could decide whether to offer contraceptive coverage, unless state law
required contraceptive coverage. Texas does not require coverage of contraception in all private health
insurance plans. Further, Texas state law allows insurers associated with religious organizations to
refuse to offer contraceptive coverage.[1] The ACA contraceptive coverage mandate applied to most
employers, but, compromises were made to accommodate religious-affiliated employers and schools by
allowing an option to refuse to cover birth control on religious or moral grounds, while ensuring their
employees would still have health coverage provided directly by the health insurance company. Even
with the exceptions, over 55 million women nationwide gained contraceptive coverage under the
guarantee.[2]

The two IFRs published on October 13 would roll back the ACA contraceptive coverage mandate, thus
allowing virtually any employer, school, or other entity to opt out of providing contraceptive coverage
for religious or moral reasons. The rules would also eliminate the guarantee that women will continue to
receive coverage for birth control, regardless of their employer's beliefs, by making the accommodation
voluntary. These rules put at risk the contraceptive coverage that millions of women rely on. Over four

---

[1] Texas Insurance Code Sec. 1369.101-1369.109; Texas Insurance Code Chapter 1507
[2] Office of the Assistant Secretary for Planning and Evaluation. *The Affordable Care Act is Improving Access to Preventive Services for Millions of Americans.* U.S. Department of Health and Human Services. May 14, 2015.

00208947

Exhibit 97

JA-0001393

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 2

million women in Texas depend on the contraceptive coverage guarantee for no-cost contraceptive services.[3]

Nearly nine in 10 women of reproductive age will use contraception at some point in their lives, whether for family planning or other medical reasons like treating endometriosis. According to the American College of Obstetrics and Gynecology (ACOG), oral contraceptives help relieve or reduce the symptoms of severe menstrual pain, which is experienced by up to 40% of all adult women and can lead to absence from work and school. Oral contraceptives are also useful in treating excessive menstrual bleeding, which can lead to anemia, and have the potential to reduce acne and excess hair growth. Additionally, oral contraceptives are used for the prevention of menstrual-related migraines, treatment of pelvic pain that accompanies endometriosis, and bleeding due to uterine fibroids.[4] In fact, a new study from the Keck School of Medicine at the University of Southern California has found that intrauterine device (IUD) use is associated with a dramatic decrease in the incidence of cervical cancer.[5]

Contraceptives also play a key role in the ability of women to decide when they will become pregnant. Women and couples use contraceptives to help time and space births, have healthier pregnancies, and to achieve their desired family size. Family planning has health benefits for mothers, newborns, and families. Pregnancies that occur too early or too late in a woman's life, or that are spaced too closely, negatively affect maternal health and increase the risk of prematurity and low birth weight. The ability to space childbearing is also important to women's social and economic advancement.[6] The decision whether or when to have children is one of the most important economic decisions a woman will make in her lifetime; access to contraception is critical to this planning. With the expansion of exemptions to contraceptive coverage, many women may face new insurance policies that deny them access to contraceptive services.

The cost of contraceptives prevents many women, especially low-income women, from using birth control consistently or choosing the best, most effective form of contraceptive for them. The most effective forms of birth control, like Long-Acting Reversible Contraception (LARC) options such as IUDs or birth control implants, have up-front costs of up to $1,000, while some birth control pills can cost $60 a month. A recent survey found one-third of voters who are women of reproductive age would not be able to afford contraception priced at over $10 per month. The same survey found that one in seven of the same group of women would not be able to afford contraception at any price.[7] The ACA's guarantees that contraception is covered by most health insurance and is not subject to a copayment or a deductible has resulted in millions of women having financial access to the full range of reliable contraceptive methods available to prevent unintended pregnancies and have healthier pregnancies. In the years since the contraceptive coverage guarantee has been in effect, the percent of United States women with out-of-pocket expenses for oral contraceptives dropped from over 20% to less than 4%. In 2013 alone the guarantee saved women using oral contraceptives over $1.4 billion. Studies show that

---

[3] Ibid.
[4] American College of Obstetricians and Gynecologists. *Non-contraceptive uses of Hormonal Contraception*. Obstetrics and Gynecology. January 2010.
[5] Cortessis, V K, et al. *Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-Analysis*. Obstetrics and Gynecology. November 3, 2017.
[6] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, New York: Guttmacher Institute, 2013.
[7] PerryUndem. *Contraceptives + Policy Through a Gender Lens: Results from a National Survey Conducted by PerryUndem*. March 22, 2017.

00208948

Exhibit 97                                         JA1204                                      JA-0001394

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 3

paying full cost for contraceptives leads to reduction in contraceptive use.[8] This in turn leads to an increased risk of unintended pregnancy, and the potential health and economic risks associated with unintended pregnancy.[9] [10]

If more employers stop providing contraceptive coverage, many women may have no other option but to rely on less effective methods, or no method at all. Increasing women's ability to plan and space their pregnancies leads to an array of benefits, including improved infant and maternal health, lower abortion rates, and better educational and economic opportunities for families. Without the contraceptive coverage guarantee, the four million women in Texas who gained no-cost contraceptive coverage since the implementation of the ACA will be at risk for losing contraceptive access. When women lose access to affordable contraception, financial security and social mobility can be more difficult, if not impossible, to achieve. Health insurance plans must cover basic and essential preventive health care services like contraception with no out-of-pocket costs. Insurance companies and employers should not be able to pick and choose what health care women can get at affordable prices.

Respectfully,

Jessica Farrar
Chair, Texas House Women's Health Caucus
State Representative, District 148

Ina Minjarez
Vice-Chair, Texas House Women's Health Caucus
State Representative, District 124

Roberto R. Alonzo
State Representative, District 104

Carol Alvarado
State Representative, District 145

Rafael Anchia
State Representative, District 103

Diana Arévalo
State Representative, District 116

[8] Pace L, et al. *Early Impact of the Affordable Care Act on Oral Contraceptive Cost Sharing, Discontinuation, and Nonadherence.* Health Affairs. September 2016. 35 (9) 1616-1624.
[9] *Unintended Pregnancy Prevention.* Centers for Disease Control and Prevention. Reproductive Health. January 22, 2015.
[10] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. *Birthspacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis.* JAMA. 2006. 295(15). 1809-1823.

00208949

Exhibit 97                    JA1205                    JA-0001395

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 4

Diego Bernal
State Representative, District 123

César Blanco
State Representative, District 76

Garnet Coleman
State Representative, District 147

Nicole Collier
State Representative, District 95

Dawnna Dukes
State Representative, District 46

Mary E. González
State Representative, District 75

Roland Gutierrez
State Representative, District 119

Gina Hinojosa
State Representative, District 49

Donna Howard
State Representative, District 48

Celia Israel
State Representative, District 50

Eric Johnson
State Representative, District 100

Armando "Mando" Martinez
State Representative, District 39

Victoria Neave
State Representative, District 107

Evelina "Lina" Ortega
State Representative, District 77

00208950

Exhibit 97

JA1206

JA-0001396

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 5

Ron Reynolds
State Representative, District 27

Eddie Rodriguez
State Representative, District 51

Justin Rodriguez
State Representative, District 125

Toni Rose
State Representative, District 110

Shawn Thierry
State Representative, District 146

Senfronia Thompson
State Representative, District 141

Chris Turner
State Representative, District 101

Tomas Uresti
State Representative, District 118

00208951

Exhibit 97                                                    JA1207                                                    JA-0001397



Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

December 4, 2017

Dear Acting Secretary Hargan,

On behalf of the Texas Women's Healthcare Coalition (TWHC), thank you for this opportunity to provide input on the set of temporary regulations, related to section 9815 of the Internal Revenue Code, expanding exemptions to protect entities and individuals with religious objections to the mandate of contraceptive coverage through the Affordable Care Act.

The TWHC and its 77 healthcare, faith, and community-based member organizations are dedicated to improving the health and well-being of Texas women, babies, and families by ensuring access to preventive healthcare - including contraception - for all Texas women.

We recognize the importance of exercising one's own faith, and value the free expression of religion. However, we also value the right women have to plan and space their pregnancies in the interest of the health and well-being of themselves and their families. We recognize a harmful precedent with this rule change that places an employer's personal beliefs above their employees'.

