**Nos. 25-2575 & 25-2662**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY,

Plaintiffs-Appellees,

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA

Defendants-Appellants,

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

Intervenor-Defendant- Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

### JOINT APPENDIX
### Vol. 4, pp. 1273–1877

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

SHARON SWINGLE
DEREK WEISS
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
*Counsel for the Federal Appellants*

# TABLE OF CONTENTS

## Volume 1

Notice of Appeal filed by the Little Sisters of the Poor Saints
Peter and Paul Home (Dkt. 358) .................................................. JA1

Notice of Appeal filed by the Federal Government (Dkt. 361) ............ JA3

Order (Dkt. 357) ..................................................................... JA5

Opinion (Dkt. 356) .................................................................. JA7

## Volume 2

Docket Sheet ......................................................................... JA62

Amended Complaint (Dkt. 89) ..................................................... JA128

Declaration of Kathryn Kost, Acting Vice President for
Domestic Research at the Guttmacher Institute
(Dkt. 90-13) ..................................................................... JA261

Declaration of Carol Weisman, Ph.D (Dkt. 90-15) ......................... JA299

Snyder, et al., The Impact of the Affordable Care Act on
Contraceptive Use and Costs among Privately Insured
Women, Women's Health Issues 28-3 (2018) (Dkt. 90-
16) ................................................................................. JA336

Declaration of Samantha Butts, M.D., MSCE (Dkt. 90-17) ............ JA342

Declaration of Dayle Steinberg, CEO of Planned Parenthood
Southeastern Pennsylvania (Dkt. 90-20) ................................ JA377

Declaration of Philip Gennace, Assistant Commissioner of
Life and Health, New Jersey Department of Banking
and Insurance (Dkt. 90-22) ................................................. JA385

Declaration of Elizabeth Coulter, Deputy Director of the
Office of Women's Health, New Jersey Department of
Health (Dkt. 90-23) ........................................................... JA391

Supplemental Declaration of Kathryn Kost, Acting Vice President for Domestic Research at the Guttmacher Institute (Dkt. 118-3) ............................................................. JA399

Joint Appendix (Dkt. 253) ........................................................ JA403

Final Religious Exemption Rule, 83 Fed. Reg. 57, 536 (Nov. 15, 2018) (Dkt. 253-1, Ex. 1) ................................................... JA410

Final Moral Exemption Rule, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (Dkt. 253-1, Ex. 2) ........................................................ JA465

2017 HRSA Guidelines, 83 Fed. Reg. 8487 (Feb. 27, 2018) (Dkt. 253-1, Ex. 3) ........................................................... JA505

IFR Religious Exemption, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (Dkt. 253-1, Ex. 4) ......................................................... JA507

IFR Moral Exemption, 82 Fed. Reg. 47,838 (Oct. 13, 2027) (Dkt. 253-1, Ex. 5) ........................................................... JA551

FAQs about ACA Implementation Part 36 (Jan. 9, 2017) (Dkt. 253-1, Ex. 7) ................................................................. JA576

2016 HRSA Guidelines, 81 Fed. Reg. 95,148 (Dec. 27, 2016) (Dkt. 253-1, Ex. 8) ........................................................... JA587

Final Rules, 80 Fed. Reg. 41,318 (July 14, 2015) (Dkt. 253-2, Ex. 10) ............................................................................... JA590

NPRM, 79 Fed. Reg. 51,118 (Aug. 27, 2014) (Dkt. 253-2, Ex. 11) ................................................................................ JA620

IFR, 79 Fed. Reg. 51,092 (Aug. 27, 2014) (Dkt. 253-2, Ex. 12) ....... JA630

Final Rule, 78 Fed. Reg. 39,870 (July 2, 2013) (Dkt. 253-2, Ex. 13) ................................................................................ JA640

## Volume 3

NPRM, 78 Fed. Reg. 8456 (Feb. 6, 2013) (Dkt. 253-2, Ex. 14) ........ JA671

ANPRM, 77 Fed. Reg. 16,501 (Mar. 21, 2012) (Dkt. 253-2, Ex. 15) ................................................................................. JA692

Final Rule, 77 Fed. Reg. 8725 (Feb. 15, 2012) (Dkt. 253-2, Ex. 16) ................................................................................. JA700

IFR, 76 Fed. Reg. 46,621 (Aug. 3, 2011) (Dkt. 253-2, Ex. 17) ......... JA706

2011 HRSA Guidelines (Dkt. 253-2, Ex. 18) ................................... JA712

2019 HRSA Guidelines (Dkt. 253-2, Ex. 18-A) ............................... JA715

Institute of Medicine, Clinical Preventive Services for Women (2011) (Dkt. 253-3, Ex. 19) ........................................ JA720

AccessMatters Comments (Dkt. 253-3, Ex. 21) .............................. JA969

American Academy of Family Physicians Comments (Dkt. 253-3, Ex. 23) ................................................................ JA981

American Academy of Nursing Comments (Dkt. 253-3, Ex. 24) ................................................................................. JA983

American College of Nurse-Midwives Comments (Dkt. 253-3, Ex. 25) ................................................................................. JA993

American College of Physicians Comments (Dkt. 253-4, Ex. 26) ................................................................................. JA996

American Congress of Obstetricians and Gynecologists, American Academy of Pediatrics, & Society for Adolescent Health and Medicine Comments (Dkt. 253-4, Ex. 27) ................................................................................. JA999

American Public Health Association Comments (Dkt. 253-4, Ex. 28) ................................................................................. JA1009

California Planned Parenthood Education Fund Comments (Dkt. 253-4, Ex. 34) ............................................................. JA1016

Center for American Progress, Autistic Self-Advocacy
    Network, Autism Women's Network, & National LGBT
    Task Force Comment (Dkt. 253-4, Ex. 38) ........................... JA1031

Colorado Consumer Health Initiative Comments (Dkt. 253-4,
    Ex. 41) ................................................................... JA1047

Colorado Health Foundation Comments (Dkt. 253-4, Ex. 42) ...... JA1054

County of Santa Clara Comments (Dkt. 253-4, Ex. 43) ............... JA1057

Center for Reproductive Rights Comments (Dkt. 253-4,
    Ex. 44)................................................................... JA1070

Massachusetts Office of Health and Human Services
    Comments (Dkt. 253-5, Ex. 62)............................... JA1096

National Council of Jewish Women Comments (Dkt. 253-6,
    Ex. 71)................................................................... JA1099

National Health Law Program Comments (Dkt. 253-6,
    Ex. 74)................................................................... JA1108

Planned Parenthood Federation of American & Planned
    Parenthood Action Fund Comments (Dkt. 253-7,
    Ex. 88)................................................................... JA1129

Public health practitioners and members of faculty,
    Columbia University Mailman School of Public Health
    Comments (Dkt. 253-7, Ex. 90)............................... JA1140

Public Health Solutions Comments (Dkt. 253-7, Ex. 91) ............. JA1146

Raising Women's Voices for the Health Care We Need
    Comments (Dkt. 253-7, Ex. 92)............................... JA1157

Reproductive Rights and Justice Practicum at Yale Law
    School Comments (Dkt. 253-7, Ex. 94) ................................ JA1172

SisterLove Inc Comments (Dkt. 253-7, Ex. 95) ............................ JA1187

State Attorneys General Comments (Dkt. 253-7, Ex. 96)............. JA1194

iv

Texas House Women's Health Caucus Comments (Dkt. 253-7, Ex. 97).................................................................... JA1203

Texas Women's Healthcare Coalition Comments (Dkt. 253-7, Ex. 99)................................................................... JA1208

URGE Unite for Reproductive and General Equality Comments (Dkt. 253-7, Ex. 100)........................................... JA1213

Wisconsin Alliance for Women's Health Comments (Dkt. 253-7, Ex. 102) .............................................. JA1232

Women's Health and Family Planning Association of Texas Comments (Dkt. 253-7, Ex. 103)............................ JA1246

Women's Law Project Comments (Dkt. 253-7, Ex. 104)............... JA1258

## Volume 4

Yale Students for Reproductive Justice Comments (Dkt. 253-7, Ex. 105)................................................................. JA1273

Archdiocese of New Orleans Comments (Dkt. 253-7, Ex. 106)  ........................................................... JA1288

Archdiocese of St. Louis Comments (Dkt. 253-7, Ex. 107)............ JA1293

Association of Catholic Colleges and Universities Comments (Dkt. 253-8, Ex. 108) .............................................. JA1294

Christian Legal Society Comments (Dkt. 253-8, Ex. 109) ............ JA1299

Church Alliance Comments (Dkt. 253-8, Ex. 110) ........................ JA1301

The Ethics & Religious Commission of the Southern Baptist Convention Comments (Dkt. 253-8, Ex. 111) ...................... JA1305

Family Research Council Comments (Religious Exemption) (Dkt. 253-8, Ex. 112) .............................................. JA1312

Family Research Council Comments (Moral Exemption) (Dkt. 253-8, Ex. 113) .............................................. JA1318

Locke Lorde LLP Comments (Dkt. 253-8, Ex. 114)....................... JA1325

National Association of Catholic Nurses USA Comments
(Religious Exemption) (Dkt. 253-8, Ex. 115) ........................ JA1328

National Association of Catholic Nurses USA Comments
(Moral Exemption) (Dkt. 253-8, Ex. 116) ............................ JA1331

National Catholic Bioethics Center Comments (Dkt. 253-8,
Ex. 117) .................................................................................. JA1334

Solidarity HealthShare Comments (Dkt. 253-8, Ex. 118) ............. JA1343

United States Conference of Catholic Bishops Comments
(Dkt. 253-8, Ex. 119) ............................................................ JA1346

Individual Comments Supporting Rules
(Dkt. 253-8, Ex. 120) ............................................................ JA1363

Conde-Aguledo, A., et al., Birth Spacing and Risk of Adverse
Perinatal Outcomes—A Meta-Analysis, Journal of the
American Medical Association (2006) (Dkt. 253-8, Ex.
128) ........................................................................................ JA1370

Fuentes-Afflick, E., & Hessol, N., Interpregnancy Interval
and the Risk of Premature Infants, Obstetrics &
Gynecology (2000) (Dkt. 253-9, Ex. 129) ............................ JA1385

Gipson, J.D., et al., The Effects of Unintended Pregnancy on
Infant, Child and Parental Health: A Review of the
Literature, Studies on Family Planning (2008)
(Dkt. 253-9, Ex. 130) ............................................................ JA1393

Zhu, B., Effect of Interpregnancy Interval on Birth
Outcomes: Findings from Recent U.S. Studies,
International Journal of Gynecology & Obstetrics
(2005) (Dkt. 253-9, Ex. 136) ................................................ JA1414

Spreadsheet of Accommodated Entities (Dkt. 253-9, Ex. 139) ...... JA1423

Spreadsheet of Litigating Entities (Final Rules) (Dkt. 253-9,
Ex. 140) .................................................................................. JA1450

ESBA Form 700 Certification (Aug. 2014) (Dkt. 253-9,
Ex. 141) .................................................................................. JA1457

Kaiser Family Foundation Employer Health Benefits (2017
    Annual Survey) (Dkt. 253-10, Ex. 142)................................ JA1459

Declaration of Mother Superior Marie Vincente (Dkt. 253-10,
    Ex. 146)................................................................ JA1681

FDA, Birth Control (Mar. 6, 2018) (Dkt. 253-10, Ex. 147)............ JA1741

FDA, Is It Really FDA Approved? (Jan. 17, 2017) (Dkt. 253-
    10, Ex. 148).......................................................... JA1761

Declaration of Seth A. Mendelsohn, Executive Deputy
    Insurance Commissioner, PA Department of Insurance
    (ECF No. 90-18) (Dkt. 253-10, Ex. 149)............................... JA1765

HHS, Trends in Teen Pregnancy and Childbearing (May 14,
    2019) (Dkt. 253-10, Ex. 152)......................................... JA1770

Supplemental Joint Appendix (index) (Dkt. 258)..................... JA1778

Declaration of Seth Mendelsohn (Dkt. 258, Ex. 177) .................. JA1780

Declaration of Philip Gennace (Dkt. 258, Ex. 178) .................. JA1784

Declaration of Cynthia H. Chuang (Dkt. 258, Ex. 179) ............... JA1789

Declaration of Leesa Allen (Dkt. 258, Ex. 181) .................... JA1799

Declaration of Sarah Adelman (Dkt. 258, Ex. 182) .................. JA1805

Luke Vander Bleek Comments on RFI (Dkt. 258, Ex. 183) ......... JA1810

Campaign Life Missouri Comments on RFI (Dkt. 258,
    Ex. 184) ............................................................. JA1815

2025 HRSA Guidelines (Dkt. 258, Ex. 185) ........................... JA1833

Government's Notice of Withdrawal of NPRM (Dkt. 326) ............ JA1839

2025 HRSA Women's Preventive Service Guidelines
    (Dkt. 341-2) ......................................................... JA1841

Declaration and Excerpts from Exhibit to Declaration of
Sharita Gruberg (Ex. 20 at preliminary-injunction hearing,
Dec. 14, 2017) ........................................................ JA1850

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan,

Yale Students for Reproductive Justice ("YSRJ") [1] is a cross-campus coalition of Yale students working toward a world where all people can make reproductive choices with dignity, free from discrimination, coercion, or violence. Our coalition includes students from forestry, nursing, law, medicine, public health, and Yale College. YSRJ unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer or university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. Finally, the IFR is predicated upon a distorted picture of the science supporting the safety and efficacy of contraception, as well as the federal programs and state laws that provide some people with access to contraception. For all of these reasons YSRJ calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

---

[1] YSRJ and its members do not purport to represent the institutional views of Yale University, Yale School of Forestry & Environmental Studies, Yale School of Nursing, Yale Law School, Yale School of Medicine, Yale School of Public Health, Yale College, or any other department or school at Yale.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

1

00396738

Exhibit 105                    JA1273                    JA-0001487

Women face a unique set of health care challenges because they use more health services than men, yet they are paid less on average than men.[3] As a result, women face a high level of health care insecurity, which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on birth control alone.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health and the health of their families. Similarly, prevention of unintended pregnancy helps women time and space their pregnancies or prevent pregnancy altogether, and it improves maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

---

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] *Id.*

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014),

http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/

Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_

Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[11] *Id.* at 103-104.

2

00396739

Exhibit 105 JA1274 JA-0001488

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] The U.S. also has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported by evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[17] Beyond the well-established evidence that contraceptives effectively prevent unintended pregnancy, contraception also has recognized benefits aside from family planning, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease,endometrial and ovarian cancer.[18] Contraception is also prescribed to treat non-gynecologic conditions.[19]

Insurance coverage for contraception is critical to ensuring women access. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services, including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty and equal protection of the law. Studies show that access to

---

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews.* 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine,* 2016, 374(9):843–852,

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id.*; Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017.

3

00396740

Exhibit 105     JA1275     JA-0001489

contraception has increased women's wages and lifetime earnings.[20] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-l940s to early 1950s.[21] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[22] which was followed by large increases in women's presence in law, medicine, and other professions.[23] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[24]

A woman and her health care providers, not politicians and bureaucrats, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but it also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care providers and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives; it implies that birth control is not health care at all.

## II. The IFR Undermines Congress's Express Intent that Birth Control Be Covered as a Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A. Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans

---

[20] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[21] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[22] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[23] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.

[24] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

4

00396741

Exhibit 105

and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[25] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[26] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that, on average, women paid more in out-of-pocket costs than men for necessary preventive care and that in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act*.[27]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "[w]ith Senator Mikulski's amendment, even more preventive screening will be covered, including for . . . family planning."[28] Senator Franken also said in regards to the Women's Health Amendment, "affordable family planning services must be accessible to all women in our reformed health care system."[29] That contraception would be covered was clear.[30]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order

---

[25] *Id*. at 8,727.

[26] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[27] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[28] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[29] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[30] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

5

00396742

Exhibit 105 JA1277 JA-0001491

to fill those gaps."[31] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[32] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[33] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations— carried out Congress' direction.

### B. "Exemptions" in Other Legislation Do Not Justify the Rule

It is undisputed that Congress rejected an exemption to the women's preventive services provision of the type that the IFR now adopts. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the exemptions in *entirely distinct* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent to maximize the number of women who have cost-free contraceptive coverage.[34] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[35] Additionally, although qualifying grandfathered plans do not have to comply with certain requirements of the ACA, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum

---

[31] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[32] *Id.* at 109-10.

[33] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

[34] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[35] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

6

00396743

Exhibit 105

coverage requirements.[36] This exemption is intended as a temporary means for transitioning employers to full compliance.[37] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[38]

## III. The IFR Is Unconstitutional

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality. In so doing, it violates the equal protection and due process guarantees furnished by the Constitution and codified in the ACA.

Religious arguments have long been weaponized in attempts to thwart women's equality, just as they have been weaponized to undermine racial equality.[39] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[40] And, as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[41]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and to ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need but that does not cover care that women need. As a result, the IFR discriminates against women on the basis of sex in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. The IFR's interference with the right to contraception constitutes a separate violation of women's fundamental constitutional right to liberty, which also finds its roots in the Due Process Clause of the Fifth Amendment. Disparate treatment of women's preventive services additionally violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[42] Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women in ways not authorized under the First Amendment. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal

---

[36] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[37] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[38] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[39] *See*, e.g., Brief of the American Civil Liberties Union et al. as Amici Curiae Supporting Respondents at 21-27, Zubik v. Burwell, 578 U.S. ___ (2016) (No. 14-1418),
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf.
[40] *Id.* at 19.
[41] *Id.* at 24-27
[42] 2 U.S.C. § 18116.

7

00396744

Exhibit 105

JA-0001493

law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [43] In fact, in *Hobby Lobby*, which was decided under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [44] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

### IV. The IFR Violates the Administrative Procedure Act

The Departments promulgated this rule as an interim final rule effective immediately upon publication. This violated the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in three key ways: (1) the Departments do not have good cause to skip notice and comment rulemaking; (2) issuing this IFR is arbitrary and capricious; and (3) the IFR exceeds the Departments' statutory authority.

The APA requires an agency to follow notice and comment procedures that provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation"[45] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest."[46] The APA further requires that a rule be published 30 days prior to its effective date.[47] Good cause plainly did not exist here, and the Departments violated the law by promulgating this rule as an IFR effective immediately upon publication.[48]

Further, the Departments' action in issuing this interim final rule is arbitrary and capricious. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's constitutional right to a critical preventive service and certain institutions' religious beliefs, and they did so

---

[43] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[44] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id.* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[45] 5 U.S.C. § 553(c).

[46] 5 U.S.C. § 553(b).

[47] 5 U.S.C. § 553(d).

[48] Nick Bagley, *The Trump Administration and Contraceptive Coverage*, TAKE CARE BLOG (Oct. 6, 2017), https://takecareblog.com/blog/the-trump-administration-and-contraception-coverage.

8

00396745

Exhibit 105

without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[49]

Additionally, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[50] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[51]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious and moral beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. YSRJ unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individuals' unfounded ideological beliefs.

### A.    Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion."[52] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts

---

[49] 5 U.S.C. § 706.

[50] 42 U.S.C. § 18114(1).

[51] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[52] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

00396746

Exhibit 105    JA1281    JA-0001495

before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[53]

## B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[54] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[55, 56] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[57] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[58]

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[59] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[60,61] In fact, school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[62,63] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[64] Overall,

---

[53] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[54] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[55] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[56] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[57] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[58] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[59] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[60] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[61] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[62] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[63] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[64] *Id.*

10

00396747

increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[65] More females are using contraception the first time they have sex.[66]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

## VI. The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[67] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of those programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws, which cannot fill in the coverage gaps caused by this IFR.

### A. Medicaid and Title X Programs Do Not Meet the Needs of Individuals Who Will Lose Contraceptive Coverage Under the IFR.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[68] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result

---

[65] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[66] *Id.*
[67] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).
[68] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).
[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

11

00396748

Exhibit 105     JA1283     JA-0001497

from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over \$30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income and is not equipped to address the gaps in coverage that this IFR will create. Unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Privately insured individuals are by definition not eligible for Medicaid, so Medicaid cannot serve as a safety net for those who lose access to contraception as a result of the IFR.

Even absent these eligibility barriers, Medicaid is plagued by provider shortages and lacks capacity to absorb those who lose covereage as a result of this IFR. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

---

[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over \$450 million to adequately address the existing need for publicly funded contraception.

[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of \$8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

12

00396749

Exhibit 105

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients'

---

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[78] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

00396750

Exhibit 105

JA-0001499

access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. It is at best perplexing and at worst profoundly disingenuous that the Department would specifically highlight Title X and Medicaid as fail-safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling with No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state

---

[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations,* Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[81] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute,

14

00396751

Exhibit 105

JA-0001500

has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments are flatly mistaken that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

This IFR will cause people to lose contraceptive coverage, and it will harm their health and well-being. It is discriminatory, violates multiple federal statutes and constitutional provisions, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, as well as of the federal programs supporting and state laws regarding contraception. For all of these reasons YSRJ calls on the Departments to rescind the IFR.


Sincerely,

Yale Students for Reproductive Justice

---

Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017,
http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

15

00396752

Exhibit 105     JA1287     JA-0001501



**Archdiocese of New Orleans**                           Office of the Archbishop

7887 Walmsley Avenue
New Orleans, LA 70125-3496
Office: (504) 861-9521
Fax (504) 314-9614
Email: archbishop@arch-no.org

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 816
Baltimore, MD 21244-8016

**Subject:   Moral Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act**

Dear Sir or Madam:

As Archbishop of the Archdiocese of New Orleans, I write on behalf of the Archdiocese and its
many Roman Catholic ministries to submit the following comments on the interim final rules,
published at 82 Fed. Reg. 47838 (Oct. 13, 2017), on moral exemptions and accommodations for
coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

In accord with Roman Catholic teaching and morals, I oppose any contraception, especially any
drugs or devices that can cause abortion.

First, as set forth in my comments on the companion interim rule on religious exemptions and for
the reasons set forth there, I believe HHS should reconsider and rescind the mandate requiring
coverage of contraception or sterilization in health plans.  My comments on the companion
interim rule are attached here for convenience.

Second, in regard to the list of those eligible for an exemption for moral reasons as set forth in
this final interim rule, that list is slightly narrower than the list of those who are exempt for
religious reasons in the companion rule.  HHS asks whether the list of those who are exempt for
moral reasons should be the same as those exempt for religious reasons in the companion interim
rule.  I urge HHS to answer that question "YES"!  The list of stakeholders who are exempt for

---

[1] Today I have also filed comments on the companion interim final rule, published at 82 Fed Reg. 47792
(Oct. 13, 2017), concerning exemptions and accommodations for religious objections to contraceptives.
The two sets of comments should be considered together, and each set of comments includes the other as
an attachment which we incorporate by reference. Unless context indicates otherwise, the use of the term
"contraceptives" refers to contraceptives, sterilization, and related education and counseling, and
"contraceptive coverage" refers to coverage of these items. The "mandate" refers to the requirement to
cover these items.

00207050

Exhibit 106                              JA1288                              JA-0001502

moral reasons should be at least as broad as the list of those who are exempt for religious reasons. The reasons that HHS has offered for those with religious exemptions exist in parallel for those with moral reasons for the exemption.

Therefore, in conclusion, I urge HHS to reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services." In addition, the list of exemptions for those with moral objections should be as broad as the list of the exemptions for those with religious objections. This interim final rule should be adjusted so that it parallels the list of stakeholders with religious objections in the companion interim final rule.

I hope and pray you give this reflection and attention.

Sincerely,

Most Reverend Gregory M. Aymond
Archbishop of New Orleans

00207051

Exhibit 106                    JA1289                    JA-0001503



**Archdiocese of New Orleans**  ·  Office of the Archbishop

7887 Walmsley Avenue
New Orleans, LA 70125-3496
Office: (504) 861-9521
Fax (504) 314-9614
Email: archbishop@arch-no.org

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 816
Baltimore, MD 21244-8016

**Subj:  Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act**

Dear Sir or Madam:

As Archbishop of the Archdiocese of New Orleans, I write on behalf of the Archdiocese and its
many Roman Catholic ministries to submit the following comments on the interim final rules,
published at 82 Fed. Reg. 47792 (Oct. 13, 2017), on religious exemptions and accommodations
for coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

In accord with Roman Catholic teaching and morals, I oppose any contraception, especially any
drugs or devices that can cause abortion.

Therefore, first, I would urge the Department of Health and Human Services("HHS") to
reconsider and rescind the mandate requiring contraception and sterilization in health plans
because these are not "preventive services" and do not prevent disease or illness.  Instead, the
drugs, devices and procedures impair the healthy condition known as fertility and pose health
risks of their own to women.  In addition, the mandate is at odds with the preventive-services
provision of the Affordable Care Act ("ACA") upon which the mandate is purportedly based.
Further, to the extent that the mandate requires coverage of all drugs and devices that can cause
an abortion, it violates the ACA provisions addressing abortion coverage, non-preemption of
state law and other laws.

---

[1] Today I have also filed comments on the companion interim final rule, published at 82 Fed
Reg. 447838 (Oct. 13, 2017), concerning exemptions and accommodations for moral objections
to contraceptives. The two sets of comments should be considered together, and each set of
comments includes the other as an attachment which we incorporate by reference. Unless context
indicates otherwise, the use of the term "contraceptives" refers to contraceptives, sterilization,
and related education and counseling, and "contraceptive coverage" refers to coverage of these
items. The "mandate" refers to the requirement to cover these items.

00207052

Exhibit 106    JA1290    JA-0001504

Second, in the present interim final rule and the companion rule in regard to moral convictions, HHS leaves to the discretion of the Health Resources and Services Administration ("HRSA") to decide whether to include contraceptives in women's preventive services Guidelines. Yet, those guidelines have never been the subject of notice and comment rulemaking and significant questions remain whether contraceptives are an appropriate subject for inclusion in the list of preventive services in the first place. For reasons that have been explained previously, especially in comments made on this interim final rule and other rules by the United States Conference of Catholic Bishops, HHS could reasonably conclude that contraceptives are not preventive services. At the very least, HHS should clarify that the mandate does not apply to any drug or device that can disrupt an existing pregnancy to comply with the abortion and non-preemption provisions of applicable law.

Third, I commend HHS in regard to the exemptions crafted in this interim final rule and the companion rule for those with religious objections to contraceptive coverage.

The last point that I make centers around the HHS indication that exempt entities will not be required to comply with self-certification. At the same time, HHS asks whether the exempt entities or others would find value in maintaining or submitting a certification. While I agree with not requiring self-certification, I see no need or value in any certification since any such certification raises religious, moral and legal concerns.

In conclusion, I ask that HHS reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services" or, at a minimum, consistent with the abortion and non-preemption provisions of the ACA and with the Weldon amendment, not mandate coverage of any drug or device that can disrupt an existing pregnancy. While the mandate or any portion of it remain in effect, I support the exemptions that this rule and the companion rule together provide to those with religious and moral objections.

I hope and pray you give this reflection and attention.

Sincerely,

Most Reverend Gregory M. Aymond
Archbishop of New Orleans

00207053

Exhibit 106 JA1291 JA-0001505

[intentionally omitted]



**ARCHDIOCESE OF ST. LOUIS**
*Cardinal Rigali Center*
*20 Archbishop May Drive*
*Saint Louis, Missouri 63119*

General Counsel
*p) 314.792.7075*
*f) 314.792.7079*
*tombuckley@archstl.org*

December 4, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8010
Baltimore, MD 21244-8010

> **Re:** **Religious Exemptions and Accomodations for Coverage of Certain**
> **Preventive Services under the Affordable Care Act, RIN 0928-AT20**

Dear Sir or Madam:

On behalf of the Archdiocese of St. Louis, its agencies and parishes, we respectfully submit the following comments on the interim final rules, published at 82 Fed. Reg. 47792 (Oct. 13, 20170, on religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").

We agree with HHS that the contraceptive mandate and accommodations, as applied to religious objectors, violated the Religious Freedom Restoration Act ("RFRA"), and we commend HHS and the other Departments for their concession of this point, and for the exemptions that the interim final rules provide to avoid further violations of RFRA. We also agree with the Department's indication that exempt entities should not be required to comply with a self-certification process, and we recommend that no such form or process be developed or necessary to claim the exemption.

We concur in and adopt as if more fully set forth herein the comments provided by the Office of the General Counsel for the United States Conference of Catholic Bishops filed on November 21, 2017.

Respectfully submitted,

Thomas M. Buckley

ARCHSTL.ORG

00207139



**ASSOCIATION OF CATHOLIC COLLEGES AND UNIVERSITIES**

One Dupont Circle NW, Suite 650, Washington, DC 20036
ph 202-457-0650 · fax 202-728-0977 · accu@accunet.org · www.accunet.org

November 28, 2017

Submitted electronically to http://www.regulations.gov

Centers for Medicare & Medicaid Services
U.S. Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

Attention:

> Jeff Wu, Centers for Medicare & Medicaid Services, U.S. Department of Health and Human Services
> Amber Rivers and Matthew Litton, Employee Benefits Security Administration, U.S. Department of Labor
> Karen Levin, Internal Revenue Service, U.S. Department of the Treasury

Re: **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT20**

Dear Mr. Wu, Ms. Rivers, Mr. Litton, and Ms. Levin:

The Association of Catholic Colleges and Universities ("ACCU" or the "Association") appreciates the opportunity to comment on the interim final rules with request for comments on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (the "Interim Final Rules").[1] In brief, ACCU is pleased that the new definition of "religious employer" will expand its members' options by recognizing them as exempt from the so-called "contraceptive mandate" as nonprofit organizations and, with respect to student health insurance coverage, as institutions of higher education. ACCU agrees with the Departments that the regulations should continue to treat student health insurance coverage in the same manner as employee health plans.

ACCU and its members and their interest in the Interim Final Rules

*ACCU*

Founded in 1899, ACCU serves as the collective voice of U.S. Catholic higher education. The Association represents **93%** of the **210** Catholic colleges and universities in the United States that offer undergraduate degree programs and are also regionally accredited and independently chartered.

Through programs and services, ACCU strengthens and promotes the Catholic identity and mission of its member institutions so that all associated with Catholic higher education can contribute to the

---

[1]     82 Fed. Reg. 47792 (Oct. 13, 2017).

00434984

Exhibit 108                                   JA1294                              JA-0001518

greater good of the world and the Roman Catholic Church. ACCU's principal purposes are to help member institutions strengthen their stated Catholic mission and to foster collaboration among Catholic colleges and universities.

ACCU maintains contact with the leadership of the Catholic Church principally through the United States Conference of Catholic Bishops ("USCCB") and the Congregation for Catholic Education of the Holy See. The Association also actively works with other Catholic organizations, such as the Association for Student Affairs at Catholic Colleges and Universities, and other higher education associations, including those with religious-affiliated members, such as the National Association of Independent Colleges and Universities.

### *Interest in the Interim Final Rules*

As an association of Catholic colleges and universities, ACCU supports healthcare for all as an aspect of human dignity,[2] but also is concerned that its members not be legally required to cover or arrange for coverage of medical services that are inconsistent with the teachings of the Catholic Church.[3] The interpretation of the Affordable Care Act ("ACA") by the Health Resources and Services Administration ("HRSA") to include coverage of all Food and Drug Administration ("FDA")-approved contraceptives, sterilization procedures, and related education and counseling for women of child-bearing age (the "contraceptive mandate"), coupled with the narrow exemption for "religious employers" under the prior rule, gave rise to such concerns.[4]

As the preamble to the Interim Final Rules notes more generally,[5] the contraceptive mandate has affected ACCU members in varying ways. For example, some ACCU members have health plans that are "grandfathered" under the ACA and are not currently subject to the contraceptive mandate. Some ACCU members participate in "church plans," as to which the Departments lack authority to enforce the contraceptive mandate against third-party administrators pursuant to the so-called "accommodation." Some ACCU members that would have been eligible for the "accommodation" were among the plaintiffs challenging the contraceptive mandate and the accommodation in cases culminating in the U.S. Supreme Court's decision in Zubik v. Burwell.[6] Some ACCU members were among the institutions of higher education that "stop[ped] arranging student plans rather than comply with the contraceptive mandate or be subject to the accommodation with respect to such populations."[7] All ACCU members share an interest in the manner in which the federal government defines religious institutions and the extent to which rules of the federal government would require ACCU members to engage in activities inconsistent with their religious mission.

---

[2]    See, e.g., Letter from His Eminence Timothy Cardinal Dolan et al. to U.S. Senate and House of Representatives (Mar. 8, 2017), available at http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/joint-letter-to-congress-on-health-care-reform-2017-03-07.cfm.

[3]    It is well known that the Catholic Church teaches respect for and protection of human life from the moment of conception, as well as openness of marriage to procreation, and therefore opposes abortion and artificial contraception on religious grounds. E.g., Libreria Editrice Vaticana, Catechism of the Catholic Church ¶¶ 1652, 2270-2271, 2370 (1st. Ed. 1994).

[4]    As you know, the current version of the HRSA guidelines is available at https://www.hrsa.gov/womens-guidelines-2016/index.html, and the current list of FDA-approved contraceptives is available at https://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm522453.htm.

[5]    82 Fed. Reg. at 47801-47802.

[6]    136 S. Ct. 1557 (2016).

[7]    82 Fed. Reg. at 47803.

\\DC - 082203/000009 - 10869690 v3

00434985

Exhibit 108
JA-0001519

ACCU's comments focus on issues of particular importance to Catholic higher education.[8]

> 1. <u>ACCU supports the Departments' expansion of the definition of "religious employer" to cover, among others, ACCU members.</u>

ACCU supports the Departments' broadening of the definition of a "religious employer" exempt from the contraceptive mandate. The prior definition of "religious employer" included only nonprofit entities that are churches; integrated auxiliaries of churches; conventions or associations of churches; or the exclusively religious activities of religious orders.[9] That restrictive view of a "religious employer" was too narrow to encompass ACCU members.

ACCU urged a broader definition of "religious employer" in its comments on the 2013 Notice of Proposed Rulemaking on preventive services under the ACA ("2013 comments").[10] As explained in that letter, under Church law Catholic colleges and universities are required to "make known [their] Catholic identity."[11] All Catholic colleges and universities are recognized by the Catholic Church, and some are also sponsored by Catholic religious orders. Canon law requires a Catholic college or university to obtain "the consent of competent ecclesiastical authority"—typically, the Bishop—before bearing the title or name of Catholic university.[12] In 1990 Pope John Paul II issued the <u>Apostolic Constitution on Catholic Universities Ex corde Ecclesiae</u> ("<u>Ex corde Ecclesiae</u>") as the "magna carta" for Catholic higher education around the world.[13] The Catholic Church defines a "Catholic University" as having four essential characteristics: (1) "a Christian inspiration not only of individuals but of the university community as such"; (2) "a continuing reflection in the light of the Catholic faith upon the growing treasury of human knowledge, to which it seeks to contribute by its own research"; (3) "fidelity to the Christian message as it comes to us through the Church"; and (4) "an institutional commitment to the service of the people of God and of the human family in their pilgrimage to the transcendent goal which gives meaning to life."[14] USCCB subsequently approved <u>The Application of Ex corde Ecclesiae for the United States</u> to implement <u>Ex corde Ecclesiae</u> in this country.[15] For Catholic colleges and universities, the "essential elements of Catholic identity" include a commitment to be faithful to the teachings of the Catholic Church; to adhere to Catholic ideals, principles, and attitudes in carrying out research, teaching, and all other university activities; and to create a campus culture and environment that are expressive and supportive of a Catholic way of life.[16]

Catholic higher education institutions fulfill one of their core religious functions by serving as "a primary

---

[8]  USCCB has submitted comments on the Interim Final Rules addressing broader Church concerns. <u>See</u> Letter from A. Picarello et al. to Centers for Medicare and Medicaid Services (Nov. 21, 2017).

[9]  45 C.F.R. § 147.131(a) (as in effect before October 6, 2017).

[10]  Letter from M. Galligan-Stierle, ACCU to M. Tavener et al., U.S. Department of Health and Human Services (April 8, 2013), available at https://www.facos.org/Public/Files/Gov%20Affairs/Reg/ACOSAOAO.pdf.

[11]  John Paul II, <u>Ex corde Ecclesiae</u> art. 2, § 3 (1990), available at http://w2.vatican.va/content/john-paul-ii/en/apost_constitutions/documents/hf_jp-ii_apc_15081990_ex-corde-ecclesiae.html; <u>accord</u>, USCCB, <u>The Application of Ex corde Ecclesiae to the United States</u>, art. 2(5) (2000) ("<u>Application</u>") ("A responsibility of every Catholic university is to affirm its essential characteristics, in accord with the principles of <u>Ex corde Ecclesiae</u>, through public acknowledgement in its mission statement and/or its other official documentation of its canonical status and its commitment to the practical implications of its Catholic identity . . . ."), <u>available at</u> http://www.usccb.org/beliefs-and-teachings/how-we-teach/catholic-education/higher-education/the-application-for-ex-corde-ecclesiae-for-the-united-states.cfm.

[12]  1983 Codex Iuris Canonici, c.808, available at http://www.vatican.va/archive/ENG1104/__P2O.HTM.

[13]  Available at http://w2.vatican.va/content/john-paul-ii/en/apost_constitutions/documents/hf_jp-ii_apc_15081990_ex-corde-ecclesiae.html.

[14]  <u>Id.</u> ¶ 13.

[15]  <u>See</u> USCCB, <u>Application</u>.

[16]  <u>Id.</u> pt. 1, § 7.

00434986

Exhibit 108

and privileged place <u>for a fruitful dialogue between the Gospel and culture</u>."[17] The decision of Catholic colleges and universities to employ non-Catholic faculty and staff and admit non-Catholic students does not diminish the institutions' commitment to their religious mission. To the contrary, it strengthens their commitment to the "continuous quest for truth," which is an integral part of their religious mission.[18] Moreover, as one commentator explains,

> [n]ot every religious school can or will insist that every teacher actively promote religion. But nearly all will at least require every teacher not to interfere. A religious school might hire a nonbelieving math teacher, but it is not likely to permit him to flaunt his nonbelief, to denigrate the church that runs the school, or to set a bad moral example. Thus, even the nonbelieving math teacher has some intrinsically religious responsibilities.[19]

USCCB calls for a "[c]ommitment of witness of the Catholic faith by Catholic administrators and teachers, especially those teaching the theological disciplines, and acknowledgement and respect on the part of non-Catholic teachers and administrators of the university's Catholic identity and mission."[20]

The expanded definition of "religious employer" under the Interim Final Rules includes, among other entities, "nonprofit organizations" and, with respect to student health insurance, "institutions of higher education."[21] All ACCU members are nonprofit organizations and institutions of higher education and generally provide health plans for their employees and students. ACCU is pleased that the Departments have adopted a definition of "religious employer" that is sufficiently broad to cover ACCU members.

### 2. ACCU supports the continuing parity of treatment of employee and student health plans.

Like the prior regulation, the Interim Final Rules treat student health plans in a manner comparable to employee health plans.[22] As expressed in our 2013 comments, ACCU agrees that the same exemption that applies to employee health plans should apply to student health plans as well. As described above, ACCU members have a religious mission that pertains to all aspects of their operations, including health plans for their employees and students. There would be no principled basis to make a distinction between employee and student health plans with respect to application of the religious exemption. ACCU is pleased that the expansion of the exemption will allow religious-affiliated institutions that discontinued student and/or employee health plans under the prior regulation to reinstitute such plans in a manner consistent with their religious beliefs.[23]

---

[17]   <u>Ex corde Ecclesiae</u> ¶ 43 (emphasis in original); <u>see also</u> <u>id.</u> at ¶ 26 ("[t]he university community of many Catholic institutions includes members of other Churches, ecclesial communities and religions, and also those who profess no religious belief"); <u>Application</u> intro. (Catholic colleges and universities, as places "where culture and faith intersect," present an opportunity to "bring diversity to American higher education").

[18]   <u>Id.</u> ¶ 30.

[19]   Douglas Laycock, <u>Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy</u>, 81 Colum. L. Rev. 1373, 1411 (1981).

[20]   <u>Application</u> pt. 1, § 7.

[21]   82 Fed. Reg. at 47835 (to be codified at 45 C.F.R. § 147.132(a)).

[22]   82 Fed. Reg. at 47834-35 (to be codified at 45 C.F.R. § 147.131(e), 147.132(a)(ii)).

[23]   To the extent that employees or students of ACCU member institutions want to obtain contraceptive services that health plans provided by ACCU members do not cover, those employees or students may have other options, such as being covered under a plan of their spouse or their parents; purchasing coverage on the individual market, including on an ACA exchange; or obtaining such services through various governmental programs described in the preamble to the Interim Final Rules. <u>See</u> 82 Fed. Reg. at 47803.

\\DC - 082203/000009 - 10869690 v3

00434987

Exhibit 108    JA1297    JA-0001521

We appreciate your consideration of these comments.

Sincerely,

Michael Galligan-Stierle, Ph.D.
President and CEO

\\DC - 082203/000009 - 10869690 v3

00434988

Exhibit 108                    JA1298                    JA-0001522



*Seeking Justice with the Love of God*

December 5, 2017

**Submitted Electronically**

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
Hubert H. Humphrey Building
200 Independence Avenue S.W.
Washington, D.C. 20201

**Re: "Preventive Services" - Comments on Interim Final Rules, Religious Exemptions and Accommodations for Coverage of Certain Preventative Services under the Affordable Care Act**

Dear Sir or Madam:

Christian Legal Society ("CLS") submits the following comments on the Interim Final Rules, Religious Exemptions and Accommodations for Coverage of Certain Preventive Services, 82 Fed. Reg. 47792 (October 13, 2017). Comments were invited on the interim final rules, which set out expanded exemptions for certain entities and individuals who have religious objections to providing insurance coverage for contraceptives under the Affordable Care Act ("ACA"). The final interim rules also leave in place the "accommodation" process for certain exempt entities that wish to use it voluntarily.

Since the enactment of the ACA in 2010, CLS filed comments each time the Department of Health and Human Services ("HHS") issued a regulatory proposal on contraceptive coverage.[1] A recurring concern in CLS' earlier comments regarding the ACA's contraceptive coverage requirement and regulations (hereinafter "the Mandate") focused on the continued insistence of bifurcating religious organizations into two categories: 1) houses of worship that qualified for the exemption and 2) religious ministries or nonprofits that did not qualify for the exemption. CLS argued that if coverage of contraceptives was to be mandated, then all entities with religious objections should be exempt. Indeed, CLS argued that the previous exemption from the Mandate

---

[1] On June 19, 2012, CLS filed comments on the Advanced Notice of Proposed Rulemaking on Preventive Services, 77 Fed. Reg. 16501 (Mar. 21, 2012), *available at* http://www.clsnet.org/document.doc?id=368. On April 8, 2013, CLS filed comments on the Advanced Notice of Proposed Rulemaking on Preventive Services, 78 Fed. Reg. 8456 (Feb. 6, 2013), *available at* http://www.clsnet.org/document.doc?id=476. On October 21, 2014, CLS filed comments on the Notice of Proposed Rulemaking on Coverage of Certain Preventive Services under the Affordable Care Act, 79 Fed. Reg. 51118 (Aug. 27, 2014), *available at* http://clsnet.org/document.doc?id=805. On October 27, 2014, CLS filed comments on the Interim Final Rules, Coverage of Certain Preventative Services under the Affordable Care Act, 79 Fed. Reg. 51092 (Aug. 27, 2014), *available at* https://www.clsnet.org/document.doc?id=1109.

00436208

Exhibit 109                              JA1299                              JA-0001523

was too narrow and that the accommodation HHS created as relief for non-exempt entities was insufficient to relieve the substantial burden the Mandate placed on them.

A second concern CLS also outlined in its earlier comment letters was that the Mandate, despite inclusion of the accommodation, violated the constitutional and federal statutory rights of religious nonprofits, particularly the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (2012) ("RFRA"). CLS pointed out that a broad exemption for religious objectors was required under RFRA, the exemption being prudent as a matter of public policy and consistent with longstanding traditions protecting conscience in the country.

These interim final rules appropriately respond to the many concerns that CLS and countless other churches, ministries, and religious nonprofits previously raised in past comment letters or through lawsuits. CLS is pleased to join other commentators in applauding these interim final rules.

As CLS previously noted, the contraceptive coverage requirement and regulations, despite inclusion of the accommodation, violated the constitutional and federal statutory rights of religious nonprofits, including RFRA. By extending the exemption, HHS has now included all entities that object to establishing, offering, maintaining, providing, or arranging coverage for some or all contraceptive services based upon sincerely held religious beliefs. By finally including all religious nonprofits that have continually objected to providing life-destroying drugs, HHS is finally recognizing the Constitutional rights of these entities.

CLS praises HHS for acknowledging that the Mandate and accommodation, as applied to religious objectors, violated RFRA. CLS further praises HHS for the expanded exemption the interim final rules provide, thereby avoiding further RFRA violations.

RFRA requires the federal government to demonstrate an actual compelling interest, unachievable by less restrictive means before it may restrict a citizen's religious practice. 42 U.S.C. § 2000bb-1(b). *See Burwell v. Hobby Lobby*, 573 U.S. ___ (2014). HHS now concedes that "application of the Mandate to entities with sincerely held religious objections ... does not serve a compelling governmental interest." 82 Fed. Reg. at 47800. Accordingly, HHS rightfully "created a broader exemption, rather than simply adjusting the accommodation process." *Id.*

The interim final rules are in step with the tradition of bipartisan protection of religious tolerance. Respect for this tradition of bipartisan protection of citizens' rights not to participate in the Mandate on religious grounds required, at a minimum, the action HHS has now taken – namely, expanding the exemption to include all non-governmental entities that object to providing insurance coverage for contraceptives based upon sincerely held religious beliefs.

Respectfully submitted,

/s/ Kimberlee Wood Colby
Kimberlee Wood Colby
Director, Center for Law and Religious Freedom
Christian Legal Society

00436209

Exhibit 109

**Chair:**
Ms. Barbara A. Boigegrain

**Secretary/Treasurer:**
Mr. Andrew Q. Hendren, Esquire

Wespath Benefits and Investments
1901 Chestnut Avenue
Glenview, Illinois 60025
(847) 866-4200

**Chair Emeritus:**
Mr. John G. Kapanke

**Members:**
Rev.Dr. Todd Adams
*Disciples of Christ*
Mr. David Anderson
*Community of Christ*
Mr. Louis Barbarin*
*American Baptist Churches*
Mr. Brian Bodager
*United Church of Christ*
Ms. Barbara A. Boigegrain*
*United Methodist Church*
Mr. John H. Bolt
*Christian Reformed Church in North America*
Mr. John Brummitt
*National Association of Free Will Baptists*
Mr. Gary D. Campbell
*Presbyterian Church in America*
Mr. Nevin Dulabaum
*Church of the Brethren*
Dr. Craig A. Dunn
*Wesleyan Church*
Dr. O. S. Hawkins *
*Southern Baptist Convention*
Mr. Paul Hawkinson
*Evangelical Covenant Church*
Mr. Reggie Hundley
*Christian Churches Pension Plan*
Mr. Jeffrey A. Jenness*
*Board of Pensions of the Church of God (IN)*
Rev. Dr. Jeffry J. Jeremiah
*Evangelical Presbyterian Church*
Mr. Raymond Jimenez
*General Conference of Seventh-Day Adventists*
Mr. Marlo J. Kauffman
*Mennonite Church*
Mr. Michael Kimmel
*Reform Pension Board*
Rev. Ross I. Morrison
*Evangelical Free Church of America*
Rev. Richard Nugent
*Unitarian Universalist Association*
Ms. Kelly Oliveira
*Reformed Church in America*
Mr. Joshua Peterman
*Wisconsin Evangelical Lutheran Synod*
Mr. Jonathan Phillips
*International Church of the Foursquare Gospel*
Mr. John M. Preis *
*Young Men's Christian Association*
Br. Michael F. Quirk, FSC*
*Christian Brothers Services*
Mr. Arthur D. Rhodes
*Church of God Benefits Board (TN)*
Mr. Larry Roberts
*Free Methodist Church of North America*
Mr. James F. Sanft*
*Lutheran Church-Missouri Synod*
Mr. Stephen Schultz
*Baptist General Conference–Converge Worldwide*
Mr. Mitchell J. Smilowitz*
*Joint Retirement Board for Conservative Judaism*
Rev. Frank C. Spencer *
*Presbyterian Church (U.S.A.) Board of Pensions*
Rev. Jeffrey Thiemann*
*Evangelical Lutheran Church in America*
Mr. James P. Thomas, CPA
*Churches of God, General Conference*
Rev. Bruce Verkruyse, Jr.
*Association of Unity Churches International*
Rev. Don L. Walter
*Church of the Nazarene*
Mr. Roger Wiles
*Associate Reformed Presbyterian Church*
Ms. Mary Kate Wold*
*Episcopal Church*

**\* Steering Committee Members**

**Counsel:**
**K&L Gates LLP**
1601 K Street NW
Washington D.C. 20006
Tel (202) 778-9000
Fax (202) 778-9100

## CHURCH ALLIANCE
Acting on Behalf of Church Benefits Programs

December 5, 2017

By electronic submission (http://www.regulations.gov)

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS–9940–IFC
P.O. Box 8016
Baltimore, MD 21244–8016

Re:     Religious Exemptions and Accommodations for Coverage of Certain
        Preventive Services Under the ACA

To Whom It May Concern:

The Church Alliance submits this comment in response to the interim final rules (the "Rules") regarding religious exemptions and accommodations for coverage of certain preventive services under the Patient Protection and Affordable Care Act ("ACA") issued jointly by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services (together, the "Departments") and published at 82 Fed. Reg. 47,792 (Oct. 13, 2017).

The Church Alliance is a coalition of the chief executive officers of 37 church benefits organizations, shown on the left side of this letterhead. As discussed in more detail below, the Church Alliance supports the religious liberty principle that no church plan should be forced to violate its religious beliefs in the provision of health benefits. Therefore, even though many Church Alliance members have no religious objection to providing the wide range of preventive services required by section 2713 of the ACA, the Church Alliance applauds the expansion of the religious exemption in the Rules, consistent with that religious liberty principle.

By way of background, the Church Alliance has submitted comments on five separate occasions regarding the ACA's preventive services coverage requirement (the "Coverage Requirement"):

•     on September 28, 2011, on the interim final rules published at 76 Fed. Reg. 46,621 (Aug. 3, 2011);[1]

•     on June 19, 2012, on the advance notice of proposed rulemaking published at 77 Fed. Reg. 16,501 (Mar. 21, 2012);[2]

---

[1] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Sept. 28, 2011), *available at* http://church-alliance.org/sites/default/files/images/u2/Comment_Letter_Contraceptive_Religious_Employer_09_28_11.pdf.

[2] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Jun. 19, 2012), *available at* http://church-alliance.org/sites/default/files/images/u2/Church_Alliance_Comment_on_ANPRM_on_Preventive_Services_June_2012.pdf.

00328198

Exhibit 110                                    JA1301                                    JA-0001525

December 5, 2017
Page 2

- on April 8, 2013, on the notice of proposed rulemaking published at 78 Fed. Reg. 84,566 (Feb. 6, 2013);[3]

- on October 27, 2014, on the notice of proposed rulemaking published at 79 Fed. Reg. 51,092 (Aug. 27, 2014);[4] and

- on September 20, 2016, in response to the request for information on coverage for contraceptive services published at 81 Fed. Reg. 47,741 (Jul. 22, 2016).[5]

We appreciate this opportunity to build on our previous comments as the Departments consider religious exemptions and accommodations for coverage of certain preventive services under the ACA.

## I. BACKGROUND ON THE CHURCH ALLIANCE

The Church Alliance represents 37 church benefits boards, covering mainline and evangelical Protestant denominations, two branches of Judaism, and Catholic schools and institutions. The Church Alliance members provide employee benefit plans, including in many cases, medical coverage, to approximately one million participants (clergy and lay workers) serving over 155,000 churches, synagogues, and affiliated organizations. These medical programs are defined as "church plans" under section 3(33) of the Employee Retirement Income Security Act of 1974 ("ERISA") and section 414(e) of the Internal Revenue Code (the "Code").

The contraceptive services requirement of section 2713 of the ACA has created challenges for some Church Alliance members. The plans of a few Church Alliance members, reflecting the religious beliefs of the churches with which they are associated, exclude coverage for all contraceptives. Other programs whose associated churches do not object to contraception, but hold fundamental convictions against abortion, exclude coverage for contraceptives that are or could be abortifacients, such as so-called "morning-after pills" or "emergency contraceptives." Many of the health care plans associated with the members of the Church Alliance do not impose any specific restrictions on contraceptive coverage. However, the Church Alliance agrees that its members should not have to risk significant penalties in order to follow the religious beliefs of the churches with which they are associated.

## II. INTERIM FINAL RULES

The Church Alliance is very grateful that the Departments have expanded the religious exemption in the Rules. As contrasted with earlier versions of regulations on the Coverage Requirement, the Rules no longer require a church or an employer associated with the church to choose between violating its religious beliefs and violating the law. The preamble to the Rules states that the exemption was expanded "among other reasons, to provide for participation in the health insurance market by certain entities or individuals free from penalties for violating sincerely held religious beliefs opposed to providing or receiving coverage of contraceptive services . . . ."[6] The Church Alliance supports that reasoning. We also commend the Departments for moving to a plan-based exemption, which the Church Alliance recommended in its prior comments.

As the Departments continue to work on the Rules, we would like to raise a few questions and technical suggestions for consideration.

---

[3] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Apr. 8, 2013), *available at* http://church-alliance.org/sites/default/files/images/u2/comment-letter-4-8-13.pdf.

[4] Letter from Church Alliance to Employee Benefits Security Admin. (Oct. 27, 2014), *available at* http://church-alliance.org/sites/default/files/images/u2/Comment-Letter-ACA-Preventive-Services-IFR-10-27-14.pdf.

[5] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Sept. 20, 2016), *available at* http://church-alliance.org/sites/default/files/images/u2/CA-Response-RFI-09-20-16.pdf.

[6] 82 Fed. Reg. 47,792, 47,815 (Oct. 13, 2017).

00328199

Exhibit 110     JA1302     JA-0001526

### A. Clarify that an Employer Adopting an Exempt Plan Cannot Be Penalized

The preamble to the Rules makes clear that if a plan is exempt under 45 C.F.R. § 147.132, neither the plan sponsor, the plan, nor an issuer providing coverage in connection with the plan will be penalized as a result of the plan not providing contraceptive coverage:

> Section 147.132(a)(1) introductory text and (a)(1)(i), by specifying that ''[a] group health plan and health insurance coverage provided in connection with a group health plan'' is exempt ''to the extent the plan sponsor objects as specified in paragraph (a)(2),'' exempt the group health plans the sponsors of which object, and exempt their health insurance issuers from providing the coverage in those plans (whether or not the issuers have their own objections).[7]

While the Rules recognize that exempt plans may cover multiple employers, the Rules do not recognize that employers adopting such plans that are not themselves "plan sponsors" can be penalized $100 per day for each employee not provided contraceptive coverage.[8] Employers that are "so closely associated" with an exempt plan sponsor that they are permitted to participate in the sponsor's health plan should not be penalized.[9] Perhaps such employers avoid a penalty on account of Section 54.9815-2713T, which is added to 26 C.F.R. Part 54, but this is not clear. We suggest this be recognized (or clarified) in guidance.

### B. Revocation of Accommodation

The preamble to the Rules states:

> If an eligible organization wishes to revoke its use of the accommodation, it can do so under these interim final rules and operate under its exempt status.[10]

However, it is unclear how such a revocation is to be accomplished, and whether the objecting organization must notify the applicable issuer and third party administrator in a particular way. The Church Alliance would appreciate the Departments' guidance on this question.

### C. Certification or Documentation of Exemption

The preamble to the Rules states:

> The Departments invite public comment on whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption, or in otherwise receiving guidance on a way to document their exemption.[11]

The Church Alliance respectfully requests that the Departments refrain from specifying forms of certification to claim or maintain an exemption. It is our understanding, as stated in the preamble to the Rules, that "exempt entities will not be required to comply with a self-certification process."[12] Moreover, the Rules state that "the exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section [45 C.F.R. § 147.132] objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its

---

[7] *Id.* at 47,808.

[8] *See* 26 U.S.C. §§ 4980D(b) and (e)(1) (imposing the $100 per day tax for any failure of a group health plan to meet the requirements of chapter 100 (relating to group health plan requirements) on the employer).

[9] 82 Fed. Reg. at 47,810.

[10] *Id.* at 47,813.

[11] *Id.* at 47,809.

[12] *Id.* at 47,808.

00328200

Exhibit 110
JA-0001527

December 5, 2017
Page 4

sincerely held religious beliefs."[13] We urge the Departments to refrain from issuing guidance on "a specific form of certification," because this guidance could be interpreted as setting a rigid standard or requirement, which may create Religious Freedom Restoration Act[14] concerns for some exempt entities. Such guidance would appear to us to be contrary to both the preamble to the Rules and the Rules themselves, which appear to condition exemption only on meeting the description in paragraph (a)(1) and objecting to certain coverage or payments based on religious beliefs, and do not include a certification.

However, the Church Alliance would find value in receiving guidance that is flexible on ways to document the religious exemption.

The Church Alliance is grateful for the expanded religious exemption in the Rules, but would welcome additional guidance on the issues we have described above. Should you have any questions or wish to discuss these issues further, please contact the undersigned at (202) 778-9000.

Sincerely,

Karishma S. Page
Partner,
K&L Gates LLP
On Behalf of the Church Alliance

---

[13] *Id.* at 47,835.
[14] 42 U.S.C. § 2000BB-1.

00328201

Exhibit 110

JA1304

JA-0001528



*Submitted Electronically*

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT20**

Dear Sir or Madam:

In response to the request for written comment as a part of the interim final rules issued by by the U.S. Department of Health and Human Services (HHS), the Ethics & Religious Liberty Commission (ERLC) of the Southern Baptist Convention (SBC) respectfully submits the following comments.[1]

The Southern Baptist Convention is America's largest Christian protestant denomination with more than 15.2 million members in over 46,000 churches nationwide. As the Convention's ethics and public policy entity, the ERLC represents Southern Baptists before the U.S. government.

The ERLC has been involved in HHS's regulatory action on this matter for many years. Among other agency actions, the ERLC submitted comments on April 8, 2013, in response to HHS's Notice of Proposed Rulemaking (NPRM) regarding Coverage of Certain Preventive Services under the Affordable Care Act.[2] This remains an issue of great concern for millions of Southern Baptists. ERLC commends HHS's interim final rules issued October 13, 2017, to resolve this important conflict by finally providing an exemption from HHS's preventive services mandate for religious reasons, published at 82 Fed. Reg. 47792 (Oct. 13, 2017).

---

[1] The ERLC also submitted comments on the companion interim final rule, published at 82 Fed. Reg. 47838 (Oct. 13, 2017), relating to moral exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act. These two letters should be considered together, and each letter is included as an attachment to the other letter, incorporated by reference.

[2] 78 Fed. Reg. 8456 (February 6, 2013).

1 of 3

00373658

Exhibit 111

JA-0001529

The ERLC's comments filed in 2013 laid out three main points of concern with the implementation of the preventive care mandate.

First, the mandate represented a fundamental breach of constitutional and statutory rights. The First Amendment prohibits the federal government from burdening the free exercise of religion. Further, under the Religious Freedom Restoration Act (RFRA), the federal government may not substantially burden the free exercise of religious without a compelling interest and then may only do so using the least restrictive means possible. The ERLC argued in 2013 and maintains today that HHS's 2013 mandate and its so-called religious accommodation effected a substantial burden on the free exercise of religion, lacked a compelling governmental interest, and used means other than the least restrictive possible.

Second, the preventive care mandate substantially burdened the free exercise of religion of millions of Southern Baptists because the preventive care mandate offended specific tenets of faith and conscience. Southern Baptists do not necessarily have doctrinal objections to the use of contraception in the context of monogamous marriage. The overwhelming majority do, however, object to the use of contraceptives with abortifacient properties. In the nearly 50 years since Roe v. Wade, the previous Administration's preventive care mandate represented the first time the government had forced pro-life citizens to directly pay for insurance coverage that includes drugs with abortifacient properties.

Third, the ERLC objected to the fact that the accommodation in the 2013 rules was far too narrow in their scope and applicability in that many religious organizations and companies were not covered. In fact, HHS stated that, "this proposal would not expand the universe of employer plans that would qualify for the exemption beyond that which is intended in the 2012 final rules." Houses of worship and their integrated auxiliaries deemed religious by HHS are not the only institutions and individuals that possess protection of their freedoms of conscience and religious expression. The freedom of conscience is a God-ordained human principle not subject to the political aims of a government agency.

With respect to the new interim final rules, ERLC commends HHS for providing a religious exemption to the preventive care mandate regarding contraception consistent with HHS's obligations under the U.S. Constitution and RFRA. In particular, ERLC commends HHS for acknowledging that the original preventive care mandate and accommodation violated the RFRA

2 of 3

00373659

Exhibit 111

rights of many entities.[3] ERLC also commends HHS for extending this exemption to the full range of entities, including churches, nonprofit organizations, and for-profit entities which have religious objections. Americans with deeply held religious objections to abortion who were forced by their government to violate those beliefs by paying for products that caused abortions welcome this relief.

The ERLC respectfully urges finalization of the rules as written because they provides a true religious exemption to the preventive care mandate. On behalf of millions of Southern Baptists, the ERLC is grateful for HHS action to preserve the fundamental principle of the free exercise of religious liberty.

We are grateful for the opportunity to comment.

Respectfully submitted,

Russell Moore
President
Ethics & Religious Liberty Commission
of the Southern Baptist Convention

Travis Wussow
Vice President of Public Policy & General Counsel
Ethics & Religious Liberty Commission
of the Southern Baptist Convention

---

[3] "Upon further examination of the relevant provisions of the Affordable Care Act and the administrative record on which the Mandate was based, the Departments have concluded that the application of the Mandate to entities with sincerely held religious objections to it does not serve a compelling governmental interest." 82 Fed. Reg. at 47800

3 of 3

Exhibit 111

00373660

JA-0001531

*Addendum*



THE ETHICS & RELIGIOUS
LIBERTY COMMISSION
OF THE SOUTHERN BAPTIST CONVENTION

Contact us:
202-547-8105
dc@erlc.com

_Submitted Electronically_

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under
the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

In response to the request for written comment as a part of the interim final rules issued by by the
U.S. Department of Health and Human Services (HHS), the Ethics & Religious Liberty Commission
(ERLC) of the Southern Baptist Convention (SBC) respectfully submits the following comments.[1]

The Southern Baptist Convention is America's largest Christian protestant denomination with more
than 15.2 million members in over 46,000 churches nationwide. As the Convention's ethics and public
policy entity, the ERLC represents Southern Baptists before the U.S. government.

The ERLC has been involved in HHS's regulatory action on this matter for many years. The ERLC
submitted comments on April 8, 2013, in response to HHS's Notice of Proposed Rulemaking (NPRM)
regarding Coverage of Certain Preventive Services under the Affordable Care Act.[2] This remains an
issue of great concern for millions of Southern Baptists. ERLC commends HHS's interim final rules
issued October 13, 2017, to resolve this important conflict by finally providing an exemption from
HHS's preventive services mandate for religious reasons, published at 82 Fed. Reg. 47838 (Oct. 13,
2017).

---

[1] The ERLC also submitted comments on the companion interim final rule, published at 82 Fed. Reg. 47792 (Oct. 13, 2017), relating to
religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act. These two letters
should be considered together, and each letter is included as an attachment to the other letter, incorporated by reference.

[2] 78 Fed. Reg. 8456 (February 6, 2013).

1 of 3

00373662

Exhibit 111

JA1309

JA-0001533

The ERLC's comments filed in 2013 laid out three main points of concern with the implementation of the preventive care mandate.

First, the mandate represented a fundamental breach of constitutional and statutory rights of religious freedom and conscience. The First Amendment prohibits the federal government from burdening the free exercise of religion. As HHS points out in the preamble to the interim final rules, Congress has a long history of protecting conscience rights related to abortion for both religious and moral reasons.[3]

Second, the preventive care mandate substantially burdened the free exercise of religion and consciences of millions of Southern Baptists because the preventive care mandate offended specific tenets of faith and conscience. Southern Baptists do not necessarily have doctrinal objections to the use of contraception in the context of monogamous marriage. The overwhelming majority do, however, object to the use of contraceptives with abortifacient properties for religious and moral reasons. In the nearly 50 years since Roe v. Wade, the previous Administration's preventive care mandate represented the first time the government had forced pro-life citizens to directly pay for insurance coverage that includes drugs with abortifacient properties.

Third, the ERLC objected to the fact that the accommodation in the 2013 rules was far too narrow in their scope and applicability in that many organizations and companies were not covered. In fact, HHS stated that, "this proposal would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." Houses of worship and their integrated auxiliaries deemed religious by HHS are not the only institutions and individuals that possess protection of their freedoms of conscience. The freedom of conscience is a God-ordained human principle not subject to the political aims of a government agency.

With respect to the new interim final rules, ERLC commends HHS for providing a moral exemption to the preventive care mandate regarding contraception consistent with HHS's discretion under the Affordable Care Act and consistent with federal law, federal regulation, and founding principles. In particular, ERLC commends HHS for acknowledging that "Congress did not set forth—and [HHS and the Departments] do not possess—interest that require [them] to violate sincerely held moral convictions in the course of generally requiring contraceptive coverage."[4] ERLC also commends HHS for extending this exemption to a broad range of entities, including churches, nonprofit organizations, and some for-profit entities which have moral objections. Americans with deeply held

---

[3] 82 Fed. Reg. at 47838 n.1, 47844–46.

[4] 82 Fed. Reg. at 47848.

2 of 3

00373663

Exhibit 111                                    JA1310                                    JA-0001534

moral objections to abortion who were forced by their government to violate their consciences by paying for products that caused abortions welcome this relief.

The ERLC respectfully urges finalization of the rules for a range of entities at least as broad as proposed because they finally provides a true moral exemption to the preventive care mandate.

On behalf of millions of Southern Baptists, the ERLC is grateful for HHS action to preserve the fundamental principle of the freedom to live according to one's own conscience.

We are grateful for the opportunity to comment.

Respectfully submitted,

Russell Moore
President
Ethics & Religious Liberty Commission
of the Southern Baptist Convention

Travis Wussow
Vice President of Public Policy & General Counsel
Ethics & Religious Liberty Commission
of the Southern Baptist Convention

3 of 3

00373664

Exhibit 111     JA1311     JA-0001535



**ADVANCING FAITH, FAMILY AND FREEDOM**

December 4, 2017

*Submitted Electronically*
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
200 Independence Avenue SW.
Washington, DC 20201

Re:   Public Comments in Regard to Religious Exemptions and Accommodations for Coverage
of Certain Preventive Services Under the Affordable Care Act
**ID: CMS-2014-0115-13773**

Dear Sir or Madam:

The Family Research Council (FRC) respectfully submits the following comments on the Interim
Final Rules (82 Fed. Reg. 47792, October 13, 2017) entitled "Religious Exemptions and
Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act".

On October 6, 2017, the Departments of Health and Human Services (HHS), Treasury, and
Labor issued two companion interim final rules that provide conscience protections to Americans
who have a religious or moral objection to being forced by the federal government under the
"HHS contraceptive mandate" to pay for healthcare insurance coverage that includes sterilization
or contraception in their employee health insurance plans, especially since some of those drugs
and devices can kill a human embryo. On behalf of the Family Research Council (FRC), which
represents hundreds of thousands of American families, we strongly support these interim final
rules.

The Religious Exemption (45 CFR § 147.132) applies to any objecting employer or health
insurance issuer. The Moral Exemption (45 CFR § 147.133) applies to any objecting nonprofit
organization or for-profit entity that is not publicly traded, and objecting health insurance issuers.
Objecting entities may also choose the now-optional accommodation process previously imposed
by the Obama Administration.

These new rules provide much-needed relief from the HHS contraceptive mandate, which
violated current religious freedom law. Religious freedom is protected in the First Amendment of
the Constitution and statutes such as the Religious Freedom Restoration Act (RFRA). Congress
has also enacted, in addition, laws such as the Church Amendments, Coats Amendment, and the
Weldon Amendment over the past 35 years to protect the conscience rights of healthcare workers
from government discrimination based on their objections to abortion and other services.

**FAMILY RESEARCH COUNCIL**
801 G STREET NW, WASHINGTON, D.C.  20001  •  202-393-2100  •  202-393-2134 FAX  •  (800) 225-4008 ORDER LINE  •  FRC.ORG

00435051

Exhibit 112                                              JA1312                                              JA-0001536

## Background on the Obama-era HHS Contraception Mandate

The *Patient Protection and Affordable Care Act* (PPACA, P.L. 111-148, "Obamacare") contains a federal mandate for private health insurance plans to cover "preventive care" services "with respect to women" without a direct cost to the patient (42 USC § 300gg–13(a)(4)), as determined by HHS' Health Resources and Services Administration (HRSA). This provision of Obamacare triggered guidance by HRSA that mandated coverage in group health insurance plans that bypass federal conscience laws and violates the First Amendment and RFRA.

Specifically, HRSA's guidance among other things, required all health insurance plans to include "all FDA approved contraceptives and sterilization services," including drugs that can destroy a human embryo, sterilization services and contraception, without a direct cost to the patient. This meant that HRSA was mandating in guidance a variety of drugs and devices that have modes of action that can be destructive of human life rather than preventive of the creation of human life.

The first of these drugs is Levonorgestral, or Plan B, which was approved by the FDA as an Emergency Contraceptive (EC). One extensive review of the available literature on Levonorgestral revealed as many as seven mechanisms of action that could potentially prevent implantation of an embryo.[1] It works by making implantation unlikely because the uterus becomes inhospitable to the embryo. In another literature review of the mechanisms of action of Levonorgestral, the authors concluded, "The evidence to date supports the contention that use of EC does not always inhibit ovulation even if used in the preovulatory phase, and that it may unfavorably alter the endometrial lining regardless of when in the cycle it is used, with the effect persisting for days."[2] Plan B's labeling information also admits this scientific reality. "[Plan B] may inhibit implantation (by altering the endometrium)."[3] The second problematic FDA drug approved as an EC, and which is covered by the mandate, is ulipristal acetate. It is marketed as Ella® by Watson Pharmaceuticals. Ella is contra-indicated for pregnancy.[4] A recent article published in Annals of Pharmacotherapy stated "[t]he mechanism of action of ulipristal in human ovarian and endometrial tissue is identical to that of its parent compound, mifepristone."[5] Numerous other research studies confirm ulipristal's abortifacient mechanism of action.[6] In one

---

[1] H. Croxatto, et al., "Mechanism of Action of Hormonal Preparations Used for Emergency Contraception: a Review of the Literature." Contraception 63 (2001): 111.
[2] C. Kahlenborn, et al., "Postfertilization Effect of Hormonal Emergency Contraception," Annals of Pharmacotherapy (2002): 468.
[3] U.S. Department of Health and Human Services Food and Drug Administration, "Plan B One Step Labeling Information" (July 2009): p. 4 http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021998lbl.pdf.
[4] U.S. Department of Health and Human Services Food and Drug Administration, "Ella Labeling Information" (August 2010): p.1 (http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf).
[5] D. Harrison and J. Mitroka, "Defining Reality: The Potential Role of Pharmacists in Assessing the Impact of Progesterone Receptor Modulators and Misoprostol in Reproductive Health." Annals of Pharmacotherapy 45 (Jan. 2011): 115-9. RU-486 (mifepristone; Mifeprex®) was approved in 2000 by the FDA as an "abortifacient."
[6] Reel et al., "Antiovulatory and Postcoital Antifertility Activity of the Antiprogestin CDB-2914 When Administered as Single, Multiple, or Continuous Doses to Rats." 58 Contraception (1998): 129-136, p. 129; VandeVoort et al., "Effects of Progesterone Receptor Blockers on Human Granulosa-Luteal Cell Culture Secretion of Progesterone, Estradiol, and Relaxin," 62 Biology of Reproduction (2000): 200-205, 200. In this article, ulipristal is referred to as "HRP-2000," Hild et al., "CDB-2914: Anti-progestational/antiglucocorticoid Profile and Post-coital

**FAMILY RESEARCH COUNCIL**

801 G STREET NW, WASHINGTON, D.C. 20001 • 202-393-2100 • 202-393-2134 FAX • (800) 225-4008 ORDER LINE • FRC.ORG

00435052

Exhibit 112        JA1313        JA-0001537

such study involving ulipristal's action in macaques (monkeys), 4 out of 5 fetuses were aborted.[7] In filings required for ulipristal acetate's Europe approval, the European Medicines Agency noted that "Ulipristal, mifepristone and lilopristone were approximately equipotent at the dose levels of 10 and 30 mg/day in terminating pregnancies in guinea-pigs…"[8] The authors of the Annals article noted: "[E]xisting studies in animals are instructive in terms of the potential abortive effects of the drug in humans."[9] Their analysis led them to conclude "it can be reasonably expected that the prescribed dose of 30 mg of ulipristal will have an abortive effect on early pregnancy in humans."[10] Thirty milligrams is the precise dose of ulipristal now provided in a single package of Ella when purchased as an emergency contraceptive in the United States.[11] These studies provide sufficient evidence for one to reasonably conclude that Ella can kill an implanted embryo, and the induced demise of an embryo post-implantation is agreed by all, even the FDA, to be an abortion.[12] Ella's inclusion among those drugs that must be covered by the HHS mandate went beyond preventing conception to destroying human life by chemical or pharmaceutical means.

### Background on the insufficient Obama-era regulations

On August 1, 2011, HRSA issued guidance ("the Mandate") which, as stated above, required coverage of all FDA approved contraceptives and sterilization services, and HHS issued regulations which only exempted churches from the Mandate but which mandated such coverage for other non-profit organizations. Religious organizations such as religious universities, non-profit charities and businesses run from a faith perspective were not exempt.

On June 28, 2013 HHS issued a "final rule" that did nothing to expand the religious employer exemption beyond churches and their auxiliaries. It also finalized the accounting gimmick proposed as a so-called "accommodation" in which that religious non-profit employers must fill out a form "self-certifying" that they had conscience objections to certain benefits, and provide

---

Anti-fertility Activity in Rats and Rabbits." 15 Human Reproduction (2000): 822-829, 824; G. Teutsch and D. Philibert, "History and Perspectives of Antiprogestins from the Chemist's Point of View," 9 Human Reproduction (1994)(suppl 1):12-31; B. Attardi, J. Burgenson, S. Hild, and J. Reel, "In vitro Antiprogestational/Antiglucocorticoid Activity and Progestin and Glucocorticoid Receptor Binding of the Putative Metabolites and Synthetic Derivatives of CDB-2914, CDB-4124, and mifepristone." Journal of Steroid Biochemistry and Molecular Biology 88 (2004): 277-88.

[7] A.F. Tarantal, A.G. Hendrickx, S.A. Matlin, et. al., "Effects of Two Antiprogestins on Early Pregnancy in the Long-tailed Macaque (Macaca fascicularis)." 54 Contraception 1996: 107-15; European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009).

[8] European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009): p. 10.

[9] Harrison and Mitroka, supra.

[10] Ibid

[11] Plan B and Ella are not the only FDA-approved contraceptive drugs or devices (e.g., IUDs) that are potentially embryocidal. However, we have focused on them because the medical evidence is most clear in these two cases that HHS's regulatory mandate includes embryo destructive items. Therefore, it is clear that the mandate will create a conflict with the moral and religious beliefs of individuals and organizations who will be forced to provide such coverage or participate in such plans.

[12] Christopher M. Gacek, "Conceiving 'Pregnancy': U.S. Medical Dictionaries and Their Definitions of 'Conception' and 'Pregnancy,'" National Catholic Bioethics Quarterly (Autumn 2009): 542-557.

00435053

Exhibit 112                         JA1314                         JA-0001538

that "form" to the insurer. The insurer in turn would notify the employees of the objections of their employer, and provide them the questionable benefits which the employer objected to in the first place. Supposedly, the insurer would cover the cost of the "free" contraceptive drugs and devices. However, under this rule, religious employers' health plans remained the legal mechanism by which the insurer will "automatically" provide these drugs, devices and services even if the employer objects to such coverage.

In June 2014, the Supreme Court ruled in *Burwell v. Hobby Lobby Stores* that under RFRA, the government could not force family businesses to violate their religious beliefs as a condition of earning a living, under threat of crippling fines. This landmark ruling for religious liberty applies to all closely held corporations.

On August 27, 2014, the Administration issued an "interim final rule" (79 Fed. Reg. 51092) addressing the so-called nonprofit "accommodation." Per the rule, non-profits that object for moral or religious reasons to the HHS Mandate could notify HHS directly of their objection in writing and HHS would then notify the employer's health insurance company or Third Party Administrator (TPA), who would then provide the health care plan recipients with the drugs and devices required by the HHS Mandate.

Non-profits could notify HHS of their objection to the HHS Mandate, or they could still fill out the self-certification form, as specified by the July 28, 2013 final rule, to their insurance company. HHS had issued a similar proposed rule regarding for-profit organizations and solicited comments on how a so-called "accommodation" to the HHS Mandate could apply to closely held for-profit corporations.

In whatever way the mandated notification was to take place, the end result of the various "accommodations" was the same: the notification by the objecting party of its objection triggers HHS or the TPA to step in and alert the employer's insurer which in turn will provide the same contraceptives, sterilization, and drugs and devices that can kill an embryo on behalf of the employer and through the employer's health insurance company at the employer's expense.

These proposals were finalized on July 10, 2015. Again, under this accounting gimmick, religious non-profit and for-profit employers still remained the legal gateway for, and were forced to pay for, objectionable items and services for their employees. The HHS mandate still affected charities, universities, hospitals or others with moral or religious objections that violate their conscience.

On May 16, 2016, the Supreme Court of the United States issued a ruling in *Zubik v. Burwell*, consolidated with *Little Sisters of the Poor v. Burwell* and other similar cases, which did not resolve the dispute of whether the "accommodation" or the HHS mandate itself violated RFRA. However, noting that the religious challengers and the Obama administration both agreed that contraceptive coverage could be provided to female employees through the insurance companies,

**FAMILY RESEARCH COUNCIL**
801 G STREET NW, WASHINGTON, D.C. 20001 • 202-393-2100 • 202-393-2134 FAX • (800) 225-4008 ORDER LINE • FRC.ORG

00435054

Exhibit 112                    JA1315                    JA-0001539

without any notice from the religious employers, the Court vacated the lower court rulings and told the parties to work out a mutually-agreeable solution to the case.

**Why the Obama-era HHS Mandate Still Violated Religious Freedom and Was Opposed by Most Americans**

Businesses and non-profit employers and their employees should be able to choose what health plan is right for them without the federal government requiring they provide coverage, even with a so-called "accommodation," for contraceptives, sterilization, and drugs and devices that can kill an embryo—drugs and services that violate their religious or moral beliefs. Employers are forced to choose between dropping healthcare coverage for their employees and their families altogether or paying heavy penalties that could put them out of business.

This Mandate put the jobs, livelihood and healthcare of millions of Americans at risk. At stake was whether the federal government could require individuals to violate their moral beliefs and force them to provide items or services they morally oppose and which can kill human life.

The majority of Americans are not in favor of the HHS Contraception Mandate. A May 2014 FRC/ADF poll showed that the majority of Americans oppose the Obama Administration's mandate for religious employers to cover drugs which can destroy a human embryo, sterilization services and contraception: 53% disagree, while 43% agree and 4% are undecided. In April 2016, a Marist poll found that 53% of registered voters believe the HHS contraceptive mandate applied to religious non-profits is unfair, while only 32% believed it is fair.

**Conclusion:**

The principle of a right of conscience is embedded in the fabric of American democracy and law. Undermining it poses a grave threat by which the government can, for whatever culturally changing reasons, deem something to be a compelling government interest to the extent it can use the full force of the federal government to require people to choose between violating the law and facing penalties or violating their deeply held beliefs. In the case of the Obamacare preventive care services mandate, and the subsequent regulations implementing the HHS contraceptive mandate, the precise mechanism by which the various proposed accounting gimmicks were implemented for religious employers is irrelevant. The fact remained, under each variation of the regulations, that the federal government was forcing employers to cover drugs and devices that violated their conscience. This created a Hobson's choice. Employers are forced to choose between either violating their conscience or paying fines for non-compliance, and worse, facing the option of dropping health coverage altogether which is bad for their employees and their families (which in turn would violate the employer coverage mandate). The HHS interim final rule exempting employers with moral or religious convictions against the HHS contraceptive mandate brings the regulatory framework implementing the Obamacare preventive care services requirements into conformity with long-standing conscience and religious freedom laws. We object to the inclusion of contraceptives and embryo destroying drugs being mandated by HRSA's guidance to begin with, believing such drugs and devices are not required by the statute and are readily available in the private market to those who choose them. Moreover, the

**FAMILY RESEARCH COUNCIL**
801 G STREET NW, WASHINGTON, D.C. 20001 • 202-393-2100 • 202-393-2134 FAX • (800) 225-4008 ORDER LINE • FRC.ORG

00435055

Exhibit 112

JA1316

JA-0001540

federal government pays over $2 billion per year for contraceptives for low-income people. However, at the very least, HHS should exempt religious and moral objectors from the HHS contraceptive mandate. Leaving in place the "accommodation" for those non-profit entities who agree with this accounting arrangement is fair, while exempting those for whom such an arrangement is unacceptable is completely warranted. HHS's new interim final rule protecting both religious belief and moral conviction is right to restore the central and long-standing principle of conscience to the healthcare system.

/s/ David Christensen
Vice President
Government Affairs

/s/ Travis S. Weber, Esq.
Director, Center for Religious Liberty

FAMILY RESEARCH COUNCIL
801 G Street, NW
Washington, DC 20001
(202) 393-2100

00435056

Exhibit 112                                    JA1317                                    JA-0001541



## ADVANCING FAITH, FAMILY AND FREEDOM

December 5, 2017

*Submitted Electronically*
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
200 Independence Avenue SW.
Washington, DC 20201

Re:     Public Comments in Regard to Moral Exemptions and Accommodations for Coverage of
Certain Preventive Services Under the Affordable Care Act
**ID: CMS-2017-0133-0002**

Dear Sir or Madam:

The Family Research Council (FRC) respectfully submits the following comments on the Interim
Final Rules (82 Fed. Reg. 47838, October 13, 2017) entitled "Moral Exemptions and
Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act".

On October 6, 2017, the Departments of Health and Human Services (HHS), Treasury, and
Labor issued two companion interim final rules that provide conscience protections to Americans
who have a religious or moral objection to being forced by the federal government under the
"HHS contraceptive mandate" to pay for healthcare insurance coverage that includes sterilization
or contraception in their employee health insurance plans, especially since some of those drugs
and devices can kill a human embryo. On behalf of the Family Research Council (FRC), which
represents hundreds of thousands of American families, we strongly support these interim final
rules.

The Religious Exemption (45 CFR § 147.132) applies to any objecting employer or health
insurance issuer. The Moral Exemption (45 CFR § 147.133) applies to any objecting nonprofit
organization or for-profit entity that is not publicly traded, and objecting health insurance issuers.
Objecting entities may also choose the now-optional accommodation process previously imposed
by the Obama Administration.

These new rules provide much-needed relief from the HHS contraceptive mandate, which
violated current religious freedom law. As religious freedom is protected in the First Amendment
of the Constitution and statutes such as the Religious Freedom Restoration Act (RFRA),
conscience rights based on moral convictions are also protected under numerous laws and the
Constitution of the United States. Congress has also provided health care conscience protections
on the basis of "moral objections" in the Church Amendments, pertaining to sterilization,

00207202

Exhibit 113                              JA1318                              JA-0001542

contraception, and other health care services and practices, or any objection pertaining to abortion in the context of the Weldon Amendment.

Numerous non-religious entities, such as the March for Life Education and Defense Foundation, oppose contraceptives, and especially drugs and devices that can destroy a human embryo, on the basis of their moral convictions rather than religious beliefs. Like religious convictions, moral convictions warrant similar protection by the federal government.

In the preamble to these regulations, "the Departments seek public comment on whether the exemption in § 147.133(a)(1)(i) for plan sponsors with moral objections to the Mandate should be finalized to encompass all of the types of plan sponsors covered by § 147.132(a)(1)(i), including publicly traded corporations with objections based on sincerely held moral convictions, and also non-federal governmental plan sponsors that may have objections based on sincerely held moral convictions." We support parity in the scope of plan sponsors covered by the exemptions provided on the basis of moral and religious objections, respectively.

The regulation's exclusion of publicly traded corporations from being allowed an exemption on the basis of a moral objection is without statutory basis. Simply because there have been no *lawsuits* against HHS by publicly traded companies with moral objections to the Mandate does not serve as a basis for excluding such entities from conscience protections. Some publicly traded corporations who would otherwise seek a moral exemption may be deterred from doing so due to concerns that such litigation may create problems from a public relations standpoint. Regardless, there is no statutory reason why publicly traded companies who have moral objections should be required to comply with the Mandate any more than a closely-held company would if they have a conscience objection to doing so.

In fact, most publicly traded companies have health policies that include contraceptive coverage, and many other publicly traded companies, such as ExxonMobil, Chevron, Visa Inc. and PepsiCo are already exempt from the Mandate due to their grandfathered status. It should not be the job of the federal government to pick winners and losers when it comes to conscience rights. Indeed, existing federal laws, such as the Church and Coats-Snowe Amendments, do not create such a distinction between small businesses, closely-held, or publically traded companies. Profit-making should not preclude publicly traded or closely-held companies from having their conscience rights protected, nor should conscience regulations assume that publicly traded entities cannot assert moral objections. While long-standing conscience laws specifically create protections in federally funded programs, the Mandate goes further in applying mandates against entities in the private sector, even when not participating in a federally funded program. The Mandate, as applied to such companies, clearly violates the spirit of existing federal conscience laws. Indeed, these laws provide equal protections for any entity, whether they are non-profit or for-profit, publicly-traded or not.

Therefore, while we applaud the Departments for providing a moral exemption from the Mandate for all nonprofits and health insurance issuers, we urge the Departments to allow an exemption for *all* for-profit entities which have sincere moral objections to the Mandate.

**FAMILY RESEARCH COUNCIL**
801 G STREET NW, WASHINGTON, D.C.  20001  •  202-393-2100  •  202-393-2134 FAX  •  (800) 225-4008 ORDER LINE  •  FRC.ORG

00207203

Exhibit 113                                  JA1319                                  JA-0001543

## Background on the Obama-era HHS Contraception Mandate

The *Patient Protection and Affordable Care Act* (PPACA, P.L. 111-148, "Obamacare") contains a federal mandate for private health insurance plans to cover "preventive care" services "with respect to women" without a direct cost to the patient (42 USC § 300gg–13(a)(4)), as determined by HHS' Health Resources and Services Administration (HRSA). This provision of Obamacare triggered guidance by HRSA that mandated coverage in group health insurance plans that bypass federal conscience laws and violates the First Amendment and RFRA.

Specifically, HRSA's guidance among other things, required all health insurance plans to include "all FDA approved contraceptives and sterilization services," including drugs that can destroy a human embryo, sterilization services and contraception, without a direct cost to the patient. This meant that HRSA was mandating in guidance a variety of drugs and devices that have modes of action that can be destructive of human life rather than preventive of the creation of human life.

The first of these drugs is Levonorgestral, or Plan B, which was approved by the FDA as an Emergency Contraceptive (EC). One extensive review of the available literature on Levonorgestral revealed as many as seven mechanisms of action that could potentially prevent implantation of an embryo.[1] It works by making implantation unlikely because the uterus becomes inhospitable to the embryo. In another literature review of the mechanisms of action of Levonorgestral, the authors concluded, "The evidence to date supports the contention that use of EC does not always inhibit ovulation even if used in the preovulatory phase, and that it may unfavorably alter the endometrial lining regardless of when in the cycle it is used, with the effect persisting for days."[2] Plan B's labeling information also admits this scientific reality. "[Plan B] may inhibit implantation (by altering the endometrium)."[3] The second problematic FDA drug approved as an EC, and which is covered by the mandate, is ulipristal acetate. It is marketed as Ella® by Watson Pharmaceuticals. Ella is contra-indicated for pregnancy.[4] A recent article published in Annals of Pharmacotherapy stated "[t]he mechanism of action of ulipristal in human ovarian and endometrial tissue is identical to that of its parent compound, mifepristone."[5] Numerous other research studies confirm ulipristal's abortifacient mechanism of action.[6] In one

---

[1] H. Croxatto, et al., "Mechanism of Action of Hormonal Preparations Used for Emergency Contraception: a Review of the Literature." Contraception 63 (2001): 111.
[2] C. Kahlenborn, et al., "Postfertilization Effect of Hormonal Emergency Contraception," Annals of Pharmacotherapy (2002): 468.
[3] U.S. Department of Health and Human Services Food and Drug Administration, "Plan B One Step Labeling Information" (July 2009): p. 4 http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021998lbl.pdf.
[4] U.S. Department of Health and Human Services Food and Drug Administration, "Ella Labeling Information" (August 2010): p.1 (http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf).
[5] D. Harrison and J. Mitroka, "Defining Reality: The Potential Role of Pharmacists in Assessing the Impact of Progesterone Receptor Modulators and Misoprostol in Reproductive Health," Annals of Pharmacotherapy 45 (Jan. 2011): 115-9. RU-486 (mifepristone; Mifeprex®) was approved in 2000 by the FDA as an "abortifacient."
[6] Reel et al., "Antiovulatory and Postcoital Antifertility Activity of the Antiprogestin CDB-2914 When Administered as Single, Multiple, or Continuous Doses to Rats," 58 Contraception (1998): 129-136. p. 129; VandeVoort et al., "Effects of Progesterone Receptor Blockers on Human Granulosa-Luteal Cell Culture Secretion of Progesterone, Estradiol, and Relaxin," 62 Biology of Reproduction (2000): 200-205, 200. In this article, ulipristal is referred to as "HRP-2000," Hild et al., "CDB-2914: Anti-progestational/antiglucocorticoid Profile and Post-coital

00207204

such study involving ulipristal's action in macaques (monkeys), 4 out of 5 fetuses were aborted.[7] In filings required for ulipristal acetate's Europe approval, the European Medicines Agency noted that "Ulipristal, mifepristone and lilopristone were approximately equipotent at the dose levels of 10 and 30 mg/day in terminating pregnancies in guinea-pigs…"[8] The authors of the Annals article noted: "[E]xisting studies in animals are instructive in terms of the potential abortive effects of the drug in humans."[9] Their analysis led them to conclude "it can be reasonably expected that the prescribed dose of 30 mg of ulipristal will have an abortive effect on early pregnancy in humans."[10] Thirty milligrams is the precise dose of ulipristal now provided in a single package of Ella when purchased as an emergency contraceptive in the United States.[11] These studies provide sufficient evidence for one to reasonably conclude that Ella can kill an implanted embryo, and the induced demise of an embryo post-implantation is agreed by all, even the FDA, to be an abortion.[12] Ella's inclusion among those drugs that must be covered by the HHS mandate went beyond preventing conception to destroying human life by chemical or pharmaceutical means.

### Background on the insufficient Obama-era regulations

On August 1, 2011, HRSA issued guidance ("the Mandate") which, as stated above, required coverage of all FDA approved contraceptives and sterilization services, and HHS issued regulations which only exempted churches from the Mandate but which mandated such coverage for other non-profit organizations. Religious organizations such as religious universities, non-profit charities and businesses run from a faith perspective were not exempt.

On June 28, 2013 HHS issued a "final rule" that did nothing to expand the religious employer exemption beyond churches and their auxiliaries. It also finalized the accounting gimmick proposed as a so-called "accommodation" in which that religious non-profit employers must fill out a form "self-certifying" that they had conscience objections to certain benefits, and provide

---

Anti-fertility Activity in Rats and Rabbits." 15 Human Reproduction (2000): 822-829, 824; G. Teutsch and D. Philibert, "History and Perspectives of Antiprogestins from the Chemist's Point of View." 9 Human Reproduction (1994)(suppl 1):12-31; B. Attardi, J. Burgenson, S. Hild, and J. Reel, "In vitro Antiprogestational/Antiglucocorticoid Activity and Progestin and Glucocorticoid Receptor Binding of the Putative Metabolites and Synthetic Derivatives of CDB-2914, CDB-4124, and mifepristone." Journal of Steroid Biochemistry and Molecular Biology 88 (2004): 277-88.

[7] A.F. Tarantal, A.G. Hendrickx, S.A. Matlin, et. al., "Effects of Two Antiprogestins on Early Pregnancy in the Long-tailed Macaque (Macaca fascicularis)." 54 Contraception 1996: 107-15; European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009).

[8] European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009): p. 10.

[9] Harrison and Mitroka, supra.

[10] Ibid.

[11] Plan B and Ella are not the only FDA-approved contraceptive drugs or devices (e.g., IUDs) that are potentially embryocidal. However, we have focused on them because the medical evidence is most clear in these two cases that HHS's regulatory mandate includes embryo destructive items. Therefore, it is clear that the mandate will create a conflict with the moral and religious beliefs of individuals and organizations who will be forced to provide such coverage or participate in such plans.

[12] Christopher M. Gacek, "Conceiving 'Pregnancy': U.S. Medical Dictionaries and Their Definitions of 'Conception' and 'Pregnancy.'" National Catholic Bioethics Quarterly (Autumn 2009): 542-557.

that "form" to the insurer. The insurer in turn would notify the employees of the objections of their employer, and provide them the questionable benefits which the employer objected to in the first place. Supposedly, the insurer would cover the cost of the "free" contraceptive drugs and devices. However, under this rule, religious employers' health plans remained the legal mechanism by which the insurer will "automatically" provide these drugs, devices and services even if the employer objects to such coverage.

In June 2014, the Supreme Court ruled in *Burwell v. Hobby Lobby Stores* that under RFRA, the government could not force family businesses to violate their religious beliefs as a condition of earning a living, under threat of crippling fines. This landmark ruling for religious liberty applies to all closely held corporations.

On August 27, 2014, the Administration issued an "interim final rule" (79 Fed. Reg. 51092) addressing the so-called nonprofit "accommodation." Per the rule, non-profits that object for moral or religious reasons to the HHS Mandate could notify HHS directly of their objection in writing and HHS would then notify the employer's health insurance company or Third Party Administrator (TPA), who would then provide the health care plan recipients with the drugs and devices required by the HHS Mandate.

Non-profits could notify HHS of their objection to the HHS Mandate, or they could still fill out the self-certification form, as specified by the July 28, 2013 final rule, to their insurance company. HHS had issued a similar proposed rule regarding for-profit organizations and solicited comments on how a so-called "accommodation" to the HHS Mandate could apply to closely held for-profit corporations.

In whatever way the mandated notification was to take place, the end result of the various "accommodations" was the same: the notification by the objecting party of its objection triggers HHS or the TPA to step in and alert the employer's insurer which in turn will provide the same contraceptives, sterilization, and drugs and devices that can kill an embryo on behalf of the employer and through the employer's health insurance company at the employer's expense.

These proposals were finalized on July 10, 2015. Again, under this accounting gimmick, religious non-profit and for-profit employers still remained the legal gateway for, and were forced to pay for, objectionable items and services for their employees. The HHS mandate still affected charities, universities, hospitals or others with moral or religious objections that violate their conscience.

On May 16, 2016, the Supreme Court of the United States issued a ruling in *Zubik v. Burwell*, consolidated with *Little Sisters of the Poor v. Burwell* and other similar cases, which did not resolve the dispute of whether the "accommodation" or the HHS mandate itself violated RFRA. However, noting that the religious challengers and the Obama administration both agreed that contraceptive coverage could be provided to female employees through the insurance companies,

00207206

Exhibit 113                                   JA1322                                   JA-0001546

without any notice from the religious employers, the Court vacated the lower court rulings and told the parties to work out a mutually-agreeable solution to the case.

**Why the Obama-era HHS Mandate Still Violated Religious Freedom and Was Opposed by Most Americans**

Businesses and non-profit employers and their employees should be able to choose what health plan is right for them without the federal government requiring they provide coverage, even with a so-called "accommodation," for contraceptives, sterilization, and drugs and devices that can kill an embryo—drugs and services that violate their religious or moral beliefs. Employers are forced to choose between dropping healthcare coverage for their employees and their families altogether or paying heavy penalties that could put them out of business.

This Mandate put the jobs, livelihood and healthcare of millions of Americans at risk. At stake was whether the federal government could require individuals to violate their moral beliefs and force them to provide items or services they morally oppose and which can kill human life.

The majority of Americans are not in favor of the HHS Contraception Mandate. A May 2014 FRC/ADF poll showed that the majority of Americans oppose the Obama Administration's mandate for religious employers to cover drugs which can destroy a human embryo, sterilization services and contraception: 53% disagree, while 43% agree and 4% are undecided. In April 2016, a Marist poll found that 53% of registered voters believe the HHS contraceptive mandate applied to religious non-profits is unfair, while only 32% believed it is fair.

**Conclusion:**

The principle of a right of conscience is embedded in the fabric of American democracy and law. Undermining it poses a grave threat by which the government can, for whatever culturally changing reasons, deem something to be a compelling government interest to the extent it can use the full force of the federal government to require people to choose between violating the law and facing penalties or violating their deeply held beliefs. In the case of the Obamacare preventive care services mandate, and the subsequent regulations implementing the HHS contraceptive mandate, the precise mechanism by which the various proposed accounting gimmicks were implemented for religious employers is irrelevant. The fact remained, under each variation of the regulations, that the federal government was forcing employers to cover drugs and devices that violated their conscience. This created a Hobson's choice. Employers are forced to choose between either violating their conscience or paying fines for non-compliance, and worse, facing the option of dropping health coverage altogether which is bad for their employees and their families (which in turn would violate the employer coverage mandate).

The HHS interim final rule exempting employers with moral or religious convictions against the HHS contraceptive mandate brings the regulatory framework implementing the Obamacare preventive care services requirements into conformity with long-standing conscience and religious freedom laws. We object to the inclusion of contraceptives and embryo destroying drugs among those mandated by HRSA's guidance to begin with, believing such drugs and

**FAMILY RESEARCH COUNCIL**

801 G STREET NW, WASHINGTON, D.C. 20001 • 202-393-2100 • 202-393-2134 FAX • (800) 225-4008 ORDER LINE • FRC.ORG

00207207

Exhibit 113                                    JA1323                                    JA-0001547

devices are not required by the statute and are readily available in the private market to those who choose them. Moreover, the federal government pays over $2 billion per year for contraceptives for low-income people. However, at the very least, HHS should exempt religious and moral objectors from the HHS contraceptive mandate. Leaving in place the "accommodation" for those non-profit entities who agree with this accounting arrangement is fair, while exempting those for whom such an arrangement is unacceptable is completely warranted.

Finally, we urge HHS to allow *all* for-profit entities to qualify for a moral exemption from the Mandate, irrespective of such an entity's publicly traded status, consistent with the treatment of for-profit entities which seek religious exemptions. HHS's new interim final rule protecting both religious belief and moral conviction is right to restore the central and long-standing principle of conscience to the healthcare system.

/s/ David Christensen
Vice President
Government Affairs

/s/ Travis S. Weber, Esq.
Director, Center for Religious Liberty

FAMILY RESEARCH COUNCIL
801 G Street, NW
Washington, DC 20001
(202) 393-2100

00207208

Exhibit 113    JA1324    JA-0001548



111 South Wacker Drive
Chicago, IL 60606
Telephone: 312-443-0700
Fax: 312-443-0336
www.lockelord.com

Laurence A. Hansen
Direct Telephone: 312-443-0456
Direct Fax: 312-896-6456
lhansen@lockelord.com

November 22, 2017

BY ELECTRONIC DELIVERY

Centers for Medicare & Medicaid Services
Department of Health and Human Resources
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

Re: CMS-9940

     Re:    Religious Exemptions and Accommodations for Coverage of Certain
            Preventive Services Under the Affordable Care Act

Dear Sir or Madam:

We submit this comment in response to the interim final rules and temporary regulations (the "Rules") issued jointly by the Internal Revenue Service (IRS), the Department of Labor (DOL) and the Department of Health and Human Services (HHS) (together, the "Departments") and published at 82 Fed. Reg. 47792 (Oct. 13, 2017).

We commend the agencies for moving to a plan-based exemption. However, we suggest that the Rules be revised in several respects to clarify the application of the Rules to multiple employer church plans.

**I.    Expand the Religious Exemption in Section 147.132**

While the Rules provide for only one exemption, the exemption appears to have two parts. One part applies at the plan level and exempts the plan and any issuer providing coverage under the plan. The other part exempts certain employers that adopt an exempt plan. The two parts may be merged in the case of single-employer plan. But it is unclear how the two parts operate in the case of a multiple employer plan adopted by an employer who neither sponsors nor maintains the plan.

The preamble to the Rules makes clear that the employer exemption applies to employers that adopt certain religious plans established by other religious organizations:

> Under these interim final Rules, however, the Departments intend that, when this regulation text exempts a plan "established or maintained by" a house of worship

00433402

Exhibit 114                    JA1325                 JA-0001549

Centers for Medicare & Medicaid Services
November 22, 2017
Page 2

> or integrated auxiliary, such exemption will no longer "be determined on an
> employer by employer basis," but will be determined on a plan basis—that is, by
> whether the plan is a "plan established or maintained by" a house of worship or
> integrated auxiliary.

82 Fed. Reg. at 47810 (emphasis added).

The phrase "house of worship or integrated auxiliary" appears to be a shorthand reference to "a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order" under Section 147.132(a)(1)(i)(A). We note, for example, that the preamble to the Rules describes "houses of worship and integrated auxiliaries" as being covered by Code sections 6033(a)(3)(A)(i) ("churches, their integrated auxiliaries, and conventions or associations of churches") and 6033(a)(3)(A)(iii) ("the exclusively religious activities of any religious order"). 82 Fed. Reg. at 47796. If so, the employer exemption is too narrow, as not all church plans are "established or maintained" by a church or an integrated auxiliary of a church. Many are established and maintained by church-affiliated organizations that are not churches themselves. They may not be integrated auxiliaries either.

The current narrow exemption leads to disparate results for similarly situated organizations. Consider, for example, a social service agency that is "associated with" a church, but is neither a church itself nor an integrated auxiliary of a church. It appears that if the agency established its own plan, the plan and the agency would be exempt. However, if the agency adopted a plan sponsored and maintained by another organization that was "associated with" the church but not an integrated auxiliary of the church, the agency would not be exempt. Such a result is not consistent with the agencies' purported respect "internal employment practices" and "choice of organizational form" of religious organizations. 82 Fed. Reg. at 47810.

Accordingly, we suggest that the final Rules expand the exemption to cover any employer that: (i) adopts an exempt plan; and (ii) objects to providing its employees and their dependents with contraception coverage on account of its sincerely held religious beliefs.

## II.    Clarify that an Employer Adopting an Exempt Plan Cannot Be Penalized

The preamble to the Rules makes clear that if a plan is exempt under 45 C.F.R. § 147.132, neither the plan sponsor, the plan or an issuer providing coverage in connection with the plan will be penalized as a result of the plan not providing contraception coverage:

Section 147.132(a)(1) introductory text and (a)(1)(i), by specifying that "[a] group health plan and health insurance coverage provided in connection with a group health plan" is exempt "to the extent the plan sponsor objects as specified in paragraph (a)(2)," exempt the group health plans the sponsors of which object, and exempt their health insurance issuers from providing the coverage in those plans (whether or not the issuers have their own objections).

82 Fed. Reg. at 47808.

As noted above, while the Rules recognize that exempt plans may cover multiple employers, the Rules fail to recognize that employers that adopt such plans that are not themselves "plan

00433403

Exhibit 114

Centers for Medicare & Medicaid Services
November 22, 2017
Page 3

sponsors" can be penalized $100 per day for each employee not provided contraception coverage. Code sections 4980D(b) and (e)(1) [26 U.S.C. § 4980D(b) and (e)(1)]. Employers that are "so closely associated" with an exempt plan sponsor that they are permitted to participate in the sponsor's health plan should not be penalized. 82 Fed. Reg. at 47810. Perhaps such employers avoid a penalty on account of Section 54.9815-2713T, but this is not clear. We suggest this be recognized (or clarified) in the final Rules.

Please contact the undersigned at 312-443-0456 if you have any questions or wish to discuss this matter further.

Very truly yours,

Laurence A. Hansen

LAH:lg

00433404

Exhibit 114

JA-0001551



*where NURSING, MINISTRY and CATHOLIC MISSION meet*

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

### Subj: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT20

Dear Sir or Madam:

The National Association of Catholic Nurses U.S.A. (NACN-USA) is the national professional organization for Catholic nurses in the United States. Representing hundreds of nurses of different backgrounds, the NACN-USA promotes education in Catholic nursing ethics, nurtures spiritual growth, provides guidance, support and networking for Catholic nurses, nursing students, and others who support our mission and objectives. The NACN-USA is approved by the U.S. Conference of Catholic Bishops and is a part of the International Catholic Committee of Nurses & Medico-Social Assistants, which collaborates with the Holy See and its Dicastery for Promoting Integral Human Development. The NACN-USA submits the following comments on the interim final rules, published at 82 Federal Register 47792 (October 13, 2017), on religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act (ACA).

The NACN-USA is pleased to see the expansion in these interim final rules of exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to the contraceptive mandate issued pursuant to the ACA. This is consistent with the free exercise of religion in the First Amendment, the Religious Freedom and Restoration Act of 1993, and Congress' history of providing protections for religious beliefs regarding contraception, sterilization and abortion. For this we are grateful.

The NACN-USA, however, is concerned that the present interim final rules allow the Health Resources and Services Administration the option to include contraceptives as a preventive service. The NACN-USA finds this puzzling. That is because to consider contraception a preventive service indicates a misunderstanding of the meaning of prevention in health care.

It has been the long-standing goal of nursing and medicine to prevent disease and disability and to promote normal functions of the human body. Pregnancy, which is what contraception is intended to prevent, is neither a disease nor a disability and, thus, should not be treated as such. Furthermore, contraceptives that have the capacity to disrupt an existing pregnancy and act as abortifacients should never be included as a preventive service, or a service of any kind, for it is the birth of a living child that is being prevented which, again, is neither a disease nor a disability. Granted, there may be times when a woman may wish to delay or avoid pregnancy but this desire does not change the normal condition of pregnancy into a disease or disability nor does it make normal the condition of infertility, which is the direct effect of contraception.

Mailing Address: Richard Zazycki, NACN-USA Treasurer | c/o Circles of Mercy | 11 Washington St. | Rensselaer, NY 12144
Business Address: NACN-USA, c/o Diocese of Joliet | Blanchette Catholic Center | 16555 Weber Rd. | Crest Hill, IL 60403
*catholicnurses@nacn-usa.org* --- *Unity In Charity* --- *www.nacn-usa.org*

00434979

Exhibit 115

JA-0001552

Some argue that contraception qualifies as a preventive service because it prevents abortion. However, the facts do not bear this out. As reported by the Guttmacher Institute, "a substantial proportion of unintended pregnancies occur despite women's and their partners' use of contraceptives... [with] about half of pregnancies that are terminated by induced abortion having occurred during use of contraceptives."[1] Even if it were true that contraception prevented abortion, it is not disease or disability that is being prevented but a procedure that terminates the life of an innocent person, who in no way could ever be considered a disease or a disability.

What the facts do support is that contraceptives pose risks of serious and even life-threatening side effects that can result in such devastating and disabling conditions as cardiovascular disease and cancer.[2] In fact, as reported by the World Health Organization and the American Cancer Society, combined hormonal contraceptives are classified as carcinogenic to human beings, on par with tobacco.[3] Women who use combined hormonal contraceptives have a two to four-fold increased risk of venous thromboembolism,[4] thrombotic stroke[5] and myocardial infarction,[6] all which can be deadly. Moreover, contraceptives do not promote normal functions of the body, namely fertility, but instead attempt to render them non-functional. In short, contraception is not a preventive service but is, in fact, a disservice.

The NACN-USA is pleased to see the expansion of exemptions in these interim final rules to protect the religious beliefs of those having objections to the contraceptive mandate. However, given that the goal of nursing and medicine is to prevent disease and disability and to promote normal healthy functioning of the body and, given that the facts show that contraceptives do neither, we recommend that contraceptives not be included among preventive services and that any mandate requiring such coverage in health plans be rescinded.

---

1. The Guttmacher Institute, *Contraceptive Failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth*, Perspectives on Sexual and Reproductive Health, 49, 1 (March 2017) 7-16. https://www.guttmacher.org/journals/psrh/2017/02/contraceptive-failure-united-states-estimates-2006-2010-national-survey-family

2. Peck R. & Norris, CW, *Significant Risks of Oral Contraceptives (OCPs): Why This Drug Class Should Not Be Included in a Preventive Care Mandate*, 79 Linacre Quarterly 41, 42 (Feb. 2012), https://familyplanning.net/sites/default/files/Significan-Risks-of-Oral-Contraceptives-OCPs-Why-This-Drug-Should-Not-Be-Included-In-a-Preventive-Care-Mandate.pdf.

3. The World Health Organization Department of Reproductive Health and Research, *The Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment*, September 2005, http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf. The American Cancer Society, *Known and Probably Human Carcinogens*, 2017, https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html

4. Lidegaard, Ø., Løkkegaard, E., Svendsen, A. L., & Agger, C. (2009). Hormonal contraception and risk of venous thromboembolism: national follow-up study. *The BMJ*, *339*, b2890. http://www.bmj.com/content/bmj/339/bmj.b2890.full.pdf.
Van Hylckama Vlieg, A., Helmerhorst, F. M., Vandenbroucke, J. P., Doggen, C. J. M., & Rosendaal, F. R. (2009). The venous thrombotic risk of oral contraceptives, effects of oestrogen dose and progestogen type: results of the MEGA case-control study. *The BMJ*, *339*, b2921. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726929/
Vinogradova, Y., Coupland, C., & Hippisley-Cox, J. (2015). Use of combined oral contraceptives and risk of venous thromboembolism: nested case-control studies using the QResearch and CPRD databases. *The BMJ*, *350*, h2135. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4444976/
de Bastos, M., Stegeman, BH., Rosendaal, FR., Van Hylckama Vlieg, A., Helmerhorst, FM., Stijnen, T., Dekkers, OM. (2014). *Combined oral contraceptives: venous thrombosis*. Cochrane Database Syst Rev. 2014, Mar 3; (3) CD010813. doi: 10.1002/14651858.CD010813.pub2. https://www.ncbi.nlm.nih.gov/pubmed?term=24590565

5. Gillum, LA., Mamidipudi, SK., Johnston, SC., (2000). *Ischemic stroke risk with oral contraceptives: A meta analysis.* JAMA 2000 Jul; 284(1), 72-78. https://www.ncbi.nlm.nih.gov/pubmed?term=10872016

6. Lidegaard, Ø., Løkkegaard, E., Jensen, A., Skovlund, CW., Keiding, N. (2012). *Thrombotic stroke and myocardial infarction with hormonal contraception*. N Eng J Med. 2012; 366(24):2257. https://www.nejm.org/doi/pdf/10.1056/NEJMoa1111840

2

00434980

Exhibit 115

We encourage evidence-based services that prevent disease and disability not produce them. Efforts should be focused on services that genuinely promote normal healthy functioning of the body and optimal flourishing of the person and not on those that do the opposite

Thank you for the opportunity to comment.

In His Holy Name,

Diana L. Ruzicka

Diana Ruzicka, RN, MSN, MA, MA, CNS-BC
Colonel, U.S. Army Retired
President, National Association of Catholic Nurses, U.S.A

3

00434981

Exhibit 115                    JA1330                    JA-0001554



*where NURSING, MINISTRY and CATHOLIC MISSION meet*

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Moral Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

The National Association of Catholic Nurse U.S.A (NACN-USA) is the national professional organization for Catholic nurses in the United States. Representing hundreds of nurses of different backgrounds, the NACN-USA promotes education in Catholic nursing ethics, nurtures spiritual growth, provides guidance, support and networking for Catholic nurses, nursing students, and others who support our mission and objectives. The NACN-USA is approved by the U.S. Conference of Catholic Bishops and is a part of the International Catholic Committee of Nurses and Medico-Social Assistants, which collaborates with the Holy See and its Dicastery for Promoting Integral Human Development. The NACN-USA submits the following comments on the interim final rules, published at 82 Federal Register 47838 (October 13, 2017), on moral exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act (ACA).

The NACN-USA is pleased to see the expansion in these interim final rules of exemptions to protect the moral convictions for certain entities and individuals whose health plans are subject to the contraceptive mandate issued pursuant to the ACA. This is consistent with Congress' history of supporting moral convictions alongside protection for religious beliefs regarding contraception, sterilization and abortion, as evidenced by long-standing laws such as the Church and Weldon Amendments. For this we are grateful.

However, as explained in NACN-USA's comments on the interim final rules published at 82 Federal Register 47792 (October 13, 2017) on religious exemptions, we are again concerned that the present interim final rules allow the Health Resources and Services Administration (HRSA) the option to include contraceptives as a preventive service when, in fact, they are not.

As directed by the Department's interim final rules, HRSA was charged with developing guidelines with respect to preventive care and screenings authorized by section 2713(a)(4) of the Public Health Service Act. In developing those guidelines, HRSA looked to a report on women's

Mailing Address: Richard Zazycki, NACN-USA Treasurer | c/o Circles of Mercy | 11 Washington St. | Rensselaer, NY 12144
Business Address: NACN-USA, c/o Diocese of Joliet | Blanchette Catholic Center | 16555 Weber Rd. | Crest Hill, IL 60403
*catholicnurses@nacn-usa.org --- **Unity in Charity** --- www.nacn-usa.org*

00208967

preventive services issued July 19, 2011 by the Institute of Medicine (IOM) which recommended coverage of the full range of FDA approved contraceptive methods, including methods with abortifacient potential, sterilization procedures, and patient education and counseling for women with reproductive capacity.  It is important to note that this recommendation was not unanimous among members of the IOM, as described at 82 Fed. Reg. at 47841, who voiced concern over the safety and lack of evidence of the preventive nature of contraceptives.  Still, HRSA proceeded to authorize contraceptives as mandated preventive services despite the objections.

The NACN-USA is baffled as to why the Government would ignore legitimate concerns and mandate that a Group 1 carcinogen that is also associated with life-threatening cardiovascular complications would be made available to the public.[1]  Surely, once a woman is diagnosed with cancer or paralyzed by a stroke it comes as no consolation to know that this came about with no cost sharing on her part other than her own tax dollars.

The NACN-USA is further perplexed by the statement that the Government wishes to better balance its interest in promoting coverage for contraceptive and sterilization services with its interest in providing conscience protections for individuals and entities with sincerely held moral convictions. While it is clearly appropriate for the Government to provide conscience protection for the public, it is clearly inappropriate for the Government to promote services that place the public at risk of disease and disability. Why would the Government have an interest in promoting contraception and sterilization among the public in the first place?

---

[1] Rebecca Peck & Charles W. Norris, *Significant Risks of Oral Contraceptives (OCPs): Why This Drug Class Should Not Be Included in a Preventive Care Mandate*, 79 Linacre Quarterly 41, 42 (Feb. 2012), https://familyplanning.net/sites/default/files/Significan-Risks-of-Oral-Contraceptives-OCPs-Why-This-Drug-Should-Not-Be-Included-In-a-Preventive-Care-Mandate.pdf.
The World Health Organization Department of Reproductive Health and Research, *The Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment*, September 2005, http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf.
The American Cancer Society, *Known and Probably Human Carcinogens*, 2017, https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html
Lidegaard, Ø., Løkkegaard, E., Svendsen, A. L., & Agger, C. (2009). Hormonal contraception and risk of venous thromboembolism: national follow-up study. *The BMJ*, *339*, b2890.
http://www.bmj.com/content/bmj/339/bmj.b2890.full.pdf.
Van Hylckama Vlieg, A., Helmerhorst, F. M., Vandenbroucke, J. P., Doggen, C. J. M., & Rosendaal, F. R. (2009). The venous thrombotic risk of oral contraceptives, effects of oestrogen dose and progestogen type: results of the MEGA case-control study. *The BMJ*, *339*, b2921. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726929/
Vinogradova, Y., Coupland, C., & Hippisley-Cox, J. (2015). Use of combined oral contraceptives and risk of venous thromboembolism: nested case-control studies using the QResearch and CPRD databases. *The BMJ*, *350*, h2135. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4444976/
de Bastos, M., Stegeman, BH., Rosendaal, FR., Van Hylckama Vlieg, A., Helmerhorst, FM., Stijnen, T., Dekkers, OM. (2014). *Combined oral contraceptives: venous thrombosis*. Cochrane Database Syst Rev. 2014, Mar 3; (3) CD010813. doi: 10.1002/14651858.CD010813.pub2. https://www.ncbi.nlm.nih.gov/pubmed?term=24590565
Gillum, LA., Mamidipudi, SK., Johnston, SC., (2000).  *Ischemic stroke risk with oral contraceptives:  A meta analysis.* JAMA 2000 Jul; 284(1), 72-78. https://www.ncbi.nlm.nih.gov/pubmed?term=10872016
Lidegaard, Ø., Løkkegaard, E., Jensen, A., Skovlund, CW., Keiding, N. (2012). *Thrombotic stroke and myocardial infarction with hormonal contraception*. N Eng J Med. 2012; 366(24):2257.
https://www.nejm.org/doi/pdf/10.1056/NEJMoa1111840

2

00208968

Exhibit 116

JA1332

JA-0001556

Except for contraception, all the other services listed by HRSA under the Women's Preventive Services Guidelines are evidence-based and pose no risk to the health and well-being of women.[2] This is as it should be. At the risk of appearing naive, the NACN-USA can come to no other conclusion than that the decision to include contraceptives as a preventive service is based not on scientific fact but on ideology. Governance of health care that adheres to ideology and ignores scientific fact places the health and well-being of the public at risk.

The NACN-USA is grateful to see the expansion of exemptions in these interim final rules to protect the moral convictions of those having objections to the contraceptive coverage mandate. For as it can be seen from the dissent of members of the IOM itself, as expert advisors to HRSA, objections are not restricted to those that are religiously based but can and should be based on science and reason. The mandate should be rescinded.

Thank you for the opportunity to comment.


In His Holy Name,

*Diana L. Ruzicka*

Diana Ruzicka, RN, MSN, MA, MA, CNS-BC
Colonel, U.S. Army Retired
President, National Association of Catholic Nurses, U.S.A

---

[2] Health Resources and Services Administration (October 2017). *Women's Preventive Service Guidelines*. https://www.hrsa.gov/womens-guidelines-2016/index.html

3

00208969

Exhibit 116     JA1333     JA-0001557

# THE NATIONAL CATHOLIC BIOETHICS CENTER

6399 Drexel Road, Philadelphia, PA 19151 • Tel 215-877-2660 • Fax 215-877-2688 • www.ncbcenter.org

December 4, 2017

**Submitted Electronically**

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, RIN 0938-AT20; and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

I am writing on behalf of The National Catholic Bioethics Center to comment on the "Interim Final Rules"[1] on religious and moral "exemptions" and "accommodations" for certain "preventive services" under the Affordable Care Act ("ACA"), known as the "Contraceptive Mandate." Specifically, the U.S. Department of Health and Human Services, the U.S. Department of Labor, and the U.S. Internal Revenue Service seek comment on their "Interim Final Rules" regarding mandatory coverage of certain so-called preventive services for women, including contraceptive and abortifacient drugs and devices. The "Interim Final Rules" modify the existing "accommodation" designed for religious ministries such as Catholic charities, universities, and hospitals, as well as closely held for-profit employers, allowing them to choose to remain accommodated or be exempt from the mandate. Furthermore, publically traded for-profit companies with a religious objection may

---

[1] 82 FR 47838 (October 13, 2017).

*Defending the dignity of the human person in health care and the life sciences since 1972*

00209129

Exhibit 117                                   JA1334                                   JA-0001558

avail themselves of these options, as can non-publicly traded for-profit companies with moral objections. We welcome these expansions and are grateful for them, but seek further relief for those not eligible for the new "exemptions."

The National Catholic Bioethics Center (NCBC) is a nonprofit research and educational institute committed to applying the moral teachings of the Catholic Church to ethical issues arising in health care and the life sciences. The Center has 2500 members throughout the United States, many of whom employ and/or serve thousands of person, and thus its collective membership is significant. The Center provides consultation to thousands of institutions and individuals seeking its opinion on the appropriate application of Catholic moral teaching to these ethical issues. The issue of the "Contraceptive Mandate," has had far-reaching negative implications for our membership who regularly seek our ethical advice on the moral quandaries in which it has placed them.

### Introductory Summary

The "Final Rules" of July 14, 2015,[2] mandated that virtually all employers provide in their employee benefit packages coverage of certain so-called preventive services for women, including contraceptive and abortifacient drugs and devices. The "Final Rules" did not provide for any new "exemption" to the Contraceptive Mandate. They did expand the definition of "eligible organization" so that "closely held" for-profit organizations with a religious objection qualified for the "accommodation," which was previously limited to religious non-profit organizations. However, the "Final Rules" did not change the limited scope of the "exemption" for most religious organizations. As before, only churches, their integrated auxiliaries, conventions and associations of churches, and the "exclusively religious activities" of religious orders were exempt from the "Contraceptive Mandate." No "exemption" was available for other religious organizations, or even for the caring ministries provided by religious orders themselves. The resulting differentiation of those religious organizations and activities deemed "religious enough," and those deemed "not religious enough," to qualify for the "exemption" is entirely arbitrary and not supported by any legitimate, let alone compelling, government interest. Religion is not limited to worship, and the freedom of religion is not limited to the freedom of worship. Religious freedom must also include the freedom to abide by Church teachings, outside of as well as inside of the four walls of the sanctuary. By limiting the "exemption" predominantly

---

[2] 80 FR 41317.

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209130

Exhibit 117                          JA1335                          JA-0001559

to houses of worship, the "exemption" represented the narrowest protection of conscience in health care anywhere in federal law.

As noted in our prior comments (September 27, 2011; June 18, 2012; April 8, 2013; October 27, 2014), federal conscience protections in the health care context are typically robust. Among such protections is the Church Amendment of 1973, which protects against government coercion of conduct that "would be contrary to [the] religious beliefs or moral convictions" of individuals and organizations. Such protections of the right to religious freedom have enjoyed broad bipartisan support and have been repeated in numerous federal conscience laws over the forty years since its original passage. Historical and legal precedents were being violated by the "Final Rules." Furthermore, religious organizations that were deemed non-exempt based on the redefinition of a religious organization, which include those that contribute most visibly to the common good through the provision of health, educational, and social services, were being unjustly coerced to violate the very beliefs that cause them to exist. Even the processes for self-certifying eligibility for an "accommodation" involved these organizations in facilitating coverages for employees that violated the employer's religious freedom.

Cases such as that of the Little Sisters of the Poor,[3] who received a permanent injunction by the US Supreme Court from having to comply with such an "accommodation," have demonstrated that such an "accommodation" does nothing to correct the violations of religious liberty imposed by the Contraceptive Mandate. This conclusion also is borne out by the U.S. Supreme Court's decision in *Burwell v. Hobby Lobby Stores*,[4] as well as lower court decisions, the majority of which have granted some form of injunctive relief to parties with a religious objection to contraceptive coverage. This mandate as presented in the "Final Rules" continued to substantially burden the religious liberty of all persons with religious objections to the mandated coverage. To be eligible for the "accommodation," employers must self-certify their religious objection, either through EBSA Form 700 or through an alternative mechanism by providing to the federal government information that ensures that the very coverage to which the employer objects is extended to its own employees. Thus, an "eligible organization" is still required to facilitate payments and coverage for the contraceptives to which it objects. The "accommodated" organization's own plan becomes a mechanism which ensures that contraceptives are made available to enrollees, preventing the organization from maintaining a plan consonant with its religious or moral beliefs. Thus, self-certification for those

---

[3] *Zubik v. Burwell*. 578 US __ (2016).
[4] 134 S. Ct. 2751 (2014).

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209131

Exhibit 117                     JA1336                     JA-0001560

seeking an "accommodation" remains problematic; and currently those organizations that are exempt have no such requirement (except to have in their files documentation of the criteria upon which the claim of an "exemption" is supported). Thus, the expanded types of organizations eligible for an "exemption" should not be required to engage in a self-certification process.

Furthermore, claims that the "accommodation" creates a "cost-neutral" plan for the employer, thus exonerating the employer from moral culpability is just not true. Notwithstanding the regulatory prohibition against directly or indirectly charging the employer or employee for contraceptives, the employer still will be contributing to the objectionable payments. The former Administration argued that cost reduction will occur by the reduction in maternity care costs. However, there are no reductions in plan premiums. If there are actually reduced maternity claims against the employer's plan as a result of its employees receiving coverage for contraceptives, those cost savings should result in the "accommodated" employers paying a reduced premium in subsequent years. But under the existing regulatory scheme, if claims against the plan are reduced, the employer would not pay a reduced premium for that plan. Instead, the employer's premium would remain as high as it was previously, even though its claims experience should result in a lower premium. And it is precisely that increment of the premium over the actual experience-based cost that would pay for contraceptives, in violation of the religious freedom of the employer.

In the case of insured plans, the Administration claimed in the preamble to its 2013 final rule that the cost of contraceptives could be treated as "an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations ...."[5] In the case of self-insured plans, funding for contraceptives is purportedly available through a reduction in the exchange user fee, but this assumes that the Third Party Administrator (TPA) will be able to find an insurer willing to make these payments and that the reduction will keep pace with the actual cost of contraceptives. Even if they kept pace, contraceptive payments would not be recovered until months after the payments are made, which raises the question of what source of funds are to be used in the meantime to make such payments. These questions give reasons for concern that the attempted segregation of those contributions from contraceptive payments will likewise turn out to be ineffective. Furthermore, insofar as the insurer/TPA is providing or arranging payments for contraceptives based on an enrollee's participation in the "eligible organization's" group plan, such

---

[5] 78 FR 39870 (July 2013).

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209132

Exhibit 117                                    JA1337                                    JA-0001561

payments are facilitated by the plan which the religious objector has offered to, and purchased for, its employees. By requiring the "eligible organization's" own health plan to be used as the mechanism or vehicle for ensuring that contraceptive coverage is made to plan enrollees, the government denies this organization the right to establish and maintain a health plan for its employees that is consistent with its religious beliefs and commitments.

In the end, the objecting but "accommodated" employer and any non-exempt employer is prevented from offering its employees a plan that comports with the provider's religious convictions.  It is evident that suppression of religious freedom can take at least two forms. It can take the form of making conscientious objectors actively cooperate with what they see as morally forbidden. And it can also take the form of depriving those objectors of the right (a right that others continue to exercise) to do what they see as morally required. Objecting employers will lose that right, because any plan they offer will be turned into a conduit for the objectionable coverage.

Finally, the practical outcome for employees and their children is exactly the same: the objectionable coverage is obtained by virtue of their enrollment in the employer-provided health plan.  Employees who share the objecting organization's religious tenets are similarly deprived of the freedom to choose an insurance plan organized according to their own values, and are forced to accept coverage for their families to which they have their own religious or moral objection.  In this way, the "Contraceptive Mandate" completely fails to acknowledge the religious freedom of both individual and institutional conscientious objectors. Because it is not narrowly tailored to accomplish a compelling government interest, the Contraceptive Mandate violates the Religious Freedom Restoration Act (RFRA), as most courts addressing the issue have either held or found likely in granting some form of injunctive relief.

### Current Status

While these "Interim Final Rules" do much to address these violations of religious freedom, and in expanding "exemption" eligibility they are to be lauded and supported, the "Contraceptive Mandate" should be rescinded in its entirety. Specifically, both of these "Interim Final Rules" and the "Final Rules" retain a regulatory scheme in which "preventive" health services are defined to include items that do not prevent disease, but rather are intended to render a woman temporarily or permanently infertile, and may be associated with adverse health outcomes. Designating contraceptives as "preventive services" does not constitute good

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209133

Exhibit 117                                JA1338                                JA-0001562

clinical medicine. An extensive body of evidence shows hormonal contraceptives pose substantial threats to women, including myocardial infarction, cerebrovascular accidents, deep venous thrombosis, pulmonary emboli,[6] as well as breast cancer, cervical cancer, and liver cancer. The relationship between hormonal contraception use and breast cancer—and in particular the disturbing connection between oral contraception use and triple-negative breast cancer (for which oral contraceptives raise the risk by 2.5 to 4.2 times)—should cause caution and concern.[7] Furthermore, it is a scientific fact that contraceptive drugs and devices also are associated with an increased risk of AIDS and sexually transmitted diseases.[8] Designating contraceptives as "preventive services" gives the false impression that these are safe and standard medications. Thus, such contraceptives are not "preventive services," but put the very women they are purported to protect at significant health risk.

Furthermore, as not all employers' religious freedoms are protected, those that are not exempt or accommodated must continue to provide coverage for surgical sterilizations and drugs and devices approved by the United States Food and Drug Administration (FDA) as contraceptives, including drugs and devices that potentially are abortifacients, inappropriately under the guise of "preventive services." Thus, the "Contraceptive Mandate" as presented in the "Interim Final Rules" continues to substantially burden the religious liberty of all employers with moral objections to the mandated coverage, who are not eligible for an "exemption" or "accommodation," for example, if they are employers of publicly traded companies. The nature of one's business holdings does not dictate who is eligible for protections of conscience. If a company is not sponsored by a faith-based community but has moral objections consistent with those companies that do have such sponsors, the fact that the company is publicly traded in no way should allow its right to protections under the RFRA to be violated. Identical moral objections to abortifacients can be held by persons of faith, agnostics, and atheists. Furthermore, whether their company is publicly traded or not should have no bearing on the protections of rights of conscience. The U.S. Supreme Court has made it clear in the *Hobby Lobby* decision, that it is not the role of government to second guess a person's religious beliefs, or what does or does not violate those

---

[6] For specific cautions and risks see: "Ortho Tri-Cyclen / Ortho-Cyclen." *RxList: The Internet Drug Index.* Available at http://www.rxlist.com/ortho_tri-cyclen-drug.htm.
[7] Jessica M. Dolle, Janet R. Daling, Emily White, et al., "Risk Factors for Triple-Negative Breast Cancer in Women under the Age of 45 Years." *Cancer Epidemiol Biomarkers Prev.* 2009; 18:1157-1166.
[8] "Hormonal contraception doubles HIV risk, study suggests." *Science Daily,* October 4, 2011, at http://www.sciencedaily.com/releases/2011/10/111003195253.htm.

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209134

Exhibit 117

JA1339

JA-0001563

beliefs. Moral objections are often grounded in religious beliefs. As long as the individual's or organization's religious beliefs are sincerely held, the government may not substitute its judgment for that of the conscientious objector.[9]

### Abortifacient Drugs and Devices are Not "Contraception."

The "Interim Final Rules" require non-exempt employer coverage of *abortifacient* drugs and devices. Thus, the "Contraceptive Mandate" departs from a longstanding tradition in federal law of protecting rights of conscience with regard to respect for unborn human life.  A number of so-called contraceptives are in fact abortifacients, capable of preventing the implantation of the fertilized human being after fertilization (conception).  This is documented by descriptors, provided by the FDA which states publicly concerning *Plan B* "emergency contraception:"

> "Plan B One-Step is believed to act as an emergency contraceptive principally by preventing ovulation or fertilization (by altering tubal transport of sperm and/or ova). In addition, it may inhibit implantation (by altering the endometrium)."[10]

The FDA did not arrive at this conclusion because there is no credible evidence that this drug prevents implantation; it arrived at this conclusion from an analysis of the relevant scientific data. Likewise, the manufacturer of *Plan B*, Teva Pharmaceuticals, states that *Plan B* may work "by preventing attachment (implantation) to the uterus (womb)."[11]  In addition, another FDA-approved emergency contraceptive is even capable of dislodging the embryo after implantation.  Specifically, ulipristal (*ellaOne*) may prevent ovulation but is clearly abortifacient.  Its chemical structure is similar to that of mifepristone (*RU-486*), which blocks natural progesterone receptors in three critical areas: destroying receptivity of the endometrial glands to embryo implantation;[12] destroying the capacity of the corpus luteum to produce progesterone for initial support of the implanted embryo;[13] and destroying the

---

[9] 134 S. Ct. at 2777-79 (discussing *Thomas v. Review Board*, 450 U.S. 707 (1981)).

[10] U.S. Food and Drug Administration, "Labeling Information" (07/10/2009). http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021998lbl.pdf.

[11] Teva Pharmaceuticals, "Plan B, One-Step FAQ" (last accessed October 27, 2014). http://www.planbonestep.com/faqs.aspx.

[12] Jerry R. Reel, Sheri Hild-Petito, and Richard P. Blye, "Antiovulatory and Postcoital Antifertility Activity of the Antiprogestin CDB-2914 When Administered as Single, Multiple, or Continuous Doses to Rats," *Contraception* 58.2 (August 1998): 129.

[13] Catherine A. VandeVoort et al., "Effects of Progesterone Receptor Blockers on Human Granulosa-Luteal Cell Culture Secretion of Progesterone, Estradiol, and Relaxin," *Biology of Reproduction* 62.1 (January 2000): 200.

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209135

Exhibit 117                    JA1340                    JA-0001564

endometrial stromal tissues necessary for the survival of the embryo.[14] However, the FDA has taken the position that "conception" only occurs upon implantation in the womb. It claims that these drugs and devices are therefore nothing but "contraceptives." However, biology textbooks are clear that a new member of the human species is alive from the time of fertilization.[15] Just because the American College of Obstetricians and Gynecologists has chosen to redefine the beginning of pregnancy as after implantation of the human embryo has occurred,[16] does not change the status of that human embryo. Furthermore, millions of Americans hold religious and moral convictions about the need to respect and protect human life from its earliest stages.

Thus, the "Contraceptive Mandate" encompasses "abortion," clearly in violation of the "ACA." Specifically, the "ACA" states that "nothing" in title I of "ACA," which includes the provision dealing with preventive services, "shall be construed to require a qualified health plan to provide coverage of [abortion] services ... as part of its essential health benefits for any plan year," and also stating that it is the "issuer" of a plan, not the government, that "shall determine whether or not the plan provides coverage of [abortion] services".[17] Thus, the very law cited as being the foundation of the "Interim Final Rules" is violated by these same rules.

## Conclusion

The "Interim Final Rules" continue to retain a regulatory scheme in which "preventive" health services are defined to include items that do not prevent disease, but rather are intended to render a woman temporarily or permanently infertile, and may be associated with adverse health outcomes. The "Contraceptive Mandate" should be rescinded in its entirety. However, the revoking of the artificially and arbitrarily differentiated definitions of the religious community, into those that are deemed "religious enough" for the "exemption" and those that are not, is sound, welcomed and lauded. Such an artificial differentiation excludes those who exercise their faith by a most visible service to the common good consistent with mandates of faith. Likewise the expansion of organizations that are

---

[14] Sheri Ann Hild et al., "CDB-2914: Anti-progestational/Anti-glucocorticoid Profile and Postcoital Anti-fertility Activity in Rats and Rabbits," *Human Reproduction* 15.4 (April 2000): 824.
[15] "Development of the embryo begins at Stage 1 when a sperm fertilizes an oocyte and together they form a zygote." [England, Marjorie A. *Life Before Birth*. 2nd ed. England: Mosby-Wolfe, 1996, p.31].
[16] See Christopher M. Gacek, "Conceiving Pregnancy: U.S. Medical Dictionaries and Their Definitions of *Conception* and *Pregnancy*," *National Catholic Bioethics Quarterly* 9.3 (Autumn 2009): 543–557, originally published by Family Research Council.
[17] 42 U.S.C. § 18023(b)(1)(A).

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209136

Exhibit 117                      JA1341                      JA-0001565

exempt from the Contraceptive Mandate, to all religiously objecting organizations, is constitutionally sound and welcomed. However, the denial of such rights to a publicly traded for-profit company, that has moral objections to such coverage, is a violation of their rights of conscience. Such companies should not lose their constitutional protections merely because they are publicly traded. Lastly, since even the "Final Rules" of 2015 did not require self-certification of those limited religious organizations that were exempt, no such self-certification should be required of those organizations deemed to be exempt by the "Interim Final Rules."

We thank you for considering our prior public comment on this matter of religious freedom, and welcome the changes contained herein. We ask you to consider the more far-reaching provisions that are needed to protect women from a false understanding of what will promote their health and prevent disease, as well as to protect the religious freedom of all organizations and employers.

Sincerely yours,

*Marie T. Hilliard*

Marie T. Hilliard, JCL, PhD., RN
Director of Bioethics and Public Policy

THE NATIONAL CATHOLIC BIOETHICS CENTER

00209137

Exhibit 117

JA1342

JA-0001566



### *VIA ELECTRONIC DELIVERY*

December 4, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
ATTN: CMS–9940–IFC
PO Box 8016
Baltimore, MD 21244-8016

To Whom It May Concern:

On behalf of Solidarity HealthShare, a health sharing ministry created to allow Americans to remain true to their religious and moral beliefs while meeting the healthcare needs of their families, I am writing to offer the following comments on the interim final rule entitled: *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act.* Solidarity applauds the Departments for issuing these regulations to liberate Americans from the multiple burdens contained in the prior administration's implementation of the Guidelines for women's preventive services, commonly referred to as the ACA's contraception coverage mandate.

### About Solidarity HealthShare

Before offering our comments on the RFI, I wish to introduce the Department to Solidarity HealthShare. Officially launched just one year ago, Solidarity HealthShare today counts 2,000 families as members. Inspired by the growth and potential of health sharing ministries, we provide an alternative to unaffordable, inflexible Affordable Care Act-era health insurance. Solidarity is building an authentic Catholic healthcare system that is faithful to the religious and ethical teachings of the Catholic Church. While Solidarity has similarities to peer health sharing ministries, we focus on the following three attributes as we build our organization:

- **Conscience:** Solidarity was founded partly to fill the tremendous need that exists to provide alternatives to health insurance coverage because of laws and regulations like the contraception coverage mandate. We are faithful to the teachings of the Catholic Church and require our members to remain faithful to these tenets as well.

- **Community**: Solidarity is committed to building an authentic community of members who are deeply committed to our mission and who desire to build an authentic Catholic community today. This includes the commitment of our members to maintaining healthy lifestyles to help limit care and expenses associated with unhealthy lifestyles. We are constantly working on ways to foster a legitimate sense of community and sharing as we know such traits are essential for our long-term success.

Page | 1

00454868

Exhibit 118

JA-0001567

- **Costs**: Because the ministry member – who is a self-pay patient – is central to our mission, Solidarity focuses extensive amounts of time and energy in negotiating the lowest possible costs for high-quality care. We scrutinize all costs submitted and seek ways to limit unnecessary expenditures and to advocate for the greatest discounts possible. Additionally, because we share actual costs and not estimates or projections, we fight each and every day for the lowest possible price and are increasingly focusing on negotiating directly with providers, particularly in states or regions where we have a critical mass of members.

## Comments on the Interim Final Rule

With this mission and vision, Solidarity is pleased to offer the following comments on the interim final rules.

As noted in our introduction, Solidarity is very pleased overall with the interim final rule (and its companion interim final rule published concurrently in the Federal Register regarding moral exemptions). As the final rule clearly laid out, the United States has a long history of protecting the religious and moral concerns of healthcare personnel dating more than 40 years to shortly after the Supreme Court's *Roe vs. Wade* and *Doe vs. Bolton* rulings. As noted in the rules, these protections have been expanded over time and today pertain to a number of specific issues including provision of abortion, sterilization or other services; education and training in such medical procedures and payment or referral for abortions and for assisted suicide.

Unfortunately, the prior administration took a significant step backward in interpreting and implementing the preventive services guidelines included in the ACA by requiring certain group health plans and health insurance issuers to cover the full range of FDA-approved methods of contraception. We agree with the Departments that such a mandate unduly burdens the religious liberties and moral concerns of those impacted by the rule and applaud the decision to expand the protections provided under the revised policy. And we agree with the related interim final rule that "the Government's interest in applying contraceptive coverage requirements to the plans of certain entities and individuals does not outweigh the sincerely held moral objections of those entities and individuals."

With regard to the specific provisions of the interim final rules, Solidarity is pleased to see that the rules cover moral objections in addition to religious beliefs and that this new policy will not require submitting any self-certification. Solidarity is also pleased that the interim final rule broadens the exemption to include certain for-profit entities, including for-profit companies that object to such coverage because of the religious beliefs of their owners. Additionally, as an organization that is driven by our members who are motivated by the ability to protect their conscience rights, Solidarity is pleased that the interim final rule includes an individual exemption whereby an employee with sincerely held moral objections to contraception coverage may obtain a plan that omits coverage of such products.

We note that the interim final rules surmise that the new policy may help boost insurance coverage by making it less likely that individuals would forgo coverage because the only options available would require them to accept a plan that covers contraceptives. While not challenging this assertion,

00454869

Exhibit 118

JA-0001568

we do wish to note the significant growth that has occurred in health sharing ministries more broadly over the seven years since the ACA has been enacted. In the case of Solidarity, which is a relatively new entrant to the space, I can note that many of our members have turned to us primarily because of their interests in following their conscience rights with regard to such issues.

In toto, Solidarity believes the interim final rule strongly improves upon the situation American employers and employees have found themselves facing over the past several years. At the same time, we must note that even with implementation of these new protections, entities and individuals may still face situations in which they are forced into a conflict between their religious beliefs or moral convictions and easing the burden of out-of-pocket medical expenses. For example, the interim final rule protects entities from plans that cover FDA-approved forms of contraception, including some products that act as abortifacients, but it does not provide any protections for employers or individuals regarding abortion. Similarly, the interim final rule offers no exemptions for plans that cover services related to gender reassignment, including surgery. Both elective abortions and services related to gender reassignment are in serious conflict with the moral and ethical teachings of the Catholic Church and many other faith traditions. But even under the broadened protections included in the interim final rules, entities will not have any guaranteed recourse from these threats.

Just this past summer, the state of Oregon enacted a law that requires health plans to cover elective abortions.[1] This extreme new law includes only a very narrow exemption for religious employers, one that does not apply to those obtaining relief under the interim final rules. These threats against conscience are, sadly, significant and very real, demonstrating the need for further protections at all levels of government.

Solidarity HealthShare believes the optimal response to these threats lies in health sharing ministries like ours that are organized around religious ethics and morals and that seek to build authentic communities while helping our members pay for their healthcare expenses. As the administration considers its overall healthcare agenda including ways to build upon the interim final rules to better protect the conscience rights of all Americans and to help drive access to affordable and meaningful healthcare coverage, we urge you to fully consider the alternatives offered through robust and authentic health sharing ministries. While health sharing ministries are not and should not be treated as health insurance, ministries like Solidarity are able to fulfill similar needs and are able to do so in ways to drive high-value care in accordance with the ethical and religious beliefs of our members. We welcome the opportunity to engage with the Departments on this issue and others as needed.

Sincerely,

/S/

Bradley Hahn
CEO
Solidarity HealthShare

---

[1] See: https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB3391

00454870

Exhibit 118          JA1345          JA-0001569



**Office of the General Counsel**
3211 FOURTH STREET NE • WASHINGTON DC 20017-1194 • 202-541-3300 • FAX 202-541-3337

<u>*Submitted Electronically*</u>

November 21, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

> **Subj:  Moral Exemptions and Accommodations for Coverage of Certain
>        Preventive Services Under the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

On behalf of the United States Conference of Catholic Bishops ("USCCB"), we submit the following comments on the interim final rules, published at 82 Fed. Reg. 47838 (Oct. 13, 2017), on moral exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

## I.    <u>The Mandate</u>

As set out in our comments on the companion interim final rule on religious exemptions, we believe HHS should reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services." These drugs, devices and procedures prevent not a disease condition, but the healthy condition known as fertility, and they pose significant risks of their own to women's life and health. For these reasons, and for reasons set out more fully in our comments on the companion interim final rule on religious exemptions, we request that the mandate be rescinded.

---

[1] Today we have also filed comments on the companion interim final rule, published at 82 Fed Reg. 47792 (Oct. 13, 2017), concerning exemptions and accommodations for religious objections to contraceptives. The two sets of comments should be considered together, and each set of comments includes the other as an attachment which we incorporate by reference. Unless context indicates otherwise, our use of the term "contraceptives" refers to contraceptives, sterilization, and related education and counseling, and "contraceptive coverage" refers to coverage of these items. The "mandate" refers to the requirement to cover these items.

1

00000004

Exhibit 119                                   JA1346                                   JA-0001570

## II.    The Exemptions

### A.   A Moral Exemption is Appropriate.

HHS has given very thorough and persuasive reasons for adopting a moral-based exemption from the mandate.  Among other things, the Department cites federal statutory protections for moral-based exemptions, including many that are applicable in the health care context generally and to contraceptives specifically; the legislative history of the Church amendment, a longstanding statute that protects moral as well as religious objectors; court precedents relevant to moral exemptions; conscience protections in regulations and among the states; broadly-framed principles of freedom of conscience embraced by the Founders; executive orders relevant to moral exemptions; and litigation surrounding the mandate.  82 Fed. Reg. at 47844-48.

We agree with the Department that there should be exemptions for those with moral objections, and we agree with the reasons that the Department has given for adopting exemptions for stakeholders with moral objections.

### B.   The List of Plan Sponsors Eligible for an Exemption on Moral Grounds Should Be at Least as Broad as the List of Plan Sponsors Eligible for an Exemption on Religious Grounds.

Currently the list of stakeholders eligible for an exemption for *moral* reasons, though commendably broad, is slightly narrower than the list of stakeholders eligible for an exemption for *religious* reasons.[2]  The Department seeks public comment specifically on "whether the exemption ... for plan sponsors with moral objections to the Mandate should be finalized to encompass all of the types of plan sponsors covered by [the exemption for plan sponsors with religious objections]...."  82 Fed. Reg. at 47851.

The answer, in our view, is yes.  That is, the range of plan sponsors eligible for an exemption if they have a moral objection should be no less broad than the range of plan sponsors eligible for an exemption on religious grounds.  We take this position for five reasons.

*First*, in the preamble to the companion interim final rule on religious exemptions, HHS states that a publicly-traded company may have a religious objection to the mandate, even if such

---

[2] For example, the companion interim final rule on religious exemptions provides a *non-exhaustive* list of plan sponsors that are exempt from the mandate if they have a religious objection.  82 Fed. Reg. at 47835 (setting out a list of plan sponsors that "include, but are not limited to," certain specified entities).  The interim final rule on moral exemptions, however, lacks the language "include, but are not limited to," *see* 82 Fed. Reg. at 47861-62, and therefore presents what is a list that is arguably exhaustive rather than illustrative.

To take another example, the companion interim final rule states that a "for-profit entity that is not closely held" may obtain an exemption on religious grounds.  82 Fed. Reg. at 47835.  But the present interim final rule states that a for-profit entity that is not closely held may obtain an exemption on moral grounds only if it is not publicly-traded.  82 Fed. Reg. at 47862.

00000005

Exhibit 119                                    JA1347                                    JA-0001571

an objection is unlikely, so HHS *allows* an exemption. 82 Fed. Reg. at 47810-11. In the preamble to the present interim final rule on moral exemptions, however, HHS states that a publicly-traded company could have a moral objection, but that such an objection is unlikely, so HHS *disallows* an exemption. 82 Fed. Reg. at 47851-52. These two arguments are inconsistent. If the possibility of a religious objection is sufficient in the case of the companion rule on religious exemptions to justify an exemption, as HHS correctly states, then the possibility of a moral objection should also be sufficient in the case of the present interim final rule to justify an exemption.

*Second*, we think the thorough, persuasive reasons HHS has offered for having a moral exemption in the first place justifies an exemption on moral grounds that is at least as broad as that provided for religious objectors.

*Third*, one can reasonably conclude that this particular mandate will generate moral as well as religious objections. That is because the locus of the objection, as evidenced by past litigation on the mandate, is very often on drugs and devices that prevent implantation and are therefore regarded by the objector as abortifacient irrespective of the objector's particular religious tradition. Indeed, in the case of a publicly-traded corporation, it is arguably *more* likely that some block of shareholders will share a common moral opposition to abortifacients than that they will share common religious traditions opposing such drugs or devices. *See Valley Hosp. Ass'n v. Mat-Su Coalition for Choice*, 948 P.2d 963 (Alaska 1997) (non-religious community hospital had moral objections to providing abortions, even though it had no religious objection); 42 U.S.C. § 300a-7 (recognizing the possibility of moral but non-religious objections to abortion, and therefore protecting such objectors). Indeed, moral objections are sometimes religiously grounded, sometimes they are not. So, the universe of moral objectors, it would seem, is almost always going to be larger than the universe of religious objectors because the former arguably includes the latter as a subset.

*Fourth*, while the current religious and moral exemptions, as written, easily pass muster under the Establishment Clause, and while the presence of a religious exemption in our view does not constitutionally *require* a parallel moral exemption, the Department, as a practical matter, may find it easier to defend against an Establishment Clause challenge a religious exemption that has a perfect parallel in a regulation providing an identical exemption for moral reasons.

*Fifth*, religious and moral exemptions that parallel each other will be easier for the public to understand and simpler for the federal government to administer.

For all these reasons, we think it would be prudent for the Department to broaden the exemption for plan sponsors with a moral objection to the mandate to include any plan sponsor that, if it had a religious objection, would be exempt under the companion rule.

3

00000006

Exhibit 119                    JA1348                    JA-0001572

### C.  No Self-Certification Should be Required.

The Department states that "exempt entities will not be required to comply with a self-certification process." 82 Fed. Reg. at 47850.  The Department asks, however, "whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption…." *Id.* at 47850.

We agree with the Department's decision not to require exempt entities to comply with a self-certification process, and we recommend that no special form or other process be developed or required to claim the exemption, especially since these have been used in the past as a mechanism for ensuring compliance with the mandate and therefore have themselves raised religious and moral concerns for many stakeholders.

### Conclusion

HHS should reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services."  These drugs, devices and procedures prevent not a disease condition, but the healthy condition known as fertility, and they pose significant risks of their own to women's life and health.  As long as the mandate is in place, we fully support the exemptions for those individuals and entities with religious and moral objections to the mandate.  The exemptions for moral objections should apply to a list of stakeholders that is at least as broad as that for religious objections.  Accordingly, we recommend that the interim final rule be adjusted so that it parallels the list of stakeholders with religious objections in the companion interim final rule.

Thank you for the opportunity to comment.

Sincerely,

Anthony R. Picarello, Jr.
Associate General Secretary &
    General Counsel

Michael F. Moses
Associate General Counsel

Hillary E. Byrnes
Assistant General Counsel

4

00000007

Exhibit 119

Addendum

00000008

Exhibit 119

JA-0001574



### *Office of the General Counsel*
3211 FOURTH STREET NE · WASHINGTON DC 20017-1194 · 202-541-3300 · FAX 202-541-3337

*Submitted Electronically*

November 21, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Religious Exemptions and Accommodations for Coverage of Certain**
**Preventive Services Under the Affordable Care Act, RIN 0938-AT20**

Dear Sir or Madam:

On behalf of the United States Conference of Catholic Bishops ("USCCB"), we submit the following comments on the interim final rules, published at 82 Fed. Reg. 47792 (Oct. 13, 2017), on religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

Since the ACA's enactment in 2010, we have filed comments each time the Department has issued a regulatory proposal on contraceptive coverage.[2] Our earlier comments raised two overarching themes.

---

[1] Today we have also filed comments on the companion interim final rule, published at 82 Fed Reg. 47838 (Oct. 13, 2017), concerning exemptions and accommodations for moral objections to contraceptives. The two sets of comments should be considered together, and each set of comments includes the other as an attachment which we incorporate by reference. Unless context indicates otherwise, our use of the term "contraceptives" refers to contraceptives, sterilization, and related education and counseling, and "contraceptive coverage" refers to coverage of these items.

[2] *See* USCCB Comments on Interim Final Rules on Preventive Services (Aug. 31, 2011), http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-preventive-services-2011-08-2.pdf; USCCB Comments on Advance Notice of Proposed Rulemaking on Preventive Services (May 15, 2012), http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-on-advance-notice-of-proposed-rulemaking-on-preventive-services-12-05-15.pdf; USCCB Comments on Notice of Proposed Rulemaking on Preventive Services (Mar. 20, 2013), http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-Comments-3-20-final.pdf; USCCB Comments on Proposed Rules on Coverage of Certain Preventive Services Under the Affordable Care Act (Oct. 8, 2014), http://www.usccb.org/about/general-

1

00000009

*First,* we argued that contraceptives should not be mandated as "preventive" services because, unlike genuinely preventive services, they do not prevent disease or illness. Instead, they are associated with an increased risk of adverse health outcomes, such as breast cancer, that other "preventive services" are designed to prevent. The contraceptive mandate is therefore at odds with the purpose of the preventive services provision of the ACA upon which the mandate purports to be based. In addition, insofar as it requires coverage of drugs and devices that can cause an abortion, the mandate violates ACA provisions dealing with abortion coverage and non-preemption of state law, as well as the Weldon amendment.

*Second,* we argued that if coverage of contraceptives were to be mandated, all stakeholders with religious or moral objections should be exempt. We argued that the previous exemption from the mandate for churches was too narrow, and that the device HHS had created for the purpose of "accommodating" non-exempt entities was insufficient to relieve non-exempt entities of the substantial burden that the mandate placed upon them. We argued that a broad exemption for religious objectors was required under the Religious Freedom Restoration Act ("RFRA"), and that an exemption for religious and moral objectors was both prudent as a matter of public policy and consistent with longstanding traditions protecting conscience in this country.

In the present interim final rule and companion rule regarding moral convictions, HHS does not address the first of these two overarching issues, but instead leaves it to the discretion of its Health Resources and Services Administration ("HRSA") "to decide whether to include contraceptives in the women's preventive services Guidelines...."[3] Because the Guidelines themselves have never been the subject of notice and comment rulemaking, and because there is no indication that they ever will be, we raise the issue here, as we have in all our past rulemaking comments on contraceptive coverage, because significant questions remain whether contraceptives are an appropriate subject for inclusion in a list of preventive services in the first instance. For reasons set out in these comments, HHS could reasonably conclude that they are not. We urge HHS, whether in this rulemaking or in some other appropriate forum, to reconsider and rescind the mandate. At a minimum, to ensure compliance with the abortion and non-preemption provisions of the ACA and with the Weldon amendment, HHS should clarify that the mandate does not apply to any drug or device that can disrupt an existing pregnancy.

On the second issue, HHS is to be commended. Consistent with the position that we and others have long urged, the Department, in these two interim final rules, has crafted exemptions that together protect all stakeholders with religious or moral objections to contraceptive

---

counsel/rulemaking/upload/2014-hhs-comments-on-proposed-rule-on-for-profits-10-8.pdf; USCCB Comments on Interim Final Rules on Coverage of Certain Preventive Services Under the Affordable Care Act (Oct. 8, 2014). http://www.usccb.org/about/general-counsel/rulemaking/upload/2014-hhs-comments-on-interim-final-rules-10-8.pdf. *See also* USCCB comments on Interim Final Rules Relating to Coverage of Preventive Services (Sept. 17, 2010) (discussing why contraceptives should not be included in the list of mandated preventive services under the ACA). http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-preventive-services-2010-09.pdf.

[3] *See, e.g.,* 82 Fed. Reg. at 47799 ("These interim final rules leave unchanged HRSA's authority to decide whether to include contraceptives in the women's preventive services Guidelines for entities that are not exempted by law, regulation, or the guidelines.").

2

00000010

coverage, for reasons that are well articulated and persuasive. The exemptions are, as the bishops noted when first apprised of them, "a return to common sense"[4] and, in the Department's words, consistent with "a long history of providing conscience protections in the regulation of health care for entities and individuals with objections based on religious beliefs and moral convictions." 82 Fed. Reg. at 47792.

## I.    **The Mandate**

Contraceptives are inappropriate candidates for inclusion under mandated "preventive services" for several reasons.

### A.    **The Meaning and Purpose of "Preventive Services"**

The justification for mandating coverage for preventive services can be determined from the plain language of the statute and its legislative history. In section 2713(a)(4) of the ACA, 42 U.S.C. § 300gg-13(a)(4), Congress gave HRSA the discretion to specify that certain group health plans shall cover, "with respect to women, such additional *preventive* care and screenings … as provided for in comprehensive guidelines" supported by HRSA. The plain meaning of "preventive" is an item or service that prevents disease or illness. Naturally, congressional debate on this provision centered almost entirely on services to prevent life-threatening illness such as breast cancer. 111 Cong. Rec. S11986-88 (Nov. 30, 2009); 111 Cong. Rec. S12025-28, S12058-60 (Dec. 1, 2009); 111 Cong. Rec. S12113-14, S12119-23, S12126-31, S12143-44, S12151-52 (Dec. 2, 2009); 111 Cong. Rec. S12267-77 (Dec. 3, 2009).

For the most part, the list of "preventive" services developed by HRSA is consistent with this meaning and with Congress's intent. HRSA has decided that covered services shall include breast cancer screening, breastfeeding services and supplies, screening for cervical cancer, screening for gestational diabetes mellitus, screening for human immunodeficiency virus infection, screening for interpersonal and domestic violence, counseling for sexually transmitted infections, and well-woman preventive visits. HRSA, Women's Preventive Services Guidelines (Dec. 20, 2016), https://www.hrsa.gov/womens-guidelines-2016/index.html. Coverage of these services is mandated because they can prevent serious illnesses or life-threatening conditions that, once they occur, will demand treatment to cure or reverse or, at the very least, can provide an early warning so these conditions can be treated more quickly and with a greater likelihood of success.

This rationale does not apply to contraceptives. Contraceptives do not prevent disease, but instead disrupt the healthy functioning of the human reproductive system, temporarily or permanently creating the condition of infertility, which is commonly seen as a health problem. Most drugs and devices in this area have a significant "failure" rate, but when they do succeed, what they most often "prevent" is a healthy pregnancy in a healthy woman of childbearing age. At various times, women may have serious personal reasons for wanting to avoid or delay a pregnancy. However, these personal reasons do not transform a temporary or permanent

---

[4] Statement of Cardinal Daniel N. DiNardo, Archbishop of Galveston-Houston and President of the USCCB, and Archbishop William E. Lori of Baltimore, Chairman of the USCCB's Ad Hoc Committee for Religious Liberty (Oct. 6, 2017), http://www.usccb.org/news/2017/17-180z.cfm.

00000011

Exhibit 119                                   JA1353                                   JA-0001577

condition of infertility into a prerequisite for health, or turn a healthy pregnancy into a disease condition.

Indeed, if contraception and sterilization were comparable to the other items listed as preventive by HRSA, the federal government would be mandating coverage in order to obviate the need for providing the "cure" or treatment later (or in order to ensure that such cure or treatment is provided early, to enhance the likelihood of success). But the condition prevented by contraceptives is pregnancy, which has its own natural course ending in live birth if not interrupted by medical intervention or spontaneous miscarriage. The "cure" or "treatment" to eliminate this condition would have to be an abortion. But the ACA *prohibits* any federal mandate to cover abortion as an essential health benefit in *any* circumstances.[5] Indeed, the Act not only leaves health plans free to exclude abortion, but explicitly allows each state to forbid coverage of abortion on or off its exchange.[6] Finally, with regard to the multi-state qualified health plans established under the ACA, at least one of these plans must exclude most abortions. 42 U.S.C. § 18054(a)(6). The ACA does not treat any other procedure this way.

In these provisions, the ACA treats pregnancy as a healthy condition and does not treat the existence of an unborn human life as an illness or condition requiring the "treatment" of abortion. It is inconsistent to *require* health plans to commit themselves to preventing this same condition.

Some may claim that contraception and sterilization are "preventive services" in the sense that they "prevent" abortion. But this is implausible for several reasons. First, abortion is not itself a disease, but a separate procedure that is performed only by agreement between a woman and a health professional. Second, most pregnancies, including unintended pregnancies, end in live birth rather than abortion, so it would be arbitrary to claim that preventing such pregnancies primarily prevents abortion rather than live birth. Third, studies have shown that the percentage of unintended pregnancies that are ended by abortion is *higher* if the pregnancy occurred during use of a contraceptive.[7] Finally, numerous studies have shown that contraceptive programs do not reliably or consistently reduce abortion rates.[8] For example, one

---

[5] 42 U.S.C. § 18023(b)(1)(A) (stating that "nothing" in title I of the ACA, which includes the provision dealing with preventive services, "shall be construed to require a qualified health plan to provide coverage of [abortion] services … as part of its essential health benefits for any plan year"); *id.* (stating that it is the "issuer" of a plan, not the government, that "shall determine whether or not the plan provides coverage of [abortion]"); *see also* 42 U.S.C. § 18023(c)(1) (stating that nothing in the ACA preempts or has any effect on State law regarding abortion coverage).

[6] 42 U.S.C. § 18023(a)(1) (providing that "A State may elect to prohibit abortion coverage in qualified health plans offered through an Exchange in such State if such State enacts a law to provide for such prohibition"); 42 U.S.C. § 18023(c)(1) (providing that "Nothing in this Act [i.e., the ACA] shall be construed to preempt or otherwise have any effect on State laws regarding the prohibition of … coverage … [of] abortions").

[7] While 40% of unintended pregnancies end in abortion, this percentage rises to 51% for women who used a contraceptive during the month they became pregnant. Guttmacher Institute, "Fact Sheet: Induced Abortion in the United States," Oct. 2017, at https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf.

[8] See fact sheets by the USCCB Secretariat of Pro-Life Activities, "Greater Access to Contraception Does Not Reduce Abortions," http://www.usccb.org/issues-and-action/human-life-and-dignity/contraception/fact-sheets/greater-access-to-contraception-does-not-reduce-abortions.cfm, and "Emergency Contraception Fails to

4

00000012

review summarizing 23 separate studies found that not one of the studies could show a reduction in abortion rates from programs expanding access to so-called "emergency contraception."[9] An evidence-based approach to health care does not permit the claim that mandating contraceptive coverage will reduce abortions or even unintended pregnancies.

One particular drug approved by the Food and Drug Administration ("FDA") for "emergency contraception" poses an especially obvious problem in this regard. Ulipristal (trade name "Ella") is a close analogue to the abortion drug RU-486, with the same biological effect – that is, it can disrupt an established pregnancy after conception has taken place.[10] Therefore, it is contraindicated for women who are or may be pregnant. To characterize this drug as a "contraceptive" is misleading at best and deprives women of the opportunity for genuine informed consent. To the extent that the contraceptive mandate requires coverage of drugs that can cause an abortion after implantation, the mandate would encompass abortion even as previous administrations have defined it. Such coverage runs afoul of the ACA provisions discussed above (see notes 5 & 6, *supra*, and accompanying text), as well as the Weldon amendment.[11]

## B. Medical Realities of Contraceptive Drugs and Devices

The *non*-contraceptive items listed by HRSA as preventive services share a basic medical profile: they pose little or no medical risk themselves, and they help prevent or ameliorate identifiable conditions that would pose known risks to life and health in the future. *See* HRSA, Women's Preventive Services Guidelines, www.hrsa.gov/womens-guidelines/index.html.

Oral contraceptives present the opposite profile, posing their own serious risks and side-effects, some of which can be life-threatening.

Oral contraceptives "fail the most important test of preventive medicine: they increase [the] risk of disease instead of decreasing it."[12] HHS acknowledges many of these risks. 82 Fed.

---

Reduce Unintended Pregnancy and Abortion," June 5, 2014, at http://www.usccb.org/issues-and-action/human-life-and-dignity/contraception/fact-sheets/emergency-contraception-fails-to-reduce-unintended-pregnancy-abortion.cfm.

[9] E.G. Raymond, et al., *Population Effect of Increased Access to Emergency Contraceptive Pills*, 109 OBSTETRICS & GYNECOLOGY 181 (2007), https://www.ncbi.nlm.nih.gov/pubmed/17197603.

[10] Documentation on this and other medical aspects of the drug is cited in testimony submitted to the FDA by the American Association of Pro-Life Obstetricians and Gynecologists, available at http://aaplog.org/aaplog-testimony-to-fdas-advisory-committee-for-reproductive-health-drugs-regarding-the-emergency-contraceptive-ella/ .

[11] Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. H, § 507(d) (stating that no Labor/HHS funds may be made available to any government agency that discriminates against any health plan on the basis that the plan does not provide abortion coverage). The previous administration concluded that the Weldon amendment "remain[s] intact" after enactment of the ACA. Executive Order 13535 (Mar. 24, 2010), quoted in 82 Fed. Reg. at 47793 (preamble).

[12] Rebecca Peck & Charles W. Norris, *Significant Risks of Oral Contraceptives (OCPs): Why This Drug Class Should Not Be Included in a Preventive Care Mandate*, 79 LINACRE QUARTERLY 41, 42 (Feb. 2012), https://familyplanning.net/sites/default/files/Significant-Risks-of-Oral-Contraceptives-OCPs-Why-This-Drug-Should-Not-Be-Included-In-a-Preventive-Care-Mandate.pdf.

5

00000013

Exhibit 119     JA1355     JA-0001579

Reg. at 47804. Women who use oral contraceptives may have an increased risk of heart-related side effects such as stroke, heart attacks and blood clots, especially if they also smoke cigarettes. The publishers of the *Physicians' Desk Reference* warn women of these "[s]erious, and possibly life-threatening, side effects," adding:

> Seek medical attention immediately if you have any of the following: chest pain, coughing up blood, or shortness of breath (indicating a possible blood clot in the lung); pain in the calf (indicating a possible blood clot in the leg); crushing chest pain or heaviness (indicating a possible heart attack); sudden, severe headache or vomiting, dizziness, fainting, vision or speech problems, weakness, or numbness in an arm or leg (indicating a possible stroke); sudden partial or complete loss of vision (indicating a possible blood clot in the eye); breast lumps (indicating possible breast cancer or fibrocystic breast disease); severe pain or tenderness in the stomach (indicating a possible liver tumor); difficulty sleeping, lack of energy, fatigue, change in mood (possibly indicating depression); yellowing of the skin or whites of the eyes (jaundice), sometimes accompanied by fever, fatigue, loss of appetite, dark-colored urine, or light-colored bowel movements (indicating possible liver problems).[13]

According to other sources, oral contraceptives have been associated with—

- Increased risk of depression.[14]

- Increased risk of venous thromboembolism.[15]

- Increased risk of thrombotic stroke and myocardial infarction.[16]

---

[13] PDR Network, "Oral contraceptives," at *PDRhealth* (2009).

[14] Charlotte Wessel Skovlund, et al., *Association of Hormonal Contraception with Depression*, JAMA PSYCHIATRY (published online Sept. 28, 2016) ("Use of hormonal contraception, especially among adolescents, was associated with subsequent use of antidepressants and a first diagnosis of depression, suggesting depression as a potential adverse effect of hormonal contraceptive use.").

[15] Peck & Norris, *supra*, at 43 ("Oral contraceptives are associated with a three to five times higher risk of VTE"); *see also* Yana Vinogradova, et al., *Use of Combined Oral Contraceptives and Risk of Venous Thromboembolism: Nested Case-Control Studies Using the QResearch and CPRD Databases*, BMJ (Mar. 19, 2015) ("Current exposure to any combined oral contraceptive was associated with an increased risk of venous thromboembolism ... compared with no exposure in the previous year."); *see also* Robert A. Hatcher et al., *Contraceptive Technology*, 18th rev. ed. (New York: Ardent Media, 2004), at 405-07.

[16] Ojvind Lidegaard, et al., *Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception*, 366 N. ENGL. J. MED. 2257 (2012) (finding that risks of thrombotic stroke and myocardial infarction were "increased by a factor of 0.9 to 1.7 with oral contraceptives that included ethinyl estradiol at a dose of 20 mg and by a factor of 1.3 to 2.3 with those that included ethinyl estradiol at a dose of 30 to 40 mg"); Peck & Norris, *supra*, at 45 (reporting a 200 percent increase in the risk of myocardial infarction among users of low-dose oral contraceptives); *see also* Hatcher, *supra*, at 404-05, 445.

6

00000014

Exhibit 119                    JA1356                    JA-0001580

- Increased risk of HIV-1 acquisition and transmission.[17]

- Increased risk of breast, cervical, and liver cancer.[18]

- Increased risk of hypertension.[19]

It is important to recall in this context that most contraceptive drugs and devices are available only by prescription not primarily because they are medically indicated for any particular illness, but because they pose sufficient risks that it would be irresponsible to distribute them without medical supervision. Indeed, even with a physician's oversight, use of oral contraceptives has given rise to a virtual cottage industry among the plaintiffs' bar seeking recovery, and obtaining multi-million dollar judgments, for resulting injuries.[20] In short, while media outlets and some advocates continue to talk about contraceptives as if they are an unmitigated boon to women's health, there is ample evidence that they can and do injure women, sometimes fatally.[21]

[17] Renee Heffron, et al., *Use of Hormonal Contraceptives and Risk of HIV-1 Transmission: A Prospective Cohort Study*, 12 THE LANCET (Jan. 2012) ("Use of hormonal contraceptives was associated with a two-times increase in the risk of HIV-1 acquisition by women and HIV-1 transmission from women to men."); *see also Hormonal Contraception Doubles HIV Risk, Study Suggests*, SCIENCE DAILY (Oct. 4, 2011). https://www.sciencedaily.com/releases/2011/10/111003195253.htm.

[18] NIH Fact Sheet, *Oral Contraceptives and Cancer Risk* (Mar. 21, 2012). https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet. One study showed that users of oral contraceptives have a 50% higher risk of invasive breast cancer, and that users of triphasic oral contraceptives have three time the risk of breast cancer, compared to women who are not on hormonal contraceptives. Richard J. Fehring, *Nurses' Health Study Provides Risks and Benefits of Exogenous Reproductive Hormone Use*, 28 CURRENT MEDICAL RESEARCH, 9, 10 (Winter/Spring 2017). http://www.usccb.org/issues-and-action/marriage-and-family/natural-family-planning/medical-research/upload/CMR-WinterSpring-2017-FINAL.pdf. Mandating contraceptive cover under the preventive services provision of the ACA is ironic given that sponsors of that provision cited the *prevention* of breast and cervical cancer as one of its key goals. Cong. Rec. S11986-91 (Nov. 30, 2009).

[19] Hatcher, *supra*, at 407, 445.

[20] *See, e.g.*, *Bayer Says It's Paid $142M Over Birth Control Lawsuits*, CHICAGO TRIB. (Apr. 26, 2012) ("Bayer says settlements of U.S. lawsuits over its Yasmin birth control pill have risen to $142 million. Bayer says it has resolved more than 600 suits claiming that Yaz causes blood clots, some of which were fatal."). http://articles.chicagotribune.com/2012-04-26/business/chi-bayer-says-its-paid-142m-over-birth-control-lawsuits--20120426_1_bayer-lawsuits-yaz; Randi Kaye & Shawna Shepherd, *Families, Lawsuits, Raise Questions About NuvaRing*, CNN (Apr. 7, 2015) www.cnn.com/2015/04/06/us/families-lawsuits-raise-questions-about-nuvaring/; Julie Deardorff, *Lawsuits Pile Up Over Popular Birth Control Pill*, CHICAGO TRIB. (Sept. 15, 2013). articles.chicagotribune.com/2013-09-15/health/ct-met-birth-control-risks-20130915_1_drospirenone-clots-pills/; Natasha Singer, *Health Concerns Over Popular Contraceptives*, N.Y. TIMES (Sept. 25, 2009). http://www.nytimes.com/2009/09/26/health/26contracept.html.

[21] There is some evidence (and HHS alludes to it) that the recommendation to list contraceptives as a preventive service did not seriously evaluate these risks. *See* 82 Fed. Reg. at 47795 (noting that the IOM's committee's recommendation, which formed the basis of HRSA's decision to list contraceptives as a preventive service, was not based on "high quality, systematic evidence," as recounted by one dissenting IOM member, and that the process that led to its recommendation was, in his words, "filtered through a lens of advocacy"). Fertility-based means of spacing births—means that are both morally licit and, if practiced, as effective as artificial contraceptives—are, of course, free of these health risks because they do not rely for their mode of action upon introducing prescribed

7

Exhibit 119
JA1357
JA-0001581
00000015

Our recommendation to rescind the mandate is also supported by the controversy and the litigation that the mandate has generated and continues to generate. The mandate provoked the largest single wave of religious freedom litigation in the history of the United States: over 100 lawsuits, including 56 suits on behalf of more than 300 plaintiffs with various denominational commitments, extending over half a decade. It appears that a second generation of litigation will be pursued by those opposed to the exemptions that the new rules create.[22] Thus, having devoted substantial time and resources defending an unprecedented volume of litigation seeking exemptions, the government now finds itself in the position of having to expend yet *more* time and resources to defend the exemptions—time and resources that could be directed to other ends if HHS would take the simple step of rescinding the mandate. On an issue as divisive as this one, the prudent course, in our view, and the one that is best in keeping with the advancement of women's health, would be to rescind the mandate. Rescission would also be consistent with HHS's expressed intention to protect human life from conception,[23] as at least some purported "contraceptives" can work post-conception.

At a minimum, to avoid violation of the Weldon amendment and the abortion provisions of the ACA, HHS should not require coverage of any drug or device that disrupts an existing pregnancy.

## II.    The Exemptions

We agree with HHS that the contraceptive mandate and accommodations, as applied to religious objectors, violated the Religious Freedom Restoration Act ("RFRA"), and we

---

substances into a woman's body. Michael D. Manhart, et al., *Fertility Awareness-Based Methods of Family Planning: A Review of Effectiveness for Avoiding Pregnancy Using SORT*, 5 OSTEOPATHIC FAMILY PHYSICIAN 2 (2013) (finding that fertility-based means of spacing births show an unintended pregnancy rate "comparable to those of commonly used contraceptives"); Richard J. Fehring, et al., *Randomized Comparison of Two Internet-Supported Fertility-Awareness-Based Methods of Family Planning*, 88 CONTRACEPTION 24-30 (2013) (noting that, unlike contraceptive methods, which are discontinued often due to side effects, fertility-based methods of family planning are "free of side effects").

[22] *ACLU v. Wright*, No. 4:17-cv-5772 (N.D. Cal.) (complaint filed Oct. 6, 2017); *Commonwealth of Massachusetts v. U.S. Dep't of Health and Human Servs.*, No. 1:17-cv-11930 (D. Mass.) (complaint filed Oct. 6, 2017); *State of California v. Wright*, No. 3:17-cv-05783 (N.D. Cal.) (complaint filed Oct. 6, 2017); *State of Washington v. Trump*, No. 2:17-cv-01510 (W.D. Wash.) (complaint filed Oct. 9, 2017); *Med. Students for Choice v. Wright*, No. 1:17-cv-02096 (D. D.C.) (complaint filed Oct. 10, 2017); *Commonwealth of Pennsylvania v. Trump*, No. 2:17-cv-04540 (E.D. Pa.) (complaint filed Oct. 11, 2017); *Campbell v. Trump*, No. 1:17-cv-02455 (D. Colo.) (complaint filed Oct. 13, 2017); *Sharaef v. Hargan*, No. 3:17-cv-0081 (N.D. Ind.) (complaint filed Oct. 31, 2017).

[23] *See* proposed HHS Strategic Plan, FY 2018-22, lines 60-61 (stating that HHS programs and initiatives serve and protect Americans "at every stage of life, beginning at conception"); *id.* at lines 846-48 (stating as a core component of HHS's missions its dedication "to serve all Americans from conception to natural death"); *id.* at lines 830-31 (promoting measures that will advance global health by "respecting the inherent dignity of persons from conception to natural death"); *id.* at lines 1143-44 (supporting the protection of human subjects in research "from conception to natural death"). The draft Strategic Plan is posted at https://cmda.org/library/doclib/hhs-strategic-plan-fy2018-2022.pdf.

00000016

Exhibit 119                                   JA1358                                   JA-0001582

commend HHS and the other Departments for their concession of this point,[24] and for the exemptions that the interim final rules provide to avoid further violations of RFRA.

RFRA has three components. It forbids the government to take an action that (a) substantially burdens free exercise unless (b) the action serves a compelling government interest (c) by the means least restrictive of free exercise. To its credit, the Department concedes that, as applied to religious objectors, the mandate and accommodation substantially burden free exercise, do not serve a compelling government interest, and are not the least restrictive means.[25] For this reason, as HHS acknowledges (82 Fed. Reg. at 47800), the government is required by law to alleviate the substantial burden that the mandate and the accommodation create.

There are several reasons, as the government is correct to point out, why the mandate and accommodation violate RFRA.

First, it is settled that the mandate imposes a substantial burden on religious objectors. *Burwell v. Hobby Lobby Stores*, 134 S. Ct. 2751, 2775-79 (2014). HHS had developed an alternative means for objecting religious entities to comply with the mandate, which it characterized as an "accommodation," but the Department now correctly concedes, 82 Fed. Reg. at 47800, as the court of appeals held in *Sharpe Holdings v. U.S. Dep't of Health & Human Services*, 801 F.3d 927 (8th Cir. 2015), that this alternative means of complying with the mandate, like the mandate itself, substantially burdens the free exercise of religious objectors.

Second, the mandate and accommodation are neither supported by a compelling government interest, nor are they the means least restrictive of free exercise. Among other things—

• Congress did not require, and has not required, coverage of contraceptives.

• Congress did not require, and has not required, across-the-board coverage of preventive services generally. As HHS notes, over 25 million grandfathered plans are exempt from the requirement to cover preventive services, 82 Fed. Reg. at 47794, and "there is no legal requirement" that these plans "ever be phased out." *Hobby Lobby Stores*, 134 S. Ct. at 2764 n.10, quoted in 82 Fed. Reg. at 47794.

---

[24] "The Departments [of Treasury, Labor, and HHS] have ... determined that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance violates their rights under RFRA." 82 Fed. Reg. at 47800. *See also id.* at 47806 ("[R]equiring ... compliance [with the mandate or accommodation] led to the violation of RFRA in many instances").

[25] *See, e.g.*, 82 Fed. Reg. at 47800 ("We have concluded that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA."); *id.* ("Although the Departments previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest, the Departments have now concluded, after reassessing the relevant interests and for the reasons stated below, that it does not."); *id.* ("the Departments have concluded that the application of the Mandate to entities with sincerely held religious objections to it does not serve a compelling governmental interest."); *id.* at 47806 ("[W]e have concluded that requiring ... compliance through the Mandate or accommodation has constituted a substantial burden on the religious exercise of many ... entities or individuals, and ... requiring such compliance did not serve a compelling interest, and was not the least restrictive means of serving a compelling interest").

9

00000017

Exhibit 119    JA1359    JA-0001583

As HHS also concedes, the government lacks the authority to compel self-insured church plans to cover preventive services. 82 Fed. Reg. at 47801. And under the prior regulations, churches themselves have always been exempt from the contraceptive mandate, regardless of the type of plan they offer. That the mandate leaves such appreciable damage to the previously claimed interest in ensuring contraceptive coverage is "strong evidence" (82 Fed. Reg. at 47801) that the mandate does not serve an interest of the highest order, as would be required to comply with RFRA. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 535 (1993).

• HHS's earlier decision to exempt churches but not church-affiliated charities from the contraceptive mandate was based on the supposition that employees of the latter were less inclined than employees of the former to support their church's position on contraceptives. HHS now acknowledges, however, that this supposition was "not supported by any specific data or other source." 82 Fed. Reg. at 47802. In addition, earlier attempts to gerrymander religious organizations, as HHS rightly acknowledges (*id.*), were in conflict with the right of such organizations to employ persons who will "advance the organization's goals and ... be respectful of [its] beliefs even if they do not share all of those beliefs."

• The ACA was intended to *expand* health coverage, but the mandate has the perverse effect of causing some entities and individuals to *drop* health coverage. 82 Fed. Reg. at 47802-03 (noting that "some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student plans rather than comply with the Mandate or be subject to the accommodation"); *id.* at 47812 (noting that the individual exemption "will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held religious beliefs").

• There are "multiple Federal, State, and local programs that provide free or subsidized contraceptives for low-income women," and for those who do not qualify for these programs, the cost of contraceptives is relatively low (about $50 per month on average). 82 Fed. Reg. at 47803. These facts "significantly diminish[] the Government's interest in applying the Mandate to employers over their sincerely held religious objections." *Id.*

• Even if contraceptives were a benefit to women's health, which we dispute, the exemptions created by the interim final rule are, in HHS's best estimate, likely to affect the contraceptive costs of approximately 31,700 women, which is "less than 0.1 percent of the 55.6 million women in private plans" that HHS estimates receive preventive services coverage under the preventive services requirement. 82 Fed. Reg. at 47821. This number is remarkably small when compared with the 25 million persons enrolled in grandfathered plans.

10

00000018

Exhibit 119                          JA1360                          JA-0001584

RFRA is, of course, a requirement that the government has no discretion to ignore, as HHS has acknowledged. 82 Fed. Reg. at 47800. Having concluded that RFRA has been violated, as it has, the government is required to take action to ensure compliance with the statute. But even if the mandate and accommodation did not violate RFRA, HHS, as it points out (*id.* at 47806), would still have the discretion to create exemptions. We agree with HHS's decision to exercise that discretion in favor of the expanded exemptions that this interim final rule creates, even if RFRA did not require it. And we agree with the decision to exempt a broad range of stakeholders with religious objections, including churches, nonprofit organizations, closely held for-profit entities, for-profit entities that are not closely held, and any other non-governmental employer, as well as institutions of higher education, health insurance issuers, and individuals.[26]

The Department indicates "exempt entities will not be required to comply with a self-certification process." 82 Fed. Reg. at 47808. The Department asks, however, "whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption…." *Id.* at 47809. We agree with the Department's decision not to require exempt entities to comply with a self-certification process, and we recommend that no special form or other process be developed or required to claim the exemption, especially since these have been used in the past as a mechanism for ensuring compliance with the mandate and therefore have themselves raised religious and moral concerns for many stakeholders.

## Conclusion

HHS should reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services." These drugs, devices and procedures prevent not a disease condition, but the healthy condition known as fertility, and they pose significant risks of their own to women's life and health. At a minimum, consistent with the abortion and non-preemption provisions of the ACA and with the Weldon amendment, HHS should not mandate coverage of any drug or device that can disrupt an existing pregnancy. As long as the mandate, or any portion of the mandate, remains in place, we fully support the exemptions that this rule and the companion rule together provide to stakeholders with religious and moral objections, and we commend HHS for adopting these exemptions.

---

[26] We raise one technical matter. The preamble to the regulation suggests that the exemption "will no longer 'be determined on an employer by employer basis,' but will be determined on a plan basis," yet the language in 45 C.F.R. § 147.132(a) does not, on its face, protect an objecting organization which is an employer that *adopts* (rather than sponsors or maintains) a plan sponsored or maintained by an objecting organization. Such organizations should be protected. A similar issue may affect objecting entities under the moral exemption.

11

00000019

Exhibit 119                                                                                                           JA-0001585

Thank you for the opportunity to comment.

Sincerely,

Anthony R. Picarello, Jr.
Associate General Secretary &
   General Counsel

Michael F. Moses
Associate General Counsel

Hillary E. Byrnes
Assistant General Counsel

12

00000020

A b.h.o. appointee no surprise.Artificial cotraception,most of it,has very serious side affects,for the women.More importantly,in too many cases it prevents nidation,causing what some doctors call a {MICRO-ABORTION} when the tiny human being is sloughed-off,and perishes,dies.Please practice N.F.P. natural-family-planning,girls ,to space your children.

00209123

Exhibit 120

JA-0001587



Judy Smith    10-10-17

Dear Medicare + Medicaid)
Abortion is "Murder"
not Birth Control). Take
precautions before, not
after having sex +
call it birth control!

It is Murder) 100%

Planned Parenthood
is a hideous organization,

Thank you,
Judy

P.S. My
sister-in-law
was adopted.
Not
Aborted.
my brother's
wife!

00186371



6 October 2017

Thank you for restoring

protections for religious freedom

in the implementation of

national healthcare law.

"No American should be forced to

choose between the dictates of the

government and their faith."

Amen!  - American citizen

Centers for Medicare & Medicaid Svcs
Department of Health & Human Svcs
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

5885
Times Square

Exhibit 120

00326663

JA-0001589

*VIA www.regulations.gov*

5 December 2017

Centers for Medicare and Medicaid Services
 Department of Health and Human Services
  Room 445-G
   Hubert H. Humphrey Building
    200 Independence Avenue, SW
     Washington, District of Columbia 20201

     Re:    Moral Exemptions and Accommodations for Coverage of Certain
            Preventive Services Under the Affordable Care Act [RIN 0938-AT46]
            (the "Interim Final Rules")

Gentlemen and Ladies:

I support the Interim Final Rules, which are intended "to expand exemptions to protect moral convictions for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act."[1]

The expanded conscious protections incorporated into the Interim Final Rule are consistent with the President's Executive Order,[2] as well as "[conform] with Congress' long history of providing or supporting conscience protections in the regulation of sensitive health-care issues, cognizant that Congress neither

---

[1]    Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act [CMS-9925-IFC; RIN 0938-AT46], 82 Fed. Reg. 47,838 (Oct. 13, 2017).

[2]    Presidential Executive Order 13,798, "Promoting Free Speech and Religious Liberty" (May 4, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/04/presidential-executive-order-promoting-free-speech-and-religious-liberty.

1

00195076

Exhibit 120

JA-0001590

required the Departments to impose the Mandate[3] nor prohibited them from providing conscience protections if they did so."[4]

Indeed, the Interim Final Rule respects Americans' Constitutionally-guaranteed right to freely exercise their religious beliefs and sincerely-held moral convictions. The Department of Health and Human Services, the Department of Labor, and the Department of the Treasury noted these broad principles predate the U.S. Constitution, as exemplified in statements of our Founding Fathers commending "respect for conscience against government coercion."[5] Thus, the re-balancing of the interests of the government *vis-à-vis* individuals and entities that have religious and moral objections to the Mandate is entirely justified and reasonable because the government has other, less burdensome alternatives to provide contraceptives to those who want contraceptives *without* seeking to compel those who in good conscience object to the Mandate to violate their deeply-held religious or moral convictions.

Thank you for the opportunity to comment on the Interim Final Rules.

<div align="center">RESPECTFULLY SUBMITTED,</div>

<div align="center">/Felicia Smith/</div>

---

[3]     The Mandate refers to the "contraceptive coverage requirement and regulations" of the Affordable Care Act. *See* Interim Final Rule, 82 Fed. Reg. at 47,839.

[4]     *Id.* at 47,844.

[5]     *Id.* at 47,847. *See also* Interim Final Rule at nn. 25-27 and accompanying text.

<div align="center">2</div>

00195077

Exhibit 120                                JA1367                                JA-0001591

To Whom It May Concern:

    I stand to defend the protection of religious organizations who are seeking exemption from the ACA's Contraceptive Mandate to provide contraceptive coverage within their insurance plans. As a Registered Nurse, and Advanced Practice Nursing Student, I respect the HHS recommendation that insurance plans should cover contraception as it is a vital part of a woman's overall health and helps increase access. However, I believe that the protection of religious beliefs is of equal importance, and that the government has a great responsibility to provide this protection. The document released by the Department of Treasury emphasizes the importance of religious freedom and the duty of the government to protect and uphold the First Amendment. Furthermore, when the ACA was implemented, Executive Order 13535 was subsequently signed in effect protecting religious beliefs and moral convictions (Federal Register, 2017, p. 11).

    A survey conducted before the ACA was put in place, showed that only about 6% of employers were not providing contraceptive coverage through their insurance plans. Taking this small number into account, the literature shows that it is highly probable that women who do not hold the same beliefs as their religious institution or employer, will still be able to find the coverage they need through Medicaid, government assistance programs, and grants that are provided across the country. Furthermore, we were already seeing a decline in the rate of unintended pregnancies and an increase in the use of contraceptives before the ACA was implemented. In a study conducted by Finer & Zolna (2016), an increase in contraceptive use over time was seen from 2007-2012. They particularly saw and increase in usage of long-acting methods from 4% to 12% in just that five-year period. Unintended pregnancy rates are highest amongst poor and low-income women, who are not suspected to be greatly affected by the new exemption. From 2008-2011, this rate has dropped from 137 per 1,000 women to 112 per 1,000 women, a drop by 18% in just three years (Guttmacher Institute, 2016). Once again, these numbers are not a result of the implemented ACA a year later.

    I believe that the most important aspect of this exemption rule is to ensure that the employer providing insurance coverage has a valid religious or moral opposition to contraceptive use. Could an example of the process of proof of this religious or moral opposition be provided to the public to ensure proper adherence to the exemption? It would also be appropriate to encourage women who are affected by this change to see out their local clinics to find out information about free or subsidized contraceptive coverage. I will follow-up with your department in two weeks and would be willing to discuss this issue further through e-mail or telephone at your convenience.

Thank you for your time and consideration.

Sincerely,

*Jenn Radmall*

Jessica Radmall, RN, SNM-SWHNP

00336209

References

Federal Register. (2017, May). Religious Exemptions and Accommodations for Coverage of
    Certain Preventive Services Under the Affordable Care Act. Retrieved from
    https://s3.amazonaws.com/public-inspection.federalregister.gov/2017-21851.pdf

Finer, L.B. & Zolna, M.R. (2016). Declines in unintended pregnancy in the United States, 2008-
    2011. *New England Journal of Medicine. 374.* 843-852. Doi: 10.1056/NEJMsa1506575

Guttmacher Institute (2016). Unintended Pregnancy in the United States. Retrieved from
    https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states.

Jost, T. & Keith, K. (2017). Trump Administration Regulatory Rebalancing Favors Religious
    and Moral Freedom Over Contraceptive Access. *Health Affairs Blog.* Retrieved from
    http://healthaffairs.org/blog/2017/10/07/trump-administration-regulatory-rebalancing-
    favors-religious-and-moral-freedom-over-contraceptive-access/

00336210

Exhibit 120                                      JA1369                                      JA-0001593

▨ REVIEW

# Birth Spacing and Risk of Adverse Perinatal Outcomes
## A Meta-analysis

Agustin Conde-Agudelo, MD, MPH

Anyeli Rosas-Bermúdez, MPH

Ana Cecilia Kafury-Goeta, MD

OTH SHORT AND LONG INTER-vals between pregnancies have been associated with increased risk of several adverse perinatal outcomes, such as preterm birth, low birth weight (LBW), small for gestational age (SGA), and perinatal death.[1-3] However, there has been disagreement on whether the relationship is due to confounding by other risk factors. For example, some researchers have argued that short intervals between pregnancies merely designate women already at higher reproductive risk, either because of underlying disorders, socioeconomic status, or lifestyle factors.[4,5] Furthermore, previous research in this area has several methodological limitations, such as small sample size, lack of control for potential confounding factors, dichotomization of the measure of birth spacing on the basis of an arbitrarily defined cut point, and use of birth interval (time elapsed between the woman's last delivery and the birth of the index child) instead of interpregnancy interval (time elapsed between the woman's last delivery and the conception of the next pregnancy) as the measure of birth spacing. The use of birth intervals overestimates the risk of adverse perinatal outcomes for very short intervals between pregnancies.

For editorial comment see p 1837.

This issue is relevant to public health and clinical practice because if short and/or long interpregnancy intervals are found to be independently associated with increased risk of adverse perinatal outcomes, birth spacing might then be considered an intervention to prevent such adverse outcomes, mainly in the developing world. Therefore, we performed a systematic review, including meta-analysis, of the relationship

**Context** Both short and long interpregnancy intervals have been associated with an increased risk of adverse perinatal outcomes. However, whether this possible association is confounded by maternal characteristics or socioeconomic status is uncertain.

**Objective** To examine the association between birth spacing and relative risk of adverse perinatal outcomes.

**Data Sources** Studies published in any language were retrieved by searching MEDLINE (1966 through January 2006), EMBASE, ECLA, POPLINE, CINAHL, and LILACS, proceedings of meetings on birth spacing, and bibliographies of retrieved articles, and by contact with relevant researchers in the field.

**Study Selection** Included studies were cohort, cross-sectional, and case-control studies with results adjusted for at least maternal age and socioeconomic status, reporting risk estimates and 95% confidence intervals (or data to calculate them) of birth spacing and perinatal outcomes. Of 130 articles identified in the search, 67 (52%) were included.

**Data Extraction** Information on study design, participant characteristics, measure of birth spacing used, measures of outcome, control for potential confounding factors, and risk estimates was abstracted independently by 2 investigators using a standardized protocol.

**Data Synthesis** A random-effects model and meta-regression analyses were used to pool data from individual studies. Compared with interpregnancy intervals of 18 to 23 months, interpregnancy intervals shorter than 6 months were associated with increased risks of preterm birth, low birth weight, and small for gestational age (pooled adjusted odds ratios [95% confidence intervals]: 1.40 [1.24-1.58], 1.61 [1.39-1.86], and 1.26 [1.18-1.33], respectively). Intervals of 6 to 17 months and longer than 59 months were also associated with a significantly greater risk for the 3 adverse perinatal outcomes.

**Conclusions** Interpregnancy intervals shorter than 18 months and longer than 59 months are significantly associated with increased risk of adverse perinatal outcomes. These data suggest that spacing pregnancies appropriately could help prevent such adverse perinatal outcomes.

*JAMA. 2006;295:1809-1823* www.jama.com

between birth spacing and the risk of adverse perinatal outcomes that provided an overall summary of the effect

**Author Affiliations:** Centro de Estudios e Investigación en Salud and Department of Obstetrics and Gynecology, Fundación Santa Fe de Bogotá, Bogotá, Colombia (Dr Conde-Agudelo); Department of Biostatistics, Universidad Autonoma de Occidente, Cali, Colombia (Ms Rosas-Bermúdez); and Clínica Materno-Infantil Los Farallones, Cali, Colombia (Dr Kafury-Goeta).
**Corresponding Author:** Agustin Conde-Agudelo, MD, MPH, Calle 58 No. 26-60, Palmira-Valle, Colombia (condeagu@uniweb.net.co).

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

Exhibit 128 JA1370 JA-0001662

000559

measure and determined both the riskiest and the optimal interpregnancy intervals. In addition, we determined whether estimates of the effect measure depend on dimensions of study quality of the primary studies and whether the relationship differs in subgroups defined by the characteristics of women, and we highlight deficits that need to be addressed in future studies.

## METHODS

We used a prospective protocol prepared specifically for this purpose. The systematic review was conducted following this protocol and reported using the checklist proposed by the Meta-analysis of Observational Studies in Epidemiology (MOOSE) group for reporting of systematic reviews of observational studies.[6]

### Identification of Studies

A search was conducted by the investigators in MEDLINE (1966 through January 2006), EMBASE (1980 through January 2006), ECLA (1980 through January 2006), POPLINE (1980 through January 2006), CINAHL (1982 through January 2006), and LILACS (1982 through January 2006), using a combination of Medical Subject Headings or key word terms for birth spacing and adverse perinatal outcomes. Terms for birth spacing included *interpregnancy interval, birth interval, interbirth interval, pregnancy spacing, pregnancy interval, birth spacing, intergenesic interval, birth to birth interval, birth to conception interval, delivery to conception interval,* and *interdelivery interval.* Terms for adverse perinatal outcomes included *perinatal outcomes, infant outcomes, pregnancy outcomes, adverse outcomes, low birth weight, preterm delivery, preterm birth, small for gestational age, intrauterine growth retardation, intrauterine growth restriction, Apgar scores, neonatal depression, neonatal intensive care unit, fetal death, stillbirth, perinatal death, fetal mortality, perinatal mortality, perinatal morbidity, perinatal outcomes, neonatal death, neonatal mortality,* and *neonatal outcomes.* Proceedings of several international

meetings on birth spacing and bibliographies of the retrieved articles were also searched by hand. No language restrictions were imposed. In the case of studies discussing more than 1 outcome, each outcome was considered independently. To find unpublished studies, we contacted relevant researchers in the field. Twelve authors were contacted as well, in an attempt to obtain additional data.

### Inclusion Criteria

Studies were included if (1) they were cohort, cross-sectional, or case-control studies that evaluated the relationship between birth or interpregnancy interval and any adverse perinatal outcome; (2) the definition of interpregnancy interval corresponded to the period between delivery of the previous infant and conception of the current pregnancy. Although the use of birth-to-birth interval overestimates the risks of adverse perinatal outcomes for very short intervals, studies using birth interval were included and analyzed separately; and (3) the authors of the studies adjusted their results for at least maternal age and socioeconomic status (measured indirectly by occupation and work status, educational level, income, housing, or other variables), because we considered these variables to be the most important confounding factors in the association between birth spacing and adverse perinatal outcomes. Studies were excluded from the systematic review if they were case series or reports, editorials, letters to the editor, or reviews without original data; if they exclusively used univariate analysis; if they did not adjust for at least maternal age and socioeconomic status; or if they did not provide data. Studies included in the systematic review were also included in the meta-analyses if they met the following additional criteria: (1) used interpregnancy interval as measure of birth spacing; (2) provided data for 4 or more interpregnancy interval strata; and (3) reported odds ratio (OR) or relative risk estimates and 95% confidence intervals (CIs) or data to calculate them.

Studies of different designs and different measures of birth spacing that are included in the systematic review are analyzed separately because of different threats to their internal validity.

All published studies deemed suitable were retrieved and reviewed independently by 2 authors (A.C.-A., A.R.-B.) to determine inclusion. Disagreements were resolved through consensus. The degree of agreement was expressed as percentage agreement and κ statistics.

### Study Quality Assessment

Study methodological quality was judged by the following 6 validated criteria believed to be important for the quality of observational studies evaluating the relationship between birth spacing and adverse perinatal outcomes[7,8]: (1) pregnancy interval used (adequate if the study used interpregnancy interval; inadequate if the study used birth interval); (2) categorization of exposure (adequate if the study examined ≥4 categories of pregnancy intervals; inadequate if the study examined <4); (3) birth spacing measurement and inquiry of outcomes (adequate if birth spacing measurement and ascertainment of outcomes were made by medical records or direct measurement; inadequate if not); (4) blinding of both birth spacing status and ascertainment of outcomes (adequate if assessment of both birth spacing status and outcomes was blinded; inadequate if not blinded or unreported); (5) loss to follow-up or exclusions (only for cohort and cross-sectional studies) (adequate if loss to follow-up or nonvalid exclusions [eg, improper elimination of records] was <10%; inadequate if ≥10% or unreported); and (6) control for confounding factors (adequate if the study additionally controlled for ≥2 of 5 confounding factors [parity, outcome of the most recent recognized pregnancy, access to prenatal care, breastfeeding, and maternal nutritional status]; inadequate if additionally controlled for <2).

Assessment of methodological quality of each study was carried out by 2 of the authors (A.C.-A., A.R.-B.) work-

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000560

Exhibit 128

JA1371

JA-0001663

ing independently. Differences of opinion were resolved through discussion.

## Data Abstraction

Data were extracted independently from each article by 2 investigators (A.C.-A., A.C.K.-G.) by means of a standardized and pilot-tested data collection form. The following information was sought from each article: title, first author's name, year, geographic location of the study (country and region), study design, characteristics and source of the study population, sample size, measures of outcome, measure of birth spacing used, categorization of intervals, method of data collection, exposure measurement and ascertainment of outcome(s), blinding of birth spacing status and ascertainment of outcome(s), loss to follow-up or invalid exclusions, confounding factors controlled for by matching or adjustment, and unadjusted and adjusted relative risks or ORs and their 95% CIs for individual adverse perinatal outcomes associated with all pregnancy intervals.

## Statistical Analysis

The studies included in our metaanalyses differed in the units used for measurement of the interpregnancy interval (days, weeks, months, or years). Therefore, we converted these different units of interpregnancy interval to months. We used 3 different metaanalytical techniques to investigate whether a relationship exists between interpregnancy interval and the risk of adverse perinatal outcomes.

**Meta-regression Analysis.** We first examined the shape of the dose-response relation between interpregnancy interval and risk of adverse perinatal outcomes. For this purpose, we used the method proposed by Greenland and Longnecker[9] and Berlin et al[10] for meta-analysis of epidemiologic dose-response data. The dose-specific confounder-adjusted natural logarithms of the ORs from all studies were pooled, and a curve using weighted quadratic spline meta-regression with no intercept term was fitted. This method was chosen because several studies have re-

ported finding a nonlinear, J-shaped relationship between interpregnancy interval and the risk of adverse perinatal outcomes such as preterm birth, LBW, and SGA. The main fields in the data set were the value x of exposures (expressed in months) assigned as the midpoints for the ranges of the reported categories of interpregnancy intervals and as 1.2 times for the lower bound of the open-ended upper categories as suggested by Berlin et al,[10] and the y-axis estimates of natural logarithm of the adjusted OR for each exposure level.

**Pooled ORs.** Depending on data availability in the original studies, we categorized interpregnancy interval into 6 groups: shorter than 6 months, 6 to 11, 12 to 17, 18 to 23, 24 to 59, and 60 months or longer. Odds ratios were used as the measure of the relation between interpregnancy interval and adverse perinatal outcomes. The interval of 18 to 23 months was used as the referent category, because this was the interval with the lowest risk for preterm birth, LBW, and SGA. Data abstracted from each study were arranged in $2 \times 2$ tables. Then, ORs with their 95% CIs for each adverse perinatal outcome considered were calculated separately for 5 predefined categories of interpregnancy interval. Separate analyses of the associations in $2 \times 2$ tables were combined to produce pooled unadjusted ORs and corresponding 95% CIs. We also calculated pooled adjusted ORs within each category using the estimated adjusted effect and its estimated standard error (often obtained indirectly from the CI) reported in each study.

**Dose-Response Regression Slopes.** Under the assumption of independence of the dose-specific OR, we estimated the dose-response regression slopes of each study using the OR, 95% CIs, and the midpoint of the exposure interval.[9] For open-ended intervals, a point 20% higher than the low end of the interval was used. Pooled dose-response slopes and estimates of risks were then obtained from random-effects models applied to the study-specific slopes. The exponentiation of

the slope gave the OR for a unit increase or decrease of the interpregnancy interval (1 month). To overcome the problem of assuming independence of dose-specific ORs (which is incorrect, as they have a common reference group), we adjusted the standard error of the within-study slopes estimating the covariance.

Heterogeneity of the results between the studies was formally tested with the quantity $I^2$, which describes the percentage of total variation across studies that is due to heterogeneity rather than chance. The $I^2$ can be calculated from basic results obtained from a typical meta-analysis as

$$I^2 = 100\% \times (Q - df)/Q$$

where $Q$ is the Cochran heterogeneity statistic.[11] We pooled results from individual studies using DerSimonian and Laird random-effects models[12] because moderate to high heterogeneity ($I^2 \geq 50\%$) was present in the majority of results.

To further explore the origin of heterogeneity, we restricted the analyses to subgroups of studies defined by study characteristics such as study quality, date of publication, and sample size. Moreover, we calculated separate estimates according to race/ethnicity and study setting (developed vs developing countries). Since a number of the largest studies were multinational, we could not analyze by country. Subgroup and sensitivity analyses were performed pooling adjusted ORs provided by the studies.

To detect publication and location biases, we explored asymmetry in funnel plots. This was examined visually, and the degree of asymmetry was measured using the Egger unweighted regression asymmetry test, with $P < .10$ indicating significant asymmetry.[13] All statistical analyses were performed using STATA version 8.0 (StataCorp, College Station, Tex).

## RESULTS

One hundred thirty studies were considered relevant, and the complete manuscripts were obtained. Of the 130 studies, 122 were published in En-

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000561

Exhibit 128                                    JA1372                                    JA-0001664

glish, 4 in Spanish, 3 in French, and 1 in Portuguese. Sixty-three studies were excluded, the main reasons being lack of adjustment for confounding factors at statistical analysis (46%) and lack of data on the relationship between birth spacing and adverse outcomes considered (35%). (The list of excluded studies is available from the corresponding author on request.) A total of 67 studies (52 cohort or cross-sectional studies[14-65] and 15 case-control studies[66-80]), including 11 091 659 pregnancies, met the inclusion criteria. The computerized search located 64 of the studies, 2 were found in proceedings of meetings on birth spacing, and the remaining 1 was found through contact with a relevant researcher in the field.

Twenty studies (30%) were conducted in the United States. The remaining 47 were conducted in 61 countries from Latin America (22 countries), Asia (20 countries), Africa (11 countries), Europe (7 countries), and Australia. Overall agreement on the inclusion of studies was 97% ($\kappa = 0.84$).

The characteristics and main findings of the cohort and cross-sectional studies included in the systematic review are presented in TABLE 1 (developed countries) and TABLE 2 (developing countries); those of the case-control studies are presented in TABLE 3. The sample size in the cohort or cross-sectional studies ranged from 201[44] to 4 841 418.[43] The number of case participants enrolled in case-control studies ranged from 36[71] to 416,[69] and the corresponding number of controls ranged from 50[71,79] to 1710.[67] Thirty studies provided data on preterm birth, 26 on LBW, 24 on SGA, 10 on fetal death, 4 on early neonatal death, 6 on perinatal death, and 2 on low Apgar scores. Twenty-four studies (36%) reported more than 1 adverse perinatal outcome. Among the 52 cohort or cross-sectional studies, 37 (71%) used birth-to-conception interval, 14 (27%) used birth-to-birth interval, and the remaining 1 used birth intervals. Of the 15 case-control studies, 9 (60%) used birth-to-conception interval and 6 (40%) birth-to-birth interval as measures of birth spacing. The stud-

ies varied in methodological quality, with 21 cohort or cross-sectional studies (40%) meeting 5 or more criteria and only 3 case-control studies (20%) meeting 4 or more criteria. The most common shortcomings were failure to blind investigators to both exposure status and ascertainment of outcome, the report of loss to follow-up or exclusions, and the categorization of pregnancy intervals.

Overall, among the studies that provided data on preterm birth, 21 (18 cohort or cross-sectional and 3 case-control) reported an association with short intervals, 6 (5 cohort or cross-sectional and 1 case-control) an association with long intervals, and 9 (8 cohort or cross-sectional and 1 case-control) found no association. With regard to studies that reported data on LBW, 20 (18 cohort or cross-sectional and 2 case-control) found an association with short intervals, 7 (6 cohort or cross-sectional and 1 case-control) an association with long intervals, and 6 (all cohort or cross-sectional) found no association. Among the studies that provided data on SGA, 14 (13 cohort or cross-sectional and 1 case-control) reported an association with short intervals, 6 cohort or cross-sectional studies reported an association with long intervals, and 10 (6 cohort or cross-sectional and 4 case-control) found no association. Two studies did not find an association between birth spacing and low Apgar scores. With regard to perinatal mortality (fetal death, early neonatal death, and perinatal death), 10 studies reported an association with short intervals, 8 with long intervals, and 7 found no association.

It was not possible to perform a meta-analysis of the case-control studies because only 3 met the minimal inclusion criteria. Moreover, different categories of intervals and reference categories were used in the few studies. Twenty-six cohort and cross-sectional studies provided data for meta-analyses. Sixteen studies provided data for preterm birth,* 10 for

*References 25, 27, 29, 33, 36, 39, 40, 45-47, 49, 50, 52, 55, 61, 64.

LBW,† 13 for SGA,‡ 7 for fetal death,[14,27,34,55,57,63,64] and 4 for early neonatal death.[34,57,63,64]

The dose-response association between interpregnancy interval and the natural logarithm of the OR of the 5 adverse perinatal outcomes in cohort and cross-sectional studies was J-shaped (FIGURE). For preterm birth, LBW, and SGA, the highest risk was for intervals shorter than 20 months and longer than 60 months. For both fetal and early neonatal death, the highest risk was for intervals shorter than 6 months and longer than 50 months.

Infants born to women with interpregnancy intervals shorter than 6 months had pooled unadjusted ORs (95% CIs) of 1.77 (1.54-2.04), 2.12 (1.98-2.26), and 1.39 (1.20-1.61) for preterm birth, LBW, and SGA, respectively, compared with infants born to women with intervals of 18 to 23 months (TABLE 4). Likewise, women with intervals of 6 to 17 months were 8% to 23% more likely to give birth to infants with these adverse outcomes. Infants conceived 60 months or more after a birth had ORs (95% CIs) of 1.27 (1.17-1.39) for preterm birth, 1.49 (1.17-1.89) for LBW, and 1.36 (1.20-1.54) for SGA. The minimal increase in the risk for adverse perinatal outcomes associated with intervals of 24 to 59 months (3%-7%) was not statistically significant. It was not possible to estimate pooled ORs for the relation between interpregnancy interval and both fetal and early neonatal death, because the categories of intervals used and the reference categories did not coincide in all studies.

The estimates of pooled adjusted ORs were lower than estimates of pooled unadjusted ORs (Table 4). Nevertheless, the associations between intervals of shorter than 6, 6 to 11, 12 to 17, and longer than 59 months and preterm birth, LBW, and SGA remained statistically significant. Compared with infants of mothers with interpregnancy intervals of 18 to

†References 16, 21, 27, 33, 36, 40, 47, 49, 56, 64.
‡References 21, 22, 24, 29, 33, 35, 36, 39, 45, 49, 52, 55, 64.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000562

Exhibit 128   JA1373   JA-0001665

**Table 1.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developed Countries

| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
|---|---|---|---|---|---|---|---|---|---|
| Fedrick and Adelstein,[14] 1973 | England, Scotland, Wales | Late fetal death (≥28 wk) | 8356 | IPI | ≤6; 7-12§; 13-24; 25-36; 37-72; 73-108; >108 | Not reported | Not reported | 1, 2, 6, 7 | No relationship between interval and late fetal death |
| Eisner et al,[16] 1979 | United States (nation-based [1974]) | LBW | 1 118 963 | IPI | <6; 6-11; 12-23; ≥24 [>6]§ | Adequate | 54.8 | 1-8 | Intervals <6 mo associated with increased risk of LBW for both white and black women |
| Spratley and Taffel,[17] 1981 | US (nation-based) | LBW | Not reported | BI | <12; 12-17; 18-23; 24-35; 36-47; 48-59; ≥60|| | Adequate | Not reported | 1, 3, 5-7, 15 | Intervals <24 mo and >59 mo associated with increased risk of LBW |
| Brody and Bracken,[20] 1987 | US (New Haven, Conn) | LBW | 1683 | IPI | <5; 5-8; ≥9§ | Not reported | 5.6 | 1-7, 12 | Intervals <9 mo associated with increased risk of LBW |
| Klebanoff,[21] 1988 | US (multicenter) | LBW, IUGR | 5938 | IPI | <3§; 3-5.9; 6-8.9; 9-11.9; 12-14.9; 15-17.9; 18-20.9; 21-23.9; ≥24 | Not reported | Not reported | 1, 3, 5-7, 10, 12 | No relationship between interval and LBW or IUGR |
| Lieberman et al,[22] 1989 | US (Boston, Mass) | SGA | 4489 | IPI | ≤3; 3-6; 6-12; 12-18; 18-24; 24-36§; 36-48; 48-60; 60-72; 72-96; >96 | Not reported | Not reported | 1-3, 5, 6, 9, 10, 12, 13 | Intervals <18 mo and >72 mo associated with increased risk of SGA |
| Miller,[24] 1989 | Sweden | IUGR | 54 725 | IPI | <12; 12-17; 18-23; 24-35; 36-47; 48-59; ≥60; [18-59]§ | Adequate | Not reported | 1, 2, 6, 7, 15 | Intervals <12 mo associated with increased risk of IUGR |
| Lang et al,[25] 1990 | US (Boston, Mass) | Preterm birth | 4467 | IPI | ≤3; 4-6; 7-12; 13-18; 19-24; 25-36§; 37-48; ≥49 | Not reported | Not reported | 1, 3-6, 8-10, 12 | No relationship between interval and preterm birth |
| Miller,[27] 1991 | Hungary, Sweden, US | LBW, preterm birth, late fetal death (>6 mo gestation) | Hungary (77 256), Sweden (51 096), US (4290) | For Hungary and Sweden BI, and for the USA IPI | <12; 12-17; 18-23; 24-35§; 36-47; 48-59; ≥60; | Adequate | Not reported | 1, 3-8, 10 | Birth intervals <12 mo associated with increased risk of LBW and preterm birth. No relationship between interval and late fetal death |
| Kallan,[26] 1992 | US | Preterm-LBW, IUGR-LBW, fetal loss (miscarriage and stillbirths) | 2104 | IPI | <7; 7-12; 13-24; 25-48; ≥49§ | Not reported | Not reported | 1-3, 5-7, 12 | Intervals <12 mo and >48 mo associated with increased risk of IUGR-LBW and fetal loss but not with preterm-LBW |

*(continued)*

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User  on 07/24/2013

000563

Exhibit 128        JA1374        JA-0001666

BIRTH SPACING AND RISK OF ADVERSE PERINATAL OUTCOMES

**Table 1.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developed Countries (cont)

| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Methodological Quality* | | | | Main Findings |
| | | | | | | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | |
|---|---|---|---|---|---|---|---|---|---|---|
| Rawlings et al,[36] 1995 | US | LBW, preterm birth, IUGR | 1922 | IPI | <3; 3-5.9; 6-8.9§; ≥9 | Not reported | | 9.1 | 1, 4, 6-8, 12 | Intervals <3 mo and <9 mo associated with an increased risk of LBW and preterm birth among white and black women, respectively. No relationship between interval and IUGR |
| Ochoa Sangrador et al,[38] 1996 | Spain | LBW, preterm birth | 279 | IPI | <3§; 3-5; 6-8; 9-11; ≥12 | Not reported | Not reported | | 1, 4, 6, 7, 12 | No relationship between interval and LBW and preterm birth |
| Kallan,[39] 1997 | US (nation-based [1981]) | Preterm birth, IUGR | 1 045 393 | IPI | <7; 7-12; 13-18; 19-24; 25-36§; 37-48; 49-60; >60 | Adequate | | Not reported | 1-4, 6-10, 12 | Intervals <7 mo and >60 mo associated with increased risk of preterm birth and IUGR for both black and white women |
| Adams et al,[40] 1997 | US (Georgia) | LBW, preterm birth | 28 273 | IPI | <3; 3-5; 6-8; 9-11; 12-17; 18-23; 24-35§; 36-47; ≥48 | Adequate | | Not reported | 1, 3, 6, 8 | For white women, intervals <3 mo and >47 mo associated with increased risk of LBW, whereas intervals <6 mo and >47 mo associated with increased risk of preterm birth. For black women, intervals <6 mo and >47 mo associated with increased risk of LBW, whereas intervals <6 mo were associated with increased risk of preterm birth |
| Bakewell et al,[41] 1997 | US (Missouri) | LBW | 182 285 | IPI | <9; ≥9§ | Adequate | | 10.0 | 1, 3-8, 10, 12 | For both women with prior LBW and women with prior normal birth weight, intervals <9 mo associated with increased risk of LBW |
| Khoshnood et al,[45] 1998 | US (nation-based [1989-1991]) | LBW, preterm birth | 4 841 418 | IPI | <6; 6-12; >12§ | Adequate | | 0.0 | 1-3, 6-8, 12 | Intervals <6 mo and <12 mo associated with increased risk of LBW and preterm birth, respectively |
| Klerman et al,[46] 1998 | US (Alabama) | Preterm birth, IUGR | 4400 | IPI | <3; 3-5; 6-11; 12-23; ≥24 [≥6]§ | Adequate | | Not reported | 1, 2, 5-8, 10, 12, 19 | Interval <6 mo associated with increased risk of preterm birth. No association between interval and IUGR |
| Ekwo and Moawad,[16] 1998 | US (Chicago) | Preterm birth | 761 | IPI | ≤3; 4-6; 7-9§; 10-24; ≥25 | Adequate | | Not reported | 1, 5-8, 12, 14 | Intervals ≤6 mo not significantly associated with increased risk of preterm birth |
| Basso et al,[47] 1998 | Denmark | LBW, preterm birth | 10 187 | IPI | ≤4; 4.01-8; 8.01-12; 12.01-24; 24.01-36§; >36 | Adequate | | 6.2 | 1, 2, 6 | Intervals <8.01 mo associated with an increased risk of preterm birth. No association between interval and LBW |
| Shults et al,[48] 1999 | US (North Carolina) | Preterm birth, SGA | Preterm birth (34 569) SGA (27 651) | IPI | <4; 4-12; 13-24§ | Adequate | | Not reported | 1-8, 12 | Women with intervals <4 mo had higher risks for preterm birth and SGA |

*(continued)*

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000564

Exhibit 128

JA1375

JA-0001667

**Table 1.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developed Countries (cont)

| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
|---|---|---|---|---|---|---|---|---|---|
| Zhu et al,[49] 1999 | US (Utah) | LBW, SGA, preterm birth | 173 205 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; 60-119; ≥120 | Adequate | 10.7 | 1-8, 10, 12, 13 | The risk for LBW, preterm birth, and SGA increased with intervals <6 mo. Intervals >59 mo associated with increased risks for LBW and SGA |
| Fuentes-Afflick and Hessol,[50] 2000 | US (California) | Preterm birth | 289 842 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; >59 | Adequate | Not reported | 1-3, 5-8, 11, 19 | Intervals <18 mo and >59 mo associated with increased risk of preterm birth |
| Zhu et al,[52] 2001 | US (Michigan) | Preterm birth, SGA | 435 327 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; 60-119; ≥120 | Adequate | 5.1 | 1-8, 12, 13 | Among white women, the risk for preterm birth increased with intervals <12 mo and >59 mo, whereas the risk for SGA increased with intervals <12 mo and >23 mo. Among black women, the risk for preterm birth increased with intervals <12 mo and >119 mo, while the risk for SGA increased with intervals <6 mo and >119 mo |
| Rousham and Gracey,[53] 2002 | Australia (Kimberley) | Birth weight, birth length | 782 | BI | <24; ≥24§ | Not reported | 1.8 | 1, 5, 6, 10, 11 | Birth interval not significantly associated with birth weight or birth length |
| Dafopoulos et al,[54] 2002 | Greece | Preterm birth | 1 230 | IPI | <6; ≥6§ | Not reported | Not reported | 1, 5, 6, 8, 12 | Intervals of <6 mo associated with greater risk of preterm birth |
| Smith et al,[55] 2003 | Scotland | Preterm birth, IUGR, fetal death (≥24 wk gestation) | 89 143 | IPI | <6; 6-11; 12-17; 18-23; 24-59 | Adequate | 13.8 | 1, 4, 6, 7, 10, 12 | Interval <6 mo an independent risk factor for preterm birth. No relationship between intervals <6 mo and IUGR or fetal death |
| Zhu and Le,[56] 2003 | US (Michigan) | LBW | 565 816 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; 60-95; 96-136 | Adequate | 21.7 | 1-3, 5-8, 12, 13 | Intervals <6 mo and >59 mo associated with an increased risk of LBW |
| Stephansson et al,[57] 2003 | Sweden | Late fetal death (≥28 wk gestation), early neonatal death (≤7 d of life) | 410 021 | IPI | <4; 4-7; 8-11; 12-35§; 36-71; ≥72 | Adequate | 12.0 | 1, 3, 4, 6, 7, 9, 11, 12, 17 | Intervals ≥72 mo associated with an increased risk of late fetal death. Intervals <12 mo not associated with an increased risk of late fetal death or early neonatal death |

Abbreviations: BI, birth interval; IPI, interpregnancy interval; IUGR, intrauterine growth restriction; LBW, low birth weight; SGA, small for gestational age.
*See "Methods" section for definitions of methodological quality criteria. Interval and outcomes inquiries were determined to be "adequate" for all studies.
†Intervals in square brackets indicate the reference group in the studies that did not use as a reference one of the intervals originally categorized.
‡For multivariate adjustments, 1 indicates maternal age; 2, parity; 3, education; 4, marital status; 5, ethnic group or race; 6, factors related to socioeconomic status; 7, previous pregnancy outcome; 8, factors relating to prenatal care; 9, medical risk factors; 10, maternal nutritional status; 11, region; 12, smoking; 13, alcohol use; 14, illicit drug use; 15, gestational age or birth weight; 16, type of hospital; 17, year of delivery; 18, religion; 19, sex of the child.
§Reference group.
∥Reference group not specified.

23 months, those born to women with intervals shorter than 6 months had a 40% increased risk of preterm birth, a 60% increased risk of LBW, and an approximately 25% increased risk of SGA. Intervals of 6 to 17 months were associated with a significantly greater risk for the 3 adverse perinatal out- comes (adjusted ORs, 1.05-1.14). On the other hand, infants born to moth- ers with intervals longer than 59 months faced a 20% to 43% increase

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000565

Exhibit 128                          JA1376                          JA-0001668

**Table 2.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developing Countries

| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
|---|---|---|---|---|---|---|---|---|---|
| Swenson and Harper,[16] 1978 | Bangladesh | Late fetal death (≥28 wk) | 9295 | IPI | <12; 12-24; >24§ | Not reported | Not reported | 1, 2, 6, 7 | No relationship between interval and late fetal death |
| Fortney and Higgins,[18] 1984 | Iran | LBW, early neonatal death | 12 995 | BI | ≤12; 13-24; 25-36§; 37-48; 49-60; 61-72; ≥73 | Not reported | Not reported | 1, 2, 6, 7 | Intervals <12 mo associated with increased risk of LBW and early neonatal death |
| DaVanzo et al,[19] 1984 | Malaysia | Birth weight | 2171 | BI | <15; 15-23; 24-35; 36-47; 48-59; 60-71; 72-83; ≥84 | Adequate | Not reported | 1, 2, 5, 6, 11, 17 | Intervals <15 mo significantly associated with reduced birth weight |
| Casterline,[23] 1989 | Ivory Coast, Tunisia, Syria, Korea, Philippines, Costa Rica, Mexico, Guyana | Fetal losses (miscarriages plus stillbirths) | 74 916 | IPI | <9; 9-15; 16-23; 24-35§; ≥36 | Adequate | Not reported | 1-3, 6 | Intervals <9 mo and >35 mo associated with increased risk of fetal death |
| Neel and Alvarez,[25] 1991 | Guatemala | IUGR | 306 | BI | <18; 18-35; 36-47§; 48-59; ≥60 | Not reported | Not reported | 1, 6 | Intervals <18 mo associated with increased risk of IUGR |
| Huttly et al,[26] 1992 | Brazil (Pelotas) | LBW, perinatal death | 3587 | BI | <18; 18-23; 24-35; 36-47; 48-71; >71 | Adequate | 2.0 | 1-3, 6, 10, 12 | Intervals <24 mo associated with increased risk of LBW. Intervals longer than 71 mo associated with increased risk of LBW and perinatal death |
| Barros et al,[30] 1992 | Brazil (Pelotas) | Preterm birth, IUGR | 4747 | BI | <24§; 24-35; 36-48; >48 | Adequate | 0.9 | 1-3, 6, 10, 12 | Intervals <24 mo associated with increased risk of IUGR. No relationship between interval and preterm birth |
| Leong et al,[31] 1993 | Singapore | Preterm birth | 11 085 | BI | <20; 20-39; ≥40 | Not reported | Not reported | 1-3, 5-8 | No relationship between interval and preterm birth |
| Gribble,[32] 1993 | Mexico | LBW | 2234 | BI | ≤12; 13-21; 22-30; 31-39; 40-48; 49-57; ≥58 [22-58]§ | Not reported | Not reported | 1-3, 6, 7, 10 | Intervals <22 mo associated with increased risk of LBW |
| Miller,[33] 1994 | Philippines | LBW, preterm birth, SGA | 1155 | IPI | <6; 6-11; 12-17; 18-23; 24-47; ≥48 | Not reported | Not reported | 1, 3, 6-8, 10, 12 | Intervals <6 mo associated with increased risk of LBW, preterm birth, and SGA in fifth or higher birth order infants. No excess risk among lower-order infants |
| Greenwood et al,[34] 1994 | Jamaica | Perinatal death | 7512 | IPI | <12; 12-23; 24-59; ≥60 | Not reported | 15.0 | 1-3, 6, 7, 9 | No relationship between interval and perinatal death |
| Fikree and Berendes,[35] 1994 | Pakistan | IUGR | 624 | IPI | <13; 13-24§; 25-36; ≥37 | Not reported | Not reported | 1-3, 6, 7, 10, 18 | Intervals <13 mo associated with increased risk of IUGR |
| Foum et al,[37] 1996 | Benin | IUGR, preterm birth | 2862 | BI | <12; 12-23; 24-35; >35§ | Not reported | Not reported | 1-4, 6, 7, 10 | No relationship between interval and preterm birth or IUGR |

*(continued)*

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000566

Exhibit 128

JA1377

JA-0001669

**Table 2.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developing Countries (cont)

| | | | | Methodological Quality* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
| Şener et al,[42] 1997 | Turkey | SGA | 420 | IPI | <12;13-24; 25-48§; >48 | Not reported | 2.1 | 1-3, 6-8, 10, 12 | Intervals <12 mo associated with increased risk of SGA |
| Deshmukh et al,[41] 1998 | India | LBW | 201 | BI | Not reported | Not reported | 1.0 | 1, 2, 6, 10, 12 | "Short interval" associated with increased risk of LBW |
| Sachar and Soni,[51] 2000 | India (Punjab) | Perinatal death (deaths from the 28th week gestation through first week of life) | 2424 | IPI | <23; ≥24§ | Not reported | Not reported | 1-3, 6-8, 10, 11 | Intervals <23 mo associated with an increased risk of perinatal death |
| van Eijk et al,[58] 2004 | Kenya | LBW, preterm birth, SGA | 2218 | IPI | <6; 6-23; ≥24 | Not reported | 6.5 | 1-3, 6, 19 | No association between interval and LBW, preterm birth, and SGA |
| Arafa et al,[59] 2004 | Egypt | Preterm birth | 1202 | IPI | <12; 12-36; 37-48; 49-60; >60§ | Not reported | 0.0 | 1, 2, 6, 8-10 | No relationship between intervals <12 mo and preterm birth |
| Pedroso et al,[60] 2004 | Brazil (Campinas) | LBW, preterm birth | 15 314 | BI | <25; 25-36; ≥37§ | Not reported | Not reported | 1-8, 10, 12, 13 | Intervals <24 mo associated with increased risk of LBW and preterm birth |
| Hsieh et al,[61] 2005 | Taiwan | Preterm birth | 4072 | IPI | <6; 6-11; 12-18; 18-48§; >48 | Adequate | Not reported | 1-4, 6, 7, 12 | Intervals <12 mo associated with increased risk of preterm birth |
| DaVanzo et al,[62] 2005 | Bangladesh (Matlab) | Early neonatal death (≤7 d) | 125 720 | BI | <15; 15-17; 18-23; 24-35; 36-59§; 60-83; ≥84 | Adequate | Not reported | 1, 2, 6, 7, 11, 17, 18 | Intervals <24 mo and ≥84 mo associated with increased risk of early neonatal death |
| Rutstein,[63] 2005 | 9 Asian countries, 7 Latin American countries, and 4 African countries | Perinatal death (deaths from the 28th week of pregnancy through first week of life) | 267 261 | IPI | <6; 6-11; 12-17; 18-23; 24-29§; 30-35; 36-41; 42-47; 48-53; 54-59 | Adequate | Not reported | 1-3, 6, 7, 11 | Intervals <18 mo and ≥42 mo significantly associated with increased risk of perinatal death |
| Conde-Agudelo et al,[64] 2005 | 18 Latin American countries | LBW, preterm birth, SGA, fetal death, early neonatal death, low Apgar scores at 5 min | 1 080 650 | IPI | <6; 6-11; 12-17; 18-23§; 24-35; 36-47; 48-59; ≥60 | Adequate | 10.7 | 1-4, 6-12, 15-17 | Intervals <12 mo and >59 mo significantly associated with increased risks of LBW, preterm birth, SGA, fetal death, and early neonatal death |
| Hosain et al,[65] 2005 | Bangladesh | LBW | 227 | BI | <24; ≥24§ | Not reported | 16.4 | 1-3, 6, 8, 10, 12 | No relationship between intervals <24 mo and LBW |

Abbreviations: BI, birth interval; IPI, interpregnancy interval; IUGR, intrauterine growth restriction; LBW, low birth weight; SGA, small for gestational age.
*See "Methods" section for definitions of methodological quality criteria. Interval and outcomes inquiries were determined to be "adequate" for all studies except Swenson and Harper (not reported).
†Intervals in square brackets indicate the reference group in the studies that did not use as a reference one of the intervals originally categorized.
‡For multivariate adjustments, 1 indicates maternal age; 2, parity; 3, education; 4, marital status; 5, ethnic group or race; 6, factors related to socioeconomic status; 7, previous pregnancy outcome; 8, factors relating to prenatal care; 9, medical risk factors; 10, maternal nutritional status; 11, region; 12, smoking; 13, alcohol use; 14, illicit drug use; 15, gestational age or birth weight; 16, type of hospital; 17, year of delivery; 18, religion; 19, sex of the child.
§Reference group.

in risk of the 3 adverse perinatal outcomes. There were no differences in the risk of adverse perinatal outcomes between women with intervals of 24 to 59 months and those with intervals of 18 to 23 months. All funnel plots showed no asymmetry, either visually (funnel plots available from the corresponding author on request) or in

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

BIRTH SPACING AND RISK OF ADVERSE PERINATAL OUTCOMES

**Table 3.** Characteristics of Case-Control Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes

| Source | Country (Region) | No. of Cases, Source | No. of Controls, Source | Intervals Used | Intervals Categories, mo | Methodological Quality* | | Main Findings |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Blinding | Confounders† | |
| Ruelas-Orozco et al,[66] 1985 | Mexico | 104 perinatal deaths (from the 27th week of pregnancy through first week of life), community | 208 live births, community | IPI | <7; 7-46‡; >46 | Not reported | 1-4, 6, 7, 9, 10, 12, 13 | Intervals <7 mo and >46 mo significantly associated with increased risk of perinatal death |
| Ferraz et al,[67] 1988 | Brazil (Natal) | 303 infants with birth weight <10th percentile for gestational age, 282 preterm infants, hospital | 1710 term infants with birth weight ≥2500 g and appropriate for gestational age, hospital | IPI | ≤6; 7-12; ≥13‡ | Not reported | 1-3, 6, 7, 10, 12 | Intervals ≤6 mo associated with increased risk of IUGR. No relationship between interval and preterm birth |
| Bartlett and Paz de Bocaletti,[68] 1991 | Guatemala | 42 Mayan Indian infants who died during birth or in the first month of life, community | 54 Mayan Indian infants who survived the first month of life, community | BI | <14; ≥14‡ | Not reported | 1-4, 6, 8, 11 | Interval <14 mo associated with increased risk of intrapartum and neonatal deaths |
| Mavalankar and Gray,[69] 1991 | India | 416 preterm-LBW infants, hospital | 926 normal birth weight infants, hospital | IPI | ≤6; 7-12; 13-24; 25-48‡; ≥49 | Not reported | 1-4, 6-12, 15, 18, 19 | Intervals <13 mo and >48 mo significantly associated with increased risk of preterm LBW |
| Dechering and Perera,[70] 1991 | Sri Lanka | 245 LBW infants | 399 with birth weight ≥2500 g | BI | <12; 12-48‡; >48 | Not reported | 1-3, 6-8, 10, 19 | Intervals <12 mo and >48 mo significantly associated with increased risk of LBW |
| Kumar and Singhi,[71] 1992 | India | 36 late fetal deaths, community | 50 live birth infants, community | BI | <24; ≥24‡ | Not reported | 1-3, 6 | Intervals <24 mo not associated with increased risk of late fetal death |
| Mavalankar et al,[72] 1992 | India | 343 term-LBW (IUGR) infants | 926 normal birth weight infants. hospital | IPI | ≤6; 7-12; 13-48‡; ≥49 | Not reported | 1-4, 6-12, 15, 18, 19 | No relationship between interval and IUGR |
| Arif et al,[73] 1998 | Pakistan | 236 LBW-SGA infants, hospital | 293 infants with birth weight ≥2500 g, hospital | BI | <24; ≥24‡ | Not reported | 1, 3, 6, 10 | Intervals <24 mo not associated with risk of LBW-SGA birth |
| Grau et al,[74] 1999 | Cuba | 202 preterm infants, hospital | 319 term infants, hospital | IPI | <24; ≥24‡ | Not reported | 1, 3, 4, 6-8, 10, 12 | Intervals <24 mo associated with increased risk of preterm birth |
| Wang and Lin,[75] 1999 | Taiwan | 208 perinatal deaths (from the 22nd week of pregnancy through first week of life), hospital | 619 live births, hospital | BI | <12; 12-24; >24‡ | Not reported | 1-3, 6, 8-10, 14 | Intervals <24 mo associated with increased risk of perinatal death |
| Mafina-Mienandi et al,[76] 2002 | Congo | 247 infants with birth weight <10th percentile for gestational age, hospital | 293 infants with birth weight appropriate for gestational age, hospital | IPI | <12; 12-24; >24‡ | Not reported | 1-4, 6, 10 | No relationship between interval and IUGR |
| Al-Jasmi et al,[77] 2002 | United Arab Emirates | 128 preterm infants, hospital | 128 term infants, hospital | IPI | 2.8-8.9; 9.0-15.9; 16.0-22.9‡; 23.0-82.7 | Not reported | 1, 2, 6-8, 10 | Intervals <16 mo associated with increased risk of preterm birth |
| Khan and Jamal,[78] 2003 | Pakistan | 190 LBW infants, hospital | 760 normal birth weight infants, hospital | IPI | <5; 5-10; >10‡ | Not reported | 1-3, 6, 8, 10 | Risk for LBW increased with intervals <5 mo |
| Orji et al,[79] 2004 | Nigeria | 50 women with intervals ≥72 months, hospital | 50 women with intervals 24 to 60 months, hospital | BI | 24-60‡; ≥72 | Not reported | 1, 2, 6 | No difference in Apgar scores between the study groups |
| Kleijer et al,[80] 2005 | Australia (Adelaide) | 233 infants with birth weight <10th percentile for gestational age, hospital | 241 infants with birth weight between the 25th and 75th percentile | IPI | <48; ≥48‡ | Not reported | 1, 2, 4-7, 10, 12, 14 | No relationship between interval <48 mo and IUGR |

Abbreviations: BI, birth interval; IPI, interpregnancy interval; IUGR, intrauterine growth restriction; LBW, low birth weight; SGA, small for gestational age.
*See "Methods" section for definitions of methodological quality criteria. Interval and outcomes inquiries were determined to be "adequate" for all studies except Bartlett and Paz de Bocaletti (inadequate).
†For multivariate adjustments, 1 indicates maternal age; 2, parity; 3, education; 4, marital status; 5, ethnic group or race; 6, factors related to socioeconomic status; 7, previous pregnancy outcome; 8, factors relating to prenatal care; 9, medical risk factors; 10, maternal nutritional status; 11, region; 12, smoking; 13, alcohol use; 14, illicit drug use; 15, gestational age or birth weight; 16, type of hospital; 17, year of delivery; 18, religion; 19, sex of the child.
‡Reference group.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000568

Exhibit 128

JA1379

JA-0001671

**Figure.** Scatterplot of Natural Logarithm Odds Ratio and Meta-regression Curves of Adverse Perinatal Outcomes According to Interpregnancy Interval in Cohort and Cross-sectional Studies



The dose-response curve line represents estimates from a smoothed spline regression. The horizontal line at y=0 represents no effect. Most studies provided ≥1 odds ratio estimate for several categories of interpregnancy intervals.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000569

Exhibit 128          JA1380          JA-0001672

terms of statistical significance ($P>.10$ for all, by Egger test).

Important statistical heterogeneity among studies was present, as confirmed by $I^2$ values greater than 50% in half of meta-analyses, and this remained in the prespecified subgroups. An examination for sources of heterogeneity among studies found that a significant portion of the heterogeneity in studies evaluating the relation between intervals shorter than 6 months and both preterm birth and LBW was explained by the study by our group[64] since the estimates of pooled adjusted ORs were significantly lowered when this study was excluded (1.30; 95% CI, 1.23-1.38; and 1.48; 95% CI, 1.40-1.57, respectively). Study quality, date of publication, sample size, and study setting provided no explanation for heterogeneity in studies evaluating the relationship between intervals of 6 to 11, 12 to 17, and 24 to 59 months and both preterm birth and LBW, because the CIs in the subgroups overlapped (data available from corresponding author on request). Compared with the overall results, the summary ORs calculated from sensitivity and subgroup analyses were almost identical. Pooled adjusted ORs calculated from subgroups evaluating intervals of 60 months or longer and preterm birth were similar to the overall adjusted OR calculated from all studies. With regard to studies evaluating the association between intervals longer than 59 months and LBW, studies from developed countries were significantly associated with higher pooled adjusted ORs. There were no significant differences in pooled adjusted ORs obtained from subgroups of studies and the overall estimates obtained from all studies assessing the association between interpregnancy interval and SGA. In general, there were no significant differences in estimates of summary adjusted ORs between white and black women in subgroups that evaluated the effects of interpregnancy interval on adverse perinatal outcomes according to race/ethnicity.[39,40,52]

For each month that interpregnancy interval was shortened from 18 months, the risk increase for preterm birth, LBW, and SGA was 1.9%, 3.3%, and 1.5%, respectively (TABLE 5). On the other hand, the risk for the 3 adverse perinatal outcomes increased by 0.6%, 0.9%, and 0.8%, respectively, for each month that interpregnancy interval was lengthened from 59 months.

**Table 4.** Odds Ratios for the Association Between Interpregnancy Interval and Adverse Perinatal Outcomes in Cohort and Cross-sectional Studies

| Interpregnancy Interval, mo | Preterm Birth | Low Birth Weight | Small for Gestational Age |
|---|---|---|---|
| **Pooled Unadjusted Results** | | | |
| <6 | | | |
| No. of Studies | 8 [25,33,40,49,50,52,55,64] | 6 [21,33,40,49,56,64] | 7 [21,22,30,49,52,55,64] |
| OR (95% CI) | 1.77 (1.54-2.04) | 2.12 (1.98-2.26) | 1.39 (1.20-1.61) |
| $I^2$, %* | 95 | 63 | 93 |
| 6-11 | | | |
| No. of Studies | 9 [25,27,33,40,49,50,52,55,64] | 6 [21,33,40,49,56,64] | 8 [21,22,24,33,49,52,55,64] |
| OR (95% CI) | 1.23 (1.16-1.31) | 1.23 (1.15-1.32) | 1.18 (1.14-1.23) |
| $I^2$, %* | 85 | 73 | 39 |
| 12-17 | | | |
| No. of studies | 9 [25,27,33,40,49,50,52,55,64] | 7 [21,27,33,40,49,56,64] | 8 [21,22,24,33,49,52,55,64] |
| OR (95% CI) | 1.11 (1.03-1.20) | 1.08 (1.02-1.14) | 1.08 (1.06-1.11) |
| $I^2$, %* | 56 | 51 | 14 |
| 18-23† | | | |
| No. of studies | 9 [25,27,33,40,49,50,57,55,64] | 7 [21,27,33,40,49,56,64] | 8 [21,22,24,33,49,52,55,64] |
| OR | 1.00 | 1.00 | 1.00 |
| 24-59 | | | |
| No. of studies | 6 [27,49,50,52,55,64] | 6 [27,33,40,49,56,64] | 7 [22,24,33,49,52,55,64] |
| OR (95% CI) | 1.03 (1.00-1.07) | 1.07 (0.99-1.15) | 1.07 (0.98-1.18) |
| $I^2$, %* | 28 | 78 | 93 |
| ≥60 | | | |
| No. of studies | 5 [27,49,50,52,64] | 4 [27,49,56,64] | 5 [22,24,49,52,64] |
| OR (95% CI) | 1.27 (1.17-1.39) | 1.49 (1.17-1.89) | 1.36 (1.20-1.54) |
| $I^2$, %* | 93 | 98 | 96 |
| **Pooled Adjusted Results** | | | |
| <6 | | | |
| No. of studies | 8 [25,39,40,49,50,52,55,64] | 4 [40,49,52,64] | 6 [22,39,49,52,55,64] |
| OR (95% CI) | 1.40 (1.24-1.58) | 1.61 (1.39-1.86) | 1.26 (1.18-1.33) |
| $I^2$, %* | 69 | 87 | 89 |
| 6-11 | | | |
| No. of studies | 8 [25,39,40,49,50,52,55,64] | 4 [40,49,52,64] | 7 [22,24,39,49,52,55,64] |
| OR (95% CI) | 1.14 (1.10-1.17) | 1.14 (1.10-1.18) | 1.11 (1.04-1.19) |
| $I^2$, %* | 87 | 91 | 32 |
| 12-17 | | | |
| No. of studies | 8 [25,39,40,42,50,52,55,64] | 4 [40,49,52,64] | 7 [22,24,39,49,52,55,64] |
| OR (95% CI) | 1.07 (1.03-1.11) | 1.05 (1.01-1.09) | 1.06 (1.01-1.10) |
| $I^2$, %* | 26 | 34 | 0 |
| 18-23† | | | |
| No. of studies | 8 [25,33,40,49,50,52,55,64] | 4 [40,49,52,64] | 7 [22,24,39,49,52,55,64] |
| OR | 1.00 | 1.00 | 1.00 |
| 24-59 | | | |
| No. of studies | 8 [25,39,40,50,52,55,64] | 4 [40,49,52,64] | 7 [22,24,39,49,52,55,64] |
| OR (95% CI) | 0.99 (0.97-1.02) | 1.01 (0.98-1.03) | 1.02 (0.99-1.05) |
| $I^2$, %* | 0 | 0 | 0 |
| ≥60 | | | |
| No. of studies | 7 [25,39,40,49,50,52,64] | 4 [40,49,52,64] | 6 [22,24,39,49,52,64] |
| OR (95% CI) | 1.20 (1.17-1.24) | 1.43 (1.27-1.62) | 1.29 (1.20-1.39) |
| $I^2$, %* | 95 | 84 | 88 |

Abbreviations: CI, confidence interval; OR, odds ratio.
*Heterogeneity test (see "Methods" section).
†Reference category.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000570

Exhibit 128    JA1381    JA-0001673

BIRTH SPACING AND RISK OF ADVERSE PERINATAL OUTCOMES

## COMMENT

Using 3 different meta-analytical techniques, we show that birth to conception intervals shorter than 18 months and longer than 59 months are significantly associated with increased risk of several adverse perinatal outcomes, such as preterm birth, LBW, and SGA. Infants can have LBW either because they are born early (preterm birth) or are born SGA. Thus, the association between interpregnancy interval and LBW could be due to the independent effect of interval on both preterm birth and SGA. Less clear is the association between birth spacing and the risk of fetal and early neonatal death, although results from meta-regression curves suggest that interpregnancy intervals shorter than 6 months and longer than 50 months are associated with increased risk of these adverse perinatal outcomes. The strength of our inferences is based on compliance with stringent criteria for performing a rigorous systematic review. These included the use of a prospective protocol designed to address a research question; the methods used in the identification of relevant studies; no language restrictions; the exclusion of studies that did not adjust for at least maternal age and socioeconomic status; the strict assessment of methodological quality of included studies; the use of several techniques of meta-analysis (both unadjusted and adjusted analyses); the exploration of sources of heterogeneity; the quantitative summarization of the evidence; and the inclusion of a large number of women from different populations throughout the world.

The reasons for the association between a short interval between pregnancies and adverse perinatal outcomes are unclear. A plausible explanation is the maternal nutritional depletion hypothesis,[27,81] which states that a close succession of pregnancies and periods of lactation worsen the mother's nutritional status because there is not adequate time for the mother to recover from the physiological stresses of the preceding pregnancy before she is subjected to the

stresses of the next. This results in depletion of maternal nutrient stores, with the subsequent increased risk of adverse perinatal outcomes.[81] The folate depletion hypothesis claims that maternal serum and erythrocyte concentrations of folate decrease from the fifth month of pregnancy onward and remain low for a fairly long time after delivery. Women who become pregnant before folate restoration is complete have an increased risk of folate insufficiency at the time of conception and during pregnancy. As a consequence, their offspring have higher risks of neural tube defects, intrauterine growth restriction, preterm birth, and LBW.[82] Some investigators have attributed the higher risk of poor pregnancy outcomes to several factors associated with having short intervals, such as socioeconomic status, unstable lifestyles, failure to use health care services or inadequate use of such services, unplanned pregnancies, and other behavioral or psychological determinants.[4,5] However, the fact that the birth spacing effects are not strongly attenuated when socioeconomic and maternal characteristics are controlled for suggests that the effects are not caused by these confounding factors.

Some hypotheses have also been proposed to explain the relationship between long intervals and adverse perinatal outcomes. Zhu et al[49] have hypothesized that, after delivery, a woman's physiologic reproductive capacities gradually decline, becoming similar to those of primigravid women (ie, "the physiological regression hypothesis"). This hypothesis is supported by the observation that perinatal outcomes for infants conceived after an excessively long interpregnancy interval are similar to outcomes of infants born to primigravid women. Another possibility is that unmeasured factors, such as sexually transmitted infections or maternal illnesses, may cause both adverse fertility and pregnancy outcomes.[5,49] These factors could differ for women in developed and developing countries. Finally, residual confounding may still be an explanation for at least part of the reported associations.

Several potential limitations of our review must also be considered. First, like any systematic review, it is limited by the quality of original data. The great majority of studies calculated the interpregnancy interval using mother's recall of her previous child's date of birth and her last menstrual period,

**Table 5.** Meta-analysis of Dose-Response Regression Slopes and Prediction of the Risk of Adverse Perinatal Outcomes for Interpregnancy Intervals <18 Months and >59 Months

| | Increase, % (95% CI) | | |
|---|---|---|---|
| **Risk Increase** | **Preterm Birth (12 Studies)** | **LBW (7 Studies)** | **SGA (12 Studies)** |
| Per month for intervals <18 mo* | 1.92 (1.80-3.04) | 3.25 (3.09-3.41) | 1.52 (1.40-1.64) |
| Per month for intervals >59 mo† | 0.55 (0.49-0.61) | 0.91 (0.83-0.99) | 0.76 (0.71-0.81) |
| Predicted by the model Interpregnancy interval, mo | | | |
| 3 | 28.8 (27.0-30.6) | 48.8 (46.4-51.2) | 22.8 (21.0-24.6) |
| 6 | 23.0 (21.6-24.5) | 39.0 (37.1-40.9) | 18.2 (16.8-19.7) |
| 9 | 17.3 (16.2-18.4) | 29.3 (27.8-30.7) | 13.7 (12.6-14.8) |
| 12 | 11.5 (10.8-12.2) | 19.5 (18.5-20.5) | 9.1 (8.4-9.8) |
| 15 | 5.8 (5.4-6.1) | 9.8 (9.3-10.2) | 4.6 (4.2-4.9) |
| 18-59‡ | 1.00 | 1.00 | 1.00 |
| 72 | 6.6 (5.9-7.3) | 10.9 (10.0-11.9) | 9.1 (8.5-9.7) |
| 96 | 19.8 (17.6-22.0) | 32.8 (29.9-35.6) | 27.4 (25.6-29.2) |
| 120 | 33.0 (29.4-36.6) | 54.6 (49.8-59.4) | 45.6 (42.6-48.6) |
| 144 | 46.2 (41.2-51.2) | 76.4 (69.7-83.2) | 63.8 (59.6-68.0) |

Abbreviations: CI, confidence interval; LBW, low birth weight; SGA, small for gestational age.
*Risk increase per each month that interpregnancy interval is shortened from 18 months.
†Risk increase per each month that interpregnancy interval is lengthened from 59 months.
‡Reference category.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

000571

Exhibit 128                    JA1382                    JA-0001674

instead of birth dates recorded on the birth records and gestational age estimated from ultrasonography. In most studies the intervals were calculated as the time elapsed between 2 consecutive live births, ignoring induced or spontaneous abortions or fetal deaths between them, which can produce even longer intervals between live births. Nevertheless, this problem would not affect the findings for short intervals. In addition, several studies did not properly address the potential confounding effects of factors other than maternal age and socioeconomic status. Second, because there was considerable statistical heterogeneity in most of the meta-analyses performed, our findings should be interpreted with caution. Nevertheless, in the great majority of comparisons the estimates showed the same direction of effect, which could suggest the absence of clinical heterogeneity among the studies. Investigation of possible sources of heterogeneity provided no plausible explanations. In addition, it is possible that the $I^2$ heterogeneity test could have excessive power when there are studies with large sample size, as was the case with some of the ones included in our meta-analyses. Third, the number of studies available for analysis on the relationship between birth spacing and some adverse perinatal outcomes is still too small to provide conclusive evidence.

The effects of birth spacing on perinatal health found in our study, as well as the effects of both short and long intervals on infant, child, and maternal health,[1,2] should furnish a strong motivating force for health personnel to provide family planning. The health sector should supply such care not only to those wishing to limit their fertility for personal, social, or economic reasons, but should also provide the needed services to those practicing family planning for health reasons. The results of our systematic review could be used by reproductive clinicians around the world to advise women on the benefits of delaying a subsequent pregnancy for approximately 2 to 5 years to

improve the health of both mother and the next infant.

Despite the advances during the last 2 decades in understanding the relationship between birth spacing and adverse pregnancy outcomes, little information is available to explain the mechanisms by which birth spacing might improve the health of mothers and their children. Also, more studies are needed on whether the effects of birth spacing on perinatal health differ in developed vs developing nations. Finally, it is imperative to understand the causes for both short and long intervals in any population to interpret the data on health risks. The consequence of this may be that family planning policies and messages may need to be tailored to different populations.

**Author Contributions:** Dr Conde-Agudelo had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Conde-Agudelo.
*Acquisition of data:* Conde-Agudelo, Rosas-Bermúdez.
*Analysis and interpretation of data:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Drafting of the manuscript:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Critical revision of the manuscript for important intellectual content:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Statistical analysis:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Obtained funding:* Conde-Agudelo.
*Administrative, technical, or material support:* Rosas-Bermúdez, Kafury-Goeta.
*Study supervision:* Conde-Agudelo.
**Financial Disclosures:** None reported.
**Funding/Support:** This work was supported by the Office of Population and Reproductive Health, Bureau for Global Health, US Agency for International Development, under the terms of Cooperative Agreements HRN-A-00-00-00003-00 and GPO-A-00-05-00027-0 awarded to the CATALYST Consortium.
**Role of the Sponsor:** The funding organization had no role in the design and conduct of the study; the collection, analysis, and interpretation of the data; or the preparation, review, or approval of the manuscript.
**Disclaimer:** The author's views expressed herein do not necessarily reflect the views of the US Agency for International Development or the US government.
**Acknowledgment:** We thank Maureen Norton, PhD (Office of Population and Reproductive Health, Bureau for Global Health, USAID, Washington, DC), Taroub Faramand, MD, MPH (CATALYST Consortium, Washington, DC), José Belizán, MD, PhD, and Eduardo Bergel, PhD (Institute for Clinical Effectiveness and Health Policy, Buenos Aires, Argentina), Bao-Ping Zhu, MD, MS (Missouri Department of Health and Senior Services, Jefferson City), Julie DaVanzo, PhD (RAND Corporation, Santa Monica, Calif), Roger Rochat, PhD (Rollins School of Public Health, Atlanta, Ga), Linda Adair, PhD (University of North Carolina at Chapel Hill), and Stan Becker, PhD (Johns Hopkins University School of Hygiene and Public Health, Balti-

more, Md), for their relevant contributions to previous versions of the article; Eileen D'Andrea, MLS, Jennifer Gelman, MLS, and Juan Carlos Toscano, BS (Academy for Educational Development, Washington, DC) and Laurel Suiter, MA (CATALYST Consortium), for their assistance in conducting the computerized literature search and obtaining the articles; and Ed Abel, MPA, Elsa Berhane, MPH, and Caroline Tran, MA (CATALYST Consortium), and Paula Hollerbach, PhD, Amy Uccello, MA, and Margaret McGunnigle, MPH (Academy for Educational Development), for their administrative support in the organization of the review.

## REFERENCES

1. Winikoff B. The effects of birth spacing on child and maternal health. *Stud Fam Plann.* 1983;14:231-245.
2. Rousso D, Panidis D, Gkoutzioulis F, Kourtis A, Mavromatidis G, Kalahanis I. Effect of the interval between pregnancies on the health of mother and child. *Eur J Obstet Gynecol Reprod Biol.* 2002;105:4-6.
3. King JC. The risk of maternal nutritional depletion and poor outcomes increases in early or closely spaced pregnancies. *J Nutr.* 2003;133:1732S-1736S.
4. Erickson JD, Bjerkedal T. Interval between pregnancies. *Lancet.* 1979;1:52.
5. Klebanoff MA. The interval between pregnancies and the outcome of subsequent births. *N Engl J Med.* 1999;340:643-644.
6. Stroup DF, Berlin JA, Morton SC, et al; Meta-analysis Of Observational Studies in Epidemiology (MOOSE) Group. Meta-analysis of observational studies in epidemiology: a proposal for reporting. *JAMA.* 2000;283:2008-2012.
7. Levine M, Walter S, Lee H, Haines T, Holbrook A, Moyer V; Evidence-Based Medicine Working Group. Users' guides to the medical literature, IV: how to use an article about harm. *JAMA.* 1994;271:1615-1619.
8. Downs SH, Black N. The feasibility of creating a checklist for the assessment of the methodological quality both of randomised and non-randomised studies of health care interventions. *J Epidemiol Community Health.* 1998;52:377-384.
9. Greenland S, Longnecker MP. Methods for trend estimation from summarized dose-response data, with applications to meta-analysis. *Am J Epidemiol.* 1992; 135:1301-1309.
10. Berlin JA, Longnecker MP, Greenland S. Meta-analysis of epidemiologic dose-response data. *Epidemiology.* 1993;4:218-228.
11. Higgins JPT, Deeks JJ, Altman DG. Measuring inconsistency in meta-analyses. *BMJ.* 2003;327:557-560.
12. DerSimonian R, Laird N. Meta-analysis in clinical trials. *Control Clin Trials.* 1986;7:177-188.
13. Egger M, Davey Smith G, Schneider M, Minder C. Bias in meta-analyses detected by a simple graphical test. *BMJ.* 1997;315:629-634.
14. Fedrick J, Adelstein P. Influence of pregnancy spacing on outcome of pregnancy. *BMJ.* 1973;4:753-756.
15. Swenson I, Harper PA. The relationship between fetal wastage and pregnancy spacing in Bangladesh. *Soc Biol.* 1978;25:251-257.
16. Eisner V, Brazie JV, Pratt MW, Hexter AC. The risk of low birthweight. *Am J Public Health.* 1979;69:887-893.
17. Spratley E, Taffel S. Interval between births: United States, 1970-77. *Vital Health Stat 21.* 1981;39:1-47.
18. Fortney JA, Higgins JE. The effect of birth interval on perinatal survival and birth weight. *Public Health.* 1984;98:73-83.
19. DaVanzo J, Habicht JP, Butz WP. Assessing socioeconomic correlates of birthweight in peninsular Malaysia: ethnic differences and changes over time. *Soc Sci Med.* 1984;18:387-404.
20. Brody DJ, Bracken MB. Short interpregnancy in-

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

Exhibit 128     JA1383     000572     JA-0001675

terval: a risk factor for low birthweight. *Am J Perinatol.* 1987;4:50-54.

**21.** Klebanoff MA. Short interpregnancy interval and the risk of low birthweight. *Am J Public Health.* 1988; 78:667-670.

**22.** Lieberman E, Lang JM, Ryan KJ, Monson RR, Schoenbaum SC. The association of inter-pregnancy interval with small for gestational age births. *Obstet Gynecol.* 1989;74:1-5.

**23.** Casterline JB. Maternal age, gravidity, and pregnancy spacing effects on spontaneous fetal mortality. *Soc Biol.* 1989;36:186-212.

**24.** Miller JE. Determinants of intrauterine growth retardation: evidence against maternal depletion. *J Biosoc Sci.* 1989;21:235-243.

**25.** Lang JM, Lieberman E, Ryan KJ, Monson RR. Interpregnancy interval and risk of preterm labor. *Am J Epidemiol.* 1990;132:304-309.

**26.** Neel NR, Alvarez JO. Risk factors of fetal malnutrition in a group of Guatemalan mothers and neonates [in Spanish]. *Bol Oficina Sanit Panam.* 1991;110: 93-107.

**27.** Miller JE. Birth intervals and perinatal health: an investigation of three hypotheses. *Fam Plann Perspect.* 1991;23:62-70.

**28.** Huttly SR, Victora CG, Barros FC, Vaughan JP. Birth spacing and child health in urban Brazilian children. *Pediatrics.* 1992;89:1049-1054.

**29.** Kallan JE. Effects of interpregnancy intervals on preterm birth, intrauterine growth retardation, and fetal loss. *Soc Biol.* 1992;39:231-245.

**30.** Barros FC, Huttly SR, Victora CG, Kirkwood BR, Vaughan JP. Comparison of the causes and consequences of prematurity and intrauterine growth retardation: a longitudinal study in southern Brazil. *Pediatrics.* 1992;90:238-244.

**31.** Leong WP, Viegas OA, Ratnam SS. Premature childbirth: social and behavioural risks in Singapore. *J Biosoc Sci.* 1993;25:465-472.

**32.** Gribble JN. Birth intervals, gestational age, and low birth weight: are the relationships confounded? *Popul Stud.* 1993;47:133-146.

**33.** Miller JE. Birth order, interpregnancy interval and birth outcomes among Filipino infants. *J Biosoc Sci.* 1994;26:243-259.

**34.** Greenwood R, Samms-Vaughan M, Golding J, Ashley D. Past obstetric history and risk of perinatal death in Jamaica. *Paediatr Perinat Epidemiol.* 1994;8(suppl 1):40-53.

**35.** Fikree FF, Berendes HW. Risk factors for term intrauterine growth retardation: a community-based study in Karachi. *Bull World Health Organ.* 1994;72: 581-587.

**36.** Rawlings JS, Rawlings VB, Read JA. Prevalence of low birth weight and preterm delivery in relation to the interval between pregnancies among white and black women. *N Engl J Med.* 1995;332:69-74.

**37.** Fourn L, Goulet L, Seguin L. Birth intervals and birth of low weight infants in Benin [in French]. *Med Trop (Mars).* 1996;56:163-166.

**38.** Ochoa Sangrador C, Luque Benlloch C, Carrascal Tejado A. Prematurity, low birth weight and the interval between pregnancies [in Spanish]. *An Esp Pediatr.* 1996;45:67-70.

**39.** Kallan JE. Reexamination of interpregnancy intervals and subsequent birth outcomes: evidence from U.S. linked birth/infant death records. *Soc Biol.* 1997; 44:205-212.

**40.** Adams MM, Delaney KM, Stupp PW, McCarthy BJ, Rawlings S. The relationship of interpregnancy interval to infant birthweight, and length of gestation among low-risk women, Georgia. *Paediatr Perinat Epidemiol.* 1997;11(suppl 1):48-62.

**41.** Bakewell JM, Stockbauer JW, Schramm WF. Factors associated with repetition of low birthweight: Missouri longitudinal study. *Paediatr Perinat Epidemiol.* 1997;11(suppl 1):119-129.

**42.** Sener T, Gürel SA, Gürel H, Özalp S, Hassa H,

Enünlü T. Risk factors associated with small for gestational age infants in a Turkish population. *J Matern Fetal Invest.* 1997;7:145-151.

**43.** Khoshnood B, Lee KS, Wall S, Hsieh HL, Mittendorf R. Short interpregnancy intervals and the risk of adverse birth outcomes among five racial/ethnic groups in the United States. *Am J Epidemiol.* 1998;148:798-805.

**44.** Deshmukh JS, Motghare DD, Zodpey SP, Wadhva SK. Low birth weight and associated maternal factors in an urban area. *Indian Pediatr.* 1998;35:33-36.

**45.** Klerman LV, Cliver SP, Goldenberg RL. The impact of short interpregnancy intervals on pregnancy outcomes in a low-income population. *Am J Public Health.* 1998;88:1182-1185.

**46.** Ekwo EE, Moawad A. The relationship of interpregnancy interval to the risk of preterm births to black and white women. *Int J Epidemiol.* 1998;27:68-73.

**47.** Basso O, Olsen J, Knudsen LB, Christensen K. Low birth weight and preterm birth after short interpregnancy intervals. *Am J Obstet Gynecol.* 1998;178:259-263.

**48.** Shults RA, Arndt V, Olshan AF, Martin CF, Royce RA. Effects of short interpregnancy intervals on small-for gestational age and preterm births. *Epidemiology.* 1999;10:250-254.

**49.** Zhu BP, Rolfs RT, Nangle BE, Horan JM. Effect of the interval between pregnancies on perinatal outcomes. *N Engl J Med.* 1999;340:589-594.

**50.** Fuentes-Afflick E, Hessol NA. Interpregnancy interval and the risk of premature infants. *Obstet Gynecol.* 2000;95:383-390.

**51.** Sachar RK, Soni RK. Perinatal mortality in rural Punjab—a population-based study. *J Trop Pediatr.* 2000; 46:43-45.

**52.** Zhu BP, Haines KM, Le T, McGrath-Miller K, Boulton ML. Effect of the interval between pregnancies on perinatal outcomes among white and black women. *Am J Obstet Gynecol.* 2001;185:1403-1410.

**53.** Rousham EK, Gracey M. Factors affecting birthweight of rural Australian Aborigines. *Ann Hum Biol.* 2002;29:363-372.

**54.** Dafopoulos KC, Galazios GC, Tsikouras PN, Koutlaki NG, Liberis VA, Anastasiadis PG. Interpregnancy interval and the risk of preterm birth in Thrace, Greece. *Eur J Obstet Gynecol Reprod Biol.* 2002;103:14-17.

**55.** Smith GC, Pell JP, Dobbie R. Interpregnancy interval and risk of preterm birth and neonatal death: retrospective cohort study [published correction appears in *BMJ.* 2003;327:851]. *BMJ.* 2003;327:313.

**56.** Zhu BP, Le T. Effect of interpregnancy interval on infant low birth weight: a retrospective cohort study using the Michigan Maternally Linked Birth Database. *Matern Child Health J.* 2003;7:169-178.

**57.** Stephansson O, Dickman PW, Cnattingius S. The influence of interpregnancy interval on the subsequent risk of stillbirth and early neonatal death. *Obstet Gynecol.* 2003;102:101-108.

**58.** van Eijk AM, Ayisi JG, ter Kuile FO, et al. Effectiveness of intermittent preventive treatment with sulphadoxine-pyrimethamine for control of malaria in pregnancy in western Kenya: a hospital-based study. *Trop Med Int Health.* 2004;9:351-360.

**59.** Arafa MA, Alkhouly A, Youssef ME. Influence of inter-pregnancy interval on preterm delivery. *Paediatr Perinat Epidemiol.* 2004;18:248-252.

**60.** Pedroso de Barros E, Avelar WM, Cecatti JG, Besteti Pires HM. Associação entre intervalo interpartal e situações maternas e perinatais. In: *Simposio Internacional "Cesárea; avaliação e propostas de ação."* Campinas, Brazil: CEMICAMP; 2004.

**61.** Hsieh TT, Chen SF, Shau WY, Hsieh CC, Hsu JJ, Hung TH. The impact of interpregnancy interval and previous preterm birth on the subsequent risk of preterm birth. *J Soc Gynecol Investig.* 2005;12:202-207.

**62.** DaVanzo J, Razzaque A, Rahman M, et al. The effects of birth spacing on infant and child mortality, pregnancy outcomes, and maternal morbidity and mor-

tality in Matlab, Bangladesh. In: *Technical Consultation and Review of the Scientific Evidence for Birth Spacing.* Geneva, Switzerland: World Health Organization; 2005.

**63.** Rutstein O. Effect of preceding pregnancy interval on fetal and perinatal mortality: multivariate cross-country analyses. In: *Technical Consultation and Review of the Scientific Evidence for Birth Spacing.* Geneva, Switzerland: World Health Organization; 2005.

**64.** Conde-Agudelo A, Belizán JM, Norton M, Rosas-Bermúdez A. Effect of the interpregnancy interval on perinatal outcomes in Latin America. *Obstet Gynecol.* 2005;106:359-366.

**65.** Hosain GM, Chatterjee N, Begum A, Saha SC. Factors associated with low birthweight in rural Bangladesh [pushed online ahead of print October 19, 2005]. *J Trop Pediatr.* 2005:662.

**66.** Ruelas-Orozco G, Guzman J, Malacara JM. Perinatal mortality risk factors in a case-control study [in Spanish]. *Bol Med Hosp Infant Mex.* 1985;42:153-158.

**67.** Ferraz EM, Gray RH, Fleming PL, Maia TM. Interpregnancy interval and low birth weight: findings from a case-control study. *Am J Epidemiol.* 1988;128: 1111-1116.

**68.** Bartlett AV, Paz de Bocaletti ME. Intrapartum and neonatal mortality in a traditional indigenous community in rural Guatemala. *Acta Paediatr Scand.* 1991; 80:288-296.

**69.** Mavalankar DV, Gray RH. Re: "Interpregnancy interval and risk of preterm labor. *Am J Epidemiol.* 1991;133:958-959.

**70.** Dechering WH, Perera RS. A secondary analysis of determinants of low birth weight. *Ceylon Med J.* 1991;36:52-62.

**71.** Kumar R, Singhi S. Risk factors for stillbirths in a rural community. *Indian J Pediatr.* 1992;59:455-461.

**72.** Mavalankar DV, Gray RH, Trivedi CR. Risk factors for preterm and term low birthweight in Ahmedabad, India. *Int J Epidemiol.* 1992;21:263-272.

**73.** Arif MA, Qureshi AH, Jafarey SN, Alam SE, Arif K. Maternal sociocultural status: a novel assessment of risk for the birth of small for gestational age, low birth weight infants. *J Obstet Gynaecol Res.* 1998;24: 215-222.

**74.** Grau Espinosa MA, Saenz Darias L, Cabrales Escobar JA. Risk factors of low birth weight: Provincial Gynecologic-Obstetric Hospital of Sancti Spiritus, Cuba [in Spanish]. *Rev Panam Salud Publica.* 1999; 6:95-98.

**75.** Wang PD, Lin RS. Perinatal mortality in Taiwan. *Public Health.* 1999;113:27-33.

**76.** Mafina-Mienandi MC, Ganga-Zandzou PS, Makoumbou P, Malonga H, Ekoundzola JR, Mayanda HF. Risk factors of intrauterine growth retardation in Congo [in French]. *J Gynecol Obstet Biol Reprod (Paris).* 2002; 31:500-505.

**77.** Al-Jasmi F, Al-Mansoor F, Alsheiba A, Carter AO, Carter TP, Hossain MM. Effect of interpregnancy interval on risk of spontaneous preterm birth in Emirati women, United Arab Emirates. *Bull World Health Organ.* 2002;80:871-875.

**78.** Khan N, Jamal M. Maternal risk factors associated with low birth weight. *J Coll Physicians Surg Pak.* 2003;13:25-28.

**79.** Orji EO, Shittu AS, Makinde ON, Sule SS. Effect of prolonged birth spacing on maternal and perinatal outcome. *East Afr Med J.* 2004;81:388-391.

**80.** Kleijer ME, Dekker GA, Heard AR. Risk factors for intrauterine growth restriction in a socioeconomically disadvantaged region. *J Matern Fetal Neonatal Med.* 2005;18:23-30.

**81.** Winkvist A, Rasmussen KM, Habicht JP. A new definition of maternal depletion syndrome. *Am J Public Health.* 1992;82:691-694.

**82.** Smits LJM, Essed GGM. Short interpregnancy intervals and unfavourable pregnancy outcome: role of folate depletion. *Lancet.* 2001;358:2074-2077.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**000573**

Exhibit 128    JA1384    JA-0001676

# Interpregnancy Interval and the Risk of Premature Infants

*ELENA FUENTES-AFFLICK, MD, MPH, AND NANCY A. HESSOL, MSPH*

*Objective*: Interpregnancy intervals are associated with the risk of low birth weight (LBW) infants, but the association between interpregnancy interval and prematurity is unknown. Our objective was to determine whether interpregnancy intervals were associated with the risk of premature infants and to define the degree of risk according to interpregnancy interval.

*Methods*: We analyzed 289,842 singleton infants born to parous Mexican-origin Hispanic and non-Hispanic white women in the United States who resided in the same county and delivered between January 1, 1991 and September 30, 1991. Interpregnancy interval was defined as the number of months between the previous live birth and conception of the index pregnancy. Multivariate logistic regression analysis was used to estimate odds ratios and 95% confidence intervals for the risk of interpregnancy interval on very premature (23–32 weeks), moderately premature (33–37 weeks), and term gestation (38–42 weeks).

*Results*: Nearly 37% of women had interpregnancy intervals less than 18 months, 45.5% of women had intervals of 18–59 months, and 17.6% of women had intervals over 59 months. After adjusting for confounding variables, women with intervals less than 18 months were 14–47% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months. Women with intervals over 59 months were 12–45% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months.

*Conclusion*: Women with interpregnancy intervals from 18–59 months had the lowest risk of very premature and moderately premature infants. Further study is needed to define the mechanisms through which interpregnancy interval influences pregnancy outcome. (Obstet Gynecol 2000;95:

383–90. © 2000 by The American College of Obstetricians and Gynecologists.)

Premature infants have higher morbidity and mortality rates than infants born at term.[1] The prevention of prematurity is a priority for public health in the United States,[2] but prematurity rates increased by 8% in the past decade.[3–13]

Interpregnancy interval is the interval between the end of one pregnancy and conception of the next pregnancy.[14,15] Short interpregnancy intervals are associated with a higher risk of low birth weight (LBW) infants,[16,17] but the relationship between interpregnancy intervals and prematurity is unknown. Some studies found that women with short intervals have a higher risk of having premature infants than women with longer intervals,[14,15,17–20] whereas other studies found no association between short intervals and prematurity.[21–23] Long interpregnancy intervals might also be important, but few studies have analyzed the relationship between long intervals and prematurity.[14,18,20,21,24] Finally, it is not known whether interpregnancy interval is an independent risk factor for perinatal outcomes or whether interpregnancy interval is associated with maternal characteristics that affect perinatal outcome.[25,26] The objectives of the present study were to determine the relationship between the interpregnancy interval length, confounding variables, and prematurity and to define the degree of risk according to interpregnancy interval.

## Methods

From the 1991 United States linked birth-infant death dataset, we selected singleton infants born from January 1, 1991, to September 30, 1991, to Mexican-origin Hispanic (Hispanic) and non-Hispanic white (white) women who had at least one previous live birth. We selected only infants born to Hispanic and white women because women from these ethnic groups have

*From the Departments of Pediatrics, Epidemiology and Biostatistics, Medicine, and Obstetrics, Gynecology and Reproductive Sciences, the Medical Effectiveness Research Center for Diverse Populations, and the Institute for Health Policy Studies, School of Medicine, University of California, San Francisco, San Francisco, California.*

*This study was supported by a grant from UC MEXUS and the Medical Effectiveness Research Center for Diverse Populations, University of California, San Francisco (AHCPR grant #HS07373).*

0029-7844/00/$20.00   **383**
PII S0029-7844(99)00583-9

**000544**

Exhibit 129

similar prematurity rates.[13] To account for community and temporal factors, we matched Hispanic and white women who resided in the same county and delivered during the same month in a one-to-one ratio. We restricted the analysis to the first 9 months of 1991 to minimize the chance of counting a birth mother more than once. The Committee on Human Research at the University of California, San Francisco approved this study.

The primary independent variable was interpregnancy interval, ie, the number of months between delivery of the previous infant and conception of the current pregnancy.[15,19] To calculate interpregnancy interval, we used birth certificate data to compute the interval between the date of last live birth and the date of birth of the index infant and then subtracted the gestational age of the index infant.[15,17,20,23] For bivariate comparisons, we created the following nine categories of interpregnancy intervals: less than 6 months, 6–11 months, 12–17 months, 18–23 months, 24–29 months, 30–35 months, 36–47 months, 48–59 months, and more than 59 months. For multivariate comparisons, we combined the 18–59 month intervals and used this group as the reference category.

We defined the following mutually exclusive dependent variables: extremely premature (less than 23 weeks' gestation), very premature (23–32 weeks' gestation), moderately premature (33–37 weeks' gestation), term (38–42 weeks' gestation, reference category), and postterm (longer than 42 weeks' gestation). We excluded births with missing data for any study variable (7.0% of all births). For the multivariate analyses of prematurity outcomes, we excluded extremely premature infants (0.07% of births) and postterm infants (7.6% of births).

We also analyzed other maternal and infant factors, including maternal age (14 years old or less, 15–17, 18–26, 27–34, and over 34 years), education (under 9, 9–11, 12, 13–15, over 15 years), birthplace (50 states and the District of Columbia compared with United States territories or other countries), parity (number of children born alive, including the current pregnancy: two, three, or more than three), previous premature or small for gestational age (SGA) infant, utilization of prenatal care, and infant sex. Utilization of prenatal care was categorized according to the Kotelchuck Adequacy of Prenatal Care Utilization index[27] (inadequate, intermediate, adequate, and adequate plus). We were unable to analyze marital status because information on marital status was not reported for every state in the dataset. Similarly, we were unable to analyze maternal tobacco use because more than half of births (56.2%) were missing that information.

We used $\chi^2$ statistics to compare maternal characteristics and prematurity outcomes across all categories of interpregnancy interval. We used logistic regression to estimate unadjusted and adjusted odds ratios (OR) and 95% confidence intervals (CI) for the association between interpregnancy interval and very premature and moderately premature outcomes. In the multivariate logistic regression models, we included maternal ethnicity, age, education, birthplace, parity, previous premature or SGA infant, utilization of prenatal care, and infant sex. Commercially available software (SAS Institute, Inc., Cary, NC) was used for all statistical analyses.

## Results

A total of 289,842 births were selected using the study criteria. Women with interpregnancy intervals over 59 months were more likely to have missing data on maternal education, parity, and utilization of prenatal care than women from the other categories of interpregnancy intervals ($P < .001$). Women with interpregnancy intervals less than 6 months had the highest proportion of missing data on gestational age relative to women in the other categories of interpregnancy intervals ($P < .001$).

Nearly thirty-seven percent (36.9%) of women had interpregnancy intervals less than 18 months (Table 1). Nine percent of women had intervals less than 6 months, 14.3% had intervals of 6–11 months, and 13.6% had intervals of 12–17 months.

Women with interpregnancy intervals less than 18 months had more demographic, obstetric, and health-service risk factors than women with intervals of 18–59 months (Table 1). Women with intervals less than 12 months were more likely to be Hispanic than women with intervals of 18–59 months. Women with interpregnancy intervals less than 18 months were younger, less educated, had higher parity, and had less adequate utilization of prenatal care than women with intermediate intervals.

Women with interpregnancy intervals less than 18 months had higher rates of very premature and moderately premature infants than women with intervals of 18–59 months (Table 2, Figures 1 and 2). For all subsequent comparisons, we used interpregnancy intervals of 18–59 months as the reference category. In unadjusted logistic regression analyses, women with intervals less than 6 months were almost twice as likely to have very premature infants as women with intervals of 18–59 months (Table 3). Similarly, women with interpregnancy intervals of 6–11 and 12–17 months were 30–53% more likely to have very premature infants than women with intervals of 18–59 months. In unadjusted analyses of moderate prematurity, women with interpregnancy intervals less than 18 months were

000545

Exhibit 129 JA1386 JA-0001678

Exhibit 129

**Table 1.** Distribution of Selected Maternal Characteristics by Interpregnancy Intervals Among Hispanic and White Women in the United States, 1991

| Characteristic | Interpregnancy interval (mo) | | | | | | | | | $x^2 P$ |
| | <6 ($n = 26,022$) | 6–11 ($n = 41,454$) | 12–17 ($n = 39,390$) | 18–23 ($n = 32,172$) | 24–29 ($n = 26,568$) | 30–35 ($n = 21,111$) | 36–47 ($n = 30,874$) | 48–59 ($n = 21,301$) | >59 ($n = 50,950$) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ethnicity* | | | | | | | | | | .001 |
| Hispanic | 62.7 | 51.8 | 44.8 | 43.1 | 43.9 | 47.4 | 49.1 | 52.6 | 52.3 | |
| White | 37.3 | 48.2 | 55.2 | 56.9 | 56.1 | 52.6 | 50.9 | 47.5 | 47.7 | |
| Age (y)* | | | | | | | | | | .001 |
| <15 | 0.10 | 0.02 | 0.02 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| 15–17 | 4.5 | 2.4 | 1.4 | 0.7 | 0.3 | 0.2 | 0.05 | 0.01 | 0.0 | |
| 18–26 | 62.3 | 54.4 | 48.2 | 45.0 | 42.9 | 42.3 | 39.0 | 33.3 | 14.4 | |
| 27–34 | 28.3 | 36.0 | 41.8 | 44.7 | 46.8 | 46.9 | 49.0 | 52.8 | 58.5 | |
| >34 | 4.9 | 7.1 | 8.6 | 9.6 | 10.0 | 10.6 | 11.9 | 13.9 | 27.1 | |
| Education (y) | | | | | | | | | | .001 |
| <9 | 23.3 | 18.7 | 15.8 | 15.0 | 15.8 | 16.7 | 18.5 | 20.4 | 21.5 | |
| 9–11 | 29.3 | 22.8 | 19.2 | 17.6 | 16.6 | 17.3 | 17.5 | 17.2 | 16.4 | |
| 12 | 27.6 | 29.2 | 29.3 | 29.5 | 29.4 | 30.9 | 31.2 | 32.6 | 33.3 | |
| 13–15 | 11.3 | 15.1 | 16.9 | 17.8 | 18.2 | 17.5 | 17.3 | 16.9 | 17.9 | |
| >15 | 8.6 | 14.3 | 18.8 | 20.2 | 20.0 | 17.6 | 15.5 | 12.9 | 10.9 | |
| Birthplace | | | | | | | | | | .001 |
| Non-United States | 40.1 | 34.3 | 30.0 | 29.6 | 30.5 | 33.6 | 35.3 | 37.8 | 37.1 | |
| United States | 59.9 | 65.7 | 70.0 | 70.4 | 69.5 | 66.4 | 64.7 | 62.2 | 62.9 | |
| Parity (no. of children born alive) | | | | | | | | | | .001 |
| 2 | 47.5 | 50.8 | 53.9 | 56.2 | 56.4 | 55.9 | 53.0 | 49.7 | 46.2 | |
| 3 | 26.8 | 26.2 | 25.5 | 25.3 | 26.0 | 26.8 | 28.7 | 30.7 | 33.6 | |
| >3 | 25.7 | 23.0 | 20.7 | 18.6 | 17.6 | 17.3 | 18.3 | 19.6 | 20.2 | |
| Previous preterm or SGA infant | | | | | | | | | | .039 |
| Yes | 1.5 | 1.4 | 1.4 | 1.3 | 1.2 | 1.2 | 1.2 | 1.3 | 1.4 | |
| No | 98.5 | 98.7 | 98.6 | 98.7 | 98.8 | 98.8 | 98.8 | 98.7 | 98.6 | |
| Use of prenatal care | | | | | | | | | | .001 |
| Inadequate | 41.6 | 29.9 | 23.7 | 20.1 | 18.9 | 18.6 | 18.4 | 18.6 | 17.8 | |
| Intermediate | 15.2 | 16.2 | 16.0 | 16.4 | 16.2 | 16.5 | 17.0 | 17.4 | 16.2 | |
| Adequate | 27.3 | 34.6 | 38.9 | 41.9 | 42.2 | 41.5 | 41.5 | 41.1 | 40.5 | |
| Adequate plus | 16.0 | 19.3 | 21.5 | 21.6 | 22.7 | 23.4 | 23.1 | 22.9 | 25.5 | |

SGA = small for gestational age.
Data are given as percentages, and may not total 100% because of rounding.

000546    JA-0001679

Table 2. Distribution of Infant Outcomes (%) by Interpregnancy Intervals Among Hispanic and White Women in the United States, 1991

| Characteristic | Interpregnancy interval (mo) | | | | | | | | | $\chi^2$ P |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | <6 (n = 26,022) | 6–11 (n = 41,454) | 12–17 (n = 39,390) | 18–23 (n = 32,172) | 24–29 (n = 26,568) | 30–35 (n = 21,111) | 36–47 (n = 30,874) | 48–59 (n = 21,301) | >59 (n = 50,950) | |
| Gestational age (wk) | | | | | | | | | | .001 |
| <23 | 0.07 | 0.05 | 0.07 | 0.05 | 0.03 | 0.03 | 0.06 | 0.08 | 0.10 | |
| 23–32 | 1.9 | 1.6 | 1.4 | 1.0 | 1.1 | 1.1 | 1.2 | 1.2 | 1.7 | |
| 33–37 | 14.6 | 13.6 | 13.4 | 11.8 | 11.8 | 12.2 | 12.6 | 12.4 | 14.0 | |
| 38–42 | 72.7 | 76.0 | 77.8 | 80.5 | 80.1 | 79.7 | 79.3 | 79.3 | 77.7 | |
| >42 | 10.7 | 8.8 | 7.3 | 6.6 | 6.9 | 6.9 | 6.9 | 7.0 | 6.5 | |
| Sex | | | | | | | | | | .213 |
| Male | 50.6 | 50.9 | 51.0 | 51.6 | 51.2 | 51.5 | 51.1 | 50.6 | 51.3 | |
| Female | 49.4 | 49.1 | 49.0 | 48.4 | 48.8 | 48.5 | 48.9 | 49.4 | 48.7 | |

Data are given as percentages and may not total 100% because of rounding.



**Figure 1.** Incidence (%) of very premature infants (23–32 weeks' gestation) by interpregnancy interval.

14–31% more likely to have moderately premature infants than women with intervals of 18–59 months.

A total of 246,726 infants whose gestation was 23–42 weeks and had complete information for all study variables were included in the multivariate analyses of very premature and moderately premature outcomes (very premature, $n = 3406$; moderately premature, $n = 34,353$; term gestation, $n = 208,967$). After adjusting for demographic, obstetric, and health-service factors, women with interpregnancy intervals less than 18 months were 14–47% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months (Table 3).

One fifth of women had interpregnancy intervals over 59 months (Table 1). Women with interpregnancy intervals over 59 months were more likely to be Hispanic and older than women with intervals of 18–59 months.



**Figure 2.** Incidence (%) of moderately premature infants (33–37 weeks' gestation) by interpregnancy interval.

000547

Exhibit 129

JA1388

JA-0001680

Table 3. Unadjusted and Adjusted Odds Ratios (95% Confidence Intervals) for the Association of Interpregnancy Intervals with Very Premature and Moderately Premature Outcomes Among Hispanic and White Women in the United States, 1991

| Characteristic | Very premature (n = 3406) | | Moderately premature (n = 34,353) | |
|---|---|---|---|---|
| | Unadjusted | Adjusted | Unadjusted | Adjusted |
| Interpregnancy interval (mo) | | | | |
| <6 | 1.85 (1.65, 2.07) | 1.47 (1.30, 1.65) | 1.31 (1.26, 1.37) | 1.20 (1.15, 1.26) |
| 6–11 | 1.53 (1.39, 1.69) | 1.39 (1.25, 1.54) | 1.17 (1.13, 1.21) | 1.14 (1.10, 1.18) |
| 12–17 | 1.30 (1.17, 1.44) | 1.26 (1.13, 1.41) | 1.14 (1.10, 1.18) | 1.15 (1.10, 1.19) |
| 18–59 | 1.00 | 1.00 | 1.00 | 1.00 |
| >59 | 1.55 (1.41, 1.70) | 1.45 (1.31, 1.60) | 1.18 (1.14, 1.21) | 1.12 (1.08, 1.15) |
| Maternal ethnicity | | | | |
| Hispanic | | 1.30 (1.19, 1.42) | | 1.26 (1.22, 1.30) |
| White | | 1.00 | | 1.00 |
| Maternal age (y) | | | | |
| <15 | | 1.25 (0.17, 9.34) | | 0.92 (0.37, 2.27) |
| 15–17 | | 2.03 (1.61, 2.55) | | 1.50 (1.35, 1.66) |
| 18–26 | | 1.00 | | 1.00 |
| 27–34 | | 0.81 (0.75, 0.89) | | 0.90 (0.87, 0.93) |
| >34 | | 1.04 (0.92, 1.18) | | 0.99 (0.95, 1.04) |
| Maternal education (y) | | | | |
| <9 | | 1.08 (0.96, 1.22) | | 1.15 (1.10, 1.20) |
| 9–11 | | 1.24 (1.12, 1.36) | | 1.16 (1.12, 1.21) |
| 12 | | 1.00 | | 1.00 |
| 13–15 | | 0.76 (0.68, 0.85) | | 0.90 (0.87, 0.94) |
| >15 | | 0.61 (0.53, 0.70) | | 0.82 (0.79, 0.86) |
| Maternal birthplace | | | | |
| Non-United States | | 0.82 (0.74, 0.90) | | 0.92 (0.89, 0.95) |
| United States | | 1.00 | | 1.00 |
| Parity (no. of children born alive) | | | | |
| 2 | | 1.00 | | 1.00 |
| 3 | | 1.07 (0.98, 1.16) | | 1.04 (1.01, 1.07) |
| >3 | | 1.34 (1.22, 1.47) | | 1.14 (1.10, 1.18) |
| Previous premature or SGA infant | | | | |
| Yes | | 4.90 (4.17, 5.76) | | 2.61 (2.40, 2.84) |
| No | | 1.00 | | 1.00 |
| Use of prenatal care | | | | |
| Inadequate | | 4.02 (3.56, 4.54) | | 2.17 (2.10, 2.26) |
| Intermediate | | 1.08 (0.90, 1.29) | | 0.88 (0.84, 0.93) |
| Adequate | | 1.00 | | 1.00 |
| Adequate plus | | 11.35 (10.17, 12.67) | | 6.92 (6.70, 7.14) |
| Infant sex | | | | |
| Male | | 1.13 (1.05, 1.21) | | 1.16 (1.12, 1.17) |
| Female | | 1.00 | | 1.00 |

SGA = small for gestational age.

Women with interpregnancy intervals over 59 months had higher rates of very premature and moderately premature infants than women with intervals of 18–59 months (Table 2, Figures 1 and 2). In unadjusted analyses, women with intervals over 59 months were 18–55% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months (Table 3). After adjusting for demographic, obstetric, and health-service factors, women with interpregnancy intervals over 59 months were 12–45% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months (Table 3).

Maternal demographic, obstetric, and health-service factors were associated with the risk of premature infants (Table 3). Relative to women from the reference categories, the odds of very premature and moderately premature infants were higher among women who were Hispanic, 15–17 years old, who had 9–11 years of education, high parity, previous premature or SGA infants, and inadequate or adequate plus utilization of prenatal care. Conversely, women who were 27–34 years old, foreign-born, and had more than 12 years of education were less likely to have very premature and moderately premature infants than women from the reference categories.

000548
Exhibit 129        JA1389        JA-0001681

## Discussion

In this study of Hispanic and white women in the United States, we found that interpregnancy intervals less than 18 months and more than 59 months were independently associated with the odds of premature infants. The distribution of maternal demographic, obstetric, and health-service factors varied by interpregnancy interval, but the relationship between interpregnancy intervals and prematurity outcomes persisted after adjusting for those factors. In our analyses, adjustment for maternal characteristics resulted in a slight (3–21%) reduction in the odds of very premature infants and a minimal (0–8%) reduction in the odds of moderately premature infants. Our results are consistent with those of a recent study that reported that adjusting for maternal characteristics reduced the odds of premature infants (less than 37 weeks' gestation) by approximately 10%.[17] The effect of interpregnancy interval on prematurity in our study was not the result of confounding by maternal characteristics, but our results cannot prove that the association between interpregnancy intervals and prematurity outcomes is causal.

In our study, women with interpregnancy intervals of 18–59 months had the lowest risk of very premature and moderately premature infants. However, 44% of the women in our study had interpregnancy intervals in this optimal category. In a recent study of Utah births, an interpregnancy interval of 18–23 months was recommended as the optimal interpregnancy interval,[20] which is substantially shorter than our finding of 18–59 months. Our findings suggest that if the proportion of women with interpregnancy intervals from 18–59 months increases, the prematurity rates at the population level might decrease.

Women in this study with interpregnancy intervals less than 18 months were more likely to have premature infants than women with intervals of 18–59 months. Furthermore, we found that interpregnancy intervals less than 18 months were more strongly associated with very premature infants than with moderately premature infants, which is consistent with a recent study of births in the United States.[17] Among women in our study with intervals less than 18 months, there was a gradient of risk for prematurity outcomes, and women with interpregnancy intervals less than 6 months had the highest risk of having premature infants. Several studies found that women with short interpregnancy intervals are more likely to have premature infants than women with longer intervals,[14,15,17,19] although most studies have used more stringent definitions of short intervals than we used (eg, less than 3 months, less than 6 months, or less than 12 months).[15,17,18,22] Some studies did not find a relationship between short interpreg-

nancy intervals and prematurity,[18,22–24,28] but most of those studies analyzed small, hospital- or clinic-based samples.

There are three hypotheses to explain the risk of short interpregnancy intervals on pregnancy outcomes. First, women with short intervals are hypothesized to have more nutritional deficiencies than women with longer intervals, because of a shortened period of replenishment between pregnancies.[15,22,23,29] Second, women with short interpregnancy intervals are believed to have more behavioral risk factors, such as tobacco or alcohol use, than women with longer intervals.[23] Finally, women with short intervals are hypothesized to experience more psychological or emotional stress than women with longer intervals.[23] We were unable to test the hypothesis that women with short interpregnancy intervals have more nutritional deficiencies because such information is not on the birth certificate. However, if the adverse effect of short interpregnancy intervals is related to nutritional factors, our results suggest that the period of recovery between pregnancies lasts up to 18 months, which is substantially longer than others have suggested.[22] We were unable to test the hypothesis that women with short interpregnancy intervals have higher rates of tobacco use than women with longer intervals, but previous studies have reported conflicting findings on the relationship between tobacco use and interpregnancy interval. Several studies found that women with short intervals were more likely to smoke than women with longer intervals,[20,22] but other studies did not find a difference in smoking rates according to interpregnancy interval.[15,21,30] Finally, the pattern of utilization of prenatal care could be an indication of maternal stress or a stressful lifestyle, and women in our study with interpregnancy intervals less than 18 months had higher rates of inadequate utilization of prenatal care than women with intermediate intervals. To understand the relationship between short interpregnancy intervals and prematurity, future studies should analyze behavioral, nutritional, and psychological factors.

Women in our study with interpregnancy intervals longer than 59 months had a higher risk of premature infants than women with intervals of 18–59 months. Although the risk of a long interval on prematurity was modest, one fifth of the women in our study had interpregnancy intervals more than 59 months. Many studies of interpregnancy intervals overlooked the issue of long intervals.[15,17,19,22,23,28,31] However, previous studies of the risk of long interpregnancy intervals on prematurity have reported conflicting findings. Among four studies that analyzed the relationship between long intervals and prematurity,[18,20,24,31] only one study found long intervals to be associated with an increased

risk of prematurity.[20] In Utah, women with interpregnancy intervals more than 120 months were 50% more likely to have premature infants than women with an interval of 18–23 months.[20] Our finding that women in the United States with interpregnancy intervals more than 59 months were more likely to have very premature and moderately premature infants conflicts with these results, but further study is needed to define the risk of long interpregnancy interval on perinatal outcomes.

Interpregnancy intervals were independently associated with the risk of prematurity in our study, but two other factors were associated more strongly with the risk of premature infants, namely, previous premature or SGA infant and utilization of prenatal care. Our results are consistent with several studies that reported that women with a history of adverse pregnancy outcomes have a higher risk of adverse outcomes, as well as shorter interpregnancy intervals, than women with favorable outcomes.[14,15,20–24,32–35] Previous studies also reported that inadequate utilization of prenatal care is a stronger predictor of adverse pregnancy outcomes than interpregnancy interval.[14,15,23]

Several limitations must be considered. First, our sample of Hispanic and white women might not be nationally representative because we matched Hispanic to white women according to county of residence and month of delivery. Second, our estimates of interpregnancy intervals could have a misclassification bias because of unrecorded abortions or miscarriages, which would result in underestimating the effect of short interpregnancy intervals and overestimating the effect of long intervals. Third, the information on gestational age that was recorded on the birth certificate may have been based on ultrasound examination, date of last menstrual period, or physical assessment of the newborn. It is possible that the method used to determine gestational age varies by interpregnancy interval, and future studies should determine whether there are systematic differences in the assignment of gestational age according to interpregnancy interval. Fourth, we were unable to analyze marital status and tobacco use because of missing data in the birth certificate dataset. If the distribution of these characteristics or other unmeasured factors varies by interpregnancy interval, then we might have overestimated the effect of interpregnancy intervals on prematurity outcomes. Finally, successive pregnancies and interpregnancy intervals might be influenced by fertility, pregnancy wantedness, access to family planning, or other socioeconomic or cultural factors.

Interpregnancy intervals are a potentially modifiable risk factor for low birth weight,[16] and our results show that interpregnancy intervals are also associated with risk of premature infants. Although prospective studies are needed to determine whether the relationship between interpregnancy intervals and pregnancy outcomes is causal, childbearing women and health care providers should be informed about the importance of family planning and pregnancy spacing.

## References

1. Goldenberg R, Rouse D. Prevention of preterm birth. N Engl J Med 1998;339:313–20.
2. Public Health Service, U.S. Department of Health and Human Services. Healthy People 2000. National Health Promotion and Disease Prevention Objectives. Washington, DC: U.S. Government Printing Office, DHHS Publication No. (PHS) 91-50212, 1991.
3. National Center for Health Statistics. Advance report of final natality statistics, 1986. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1988; 37 (Suppl.):1–47.
4. National Center for Health Statistics. Advance report of final natality statistics, 1987. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1989; 38 (Suppl.):1–47.
5. National Center for Health Statistics. Advance report of final natality statistics, 1988. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1990; 39 (Suppl.):1–47.
6. National Center for Health Statistics. Advance report of final natality statistics, 1989. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1991; 40 (Suppl.):1–55.
7. National Center for Health Statistics. Advance report of final natality statistics, 1990. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1993; 41 (Suppl.):1–52.
8. National Center for Health Statistics. Advance report of final natality statistics, 1991. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1993; 42 (Suppl.):1–48.
9. Ventura SJ, Martin JA, Taffel SM, Mathews TJ, Clarke SC. Advance report of final natality statistics, 1992. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1994;43 (Suppl.):1–88.
10. Ventura SJ, Martin JA, Taffel SM, Mathews TJ, Clarke SC. Advance report of final natality statistics, 1993. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1995;44 (Suppl.):1–88.
11. Ventura S, Martin J, Mathews T, Clarke S. Advance report of final natality statistics, 1994. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1996;44 (Suppl.):1–88.
12. Ventura S, Martin J, Curtin S, Mathews T. Report of final natality statistics, 1995. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1997; 45:1–84.
13. Ventura S, Martin J, Curtin S, Mathews T. Report of final natality statistics, 1996. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1998;46 (Suppl.):1–100.
14. Miller J. Birth intervals and perinatal health: An investigation of three hypotheses. Fam Plann Perspect 1991;23:62–70.
15. Rawlings JS, Rawlings VB, Read JA. Prevalence of low birth weight

000550

Exhibit 129    JA1391    JA-0001683

and preterm delivery in relation to the interval between pregnancies among white and black women. N Engl J Med 1995;332:69–74.

16. Committee to Study the Prevention of Low Birthweight. Preventing low birthweight. Washington, DC: National Academy Press, 1985.

17. Khoshnood B, Lee KS, Wall S, Hsieh HL, Mittendorf R. Short interpregnancy intervals and the risk of adverse birth outcomes among five racial/ethnic groups in the United States. Am J Epidemiol 1998;148:798–805.

18. Lang J, Lieberman E, Ryan K, Monson R. Interpregnancy interval and risk of preterm labor. Am J Epidemiol 1990;132:304–9.

19. Klerman L, Cliver S, Goldenberg R. The impact of short interpregnancy intervals on pregnancy outcomes in a low-income population. Am J Public Health 1998;88:1182–5.

20. Zhu BP, Rolfs R, Nangle B, Horan J. Effect of the interval between pregnancies on perinatal outcomes. N Engl J Med 1999;340:589–94.

21. Fedrick J, Adelstein P. Influence of pregnancy spacing on outcome of pregnancy. BMJ 1973;4:753–6.

22. Brody D, Bracken M. Short interpregnancy interval: A risk factor for low birthweight. Am J Perinatol 1987;4:50–4.

23. Ekwo E, Moawad A. The relationship of interpregnancy interval to the risk of preterm births to black and white women. Int J Epidemiol 1998;27:68–73.

24. Kallan J. Effects of interpregnancy intervals on preterm birth, intrauterine growth retardation, and fetal loss. Soc Biol 1992;39: 231–45.

25. Erickson J, Bjerkedal T. Interpregnancy interval: Association with birth weight, stillbirth, and neonatal death. J Epidemiol Community Health 1978;32:124–30.

26. Klebanoff M. Short interpregnancy interval and the risk of low birthweight. Am J Public Health 1988;78:667–70.

27. Kotelchuck M. An evaluation of the Kessner adequacy of prenatal care index and a proposed adequacy of prenatal care utilization index. Am J Public Health 1994;84:1414–20.

28. Ferraz E, Gray R, Fleming P, Maia T. Interpregnancy interval and low birth weight: Findings from a case-control study. Am J Epidemiol 1988;128:1111–6.

29. Winkvist A, Rasmussen K, Habicht JP. A new definition of maternal depletion syndrome. Am J Public Health 1992;82:691–4.

30. Hebert C, Bouyer J, Collin D, Menger I. Spontaneous abortion and interpregnancy interval. Eur J Obstet Gynecol Reprod Biol 1986; 22:125–32.

31. Farahati M, Bozorgi N, Luke B. Influence of maternal age, birth-to-conception intervals and prior perinatal factors on perinatal outcomes. J Reprod Med 1993;38:751–6.

32. Creasy R, Gummer B, Liggins G. System for predicting spontaneous preterm birth. Obstet Gynecol 1980;55:692–5.

33. Juntunen K, Kirkinen P, Kauppila A. Natural interpregnancy interval of fertile couples: A longitudinal survey of grand grand multiparous women. Fertil Steril 1994;62:722–5.

34. Albrechtsen S, Rasmussen S, Dalaker K, Irgens L. Reproductive career after breech presentation: Subsequent pregnancy rates, interpregnancy interval, and recurrence. Obstet Gynecol 1998;92: 345–50.

35. Zimmer B. Consequences of the number and spacing of pregnancies on outcome, and of pregnancy outcome on spacing. Soc Biol 1979;26:161–78.

Reprints are not available.

Address correspondence to:
Elena Fuentes-Afflick, MD, MPH
Deptartment of Pediatircs, San Francisco General Hospital
University of California, San Francisco
1001 Potrero Avenue, Mail Stop 6E
San Francisco, CA 94110

Received May 20, 1999.
Received in revised form September 8, 1999.
Accepted September 15, 1999.

Copyright © 2000 by The American College of Obstetricians and Gynecologists. Published by Elsevier Science Inc.

000551

Exhibit 129  JA1392  JA-0001684

# The Effects of Unintended Pregnancy on Infant, Child, and Parental Health: A Review of the Literature

Jessica D. Gipson, Michael A. Koenig, and Michelle J. Hindin

*This article provides a critical review of studies assessing the effects of unintended pregnancy on the health of infants, children, and parents in developed and developing countries. A framework for determining and measuring the pathways between unintended pregnancy and future health outcomes is outlined. The review highlights persistent gaps in the literature, indicating a need for more studies in developing countries and for further research to assess the impact of unintended pregnancy on parental health and long-term health outcomes for children and families. The challenges in measuring and assessing these health impacts are also discussed, highlighting avenues in which further research efforts could substantially bolster existing knowledge.* (STUDIES IN FAMILY PLANNING 2008; 39[1]: 18–38)

In the United States, nearly one-half of all pregnancies are unintended; 42 percent of these end in abortion (Finer and Henshaw 2006). Similarly, high levels of unintended pregnancy are found in developing countries. Recent data from the Demographic and Health Surveys (DHS) indicate that 14 to 62 percent of recent births were unintended, the highest levels being found in the Latin American–Caribbean and South–Southeast Asia regions (ORC Macro 2007).

Unintended pregnancy is a concern from both a human rights and a public health perspective. At the 1994 International Conference on Population and Development (ICPD) held in Cairo, the Programme of Action stated that "[a]ll couples and individuals have the basic right to decide freely and responsibly the number and spacing of their children and to have the information, education and means to do so" (ICPD 1994: Principle 8). A similar sentiment emerged from the Committee on Unintended Pregnancy of the Institute of Medicine. In 1995, the Committee concluded that "the consequences of unintended pregnancy are serious, imposing appreciable burdens on children, women, men, and families" (Brown and Eisenberg 1995:1).

In light of the prevalence of unintended pregnancy and its potential impact on the health and well-being of families, this review is intended to provide a comprehensive and critical summary of studies assessing the consequences of unintended pregnancy on infant, child, and parental health. The measurement of and analytical challenges to studying the effects of pregnancy intention on health outcomes are discussed, and a conceptual framework is provided to illustrate the mechanisms through which unintended pregnancy may influence health outcomes. Our framework serves to structure the subsequent review of studies, highlighting the existing knowledge and persistent gaps in the literature. Promising directions for future research are highlighted.

## Methods

This literature review summarizes peer-reviewed publications and published reports that were identified via PubMed and SCOPUS search engines through July 2007. In addition, publication references were cross-checked to ensure that all pertinent literature was identified and included. Searches were conducted using the terms "pregnancy intention," "unintended pregnancy," "unplanned pregnancy," "unintended childbearing," "unintended fertility," "unintended births," and "unwanted pregnan-

*Jessica D. Gipson is Ellertson Postdoctoral Fellow, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family and Reproductive Health, 615 North Wolfe Street Room E4008, Baltimore, MD 21205. E-mail: jgipson@jhsph.edu. Michael A. Koenig is Professor and Michelle J. Hindin is Associate Professor, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family and Reproductive Health.*

001279

Exhibit 130                    JA1393                    JA-0001685

cy." Studies were identified that assessed the relationship between pregnancy intention and health outcomes, focusing specifically on investigations with at least one of the following criteria: (1) data were derived from a population-based sample; (2) the study employed a longitudinal design in which fertility preferences were ascertained prior to the health outcome; or (3) the study investigators employed multivariate analyses to control for potentially confounding variables in their analyses. Although we provide an overview of all of the studies found that met at least one of the criteria, we focus predominantly on studies that were considered to be more rigorous. Appendix Table A1 provides a summary of this subset of studies.

## Measurement and Analytical Concerns

Assessing the relationship between pregnancy intention and its potential health consequences is fraught with a number of measurement and analytical concerns. We highlight some of the key challenges below; further discussion of these issues can be found elsewhere (see, for example, Lloyd and Montgomery 1996; Santelli et al. 2003; and Chalasani et al. 2007).

### Contextual Influences on Unintended Pregnancy

The characterization of a pregnancy as "unintended," as well as a family's (or society's) ability to respond to and to compensate for the potential repercussions of an unintended pregnancy, vary across social and cultural settings. At the societal level, the magnitude of the consequences of unintended childbearing is likely to differ according to the level of economic development, the stage of demographic transition, kinship and family norms, and social expenditure on families and children (Lloyd 1994; Chalasani et al. 2007). Because of this variation, comparing studies from different locations or temporal periods is difficult.

Anthropological ethnographies have contributed to our understanding of the meaning of unintended pregnancy at the family level. These studies provide insight into such issues as why pregnancies are deemed unintended, how unintended pregnancies and the children that result from these pregnancies are viewed and treated by the family and caregivers, and what the physical and mental manifestations of being unintended may be for both the child and the child's family (Levine 1987; Scrimshaw and Scrimshaw 1990; Scheper-Hughes 1992). The greater level of detail provided in anthropological studies is needed in order to understand the role that sociocultural context plays, both in the conceptualization and measurement of unintended pregnancy and in assessing associated health outcomes.

### Definition and Measurement of Unintended Pregnancy

As illustrated in Appendix Table A1, substantial variation exists in the way studies have measured pregnancy intention, in terms of the questions asked and the timing of these questions with respect to the pregnancy. Most surveys ask women to classify their pregnancies according to distinct response categories (wanted, unwanted, or mistimed), despite concerns that intentions may be better captured by a continuum, or range of feelings (Bachrach and Newcomer 1999; Luker 1999).[1] Moreover, the terms used to characterize pregnancy intention vary across settings and by study participants (Fischer et al. 1999; Barrett and Wellings 2002; Kendall et al. 2005).

Although most survey instruments ask women to make the distinction between mistimed pregnancies (wanted later) and unwanted pregnancies (not wanted at all), most studies combine these categories for analysis, usually because of limitations in sample size. The distinctions between and within these two pregnancy-intention classifications can be substantial, however, in terms of women's characteristics, the extent of pregnancy mistiming, and the severity of the effects on children who are considered to be mistimed versus unwanted (Pulley et al. 2002; D'Angelo et al. 2004). The characterization of a pregnancy as mistimed versus unwanted is also likely to vary across study settings and populations. From an analytical perspective, studies that lump these two categories may blur the individual effects of these distinct classifications of pregnancy intention, thereby underestimating the true effect of "unwantedness," and overestimating the effect of being "mistimed."

### Timing of Pregnancy-intention Measurements

Most studies rely on cross-sectional, retrospective reports of pregnancy intention by asking mothers to think back to their feelings at the time of conception or to report on their feelings regarding their most recent live birth. Retrospective reports are problematic, however, because women may rationalize an unwanted pregnancy as a wanted birth (McClelland 1983; Bankole and Westoff 1998; Williams and Abma 2000; Koenig et al. 2006). Evidence from panel studies in Morocco and India found that women were more likely to shift to a more positive response in retrospective reports of pregnancy intention, reclassifying a child from being "unwanted" to "wanted" (Bankole and Westoff 1998; Koenig et al. 2006). Other researchers contend, however, that parents may also shift from a "wanted" pregnancy to an "unwanted" one if the child's

001280

Exhibit 130

attributes differ from those that the parent was expecting (McClelland 1983; Rosenzweig and Wolpin 1993).

Given the inherently dynamic nature of childbearing decisions, prospective measurements also present challenges. Studies conducted in the United States have found that fertility preferences are relatively stable over time (Westoff and Ryder 1977; Schoen 1999); however, some women may experience changes in their personal situations or living conditions that influence fertility intentions (Williams et al. 1999). In developing country settings, particularly those in the midst of a rapid fertility transition, fertility preferences are considered to be less stable and more dependent on external influences such as family-composition preferences, child mortality, and partners' differential motivations for childbearing (Lloyd and Montgomery 1996; Bankole and Singh 1998; Montgomery and Cohen 1998; Gipson and Hindin 2007).

### Participants in Studies of Unintended Pregnancy

More than one-fifth of the known pregnancies that occurred worldwide in 1999 were aborted (AGI 1999). The likelihood that a woman will have an abortion is highly dependent on her acceptance of induced abortion as a means of terminating an unintended pregnancy, the availability of abortion services, and her ability to access these abortion services (AGI 1999). These characteristics vary greatly across countries and even within countries; thus, unwanted pregnancies may be resolved in different ways, depending on the woman's characteristics and the setting. The variation in induced abortion across study settings complicates assessments of the consequences of unintended pregnancy because many of the existing study designs recruit women from antenatal care facilities or ask women to report their pregnancy intentions for recent live births (for example, Demographic and Health Surveys). In both cases, these samples are highly selective, omitting women who do not seek antenatal care and women who terminate their pregnancies.

A second limitation regarding the selection of study participants concerns the use of individuals' versus couples' reports. Historically, surveys have elicited fertility preferences from women because of the primary focus on women within family planning and reproductive health programs. Women have typically been asked to report their own preferences and, in some instances, to report on the perceived preferences of their partner (proxy reports). Despite the acknowledged influence that men have on reproductive decisionmaking (see Ezeh 1993; Lasee and Becker 1997; Bankole and Singh 1998; and Mason and Smith 2000), relatively few studies have collected and incorporated the fertility preferences of both partners.

In the few studies that do collect them, the health consequences associated with unintended pregnancy appear to be more pronounced among children who were considered unwanted by both parents, compared with those whom only one parent reported as unwanted (Frenzen and Hogan 1982; Sangi-Haghpeykar et al. 2005; Shapiro-Mendoza et al. 2005). Another study, however, found no effect on health outcomes when the mothers' proxy reports of fathers' pregnancy intentions were included (Korenman et al. 2002).

### Causal Inferences and Unobserved Heterogeneity Biases

Another issue that plagues this research is the problem of establishing causality between unintended pregnancy and subsequent health outcomes. Although a randomized, controlled trial is often considered the "gold standard" with respect to research designs, pregnancy intentions are not something that can be randomly assigned. Moreover, as noted above, women's and men's intentions are likely to change throughout a pregnancy and may be dependent on the birth outcome. Although longitudinal data may provide some inferences about the observed associations, causality is difficult if not impossible to show (Moffit 2005; Ní Bhrolcháin and Dyson 2007).

An additional concern is that both health outcomes and pregnancy intentions may be jointly determined by a single, often unobserved factor. A variety of study designs have attempted to control for both measured and unmeasured confounders between unintended pregnancy and health outcomes. Some of the earliest studies of this issue were conducted in Europe among women who were denied abortion in Sweden and in the Czech Republic (Forssman and Thuwe 1966; David 2006). In these studies, children who were born to these women (considered to be unintended) were matched with intended children with similar sociodemographic characteristics. Other study designs have used twin babies or compared unintended and intended children who are siblings in an attempt to control for measured and unmeasured family characteristics (Rosenzweig and Wolpin 1980; Joyce et al. 2000b; Chalasani et al. 2007). These approaches, however, generally do not provide an easy solution to sorting out causal associations under normal circumstances. Moreover, they rely on data abstracted from specific populations, or segments of the population, limiting the generalizability of the findings.

An important consideration in the measurement of unintended pregnancy is to determine who is affected when a pregnancy or birth is unintended. The effects of unintended pregnancy may extend beyond the index pregnancy or child to other siblings or to parents. In some

001281

Exhibit 130                                                    JA1395                                                    JA-0001687

contexts, specific children may be considered unwanted according to their sex or birth order (for example, the youngest daughter), and may be particularly likely to suffer neglect or maltreatment (Das Gupta 1987). Although son preference may be the best-documented manifestation of this phenomenon, "differential care can proceed against any less desirable child, as moderated by family circumstances and existing family composition" (Levine 1987:282). In her ethnographic work, Scheper-Hughes (1984:535) describes the conflict that parents and particularly women, as caregivers, face amidst poverty and the increasing pressure of a growing family: essentially, being "cast in the role of family strategists, necessarily allocating scarce resources so that some of their children may be more or less favored for survival."

In impoverished settings, not only the children but also the mother is likely to be malnourished, so that she has less energy to care for the demands of an increasingly large family (Graves 1976; Scrimshaw and Scrimshaw 1990). Other parental situations related to health could be exacerbated by the occurrence of an unintended pregnancy (for example, intimate partner violence), whereas other conditions (for example, anxiety and depression) may arise as a direct consequence of the unintended pregnancy.

An additional concern in the measurement of the consequences of unintended pregnancy is how the impact of being unintended may be influenced by family size. Desai (1995) analyzed DHS data from 1986–90 for 15 countries to assess siblings' impact on younger children's nutritional status (Desai 1995). Findings from this analysis indicated that unintended pregnancy and family size have independent effects on children's health. Desai found a significant effect of family size among all planned and unplanned families; however, "the negative impact of family size was greater among families which had exceeded their desired size than among families that were planned" (page 208). Overall, Desai's and others' findings (for example, those of Lloyd 1994) highlight the importance of considering the potential interaction between family size and pregnancy intention and of accounting for contextual factors, an aspect that has received only limited attention in studies assessing the impact of unintended pregnancy on health outcomes.

## Schematic Framework

Figure 1 illustrates the potential pathways by which pregnancy intention may influence health outcomes. A body of literature from both developed and developing country settings has shown that a variety of individual, family, community, and programmatic factors are associated with the occurrence of an unintended pregnancy (for example, Brown and Eisenberg 1995; Adetunji 1998). Subsequently, an unintended pregnancy may lead to a range of health consequences with respect to maternal behavior during pregnancy, birth outcomes, maternal postpartum behaviors, and infant and child well-being.

As noted in this framework, the impacts of unintended pregnancy may affect health outcomes within one particular time period (for example, the prenatal period). The health impacts of unintended pregnancy may also be persistent and cumulative, extending into childhood.[2] Additionally, the framework includes the potential for deleterious health outcomes of unintended pregnancies for the index children, their siblings, and their parents.

## Consequences of Unintended Pregnancy: A Review of Studies

### Maternal Behavior During Pregnancy

A few developed country studies have found a positive association between unintended pregnancies and maternal risk behaviors, including alcohol and illicit drug use, cigarette smoking, and caffeine intake (Weller et al. 1987; Altfeld et al. 1997; Than et al. 2005). Most studies, however, have found mixed or no effects (McCormick et al. 1987; Marsiglio and Mott 1988; Bitto et al. 1997; Hellerstedt et al. 1998; Kost et al. 1998b; Rubin and East 1999; Joyce et al. 2000a and 2000b; Korenman et al. 2002; Wells et al. 2006). Two population-based studies by Joyce and his colleagues (2000b) and Korenman and his colleagues (2002) analyzed data from the National Longitudinal Survey of Youth (NLSY) (1979–92), finding mixed effects of pregnancy intention on maternal behavior. The Joyce study first employed cross-sectional models to compare unintended with intended pregnancies and fixed-effects models to compare unintended and intended pregnancies from the same family to control for family-background variables that could confound the relationship between pregnancy intention and maternal behavior. Although significant associations were found between unintended (unwanted and mistimed) pregnancies and heavy smoking in the cross-sectional models with exogenous controls, these effects diminished in models that controlled for potentially endogenous variables and in the fixed-effects models.

Korenman and his colleagues (2002) used the same data from the NLSY; however, they incorporated the woman's report of her partner's fertility preference in the analyses. They found no significant effects of having an unintended pregnancy on maternal risk behavior among

001282

Exhibit 130                                JA1396                                JA-0001688

Case 1:25-cv-02540-DLC   Document 54-4   Page: 138   Date Filed: 12/11/2025 296

**Figure 1**   Potential effects of unintended pregnancy on infant, child, and parental health outcomes



unmarried women. Among married women, they found significant effects for smoking during pregnancy when either the woman or her partner reported the pregnancy as unintended, but this relationship disappeared in the fixed-effects model.

Kost and her colleagues (1998b) explored the relationship between maternal risk behaviors and pregnancy intention in the 1988 National Maternal and Infant Health Survey and the 1988 National Survey of Family Growth. After adjusting for pregnancy intention, women's characteristics, and pregnancy experience, they found no significant effects for alcohol or vitamin use or for recommended weight gain. Significant effects of smoking behavior were limited to women reporting mistimed pregnancies; these women were 26 percent less likely to quit smoking during pregnancy, compared with women who had intended pregnancies.

The evidence from three large, rigorous studies conducted in the United States suggests that maternal risk behaviors are not strongly related to pregnancy intention, once family-background variables are controlled. Research from other countries is needed, however, to assess whether the effects of pregnancy intention on maternal risk behaviors vary by context.

*Antenatal and Delivery Care*

Numerous United States and European studies have found a significant positive association between pregnancy intention and delayed initiation of antenatal care and/or decreased number of antenatal care visits (Weller et al.

1987; Marsiglio and Mott 1988; Sable et al. 1990; Bitto et al. 1997; Delgado-Rodriguez et al. 1997; Kost et al. 1998b; Hulsey et al. 2000; Joyce et al. 2000a; Pagnini and Reichman 2000; Korenman et al. 2002; Sangi-Haghpeykar et al. 2005). Inconsistent or no effects were found in a few studies, however (Joyce and Grossman 1990; Altfeld et al. 1997; Joyce et al. 2000b). Comparisons among studies are complicated by the variety of ways in which antenatal care is measured: whether the woman sought any antenatal care, whether she initiated care before the first or second trimester, or whether she obtained a certain number of visits.

The three United States studies reviewed concerning maternal risk behaviors also considered pregnancy intention and antenatal care. Joyce and his colleagues' analysis (2000b) of NLSY data showed significant effects between intentions and antenatal care in cross-sectional models, but these effects diminished once observed family-background variables and fixed-effects models were used. Marginally significant effects were found indicating that women with unwanted pregnancies were more likely to receive later antenatal care (at six months' or longer gestation), compared with women who experienced wanted pregnancies. Korenman and his colleagues (2002) found more persistent effects on antenatal care. Using fixed-effects modeling, they found that unmarried women who had an unintended pregnancy (according to the woman or her partner) were nearly two times more likely than unmarried women with a wanted pregnancy to delay seeking antenatal care until after the first trimester. Among married women, the effects found for delayed ini-

001283

Exhibit 130                                        JA1397                                        JA-0001689

tiation of antenatal care among women with unintended pregnancies diminished in the fixed-effects models, with a marginally significant association between unintended pregnancy and late initiation of antenatal care (after the first trimester).

The study by Kost and her colleagues (1998b) found that women with unintended (mistimed and unwanted) pregnancies were less likely to recognize their pregnancies within the first six weeks, and were significantly less likely than women with wanted pregnancies to obtain an antenatal care visit in the first eight weeks of pregnancy, after controlling for recognition of the pregnancy (odds ratio [OR] = 0.69 for mistimed; OR = 0.67 for unwanted). Despite delays for first antenatal care visits, no significant difference was found in the total number of antenatal care visits that women with unintended pregnancies received, compared with women having intended pregnancies. Kost and her colleagues highlighted the importance of controlling for women's recognition of pregnancy in assessing the impact of pregnancy intention on antenatal care adherence. The inability to distinguish a significant difference in the number of visits after controlling for recognition of the pregnancy suggests that women with unintended pregnancies may not seek antenatal care as early as do women with intended pregnancies, either because of late recognition of the pregnancy or because they delay in deciding whether to terminate the pregnancy. At least within the United States, however, women who continue with their pregnancies appear to be equally compliant in terms of seeking the adequate number of antenatal care visits.

Developing country studies on pregnancy intention and antenatal care have yielded inconsistent results. Some studies have found a positive association between unintended pregnancy and antenatal or delivery care (Eggleston 2000; Magadi et al. 2000), and others have found no association or mixed effects (Ni and Rossignol 1994; Gage 1998; Marston and Cleland 2003). Most of these studies were based on DHS data and, therefore, relied on women's retrospective recall of the timing of their antenatal care visits and on their retrospective assessments of pregnancy intention.

Two studies using DHS data from sub-Saharan Africa explored the relationship between pregnancy intention and initiation of antenatal care and total number of antenatal visits. Data from Kenya showed that women experiencing unwanted or mistimed births had, on average, fewer antenatal care visits and were more likely to delay the timing of the initial visit than women with wanted births (Magadi et al. 2000). In contrast, DHS data on premarital childbearing in Kenya and Namibia found no significant relationship between pregnancy intention

and initiation of antenatal care within the first trimester (Gage 1998).

In a more recent five-country DHS study by Marston and Cleland (2003), the effect of pregnancy intention was assessed for four health outcomes for births occurring three to five years prior to the survey, including receipt of antenatal care before the sixth month of gestation. In Peru and the Philippines, women experiencing unwanted pregnancies were significantly more likely to delay antenatal care (Peru: OR = 1.39; 95 percent confidence interval [CI]: 1.24–1.56; the Philippines: OR = 1.21; 95 percent CI: 1.01–1.46); Egyptian women with unwanted pregnancies were significantly less likely, however, to delay antenatal care (OR = 0.79; 95 percent CI: 0.66–0.95), compared with women with wanted pregnancies. Mistimed births were also associated with a significantly higher risk of late antenatal care in Kenya, Peru, and the Philippines. The authors subsequently compared the regression results from all births and from births of parity three and higher, finding that "birth order [had] a stronger and more pervasive influence than wantedness" (page 91).They argued that to assess adequately the effect of pregnancy intention on health outcomes, the interaction of birth order and family size must be considered.

Eggleston (2000) used retrospective, cross-sectional data from the 1994 Ecuador Demographic and Maternal Child Health Survey (ENDEMAIN) to assess the impact of mistimed and unwanted pregnancy on three measures of antenatal care: any antenatal care, initiation of antenatal care within the first trimester of pregnancy, and receipt of the recommended number of visits (four or more, according to World Health Organization guidelines). After controlling for sociodemographic characteristics, mothers with unwanted pregnancies were significantly less likely to have received antenatal care (OR = 0.68; 95 percent CI: 0.57–0.82), less likely to have initiated antenatal care in the first trimester (OR = 0.75; 95 percent CI: 0.60–0.92), and less likely to have received an adequate number of antenatal care visits, compared with women who reported wanted pregnancies (OR = 0.71; 95 percent CI: 0.57–0.89). No effects were found for mistimed pregnancies, however.

In general, findings from the developing country studies indicate that pregnancy intention affects both the initiation and the frequency of antenatal care visits, but as indicated by the five-country DHS study, the effects are likely to vary according to country context. Lessons learned from the United States studies, including the need to control for pregnancy recognition and to employ more sophisticated modeling, have yet to be widely incorporated. Moreover, most studies continue to rely on retrospective measures of pregnancy intention.

001284

Exhibit 130

### Birth Outcomes

An extensive literature exists on the effect of unintended pregnancy on birth outcomes in developed countries. Although some United States and European studies have found an increased risk of congenital anomalies, spontaneous abortion, premature delivery, and low birth weight among unwanted pregnancies (Blomberg 1980d; Sable et al. 1997; Kost et al. 1998a; Orr et al. 2000; Sable and Wilkinson 2000), other studies have found mixed results (Keeton and Hayward 2007; Mohllajee et al. 2007), or weak or nonsignificant associations (Matějček et al. 1978; Blomberg 1980a and 1980c; Laukaran and van den Berg 1980; Marsiglio and Mott 1988; Bitto et al. 1997; Joyce et al. 2000b; Ahluwalia et al. 2001; Korenman et al. 2002).

In the study by Joyce and his colleagues (2000b), the authors assessed the effect of pregnancy intention on low birth weight, finding only marginally significant effects in cross-sectional models for unwanted births after controlling for exogenous variables (for example, the child's sex and maternal race, education, and residence), and no significant effect in fixed-effects models. In their analysis comparing families with and without unintended births, small but significant effects of pregnancy intention on low birth weight were found for mistimed births. In the study by Korenman and his colleagues (2002), after controlling for covariates including maternal characteristics and birth order, the authors found no effect of pregnancy intention on birth weight. In another study, Kost and her colleagues (1998a) analyzed data from the National Maternal and Infant Health Survey (NMIHS) and the National Survey of Family Growth (NSFG) to assess the effect of pregnancy intention on birth outcomes and infant care. The authors constructed a summary variable of adverse birth outcomes: prematurity, low birth weight, and infant's small size for gestational age. Mothers with unwanted births had higher odds of having one or more adverse birth outcomes, after controlling for physical and socioeconomic characteristics. When the mother's behaviors during pregnancy, such as smoking, alcohol use, and antenatal care, were added to the model, however, the effect of pregnancy intention disappeared, indicating that the relationship between pregnancy intention and health outcomes is mediated by the antenatal maternal behaviors. Overall, these more rigorous United States studies point to weak or no effects of pregnancy intention on birth outcomes.

Findings for birth outcomes were mixed from the matched case-control studies in Europe (Czech Republic, Finland, and Sweden). In the Czech (Matějček et al. 1978; David 2006) and Swedish (Hook 1963; Blomberg 1980a and 1980c) studies, children born to women who applied for and were refused therapeutic abortion were matched with "wanted" children and mothers of similar sociodemographic characteristics. These studies found no effect of being unwanted on birth outcomes. The Finnish study (Myhrman 1988) recruited women who sought antenatal care in two northern provinces and followed the children who resulted from unintended pregnancies (1966–82). Children born to mothers who considered their pregnancies to be unwanted were later matched with children from wanted pregnancies according to sociodemographic characteristics. This study, in contrast to the Czech and Swedish studies, found that children resulting from unwanted pregnancies were more likely to be of low birth weight and to be born prematurely than were children who were wanted.

In the only developing country study, ENDEMAIN data in Ecuador were used to examine the association between unwanted pregnancy and the risk of low birth weight (Eggleston et al. 2001). After controlling for pregnancy and delivery characteristics and sociodemographic characteristics, low birth weight ($\leq 2,500$ grams) was found to be significantly more frequent among births that were considered unwanted (OR = 1.64; 95 percent CI: 1.22–2.20); this association was not found for mistimed births, however. An important caveat to this study is that birth weight was determined by means of the mother's self-report and intentions were measured based on cross-sectional retrospective reports.

### Maternal Postpartum Behavior

#### Breastfeeding

Nearly all United States and European studies assessing the effect of pregnancy intention on breastfeeding have concluded that children who are born from unintended pregnancies are less likely to be breastfed or are more likely to be breastfed for a shorter duration, compared with children whose birth was intended (Matějček et al. 1978; Kost et al. 1998a; Joyce et al. 2000b; Korenman et al. 2002; Taylor and Cabral 2002). Only one exception to this finding was observed, in an analysis of primiparous women aged 19–27 who participated in the 1979 National Longitudinal Survey of Labor Market Experience of Youth (Marsiglio and Mott 1988). Even in studies in which fixed-effects models were employed to compare unwanted with wanted siblings within the same family, unwanted siblings were significantly less likely to be breastfed, after controlling for other sociodemographic characteristics (Joyce et al. 2000b; Korenman et al. 2002). Using couple data concerning pregnancy intention, Korenman and his colleagues found that both married and unmarried wom-

001285

Exhibit 130                    JA1399                    JA-0001691

en with unintended pregnancies were much less likely to breastfeed, compared with women whose pregnancies were intended.

In an analysis of DHS data from 18 countries, Hromi-Fiedler and Pérez-Escamilla (2006) assessed whether women with unintended pregnancies were less likely to engage in prolonged breastfeeding (for 13 to 36 months). In the within-country analyses, they found a negative effect of unintended pregnancy on prolonged breastfeeding in only three of the 18 countries; in the pooled data analysis, however, they found that women with unintended pregnancies were 10 percent less likely to continue breastfeeding beyond the first year of life (OR = 0.90; 95 percent CI: 0.85–0.96). A handful of other developing country studies found that women with unplanned pregnancies were less likely to breastfeed and to continue breastfeeding, compared with women with planned pregnancies (Pérez-Escamilla et al. 1999; Berra et al. 2001; Chinebuah and Pérez-Escamilla 2001). Again, these studies generally rely on cross-sectional data with retrospective self-reports on pregnancy intention and breastfeeding duration. Differences in the classifications of pregnancy-intention groups (for example, "unplanned" versus "unintended") further complicate the comparison of these studies.

### Preventive and Curative Care

No effects were found in the few studies assessing the association between pregnancy intention and well-baby care, child immunization, or curative care in the United States and Europe (Matějček et al. 1978; Marsiglio and Mott 1988; Rosenzweig and Wolpin 1993; Kost et al. 1998a; Hulsey et al. 2000). Marsiglio and Mott (1988) focused on young primiparous women who participated in the NLSY, finding no significant effects of pregnancy intention on breastfeeding or well-baby care in multivariate models. For Kost and her colleagues (1998a), the analysis of the infant care variables revealed that, after controlling for physical and socioeconomic characteristics, birth outcome, and pregnancy behaviors, mothers who considered their pregnancies to be unwanted were no less likely than mothers with wanted pregnancies to seek well-baby care within three months.

Published studies from developing countries in this area are limited. The five-country DHS analysis by Marston and Cleland (2003) found significantly higher risks of incomplete child vaccination by one year of age for mistimed births in Egypt (OR = 1.40; 95 percent CI: 1.08–1.82) and for unwanted births in Kenya (OR = 1.60; 95 percent CI: 1.12–2.28) and Peru (OR = 1.24; 95 percent CI: 1.09–1.41). Similar to their findings on antenatal care, the authors found that higher-order births were more disadvantaged with respect to health outcomes; they found no

difference in outcomes by sex of the child, however. No significant effects were found for the other two countries in the analysis, Bolivia and the Philippines.

Two studies by Jensen and Ahlburg assessed the effect of pregnancy intention on the incidence and treatment of acute respiratory infection and diarrhea. In their study using DHS data from 11 countries and one Indian state, the authors found that unwanted children were more likely than wanted children to become ill; once they were ill, however, unwanted and wanted children were equally likely to be taken for treatment (Jensen and Ahlburg 1999). Their later study, conducted with data from the 1991 Indonesia DHS, found that unwanted children were more likely to become ill and less likely to receive treatment, compared with wanted children (Jensen and Ahlburg 2002).

Overall, studies conducted in the United States indicate no effect of unintended pregnancy on preventive and curative care, whereas findings from developing countries find mixed effects. Children resulting from unintended pregnancies may be disadvantaged with respect to vaccinations, illness, and curative care; these effects seem to be highly context specific, however.

### Infant and Child Health

#### Infant and Child Mortality

Some of the earliest evidence on the effects of pregnancy intention on child mortality—most notably, elevated mortality risk for female offspring—comes from societies characterized by a strong preference for sons. Excess female mortality during early childhood has been reported in a number of South Asian countries in terms of absolute mortality differences (D'Souza and Chen 1980; Dyson and Moore 1983; Koenig and D'Souza 1986) and relative differences, after adjusting for the biological survival advantage of females (Hill 1995). Further support for selective mortality among female offspring comes from a study conducted in the Punjab, India, which found that sex bias in survival was not generalized; rather, it was pronounced only among higher-order female births (Das Gupta 1987). More recent evidence has documented the continued differential treatment of sons and daughters, as well as the increased use of sex-selective abortion in some regions of the world (Arnold et al. 2002; Hesketh and Xing 2006). In a band of countries from East Asia through South Asia to the Middle East and North Africa, discrimination against females—through sex-selective abortion, female infanticide, abandonment of newborn girls, and neglect of daughters through differential allocation of food and care-seeking behavior—has resulted

001286

Exhibit 130                    JA1400                    JA-0001692

in severely imbalanced sex ratios (Li 2004; Yount 2004; Hesketh and Xing 2006).

Evidence of the direct relationship between unintended childbearing and childhood mortality is derived from studies from both the developed and developing world. Two longitudinal studies in the United States (1959–66) followed a cohort of married, pregnant women in San Francisco who were enrolled in a particular health maintenance organization. Although the authors used limited control variables, the results indicated adverse outcomes for births that occurred to women who felt "negative" about their pregnancies, including increased risk of neonatal mortality (Bustan and Coker 1994: RR = 2.4; CI: 1.5–4.0; Laukaran and van den Berg 1980: RR = 1.80 [p = 0.003] and RR = 1.78 [p = 0.002]). The findings from these studies should be interpreted cautiously; the analytical models do not control for the mother's health status, nor is an attempt made in these studies to explain the intervening mechanisms that may have led to higher mortality rates for children from unwanted pregnancies. These findings, particularly among a "low-risk" cohort of women with health insurance who received early prenatal care, warrant further investigation into the potential association between unintended pregnancy and infant death.

Several developing country studies have assessed the direct effects of pregnancy intention on child mortality. Frenzen and Hogan (1982) analyzed data collected through the Northern Thailand Fertility Study in the Chiang Mai and Chiang Rai provinces (1976–77). Ever-married women aged 15–44 (N = 1,921) and husbands (N = 1,615) provided information on pregnancy and contraceptive history and on individual and family-level sociodemographic characteristics. Births reported as wanted by one or neither parent experienced significantly higher risks of infant mortality (OR = 1.15), after controlling for a substantial number of sociodemographic characteristics. As a consequence, however, of the cross-sectional design of this study and the simultaneous ascertainment of both infant death and pregnancy intention, these findings may be affected by recall bias and also should be interpreted cautiously.

Montgomery and his colleagues (1997b) analyzed retrospective DHS data from five developing countries to assess the effects of unintended fertility (births considered to be either unwanted or mistimed at the time of conception) and excess fertility (when a woman's parity at the time of the survey exceeded her reported ideal family size). The multivariate models controlled for children's characteristics, parents' characteristics, and cluster characteristics (for example, access to health-care facilities, size of cluster, and so forth). The authors found

that in three of the countries (Egypt, the Philippines, and Thailand), babies born to women who reported excess fertility at the time of the DHS survey experienced higher neonatal and postneonatal mortality. The retrospective measure of unintended fertility, in contrast, showed weak or inconsistent effects on mortality.

Surveillance data from rural Bangladesh were used to investigate the relationship between pregnancy intention and childhood mortality among a sample of 9,869 births that occurred over the 1982–93 period (Montgomery et al. 1997a). The authors found no significant relationship between pregnancy wantedness and childhood mortality. The authors noted, however, that focusing on an intermediate outcome of child mortality (that is, postneonatal mortality) might have affected the results by separating the effect of birth interval from the effect of pregnancy wantedness on mortality.

Chalasani and colleagues (2007) address this concern by assessing the impact of child wantedness on neonatal, postneonatal, and early childhood death in their analysis of longitudinal surveillance data from the Maternal-Child Health Extension Project (1982–2002) in rural Bangladesh. Fixed-effects models were used to compare unwanted and wanted siblings within families. The authors assessed the effects of (1) sex-specific unwantedness, based on mother's prospective reports of a specific preference for a male or female child, and (2) general unwantedness, based on whether the woman wanted another child at all. They find higher odds of neonatal (OR = 1.30) and postneonatal (OR = 2.08) mortality among children who were unwanted because they were the "wrong" sex. The additional negative effect of being "excess quantity" was apparent in the neonatal case (OR = 1.72). Lastly, the authors conducted a natural experiment analysis on a subset of women who indicated a desire for additional children of one sex but not the other, assuming that desire for a child of a specific sex was not conditional on the number or sex composition of existing children. The natural experiment analysis, however, found no significant effect on any of the mortality outcomes.

Overall, the existing evidence for child mortality suggests a disadvantage for unintended children. The study by Chalasani and colleagues, indicating that unwanted infants may be significantly more likely to die in the neonatal or postneonatal periods than wanted infants, is remarkable in light of its rigor in incorporating prospective measures of pregnancy intention, employing longitudinal data, and using fixed-effects analyses of siblings' outcomes. Future studies are needed, however, to assess this relationship in other settings and to explore further the mechanisms through which unintended pregnancy may result in the increased risk of infant mortality.

001287

Exhibit 130                    JA1401                    JA-0001693

## Nutritional Status

Studies focusing on nutritional status are generally conducted in developing countries, where malnutrition remains a major problem. Stunting can be caused by chronic malnutrition or repeated illness, or both, and is typically measured by comparing the child's height-for-age to international standards. Marston and Cleland (2003) found that stunting was 15 percent more likely for children born as a result of unwanted pregnancies in Peru (OR = 1.15; 95 percent CI: 1.02–1.29) but significantly less likely for children born as a result of both mistimed and unwanted births in Egypt (mistimed OR = 0.81; 95 percent CI: 0.68–0.96; unwanted OR = 0.84; 95 percent CI: 0.71–0.99). In the DHS analysis by Montgomery and his colleagues (1997a), excess and unwanted fertility were found to be associated with significantly lower height-for-age in only one of the five countries studied, the Dominican Republic. A recent study using data from the 1998 Bolivia DHS also found that children aged 12–35 months who were considered to be either mistimed or unwanted were approximately 30 percent more likely to be stunted, compared with wanted children (Shapiro-Mendoza et al. 2005).

## Child Development

All of the identified studies assessing the impact of pregnancy intention on child development before the age of five have been conducted in the United States. An additional set of studies have looked at long-term effects of pregnancy intention on development in later childhood, adolescence, and early adulthood; these studies are not reviewed here (Forssman and Thuwe 1966 and 1981; Myhrman 1988; Axinn et al. 1998; Barber et al. 1999; Joyce et al. 2000b; David 2006).

Baydar (1995) analyzed data from a sample of 1,327 mothers and their children (younger than two) who participated in the National Longitudinal Survey of Youth. Children's resources and developmental outcomes (for example, motor and social development, vocabulary, attachment) were assessed at two time points (1986 and 1988) according to their wantedness status. Although the bivariate results indicated disadvantages for unwanted and mistimed children, these effects mostly diminished once family-environment characteristics were included in the model. The only significant finding from the multivariate models was that children resulting from mistimed pregnancies experienced less favorable (that is, nonauthoritarian) parenting styles, compared with those resulting from wanted pregnancies.

Hummer and his colleagues (2004) and Crissey (2005), using nationally representative data from the 1988 National Maternal and Infant Health Survey and the 1991 Longitudinal Follow-Up, found mixed effects of pregnancy intention on maternal reports of child health, activity level, and overall development. Because of the scarcity of studies that have assessed child development as associated with pregnancy intention, further research in this area is warranted and would benefit from the inclusion of objective measures of child development and sufficient control of potentially confounding variables in the causal pathway.

## Child Abuse and Violence

Assessments of the impact of pregnancy intention on subsequent child abuse and violence are limited; only a handful of studies have been conducted in the United States, Europe, and Japan, and no studies identified from developing country settings have examined this relationship. The developed country studies suggest a positive association between unintended pregnancy and child abuse (Hunter et al. 1978; Zuravin 1987 and 1991; Sidebotham et al. 2003; Goto et al. 2005 and 2006), with one exception (Zuravin 1988).

The only population-based study, conducted by Sidebotham and his colleagues (2003), analyzed data from the Avon Longitudinal Study of Parents and Children in the United Kingdom for 14,256 children. In addition to information on hospital admission, infant health and development, and child characteristics, the pregnancy intention of the mother was ascertained at 12 weeks' gestation. Children from the cohort who were registered with the child protection agency by the age of six (n = 115) were nearly three times more likely than others to have resulted from a pregnancy that the mother considered to be unintended (OR = 2.92; 95 percent CI: 1.83–4.64), after controlling for birth weight, child health, developmental problems, and reported positive attributes of the child.

Because the existing studies on the relationship between pregnancy intention and subsequent child abuse are extremely limited in number and geographic focus, additional population-based, longitudinal studies from other countries are needed to foster a better understanding of this association.

## Parental Health and Well-being

### Maternal Mortality

Each year an estimated 529,000 maternal deaths occur throughout the world (Ronsmans and Graham 2006). Many factors contribute to maternal mortality, including poor maternal nutrition, deficient health systems, and a lack of skilled providers. The highest risk of death is with-

001288

Exhibit 130

JA-0001694

in impoverished developing country settings, where one in six women will die as a result of pregnancy or childbirth (Ronsmans and Graham 2006). Although very few studies (for example, Ni and Rossignol 1994 and Czeizel et al. 1999) have directly investigated whether unintended pregnancies increase the risk of maternal mortality, an association is suggested by the following observations. First, every pregnancy brings increased exposure to the risk of maternal death; thus, every unintended pregnancy, but particularly those in high-maternal-mortality settings, subjects the woman to a life-threatening event not of her choosing. Second, unintended pregnancies are more likely to be of higher parity and/or to be experienced by very young or older women, for whom the risks of maternal death are inherently greater (Campbell and Graham 2006). A recent analysis by the Guttmacher Institute and UNFPA found that by averting the 52 million unintended pregnancies that occur worldwide each year, 22 million induced abortions, 1.4 million infant deaths, and 142,000 maternal deaths could also be prevented (Singh et al. 2003).

## Unsafe Abortion

According to estimates from the Guttmacher Institute, 210 million pregnancies occurred worldwide in 1999, of which 22 percent were terminated by means of induced abortion (AGI 1999). Although induced abortion is a relatively common means of terminating an unintended pregnancy, one in four of the world's women live in countries that ban the procedure or permit it only to save the woman's life.

Differences in legal status, accessibility, and provision of abortion and postabortion services result in substantial variation in the risks of abortion to maternal health in different settings. In the United States, induced abortion results in an estimated 50 deaths per 100,000 procedures, compared with 100–1,000 deaths per 100,000 procedures in developing countries (the number varies depending on the safety of procedure used, the severity of complications, and the woman's access to postabortion care) (Ahman and Shah 2004). According to estimates from 1995, 26 million legal and 20 million illegal abortions were performed worldwide; nearly all unsafe abortions occurred in developing countries (Henshaw et al. 1999; Ahman and Shah 2004).

An estimated 74,000 women die every year from unsafe abortion (UNFPA 2007); these procedures account for 13 percent of all maternal deaths worldwide and are responsible for an estimated five million person-years of productive life lost due to death and illness (Singh et al. 2003; Ahman and Shah 2004; Grimes et al. 2006).

Morbidity is a far more common consequence of unsafe abortion, manifested both in short-term and potentially long-term complications. An estimated 20–30 percent of unsafe abortions result in reproductive tract infections, of which 20–40 percent result in infection of the upper reproductive tract and infertility (Ahman and Shah 2004). Long-term complications include infertility, chronic infections, and risks to subsequent pregnancies. An estimated 2 percent of women of reproductive age become infertile as a result of unsafe abortion, and 5 percent suffer from chronic infections (Ahman and Shah 2004).

## Maternal Mental Health

Evidence suggests a link between unintended childbearing and a significantly increased risk of maternal depression (Najman et al. 1991; Barber et al. 1999; Lara et al. 2006; Nakku et al. 2006; Lau and Keung 2007), of anxiety (Najman et al. 1991), and of a decline in psychological well-being or psychosocial conditions (Laukaran and van den Berg 1980; Hardee et al. 2004). The evidence, however, especially from developing countries, is limited.

Barber and her colleagues (1999) used longitudinal data from the National Survey of Families and Households to examine maternal depression, happiness, and overall perception of health. After controlling for maternal characteristics, total number of children in the family, and presence in the household of a child aged 5–18, mothers who had experienced any unwanted births reported higher levels of depression and lower levels of happiness; no effects on physical health were found, however. The authors also found that mothers who had experienced unwanted births were more likely to spank or slap their children and to have spent less leisure time with them, compared with other mothers. These negative outcomes were significantly exacerbated by the mother's mental health status: mothers with unwanted births who were also depressed were even more likely to have negative outcomes.

Najman and colleagues (1991) found significantly higher rates of anxiety and depression among a sample of Australian mothers when measured at three timepoints—before, shortly after, and six months after the birth of a child from an unwanted pregnancy—after controlling for mother's age, income, marital status, and parity. No measure was available for the mental health status of mothers prior to the pregnancy, however, indicating that these conditions may have preceded the unwanted pregnancy.

In the only developing country study identified, Hardee and her colleagues (2004) assessed psychosocial well-being in Indonesia among women with and without unintended pregnancies. Women were grouped into three clusters, according to their scores on five scales of

001289

Exhibit 130   JA1403   JA-0001695

psychosocial well-being. After controlling for sociodemographic variables, the authors found that women who had reported ever experiencing an unintended pregnancy were nearly three times more likely to be in the low well-being than in the high well-being cluster (OR = 2.8; 95 percent CI: 1.5–5.1)

In light of the paucity of studies investigating the impact of unintended pregnancy on psychosocial health and well-being, and their limitations in terms of establishing causality, the existing research should only be considered to be suggestive of such an impact.

*Childrearing and Domestic Violence*

Some studies have found unwanted pregnancy to be associated with increased risks of negative childrearing outcomes and parenting difficulty (Goto et al. 2005 and 2006), and physical abuse and violence (Gazmararian et al. 1995; Goodwin et al. 2000; Lau 2005), although the studies are few and are unable to determine causality as a result of their design or the inclusion of limited control variables. Goto et al. (2006) surveyed women in Japan during their pregnancies and at six weeks postpartum to determine whether unintended pregnancy was associated with childrearing outcomes. Although their multivariate analyses indicated that mothers of unintended children were more likely to report lower mother-to-child attachment, increased negative feelings of mothers, and a lower level of participation by fathers in childrearing, their sample size was relatively small, especially for the follow-up (N = 140), and likely to be highly select.

The relationship between pregnancy intention and physical violence was assessed in two studies using US data from the Pregnancy Risk Assessment Monitoring System (PRAMS). In the Gazmararian et al. (1995) and Goodwin et al. (2000) studies, the authors found higher odds of physical abuse among women who reported retrospectively that their most recent pregnancy was unintended. Several limitations of both studies are noted by the authors, however, including their inability to establish the direction of causality between pregnancy intention and physical abuse, as well as the exclusion of women with non-live birth outcomes.

In a study of Chinese women in Hong Kong, Lau (2005) found that women with unplanned pregnancies experienced higher risks of physical and sexual abuse than those having planned pregnancies. Women with unplanned pregnancies were more than two times more likely than those whose pregnancies were planned to experience sexual coercion, after controlling for socioeconomic, demographic, and cultural variables (OR: 2.13; 95 percent CI: 1.18–3.84). Like the studies of maternal mental health, this study does not control for any history of domestic violence that may have preceded the pregnancy. Moreover, because of the study's cross-sectional design, determining the causal pathway between violence and unintended pregnancy is not possible; domestic violence may have precipitated an unintended pregnancy or may have resulted from an unintended pregnancy.

## Conclusions

The existing evidence on the impact of unintended pregnancy on child and parental health outcomes is mixed and is limited by an insufficient number of studies for some outcomes and by the aforementioned measurement and analytical concerns. Differences in the measurement and classification of pregnancy intention further complicate the comparison of studies. Among the studies that incorporated both mistimed and unwanted pregnancies/births, the impact of pregnancy intention on health consequences was inconsistent, with some studies finding unwanted pregnancies particularly disadvantaged (for example, Eggleston 2000) and others finding significant negative effects only for mistimed pregnancies (for example, Gage 1998 and Kost et al. 1998b). These inconsistencies point to the need for improved understanding and measurement of pregnancy intention across study settings. In addition, the broader acknowledgment and incorporation of the degrees of "unintendedness" into analytic models would better represent the heterogeneity of this concept and the severity of associated health outcomes.

Despite a considerable number of studies (often conducted in the United States) on some outcomes, evidence for other outcomes is limited or nonexistent. That so few studies are available from developing country settings is particularly striking, considering that the financial, social, and physical costs of unintended pregnancy are likely to be greater in resource-poor settings. The scarcity of studies on this topic is surprising, given that the prevention of unintended pregnancy has been a major rationale for the funding and provision of family planning, both in the United States and internationally.

The evidence of the impact of unintended pregnancy on abortion-related morbidity and mortality points to the need for primary and secondary prevention efforts. Primary prevention, through the increased provision and use of effective contraceptive methods, can reduce levels of unintended pregnancy. In the event of an unintended pregnancy, secondary prevention efforts can help to ensure safe abortion and postabortion services to prevent

001290

Exhibit 130                               JA1404                               JA-0001696

ongoing illness and death for the estimated 46 million women around the world who have abortions each year (AGI 1999).

Among studies that have assessed antenatal care, breastfeeding behavior, and child nutrition, the evidence is relatively consistent, showing a negative effect of unintended pregnancy. The developed country studies found more pronounced effects on the timing, rather than the frequency, of antenatal care and found persistent negative effects on the breastfeeding of children who resulted from unintended pregnancies. For developing countries, the evidence of these outcomes is more limited, yet what evidence there is suggests that the effects of pregnancy intention on antenatal care may be even more severe than it is in developed countries, and that unintended pregnancy also may affect negatively the breastfeeding and nutritional status of children who resulted from unwanted pregnancies.

For other outcomes, such as maternal risk behaviors, pregnancy outcomes, and curative care, developed country studies failed to find a significant association with pregnancy intention; the paucity of studies from developing countries precludes an overall assessment of such an impact. The few existing studies suggest that the children who result from unintended pregnancies may, in fact, be disadvantaged with respect to low birth weight and incomplete vaccinations; additional investigation is needed to substantiate or contradict these findings.

Although studies conducted in developed countries are limited, findings from rigorous developing country studies suggest that children who are the result of unintended pregnancies are at an increased risk of infant mortality, compared with children resulting from intended pregnancies. Consistent evidence shows higher levels of mortality and malnutrition for female children as a result of son preference. Differentiation of the effects of being unintended versus the effect of the child's sex could help to broaden the understanding of differential treatment and underinvestment in children, particularly within developing country settings.

The scarcity of studies on the effects of unintended pregnancy on the physical and mental health of men and women also must be noted. Beyond maternal and abortion-related mortality, relatively few studies have assessed the effects of unintended pregnancy on women's health and well-being. The studies that have been conducted indicate a positive association between unintended pregnancy and depression, anxiety, and abuse. Several of these studies are cross-sectional, however, and do not include baseline measures of psychosocial well-being. An additional concern is the absence of studies designed to assess the potential consequences to fathers of unintended pregnancies. Because the role of fathers is that of principal or sole wage earner in many contexts throughout the world, the pressure to provide adequately for a family increases with the number of children in the household. Research is needed to assess whether unintended pregnancy results in adverse physical and mental health outcomes for both men and women.

Although they are not reviewed here, a few studies have attempted to measure the long-term social and health impacts on older children, adolescents, and adults that result from unintended pregnancies. As Lloyd and Montgomery (1996) point out in their discussion of the methodological limitations of research on unintended childbearing, the potential long-term and cumulative consequences of unwantedness necessitate longitudinal study designs and a focus on health outcomes beyond the early childhood years. Efforts by Axinn and his colleagues (1998) and Barber and her colleagues (1999) corroborate this argument; their findings of the impact of pregnancy intention into late adolescence and early adulthood suggest that future work in this area is warranted.

In their design and analysis, future studies should incorporate strategies to isolate and to estimate accurately the independent effects of being "unintended" on children's health outcomes. Longitudinal cohort studies provide an opportunity to assess such temporal associations and could provide a means of assessing the cumulative effects of unintended pregnancy. The use of hierarchical models or matched sibling analyses could allow for the comparison of both wanted and unwanted siblings, thereby controlling for both observable and unobservable family-level characteristics.

Although this literature review identifies specific gaps in existing knowledge of the effects of unintended pregnancy, the most recent studies also indicate a shift toward more rigorous methodologies and research designs. Future research in this area must continue to evolve by overcoming methodological limitations and by embracing a broader view of the potential impacts of unintended pregnancy for children and their families.

001291

Exhibit 130                    JA1405                    JA-0001697

# Appendix

**Table A1** Measures of pregnancy intention employed in selected studies

| Study | Measure of pregnancy intention |
|---|---|
| Barber et al (1999) | "Thinking back to shortly before your recent pregnancy began, did you really want to have a(nother) child sometime, or would you rather not have had any(more)?" Unwanted birth: Mother reported they did not want any additional children. Wanted birth: Mother reported that they wanted at least one (more) child. Any unwanted births: Assessed across study waves if mother had any unwanted births. Mother had more children than she wanted: Compared actual with preferred childbearing, "If you could start life over again, knowing that things would turn out just about the way they have for you and your husband, what number of children would you want to have when your family is complete?" |
| Baydar (1995) | Wanted pregnancy: One for which the mother had planned or one that she had not planned, but nevertheless had wanted. Mistimed pregnancy: One that occurred at a time the woman would rather have postponed childbearing, whether or not she was practicing contraception. Unwanted pregnancy: One that a woman would have preferred not to have had at any time. (Measured before birth and within 90 days postpartum.) |
| Bustan and Coker (1994) | "How do you feel about having a baby now?" (asked during first trimester). Unwanted pregnancy: If the woman indicated that she or her husband was unhappy, resentful, or upset about the pregnancy or did not want the pregnancy, or that the pregnancy was mistimed. Accepted pregnancy: If the woman indicated that she and her husband were happy about the pregnancy or stated that they had wanted, accepted, or planned the pregnancy. |
| Chalasani et al (2007) | "Do you want any more children?" (overall wantedness). "How many children (of each sex) do you want?" (sex-specific wantedness), asked via periodic surveys before birth of the child. |
| Eggleston (2000) | "At the time you became pregnant, did you want to become pregnant, did you want to wait until later, or did you not want this pregnancy?" |
| Frenzen and Hogan (1982) | Was birth wanted by both parents, by only one parent, or by neither parent? (Question not specified). |
| Gage (1998) | DHS question: "At the time you became pregnant, did you want to become pregnant then, did you want to wait until later, or did you want no (more) children at all?" (Asked of all women who had had a live birth in the preceding five years.) |
| Hrom-Fiedler and Pérez-Escamilla (2006) | DHS question: Combined mistimed and unwanted into "unintended." |
| Jensen and Ahlburg (1999) | DHS question: Compared unwanted with wanted/mistimed. |
| Jensen and Ahlburg (2002) | DHS question: Compared unwanted with wanted/mistimed. |
| Joyce et al (2000b) | Same as Baydar (1995). (Women were asked a series of four questions before the birth [29 percent], or within one year of child's birth.) (For approximately 11 percent of the children in the sample, child outcomes were not linked to pregnancy intention questions and were classified as "not determined.") |
| Korenman et al (2002) | Same as Baydar (1995). (Mistimed and unwanted pregnancies were combined into one category [unintended] for multivariate analyses.) |
| Kost et al (1998a) and (1998b) | Intended births: Births occurring to women who had wanted to become pregnant when they did. Mistimed births: Births occurring to women who had not wanted to conceive at that time but who had wanted to have a child in the future. Unwanted births: Births occurring to women who had not wanted to have any, or any more, children. National Survey of Family Growth measure asks whether, just before the woman became pregnant, she had wanted to become pregnant, would have preferred the pregnancy to occur earlier or later, or had not wanted to be pregnant at all. National Maternal and Infant Health Survey measure asks whether the woman had wanted to become pregnant at the time she conceived, would have preferred it to happen later, or had not wanted to become pregnant ever again. |
| Laukaran and van den Berg (1980) | "How do you feel about having a baby now?" (asked during first trimester). Wanted pregnancy: Woman gave strong favorable response (delighted, pleased, excited, wanted it, very happy, glad). Unwanted pregnancy: Woman gave strong negative response (unhappy, resentful, upset, did not want). |
| Magadi et al (2000) | DHS question |
| Marsiglio and Mott (1988) | "Was the reason you were not/stopped using any contraceptive methods because you yourself wanted to become pregnant?" If no, "Just before you became pregnant, did you want to become pregnant when you did?" If no, "Did you want a baby, but not at that time, or did you want none at all?" Wanted pregnancy: "Yes" to initial question, or "yes/didn't matter" to second item. |
| Marston and Cleland (2003) | DHS question |
| Montgomery et al (1997a) | DHS question |
| Montgomery et al (1997b) | "Do you want any more children?" (overall wantedness). "How many children (of each sex) do you want?" (sex-specific wantedness, asked via periodic surveys before birth of child). |
| Najman et al (1991) | Unwanted pregnancy: Women reported negatively to following two items: "How well do the following statements describe how you felt when you found out you were pregnant?" (Likert-scale range: 1–5 for four possible responses: I felt overjoyed, I would have preferred not to become pregnant, I felt unhappy, I felt it was the worst thing that could have happened to me.) "Choose one of the following: I planned to get pregnant at this time. I meant to avoid pregnancy at this time. I wanted to get pregnant at this time. My method of family planning failed." |

001292

Exhibit 130    JA1406    JA-0001698

Exhibit 130

32    Studies in Family Planning

**Table A2    Summary of studies on the health effects of unintended pregnancy**

| Study | Sample | Outcomes | Significant findings | Comments |
|---|---|---|---|---|
| Barber et al. (1999) | 882 white, married mothers and their children from 1961 Detroit birth records, Intergenerational Panel Study of Mothers and Children (IPSMC); 2,162 white women aged 19+ with at least one child younger than 18 who participated in National Survey of Families and Households (NSFH) (Wave 1) in 1987–88 | IPSMC: Parent–child relationships (affection, social support, financial support) NSFH: Mother's health (depression, happiness, overall health), mother–child interaction (leisure time spent with children, frequency of spanking children) | IPSMC: Family-level unwanted childbearing negatively related to mother–child affection in early adulthood. Women with excess childbearing had significant declines in relationships and gave less social support to adult children. No effect on financial support. NSFH: Mothers with unwanted births had higher levels of depression, lower levels of happiness, less involvement in children's leisure, and were more likely to use physical punishment than other mothers. No effect on physical health. | IPSMC controls: sex of child, mother's age, birth order, total number of children in the family in 1977, parental education, family income, and mother's participation in the labor force NSFH controls: total number of children in the family, mother's age, mother's education, parental income, whether mother was working outside the home, and whether household included a child aged 5–18 |
| Baydar (1995) | 1,327 mothers with children younger than two in 1986 who participated in the National Longitudinal Survey of Youth (NLSY) | Developmental resources, child developmental outcomes | Mistimed children were more likely to experience authoritarian parenting. No other effects found. | Controls: maternal sociodemographic characteristics, maternal self-esteem, and child's characteristics (sex, age, birth order, low-birth-weight status, at risk of having birth defects) |
| Bustan and Coker (1994) | 8,823 married HMO patients enrolled (1959–66), San Francisco | Fetal, neonatal, and postneonatal death | Unwanted pregnancies had higher neonatal death rate. No effects for fetal or postneonatal death. | Limited controls: mother's age, race, parity, and husband's education only. Excluded couples who had contradictory feelings about the pregnancy |
| Chalasani et al (2007) | 21,920 children (n = 3,283 for fixed-effects models; 1,008 sets of siblings) from Maternal-Child Health Extension Project Bangladesh (1982–2002) | Neonatal, postneonatal, and early childhood mortality | Higher odds of neonatal and postneonatal mortality among children born to mothers who wanted a child of the opposite sex. Higher odds of neonatal and postneonatal mortality among children born to mothers who did not want a child. Children who were "up to God" or not wanted attained less schooling than wanted children. | Controls: sex and birth year of child, birth order, maternal age, parental education, religion, and thana (county). Prospective measurement of overall and sex-specific wantedness. Pregnancy intentions: wanted, "up to God," and unwanted. Used fixed-effects models of sets of siblings. |
| Eggleston (2000) | 3,988 women aged 15–49, 1994 Ecuador Demographic and Maternal-Child Health Survey | More than 1 antenatal care visit, initiate care in first trimester, 4+ antenatal care visits | Women with unwanted pregnancies were less likely to: obtain antenatal care, initiate care in first trimester, receive 4+ visits. No effect for mistimed pregnancies. | Controls: maternal age, parity, education, socioeconomic status, geographic region, marital status, and previous use of family planning methods |
| Frenzen and Hogan (1982) | 1,921 ever-married women (aged 15–44) and 1,615 husbands; Northern Thailand Fertility Study (1976–77) | Infant mortality | Higher odds of infant mortality among births wanted by only one or neither parent | Controls: social class, maternal education, district development, parents' feelings toward wealth transfer in family, health information, maternal age, parity, birth interval, and year of birth |
| Gage (1998) | Women aged 15–49 who participated in 1993 Kenya DHS (n = 3,700) or 1992 Namibia DHS (n = 2,294) and who had a live birth within the past five years | First antenatal care visit at less than three months' gestation, institutional delivery | No effects on initiation of antenatal care. Mistimed births in Kenya were less likely to have institutional delivery | Controls: education, urban residence, presence of child younger than three, distance to nearest health facility, ethnic group, premarital status, and maternal age |
| Hromi-Fiedler and Perez-Escamilla (2006) | 41,353 women who had a live child aged 13–36 months; 18 DHS Surveys (1995–2000) | Mother reported breastfeeding child aged between 13 and 36 months | Women with unintended pregnancies in three countries were less likely to breastfeed for more than 12 months. In pooled analysis, women with unintended pregnancies were less likely to breastfeed for more than 12 months | Controls: child's age (months), sex, place of residence, maternal employment, parity, maternal age, pregnancy status of the respondent at time of interview, maternal education, and marital status |
| Jensen and Ahlburg (1999) | DHS data from 11 countries and one Indian state | Child ill with fever or diarrhea at less than 2 weeks, modern treatment for fever or diarrhea, number of vaccinations received | Wanted children had lower incidence of acute respiratory infection (all countries) and lower incidence of diarrhea (seven countries). No consistent effects on treatment. Wanted children had higher levels of vaccination in countries where vaccination levels are low | Controls: child's sex and age, maternal education and age, father's education, assets, household facilities, and areal prevalence of disease at cluster level. Assessed children born in the survey window who have at least one surviving sibling. Estimated effects on children and family. |
| Jensen and Ahlburg (2002) | 14,393 children born to women who participated in 1991 Indonesian DHS | Child ill with fever/cough or diarrhea, use of curative care | Unwanted children had higher incidence of illness and lower levels of curative care. | Controls: sex and age of child, number of siblings, maternal age, education of mother and father, household assets and condition, residence, and province mean. |

(continued)

Exhibit 130

**Table A2**   (continued)

| Study | Sample | Outcomes | Significant findings | Comments |
|---|---|---|---|---|
| Joyce et al. (2000b) | Children born to 3,038 women who had had at least two births and who participated in the NLSY (1979–92) | Initiated antenatal care at more than six months, smoked more than a pack a day, low birth weight, ever breastfed, cognitive development, social development | Cross-sectional models (model A). Unwanted and mistimed pregnancies associated with late antenatal care, heavy smoking, lower likelihood of breastfeeding, and negative effects on child development. Fixed-effect, within-mother models (models A and B). Unwanted children less likely to be breastfed, marginal effects on late antenatal care, no effects on child development. Between-family models (model A). Families with unwanted or mistimed pregnancies associated with heavy smoking, lower likelihood of breastfeeding, negative effects on child development (model B). Mistimed pregnancies less likely to result in low-birth-weight child; marginally less likely to be breastfed; negative effects on child development | Model A (exogenous) controls child's sex, region, urban residence, mother's race/ethnicity, and characteristics of mother's household when she was 14 years old. Model B (exogenous and potentially endogenous controls): Model A + child's birth order, number of siblings at time of birth, mother's religious attendance, year of child's birth, mother's marital status. Aid to Families with Dependent Children participation in year following the birth, mother's education, age at birth, family income in year following birth, mother's 1980 Armed Forces Qualifications Test (AFQT) score, 1979 self-efficacy (Rotter) score, and 1980 self-esteem score. |
| Korenman et al. (2002) | Children born to 5,514 married and 2,614 unmarried women who participated in the NLSY (1979–92) | Initiation of antenatal care after first trimester and after second trimester, smoked at all or more than one pack a day during pregnancy, ever breastfed, low birth weight | Cross-sectional models: Unmarried women more likely to initiate antenatal care after first trimester. Married women with unintended pregnancy more likely to initiate antenatal care after first trimester, more likely to smoke, and less likely to breastfeed. Fixed-effects, within-mother models: Unmarried women more likely to initiate antenatal care after first trimester and less likely to breastfeed, marginal effects on antenatal care and breastfeeding for married women | Controls: undetermined pregnancy intention, region and urban residence, mother's race and ethnicity, child's sex, birth order, year of birth, characteristics of mother's household at age 14, mother's score on the AFQT (1980), and timing of pregnancy-intention report. Mother proxy-reported the father's intention. |
| Kost et al. (1998a) | 9,122 births reported in the 1988 National Maternal and Infant Health Survey and 2,548 births reported in the 1988 National Survey of Family Growth | Any of following: birth < 37 weeks, birth weight < 2,500 grams, > 42 weeks' gestational age weighing < 2,500 grams, well-baby care in first three months, first six months, ever breastfed | No effects on birth outcome when adjusted for pregnancy behaviors. No effect found on well-baby care. Children from unwanted pregnancies less likely to be breastfed (NMIHS). No effect found for NSFG | Controls: mother's health and sociodemographic characteristics, socioeconomic characteristics, and pregnancy behaviors. Births occurring before 25 weeks' gestation were omitted from small-for-gestational-age analyses. NSFG: self-reported behaviors. NMIHS: self-reported behaviors and infant's birth certificate. Excluded multiple live births. |
| Kost et al. (1998b) | 9,122 births reported in the 1988 National Maternal and Infant Health Survey and 2,586 births reported in the 1988 National Survey of Family Growth | Recognized pregnancy in six weeks, received antenatal care in eight weeks, made recommended number of visits, quit smoking, stopped or reduced use of alcohol, took vitamins, gained weight within five pounds of advice | Mistimed and unwanted pregnancies less likely to receive antenatal care in first eight weeks (NMIHS). No effect on number of antenatal care visits. Women with mistimed pregnancies less likely to quit smoking (NMIHS). No effect for alcohol use, vitamin use, or adequate weight gain | Controls: maternal age and race/ethnicity, marital status, mother's education, poverty status, received public assistance, worked during pregnancy, number of previous live births, prior negative pregnancy experience, and recognized pregnancy in first six weeks. NMIHS: self-reported behaviors and infant's birth certificate. Excluded multiple live births. |
| Laukaran and van den Berg (1980) | 7,901 live births to married, pregnant Caucasian patients enrolled from 1959 to 1966 in Child Health and Development Study through Kaiser HMO, San Francisco | Perinatal death, congenital anomalies, postpartum hemorrhage or infection, antenatal visit for accidental injury, three or more doses of analgesics, psychosocial conditions, birth outcomes and obstetric complications | Unwanted status associated with increased risk of perinatal death, congenital anomalies, postpartum hemorrhage or infection, antenatal visit for accidental injury, three or more doses of analgesics, and psychosocial conditions. No significant differences in birth weight, duration of gestation, length of labor, or antenatal and intrapartum obstetric complications | Controls were employed using two models: husband's occupation and parity, and mother's age and parity. Included random-effects models to control for woman-level and community variance. |
| Magadi et al. (2000) | 5,104 births occurring within previous five years to women aged 15–49 who participated in the 1993 Kenya DHS and who received antenatal care | Frequency and timing of antenatal care visits | Women with unwanted or mistimed pregnancies had fewer antenatal visits and delayed first visit | Controls: maternal sociodemographic variables, preceding birth interval, age at first birth, ideal number of children, use of family planning methods, distance and time to nearest health facility, and birth order. |

(continued)

001294
JA-0001700

Exhibit 130

34   Studies in Family Planning

**Table A2**   (continued)

| Study | Sample | Outcomes | Significant findings | Comments |
|---|---|---|---|---|
| Marsiglio and Mott (1988) | Mothers of firstborn children from 1979 NLSY, reinterviewed in 1984 at age 19–27 (n = 6,015 women) | Antenatal care at less than three months, never smoked during pregnancy, one or no alcoholic drinks per month during pregnancy, ever breastfed, well-baby care at less than one month, weight gain of ≤ 15 or ≥ 50 pounds, low or high birth weight (less than 5.5 pounds; more than nine pounds) | Women with wanted pregnancies more likely to seek early antenatal care, to gain more than 50 pounds during pregnancy, and to have a baby weighing more than nine pounds. No significant effects for alcohol use, smoking insufficient weight gain, low birth weight, breastfeeding, or well-baby care | Controls: race/ethnicity, residence at age 14, education of respondent's mother, and age at birth. Restricted to relatively young mothers who did not quickly repeat the childbearing process |
| Marston and Cleland (2003) | Women who had live births within five years of marriage and who participated in DHS surveys: Bolivia (1998), Egypt (1995), Kenya (1998), Peru (1996), Philippines (1998) | Received antenatal care at less than six months of pregnancy, supervised delivery, received full vaccination, stunting | Antenatal care: Women with mistimed pregnancies were less likely to receive antenatal care in the first six months of pregnancy (Kenya, Peru, Philippines). Women with unwanted pregnancies were less likely (Peru, Philippines) and more likely (Egypt) to receive antenatal care in the first six months of pregnancy. Supervised delivery: Women with unwanted pregnancies were more likely (Egypt) and less likely (Peru) to have a supervised delivery. Full vaccination by one year: Children who resulted from mistimed pregnancies were more likely to have their full vaccinations (Egypt). Children who resulted from unwanted pregnancies were less likely to have their full vaccinations (Kenya, Peru). Stunting: Children who resulted from mistimed pregnancies were less likely to be stunted (Egypt). Children who resulted from unwanted pregnancies were less likely to be stunted (Egypt) and more likely to be stunted (Peru) | Controls: birth order, maternal education, household wealth, type of residence, ethnic group, language, region (sex/age of child added for postnatal outcomes). For multiple births, only firstborn child is included. Vaccination and growth data are available only for those children who survived one year. |
| Montgomery et al. (1997a) | 9,869 children from demographic surveillance households in rural Bangladesh (1982–93) | Child survival 0–5 years | Unwantedness was not associated with child mortality | Controls: child sex, birth order, parity, mother's education, father's education, family background (house size, assets, religion), thana (county), and time period. |
| Montgomery et al. (1997b) | DHS data from Dominican Republic (1991), Egypt (1988), Kenya (1993), Philippines (1993), and Thailand (1987) | Child survival 0–5 years, nutritional status | Excess fertility was associated with higher mortality (Egypt, Philippines, Thailand), excess and unwanted fertility was negatively associated with height-for-age (Dominican Republic only). Child-specific variables of excess fertility had weak or inconsistent effects. | Controls: child characteristics (sex, age, birth interval, birth order, parity, twin, premature, antenatal care, tetanus vaccination), parents' characteristics (mother's age at birth, mother's schooling, union status, spouse's schooling, standard of living index, index squared), and cluster characteristics (cluster size, distance to and number of hospital/health center[s], number of health services provided at health centers, community has health worker/trained midwife/mobile health clinic). |
| Najman et al (1991) | 6,642 pregnant women enrolled at first antenatal-care visit and followed postpartum (1981–84; Mater-University of Queensland Study of Pregnancy) | Anxiety, depression | Anxiety and depression were associated with unwanted pregnancy | Controls: mother's age, income, marital status, and parity. Lack of measurement of mental health prior to pregnancy |

## Notes

1   The exception among the reviewed studies is the measure employed by Bustan and Coker (1994) and Laukaran and van den Berg (1980), in which women were asked, "How do you feel about having a baby now?" The participants' responses were noted and coded in seven distinct categories, ranging from "strongly favorable" (for example, delighted, pleased) to a "negative response" (for example, unhappy, resentful).

2   Health outcomes for children until age five are addressed in this review; however, some evidence suggests that the cumulative effects of unintended pregnancy may persist into adolescence and early adulthood (Hook 1963; Blomberg 1980b; Myhrman 1988; David 1992; Axinn et al. 1998; Barber et al. 1999).

## References

Adetunji, Jacob A. 1998. "Unintended Childbearing in Developing Countries: Levels, Trends, and Determinants." *Demographic and Health Surveys Analytical Reports* No. 8. Calverton, MD: Macro International.

Ahluwalia, Indu B., Rob Merritt, Laurie F. Beck, and Mary Rogers. 2001. "Multiple lifestyle and psychosocial risks and delivery of small for gestational age infants." *Obstetrics & Gynecology* 97(1): 649–656.

Ahman, Elisabeth and Iqbal Shah. 2004. *Unsafe Abortion: Global and Regional Estimates of the Incidence of Unsafe Abortion and Associated Mortality in 2000.* Fourth edition. Geneva: World Health Organization.

Alan Guttmacher Institute (AGI). 1999. *Sharing Responsibility: Women, Society, and Abortion Worldwide.* New York: AGI.

Altfeld, Susan, Arden Handler, Dee Burton, and Leatrice Berman. 1997. "Wantedness of pregnancy and prenatal health behaviors." *Women & Health* 26(4): 29–43.

Arnold, Fred, Sunita Kishor, and T.K. Roy. 2002. "Sex-selective abortions in India." *Population and Development Review* 28(4): 759–785.

Axinn, William G., Jennifer S. Barber, and Arland Thornton. 1998. "The long-term impact of parents' childbearing decisions on children's self-esteem." *Demography* 35(4): 435–443.

Bachrach, Christine A. and Susan Newcomer. 1999. "Intended pregnancies and unintended pregnancies: Distinct categories or opposite ends of a continuum?" Forum on contraceptive failure and unintended pregnancy. *Family Planning Perspectives* 31(5): 251–252.

Bankole, Akinrinola and Susheela Singh. 1998. "Couples' fertility and contraceptive decision-making in developing countries: Hearing the man's voice." *International Family Planning Perspectives* 24(1): 15–24.

Bankole, Akinrinola and Charles F. Westoff. 1998. "The consistency and validity of reproductive attitudes: Evidence from Morocco." *Journal of Biosocial Sciences* 30(4): 439–455.

Barber, Jennifer S., William G. Axinn, and Arland Thornton. 1999. "Unwanted childbearing, health, and mother-child relationships." *Journal of Health and Social Behavior* 40(3): 231–257.

Barrett, Geraldine and Kaye Wellings. 2002. "What is a 'planned' pregnancy? Empirical data from a British study." *Social Science & Medicine* 55(4): 545–557.

Baydar, Nazli. 1995. "Consequences for children of their birth planning status." *Family Planning Perspectives* 27(6): 228–234, 245.

Berra, S., L. Rajmil, R. Passamonte, E. Fernandez, and J. Sabulsky. 2001. "Premature cessation of breastfeeding in infants: Development and evaluation of a predictive model in two Argentinian cohorts: The CLACYD study, 1993–1999." *Acta Paediatrica* 90(5): 544–551.

Bitto, Adenike, Ronald H. Gray, Joe L. Simpson, et al. 1997. "Adverse outcomes of planned and unplanned pregnancies among users of natural family planning: A prospective study." *American Journal of Public Health* 87(3): 338–343.

Blomberg, Stig. 1980a. "Influence of maternal distress during pregnancy on complications in pregnancy and delivery." *Acta Psychiatrica Scandinavica* 62(5): 399–404.

———. 1980b. "Influence of maternal distress during pregnancy on postnatal development." *Acta Psychiatrica Scandinavica* 62(5): 405–417.

———. 1980c. "Influence of maternal distress during pregnancy on fetal development and mortality." *Acta Psychiatrica Scandinavica* 62(4): 298–314.

———. 1980d. "Influence of maternal distress during pregnancy on fetal malformations." *Acta Psychiatrica Scandinavica* 62(4): 315–330.

Brown, Sarah S. and Leon Eisenberg (eds.). 1995. *The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families.* Washington, DC: National Academies Press.

Bustan, M.N. and A.L. Coker. 1994. "Maternal attitude toward pregnancy and the risk of neonatal death." *American Journal of Public Health* 84(3): 411–414.

Campbell, Oona M. and Wendy J. Graham. 2006. "Strategies for reducing maternal mortality: Getting on with what works." *Lancet* 368(9,543): 1,284–1,299.

Chalasani, Satvika, John B. Casterline, and Michael A. Koenig. 2007. "Consequences of unwanted childbearing: A study of child outcomes in Bangladesh." Paper presented at the Annual Meeting of the Population Association of America, New York, 29–31 March.

Chinebuah, Bridget and Rafael Pérez-Escamilla. 2001. "Unplanned pregnancies are associated with less likelihood of prolonged breastfeeding among primiparous women in Ghana." *Journal of Nutrition* 131: 1,247–1,249.

Crissey, Sarah R. 2005. "Effect of pregnancy intention on child well-being and development: Combining retrospective reports of attitude and contraceptive use." *Population Research and Policy Review* 24(6): 593–615.

Czeizel, A.E., L. Timar, et al. 1999. "Timing of suicide attempts by self-poisoning during pregnancy and pregnancy outcomes." *International Journal of Gynaecology and Obstetrics* 65(1): 39–45.

D'Angelo, Denize V., Brenda Colley Gilbert, Roger W. Rochat, John S. Santelli, and Joan M. Herold. 2004. "Differences between mistimed and unwanted pregnancies among women who have live births." *Perspectives on Sexual and Reproductive Health* 36(5): 192–197.

Das Gupta, Monica. 1987. "Selective discrimination against female children in rural Punjab, India." *Population and Development Review* 13(1): 77–100.

David, Henry P. 1992. "Born unwanted: Long-term developmental effects of denied abortion." *Journal of Social Issues* 48(3): 163–181.

———. 2006. "Born unwanted, 35 years later: The Prague study." *Reproductive Health Matters* 14(27): 181–190.

Delgado-Rodriguez, Miguel, Montserrat Gómez-Olmedo, Aurora Bueno-Cavanillas, and Ramón Galvez-Vargas. 1997. "Unplanned pregnancy as a major determinant in inadequate use of prenatal care." *Preventive Medicine* 26(6): 834–838.

001296

Exhibit 130    JA1410    JA-0001702

Desai, Sonalde. 1995. "When are children from large families disadvantaged? Evidence from cross-national analyses." *Population Studies* 49(2): 195–210.

D'Souza, Stan and Lincoln C. Chen. 1980. "Sex differentials in mortality in rural Bangladesh." *Population and Development Review* 6(2): 257–270.

Dyson, Tim and Mick Moore. 1983. "On kinship structure, female autonomy, and demographic behavior in India." *Population and Development Review* 9(1): 35–60.

Dytrych, Zdenek, Zdenek Matějček, Vratislav Schuller, Henry P. David, and Herbert L. Friedman. 1975. "Children born to women denied abortion." *Family Planning Perspectives* 7(4): 165–171.

Eggleston, Elizabeth. 2000. "Unintended pregnancy and women's use of prenatal care in Ecuador." *Social Science & Medicine* 51(2): 1,011–1,018.

Eggleston, Elizabeth, Amy Ong Tsui, and Milton Kotelchuck. 2001. "Unintended pregnancy and low birthweight in Ecuador." *American Journal of Public Health* 91(5): 808–810.

Ezeh, Alex C. 1993. "The influence of spouses over each other's contraceptive attitudes in Ghana." *Studies in Family Planning* 24(3): 163–174.

Finer, Lawrence B. and Stanley K. Henshaw. 2006. "Disparities in rates of unintended pregnancy in the United States, 1994 and 2001." *Perspectives on Sexual and Reproductive Health* 38(2): 90–96.

Fischer, Rachel C., Joseph B. Stanford, Penny Jameson, and M. Jann DeWitt. 1999. "Exploring the concepts of intended, planned, and wanted pregnancy." *Journal of Family Practice* 48(2): 117–122.

Forssman, Hans and Inga Thuwe. 1966. "One hundred and twenty children born after application for therapeutic abortion refused: Their mental health, social adjustement and educational level up to the age of 21." *Acta Psychiatrica Scandinavica* 42(1): 71–88.

———. 1981. "Continued follow-up study of 120 persons born after refusal of application for therapeutic abortion." *Acta Psychiatrica Scandinavica* 64(2): 142–149.

Frenzen, Paul D. and Dennis P. Hogan. 1982. "The impact of class, education, and health care on infant mortality in a developing society: The case of rural Thailand." *Demography* 19(3): 391–408.

Gage, Anastasia J. 1998. "Premarital childbearing, unwanted fertility and maternity care in Kenya and Namibia." *Population Studies* 52(1): 21–34.

Gazmararian, Julie A., Melissa M. Adams, Linda E. Saltzman, et al. 1995. "The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group." *Obstetrics and Gynecology* 85(6): 1,031–1,038.

Gipson, Jessica D. and Michelle J. Hindin. 2007. "'Marriage means having children and forming your family, so what is the need of discussion?' Communication and negotiation of childbearing preferences among Bangladeshi couples." *Culture, Health & Sexuality* 9(2): 185–198.

Goodwin, Mary M., Julie A. Gazmararian, Christopher H. Johnson, Brenda Colley Gilbert, Linda E. Saltzman, and PRAMS Working Group. 2000. "Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996–1997." *Maternal and Child Health Journal* 4(2): 85–92.

Goto, Aya, Seiji Yasumura, Junko Yabe, Yukiko Anazawa, and Yuko Hashimoto. 2005. "Association of pregnancy intention with parenting difficulty in Fukushima, Japan." *Journal of Epidemiology* 15(6): 244–246.

Goto, Aya, Seiji Yasumura, Junko Yabe, and Michael R. Reich. 2006. "Addressing Japan's fertility decline: Influences of unintended pregnancy on child rearing." *Reproductive Health Matters* 14(27): 191–200.

Graves, Pirkko Lauslahti. 1976. "Nutrition, infant behavior, and maternal characteristics: A pilot study in West Bengal, India." *American Journal of Clinical Nutrition* 29(3): 305–319.

Grimes, David A, Janie Benson, Susheela Singh, et al. 2006. "Unsafe abortion: The preventable pandemic." *Lancet* 368(9,550): 1,908–1,919.

Hardee, Karen, Elizabeth Eggleston, Emelita L. Wong, Irwanto, and Terrence H. Hull. 2004. "Unintended pregnancy and women's psychological well-being in Indonesia." *Journal of Biosocial Science* 36(5): 617–626.

Hellerstedt, Wendy L., Phyllis L. Pirie, Harry A. Lando, et al. 1998. "Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies." *American Journal of Public Health* 88(4): 663–666.

Henshaw, Stanley K., Susheela Singh, and Trevor Haas. 1999. "The incidence of abortion worldwide." *International Family Planning Perspectives* 25(Supplement): S30–S38.

Hesketh, Therese and Zhu Wei Xing. 2006. "Abnormal sex ratios in human populations: Causes and consequences." *Proceedings of the National Academy of Sciences of the United States of America* 103(36): 13,271–13,275.

Hill, Kenneth. 1995. "Age patterns of child mortality in the developing world." *Population Bulletin of the United Nations* (39): 112–132.

Hook, Kerstin. 1963. "Refused abortion: A follow-up study of 249 women whose applications were refused by the National Board of Health in Sweden." *Acta Psychiatrica Scandinavica* 37(Supplement 168): 1–156.

Hromi-Fiedler, Amber J. and Rafael Pérez-Escamilla. 2006. "Unintended pregnancies are associated with less likelihood of prolonged breastfeeding: An analysis of 18 Demographic and Health Surveys." *Public Health Nutrition* 9(3): 306–312.

Hulsey, Tara McComb, Marilyn Laken, Virginia Miller, and Joel Ager. 2000. "The influence of attitudes about unintended pregnancy on use of prenatal and postpartum care." *Journal of Perinatology* 20(8): 513–519.

Hummer, Robert A., Kimberly A. Hack, and R. Kelly Raley. 2004. "Retrospective reports of pregnancy wantedness and child well-being in the United States." *Journal of Family Issues* 25(3): 404–428.

Hunter, Rosemary S., Nancy Kilstrom, Ernest N. Kraybill, and Frank Loda. 1978. "Antecedents of child abuse and neglect in premature infants: A prospective study in a newborn intensive care unit." *Pediatrics* 61(4): 629–635.

International Conference on Population and Development (ICPD). 1994. "International Conference on Population and Development Programme of Action." <http://www.un.org/popin/icpd/conference/offeng/poa.html>. Accessed 19 December 2002.

Jensen, Eric R. and Dennis A. Ahlburg. 1999. *A Multicountry Analysis of the Impact of Unwantedness and Number of Children on Child Health and Preventive and Curative Care.* Washington, DC: POLICY Project, Futures Group International.

———. 2002. "Family size, unwantedness, and child health and health care utilisation in Indonesia." *Bulletin of Indonesian Economic Studies* 38(1): 43–59.

Joyce, Theodore J. and Michael Grossman. 1990. "Pregnancy wantedness and the early initiation of prenatal care." *Demography* 27(1): 1–17.

001297

Exhibit 130                    JA1411                    JA-0001703

Joyce, Ted, Robert Kaestner, and Sanders Korenman. 2000a. "The stability of pregnancy intentions and pregnancy-related maternal behaviors." *Maternal and Child Health Journal* 4(3): 171–178.

———. 2000b. "The effect of pregnancy intention on child development." *Demography* 37(1): 83–94.

———. 2002. "On the validity of retrospective assessments of pregnancy intention." *Demography* 39(1): 199–213.

Keeton, Kristie and Rodney A. Hayward. 2007. "Pregnancy intention and birth outcomes: Does the relationship differ by age or race?" *Journal of Women's Health* 16(4): 510–516.

Kendall, Carl, Aimee Afable-Munsuz, Ilene Speizer, Alexis Avery, Norine Schmidt, and John Santelli. 2005. "Understanding pregnancy in a population of inner-city women in New Orleans—Results of qualitative research." *Social Science & Medicine* 60(2): 297–311.

Koenig, Michael A. and Stan D'Souza. 1986. "Sex differences in childhood mortality in rural Bangladesh." *Social Science & Medicine* 22(1): 15–22.

Koenig, Michael A., Rajib Acharya, Sagri Singh, and Tarun K. Roy. 2006. "Do current measurement approaches underestimate levels of unwanted childbearing? Evidence from rural India." *Population Studies* 60(3): 243–256.

Korenman, Sanders, Robert Kaestner, and Ted Joyce. 2002. "Consequences for infants of parental disagreement in pregnancy intention." *Perspectives on Sexual and Reproductive Health* 34(4): 198–205.

Kost, Kathryn, David J. Landry, and Jacqueline E. Darroch. 1998a. "The effects of pregnancy planning status on birth outcomes and infant care." *Family Planning Perspectives* 30(2): 223–230.

———. 1998b. "Predicting maternal behaviors during pregnancy: Does intention status matter?" *Family Planning Perspectives* 30(2): 79–88.

Lara, Ma. Asunción, Claudia Navarro, Laura Navarrete, et al. 2006. "Depressive symptoms in pregnancy and associated factors in patients of three health institutions in Mexico City (Síntomas depresivos en el embarazo y factores asociados, en pacientes de tres instituciones de salud de la ciudad de México)." *Salud Mental* 29(4): 55–62.

Lasee, Ashraf and Stan Becker. 1997. "Husband-wife communication about family planning and contraceptive use in Kenya." *International Family Planning Perspectives* 23(1): 15–20, 33.

Lau, Ying. 2005. "Does pregnancy provide immunity from intimate partner abuse among Hong Kong Chinese women?" *Social Science & Medicine* 61(2): 365–377.

Lau, Ying and Daniel Wong Fu Keung. 2007. "Correlates of depressive symptomatology during the second trimester of pregnancy among Hong Kong Chinese." *Social Science & Medicine* 64(9): 1,802–1,811.

Laukaran, V.H. and B.J. van den Berg. 1980. "The relationship of maternal attitude to pregnancy outcomes and obstetric complications: A cohort study of unwanted pregnancy." *American Journal of Obstetrics and Gynecology* 136(3): 374–379.

Levine, Nancy E. 1987. "Differential child care in three Tibetan communities: Beyond son preference." *Population and Development Review* 13(2): 281–304.

Li, Jiali. 2004. "Gender inequality, family planning, and maternal and child care in a rural Chinese county." *Social Science & Medicine* 59(4): 695–708.

Lloyd, Cynthia B. 1994. "Investing in the next generation: The implications of high fertility at the level of the family." In *Population and Development: Old Debates, New Conclusions*. Ed. Robert Cassen. New Brunswick, NJ: Transaction Publishers. Pp. 181–202.

Lloyd, Cynthia B. and Mark R. Montgomery. 1996. "The Consequences of Unintended Fertility for Investments in Children: Conceptual and Methodological Issues." *Policy Research Division Working Paper* No. 89. New York: Population Council.

Luker, Kristin C. 1999. "A reminder that human behavior frequently refuses to conform to models created by researchers. Forum: Contraceptive failure and unintended pregnancy." *Family Planning Perspectives* 31(5): 248–249.

Magadi, Monica Akinyi, Nyovani Janet Madise, and Roberto Nascimento Rodrigues. 2000. "Frequency and timing of antenatal care in Kenya: Explaining the variations between women of different communities." *Social Science & Medicine* 51(4): 551–561.

Marsiglio, William and Frank L. Mott. 1988. "Does wanting to become pregnant with a first child affect subsequent maternal behaviors and infant birth weight?" *Journal of Marriage and the Family* 50(4): 1,023–1,036.

Marston, Cicely and John Cleland. 2003. "Do unintended pregnancies carried to term lead to adverse outcomes for mother and child? An assessment in five developing countries." *Population Studies* 57(1): 77–93.

Mason, Karen Oppenheim and Herbert L. Smith. 2000. "Husbands' versus wives' fertility goals and use of contraception: The influence of gender context in five Asian countries." *Demography* 37(3): 299–311.

Matějček, Z., Z. Dytrych, and V. Schuller. 1978. "Children from unwanted pregnancies." *Acta Psychiatrica Scandinavica* 57(1): 67–90.

McClelland, Gary H. 1983. "Family size desires as measures of demand." In *Determinants of Fertility in Developing Countries: Supply and Demand for Children*. Volume 1. Eds. Rodolfo A. Bulatao and Ronald D. Lee. New York: Academic Press. Pp. 288–343.

McCormick, M.C., J. Brooks-Gunn, T. Shorter, C.Y. Wallace, J.H. Holmes, and M.C. Heagarty. 1987. "The planning of pregnancy among low-income women in central Harlem." *American Journal of Obstetrics and Gynecology* 156(1): 145–149.

Moffit, Robert. 2005. "Remarks on the analysis of causal relationships in population research." *Demography* 42(1): 91–108.

Mohllajee, A.P., K.M. Curtis, B. Morrow, and P.A. Marchbanks. 2007. "Pregnancy intention and its relationship to birth and maternal outcomes." *Obstetrics and Gynecology* 109(3): 678–686.

Montgomery, Mark R. and Barney Cohen. 1998. *From Death to Birth: Mortality Decline and Reproductive Change*. Washington, DC: National Academy of Sciences.

Montgomery, Mark R., Mian Bazle Hossain, J. Zhao, and Barkat-e-Khuda. 1997a. "Unwanted fertility and investments in children's human capital: The Bangladesh case." Unpublished.

Montgomery, Mark R., Cynthia B. Lloyd, Paul C. Hewett, and Patrick Heuveline. 1997b. "The Consequences of Imperfect Fertility Control for Children's Survival, Health, and Schooling." *Demographic and Health Surveys Analytical Reports* No.7. Calverton, MD: Macro International.

Myhrman, Antero. 1988. "The Northern Finland cohort, 1966–82: A follow-up study of children unwanted at birth." In *Born Unwanted: Developmental Effects of Denied Abortion*. Eds. Henry P. David, Zdenek Dytrych, Zdenek Matějček, and Vratislav Schuller. New York: Springer Publishing. Pp. 103–110.

Najman, J.M., J. Morrison, G. Williams, M. Andersen, and J.D. Keeping. 1991. "The mental health of women 6 months after they give birth to an unwanted baby: A longitudinal study." *Social Science & Medicine* 32(3): 241–247.

Nakku, J.N., G. Nakasi, and F. Mirembe. 2006. "Postpartum major depression at six weeks in primary health care: Prevalence and associated factors." *African Health Sciences* 6(4): 207–214.

001298

Exhibit 130 JA1412 JA-0001704

Ni, Hanyu and Annette MacKay Rossignol. 1994. "Maternal deaths among women with pregnancies outside of family planning in Sichuan, China." *Epidemiology* 5(5): 490–494.

Ní Bhrolcháin, Máire and Tim Dyson. 2007. "On causation in demography: Issues and illustrations." *Population and Development Review* 33(1): 1–36.

ORC Macro. 2007. MEASURE DHS STATCompiler. <http://www.measuredhs.com>. Accessed 26 June 2007.

Orr, Suezanne T., C. Arden Miller, Sherman A. James, and Salvatore J. Babones. 2000. "Unintended pregnancy and preterm birth." *Paediatric and Perinatal Epidemiology* 14(4): 309–313.

Pagnini, Deanna L. and Nancy E. Reichman. 2000. "Psychosocial factors and the timing of prenatal care among women in New Jersey's HealthStart program." *Family Planning Perspectives* 32(2): 56–64.

Pérez-Escamilla, Rafael, José A. Cobas, Hector Balcazar, and Mary Holland Benin. 1999. "Specifying the antecedents of breast-feeding duration in Peru through a structural equation model." *Public Health Nutrition* 2(4): 461–467.

Pulley, LeaVonne, Lorraine V. Klerman, Hao Tang, and Beth A. Baker. 2002. "The extent of pregnancy mistiming and its association with maternal characteristics and behaviors and pregnancy outcomes." *Perspectives on Sexual and Reproductive Health* 34(4): 206–211.

Ronsmans, Carine and Wendy J. Graham. 2006. "Maternal mortality: Who, when, where, and why." *Lancet* 368(9,542): 1,189–1,200.

Rosenzweig, Mark R. and Kenneth I. Wolpin. 1980. "Testing the quantity-quality fertility model: The use of twins as a natural experiment." *Econometrica* 48(1): 227–240.

———. 1993. "Maternal expectations and ex post rationalizations: The usefulness of survey information on the wantedness of children." *Journal of Human Resources* 28(2): 205–229.

Rubin, Valerie and Particia L. East. 1999. "Adolescents' pregnancy intentions: Relations to life situations and caretaking behaviors prenatally and two years postpartum." *Journal of Adolescent Health* 24(5): 313–320.

Sable, Marjorie R. and Deborah Schild Wilkinson. 2000. "Impact of perceived stress, major life events and pregnancy attitudes on low birth weight." *Family Planning Perspectives* 32(6): 288–294.

Sable, Marjorie R., John C. Spencer, Joseph W. Stockbauer, Wayne F. Schramm, Vicky Howell, and Allen A. Herman. 1997. "Pregnancy wantedness and adverse pregnancy outcomes: Differences by race and Medicaid status." *Family Planning Perspectives* 29(2): 76–81.

Sable, Marjorie R., Joseph W. Stockbauer, Wayne F. Schramm, and Garland H. Land. 1990. "Differentiating the barriers to adequate prenatal care in Missouri, 1987–88." *Public Health Reports* 105(6): 549–555.

Sangi-Haghpeykar, Haleh, Mina Mehta, Sam Posner, and Alfred N. Poindexter. 2005. "Paternal influences on the timing of prenatal care among Hispanics." *Maternal and Child Health Journal* 9(2): 159–163.

Santelli, John, Roger Rochat, Kendra Hatfield-Timajchy, et al. 2003. "The measurement and meaning of unintended pregnancy." *Perspectives on Sexual and Reproductive Health* 35(2): 94–101.

Scheper-Hughes, Nancy. 1984. "Infant mortality and infant care: Cultural and economic constraints on nurturing in Northeast Brazil." *Social Science & Medicine* 19(5): 535–546.

———. 1992. *Death Without Weeping: The Violence of Everyday Life in Brazil.* Berkeley: University of California Press.

Schoen, Robert, Nan Marie Astone, Young J. Kim, Constance A. Nathanson, and Jason M. Field. 1999. "Do fertility intentions affect fertility behavior?" *Journal of Marriage and the Family* 61(3): 790–799.

Scrimshaw, M.W. and S.C.M. Scrimshaw. 1990. "Maternal management strategies on a Guatemalan coastal plantation: Differential success in maintaining child health." Los Angeles: University of California, Los Angeles. Unpublished.

Shapiro-Mendoza, Carrie, Beatrice J. Selwyn, David P. Smith, and Maureen Sanderson. 2005. "Parental pregnancy intention and early childhood stunting: Findings from Bolivia." *International Journal of Epidemiology* 34(2): 387–396.

Sidebotham, Peter, Jon Heron, and the ALSPAC Study Team. 2003. "Child maltreatment in the 'children of the nineties': The role of the child." *Child Abuse and Neglect* 27(3): 337–352.

Singh, Susheela, Jacqueline E. Darroch, Michael Vlassoff, and Jennifer Nadeau. 2003. *Adding It Up: The Benefits of Investing in Sexual and Reproductive Health Care.* New York and Washington, DC: Alan Guttmacher Institute and United Nations Population Fund.

Taylor, Julie Scott and Howard J. Cabral. 2002. "Are women with an unintended pregnancy less likely to breastfeed?" *Journal of Family Practice* 51(5): 431–436.

Than, Lara C., Margaret A. Honein, Margaret L. Watkins, Paula W. Yoon, Katherine Lyon Daniel, and A. Adolfo Correa. 2005. "Intent to become pregnant as a predictor of exposures during pregnancy: Is there a relation?" *Journal of Reproductive Medicine* 50(6): 389–396.

United Nations Population Fund (UNFPA). 2007. *Facts about Safe Motherhood.* <http://www.unfpa.org/mothers/facts.htm>. Accessed 6 February 2008.

Weller, Robert H., Isaac W. Eberstein, and Mohamed Bailey. 1987. "Pregnancy wantedness and maternal behavior during pregnancy." *Demography* 24(3): 407–412.

Wells, Chris S., Renee Schwalberg, Gretchen Noonan, and Vivian Gabor. 2006. "Factors influencing inadequate and excessive weight gain in pregnancy: Colorado, 2000–2002." *Maternal and Child Health Journal* 10(1): 55–62.

Westoff, Charles F. and Norman B. Ryder. 1977. "The predictive validity of reproductive intentions." *Demography* 14(4): 431–453.

Williams, Lindy and Joyce Abma. 2000. "Birth wantedness reports: A look forward and a look back." *Social Biology* 47(3–4): 147–163.

Williams, Lindy, Joyce Abma, and Linda J. Piccinino. 1999. "The correspondence between intention to avoid childbearing and subsequent fertility: A prospective analysis." *Family Planning Perspectives* 31(5): 220–227.

Yount, Kathryn M. 2004. "Maternal resources, proximity of services, and curative care of boys and girls in Minya, Egypt 1995–97." *Population Studies* 58(3): 345–355.

Zuravin, Susan J. 1987. "Unplanned pregnancies, family planning problems, and child maltreatment." *Family Relations* 36(2): 135–139.

———. 1988. "Fertility patterns: Their relationship to child physical abuse and child neglect." *Journal of Marriage and the Family* 50(4): 983–993.

———. 1991. "Unplanned childbearing and family size: Their relationship to child neglect and abuse." *Family Planning Perspectives* 23(4): 155–161.

## Acknowledgments

Jessica Gipson would like to acknowledge financial support from USAID/Dhaka and the Charlotte Ellertson Social Science Postdoctoral Fellowship in Abortion and Reproductive Health in the research and writing phases of this manuscript. The authors are indebted to John Casterline for his insightful comments on an earlier version of this manuscript.

Exhibit 130    JA1413    JA-0001705

International Journal of Gynecology and Obstetrics (2005) 89, S25–S33



International Journal of
**GYNECOLOGY**
**& OBSTETRICS**

www.elsevier.com/locate/ijgo

ARTICLE

# Effect of interpregnancy interval on birth outcomes: findings from three recent US studies

## B.-P. Zhu*

*State Epidemiologist and Chief, Office of Epidemiology, Missouri Department of Health and Senior Services, 920 Wildwood Drive, P.O. Box 570, Jefferson City, MO 65102, USA*

**KEYWORDS**
Birth intervals;
Low birth weight;
Prematurity;
Small for gestational age;
Pregnancy outcome

**Abstract**

The relationship between interpregnancy interval and adverse birth outcomes (i.e., low birth weight, preterm birth, and small size for gestational age) was examined in three recent studies conducted in Utah and Michigan of the United States. These studies were conducted among different populations, used different study designs (i.e., cross-sectional and retrospective cohort designs), and addressed several other methodological limitations in the previously published literature. In addition, the data were stratified by, and controlled for, several maternal reproductive risk factors. A J-shaped relationship between interpregnancy interval and adverse birth outcomes was observed in all three studies. The risk for adverse birth outcomes is lowest when the interpregnancy interval was 18–23 months and increased when the interval departed from 18–23 months. This J-shaped relationship existed at levels of maternal reproductive risk factors and after these risk factors were controlled for using logistic regression. Based on the consistency of the findings from all three studies, it appears that the J-shaped relationship between interpregnancy interval and adverse birth outcomes is causal. This information can be used by health care providers and public health programs to counsel and educate women who recently gave births on reducing the risk for adverse birth outcomes by means of appropriate pregnancy spacing.
© 2004 International Federation of Gynecology and Obstetrics. Published by Elsevier Ireland Ltd. All rights reserved.

"*If two or more instances of the phenomenon under investigation have only one circumstance in common, the circumstance in which alone all the instances agree is the cause (or effect) of the given phenomenon.*"—John Stuart Mill [1]

* Tel.: +1 573 751 6128; fax: +1 573 522 6003.
  *E-mail address:* ZhuB@dhss.mo.gov.

## 1. Introduction

Low birth weight and preterm birth combined are the second leading cause of death for all U.S. infants, and the leading cause of death for African-American infants [2–5]. In addition, low birth weight and preterm birth may lead to serious and costly sequelae, such as cerebral palsy, for the

0020-7292/$ - see front matter © 2004 International Federation of Gynecology and Obstetrics. Published by Elsevier Ireland Ltd. All rights reserved.
doi:10.1016/j.ijgo.2004.08.002

**000535**

Exhibit 136

affected infant. Little progress has been made in recent years in reducing the prevalence of low birth weight and preterm birth. In fact, during the past two decades, the prevalence of low birth weight and preterm birth in the U.S. has steadily increased [6]. Although many studies have been conducted on the causes of low birth weight and preterm birth, the etiology remains largely unknown.

Since the early 1920s, many researchers have investigated the relationship between pregnancy spacing (i.e., the time lapsed between two consecutive pregnancies) and various adverse birth outcomes, including low birth weight, preterm birth, small size for gestational age, and infant mortality. Most studies have found that a short interpregnancy interval was associated with increased risk for various adverse birth outcomes [7–13]. However, a review of the literature revealed a number of methodological limitations in previously published literature. First, many earlier studies used birth interval (i.e., the time between two consecutive live births) to measure pregnancy spacing. It has been demonstrated that using birth interval overestimates the adverse effect of very short birth intervals [8]. Therefore, interpregnancy interval is preferred over birth interval in this kind of research. Second, extreme interpregnancy intervals (e.g., <3 months or >10 years) are rare. Thus a large sample size, which most of the previously published studies lacked, is needed to study their effects. Third, many maternal reproductive risk factors are associated with both interpregnancy interval and adverse birth outcomes. The potential confounding effect of these risk factors needs to be carefully examined through stratified and multivariable analyses. However, many of the previously published studies lacked the sample size to perform detailed stratified and multivariable analyses. Fourth, most of the previously published studies arbitrarily categorized interpregnancy interval into "short" and "nonshort," using various cutoff points (e.g., <3, <6, <9, or <12 months). As will be seen later in this paper, the underlying association between interpregnancy interval and adverse birth outcomes is J-shaped; hence such arbitrary categorization of the interpregnancy interval may underestimate the risk of short interpregnancy interval. Therefore, one needs to examine the association over the entire range of interpregnancy interval. Fifth, most of the previously published studies used cross-sectional design. The findings of those studies need to be verified using the longitudinal design. Sixth, many studies used the combined birth records data in the same jurisdiction over several years. These data contain birth records for siblings born to the same

biological mother, which are correlated with each other. Therefore, appropriate statistical techniques are needed to account for this correlation [14,15].

Those methodological limitations in the published literature have led many researchers to suspect that the association between interpregnancy interval and adverse birth outcomes may be artificial. Therefore, the author of this paper, in collaboration with his colleagues, conducted a series of three studies in various settings and used different study designs (Table 1). This paper summarizes the findings of those studies.

## 2. The Utah Study [16]

The first study was conducted in Utah [16]. The study used the birth certificate data for singleton infants born during 1989–1996 to multiparous Utah women (i.e., those who had at least one previous live birth). The study examined three adverse birth outcomes—low birth weight (<2500 g), preterm birth (gestational age <37 weeks), and small size for gestational age (birth weight <10th percentile for the infant's gestational age and sex compared with all singleton births in Utah from 1989 to 1996). The interpregnancy interval was defined as the period between the delivery of a live birth and the conception of the subsequent live birth, and was computed as the interval between two consecutive deliveries minus the gestational age of the second infant. To examine the question whether the relationship was due to confounding, 16 maternal reproductive risk factors were evaluated: Maternal age at delivery, outcome of the most recent recognized pregnancy, number of previous live-born infants who were still alive, number of previous live-born infants who had died, number of previous spontaneous or induced abortions, height, prepregnancy weight, weight gain during pregnancy, trimester at which prenatal care was started, number of prenatal care visits, marital status, education, race or ethnic group, residence (rural or urban), tobacco use during pregnancy, and alcohol use during pregnancy.

These data offered an excellent opportunity for evaluating the relationship between interpregnancy intervals and adverse birth outcomes because of the relatively high average parity of mothers in Utah. Also, the association can be examined with less potential for confounding because other reproductive risk factors, notably tobacco and alcohol use, are substantially less prevalent among Utah women than among women elsewhere in the U.S. The relationship between

**000536**

Exhibit 136                                    JA1415                                    JA-0001785

**Table 1**  Summary of three recent U.S. studies on the effect of interpregnancy interval on birth outcomes

| Study | Sample size | Study design | Adverse birth outcomes examined[a] | Use of IPI vs. BI[b] | Other maternal risk factors examined | Main conclusions | Comments |
|---|---|---|---|---|---|---|---|
| Utah Study (1999) [16] | 173,205 singleton live births to multiparous women in Utah, 1989–1996 | Cross-sectional study | LBW; PTB; SGA[c] | Used IPI; 0–5; 6–11; 12–17; 18–23; 24–59; 60–119; 120+ months | Age at delivery; outcome of preceding pregnancy; no. of previous infants still alive; no. of previous infants deceased; no. of previous spontaneous or induced abortions; height; prepregnancy weight; weight gain during pregnancy; trimester prenatal care started; no. of prenatal care visits; marital status; education; ethnicity; rural or urban residence; tobacco/alcohol use during pregnancy. | The optimal IPI appears to be 18–23 months; both short and long IPIs were associated with increased risk for adverse birth outcomes; risk increased in a linear fashion as IPI departs from optimal IPI in either direction; the association between IPI and adverse birth outcomes was not due to confounding by other risk factors. | Used vital records data in the same state compiled over several years; unable to examine the relationship by race. |
| Michigan Cross-Sectional Study (2001) [17] | 435,327 singleton live births (346,250 to white women, 89,077 to black women), Michigan, 1993–1998 | Cross-sectional study | LBW; PTB; SGA[d] | Used IPI; 0–5; 6–11; 12–17; 18–23; 24–59; 60–119; 120+ months | Race (white, black); age at delivery; marital status; education; adequacy of prenatal care; outcome of the preceding pregnancy (live birth or stillbirth); total number of previous pregnancies; tobacco/alcohol use during pregnancy. | Upheld findings of the Utah Study; an IPI of 18–23 months was optimal for both white and black women; risk for adverse birth outcomes increased appreciably when IPI was <6 months or >5 years. | Data were analyzed separately by race; used vital records data in the same state compiled over several years. |
| Michigan Retrospective Cohort Study (2003) [20] | 565,911 singleton live births to Michigan women, 1993–2000, linked to biological mothers | Retrospective cohort study using maternally linked birth data | LBW (data on PTB and SGA available but not published) | <6; 6–11; 12–17; 18–23; 24–59; 60–95; 96–136 months | Preceding infant's birth weight; mother's age, race, education, prenatal care utilization, tobacco/alcohol use during pregnancy; outcome of preceding pregnancy; number of previous live births; paternal acknowledgment on the birth certificate. | Upheld findings from the Utah Study and Michigan Cross-Sectional Study; population attributable risk (PAR)=9.4% if optimal IPI is defined as 18–23 months; PAR=5.1% if optimal IPI is defined as 6–59 months. | Data were analyzed separately by pairs of births. Stratified by, and controlled for birth weight of preceding sibling. |

[a] LBW=low birth weight; PTB=preterm birth; SGA=small-for-gestational-age birth.
[b] IPI: interpregnancy interval; BI: birth interval.
[c] SGA=birth weight below the 10th percentile for the infant's gestational age and sex among singleton births in Utah from 1989 to 1996.
[d] SGA=birth weight <10th percentile of the referent population of U.S. newborns for the infant's gestational age, race, sex, and parity [18].

000537

Exhibit 136   JA1416   JA-0001786

interpregnancy interval and the three adverse birth outcomes was examined at each level of the 16 maternal risk factors. In addition, the logistic regression technique was used to simultaneously control for all 16 risk factors.

A total of 173,205 singleton infants were included in the study. When the risk for the three adverse birth outcomes was examined according to interpregnancy interval, a J-shaped pattern emerged: The risk for all three outcomes was high when the interpregnancy interval was very short (e.g., <3 months). The risk declined sharply as the interpregnancy interval increased, and reached the lowest point when the interpregnancy interval was approximately 18–23 months. After that point, the risk for all three adverse birth outcomes slowly increased in a linear fashion as the interpregnancy interval further increased. This J-shaped pattern was observed at each level of the 16 maternal reproductive risk factors wherever data were sufficient to support the stratified analysis. (Fig. 1 shows the relationship between interpregnancy interval and low birth weight in all three U.S. studies. Although not shown in the figure, the relationship between interpregnancy interval and the other two adverse birth outcomes is similar.)

When all 16 maternal reproductive risk factors were simultaneously controlled for, the J-shaped

pattern persisted. For example, as compared with an interpregnancy interval of 18–23 months, the adjusted odds ratios for an interpregnancy interval shorter than 6 months were 1.4 for low birth weight, 1.4 for preterm birth, and 1.3 for small size for gestational age; the adjusted odds ratios for an interpregnancy interval of 120 months or longer were 2.0 for low birth weight, 1.5 for preterm birth, and 1.8 for small size for gestational age (Table 2).

The Utah Study addressed several methodological limitations in previously published studies. It used the interpregnancy interval instead of the birth interval. Also, it assembled the birth records of a large number of infants, enabling the researchers to perform extensive stratified and multivariable analyses. Additionally, it examined the association over the full range of interpregnancy interval rather than arbitrarily categorizing the interpregnancy interval into "short" and "non-short" intervals. However, several issues remained unaddressed. The study was based on a cross-sectional design using a data set compiled of the birth records in Utah over 8 years, and the correlation between biological siblings was not appropriately accounted for. Concerns were also raised by other researchers as to whether a study con-



**Figure 1**  Relationship between interpregnancy interval and low birth weight (LBW): summary of three recent U.S. studies [16,17,20].

000538

Exhibit 136

JA-0001787

Table 2 Adjusted odds ratios (OR) of adverse birth outcomes and their 95% confidence intervals (CI) associated with various interpregnancy intervals from two cross-sectional studies conducted in Utah [16] and Michigan [17]

| Interpregnancy interval (months) | Low birth weight[a] | | Preterm birth[a] | | Small size for gestational age[b] | |
|---|---|---|---|---|---|---|
| | OR | 95% CI | OR | 95% CI | OR | 95% CI |
| *Utah Study[c]* | | | | | | |
| 0–5 | 1.4 | 1.3–1.6 | 1.4 | 1.3–1.5 | 1.3 | 1.2–1.4 |
| 6–11 | 1.1 | 1.0–1.2 | 1.0 | 0.9–1.1 | 1.1 | 1.0–1.2 |
| 12–17 | 1.1 | 1.0–1.2 | 1.0 | 0.9–1.1 | 1.1 | 1.0–1.1 |
| 18–23 | referent | | referent | | referent | |
| 24–59 | 1.1 | 1.0–1.1 | 1.0 | 0.9–1.1 | 1.1 | 1.1–1.2 |
| 60–119 | 1.5 | 1.3–1.6 | 1.1 | 1.0–1.2 | 1.4 | 1.3–1.5 |
| 120+ | 2.0 | 1.7–2.4 | 1.5 | 1.3–1.7 | 1.8 | 1.6–2.0 |
| | | | | | | |
| *Michigan Cross-Sectional Study[d]* | | | | | | |
| White | | | | | | |
| 0–5 | 1.5 | 1.4–1.6 | 1.3 | 1.2–1.4 | 1.3 | 1.3–1.4 |
| 6–11 | 1.1 | 1.0–1.2 | 1.2 | 1.1–1.2 | 1.1 | 1.1–1.2 |
| 12–17 | 1.0 | 1.0–1.1 | 1.1 | 1.0–1.1 | 1.0 | 1.0–1.1 |
| 18–23 | referent | | referent | | referent | |
| 24–59 | 1.1 | 1.0–1.2 | 1.0 | 1.0–1.1 | 1.1 | 1.1–1.2 |
| 60–119 | 1.3 | 1.2–1.4 | 1.2 | 1.1–1.2 | 1.3 | 1.3–1.4 |
| 120+ | 1.9 | 1.7–2.1 | 1.4 | 1.3–1.5 | 1.7 | 1.6–1.8 |
| Black | | | | | | |
| 0–5 | 1.5 | 1.3–1.6 | 1.2 | 1.1–1.3 | 1.3 | 1.2–1.4 |
| 6–11 | 1.2 | 1.1–1.3 | 1.1 | 1.1–1.2 | 1.1 | 1.0–1.3 |
| 12–17 | 1.0 | 0.9–1.1 | 1.0 | 1.0–1.1 | 1.0 | 0.9–1.1 |
| 18–23 | referent | | referent | | referent | |
| 24–59 | 1.0 | 1.0–1.1 | 0.9 | 0.9–1.0 | 1.1 | 1.0–1.2 |
| 60–119 | 1.2 | 1.1–1.3 | 1.0 | 0.9–1.1 | 1.1 | 1.0–1.2 |
| 120+ | 1.6 | 1.4–1.7 | 1.3 | 1.2–1.4 | 1.4 | 1.2–1.6 |

[a] Low birth weight=birth weight <2500 g; preterm birth=gestational age <37 weeks.

[b] Small size for gestational age: In Utah Study was defined as birth weight <10th percentile for infant's gestational age and sex among singleton birth in Utah from 1989 to 1996; in Michigan Cross-Sectional Study was defined as birth weight <10th percentile of referent population of U.S. newborns for the infant's gestational age, race, sex, and parity [18].

[c] Controlled for maternal age at delivery, outcome of most recent recognized pregnancy, number of previous live-born children who were still alive, number of previous live-born children who had died, number of previous spontaneous or induced abortions, height, weight before pregnancy, weight gain during pregnancy, trimester when prenatal care started, number of prenatal care visits, marital status, education, race or ethnic group, rural or urban residence, tobacco use during pregnancy, and alcohol use during pregnancy.

[d] Controlled for maternal age at delivery, marital status, education, adequacy of prenatal care, outcome of the preceding birth (live birth or still birth), total number of previous pregnancies, tobacco use during pregnancy, and alcohol use during pregnancy.

ducted in a largely homogeneous, mostly white middle-income population can be generalized to other populations. Of special concern was the unavailability of data on whether the relationship between interpregnancy interval and adverse birth outcomes among other racial and ethnic groups differed from that among white non-Hispanics.

## 3. The Michigan Cross-Sectional Study [17]

The Michigan Cross-Sectional Study [17] was designed to address the questions on whether the Utah Study was generalizable to other populations, and whether there was any racial differences in the relationship between interpregnancy interval and adverse birth outcomes. The three adverse birth outcomes examined in this study were the same as in the Utah Study: Low birth weight (<2500 g), preterm birth (gestational age <37 weeks); and small-for-gestational-age birth, which was defined as birth weight <10th percentile of the referent population of U.S. newborns for the infant's gestational age, race, sex, and parity [18]. Of note, this definition used the U.S. national population as the reference population, which is slightly different from that in the Utah Study; the latter used the internal Utah population as the reference.

The population in Michigan is more similar to the general U.S. population than the Utah population. Also, there is a sizable (approximately 18%) African-American population in Michigan, enabling the researchers to examine the relationship between

000539

Exhibit 136 JA1418 JA-0001788

interpregnancy interval and adverse birth outcomes among both white and African-American women. The study compiled the birth records of 435,927 singleton infants born in Michigan during 1993–1998 to multiparous white and African-American women. Separate analyses were performed for white ($N$=346,250) and African-American ($N$= 89,077) women. Within each racial group, the relationship between interpregnancy interval and adverse birth outcomes was examined at each level of eight maternal reproductive risk factors: age at delivery, marital status, education, adequacy of prenatal care, outcome of the preceding pregnancy (i.e., live birth or stillbirth), total number of previous pregnancies, tobacco use during pregnancy, and alcohol use during pregnancy.

All three adverse birth outcomes were more prevalent among newborns in Michigan than among those in Utah because the percent of African-American women was higher in Michigan than in Utah, and infants born to African-American women are at greater risk for adverse birth outcomes [19]. However, the relationship between interpregnancy interval and adverse birth outcomes was very similar in the Michigan Cross-Sectional Study as compared to that in the Utah Study. (Fig. 1 shows the relationship between interpregnancy interval and low birth weight in the three studies.) Both short and long interpregnancy intervals were associated with an increased risk for adverse birth outcomes. When the association was examined for white and African-American women separately, the J-shaped relationship between interpregnancy interval and the three adverse birth outcomes existed in both racial groups. Moreover, the J-shaped relationship persisted at each level of other maternal reproductive risk factors within each racial group, and after controlling for those risk factors simultaneously by logistic regression (Table 2).

The Michigan Cross-Sectional Study observed a similar J-shaped relationship in a population resembling the average population in the U.S., and among both white and African-American women. Therefore, the findings from the Utah Study appeared to be generalizable to other populations. However, both the Michigan Cross-Sectional Study and the Utah Study were based on compiled vital records data registered in the same state over several years. Both data sets likely contained many sets of siblings born to the same biological mothers. The data for these siblings are statistically correlated. Theoretically, this type of cross-sectional study designs may produce correct point estimates of the risks and odds ratios. However, the estimated variances, as well as the resulting confidence interval estimates as well as statistical inferences, may be incorrect [14,15].

## 4. The Michigan Retrospective Cohort Study [20]

The Michigan Retrospective Cohort Study [20] was designed to verify the findings from the Utah Study and the Michigan Cross-Sectional Study, and to address the statistical problem regarding the correlation among biological siblings in the data. The published paper only included data on the relationship between interpregnancy interval and low birth weight (<2500 g). The researchers also examined preterm birth and small size for gestational age in relation to interpregnancy interval, and found similar results in comparison with the findings regarding low birth weight. These data are available from the author of this paper upon request.

The data for the Michigan Retrospective Cohort Study were the birth records for infants born in Michigan and out of state births to Michigan resident women between January 1, 1989 and December 31, 2000. The data for the infants born to the same biological mother were linked, using the mother's social security number, first name, last name, middle initial, maiden name, and birth date. When a link is in question, the mother's address, the infant's birth date, and other information on the birth certificate were used for verification.

By linking the birth records of the infants born to the same biological mother, the reproductive histories of cohorts of women who delivered live births in Michigan from 1989 to 2000 were re-created. This design allowed the researchers to conduct retrospective cohort analyses, and verify the findings from the previously published cross-sectional studies. Also, because the researchers were able to identify the biological siblings through this design, they were able to use appropriate statistical techniques to address the statistical problems caused by the correlation among the siblings in the data. Additionally, this approach enabled the researchers to calculate the interpregnancy interval directly from the recorded birth dates of two consecutive live births rather than relying on the self-reported date of the previous live birth; thus, the accuracy of the estimated interpregnancy interval was improved. Moreover, the researchers were able to evaluate and control for the birth weight of the preceding sibling. Previously, researchers have raised concerns about the potential confounding effect of this variable,

**000540**

Exhibit 136                           JA1419                           JA-0001789

because it is a powerful predictor for the birth weight of the subsequent sibling.

The overall relationship between interpregnancy interval and low birth weight was examined. The data were then stratified into pairs of births by the birth order of the biological siblings (i.e., first-second, second—third, third—fourth, and forth—fifth), and the relationship was examined by pairs of births. The potential confounding effect of other reproductive risk factors was examined through stratified and multivariable analysis within the pairs of births.

The birth records of 565,816 infants born during 1989 and 2000 in Michigan who had at least one biological sibling born during the same time period in Michigan or to a Michigan resident woman were identified and linked to their biological mothers. These infants were born to 422,590 mothers, of whom 79.6% were whites, 18.2% were African-Americans, 1.3% were Asians or Pacific Islanders, 0.5% were Native Americans, and 0.4% were women of other racial groups or whose racial group was not identified on the birth certificate. A similar J-shaped relationship between interpregnancy interval and low birth weight was found overall (Fig. 1), and among both white and African-American women in this study. When the data were stratified by pairs of birth, a J-shaped relationship existed among the first—second, second—third, third—fourth, and forth—fifth pairs of births, and persisted after controlling for other risk factors, most notably the birth weight of the preceding sibling (Table 3). Also, the study estimated the adjusted population attributable risk for low birth weight due to "non-optimal" interpregnancy intervals. It was found that the adjusted population attributable risk was 5.1% if the optimal interpregnancy interval was defined as 6—59 months, and 9.4% if the optimal interval was defined as 18—23 months.

## 5. Discussion

The three studies conducted in various populations, using different study designs, stratified by, and controlling for various maternal reproductive risk factors addressed a number of methodological limitations regarding previously published studies. It was gratifying to observe a consistent J-shaped relationship between interpregnancy interval and adverse birth outcomes in all three studies. It is noteworthy that all three studies meticulously stratified the data by 5-year maternal age groups. A J-shaped relationship between interpregnancy interval and adverse birth outcomes persisted in all age groups wherever the data supported the stratified analysis. Hence these studies adequately demonstrated that the relationship between a long interpregnancy interval and adverse birth outcomes is not due to confounding by maternal age. Therefore, short of a proof from a randomized controlled trial, one may conclude, with due caution, that there is a causal relationship between interpregnancy interval and adverse birth outcomes. The optimal interpregnancy interval for preventing adverse birth outcomes appeared to be approximately 18—23 months, departing from which the risk for adverse birth outcomes increased, although the increase was not appreciable unless the interpregnancy interval was shorter than 6 months or longer than 5 years.

Prior to these studies, researchers had mostly examined the relationship between a short interpregnancy interval (albeit arbitrarily defined) and the risk for adverse birth outcomes, and proposed various theories about the mechanisms to explain the relationship. The most widely accepted theories involved postpartum nutritional depletion (especially folate deficiency) and stress [21—23].

Two hypotheses were proposed to explain the relationship between a long interpregnancy inter-

Table 3    Adjusted[a] odds ratios (OR) of low birth weight (<2500 g) and their 95% confidence intervals (CI) associated with various interpregnancy intervals, by birth pairs, from the Michigan Retrospective Cohort Study [19]

| Interpregnancy interval (months) | First—second birth pairs | | Second—third birth pairs | | Third—fourth birth pairs | | Fourth—fifth birth pairs | |
|---|---|---|---|---|---|---|---|---|
| | OR | 95% CI | OR | 95% CI | OR | 95% CI | OR | 95% CI |
| <6 | 1.4 | 1.3—1.5 | 1.5 | 1.3—1.6 | 1.2 | 1.1—1.4 | 1.3 | 1.1—1.6 |
| 6—11 | 1.1 | 1.0—1.1 | 1.1 | 1.0—1.2 | 1.0 | 0.9—1.2 | 1.0 | 0.9—1.3 |
| 12—17 | 1.0 | 0.9—1.1 | 1.0 | 0.9—1.1 | 1.0 | 0.8—1.1 | 1.0 | 0.8—1.3 |
| 18—23 | referent | | referent | | referent | | referent | |
| 24—59 | 1.1 | 1.0—1.1 | 1.1 | 1.0—1.1 | 1.0 | 0.9—1.1 | 1.1 | 1.0—1.4 |
| 60—95 | 1.5 | 1.3—1.6 | 1.3 | 1.2—1.4 | 1.3 | 1.1—1.5 | 1.2 | 0.9—1.5 |
| 96—136 | 1.5 | 1.3—1.8 | 1.6 | 1.3—2.0 | 1.4 | 1.0—2.0 | 1.3 | 0.8—2.3 |

[a] Controlled for the preceding infant's birth weight, paternal acknowledgment on birth certificate, mother's age at delivery, race, education, adequacy of prenatal care utilization, outcome of preceding pregnancy (live birth, stillbirth), tobacco use and alcohol use during pregnancy.

000541

Exhibit 136                    JA1420                    JA-0001790

val and adverse birth outcomes by the researchers of the three studies [16,17,20]. One is the "physiological regression hypothesis," i.e., the mother's physiologic processes are primed for fetal growth during pregnancy. This benefit gained during pregnancy would decline gradually postpartum if the mother is not pregnant again. This hypothesis is supported by the observation that perinatal outcomes for infants conceived after an excessively long interpregnancy interval are similar to outcomes of infants born to primigravid women [16]. Another hypothesis is that the increased risk of adverse perinatal outcomes after a long interpregnancy interval is due to reproductive wastage, i.e., long interpregnancy intervals may involve factors that cause both secondary infertility and adverse perinatal outcomes.

An interesting point of note is that the median interpregnancy interval in all three studies and among all racial groups was approximately 20 months, which coincides with the optimal interval associated with the lowest risk for adverse birth outcomes (18−23 months). These findings suggest that there may be adaptive advantages for the humans to space their pregnancies for approximately 20 months.

Although these three studies have made some advancement in understanding the relationship between interpregnancy interval and adverse birth outcomes, there are still many unanswered questions. For example, more studies are needed on the effects of interpregnancy interval on infant mortality, especially in developing nations. Additionally, more research is needed to understand the relationship between interpregnancy interval and other health outcomes, e.g., maternal morbidity and mortality, and long-term health and development (including physical, behavioral, social, and intellectual development) of the children affected. Also, studies are needed on whether the effects of interpregnancy interval differ between developing and developed nations. On a methodological note, researchers should consider unifying the categorization of interpregnancy interval in their studies to facilitate comparison between studies and meta-analysis. Journals which publish such studies and their reviewers can play an important role in this respect by discouraging the practice of arbitrarily categorizing the interpregnancy interval into "short" and "non-short" interpregnancy intervals, and encouraging researchers to examine the relationship over the full spectrum of the interpregnancy interval.

The findings of these three studies suggest various strategies for preventing adverse birth outcomes through pregnancy spacing. For example, health care providers, especially obstetricians, gynecologists, family practice physicians, pediatricians, nurses, and midwives could use the information from these studies to counsel women who have recently given birth about the risk of delivering infants with adverse birth outcomes if the pregnancies are spaced excessively short or long. Public health programs serving low-income, minority, immigrant, and other vulnerable populations of women could consider developing educational materials about the benefit of optimal pregnancy spacing, and referring clients to family planning services.

## References

[1] Mills JS. A system of logic: ratiocinative and inductive. London: Spottiswoode, Ballantyne and Co.; 1949. p. 255. New impression.
[2] Committee to Study the Prevention of Low Birthweight, Division of Health Promotion and Disease Prevention, Institute of Medicine. Preventing low birthweight. Washington (DC): National Academy Press; 1985.
[3] McCormick MC. The contribution of low birth weight to infant mortality and childhood morbidity. N Engl J Med 1985;312:82−90.
[4] Copper RL, Goldenberg RL, Creasy RK, DuBard MB, Davis RO, Entman SS, et al. A multicenter study of preterm birth weight and gestational age-specific neonatal mortality. Am J Obstet Gynecol 1993;168:78−84.
[5] Guyer B, Martin JA, MacDorman MF, Anderson RN, Strobino DM. Annual summary of vital statistics—1996. Pediatrics 1997;100:905−18.
[6] Arias E, MacDorman MF, Strobino DM, Guyer B. Annual summary of vital statistics—2002. Pediatrics 2003;112: 1215−30.
[7] Woodbury RM. Causal factors in infant mortality: a statistical study based on investigations in eight cities. Washington (DC): Government Printing Office; 1925. Children's Bureau publication no. 142.
[8] Eastman NJ. The effect of interval between births on maternal and fetal outlook. Am J Obstet Gynecol 1944;47: 445−66.
[9] Fedrick J, Adelstein P. Influence of pregnancy spacing on outcome of pregnancy. BMJ 1973;4:753−6.
[10] Erickson JD, Bjerkedal T. Interpregnancy interval: association with birthweight, stillbirth, and neonatal death. J Epidemiol Community Health 1978;32:124−30.
[11] Bakketeig LS, Hoffman HJ, Titmuss Oakley AR. Perinatal mortality. In: Bracken MB, editor. Perinatal epidemiology. New York: Oxford University Press, 1984. p. 99−151.
[12] Adams MM, Delaney KM, Stupp PW, McCarthy BJ, Rawlings JS. The relationship of interpregnancy interval to infant birthweight and length of gestation among low-risk women, Georgia. Paediatr Perinat Epidemiol 1997;11(Suppl. 1): 48−62.
[13] Klerman LV, Cliver SP, Goldenberg RL. The impact of short interpregnancy intervals on pregnancy outcomes in a low-income population. Am J Public Health 1998;88:1182−5.
[14] Watier L, Richardson S. Accounting for pregnancy dependence in epidemiologic studies of reproductive outcomes. Epidemiology 1997;8:629−36.
[15] Diggle PJ, Liang K-Y, Zeger SL. Analysis of longitudinal data. Oxford: Oxford University Press; 1994.

000542

Exhibit 136                            JA1421                            JA-0001791

[16] Zhu BP, Rolfs RT, Nangle BE, Horan JM. Effect of the interval between pregnancies on perinatal outcomes. N Engl J Med 1999;340:589—94.

[17] Zhu BP, Haines KM, Le T, McGrath-Miller K, Boulton M. Effect of the interval between pregnancies on perinatal outcomes among white and black women. Am J Obstet Gynecol 2001;185:1403—10.

[18] Zhang J, Bowes Jr WA. Birth-weight for gestational-age patterns by race, sex, and parity in the United States population. Obstet Gynecol 1995;86:200—8.

[19] CDC. Infant mortality and low birth weight among black and white infants—United States, 1980—2000. MMWR Morb Mortal Wkly Rep 2002;51:589—92.

[20] Zhu BP, Le T. Effect of interpregnancy interval on low birthweight: a retrospective cohort study using the Michigan maternally linked birth data. MCH J 2003;7:169—78.

[21] Miller JE. Birth intervals and perinatal health: an investigation of three hypotheses. Fam Plann Perspect 1991;23:62—70.

[22] Winkvist A, Rasmussen KM, Habicht J-P. A new definition of maternal depletion syndrome. Am J Public Health 1992;82:691—4.

[23] Smits LJ, Essed GG. Short interpregnancy intervals and unfavourable pregnancy outcome: role of folate depletion. Lancet 2001;358:2074—7.

000543

Exhibit 136                    JA1422                    JA-0001792

|   | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | DRAFT: INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been pub lcly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated distributed or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the fu l extent of the law. | | | | | | | |
| 2 | | | | | Notification from Elig ble Organizations to HHS Regarding Religious Objections to Providing Contraceptive Coverage | | | | | | | |
| 3 | | | | | Redacted | | | | | | | |
| 4 | | | | | | | | | | | | |
| 5 | | | | | Eligible Organization Information | | | | | Plan Information | | |
| 6 | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| 7 | Redacted | 8/26/2014 | E-mail | Cummins-Al ison Corp and Cummins Illinois Inc. | Redacted | Other | No | Plan B Ella Mirena Copper IUDs | Redacted | Other | self-insured | Redacted |
| 8 | | | | | | | | | | Other | Fully insured | |
| 9 | | 9/8/2014 | E-mail | Loyola University | | Non-profit | No | All | | Other | Fully insured | |
| 10 | | | | | | | | | | Other | Fully insured | |
| 11 | | 9/10/2014 | E-mail | Valley Forge Christian College | | Non-profit | Yes | Ulipristal (aka E la) Levonorgestrel (aka Plan B Plan B One-Step Next Choice) Intrauterine Devices (of any type) Abortion services except as save the life of the mother | | Other | Fully insured | |
| 12 | | | | | | | | | | Other | self-insured | |
| 13 | | 9/18/2014 | E-mail | Sisters of the Order of St. Dominic of Grand Rapids (Dominican Sisters) | | Non-Profit | No | All | | Other | Fully insured | |
| 14 | | 9/19/2014 | E-mail | Continuant | | Other | No | Emergency Contraceptives & IUD's | | Other | Fully insured | |
| 15 | | | | | | | | | | Other | Fully insured | |
| 16 | | 10/ /2014 | E-mail | Management Analysis and Ut lization Inc. | | Other | No | "All abortifacient coverages such as but not limited to morning after and week after services" | | Other | Both | |
| 17 | | | | | | | | | | Other | Both | |
| 18 | | | | | | | | | | Other | self-insured | |
| 19 | | 10/5/2014 | E-mail | Holy Ghost Preparatory School | | Non-profit | No | All | | Other | Fully insured | |
| 20 | | 10/9/2014 | Ma l | The Catholic Diocese of Memphis in Tennessee | | Non-profit | No | | | Church Plan | self-insured | |
| 21 | | | | | | | | | | Other | self-insured | |
| 22 | | 10/9/2014 | Ma l | Bellhaven University | | Non-profit | No | All | | Other | self-insured | |
| 23 | | | | | | | | | | Other | self-insured | |
| 24 | | 10/10/2014 | E-mail | Bingaman and Son Lumber Inc. PO Box 247 1195 Creek Mountain Rd Kreamer PA 17833 | | Other | No | Plan B Ella Mirena Paraguard | | Other | Fully insured | |
| 25 | | | | | | | | | | Other | Fully insured | |

Notifications

670107

Exhibit 139     JA1423     JA-0001937



670108

Exhibit 139

JA-0001938

| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Redacted | | | | Redacted | | | | Redacted | | | Redacted |
| | | | | | | | | | Other | Fully insured | |
| | 10/15/2014 | E-mail | Loyola University | | Non-profit | No | All | | Other | Fully insured | |
| | | | | | | | | | Other | Fully insured | |
| | | | | | | | | | Other | Fully insured | |
| | 10/16/2014 | Litigation | Wheaton College | | Non-profit | Yes | "Abortion-causing drugs abortion procedures and related services but has no religious objection to providing coverage for contraceptive drugs and devices that prevent conception (as opposed to interfering with the continued survival of a human embryo). Specifica ly identifies Plan B ella and certain unspecified IUDs as drugs and devices to which it has religious objections." | | Other | self-insured | |
| | | | | | | | | | Other | self-insured | |
| | | | | | | | | | Student | Fully insured | |
| | 10/20/2014 | Ma l | Carithers-Wallace-Courtenay LLC | | Other | | | | | | |
| | 10/29/2014 | Email | Contract Packaging Inc. | | Other | | Plan B E la Next Choice | | Other | | |
| | 11/5/2014 | Ma l | Avesta Homes LLC | | Other | | All | | Other | Fully insured | |
| | 11/1 /2014 | E-mail | Kent Manufacturing Company | | Other | | | | | | |
| | 11/14/2014 | Ma l | Dakota Tube Inc | | Other | | | | | | |
| | 11/18/2014 | E-mail | Oral Roberts University | | Non-profit | | EC Plan B One-step (the morning after pil ); Ella Ulipristal Acetate (the week after pil ); copper intrauterine devices; hormonal intrauterine devices; as we l as any other drug device procedure or mechanism which has the purpose or effect of preventing an already fertilized egg from developing further by inhibiting or terminating its attachment to the uterus" | | Other | Fully insured | |

Notifications

670109

Exhibit 139    JA1425    JA-0001939



670110

Exhibit 139

JA1426

JA-0001940

| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See Instruction #3 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11/20/2014 | E-mail | J.E. Dunn Construction Group Inc. | | Other | | - Plan B (levonorgestrel) and its generic equivalents  - ella (ulipristal acetate)  - ParaGard (copper IUD)  - Mirena and Skyla (levonorgestrel-releasing IUDs) | | Other | Self-insured | |
| | | | | | | | | | Other | Self-insured | |
| | 12/5/2014 | E-mail | Greenville College | | Non-profit | | Plan B, Ella and/or I IUDs | | Other | self-insured | |
| | | | | | | | | | Other | self-insured | |
| | | | | | | | | | Other | self-insured | |
| | 12/5/2014 | E-mail | Covenant Presbyterian Church | | Non-profit | | | | | | |
| | 12/17/2014 | E-mail | Trinity Schools Inc. D/B/A Trinity School at River Ridge | | Non-profit | No | | | Other? | Fully insured? | |
| | 12/17/2014 | E-mail | People of Praise Minnesota Inc. | | Non-profit | No | | | Other? | Fully insured? | |
| | 12/2 /2014 | E-mail | Oral Roberts University | | Non-profit | | EC Plan B One-step (the morning after pill), Ella (Ulipistal Acetate (the week after pill ) copper intrauterine devices; hormonal intrauterine devices; as well as any other drug, device, procedure or mechanism which has the purpose or effect of preventing an already fertilized egg from developing further by inhibiting or terminating its attachment to the uterus" | | Other | self-insured | |
| | 1/8/2015 | Mail | PartsNGIFT LLC | | Other | | "All contraceptive medications and procedures (iuter llaction abortions Rx contraceptive devices etc.)" | | Other | Fully insured | |
| | | | | | | | | | Other | Fully insured | |
| | 1/12/2015 | Mail | D4S Companies Inc. | | Other | | All | | Other | self-insured | |
| | 1/30/2015 | E-mail | Illinois Baptist Children's Home and Fam ly Services | | Non-profit | No | | | | | |
| | 2/1 /2015 | Mail | Olivet Nazarene University | | Non-profit | No | "the Health Plan w ll not provide pay for and/or facilitate access to abortion-inducing products and related counseling. This includes the use of Yaz (BloCne and the Copper T IUD) when prescribed with a diagnosis of pregnancy."  The Health Plan will require a prior authorization for the dispensing of Yaz (BloCne and the Copper T IUD. Coverage of these products will not be allowed until a doctor confirms the use of the medications for non-abortifacient purposes."  Plan B will be non-covered." | | Other | Fully insured | |
| | 4/15/2015 | Mail | St. Raphael Health Plan - all participating employers (LINE 4) | | Non-profit | | All | | Church Plan | self-insured | |

Notifications



670112

Exhibit 139          JA1428          JA-0001942

| | A | B | C | D | Eligible Organization Information | | F | G | H | | Plan Information | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | | | | | | | | | | | | |
| 6 | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | | Type of organization (Non-profit or other) | Plaintiff in Litigation? [Yes or No] [See Instruction #2 above] | Contraceptive services not provided | | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| | Redacted | | | | Redacted | | | | | | Redacted | | | Redacted |
| 54 | | 5/4/2015 | Ma l | Society of the Precious Blood | | | Non-profit | | All | | | Other | Fully insured | |
| 55 | | 5/22/2015 | E-mail | Michael James Sales Tax Solutions LLC | | | Other | | "Any and a l abortifacients" | | | Other | Fully insured | |
| 56 | | 07/087/15 | Litigation (Zub k v. Burwell) | The ROMAN CATHOLIC DIOCESE OF PITTSBURGH (* exempt) | | | Non-profit | Yes | All | | | Church Plan | self-insured | |
| 57 | | 07/087/15 | Litigation (Zub k v. Burwell) | THE ROMAN CATHOLIC DIOCESE OF ERIE (*exempt) | | | Non-profit | Yes | All | | | Church Plan | self-insured | |
| 58 | | 07/087/15 | Litigation (Zubik v. Burwell) | CATHOLIC CHARITIES OF THE DIOCESE OF PITTSBURGH INC. | | | Non-profit | Yes | All | | | Church Plan | self-insured | |
| 59 | | 07/087/15 | Litigation (Zubik v. Burwell) | THE CATHOLIC CEMETERIES ASSOCIATION OF THE DIOCESE OF PITTSBURGH | | | Non-profit | Yes | All | | | Church Plan | self-insured | |
| 60 | | 07/087/15 | Litigation (Zubik v. Burwell) | ST. MARTIN CENTER INC. | | | Non-profit | Yes | All | | | Church Plan | self-insured | |
| 61 | | 07/087/15 | Litigation (Zubik v. Burwell) | PRINCE OF PEACE CENTER INC. | | | Non-profit | Yes | All | | | Church Plan | self-insured | |
| 62 | | 07/087/15 | Litigation (Zub k v. Burwell) | ERIE CATHOLIC PREPARATORY SCHOOL | | | Non-profit | Yes | All | | | Church Plan | self-insured | |
| 63 | | 8/3/2015 | Mall | Oral Roberts University | | | Non-profit | | EC Plan B One-step (the morning after pil ); Ella Ulipristal Acetate (the week after pil ); copper intrauterine devices; hormonal intrauterine devices; as wel l as any other drug device  procedure  or mechanism which has the purpose or effect of preventing an already fertilized egg  from developing further by inhibiting or terminating its attachment to the uterus" | | | Student | Fully insured | |

Notifications

670113

Exhibit 139

| M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|
| Service Provider Information | | | Original information or updated information? | For updated information, date the information is effective | | | | Action Taken | | |
| Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | | | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |

Notifications

670114

Exhibit 139

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tracking number | Date notification received | Received via mail or e-mail? | Eligible Organization Information | | | | | | Plan Information | | |
| | | | | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? [Yes or No] [See Instruction #2 above] | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| 64 | Redacted | 8/2 /2015 | E-mail | Cummins-Al ison Corp and Cummins II inois Inc | Redacted | Other | No | Plan B  Ella  Mirena  Copper IUDs | Redacted | Other | self-insured | Redacted |
| 65 | | 9/25/2015 | E-mail | Weingartz Supply Co.  Inc. & W & P Management LLC | | Other | Yes | All contraceptive services | | Other | Fully insured | |
| 66 | | 10/14/2015 | Ma l | Carolyn's Place  Inc. | | Non-profit | | All contraceptive services | | | Fully insured | |
| 67 | | 10/14/2015 | Ma l | Dakota Tube Inc | | Other | | | | | | |
| 68 | | 10/28/2015 | Ma l | Tyndale House Publishers  Inc. | | Other | | post-conceptive medications and devices  namely emergency contraceptives such as the "morning-after pill " the "week-after pi l " and intrauterine devices | | Other | Self-insured | |
| 69 | | 10/29/2015 | E-mail | Electrolock  Inc.  Dunstone Co.  Inc. and Stone River Mgmt. Co.  LLC. | | Other | | All | | Other | self-insured | |
| 70 | | 11/19/2015 | Ma l | Management  Analysis and Ut lization  Inc. | | Other | | Ella  Plan B  Plan B One Stop  Next Choice  Next Choice One Dose  My Way  and Take Action | | Other | Fully insured | |
| 71 | | | | | | | | | | | Fully insured | |
| 72 | | | | | | | | | | | self-insured | |
| 73 | | 12/17/2015 | SW/FT | Conestoga Wood Specialties Corp. Conestoga Transportation  Inc. Phone: 717-445-6701 | | Other | Yes | Any hormonal drugs or IUDs | | Other | self-insured | |
| 74 | | 12/2 /2015 | E-mail | St. Joseph's Abby (AKA. Cistercian Abby of Spencer) | | Non-profit | No | ALL contraceptive services required to be covered under PHS Act section 2713  as added by the Affordable Care Act  and incorporated into ERISA section 715 and Code section 9815 | | Church Plan | Fully insured | |
| 75 | | 12/2 /2015 | Ma l | Dakota Tube Inc. | | Other | | | | | | |
| 76 | | 1/28/2016 | Ma l | Community Foundation of Northwest Indiana  Inc. St. Mary Medical Center St. Catherine Hospital | | Non-profit | | All - "objection to providing coverage of all contraceptive services required to be covered under PHS Act section 2713  as added by the Affordable Care Act  and incorporated into ERISA section 715 and Code section 9815." | | Other | Self-insured | |
| 77 | | 2/2 /2016 | E-mail | Miller Contracting Services Inc. | | Other | | All | | Other | | |
| 78 | | 3/3/2016 | E-mail | Earth Sun Moon Trading company  Inc | | Other | | All | | Other | Fully insured | |

Notifications

670115

Exhibit 139     JA1431     JA-0001945

| M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|
| Service Provider Information | | | Original information or updated information? | For updated information, date the information is effective | | Action Taken | | | | |
| Contact information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact information for TPA (enter N/A if none) | | | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| Redacted | Redacted | Redacted | | | Redacted | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | | | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | | | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |

Notifications

**670116**

Exhibit 139          JA1432          JA-0001946

| | Eligible Organization Information | | | | | | | Plan Information | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| Redacted | 3/7/2016 | E-mail | Luurtsema Sales | Redacted | Other | | All | Redacted | Other | Fully insured | Redacted |
| | 3/24/2016 | E-mail | Continuum Health Partnerships Inc. | | Other | | Abortion causing drugs devices and sterilizations; patient education and counseling for all women with reproductive capacity. | | Other | self-insured | |
| | | | Continuum Health Management LLC | | | | | | | | |
| | | | Mountain States Health Properties LLC. | | | | | | | | |
| | 3/28/2016 | E-Mail | Fresh Unlimited Inc. | | Other | | All | | Other | Fully Insured | |
| | 4/1/2016 | E-mail | Sarkes Tarzian Inc. | | Other | | All | | Other | Fully insured | |
| | 7/19/2016 | E-Mail | Mersino Management Company Mersino Southwest, LLC Mersino Enterprise Inc. Global Pump Company Mersino Properties Company, LLC Mersino Dewatering Inc. | | Other | Yes | All | | Other | self-insured | |
| | 7/26/2016 | Litigation: 2nd Circuit Court 1:12-cv-02542- BMC Catholic Health Care System | Catholic Health Care System (aka ArchCare) | | | Yes | abortion-inducing drugs  sterilizations  contraceptives | | | self-insured | |
| | | | Cardinal Spellman High School | | | Yes | | | | self-insured | |
| | | | Monsignor Farrell High School | | | | | | | self-insured | |
| | | | Catholic Health Services of Long Island | | | Yes | | | | self-insured | |
| | 7/26/2016 | Litigation: Geneva 3rd Circuit Court 2:12-cv-00207 | Geneva College (employee) | | | Yes | abortion-inducing drugs | | Other | Fully insured | |
| | | | Geneva College (Student) | | | Yes | | | Student | Fully insured | |
| | 7/26/2016 | Litigation: Persico 3rd Circuit Court 1:13-cv-00303 | The Roman Catholic Diocese of Erie* (exempt) | | Non-profit | Yes | abortion-inducing drugs  contraceptives  or sterilization | | Church Plan | self-insured | |
| | | | Erie Catholic Preparatory School | | Non-profit | | | | | | |
| | | | PRINCE OF PEACE CENTER  INC. | | Non-profit | | | | | | |
| | | | ST. MARTIN CENTER  INC. | | Non-profit | | | | | | |
| | 7/26/2016 | Litigation: Zubik 3rd Circuit Court 2:12-cv-00676 | Catholic Charities of Pittsburgh Diocese of Pittsburgh* (Exempt) | | Non-profit | Yes | abortion-inducing drugs  contraceptives  or sterilization | | Church Plan | self-insured | |
| | 7/26/2016 | Litigation: Catholic Diocese of Beaumont 5th Circuit Court | Catholic Charities of Southeast Texas Catholic Diocese of Beaumont* (Exempt) | | | Yes | abortifacients  contraception  and sterilization | | Other | self-insured | |

Notifications

670117

Exhibit 139  JA1433  JA-0001947

| | M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | Service Provider Information | | | | | | | Action Taken | | |
| 6 | Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| 79 | Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| 80 | | | | Original | N/A | | | | | | |
| 81 | | | | Original | N/A | | | | | | |
| 82 | | | | | | | | | | | |
| 83 | | | | Original | N/A | | | | | | |
| 84 | | | | Original | N/A | | | | | | |
| 85-90 | | | | Original | N/A | | | | | | |
| 91 | | | | Original | N/A | | | | | | |
| 92 | | | | Original | N/A | | | | | | |
| 93 | | | | Original | N/A | | | | | | |
| 94 | | | | Original | N/A | | | | | | |
| 95 | | | | Original | N/A | | | | | | |
| 96 | | | | Original | N/A | | | | | | |
| 97-100 | | | | Updated | N/A | | | | | | |
| 101 | | | | Updated | N/A | | | | | | |
| 102-104 | | | | Original | N/A | | | | | | |

Notifications

670118

Exhibit 139

JA1434

JA-0001948

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | | | | Eligible Organization Information | | | | | Plan Information | | |
| 6 | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See Instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| 105 | Redacted | 7/26/2016 | Litigation: ETBU 5th Circuit Court 4:12-CV-3009 | East Texas Baptist University (employee) | Redacted | | Yes | "abortion-inducing drugs … and related services" NOT including contraceptives (compl. ¶ 28) | Redacted | Other | self-insured | Redacted |
| 106 | | | | Houston Baptist | | | Yes | | | | self-insured | |
| 107 | | | | Westminster | | | Yes | | | | | |
| 108 | | 7/26/2016 | Litigation: University of Dallas 5th Circuit Court 4:12-cv-314 | Roman Catholic Diocese of Fort Worth* (Exempt) | | Non-profit | Yes | "abortion-inducing drugs" sterilization and contraception | | Church Plan | self-insured | |
| 109 | | | | University of Dallas (employee) | | | Yes | "abortion-inducing drugs" and sterilization | | | self-insured | |
| 110 | | | | University of Dallas (student) | | | Yes | "abortion-inducing drugs" sterilization and contraception (prescribed to treat a medical condition only not to prevent pregnancy) | | Student | Fully-insured | |
| 111 | | | | Catholic Charities of Fort Worth | | | Yes | abortion-inducing drugs sterilization and contraception | | | Fully-insured | |
| 112 | | 7/26/2016 | Litigation: Catholic Diocese of Nashville 6th Circuit Court 3:13-cv-01303 | Aquinas College Nashville | | | | | | | | |
| 113 | | | | Camp Marymount Inc. | | | | | | | | |
| 114 | | | | Catholic Charities of Tennessee | | | | | | | | |
| 115 | | | | The Catholic Diocese of Nashville* (Exempt) | | | Yes | "abortion-inducing products" sterilization and contraception | | | Fully-insured | |
| 116 | | | | Dominican Sisters of St. Cecilia* (Exempt) | | | | | | | | |
| 117 | | | | Mary Queen of Angels | | | | | | | | |
| 118 | | | | St. Mary's V Ba Inc. | | | | | | | | |
| 119 | | 7/26/2016 | Litigation: MCC 6th Circuit Court 1:13-cv-01247-GJQ | Catholic Family Services (aka Catholic Charities of Kalamazoo) | | | Yes | contraception and sterilization | | | self-insured | |
| 120 | | | | Michigan Catholic Conference* (Exempt) | | | | | | | | |
| 121 | | 7/26/2016 | Litigation: Catholic Charities of Ft. Wayne 7th Circuit Court 1:12-cv-00159-JD-RBC | Catholic Charities of Ft. Wayne | | | Yes | "abortion-inducing products" sterilization and contraception | | | Self-insured | |
| 122 | | | | Diocese of Ft. Wayne* (Exempt) | | | Yes | "abortion-inducing products" sterilization and contraception | | | Self-insured | |
| 123 | | | | Franciscan Alliance | | | Yes | "abortion-inducing products" sterilization and contraception | | | Both | |
| 124 | | | | Our Sunday Visitor | | | Yes | "abortion-inducing products" sterilization and contraception | | | Self-insured | |
| 125 | | | | Specialty Physicians of Illinois | | | Yes | "abortion-inducing products" sterilization and contraception | | | Fully-insured | |
| 126 | | | | St. Anne Home | | | Yes | "abortion-inducing products" sterilization and contraception | | | Self-insured | |
| 127 | | | | University of St. Francis | | | Yes | "abortion-inducing products" sterilization and contraception | | | Self-insured | |

Notifications

670119

Exhibit 139

JA-0001949

| | Service Provider Information | | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | | | Action Taken | | Notes | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | | | | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | | |
| 105 | Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| 106 | | | | Original | N/A | | | | | | |
| 107 | | | | Original | N/A | | | | | | |
| 108 | | | | | | | | | | | |
| | | | | Original | N/A | | | | | | |
| 109 | | | | | | | | | | | |
| 110 | | | | Original | N/A | | | | | | |
| 111 | | | | Original | N/A | | | | | | |
| 112 | | | | | | | | | | | |
| 113 | | | | | | | | | | | |
| 114 | | | | Original | N/A | | | | | | |
| 115 | | | | | | | | | | | |
| 116 | | | | | | | | | | | |
| 117 | | | | | | | | | | | |
| 118 | | | | | | | | | | | |
| 119 | | | | Original | N/A | | | | | | |
| 120 | | | | Original | N/A | | | | | | |
| 121 | | | | Original | N/A | | | | | | |
| 122 | | | | | | | | | | | |
| | | | | Original | N/A | | | | | | |
| 123 | | | | | | | | | | | |
| 124 | | | | Original | N/A | | | | | | |
| | | | | Original | N/A | | | | | | |
| 125 | | | | | | | | | | | |
| 126 | | | | Original | N/A | | | | | | |
| 127 | | | | Original | N/A | | | | | | |

Notifications

**670120**

Exhibit 139

JA-0001950

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Eligible Organization Information** | | | | | | **Plan Information** | | |
| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) [See instruction R2 above] | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| Redacted | | | | Redacted | | | | Redacted | | | Redacted |
| | | Litigation: Grace Schools 7th Circuit Court 3:12-cv-00459-JD-CAN | Biola University (employee) | | | Yes | "abortion-inducing drugs like ella and Plan B" but not other contraceptives | | | Fully insured | |
| | 7/26/2016 | | Biola University (student) | | | Yes | "abortion-inducing drugs like ella and Plan B" but not other contraceptives | | Student | Fully insured | |
| | | | Grace Schools (employee) | | | Yes | "abortificient drugs" but not all contraceptives | | | Self-insured | |
| | | | Grace Schools (student) | | | Yes | "abortificient drugs" but not all contraceptives | | Student | Fully insured | |
| | 7/26/2016 | Litigation: CNS 8th Circuit Court 2:12-cv-00092 | CNS International Ministries (holding company for other listed plaintiffs: Sharpe Holdings Inc. Ozark Nat'l Life Ins. Co. and N.I.S. Financial Services Inc.) | | | Yes | Plan B ella Copper IUDs | | | Self-insured | |
| | | | Heartland Christian College | | | Yes | Plan B ella Copper IUDs | | | Self-insured | |
| | 7/26/2016 | Litigation: Dordt 8th Circuit Court 5:13-cv-04100 | Cornerstone University | | | Yes | "post-coital 'emergency contraceptives'" such as "ella Plan B and IUDs" | | | Fully-insured | |
| | | | Dordt College (employee) | | | | | | | Self-insured | |
| | | | Dordt College (student) | | | | | | Student | Fully-insured | |
| | 7/26/2016 | Litigation: Little Sisters Little Sisters 10th Circuit Court No. 13-1540 (10th Cir) Appeal of No. 1:13-CV-02611 (D. Co.) | Little Sisters of the Poor Baltimore Inc. ( Little Sisters of Baltimore") | | Non-profit | Yes | "sterilization contraceptives and drugs that cause abortions." "contraceptives abortifacient drugs sterilizations and related education and counseling " | | | self-insured | |
| | | | Little Sisters of the Poor Home for the Aged Denver Colorado ("Little Sisters of Denver") | | Non-profit | | | | | | |
| | 7/26/2016 | Litigation: Reaching Souls | Reaching Souls Truett-McConnell College | | | Yes | ella Plan B Plan B one-step Next Choice Copper IUDs IUDs w/Progestin | | Church Plan | self-insured | |
| | | | Mid-America Christian | | | Yes | "contraceptives abortifacients (such as Plan B and e la) and related counseling to their employees and students." | | | self-insured | |
| | | | Oklahoma Baptist (employee) | | | | | | | Fully-insured | |
| | 7/26/2016 | Litigation: Southern Nazarene 8th Circuit Court No. 14-6026 (10th Cir) appeal of No. 5:13 CV-01015-F (W.D. Okla.) | Oklahoma Baptist (student) | | | | | | Student | Fully-insured | |
| | | | Oklahoma Wesleyan | | | Yes | Plan B ella and IUDs | | | Fully-insured | |
| | | | Southern Nazarene University (employee) | | | | "contraceptives abortifacients (such as Plan B and e la) and related counseling to their employees and students." | | | Partially self-insured. Insured for claims over $100 000 | |

Notifications

670121

Exhibit 139  JA1437  JA-0001951

| | M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Service Provider Information | | | Original information or updated information? | For updated information, date the information is effective | Action Taken | | | | | |
| | Contact information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact information for TPA (enter N/A if none) | | | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| 128 | Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| 129 | | | | Original | N/A | | | | | | |
| 130 | | | | | | | | | | | |
| 131 | | | | Original | N/A | | | | | | |
| 132 | | | | Original | N/A | | | | | | |
| 133 | | | | Original | N/A | | | | | | |
| 134 | | | | Original | N/A | | | | | | |
| 135 | | | | Original | N/A | | | | | | |
| 136 | | | | Original | N/A | | | | | | |
| 137 | | | | Original | N/A | | | | | | |
| 138 | | | | | | | | | | | |
| 139 | | | | Original | N/A | | | | | | |
| 140 | | | | | | | | | | | |
| 141 | | | | | | | | | | | |
| 142 | | | | | | | | | | | |
| 143 | | | | | | | | | | | |
| 144 | | | | Original | N/A | | | | | | |
| 145 | | | | | | | | | | | |

Notifications

670122

Exhibit 139

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | | | | Eligible Organization Information | | | | | Plan Information | | |
| 6 | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| 146 | Redacted | | | Southern Nazarene University (student) | Redacted | | | | Redacted | Student | Fully-insured | Redacted |
| 147 | | 7/26/2016 | Litigation: Priests for Life DC 1:13-cv-01261 | Priests for Life | | | Yes | "contraception  sterilization  [and] abortifacients" | | | Fully-insured | |
| 148 | | | | Archdiocese of Washington ( listed in complaint as "Roman Catholic Archbishop of Washington  D.C." and as "Archdiocese of Washington")* (exempt) | | | | | | | self-insured | |
| 149 | | | | Catholic Charities of the Archdiocese of Washington  Inc. | | | | | | | | |
| 150 | | | | Catholic Information Center  Inc | | | | | | | | |
| 151 | | | | The Catholic University of America | | | | | | | Fully-insured | |
| 152 | | 7/26/2016 | Litigation: RCAW DC 1:13-cv-01441 | The Catholic University of America (student) | | | Yes | abortion-inducing products  contraception  or sterilization | | Student | Fully-insured | |
| 153 | | | | The Consortium of Catholic Academies of the Archdiocese o Washington  D.C. | | | | | | | | |
| 154 | | | | Archbishop Carroll High School | | | | | | | | |
| 155 | | | | Don Bosco Cristo Rey High School of the Archdiocese of Washington  D.C. | | | | | | | | |
| 156 | | | | Mary of Nazareth Roman Catholic Elementary School  Inc. | | | | | | | self-insured | |
| 157 | | | | Roman Catholic Archbishop of Washington | | | | | | | | |
| 158 | | | | Victory Housing  Inc. | | | | | | | | |
| 159 | | | | Thomas Aquinas College | | | | | | | | |
| 160 | | 7/26/2016 | Litigation: Beckwith Electric 11th Circut (M.D. FL) 8:16-cv-01944 | Beckwith Electric Co.  Inc. | | Other | Yes | "emergency contraception " "abort facients " "any drugs  devices  and services capable of ending innocent human life" (spec fica ly lists Plan B  ella  and the IUD as examples of "abortifacients") | | Other | self-insured | |
| 161 | | 7/26/2016 | Litigation: Johnson Welded DC(DCC) 1:16-cv-00557 | Johnson Welded Products  Inc. | | Other | Yes | "all of the contraceptive services required by the contraceptive services mandate" | | Other | Not indicated | |
| 162 | | 8/5/2016 | Ma l | Society of the Precious Blood | | Non-profit | No | All | | Other | Fully-insured | |
| 163 | | 9/1/2016 | Litigation: Catho ic Charities Archdiocese of Ph ladelphia 3rd Circuit  2:14-cv-03096-AB | Catholic Charities of the Archdiocese of Philadelphia d/b/a Catho ic Social Services | | Non-profit | Yes | "a l of the required contraceptive services  with  the exception of the prescription and use of contraceptive medications for non-contraceptive  medical purposes." | | Church Plan | Self-insured | |
| 164 | | 9/1/2016 | Litigation: Catho ic Charities Archdiocese of Ph ladelphia 3rd Circuit  2:14-cv-03096-AB | St. John's Orphan Asylum | | Non-profit | Yes | "a l of the required contraceptive services  with  the exception of the prescription and use of contraceptive medications for non-contraceptive  medical purposes." | | Church Plan | Self-insured | |

Notifications

670123

Exhibit 139                                    JA1439                                    JA-0001953



Notifications

670124

Exhibit 139

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? [Yes or No] [See Instruction #2 above] | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| | Redacted | | | | Redacted | | | | Redacted | | | Redacted |
| 165 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | St. Edmond's Home for Crippled Children | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 166 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Don Guanella Village of the Archdiocese of Philadelphia | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 167 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Divine Providence Village | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 168 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Philadelphia Protectory for Boys d/b/a St. Gabriel's System | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 169 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Catholic Community Services Inc. | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 170 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Nutritional Development Services Inc. | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 171 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Catholic Health Care Services - Supportive Independent Living d/b/a Villa St. Martha and Community Based Services | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 172 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | St. John Vianney Center | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 173 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Catholic Clinical Consultants | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 174 | | 9/1/2016 | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Roman Catholic Archdiocese of Philadelphia | | Non-profit | Yes | "a] of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 175 | | 9/15/2015 | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | Diocese of Cheyenne | | Non-profit | Yes | "to providing procuring or facilitating access to abortion-inducing products abortion sterilization or contraceptives" except when "prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy or to induce abortion." | | Church Plan | Self-insured | |
| 176 | | 9/15/2015 | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | Catholic Charities of Wyoming | | Non-profit | Yes | "to providing procuring or facilitating access to abortion-inducing products abortion sterilization or contraceptives" except when "prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy or to induce abortion." | | Church Plan | Self-insured | |
| 177 | | 9/15/2015 | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | Saint Joseph's Children's Home | | Non-profit | Yes | "to providing procuring or facilitating access to abortion-inducing products abortion sterilization or contraceptives" except when "prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy or to induce abortion." | | Church Plan | Self-insured | |

Notifications

670125

Exhibit 139    JA1441    JA-0001955

| | Service Provider Information | | Original information or updated information? | For updated information, date the information is effective | | | | Action Taken | | Notes | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | | | For updated information, summary of changes | For fully insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | | | |
| Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |
| | | | Original | N/A | | | | | | | |

Notifications

**670126**

Exhibit 139

| | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) [See instruction #2 above] | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 178 | Redacted | 9/15/2015 | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | St. Anthony Tri-Parish Catholic School | Redacted | Non-profit | Yes | "to providing procuring or fac litating access to abortion-inducing products abortion steri ization or contraceptives" except when "prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy or to induce abortion." | Redacted | Church Plan | Self-insured | Redacted |
| 179 | | 9/15/2015 | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | Wyoming Catholic College | | Non-profit | Yes | " abortion-inducing products or user lization" except " contraceptives only when prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy." | | Church Plan | self-insured | |
| 180 | | 9/15/2015 | Litigation: Colorado Christian University 10th Circuit Cours 14-1329 | Colorado Christian University (employee) | | Non-profit | Yes | "coverage for a l services drugs and devices that could terminate human life from the moment of conception including medical abortions emergency contraceptives like Plan B and E la and IUDs" and "other contraceptives." | | Other | self-insured | |
| 181 | | 9/15/2015 | Litigation: Colorado Christian University 10th Circuit Court 14-1330 | Colorado Christian University (student) | | Non-profit | Yes | "coverage for abortions and all contraceptives including emergency contraceptives and IUDs." | | Student | Fully insured | |
| 182 | | 9/15/2015 | Litigation: Dobson 10th Circuit court 14-1233 | Family Talk | | Non-profit | Yes | "abortion-inducing or implantation-preventing drugs abortifacient items and related education and counseling spec fically IUDs and 'emergency contraception' such as Plan B and Ella" and "any course ing or referrals to promote or refer for … such abortion-inducing drugs and IUDs." | | Other | Partia ly Self-insured with a stop-loss provider and a third-party administrator | |
| 183 | | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Association of Christian Schools International (employee) | | Non-profit | Yes | "the procurement of participation in facilitation of or payment for abortion (including abortion-causing drugs and devices like Plan B ella and IUDs)" | | Other | self-insured | |
| 184 | | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Samaritan Ministries International (employee) | | Non-profit | Yes | "the procurement of participation in facilitation of or payment for abortion (including abortion-causing drugs and devices like Plan B ella and IUDs)" | | Other | self-insured | |
| 185 | | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Taylor University (employee) | | Non-profit | Yes | "the procurement of participation in facilitation of or payment for abortion (including abortion-causing drugs and devices like Plan B ella and IUDs)" | | Other | self-insured | |
| 186 | | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Indiana Wesleyan University | | Non-profit | Yes | "the procurement of participation in facilitation of or payment for abortion (including abortion-causing drugs and devices like Plan B ella and IUDs)" | | Other | self-insured | |
| 187 | | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Asbury Theological Seminary | | Non-profit | Yes | "the procurement of participation in facilitation of or payment for abortion (including abortion-causing drugs and devices like Plan B ella and IUDs)" | | Other | self-insured | |
| 188 | | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Alliance Defending Freedom | | Non-profit | Yes | "emergency contraceptive medications hormonal contraceptive medications and devices and implanted contraceptive devices or related counseling or referrals to promote the use of such items" | | Other | self-insured | |
| 189 | | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163 14-6171 | Good Will Pub ishers Inc. | | Other | Yes | "contraception abortion-inducing drugs or devices sterilization and related counseling" | | Other | Fully-insured | |
| 190 | | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163 14-6171 | Catholic Charities of the Archdiocese of Oklahoma City | | Non-profit | Yes | "contraception abortion-inducing drugs or devices sterilization and related counseling" | | likely church plan but never alleged | self-insured | |
| 191 | | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163 14-6171 | All Saints Catholic School | | Non-profit | Yes | "contraception abortion-inducing drugs or devices sterilization and related counseling" | | likely church plan but never alleged | self-insured | |

Notifications

670127

Exhibit 139          JA1443          JA-0001957

| | Service Provider Information | | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | Action Taken | | | Notes | |
|---|---|---|---|---|---|---|---|---|---|---|
| Contact information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact information for TPA (enter N/A if none) | | | | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | | |
| Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |

Notifications

**670128**

Exhibit 139

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| Tracking number | | | | | | | | | | | |
| Redacted | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163 14-6171 | The Cathedral Foundation d/b/a Catholic Review Media | Redacted | Non-profit | Yes | "contraception abortion-inducing drugs or devices sterilization and related counseling" | Redacted | likely church plan but never alleged | self-insured | Redacted |
| | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163 14-6171 | VI la St. Francis Catholic Care Center Inc. | | Non-profit | Yes | "contraception abortion-inducing drugs or devices sterilization and related counseling" | | Other | Fully-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13239 | THE ROMAN CATHOLIC ARCHDIOCESE OF ATLANTA an association of churches and schools | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related course ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13240 | THE MOST REVEREND WILTON D GREGORY and his successors Archbishop of the Roman Catholic Archdiocese of Atlanta | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related course ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13241 | CATHOLIC CHARITIES OF THE ARCHDIOCESE OF ATLANTA INC. a Georgia non-profit corporation | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related course ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13242 | Catho ic Education of North Georgia Inc. (CENGI) | | Other | Yes | "abortion-inducing products contraception steri lization and related course ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13243 | THE ROMAN CATHOLIC DIOCESE OF SAVANNAH an ecclesiastical territory | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related course ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13244 | THE MOST REVEREND JOHN HARTMAYER and his successors Bishop of The Roman Catholic Diocese of Savannah et al. | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related course ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Eternal Word Television Network v. Burwell No. 14-12696 | Eternal Word Television Network Inc. | | Non-profit | Yes | "artificial contraception ster lization or abortion or related education and counseling." | | other | Self-insured | |
| | 11/ /2016 | Email/mail | Bick Group Inc. | | Other | Yes | "all contraceptive services" | | Other | Fully-insured | |
| | 11/9/2016 | Email | The Energy Lab INC | | Other | No | All | | Other | Fully-insured | |
| | 11/2 /2016 | Email | Marian University | | Non-profit | No | All | | Church Plan | self-insured | |

Notifications

670129

| | M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Service Provider Information | | | Original information or updated information? | For updated information, date the information is effective | | | | Action Taken | Notes | |
| | Contact information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact information for TPA (enter N/A if none) | | | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | | |
| 192 | Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| 193 | | | | Original | N/A | | | | | | |
| 194 | | | | Original | N/A | | | | | | |
| 195 | | | | Original | N/A | | | | | | |
| 196 | | | | Original | N/A | | | | | | |
| 197 | | | | Original | N/A | | | | | | |
| 198 | | | | Original | N/A | | | | | | |
| 199 | | | | Original | N/A | | | | | | |
| 200 | | | | Original | N/A | | | | | | |
| 201 | | | | Original | N/A | | | | | | |
| 202 | | | | Original | N/A | | | | | | |
| 203 | | | | Original | N/A | | | | | | |

Notifications

670130

Exhibit 139                    JA1446                    JA-0001960

| | Eligible Organization Information | | | | | | | Plan Information | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #3 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| Redacted | 11/26/2014 | Litigation: Louisiana College v. Burwel et al. No. 14 2t-147 | Louisiana College | Redacted | Non-profit | Yes | Objects to providing: RU-486; Plan B; etc; "counseling regarding the use of abortifacients like ella and Plan B;" and any "drugs, devices, services or procedures contrary to its faith." Sec. Am. Compl. Stat. Ct. Dkt ?? at ¶¶ 27-13; "While excluding abortifacients like ella and Plan B, LC's employee health plan does cover contraceptives that prevent ovulation." Sec. Am. Compl. Dist. Ct. Dkt ?? at ¶ 97 | Redacted | Church Plan | self-insured | Redacted |
| | 4/7 /2017 | Ala I | Continuum Health Partnerships Inc.; Continuum Health Management LLC; Mountain States Health Properties LLC | Redacted | Other | No | Abortion causing drugs, devices and sterilizations; patient education and counseling for all women with reproductive capacity. | Redacted | Other | self-insured | Redacted |

Notifications

670131

Exhibit 139

JA-0001961

| | Service Provider Information | | | | | | | | Action Taken | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contact information for issuer(enter N/A if none) | Name of TPA (enter N/A if none) | Contact information for TPA (enter N/A if none) | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu lly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see information #5 above) | Notes | | |
| | Redacted | Redacted | Redacted | | | Redacted | | | | | | |
| | | | | Original | N/A | | | | | | | |
| | | | | Updated | 4/1/2017 | | | | | | | |

670132

Exhibit 139



Addresses

670133

Exhibit 139

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Am. Pulverizer Co. v. U.S. Dep't of Health and Human Servs., No. 6:12-cv-03459, 2012 WL 6951316 (W.D. Mo. Dec. 20, 2012); | | 175 employees | Complaint | Yes | | 175 | 175 | |
| American Family Association v. Sebelius, 1:13-cv 00032-SA-DAS (N.D. Miss. Feb. 20, 2013) | | 135 employees | Complaint | Yes | | 135 | 135 | |
| Annex Med., Inc. v. Burwell, No. 13-1118, 2013 WL 1276025 (8th Cir. Feb. 1, 2013) | | 18 employees | Complaint | Yes | | 18 | 18 | |
| Archdiocese of St. Louis v. Burwell, No. 4:13-cv-02300 (E.D. MO), No. 14-3016 (8th Cir.) | Archdiocese of St. Louis | 7,800 employees/staff | Complaint | No | Diocese self-insured plan (see Brandt v Burwell note below | 0 | 0 | |
| | Catholic Charities of St. Louis | 1600 employees | Complaint | No | same | 0 | 0 | |
| Armstrong v. Burwell, No. 1:13-cv-00563-RBJ (D. Colo. Sept. 17, 2013); gov't appeal dismissed Sept. 4 2014 (10th Cir. order); | | 730 employees | Complaint | Yes | | 730 | 730 | |
| Association of Christian Schools International v. Burwell, No. 1:14-cv-2966 (D. Colo.), No. 14-1492 (10th Cir.) | Association of Christian Schools International | 140 employees | Complaint | Yes | | 140 | 140 | |
| | Samaritan Ministries International | 133 employees | Complaint | Yes | | 133 | 133 | |
| | Taylor University | 1,900 Students; 641 Employees | Complaint | Students = no; employees = yes | Complaint does not state that they offer a student health plan; therefore students not counter. | 641 | 641 | 0 |
| | Indiana Wesleyan University | 15,000 students; 3,565 employees (1,018 FT and 2,547 PT) | Complaint | Students = no; employees = partial | Complaint does not state that they offer a student health plan; therefore students not counted. Complaint states that 890 employees enroll in the plan. Because other entities usually provide the overall number of employees, not the number enrolled in the plan, and in the IFR we estimate 62% of all employees are in plans, this number is upscaled to 890/62%=1435 | 1,435 | 1,435 | 0 |
| Autocam Corp. v. Burwell, 730 F.3d 618 (6th Cir. Sept. 17, 2013), | Autocam | 478 employees | Complaint | Yes | | 478 | 478 | |
| | Autocam Medical | 183 employees | Complaint | Yes | | 183 | 183 | |
| Ave Maria Foundation v. Burwell, No. 2:13-cv-15198 (E.D. Mich.), Nos. 14-1310 (6th Cir.) | The Ave Maria Foundation | 51 employees | Estimated number based on online information | Yes | | 51 | 51 | |
| | Ave Maria Communications | 19 employees | Form W-3 filing | Yes | | 19 | 19 | |
| | Domino's Farms Petting Farm | 18 employees | Form W-3 filing | Yes | | 18 | 18 | |
| | Rhodora J. Donahue Academy, Inc. | 26 employees | Website | Yes | | 26 | 26 | |
| | Thomas More Law Center | 14 employees | Form W-3 filing | Yes | | 14 | 14 | |
| Ave Maria School of Law v. Burwell, No. 2:13-cv-00795 (M.D. Fla.), Nos. 14-15777 (11th Cir.) | | 68 employees | Complaint | Employees = yes; students = no | Permanent injunction 07/11/2018 | 0 | 0 | 0 |
| Ave Maria University v. Burwell, No. 2:13-cv-00630 (M.D. Fla.), Nos. 14-15780 (11th Cir.) | | 150 employees | Complaint | Employees = yes; students = no | Permanent injunction 07/11/2018 | 0 | 0 | 0 |
| Barron Indus., Inc. v. Burwell, No. 1:13-cv-01330 KBJ (D.D.C. Sept. 25, 2013). | | 56 employees | Complaint | Yes | | 56 | 56 | |
| Beckwith Elec. Co. v. Burwell, No. 8:16-cv-1944 (M.D. Fla.) | | 126 employees | Complaint | Yes | | 126 | 126 | |
| Belmont Abbey College v. Sebelius, et al., No. 1:11 cv-01989 (D.D.C. Nov. 10, 2011) | | 1,600 students; 305 employees | Complaint | Yes | | 1,600 students; 305 employees | 305 | 1,600 |
| Bick Holdings, Inc. v. Burwell, No. 4:13-cv-00462 AGF (E.D. Mo. Apr. 1, 2013); | | 196 employees | Complaint | Yes | | 196 | 196 | |
| Brandt v. Burwell, No. 2:14-cv-00681 (W.D. Pa.), Nos. 14-3663, 14-4087 (3d Cir.) | Diocese of Greensburg | 3,100 employees; 5,000 other participants in plan (this is a high number- it includes employees from other Dioceses) | Complaint | No | Diocese self-insured plan; Government argued that these and all similar Catholic diocese-sponsored self-insured plans and entities participating in such plans that are litigants represented by Jones Day likely qualify to be church plans exempt from ERISA. See, e.g., Doc. # 25, 2:14-cv-00681-AJS (W.D. Pa.). We cannot force such plan TPAs to offer contraceptive payments, and it is likely the churches will tell them not to, and the TPAs will not make the offers. | 0 | 0 | |
| | Catholic Charities | 18 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St. John School | 13 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |

00805059

Exhibit 140

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Briscoe v. Burwell, No. 1:13-cv-00285-WYD-BNB (D. Colo. Sept. 6, 2013; gov't appeal dismissed Sept. 4, 2014 (10th Cir. order); | Briscoe owns all plaintiff organizations involved: Continuum Health Partnerships, Inc./ Mountain States Health Properties, LLC/ Continuum Health Management, LLC/ CHI-Greeley, LLC | 200 employees | Complaint | Yes | | 200 | 200 | |
| Catholic Benefits Association LCA v. Burwell (CBA I), No. 5:14-cv-00240 (W.D. Okla.), Catholic Benefits Association LCA v. Burwell (CBA II), No. 5:14-cv-00685 (W.D. Okla.), Nos. 14-6171, 14-6163, 15-6029, 15-6037, 15-6139, 16-6030, 16-6217 (10th Cir.) | Catholic Benefits Associaton | Unknown | N/A | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Catholic Insurance Company | Unknown | N/A | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Archdiocese of Baltimore | 5, 500 participants | Complaint | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Cathedral Foundation (AKA Catholic Review Media) | 32 employees | Complaint | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Archdiocese of Oklahoma City- Complaint lists Mount St. Mary, St. Ann, and Office of Catholic Schools as sub-ministries | Unknown (see St. Ann, Mount St. Mary and Office of Catholic Schools below) | | No | Permanent injunction 03/07/2018 | 0 | | |
| | St. Ann | 78 employees | Form W-3 filing | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Mount St. Mary | Unknown | | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Office of Catholic Schools | | | | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Villa St. Francis Catholic Care Center | 100 participants | Complaint | Yes | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Goodwill Publishers | 140 employees | Complaint | Yes | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Catholic Charities Oklahoma City | 103 employees | Form W-3 filing | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | All Saints | Unknown | | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Catholic Charities and Family Services, Diocese of Norwich | 69 employees | Second Complaint | Yes | Permanent injunction 03/07/2018 | 0 | 0 | |
| Catholic Charities of the Archdioceses of Philadelphia v. Burwell, No. 2:14-cv-3096 (E.D. Pa.), No. 14-3126 (3d Cir.) | Catholic Social Services | 626 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Francis Homes for Boys | 227 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Edmund's Home for Children | 226 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Don Guanella Village | 413 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Divine Providence Village | 667 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Gabriel's System | 458 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Community Services | 92 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Nutritional Development Services | 64 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Villa St. Martha | 117 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Monica Manor | 356 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. John Neumann Nursing Home | 360 Employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Immaculate Mary Home | 490 Employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Francis Country House | 488 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Martha Manor | 272 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Mary Manor | 339 employees | Form W-3 filing | No | Dioscese self-insured plan | 0 | 0 | |
| | St. John Vianney Center | 84 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Clinical Consultants | 19 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| Catholic Diocese of Beaumont v. Burwell, No. 1:13-cv-00709 (E.D. Tex.), No. 14-40212 (5th Cir.) | Diocese | 950 employees; 232 staff at schools | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| | Catholic Charities of Southeast Texas, Inc. | 18 employees | Complaint | | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| Catholic Diocese of Biloxi v. Burwell, No. 1:14-cv-00146 (S.D. Miss.) | Diocese of Jackson | 900 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 140 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Vicksburg | 70 employees | Website | No | Diocese self-insured plan | 0 | 0 | |
| | St Joseph | 85 employees | Website | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Biloxi | 600 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | De L'epee Deaf Center | 5 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Social & Community Services Inc. | 20 employees | Form W-3 filing | no | Diocese self-insured plan | 0 | 0 | |
| | Resurrection Catholic and Sacred Heart | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |

Draft- For Deliberative Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| | St. Dominic-Jackson Memorial Hospital and affiliated locations and programs | 2,200 employees | Complaint | No | Self-insured plan sponsored by Catholic affiliated hospital; grandfathered and already omits contraceptives; so could retain grandfathered status or pursue church plan status to continue omitting. | 0 | 0 | |
| Conlon, Bishop of Catholic Diocese of Joliet v. Sebelius, 1:12-cv-03932 (N.D. Ill. May 21, 2012) | Diocese of Joliet | At least 1,570 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities of Joliet | 240 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Springfield | 2585 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities of Springfield | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities of Chicago | 2700 employees | Complaint | Yes | Self-funded welfare benefit plan but not sure if church plan | 2,700 | 2,700 | |
| Catholic Diocese of Nashville v. Burwell, No. 3:13-cv-1303 (M.D. Tenn.), No. 13-6640 (6th Cir.) | Diocese of Nashville | 1200 employees | Complaint | No | House of Worship, fully insured | 0 | 0 | |
| | Catholic Charities | 115 employees | Complaint | Yes | | 115 | 115 | |
| | Aquinas College | 16 employees | Website | employees: yes; students: no | Website/news reports indicate recent drastic downsizing of workforce; students not counted because complaint does not allege a student plan | 16 | 16 | 0 |
| | Camp Marymount | 75 employees | Complaint | Yes | | 75 | 75 | |
| | MQA | 85 employees | Complaint | Yes | | 85 | 85 | |
| | St. Mary Villa | 50 employees | Complaint | Yes | | 50 | 50 | |
| | Dominican Sisters | 23 employees | | No | Religious order | 0 | 0 | |
| Catholic Diocese of Peoria v. Sebelius, 1:12-cv-01276-JES-BGC (C.D. Ill. August 9, 2012) | | Unknown | | No | Diocese self-insured plan (court order, 2013 WL 74240), and grandfathered | 0 | 0 | |
| Catholic Health Care System v. Burwell, No. 1:12-cv-02542 (E.D.N.Y.), No. 14-427 (2d Cir.); PACER | | | | | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | | | |
| | Archdiocese of New York | 10,000 employees | Complaint | No | | 0 | 0 | |
| | ArchCare | 4,000 employees | Complaint | No | Catholic hospital self-insured plan | 0 | 0 | |
| | Catholic Health Services of Long Island | 17,000 employees | Complaint | No | Catholic hospital self-insured plan | 0 | 0 | |
| | The Diocese of Rockville Centre | 2,000 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | 0 | 0 | |
| | Monsignor Farrel High School | 73 employees | Website | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | 0 | 0 | |
| | Cardinal Spellman High School | 100 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | 0 | 0 | |
| Christian & Missionary Alliance Foundation, Inc., No. 2:14-cv-00580 (M.D. FL.), Nos. 15-11437, 15-11635 (11th Cir.) | CMA d/b/a Shell Point Retirement Center | 1247 employees | Form W-3 filing | Yes | | 1,247 | 1,247 | |
| | Alliance Community for Retirement Living | 344 employees | Form W-3 filing | Yes | | 344 | 344 | |
| | Alliance Home of Carlisle | 219 employees | Form W-3 filing | Yes | | 219 | 219 | |
| | Town and Country Manor | 365 employees | Form W-3 filing | Yes | | 365 | 365 | |
| | Simpson University | 815 employees | Complaint | employees: yes; students: no | Complaint does not seek relief for any student plan | 815 | 815 | 0 |
| | Crown College | 114 employees | Form W-3 filing; student enrollment: https://www.crown.edu/about/quick-facts/ ("nearly 1,300 students") | Yes | | 1,275 students; 114 employees | 114 | 1,275 |
| Christian Employers Alliance v. Burwell, No. 3:16-cv-309 (D.N.D.) | Christian Employers Alliance | Unknown | | No | No claim was made for CEA plans, and no list of members beyond TBC and TIC | 0 | 0 | |
| | Trinity Bible College | 249 employees | Form W-3 filing | employees: yes; students: no | complaint does not mention student plan | 249 | 249 | |
| | Treasure Island Coins | 9 staff | Website | Yes | | 9 | 9 | |
| Colorado Christian Univ. v. Burwell, No. 1:13-cv-02105 (D. Colo.), No. 14-1329 (10th Cir.) | Colorado Christian University | 5,300 students; 680 employees | Complaint | Yes | Permanent injunction 07/11/2018 | 0 | 0 | 0 |
| Conestoga Wood Specialties Corp. v. Burwell (Burwell v. Hobby Lobby Stores, Inc.), No. 13-356 (U.S. June 30, 2014); | Conestoga Wood Specialties Corp. (Individual operators of Conestoga Wood Specialities Corporation are the three other named plaintiffs) | 950 employees | Complaint | Yes | | 950 | 950 | |

00805061

Exhibit 140

JA1452

JA-0001966

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW1A and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| DeOtte v. Azar, No. 4:18-cv-00825-Y (N.D. Tex. Complaint Oct. 6, 2018) | Richard W. DeOtte, Yvette DeOtte, John Kelley, Alison Kelley, Hotze Health & Wellness Center | 75 employees | Complaint | Yes | | 75 | 75 | |
| Diocese of Cheyenne v. Burwell, No. 2:14-cv-00021 (D. Wyo.), No. 14-8040 (10th Cir.) | Diocese of Cheyenne | 16 employees plus over 100 teachers | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 6 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St. Anthony School | 41 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St. Joseph's Home | 130 employees, 62 orphan children | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | JPIICS | 20 | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Wyoming Catholic College | 32 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | 0 |
| Diocese of Fort Wayne-South Bend Inc. v. Burwell, No. 1:12-cv-00159 (N.D. Ind.), No. 14-1431 (7th Cir.) | Diocese of Fort Wayne South Bend | 2,741 employees | Complaint | No | Diocese self-insured plan; also grandfathered | 0 | 0 | |
| | Catholic Charities | 39 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St Anne Home | 310 employees | Complaint | Yes | Self-insured plan, but not sure if it is a church plan | 310 | 310 | |
| | University of St Francis | 2,300 students, 413 employees | Complaint | employees: yes; students: no | No student plan discussed; Employees are offered a self-insured health plan, but not sure it is a church plan, so included | 413 | 413 | 0 |
| | Our Sunday Visitor | 300 employees | Complaint | Yes | Self-insured plan, but not sure if it is a church plan | 300 | 300 | |
| | Specialty Physicians | 342 employees | Complaint | Yes | | 342 | 342 | |
| | Franciscan Alliance | 18,000 employees | Complaint | Partial | All but 1,733 employees are on a church plan exempt from ERISA. See: https://www.franciscanhealth.org/site s/default/files/2015%20employee%2 0benefit%20booklet.pdf (Only employees in Illinois are in BCBS plans and there are 1733 of those employees according to complaint | 1,733 | 1,733 | |
| Doboszenski & Sons, Inc. v. Burwell, No. 0:13-cv 03148-JNE-FLN (D. Minn. Nov. 11, 2013); | | 32 employees | Complaint | Yes | | 32 | 32 | |
| Dobson v. Burwell, No. 1:13-cv-03326 (D. Colo.), No. 14-1233 (10th Cir.) | | 28 employees | Complaint | Yes | | 28 | 28 | |
| Domino's Farms Corporation v. Sebelius et al., No. 12-cv-15488 (E.D. Mich. Dec. 20, 2012) | | 89 employees | Complaint | Yes | | 89 | 89 | |
| Dordt Coll. v. Burwell, No. 5:13-cv-04100 (N.D. Iowa, Western Divison), No. 14-2726 (8th Cir.) | Dordt College | 1,400 students, 280 employees | Complaint | Yes | Permanent injunction 06/14/2018 | 0 | 0 | 0 |
| | Cornerstone University | 2,923 students, 294 employees | Complaint | employees: yes; students: no | Permanent injunction 06/14/2018 | 0 | 0 | 0 |
| East Texas Baptist Univ. v. Burwell, No. 4:12-cv-03009 (S.D. Tex.), No. 14-20112 (5th Cir.) | Houston Baptist University | 2,589 students, 416 employees | Complaint | No | Self-insured church plan | 0 | 0 | 0 |
| | East Texas Baptist University | 1,290 students, 283 employees | Complaint | Yes | | 1,290 students, 283 employees | 283 | 1,290 |
| | Westminster Theological Seminary (Intervenor) | 60 FT, 65 PT employees, 620 students | Complaint in intervention | employees: yes; students: no | complaint does not mention student plan | 125 | 125 | 0 |
| Eden Foods, Inc. v. Burwell, No. 13-1677 (6th Cir. June 28, 2013), | | 128 employees | Complaint | Yes | | 128 | 128 | |
| Eternal Word Television Network, Inc. v. Burwell, No. 1:13-cv-00521 (S.D. AL), No. 14-12696 (11th Cir.) | | 350 employees | Complaint | Yes | | 350 | 350 | |
| Fellowship of Catholic University Students v Burwell, No. 1:13-cv-03263-MSK-KMT (D. Colo. Apr. 23, 2014) | | 450 employees | Complaint | No | Case resolved on basis that plaintiff is integrated auxiliary | 0 | 0 | |
| Feltl & Co., Inc. v. Burwell, No. 13-CV-2635 DWF/JJK (D. Minn. Nov. 8, 2013); | Complaint lists two owners of the company as individual plaintiffs | 4 employees | Website | Yes | | 4 | 4 | |
| Franciscan University v. Sebelius, 2:12–CV-440 (S.D. Ohio) | | Unknown | Complaint | No | Sued while grandfathered and then dropped student plan. With no additional suit, no apparent affect from rule. | 0 | 0 | 0 |
| Geneva College v. Burwell, No. 2:12-cv-00207 (W.D. Pa.), Nos. 13-3536, 14-1374 (3rd. Cir.) | Geneva College | 1,850 students, 350 employees | Complaint | Yes | Permanent injunction docket # 144 | 0 | 0 | 0 |
| Gilardi v. U.S. Dep't of Health and Human Servs., No. 13-5069, 2013 WL 5854246 (D.C. Cir. Nov. 1, | Seneca Hardwood Lumber | 22 employees | Complaint | No | Permanent injunction shields from previous rule | 0 | 0 | |
| | Freshway Foods | 340 employees | Complaint | Yes | | 340 | 340 | |
| | Freshway Logistics | 55 employees | Complaint | Yes | | 55 | 55 | |
| Grace Schools v. Burwell, No. 3:12-cv-00459 (N.D. Ind.), No. 14-1430 (7th Cir.) | Grace College and Seminary | 2,700 students, 457 employees | Complaint | Yes | Permanent injunction 06/14/2018 | 0 | 0 | 0 |
| | Biola University | 6,222 students, 856 employees | Complaint | Yes | Permanent injunction 06/14/2018 | 0 | 0 | 0 |

00805062

Exhibit 140

JA1453

JA-0001967

Draft - For Deliberative Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Grote Indus. LLC v. Burwell, No. 13-1077, 2013 WL 5960692 (7th Cir. Nov. 8, 2013), cert. denied sub nom. Burwell v. Korte, No. 13-937 (U.S. July 1, 2014); | | 1,148 employees | Complaint | Yes | | 1,148 | 1,148 | |
| Hall v. Burwell, No. 0:13-cv-00295-JRT-LIB (D. Minn. Apr. 2, 2013); | | Approximately 50 employees | Complaint and online news reports | Yes | | 50 | 50 | |
| Hartenbower v. U.S. Dep't of Health and Human Servs., No. 1:13-cv-02253 (N.D. Ill. Apr. 18, 2013); | Hart Electric H.I. Hart | 54 employees (including owners) 7 employees | Complaint Complaint | Yes Yes | | 54 7 | 54 7 | |
| Hastings Chrysler Center, Inc. v. Burwell, No. 0:14-cv-00265-PAM-JJG (D. Minn. May 28, 2014); | | 60 employees | Complaint | Yes | | 60 | 60 | |
| Hobby Lobby Stores, Inc., et al. v. Sebelius, et al., No: CIV-12-1000-HE (W.D. Okla. Oct. 2, 2012); | Hobby Lobby Mardel | 13,240 employees 372 employees | Complaint Complaint | Yes Yes | | 13,240 372 | 13,240 372 | |
| Holland v. U.S. Dep't of Health and Human Servs, No. 13-15487 (S.D. W. Va. July 15, 2014); | | 150 employees | Complaint | Yes | | 150 | 150 | |
| Infrastructure Alternatives, Inc. v. Burwell, No. 1:13-cv-00031-RJJ (W.D. Mich. Sept. 30, 2013) | | 70 employees | Complaint | Yes | | 70 | 70 | |
| Insight for Living Ministries v. Burwell, No. 4:14-cv-675 (E.D. Tex.), No. 15-40031 (5th Cir.) | | 108 employees | Form W-3 filing | Yes | | 108 | 108 | |
| Johnson Welded Prods. v. Burwell, No. 1:16-cv-557 (D.D.C.) | | 421 employees (including Lilli Johnson) | Complaint | Yes | | 421 | 421 | |
| Korte v. Burwell, No. 12-3841, 2013 WL 5960692 (7th Cir. Nov. 8, 2013), cert. denied No. 13-937 (U.S. July 1, 2014); | | 90 employees | Complaint | Yes | | 90 | 90 | |
| Legatus v. Burwell, No. 2:12-cv-12061-RHC-MJH (E.D. Mich. Dec. 20, 2013) | Legatus | 69 employees | Complaint | Yes | Legatus injunction 12/20/2013, case dismissed 02/02/2018 | 0 | 0 | |
| | Weingartz Supply Company, W&P Management LLC, and subsidiaries | 170 employees | Complaint | Yes | | 170 | 170 | |
| Lindsay v. U.S. Dep't of Health and Human Servs., No. 13-cv-1210 (N.D. Ill. Mar. 20, 2013); | | 70 employees | Complaint | Yes | | 70 | 70 | |
| Little Sisters of the Poor Home for the Aged v. Burwell, No. 1:13-cv-2611 (D. Colo.), No. 13-1540 (10th Cir.) | Christian Brothers Employee Benefit Trust ( Little Sisters uses Christian Brothers Employee Benefit Trust, and Christian Brothers Services is the TPA for the Christian Brothers Employee Benefit Trust) | 5,000 employees | Complaint | No | Self-insured church plan, and permanent injunction 05/29/2018 | 0 | 0 | |
| Louisiana Coll. v. Burwell, No. 1:12-cv-00463 (W.D. La.), No. 14-31167 (5th Cir.) | | 1,450 students, 260 employees | Complaint | No | Self-insured church plan | 0 | 0 | 0 |
| March for Life v. Burwell, No. 1:14-cv-1149 (D.D.C.), No. 15-5301 (D.C. Cir.) | | 2 employees covered in plan; less than 10 overall | | No | All employees must/do oppose the coverage; therefore not counting as affected by rules | 0 | 0 | |
| Media Research Center v. Sebelius, No. 1:14-CV-379 (E.D. Virginia) | | 114 employees | Complaint | Yes | | 114 | 114 | |
| Mersino Mgmt. Co. v. Burwell, No. 13-1944 (6th Cir. July 9, 2014) | | 110 employees | Complaint | Yes | | 110 | 110 | |
| Michigan Catholic Conf. v. Burwell, No. 1:13-cv-1247 (W.D. Mich.), No. 13-2723 (6th Cir.) | Michigan Catholic Charities Catholic Charities | 6,429 employees 55 employees | Complaint Complaint | No No | Self-insured church plan Self-insured church plan | 0 0 | 0 0 | |
| Midwest Fastener Corp. v. Burwell, No. 1:13-cv-01337-ESH (D.D.C. Oct. 16, 2013); | | 187 employees | Complaint | Yes | | 187 | 187 | |
| MK Chambers Co. v. Dep't of Health and Human Servs., No. 13-cv-11379 (E.D. Mich. Nov. 21, 2014) | | 106 employees | Business profile on manta.org | Yes | | 106 | 106 | |
| Nagle, Christopher, et al. v. Kathleen Sebelius, et al., No. 2:13-cv-12036-VAR-DRG (E.D. Mich. May 10, 2013) (AKA "M&N Plastics") | | 109 employees | Complaint | Yes | | 109 | 109 | |
| Newland v. Burwell, 881 F. Supp. 2d 1287 (D. Colo. July 27, 2012), affirmed on appeal, No. 12-1380 (10th Cir. Oct. 3, 2013) | | 265 employees | Dist Ct Brief 4/30/12 | No | Permanent injunction | 0 | | |
| O'Brien v. U.S. Dep't of Health & Human Servs., No. 12-3357 (8th Cir. Nov. 28, 2012) | | 87 employees | Complaint | Yes | | 87 | 87 | |
| Ozinga v. Burwell, No. 1:13-cv-3292 (N.D. Ill.), No. 15-3648 (7th Cir.) | | 675+ employees | Complaint | Partial | Only 110 obtain insurance through the plan that would be affected by the exemption. This is upscaled to 110/62%=178 | 178 | 178 | |
| Persico v. Burwell, No. 1:13-cv-0303 (W.D. Pa.), Nos. 14-1376 (3d Cir.); | Catholic Diocese of Erie St Martin Center Prince of Peace Center Erie Catholic Preparatory School | 1,500 employees 61 employees 20 employees 80 employees | Complaint Form W-3 filing Form W-3 filing Complaint | No No No No | Diocese self-insured plan Diocese self-insured plan Diocese self-insured plan Diocese self-insured plan | 0 0 0 0 | 0 0 0 0 | |
| formerly Most Reverend Donald W. Trautman, Bishop of the Roman Catholic Diocese of Erie, et al. v. Sebelius, No. 1:12-cv-00123-SPB (W.D. Pa. May 8, 2013); | | | | | | | | |
| Priests for Life, No. 1:13-cv-01261 (D.D.C.), No. 13-5368 (D.C. Cir.) | | 60 employees | Website | Yes | | 60 | 60 | |

for DOI

00805063

Exhibit 140

JA1454

JA-0001968

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Randy Reed Auto. Inc. v. Burwell, No. 5:13-cv-6117-SJ-ODS (W.D. Mo. Dec. 3, 2013); | | approximately 179 employees | Complaint | Yes | | 179 | 179 | |
| Reaching Souls Int'l, Inc. v. Burwell, No. 5:13-cv-01092 (W.D. Okla.), No. 14-6028 (10th Cir.) | | 78,000 participants (pastors, employees, and their families) | Complaint | No | Self insured church plan and permanent injunction 03/15/2018 | 0 | 0 | |
| Real Alternatives, Inc. v. Burwell, No. 1:15-cv-105 (M.D. Pa.), No. 16-1275 (3d Cir.) | | 3 employees | Complaint | No | All employees must/do oppose the coverage; therefore not counting as affected by rules | 0 | 0 | |
| Right to Life of Michigan v. Kathleen Sebelius; No. 1:13-CV-01202 (W.D. Mich. Nov. 22, 2013) | | 43 employees | Complaint | No | All employees must/do oppose the coverage; therefore not counting as affected by rules | 0 | 0 | |
| Roman Catholic Archbishop of Washington v. Burwell, No. 1:13-cv-01441 (D.D.C.), Nos. 13-5371, 14-5021 (D.C. Cir.) | Catholic University | 7,000 students, 1,766 employees | Complain | Yes | | 7,000 students, 1,766 employees | 1,766 | 7,000 |
| | Archdiocese of Washington | 2,100 eligible employees, 1,200 teachers/employees at schools | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Thomas Aquinas College | 370 students, 78 eligible employees | Complaint | No | Church plan and complaint does not state that it offers student insurance | 0 | 0 | 0 |
| | Consortium of Catholic Academies | 119 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Archbishop Carroll | 70 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Don Bosco | 51 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Cathloic Information Center | 9 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Mary of Nazareth | 44 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 890 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Victory Housing | 184 employee | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Roman Catholic Archdiocese of Atlanta v. Burwell, No. 1:12-cv-03489 (N.D. Ga.), Nos. 14-12890, 14-13239 (11th Cir.) | Roman Catholic Archdiocese of Atlanta | 9,800 students, 4,200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 75 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | CENG | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Savannah | 5,000 students; hundreds of employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Roman Catholic Diocese of Dallas v. Sebelius, No. 3:12-cv-01589-B (N.D. Tex.) | | 900 teachers/staff, 100+ employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| School of the Ozarks v. Rightchoice Managed Care, Inc., No. 6:13-cv-03157 (W.D. Mo.), No. 15-1330 (8th Cir.) | | 1,442 students, 601 employees | Students - online; employees Form w3 Filing | Employees only | Complaint does not say they offer a student plan | 601 | 601 | |
| Sharpe Holdings, Inc. v. Burwell, No. 2:12-cv-92 (E.D. Mo.) and CNS Intl Ministries, No. 14-1507 (8th Cir.) | Sharpe | 50 employees | 2dam complaint and Linked in | Yes | | 50 | 50 | |
| | Ozark | 51 employees | 2dam complaint and Linked in | Yes | | 51 | 51 | |
| | CNS International Ministries | 204 employees | Form W-3 filing | Yes | | 204 | 204 | |
| | NIS Financial | 49 employees | 2dam Complaint | Yes | | 49 | 49 | |
| | CNS Corp | 49 employees | 2dam Complaint | Yes | | 49 | 49 | |
| | Heartland Christian College | 12 employees | Form W-3 filing | Employees only | Complaint does not say they offer a student plan | 12 | 12 | 0 |
| Sioux Chief Mfg. Co. v. Burwell, No. 13-0036-CV W-ODS (W.D. Mo. Feb. 28, 2013); | | 370 employees | Complaint | Yes | | 370 | 370 | |
| SMA, LLC v. Burwell, No. 0:13-cv-01375-ADM-LIB (D. Minn. July 8, 2013); | | 35 employees | Complaint | Yes | | 35 | 35 | |
| Southern Nazarene Univ. v. Burwell, No. 5:13-cv-1015 (W.D. Okla.), No. 14-6026 (10th Cir.) | Southern Nazarene University | 2,100 students, 505 employees | Complaint | Yes | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| | OK Weselan University | 1,220 students, 557 employees | Complaint | Employees only | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| | OK Baptist University | 1,900 students, 328 employees | Complaint | Yes | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| | Mid America Christian University | 1,447 stuends, 298 employees | Complaint | No | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| Stewart v. Burwell, No. 1:13-cv-01879 (D.D.C. Apr. 3, 2014); | Encompass Develop, Design & Construct, LLC | 43 employees | Complaint | Yes | | 43 | 43 | |
| Stinson Electric, Inc. v. Burwell, No. 14-00830-PJS-JJG (D. Minn. April 30, 2014); | | 19 employees | Business profile on manta.org | Yes | | 19 | 19 | |
| The C.W. Zumbiel Co. v. Burwell, No. 1:13-cv-01611 (D.D.C. Nov. 27, 2013); | | 350 employees | Complaint | Yes | | 350 | 350 | |
| The Criswell College v. Sebelius, No. 3:12-cv-04404-N (N.D. Tex.) | | 322 students, 50 employees | Complaint | Employees only | Complaint does not say they offer a student plan | 50 | 50 | |
| The QC Grp., Inc., v. Burwell, No. 0:13-cv-01726-JRT-SER (D. Minn. Sept. 11, 2013); | | 62 employees | Complaint | Yes | | 62 | 62 | |

00805064

Exhibit 140

JA-0001969

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPIs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Thomas G. Wenski v. Kathleen Sebelius; No. 12-cv-23820-Graham/Goodman (S.D. Fla. Nov. 7, 2012) | Archdiocese of Miami | Unknown | | No | House of worship | 0 | 0 | |
| | Catholic Health Services | 2,000 employees | Complaint | Yes | | 2,000 | 2,000 | |
| | Catholic Hospice | 610 employees | Form W-3 filing | Yes | | 610 | 610 | |
| | St. Thomas University | Unknown | | No | Lawsuit mentions St. Thomas University but asserts no claims for its health plans | 0 | 0 | 0 |
| Tonn & Blank Constr. v. Burwell, No. 1:12-cv-00325 JD-RBC (N.D. Ind. Apr. 1, 2013); | | 60 employees | Complaint | Yes | | 60 | 60 | |
| Trijicon, Inc. v. Burwell, No. 1:13-cv-1207 (D.D.C.) | | 469 employees | Complaint | Yes | | 469 | 469 | |
| Tyndale House Publishers, Inc. v. Burwell, 904 F. Supp. 2d 106 (D.D.C. Nov. 16, 2012); | | 260  employees | Complaint | Yes | | 260 | 260 | |
| Union University v. Burwell, No. 1:14-cv-1079 (W.D. Tenn.) | | 2,829 students, 1,116 employees | Students - online; employees Form w3 Filing | Employees only | Complaint does not say they offer a student plan | 1,116 employees | 1,116 | 0 |
| Univ of Dallas v. Burwell, No. 4:12-cv-00314 (N.D. Tex.), No. 14-10241 (5th Cir.), Nos. 14-10661 (5th Cir.) | Roman Catholic Diocese of Fort Worth | 6,500 students, 2,000 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plar | 0 | 0 | |
| | University of Dallas | 2,600 students; 725 employees | Complaint | Yes | | 2,600 students; 725 employees | 725 | 2,600 |
| | Catholic Charities | 332 employees | Complaint | Yes | | 332 | 332 | |
| | Our Lady Of Victory Catholic School | 23 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plar | 0 | 0 | |
| Univ. of Notre Dame v. Burwell, No. 3:13-cv-1276 (N.D. Ind.), No. 13-3853 (7th Cir.) | | 11,500 students, 5,000 employees | Complaint | yes | | 11,500 students, 5,000 employees | 5,000 | 11,500 |
| Valley Forge Christian College of the Assemblies of God v. Burwell, No. 14-4622 (E.D. Pa. Aug. 14, 2014) | | Unknown | Complaint | No | Plaintiff voluntarily dismissed suit; our understanding is they were satisfied with previous | 0 | 0 | 0 |
| Weingartz Supply Co. v. Burwell, No. 2:12-cv-12061 (E.D. Mich.), No. 14-1183 (6th Cir.) | | 170 employees | DC Ruling | Yes | | 170 | 170 | |
| Wheaton College v. Burwell, No. 1:13-cv-08910 (N.D. Ill.), No. 14-2396 (7th Cir.) | | 870 Employees | Complaint | Yes | Permanent injunction 02/22/2018 | 0 | 0 | 0 |
| Williams v. Burwell, No. 1:13-cv-01699 (D.D.C. Nov. 19, 2013); | | 3 employees | Complaint | Yes | | 3 | 3 | |
| Willis Law v. Burwell, No. 1:13-cv-01124-CKK (D.D.C. Aug. 23, 2013); | | 15 employees | Complaint | Yes | | 15 | 15 | |
| Yep v. Sebius, No. 1:12-cv-6756 (N.D. Ill.), Triune Health Group, Inc. v. Burwell, No. 1:12-cv-06756 (N.D. Ill.); No. 13-1478 (7th Cir.) | | 4 employees | Website | Yes | | 4 | 4 | |
| Zubik v. Burwell, No. 2:13-cv-1459 (W.D. Pa.), Nos. 14-1377 (3d Cir.) | Diocese | 140+ full-time employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 115 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Cemeteries | 207 employees | Complaint | No | Diocese self-insured plan. Cemeteries was covered by the diocese's previous self-insured plan the Catholic Employers Benefits Plan; the new complaint says that CEBS was converted to the Catholic Benefits Trust, and Cemeteries are omitted as co-plaintiffs | 0 | 0 | |

| | | | | | | Total | 48,654 | 25,265 |

10.9% of students covered in 2014

estimated 2,100,000 students were covered by plans of four-year granting institutions of higher education, and there were a total of 20,207,000 students in degree-granting postsecondary institutions other than 2-year degree programs. see at

https://www.acha.org/documents/Networks/Coalitions/Why_SHIPs_Matter.pdf and

https://nces.ed.gov/programs/digest/d16/tables/dt16_105.20.asp?current=yes.

| | | | | | | Total | 48,654 employees in affected plans | 2,626 students in affected plans |

Exhibit 140

JA1456

JA-0001970

## EBSA FORM 700-- CERTIFICATION
(revised August 2014)

This form may be used to certify that the health coverage established or maintained or arranged by the organization listed below qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing, pursuant to 26 CFR 54.9815-2713A, 29 CFR 2590.715-2713A, and 45 CFR 147.131. Alternatively, an eligible organization may also provide notice to the Secretary of Health and Human Services.

Please fill out this form completely. This form should be made available for examination upon request and maintained on file for at least 6 years following the end of the last applicable plan year.

| | |
|---|---|
| Name of the objecting organization | |
| Name and title of the individual who is authorized to make, and makes, this certification on behalf of the organization | |
| Mailing and email addresses and phone number for the individual listed above | |

I certify the organization is an eligible organization (as described in 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)) that has a religious objection to providing coverage for some or all of any contraceptive services that would otherwise be required to be covered.

Note: An organization that offers coverage through the same group health plan as a religious employer (as defined in 45 CFR 147.131(a)) and/or an eligible organization (as defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)), and that is part of the same controlled group of corporations as, or under common control with, such employer and/or organization (within the meaning of section 52(a) or (b) of the Internal Revenue Code), is considered to meet the requirements of 26 CFR 54.9815-2713A(a)(3), 29 CFR 2590.715-2713A(a)(3), and 45 CFR 147.131(b)(3).

*I declare that I have made this certification, and that, to the best of my knowledge and belief, it is true and correct. I also declare that this certification is complete.*

_____
Signature of the individual listed above

_____
Date

**667329**

Exhibit 141

The organization or its plan using this form must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement.

Notice to Third Party Administrators of Self-Insured Health Plans

In the case of a group health plan that provides benefits on a self-insured basis, the provision of this certification to a third party administrator for the plan that will process claims for contraceptive coverage required under 26 CFR 54.9815-2713(a)(1)(iv) or 29 CFR 2590.715-2713(a)(1)(iv) constitutes notice to the third party administrator that the eligible organization:

(1) Will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and

(2) The obligations of the third party administrator are set forth in 26 CFR 54.9815-2713A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A.

As an alternative to using this form, an eligible organization may provide notice to the Secretary of Health and Human Services that the eligible organization has a religious objection to providing coverage for all or a subset of contraceptive services, pursuant to 26 CFR 54.9815-2713A(b)(1)(ii)(B) and (c)(1)(ii), 29 CFR 2590.715-2713A(b)(1)(ii)(B) and (c)(1)(ii), and 45 CFR 147.131(c)(1)(ii). A model notice is available at: http://www.cms.gov/cciio/resources/Regulations-and-Guidance/index.html#Prevention.

This form or a notice to the Secretary is an instrument under which the plan is operated.

PRA Disclosure Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 1210-0150. An organization that seeks to be recognized as an eligible organization that qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing may complete this self-certification form, or provide notice to the Secretary of Health and Human Services, in order to obtain or retain the benefit of the exemption from covering certain contraceptive services. The self-certification form or notice to the Secretary of Health and Human Services must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974, which generally requires records to be retained for six years. The time required to complete this information collection is estimated to average 50 minutes per response, including the time to review instructions, gather the necessary data, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: U.S. Department of Labor, Employee Benefits Security Administration, Office of Policy and Research, 200 Constitution Avenue, N.W., Room N-5718, Washington, DC 20210 or email ebsa.opr@dol.gov and reference the OMB Control Number 1210-0150.

**667330**

Exhibit 141                    JA1458                                   JA-0001972



THE KAISER FAMILY FOUNDATION
- AND -
HEALTH RESEARCH &
EDUCATIONAL TRUST

•

# Employer Health Benefits

•

2017

ANNUAL SURVEY

KAISER FAMILY FOUNDATION  -and-  HRET HEALTH RESEARCH & EDUCATIONAL TRUST

667080

**Primary Authors:**

## KAISER FAMILY FOUNDATION

**Gary Claxton**

**Matthew Rae**

**Michelle Long**

**Anthony Damico**

## HEALTH RESEARCH & EDUCATIONAL TRUST

**Gregory Foster**

## NORC AT THE UNIVERSITY OF CHICAGO

**Heidi Whitmore**

Filling the need for trusted information on national health issues, the **Kaiser Family Foundation** is a nonprofit organization based in Menlo Park, California.

Founded in 1944, the **Health Research & Educational Trust (HRET)** is the not-for-profit research and education affiliate of the American Hospital Association (AHA). HRET's mission is to transform health care through research and education. HRET's applied research seeks to create new knowledge, tools and assistance in improving the delivery of health care by providers and practitioners within the communities they serve.

**NORC** at the University of Chicago is an independent research organization headquartered in downtown Chicago with additional offices on the University of Chicago's campus and in the D.C. Metro area. NORC also supports a nationwide field staff as well as international research operations. With clients throughout the world, NORC collaborates with government agencies, foundations, educational institutions, nonprofit organizations, and businesses to provide data and analysis that support informed decision making in key areas including health, education, economics, crime, justice, energy, security, and the environment. NORC's 75 years of leadership and experience in data collection, analysis, and dissemination—coupled with deep subject matter expertise—provides the foundation for effective solutions.

Copyright © 2017 Henry J. Kaiser Family Foundation, Menlo Park, California, and Health Research & Educational Trust, Chicago, Illinois. All rights reserved.

Printed in the United States of America.

**667081**

Exhibit 142                                    JA1460                                    JA-0001974

# Abstract

This annual survey of employers provides a detailed look at trends in employer-sponsored health coverage including premiums, employee contributions, cost-sharing provisions, and employer practices. The 2017 survey included more than 2,100 interviews with non-federal public and private firms.

Annual premiums for employer-sponsored family health coverage reached $18,764 this year, up 3% from last year, with workers on average paying $5,714 towards the cost of their coverage, according to the Kaiser Family Foundation/Health Research & Education Trust 2017 Employer Health Benefits Survey. The 2017 survey includes information on the use of incentives for employer wellness programs, plan cost sharing, and firm offer rates. Survey results are released in a variety of ways, including a full report with downloadable tables on a variety of topics, summary of findings, and an article published in the journal *Health Affairs*.

**667082**

Exhibit 142                                    JA1461                                    JA-0001975

# Summary of Findings

Employer-sponsored insurance covers over half of the non-elderly population; approximately 151 million nonelderly people in total.[1] To provide current information about employer-sponsored health benefits, the Kaiser Family Foundation (Kaiser) and the Health Research & Educational Trust (HRET) conduct an annual survey of private and nonfederal public employers with three or more workers. This is the nineteenth Kaiser/HRET survey and reflects employer-sponsored health benefits in 2017.

## HEALTH INSURANCE PREMIUMS AND WORKER CONTRIBUTIONS

In 2017, the average annual premiums for employer-sponsored health insurance are $6,690 for single coverage and $18,764 for family coverage [Figure A]. The average single premium increased 4% and the average family premium increased 3% in 2017. Workers' wages increased 2.3% and inflation increased 2.2% over the last year.[2] The average premium for family coverage is lower for covered workers in small firms (3-199 workers) than for workers in large firms (200 or more workers) ($17,615 vs. $19,235).

Premiums for family coverage have increased 19% since 2012 and 55% since 2007 [Figure B]. Average premiums for high-deductible health plans with a savings option (HDHP/SOs) are considerably lower than the overall average for all plan types for both single and family coverage, at $6,024 and $17,581, respectively [Figure A]. These premiums do not include any firm contributions to workers' health savings accounts or health reimbursement arrangements.

Premiums vary significantly around the averages for both single and family coverage, reflecting differences in health care costs and compensation decisions across regions and industries. Seventeen percent of covered workers are in plans with an annual total premium for family coverage of at least $22,517 (120% or more of the average family premium), and 21% of covered workers are in plans where the family premium is less than $15,011 (less than 80% of the average family premium).

Most covered workers make a contribution toward the cost of the premium for their coverage. On average, covered workers contribute 18% of the premium for single coverage and 31% of the premium for family coverage. Workers in small firms contribute a higher average percentage of the premium for family coverage than workers in large firms (39% vs. 28%).

Covered workers in firms with a relatively high percentage of lower-wage workers (at least 35% of workers earn $24,000 a year or less) contribute higher percentages of the premium for single (23%) and family (37%) coverage than workers in firms with a smaller share of lower-wage workers (18% and 31%, respectively).[3]

As with total premiums, the share of the premium contributed by workers varies considerably. For single coverage, 14% of covered workers are in plans that do not require them to make a contribution, 60% are in plans that require a contribution of 25% or less of the total premium, and 2% are in plans that require a contribution of more than half of the premium. For family coverage, 3% of covered workers are in plans that do not require them to make a contribution, 44% are in a plan that requires a contribution of 25% or less of the total premium, and 16% are in plans that require more than half of the premium. Covered workers in small firms are more likely than covered workers in large firms to be in a plan that requires the worker to contribute more than 50% of the total family premium (36% vs. 8%).

---

[1] Kaiser Commission on Medicaid and the Uninsured. The uninsured: A primer — Key facts about health insurance and the uninsured in the era of health reform: Supplemental Tables [Internet]. Washington (DC): The Commission; 2016 Nov [cited 2017 Aug 1]. http://files.kff.org/attachment/ Supplemental-Tables-The-Uninsured-A%20Primer-Key-Facts-about-Health-Insurance-and-the-Uninsured-in-America-in-the-Era-of-Health-Reform. See Table 1: 271.3 million nonelderly people, 55.8% of whom are covered by employer-sponsored insurance.

[2] Kaiser/HRET surveys use the April-to-April time period, as do the sources in this and the following note. The inflation numbers are not seasonally adjusted. Bureau of Labor Statistics. Consumer Price Index - All Urban Consumers: Department of Labor; 2017. [cited 2017 July 21] https: //data.bls.gov/timeseries/CUUR0000SA0?output_view=pct_1mth. Wage data are from the Bureau of Labor Statistics and based on the change in total average hourly earnings of production and nonsupervisory employees. Employment, hours, and earnings from the Current Employment Statistics survey: Department of Labor; 2017 [cited 2017 July 21]. http://data.bls.gov/timeseries/CES0500000008

[3] This threshold is based on the twenty-fifth percentile of workers' earnings as reported by the Bureau of Labor Statistics, using data for 2016. Bureau of Labor Statistics. May 2016 national occupational employment and wage estimates: United States [Internet]. Washington (DC): BLS; [last modified 2017 Mar 310; cited 2017 Aug 15]. Available from: http://www.bls.gov/oes/current/oes_nat.htm

**667083**

Exhibit 142                                    JA1462                                    JA-0001976

With regard to dollar amounts, the average annual premium contributions by covered workers for 2017 are $1,213 for single coverage and $5,714 for family coverage. Eight percent of covered workers contribute $12,000 or more a year for family coverage [Figure C]. Average contribution amounts for covered workers in HDHP/SOs are lower for single and family coverage than for covered workers in other plan types [Figure A]. Covered workers' average dollar contribution to family coverage has increased 74% since 2007 and 32% since 2012 Figure B]. Covered workers in small firms have lower average contributions for single coverage than workers in large firms ($1,030 vs. $1,289), but higher average contributions for family coverage ($6,814 vs. $5,264).

One reason for this variation in dollar amounts is the different approaches that employers use to structure employee contributions, particularly for family coverage. Of firms that offer family coverage, 45% of small firms and 15% of large firms provide the same dollar contribution for single and family coverage, which means that workers must pay the full additional premium cost to enroll family members in their plan. Forty-five percent of small firms and 75% of large firms make a higher dollar contribution for family coverage than for single coverage; 1% of small firms and 4% of large firms vary their approach with the class of the employee; and the remaining 9% of small firms and 6% of large firms take some other approach. Sixteen percent of covered workers are in a plan that requires workers who use tobacco to contribute more toward the premium.

**Figure A**
**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Single and Family Coverage, by Plan Type, 2017**



* Estimate is statistically different from All Plans estimate within coverage type (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667084**

Exhibit 142       JA1463       JA-0001977

**Figure B**
**Average Annual Health Insurance Premiums and Worker Contributions for Family Coverage, 2007-2017**



NOTE: Since 2007, the average family premium has increased 55% and the average worker contribution toward the premium has increased 74%.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**Figure C**
**Distribution of Worker Premium Contributions for Single and Family Coverage, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 6

**667085**

Exhibit 142    JA1464    JA-0001978

## PLAN ENROLLMENT

PPOs continue to be the most common plan type in 2017, enrolling 48% of covered workers. Twenty-eight percent of covered workers are enrolled in a high-deductible plan with a savings option (HDHP/SO), 14% in an HMO, 10% in a POS plan, and <1% in a conventional (also known as an indemnity) plan [Figure D]. Over the last five years, enrollment in PPOs has fallen by 8 percentage points while enrollment in HDHP/SOs has increased by 9 percentage points. Six percent of firms offering an HDHP/SO offer only an HDHP/SO to at least some of their workers.

**Figure D**
**Distribution of Health Plan Enrollment for Covered Workers, by Plan Type and Firm Size, 2017**



* Enrollment in plan type is statistically different between All Small Firms and All Large Firms (p < .05)
NOTE: HMO is health maintenance organization, PPO is preferred provider organization, POS is point-of-service plan, HDHP/SO is high-deductible health plan with a savings option, such as a health reimbursement arrangement (HRA) or a health savings account (HSA).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Self-Funding.** Fifteen percent of covered workers in small firms and 79% in large firms are enrolled in plans that are either partially or completely self-funded, similar to last year. Although there has been discussion of more insurers offering partially self-funded plans (sometimes called level-premium plans) to smaller employers, we have not seen an increase in respondents reporting that they have self-funded plans in recent years.

**Association Health Plans.** Six percent of offering firms with fewer than 250 workers offer health benefits arranged through a trade or professional association.

## EMPLOYEE COST SHARING

Most covered workers must pay a share of the cost when they use health care services. Eighty-one percent of covered workers have a general annual deductible for single coverage that must be met before most services are paid for by the plan [Figure E]. Even workers without a general annual deductible often face other types of cost sharing when they use services, such as copayments or coinsurance for office visits and hospitalizations.

Among covered workers with a general annual deductible, the average deductible amount for single coverage is $1,505, similar to the average deductible last year ($1,478). The average deductible for covered workers is higher in small firms than in large firms ($2,120 vs. $1,276). Among all covered workers, including both those with and without a deductible, the average

667086

Exhibit 142                    JA1465                    JA-0001979

deductible is $1,221. Fifty-eight percent of covered workers in small firms and 48% of covered workers in large firms are in a plan with a deductible of at least $1,000 for single coverage, similar to the percentages last year. Over the last five years, however, the percentage of covered workers with a general annual deductible of $1,000 or more for single coverage has grown substantially, increasing from 34% in 2012 to 51% in 2017 [Figure E]. Thirty-seven percent of covered workers in small firms are in a plan with a deductible of at least $2,000, compared to 15% for covered workers in large firms.

Deductibles have increased in recent years due to higher deductible amounts within plan types and to higher enrollment in HDHP/SOs. While growing deductibles in PPOs and other plan types generally increase enrollee out-of-pocket liability, the shift in enrollment to HDHP/SOs does not necessarily do so because most HDHP/SO enrollees receive an account contribution from their employers. Twenty-one percent of covered workers in an HDHP with a Health Reimbursement Arrangement (HRA) and 2% of covered workers in a Health Savings Account (HSA)-qualified HDHP receive an account contribution for single coverage at least equal to their deductible, while another 35% of covered workers in an HDHP with an HRA and 30% of covered workers in an HSA-qualified HDHP receive account contributions that, if applied to their deductible, would reduce their cost sharing to less than $1,000.

Whether they face a general annual deductible or not, a large share of covered workers also pay a portion of the cost when they visit an in-network physician. For primary care, 71% of covered workers have a copayment (a fixed dollar amount) when they visit a doctor and 22% have coinsurance (a percentage of the covered amount). For specialty care, 67% face a copayment and 26% face coinsurance. The average copayments are $25 for primary care and $38 for specialty care. The average coinsurance is 19% for primary and 19% for specialty care. These amounts are similar to those in 2016.

Most workers also face additional cost sharing for an emergency room visit, hospital admission, or outpatient surgery. After any general annual deductible is met, 32% of covered workers have a coinsurance and 58% have a copayment for an emergency room visit, and 64% of covered workers have a coinsurance and 12% have a copayment for hospital admissions. The average coinsurance rate for hospital admissions is 19% and the average copayment is $336 per hospital admission. The cost sharing provisions for outpatient surgery follow a similar pattern to those for hospital admissions.

While almost all (98%) covered workers are in plans with a limit on in-network cost sharing (called an out-of-pocket maximum) for single coverage, there is considerable variation in the actual dollar limits [Figure F]. Fifty-seven percent of these workers are in a plan with an annual out-of-pocket maximum for single coverage of more than $3,000, while 18% are in a plan with an out-of-pocket maximum of $6,000 or more.

667087

Exhibit 142                                    JA1466                                    JA-0001980

Case 1:25-cv-07540-DLC   Document 44-4   Page 203   Filed Date Filed: 12/12/2025   Page 203

SUMMARY OF FINDINGS

**Figure E**

**Percentage Of Covered Workers With Various Single Coverage General Annual Deductible Levels, 2012 and 2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. Account contributions include an employer's contribution to an HSA or HRA. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012 and 2017.

**Figure F**

**Percentage of Covered Workers Enrolled in a Plan with an Out-of-Pocket Maximum for Single Coverage, 2009-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: OOP refers to out-of-pocket. Out-of-pocket maximums reported are for in-network services. Covered workers without an OOP maximum are considered to be exposed to at least the specified threshold. Some of these workers may be enrolled in plans whose cost-sharing structure has other limits that make it impossible to reach the specified threshold.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017.

The Kaiser Family Foundation and Health Research & Educational Trust / Page 9

**667088**

Exhibit 142                                   JA1467                                   JA-0001981

# AVAILABILITY OF EMPLOYER-SPONSORED COVERAGE

Fifty-three percent of firms offer health benefits to at least some of their workers, similar to the percentage last year [Figure G]. Eighty-nine percent of workers are in a firm that offers health benefits to at least some of its workers. Over the past decade, the percentage of workers at small firms that offer health benefits to at least some workers has decreased (78% vs 73%).

The likelihood of offering health benefits differs significantly by firm size, with only 40% of firms with 3 to 9 workers offering coverage while virtually all firms with 1,000 or more workers offer coverage.

Even in firms that offer health benefits, some workers are not eligible to enroll (e.g., waiting periods or part-time or temporary work status) and others who are eligible choose not to enroll (e.g., they feel the coverage is too expensive or they are covered through another source). In firms that offer coverage, 79% of workers are eligible for the health benefits offered, and of those eligible, 78% take up the firm's offer, resulting in 62% of workers in offering firms enrolling in coverage through their employer. All of these percentages are similar to 2016.

Looking across workers both in firms that offer and those that do not offer health benefits, 55% of workers are covered by health plans offered by their employer.

**Coverage for Family members.** Among firms offering health benefits, virtually all large firms and 94% of small firms offer coverage to spouses of eligible workers. Similarly, virtually all large firms and 92% of small firms offering health benefits offer coverage to other dependents of their eligible workers, such as children.



**Figure G**
**Percentage of Firms Offering Health Benefits, by Firm Size, 1999-2017**

\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

# RETIREE COVERAGE

Of the large firms offering health benefits to workers in 2017, 25% also offer health benefits to retirees, similar to the percentage in 2016 (24%). Among large firms that offer retiree health benefits, 95% offer health benefits to early retirees (workers retiring before age 65) and 66% offer health benefits to Medicare-age retirees. Twenty-six percent of large firms

**667089**

Exhibit 142                                    JA1468                                    JA-0001982

offering retiree benefits contribute to benefits through a contract with a Medicare Advantage plan. Twelve percent of large firms offering retiree benefits offer retiree benefits through a corporate or private exchange.

## SUPPLEMENTAL AND VOLUNTARY BENEFITS

Firms offering health benefits also offer a variety of supplemental and other health benefits to their workers. Among firms offering health benefits, 67% of small firms and 97% of large firms offer dental benefits to their workers; 47% of small firms and 82% of large firms offer vision benefits; 23% of small firms and 46% of large firms offer critical illness insurance; 16% of small firms and 28% of large firms offer hospital indemnity insurance; and 16% of small firms and 25% of large firms offer long-term care insurance. Among all firms offering these supplemental benefits, firms are more likely to make a contribution toward dental coverage (67%) or vision coverage (54%) than for critical illness insurance (3%) or hospital indemnity insurance (5%).

## WELLNESS, HEALTH RISK ASSESSMENTS AND BIOMETRIC SCREENINGS

A large share of firms have programs that encourage workers to identify health issues and to take steps to improve their health. Many firms offer health screening programs including health risk assessments, which are questionnaires asking workers about lifestyle, stress or physical health, and in-person examinations such as biometric screenings. Many firms also use incentives to encourage workers to complete assessments, participate in wellness programs, or meet biometric outcomes. As we have seen in previous years, there is considerable uncertainty among small firms on some questions, particularly those related to incentives, so findings are reported only for large firms in some instances.

**Health Risk Assessments.** Among firms offering health benefits, 38% of small firms and 62% of large firms provide workers an opportunity to complete a health risk assessment. A health risk assessment includes questions about a person's medical history, health status, and lifestyle. Fifty-two percent of large firms with a health risk assessment program offer an incentive to encourage workers to complete the assessment. Among large firms with an incentive, the incentives include: gift cards, merchandise or similar incentives (50% of firms); requiring a completed health risk assessment to be eligible for other wellness incentives (46% of firms); lower premium contributions or cost sharing (46% of firms); and financial rewards such as cash, contributions to health-related savings accounts, or avoiding a payroll fee (40% of firms).

**Biometric Screenings.** Twenty-one percent of small firms and 52% of large firms offering health benefits offer workers the opportunity to complete a biometric screening. A biometric screening is a health examination that measures a person's risk factors such as body weight, cholesterol, blood pressure, stress, and nutrition. Fifty-three percent of large firms with biometric screening programs offer workers an incentive to complete the screening. Among large firms with an incentive, the incentives include: lower premium contributions or cost sharing (49% of firms); gift cards, merchandise or similar incentives (44% of firms); requiring a completed biometric screening to be eligible for other wellness incentives (41% of firms); and financial rewards such as cash, contributions to health-related savings accounts, or avoiding a payroll fee (33% of firms). In addition, 14% of large firms with a biometric screening program have incentives tied to whether workers met specified biometric outcomes, such as a targeted body mass index (BMI) or cholesterol level.

**Health and Wellness Promotion Programs.** Many firms offer programs to help workers identify health risks and unhealthy behaviors and improve their lifestyles. Fifty-eight percent of small firms and 85% of large firms offer a program in at least one of these areas: smoking cessation; weight management; behavioral or lifestyle coaching. Thirty-two percent of large firms with one of these health and wellness programs offer workers an incentive to participate in or complete the program. Among large firms with an incentive for completing wellness programs, incentives include: gift cards, merchandise or similar incentives (68% of firms); requiring completion of activities to be eligible for other wellness incentives (44% of firms); financial rewards such as cash, contributions to health-related savings accounts, or avoiding a payroll fee (37% of firms); and lower premium contributions or cost sharing (19% of firms).

Eight percent of small firms and 14% of large firms report collecting health information from workers through wearable devices such as a Fitbit or Apple Watch.

As risk assessments and wellness programs have become more complex, incentives and rewards have become more sophisticated and may involve participating in or meeting goals in different programs (e.g., completing an assessment and

667090

Exhibit 142                                    JA1469                                    JA-0001983

participating in a health promotion activity). To better understand the combined incentives or penalties facing program participants, we asked large firms that had any incentives for health risk assessments, biometric screenings, or the specified health and wellness promotion programs what the maximum incentive was for a worker for all of their programs combined. Among large firms with any type of incentive, 25% have a maximum incentive of 150 or less; 33% have a maximum incentive between $151 and $500; 23% have a maximum incentive between $501 and $1,000; 13% have a maximum incentive between $1,001 and $2,000; and 6% have a maximum incentive of more than $2,000 [Figure H].



**Figure H**
**Among Large Firms That Offer Workers an Incentive to Participate In or Complete Any Health Promotion Programs, Maximum Annual Value of the Incentive for All Programs Combined, 2017**

NOTE: Large firms have 200 or more workers. Includes incentives for health risk assessments, biometric screenings, and wellness programs. Firms with at least one of the listed health promotion programs were asked to report the maximum incentive an employee and his/her dependent could receive for all of the firm's health promotion programs combined. Forty-five percent of large offering firms have an incentive to complete any of their health promotion programs.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SITES OF CARE

**Telemedicine.** Sixty-three percent of large firms that offer health benefits cover the provision of health care services through telecommunication in their largest health plan [Figure I]. Among these firms, 33% reported that workers have a financial incentive to receive services through telemedicine instead of visiting a physician's office.

**Retail Health Clinics.** Seventy-three percent of large firms cover services offering health benefits provided in retail health clinics, such as those found in pharmacies and supermarkets, in their largest health plan [Figure I]. Among these firms, 17% reported that workers have a financial incentive to receive services in a retail clinic instead of visiting a traditional physician's office.

**Nurse Hotline.** Seventy-nine percent of large firms offering health benefits have a nurse hotline as part of their largest health plan [Figure I].

## PROVIDER NETWORKS

**High Performance or Tiered Networks.** Fifteen percent of large firms offering health benefits have high performance or tiered networks in their largest health plan, similar to the percentage reported last year [Figure I]. These programs identify

providers that are more efficient and generally provide financial or other incentives for enrollees to use the selected providers.

**Narrow Networks.** Nine percent of large firms offering health benefits offer a health plan that they consider to have a narrow network (i.e., a network they would consider more restrictive than a standard HMO network), similar to the percentage reported last year [Figure I].

**Eliminated Hospitals or Health Systems.** Only 3% of large firms report that they or their health plan eliminated a hospital or health system in the past year in order to reduce the costs of their plan, similar to the percentage reported last year [Figure I].



**Figure I**
**Among Large Firms Offering Health Benefits, Percentage of Firms Whose Plan Includes Various Features, 2017**

NOTE: Large Firms have 200 or more workers. For Coverage at Retail Clinics, Delivery of Care Through Telemedicine, High Performance or Tiered Provider Network, and Nurse Hotline, firms were asked if their plan with the largest enrollment had these features. The High Performance or Tiered Provider Network question was asked of firms with 50 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Private Exchanges.** Four percent of firms offering health benefits with at least 50 workers offer health benefits through a private exchange. Among firms offering health benefits that do not currently offer through a private exchange, 10% with at least 50 workers, including 22% with at least 5,000 workers, say they have considered offering coverage through a private exchange.

# CONCLUSION

The market for employer-sponsored health benefits continues along with no big changes in 2017. Premium increases are modest and there is no appreciable change in cost sharing or enrollment by type of plan. Employers continue to invest in health promotion and wellness approaches, including building incentives around programs that collect information about employee health and lifestyles.

Despite continuing economic improvement, with lower rates of unemployment, and the ACA employer mandate, there are no signs that the long-term declines in the offer and coverage rates are reversing. Even with modest premium growth, offer rates for small firms remain much lower than those for large firms, and the percentage of workers covered at work remains at 62%.

We continue to see significant variation around the average premiums and contribution amounts, particularly for small businesses. A meaningful share of covered workers in small firms must pay a substantial share of the cost of family coverage, raising the question of whether this is a viable source of coverage for the dependents of these workers.

The Kaiser Family Foundation and Health Research & Educational Trust / Page 13

**667092**

Exhibit 142                    JA1471                    JA-0001985

The debate about the future of the ACA has focused on the provisions that extended coverage in the non-group market and Medicaid, with the provisions affecting employer-sponsored coverage receiving relatively little attention. Employers generally appear to have adapted to ACA provisions without significant disruption, including the employer requirement to offer coverage or pay a penalty, the provisions requiring preventive care be covered without cost sharing, and that non-grandfathered plans have an out-of-pocket limit on cost sharing. Even if repeal and replace efforts ultimately succeed, the impacts on the group market will likely be relatively small: for example, some employers may reduce offers of coverage to some of their lower-paid employees or may reduce the number of preventive services available without cost sharing; but the larger metrics measuring costs and coverage are unlikely to change in any significant way.

One policy that could affect the market over the next couple of years is the high-cost plan tax, also known as the Cadillac tax. In previous surveys, employers reported increasing cost sharing and making other changes in anticipation of the high-cost plan tax taking effect in 2018. With the effective date of the tax delayed until 2020 (and with the apparent widespread Congressional support for further delay), the pressure for employers with more expensive plans to take actions to reduce their cost seems to have abated. This could change abruptly, however, if the tax is not further delayed in the near future.

## METHODOLOGY

The Kaiser Family Foundation/Health Research & Educational Trust 2017 Annual Employer Health Benefits Survey (Kaiser/HRET) reports findings from a telephone survey of 2,137 randomly selected non-federal public and private employers with three or more workers. Researchers at the Health Research & Educational Trust, NORC at the University of Chicago, and the Kaiser Family Foundation designed and analyzed the survey. National Research, LLC conducted the fieldwork between January and June 2017. In 2017, the overall response rate is 33%, which includes firms that offer and do not offer health benefits. Among firms that offer health benefits, the survey's response rate is also 33%. To improve estimates for small firms, the 2017 survey had a significantly larger sample than previous years; the increased sample size lead to both more firms completing the survey and a lower response rate than in years past. Unless otherwise noted, differences referred to in the text and figures use the 0.05 confidence level as the threshold for significance.

For more information on the survey methodology, please visit the Methodology section at http://ehbs.kff.org/.

---

**The Kaiser Family Foundation**, a leader in health policy analysis, health journalism and communication, is dedicated to filling the need for trusted, independent information on the major health issues facing our nation and its people. The Foundation is a non-profit private operating foundation based in Menlo Park, California.

**The Health Research & Educational Trust (HRET)** Founded in 1944, the Health Research & Educational Trust (HRET) is the not-for-profit research and education affiliate of the American Hospital Association (AHA). HRET's mission is to transform health care through research and education. HRET's applied research seeks to create new knowledge, tools and assistance in improving the delivery of health care by providers and practitioners within the communities they serve.

**667093**



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Survey Design
and
Methods

667094

# Survey Design and Methods

The Kaiser Family Foundation and the Health Research & Educational Trust (Kaiser/HRET) conduct this annual survey of employer-sponsored health benefits. HRET, a nonprofit research organization, is an affiliate of the American Hospital Association. The Kaiser Family Foundation designs, analyzes, and conducts this survey in partnership with HRET, and also funds the study. Kaiser contracts with researchers at NORC at the University of Chicago (NORC) to work with the Kaiser and HRET researchers in conducting the study. Kaiser/HRET retained National Research, LLC (NR), a Washington, D.C.-based survey research firm, to conduct telephone interviews with human resource and benefits managers using the Kaiser/HRET survey instrument. From January to June 2017, NR completed full interviews with 2,137 firms.

## SURVEY TOPICS

The survey includes questions on the cost of health insurance, health benefit offer rates, coverage, eligibility, enrollment patterns, premium contributions,[4] employee cost sharing, prescription drug benefits, retiree health benefits, and wellness benefits.

Kaiser/HRET asks each participating firm as many as 400 questions about its largest health maintenance organization (HMO), preferred provider organization (PPO), point-of-service (POS) plan, and high-deductible health plan with a savings option (HDHP/SO).[5] We treat exclusive provider organizations (EPOs) and HMOs as one plan type and report the information under the banner of "HMO"; if an employer sponsors both an HMO and an EPO, they are asked about the attributes of the plan with the larger enrollment. Similarly, starting in 2013, plan information for conventional (or indemnity) plans was collected within the PPO battery. Less than one percent of firms that completed the PPO section had more enrollment in a conventional plan than in a PPO plan. Firms with 50 or more workers were asked: "Does your firm offer health benefits for current employees through a private or corporate exchange?" Employers were still asked for plan information about their HMO, PPO, POS and HDHP/SO plan regardless of whether they purchased health benefits through a private exchange or not.

Firms are asked about the attributes of their current plans during the interview. While the survey's fielding period begins in January, many respondents may have a plan whose 2017 plan year has not yet begun [Figure M.1]. In some cases, plans may report the attributes of their 2016 plans and some plan attributes (such as HSA deductible limits) may not meet the calendar year regulatory requirements.

[4] HDHP/SO premium estimates do not include contributions made by the employer to Health Savings Accounts or Health Reimbursement Arrangements.
[5] HDHP/SO includes high-deductible health plans with a deductible of at least $1,000 for single coverage and $2,000 for family coverage and that offer either a Health Reimbursement Arrangement (HRA) or a Health Savings Account (HSA). Although HRAs can be offered along with a health plan that is not an HDHP, the survey collected information only on HRAs that are offered along with HDHPs. For specific definitions of HDHPs, HRAs, and HSAs, see the introduction to Section 8.

**667095**

Exhibit 142          JA1474          JA-0001988

### Figure M.1

### Among Firms Offering Health Benefits, Month In Which Plan Year Begins, 2017

| | Percentage of Covered Workers | Percentage of Firms |
|---|---|---|
| January | 69% | 37% |
| February | 1 | 1 |
| March | 2 | 5 |
| April | 3 | 3 |
| May | 1 | 4 |
| June | 3 | 9 |
| July | 6 | 6 |
| August | 1 | 1 |
| September | 3 | 4 |
| October | 4 | 8 |
| November | 2 | 6 |
| December | 4% | 17% |
| SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017 | | |

## RESPONSE RATE

After determining the required sample from U.S. Census Bureau data, Kaiser/HRET drew its sample from a Survey Sampling Incorporated list (based on an original Dun and Bradstreet list) of the nation's private employers and from the Census Bureau's Census of Governments list of public employers with three or more workers. To increase precision, Kaiser/HRET stratified the sample by ten industry categories and six size categories. Kaiser/HRET attempted to repeat interviews with prior years' survey respondents (with at least ten employees) who participated in either the 2015 or the 2016 survey, or both. Firms with 3-9 employees are not included in the panel to minimize the impact of panel effects on the offer rate statistic. As a result, 1,427 of the 2,137 firms that completed the full survey also participated in either the 2015 or 2016 surveys, or both.[6] The overall response rate is 33%.[7] Response rates are calculated using a CASRO method, which accounts for firms that are determined to be ineligible in its calculation. Beginning in 2012, the calculation of the response rates was adjusted to be slightly more conservative than previous years.

While the Kaiser/HRET survey similar to other employer and household surveys has seen a general decrease in response rates over time, the decrease between the 2016 and 2017 response rates is not solely explained by this trend. In order to improve statistical power among sub-groups, including small firms and those with a high share of low income workers, the size of the sample was expanded from 5,732 in 2016 to 7,895 in 2017. As a result, the 2017 survey includes 204 more completes than the 2016 survey. While this generally increases the precision of estimates (for example, a reduction in the standard error for the offer rate from 2.2% to 1.8%), it has the effect of reducing the response rate. In 2017, non-panel firms had a response rate of 17%, compared to 62% for firms that had participated in one of the last two years.

To increase response rates, firms with 3-9 employees were offered an incentive for participating in the survey. A third of these firms were sent a $5 Starbucks gift card in the advance letter, a third were offered an incentive of $50 in cash or as a donation to a charity of their choice after completing the full survey, and a third of firms were offered no incentive at all. Our analysis does not show significant differences in responses to key variables among these incentive groups.

---

[6] In total, 139 firms participated in 2015, 274 firms participated in 2016, and 1,014 firms participated in both 2015 and 2016.
[7] Response rate estimates are calculated by dividing the number of completes over the number of refusals and the fraction of the firms with unknown eligibility to participate estimated to be eligible. Firms determined to be ineligible to complete the survey are not included in the response rate calculation.

**667096**

Exhibit 142

The vast majority of questions are asked only of firms that offer health benefits. A total of 1,832 of the 2,137 responding firms indicated they offered health benefits. The response rate for firms that offer health benefits is also 33%.

We asked one question of all firms in the study with which we made phone contact but where the firm declined to participate. The question was "Does your company offer a health insurance program as a benefit to any of your employees?". A total of 3,938 firms responded to this question (including 2,137 who responded to the full survey and 1,801 who responded to this one question). These responses are included in our estimates of the percentage of firms offering health benefits.[8] The response rate for this question is 61%.

Beginning in 2014, we collected whether firms with a non-final disposition code (such as a firm that requested a callback at a later time or date) offered health benefits. By doing so we attempt to mitigate any potential non-response bias of firms either offering or not offering health benefits on the overall offer rate statistic. In 2017, 640 of the 1,801 firm responses that solely answered the offer question were obtained through this pathway.

## FIRM SIZE CATEGORIES AND KEY DEFINITIONS

Throughout the report, figures categorize data by size of firm, region, and industry. Unless otherwise specified, firm size definitions are as follows: small firms: 3 to 199 workers; and large firms: 200 or more workers. Figure M.2 shows selected characteristics of the survey sample. A firm's primary industry classification is determined from Survey Sampling International's (SSI) designation on the sampling frame and is based on the U.S. Census Bureau's North American Industry Classification System (NAICS). A firm's ownership category and other firm characteristics used in figures such as 3.3 and 6.22 are based on respondents' answers. While there is considerable overlap in firms in the "State/Local Government" industry category and those in the "public" ownership category, they are not identical. For example, public school districts are included in the service industry even though they are publicly owned.

**Figure M.2**

**Selected Characteristics of Firms in the Survey Sample, 2017**

| | Sample Size | Sample Distribution After Weighting | Percentage of Total for Weighted Sample |
|---|---|---|---|
| **FIRM SIZE** | | | |
| 3-9 Workers | 129 | 1,921,747 | 60.5% |
| 10-24 Workers | 248 | 749,042 | 23.6 |
| 25-49 Workers | 229 | 268,005 | 8.4 |
| 50-199 Workers | 271 | 186,142 | 5.9 |
| 200-999 Workers | 507 | 43,191 | 1.4 |
| 1,000-4,999 Workers | 418 | 8,098 | 0.3 |
| 5,000 or More Workers | 334 | 2,121 | 0.1 |
| **REGION** | | | |
| Northeast | 397 | 631,535 | 19.9% |
| Midwest | 635 | 703,383 | 22.1 |
| South | 696 | 1,091,813 | 34.4 |
| West | 409 | 751,614 | 23.6 |
| **INDUSTRY** | | | |
| Agriculture/Mining/Construction | 105 | 332,848 | 10.5% |
| Manufacturing | 227 | 178,917 | 5.6 |
| Transportation/Communications/Utilities | 129 | 120,624 | 3.8 |
| Wholesale | 88 | 171,310 | 5.4 |
| Retail | 170 | 377,197 | 11.9 |
| Finance | 144 | 205,236 | 6.5 |
| Service | 783 | 1,333,575 | 42 |
| State/Local Government | 151 | 47,308 | 1.5 |
| Health Care | 340 | 411,531 | 12.9 |
| **ALL FIRMS** | **2,137** | **3,178,345** | **100%** |

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Figure M.3 presents the breakdown of states into regions and is based on the U.S Census Bureau's categorizations. State-level data are not reported both because the sample size is insufficient in many states and we only collect information on a

---

[8] Estimates presented in Figures 2.1, 2.2, 2.3, 2.4, 2.5, and 2.26 are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.

**667097**

Exhibit 142

firm's primary location rather than where all workers may actually be employed. Some mid- and large-size employers have employees in more than one state, so the location of the headquarters may not match the location of the plan for which we collected premium information.

---

**Figure M.3**
**States by Region, 2017**

| Northeast | Midwest | South | West |
|---|---|---|---|
| Connecticut | Illinois | Alabama | Alaska |
| Maine | Indiana | Arkansas | Arizona |
| Massachusetts | Iowa | Delaware | California |
| New Hampshire | Kansas | District of Columbia | Colorado |
| New Jersey | Michigan | Florida | Hawaii |
| New York | Minnesota | Georgia | Idaho |
| Pennsylvania | Missouri | Kentucky | Montana |
| Rhode Island | Nebraska | Louisiana | Nevada |
| Vermont | North Dakota | Maryland | New Mexico |
| | Ohio | Mississippi | Oregon |
| | South Dakota | North Carolina | Utah |
| | Wisconsin | Oklahoma | Washington |
| | | South Carolina | Wyoming |
| | | Tennessee | |
| | | Texas | |
| | | Virginia | |
| | | West Virginia | |

Source: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017. From U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau, available at http://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf

---

Figure M.4 displays the distribution of the nation's firms, workers, and covered workers (employees receiving coverage from their employer). Among the three million firms nationally, approximately 60.5% employ 3 to 9 workers; such firms employ 7.8% of workers, and 3.1% of workers covered by health insurance. In contrast, less than one percent of firms employ 5,000 or more workers; these firms employ 35.5% of workers and 39.9% of covered workers. Therefore, the smallest firms dominate any statistics weighted by the number of employers. For this reason, most statistics about firms are broken out by size categories. In contrast, firms with 1,000 or more workers are the most influential employer group in calculating statistics regarding covered workers, since they employ the largest percentage of the nation's workforce.

Exhibit 142     JA1477     JA-0001991



**Figure M.4**
**Distribution of Employers, Workers, and Workers Covered by Health Benefits, by Firm Size, 2017**

NOTE: Data are based on a data request to the U.S. Census Bureau for their most recent (2014) Statistics of U.S. Businesses data on private sector firms. State and local government data are from the Census Bureau's 2012 Census of Governments.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Throughout this report, we use the term "in-network" to refer to services received from a preferred provider. Family coverage is defined as health coverage for a family of four.

The survey asks firms what percentage of their employees earn less than a specified amount in order to identify the portion of a firm's workforce that has relatively low wages. This year, the income threshold is $24,000 per year for lower-wage workers and $60,000 for higher-wage workers. These thresholds are based on the 25th and 75th percentile of workers' earnings as reported by the Bureau of Labor Statistics using data from the Occupational Employment Statistics (OES) (2016).[9] The cutoffs were inflation-adjusted and rounded to the nearest thousand. Prior to 2013, wage cutoffs were calculated using the now-eliminated National Compensation Survey.

## ROUNDING AND IMPUTATION

Some figures in the report do not sum to totals due to rounding. In a few cases, numbers from distribution figures may not add to the numbers referenced in the text due to rounding. Although overall totals and totals for size and industry are statistically valid, some breakdowns may not be available due to limited sample sizes or a high relative standard error. Where the unweighted sample size is fewer than 30 observations, figures include the notation "NSD" (Not Sufficient Data). Estimates with high relative standard errors are reviewed and in some cases not published. Many breakouts by subsets may have a large standard error, meaning that even large differences are not statistically different. Statistics among small firms and those weighted by the number of firms tend to have more variability.

To control for item nonresponse bias, Kaiser/HRET imputes values that are missing for most variables in the survey. On average, 5% of observations are imputed. All variables are imputed following a hotdeck approach. The hotdeck approach replaces missing information with observed values from a firm similar in size and industry to the firm for which data are missing. In 2017, there were eleven variables where the imputation rate exceeded 20%; most of these cases were for individual plan level

[9] General information on the OES can be found at http://www.bls.gov/oes/oes_emp.htm#scope. A comparison between the OES and the NCS is available at https://www.bls.gov/opub/mlr/2013/article/lettau-zamora.htm

**667099**

Exhibit 142

statistics. When aggregate variables were constructed for all of the plans, the imputation rate was usually much lower. There are a few variables that Kaiser/HRET has decided not to impute; these are typically variables where "don't know" is considered a valid response option (for example, the percentage of workers respondents believe are covered by Medicaid). Some variables are imputed based on their relationship to each other. For example, if a firm provided a worker contribution for family coverage but no premium information, a ratio between the family premium and family contribution was imputed and then the family premium was calculated. In addition, there are several variables in which missing data are calculated based on respondents' answers to other questions (for example, employer contributions to premiums are calculated from the respondent's premium and the worker contribution to premiums).

Since 2014, we estimate separate single and family coverage premiums for firms that provide premium amounts as the average cost for all covered workers, instead of differentiating between single and family coverage. This method more accurately accounts for the portion that each type of coverage contributes to the total cost for the one percent of covered workers who are enrolled at firms affected by this adjustment.

# SAMPLE DESIGN

We determined the sample requirements based on the universe of firms obtained from the U.S. Census Bureau. Prior to the 2010 survey, the sample requirements were based on the total counts provided by Survey Sampling Incorporated (SSI) (which obtains data from Dun and Bradstreet). Since 2010, we define Education as a separate sampling category for the purposes of sampling, rather than as a subgroup of the Service category. In the past, Education firms were a disproportionately large share of Service firms. Education is controlled for during post-stratification, and adjusting the sampling frame to also control for Education allows for a more accurate representation of both the Education and Service industries.

In past years, both private and government firms were sampled from the Dun and Bradstreet database. Beginning in 2009, Government firms were sampled from the 2007 Census of Governments. This change was made to eliminate the overlap of state agencies that were frequently sampled from the Dun and Bradstreet database. The sample of private firms is screened for firms that are related to state/local governments, and if these firms are identified in the Census of Governments, they are reclassified as government firms and a private firm is randomly drawn to replace the reclassified firm. The federal government is not included in the sample frame.

Finally, the data used to determine the 2017 Employer Health Benefits Survey sample frame include the U.S. Census' 2013 Statistics of U.S. Businesses and the 2012 Census of Governments. At the time of the sample design (December 2016), these data represented the most current information on the number of public and private firms nationwide with three or more workers. As in the past, the post-stratification is based on the most up-to-date Census data available (the 2014 update to the Census of U.S. Businesses was purchased during the survey fielding period).

# WEIGHTING AND STATISTICAL SIGNIFICANCE

Because Kaiser/HRET selects firms randomly, it is possible through the use of statistical weights to extrapolate the results to national (as well as firm size, regional, and industry) averages. These weights allow us to present findings based on the number of workers covered by health plans, the number of total workers, and the number of firms. In general, findings in dollar amounts (such as premiums, worker contributions, and cost sharing) are weighted by covered workers. Other estimates, such as the offer rate, are weighted by firms. Specific weights were created to analyze the HDHP/SO plans that are offered with a Health Reimbursement Arrangement (HRA) or that are Health Savings Account (HSA)-qualified. These weights represent the proportion of employees enrolled in each of these arrangements.

Calculation of the weights follows a common approach. We trimmed the weights in order to reduce the influence of weight outliers. First, we grouped firms into size and offer categories of observations. Within each strata, we identified the median and the interquartile range of the weights and calculated the trimming cut point as the median plus six times the interquartile range $(M + [6 * IQR])$. Weight values larger than this cut point are trimmed to the cut point. In all instances, very few weight values were trimmed. Finally, we calibrated the weights to U.S. Census Bureau's 2014 Statistics of U.S. Businesses for firms in the private sector, and the 2012 Census of Governments as the basis for calibration / post-stratification for public sector firms. Historic employer-weighted statistics were updated in 2011.

Case: 17-25-VBC Document 34-4 25 Page: 21 Filed 02/12/21 Page 2 of 22
Case: 17-2570-VBC Document 34-4 25 Page: 216 Filed 02/12/21 Page 677

SURVEY DESIGN AND METHODS

In 2017, weights were not adjusted using the nonresponse adjustment process described in previous years' methods. As in past years, Kaiser/HRET conducted a small follow-up survey of those firms with 3-49 workers that refused to participate in the full survey. Based on the results of a McNemar test, we were not able to verify that the results of the follow-up survey were comparable to the results from the original survey. In 2010 and 2015, the results of the McNemar test were also significant and we did not conduct a nonresponse adjustment.

Between 2006 and 2012, only limited information was collected on conventional plans. Starting in 2013, information on conventional plans is collected under the PPO section and therefore, the covered worker weight is representative of all plan types for which the survey collects information.

The survey collects information on physician office visits for each plan type. Different plan types at the same firm may have different cost-sharing structures (e.g., copayments or coinsurance). Because the composite variables (using data from across all plan types) are reflective of only those plans with that provision, separate weights for the relevant variables were created in order to account for the fact that not all covered workers have such provisions. As discussed below, changes in the 2017 survey have reduced the number of variable-specific weights used.

To account for design effects, the statistical computing package R and the library package "survey" were used to calculate standard errors.[10],[11] All statistical tests are performed at the .05 confidence level, unless otherwise noted. For figures with multiple years, statistical tests are conducted for each year against the previous year shown, unless otherwise noted. No statistical tests are conducted for years prior to 1999.

Statistical tests for a given subgroup (firms with 25-49 workers, for instance) are tested against all other firm sizes not included in that subgroup (all firm sizes NOT including firms with 25-49 workers, in this example). Tests are done similarly for region and industry; for example, Northeast is compared to all firms NOT in the Northeast (an aggregate of firms in the Midwest, South, and West). However, statistical tests for estimates compared across plan types (for example, average premiums in PPOs) are tested against the "All Plans" estimate. In some cases, we also test plan-specific estimates against similar estimates for other plan types (for example, single and family premiums for HDHP/SOs against single and family premiums for HMO, PPO, and POS plans); these are noted specifically in the text. The two types of statistical tests performed are the t-test and the Wald test. The small number of observations for some variables resulted in large variability around the point estimates. These observations sometimes carry large weights, primarily for small firms. The reader should be cautioned that these influential weights may result in large movements in point estimates from year to year; however, these movements are often not statistically significant. Standard Errors for most key statistics are available in a technical supplement available at www.kff.org/ehbs.

## 2017 SURVEY

In 2017, we continued to make revisions to how the survey asks employers about their prescription drug coverage. In most cases, information reported in Prescription Drug Benefits (Section 9) is not comparable with previous years' findings. Over time, plans have developed more complex benefit designs. In order to better capture information on specialty drugs, we elected to ask about these drugs separately from the cost sharing on other tiers. We modified the question about the number of tiers a firm's cost-sharing structure has to ask specifically about tiers that do not exclusively cover specialty drugs. Average copayment and coinsurance values are still reported among workers with three or more tiers, two tiers, or the same cost sharing regardless of drug class, but none of these tiers includes cost sharing for tiers that exclusively cover specialty drugs. Forty-five percent of firms with drug coverage cover specialty drugs but do not have a tier that only covers this class of drugs. In these cases, cost sharing among specialty drugs is still captured with the plan's other drug classes.

Figures 9.1 and 9.2 report the distribution of cost-sharing structures including any tiers for specialty drugs. This analysis adds the number of tiers the firm reported by any tiers they may have for specialty drugs. Therefore, a firm with two tiers and a tier exclusively for specialty drugs is considered a three tier plan in this analysis, but a two tier plan when reporting average cost sharing values. Even if a firm has multiple specialty-only tiers, we collect information on only one.

Similar to 2016, we no longer require that a firm's cost-sharing tiers be sequential, meaning that the second tier copayment was higher than the first tier, the third tier was higher than the second, and the fourth was higher than the third. As drug

---

[10] Analysis of the 2011 survey data using both R and SUDAAN (the statistical package used prior to 2012) produced the same estimates and standard errors.
[11] A supplement with standard errors for select estimates can be found online at Technical Supplement: Standard Error Tables for Selected Estimates, http://ehbs.kff.org

**667101**

Exhibit 142                                        JA1480                                        JA-0001994

formularies have become more intricate, many firms have minimum and maximum amounts attached to their copayments and coinsurance, leading us to believe it was no longer appropriate to assume that a firm's cost sharing followed this sequential logic.

To reduce the length of survey, in several areas, including stoploss coverage for self-funded firms and cost sharing for hospital admissions, outpatient surgery, and emergency room visits, we revised the questionnaire to ask respondents about the attributes of their largest health plan rather than each plan type they may offer. This expands on the method we used for prescription drug coverage in 2016. Therefore, for these topics, aggregate variables represent the attributes of the firm's largest plan type, and are not a weighted average of all of the firms plan types. In previous surveys, if a firm had two plan types, one with a copayment and one with a coinsurance for hospital admissions, the covered worker weight was allotted proportionally toward the average copayment and coinsurance based on the number of covered workers with either feature. With of this change, comparison among plans types is now a comparison of firms where any given plan type is the largest. The change only affects firms that have multiple plan types (58% of covered workers). After reviewing the responses and comparing them to prior years where we asked about each plan type, we find that the information we are receiving is similar to responses from previous years. For this reason, we will continue to report our results for these questions weighted by the number of covered workers in responding firms.

Starting in 2017, respondents were allowed to volunteer that their plans did not cover outpatient surgery or hospital admissions. Less than 1% of respondents indicated that their plan did not include coverage for these services. Cost sharing for hospital admissions, outpatient surgery and emergency room visits was imputed by drawing a firm similar in size and industry within the same plan type.

In 2017, HSA-qualified health plans are not allowed to have separate per-person deductibles below the minimum family deductible ($2,600 in 2017). Some firms reported per-person deductibles below this limit; in these cases, firms were re-contacted, and in some instances, respondents confirmed these responses. We elected not to edit these deductibles to the legal minimum.

Beginning in 2017, values below 3% are not shown on graphical figures to improve the readability of those graphs. The underlying data for all estimates presented in graphs is available at www.kff.org/ehbs.

Annual inflation estimates are usually calculated from April to April. The 12 month percentage change for May to May was 2%.[12]

## HISTORICAL DATA

Data in this report focus primarily on findings from surveys jointly authored by the Kaiser Family Foundation and the Health Research & Educational Trust, which have been conducted since 1999. Prior to 1999, the survey was conducted by the Health Insurance Association of America (HIAA) and KPMG using a similar survey instrument, but data are not available for all the intervening years. Following the survey's introduction in 1987, the HIAA conducted the survey through 1990, but some data are not available for analysis. KPMG conducted the survey from 1991-1998. However, in 1991, 1992, 1994, and 1997, only larger firms were sampled. In 1993, 1995, 1996, and 1998, KPMG interviewed both large and small firms. In 1998, KPMG divested itself of its Compensation and Benefits Practice, and part of that divestiture included donating the annual survey of health benefits to HRET.

This report uses historical data from the 1993, 1996, and 1998 KPMG Surveys of Employer-Sponsored Health Benefits and the 1999-2016 Kaiser/HRET Survey of Employer-Sponsored Health Benefits. For a longer-term perspective, we also use the 1988 survey of the nation's employers conducted by the HIAA, on which the KPMG and Kaiser/HRET surveys are based. The survey designs for the three surveys are similar.

Published: September 19th, 2017. Last Updated: 2017-09-14

---

[12] Bureau of Labor Statistics, Consumer Price Index. U.S. City Average of Annual Inflation (April to April), 2000-2017: [cited 2017 July 21] http://data.bls.gov/timeseries/CUUR0000SA0?output_view=pct_1mth

667102

Exhibit 142                    JA1481                    JA-0001995



667103

Exhibit 142    JA1482    JA-0001996

# Section 1

# Cost of Health Insurance

The average annual premiums in 2017 are $6,690 for single coverage and $18,764 for family coverage. The average premium for single coverage increased by 4% since 2016 and the average premium for family coverage increased by 3%. The average family premium has increased 55% since 2007 and 19% since 2012. The average family premium for covered workers in small firms (3-199 workers) ($17,615) is significantly lower than average family premiums for workers in large firms (200 or more workers) ($19,235).

## PREMIUM COSTS FOR SINGLE AND FAMILY COVERAGE

- The average premium for single coverage in 2017 is $6,690 per year. The average premium for family coverage is $18,764 per year [Figure 1.1].

- The average annual premium for family coverage for covered workers in small firms ($17,615) is lower than the average premium for covered workers in large firms ($19,235) [Figure 1.2].

- The average annual premiums for covered workers in HDHP/SOs are lower for single coverage ($6,024) and family coverage ($17,581) than overall average premiums. The average premiums for covered workers enrolled in PPO plans are higher for single ($6,965) and family coverage ($19,481) than the overall plan average [Figure 1.1].

- The average premiums for covered workers are lower in the South ($6,372 for single coverage and $18,038 for family coverage) than the average premiums for covered workers in all other regions. The average premium for family coverage for covered workers in the Northeast ($20,092) is higher than the average family premium for covered workers in all other regions [Figure 1.3].

- The average premiums for covered workers vary across industries, with those in the retail industry being particularly low ($5,716 for single coverage and $16,920 for family coverage) [Figure 1.4].

- The average premiums for covered workers in firms with a relatively large share of younger workers (where at least 35% of the workers are age 26 or younger) are lower than the average premiums for covered workers in firms with a smaller share of younger workers ($5,922 vs. $6,762 for single coverage and $16,893 vs. $18,939 for family coverage) [Figures 1.5 and 1.6].

- Premiums also vary by firm wage level. The average premiums for covered workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) are less than the average premiums at firms with a smaller share of lower-wage workers ($6,035 vs. $6,739 for single coverage and $16,376 vs. $18,942 for family coverage) [Figures 1.5 and 1.6].

- The average premiums for covered workers in firms with at least some union workers are higher than the average premiums for covered workers in firms without union workers ($7,183 vs. $6,434 for single coverage and $19,885 vs. $18,177 for family coverage) [Figures 1.5 and 1.6].

- There is also variation in premiums by type of firm ownership. For both single and family coverage, covered workers at private for-profit firms have lower average annual premiums than covered workers at public firms or private not-for-profit firms [Figures 1.5 and 1.6].

**667104**

Exhibit 142                    JA1483                    JA-0001997



**Figure 1.1**
**Average Annual Premiums for Covered Workers, Single and Family Coverage, by Plan Type, 2017**



* Estimate is statistically different from All Plan Types estimate (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667105**

Exhibit 142                    JA1484                    JA-0001998

**Figure 1.2**

**Average Monthly and Annual Premiums for Covered Workers, by Plan Type and Firm Size, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| All Small Firms (3-199 Workers) | $566 | $1,523 | $6,794 | $18,281 |
| All Large Firms (200 or More Workers) | 596 | 1,614 | 7,154 | 19,369 |
| **ALL FIRM SIZES** | **$588** | **$1,589** | **$7,052** | **$19,071** |
| **PPO** | | | | |
| All Small Firms (3-199 Workers) | $573 | $1,566 | $6,874 | $18,787 |
| All Large Firms (200 or More Workers) | 583 | 1,646 | 7,000 | 19,749 |
| **ALL FIRM SIZES** | **$580** | **$1,623** | **$6,965** | **$19,481** |
| **POS** | | | | |
| All Small Firms (3-199 Workers) | $512* | $1,328* | $6,149* | $15,942* |
| All Large Firms (200 or More Workers) | 615* | 1,726* | 7,383* | 20,711* |
| **ALL FIRM SIZES** | **$560** | **$1,512** | **$6,716** | **$18,146** |
| **HDHP/SO** | | | | |
| All Small Firms (3-199 Workers) | $480 | $1,344* | $5,761 | $16,134* |
| All Large Firms (200 or More Workers) | 509 | 1,502* | 6,105 | 18,029* |
| **ALL FIRM SIZES** | **$502** | **$1,465** | **$6,024** | **$17,581** |
| **ALL PLANS** | | | | |
| All Small Firms (3-199 Workers) | $540 | $1,468* | $6,486 | $17,615* |
| All Large Firms (200 or More Workers) | 565 | 1,603* | 6,776 | 19,235* |
| **ALL FIRM SIZES** | **$558** | **$1,564** | **$6,690** | **$18,764** |

* Estimates are statistically different within plan and coverage types between All Small Firms and All Large Firms (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667106

Exhibit 142    JA1485    JA-0001999

**Figure 1.3**

**Average Monthly and Annual Premiums for Covered Workers, by Plan Type and Region, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| Northeast | $639 | $1,826* | $7,663 | $21,911* |
| Midwest | $613 | $1,637 | $7,356 | $19,648 |
| South | $529* | $1,529 | $6,353* | $18,348 |
| West | $599 | $1,542 | $7,179* | $18,508 |
| **ALL REGIONS** | **$588** | **$1,589** | **$7,052** | **$19,071** |
| **PPO** | | | | |
| Northeast | $637* | $1,829* | $7,641* | $21,946* |
| Midwest | $592 | $1,676 | $7,105 | $20,115 |
| South | $541* | $1,502* | $6,489* | $18,019* |
| West | $604 | $1,645 | $7,250 | $19,741 |
| **ALL REGIONS** | **$580** | **$1,623** | **$6,965** | **$19,481** |
| **POS** | | | | |
| Northeast | $604 | $1,656 | $7,250 | $19,875 |
| Midwest | $595 | $1,665 | $7,145 | $19,977 |
| South | $523 | $1,413 | $6,279 | $16,951 |
| West | $567 | $1,478 | $6,805 | $17,731 |
| **ALL REGIONS** | **$560** | **$1,512** | **$6,716** | **$18,146** |
| **HDHP/SO** | | | | |
| Northeast | $490 | $1,431 | $5,877 | $17,170 |
| Midwest | $514 | $1,454 | $6,171* | $17,446 |
| South | $512 | $1,538 | $6,150 | $18,459 |
| West | $481* | $1,398 | $5,766 | $16,780 |
| **ALL REGIONS** | **$502** | **$1,465** | **$6,024** | **$17,581** |
| **ALL PLANS** | | | | |
| Northeast | $583 | $1,674* | $7,001 | $20,092* |
| Midwest | $586 | $1,592 | $6,792 | $19,101 |
| South | $531* | $1,503* | $6,372* | $18,038* |
| West | $572 | $1,545 | $6,867 | $18,536 |
| **ALL REGIONS** | **$558** | **$1,564** | **$6,690** | **$18,764** |

* Estimates are statistically different within plan and coverage types from estimate for all firms not in the indicated region (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Exhibit 142     JA1486     JA-0002000

**Figure 1.4**

**Average Monthly and Annual Premiums for Covered Workers, by Plan Type and Industry, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| Agriculture/Mining/Construction | NSD | NSD | NSD | NSD |
| Manufacturing | $540 | $1,441 | $6,486 | $17,286 |
| Transportation/Communications/Utilities | $780* | $1,708* | $9,354* | $20,499* |
| Wholesale | NSD | NSD | NSD | NSD |
| Retail | NSD | NSD | NSD | NSD |
| Finance | $538 | $1,585 | $6,453 | $19,024 |
| Service | $561 | $1,614 | $6,735 | $19,365 |
| State/Local Government | $608 | $1,699 | $7,292 | $20,392 |
| Health Care | $605 | $1,681 | $7,259 | $20,175 |
| **ALL INDUSTRIES** | **$588** | **$1,589** | **$7,052** | **$19,071** |
| **PPO** | | | | |
| Agriculture/Mining/Construction | $523* | $1,523 | $6,278* | $18,280 |
| Manufacturing | $575 | $1,667 | $6,899 | $20,002 |
| Transportation/Communications/Utilities | $673* | $1,831** | $8,074* | $21,973* |
| Wholesale | $543 | $1,617 | $6,516 | $19,409 |
| Retail | $504* | $1,451* | $6,051* | $17,410* |
| Finance | $579 | $1,656 | $6,953 | $19,872 |
| Service | $576 | $1,587 | $6,909 | $19,043 |
| State/Local Government | $594 | $1,519 | $7,131 | $18,228 |
| Health Care | $602 | $1,722 | $7,219 | $20,658 |
| **ALL INDUSTRIES** | **$580** | **$1,623** | **$6,965** | **$19,481** |
| **POS** | | | | |
| Agriculture/Mining/Construction | NSD | NSD | NSD | NSD |
| Manufacturing | NSD | NSD | NSD | NSD |
| Transportation/Communications/Utilities | NSD | NSD | NSD | NSD |
| Wholesale | NSD | NSD | NSD | NSD |
| Retail | NSD | NSD | NSD | NSD |
| Finance | NSD | NSD | NSD | NSD |
| Service | $554 | $1,473 | $6,647 | $17,680 |
| State/Local Government | NSD | NSD | NSD | NSD |
| Health Care | $599 | $1,652 | $7,182 | $19,826 |
| **ALL INDUSTRIES** | **$560** | **$1,512** | **$6,716** | **$18,146** |
| **HDHP/SO** | | | | |
| Agriculture/Mining/Construction | $472 | $1,245 | $5,666 | $14,944 |
| Manufacturing | $475 | $1,392 | $5,708 | $16,699 |
| Transportation/Communications/Utilities | $513 | $1,512 | $6,161 | $18,141* |
| Wholesale | $444* | $1,331** | $5,322* | $15,970* |
| Retail | $457* | $1,411 | $5,489* | $16,928 |
| Finance | $473 | $1,410 | $5,677 | $16,923 |
| Service | $502 | $1,474 | $6,020 | $17,686 |
| State/Local Government | $494 | $1,322* | $5,929 | $15,860* |
| Health Care | $606* | $1,707* | $7,270* | $20,483* |
| **ALL INDUSTRIES** | **$502** | **$1,465** | **$6,024** | **$17,581** |
| **ALL PLANS** | | | | |
| Agriculture/Mining/Construction | $513* | $1,429 | $6,151* | $17,144 |
| Manufacturing | $534 | $1,532 | $6,413 | $18,383 |
| Transportation/Communications/Utilities | $653* | $1,689* | $7,838* | $20,263* |
| Wholesale | $509* | $1,457 | $6,106* | $17,486 |
| Retail | $476* | $1,410* | $5,716* | $16,920* |
| Finance | $523* | $1,555 | $6,271* | $18,662 |
| Service | $550 | $1,546 | $6,599 | $18,555 |
| State/Local Government | $591 | $1,548 | $7,090 | $18,581* |
| Health Care | $603* | $1,703* | $7,233* | $20,442* |
| **ALL INDUSTRIES** | **$558** | **$1,564** | **$6,690** | **$18,764** |

NOTE: NSD: Not Sufficient Data

* Estimate is statistically different within plan type from estimate for all firms not in the indicated industry (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 29

**667108**

Exhibit 142          JA1487          JA-0002001

**Figure 1.5**

**Average Annual Premiums for Covered Workers With Single Coverage, by Firm Characteristics and Firm Size, 2017**

| | A. Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | $6,527 | $6,823* | $6,739* |
| Many Lower-Wage Workers | $6,138 | $5,954* | $6,035* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | $6,302 | $6,538* | $6,455* |
| Many Higher-Wage Workers | $6,758 | $6,973* | $6,922* |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | $7,252* | $7,178* | $7,183* |
| Firm Does Not Have Any Union Workers | $6,408* | $6,452* | $6,434* |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | $6,576* | $6,843* | $6,762* |
| Many Younger Workers | $5,086* | $6,143* | $5,922* |
| **OLDER WORKERS** | | | |
| Few Older Workers | $6,088* | $6,353* | $6,257* |
| Many Older Workers | $7,250* | $7,176* | $7,192* |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | $6,466 | $6,904 | $6,626 |
| Self-Funded | $6,608 | $6,742 | $6,733 |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | $6,204* | $6,339* | $6,291* |
| Public | $7,350 | $7,549* | $7,531* |
| Private Not-For-Profit | $7,194* | $7,061** | $7,096* |
| **ALL FIRMS** | **$6,486** | **$6,776** | **$6,690** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667109**

Exhibit 142
JA1488
JA-0002002

**Figure 1.6**

**Average Annual Premiums for Covered Workers With Family Coverage, by Firm Characteristics and Firm Size, 2017**

| | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | $17,920* | $19,339* | $18,942* |
| Many Lower-Wage Workers | $15,033* | $17,437* | $16,376* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | $16,883* | $18,614* | $17,941* |
| Many Higher-Wage Workers | $18,983* | $19,750* | $19,565* |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | $20,673* | $19,817* | $19,585* |
| Firm Does Not Have Any Union Workers | $17,300* | $18,765* | $18,177* |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | $17,970* | $19,352* | $18,939* |
| Many Younger Workers | $15,297* | $18,129* | $16,893* |
| **OLDER WORKERS** | | | |
| Few Older Workers | $16,827* | $18,393* | $17,834* |
| Many Older Workers | $19,136* | $20,032* | $19,840* |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | $17,574 | $18,902 | $18,067* |
| Self-Funded | $17,852 | $19,321 | $19,217* |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | $17,167 | $18,867 | $18,285* |
| Public | $19,623 | $19,232 | $19,267 |
| Private Not-For-Profit | $18,600 | $20,057* | $19,658* |
| **ALL FIRMS** | **$17,615** | **$19,235** | **$18,764** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## PREMIUM DISTRIBUTION

- There is considerable variation in premiums for both single and family coverage.

  – Twenty percent of covered workers are employed in a firm with a single premium at least 20% higher than the average single premium, while 21% of covered workers are in firms with a single premium less than 80% of the average single premium [Figures 1.7].

  – For family coverage, 17% of covered workers are employed in a firm with a family premium at least 20% higher than the average family premium, while 21% of covered workers are in firms with a family premium less than 80% of the average family premium [Figure 1.7].

- Six percent of covered workers are in a firm with a premium of at least $10,000 a year for single coverage [Figure 1.8]. Seven percent of covered workers are in a firm with a premium of at least $26,000 a year for family coverage [Figure 1.9].

667110

Exhibit 142          JA1489          JA-0002003

**Figure 1.7**

**Distribution of Annual Premiums for Single and Family Coverage Relative to the Average Annual Single or Family Premium, 2017**



NOTE: The average annual premium is $6,690 for single coverage and $18,764 for family coverage. The premium distribution is relative to the average single or family premium. For example, $5,152 is 80% of the average single premium, $6,021 is 90% of the average single premium, $7,360 is 110% of the average single premium, and $8,029 is 120% of the average single premium. The same break points relative to the average are used for the distribution for family coverage.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 1.8**

**Distribution of Annual Premiums for Covered Workers with Single Coverage, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 32

**667111**

**Figure 1.9**

**Distribution of Annual Premiums for Covered Workers with Family Coverage, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

# PREMIUM CHANGES OVER TIME

- The average premium for single coverage is 4% higher than the single premium last year and the average premium for family coverage is 3% higher than the average family premium last year [Figure 1.10].

  - The average premiums for single and family coverage have grown at the same rate (19%) since 2012.

  - The average family premiums for both small and large firms have increased at similar rates since 2012 (15% for small firms and 20% for large firms). For small firms, the average family premium rose from $15,253 in 2012 to $17,615 in 2017. For large firms, the average family premium rose from $15,980 in 2012 to $19,235 in 2017 [Figures 1.11 and 1.12].

  - The $18,764 average family premium in 2017 is 19% higher than the average family premium in 2012 and 55% higher than the average family premium in 2007 [Figure 1.10] . The 19% family premium growth in the last five years is smaller than the 30% growth between 2007 and 2012, or the 51% premium growth between 2002 and 2007 [Figure 1.13].

  - The average family premiums for both small and large firms have increased at similar rates since 2007 (49% for small firms and 57% for large firms). For small firms, the average family premium rose from $11,835 in 2007 to $17,615 in 2017. For large firms, the average family premium rose from $12,233 in 2007 to $19,235 in 2017 [Figures 1.11 and 1.12].

- For covered workers in large firms, over the last five years, the average family premium in firms that are fully insured has grown at a similar rate to the average family premium for covered workers in fully or partially self-funded firms (16% for fully insured plans and 21% for self-funded firms) [Figure 1.14].

**667112**

Exhibit 142                    JA1491                    JA-0002005

### Figure 1.10
**Average Annual Premiums for Single and Family Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

### Figure 1.11
**Average Annual Premiums for Covered Workers with Family Coverage, by Firm Size, 1999-2017**



\* Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 34

**667113**

Exhibit 142

JA1492

JA-0002006

**Figure 1.12**
**Average Annual Premiums for Covered Workers with Family Coverage, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 1.13**
**Cumulative Premium Increases for Covered Workers with Family Coverage, 2002-2017**



* Percentage change in family premiums statistically different from previous five year period shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017; Bureau of Labor Statistics, Consumer Price Index, U.S. City Average of Annual Inflation (April to April), 2002-2017; Bureau of Labor Statistics, Seasonally Adjusted Data from the Current Employment Statistics Survey, 2002-2017 (April to April)

The Kaiser Family Foundation and Health Research & Educational Trust / Page 35

**667114**

Exhibit 142          JA1493          JA-0002007

**Figure 1.14**
**Among Workers in Large Firms, Average Annual Premiums for Family Coverage, by Funding Arrangement, 1999-2017**





* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Large Firms have 200 or more workers. For definitions of Self-Funded and Fully Insured Plans, see the introduction to Section 10. Due to a change in the survey questionnaire, funding status was not asked of firms with conventional plans in 2006. Therefore, conventional plan funding status is not included in the averages shown in this figure for 2006. Self-Funded includes plans that purchase stoploss coverage against some risk.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017



EMPLOYER HEALTH BENEFITS

2017 ANNUAL SURVEY

Health
Benefits
Offer Rates

SECTION

2

667116

# Section 2

# Health Benefits Offer Rates

While nearly all large firms (200 or more workers) offer health benefits to at least some employees, small firms (3-199 workers) are significantly less likely to do so. The percentage of all firms offering health benefits in 2017 (53%) is similar to the percentage of firms offering health benefits last year (56%), but lower than the percentages of firms offering health benefits in 2007 (59%) and 2012 (61%). As we reported last year, there has been a long-term decline in the offer and coverage rates for employer-provided coverage, particularly among smaller firms.[1]

Firms not offering health benefits continue to cite cost as the most important reason they do not do so. Almost all firms that offer coverage offer to dependents such as children and the spouses of eligible employees.

## FIRM OFFER RATES

- In 2017, 53% of firms offer health benefits, similar to the 56% who reported doing so in 2016 [Figure 2.1].

  - Ninety-nine percent of large firms offer health benefits to at least some of their workers. In contrast, only 53% of small firms offer health benefits in 2017 [Figures 2.2 and 2.3]. The percentages of both small and large firms offering health benefits to at least some of their workers are similar to those of last year [Figure 2.2].

  - The overall percentage of firms offering coverage in 2017 is less than the percentage offering coverage in 2012 (61%) and 2007 (59%) [Figure 2.1]. As we reported last year, there has been a long-term decline in the offer and coverage rates for employer-provided coverage, particularly among smaller firms.

  - Since most firms in the country are small, variation in the overall offer rate is driven largely by changes in the percentages of the smallest firms (3-9 workers) offering health benefits. For more information on the distribution of firms in the country, see the Survey Design and Methods Section and Figure M.4.[2]

  - Ninety-six percent of firms with 100 or more workers offer health benefits to at least some of their workers in 2017. Ninety percent of firms with 50-99 workers offer benefits to at least some workers [Figure 2.4].

  - Eighty-nine percent of all workers are employed by a firm that offers health benefits to at least some of its workers [Figure 2.26].

- Offer rates vary across different types of firms.

  - Smaller firms are less likely to offer health insurance: 40% of firms with 3-9 workers offer coverage, compared to 78% of firms with 25-49 workers, and 92% of firms with 50-199 workers [Figure 2.3].

  - Offer rates throughout different firm size categories in 2017 remain similar to those reported in 2016 [Figure 2.2].

[1] Kaiser Family Foundation. Diminishing offer and coverage rates among private sector employees [Internet]. Menlo Park, (CA): KFF; 2016 Sep [cited 2017 Jul 13]. Available from: http://www.kff.org/private-insurance/issue-brief/diminishing-offer-and-coverage-rates-among-private-sector-employees/
[2] Because surveys only collect information from a portion of the total number of firms in the country, there is uncertainty in any estimate. Since there are so many small firms, sometimes even seemingly large differences are not statistically different. For more information on the Employer Health Benefits Survey's weighting and design please see the Survey Design and Methods section.

**667117**

Exhibit 142

JA-0002010

**Figure 2.1**
**Percentage of Firms Offering Health Benefits, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 2.2**

**Percentage of Firms Offering Health Benefits, by Firm Size, 1999-2017**

| | 3-9 Workers | 10-24 Workers | 25-49 Workers | 50-199 Workers | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|---|---|---|---|
| 1999 | 55% | 74% | 88% | 97% | 65% | 99% | 66% |
| 2000 | 57% | 80% | 91% | 97% | 68% | 99% | 68% |
| 2001 | 58% | 77% | 90% | 96% | 67% | 99% | 68% |
| 2002 | 58% | 70%* | 87% | 95% | 65% | 98% | 66% |
| 2003 | 55% | 76% | 84% | 95% | 65% | 97% | 66% |
| 2004 | 52% | 74% | 87% | 92% | 62% | 98% | 63% |
| 2005 | 47% | 72% | 87% | 93% | 59% | 97% | 60% |
| 2006 | 49% | 73% | 87% | 92% | 60% | 98% | 61% |
| 2007 | 45% | 76% | 83% | 94% | 59% | 99% | 59% |
| 2008 | 50% | 78% | 90%* | 94% | 62% | 99% | 63% |
| 2009 | 47% | 72% | 87% | 95% | 59% | 98% | 59% |
| 2010 | 59%* | 76% | 92% | 95% | 68%* | 99% | 69%* |
| 2011 | 48%* | 71% | 85%* | 93% | 59%* | 99% | 60%* |
| 2012 | 50% | 73% | 87% | 94% | 61% | 98% | 61% |
| 2013 | 45% | 68% | 85% | 91% | 57% | 99% | 57% |
| 2014 | 44% | 64% | 83% | 91% | 54% | 98% | 55% |
| 2015 | 47% | 63% | 82% | 92% | 56% | 98% | 57% |
| 2016 | 46% | 61% | 80% | 91% | 55% | 98% | 56% |
| 2017 | 40% | 66% | 78% | 92% | 53% | 99% | 53% |

NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 2.3**

**Percentage of Firms Offering Health Benefits, by Firm Size, Region, and Industry, 2017**

| | Percentage of Firms Offering Health Benefits |
|---|---|
| **FIRM SIZE** | |
| 3-9 Workers | 40%* |
| 10-24 Workers | 66* |
| 25-49 Workers | 78* |
| 50-199 Workers | 92* |
| 200-999 Workers | 98* |
| 1,000-4,999 Workers | 99* |
| 5,000 or More Workers | 100* |
| **All Small Firms (3-199 Workers)** | **53%*** |
| **All Large Firms (200 or More Workers)** | **99%*** |
| **REGION** | |
| Northeast | 58% |
| Midwest | 52 |
| South | 50 |
| West | 55 |
| **INDUSTRY** | |
| Agriculture/Mining/Construction | 57% |
| Manufacturing | 67* |
| Transportation/Communications/Utilities | 57 |
| Wholesale | 63 |
| Retail | 42* |
| Finance | 58 |
| Service | 50 |
| State/Local Government | 83* |
| Health Care | 54 |
| **ALL FIRMS** | **53%** |

NOTE: As noted in the Survey Design and Methods section. estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.

\* Estimate is statistically different from estimate for all firms not in the indicated size, region. or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits. 2017

**667119**

Exhibit 142     JA1498     JA-0002012

**Figure 2.4**
**Percentage of Firms Offering Health Benefits to At Least Some of Their Workers, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits. Firm size categories are determined by the number of workers at a firm, which may include full-time and part-time workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.5**
**Percentage of Firms Offering Health Benefits, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 41

**667120**

Exhibit 142                    JA1499                    JA-0002013

SECTION 2. HEALTH BENEFITS OFFER RATES

## PART-TIME AND TEMPORARY WORKERS

- Among firms offering health benefits, relatively few offer benefits to their part-time and temporary workers.

  - The ACA defines full-time workers as those who on average work at least 30 hours per week, and part-time workers as those who on average work fewer than 30 hours per week. The employer shared responsibility provision of the ACA requires that firms with at least 50 full-time equivalent employees offer full-time employees coverage that meets minimum standards or be assessed a penalty.[3] Beginning in 2015, we modified the survey to explicitly ask employers whether they offered benefits to employees working fewer than 30 hours. Our previous question did not include a definition of "part-time". For this reason, historical data on part-time offer rates are shown, but we did not test whether the differences between 2014 and 2015 were significant. Many employers may work with multiple definitions of part-time; one for their compliance with legal requirements and another for internal policies and programs.

  - In 2017, 13% of all firms that offer health benefits offer them to part-time workers [Figure 2.7]. Large firms are more likely to offer health benefits to part-time workers than small firms (31% vs. 12%) [Figure 2.9].

- A small percentage (5%) of firms offering health benefits offer them to temporary workers [Figure 2.8]. Among firms offering health benefits, large firms are more likely than small firms to offer benefits to temporary workers (13% vs. 5%) [Figure 2.10]. The percentage of large firms offering health benefits to temporary workers is not statistically different from the 17% reported in 2016 [Figure 2.8].

**Figure 2.6**
**Among Firms Offering Health Benefits, Percentage That Offer Health Benefits to Part-Time Workers, by Firm Size, 1999-2017**

| | 3-24 Workers | 25-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|---|---|---|---|---|
| 1999 | 20% | 25% | 35% | 52% | 61% | 21% | 39% | 21% |
| 2000 | 21% | 24% | 34% | 48% | 52% | 22% | 37% | 22% |
| 2001 | 17% | 31% | 42% | 55% | 60% | 20% | 45% | 20% |
| 2002 | 22% | 29% | 43% | 60% | 58% | 23% | 46% | 24% |
| 2003 | 24% | 29% | 38% | 57% | 57% | 25% | 42% | 26% |
| 2004 | 20% | 29% | 41% | 51% | 60% | 22% | 43% | 23% |
| 2005 | 27% | 28% | 33% | 46% | 61% | 27% | 38%* | 27% |
| 2006 | 31% | 28% | 40%* | 55%* | 63% | 30% | 43%* | 31% |
| 2007 | 23% | 25% | 38% | 54% | 63% | 23% | 41% | 24% |
| 2008 | 22% | 30% | 40% | 53% | 67% | 24% | 43% | 25% |
| 2009 | 31% | 27% | 44% | 55% | 60% | 30% | 48% | 31% |
| 2010 | 24% | 28% | 35%* | 55% | 61% | 25% | 39%* | 25% |
| 2011 | 12% | 26% | 40% | 50% | 59% | 15% | 42% | 16% |
| 2012 | 27%* | 30% | 41% | 61%* | 66% | 28%* | 45% | 28%* |
| 2013 | 24% | 28% | 45% | 55% | 68% | 25% | 47% | 25% |
| 2014 | 22% | 28% | 44% | 55% | 58%* | 24% | 46% | 24% |
| 2015 | 19% | 17% | 30% | 52% | 68% | 18% | 35% | 19% |
| 2016 | 15% | 18% | 28% | 48% | 56%* | 15% | 33% | 16% |
| 2017 | 12% | 14% | 28% | 40% | 62% | 12% | 31% | 13% |

NOTE: Prior to 2015, each respondent defined part-time according to their firm's policies, starting in 2015, respondents were asked whether employees working fewer than 30 hours per week were eligible for benefits. Due to this change, no statistical testing was conducted between the 2014 and 2015 estimates.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

---

[3] Internal Revenue Code. 26 U.S. Code § 4980H - Shared responsibility for employers regarding health coverage. 2011. https://www.gpo.gov/fdsys/pkg/USCODE-2011-title26/pdf/USCODE-2011-title26-subtitleD-chap43-sec4980H.pdf

**Figure 2.7**

**Among Firms Offering Health Benefits, Percentage That Offer to Part-Time Workers, by Firm Size, 2017**



| 3-24 Workers | 25-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | ALL FIRMS |
|---|---|---|---|---|---|
| 12% | 14% | 28%* | 40%* | 62%* | 13% |

\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.8**

**Among Firms Offering Health Benefits, Percentage That Offer to Temporary Workers, by Firm Size, 1999-2017**

| | 3-24 Workers | 25-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|---|---|---|---|---|
| 1999 | 5% | 3% | 3% | 7% | 9% | 4% | 4% | 4% |
| 2000 | 2% | 7% | 9% | 8% | 8% | 3% | 9% | 3% |
| 2001 | 4% | 3% | 6% | 9% | 8% | 4% | 7% | 4% |
| 2002 | 3% | 4% | 5% | 8% | 7% | 3% | 6% | 3% |
| 2003 | 1% | 4% | 9% | 7% | 10% | 2% | 9% | 2% |
| 2004 | 4% | 3% | 8% | 8% | 7% | 3% | 8% | 4% |
| 2005 | 2% | 5% | 5% | 5% | 9% | 3% | 5% | 3% |
| 2006 | 3% | 4% | 8% | 9% | 11% | 3% | 6% | 3% |
| 2007 | 2% | 4% | 7% | 9% | 6%* | 2% | 7% | 2% |
| 2008 | 3% | 3% | 4% | 7% | 8% | 3% | 5% | 3% |
| 2009 | 4% | 3% | 4% | 7% | 9% | 3% | 5% | 3% |
| 2010 | 1% | 4% | 6% | 8% | 8% | 1% | 6% | 1% |
| 2011 | 4% | 4% | 6% | 5% | 4% | 4% | 6% | 4% |
| 2012 | 2% | 2% | 8% | 5% | 8% | 2% | 6% | 2% |
| 2013 | 2% | 5% | 6% | 5% | 8% | 3% | 6% | 3% |
| 2014 | 6% | 4% | 8% | 11%* | 8% | 5% | 9% | 5% |
| 2015 | 3% | 4% | 11% | 12% | *3%* | 3% | 11% | 3% |
| 2016 | 1% | 9% | 18% | 23%* | 20% | 3% | 17%* | 3% |
| 2017 | 3% | 8% | 11% | 18% | 25% | 5% | 13% | 5% |

\* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 43

**667122**

Exhibit 142     JA1501     JA-0002015

**Figure 2.9**
**Among Firms Offering Health Benefits, Percentage That Offer to Part-Time Workers, by Firm Size, 1999-2017**



\* Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05).
NOTE: Prior to 2015, each respondent defined part-time according to their firm's policies. starting in 2015, respondents were asked whether employees working fewer than 30 hours per week were eligible for benefits.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 2.10**
**Among Firms Offering Health Benefits, Percentage That Offer to Temporary Workers, by Firm Size, 1999-2017**



\* Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 44

**667123**

# SPOUSES, DEPENDENTS AND DOMESTIC PARTNER BENEFITS

- The majority of firms offering health benefits offer to spouses and dependents, such as children. In 2017, 94% of small firms and 100% of large firms offering health benefits offer coverage to spouses, similar to last year. Ninety-two percent of small firms and 100% of large firms offering health benefits cover other dependents, such as children, similar to last year. Five percent of small firms offering health benefits offer only single coverage to employees [Figure 2.11].

- Employers were also asked whether same-sex or opposite-sex domestic partners were allowed to enroll in the firm's coverage. While definitions may vary, employers often define domestic partners as an unmarried couple who has lived together for a specified period of time. Firms may define domestic partners separately from any legal requirements a state may have, and also, employers may have a different policy in different parts of the country or for different workers.

   - In 2017, 36% of firms offering health benefits offer coverage to opposite-sex domestic partners, similar to the 27% who did so in 2016. Forty percent of firms offering health benefits offer coverage to same-sex domestic partners, similar to the 32% who did so last year [Figure 2.13].

   - When firms are asked if they offer health benefits to opposite or same-sex domestic partners, many report that they have not encountered this issue. At some small firms, the firm may not have formal human resource policies on domestic partners simply because none of the firm's workers have asked to cover a domestic partner. Regarding health benefits for opposite-sex domestic partners, 30% of firms report in 2017 that they have not encountered this request or that the question was not applicable [Figure 2.12]. The vast majority of firms in the United States are small businesses [Figure M.1]. Therefore, statistics about the percentage of firms that offer domestic partner benefits are largely determined by small businesses. More small firms (31%) than large firms (2%) indicate that they have not encountered this request or that the question was not applicable [Figure 2.12]. Regarding health benefits for same-sex domestic partners, 34% of firms report that they have not encountered the request or that the question was not applicable. More small firms (35%) than large firms (4%) report that they have not encountered the issue of offering benefits to same-sex domestic partners [Figure 2.12].

   - Among large firms not offering health benefits to same-sex domestic partners, 3% stopped offering them within the last 12 months.

- Over half (57%) of firms that offer health benefits to spouses also offer coverage to same-sex spouses, with large firms more likely than small firms to offer coverage to same-sex spouses (88% vs. 56%). Small firms are more likely than large firms to report that this request has not been encountered (32% vs. 4%) [Figure 2.15].

- Among all firms that offer health benefits, 15% report providing additional compensation or benefits to employees if they enroll in a spouse's plan, and 18% provide additional compensation or benefits to employees if they do not participate in the firm's health benefits [Figure 2.16].

667124

Exhibit 142                    JA1503                    JA-0002017



**Figure 2.11**

**Among Firms Offering Benefits, Percentage That Offer to Spouses, Dependents and Partners, 2017**



NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Not Encountered refers to firms where no workers requested domestic partner benefits and there is no corporate policy on coverage for that classification of domestic partners.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.12**

**Among Firms Offering Health Benefits, Percentage That Offer to Unmarried Same-Sex and Opposite-Sex Domestic Partners, by Firm Size and Region, 2017**

|  | Same-Sex | | | Opposite-Sex | | |
|---|---|---|---|---|---|---|
|  | Yes | No | Not Encountered | Yes | No | Not Encountered |
| **FIRM SIZE** | | | | | | |
| 3-24 Workers | 37% | 22%* | 40%* | 33% | 29%,* | 37%* |
| 25-199 Workers | 45 | 34 | 21* | 41 | 43* | 15* |
| 200-999 Workers | 46 | 49* | 5* | 40 | 58* | 2* |
| 1,000-4,999 Workers | 43 | 56* | 1* | 38 | 61* | ** |
| 5,000 or More Workers | 53* | 47* | 0* | 47* | 53* | 0* |
| **All Small Firms (3-199 Workers)** | 40% | 25%* | 35%* | 36% | 33%* | 31%* |
| **All Large Firms (200 or More Workers)** | 46% | 50%* | 4%* | 40% | 58%* | 2%* |
| **REGION** | | | | | | |
| Northeast | 48% | 28% | 24% | 35% | 38% | 27% |
| Midwest | 13* | 39* | 48 | 13* | 45 | 42 |
| South | 33 | 28 | 39 | 35 | 36 | 29 |
| West | 62* | 12* | 26 | 55* | 21* | 24 |
| **ALL FIRMS** | 40% | 26% | 34% | 36% | 34% | 30% |

NOTE: Not Encountered refers to firms where no workers requested domestic partner benefits and there is no corporate policy on coverage for that classification of same-sex partners.

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < 05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667125**

Exhibit 142    JA1504    JA-0002018

**Figure 2.13**

**Among Firms Offering Health Benefits, Percentage That Offer to Unmarried Opposite-Sex and Same-Sex Domestic Partners, by Firm Size, 2008-2017**

|  | 2008 | 2009 | 2012 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **Opposite-Sex Domestic Partners** | | | | | | | |
| Small Firms | 24% | 31% | 37% | 39% | 28% | 26% | 36% |
| Large Firms | 32% | 34% | 38%* | 39% | 38% | 42% | 40% |
| **All Firms** | 24% | 31% | 37% | 39% | 28% | 27% | 36% |
| **Same-Sex Domestic Partners** | | | | | | | |
| Small Firms | 22% | 21% | 31% | 39% | 42% | 32% | 40% |
| Large Firms | 32% | 34% | 42%* | 49% | 47% | 49% | 48% |
| **All Firms** | 22% | 21% | 31% | 39% | 42% | 32% | 40% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. See Figure 2.12 for the percentage of firms indicating no and not encountered. These questions were not asked in the 2010, 2011, and 2013 surveys.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2008-2017

**Figure 2.14**

**Among Firms Not Offering Domestic Partner Benefits, Percentage of Firms That Stopped Offering Those Benefits in the Last 12 Months, by Firm Size, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 47

**667126**

**Figure 2.15**

**Among Firms Offering Health Benefits to Spouses, Percentage of Firms That Offer Coverage to Same-Sex Spouses, by Firm Size, 2017**

| FIRM SIZE | Yes | No | Not Encountered |
|---|---|---|---|
| 3-49 Workers | 54%* | 11% | 35%* |
| 50-199 Workers | 67 | 15 | 18* |
| 200-999 Workers | 87* | 8 | 5* |
| 1 000-4,999 Workers | 92* | 8 | 1* |
| 5 000 or More Workers | 94* | 6 | 0* |
| All Small Firms (3-199 Workers) | 56%* | 12% | 32%* |
| All Large Firms (200 or More Workers) | 88%* | 8% | 4%* |
| **ALL FIRMS** | **57%** | **11%** | **31%** |

NOTE: Not Encountered refers to firms where no workers requested domestic partner benefits and there is no corporate policy on coverage for that classification of domestic partners

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017



**Figure 2.16**

**Among Firms Offering Health Benefits, Percentage That Provide Additional Incentives to Workers For Various Enrollment Decisions, by Firm Size, 2017**

■ Additional Incentives for Enrolling in a Spouse's Plan    ▨ Additional Incentives for Not Participating in Firm's Health Benefits

|  | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | ALL FIRMS |
|---|---|---|---|
| Additional Incentives for Enrolling in a Spouse's Plan | 15% | 13% | 15% |
| Additional Incentives for Not Participating in Firm's Health Benefits | 18% | 17% | 18% |

Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SUPPLEMENTAL AND VOLUNTARY BENEFITS

- Firms offering health benefits also offer a variety of supplemental and other health benefits to their workers. Large firms are more likely than small firms to offer these benefits [Figure 2.17]. Among firms offering health benefits:

  – Sixty-seven percent of small firms and 97% of large firms offer dental benefits to their employees. Of firms offering these benefits, 67% make a contribution toward the cost of the coverage [Figure 2.18].

  – Forty-seven percent of small firms and 82% of large firms offer vision benefits to their employees. Of firms offering these benefits, 54% make a contribution toward the cost of the coverage [Figure 2.18].

**667127**

Exhibit 142    JA1506    JA-0002020

- Critical illness insurance provides a cash benefit when an enrollee is diagnosed with a specified condition, such as cancer. Twenty-three percent of small firms and 46% of large firms offer critical illness insurance to their employees. Of firms offering these benefits, 3% make a contribution toward the cost of the coverage [Figure 2.18].

- Hospital indemnity plans, sometimes known as hospital cash plans, provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Sixteen percent of small firms and 28% of large firms offer hospital indemnity insurance to their employees. Of firms offering these benefits, 5% make a contribution toward the cost of the coverage [Figure 2.18].

- Long-term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. Sixteen percent of small firms and 25% of large firms offer long-term care insurance to their employees, similar to the percentages in 2011. Of firms offering these benefits, 47% make a contribution toward the cost of the coverage [Figure 2.18].

**Figure 2.17**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer Voluntary Benefits In Addition to the Health Plan, by Firm Size, Region and Industry, 2017**

| | Separate Dental Insurance | Separate Vision Insurance | Separate Critical Illness Insurance | Separate Hospital Indemnity Insurance | Separate Long Term Care Insurance |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 3-49 Workers | 64%* | 44%* | 21%* | 14%* | 15% |
| 50-199 Workers | 89* | 71* | 43* | 31* | 23 |
| 200-999 Workers | 97* | 82* | 46* | 30* | 26* |
| 1,000-4,999 Workers | 97* | 86* | 44* | 29 | 20 |
| 5,000 or More Workers | 97* | 86* | 56* | 24 | 26* |
| All Small Firms (3-199 Workers) | 67%* | 47%* | 23%* | 16%* | 16%* |
| All Large Firms (200 or More Workers) | 97%* | 82%* | 46%* | 28%* | 25%* |
| **REGION** | | | | | |
| Northeast | 70% | 51% | 23% | 11% | 11% |
| Midwest | 54 | 39 | 14* | 12 | 11 |
| South | 68 | 49 | 37* | 26* | 25 |
| West | 78 | 64 | 20 | 14 | 15 |
| **INDUSTRY** | | | | | |
| Agriculture/Mining/Construction | 44% | 34% | 21% | 2%* | 14% |
| Manufacturing | 82 | 75* | 38 | 7* | 8 |
| Transportation/Communications/Utilities | 36 | 31 | 12 | 7 | 7 |
| Wholesale | 49 | 25* | 20 | 23 | 9 |
| Retail | 73 | 51 | 19 | 10 | 15 |
| Finance | 85 | 84 | 28 | 13 | 52* |
| Service | 70 | 47 | 18* | 12 | 10* |
| State/Local Government | 72 | 58 | 36 | 29 | 23 |
| Health Care | 86* | 62 | 59* | 50* | 30 |
| **ALL FIRMS** | 68% | 49% | 24% | 16% | 16% |

NOTE: Critical illness insurance provides a cash benefit when an enrollee is diagnosed with a specified condition, such as cancer. Hospital indemnity plans provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Long-term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to supplemental benefits that are separate from coverage their health plans might include.

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category ($p < .05$)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667128**

Exhibit 142                    JA1507                    JA-0002021

**Figure 2.18**

**Among Firms Offering Health Benefits, Percentage That Offer Voluntary Benefits In Addition to Benefits Offered Through the Health Plan, by Firm Size, 2017**

| | Dental | | Vision | | Critical Illness | | Hospital Indemnity | | Long Term Care | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute |
| **FIRM SIZE** | | | | | | | | | | |
| 200-999 Workers | 97%* | 69% | 82%* | 41% | 45%* | 2% | 30%* | 1% | 26%* | 41% |
| 1,000-4,999 Workers | 97* | 77 | 86* | 40* | 44* | 10* | 19 | 8 | 2C | 42 |
| 5,000 or More Workers | 97* | 78 | 86* | 33* | 58* | 1 | 24 | 5 | 26* | *6* |
| All Small Firms (3-199 Workers) | 67%* | 67% | 47%* | 55%* | 23%* | 3% | 16%* | 6% | 16%* | 47% |
| All Large Firms (200 or More Workers) | 97%* | 71% | 82%* | 41%* | 46%* | 3% | 28%* | 2% | 25%* | 40% |
| **ALL FIRMS** | 68% | 67% | 49% | 54% | 24% | 3% | 16% | 5% | 16% | 47% |

NOTE: Critical illness insurance provides a cash benefit when an employee is diagnosed with a specified condition, such as cancer. Hospital indemnity plans provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Long term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to supplemental benefits that are separate from coverage their health plans might include.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.19**

**Among Firms Offering Health Benefits, Percentage That Offer Supplemental Insurance Benefits in Addition to Benefits Offered Through the Health Plan, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Critical illness insurance provides a cash benefit when an enrollee is diagnosed with a specified condition, such as cancer. Hospital indemnity plans provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Long term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to supplemental benefits that are separate from any their health plans might include.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667129**

Exhibit 142

JA-0002022



**Figure 2 20**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer or Contribute to a Separate Benefit Plan Providing Dental or Vision Benefits, by Firm Size, 2000-2017**

|  | 2000 | 2003 | 2006 | 2008 | 2010 | 2012 | 2014 | 2017 |
|---|---|---|---|---|---|---|---|---|
| Separate Dental Benefits: Small Firms | 30% | 37% | 48%* | 42% | 45% | 53%* | 62%* | 67%* |
| Separate Dental Benefits: Large Firms | 69% | 78%* | 79% | 81%* | 87%* | 89% | 88%* | 97%* |
| **Separate Dental Benefits: ALL FIRMS** | 31% | 38% | 50%* | 43% | 46% | 54%* | 53% | 68%* |
|  |  |  |  |  |  |  |  |  |
| Separate Vision Benefits: Small Firms | 20% | 15% | 16% | 27%* | 34% | 47%* |  |  |
| Separate Vision Benefits: Large Firms | 42% | 47% | 51% | 62%* | 63%* | 82%* |  |  |
| **Separate Vision Benefits: ALL FIRMS** | 20% | 16% | 17% | 27%* | 35% | 49%* |  |  |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Data on vision benefits was not collected in 2000 and 2003. The survey asks firms that offer health benefits if they offer or contribute to a dental or vision insurance program that is separate from any dental or vision coverage their health plans might include.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2000-2017

**Figure 2.21**

**Among Firms Offering Health Benefits, Percentage That Offer Long Term Care Insurance in Addition to Benefits Offered Through the Health Plan, by Firm Size, 2007, 2011, and 2017**

* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Long term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to long term care insurance that is separate from any coverage their health plans might include.

SOURCE: Kaiser/HRET Survey of Employer Sponsored Health Benefits, 2007, 2011, and 2017

# FIRMS NOT OFFERING HEALTH BENEFITS

- The survey asks firms that do not offer health benefits if they have offered insurance or shopped for insurance in the recent past, and about their most important reasons for not offering coverage. Because such a small percentage of large firms report not offering health benefits, we present responses for small non-offering firms only.

  - The cost of health insurance remains the primary reason cited by firms for not offering health benefits. Among small firms not offering health benefits, 44% cite high cost as "the most important reason" for not doing so, followed by "the firm is too small" (17%) [Figure 2.22]. Relatively few small firms indicate that they do not offer because they believe that employees will get a better deal on the health insurance exchanges (2%).

- Many small non-offering firms have either offered health insurance in the past five years, or have shopped for health insurance in the past year. Twenty percent of small non-offering firms have offered health benefits in the past five years, and 13% have shopped for coverage in the past year [Figure 2.23]. The 20% of small non-offering firms that have offered

coverage in the past five years is similar to the 19% reported last year.

• Among small non-offering firms that report they stopped offering coverage within the last five years, 18% stopped offering coverage within the last year.

• Among small non-offering firms, 16% report that they provide funds to their employees to purchase health insurance on their own in the individual market or through a health insurance exchange [Figure 2.24]. Forty percent of these firms provide workers between $2,000 and $5,999 a year to purchase non-group insurance [Figure 2.25].

---

**Figure 2.22**

**Among Small Firms Not Offering Health Benefits, Most Important Reason for Not Offering, 2017**

| | 3-9 Workers | 10-199 Workers | All Small Firms (3-199 Workers) |
|---|---|---|---|
| Cost of Health Insurance Too High | 42% | 49% | 44% |
| Firm is Too Small | 18 | 15 | 17 |
| Employees Are Covered Under Another Plan, Including Spouse's | 16 | 14 | 15 |
| Employees Will Get a Better Deal On Health Insurance Exchanges | 2 | 4 | 2 |
| Employee Turnover Is Too Great | 0 | 3 | * |
| No Interest/Employees Do Not Want It | 10 | 4 | 9 |
| Most Employees Are Part-Time or Temporary Workers | 7 | 11 | 8 |
| Other | 4 | 5 | 4 |
| Don't Know | 0% | 2% | <1% |

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---



**Figure 2.23**
**Among Small Firms Not Offering Health Benefits, Percentage That Report the Following Actions, 2009-2017**

* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Small Firms have 3-199 workers. Eighteen percent of small non-offering firms who indicated they had offered health insurance in the past five years said they stopped offering health benefits in the past 12 months.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**667131**

Exhibit 142    JA1510    JA-0002024

**Figure 2.24**

**Among Small Firms Not Offering Health Benefits, Percentage That Provide Workers Funds to Purchase Non-Group Insurance, by Firm Size, 2012-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Among firms who provide funds to workers to purchase non-group coverage 7 percent started providing funds within the last 12 months. Starting in 2014, this question was modified to, Does your firm provide funds for workers to purchase insurance on their own in the individual market, or through a health insurance exchange?.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012-2017

**Figure 2.25**

**Among Small Firms That Provide Workers Funds to Purchase Non-Group Insurance, Annual Amounts That Firms Provide to Workers, 2017**



NOTE: Many employers indicated that they base non-group insurance contributions on a variety of factors.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 53

**667132**

Exhibit 142                                          JA1511                                          JA-0002025



**Figure 2.26**
**Percentage of All Workers at Firms That Offer Health Benefits to At Least Some Workers,**
**by Firm Size, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits. Not all workers at a firm offering benefits are eligible or enrolled in their firm's health benefits.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667133**

Exhibit 142                     JA1512                     JA-0002026



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Employee
Coverage,
Eligibility, and
Participation

SECTION

3

667134

Exhibit 142                    JA1513                    JA-0002027

# Section 3

# Employee Coverage, Eligibility, and Participation

Employers are the principal source of health insurance in the United States, providing health benefits for about 151 million non-elderly people in America.[1] Most workers are offered health coverage at work, and the majority of workers who are offered coverage take it. Workers may not be covered by their own employer for several reasons: their employer may not offer coverage, they may not be eligible for the benefits offered by their firm, they may elect to receive coverage through their spouse's employer, or they may refuse coverage from their firm. Before eligible workers may enroll, about three-quarters (76%) of covered workers face a waiting period.

## ELIGIBILITY

- Not all workers are eligible for the health benefits offered by their firm, and not all eligible workers "take up" (i.e., elect to participate in) the offer of coverage. The share of workers covered in a firm is a product of both the percentage of workers who are eligible for the firm's health insurance and the percentage that choose to take up the benefit. The percentage of workers eligible for health benefits at offering firms in 2017 is similar to last year and the recent past for both small and large firms [Figure 3.1].

  - Seventy-nine percent of workers in firms offering health benefits are eligible for the coverage offered by their employer. The percentage of eligible workers is higher in small firms with 3-24 workers (84%) than other firm sizes [Figure 3.2].

  - Eligibility varies considerably by firm wage level. Workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) are less likely to be eligible for health benefits than workers in firms with a smaller share of lower-wage workers (68% vs. 81%) [Figure 3.3].

  - Workers in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually) are more likely to be eligible for health benefits than workers in firms with a smaller share of higher-wage workers (88% vs. 73%) [Figure 3.3].

  - Eligibility also varies by the age of the workforce. Those in firms with a relatively small share of younger workers (where fewer than 35% of the workers are age 26 or younger) are more likely to be eligible for health benefits than those in firms with a larger share younger workers (81% vs. 64%) [Figure 3.3].

  - The average eligibility rate is particularly low in retail firms (54%) [Figure 3.2].

---

[1] Kaiser Commission on Medicaid and the Uninsured. The uninsured: A primer—Key facts about health insurance and the uninsured in the wake of national health reform [Internet]. Washington (DC): The Commission; 2016 Nov [cited 2016 Aug 1]. http://www.kff.org/uninsured/report/the-uninsured-a-primer-key-facts-about-health-insurance-and-the-uninsured-in-the-wake-of-national-health-reform/. See supplemental tables - Table 1: 270.2 million non-elderly people, 55.5% of whom are covered by ESI.

SECTION 3. EMPLOYEE COVERAGE, ELIGIBILITY, AND PARTICIPATION

**Figure 3.1**

**Eligibility, Take-Up Rate, and Coverage for Workers In Firms Offering Health Benefits, by Firm Size, 1999-2017**

| | Percentage Eligible | | | Percentage of Eligible That Take Up | | | Percentage Covered | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Small Firms | All Large Firms | All Firms | All Small Firms | All Large Firms | All Firms | All Small Firms | All Large Firms | All Firms |
| 1999 | 81% | 78% | 79% | 83% | 86% | 85% | 67% | 68% | 66% |
| 2000 | 82% | 80% | 81% | 83% | 84% | 84% | 68% | 67% | 67% |
| 2001 | 85% | 82% | 83% | 83% | 85% | 84% | 71% | 69% | 70% |
| 2002 | 82%* | 80% | 81%* | 82% | 86% | 85%* | 67%* | 69% | 68% |
| 2003 | 84% | 80% | 81% | 81% | 85% | 84% | 68% | 68% | 68% |
| 2004 | 82% | 81% | 80% | 80% | 84% | 83% | 64% | 68% | 67% |
| 2005 | 81% | 79% | 80% | 81% | 85% | 83% | 67% | 67% | 66% |
| 2006 | 83% | 76% | 78% | 81% | 84% | 83% | 67% | 63% | 65% |
| 2007 | 80% | 78% | 79% | 80% | 84% | 82% | 64% | 65% | 65% |
| 2008 | 81% | 79% | 80% | 80% | 84% | 82% | 65% | 66% | 65% |
| 2009 | 81% | 79% | 79% | 79% | 82% | 81% | 64% | 65% | 65% |
| 2010 | 82% | 77% | 79% | 77% | 82% | 80% | 63% | 63% | 63% |
| 2011 | 83% | 78% | 79% | 78% | 83% | 81% | 65% | 65% | 65% |
| 2012 | 78%* | 76% | 77% | 78% | 82% | 81% | 61% | 62% | 62% |
| 2013 | 80% | 76% | 77% | 77% | 81% | 80% | 62% | 62% | 62% |
| 2014 | 79% | 76% | 77% | 77% | 81% | 80% | 61% | 62% | 62% |
| 2015 | 81% | 79% | 79% | 76% | 81% | 79% | 61% | 63% | 63% |
| 2016 | 82% | 78% | 79% | 77% | 79% | 79% | 63% | 62% | 62% |
| 2017 | 82% | 78% | 79% | 75% | 79% | 78% | 62% | 62% | 62% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. In 2009, Kaiser/HRET began weighting the percentage of workers that take up coverage by the number of workers eligible for coverage. The historical take-up estimates have also been updated. See the Survey Design and Methods section for more information.

* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 3.2**

**Eligibility, Take-Up Rate, and Coverage In Firms Offering Health Benefits, by Firm Size, Region, and Industry, 2017**

| | Percentage of Workers Eligible for Health Benefits Offered by Their Employer | Percentage of Eligible Workers Who Participate in Their Employers' Plan (Take-Up Rate) | Percentage of Workers Covered by Their Employers' Health Benefits |
|---|---|---|---|
| **FIRM SIZE** | | | |
| 3-24 Workers | 84%* | 78% | 66% |
| 25-49 Workers | 81 | 73 | 59 |
| 50-199 Workers | 81 | 74* | 60 |
| 200-999 Workers | 78 | 78 | 61 |
| 1,000-4,999 Workers | 82 | 80 | 65 |
| 5,000 or More Workers | 77 | 79 | 61 |
| **All Small Firms (3-199 Workers)** | 82% | 75%* | 62% |
| **All Large Firms (200 or More Workers)** | 78% | 79%* | 62% |
| **REGION** | | | |
| Northeast | 78% | 77%* | 60% |
| Midwest | 76 | 76 | 58 |
| South | 81 | 79 | 64 |
| West | 81 | 79 | 64 |
| **INDUSTRY** | | | |
| Agriculture/Mining/Construction | 84% | 74% | 62% |
| Manufacturing | 93* | 79 | 74* |
| Transportation/Communications/Utilities | 87* | 87* | 76* |
| Wholesale | 91* | 85* | 77* |
| Retail | 54* | 63* | 34* |
| Finance | 95* | 82* | 78* |
| Service | 77 | 75* | 57* |
| State/Local Government | 88* | 89* | 79* |
| Health Care | 79 | 79 | 62 |
| **ALL FIRMS** | 79% | 78% | 62% |

* Estimate for eligibility, take-up rate, or coverage is statistically different from all other firms not in the indicated size, region, or industry category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667136

Exhibit 142

JA1515

JA-0002029



**Figure 3.3**

**Among Workers in Firms Offering Health Benefits, Percentage of Workers Eligible for Health Benefits Offered by Their Firm, by Firm Characteristics, 2017**

* Estimates are statistically different from each other within category *p < .05).
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## TAKE-UP RATE

- A large share of workers who are offered health benefits at work elect to enroll. In 2017, 78% of eligible workers take up coverage when it is offered to them, similar to last year [Figure 3.1].[2] Eligible workers in large firms (200 or more workers) are more likely to take up coverage when offered than eligible workers in small firms (3-199 workers) (79% vs. 75%) [Figure 3.2].

  - The likelihood of a worker accepting a firm's offer of coverage varies by firm wage level. Eligible workers in firms with a relatively small share of lower-wage workers (where fewer than 35% of workers earn $24,000 a year or less) are more likely to take up coverage than eligible workers in firms with a larger share of lower-wage workers (79% vs. 65%) [Figure 3.4].

  - Eligible workers in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually) are more likely to take up coverage than those in firms with a smaller share of higher-wage workers (82% vs. 74%) [Figure 3.4].

  - Eligible workers in firms with relatively large share of younger workers (where at least 35% of the workers are age 26 or younger) are less likely to take up coverage than those in firms with a smaller share of younger workers (70% vs. 79%) [Figure 3.4].

  - The percentage of eligible workers taking up benefits in offering firms also varies by industry, with a lower average take-up rate at retail firms (63%) and a higher average take-up rate at state and local governments (89%) [Figure 3.2].

[2] In 2009, Kaiser/HRET began weighting the percentage of workers that take up coverage by the number of workers eligible for coverage. The historical take up estimates have also been updated. See the Survey Design and Methods section for more information.

667137

Exhibit 142

JA1516

JA-0002030

- The share of eligible workers taking up benefits in offering firms (78%) has decreased over time, from 81% in 2012 and 82% in 2007.

**Figure 3.4**

**Among Workers in Firms Offering Health Benefits, Percentage of Eligible Workers Who Take Up Health Benefits Offered by Their Firm, by Firm Characteristics, 2017**



* Estimates are statistically different from each other within category (p < .05)
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012

## COVERAGE

- The percentage of workers at firms offering health benefits that are covered by their firm's health plan in 2017 is 62%, the same percentage as last year [Figure 3.1].

  - The coverage rate at firms offering health benefits is the same for small firms and large firms in 2017. These rates are similar to the rates last year for both small firms and large firms [Figure 3.1].

- There is significant variation by industry in the coverage rate among workers in firms offering health benefits. The average coverage rate is particularly low in retail (34%) and service (57%) industries [Figure 3.2].

- Among workers in firms offering health benefits, those in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) are less likely to be covered by their own firm than workers in firms with a smaller share of lower-wage workers (44% vs. 64%). A comparable pattern exists in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually), with workers in these firms being more likely to be covered by their employer's health benefits than those in firms with a smaller share of higher-wage workers (72% vs. 54%) [Figure 3.5].

- Among workers in firms offering health benefits, those in firms with a relatively small share of younger workers (where fewer than 35% of the workers are age 26 or younger) are more likely to be covered by their own firm than those in firms with a larger share of younger workers (64% vs. 45%) [Figure 3.5].

- Among workers in all firms, including those that offer and those that do not offer health benefits, 55% of workers are covered by health benefits offered by their employer, the same percentage as last year. The coverage rate in 2017 is lower than the coverage rate in 2007 (59%).

**667138**

Exhibit 142

**Figure 3.5**

**Among Workers in Firms Offering Health Benefits, Percentage of Workers Covered by Health Benefits Offered by Their Firm, by Firm Characteristics, 2017**



* Estimates are statistically different from each other within category (p < .05)

NOTE: Firms with many lower wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 3.6**

**Percentage of All Workers Covered by Their Employer's Health Benefits, Both in Firms Offering and Not Offering Health Benefits, by Firm Size, 1999-2017**

| | 3-24 Workers | 25-49 Workers | 50-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All Small Firms | All Large Firms | All Firms |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | 50% | 56% | 61% | 69% | 65% | 64% | 55% | 66% | 62% |
| 2000 | 50% | 63% | 62% | 69% | 68% | 68% | 57% | 67% | 63% |
| 2001 | 49% | 62% | 67% | 71% | 69% | 69% | 58% | 69% | 65% |
| 2002 | 45% | 57% | 64% | 69% | 70% | 68% | 54% | 69% | 63% |
| 2003 | 44% | 59% | 61% | 68% | 69% | 68% | 53% | 68% | 62% |
| 2004 | 43% | 56% | 58% | 69% | 68% | 67% | 50% | 68% | 61% |
| 2005 | 41% | 55% | 59% | 65% | 69% | 66% | 50% | 66% | 60% |
| 2006 | 45% | 55% | 62% | 62% | 68% | 65% | 53% | 63% | 59% |
| 2007 | 42% | 51% | 59% | 65% | 69% | 63% | 50% | 65% | 59% |
| 2008 | 43% | 57% | 60% | 67% | 69% | 64% | 52% | 66% | 60% |
| 2009 | 39% | 54% | 58% | 63% | 67% | 65% | 49% | 65% | 59% |
| 2010 | 44% | 59% | 60% | 67% | 66% | 63% | 52% | 63% | 59% |
| 2011 | 38% | 49% | 59% | 63% | 66% | 64% | 48%* | 64% | 58% |
| 2012 | 36% | 54% | 56% | 61% | 66% | 61% | 47% | 62% | 56% |
| 2013 | 36% | 53% | 57% | 63% | 67% | 58% | 46% | 61% | 56% |
| 2014 | 33% | 52% | 55% | 60% | 66% | 61% | 44% | 62% | 55% |
| 2015 | 36% | 49% | 54% | 61% | 66% | 63% | 45% | 63% | 56% |
| 2016 | 32% | 47% | 57% | 62% | 63% | 60% | 44% | 61% | 55% |
| 2017 | 32% | 45% | 55% | 60% | 64% | 61% | 43% | 62% | 55% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.

* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667139**

Exhibit 142

JA1518

JA-0002032

## WAITING PERIODS

- Waiting periods are a specified length of time after beginning employment before workers are eligible to enroll in health benefits. With some exceptions, the Affordable Care Act requires that waiting periods cannot exceed 90 days.[3] For example, employers are permitted to have orientation periods before the waiting period begins which, in effect, means a worker is not eligible for coverage 3 months after hire. If a worker is eligible to enroll on the 1st of the month after three months of employment, this survey rounds up and considers the firm's waiting period four months. For these reasons, some employers still have waiting periods exceeding the 90-day maximum.

- Seventy-six percent of covered workers face a waiting period before coverage is available, similar to last year [Figure 3.9]. Covered workers in small firms are more likely than those in large firms to have a waiting period (84% vs. 73%) [Figure 3.7].

- The average waiting period among covered workers who face a waiting period is 1.9 months [Figure 3.7]. A small percentage (2%) of covered workers with a waiting period have a waiting period of more than 3 months.

  - Respondents with waiting periods greater than 4 months generally indicated that employees had training or orientation periods, or measurement periods in which they were employees but were not eligible for health benefits. Some employers have measurement periods to determine whether variable hour employees will meet the requirements for the firm's health benefits.[4]

**Figure 3.7**

**Percentage of Covered Workers In Firms With a Waiting Period for Coverage and Average Waiting Period In Months, by Firm Size, Region, and Industry, 2017**

| | Percentage of Covered Workers in Firms With a Waiting Period | Among Covered Workers With a Waiting Period, Average Waiting Period (Months) |
|---|---|---|
| **FIRM SIZE** | | |
| All Small Firms (3-199 Workers) | 84%* | 2.2* |
| All Large Firms (200 or More Workers) | 73%* | 1.8* |
| **REGION** | | |
| Northeast | 71% | 1.9 |
| Midwest | 76 | 1.7* |
| South | 75 | 2 |
| West | 80 | 1.9 |
| **INDUSTRY** | | |
| Agriculture/Mining/Construction | 88%* | 2.5 |
| Manufacturing | 84* | 1.9 |
| Transportation/Communications/Utilities | 73 | 2 |
| Wholesale | 82 | 1.9 |
| Retail | 88* | 2.4* |
| Finance | 71 | 1.5* |
| Service | 68* | 1.9 |
| State/Local Government | 68 | 1.6* |
| Health Care | 84* | 1.8 |
| **ALL FIRMS** | **76%** | **1.9** |

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

[3] Variable hour employees may have a measurement period of up to 12 months before it is determined if they are eligible for benefits. Employers may require a cumulative service requirement of up to 1,200 hours before an employee may enroll. Federal Register. Vol. 79, No. 36. Feb 12, 2014. https://www.gpo.gov/fdsys/pkg/FR-2014-02-24/pdf/2014-03809.pdf

[4] Under the ACA, employers may determine whether or not an employee is a full-time employee by looking back at the number of hours an employee has worked during a defined period. See https://www.irs.gov/affordable-care-act/employers/identifying-full-time-employees

**667140**

Exhibit 142    JA1519    JA-0002033

**Figure 3.8**
**Distribution of Covered Workers with the Following Waiting Periods for Coverage, 2017**



*Estimates are statistically different from each other within category (p < .05).
NOTE: If a worker is eligible to enroll on the 1st of the month after three months of employment, this survey rounds up and considers the firm's waiting period four months. Some firms indicated that employees had training or measurement periods during which they were not eligible for health benefits. For these reasons, some firms still have waiting periods exceeding the 90-day maximum.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 3.9**

**Percentage of Covered Workers In Firms With a Waiting Period for Coverage and Average Waiting Period In Months, by Firm Size, 2002-2017**

| | Percentage of Covered Workers with a Waiting Period | | | Average Waiting Period (Months) | | |
|---|---|---|---|---|---|---|
| | All Small Firms | All Large Firms | All Firms | All Small Firms | All Large Firms | All Firms |
| 2002 | 86% | 71% | 76% | 2.6 | | 2.2 |
| 2003 | 82% | 77% | 78% | 2.8 | 1.9 | 2.2 |
| 2004 | 82% | 65%* | 70%* | 2.6 | 2 | 2.2 |
| 2005 | 80% | 72% | 75% | 2.5 | 2.1 | 2.2 |
| 2006 | 81% | 69% | 73% | 2.5 | 2 | 2.2 |
| 2007 | 78% | 73% | 75% | 2.6 | 2 | 2.2 |
| 2008 | 78% | 73% | 75% | 2.5 | 1.9 | 2.1 |
| 2009 | 81% | 70% | 74% | 2.5 | 2 | 2.2 |
| 2010 | 78% | 73% | 74% | 2.5 | 2 | 2.2 |
| 2011 | 79% | 68% | 72% | 2.5 | 2 | 2.2 |
| 2012 | 81% | 70% | 74% | 2.7 | 2.1 | 2.3 |
| 2013 | 83% | 74% | 77% | 2.6 | 2.1 | 2.3 |
| 2014 | 83% | 72% | 75% | 2.3* | 2 | 2.1* |
| 2015 | 81% | 71% | 74% | 2.2 | 1.8* | 2* |
| 2016 | 78% | 70% | 72% | 2.1 | 1.9 | 1.9 |
| 2017 | 84% | 73% | 76% | 2.2 | 1.8 | 1.9 |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
* Estimate is statistically different from estimate for the previous year shown (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017

667141

Exhibit 142      JA1520      JA-0002034

## AUTO ENROLLMENT

- Thirty-one percent of firms offering health benefits, including 35% of firms with 3 to 49 workers and 18% of firms with 5,000 or more workers, automatically enroll eligible workers in health benefits after any applicable waiting period [Figure 3.10].



**Figure 3.10**
**Among Firms Offering Health Benefits, Percentage of Firms That Automatically Enroll Eligible Workers in Health Benefits, by Firm Size, 2017**

* Estimate is statistically different from estimate for all other firms not in the indicated size category. ($p < .05$)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667142

Exhibit 142          JA1521          JA-0002035



EMPLOYER HEALTH BENEFITS

2017 ANNUAL SURVEY

# Types of Plans Offered

SECTION

4

667143

Exhibit 142    JA1522    JA-0002036

# Section 4

# Types of Plans Offered

Most firms that offer health benefits offer only one type of health plan (81%). Large firms (200 or more workers) are more likely to offer more than one type of health plan than small firms (3-199 workers). Firms are most likely to offer their workers a PPO plan and are least likely to offer a conventional plan (sometimes known as indemnity insurance).

- Eighty-one percent of firms offering health benefits in 2017 offer only one type of health plan. Large firms are more likely to offer more than one plan type than small firms (55% vs. 17%) [Figure 4.1].

- The percentage of covered workers at firms that offer multiple plan types can also be analyzed. Fifty-eight percent of covered workers are employed in a firm that offers more than one health plan type. Seventy percent of covered workers in large firms are employed by a firm that offers more than one plan type, compared to 30% in small firms [Figure 4.2].

- About three-quarters (73%) of covered workers in firms offering health benefits work in firms that offer one or more PPO plans; 57% work in firms that offer one or more HDHP/SO plans; 33% work in firms that offer one or more HMO plans; 15% work in firms that offer one or more POS plans; and 1% work in firms that offer one or more conventional plans [Figure 4.4].[1]

- Among covered workers in firms offering only one type of health plan, those in large firms are more likely to be offered an HDHP/SO (36%) than those in small firms (23%). Covered workers in small firms offering only one type of plan are more likely to be offered a POS plan than covered workers in large firms (19% vs. 2%) [Figure 4.5].

- Among covered workers in firms offering only one type of health plan, 30% are in firms that only offer an HDHP/SO and 52% are in firms that only offer a PPO [Figure 4.5].

[1] Starting in 2010, we included firms that said they offer a plan type even if there are no covered workers enrolled in that plan type.

**667144**

Exhibit 142

**Figure 4.1**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer One, Two, or Three or More Plan Types, by Firm Size, 2017**



\* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05).

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---

**Figure 4.2**

**In Firms Offering Health Benefits, Percentage of Covered Workers in Firms Offering One, Two, or Three or More Plan Types, by Firm Size, 2017**



\* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05).

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Exhibit 142

**Figure 4.3**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer the Following Plan Types, by Firm Size, 2017**

| | Conventional | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 3-24 Workers | 2% | 15% | 48% | 25% | 17%* |
| 25-199 Workers | 2 | 22 | 56 | 25 | 38* |
| 200-999 Workers | 1 | 31* | 70* | 11* | 52* |
| 1,000-4,999 Workers | 1 | 31* | 83* | 8* | 56* |
| 5,000 or More Workers | 1 | 34* | 82* | 12* | 69* |
| **All Small Firms (3-199 Workers)** | **2%** | **17%*** | **49%*** | **25%*** | **23%*** |
| **All Large Firms (200 or More Workers)** | **1%** | **31%*** | **73%*** | **10%*** | **53%*** |
| **ALL FIRMS** | **2%** | **17%** | **50%** | **25%** | **24%** |

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 4.4**

**In Firms Offering Health Benefits, Percentage of Covered Workers In Firms That Offer the Following Plan Types, by Firm Size, 2017**

| | Conventional | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 200-999 Workers | 1% | 32% | 74% | 9%* | 54% |
| 1,000-4,999 Workers | 1 | 32 | 84* | 10 | 59 |
| 5,000 or More Workers | 2 | 44* | 78 | 14 | 76* |
| **All Small Firms (3-199 Workers)** | **1%** | **19%*** | **60%*** | **21%*** | **32%*** |
| **All Large Firms (200 or More Workers)** | **1%** | **39%*** | **78%*** | **12%*** | **67%*** |
| **ALL FIRMS** | **1%** | **33%** | **73%** | **15%** | **57%** |

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667146

Exhibit 142

JA1525

JA-0002039

**Figure 4.5**

**In Firms Offering Only One Type of Health Plan, Percentage of Covered Workers in Firms That Offer the Following Plan Type, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POs, and HDHP/SO.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 4.6**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer Workers Various Plan Choices, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Firms with an HDHP/SO and at least one other plan type were asked if any workers were offered only an HDHP/SO. Among firms that offer an HDHP/SO, 61% of firms offer at least some workers no other plan type options either because they only offer an HDHP/SO or because some workers are only eligible to enroll in an HDHP/SO.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667147**

Exhibit 142

JA-0002040

The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers workers. In addition, firms may offer different types of plans to different workers. For example, some workers might be offered one type of plan at one location, while workers at another location are offered a different type of plan.

**HMO**  is a health maintenance organization. The survey defines an HMO as a plan that does not cover non-emergency out-of-network services.

**PPO**  is a preferred provider organization. The survey defines PPOs as plans that have lower cost sharing for in-network provider services, and do not require a primary care gatekeeper to screen for specialist and hospital visits.

**POS**  is a point-of-service plan. The survey defines POS plans as those that have lower cost sharing for in-network provider services, but do require a primary care gatekeeper to screen for specialist and hospital visits.

**HDHP/SO**  is a high-deductible health plan with a savings option such as an HRA or HSA. The survey treats HDHP/SOs as a distinct plan type even if the plan would otherwise be considered a PPO, HMO, POS plan. or indemnity plan.

**667148**

Exhibit 142                    JA1527                    JA-0002041



667149

# Section 5

# Market Shares of Health Plans

The largest share of covered workers is enrolled in PPOs, covering 48% of covered workers, followed by HDHP/SOs, HMOs, POS plans, and conventional plans. Enrollment distribution varies by firm size: HDHP/SOs have a relatively higher share of enrollment among large firms (200 or more workers) than small firms (3-199 workers) (30% vs. 23%), and POS plans are relatively more popular among small firms than large firms (18% vs. 6%).

- Forty-eight percent of covered workers are enrolled in PPOs, followed by HDHP/SOs (28%), HMOs (14%), POS plans (10%), and conventional plans (<1%) [Figure 5.1].

- The percentage of covered workers enrolled in HDHP/SOs is similar to last year.

- A larger share of covered workers are enrolled in HDHP/SOs than in HMOs in both small firms and large firms.

- Plan enrollment patterns vary by firm size.

  - Covered workers in large firms are more likely than covered workers in small firms to enroll in HDHP/SOs (30% vs. 23%). Covered workers in small firms are more likely than covered workers in large firms to enroll in POS plans (18% vs. 6%) [Figure 5.2].

- Plan enrollment patterns also differ across regions.

  - HMO enrollment is significantly higher in the West (29%) and significantly lower in the South (10%) and Midwest (8%) [Figure 5.3].

  - Covered workers in the South (54%) are more likely to be enrolled in PPOs than workers in other regions, while covered workers in the West (39%) are less likely to be enrolled in a PPO [Figure 5.3].

  - Covered workers in the Midwest (36%) are more likely to be enrolled in HDHP/SOs than workers in other regions, while covered workers in the South (23%) are less likely to be enrolled in HDHP/SOs [Figure 5.3].

**667150**

Exhibit 142

JA-0002043

**Figure 5.1**
**Distribution of Health Plan Enrollment for Covered Workers, by Plan Type, 1988-2017**



NOTE: Information was not obtained for POS plans in 1988 or for HDHP/SO plans until 2006. A portion of the change in plan type enrollment for 2005 is likely attributable to incorporating more recent Census Bureau estimates of the number of state and local government workers and removing federal workers from the weights. See the Survey Design and Methods section from the 2005 Kaiser/HRET Survey of Employer-Sponsored Health Benefits for additional information.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017; KPMG Survey of Employer-Sponsored Health Benefits, 1993, 1996; The Health Insurance Association of America (HIAA), 1988

**Figure 5.2**
**Distribution of Health Plan Enrollment for Covered Workers, by Plan Type and Firm Size, 2017**



* Enrollment in plan type is statistically different between All Small Firms and All Large Firms (p < .05)

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. HMO is health maintenance organization. PPO is preferred provider organization. POS is point-of-service plan. HDHP/SO is high-deductible health plan with a savings option (such as a health reimbursement arrangement [HRA] and health savings account [HSA])

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667151

Exhibit 142

JA1530

JA-0002044

**Figure 5.3**

**Distribution of Health Plan Enrollment for Covered Workers, by Firm Size, Region, and Industry, 2017**

| | Conventional | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 3-24 Workers | 1% | 11% | 43% | 29%* | 16%* |
| 25-49 Workers | 3 | 17 | 40 | 17* | 23 |
| 50-199 Workers | 0* | 14 | 49 | 10 | 27 |
| 200-999 Workers | <1 | 20* | 47 | 5* | 29 |
| 1,000-4,999 Workers | <1 | 14 | 59* | 4* | 22* |
| 5,000 or More Workers | <1* | 12 | 46 | 8 | 34* |
| **All Small Firms (3-199 Workers)** | **1%** | **14%** | **45%** | **18%*** | **23%*** |
| **All Large Firms (200 or More Workers)** | **<1%** | **14%** | **49%** | **6%*** | **30%*** |
| **REGION** | | | | | |
| Northeast | <1% | 11% | 45% | 10% | 34% |
| Midwest | <1* | 8* | 49 | 7 | 36* |
| South | 1 | 10* | 54* | 11* | 23* |
| West | 1 | 29* | 39* | 9 | 22 |
| **INDUSTRY** | | | | | |
| Agriculture/Mining/Construction | 0%* | 15% | 57% | 12% | 16%* |
| Manufacturing | <1* | 10 | 47 | 5 | 38* |
| Transportation/Communications/Utilities | 1 | 20 | 48 | 10 | 23 |
| Wholesale | 0* | 11 | 48 | 16 | 25 |
| Retail | 2 | 11 | 52* | 7 | 28 |
| Finance | 0* | 14 | 35* | 6 | 46* |
| Service | 1 | 14 | 48 | 10 | 29 |
| State/Local Government | 0* | 16 | 65* | 7 | 12* |
| Health Care | 1 | 16 | 48 | 12 | 24 |
| **ALL FIRMS** | **<1%** | **14%** | **48%** | **10%** | **28%** |

NOTE: HMO is health maintenance organization. PPO is preferred provider organization. POS is point-of-service plan. HDHP/SO is high-deductible health plan with a savings option, such as a health reimbursement arrangement (HRA) and health savings account (HSA).

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667152

Exhibit 142     JA1531     JA-0002045



Exhibit 142

667153

# Section 6

# Worker and Employer Contributions for Premiums

In 2017, premium contributions by covered workers average 18% for single coverage and 31% for family coverage.[1] The average monthly worker contributions are $101 for single coverage ($1,213 annually) and $476 for family coverage ($5,714 annually).[2] Covered workers in small firms (3-199 workers) have a lower average contribution amount for single coverage ($1,030 vs. $1,289), but a higher average contribution amount for family coverage ($6,814 vs. $5,264) than covered workers in large firms (200 or more workers).

- In 2017, covered workers on average contribute 18% of the premium for single coverage and 31% of the premium for family coverage [Figure 6.1]. The average contribution percentage for single coverage has remained stable in recent years. The average contribution percentage for family coverage is higher in 2017 than in 2012 (31% vs. 28%).

  - Covered workers in small firms on average contribute a lower percentage of the premium for single coverage (16% vs. 19%) and a higher percentage of the premium for family coverage (39% vs. 28%) than covered workers in large firms [Figure 6.24].

- Workers with single coverage have an average contribution of $101 per month ($1,213 annually), and workers with family coverage have an average contribution of $476 per month ($5,714 annually) toward their health insurance premiums [Figures 6.2, 6.3, and 6.4].

  - The average worker contributions in HDHP/SOs are lower than the overall average worker contribution for single coverage ($1,020 vs. $1,213) and family coverage ($4,599 vs. $5,714) [Figure 6.5].

- Worker contributions also differ by firm size. As in previous years, workers in small firms on average contribute a lower amount annually for single coverage than workers in large firms ($1,030 vs. $1,289). In contrast, workers in small firms on average contribute significantly more annually for family coverage than workers in large firms ($6,814 vs. $5,264) [Figure 6.6].

- The average worker contributions for single and family coverage in small firms and for single coverage in large firms are similar to last year. The average worker contribution for family coverage in large firms increased from $4,719 to $5,264 [Figures 6.8 and 6.9].

[1] Estimates for premiums, worker contributions to premiums, and employer contributions to premiums presented in Section 6 do not include contributions made by the employer to Health Savings Accounts (HSAs) or Health Reimbursement Arrangements (HRAs). See Section 8 for estimates of employer contributions to HSAs and HRAs.

[2] The average percent contribution is calculated as a weighted average of all a firm's plan types and may not necessarily equal the average worker contribution divided by the average premium.

**667154**

Exhibit 142

JA-0002047

**Figure 6.1**
**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 6.2**
**Average Monthly Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667155**

Exhibit 142                                    JA1534                                    JA-0002048

**Figure 6.3**
**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Single Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 6.4**
**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Family Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

667156

Exhibit 142                    JA1535                    JA-0002049

**Figure 6.5**
**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Single and Family Coverage, by Plan Type, 2017**



\* Estimate is statistically different from All Plans estimate within coverage type (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 6.6**
**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Single and Family Coverage, by Firm Size, 2017**



\* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 78

**667157**

Exhibit 142                    JA1536                    JA-0002050

**Figure 6.7**

**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Single and Family Coverage, By Firm Wage Level, 2017**



* Estimate is statistically different between firm wage level category (p < .05).
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017.

**Figure 6.8**

**Average Annual Worker Contributions for Covered Workers with Single Coverage, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017.

Exhibit 142                    JA1537                    JA-0002051

**Figure 6.9**
**Average Annual Worker Contributions for Covered Workers with Family Coverage, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667159**

**Figure 6.10**

**Average Annual Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Firm Size, 1999-2017**

|  | Single Coverage | | Family Coverage | |
|---|---|---|---|---|
|  | All Small Firms | All Large Firms | All Small Firms | All Large Firms |
| 1999 | $286 | $334 | $1,831* | $1,398* |
| 2000 | $280* | $363* | $1,940* | $1,453* |
| 2001 | $306* | $380* | $2,252* | $1,551* |
| 2002 | $406* | $495* | $2,647* | $1,893* |
| 2003 | $450 | $536 | $2,970* | $2,146* |
| 2004 | $513 | $578 | $3,382* | $2,340* |
| 2005 | $556 | $638 | $3,170* | $2,487* |
| 2006 | $515* | $689* | $3,550* | $2,658* |
| 2007 | $561* | $759* | $4,236* | $2,831* |
| 2008 | $624* | $769* | $4,101* | $2,982* |
| 2009 | $625* | $854* | $4,204* | $3,182* |
| 2010 | $865 | $917 | $4,665* | $3,652* |
| 2011 | $762* | $996* | $4,946* | $3,755* |
| 2012 | $848* | $1,001* | $5,134* | $3,926* |
| 2013 | $862* | $1,065* | $5,284* | $4,226* |
| 2014 | $902* | $1,160* | $5,508* | $4,523* |
| 2015 | $899* | $1,146* | $5,904* | $4,549* |
| 2016 | $1,021* | $1,176* | $6,597* | $4,719* |
| 2017 | $1,030* | $1,289* | $6,814* | $5,264* |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.

* Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 6.11**

**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Single Coverage, by Plan Type and Firm Size, 2017**



\* Estimates are statistically different within plan type between All Small Firms and All Large Firms (p < .05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 6.12**

**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Family Coverage, by Plan Type and Firm Size, 2017**



\* Estimates are statistically different within plan type between All Small Firms and All Large Firms (p < .05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 82

**667161**

Exhibit 142                    JA1540                    JA-0002054

**Figure 6.13**

**Average Monthly and Annual Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Plan Type and Firm Size, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| All Small Firms (3-199 Workers) | $90 | $733* | $1,078 | $8,791* |
| All Large Firms (200 or More Workers) | 143 | 510* | 1,713 | 6,120* |
| **ALL FIRM SIZES** | **$128** | **$571** | **$1,532** | **$6,850** |
| **PPO** | | | | |
| All Small Firms (3-199 Workers) | 510* | $628* | $1,218 | $7,535* |
| All Large Firms (200 or More Workers) | 112 | 456* | 1,349 | 5,477* |
| **ALL FIRM SIZES** | **$109** | **$504** | **$1,312** | **$6,050** |
| **POS** | | | | |
| All Small Firms (3-199 Workers) | $59 | $493 | $712 | $5,914 |
| All Large Firms (200 or More Workers) | 76 | 439 | 912 | 5,269 |
| **ALL FIRM SIZES** | **$67** | **$468** | **$804** | **$5,616** |
| **HDHP/SO** | | | | |
| All Small Firms (3-199 Workers) | $72 | $408 | $863 | $4,897 |
| All Large Firms (200 or More Workers) | 89 | 376 | 1,068 | 4,507 |
| **ALL FIRM SIZES** | **$85** | **$383** | **$1,020** | **$4,599** |
| **ALL PLANS** | | | | |
| All Small Firms (3-199 Workers) | $86* | $568* | $1,030* | $6,814* |
| All Large Firms (200 or More Workers) | 107* | 439* | 1,289* | 5,264* |
| **ALL FIRM SIZES** | **$101** | **$476** | **$1,213** | **$5,714** |

* Estimates are statistically different within plan and coverage types between All Small Firms and All Large Firms (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 83

**667162**

Exhibit 142          JA1541          JA-0002055

**Figure 6.14**

**Average Monthly and Annual Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Plan Type and Region, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| Northeast | $116 | $420* | $1,397 | $5,036* |
| Midwest | 125 | 426 | 1,502 | 5,118 |
| South | 116 | 613 | 1,390 | 7,357 |
| West | 139 | 630 | 1,667 | 7,562 |
| **ALL REGIONS** | **$128** | **$571** | **$1,532** | **$6,850** |
| **PPO** | | | | |
| Northeast | $139* | $463 | $1,673* | $5,556 |
| Midwest | 110 | 459 | 1,325 | 5,514 |
| South | 99* | 521 | 1,190* | 6,254 |
| West | 102 | 557 | 1,230 | 6,686 |
| **ALL REGIONS** | **$109** | **$504** | **$1,312** | **$6,050** |
| **POS** | | | | |
| Northeast | $124* | $418 | $1,484* | $5,022 |
| Midwest | 75 | 405 | 898 | 4,866 |
| South | 48 | 525 | 581 | 6,301 |
| West | 47 | 441 | 566 | 5,296 |
| **ALL REGIONS** | **$67** | **$468** | **$804** | **$5,616** |
| **HDHP/SO** | | | | |
| Northeast | $86 | $346 | $1,036 | $4,152 |
| Midwest | 92 | 392 | 1,106 | 4,706 |
| South | 89 | 438* | 1,072 | 5,250* |
| West | 65* | 323 | 775* | 3,875 |
| **ALL REGIONS** | **$85** | **$383** | **$1,020** | **$4,599** |
| **ALL PLANS** | | | | |
| Northeast | $117* | $414* | $1,407* | $4,967* |
| Midwest | 103 | 429* | 1,232 | 5,145* |
| South | 93 | 511* | 1,115 | 6,138* |
| West | 99 | 515 | 1,194 | 6,179 |
| **ALL REGIONS** | **$101** | **$476** | **$1,213** | **$5,714** |

* Estimate is statistically different within plan and coverage type from estimate for all other firms not in the indicated region (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667163**

Exhibit 142          JA1542          JA-0002056

**Figure 6.15**

**Average Annual Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Firm Characteristics, 2017**

|  | Single Coverage | Family Coverage |
|---|---|---|
| **LOWER WAGE LEVEL** | | |
| Few Lower-Wage Workers | $1,201 | $5,693 |
| Many Lower-Wage Workers | $1,378 | $6,001 |
| **HIGHER WAGE LEVEL** | | |
| Few Higher-Wage Workers | $1,140 | $5,943 |
| Many Higher-Wage Workers | $1,285 | $5,492 |
| **UNIONS** | | |
| Firm Has at Least Some Union Workers | $1,355 | $5,033* |
| Firm Does Not Have Any Union Workers | $1,140 | $6,072* |
| **YOUNGER WORKERS** | | |
| Few Younger Workers | $1,213 | $5,781* |
| Many Younger Workers | $1,212 | $5,008* |
| **OLDER WORKERS** | | |
| Few Older Workers | $1,145 | $5,610 |
| Many Older Workers | $1,292 | $5,835 |
| **FUNDING ARRANGEMENT** | | |
| Fully Insured | $1,248 | $6,917* |
| Self-Funded | $1,190 | $4,933* |
| **FIRM OWNERSHIP** | | |
| Private For-Profit | $1,308 | $5,875 |
| Public | $1,110 | $5,213 |
| Private Not-For-Profit | $1,047* | $5,668 |
| **ALL FIRMS** | **$1,213** | **$5,714** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from each other within firm characteristic (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

# VARIATION IN WORKER CONTRIBUTIONS TO THE PREMIUM

- About four-fifths of covered workers are in a plan where the employer contributes at least half of the premium for both single and family coverage.
  - Fourteen percent of covered workers are in a plan where the employer pays the entire premium for single coverage; 3% of covered workers are in a plan where the employer pays the entire premium for family coverage [Figure 6.18].
- Covered workers in small firms are much more likely than covered workers in large firms to be in a plan where the employer pays 100% of the premium. Thirty-three percent of covered workers in small firms have an employer that pays the full premium for single coverage, compared to 6% of covered workers in large firms [Figure 6.17]. For family coverage, 10% of covered workers in small firms have an employer that pays the full premium, compared to 1% of covered workers in large firms [Figure 6.16].
- Sixteen percent of covered workers are in a plan where enrollees have a contribution of more than 50% of the premium for family coverage [Figure 6.18].

The Kaiser Family Foundation and Health Research & Educational Trust / Page 85

**667164**

SECTION 6.  WORKER AND EMPLOYER CONTRIBUTIONS FOR PREMIUMS

    – Thirty-six percent of covered workers in small firms work in a firm where the enrollee contribution for family coverage is more than 50% of the premium, compared to 8% of covered workers in large firms [Figure 6.18].

    – For single coverage, 3% of covered workers in small firms and 2% of covered workers in large firms are in a plan where the enrollee contribution for family coverage is more than 50% of the premium. The difference between the estimates for small and large firms is not statistically significant [Figure 6.18].

• There is substantial variation among workers in small firms and workers in large firms in the dollar amounts they contribute for single and family coverage. For example, among covered workers in small firms, 10% have no contribution for family coverage, while 19% have a contribution of more than $12,000. Among covered workers in large firms, 1% have no contribution for family coverage, while 4% have a contribution of more than $12,000 [Figure 6.16].

**Figure 6.16**
**Distribution of Worker Contributions for Single Coverage, by Firm Size, 2017**



\* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer Sponsored Health Benefits, 2017

**667165**

**Figure 6.17**

**Distribution of Worker Contributions for Family Coverage, by Firm Size, 2017**



\* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 6.18**

**Distribution of Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Firm Size, 2017**



\* Distributions are statistically different between All Small Firms and All Large Firms within coverage type (p < 0.05)

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667166**

Exhibit 142                                JA1545                                JA-0002059

**Figure 6.19**
**Distribution of Percentage of Premium Paid by Covered Workers for Single Coverage, 2002-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017

**Figure 6.20**
**Distribution of Percentage of Premium Paid by Covered Workers for Family Coverage, 2002-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 88

667167



**Figure 6.21**

**Distribution of the Percentage of Total Premium Paid by Covered Workers for Single and Family Coverage, by Firm Wage Level, 2017**

*Distributions for higher-wage and lower-wage firms are statistically different within single and family coverage (p < .05).
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## DIFFERENCES BY FIRM CHARACTERISTICS

- The percentage of the premium paid by covered workers also varies by firm characteristics.

  - Covered workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) on average have higher contribution rates for single coverage (23% vs. 18%) and family coverage (37% vs. 31%) than those in firms with a smaller share of lower-wage workers [Figures 6.22 and 6.23].

  - Covered workers in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually) on average have lower contribution rates for family coverage than those in firms with a smaller share of higher-wage workers (29% vs. 34%) [Figure 6.23].

  - Covered workers in large firms that have at least some union workers on average have lower contribution rates for family coverage than those in firms without any union workers (25% vs. 30%) [Figures 6.23].

  - Covered workers in large firms that are partially or completely self-funded on average have lower contribution rates for family coverage than workers in large firms that are fully insured (26% vs. 35%) [Figure 6.23].[3]

  - Covered workers in private for-profit firms on average have higher contribution rates for both single coverage (21%) and family coverage (33%) than workers in public organizations and private not-for-profit firms [Figures 6.22 and 6.23].

[3]For definitions of Self-Funded and Fully-Insured plans, see the introduction to Section 10.

**667168**

Exhibit 142                                      JA1547                                      JA-0002061

**Figure 6.22**

**Average Percentage of Premium Paid by Covered Workers for Single Coverage, by Firm Characteristics and Size, 2017**

| | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | *16% | 19%* | 18%* |
| Many Lower-Wage Workers | 21% | 25%* | 23%* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | *18% | *19% | 18% |
| Many Higher-Wage Workers | *15% | 20% | 18% |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | *17% | *19% | 19% |
| Firm Does Not Have Any Union Workers | *16% | 20% | 18% |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | *16% | *19% | 18% |
| Many Younger Workers | 21% | 22% | 22% |
| **OLDER WORKERS** | | | |
| Few Older Workers | *17% | 20% | 19% |
| Many Older Workers | *16% | *19% | 18% |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | *16% | 22% | 19% |
| Self-Funded | *17% | *18% | 18% |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | 19%* | 22%* | 21%* |
| Public | 7%* | 14% | 14% |
| Private Not-For-Profit | 12%* | 16%* | 15%* |
| **ALL FIRMS** | **16%** | **19%** | **18%** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 90

**667169**

Exhibit 142     JA1548     JA-0002062

**Figure 6.23**

**Average Percentage of Premium Paid by Covered Workers for Family Coverage, by Firm Characteristics and Size, 2017**

| | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | 39% | 27%* | 31%* |
| Many Lower-Wage Workers | 41% | 34%* | 37%* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | 41% | 30%* | 34%* |
| Many Higher-Wage Workers | 37% | 26%* | 29%* |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | 30% | 28%* | 28%* |
| Firm Does Not Have Any Union Workers | 40% | 30%* | 34%* |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | 39% | 28%* | 31% |
| Many Younger Workers | 35% | 30% | 31% |
| **OLDER WORKERS** | | | |
| Few Older Workers | 39% | 28% | 32% |
| Many Older Workers | 39% | 27% | 30% |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | 40%* | 35% | 39%* |
| Self-Funded | 31%* | 26%* | 26%* |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | 40% | 29% | 33%* |
| Public | 23%* | 29% | 28% |
| Private Not-For-Profit | 40% | 25%* | 28% |
| **ALL FIRMS** | **39%** | **28%** | **31%** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 91

**667170**

Exhibit 142

JA-0002063

**Figure 6.24**

**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Plan Type and Firm Size, 2017**

| | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| All Small Firms (3-199 Workers) | 16% | 47%* |
| All Large Firms (200 or More Workers) | 23% | 32%* |
| **ALL FIRM SIZES** | **21%** | **36%** |
| **PPO** | | |
| All Small Firms (3-199 Workers) | 19% | 41%* |
| All Large Firms (200 or More Workers) | 20% | 29%* |
| **ALL FIRM SIZES** | **20%** | **32%** |
| **POS** | | |
| All Small Firms (3-199 Workers) | 12% | 38%* |
| All Large Firms (200 or More Workers) | 13% | 25%* |
| **ALL FIRM SIZES** | **12%** | **32%** |
| **HDHP/SO** | | |
| All Small Firms (3-199 Workers) | 15% | 31%* |
| All Large Firms (200 or More Workers) | 18% | 25%* |
| **ALL FIRM SIZES** | **17%** | **26%** |
| **ALL PLANS** | | |
| All Small Firms (3-199 Workers) | 16%* | 39%* |
| All Large Firms (200 or More Workers) | 19%* | 28%* |
| **ALL FIRM SIZES** | **18%** | **31%** |

* Estimates are statistically different within plan and coverage types between All Small Firms and All Large Firms (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Exhibit 142                                                   JA1550                                                   JA-0002064

**Figure 6.25**

**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Plan Type and Region, 2017**

| | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| Northeast | 19% | 24%* |
| Midwest | 20 | 26* |
| South | 23 | 40 |
| West | 20 | 41 |
| **ALL REGIONS** | **21%** | **36%** |
| **PPO** | | |
| Northeast | 23%* | 26%* |
| Midwest | 19 | 28* |
| South | 19 | 36* |
| West | 19 | 34 |
| **ALL REGIONS** | **20%** | **32%** |
| **POS** | | |
| Northeast | 22%* | 26% |
| Midwest | 13 | 26 |
| South | 9 | 38 |
| West | 9 | 32 |
| **ALL REGIONS** | **12%** | **32%** |
| **HDHP/SO** | | |
| Northeast | 17% | 24% |
| Midwest | 18 | 27 |
| South | 18 | 29* |
| West | 14 | 22 |
| **ALL REGIONS** | **17%** | **26%** |
| **ALL PLANS** | | |
| Northeast | 20% | 25%* |
| Midwest | 19 | 27* |
| South | 18 | 35* |
| West | 17 | 33 |
| **ALL REGIONS** | **18%** | **31%** |

* Estimate is statistically different within plan and coverage type from estimate for all other firms not in the indicated region (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667172

Exhibit 142       JA1551       JA-0002065



**Figure 6.26**
**Average Percentage of Premium Paid by Covered Workers, by Industry, 2017**

\* Estimate is statistically different within coverage type from estimate for all other firms not in the indicated industry category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## CONTRIBUTION APPROACHES

- Firms take different approaches for contributing toward family coverage. Among firms offering health benefits, 45% of small firms and 15% of large firms contribute the same dollar amount for single coverage as for family coverage, which means that the worker must pay the entire difference between the cost of single and family coverage if they wish to enroll their family members. Forty-five percent of small firms and 75% of large firms make a larger dollar contribution for family coverage than for single coverage [Figure 6.27].

**667173**

Exhibit 142

JA1552

JA-0002066



**Figure 6.27**
**Among Firms Offering Family Coverage, Percentage Using Various Approaches to Family Premium Contributions, by Firm Size, 2017**

\* Estimate is statistically different within response selection from all other firms not in the indicated firm size category (p < 0.05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## CHANGES OVER TIME

- The average worker contributions for single and family coverage have increased 75% and 74%, respectively, over the last 10 years, and 28% and 32%, respectively, over the last five years.

- Over the last five years, the average worker contribution for family coverage has increased faster than the average employer contribution for family coverage (32% vs. 14% ) and the last ten years (74% vs. 48% ).

**Figure 6.28**

**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 6.29**

**Average Annual Worker Contributions for Covered Workers with Family Coverage, by Firm Wage Level, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

667175

Exhibit 142                    JA1554                    JA-0002068



EMPLOYER HEALTH BENEFITS

2017 ANNUAL SURVEY

# Employee Cost Sharing

SECTION

7

667176

Exhibit 142        JA1555        JA-0002069

# Section 7

# Employee Cost Sharing

In addition to any required premium contributions, most covered workers face cost sharing for the medical services they use. Cost sharing for medical services can take a variety of forms, including deductibles (an amount that must be paid before most services are covered by the plan), copayments (fixed dollar amounts), and coinsurance (a percentage of the charge for services). The type and level of cost sharing often vary by the type of plan in which the worker is enrolled. Cost sharing may also vary by the type of service, such as office visits, hospitalizations, or prescription drugs.

The cost-sharing amounts reported here are for covered workers using services provided in-network by participating providers. Plan enrollees receiving services from providers that do not participate in plan networks often face higher cost sharing and may be responsible for charges that exceed plan allowable amounts. The framework of this survey does not allow us to capture all of the complex cost-sharing requirements in modern plans, particularly for ancillary services (such as durable medical equipment or physical therapy) or cost-sharing arrangements that vary across different settings (such as tiered networks). Therefore, we do not collect information on all plan provisions and limits that affect enrollee out-of-pocket liability.

## GENERAL ANNUAL DEDUCTIBLES FOR WORKERS IN PLANS WITH DEDUCTIBLES

- A general annual deductible is an amount that must be paid by enrollees before most services are covered by their health plan. Non-grandfathered health plans are required to cover some services such as preventive care without cost sharing. Some plans require enrollees to meet a service-specific deductible, such as on prescription drugs or hospital admissions, in lieu of or in addition to a general annual deductible.

  - Eighty-one percent of covered workers are enrolled in a plan with a general annual deductible for single coverage, similar to 83% in 2016, but an increase from 72% in 2012 [Figure 7.2].

  - The percentage of covered workers enrolled in a plan with a general annual deductible for single coverage is similar for small firms (3-199 workers) and large firms (200 or more workers) (77% and 83%) [Figure 7.2].

  - The likelihood of having a deductible varies by plan type [Figure 7.1]. Covered workers in HMOs are less likely to have a general annual deductible for single coverage than workers in other plan types. Sixty-two percent of workers in HMOs do not have a general annual deductible for single coverage, compared to 35% of workers in POS plans and 14% of workers in PPOs.

- For covered workers in a plan with a general annual deductible for single coverage is $1,505, similar to the average deductible ($1,478) last year [Figures 7.3 and 7.10].

  - For covered workers in plans with a general annual deductible, the average deductibles for single coverage are $1,175 in HMOs, $1,046 in PPOs, $1,301 in POS plans, and $2,304 in HDHP/SOs [Figure 7.6].

  - The average deductibles for single coverage are higher across plan types for covered workers in small firms than for covered workers in large firms. For covered workers in PPOs with a general annual deductible, for example, the average deductible amount for single coverage in small firms is much higher than the average deductible amount in large firms ($1,594 vs. $856) [Figure 7.6]. Overall, for covered workers in plans with a general annual deductible, the average deductible amount for single coverage in small firms is higher than the average deductible amount in large firms ($2,120 vs. $1,276) [Figure 7.3].

  - Among covered workers in plans with a general annual deductible, the average deductible for workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less)

**667177**

is higher than the average deductible for covered workers in firms with a smaller share of lower-wage workers ($2,234 vs. $1,449) [Figure 7.4].

– The average general annual deductible for single coverage for covered workers in plans with a deductible has increased 37% over the last five years, from $1,097 in 2012 to $1,505 in 2017 [Figure 7.8].

• There is considerable variation in the dollar values of general annual deductibles for covered workers at different firms. For example, 20% of covered workers enrolled in a PPO plan with a general annual deductible for single coverage have a deductible of less than $500, while 13% have a deductible of $2,000 or more [Figure 7.19].

---

**Figure 7.1**

**Percentage of Covered Workers With No General Annual Deductible for Single and Family Coverage, by Plan Type and Firm Size, 2017**

|  | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| 200-999 Workers | 66% | 66% |
| 1,000-4,999 Workers | 70 | 70 |
| 5,000 or More Workers | 58 | 58 |
| All Small Firms (3-199 Workers) | 59% | 58% |
| All Large Firms (200 or More Workers) | 63% | 63% |
| **ALL FIRMS** | **62%** | **62%** |
| **PPO** | | |
| 200-999 Workers | 17% | 17% |
| 1,000-4,999 Workers | 12 | 12 |
| 5,000 or More Workers | 9* | 9* |
| All Small Firms (3-199 Workers) | 22%* | 22%* |
| All Large Firms (200 or More Workers) | 12%* | 12%* |
| **ALL FIRMS** | **14%** | **14%** |
| **POS** | | |
| 200-999 Workers | 32% | 32% |
| 1,000-4,999 Workers | 24 | 24 |
| 5,000 or More Workers | 49 | 49 |
| All Small Firms (3-199 Workers) | 29% | 29% |
| All Large Firms (200 or More Workers) | 42% | 42% |
| **ALL FIRMS** | **35%** | **35%** |
| **ALL PLANS** | | |
| 200-999 Workers | 23% | 23% |
| 1,000-4,999 Workers | 13 | 18 |
| 5,000 or More Workers | 15 | 15 |
| All Small Firms (3-199 Workers) | 23% | 23% |
| All Large Firms (200 or More Workers) | 17% | 17% |
| **ALL PLANS** | **19%** | **19%** |

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. HDHP/SOs are not shown because all covered workers in these plans face a minimum deductible. HDHP/SOs are included in the All Plans estimate. In HDHP/HRA plans, as defined by the survey, the minimum deductible is $1,000 for single coverage and $2,000 for family coverage. In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

* Estimate is statistically different from estimates for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667178

Exhibit 142
JA1557
JA-0002071

SECTION 7. EMPLOYEE COST SHARING

**Figure 7.2**

**Percentage of Covered Workers In a Plan That Includes a General Annual Deductible for Single Coverage, by Plan Type, 2006-2017**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **HMO** | | | | | | | | | | | | |
| All Small Firms | 17% | 14% | 25% | 27% | 34% | 38% | 33% | 44% | 59% | 46% | 44% | 41% |
| All Large Firms | 10% | 20%* | 18% | 12% | 26%* | 27% | 29% | 40% | 28% | 40% | 47% | 37% |
| All Firms | 12% | 18% | 20% | 16% | 28% | 29% | 30% | 41% | 37% | 42% | 46% | 38% |
| **PPO** | | | | | | | | | | | | |
| All Small Firms | 66%* | 72% | 73% | 74% | 80% | 76% | 76% | 78% | 83% | 85% | 85% | 78% |
| All Large Firms | 69% | 71% | 66% | 74% | 76% | 82% | 77% | 82% | 86% | 84% | 84% | 88% |
| All Firms | 69% | 71% | 66% | 74% | 77% | 81% | 77% | 81% | 85% | 85% | 84% | 86% |
| **POS** | | | | | | | | | | | | |
| All Small Firms | 36% | 53%* | 59% | 63% | 64% | 68% | 58% | 58% | 78%* | 59% | 80% | 71% |
| All Large Firms | 28% | 41% | 41% | 58% | 70% | 71% | 63% | 49% | 72%* | 61% | 66% | 58% |
| All Firms | 32% | 48%* | 50% | 62% | 66% | 60% | 60% | 66% | 70% | 72% | 76% | 65% |
| **ALL PLANS** | | | | | | | | | | | | |
| All Small Firms | 56% | 60% | 65% | 67% | 73% | 75% | 72% | 77% | 82% | 82% | 82% | 77% |
| All Large Firms | 54% | 59% | 56% | 61% | 68%* | 74% | 73% | 78% | 80% | 81% | 83% | 83% |
| **ALL FIRMS** | 55% | 59%* | 59% | 63% | 70%* | 74% | 72% | 78%* | 80% | 81% | 83% | 81% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. By definition, all HDHP/SOs have a deductible.

* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

---

**Figure 7.3**

**Percentage of Covered Workers In a Plan That Includes a General Annual Deductible and Average Deductible for Single Coverage, by Firm Size and Region, 2017**

| | Percentage of Covered Workers In a Plan With a General Annual Deductible | Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible |
|---|---|---|
| **FIRM SIZE** | | |
| 3-49 Workers | 75% | $2,142* |
| 50-199 Workers | 79 | 2,096* |
| 200-999 Workers | 77 | 1,608 |
| 1,000-4,999 Workers | 82 | 1,184* |
| 5,000 or More Workers | 85 | 1,190* |
| **All Small Firms (3-199 Workers)** | **77%** | **$2,120*** |
| **All Large Firms (200 or More Workers)** | **83%** | **$1,276*** |
| **REGION** | | |
| Northeast | 80% | $1,405 |
| Midwest | 93* | 1,594 |
| South | 83 | 1,550 |
| West | 67* | 1,413 |
| **ALL FIRMS** | **81%** | **$1,505** |

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667179

Exhibit 142     JA1558     JA-0002072

**Figure 7.4**

**Percentage of Covered Workers In a Plan That Includes a General Annual Deductible and Average Deductible Values for Single Coverage, by Firm Characteristics, 2017**

| | Percentage of Covered Workers In a Plan With a General Annual Deductible | Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible |
|---|---|---|
| **LOWER WAGE LEVEL** | | |
| Few Lower-Wage Workers | 80%* | $1,449* |
| Many Lower-Wage Workers | 90%* | $2,234* |
| **HIGHER WAGE LEVEL** | | |
| Few Higher-Wage Workers | 82% | $1,604* |
| Many Higher-Wage Workers | 80% | $1,408* |
| **UNIONS** | | |
| Firm Has at Least Some Union Workers | 79% | $1,198* |
| Firm Does Not Have Any Union Workers | 82% | $1,665* |
| **YOUNGER WORKERS** | | |
| Few Younger Workers | 81% | $1,493 |
| Many Younger Workers | 85% | $1,626 |
| **OLDER WORKERS** | | |
| Few Older Workers | 84% | $1,554 |
| Many Older Workers | 77% | $1,446 |
| **FIRM OWNERSHIP** | | |
| Private For-Profit | 86%* | $1,680* |
| Public | 68%* | $1,001* |
| Private Not-For-Profit | 77% | $1,374 |
| **ALL FIRMS** | 81% | $1,505 |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from each other within firm characteristic (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667180**

Exhibit 142     JA1559     JA-0002073

**Figure 7.5**

**Among Covered Workers With No General Annual Deductible, Percentage With Other Separate Cost Sharing for Various Services, by Plan Type, 2017**

| | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| Hospital Admissions | 73% | 72% |
| Outpatient Surgery | 87% | 87% |
| Emergency Room Visits | 100% | 100% |
| **PPO** | | |
| Hospital Admissions | 69% | 69% |
| Outpatient Surgery | 65% | 65% |
| Emergency Room Visits | 93% | 93% |
| **POS** | | |
| Hospital Admissions | 90% | 90% |
| Outpatient Surgery | 94% | 94% |
| Emergency Room Visits | 94% | 94% |
| **ALL PLANS** | | |
| Hospital Admissions | 74% | 74% |
| Outpatient Surgery | 80% | 80% |
| Emergency Room Visits | 97% | 97% |

NOTE: Separate cost sharing for hospital admissions includes the following types: separate annual deductible, copayment, coinsurance, and/or a charge per day (per diem). Cost sharing for emergency room visits and outpatient surgery include the following types: separate annual deductible, copayment, and/or coinsurance. HDHP/SOs are excluded because, by definition, all workers face a deductible.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667181**

Exhibit 142    JA1560    JA-0002074

**Figure 7.6**

**Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible, by Plan Type and Firm Size, 2017**

|  | Average Single Coverage Deductible |
|---|---|
| **HMO** | |
| All Small Firms | $1,779* |
| All Large Firms | $906* |
| **ALL FIRM SIZES** | **$1,175** |
| **PPO** | |
| All Small Firms | $1,594* |
| All Large Firms | $856* |
| **ALL FIRM SIZES** | **$1,046** |
| **POS** | |
| All Small Firms | $1,697* |
| All Large Firms | $728* |
| **ALL FIRM SIZES** | **$1,301** |
| **HDHP/SO** | |
| All Small Firms | $3,298* |
| All Large Firms | $1,995* |
| **ALL FIRM SIZES** | **$2,304** |
| **ALL PLANS** | |
| All Small Firms | $2,120* |
| All Large Firms | $1,276* |
| **ALL FIRM SIZES** | **$1,505** |

NOTE  Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667182**

Case 7-25-25750-WB Document 34-125 Page 298 Date Filed 12/12/2025 677

**Figure 7.7**

**Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible, by Plan Type and Region, 2017**

| | Average Single Coverage Deductible |
|---|---|
| **HMO** | |
| Northeast | $880 |
| Midwest | NSD |
| South | 1,599* |
| West | 1,138 |
| **ALL REGIONS** | **$1,175** |
| **PPO** | |
| Northeast | $932 |
| Midwest | 983 |
| South | 1,149* |
| West | 981 |
| **ALL REGIONS** | **$1,046** |
| **POS** | |
| Northeast | $741* |
| Midwest | 1,142 |
| South | 1,896 |
| West | NSD |
| **ALL REGIONS** | **$1,301** |
| **HDHP/SO** | |
| Northeast | $2,160 |
| Midwest | 2,545 |
| South | 2,188 |
| West | 2,321 |
| **ALL REGIONS** | **$2,304** |
| **ALL PLANS** | |
| Northeast | $1,405 |
| Midwest | 1,594 |
| South | 1,550 |
| West | 1,413 |
| **ALL REGIONS** | **$1,505** |

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
NSD: Not Sufficient Data

* Estimate is statistically different from estimate for all other firms not in the indicated region category (p < 05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667183**

Exhibit 142

Case: 25-25750-WB Document 84-1 Page: 299 Date Filed: 12/11/2025
Case: 25-25750 Document 34-1 Page: 299 Date Filed: 12/11/2025 677

SECTION 7. EMPLOYEE COST SHARING

**Figure 7.8**

**Among Covered Workers With a General Annual Deductible, Average Single and Family Coverage Deductible, by Plan Type, 2006-2017**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Single Coverage** | | | | | | | | | | | | |
| HMO | $352 | $401* | $563 | $809* | $601 | $811 | $661 | $729 | $1,032* | $1,025 | $917 | $1,175 |
| PPO | $473 | $461* | $560* | $634* | $675 | $675 | $733 | $799 | $843 | $958 | $1,024 | $1,046 |
| POS | $563 | $562* | $782 | $1,061* | $1,046 | $928 | $1,014 | $1,314 | $1,215 | $1,230 | $1,737* | $1,301 |
| HDHP/SO | $1,715 | $1,729 | $1,812 | $1,838 | $1,903 | $1,908 | $2,086 | $2,003 | $2,215* | $2,099 | $2,199 | $2,304 |
| ALL PLANS | $584 | $616 | $735* | $826* | $917* | $991 | $1,097* | $1,135 | $1,217 | $1,318 | $1,478* | $1,505 |
| | | | | | | | | | | | | |
| **Family Coverage Deductible With Aggregate Structure** | | | | | | | | | | | | |
| HMO | $751* | $769 | $1,063 | $1,524* | $1,321 | $1,487 | $1,329 | $1,743 | $2,328 | $2,758 | $2,248 | $2,732 |
| PPO | $1,034 | $1,040 | $1,344* | $1,484 | $1,516 | $1,521 | $1,777 | $1,854 | $1,947 | $2,012 | $2,147 | $2,563* |
| POS | $1,227 | $1,368 | $1,660 | $2,191* | $2,283 | $1,789 | $2,183 | $2,821 | $2,470 | $2,467 | $3,769* | $2,897 |
| HDHP/SO | $3,511 | $3,596 | $3,569 | $3,626 | $3,610 | $3,566 | $3,594 | $4,079 | $4,522* | $4,332 | $4,343 | $4,527 |
| | | | | | | | | | | | | |
| **Family Coverage Deductible With Separate Per-Person Structure** | | | | | | | | | | | | |
| HMO | $506 | $472 | $462 | $685 | $600 | $885 | $764 | $609 | $870 | $652 | $652 | $1,046 |
| PPO | $710 | $482* | $614 | $633 | $666 | $646 | $632 | $782* | $821 | $944 | $1,152 | $1914 |
| POS | $992 | $592 | $778 | $1,060 | $1,164 | $912 | $1,092 | $1,080 | $1,153 | $1,153 | $1,180 | $1,128 |
| HDHP/SO | $3,005 | $3,427 | $2,334* | $2,091 | $2,053 | $2,149 | $2,821* | $2,203* | $2,126 | $1,986 | $2,411 | $2,645 |

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount, in which all family members' costs are totaled toward the deductible, and plans that have a separate amount for each family member (typically with a limit on the number of family members required to reach that amount).

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017.

**Figure 7.9**

**Prevalence and Value of General Annual Health Plan Deductible for Single Coverage, by Firm Size, 2006-2017**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Average General Annual Deductible Among Covered Workers Who Face a Deductible for Single Coverage** | | | | | | | | | | | | |
| All Small Firms | $776 | $862 | $1,124* | $1,254 | $1,391 | $1,537 | $1,596 | $1,715 | $1,797 | $1,836 | $2,069 | $2,120 |
| All Large Firms | $496 | $519 | $563 | $649* | $686 | $757 | $875* | $884 | $971 | $1,066* | $1,224 | $1,276 |
| All Firms | $584 | $616 | $735* | $826* | $917* | $991 | $1,097* | $1,135 | $1,217 | $1,318 | $1,478* | $1,505 |
| | | | | | | | | | | | | |
| **Percentage of Covered Workers Who Face a General Annual Deductible for Single Coverage** | | | | | | | | | | | | |
| All Small Firms | 56% | 60% | 65% | 67% | 73%* | 75% | 72% | 77% | 82% | 82% | 82% | 77% |
| All Large Firms | 54% | 59% | 55% | 61% | 68%* | 74% | 73% | 78% | 80% | 81% | 83% | 83% |
| All Firms | 56%* | 59%* | 59%* | 63% | 70%* | 74% | 72% | 78% | 80% | 83% | 81%* | |
| | | | | | | | | | | | | |
| **Average General Annual Deductible for Single Coverage Among All Covered Workers** | | | | | | | | | | | | |
| All Small Firms | $435* | $484 | $727* | $851 | $1,001* | $1,177 | $1,163 | $1,330 | $1,493 | $1,507 | $1,689 | $1,631 |
| All Large Firms | $264 | $269 | $284 | $376* | $490* | $560 | $629* | $670 | $769* | $869* | $1,026 | $1,049 |
| ALL FIRMS | $303 | $343 | $433* | $533* | $646* | $747* | $802 | $883 | $989* | $1,077 | $1,221* | $1,221 |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. Average general annual deductible is among all covered workers. Workers in plans without a general annual deductible for in-network services are assigned a value of zero.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017.

# GENERAL ANNUAL DEDUCTIBLES AMONG ALL COVERED WORKERS

- As discussed above, the share of covered workers in plans with a general annual deductible has increased significantly over time: from 59% in 2007, to 72% in 2012, to 81% in 2017 [Figure 7.2], as have the average deductible amounts for covered workers in plans with deductibles: from $616 in 2007, to $1,097 in 2012, to $1,505 in 2017 [Figure 7.10]. Neither trend by itself captures the full impact of changes in deductibles on covered workers. We can look at the average impact of both trends together on covered workers by assigning a zero deductible value to covered workers in plans with no deductible and looking at how the resulting averages change over time. These average deductible amounts are lower in any given year but the changes over time reflect both the higher deductibles in plans with deductibles and the fact that more workers face them.

  - Using this approach, the average general annual deductible for single coverage for all covered workers in 2017 is $1,221 [Figures 7.9 and 7.10].

  - The 2017 value is 52% higher than the average general annual deductible of $802 in 2012 and 255% higher than the average general annual deductible of $343 in 2007 [Figures 7.9 and 7.10].

Case 2:25-cv-25550-WB Document 34-125 Page: 300 Date Filed: 12/12/2025 677

- Another way to look at deductibles is the percentage of all covered workers who are in a plan with a deductible that exceeds certain thresholds. Fifty-one percent of covered workers are in plans with a general annual deductible of $1,000 or more for single coverage, the same percentage as last year [Figure 7.12].

  - Over the last five years, the percentage of covered workers with a general annual deductible of $1,000 or more for single coverage has grown substantially, increasing from 34% to 51% [Figure 7.12].

  - Workers in small firms are more likely to have a general annual deductible of $1,000 or more for single coverage than workers in large firms (58% vs. 48%) [Figure 7.11].

  - Twenty-two percent of covered workers are enrolled in a plan with a deductible of $2,000 or more, similar to the percentage last year (23%) [Figure 7.14]. Thirty-seven percent of covered workers in small firms have a general annual deductible of $2,000 or more, as compared to 15% in large firms [Figure 7.14].

- One of the reasons for the growth in deductible amounts has been the growth in enrollment in HDHP/SOs, which have higher deductibles than other plans. While growing deductibles in other plan types generally increases enrollee out-of-pocket liability, the shift in enrollment to HDHP/SOs does not necessarily do so because most HDHP/SO enrollees receive an account contribution from their employers, which in essence reduces the high cost sharing in these plans.

  - Twenty-one percent of covered workers in an HDHP with an HRA and 2% of covered workers in an HSA-qualified HDHP receive an account contribution for single coverage at least equal to their deductible, while another 35% of covered workers in an HDHP with an HRA and 30% of covered workers in an HSA-qualified HDHP receive account contributions that, if applied to their deductible, would reduce the deductible to $1,000 or less [Figure 7.16].

  - If we reduce the deductibles that workers face by employer account contributions, the percentage of covered workers with a deductible liability of $1,000 or more would be reduced from 51% to 40% [Figures 7.12 and 7.13].

**Figure 7.10**
**Average General Annual Health Plan Deductibles for Single Coverage, 2006-2017**





* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Average general annual deductible is among all covered workers. Workers in plans without a general annual deductible for in-network services are assigned a value of zero.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

667185

Exhibit 142                                    JA1564                                    JA-0002078

**Figure 7.11**
**Percentage of Covered Workers Enrolled in a Plan with a High General Annual Deductible for Single Coverage, by Firm Size, 2017**



\* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).
NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductible for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.12**
**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $1,000 or More for Single Coverage, by Firm Size, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**667186**

Exhibit 142                    JA1565                    JA-0002079

**Figure 7.13**

**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $1,000 or More for Single Coverage, Reduced by Any HRA/HSA Contributions, by Firm Size, 2009-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**Figure 7.14**

**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $2,000 or More for Single Coverage, by Firm Size, 2009-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 108

**667187**

Exhibit 142          JA1566          JA-0002080

JA-0002080

Case 1:25-cv-25570-WDB Document 34-125 Page: 303 Filed 02/21/2025 Page 303 of 677

**Figure 7.15**

**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $2,000 or More for Single Coverage, Reduced by Any HRA/HSA Contributions, by Firm Size, 2009-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 109

**667188**

Exhibit 142                    JA1567                    JA-0002081

Case: 7-25-25750-WD Document 34-125 Page: 304 Date Filed: 12/11/2025 677

**Figure 7.16**

**Among Covered Workers, Average General Annual Deductibles for Single Coverage, Reduced by Any HRA/HSA Contributions, by Plan Type and Firm Size, 2017**

|  | $0 (Or Less) | $1,000 or Less | More Than $1,000 |
|---|---|---|---|
| **HDHP/HRA** | | | |
| All Small Firms | 30% | 26% | 44% |
| All Large Firms | 18% | 38% | 44% |
| All Firms | 21% | 35% | 44% |
| | | | |
| **HSA** | | | |
| All Small Firms | 7%* | 15%* | 78% |
| All Large Firms | 0%* | 34%* | 66% |
| All Firms | 2% | 30% | 68% |
| | | | |
| **All HDHP/SO** | | | |
| All Small Firms | 16% | 20%* | 64% |
| All Large Firms | 7% | 36%* | 58% |
| All Firms | 9% | 32% | 59% |
| | | | |
| **Non-HDHP/SO** | | | |
| All Small Firms | N/A | 35%* | 65%* |
| All Large Firms | N/A | 67%* | 33%* |
| All Firms | N/A | 58% | 42% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services. N/A: Not Applicable.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667189**

Exhibit 142     JA1568     JA-0002082

Case 1:25-cv-05550-WBS Document 34-1 25 Page: 305 Date Filed: 12/11/2025 677

**Figure 7.17**

**Distribution of General Annual Deductibles for Single Coverage, Reduced by Any HRA/HSA Contributions, by Firm Size, 2007-2017**



Tests found no statistical difference from distribution for the previous year shown (p < .05)

NOTE: Account contributions include an employer's contribution to an HSA or HRA. These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**Figure 7.18**

**Among Covered Workers With a General Annual Health Plan Deductible for Single Coverage, Distribution of Deductibles, 2007-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05)

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 111

**667190**

Exhibit 142

JA-0002083



**Figure 7.19**
**Distribution of General Annual Deductibles for Single Coverage, by Plan Type, 2017**

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

# GENERAL ANNUAL DEDUCTIBLES FOR WORKERS ENROLLED IN FAMILY COVERGE

- For family coverage, the majority of covered workers with general annual deductibles have an aggregate deductible, which means that all family members' out-of-pocket expenses count toward meeting the deductible amount. Among covered workers in a plan with family coverage, the percentages of covered workers with an average aggregate general annual deductible are 24% for workers in HMOs, 50% for workers in PPOs, and 43% for workers in POS plans [Figure 7.20].

    - The average deductible amounts for covered workers with an aggregate deductible for family coverage are $2,732 for HMOs, $2,503 for PPOs, $2,697 for POS plans, and $4,527 for HDHP/SOs [Figure 7.21]. Deductible amounts for aggregate family deductibles are similar to last year for plan types other than PPOs.

- The other type of family deductible, a separate per-person deductible, requires each family member to meet a separate per-person deductible amount before the plan covers expenses for that member. About two-thirds of covered workers in plans with separate per-person family deductibles (68%) consider the deductible met for all family members if a prescribed number of family members each reaches his or her separate deductible amounts [Figure 7.24].[1] Plans may also require each family member to meet a separate per-person deductible until the family's combined spending reaches a specified dollar amount.

    - For covered workers in health plans that have separate per-person general annual deductible amounts for family coverage, the average deductibles are $1,045 for HMOs, $914 for PPOs, $1,128 for POS plans, and $2,645 for HDHP/SOs [Figure 7.21].

---

[1] Some workers with separate per-person deductibles or out-of-pocket maximums for family coverage do not have a specific number of family members that are required to meet the deductible amount and instead have another type of limit, such as a per-person amount with a total dollar amount limit. These responses are included in the averages and distributions for separate family deductibles and out-of-pocket maximums.

Exhibit 142

JA1570

JA-0002084

Case 2:25-cv-25550-WB Document 34-125 Page 307 of 613 Date Filed: 12/12/2025 Page 677

- Most covered workers in plans with a separate per-person general annual deductible for family coverage have a limit to the number of family members required to meet the separate deductible amounts [Figure 7.24]. Among those covered workers in plans with a limit on the number of family members, the most frequent number of family members required to meet the separate deductible amounts is two (39%) [Figure 7.25].

• For covered workers in plans with an aggregate deductible for family coverage, the average annual family deductibles in small firms are higher than the average annual family deductibles in large firms across plan types [Figure 7.21].

Figure 7.20

**Distribution of Type of General Annual Deductible for Covered Workers With Family Coverage, by Plan Type and Firm Size, 2017**

| | Aggregate Amount | Separate Amount | No Deductible |
|---|---|---|---|
| **HMO** | | | |
| All Small Firms | 30% | 11% | 58% |
| All Large Firms | 21% | 16% | 63% |
| **ALL FIRM SIZES** | 24% | 14% | 62% |
| **PPO** | | | |
| All Small Firms | 61%* | 17%* | 22%* |
| All Large Firms | 45%* | 43%* | 12%* |
| **ALL FIRM SIZES** | 50% | 36% | 14% |
| **POS** | | | |
| All Small Firms | 49% | 22% | 29% |
| All Large Firms | 37% | 21% | 42% |
| **ALL FIRM SIZES** | 43% | 22% | 35% |
| **HDHP/SO** | | | |
| All Small Firms | 82% | 18% | N/A |
| All Large Firms | 85% | 15% | N/A |
| **ALL FIRM SIZES** | 84% | 16% | N/A |
| **ALL PLANS** | | | |
| All Small Firms | 59% | 18%* | 23% |
| All Large Firms | 53% | 31%* | 17% |
| **ALL FIRM SIZES** | 55% | 27% | 18% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Values for No Deductible for HDHP/SOs are not shown because all covered workers in these plans face a minimum deductible. HDHP/SOs are included in the All Plans estimate. In HDHP/HRA plans, as defined by the survey, the minimum deductible is $1,000 for single coverage and $2,000 for family coverage. In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. Among workers with a general annual family deductible, 62% of workers in HMOs, 58% of workers in PPOs, and 67% of workers in POS plans have an aggregate deductible. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount. N/A: Not Applicable.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667192

Exhibit 142  JA1571  JA-0002085

Case: 25-25550-WB Document: 34-4 Page: 308 Date Filed: 12/12/2025 677

**Figure 7.21**

**Among Covered Workers With a General Annual Deductible, Average Deductibles for Family Coverage, by Deductible Type, Plan Type and Firm Size, 2017**

| | Aggregate Amount | Separate Amount Per-Person |
|---|---|---|
| **HMO** | | |
| All Small Firms | $3,930* | NSD |
| All Large Firms | $2,091* | $744** |
| **ALL FIRM SIZES** | **$2,732** | **$1,045** |
| **PPO** | | |
| All Small Firms | $3,660* | $1,131 |
| All Large Firms | $1,899* | $880 |
| **ALL FIRM SIZES** | **$2,503** | **$914** |
| **POS** | | |
| All Small Firms | $3,348* | NSD |
| All Large Firms | $1,700* | NSD |
| **ALL FIRM SIZES** | **$2,697** | **$1,128** |
| **HDHP/SO** | | |
| All Small Firms | $6,633* | $3,409* |
| All Large Firms | $3,898* | $2,360* |
| **ALL FIRM SIZES** | **$4,527** | **$2,645** |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount. NSD: No: Sufficient Data

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits. 2017

**667193**

Exhibit 142

JA1572

JA-0002086

Case 1:25-cv-25750-WB Document 34-125 Page: 309 Date Filed: 12/12/2025 Page 677

**Figure 7.22**

**Among Covered Workers with a Separate Per-Person General Annual Health Plan Deductible for Family Coverage, Distribution of Deductibles, by Plan Type, 2017**



NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.23**

**Among Covered Workers with an Aggregate General Annual Health Plan Deductible for Family Coverage, Distribution of Deductibles, by Plan Type, 2017**



NOTE: By definition, 100% of covered workers in an HDHP/SO with an aggregate deductible have a family deductible of $2,000 or more. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667194**

Exhibit 142

JA-0002087

Case 1:7-25-25750-WB Document 34-125 Page 310 Date Filed 12/41/2025 677

**Figure 7.24**

**Among Covered Workers With a Separate Per-Person General Annual Health Plan Deductible for Family Coverage, Structure of Deductible Limits, by Plan Type, 2017**



NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.25**

**Among Covered Workers With a Separate Per-Person General Annual Health Plan Deductible for Family Coverage and a Per-Person Limit, Distribution of Maximum Number of Family Members Required to Meet the Deductible, by Plan Type, 2017**



NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount. Plans that reported having a separate family deductible were asked if they had a combined limit or if the limit was considered met when a specified number of family members reached their separate per-person limit. 'Other' category may include per-person limits with a total family dollar limit.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 116

**667195**

Exhibit 142                    JA1574                    JA-0002088



**Figure 7.26**

**Among Covered Workers With an Aggregate General Annual Health Plan Deductible for Family Coverage, Distribution of Aggregate Deductibles, by Plan Type, 2012 and 2017**

NOTE: By definition, 100% of covered workers in an HDHP/SO with an aggregate deductible have a family deductible of $2,000 or more. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012 and 2017

## CHARACTERISTICS OF GENERAL ANNUAL DEDUCTIBLES

- The majority of covered workers with a general annual deductible are in plans where the deductible does not have to be met before certain services, such as physician office visits or prescription drugs, are covered.

  - Large majorities of covered workers (74% in HMOs, 75% in PPOs, and 74% in POS plans) with general annual deductibles are enrolled in plans where the deductible does not have to be met before physician office visits for primary care are covered [Figure 7.27].

  - Similarly, among workers with a general annual deductible, large shares of covered workers in HMOs (96%), PPOs (92%), and POS plans (94%) are enrolled in plans where the general annual deductible does not have to be met before prescription drugs are covered [Figure 7.27].

**667196**

**Figure 7.27**

**Among Covered Workers with a General Annual Health Plan Deductible, Percentage with Coverage for the Following Services Without Having to First Meet the Deductible, by Plan Type, 2017**



NOTE: These questions are asked of firms with a deductible for single or family coverage. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. HSA Qualified HDHPs are required by law to apply the plan deductible to nearly all services and therefore are not included here.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## HOSPITAL ADMISSIONS, OUTPATIENT SURGERY AND EMERGENCY ROOM VISITS

- Whether or not a worker has a general annual deductible, most workers face additional types of cost sharing (such as a copayment, coinsurance, or a per diem charge) when admitted to a hospital or having outpatient surgery. The distribution of workers with cost sharing for hospital admissions, outpatient surgery and emergency room visits does not equal 100% as workers may face a combination of types of cost sharing. In some cases, these cost-sharing arrangements are very complicated; for example workers visiting an emergency room may have some forms of cost-sharing waived if they are admitted to the hospital but still face other cost-sharing. In addition, the average copayment and coinsurance rates include workers who may have a combination of these types of cost sharing.

- Beginning this year, to reduce burden on respondents, we revised the survey to ask respondents about cost sharing for inpatient admissions, outpatient surgery and emergency room visits only in their largest health plan type; previously, we asked for this information for the largest plan for each of the plan types that they offered. After reviewing the responses and comparing them to prior years where we asked about each plan type, we find that the information we are receiving is quite similar to responses from previous years. For this reason, we will continue to report our results for these questions weighted by the number of covered workers in the responding firms. There is a more detailed discussion in the survey design and methods section on this topic.

- For hospital admissions, 64% of covered workers have coinsurance and 12% have copayments. Lower percentages of workers have per day (per diem) payments (10%), a separate hospital deductible (1%), or both a copayment and coinsurance (6%), while 17% have no additional cost sharing for hospital admissions after any general annual deductible has been met [Figure 7.28].

  – For covered workers in HMO plans, copayments are more common (38%) and coinsurance (28%) is less common than the average for all covered workers [Figure 7.28].

  – HDHP/SOs, on average, have a different cost-sharing structure than other plan types for hospital admissions. Only

1% of covered workers in HDHP/SOs have a copayment for hospital admissions, lower than the average for all covered workers [Figure 7.28].

– The average coinsurance rate for a hospital admission is 19%, the average copayment is $336 per hospital admission, and the average per diem charge is $257 [Figure 7.32]. Ninety-three percent of workers enrolled in a plan with a per diem for hospital admissions have a limit on the number of days a worker must pay the amount [Figure 7.33].

• The cost-sharing provisions for outpatient surgery are similar to those for hospital admissions, as most workers have coinsurance or copayments. In 2017, 19% of covered workers have a copayment and 64% have coinsurance for outpatient surgery. In addition, 6% have both a copayment and coinsurance, while 16% have no additional cost sharing after any general annual deductible has been met [Figure 7.29].

– For covered workers with cost sharing for outpatient surgery, the average coinsurance rate is 19% and the average copayment is $231 [Figure 7.32].

• The large majority of covered workers have cost sharing when they visit an emergency room. In 2017, 58% percent of covered workers have a copayment for emergency room visits and 32% have a coinsurance [Figure 7.30].

– For covered workers with cost sharing for an emergency room visit, the average coinsurance rate is 20% and the average copayment is $180 [Figure 7.32].

– Among covered workers in HDHP/SO plans, 21% have no cost sharing for an emergency room visit after any general annual deductible has been met, compared to 8% of covered workers in all plans [Figure 7.30].

**Figure 7.28**

**Distribution of Covered Workers With Separate Cost Sharing for Hospital Admissions, In Addition to Any General Annual Deductible, by Plan Type, 2017**

| Plan Type | Separate Annual Deductible for Hospital Admissions | Copayment | Coinsurance | Both Copayment and Coinsurance | Charge Per Day | None |
|---|---|---|---|---|---|---|
| HMO | 2% | 38%* | 28%* | 5% | 13% | 23% |
| PPO | * | 11 | 72* | 9 | 7 | 12* |
| POS | 6 | 15 | 46 | 10 | 43* | 1* |
| HDHP/SO | <1* | 1* | 74* | <1** | 1* | 24* |
| **ALL PLANS** | **1%** | **12%** | **64%** | **6%** | **10%** | **17%** |

NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an "Other" type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. "Both Copayment and Coinsurance" category includes workers who are required to pay the higher amount of either the copayment or coinsurance. Under the plan. Zero percent of covered workers are enrolled in a plan that does not cover hospital admissions.

* Estimate is statistically different from All Plans estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667198

Exhibit 142          JA1577          JA-0002091

**Figure 7.29**

**Distribution of Covered Workers With Separate Cost Sharing for Outpatient Surgery, In Addition to Any General Annual Deductible, by Plan Type, 2017**

| Plan Type | Separate Annual Deductible for Outpatient Surgery | Copayment | Coinsurance | Both Copayment and Coinsurance | None |
|---|---|---|---|---|---|
| HMO | <1% | 57%* | 26%* | 5% | 15% |
| PPO | <1 | 12* | 73* | 7 | 14 |
| POS | <1 | 49* | 40* | 22 | 9* |
| HDHP/SO | <1 | 2* | 74* | <1* | 24* |
| **ALL PLANS** | **<1%** | **19%** | **64%** | **6%** | **16%** |

NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an 'Other' type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. 'Both Copayment and Coinsurance' category includes workers who are required to pay the higher amount of either the copayment or coinsurance under the plan. Zero percent of covered workers are enrolled in a plan that does not cover outpatient surgery.

* Estimate is statistically different from All Plans estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.30**

**Distribution of Covered Workers With Separate Cost Sharing for an Emergency Room Visit, In Addition to Any General Annual Deductible, by Plan Type, 2017**

| Plan Type | Separate Annual Deductible for Emergency Room Visits | Copayment | Coinsurance | Both Copayment and Coinsurance | None |
|---|---|---|---|---|---|
| HMO | 6% | 94%* | 6%* | 10%* | <1%* |
| PPO | 1 | 68* | 26 | 27* | 4* |
| POS | 3 | 83* | 9* | 27 | 2* |
| HDHP/SO | <1* | 16* | 62* | 7* | 21* |
| **ALL PLANS** | **1%** | **58%** | **32%** | **20%** | **8%** |

NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an 'Other' type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. 'Both Copayment and Coinsurance' category includes workers who are required to pay the higher amount of either the copayment or coinsurance under the plan. Zero percent of covered workers are enrolled in a plan that does not cover emergency room visits.

* Estimate is statistically different from All Plans estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.31**

**Percentage of Covered Workers with the Following Types of Cost Sharing for Various Services, in Addition to Any General Annual Deductible, 2017**



NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an "Other" type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. "Both Copayment and Coinsurance" category includes workers who are required to pay the higher amount of either the copayment or coinsurance under the plan.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.32**

**Among Covered Workers With Separate Cost Sharing for Hospital Admissions, Outpatient Surgery or Emergency Room Visits, Average Cost Sharing, 2017**

| Type of Cost Sharing | Emergency Room Visit | Hospital Admission | Outpatient Surgery |
|---|---|---|---|
| Coinsurance | 20% | 18% | 19% |
| Copayment | $180 | $336 | $231 |
| Separate Annual Deductible | N/A | NSD | NSD |

NOTE: Estimates represent cost sharing in addition to any general annual deductible. The average amounts include workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers. N/A: Not Applicable
NSD: Not Sufficient Data

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667200**

Exhibit 142

### Figure 7.33

### Among Covered Workers With a Charge Per Day for Hospital Admissions, Average Cost Sharing, 2017

| | Among Covered Workers With a Charge Per Day for Hospital Admissions |
|---|---|
| Average Charge Per Day | $257 |
| Percentage of Covered Workers With a Limit On the Number of Days a Worker Must Pay Per-Day Amount | 93% |
| Average Number of Days the Per-Day Amount Must Be Paid | 5 |

NOTE: Estimates represent cost sharing in addition to any general annual deductible. Average amounts include workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers. Among covered workers with coinsurance for emergency room visits, 93% are enrolled in a plan with neither a minimum nor maximum dollar amount for in-network visits.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

### Figure 7.34
### Among Covered Workers with a Copayment for Hospital Admissions, Outpatient Surgery or Emergency Room Visits, Distribution of Copayments, 2017



NOTE: Estimates represent cost sharing in addition to any general annual deductible. Distribution includes workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667201**

Exhibit 142          JA1580          JA-0002094



**Figure 7.35**

**Among Covered Workers with Coinsurance for Hospital Admissions, Outpatient Surgery or Emergency Room Visits, Distribution of Coinsurance Rates, 2017**

NOTE: Estimates represent cost sharing in addition to any general annual deductible. Distribution includes workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## COST SHARING FOR PHYSICIAN OFFICE VISITS

- The majority of covered workers are enrolled in health plans that require cost sharing for an in-network physician office visit, in addition to any general annual deductible.[2]

  - The most common form of physician office visit cost sharing for in-network services is copayments. Seventy-one percent of covered workers have a copayment for a primary care physician office visit and 22% have coinsurance. For office visits with a specialty physician, 67% of covered workers have copayments and 26% have coinsurance [Figure 7.36].

  - Over the last five years, the percentage of covered workers with coinsurance for office visits with a specialist has risen from 19% to 26%.

  - Covered workers in HMOs, PPOs, and POS plans are much more likely to have copayments for both primary care and specialty care physician office visits than workers in HDHP/SOs. For primary care physician office visits, 62% of covered workers in HDHP/SOs have coinsurance, 18% have no cost sharing after the general annual plan deductible is met, and 18% have copayments [Figure 7.36].

  - Among covered workers with a copayment for in-network physician office visits, the average copayment is $25 for primary care and $38 for specialty physician office visits [Figure 7.37], similar to the amounts last year.

  - Among covered workers with coinsurance for in-network physician office visits, the average coinsurance rates are 19% for a visit with a primary care physician and 19% for a visit with a specialist [Figure 7.37], similar to the rates

[2] Starting in 2010, the survey asked about the prevalence and cost of physician office visits separately for primary care and specialty care. Prior to the 2010 survey, if the respondent indicated the plan had a copayment for office visits, we assumed the plan had a copayment for both primary and specialty care visits. The survey did not allow for a respondent to report that a plan had a copayment for primary care visits and coinsurance for visits with a specialist physician. The changes made in 2010 allow for variations in the type of cost sharing for primary care and specialty care visits. The survey includes cost sharing for in-network services only.

last year.

**Figure 7.36**

**Percentage of Covered Workers with the Following Types of Cost Sharing for Physician Office Visits, by Plan Type, 2017**



* Estimate is statistically different from All Plans estimate (p < .05).

NOTE: Figure represents cost sharing in addition to any general annual deductible. The survey includes questions on cost sharing for in-network services only.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.37**

**Among Covered Workers With Copayments And/Or Coinsurance for In-Network Physician Office Visits, Average Copayments and Coinsurance, by Plan Type, 2017**

|  | HMO | PPO | POS | HDHP/SO | All Plans |
|---|---|---|---|---|---|
| **Primary Care Office Visit** | | | | | |
| Average Copay | $22* | $25 | $25 | $25 | $25 |
| Average Coinsurance | NSD | 19% | NSD | 18% | 19% |
| **Specialty Care Office Visit** | | | | | |
| Average Copay | $35 | $39 | $39 | $40 | $38 |
| Average Coinsurance | NSD | 21% | NSD | 18% | 19% |

NOTE: NSD: Not Sufficient Data

* Estimate is statistically different from All Plans estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667203

Exhibit 142     JA1582     JA-0002096

Case 1:7-25-25750-WB Documenteut 34-125 Page: 319 0/20/Filed: P12/12/2025 677



**Figure 7.38**
**Among Covered Workers with a Copayment for a Primary Care Physician Office Visit,**
**Distribution of Copayments, by Plan Type, 2017**

NOTE: Copayments for PPOs, POS plans, and HDHP/SOs are for in-network providers
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017



**Figure 7.39**
**Among Covered Workers with a Copayment for a Specialist Physician Office Visit,**
**Distribution of Copayments, by Plan Type, 2017**

NOTE: Copayments for PPOs, POS plans, and HDHP/SOs are for in-network providers
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 125

**667204**

Exhibit 142 — JA1583 — JA-0002097

Case 1:7-25-25750-WB Document 34-125 Page: 320 0 Date Filed 12/41/2025 677

**Figure 7.40**
**Among Covered Workers with a Copayment for a Primary Care Physician Office Visit,**
**Distribution of Copayments, 2006-2017**



\* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**Figure 7.41**
**Among Covered Workers with a Copayment for a Specialist Physician Office Visit,**
**Distribution of Copayments, 2006-2017**



\* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**667205**

Exhibit 142                    JA1584                    JA-0002098

## OUT-OF-POCKET MAXIMUM AMOUNTS

- Most covered workers are in a plan that partially or totally limits the cost sharing that a plan enrollee must pay in a year. These limits are generally referred to as out-of-pocket maximum amounts. The Affordable Care Act (ACA) requires that non-grandfathered health plans have an out-of-pocket maximum of $7,150 or less for single coverage and $14,300 for family coverage.[3] Many plans have complex out-of-pocket structures, which makes it difficult to accurately collect information on this element of plan design.

- In 2017, 98% percent of covered workers are in a plan with an out-of-pocket maximum for single coverage. This is a significant increase from 87% in 2012 [Figure 7.42].

- For covered workers in plans with out-of-pocket maximums for single coverage, there is wide variation in spending limits.

    - Fifteen percent of covered workers in plans with an out-of-pocket maximum for single coverage have an out-of-pocket maximum of less than $2,000, while 21% have an out-of-pocket maximum of $6,000 or more [Figure 7.44].



**Figure 7.42**
**Percentage of Covered Workers in a Plan with an Out-of-Pocket Maximum for Single Coverage, 2009-2017**

* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Out-of-pocket maximums reported are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

[3] For those enrolled in an HDHP/HSA, the out-of-pocket maximum is $6,550 for an individual plan and $13,100 for a family plan.

**667206**

Exhibit 142   JA1585   JA-0002099

Case 7-25-25750-WB Document 34-125 Page: 322 Filed 02/21/2025 Page 677
Case 2:25-cv-05750-WB Document 34-125 Page: 322 Date Filed: 12/12/2025

SECTION 7. EMPLOYEE COST SHARING

**Figure 7.43**

**Percentage of Covered Workers in a Plan with an Out-of-Pocket Maximum Above Certain Thresholds for Single Coverage, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: OOP refers to out-of-pocket. Out-of-pocket maximums reported are for in-network services. Covered Workers without an OOP maximum are considered to be exposed to at least the specified threshold. Some of these workers may be enrolled in plans whose cost-sharing structure has other limits that make it impossible to reach the specified threshold.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**Figure 7.44**

**Among Covered Workers with an Out-of-Pocket Maximum for Single Coverage, Distribution of Out-of-Pocket Maximums, by Plan Type, 2017**



\* Estimate is statistically different from All Plans estimate within plan type (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 128

**667207**

Exhibit 142                    JA1586                    JA-0002100



**Figure 7.45**

**Among Covered Workers with an Out-of-Pocket Maximum for Single Coverage, Average Out-of-Pocket Maximums, by Firm Size, 2017**



\* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667208**

Exhibit 142

JA1587

JA-0002101



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# High-Deductible Health Plans with Savings Option

SECTION

**8**

53%

$18,764

$5,690

2017

**667209**

Exhibit 142     JA1588     JA-0002102

Case 1:25-cv-25750-WPD Document 34-4 25 Page: 325 Date Filed: 12/12/2025 677

# Section 8

# High-Deductible Health Plans with Savings Option

To help cover out-of-pocket expenses not covered by a health plan, some firms offer high deductible plans that are paired with an account that allows enrollees to use tax-preferred savings to pay plan cost sharing and other out-of-pocket medical expenses. The two most common are health reimbursement arrangements (HRAs) and health savings accounts (HSAs). HRAs and HSAs are financial accounts that workers or their family members can use to pay for health care services. These savings arrangements are often (or, in the case of HSAs, always) paired with health plans with high deductibles. The survey treats high-deductible plans paired with a savings option as a distinct plan type - High-Deductible Health Plan with Savings Option (HDHP/SO) - even if the plan would otherwise be considered a PPO, HMO, POS plan, or conventional health plan. Specifically for the survey, HDHP/SOs are defined as (1) health plans with a deductible of at least $1,000 for single coverage and $2,000 for family coverage[1] offered with an HRA (referred to as HDHP/HRAs); or (2) high-deductible health plans that meet the federal legal requirements to permit an enrollee to establish and contribute to an HSA (referred to as HSA-qualified HDHPs).[2]

## PERCENTAGE OF FIRMS OFFERING HDHP/HRAS AND HSA-QUALIFIED HDHPS

- Twenty-four percent of firms offering health benefits offer an HDHP/HRA, an HSA-qualified HDHP, or both. Among firms offering health benefits, 9% offer an HDHP/HRA and 17% offer an HSA-qualified HDHP [Figure 8.1]. The percentage of firms offering an HDHP/SO is similar to last year.

  - Large firms (200 or more workers) are more likely than small firms (3-199 workers) to offer an HDHP/SO (53% vs. 23%). [Figure 8.3].

---

[1] There is no legal requirement for the minimum deductible in a plan offered with an HRA. The survey defines a high-deductible HRA plan as a plan with a deductible of at least $1,000 for single coverage and $2,000 for family coverage. Federal law requires a deductible of at least $1,300 for single coverage and $2,600 for family coverage for HSA-qualified HDHPs in 2017. See the Text Box for more information on HDHP/HRAs and HSA-qualified HDHPs.

[2] The definitions of HDHP/SOs do not include other consumer-driven plan options, such as arrangements that combine an HRA with a lower-deductible health plan or arrangements in which an insurer (rather than the employer as in the case of HRAs or the enrollee as in the case of HSAs) establishes an account for each enrollee. Other arrangements may be included in future surveys as the market evolves.

**667210**

Exhibit 142　　　　　　　JA1589　　　　　　　JA-0002103

**Figure 8.1**
**Among Firms Offering Health Benefits, Percentage That Offer an HDHP/HRA and/or an HSA-Qualified HDHP, 2005-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Among all firms that offer health benefits, 2.3% offer both an HDHP/HRA and an HSA-qualified HDHP. Adding the percentage of firms offering HDHP/HRA and HSA-Qualified HDHPs may not sum to the percentage of firms offering HDHP/SOs because some firms offer both.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

**Figure 8.2**
**Among Firms Offering Health Benefits, Percentage That Offer an HDHP/SO, by Firm Size, 2005-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 132

**667211**

Exhibit 142　　　　　　　　　　　　JA1590　　　　　　　　　　　　JA-0002104

Case 1:17-cv-02550-WB Document 24-125 Page: 327 Date Filed: 12/12/2025 Page 677

**Figure 8.3**
**Among Firms Offering Health Benefits, Percentage That Offer an HDHP/HRA and/or an HSA-Qualified HDHP, by Firm Size, 2017**



* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).
NOTE: Among all firms that offer benefits, 23% offer both an HDHP/HRA and an HSA-qualified HDHP. Adding the percentage of firms offering HDHP/HRA and HSA-Qualified HDHPs may not sum to the percentage of firms offering HDHP/SOs because some firms offer both.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

## ENROLLMENT IN FIRMS OFFERING HDHP/HRAS AND HSA-QUALIFIED HDHPS

- Enrollment in HDHP/SO plans has increased over the last five years, from 19% of covered workers in 2012 to 28% in 2017.
  - Nine percent of covered workers are enrolled in HDHP/HRAs and 19% of covered workers are enrolled in HSA-qualified HDHPs in 2017. These percentages are the same as the percentages last year [Figure 8.5].
  - A higher percentage of covered workers in large firms is enrolled in HDHP/SOs than in small firms (30% vs. 23%) [Figure 8.6].

667212

Exhibit 142          JA1591          JA-0002105

**Figure 8.4**
**Percentage of Covered Workers Enrolled in an HDHP/SO, by Firm Size, 2006-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**Figure 8.5**
**Percentage of Covered Workers Enrolled in an HDHP/HRA or HSA-Qualified HDHP, 2006-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Covered workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 134

**667213**

Exhibit 142          JA1592          JA-0002106



**Figure 8.6**
**Percentage of Covered Workers Enrolled in an HDHP/HRA or HSA-Qualified HDHP, by Firm Size, 2017**

\* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).
NOTE: Covered workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017.

## PREMIUMS AND WORKER CONTRIBUTIONS

- The average annual premiums in 2017 for covered workers in HDHP/HRAs are $6,438 for single coverage and $18,948 for family coverage [Figure 8.7]. The average annual premium for single coverage in HDHP/HRAs is significantly less than the average annual premium for single coverage for covered workers in plans that are not HDHP/SOs [Figure 8.8].

- The average annual premium for workers in HSA-qualified HDHPs is $5,773 for single coverage and $16,821 for family coverage. These amounts are significantly less than the average single and family premium for covered workers in plans that are not HDHP/SOs [Figure 8.8].

- The average single and family coverage premiums for covered workers enrolled in HSA-qualified HDHPs are lower than the premiums for covered workers enrolled in HDHP/HRAs.

- The average annual worker contributions to premiums for workers enrolled in HDHP/HRAs are $1,216 for single coverage and $5,130 for family coverage [Figure 8.7].

- The average annual worker contributions to premiums for workers in HSA-qualified HDHPs are $918 for single coverage and $4,289 for family coverage. The average contributions for single and family coverage for covered workers in HSA-qualified HDHPs are significantly less than the average premium contribution made by covered workers in plans that are not HDHP/SOs [Figure 8.8].

**667214**

Exhibit 142     JA1593     JA-0002107

**Figure 8.7**

**HDHP/HRA and HSA-Qualified HDHP Features for Covered Workers, 2017**

| Annual Plan Averages For: | HDHP/HRA | | HSA-QUALIFIED HDHP | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| Premium | $6,438 | $18,948 | $5,773 | $16,821 |
| Worker Contribution to Premium | $1,216 | $5,130 | $918 | $4,289 |
| General Annual Deductible | $2,129 | $4,448 | $2,433 | $4,647 |
| Out-Of-Pocket Liability | $4,063 | Not Available | $4,271 | Not Available |
| Firm Contribution to the HRA or HSA | $1,351 | $2,444 | $608 | $1,086 |

NOTE: Firms were not asked about family coverage out-of-pocket maximums in 2017. The deductible averages for family coverage are for covered workers that face an aggregate amount. Twenty-one percent of covered workers enrolled in HDHP/HRA plans and 13.3% of covered workers in HSA-qualified HDHPs are in plans with a separate per person amount. When those firms that do not contribute to the HSA (47% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 8.8**

**Average Annual Premiums and Contributions to Savings Accounts for Covered Workers in HDHP/HRAs or HSA-Qualified HDHPs, Compared to Non-HDHP/SO Plans, 2017**

| | Single Coverage | | | Family Coverage | | |
|---|---|---|---|---|---|---|
| | HDHP/HRA | HSA-Qualified HDHP | Non-HDHP/SO Plans | HDHP/HRA | HSA-Qualified HDHP | Non-HDHP/SO Plans |
| Annual Premium | $6,438* | $5,773* | $6,949 | $18,948 | $16,821* | $19,225 |
| Worker Contribution to Premium | $1,216 | $918* | $1,288 | $5,130* | $4,289* | $6,149 |
| Firm Contribution to Premium | $5,222 | $4,855* | $5,661* | $13,817 | $12,532 | $13,076 |
| Annual Firm Contribution to the HRA or HSA | $1,351* | $608 | Not Applicable | $2,444 | $1,086 | Not Applicable |
| Total Annual Firm Contribution (Firm Share of Premium Plus Firm Contribution to HRA or HSA) | $6,573* | $5,473 | $5,661* | $16,261* | $13,608 | $13,076 |
| Total Annual Cost (Total Premium Plus Firm Contribution to HRA or HSA) | $7,789* | $6,390* | $6,949 | $21,391* | $17,895* | $19,225 |

NOTE: When those firms that do not contribute to the HSA (47% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution. 3% for single coverage and 3% for family coverage. Values shown in the table may not equal the sum of their component parts. The averages presented in the table are aggregated at the firm level and then averaged, which is methodologically more appropriate than adding the averages.

* Estimate is statistically different from estimate for Non-HDHP/SO Plans (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667215**

Exhibit 142                                    JA1594                                    JA-0002108

SECTION 8.  HIGH-DEDUCTIBLE HEALTH PLANS WITH SAVINGS OPTION

**Figure 8.9**

**Average Annual Premiums and Contributions for Covered Workers in HDHP/SOs and Non-HDHP/SO Plans, for Family Coverage, 2017**



\* Estimate is statistically different from estimate for Non-HDHP/SO Plans (p < .05).

NOTE: When those firms that do not contribute to the HSA (42% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm's contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage). Values shown in the table may not equal the sum of their component parts. The averages presented in the table are aggregated at the firm level and then averaged, which is methodologically more appropriate than adding the averages.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 8.10**

**Total Annual Costs (Premiums and Account Contributions) for Covered Workers in HDHP/SOs, for Family Coverage, by Firm Size, 2017**



\* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

NOTE: Small Firms have 3-199 workers, and Large Firms have 200 or more workers. When those firms that do not contribute to the HSA (42% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage). Values shown in the table may not equal the sum of their component parts. The averages presented in the table are aggregated at the firm level and then averaged, which is methodologically more appropriate than adding the averages.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 137

**667216**

Exhibit 142                    JA1595                    JA-0002109

**Figure 8.11**
**Average Annual Premiums for Covered Workers with Family Coverage, by Plan Type, 2007-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**Figure 8.12**
**Average Annual Premiums for Covered Workers with Single Coverage, by Plan Type, 2007-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 138

**667217**

Exhibit 142                                JA1596                                JA-0002110

## PLAN DEDUCTIBLES

- As expected, workers enrolled in HDHP/SOs have higher deductibles than workers enrolled in HMOs, PPOs, or POS plans.
  - The average general annual deductible for single coverage is $2,129 for HDHP/HRAs and $2,433 for HSA-qualified HDHPs [Figure 8.14]. These averages are similar to the amounts reported in recent years. There is wide variation around these averages: 19% of covered workers enrolled in an HDHP/SO are in a plan with a deductible of $1,000 to $1,499 while 24% are in a plan with a deductible of $3,000 or more [Figure 8.13].
- The survey asks firms whether the family deductible amount is (1) an aggregate amount (i.e., the out-of-pocket expenses of all family members are counted until the deductible is satisfied), or (2) a per-person amount that applies to each family member (typically with a limit on the number of family members that would be required to meet the deductible amount) (see Section 7 for more information).
  - The average aggregate deductibles for workers with family coverage are $4,448 for HDHP/HRAs and $4,647 for HSA-qualified HDHPs [Figure 8.7]. As with single coverage, there is wide variation around these averages for family coverage: 18% of covered workers enrolled in HDHP/SOs with an aggregate family deductible have a deductible of $2,000 to $2,999 while 22% have a deductible of $6,000 dollars or more [Figure 8.15].

**Figure 8.13**

**Distribution of Covered Workers with the Following General Annual Deductible Amounts for Single Coverage, HSA-Qualified HDHPs and HDHP/HRAs, By Firm Size, 2017**



NOTE: In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage. Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667218

Exhibit 142    JA1597    JA-0002111

Case 7:25-cv-25750-WB Document 34-1 25 Page: 334 Date Filed: 12/12/2025 677

**Figure 8.14**

**General Annual Deductible for Workers In an HDHP/SO After Any Employer Account Contributions for Single Coverage, by Firm Size, 2017**

| | HDHP/HRA | HSA-Qualified HDHP | HDHP/SO |
|---|---|---|---|
| **General Annual Deductible for Single Coverage** | | | |
| All Small Firms (3-199 Workers) | $3,072* | $3,416* | $3,298* |
| All Large Firms (200 or More Workers) | $1,699* | $2,164* | $1,995* |
| **ALL FIRMS** | **$2,129** | **$2,433** | **$2,304** |
| **General Annual Deductible After Any HRA or HSA Contributions** | | | |
| All Small Firms (3-199 Workers) | $879 | $2,580* | $1,889* |
| All Large Firms (200 or More Workers) | $860 | $1,610* | $1,350* |
| **ALL FIRMS** | **$867** | **$1,823** | **$1,479** |

NOTE: The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services.

Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017



**Figure 8.15**

**Distribution of Covered Workers with the Following Aggregate Family Deductible Amounts, HDHP/HRAs and HSA-Qualified HDHPs, 2017**

NOTE: The deductible averages for family coverage are for covered workers that face an aggregate amount. Twenty-one percent of covered workers enrolled in HDHP/HRA plans and 13.3% of covered workers in HSA-qualified HDHPs are in plans with a separate per-person amount. In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

# OUT-OF-POCKET MAXIMUM AMOUNTS

- HSA-qualified HDHPs are legally required to have an annual out-of-pocket maximum of no more than $6,550 for single coverage and $13,100 for family coverage in 2017. Non-grandfathered HDHP/HRA plans starting in 2017 are required to have out-of-pocket maximums of no more than $7,150 for single coverage and $14,300 for family coverage. Virtually all HDHP/HRA plans have an out of pocket maximum for single coverage in 2017.

  – The average annual out-of-pocket maximum for single coverage is $4,083 for HDHP/HRAs and $4,271 for HSA-qualified HDHPs [Figure 8.7].

**667219**

Exhibit 142
JA1598
JA-0002112

Case 1:25-cv-05350-WB   Document 34-1   Filed 03/20/25   Page 335 of 677
Case 1:25-cv-05350-WB   Document 34-1   Filed 03/20/25   Page 335 of 677

SECTION 8. HIGH-DEDUCTIBLE HEALTH PLANS WITH SAVINGS OPTION

# EMPLOYER CONTRIBUTIONS TO PREMIUMS AND SAVINGS OPTIONS

- Employers contribute to HDHP/SOs in two ways: through their contributions toward the premium for the health plan and through their contributions (if any, in the case of HSAs) to the savings account option (i.e., the HRAs or HSAs themselves).

  - Looking at only the annual employer contributions to premiums, covered workers in HDHP/HRAs on average receive employer contributions of $5,222 for single coverage and $13,817 for family coverage [Figure 8.8]. These amounts are similar to the contribution amounts last year.

  - The average annual employer contributions to premiums for workers in HSA-qualified HDHPs are $4,855 for single coverage and $12,532 for family coverage, similar to the contribution amounts last year. The average employer contribution for covered workers in HSA-qualified HDHPs for single coverage is lower than the average contribution for covered workers in plans that are not HDHP/SOs [Figure 8.8].

- Looking at employer contributions to the savings options, covered workers enrolled in HDHP/HRAs on average receive an annual employer contribution to their HRA of $1,351 for single coverage and $2,444 for family coverage [Figure 8.8].

  - HRAs are generally structured in such a way that employers may not actually spend the whole amount that they make available to their employees' HRAs.[3] Amounts committed to an employee's HRA that are not used by the employee generally roll over and can be used in future years, but any balance may revert back to the employer if the employee leaves his or her job. Thus, the employer contribution amounts to HRAs that we capture in the survey may exceed the amount that employers will actually spend.

- Covered workers enrolled in HSA-qualified HDHPs on average receive an annual employer contribution to their HSA of $608 for single coverage and $1,086 for family coverage [Figure 8.8]. These amounts do not include the 3% of covered workers in HSA-qualified HDHPs whose employers say they vary account contributions based on certain factors, such as job classification or participation in a wellness program [Figure 8.18].

  - In many cases, employers that sponsor HSA-qualified HDHP/SOs do not make contributions to HSAs established by their employees. Forty-seven percent of employers offering single coverage and 46% offering family coverage through HSA-qualified HDHPs do not make contributions toward the HSAs that their workers establish. Twenty-three percent of workers with single coverage and 23% of workers with family coverage in an HSA-qualified HDHP do not receive an account contribution from their employer [Figures 8.16 and 8.17].

  - The average HSA contributions reported above include the portion of covered workers whose employer contribution to the HSA is zero. When those firms that do not contribute to the HSA are excluded from the calculation, the average employer contribution for covered workers is $795 for single coverage and $1,417 for family coverage.

  - The percentage of covered workers enrolled in a plan where the employer makes no HSA contribution for single and family coverage (23%) is similar to the percentage in recent years.

- Employer contributions to savings account options (i.e., the HRAs and HSAs themselves) for their workers can be added to their health plan premium contributions to calculate total employer contributions toward HDHP/SOs. We note that HRAs are a promise by an employer to pay up to a specified amount and that many employees will not receive the full amount of their HRA in a year, so adding the employer premium contribution amount and the HRA contribution represents an upper bound for employer liability that overstates the amount that is actually expended. Since employer contributions to employee HSA accounts immediately transfer the full amount to the employee, adding employer premium and HSA contributions is a good way to look at their total liability under these plans.

  - For HDHP/HRAs, the average annual total employer contribution for covered workers is $6,573 for single coverage and $16,261 for family coverage. The average total employer contribution amounts for covered workers for single

---

[3] The survey asks "Up to what dollar amount does your firm promise to contribute each year to an employee's HRA or health reimbursement arrangement for single coverage?" We refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. As discussed, HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Some employers may make their HRA contribution contingent on other factors, such as completing wellness programs.

Exhibit 142                                    JA1599                                    JA-0002113

Case 1:7-25-25750-WB Document 34-125 Page: 336 Date Filed: 12/12/2025 677

coverage and family coverage in HDHP/HRAs are higher than the average amount that employers contribute toward family coverage in health plans that are not HDHP/SOs [Figure 8.8].

- For HSA-qualified HDHPs, the average total annual firm contribution for covered workers is $5,473 for single coverage and $13,608 for workers with family coverage. The average total firm contribution amounts for single and family coverage in HSA-qualified HDHPs are similar to the average firm contributions toward single and family coverage in health plans that are not HDHP/SOs [Figure 8.8].

• There is considerable variation in the amount that employers contribute to savings accounts.

- Forty-six percent of covered workers in an HDHP/HRA have an annual HRA contribution of less than $800, while 22% have an annual HRA contribution of $1,600 or more.

- Thirty-seven percent of covered workers in an HSA-qualified HDHP have an annual HSA contribution of less than $400, including 23% that have no HSA contribution from their employer. In contrast, 12% of covered workers in an HSA-qualified HDHP have an annual HSA contribution of $1,200 or more. These percentages do not include the 3% of covered workers with an employer that matches their HSA contribution.

**Figure 8.16**
**Distribution of Covered Workers with the Following Annual Employer Contributions to Their HRA or HSA, for Single Coverage, 2017**



NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667221

Exhibit 142      JA1600      JA-0002114

**Figure 8.17**
**Distribution of Covered Workers with the Following Annual Employer Contributions to Their HRA or HSA, for Family Coverage, 2017**



NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 8.18**
**Among Firms Offering Family Coverage and an HSA-Qualified HDHP, Percentage of Firms That Vary Their HSA Contribution on Anything Other Than Number of Dependents, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: Includes firms who vary contributions based on participation in a wellness program, employee contributions, or job classification
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 143

**667222**

Exhibit 142                    JA1601                    JA-0002115

SECTION 8.  HIGH-DEDUCTIBLE HEALTH PLANS WITH SAVINGS OPTION

**Figure 8.19**

**Among Firms Offering an HSA-Qualified HDHP, Percentage of Firms That Contribute to the HSA through a Section 125 Cafeteria Plan, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

NOTE: A Section 125 cafeteria plan allows employees to receive certain benefits, such as health insurance premiums, on a pretax basis. Under this arrangement, some employees may be able to elect to place money into an HSA account or into other benefit options.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Figure 8.20

Average Annual Employer Contributions to HSA Accounts for Covered Workers Enrolled in an HSA-Qualified HDHP, 2009-2017

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| **Among All Workers Enrolled in an HSA-Qualified HDHP: Average Employer Account Contribution** | | | | | | | | | |
| Single Coverage | | | | | | | | | |
| All Small Firms (3-199 Workers) | $1,119 | $989 | $1,186 | $1,248 | $1,384 | $1,519 | $1,224 | $1,486 | $1,537 |
| All Large Firms (200 or More Workers) | $945 | $748 | $641 | $876 | $757 | $792 | $667 | $707 | $670 |
| **ALL FIRMS** | $1,000 | $858 | $886 | $979 | $951 | $1,009 | $809 | $916 | $795 |
| Family Coverage | | | | | | | | | |
| All Small Firms (3-199 Workers) | $2,077 | $1,696 | $1,671 | $2,951 | $2,383 | $2,307 | $1,630 | $2,332 | $2,192 |
| All Large Firms (200 or More Workers) | $1,121 | $1,431 | $1,241 | $1,179 | $1,337 | $1,257 | $1,267 | $1,393 | $1,253 |
| **ALL FIRMS** | $1,640 | $1,546 | $1,559 | $1,611 | $1,675 | $1,744 | $1,417 | $1,657 | $1,417 |
| | | | | | | | | | |
| **Among Workers Enrolled in a Plan With an Employer Account Contribution: Average Employer Contribution to HSAs** | | | | | | | | | |
| Single Coverage | | | | | | | | | |
| All Small Firms (3-199 Workers) | $698 | $542 | $815 | $848 | $542 | $1,142 | $776 | $968 | $873 |
| All Large Firms (200 or More Workers) | $645 | $967 | $446 | $402 | $567 | $544 | $461 | $583 | $536 |
| **ALL FIRMS** | $688 | $858 | $611 | $609 | $658 | $769 | $563 | $686 | $608 |
| Family Coverage | | | | | | | | | |
| All Small Firms (3-199 Workers) | $1,764 | $989 | $1,157 | $1,423 | $1,429 | $1,508 | $1,700 | $1,447 | $1,290 |
| All Large Firms (200 or More Workers) | $811 | $1,067 | $864 | $750 | $992 | $876 | $801 | $1,084 | $999 |
| **ALL FIRMS** | $1,126 | $1,006 | $1,089 | $1,070 | $1,154 | $1,346 | $991 | $1,208 | $1,086 |

NOTE: In 2017, 22% of covered workers in an HSA-qualified single coverage plan and 13% of workers in family coverage were enrolled in plans in which their employer contribution to the account. Covered workers enrolled in a plan where the firm makes an employee contribution to HSA accounts are not included in the average contribution. 3% for single coverage and 3% for family coverage.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

Case: 25-2550 Document: 34-12 Page: 339 Date Filed: 12/11/2025

**Figure 8.21**

## Average Annual Employer Contributions to HSA and HRA Accounts, 2017

|  | Average Employer Account Contribution |
|---|---|
| **HSA for Single Coverage** |  |
| All Small Firms (3-199 Workers) | $870* |
| All Large Firms (200 or More Workers) | $535* |
| **ALL FIRMS** | **$608** |
|  |  |
| **HSA for Family Coverage** |  |
| All Small Firms (3-199 Workers) | $1,396* |
| All Large Firms (200 or More Workers) | $999* |
| **ALL FIRMS** | **$1,086** |
|  |  |
| **HRA for Single Coverage** |  |
| All Small Firms (3-199 Workers) | $2,494* |
| All Large Firms (200 or More Workers) | $830* |
| **ALL FIRMS** | **$1,351** |
|  |  |
| **HRA for Family Coverage** |  |
| All Small Firms (3-199 Workers) | $4,472* |
| All Large Firms (200 or More Workers) | $1,523* |
| **ALL FIRMS** | **$2,444** |

NOTE: When those firms that do not contribute to the HSA (47% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage). For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667224**

Exhibit 142

JA-0002117

## COST-SHARING FOR OFFICE-VISITS

- The cost-sharing pattern for primary care office visits differs for workers enrolled in HDHP/SOs. Thirty-nine percent of covered workers in HDHP/HRAs have a copayment for primary care physician office visits compared to 7% enrolled in an HSA-qualified HDHP [Figure 8.22]. Workers in other plan types are much more likely to face copayments than coinsurance for physician office visits (see Section 7 for more information).

Figure 8.22

**Distribution of Covered Workers In HDHP/HRAs and HSA-Qualified HDHPs With the Following Types of Cost Sharing In Addition to the General Annual Deductible, 2017**

|  | HDHP/HRA | HSA-Qualified HDHP | HDHP/SO |
|---|---|---|---|
| **Separate Cost Sharing for Primary Care Physician Office Visits** | | | |
| Copayment | 39% | 7% | *8% |
| Coinsurance | 46% | 69% | 62% |
| None | 13% | 21% | *8% |
| Other | 3% | 3% | 3% |
| **Separate Cost Sharing for Specialty Care Physician Office Visits** | | | |
| Copayment | 32% | 7% | *6% |
| Coinsurance | 54% | 70% | 66% |
| None | 11% | 20% | *7% |
| Other | 3% | 3% | 3% |

NOTE: The survey asks firms about the characteristics of either the largest HRA or HSA-Qualified HDHP. The HDHP/SO category is the aggregate of both the HRA and HSA plans. For more information, see the Methods Section.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Health Reimbursement Arrangements (HRAs)** are medical care reimbursement plans established by employers that can be used by employees to pay for health care. HRAs are funded solely by employers. Employers may commit to make a specified amount of money available in the HRA for premiums and medical expenses incurred by employees or their dependents. HRAs are accounting devices, and employers are not required to expend funds until an employee incurs expenses that would be covered by the HRA. Unspent funds in the HRA usually can be carried over to the next year (sometimes with a limit). Employees cannot take their HRA balances with them if they leave their job, although an employer can choose to make the remaining balance available to former employees to pay for health care. HRAs often are offered along with a high-deductible health plan (HDHP). In such cases, the employee pays for health care first from his or her HRA and then out-of-pocket until the health plan deductible is met. Sometimes certain preventive services or other services such as prescription drugs are paid for by the plan before the employee meets the deductible.

**Health Savings Accounts (HSAs)** are savings accounts created by individuals to pay for health care. An individual may establish an HSA if he or she is covered by a "qualified health plan" –a plan with a high deductible (i.e., a deductible of at least $1,300 for single coverage and $2,600 for family coverage in 2017) that also meets other requirements. Employers can encourage their employees to create HSAs by offering an HDHP that meets the federal requirements. Employers in some cases also may assist their employees by identifying HSA options, facilitating applications, or negotiating favorable fees from HSA vendors. Both employers and employees can contribute to an HSA, up to the statutory cap of $3,400 for single coverage and $6,750 for family coverage in 2017. Employee contributions to the HSA are made on a pre-income tax basis, and some employers arrange for their employees to fund their HSAs through payroll deductions. Employers are not required to contribute to HSAs established by their employees but if they elect to do so, their contributions are not taxable to the employee. Interest and other earnings on amounts in an HSA are not taxable. Withdrawals from the HSA by the account owner to pay for qualified health care expenses are not taxed. The savings account is owned by the individual who creates the account, so employees retain their HSA balances if they leave their job.[4]

---

[4] See U.S. Department of the Treasury, Health Savings Accounts, available at http://www.irs.gov/pub/irs-drop/rp-14-30.pdf

The Kaiser Family Foundation and Health Research & Educational Trust / Page 146

**667225**

Exhibit 142                    JA1604                    JA-0002118



EMPLOYER HEALTH BENEFITS

2017 ANNUAL SURVEY

Prescription
Drug Benefits

SECTION

9

Exhibit 142

JA1605

JA-0002119

667226

# Section 9

# Prescription Drug Benefits

Almost all covered workers have coverage for prescription drugs. Over the years that we have conducted the survey, coverage for prescriptions has become more complex as employers and insurers expanded the use of formularies with multiple cost-sharing tiers as well as other management approaches. Collecting information about these practices is challenging and was burdensome to respondents with multiple plans to report on.

Beginning in 2016, to reduce burden on respondents, we revised the survey to ask respondents about the attributes of prescription drug coverage only in their largest health plan; previously, we asked about prescription coverage in their largest plan for each of the plan types that they offered. After reviewing the responses and comparing them to prior years where we asked about each plan type, we find that the information we are receiving is quite similar to responses from previous years. For this reason, we will continue to report our results for these questions weighted by the number of covered workers in responding firms. There is a more detailed discussion in the survey design and methods section on this topic.

In addition, because of the significant policy interest in access to and the cost of specialty drugs, in 2016 we also began asking employers to report separately about the cost sharing for tiers that cover only specialty drugs. In cases in which a tier covers only specialty drugs, we report its attributes under the specialty banner, rather than as one of the standard tiers. This entails revising the way we group formulary tiers: for example, a three-tier formulary where the third tier covers exclusively specialty drugs is now consider a two-tier plan with an additional tier. This approach allows us to report on the cost sharing for specialty drugs regardless of the number of tiers in the formulary. For this reason, we are not presenting statistical comparisons of estimates relying on tiers to prior years.[1]  This change is also discussed more fully in the survey design and methods section.

- Nearly all (99%) covered workers work at a firm that provides prescription drug coverage in their largest health plan.

## DISTRIBUTION OF COST-SHARING

- A large share of covered workers (91%) are in a plan with a tiered cost-sharing formula for prescription drugs [Figure 9.1]. Cost-sharing tiers generally refer to a health plan placing a drug on a formulary or preferred drug list that classifies drugs into categories that are subject to different cost sharing or management. It is common for there to be different tiers for generic, preferred and non-preferred drugs. In recent years, plans have created additional tiers which, for example, may be used for lifestyle drugs or expensive biologics. Some plans may have multiple tiers for different categories; for example, a plan may have preferred and non-preferred specialty tiers. The survey obtains information about the cost-sharing structure for up to five tiers.

- Eighty-three percent of covered workers are in a plan with three, four, or more tiers of cost sharing for prescription drugs [Figure 9.1]. These totals include tiers that cover only specialty drugs, even though the cost-sharing information for those tiers is reported separately.

  - HDHP/SOs have a different cost-sharing pattern for prescription drugs than other plan types. Covered workers in HDHP/SOs are more likely to be in a plan with the same cost sharing regardless of drug type (15% vs. 2%) or in a plan that has no cost sharing for prescriptions once the plan deductible is met (13% vs. <1%) as compared to covered workers in other types of plans [Figure 9.2].

---

[1] See the Methods Section for more information. In cases in which a firm indicated that one of their tiers was exclusively for specialty drugs, we reported the cost-sharing structure and any copay or coinsurance information under the specialty drug banner. Therefore, a firm that has three tiers of cost sharing may only have plan attributes for the generic and preferred tiers.

**667227**

Exhibit 142   JA-0002120

**Figure 9.1**
**Distribution of Covered Workers Facing Different Cost-Sharing Formulas for Prescription Drug Benefits, by Firm Size, 2017**



* Distribution is statistically different between Small Firm and Large Firm distributions (p < .05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Number of tiers include any tiers specifically for specialty drugs. Excluding tiers specifically for specialty drugs, 14% of covered workers with prescription drug coverage are enrolled in a plan with four or more tiers, 65% have three tiers, 11% have two tiers, 7% have the same cost sharing regardless of the drug, and 2% have no cost sharing after the deductible is met. For more information on the definition of specialty drugs and how this survey defines drug formulary tiers, see section 9.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 9.2**
**Distribution of Covered Workers Facing Different Cost-Sharing Formulas for Prescription Drug Benefits, by Plan Type, 2017**



* Distribution is statistically different between HDHP/SO Plan and Non-HDHP/SO distributions (p < .05).
NOTE: Number of tiers include any tiers specifically for specialty drugs. Excluding tiers specifically for specialty drugs, 14% of covered workers with prescription drug coverage are enrolled in a plan with four or more tiers, 65% have three tiers, 11% have two tiers, 7% have the same cost sharing regardless of the drug, and 2% have no cost sharing after the deductible is met. For more information on the definition of specialty drugs and how this survey defines drug formulary tiers, see section 9.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667228

Exhibit 142

## AVERAGE COST-SHARING NOT INCLUDING TIERS EXCLUSIVELY COVERING SPECIALTY DRUGS

- Even when formulary tiers covering only specialty drugs are not included, a large share (77%) of covered workers are in a plan with three or more tiers of cost sharing for prescription drugs. The cost-sharing statistics presented in this section do not include information about tiers that cover only specialty drugs. In cases in which a plan covers specialty drugs on a tier with other drugs, they will still be included in these averages. Cost-sharing statistics for tiers covering only specialty drugs are presented in the next section.

- For covered workers in a plan with three or more tiers of cost sharing for prescription drugs, copayments are the most common form of cost sharing in the first three tiers and coinsurance is the next most common. Among those with a fourth tier, the difference between the percentage with a copayment and a coinsurance requirement is not statistically significant [Figure 9.3].

  - Among covered workers in plans with three or more tiers of cost sharing for prescription drugs, the average copayments are $11 for first-tier drugs, $33 second-tier drugs, $59 for third-tier drugs, and $110 for fourth-tier drugs [Figure 9.6].

  - Among covered workers in plans with three or more tiers of cost sharing for prescription drugs, the average coinsurance rates are 17% for first-tier drugs, 25% second-tier drugs, 38% third-tier drugs, and 28% for fourth-tier drugs [Figure 9.6].

- Eleven percent of covered workers are in a plan with two tiers for prescription drug cost sharing (excluding tiers covering only specialty drugs).

  - For these workers, copayments are more common than coinsurance for both first-tier and second-tier drugs. The average copayment for the first tier is $11 and the average copayment for the second tier is $30 [Figure 9.3].

- Seven percent of covered workers are in a plan with the same cost sharing for prescriptions regardless of the type of drug (excluding tiers covering only specialty drugs).

  - Among these workers, 21% have copayments and 79% have coinsurance [Figure 9.3]. The average coinsurance rate is 19% and the average copayment is $11 [Figure 9.7].

  - Twenty-one percent of these workers are in a plan that limits coverage for prescriptions to generic drugs [Figure 9.9].

- Coinsurance rates for prescription drugs often have maximum and/or minimum dollar amounts associated with the coinsurance rate. Depending on the plan design, coinsurance maximums may significantly limit the amount an enrollee must spend out-of-pocket for higher cost drugs.

- These coinsurance minimum and maximum amounts vary across the tiers.

  - For example, among covered workers in a plan with coinsurance for the first cost-sharing tier, 25% have only a maximum dollar amount attached to the coinsurance rate, 8% have only a minimum dollar amount, 18% have both a minimum and maximum dollar amount, and 49% have neither. For those in a plan with coinsurance for the fourth cost-sharing tier, 52% have only a maximum dollar amount attached to the coinsurance rate, 4% have only a minimum dollar amount, 12% have both a minimum and maximum dollar amount, and 33% have neither. [Figure 9.8].

Exhibit 142

JA-0002122

**Figure 9.3**
**Among Workers with Prescription Drug Coverage, Distribution of Covered Workers with the Following Types of Cost Sharing for Prescription Drugs, 2017**



NOTE: Number of tiers refers to the number of tiers excluding those specifically for specialty drugs  Copay or Coinsurance Plus Any Difference' category includes workers who pay a copayment or coinsurance plus the difference between the cost of the prescription and the cost of a comparable generic drug

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667230

Exhibit 142                                        JA1609                                        JA-0002123

**Figure 9.4**

**Among Workers With Three or More Tiers of Cost Sharing, Distribution of Covered Workers With the Following Types of Cost Sharing for Prescription Drugs. by Firm Size, 2017**

| | Copayment | Coinsurance | No Cost Sharing for Generic Drugs | Some Other Amount |
|---|---|---|---|---|
| **First-Tier Drugs, Often Called Generics** | | | | |
| All Small Firms | 91%* | 4%* | 4% | 1% |
| All Large Firms | 78%* | 12%* | 8% | 2% |
| All Firms | 81% | 10% | 7% | 2% |
| | | | **Copay or Coinsurance Plus Any Difference** | |
| **Second-Tier Drugs, Often Called Preferred Drugs** | | | | |
| All Small Firms | 93%* | 6%* | 0% | 1% |
| All Large Firms | 62%* | 36%* | <1% | 1% |
| All Firms | 71% | 28% | <1% | 1% |
| **Third-Tier Drugs, Often Called Non-Preferred Drugs** | | | | |
| All Small Firms | 88%* | 11%* | 0% | 1% |
| All Large Firms | 59%* | 38%* | <1% | 3% |
| All Firms | 67% | 30% | <1% | 2% |
| **Fourth-Tier Drugs** | | | | |
| All Small Firms | 55% | 35% | 0% | 10% |
| All Large Firms | 42% | 45% | 3% | 10% |
| All Firms | 48% | 40% | 2% | 10% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Among covered workers enrolled in a plan with three or more tiers, 85% of covered workers are enrolled in a plan where the first tier only covers generic drugs. 'Number of tiers' refers to the number of tiers excluding those specifically for specialty drugs. 'Copay or Coinsurance Plus Any Difference' category includes workers who pay a copayment or coinsurance plus the difference between the cost of the prescription and the cost of a comparable generic drug.

* Estimates are statistically different between Small Firm and Large Firm estimates within category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits. 2017

Case 1:17-cv-25550-WB Document 34-4 25 Page: 347 of 0 Date Filed: 12/41/2025 677
Case 1:25-cv-25550-WB Document 34-4 25 Page: 347 of 0 Date Filed: 12/41/2025 677

SECTION 9. PRESCRIPTION DRUG BENEFITS

**Figure 9.5**

**Among Covered Workers With Three or More Tiers of Prescription Cost Sharing, Distribution of Covered Workers With the Following Types of Cost Sharing for Prescription Drugs, by Plan Type, 2017**

| | Copayment | Coinsurance | No Cost Sharing for Generic Drugs | Some Other Amount |
|---|---|---|---|---|
| **First-Tier Drugs, Often Called Generics** | | | | |
| HDHP/SO Plans | 64%* | 16%* | 19% | 1% |
| Non-HDHP/SO Plans | 86%* | 8%* | 4% | 2% |
| ALL FIRMS | 81% | 10% | 7% | 2% |
| | | | **Copay or Coinsurance Plus Any Difference** | |
| **Second-Tier Drugs, Often Called Preferred Drugs** | | | | |
| HDHP/SO Plans | 46%* | 53%* | 0% | <1% |
| Non-HDHP/SO Plans | 77%* | 21%* | <1% | 1% |
| ALL FIRMS | 71% | 28% | <1% | 1% |
| **Third-Tier Drugs, Often Called Non-Preferred Drugs** | | | | |
| HDHP/SO Plans | 44%* | 56%* | 0% | 1% |
| Non-HDHP/SO Plans | 73%* | 24%* | <1% | 2% |
| ALL FIRMS | 67% | 30% | <1% | 2% |
| **Fourth-Tier Drugs** | | | | |
| HDHP/SO Plans | 27%* | 66%* | 0% | 7% |
| Non-HDHP/SO Plans | 52%* | 35%* | 2% | 10% |
| ALL FIRMS | 48% | 40% | 2% | 10% |

NOTE: Among covered workers enrolled in a plan with three or more tiers, 86% of covered workers are enrolled in a plan where the first tier only covers generic drugs. Number of tiers refers to the number of tiers excluding those specifically for specialty drugs. 'Copay or Coinsurance Plus Any Difference' category includes workers who pay a copayment or coinsurance plus the difference between the cost of the prescription and the cost of a comparable generic drug.

* Estimates are statistically different between plan type estimates within category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 9.6**

**Among Covered Workers With Three or More Tiers of Prescription Drug Cost Sharing, Average Copayments and Coinsurance, 2017**

|  | Cost Sharing for Covered Workers Enrolled In Plans With Three or More Tiers |
|---|---|
| **Average Copay** | |
| First Tier Copay | $11 |
| Second Tier Copay | $33 |
| Third Tier Copay | $59 |
| Fourth Tier Copay | $110 |
| | |
| **Average Coinsurance** | |
| First Tier Coinsurance | 17% |
| Second Tier Coinsurance | 25% |
| Third Tier Coinsurance | 38% |
| Fourth Tier Coinsurance | 28% |

NOTE. Among covered workers enrolled in a plan with three or more tier tiers. 86% of covered workers are enrolled in a plan where the first tier only covers generic drugs. Number of tiers refers to the number of tiers excluding those specifically for specialty drugs.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667233**

Exhibit 142
JA-0002126

Case 7-25-25750-WB Document 34-1 25 Page: 349 0 Date Filed: 12/12/2025 677
Case 25-2550-WB Document 34-1 25 Page: 349 0 Date Filed: 12/12/2025 677

SECTION 9. PRESCRIPTION DRUG BENEFITS

### Figure 9.7

### Among Covered Workers With Prescription Drug Coverage, Average Copayments and Coinsurance, 2017

| | Average Copay | Average Coinsurance |
|---|---|---|
| **Plans With Three or More Tiers** | | |
| First Tier | $11 | 17% |
| Second Tier | $33 | 25% |
| Third Tier | $59 | 38% |
| Fourth Tier | $110 | 28% |
| | | |
| **Plans With Two Tiers** | | |
| First Tier | $11 | NSD |
| Second Tier | $30 | 29% |
| | | |
| **Plans With the Same Cost-Sharing For All Covered Drugs** | | |
| First Tier | $11 | 19% |

NOTE: Number of tiers refers to the number of tiers excluding those specifically for specialty drugs.

NSD: Not Sufficient Data

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

### Figure 9.8

### Distribution of Coinsurance Structures for Covered Workers Facing a Coinsurance for Prescription Drugs, 2017



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667234**

Exhibit 142          JA1613          JA-0002127

Case 1:7-25-05-750-WD8 Document 34-125 Page 350 Date Filed: 12/41/2025 677



Figure 9.9
Among Covered Workers with Prescription Drug Coverage, Coverage of Generic Drugs by Plan Design, 2017

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SPECIALTY DRUGS

- Specialty drugs, such as biologics that may be used to treat chronic conditions or some cancer drugs, can be quite expensive and often require special handling and administration. We revised our questions beginning with the 2016 survey to obtain more information about formulary tiers that are exclusively for specialty drugs. We are reporting results only among large firms because a substantial share of small firms were unsure whether their largest plan covered these drugs.

  - Ninety-seven percent of covered workers at large firms have coverage for specialty drugs [Figure 9.10]. Among these workers, 47% are in a plan with at least one cost-sharing tier just for specialty drugs [Figure 9.11].

  - Among covered workers in a plan with a separate tier for specialty drugs, 45% have a copayment for specialty drugs and 46% have a coinsurance [Figure 9.12]. The average copayment is $101 and the average coinsurance rate is 27% [Figure 9.13]. Eighty percent of those with a coinsurance have a maximum dollar limit on the amount of coinsurance they must pay.

- Some covered workers are also required to meet a deductible before the plan covers specialty drugs. Among covered workers enrolled in a plan with a deductible and specialty drug coverage, 29% must meet the general annual deductible and 15% must meet a separate drug deductible before specialty drugs are covered [Figure 9.14].

**667235**

Exhibit 142    JA1614    JA-0002128

Case 1:25-cv-25550-WB   Document 34-125   Page: 351   Date Filed: 12/12/2025   677

**Figure 9.10**
**Among Large Firms Whose Prescription Drug Coverage Includes Specialty Drugs, Percentage of Covered Workers Whose Plan with the Largest Enrollment Includes Coverage for Specialty Drugs, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 9.11**
**Among Large Firms Whose Prescription Drug Coverage Includes Specialty Drugs, Percentage of Covered Workers Enrolled in a Plan That Has a Separate Tier for Specialty Drugs, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05).
NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667236**

Exhibit 142                                   JA1615                                   JA-0002129

**Figure 9.12**

**Among Covered Workers at Large Firms Enrolled in a Plan with a Separate Tier for Specialty Drugs, Distribution of Covered Workers with the Following Types of Cost Sharing, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size within each category (p < .05)
NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 9.13**

**Among Covered Workers at Large Firms Enrolled In a Plan With a Separate Tier for Specialty Drugs, Average Copayments and Coinsurance, by Firm Size, 2017**

| FIRM SIZE | Average Copay | Average Coinsurance |
|---|---|---|
| 200-999 Workers | $90 | 24% |
| 1,000-4,999 Workers | 89 | 27 |
| 5,000 or More Workers | 111* | 28 |
| ALL FIRMS | $101 | 27% |

NOTE: Large Firms have 200 or more workers.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667237**

Exhibit 142          JA1616          JA-0002130

Case 1:21-cv-02552-WB Document 34-125 Page: 358 Date Filed: 12/14/2025 677



**Figure 9.14**

**Among Covered Workers Enrolled in a Plan with a Deductible and Specialty Drug Coverage, Percentage of Workers Enrolled in a Plan with Specialty Drugs Subject to a Deductible, by Firm Size, 2017**

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Seventy-nine percent of covered workers in small firms and 86% of covered workers in large firms are enrolled in a plan with either a general annual deductible or a separate annual deductible for prescription drugs.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SEPARATE ANNUAL DRUG DEDUCTIBLES

- In addition to other cost sharing, some covered workers are also required to meet a separate prescription drug deductible before the plan covers some or all drugs. Fifteen percent of covered workers are in a plan with a separate annual deductible for prescription drugs [Figure 9.15]. These prescription drug deductibles are separate from any general annual deductible and may apply to all or a select number of tiers.

    – For 57% of covered workers in firms with a separate deductible for prescription drugs, the deductible applies to all drugs on each of the formulary tiers [Figure 9.16].

    – The average annual deductible among covered workers in firms who face a separate annual deductible is $149 [Figure 9.16].

**667238**

Case 1:7-25-25750-WB Document 34 125 Page 354 Document 34 Filed 02/11/2025 Page 1 of 677

**Figure 9.15**

**Among Covered Workers with Prescription Drug Coverage, Percentage of Workers with a Separate Annual Deductible That Applies Only to Prescription Drugs, by Firm Size, 2005-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

**Figure 9.16**

**Percentage of Covered Workers With Drug Coverage Who Face a Separate Drug Deductible and Value of Drug Deductible, by Firm Size, 2017**

| | Percentage of Covered Workers With Drug Coverage Who Face a Separate Drug Deductible | Average Value of Drug Deductible | Among Covered Workers With a Separate Drug Deductible Percentage Enrolled In a Plan Where Deductible Applies to All Drugs Covered by the Plan's Formulary |
|---|---|---|---|
| **FIRM SIZE** | | | |
| 200-999 Workers | 8%* | $142 | 42% |
| 1,000-4,999 Workers | 15 | 204 | 51 |
| 5,000 or More Workers | 22* | 111* | 58 |
| All Small Firms (3-199 Workers) | 9%* | $223* | 63% |
| All Large Firms (200 or More Workers) | 17%* | $132* | 55% |
| **ALL PLANS** | **15%** | **$149** | **57%** |

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Generic drugs**  Drugs that are no longer covered by patent protection and thus may be produced and/or distributed by multiple drug companies.

**Preferred drugs**  Drugs included on a formulary or preferred drug list; for example, a brand-name drug without a generic substitute.

**Non-preferred drugs**  Drugs not included on a formulary or preferred drug list; for example, a brand-name drug with a generic substitute.

**Fourth-tier drugs**  New types of cost-sharing arrangements that typically build additional layers of higher copayments or coinsurance for specifically identified types of drugs, such as lifestyle drugs or biologics.

**Specialty drugs**  Specialty drugs such as biological drugs are high cost drugs that may be used to treat chronic conditions

**667239**

Exhibit 142
JA1618
JA-0002132

such as blood disorder, arthritis or cancer. Often times they require special handling and may be administered through injection or infusion.

667240

Exhibit 142                                         JA1619                                         JA-0002133



EMPLOYER HEALTH BENEFITS

2017 ANNUAL SURVEY

Plan
Funding

SECTION

10

667241

Exhibit 142                           JA1620                           JA-0002134

Case 1:25-cv-02550-WB   Document 34-1   Page: 357   Date Filed: 12/12/2025   677

# Section 10

# Plan Funding

Many firms, particularly larger firms, choose to pay for the health services of their workers directly from their own funds rather than by purchasing health insurance for them. This is called self-funding. Federal law (the Employee Retirement Income Security Act of 1974, or ERISA) exempts self-funded plans established by private employers from most state insurance laws, including reserve requirements, mandated benefits, premium taxes, and consumer protection regulations. Sixty percent of covered workers are in a self-funded health plan. Self-funding is common among larger firms because they can spread the risk of costly claims over a large number of workers and dependents.

Many firms with self-funded plans also use insurance, often called stoploss coverage, to limit their liability for very large claims or an unexpected level of expenses. About three-fifths of covered workers in fully or partially self-funded plans are in plans with stoploss insurance.

- Sixty percent of covered workers are in a plan that is completely or partially self-funded, similar to last year [Figures 10.1 and 10.2].

  - The percentage of covered workers enrolled in self-funded plans has been stable in recent years across firm sizes [Figure 10.2].

  - As expected, covered workers in large firms are significantly more likely to be in a self-funded plan than covered workers in small firms (79% vs. 15%). The percentage of covered workers in self-funded plans increases as the number of workers in a firm increases. Eighty-one percent of covered workers in firms with 1,000 to 4,999 workers and 91% of covered workers in firms with 5,000 or more workers are in self-funded plans in 2017 [Figures 10.1 and 10.4].

667242

Exhibit 142

JA1621

JA-0002135

**Figure 10.1**
**Percentage of Covered Workers Enrolled in a Self-Funded Plan, by Firm Size, 2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Due to a change in the survey questionnaire, funding status was not asked of firms with conventional plans in 2006; therefore, conventional plan funding status is not included in the averages in this figure for 2006. For definitions of self-funded and fully insured plans, see the introduction to Section 10.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 10.2**
**Percentage of Covered Workers Enrolled in a Self-Funded Plan, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Overall, 60% of covered workers are in a partially or completely self-funded plan in 2017. Due to a change in the survey questionnaire, funding status was not asked of firms with conventional plans in 2006; therefore, conventional plan funding status is not included in the averages in this figure for 2006. For definitions of self-funded and fully insured plans, see the introduction to Section 10.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667243

Exhibit 142

**Figure 10.3**

**Percentage of Covered Workers Enrolled in a Self-Funded Plan, by Plan Type, 1999-2017**

|  | Conventional | HMO | PPO | POS | HDHP/SO | All Plans |
|---|---|---|---|---|---|---|
| 1999 | 65% | 16% | 60% | 42% |  | 44% |
| 2000 | 64% | 23%* | 63% | 45% |  | 49% |
| 2001 | 65% | 31%* | 61% | 42% |  | 49% |
| 2002 | 58% | 27% | 61% | 40% |  | 49% |
| 2003 | 49% | 29% | 61% | 44% |  | 52% |
| 2004 | 43% | 29% | 64% | 46% |  | 54% |
| 2005 | 53% | 32% | 65% | 36% |  | 54% |
| 2006 |  | 33% | 63% | 32% | 50% | 55% |
| 2007 | 53% | 34% | 65% | 34% | 41% | 55% |
| 2008 | 47% | 40% | 64% | 29% | 35% | 55% |
| 2009 | 48% | 40% | 67% | 25% | 48%* | 57% |
| 2010 | 61% | 41% | 67% | 32% | 61%* | 59% |
| 2011 | 53% | 41% | 70% | 26% | 54% | 60% |
| 2012 | 38% | 37% | 70% | 29% | 54% | 60% |
| 2013 |  | 31% | 70% | 31% | 62% | 61% |
| 2014 |  | 32% | 71% | 22% | 60% | 61% |
| 2015 |  | 38% | 70% | 36%* | 68%* | 63% |
| 2016 |  | 37% | 69% | 24% | 67% | 61% |
| 2017 |  | 24% | 67% | 39% | 7*% | 60% |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Information was not obtained for conventional plans in 2006 and for HDHP/SO plans prior to 2006. Starting in 2013, information on conventional plans is included in the PPO estimate. See the Survey Design and Methods section for more information. Due to a change in the survey questionnaire, funding status was not asked of firms with conventional plans in 2006; therefore, conventional plan funding status is not included in the averages in this figure for 2006. For definitions of self-funded and fully insured plans, see the introduction to Section 10.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

Case 1:25-cv-25550-WB Document 34-125 Page: 360 0 Date Filed: 12/12/2025 677

**Figure 10.4**

**Percentage of Covered Workers in a Self-Funded Plan, by Firm Size, Region, and Industry, 2017**

|  | Self-Funded (Employer Bears Some or All of Financial Risk) |
|---|---|
| **FIRM SIZE** | |
| 200-999 Workers | 47%* |
| 1,000-4,999 Workers | 81* |
| 5,000 or More Workers | 91* |
| **All Small Firms (3-199 Workers)** | **15%*** |
| **All Large Firms (200 or More Workers)** | **79%*** |
| **REGION** | |
| Northeast | 68%* |
| Midwest | 63 |
| South | 64 |
| West | 45* |
| **INDUSTRY** | |
| Agriculture/Mining/Construction | 45%* |
| Manufacturing | 56 |
| Transportation/Communications/Utilities | 72 |
| Wholesale | 59 |
| Retail | 64 |
| Finance | 63 |
| Service | 49* |
| State/Local Government | 78* |
| Health Care | 76* |
| **ALL FIRMS** | **60%** |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. For definitions of self-funded and fully insured plans, see the introduction to Section 10.

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667245**

Exhibit 142

JA-0002138

Case 1:25-cv-02550-WB   Document 84-125   Page 361 of 613   Date Filed: 12/11/2025   Page 677

**Figure 10.5**

**Percentage of Covered Workers Enrolled in a Self-Funded Plan, by Plan Type and Firm Size, 2017**

| | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|
| **FIRM SIZE** | | | | |
| 200-999 Workers | 20% | 60% | 28% | 46%* |
| 1,000-4,999 Workers | 39 | 88* | 9** | 90* |
| 5,000 or More Workers | 35 | 95* | 90* | 99* |
| **ALL FIRMS** | **24%** | **67%** | **39%** | **71%** |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. For definitions of self-funded and fully insured plans, see the Introduction to Section 10.

* Estimate is statistically different from estimate for all other firms not in the indicated size category within plan type (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---

**Figure 10.6**

**Percentage of Covered Workers Enrolled in Self-Funded HMO, PPO, and HDHP/SO Plans, by Firm Size, 1999-2017**

| | HMO | | | | | PPO | | | | | HDHP/SO | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All HMO Plans | 3-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All PPO Plans | 3-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All HDHP/SO Plans |
| 1999 | 5% | 14% | 20% | * | 18* | *9 | 69% | 84% | 87% | 60% | | | | | |
| 2000 | 4% | 13% | 27% | 35%* | 23%* | 23% | 72% | 69% | 88% | 63% | | | | | |
| 2001 | 14% | 23% | 32% | 40% | 31%* | 23% | 66% | 87% | 87% | 61% | | | | | |
| 2002 | 10% | 18% | 37% | 38% | 27% | *5% | 61% | 83% | 93% | 61% | | | | | |
| 2003 | 8% | 27% | 27% | 44% | 29% | *3% | 60% | 85% | 93% | 61% | | | | | |
| 2004 | 4% | 18% | 48% | 40% | 29% | *3% | 63% | 85% | 95% | 64% | | | | | |
| 2005 | 10% | 17% | 50% | 44% | 32% | 18% | 67% | 86% | 95% | 65% | | | | | |
| 2006 | 3% | 29% | 54% | 47% | 33% | *9% | 61% | 85% | 97% | 63% | 7% | 57% | 51% | 100% | 50% |
| 2007 | *7% | 19% | 44% | 58% | 34% | *7% | 66% | 87% | 90%* | 65% | 4% | 27% | 48% | 97% | 41% |
| 2008 | 10% | 22% | 48% | 86% | 40% | *9% | 55% | 85% | 94% | 64% | 7% | 48% | 72% | 91% | 35% |
| 2009 | 6% | 26% | 60% | 67% | 40% | 21% | 57% | 87% | 93% | 67% | 18% | 36% | 81% | 96% | 48%* |
| 2010 | 9% | 23% | 59% | 59% | 41% | 18% | 69%* | 85% | 96% | 67% | 24% | 52% | 88% | 99% | 51%* |
| 2011 | 5% | 18% | 54% | 67% | 41% | *9% | 65% | 84% | 88% | 70% | 11% | 45% | 89% | 98% | 54% |
| 2012 | 13% | 14% | 45% | 80% | 37% | 20% | 63% | 84% | 97% | 70% | 14% | 39% | 86% | 98% | 54% |
| 2013 | 10% | 12% | 50% | 52% | 31% | *8% | 69% | 87% | 98% | 70% | 17% | 57% | 83% | 97% | 62% |
| 2014 | 1%* | 22% | 59% | 47% | 32% | 21% | 67% | 86% | 98% | 71% | 15% | 49% | 85% | 97% | 60% |
| 2015 | 11% | 15% | 4*% | 66% | 38% | 21% | 63% | 89% | 94% | 70% | 18% | 59% | 89% | 99% | 68%* |
| 2016 | 5% | 23% | 44% | 70% | 37% | 17% | 61% | 91% | 95% | 69% | 20% | 38%* | 87% | 98% | 67% |
| 2017 | 5% | 20% | 39% | 35%* | 24% | *9% | 69% | 88% | 95% | 67% | 19% | 46% | 90% | 99% | 71% |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Estimates for POS plans are not shown due to high relative standard errors. For definitions of self-funded and fully insured plans, see the Introduction to Section 10. Information on funding status for HDHP/SOs was not collected prior to 2006.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

## STOPLOSS COVERAGE AND ATTACHMENT POINTS

- Fifty-eight percent of covered workers in self-funded health plans are in plans that have stoploss insurance [Figure 10.7]. Stoploss coverage may limit the amount of claims that must be paid for each worker or may limit the total amount the plan sponsor must pay for all claims over the plan year.

  – The percentage of covered workers in self-funded plans with stoploss insurance (58%) is similar to the value when the survey first asked about stoploss insurance in 2011 (58)%.

  – Eighty-eight percent of covered workers in self-funded plans that have stoploss protection are in plans where the stoploss insurance limits the amount that the plan must spend on each worker. This includes stoploss insurance plans that limit a firm's per-employee spending and plans that limit both a firm's overall spending and per-employee spending [Figure 10.8].

  – Firms with per-enrollee stoploss coverage were asked for the dollar amount where the stoploss coverage would start to pay for most or all of the claim (called an attachment point). The average attachment point in small firms is $80,000. For large firms with a per-person limit, the average attachment point is $340,000 [Figure 10.8].

**667246**

Exhibit 142     JA1625     JA-0002139

Case 1:7-25-25-550-WB Document 34-125 Page 362 0D/ate Filed P 12/41/20025 677

**Figure 10.7**
**Among Covered Workers Enrolled in a Self-Funded Plan, Percentage Covered by Stoploss Insurance, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. For definitions of self-funded and fully insured plans, see the introduction to Section 10.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667247**

Exhibit 142                                                                 JA1626                                                          JA-0002140

Case 1:7-25-25750-WB Document 34-125 Page: 363 0/30/20 Filed:12/12/2025 677

**Figure 10.8**

**Prevalence and Average Attachment Points of Stoploss Insurance, by Firm Size and Region, 2017**

| | Percentage of Covered Workers in Partially or Completely Self-Funded Plans | Percentage of Covered Workers Enrolled in a Self-Funded Plan That Purchased Stoploss Insurance | Percentage of Covered Workers Enrolled in a Self-Funded Plan That Purchased Stoploss Insurance That Includes a Limit On Per-Employee Spending | Average Per-Employee Claims Cost at Which Stoploss Insurance Pays Benefits (Attachment Point) |
|---|---|---|---|---|
| **FIRM SIZE** | | | | |
| 50-199 Workers | 23%* | 73% | 94% | $80,000* |
| 200-999 Workers | 47* | 93* | 85 | 150,000* |
| 1,000-4,999 Workers | 81* | 91* | 92 | 290,000 |
| 5,000 or More Workers | 91* | 39* | 87 | 480,000* |
| **All Small Firms (3-199 Workers)** | 15%* | 60% | 93% | $80,000* |
| **All Large Firms (200 or More Workers)** | 79%* | 58% | 88% | $340,000* |
| **REGION** | | | | |
| Northeast | 68%* | 51% | 88% | $340,000 |
| Midwest | 63 | 71* | 89 | 320,000 |
| South | 64 | 58 | 85 | 300,000 |
| West | 45* | 48 | 96* | 390,000 |
| **All Self-Funded Firms** | 60% | 58% | 88% | $320,000 |

NOTE: A Limit on Per-Employee Spending includes stoploss insurance plans that limit a firm's per-employee spending as well as plans that limit both a firm's overall spending and per-employee spending. Attachment points refer to the dollar amount at which stoploss coverage begins to pay for most or all of a claim. For definitions of self-funded and fully insured plans, see the Introduction to Section 10. There was insufficient data to report estimates for firms with 3 to 49 workers.

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667248**

Exhibit 142    JA1627    JA-0002141

Case 2:17-cv-04540-WB Document 35-4 25 Page: 364 of 630 Filed: 12/11/2025 677

**Figure 10.9**

**Among Self-Funded Firms With Stoploss Coverage, Percentage of Covered Workers Enrolled in a Plan With an Attachment Point of $100,000 or Less, by Firm Size, 2011-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05).
NOTE: Among workers covered by a stoploss policy that include a per-person limit.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017

**Figure 10.10**

**Percentage of Covered Workers Enrolled in Self-Insured Plans That Purchase Different Types of Stoploss Insurance, by Firm Size, 2017**



NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. There was insufficient data to report estimates for All Small Firms (3-199 Workers).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667249**

Case 1:25-cv-05750-WB Document 34-125 Page: 365 of Date Filed: 12/12/2025 677



**Figure 10.11**
**Among Covered Workers Enrolled in a Self-Funded Plan, Percentage Covered by Stoploss Insurance, by Firm Size, 2011-2017**

Tests found no statistical difference from est mate for the previous year shown (p < .05)
NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017

**Self-Funded Plan** An insurance arrangement in which the employer assumes direct financial responsibility for the costs of enrollees' medical claims. Employers sponsoring self-funded plans typically contract with a third-party administrator or insurer to provide administrative services for the self-funded plan. In some cases, the employer may buy stoploss coverage from an insurer to protect the employer against very large claims.

**Fully Insured Plan** An insurance arrangement in which the employer contracts with a health plan that assumes financial responsibility for the costs of enrollees' medical claims.

**667250**

Exhibit 142                    JA1629                    JA-0002143



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Retiree Health
Benefits

SECTION

11

667251

Exhibit 142     JA1630     JA-0002144

# Section 11

# Retiree Health Benefits

Retiree health benefits are an important consideration for older workers making decisions about their retirement. Health benefits for retirees provide an important supplement to Medicare for retirees age 65 or older. Over time, the percentage of firms offering retiree coverage has decreased. This survey asks retiree health benefits questions only of large firms (200 or more workers).

## EMPLOYER RETIREE BENEFITS

- In 2017, 25% of large firms that offer health benefits to their workers offer retiree coverage, similar to recent years [Figure 11.1]. However, there has been a downward trend in the percentage of firms offering retirees coverage, from 32% in 2007 and 40% in 1999.

- Retiree health benefits offer rates vary considerably by firm characteristics.

  – Among large firms offering health benefits, firms with 200-999 workers are less likely to offer retiree health benefits than firms with 1,000 or more workers (23% vs. 36%) [Figure 11.2].

  – The share of large firms offering retiree health benefits varies considerably by industry. State and local governments (73%) and transportation/communication/utilities industries (47%) have higher than average offer rates, while retail (5%) and health care (8%) have lower than average offer rates [Figure 11.2].

  – Among large firms offering health benefits, the share of public firms offering retiree benefits (67%) is higher than the shares of private for-profit firms (11%) or private not-for-profit firms (19%) offering retiree benefits [Figure 11.3].

  – Large firms with at least some union workers are more likely to offer retiree health benefits than large firms without any union workers (45% vs. 18%) [Figure 11.3].

- Twenty-six percent of large firms offering retiree benefits contribute to those benefits through a contract with a Medicare Advantage plan. Firms with 1,000-4,999 workers are more likely to contribute to retiree benefits through a contract with a Medicare Advantage plan than other large firms (44% vs. 21%) [Figure 11.4].

Case 1:25-cv-02350-WB   Document 34-125   Page: 368   Date Filed: 12/12/2025   677

**Figure 11.1**
**Among Large Firms Offering Health Benefits to Active Workers, Percentage of Firms Offering Retiree Health Benefits, 1988-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05). No statistical tests are conducted for years prior to 1999.

NOTE: Large Firms have 200 or more workers.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017; KPMG Survey of Employer-Sponsored Health Benefits, 1991, 1993, 1995-1998; The Health Insurance Association of America (HIAA), 1988

**667253**

Exhibit 142                    JA1632                    JA-0002146

Case 1:7-25-2557-0-WB Document 34-125 Page: 369 0 0/30/20 led: 12/41/2025 677

**Figure 11.2**

**Among Large Firms Offering Health Benefits to Active Workers, Percentage of Firms Offering Retiree Health Benefits, by Firm Size, Region, and Industry, 2017**

|  | Percentage of Large Firms Offering Retiree Health Benefits |
|---|---|
| **FIRM SIZE** |  |
| 200-999 Workers | 23%* |
| 1,000-4,999 Workers | 34* |
| 5,000 or More Workers | 42* |
| **REGION** |  |
| Northeast | 26% |
| Midwest | 25 |
| South | 26 |
| West | 23 |
| **INDUSTRY** |  |
| Agriculture/Mining/Construction | 13% |
| Manufacturing | 19 |
| Transportation/Communications/Utilities | 47* |
| Wholesale | 21 |
| Retail | 5* |
| Finance | 25 |
| Service | 25 |
| State/Local Government | 73* |
| Health Care | 8* |
| **All Large Firms (200 or More Workers)** | 25% |

* Estimate is statistically different from estimate for all other large firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667254**

Exhibit 142

JA-0002147

Case 1:17-cv-05350-WB Document 34-125 Page: 370 Filed 02/24/2025 Page 176 of 677

**Figure 11.3**

**Among Large Firms Offering Health Benefits to Active Workers, Percentage of Firms Offering Retiree Health Benefits, by Firm Characteristics, 2017**



\* Estimates are statistically different from each other within category (p < .05)

NOTE: Large Firms have 200 or more workers. Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667255

Exhibit 142                                  JA1634                                  JA-0002148

Case 2:25-cv-02550-WB Document 34-125 Page: 371 Date Filed: 12/12/2025 677

**Figure 11.4**

**Among Large Firms Offering Health Benefits to Medicare-Age Retirees, Percentage of Firms Offering Retiree Health Benefits Through a Contract With a Medicare Advantage Plan, by Firm Size and Region, 2017**

| | Percentage of Large Firms Offering Retiree Health Benefits Through a Contract With a Medicare Advantage Plan |
|---|---|
| **FIRM SIZE** | |
| 200-999 Workers | 20%* |
| 1,000-4,999 Workers | 44* |
| 5,000 or More Workers | 29 |
| **REGION** | |
| Northeast | 34% |
| Midwest | 27 |
| South | 29 |
| West | 11* |
| **All Large Firms (200 or More Workers)** | **26%** |

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## EARLY RETIREES AND MEDICARE-AGE RETIREES

- Among large firms offering retiree health benefits, most firms offer to early retirees under the age of 65 (95%). A lower percentage (66%) of large firms offering retiree health benefits offer to Medicare-age retirees. These percentages are similar to those in recent years [Figure 11.5].

- Among all large firms offering retiree health benefits, 61% offer health benefits to both early and Medicare-age retirees [Figure 4.6].

**667256**

Exhibit 142

JA1635

JA-0002149

Case 7-25-25750-WB Document 34-125 Page: 372 Filed 09/30/20 Filed: 12/41/2025 677

**Figure 11.5**
**Among Large Firms Offering Health Benefits to Active Workers and Offering Retiree**
**Coverage, Percentage of Firms Offering Health Benefits to Early and Medicare-Age**
**Retirees, 2000-2017**





* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Large Firms have 200 or more workers. Early retirees are those who retire before the age of 65. Among all large firms offering health benefits
to active workers and offering retiree coverage, 61% offer health benefits to both early and Medicare-age retirees.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2000-2017

---

**Figure 11.6**

**Among Large Firms Offering Health Benefits to Active Workers and Offering Retiree Coverage,**
**Percentage of Firms Offering Retiree Health Benefits to Early and Medicare-Age Retirees, by**
**Firm Size and Region, 2017**

| | Percentage of Large Firms Offering Retiree Health Benefits to Early Retirees | Percentage of Large Firms Offering Retiree Health Benefits to Medicare-Age Retirees |
|---|---|---|
| **FIRM SIZE** | | |
| 200-999 Workers | 95% | 63% |
| 1,000-4,999 Workers | 95 | 73 |
| 5,000 or More Workers | 95 | 77 |
| **REGION** | | |
| Northeast | 97% | 62% |
| Midwest | 94 | 54 |
| South | 98 | 70 |
| West | 90 | 82* |
| **All Large Firms (200 or More Workers)** | **95%** | **66%** |

NOTE: Early retirees are those who retire before the age of 65. Among all large firms offering health benefits to active workers and
offering retiree coverage, 61% offer health benefits to both early and Medicare-age retirees.

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667257**

Exhibit 142

JA-0002150

Case 1:17-cv-05770-WB Document 34-125 Page: 378 Date Filed: 12/12/2025 677

## PRIVATE EXCHANGES

- Private exchanges have received considerable attention over the last several years. They are typically created by a consulting company, broker, or insurer, and are different than the public exchanges created under the Affordable Care Act (ACA). Private exchanges allow employees or retirees from multiple companies to choose from a larger number of health benefit options than one firm would generally provide. Twelve percent of large firms offering retiree health benefits report they offer benefits through a private exchange, similar to the percentage last year (6%) [Figure 11.7]. For more information on the use of private exchanges for active employees, please see Section 14.

- Thirty percent of large firms offering retiree benefits make a defined contribution for retiree health benefits [Figure 11.7]. A defined contribution is a set dollar amount that the retiree can use to purchase a retiree health plan they choose.

### Figure 11.7

**Among Large Firms Offering Health Benefits to Active Workers and Retirees, Firm's Approach to Offering Retiree Health Benefits, by Firm Size and Region, 2017**

|  | Percentage of Large Firms Offering Retiree Health Benefits Through a Private Exchange | Percentage of Large Firms Offering Retiree Health Benefits Using a Defined Contribution Approach |
|---|---|---|
| **FIRM SIZE** | | |
| 200-999 Workers | 12% | 27% |
| 1,000-4,999 Workers | 10 | 39 |
| 5,000 or More Workers | 14 | 33 |
| **REGION** | | |
| Northeast | 25% | 16%* |
| Midwest | 9 | 26 |
| South | 7 | 37 |
| West | 2 | 45 |
| **All Large Firms (200 or More Workers)** | 12% | 30% |

\* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667258**

Exhibit 142

JA-0002151

**Figure 11.8**
**Among Large Firms Offering Health Benefits to Active Workers and Retirees, Percentage of Firms That Offer Retiree Coverage Through a Private Exchange, by Firm Size, 2014-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2014-2017

667259

Exhibit 142                                                   JA1638                                              JA-0002152



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# Health and Wellness Programs

SECTION

12

667260

# Section 12

# Health and Wellness Programs

Firms continue to show considerable interest in programs that help workers identify health issues and manage chronic conditions. Many employers believe that improving the health of their workers and their family members can improve morale, productivity and reduce health care costs. In addition to wellness programs, many large firms use disease management programs to help workers manage chronic conditions.

In addition to offering wellness programs, a majority of large firms now offer health screening programs, including health risk assessments, which are questionnaires asking workers about lifestyle, stress or physical health, and biometric screening, which we define as in-person health examinations conducted by a medical professional. Firms and insurers may use the health information collected during screenings to target wellness offerings or other health services to workers with certain conditions or behaviors that pose a risk to their health. Some firms have incentive programs that reward or penalize workers for different activities, including participating in wellness programs or completing health screenings.

Only firms offering health benefits were asked about their wellness and health promotion programs. Information about incentives is reported only for large firms (200 or more workers) because many small firm (3-199 workers) respondents do not know this information about their programs. This year's survey includes new questions about how a firm evaluates its wellness programs and about penalties for workers who use tobacco.

Among large firms offering health benefits in 2017, 62% offer workers the opportunity to complete a health risk assessment, 52% offer workers the opportunity to complete a biometric screening, and 85% offer workers wellness programs such as programs to help them stop smoking or lose weight, or programs that offer lifestyle and behavioral coaching. Substantial shares of these large firms provide incentives for workers to participate in or to complete the programs.

## HEALTH RISK ASSESSMENTS

Some firms provide workers the opportunity to complete a health risk assessment to identify potential health issues. Health risk assessments generally include questions about medical history, health status. and lifestyle. At small firms, health risk assessments are typically administered by an insurer.

- Among firms offering health benefits, 38% of small firms and 62% of large firms provide workers the opportunity to complete a health risk assessment [Figure 12.1]. These percentages are similar to the corresponding percentages for 2016 (32% for small firms and 59% for large firms) [Figure 12.2].
    - Seventy-eight percent of firms offering health benefits with 5,000 or more workers provide workers the opportunity to complete a health risk assessment, similar to the percentage for 2016 (74%) [Figure 12.1].
- In firms providing workers the opportunity to complete a health risk assessment, 42% of covered workers complete an assessment, similar to the percentage in 2016 [Figure 12.3].
    - There is considerable variation across firms in the percentage of workers who complete the assessment. Nineteen percent of large firms providing workers the opportunity to complete a health risk assessment report that more than 75% of their workers complete the assessment, while 45% report no more than 25% of workers complete the assessment.
- Some firms offer incentives to encourage workers to complete a health risk assessment.
    - Among large firms that offer a health risk assessment, 52% offer workers an incentive to complete the assessment [Figure 12.4].

The Kaiser Family Foundation and Health Research & Educational Trust / Page 182

**667261**

– Among large firms offering incentives for workers to complete a health risk assessment, 46% lower premium contributions or reduce cost sharing and 40% offer cash, HSA or HRA contributions, or allow the worker to avoid a payroll deduction [Figure 12.5]. In some firms, workers must complete the assessment to be eligible for other rewards under the firm's wellness programs. Some firms offer workers more than one type of incentive.

---

### Figure 12.1

### Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Health Risk Assessment, by Firm Size, 2017

|  | Percentage of Firms That Offer a Health Risk Assessment |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 36% |
| 25-199 Workers | 44 |
| 200-999 Workers | 59* |
| 1,000-4,999 Workers | 77* |
| 5,000 or More Workers | 78* |
| **All Small Firms (3-199 Workers)** | **38%*** |
| **All Large Firms (200 or More Workers)** | **62%*** |
| **ALL FIRMS** | **39%** |

NOTE. A health risk assessment or appraisal includes questions on medical history, health status, and lifestyle and is designed to identify the health risks of the person being assessed.

 * Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---

**667262**

Exhibit 142

Case 1:25-cv-05570-WB Document 34-125 Page: 378 Filed 02/12/2025 Page 677

**Figure 12.2**

**Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Health Risk Assessment, by Firm Size, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: A health risk assessment or appraisal includes questions on medical history, health status, and lifestyle and is designed to identify the health risks of the person being assessed.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**Figure 12.3**

**Among Firms Providing Workers an Opportunity to Complete a Health Risk Assessment, Percentage of Workers that Complete the Assessment, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 184

**667263**

Exhibit 142        JA1642        JA-0002156

Case 2:17-cv-04540-WB Document 34-4 253 Page: 379 of 20 Date Filed: 12/12/2025 677

**Figure 12.4**

**Among Large Firms Offering Health Benefits and Providing an Opportunity to Complete a Health Risk Assessment, Percentage of Firms That Offer Workers Incentives to Complete the Assessment, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

NOTE: A health risk assessment or appraisal includes questions on medical history, health status, and lifestyle and is designed to identify the health risks of the person being assessed.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.5**

**Among Large Firms Offering an Incentive to Workers Who Complete a Health Risk Assessment, Percentage of Firms Using Different Types of Incentives, by Firm Size, 2017**



NOTE: Large Firms have 200 or more workers. HRA is a health reimbursement arrangement and HSA is a health savings account. For more information, see Section 8.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667264**

Exhibit 142                    JA1643                    JA-0002157

Case 1:25-cv-05576-WD Document 34-1 25 Page: 380 0f 20 Filed: 12/12/2025 677

## BIOMETRIC SCREENING

Biometric screening is a health examination that measures a person's risk factors (such as cholesterol, blood pressure, and body mass index (BMI)) for certain medical issues. A biometric outcome involves assessing whether an enrollee meets specified health targets related to certain risk factors, such as meeting a target BMI or cholesterol level. As defined by this survey, goals related to smoking are not included in the biometric screening questions.

- Among firms offering health benefits, 21% of small firms and 52% of large firms provide workers the opportunity to complete a biometric screening [Figure 12.6]. These percentages are similar to 2016 (20% and 53%) [Figure 12.7].

- In firms providing workers the opportunity to complete a biometric screening, 41% of covered workers complete a screening [Figure 12.8].

  - There is considerable variation across firms in the percentage of workers who complete a biometric screening. Twenty-two percent of large firms providing workers the opportunity to complete a biometric screening report that more than 75% of their workers complete the screening, while 26% report no more than 25% of workers complete the screening.

- Firms that provide workers the opportunity to complete a biometric screening may include additional incentives for those workers who do so.

  - Among large firms with biometric screening programs, 53% offer workers an incentive to complete the screening [Figure 12.10]. The likelihood of a firm with a biometric screening program offering an incentive to complete a biometric screening increases with firm size [Figure 12.10]. Some firms report offering more than one type of incentive.

  - Among large firms with an incentive for workers to complete a biometric screening, 49% lower premium contributions or reduce cost sharing and 33% offer cash, HRA or HSA contributions, or allow the worker to avoid a payroll deduction. As with incentives for health risk assessments, workers in some firms must complete the biometric screening to be eligible for other rewards under the firm's wellness programs. [Figure 12.11].

- In addition to incentives for completing a biometric screening, some firms offer workers incentives to meet biometric outcomes. Among large firms with biometric screening programs, 14% reward or penalize workers based on achieving specified biometric outcomes (such as meeting a target BMI) [Figure 12.10].

  - The size of the incentives firms offer for meeting biometric outcomes varies considerably. Among large firms offering a reward or penalty for meeting biometric outcomes, the maximum reward is valued at $150 or less for 9% of firms and more than $1,000 for 17% of firms [Figure 12.12]. Twenty-three percent of these firms combine the reward with incentives for other activities.

667265

Exhibit 142     JA1644     JA-0002158

**Figure 12.6**

**Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Biometric Screening, by Firm Size, 2017**

|  | Percentage of Firms That Offer a Biometric Screening |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 19%* |
| 25-199 Workers | 27 |
| 200-999 Workers | 49* |
| 1,000-4,999 Workers | 63* |
| 5,000 or More Workers | 67* |
| **All Small Firms (3-199 Workers)** | 21%* |
| **All Large Firms (200 or More Workers)** | 52%* |
| **ALL FIRMS** | 22% |

NOTE: Biometric screening is a health examination that measures a person's risk factors for certain medical issues. Biometric outcomes could include meeting a target body mass index (BMI) or cholesterol level, but not goals related to smoking.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667266**

Exhibit 142
JA1645
JA-0002159

Case 2:25-cv-25550-WB Document 34-125 Page: 382 Date Filed: 12/12/2025 677

**Figure 12.7**

**Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Biometric Screening, by Firm Size, 2012-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Biometric screening is a health examination that measures a person's risk factors for certain medical issues. Biometric outcomes could include meeting a target body mass index (BMI) or cholesterol level, but not goals related to smoking.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012-2017

**Figure 12.8**

**Among Firms Providing Workers an Opportunity to Complete a Biometric Screening, Percentage of Workers That Complete the Screening, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667267

Exhibit 142     JA1646     JA-0002160

### Figure 12.9

**Among Large Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete Either a Biometric Screening or a Health Risk Assessment, by Region and Industry, 2017**

| | Health Risk Assessment | Biometric Screening |
|---|---|---|
| **REGION** | | |
| Northeast | 56% | 48% |
| Midwest | 66 | 55 |
| South | 63 | 54 |
| West | 65 | 50 |
| **INDUSTRY** | | |
| Agriculture/Mining/Construction | 43% | 32% |
| Manufacturing | 63 | 57 |
| Transportation/Communications/Utilities | 72 | 67 |
| Wholesale | 68 | 55 |
| Retail | 36* | 27* |
| Finance | 80* | 59 |
| Service | 58 | 50 |
| State/Local Government | 79* | 69* |
| Health Care | 64 | 51 |
| **All Large Firms (200 or More Workers)** | **62%** | **52%** |

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

### Figure 12.10

**Among Large Firms Offering Health Benefits and Providing an Opportunity to Complete a Biometric Screening, Percentage of Firms with Incentives to Complete the Screening, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667268

Case 1:25-cv-02550-WB   Document 34-125   Page 384   Date Filed 12/12/2025   677

**Figure 12.11**
**Among Large Firms Offering Workers an Incentive to Complete a Biometric Screening, Percentage of Firms with Various Types of Incentives, by Firm Size, 2017**



NOTE: Large Firms have 200 or more workers. HRA is a health reimbursement arrangement and HSA is a health savings account. For more information, see Section 8.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.12**
**Among Large Firms Offering Workers an Incentive to Meet Biometric Outcomes, Maximum Value of Incentive a Worker Can Receive for Achieving Outcomes, 2017**



NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667269**

Exhibit 142                                          JA1648                                          JA-0002162

Case 1:25-cv-25570-WRB   Document 34-125   Page: 385   06/30/2025   Page 121/2025 677

## ADMINISTRATION OF HEALTH SCREENING PROGRAMS

Among firms offering health benefits, 44% of small firms and 69% of large firms offer workers a health risk assessment, biometric screening or both screening programs. The scope and administration of screening programs vary considerably across firms, and some firms use different administrators for different programs.

- Among firms that offer a health screening program, an insurer or third-party administrator administers some health screening programs at 87% of firms. third party vendors, such as wellness providers, administer some screening programs at (29%) of firms, and the firm itself administers some health screening programs at (9%) of firms [Figure 12.13].

- Thirty-seven percent of large firms offering health benefits have an incentive for workers to complete biometric screening or a health risk assessment. Among large firms with an incentive for either health screening program, 34% have incentives for workers not enrolled in the health plan and 49% have incentives for spouses enrolled as dependents in the plan [Figure 12.14].

- Among firms offering health benefits, 8% of small firms and 14% of large firms collect information from workers' wearable devices, such as a Fitbit or Apple Watch, as part of their wellness or health promotion program [Figure 12.15].



**Figure 12.13**
**Among Firms That Offer a Health Screening Program, Who Administers the Program, by Firm Size 2017**

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)
NOTE: Among firms offering health benefits, 44% of small firms and 69% of large firms offer workers a health risk assessment, biometric screening or both screening programs. Screening programs include either a health risk assessment or a biometric screening. TPA refers to Third Party Administrator, which some employers contract with to manage self-funded health plans. Percentages do not add to 100% because some firms may have different types of administrators for different screening programs.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667270**

Exhibit 142          JA1649          JA-0002163



**Figure 12.14**
**Among Large Firms That Offer an Incentive for a Screening Program, Eligibility for Incentives or Penalties, 2017**



NOTE: Large Firms have 200 or more workers. Screening programs include either a health risk assessment or a biometric screening. Thirty-seven percent of large firms offering health benefits have an incentive for workers to complete either a biometric screening or a health risk assessment.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667271**

Exhibit 142                              JA1650                              JA-0002164

Case 1:17-cv-25550-WDB Document 34-125 Filed 02/24/2025 Page 387 of Date Filed: 12/12/2025 677

**Figure 12.15**

**Among Firms Offering Health Benefits, Percentage of Firms Whose Wellness Program Collects Information From Workers' Mobile Apps or Wearable Technologies, by Firm Size, 2017**

| | Percentage of Offering Firms Collecting Information From Workers' Mobile Apps or Wearable Technologies |
|---|---|
| **FIRM SIZE** | |
| 3-24 Workers | 9% |
| 25-199 Workers | 7 |
| 200-999 Workers | 11 |
| 1,000-4,999 Workers | 22* |
| 5,000 or More Workers | 29* |
| **All Small Firms (3-199 Workers)** | **8%** |
| **All Large Firms (200 or More Workers)** | **14%** |
| **ALL FIRMS** | **8%** |

NOTE: Wearable technologies could include Fitbits or Apple Watches.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## WELLNESS AND HEALTH PROMOTION PROGRAMS

Many firms and health plans offer programs to help workers engage in healthy lifestyles and reduce health risks. Wellness and health promotion programs may include exercise programs, health education classes, and stress-management counseling. These programs may be offered directly by the firm, an insurer, or a third-party contractor.

- Among firms offering health benefits, 40% of small firms and 72% of large firms offer programs to help workers stop smoking, 34% of small firms and 67% of large firms offer programs to help workers lose weight, and 47% of small firms and 72% of large firms offer some other lifestyle or behavioral coaching program. Fifty-eight percent of small firms and 85% of large firms offering health benefits offer at least one of these three programs [Figures 12.16 and 12.17].

- To encourage participation in wellness programs, firms may offer incentives to workers who participate in or complete wellness programs.

    - Thirty-two percent of large firms offering one of these wellness or health promotion programs offer an incentive to encourage workers to participate in or complete the programs [Figure 12.18]. Forty-six percent of firms with more than 5,000 workers offering one of these wellness or health promotion programs offer an incentive to participate in or complete the programs.

    - Among large firms offering incentives to workers to participate in or complete wellness or health promotion programs, 19% lower premium contributions or reduce cost sharing and 37% offer cash , HSA or HRA

**667272**

Exhibit 142     JA1651     JA-0002165

contributions, or allow the worker to avoid a payroll deduction [Figure 12.19].

- Firms with incentives for health risk assessments, biometric screening, or wellness or health promotion programs were asked to report the maximum reward or penalty a worker could earn for all of the firm's health promotion activities combined. Some firms do not offer incentives for individual activities, but offer rewards to workers who complete a variety of activities. Among large firms offering incentives for any of these programs, the maximum value for all wellness-related incentives is $150 or less in 25% of firms and more than $1,000 in 19% of firms [Figure 12.20].

- Firms with incentives for health risk assessments, biometric screening, or wellness or health promotion programs were also asked how effective they believed incentives were for encouraging participation. Thirty-four percent of large firms offering incentives for any one of these programs said the incentives are "very effective" at encouraging workers to participate and 58% said the incentives are "somewhat effective", while 7% said the incentives are "not at all effective" [Figure 12.21].

- Firms offering a health screening program or a wellness program use a variety of metrics to evaluate their health promotion programs, including participation, employee satisfaction, and return on investment [Figure 12.23].

**Figure 12.16**

**Among Firms Offering Health Benefits, Percentage of Firms Offering Specific Wellness Programs to Their Workers, by Firm Size and Region, 2017**

| | Programs to Help Workers Stop Smoking | Programs to Help Workers Lose Weight | Other Lifestyle or Behavioral Coaching | At Least One of These Programs |
|---|---|---|---|---|
| **FIRM SIZE** | | | | |
| 3-49 Workers | 39%* | 31%* | 45%* | 57%* |
| 50-199 Workers | 52 | 52* | 55 | 64 |
| 200-999 Workers | 70* | 64* | 70* | 84* |
| 1,000-4,999 Workers | 80* | 78* | 75* | 90* |
| 5,000 or More Workers | 90* | 79* | 85* | 96* |
| **All Small Firms (3-199 Workers)** | 40%* | 34%* | 47%* | 58%* |
| **All Large Firms (200 or More Workers)** | 72%* | 67%* | 72%* | 85%* |
| **REGION** | | | | |
| Northeast | 60%* | 52%* | 58% | 72% |
| Midwest | 31 | 3* | 44 | 54 |
| South | 33 | 28 | 43 | 55 |
| West | 44 | 32 | 47 | 55 |
| **ALL FIRMS** | 41% | 35% | 47% | 59% |

NOTE: 'Other Lifestyle or Behavioral Coaching' can include health education classes, stress management, or substance abuse counseling.

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667273

Exhibit 142

JA-0002166

**Figure 12.17**

**Among Firms Offering Health Benefits, Percentage of Firms Offering Specific Wellness Programs to Their Workers, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

NOTE: 'Other Lifestyle or Behavioral Coaching' can include health education classes, stress management, or substance abuse counseling.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---

**Figure 12.18**

**Among Firms Offering Specific Wellness Programs, Percentage of Firms That Offer Incentives to Workers Who Participate In or Complete Wellness Programs, by Firm Size, 2017**

|  | Incentives to Participate In or Complete Wellness Programs |
|---|---|
| **FIRM SIZE** |  |
| 200-999 Workers | 28%* |
| 1,000-4,999 Workers | 45* |
| 5,000 or More Workers | 46* |
| **All Small Firms (3-199 Workers)** | 11%* |
| **All Large Firms (200 or More Workers)** | 32%* |
| **ALL FIRMS** | 12% |

\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667274**

Exhibit 142                    JA1653                    JA-0002167

Case 1:25-cv-25750-WB  Document 34-125  Page: 390  Filed: 12/12/2025  Page 677

**Figure 12.19**
**Among Large Firms Offering Incentives to Workers Who Participate In or Complete Wellness Programs, Type of Incentive, 2017**



NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.20**
**Among Large Firms That Offer Workers an Incentive to Participate In or Complete Any Health Promotion Programs, Maximum Annual Value of the Incentive for All Programs Combined, 2017**



NOTE: Large Firms have 200 or more workers. Includes incentives for health risk assessments, biometric screenings, and wellness programs. Firms with at least one of the listed health promotion programs were asked to report the maximum incentive a worker and his/her dependents could receive for all of the firms health promotion programs combined. Forty-five percent of offering firms have an incentive to complete any of their health promotion programs.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 196

**667275**

Exhibit 142

Case 1:17-cv-02350-WUB Document 345-1 Page: 391 Date Filed: 12/12/2025 Page 2 of 677

**Figure 12.21**
**Among Large Offering Firms That Offer Workers an Incentive to Participate In or Complete Any Health Promotion Programs, Firms' Opinions on How Effective Incentives are for Employee Participation, by Firm Size, 2017**



Tests found no statistical difference for response choice from estimate for all other large firms
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.22**

Among Large Firms Offering Health Benefits, Percentage of Firms Offering Various Wellness and Health Promotion Activities and Incentives, by Firm Size, 2017

| | Firm Offers Health Risk Assessment | Incentive Offered for Completing Health Risk Assessment | Firm Offers Biometric Screening | Incentive Offered for Completing Biometric Screening | Incentive Offered for Meeting Biometric Outcomes | Firm Offers Specific Wellness Programs | Incentive Offered for Participating In or Completing Wellness Programs |
|---|---|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | | | |
| 200-999 Workers | 59%* | 28%* | 49%* | 24%* | 5%* | 84%* | 24%* |
| 1,000-4,999 Workers | 77* | 51* | 63* | 43* | 13* | 90 | 40* |
| 5,000 or More Workers | 78* | 54* | 67* | 50* | 16* | 96* | 44* |
| **All Large Firms (200 or More Workers)** | 62% | 32% | 52% | 28% | 7% | 85% | 27% |

NOTE: Specific Wellness Programs include Programs to Help Workers Stop Smoking, Programs to Help Workers Lose Weight, or Other Lifestyle or Behavioral Coaching

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667276



**Figure 12.23**
**Among Firms Offering An Incentive for Health Screening or Wellness Programs, Percentage of Firms Using Various Methods to Evaluate Programs, by Firm Size, 2017**

Tests: found no statistical difference between All Small Firms and All Large Firms estimate (p < .05).
NOTE: Includes firms who have an incentive for a health risk assessment, biometric screening, or to participate in a wellness or health promotion program
SOURCE: Kaiser/HRET Survey of Employer Sponsored Health Benefits, 2017

## DISEASE MANAGEMENT

Disease management programs aim to improve health and reduce costs for enrollees with chronic illnesses by educating them about their disease and suggesting treatment options. These programs can help enrollees with conditions such as diabetes, asthma, hypertension, and high cholesterol.

- Forty-one percent of firms that offer health benefits offer disease management programs. Large firms are more likely than small firms to offer disease management programs (68% vs. 40%) [Figure 12.24].

- Nine percent of large firms that offer disease management programs offer incentives for workers to participate in or complete the programs. This percentage is highest among firms with 5,000 or more workers (26%) [Figure 12.26].

**667277**

Exhibit 142                    JA1656                    JA-0002170

Case 1:7-25-25750-WB Document 34-125 Page: 398 0 Date Filed: 12/41/2025 677

**Figure 12.24**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer Disease Management Programs, by Firm Size, Region and Industry, 2017**

|  | Percentage of Firms Offering Disease Management Programs |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 39% |
| 25-199 Workers | 40 |
| 200-999 Workers | 66* |
| 1,000-4,999 Workers | 76* |
| 5,000 or More Workers | 82* |
| **All Small Firms (3-199 Workers)** | **40%*** |
| **All Large Firms (200 or More Workers)** | **68%*** |
| **REGION** |  |
| Northeast | 61%* |
| Midwest | 29 |
| South | 40 |
| West | 34 |
| **INDUSTRY** |  |
| Agriculture/Mining/Construction | 28% |
| Manufacturing | 60 |
| Transportation/Communications/Utilities | 14* |
| Wholesale | 15* |
| Retail | 32 |
| Finance | 35 |
| Service | 44 |
| State/Local Government | 36 |
| Health Care | 63* |
| **ALL FIRMS** | **41%** |

NOTE: Disease management programs try to improve health and reduce costs for enrollees with chronic illness such as diabetes, asthma, hypertension, and high cholesterol by teaching patients about their disease and suggesting treatment options.

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667278**

Exhibit 142    JA1657    JA-0002171

Case 1:17-cv-02573-WBS Document 34-1 25 Page: 394 0 D/30/20 Filed: 12/12/2025 677

**Figure 12.25**
**Among Firms Offering Health Benefits, Percentage of Firms That Offer Disease Management Programs, by Firm Size, 2006-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Disease management programs try to improve health and reduce costs for enrollees with chronic illness such as diabetes, asthma, hypertension, and high cholesterol by teaching patients about their disease and suggesting treatment options.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017.

**Figure 12.26**
**Among Large Firms Offering Disease Management Programs, Percentage of Firms That Offer Incentives to Workers Who Participate In or Complete Programs, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
NOTE: Disease management programs try to improve health and reduce costs for enrollees with chronic illness such as diabetes, asthma, hypertension, and high cholesterol by teaching patients about their disease and suggesting treatment options.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017.

The Kaiser Family Foundation and Health Research & Educational Trust / Page 200

**667279**

Exhibit 142                     JA1658                     JA-0002172

## PENALTIES FOR TOBACCO USE

- Among firms offering health benefits, 16% of small firms and 14% of large firms, including 49% of firms with 5,000 or more workers, require higher premium contributions or cost sharing from workers who use tobacco [Figure 12.27]. Some firms noted that not smoking is a condition of employment.

- Among firms with higher costs for workers who use tobacco, virtually all firms rely on self-reporting, including through a health risk assessment, to determine whether a worker uses tobacco [Figure 12.28].

- Among large firms with higher costs for workers who use tobacco, 56% indicate that dependents also have higher premium contributions or cost sharing if they use tobacco [Figure 12.29].

**Figure 12.27**
**Among Firms Offering Health Benefits, Percentage That Require Workers Who Use Tobacco to Contribute More to the Premium or Cost Sharing, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)
NOTE: 1.96% of firms offering health benefits self-reported that not smoking is a condition of employment
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667280**

Exhibit 142                JA1659                JA-0002173

Case 1:25-cv-05750-WDB   Document 34-1253   Page: 396   Filed: 02/20/2025   Page 677

**Figure 12.28**
**Among Firms With Higher Costs for Workers Who Use Tobacco, Percentage of Firms Using Various Methods to Determine Tobacco Use, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .03)
NOTE: Higher costs may include higher cost sharing or higher premium contributions
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.29**
**Among Large Firms With Higher Costs for Workers Who Use Tobacco, Percentage of Firms with Higher Premium Contributions or Cost Sharing for Spouses or Dependents Who Use Tobacco, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 202

**667281**

Exhibit 142     JA1660     JA-0002174



EMPLOYER HEALTH BENEFITS

2017 ANNUAL SURVEY

# Grandfathered Health Plans

SECTION

13

667282

# Section 13

# Grandfathered Health Plans

The Affordable Care Act (ACA) exempts certain health plans that were in effect when the law was passed, referred to as grandfathered plans, from some standards in the law, including the requirement to cover preventive benefits without cost sharing, have an external appeals process, or comply with the new benefit and rating provisions in the small group market. In 2017, 23% of firms offering health benefits offer at least one grandfathered health plan, and 17% of covered workers are enrolled in a grandfathered plan.

As in years past, some firms had difficulty with the details of the term "grandfathering", as described in the provisions of the ACA. We would note that smaller firms in particular appeared to have some confusion about whether or not they are grandfathered. Many smaller firms, even those offering a health plan in effect in March 2010 (when the ACA was enacted), were unsure about whether their plan was grandfathered.

- Twenty-three percent of offering firms report having at least one grandfathered plan in 2017, unchanged from 23% in 2016 [Figure 13.1].

- Seventeen percent of covered workers are enrolled in a grandfathered health plan in 2017 [Figure 13.2].

  - The percentage of covered workers enrolled in a grandfathered plan is lower than 2016 (23%), continuing a decline from 26% in 2014, 36% in 2013, and 48% in 2012 [Figure 13.3].

**667283**

Exhibit 142

JA1662

JA-0002176

Case: 25-2550-WD Document: 34-12 Page: 399 Date Filed: 12/22/2025 677

**Figure 13.1**

**Percentage of Firms With at Least One Plan Grandfathered Under the Affordable Care Act (ACA), by Size and Region, 2017**

|  | Percentage of Firms With at Least One Grandfathered Plan |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 23% |
| 25-49 Workers | 22 |
| 50-199 Workers | 20 |
| 200-999 Workers | 26 |
| 1,000-4,999 Workers | 17 |
| 5,000 or More Workers | 15 |
| **All Small Firms (3-199 Workers)** | **23%** |
| **All Large Firms (200 or More Workers)** | **24%** |
| **REGION** |  |
| Northeast | 17% |
| Midwest | 29 |
| South | 21 |
| West | 25 |
| **ALL FIRMS** | **23%** |

NOTE: For definitions of grandfathered health plans, see the introduction to Section 13.

Tests found no statistical difference from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667284**

Exhibit 142     JA1663     JA-0002177

Case 1:25-cv-05750-WMR Document 34-1 253 Page: 400 0f Date/Filed:12/22/2025 677

**Figure 13.2**

**Percentage of Covered Workers Enrolled In Plans Grandfathered Under the Affordable Care Act (ACA), by Size, Region, and Industry, 2017**

|  | Percentage of Covered Workers Enrolled In a Grandfathered Health Plan |
|---|---|
| **FIRM SIZE** | |
| 3-24 Workers | 26% |
| 25-49 Workers | 21 |
| 50-199 Workers | 16 |
| 200-999 Workers | 27* |
| 1,000-4,999 Workers | 15 |
| 5,000 or More Workers | 13* |
| **All Small Firms (3-199 Workers)** | **20%** |
| **All Large Firms (200 or More Workers)** | **16%** |
| **REGION** | |
| Northeast | 12% |
| Midwest | 18 |
| South | 18 |
| West | 19 |
| **INDUSTRY** | |
| Agriculture/Mining/Construction | 24% |
| Manufacturing | 11* |
| Transportation/Communications/Utilities | 27 |
| Wholesale | 15 |
| Retail | 10* |
| Finance | 12 |
| Service | 18 |
| State/Local Government | 23 |
| Health Care | 17 |
| **ALL FIRMS** | **17%** |

NOTE: For definitions of grandfathered health plans, see the introduction to Section 13. Nine percent of respondents indicated they did not know if their firm's plan was grandfathered.

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667285**

Exhibit 142

Case: 25-25550-WB Document 34-1 25 Page: 401 Date Filed: 12/12/2025 677

**Figure 13.3**

**Percentage of Covered Workers Enrolled in Plans Grandfathered Under the Affordable Care Act (ACA), by Firm Size , 2011-2017**

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | | | |
| 3-24 Workers | 69% | 57% | 53% | 36%* | 39% | 20%* | 26% |
| 25-49 Workers | 52 | 45 | 52 | 40 | 42 | 24* | 2* |
| 50-199 Workers | 63 | 55 | 44 | 31* | 26 | 26 | 16* |
| 200-999 Workers | 61 | 60 | 42* | 33 | 26 | 29 | 27 |
| 1,000-4,999 Workers | 54 | 41* | 34 | 21* | 20 | 17 | 15 |
| 5,000 or More Workers | 49 | 42 | 23* | 18 | 20 | 22 | 13 |
| **All Small Firms (3-199 Workers)** | 63% | 54%* | 49% | 35%* | 34% | 24%* | 20% |
| **All Large Firms (200 or More Workers)** | 53% | 46% | 30%* | 22%* | 22% | 22% | 16% |
| **ALL FIRMS** | 56% | 48%* | 36%* | 26%* | 25% | 23% | 17%* |

NOTE: For definitions of grandfathered health plans, see the introduction to Section 13.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017



**Figure 13.4**

**Percentage of Covered Workers Enrolled in Plans Grandfathered Under the Affordable Care Act (ACA), by Firm Size, 2011-2017**

* Estimate is statistically different from estimate from the previous year shown (p < .05).
NOTE: For definitions of grandfathered health plans, see the introduction to Section 13.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017

**Grandfathered Plans** In the employer-sponsored market, health plans that were in place when the ACA was enacted (March 2010) can be grandfathered health plans. Department of Health and Human Services (HHS) rules stipulate that firms cannot significantly change cost sharing, benefits, employer contributions, or access to coverage in grandfathered plans. New employees can enroll in a grandfathered plan as long as the firm has maintained consecutive enrollment in the

**667286**

Exhibit 142

JA-0002179

plan. Grandfathered plans are exempted from many, but not all, of the ACA's consumer protection provisions.

667287

Exhibit 142

JA1666

JA-0002180



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# Employer Practices and Health Plan Networks

SECTION

**14**

667288

Case 1:7-25-25750-WB3cuDoentu3e4-1253Pa0e: 404e 0D3te/20ile/d:Pfa4e222025 677

# Section 14

# Employer Practices and Health Plan Networks

Employers play a significant role in financing and arranging for health care and health insurance coverage, so their experiences are important factors in health policy discussions. In recent years, employers have included new providers and sites of care, such as retail clinics, and some have pursued changes to their networks to reduce costs or improve quality. There also has been considerable interest in private health exchanges, which could provide firms and workers with a wider array of health plan choices, although thus far enrollment has been low.

## SHOPPING FOR HEALTH COVERAGE

Fifty-nine percent of firms offering health benefits reported shopping for a new health plan or a new insurance carrier in the past year, similar to the percentage last year. Small firms (3-199 workers) were more likely to shop for coverage (59%), and firms with 1,000-4,999 workers and firms with 5,000 or more workers were less likely to shop for coverage (36% and 24%, respectively) than firms in other size categories [Figure 14.1].

- Among firms that offer health benefits and who shopped for a new plan or carrier in the past year, 28% changed insurance carriers [Figure 14.2].

- Eighty-eight percent of firms offering health benefits used a broker or consultant to assist in choosing a health plan [Figure 14.3].

**667289**

Exhibit 142       JA1668       JA-0002182

Case 1:25-cv-05750-WB Document 34-1 253 Page: 405 0f/30/25 Filed: 12/22/2025 677

**Figure 14.1**
**Percentage of Firms Offering Health Benefits That Shopped For a New Plan or Health Insurance Carrier in the Past Year, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.2**
**Among Firms Offering Health Benefits That Shopped for a New Plan or Insurance Carrier, Percentage of Firms That Changed Insurance Carriers in the Past Year, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667290**

Exhibit 142                    JA1669                    JA-0002183

Case 7-25-25550-WD  Document 84-1 25 Page: 406  Date Filed: 12/22/2025 677

**Figure 14.3**

**Among Firms Offering Health Benefits, Percentage of Firms That Use a Broker or Consultant to Assist In Choosing a Health Plan, by Firm Size, 2007, 2013, and 2017**

|  | 2007 | 2013 | 2017 |
|---|---|---|---|
| **FIRM SIZE** | | | |
| All Small Firms (3-199 Workers) | 68% | 82%* | 87% |
| All Large Firms (200 or More Workers) | 82% | 90%* | 91% |
| **ALL FIRMS** | 68% | 82%* | 88% |

* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007, 2013, and 2017

## PROVIDER NETWORKS

Firms and health plans can structure their networks of providers and their cost sharing to encourage enrollees to use providers who are lower cost or who provide better care. A tiered or high-performance network groups providers in the network based on the cost, quality and/or efficiency of the care they deliver. These networks encourage enrollees to visit preferred doctors by either restricting networks to efficient providers, or by having different cost sharing requirements based on the provider's tier.

- Twelve percent of firms with 50 or more workers that offer health benefits include a high-performance or tiered provider network in their health plan with the largest enrollment, a similar percentage to last year [Figures 14.6 and 14.7].

- Firms with 1,000-4,999 workers (23%) and firms with 5,000 or more workers (31%) are more likely to incorporate a high-performance or tiered network into their largest plan [Figure 14.6].

- Eight percent of firms offering health benefits report that they offer a plan that they considered to be a narrow network plan, similar to the percentage reported last year [Figures 14.4]. Narrow network plans limit the number of providers who can participate in order to reduce costs. Narrow network plans are generally more restrictive than standard HMO networks.

    - Firms with 5,000 or more workers offering health benefits are more likely to offer at least one plan with a narrow network than firms of other sizes [Figure 14.4].

- Six percent of firms offering health benefits said that either they or their insurer eliminated a hospital or health system from a provider network in order to reduce the plan's cost during the last year [Figure 14.4].

**667291**

Exhibit 142                                    JA1670                                    JA-0002184


**Figure 14.4**

**Among Firms Offering Health Benefits, Percentage of Firms That Eliminated Hospitals From Their Network or Offer a Narrow Network Plan, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.5**

**Among Firms With 50 or More Workers Offering Health Benefits, Percentage of Firms That Eliminated Hospitals From Their Network or Offer a Narrow Network Plan, by Firm Size, 2014-2017**

| | Firm Offers a Plan Considered a Narrow Network Plan | | | | Firm Insurer Eliminated a Hospital or Health System from Network to Reduce Cost | | | |
|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2014 | 2015 | 2016 | 2017 |
| **FIRM SIZE** | | | | | | | | |
| All Small Firms (50-199 Workers) | 8% | 6% | 6% | 8% | 6% | 4% | 4% | 4% |
| All Large Firms (200 or More Workers) | 8% | 5% | 6% | 8% | 6% | 5% | 5% | 3% |
| **ALL FIRMS (50 or More Workers)** | 8% | 6% | 6% | 8% | 6% | 5% | 4% | 4% |

NOTE: This question was asked of offering firms with 50 or more workers in 2014 and has since been asked of all offering firms regardless of firm size. In 2017, 6% of all offering firms eliminated a hospital or health system from their network and 8% of all offering firms offers a plan that could be considered a narrow network plan.

Tests found no statistical difference from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2014-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 213

**667292**

Exhibit 142

JA1671

JA-0002185

**Figure 14.6**

**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Largest Plan Includes a High-Performance or Tiered Provider Network, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

NOTE: A high-performance network is one that groups providers within the network based on quality, cost, and/or the efficiency of care they deliver.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.7**

**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Largest Plan Includes a High-Performance or Tiered Provider Network, by Firm Size, 2007-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: A high-performance network is one that groups providers within the network based on quality, cost, and/or the efficiency of care they deliver.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**667293**

Exhibit 142                    JA1672                    JA-0002186

# ALTERNATIVE CARE SETTINGS: TELEMEDICINE AND RETAIL CLINICS

Firms and health plans are incorporating new sites and methods of care in order to improve convenience and potentially reduce costs.

- Fifty-three percent of firms with 50 or more workers who offer health benefits cover the provision of some health care services through telemedicine in their largest health plan [Figure 14.8]. Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location, including video chat and remote monitoring. This would not include the mere exchange of information via email, exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition. Larger firms are more likely to cover services provided through telemedicine than smaller firms [Figure 14.8].

  - Among firms with 50 or more workers whose plans cover health services through telemedicine, 26% provide a financial incentive for workers to use telemedicine instead of visiting a traditional physician's office in-person [Figure 14.9].

  - The percentage of large firms reporting that they cover services through telemedicine rose significantly in the last year, from 39% last year to 63% this year [Figure 14.10]. We note that we made a small change to the survey question, which could account for some of that change. This is a significant increase in one year, and we will examine this next year to see if the higher prevalence persists.

- Seventy-five percent of firms that offer health benefits cover care received in retail clinics, such as those located in pharmacies, supermarkets and retail stores, in their largest health plan [Figure 14.11]. These clinics are often staffed by nurse practitioners or physician assistants and treat minor illnesses and provide preventive services.

  - The percentage of firms covering care received in retail clinics in their largest health plan increased in the last year [Figure 14.12].

  - Fifteen percent of firms that cover care at retail clinics provide a financial incentive for workers to visit a retail clinic instead of a traditional physician's office [Figure 14.11].

- Seventy-three percent of firms that offer health benefits include a nurse hotline in their largest health plan. This is a significant increase from 55% in 2013 [Figure 14.13].

**667294**

Exhibit 142

JA1673

JA-0002187

Case 1:7-25-2550-WB Document 34-125 Page: 410 DFiled Date Filed: 12/12/2025 677

**Figure 14.8**

**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Plan with the Largest Enrollment Covers Telemedicine, by Firm Size, 2017**



* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)
NOTE: Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location, including video chat and remote monitoring. This would not include the mere exchange of information via email exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---

**Figure 14.9**

**Among Firms With 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Plan with the Largest Enrollment Covers Telemedicine and That Have an Incentive for Using Telemedicine, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location, including video chat and remote monitoring. This would not include the mere exchange of information via email exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667295**

Exhibit 142                                    JA1674                                    JA-0002188

**Figure 14.10**

**Among Large Firms Offering Health Benefits, Percentage of Firms Whose Plan with the Largest Enrollment Covers Telemedicine, 2015-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Large Firms have 200 or more workers. Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location, including video chat and remote monitoring. This would not include the mere exchange of information via email exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition. There was a minor change in the survey question about telemedicine between 2016 and 2017.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2015-2017

**Figure 14.11**

**Among Firms Offering Health Benefits, Percentage of Firms Whose Plan With the Largest Enrollment Covers Care at Retail Clinics and That Have an Incentive to Visit Retail Clinics, by Firm Size, 2017**

| | Percentage of Firms That Cover Care Received at Retail Clinics | Among Firms That Cover Care Received at Retail Clinics, Percentage That Offer Financial Incentives to Visit a Retail Clinic Instead of a Traditional Physician's Office |
|---|---|---|
| **FIRM SIZE** | | |
| 200-999 Workers | 73% | 17% |
| 1,000-4,999 Workers | 75 | 18 |
| 5,000 or More Workers | 72 | 27* |
| **All Small Firms (3-199 Workers)** | 75% | 15% |
| **All Large Firms (200 or More Workers)** | 73% | 17% |
| **ALL FIRMS** | 75% | 15% |

NOTE: A retail clinic is a health care clinic located in retail stores, supermarkets, and pharmacies that treats minor illnesses and provides preventive health care services, such as flu shots.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667296**

Exhibit 142
JA1675
JA-0002189

### Figure 14.12
### Among Firms Offering Health Benefits, Percentage of Firms Whose Plan With the Largest Enrollment Covers Care at Retail Clinics and That Have an Incentive to Visit Retail Clinics, by Firm Size, 2010-2017

| | Percentage of Firms That Cover Care Received at Retail Clinics | | | Among Firms that Cover Care Received at Retail Clinics, Percentage That Offer Financial Incentives | | |
|---|---|---|---|---|---|---|
| | All Small Firms | All Large Firms | All Firms | All Small Firms | All Large Firms | All Firms |
| 2010 | 43% | 47% | 43% | 4% | 16% | 5% |
| 2013 | 56%* | 61%* | 56%* | 17%* | 13% | 17%* |
| 2014 | 56% | 67% | 57% | 8% | 14% | 8% |
| 2016 | 60% | 73% | 61% | 6% | 10% | 6% |
| 2017 | 75%* | 73% | 75%* | 15% | 17%* | 15%* |

NOTE. Small Firms have 3-199 workers and Large Firms have 200 or more workers. A retail clinic is a health care clinic located in a retail store, supermarket, or pharmacy that treats minor illnesses and provides preventive health care services such as flu shots. Financial incentives include lower cost sharing for care received at retail clinics instead of traditional physician offices

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE. Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2010-2017

### Figure 14.13

### Among Firms Offering Health Benefits, Percentage of Firms Whose Plan With the Largest Enrollment Includes a Nurse Hotline, by Firm Size, 2013 and 2017

| | 2013 | 2017 |
|---|---|---|
| **FIRM SIZE** | | |
| 3-24 Workers* | 49% | 74% |
| 25-199 Workers | 70% | 71% |
| 200-999 Workers* | 71% | 79% |
| 1,000-4,999 Workers | 84% | 81% |
| 5,000 or More Workers | 85% | 82% |
| **All Small Firms (3-199 Workers)*** | 54% | 73% |
| **All Large Firms (200 or More Workers)** | 74% | 79% |
| **ALL FIRMS*** | 55% | 73% |

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2013 and 2017

Case 1:7-25-25550-WD  Document 34-125 Page: 413  Filed 08/20/2025 Page 22:025 677

**Figure 14.14**

**Among Firms Offering Health Benefits, Percentage of Firms Whose Largest Plan Has Various Features, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

NOTE: For Coverage at Retail Clinics, Delivery of Care Through Telemedicine, High Performance or Tiered Provider Network, and Nurse Hotline, firms were asked if their plan with the largest enrollment had these features. The High Performance or Tiered Provider Network question was asked of firms with 50 or more workers.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## PRIVATE EXCHANGES AND DEFINED CONTRIBUTIONS

A private exchange is a virtual market that allows employers to provide their workers with a choice of several different health benefit options, often including supplemental or ancillary benefits options. Private exchanges generally are created by consulting firms, insurers, or brokers, and are different than the public exchanges run by the states or the federal government. There is considerable variation in the types of exchanges currently offered: some exchanges allow workers to choose between multiple plans offered by the same carrier while in other cases multiple carriers participate. The exchange operator may establish standards for the plans offered and may negotiate with insurers over the price and services provided. Although there has been considerable attention to the potential of private exchanges to change the market for employer-based coverage, participation thus far has been quite modest.

- Four percent of firms offering health benefits with 50 or more workers offer coverage through a private exchange. These firms provide coverage to 2% of covered workers in firms with 50 or more workers [Figure 14.16]. These percentages are the same as those in 2016.

- Firms offering health benefits with 50 or more workers that do not already offer health benefits through a private exchange were asked whether they had considered offering coverage through a private exchange. Ten percent of these firms are considering such an approach, lower than the percentage last year (18%) [Figure 14.15].

Some firms use a defined contribution approach to contribute toward the cost of health insurance. A defined contribution is a set dollar amount offered to the worker by the employer. Workers may then select one of several plans, paying the difference between the defined contribution and the cost of their chosen health insurance plan. This allows a firm to offer a larger variety of health plans to workers and to structure contributions or other rules to encourage workers to choose more efficient plans. Some private exchanges encourage employers to use a defined contribution approach to encourage competition among the participating insurers.

- Firms offering health benefits with 50 or more workers and that do not already offer benefits through a private

**667298**

Exhibit 142                                    JA1677                                    JA-0002191

exchange were asked whether they had considered using a defined contribution approach. Nineteen percent of these firms were considering such an approach [Figure 14.15].

**Figure 14.15**

**Among Firms With 50 or More Workers Offering Health Benefits, Percentage Considering Offering Benefits Through a Private Exchange or Using a Defined Contribution Approach, by Firm Size and Region, 2017**

| | Private Exchange | | | Defined Contribution | | |
|---|---|---|---|---|---|---|
| | Have Considered Offering Benefits Through a Private Exchange | Have Not Considered Offering Benefits Through a Private Exchange | Don't Know | Have Considered Using a Defined Contribution Approach | Have Not Considered Using a Defined Contribution Approach | Don't Know |
| **FIRM SIZE** | | | | | | |
| 200-999 Workers | 13% | 85% | 2%* | 7%* | 81%* | 2% |
| 1,000-4,999 Workers | 12 | 87 | 1 | 18 | 81 | * |
| 5,000 or More Workers | 22* | 76* | 2 | 22 | 76 | 3 |
| **All Small Firms (50-199 Workers)** | 9% | 90% | <1%* | 19% | 77% | 4% |
| **All Large Firms (200 or More Workers)** | 13% | 85% | 2%* | 18% | 80% | 2% |
| **REGION** | | | | | | |
| Northeast | 17% | 83% | 1% | 24% | 74% | 1% |
| Midwest | 9 | 90 | 1 | 25 | 69 | 6 |
| South | 7 | 92 | <1 | 18 | 82 | <1* |
| West | 9 | 90 | <1 | 7* | 85 | 7 |
| **ALL FIRMS (50 or More Workers)** | 10% | 89% | 1% | 19% | 78% | 3% |

NOTE: These questions were not asked of firms that already offer health benefits through a private exchange. In 2017, 4% of offering firms with 50 or more workers offered coverage through a private exchange. A private exchange is one created by a consulting company, not by a federal or state government. Private exchanges allow employees to choose from several health benefit options offered on the exchange. A defined premium contribution is a set dollar amount offered to the employee. Employees may then select one of several plans and pay the difference between the defined contribution and the cost of the health insurance option they choose.

* Estimate is statistically different from estimate within response option for all other firms not in the indicated size or region category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017



**Figure 14.16**

**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Covered Workers Enrolled at a Firm That Offers Benefits Through a Private or Corporate Exchange, by Firm Size, 2017**

| 50-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | ALL FIRMS (50 or More Workers) |
|---|---|---|---|---|
| 5% | 1% | 1% | 2% | 2% |

NOTE: A private exchange is one created by a consulting company, not by a federal or state government. Private exchanges allow employees to choose from several health benefit options offered on the exchange. In 2017, 4% of offering firms with 50 or more workers offered coverage through a private exchange.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667299

Exhibit 142
JA1678
JA-0002192

## ASSOCIATION HEALTH PLANS AND MEDICAID

- An association health plan is an organization of employers that coordinates coverage in order to reduce costs or improve benefits. Six percent of offering firms with fewer than 250 workers offer health benefits through a trade or professional association health plan [Figure 14.17].

- A substantial share of firms that offer health benefits report having workers who receive coverage from Medicaid. Medicaid is a federally and state-funded program that provides health coverage for people who are poor, aged or disabled. Twenty percent of small firms and 48% of large firms report that they have workers covered by Medicaid. We note that, as expected, there is a significant share of firms, particularly larger firms, that do not know the answer to this question [Figure 14.18].

**Figure 14.17**
**Among Firms with Fewer Than 250 Workers Offering Health Benefits, Percentage of Firms Offering Benefits Through an Association Health Plan, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.18**

**Percentage of All Firms Stating That Some Workers Receive Coverage Through Medicaid, by Firm Size, 2017**

| | All Firms | | | Offering Firms | | | Non-Offering Firms | | |
|---|---|---|---|---|---|---|---|---|---|
| | Yes | No | Don't Know | Yes | No | Don't Know | Yes | No | Don't Know |
| **FIRM SIZE** | | | | | | | | | |
| 3-24 Workers | 15% | 66%* | 18% | 18% | 74% | 8% | 15%* | 61%* | 23%* |
| 25-199 Workers | 27 | 47% | 26 | 25 | 54* | 21* | 38* | 61* | 4% |
| 200-999 Workers | 48 | 34* | 19 | 48* | 34 | 19* | NSD | NSD | NSD |
| 1,000-4,999 Workers | 47 | 23* | 31 | 47* | 23* | 30 | NSD | NSD | NSD |
| 5,000 or More Workers | 48* | 20* | 32* | 48 | 20* | 32* | NSD | NSD | NSD |
| All Small Firms (3-199 Workers) | 17%* | 65%* | 20% | 20%* | 68%* | 12%* | 14%* | 59% | 26% |
| All Large Firms (200 or More Workers) | 48%* | 32%* | 21% | 48%* | 31%* | 21%* | NSD | NSD | NSD |
| **ALL FIRMS** | 17% | 65% | 20% | 21% | 67% | 12% | 14% | 59% | 26% |

* NZD, NSD: Not Sufficient Data
* Estimate is statistically different from estimate for all other firms not in the indicated size category. (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667300**



-and-



The Henry J. Kaiser Family Foundation

Headquarters
2400 Sand Hill Road
Menlo Park, CA 94025
Phone 650-854-9400

Washington Offices and
Barbara Jordan Conference Center
1330 G Street, NW
Washington, DC 20005
Phone 202-347-5270

**www.kff.org**

Health Research & Educational Trust

155 North Wacker
Suite 400
Chicago, IL 60606
Phone 312-422-2600   Fax 312-422-4568

**www.hret.org**

This publication (#9060) is available on the Kaiser Family Foundation's website at www.kff.org.

September 2017

**667301**

Exhibit 142          JA1680          JA-0002194

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

     *Plaintiff,*

    v.

DONALD J. TRUMP, *et al.*

     *Defendants,*

LITTLE SISTERS OF THE POOR
SAINTS PETER AND PAUL HOME,

     *Proposed Defendant-Intervenors*

Civil No. 2:17-CV-4540

**DECLARATION OF MOTHER
SUPERIOR MARIE
VINCENTE**

I. Mother Superior Marie Vincente, hereby declare as follows:

1.   I am over the age of 21 and am capable of making this declaration pursuant to 28 U.S.C. § 1746. I have not been convicted of a felony or crime involving dishonesty. I make this declaration based on my personal knowledge and experience of the Little Sisters, our organization, our ministry, and our religious beliefs and practices. My statements about the history of the Little Sisters, the scope of our ministry internationally, and the founding dates of our homes are drawn from organizational and historical documents that I believe to be correct.

2.   I am the Mother Superior of the Saints Peter and Paul Home of the Little Sisters of the Poor in Pittsburgh, Pennsylvania.

3.   I have been a Little Sister for 63 years, and have served as the Mother Superior of the Saints Peter and Paul Home for over 12 years.

## I.  History, Organization, and Structure of the Little Sisters of the Poor

4.   The Little Sisters of the Poor is an international Roman Catholic Congregation of Sisters that has provided loving care to needy elderly persons of any race, sex, or religion for over 175 years.

5.   The Little Sisters of the Poor were founded in France, in the winter of 1839, when St. Jeanne Jugan carried a blind elderly woman off the streets and into her home and laid the woman in her own bed.  Over time, other women joined St. Jeanne in a religious ministry designed to protect and care for the elderly poor.

6.   By the time St. Jeanne died forty years later, the Little Sisters of the Poor had established homes in eight countries, including the United States, where the first home was founded in 1868 in Brooklyn, New York.

7.   Today, there are Little Sisters homes in over thirty countries around the world serving over 13,000 poor elderly people.

8.   The Little Sisters of the Poor have founded and operate over twenty-five homes in the United States, which are located in twenty states and the District of Columbia. These homes are hosted by over 300 Little Sisters of various nationalities.

9.   All Little Sisters homes share the same fidelity to the Catholic beliefs. Every home is operated under the control of the Little Sisters, and every Little Sister takes a vow of obedience to God, which assumes obedience to the Pope, the Church's teaching, and the authority of the Church in her hierarchy.

10.  While Catholic and committed to following Church teaching, the Little Sisters' homes are not under the civil legal ownership and control of the dioceses in

1

Exhibit 146

JA-0002285

which they are located. Instead, the Little Sisters of the Poor own and control the homes ourselves, through local corporations that are entirely within the civil legal control of the Little Sisters.

11. The Little Sisters' homes are not directly funded by the dioceses in which we are located. Instead, we take responsibility for funding our own operations. For most homes, about half of the budget comes from voluntary gifts, largely in response to the begging for funds and gifts in kind that the Little Sisters do to support our ministry.

## II. Little Sisters of the Poor Pittsburgh

12. The Saints Peter and Paul Home of the Little Sisters of the Poor in Pittsburgh ("Little Sisters Pittsburgh"), is a Pennsylvania non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 ("the Code"). The Pittsburgh home is under my direct authority as Mother Superior.

13. Little Sisters Pittsburgh currently employs about 67 full-time employees.

14. Little Sisters Pittsburgh have adopted the Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust") to provide medical benefits coverage for their employees.

15. It is my understanding that Christian Brothers Trust is a Catholic entity designed to serve the Catholic Church and related faith-based entities. It is my understanding that, like the Little Sisters, the Christian Brothers Trust operates in a manner consistent with our mutual Catholic beliefs. One of the reasons the Little Sisters chose to use the Christian Brothers Trust for our health benefits is because it

2

Exhibit 146

JA-0002286

shares and is administered in accordance with our religious beliefs and provide benefits accordingly.

### III. Religious Beliefs and Commitments of the Little Sisters of the Poor

16.   Jesus taught that "in so far as you did it to the least of these brothers of mine, you did it to me." *See* Matthew 25:34. This teaching is a fundamental part of who the Little Sisters are. St. Jeanne urged her fellow Little Sisters, "Never forget that the poor are Our Lord; in caring for the poor say to yourself: This is for my Jesus—what a great grace!" Thus, each Little Sister makes a vow of Hospitality, through which she promises to care for the aged as if they were Christ himself.

17.   As Little Sisters, we strive to witness to the value of the elderly by believing in their inviolable dignity. by recognizing their unique contributions to the Church and society, and by involving them in the activities of our Homes to develop their human potential.

18.   Caring for the dying is the summit of the Little Sisters' service to the elderly poor. The Little Sisters maintain a constant presence with those who have entered the dying process and their families. We try to relieve their sufferings as much as possible, which includes giving emotional and prayerful support. Our provision of spiritual support is always consistent with the faith of the person we are serving; we do not force religious observance on anyone.

19.   Because the Little Sisters care for those who are weak and dying, we strive to emphasize our respect for the uniqueness and dignity of each elderly person as they reach the end of their life. We offer this respect for two reasons. First, to treat

3

Exhibit 146                    JA1684                    JA-0002287

the individual with the dignity they are due as a person loved and created by God, with the same respect and compassion as if he or she was Jesus Christ. Second, to convey a public witness of respect for life, in the hope that we can help build a Culture of Life in our society.

20. We care for the elderly poor of all races and religions, or of no religion at all. We do not care for people because they are Catholic, but because we are Catholic.

21. We also hire employees of all races and religions, or of no religion at all. Because staff members are an important extension of our ministry to the elderly, they must support the Little Sisters' mission by welcoming the elderly poor, helping to make them happy and caring for them with respect or dignity until death. Failure to do so is one of the relatively few explicit grounds for staff dismissal.

22. The Little Sisters have also taken a vow of obedience to God, which assumes obedience to the Pope. We carefully follow all of his guidance, and obey all the decisions of the Church. Thus, we develop all of our programs, policies, and procedures in accord with the teachings of the Catholic Church, including its ethical teachings on the inviolable dignity of every human life.

23. These teachings include Catholic religious teachings about abortion, contraception, sterilization, and cooperation with acts that are intrinsically immoral.

24. Authoritative Catholic teachings are located in sacred Scripture and sacred tradition, and are set forth and specified in the Catechism of the Catholic Church, documents of ecumenical councils (such as the Second Vatican Council), papal encyclicals, directives issued by bishops' conferences, and other teaching documents

4

Exhibit 146

JA-0002288

of the Church. *See generally* Catechism of the Catholic Church Nos. 888-892 (describing the teaching office of the Church); *Dei Verbum* No. 10 (describing how "[s]acred tradition and Sacred Scripture form one sacred deposit of the word of God, committed to the Church").

25.  Sections 2270 and 2271 of the Catechism of the Catholic Church (1994) affirm that life begins at conception, that directly intending to take innocent human life is gravely immoral.  Thus a post-conception contraceptive is an abortifacient and "gravely contrary to moral law."  *See also* section 2274 ("Since it must be treated from conception as a person, the embryo must be defended in its integrity, cared for, and healed, as far as possible, like any other human being.")

26.  The Catholic Church also teaches that contraception and sterilization are intrinsic evils.  *Id.* at Section 2370.

27.  The Church teaches that programs of "economic assistance aimed at financing campaigns of sterilization and contraception" are "affronts to the dignity of the person and the family." *See* Section 234 of the Compendium of the Social Doctrine of the Church (2004).

28.  In a landmark encyclical, Blessed Pope John Paul II made clear that Catholics may never "encourage" the use of "contraception, sterilization, and abortion[.]" *See* Section 91 of *Evangelium Vitae* (1995).

29.  Similarly, the United States Conference of Catholic Bishops ("USCCB") has issued a series of directives to inform the provision of health services in every U.S. Catholic health institution. These directives prohibit providing, promoting,

5

Exhibit 146                                                                 JA-0002289

condoning, or participating in the provision of abortions, abortion-inducing drugs, contraceptives, and sterilization. Exhibit A, USCCB Directives for Catholic Health Care Services at Nos. 45, 52, & 53.

30. The directives specifically warn against partnering with other entities in a manner that could involve Catholic health care services in the provision of such "intrinsically immoral" services. *Id.* at Nos. 67-72.

31. Rather, the USCCB Directives instruct us to "distinguish [ourselves] by service to and advocacy for" people who are "at the margins of society" and "particularly vulnerable to discrimination," such as "the poor, the uninsured and underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees." *Id.* at No. 3.

32. The Little Sisters are particularly concerned about the possibility that our conduct may lead others to do evil, or think that the Little Sisters condone evil. *See* Catechism No. 2284, 86 (instructing Catholic institutions to avoid "scandal" and defining "scandal" as "an attitude or behavior which leads another to do evil"; scandal can be caused "by laws or institutions"). The Little Sisters beg for funds and goods at Catholic parishes and elsewhere to support our ministry. Thus, participating in the provision of health benefits that violate Catholic teaching poses a grave risk for the Little Sisters as they interact with Catholic faithful and others who share our beliefs.

33. Catholic teaching also instructs us to provide our employees and their families adequate health benefits. "In return for their labor, workers have a right to

6

Exhibit 146     JA1687     JA-0002290

wages and other benefits sufficient to sustain life in dignity." *Economic Justice For All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* ¶ 103, http://www.usccb.org/upload/economic_justice_for_all.pdf ("The dignity of workers also requires adequate health care").

34.   These religious teachings binding on how the Little Sisters carry out our religious ministry of caring for the elderly poor. We believe that the health plans that each home offers should be consistent with Catholic teaching.

**IV. The Impact of the Mandate on the Little Sisters**

35.   The HHS contraceptive mandate (the "Mandate") requires the Little Sisters to participate in the provision of contraception, abortion, and sterilization to our employees via the use of our health plans, health plan information, and health plan infrastructure. If we do not comply with the Mandate, we face massive penalties, which places enormous pressure on the Little Sisters to violate our religious beliefs.

36.   Our vow of hospitality, which asks us to treat each person in our care as if he or she were Christ himself, commits us just as much to respecting the dignity of human life at its beginning as at its end. We can no more participate in the provision of contraception, abortion, and sterilization than we could participate in the provision of euthanasia or assisted suicide.

37.   Because of the religious beliefs set forth above, the Little Sisters cannot:

   a. participate in the Mandate's program to promote and facilitate access to the use of sterilization, contraceptives, and abortion-inducing drugs and devices,

7

Exhibit 146

b. provide health benefits to our employees and plan beneficiaries that will include or facilitate access to sterilization, contraception, and abortion-inducing drugs and devices,

c. designate, authorize, or incentivize any third party to provide our employees or plan beneficiaries with access to sterilization, contraception, and abortion-inducing drugs and devices,

d. sign, execute, deliver, or otherwise file documents with a third party or with the government which could then be used to require, authorize, or incentivize that third party to provide our employees with access to sterilization, contraception, and abortion-inducing drugs;

e. agree to refrain from speaking with a third party to ask or instruct it not to deliver contraceptives, sterilization, and abortifacients to Little Sisters' employees and plan beneficiaries in connection with Little Sisters' health plans;

f. create or facilitate a provider-insured relationship (between the Little Sisters and Christian Brothers Services or any other third-party administrators), the sole purpose of which would be to provide contraceptives, sterilization, and abortifacients in connection with the Little Sisters' health plans;

g. create, maintain, support, and facilitate health insurance plans, information, and infrastructure that is used to provide contraceptives,

8

Exhibit 146

JA-0002292

      sterilization, and abortifacients to Little Sisters' employees and plan beneficiaries;

h. take any action that would require, authorize, or incentivize Christian Brothers Trust or Christian Brothers Services to violate their own Catholic religious beliefs.

38. Obeying the Mandate's requirement to participate in the provision of abortion-inducing drugs would violate our public witness to the respect for life and human dignity that we are committed to displaying at all times through our vow of hospitality and our fidelity to Church teaching. It would similarly violate our duty to "advoca[te] for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable," such as "the unborn." Exhibit A, USCCB Directives, at No. 3.

39. The Little Sisters believe that our ministry and all of our resources—including our health insurance plans and the efforts we make to maintain those plans—are gifts from God that we must use to God's glory and for the good of all, to help bear the burdens and sufferings of others. We cannot allow those gifts to be co-opted to serve ends that we believe dishonor God and the dignity of the human person.

40. The Mandate threatens the Little Sisters with large fines and penalties if we continue to act in accordance with our religious beliefs.

41. For example, if we continue our practice of providing health benefits to our employees and their families without including or facilitating free access to sterilization, contraception, and abortion-inducing drugs and devices, we will face

9

Exhibit 146

JA-0002293

fines of "$100 for each day in the noncompliance period with respect to each individual to whom such failure relates."  26 U.S.C. § 4980D(b)(1).

42.    Depending on how the I.R.S. applied this penalty, the Little Sisters homes could face tens of millions of dollars of fines *each year* for our inability to facilitate the required coverage.

43.    Little Sisters Pittsburgh currently employs about 67 full-time employees.  If the I.R.S. levies the fine on a per-full-time-employee basis, we would be facing daily fines of $6,700 and annual fines of $2,445,500. If the I.R.S. levies the fine on the basis of total number of employees and dependents receiving benefits, the fines would be orders of magnitude larger.

44.    The entire annual budget for Little Sisters Pittsburgh, which currently provides care for about 95 needy elderly individuals, is about $8 million.

45.    Nor can we avoid these fines by choosing not to provide health benefits at all. Cutting off all benefits for our employees would be unconscionable.  We love and respect our employees and are dedicated to providing adequate health benefits.

46.    Cutting off all employee benefits would also have a severe negative impact on our employees and their families, and on our ability to hire and retain qualified medical staff and other employees. Benefits plans are an important reason that many employees make choices about which jobs to pursue, to keep, and to abandon.

47.    Even if we could cut off all benefits in good conscience and without harming our employees or our homes, we would face large government fines for doing so. For

10

Exhibit 146                                                    JA1691                                           JA-0002294

example, Little Sisters Pittsburgh would face annual fines of approximately $134,000 for dropping health benefits altogether.

48.   For these reasons, the Mandate imposes enormous pressure on the Little Sisters to participate in activities prohibited by our sincerely held religious beliefs.

49.   Prior to the Mandate, we engaged in conduct motivated by our sincerely held religious beliefs: providing benefits plans that do not include sterilization, contraception, and abortion-inducing drugs and devices. The Mandate penalizes our participation in that religious exercise.

50.   The Mandate also places enormous pressure on the Little Sisters to engage in conduct contrary to our sincerely held religious beliefs. I am charged with making decisions for the Little Sisters Pittsburgh. The severe threats of fines and punishment create enormous pressure on me to violate my religious beliefs as the price of continuing our mission of helping the needy elderly.

51.   We object to the Mandate not because it makes us *use* drugs or devices against our religious beliefs, but because it forces us to participate as a necessary part of the government's scheme to provide those drugs and devices.

**The Little Sisters' Litigation Against the Mandate**

52.   The Little Sisters tried to avoid having to sue the federal government to protect our ministry. We made multiple public statements and filed a detailed public comment with the federal government to inform it of our sincere religious objection to incorporating us into its scheme. But the government refused to exempt us. Which meant that on January 1, 2014, we would start facing massive penalties.

11

53.  We filed suit on September 24, 2013, and filed a motion for preliminary injunction one month later, on October 24. *Little Sisters of the Poor v. Sebelius*, No. 13-cv-2611 (D. Colo.).

54.  Over the next four years, we would remain in constant litigation with the federal government. We twice had to go to the Supreme Court to be protected from the imposition of massive financial penalties.

55.  The first time came on December 31, 2013, when just hours before the start of the penalties we filed for and received a temporary emergency injunction from Justice Sotomayor just hours. Later in January 2014, the rest of the Supreme Court would grant an injunction pending appeal without noted dissent. *Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (2014).

56.  And the second time came after the Supreme Court granted certiorari in our case, when it vacated a Tenth Circuit ruling against us, remanded the case for further consideration, and ordered that "the Government may not impose taxes or penalties" on us while the case remained pending. *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

57.  Our case has remained pending at the Tenth Circuit since that time.

**The Interim Final Rule**

58.  On May 4, 2017, President Trump invited members of the Little Sisters of the Poor to the White House for the traditional proclamation of the National Day of Prayer and the signing of an Executive Order related to religious liberty.

59.  At the signing ceremony, the President made clear that the Mandate's application to the Little Sisters had been inappropriate and illegal. The President

12

described the Mandate as an "attack[ ] against the Little Sisters of the Poor" that had put them through "a long, hard ordeal," and he listed it as an example of past "abuses" of religious liberty. *See* https://www.c-span.org/video/?428059-1/president-trump-signsreligious-liberty-executive-order (starting at 28:30).

60. The agencies issued an Interim Final Rule on October 6, 2017. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47792 (Oct. 13, 2017). The rule explicitly referred to the Little Sisters' lawsuit and the Supreme Court decision in our case as the impetus for the regulatory change: "Consistent with the President's Executive Order and the Government's desire to resolve the pending litigation and prevent future litigation from similar plaintiffs, the Departments have concluded that it is appropriate to reexamine the exemption and accommodation scheme currently in place for the Mandate." 82 Fed. Reg. 47799; *see also id.* at 47798 (describing lawsuits and *Zubik* decision).

61. The Interim Final Rule conceded that "requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA," and that because "requiring such compliance did not serve a compelling interest and was not the least restrictive means of serving a compelling interest, we now believe that requiring such compliance led to the violation of RFRA in many instances." *Id.* at 47800, 47806.

13

Exhibit 146

### Conclusion

62.   Being forced into four years of litigation, including two trips to the Supreme Court, has been a difficult and burdensome experience for the Little Sisters. We do not want to alarm in any way the elderly poor whom we serve, nor their families, our employees, or our benefactors. But to protect our ability to serve them as we always have, and to avoid violating and publicly rejecting our religious beliefs, our only recourse was a lawsuit.

63.   It is deeply troubling to us that, after years of respectfully seeking recourse in federal court to be protected from the *federal* government, we are being forced to defend those same rights that are threatened by a *state* government. We had never been required to provide these objectionable services by Pennsylvania, and do not understand why Pennsylvania asks this Court to force us to provide them now. We hope a day will come when government will cease threatening our ministry in this way.

14

Exhibit 146

JA-0002298

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th day of November, 2017,

*Mother Superior Marie -Vincente, L.S.P.*
Mother Superior Marie Vincente

15

Exhibit 146                                   JA1696                                   JA-0002299

# EXHIBIT A

Exhibit 146

JA-0002300



*Issued by USCCB, November 17, 2009*

*Copyright © 2009, United States Conference of Catholic Bishops.*
*All rights reserved.*

*To order a copy of this statement, please visit* www.usccbpublishing.org *and click on*
*"New Titles."*

# Ethical and Religious Directives for Catholic Health Care Services

## *Fifth Edition*

United States Conference of Catholic Bishops

# CONTENTS

Preamble

General Introduction

Part One: The Social Responsibility of Catholic Health Care Services

Part Two: The Pastoral and Spiritual Responsibility of Catholic Health Care

Part Three: The Professional-Patient Relationship

Part Four: Issues in Care for the Beginning of Life

Part Five: Issues in Care for the Seriously Ill and Dying

Part Six: Forming New Partnerships with Health Care Organizations and Providers

Conclusion

Exhibit 146

JA-0002302

# PREAMBLE

Health care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services.*

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious*

3

Exhibit 146
JA-0002303

*Directives* then is twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in which concrete issues can be discussed from the perspective of the Catholic faith. The second section is

Exhibit 146

in prescriptive form; the directives promote and protect the truths of the Catholic faith as those

truths are brought to bear on concrete issues in health care.

5

Exhibit 146

JA-0002305

# GENERAL INTRODUCTION

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic

6

Exhibit 146

JA-0002306

health care ministry bears witness to the truth that, for those who are in Christ, suffering and death are the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

7

Exhibit 146

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

Exhibit 146
JA-0002308

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

9

Exhibit 146

JA-0002309

PART ONE

## The Social Responsibility of Catholic Health Care Services

**Introduction**

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

10

Exhibit 146

JA-0002310

Fourth, Catholic health care ministry exercises responsible stewardship of available health care resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

**Directives**

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among caregivers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person

11

with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant

12

requirements of canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

13

Exhibit 146

JA-0002313

PART TWO

**The Pastoral and Spiritual Responsibility of Catholic Health Care**

**Introduction**

The dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological advances in medicine have reduced the length of hospital stays dramatically. It

14

Exhibit 146　　　　　JA1711　　　　　JA-0002314

follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the creative response of these pastoral caregivers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

**Directives**

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

15

Exhibit 146

JA-0002315

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its baptism/confirmation registers.

16

Exhibit 146

JA-0002316

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

17

Exhibit 146
JA-0002317

Case 1:25-cv-02750-VDB Document 34-1 35 Page: 451 10 Date: Filed 12/23/2025 677

PART THREE

# The Professional-Patient Relationship

**Introduction**

A person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting

18

health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

### Directives

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to

19

Exhibit 146                    JA1716                    JA-0002319

know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

20

Exhibit 146     JA1717     JA-0002320

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given free and informed consent. In instances of nontherapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred

21

Exhibit 146

JA-0002321

already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

22

Exhibit 146

JA-0002322

# PART FOUR

## Issues in Care for the Beginning of Life

**Introduction**

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

> This love is an eminently human one. . . . It involves the good of the whole
>
> person. . . . The actions within marriage by which the couple are united intimately
>
> and chastely are noble and worthy ones. Expressed in a manner which is truly

23

Exhibit 146

JA-0002323

human, these actions signify and promote that mutual self-giving by which spouses enrich each other with a joyful and a thankful will.[21]

Marriage and conjugal love are by their nature ordained toward the begetting and educating of children. Children are really the supreme gift of marriage and contribute very substantially to the welfare of their parents. . . . Parents should regard as their proper mission the task of transmitting human life and educating those to whom it has been transmitted. . . . They are thereby cooperators with the love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number of their children by natural means. The Church cannot approve contraceptive interventions that "either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."[23] Such interventions violate "the inseparable connection, willed by God . . . between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new technologies for responding to the problem of infertility. While we rejoice in the potential for good inherent in many of these technologies, we cannot assume that what is technically possible is always morally right. Reproductive technologies that substitute for the marriage act are not consistent with human dignity. Just as the marriage act is joined naturally to procreation, so procreation is joined naturally to the marriage act. As Pope John XXIII observed:

The transmission of human life is entrusted by nature to a personal and conscious act and as such is subject to all the holy laws of God: the immutable and

24

inviolable laws which must be recognized and observed. For this reason, one cannot use means and follow methods which could be licit in the transmission of the life of plants and animals.[25]

Because the moral law is rooted in the whole of human nature, human persons, through intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the Creator.[26]

**Directives**

38. When the marital act of sexual intercourse is not able to attain its procreative purpose, assistance that does not separate the unitive and procreative ends of the act, and does not substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative meanings of sexual intercourse and do not involve the destruction of human embryos, or their deliberate generation in such numbers that it is clearly envisaged that all cannot implant and some are simply being used to maximize the chances of others implanting, may be used as therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the use of gametes coming from at least one donor other than the spouses) is prohibited because it is contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception using the gametes of the two spouses joined in marriage) is prohibited when it separates procreation from the marital act in its unitive significance (e.g., any technique used to achieve extracorporeal conception).[29]

25

Exhibit 146

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

26

Exhibit 146

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

27

Exhibit 146     JA1724     JA-0002327

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

Exhibit 146

JA-0002328

PART FIVE

**Issues in Care for the Seriously Ill and Dying**

**Introduction**

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for

29

Exhibit 146

JA-0002329

formulating a true moral judgment about the use of technology to maintain life. The use of life-sustaining technology is judged in light of the Christian meaning of life, suffering, and death. In this way two extremes are avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

The Church's teaching authority has addressed the moral issues concerning medically assisted nutrition and hydration. We are guided on this issue by Catholic teaching against euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] While medically assisted nutrition and hydration are not morally obligatory in certain cases, these forms of basic care should in principle be provided to all patients who need them, including patients diagnosed as being in a "persistent vegetative state" (PVS), because even the most severely debilitated and helpless patient retains the full dignity of a human person and must receive ordinary and proportionate care.

**Directives**

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that would make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

30

Exhibit 146　　　　　　　　　　　　　JA1727　　　　　　　　　　　　　JA-0002330

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[39]

57. A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

58. In principle, there is an obligation to provide patients with food and water, including medically assisted nutrition and hydration for those who cannot take food orally. This obligation extends to patients in chronic and presumably irreversible conditions (e.g., the "persistent vegetative state") who can reasonably be expected to live indefinitely if given such care.[40] Medically assisted nutrition and hydration become morally optional when they cannot reasonably be expected to prolong life or when they would be "excessively burdensome for the patient or [would] cause significant physical discomfort, for example resulting from complications in the use of the means employed."[41] For instance, as a patient draws close to inevitable death from an underlying progressive and fatal condition, certain measures to provide nutrition and hydration may become excessively burdensome and therefore not obligatory in light of their very limited ability to prolong life or provide comfort.

59. The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

31

Exhibit 146     JA1728     JA-0002331

60.     Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way. Dying patients who request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

65. The use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

32

Exhibit 146

JA-0002332

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

Exhibit 146

JA-0002333

PART SIX

**Forming New Partnerships with Health Care Organizations and Providers**

**Introduction**

Until recently, most health care providers enjoyed a degree of independence from one another. In ever-increasing ways, Catholic health care providers have become involved with other health care organizations and providers. For instance, many Catholic health care systems and institutions share in the joint purchase of technology and services with other local facilities or physicians' groups. Another phenomenon is the growing number of Catholic health care systems and institutions joining or co-sponsoring integrated delivery networks or managed care organizations in order to contract with insurers and other health care payers. In some instances, Catholic health care systems sponsor a health care plan or health maintenance organization. In many dioceses, new partnerships will result in a decrease in the number of health care providers, at times leaving the Catholic institution as the sole provider of health care services. At whatever level, new partnerships forge a variety of interwoven relationships: between the various institutional partners, between health care providers and the community, between physicians and health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health care institutions and services to witness to their religious and ethical commitments and so influence the healing profession. For example, new partnerships can help to implement the Church's social teaching. New partnerships can be opportunities to realign the local delivery system in order to provide a continuum of health care to the community; they can witness to a

34

Exhibit 146

responsible stewardship of limited health care resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way, especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops) has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief

<p style="text-align:center">35</p>

Exhibit 146    JA1732    JA-0002335

articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

**Directives**

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities must be limited to what is in accord with the moral principles governing cooperation.

36

Exhibit 146

JA-0002336

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

37

Exhibit 146

JA-0002337

## CONCLUSION

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

Exhibit 146

JA-0002338

Case 1:25-cv-25750-VDo-cwEento26u4m-e13t.P33ge: 4F72le10/D2a0te/2Fi0le25d 12/4P/a2g025 of P67age 23/65 677

# Notes

1. United States Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, DC: United States Conference of Catholic Bishops, 1981).

2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, outpatient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.

3. *Health and Health Care*, p. 5.

4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity* (*Apostolicam Actuositatem*) (1965), no. 1.

5. Pope John Paul II, Post-Synodal Apostolic Exhortation *On the Vocation and the Mission of the Lay Faithful in the Church and in the World* (*Christifideles Laici*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 29.

6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day* (*Donum Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1987).

7. Pope John XXIII, Encyclical Letter *Peace on Earth* (*Pacem in Terris*) (Washington, DC: United States Conference of Catholic Bishops, 1963), no. 11; *Health and Health Care*, pp. 5, 17-18; *Catechism of the Catholic Church*, 2nd ed. (Washington, DC: Libreria Editrice Vaticana– United States Conference of Catholic Bishops, 2000), no. 2211.

8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio"* (*Sollicitudo Rei Socialis*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

9. United States Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, DC: United States Conference of Catholic Bishops, 1986), no. 80.

39

Exhibit 146

JA-0002339

10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.

11. *Health and Health Care,* p. 12.

12. Cf. *Code of Canon Law,* cc. 921-923.

13. Cf. ibid., c. 867, § 2, and c. 871.

14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."

15. Cf. c. 883, 3°.

16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.

17. Cf. directive 53.

18. *Declaration on Euthanasia,* Part IV; cf. also directives 56-57.

19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.

20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.

21. Second Vatican Ecumenical Council, *Pastoral Constitution on the Church in the Modern World* (*Gaudium et Spes*) (1965), no. 49.

22. Ibid., no. 50.

23. Pope Paul VI, Encyclical Letter *On the Regulation of Birth* (*Humanae Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1968), no. 14.

24. Ibid., no. 12.

40

Exhibit 146

25. Pope John XXIII, Encyclical Letter *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae,* no. 4.

26. Pope John Paul II, Encyclical Letter *The Splendor of Truth* (*Veritatis Splendor*) (Washington, DC: United States Conference of Catholic Bishops, 1993), no. 50.

27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae,* Part II, B, no. 6; cf. also Part I, nos. 1, 6).

28. Ibid., Part II, A, no. 2.

29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae,* Part II, B, no. 6).

30. Ibid., Part II, A, no. 3.

31. Cf. directive 45.

32. *Donum Vitae,* Part I, no. 2.

33. Cf. ibid., no. 4. (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.

35. Pope John Paul II, Apostolic Letter *On the Christian Meaning of Human Suffering* (*Salvifici Doloris*) (Washington, DC: United States Conference of Catholic Bishops, 1984), nos. 25-27.

36. United States Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

37. See *Declaration on Euthanasia.*

38. Ibid., Part II.

39. Ibid., Part IV; Pope John Paul II, Encyclical Letter *On the Value and Inviolability of Human Life* (*Evangelium Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1995), no. 65.

41

Exhibit 146

JA-0002341

40. See Pope John Paul II. Address to the Participants in the International Congress on "Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas" (March 20, 2004), no. 4, where he emphasized that "the administration of water and food, even when provided by artificial means, always represents a *natural means* of preserving life, not a *medical act*." See also Congregation for the Doctrine of the Faith, "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration" (August 1, 2007).

41. Congregation for the Doctrine of the Faith. Commentary on "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration."

42. See *Declaration on Euthanasia*, Part IV.

43. *Donum Vitae,* Part I. no. 4.

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil, in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas. Oklahoma, and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumqu Sterilizatio*). March 13, 1975, *Origins* 6 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition, directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and, *a fortiori*, its management and execution in accord with hospital regulations, is a matter which, in the objective order, is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977, in *Origins* 7 (1977): 399-400.

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284): "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

42

Exhibit 146                                        JA-0002342

This fifth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the United States Conference of Catholic Bishops (USCCB) and approved as the national code by the full body of the USCCB at its November 2009 General Meeting. This edition of the *Directives*, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

*Msgr. David J. Malloy, STD*
*General Secretary, USCCB*

In 2001 the National Conference of Catholic Bishops and United States Catholic Conference became the United States Conference of Catholic Bishops.

Excerpts from *The Documents of Vatican II,* ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible,* copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C., 20017 and are used by permission of the copyright owner. All rights reserved.

Copyright © 2009, United States Conference of Catholic Bishops, Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

To obtain a catalog of USCCB titles, visit *www.usccbpublishing.org* or call toll-free 800-235-8722. In the Washington metropolitan area or from outside the United States, call 202-722-8716. Para pedidos en español, llame al 800-235-8722 y presione 4 para hablar con un representante del servicio al cliente en español.

43

# Birth Control

**Print the Birth Control Chart
(/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM517406.pdf)**
(2628 KB)

**En Español (/downloads/ForConsumers/ByAudience/ForWomen/FreePublica-
tions/UCM517408.pdf)** (433KB)

If you do not want to get pregnant, there are many birth control options to choose from. No one product is best for everyone. Some methods are more effective than others at preventing pregnancy. The only sure way to avoid pregnancy is not to have any sexual contact. This page lists FDA-approved and cleared methods for birth control. Talk to your healthcare provider about the best method for you.

**Types of Medicines and Devices for Birth Control**

- **Permanent Sterilization**
- **Long-Acting Reversible Contraceptives (LARC)**
- **Contraceptive Injection**
- **Short-Acting Hormonal Methods**
- **Barrier Methods**

**Other Contraception**

- **Emergency Contraception**

**Some things to think about when you choose birth control:**

- Your health.
- If you want to have children in the future.
- How often you have sex.
- How many sexual partners you have.
- If you will need a prescription or if you can buy the method over-the-counter.
- The number of pregnancies expected per 100 women who use a method for one year. For comparison, about 85 out of 100 sexually active women who do not use any birth control can expect to become pregnant in a year.
- This page lists pregnancy rates based on **typical use**. Typical use shows how effective the different methods are during actual use (including sometimes using a method in a way that is not correct or not consistent).

00803074

Exhibit 147

JA1741

JA-0002344

- For more information on the chance of getting pregnant while using a method or on the risks of a specific product, please check the product label or **Trussell,J. (2011)."Contraceptive failure in the United States." Contraception 83(5):397-404. (http://www.kupferkette.info/down-loads/contraceptive-failure-in-the-united-states---2.pdf)** ⏎ **(http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/de-fault.htm)**

**Tell your doctor, healthcare provider, or pharmacist if you:**

- Smoke.
- Have liver disease.
- Have blood clots.
- Have family members who have had blood clots.
- Are taking any other medicines, like antibiotics or daily prescription medicines.
- Are taking any herbal products, like St. John's Wort.
- Are breastfeeding.
- Have been pregnant recently.

**To avoid pregnancy:**

- No matter which method you choose, it is important to follow all of the directions carefully. If you don't, you increase your chance of getting pregnant.
- The best way to avoid pregnancy is to not have any sexual contact.

## Sterilization Surgery for Women (also called trans-abdominal surgical sterilization)



### What is it?

One way is by tying and cutting the tubes — this is called tubal ligation.

The fallopian tubes also can be sealed using an instrument with an electrical current.

They also can be closed with clips, clamps, or rings.

Sometimes, a small piece of the tube is removed.

### How does it work?

- The fallopian tubes are blocked so the egg and sperm can't meet in the fallopian tube. This

00803075

Exhibit 147
JA1742
JA-0002345

stops you from getting pregnant.

- It is supposed to be permanent.
- Sometimes it is possible to reverse the sterilization. Reversal involves another surgery that might not work.

### How do I get it?

- This is surgery.
- You will need general anesthesia.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, less than 1 may get pregnant.

### Some Risks

- Pain
- Bleeding
- Infection or other complications after surgery

**Does it protect me from sexually transmitted infections (STIs)?** No.

## Sterilization Implant for Women (Transcervical Tubal Sterilization Implant)



### What is it?

Small flexible, metal (containing nickel) coil that is put into the fallopian tubes with a special catheter through the vagina.

### How does it work?

The device works by causing scar tissue to form around the coil. This blocks the fallopian tubes and stops the sperm from reaching the eggs.

You need to use another birth control method during the first 3 months. You will need a special test to make sure the device is in the right place before you can stop your birth control.

00803076

Exhibit 147

JA1743

JA-0002346

• It is permanent.

**How do I get it?**

• The devices are placed into the tubes using a camera placed in the uterus.
• You will probably need anesthesia.
• Because it is inserted through the vagina, you do not need an incision (cutting).

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

• Out of 100 women who use this method, less than 1 may get pregnant.

**Some Risks**

• Pain/ cramping
• Pelvic or back discomfort
• Vaginal bleeding

**Does it protect me from sexually transmitted infections (STIs)?** No

**Learn more about the Sterilization Implant for Women. (/MedicalDevices/ProductsandMedi-calProcedures/ImplantsandProsthetics/EssurePermanentBirthControl/default.htm)**

---

# Sterilization Surgery for Men (Vasectomy)

This method is for men who are sure they never want to have a child or do not want any more children. If you are thinking about reversal, vasectomy may not be right for you. Sometimes it is possible to reverse the operation, but the likelihood of reversal decreases the more time passes between vasectomy and reversal.  Reversal involves complicated surgery that might not work.



**What is it?**

This is a surgery a man needs only once.

It is permanent.

**How does it work?**

•           The surgery blocks a man's vas deferens (the tubes that carry sperm from the testes).

• After this surgery, the semen (the fluid that comes out of a man's penis) has no sperm in it.

00803077

Exhibit 147                                    JA1744                              JA-0002347

- It takes about three months to clear sperm out of a man's system. You need to use another form of birth control until a test shows there are no longer any sperm in the seminal fluid.

**How do I get it?**

- This is surgery.
- Local anesthesia is used.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

- Out of 100 women whose partner has had a vasectomy, less than 1 may get pregnant.

**Some Risks**

- Pain
- Bleeding
- Infection

**The success of reversal surgery depends on:**

- The length of time since the vasectomy was performed.
- Whether or not antibodies to sperm have developed.
- The method used for vasectomy
- Length and location of the segments of vas deferens that were removed or blocked.

**Does it protect me from sexually transmitted infections (STIs)?** No.

## Long-acting Reversible Contraceptives (LARC)

**These methods last for several years. If you want to get pregnant, you can stop using them at any time.**

## IUD or IUS (intrauterine device or system)

**Copper IUD**

**What is it?**

00803078

Exhibit 147                                    JA1745                                    JA-0002348



A T-shaped device containing copper that is put into the uterus by a healthcare provider.

**How does it work?**

The IUD prevents sperm from reaching the egg, from fertilizing the egg, and may prevent the egg from attaching (implanting) in the womb (uterus).

It does not stop the ovaries from making an egg (ovulating) each month.

The copper IUD can be used for up to 10 years.

After the IUD is taken out, it is possible to get pregnant.

**How do I get it?**

• A doctor or other healthcare provider needs to put in the IUD.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

• Out of 100 women who use this method, less than 1 may get pregnant.

**Some Side Effects**

• Cramps

• Heavier, longer periods or spotting between periods.

**Some Less Common Risks**

• Pelvic inflammatory disease

• Ectopic pregnancy (a pregnancy outside of the uterus)

• Uterine perforation

• Expulsion - the IUD is no longer in the uterus and therefore there is no pregnancy protection

**Does it protect me from sexually transmitted infections (STIs)?** No.

**IUD with progestin**



**What is it?**

A T-shaped device containing a progestin that is put into the uterus by a healthcare provider.

**How does it work?**

It may thicken the mucus of your cervix, which makes it harder for sperm to get to the egg, and also thins the lining of your uterus.

• The IUD with progestin can be used for up to 3 to 5 years, depending on the type.

• After the IUD is taken out, it is possible to get pregnant.

https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm   11/28/2018

00803079

Exhibit 147
JA1746
JA-0002349

### How do I get it?

- A healthcare provider needs to put in the IUD.
- You may need local anesthesia.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year

- Out of 100 women who use this method, less than 1 may get pregnant.

### Some Side Effects

- Irregular bleeding
- No periods (amenorrhea)
- Abdominal/pelvic pain

### Some Less Common Risks

- Pelvic inflammatory disease
- Severe infection
- Ectopic Pregnancy
- Uterine perforation
- Expulsion - the IUD is no longer in the uterus and therefore there is no pregnancy protection
- Ovarian cysts

### Does it protect me from sexually transmitted infections (STIs)? No.

---

### Implantable Rod



### What is it?

A thin, matchstick-sized rod that contains a progestin hormone.

It is put under the skin on the inside of your upper arm.

### How does it work?

- It stops the ovaries from releasing eggs.
- It thickens the cervical mucus, which keeps sperm from getting to the egg.
- It can be used for up to 3 years.

### How do I get it?

- After giving you local anesthesia, a healthcare provider will put it under the skin of your arm with a special needle.

00803080

Exhibit 147                                    JA1747                                    JA-0002350

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

• Out of 100 women who use this method, less than 1 may get pregnant.

**Some Side Effects**

• Changes in menstrual bleeding patterns

• Weight gain

• Headache

• Acne

**Some Less Common Risks**

• Complication of insertion and removing including pain, bleeding, scarring, infection or movement of the implant to another part of the body.

• Ectopic pregnancy

• Ovarian cysts

• It is rare but some women will have blood clots, heart attacks or strokes.

**Does it protect me from sexually transmitted infections (STIs)?** No.

---

# Contraceptive Injection

**This metod is given as a shot (injection) every 3 months. If you want to get pregnant, you can stop using this at any time.**

**Progestin Shot/Injection (Depo-Provera)**



**What is it?**

• A shot of a progestin hormone, either in the muscle or under the skin.

**How does it work?**

• The shot stop3 the ovaries from releasing eggs

• It also thickens the cervical mucus, which keeps the sperm from getting to the egg.

**How do I get it?**

• You need one shot every 3 months from a healthcare provider.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100**

00803081

Exhibit 147                                          JA1748                                          JA-0002351

**women who use this method for one year)**

- Out of 100 women who use this method, including women who don't get the shot on time, up to 6 may get pregnant.

### Some Side Effects

- Loss of bone density
- Irregular bleeding or bleeding between periods
- Headaches
- Weight gain
- Nervousness
- Dizziness
- Abdominal discomfort

### Some Less Common Risks

- Ectopic pregnancy
- It is rare, but some women will have blood clots.

**Does it protect me from sexually transmitted infections (STIs)?** No.

## SHORT ACTING HORMONAL METHODS

**Prevent pregnancy by interfering with ovulation and possibly fertilization of the egg. If you want to get pregnant, you can stop using them at any time.**

**Combination Oral Contraceptives
"The Pill"**



### What is it?

A pill that has two hormones (estrogen and a progestin) to stop the ovaries from releasing eggs

It also thickens the cervical mucus, which keeps sperm from getting to the egg.

### How do I use it?

- You should swallow the pill at the same time every day, whether or not you have sex.
- If you miss one or more pills, or start a pill pack too late, you may need to use another method of birth control, like a condom and spermicide

00803082

Exhibit 147

JA1749

JA-0002352

## How do I get it?

- You need a prescription from a healthcare provider.

## Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, about 9 may get pregnant.

## Some Side Effects

- Spotting or bleeding between periods
- Nausea
- Breast tenderness
- Headache

## Less Common Serious Side Effects

- It is not common, but some women who take the pill develop high blood pressure.
- It is rare, but some women will have blood clots, heart attacks, or strokes.

## Does it protect me from sexually transmitted infections (STIs)? No.

---

### Oral Contraceptives (Progestin-only)

### "The Mini Pill"



### What is it?

A pill that has only one hormone, a progestin.

It thickens the cervical mucus, which keeps sperm from getting to the egg.

Less often, it stops the ovaries from releasing eggs.

### How do I use it?

- You should swallow the pill at the same time every day, whether or not you have sex.
- You may need to use another method of birth control, like a condom and spermicide if:
- you are several hours late taking your pill
- you miss one or more pills
- you start a pack too late

### How do I get it?

- You need a prescription from a healthcare provider.

00803083

Exhibit 147

JA1750

JA-0002353

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year**

• Out of 100 women who use this method, about 9 may get pregnant.

**Some Side Effects**

• Irregular bleeding

• Nausea

• Breast tenderness

• Headache

**Some Less Common Risks**

• It is not common, but some women who take the pill develop high blood pressure.

**Does it protect me from sexually transmitted infections (STIs)?** No.

---

**Patch**



**What is it?**

This is a skin patch you can wear on the lower abdomen, buttocks, upper arm or upper back.

It has two hormones (estrogen and progestin) that stop the ovaries from releasing eggs.

• It also thickens the cervical mucus, which keeps sperm from getting to the egg.

**How do I use it?**

• You put on a new patch and take off the old patch once a week for 3 weeks (21 total days).

• Don't put on a patch during the fourth week. Your menstrual period should start during this patch-free week.

• If the patch comes loose or falls off, you may need to use another method of birth control, like a condom and spermicide.

**How do I get it?**

• You need a prescription from a healthcare provider.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

• Out of 100 women who use this method, about 9 may get pregnant.

**Some Side Effects**

00803084

Exhibit 147

JA1751

JA-0002354

- Spotting or bleeding between periods
- Nausea, stomach pain
- Breast tenderness
- Headache
- Skin irritation

## Some Risks

- It will expose you to higher levels of estrogen compared to most combined oral contraceptives.
- There may be an increased risk of blood clots among women who use the patch as compared to women who use certain combined oral contraceptives.

**Does it protect me from sexually transmitted infections (STIs)?** No.

### Vaginal Contraceptive Ring



### What is it?

It is a flexible ring that is about 2 inches around.

It releases two hormones (progestin and estrogen) to stop the ovaries from releasing eggs.

- It also thickens the cervical mucus, which keeps sperm from getting to the egg.

### How do I use it?

- You put the ring into your vagina.
- Keep the ring in your vagina for 3 weeks and then take it out for 1 week. Your menstrual period should start during this ring-free week.
- If the ring falls out and stays out for more than 3 hours, replace it but use another method of birth control, like a condom and spermicide, until the ring has been in place for 7 days in a row.

### How do I get it?

- You need a prescription from a healthcare provider.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, about 9 may get pregnant.

### Some Side Effects and Risks

- Vaginal discharge, discomfort in the vagina, and mild irritation.
- Headache

00803085

Exhibit 147
JA1752
JA-0002355

- Mood changes
- Nausea
- Breast tenderness

**Some Less Common Risks**

- It is not common, but some women who take the pill develop high blood pressure.
- It is rare, but some women will have blood clots, heart attacks, or strokes.

**Does it protect me from sexually transmitted infections (STIs)?** No.

# BARRIER METHODS:

**Block sperm from reaching the egg.**

**Diaphragm with Spermicide**
**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**



**What is it?**

A dome-shaped flexible disk with a flexible rim.

Made from silicone.

It covers the cervix.

**How do I use it?**

- You need to put a spermicidal jelly, cream or foam on the inside of the diaphragm before putting it into the vagina.
- You must put the diaphragm into the vagina before having sex.
- You must leave the diaphragm in place at least 6 hours after having sex.
- It can be left in place for up to 24 hours. You need to use additional spermicide every time you have sex.

**How do I get it?**

- You need a prescription.
- A healthcare provider will need to do an exam to find the right size diaphragm for you.
- You should have the diaphragm checked after childbirth or if you lose more than 15 pounds because you might need a different size.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

- Out of 100 women who use this method, about 12 may get pregnant.

00803086

Exhibit 147
JA1753
JA-0002356

## Some Side Effects

- Irritation
- Allergic reactions
- Urinary tract infection

## Some Less Common Risks

- If you keep it in place longer than 24 hours, there is a risk of toxic shock syndrome. Toxic shock syndrome is a rare but serious infection.

**Does it protect me from sexually transmitted infections (STIs)?** No.

---

### Sponge with Spermicide

**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**



### What is it?

A disk-shaped polyurethane sponge-like device with the spermicide N9 (nonoxynol-9) in it.

### How do I use it?

- Put it into the vagina before you have sex.
- Protects for up to 24 hours.
- You do not need to use more spermicide each time you have sex.
- You must leave the sponge in place for at least 6 hours after last having sex.
- You must take the sponge out within 30 hours after you put it in. Throw it away after you use it.

## How do I get it?

- You do not need a prescription.
- You can buy it over-the-counter.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, 12 may get pregnant.
- It may not work as well for women who have given birth. Childbirth stretches the vagina and cervix and the sponge may not fit as well. Out of 100 women who use this method who gave birth, 24 may get pregnant.

## Some Side Effects

- Irritation

00803087

Exhibit 147                                   JA1754                                   JA-0002357

## Some Less Common Risks

• If you keep it in place longer than 24-30 hours, there is a risk of toxic shock syndrome. Toxic shock syndrome is a rare but serious infection.

**Does it protect me from sexually transmitted infections (STIs)?** No.

## Cervical Cap with Spermicide
**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**



### What is it?

A soft latex or silicone cup with a round rim, which fits snugly around the cervix.

### How do I use it?

• You need to put spermicide inside the cap before you use it.

• You must put the cap in the vagina before you have sex.

• You must leave the cap in place for at least 6 hours after having sex.

• You may leave the cap in for up to 48 hours.

• You do NOT need to use more spermicide each time you have sex.

### How do I get it?

• First, a healthcare provider needs to determine the correct cervical cap size for you. Then you need a prescription for the device.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

• Out of 100 women who use this method, about 17 to 23 may get pregnant.

• It may not work as well for women who have given birth. Childbirth stretches the vagina and cervix and the cap may not fit as well.

### Some Side Effects and Risks

• Irritation

• Allergic reactions

• Aabnormal Pap test

00803088

Exhibit 147
JA1755
JA-0002358

## Some Less Common Risks

• If you keep it in place longer than 48 hours, there is a risk of toxic shock syndrome. Toxic shock syndrome is a rare but serious infection.

### Does it protect me from sexually transmitted infections (STIs)? No.

## Male Condom



### What is it?

A thin film sheath placed over the erect penis.

### How do I use it?

• Put it on the erect penis right before sex.

• Pull out before the penis softens.

• Hold the condom against the base of the penis before pulling out.

• Use it only once and then throw it away.

## How do I get it?

• You do not need a prescription.

• You can buy it over-the-counter or online.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

• Out of 100 women whose partners' use this method, 18 may get pregnant.

• The most important thing is that you use a condom every time you have sex.

• It can be used with other barrier methods to decrease your chances of becoming pregnant.

## Some Risks

• Irritation

• Allergic reactions (If you are allergic to latex, you can try condoms made of polyurethane).

### Does it protect me from sexually transmitted infections (STIs)?

• Yes. Consistent and correct use of the male latex condom reduces the risk of STIs. The condom cannot provide absolute protection against STIs.

00803089

Exhibit 147                                    JA1756                                    JA-0002359

### Female Condom



### What is it?

A thin, lubricated pouch that is put into the vagina. It consists of a nitrile (non-latex) sheath, a flexible larger outer ring, and a polyurethane inner ring to place in the vagina. Nitrile is also commonly used to make surgical gloves.

### How do I use it?

- Put the female condom into the vagina before sex.
- Follow the directions on the package to be sure the penis stays within the condom during sex and does not move outside the condom.
- Use it only once and then throw it away.

### How do I get it?

- You do not need a prescription.
- You can buy it over-the-counter or online.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, about 21 may get pregnant.
- The most important thing is that you use a condom every time you have sex.

### Some Risks

- Discomfort or pain during insertion or sex.
- Burning sensation, rash or itching.

### Does it protect me from sexually transmitted infections (STIs)?

- Yes. When used in the vagina, the female condom reduces the risks of STIs. The condom cannot provide absolute protection against STIs.

### Spermicide Alone
**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**

### What is it?

- A foam, cream, jelly, film, or tablet that you put into the vagina.

### How do I use it?

00803090

Exhibit 147

JA1757

JA-0002360



You need to put spermicide into the vagina 5 to 90 minutes before you have sex.

You usually need to leave it in place at least 6 to 8 hours after sex; do not douche or rinse the vagina for at least 6 hours after sex.

Instructions can be different for each type of spermicide. Read the label carefully before you use a spermicide.

For better pregnancy protection, a spermicide may be used with a condom, diaphragm or cervical cap.

**How do I get it?**

- You do not need a prescription.
- You can buy it over-the-counter.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

- Out of 100 women who use this method, about 28 may get pregnant.
- Different studies show different rates of effectiveness.

**Some Risks**

- Irritation
- Allergic reactions
- Urinary tract infection
- If you are also using a medicine for a vaginal yeast infection, the spermicide might not work as well.

**Does it protect me from sexually transmitted infections (STIs)?** No.

## Other Contraception

**Emergency Contraception (EC): May be used if you did not use birth control or if your regular birth control fails (such as a condom breaks). It should not be used as a regular form of birth control.**

**Levonorgestrel 1.5 MG (1 pill) or Levonorgestrel .75 MG (2 pills)**

**What is it?**

- These are pills with a progestin hormone.
- They help prevent pregnancy after a birth control failure or unprotected sex.

00803091

Exhibit 147
JA1758
JA-0002361



### How does it work?

It works mainly by stopping the release of an egg from the ovary. It may also work by preventing fertilization of an egg (the uniting of sperm with the egg) or by preventing attachment (implantation) to the womb (uterus).

For the best chance for it to work, you should start taking the pill as soon as possible within 72 hours after unprotected sex or birth control failure.

## How do I get it?

- 1-pill version: You can buy it over-the-counter. You do not need a prescription.
- 2-pill version: You can buy it over-the-counter if you are 17 or older. If you are younger than 17, you will need a prescription.
- Both the 1-pill and 2-pill options are equally safe and effective.

### Chance of getting pregnant

- One large study showed 7 out of every 8 women who would have gotten pregnant did not become pregnant after taking emergency contraception; other studies have resulted in lower pregnancy prevention rates.

### Some Side Effects

- Menstrual changes
- Headache, nausea, vomiting, dizzines
- Lower stomach (abdominal) pain
- Breast pain
- Tiredness

**Does it protect me from sexually transmitted infections (STIs)?** No.

### Ulipristal Acetate



### What is it?

A pill that blocks the hormone progesterone.

It helps prevent pregnancy after a birth control failure or unprotected sex.

00803092

Exhibit 147
JA1759
JA-0002362

- It works mainly by stopping or delaying the ovaries from releasing an egg. It may also work by changing the lining of the womb (uterus) that may affect attachment (implantation).

## How do I use it?

- For the best chance for it to work, you should take the pill as soon as possible within 120 hours after unprotected sex.

## How do I get it?

- You need a prescription from a healthcare provider.

## Chance of getting pregnant

- In two large studies, 60 to 66% of expected pregnancies were prevented with correct use of ulipristal acetate.

## Most Common Side Effects

- Headache
- Nausea
- Abdominal pain
- Menstrual pain
- Tiredness
- Dizziness

## Does it protect me from sexually transmitted infections (STIs)? No.

This page should not be used in place of talking to your healthcare provider and reading the label for your product. This page is not intended to guide clinical practice. The product and risk information may change. See the product label and talk with your healthcare provider for more information on the risks of a specific product or on the chance of getting pregnant while using a method.

**More in Free Publications
(/ForConsumers/ByAudience/ForWomen/FreePublications/default.htm)**

**English Publications (/ForConsumers/ByAudience/ForWomen/FreePublications/ucm116718.htm)**

**Spanish Publications (/ForConsumers/ByAudience/ForWomen/FreePublications/ucm116729.htm)**

**Publications in Other Languages
(/ForConsumers/ByAudience/ForWomen/FreePublications/ucm116738.htm)**

00803093

Exhibit 147

JA1760

JA-0002363

←

# Is It Really 'FDA Approved?'



*"FDA approved!"*

Maybe you saw those words on a company's website, or in a commercial promoting a new product or treatment. Some marketers may say their products are "FDA approved," but how can you know for sure what the U.S. Food and Drug Administration approves?

FDA is responsible for protecting public health by regulating human drugs and biologics, animal drugs, medical devices, tobacco products, food (including animal food), cosmetics, and electronic products that emit radiation.

But not all those products undergo premarket approval — that is, a review of safety and effectiveness by FDA experts and agency approval before a product can be marketed. In some cases, FDA's enforcement efforts focus on products after they are already for sale. That is determined by Congress in establishing FDA's authorities (/about-fda/fda-basics/what-does-fda-regulate). Even when FDA approval is not required before a product is sold, the agency has regulatory authority (http://www.fda.gov/NewsEvents/ProductsApprovals/default.htm) to act when safety issues arise.

Here is a guide to how FDA regulates products — and what the agency does (and doesn't) approve.

## FDA doesn't approve companies.

FDA does not "approve" health care facilities, laboratories, or manufacturers. FDA does have authority to inspect regulated facilities to verify that they comply with applicable good manufacturing practice regulations.

Exhibit 148                                      JA1761                                      JA-0002364

Owners and operators of domestic or foreign food, drug, and most device facilities must register their facilities with FDA, unless an exemption applies. Blood and tissue facilities also must register with the agency.

Mammography facilities must be FDA certified and must display their FDA certificates where patients can see them. The certificate indicates that the facilities have met stringent standards for providing quality mammography (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMQSA/mqsa.cfm).

## FDA approves new drugs and biologics.

New drugs and certain biologics must be proven safe and effective to FDA's satisfaction before companies can market them in interstate commerce. Some examples of biologics that require approval are therapeutic proteins, vaccines, cellular therapies, and blood and blood products. Manufacturers must also prove they are able to make the drug product according to federal quality standards.

FDA does not develop or test products before approving them. Instead, FDA experts review the results of laboratory, animal, and human clinical testing done by manufacturers. If FDA grants an approval, it means the agency has determined that the benefits of the product outweigh the known risks for the intended use.

See the directory of approved and unapproved finished drugs on the market (/drugs/drug-approvals-and-databases/national-drug-code-directory).

## FDA doesn't approve compounded drugs.

Compounding is generally a practice in which a pharmacist or a doctor combines ingredients to create medications that meet the needs of individual patients, including those who are allergic to ingredients in FDA-approved medicines or who cannot swallow an FDA-approved pill. But consumers need to be aware that compounded drugs are not FDA approved. This means that FDA does not review applications for compounded drugs to evaluate their safety, effectiveness, or quality.

## FDA uses a risk-based, tiered approach for regulating medical devices.

FDA classifies devices according to risk. The highest-risk devices (Class III), such as mechanical heart valves and implantable infusion pumps, generally require FDA approval of a premarket approval application before marketing. To receive FDA approval for these devices, manufacturers must demonstrate with sufficient, valid scientific evidence that there is a reasonable assurance that the devices are safe and effective for their intended uses.

Generally, FDA "clears" moderate-risk medical devices (Class II) (for example dialysis equipment and many types of catheters) for marketing once it has been demonstrated that the device is substantially equivalent to a legally marketed predicate device that does not require premarket approval.

Devices that present a low risk of harm to the user (Class I) (for example non-powered breast pumps, elastic bandages, tongue depressors, and exam gloves) are subject to general controls only, and most are exempt from premarket notification requirements.

## FDA uses a risk-based approach for human cells and tissues.

All human cells and tissues intended for use in humans — collectively referred to as human cells, tissues, and cellular and tissue based products — are regulated to prevent the transmission of infectious disease. Those that pose an additional risk also require FDA approval before marketing. Examples of cells and tissues include bone, skin, corneas, ligaments, tendons, dura mater, heart valves, and reproductive tissue.

## FDA doesn't approve tobacco products.

There's no such thing as a safe tobacco product, so FDA's safe and effective standard for evaluating medical products is not appropriate for tobacco products. Instead, FDA regulates tobacco products based on a public health standard that considers the product's risks to the population as a whole.

To legally sell or distribute a new tobacco product in the United States, manufacturers must receive a written order from FDA. There are three pathways available to bring a tobacco product to market: premarket tobacco applications (/premarket-tobacco-applications), substantial equivalence applications (http://www.fda.gov/TobaccoProducts/Labeling/TobaccoProductReviewEvaluation/SubstantialEquivalence/default.htm), or exemption from substantial equivalence (http://www.fda.gov/TobaccoProducts/Labeling/TobaccoProductReviewEvaluation/ExemptionfromSubstantialEquivalence/default.htm).

Exhibit 148
                                        JA1762                                        JA-0002365

A marketing order does not indicate that the tobacco product is either safe or "approved." It means that the manufacturer has complied with the requirements under the law to bring its product to market.

## FDA approves food additives in food for people.

Although FDA does not have premarket approval of food products, it has the authority to approve certain ingredients before they are used in foods. Those include food additives, such as substances added intentionally to food, and color additives.

Companies that want to add new food additives to food are responsible for providing FDA with information demonstrating that the additives are safe. FDA experts review the results of appropriate tests done by companies to ensure that the food additive is safe for its intended use. An approved food additive must be used in compliance with its approved uses, specifications, and restrictions.

Some food additives are food contact substances that could migrate into food, such as coatings, plastics, paper and adhesives, as well as colorants, antimicrobials, and antioxidants found in packaging. They undergo a different review process. The same safety standards still apply, but the food contact notification process is specific to the identified manufacturer or supplier. If at the end of the review period FDA does not object, the food contact notification becomes effective and the food contact substance may be legally marketed.

Certain food ingredients, such as those that are considered "generally recognized as safe" (GRAS) by scientific experts, do not require premarket approval as a food additive. FDA has a voluntary notification process under which a manufacturer may submit a conclusion that the use of an ingredient is GRAS.

## FDA approves color additives used in FDA-regulated products.

This includes those used in food (including animal food), dietary supplements, drugs, cosmetics, and some medical devices. These color additives (except coal-tar hair dyes) are subject by law to approval by the agency, and each must be used only in compliance with its approved uses, specifications, and restrictions.

In the approval process, FDA evaluates safety data to ensure that a color additive is safe for its intended purposes.

## FDA approves animal drugs and approves food additives for use in food for animals.

FDA is responsible for approving drugs for animals, including pets, livestock, and poultry. (Minor animal species include animals other than cattle, swine, chickens, turkeys, horses, dogs, and cats.)

Although FDA does not approve animal foods, including pet food, for marketing, it does approve food additives used in these products. FDA works to help ensure that food for animals (which includes livestock and poultry food, pet food and pet treats) is safe, made under sanitary conditions, and properly labeled.

The Preventive Controls for Animal Food rule, a new regulation mandated by the FDA Food Safety Modernization Act (FSMA), requires food companies to take steps to prevent foods from being contaminated and to use current good manufacturing practices (such as hygienic personnel practices, adequate sanitation practices, and proper equipment use) when making food for animals.

## FDA does not approve cosmetics.

Examples of cosmetics are perfumes, makeup, moisturizers, shampoos, hair dyes, face and body cleansers, and shaving preparations. Cosmetic products and ingredients, and their labeling, do not require FDA approval before they go on the market. There's one exception: color additives (other than coal-tar hair dyes). Cosmetics must be safe for their intended use and properly labeled.

## FDA doesn't approve medical foods.

A medical food is used for the dietary management of a disease or health condition that requires special nutrient needs. An example of a medical food is a food for use by persons with phenylketonuria, a genetic disorder. A person with this disorder may need medical foods that are formulated to be free of the amino acid phenylalanine. A medical food is intended for use under the supervision of a physician. It doesn't include products such as meal replacements or diet shakes, or products for the management of diseases like diabetes, which can be managed through modification of the normal diet.

Medical foods do not have to undergo premarket approval by FDA. But medical food companies must comply with other requirements, such as good manufacturing practices and registration of food facilities. Medical foods do not have to include nutrition information on their labels, and any claims in their labeling must be truthful and not misleading.

## FDA doesn't approve infant formula.

Exhibit 148

JA1763

JA-0002366

FDA does not approve infant formulas before they can be marketed. But manufacturers of infant formula are subject to FDA's regulatory oversight.

Manufacturers must ensure that infant formula complies with federal nutrient requirements. Manufacturers must register with FDA and provide the agency with a notification before marketing a new formula.

FDA conducts yearly inspections of all facilities that manufacture infant formula and collects and analyzes product samples. FDA also inspects new facilities. If FDA determines that an infant formula presents a risk to human health, the manufacturer of the formula must conduct a recall.

### FDA doesn't approve dietary supplements.

Unlike new drugs, dietary supplements are not reviewed and approved by FDA based on their safety and effectiveness. Unless an exception applies, dietary supplements that contain a new dietary ingredient (a dietary ingredient not marketed in the United States before Oct. 15, 1994) require a notification to FDA at least 75 days before marketing.

The notification must include the information that provides the manufacturer's or distributor's basis for concluding that the dietary supplement will reasonably be expected to be safe. When public health concerns arise about a dietary supplement after the product is on the market, FDA evaluates the product's safety through research and adverse event monitoring.

### FDA doesn't approve the food label, including the Nutrition Facts panel.

FDA does not approve individual food labels before food products can be marketed. But FDA regulations require nutrition information to appear on most foods, including dietary supplements. Also, any claims on food products must be truthful and not misleading, and must comply with any regulatory requirements for the type of claim.

Manufacturers must provide the serving size of the food and specified information about the nutrient content of each serving on the "Nutrition Facts" panel of the food label (or on the "Supplement Facts" panel for dietary supplements).

### FDA doesn't approve structure-function claims on dietary supplements and other foods.

Structure-function claims describe the role of a food or food component (such as a nutrient) that is intended to affect the structure or function of the human body. One example is "calcium builds strong bones."

Dietary supplement companies that make structure-function claims on labels or in labeling must submit a notification to FDA. This notification must be submitted no later than 30 days after first marketing the dietary supplement with the structure-function claim. Also, the notification must include the text of the claim, as well as other information, such as the name and address of the notifier. Structure-function claims on dietary supplements carry a disclaimer stating that the claim has not been reviewed by FDA, and that the product is not intended to diagnose, treat, cure, or prevent any disease.

FDA does not require conventional food manufacturers to notify FDA about their structure-function claims or to carry a disclaimer.

### Misuse of FDA's logo may violate federal law.

FDA's logo is for official government use only. FDA's logo should not be used to misrepresent the agency or to suggest that FDA endorses any private organization, product, or service.

These are just some of the many ways FDA is responsible for protecting the public health.

Exhibit 148　　　　　　　　　　　　　　JA1764　　　　　　　　　　　　　　JA-0002367

# EXHIBIT P

Exhibit 149

JA-0002368

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

COMMONWEALTH OF
PENNSYLVANIA,

              Plaintiff,

    v.                            **NO. 2:17-cv-04540-WB**

DONALD J. TRUMP *et al.*

              Defendants.

## **DECLARATION OF SETH A. MENDELSOHN**

I, Seth A. Mendelsohn, declare and state as follows:

1.     I am the Executive Deputy Insurance Commissioner for the Pennsylvania
Department of Insurance (the "Department"). In this capacity I oversee, *inter alia*, the Office of
Insurance Product Regulation and Administration, including the Bureau of Life, Accident and
Health Insurance.

2.     The Department is the primary regulator for all health insurance products sold in
the Commonwealth of Pennsylvania.

3.     Insurance providers are subject to a complex set of federal and state laws and
regulations, and federal and state agencies have distinct but overlapping responsibilities in
regulating these entities.

4.     For instance, the federal Employee Retirement Income Security Act of 1974, 29
U.S.C. § 1001 *et seq.* (ERISA), governs most employee health care coverage and other benefit
plans offered by private employers. ERISA preempts certain state laws relating to the regulation
of insurance.

Exhibit 149

5.      As a result of the preemption provisions of ERISA, the Department does not regulate self-funded health care coverage plans offered by private employers, which are plans established and maintained by an employer or by an employee organization for which the employer or employee organization bears the direct financial risk for the cost of claims for health care benefits. These plans are subject to ERISA and are regulated primarily by the U.S. Department of Labor.

6.      The Department does regulate fully-insured employer group health insurance policies. These are health plans that an employer group purchases from an insurer, for which the insurer assumes the direct financial risk for the cost of claims for health care benefits.

7.      In addition, the Department regulates health insurance policies offered in the individual market.

8.      I am familiar with the Affordable Care Act's requirement that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services, including FDA-approved methods of contraception, without any cost-sharing requirements (the "Contraceptive Care Mandate").

9.      The Contraceptive Care Mandate applies both to ERISA-regulated plans as well as almost all insured group and individual health insurance plans that are regulated by the Department.

10.      More than 2.5 million women in Pennsylvania could benefit from the Contraceptive Care Mandate. This total includes women who receive insurance through their employer or through a spouse or other family member's employer, along with those who purchase insurance for themselves and their families through the individual market.

2

Exhibit 149

11.     The Department estimates that the women in Pennsylvania who have benefited from the Contraceptive Care Mandate have saved over $250 million annually as a result.

12.     Many states have enacted laws requiring insurers that cover prescription drugs to provide coverage for any Food and Drug Administration-approved contraceptive. These statutes are commonly referred to as "contraceptive parity" laws.

13.     Pennsylvania, however, does not have a "contraceptive parity" statute. As a result, employers offering Department-regulated plans that opt out of the ACA's Contraceptive Care Mandate will not be subject to any requirement to provide contraceptives to their employees and beneficiaries. Thus, women in plans provided by these employers will not receive contraceptive coverage through these plans.

14.     Similarly, employers offering plans that are subject to ERISA that opt out of the Contraceptive Care Mandate will also not be subject to any requirement to provide contraception to their employees and beneficiaries.

15.     The Department anticipates that women who lose contraceptive coverage through employer plans – whether the plan of their own employer or that of another family member – may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.

16.     Further, insofar as the Final Rules[1] effectively expand the universe of employers that may claim a contraceptive coverage exemption, even more women may be denied access to contraceptive coverage.

---

[1] "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57536 et seq. (Nov. 15, 2018) and "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57592 et seq. (Nov. 15, 2018) (the "Final Rules").

3

Exhibit 149

17.     Moreover, because the Final Rules contemplate that individuals, covered by employer plans that provide contraceptive care, may nevertheless opt out of the ACA's Contraceptive Care Mandate, and, in so doing, effectively deny contraceptive care to all of the individual's female dependents covered by the same plan, still more women may be denied access to contraceptive coverage.

18.     In any case, whether it is the employer's choice or the individual's choice or the choice of the individual as to whom a woman is a dependent, women who have access to affordable employer-based coverage but who lose contraceptive coverage as a result of the Final Rules will be unable to purchase individual coverage on the marketplace with any applicable premium tax credit and cost sharing reductions.  Again, the Department anticipates that women put in this position may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Seth A. Mendelsohn

SETH A. MENDELSOHN

Dated: December 12, 2018

4

Exhibit 149                              JA1769                              JA-0002372

U.S. Department of Health & Human Services

## Office of Adolescent Health

# Trends in Teen Pregnancy and Childbearing

## Teen Births

In 2016, there were 20.3 births for every 1,000 adolescent females ages 15-19, or 209,809 babies born to females in this age group.[1] Births to teens ages 15-19 account for 5.3 percent of all births in 2016. Nearly nine in ten (89 percent) of these births occurred outside of marriage.[1] The 2016 teen birth rate (births per 1,000 females ages 15-19 in a given year) is down nine percent from 2015, when the birth rate was 22.3, and down 67 percent from 1991 when it was at a record high of 61.8.[1] The teen birth rate has declined more or less continuously over the past quarter century, and is at the lowest level ever recorded. Still, the teen birth rate in the United States remains higher than that in many other developed countries, including Canada and the United Kingdom.[2]

Not all teen births are first births. In 2016, one in six (17 percent) births to 15- to 19-year-olds were to females who already had one or more births.[1] Avoiding repeat teen births is one of the goals of OAH's Pregnancy Assistance Fund (PAF) grant program to states and tribes. Grantees may use PAF Program funds to help expectant and parenting teens complete high school or earn postsecondary degrees, as well as to gain access to healthcare, child care, family housing, and other critical supports. The money can also be used to improve services for pregnant women who are victims of domestic violence and to increase public awareness and education efforts surrounding teen pregnancy prevention, among other activities. Through PAF Program grants, OAH also supports work with adolescent males who become young fathers. Find more information about the Pregnancy Assistance Fund.

## Variations in Teen Birth Rates across Populations

Teen birth rates differ substantially by age, racial and ethnic group, and region of the country. Most adolescents who give birth are 18 or older; in 2016, 74 percent of all teen births occurred to 18- to 19-year-olds.[1] Birth rates are also higher among Hispanic and black adolescents than among their white counterparts. In 2016, Hispanic adolescent females ages 15-19 had a higher birth rate (31.9 births per 1,000 adolescent females) than black adolescent females (29.3) and white adolescent females (14.3) (see Figure 1).[1] To help put these differences in perspective, estimates from 2013 show that eight percent of white adolescent females will give birth by their 20th birthday, as will 16 percent of black adolescent females and 17 percent of Hispanic adolescent females.[3]

Although Hispanic teens still have a higher birth rate than their black and white peers, the rate has declined substantially in recent years. Since 2007, the teen birth rate among Hispanics has declined by 58 percent, compared with declines of 53 percent for blacks and 47 percent for whites.[1]

Figure 1: Birth rates per 1,000 females ages 15-19, by race and Hispanic origin of mother, 1990-2016

Exhibit 152　　　　　　　　　　　　　　　　JA1770　　　　　　　　　　　　　　　　JA-0002556

In 1990, birth rates were 116.2 for black adolescents, 100.3 for
Hispanic adolescents, and 42.5 for white adolescents. In 2016, the birth
rates were 29.3 for black adolescents, 31.9 for Hispanic adolescents,
and 14.3 for white adolescents.

*Source for 1990-2014: Centers for Disease Control and Prevention. (2015). Births: Final data for 2014.
National Vital Statistics Reports, 64(12). Retrieved
from https://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_12.pdf - PDF*

*Source for 2015: Centers for Disease Control and Prevention. (2017). Births: Final data for 2015. National
Vital Statistics Reports, 66(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_01.pdf -
PDF*

*Source for 2016: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. National
Vital Statistics Reports, 67(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_01.pdf -
PDF*

Table 1: Birth rates per 1,000 females ages 15-19, by race and Hispanic origin of mother, 1990-2016

| Year | Total | White | Black | Hispanic |
|------|-------|-------|-------|----------|
| 1990 | 59.9 | 42.5 | 116.2 | 100.3 |
| 1991 | 61.8 | 43.4 | 118.2 | 104.6 |
| 1992 | 60.3 | 41.7 | 114.7 | 103.3 |
| 1993 | 59.0 | 40.7 | 110.5 | 101.8 |
| 1994 | 58.2 | 40.4 | 105.7 | 101.3 |
| 1995 | 56.0 | 39.3 | 97.2 | 99.3 |
| 1996 | 53.5 | 37.6 | 91.9 | 94.6 |
| 1997 | 51.3 | 36.0 | 88.3 | 89.6 |
| 1998 | 50.3 | 35.3 | 85.7 | 87.9 |
| 1999 | 48.8 | 34.1 | 81.0 | 86.8 |
| 2000 | 47.7 | 32.6 | 79.2 | 87.3 |
| 2001 | 45.0 | 30.3 | 73.1 | 84.4 |
| 2002 | 42.6 | 28.6 | 67.7 | 80.6 |

Exhibit 152                                      JA1771                                   JA-0002557

| Year | Total | White | Black | Hispanic |
|------|-------|-------|-------|----------|
| 2003 | 41.1 | 27.4 | 63.7 | 78.4 |
| 2004 | 40.5 | 26.7 | 61.8 | 78.1 |
| 2005 | 39.7 | 26.0 | 59.4 | 76.5 |
| 2006 | 41.1 | 26.7 | 61.9 | 77.4 |
| 2007 | 41.5 | 27.2 | 62.0 | 75.3 |
| 2008 | 40.2 | 26.7 | 60.4 | 70.3 |
| 2009 | 37.9 | 25.7 | 56.7 | 63.6 |
| 2010 | 34.3 | 23.5 | 51.5 | 55.7 |
| 2011 | 31.3 | 21.7 | 47.3 | 49.6 |
| 2012 | 29.4 | 20.5 | 43.9 | 46.3 |
| 2013 | 26.5 | 18.6 | 39.0 | 41.7 |
| 2014 | 24.2 | 17.3 | 34.9 | 38.0 |
| 2015 | 22.3 | 16.0 | 31.8 | 34.9 |
| 2016 | 20.3 | 14.3 | 29.3 | 31.9 |

*Source for 1990-2014: Centers for Disease Control and Prevention. (2015). Births: Final data for 2014.*
*National Vital Statistics Reports, 64(12). Retrieved from*
*https://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_12.pdf - PDF*
*Source for 2015: Centers for Disease Control and Prevention. (2017). Births: Final data for 2015. National*
*Vital Statistics Reports, 66(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_01.pdf -*
*PDF*
*Source for 2016: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. National*
*Vital Statistics Reports, 67(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_01.pdf -*
*PDF*

Teen birth rates also vary substantially across regions and states. In 2016, the lowest teen birth rates were reported in the Northeast, while rates were highest in states across the southern part of the country (see Figure 2).[1] See how your state compares on birth rates, pregnancy rates, sexual activity, and contraceptive use with OAH's <u>reproductive health state fact sheets</u>.

Figure 2: Birth rates per 1,000 females ages 15-19, by state, 2016

The U.S. teen birth rate was 20.3 in 2016.

*Source: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. Hyattsville, MD: National Center for Health Statistics. Retrieved from:* https://www.cdc.gov/nchs/pressroom/sosmap/teen-births/teenbirths.htm

Table 2: Birth rates per 1,000 females ages 15-19, by state, 2016

| State | Teen birth rate (ages 15-19 year) | Teen birth rate range |
|---|---|---|
| United States | 20.3 | — |
| Alabama | 28.4 | 28.0 - 34.6 (dark red) |
| Alaska | 25.8 | 23.4 - 26.1 (red) |
| Arizona | 23.6 | 23.4 - 26.1 (red) |
| Arkansas | 34.6 | 28.0 - 34.6 (dark red) |
| California | 17.0 | 15.5 - 17.8 (light orange) |
| Colorado | 17.8 | 15.5 - 17.8 (light orange) |
| Connecticut | 9.4 | 8.5 - 15.0 (cream) |
| Delaware | 19.5 | 18.7 - 21.9 (orange) |
| District of Columbia | 24.0 | 23.4 - 26.1 (red) |
| Florida | 19.3 | 18.7 - 21.9 (orange) |
| Georgia | 23.6 | 23.4 - 26.1 (red) |
| Hawaii | 19.2 | 18.7 - 21.9 (orange) |
| Idaho | 20.1 | 18.7 - 21.9 (orange) |
| Illinois | 18.7 | 18.7 - 21.9 (orange) |
| Indiana | 23.6 | 23.4 - 26.1 (red) |
| Iowa | 17.2 | 15.5 - 17.8 (light orange) |
| Kansas | 21.9 | 18.7 - 21.9 (orange) |

Exhibit 152                                   JA1773                                   JA-0002559

| State | Teen birth rate (ages 15-19 year) | Teen birth rate range |
|-------|-----------------------------------|------------------------|
| Kentucky | 30.9 | 28.0 - 34.6 (dark red) |
| Louisiana | 30.6 | 28.0 - 34.6 (dark red) |
| Maine | 14.7 | 8.5 - 15.0 (cream) |
| Maryland | 15.9 | 15.5 - 17.8 (light orange) |
| Massachusetts | 8.5 | 8.5 - 15.0 (cream) |
| Michigan | 17.7 | 15.5 - 17.8 (light orange) |
| Minnesota | 12.6 | 8.5 - 15.0 (cream) |
| Mississippi | 32.6 | 28.0 - 34.6 (dark red) |
| Missouri | 23.4 | 23.4 - 26.1 (red) |
| Montana | 23.7 | 23.4 - 26.1 (red) |
| Nebraska | 19.1 | 18.7 - 21.9 (orange) |
| Nevada | 24.2 | 23.4 - 26.1 (red) |
| New Hampshire | 9.3 | 8.5 - 15.0 (cream) |
| New Jersey | 11.0 | 8.5 - 15.0 (cream) |
| New Mexico | 29.8 | 28.0 - 34.6 (dark red) |
| New York | 13.2 | 8.5 - 15.0 (cream) |
| North Carolina | 21.8 | 18.7 - 21.9 (orange) |
| North Dakota | 20.3 | 18.7 - 21.9 (orange) |
| Ohio | 21.8 | 18.7 - 21.9 (orange) |
| Oklahoma | 33.4 | 28.0 - 34.6 (dark red) |
| Oregon | 16.6 | 15.5 - 17.8 (light orange) |
| Pennsylvania | 15.8 | 15.5 - 17.8 (light orange) |

Exhibit 152                                      JA1774                                      JA-0002560

| State | Teen birth rate (ages 15-19 year) | Teen birth rate range |
|---|---|---|
| Rhode Island | 12.9 | 8.5 - 15.0 (cream) |
| South Carolina | 23.7 | 23.4 - 26.1 (red) |
| South Dakota | 25.1 | 23.4 - 26.1 (red) |
| Tennessee | 28.0 | 28.0 - 34.6 (dark red) |
| Texas | 31.0 | 28.0 - 34.6 (dark red) |
| Utah | 15.6 | 15.5 - 17.8 (light orange) |
| Vermont | 10.3 | 8.5 - 15.0 (cream) |
| Virginia | 15.5 | 15.5 - 17.8 (light orange) |
| Washington | 16.6 | 15.5 - 17.8 (light orange) |
| West Virginia | 29.3 | 28.0 - 34.6 (dark red) |
| Wisconsin | 15.0 | 8.5 - 15.0 (cream) |
| Wyoming | 26.1 | 23.4 - 26.1 (red) |

*Source: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. Hyattsville, MD: National Center for Health Statistics. Retrieved from: https://www.cdc.gov/nchs/pressroom/sosmap/teen-births/teenbirths.htm*

## Teen Pregnancies

The national teen pregnancy rate (number of pregnancies per 1,000 females ages 15-19) has declined almost continuously over the last quarter century. The teen pregnancy rate includes pregnancies that end in a live birth, as well as those that end in abortion or miscarriage (fetal loss).* The teen pregnancy rate declined by 63 percent in less than 25 years — from 117.6 pregnancies per 1,000 females ages 15-19 in 1990 to 43.4 in 2013 (the most recent year in which data are available).[4] According to recent research, this decline is due to the combination of an increased percentage of adolescents who are waiting to have sexual intercourse and the increased use of effective contraceptives by teens.[4,5]

About 77 percent of teen pregnancies are unplanned. In other words, the pregnancies are unwanted or occurred "too soon," according to a national survey of adolescents.[6] In 2013, the majority of pregnancies to adolescent females ages 15-19 in the United States — an estimated 61 percent — ended in a live birth;

Exhibit 152                                JA1775                                    JA-0002561

15 percent ended in a miscarriage; and 25 percent ended in an abortion. The rate of abortions among adolescents is the lowest since abortion was legalized in 1973 and is 76 percent lower than its peak in 1988.[4]

\* The teen pregnancy rate is the sum all live births, abortions, and miscarriages (or fetal losses) per 1,000 adolescent females ages 15-19 in a given year.

## Characteristics Associated with Adolescent Childbearing

Numerous individual, family, and community characteristics have been linked to adolescent childbearing. For example, adolescents who are enrolled in school and engaged in learning (including participating in after-school activities, having positive attitudes toward school, and performing well educationally) are less likely than are other adolescents to have a baby.[7] At the family level, adolescents with mothers who gave birth as teens and/or whose mothers have only a high school degree are more likely to have a baby before age 20 than are teens whose mothers were older at their birth or who attended at least some college. In addition, having lived with both biological parents at age 14 is associated with a lower risk of a teen birth.[6] At the community level, adolescents who live in wealthier neighborhoods with strong levels of employment are less likely to have a baby than are adolescents in neighborhoods in which income and employment opportunities are more limited.[7]

---

< Previous: Teen Pregnancy Prevention Program

Next: Negative Impacts of Teen Childbearing >

---

## Footnotes

[1] Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. National Vital Statistics Reports, 67(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_01.pdf - PDF

[2] United Nations Statistics Division. (2015). *Demographic Yearbook 2013*. New York, NY: United Nations. Retrieved from http://unstats.un.org/unsd/demographic/products/dyb/dyb2013/Table10.pdf - PDF

[3] Cook, E. (Unpublished). *Percentage of teens who will experience a first birth based on analyses of NCHS Vital Statistics 2013 final birth data.* Washington, DC: Child Trends.

[4] Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017). *Pregnancies, births and abortions among adolescents and young women in the United States, 2013: National and state trends by age, race and ethnicity.* Guttmacher Institute. Retrieved from https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf - PDF

[5] Santelli, J. S., Lindberg, L. D., Finer, L. B., & Singh, S. (2007). Explaining recent declines in adolescent pregnancy in the United States: The contribution of abstinence and improved contraceptive use. *American Journal of Public Health, 97*(1), 150-156.

Exhibit 152                                    JA1776                                    JA-0002562

Case 1:25-cv-25550-WDB Document 34-125 Filed 03/20/25 Page 513 of 613 Page 677

[6] Centers for Disease Control and Prevention. (2012). *National health statistics reports: Intended and unintended births in the United States: 1982-2010* (No. 55). Retrieved from http://www.cdc.gov/nchs/data/nhsr/nhsr055.pdf - PDF

[7] Kirby, D., & Lepore, G. (2007). *Sexual risk and protective factors: Factors affecting teen sexual behavior, pregnancy, childbearing and sexually transmitted disease.* Washington, DC: ETR Associates and The National Campaign to Prevent Teen and Unplanned Pregnancy. Retrieved from http://recapp.etr.org/recapp/documents/theories/RiskProtectiveFactors200712.pdf - PDF

[8] Centers for Disease Control and Prevention. (2011). Teenagers in the United States: Sexual activity, contraceptive use, and childbearing, 2006-2010 National Survey of Family Growth. *Vital Health Statistics, 23*(31). Retrieved from http://www.cdc.gov/nchs/data/series/sr_23/sr23_031.pdf - PDF

---

Content created by Office of Adolescent Health

Content last reviewed on May 14, 2019



Exhibit 152                              JA1777                                    JA-0002563

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
and STATE OF NEW JERSEY,

     Plaintiffs,

  v.

DONALD J. TRUMP, et al.

     Defendants,

LITTLE SISTERS OF THE POOR SAINTS
PETER AND PAUL HOME,

     Intervenor-Defendant.

No. 17-CV-4540-WB

**INTERVENOR-DEFENDANT'S
SUPPLEMENTAL JOINT
APPENDIX**

| SUPPLEMENTAL JOINT APPENDIX INDEX | | | |
|---|---|---|---|
| **Exhibit Number** | **Begin Bates** | **End Bates** | **Description** |
| Exhibit 177 | JA-0003410 | JA-0003413 | Mendelsohn Decl., Dkt. No. 90-18 |
| Exhibit 178 | JA-0003414 | JA-0003418 | Gennace Decl., Dkt. No. 90-22 |
| Exhibit 179 | JA-0003419 | JA-0003428 | Chuang Decl. Excerpt, Dkt. No. 90-14 |
| Exhibit 180 | JA-0003429 | JA-0003437 | Butts Decl. Excerpt, Dkt. No. 90-17 |
| Exhibit 181 | JA-0003438 | JA-0003443 | Allen Decl., Dkt. No. 90-19 |
| Exhibit 182 | JA-0003444 | JA-0003448 | Adelman Decl., Dkt. No. 90-21 |
| Exhibit 183 | JA-0003449 | JA-0003453 | Luke Vander Bleek Comments on RFI |
| Exhibit 184 | JA-0003454 | JA-0003471 | Campaign Life Missouri Comments on RFI |
| Exhibit 185 | JA-0003472 | JA-0003476 | Current HRSA Guidelines |

Date Filed: 12/12/2025    Page: 516    Document: 34-4    Case: 25-2575

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

                    Plaintiff,

    v.

DONALD J. TRUMP *et al.*

                    Defendants.

NO. 2:17-cv-04540-WB

### DECLARATION OF SETH A. MENDELSOHN

I, Seth A. Mendelsohn, declare and state as follows:

    1.     I am the Executive Deputy Insurance Commissioner for the Pennsylvania Department of Insurance (the "Department"). In this capacity I oversee, *inter alia*, the Office of Insurance Product Regulation and Administration, including the Bureau of Life, Accident and Health Insurance.

    2.     The Department is the primary regulator for all health insurance products sold in the Commonwealth of Pennsylvania.

    3.     Insurance providers are subject to a complex set of federal and state laws and regulations, and federal and state agencies have distinct but overlapping responsibilities in regulating these entities.

    4.     For instance, the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA), governs most employee health care coverage and other benefit plans offered by private employers. ERISA preempts certain state laws relating to the regulation of insurance.

JA-0003410

Case: 25-2575    Document: 34-4    Page: 517    Date Filed: 12/12/2025

5.      As a result of the preemption provisions of ERISA, the Department does not regulate self-funded health care coverage plans offered by private employers, which are plans established and maintained by an employer or by an employee organization for which the employer or employee organization bears the direct financial risk for the cost of claims for health care benefits.  These plans are subject to ERISA and are regulated primarily by the U.S. Department of Labor.

6.      The Department does regulate fully-insured employer group health insurance policies.  These are health plans that an employer group purchases from an insurer, for which the insurer assumes the direct financial risk for the cost of claims for health care benefits.

7.      In addition, the Department regulates health insurance policies offered in the individual market.

8.      I am familiar with the Affordable Care Act's requirement that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services, including FDA-approved methods of contraception, without any cost-sharing requirements (the "Contraceptive Care Mandate").

9.      The Contraceptive Care Mandate applies both to ERISA-regulated plans as well as almost all insured group and individual health insurance plans that are regulated by the Department.

10.      More than 2.5 million women in Pennsylvania could benefit from the Contraceptive Care Mandate. This total includes women who receive insurance through their employer or through a spouse or other family member's employer, along with those who purchase insurance for themselves and their families through the individual market.

JA-0003411

11. The Department estimates that the women in Pennsylvania who have benefited from the Contraceptive Care Mandate have saved over $250 million annually as a result.

12. Many states have enacted laws requiring insurers that cover prescription drugs to provide coverage for any Food and Drug Administration-approved contraceptive. These statutes are commonly referred to as "contraceptive parity" laws.

13. Pennsylvania, however, does not have a "contraceptive parity" statute. As a result, employers offering Department-regulated plans that opt out of the ACA's Contraceptive Care Mandate will not be subject to any requirement to provide contraceptives to their employees and beneficiaries. Thus, women in plans provided by these employers will not receive contraceptive coverage through these plans.

14. Similarly, employers offering plans that are subject to ERISA that opt out of the Contraceptive Care Mandate will also not be subject to any requirement to provide contraception to their employees and beneficiaries.

15. The Department anticipates that women who lose contraceptive coverage through employer plans – whether the plan of their own employer or that of another family member – may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.

16. Further, insofar as the Final Rules[1] effectively expand the universe of employers that may claim a contraceptive coverage exemption, even more women may be denied access to contraceptive coverage.

---

[1] "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57536 et seq. (Nov. 15, 2018) and "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57592 et seq. (Nov. 15, 2018) (the "Final Rules").

Case: 25-2575    Document: 34-4    Page: 518    Date Filed: 12/12/2025

JA-0003412

17.    Moreover, because the Final Rules contemplate that individuals, covered by employer plans that provide contraceptive care, may nevertheless opt out of the ACA's Contraceptive Care Mandate, and, in so doing, effectively deny contraceptive care to all of the individual's female dependents covered by the same plan, still more women may be denied access to contraceptive coverage.

18.    In any case, whether it is the employer's choice or the individual's choice or the choice of the individual as to whom a woman is a dependent, women who have access to affordable employer-based coverage but who lose contraceptive coverage as a result of the Final Rules will be unable to purchase individual coverage on the marketplace with any applicable premium tax credit and cost sharing reductions.  Again, the Department anticipates that women put in this position may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


SETH A. MENDELSOHN

Dated: December 12, 2018

4

JA-0003413

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, and STATE OF NEW JERSEY, | Civil Action No: 2:17-cv-04540-WB |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *et al.* | |
| Defendants. | |

## <u>DECLARATION OF PHILIP GENNACE</u>

I, Philip Gennace, declare and state as follows:

1.  I am the Assistant Commissioner of Life and Health in the New Jersey Department of Banking and Insurance ("DOBI"). In this capacity, I oversee, *inter alia*, the licensing and oversight of health insurance regulated by the State of New Jersey. I make this affidavit based on my personal knowledge and information provided to me in my official capacity.

2.  DOBI is the primary regulator for all fully-insured health insurance plans sold in the State of New Jersey.

3.  Insurance carriers are subject to a complex set of federal and state laws and regulations, and federal and state agencies have distinct but overlapping responsibilities in regulating these entities.

4.  For instance, the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), governs most employee benefit plans offered by private employers, including private employers' self-funded employee health benefit plans. ERISA

JA-0003414

preempts most state laws relating to such plans.

5.      As a result of the preemption provisions of ERISA, DOBI does not regulate self-funded health coverage plans offered by private employers, which are plans established and maintained by an employer or by an employee organization for which the employer or employee organization bears the direct financial risk for the costs of claims for health care benefits. These plans are subject to ERISA and are regulated primarily by the U.S. Department of Labor, and are often colloquially referred to as "ERISA plans."

6.      DOBI does regulate fully-insured employer group health plans issued in the State. These are health plans that an employer group purchases from an insurer, for which the insurer assumes the direct financial risk for the cost of claims for health care benefits.

7.      In addition, DOBI regulates health insurance policies offered in the individual market.

8.      I am familiar with the Affordable Care Act's (ACA) requirement that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services, including FDA-approved methods of contraception, without any cost-sharing requirement (the "Contraceptive Care Mandate").

9.      The Contraceptive Care Mandate applies both to non-grandfathered ERISA-regulated plans, as well as almost all insured group and individual health insurance plans that are regulated by DOBI.

10.     In addition, New Jersey law requires employers who offer fully-insured plans to provide coverage for expenses incurred in the purchase of prescription female contraceptives to the same extent as any other outpatient prescription drug under the policy ("New Jersey

JA-0003415

Mandate").[1]

11.    Unlike the ACA's Contraceptive Care Mandate, however, the New Jersey Mandate does not require insurers to cover women's contraceptive services without cost sharing. Also, the ACA contraceptive mandate covers all FDA-approved female contraceptive methods. By contrast, the New Jersey mandate covers only those methods which are obtained via prescription (not those that are available over the counter or through an inpatient or out-patient procedure).

12.    In addition, a religious employer (defined as a church, association or convention of churches, or an elementary or secondary school controlled, operated, or principally supported by a church) is statutorily entitled to an exclusion from the New Jersey Mandate if the required coverage conflicts with the employer's *bona fide* religious beliefs and practices. The exemption is not available for prescription drugs that may act as contraceptives but are prescribed for a particular user for medical reasons other than contraception. Also, the exemption is not available for prescription female contraceptives that are necessary to preserve the life or health of an insured.

13.    Approximately 3,434,000 New Jersey residents who have health coverage are covered by employer plans that are self-funded.[2] Under ERISA, such plans offered by private employers are exempt from state regulation, including the New Jersey Mandate.

14.    Private employers offering self-funded plans that opt out of the Contraceptive Care

---

[1] *See* N.J.S.A. 17B:27A-7.12 (for individual health benefits plans); N.J.S.A. 17B:26-2.1y (for individual health insurers); N.J.S.A. 17:48A-7bb (for medical service corporations); N.J.S.A. 17:48-6ee (for hospital service corporations) and N.J.SA. 17:48E-35.29 (for health service corporations); N.J.S.A. 17:48F-13.2 (for prepaid prescription service organizations); N.J.S.A. 26:2J-4.30 (for health maintenance organizations); N.J.S.A. 17B:27A-19.15 (for small employer health benefits plans); N.J.S.A. 52:14-17.29j (for the State Health Benefits Plan); and N.J.S.A. 17B:27:46.1ee (for group health insurers).

[2] This includes residents covered under New Jersey's state health benefits programs, as well as self-funded plans offered by private employers.

JA-0003416

Mandate under the newly expanded exemptions will not be subject to any federal or state requirement to provide contraception to their employees and beneficiaries. Thus, women in plans provided by these employers will not receive contraceptive coverage through these plans.

15.     Upon information and belief, a number of these newly-exempted employers are expected to be New Jersey employers.  As a result, those newly-exempted entities that offer self-funded plans, or that are church-affiliated schools eligible for New Jersey's religious exemption,[3] would no longer have an obligation to provide any contraceptive coverage for their employees and their employees' female dependents.

16.     Moreover, because the ACA's Contraceptive Care Mandate is broader than the New Jersey Mandate and prohibits cost sharing, even employees and female dependents of newly-exempt employers who offer fully-insured plans subject to the New Jersey Mandate will lose coverage for certain contraceptive methods and be subject to cost sharing that was previously prohibited.

17.     Therefore, many New Jersey women are likely to lose the medical coverage for contraceptive care to which they are otherwise entitled under the ACA.

18.     DOBI anticipates that some women who lose contraceptive coverage through their employer's plans, particularly low-income women, will seek contraceptive coverage from other sources, including state-funded programs, such as the New Jersey Prescription Assistance Program, Medicaid, and Title X clinics. Women who do not seek outside funding or who seek it but do not qualify for financial assistance likely will face substantial additional costs. Among

---

[3] Churches and associations and conventions of churches have been exempted from the ACA's Contraceptive Care Mandate since 2011.  *See* 76 Fed. Reg. 46621-01 (Aug. 3, 2011).  However, unlike Defendants' broad new religious exemption, the 2011 exemption was not applicable to most church-affiliated schools.

JA-0003417

these women, some likely will forgo regular contraceptive use or use cheaper, less effective contraceptive methods, resulting in more unintended pregnancies.

19.     Women who lose their contraceptive coverage obtained through their employers' plans, even if they are in plans that remain subject to the New Jersey Mandate, likely will in many cases face copays and deductibles when attempting to obtain necessary contraceptive coverage. These financial constraints likely will cause some women to change their preferred choice of contraceptive method, fail to consistently maintain their use of contraceptives, or forgo contraceptive use entirely, which will result in more unintended pregnancies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

PHILIP GENNACE

Dated: 12/12/18

JA-0003418

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

     Plaintiff,

 v.

DONALD J. TRUMP, *et al.*,

    Defendants.

**No. 2:17-cv-04540-WB**

### DECLARATION OF CYNTHIA H. CHUANG, M.D., MSc[1]

  I, Cynthia H. Chuang, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned matter and, in support thereof, I state as follows:

### I.   My Background and Experience

  1. I am a practicing general internist, primary care provider, professor, and health services researcher, with a principal research interest in unintended pregnancy prevention and contraceptive decision-making in adult women.

### A. *My Job, Educational Training and Academic Practice*

  2. I work as a Professor of Medicine, Public Health Services, and Obstetrics and Gynecology in the Departments of Medicine, Public Health Sciences, and Obstetrics and Gynecology at the Pennsylvania State University College of Medicine, where I also serve as the Chief of the Division of General Internal Medicine, a division of over 70 physicians with clinical practice in primary care medicine, hospital medicine, palliative care, and post-acute care.

---

[1] I attach a true and correct copy of my curriculum vitae hereto as Exhibit 1.

JA-0003419

3.      I am also the Research Director of the Penn State K12 BIRCWH (Building Interdisciplinary Research Careers in Women's Health) Program.

4.      I have been on faculty at the Penn State College of Medicine since 2004.

5.      I earned a Bachelor of Science degree from the University of Michigan in 1992 and earned my Medical Degree from the New York University School of Medicine in 1997.

6.      Thereafter, I completed my residency and chief residency in Internal Medicine at Temple University Hospital, in Philadelphia, Pennsylvania, in 2001.

7.      I earned a Masters of Science in Epidemiology (MSc) from the Boston University School of Public Health in 2003 and completed my General Internal Medicine fellowship and residency in Preventive Medicine at Boston University School of Medicine, in 2004.

8.      During my training, some of my most formative experiences were when I worked with patients in the areas of pregnancy prevention and contraceptive care at a family planning clinic in rural California; a primary care clinic at Temple University in North Philadelphia, Pennsylvania; and a women's health clinic at Boston Medical Center in Boston, Massachusetts.

9.      Throughout my career, I have been an investigator on a number of studies and projects regarding contraception and reproductive health.  For example, I was the Principal Investigator of a Patient-Centered Outcomes Research Institute (PCORI) contract to design and evaluate interventions aimed at assisting women with personalized contraceptive choices that best meet their individual needs (CD–1304–6117), and recipient of a National Institutes of Health (NIH) K23 career development award to study unintended pregnancy in women with chronic medical conditions.  I am the Penn State site Principal Investigator for the PCORNet PaTH Clinical Data Research Network, a multi-institutional integrated research network in partnership with the University of Pittsburgh/University of Pittsburgh Medical Center, Temple University Health

2

JA-0003420

System, Johns Hopkins University Health System, Geisinger Health System, and the University of Utah Health System.

10. I have authored over 70 scholarly publications, a significant portion of which focus on women's healthcare and preventive services. Among other topics, I have written about: reducing unintended pregnancies through reproductive planning and contraceptive action planning, contraceptive decision-making in women with and without chronic medical conditions, and the meaning of pregnancy intention.

11. Some of my recent articles include:

a. Snyder A, Weisman CS, Liu G, Leslie D, Chuang CH. The impact of the Affordable Care Act on contraceptive use and costs among privately insured women. *Women's Health Issues* 2018, 28(3): 219-223.

b. "Measuring Oral Contraceptive Adherence Using Self-Report Versus Pharmacy Claims Data," Contraception, 2017 Sep 04, Nelson HN, Borrero S, Lehman E, Velott DL, Chuang CH;

c. "How Do Pregnancy Intentions Affect Contraceptive Choices When Cost Is Not a Factor? A Study of Privately Insured Women," Contraception, 2015 Nov; 92(5):501-7, Weisman CS, Lehman EB, Legro RS, Velott DL, Chuang CH; and

d. "Making the Most of the Affordable Care Act's Contraceptive Coverage Mandate for Privately-Insured Women," Women's Health Issues, 2014 Sep-Oct; 24(5):465-8, Weisman CS, Chuang CH.

12. I have received multiple awards and recognitions for my academic work including delivering the 2017 Spring Dean's Lecture (Contraceptive Use: Before, During and After the Affordable Care Act). I received the Dean's Award for Innovation in Team Science in 2014, the

JA-0003421

Department of Medicine Excellence in Mentoring Award in 2014 and the Junior Faculty Award for Excellence in Research in 2008. I have also received the Dean's Award for Excellence in Teaching in 2010 and 2014, and the Special Recognition for Education Leadership and Service Award on 2005.

**B.** *My Medical Practice*

13.     In addition to my academic work, I am also a clinician and maintain an active adult primary care practice in Hershey, Pennsylvania, in which a portion of my patients are women of child-bearing age.

14.     My practice is focused on preventive medicine and chronic disease management.

15.     For my female patients of child-bearing age, preventive medicine includes reproductive life planning, including the use of contraceptives.

16.     For medical reasons, the ideal "spacing" between pregnancies is eighteen months, because there is a greater risk of poor birth outcomes, like low birthweight and preterm birth, if pregnancies are not properly spaced.

17.     I routinely have conversations with my patients about spacing out their pregnancies due to their medical health and educational, work and economic goals.  Indeed, the Centers for Disease Control and Prevention (CDC) recommends that doctors counsel their patients about issues of "reproductive life planning," including their life, financial and job goals.

18.     These conversations routinely result in changes to patients' contraceptive care. Indeed, I have found that it is important to be flexible with respect to contraceptive care because patients' changing life situations will frequently call for changes in their contraceptive method choice.

19.     Through my medical practice, I have found that the most important thing about

4

JA-0003422

providing preventive contraceptive care is to counsel my patients to use the method of contraception that is best suited for their individual needs at their particular place in life.

20.     My patients are generally highly insured and mostly white.

21.     Some live in highly rural areas and drive long distances to see me.

22.     I direct low-income patients without insurance to the Medicaid program (if eligible). I direct other uninsured or underinsured women without contraceptive coverage to seek care through Planned Parenthood, or another Federally Qualified Health Center (FQHC), where they may qualify for contraceptive coverage under Title X.

23.     Some of my patients also work for and receive their health insurance through Catholic Schools and other institutions which might seek to eliminate contraceptive coverage through their employer-sponsored plans under the new religious and moral exemptions.

## II.     My Opinion on the Final Religious Exemption Rule and Final Moral Exemption Rule

24.     I have reviewed both the final Religious Exemption Rule and the final Moral Exemption Rule (together, the "Final Exemption Rules"), as well as the amended Complaint filed by the Commonwealth of Pennsylvania in the above-captioned matter that challenges them.

25.     Based upon my knowledge, education, training and experience, it is my professional opinion that the Final Exemption Rules will cause immediate and irreversible harm because they will cause women to lose preventive contraceptive care under their employer group health plans.

### A. *Cost is a Barrier to Contraceptive Access*

26.     It is my understanding, and it has been my experience, that cost is a barrier to access to contraceptives.   This has been corroborated in research studies.

27.     Prior to passage of the Affordable Care Act (the "Affordable Care Act" or "ACA"),

5

JA-0003423

before preventive contraceptive care was provided at no out-of-pocket cost under the ACA's contraceptive mandate, I regularly counseled my patients about the cost related to their recommended contraceptive choices.

28.    At that time, it was not unusual for my patients to reject the specific contraceptive I had recommended due to its cost; instead, they would request that I prescribe a less effective, but cheaper, method of contraception.  Or they would forego use of contraception altogether.

29.    Such requests were most frequent when I had recommended intrauterine Devices (IUDs) or contraceptive implants. IUDs and implants carried heavy cost-sharing responsibilities and, therefore, were most expensive to patients pre-ACA.  But they are also a much more effective method of contraceptive care (<1% failure rate) than birth control pills (9% failure rate).

30.    After the ACA passed and the contraceptive mandate was instituted, however, I saw that my patients were free to make contraceptive choices on the basis of their medical and personal needs and concerns, alone, without the burden of having to weigh the cost of the preferred medical choice. Put otherwise, post-ACA, the only concern has become what is best for the patient.

31.    Since the ACA passed, no patient has contacted me to ask for a different, cheaper method of contraception than the one I had prescribed due to the cost under private insurance plans.

32.    Furthermore, as a result of the ACA's contraceptive mandate, I have seen patients switch from a cheaper, less effective method to a more effective, expensive method that was better for their medical health and personal needs.

JA-0003424

**B.** ***Because Patients Will Lose Contraceptive Coverage under the New Final Exemption Rules, They Will Make Less Medically Sound Contraceptive Choices and, Therefore, Will Be Harmed***

33.    It is apparent, however, that under the new Final Exemption Rules this post-ACA focus on what is best for the patient will change.

34.    This is so because, as a result of the Final Exemption Rules, some women will lose insurance coverage for preventive contraceptive care.

35.    As a result, their costs for contraceptive care will rise.

36.    Based upon my own experience and existing scientific and empirical information that I have reviewed and am aware of, under the new Final Exemption Rules, cost will, again, become a barrier to women's access to and use of the contraceptive that is medically recommended for them.

37.    Many of these women who will no longer receive contraceptive coverage will not only face financial harm, but will also face medical harm.

38.    This harm will manifest itself in the disruption of these patients' medical treatment, whether by substituting a less effective but cheaper method of contraception or by being forced to stop using contraceptives at all, due to financial reasons.

39.    Some of these women will face unintended pregnancy and other adverse medical consequences.

**C.** ***The New Final Exemption Rules Are Not Based Upon Sound Scientific or Empirical Evidence***

40.    It is also my opinion that the new Final Exemption Rules are not based upon sound scientific or empirical evidence.

41.    The Final Exemption Rules indicate, among other things, that contraceptives are not effective in preventing unintended pregnancy.  This is false.

7

JA-0003425

42.     This claim in the Final Exemption Rules is inconsistent with the weight of scientific and empirical authority.

43.     Indeed, well-established research indicates that contraceptives are, in fact, effective preventing unintended pregnancy. To be sure, while various methods of contraception can be effective at preventing unintended pregnancy, some are more effective than others.

44.     Several other statements in the Final Exemption Rules are also not scientifically credible.

45.     The Final Exemption Rules state that some commenters criticized the 2011 IOM Report for citing studies that assert associative relationship between contraceptive use and decreases in unintended pregnancy, and not causal relationships.  Establishing a causal relationship would be unethical and unrealistic.  Studies of association have shown that women using specific contraceptive methods are less likely to become pregnant than women not using those methods. A causal relationship could only be established if a study were conducted where women were randomly assigned to receive a specific contraceptive method and compared with women who were randomly assigned to use no contraceptive method. Studies of association have provided the rationale for the knowledge that smoking causes lung cancer, HIV causes AIDS, and Pap smears reduce cervical cancer.

46.     The Final Exemption Rules acknowledge commenters who report that hormonal contraceptives cause depression, citing one large study from Denmark.  This report should not be evaluated in isolation, as other studies have found no consistent association between hormonal contraceptive use and depressive symptoms, while others have found hormonal contraception has reduced levels of depressive symptoms.  These studies are difficult to conduct, since women who are receiving hormonal contraception must be enrolled in health care services, where they are more

JA-0003426

likely to be screened and treated for depression.

47.     The Final Exemption Rules acknowledge commenters who report that hormonal contraceptives may increase the risk of certain health conditions, such as venous thromboembolic disease (VTE) (i.e., deep venous thrombosis and pulmonary embolism).  While it is true that the risk of VTE is increased with use of estrogen-containing hormonal contraception, pregnancy and the postpartum state increase VTE risk significantly more so.  Thus, preventing unintended pregnancy is a more effective way to reduce risk of VTE than avoiding hormonal contraception.

48.     Similarly, the Final Exemption Rules acknowledge commentators who expressed concern over the possible increased risk of certain cancers.  There is conflicting evidence as to whether long-term hormonal contraceptive use may increase the risk of breast cancer, however there is strong evidence that hormonal contraception reduces the risk of ovarian and uterine cancer, and some evidence that it reduces the risk of colorectal cancer.  The magnitude of the reductions in ovarian, uterine, and colorectal cancer greatly outweigh the potential increased risk in breast cancer.

JA-0003427

49.     For these reasons, I believe that an injunction of the Final Exemption Rules is necessary to prevent immediate and irreparable harm to women in Pennsylvania and around the Country, who will lose ongoing preventive care coverage under their group health plans due to the Final Exemption Rules.


I hereby affirm that the foregoing is true and correct based upon my knowledge, information and belief, and I make these statements subject to the penalty of perjury.


Date: 12/14/2018            By: _____

CYNTHIA H. CHUANG, M.D., MSc

10

JA-0003428

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

               Plaintiff,

     v.

DONALD J. TRUMP *et al.*

               Defendants.

NO. 2:17-cv-04540-WB

## DECLARATION OF LEESA ALLEN

I, Leesa Allen, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned matter and, in support thereof, I state as follows:

**I.**    **Background**

1.    I serve as the Acting Executive Deputy Secretary for the Pennsylvania Department of Human Services ("DHS" or "the Department"). Before assuming my current position, I was the Deputy Secretary for Medical Assistance Programs at DHS. I have worked for the Department of Public Welfare, now DHS, since 1993, serving in various roles within the Office of Medical Assistance Programs since 2000. I was most recently the Deputy Secretary for Medical Assistance Programs, the Executive Medicaid Director, Chief of Staff, and Director of the Bureau of Policy. In my current role, I oversee all of the Department's operations and report directly to the Acting Secretary of DHS, who serves as a member of the Governor's cabinet.

2.    DHS is responsible for administering a variety of services and benefits to residents of Pennsylvania, including health care services, support for individuals with

JA-0003438

disabilities, child support enforcement, treatment for substance use disorder, and services for children and families.

## II. Pennsylvania's Medical Assistance Program

3. DHS's Office of Medical Assistance Programs has primary responsibility for overseeing Commonwealth programs that offer health benefits to Pennsylvania residents. Those programs include the Medicaid program, known as Medical Assistance in Pennsylvania. In my prior role as Deputy Secretary for Medical Assistance Programs, I oversaw the Office of Medical Assistance Programs.

4. Medicaid is a program jointly funded by the states and the federal government that makes health care available to low-income individuals and families. States have responsibility for administering Medicaid, but are subject to federal oversight.

5. Medicaid is funded according to a formula under which the federal government contributes a specific amount for every dollar spent by Pennsylvania. If additional Pennsylvanians enroll in the Medical Assistance program, the federal and state government will both spend more on the program, thereby shifting costs from the private to the public sector.

6. As of August 2017, there were 2,869,246 Pennsylvanians enrolled in the Medical Assistance program. For the period April 1, 2016, through March 31, 2017, a total of $28.8 billion in state and federal funding was spent on Medical Assistance. Of that amount, $11.2 billion was provided by the Commonwealth, and the remainder was provided by the federal government.

7. Eligibility for Medical Assistance is based primarily on income level. The Affordable Care Act expanded Medicaid eligibility so that individuals and families with incomes up to 138% of the federal poverty limit would generally be eligible for the program. However, in

2

JA-0003439

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), the Supreme Court ruled that states could not be required to expand Medicaid under the ACA, and therefore the expansion was rendered optional.

8.      Governor Tom Wolf elected to expand the Medical Assistance program in 2015, so that individuals and families in Pennsylvania with incomes up to 138% of the federal poverty limit are eligible for the program. Over 700,000 Pennsylvanians have enrolled in the Medical Assistance program as a result of the expansion.

9.      For women who are pregnant, Medical Assistance eligibility requirements are different. Pregnant women are eligible if they have incomes at or below 215% of the federal poverty limit. In 2017, 215% of the federal poverty limit is $25,929 for an individual and $52,890 for a family of 4.

10.      Medical Assistance provides beneficiaries with a variety of contraception options. In November 2016, DHS announced that it was making changes to its payment policies to hospitals to encourage the use of long-acting reversible contraception (LARC), which includes intrauterine devices and birth control implants.

11.      Although LARCs are more effective than other methods of contraception and save money in the long run, they can have high upfront costs. By changing its fee-for-service payment policies for hospital providers for these costs, DHS has made it easier for women to use LARCs.

12.      Over half of all unplanned pregnancies occur within two years of delivery of a child. For this reason, the Commonwealth encourages the use of LARCs as post-partum contraception to reduce the rate of such unplanned pregnancies.

3

JA-0003440

13.     In addition, Medical Assistance offers specific benefits for eligible pregnant women Those benefits include full scope medical benefits, as well as other benefits including proper prenatal care and early detection and treatment of health problems.

### III.    Pennsylvania's Family Planning Services Program

14.     DHS also administers Pennsylvania's Family Planning Services program. The Family Planning Services program provides family planning benefits to individuals who are not eligible for full Medical Assistance benefits but satisfy other conditions. The Family Planning Services program receives federal and state Medicaid funds.

15.     The Family Planning Services program was launched in 2008 as the SelectPlan for Women. Originally, it operated pursuant to a "Section 1115 waiver" granted by the U.S. Secretary of Health and Human Services. Section 1115 waivers free states from certain requirements of the Medicaid program so they can implement demonstration projects using federal and state Medicaid funds. Section 1115 waivers must be renewed every 5 years.

16.     In 2015, the SelectPlan for Women Program authorized under the Section 1115 Waiver was transitioned to the Family Planning Services program authorized under the Medicaid State Plan. Under a provision of the ACA, states were provided the option to provide family planning and family planning-related services to individuals with incomes at or below 215% of the federal poverty limit who would not otherwise be eligible for Medicaid. With the transition, the program began to provide family planning and family planning-related services to men as well. As a result of this new authority, the Commonwealth no longer needs to seek a waiver from the Department of Health and Human Services every five years.

JA-0003441

17. The Family Planning Services program is open to individuals and families with incomes at or below 215% of the federal poverty limit. Pregnant women (who would be eligible for Medical Assistance) are not eligible.

18. In August 2017, 17,333 individuals were enrolled in the Family Planning Services program.

19. Women and men who are employed and who receive health insurance through their employer may participate in Family Planning Services, provided they satisfy the eligibility criteria, and many beneficiaries of the program are employed. However, individuals who receive coverage for family planning services through their employer or from another source are not eligible for the program. Therefore, those participants in Family Planning Services who are employed either do not receive health coverage from their employers or receive coverage that does not include family planning services.

20. Because the Family Planning Services program is funded under Medicaid, total spending on the program depends on enrollment. If more individuals participate in the program, federal and state spending increase.

21. The Family Planning Services program provides contraceptive benefits, including coverage for birth control pills and LARCs. The program also provides a variety of other benefits, including pregnancy counseling, HIV and STD testing and treatment, and male and female sterilization.

22. These services are provided to beneficiaries without copays, deductibles, or other cost-sharing arrangements.

23. It is not unreasonable to expect that women who do not receive contraceptive care from their employers or private insurance will turn to government-funded programs,

JA-0003442

such as Medical Assistance, to the extent they are eligible for these programs. Therefore, some eligible women who require contraceptive care but who work for employers that choose to opt out under the new exemption rules will likely seek out other coverage options, including the Commonwealth-funded programs discussed above.

## IV.    The Administration's Executive Orders

24.    I am generally familiar with the Affordable Care Act's Contraceptive Care Mandate, which requires non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage to provide coverage for FDA-approved methods of contraception without imposing cost-sharing requirements.

25.    I understand that the Administration issued two rules on October 6, 2017, that expanded the exemptions from the Contraceptive Care Mandate. Under these rules, covered entities may opt out of complying with the mandate on the basis of a sincerely held moral or religious conviction.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


_Leesa M. Allen_

Dated: October 27 , 2017

6

JA-0003443

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, and STATE OF NEW JERSEY | **Civil Action No:** **2:17-cv-04540-WB** |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *et al.* | |
| Defendants. | |

## <u>DECLARATION OF SARAH ADELMAN</u>

I, Sarah Adelman, declare and state as follows:

1.      I serve as Deputy Commissioner of the New Jersey Department of Human Services. In this capacity I oversee the Division of Medical Assistance and Health Services ("DMAHS").

2.      DMAHS administers New Jersey's $17 billion state- and federally- funded Medicaid and Children's Health Insurance Programs (collectively referred to as "NJ FamilyCare") that provide health coverage for certain low to moderate income residents. Through its programs, DMAHS serves more than 1.7 million people in New Jersey.

3.      NJ FamilyCare provides comprehensive medical coverage and family planning services to its beneficiaries.

4.      New Jersey also has Title X family planning clinics within the state that are not affiliated with DMAHS.

JA1805

JA-0003444

5.      Medicaid is a program jointly funded by the states and the federal government that makes health care available to low-income individuals and families. States have responsibility for administering Medicaid, but are subject to federal oversight.

6.      Medicaid is funded according to a formula under which the federal government contributes a specific amount for every dollar spent by New Jersey. If additional New Jerseyans enroll in the Medical Assistance program, the federal and state government will both spend more on the program, thereby shifting costs from the private to the public sector.

7.      As of October 2018, there were 1,747,375 NJ FamilyCare beneficiaries in New Jersey. For State fiscal year 2018, a total of approximately $16,267,000,000 in state and federal funding was spent on NJ FamilyCare. Of that amount, roughly $9,843,000,000 was provided by the federal government, and $6,424,000,000 was provided by New Jersey.

8.      For fiscal year 2018, DMAHS's estimated cost to provide contraceptive and family planning coverage through NJ FamilyCare was approximately $15 million, with the federal government covering 90% of that cost.

9.      Eligibility for NJ FamilyCare is based primarily on income level. The Affordable Care Act expanded Medicaid eligibility so that individuals and families with incomes up to 138% of the federal poverty level would generally be eligible for the program. However, in National Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012), the Supreme Court ruled that states could not be required to expand Medicaid under the Affordable Care Act, and therefore the expansion was rendered optional.

10.     New Jersey elected to expand Medicaid in January 2014, so that single adults, childless couples, parents, and caretakers with incomes up to 138% of the federal poverty limit

Case: 25-2575    Document: 34-4    Page: 542    Date Filed: 12/12/2025

JA-0003445

are eligible for the program. Over 500,000 of these individuals have enrolled in NJ FamilyCare since its expansion.

11.     For women who are pregnant, NJ FamilyCare has expanded income-based eligibility so that pregnant women are eligible if they have incomes at or below 205% of the federal poverty level. At present, 205% of the federal poverty level is $4,302 per month for a family of four.

12.     DMAHS is planning the 2019 rollout of a family planning benefit program called Plan First for individuals with income ranging from 133% to 205% of the federal poverty level.

13.     DMAHS projects that there will be 10,000 to 12,000 Plan First participants in the first year of the program, and between 31,000 to 55,000 participants by the fifth program year.

14.     DMAHS designed the Plan First program to allow pregnant women to transition seamlessly into the Plan First program after the 60-day postpartum period and to allow Plan First beneficiaries who become pregnant to easily transition to a DMAHS program ensuring early prenatal treatment. The eligibility standards for Plan First will mirror the current NJ FamilyCare requirements for pregnant women.

15.     NJ FamilyCare provides beneficiaries with a variety of contraception options, and there is no co-pay for family planning preventive services.

16.     Among those options is long-acting reversible contraception ("LARC"), which includes intrauterine devices and birth control implants. While NJ FamilyCare has always covered LARC devices in an outpatient setting or as part of a bundled inpatient payment, it began to allow providers to bill separately for devices and insertion in the immediate postpartum period (defined as within 10 minutes after delivery of the placenta) in July 2018. In addition, the Plan First program will provide for access to LARCs for additional individuals in 2019.

JA-0003446

Date Filed: 12/12/2025    Page: 544    Document: 34-4    Case: 25-2575

17.    New Jersey recognizes the importance of allowing members who wish to utilize LARC devices to have free and open access to them to reduce the rate of unplanned pregnancies. Although LARCs can have high upfront costs, they are not associated with compliance issues that can cause failures with other comparable methods of birth control, and as such are more effective than most other methods of contraception and would likely result in better outcomes and better long-term savings to the State when compared to other contraceptive methods.

18.    LARCs facilitate optimal "birth spacing," defined as a minimum 18 month interval between pregnancies. Without birth spacing, babies are more likely to be premature, of low birthweight, small for their gestational age, and, consequently, more likely to face long-term health problems and higher mortality rates. In 2017, the prematurity rate in New Jersey was one in eleven babies.[1]

19.    DMAHS anticipates that some women, particularly low-income women, who lose contraceptive coverage through their employer's plans may seek contraceptive coverage from other sources, such as NJ FamilyCare, Plan First, and Title X. This will result in additional costs to New Jersey, which will be forced to absorb additional costs presently borne by private insurers.

20.    Other women who lose their contraceptive benefits may forego contraceptive use entirely, which would result in increased numbers of unintended pregnancies and a dramatic increase in costs to State-funded programs designed to ensure the health of women and infants.

21.    The loss of employer-sponsored health insurance coverage for contraception can be expected to disproportionately impact New Jersey's women of color. In 2015, 28% of New

---

[1]  March of Dimes, *A Profile of Prematurity in New Jersey, available at* https://www.marchofdimes.org/peristats/tools/prematurityprofile.aspx?reg=34.

JA-0003447

Jersey pregnancies were unplanned, including 53.1% among non-Hispanic black women and 31.8% among Hispanic women.[2]

22.    I am generally familiar with the Affordable Care Act's Contraceptive Care Mandate, which requires non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage to provide coverage for FDA-approved methods of contraception without imposing cost-sharing requirements.

23.    I understand that the Administration has issued rules that expanded the exemptions from the Contraceptive Care Mandate. Under these rules, covered entities may opt out of complying with the mandate on the basis of a sincerely held moral or religious conviction.

24.    The expanded exemptions are expected to result in greater financial expenditures by both the State of New Jersey and women in New Jersey on contraceptive coverage and on healthcare generally for women and infants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Sarah Adelman

Dated: 12|7|18

---

[2] The Centers for Disease Control and Prevention and New Jersey Department of Health, *Pregnancy Risk Assessment Monitoring Report on Pregnancy Intention 2012-2015, available at* https://www.nj.gov/health/fhs/maternalchild/documents/NJ%20Pregnancy%20Intention%20Topic%20Report%202012-2015.pdf.

JA-0003448

**As of:** November 03, 2017
**Received:** September 20, 2016
**Status:** Posted
**Posted:** October 26, 2016
**Tracking No.** 1k0-8s0q-ymha
**Comments Due:** September 20, 2016
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** CMS-2016-0123
Coverage for Contraceptive Services CMS-9931-NC

**Comment On:** CMS-2016-0123-0001
Requests for Information: Coverage for Contraceptive Services

**Document:** CMS-2016-0123-54186
IL

## Submitter Information

**Name:** Luke Vander Bleek
**Address:**
    Morrison, IL, 61270
**Email:** lukevb@fitzgeraldpharmacy.com
**Organization:** NA

## General Comment

See attached file(s)

## Attachments

Sample drug coupon

Alternative Ways Women Might Access Contraceptives

569472

JA-0003449

# Discount Drug Coupon

ENVISIONRx

**Your Prescription:**

## atorvastatin 20mg

30 tablets

Discounted price with this coupon:

$**10.63** — If your prescription is for 30 tablets to be taken over **30 to 84 days**.

$**10.63** — If your prescription is for 30 tablets to be taken over **84+ days**.

This is your estimated price at **Kroger Pharmacy**; he pharmacy will provide the exact pricing.

Questions? Call **1-844-852-7434**

**Pharmacist Info:**

Member ID
**1RX471245**

RxGroup
**RXG1**

RxBin
**009893**

RxPCN
**DCAE1**

Pharmacists call: **1-844-852-7434**

---

## Print this free coupon and hand it to your pharmacist.

## Frequently Asked Questions

**What if my pharmacy cannot process this coupon?**

If your pharmacy is unable or unwilling to process your coupon, please call 1-844-852-7434. Most issues can be resolved quickly.

**Can I use the coupon with my health insurance?**

This coupon price may be lower than your health insurance co-pay, but it cannot be used to lower your co-pay. Ask your pharmacist to help you find the best possible price.

**What do I do if the coupon price is wrong?**

While GoodRx prices are generally very accurate, prices can change. Please report any issues to info@goodrx.com so we can help. The final price is determined by your local pharmacy.

## Remember...this coupon:

- Will work at other pharmacies (price may vary).
- Can be used for all of your family's prescriptions.
- Has no fees or obligations. It's free to use.

### For the Pharmacist

This coupon displays a contracted rate based on agreements between your pharmacy or purchasing group and a Pharmacy Benefit Manager (PBM).

Please use the above BIN, PCN and Group number to adjudicate.

Questions? Please call 1-844-852-7434.

---

**This coupon was printed on 08/31/16. Please note that all prices are subject to change over time.
For up-to-date prices and coupons, check www.goodrx.com or download the GoodRx iPhone or Android app.**

---

**Questions? We're here to help - email us at info@goodrx.com**

THIS CARD IS NOT INSURANCE. IT CANNOT BE USED IN CONJUNCTION WITH ANY FEDERAL OR STATE FUNDED PROGRAM, SUCH AS MEDICARE OR MEDICAID.

569473

JA-0003450

Centers for Medicare & Medicaid Services
Department of Health and Human Resources
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

      Re:    CMS – 9931 – NC:  Request for Information

Dear Sir or Madam:

I am writing in response to the government's "request for information" or "RFI" concerning alternative ways to provide women with "seamless" access to contraceptives in ways that do not make use of an objecting religious employer's health plan.

By way of background, I am a pharmacist with over three decades of experience serving patients. I am also the owner and operator of a community pharmacy. From 2006 to 2007, I served as President and subsequently as Chairman of the Board of the Illinois Pharmacists Association.

The community pharmacist's role in providing healthcare provides some valuable insights about ways in which the government can provide seamless access to contraceptives separate from an employer-provided plan.  Therefore, in an effort to assist the government in fulfilling the Supreme Court's direction to find alternative ways women might obtain contraceptives, I am writing to offer the following brief comments.

1. Women seeking to use an insurance policy to pay for prescription contraceptives in nearly all cases must obtain a prescription from a licensed prescriber and have it filled at a pharmacy.  As such, and by law, nearly everyone obtaining prescription contraceptives will interact with a pharmacy to get them.

2. That is a good thing.  Pharmacies and pharmacists help patients every day by ensuring that they receive the correct medications, understand the safe and proper use of medications, avoid contra-indications that could be dangerous to the patient's health, and to facilitate patients' use of their insurance, other benefits cards, and coupons to obtain the best price for their medications.

3. According to the Kaiser Family Foundation, in 2015 alone, patients entrusted community retail pharmacies in the United States to fill and assist in billing more than four billion prescriptions.  Because of that experience, pharmacists have an intricate knowledge of the various plans, cards, and systems used to pay for prescription drugs.

4. For example, pharmacists regularly process coupons such as the attached to obtain free or reduced price medications for patients.  These coupons have become increasingly common in recent years and work by using the networks constructed by large pharmacy benefit managers or "PBMs." Because they use the same systems used for processing insurance claims, these coupons typically include information virtually identical to an insurance card, including a member ID, group number, bank identification number, and processor control number.  Pharmacists routinely enter this type of information in order to process insurance claims for prescription drugs.  Pharmacists often get this information

569474

JA-0003451

from a coupon provided by the patient, from a patient's insurance card, or even by looking on the internet for coupon offers that would help a particular patient.

5. One simple way to provide seamless contraceptive coverage separate from an employer's plan would be to provide women with coupons that would entitle them to free birth control. The coupons could be made available in doctor's offices, on the internet, in magazines, etc., and would allow the bearer to have the prescription filled free of charge.

6. Alternatively, rather than requiring a patient to have a coupon, pharmacies could easily be alerted to the coupon codes and informed that, if a patient's insurance does not completely cover the costs of contraceptives, to enter the coupon code instead. From the patient's point of view, this transaction would be entirely seamless.

7. This could be as simple as having PBM companies—which would process any claim that would be rejected by an insurer—respond to the pharmacy by including information that would allow for payment. Thus, instead of simply sending a claim response message that reads **"claim rejected: drug not covered by plan,"** the PBM could also send **"For coverage resubmit using i.d.,# 111111111, BIN # 0123465, PCN : BCPILL, and group number: 42057830."**

8. Making use of the transaction with the PBM—which anyone receiving coverage through an insurer would need to conduct anyway--would ensure that anyone whose insurance plan rejected a claim for contraceptives would be able to receive them. This approach would have the added benefit of addressing not only the situation of a religious objector but also the tens of millions of people who do not have contraceptive coverage for other reasons (for example, if they are on a grandfathered plan that excludes coverage).

9. The government could likely partner with a pharmacy benefits manager or "PBM" company to work on such a system. PBMs, having extensive experience processing payments for prescription drugs, would likely be eager to work with the government in this respect. Furthermore, a PBM company may charge little or nothing at all for its services, since PBM companies typically receive significant value by monetizing the data that is received in processing the payments.

10. To eliminate the need for coupons or coupon codes for subsequent transactions, the government program could simply use the information received from the original coupon transaction, which generally contains patient specific information including the patient's full name, address, date of birth and gender, to enroll each woman in a "contraceptive-only plan" going forward. A personalized "contraceptive only" insurance card could be mailed discretely to the patient's home for use at any participating pharmacy.

11. Using coupons, or coupon codes, or contraceptive-only plans would allow women to obtain free contraceptives separate from their employer's plan. Separate coverage would not interfere with seamless access. In fact, by utilizing processes created by federal and state governments and health insurance companies referred to a coordination of benefits "COB", pharmacists regularly facilitate billing transactions involving multiple insurance plans. Millions of patients have more than one plan—including health, dental, vision, prescription drug, supplemental, and sometimes government plans. Likewise, many patients have both insurance plans and a flex-spending card, and patients regularly use both when obtaining prescription medications. Pharmacies are accustomed to dealing

569475

JA-0003452

with this situation and would certainly be able to assist patients in using a particular plan designed to cover contraceptives.

12. For women who work for religious employers opposed to contraception, an additional benefit of using an alternative payment source is that alternative sources would have nothing at all to do with a woman's employer or the employer's health insurance plan. This would give an added measure of privacy and comfort to women who work for a religious employer but who do not share the employer's religious beliefs about contraception.

13. Just today as I administered influenza vaccines I noted how fast, efficient and seamless the experience is for our Medicare patients as our staff quickly processed prescription and billing claims with little more required of our patients than their dates of birth and Medicare numbers. None of these patients used employer insurance plans to pay for their care. Perhaps there is no need to examine any system other than that used by Medicare to facilitate community pharmacy-provided influenza vaccination services to find how simply the federal government can provide medication services to a specific patient population.

In short, because virtually every sale of prescription contraceptives necessarily involves a willing doctor and a willing pharmacy, there is no reason to drag an unwilling employer into the transaction. Rather, pharmacies are quite capable of filling prescriptions for contraceptives seamlessly without using an employer's plan. Pharmacists assist patients in using multiple plans, multiple cards, coupons, coupon codes and government reimbursement programs every day across the country. They would be well situated to assist the government in achieving its goals of expanding access to contraceptives separate from an employer-provided health plan.

JA1814

569476

JA-0003453



Samuel Lee
Director

*Submitted electronically via* regulations.gov

September 20, 2016

Secretary Sylvia M. Burwell
U.S. Department of Health & Human Services
200 Independence Ave., SW
Washington, D.C.  20201

Secretary Thomas E. Perez
U.S. Department of Labor
200 Constitution Ave., NW
Washington D.C.  20210

Secretary Jacob J. Lew
U.S. Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, D.C.  20220

Dear Secretaries Burwell, Perez and Lew,

Thank you for the opportunity to respond to your Request for Information (code CMS-9931-NC) regarding contraceptive coverage in health insurance plans that also respects the conscience rights of those who do not wish to provide it for their employees.

I submit to you and other interested parties the experience in Missouri, where 15 years ago a compromise was struck on a fair and comprehensive contraceptive mandate law.

In 2001, the Missouri General Assembly enacted, and Governor Bob Holden signed into law, a measure which requires most health insurance companies to provide contraceptive coverage as part of health benefit plans – while also protecting the conscience rights of those who don't want to pay for or provide contraceptive coverage.

I have first-hand knowledge of this legislation, both as a pro-life lobbyist at the time (and currently) at the Missouri State Capitol, as well as having personally benefitted by being able to purchase health insurance coverage that excludes contraceptive coverage.

The law came after much debate, discussion and give-and-take by both pro-life and pro-choice sides. The proposal had broad bipartisan support at a time when the Missouri House of Representatives was controlled by Democrats and the Missouri Senate by Republicans.  The measure was part of a bill that

JA-0003454

was a priority for Democratic Governor Bob Holden. It passed almost unanimously in both legislative bodies.

Section 376.1199[1] was the result of this compromise, and it passed in virtually identical form in two bills: HB 762[2] & SB 266[3].

Among other women's health benefits required to be provided in section 376.1199 (i.e., direct access to an OB/GYN, annual cancer screenings, treatment for osteoporosis), the law requires that effective January 1, 2002:

1. Health carriers issuing health benefit plans (defined in section 376.1350[4]) that provide pharmaceutical coverage shall include coverage for prescription contraceptives at no charge or at the same level of deductible, coinsurance or co-payment as any other covered drug;

2. Contraceptives are defined as those approved by the FDA for use as a contraceptive, while excluding drugs and devices that are intended to induce an abortion (defined in section 188.015[5]). No health carrier shall be required to pay for, reimburse, provide any resources for, refer a patient for, etc., an abortion, except to save the life of the mother;

3. Health carriers shall offer and issue health benefit plans to a person or entity which excludes coverage for contraceptives if the use or provision of contraceptives is contrary to the moral, ethical or religious beliefs or tenets of the person or entity;

4. Health carriers owned, operated or controlled in substantial part by an entity that is operated pursuant to moral, ethical or religious tenets that are contrary to the use or provision of contraceptives are exempt from the insurance requirement for contraceptive coverage;

5. Prescription contraceptive drugs or devices ordered by a health care provider for reasons other than contraceptive or abortion purposes shall not be excluded from coverage;

6. Except for health carriers that are exempt from providing contraceptive coverage (those operated pursuant to moral, ethical or religious tenets opposed to contraception; those that provide certain supplemental insurance policies, accident-only policies, short-term policies, etc.), a health carrier shall allow enrollees in a health benefit plan that excludes coverage for contraceptives to purchase a health benefit plan that includes coverage for contraceptives. As discussed below, health carriers as a matter of practice have not charged enrollees for this add-on contraceptive benefit;

7. Health benefit plans shall provide clear and conspicuous written notice:
   a. Whether coverage for contraceptives is or is not included;
   b. That an enrollee in a group health plan with coverage for contraceptives has the right to exclude coverage for contraceptives;

---

[1] Section 376.1199, RSMo, http://www.moga.mo.gov/mostatutes/stathtml/37600011991.html (last visited September 19, 2016). Click on the year "2001" at the bottom of the web page to bring up the version as enacted in 2001.
[2] Missouri House of Representatives website, HB 762 in 2001, http://house.mo.gov/content.aspx?info=/bills01/bills01/HB762.htm (last visited September 19, 2016).
[3] Missouri Senate website, SB 266 in 2001, http://www.senate.mo.gov/01INFO/bills/SB266.htm (last visited September 19, 2016).
[4] Section 376.1350, RSMo, http://www.moga.mo.gov/mostatutes/stathtml/37600013501.html (last visited September 19, 2016).
[5] Section 188.015, RSMo, http://www.moga.mo.gov/mostatutes/stathtml/18800000151.html (last visited September 19, 2016).

568144

JA-0003455

    c. That an enrollee in a group health plan without coverage for contraceptives has the right to purchase coverage for contraceptives;

8. Health carriers shall not disclose to the person who or entity which purchased the health benefit plan the names of enrollees who either exclude or include coverage for contraceptives;

9. Health carriers and the person who or entity which purchased the health benefit plan shall not discriminate against an enrollee who either excluded or included coverage for contraceptives.

HB 762 passed 150-0 in the House and 30-2 in the Senate. Governor Bob Holden signed the bill into law on June 21, 2001.[6] SB 266 passed 29-2 in the Senate[7] and 154-0 in the House[8]. The governor signed that bill into law on July 12, 2001[9].

Although section 376.1199 was enacted in two separate bills, the original and main vehicle was in HB 762, which was sponsored by Democratic House Speaker Jim Kreider[10], but handled by Democratic Rep. Joan Barry[11] in the House and Republican Sen. Betty Sims[12] in the Senate.

News reports at the time accurately recounted that:

> Sen. Betty Sims, R-Ladue, and Rep. Joan Barry, D-Oakville, celebrated Friday afternoon over passage of the women's health initiative, another top priority of Holden's. It was one of the few major bills that Republicans and Democrats could agree upon. … The measure also says that if an HMO has pharmaceutical coverage, it also must cover contraceptives. That part of the bill progressed only after abortion rights groups, anti-abortion organizations and insurance companies worked out a compromise in Barry's office earlier in the session. The coverage does not include abortion-inducing drugs. People with moral or ethical concerns may opt out of the contraception coverage. ("Lawmakers leave without action on many issues," *St. Louis Post-Dispatch*, May 19, 2001, page 12[13])

The passage of this contraceptive mandate law with robust conscience protection was hailed in a *St. Louis Post-Dispatch* editorial as "no small triumph this year when abortion opponents and abortion rights supporters compromised on an important women's health bill …":

---

[6] Missouri House of Representatives Activity History for HB 762, http://house.mo.gov/content.aspx?info=/bills01/action/aHB762.htm (last visited September 19, 2016).
[7] Journal of the Senate for Friday, May 18, 2001, page 1748, http://www.senate.mo.gov/01info/pdf-jrnl/Day76.pdf#page=8 (last visited September 19, 2016).
[8] Journal of the House for Friday, May 18, 2001, pages 2545-47, http://www.house.mo.gov/billtracking/bills01/jrn01/jrn077.pdf#page=80 (last visited September 19, 2016).
[9] Missouri Senate website, SB 266 in 2001, http://www.senate.mo.gov/01info/actions/SB266a.htm (last visited September 19, 2016).
[10] Speaker of the Missouri House Jim Kreider, 2001, http://house.mo.gov/content.aspx?info=/bills01/member01/mem142.htm (last visited September 19, 2016).
[11] Representative Joan Barry, 2001, http://house.mo.gov/content.aspx?info=/bills01/member01/mem100.htm (last visited September 19, 2016).
[12] Senator Betty Sims, 2001, http://www.senate.mo.gov/01info/members/mem24.htm (last visited September 19, 2016).
[13] "Lawmakers leave without action on many issues," *St. Louis Post-Dispatch*, May 19, 2001, page 12, https://www.newspapers.com/clip/6697562/st_louis_postdispatch/ (last visited September 19, 2016).

568145
JA-0003456

… The controversial part of the bill requires insurers that provide prescription drug benefits to also cover contraceptives.  Abortion opponents were able to accept this provision once the word contraceptive was defined to exclude the abortion pill, RU-486.  Abortion rights supporters made a concession to the other side by agreeing to an exemption that allows those who object to contraceptives on religious or ethical beliefs to opt out. … Lobbyists for Planned Parenthood, the Missouri Catholic Conference and Campaign Life Missouri say they kept focused on their common goal – better health care for women. ("Abortion: Finding common ground," Editorial: *St. Louis Post-Dispatch*, June 20, 2001, page 20[14])

The health insurance lobby joined pro-life and pro-choice groups, Republicans and Democrats, in supporting the measure:

[S]upporters say the law is taking effect only because of successful behind-the-scenes negotiations that anti-abortion activist Sam Lee calls "unique." … The Missouri Association of Health Plans, which represents 15 managed-care insurers, backs the bill.  So does the Missouri Catholic Conference, Lee's Campaign Life Missouri and Planned Parenthood – three groups that generally are together only in court. ("'Unique' detente in abortion war produced women's health care bill," *St. Louis Post-Dispatch*, June 17, 2001, page C2[15])

Prior to the bill's signing, Planned Parenthood encouraged the governor to sign it into law:

"The Missouri General Assembly just passed a law that the governor proposed as part of a women's health commitment that would require insurance companies to include federally approved contraceptives for women in their health plans," [Erika] Fox[, vice president of public policy for the Kansas City chapter of Planned Parenthood] said.  "We hope that the governor will sign it, and it will come into effect July 1." ("Missouri could require employers to cover contraceptives," *The Maneater* (University of Missouri – Columbia, Mo., student newspaper), June 20, 2001[16])

And during the bill signing with Gov. Holden, Planned Parenthood and other women's health advocates praised the passage of the law:

"We're thrilled about the impact this is going to have to improve the lives of women," Paula Gianino of Planned Parenthood of the St. Louis Region, whose group fought for the legislation for the last three years. ("Women's health care law is praised at signing by Holden," *St. Louis Post-Dispatch*, June 22, 2001, page A12[17])

---

[14] "Abortion: Finding common ground," Editorial: *St. Louis Post-Dispatch*, June 20, 2001, page 20 https://stltoday.newspapers.com/clip/6706104/abortion_finding_common_ground/ (last visited September 20, 2016).
[15] "'Unique' detente in abortion war produced women's health care bill," *St. Louis Post-Dispatch*, June 17, 2001, page C2, https://stltoday.newspapers.com/clip/6697457/st_louis_postdispatch/ (last visited September 20, 2016).
[16] "Missouri could require employers to cover contraceptives," *The Maneater* (University of Missouri – Columbia, Mo., student newspaper), June 20, 2001 http://www.themaneater.com/stories/2001/6/20/missouri-could-require-employers-cover-contracepti/ (last visited September 20, 2016).
[17] "Women's health care law is praised at signing by Holden," *St. Louis Post-Dispatch*, June 22, 2001, pages A1, A12, https://stltoday.newspapers.com/clip/6697043/st_louis_postdispatch/ and https://stltoday.newspapers.com/clip/6697157/st_louis_postdispatch/ (last visited September 20, 2016).

568146
JA-0003457

Later in 2001, the Guttmacher Institute, in its state legislative roundup, described the new law as "progress" for "reproductive health advocates":

> For their part, reproductive health advocates have continued to make progress in requiring insurance coverage of contraceptives, with three states approving new mandates for a total of 16 (see chart).  Missouri, New Mexico and Texas enacted laws … All three new laws include some type of exemption: Missouri's, a painstaking compromise, is the broadest, applying to employers, insurers and individual enrollees and allowing for moral and ethical objections, in addition to religious ones.  However, it also allows enrollees to buy coverage directly from the insurer, and it protects enrollees from discrimination and guarantees their privacy in relation to their decisions about coverage. ("The States at Midyear: Major Actions on Reproductive Health–Related Issue," *The Guttmacher Report on Public Policy*, August 2001, pages 8-9[18])

The new law worked as planned, and those who wanted to opt out of contraceptive coverage were able to do so.  The Archdiocese of St. Louis, for example, was able to provide contraceptive-free plans for its employees.  Other not for profit organizations in Missouri have been able to obtain coverage for their employees that excludes contraceptive coverage.

I purchased an individual plan in 2008 from Anthem Blue Cross and Blue Shield that excluded contraceptive coverage.  Even after the passage of the Affordable Care Act, I was able to continue contraceptive-free coverage because my plan was considered grandfathered.  (A PDF copy of my last Anthem Contract in 2015 is available upon request.)  I retained that plan until July 1, 2015, when I switched to a contraceptive-free plan through the Archdiocese of St. Louis.  (As a deacon in the Catholic Church, I am eligible to purchase health insurance through the Archdiocese.)

For those who are in a group health plan that does not have contraceptive coverage, health insurance companies notify enrollees that they can obtain it.  And if they are in a group health plan that does have contraceptive coverage, health insurance companies notify enrollees that they can exclude it.

For example, Anthem Blue Cross and Blue Shield in Missouri has provided this notice and form in some insurance plan documents:

> **Notice to Applicant/Subscriber**
> **Concerning Contraceptive Coverage**
>
> If the coverage offered to you includes benefits for prescription drugs (pharmaceuticals), it probably also includes benefits for contraceptive drugs and devices.
>
> *The following information applies to you and any family members to be covered under your health benefits plan through Anthem Blue Cross and Blue Shield (Anthem):*

---

[18] "The States at Midyear: Major Actions on Reproductive Health–Related Issue," *The Guttmacher Report on Public Policy*, August 2001, pages 8-9, https://www.guttmacher.org/sites/default/files/article_files/gr040408.pdf (last visited September 20, 2016).

568147
JA-0003458

      o   If the coverage offered to you includes benefits for contraceptive drugs and devices, you may exclude them from your own coverage because of your moral, ethical or religious beliefs.

      o   If the coverage offered to you does not include benefits for contraceptive drugs and devices, you may add them to your own coverage.

***If you do not wish to change your benefits for contraceptive drugs and devices, please discard this form.***

To make one of the choices indicated above, please complete the Contraceptive Benefits Option Form on the reverse side.  Date of birth and Social Security Number information will be used only to identify the person completing this form.

Please mail your completed form directly to Anthem at the address shown below

And on the next page, the form provides two options: "Option 1: To Exclude Contraceptives" and "Option 2: To include Contraceptives."  Option 1 states:

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) includes benefits for contraceptive drugs and devices.  However, because of my moral, ethical and/or religious beliefs, I do not want benefits for contraceptive drugs and devices as part of the coverage for myself or for any family members to be included on my membership. I understand that *my premium will not be reduced because of this change*.

Option 2 states:

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) covers prescription drugs but does not cover contraceptive drugs and devices. However, I wish to include benefits for contraceptive drugs and devices as part of the coverage for myself and for any family members to be included on my membership.  I understand that *my premium will not be increased because of this benefit change.* [19]

**Thus, for those enrollees in Missouri without contraceptive coverage who wish to obtain it, they can do so directly from Anthem.  It will obtained at no cost to the enrollee, with no notification made to their employer and without any action needing to be taken by their employer.**

UnitedHealthCare in Missouri provides similar notices and forms.  For those with contraceptive coverage included, UnitedHealthCare has provided this notice and form in plan documents:

- According to our records, your health benefit plan currently ***includes*** benefits for contraceptives. …

---

[19] "Notice to Applicant/Subscriber Concerning Contraceptive Coverage," *Anthem Blue Cross and Blue Shield in Missouri*, form 23330MOMENABS 8/11, https://www.anthem.com/shared/noapplication/f4/s2/t0/pw_ad085567.pdf (last visited September 20, 2016).

568148
JA-0003459

… **If you choose to request a change in your health plan's benefits for contraceptives, please complete and return the Contraceptive Benefits Option form below.** Missouri state law requires that we keep your decision about contraceptive coverage confidential. <u>Do not send this completed form to your employer.</u> …

## … Contraceptive Benefits Option Form

*Only complete this form if you are requesting a change in your contraceptive benefits.*

I understand that my employer's health benefit plan *includes* benefits for contraceptive drugs and devices. Because of my moral, ethical and/or religious beliefs, **I do *not* want benefits for contraceptives as part of the coverage for myself or for any family members to be included.** I understand that the amount I am charged for my health benefit plan will not change because of this request.[20]

And for those who have a plan in which contraceptive coverage has been excluded, this <u>form and plan</u> has been included in plan documents:

- According to our records, your health benefit plan currently ***does not include*** benefits for contraceptives. …

… **If you choose to request a change to your benefits for contraceptives, please complete the Contraceptive Benefits Option Form below.** Missouri state law requires that we keep your decision about your contraceptive coverage confidential. <u>Do not send this completed form to your employer.</u> …

## … Contraceptive Benefits Option Form

*Only complete this form if you are requesting a change in your contraceptive benefits.*

I understand that my employer's health benefit plan covers prescription drugs but does **not** cover contraceptive drugs and devices. **I wish to *include* benefits for contraceptives as part of the coverage for myself and for any family members covered on this plan.** I understand that the amount I am charged will not change because of this request and my benefits for contraceptives will be subject to the terms of my health benefit plan.[21]

**Again, for those enrollees in Missouri with or without contraceptive coverage who wish to make changes to their plan, they can do so directly with UnitedHealthCare. Contraception will be included or excluded at no cost to the enrollee, with no notification made to their employer and without any action needing to be taken by their employer.**

For your convenience, I've attached to this letter a copy of the Missouri law, as well as some of the sample notices and forms used by Anthem Blue Cross and Blue Shield and UnitedHealthCare.

---

[20] "Notice of Benefits/Contraceptive Benefits Option Form," UnitedHealthCare, form M52067-C 11/12, http://broker.uhc.com/assets/MissouriCsubscriber.pdf, (last visited September 20, 2016).
[21] "Notice of Benefits/Contraceptive Benefits Option Form," UnitedHealthCare, form M52067-B 11/12, https://broker.uhc.com/assets/MissouriBsubscriber.pdf, (last visited September 20, 2016).

568149
JA-0003460

I am happy to provide additional information on the Missouri contraceptive mandate law with conscience protection, and how it has worked in Missouri.

Sincerely yours,

Samuel Lee
Director, Campaign Life Missouri
(314) 368-4242
samuelhlee@mindspring.com

568150
JA-0003461

Case: 25-2570   Document: 34   Page: 559   Date Filed: 12/23/2025

# Missouri Revised Statutes

Chapter 376
Life, Health and Accident Insurance

←376.1192

**Section 376.1199.1**

376.1200→

August 28, 2015

**Coverage for certain obstetrical/gynecological services--exclusion of contraceptive coverage permitted, when--rulemaking authority.**

376.1199. 1. Each health carrier or health benefit plan that offers or issues health benefit plans providing obstetrical/gynecological benefits and pharmaceutical coverage, which are delivered, issued for delivery, continued or renewed in this state on or after January 1, 2002, shall:

(1) Notwithstanding the provisions of subsection 4 of section 354.618, provide enrollees with direct access to the services of a participating obstetrician, participating gynecologist or participating obstetrician/gynecologist of her choice within the provider network for covered services. The services covered by this subdivision shall be limited to those services defined by the published recommendations of the accreditation council for graduate medical education for training an obstetrician, gynecologist or obstetrician/gynecologist, including but not limited to diagnosis, treatment and referral for such services. A health carrier shall not impose additional co-payments, coinsurance or deductibles upon any enrollee who seeks or receives health care services pursuant to this subdivision, unless similar additional co-payments, coinsurance or deductibles are imposed for other types of health care services received within the provider network. Nothing in this subsection shall be construed to require a health carrier to perform, induce, pay for, reimburse, guarantee, arrange, provide any resources for or refer a patient for an abortion, as defined in section 188.015, other than a spontaneous abortion or to prevent the death of the female upon whom the abortion is performed, or to supersede or conflict with section 376.805; and

(2) Notify enrollees annually of cancer screenings covered by the enrollees' health benefit plan and the current American Cancer Society guidelines for all cancer screenings or notify enrollees at intervals consistent with current American Cancer Society guidelines of cancer screenings which are covered by the enrollees' health benefit plans. The notice shall be delivered by mail unless the enrollee and health carrier have agreed on another method of notification; and

(3) Include coverage for services related to diagnosis, treatment and appropriate management of osteoporosis when such services are provided by a person licensed to practice medicine and surgery in this state, for individuals with a condition or medical history for which bone mass measurement is medically indicated for such individual. In determining whether testing or treatment is medically appropriate, due consideration shall be given to peer-reviewed medical literature. A policy, provision, contract, plan or agreement may apply to such services the same deductibles, coinsurance and other limitations as apply to other covered services; and

Case: 25-2570    Document: 34    Page: 560    Date Filed: 12/12/2025

(4) If the health benefit plan also provides coverage for pharmaceutical benefits, provide coverage for contraceptives either at no charge or at the same level of deductible, coinsurance or co-payment as any other covered drug.

No such deductible, coinsurance or co-payment shall be greater than any drug on the health benefit plan's formulary. As used in this section, "contraceptive" shall include all prescription drugs and devices approved by the federal Food and Drug Administration for use as a contraceptive, but shall exclude all drugs and devices that are intended to induce an abortion, as defined in section 188.015, which shall be subject to section 376.805. Nothing in this subdivision shall be construed to exclude coverage for prescription contraceptive drugs or devices ordered by a health care provider with prescriptive authority for reasons other than contraceptive or abortion purposes.

2. For the purposes of this section, "health carrier" and "health benefit plan" shall have the same meaning as defined in section 376.1350.

3. The provisions of this section shall not apply to a supplemental insurance policy, including a life care contract, accident-only policy, specified disease policy, hospital policy providing a fixed daily benefit only, Medicare supplement policy, long-term care policy, short-term major medical policies of six months or less duration, or any other supplemental policy as determined by the director of the department of insurance, financial institutions and professional registration.

4. Notwithstanding the provisions of subdivision (4) of subsection 1 of this section to the contrary:

(1) Any health carrier shall offer and issue to any person or entity purchasing a health benefit plan, a health benefit plan that excludes coverage for contraceptives if the use or provision of such contraceptives is contrary to the moral, ethical or religious beliefs or tenets of such person or entity;

(2) Upon request of an enrollee who is a member of a group health benefit plan and who states that the use or provision of contraceptives is contrary to his or her moral, ethical or religious beliefs, any health carrier shall issue to or on behalf of such enrollee a policy form that excludes coverage for contraceptives. Any administrative costs to a group health benefit plan associated with such exclusion of coverage not offset by the decreased costs of providing coverage shall be borne by the group policyholder or group plan holder;

(3) Any health carrier which is owned, operated or controlled in substantial part by an entity that is operated pursuant to moral, ethical or religious tenets that are contrary to the use or provision of contraceptives shall be exempt from the provisions of subdivision (4) of subsection 1 of this section. For purposes of this subsection, if new premiums are charged for a contract, plan or policy, it shall be determined to be a new contract, plan or policy.

5. Except for a health carrier that is exempted from providing coverage for contraceptives pursuant to this section, a health carrier shall allow enrollees in a health benefit plan that excludes coverage for contraceptives pursuant to subsection 4 of this section to purchase a health benefit plan that includes coverage for contraceptives.

6. Any health benefit plan issued pursuant to subsection 1 of this section shall provide clear and conspicuous written notice on the enrollment form or any accompanying materials to the enrollment form and the group health benefit plan application and contract:

568152

JA-0003463

Case: 25-2574    Document: 34    Page: 561    Date Filed: 12/12/2025

(1) Whether coverage for contraceptives is or is not included;

(2) That an enrollee who is a member of a group health benefit plan with coverage for contraceptives has the right to exclude coverage for contraceptives if such coverage is contrary to his or her moral, ethical or religious beliefs;

(3) That an enrollee who is a member of a group health benefit plan without coverage for contraceptives has the right to purchase coverage for contraceptives;

(4) Whether an optional rider for elective abortions has been purchased by the group contract holder pursuant to section 376.805; and

(5) That an enrollee who is a member of a group health plan with coverage for elective abortions has the right to exclude and not pay for coverage for elective abortions if such coverage is contrary to his or her moral, ethical, or religious beliefs.

For purposes of this subsection, if new premiums are charged for a contract, plan, or policy, it shall be determined to be a new contract, plan, or policy.

7. Health carriers shall not disclose to the person or entity who purchased the health benefit plan the names of enrollees who exclude coverage for contraceptives in the health benefit plan or who purchase a health benefit plan that includes coverage for contraceptives. Health carriers and the person or entity who purchased the health benefit plan shall not discriminate against an enrollee because the enrollee excluded coverage for contraceptives in the health benefit plan or purchased a health benefit plan that includes coverage for contraceptives.

8. The departments of health and senior services and insurance, financial institutions and professional registration may promulgate rules necessary to implement the provisions of this section. No rule or portion of a rule promulgated pursuant to this section shall become effective unless it has been promulgated pursuant to chapter 536. Any rule or portion of a rule, as that term is defined in section 536.010, that is created under the authority delegated in this section shall become effective only if it complies with and is subject to all of the provisions of chapter 536 and, if applicable, section 536.028. This section and chapter 536 are nonseverable and if any of the powers vested with the general assembly pursuant to chapter 536 to review, to delay the effective date or to disapprove and annul a rule are subsequently held unconstitutional, then the grant of rulemaking authority and any rule proposed or adopted after August 28, 2001, shall be invalid and void.

(L. 2001 H.B. 762 merged with S.B. 266, A.L. 2012 S.B. 749)

*Effective 10-12-12, see § 21.250. S.B. 749 was vetoed on July 12, 2012. The veto was overridden on September 12, 2012.

(2013) Subsections 1(4), 4, 5, 6(1), 6(2), and 6(3) of section are pre-empted by the federal Affordable Care Act and its implementing regulations. Missouri Insurance Coalition v. Huff, 947 F.Supp.2d 1014 (E.D.Mo.).

568153
JA-0003464

Case: 25-2574    Document: 34    Page: 562    Date Filed: 12/23/2025

2001

2001

376.1199. 1. Each health carrier or health benefit plan that offers or issues health benefit plans providing obstetrical/gynecological benefits and pharmaceutical coverage, which are delivered, issued for delivery, continued or renewed in this state on or after January 1, 2002, shall:

(1) Notwithstanding the provisions of subsection 4 of section 354.618, provide enrollees with direct access to the services of a participating obstetrician, participating gynecologist or participating obstetrician/gynecologist of her choice within the provider network for covered services. The services covered by this subdivision shall be limited to those services defined by the published recommendations of the accreditation council for graduate medical education for training an obstetrician, gynecologist or obstetrician/gynecologist, including but not limited to diagnosis, treatment and referral for such services. A health carrier shall not impose additional co-payments, coinsurance or deductibles upon any enrollee who seeks or receives health care services pursuant to this subdivision, unless similar additional co-payments, coinsurance or deductibles are imposed for other types of health care services received within the provider network. Nothing in this subsection shall be construed to require a health carrier to perform, induce, pay for, reimburse, guarantee, arrange, provide any resources for or refer a patient for an abortion, as defined in section 188.015, other than a spontaneous abortion or to prevent the death of the female upon whom the abortion is performed, or to supersede or conflict with section 376.805; and

(2) Notify enrollees annually of cancer screenings covered by the enrollees' health benefit plan and the current American Cancer Society guidelines for all cancer screenings or notify enrollees at intervals consistent with current American Cancer Society guidelines of cancer screenings which are covered by the enrollees' health benefit plans. The notice shall be delivered by mail unless the enrollee and health carrier have agreed on another method of notification; and

(3) Include coverage for services related to diagnosis, treatment and appropriate management of osteoporosis when such services are provided by a person licensed to practice medicine and surgery in this state, for individuals with a condition or medical history for which bone mass measurement is medically indicated for such individual. In determining whether testing or treatment is medically appropriate, due consideration shall be given to peer-reviewed medical literature. A policy, provision, contract, plan or agreement may apply to such services the same deductibles, coinsurance and other limitations as apply to other covered services; and

(4) If the health benefit plan also provides coverage for pharmaceutical benefits, provide coverage for contraceptives either at no charge or at the same level of deductible, coinsurance or co-payment as any other covered drug. No such deductible, coinsurance or co-payment shall be greater than any drug on the health benefit plan's formulary. As used in this section, "contraceptive" shall include all prescription drugs and devices approved by the federal Food and Drug Administration for use as a contraceptive, but shall exclude all drugs and devices that are intended to induce an abortion, as defined in section 188.015, which shall be subject to section 376.805. Nothing in this subdivision shall be construed to exclude coverage for prescription contraceptive drugs or devices ordered by a health care provider with prescriptive authority for reasons other than contraceptive or abortion purposes.

2. For the purposes of this section, "health carrier" and "health benefit plan" shall have the

568154

JA-0003465

Case: 25-2574   Document: 34   Page: 563   Date Filed: 12/23/2025

same meaning as defined in section 376.1350.

3. The provisions of this section shall not apply to a supplemental insurance policy, including a life care contract, accident-only policy, specified disease policy, hospital policy providing a fixed daily benefit only, Medicare supplement policy, long-term care policy, short-term major medical policies of six months or less duration, or any other supplemental policy as determined by the director of the department of insurance, financial institutions and professional registration.

4. Notwithstanding the provisions of subdivision (4) of subsection 1 of this section to the contrary:

(1) Any health carrier may issue to any person or entity purchasing a health benefit plan, a health benefit plan that excludes coverage for contraceptives if the use or provision of such contraceptives is contrary to the moral, ethical or religious beliefs or tenets of such person or entity;

(2) Upon request of an enrollee who is a member of a group health benefit plan and who states that the use or provision of contraceptives is contrary to his or her moral, ethical or religious beliefs, any health carrier shall issue to or on behalf of such enrollee a policy form that excludes coverage for contraceptives. Any administrative costs to a group health benefit plan associated with such exclusion of coverage not offset by the decreased costs of providing coverage shall be borne by the group policyholder or group plan holder;

(3) Any health carrier which is owned, operated or controlled in substantial part by an entity that is operated pursuant to moral, ethical or religious tenets that are contrary to the use or provision of contraceptives shall be exempt from the provisions of subdivision (4) of subsection 1 of this section.

For purposes of this subsection, if new premiums are charged for a contract, plan or policy, it shall be determined to be a new contract, plan or policy.

5. Except for a health carrier that is exempted from providing coverage for contraceptives pursuant to this section, a health carrier shall allow enrollees in a health benefit plan that excludes coverage for contraceptives pursuant to subsection 4 of this section to purchase a health benefit plan that includes coverage for contraceptives.

6. Any health benefit plan issued pursuant to subsection 1 of this section shall provide clear and conspicuous written notice on the enrollment form or any accompanying materials to the enrollment form and the group health benefit plan contract:

(1) Whether coverage for contraceptives is or is not included;

(2) That an enrollee who is a member of a group health benefit plan with coverage for contraceptives has the right to exclude coverage for contraceptives if such coverage is contrary to his or her moral, ethical or religious beliefs; and

(3) That an enrollee who is a member of a group health benefit plan without coverage for contraceptives has the right to purchase coverage for contraceptives.

568155
JA-0003466

Case: 25-2573    Document: 34-4    Page: 564    Date Filed: 12/22/2025

7. Health carriers shall not disclose to the person or entity who purchased the health benefit plan the names of enrollees who exclude coverage for contraceptives in the health benefit plan or who purchase a health benefit plan that includes coverage for contraceptives. Health carriers and the person or entity who purchased the health benefit plan shall not discriminate against an enrollee because the enrollee excluded coverage for contraceptives in the health benefit plan or purchased a health benefit plan that includes coverage for contraceptives.

8. The departments of health and senior services and insurance, financial institutions and professional registration may promulgate rules necessary to implement the provisions of this section. No rule or portion of a rule promulgated pursuant to this section shall become effective unless it has been promulgated pursuant to chapter 536. Any rule or portion of a rule, as that term is defined in section 536.010, that is created under the authority delegated in this section shall become effective only if it complies with and is subject to all of the provisions of chapter 536 and, if applicable, section 536.028. This section and chapter 536 are nonseverable and if any of the powers vested with the general assembly pursuant to chapter 536 to review, to delay the effective date or to disapprove and annul a rule are subsequently held unconstitutional, then the grant of rulemaking authority and any rule proposed or adopted after August 28, 2001, shall be invalid and void.

Top



Missouri General Assembly

Copyright © Missouri Legislature, all rights reserved.

568156

JA-0003467

**Notice to Applicant/Subscriber**
**Concerning Contraceptive Coverage**

If the coverage offered to you includes benefits for prescription drugs (pharmaceuticals), it probably also includes benefits for contraceptive drugs and devices.

*The following information applies to you and any family members to be covered under your health benefits plan through Anthem Blue Cross and Blue Shield (Anthem):*

- If the coverage offered to you includes benefits for contraceptive drugs and devices, you may exclude them from your own coverage because of your moral, ethical or religious beliefs.

- If the coverage offered to you does not include benefits for contraceptive drugs and devices, you may add them to your own coverage.

***If you do not wish to change your benefits for contraceptive drugs and devices, please discard this form.***

To make one of the choices indicated above, please complete the Contraceptive Benefits Option Form on the reverse side. Date of birth and Social Security Number information will be used only to identify the person completing this form.

Please mail your completed form directly to Anthem at the address shown below:

Anthem Blue Cross and Blue Shield
P.O. Box 659804
San Antonio, TX  78265-9104

JA1829

# Contraceptive Benefits Option Form



---

**You need to complete this form only if you want to make changes in your contraceptive coverage.**

## OPTION 1: TO EXCLUDE CONTRACEPTIVES

**Complete Option 1 *only* if your health benefits plan includes benefits for contraceptive drugs and devices *and* you want to exclude these benefits from your coverage for moral, ethical or religious reasons.**

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) includes benefits for contraceptive drugs and devices. However, because of my moral, ethical and/or religious beliefs, I do not want benefits for contraceptive drugs and devices as part of the coverage for myself or for any family members to be included on my membership. I understand that *my premium will not be reduced because of this change.*

| Printed last name | First name | M.I. | Date of birth |
|---|---|---|---|
| | | | |

| Member signature | | Date | Social security no. or Anthem identification no. |
|---|---|---|---|
| X | | | |

If you are enrolling through a group, please complete the following:

| Anthem group name | Anthem group no. (if known) |
|---|---|
| | |

## OPTION 2: TO INCLUDE CONTRACEPTIVES

**Complete Option 2 *only* if your health benefits plan excludes benefits for contraceptive drugs and devices, but you want contraceptive coverage.**

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) covers prescription drugs but does not cover contraceptive drugs and devices. However, I wish to include benefits for contraceptive drugs and devices as part of the coverage for myself and for any family members to be included on my membership. I understand that *mv premium will not be increased because of this benefit change.*

| Printed last name | First name | M.I. | Date of birth |
|---|---|---|---|
| | | | |

| Member signature | | Date | Social security no. or Anthem identification no. |
|---|---|---|---|
| X | | | |

If you are enrolling through a group, please complete the following:

| Anthem group name | Anthem group no. (if known) |
|---|---|
| | |

In Missouri, (excluding 30 counties in the Kansas City area) Anthem Blue Cross and Blue Shield is the trade name of RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. Independent licensees of the Blue Cross and Blue Shield Association.
® ANTHEM is a registered trademark of Anthem Insurance Companies, Inc. The Blue Cross and Blue Shield names and symbols are registered marks of the Blue Cross and Blue Shield Association.

23330MOMENABS  8/11

JA-1830

568158

JA-0003469



UnitedHealthcare®

<Adr_Ln_1_Txt>
<Adr_Ln_2_Txt>
<Cty_Nm>, <State_Cd> <Zip_Cd>

# Notice of Benefits

This notice is to tell you about benefit coverage for contraceptives (birth control) under your current health benefit plan and your right, under Missouri law, to request that benefits for contraceptives be removed from your plan coverage.

- According to our records, your health benefit plan currently ***includes*** benefits for contraceptives.
- Missouri state law gives you the right to ***remove*** benefits for contraceptives in your health benefit plan.
- Your health benefit plan does ***not*** pay for abortions unless a spontaneous abortion ***or*** as necessary to save the life of the mother.

**If you choose to request a change in your health plan's benefits for contraceptives, please complete and return the Contraceptive Benefits Option form below.** Missouri state law requires that we keep your decision about contraceptive coverage confidential. Do not send this completed form to your employer.

Please make a copy for your records and mail your completed form to:
**UnitedHealthcare**
**Attention: Executive Administration**
**13655 Riverport Drive**
**Maryland Heights, MO 63043**

Cut here and return bottom portion

---

## Contraceptive Benefits Option Form

***Only complete this form if you are requesting a change in your contraceptive benefits.***

I understand that my employer's health benefit plan ***includes*** benefits for contraceptive drugs and devices. Because of my moral, ethical and/or religious beliefs, **I do *not* want benefits for contraceptives as part of the coverage for myself or for any family members to be included.** I understand that the amount I am charged for my health benefit plan will not change because of this request.

Printed Name of Subscriber ______________________________

Date of Birth of Subscriber ______________ Subscriber Identification Number ______________

Group Name ______________________________ Group Number ______________

Signature of Subscriber ______________________________ Date ______________

 © 2012 United HealthCare Services, Inc.



UnitedHealthcare®

<Fst_Nm> <Lst_Nm>
<Adr_Ln_1_Txt>
<Adr_Ln_2_Txt>
<Cty_Nm>, <State_Cd> <Zip_Cd>

# Notice of Benefits

This notice is to tell you about benefit coverage for contraceptives (birth control) under your current health benefit plan and your right, under Missouri law, to request to include benefits for contraceptives in your plan coverage.

- According to our records, your health benefit plan currently ***does <u>not</u> include*** benefits for contraceptives.
- Missouri state law gives you the right to ***include*** benefits for contraceptives in your health benefit plan. To request contraceptive benefits, use the form provided below.
- Your health benefit plan does ***<u>not</u>*** pay for abortions unless a spontaneous abortion ***or*** as necessary to save the life of the mother.

**If you choose to request a change to your benefits for contraceptives, please complete the Contraceptive Benefits Option Form below.** Missouri state law requires that we keep your decision about your contraceptive coverage confidential. <u>Do not send this completed form to your employer.</u>

Please make a copy for your records and mail your completed form directly to the following address:
**UnitedHealthcare**
**Attention: Executive Administration**
**13655 Riverport Drive**
**Maryland Heights, MO 63043**

Cut here and return bottom portion

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Contraceptive Benefits Option Form

***Only complete this form if you are requesting a change in your contraceptive benefits.***

I understand that my employer's health benefit plan covers prescription drugs but does **<u>not</u>** cover contraceptive drugs and devices. **I wish to *include* benefits for contraceptives as part of the coverage for myself and for any family members covered on this plan.** I understand that the amount I am charged will not change because of this request and my benefits for contraceptives will be subject to the terms of my health benefit plan.

Printed Name of Subscriber ______________________________________________

Date of Birth of Subscriber ________________ Subscriber Identification Number ____________________

Group Name ______________________________ Group Number ________________________

Signature of Subscriber ______________________________________ Date ____________

 © 2012 United HealthCare Services, Inc.

10/23/2020                                 Women's Preventive Services Guidelines | Official web site of the U.S. Health Resources & Services Administration

Health Resources & Services Administration                                                    Explore

**Get reimbursed for COVID-19 testing and treatment of uninsured individuals.**   Learn more »



[          search box          ] 🔍

Home > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines

 On December 17, 2019, HRSA updated the HRSA-supported Women's Preventive Services Guidelines. Read the most current version.

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 17, 2020. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the previously issued guidelines.*

In 2018, the HRSA-supported Women's Preventive Services Initiative released the Well Woman Chart, a resource that includes age-based preventive service recommendations for women from adolescence to maturity. The chart does not include updates to the HRSA-supported comprehensive guidelines, but provides additional clarity for patients and providers, with the goal of improving women's health across the life span.

## Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing for those services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

### Women's Preventive Services Guidelines Supported by the Health Resources and Services Administration

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – generally must be covered with no cost sharing. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Health Resources and Services Administration Women's Preventive Services Guidelines

## Learn More

- Women's Preventive Services Initiative report 🔗
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps* 🔗
- 2016 Guidelines
- US Preventive Services Task Force 🔗
- Bright Futures 🔗
- Advisory Committee on Immunization Practices 🔗

## For Further Information

Contact
wellwomancare@hrsa.gov.

https://www.hrsa.gov/womens-guidelines/index.html                                                                    JA-0003472

Case 3:25-cv-03756-LJC   Document 14-1   Filed 12/12/2020   Page 570 of 613

*Non-grandfathered plans (plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) generally are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health Insurance Coverage | Frequency |
|---|---|---|
| Well-woman visits. | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception care and many services necessary for prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors. * (see note) |
| Screening for gestational diabetes. | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| Human papillomavirus testing. | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| Counseling for sexually transmitted infections. | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| Counseling and screening for human immune-deficiency virus. | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual. |
| Contraceptive methods and counseling. ** , *** (see note) | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed. |
| Breastfeeding support, supplies, and counseling. | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth. |
| Screening and counseling for interpersonal and domestic | Screening and counseling for interpersonal and | Annual. |

JA1834

JA-0003473

Case 2:25-cv-25755-4 Document 44-4 Page: 571 Date Filed: 12/18/2020

| violence. | domestic violence. | |
|---|---|---|
| Screening for anxiety. | Screening for anxiety in adolescent and adult women, including those who are pregnant or postpartum. Optimal screening intervals are unknown and clinical judgement should be used to determine screening frequency. | As prescribed. |
| Screening for breast cancer. | Screening for breast cancer by mammography in average-risk women no earlier than age 40 and no later than age 50. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening. | Screening mammography should occur at least biennially and as frequently as annually. |
| Screening for diabetes mellitus after pregnancy. | Screening for diabetes mellitus in women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes mellitus . | Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum. |
| Screening for urinary incontinence. | Screening for urinary incontinence. | Annual. |

_* Refer to guidance issued by the Center for Consumer Information and Insurance Oversight entitled _Affordable Care Act Implementation FAQs, Set 12, Q10_.

**(I)(a) Objecting entities—religious beliefs.

_(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:_
_(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (I)(a)(2) of this note. Such non-governmental plan sponsors include, but are not limited to, the following entities:_
_(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order;_
_(B) A nonprofit organization;_
_(C) A closely held for-profit entity;_
_(D) A for-profit entity that is not closely held; or_
_(E) Any other non-governmental employer;_
_(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (I)(a) (2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and_
_(iii) A health insurance issuer offering group or individual insurance coverage to the extent the_

JA1835

JA-0003474

*issuer objects as specified in paragraph (I)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (I)(a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (I)(a) will apply to the extent that an entity described in paragraph (I)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.*

*(b) Objecting individuals—religious beliefs. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (I)(b), and nothing in 45 CFR 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.*

*(II)(a) Objecting entities—moral convictions.*

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*

*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent one of the following non-governmental plan sponsors object as specified in paragraph (II)(a)(2) of this note:*
*(A) A nonprofit organization; or*
*(B) A for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934);*
*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (II)(a) (2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*
*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (II)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (II)(a)(1)(iii), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (II)(a) will apply to the extent that an entity described in paragraph (II)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.*

*(b) Objecting individuals—moral convictions. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (II)(b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815– 2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.*

*(III) Definition. For the purposes of this note, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of these Guidelines.*

JA1836

JA-0003475

Case 2:25-cv-25785-4 Document 04-1 am Page 573 of 198 U.S. Health Resources & Services Administration

*See Federal Register Notice:* [Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act](#) (PDF - 488 kb).

HRSA, in concert with an external review committee, will review, and continually update, the [Women's Preventive Services' Guidelines](#).

*\_*** General Notice*

*On July 29, 2019, in a case in the Northern District of Texas, DeOtte v. Azar, No. 4:18-CV-00825-O, 2019 WL 3786545 (N.D. Tex. July 29, 2019) the court determined that the "Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), violates the Religious Freedom Restoration Act" with respect to individuals and entities with religious objections to contraceptive coverage and thus enjoined enforcement of those provisions against such individuals and entities.*

*The Departments of Labor, Health and Human Services, and the Treasury are working with the Department of Justice in these on-going suits.*

*Date Last Reviewed:  December 2019*

 About HRSA

 Connect with HRSA

 Find Health Services

- **Bureaus & Offices**
- **Budget**
- **Strategic Plan**
- **Working at HRSA**
- **About HRSA**

   

Health Center

HIV Medical Care and Treatment

 Sign up for email updates

  Locate other health services

Contact Us  |  Viewers & Players  |  Privacy Policy  |  Disclaimers  |  Accessibility  |  Freedom of Information Act  |  EEO/No Fear Act
U.S. Department of Health and Human Services  |  USA.gov  |  Whitehouse.gov

## Language Assistance Available

| | | | |
|---|---|---|---|
| Español | 繁體中文 | Tiếng Việt | 한국어 |
| Tagalog | Русский | العربية | Kreyòl Ayisyen |
| Français | Polski | Português | Italiano |
| Deutsch | 日本語 | فارسی | English |

https://www.hrsa.gov/womens-guidelines/index.html

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: October 23, 2020

/s/ Mark Rienzi
Mark Rienzi
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 2:17-cv-04540 (WB) |
| JOSEPH R. BIDEN, in his official capacity as President of the United States; *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

<u>**NOTICE OF WITHDRAWAL OF NOTICE OF PROPOSED RULEMAKING**</u>

Federal Defendants respectfully give notice to the Court that the U.S. Department of the Treasury, the U.S. Department of Labor, and the U.S. Department of Health and Human Services are withdrawing in their entirety proposed rules that were published in the Federal Register on February 2, 2023, regarding coverage of certain preventive services under the Affordable Care Act. The unpublished version of the notice of withdrawal can be viewed on the website of the Federal Register at the following address: https://public-inspection.federalregister.gov/2024-31239.pdf. The withdrawal will become effective upon publication in the Federal Register on December 30, 2024.

Dated: December 23, 2024               Respectfully submitted,


                                        BRIAN NETTER
                                        Deputy Assistant Attorney General

                                        MICHELLE R. BENNETT
                                        Assistant Director, Federal Programs Branch

JA1839

<div style="text-align: right;">

*/s/ Daniel Riess*
DANIEL RIESS
MICHAEL GERARDI
REBECCA M. KOPPLIN
Trial Attorneys
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 353-3098
Daniel.Riess@usdoj.gov
*Attorneys for Federal Defendants*

</div>

2

Exhibit 177

Case 2:25-cv-05744-JAK-E Document 34-1 Page 578 Filed Date Filed: 12/12/2025



**Health Resources & Services Administration**

**Call or Text the Maternal Mental Health Hotline**

HRSA
Health Resources & Services Administration

MENU

Home » Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines

## Affordable Care Act expands prevention coverage for women's health and well-being

The Affordable Care Act (ACA)—the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010—helps make prevention services affordable and accessible for all Americans by requiring most health insurance plans to provide coverage without cost sharing for certain recommended preventive services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

Under the ACA, most private health insurers must provide coverage of women's preventive health care—such as mammograms, screenings for cervical cancer, prenatal care, and other services—with no cost sharing. Under section 2713 of the Public Health Service Act, as modified by the ACA, non-grandfathered group health plans and non-grandfathered group and individual health insurance coverage are required to cover specified preventive services without a copayment, coinsurance, deductible, or other cost sharing, including preventive care and screenings for women as provided for in comprehensive guidelines supported by HRSA for this purpose.

The law recognizes and HHS understands the unique health needs of women across their lifespan. The purpose of WPSI is to improve women's health across the lifespan by identifying preventive services and screenings to be used in clinical practice and, when supported by HRSA, incorporated in the Guidelines.

## HRSA-supported Women's Preventive Services Guidelines: Background

The HRSA-supported Women's Preventive Services Guidelines (Guidelines) were originally established in 2011 based on recommendations from a Department of Health and Human Services' commissioned study by the Institute of Medicine (IOM), now known as the National Academy of Medicine (NAM).

Since the establishment of the Guidelines, there have been advancements in science and gaps identified in clinical practice. To address these, in 2016, the Health Resources and Services Administration (HRSA) awarded five-year cooperative agreement, the Women's Preventive Services Initiative (WPSI), to the American College of

JA1842

Exhibit 177 - JA-0003410

Obstetricians and Gynecologists (ACOG) to convene a coalition of clinician, academic, and consumer-focused health professional organizations to conduct a scientifically rigorous review to develop recommendations for updated Guidelines in accordance with the model created by the NAM Clinical Practice Guidelines We Can Trust. The American College of Obstetricians and Gynecologists (ACOG) formed an expert panel, also called the WPSI, for this purpose.

In March 2021, ACOG was awarded a subsequent cooperative agreement to review and recommend updates to the Guidelines. Under ACOG, WPSI reviews existing Women's Preventive Services Guidelines at least once every five years, or upon the availability of new evidence, as well as new preventive services topics. New topics for future consideration can be submitted on a rolling basis at the [Women's Preventive Services Initiative website](#).

# HRSA-supported Women's Preventive Services Guidelines

HRSA supports the Women's Preventive Services Guidelines (Guidelines) listed below that address health needs specific to women.

In December 2024, HRSA approved updates to the Guidelines for two listed preventive services: Screening and Counseling for Intimate Partner and Domestic Violence and Breast Cancer Screening for Women at Average Risk. HRSA also approved a new guideline for Patient Navigation Services for Breast and Cervical Cancer Screening. The Guidelines are provided in the table.

## Updated guidelines

| Type of Preventive Service | Current Guidelines | Updated Guideline Beginning with Plan Years Starting in 2026 |
|---|---|---|
| **Screening and Counseling for Intimate Partner and Domestic Violence** | WPSI recommends screening adolescents and women for interpersonal and domestic violence, at least annually, and, when needed, providing or referring for initial intervention services. Interpersonal and domestic violence includes physical violence, sexual violence, stalking and psychological aggression (including coercion), reproductive coercion, neglect, and the threat of violence, abuse, or both. Intervention services include, but are not limited to, counseling, education, harm reduction strategies, and referral to appropriate supportive services. | The Women's Preventive Services Initiative recommends screening adolescent and adult women for intimate partner and domestic violence, at least annually, and, when needed, providing or referring to intervention services. Intimate partner and domestic violence includes physical violence, sexual violence, stalking and psychological aggression (including coercion), reproductive coercion, neglect, and the threat of violence, abuse, or both. Intervention services include, but are not limited to, counseling, education, harm reduction strategies, and appropriate supportive services. |
| **Breast Cancer** | WPSI recommends that average-risk women initiate mammography | The Women's Preventive Services Initiative recommends that women at average risk of |

JA1843

Exhibit 177 - JA-0003411

| | | breast cancer initiate mammography screening no earlier than age 40 years and no later than age 50 years. Screening mammography should occur at least biennially and as frequently as annually. Women may require additional imaging to complete the screening process or to address findings on the initial screening mammography. If additional imaging (e.g., magnetic resonance imaging (MRI), ultrasound, mammography) and pathology evaluation are indicated, these services also are recommended to complete the screening process for malignancies. Screening should continue through at least age 74 years, and age alone should not be the basis for discontinuing screening. |
| **Screening for Women at Average Risk** | screening no earlier than age 40 and no later than age 50. Screening mammography should occur at least biennially and as frequently as annually. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening.<br><br>These screening recommendations are for women at average risk of breast cancer. Women at increased risk should also undergo periodic mammography screening, however, recommendations for additional services are beyond the scope of this recommendation. | Women at increased risk also should undergo periodic mammography screening, however, recommendations for additional services are beyond the scope of this recommendation. |

## New guideline

| Type of Preventive Service | New Guideline Beginning with Plan Years Starting in 2026 |
|---|---|
| **Patient Navigation Services for Breast and Cervical Cancer Screening** | The Women's Preventive Services Initiative recommends patient navigation services for breast and cervical cancer screening and follow-up, as relevant, to increase utilization of screening recommendations based on an assessment of the patient's needs for navigation services. Patient navigation services involve person-to-person (e.g., in-person, virtual, hybrid models) contact with the patient. Components of patient navigation services should be individualized. Services include, but are not limited to, person-centered assessment and planning, health care access and health system navigation, referrals to appropriate support services (e.g., language translation, transportation, and social services), and patient education. |

## Current guidelines

| Type of Preventive Service | Current Guidelines |
|---|---|

https://www.hrsa.gov/womens-guidelines
Exhibit 177 - JA-0003412

Case 2:23-cv-05454... Women's Preventive Services Initiative Recommendations

| | |
|---|---|
| **Screening for Anxiety** | WPSI recommends screening for anxiety in adolescent and adult women, including those who are pregnant or postpartum. Optimal screening intervals are unknown and clinical judgement should be used to determine screening frequency. Given the high prevalence of anxiety disorders, lack of recognition in clinical practice, and multiple problems associated with untreated anxiety, clinicians should consider screening women who have not been recently screened. |
| **Screening for Cervical Cancer** | WPSI recommends cervical cancer screening for average-risk women aged 21 to 65 years. For women aged 21 to 29 years, the Women's Preventive Services Initiative recommends cervical cancer screening using cervical cytology (Pap test) every 3 years. Cotesting with cytology and human papillomavirus testing is not recommended for women younger than 30 years. Women aged 30 to 65 years should be screened with cytology and human papillomavirus testing every 5 years or cytology alone every 3 years. Women who are at average risk should not be screened more than once every 3 years. |
| **Obesity Prevention in Midlife Women** | WPSI recommends counseling midlife women aged 40 to 60 years with normal or overweight body mass index (BMI) (18.5-29.9 kg/m2) to maintain weight or limit weight gain to prevent obesity. Counseling may include individualized discussion of healthy eating and physical activity. |
| **Breastfeeding Services and Supplies** | WPSI recommends comprehensive lactation support services (including consultation; counseling; education by clinicians and peer support services; and breastfeeding equipment and supplies) during the antenatal, perinatal, and postpartum periods to optimize the successful initiation and maintenance of breastfeeding.<br><br>Breastfeeding equipment and supplies include, but are not limited to, double electric breast pumps (including pump parts and maintenance) and breast milk storage supplies. Access to double electric pumps should be a priority to optimize breastfeeding and should not be predicated on prior failure of a manual pump. Breastfeeding equipment may also include equipment and supplies as clinically indicated to support dyads with breastfeeding difficulties and those who need additional services. |
| **Contraception \*** | WPSI recommends that adolescent and adult women have access to the full range of contraceptives and contraceptive care to prevent unintended pregnancies and improve birth outcomes. Contraceptive care includes screening, education, counseling, and provision of contraceptives (including in the immediate postpartum period).\*\* Contraceptive care also includes follow-up care (e.g., management, evaluation and changes, including the removal, continuation, and discontinuation of contraceptives). WPSI recommends that the full range of U.S. Food and Drug Administration (FDA)- approved, -granted, or -cleared contraceptives, effective family planning practices, and sterilization procedures be available as part of contraceptive care. The full range of contraceptives includes those currently listed in the FDA's Birth Control Guide\*\*\*: (1) sterilization surgery |

Exhibit 177 - JA-0003413

for women, (2) implantable rods, (3) copper intrauterine devices, (4) intrauterine devices with progestin (all durations and doses), (5) injectable contraceptives, (6) oral contraceptives (combined pill), 7) oral contraceptives (progestin only), (8) oral contraceptives (extended or continuous use), (9) the contraceptive patch, (10) vaginal contraceptive rings, (11) diaphragms, (12) contraceptive sponges, (13) cervical caps, (14) condoms, (15) spermicides, (16) emergency contraception (levonorgestrel), and (17) emergency contraception (ulipristal acetate), and any additional contraceptives approved, granted, or cleared by the FDA. Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method.****

| | |
|---|---|
| **Counseling for Sexually Transmitted Infections (STIs)** | WPSI recommends directed behavioral counseling by a health care clinician or other appropriately trained individual for sexually active adolescent and adult women at an increased risk for STIs. WPSI recommends that clinicians review a woman's sexual history and risk factors to help identify those at an increased risk of STIs. Risk factors include, but are not limited to, age younger than 25, a recent history of an STI, a new sex partner, multiple partners, a partner with concurrent partners, a partner with an STI, and a lack of or inconsistent condom use. For adolescents and women not identified as high risk, counseling to reduce the risk of STIs should be considered, as determined by clinical judgment. |
| **Human Immunodeficiency Virus Infection (HIV)** | WPSI recommends all adolescent and adult women, ages 15 and older, receive a screening test for HIV at least once during their lifetime. Earlier or additional screening should be based on risk, and rescreening annually or more often may be appropriate beginning at age 13 for adolescent and adult women with an increased risk of HIV infection.<br><br>WPSI recommends risk assessment and prevention education for HIV infection beginning at age 13 and continuing as determined by risk. A screening test for HIV is recommended for all pregnant women upon initiation of prenatal care with rescreening during pregnancy based on risk factors. Rapid HIV testing is recommended for pregnant women who present in active labor with an undocumented HIV status. Screening during pregnancy enables prevention of vertical transmission. |
| **Well-Woman Preventative Visits** | WPSI recommends that women receive at least one preventive care visit per year beginning in adolescence and continuing across the lifespan to ensure the provision of all recommended preventive services, including preconception and many services necessary for prenatal and interconception care, are obtained. The primary purpose of these visits should be the delivery and coordination of recommended preventive services as determined by age and risk factors. These services may be completed at a single or as part of a series of visits that take place over time to obtain all necessary services depending on a woman's age, health status, reproductive health needs, pregnancy status, and risk factors. Well-women visits also include prepregnancy, prenatal, postpartum and interpregnancy visits. |

Exhibit 177 - JA-0003414

| Screening for Diabetes in Pregnancy | The Women's Preventive Services Initiative recommends screening pregnant women for gestational diabetes mellitus after 24 weeks of gestation (preferably between 24 and 28 weeks of gestation) to prevent adverse birth outcomes. WPSI recommends screening pregnant women with risk factors for type 2 diabetes or GDM before 24 weeks of gestation—ideally at the first prenatal visit. |
|---|---|
| Screening for Diabetes after Pregnancy | The WPSI recommends screening for type 2 diabetes in women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes. Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum. Women who were not screened in the first year postpartum or those with a negative initial postpartum screening test result should be screened at least every 3 years for a minimum of 10 years after pregnancy. For those with a positive screening test result in the early postpartum period, testing should be repeated at least 6 months postpartum to confirm the diagnosis of diabetes regardless of the type of initial test (e.g., fasting plasma glucose, hemoglobin A1c, oral glucose tolerance test). Repeat testing is also indicated for women screened with hemoglobin A1c in the first 6 months postpartum regardless of whether the test results are positive or negative because the hemoglobin A1c test is less accurate during the first 6 months postpartum. |
| Screening for Urinary Incontinence | The Women's Preventive Services Initiative recommends screening women for urinary incontinence annually. Screening should assess whether women experience urinary incontinence and whether it impacts their activities and quality of life. If indicated, facilitating further evaluation and treatment is recommended. |

# Implementation considerations

While not included as part of the HRSA-supported guidelines, the Women's Preventive Services Initiative, through ACOG, also developed implementation considerations, available at the Women's Preventive Services Initiative website, which provide additional clarity on implementation of the guidelines into clinical practice. The implementation considerations are separate from the clinical recommendations, are informational, and are not part of the formal action by the Administrator under Section 2713.

Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these Guidelines beginning with the first plan year (in the individual market policy year) that begins on or after one year from the date the updated Guidelines are accepted by the HRSA Administrator. In the interim, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the Guidelines as previously updated.

* With respect to religious and moral exemptions in connection with coverage of certain preventive health services, see 45 CFR 147.132 and 45 CFR 147.133.

** Education and counseling includes all methods of contraception, including but not limited to, hormonal, devices, surgical, barrier, and fertility-based awareness methods, including lactation amenorrhea.

*** FDA's Birth Control Guide
This refers to FDA's Birth Control Guide as posted on December 22, 2021 with the exception of sterilization surgery for men, which is beyond the scope of the WPSI.

**** Notice
This sentence, included at the end of the "Contraception" section of the previous Guidelines, remains at the conclusion of the "Contraception" section of the 2021 Guidelines per a Final Order issued on December 6, 2022, in *Tice-Harouff v. Johnson*, Eastern District of Texas (Tyler Division), Case No. 6:22-cv-201-JDK. This is consistent with footnote **above, which indicates that education and counseling within the "Contraception" section of the 2021 Guidelines includes fertility awareness-based methods, including lactation amenorrhea.

## Contact

wellwomancare@hrsa.gov.

## Learn more

- HRSA/MCHB Preventive Guidelines and Screening for Women, Children, and Youth
- Historical Files
- 2019 Guidelines
- 2016 Guidelines
- Institute of Medicine: *Clinical Preventive Services for Women (2011)*
- Bright Futures
- Advisory Committee on Heritable Disorders in Newborns and Children

**Date Last Reviewed:**  January 2025

Return to top

Sign up for email updates.    **Subscribe**

**Find a Medically Underserved Area**

**Search the data**



Bureaus & Offices

Budget

EEO/Civil Rights

Working at HRSA

About HRSA





Contact Us

---

Accessibility | Disclaimers | Freedom of Information Act | Health and Human Services | No FEAR Act | Privacy Policy | USA.gov

Viewers & Players | Vulnerability Disclosure Policy | WhiteHouse.gov

---

## Language Assistance

| | | | |
|---|---|---|---|
| Deutsch | English | Español | Français |
| Italiano | Kreyòl Ayisyen | Polski | Português |
| Tagalog | Tiếng Việt | Русский | العربية |
| فارسی | 日本語 | 繁體中文 | 한국어 |

Exhibit 177 - JA-0003417

1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   JULIE WENG-GUTIERREZ, State Bar No. 179277
    Senior Assistant Attorney General
3   CHRISTINA BULL ARNDT, State Bar No. 175403
    Deputy Solicitor General
4   R. MATTHEW WISE, State Bar No. 238485
    MICHELE L. WONG, State Bar No. 167176
5   KARLI EISENBERG, State Bar No. 281923
    Deputy Attorneys General
6     1300 I Street, Suite 125
      P.O. Box 944255
7     Sacramento, CA 94244-2550
      Telephone: (916) 210-7913
8     Fax: (916) 324-5567
      E-mail: Karli.Eisenberg@doj.ca.gov
9   *Attorneys for Plaintiff State of California*

10  *[Additional counsel listed on next page]*

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14  **THE STATE OF CALIFORNIA; THE**          4:17-cv-05783-HSG
    **STATE OF DELAWARE; THE STATE OF**
15  **MARYLAND; THE STATE OF NEW**            **DECLARATION OF SHARITA**
    **YORK; THE COMMONWEALTH OF**             **GRUBERG IN SUPPORT OF THE**
16  **VIRGINIA,**                             **STATES' REPLY TO OPPOSITION TO**
                                              **MOTION FOR PRELIMINARY**
17                          Plaintiffs,       **INJUNCTION**

18           v.

19

20  **ERIC D. HARGAN, IN HIS OFFICIAL**
    **CAPACITY AS ACTING SECRETARY OF THE**
21  **U.S. DEPARTMENT OF HEALTH & HUMAN**
    **SERVICES; U.S. DEPARTMENT OF**
22  **HEALTH AND HUMAN SERVICES; R.**
    **ALEXANDER ACOSTA, IN HIS OFFICIAL**
23  **CAPACITY AS SECRETARY OF THE U.S.**
    **DEPARTMENT OF LABOR; U.S.**
24  **DEPARTMENT OF LABOR; STEVEN**
    **MNUCHIN, IN HIS OFFICIAL CAPACITY AS**
25  **SECRETARY OF THE U.S. DEPARTMENT OF**
    **THE TREASURY; U.S. DEPARTMENT OF**
26  **THE TREASURY; DOES 1-100,**

27                          Defendants.

28

                                  1

Declaration of Sharita Gruberg in support of States' Reply to Opposition to Mot. For Prelim. Inj. (4:17-cv-05783-HSG)

JA1850                                        JA 654

654 of 1055

ATTORNEYS FOR ADDITIONAL PLAINTIFFS

MATTHEW P. DENN
*Attorney General of Delaware*
AARON R. GOLDSTEIN*
*State Solicitor*
LAKRESHA S ROBERTS*
*Chief Deputy Attorney General*
JESSICA M. WILLEY*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN E. FROSH
*Attorney General of Maryland*
STEVE M. SULLIVAN*
*Solicitor General*
CAROLYN A. QUATTROCKI*
*Deputy Attorney General*
KIMBERLY S. CAMMARATA*
*Director, Health Education and Advocacy*
200 St. Paul Place
Baltimore, MD 21202

ERIC T. SCHNEIDERMAN
*Attorney General of New York*
LISA LANDAU*
*Bureau Chief, Health Care Bureau*
SARA MARK*
*Special Counsel*
ELIZABETH CHESLER*
*Assistant Attorney General*
120 Broadway
New York, NY 10271

MARK R. HERRING
*Attorney General of Virginia*
SAMUEL T. TOWELL*
*Deputy Attorney General*
202 North Ninth Street
Richmond, VA 23219

* Pro hac vice application forthcoming

2

JA1831    JA 6465 of 1055

I, Sharita Gruberg, declare as follows:

1. I am Associate Director of the LGBT Research and Communications Project at the Center for American Progress (CAP). I am a lawyer with five years of experience filing Freedom of Information Act requests.

2. On May 31, 2017, CAP submitted a Freedom of Information Act (FOIA) request to the U.S. Department of Health and Human Services for all records of religious accommodation requests submitted to the agency under the Affordable Care Act's contraceptive mandate. Records were requested from when the Affordable Care Act went into effect to the date the FOIA request was submitted and included filings made by requesting entities as well as the agency's responses.

3. We received 558 pages of documents from January 2014 to March 2016 in response to our request. A true and correct copy of these documents is attached as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct of my own personal knowledge.

Executed on December 6, 2017 in Washington, D.C.

Sharita Gruberg
Center for American Progress

SA2017109209
52715008.docx

3

Declaration of Sharita Gruberg in support of States' Reply to Opposition to Mot. For Prelim. Inj. (4:17-cv-05783-HSG)

JA1852

JA 656 of 1055



Office of the President

September 10, 2014

Sylvia Mathews Burwell
Secretary of Health and Human Services
Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H
Via email to marketreform@cms.hhs.gov

Re: Valley Forge Christian College Objection to Health Care Mandate

To the Secretary of Health and Human Services:

Valley Forge Christian College has a religious objection to providing coverage of a subset of
contraceptive services required to be covered under PHS Action Section 2713, as adopted by the
Affordable Care Act, and incorporated under ERISA section 715 and Code section 9815.
**The services for which this organization objects are the following**:
We are requesting relief, based on our sincerely held religious beliefs, from the regulations
issued under the Patient Protection and Affordable Care Act (PPACA) that force employers to
provide, directly or indirectly, insurance plans that include potentially life threatening drugs and
devices, which harm or terminate a fertilized human egg (the "Mandate"); including but not
limited to:

- Ulipristal (aka Ella)
- Levonorgestrel (aka Plan B, Plan B One-Step, Next Choice)
- Intrauterine Devices (of any type)
- Abortion services except to save the life of the mother

**Service Provider Information**

| (a) Plan Name | (b) Service Provider Name | (c) Service Provider Contact Information | (d) Service Provider Category | (e) Plan type if applicable |
|---|---|---|---|---|
| Valley Forge Christian College | Aetna | Karla Hellings Senior Account Manager-Established Business SEPA 980 Jolly Road U11E Blue Bell, PA 19422 215-775-7815 HellingsKJ@aetna.com | Issuer | N/A |
| Valley Forge Christian College | PrimePay | Brad Ramer Product Specialist/Channel Manager, HR & Benefit Services 1487 Dunwoody Drive, West Chester, PA 19335 484.913.3535 **bramer@primepay.com** | TPA | N/A |

**Information being submitted is:**

    [ x ] Original Information    [   ] Updated

**Contact Information:**  Kindly direct all correspondence related to this matter to

<div align="center">

Don Meyer, Ph.D.
President
VALLEY FORGE CHRISTIAN COLLEGE
1401 Charlestown Road
Phoenixville, PA 19460
610.917.1402 (O)

</div>

**Eligible Organization:**   Nonprofit entity – Christian college

<div align="right">

**VALLEY FORGE CHRISTIAN COLLEGE**

By _____

**Don Meyer, Ph.D.**
President

</div>



December 29, 2014

Honorable Sylvia Burwell
Secretary, Health & Human Services
The U.S. Department of Health and Human Services
c/o Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
Room 739H
200 Independence Avenue, SW
Washington, DC 20201

Notification of Objection

Dear Ms. Burwell:

DAS Companies, Inc. is a closely-held corporation organized in Pennsylvania. The sole shareholder of the corporation is a ██████████████ and adheres to the tenets of his faith. As a closely-held family corporation with deep religious convictions and based on the United States Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (U.S. 2014), DAS objects to providing coverage of all contraceptive services required to be covered under PHS Act section 2713, as added by the Affordable Care Act, and incorporated into ERISA section 715 and Code section 9815.

DAS will continue to provide comprehensive health care plans for its employees. Based on its religious objections to the mandate to provide contraceptives, however, no form of contraceptives will be offered in the health care plans provided for its employees. The DAS health plan is the DAS Companies, Inc. PPO. It is administered by a Third Party Administrator: Highmark Blue Shield, 1800 Center Street, Camp Hill PA 17089.

Should you have any questions regarding this letter, please feel free to contact the undersigned.

Sincerely,



Chief Financial Officer & Assistant Secretary

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 13101



**CMS**
CENTERS FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR CONSUMER INFORMATION
& INSURANCE OVERSIGHT**

## VIA CERTIFIED MAIL & EMAIL
## RETURN RECEIPT REQUESTED

March 03, 2016

Mary Hentosz
UPMC Health Plan
600 Grant Street
Pittsburgh, Pa. 15219

Re: Earth Sun Moon Trading Health Plan, Earth Sun Moon Trading Company, Inc.

Dear Ms. Hentosz,

This is to inform you that the Department of Health and Human Services (HHS) has received notice from Earth Sun Moon Trading Company, Inc. that it is an eligible organization as defined in 45 CFR 147.131(b) and that your organization is the issuer of its group health insurance coverage. Earth Sun Moon Trading Company, Inc. has notified HHS of its religious objection to the coverage of the following contraceptive services for its group health plan(s) Earth Sun Moon Trading Health Plan: "all contraceptive benefits".

As the issuer of the eligible organization's health insurance coverage your organization is responsible for complying with PHS Act section 2713(a)(4) and 45 CFR 147.131 with respect to coverage of such contraceptive services to which the eligible organization objects on religious grounds. As such, your organization is required to provide payments for such contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. You may not require any documentation or other information from the eligible organization.

Questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

Jacob Ackerman
Acting Director, Market-wide Regulation Division
Oversight Group

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H



**CENTER FOR CONSUMER INFORMATION
& INSURANCE OVERSIGHT**

## VIA CERTIFIED MAIL & EMAIL
## RETURN RECEIPT REQUESTED

October 14, 2014

Andrea Meehan
Sr. Account Executive
Sales
3031C Walton Road, Ste. 201
Plymouth Meeting, PA 19462
Andrea.Meehan@ibx.com

Re: PAISBOA Plan & Trust, Holy Ghost Preparatory School

Dear Ms. Meehan,

This is to inform you that the Department of Health and Human Services has received notice from Holy Ghost Preparatory School that it is an eligible organization as defined in 45 CFR 147.131(b) and that your organization is the issuer of its group health insurance coverage. Holy Ghost Preparatory School has notified HHS of its religious objection to the coverage of all contraceptive services for its group health plan PAISBOA Plan & Trust.

As the issuer of the eligible organization's health insurance coverage your organization is responsible for complying with PHS Act section 2713(a)(4) and 45 CFR 147.131 with respect to coverage of such contraceptive services to which the eligible organization objects on religious grounds. As such, your organization is required to provide payments for such contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. You may not require any documentation or other information from the eligible organization.

Questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

James Mayhew
Director, Division of Regulations and Policy
Acting Director, Division of Compliance and Enforcement
Oversight Group

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room T3911



## VIA OVERNIGHT MAIL & E-MAIL
## RETURN RECEIPT REQUESTED

September 18, 2014

Karla Hellings
Senior Account Manager-Established Business SEPA
Aetna
980 Jolly Road U11E
Blue Bell, PA 19422
215-775-7815
HellingsKJ@aetna.com

Re: Valley Forge Christian College

Dear Ms. Hellings,

This is to inform you that the Department of Health and Human Services has received notice
from Valley Forge Christian College that it is an eligible organization as defined in 45 CFR
147.131(b) and that your organization is the issuer of its group health insurance coverage. Valley
Forge Christian College has notified HHS of its religious objection to the coverage of the
following contraceptive services that for its group health plan Valley Forge Christian College:
drugs and devices which harm or terminate a fertilized human egg, including but not limited to

- Ulipristal (aka Ella)
- Levonorgestrel (aka Plan B, Plan B One-Step, Next Choice)
- Intrauterine Devices (of any type)
- Abortion services except to save the life of the mother

As the issuer of the eligible organization's health insurance coverage your organization is
responsible for complying with PHS Act section 2713(a)(4) and 45 CFR 147.131 with respect to
coverage of such contraceptive services to which the eligible organization objects on religious
grounds. As such, your organization is required to provide payments for such contraceptive
services for plan participants and beneficiaries without imposing any cost-sharing requirements
(such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other
charge, or any portion thereof, directly or indirectly, on the eligible organization, the group
health plan, or plan participants or beneficiaries. You may not require any documentation or
other information from the eligible organization.

Case 25-2575, Document 34-163, Page 595, Date Filed 12/12/2025
Case 4:17-cv-05783-HSG   Document 78-2   Filed 12/06/17   Page 40 of 588

2

Questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

James Mayhew
Director, Division of Regulations and Policy
Acting Director, Division of Compliance and Enforcement
Oversight Group

 | Office of the President

September 10, 2014

Sylvia Mathews Burwell
Secretary of Health and Human Services
Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H
Via email to marketreform@cms.hhs.gov

Re: Valley Forge Christian College Objection to Health Care Mandate

To the Secretary of Health and Human Services:

Valley Forge Christian College has a religious objection to providing coverage of a subset of
contraceptive services required to be covered under PHS Action Section 2713, as adopted by the
Affordable Care Act, and incorporated under ERISA section 715 and Code section 9815.
**The services for which this organization objects are the following**:
We are requesting relief, based on our sincerely held religious beliefs, from the regulations
issued under the Patient Protection and Affordable Care Act (PPACA) that force employers to
provide, directly or indirectly, insurance plans that include potentially life threatening drugs and
devices, which harm or terminate a fertilized human egg (the "Mandate"); including but not
limited to:

- Ulipristal (aka Ella)
- Levonorgestrel (aka Plan B, Plan B One-Step, Next Choice)
- Intrauterine Devices (of any type)
- Abortion services except to save the life of the mother

**Service Provider Information**

| (a) Plan Name | (b) Service Provider Name | (c) Service Provider Contact Information | (d) Service Provider Category | (e) Plan type if applicable |
|---|---|---|---|---|
| Valley Forge Christian College | Aetna | Karla Hellings Senior Account Manager-Established Business SEPA 980 Jolly Road U11E Blue Bell, PA 19422 215-775-7815 HellingsKJ@aetna.com | Issuer | N/A |
| Valley Forge Christian College | PrimePay | Brad Ramer Product Specialist/Channel Manager, HR & Benefit Services 1487 Dunwoody Drive, West Chester, PA 19335 484.913.3535 **bramer@primepay.com** | TPA | N/A |

**Information being submitted is:**

[ x ] Original Information    [   ] Updated

**Contact Information:**  Kindly direct all correspondence related to this matter to

<div align="center">

Don Meyer, Ph.D.
President
VALLEY FORGE CHRISTIAN COLLEGE
1401 Charlestown Road
Phoenixville, PA 19460
610.917.1402 (O)

</div>

**Eligible Organization:**  Nonprofit entity – Christian college

<div align="right">

**VALLEY FORGE CHRISTIAN COLLEGE**

By_____

**Don Meyer, Ph.D.**
President

</div>

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H



August 19, 2015

Michael Worrell
Director, Human Resources
Bingaman and Son Lumber Inc.
PO Box 247
1195 Creek Mountain Rd
Kreamer, PA 17833
E-mail: mworrell@bingamanlumber.com

Re: Notification regarding religious objections to providing contraceptive coverage

Dear Mr. Worrell,

The Department of Health and Human Services (HHS) has received notice from your for-profit organization of its religious objection to the coverage of contraceptive services for its group health plan(s).

The Departments of the Treasury, Labor, and HHS recently published final rules titled "Coverage of Certain Preventive Services Under the Affordable Care Act" (July 14, 2015, 80 FR 41318), which expand the set of entities that may avail themselves of an accommodation with respect to the coverage of contraceptive services to include a closely held for-profit entity whose highest governing body has adopted a resolution or similar action under its applicable rules of governance and consistent with state law establishing that it objects to covering some or all contraceptive services on account of the owners' sincerely held religious beliefs. The regulations define a closely held for-profit entity as one that is not publicly traded and has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto. For purposes of determining ownership interests, an individual is considered to own the ownership interests owned by or for his or her family (brothers, sisters, half-brothers, half-sisters, spouse, ancestors, and lineal descendants). These family members count as a single owner. These final regulations are effective September 14, 2015 and are applicable beginning on the first day of the first plan year that begins on or after September 14, 2015.

If an organization satisfies the definition of an eligible organization as defined in 45 CFR 147.131(b), it may use EBSA Form 700 to notify the issuer or third-party administrator of its group health plan of its religious objections to coverage of all or a subset of contraceptive services. The EBSA Form 700 is accessible at:
http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf

Case 2:25-... Document 34-1... Page 599... Date Filed 12/12/2025...2019
Case 4:17-cv-05783-HSG   Document 78-2   Filed 12/06/17   Page 86 of 558

Page 2 of 2

Alternately, an eligible organization may notify HHS in writing of its religious objection to coverage of all or a subset of contraceptive services. The notice must include the following information, as required in 45 CFR 147.131(c): the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, including, if applicable, an identification of the subset of contraceptive services to which coverage the eligible organization objects; the plan name and type (i.e., whether it is a student health insurance plan within the meaning of § 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. A model notice is available at
http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Model-Notice-8-22-14.pdf.

If your organization is eligible and would like to avail itself of the accommodation, please provide notification, using one of the two mechanisms described above, that your organization meets the definition of a closely held for-profit entity as set forth in 45 CFR 147.131(b) and include all the required information. If you have any questions regarding whether your organization qualifies for the accommodation, you may send a letter describing its ownership structure to HHS at accommodation@cms.hhs.gov. The rules cited above specify the process that will occur after HHS receives such a letter. Other questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

Jacob Ackerman
Acting Director, Market Rules Division
Oversight Group



**CONESTOGA**
WOOD SPECIALTIES

November 23, 2015

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue, SW
Room 739H
Washington, DC  20201

### Re: Religious Objection to Providing Certain forms of Contraception

To the Secretary of Health and Human Services:

As you are well aware, Conestoga Wood Specialties, Corp., Conestoga Wood Transportation, Inc., and its owners, the Hahn family, have long objected to providing certain forms of contraception as part of their employer sponsored healthcare plan. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014) (which consolidated our appeal with that of Hobby Lobby and provided us injunctive relief from the relevant mandate). As our history in this subject demonstrates, we are an eligible, closely-held, for-profit corporation with a sincerely held religious belief. As such, we do not provide any of the hormonal drugs or IUDs but do provide barrier contraception and sterilization.

I can be reached at the address and phone number listed on this letterhead. Additionally, you can reach our Third Party Administrator for Conestoga Wood Specialties Employee Benefit Plan through Highmark Blue Shield, Attention: Jason Campbell, Lead Client Manager, 1800 Center Street 1A L4, Camp Hill, PA  17089-0089 (717) 302-2461.

Sincerely,

Anthony Hahn
President and Chief Executive Officer

AH/mms

Conestoga Wood Specialties Corp.
245 Reading Road • PO Box 158 • East Earl, PA • 17519-0158
Telephone: 717.445.6701 • www.conestogawood.com

JA1864                                                    JA 6368

568 of 1055

**MODEL NOTICE**

Date:   10/7/2014

To the Secretary of Health and Human Services:

The following eligible organization has a religious objection to providing coverage of [ ] all or [X] a subset of contraceptive services required to be covered under PHS Act section 2713, as added by the Affordable Care Act, and incorporated into ERISA section 715 and Code section 9815. *If the eligible organization objects to providing coverage of a subset of contraceptive services, insert a description of the services for which the eligible organization objects to providing coverage:*

**Plan B,** which is one form of the morning-after pill.

**Ella** (the manufacturer uses a lower case "e") is another version of the morning-after pill.

**Mireena,** an IUD that changes cervical mucus.

**ParaGard,** which is a copper IUD.

(1) Name of eligible organization:   Bingaman and Son Lumber Inc. Po Box 247 (1195 Creek Mountain rd) Kreamer PA 17833

Contact information:   Michael Worrell, Director Human Resources  570-374-1108
mworrell@bingamanlumber.com

Eligible organization is a: [ ] Non-profit entity; OR [X] Other eligible organization

(2) Service provider
information:

| (a) Plan name | (b) Service provider name | (c) Service provider contact information | (d) Service provider category | (e) Plan type (if applicable) |
|---|---|---|---|---|
| Health America/ Health Assurance PPO $5000 plan | PO Box 6506 Carol Stream Il 60197 | | [X ]Issuer or [ ]TPA | [ ]Church plan [ ]Student plan |
| UPMC PPO $5500 plan | One Chatham Center 112 Washington Place Pittsburgh PA 15219 | | [X ]Issuer or [ ]TPA | [ ]Church plan [ ]Student plan |

(3) Information being submitted is (check one):
[X] Original information; OR [ ] Updated information.

*If updated information is being provided, specify the date upon which the updated information was, or will be, effective and what has changed* _____

_(signature)_                                                    10/7/2014
Signature of authorized representative of eligible organization        Date

___Michael Worrell___                                    Date   10/7/2014
Typed name of authorized representative of eligible organization



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H

August 19, 2015

Michael Worrell
Director, Human Resources
Bingaman and Son Lumber Inc.
PO Box 247
1195 Creek Mountain Rd
Kreamer, PA 17833
E-mail: mworrell@bingamanlumber.com

Re: Notification regarding religious objections to providing contraceptive coverage

Dear Mr. Worrell,

The Department of Health and Human Services (HHS) has received notice from your for-profit organization of its religious objection to the coverage of contraceptive services for its group health plan(s).

The Departments of the Treasury, Labor, and HHS recently published final rules titled "Coverage of Certain Preventive Services Under the Affordable Care Act" (July 14, 2015, 80 FR 41318), which expand the set of entities that may avail themselves of an accommodation with respect to the coverage of contraceptive services to include a closely held for-profit entity whose highest governing body has adopted a resolution or similar action under its applicable rules of governance and consistent with state law establishing that it objects to covering some or all contraceptive services on account of the owners' sincerely held religious beliefs. The regulations define a closely held for-profit entity as one that is not publicly traded and has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto. For purposes of determining ownership interests, an individual is considered to own the ownership interests owned by or for his or her family (brothers, sisters, half-brothers, half-sisters, spouse, ancestors, and lineal descendants). These family members count as a single owner. These final regulations are effective September 14, 2015 and are applicable beginning on the first day of the first plan year that begins on or after September 14, 2015.

If an organization satisfies the definition of an eligible organization as defined in 45 CFR 147.131(b), it may use EBSA Form 700 to notify the issuer or third-party administrator of its group health plan of its religious objections to coverage of all or a subset of contraceptive services. The EBSA Form 700 is accessible at:
http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf.

Case 2:25-cv-... Document 34-1 ... Page 603 ... Date Filed 12/12/2025 2019
Case 4:17-cv-05783-HSG   Document 78-2   Filed 12/06/17   Page 178 of 588

Page 2 of 2

Alternately, an eligible organization may notify HHS in writing of its religious objection to coverage of all or a subset of contraceptive services. The notice must include the following information, as required in 45 CFR 147.131(c): the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, including, if applicable, an identification of the subset of contraceptive services to which coverage the eligible organization objects; the plan name and type (i.e., whether it is a student health insurance plan within the meaning of § 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. A model notice is available at http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Model-Notice-8-22-14.pdf.

If your organization is eligible and would like to avail itself of the accommodation, please provide notification, using one of the two mechanisms described above, that your organization meets the definition of a closely held for-profit entity as set forth in 45 CFR 147.131(b) and include all the required information. If you have any questions regarding whether your organization qualifies for the accommodation, you may send a letter describing its ownership structure to HHS at accommodation@cms.hhs.gov. The rules cited above specify the process that will occur after HHS receives such a letter. Other questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

Jacob Ackerman
Acting Director, Market Rules Division
Oversight Group

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H



August 19, 2015

John Borst
Chief Financial Officer & Assistant Secretary
DAS Companies, Inc.
724 Lawn Road,
Palmyra, PA 17078

Re: Notification regarding religious objections to providing contraceptive coverage

Dear Mr. Borst,

The Department of Health and Human Services (HHS) has received notice from your for-profit organization of its religious objection to the coverage of contraceptive services for its group health plan(s).

The Departments of the Treasury, Labor, and HHS recently published final rules titled "Coverage of Certain Preventive Services Under the Affordable Care Act" (July 14, 2015, 80 FR 41318), which expand the set of entities that may avail themselves of an accommodation with respect to the coverage of contraceptive services to include a closely held for-profit entity whose highest governing body has adopted a resolution or similar action under its applicable rules of governance and consistent with state law establishing that it objects to covering some or all contraceptive services on account of the owners' sincerely held religious beliefs. The regulations define a closely held for-profit entity as one that is not publicly traded and has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto. For purposes of determining ownership interests, an individual is considered to own the ownership interests owned by or for his or her family (brothers, sisters, half-brothers, half-sisters, spouse, ancestors, and lineal descendants). These family members count as a single owner. These final regulations are effective September 14, 2015 and are applicable beginning on the first day of the first plan year that begins on or after September 14, 2015.

If an organization satisfies the definition of an eligible organization as defined in 45 CFR 147.131(b), it may use EBSA Form 700 to notify the issuer or third-party administrator of its group health plan of its religious objections to coverage of all or a subset of contraceptive services. The EBSA Form 700 is accessible at:
http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf

Alternately, an eligible organization may notify HHS in writing of its religious objection to coverage of all or a subset of contraceptive services. The notice must include the following

information, as required in 45 CFR 147.131(c): the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, including, if applicable, an identification of the subset of contraceptive services to which coverage the eligible organization objects; the plan name and type (i.e., whether it is a student health insurance plan within the meaning of § 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. A model notice is available at
http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Model-Notice-8-22-14.pdf.

If your organization is eligible and would like to avail itself of the accommodation, please provide notification, using one of the two mechanisms described above, that your organization meets the definition of a closely held for-profit entity as set forth in 45 CFR 147.131(b) and include all the required information. If you have any questions regarding whether your organization qualifies for the accommodation, you may send a letter describing its ownership structure to HHS at accommodation@cms.hhs.gov. The rules cited above specify the process that will occur after HHS receives such a letter. Other questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

Jacob Ackerman
Acting Director, Market Rules Division
Oversight Group

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room T3911



## VIA OVERNIGHT MAIL & E-MAIL
## RETURN RECEIPT REQUESTED

September 18, 2014

Karla Hellings
Senior Account Manager-Established Business SEPA
Aetna
980 Jolly Road U11E
Blue Bell, PA 19422
215-775-7815
HellingsKJ@aetna.com

Re: Valley Forge Christian College

Dear Ms. Hellings,

This is to inform you that the Department of Health and Human Services has received notice
from Valley Forge Christian College that it is an eligible organization as defined in 45 CFR
147.131(b) and that your organization is the issuer of its group health insurance coverage. Valley
Forge Christian College has notified HHS of its religious objection to the coverage of the
following contraceptive services that for its group health plan Valley Forge Christian College:
drugs and devices which harm or terminate a fertilized human egg, including but not limited to

- Ulipristal (aka Ella)
- Levonorgestrel (aka Plan B, Plan B One-Step, Next Choice)
- Intrauterine Devices (of any type)
- Abortion services except to save the life of the mother

As the issuer of the eligible organization's health insurance coverage your organization is
responsible for complying with PHS Act section 2713(a)(4) and 45 CFR 147.131 with respect to
coverage of such contraceptive services to which the eligible organization objects on religious
grounds. As such, your organization is required to provide payments for such contraceptive
services for plan participants and beneficiaries without imposing any cost-sharing requirements
(such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other
charge, or any portion thereof, directly or indirectly, on the eligible organization, the group
health plan, or plan participants or beneficiaries. You may not require any documentation or
other information from the eligible organization.

Case: 25-2575   Document: 34-13   Page: 607   Date Filed: 12/12/2025
Case 4:17-cv-03783-HSG   Document 78-2   Filed 12/06/17   Page 198 of 588

2

Questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

James Mayhew
Director, Division of Regulations and Policy
Acting Director, Division of Compliance and Enforcement
Oversight Group

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H



**CMS**
CENTER FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR CONSUMER INFORMATION**
**& INSURANCE OVERSIGHT**

## VIA CERTIFIED MAIL & EMAIL
## RETURN RECEIPT REQUESTED

October 14, 2014

Andrea Meehan
Sr. Account Executive
Sales
3031C Walton Road, Ste. 201
Plymouth Meeting, PA 19462
Andrea.Meehan@ibx.com

Re: PAISBOA Plan & Trust, Holy Ghost Preparatory School

Dear Ms. Meehan,

This is to inform you that the Department of Health and Human Services has received notice
from Holy Ghost Preparatory School that it is an eligible organization as defined in 45 CFR
147.131(b) and that your organization is the issuer of its group health insurance coverage. Holy
Ghost Preparatory School has notified HHS of its religious objection to the coverage of all
contraceptive services for its group health plan PAISBOA Plan & Trust.

As the issuer of the eligible organization's health insurance coverage your organization is
responsible for complying with PHS Act section 2713(a)(4) and 45 CFR 147.131 with respect to
coverage of such contraceptive services to which the eligible organization objects on religious
grounds. As such, your organization is required to provide payments for such contraceptive
services for plan participants and beneficiaries without imposing any cost-sharing requirements
(such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other
charge, or any portion thereof, directly or indirectly, on the eligible organization, the group
health plan, or plan participants or beneficiaries. You may not require any documentation or
other information from the eligible organization.

Questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

James Mayhew
Director, Division of Regulations and Policy
Acting Director, Division of Compliance and Enforcement
Oversight Group

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room T391E



**VIA CERTIFIED MAIL & EMAIL**
**RETURN RECEIPT REQUESTED**

October 17, 2014

Patricia Mayhall
United HealthCare
1110 Montlimar Drive
Suite 250
Mobile, AL 36609
Patricia_Mayhall@uhc.com

Re: Loyola University Core, Basic and Plus Plans (Policy Number 903297), Loyola University
New Orleans

Dear Ms. Mayhall,

This is to inform you that the Department of Health and Human Services has received notice
from Loyola University New Orleans that it is an eligible organization as defined in 45 CFR
147.131(b) and that your organization is the issuer of its group health insurance coverage. Loyola
University New Orleans has notified HHS of its religious objection to the coverage of the
following contraceptive services for its group health plans Loyola University Core Plan (Policy
Number 903297, Balanced - 40/1000/80% Plan 422 Modified), Loyola University Basic Plan
(Policy Number 903297, Traditional with Deductible - 25/500/90% Plan 4Y4 Modified), and
Loyola University Plus Plan (Policy Number 903297, Traditional with Deductible - 20/100%
3D1 Modified); all contraceptive benefits.

As the issuer of the eligible organization's health insurance coverage your organization is
responsible for complying with PHS Act section 2713(a)(4) and 45 CFR 147.131 with respect to
coverage of such contraceptive services to which the eligible organization objects on religious
grounds. As such, your organization is required to provide payments for such contraceptive
services for plan participants and beneficiaries without imposing any cost-sharing requirements
(such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other
charge, or any portion thereof, directly or indirectly, on the eligible organization, the group
health plan, or plan participants or beneficiaries. You may not require any documentation or
other information from the eligible organization.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H



**VIA CERTIFIED MAIL & EMAIL**
**RETURN RECEIPT REQUESTED**

March 03, 2016

Mary Hentosz
UPMC Health Plan
600 Grant Street
Pittsburgh, Pa. 15219

Re: Earth Sun Moon Trading Health Plan, Earth Sun Moon Trading Company, Inc.

Dear Ms. Hentosz,

This is to inform you that the Department of Health and Human Services (HHS) has received notice from Earth Sun Moon Trading Company, Inc. that it is an eligible organization as defined in 45 CFR 147.131(b) and that your organization is the issuer of its group health insurance coverage. Earth Sun Moon Trading Company, Inc. has notified HHS of its religious objection to the coverage of the following contraceptive services for its group health plan(s) Earth Sun Moon Trading Health Plan: "all contraceptive benefits".

As the issuer of the eligible organization's health insurance coverage your organization is responsible for complying with PHS Act section 2713(a)(4) and 45 CFR 147.131 with respect to coverage of such contraceptive services to which the eligible organization objects on religious grounds. As such, your organization is required to provide payments for such contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. You may not require any documentation or other information from the eligible organization.

Questions can be directed to marketreform@cms.hhs.gov.

Sincerely,

Jacob Ackerman
Acting Director, Market-wide Regulation Division
Oversight Group



Office of the President

September 10, 2014

Sylvia Mathews Burwell
Secretary of Health and Human Services
Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201
Room 739H
Via email to marketreform@cms.hhs.gov

Re: Valley Forge Christian College Objection to Health Care Mandate

To the Secretary of Health and Human Services:

Valley Forge Christian College has a religious objection to providing coverage of a subset of
contraceptive services required to be covered under PHS Action Section 2713, as adopted by the
Affordable Care Act, and incorporated under ERISA section 715 and Code section 9815.
**The services for which this organization objects are the following**:
We are requesting relief, based on our sincerely held religious beliefs, from the regulations
issued under the Patient Protection and Affordable Care Act (PPACA) that force employers to
provide, directly or indirectly, insurance plans that include potentially life threatening drugs and
devices, which harm or terminate a fertilized human egg (the "Mandate"); including but not
limited to:

- Ulipristal (aka Ella)
- Levonorgestrel (aka Plan B, Plan B One-Step, Next Choice)
- Intrauterine Devices (of any type)
- Abortion services except to save the life of the mother

## Service Provider Information

| (a) Plan Name | (b) Service Provider Name | (c) Service Provider Contact Information | (d) Service Provider Category | (e) Plan type if applicable |
|---|---|---|---|---|
| Valley Forge Christian College | Aetna | Karla Hellings Senior Account Manager-Established Business SEPA 980 Jolly Road U11E Blue Bell, PA 19422 215-775-7815 HellingsKJ@aetna.com | Issuer | N/A |
| Valley Forge Christian College | PrimePay | Brad Ramer Product Specialist/Channel Manager, HR & Benefit Services 1487 Dunwoody Drive, West Chester, PA 19335 484.913.3535 **bramer@primepay.com** | TPA | N/A |

## Information being submitted is:

[ x ] Original Information     [   ] Updated

**Contact Information:**   Kindly direct all correspondence related to this matter to

Don Meyer, Ph.D.
President
VALLEY FORGE CHRISTIAN COLLEGE
1401 Charlestown Road
Phoenixville, PA 19460
610.917.1402 (O)

**Eligible Organization**:   Nonprofit entity – Christian college

**VALLEY FORGE CHRISTIAN COLLEGE**

By_____

**Don Meyer, Ph.D.**
President

**MODEL NOTICE**

Date: 10/7/2014

To the Secretary of Health and Human Services:

The following eligible organization has a religious objection to providing coverage of [ ] all or [X] a subset of contraceptive services required to be covered under PHS Act section 2713, as added by the Affordable Care Act, and incorporated into ERISA section 715 and Code section 9815. *If the eligible organization objects to providing coverage of a subset of contraceptive services, insert a description of the services for which the eligible organization objects to providing coverage:*

**Plan B,** which is one form of the morning-after pill.

**Ella** (the manufacturer uses a lower case "e") is another version of the morning-after pill.

**Mirena,** an IUD that changes cervical mucus.

**ParaGard,** which is a copper IUD.

(1) Name of eligible organization: Bingaman and Son Lumber Inc. Po Box 247 (1195 Creek Mountain rd) Kreamer PA 17833

Contact information: Michael Worrell, Director Human Resources 570-374-1108 mworrell@bingamanlumber.com

Eligible organization is a: [ ] Non-profit entity; OR [X] Other eligible organization

(2) Service provider information:

| (a) Plan name | (b) Service provider name | (c) Service provider contact information | (d) Service provider category | (e) Plan type (if applicable) |
|---|---|---|---|---|
| Health America/ Health Assurance PPO $5000 plan | PO Box 6506 Carol Stream Il 60197 | | [X ]Issuer or [ ]TPA | [ ]Church plan [ ]Student plan |
| UPMC PPO $3500 plan | One Chatham Center 112 Washington Place Pittsburgh PA 15219 | | [X ]Issuer or [ ]TPA | [ ]Church plan [ ]Student plan |

(3) Information being submitted is (check one):
[X] Original information; OR [ ] Updated information.

*If updated information is being provided, specify the date upon which the updated information was, or will be, effective and what has changed:*

Signature of authorized representative of eligible organization          Date 10/7/2014

Michael Worrell          Date 10/7/2014
Typed name of authorized representative of eligible organization