# United States Court of Appeals for the Third Circuit

COMMONWEALTH OF PENNSYLVANIA AND STATE OF NEW JERSEY,
*Plaintiffs-Appellees,*

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT
OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY
UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF
LABOR; UNITED STATES OF AMERICA,
*Defendants-Appellants,*

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,
*Intervenor-Defendant-Appellant.*

On Appeal from the U.S. District Court for the
Eastern District of Pennsylvania, No. 2:17-cv-04540-WB
(Hon. Chief Judge Wendy Beetlestone, U.S.D.J.)

## INTERVENOR-APPELLANT'S OPENING BRIEF

| | |
|---|---|
| PAUL D. CLEMENT | MARK L. RIENZI |
| ERIN E. MURPHY | ERIC C. RASSBACH |
| Clement & Murphy | LORI H. WINDHAM |
| 706 Duke Street | ADÈLE A. KEIM |
| Alexandria, VA 22314 | DIANA VERM THOMSON |
| (202) 742-8900 | BENJAMIN A. FLESHMAN |
| | DANIEL L. CHEN |
| NICHOLAS M. CENTRELLA | RICHARD C. OSBORNE |
| Clark Hill | The Becket Fund for Religious Liberty |
| 2 Commerce Street | 1919 Pennsylvania Ave NW, Suite 400 |
| 2001 Market Street, Suite 2620 | Washington, DC 20006 |
| Philadelphia, PA 19103 | (202) 955-0095 |
| (215) 864-8098 | mrienzi@becketfund.org |

*Counsel for Intervenor-Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Intervenor-Defendant-Appellant Little Sisters of the Poor Saints Peter and Paul Home represents that it does not have any parent entities and does not issue stock.

/s/ *Mark L. Rienzi*
Mark L. Rienzi

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 3

STATEMENT OF THE ISSUES .............................................................. 4

STATEMENT OF RELATED CASES ...................................................... 4

STATEMENT OF THE CASE ................................................................. 5

    A. The mandate and its exceptions ...................................................... 5

    B. The creation of the mandate and the religious exemptions ............ 7

    C. The challenges to the mandate and the resulting injunctions ...... 10

    D. Challenges to the religious exemption ......................................... 14

    E. The Supreme Court's decision ...................................................... 15

    F. Proceedings on remand ................................................................. 17

STANDARD OF REVIEW ..................................................................... 19

SUMMARY OF THE ARGUMENT ....................................................... 20

ARGUMENT .......................................................................................... 23

I. The States have no Article III injury. ............................................... 23

II. The States cannot show redressability. ............................................ 26

    A. The mandate violates the Free Exercise Clause
       as applied to religious objectors ..................................................... 29

    B. The mandate, without the Final Rule, discriminates
       on the basis of religion. ................................................................... 32

C. The mandate violates the nondelegation doctrine......................... 34

III. The Final Rule does not violate the APA. ......................................... 37

  A. The Final Rule is required by RFRA. .............................................. 37

    1. The mandate, without the Final Rule, violates RFRA. ............ 37

    2. *Geneva College* and *Real Alternatives* do not control
       the RFRA analysis. ................................................................. 42

  B. The Final Rule is permitted by RFRA. ........................................... 46

  C. The Final Rule is not otherwise arbitrary and capricious. ........... 51

CONCLUSION .......................................................................................... 54

COMBINED CERTIFICATIONS ............................................................. 56

ADDENDUM ............................................................................................ 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ................................................................. 36-37

*Barr v. Am. Ass'n of Pol. Consultants,*
591 U.S. 610 (2020) ................................................................. 50

*Blunt v. Lower Merion Sch. Dist.,*
767 F.3d 247 (3d Cir. 2014) ................................................... 27

*Bose Corp. v. Consumers Union of U.S.,*
466 U.S. 485 (1984) ................................................................. 19-20

*Bro-Tech Corp. v. NLRB,*
105 F.3d 890 (3d Cir. 1997) ................................................... 36

*Brumfield v. Dodd,*
749 F.3d 339 (5th Cir. 2014) ................................................. 28

*Burwell v. Hobby Lobby Stores,*
573 U.S. 682 (2014) ........................................................ *passim*

*Catholic Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n,*
605 U.S. 238 (2025) ................................................ 21, 32-33

*Christ the King Manor v. HHS,*
730 F.3d 291 (3d Cir. 2013) ................................................... 51

*Corp. of Presiding Bishop v. Amos,*
483 U.S. 327 (1987) ................................................................. 48

*FCC v. Consumers' Rsch.,*
606 U.S. 656 (2025) ......................................................... 34-35, 37

*FCC v. Fox Television,*
556 U.S. 502 (2009) ................................................................. 52

iv

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ............................................................ 25

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) ........................................................ 51-52

*Fellowship of Christian Athletes v.*
*San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) .............................................. 30

*Freeman v. Corzine*,
629 F.3d 146 (3d Cir. 2010) ............................................... 24

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ..................................................... *passim*

*Galli v. N.J. Meadowlands Comm'n*,
490 F.3d 265 (3d Cir. 2007) ............................................... 20

*Geneva Coll. v. Secretary of HHS*,
778 F.3d 422 (3d Cir. 2015) ............................. 18, 43, 45, 46

*Grace Schs. v. Azar*,
No. 3:12-cv-459, 2018 WL 8755890
(N.D. Ind. June 1, 2018) .................................................... 41

*Greenberg v. Lehocky*,
81 F.4th 376 (3d Cir. 2023) ......................................... 23, 26

*Gundy v. United States*,
588 U.S. 128 (2019) .................................................... 34, 36

*Huber v. Simon's Agency*,
84 F.4th 132 (3d Cir. 2023) ............................................... 19

*Humphreys v. DEA*,
96 F.3d 658 (3d Cir. 1996) ......................................... 22, 51

*Larson v. Valente*,
456 U.S. 228 (1982) .......................................................... 32

*Little Sisters of the Poor Saints Peter*
   *& Paul Home v. Pennsylvania,*
   591 U.S. 657 (2020) ................................................................ *passim*

*Little Sisters of the Poor v. Burwell,*
   794 F.3d 1151 (10th Cir. 2015) ............................................ 10

*California ex rel. Lockyer v. United States,*
   450 F.3d 436 (9th Cir. 2006) ................................................ 28

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
   485 U.S. 439 (1988) ............................................................. 45

*Mahmoud v. Taylor,*
   606 U.S. 522 (2025) ............................................................. 46

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ................................................. 20, 24-25

*Maxon v. Fuller Theological Seminary,*
   No. 20-56156, 2021 WL 5882035 (9th Cir. 2021) .............. 50

*Melrose v. City of Pittsburgh,*
   613 F.3d 380 (3d Cir. 2010) ................................................. 19

*Mervilus v. Union County,*
   73 F.4th 185 (3d Cir. 2023) ................................................. 19

*Mistretta v. United States,*
   488 U.S. 361 (1989) ............................................................. 34

*Nat'l Ass'n of Regul. Util. Comm'rs v. ICC,*
   41 F.3d 721 (D.C. Cir. 1994) ......................................... 28, 29

*Nat'l Shooting Sports Found. v. Jones,*
   716 F.3d 200 (D.C. Cir. 2013) ............................................. 54

*NCAA v. Corbett,*
   296 F.R.D. 342 (M.D. Pa. 2013) ......................................... 28

*Pa. Prison Soc'y v. Cortes,*
   508 F.3d 156 (3d Cir. 2007) ................................................. 23

*Panama Refining Co. v. Ryan,*
    293 U.S. 388 (1935) ................................................................ 37

*Pennsylvania v. President of the U.S.,*
    888 F.3d 52 (3d Cir. 2018) ............................................ 4, 27

*Pennsylvania v. President of the U.S.,*
    930 F.3d 543 (3d Cir. 2019) .......................................... 4, 15

*Pennsylvania v. Trump,*
    281 F. Supp. 3d 553 (E.D. Pa. 2017) .................................. 14

*Pennsylvania v. Trump,*
    351 F. Supp. 3d 791 (E.D. Pa. 2019) .......................... 15, 23

*Reaching Souls Int'l v. Azar,*
    No. 5:13-cv-1092, 2018 WL 1352186
    (W.D. Okla. Mar. 15, 2018) ........................................ 13, 41

*Real Alternatives v. Secretary of HHS,*
    867 F.3d 338 (3d Cir. 2017) ........................... 18, 42, 43, 45

*Schuchardt v. President of the U.S.,*
    839 F.3d 336 (3d Cir. 2016) ............................................... 24

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ................................................... 50-51

*Spivack v. City of Philadelphia,*
    109 F.4th 158 (3d Cir. 2024) ............................................ 30

*T-Mobile Ne. LLC v. Town of Barnstable,*
    969 F.3d 33 (1st Cir. 2020) ............................................... 28

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ..................................................... 30, 31

*Thomas v. Rev. Bd.,*
    450 U.S. 707 (1981) ........................................................... 45

*United States v. Berberena,*
    694 F.3d 514 (3d Cir. 2012) ............................................. 36

*United States v. Bruce,*
   950 F.3d 173 (3d Cir. 2020) ............................................................ 36

*United States v. Cooper,*
   750 F.3d 263 (3d Cir. 2014) ............................................................ 34

*United States v. Frame,*
   885 F.2d 1119 (3d Cir. 1989) ..................................................... 35, 36

*United States v. Virgin Islands,*
   748 F.3d 514 (3d Cir. 2014) ............................................................ 27

*Wheaton Coll. v. Azar,*
   No. 1:13-cv-8910, 2018 WL 11664758
   (N.D. Ill. Feb. 22, 2018) ................................................................. 41

*Wheaton Coll. v. Burwell,*
   573 U.S. 958 (2014) ......................................................................... 10

*Zold v. Township of Mantua,*
   935 F.2d 633 (3d Cir. 1991) ............................................................ 20

*Zorach v. Clauson,*
   343 U.S. 306 (1952) ......................................................................... 25

*Zubik v. Burwell,*
   578 U.S. 403 (2016) .................................................... 11, 12, 14, 42

*Zzyym v. Pompeo,*
   958 F.3d 1014 (10th Cir. 2020) ...................................................... 48

## Statutes & Regulations

26 U.S.C. § 4980D .................................................................... 7, 38

26 U.S.C. § 4980H ................................................................ *passim*

26 U.S.C. § 5000A ..................................................................... 5, 35

26 U.S.C. § 6033 ............................................................................. 9

28 U.S.C. § 1291 ............................................................................. 4

28 U.S.C. § 1331.................................................................. 3

29 U.S.C. § 1185d .......................................................... 5, 35

42 U.S.C. § 300gg-13 .................................................. *passim*

42 U.S.C. § 300gg-91 .......................................................... 7

42 U.S.C. § 2000bb *et seq.* ...................................... 11, 37, 38

42 U.S.C. § 18011.......................................................... 6, 30

26 C.F.R. § 54.9815-1251.................................................. 50

29 C.F.R. § 2590.............................................................. 50

34 C.F.R. § 106.12.......................................................... 50

45 C.F.R. § 147.130 .......................................................... 6

45 C.F.R § 147.131 ........................................................ 14

45 C.F.R. § 147.132 .................................................... 49, 50

45 C.F.R. § 147.140 .................................................... 30, 50

75 Fed. Reg. 34,538 (June 17, 2010) ................................... 6

75 Fed. Reg. 41,726 (July 19, 2010) ................................ 7-8

76 Fed. Reg. 46,621 (Aug. 3, 2011) ................................. 6, 8

77 Fed. Reg. 16,501 (Mar. 21, 2012) .................................. 8

77 Fed. Reg. 8725 (Feb. 15, 2012) ................................. 6, 8

78 Fed. Reg. 39,870 (July 2, 2013) ............................. *passim*

78 Fed. Reg. 8456 (Feb. 6, 2013) .................................. 8, 9

79 Fed. Reg. 51,092 (Aug. 27, 2014) ................................ 10

80 Fed. Reg. 41,318 (July 14, 2015) ......................... 10, 53, 54

81 Fed Reg. 47,741 (July 22, 2016) ........................................... 13

82 Fed. Reg. 47,792 (Oct. 13, 2017) ...................................... 13, 14

82 Fed. Reg. 47,838 (Oct. 13, 2017) ........................................ 14

83 Fed. Reg. 57,536 (Nov. 15, 2018)................................ 15, 40, 47, 52, 53

84 Fed. Reg. 7714 (Mar. 4, 2019) ........................................... 40

88 Fed. Reg. 7236 (Feb. 2, 2023)................................ 17, 18, 40, 53-54

## Constitutional Provisions

U.S. Const. amend. I........................................................ 29, 32

