ORAL ARGUMENT NOT YET SCHEDULED
Nos. 25-2575

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

COMMONWEALTH OF PENNSYLVANIA, *et al.*,

*Plaintiffs-Appellees,*

*v.*

PRESIDENT OF THE UNITED STATES OF AMERICA, *et al.*,

*Defendants-Appellants,*

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

*Intervenor-Defendant-Appellant.*

---

On Appeal from the United States District Court for the Eastern
District of Pennsylvania, No. 2:17-cv-04540-WB

---

### BRIEF *AMICUS CURIAE* OF THE
### NEW CIVIL LIBERTIES ALLIANCE
### IN SUPPORT OF INTERVENOR-DEFENDANT-APPELLANT

---

Andrew J. Morris
  *Counsel of Record*
John J. Vecchione
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal
*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned counsel certifies that *amicus curiae* the New Civil Liberties Alliance is a nonprofit organization under the laws of the District of Columbia.  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

The undersigned further certifies that no counsel for a party authored this brief in whole or in part, and that no person or entity, other than NCLA and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).

/s/ Andrew J. Morris
Andrew J. Morris

i

## STATEMENT REGARDING CONSENT TO FILE AND BAR MEMBERSHIP

Pursuant to Fed. R. App. P. 29(a)(2), the undersigned represents that all parties have consented to the filing of this brief.  The undersigned further represents, pursuant to L.A.R. 28.3(d) and 46.1(e), that he has been admitted to practice before the United States Court of Appeals for the Third Circuit.

/s/ Andrew J. Morris
Andrew J. Morris

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

STATEMENT REGARDING CONSENT TO FILE AND BAR MEMBERSHIP ...................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF AMICUS CURIAE ........................................................ 1

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF ARGUMENT .............................................................. 8

ARGUMENT ................................................................................... 11

   I.   THE ACA PROVIDES NO LIMITING PRINCIPLE TO RESTRAIN HRSA OR THE COURTS, AS THE DISTRICT COURT'S LATEST ERRONEOUS DECISION SHOWS ........................................ 11

      A.   This Court Should Follow the Supreme Court's Signal in *Little Sisters* by Addressing the Nondelegation Doctrine ... 11

      B.   The ACA's "Additional Preventive Care" Provision Violates the Nondelegation Doctrine .................................. 13

      C.   By Vesting "All legislative Powers" in Congress, as Well as Through the First Amendment, the Constitution Protects Americans' Religious Liberty .......... 17

CONCLUSION ................................................................................. 22

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, TYPE-STYLE REQUIREMENTS, IDENTITY OF DOCUMENTS, AND VIRUS TESTING ....................... 23

CERTIFICATE OF SERVICE ............................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) .............................................................................. 15

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) .............................................................................. 3

*Cellco P'ship & N.Y. SMSA LP v. The County of Monmouth,*
  No. 23-18091, 2024 WL 989824 (D.N.J. Mar. 7, 2024) ........................ 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) .............................................................................. 18

*Employment Division v. Smith,*
  494 U.S. 872 (1990) .............................................................. 10, 18, 19

*Gundy v. United States,*
  588 U.S. 128 (2019) .............................................................. 12, 15, 16

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) ...................................... 6, 8, 9, 12, 14, 21

*Nat'l Ass'n of Regul. Util. Comm'rs v. I.C.C.,*
  41 F.3d. 721 (D.C. Cir. 1994) .............................................................. 13

*Opp Cotton Mills v. Adm'r of Wage and Hour Div.,*
  312 U.S. 126 (1941) .............................................................................. 15

*Panama Refining Co. v. Ryan,*
  293 U.S. 388 (1935) .................................................................. 15, 17

*Pennsylvania v. President of the United States,*
  930 F.3d 543 (3d Cir. 2019)................................................................ 5, 6

*Pennsylvania v. Trump,*
  281 F. Supp. 3d 553 (E.D. Pa. 2017) .............................................. 5, 21

*Pennsylvania v. Trump,*
  351 F. Supp. 3d 791 (E.D. Pa. 2019) .................................................... 5

