Nos. 25-2575, 25-2662

# United States Court of Appeals for the Third Circuit

Commonwealth of Pennsylvania and State of New Jersey,
*Plaintiffs-Appellees*,

v.

President United States of America; Secretary United States Department of Health and Human Services; United States Department of Health and Human Services; Secretary United States Department of Treasury; United States Department of Treasury; Secretary United States Department of Labor; United States Department of Labor; United States of America,
*Defendants-Appellants,*

and

Little Sisters of the Poor Saints Peter and Paul Home,
*Intervenor-Defendant-Appellant.*

On Appeal from the U.S. District Court for the
Eastern District of Pennsylvania
No. 2:17-cv-04540-WB (Hon. Wendy Bettlestone)

## BRIEF OF LINDSAY AND MATT MOROUN RELIGIOUS LIBERTY CLINIC AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS

John A. Meiser
Meredith H. Kessler
Lindsay & Matt Moroun
Religious Liberty Clinic
Notre Dame Law School
1338 Biolchini Hall of Law
Notre Dame, IN 46556
(574) 631-8722
mhollan4@nd.edu

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Lindsay and Matt Moroun Religious Liberty Clinic is not a corporate entity, does not issue stock, and operates within the Notre Dame Law School at the University of Notre Dame, a nonprofit educational institution organized exclusively for charitable, religious, and scientific purposes within the meaning of section 501(c)(3) of the Internal Revenue Code.

Dated: December 19, 2025                     */s/ Meredith H. Kessler*
                                            Meredith H. Kessler
                                            *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF *AMICUS CURIAE*........................................................................ 1

SUMMARY OF THE ARGUMENT ..................................................................... 2

ARGUMENT ......................................................................................................... 3

I.    The government adopted the challenged Rules specifically to avoid imposing a contraceptive mandate that violates RFRA ............................ 3

    A.    Before the promulgation of the Rules, the Supreme Court repeatedly held that the contraceptive mandate violated RFRA....................... 3

    B.    The agencies adopted the Rules as the only solution to retaining a contraceptive mandate while avoiding further RFRA violations.... 7

II.   It is appropriate for agencies to regulate cautiously so that they do not violate federal rights. ............................................................................ 11

    A.    The lower court's disregard for the agencies' cautious approach turns APA review on its head........................................................ 11

    B.    Agencies are expected—and should be encouraged—to take into account individual rights when regulating .................................... 17

CONCLUSION.................................................................................................... 21

COMBINED CERTIFICATES ............................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...................... 4, 5, 6, 20

*Continental Air Lines, Inc. v. Dep't of Transp.*,
  843 F.2d 1444 (D.C. Cir. 1988) ......................................................... 13

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................ 14, 15, 16, 21

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) .......................................................................... 19

*Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430 (1968) .......................... 18

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................ 20

*J&G Sales Ltd. v. Truscott*, 473 F.3d 1043 (9th Cir. 2007) .................................... 16

*Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*,
  476 F.3d 946 (D.C. Cir. 2007) ........................................................... 16

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020) ................................................................... *passim*

*Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Sebelius*,
  571 U.S. 1171 (2014) .......................................................................... 6

*Local 1976, United Bhd. of Carpenters & Joiners of Am., AFL v. NLRB*,
  357 U.S. 93 (1958) ........................................................................... 13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................. 12, 13, 16

*Pa. Funeral Directors Ass'n, Inc. v. FTC*, 41 F.3d 81 (3d Cir. 1994) ................... 12

*Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa. 2019) ............................. 10

*Pennsylvania v. Trump*, 930 F.3d 543 (3d Cir. 2019) ........................................... 10

*Rodriguez v. United States*, 480 U.S. 522 (1987) .................................................. 13

*Seven Cnty. Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025) ........ 12

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ........................................ 20

*Wheaton College v. Burwell*, 573 U.S. 958 (2014) ......................................... 4, 5, 6

*Wilkinson v. Att'y Gen. of the United States of America*,
131 F.4th 134 (3d Cir. 2025) ............................................................. 12

*Zubik v. Burwell*, 578 U.S. 403 (2016) ...................................................... 7

*Zzyym v. Pompeo*, 958 F.3d 1014 (10th Cir. 2020) ................................. 16

## Statutes & Regulations

5 U.S.C. § 706(2) ........................................................................................ 13

26 U.S.C. § 4980H ........................................................................................ 3

26 U.S.C. § 5000A ........................................................................................ 3

42 U.S.C. § 300gg-13 .................................................................................... 3

42 U.S.C. § 2000bb-1 .................................................................................... 3

Coverage of Certain Preventive Services Under the Affordable Care Act,
78 Fed. Reg. 39,870 (July 2, 2013) .......................................................... 5

