No. 25-2575

# United States Court of Appeals for the Third Circuit

COMMONWEALTH OF PENNSYLVANIA AND STATE OF NEW JERSEY,

*Plaintiffs-Appellees,*

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA,

*Defendants-Appellants,*

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

*Intervenor-Defendant-Appellant.*

On Appeal from the U.S. District Court for the
Eastern District of Pennsylvania, No. 2:17-cv-04540-WB
(Hon. Chief Judge Wendy Beetlestone, U.S.D.J.)

## BRIEF OF *AMICUS CURIAE*
## ETHICS AND PUBLIC POLICY CENTER
## IN SUPPORT OF INTERVENOR-APPELLANT

ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

December 19, 2025

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1.1, *Amicus Curiae* Ethics and Public Policy Center is a 501(c)(3) non-profit corporation. EPPC has no parent companies, subsidiaries, or affiliates and does not issue shares to the public.

Dated: December 19, 2025

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES....................................................iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ...........................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................1

ARGUMENT ......................................................................5

    I.  The district court's claim that the "the Accommodation did not substantially burden religious exercise" is rooted not in law but in unsupported claims made by *Geneva College* and other federal circuits. ....................................................5

    II.  The accommodation relies on ERISA; under ERISA, the accommodation can only work by hijacking religious employers' plans and forcing them to trigger their TPA's duty to provide contraceptives. ....................................15

    III. Correcting *Geneva College's* substantial burden analysis in light of ERISA resolves the case at hand....................................26

CONCLUSION ........................................................................29

CERTIFICATE OF COMPLIANCE....................................................30

CERTIFICATE OF FILING AND SERVICE .........................................31

# TABLE OF AUTHORITIES

## Cases

*Bruesewitz v. Wyeth LLC,*
562 U.S. 223 (2011) .................................................................... 25

*Cath. Health Care Sys. v. Burwell,*
796 F.3d 207 (2d Cir. 2015) ...................................................... 13

*Cigna Corp. v. Amara,*
563 U.S. 421 (2011) ............................................................ 27, 28

*Curtiss-Wright Corp. v. Schoonejongen,*
514 U.S. 73 (1995) .................................................................... 28

*East Texas Baptist Univ. v. Burwell,*
793 F.3d 449 (5th Cir. 2015) .................................................... 15

*Geneva Coll. v. Sec'y, U.S. Dep't of Health & Human Servs.,*
778 F.3d 422 (3d Cir. 2015) .............................................. passim

*Kungys v. United States,*
485 U.S. 759 (1988) .................................................................. 26

*La. Pub. Servs. Comm'n v. FCC,*
476 U.S. 355 (1986) ................................................ 1, 17, 31, 32

*Mich. Cath. Conf. v. Burwell,*
755 F.3d 372 (6th Cir. 2014) ............................................ 12, 14

*Mich. Cath. Conf. v. Burwell,*
807 F.3d 738 (6th Cir. 2015) .................................................... 13

*Overby v. Nat'l Ass'n of Letter Carriers,*
595 F.3d 1290 (D.C. Cir. 2010) ................................................ 28

*Pennsylvania v. President of the United States,*
930 F.3d 543 (3d Cir. 2019). ...................................................... 8

*Priests For Life v. U.S. Dep't of Health & Human Servs.*,
772 F.3d 229 (D.C. Cir. 2014) .................................................. 26

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
808 F.3d 1 (D.C. Cir. 2015) ........................................................ 1

*Real Alternatives* v. *Sec'y of Dep't Health & Human Servs.*,
867 F.3d 338 (3d Cir. 2017) ............................................... 7, 22

*Roman Cath. Archdiocese of New York v. Sebelius*,
987 F. Supp. 2d 232 (E.D.N.Y. 2013). ................................... 18

*Univ. of Notre Dame* v. *Sebelius*,
743 F.3d 547 (7th Cir. 2014) ...................................... passim

*US Airways, Inc. v. McCutchen*,
569 U.S. 88 (2013) ................................................................ 27

*Wheaton Coll. v. Burwell*,
791 F.3d 792 (7th Cir. 2015) ............................................... 26

*Zubik v. Burwell*,
136 S. Ct. 1557 (2016) ................................................... 17, 19

**Statutes**

26 U.S.C. § 4980D ................................................................ 19

26 U.S.C. § 5000 ................................................................. 19

29 U.S.C. § 1002 ....................................................... passim

29 U.S.C. § 402 ................................................................. 25

42 U.S.C. § 300gg-13 ....................................................... 17, 18

42 U.S.C. § 300gg-91 ........................................................ 18

**Other Authorities**

A. Scalia & B. Garner, Reading Law:
The Interpretation of Legal Texts (2012)............................................23

