Nos. 25-2575 & 25-2662

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY,
*Plaintiffs-Appellees,*

v.

PRESIDENT UNITED STATES OF AMERICA, *et al.*,
*Defendants-Appellants in No. 25-2662,*

and

LITTLE SISTERS OF THE POOR SAINTS PETER & PAUL HOME,
*Intervenor-Defendant-Appellant in No. 25-2575.*

U.S. District Court E.D. Pa. No. 2:17-cv-04540

## BRIEF FOR APPELLEES

JENNIFER DAVENPORT
Attorney General, State of New Jersey
JEREMY M. FEIGENBAUM
Solicitor General
SHANKAR DURAISWAMY
Deputy Solicitor General
JANINE S. BALEKDJIAN
JOSHUA P. BOHN
MEGHAN MUSSO
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street
Trenton, NJ 08625
(609) 696-5366
joshua.bohn@law.njoag.gov

JENNIFER C. SELBER
General Counsel of the
  Commonwealth of Pennsylvania
MICHAEL J. FISCHER
Executive Deputy General Counsel
AIMEE D. THOMSON
Deputy General Counsel
Governor's Office of
  General Counsel
30 North Third Street, Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov

February 25, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

COUNTERSTATEMENT OF JURISDICTION ....................................... 1

COUNTERSTATEMENT OF ISSUES ..................................................... 1

RELATED CASES AND PROCEEDINGS ............................................... 1

INTRODUCTION ................................................................................. 2

COUNTERSTATEMENT OF THE CASE ................................................ 5

I.     Women's Health Guidelines. ............................................................ 5

II.    Prior Rules. ....................................................................................... 6

III.   Prior Litigation. ................................................................................ 8

IV.    The Challenged Rules. .................................................................... 11

V.     Procedural History. ........................................................................ 12

SUMMARY OF THE ARGUMENT ...................................................... 18

STANDARD OF REVIEW ................................................................... 22

ARGUMENT ..................................................................................... 23

I.     The States have standing. ............................................................... 23

       A.   The States have Article III injuries. ..................................... 24

       B.   The States' injuries are redressable. ..................................... 27

            1.   Relief in this case will redress the States'
                 injuries. ......................................................................... 28

            2.   The mandate is constitutional. ...................................... 31

II.    The District Court correctly held that the Religious and
       Moral Rules are arbitrary and capricious. .................................... 37

       A.   The Agencies did not reasonably explain the Moral
            Rule. ...................................................................................... 38

       B.   The Agencies did not reasonably explain the
            exemption for publicly traded companies. ............................ 45

i

C.   The Agencies did not reasonably explain the breadth of the Religious Rule. ...............................51

1.   The Religious Rule did not reasonably address potential RFRA conflicts. ............................51

2.   RFRA did not compel the Religious Rule. ...................59

3.   The Agencies' post-hoc rationalizations cannot justify the Religious Rule................................67

D.   The Rules were insufficiently reasoned in other ways. ......................................................................72

1.   The Agencies unreasonably changed position on the safety and effectiveness of contraception. ...........................................................72

2.   The Agencies failed to meaningfully consider regulatory alternatives. ...............................82

III.   The Rules were properly vacated....................................88

CONCLUSION .....................................................................92

# TABLE OF AUTHORITIES

## Cases

*Abington Mem'l Hosp. v. Heckler*, 750 F.2d 242 (3d Cir. 1984) .............................................................................. 88

*Bowen v. Roy*, 476 U.S. 693 (1986) .................................. 64, 65

*Braidwood Mgmt. v. Kennedy*, No. 20-cv-00283, ECF No. 153 (N.D. Tex. Dec. 17, 2025) ............................................ 37

*Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014) ................... passim

*Camp v. Pitts*, 411 U.S. 138 (1973) ............................................ 79

*Catholic Charities Bureau v. Wis. Labor & Indus. Review Comm'n*, 605 U.S. 238 (2025) ............................. 35, 36

*Christ the King Manor v. Sec'y U.S. HHS*, 730 F.3d 291 (3d Cir. 2013) ............................................................... 22

*City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987) ............................................................ 83

*Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013) ........................ 29

*Coinbase, Inc. v. SEC*, 126 F.4th 175 (3d Cir. 2025) .............. 68, 87

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ............................................... 89, 90, 91

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ................................ 57

*Del. Dep't of Nat. Resources & Envtl. Ctrl. v. EPA*, 785 F.3d 1 (D.C. Cir. 2015) ............................................... 85

*Dep't of Comm. v. New York*, 588 U.S. 752 (2019) .................. 26

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020) ........................................... 81, 82, 90, 91

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 1 (2025) ............................................................................ 25

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59 (1978) ........................................................ 29

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ...................... 72

*FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) ............................... 36, 37

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 505 (2009) .................................................................... passim

*Freeman v. Corzine*, 629 F.3d 146 (3d Cir. 2010) .................................. 27

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) .................. 33, 34, 63

*Geneva Coll. v. Azar*, No. 12-cv-00207, 2018 WL 3348982 (W.D. Pa. July 5, 2018) ..................................................... 62

*Geneva Coll. v. Sec'y of HHS*, 778 F.3d 442 (3d Cir. 2015) ........................................................................ 10, 60, 61

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ......................................... 53

*Gundy v. United States*, 588 U.S. 128 (2019) ...................................... 36

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ........................ 88

*Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301 (3d Cir. 2020) ................................................................. 27

*Henson v. Santander Consumer USA, Inc.,* 582 U.S. 79 (2017) ................................................................. 39

*Holt v. Hobbs*, 574 U.S. 352 (2015) ...................................................... 53

*In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237 (3d Cir. 1998) ...................................................... 39

iv

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983) .................................................... 50

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952) .................................. 40

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) ...................................... 46

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020)............................................. passim

*Little Sisters of the Poor v. Azar*, No. 13-cv-2611, ECF Nos. 82–83 (D. Colo. May 29, 2018)................................. 30, 59

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ................. 46, 59

*Loughrin v. United States*, 573 U.S. 351 (2014) .................................... 39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)............................... 28

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988)................................................................. 64

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ....................................... 64, 65

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) .................................. 40

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) ..................................................................................... 83

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................... passim

*Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032 (D.C. Cir. 2012) ................................................................. 76

*Neale v. Volvo Cars of N. Am.*, 794 F.3d 353 (3d Cir. 2015)........................................................................... 22

*Olympus Spa v. Armstrong*, 138 F.4th 1204 (9th Cir. 2025)........................................................................... 34

*Ozinga v. Price*, 855 F.3d 730 (7th Cir. 2017).........................63

*Pegram v. Herdrich,* 530 U.S. 211 (2000) ...............................65

*Pennsylvania v. President ("Pa III")*, 930 F.3d 543 (3d
     Cir. 2019)...................................................................... passim

*Pennsylvania v. Trump ("Pa I")*, 281 F. Supp. 3d 553
     (E.D. Pa. 2017) ...................................................................12

*Pennsylvania v. Trump ("Pa II")*, 351 F. Supp. 3d 791
     (E.D. Pa. 2019) ...................................................................12

*PJM Power Providers Grp. v. FERC*, 88 F.4th 250 (3d
     Cir. 2023)...........................................................................88

*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir.
     2004)...................................................................................22

*Rd.-Con, Inc. v. City of Phila.,* 120 F.4th 346 (3d Cir.
     2024)...................................................................................27

*Real Alts., Inc. v. Sec'y of HHS*, 867 F.3d 338 6 (3d Cir.
     2017)..................................................................... passim

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017)................23, 62

*Schuchardt v. President of the United States*, 839 F.3d
     336 (3d. Cir. 2016)...............................................................25

*Sharpe Holdings, Inc. v. U.S. Dep't HHS*, 801 F.3d 927
     (8th Cir. 2015) .....................................................................63

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260
     (4th Cir. 2018) .....................................................................29

*Spivack v. City of Philadelphia*, 109 F.4th 158 (3d Cir.
     2024)...................................................................................32

*Sun Chem. Corp. v. Fike Corp.*, 981 F.3d 231 (3d Cir. 2020)...................................................................................72

*Tandon v. Newsom*, 593 U.S. 61 (2021) .............................32

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707 (1981)..........................................................................52

*United States v. Lee*, 455 U.S. 252 (1982) ..............................66

*United States v. Safehouse*, 146 F.4th 315 (3d Cir. 2025) .................................................................................46, 49

*United States v. Texas*, 599 U.S. 670 (2023) ....................89, 90

*We the Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130 (2d Cir. 2023)......................34

*Wheaton College v. Burwell*, 573 U.S. 958 (2014)..............9, 53

*Zubik v. Burwell*, 578 U.S. 403 (2016) ..........................passim

**Statutes**

1 U.S.C. § 1 ....................................................................47

20 U.S.C. § 1681 ............................................................58

26 U.S.C. § 410 ..............................................................60

26 U.S.C. § 6033 ...............................................34, 35, 58

26 U.S.C. § 7611 ............................................................34

42 U.S.C. § 12187 ..........................................................34

42 U.S.C. § 18011 ...................................................32, 59

42 U.S.C. § 18114 ..........................................................83

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb
et seq. .......................................................................... passim

    42 U.S.C. § 2000bb.............................................. 42, 52

    42 U.S.C. § 2000bb-1........................................... 52, 65

42 U.S.C. § 2000e ............................................................ 66

42 U.S.C. § 2000e-1 ......................................................... 34

Women's Health Amendment, 42 U.S.C. § 300gg-
13(a)(4) ...................................................................... passim

5 U.S.C. § 706 ........................................................... 88, 90

50 U.S.C. § 3802 ............................................................. 66

Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) ...................... 67

## Regulations

26 C.F.R. § 54.9815-1251 .............................................. 59

29 C.F.R. § 2510.3-16 ................................................... 65

34 C.F.R. § 106.12 ........................................................ 58

45 C.F.R. § 147.131 .................................................. 11, 54

45 C.F.R. § 147.132 .................................................. 11, 54

45 C.F.R. § 147.133 ...................................................... 11

45 C.F.R. § 147.140 .................................................. 32, 59

45 C.F.R. § 46.202 ....................................................... 77

40 Fed. Reg. 33,526 (Aug. 8, 1975)................................... 77

75 Fed. Reg. 34,538 (June 17, 2010) .............................. 32, 58

87 Fed. Reg. 1763 (Jan. 12, 2022) ............................................. 5

88 Fed. Reg. 7236 (Feb. 2, 2023) ...................................... 14, 87

88 Fed. Reg. 876 (Jan. 5, 2023) ............................................... 6

89 Fed. Reg. 106,522 (Dec. 30, 2024) ..................................... 6

89 Fed. Reg. 472 (Jan. 4, 2024) .............................................. 6

## Other Authorities

155 Cong. Rec. 28,841 (2009) (Sen. Boxer) ........................... 41

155 Cong. Rec. 28,843 (2009) (Sen. Gillibrand) .................... 41

155 Cong. Rec. 28,844 (2009) (Sen. Mikulski) ...................... 41

155 Cong. Rec. 29,070 (2009) (Sen. Feinstein) ..................... 41

155 Cong. Rec. 29,311 (2009) (Sen. Nelson) ......................... 41

158 Cong. Rec. 2621–34 (2012) .............................................. 41

158 Cong. Rec. S539, S1162–1173 (2012) .............................. 87

3d Cir. I.O.P. 9.1 ............................................................... 23, 62

Ashleigh Fields, *Trump administration restores funding to Planned Parenthood, other groups after lawsuit*, The Hill (Jan. 15, 2026) .................................... 67

Black's Law Dictionary (3d ed. 1933) ................................... 90

Fed. Mem. of Law, *Pennsylvania v. Trump*, No. 17-cv-4540, ECF No. 344 (E.D. Pa. Apr. 18, 2025) (2025 WL 4104546) ............................................................ 71

*Insurance Coverage of Contraceptives*, Guttmacher Institute (June 11, 2018) .................................. 43

Tr. of Oral Arg., *Little Sisters v. Pennsylvania*, 591 U.S.
657 (2020) (No. 19-431) ........................................................ 84

Tr. of Oral Arg., *Zubik v. Burwell*, 578 U.S. 403 (2016)
(Nos. 14-1418 *et al.*) ............................................................ 60

## COUNTERSTATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES

I.    Whether Plaintiffs had Article III standing to bring suit.

II.    Whether the Moral Rule is arbitrary and capricious.

III.    Whether the extension of the Religious Rule's exemptions to publicly traded corporations is arbitrary and capricious.

IV.    Whether the Religious Rule's overbreadth is arbitrary and capricious.

V.    Whether the Final Rules are insufficiently reasoned.

VI.    Whether the District Court properly vacated the Rules.

## RELATED CASES AND PROCEEDINGS

This case was previously before this Court. *Pennsylvania v. President*, 930 F.3d 543 (3d Cir. 2019). Several other challenges to the rules are pending in other courts. *California v. HHS*, No. 17-5783 (N.D. Cal.); *Massachusetts v. HHS*, No. 21-2076 (1st Cir.).

## INTRODUCTION

This case asks whether a group of federal agencies acted in an arbitrary and capricious manner when they crafted sweeping exemptions—untethered to the record and without reasoned analysis—that denied women access to the contraceptive care guaranteed to them by law. The answer is yes.

Federal law guarantees women with private health insurance access to preventive services without cost-sharing. Swiftly after that underlying law passed, the Health Resources and Services Administration designated contraception as a covered preventive service—a designation it has maintained since. And for good reason: as countless studies have shown, contraception is, for many women, essential preventive medicine, with benefits for women's health as well as their economic security, personal autonomy, and overall well-being.

But in 2017, the Departments of Health and Human Services, Treasury, and Labor (the "Agencies") issued two sweeping rules creating exemptions from the requirement that health insurance plans cover contraception without cost-sharing, not solely for religious organizations,

but also for publicly traded companies and for entities with merely secular moral objections to providing contraception.

