Nos. 25-2575 & 25-2662
IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA & STATE OF NEW JERSEY,
Plaintiffs-Appellees,
v.
PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES  DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA,
Defendants-Appellants,
and
LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,
Intervenor-Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 2:17-CV-04540-WB

BRIEF OF AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, NATIONAL WOMEN'S LAW CENTER, AND 63 OTHER RELIGIOUS AND CIVIL RIGHTS ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS AND AFFIRMANCE

Michelle Banker
Alison Tanner
Payton Small Gannon
Monae White
K.M. Bell
Dorianne Mason
NATIONAL WOMEN'S LAW
CENTER

Jenny Samuels
Elias Daiute
Rebecca S. Markert
AMERICANS UNITED FOR
SEPARATION OF CHURCH
AND STATE

*Counsel for* Amici Curiae*; full contact information on signature page.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that (1) *amici* are not publicly held corporations; (2) *amici* do not have parent corporations; and (3) no publicly held corporation owns 10% or more of stock in the respective *amici*.

## RULE 29 STATEMENT

*Amici curiae* file this brief with the consent of all parties. *See* Fed. R. App. P. 29(a)(2). No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person other than *amici curiae* contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

RULE 29 STATEMENT ................................................................ ii

TABLE OF CONTENTS ............................................................... iii

TABLE OF AUTHORITIES ............................................................. v

INTERESTS OF THE *AMICI CURIAE* ............................................... 1

SUMMARY OF ARGUMENT ........................................................... 1

ARGUMENT ............................................................................ 2

I.   RFRA does not require the Rules. ............................................ 2

II.  The Rules are arbitrary and capricious. ..................................... 8

   A.   The Rules bear no rational connection to the problem the Departments purported to solve. ........................................ 9

     i.   The Rules allow entities without sincere religious objections to exempt themselves. ................................. 10

     ii.  The Rules exempt publicly traded corporations without any RFRA justification. ........................................ 12

     iii. The Rules exempt entities that do not object to the Accommodation. ...................................................... 13

   B.   The Departments inadequately considered the harm to women. ...................................................................... 14

     i.   The Departments' estimates of the total number of individuals harmed were illogical. ................................ 15

     ii.  The Departments reversed course on the importance of seamless contraception coverage without sufficient explanation. ............................................................ 18

     iii. The Departments wrongly assumed those most at risk of unintended pregnancy would not likely be affected. ........... 21

     iv. The Departments suggested false alternative means to access coverage. .................................................. 23

     v.  The Departments ignored the important health benefits of contraception. .................................................. 25

     vi. The Departments ignored how the Rules will undermine individuals' economic security and social equality. ............. 28

CONCLUSION ...................................................................................... 32

CERTIFICATE OF COMPLIANCE ...................................................... 33

CERTIFICATE OF SERVICE ................................................................. 34

APPENDIX .............................................................................................. 35

# TABLE OF AUTHORITIES

## Cases

*Association of Private Sector Colleges & Universities v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012) .................................................... 15

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) ................................................................ 9

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......................................................... 10, 12

*Employment Division v. Smith*,
494 U.S. 872 (1990) ................................................................ 4

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .............................................................. 15

*Gill v. Whitford*,
585 U.S. 48 (2018) .................................................................. 4

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) .......................................................... 4, 6, 8

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ................................................ 11

*Holt v. Hobbs*,
574 U.S. 352 (2015) ............................................................ 6, 10

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ........................................................ *passim*

*Motor Vehicle Manufacturers Association of the United States, Inc. v.
State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ........................................................ 9, 11, 15

*Nielsen v. Preap*,
586 U.S. 392 (2019) ................................................................ 4

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*,
867 F.3d 338 (3d Cir. 2017) ...................................................... 3

*Sherbert v. Verner,*
374 U.S. 398 (1963) ...................................................................4

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ..................................................................4

*United States v. Manneh,*
645 F. Supp. 2d 98 (E.D.N.Y. 2008) ....................................11

*United States v. Quaintance,*
608 F.3d 717 (10th Cir. 2010) .............................................11

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ..................................................................4

*Zubik v. Burwell,*
578 U.S. 403 (2016) ..................................................................7

**Constitutions**

U.S. Const. art. II, § 3 ................................................................5

**Statutes**

42 U.S.C. § 1396a .......................................................................24

42 U.S.C. § 2000bb .....................................................................4

42 U.S.C. § 2000bb-1 ................................................. 2, 3, 4, 10

8 U.S.C. § 1613 ..........................................................................24

**Other Authorities**

155 Cong. Rec. S11987 (daily ed. Nov. 30, 2009) ....................31

155 Cong. Rec. S12025 (daily ed. Dec. 1, 2009) ......................30

156 Cong. Rec. H1711 (daily ed. Mar. 19, 2010) .....................31

158 Cong. Rec. S538 (Feb. 9, 2012) .........................................31

Alliance for Women's Health & Prevention, *New Ipsos Survey Highlights Critical Gaps in Preventive Care for Women* (Feb. 12, 2025) ....................................................................... 20

K.D. Bertakis et al., *Gender Differences in the Utilization of Health Care Services*, 49 Journal of Family Practice 147 (2000) ................... 18

M. Antonia Biggs et al., *Access to Reproductive Health Services Among People With Disabilities*, JAMA Network Open (2023) ...................... 21

Bureau of Labor Statistics, May 2018 National Occupational Employment & Wage Statistics ........................................................... 22

Drug Enforcement Administration, EO-DEA007, DEA-DC-5, *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act (Revised)* (Nov. 20, 2020) .......................................... 7-8

Ewa Cukrowska-Torzewska & Anna Matysiak, *The Motherhood Wage Penalty: A Meta-Analysis*, 88-89 Social Science Research 102416 (March 19, 2020) ................................................................. 30

Jessica L. Gleason, *Risk of Adverse Maternal Outcomes in Pregnant Women With Disabilities*, JAMA Network Open (Dec. 15, 2021) ....... 27

Latoya Hill et al., Kaiser Family Found., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them* (Oct. 25, 2024). ........................................................... 27

