Nos. 25-2575 and 25-2662

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,
*Plaintiffs-Appellees,*

v.

PRESIDENT OF THE UNITED STATES OF AMERICA; SECRETARY OF HEALTH
AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; SECRETARY OF THE TREASURY; UNITED STATES
DEPARTMENT OF THE TREASURY; SECRETARY OF LABOR; UNITED STATES
DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA,
*Defendants-Appellants,*

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,
*Intervenor-Defendant-Appellant.*

Appeal from the United States District Court for the Eastern
District of Pennsylvania (No. 2:17-cv-4540) (Beetlestone, J.)

## BRIEF OF MASSACHUSETTS, 20 OTHER STATES,
## AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
ALLYSON SLATER
  *Director, Reproductive Justice Unit*
GERARD J. CEDRONE
  *Deputy State Solicitor*
RUCHI RAMAMURTHY
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

March 4, 2026                 (Additional counsel listed at pages 22-23)

# TABLE OF CONTENTS

Interest of Amici Curiae ............................................................. 1

Background ................................................................................ 3

Summary of the Argument ........................................................ 6

Argument ................................................................................... 7

    I.   The Final Rules will impose costs on the amicus states
        and their residents.................................................................... 7

        A.   The Final Rules will cause more people to seek
              contraceptive coverage through state-funded sources,
              straining essential state programs...................................... 8

        B.   The Final Rules will cause states to bear higher costs
              associated with unintended pregnancies and negative
              health outcomes. ................................................................ 10

        C.   The Final Rules will result in greater out-of-pocket
              costs for people trying to access contraceptive care. .......... 12

    II.  Circumstances have changed since defendants
        promulgated the Final Rules.................................................... 13

        A.   With many federally funded programs recently
              slashed or under attack, women have fewer
              alternative sources of contraceptive care than before. ...... 14

        B.   Post-*Dobbs* restrictions on abortion care have made
              access to contraception even more important. ................... 17

    III. The Final Rules will have a significant and
        disproportionate impact on historically marginalized
        communities.............................................................................. 19

Conclusion ............................................................................... 21

# TABLE OF AUTHORITIES

**Cases:**

*California v. U.S. Dep't of Health & Hum. Servs.*,
  No. 4:17-cv-5783 (N.D. Cal.). ................................................................. 3

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ......................................................................... 7, 17

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
  No. 21-1076 (1st Cir.) ......................................................................... 3

*Planned Parenthood v. Casey*,
  505 U.S. 833 (1992) ............................................................................ 17

*Roe v. Wade*,
  410 U.S. 113 (1973) ............................................................................ 17

**Statutes:**

42 U.S.C.:

  §300gg-13(a)(4) .................................................................................. 2

  §1396b .................................................................................................. 9

  §1396d(b) ............................................................................................. 9

Mass. Gen. Laws c. 118E, §10K .................................................... 2, 10

One Big Beautiful Bill Act,
  Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................ 16

**Regulations:**

130 Code Mass. Regs. §450.317 ......................................................... 11

82 Fed. Reg. 47,792 (Oct. 13, 2017) ............................................... 8, 13

83 Fed. Reg. 57,536 (Nov. 15, 2018) ............................... 8, 11, 12, 13, 14

**Rules:**

Fed. R. App. P. 29(a)(2) ......................................................................... 1

**Litigation Materials:**

Decl. of Megan L. Kavanaugh, *California v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-12118 (D. Mass.) (ECF No. 62-5) .......................................................................................... 16

**Other Authorities:**

Adam Sonfield et al., *New Federal Medicaid Cuts Will Devastate Coverage for Reproductive Health Care*, Guttmacher Inst. (Nov. 10, 2025), https://perma.cc/QC3J-LD7X ...................................................................................... 9, 15

Adam Sonfield et al., Guttmacher Inst., *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010* (Feb. 2015), https://perma.cc/HF4U-U64Z .......................................................................... 10

Alexa C. DeBoth et al., *Title X Family Planning Program*, Cong. Rsch. Serv. (May 16, 2025), https://bit.ly/4c1v6D9 .................. 14

Amy Deschner et al., *Contraceptive Use Is Key to Reducing Abortion Worldwide*, Guttmacher Pol'y Rev. (Oct. 2003), https://perma.cc/F7AR-7ZXB ............................................................ 5

Audiey Kao, *History of Oral Contraception*, 2 AMA J. Ethics 55 (2000), https://bit.ly/49E2Pks ............................................................ 3

Berkeley Lovelace Jr., *A Record Number of Americans Are Anxious About Health Care Costs Going into Next Year*, NBC News (Nov. 18, 2025), https://perma.cc/NS97-J9YJ ........................... 13

Brenna C. Kelly et al., *Disparities in Distance to Abortion Care Under Reversal of Roe v. Wade*, Utah Women & Reprod. Health (May 9, 2022), https://perma.cc/RD8Y-PBRW ....................... 20

Brittni Frederiksen et al., *Contraceptive Experiences, Coverage, and Preferences: Findings from the 2024 KFF Women's Health Survey*, KFF (Nov. 22, 2024), https://perma.cc/NAY9-2T2A ................................................................................................ 4, 15

Brittni Frederiksen et al., *The Impact of Medicaid and Title X on Planned Parenthood*, KFF (Apr. 16, 2025), https://perma.cc/RM7D-3JP3 ................................................................... 15