### Contraceptive Use and the Impact the New Rules Will Have on Women

Access to preventive healthcare – including contraception – is critically important to the health and well-being of women and babies. When women and couples are able to plan and space pregnancies, babies have less risk of prematurity and low birth weight, and mothers experience healthier outcomes too. Planned pregnancies have a healthier start, with earlier prenatal care, less alcohol and tobacco exposure, more folic acid to prevent birth defects, more breastfeeding, and many positive outcomes for children.

The new rule provides broad exemptions for insurers and employers to claim a moral or religious objection to providing birth control and related services. This rule puts at risk the contraceptive coverage that millions of women rely on, including the over four million women in Texas who

00715511

Exhibit 99　　　　　　　　　　　JA1208　　　　　　　　　　　JA-0001405

depend on the contraceptive coverage guarantee for no-cost birth control and contraceptive services.

Prescription cost is a major barrier for many to obtain the medication they need.[i] A recent survey found one-third of voters who are women of reproductive age would not be able to afford contraception priced at over \$10 per month.[ii] The same survey found that one in seven of the same group of women would not be able to afford contraception at any price.[iii] In the years since the contraceptive coverage guarantee has been in effect, the percent of US women with out-of-pocket expenses for oral contraceptive pills (OCPs) dropped from over 20% to less than 4%.[iv] In 2013, the guarantee saved women using OCPs over \$1.4 billion.[v] Studies show that paying full cost leads to reduction in contraceptive use.[vi] This in turn leads to an increased risk of unintended pregnancy, and the potential health and economic risks associated with unintended pregnancy.[vii] [viii] [ix]

These financial challenges are even greater for women trying to access more effective forms of contraception, such as implants or intrauterine devices (IUDs). These forms of birth control can be 20 times more effective than other methods, but they are also expensive.[x] High up-front costs and insufficient contraceptive counseling have been found as significant barriers to access for women who have a preference for a LARC method.[xi] [xii] If more employers stop providing coverage, many women may have no other option but to rely on less effective methods, or no method at all.

As part of the Administration's justification for the new rules, the rules preamble suggests that existing public programs are able to meet the need for subsidized free or contraceptive care. However, it is clear that women are still in need of these services. For example, Texas is still struggling to serve the 1.8 million women in need of contraceptive care in the state. Recent state investments in family planning have been critical, but data continues to show that Texas is only serving a fraction of the women in need. Our state's fragile family planning programs will be even further strained if forced to absorb insured clients that may now require free or low-cost contraceptive services.

Increasing women's ability to plan and space their pregnancies leads to an array of benefits, including lower abortion rates, improved infant and maternal health, better educational and economic opportunities for families, and cost savings for the state. Without the contraceptive coverage guarantee, the 55 million women (including 4 million women in Texas) who gained no-cost contraceptive coverage since the implementation of the ACA will be at risk of losing contraceptive access.[xiii]

Given the importance of ensuring all women have access to preventive and contraceptive care, we urge the Department of Labor and the Department of Health and Human Services not to adopt these interim final rules.

Thank you for your consideration of these comments. Please let us know if we can provide you with any additional information.

2

00715512

Exhibit 99    JA1209    JA-0001406

Respectfully,

Janet Realini, MD, MPH
Chair, Texas Women's Healthcare Coalition

3

00715513

Exhibit 99     JA1210     JA-0001407

[i] Cox C and Sawyer B. How Does Cost Affect Access to Care. Kaiser Family Foundation. Peterson-Kaiser Health System Tracker. November 29, 2016.

[ii] PerryUndem. Contraceptives + Policy Through a Gender Lens: Results from a National Survey Conducted by PerryUndem. March 22, 2017. Accessible at https://www.scribd.com/document/342699692/PerryUndem-Genderand-Birth-Control-Access-Report.

[iii] PerryUndem. Contraceptives + Policy Through a Gender Lens: Results from a National Survey Conducted by PerryUndem. March 22, 2017. Accessible at https://www.scribd.com/document/342699692/PerryUndem-Genderand-Birth-Control-Access-Report.

[iv] Becker N, Polsky D. Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs. 34 (7) 1204-1211. July 2015.

[v] Cox C, et al. Examining high prescription drug spending for people with employer sponsored health insurance. Kaiser Family Foundation. October 27, 2016.

[vi] Pace L, et al. Early Impact of the Affordable Care Act on Oral Contraceptive Cost Sharing, Discontinuation, and Nonadherence. Health Affairs. September 2016. 35 (9) 1616-1624.

[vii] Unintended Pregnancy Prevention. Centers for Disease Control and Prevention. and Reproductive Health. January 22, 2015.

[viii] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birthspacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis. JAMA. 2006. 295(15). 1809-1823.

[ix] Sonfield A et al. The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children. Guttmacher Institute. 2013.

[x] Peipert J, et al. Preventing Unintended Pregnancies by Providing No-Cost Contraception. Obstetrics & Gynecology. 120 (6) 1291-1297. December 2012.

[xi] Potter J, et al. Contraception After Delivery Among Publicly Insured Women in Texas. Obstetrics and Gynecology. 130 (2) 1-10. August 2017.

[xii] Durante J, Woodhams E. Patient Education About the Affordable Care Act Contraceptive Coverage Requirement Increases Interest in Using Long-Acting Reversible Contraception. Women's Health Issues. 27 (2) 152-157. January 4 2017.

[xiii] Office of the Assistant Secretary for Planning and Evaluation. The Affordable Care Act is Improving Access to Preventive Services for Millions of Americans. U.S. Department of Health and Human Services. May 14, 2015.

4

00715514

Exhibit 99

## Texas Women's Healthcare Coalition Steering Committee Members

Texas Medical Association
District XI (Texas) American Congress of Obstetricians and Gynecologists
Texas Academy of Family Physicians
Texas Association of Community Health Centers
Methodist Healthcare Ministries
Teaching Hospitals of Texas
Women's Health and Family Planning Association of Texas
Texans Care for Children
Center for Public Policy Priorities
Healthy Futures of Texas

## Texas Women's Healthcare Coalition General Members

Access Esperanza Clinics Inc.
Amistad Community Health Center
Austin Advanced Practice Nurses
Austin Physicians for Social Responsibility
AWHONN Texas
Brazos Valley Community Action Agency, Inc.
Brazos Valley Nurse Practitioner Association
Cardea
Center for Community Health, UNTHSC
Central Texas Nurse Practitioners
Children's Hospital Association of Texas
Coalition for Nurses in Advanced Practice
Coastal Bend Advanced Practice Nurses
Coastal Bend Wellness Foundation
Community Healthcare Center
Consortium of Texas Certified Nurse Midwives
Department of Ob/Gyn of UNTHSC and the ForHER Institute
El Buen Samaritano
El Centro De Corazón
El Paso Area Advanced Practice Nurse Association
Food Bank of the Rio Grande Valley
Fort Worth Region Nurse Practitioners
Gateway to Care
Good Neighbor Health Center
Haven Health
Hill Country Advanced Practice Nurses & Physicians
Assistants Association
Houston Area Chapter of NAPNAP
Houston Area Nurse Practitioners
League of Women Voters of Texas
Legacy Community Health Services
March of Dimes - Texas
Mental Health America of Greater Houston
National Council of Jewish Women—Texas State Policy
Advocacy Network

National Latina Institute for Reproductive Health
North Harris Montgomery Advanced Practice Nurse Society
North Texas Alliance to Reduce Teen Pregnancy
North Texas Nurse Practitioners
Panhandle Nurse Practitioner Association
Pasadena Health Center
People's Community Clinic
Port Arthur Housing Authority
Pregnancy and Postpartum Health Alliance of Texas
SALVERE (Striving to Achieve Literacy via Education,
Research, and Engagement)
San Antonio Metropolitan Health District
San Antonio Nurses in Advanced Practice
Schneider Communications
South Plains Nurse Practitioner Association
South Texas Family Planning & Health Corp.
Southeast Texas Nurse Practitioner Associates
Special Health Resources
St. David's Foundation
Texas Association of Obstetricians and Gynecologists
Texas Campaign to Prevent Teen Pregnancy
Texas Council on Family Violence
Texas Health Institute
Texas Hospital Association
Texas Medical Association Alliance
Texas Nurse Practitioners
Texas Nurses Association
Texas Pediatric Society
Texas Unitarian Universalist Justice Ministry
The Contraceptive Initiative
The SAFE Alliance
The Women's Fund for Health Education and Resiliency
University Health System
Valley AIDS Council
Women's & Men's Health Services of the Coastal Bend, Inc.