U.S. Const. art. VI, cl. 2 ...................................................... 25

## Other Authorities

Congressional Research Service, *Federal Support for
    Reproductive Health Services: Frequently Asked
    Questions* (2016) ...................................................... 7

DMDatabases.com, *USA Business List –
    Employee Size Profile* ................................................ 6

Fed. R. App. P. 4 ............................................................ 4

Fed. R. Civ. P. 56 ........................................................... 19

*HHS Case Database,* The Becket Fund
    for Religious Liberty ................................................ 11

Institute of Medicine, *Clinical Preventive Services
    for Women: Closing the Gaps*, The National
    Academies Press (2011) ............................................. 6

Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell
    *and the Perils of Judicial Faith in Government
    Claims*, 2016 Cato Sup. Ct. Rev. 123 (2015-2016) ............... 44

U.S. Dep't of Lab., *FAQs About Affordable Care Act Implementation* (2017) ........................................................................ 13

The White House, *Health Reform for Small Businesses: The Affordable Care Act Increases Choice and Saving Money for Small Businesses* (2010) ...................................................... 6

**INTRODUCTION**

For more than a decade, various government actors have tried to force religious objectors to obey a federal contraceptive mandate. As many courts have found—and as the federal government now openly admits—such coercion violates a federal civil rights law known as the Religious Freedom Restoration Act. That is why the federal government stopped requiring religious objectors to comply with the federal contraceptive mandate in 2017. Indeed, presidential administrations of both political parties have now followed this course.

Yet the Appellee States maintain that *state* governments somehow have an interest in forcing the *federal* government to force religious objectors to comply with the *federal* contraceptive mandate—even though the federal government need not have any contraceptive mandate at all, and even though the states themselves have chosen not to have such mandates of their own.

When this case was last at the Supreme Court, seven Justices roundly rejected the States' leading statutory arguments. The Court explained that the federal agencies have "virtually unbridled discretion" about what services to include in the contraceptive mandate and what exemptions to create. The Court said that its decisions had "made it abundantly clear that, under RFRA, the Departments must accept the sincerely held complicity-based objections of religious entities." The Court emphasized

that the agencies were not free to tell religious objectors that "the connection between what the objecting parties must do and the end that they find morally wrong is simply too attenuated." And the Court said it had already "directed the parties … to 'accommodate' the free exercise rights of those with complicity-based objections to the self-certification accommodation."

Nevertheless, after a four-year stay, and while adjudicating the States' leftover arguments, the district court again misinterpreted RFRA so badly that it claimed the religious exemption rule was not even "rationally connected" to solving the RFRA problem. Worse still, the district court's analysis purports to revive—and treat as Circuit precedent—RFRA analysis from *Geneva College* that has twice been vacated by the Supreme Court, was based on since-disproven factual claims, and is irreconcilable with the Supreme Court's most recent opinion in this case.

The district court's statutory errors also lead inexorably to a constitutional conflict, because the original contraceptive mandate cannot constitutionally be re-imposed. The mandate is not a generally applicable law under the Court's recent decisions in *Fulton* and *Tandon*. The mandate's discrimination among religious objectors is flatly unconstitutional under the Court's recent unanimous decision in *Catholic Charities Bureau*. And the complete lack of standards or principles to constrain agency discretion—what the Supreme Court has already recognized as "virtually un-

bridled discretion"—violates the non-delegation doctrine. These constitutional infirmities mean that the States' claims are not redressable, because no court could lawfully provide the requested relief. Nor have the States offered *any* evidence that they have been harmed by the religious exemption rule.

In 2020, the Supreme Court lamented that "for the past seven years" the Little Sisters "have had to fight for the ability to continue in their noble work without violating their sincerely held religious beliefs." Another five years have now passed without resolution. The Little Sisters respectfully request that this Court find, once and for all, that RFRA requires the religious exemption rule. In the alternative, this Court should find that re-imposition of the mandate would violate the Constitution, and that the States' claims are therefore not redressable and nonjusticiable under Article III. Either ruling would hasten this unnecessary conflict toward its final and inevitable conclusion. The myth of Sisyphus is supposed to be a cautionary tale, not a how-to guide.

## JURISDICTIONAL STATEMENT

The States asserted jurisdiction under 28 U.S.C. § 1331, but the district court was without jurisdiction because the States lack Article III standing. *See infra* Parts I & II. The district court granted summary judgment to the States on August 13, 2025. JA.6. Defendant-Intervenor filed

a timely notice of appeal on August 13, 2025, JA.1, and Defendants followed on August 26, 2025. JA.3; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The Little Sisters' appeal presents three main issues:

**Injury.** Was the district court correct that the States have standing, even though the States have not identified a single woman who would lose coverage because of the Final Rule and so be harmed, let alone one who would then qualify for and turn to the States' own coverage?

**Redressability.** Could the district court lawfully reinstate the mandate that preceded the Final Rule, when that mandate violates the First Amendment's guarantee of free exercise of religion and Article I's prohibition on the delegation of the legislative power?

**Success on the merits.** Have the States demonstrated that the Final Rule is arbitrary and capricious, despite the Supreme Court's clear instructions that burdens like those upon Plaintiffs' religious exercise trigger RFRA's protections, and that religious objectors to the contraceptive mandate must be accommodated consistently with RFRA?

## STATEMENT OF RELATED CASES

This case has been before this Court previously in the related appeal No. 17-3679, resulting in the decision reported at 888 F.3d 52; and the related appeals Nos. 17-3752, 18-1253, 19-1129, and 19-1189, resulting in the decision reported at 930 F.3d 543 and reversed by 591 U.S. 657.

All of the actions listed below involve challenges to the Final Rules at issue here.

1. *Irish 4 Reprod. Health v. HHS*, No. 3:18-cv-491 (N.D. Ind.) (dismissed by stipulation Jan. 6, 2025);

2. *Massachusetts v. HHS*, No. 17-cv-11930 (D. Mass.), *appeal filed*, No. 21-1076 (1st Cir. 2021) (appeal pending);

3. *California v. HHS*, No. 4:17-cv-05783 (N.D. Cal.), *aff'd in part, vacated in part*, 911 F.3d 558 (9th Cir. 2018), *vacated and remanded*, 591 U.S. 657 (2020) (pending before N.D. Cal.).

## STATEMENT OF THE CASE

### A. The mandate and its exceptions

This case originates with the Patient Protection and Affordable Care Act of 2010 (ACA). That law requires employers with over 50 employees to offer group benefits with "minimum essential coverage." 26 U.S.C. §§ 5000A(f), 4980H(a), (c)(2). That "minimum essential coverage" must include, among other things, coverage for "preventive care and screenings" for women. 42 U.S.C. § 300gg-13(a)(4); 29 U.S.C. § 1185d.

Congress did not define "preventive care" in the statute. Instead, Congress delegated to the Health Resources and Services Administration (HRSA), a division of HHS, the authority to determine what should be included as preventive care "for purposes of this paragraph." 42 U.S.C. § 300gg-13(a)(4). HRSA asked for recommendations from the Institute of

Medicine (IOM). 77 Fed. Reg. 8725, 8726 (Feb. 15, 2012). And IOM proposed including, among other things, all FDA-approved contraceptives and sterilization methods, including four drugs and devices that prevent implantation of a fertilized egg, causing an early abortion.[1] *See Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 691, 698 n.7 (2014). HRSA adopted IOM's recommendation and mandated coverage of all FDA-approved female contraceptive methods (the mandate). 77 Fed. Reg. at 8725-26; 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011); 45 C.F.R. § 147.130(a)(1)(iv).

Many private employers are exempt from this mandate. First, the vast majority of employers—those with fewer than 50 employees—are not required to provide any insurance coverage *at all*. *See* 26 U.S.C. § 4980H(c)(2).[2] Second, at the time the Final Rule was issued, approximately twenty percent of large employers were exempt through the ACA's exception for "grandfathered health plans." *See* 42 U.S.C. § 18011; 75 Fed. Reg. 34,538, 34,542 (June 17, 2010); JA.1662 (Kaiser Family

---

[1]  Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, The National Academies Press 3 (2011), https://perma.cc/2Y2N-N6W6.

[2]  According to some estimates, more than 97% of employers have fewer than 50 employees and therefore face no federal obligation to provide coverage at all. *See, e.g.*, DMDatabases.com, *USA Business List – Employee Size Profile*, https://perma.cc/5WDN-DC6U. The *Hobby Lobby* Court estimated that "34 million workers" are employed by firms with fewer than 50 employees. 573 U.S. at 700 (citing The White House, *Health Reform for Small Businesses: The Affordable Care Act Increases Choice and Saving Money for Small Businesses*, 1 (2010), https://perma.cc/LHF7-7NZ3).

Foundation Employer Health Benefits 2017 Annual Survey, containing projection through 2017). Public employers are also exempt. The statute does not cover government plans such as Medicare, some Medicaid programs, and TRICARE. *See* 42 U.S.C. §§ 300gg-13(a), 300gg-91(a)(1), (b)(2). Such government programs may impose cost-sharing or exclude some forms of contraception.[3]

For non-exempt employers, the penalty for offering a plan that excludes coverage for even one of the FDA-approved contraceptive methods is $100 per day for each affected individual. 26 U.S.C. § 4980D(a)-(b). If an employer with more than 50 employees fails to offer a plan at all, the employer owes $2,000 per year for each of its full-time employees. *Id.* § 4980H(a), (c)(1).

## B. The creation of the mandate and the religious exemptions

The mandate was first implemented through an interim final rule (IFR) published by HHS, the Department of Labor, and the Treasury Department (the agencies) in July 2010. *See* 75 Fed. Reg. 41,726, 41,728

---

[3] *See* Congressional Research Service, *Federal Support for Reproductive Health Services: Frequently Asked Questions*, 13 (2016), https://perma.cc/Y2AZ-X2ZF ("There is no explicit statutory requirement for Medicare to cover contraceptive services[.]"); *id.* at 7 ("States have discretion in identifying the specific services and supplies (including emergency contraception) covered under the traditional Medicaid state plan."); *id.* at 2 (TRICARE is "not subject to the ACA's requirements regarding coverage of women's preventive health services.").

(July 19, 2010) (First IFR). That First IFR tasked HRSA with producing guidelines and providing additional guidance about cost sharing. *See id.*

Shortly thereafter, HHS issued a second IFR regarding coverage of all FDA-approved contraceptives. 76 Fed. Reg. 46,621 (Second IFR). The Second IFR came just thirteen days after IOM issued its recommendation for contraceptive coverage and provided no opportunity for prior public comment. That same day, HRSA published guidelines adopting IOM's recommendations in full to the HRSA website. JA.712 (2011 guidelines posted to HRSA website).

The Second IFR also gave HRSA "discretion to exempt certain religious employers from the Guidelines," 76 Fed. Reg. at 46,623. But the Second IFR defined "religious employer" so narrowly that it excluded many religious non-profits that, like the Little Sisters, serve people of all faiths. *See id.* at 46,626. The agencies received "over 200,000" comments on the Second IFR, many of which emphasized the need for a broader religious exemption. *See* 77 Fed. Reg. at 8726. But the Second IFR was "finalize[d], without change." *Id.* at 8725.