*Pennsylvania v. Trump,*
  795 F. Supp. 3d 607 (E.D. Pa. 2025) .................................. 4, 7, 8, 9, 21

*Pennsylvania v. Trump,*
    888 F.3d 52 (3d Cir. 2018) ................................................................ 21

*Sw. Pa Growth All. v. Browner,*
    121 F.3d 106 (3d Cir. 1997) .............................................................. 12

*Trent v. Dial Med. of Fla., Inc.,*
    No. 92-4493, 1992 WL 365625 (E.D. Pa. Nov. 30, 1992 ) .................... 12

*Wayman v. Southard,*
    23 U.S. (10 Wheat.) 1 (1825) ...................................................... 15, 16

*Yakus v. United States,*
    321 U.S. 414 (1944) ......................................................................... 15

*Zubik v. Burwell,*
    578 U.S. 403 (2016) ........................................................................... 3

## Constitutional Provisions

U.S. CONST. amend. I ........................................................................... 19

U.S. CONST. art. I, § 1 .......................................................................... 15

U.S. CONST. art. II, § 1 ......................................................................... 15

U.S. CONST. art. III, § 1 ........................................................................ 15

## Statutes

42 U.S.C. § 2000bb-1(a) ......................................................................... 6

42 U.S.C. § 300gg-13(a)(4) ............................................................ 3, 5, 9

## Other Authorities

John Locke,
    *The Second Treatise of Civil Government and a Letter Concerning
    Toleration*
    (J.W. Gough ed. Oxford: Basil Blackwood 1948) (1690) ..................... 22

Philip Hamburger,
    *Exclusion and Equality: How Exclusion from the Political Process
    Renders Religious Liberty Unequal,*
    90 Notre Dame L. Rev. 1919 (2015) .................................................. 27

Philip Hamburger,
  *Nondelegation Blues*,
  91 Geo. Wash. L. Rev. 1083 (2023) ....................................................... 20

## INTEREST OF AMICUS CURIAE

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil-rights organization devoted to defending constitutional freedoms from violations by the administrative state. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself: jury trials, due process of law, and the right to live under laws made by the nation's elected lawmakers through constitutionally and statutorily prescribed channels. Yet these self-same rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, administrative agencies, and even sometimes courts have neglected them for so long.

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints on the administrative state. Although Americans still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's concern.

1

NCLA is particularly disturbed that, when Congress adopted the Affordable Care Act (ACA), Pub. L. 111-148 (2010), it improperly delegated to the administrative state the power to write laws governing the conduct of health insurance providers. NCLA is concerned that this unconstitutional delegation is especially harmful because administrative agencies are far more likely than Congress to systematically undervalue the constitutionally protected religious liberties of Americans. Agencies focus their attention on statutorily delegated tasks and are not directly answerable to voters.

NCLA asks the Court to address the Affordable Care Act's improper delegation of legislative power and, in doing so, to redress this agency undervaluation of Americans' protected religious liberties.

## STATEMENT OF THE CASE

The ACA broadly delegates to the Executive Branch authority to determine health insurance coverage that must be offered by group health plans and health-insurance issuers. In particular, the ACA authorizes the Health Resources and Services Administration (HRSA), an agency of the U.S. Department of Health and Human Services (HHS), to specify coverage requirements "with respect to women, such additional

preventive care and screenings … as provided for in comprehensive guidelines supported by" HRSA. 42 U.S.C. § 300gg-13(a)(4).

Acting under that delegated authority, HRSA issued guidelines in 2011 that included within the required coverage all Food and Drug Administration-approved contraceptive methods (the "Contraceptive Mandate"). HHS, in conjunction with the Departments of Labor and Treasury (collectively, "HHS"), simultaneously issued a rule directing HRSA to recognize an exemption from the Contraceptive Mandate for a narrow subset of religious employers.[1]

Other employers subject to the mandate objected to their exclusion from the exemption, asserting that the mandate imposed unwarranted burdens on the exercise of their religious beliefs. In response to those concerns and to the Court's decision in *Zubik v. Burwell*, 578 U.S. 403 (2016), HHS broadened exemptions from the Contraceptive Mandate to

---

[1] HHS issued the exemption as an interim final rule (IFR) on August 3, 2011. The following year, it issued the exemption in final form "without change." 77 Fed. Reg. 8,725 (Feb. 15, 2012). In response to federal-court challenges to the Contraceptive Mandate and this Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), HHS issued final regulations modifying the scope of the exemption in 2013 and again in 2015.