Coverage of Certain Preventive Services Under the Affordable Care Act,
80 Fed. Reg. 41,318 (July 14, 2015) ...................................................... 6, 8

Moral Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act,
83 Fed. Reg. 57,592 (Nov. 15, 2018) ................................................... 8, 9

Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act,
83 Fed. Reg. 57,536 (Nov. 15, 2018) .............................................. 8, 9, 10

## Other Authorities

1 Annals of Congress 500 (1789) (James Madison)................................. 17

Alix McKenna, FCC Repeals the Fairness Doctrine and Other Regulations, *The
Regulatory Rev.* (Sept. 26, 2011) ........................................................... 19

Letter from Thomas Jefferson to Spencer Roane (Sept. 6, 1819),
https://bit.ly/4oYyJwo............................................................................ 17

Ruth Marcus, *Reins on Religious Freedom?*, Washington Post (Mar. 8, 1991) .... 18

U.S. Dep't of Labor, *FAQs About Affordable Care Act Implementation Part 36*
(Jan. 9, 2017), https://bit.ly/4qkjFu5 ....................................................... 8

E.O. 12630, Governmental Actions and Interference with Constitutionally
Protected Property Rights, 53 Fed. Reg. 8859 (Mar. 15, 1988)......................... 18

E.O. 13279, Equal Protection of the Laws for Faith-Based and Community
  Organizations, 67 Fed. Reg. 77,141 (Dec. 12, 2002) ........................................ 18

E.O. 13579, Regulation and Independent Regulatory Agencies,
  76 Fed. Reg. 41,587 (July 11, 2011) ............................................................. 18, 19

E.O. 13892, Promoting the Rule of Law Through Transparency and Fairness in
  Civil Administrative Enforcement and Adjudication,
  84 Fed. Reg. 55,239 (Oct. 9, 2019) ........................................................ 18, 19, 21

E.O. 14206, Protecting Second Amendment Rights,
  90 Fed. Reg. 9503 (Feb. 7, 2025) ...................................................................... 19

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* is the Lindsay and Matt Moroun Religious Liberty Clinic within Notre Dame Law School.[2]  As an academic institution and teaching law practice, the Clinic promotes and defends the freedom of religion for all people.  It advocates for the right of all people to exercise, express, and live according to their beliefs.  It defends individuals and organizations of all faiths against interference with these fundamental liberties and has represented an array of groups in cases to defend the right to religious exercise.

Among other things, the Clinic works to ensure that courts uphold meaningful protections to safeguard the rights of religious believers under both the First Amendment and laws like the Religious Freedom Restoration Act.  It submits this brief in particular to address the district court's alarming view that federal agencies must prioritize general regulatory interests over and above the demands of federal law and its safeguards for fundamental rights like the freedom of religious exercise.  That notion is inconsistent with both basic principles of APA review and foundational concepts of the rule of law in our federal system.

---

[1] Counsel for all parties consented to the filing of this brief.  No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.  *See* Fed. R. App. P. 29(a)(4)(E).

[2] The views expressed here do not necessarily represent those of the University of Notre Dame or Notre Dame Law School.

## SUMMARY OF THE ARGUMENT

The agencies'[3] promulgation of the Religious and Moral Rules challenged in this case was neither arbitrary nor capricious.  Widespread litigation against the agencies' contraceptive mandate under the Religious Freedom Restoration Act—and multiple trips to the Supreme Court—made clear that the mandate violates the federally protected rights of organizations like the Little Sisters of the Poor.  After years of failed efforts to alleviate that problem, the agencies adopted these Rules to give wider protections to religious exercise and finally put an end to these ongoing violations of federal law.  The agencies explained at length why no other alternative offered a solution to the problem.

Federal law plainly allows the agencies to take this cautious approach to regulation in the shadow of federally protected rights.  Indeed, this is exactly what the law expects—and the Supreme Court called—the agencies to do when attempting to regulate in an area fraught with the risk of infringing such rights.  The lower court's demand that the agencies instead regulate more aggressively to enforce a contraceptive mandate even at the cost of violating RFRA is plainly wrong. The decision below turns the deferential posture of arbitrary and capricious review on its head and subverts basic principles about the rule of law—and the priority of federal rights—in our constitutional system.  It must be reversed so that federal agencies enjoy the latitude to ensure that the exercise of their regulatory powers aligns with the demands of federal laws like RFRA.

---

[3] These Rules were published by HHS, the Department of Labor, and the Treasury Department—which, for simplicity, are referred to collectively as "the agencies" throughout this brief.

# ARGUMENT

## I.    The government adopted the challenged Rules specifically to avoid imposing a contraceptive mandate that violates RFRA.