DOL, *Report of the Working Group on Orphan Plans* (Nov. 8, 2002) ....22

Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell *and the Perils of Judicial Faith in Government Claims*, 2016 Cato Sup. Ct. Rev. 123 (2016)............................................................................................34

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The Ethics and Public Policy Center is a nonprofit research institution dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy, law, culture, and politics, including on matters of religious liberty. EPPC scholars work to protect and advance a culture of life and have extensively criticized the federal agencies' contraception mandate for its intrusions on religious liberty.

## INTRODUCTION AND SUMMARY OF ARGUMENT

[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.

*La. Pub. Servs. Comm'n v. FCC*, 476 U.S. 355, 357 (1986).

[T]he form matters and plays a role in this scheme. . . . If the form were meaningless, the Government would not require it and perpetuate this rancorous dispute with religious organizations around the country.

*Priests for Life* v. *U.S. Dep't of Health & Human Servs.*, 808 F.3d 1, 20 and n.5 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from the denial of rehearing en banc).

\*     \*     \*

---

[1] Pursuant to Fed. R. App. P. 29(a), counsel for *amicus* states that all parties have consent to the filing of this brief. Further, no party's counsel authored any part of this brief and no person other than *amicus* made a monetary contribution to fund its preparation or submission.

This appeal challenges the district court holding that the federal agencies acted arbitrarily and capriciously when they created a religious exemption to the federal contraception mandate. The court claimed that the agencies' decision to create an exemption rested on their "erroneous conclusion" that the Religious Freedom Restoration Act (RFRA) required them to do so. This judgment about RFRA relied on this Court's holding in *Geneva College* that the agencies' longstanding "accommodation" to the contraception mandate adequately addresses religious objections and "d[oes] not impose a substantial burden on religious exercise" under RFRA. J.A. 46.

*Geneva College* held that the accommodation was unassailable under RFRA because it found that the Department of Labor had the authority to unilaterally reassign an employer's legal duty to provide contraceptives over to the employer's third party administrator (TPA).[2] *See* Little.Sisters.Br. at 8-9. According to *Geneva College*, all the religious employer has to do is "opt out" and Labor does the rest. Thus, religious

_____

[2] *Amicus'* analysis focuses on how the accommodation affects self-insured employers like the Little Sisters. It does not address the accommodation as applied to religious employers with fully-insured plans.

employers' remaining legal challenges were simply attempts to control the independent actions of third parties, gripes that don't qualify as a substantial burden on religious exercise under RFRA.

But the district court was wrong to strike the agencies' religious exemption down on Administrative Procedure Act (APA) grounds because *Geneva College* was wrong to strike down religious employers' objections to the accommodation on RFRA grounds.

This brief demonstrates that *Geneva College* erred because it failed to do what it promised: to "objectively assess" "how the regulatory measure actually works" under federal law. Instead, the panel uncritically accepted what the agencies at the time said about their authority to make the accommodation work, echoing and amplifying similar mistakes made by the Seventh, Sixth, and D.C. Circuits.

Had *Geneva College* "objectively assess[ed]" how the accommodation "actually works," had it measured the agencies' claims against ERISA, it would have recognized that the accommodation does not *and could not* work the way other circuits had said. Under ERISA and the ACA, the accommodation must "hijack" the religious employer's plan because Labor has no authority to enforce the contraception

mandate against a TPA outside of a plan established by, contributed to by, and associated with an employer.

ERISA also confirms that the accommodation forces a ministry to "trigger" its TPA's obligations to provide contraceptives under its plan. Labor *needs this form* because it is constrained by the rules that Congress established in ERISA for group health plans. Those rules state that (1) a TPA cannot become liable for providing mandated benefits unless it is appointed as a plan administrator; and (2) a TPA cannot become a plan administrator unless the plan sponsor (i.e. the objecting ministry) designates its TPA as such is designated as such under a plan instrument.

The straightforward ERISA analysis shows that *Geneva College* misunderstood how the accommodation works. That misunderstanding led *Geneva College* to misjudge what the accommodation actually requires of religious employers, and thus whether it substantially burdens religious exercise under RFRA. ERISA therefore also shows that the district court was wrong to hold, relying on *Geneva College*, that it arbitrary and capricious for the agencies to assert that RFRA compelled them to create a religious exemption from the mandate.