Although the Supreme Court subsequently affirmed the Agencies' statutory authority to craft these rules, it did not address whether they had exercised this authority in an arbitrary-and-capricious way, with two members of the majority concurring to emphasize such claims remained both live and viable. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 707 (2020) (Kagan, J., concurring).

Among other things, the concurring justices emphasized serious concerns about whether the Agencies articulated sufficient reasons for an exemption based on undefined moral (rather than religious) objections; sufficiently supported the "unusual" choice to grant publicly-traded companies a religious exemption from this requirement; and justified the "mismatch between the scope of the religious exemption and the problem the agencies set out to address." *Id.* at 707–10. Assessed against the APA's "standard of reasonableness," they added, these final rules "give every appearance of coming up short." *Id.* at 707. On remand, the District Court picked up where the Court left off and correctly found the rules arbitrary and capricious in multiple ways.

This Court should affirm the District Court's thorough opinion. As the court below found, the Agencies have not justified an exemption based on moral beliefs, both because such an exception is not related to the Religious Freedom Restoration Act (RFRA) interests on which these Final Rules had focused, and because the Agencies failed to explain why a secular moral exception was required solely because a religious exception was. The Agencies further failed to justify why publicly traded companies, which are owned by thousands or even millions of shareholders, merited exemptions for religious beliefs—or how the Agencies would divine those beliefs in practice. The Agencies also failed to provide sufficient reasoning for the scope of the religious exception—in particular their adoption of an approach that went well beyond accommodating religious objections of previous challengers. And repeatedly, the Agencies offered inexplicable and unsupported reasoning that downplayed the impacts of denying women access to contraception—contrary to the overwhelming scientific evidence and their prior conclusions.

Because the District Court's conclusions are well-supported, and because none of the other issues Intervenor seeks to interject belong in this case, this Court should affirm. These Final Rules must be vacated,

so that the Agencies can now exercise their statutory authority consistent with the APA's bedrock demands of reasoned decisionmaking.

## COUNTERSTATEMENT OF THE CASE

### I. Women's Health Guidelines.

The Women's Health Amendment (WHA) to the Affordable Care Act (ACA) requires that, "with respect to women," group health plans and health insurance issuers "shall, at a minimum provide coverage" without cost-sharing for "preventive care and screenings ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" (HRSA). 42 U.S.C. § 300gg-13(a)(4). This provision is one of several ACA health insurance reforms aimed at expanding access to and reducing costs of health care coverage.

After the ACA passed, HRSA issued its first "Women's Preventive Services Guidelines." JA712–14. The Guidelines required health plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." JA71.[1] These Guidelines relied on

---

[1] HRSA has updated the Guidelines several times since 2011. *See* JA505–06; JA587–89; JA715–19; 87 Fed. Reg. 1763 (Jan. 12, 2022); 88 Fed. Reg. (continued…)

recommendations from the medical professionals that "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education" be covered as evidence-based preventive services, given that "contraception and contraceptive counseling are effective at reducing unintended pregnancies." JA713; JA733; JA742. The ACA together with the HRSA Guidelines ensure women have access to contraceptive coverage with no cost-sharing and is known as the "contraceptive mandate."

## II.    Prior Rules.

Shortly after the Guidelines were issued, the Agencies promulgated an interim final rule (in February 2013) that "provide[d] HRSA with the discretion" to make the contraceptive coverage requirement inapplicable to any insurance plan maintained by "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." JA673; JA708. This is known as the "church exemption."

---

876 (Jan. 5, 2023); 89 Fed. Reg. 472 (Jan. 4, 2024); 89 Fed. Reg. 106,522 (Dec. 30, 2024). The Guidelines continue to include contraception as a service that "address[es] health needs specific to women." JA1843–46.

The Agencies subsequently promulgated (in July 2013) the final rule, which added an "Accommodation" for any nonprofit entity that held "itself out as a religious organization" and that had religious objections to "providing coverage for some or all of any contraceptive services required" by the Guidelines. JA667. Under the rule, such entities were not required to provide contraceptive coverage to their insured employees if the entity submitted a standardized form to its insurance company (if fully-insured) or third-party administrator (if self-insured) stating its religious objection. *See* JA645–46; JA1457–58.

For fully-insured employers, the insurance provider receiving an objection was then required to "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan," and to instead "[p]rovide separate payments for any contraceptive services required to be covered … for plan participants and beneficiaries for so long as they remain enrolled in the plan." JA667. The insurer further had to "segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services." *Id.* Finally, the insurer had to provide written notice to plan participants and beneficiaries of the fact that "the eligible

organization does not administer or fund contraceptive benefits," but that such benefits were available directly from the insurer. JA668.

For self-insured objecting employers that directly pay for covered health expenses, typically with the administrative assistance of a third-party administrator (TPA), the TPA receiving the objection would then assume the obligation to provide contraceptive coverage to plan participants and beneficiaries, either by paying for contraceptive services directly or contracting with another entity to do so. *See* JA665–66. The TPA was obligated to provide the same notice that insurers were required to provide, stating that the employer did not provide contraceptive benefits, but that the TPA did. *See id.*

For both employer types, the upshot was that the employer could opt out of providing contraception, but plan participants and beneficiaries would still receive the benefits to which they were entitled.

## III. Prior Litigation.

Despite the Agencies' efforts to address religious objections, multiple lawsuits challenged objecting employers' obligation to cover contraceptive care or, for those eligible for the Accommodation, the obligation to notify their insurer or TPA of their decision not to do so.

The Supreme Court repeatedly addressed the issue. In *Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014), the Court held that requiring closely held, for-profit corporations with religious beliefs to provide contraceptive coverage violated their rights under RFRA, 42 U.S.C. § 2000bb et seq. The Court noted that the Agencies could still promote access to contraceptive care without burdening employers' exercise of religion by making them eligible for the Accommodation. 573 U.S. at 728–32. Three weeks later, in *Wheaton College v. Burwell*, 573 U.S. 958 (2014), the Court issued an injunction pending appeal in a religious college's challenge to the requirement that exempted employers notify their insurer or TPA of their objection. The Court permitted the college to notify HHS instead and stressed that its order should not affect the ability of any covered persons "to obtain, without cost, the full range of FDA approved contraceptives" because HHS could rely on the notice to "facilitate the provision of full contraceptive coverage under the Act." *Id.* at 959. In response, the Agencies issued new interim (August 2014) and then final (July 2015) rules that expanded the eligibility criteria for the Accommodation to include closely held companies and allow objecting entities the option of notifying HHS of their objection. JA590–619; JA630–39.

Two years later, in *Zubik v. Burwell*, 578 U.S. 403 (2016), the Court agreed to review rulings from this Court (*Geneva Coll. v. Sec'y of HHS*, 778 F.3d 442 (3d Cir. 2015)) and three other circuits regarding whether the Accommodation process impermissibly burdened RFRA rights of employers who claimed a religious objection to notifying their insurer or the Agencies of their religious objection to providing contraceptive coverage. The Court ultimately issued a per curiam order vacating the judgments on appeal and remanding for the parties to have "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage." *Id.* at 408 (cleaned up).

On January 9, 2017, the Agencies announced that they were maintaining the Accommodation because "no feasible approach has been identified … that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." JA579. A few months later, the Third Circuit ruled—for a second time—that the Accommodation does not

10

violate RFRA. *Real Alts., Inc. v. Sec'y of HHS*, 867 F.3d 338, 359–66 (3d Cir. 2017).

## IV.    The Challenged Rules.

In October 2017, the Agencies issued two interim rules that created broad exceptions to the contraceptive mandate—one addressing moral objections (interim Moral Rule), the other addressing religious objections (interim Religious Rule). JA507–50; JA551–75.

Following the acceptance of comments, in November 2018 the Agencies issued final versions. JA410–64; JA465–504. The Moral Rule exempted employers with non-religious moral objections, but did not define the beliefs that qualify as a "sincerely held moral conviction" sufficient to claim the exemption. The Religious Rule greatly expanded the religious exemption by: (i) extending eligibility to publicly-traded corporations with religious objections; (ii) exempting employers with religious objections to contraceptive care even if the Accommodation satisfied their concerns; and (iii) removing any obligation for objecting employers to file a notice or certification of their objection. JA432; JA436; JA463–64; JA503–04; 45 C.F.R. §§ 147.131, 147.132(a)–(b), 147.133(a)–(b).

## V.    Procedural History.

Pennsylvania filed suit shortly after the Agencies issued the interim rules and moved for a preliminary injunction, JA77–78, which the District Court granted in December 2017, *Pennsylvania v. Trump ("Pa I")*, 281 F. Supp. 3d 553 (E.D. Pa. 2017). After the Final Rules were issued, New Jersey joined the suit, and the District Court issued a second preliminary injunction, concluding the Agencies had violated the APA's notice-and-comment requirements and lacked authority to create exemptions from the Guidelines. *Pennsylvania v. Trump ("Pa II")*, 351 F. Supp. 3d 791, 811–27 (E.D. Pa. 2019).

The Third Circuit affirmed the District Court's decision in its totality. *Pennsylvania v. President ("Pa III")*, 930 F.3d 543 (3d Cir. 2019). As to standing, this Court held that the States established a concrete and particularized injury "from the increased use of state-funded services" attributed to loss of coverage, that this injury was "causally connected and fairly traceable to the Exemptions," and that the District Court's injunction would redress the injury. *Id.* at 562, 564. The Court pointed to the Agencies' regulatory impact analysis estimating that between 70,500 and 126,400 women would imminently lose coverage due to the Rules and

rejected the notion that the States needed to identify specific women impacted. *Id.* at 562–64. On the merits, the Court held that the Agencies lacked good cause to forgo the need for public comment, the WHA did not give the Agencies the discretion to create exemptions from the Guidelines, RFRA neither required nor authorized the Religious Rule independent of the WHA, and the Agencies contravened Congress's intent by promulgating the Moral Rule. *Id.* at 565–74.

The Supreme Court reversed on the merits. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020). As to the Agencies' statutory authority, the Court held that the WHA provides the Agencies with discretion to define what services must be covered, and who must cover them. *Id.* at 676–77. While the majority did not reach the question whether RFRA required or authorized the Rules, it found that the Agencies could nevertheless "consider RFRA as they formulated the religious exemption from the contraceptive mandate" under the WHA. *Id.* at 680–82. The Court also reversed on the procedural APA claim, holding that the Agencies' acceptance of comments following the issuance of the interim rules was sufficient. *Id.* at 683–86.

Concurring in the judgment only, Justice Kagan (joined by Justice Breyer) stressed that the Court's statutory interpretation and procedural APA holdings did "not mean the Departments should prevail when these cases return to the lower courts." *Id.* at 707. Instead, she explained, there remained live arbitrary-and-capricious claims. *Id.* She emphasized that "[a]n agency acting within its sphere of delegated authority can of course flunk the test of 'reasoned decisionmaking.'" *Id.* And she described several ways the Agencies flunked it here, ranging from the decision to "exempt[] all employers with objections to the mandate, even if the accommodation met their religious needs," to the inclusion of publicly-traded companies within the scope of the Religious Rule and the issuance of the Moral Rule, neither of which could plausibly be justified by RFRA. *Id.* at 708–10; *see also id.* at 707 (finding "the exemptions HRSA and the Departments issued give every appearance of coming up short").

Following the presidential administration change in January 2021, the District Court stayed this case at the request of the Agencies in anticipation of potential regulatory changes. JA118–19. On February 2, 2023, the Agencies published a notice of proposed rulemaking. 88 Fed. Reg. 7236 (Feb. 2, 2023). The Agencies received more than 40,000

comments, JA26, including a comment letter joined by Pennsylvania and New Jersey, supporting rescission of the Moral Rule and a new individual contraceptive arrangement that would provide contraceptive coverage for women whose employers had complicity-based objections to the Accommodation process. The Agencies repeatedly indicated that the Proposed Rule would be finalized in December 2024, and so the States agreed to hold this case in abeyance. JA26. But the Agencies ultimately withdrew the Proposed Rule in its entirety on December 30, 2024. JA1839.

The parties cross-moved for summary judgment, JA124–25, and the District Court granted summary judgment to the States; denied both the Agencies' and Little Sisters' motions; and vacated the Final Rules. JA10.

As a threshold matter, the court held the States had standing, finding that the Rules "inflict a direct injury upon the States by imposing substantial final burdens on their coffers," that financial injury is "fairly traceable" to the issuance of the Rules, and the injury is redressable because vacatur "would return the state of women's coverage to the pre-Final Rules framework, meaning less women will be without contraceptive coverage, so fewer of them will have to turn to the States to provide that coverage." JA31–33. The court rejected constitutional challenges to

the mandate raised by Little Sisters in connection with redressability, holding that such issues were not properly before the court. JA35.

On the merits, the court held that "in promulgating the [Rules] the Agencies['] actions were 'arbitrary and capricious.'" JA10. The court held that the Moral Rule was arbitrary and capricious because "the Agencies relied on factors which Congress has not intended it to consider." JA48. Nothing in the ACA or RFRA, the court reasoned, supported an exemption based on secular moral scruples, and the Agencies did not otherwise explain the need or justification for a moral exception.

For the Religious Rule, the court emphasized "the Agencies identified a problem (RFRA violations) and then proposed a solution that is not rationally connected to solving that problem (exempting organizations whose compliance with the Accommodation posed no potential conflict with RFRA to begin with)." JA43. Among other arbitrary provisions, the Religious Rule granted an exemption to a category of entities—publicly traded corporations—that have no RFRA rights in the first place. JA41–42. In addition, applying this Court's precedents in *Geneva College* and *Real Alternatives*, the court concluded that "the Accommodation did not

impose a substantial burden on religious exercise," meaning the "Agencies cannot rely on RFRA as compelling the Religious Rule." JA47–48.