Samantha Malone et al., *Continuity of Health Insurance Coverage & Choice of Contraception Method*, 33 Journal of Women's Health 1327 (2024) .................................................................. 20

Medical Expenditure Panel Survey United States (2018) ..................... 22

National Women's Law Center, *Collateral Damage: Scheduling Challenges for Workers in Low-Paid Jobs and Their Consequences* (Sep. 14, 2023) ................................................................. 30

Alice Miranda Ollstein, *Clinics Begin Closing as Trump Admin Continues Freeze on Family Planning Funds*, POLITICO (Apr. 22, 2025) ................................................................. 25

Pub. L. No. 119-21, § 71113, 139 Stat. 72, 300-01 (July 4, 2025)...........25

Sarah J. Purvis & Ashley E. Fico, *#MeToo: Associations of Educational Institution Religious Affiliation with Sexual Health Services and Rates of Sexual Assault*, 70 Journal of American College Health 1403 (2022)...............................................31-32

Sarina Schrager et al., *Beyond Birth Control: Noncontraceptive Benefits of Hormonal Methods and Their Key Role in the General Medical Care of Women*, 29 Journal of Women's Health 937 (2020)..28

Adam Sonfield et al., Guttmacher Inst., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* (2013) ......................................................30

Terri-ann Monique Thompson et al., *Racism Runs Through It: Examining the Sexual and Reproductive Health Experience of Black Women in the South*, 41 Health Affairs 195 (2022) ...........................21

Samantha Truong et al., *Transcending Language Barriers in Obstetrics & Gynecology: A Critical Dimension for Health Equity*, 142 Obstetrics & Gynecology 809 (2023) ............................................21

U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2008* (2009) ........................................18

Erin Wingo et al., *Reproductive Health Care Priorities & Barriers to Effective Care for LGBTQ People Assigned Female at Birth: A Qualitative Study*, 28 Women's Health Issues 350 (2018).................21

## Regulations

45 C.F.R. § 147.120...................................................................23

## INTERESTS OF THE *AMICI CURIAE*

*Amici* are religious and civil-rights organizations that respect the important but distinct roles of religion and government in our nation. *Amici* oppose laws and regulations that permit people to impose their beliefs on others, particularly in private matters around how, when, and whether to start a family. *Amici* are committed to ensuring that individuals who may become pregnant have access to full and equal health coverage, including contraceptive coverage.

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's grant of summary judgment for Pennsylvania and New Jersey and reject Appellants' and Intervenor-Appellant's defense of the unchecked exemptions from the Affordable Care Act (ACA)'s contraceptive coverage requirement established by the challenged regulations: *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,536, 57,536 (Nov. 15, 2018) (JA410) ("the Religious Rule"), and *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592, 57,592 (Nov. 15, 2018) (JA465) ("the Moral Rule") (together, "the Rules"). As a threshold matter, the Religious Freedom

1

Restoration Act (RFRA), 42 U.S.C. § 2000bb-1 *et seq.*, does not require the Rules. And, as the District Court recognized, the Rules are arbitrary and capricious because they extend exemptions far beyond what would be necessary to achieve the Departments' stated goal of resolving conflicts with RFRA. Further, the Departments failed to grapple with the true scope of harm that the Rules would cause or adequately explain their switch in position on the importance of seamless contraceptive coverage to women's health and equality.

## ARGUMENT

### I.  RFRA does not require the Rules.

The Departments assert that the Religious Rule is "compelled by RFRA." Gov't Br. at 34.[1] But RFRA contains key constraints that the Rules flout: RFRA expressly contemplates individualized assessment of substantial burdens on sincerely held religious beliefs and case-by-case accommodations that allow the government to continue to achieve its compelling interests by the least restrictive means. *See* 42 U.S.C. 2000bb-

---

[1] The Departments do not justify the Moral Rule as compelled by RFRA and, as the District Court recognized, they cannot. JA38 n.16.

1(a)-(b). Blanket, unchecked exemptions like the Rules are antithetical to RFRA's statutory scheme and therefore cannot be justified by it.[2]

*1.* The text and preamble of RFRA demonstrate that it does not permit—let alone require—blanket exemptions. RFRA states that "Government shall not substantially burden a person's exercise of religion," except where the government can satisfy strict scrutiny. 42 U.S.C. § 2000bb-1(a). Once a person establishes that their religious exercise has been "substantially burdened," the government must "demonstrate[] that application of the burden *to the person*" is the least restrictive means of furthering a compelling interest. 42 U.S.C. § 2000bb-1(b) (emphasis added). The statute plainly refers to a claim for religious accommodation by "the person" to whom the challenged law applies—"the particular claimant whose sincere exercise of religion is being substantially burdened," not some hypothetical group—and contemplates an individualized assessment as to whether the burden on

---

[2] As the District Court correctly held, RFRA cannot require the Rules because the prior regulations' Accommodation did not impose a substantial burden. JA47-48 (citing *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 360 (3d Cir. 2017)); *see also* Plaintiffs-Appellees' Br. at 59-63. But even if such a burden could be shown for some entities, RFRA cannot require broad prophylactic regulatory exemptions like those here.

that person is justified. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006); *see also Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("[G]rammar and usage establish that 'the' is a function word indicating that a following noun or noun equivalent is definite or has been previously specified by context." (citation omitted)).

This construction follows RFRA's purpose. The statute's preamble specifies that Congress enacted RFRA to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)" after the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). 42 U.S.C. §§ 2000bb(a)(4), (b)(1). *Sherbert* and *Yoder* "scrutinized the asserted harm of granting *specific* exemptions to *particular* religious claimants." *O Centro*, 546 U.S. at 431 (emphasis added). To effectuate this purpose, the statute specifies that "[s]tanding to assert a claim or defense under [RFRA] shall be governed by the general rules of standing under article III of the Constitution." 42 U.S.C. § 2000bb-1(c). Article III standing "is not dispensed in gross"; rather, it requires proof of individualized harm and the "remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 843-46 (2025).