Brittni Frederiksen et al., *Title X Grantees and Clinics Affected by the Trump Administration's Funding Freeze*, KFF (Apr. 15, 2025), https://perma.cc/T49J-2X47 ........................................ 15

Carter Sherman, *Hospitals and Clinics Are Shutting Down Due to Trump's Healthcare Cuts. Here's Where.*, Guardian (Nov. 21, 2025), https://perma.cc/A5LE-GSVV ............................... 16

Céline Gounder, *The Quiet Collapse of America's Reproductive Health Safety Net*, KFF Health News (Oct. 30, 2025), https://perma.cc/U79G-DPWC .................................................. 15

Chantelle Lee, *Abortion Is Legal in Maine, but Trump's 'Big Beautiful Bill' Could Gut Much of the State's Reproductive Health Care Access*, Time (Jul. 2, 2025), https://perma.cc/ZKJ5-YXGJ ............................................................... 16

Deidre McPhillips, *Abortion Clinics Are Closing, Even in States That Have Become Key Access Points*, CNN (Feb. 18, 2026, https://perma.cc/M9LQ-VGB9 .................................... 16

Giovanna DeStefanis, *Planned Parenthood Forced to Close 20 Clinics After Medicaid Cuts*, Feminist Majority Found. (Nov. 18, 2025), https://perma.cc/9FC7-FN8M ........................ 16

Grace Sparks et al., *Americans' Challenges with Health Care Costs*, KFF (Dec. 11. 2025), https://perma.cc/STQ7-A3R7 ..................... 13

Guttmacher Inst., *Year One of Project 2025: Tracking the Trump Administration's Devastating Campaign Against Sexual and Reproductive Health and Rights* (Jan. 2026), https://perma.cc/W9RE-KFVG ..................................................... 16

Hanna Lodin, *Beyond Contraception: Other Uses for Birth Control*, Mayo Clinic (Nov. 2, 2022), https://perma.cc/AFR3-RVVD ............................................................................ 5, 6

Jameson A. Mitchell et al., *Permanent and Long-Acting Reversible Contraception Volumes at a Multihospital System in Ohio Before and After* Dobbs, 137 Contraception 110471 (2024), https://perma.cc/S4PM-2DHC ................................................ 18

Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291 (2012), https://perma.cc/5BA7-DLB3 ........................ 5

Jennifer J. Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Use, 2020*, Guttmacher Inst. (May 2025), https://perma.cc/ P9PM-24X9 ......................................................................................... 15

Jon Deauna, *The Religious and Moral Exemption Rules: Increasing Systemic Barriers for Women of Color*, Lawyers' Comm. for Civil Rights Under Law (Apr. 26, 2019), https://perma.cc/KD5G-5LP2 ................................................... 21

Justin Theal et al., *The Share of State Budgets Spent on Medicaid Posts Largest Annual Increase in 20 Years*, Pew (June 16, 2025), https://perma.cc/72HK-YNJJ ..................................... 9

KFF, *Employer Health Benefits: 2025 Annual Survey*, https://perma.cc/CK2L-SVS8 ............................................................. 11

Karen Diep et al., *Oral Contraceptive Pills: Access and Availability*, KFF (Mar. 20, 2024), https://perma.cc/Q7RS-XNE7 ............................................................................................ 4

KFF, *State Requirements for Insurance Coverage of Contraceptives* (Dec. 2024), https://perma.cc/LHU8-S3BB ................... 1

Linda J. Piccinino et al., *Trends in Contraceptive Use in the United States: 1982-1995*, 30 Persp. on Sex & Reprod. Health 4 (1998), https://perma.cc/QE6G-AZA6 ................................................. 4

Madeline Y. Sutton et al., *Racial and Ethnic Disparities in Reproductive Health Services and Outcomes, 2020*, 5 Obstetrics Gynecology 225 (2021), https://perma.cc/3EKS-C3LP .............................................................................................. 20

March of Dimes, *Nowhere to Go: Maternity Care Deserts Across the US* (2024), https://perma.cc/5U7U-DHLS ..................................... 20

Mass. Exec. Off. of Health & Hum. Servs., *MassHealth Overview* (Jan. 2024), https://perma.cc/27LP-LY4W ........................... 9

Meghan Etsey et al., *Uneven Ground: Exploring Women's Health in Rural and Urban America*, Am. Med. Women's Ass'n (Aug. 5, 2025), https://perma.cc/799H-R859 ............................. 12

Nat'l Women's L. Ctr., *When Women Are Deserted* (2025), https://perma.cc/NJ63-XRHA ...................................................... 20, 21

N.C. Div. of Pub. Health, *Food and Drug Administration (FDA) Approved Methods of Birth Control*, N.C. Dep't of Health & Hum. Servs. (Aug. 2013), https://perma.cc/C3WK-LKED ................... 4

Nat'l Conf. of State Legislatures, *Balancing State Medicaid Budgets* (June 23, 2025), https://bitly/3MBQdla ................................. 9

News Release, *Cost Continues to Pose Significant Barriers to Contraceptive Access,* Guttmacher Inst. (May 24, 2023), https://perma.cc/Z9FP-25AK................................................................ 12