00715515

Exhibit 99



December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT20)**

To whom it may concern:

URGE: Unite for Reproductive & Gender Equity is pleased to provide comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule ("Religious Exemptions IFR" or "Rule") published in the Federal Register on October 13, 2017.[1] For the reasons set forth below, we urge the Department of the Treasury, Department of Labor, and Department of Health and Human Services (collectively, "the Departments") to set aside this Rule. First, the Religious Exemptions IFR creates a harmful and dangerous precedent by allowing the denial of health care coverage based on religious views while paying scant attention to the harm such denials cause to third parties. Second, the rule will harm young people, especially LGBT young people, by restricting access to essential reproductive and other health care services. And third, the Religious Exemptions IFR violates the Administrative Procedure Act ("APA") and both the First and Fifth Amendments to the United States Constitution.

URGE envisions a world where all people have agency over their own bodies and relationships, and the power, knowledge, and tools to exercise that agency. URGE builds this vision by engaging young people in creating and leading the way to sexual and reproductive justice for all by providing training, field mobilization, and national

---

[1] 82 Fed. Reg. 47792 et seq.

00373543

Exhibit 100

leadership for a youth-driven agenda. URGE seeks to empower and uplift the voices of young people, especially those most impacted by oppressive rules such as this IFR such as young people of color and young queer people.

## I. Background

### A. The Benefits of Contraception Are Well Known

Access to contraception is an essential part of shaping women's health and well-being.[2] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[3] About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners do not use a contraceptive method correctly and consistently.[4] Heterosexual couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[5] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[6] For young people, access to affordable contraception is imperative to their ability to plan and space pregnancy and meet their desired family size.

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[7] Contraceptives make up an estimated 30–44% of out-of-pocket health care

---

[2] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[3] Kimberly Daniels, Jill Daugherty, and Jo Jones, *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS 173 (2014), http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

[4] Jo Jones, William Mosher, and Kimberly Daniels, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

[5] J Trussell, *Contraceptive failure in the United States*, 83 CONTRACEPTION 297–404, (May 2011).

[6] *Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics*, THE ALAN GUTTMACHER INSTITUTE (AGI) (2000), https://www.guttmacher.org/sites/default/files/pdfs/pubs/fulfill.pdf.

[7] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

(Continued...)

2

Exhibit 100     JA1214     JA-0001411

00373544

spending for those who use them.[8] A year's worth of birth control can cost upwards of $370—the equivalent of 51 hours of work for someone earning the federal minimum wage of $7.25 an hour.[9] Long-acting birth control methods, such as an IUD or contraceptive implant, cost more than $1,000 out of pocket[10]—almost one month's salary for a person earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.[11]

The ACA has expanded contraceptive coverage without cost-sharing to millions of people across the nation.[12] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with almost 65% of the decrease directly attributed to the contraceptive coverage provision. After the implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[13] Studies show that the use of long-term contraceptives methods, such as an IUD or an implant, has increased in recent years because the

---

[8] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11, http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[9] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose,* NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *See* Elizabeth Celms, *How much do birth-control pills cost?,* CLEAR HEALTH COSTS (Apr. 29, 2013), https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[10] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose,* NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/.

[11] *Insurance Coverage of Contraceptives,* GUTTMACHER INSTITUTE (Oct. 1, 2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives; Adara Bearmesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[12] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[13] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.
(Continued...)

3

00373545

Exhibit 100          JA1215          JA-0001412

high upfront costs were removed.[14] These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[15] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[16] Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[17]

Contraceptive use benefits women and families in numerous ways. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, risk of sexually transmitted infections, desire for confidentiality and control, as well as many other considerations. Identifying the "right" methods helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording them greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families.

Access to comprehensive family planning services, and to culturally competent providers of those services, is critically important for the LGBT community. Lesbian, gay and bisexual youth have been shown to experience more pregnancies than do youth who do not identify as a sexual minority.[18] Bisexual women and some

---

[14] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[15] Alina Salganicoff, Laurie Sobel, and Caroline Rosenzweig, *The Future of Contraceptive Coverage*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[16] *Id.*

[17] *The Affordable Care Act's Birth Control Benefit is Working for Women,* NATIONAL WOMEN'S LAW CENTER (Dec. 16, 2016), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

[18] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us,* ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

4

00373546

Exhibit 100 JA1216 JA-0001413

transgender people are also at risk for pregnancy and are often over-looked when considering access to reproductive health care. Access to family planning is thus essential for this community and should be made more, not less, accessible.

It is deeply troubling that federal agencies charged with ensuring public health would seek to enact a rule that gives employers and universities such sweeping veto power over the health care services their employees or students may access under their health care coverage. Students should be free to choose their institute of higher education based on their independently determined career path, not based on whether their school will block them from necessary health care. Health insurance is a form of compensation that employees earn, like wages. Allowing employers an explicit religiously-motivated veto over how an employee uses his or her earned health care coverage is bad public health policy and represents an overemphasis on an exaggerated view of religious liberty at the expense of employee health and well-being.

## B. The Affordable Care Act's Contraceptive Coverage Provision

The ACA was enacted to achieve several health care reform goals, including improving the availability of primary and preventive health care services. When preventive services coverage was written into the ACA, Congress included a provision directing the Department of Health and Human Services (HHS) to identify the preventive services that should be provided to women.

HHS undertook a thorough and evidence-based process to develop this list of women's preventive services, calling on the independent National Academy of Medicine to convene experts and determine what services should be covered. It surprised no one with a background in public health or medicine that contraception was among the essential preventive services that the Academy included in its recommendations. The Department included contraception in its final rule delineating the list of women's preventive services, exempting houses of worship from covering contraception in their health plans if they had a religious objection. Seeking a broader exemption, some employers, both for-profit and non-profit, filed lawsuits seeking to challenge the requirement to cover contraception on religious grounds.

The Supreme Court resolved the for-profit challenges in 2014, in *Burwell v. Hobby Lobby*.[19] The Court ruled that the Religious Freedom Restoration Act required that a

---

[19] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786–87 (2014).

5

00373547

Exhibit 100                    JA1217                    JA-0001414

closely held for-profit company whose owners objected to contraception on religious grounds must be permitted to use the same accommodation given to non-profit entities (described below). Importantly, the Court stressed that there would be no harm to the company's workers caused by permitting the company to use the same accommodation to provide its employees with contraceptive coverage, as the employees would still receive coverage without cost sharing.

With respect to non-profit employers, the Departments developed an accommodation to permit religiously affiliated non-profit employers to certify that they objected to contraception and notify their insurer or third-party administrator (TPA), which would arrange for contraceptive coverage for the objecting employer's employees at no cost to the employer. Following the *Hobby Lobby* decision, two more rules were adopted—one creating an additional notice mechanism for objecting non-profits (to HHS rather than to the insurer/TPA), and another allowing closely-held for-profit entities to avail themselves of the same accommodation, pursuant to the holding in *Hobby Lobby.*

### C. Changes Under the Religious Exemptions IFR

The Religious Exemptions IFR expands eligibility for the complete exemption—formerly reserved for houses of worship—to *all* nonprofit and for-profit employers. It also retains the accommodation, formerly available to non-profit and closely-held for-profit employers, as an optional alternative for any employer. Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision.

## II. Comments on the Religious Exemptions IFR

URGE opposes the Religious Exemptions IFR for several reasons. Allowing restrictions on the availability of health care services based on the religious beliefs of others—already too prevalent in reproductive health care—sets a dangerous precedent for access to health care for young people and LGBT people. Limiting the availability of contraceptive coverage will itself have an adverse impact on young people and the LGBT community. And the Rule is unlawful, in violation of the Administrative Procedure Act, the First Amendment, and the Fifth Amendment.