In response to the numerous religious objections, the agencies introduced an arrangement—styled an "accommodation"—via an Advance Notice of Proposed Rulemaking (ANPRM), 77 Fed. Reg. 16,501 (Mar. 21, 2012), and a Notice of Proposed Rulemaking (NPRM), 78 Fed. Reg. 8456 (Feb. 6, 2013), which were then adopted in a final rule, 78 Fed. Reg. 39,870 (July 2, 2013). The agencies received over 600,000 comments on

those proposals, many of which explained how even the accommodation would violate the conscience of religious believers who objected to the contraceptives at issue. 78 Fed. Reg. at 8459; 78 Fed. Reg. at 39,871.

Over the course of this rulemaking, the agencies amended the definition of a religious employer by eliminating some of the criteria from the Second IFR, limiting the definition to organizations "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code," thus exempting "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order," from the mandate. 78 Fed. Reg. at 39,874; *see* 26 U.S.C. § 6033(a)(3)(A)(i), (iii). This religious exemption still did not exempt nonprofits like the Little Sisters, however.

Nonprofit religious objectors who were not exempt were required to use the accommodation, by which religious employers could offer the objected-to coverage on their health plans by executing a self-certification and delivering it to the organization's insurer or the plan's third-party administrator (TPA). That self-certification would trigger the insurer or TPA's obligation to "provide[] payments for contraceptive services." 78 Fed. Reg. at 39,876 (insurers); *id.* at 39,879 (TPAs).

The accommodation did not address the religious objections of those like the Little Sisters because it continued to require them to authorize the provision of religiously objectionable drugs and services through their health plans, and many brought lawsuits. The Little Sisters were part of

a class action filed in September 2013. Complaint, *Little Sisters of the Poor Home for the Aged v. Sebelius*, 6 F. Supp. 3d 1225 (D. Colo. 2013) (No. 13-2611). One religious school, Wheaton College, sought emergency relief from the Supreme Court in June 2014. The Supreme Court granted relief and held that the government was "enjoined from enforcing" the accommodation against Wheaton by requiring Wheaton to authorize the provision of contraceptives through the agencies' form. *Wheaton Coll. v. Burwell*, 573 U.S. 958, 958 (2014).

In August 2014, the agencies published a third IFR "in light of the Supreme Court's interim order" in *Wheaton College*. 79 Fed. Reg. 51,092 (Aug. 27, 2014) (Third IFR). This Third IFR amended the "accommodation" to allow a religious objector to "notify HHS in writing of its religious objection" instead of notifying its insurer or TPA. *Id.* at 51,094. The Third IFR was finalized on July 14, 2015. 80 Fed. Reg. 41,318 (July 14, 2015).

**C. The challenges to the mandate and the resulting injunctions**

This change to the regulatory scheme still did not address the Little Sisters' religious objections to the mandate. On appeal, the Tenth Circuit ruled against them. *Little Sisters of the Poor v. Burwell*, 794 F.3d 1151 (10th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016). At the Supreme Court, their appeal was consolidated

with similar cases from the Third, Fifth, and D.C. Circuits. *See Zubik*, 578 U.S. at 403.[4]

At the Supreme Court, the agencies abandoned the arguments and factual findings they pressed below. First, the agencies admitted for the first time that the accommodation required contraceptive coverage to be "part of the same plan as the coverage provided by the employer." Resp'ts' Br. at 38, *Zubik*, 578 U.S. 403 (No. 14-1418), https://perma.cc/B5ZB-9GTY (quotation marks omitted); Tr. of Oral Arg. at 60-61, *Zubik*, 578 U.S. 403 (No. 14-1418) (Chief Justice Roberts: "You want the coverage for contraceptive services to be provided, I think as you said, seamlessly. You want it to be in one insurance package. … Is that a fair understanding of the case?"; Solicitor General Verrilli: "I think it is one fair understanding of the case."). The government thus removed any basis for the lower courts' prior holding that the mandate did not impose a substantial burden on the religious exercise of objecting employers because the provision

---

[4]  Each of these lawsuits—and many others challenging the mandate—relied on the Religious Freedom Restoration Act (RFRA). 42 U.S.C. § 2000bb *et seq*. RFRA prohibits federal agencies from imposing substantial burdens on religion—they "shall not" do it—unless they demonstrate that the burden is required by a compelling government interest and there is no "less restrictive" means of achieving that interest. 42 U.S.C. § 2000bb-1; *Hobby Lobby*, 573 U.S. at 728; *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 668 (2020). The various cases challenging the mandate prior to *Zubik* are collected at *HHS Case Database,* The Becket Fund for Religious Liberty, https://perma.cc/N8ZA-2MW9.

of contraceptives was separate from their plans. Tr. of Oral Arg. at 61, *Zubik*, 578 U.S. 403 (No. 14-1418) (Solicitor General Verrilli "would be content" if the Court would "assume a substantial burden" and rule only on the government's strict scrutiny defense).

Next, the agencies admitted to the Supreme Court that women who do not receive contraceptive coverage from their employer can "ordinarily" get it from "a family member's employer," "an Exchange," or "another government program." Resp'ts' Br. at 65, *Zubik*, 578 U.S. 403 (No. 14-1418), https://perma.cc/B5ZB-9GTY. The government also acknowledged that the mandate "could be modified" to better protect religious liberty, Suppl. Resp'ts' Br. at 14-15, *Zubik*, 578 U.S. 403 (No. 14-1418), https://perma.cc/A28Y-MBV2, thus admitting the mandate was not the least restrictive means of achieving the government's interests.

The Supreme Court unanimously vacated the decisions of the Third, Fifth, Tenth, and D.C. Circuits, which had ruled in favor of the agencies. *Zubik*, 578 U.S. at 410. It noted a "substantial" change in the government's position at the Supreme Court and ordered that the parties should be "afforded an opportunity to arrive at an approach going forward" that would resolve the dispute. *Id.* at 408. The Court thus ordered the government not to impose taxes or penalties on petitioners for failure to comply with the mandate and remanded the cases. *Id.* at 409-10.

After making the concessions that prompted the Supreme Court's order in *Zubik*, the agencies issued a "Request for Information" in July 2016

to seek input on "whether there are modifications to the accommodation that would be available under current law and that could resolve the RFRA claims raised by organizations that object to the existing accommodations on religious grounds." 81 Fed Reg. 47,741, 47,743 (July 22, 2016). The agencies received "over 54,000 public comments." 82 Fed. Reg. 47,792, 47,814 (Oct. 13, 2017). The agencies concluded, in a set of FAQs published only on the Department of Labor's website, that they were unable to modify the accommodation in a way that respected both the agencies' goals and the religious objectors' concerns.[5]

Beyond the *Zubik* order, other injunctions from courts across the country prohibited the government from enforcing the mandate against religious objectors, including in open-ended class or associational standing cases that allow new members to join.[6] These injunctions continue to bind the agency Defendants to this day, such that Defendants are forbidden from enforcing the mandate against many religious objectors.

---

[5] U.S. Dep't of Lab., *FAQs About Affordable Care Act Implementation* Part 36, 4 (2017), https://perma.cc/M4VX-XHYH.

[6] *See, e.g.*, *Reaching Souls Int'l v. Azar*, No. 5:13-cv-1092, 2018 WL 1352186, at *2 (W.D. Okla. Mar. 15, 2018) (granting permanent injunction to "employers participating in the GuideStone Plan"); Order, *Catholic Benefits Ass'n LCA v. Hargan*, No. 5:14-cv-240 (W.D. Okla. Mar. 7, 2018), Dkt. 184 (granting permanent injunction of mandate to current and future nonprofit members of Catholic Benefits Association); Order, *Christian Emps. All. v. Azar*, No. 3:16-cv-309 (D.N.D. May 15, 2019), Dkt. 53 (granting permanent injunction to current and future members of Christian Employers Alliance).

### D. Challenges to the religious exemption

In 2017, after years of unsuccessful attempts to justify the mandate in court, the agencies changed course. In compliance with Congress's requirement in RFRA that the government "shall not" impose a substantial burden on religion, and in compliance with injunctions forbidding enforcement against religious objectors, *see, e.g.*, *Zubik*, 578 U.S. at 410, the agencies issued two Interim Final Rules providing that the mandate will not be enforced against employers with religious or moral objections, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (Fourth IFR); 82 Fed. Reg. 47,838 (Oct. 13, 2017) (Fifth IFR).[7] The IFRs otherwise left the mandate in place as to all employers previously covered. The IFRs also left the accommodation in place for those who elect to use it. 45 C.F.R § 147.131.

The IFRs were immediately challenged in this lawsuit, brought by Pennsylvania, and in others around the country. The district court here entered a nationwide injunction preventing the implementation of the Fourth and Fifth IFRs on December 15, 2017, holding that the IFRs were invalid under the Administrative Procedure Act's procedural and substantive provisions. 281 F. Supp. 3d 553 (E.D. Pa. 2017). While this law-

---

[7]  Many of the arguments presented here are relevant to both the religious and moral exemption, but the Little Sisters address only the religious exemption. References to "IFR" or "Final Rule" in the singular are to that rule.

suit was pending, the agencies received comments on the IFRs and reviewed them. They then finalized the religious exemption in a final rule that took effect on January 14, 2019. 83 Fed. Reg. 57,536 (Nov. 15, 2018) (Final Rule). New Jersey joined this lawsuit in an amended complaint on December 14, 2018, and both States moved for a preliminary injunction of the Final Rule based on their claims that the agencies lacked authority to promulgate the Rule under either the ACA or RFRA and that the agencies had violated the APA by bypassing the notice and comment procedures without adequate justification.

The district court granted a preliminary nationwide injunction against the Final Rule on January 14, 2019. 351 F. Supp. 3d 791 (E.D. Pa. 2019). The agencies and the Little Sisters appealed that injunction to this Court, where those appeals were consolidated with the appeals of the injunction against the IFRs. This Court affirmed the district court's injunctions. 930 F.3d 543 (3d Cir. 2019).

### E. The Supreme Court's decision

The agencies and the Little Sisters appealed to the Supreme Court, which in July 2020 reversed by a vote of 7-2. The Court held that the ACA "grants sweeping authority to HRSA" to issue guidelines and leaves HRSA with "unchecked" discretion "to identify and create exemptions from its own Guidelines." *Little Sisters*, 591 U.S. at 676. In recognizing Congress's "capacious grant of authority," the Court noted that "no party has pressed a constitutional challenge to the breadth of the delegation"

in the mandate, and it upheld the Final Rule under the text of the statute. *Id.* at 676, 679. The Court also reasoned that a ruling striking down the Final Rule under the ACA would require the conclusion that the agencies also lacked authority to issue the initial church exemption and the "accommodation," and that "[i]t would be passing strange for this Court to direct the Departments to make such an accommodation if it thought the ACA did not authorize one." *Id.* at 677, n.7. Considering whether the Final Rule would harm women, the Court held that "no language in the statute itself even hints that Congress intended that contraception should or must be covered," and therefore "it is Congress, not the Departments, that has failed to provide the protection for contraceptive coverage." *Id.* at 678-79.

The Court also considered this Court's holding that RFRA did not give the agencies leeway to issue the Final Rule. The Court reiterated its prior holdings that federal agencies "must accept the sincerely held complicity-based objections of religious entities," and found that because its "decision[] all but instructed" the agencies to consider RFRA, "[i]t is hard to see how" the agencies could have complied with the Supreme Court's holding without "overtly" considering religious objectors' rights under RFRA. *Id.* at 681-82. Indeed, the Court explained, if the agencies had not applied RFRA, "they would certainly be susceptible to claims that the rules were arbitrary and capricious." *Id.* at 682.

The Court also held that the rules were procedurally valid because the IFR "explained its position in fulsome detail and 'provide[d] the public with an opportunity to comment,'" and because the Final Rules "explain[ed] that the rules were 'necessary to protect sincerely held' moral and religious objections." *Id.* at 684, 686.