"ensure that proper respect is afforded to sincerely held religious objections in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision otherwise to require contraceptive coverage." *Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act,* 83 Fed. Reg. 57,536, 57,537 (Nov. 15, 2018).[2]  The agency also issued the *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (the "Moral Rule").  After providing an opportunity for notice and comment, HHS issued final regulations expanding the religious and moral exemptions (the "Final Rule"), to take effect in January 2019. *See* 45 C.F.R. § 147.132.

Pennsylvania and New Jersey filed a federal-court challenge to the Final Rule, asserting *inter alia* that it violated the ACA by failing to mandate coverage of the "additional preventive care" specified by § 300gg-13(a)(4).  The district court agreed and granted a nationwide

---

[2] NCLA will use the district court's terminology and refer to this as the "Religious Rule."  *Pennsylvania v. Trump*, 795 F. Supp. 3d 607, 614 (E.D. Pa. 2025).

preliminary injunction against the Final Rule on the day it was to take effect. *See Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 570–81 (E.D. Pa. 2017); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 810–27 (E.D. Pa. 2019). It held that the ACA authorizes neither the Final Rule nor a related rule granting an exemption to employers with "moral" objections to the Contraceptive Mandate and thus they were enacted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," making them "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 816–17 (quoting 5 U.S.C. § 706(2)(A), (C)).

The Third Circuit affirmed. *Pennsylvania v. President of the United States*, 930 F.3d 543 (3d Cir. 2019). The appeals court held that the statutory authority to issue "comprehensive guidelines" (set out in 42 U.S.C. § 300gg-13(a)(4)) "concerns the type of services that are to be provided and does not provide authority to undermine Congress's directive concerning who must provide coverage for these services." *Id.* at 570. It held that by using the word "comprehensive" to describe the mandated guidelines, the ACA indicated that the guidelines should cover

"health care services for the identified group[ ]" (*i.e.*, women) without exempting specified employers from the mandate. *Id.* at 571.

The court also held that RFRA neither required, *id.* at 574, nor permitted, *id.* at 572–73, the Final Rule's expanded exemption for religious objectors. Although RFRA imposes strict limits on the federal government's authority to "substantially burden [a person's] exercise of religion," 42 U.S.C. § 2000bb-1(a), the court held that the "Accommodation" mechanism adopted by HHS in its final rules eliminated any substantial burden on an employer's exercise of religion. *Id.* at 573.

But the Supreme Court reversed, holding both that the administration had properly proceeded under notice and comment and that the agencies were empowered to create religious and moral exemptions under the Final Rule. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 683–84, 663 (2020) (cited in *Pennsylvania v. Trump*, 795 F. Supp. 3d at 615).

Upon eventual remand, after the Final Rule was revived subsequent to the end of the Biden administration, the district court struck it down again. This time it held, *inter alia*, that in adopting the

6

Final Rule the agencies were "arbitrary and capricious" in violation of 5 U.S.C. § 706(2)(A) and had failed to engage in "reasoned decision making." 795 F. Supp. 3d at 615.[3]

The district court held that the Religious Rule was overbroad for the problems that the agencies stated they were addressing. *Id.* at 631-635. Curiously, the district court faulted the Religious Rule because it applied to publicly traded companies that were "unlikely" to make any religious objection. *Id.* at 633. The court ruled that "unlikely" does not mean "never will." The district court also held that under "binding Third Circuit precedent" notifying HHS of religious objections did not make an organization complicit in the providing of contraceptive coverage. *Id.* at 635 (citing *Real Alts. v. Secretary of HHS*, 867 F.3d 338 (3d Cir. 2017)). The district court found that the agencies had failed to explain a change in position on the safety and effectiveness of contraceptives and regulatory alternatives to the Final Rule. 795 F. Supp. 3d. at 640–42.