For years, the agencies faced wide-ranging litigation under RFRA[4] over their failure to sufficiently protect religious exercise when requiring certain employers to provide insurance coverage for contraceptives.    Their early attempts to accommodate religious objectors proved inadequate, prompting further litigation demanding religious exemptions.    Throughout these challenges, the Supreme Court repeatedly instructed the agencies to take into account the requirements of RFRA when enforcing the contraceptive mandate.

The agencies have finally heeded that instruction by promulgating the challenged Rules—the only exemption regime that has proven capable of satisfying RFRA's stringent demands.

### A.    Before the promulgation of the Rules, the Supreme Court repeatedly held that the contraceptive mandate violated RFRA.

The Rules trace back to the Patient Protection and Affordable Care Act of 2010, which requires certain employers to provide "minimum essential [insurance] coverage," including "preventive care and screenings" for women.    26 U.S.C. §§ 5000A(f), 4980H(a), (c)(2); 42 U.S.C. § 300gg-13(a)(4).    Congress did not define what "preventive care" must include, instead authorizing the Health Resources and Services Administration "to make that important and sensitive decision."    *Burwell*

---

[4] RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion," unless it can justify that burden under strict scrutiny. 42 U.S.C. § 2000bb-1(a).

*v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014). This litigation grows out of the HRSA's determination that such care should include contraception—and the agencies' many ensuing efforts to find a way to enforce that demand consistent with federal law that protects the rights of employers with religious objections to it.

**1.** Under the Obama administration, HRSA promulgated guidelines that generally required employers to provide coverage for all "contraceptive methods [and] sterilization procedures" approved by the Food and Drug Administration. *Id.* (citation omitted). That requirement raises obvious concerns for some religious organizations. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 681 (2020). Indeed, HRSA seemingly recognized as much from the start: It exempted certain narrowly defined "religious employers"— essentially churches and other houses of worship—from the so-called contraceptive mandate. *Hobby Lobby*, 573 U.S. at 698. And, soon after, HHS "accommodat[ed]" some religious nonprofit organizations by allowing them to certify to their insurance issuer that they are a "religious organization" that opposes providing such coverage "on account of religious objections." *Id.* (quotation omitted). Under that system, once the issuer receives notice of an employer's religious objection, it must "exclude contraceptive coverage from the employer's plan and provide separate payments for contraceptive services for plan participants." *Id.* at 698–99.

These early protections fell woefully short of safeguarding federal free exercise rights guaranteed under RFRA. Indeed, the Supreme Court soon made clear that the agencies' initial regulatory scheme violated federal law in at least two ways.

*First*, the accommodation process applied too narrowly, failing to alleviate the burdens imposed on some religious organizations. Namely, although the agencies had implemented a system that might accommodate some religious *nonprofit* corporations, they did not offer the same to the owners of *for-profit* corporations with similar religious objections. *Hobby Lobby*, 573 U.S at 692. Litigation ensued. In *Hobby Lobby*, the Supreme Court held that the mandate indeed violated RFRA as applied to the owners of several closely held, for-profit corporations with religious objections to providing contraceptive coverage. *Id.* at 700–04. The Court explained that the religious burden on such employers was obviously substantial, and the government's interest in providing "cost-free access" to contraception could not justify the imposition of that burden. *Id.* at 692. For example, the government could provide that same access in other, less burdensome ways—including the same accommodation system already in place for objecting nonprofit religious organizations. *Id.* at 692. Thus, the Court reasoned, RFRA required the agencies to modify the contraceptive mandate's broad scope to avoid burdening religious exercise in this way. *Id.* at 730.

*Second*, the agencies' original accommodation process itself—even when available—did not alleviate all substantial burdens on religious exercise. That scheme supposedly accommodated objecting employers by "not requir[ing] [them] to contract, arrange, pay, or refer for contraceptive coverage." Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,874 (July 2, 2013). But, to qualify for the exception, the objecting organization needed to certify its objection to the relevant insurance issuer. *Id.* at 39,876. That

certification then triggered several obligations for the insurer—including to pay for contraceptives for beneficiaries otherwise covered under the objecting organization's group insurance plan. *Id.* Again, many filed suit. Intervenor Br. 9–10. And, again, the Supreme Court reasoned that enforcing the regulatory scheme would violate some organizations' rights under RFRA. *Wheaton College v. Burwell*, 573 U.S. 958 (2014) (order granting writ of injunction). Specifically, Wheaton College argued that filing the self-certification form violated its religious beliefs because it made Wheaton "complicit in the provision of contraceptives by triggering the obligation for someone else to provide the services to which it objects." *Id.* at 960 (Sotomayor, J., dissenting). The Supreme Court granted Wheaton relief pending the adjudication of its appeal and enjoined the government from enforcing the contraceptive mandate against it or requiring it to complete the self-certification process in the meantime. *Id.* at 958 (maj.); *see also Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Sebelius*, 571 U.S. 1171 (2014).