For far too long, this Court's rulings over the contraception mandate have not been rooted in ERISA but in unmoored claims about Labor's seemingly unlimited power to shuffle the deck to advance policy goals. That is dangerous, destabilizing, and wrong. Amicus urges this Court to use this opportunity to correct *Geneva College's* flawed understanding of how the accommodation works. Measuring *Geneva College's* substantial burden analysis under ERISA would also show that the district court show erred in relying on *Geneva College* to rule the agencies' religious exemption to the contraception mandate unlawful.

## ARGUMENT

## I. The district court's claim that the "the Accommodation did not substantially burden religious exercise" is rooted not in law but in unsupported claims made by *Geneva College* and other federal circuits.

The district court ruled it was arbitrary and capricious for the agencies to create the religious exemption under the guise that RFRA required them to do so. It so held based on this Court's 2015 decision in *Geneva College v. Secretary, United States Department of Health & Human Services,* 778 F.3d 422 (3d Cir. 2015), which held that "the Accommodation did not substantially burden religious exercise." J.A. 44 (citing *Geneva College*).

This Court has continued to reaffirm this holding from *Geneva College* in the decade since. But a close look at that decision shows that the panel never made good on it's promise to "objectively assess" how the accommodation actually works under federal law. *Geneva College* instead uncritically accepted what the agencies claimed about their power to compel TPAs to cover contraceptives without any assistance from objective employers.

The fact that *Geneva College* relied on similar holdings from three other circuits does not make its conclusions stronger, as those circuits likewise failed in their fundamental duty to measure the agencies' claims against ERISA.

## A. The district court's substantial burden holding rests entirely on *Geneva College.*

The district court concluded that the agencies' decision to create a religious exemption from their contraception mandate was unlawful under the APA because it was "based on an erroneous interpretation of law," namely the agencies' claim that RFRA required them to create a religious exemption. J.A. 43-46. The district court rooted that finding in "binding Third Circuit precedent," this Court's 2015 *Geneva College* decision, which held that "the Accommodation did not substantially

burden religious exercise." J.A. 44. The district court specifically cited *Geneva College's* finding "that the self-certification" required under the accommodation "did not trigger or facilitate the provision of coverage— the Contraception Mandate did—and therefore, the self-certification process did not substantially burden the religious exercise" of objecting religious employers. J.A. 44 (citing *Geneva College*, 778 F.3d at 437-38).

The district court notes that though "*Geneva* was vacated by the Supreme Court in *Zubik*," this Court's 2017 decision in *Real Alternatives* "embraced *Geneva's* reasoning in its entirety," "without reservation." J.A. 45, 46; *see also id.* at 48 (quoting *Real Alternatives v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 364 (3d Cir. 2017), quoting *Geneva*, 778 F.3d at 440-41). "[A]pplying the law of this Circuit as announced in *Geneva* and reaffirmed by *Real Alternatives*, the Accommodation did not impose a substantial burden on religious exercise; so the Agencies cannot rely on RFRA as compelling the Religious Rule." J.A. at 47-48.

Though this Court has reaffirmed *Geneva College's* substantial burden holding in *Real Alternatives* and *Pennsylvania v. President of the United States*, neither decision independently examines how the accommodation works. Each quotes *Geneva College* extensively and

presumes that it correctly assessed how the accommodation works. *See* J.A. 45, 48 (quoting and discussing *Real Alternatives*) and 930 F.3d 543, 573 (3d Cir. 2019).

In short, the district court's holding that the agencies' religious exemption is "arbitrary and capricious" rests on its claim that the accommodation does not substantially burden religious exercise. And that holding rests entirely on what *Geneva College* claimed about how the accommodation works. Nothing in the district court's opinion and nothing in either *Real Alternatives* or *Pennsylvania* has revisited the key question of how the accommodation transfers the legal duty to provide contraceptive coverage from an objecting religious employer to the employer's TPA. Thus, the district court's holding that the agencies' decision to create the religious exemption was "based on an erroneous interpretation of law" rises or falls based on *Geneva College's* conclusion that the accommodation is an "opt-out" that does not substantially burden the religious exercise" of objecting religious employers. J.A. 48; *Geneva College*, 778 F.3d at 438.