Finally, the District Court held that both Rules were arbitrary and capricious because the Agencies did not provide a reasoned explanation "for their change in course regarding contraception's safety and efficacy," JA51, and failed to consider reasonable alternatives "providing an avenue for individuals to still get contraceptive coverage even if they are member of an exempt plan" when they promulgated the Final Rules, JA54–55.

Having determined that both Rules were arbitrary and capricious, the court vacated the Rules in toto, JA61, finding that "it is particularly appropriate to remand the case with vacatur because if [the court] did not do so, [it] would leave in place a rule that is causing the very adverse effect that [the Agencies are] charged with preventing." JA58.

## SUMMARY OF THE ARGUMENT

1.    As this Court recognized in 2019—and as the Agencies do not dispute—the States have standing to challenge these rules based on the loss of contraceptive coverage they predictably cause for thousands of women and the undisputed record that this would increase State health care costs. These harms can be redressed by vacating the Final Rules.

Little Sisters does not dispute the record evidence; instead, it claims that the States must identify a specific woman impacted. But this misapprehends the legal requirement for particularized injury, which the States have satisfied with witness affidavits as well as admissions and data from the Agencies themselves. Little Sisters also argues that the States' injuries are not redressable because the contraceptive mandate itself is unconstitutional, but this is wrong several times over. Speculation about how hypothetical future cases might resolve is irrelevant to whether vacating the Final Rules remedies the States' injuries today. And because Little Sisters has not filed crossclaims against the Agencies, this Court cannot (as a matter of basic procedure) reach the mandate's constitutionality here. But even if it did, Little Sisters offers no reason to find the mandate unconstitutional.

2.    The District Court correctly held that the Final Rules are arbitrary and capricious.

To begin, the Agencies failed to articulate a satisfactory explanation for their novel choice to exempt employers with moral, nonreligious objections to contraception from the mandate. No statutory evidence or legislative history suggests that Congress intended for the Agencies to adopt a moral exemption to the contraceptive mandate. Nor can the Agencies call on a desire for uniformity, given the well-established legal distinction between religious beliefs and moral convictions.

The Agencies' novel extension of the religious exemption to publicly traded corporations likewise lacked any reasoned explanation for concluding that these corporations have rights under RFRA. The Agencies also failed to consider how such an exemption would work in practice.

The Religious Rule's overbreadth in other areas demonstrated a further lack of reasoned decisionmaking. The Agencies promulgated the Religious Rule "to expand the protections for the sincerely held religious objections of certain entities and individuals" but went well beyond what was necessary to address RFRA concerns. The Religious Rule does not require an exempt employer to claim substantial burden or provide

notice, and extends even to employers for whom the Accommodation resolved all religious objections. This overbreadth is inconsistent with RFRA, which Congress intended to address individualized burdens, and with the WHA, which Congress enacted to provide women with access to preventive services without cost-sharing.

The Agencies also wrongly concluded that RFRA compelled the Religious Rule for employers with religious objections to the Accommodation. Courts, not the Agencies, determine the meaning and scope of RFRA. The Agencies ignored this Court's opinion in *Real Alternatives*, which had reaffirmed that the Accommodation does not impose a substantial burden on religious exercise. The Agencies also did not reasonably conclude that the Accommodation would fail strict scrutiny.

The Agencies—for the first time in seven years of litigation—now claim that they adopted the Religious Rule for policy reasons independent of RFRA. But such post-hoc rationalizations are impermissible when the record is clear that the rule was premised on adhering to RFRA. Even if the Agencies had independent policy grounds, they were not presented to the District Court and do not withstand scrutiny.

The Final Rules were insufficiently reasoned in other ways. The Agencies justified the Final Rules in part because of purported doubts about whether contraception is safe, is an abortifacient, reduces teen pregnancy, and benefits women—doubts which they claimed undermine any compelling interest in facilitating access to contraceptive care. But these changes in position were contrary to the Agencies' longstanding views and were not consistent with the record evidence. The Agencies' change in position also failed to account for the reliance interests of women Congress intended the WHA to benefit.

Finally, the Agencies failed to consider obvious alternatives, such as limiting the religious exemption to entities that objected to the Accommodation, providing a narrow moral exemption tailored to those objectors, and establishing a separate process for women of exempt employers to obtain contraceptives without requiring notification from employers with complicity-based objections.

3.    Having found that the Final Rules are arbitrary and capricious in violation of the APA, the District Court correctly vacated the Final Rules. Vacatur is a well-established remedy under the APA and distinct from traditional equitable remedies.

## STANDARD OF REVIEW

This Court "exercise[s] plenary review over a threshold question of law, such as that presented by an Article III standing challenge." *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 358 (3d Cir. 2015). It applies "*de novo* review to a district court's grant of summary judgment in a case brought under the APA, and in turn applies the applicable standard of review to the underlying agency decision." *Christ the King Manor v. Sec'y U.S. HHS*, 730 F.3d 291, 305 (3d Cir. 2013).

An agency action may be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under that standard, this Court must consider whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," while being careful "not to substitute its judgment for that of the agency." *Id.*; *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 389–90 (3d Cir. 2004).

## ARGUMENT[2]

### I.    The States have standing.

This Court should reject Little Sisters' argument that the States lack Article III standing. To begin, it is squarely foreclosed by this Court's decision in *Pa III*, which found standing based on the loss of contraceptive coverage for thousands of women and the undisputed record that this would increase health care costs for the States. *See Pa III*, 930 F.3d at 561–65; *see also*, *e.g.*, *Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017) (holding that precedential panel opinions are "binding on subsequent panels" and cannot be overruled without en banc consideration); 3d Cir. I.O.P. 9.1. Accepting Little Sisters' view requires contravening binding panel precedent. It would also mean all nine Supreme Court Justices were wrong to reach the merits in this case in *Little Sisters*. The summary judgment posture does not alter this binding precedential conclusion.

---

[2] Citations herein to the briefs filed in this appeal by the Agencies and Little Sisters are "Fed.Br." and "Int.Br.", respectively.

### A.    The States have Article III injuries.

As the District Court and this Court have correctly held, the Rules "inflict a direct injury upon the States by imposing substantial financial burdens on their coffers." JA31. Indeed, the record establishes a particularized harm to the States: the Rules deprive women of insurance coverage, causing them to rely on these States' programs instead.

First, the Agencies' own analyses established that "between 70,500 and 126,400 women nationwide will lose contraceptive coverage as a result of their employers' invocation of the [Religious Rule]" alone. *Pa III*, 930 F.3d at 562; *see* JA452; JA455–56; JA500. This includes at least eight identified employers in Pennsylvania or New Jersey who previously made clear their plan to use the expanded exemptions. *See Pa III*, 930 F.3d at 562; JA1423–56. Second, the States submitted detailed declarations evidencing the financial harm they would consequently suffer as women losing coverage would turn to the States for contraceptive care. JA32–33; *see, e.g.*, JA1780–1809. This Court already found this analysis sufficient to establish Article III standing. *Pa III*, 930 F.3d at 561–64.

Little Sisters does not dispute this evidence but instead argues that the States can only establish "particularized harm" if they first "identify

24

any citizens who have been harmed by the Final Rule." Int.Br.24. This misapprehends the requirement of "particularized injury," which requires only that plaintiffs identify an injury that affects them "in a personal and individual way," as opposed to "generalized grievances ... undifferentiated and common to all members of the public." *Schuchardt v. President of the United States*, 839 F.3d 336, 344–45 (3d. Cir. 2016). The States have done that here, establishing that "each State's coffers will be depleted by the expenditure of funds to meet the increased demand for state services" among the women who lose coverage due to the Rules. JA32.[3]

Nothing about the "particularized injury" requirement demands that the States "identify a specific woman who will be affected by the Final Rules." *Pa III*, 930 F.3d at 564. Broader evidence that women will lose coverage and inevitably turn to state programs suffices. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 120–21 (2025) (plaintiffs

---

[3] For the same reason, Little Sisters' conclusory assertion that the States lack a "legitimate interest" in the scope and application of the mandate, Int.Br.25, fails. The States have a patent interest in federal policies that shift the burden of health care coverage to the States' public fiscs. That is a "clear injury to their own distinct interests," apart from the burdens that an overbroad exemption imposes on individual residents.

need not introduce particular evidence "to show how third parties would likely respond to a government regulation or invalidation thereof," but instead "must simply show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury" (cleaned up)); *see also Dep't of Comm. v. New York*, 588 U.S. 752, 767–69 (2019) (States had standing to challenge Census citizenship question based on effects on noncitizen response rates without requirement that States produce affidavits or testimony on specific noncitizens). And the evidence here is especially compelling, as it comes directly from the Agencies' own analyses and from state declarations—which are all unrefuted. Little Sisters' contrary argument depends on the implausible notion that no one is taking advantage of the exemption that Little Sisters is fighting so hard to preserve simply because the States did not name them.

Nor must the States suddenly marshal anecdotal evidence and testimony from individual women just because the case is now at the summary judgment stage. *Contra* Int.Br.24. Regardless of the stage of the case, the relevant moment for assessing standing is "the time [the States] brought the lawsuit." *Rd.-Con, Inc. v. City of Phila.,* 120 F.4th 346, 354

(3d Cir. 2024).[4] To be sure, a plaintiff seeking summary judgment cannot rely on allegations and must "set forth by affidavit or other evidence specific facts" establishing standing. *Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010). But that is what the States have done. Throughout this case, including at summary judgment, the States relied on witness affidavits and admissions and data from the Agencies themselves. *See supra* at 24.

Because the States have established the elements of standing with competent evidence, this Court should affirm that they have standing.

### B.    The States' injuries are redressable.

This Court also need not revisit its prior ruling as to redressability, which likewise remains binding. In seeking to re-litigate this issue, Little Sisters tries to turn the States' lawsuit into a vehicle for resolving constitutional challenges to the underlying contraceptive mandate that have

---

[4] To the extent Little Sisters argues that post-filing developments have "mooted the case," it cannot meet the "heavy burden" of establishing there is "no longer a live controversy." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305–06 (3d Cir. 2020). Little Sisters has not proffered an iota of evidence suggesting that the Rules failed to do exactly what the Agencies said they would—cause a loss of contraceptive coverage.

never been at issue in this case. This Court should not reach such improperly raised arguments; even if it does, they lack merit.

### 1.     Relief in this case will redress the States' injuries.

The merits of Little Sisters' challenge to the mandate's constitutionality is irrelevant to redressability. To establish redressability, a plaintiff must show it is "likely" that their injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As this Court previously found in a panel decision that remains binding, a favorable ruling for the States "redress[es] the financial injury the States face" by relieving them of the "financial burden" resulting from the loss of employer-sponsored contraceptive coverage. *Pa III*, 930 F.3d at 562–64. The District Court properly applied this precedent in granting summary judgment, finding that vacatur of the Rules "would return the state of women's coverage to the pre-Final Rules framework, meaning less women will be without contraceptive coverage, so fewer of them will have to turn to the States to provide that coverage." JA33.

Little Sisters claims that the States' injuries are not redressable because even if the Final Rules are vacated, "the residual mandate" cannot "lawfully be enforced against religious objectors." Int.Br.26. But

although the immediate effect of the District Court's vacatur is to restore the pre-Final Rules framework for implementation of the mandate, no court has precluded enforcement of the mandate in toto.

This means Little Sisters asks the Court to find the States' Article III injuries not redressable today because the States might face those same injuries later following lawsuits brought by some future parties, which may or may not prevail and which may or may not obtain universal relief against the mandate. That sort of speculation about how a court would handle a future challenge to the mandate cannot defeat a showing of redressability in this one. *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 75–78 (1978) (plaintiffs need not "negate . . . speculative and hypothetical possibilities" that the plaintiffs' relief would be mooted by other developments in the future to show redressability); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018) (defendants "cannot simply hypothesize as to possible future harm to overcome the fact that a favorable ruling would redress Petitioners' only injury at this time"); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398, 413–14 (2013) ("[I]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.").

Little Sisters cannot rehabilitate its redressability argument by making the procedurally improper ask that this Court itself simply "hold that the mandate cannot be lawfully enforced against [intervenor] and those exempted by the Final Rule." Int.Br.29. This case is a challenge to the Final Rule brought by Pennsylvania and New Jersey. Little Sisters never pleaded cross-claims against the Agencies to enjoin or vacate the underlying mandate. As a matter of Article III and the Federal Rules of Civil Procedure, this Court genuinely cannot issue such an order.

Little Sisters is, of course, free to bring its own separate challenge to the mandate. In fact, it has—and secured a final judgment (after intervening here) that insulates it from compliance with the mandate. *See Little Sisters of the Poor v. Azar*, No. 1:13-cv-2611, ECF Nos. 82–83 (D. Colo. May 29, 2018) (final order and injunction).[5] That only makes its attempt to shoehorn the mandate's constitutionality into this case even more improper.

---

[5] https://storage.courtlistener.com/recap/gov.uscourts.cod.143341/gov.uscourts.cod.143341.82.0_1.pdf (ECF No. 82); https://storage.courtlistener.com/recap/gov.uscourts.cod.143341/gov.uscourts.cod.143341.83.0.pdf (ECF No. 83).

In any event, even assuming this Court could issue a binding ruling that blocks enforcement of the mandate, that is irrelevant to the States' standing to bring their claims. Redressability turns on whether a "favorable decision" for the States—granting the relief *the States* request—remedies their injury at least in part. And here, the States requested only that the Final Rules be vacated, the direct consequence of which is the restoration of the pre-Final Rules status quo under which the mandate continues to operate. It is no answer for Little Sisters to say that if the Court issues a separate legal conclusion as to the mandate's constitutionality (that the States have not sought and that is not relevant to the merits of the States' APA challenge to the Final Rules) then the States' injuries would persist. Because Little Sisters' constitutional arguments challenging the mandate have no bearing on the States' standing, the Court need not and should not address them.