RFRA thus codifies a pre-*Smith* jurisprudential standard mandating individualized assessment of the substantiality of burdens and whether those burdens are justified. It also incorporates Article III's limitations, precluding relief for those who cannot prove that their RFRA rights have been violated. As such, RFRA does not allow, let alone require, the Departments prophylactically to excuse broad swaths of individuals or entities from compliance with the laws they administer, nor does it permit the Departments to extend exemptions without any functional mechanism for claim adjudication or oversight. Indeed, such a rule would run roughshod over basic principles of separation of powers and the Executive's obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Nonetheless, as the District Court recognized, the Rules allow entities "to exempt themselves from the Contraceptive Mandate without notifying anyone of their objection," JA42, and provide "no mechanism for evaluating the sincerity of the objector's religious beliefs" or the substantiality of the burden before the Exemption is taken. JA43. The Departments insist that discretionary *ex post* enforcement suffices to weed out insincere or otherwise improper claims, Gov't Br. at 43-44, but RFRA requires *every* claimant to establish that their sincere religious

exercise has been substantially burdened, *O Centro*, 546 U.S. at 431; *see also Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015) (RFRA claimants bear "the initial burden of proving" substantial burden on religious exercise that is "sincerely based on a religious belief and not some other motivation"). As the Departments themselves recognize, without a notice requirement, they must rely on the mere possibility that an individual (a) has a plan governed by ERISA that provides notice of the coverage loss (which not all implicated plans do), (b) reads that notice or otherwise learns they have lost coverage, and (c) has the resources and ability to file a federal complaint asserting that their employer's or plan's exemption is based on insincere beliefs or insubstantial burdens. Gov't Br. at 43-44.[3] By design, this will result in underinclusive adjudication of claims for the exemption, falling short of RFRA's demands.

*2.* The Departments overread *Little Sisters* to conclude that the Supreme Court mandated the Rules. *Compare* Gov't Br. at 38 n.6, *with Little Sisters v. Pennsylvania*, 591 U.S. 657, 707-10 (2020) (Kagan, J.,

---

[3] Requiring women to take legal action (either administratively or in court) to obtain coverage for contraception (a time-sensitive medication) when they suspect their plan sponsor (generally, their employer or school) has wrongly claimed an exemption shifts significant burdens onto plan beneficiaries—a harm that the Rules failed to recognize.

concurring). In *Little Sisters*, the Court expressly declined to address whether RFRA compelled or even permitted the Rules, noting only that it was "appropriate for the Departments to consider RFRA." 591 U.S. at 680. And in *Zubik v. Burwell*, the Court declined to take a position on the merits of petitioners' RFRA challenge to the prior regulation's Accommodation, instead directing the Departments on remand to adopt an approach that "accommodates petitioners' religious exercise *while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage.*" 578 U.S. 403, 408 (2016) (quotation marks omitted) (emphasis added).

To better comply with these directives, the obvious alternative to these Rules would have been for the Departments to create a process by which entities could *request* exemptions from the Accommodation. This is what the Drug Enforcement Administration did in response to the Supreme Court's ruling in *O Centro* that the Controlled Substances Act is subject to RFRA: it published guidance setting forth detailed requirements for exemption requests to be filed by those who use controlled substances in their religious practice. *See* Drug Enforcement Administration, EO-DEA007, DEA-DC-5, *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to*

*the Religious Freedom Restoration Act (Revised)* (Nov. 20, 2020), https://perma.cc/HBX4-FEKC. As it did when considering the Women's Health Amendment of the ACA, the Court held that the Controlled Substances Act gives the government broad discretionary power to create exceptions to its requirements. *Compare Little Sisters*, 591 U.S. at 677, *with O Centro*, 546 U.S. at 432. Nonetheless, for its rules regarding religious exemptions from the Controlled Substances Act, the DEA complied with RFRA's requirement of individualized evaluation. Here, instead, the Departments flouted RFRA's requirements, arbitrarily creating these sweeping Rules.[4]

## II.   The Rules are arbitrary and capricious.

The Departments next assert that the Rules are a permissible exercise of the discretion conferred by the ACA. Gov't Br. at 19. But any discretion is cabined by the APA's standards for reasoned decision-making. And as the District Court concluded, the Rules are arbitrary and capricious because they are too broad to serve the Departments' stated

---

[4] For this reason, this Court should also affirm the District Court's holding that the Rules are arbitrary and capricious because the Departments failed to consider regulatory alternatives. *See* JA54-55.

8

purpose[5] and the Departments failed to consider the full scope of the harm that the Rules would cause.

### A. The Rules bear no rational connection to the problem the Departments purported to solve.

As explained *supra*, the Rules purport to resolve conflicts with RFRA, *see, e.g.*, JA175,[6] by adopting blanket, unchecked exemptions. But agency action is arbitrary and capricious if it lacks a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Overbreadth is a tell-tale sign that there is no such rational connection. *See Little Sisters*, 591 U.S. at 708 (Kagan, J., concurring).

---

[5] The only justification the Departments offer for the Moral Rule is avoiding disparities "from respecting religious objections… but not respecting parallel objections for moral convictions." Gov't Br. at 57 (citing JA476). Because the Moral Rule is premised solely on creating parity with the fatally overbroad religious exemptions, it too must fall.

[6] The Government asserts on appeal that independent "policy reasons regardless of what RFRA required" motivated the adoption of the Rules. Gov't Br. 25-30. But the citations that the Government points to explain the Rules by reference to RFRA. *See, e.g.*, JA419 ("[A]n expanded exemption, as opposed to the existing accommodation, is required by RFRA."); *id.* ("[A]n expanded exemption is required by RFRA for at least some objectors."); *id.* ("RFRA prohibits the government from substantially burdening a person's religious exercise where doing so is not the least restrictive means of furthering a compelling interest."). The Government cannot rely on post-hoc rationalizations for the Rules.