Planned Parenthood, *New Study on Birth Control Use Shows That, When Fully Implemented, the Affordable Care Act Could Dramatically Reduce Unintended Pregnancy in the U.S.* (Jan. 30, 2014), https://perma.cc/BL4N-HMQ6............................ 5

Talia Curhan, *State Bans on Abortion Throughout Pregnancy*, Guttmacher Inst. (Nov. 24, 2025), https://perma.cc/A985-VQPL............................................................................................... 18

Tara Law, *21% of Women Reported Switching Their Birth Control Method Post-Roe*, Time (July 27, 2022), https://perma.cc/8X3Z-L5QL ............................................................................ 18

Terrell Blei, *Contraception, Misconceptions & Leftover Questions: The Trump Administration's Latest Birth Control Rollback*, Colo. Consumer Health Initiative, https://perma.cc/Y3MN-7AN7................................................................................. 12

Trent Gillies, *Why Health Care Costs Are Making Consumers More Afraid of Medical Bills Than an Actual Illness*, CNBC (Apr. 22, 2018, https://perma.cc/FFA4-8Q2Q ...................................... 13

Upstream USA, *Contraceptive Deserts: What They Are and How to Improve Access*, (Aug. 13, 2024), https://perma.cc/V34N-VFXD .................................................................................... 19

USAID et al., *Family Planning: A Global Handbook for Providers* (2022), https://bit.ly/4rbhUzv ................................................. 4

Virginia Langmaid, *Contraception Demand Up After Roe Reversal, Doctors Say,* CNN (Jul. 6, 2022), https://perma.cc/RDF9-C9TB................................................................ 18

## INTEREST OF AMICI CURIAE

Massachusetts, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, and Washington (collectively, amici or amicus states) respectfully submit this brief pursuant to Fed. R. App. P. 29(a)(2) to defend two important state interests.

First, amici have an interest in protecting the physical and economic wellbeing of their residents. One key determinant of that wellbeing is individuals' access to contraceptive care. As the amicus states can attest, and as decades of evidence have shown, access to safe and effective contraception advances women's educational opportunities, workplace equality, and financial empowerment; improves the health of women and children; and reduces healthcare costs for individuals and families.

For that reason, amici are committed to making contraception as available and affordable as possible. A majority of states—including most of the amicus states—advance that goal through laws that safeguard access to contraception, such as laws requiring insurance companies to cover FDA-approved contraceptives.[1] Some states have gone even

---

[1] KFF, *State Requirements for Insurance Coverage of Contraceptives* (Dec. 2024), https://perma.cc/LHU8-S3BB (showing that 31 states and the District of Columbia require coverage of prescription contraception).

further, requiring coverage for contraceptive methods in certain circumstances without *any* cost to the consumer. *See, e.g.*, Mass. Gen. Laws c. 118E, § 10K(b)(1).

But state law is only half the picture: the federal government also plays an important role in Americans' access to contraceptive care. Under the Patient Protection and Affordable Care Act (ACA), employer-sponsored health plans are supposed to provide women with comprehensive, no-cost coverage for contraceptive care and services. *See* 42 U.S.C. § 300gg-13(a)(4). As this case demonstrates, however, federal agencies are frustrating that guarantee by promulgating arbitrary, capricious, and unlawful regulations. Amici have a strong interest in the prompt vacatur of such illegal impediments to contraceptive care.

Second, amici also have a direct fiscal stake in the outcome of this case. As the district court explained, "the Final Rules [at issue in this appeal] inflict a direct injury upon the states by imposing substantial financial burdens on their coffers." JA31. The Final Rules will cause thousands of women nationwide to lose contraceptive coverage—a fact the defendant agencies have conceded. *Id.* The inevitable result of that loss of coverage will be an "increased demand for state services," *id.*, such as state-funded healthcare. The amicus states have an obvious interest in avoiding that fiscal strain, which results from agency rules that

unlawfully impede basic access to necessary healthcare services.[2]

For the reasons set forth below, as well as those articulated by plaintiffs New Jersey and Pennsylvania, the amicus states respectfully urge the Court to affirm the district court's judgment.

## BACKGROUND

This case arises against the backdrop of a long history of safe and effective use of contraception in the United States. An understanding of that backdrop helps frame the current dispute.

The FDA approved the first oral contraceptive for use in the United States over 60 years ago.[3] A majority of women have used one contraceptive method or another for almost 50 years—and the rate of use has been steadily increasing since the 1980s.[4] In 1982, 56% of women aged 15 to 44 were using contraception; by 1995, that number stood at 64%.[5] Today,

---

[2] This is not the only case involving the Final Rules: Massachusetts, California, and a number of other states have brought litigation challenging the rules as well. *See Massachusetts v. U.S. Dep't of Health & Hum. Servs.,* No. 21-1076 (1st Cir.); *California v. U.S. Dep't of Health & Hum. Servs.*, No. 4:17-cv-5783 (N.D. Cal.). For that reason, too, amici have an interest in this appeal.

[3] Audiey Kao, *History of Oral Contraception*, 2 AMA J. Ethics 55, 55-56 (2000), https://bit.ly/49E2Pks.

[4] Linda J. Piccinino et al., *Trends in Contraceptive Use in the United States: 1982-1995*, 30 Persp. on Sex & Reprod. Health 4, 4 (1998), https://perma.cc/QE6G-AZA6.