6

00373548

Exhibit 100                                   JA1218                                   JA-0001415

## A. Religious Exemptions in Health Care Cause Harm

Unlike other nations whose legal regimes have also sought to balance the conscience rights of providers with the rights of persons to access health care, in the United States there is often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care. And given the nature of the services to which religious exemptions are most commonly applied, these refusal laws have a discriminatory impact on LGBT people and women seeking reproductive health care.

At the federal level, there are already numerous statutory protections for health care providers' religious beliefs. These laws include the Church,[20] Weldon,[21] and Coats[22] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church Amendment also reaches sterilization services.[23]

Most states have similar laws; forty-five allow individual healthcare providers, and forty-three allow institutions, to refuse to provide abortion services.[24] Provider conscience clauses at the state level apply not only to abortion services but also to contraceptive care. Twelve states permit some healthcare providers to refuse to provide contraception and related services (such as counseling).[25] Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies. Eighteen states allow providers to refuse to provide sterilization services.[26]

State conscience clauses have now expanded to end of life care, stem cell research, and to any unspecified health services to which a moral or religious objection may be raised, including counseling or providing information regarding the patient's health status.[27] These state laws are also expanding to cover more entities.[28] Provider conscience laws exist in states where there are significant numbers of

---

[20] 42 U.S.C. § 300a-7 et seq.

[21] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.

[22] 42 U.S.C. § 238(n).

[23] 42 U.S.C. § 300a-7 et seq.

[24] GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[25] Id.

[26] Id.

[27] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2470 (2015).

[28] Id.

(Continued...)

7

00373549

Exhibit 100

JA-0001416

communities of color, including Texas and Florida,[29] and many of these states have enacted additional, broad constitutional or statutory religious exemptions that impact LGBT persons.[30]

While religiously-based objections to contraception and abortion are well known and have posed access barriers for years, less well known is how these types of refusals can also affect the LGBT community. LGBT people and people living with HIV experience pervasive discrimination in the provision of health care, much of it justified by reference to religious beliefs. According to an in-depth survey concerning health care discrimination against LGBT people and people living with HIV, more than half of all respondents reported that they have experienced at least one of the following types of discrimination in care: being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health care status; or health care professionals being physically rough or abusive.[31] Many members of the LGBT community have a "high degree of anticipation and belief that they w[ill] face discriminatory care" which ultimately causes many people to not seek the essential care that they need.[32] For many transgender and gender-nonconforming people the fear of potential negative treatment from health care professionals is even more exacerbated. Undocumented transgender persons were found to be vulnerable to physical attacks in doctors' offices, hospitals, and emergency rooms.[33] There are also geographic considerations that may further

---

[29] For instance, Florida allows private, religious, and public institutions and individual providers to refuse abortion care to patients and allows individual providers and pharmacists to refuse contraception. GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[30] MOVEMENT ADVANCEMENT PROJECT, LGBT POLICY SPOTLIGHT: STATE AND FEDERAL RELIGIOUS EXEMPTIONS AND THE LGBT COMMUNITY (2015), http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-rfra.

[31] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV 5 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf (explaining that "almost 56 percent of lesbian, gay or bisexual (LGB) respondents had at least one of these experiences; 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and nearly 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care. In almost every category, transgender and gender-nonconforming respondents reported higher levels of discrimination by health care providers.").

[32] Id. at 6.

[33] GRANT JM. ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 74 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.
(Continued...)

Exhibit 100                                JA1220                                JA-0001417

exacerbate discrimination against LGBT individuals.[34] These realities have created a major barrier to health care services for LGBT people.

LGBT people of color and people with lower socioeconomic status experience even higher levels of discriminatory and substandard care.[35] Data from one report[36] show, among other things:

- Only 64 percent of LGB Latino adults had health insurance coverage compared to 77 percent of all LGB adults and 82 percent of the heterosexual adult population.

- Thirty percent of LGB African-American adults were likely to delay or not get needed medication compared to 19 percent of African-American heterosexual adults.

- Twenty-six percent of LGB Latino adults did not have a regular source for basic health care.

- Only 35 percent of LGB African-American women had a mammogram in the past two years, compared to 57 percent of all LGB women and 62 percent of all heterosexual women.

Religious objections have presented barriers even in instances involving people trying to <u>become</u> pregnant, rather than avoid or terminate a pregnancy. Many religious health care providers are "opposed to infertility treatments altogether or

---

[34] NAT'L WOMEN'S LAW CTR., FACT SHEET: HEALTH CARE REFUSALS HARM PATIENTS: THE THREAT TO REPRODUCTIVE HEALTH CARE 2 (2014), http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf.

[35] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV, 11 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf ("In addition to the overall rates of substandard care, respondents (defined in this survey as having a household income under $20,000) in nearly every category experienced higher rates of discrimination and substandard care. For example, while transgender respondents as a whole reported a care-refusal rate of almost 27 percent, low-income transgender respondents reported a rate of almost 33 percent. Almost 11 percent of low-income LGB respondents and LGB respondents of color were refused care compared to almost 8 percent of LGB people overall."); *see also The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*, INSTITUTE OF MEDICINE (2011), http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

[36] *Health Disparities in LGBT Communities of Color: By the Numbers*, CENTER FOR AMERICAN PROGRESS (2010), https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color (Continued...)

00373551

are opposed to providing it to certain groups of people" such as members of the LGBT community.[37] Health care providers have even "sought exemptions from state antidiscrimination laws to avoid providing reproductive services to lesbian parents."[38]

The problems for patients presented by the expansion of refusal provisions in state law have been exacerbated by the growth in health care systems owned and operated by religious orders. Mergers between Catholic and nonsectarian hospitals have continued as hospital consolidation has intensified. Catholic hospitals and health systems must follow the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), which prohibit a wide range of reproductive health services, such as contraception, sterilization, abortion care, and other needed health care.[39] Nonsectarian hospitals must often agree to comply with these Directives in order to merge with Catholic hospitals.[40]

Health insurance benefits earned by employees and guaranteed under federal law should not be subject to a religious veto by employers. The regulatory regime that existed prior to this IFR was the result of several years of considered policymaking and constituted a balance between religious beliefs and health care access. This IFR would upend that careful balance and subjugate employee health care needs to the religious objections of any employer. Not only is this poor public health policy, as described further in section B below, it is contrary to numerous provisions of law, set forth in section C.

---

[37] U.S. CONF. OF CATHOLIC BISHOPS, ETHICAL AND RELIGIOUS DIRECTIVES FOR CATHOLIC HEALTH SERVICES 25 (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf (Directive 41 of the Ethical and Religious Directives for Catholic Health Care states: "Homologous artificial fertilization is prohibited when it separates procreation from the marital act in its unitive significance.")

[38] Douglas Nejaime et al., *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 YALE L.J. 2516, 2518 (2015). *See, e.g., N. Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court*, 189 P.3d 959 (Ca. 2008) (on the potential impact of healthcare refusal laws on same-sex couples).

[39] U.S. CONF. OF CATHOLIC BISHOPS, ETHICAL AND RELIGIOUS DIRECTIVES FOR CATHOLIC HEALTH SERVICES (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.

[40] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2488-89 (2015)..
(Continued…)

10

00373552

Exhibit 100

JA-0001419

## B. The Religious Exemptions IFR Will Increase Health Disparities Faced by Young People, especially within the LGBT Community

The Religious Exemptions IFR harms young people and the LGBT community by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender people. Young people's ability to begin their independent lives and determine their reproductive futures relies significantly on their access to affordable birth control. Access to birth control is particularly crucial for the health and well-being of lesbian and bisexual women because they are at risk for unintended pregnancies.[41]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men and at least 30% have been pregnant,[42] 50% have used oral contraceptives, and 16% reported one or more abortions.[43] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[44] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[45]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more

---

[41] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[42] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2003).

[43] Elizabeth M. Saewyc, Linda H. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 FAMILY PLANNING PERSPECTIVES 127 (1999).