## F. Proceedings on remand

On remand to the district court, the parties filed dispositive motions on the States' other claims that the Final Rule is arbitrary and capricious. While those motions were pending, the federal Defendants requested a stay to allow the Biden Administration to "evaluate the issues presented by this case." Dkt. 269. The district court granted the stay on March 8, 2021, over the objection of the States and the Little Sisters. Dkts. 269, 271. The federal government requested and was granted further stays for nearly three more years, until December 2024, with no further objections from the States. *See, e.g.*, Dkts. 274, 325.

Meanwhile, on February 2, 2023—nearly two years after first requesting a stay—the agencies published an NPRM that proposed to "maintain the religious exemption from the November 2018 Religious Exemption final rules." 88 Fed. Reg. 7236 (Feb. 2, 2023). The proposed rule would have rescinded the moral exemption and established a new individual contraceptive arrangement (ICA), under which women employed by objecting entities could obtain contraception directly from a provider that

offered it, coverage that would theoretically be independent from the employers' health plan. *See id.* at 7252-54. The comment period for the NPRM closed on April 3, 2023. On December 30, 2024, the agencies withdrew the NPRM. The parties then filed renewed motions for summary judgment based on the same Final Rule that the Supreme Court considered in 2020, which had remained in effect ever since that decision.

On August 13, 2025, the district court vacated the Final Rule nationwide, deeming it arbitrary and capricious. JA.5; JA.7. First, according to the court, the agencies failed to provide a reasoned explanation for the Final Rule. JA.38. While the agencies justified the Final Rule under RFRA, the district court held that the rule exceeded RFRA's bounds because it "extends exemptions even to entities *without*" "sincerely held, complicity-based objections to the Accommodation," as well as to publicly traded entities, which, according to the court "are unlikely" "to be capable of maintaining a religious objection." JA.40-41.

Second, relying on this Court's decisions in *Geneva College v. Secretary of HHS*, 778 F.3d 422 (3d Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016), and *Real Alternatives v. Secretary of HHS*, 867 F.3d 338 (3d Cir. 2017), the district court held that RFRA does not require the Final Rule because "the Accommodation did not substantially burden religious exercise." JA.44. Although *Geneva College* was vacated by the Supreme Court, the district court reasoned that *Real Alternatives* revitalized its holdings and that *Geneva College* was likewise

undisturbed by subsequent, contrary Supreme Court decisions like *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). *See* JA.46-47.

Finally, the district court held that the Final Rule was "insufficiently reasoned" because the agencies (1) did not provide a reasoned explanation for allegedly changing their stance on the safety and efficacy of contraceptives, JA.51, and (2) failed to consider regulatory alternatives for achieving their goals—specifically the scheme that the agencies eventually proposed in 2023, JA.54-55. The Little Sisters and federal defendants timely appealed. JA.1; JA.3.

## STANDARD OF REVIEW

This Court "give[s] a fresh review to a district court's entry of summary judgment." *Mervilus v. Union County*, 73 F.4th 185, 193 (3d Cir. 2023). That review is *de novo* and "plenary, meaning [this Court] review[s] anew the District Court's summary judgment decision, applying the same standard it must apply." *Huber v. Simon's Agency*, 84 F.4th 132, 144 (3d Cir. 2023) (citation omitted).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases "involv[ing] First Amendment issues, an appellate court must 'make an independent examination of the whole record.'" *Melrose v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 499

(1984)). That means an "exacting review of the whole record with a particularly close focus on facts that are determinative of a constitutional right." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007). And "[a]n appellate court in such instances may draw its own inferences from facts in the record." *Zold v. Township of Mantua*, 935 F.2d 633, 636 (3d Cir. 1991).

## SUMMARY OF THE ARGUMENT

**I.** The district court erred at the threshold because the States failed to show an Article III injury. Through the entire life of this litigation, the States and the district court have failed to identify a single woman who would be harmed by the Final Rule, much less explained how that harm would accrue to any state government. That is particularly remarkable when the rule the States challenge has now been in effect for the better part of a decade, giving them more than ample time to do so.

The district court relied on *Massachusetts v. EPA*, 549 U.S. 497 (2007), to excuse the States from this obligation. But nothing in that case exempts states from establishing the basic, bedrock requirement that a plaintiff must suffer some particularized harm. Yet States failed to provide *any* evidence that even a single one of their citizens has lost contraceptive access during all the years that the Final Rule has been in place, much less turned to the States for help. The district court thus erred by finding a particularized injury when none has been shown.

**II.** The district court also erred because the States' purported injury cannot be redressed by a favorable court decision. The claimed injury is redressable only if the contraceptive mandate could legally be enforced against the parties exempted by the Final Rule. But there are at least three independent reasons it could not.

First, without the Final Rule, the mandate violates the Free Exercise Clause as applied to religious objectors. The mandate is not neutral or generally applicable and fails to satisfy strict scrutiny. It categorically exempts comparable secular activity and gives HRSA "virtually unbridled discretion" to create exemptions, *Little Sisters*, 591 U.S. at 676. It thus triggers strict scrutiny multiple times over.

Second, the mandate independently violates the Free Exercise and Establishment Clauses of the First Amendment. *Catholic Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025). The mandate exempts certain religious groups entirely on "theological lines" and thus involves a "paradigmatic form of denominational discrimination." *Id.* at 248-49.

Third, the mandate cannot be lawfully enforced because it violates the nondelegation doctrine. Nothing in the underlying statute limits or informs how the HRSA is to exercise its plenary delegated authority to decide what services are covered under the ACA. With no intelligible principle delineating HRSA's delegated authority, the mandate fails the nondelegation doctrine.

The district court refused to address these questions, asserting that they couldn't be aired because they were raised by the Little Sisters as Defendant-Intervenor. But these arguments go to redressability and standing, which means the district court had the obligation to consider them in assurance of its own jurisdiction. And even on the merits, intervenors are permitted to raise independent and non-overlapping arguments compared to the original parties. Indeed, that ability is what often justifies intervention in the first place.

**III.** Finally, the district court erred because the Final Rule does not violate the APA. That's because the Final Rule is required by RFRA. Otherwise, the mandate would substantially burden the Little Sisters' (and others') religious beliefs without satisfying strict scrutiny.

Even if the Final Rule were not *required* by RFRA, it is nonetheless *permitted* by RFRA, which allows the government to accommodate religious beliefs and practices. The Final Rule applies only to religious groups with sincerely held religious objections to providing contraceptives, so there is no mismatch or overbreadth between the Final Rule and the mandate's substantial burden on religion.

Nor is the Final Rule arbitrary and capricious. That standard is "very deferential," *Humphreys v. DEA*, 96 F.3d 658, 664 (3d Cir. 1996), and the government provided sufficient explanation and reasonable alternatives to clear that low bar.

## ARGUMENT

## I. The States have no Article III injury.

In more than eight years of litigation, neither the States nor the district court have identified anyone who has been or would be harmed by the Final Rule. *See, e.g.*, *Pennsylvania v. Trump*, 351 F. Supp. 3d at 807 ("Defendants point out that the States have not yet identified a woman resident who has lost contraceptive coverage due to the Final Rules."). Instead, the States sat on their heels for four years while the Final Rule remained in effect. Their failure to establish any harm over that time is dispositive.

Standing is "an indispensable part of the plaintiff's case" on which it always "bears the burden of proof." *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 161 (3d Cir. 2007). When, as here, a case has proceeded to summary judgment, "the manner and degree of evidence required" for the plaintiff to demonstrate standing rises. *Id.* That is, "a plaintiff 'can no longer rest on … mere allegations, but must set forth by affidavit or other evidence specific facts' establishing": (1) an injury (2) that is traceable to the challenged action and (3) is redressable by a decision from the court. *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023). The States have failed to offer any affidavit or other evidence of women complaining that they could not get coverage due to the Final Rule.

Despite this complete lack of evidence, the district court found that the States have standing to challenge the Final Rule because it "impos[es]" a

"substantial financial burden[] on their coffers." JA.31. In reaching that conclusion, the district court relied on this Court's now-vacated opinion from the preliminary-injunction stage, which allowed the States to establish standing for preliminary-injunctive relief through *projections* from 2018 about how many women nationwide might lose coverage. *Id.* But relying on nationwide projections misses the mark because the States can no longer rely on old predictions of future injury at the summary judgment stage; they must instead provide evidence and prove that they have actually suffered some harm. *See Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010) (plaintiff moving for summary judgment must provide evidence "demonstrating that these [standing] requirements have been met"). And even though the Final Rule has been in effect for over five years, the States have made no effort to show that they've been forced to provide contraceptive coverage for even one of their citizens because of the Final Rule.

Relying on *Massachusetts v. EPA*, the district court excused the States' inability to identify any citizens who have been harmed by the Final Rule, claiming that "the States need not define injury with such a demanding level of particularity to establish standing." JA.31-32. But nothing in *Massachusetts v. EPA* exempts states from Article III's basic requirement that a plaintiff "suffer[] a particularized harm." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 345 (3d Cir. 2016). Indeed, the Supreme Court expressly found that Massachusetts had "alleged a particularized injury

in its capacity as a landowner" and noted that no party "dispute[d] those allegations." *Massachusetts v. EPA*, 549 U.S. at 522, 523 & n.21. By the district court's own admission, the States have not done that here, which means that they lack standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (plaintiffs "may not sue based only on an 'asserted right to have the government act in accordance with law'").

Moreover, the States have no legitimate interest in interfering with the federal government's efforts to accommodate religious exercise or comply with RFRA. When the government accommodates religious exercise it "follows the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). In our system of federalism, the States have no legitimate interest in getting in the way of the federal government's effort to accommodate religious exercise within the confines of a federal program. *Cf.* U.S. Const. art. VI, cl. 2 (Supremacy Clause). At bare minimum, the States would need to point to a particularly clear injury to their own distinct interests as opposed to wholly speculative injuries to in-state residents. Even if the net effect of a federal accommodation for religion would be to deny coverage to identifiable in-state individuals the States would then need to cover—something the States have failed to show despite eight years of opportunity—that would still avoid the constitutional problem, as the States (as opposed to a religious objector) would be providing coverage.

Put differently, the State has failed to clear the minimal hurdles for Article III standing. The States' view essentially guarantees endless litigation any time the federal government tries to follow the best of our traditions and accommodate religion. If the federal government does not go far enough, the religious objector will sue; and if a state thinks the federal government has gone too far, then it will sue. This Court should end this madness (and this litigation) and hold the States have no legitimate interest in preventing the federal government from accommodating religion.

## II. The States cannot show redressability.

The States also lack standing because a judicial decision vacating the Final Rule will not redress their alleged injury. *See Greenberg*, 81 F.4th at 384. That's because the States' purported injury is redressable only if their requested relief would actually lead to contraceptive coverage provided by a third party—i.e., if the residual mandate could lawfully be enforced against religious objectors exempted by the Final Rule. It cannot, for at least three reasons.

First, without the Final Rule, the mandate violates the Free Exercise Clause as applied to religious objectors. Second, the mandate violates both the Free Exercise Clause and the Establishment Clause by discriminating between religious objectors. Finally, the mandate violates the nondelegation doctrine.

The district court skirted these issues, claiming that because the Little Sisters are intervenors, they can "only argue issues that have been raised by the principal parties." JA.35. That's doubly wrong.

To begin, these arguments go to Article III standing and specifically redressability—an issue the government has raised repeatedly. *See, e.g.*, Dkt.107-1 at 11-16; Dkt.15 at 13-18. And because redressability is an indispensable component of Article III standing, it can be raised at any time and by any party (and even the court). *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 280 (3d Cir. 2014). Indeed, courts have the "bedrock obligation to examine their own subject matter jurisdiction and that of the district courts, and standing is perhaps the most important of jurisdictional doctrines." *Id.* (cleaned up). Here, the district court breached that obligation when it refused to answer the jurisdictional questions raised by the Little Sisters.