---

[3] The district court declined to address the nondelegation doctrine, or the Appointments Clause, or the Free Exercise Clause of the First Amendment, or the ecclesiastical abstention doctrine because only Little Sisters challenged the Contraceptive Mandate itself and raised these arguments. According to the district court, the parties did not. 795 F. Supp. 3d at 630–31.

7

It found RFRA did not compel the Religious Rule.  *Id.* at 635.  It also found that the Moral Rule was not allowed by statute because the ACA does not allow such violations.  *Id.* at 638.  The district court used Congress's failure to amend the ACA to include a moral rule after the agencies stated it would include contraceptive coverage as meaning it did not contemplate allowing a moral rule.  *Id.* 639.  It did so despite the Supreme Court's direct statement that an agency could consider moral qualms in creating exemptions under the ACA.  *Little Sisters of the Poor*, 591 U.S. at 677.

## SUMMARY OF ARGUMENT

*Amicus* submits this brief to amplify the Little Sisters' argument that the ACA provision authorizing HHS/HRSA to specify coverage requirements violates the nondelegation doctrine. [4]  That provision

---

[4] In addition to discussing the nondelegation doctrine, Little Sisters' opening brief ably describes the district court's numerous errors in applying the Administrative Procedure Act ("APA").  *See* Intervenor-Appellant's Opening Brief ("Br.") at 37–54.  Indeed, as that brief also describes, the district court did cartwheels to avoid the explicit holding that reversed its previous erroneous decision.  An error intervenors do not dwell on is the district court's conclusion that HRSA engaged in unreasoned decision-making by allowing religious exemptions to some publicly traded companies that are unlikely to take advantage of such

8

requires employers with more than 50 employees to provide, among other things, coverage for "preventive care and screenings" for women. 42 U.S.C. § 300gg-13(a)(4). The ACA does not define "preventive care." The Supreme Court has implied that this provision made an excessive delegation to the agency, *Little Sisters of the Poor*, 591 U.S. at 676–77 (stressing that this provision granted HRSA "unbridled discretion"). This Court should follow the Supreme Court's signal by resolving the issue.

The statute does not set forth any congressional policy regarding what "additional" goods and services group health plans should be required to cover. It supplies no "intelligible principle" to guide HHS in its lawmaking effort. Instead, § 300gg-13(a)(4) simply states that the mandatory-coverage list is to be supplemented by including "with respect to women, such additional preventive care and screenings" as are included in "comprehensive guidelines" to be issued by HHS (through its subordinate agency, HRSA). Any such delegation of legislative power to

---

exemption. 795 F. Supp. 3d at 633–34. That statement is not a finding that they never will, and agencies can forestall constitutional violations before they occur by applying exceptions uniformly across firms. The district court therefore erred by holding that in this respect the Religious Rule was "not rational." *Id.* at 634.

an administrative agency—especially without an intelligible principle—
is in derogation of the freedom of Americans to protect their religious
interests via Congress.

The "intelligible principle" requirement is especially important
where a statute authorizes agency action that has the potential to
threaten the free exercise of religion. Federal administrators tend to
focus on accomplishing what they view as their statutory mission in the
most rational and efficient manner, and they rarely view accommodating
the interests of religious minorities as part of that mission.

For this reason, vindicating the nondelegation doctrine also will
provide needed protection for rights guaranteed by the First
Amendment's Free Exercise Clause. As the Supreme Court has
recognized, Congress's institutional structure may render it receptive to
concerns about the free exercise of religion. *See Employment Division v.
Smith*, 494 U.S. 872, 890 (1990) (noting that legislatures are sometimes
persuaded by constituents to adopt free-exercise protections). But
administrative agencies do not operate under the same political
constraints as legislatures. Their proceedings are rarely accessible to

citizens who oppose adoption of rules that, although neutral on their face, impose substantial free-exercise burdens.