**2.** In response to the Supreme Court's decisions, the agencies tweaked the regulatory scheme in an effort to avoid further RFRA violations. In response to *Hobby Lobby*, the Obama administration extended the religious accommodation to certain closely held, for-profit corporations. Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,324 (July 14, 2015). And in response to *Wheaton College*, it created an alternative process through which objecting organizations could notify the government—rather than the insurer—of their religious objections. *Id.* at 41,337.

But those adjustments still did not remedy the contraceptive mandate's conflicts with RFRA. So, again, litigation ensued—and, again, the agencies found themselves defending against RFRA challenges before the United States Supreme Court. There, religious employers challenged the newly altered self-certification process, alleging that the required notice—whether sent to the government or an insurer—violated their beliefs by making them complicit in a process that ultimately results in the provision of contraceptive services. *Zubik v. Burwell*, 578 U.S. 403, 406–07 (2016) (per curiam). After oral argument, the Supreme Court ordered supplemental briefing to address whether it would be feasible for the government to provide contraception without imposing that religious burden. Namely, the Court asked whether the objecting employers' insurance companies could provide contraceptive coverage *without* requiring the self-certification process first. *Id.* at 407. Before the Court, the government confirmed that such an option was possible, and the employers confirmed that such an option would not violate their beliefs. *Id.* at 407–08. Based on these representations, the Supreme Court vacated several circuit decisions, enjoined the government from penalizing the religious employers, and remanded the cases with instructions to give the parties "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring" contraceptive coverage. *Id.* at 407–10.

**B.    The agencies adopted the Rules as the only solution to retaining a contraceptive mandate while avoiding further RFRA violations.**

Striking that balance was apparently no easy task. Despite its representations to the Court in *Zubik*, the Obama administration later concluded that there was in

7

fact "no feasible approach" to the contraceptive mandate that would not violate RFRA. U.S. Dep't of Labor, *FAQs About Affordable Care Act Implementation Part 36*, at 4 (Jan. 9, 2017), https://bit.ly/4qkjFu5.  The agencies had requested comments from the public to determine "whether modifications to the existing accommodation procedure could resolve the [religious] objections." *Id.*  They received over 50,000 public comments. *Id.*  But apparently none was helpful, and the agencies declined to make a single change to the accommodation process after *Zubik*—even though leaving it in place would leave unresolved known religious objections.  In short, a year after the Court ordered the agencies to find a solution, the agencies effectively threw in the towel, determining that promoting maximum access to contraceptive coverage prevailed over the need to operate in a way that would be consistent with the demands of RFRA.  *See id.* at 9 (concluding that other proposed approaches to eliminate RFRA violations "would potentially undermine women's access to full and equal coverage"); *see also* 80 Fed. Reg. at 41,337.  Sure enough, the litigation against that mandate continued.

In the face of this continued litigation, the next administration took a different tack.  Specifically, the agencies reconsidered whether there were methods to enforce a contraceptive mandate in a way that would avoid further violations of RFRA.  Eventually, the agencies promulgated the Rules at issue here.  *See* Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,592 (Nov. 15, 2018); Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536 (Nov. 15, 2018).  Aware that they needed

to "tread carefully" in this area that implicated widespread religious objections, 83 Fed. Reg. at 57,602, the agency's Rules reflect a more cautious approach to imposing the contraceptive mandate against religious objectors in several ways. First, the Rules anticipated objections by organizations not represented in the Supreme Court's earlier cases and exempted additional objecting employers—including for-profit corporations and those with moral objections to providing contraceptive coverage. *See* 83 Fed. Reg. at 57,592. Second, to alleviate the complicity burdens reflected in *Wheaton College* and *Zubik*, the agencies eliminated the self-certification requirement. *See* 83 Fed. Reg. at 57,536.

Critically, this modified scheme is the *only* iteration of the contraceptive mandate that would alleviate the RFRA violations identified by the Supreme Court's cases and reflected in continued litigation around the country. Indeed, the agencies explained, the Rules were the only solution that encompassed all known objectors to the mandate and thus would both resolve pending litigation and prevent more in the future. *Id.* at 57,545. For example, the expanded protections for religious organizations are consistent with—and perhaps demanded by—RFRA's broad sweep. 83 Fed. Reg. at 57,544. And, as the agencies explained, eliminating the self-certification process was necessary to eliminate the burdens on organizations, like those in *Zubik*, with religious objections to taking any action that would make them complicit in the provision of contraception. *Id.* The agencies also considered, and rejected, other mechanisms. *See generally* Federal Appellants Br. 54–57; Intervenor Br. 53–54. And public comments again failed "to identify an [alternative] accommodation process that would eliminate the religious objections of all

plaintiffs"—as the prior administration had also recognized. 83 Fed. Reg. at 57,544 ("[W]e stated in January 2017 that we were unable to develop such an approach at that time."). In brief, the agencies explained in detail their decision to proceed cautiously with these Rules to avoid violating RFRA, even if they might arguably reduce the provision of contraceptive coverage.