**B.** *Geneva College's* **substantial burden analysis relies entirely on related decisions from the Seventh, Sixth, and D.C. Circuits.**

Because *Geneva College's* substantial burden analysis is central to the district court's ruling on the merits, it is critical that this Court understand how *Geneva College* reached its conclusion. *Geneva College* understood that it had a duty to "objectively assess" "how the regulatory measure actually works." 778 F.3d at 435, 436. But the panel did nothing of the sort. Instead, *Geneva College* uncritically accepted the agencies' claims and leaned heavily on related decisions from other circuits.

Religious employers have long made two claims about how the accommodation forces them to help give their employees access to contraceptives. First, the accommodation makes them complicit because it **hijacks** a ministry's own group health plan, making its plan a conduit for delivering contraceptive coverage to plan participants. *See id.* at 438. Second, the accommodation is not an "opt out" because it forces a ministry to execute a document that **triggers** its TPA's duty to deliver contraceptive services. *See id.* at 435.

*Geneva College* rejected the ministries' "hijack" argument in a footnote. Without reviewing any statute or regulation, the panel

concluded that the ministries' substantial burden claim was "unavailing." *Id.* at 438 n.13. The court's only citation in this footnote is to the D.C. Circuit's decision in *Priests for Life*, which held that "contraceptive services are not provided to women because of Plaintiffs' contracts[]; they are provided because federal law requires . . . TPAs to provide insurance beneficiaries with coverage for contraception." *Priests For Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 253 (D.C. Cir. 2014).

*Geneva College's* treatment of the ministries' "trigger" argument was lengthier, but equally deficient. First, relying on Judge Posner's opinion for the Seventh Circuit in *University of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014), *Geneva College* asserted that a TPA's legal obligation to deliver contraceptive services to a ministry's plan beneficiaries exists *independent of any action* taken by the ministry:

> As Judge Posner has explained, this is not a situation where the self-certification form enables the provision of the very contraceptive services that the appellees find sinful. Rather, "[f]ederal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured plans, to cover contraceptive services." *Notre Dame*, 743 F.3d at 554. Thus, federal law, not the submission of the self-certification form, enables the provision of contraceptive coverage.

*Geneva*, 778 F.3d at 437.

Note that *Geneva College's* pivotal conclusion about "federal law" does not actually cite any federal law. Instead, the *Geneva* opinion simply notes that the Sixth and D.C. Circuits had also adopted "Judge Posner's logic." *Id*. at 437-38.

***Geneva College* failed to engage with the text of ERISA, not citing it once.** Instead, immediately after declaring that it would not "accept [the ministries'] characterization of the regulatory scheme on its face," *Geneva*, 778 F.3d at 436 (quoting *Mich. Cath. Conf. v. Burwell*, 755 F.3d 372, 385 (6th Cir. 2014)), *Geneva College*—following the lead of three other circuits—accepted the *government's* account as gospel.

## C. The decisions on which *Geneva College* relied rejected RFRA claims because they accepted the agencies' unsupported claims about their authority to rewrite private insurance contracts.

The Third Circuit's reliance on the Seventh, Sixth, and D.C. Circuits might be defensible if *those* courts had objectively assessed how the regulatory measure works. But they did not.

The first federal appellate court to hear a RFRA claim against the accommodation was the Seventh Circuit in *University of Notre Dame* v. *Sebelius*, 743 F.3d 547 (7th Cir. 2014), which became the template for

every other circuit that sided with the government. For example, *Notre Dame* was the first to accept the government's characterization of the accommodation as an "opt out." *Notre Dame*, 743 F.3d at 550 at 609. That phrase went judicially viral, invoked over 200 times by other circuits, 25 times in *Geneva College* alone.[3]

*Notre Dame* styled the accommodation as an "opt out" because the Seventh Circuit assumed that Congress had granted the agencies power to "enlist[], draft[], conscript[] substitute providers" into providing contraceptive coverage after a ministry invokes the accommodation. *Id.* at 548. The court denied that ministries' plans remained a "conduit" for contraceptive coverage, instead declaring that "the government . . . uses private . . . health plan administrators as *its agents* to provide medical services." *Id.* at 556. **These pronouncements cited no legal authority.**

The second appellate court to address the accommodation was the Sixth Circuit in in *Michigan Catholic Conference*, which agreed with the

[3] *Little Sisters of the Poor v. Burwell*, 794 F.3d 1151 (10th Cir. 2015) (123 times); *Priests For Life*, 772 F.3d 229 (44 times); *Geneva*, 778 F.3d 422 (5 times); *Cath. Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015) (25 times); *Mich. Cath.* v. *Burwell*, 807 F.3d 738 (6th Cir. 2015) (8 times).