### 2. The mandate is constitutional.

Even if this Court reaches Little Sisters' constitutional arguments, they lack merit.

1.    First, Little Sisters errs in arguing that the mandate's inclusion of other "categorical exemptions" unlawfully privileges secular over

religious activity. *Contra* Int.Br.30–31. The sole exemption Little Sisters cites for this point is the grandfathered plan exemption, which exempts certain preexisting plans from the ACA's preventive care mandate (and several other requirements) altogether. *See* 42 U.S.C. § 18011; 45 C.F.R. § 147.140.[6] But this exemption is merely another generally applicable rule that applies equally to secular *and religious* employers' plans, not an exception that "treat[s] ... comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), or makes "arbitrary distinctions between religious and secular conduct," *Spivack v. City of Philadelphia*, 109 F.4th 158, 167 (3d Cir. 2024). Rather than applying based on a plan sponsor's beliefs (religious or secular), it applies based on a plan's preexisting nature—to "balance" the "objective of preserving the ability to maintain existing coverage with the goals of expanding access." 75 Fed. Reg. 34,538, 34,540 (June 17, 2010); *contra* Int.Br.30. That does not "target[] religious practices for distinctive treatment." *Spivack*, 109 F.4th at 177.

---

[6] Little Sisters states that "HRSA has also created additional categorical exemptions for comparable secular activity," Int.Br.30, but does not identify any other exemptions.

Little Sisters also errs in arguing that the mandate is not generally applicable under *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). Int.Br.31–32. *Fulton* found that the "creation of a formal mechanism for granting exemptions" on an individualized, ad hoc basis defeats general applicability because it "invites the government to decide which reasons for not complying with the policy are worthy of solicitude" in each case. 593 U.S. at 537 (cleaned up). Nothing like that exists here because the pre-Final Rule regulations do not allow for individualized discretionary exceptions. *See* JA594–95; *contra Fulton*, 593 U.S. at 523 (invalidating policy that permitted exceptions "at the sole discretion of the Commissioner" (cleaned up)).

Instead, HRSA has statutory authority to "define preventive care and screenings" in the first place, which the Supreme Court understood to grant HRSA the authority to create categorical exceptions, including for religious objections as it did here. *Little Sisters*, 591 U.S. at 677. But the ability to create (via a published regulation) such categorical exemptions is entirely distinct from the authority to create individualized, ad hoc exceptions. Courts have held that non-discretionary, categorical exemptions do not implicate *Fulton* because they "do not allow the

government to decide which reasons for not complying with the policy are worthy of solicitude." *We the Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 151 (2d Cir. 2023) (cleaned up); *see also Olympus Spa v. Armstrong*, 138 F.4th 1204, 1219 (9th Cir. 2025) (categorical exemption did not invite the government "to consider the particular reasons for a person's conduct" (quoting *Fulton*, 593 U.S. at 523)).

The church exemption is also not a comparator. *See* Int.Br.30–32. This is a categorical exemption tied to defined criteria in the tax code, not an ad hoc exemption scheme. *See* JA645; JA667 (citing 26 U.S.C. § 6033(a)(3)(A)(i), (iii)). It also makes no sense to conclude that the Agencies discriminated against religion by specifically exempting certain religious institutions—churches. Indeed, myriad federal laws privilege churches and other places of worship, from Title VII to the tax code, without those decisions themselves being signs of religious animus against entities like Little Sisters. *See, e.g.*, 42 U.S.C. § 2000e-1(a) (Title VII); 42 U.S.C. § 12187 (Title III of the ADA); 26 U.S.C. § 7611(b) (restrictions on tax inquiries and examinations of churches).

For these reasons, Little Sisters' as-applied free exercise challenges fail.

2.    Nor does the mandate "violate[] both Religion Clauses" because the church exemption applies to "exclusively religious activities of any religious order" but not activities of a religious order that are not exclusively religious. Int.Br.32–34; *see* 26 U.S.C. § 6033(a)(3)(A)(iii). Relying on *Catholic Charities Bureau v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), Little Sisters argues this standard (incorporated from the tax code) discriminates against religious orders that engage in activities that are not "exclusively religious." Int.Br.32–34.

The church exemption, however, does not incorporate any denominational preferences or require proselytization or exclusive service to adherents of an order's religion. *Cf. Catholic Charities*, 605 U.S. at 241. Rather, the exemption requires the order's activities to *be religious*, without setting forth specific requirements, and thus can turn on how the entity itself perceives religious action. *See* JA644–45. The Wisconsin requirement that nonprofits be "operated primarily for religious purposes" was not itself problematic; the issue was the Wisconsin Supreme Court's interpretation, which required the organization to engage in acts of proselytization barred by their faith in the context of charitable acts in order to claim the exemption, thus preferring denominations that allow the

mixture of these activities over those that do not. *Catholic Charities*, 605 U.S. at 241–42, 249–50. Simply requiring that a religious order's activities be exclusively religious does not itself discriminate between religious denominations or privilege certain religious acts.

3.    Little Sisters gets no further with the nondelegation doctrine. That doctrine prevents Congress from assigning implementation discretion to an agency without providing an intelligible principle to guide its exercise of its responsibility. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 672–73, 691 (2025). This standard is "not demanding," *Gundy v. United States*, 588 U.S. 128, 146 (2019), and merely requires guidance as to "the general policy that the agency must pursue and the boundaries of its delegated authority," *Consumers' Rsch.*, 606 U.S. at 673 (cleaned up). Only two statutes have ever failed that standard and only then because "Congress had failed to articulate any policy or standard" to govern discretion. *Gundy*, 588 U.S. at 146; *see also Consumers' Rsch.*, 606 U.S. at 683–84.

There is no basis for the Court to conclude that the WHA is the first constitutionally infirm delegation in over ninety years. The Guidelines are to include services that are: (1) for women, (2) preventive, and (3) exclusive of services that the United States Preventive Task Force

recommends. 42 U.S.C. § 300gg-13(a)(4). Those principles are intelligible and the WHA is just like other delegations the Court has upheld. *See Consumers' Rsch.*, 606 U.S. at 683–84 (citing with approval cases upholding a delegation "to set air quality standards at levels requisite to protect the public health," and upholding an agency delegation "to ensure [] corporate structures did not unfairly or inequitably distribute voting power among security holders" (cleaned up)). Other courts have found the same. *Braidwood Mgmt. v. Kennedy*, No. 20-cv-00283, ECF No. 153 (N.D. Tex. Dec. 17, 2025)[7] (entering a consent final judgment that held "42 U.S.C. § 300gg-13(a)(1)–(a)(4) do not violate the nondelegation doctrine," after Fifth Circuit rejected claim and the Supreme Court denied certiorari).

## II.  The District Court correctly held that the Religious and Moral Rules are arbitrary and capricious.

Although the Agencies had authority to issue exemptions, the District Court rightly found that they "flunk[ed] the test of 'reasoned decisionmaking'" several times over. *Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring). The Agencies identified no legislative intent or other reasoned basis to support the Moral Rule. They identified no legal authority

---

[7] https://storage.courtlistener.com/recap/gov.uscourts.txnd.330381/gov.uscourts.txnd.330381.153.0.pdf.

to extend the Religious Rule to publicly traded companies and failed to grapple with the practical implications. They expanded the Religious Rule well beyond what was necessary to address potential RFRA conflicts and incorrectly reasoned that RFRA compelled the rule in some instances. On appeal, the Agencies offer an improper post-hoc rationalization for the Religious Rule that is not supported by the record or credible on its face and was not presented to the District Court. The Agencies also failed to provide reasoned explanations for changing position on the evidence concerning contraception's safety and effectiveness, and failed to meaningfully consider reasonable alternatives.

## A.    The Agencies did not reasonably explain the Moral Rule.

The Agencies failed to "articulate a satisfactory explanation" for their novel choice to exempt employers with moral, nonreligious objections to contraception from the mandate. *State Farm*, 463 U.S. at 43. None of the reasons the Agencies proffered withstand scrutiny.

1.    The Agencies' principal justification that they gave when adopting the Moral Rule—that Congress *would have* included a moral exemption had Congress known the ACA would include a contraceptive mandate, *see* JA476; Fed.Br.57—is not supported by any statutory

evidence. While the Supreme Court held that Congress gave the Agencies *discretion* to identify the scope of exemptions, *Little Sisters*, 591 U.S. at 679, that is a far cry from expressing an unspoken affirmative desire for the Agency to include specific moral exemptions to certain later required care, c*f. Henson v. Santander Consumer USA, Inc.,* 582 U.S. 79, 89 (2017) ("[I]t is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question[.]"); *In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237, 244 (3d Cir. 1998) (refusing to "attribute to Congress an unstated intent to act"). The Moral Rule must succeed on the justifications provided by the Agencies—not imagined, counterfactual desires by Congress.

Among the Agencies' justifications were unrelated instances of Congress respecting morally informed objections to generally applicable laws, including other healthcare laws. JA471–73. As the District Court recognized, however, the ordinary inference to draw from Congress having created moral exceptions to other general laws, but not to the ACA's coverage requirements, is just the opposite: that the difference is intentional. JA50; *see, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014)

(explaining Congress's use of language in one section of a statute, but not another, is intentional); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 384 (2013) (applying same interpretive principles across statutes). The Agencies gave no persuasive reason to depart from this presumption.

Contrary to the Agencies' argument, Congress's decision not to include a conscience objection in the ACA is far from irrelevant to whether it desired a moral exemption to any contraceptive mandate. The Agencies contended that applying normal rules of statutory construction to the ACA would "negate … the previous exemptions provided for houses of worship and integrated auxiliaries, and the indirect exemption for self-insured church plans that use the accommodation." JA472. But those religious exemptions do not rely on inferences about Congress's intent animating the ACA; instead, they are consistent with the well-established church autonomy doctrine rooted in the First Amendment's Religion Clauses. *See, e.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952).[8] By contrast, the

---

[8] For this reason, affirming the district court's judgment would not upset the church exemption. *See, e.g.*, JA708 (the church exemption "respect[s] the unique relationship between certain religious employers and their employees in certain religious positions"); JA597 (the exemption respects the "particular sphere of autonomy for houses of worship").

Moral Rule is untethered from any such established doctrine. *See also Little Sisters*, 591 U.S. at 710 (Kagan, J., concurring) (RFRA "does not apply to those with only moral scruples").

Further, the Agencies' unfounded speculation that Congress would have included a conscience exemption if it had known the WHA would encompass contraception, Fed.Br.57; JA476, is directly contradicted by actual legislative history. The legislative record for the WHA is replete with evidence that Congress expected contraception would be covered. *See, e.g.*, 155 Cong. Rec. 28,841 (2009) (Sen. Boxer); *id.* at 28,843 (Sen. Gillibrand); *id.* at 28,844 (Sen. Mikulski); *id.* at 29,070 (Sen. Feinstein); *id.* at 29,311 (Sen. Nelson). And after the first version of the Guidelines (which included contraception) was released, Congress voted against adding conscience exemptions that functioned just as the Moral Rule does. 158 Cong. Rec. 2621–34 (2012); *see also Hobby Lobby*, 573 U.S. at 719 n.30 (describing this legislative history). While this failed vote may not be dispositive, *see* Fed.Br.60 n.11, it further undermines rather than supports the Agencies' counterfactual assumptions about intent.

The Agencies' stated desire to avoid a disparity in the treatment of religious and moral beliefs also does not support the Moral Rule. There

is an obvious distinction driving this purported disparity: the religious exemptions to the mandate are based upon the need to comply with RFRA—which covers religious beliefs, not secular moral ones. 42 U.S.C. § 2000bb. The Agencies' history of affording religious exemptions to the mandate is similarly irrelevant and inapplicable to the Moral Rule, *contra* JA470, and the previous history of litigation was likewise overwhelmingly driven by religious, not moral, objections. So the "long shadow" that RFRA cast over "the [Agencies'] rulemaking" cannot support the Moral Rule. *Little Sisters*, 591 U.S. at 709 (Kagan, J., concurring).

While the Agencies claimed they wanted as a policy matter to treat the two objections alike in this "health care contex[t]," JA473, they did not genuinely explain why. The Agencies disclaimed, as they must, that "moral convictions must always be protected alongside religious beliefs," JA474, or else RFRA and the First Amendment itself would be called into question. But the Agencies did not explain what it was about this specific context of contraceptive care that requires parallel treatment here, given how infrequently they are treated in parallel elsewhere, including as to other forms of health care under RFRA.

The Agencies' arguments regarding other federal agencies and States that allowed for exceptions to neutral laws based on moral objections, JA474, and purported founding-era respect for conscientious objections, JA474–75, are beside the point. The Agencies did not explain why a minority of States' laws allowing certain health care providers to opt out of contraception or sterilization services, *see* JA474 & n.18, support a moral exemption from the mandate in the separate context of employer-provided healthcare. Indeed, only two States allowed any non-religious exemptions from employer-provided contraceptive coverage at the time was Rules were promulgated.[9] And general founding-era respect for conscience—which does not clearly differentiate religious from moral conviction, *see* JA474–75—says nothing about whether the Agencies should create a specific carve-out for moral disagreements with the contraceptive mandate under this modern statutory framework.