Here, the Rules reach far broader than resolving any conflicts with RFRA: the Rules expressly contemplate that exemptions will be claimed by entities that may not sincerely profess a religious objection or are not substantially burdened by the prior Accommodation. JA187. None of these entities could state RFRA claims. The Rules therefore lack a rational connection to the problem they purport to address.

### i.  *The Rules allow entities without sincere religious objections to exempt themselves.*

First, the Rules flout RFRA's requirement that religious beliefs must be genuine to prompt protection.

As discussed *supra*, under RFRA, the religious objector bears the burden of proving a substantial burden on her religious exercise. 42 U.S.C. § 2000bb-1(a); *Holt*, 574 U.S. at 360. Pretextual objections do not entitle claimants to an exemption. Instead, "[t]o qualify for RFRA's protection, an asserted belief must be 'sincere.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014). Thus, "a[n employer]'s pretextual assertion of a religious belief in order to obtain an exemption [from the contraceptive coverage requirement] for financial reasons would fail." *Id.* As would "the case, say, of a wily businessman seeking to use an insincere claim of faith as cover to avoid a financially burdensome

10

regulation." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1152 (10th Cir. 2013) (Gorsuch, J., concurring), *aff'd sub nom. Burwell*, 573 U.S. 682.

In promulgating the final Rules, the Departments brushed aside concerns about insincere claims, stating that they were "not aware of instances" of entities "abus[ing] the availability of an exemption or us[ing] exempt status insincerely." JA187. Of course, this lack of knowledge is the outcome of the Rules' eschewal of any notice requirement. *See supra*. Moreover, the risk that some entities without sincere religious objections would opt out is far from hypothetical—courts routinely field, and reject, pretextual RFRA claims. *See, e.g.*, *United States v. Quaintance*, 608 F.3d 717, 718, 722 (10th Cir. 2010) (Gorsuch, J.); *United States v. Manneh*, 645 F. Supp. 2d 98, 98, 111 (E.D.N.Y. 2008). Unfortunately, case law makes clear that objectors sometimes abuse RFRA, employing "religious" beliefs insincerely for material benefit, and courts—per RFRA's requirements—reject those claims.

Because the Rules allow insincere objectors to unilaterally exempt themselves from the ACA's requirements, the Rules are impermissibly overbroad. *State Farm*, 463 U.S. at 52.

### ii. *The Rules exempt publicly traded corporations without any RFRA justification.*

Second, the Rules exempt publicly traded corporations even though none ever filed litigation nor used the prior Accommodation, JA436-37, 453, and even though the Supreme Court already concluded that "numerous practical restraints would likely prevent" a publicly traded corporation from asserting RFRA rights, *Hobby Lobby*, 573 U.S. at 717. As the Court explained, "the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable." *Id.* With that understanding, *Hobby Lobby* held that the contraceptive coverage requirement violated RFRA as applied to closely held corporations, *id.* at 735, but explicitly declined to extend its holding to publicly traded corporations, *id.* at 717.

The Departments were fully aware when they promulgated the Rules that exemptions for publicly traded corporations could not possibly be justified by compliance with RFRA. In the Rules' preamble, the Departments "*agree[d]* with the Supreme Court's statement in *Hobby Lobby* that it is unlikely that many publicly traded companies will adopt religious objections to offering women contraceptive coverage." JA191

(emphasis added). Nevertheless, the Rules extend exemptions to publicly traded corporations. *See* JA191-92.

That overbroad approach cannot be squared with *Hobby Lobby*, and it demonstrates that there is no rational connection between the Departments' stated goal and their chosen means. *See Little Sisters*, 591 U.S. at 709 (Kagan, J., concurring) ("The Departments allow even publicly traded corporations to claim a religious exemption…. That option is unusual enough to raise a serious question about whether the Departments adequately supported their choice." (internal citation omitted)).

### iii.   *The Rules exempt entities that do not object to the Accommodation.*

Third, the Rules unnecessarily provide wholesale exemptions to entities that do not claim to be burdened by the preexisting Accommodation—let alone substantially so.

"[U]nder the old system, an employer objecting to the contraceptive mandate for religious reasons could avail itself of the self-certification accommodation," *Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring), after which the entity would bear no responsibility for providing coverage. The Accommodation "met the[] religious needs" of many

entities and resolved their burdens. *Id.* at 708. Yet, as acknowledged in the preamble, the Rules permit entities that are satisfied by the Accommodation—whose religious exercise is not burdened—to take the exemption. *See* JA205-206 ("Of course, some of the[] religious" institutions that "do not conscientiously oppose participating" in the Accommodation "may opt for the expanded exemption."); JA190 ("[I]t is not clear to the Departments" how many of the religious employers who had used the accommodation without objection "will choose to use the expanded exemption instead.").[7] The Rule therefore lacks a rational connection to resolving conflicts with RFRA.

### B. The Departments inadequately considered the harm to women.

The Rules' consideration of the harm that the exemptions would cause was wholly inadequate. The Departments relied on illogical estimates of the number of women affected, ignored important comments about barriers the Rules would create, and inexplicably reversed previous administrations' positions on the importance of the contraceptive coverage requirement for women's health and equality. A

---

[7] These admissions from the Departments disprove Intervenor-Appellant's argument that "[t]hose who do not actually object cannot qualify" for an exemption. Little Sisters Br. 49.

rule must be set aside as arbitrary and capricious if the Departments failed to consider important aspects of the problem raised by commenters, reached a conclusion contrary to the evidence before it, or reversed previously held positions without sufficient explanation. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *State Farm*, 463 U.S. at 43. Failure to address significant comments, the evidence before it, or its prior position—or addressing these issues in a conclusory manner—is fatal to the Departments' defense of a rule. *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441, 449 (D.C. Cir. 2012). Here, the Departments cannot defend their ill-reasoned explanation of the harm the Rules were likely to cause.