[5] *Id.* at 5.

more than 80% of women aged 18 to 49 report having used some form of contraception in the past 12 months.[6]

In addition to being "safe and suitable for nearly all women,"[7] the most widely used forms of contraception are also highly effective. Methods like contraceptive pills, patches, shots, intrauterine devices (IUDs), and vaginal rings, for example, are over 99% effective with "perfect" use and over 90% effective with "typical" use.[8] Among those options, the pill remains "the most commonly used form of reversible contraception," though in recent years there has been "an increase in the use of long-acting reversible contraceptives" like IUDs and implants.[9]

By virtue of their safety and efficacy, modern contraceptives are the most reliable means of preventing unwanted pregnancy and abortion. Numerous studies have established a strong correlation between the use

---

[6]   Brittni Frederiksen et al., *Contraceptive Experiences, Coverage, and Preferences: Findings from the 2024 KFF Women's Health Survey*, KFF (Nov. 22, 2024), https://perma.cc/NAY9-2T2A.

[7]   USAID et al., *Family Planning: A Global Handbook for Providers* 5, 32, 71, 100, 135, 168, 283 288 (2022), https://bit.ly/4rbhUzv.

[8]   N.C. Div. of Pub. Health, *Food and Drug Administration (FDA) Approved Methods of Birth Control*, N.C. Dep't of Health & Hum. Servs. (Aug. 2013), https://perma.cc/C3WK-LKED.

[9]   Karen Diep et al., *Oral Contraceptive Pills: Access and Availability*, KFF (Mar. 20, 2024), https://perma.cc/Q7RS-XNE7.

of contraception and reduction in abortion rates.[10]  One study, for example, showed lower abortion rates over a four-year period among 9,256 women and teens who were given full coverage for the contraceptive method of their choice[11]—an arrangement that "simulate[d] the Affordable Care Act's birth control benefit."[12]  The study estimated that "changes in contraceptive policy" matching those in the study "would prevent as many as 41% to 71% of abortions performed annually in the U.S."[13]

In addition to its role in preventing unplanned pregnancies, modern contraceptives also play a role in disease management and prevention. For example, hormonal forms of birth control (such as pills and certain IUDs) can be used to treat conditions like endometriosis and polycystic ovarian syndrome.[14]  Hormonal birth control can also help individuals

---

[10]  *E.g.*, Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291, 1295-1296 (2012), https://perma.cc/5BA7-DLB3; Amy Deschner et al., *Contraceptive Use Is Key to Reducing Abortion Worldwide*, Guttmacher Pol'y Rev. (Oct. 2003), https://perma.cc/F7AR-7ZXB; Planned Parenthood, *New Study on Birth Control Use Shows That, When Fully Implemented, the Affordable Care Act Could Dramatically Reduce Unintended Pregnancy in the U.S.* (Jan. 30, 2014), https://perma.cc/BL4N-HMQ6.

[11]  *See* Peipert et al., *supra* note 10, at 1295-1296.

[12]  Planned Parenthood, *supra* note 10.

[13]  *See* Peipert et al., *supra* note 10, at 1297.

[14]  *See* Hanna Lodin, *Beyond Contraception: Other Uses for Birth Control*, Mayo Clinic (Nov. 2, 2022), https://perma.cc/AFR3-RVVD.

with a high risk of ovarian or endometrial cancer to reduce their risk by up to 50%.[15]

## SUMMARY OF THE ARGUMENT

Defendants' attempt to nullify provisions of the ACA that guarantee women equal access to contraceptive care and services would, if successful, harm not only Pennsylvania and New Jersey, but also other states and women across the country. Beyond the arguments that the plaintiff states make in their briefing, the amicus states write to underscore three points.

First, the Final Rules have caused—and will continue to cause—significant harm to states nationwide. By defendants' own admission, the Final Rules will deprive hundreds of thousands of employees, students, and their dependents of contraceptive coverage. That deprivation threatens the health and wellbeing of the states' residents and the economic and public health of the states generally. As a result of defendants' unlawful actions, states will be forced to expend millions of dollars to provide replacement contraceptive care and services for their residents.

Second, the factual and legal landscape that defendants relied on when drafting the Final Rules in 2017 and 2018 has significantly shifted since then. In the intervening years, federal programs providing funding

---

[15] *Id.*

for sexual and reproductive healthcare programming, including Title X, have been gutted. And the Supreme Court's 2022 decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), overturned any federal right to abortion and ushered in significant restrictions on access to abortion care in states around the country. The Final Rules thus presupposed robust access to reproductive healthcare and funding schemes for such care that simply do not exist anymore.

Third, and finally, the Final Rules disproportionately affect various marginalized communities. People of color and people with low incomes are more others to live in "contraceptive deserts"—that is, areas that lack reasonable access to the full range of contraceptive care—and to face other barriers to healthcare. The Final Rules will thus exacerbate already significant health disparities across the country.