[44] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, THE HENRY J. KAISER FAMILY FOUNDATION (Nov. 2016), https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[45] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

(Continued...)

11

00373553

Exhibit 100                    JA1223                    JA-0001420

likely to experience teen pregnancy than are heterosexual adolescent women.[46] One study found that 12% of lesbian and bisexual adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women. And a 2016 study by the Centers for Disease Control and Prevention found that LGBT high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[47]

In sum, access to contraception is essential for the health and well-being of many members of the LGBT community, especially young people, and allowing a wide range of employers and universities to withhold coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### C. The Religious Exemptions IFR is Unlawful

In addition to subjecting women's and LGBT people's access to health care to the religious veto of employers, and increasing health disparities faced by members of the LGBT community, the Religious Exemptions IFR should also be rescinded because it violates the APA and First and Fifth Amendments to the United States Constitution.

### i. The Religious Exemptions IFR Violates the APA

The Administrative Procedure Act imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[48] The APA is applicable here because the Religious Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[49] By enacting the Religious Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

---

[46] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2013), http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.

[47] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015,* CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students*, 105 AM. J. OF PUB. HEALTH 1379 (2015).

[48] 5 U.S.C. § 551(5).

[49] *Id*.

(Continued...)

12

00373554

## 1. Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the APA

The APA contains two procedural rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[50] Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[51] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[52] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[53]

The Religious Exemptions IFR violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its stated reasoning, the Departments do not have good cause, which is limited to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[54] Courts have found good cause in cases that involve: (1) emergencies;[55] (2) context where prior notice would subvert the underlying statutory scheme;[56] and (3)

---

[50] Id.

[51] 5 U.S.C. § 553(b).

[52] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[53] Omnipoint Corp. v. F.C.C., 78 F.3d 620, 630 (D.C. Cir. 1996).

[54] 5 U.S.C. § 553(b).

[55] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. See Jifry v. F.A.A., 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[56] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

(Continued...)

00373555

Exhibit 100

JA-0001422

situations where Congress intends to waive section 553's requirements.[57] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[58] This means that the Departments must have good cause to waive each requirement.

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[59] While these statutes empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[60] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[61] This conclusory statement does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made claims of an emergency situation, unaccompanied by independent facts, which the courts determined were insufficient to constitute good cause.[62] Declaring that it would be impracticable and contrary to the public

---

[57] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

[58] *United States v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[59] Religious Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. 47792, 47813 (Oct. 13, 2017).

[60] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); 42 U.S.C. § 300gg–92.

[61] 82 Fed. Reg. at 47813.

[62] *See, e.g., Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v.Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *Brewer*, 766 F.3d at 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text (Continued...)

14

Exhibit 100                                    JA1226                              JA-0001423

00373556

interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[63] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Religious Exemptions IFR and cease to offer contraception without cost-sharing.

The Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and its post-adoption publication requirements. They have not adequately established that the APA's procedural requirements do not apply or that they have good cause for disregarding them. Because the Religious Exemptions IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Religious Exemptions IFR should be rescinded.

## 2. Substantive Violations of the APA

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction." The Religious Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts several provisions of the Patient Protection and Affordable Care Act ("ACA").

Section 1554 of the ACA prohibits the Departments from issuing regulations that create unreasonable barriers to individuals obtaining medical care; impede timely access to health care services; interfere with communications regarding a full range of treatment options between patient and provider; restrict the ability of providers

---

of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[63] 82 Fed. Reg. at 47814–15.

00373557

Exhibit 100

JA-0001424

to provide full disclosure of all relevant information for making health care decisions; violate the principles of informed consent and ethical standards of health care professionals; or limit the availability of treatment for the full duration of a patient's medical needs.[64] The Religious Exemptions IFR is not in accordance with Section 1554 of the ACA because it creates unreasonable barriers to the ability of individuals to obtain appropriate medical care and it impedes timely access to health-care services.

Section 1557 of the ACA prohibits discrimination on the basis of sex.[65] The implementing regulations for this section issued by HHS state that this includes "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[66] The regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies." [67] By allowing the denial of a health care service used almost exclusively by women, the Religious Exemptions IFR is not in accordance with Section 1557 of the ACA because it discriminates on the basis of sex.

By expanding eligibility for an exemption from the contraceptive coverage benefit beyond houses of worship, the Religious Exemptions IFR erects unreasonable barriers to critical medical coverage, violating Section 1554 of the ACA. By permitting objecting employers to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Religious Exemptions IFR violates the ACA, this Rule also violates the APA and must be set aside.

---

[64] 42 U.S.C. § 18114.
[65] 42 U.S.C. § 18116.
[66] 45 CFR § 92.4.
[67] 45 CFR § 92.101.

16

00373558

Exhibit 100          JA1228          JA-0001425

### ii. The Religious Exemptions IFR Violates the Establishment Clause of the First Amendment

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[68] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties.[69] While the administration has asserted that the Religious Freedom Restoration Act[70] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[71] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence to distinguish between these federal statutory entitlements and the contraceptive coverage benefit in the ACA. The Religious Exemption IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find religiously objectionable. Such a result

---

[68] *See* U.S. CONST. amend. I.

[69] *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).

[70] 42 U.S.C. § 2000bb.

[71] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby,* 134 S. Ct. at 2786–87.

(Continued...)

00373559

Exhibit 100
JA-0001426

would impermissibly shift the cost of religious accommodation onto third parties, subjecting employees to serious harms with no recourse.

### iii. The Religious Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

This Rule also violates the Fifth Amendment because it constitutes impermissible sex discrimination.[72] The ACA's women's preventive services benefit, which includes the contraceptive coverage provision, was implemented in part to address the fact that women tended to pay more for insurance coverage than did men.[73] The Religious Exemptions IFR violates the Fifth Amendment because it exclusively targets a benefit provided to women. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Religious Exemption IFR discriminates based on sex.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[74] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[75] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[76] Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as employers avail themselves of the newly available religious exemption.

---

[72] U.S. CONST. amend. V.

[73] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

[74] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[75] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[76] *Id.*

18

00373560

Exhibit 100                              JA1230                              JA-0001427

### III.   Conclusion

The Religious Exemptions IFR denies coverage for health care services based on religious objections without regard to the impact on employees or students, stripping from women and the LGBT community coverage for essential health care services that would otherwise be guaranteed under federal law. The Rule privileges particular religious beliefs at the expense of employee and student health and is contrary to law. For these reasons, the Departments should rescind the Religious Exemptions IFR.

\*\*\*

URGE: Unite for Reproductive & Gender Equity appreciates the opportunity to comment on this interim final rule. If you need further information, please contact Alexis Cole, Policy Director, at (202) 965-7700 or acole@urge.org.

Sincerely,


URGE: Unite for Reproductive & Gender Equity

19

00373561

Exhibit 100          JA1231          JA-0001428



Wisconsin Alliance for
**Women's Health**
www.supportwomenshealth.org

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9925-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan:

The Wisconsin Alliance for Women's Health (WAWH) is committed to ensuring all individuals have affordable coverage of birth control. WAWH unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons, WAWH calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.
[3] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.
[4] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.

00206974

Exhibit 102                               JA1232                               JA-0001446



Wisconsin Alliance for
**Women's Health**
www.supportswomenshealth.org

just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with

---

[5] *Id.*

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[11] *Id.* at 103-104.

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

P.O. Box 1726 Madison, WI 53701-1726    608-251-0139    Toll Free 866-399-9294    Fax 608-256-3004    info@supportswomenshealth.org

00206975

Exhibit 102                           JA1233                           JA-0001447



approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in

[14] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show," Institute for Health Metrics and Evaluation, University of Washington, 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7. and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] Id.

[20] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/w1 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[23] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

P.O. Box 1726 Madison, WI 53701-1726    608-251-0139    Toll Free 866-399-9294    Fax 608-256-3004    info@wawh.org

00206976

Exhibit 102    JA1234    JA-0001448



law, medicine, and other professions.[24] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II. The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A. Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[26] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

---

[24] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002). https://dash.harvard.edu/handle/1/2624453.

[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

[26] Id. at 8,727.