As to the merits of the district court's opinion, courts typically allow intervention for the very purpose of presenting new or different arguments. This Court (and others) grant intervention under Rule 24 when, among other things, an applicant demonstrates that its interest is not adequately represented by the existing parties. *Pennsylvania v. President of the U.S.*, 888 F.3d 52, 57 (3d Cir. 2018). One means of identifying inadequate representation is assessing whether a putative intervenor would raise distinct arguments compared to the existing parties. *See, e.g.*, *United States v. Virgin Islands*, 748 F.3d 514, 522-24 (3d Cir. 2014)

(denying intervention because putative intervenor sought to make essentially identical arguments as an existing party); *NCAA v. Corbett*, 296 F.R.D. 342, 350 (M.D. Pa. 2013). But it would make little sense to permit intervention when an intervenor "bring[s] a point of view to the litigation not presented by either the plaintiffs or the defendants" only to prohibit the very presentation of those arguments. *California ex rel. Lockyer v. United States*, 450 F.3d 436, 445 (9th Cir. 2006) (reversing denial of intervention and instructing the clerk to issue the mandate immediately to "put the new parties on an equal footing with the original parties" and argue "cross-motions for summary judgment"); *see also Brumfield v. Dodd*, 749 F.3d 339, 346 (5th Cir. 2014) (permitting intervention for parties "staking out a position significantly different from that of the state"); *T-Mobile Ne. LLC v. Town of Barnstable*, 969 F.3d 33, 40 (1st Cir. 2020) ("[A] court ordinarily may deem an existing party's representation adequate if that party is likely to raise the putative intervenor's preferred arguments and it seems improbable that the putative intervenor will add any missing element.").

The district court erred by contriving a categorical rule prohibiting any independent argument from the Little Sisters. JA.35. It relied on a case from the D.C. Circuit, *Nat'l Ass'n of Regul. Util. Comm'rs v. ICC*, 41 F.3d 721, 729 (D.C. Cir. 1994), but that decision was limited to the context of petitions for review of agency proceedings. And in any event, there the D.C. Circuit explained that courts retain discretion to review arguments

from intervenors if they are "potentially determinative of the outcome of judicial review." *Id.* That's this case, and the district court therefore erred by refusing to address the Little Sisters' redressability arguments.

Accordingly, this Court should reach the Little Sisters' constitutional arguments and hold that the mandate cannot be lawfully enforced against the Little Sisters and those exempted by the Final Rule, thereby making it impossible for the court to redress the States' alleged harm.

## A. The mandate violates the Free Exercise Clause as applied to religious objectors.

No federal court could give the States the relief they seek—reimposition of the mandate on religious objectors—because that mandate violates the Free Exercise Clause and therefore cannot provide the redress sought by the States. An exemption for religious objectors is required by the First Amendment because the mandate is not neutral and generally applicable, and it cannot satisfy strict scrutiny.

***Categorical exemptions.*** First, the mandate itself contains categorical exemptions.

"When the government says that it cannot exempt religious exercise from a policy because doing so would undermine an important interest, but then exempts other groups or actions that undermine that same interest in the same way, its arbitrary distinction between religious and

secular behavior raises an inference that it has targeted religious practice for distinctive treatment." *Spivack v. City of Philadelphia*, 109 F.4th 158, 177 (3d Cir. 2024). That triggers strict scrutiny.

As the en banc Ninth Circuit has explained, it is "bedrock" First Amendment law that "the government may not 'treat … comparable secular activity more favorably than religious exercise.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)); *see also Fulton*, 593 U.S. at 534 ("A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.").

Here, the ACA exempts grandfathered health plans providing contraceptives. *See* 42 U.S.C. § 18011 (exemption); 45 C.F.R. § 147.140 (rules for grandfathered plans). HRSA has also created additional categorical exemptions for comparable secular activity, not to mention comparable religious activity in church-owned plans. The mandate and the ACA thus permit a for-profit company to refuse to provide contraceptive coverage for secular reasons, but they prohibit the Little Sisters from declining to provide such coverage for religious reasons. That is anything but a generally applicable law.

In response, the States argued below that these exceptions do not draw distinctions based on religious status and are thus not comparable to the

Final Rule's exemption for Plaintiffs' religious exercise. But that's wrong as a matter of fact. HRSA employed its "unbridled discretion" to exempt comparable religious activity in church-owned plans, 78 Fed. Reg. at 39,874, so the exceptions do indeed draw facial and unconstitutional distinctions based on religious status. *See also infra* Part II.B.

Furthermore, the States' objection is irrelevant as a matter of law, because "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the *asserted government interest that justifies the regulation at issue.*" *Tandon*, 593 U.S. at 62 (emphasis added). That is true whether the exemption is religious, like the church plan exemption, or secular, like the grandfathered plan exemption. And here, the government's interest—facilitating contraceptive access—exists equally as to previously exempted plans and plans exempted by the Final Rule.

***Discretionary individualized exemptions.*** Second, the mandate authorizes HRSA to grant discretionary individualized exemptions. In *Fulton*, the Supreme Court made clear that "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." 593 U.S. at 537.

The Supreme Court has already held—in this very case—that "HRSA has virtually unbridled discretion to decide what counts as preventive

31

care," and that "the same capacious grant of authority … leaves [HRSA's] discretion equally unchecked in other areas, including the ability to identify and create exemptions from its own Guidelines." *Little Sisters*, 591 U.S. at 676. Put differently, HRSA has unchecked discretion to make exemptions to the mandate. The existence of that discretion alone—"regardless whether any exceptions have been given"—triggers strict scrutiny. *Fulton*, 593 U.S. at 537. But it is not just that HRSA has such discretion; HRSA has exercised that discretion not only to create the exemptions in the Final Rules, but also to create *other* religious exemptions *with which the States apparently have no objection at all.* 78 Fed. Reg. at 39,874; *Little Sisters*, 591 U.S. at 666; Resp'ts' Br. at 34, *Little Sisters*, 591 U.S. 657, https://perma.cc/943S-3FJS (States' challenge does not upset the church exemption). Under *Fulton*, that suffices to trigger strict scrutiny, as it confirms that the mandate is not generally applicable.

## B. The mandate, without the Final Rule, discriminates on the basis of religion.

The mandate also independently violates both Religion Clauses because it makes "explicit and deliberate distinctions between different religious organizations." *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982) (striking down laws that treated differently "well-established churches" and "churches which are new and lacking in a constituency").

The Supreme Court's recent decision in *Catholic Charities Bureau* controls this case. In *Catholic Charities*, Wisconsin provided an exemption

from its unemployment compensation program for "nonprofits 'operated primarily for religious purposes.'" 605 U.S. at 241. The Wisconsin Supreme Court found that Catholic Charities Bureau did not qualify for the religious exemption because it "neither engage[s] in proselytization nor serve[s] only Catholics." *Id*. The U.S. Supreme Court unanimously reversed, holding that this ruling violated the principle under the Establishment Clause and the Free Exercise Clause "that the government may not 'officially prefe[r]' one religious denomination over another." *Id*. at 247. That's because "eligibility for the exemption ultimately turns on inherently religious choices (namely, whether to proselytize or serve only co-religionists)." *Id*. at 250.

Here, the mandate discriminates on nearly identical theological lines. It exempts religious orders that engage in what the government deems "exclusively religious" activities. *See* 78 Fed. Reg. at 39,874 (granting exemption to the "exclusively religious activities of any religious order"). But it does not exempt religious orders that, because of their faith, engage in activities the government deems not "exclusively religious," such as serving the elderly poor. After *Catholic Charities*, there is no doubt that these types of distinctions violate the Religion Clauses because "[d]ecisions about whether to 'express and inculcate religious doctrine' … when performing charitable work are … fundamentally theological choices driven by … different religious doctrines." 605 U.S. at 252.

The mandate the States wish to resurrect is thus unconstitutional and could never provide the redress the States seek.

## C. The mandate violates the nondelegation doctrine.

Beyond all of this, the mandate is unenforceable—and thus can provide no redress—because it violates the nondelegation doctrine. Congress cannot "delegate its legislative power to another branch." *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989); *accord United States v. Cooper*, 750 F.3d 263, 266 (3d Cir. 2014). In *Little Sisters*, the Supreme Court held that Congress gave HRSA "virtually unbridled discretion" to create the mandate and its exceptions. 591 U.S. at 676. The Court declined to rule on the nondelegation doctrine because "no party ha[d] pressed" a challenge to the mandate itself. *Id.* at 679. But this capacious authority given to HRSA is not delegable.

Congress has the ability to "confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality). Congress may do so if it "lay[s] down by legislative act an intelligible principle to which the … body authorized … is directed to conform." *Mistretta*, 488 U.S. at 372. A statute gives an intelligible principle if a court can say "what task it delegates and what instructions it provides"—both what to do, *and* how to do it. *Gundy*, 588 U.S. at 136. At absolute minimum, Congress must "ha[ve] provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *FCC v. Consumers' Rsch.*,

606 U.S. 656, 673 (2025); *accord United States v. Frame*, 885 F.2d 1119, 1128 (3d Cir. 1989), *abrogated on other grounds by Cochran v. Veneman*, 359 F.3d 263 (3d Cir. 2004) (delegation must "provide[] an administrative agency with standards guiding its action such that a court could ascertain whether the will of Congress had been obeyed"). So it's not enough to say *what* choice to make; Congress must also tell an agency *how* to make it.

Here, Congress failed even that most basic test. Congress required employers with more than 50 employees to offer group benefits with "minimum essential coverage." 26 U.S.C. § 5000A(f); 26 U.S.C. § 4980H(a), (c)(2). That minimum essential coverage is to include, among other things, coverage for "preventive care and screenings" for women. 42 U.S.C. § 300gg-13(a)(4); 29 U.S.C. § 1185d. What preventive care and screenings? "[S]uch … as provided for in comprehensive guidelines supported by [HRSA]." 42 U.S.C. § 300gg-13(a)(4). That is it.

Leaving HRSA to create its own guidelines is not an intelligible principle. *Congress* must create the intelligible principle: that is the whole point, and the absolute minimum, of the nondelegation doctrine. *Consumers' Rsch.*, 606 U.S. at 673. But as the Supreme Court explained, Congress "chose not to" limit HRSA's discretion with "an exhaustive or illustrative list" of preventive services, or with "any criteria or standards," or with any other requirements "in the formulation of the Guidelines." *Little Sisters*, 591 U.S. at 676-77. This is an impermissible delegation. *See*

*Frame*, 885 F.2d at 1128 (requiring "standards guiding [agency] action such that a court could ascertain whether the will of Congress had been obeyed"). Nothing in § 300gg-13(a)(4) "limit[s] and inform[s]" how HRSA "must exercise its delegated authority" to pick services. *United States v. Berberena*, 694 F.3d 514, 523 (3d Cir. 2012). Nothing suggests to HRSA the "boundaries of [its] authority." *Gundy*, 588 U.S. at 146; *accord United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020).

Even if Congress did mean to decide national policy on a hotly contested issue by hiding a contraceptive mandate in one clause about preventive services, it gave its delegee no bounds to stay within. That is "major authority, and the basis for the claim[ed authority]" is absent from § 300gg-13(a)(4). Tr. of Oral Argument, *Learning Resources v. Trump* (2025) (Nos. 24-1287, 25-250) (Roberts, C.J.). This Court has said that "it gives us pause when" an executive body "acts legislatively without clear Congressional direction unless there is rigorous judicial review." *Bro-Tech Corp. v. NLRB*, 105 F.3d 890, 895 (3d Cir. 1997). That review is needed most when there is "scant direction from Congress;" and where the agency is "asked to translate these guideposts into practical rules." *Id.* That is precisely the problem here.

Worse yet, whatever choices HRSA made would bind covered employers nationwide. That broad scope is another hallmark of an unconstitutional delegation. Congress's "failure to enact" "the standards of legal ob-

ligation" for covered employers illicitly "attempted to transfer that function to others," i.e., HRSA. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 530 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935) ("Congress has declared no policy, has established no standard, has laid down no rule."). And a standardless choice made across the whole of the national economy violates nondelegation. *See Consumers' Rsch.*, 606 U.S. at 683.