## ARGUMENT

I.   **THE ACA PROVIDES NO LIMITING PRINCIPLE TO RESTRAIN HRSA OR THE COURTS, AS THE DISTRICT COURT'S LATEST ERRONEOUS DECISION SHOWS**

### A. This Court Should Follow the Supreme Court's Signal in *Little Sisters* by Addressing the Nondelegation Doctrine

As the Little Sisters explain in their opening brief, the district court has erroneously employed the APA to strike down religious and moral exemptions from the broad HRSA-imposed contraceptive mandate.  Br. at 37–46.  The district court thus maximized the burden HRSA imposed on liberty while preventing the same agency from lightening that burden by exempting sincere religious and moral objectors.  This decision restores the result the same district court ordered eight years ago—one the Supreme Court later reversed.  But the district court now bases that same outcome on different grounds.

This history in the district court casts a spotlight on the underlying constitutional defect in the ACA's "minimum essential coverage" provision: the lack of the constitutionally required limiting principle.

11

This nondelegation violation is not a new issue in this long-running litigation. Five years ago, in *Little Sisters*, the Supreme Court signaled that the contraceptive mandate might violate the nondelegation doctrine. *See* 591 U.S. at 676–77. After pointing out the "virtually unbridled discretion" the ACA granted HRSA, *id*. at 677, the Court noted that "no party has pressed a constitutional challenge to the breadth of the delegation involved here," *id*. at 679 (citing *cf. Gundy* v. *United States,* 588 U.S. 128 (2019)).

There are three reasons the Court should follow the Supreme Court's signal and address the issue. First, although the court below excluded such arguments since they were only raised by intervenors, such "unique" arguments are the very purpose of allowing intervenors. *See Cellco P'ship & N.Y. SMSA LP v. The County of Monmouth*, No. 23-18091, 2024 WL 989824, at *5 (D.N.J. Mar. 7, 2024) (intervenor allowed precisely so the court could review "unique" arguments); *Trent v. Dial Med. of Fla., Inc.*, No. 92-4493, 1992 WL 365625, at n.1 (E.D. Pa. Nov. 30, 1992) (noting importance of intervenors' claims). And this Circuit has reviewed arguments set out fully only in intervenors' briefs. *See*, *e.g.*, *Sw. Pa. Growth All. v. Browner*, 121 F.3d 106, 122 (3d Cir. 1997) (noting an

issue only mentioned by reference in a party brief can be fully fleshed out by an intervenor).

Second, as Little Sisters' brief explains, this Court must address the issue to determine redressability and standing.  Br. at 34.

Third, it is completely in an appellate court's discretion to "entertain arguments raised only by an intervenor on review if they have been 'fully litigated in the agency proceedings and [are] potentially determinative of the outcome of judicial review.'"  *Nat'l Ass'n of Regul. Util. Comm'rs v. I.C.C.*, 41 F.3d. 721, 729 (D.C. Cir. 1994) (citations omitted).  The intervenors here, Little Sisters, have been to the Supreme Court three times on these issues.  The Court should exercise its discretion to examine their arguments, and those made here in support, so as to provide the Supreme Court with its views should the intervenors make another trip to that Court to protect their religious freedom.

## B. The ACA's "Additional Preventive Care" Provision Violates the Nondelegation Doctrine

Congress's grant of unbridled discretion to HRSA to mandate coverage of "additional preventive care and screenings" runs afoul of the nondelegation doctrine.  The Supreme Court expressed this very concern

in *Little Sisters*. There it held that the ACA authorized HRSA to exempt or accommodate employers' religious or moral objections to providing contraceptive coverage, *id.* at 687, but it also signaled the ACA might violate the nondelegation doctrine. It stressed "that HRSA has *virtually unbridled discretion* to decide what counts as preventive care and screenings," 591 U.S. at 676 (emphasis added), explaining that Congress "enacted expansive language offering no indication whatever that the statute limits what HRSA can designate as preventive care and screenings or who must provide that coverage," *id.* at 677 (cleaned up). *See also id.* ("By its terms, the ACA leaves the Guidelines' content to the exclusive discretion of HRSA.")