Still, this litigation and others ensued. Intervenor Br. 14. In this case, the lower court granted the States' request for a preliminary nationwide injunction against the Rules, and this Court affirmed. 351 F. Supp. 3d 791, 835 (E.D. Pa. 2019); 930 F.3d 543, 576 (3d Cir. 2019). But the Supreme Court reversed. 591 U.S. 657. The Court confirmed that the Rules were both substantively and procedurally valid. *Id.* at 687. And the Court the confirmed that the ACA gave "sweeping authority to HRSA to craft a set of standards defining the preventive care that applicable health plans must cover," including the authority "to identify and create exemptions from [the agency's] own Guidelines." *Id.* at 676.[5] The Court also confirmed that the agencies can—indeed *should*—look to RFRA when crafting those exemptions. *Id.* at 680–82. In fact, the Court explained, refusing to look to RFRA would raise concerns that the Rules "were arbitrary and capricious for failing to consider an important aspect of the problem." *Id.* at 682. Prior cases had already held that the contraceptive mandate violated RFRA in some circumstances and "made it

---

[5] The authority to craft exemptions makes all the more sense given that the decision to provide contraceptive coverage is one of agency policy in the first place. Indeed, Congress "declined to expressly require contraceptive coverage in the ACA itself." *Little Sisters*, 591 U.S. at 679; *see also* 83 Fed. Reg. at 57,542.

abundantly clear that" RFRA required the agencies to accommodate "the sincerely held complicity-based objections of religious entities." *Id.* at 681.

In short, the Supreme Court has already confirmed that the agencies had the authority to craft exemptions from their contraceptive mandate; that the agencies properly looked "to RFRA as a guide" to frame those exemptions; and that the Rules were duly promulgated. *Little Sisters*, 591 U.S. at 683. Despite all this, Appellees press their argument that the agencies somehow acted improperly when promulgating the Rules—apparently preferring that the agencies instead violate federal law by substantially burdening religious exercise. That cannot be right.

## II. It is appropriate for agencies to regulate cautiously so that they do not violate federal rights.

It should go without saying that federal agencies have the leeway—in fact, the *duty*—to ensure that their actions do not violate federal law. But the lower court's decision would effectively force the agencies here to violate RFRA by demanding that they eliminate the only exemption that has ever been suggested as capable of respecting the religious rights of groups like the Little Sisters. That demand finds no home in APA review, and the underlying suggestion that federal agencies must regulate maximally, notwithstanding any intrusions upon individual rights, is incompatible with basic understandings of the rule of law in our federal system.

### A. The lower court's disregard for the agencies' cautious approach turns APA review on its head.

Judicial review of agency rulemaking under the APA is limited. The APA's arbitrary and capricious standard "is narrow"; under that standard, courts will not set

11

aside an agency rule that is "rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983). The question is not whether a court agrees with the agency's choices but, instead, whether the agency has gone beyond the law or acted in a "clear error of judgment." *Id.* at 43 (quotation omitted).

An important consequence of this circumscribed review is that courts do not endeavor to set agency enforcement priorities themselves. Indeed, the APA does not invite a court to "substitute its [own] judgment" on appropriate enforcement policy for that of the agency. *Id.* As the Supreme Court recently explained, "[c]ourts should afford substantial deference and should not micromanage . . . agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 183 (2025). Agencies are given "broad latitude to draw a manageable line" in making "fact-dependent, context-specific, and policy-laden choices." *Id.* at 182–83 (quotation omitted).

Nor may courts insist that agencies pursue a perceived statutory goal at all costs. Agencies must necessarily take into account a variety of competing considerations when choosing how to regulate—and courts are "very deferential" to how the agency chooses to balance them. *Pa. Funeral Directors Ass'n, Inc. v. FTC*, 41 F.3d 81, 85 (3d Cir. 1994). That deferential approach, this Court recently explained, is appropriate specifically because it applies where the "decisionmaker has a wide range of choice as to what he decides." *Wilkinson v. Att'y Gen. of the United States of America*, 131 F.4th 134, 141 (3d Cir. 2025). "If carried out

correctly," arbitrary-and-capricious review "does not put the court into the (agency's) driver's seat," but instead leaves it to the agency "to decide the exact trade-off among conflicting goals." *Continental Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451 (D.C. Cir. 1988). Indeed, those kinds of questions—selecting "what competing values will or will not be sacrificed to the achievement of a particular objective"—are at the heart of the policymaking that is left to the political branches. *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). Courts may not "simplistically . . . assume that *whatever* furthers the statute's primary objective must be the law." *Id.*