Seventh Circuit that a TPA must "provid[e] contraceptive coverage to [a ministry's] employees pursuant to independent obligations under federal law," even while it acknowledged that the mandate only applies to insurers and group health plans. 755 F.3d at 388, n.12. ***Michigan Catholic Conference* does not mention ERISA once.**

Next came *Priests for Life*, where the D.C. Circuit claimed that the accommodation "designate[s] the relevant [TPA] as plan administrator under section 3(16) of ERISA" without "amend[ing] or alter[ing] Plaintiffs' own plan instruments." 772 F.3d at 255. It denied that the accommodation "require[s] the self-insured Plaintiffs to name their TPAs as ERISA plan fiduciaries"; it claimed that Labor has "authority to author a plan instrument or designate a particular writing as a plan instrument." *Id.* at 254, 255. Like the Seventh and Sixth Circuit decisions on which it relied, **the D.C. Circuit made no effort to reconcile these claims with ERISA's text.**

*Geneva College* cited these three cases a combined twenty times, 778 F.3d at 435-43, and claimed that *Notre Dame* "analyzes the mechanics of the accommodation," *id.* at 435 n.10. These decisions were the basis for *Geneva College* conclusion that a ministry's decision to

invoke the accommodation "has no effect on the designation of the plan administrator" as the "purported causal connection is nonexistent." *Id*. at 438.

*Geneva College's* deference to its sister circuits contributed to an echo chamber that became ever more confident and disconnected from federal law as time went on. Four months after *Geneva College*, the Fifth Circuit cited the Third Circuit in support of its claim that TPAs are "*already required by law*" to provide contraceptive coverage before ministries either "complet[e] Form 700 or submit[] a notice to HHS." *ETBU v. Burwell*, 793 F.3d 449, 459 and n.38 (5th Cir. 2015) (emphasis added).

The next month, Judge Posner went even further in the Seventh Circuit's *Wheaton College* decision, writing: "What had been Wheaton's plan, so far as emergency contraception was concerned, the Affordable Care Act made the government's plan when Wheaton refused to comply with the Act's provision on contraception coverage." 791 F.3d at 800. Under the accommodation, Judge Posner ventured, "new contracts are created," through "governmental plan instrument[s]," "to which [objecting employers are] not a party." *Id*. at 796, 800. Judge Posner

insisted that "the government isn't using the college's plans" because contraception coverage was being provided through the "government's plan." *Id.* at 800, 801.

But there is no such thing as a "governmental plan instrument." The phrase does not appear in any federal statute or regulation, and had never before appeared in a published opinion.

As shown here, *Geneva College* belongs to a strain of decisions that rejected RFRA claims based on government assertions without foundation in law. Though *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), vacated many of the worst decisions in this strain, including *Geneva College*, their lineage survives through *Real Alternatives*, *Pennsylvania*, and the decision below.

## II. The accommodation relies on ERISA; under ERISA, the accommodation can only work by hijacking religious employers' plans and forcing them to trigger their TPA's duty to provide contraceptives.

The Little Sisters' appeal presents this Court with a fresh opportunity to do what it promised in *Geneva College*: to "objectively assess" "how the regulatory measure actually works." 778 F.3d at 435, 436. This is a critical task, for "an agency literally has no power to act . .

. unless and until Congress confers power upon it." *La. Pub. Servs. Comm'n*, 476 U.S. at 357.

The way forward is simple. Before rejecting ministries' "hijack" argument, a court must ask, what law (if any) confers power on the agencies to order TPAs to provide contraceptive services outside of an objecting ministry's plan? Likewise, before rejecting ministries' "trigger" argument, a court must ask, what law (if any) confers power on Labor to unilaterally appoint a ministry's TPA as a plan administrator for contraceptive services?

The only law that might confer these powers is ERISA.[4] A close look at ERISA confirms the two longstanding objections ministries have made against the accommodation. First, the accommodation *must* piggyback on the objecting ministry's plan, because the agencies do not have the power to enforce the mandate outside of an employer-sponsored group health plan.

---

[4] The agencies have long acknowledged this. *See Roman Cath. Archdiocese of New York v. Sebelius*, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013). That is why the agencies have for over a decade admitted they have no power to enforce the accommodation against church plans, which are exempt from ERISA. *Id.*

Second, the structure and text of ERISA 3(16) reveal that the accommodation does not work *unless* the objecting employer executes a document that designates its TPA as its plan administrator for contraceptive services. This must happen because Congress only gave Labor the power to designate a new plan administrator under limited circumstances that do not apply here. Either the objecting employer amends its plan instrument to designate its TPA as its plan administrator, or else the TPA never becomes responsible for providing contraceptive services.