2.     The District Court did not, as the Agencies argue, "defy" the Supreme Court's holding that the Agencies had statutory authority to

---

[9] *See* JA477 n.25 (citing *Insurance Coverage of Contraceptives*, Guttmacher Institute (June 11, 2018), https://web.archive.org/web/20180618035121/https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives).

create a moral exemption. Fed.Br.59–61; *see also Little Sisters*, 591 U.S. at 679. The District Court accounted for this holding, JA48–49, and recognized that whether the Agencies have authority is distinct from whether the Agencies, "acting within [their] sphere of delegated authority," have exercised "reasoned decisionmaking," *Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring); *see id.* (whether the exemptions are arbitrary and capricious is "now ready for resolution, unaffected by today's decision"). The fact that an agency may have statutory authority to promulgate a regulation does not mean that it exercised that authority in a reasoned manner.

The Agencies' brief makes little effort to otherwise justify the Moral Rule, characterizing the sweeping exemption as a "modest shift in views," Fed.Br.61, and relying entirely on the purported basis for the Religious Rule, *id.* at 61–62 (*citing* JA482–86; JA496). But relying on an analysis for religious objections without "weigh[ing] anew, in this different context, the benefits of exempting more employers from the mandate against the harms of depriving more women of contraceptive coverage" is not reasoned analysis. *Little Sisters*, 591 U.S. at 710 (Kagan, J., concurring).

Because the Agencies' exercise of discretion still required proper reasoning, the District Court properly held that the Moral Rule is arbitrary and capricious.

## B. The Agencies did not reasonably explain the exemption for publicly traded companies.

The Agencies' novel—and unexplained—expansion of the religious exemption to sweep in publicly traded corporations lacked a reasoned explanation for concluding that these corporations have RFRA rights and failed to consider how such an exemption works in practice. *See Little Sisters*, 591 U.S. at 709 (Kagan, J., concurring) (noting the decision to "allow even publicly traded corporations to claim a religious exemption … is unusual enough to raise a serious question about whether the [Agencies] adequately supported their choice"). The Agencies cannot rehabilitate flawed reasoning by arguing that no publicly traded corporation will claim the exemption anyway.

1.    The Agencies' sole justification for extending the religious exemption to publicly traded corporations was to protect RFRA rights.[10] Yet

---

[10] Although the Agencies' brief argues that they adopted the religious and moral exemptions for policy reasons independent of RFRA, this is not so with respect to the religious exemption for publicly traded companies, for which they cite no independent policy justification.

they failed to provide a "reasoned explanation," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), of whether such corporations have RFRA rights at all, *see* JA436–37.

Courts have final say over the meaning and scope RFRA. JA44 n.18 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398–401 (2024)). But no precedent establishes that a publicly traded corporation—which is owned by an ever-changing group of diffuse shareholders—can, legally, engage in the "exercise of religion" as required under RFRA. To the contrary, multiple courts have questioned whether this is even possible. *See, e.g.*, *Hobby Lobby*, 573 U.S. at 717 (declining to extend holding to publicly-traded corporations since it "seems improbable" that "unrelated shareholders ... would agree to run a corporation under the same religious beliefs"); *United States v. Safehouse*, 146 F.4th 315, 320 (3d Cir. 2025) (noting that while such corporations are "persons," "it would be unlikely for corporate giants to assert such claims" given their structures (cleaned up)); *Korte v. Sebelius*, 735 F.3d 654, 682 n.17 (7th Cir. 2013) (distinguishing closely-held companies from publicly traded).

In the absence of legal authority, the Agencies' paltry one-paragraph explanation falls woefully short of reasoned decision-making. The

Agencies asserted that because publicly traded corporations are "persons" under the Dictionary Act, 1 U.S.C. § 1, they must be "persons" with religious rights under RFRA, *see* JA436. But the question is not whether a corporation meets the definition of "person"; it is whether it is the kind of "person" that can hold and act based on sincerely held religious beliefs. *Hobby Lobby*, for example, devoted the bulk of its analysis not to whether closely held for-profit corporations are "persons," but to whether they could "exercise religion." 573 U.S. at 709–17. By contrast, the Agencies did not consider how publicly traded corporations could "exercise religion" at all. The Agencies claimed "[t]he mechanisms for determining whether a company has adopted and holds certain principles or views, such as sincerely held religious beliefs, is a matter of well-established State law with respect to corporate decision-making." JA436. But they identified no such state law, much less "well-established" state law, that would determine whether and how publicly traded corporations can adopt and sincerely hold religious beliefs. *See id.* & n.61.[11]

---

[11] The Rule also cites an article listing four companies that take some religious actions, such as keeping chaplains on staff or providing Bible verses with meals. JA436 n.63 (citing James Dennin, *4 Publicly Traded Religious Companies if You're Looking to Invest in Faith*, Nasdaq (Feb. 7, (continued…)

2.    Apart from its inadequate explanation of the legal basis for the exemption, the Agencies "failed to consider" another "important aspect of the problem" by entirely ignoring how such an exemption would work in practice. *State Farm*, 463 U.S. at 43.

The Agencies did not explain how they would determine what a publicly traded corporation's religious beliefs are—let alone whether they are "sincere," as RFRA requires. What percentage of a public company's owners must share a religious belief for the company to espouse it? Is a plurality enough? What about the rights of minority shareholders? What happens if large shareholder sells? What if a majority of shareholders agree that they oppose the provision of contraception, but they have different religious reasons for doing so? What if some of those shareholders have moral or even business reasons for holding that view? Is it even shareholders' views that control, or might it be those of the board of directors?

---

2014), https://www.nasdaq.com/articles/4-publicly-traded-religious-companies-if-youre-looking-invest-faith-2014-02-07). But the article does not claim—let alone substantiate—that any of these companies have formally adopted religious beliefs.

In a rule that presents the possibility for exactly the kind of "divisive, polarizing proxy battles over the religious identity of large, publicly traded corporations such as IBM or General Electric" that the Supreme Court avoided in *Hobby Lobby*, 573 U.S. at 717 (quoting Brief for United States at 30), the Agencies did not even attempt to answer these obvious threshold questions.

The failure to consider the workability of the exemption in this context—where an unknown and rotating cast of shareholders are unlikely to agree about religious beliefs—is especially concerning since the Agencies did not require any certification or ex ante determination that a corporation in fact has sincerely held religious beliefs. When the Agencies defended that choice, *see* JA432, they ignored the intractable challenges posed by having to determine whether a publicly traded corporation's beliefs are sincerely held, *see Safehouse*, 146 F.4th at 320 ("In such cases, the applicability of RFRA would likely hinge on sincerity."). Yet by ignoring this difficulty, the Agencies merely opened the door to novel corporate battles over religion without either criteria or a mechanism for determining a public company's sincerely held religious beliefs. The Agencies' failure to consider—let alone resolve—such novel issues rendered public

companies' inclusion in the religion rule arbitrary and capricious. *Cf. Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 818–26 (D.C. Cir. 1983) (holding that it was arbitrary and capricious for the Department of Labor to rescind certain labor restrictions in the knitted outerwear industry without explaining how it was feasible to enforce the Fair Labor Standards Act without them).

This Court should reject the Agencies' plea to ignore these problems because any error in including an exemption for publicly traded corporations "would be harmless as the regulation would have no effect" if none have invoked it. Fed.Br.41; *see also* JA436 (Agencies' "best estimate of the anticipated effects of these rules is that no publicly traded employers will invoke the religious exemption"). But if the Agencies' position is that no one needs this broadened exemption, then there is no "rational" need for it. *State Farm*, 463 U.S. at 43. As the District Court recognized, creating an exemption that no one needs, to satisfy another statutory regime that does not implicate these companies, is irrational. *See* JA41–43.

## C.     The Agencies did not reasonably explain the breadth of the Religious Rule.

### 1.     The Religious Rule did not reasonably address potential RFRA conflicts.

The Agencies claimed that the Religious Rule addresses conflicts between RFRA and the mandate, but did not reasonably explain why the Rule's scope was necessary or appropriate to address their concern. By their own terms, the Agencies promulgated the Religious Rule "to expand the protections for the sincerely held religious objections of certain entities and individuals." JA411. Although the Agencies' discretion under the WHA permits them to accommodate religious objections to contraception because "the potential for conflict between the contraceptive mandate and RFRA is well settled," *Little Sisters*, 591 U.S. at 681, the APA demands a "rational connection" between the actual conflicts that exist and the Agencies' chosen solution, *State Farm*, 463 U.S. at 43; *see also Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring). Here, the Agencies did not show such a connection because their proposed solution goes far beyond what is necessary to address any conflicts with RFRA.

The District Court accurately recognized that the Religious Rule is categorically overinclusive in its attempt to address "potential conflicts

between the Contraceptive Mandate and RFRA." JA37. After carefully examining both the purpose of RFRA and the history of litigation surrounding the mandate, the Court concluded that, in addition to improperly including publicly traded companies in the exemption, *see supra* Section II.B, the Religious Rule allows entities to avoid compliance with the mandate or the Accommodation even if there is no substantial burden on religious exercise. JA39–43. The Rule is "not rationally connected to solving" the potential RFRA conflicts on which the Agencies relied. JA43.

1.    Congress enacted RFRA to restore a compelling interest balancing test whenever generally applicable law substantially burdens a person's free exercise of religion. JA38 (quoting 42 U.S.C. § 2000bb(b)(1)). Under RFRA, the government "may substantially burden *a person's* exercise of religion only if it demonstrates that application of the burden *to the person* (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b) (emphasis added).

Because religious exercise is both deeply personal and highly subjective, *e.g.*, *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981), consideration of RFRA is necessarily an individualized

and "focused inquiry." *Hobby Lobby*, 573 U.S. at 726–27 (cleaned up). Only covered individuals can assert that a rule of general applicability compels them "to perform acts *undeniably* at odds with fundamental tenets of their religious beliefs." *Real Alts.*, 867 F.3d at 355 (cleaned up); *see also Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). Correspondingly, the Government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 573 U.S. at 726 (quoting *O Centro*, 546 U.S. at 430–31).

In the Religious Rule, the Agencies went well beyond what would be necessary to address RFRA conflicts. Although they promulgated the rule "in light of RFRA." JA419, the preceding history showed that the Accommodation (as expanded by *Hobby Lobby* and *Wheaton College*) satisfied many employers' religious needs. Nevertheless, the Agencies chose

to offer an exemption to any entity that merely *objects* to contraceptive coverage because of a sincerely held religious belief.[12]

As a result, the Religious Rule extends beyond the Agencies' stated purpose several times over. For one, an exempt employer need not even claim that directly covering contraception, or complying with the Accommodation, would cause a substantial burden. The Agencies conceded that they did not know whether entities taking advantage of the exemption would do so "based on sincerely held religious beliefs against contraceptive coverage." JA424. In addition, an employer satisfied with the Accommodation nonetheless may deny contraceptive coverage to their employees. JA40. The Agencies conceded that some employers for whom the

---

[12] Little Sisters—but not the Agencies—claims that only an employer unsatisfied with the Accommodation can invoke the Religious Rule's exemption. *Compare* Int.Br.49, *with* Fed.Br.27. But the Agencies made the exemption available to any entity that objects to any one of "establishing, maintaining, providing, offering, or arranging" for payment for "contraceptive services" and makes the Accommodation only a voluntary alternative. 45 C.F.R. §§ 147.132(a)(2), 147.131(c)(2). The Religious Rule's preamble further explains that the Accommodation is "optional for entities that are otherwise also eligible for the expanded exemptions" and remains "an option that exempt entities can choose." JA443. And practically, because there is no process by which an entity would "qualify" for the exemption, *contra* Int.Br.49, there is no way to prevent an entity that has no objection to the Accommodation—or objection to the contraceptive mandate itself—from simply refusing coverage, *see* JA40 n.17.

Accommodation addresses any religious objection would nonetheless take advantage of the exemption rather than go through the Accommodation process. JA 450–51. And finally, the Religious Rule allows employers to claim the exemption without providing any notice of that decision to the government, insurer, or TPA. JA42–43. Without a notice requirement, or something similar, the Religious Rule lacks any mechanism for distinguishing sincere claims of substantial burden from insincere ones.[13]

This overbreadth matters because Congress intended that RFRA resolve individualized burdens. *E.g.*, *Real Alts.*, 867 F.3d at 355–58; *Hobby Lobby*, 573 U.S. at 717–18. A person cannot avoid compliance with a generally applicable law based only on her objection to it. Instead, a substantial burden on her religious exercise is a necessary (though not sufficient) predicate. *See Real Alts.*, 867 F.3d at 355–58. Nor can RFRA justify empowering employers to erase the Guidelines' contraceptive coverage requirement when those employers had no RFRA conflict with the existing Accommodation.

---

[13] The Moral Rule shares these flaws, in addition to having no basis in the interest in avoiding RFRA conflicts. JA487–88; JA496.

The individualized nature of RFRA—including distinguishing sincere claims of substantial burden from insincere ones—was an essential part of the Supreme Court's decision to extend RFRA to closely held corporations. *Hobby Lobby*, 573 U.S. at 717–18. Because courts can distinguish the two, the Court discounted concerns that for-profit entities would take advantage of RFRA, noting that "[t]o qualify for RFRA's protection, an asserted belief must be 'sincere'; a corporation's pretextual assertion of a religious belief in order to obtain an exemption for financial reasons would fail." *Id.* at 717 n.28. Under the Religious Rule, however, there is no way to discern honest from pretextual beliefs or evaluate whether beliefs are substantially burdened. Indeed, *Hobby Lobby* criticized a failed bill (that also lacked a mechanism for scrutinizing an objector's belief) for "extend[ing] more broadly than the pre-existing protections of RFRA," *id.* at 719 n.30—a point the Agencies did not acknowledge.

The Religious Rule's overbreadth also matters because the difference between the Accommodation (or similar alternative, *see infra* Section II.D.2) and a total exemption is whether women retain contraceptive coverage that is "necessary for women's health and well-being"—a

conclusion that the Final Rules did not disturb. *See* JA417; JA477; JA1842–49.