### i.  *The Departments' estimates of the total number of individuals harmed were illogical.*

Because the Rules permit entities to exempt themselves with no reporting requirement or practical oversight mechanism, it is impossible to know how many people have been affected by the Rules. Nonetheless, the Rules estimated that anywhere from 70,500 to 126,400 women would lose coverage, at a cost of $41.2 to $68.9 million. JA167; JA207; JA455. Even without current data on the number of women affected, it was clear

when the Rules were promulgated that these estimates undercounted the number of women harmed because they relied on faulty assumptions.

*1.* First, the Departments provided no basis for their assumptions about how many entities would take the Exemption. The Departments assumed that only those entities that filed litigation, some that used the Accommodation, and a trivial number of similar entities would use the Exemption. JA255, 450-52, 454. But by exempting *all* nongovernmental employers and universities, the Rules invited *thousands* of entities to exclude contraception coverage. In addition, the Rules recognized that publicly traded corporations, newly entitled to an exemption, employed "31.3 percent of employees in the private sector" in 2018. JA454, 537. The Departments' assumption that so few eligible entities would take up the invitation lacks sufficient explanation and reason.

*2.* Even as to this unexplainedly small number of harmed individuals, the Departments erred further. The Rules applied census data as to the percentage of women *in the general population* that are of childbearing age to estimate the percentage of women enrolled in objecting plans that are of childbearing age. JA205. But the Rules will generally affect women on employer or university-sponsored insurance, and the percentage of women in the workforce or in college who are of

childbearing age must be substantially higher than estimates based on the general population (because the workforce population excludes those too young to work or above average retirement age, and college students are predominantly of reproductive age). These logical limitations suggest the exemptions harm more women of childbearing age than the Departments estimated.

*3.* Finally, the Departments improperly assumed that plan participants and beneficiaries would not suffer harm because they would share their plan sponsors' objections. JA437-38, 455, 499. But as commenters emphasized, people of faith and their dependents who rely on objecting entities for health insurance use contraception and will be affected by a loss of coverage.[8] Indeed, *amici* NWLC continually receives reports from women who want and need access to contraception but are faced with exorbitant costs because their plan sponsors have claimed a religious exemption.[9]

---

[8] *See, e.g.*, Exhibit 35–Catholics for Choice Comment (Dec. 5, 2017), JA-0000724.

[9] *See, e.g.*, Nat'l Women's L. Ctr. (NLWC) Intake (June 3, 2025) (on file) ("I have insurance through my employer. I'm a social worker. I work for … [a religious] organization, so they do not . . . cover birth control…. The cost estimate they gave me was like $1,200 [for my contraception]…. I don't know what to do. I have [an IUD] in. It's expired…. I can't afford [to have it replaced]."); NWLC Intake (Jan. 25, 2025) (on file) ("I am

### ii. *The Departments reversed course on the importance of seamless contraception coverage without sufficient explanation.*

The Rules make an unexplained about-face on the importance of providing "seamless" contraception coverage. In doing so, they ignored the data previous administrations relied on in establishing the coverage requirement as well as the new barriers to access that the Rules themselves would create.

When the Departments first promulgated the contraceptive coverage requirement, they recognized that, in enacting the ACA, Congress determined existing health coverage "did not adequately serve the unique healthcare needs of women." JA644. Women used more health services than men. *See generally* K.D. Bertakis et al., *Gender Differences in the Utilization of Health Care Services*, 49 J. Fam. Prac. 147 (2000). Yet, as the U.S. Census Bureau noted in 2009, earned less on average, presenting women with a unique set of challenges to accessing healthcare. *See* U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2008* 36 (2009). Burdened by

---

prescribed the . . . birth control patch and pay $70 out of pocket. I am on [insurance] under my mom, who is employed by a [religious] organization[, my birth control] has never been this expensive.").

their more significant out-of-pocket expenses (68% greater than men), women of childbearing age would more often forgo preventive healthcare. JA658. To ensure that women achieved the full cost-saving benefits of the ACA, the Departments found it necessary to expand coverage without cost-sharing for services that addressed women's unique health needs, including contraception. *Id.*

The Departments further recognized the importance of ensuring that contraceptive coverage was not only cost-free but *seamless*, meaning that plan beneficiaries "should not be required to incur additional costs— financial or otherwise—to receive access" to contraception. JA600. The Departments thus determined that the Accommodation was necessary to ensure that women could access contraceptive coverage "through the same issuers or third party administrators that provide or administer the health coverage furnished by the eligible organization, and without financial, logistical, or administrative obstacles." JA577.

Nowhere do the Rules acknowledge these prior findings, or the extensive data confirming that cost is a major determinant of whether people obtain contraceptive care. Yet not only was this data foundational

to the Departments' earlier regulations, it was reconfirmed by numerous commenters in 2017[10]—and sadly it remains true today.[11]

In reversing course, the Departments ignored comments that emphasized how the Rules would create new barriers to access, not only reinstating cost barriers, but also imposing significant informational, administrative, and logistical burdens on women.[12] Rather than ensuring seamless coverage, the Rules force individuals to obtain contraception outside their regular health plan and away from trusted providers who know their medical histories.[13] This poses particular challenges for

---

[10] *See* Exhibit 84-NWLC Comment (Dec. 5, 2017), JA-00001266-67 (noting that, before the ACA, "one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it" and that "[t]he gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes").

[11] *See* Alliance for Women's Health & Prevention, *New Ipsos Survey Highlights Critical Gaps in Preventive Care for Women* (Feb. 12, 2025), https://womenshealthandprevention.org/new-ipsos-survey-highlights-critical-gaps-in-preventive-care-for-women/ (finding that 42% of women forgo preventive care services due to affordability concerns and other constraints).

[12] *See* Exhibit 84-NWLC Comment (Dec. 5, 2017), JA-00001266.

[13] *See* Samantha Malone et al., *Continuity of Health Insurance Coverage & Choice of Contraception Method*, 33 J. Women's Health 1327, 1328 (2024) ("A lapse in insurance coverage may impact women needing a prescription renewal, or may make a prescription method unaffordable altogether.").

people with limited resources, people of color, people with disabilities, people with limited English proficiency, and the LGBTQ community— groups that already face multiple barriers to obtaining reproductive health services, including cost, language, communication, accessibility, and geographical barriers, implicit bias, and outright discrimination.[14]

### iii.    *The Departments wrongly assumed those most at risk of unintended pregnancy would not likely be affected.*

The Rules suggested, without evidence, that those most at risk of unintended pregnancies—women with limited incomes, women of color, and women aged 18-24—were not likely to be covered by group health plans or individual insurance. JA176-77. False.