## ARGUMENT

### I.    The Final Rules will impose costs on the amicus states and their residents.

The Final Rules will cause women around the country to lose coverage for contraceptive care—as defendants' own analysis shows. According to defendants' regulatory impact analysis—*i.e.*, defendants' official, legally mandated explanation of the Final Rules' anticipated costs, benefits, and broader effects—approximately three million people receive health insurance through employers and universities that had already

objected providing contraceptive coverage before the promulgation of the Final Rules.  83 Fed. Reg. 57,536, 57,575-57,578 (Nov. 15, 2018).  And many other individuals receive insurance through employers that the Final Rules make newly eligible to opt out of providing coverage.  *See id.* at 57,628; *see also* 82 Fed. Reg. 47,792, 47,823 (Oct. 13, 2017).  Of these individuals, as many as 126,400 will—by defendants' own estimate—lose employer-based coverage for their chosen method of contraception.  83 Fed. Reg. at 57,578, 57,580, 57,627-57,628.  By depriving these women of employer-based contraceptive coverage, the Final Rules will place significant financial burdens on the amicus states and their residents.

A.    **The Final Rules will cause more people to seek contraceptive coverage through state-funded sources, straining essential state programs.**

Defendants' regulatory impact analysis estimates that the cost of providing replacement contraceptive care and services for those who lose employer-sponsored coverage because of the Final Rules will be between $41.2 and $67.3 million annually.  83 Fed. Reg. at 57,578, 57,581.  States will bear a significant share of this cost.  As defendants acknowledge, many who lose coverage because of the Final Rules will end up obtaining care and services through state-funded programs "that provide free or subsidized contraceptives."  82 Fed. Reg. at 47,803.

Medicaid is one such program.  Funded in large part by state tax

dollars, *see* 42 U.S.C. §§ 1396b, 1396d(b), Medicaid contributes 75% of all public expenditures on family planning care, and 23% of American women rely on the program for contraceptive care.[16] With states already spending an average of 30% of their *entire budgets* on Medicaid, the additional reliance on the program occasioned by the Final Rules will further strain states' already limited resources.[17]

That strain will be felt particularly acutely in states, like Massachusetts, that receive comparatively less money from the federal government for their Medicaid expenditures.[18] Massachusetts's state Medicaid program, MassHealth, provides secondary coverage—*i.e.*, coverage for costs that primary insurance will not reimburse—to around 500,000 residents of the Commonwealth.[19] If employers cut off contraceptive

---

[16] *See* Adam Sonfield et al., *New Federal Medicaid Cuts Will Devastate Coverage for Reproductive Health Care*, Guttmacher Inst. (Nov. 10, 2025), https://perma.cc/QC3J-LD7X.

[17] Nat'l Conf. of State Legislatures, *Balancing State Medicaid Budgets* (June 23, 2025), https://bit.ly/3MBQdla.

[18] In fiscal year 2023, the federal government covered 59.3% of Medicaid expenditures in Massachusetts, the state that received the lowest share of federal funds, as compared to 81.4% in the state that received the highest share of federal funds. *See* Justin Theal et al., *The Share of State Budgets Spent on Medicaid Posts Largest Annual Increase in 20 Years*, Pew (June 16, 2025), https://perma.cc/72HK-YNJJ.

[19] Mass. Exec. Off. of Health & Hum. Servs., *MassHealth Overview* (Jan. 2024), https://perma.cc/27LP-LY4W.

coverage, women who have MassHealth as secondary coverage will automatically receive state-funded replacement coverage, *see* Mass. Gen. Laws c. 118E, § 10K(a), with a corresponding impact on the state budget. And, of course, many other individuals facing employer opt-outs will either enroll in state Medicaid programs for secondary coverage for the first time or visit a community health center that provides publicly funded reproductive healthcare.

In sum, the Final Rules will negatively affect the amicus states and their budgets by increasing reliance on Medicaid and other state-funded programs for people whose employers refuse to cover contraceptive care.

## B. The Final Rules will cause states to bear higher costs associated with unintended pregnancies and negative health outcomes.

The reduction in access to contraception caused by the Final Rules will also increase the number of unplanned pregnancies and raise the likelihood of negative health outcomes for women and children. This, too, will impose costs on the states. States already spend billions of dollars annually to cover medical costs associated with unplanned births, including expenses related to prenatal care and delivery.[20] The Final Rules will

---

[20] Adam Sonfield et al., Guttmacher Inst., *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, at 8, 13 tbl. 3 (Feb. 2015), https://perma.cc/HF4U-U64Z (explaining that 68%

drive these costs up—a fact that defendants effectively acknowledge. *See* 83 Fed. Reg. 57,585 & n. 123 (conceding that one "noteworthy" potential effect of the Final Rules is an increase in spending on "pregnancy-related medical services").

Importantly, states will bear these increased costs even though women deprived of contraceptive coverage by the Final Rules will retain the balance of their employer-sponsored coverage. Among other things, increased healthcare costs will be passed on to the state through Medicaid and other programs that provide wraparound coverage and reimbursement for deductibles, co-insurance, emergency care, and other amounts not covered by primary insurance. *See, e.g.*, 130 Code Mass. Regs. §450.317 (MassHealth wraparound insurance regulations). These costs are significant: the average employer-sponsored plan has an annual deductible of $1,886 for individuals; on top of this expense, 65% of covered workers have co-insurance and 11% have a copayment that apply to inpatient hospital admissions.[21] State budgets will thus absorb significant costs associated with the unintended pregnancies of women who lose coverage because of the Final Rules.

---

of unplanned births in 2010 were paid for by public insurance, as compared to 38% of planned births).