[27] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); see also id. at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

P.O. Box 1726  Madison, WI 53701-1726     608-251-0139     Toll Free 866-399-9294     Fax 608-256-3004     info@supportwomenshealth.org

00206977

Exhibit 102     JA1235     JA-0001449



> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage. . . .* In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[29] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[30] That contraception would be covered was clear.[31]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[32] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[33] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[34] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

## B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

---

[28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[29] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[30] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also*, 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[31] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id, at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[32] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[33] *Id.* at 109-10.

[34] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

P.O. Box 1726 Madison, WI 53701-1726     608-251-0139     Toll Free 866-398-9294     Fax 608-256-3004     info@wiawh.org

00206978

Exhibit 102          JA1236          JA-0001450



It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[35] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[36] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[37] This exemption is intended as a temporary means for transitioning employers to full compliance.[38] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[39]

### III.  The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[40] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on

---

[35] *See* Priests for Life. v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[36] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.,* Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees. Age Discrimination in Employment Act of 1967. Pub. L. No. 90-202. 81 Stat. 605 (1967). the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[37] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans. 80 Fed. Reg. 72,192. 72,192- 72,193 (Nov. 18. 2015).

[38] Coverage of Certain Preventive Services Under the Affordable Care Act. 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby,* 134 S. Ct. at 2800-01 (Ginsburg. J., dissenting).

[39] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017). http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[40] *See,* e.g., at 21
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf

P.O. Box 1726  Madison, WI 53701-1726        608-251-0139        Toll Free 866-399-9294        Fax 608-256-3004        info@wawh.org

00206979

Exhibit 102                                JA1237                                JA-0001451



religion.[41] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[42]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[43]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[44] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[45] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[46] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public

---

[41] *Id.* at 19.
[42] *Id.* at 24-27
[43] 2 U.S.C. § 18116.
[44] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).
[45] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).
[46] 5 U.S.C. § 553(b), (c).

00206980

Exhibit 102                                    JA1238                                    JA-0001452



comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[47] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[48]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[49] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[50]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

---

[47] 5 U.S.C. § 553(d).
[48] 5 U.S.C. § 706.
[49] 42 U.S.C. § 18114(1).
[50] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

P.O. Box 1726 Madison, WI 53701-1726    608-251-0139    Toll Free 866-399-9294    Fax 608-256-3004    info@wawh.org

00206981

Exhibit 102    JA1239    JA-0001453



As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. WAWH unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[51] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[52]

### B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[53] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[54, 55] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[56] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[57]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

---

[51] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[52] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[53] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[54] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[55] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[56] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[57] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use. 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

Exhibit 102                                    JA1240                                    JA-0001454



The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[58] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[59,60] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[61,62] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[63] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[64] More females are using contraception the first time they have sex.[65]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

## VI. The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[66] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded

[58] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[59] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[60] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[61] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.
[62] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[63] Id.
[64] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[65] Id.
[66] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

00206983

Exhibit 102    JA1241    JA-0001455



**Wisconsin Alliance** for
**Women's Health**
www.supportwomenshealth.org

health centers to give priority to "persons from low-income families."[67] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[68] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages

---

[67] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).
[68] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).
[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7). (9).
[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.
[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, CI, Gable, J., Wang, J., & Lasater, B. *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico. The Henry J. Kaiser Family Foundation. The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid. (2017). https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

P.O. Box 1726  Madison, WI 53701-1726       608-251-0139       Toll Free 866-398-9294       Fax 608-256-3004       info@wawh.org

00206984

Exhibit 102                    JA1242                    JA-0001456



Wisconsin Alliance for
**Women's Health**
www.supportwomenshealth.org

have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

---

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services. supra at note 7.

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office. Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants. 6. (Sept 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis. Nat'l Health Law Program. Top 10 Changes to Medicaid Under the Graham-Cassidy Bill. (Sept. 14, 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC). https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham. *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*. WASH. POST (Nov. 7, 2017). https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[78] Kinsey Hasstedt. Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net. Guttmacher Policy Review. (2017). https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

P.O. Box 1726  Madison, WI 53701-1726       608-251-0139       Toll Free 866-399-9294       Fax 608-256-3004       info@wiawh.org

00206985

Exhibit 102      JA1243      JA-0001457



Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments.

---

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act. 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[81] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf  (last visited Nov 3, 2017).

[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

P.O. Box 1726  Madison, WI 53701-1726     608-251-0139     Toll Free 866-399-9294     Fax 608-256-3004     info@supportwomenshealth.org

00206986

Exhibit 102

JA-0001458



deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

### VII.   The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit.  Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded.  As described in detail above, this assumption is incorrect.  Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being.  It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons, WAWH calls on the Departments to rescind the IFR.


Sincerely,

Sara Finger
Executive Director
Wisconsin Alliance for Women's Health


---

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017. https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

P.O. Box 1726  Madison, WI 53701-1726      608-251-0139      Toll Free 866-398-9294      Fax 608-256-3004      info@supportwomenshealth.org

00206987

Exhibit 102                                    JA1245                                    JA-0001459



Women's Health and Family Planning
A S S O C I A T I O N   O F   T E X A S

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
US Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Re:  **Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (CMS-9925-IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

The Women's Health and Family Planning Association of Texas (WHFPT) is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. As a result, WHFPT has strongly supported the nation's efforts to ensure individuals have robust insurance coverage of contraception without cost-sharing and unequivocally opposes the Departments of Health and Human Services, Labor and Treasury's (the Departments') recent efforts that undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this interim final rule (IFR).

WHFPT is a non-profit organization dedicated to ensuring Texans have equal access to high-quality reproductive health services and control over the timing and spacing of their children. As the sole Title X Family Planning Program grantee for the state of Texas, WHFPT funds a diverse network of 28 providers—including federally qualified health centers (FQHCs), public health departments, hospital based clinics, and free-standing family planning clinics—that operates approximately 100 clinic sites throughout Texas and provides critical reproductive health care services to over 180,000 women, men, and young people each year.

1114 Lost Creek Boulevard, Suite 110 | Austin, Texas 78746 | 512.448.4857 | www.whfpt.org

00207120

Exhibit 103                    JA1246                    JA-0001460

The women's preventive services requirement of the ACA was designed to promote preventive health care, reduce future medical costs, and improve the health, equality, and economic security of women and families.[1] More than 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, screening for sexually transmitted diseases, and contraception and contraceptive counseling.[2] By allowing virtually any employer or university to claim this moral exemption and deprive women of contraceptive coverage, this IFR will harm the health and well-being of women, their partners, and their families. Furthermore, the IFR is predicated upon a distorted picture of the of the federal programs that compose the family planning safety net, the Title X family planning program and Medicaid. **For these reasons, WHFPT calls on the Departments to rescind the IFR and restore equal access to contraceptive coverage regardless of employer.**

## CONTRACEPTION IS CRITICAL TO HEALTH

Women face a unique set of health care challenges because they access more health services than men, yet earn less on average than men.[3] As a result, women face a high level of health care insecurity, which in turn leads many women to forgo necessary care due to prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on contraception alone.[5] As a result of the ACA and its contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on oral contraceptives in 2013 alone.[6]

The goal of preventive health care is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of contraception is to prevent unintended pregnancy, control the timing of a desired pregnancy and spacing between pregnancies, in accordance with patient choice and to improve maternal, child, and family health.[7] In addition, contraception is particularly critical for women with underlying physical and psychological conditions, some of which can be exacerbated by pregnancy itself. These

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. Available at https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] Ibid.

[6] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[7] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016). Available at https://www.womenspreventivehealth.org/final-report/.

00207121

Exhibit 103

women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[8]

Unintended pregnancies have higher rates of long-term health complications for women and their infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and experiencing physical violence during pregnancy.[10]

Unintended pregnancy rates are higher in the US than in most other developed countries, with approximately 45% of pregnancies unintended.[11] In addition, the US has the highest rate of maternal mortality in the developed world.[12] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[13] Contraception is considered a major factor in reducing rates of maternal morbidity and mortality.