Thus, § 300gg-13(a)(4) gives HRSA an unbounded choice and makes HRSA's black-box decision binding upon the national economy. That violates the nondelegation doctrine. As a result, the States' claims are not redressable, as no federal court could lawfully force any objector to comply with the mandate the States seek to impose.

## III. The Final Rule does not violate the APA.

### A. The Final Rule is required by RFRA.

RFRA only allows the federal government to impose substantial burdens on religious exercise where it can prove that imposing the burden is the least restrictive means of advancing a compelling governmental interest. The Final Rule was required—and therefore does not violate the APA—because, without it, the mandate cannot satisfy RFRA. 42 U.S.C. § 2000bb-1.

#### 1. The mandate, without the Final Rule, violates RFRA.

*Substantial burden.* The Little Sisters and other religious groups exercise religion by providing health insurance that complies with their

religious beliefs. JA.1687-88, ¶¶ 33-34 (Decl. of Mother Superior Marie Vincente). It is undisputed that these groups have a sincere religious objection to complying with the "accommodation." *Id.* ¶¶ 35-38; *Little Sisters*, 591 U.S. at 663 ("religious and conscientious objections"). Failure to comply with the accommodation process, however, would result in large fines under 26 U.S.C. § 4980D ($100 per day per person affected); 26 U.S.C. § 4980H(c)(1) ($2000 per employee per year)—the same fines that constituted an obvious substantial burden in *Hobby Lobby*. 573 U.S. at 691 ("If these consequences do not amount to a substantial burden, it is hard to see what would."). As the Supreme Court held in *Hobby Lobby*, and reinforced in this case, the federal government "must accept the sincerely held complicity-based objections of religious entities." *Little Sisters*, 591 U.S. at 681. The agencies have obeyed that command and now concede that forcing religious groups to comply with the accommodation "constituted a substantial burden" on their religious exercise. JA.420.

**Strict scrutiny.** Here, the federal government cannot carry its statutory burden of showing that the mandate is "the least restrictive means of furthering [its] compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(2). And indeed, it has finally stopped trying. The mandate neither advances a sufficiently compelling interest nor is the least restrictive means.

First, there is no compelling government interest in forcing employers to provide contraceptives. This is why Congress has never imposed the

requirement, and why the original mandate has exemptions for grandfathered plans, churches, small employers, and government-sponsored plans. Even Pennsylvania and New Jersey themselves don't treat the mandate as a compelling interest, as they have not imposed their own contraceptive mandates on religious employers. They cannot seriously contend the interest in forcing religious employers to provide coverage is compelling when Pennsylvania has not bothered to require *any* employers to do so in the eight years since it launched this suit, and New Jersey's mandate includes cost-sharing and a religious exemption broader than the federal one the States seek to reimpose. JA.1768, ¶ 13 (Decl. of Seth A. Mendelsohn); JA.1786 ¶ 11 (Decl. of Philip Gennace).

As the Obama Administration acknowledged to the Supreme Court, women have many other avenues to obtain contraceptive coverage, so the mandate is not the least restrictive means of accomplishing the agencies' goals. Resp'ts' Br. at 65, *Zubik*, 578 U.S. 403 (No. 14-1418), https://perma.cc/B5ZB-9GTY. This concession is part of why the Supreme Court remanded *Zubik* and why the government subsequently lost every case. Indeed, the States' entire case is premised on the availability of a range of state programs that *do* provide contraceptives. The very existence of those programs proves that forcing Catholic nuns to provide plans that violate their religious beliefs is not the least restrictive means of distributing contraceptives. JA.1800-04 (Decl. of Leesa Allen); JA.1805-09 (Decl. of Sarah Adelman).

As the Supreme Court explained in *Hobby Lobby*, "[t]he most straight-forward way of doing this would be for the Government to assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." 573 U.S. at 728. This possibility alone means that the mandate cannot pass strict scrutiny. But there are several other ways the government could provide contraceptives without using nuns' plans. For example, the government could provide Title X-funded contraceptives for women whose employers conscientiously object to contraceptive coverage, as the first Trump Administration did, 84 Fed. Reg. 7714, 7787 (Mar. 4, 2019), or it could adopt an individual contraceptive arrangement, as the Biden Administration proposed, 88 Fed. Reg. 7236. The government's ability to cover any additional expenses forecloses any argument that the forced involvement of the Little Sisters is necessary.

In any event, the agencies have publicly acknowledged that the mandate fails strict scrutiny, 83 Fed. Reg. at 57,546-47. This is dispositive. The federal government cannot carry its statutory burden in this or any other court. That is evidenced by the RFRA cases that continued after the Supreme Court's order in *Zubik*. Some RFRA cases settled, but many did not, and to date, every single religious employer case that has been litigated to conclusion has resulted in a permanent injunction against the

mandate. Those injunctions find a RFRA violation and forbid the agencies from enforcing the mandate against the religious objector. For example:

- *Geneva Coll. v. Azar*, No. 2:12-cv-207 (W.D. Pa. July 5, 2018), Dkt. 153 at 2 ("defendants … violated Geneva College's rights under RFRA" by enforcing "the accommodation procedure[] against Geneva College");

- *Little Sisters of the Poor v. Azar*, No. 1:13-cv-2611 (D. Colo. May 29, 2018), Dkt. 82 at 1-2 ("enforcement of the mandate against Plaintiffs, either through the accommodation or other regulatory means … violated and would violate the Religious Freedom Restoration Act");

- *Wheaton Coll. v. Azar*, No. 1:13-cv-8910, 2018 WL 11664758, at *2 (N.D. Ill. Feb. 22, 2018) ("enforcement of the contraceptive mandate against Wheaton would violate Wheaton's rights under the Religious Freedom Restoration Act");

- *Reaching Souls Int'l*, 2018 WL 1352186, at *2 ("enforcement of the contraceptive mandate against Plaintiffs … violated and would violate RFRA");

- *Grace Schs. v. Azar*, No. 3:12-cv-459, 2018 WL 8755890, at *2 (N.D. Ind. June 1, 2018) ("[G]iven Defendants' concessions on the merits of Plaintiffs' RFRA claims, the Court agrees that Plaintiffs are entitled to a permanent injunction and declaratory relief, similar to the relief provided in substantively identical cases.").

These injunctions continue to bind the federal agencies and the holes they create in the mandate's enforcement make it impossible for the mandate to ever survive strict scrutiny.

### 2. *Geneva College* and *Real Alternatives* do not control the RFRA analysis.

The district court insisted that *Geneva College* and *Real Alternatives* precluded finding a RFRA violation. JA.44-46. Neither does.

First, *Geneva College* was one of the decisions vacated by the Supreme Court in *Zubik*. 578 U.S. 403. It thus has no precedential force in this Circuit or anywhere else. Indeed, in *Geneva College* itself, the district court subsequently entered a permanent injunction on RFRA grounds. No. 2:12-cv-207 (W.D. Pa. July 5, 2018), Dkt. 153. The panel decision in *Geneva College* is thus not even the law of the *case* in *Geneva College*; it is certainly not the law of the *Circuit*, binding district courts or subsequent panels in other cases.

Second, nothing in *Real Alternatives* revived *Geneva College*. The only RFRA claim at issue in *Real Alternatives* concerned whether an *employee* might have a RFRA claim based on participation in a health plan that offers objectionable benefits. *Real Alternatives*, 867 F.3d at 354-55. That RFRA claim is fundamentally different from the claim in *Geneva College* and here—that it violates RFRA to force *employers* to authorize and facilitate the provision of objectionable products on the plans they sponsor. *Id.* (calling employee claim "a question of first impression" and "distinct from an employer's RFRA claim objecting to the mandated provision" of coverage). Indeed, the majority in *Real Alternatives* specifically dis-

claimed any suggestion that it considered *Geneva College* to be precedential, *id.* at 356 n.18 ("*Geneva* is no longer controlling"), and specifically distinguished the RFRA claim of an employee from that of an employer, *id.* at 362 ("There is a material difference between employers arranging or providing an insurance plan that includes contraception coverage" and an employee's act of signing up for the plan).

Third, the vacated opinion in *Geneva College* was procured on the false premise that the accommodation didn't use the employer's health plan, a premise that the federal government later conceded at the Supreme Court was incorrect. In its briefing to this Court, the government claimed that: (1) "in all cases" contraceptive coverage "is provided separately from [the religious employer's] health coverage," Br. for Appellants, *Geneva Coll.*, No. 14-1376, 2014 WL 2812346, at *1-2 (3d Cir. June 10, 2014); (2) that the accommodation involved "separate payments," *id.* at *8, 9, 17, 18, 22, 28, 35, 38; and (3) that the accommodation worked "through alternative mechanisms," *id.* at *8.

The *Geneva College* panel accepted these representations as true and relied on them in making its substantial burden holding. *See Geneva Coll.*, 778 F.3d at 438-39, 438 n.13 (coverage is "separate and apart from" religious employer's plan; "[t]he provision of contraceptive coverage is not dependent upon Geneva's contract with its insurance company").

At the Supreme Court, however, the agencies admitted that the accommodation "coverage" actually *is* "part of the same plan as the coverage provided by the employer." Resp'ts' Br. at 38, *Zubik*, 578 U.S. 403 (No. 14-1418) (internal quotation marks omitted), https://perma.cc/B5ZB-9GTY; *see also* Tr. of Oral Arg. at 60-61, *Zubik*, 578 U.S. 403 (No. 14-1418) (admitting that it is "a fair understanding of the case" that all services are "in the one insurance package"); *id.* at 61 (agencies "would be content" if Court would "assume a substantial burden" and rule only on strict scrutiny). This factual about-face would deprive *Geneva College*'s burden analysis of any force even if the case were otherwise still good law.[8]

Beyond the factual developments, two intervening Supreme Court decisions, *Fulton* and *Mahmoud*, have rejected the kind of burden analysis *Real Alternatives* and *Geneva College* employed. In *Fulton*, the city argued that no burden existed because the government did not view the form the religious plaintiffs had to sign as violating their religious beliefs: "In [Philadelphia's] view, certification reflects only that foster parents satisfy the statutory criteria, not that the agency endorses their relationships." But as the Court explained, what mattered was *the plaintiffs*' "belie[f] that certification is tantamount to endorsement." 593 U.S. at 532-

---

[8] *See* Mark L. Rienzi, *Fool Me Twice*: Zubik v. Burwell *and the Perils of Judicial Faith in Government Claims*, 2016 Cato Sup. Ct. Rev. 123, 135-37, 145-47 (2015-2016).

33. That sufficed to end the burden inquiry, as "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* (quoting *Thomas v. Rev. Bd.*, 450 U.S. 707, 714 (1981)). Like the plaintiffs in *Fulton*, the Little Sisters sincerely believe that their participation in the accommodation is—at a minimum—tantamount to an endorsement of the contraceptives their plans would cover as a result of their certification. JA.1690 ¶ 38 (Decl. of Mother Superior Marie Vincente). Under *Fulton* alone, that is sufficient to show a substantial burden.

In *Mahmoud*, the defendant school district relied on *Lyng* and *Bowen* to reason that exposing students to curriculum contrary to parents' religious beliefs did not constitute a free-exercise burden on the parents because the curriculum "carrie[d] 'no tendency to coerce individuals into acting contrary to their religious beliefs.'" Br. of Resp'ts at 41, *Mahmoud v. Taylor*, 606 U.S. 522 (2025) (No. 24-297), 2025 WL 1032103. This echoed *Geneva College*'s reliance on *Lyng* and *Bowen* for the proposition that the "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute a substantial burden. *Geneva Coll.*, 778 F.3d at 440 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988)); *see also Real Alternatives*, 867 F.3d at 357 (citing *Lyng* and *Bowen*).