Such an unlimited grant of authority violates the nondelegation doctrine by transferring legislative power to HRSA. The Constitution establishes that legislative power cannot be shared or transferred: "*All* legislative Powers herein granted shall be vested in a Congress of the United States … ." U.S. CONST. art. I, § 1 (emphasis added). Of the Constitution's three Vesting Clauses, only the clause that confers legislative power refers to "all" power of that type. *See* U.S. CONST. art. I, § 1 ("All legislative Powers … ."), art. II , § 1 ("The executive Power …

14

.”), art. III, § 1 (“The judicial Power … .”).  Additionally, the Vesting Clauses not only transfer the People's separate powers but say where each power “shall” and thus must be located.  The phrase “shall be vested” reinforces that “the Constitution's vesting of powers is not just an initial distribution[,]” it is a permanent placement.  *See* Philip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. 1083, 1174 (2023); *Gundy*, 588 U.S. at 135 (the assignment of legislative power to Congress “is a bar on its further delegation”).

Statutes such as the ACA must provide standards or rules of decision for an agency to implement.  *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935); *Opp Cotton Mills v. Adm'r of Wage and Hour Div.*, 312 U.S. 126, 144 (1941); *Yakus v. United States*, 321 U.S. 414, 423–24 (1944).

This Court has held repeatedly that Article I's grant of “[a]ll legislative Powers” to Congress means that Congress may not transfer to others “powers which are strictly and exclusively legislative.”  *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825).  Writing for the Court, Chief Justice John Marshall explained that while Congress may delegate

15

to another branch of government the task of "fill[ing] up the details" of legislation, Congress itself must perform the task of announcing overriding general policies. *Id.* at 31, 43.[5]

As Justice Gorsuch has explained:

> If Congress could pass off its legislative power to the executive branch, the "[v]esting [c]lauses, and indeed the entire structure of the Constitution," would "make no sense." Without the involvement of representatives from across the country or the demands of bicameralism and presentment, legislation would risk becoming nothing more than the will of the current President.

*Gundy v. United States*, 588 U.S. at 155 (Gorsuch, J., dissenting) (quoting Gary Lawson, *Delegation and the Original Meaning*, 88 Va. L. Rev. 327, 340 (2002)).

But where, as here, Congress has delegated to others authority to adopt binding laws without articulating any policies to guide the exercise of that authority—nor even establishing an intelligible principle

---

[5] John Locke—whose views on separation of powers were highly influential among the Founding Generation—wrote, "The legislative cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others." John Locke, *The Second Treatise of Civil Government and a Letter Concerning Toleration* § 141, at 71 (J.W. Gough ed. Oxford: Basil Blackwood 1948) (1690).

underlying its delegation—the Court has struck down the delegation as a violation of Article I, § 1 of the Constitution.  In *Panama Refining*, for example, the Court invalidated a provision of the National Industrial Recovery Act that authorized the President to criminalize the interstate transportation of petroleum produced in excess of state limits.  293 U.S. at 405–06.  The Court concluded that the provision's long list of policy objectives served as nothing more than a "broad outline" containing "nothing as to the circumstances or conditions in which transportation of petroleum … should be prohibited."  *Id.* at 417–18 ("The section also speaks in general terms of the conservation of natural resources, but it prescribes no policy for the achievement of that end.").  To uphold the delegation, bounded only by a "broad outline" of objectives, it explained, would be to "invest [the President] with an uncontrolled legislative power."  *Id.* at 432.

### C. By Vesting "All legislative Powers" in Congress, as Well as Through the First Amendment, the Constitution Protects Americans' Religious Liberty

The Constitution's bar on delegation of legislative power is especially important when a statute authorizes agency action that can infringe religious liberty.  The Court's Free Exercise Clause case law

17

(post *Smith*) is premised on the assumption that the people's elected representatives will respectfully consider the views of religious minorities when adopting generally applicable laws. That assumption is unwarranted when, as here, the legislature has delegated its lawmaking function to federal administrative agencies, because administrative agencies are less likely than Congress to accommodate religious objectors.

The Free Exercise Clause of the First Amendment states that "Congress shall make no law … prohibiting the free exercise [of religion]." U.S. CONST. amend. I. Its protections bar any law that "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). But *Employment Division v. Smith* held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U.S. at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)).

18

In support of its decision to "leave … to the political process" the decision whether to accommodate religious objectors by creating exemptions from laws of general applicability, *Smith* stated:

> Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process. Just as a society that believes in the negative protection accorded to the press by the First Amendment is likely to enact laws that affirmatively foster the dissemination of the printed word, so also a society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation as well.