One consideration agencies may—and often must—take into account when setting regulatory policy is compliance with other federal laws. This is explicit within the APA itself, which authorizes courts to set aside agency action that is "not in accordance with law" or is "contrary to constitutional right." 5 U.S.C. § 706(2)(A)–(B). Indeed, an agency may not "apply the principles of [one] statute so single-mindedly as to ignore other equally important congressional objections." *Local 1976, United Bhd. of Carpenters & Joiners of Am., AFL v. NLRB*, 357 U.S. 93, 111 (1958). Agencies would therefore expose themselves to legal challenge if they *failed* to account for known constraints imposed by other federal laws. The need to address such constraints is especially obvious here. An agency rule will often be found arbitrary and capricious if it "failed to consider an important aspect of the [regulatory] problem." *State Farm*, 463 U.S. at 43. As the Supreme Court pointed out, years of litigation over the contraceptive mandate confirmed that its interaction with RFRA was an "important aspect" of the problem facing the

13

agencies. *Little Sisters*, 591 U.S. at 682. Accordingly, the Court opined, any failure to "look to RFRA's requirements" when formulating the contraceptive mandate would, itself, have left the agencies susceptible to the very sort of arbitrary and capricious challenge they face now. *Id.* Indeed, the Court "all but instructed the Departments to consider RFRA going forward." *Id.* at 681.

The Supreme Court's decision in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), explains what happens when an agency arguably fails to address rights like these. That case considered a challenge to the FCC's rules enforcing a statutory ban against profane language on commercial television and radio. *See id.* at 506. Over many decades, the FCC calibrated its policies to enforce that ban in a way that would also be consistent with the First Amendment rights of broadcasters. After the Supreme Court upheld an earlier version of the FCC's rules, the Commission embarked on a "cautious, but gradually expanding, approach," through which it regulated greater amounts of speech in an effort to enforce the ban to the maximum extent constitutionally permitted. *Id.* at 507. Eventually, the Commission's expanded approach was challenged, including on the theory that it had not adequately addressed the constraints of the First Amendment. *See id.* at 526 (plurality op.). The Supreme Court ultimately disagreed, holding that the agency had sufficiently explained why it believed the policy "is consistent with the First Amendment." *Id.* But—critically—the Court confirmed a basic premise of the challenge: "unlawful" agency action under the APA "of course includes unconstitutional action." *Id.* at 516 (majority op.). Stated differently, if the FCC *had* shifted to a policy that infringed First Amendment rights, it would have been set

aside by the Court. *See id.*; *see also id.* at 526 (plurality op.) (agency action may be reversed "for violating our cases").

The four dissenters in *Fox Television* would have imposed an even greater duty on agencies to steer clear of violating federal rights. Namely, they contended that the FCC had failed to justify its departure from its earlier, more cautious regulatory approach, which had been designed to "avoid treading too *close* to the constitutional line." *Id.* at 555–56 (Breyer, J., dissenting) (emphasis added). Because the FCC knew that it was regulating "in the shadow of the First Amendment," the dissenters argued that the agency needed to be especially careful to give wide berth to those rights. *Id.* In other words, those justices contended that agency action may be set aside not only when it *actually violates* federal rights, but even if it unjustifiably *risks* doing so. *See also id.* at 566 (arguing that, in a close constitutional case, courts should remand to "ask the agency to reconsider its policy in light of the [constitutional] concerns raised in a judicial opinion").

Here, the lower court turned this review on its head. Indeed, it effectively faulted the agencies for doing exactly what all nine members of the Supreme Court in *Fox Television* suggested an agency often *must* do. A series of decisions made clear that the agencies here were regulating in the "shadow" of RFRA. *Little Sisters*, 591 U.S. at 710 (Kagan, J., concurring). Accordingly, the agencies have chosen a less aggressive regulatory stance, to be sure they don't infringe those rights. In *Fox Television*, the Supreme Court recognized that an agency can, at least in some circumstances, be faulted for *failing* to take that kind of cautious approach. The lower court's decision faulting the agency for doing so gets things backwards.