This statutory analysis confirms that the ministries objecting to the accommodation have been right all along: the accommodation is not an "opt-out"; it is an "opt-in" that substantially burdens religious exercise under RFRA.[5]

---

[5] As the Little Sisters note, the key premises of *Geneva College's* substantial burden holdings are undercut by the agencies' concessions before the Supreme Court in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016). *See* Little.Sisters.Br. at 43-44; *see also* Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell *and the Perils of Judicial Faith in Government Claims*, 2016 Cato Sup. Ct. Rev. 123, 132-42 (2016).

## A. Under ERISA, the accommodation must commandeer an objecting ministry's existing health plan.

*Geneva College* erred when it accepted the D.C. Circuit's claim that the agencies have the power to force a TPA to deliver contraceptive services outside of an objecting ministry's existing group health plan. *Geneva*, 778 F.3d at 438 n.13. No federal law grants the agencies such power.

ERISA and the ACA allow only one conclusion: given that the mandate only applies to group health plans, and given that group health plans can only be established by employers, the mandate *must* work by compelling TPAs to provide contraceptive services as part of the objecting ministry's own health plan.

**First**, the ACA's Preventive Health Services Mandate, the statute HRSA used to create the contraception mandate, does not apply to TPAs but only to "group health plans." 42 U.S.C. § 300gg-13(a).[6] The agencies stated as much in the Federal Register: "If an employer has a self-insured

_____

[6] Although the ACA also imposes the contraception mandate on "health insurance issuer[s]," *id.* § 300gg-13(a), this brief does not address that aspect of the mandate, see *supra* note 3.

plan, the statutory obligation to provide contraceptive coverage falls only on the plan." 81 Fed. Reg. 47,741, 47,744 (July 22, 2016).

**Second,** only employers can establish and maintain the "group health plans" that are subject to the mandate. Statutes governing each of the three agencies align on this point. The Public Health Service Act defines a "'group health plan' [as] an *employee* welfare benefit plan [as defined in ERISA § 3(1), codified at 29 U.S.C. § 1002(1)] to the extent that the plan provides medical care . . . to *employees* or their dependents." 42 U.S.C. § 300gg-91(a)(1) (emphases added). ERISA likewise governs "*employee* welfare benefit plans," which it defines as "any plan, fund or program . . . established or maintained *by an employer* . . . for the purpose of providing for its participants or their beneficiaries . . . medical . . . care or benefits." 29 U.S.C. § 1002(1) (emphases added). Finally, the Internal Revenue Code defines a group health plan as "a plan (including a self-insured plan) of, or contributed to by, an *employer* . . . to provide health care (directly or otherwise) to the *employees*, former *employees*, . . . or others associated or formerly *associated with the employer*." 26 U.S.C. § 5000(b)(1) (emphases added).

**Third,** the mandate's penalty also points to its plan-centric nature. Because only employers have group health plans, the penalty for failing to comply with the contraception mandate—$36,500 per covered employee per year—is imposed on the "employer" that maintains a non-compliant "group health plan." 26 U.S.C. § 4980D(a), (b)(1), (e)(1).

In sum, under ERISA and the ACA, the contraception mandate *cannot* apply to a TPA outside of an employer-maintained plan. And the fines the government uses to enforce the mandate can be levied only against the employer that sponsors the plan.

The fact that the agencies claimed otherwise is irrelevant. Nor does it matter that, as this Court emphasized in *Real Alternatives*, "virtually all of our sister circuits" found likewise. 867 F.3d at 358. For neither an executive agency nor a court has the constitutional power to change or ignore the legal structure that Congress has established.

The bottom line is this: ERISA plainly does not give the agencies the power to require a ministry's TPA to deliver contraceptive services outside of the ministry's existing plan. Accordingly, the only way federal agencies can oblige a TPA to deliver contraceptive services under the

accommodation is by "hijacking" an objecting ministry's group health plan—just as ministries have argued all along.

### B. Under ERISA, the accommodation must force an objecting ministry to trigger its TPA's duty to deliver contraceptive services.

*Geneva College* also erred when it rejected the ministries' "trigger" argument based on Judge Posner's conclusion in *Notre Dame* that Labor has the power to "treat[] and designate[] the third-party administrator as the plan administrator under ERISA." *Geneva*, 778 F.3d 438 (citing *Notre Dame*, 743 F.3d at 555).