RFRA requires "adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Hobby Lobby*, 573 U.S. at 729 n.37 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)); *accord Cutter*, 544 U.S. at 722 ("Our decisions indicate that an accommodation must be measured so that it does not override other significant interests."). In *Hobby Lobby*, for example, the Supreme Court disclaimed any suggestion that RFRA "demands accommodation of a for-profit corporation's religious beliefs no matter the impact that accommodation may have on … thousands of women employed by Hobby Lobby." 573 U.S. at 693 (cleaned up). To the contrary: the Court emphasized that it sanctioned the accommodation precisely because the effect "on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero." *Id.*

In the rule, the Agencies brushed aside these concerns. JA423. They suggested that any third-party harm "rests on an incorrect presumption"—namely, "that the government has an obligation to force private parties to benefit … third parties and that the third parties have a right

to those benefits." *Id.* But it is the law, not the government, that provides women with a right to cost-free preventive care. 42 U.S.C. § 300gg–13(a)(4). As a result, in every instance in which the Accommodation fully resolves an entity's religious or moral objection, but the entity elects the exemption instead, the rule "yield[s] all costs and no benefits," *Little Sisters*, 591 U.S. at 709 (Kagan, J., concurring).

2.    Both the Agencies and Little Sisters defend the Religious Rule because other exemptions in law do not require notice or self-certification. Fed.Br.44; Int.Br.49–50. But the cited exemptions are based on an entity's legal status, not on its subjective, individualized assertion of a substantial burden on sincere religious beliefs.

For example, notice and self-certification are not necessary (and so not required) for the church exemption because it is based on an entity's legal status under the tax code. *See* JA667 (citing 26 U.S.C. § 6033(a)(3)(A)(i), (iii)). Title IX grants exemptions based on status as an "educational institution which is controlled by a religious organization," 34 C.F.R. § 106.12(a), as expressly required by Congress, 20 U.S.C. § 1681(a)(3). And Congress chose to grandfather some plans "to ease the transition of the healthcare industry," 75 Fed. Reg. at 34,541, with the

status delineated by the contents of the health plan, 42 U.S.C. § 18011; 45 C.F.R. § 147.140(g); 26 C.F.R. § 54.9815-1251.

### 2.   RFRA did not compel the Religious Rule.

The Religious Rule suffers an additional flaw: the Agencies did not reasonably determine that it was needed to remedy any RFRA violations. The District Court correctly recognized that under this Court's precedent, the Accommodation does not impose a substantial burden and so does not violate RFRA. JA44–46; *see Real Alts.*, 867 F.3d at 359–66 & n.18.

1.   RFRA is a remedial statute, giving courts final say over its meaning. JA44 n.18 (citing *Loper Bright*, 603 U.S. at 398–401). What courts have held to be a RFRA violation therefore controls. That the Agencies may exercise their rulemaking discretion to resolve RFRA violations as *Little Sisters* held, 591 U.S. at 680, does not give their legal analysis as to *what* is a RFRA violation "dispositive" effect, *contra* Int.Br.37–41; Fed.Br.38–39.[14] And although courts must accept the

---

[14] The existence of other permanent injunctions against the mandate and Accommodation is also not dispositive, *contra* Int.Br.40-41, because each rested on the Agencies' concession of a RFRA violation and therefore contained no relevant legal analysis.

Little Sisters neglects to mention that one of these cases covers them: *Little Sisters of the Poor v. Azar*, ECF Nos. 82–83, No. 13-cv-2611 (D. (continued…)

"sincerely held complicity-based objections of religious entities," *Little Sisters*, 591 U.S. at 681, courts are still required to conduct an "objective evaluation of the *nature* of the claimed burden and the *substantiality* of that burden on the [claimant's] religious exercise," *Real Alts.*, 867 F.3d at 356 (quoting *Geneva Coll.*, 778 F.3d at 436, *vacated and remanded sub nom. Zubik*, 578 U.S. 403 (2016)).

In *Geneva College*, this Court concluded that the Accommodation does not impose a substantial burden under RFRA. 778 F.3d at 435–42.

---

Colo. May 29, 2018); *see supra* note 7. "Little Sisters Pittsburgh have adopted the Christian Brothers Employee Benefit Trust … to provide medical benefits coverage for their employees." JA1683. That decision enjoins the Agencies from enforcing the contraceptive mandate against "all current and future participating employers in the Christian Brothers Employee Benefit Trust Plan, and any-third party administrators acting on behalf of these entities with respect to the Christian Brothers Employee Benefit Trust Plan, including Christian Brothers Services." *Little Sisters of the Poor v. Azar*, No. 13-02611, ECF 82; *see also Little Sisters*, 591 U.S. at 674 n.6 ("[A] District Court in Colorado had permanently enjoined the contraceptive mandate as applied to plans in which the Little Sisters participate.").

Moreover, because Little Sisters administers benefits through a "church plan" that is exempt from ERISA, *see* 26 U.S.C. § 410(d), Little Sisters is not subject to penalties for failing to comply with the mandate, as the Federal Government previously conceded, *see* Tr. of Oral Arg. at 84:10–24, *Zubik v. Burwell*, 578 U.S. 403 (2016) (Nos. 14-1418 *et al.*).

The States have never sought to force Little Sisters to comply with the mandate nor suggested that it is required to do so.

This Court held that the Accommodation does not, as a matter of fact and law, "trigger or facilitate the provision of contraceptive coverage because coverage is mandated to be otherwise provided by federal law." *Id.* at 437. Nor did it make religious objectors complicit as a matter of law because it shifted the regulatory requirement from the objector to third parties. *Id.* at 438–49.[15]

Although the Supreme Court vacated *Geneva College*, this Court reaffirmed its holding and reasoning in *Real Alternatives*:

> [*Geneva College*] sets forth the view of our Court … regarding our duty to assess substantiality as well as our conclusion that the regulation at issue there did not impose a substantial burden. … *Zubik* vacated our judgment in *Geneva* but did not attack our reasoning. … While *Geneva* is no longer controlling, there is nothing that would require us—or anyone else—to conclude that our reasoning in that opinion was incorrect.

*Real Alts.*, 867 F.3d at 356 n.18.

---

[15] Little Sisters incorrectly claims that the opinion in *Geneva College* rested on a "false premise" because the contraceptive coverage provided by their TPA through the Accommodation would be part of the "same 'plan'" as their other health coverage. Int.Br.43–44 (quoting Br. for Resp'ts at 38, *Zubik*, 578 U.S. 403). But the cited brief expressly notes that "[i]f the employer has a self-insured church plan … any contraceptive coverage voluntarily provided by the TPA is not part of the employer's ERISA-exempt plan." Br. for Resp'ts at 38 n.15, *Zubik*, 578 U.S. 403. And Little Sisters cannot allege that its religious exercise is burdened by the operation of the Accommodation with respect to *other* employers.

*Real Alternatives* remains a binding decision of this Court—both as to the test applied when evaluating a RFRA claim and whether the Accommodation violated RFRA. JA44–46; *see Reilly*, 858 F.3d at 177; 3d Cir. I.O.P. 9.1; *contra* Fed.Br.38.[16] Nothing in *Little Sisters* states that courts must passively accept any claim that a religious entity is substantially burdened by the operation of a generally applicable rule, or that courts must accept that an alleged burden exists when premised on a faulty characterization of law. *See Real Alts.*, 867 F.3d at 356 (rejecting these positions). Nor did the Supreme Court hold, in either *Zubik* or *Little Sisters*, that the Accommodation imposes a substantial burden. See *Zubik*, 578 U.S. at 409; *Little Sisters*, 591 U.S. at 681. Instead, the Court said only that it was appropriate for the Agencies, when revisiting the contraceptive coverage guarantee after *Zubik*, to consider what RFRA required. *Little Sisters*, 591 U.S. at 681.

---

[16] Even if this Court were to find this language to be *dicta*, the Court's reasoning in *Geneva College*—which the Supreme Court has never addressed—still persuasively explains why the Accommodation does not impose a substantial burden. The permanent injunction entered by the district court, Int.Br.42, came only because the Agencies conceded a RFRA violation, *see Geneva Coll. v. Azar*, No. 12-cv-00207, 2018 WL 3348982, at *3 (W.D. Pa. July 5, 2018).

The Agencies defend the Religious Rule as a "reasonable" response to "considerable doubt about the sufficiency of the accommodation." Fed.Br.39. But the Agencies failed to acknowledge this Court's majority opinion in *Real Alternatives* in the Rule, citing only to the dissent. JA433 n.56. This failure is all the more remarkable because *Real Alternatives* was one of only two published decisions by a court of appeals addressing a post-*Zubik* RFRA challenge to the mandate prior to the issuance of the interim rules. *See also Ozinga v. Price*, 855 F.3d 730, 735–36 (7th Cir. 2017) (dismissing challenge to mandate as moot in light of *Hobby Lobby*). Exacerbating this error, the only decision other than *Hobby Lobby* that the Agencies cited to support their conclusion that the Accommodation imposes a substantial burden is *Sharpe Holdings, Inc. v. U.S. Department of Health & Human Services*, 801 F.3d 927 (8th Cir. 2015)—an Eighth Circuit decision vacated by *Zubik*. Fed.Br.36–37 & n.4; JA420. Concluding that the Accommodation may substantially burden religious beliefs without addressing key judicial decisions constitutes unreasoned decisionmaking.

2.     As the District Court rightly recognized, JA46–47, the Supreme Court's decision in *Fulton* does not undermine *Real Alternatives*—

to the contrary, it supports this Court's reasoning. *Contra* Int.Br.44–45. In *Fulton*, the plaintiff foster agency was asked to certify and "approve" same-sex couples as foster families, even though the agency believed that such certification constituted an endorsement inconsistent with its religious beliefs. 593 U.S. at 530 (cleaned up). But the Court did not suggest that the agency could object to *others* certifying same-sex couples; indeed, the agency itself would direct those couples to other agencies with different views. *Id.* The Accommodation requires even less from religious objectors: it excuses the objector from certifying and approving contraceptive coverage, while federal law and the government require third parties to provide it instead. JA595.

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) also supports this Court's reasoning. *Contra* Int.Br.45–46. That case turned on a public school district's failure to allow parents to opt their children out of reading certain books in the school curriculum. *Mahmoud*, 606 U.S. at 537–38. The Supreme Court held that *Bowen v. Roy*, 476 U.S. 693 (1986), and *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), which apply to matters of internal government affairs, were inapplicable because a public school curriculum necessarily impacts students.

64

*Mahmoud*, 606 U.S. at 556–57. Unlike a school curriculum, the government's implementation of the Accommodation has no "direct, coercive" impact on a religious objector. *Cf. id.* If a self-insured employer uses the Accommodation, the government, utilizing its authority under section 3(16)(A) of ERISA, then designates the TPA as the plan administrator for purposes of providing contraceptive coverage. *See* 29 C.F.R. § 2510.3-16(b). An ERISA "plan" is simply a "set of rules that define the rights of a beneficiary and provide for their enforcement." *Pegram v. Herdrich,* 530 U.S. 211, 223 (2000). An objection to the way this contraceptive coverage is classified under ERISA—*i.e.,* whether it is technically part of the same "plan" as the employer's health coverage—is a "matter of 'internal affairs'" that has no "direct or coercive interaction[]" with the objector. *Mahmoud*, 606 U.S. at 557 (quoting *Bowen*, 476 U.S. at 699).

3.      Even if the Accommodation substantially burdened religious exercise, the Agencies would have to have reasonably considered the governmental interests at stake and whether the Accommodation was the least restrictive means of accomplishing those interests before concluding that the Accommodation violates RFRA. 42 U.S.C. § 2000bb-1(b). But their compelling interest analysis was largely circular—referring to the

burden on religious employers in evaluating whether employees' access to cost-free contraception was a compelling interest, JA420–21—and they did not consider whether the Accommodation was the least restrictive means, JA420–22.

That the ACA's guarantee of coverage for medically necessary preventive services does not reach every woman cannot justify depriving thousands more or somehow negate the government's compelling interest in ensuring cost-free access to contraception. JA420–22. Regulatory schemes that serve a compelling interest while allowing for certain exceptions are common. No one disputes the government's compelling interest in raising revenue, raising an army, or preventing employment discrimination, even though those have exemptions. *E.g.*, 50 U.S.C. § 3802 (exempting women from the draft); 42 U.S.C. § 2000e(b) (exempting small employers from Title VII); *United States v. Lee*, 455 U.S. 252, 260 (1982) (recognizing government interest in imposing Social Security taxes, notwithstanding certain exceptions).

The existence of other "possible sources" of contraception, JA422, has the compelling interest exactly backwards, *contra* Int.Br.39–40; Fed.Br.48, 50. As multiple commenters noted in 2017, many

employees enrolled in employer-sponsored coverage are ineligible for such programs; the administration was contemporaneously reducing coverage and availability of those programs; and state laws largely did not provide uniform coverage. *See, e.g.*, JA1135–36; JA1149–53; JA1167–71; JA1182–86; JA1192; JA1209; JA1241–45; JA1249–53; JA1268–72; JA1283–87.[17] The goal of the WHA was to eliminate such hurdles to women's access to necessary health care. JA643–44.

### 3.   The Agencies' post-hoc rationalizations cannot justify the Religious Rule.

The Agencies—for the first time in seven years of litigation—disclaim RFRA. Instead, they claim that they promulgated the Religious Rule as a "policy decision . . . justified" for reasons "independent" of RFRA. Fed.Br.25–34. But it is blackletter law that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *State*

---

[17] Those concerns remain today. The current Administration froze Title X funding last year, restoring it only after litigation. Ashleigh Fields, *Trump administration restores funding to Planned Parenthood, other groups after lawsuit*, The Hill (Jan. 15, 2026), https://thehill.com/policy/healthcare/5690881-trump-administration-planned-parenthood-funding/. The 2025 budget reconciliation act defunded Planned Parenthood for one year and made significant changes to Medicaid that will cause coverage losses and exacerbate care shortages. Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025).