---

[14] *See generally* Terri-ann Monique Thompson et al., *Racism Runs Through It: Examining the Sexual and Reproductive Health Experience of Black Women in the South*, 41 Health Affs. 195 (2022) (discussing how racism limits Black women's use of reproductive health services); M. Antonia Biggs et al., *Access to Reproductive Health Services Among People With Disabilities*, JAMA Network Open (2023) (discussing common barriers to reproductive healthcare for people with disabilities and finding that people with disabilities are more likely than non-disabled people to encounter more than one barrier to care); Samantha Truong et al., *Transcending Language Barriers in Obstetrics & Gynecology: A Critical Dimension for Health Equity*, 142 Obstetrics & Gynecology 809 (2023) (discussing language discordance in reproductive care); Erin Wingo et al., *Reproductive Health Care Priorities & Barriers to Effective Care for LGBTQ People Assigned Female at Birth: A Qualitative Study*, 28 Women's Health Issues 350 (2018) (discussing impediments to healthcare access for queer people).

As commenters highlighted, millions of women who are most at-risk for unintended pregnancy rely on private insurance, particularly following the implementation of the ACA.[15] Nationwide, when the Rules were promulgated, over 640,000 private sector employers offering health insurance had workforces that were mostly low-wage.[16] And women of color were overrepresented in the low-wage workforce; in 2018, Latinas made up 16% of women in the overall workforce, but 25% of women in the forty lowest-paying jobs, and Black women likewise made up 13% of women in the overall workforce, but 15% of women in the forty lowest-paying jobs.[17]

Further, the ACA specifically expanded coverage for young people, allowing them to remain covered as dependents on their parents' group health plans or individual insurance until age 26 regardless of whether

---

[15] *See, e.g.*, Exhibit 51-Guttmacher Institute Comment (Dec. 5, 2017), JA-0000912.

[16] NWLC calculations (on file) from Medical Expenditure Panel Survey United States Tables V.A.1., V.A.2, VII.A.1, VII.A.2 (2018), https://bit.ly/2UOFFAh; *see also* Exhibit 84-NWLC Comment (Dec. 5, 2017), JA-00001267 (noting that the typical median wage for an aide at a healthcare facility, like many of the plaintiffs that challenged the Accommodation process, was less than $12 an hour in 2017, meaning that her monthly pre-tax earnings qualified her as low-income).

[17] Bureau of Lab. Stats., May 2018 Nat'l Occupational Emp. & Wage Stats., https://bit.ly/3dTgfu2.

they are working or attending school. 45 C.F.R. § 147.120. Also, many young people rely on student health plans governed by the ACA. Each of these young adults risks losing contraceptive coverage if their university, employer, or parents' employer objects to providing it.

### iv. *The Departments suggested false alternative means to access coverage.*

The Departments waved off the harm to those who would lose contraception coverage by suggesting that these individuals could find alternatives. But these alternatives were only hollow promises.

First, the Departments attempted to minimize harms by assuming that some employers would choose to cover at least some methods of contraception. JA204. But allowing employers to pick-and-choose covered methods is a harm in-and-of-itself: As commenters warned, removing people's ability to choose the contraceptive method that is most appropriate for them thwarts their ability to use contraception effectively, undermines their autonomy, and increases the risk of unintended pregnancy.[18] And for women with disabilities, certain

---

[18] *See, e.g.*, Exhibit 38-Center for American Progress et al. Comment (Dec. 5, 2017), JA1035 (explaining that people are more likely to use contraception consistently and correctly when they can use the method that suits their needs).

contraceptive methods may be contraindicated because of how it interacts with their disabilities or disability related medications.[19]

Second, the Departments suggested that the harm from loss of coverage would be offset by public programs such as Title X, Medicaid, and state-run programs. JA518. While the Rules have forced thousands to seek contraceptive care from these already-strained programs, causing the States fiscal harm, many who lose coverage are not able to access care through these programs at all due to eligibility restrictions and capacity constraints. *See, e.g.*, 8 U.S.C. § 1613(a) (restricting Medicaid eligibility for five years after entry for most lawful permanent residents); 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) (limiting Medicaid eligibility for childless, non-pregnant adults to those at 133% of the federal poverty line); *id.* at § 1396a(xx)(2) (limiting Medicaid eligibility to people who can prove that they meet extensive work reporting requirements). This problem has only been exacerbated by ongoing cuts to Planned Parenthood and the Title X family planning program.[20]

---

[19] *See, e.g.*, *id.* at JA1039 (explaining that people with disabilities depend on the full range of contraceptive methods to address their particular needs).

[20] Since taking office for a second time, the Trump administration froze over $65 million in Title X grants. *See* Alice Miranda Ollstein, *Clinics Begin Closing as Trump Admin Continues Freeze on Family Planning*

### v. *The Departments ignored the important health benefits of contraception.*

The Departments failed to consider how erecting new cost barriers would undermine the health benefits of the contraceptive coverage requirement that they had previously recognized. Instead, the Departments ended their consideration of the Rules' health impact by simply refusing to take a position on the efficacy of contraception at preventing pregnancy, JA185,[21] without considering contingent public health consequences—even those unrelated to pregnancy prevention.

As the Departments previously acknowledged, contraception is highly effective at preventing unintended pregnancy and enabling individuals to time and space desired pregnancies. *See* JA625. And as the Departments also previously acknowledged, the ability to prevent

---

*Funds*, POLITICO (Apr. 22, 2025), https://www.politico.com/news/2025/04/22/clinics-begin-closing-as-trump-admin-continues-freeze-on-family-planning-funds-00302504. That funding has since been restored, but the administration's actions drained the resources of Title X providers. Further, the One Big Beautiful Bill Act now prohibits Medicaid funds from reimbursing for services provided at certain healthcare facilities that provide abortion care. *See* Pub. L. No. 119-21, § 71113, 139 Stat. 72, 300-01 (July 4, 2025).