[21] *See* KFF, *Employer Health Benefits: 2025 Annual Survey* 104, 123, https://perma.cc/CK2L-SVS8.

**C.** **The Final Rules will result in greater out-of-pocket costs for people trying to access contraceptive care.**

In addition to burdening the amicus states, the Final Rules will also, of course, burden the individuals directly affected by employer opt-outs. The federal agencies that promulgated the Final Rules found that the rules' exemptions for religious beliefs alone would affect as many as 126,400 women of childbearing age. 83 Fed. Reg. at 57,550. With contraception costing an average of $584 per user per year (again, by defendants' own estimate), this means the Final Rules will shift around $73.8 million in expenses to people who use contraception. *See id.* at 57,578, 57,581.[22]

These costs will likely significantly impede women's access to safe and effective care. After all, "cost is a major barrier for people without health insurance coverage for birth control."[23] Around 36% of adults report skipping or postponing needed healthcare services due to cost in the

---

[22] *Accord* Terrell Blei, *Contraception, Misconceptions & Leftover Questions: The Trump Administration's Latest Birth Control Rollback*, Colo. Consumer Health Initiative, https://perma.cc/Y3MN-7AN7.

[23] News Release, *Cost Continues to Pose Significant Barriers to Contraceptive Access,* Guttmacher Inst. (May 24, 2023), https://perma.cc/Z9FP-25AK; *see also* Meghan Etsey et al., *Uneven Ground: Exploring Women's Health in Rural and Urban America*, Am. Med. Women's Ass'n (Aug. 5, 2025), https://perma.cc/799H-R859 (detailing the uneven access to healthcare between women in urban and rural communities).

past twelve months,[24] and a recent survey shows that 47% of Americans are anxious that they will not be able to afford healthcare costs in the upcoming year.[25]  This anxiety has real consequences, as even the fear of out-of-pocket healthcare costs can cause people to skip healthcare appointments.[26]

## II. Circumstances have changed since defendants promulgated the Final Rules.

Defendants made a series of assumptions about the state of the world when they considered how much harm the Final Rules would cause.[27]  But since the Final Rules were promulgated, the legal and policy landscape has changed in two fundamental ways.  First, recent federal funding cuts have decimated programs that otherwise would have

---

[24] Grace Sparks et al., *Americans' Challenges with Health Care Costs*, KFF (Dec. 11. 2025), https://perma.cc/STQ7-A3R7.

[25] Berkeley Lovelace Jr., *A Record Number of Americans Are Anxious About Health Care Costs Going into Next Year*, NBC News (Nov. 18, 2025), https://perma.cc/NS97-J9YJ.

[26] Trent Gillies, *Why Health Care Costs Are Making Consumers More Afraid of Medical Bills Than an Actual Illness*, CNBC (Apr. 22, 2018, https://perma.cc/FFA4-8Q2Q.

[27] *See, e.g.*, 82 Fed. Reg. at 47,803 (assuming the availability of "multiple Federal, State, and local programs that provide free or subsidized contraceptives for low-income women"); 83 Fed. Reg. at 57,605 (assuming the availability of "many other mechanisms by which the Government advances contraceptive coverage, particularly for low-income women, including through such programs as Medicaid and Title X").

alleviated the contraceptive shortfall the Final Rules will cause.  Second, a wave of post-*Dobbs* abortion restrictions has constricted the options available to women experiencing unplanned pregnancies.  Together, these circumstances will exacerbate the Final Rules' harmful effects.

### A.     With many federally funded programs recently slashed or under attack, women have fewer alternative sources of contraceptive care than before.

When defendants promulgated the Final Rules in 2017 and 2018, they may have expected that, in addition to state-run health programs, private clinics would step in to shoulder part of the shortfall in contraceptive coverage.[28]  But the facts on the ground have changed.

Many clinics that provide reproductive healthcare services rely on federal funding, such as the Title X Family Planning Program.  Enacted in 1970, Title X provides grants to public and nonprofit entities to fund family planning services, research, and training.[29]  Clinics use these funds to provide free and low-cost contraception, STI testing and

---

[28] *See, e.g.*, 83 Fed. Reg. at 57,548 (describing "availability of contraceptive coverage from other possible sources—including…other governmental programs for low-income women" as a factor supporting why applying the mandate to objecting employers is not supported by a compelling governmental interest).

[29] Alexa C. DeBoth et al., *Title X Family Planning Program*, Cong. Rsch. Serv. (May 16, 2025), https://bit.ly/4c1v6D9.

treatment, cancer screening, and other preventative services.[30]

These and other sources of federal funding for contraception are quickly drying up.  During the first Trump Administration, changes in federal policies—compounded by the effects of the COVID pandemic—led to a dramatic reduction in the availability of Title X services.  The numbers were staggering: as clinics faced disruptions or closed, "[t]he share of women receiving contraceptive services from a Title X-funded clinic fell from 61% in 2015 to 28% in 2020."[31]  And clinics are facing even greater headwinds in the second Trump Administration.  Last year, the federal government decided to withhold Title X funding from as many as 144 reproductive health clinics in 20 states,[32] prompting still more clinics to close.[33]  Over the past year, clinics have also had to grapple with Medicaid cuts, the lapse of ACA subsidies, and cuts to programs in the Health

---

[30]  Frederiksen et al., *supra* note 6.