Beyond the well-established evidence that contraception is effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[14] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[15,16]

The patient, in consultation with a trusted health care provider, should determine the right contraceptive method for her unique health care needs without interference from politicians. The IFR interferes with the patient-provider relationship, and conversations about if and when to become pregnant as well as which contraceptive method to use to avoid pregnancy.

---

[8] *Id.* at 103-104.

[9] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809-23.

[10] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010.32(1).152-174. doi.10.1093/epirev/mxq012.

[11] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008-2011, *New England Journal of Medicine*, 2016, 374(9):843-852.

[12] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[13] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[14] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1) 41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250-5.

[15] Schindler AE. supra.

[16] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017.

00207122

Exhibit 103                    JA1248                    JA-0001462

## OTHER GOVERNMENT PROGRAMS CANNOT MEET THE NEED FOR CONTRACEPTIVE COVERAGE

In the accompanying IFR on religious exemptions (CMS-9940-IFC), the Department of Health and Human Services (HHS) asserts that existing government-sponsored programs, such as Medicaid and the Title X family planning program, can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost-sharing under their employer-sponsored or student health plans.[17] As discussed below, this assertion fails to recognize that: 1) programs such as Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals; 2) those programs do not have the capacity to meet the needs of current enrollees and those seeking care at Title X-funded health centers; and, 3) legislative and administrative proposals threaten the capacity and goals of these programs. Moreover, the claim that state coverage requirements are an alternative misconstrues the scope and protections provided by these requirements, which cannot fill in the gaps of coverage for many individuals who will lose contraceptive coverage.

### Medicaid and Title X are not designed to meet the needs of individuals who lose access to contraceptive coverage under their employer-sponsored or student health plans.

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[18] While Title X-funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[19] Low-income individuals receive services at low or no cost depending on their family income.[20] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[21]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-

---

[17] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[18] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

[19] 42 CFR § 59.5 (a)(6-9).

[20] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[21] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

00207123

Exhibit 103                                  JA1249                                  JA-0001463

sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible for this coverage.[22] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[23] In many of these states, childless adults remain ineligible for the program.[24] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

**Medicaid and Title X do not have capacity to meet the increased need.**

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people. Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. Despite this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[25] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning and sexual health providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care plans had provider shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[26]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage caused by employer exemptions and would have to provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would from the IFR. Since 2010, the reported annual number of clients served at Title X-funded health centers has dropped from approximately 5.2

---

[22] The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision. Available at https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last updated Nov. 8, 2017).

[23] Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017). Available at https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[24] Ibid.

[25] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012), http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). Available at http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[26] U.S. Department of Health and Human Services, supra at note 7.

00207124

million patients to just over 4 million.[27] This decline corresponds with over $30 million in cuts to Title X's annual appropriated amount over the same period.[28] A recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X–funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[29] Requiring otherwise higher-income, privately insured individuals to use Title X–funded health centers would deplete resources from an already overburdened and underfunded program. Thus, WHFPT is unconvinced that Medicaid and Title X are plausible alternatives for the individuals affected by this IFR.

**Political assault on Medicaid, Title X, and Planned Parenthood health centers have already compounded the threat to women's access to contraceptive care.**

Medicaid is a vital source of coverage for family planning and sexual health care in the United States, but political threats to the program may undermine its ability to provide the coverage that meets the needs of individuals and families. In 2010, Medicaid covered nearly 45% of all births in the US, and in many states Medicaid covers well over half of births.[30] Medicaid is also the single largest source of public funding for family planning services and supplies.[31]

Within the last year, policymakers have sought to radically alter the financial structure of Medicaid. The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars from the program over the next ten years.[32] The proposal would have repealed Medicaid expansion,

---

[27] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[28] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[29] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.
[30] Kathy Gifford et al., The Henry J. Kaiser Family Found., Medicaid Coverage of Pregnancy and Perinatal Benefits: Results from a State Survey, (2017), available at http://kff.org/womens-health-policy/report/medicaid-coverage-of-pregnancy-and-perinatal-benefits-results-from-a-state-survey/; *Births Financed by Medicaid*, The Henry J. Kaiser Family Found., available at http://kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Nov. 6, 2017).
[31] In 2010, Medicaid accounted for 75 percent of all public funds spent on contraceptive services and supplies. Kinsey Hasstedt et al., Guttmacher Institute, Public Funding for Family Planning and Abortion Services, FY 1980-2015 (2017), https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.
[32] Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), available at https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf.

00207125

Exhibit 103  JA1251  JA-0001465

converted Medicaid's financing structure to a per-capita cap, and permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve.[33]

The administration has also made moves that could radically alter the Medicaid program. Earlier this year, then–Secretary Tom Price and CMS Administrator Seema Verma issued a letter to governors announcing HHS' intent to use existing Section 1115 waiver authority to approve changes to state Medicaid programs that could undermine the ability of individuals qualified to enroll in Medicaid—particularly non-disabled, working-age adults—to receive the coverage and health care they need.[34]

In addition to these legislative and administrative efforts to alter the Medicaid program, Congress and the administration have threatened access to trusted family planning and sexual health providers by attempting to block Planned Parenthood from participating in Medicaid despite the dominant role Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57% of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[35]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks. Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program. In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018.[36] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[37] For instance, the president's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even

[33] Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), available at http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[34] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), available at https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

[35] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), available at https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[36] Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, available at https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[37] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018.

00207126

Exhibit 103                    JA1252                    JA-0001466

though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[38,39]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X–funded providers and those enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ+ individuals, communities of color, and young people.

**Most state coverage requirements fail to guarantee coverage of the full range of contraceptive methods, services, and counseling with no cost-sharing.**

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that 22 states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other 28 states.[40] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[41] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[42] Additionally, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[43]

**The Departments' assertion that other programs and legal requirements can meet the need for contraceptive coverage created by this rule is inaccurate.**

---

[38] Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[39] White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[40] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[41] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[42] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[43] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, available at https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00207127

Exhibit 103                          JA1253                          JA-0001467

## JUSTIFICATIONS FOR THE IFR DO NOT MEET BASIC SCIENTIFIC STANDARDS

As the nation's health policy center, HHS must adopt policies and activities firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and the Women's Preventive Services Initiative (WPSI), instead prioritizing moral objections over evidence-based medical recommendations. The Departments make several false and misleading statements in the IFR to undermine the contraceptive coverage benefit. WHFPT fundamentally disagrees with the Departments' decision to promulgate this IFR based on the moral beliefs of individuals and entities rather than science and medicine.

### Contraception does not interfere with an existing pregnancy.

The IFR takes issue with the IOM-recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices…that many persons and organizations believe are abortifacient—that is, as causing early abortion."[44] FDA-approved contraceptive methods do not function as abortifacients. Every FDA-approved contraceptive method acts before implantation, does not interfere with an existing pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[45]

### Contraception is medication and carries risks like any medication.

The IFR raises concerns about the "negative health effects" of contraception.[46] As with any medication, some contraceptive methods may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[47,48] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[49] The IFR also suggests contraception

---

[44] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13–354). Available at http://acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf.

[46] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[47] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[48] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[49] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

00207128

Exhibit 103                    JA1254                    JA-0001468

increases the risk of breast cancer, but there is no scientifically-proven increased risk of breast cancer among contraceptive users, particularly those under 40.[50]

**Contraception makes sex among adolescents healthier, not more likely to happen.**

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[51] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[52,53] In fact, research has shown that school-based health centers that provide access to contraception are proven to increase use of contraception by already sexually active students, not to increase onset of sexual activity.[54,55] On the other hand, young women who did not use contraception at first sexual intercourse were twice as likely to become teen mothers.[56] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[57]

**The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.**

## THE IFR UNDERMINES CONGRESSIONAL INTENT

The Departments ignore Congress' clear intent that contraception be covered as a preventive service under the ACA. When Congress passed the Women's Health Amendment, it meant to "ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[58] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

---

[50] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1-66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[51] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[52] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[53] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2-9).

[54] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[55] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114-26.

[56] Ibid.

[57] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007-2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[58] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8727 (Feb. 15, 2012).