But *Mahmoud* rejected this kind of reliance on *Lyng* and *Bowen* for the burden analysis. Rather, *Mahmoud* treated *Lyng* and *Bowen* as applying a rule that the Free Exercise Clause doesn't apply to the government's "own internal affairs" that are "akin to the administration of Social Security or the selection of 'filing cabinets,'" *Mahmoud*, 606 U.S. at 557. But where, as here, the government "coerce[s] individuals into acting contrary to their religious beliefs," it is no "matter of 'internal affairs.'" *Id.* Even government interactions that are short of "direct compulsion or coercion," *id.* at 563, can be a sufficient burden. The substantiality of a burden does not turn on the involvement of a "third party," *Geneva Coll.*, 778 F.3d at 441, but on the "interactions between the State" and the person upon whom the government "imposes rules," *Mahmoud*, 606 U.S. at 557. Here, it is the employers who are fined by the government for failure to comply with the mandate. The sincerely held objection the Little Sisters have to the accommodation is not to how the federal government arranges its "filing cabinets" but to their own participation in the government's scheme.

In short, nothing in *Geneva College* or *Real Alternatives* forces this Court to rely on incorrect reasoning that conflicts with later Supreme Court cases and has twice been vacated by the Court.

## B. The Final Rule is permitted by RFRA.

Even if RFRA did not require the agencies to issue the Final Rule, it would still fully justify the rule that the agencies created because the

minimum level of accommodation required by RFRA is not the maximum permitted by the ACA. The first time this case went to the Supreme Court, the Court emphasized that, in *Zubik*, it had "directed the parties on remand to 'accommodat[e]'" religious objectors in a manner consistent with RFRA. *Little Sisters*, 591 U.S. at 681. As the Court has already explained, "[i]t is hard to see how the Departments could promulgate rules consistent with these decisions if they did not overtly consider these entities' rights under RFRA." *Id.* at 681-82.

That's precisely what the agencies did. After considering the wide range of potential conflicts, the agencies determined that "in light of RFRA, an expanded exemption rather than the existing accommodation is the most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*." 83 Fed. Reg. at 57,545. As the Supreme Court noted in *Little Sisters*, it was perfectly permissible for the agencies to "simply reach[] a different conclusion on whether the accommodation satisfied RFRA" than the States have. 591 U.S. at 682 n.12; *cf. id.* at 682 ("If the Departments did not look to RFRA's requirements … when formulating their solution, they would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem.").

Despite the Supreme Court's clear instructions in *Zubik* and *Little Sisters*, the district court here held that there is no "rational connection" between RFRA—a statute designed to "provide very broad protection for

religious liberty," *Hobby Lobby*, 573 U.S. at 693—and the Final Rule, which protects employers with religious objections. JA.37-43. The district court justified that mystifying conclusion by observing that the Final Rule might be more expansive than strictly necessary. *But see Zzyym v. Pompeo*, 958 F.3d 1014, 1027 (10th Cir. 2020) ("Under arbitrary-and-capricious review, the agency need not select a perfect solution—just a rational one."). It reasoned that there is a "mismatch" between the Final Rule's stated goal—preventing conflicts between RFRA and the mandate—and the Final Rule's exemption for both publicly traded companies and (supposedly) "entities *without*" "complicity-based objections to the Accommodation." JA.37, 39-41.

That analysis is incorrect. For one thing, it is not "far beyond" the goal of avoiding conflicts between religious objectors and the accommodation to provide a robust exemption that minimizes potential conflicts in the first place. *Cf. Little Sisters*, 591 U.S. at 681 ("[T]he potential for conflict between the contraceptive mandate and RFRA is well settled."); *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 339 (1987) (holding Title VII's religious exemption was lawful in part because it "effectuates a more complete separation" of "church and state" and "avoids … intrusive inquiry into religious belief"). This is true even of the publicly-traded companies exempted by the Final Rule. Though the Supreme Court acknowledged in *Hobby Lobby* that "it seems unlikely" that such companies "will often assert RFRA claims," the Court did *not* hold that they would be

foreclosed from doing so. 573 U.S. at 717. To avoid potential future conflicts, then, it was reasonable for the agencies to provide an exemption that covered even such "unlikely"—yet still possible—scenarios.[9]

The district court was also wrong that the Final Rule exempts entities without complicity-based objections. The Final Rule's exemption applies only "to the extent that an entity … objects" to compliance with the accommodation. 45 C.F.R. § 147.132(a)(2). Those who do not actually object cannot qualify. The district court ignored this provision, reasoning that because "no notice is required to take advantage of the exemption, … the practical outcome is that the exemption does not require anyone to affirmatively state an objection." JA.40 n.17. That is nonsensical. As an initial matter, employers *are* required to provide notice of exclusions in the plan documents they provide to their employees, as the district court acknowledged. JA.19 n.6. That no separate notice of the religious objection is required does not change the baseline condition that to claim the exemption, an entity must actually object to compliance. Nor does it make sense to say that the Final Rule is not rationally related to RFRA solely because of the identity of the person receiving the notice—the employees rather than the federal government. Indeed, other significant exceptions

---

[9]   Even if it were unreasonable to do so, it would ultimately be harmless. Either corporations with proper religious objections exist—in which case RFRA would justify exempting them—or else they do not exist—in which case there is absolutely no harm to the States (or to anyone) in the agencies' cautious approach.

to federal law do not have notice requirements. *See, e.g.*, 34 C.F.R. § 106.12(b) (religious institutions "not required" to request exemption from Title IX in order to use exemption); *Maxon v. Fuller Theological Seminary*, No. 20-56156, 2021 WL 5882035, at *2 (9th Cir. 2021) ("The language of Title IX does not condition an institution's ability to claim the religious exemption on filing written notice or on any other process— the exemption is mandatory and automatic."). Nor are other entities that are exempt from the mandate itself—such as small businesses or those with grandfathered plans—required to provide any specific notice to the agencies to take advantage of their respective exemptions. *See, e.g.*, 26 C.F.R. § 54.9815-1251 (listing requirements to maintain status as grandfathered health plan); 45 C.F.R. § 147.140 (same); 29 C.F.R. § 2590 (requiring notice of benefits under grandfathered plans only to beneficiaries). The district court's bizarre "practical" reading of the statute would lead to the invalidation of all these other regulations as arbitrary and capricious as well.

Even if the district court's bizarre reading were correct, the appropriate remedy would be to sever the overbroad provisions of the Rule in accordance with its severability clause—not to vacate the Final Rule entirely nationwide. 45 C.F.R. § 147.132(d); *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 636 (2020) (plurality) (emphasizing "strong presumption of severability"); *Seila Law LLC v. CFPB*, 591 U.S. 197, 235 (2020) (severing "offending tenure restriction" where other portions were

"fully operative" and nothing "in the [statute's] text and history" displaced the severability clause). Here, there is no reason the rest of the Final Rule could not stand without the particular applications the district court found invalid. Indeed, to the extent it is required by RFRA, *supra* Part III.A, the district court *cannot* vacate the Final Rule.

## C. The Final Rule is not otherwise arbitrary and capricious.

The arbitrary and capricious standard is "very deferential" to agencies. *Humphreys*, 96 F.3d at 664. It requires only that "the agency examine[] the relevant data and articulate[] a satisfactory explanation for its action." *Christ the King Manor v. HHS*, 730 F.3d 291, 305 (3d Cir. 2013). Here, the Supreme Court has already found that "[t]he final rules included a concise statement of their basis and purpose, explaining that the rules were 'necessary to protect sincerely held' moral and religious objections and summarizing the legal analysis supporting the exemptions," and that they contained a "lengthy analysis" regarding why the agencies changed their position on the accommodation. *Little Sisters*, 591 U.S. at 686, 673. Nevertheless, the district court held that the agencies did not provide a "satisfactory explanation" for the Final Rule, JA.51, and that the agencies' explanation failed to consider sufficient alternatives, JA.54-55. Neither conclusion holds water.

***Sufficient explanation.*** When an agency changes its position, "the agency does not need to show 'that the reasons for the new policy are *better* than the reasons for the old one.'" *See, e.g.*, *FDA v. Wages & White*

*Lion Invs., LLC*, 604 U.S. 542, 570 (2025). "Nor must it 'provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Id.*

The district court held that the agencies needed to provide a "more detailed justification" for the Final Rule because they had "changed [their] position" about the safety and efficacy of contraceptives. JA.51-54. In the district court's view, the agencies "rest[ed]" the Final Rule "upon factual findings that contradict those which underlay its prior policy." JA.51 (quoting *FCC v. Fox Television*, 556 U.S. 502, 515 (2009)). But that's impossible. The Final Rule could not have "rest[ed] upon factual findings" contrary to prior agency regulations when the agencies expressly did "*not* take a position on the variety of empirical questions" relating to safety and efficacy. 83 Fed. Reg. at 57,555 (emphasis added).

Regardless, the agencies didn't need to take a position on those questions because the exemption didn't rely on answers to them. The policy change was driven by the need to accommodate religious objectors—something the Supreme Court ordered the agencies to reconsider—not by concerns over the safety and efficacy of contraceptives. *See* 83 Fed. Reg. at 57,537, 57,546-48; *see also Little Sisters*, 591 U.S. at 681-82, 682 n.12 ("[O]ur decisions all but instructed the Departments to consider RFRA going forward.").

Nor was it arbitrary and capricious to consider commenters' views that some contraceptives "constitute 'abortifacients.'" JA.54. When, as here,

the agencies have been "directed" to accommodate religious beliefs, *Little Sisters*, 591 U.S. at 681, considering commenters' views about their complicity with ending human life does not mean that the agencies used "religious beliefs" to "drive[] their switch-in-position," JA.54. It means they lawfully addressed the problem at hand.

***Reasonable alternatives.*** The district court also concluded that the Final Rule was arbitrary and capricious because the agencies failed to consider, in 2017, a specific "Individual Contraceptive Arrangement" (ICA), that was proposed in 2023. *See* JA.55; 88 Fed. Reg. at 7243 (proposing ICA). But that's as untrue as it is irrelevant.

First, it is untrue because the agencies *have* considered and rejected the ICA (or similar variations that would provide independent paths to coverage) at least three times. *See* 78 Fed. Reg. at 39,888 (July 2, 2013) (rejecting because "the Departments lack the statutory authority and funding," and such a program would impose "additional barriers to women receiving the intended coverage"); 80 Fed. Reg. at 41,328 (July 14, 2015) (rejecting because "the Departments do not have the legal authority" to create such a program, and such a program would impede the ability "to provide seamless coverage of the contraceptive services"); 83 Fed. Reg. at 57,546-67 (Nov. 15, 2018) (rejecting because "the Departments are not aware of the authority, or of a practical mechanism, for" creating such a program); *see also* 88 Fed. Reg. at 7254 (Feb. 2, 2023) (acknowledging such a program "would not achieve the Women's Health

Amendment's goal of ensuring that women have seamless cost-free coverage of contraceptives").

Second, it's irrelevant because agencies "need not consider every alternative proposed nor respond to every comment made. Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives." *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (citation omitted). And here, the Obama Administration had twice determined that an independent path to coverage was not viable. *See* 78 Fed. Reg. at 39,888; 80 Fed. Reg. at 41,328. The APA doesn't require agencies to repeatedly reject nonviable alternatives.

In sum, the district court was wrong to fault the agencies for not considering an alternative that they'd rejected multiple times over.

## CONCLUSION

The States lack injury, and their claims are not redressable in any lawful way, so the decision below should be vacated and the case remanded with instructions to dismiss. If the Court reaches the merits, it should reverse the decision below and enter judgment for Defendants.