*Id.* at 890.   But that justification is unpersuasive in the context of delegated lawmaking authority (including the authority to create religious exemptions) exercised by federal agencies.   For a variety of reasons, government administrators are far less likely than legislators to be "solicitous of [religious] value[s]."

In particular, a legislator (unlike an administrator) is directly answerable to voters and can be voted out of office if too many citizens come to believe that he is not responding to their concerns.   Legislators are thus inclined to take steps to avoid antagonizing religious voters, by creating religious exemptions from a generally applicable law if they conclude that the exemptions will not significantly undercut the law's

19

effectiveness. Administrators, whose actions are largely obscured from public view, do not have to stand for re-election and thus lack similar incentives. As one administrative law expert has noted, "most Americans have no hope of even identifying most administrative lawmakers, let alone meeting or speaking with them." Philip Hamburger, *Exclusion and Equality: How Exclusion from the Political Process Renders Religious Liberty Unequal*, 90 Notre Dame L. Rev. 1919, 1939 (2015).

The ability of administrators to engage in "expert," "rational" decision-making, free from the political pressures to which legislators are routinely subjected, is often touted by defenders of the administrative state as one of the principal reasons for delegating legislative power away from the people's elected representatives. Legislation creating an administrative agency generally identifies a narrow range of goals on which the agency is directed to focus; accommodating the interests of religious minorities who might be burdened by the agency's rules is virtually never identified as one of those goals. Personnel are selected based on their expertise in fields related to the agency's goals, not for their sensitivity to religious concerns. So (not surprisingly)

administrators only rarely consider the need for religious accommodations while pursuing their agency's mission.

The interests of religious Americans are protected not only by the Free Exercise Clause but also by Article I's vesting of "[a]ll legislative Powers" in Congress. Article I ensures that legislation constraining the rights of the people will not be adopted lightly and that religious Americans will have an opportunity to be heard by their elected representatives before any such constraints are enacted. By delegating its legislative powers to HRSA (especially when, as here, the delegation was unaccompanied by any "intelligible principle" to guide HHS in the exercise of those powers), Congress acted in derogation of the freedom of Americans to protect their religious interests in the halls of Congress.[6]

---

[6] Worse than the agencies discussed above, which generally do consider religious liberty interests, the district court has treated religious exercise as a disfavored interest. First, the court denied intervention by the Little Sisters until reversed by the Third Circuit. *See Pennsylvania v. President of the United States*, 888 F.3d 52, 62 (3d Cir. 2018). Then it provided the extraordinary relief of an injunction against the Final Rule, *Pennsylvania v. Trump*, 281 F. Supp. 3d at 585, until reversed by the Supreme Court, *Little Sisters*, 591 U.S. at 663. Finally, it has now, under the rubric of "arbitrary and capricious" review, struck the same exemptions by flouting the direct holding of a Supreme Court case that reversed its first ruling. 795 F. Supp. 3d at 615.

**CONCLUSION**

For all these reasons, the Court should conclude that 42 U.S.C. § 300gg-13(a)(4) (requiring coverage for "preventive care and screenings" for women) violates the nondelegation doctrine, hold that the states' claims are therefore not redressable, and dismiss the states' complaint.

Respectfully submitted,

/s/ *Andrew J. Morris*
Andrew J. Morris
        *Counsel of Record*
John J. Vecchione
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal

Dated: December 19,  2025

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, TYPE-STYLE REQUIREMENTS, IDENTITY OF DOCUMENTS, AND VIRUS TESTING**

1.   This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,272 words.

2.   This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook 14-point font, a proportionally spaced typeface.

3.   The text of the electronic brief is identical to the text in the paper copies.

4.   A virus detection program has been run on the electronic file containing this brief and no virus was detected.  The virus detection program used was Huntress Agent, version 0.14.96.


/s/ *Andrew J. Morris*
Andrew J. Morris
Attorney for the
New Civil Liberties
Alliance

Dated: December 19, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of filing to all counsel of record.

/s/ *Andrew J. Morris*
Andrew J. Morris

24