Finally, it is not a problem that the Rules might sweep somewhat broader than what RFRA would strictly demand. An agency need only make a "rational connection" between the problem identified and the means chosen to address it. *State Farm*, 463 U.S. at 43. The district court's transformation of that deferential standard into a requirement for a perfect match, JA.37, 43, defies both the law and commonsense. No prophylactic rule will ever match perfectly, and the APA does not presume that agencies can (let alone must) regulate with such precision. *See, e.g.*, *Zzyym v. Pompeo*, 958 F.3d 1014, 1027 (10th Cir. 2020) ("[T]he agency need not select a perfect solution—just a rational one."); *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The] test is only reasonableness, not perfection."); *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007) (O'Connor, J.) ("The agency need not craft the perfect threshold in order to survive review . . . ."). Indeed, not a single justice in *Fox Television* suggested that the FCC's previously more cautious approach to regulating profanity was somehow invalid because it gave broadcasters more freedom than the First Amendment might require. Likewise, the Supreme Court held that it is appropriate for the agencies here to "*consider* RFRA" and look to it "as a *guide*"—not that the agencies were permitted only to craft exemptions that mirror RFRA exactly. *Little Sisters*, 591 U.S. at 680, 683 (emphases added); *see also id.* at 702 (Alito, J., concurring) (agencies have "discretion" to craft "the best solution" to avoid RFRA violations). And no one appears to have ever suggested any rule that could protect these rights without being at least somewhat overinclusive. The agencies were perfectly rational to steer clear of violating those rights.

**B.    Agencies are expected—and should be encouraged—to take into account individual rights when regulating.**

The lower court's decision also suggests a troubling view of the role of executive agencies within our system of government.  Executive officials are not expected to be simply functionaries who mindlessly pursue regulatory goals in a vacuum and at all costs.  They—like all constitutional actors—swear an oath to uphold the Constitution and federal law.  And executive agencies—like all political branches—may therefore take care to ensure that they conduct their affairs in accordance with the restraints imposed by those laws.  In fact, the rule of law demands that they do so.

The decision below suggests that federal agencies enjoy little room to craft rules that will ensure, *ex ante*, that their actions will not infringe federal rights.  The court repeatedly faulted the agencies for issuing a rule to protect religious exercise that will not neatly follow the precise lines that might instead be set through repeated litigation of individual RFRA lawsuits.  *See generally* JA.37–43.  The overall implication is that the complicated business of defining or protecting individual rights should be left to courts.

The prerogative to safeguard federal rights is not unique to courts.  A basic premise of our constitutional system is that all branches of the government have the right and the obligation to align their actions with their "dut[ies] under the constitution" and federal law.  Letter from Thomas Jefferson to Spencer Roane (Sept. 6, 1819), https://bit.ly/4oYyJwo; *see also, e.g.*, 1 Annals of Congress 500 (1789) (James Madison) ("[I]t is incontrovertibly of as much importance to this

branch of the Government as to any other, that the constitution should be preserved entire.  It is our duty.").  And court decisions do not, alone, give effect to individual rights.  Each branch of government plays a pivotal role in protecting those rights, and it is often incumbent on the political branches specifically to safeguard them. *See, e.g.*, *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 433 n.2 (1968) ("Congress, concerned with the lack of progress in school desegregation [following *Brown v. Board of Education*], included provisions in the Civil Rights Act of 1964 to deal with the problem through various agencies of the Federal Government."). Indeed, the failure of some executive agencies to sufficiently accommodate religious objections is one of the very things that led to the passage of RFRA in the first place. *See* Ruth Marcus, *Reins on Religious Freedom?*, Washington Post (Mar. 8, 1991) (reporting that the rescission of an OSHA rule that provided religious exemptions from hard-hat regulations was one of the concerns expressed by RFRA's sponsors).

For these very reasons, agencies—across presidential administrations—are routinely called to account for federal rights when setting their regulatory agendas.[6]

---

[6] *See, e.g.*, E.O. 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights, 53 Fed. Reg. 8859 (Mar. 15, 1988) (ordering federal agencies to "review their actions carefully to prevent unnecessary takings" implicated by the Fifth Amendment's Takings Clause); E.O. 13279, Equal Protection of the Laws for Faith-Based and Community Organizations, 67 Fed. Reg. 77,141 (Dec. 12, 2002) (ordering agencies to develop policies to ensure their programs are conducted in a way to "ensure equal protection of the laws for faith-based and community organizations); E.O. 13579, Regulation and Independent Regulatory Agencies, 76 Fed. Reg. 41,587 (July 11, 2011) (ordering agencies to review and revise rules that are "excessively burdensome"); E.O. 13892, Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication, 84 Fed. Reg. 55,239 (Oct. 9, 2019) (ordering agencies to "afford regulated parties the safeguards described in this order, above

This includes setting policies under which agencies afford regulated parties protections for liberty "above and beyond those courts have interpreted" the minimum demands of federal law to require.  E.O. 13892, Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication, 84 Fed. Reg. 55,239 (Oct. 9, 2019) (requiring additional due process protections in agency actions).  And it means that agencies must sometimes step back from prior policies that they have found to infringe protected rights.  *See, e.g.*, Alix McKenna, FCC Repeals the Fairness Doctrine and Other Regulations, *The Regulatory Rev.* (Sept. 26, 2011) (reporting repeal, under E.O. 13579, of FCC's "fairness doctrine," which had been criticized in prior administrations as raising First Amendment concerns).