The legal analysis turns on ERISA 3(16), which lies at the center of the accommodation regulation, 29 C.F.R. 2510.3-16(b). The central statutory questions are two-fold. First, how does ERISA 3(16) define the term "plan administrator"? Second, under what circumstances has Congress conferred on Labor the power to designate a TPA as a plan administrator?

Under ERISA, the "plan administrator" is the party with "fiduciary" responsibility for implementing an employee benefit plan and for keeping the plan in compliance with federal law. *See* 29 U.S.C. § 1002(14)(A). This term is crucial because a ministry's TPA can only be

held legally responsible for delivering contraceptive services if the TPA has been designated a plan administrator in the ministry's plan instrument. Labor's regulation confirms that this designation must take place under both the original and the amended accommodations. 29 C.F.R. 2510.3-16(b).

Outside of the accommodation, TPAs almost never serve as plan administrators. They only carry out non-discretionary tasks—mostly processing claims and payments—on behalf of the plan sponsor.[7]

Congress controls the appointment of a plan administrator through ERISA 3(16),[8] which sets out three simple rules. First, by default, the administrator is the "plan sponsor,"—i.e. the employer who created the group health plan. 29 U.S.C. § 1002(16)(A)(ii). Second, the plan sponsor can override this default by designating another plan administrator in "the terms of the instrument under which the plan is operated." *Id.* §

---

[7] *See* 83 Fed. Reg. at 57,566 ("[I]t is the Departments' understanding that third party administrators are not typically designated as plan administrators, and, therefore, would not normally act as plan administrators, under section 3(16) of ERISA.").

[8] Codified at 29 U.S.C. § 1002(14)(A).

1002(16)(A)(i). Third, Congress gave Labor power to override these first two rules when the plan sponsor "cannot be identified." *Id*. § (16)(A)(iii).[9]

The third provision is key because it shows that Congress considered whether, and under what circumstances, to grant Labor power to override an employer's plan instrument and designate a new plan administrator. Congress conferred that power under narrow circumstances that do not apply here. Under the principle of *expressio unius est exclusio alterius*,[10] section 1002(16)(A)(iii) undermines the agencies' claim that Congress granted Labor the "broad rulemaking authority" to designate a plan administrator when, as here, the plan sponsor *can* be identified. 80 Fed. Reg. 41,318, 41,323 (July 14, 2015).

The accommodation might still work as *Geneva College* claimed if Congress had authorized Labor to *change* a plan or *create new* plan instruments. That seems to be what Judge Posner was after when he

---

[9] If a plan sponsor cannot be identified, the plan is called an "orphan plan." *See* DOL, *Report of the Working Group on Orphan Plans* (Nov. 8, 2002), https://perma.cc/672T-HD6M.

[10] *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012); see also *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 232 (2011) ("If all three [grounds for liability] were intended, it would be strange to mention specifically only two, and leave the third to implication.").

claimed that, under the accommodation, the government creates "new contracts" through "governmental plan instrument[s]," "to which [objecting employers are] not a party." *Wheaton College v. Burwell*, 791 F.3d 792, 796 (7th Cir. 2015); see also *Priests for Life*, 772 F.3d at 255 (positing that Labor has the "authority to author a plan instrument or designate a particular writing as a plan instrument").

But Congress never gave Labor this power. First, this theory is precluded by the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion). Section 1002(16)(A)(iii) is "entirely redundant" if Congress had *already* given Labor the power to rewrite or create plan instruments that override the plan sponsor's choice as to who would serve as plan administrator under the employer's plan.

Second, the Supreme Court has consistently held that Congress gave *employers* the *exclusive power* to create and amend plan instruments. It is the exclusive role of the employer, as plan sponsor, to create an employee benefit plan by establishing a written instrument that sets out a plan's "basic terms and conditions." *Cigna Corp. v. Amara*,

563 U.S. 421, 437 (2011) (citing 29 U.S.C. §§ 402, 1102). This accords with the general principle that ERISA "is built around reliance on the face of written plan documents." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013).

The Supreme Court has been just as clear that the employer alone is responsible for amending its plan. Under ERISA, the employer's plan instrument must explain how it will amend its plan. *Cigna Corp.*, 563 U.S. at 437. These amendment procedures "must be followed for the valid adoption of an amendment." *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1295 (D.C. Cir. 2010) (citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 85 (1995)). Statements in documents not issued by the plan sponsor "do not themselves constitute the terms of the plan." *Cigna Corp.*, 563 U.S. at 438 (emphasis omitted).