*Farm*, 463 U.S. at 50. Instead, courts "look only to what the agency said at the time of the action." *Coinbase, Inc. v. SEC*, 126 F.4th 175, 200 (3d Cir. 2025) (cleaned up).

The Agencies clearly stated their purpose in adopting the Religious Rule: they were attempting to eliminate potential RFRA violations. *E.g.*, JA411 ("The rules are necessary to expand the protections for the sincerely held religious objections of certain entities and individuals."); JA419 ("in light of RFRA, an expanded exemption rather than the existing accommodation is the most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*"); JA418 ("a broader exemption, rather than a mere accommodation, is the appropriate response" to a "statute that imposes a substantial burden on the exercise of religion under RFRA"); *id.* (for religious employers, "without finalizing the expanded exemptions … the Departments would violate their rights under RFRA"); JA420 ("requiring certain religiously objecting entities or individuals to choose between the Mandate, the accommodation, or incurring penalties for noncompliance imposes a substantial burden on religious exercise under RFRA"); *accord Little Sisters*, 591 U.S. at 686 (stating that the Agencies explained that

the rules were "necessary to protect sincerely held" religious objections, citing JA411–12).

The Agencies' arguments elsewhere in their appellate brief confirm that the Religious Rule is inextricably intertwined with RFRA. The District Court held, among other things, that the Religious Rule "provides 'no mechanism for evaluating the sincerity of the objector's religious beliefs, or whether complying with the [Contraceptive Mandate] (or the [A]ccommodation) substantially burdens the individual's religious exercise.'" Fed.Br.43 (quoting JA43). In attempting to rebut this conclusion, the Agencies argue that employees can "police insincere religious objections" using other laws. Fed.Br.43–44. But sincere religious objections and substantial burdens are metrics relevant only under RFRA.[18] The Agencies also defend their discussion of certain contraceptives as "abortifacients" as legally justified "under RFRA," Fed.Br.51, and defend the inclusion of publicly traded companies as supported by RFRA, *id.* at 41.

The Agencies' passing reference to adopting the expanded exemptions "even if RFRA does not compel" it, Fed.Br.26 (quoting JA418), did

---

[18] This argument also unreasonably outsources responsibility for ensuring compliance with RFRA to beneficiaries of the mandate.

not set forth an independent basis for the Rule; the Agencies in the same sentence said that the Rule is responsive to "religious objections that have been raised," JA418. Likewise, the purportedly "independent" rationale, Fed.Br.26 (quoting JA419), was actually the Agencies' determination that RFRA provided independent legal authority, JA419. Indeed, even the Agencies' so-called independent reasons were still based on the existence of RFRA as a "background rule" and a desire to protect religious beliefs. *See* Fed.Br.28 (quoting JA416); *see generally id.* 27–30.

Even if the Agencies had acted independent of RFRA, their policy explanations do not withstand scrutiny. A broad exemption that sweeps well beyond the scope of existing objections is not "more direct." *Contra* Fed.Br.27. Nor is it an "effective means of satisfying all bona fide religious objectors" when the decision not to require notice prevents the Agencies from knowing whether the objections are "bona fide." *Contra id.* That the Religious Rule would be "more workable than providing the accommodation as the sole option for companies with religious objections," defies common sense when the Agencies continued to offer the Accommodation and so must maintain the relevant staff and infrastructure. *Contra id.* (cleaned up). Avoiding "inconsistency in respecting religious

objections," Fed.Br.27–28 (quoting JA416), has RFRA exactly backwards; the relief granted should be specific to the objector, not uniformly defined by the broadest objection—especially when expanding exemptions increases the number of women denied "full and equal health coverage, including contraceptive coverage," *Zubik*, 578 U.S. at 408 (cleaned up). And the Agencies' claim that employers satisfied with the Accommodation will continue using it, Fed.Br.29, was both inconsistent with their other reasons and with their own estimates that more than half of previously accommodated entities will invoke the exemptions instead, JA451.

The Agencies criticize the District Court for "substitut[ing] its own judgment about what it wished the agencies had set out to accomplish." Fed.Br.31. But the District Court correctly analyzed the grounds invoked by the Agencies in the Religious Rule—avoiding RFRA conflicts, JA43—which were the same grounds the Agencies argued before the District Court. *E.g.*, Fed. Mem. of Law at 13, *Pennsylvania v. Trump*, No. 17-cv-4540, ECF No. 344 (E.D. Pa. Apr. 18, 2025) (2025 WL 4104546) ("The Rule is intended to alleviate the burden on those whose religious objections to the mandate are not adequately addressed by the accommodation, which it does by exempting such entities from the mandate.").

Arguments asserted for the first time on appeal are deemed forfeited. *Sun Chem. Corp. v. Fike Corp.*, 981 F.3d 231, 235 n.1 (3d Cir. 2020).

*    *    *

Despite relying on RFRA to justify the Religious Rule, the Agencies failed to draw a "rational connection" between any actual RFRA conflicts and the Agencies' chosen solution. *See State Farm*, 463 U.S. at 43; *see also Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring). For these reasons, the District Court correctly found that the Religious Rule is arbitrary and capricious.

### D.    The Rules were insufficiently reasoned in other ways.

### 1.    The Agencies unreasonably changed position on the safety and effectiveness of contraception.

The Agencies failed to reasonably explain their new doubts about the safety, effectiveness, and benefits of contraceptive care, which they claimed undermine any compelling interest in facilitating access to that care and helped justify the exemptions. JA422; JA426–30; JA482–86; *see* Fed.Br.61. Agencies may "change their existing policies," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), but must provide a "reasoned explanation" and "show that there are good reasons for the new policy," *Fox Television*, 556 U.S. at 515. And when an agency's "new policy

72

rests upon factual findings that contradict those which underlay its prior policy" or "its prior policy has engendered serious reliance interests," the agency must provide "a more detailed justification." *Id.* Here, the District Court rightly concluded that the Rules lack a detailed—or even reasoned—explanation for the Agencies' changed stance and therefore "run[] counter to the evidence before the agency." JA51–54; *State Farm*, 463 U.S. at 43.

Before 2017, the Agencies had determined that because women face unique health needs associated with the ability to become pregnant, and because unintended pregnancy poses health risks, contraception is a preventive service. JA51; *see* JA580; JA643–44; JA658; JA702–03. And because cost-sharing is a barrier to effective contraception use, the Agencies concluded that the contraceptive care requirement is necessary to remedy a critical gender disparity that prevents women from achieving equal health outcomes with men. *Ibid.* Those findings generated significant reliance interests: the Agencies acknowledged that between 55.6 and 62.4 million women covered by private insurance then had cost-free contraceptive coverage, JA452, and conceded that at least 70,515 women will lose coverage under the Rules. JA452; JA500.

In the Final Rules, however, the Agencies reversed course on a host of questions—whether contraception is safe, is an abortifacient, reduces teen pregnancy, and benefits women—without a reasoned explanation and to severe detriment of the reliance interests of tens of thousands of women.

1.    As the District Court recognized, JA53–54, the Agencies backtracked on the safety and effectiveness of contraception. They purport to identify some "empirical questions"—including how severe the side effects of contraception are and whether contraception increases or decreases unintended pregnancies—that they claimed indicate that "significantly more uncertainty and ambiguity exists on these issues." JA429, *see also* JA484.

In reaching this conclusion, however, the Agencies did not address the FDA's undisputed determination that the 17[19] approved contraceptive methods are "proven safe and effective." JA1741–64. Nor did they consider the medical community's overwhelming consensus that contraception is safe and effective. *E.g.*, JA981; JA984–85; JA994; JA996;

---

[19] Although there are 18 forms of contraception approved by the FDA, the mandate applies only to preventive care for women, which excludes vasectomies. JA641 n.1.

JA1000–01; JA1003–04; JA1012; JA1370–1422. And they did not identify any new evidence contradicting their prior conclusion that unintended pregnancy is a health risk for women. JA53.

Instead, the Agencies pointed only to studies concerning side effects associated with certain kinds of contraception for certain population groups—irrationally treating all 17 forms of FDA-approved contraception as posing the same side effect risks for all populations. Methods of contraception, like all medical services, must be individually prescribed; a form of contraception indicated for one woman may be contraindicated for another. *See* JA1741. And all safe and effective medication will have side effects for some patients. This is exactly why the Agencies had previously concluded that "[i]t is for a woman and her health care provider in each particular case to weigh any risks against the benefits in deciding whether to use contraceptive services in general or any particular contraceptive service." JA643.

The Agencies now claim that the District Court "merely disagreed with the agencies' technical judgment" and ask for the deference usually shown to agency expertise. Fed.Br.52–53. But the Agencies did not make technical judgments or demonstrate any expertise. JA53. Instead, they

purported to uncover a medical controversy that did not previously exist (claiming "significantly more uncertainty and ambiguity" on the "health effects of contraception and pregnancy," JA429, 426)—and then declined to "take a position on the variety of empirical questions discussed above." JA429. This "just-asking-questions" approach does not constitute agency expertise.

It was not error for the District Court to observe (accurately) that many of the studies cited by the Agencies "were published either before or during the years that the Agencies concluded that contraception was safe and effective." JA53; *see* JA426–29. The District Court did not claim that the Agencies are legally prohibited from reevaluating their position. *Contra* Fed.Br.53. Rather, the District Court rightly faulted the Agencies for not explaining, in light of their changed position, "why these studies now compel a different conclusion about contraception's safety when they did not do so in previous years." JA53; *see Fox Television*, 556 U.S. at 516 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."); *cf. Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1037–39 (D.C. Cir. 2012) (finding that the EPA reexamined the existing record to conclude that an

opt-out provision from lead-paint work-practice standards did not protect public health).

2.    The District Court also recognized that the Agencies "introduced a more fundamental ambiguity: whether certain forms of contraception constitute 'abortifacients.'" JA54; *see* JA428; JA483. In a section addressing the "Health Effects of Contraception and Pregnancy," the Agencies improperly injected some commenters' religious views on this issue, backtracking from the Agencies' earlier conclusion that "FDA-approved contraceptive methods, including Plan B, Ella, and IUDs, are not abortifacients within the meaning of federal law." JA659. Indeed, the Agencies' new position is contrary to HHS's own longstanding definition of pregnancy, *see* 45 C.F.R. § 46.202(f) (defining pregnancy as "the period of time from implantation until delivery"); 40 Fed. Reg. 33,526, 33,529 (Aug. 8, 1975) (pregnancy is the "period of time from confirmation of implantation until expulsion or extraction of the fetus"), as well as that of the broader medical community, JA1022.[20]

---

[20] The Agencies also misrepresented how the FDA describes several methods of contraception, JA428 n.39; JA483 n.41, which "may also work … by preventing attachment (implantation) to the womb (uterus)." JA1745–46; JA1758–60. The Agencies inserted the words "of a human embryo after fertilization," which the FDA did not use. *See id.*

The Agencies criticize the District Court for "fail[ing] to engage with the agencies' *legal* reasons" for declining to take a position on whether certain contraceptives are "abortifacients." Fed.Br.51–52. But that some people sincerely believe certain forms of contraception cause abortion is not a "technical judgment" relevant to a discussion of health effects. *Cf.* Fed.Br.52–53. Nor is it relevant to whether the Agencies have a compelling interest in providing women with contraceptive coverage—which is what the Agencies were purportedly assessing. Fed.Br.46.

3.    The Agencies similarly erred in relying on purported ambiguity over the "empirical question of whether contraception has caused certain reductions in teen pregnancy" to conclude that "it is difficult to establish causation between granting religious exemptions to the contraceptive Mandate and either an increase in teen pregnancies in particular, or unintended pregnancies in general." JA428; *accord* JA484. This disregards without explanation the HHS Office of Adolescent Health's earlier conclusion that the 63% decline in teen pregnancy between 1990 and 2013 "is due to the combination of an increased percentage of adolescents

who are waiting to have sexual intercourse and the increased use of effective contraceptives by teens." JA1775–77.[21]

As the District Court recognized, JA53–54, the cited studies by the Agencies do not suggest otherwise. The influence of other factors on the decline in teen pregnancy does not eliminate the role of increased access to contraception. And the fact that some women who had abortions were using contraception when they got pregnant says nothing about the overall effectiveness of contraceptive use. *Cf.* JA428–29; JA484; *contra* Fed.Br.49–51. Here, too, the Agencies identified no evidence suggesting that contraception is ineffective at preventing pregnancy.

The Agencies attempt to reframe this change in position as one merely about the effectiveness of the "*contraceptive-coverage* mandate." Fed.Br.49–51. But they provide no evidence to conclude that the mandate has not facilitated access to contraception. To the contrary, they ignore studies showing that contraceptive mandates have reduced unwanted pregnancy. *See infra* 80–81.

---

[21] Whether agency action is arbitrary and capricious is judged based on information contained in the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). HHS's earlier report on trends in teen pregnancy, however, only documents its prior position.

4.    Finally, the Agencies did not sufficiently explain their summary conclusion that the Rules "are not likely to have negative effects on the health or equality of women nationwide," JA429–30; *accord* JA484–86.[22] The Agencies failed to provide any evidence contradicting their earlier conclusions that contraception "improves the social and economic status of women" and that contraceptive coverage without cost sharing is necessary to eliminate the "financial barriers that prevented women from achieving health outcomes on an equal basis with men." JA644; JA658; JA703.