[21] For the reasons stated by *amici* ACOG et al., contraceptives are plainly effective.

unintended pregnancy improves health outcomes for both women and infants. JA658.

Commenters on the Rules offered substantial evidence supporting the Departments' previous findings. Commenters highlighted that unintended pregnancies have higher rates of short- and long-term health complications, including increased risk of infant mortality, birth defects, low birth weight, preterm birth, maternal depression, and maternal mortality and morbidity.[22] Commenters explained that contraception is a major factor in reducing rates of maternal mortality and morbidity and that access to contraception to prevent pregnancy is particularly critical for women with pre-existing or chronic physical and psychological conditions, which can be exacerbated by pregnancy.[23] Commenters explained that the health consequences of increased cost barriers will be particularly acute among Black women, who experience systemic barriers to care and have a higher prevalence of conditions complicated

---

[22] *See, e.g.*, Exhibit 54-Ibis Reproductive Health Comment (Dec. 5, 2017), JA-0000946.

[23] *See, e.g.*, Exhibit 32-Black Women's Health Imperative Comment (Dec. 5, 2017), JA-0000694.

by pregnancy.[24] Current health data continues to support these comments.[25]

Commenters also discussed multiple health benefits of contraception that have nothing to do with preventing pregnancy. While most women aged 18-44 use contraception to prevent pregnancy, many also use it for other health purposes, including preventive purposes. JA1088. Commenters presented evidence that contraception is associated with decreased risk of colorectal cancer, endometrial cancer, and ovarian cancer.[26] Commenters also showed that contraception is correlated with preservation of bone density, reduced menstrual pain, reduced risk of myoma, pelvic inflammatory disease, and rheumatoid arthritis, and reduced symptoms from asthma, endometriosis,

---

[24] *See, e.g.*, *id.* at JA-0000693-64.

[25] *See, e.g.*, Latoya Hill et al., Kaiser Family Found., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them* (Oct. 25, 2024), https://www.kff.org/racial-equity-and-health-policy/racial-disparities-in-maternal-and-infant-health-current-status-and-efforts-to-address-them/; Jessica L. Gleason, *Risk of Adverse Maternal Outcomes in Pregnant Women With Disabilities*, JAMA Network Open (Dec. 15, 2021), https://doi.org/10.1001/jamanetworkopen.2021.38414 (finding that women with disabilities are at significantly higher risk for pregnancy and birth-related complications, including an eleven times higher risk of death).

[26] *See, e.g.*, Exhibit 54–Ibis Reproductive Health Comment (Dec. 5, 2017), JA-0000946.

premenstrual syndrome, and premenstrual dysphoric disorder.[27] Current health data continues to support these benefits as well.[28]

The Departments' failure to weigh the predictable harm to women's health and maternal and infant health renders the Rules arbitrary and capricious.

> ### vi. *The Departments ignored how the Rules will undermine individuals' economic security and social equality.*

As the Departments made clear in 2012, the lack of coverage for contraceptives prior to the ACA put "women in the workforce at a disadvantage compared to their male coworkers," whereas "access to contraception improves the social and economic status of women." JA703. In 2013, the Departments recognized that cost-free access to contraception eliminates "financial barriers that prevented women from achieving health outcomes on an equal basis with men" and thereby "[helps] women contribute to society to the same degree as men." JA658.

---

[27] *See, e.g.*, *id.* JA-0000947.

[28] Sarina Schrager et al., *Beyond Birth Control: Noncontraceptive Benefits of Hormonal Methods and Their Key Role in the General Medical Care of Women*, 29 J. Women's Health 937, 938 (2020) (explaining that contraceptives can be used to treat a variety of gynecological conditions, such as endometriosis and uterine fibroids, and general medical conditions, like polycystic ovary syndrome and bleeding disorders).

And again in 2014, the Departments made clear that "[c]ontraceptive coverage is crucial to women's health and equality for a number of reasons, including but not limited to the psychological toll and compromised financial position, and adverse health consequences, that can result from unplanned or unwanted pregnancies" and that providing seamless coverage to participants on objecting health plans was a compelling governmental interest. JA625.

In the Rules, however, the Departments ignored these benefits. In 2018, the Departments acknowledged commenters' warnings that the Rules would "caus[e] … workplace, economic, or societal inequality." JA422. But the Departments brushed these concerns aside, determining that the *majority* of women benefitting from the contraceptive coverage requirement would not experience them. *Id.*

This conclusion—which, as described above, is based on faulty calculations—does not mean that those who are denied coverage will not suffer harm. As commenters made clear, contraception has life-long economic benefits, enabling individuals to complete higher levels of education, improve earnings and labor-force participation, and secure

economic independence.[29] On the other hand, having a child can entrench an individual in dire economic circumstances; for instance, as many commenters noted, studies show that having a child creates both immediate decreases in women's earnings and long-term drops in lifetime earning trajectories.[30] This was—and remains[31]—particularly true for individuals in low-wage jobs, who are less likely to have parental leave or predictable and flexible work schedules and more likely to be denied pregnancy accommodations and face workplace discrimination.[32]

Ignoring these concerns runs counter to the purpose of the ACA. In addition to promoting women's health,[33] Congress emphasized that the

---

[29] *See, e.g.*, Exhibit 84-NWLC Comment (Dec. 5, 2017), JA-00001269-70.

[30] *See, e.g.*, *id.* (citing Adam Sonfield et al., Guttmacher Inst., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* (2013), https://www.guttmacher.org/sites/default/files/pdfs/pubs/social-economic-benefits.pdf).

[31] *See* Ewa Cukrowska-Torzewska & Anna Matysiak, *The Motherhood Wage Penalty: A Meta-Analysis*, 88-89 Soc. Sci. Rsch. 102416 (March 19, 2020).