[31]  Jennifer J. Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Use, 2020*, Guttmacher Inst. (May 2025), https://perma.cc/P9PM-24X9.

[32]  Brittni Frederiksen et al., *The Impact of Medicaid and Title X on Planned Parenthood*, KFF (Apr. 16, 2025), https://perma.cc/RM7D-3JP3.

[33]  Brittni Frederiksen et al., *Title X Grantees and Clinics Affected by the Trump Administration's Funding Freeze*, KFF (Apr. 15, 2025), https://perma.cc/T49J-2X47; Sonfield et al., *supra* note 16; *accord* Céline Gounder, *The Quiet Collapse of America's Reproductive Health Safety Net*, KFF Health News (Oct. 30, 2025), https://perma.cc/U79G-DPWC.

Resources and Services Administration and Centers for Disease Control and Prevention."[34]

Last year's One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, 139 Stat. 72 (2025), has further constricted the alternatives available to women seeking contraceptive care outside of an employer health plan. Under the OBBBA, Planned Parenthood and certain other health centers that provide abortion services are now excluded from participating in Medicaid, *see id.* §71113, 139 Stat. at 300-301; although these health centers were already prohibited from using Medicaid dollars to pay for abortions, the statute cut off Medicaid funding for these clinics *entirely*, interfering with their ability to provide services like contraception, cancer screenings, and STI testing.[35] The impact of withholding Medicaid funding from these clinics, even for a year, has been profound; some clinics have had to close their doors, while others, although still open, are not able to provide as much low- or no-cost care.[36]

---

[34] Giovanna DeStefanis, *Planned Parenthood Forced to Close 20 Clinics After Medicaid Cuts*, Feminist Majority Found. (Nov. 18, 2025), https://perma.cc/9FC7-FN8M.

[35] Guttmacher Inst., *Year One of Project 2025: Tracking the Trump Administration's Devastating Campaign Against Sexual and Reproductive Health and Rights* (Jan. 2026), https://perma.cc/W9RE-KFVG.

[36] Carter Sherman, *Hospitals and Clinics Are Shutting Down Due to Trump's Healthcare Cuts. Here's Where.*, Guardian (Nov. 21, 2025), https://perma.cc/A5LE-GSVV; Deidre McPhillips, *Abortion Clinics Are*

These recent federal actions have significantly curtailed the options that would otherwise be available to women when their employers opt out of providing contraceptive coverage.  Thus, the Final Rules will impose additional barriers—not anticipated in 2017 or 2018—for those struggling to access contraceptive care.  And, once again, the states will need to step into the breach.

### B.    Post-*Dobbs* restrictions on abortion care have made access to contraception even more important.

At the time defendants promulgated the Final Rules in 2017 and 2018, the Supreme Court's decisions in *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), ensured at least a baseline of access to abortion care nationwide.  In 2022, however, the Supreme Court overturned *Roe* and *Casey*, holding that the Constitution does not protect a right to abortion.  *See Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022).  Since then, numerous states have enacted abortion bans.  Currently, abortion is illegal in 13 states,

*Closing, Even in States That Have Become Key Access Points*, CNN (Feb. 18, 2026, https://perma.cc/M9LQ-VGB9; Chantelle Lee, *Abortion Is Legal in Maine, but Trump's 'Big Beautiful Bill' Could Gut Much of the State's Reproductive Health Care Access*, Time (Jul. 2, 2025), https://perma.cc/ ZKJ5-YXGJ; *see also* Decl. of Megan L. Kavanaugh ¶41, *California v. U.S. Dep't of Health & Human Servs.*, 1:25-cv-12118 (D. Mass.) (ECF No. 62-5).

and it is restricted based on gestational duration in 29 others.[37]

The Final Rules thus impede access to contraceptives at a time when they are most needed.  After abortion was made illegal in many states, people quickly turned to various forms of contraception, including emergency contraception, birth control pills, and long-acting reversible contraceptives like IUDs and implants.[38]  A popular online pharmacy, Nurx, received 10 times its normal number of requests for emergency contraception and 3 to 4 times the number of requests for birth control pills in the wake of *Dobbs*.[39]  Planned Parenthood similarly noted a 21% increase of birth control appointments, and a 41% increase in IUD appointments specifically.[40]  One study shows that tubal ligation and long-acting reversible contraceptives increased by 15.8% post-*Dobbs*.[41]

By impeding access to contraceptive coverage, the Final Rules

---

[37] Talia Curhan, *State Bans on Abortion Throughout Pregnancy*, Guttmacher Inst. (Nov. 24, 2025), https://perma.cc/A985-VQPL.

[38] Virginia Langmaid, *Contraception Demand Up After Roe Reversal, Doctors Say,* CNN (Jul. 6, 2022), https://perma.cc/RDF9-C9TB.

[39] *Id.*

[40] Tara Law, *21% of Women Reported Switching Their Birth Control Method Post-Roe*, Time (July 27, 2022), https://perma.cc/8X3Z-L5QL.

[41] Jameson A. Mitchell et al., *Permanent and Long-Acting Reversible Contraception Volumes at a Multihospital System in Ohio Before and After* Dobbs, 137 Contraception 110471 (2024), https://perma.cc/F2BB-3DN2.

underestimate how necessary this care is in the wake of such significant changes in the healthcare landscape.