00207129

Exhibit 103

JA1255

JA-0001469

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[59] In enacting the amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*… In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[60]

In considering the amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[61] Additional statements from Senators Boxer, Feinstein, Nelson, and Durbin prove that the intent to cover contraception was clear.[62]

To meet the amendment's objectives, HHS commissioned the Institute of Medicine (IOM) to convene a diverse committee of experts in disease prevention, women's health and adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for HHS to consider in order to fill those gaps.[63] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[64] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM report.[65] These were updated in 2016 based on

---

[59] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski), *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[60] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[61] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[62] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[63] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), available at http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[64] *Id.* at 109-10.

[65] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, available at http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

00207130

recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These, too, were adopted by HRSA.

HHS, through the adoption of the IOM's recommendations and the subsequent adoption of the WPSI recommendations, carried out Congress' intent. **The Departments should rescind the IFR to continue reflecting that intent.**

\*\*\*

WHFPT appreciates the opportunity to provide comment on the moral exemptions and accommodations for coverage of certain preventive services interim final rule. This IFR will cause people to lose contraceptive coverage and harm their health and well-being. It ignores congressional intent that contraception be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting contraceptive access. **For all of these reasons, WHFPT calls on the Departments to rescind the IFR.**

If you require additional information about the issues raised in this letter, please contact Kami Geoffray at kami.geoffray@whfpt.org or (512) 448-4857.

Sincerely,

Kami Geoffray
Chief Executive Officer

00207131

Exhibit 103

JA-0001471

# ///  **Women's Law Project**

BOARD OF TRUSTEES
Catherine T. Barbieri, Esq.
Jessica Beckett-McWalter, Esq.
Valentine Brown, Esq.
David S. Cohen, Esq.
Ellen Deringer, Esq.
Dianne Coady Fisher, Esq.
Nancy Ginter
Susanne M. Gollin
Pamela S. Goodwin, Esq.
Amanda Green Hawkins, Esq.
Tomás Leal
Sophia Lee, Esq.
Karen Kainz LoDico
Debra Loggia
Joann Mitchell, Esq. (Chair)
Deborah Moretti
Eleanor Myers, Esq.
Robin Neifield
Lisa Perriera
Nancy Reese
Ariana Ornelas Smyth, Esq.
Robin Stuntebeck
Carol E. Tracy, Esq. (ex-officio)
Wanda Whitted-Smith
Thomas E. Zemaitis, Esq.

EXECUTIVE DIRECTOR
Carol E. Tracy, Esq.
MANAGING ATTORNEY
Terry L. Fromson, Esq.
ASSOCIATE DIRECTOR
Dabney Miller
SENIOR STAFF ATTORNEY
Susan Frietsche, Esq.*
STAFF ATTORNEY
Amal Bass, Esq.
IT DIRECTOR
Barbara Burgos DiTuilio
DEVELOPMENT DIRECTOR
Jennifer Nix
STRATEGIC
COMMUNICATIONS
Tara Murtha
STAFF ATTORNEY
Christine Castro*
IF/WHEN/HOW FELLOW
Mica Lee Williams*
UPENN PUBLIC INTEREST FELLOW
Margaret Zhang
DEVELOPMENT/ADMIN
COORDINATOR
Brittany Green*
OFFICE MANAGER
Kathy Eisenberg

A copy of the official registration and
financial information may be obtained
from the Pennsylvania Department of
State by calling toll free
1.800.732.0999. Registration does not
imply endorsement.

December 1, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

Dear Acting Secretary Hargan,

The Women's Law Project is committed to ensuring all individuals have affordable coverage of birth control. Founded in 1974, the Women's Law Project (WLP) is a Pennsylvania-based nonprofit women's legal advocacy organization providing legal representation, public education, and advocacy on a wide range of legal issues related to women's health, well-being, and equality. Because access to the full range of reproductive health care is necessary to protect women's health and critical to women's ability to participate on an equal basis in civic and professional endeavors, WLP has made access to contraceptive care in Pennsylvania a high priority.

The Women's Law Project unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

---

**MAIN OFFICE**

Sheridan Building
125 South 9th Street, Suite 300
Philadelphia, PA 19107

215.928.5761 t • 215.928.9848 f
www.womenslawproject.org
info@womenslawproject.org

**\* WESTERN PENNSYLVANIA OFFICE**

The Pittsburgher
428 Forbes Avenue, Suite 1710
Pittsburgh, PA 15219

412.281.2892 t • 215.928.9848 f
www.womenslawproject.org
infopitt@womenslawproject.org

00433458

Exhibit 104                    JA1258                    JA-0001472

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

---

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.
[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
[5] *Id.*
[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014),
http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.
[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/
Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_
Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.
[11] *Id.* at 103-104.

2

00433459

Exhibit 104 JA1259

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, evidence also supports non-contraceptive health benefits of contraception, including decreased bleeding and pain with menstrual periods, reduced risk of gynecologic disorders, including endometriosis, myoma, and pelvic inflammatory disease, and decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased

---

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852,

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id*.

[20] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

3

Exhibit 104 JA1260 JA-0001474

00433460

women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in law, medicine, and other professions.[24] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.    Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique

---

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[23] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).
[24] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.
[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

4

00433461

Exhibit 104                          JA1261                          JA-0001475

health care needs and burdens."[26] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, undermines the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage.* . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[29] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[30] That contraception would be covered was clear.[31]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order

---

[26] *Id.* at 8,727.

[27] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[29] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[30] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[31] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

5

00433462

Exhibit 104           JA1262

to fill those gaps."[32] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[33] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[34]  These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

## B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation.  Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[35] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[36] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum

---

[32] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
[33] *Id.* at 109-10.
[34] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).
[35] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").
[36] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

6

Exhibit 104          JA1263          JA-0001477

00433463

coverage requirements.[37] This exemption is intended as a temporary means for transitioning employers to full compliance.[38] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[39]

## III. The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[40] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[41] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[42]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[43]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it

---

[37] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[38] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[39] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[40] *See*, e.g., at 21
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf
[41] *Id.* at 19.
[42] *Id.* at 24-27
[43] 2 U.S.C. § 18116.

7

00433464

Exhibit 104    JA1264    JA-0001478

does not override other significant interests" or "impose unjustified burdens on other[s]."[44] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[45] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[46] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[47]   Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Women's Law Project has had no opportunity to comment on the specific questions posed in by this IFR.

The Departments further assert that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the

---

[44] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[45] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[46] 5 U.S.C. § 553(b), (c).

[47] 5 U.S.C. § 553(d).

8

00433465

Exhibit 104                                        JA1265                                        JA-0001479

accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[48]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[49] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[50]

For each of these reasons, the rule violates the APA and should be rescinded.

## V. Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. The Women's Law Project unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based individual's beliefs instead of science and medicine.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and

---

[48] 5 U.S.C. § 706.

[49] 42 U.S.C. § 18114(1).

[50] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

9

00433466

Exhibit 104 JA1266

devices... that many persons and organizations believe are abortifacient—that is, as causing early abortion."[51] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[52]

## B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[53] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[54, 55] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[56] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[57]

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[58] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[59,60] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[61,62] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to

---

[51] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[52] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[53] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[54] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[55] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[56] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[57] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[58] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[59] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[60] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[61] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[62] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

10

Exhibit 104

00433467

JA-0001481

become teen mothers.[63] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[64] More females are using contraception the first time they have sex.[65]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

## VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[66] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.    Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[67] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[68] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

---

[63] *Id.*

[64] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[65] *Id.*

[66] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[67] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[68] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

11

00433468

Exhibit 104                                     JA1268                                     JA-0001482

Further, the IFR states that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and

---

[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

12

00433469

Exhibit 104                    JA1269                    JA-0001483

Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

## B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011,

---

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[78] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

13

00433470

Exhibit 104
JA1270
JA-0001484

political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

## C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state

---

[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[81] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute,

14

00433471

Exhibit 104      JA1271      JA-0001485

has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons the Women's Law Project calls on the Departments to rescind the IFR.

Sincerely,

Terry L. Fromson

Terry L. Fromson
Managing Attorney

---

Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017,
http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

15

00433472

Exhibit 104
JA-0001486