Dated: December 12, 2025

Respectfully submitted,

*/s/ Mark L. Rienzi*

PAUL D. CLEMENT
ERIN E. MURPHY
Clement & Murphy
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

NICHOLAS M. CENTRELLA
Clark Hill
2 Commerce Street
2001 Market Street, Suite 2620
Philadelphia, PA 19103
(215) 864-8098

MARK L. RIENZI
ERIC C. RASSBACH
LORI H. WINDHAM
ADÈLE A. KEIM
DIANA VERM THOMSON
BENJAMIN A. FLESHMAN
DANIEL L. CHEN
RICHARD C. OSBORNE
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave
  NW, Suite 400
Washington, DC 20006
(202) 955-0095
mrienzi@becketfund.org

*Counsel for Intervenor-Defendant-Appellant*

## COMBINED CERTIFICATIONS

1. I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. This brief complies with the type-volume limitations imposed by Federal Rules of Appellate procedure 29(d) and 32(a)(7)(B). It contains 12,730 words, excluding the parts of the brief exempted by Federal Rule 32(a)(7)(B)(iii) and by Local Rule 29.1(b).

3. This brief complies with the typeface and typestyle requirements of Federal Rule 32(a)(5) and 32(a)(6). It has been prepared in a proportion-ally-spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

4. This brief complies with the electronic filing requirements of Local Rule 31.1(c). The text of this electronic brief is identical to the text of the paper copies, and Microsoft Windows Defender has been run on the file containing the electronic version of this brief and no virus has been de-tected.

5. On December 12, 2025, the foregoing brief and Appendix were elec-tronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

Dated: December 12, 2025

*/s/ Mark L. Rienzi*
Mark L. Rienzi

*Counsel for Intervenor-Defendant-Appellant*

# ADDENDUM

## Table of Contents

U.S. Const. amend. I.................................................................58

42 U.S.C. § 2000bb-1 .............................................................59

26 U.S.C. § 4980D.................................................................60

26 U.S.C. § 4980H.................................................................61

26 U.S.C. § 5000A.................................................................63

29 U.S.C. § 1185d .................................................................66

42 U.S.C. § 300gg-13 ............................................................67

42 U.S.C. § 18011.................................................................68

45 C.F.R. § 147.130...............................................................71

45 C.F.R. § 147.131...............................................................72

45 C.F.R. § 147.132...............................................................80

## U.S. Const. amend. I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Free exercise of religion protected

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## 26 U.S.C. § 4980D

Failure to meet certain group health plan requirements

(a) General rule.--There is hereby imposed a tax on any failure of a group health plan to meet the requirements of chapter 100 (relating to group health plan requirements).

(b) Amount of tax.--

(1) In general.--The amount of the tax imposed by subsection (a) on any failure shall be $100 for each day in the noncompliance period with respect to each individual to whom such failure relates.

\*   \*   \*

Shared responsibility for employers regarding health coverage

(a) Large employers not offering health coverage.--If--

(1) any applicable large employer fails to offer to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan (as defined in section 5000A(f)(2)) for any month, and

(2) at least one full-time employee of the applicable large employer has been certified to the employer under section 1411 of the Patient Protection and Affordable Care Act as having enrolled for such month in a qualified health plan with respect to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee, then there is hereby imposed on the employer an assessable payment equal to the product of the applicable payment amount and the number of individuals employed by the employer as full-time employees during such month.

\* \* \*

(c) Definitions and special rules.--For purposes of this section--

(1) Applicable payment amount.--The term "applicable payment amount" means, with respect to any month, $1/_{12}$ of $2,000.

(2) Applicable large employer.--

(A) In general.--The term "applicable large employer" means, with respect to a calendar year, an employer who employed an average of

at least 50 full-time employees on business days during the preceding calendar year.

*   *   *

Requirement to maintain minimum essential coverage

(f) Minimum essential coverage.--For purposes of this section--

(1) In general.--The term "minimum essential coverage" means any of the following:

(A) Government sponsored programs.--Coverage under--

(i) the Medicare program under part A of title XVIII of the Social Security Act,

(ii) the Medicaid program under title XIX of the Social Security Act,

(iii) the CHIP program under title XXI of the Social Security Act or under a qualified CHIP look-alike program (as defined in section 2107(g) of the Social Security Act),

(iv) medical coverage under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;

(v) a health care program under chapter 17 or 18 of title 38, United States Code, as determined by the Secretary of Veterans Affairs, in coordination with the Secretary of Health and Human Services and the Secretary,

(vi) a health plan under section 2504(e) of title 22, United States Code (relating to Peace Corps volunteers); or

(vii) the Nonappropriated Fund Health Benefits Program of the Department of Defense, established under section 349 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103-337; 10 U.S.C. 1587 note).

(B) Employer-sponsored plan.--Coverage under an eligible employer-sponsored plan.

(C) Plans in the individual market.--Coverage under a health plan offered in the individual market within a State.

(D) Grandfathered health plan.--Coverage under a grandfathered health plan.

(E) Other coverage.--Such other health benefits coverage, such as a State health benefits risk pool, as the Secretary of Health and Human Services, in coordination with the Secretary, recognizes for purposes of this subsection.

(2) Eligible employer-sponsored plan.--The term "eligible employer-sponsored plan" means, with respect to any employee, a group health plan or group health insurance coverage offered by an employer to the employee which is--

(A) a governmental plan (within the meaning of section 2791(d)(8) of the Public Health Service Act), or

(B) any other plan or coverage offered in the small or large group market within a State.

Such term shall include a grandfathered health plan described in paragraph (1)(D) offered in a group market.

* * *

Additional market reforms

(a) General rule

Except as provided in subsection (b)--

(1) the provisions of part A of title XXVII of the Public Health Service Act (as amended by the Patient Protection and Affordable Care Act) shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart; and

(2) to the extent that any provision of this part conflicts with a provision of such part A with respect to group health plans, or health insurance issuers providing health insurance coverage in connection with group health plans, the provisions of such part A shall apply.

(b) Exception

Notwithstanding subsection (a), the provisions of sections 2716 and 2718 of title XXVII of the Public Health Service Act (as amended by the Patient Protection and Affordable Care Act) shall not apply with respect to self-insured group health plans, and the provisions of this part shall continue to apply to such plans as if such sections of the Public Health Service Act (as so amended) had not been enacted.

Coverage of preventive health services

(a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for--

\* \* \*

(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.[2]

\* \* \*

Preservation of right to maintain existing coverage

(a) No changes to existing coverage

(1) In general

Nothing in this Act (or an amendment made by this Act) shall be construed to require that an individual terminate coverage under a group health plan or health insurance coverage in which such individual was enrolled on March 23, 2010.

(2) Continuation of coverage

Except as provided in paragraph (3), with respect to a group health plan or health insurance coverage in which an individual was enrolled on March 23, 2010, this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply to such plan or coverage, regardless of whether the individual renews such coverage after March 23, 2010.

(3) Application of certain provisions

The provisions of sections 2715 and 2718 of the Public Health Service Act (as added by subtitle A) shall apply to grandfathered health plans for plan years beginning on or after March 23, 2010.

(4) Application of certain provisions

(A) In general

The following provisions of the Public Health Service Act (as added by this title) shall apply to grandfathered health plans for plan years beginning with the first plan year to which such provisions would otherwise apply:

> (i) Section 2708 (relating to excessive waiting periods).
>
> (ii) Those provisions of section 2711 relating to lifetime limits.
>
> (iii) Section 2712 (relating to rescissions).
>
> (iv) Section 2714 (relating to extension of dependent coverage).

(B) Provisions applicable only to group health plans

\* \* \*

(b) Allowance for family members to join current coverage

With respect to a group health plan or health insurance coverage in which an individual was enrolled on March 23, 2010, and which is renewed after such date, family members of such individual shall be permitted to enroll in such plan or coverage if such enrollment is permitted under the terms of the plan in effect as of March 23, 2010.

(c) Allowance for new employees to join current plan

A group health plan that provides coverage on March 23, 2010, may provide for the enrolling of new employees (and their families) in such plan, and this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply with respect to such plan and such new employees (and their families).

\* \* \*

(e) Definition

In this title, the term "grandfathered health plan" means any group health plan or health insurance coverage to which this section applies.

(a) Services—

(1) In general. Beginning at the time described in paragraph (b) of this section and subject to §§ 147.131, 147.132, and 147.133, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

\* \* \*

(iv) With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to §§ 147.131, 147.132, and 147.133; and

\* \* \*

Accommodations in connection with coverage of certain preventive health services.

(a)–(b) [Reserved]

(c) Eligible organizations for optional accommodation. An eligible organization is an organization that meets the criteria of paragraphs (c)(1) through (3) of this section.

(1) The organization is an objecting entity described in § 147.132(a)(1)(i) or (ii), or 45 CFR 147.133(a)(1)(i) or (ii).

(2) Notwithstanding its exempt status under § 147.132(a) or § 147.133, the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (d) of this section; and

(3) The organization self-certifies in the form and manner specified by the Secretary or provides notice to the Secretary as described in paragraph (d) of this section. To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (d) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) An eligible organization may revoke its use of the accommodation process, and its issuer must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) Transitional rule—If contraceptive coverage is being offered on January 14, 2019, by an issuer through the accommodation process, an eligible organization may give 60–days notice pursuant to section 2715(d)(4) of the PHS Act and § 147.200(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) General rule—In plan years that begin after January 14, 2019, if contraceptive coverage is being offered by an issuer through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(d) Optional accommodation—insured group health plans—

(1) General rule. A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for

all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more health insurance issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in § 147.132 or § 147.133 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 147.130(a)(iv).

(B) When a notice is provided to the Secretary of the Department of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in § 147.132 or § 147.133 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of § 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information

for any of the plan's health insurance issuers. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation to remain in effect. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of the Department of Health and Human Services has received a notice under paragraph (d)(1)(ii) of this section and describing the obligations of the issuer under this section.

(2) If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (d)(1)(ii) of this section and does not have an objection as described in § 147.132 or § 147.133 to providing the contraceptive services identified in the self-certification or the notification from the Department of Health and Human Services, then the issuer will provide payments for contraceptive services as follows—

(i) The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 141.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, co-insurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 147.130(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(3) A health insurance issuer may not require any documentation other than a copy of the self-certification from the eligible organization or the notification from the Department of Health and Human Services described in paragraph (d)(1)(ii) of this section.

(e) Notice of availability of separate payments for contraceptive services—insured group health plans and student health insurance cover-

age. For each plan year to which the optional accommodation in paragraph (d) of this section is to apply, an issuer required to provide payments for contraceptive services pursuant to paragraph (d) of this section must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (e) "Your [employer/institution of higher education] has certified that your [group health plan/student health insurance coverage] qualifies for an accommodation with respect to the Federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your [employer/institution of higher education] will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of health insurance issuer] will provide separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in

your [group health plan/student health insurance coverage]. Your [employer/institution of higher education] will not administer or fund these payments. If you have any questions about this notice, contact [contact information for health insurance issuer]."

(f) Reliance—

(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (d) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (d) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

(g) Definition. For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).

(h) Severability. Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance,

shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

Religious exemptions in connection with coverage of certain preventive health services.

(a) Objecting entities.

(1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections specified below. Thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (a)(2) of this section. Such non-governmental plan sponsors include, but are not limited to, the following entities—

(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order.

(B) A nonprofit organization.

(C) A closely held for-profit entity.

(D) A for-profit entity that is not closely held.

(E) Any other non-governmental employer.

(ii) A group health plan, and health insurance coverage provided in connection with a group health plan, where the plan or coverage is established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other non-governmental organization or association, to the extent the plan sponsor responsible for establishing and/or maintaining the plan objects as specified in paragraph (a)(2) of this section. The exemption in this paragraph applies to each employer, organization, or plan sponsor that adopts the plan;

(iii) An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

(iv) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health

insurance coverage is exempt under this subparagraph (iv), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement.

(2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable):

(i) Coverage or payments for some or all contraceptive services; or

(ii) A plan, issuer, or third party administrator that provides or arranges such coverage or payments.

\* \* \*

(c) Definition. For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).

(d) Severability. Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application

of the provision to persons not similarly situated or to dissimilar circum-
stances.