The district court's concern over the agencies' failure to regulate *more* private conduct by imposing a broader contraceptive mandate is also unwarranted.  The fact that these agencies have exercised their regulatory authority cautiously—taking care not to trample federal rights—is to be embraced, not feared.  Agencies "wield[] vast power and touch[] almost every aspect of daily life." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010).  The very point of the APA is to provide "a check upon administrators whose zeal might otherwise have carried them to excesses" in exercising those regulatory powers.  *Loper Bright Enters. v.*

---

and beyond those that the courts have interpreted the Due Process Clause of the Fifth Amendment to the Constitution to impose"); E.O. 14206, Protecting Second Amendment Rights, 90 Fed. Reg. 9503 (Feb. 7, 2025) (ordering Attorney General to evaluate federal regulations that "may have impinged on the Second Amendment rights of law-abiding citizens").

*Raimondo*, 603 U.S. 369, 391 (2024) (quotation omitted). The central focus of judicial review in this area is to police against regulatory *overreach* through "arbitrary official encroachment on private rights." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950). The choice *not* to regulate—or to regulate less— does not present that same concern. Indeed, when an agency declines to regulate "it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (emphasis omitted). And this is certainly not the rare case where an agency has been accused of adopting a policy of under-regulation "so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n.4.[7]

Nor is the district court right to fault the agencies for reading the reasoning of Supreme Court cases like *Hobby Lobby* and *Zubik* to suggest the need to protect religious exercise in circumstances that extend beyond the precise facts of those cases. *See* JA.37–43. The district court's suggestion that agencies must risk infringing federal rights until a court explicitly tells them not to do so gets things exactly backwards. If anything, uncertainty around the scope of a right would suggest that agencies take the opposite approach and err on the side of caution (and compliance with federal law). To be sure, an agency is not always *required* to take

---

[7] The cautious approach to regulatory power reflected here is distinct from other areas that might present a legitimate concern: where agencies regulate private parties *in excess* of their delegated authority in an overzealous effort to protect individual rights. Even benign ends like seeking to protect fundamental freedoms may not justify an attempt to wield power beyond that which an agency has been given.

a broad view of individual rights or to refrain from regulating in an area of legal uncertainty—but it certainly is *permitted* to take that careful approach. *Cf. Fox Television*, 556 U.S. at 526–27 (plurality op.) (considering whether agency acted arbitrarily by interpreting constraints of the First Amendment too narrowly); *id.* at 553–54 (Breyer, J., dissenting) (same); *see also* E.O. 13892, Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication (Oct. 9, 2019) (requiring agency due-process safeguards "above and beyond those that the courts have" defined). The district court's suggestion otherwise is plainly wrong.

## CONCLUSION

After extensive litigation and repeated exhortations from the Supreme Court to take account of RFRA, the agencies created the first Rules that sufficiently protect religious objections to the contraceptive mandate. To this day, no other alternative has been offered to enforce such a mandate in a way that will not violate these federal rights. If widely adopted, the lower court's misapplication of arbitrary and capricious review would result in a constitutional system that not only tolerates violations of federal law but indeed requires them.

*Amicus curiae* urges the court to reverse the decision below.[8]

---

[8] *Amicus curiae* thanks students Cameron Grinnell, Cathy Kolesar, and Jennifer Merkley for their assistance in preparing this brief.

Dated: December 19, 2025          Respectfully submitted,
_/s/ Meredith H. Kessler_

John A. Meiser
Meredith H. Kessler
LINDSAY AND MATT MOROUN
RELIGIOUS LIBERTY CLINIC
1338 Biolchini Hall of Law
Notre Dame, IN 46556
(574) 631-8722
mhollan4@nd.edu

*Counsel for* Amicus Curiae

# COMBINED CERTIFICATIONS

1.  I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.  This amicus brief complies with the type-volume limitations imposed by Federal Rule of Appellate Procedure 29(a)(5) as it contains 5,779 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

3.  This brief complies with the typeface and typestyle requirements of Federal Rule 32(a)(5) and 32(a)(6) because it was prepared in 14-point Times New Roman, a proportionally spaced font.

4.  This brief complies with the electronic filing requirements of Local Rule 31.1(c). The text of this electronic brief is identical to the text of the paper copies, and ThreatDown Virus Protection Software has been run on the file containing the electronic version of this brief and no virus has been detected.

5.  On December 19, 2025, this amicus brief was electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

*/s/ Meredith H. Kessler*
Meredith H. Kessler
*Counsel for* Amicus Curiae