The Supreme Court has scrupulously protected the rules that Congress created to guarantee that employers and beneficiaries can know how their health plans work by reading the written plan document. *Geneva College*, and by extension the decision below, undermine this guarantee by advancing the baseless claim that Congress granted Labor

the power to rewrite an employer's group health plan whenever it sees fit.

## III. Correcting *Geneva College's* substantial burden analysis in light of ERISA resolves the case at hand.

The statutory analysis above provides the best and easiest way to resolve this case. For the Little Sisters to prevail, the nuns do not need this Court "to accept [their] characterization of the regulatory scheme on its face." *Geneva College*, 778 F.3d at 436. All the Sisters need is for this Court to do is make good on the promise *Geneva College* left unfulfilled: "objectively assess whether the [religious employers'] compliance with the self-certification procedure does, in fact, trigger, facilitate, or make them complicit in the provision of contraceptive coverage." *Id*. at 435.

As shown in Part One, *Geneva College* failed to test the agencies' claims and other court's rulings against ERISA. As shown in Part Two, ERISA makes clear that *Geneva College* was wrong to accept Judge Posner's assertion that "this is not a situation where the self-certification form enables the provision of the very contraceptive services that the appellees find sinful." *Id*. at 437 (quoting *Notre Dame*, 743 F.3d at 554).

Much to the contrary, ERISA shows that that the self-certification form does *exactly* that. *It must*. Labor cannot transfer the plan sponsor's

legal duty to its TPA. Only the plan sponsor—the objecting religious employer—can do that, by designating another plan administrator in "the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(i).

ERISA thus undercuts the claims at the heart of *Geneva College's* substantial burden analysis. Religious employers are not objecting to what the government does *after* they "opt out;" they are not objecting to the independent, subsequent actions of third parties. To the contrary, their objections reflect an accurate understanding of Labor's limited power to enforce the mandate under ERISA, which means the agencies can't make the accommodation work without their help. *Geneva College's* analogies to the unsuccessful plaintiffs in *Kaemmerling*, *Bowen*, and *Lyng* are inapposite. *See* 778 F.3d at 435-36.

Because ERISA shows that *Geneva College* was wrong about how the accommodation works, it also shows that *Geneva College* got the substantial burden analysis wrong. ERISA shows that the accommodation "works" by coercing an objecting religious employer into executing a legal document that forces a third party to do something the employer believes is immoral. If the religious employer refuses to create

this legal duty, it suffers crippling fines. That is easily a substantial burden under binding Supreme Court precedent. *See* Little.Sisters.Br. at 37-38.

Finally, because ERISA undercuts *Geneva College's* substantial burden analysis, it also requires the Court to overturn the district court's holding that the agencies' decision to create a religious exemption was "based on an erroneous interpretation of law" and therefore "an abuse of discretion" under the APA. J.A. 48. It was eminently reasonable for the agencies to conclude that the accommodation, properly understood, substantially burdens religious exercise. Thus, it was reasonable for the conclude that RFRA required them to do more to protect religious freedom.

Though the district court stuck down the agencies' religious exemption under the APA, that ruling turns on what *Geneva College* said about the mandate's accommodation under RFRA. And because the RFRA question turns on the "nature and scope of the authority granted by Congress to the agenc[ies]," *La. Pub. Servs. Comm'n*, 476 U.S. at 357, this is really, at its heart, an ERISA case.

For all these reasons, amicus EPPC urges the Court to finally do what Geneva College promised but failed to do: "objectively assess" how the accommodation works under ERISA. Then, in light of that analysis, amicus urges the Court to revisit both *Geneva College* and the portions of the decision below that turn on Geneva College's incorrect substantial burden analysis.

## CONCLUSION

EPPC urges the Court to examine the accommodation under ERISA, hold that the accommodation substantially burdens religious exercise, and on that basis reverse the decision below.

Respectfully submitted,

s/ Eric N. Kniffin
ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

December 19, 2025          *Counsel for* Amicus Curiae

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because this brief contains 5,091 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2304 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: December 19, 2025

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

## CERTIFICATE OF FILING AND SERVICE

I certify that I electronically filed this document through the CM/ECF/ACMS system and that it will be thereby sent electronically to the registered participants in this appeal who are registered CM/ECF users.

Dated: December 19, 2025

/s/ Eric N. Kniffin
*Counsel for* Amicus Curiae