Additionally, the Agencies cited no study supporting any ambiguity regarding the impact of contraceptive mandates on reducing unintended pregnancy; their only source for claiming that state mandates "have not necessarily lowered rates of unintended pregnancy (or abortion) overall"

---

[22] The Agencies had previously explained that the church exemption would likely not negatively impact women because houses of worship "are more likely than other employers to employ people of the same faith who share the same objection." JA645. But the Agencies had rejected expanding the exemption to other employers precisely because female employees of non-religious employers are "less likely than individuals in plans of religious employers to share their employer's (or institution of higher education's) faith and objection to contraceptive coverage on religious grounds." JA658. The Agencies have not abandoned that position. *Contra* Fed.Br.48.

80

is a law review article, not a research study. JA429 n.53; JA485 n.56. The Agencies ignored several comments proving that Colorado's contraceptive mandate, for example, reduced the unintended pregnancy and abortion rates, JA1047–48; JA1055; JA1142; *see* Fed.Br.47—instead wrongly claiming that no commenter provided empirical data about state contraceptive equality mandates, JA429; JA485. The Agencies also ignored evidence that the contraceptive coverage requirement has allowed women to choose longer-term and more effective forms of contraception, which decreases the risk of unintended pregnancies. *See, e.g.*, JA1097; JA1105; JA1117–18; JA1141–42.

5.    The lack of sufficient explanation for the reversal of their position is magnified by the Agencies' failure to consider the reliance interests of the women who stood to lose contraceptive coverage, and to "weigh" these interests against competing policy objectives. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020); *see also Fox Television*, 556 U.S. at 515. The Agencies themselves estimated that the Rules would cause between 70,515 and 126,400 women who were entitled to coverage under the prior regulations to lose that coverage. JA449–56; JA498–501. The results are increased contraceptive costs and

unplanned pregnancies, and decreased contraceptive choice and access to regular medical providers. *See* JA452; JA459.

The Rules cause "serious harm" to women who, for years, have relied upon the mandate for access to critical contraceptive care. *Little Sisters*, 591 U.S. at 708 (Kagan, J., concurring). And they do so while retaining HRSA's determination that the "mandate is 'necessary for women's health and well-being.'" *Id.* Because the Agencies were "not writing on a blank slate," they must account for these interests in reversing their prior position. *Regents*, 591 U.S. at 31–33.

At bottom, the Agencies failed to provide a reasoned explanation— much less a detailed justification—for their newfound view that contraception is not safe, effective, and beneficial for women. *See Fox Television*, 556 U.S. at 515. And all evidence cuts against the Agencies' conclusion.

### 2.    The Agencies failed to meaningfully consider regulatory alternatives.

The District Court correctly held the Agencies arbitrarily and capriciously failed to consider regulatory alternatives "providing an avenue for individuals to still get contraceptive coverage even if they are a member of an exempt plan." JA55.

An agency must consider "significant" and "obvious" alternatives to any regulatory action, and provide a "reasoned explanation for its rejection of such alternatives." *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987). The duty to consider alternatives is shaped by the statutory purposes that guided—and here, constrained—the Agencies' rulemaking. The ACA's preventive care mandate, through the HRSA guidelines that operationalized it, required the Agencies "to minimize[e] the impact on contraceptive coverage, even as they sought to protect employers with continuing religious objections." *Little Sisters*, 591 U.S. at 708–09 (Kagan, J., concurring); *see also Zubik*, 578 U.S. at 408 (tasking Agencies with considering reasonable alternatives that "accommodate[] [objecting employers'] religious exercise while at the same time ensuring that women covered by [objecting employers'] health plans receive full and equal health coverage, including contraceptive coverage." (cleaned up)); 42 U.S.C. § 300GG-13(a)(4).[23]

---

[23] The Agencies were also obligated to avoid creating "unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "imped[ing] timely access to health care services." 42 U.S.C. § 18114(1), (2). The Agencies had to consider this additional statutory touchstone in exercising their discretion to create an exemption. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020) (finding requirement that (continued…)

While Agencies need not consider "every conceivable alternative," Fed.Br.56, this statutory regime required them, at a minimum, to carefully assess specific options that minimize the impact on contraceptive coverage. They did not do so.

First, the Agencies could have broadened the exemption to just employers who notified the Agencies of a sincere objection to the Accommodation.[24] *See Little Sisters*, 591 U.S. at 708 (Kagan, J., concurring). Almost certainly, that would have significantly reduced the number of women who would lose coverage: per the Agencies' own estimate, most women losing coverage under the Rules (approximately 64,000, JA452), had previously been able to get coverage through the Accommodation from employers who presumably had not indicated any objection to the Accommodation. JA450–51. Moreover, this would not have required the Agencies to "create[e] a new government program," *contra* Fed.Br.55–56;

---

recipients of Title X funding refrain from referring women for abortion care "creates unreasonable barriers to appropriate medical care, and impedes timely access to health care services." (cleaned up)).

[24] Little Sisters previously stated it had no "objection to simply objecting" to acquire the exemption. *See* Tr. of Oral Arg. at 29, *Little Sisters v. Pennsylvania*, 591 U.S. 657 (2020) (No. 19-431).

JA419–20, as it merely alters the scope of employers participating in the existing Accommodation process.

The Agencies failed to grapple with this option. Instead, as to the religious exemption, they simply asserted that it was impossible to create an accommodation that provides "seamless" coverage for women and "eliminate[s] the ... objections of all [employers]," JA418, without addressing whether the Accommodation could provide substantially more coverage for women for those employers who do not have a religious objection to such a process. And as to the moral exemption, they simply referred back to their conclusory assertions regarding the *religious* exemption. *See* JA477 (asserting same as to moral objections).

The Agencies also resorted to generalities about a desire to "avoid inconsistency," JA416, but "vague desire for uniformity" is no substitute for reasoned analysis, *see Del. Dep't of Nat. Resources & Envtl. Ctrl. v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015), particularly where, as here, there is a reason to treat differently situated employers differently: some have religious objections to the Accommodation process while others only object to the underlying mandate. Indeed, principled differentiation is a

hallmark of the "reasoned judgment" the APA requires. *Little Sisters*, 591

U.S. at 708–09 (Kagan, J., concurring).

Second, the Agencies could have provided a more limited exemption

for moral objectors whose objections, unlike those of religious objectors,

do not implicate statutory RFRA rights. *See* JA476 (acknowledging pub-

lic comments arguing that no moral exemptions should be provided; that

the expanded moral exemptions are "too broad"; and that only an accom-

modation should be provided for moral objections). With no RFRA foun-

dation for the Moral Rule, *see supra* Section II.A, the calculus for how to

weigh moral objections against a statutory directive differs from the case

of religious objections. The Agencies should "have weighed anew … the

benefits of exempting more employers from the mandate against the

harms of depriving more women of contraceptive coverage." *Little Sisters*,

591 U.S. at 710 (Kagan, J., concurring).

Instead of considering narrow alternatives for the moral exemption,

the Agencies ported over the structure and breadth of the RFRA-based

religious exemption. At the very least, the Agencies should have ex-

plained why they would refuse to distinguish *at all* between religious and

moral scruples when federal statutory law already embraces distinctions

between the two. *See id.* at 709–10 (RFRA does not apply to moral be-liefs); 158 Cong. Rec. S539, S1162–1173 (2012) (Congress voted against adding conscience exemptions to the WHA that functioned just as the Moral Rule does); *Hobby Lobby*, 573 U.S. at 744 (Ginsburg, J., dissenting) (describing this same legislative history).

Third, as the District Court held, the Agencies could have consid-ered a separate process for women of exempt employers to obtain contra-ception without requiring notification from employers with complicity-based objections, JA54–55, such as the Agencies' 2023 Proposed Rule, which sought to reimburse willing contraceptive care providers from ACA exchange user fees. *See* 88 Fed. Reg. at 7243.[25] The Agencies now offer an impermissible post-hoc rationalization for why they could not have adopted such an option. *Coinbase*, 126 F.4th at 200; *see* Fed.Br.55–56. To be clear, the States do not contend that the Agencies were statutorily compelled to choose this or any of the other foregoing approaches. Rather,

---

[25] Little Sisters wrongly argues the Agencies considered this approach. Int.Br.53–54. But at no point did the Agencies contemplate a system that would reimburse willing providers of contraceptive services, backstopped through federal and state exchange user fee adjustments. *See* JA659; JA600; JA420–41.

the Agencies had to *consider* these alternatives and provide a reasoned explanation for rejecting them. They did not.

The District Court correctly found the failure to consider more limited alternatives arbitrary and capricious.

## III.   The Rules were properly vacated.

Under the APA, courts shall "hold unlawful and set aside agency action" that is arbitrary and capricious or otherwise found to be improper. 5 U.S.C. § 706(2). In the context of agency rules, "setting aside" is equivalent to vacatur, as decades of precedent confirm. *See, e.g.*, *Abington Mem'l Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984) ("[O]ur statutory authority under the Administrative Procedure Act … envisions the vacation of unlawfully promulgated regulations."); *PJM Power Providers Grp. v. FERC*, 88 F.4th 250, 265 n.81, 266 (3d Cir. 2023), *cert. denied*, 145 S. Ct. 140 (2024) (equating "set[ing] aside" with vacatur of agency action); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Based on this precedent, the

District Court properly vacated the rules after finding them to be unlawful.[26]

The Agencies ignore the many decisions of this and other courts vacating agency rules found to be unlawful, Fed.Br.62–64, and instead point to a concurring opinion by Justice Gorsuch, joined by Justices Thomas and Barrett, stating that the question whether the APA authorizes vacatur "warrant[s] careful consideration," *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring). No other justice has expressed the view that the APA does not authorize vacatur of unlawful agency action. Justice Alito wrote that the concurrence's suggestion "would be a sea change in administrative law as currently practiced in the lower courts." *Id.* at 721 (Alito, J., dissenting). Justice Kavanaugh has firmly rejected the concurrence's position, stating that "the APA authorizes vacatur of agency rules." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). Chief Justice Roberts, writing for a majority that included Justices

---

[26] The District Court also rejected the Agencies' request that it remand without vacatur, given the lack of Third Circuit precedent for such remedy. JA58–59. To the extent the Agencies press this argument, *cf.* Fed.Br. 57, it should be rejected as wholly unsupported and contrary to the text of the APA.

Kagan and Sotomayor, has reached the same conclusion. *See Regents*, 591 U.S. at 8–9, 35–36 (concluding that APA violation required vacatur of agency action).

This precedent is squarely grounded in the APA's text and structure. At the time of its adoption, "the phrase 'set aside' meant 'cancel, annul, or revoke.'" *Corner Post*, 603 U.S. at 829 (Kavanaugh, J., concurring) (quoting Black's Law Dictionary 1612 (3d ed. 1933)). And, contrary to the Agencies' suggestion, the phrase appears in a section of the APA—5 U.S.C. § 706—that speaks directly to the remedies that may be imposed for unlawful agency action. The command in § 706(2) to "set aside" unlawful agency actions immediately follows § 706(1)'s instruction to courts to "compel agency action unlawfully withheld or unreasonably delayed." The Agencies' suggestion that § 706 merely addresses "the court's decisional process" and not "the remedies the court may authorize," Fed.Br.64, cannot be squared with the plainly remedial language of § 706(1). Even Justice Gorsuch's concurrence in *United States v. Texas* conceded that this provision "does seem to contemplate a remedy." 599 U.S. at 700.

The suggestion, Fed.Br.65–67, that equitable considerations require limiting the scope of any vacatur simply repackages the same flawed argument. As Justice Kavanaugh explained, Congress's choice to authorize courts to "set aside" unlawful agency action represented an intentional departure from traditional principles of equity. *See Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) ("But in the APA, Congress did in fact depart from that baseline [*i.e.,* traditional equitable limitations on relief] and authorize vacatur."). Consequently, "[t]he text of § 706(2) directs federal courts to vacate agency actions in the same way that appellate courts vacate the judgments of trial courts." *Id.* The Agencies ignore that it is the text of § 706(2) that creates the remedy of vacatur, and nothing in that text limits the scope of relief in any of the ways the Agencies claim.

Thus, in *Regents*, the Court rejected the suggestion that traditional limitations on the scope of equitable relief applied in the context of vacatur, instead concluding that vacatur "ma[de] it unnecessary to examine the propriety of the nationwide scope" of injunctions entered against the same defendants. *See* 591 U.S. at 36 n.7.

For these reasons, the District Court correctly vacated the Rules.

# CONCLUSION

This Court should affirm.

February 25, 2026

Respectfully submitted,

JENNIFER DAVENPORT
Attorney General, State of New Jersey
JEREMY M. FEIGENBAUM
Solicitor General
SHANKAR DURAISWAMY
Deputy Solicitor General
JANINE S. BALEKDJIAN
JOSHUA P. BOHN
MEGHAN MUSSO
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street
Trenton, NJ 08625
(609) 696-5366
joshua.bohn@law.njoag.gov

*Counsel for State of New Jersey*

JENNIFER C. SELBER
General Counsel of the
  Commonwealth of Pennsylvania
MICHAEL J. FISCHER
Executive Deputy General Counsel

/s/ *Aimee D. Thomson*
AIMEE D. THOMSON
Deputy General Counsel
Governor's Office of
  General Counsel
30 North Third Street, Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov

*Counsel for Commonwealth of Pennsylvania*

# CERTIFICATES

I, Aimee D. Thomson, certify that:

1.    I am a member of the bar of this Court in good standing;

2.    Virus detection software was run on this file and no virus was detected;

3.    The text of this brief is identical to the text in paper copies that will be filed with the Court; and

4.    This response contains 17,894 words and therefore complies with this Court's Order (Feb. 11, 2026) granting Appellees' motion for leave to file an overlength brief of no more than 18,000 words. In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

February 25, 2026                         /s/ *Aimee D. Thomson*

# CERTIFICATE OF SERVICE

I, Aimee D. Thomson, hereby certify that a copy of this response has been served on all counsel of record using the Court's CM/ECF system.


February 25, 2026                    /s/ *Aimee D. Thomson*