[32] *See* Exhibit 61-Lift Louisiana Comment (Dec. 5, 2017), JA-0001019. Unfortunately, this trend has persisted. *See* NWLC, *Collateral Damage: Scheduling Challenges for Workers in Low-Paid Jobs and Their Consequences* (Dec. 1, 2025), https://nwlc.org/resource/collateral-damage-scheduling-challenges-workers-low-wage-jobs-and-their-consequences/.

[33] *See, e.g.*, 155 Cong. Rec. S12025 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer) (women's preventive services provision addresses "critical

ACA would combat discrimination against women.[34] Congress recognized that "[w]omen are more likely than men to neglect care or treatment because of cost."[35] And Congress explicitly rejected an exemption of the type implemented by the Rules.[36]

It was also particularly unreasonable for the Departments to ignore the educational equality concerns raised by commenters because the Departments themselves anticipated that multiple colleges and universities would claim exemptions, JA450, and because access to contraception is critical to the ability of young women to achieve their educational goals.[37]

---

issue by requiring that all health plans cover comprehensive women's preventive care and screenings" including "family planning services").

[34] *See, e.g.*, 156 Cong. Rec. H1711 (daily ed. Mar. 19, 2010) (statement of Rep. Speier) ("If there ever was an issue on healthcare that must be addressed and is addressed in [the ACA], it is gender discrimination.").

[35] 155 Cong. Rec. S11987 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski); *see also id.* ("Fourteen percent of women report they delay or go without needed healthcare.").

[36] 158 Cong. Rec. S538-39 (Feb. 9, 2012) (S. Amdt. 1520).

[37] *See, e.g.*, Exhibit 30-Americans United for Separation of Church and State Comment (Dec. 5, 2017), JA-0000671. In particular, while religiously affiliated educational institutions had higher reports of rape at the time the Rules were promulgated, they offered fewer sexual health services to students. *See generally* Sarah J. Purvis & Ashley E. Fico, *#MeToo: Associations of Educational Institution Religious Affiliation*

The Departments blithely brushed aside the evidence before them that the Rules would contravene the equality aims of the ACA. This was arbitrary and capricious.

## CONCLUSION

The judgment of the District Court should be affirmed.

Respectfully submitted,

/s/ Michelle Banker

Jenny Samuels
Elias Daiute
Rebecca S. Markert
AMERICANS UNITED FOR
SEPARATION OF CHURCH
AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
Tel.: (202) 466-7308
*samuels@au.org*
*daiute@au.org*
*markert@au.org*

Michelle Banker
Alison Tanner
Payton Small Gannon
Monae White
K.M. Bell
Dorianne Mason
NATIONAL WOMEN'S LAW
CENTER
1350 I Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 588-5180
*mbanker@nwlc.org*
*atanner@nwlc.org*
*psmallgannon@nwlc.org*
*mwhite@nwlc.org*
*kmbell@nwlc.org*
*dmason@nwlc.org*

---

*with Sexual Health Services and Rates of Sexual Assault*, 70 J. Am. Coll. Health 1403 (2022).

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,326 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14 point.

/s/ Michelle Banker

## CERTIFICATE OF SERVICE

I certify that on March 4, 2026, I electronically filed the foregoing brief in PDF format with the Clerk of Court via the Court's ACMS system. I certify that all counsel of record are registered ACMS users, and service will be accomplished via the ACMS system.

/s/ Michelle Banker

# APPENDIX

The *Amici* are:

1.   AIDS United

2.   American Association of University Women

3.   American Civil Liberties Union

4.   American Civil Liberties Union of New Jersey

5.   American Civil Liberties Union of Pennsylvania

6.   American Society for Emergency Contraception

7.   Americans United for Separation of Church and State

8.   Autistic Self Advocacy Network

9.   Autistic Women & Nonbinary Network

10.  California Women's Law Center

11.  Central Atlantic Conference of the United Church of Christ

12.  Central Florida Birth Network

13.  Chicago Abortion Fund

14.  Clearinghouse on Women's Issues

15.  DignityUSA

16.  Disability Rights Education and Defense Fund

17.  Equality California

18.  eTeam Show Productions and Hope Project Inc.

19.  Fair Wisconsin

20.  Families USA

21.  Feminist Majority Foundation

22.     Florida Interfaith Coalition for Reproductive Health and Justice

23.     Florida National Organization for Women

24.     Garden State Equality Action Fund

25.     Gender Justice

26.     Gender Justice League

27.     Global Justice Institute, Metropolitan Community Churches

28.     Hindu American Foundation

29.     If/When/How: Lawyering for Reproductive Justice

30.     Implementing Contraceptive Access Now

31.     Indivisible Pro-Choice Pinellas

32.     Jane's Due Process

33.     Japanese American Citizens League

34.     Lambda Legal Defense and Education Fund, Inc.

35.     Lawyers for Good Government

36.     Methodist Federation for Social Action

37.     Mississippi Center for Justice

38.     Montanans for Choice Take Action

39.     National Abortion Federation

40.     National Asian Pacific American Women's Forum

41.     National Association for the Advancement of Colored People

42.     National Council of Jewish Women

43.     National Health Law Program

44.     National Latina Institute for Reproductive Justice

45.    National LGBTQ+ Bar Association

46.    National Network of Abortion Funds

47.    National Organization for Women Foundation

48.    National Partnership for Women & Families

49.    National Women's Law Center

50.    Pennsylvania State Representative Mary Jo Daley

51.    People Power United

52.    Planned Parenthood Federation of America

53.    Reproaction

54.    Reproductive Equity Now Foundation

55.    Reproductive Freedom for All

56.    RISE Collective

57.    Rocky Mountain Equality

58.    Sadhana: Coalition of Progressive Hindus

59.    Society for Humanistic Judaism

60.    State Innovation Exchange

61.    The Advocates for Human Rights

62.    The Jane Network

63.    The Lawyering Project

64.    The Welcome Project Pennsylvania

65.    Women's Law Project