## III. The Final Rules will have a significant and disproportionate impact on historically marginalized communities.

In addition to harming states and their residents in all the ways discussed above, the Final Rules will also exacerbate the challenges confronting individuals who *already* face significant hurdles in accessing quality, affordable healthcare.

First, the Final Rules' negative effects will fall particularly hard on rural and low-income communities. Lower-income women are disproportionately likely to live in "contraceptive deserts"—that is, areas lacking reasonable access to a healthcare facility that offers a full range of contraceptive methods.[42] Around 19 million women between the age of 13 and 44 live in these areas, and 1.2 million reside in counties without a health center offering full-spectrum contraceptive care.[43] Rural and lower-income women are also more likely than others to live in "pregnancy care deserts", "abortion deserts," and "reproductive healthcare deserts"—that is, areas where there are no health centers that offer care

---

[42] Upstream USA, *Contraceptive Deserts: What They Are and How to Improve Access*, (Aug. 13, 2024), https://perma.cc/V34N-VFXD.

[43] *Id.*

related to pregnancy, abortion, or reproductive health.[44]  Pregnancy care deserts affect over 3.8 million women of reproductive age; abortion deserts, over 18.4 million; and reproductive healthcare deserts, a staggering 41.5 million.[45]

Second, the Final Rules will aggravate existing health disparities facing women of color.  Studies have shown that, in seeking reproductive healthcare, racial and ethnic minority groups in the United States confront a number of "social and structural" impediments, including "fewer neighborhood health services, less insurance coverage, decreased access to educational and economic attainment, and even practitioner-level factors such as racial bias and stereotyping."[46]  A 2017 survey found that 39% of African-American women ages 18 to 44 cannot afford to pay more than $10 each month for birth control, while another survey found that 57% of Latina women ages 18 to 34 had trouble affording birth control

---

[44] *See* March of Dimes, *Nowhere to Go: Maternity Care Deserts Across the US* (2024), https://perma.cc/5U7U-DHLS; Brenna C. Kelly et al., *Disparities in Distance to Abortion Care Under Reversal of Roe v. Wade*, Utah Women & Reprod. Health (May 9, 2022), https://perma.cc/RD8Y-PBRW; Nat'l Women's L. Ctr., *When Women Are Deserted* 1, 12 (2025), https://perma.cc/NJ63-XRHA.

[45] Nat'l Women's L. Ctr., *supra* note 44, at 1, 5.

[46] Madeline Y. Sutton et al., *Racial and Ethnic Disparities in Reproductive Health Services and Outcomes, 2020*, 5 Obstetrics Gynecology 225, 225 (2021), https://perma.cc/3EKS-C3LP.

before the ACA was enacted.[47]  Women of color are also more likely to live in one of the care deserts described above.[48]

In short, the Final Rules increase the barriers for those already facing discrimination within the healthcare system.  By limiting access to necessary contraceptive care, the Final Rules deepen already prevalent racial, gender, and income disparities.  The burden to alleviate such disparities will fall on the states, whose marginalized communities will be directly impacted.

## CONCLUSION

The Court should affirm the judgment below.

---

[47]  Jon Deauna, *The Religious and Moral Exemption Rules: Increasing Systemic Barriers for Women of Color*, Lawyers' Comm. for Civil Rights Under Law (Apr. 26, 2019), https://perma.cc/KD5G-5LP2.

[48]  Nat'l Women's L. Ctr., *supra* note 44, at 4-5.

March 4, 2026

Respectfully submitted.

/s/ *Gerard J. Cedrone*

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
ALLYSON SLATER
  *Director, Reproductive Justice Unit*
GERARD J. CEDRONE
  *Deputy State Solicitor*
RUCHI RAMAMURTHY
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

KRISTIN K. MAYES
  *Attorney General of Arizona*
2005 N. Central Ave.
Phoenix, AZ 85004

ROB BONTA
  *Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
  *Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
  *Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
  *Attorney General of*
    *the District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
  *Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

22

AARON M. FREY
  *Attorney General of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
  *Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
  *Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
  *Attorney General of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
  *Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
  *Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
  *Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

ANTHONY G. BROWN
  *Attorney General of Maryland*
200 St. Paul Place
Baltimore, MD 21202

KEITH ELLISON
  *Attorney General of Minnesota*
75 Martin Luther King Jr. Blvd.
St. Paul, MN 55155

RAÚL TORREZ
  *Attorney General of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

JEFF JACKSON
  *Attorney General of North Carolina*
P.O. Box 629
Raleigh, NC 27602

PETER F. NERONHA
  *Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

JAY JONES
  *Attorney General of Virginia*
202 N. 9th Street
Richmond, VA 23219

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced serif font.

2.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,460 words, excluding the parts of the brief exempted under Rule 32(f).

3.     The text of this electronic brief is identical to the text in the paper copies of the brief.

4.     A virus scan was performed on this electronic brief using Crowdstrike Falcon version 7.33.20505.0, and no virus was detected.

5.     I am a member of the bar of this Court

March 4, 2026                           /s/ *Gerard J. Cedrone*
                                        Gerard J. Cedrone
                                          *Deputy State Solicitor*
                                        One Ashburton Place
                                        Boston, MA 02108
                                        (617) 963-2282
                                        gerard.cedrone@mass.gov