No. 25-2575

# United States Court of Appeals for the Third Circuit

COMMONWEALTH OF PENNSYLVANIA AND STATE OF NEW JERSEY,

*Plaintiffs-Appellees,*

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA,

*Defendants-Appellants,*

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

*Intervenor-Defendant-Appellant.*

On Appeal from the U.S. District Court for the
Eastern District of Pennsylvania, No. 2:17-cv-04540-WB
(Hon. Chief Judge Wendy Beetlestone, U.S.D.J.)

## INTERVENOR-APPELLANT'S REPLY BRIEF

PAUL D. CLEMENT
ERIN E. MURPHY
Clement & Murphy
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

NICHOLAS M. CENTRELLA
Clark Hill
2 Commerce Street
2001 Market Street, Suite 2620
Philadelphia, PA 19103
(215) 864-8098

MARK L. RIENZI
ERIC C. RASSBACH
LORI H. WINDHAM
ADÈLE A. KEIM
DIANA VERM THOMSON
BENJAMIN A. FLESHMAN
DANIEL L. CHEN
RICHARD C. OSBORNE
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave NW, Suite 400
Washington, DC 20006
(202) 955-0095
mrienzi@becketfund.org

*Counsel for Intervenor-Defendant-Appellant*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................ii

INTRODUCTION.......................................................................... 1

ARGUMENT .................................................................................3

I.  The States have no Article III injury. ...............................................3

II. The States cannot show redressability. ...........................................6

   A. The mandate violates the Free Exercise Clause. ...........................7

   B. The mandate discriminates based on religion.............................10

   C. The mandate violates the nondelegation doctrine. ......................11

III. The Final Rule is not arbitrary and capricious..............................13

   A. The Final Rule is required by RFRA. ...........................................13

   B. The Final Rule is permitted by RFRA...........................................18

   C. The Final Rule is not otherwise arbitrary and capricious. ...........24

CONCLUSION ..............................................................................28

COMBINED CERTIFICATIONS...........................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Braidwood Mgmt. v. Becerra,*
627 F. Supp. 3d 624 (N.D. Tex. 2022)................................................12

*Braidwood Mgmt. v. EEOC,*
70 F.4th 914 (5th Cir. 2023) ............................................................14

*Burwell v. Hobby Lobby Stores,*
573 U.S. 682 (2014)..................................................... 1, 13, 14

*Catholic Charities Bureau v. Wis. Lab. & Indus. Rev.*
*Comm'n,*
605 U.S. 238 (2025)..................................................... 10, 11

*Christ the King Manor v. HHS,*
730 F.3d 291 (3d Cir. 2013) .............................................................24

*Church of the Lukumi Babulu Aye v. City of Hialeah,*
508 U.S. 520 (1993)................................................................17

*In re Cont'l Airlines,*
134 F.3d 536 (3d Cir. 1998) ............................................................16

*Diamond Alternative Energy, LLC v. EPA,*
606 U.S. 100 (2025)..................................................................5

*Duke Power Co. v. Carolina Env't Study Grp.,*
438 U.S. 59 (1978).................................................................7

*FCC v. Consumers' Rsch.,*
606 U.S. 656 (2025)................................................................12

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021)................................................................19

*FDA v. All. for Hippocratic Medicine,*
602 U.S. 367 (2024)................................................................5, 6

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021).......................................................... 10, 16

*Geneva Coll. v. Sec'y of HHS*,
   778 F.3d 422 (3d Cir. 2015) ................................................... 17

*Gonzales v. O Centro Espírita Beneficente União
   do Vegetal*, 546 U.S. 418 (2006)............................................ 17

*Gundy v. United States*,
   588 U.S. 128 (2019).............................................................. 11

*Holt v. Hobbs*,
   574 U.S. 352 (2015).............................................................. 18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.
   EEOC*,
   565 U.S. 171 (2012)................................................................ 7

*Humphreys v. DEA*,
   96 F.3d 658 (3d Cir. 1996) .................................................... 24

*Larson v. Valente*,
   456 U.S. 228 (1982)............................................................... 26

*Leyse v. Bank of Am. Nat'l Assoc.*,
   856 F. App'x 408 (3d Cir. 2021) ............................................... 4

*Little Sisters of the Poor Home for the Aged v. Burwell*,
   794 F.3d 1151 (10th Cir. 2015)............................................... 11

*Little Sisters of the Poor Saints Peter & Paul Home v.
   Pennsylvania*,
   591 U.S. 657 (2020).................................................... *passim*

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)........................................................ 13, 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................. 3

iii

*Mahmoud v. Taylor,*
  606 U.S. 522 (2025).................................................................. 16

*Massachusetts v. HHS,*
  513 F. Supp. 3d 215 (D. Mass. 2021)............................................. 25, 26

*Mistretta v. United States,*
  488 U.S. 361 (1989).................................................................. 11

*Nat'l Shooting Sports Found. v. Jones,*
  716 F.3d 200 (D.C. Cir. 2013) ...................................................... 26

*Pennsylvania v. President of the U.S.,*
  930 F.3d 543 (3d Cir. 2019) ......................................................... 4

*Real Alts. v. Sec'y of HHS,*
  867 F.3d 338 (3d Cir. 2017) ........................................................ 15

*Schuchardt v. President of the U.S.,*
  839 F.3d 336 (3d Cir. 2016) .......................................................... 4

*Shelley v. Kraemer,*
  334 U.S. 1 (1948).................................................................... 7

*Spivack v. City of Philadelphia,*
  109 F.4th 158 (3d Cir. 2024)......................................................... 8

*Tandon v. Newsom,*
  593 U.S. 61 (2021).............................................................. 7, 8, 9

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021).................................................................. 3

*U.S. Navy SEALs 1-26 v. Austin,*
  594 F. Supp. 3d 767 (N.D. Tex. 2022)............................................... 23

*United States v. Friday,*
  525 F.3d 938 (10th Cir. 2008)....................................................... 23

*United States v. Playboy Ent. Grp.,*
  529 U.S. 803 (2000).................................................................. 18

iv

*In re Yellow Corp.*,
  152 F.4th 491 (3d Cir. 2025) ......................................................... 13, 19

*Zzyym v. Pompeo*,
  958 F.3d 1014 (10th Cir. 2020) ..................................................... 18, 19

**Statutes**

20 U.S.C. § 1681 ................................................................................ 21, 22

42 U.S.C. § 300gg-13 ........................................................................ 11, 12

42 U.S.C. § 2000bb-1 ..............................................................................22

42 U.S.C. § 2000bb-3 .................................................................................1

**Other Authorities**

45 C.F.R. § 147.132 ..................................................................................21

78 Fed. Reg. 39,870 (July 2, 2013) .................................................. 10, 27

83 Fed. Reg. 57,536 (Nov. 5, 2018)................................................ 3, 25, 26

88 Fed. Reg. 7236 (Feb. 2, 2023) ...........................................................27

12 Wright & Miller's Federal Practice & Procedure (3d ed.
  1998) .........................................................................................................7

## INTRODUCTION

For fifteen years, contraceptive mandate litigation has focused on RFRA. That is no surprise, since RFRA "was designed to provide very broad protection for religious liberty," *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 706 (2014), and to control "all Federal law, and the implementation of that law, whether statutory or otherwise," 42 U.S.C. § 2000bb-3(a). Federal courts across the country have entered RFRA-based permanent injunctions forbidding the government from enforcing the mandate without a religious exemption. And six years ago—in this very case—the Supreme Court said its own decisions had "all but instructed" the agencies to focus on RFRA and observed that RFRA "feature[d] prominently in the Departments' discussion of exemptions that would not pose similar legal problems" in the Final Rule at issue here. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 681 (2020).

Yet the States persist in arguing that the religious exemption Rule is somehow "not rationally connected" to RFRA. That conclusion is self-evidently wrong. And getting the RFRA analysis wrong leads to all sorts of even deeper constitutional problems, such as states suing to control federal law over unrealized injuries, and federal courts re-imposing a long-defunct unconstitutional agency action that violates the Free Exercise Clause and the nondelegation doctrine.

1

This Court could end the States' misadventures by ruling on any of those grounds, including the various constitutional ones. But the statutory ground provided by RFRA remains the most straightforward: Because RFRA forbids application of the contraceptive mandate to religious objectors, the Final Rule is well within the federal government's "virtually unbridled discretion" to "create exemptions from its own Guidelines"—especially under the deferential arbitrary and capricious standard that all sides agree applies.

Instead of engaging with the agencies' reasoned rulemaking and the Supreme Court's instructions, the States offer a series of inartful dodges. First, they urge this Court to rely on *Geneva College* (which has been vacated) and *Real Alternatives* (which is not an employer mandate case at all). Next, they try to inflate the Final Rule's scope, asserting that employers with *no religious objection* can take advantage of the exemption—which is flatly contradicted by the Rule's text. Then the States claim that the agencies "backtracked" on contraceptive safety, even though the Final Rule expressly did "not take a position" on that question. And finally, the States continue to fault the Final Rule for failing to consider, in 2017, a failed regulatory proposal that the Biden Administration first raised in 2023.

This Court should reject the States' distorted thinking and reaffirm that the Final Rule easily constitutes "reasoned decisionmaking" because RFRA requires religious exemptions.

2

## ARGUMENT

### I. The States have no Article III injury.

More than five years after the Final Rule took effect, the States have suffered no Article III injury. They brought this lawsuit based upon rank speculation about future harms, but those harms never came to pass. To this day there is no testimony of any woman complaining that she could not get contraceptive coverage due to the Final Rule, nor any evidence of such women turning to the States for help. Br.23-25.

The States presented evidence at the pleadings stage of *predicted* injuries, JA.31, but, as the district court recognized, JA.30 n.13, that doesn't mean they have standing at the summary-judgment stage.[1] At summary judgment, "the specific facts set forth by the plaintiff to support standing must be 'supported adequately by the evidence adduced,'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). That never happened. *See* JA.32 (allowing the States to "continue to rely on [the preliminary-injunction] record").

---

[1]   That evidence was flawed all along. Estimates of religious objectors to the mandate included "litigating entities" who had not yet obtained an injunction by November 2018, but who could have done so since, 83 Fed. Reg. 57,536, 57,575-76 (Nov. 15, 2018), and employers who were satisfied with the accommodation at that time, *id.* at 57,576-77 (acknowledging that "[a] broad range" of religious employers "have publicly indicated that they do not conscientiously oppose participating in the accommodation").

While speculation and predictions might be the best the States could have offered at the outset of this case and the inception of the Final Rule, nearly a decade later, one would expect the States to have amassed at least *some* evidence of actual injury. But rather than provide this evidence, the States offer more speculation, musing that the Supreme Court shouldn't have taken the case at the preliminary injunction stage and relying on the now-reversed decision from this Court. That decision was premised on the notion that the States would suffer a "concrete financial injury from the increased use of state-funded services." *Pennsylvania v. President of the U.S.*, 930 F.3d 543, 562 (3d Cir. 2019). But the predictive injuries on which that decision relied never materialized, as the lack of evidence at summary judgment makes plain. *See Schuchardt v. President of the U.S.*, 839 F.3d 336, 353-54 (3d Cir. 2016) (finding standing based on the pleadings but emphasizing that "[t]his does not mean the [the plaintiff] *has* standing to sue" given that discovery could prove otherwise); *Leyse v. Bank of Am. Nat'l Assoc.*, 856 F. App'x 408, 409-11 (3d Cir. 2021) (holding that while the complaint's allegations were sufficient for standing at the pleading stage, plaintiff lacked standing at summary judgment). This Court should not blind itself to the evident lack of any concrete injury just because seven years ago it credited a now-defunct estimate of future harm.

4

The States do not defend the district court's erroneous reliance on *Massachusetts v. EPA*. *See* Br.24-25. Rather, they rely upon *Diamond Alternative Energy, LLC v. EPA*, where affidavits based on predictions sufficed to establish standing. *See* 606 U.S. 100, 108 (2025). But there, "no party dispute[d]" whether an injury-in-fact existed given that the diminution of the plaintiffs' business was "the whole point of the regulations." *Id.* at 113-14. The correct analogue here is *FDA v. Alliance for Hippocratic Medicine*, which rejected similar speculation about increased cost because "[t]he chain of causation [was] simply too attenuated." 602 U.S. 367, 391 (2024). "Allowing doctors … to challenge safety regulations as unlawfully lax would be an unprecedented and limitless approach and would allow doctors to sue in federal court to challenge almost any policy affecting public health." *Id.* at 391-92.

The same is true here. The States' sweeping theory would establish standing to challenge any federal healthcare regulation, since any regulation would hypothetically change the behavior of the state's citizens around the margins and lead some to turn to state-funded Medicaid, CHIP, or public hospitals. That is doubly true now that the States have failed to provide evidence of the increased costs they alleged in the complaint. Standing ensures "that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the

consequences of judicial action." *Id.* at 379. Nearly a decade in, the States' consequences are still zero.

## II. The States cannot show redressability.

Having identified no women affected by the Final Rule, the States' claimed harm is hypothetical and illusory. Resp.27-31. Yet even if the States had identified some concrete harm, it would not be redressable by vacating the Final Rule. Vacating the Final Rule helps the States only if religious employers like the Little Sisters *are* covered by the mandate and *will* be forced to provide coverage when the Final Rule is vacated. But here, the mandate cannot be constitutionally enforced against these religious objectors, and the States thus have no redress.

Abandoning the district court's reasoning, the States argue that the Little Sisters' constitutional arguments are speculative and procedurally improper. Resp.29-30. But, unlike the States' injury arguments, the Little Sisters' arguments do not require speculation as to the future actions of independent parties. The Little Sisters present arguments about the relief requested by the States in this case: revival of the mandate to force religious objectors to provide coverage. The Court does not have to determine that religious objectors would necessarily seek relief against the federal government, nor does it have to enter judgment against the federal government to determine that the mandate cannot be lawfully enforced against religious objectors like the Little Sisters.

6

Instead, it is hornbook law that a court's "award of … relief" cannot "be … prohibited by the First Amendment." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194 (2012). The relief sought must be within the court's "remedial powers" to give, *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 74 (1978), and a court is without power to act to deprive a party of a protected right, *see Shelley v. Kraemer*, 334 U.S. 1, 13-15 (1948); *accord* 12 Wright & Miller's Federal Practice & Procedure § 3005 (3d ed. 1998) ("the court may not enter an injunction that calls for an illegal act"). Just as this Court could not enter relief enforcing racial covenants, it cannot enter relief re-imposing an unconstitutional mandate against religious objectors, so the relief the States request can't solve their (alleged) problem.

**A. The mandate violates the Free Exercise Clause.**

The mandate violates the Free Exercise Clause because it permits categorical and individualized exemptions and is therefore not generally applicable. Br.29-32. The States' response ignores Supreme Court precedent and attempts to reduce the Free Exercise Clause to a prohibition on "animus" and "target[ing]" religion. Resp.32, 34.

First, the States claim that the mandate is generally applicable because the grandfathered plan exemption "applies equally to secular *and religious* employers' plans." Resp.32. That misses the point entirely. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the *asserted government interest* that

7

justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis added). That's neither an animus determination, nor an "*only* religious versus *only* secular" determination, but a requirement that religious claims be treated at least as well as other activities that equally undermine the government's interest.

Here, grandfathered health plans and the religious exemption are comparable: the government's asserted interest across the mandate is facilitating contraceptive access, and grandfathered plans undermine that interest in the same way the Final Rule does.[2] "When the government says that it cannot exempt religious exercise from a policy because doing so would undermine an important interest, but then exempts other groups or actions that undermine that same interest in the same way," the government's law is not generally applicable. *Spivack v. City of Philadelphia*, 109 F.4th 158, 177 (3d Cir. 2024). That the grandfathered plan exemption applies to both secular and religious employers is irrelevant. Resp.32. The Supreme Court rejected that very argument in *Tandon*, where both the regulation on gatherings in private homes and the exceptions for gatherings in public spaces applied to religious and secular conduct alike. 593 U.S. at 63; *see id.* at 65 (Kagan, J., dissenting). In any

---

[2]  This is not to mention other secular exemptions from the mandate that also undermine the government's asserted interest, including small employers who choose not to offer insurance at all. Br.50.

event, the dispositive question is whether the mandate as a whole is generally applicable. It isn't, as the grandfathered plan exemption proves.

Next, the States argue that the mandate is generally applicable because the church exemption is not a proper comparator. Resp.34. But they badly mangle the law when they claim the mandate is generally applicable because the church exemption is "tied to defined criteria in the tax code, not an ad hoc exemption scheme." *Id. Tandon* rejected that kind of hairsplitting argument, noting that in the COVID-19 context, "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather." 593 U.S. at 62. So too here: comparability asks *whether* another exemption undermines contraceptive access, not *why* that exemption does so (grandfathering, small employers, churches, or the Final Rule). The church exemption undeniably hinders contraceptive access, so the States must satisfy strict scrutiny and explain why a similar exemption cannot be given to the Little Sisters. That they cannot do.

Finally, the States assert that the mandate does not run afoul of *Fulton* because the mandate does not allow HRSA to create exceptions. Resp.33. That's plainly wrong. According to the Supreme Court, "HRSA has virtually unbridled discretion to decide what counts as preventive care," including its "ability to identify and create exemptions from its own Guidelines." *Little Sisters*, 591 U.S. at 676. Nothing in that discretion limits HRSA's ability to make individualized exemptions any more than categorical exemptions. And even if no exceptions existed, HRSA retains

the discretion to create them, and that latent discretion alone triggers strict scrutiny. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021) (discretion triggers strict scrutiny "regardless whether any exceptions have been given"). The States concede as much, admitting that HRSA has authority to create exemptions via published regulations, as the church exemption demonstrates. Resp.33.

Therefore, this is an even easier case than *Fulton*. Indeed, HRSA has already exercised its discretion numerous times to create exceptions—thereby rendering its policies not generally applicable.

**B. The mandate discriminates based on religion.**

The mandate also cannot be re-imposed because it would run afoul of *Catholic Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025). As explained, the mandate exempts a religious order's "exclusively religious activities," 78 Fed. Reg. 39,870, 39,874 (July 2, 2013), but doesn't exempt activities not deemed "exclusively religious," such as serving the elderly poor, Br.33. That violates both Religion Clauses, because "eligibility for the exemption ultimately turns on inherently religious choices"—here, whether to serve the elderly poor as an expression of religious faith. *See Catholic Charities*, 605 U.S. at 250.

The States' response is astonishing. They argue for the first time that the Little Sisters *are* covered by the church exemption, because eligibility "can turn on how the entity itself perceives religious action." Resp.35. But in the over-ten-year saga of litigation over the mandate, no party and no

10

judge has ever thought that the church exemption applies to the Little Sisters' homes. Rather, a straightforward reading of the exemption shows that "[t]he Little Sisters are subject to the [m]andate unless they take advantage of the accommodation scheme." *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1167 (10th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016). The mandate exempts religious organizations based on the government-assessed religiosity of their activities; it discriminates against the Little Sisters' theological choice to do "charitable work" and thus violates the Religion Clauses. *Catholic Charities*, 605 U.S. at 252.

**C. The mandate violates the nondelegation doctrine.**

Congress may grant an agency the discretion "to implement and enforce the laws," *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality), but only if it also "lay[s] down … an intelligible principle to which the" agency "is directed to conform," *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Congress must say "what task it delegates and what instructions it provides." *Gundy*, 588 U.S. at 136. The Supreme Court observed in *Little Sisters* that 42 U.S.C. § 300gg-13(a)(4) "is completely silent as to *what* those 'comprehensive guidelines' must contain, or how HRSA must go about creating them." 591 U.S. at 676 (emphasis in original). Instead, HRSA has "virtually unbridled discretion to decide what counts as preventive care." *Id.* The Supreme Court stopped just short of

11

holding so, because "no party ha[d] pressed" a challenge to the mandate itself. *Id.* at 679.

The States ignore the Supreme Court's warning. Without citing *Little Sisters* at all, they incorrectly state the nondelegation standard as "merely requir[ing] guidance." Resp.36. But they omit how that "guidance" must "*ma[k]e clear* both 'the general policy' … and 'the boundaries'" Congress wishes to impose. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (emphasis added). The mandate does neither. Next, the States suggest that every word just *is* a principle: they claim that because § 300gg-13(a)(4) contains a noun ("women"), an adjective ("preventive"), and an internal cross-reference (to § 300gg-13(a)(1)), it sets *three* intelligible principles. Resp.36-37. But an *ipse dixit* is not an intelligible principle. The Supreme Court read that same text as "'expansive language offer[ing] no indication whatever' that the statute limits what HRSA can designate as preventive care and screenings." *Little Sisters*, 591 U.S. at 677. Nor does *Braidwood Management v. Kennedy* support the States' argument. *See* Resp.37 (citing Order and Final J., No. 20-cv-00283 (N.D. Tex. Dec. 17, 2025), ECF No. 153). The consent judgment there was required by Fifth Circuit precedent about a different statute. *See Braidwood Mgmt. v. Becerra*, 627 F. Supp. 3d 624, 649-50 (N.D. Tex. 2022). So the mandate is *not* "just like other delegations" that were upheld, Resp.37, because the Supreme Court did not label them as granting "virtually unbridled discretion." *Little Sisters*, 591 U.S. at 676.

12

## III. The Final Rule is not arbitrary and capricious.

The majority in *Little Sisters* found that "[t]he final rules included a concise statement of their basis and purpose," an "expla[nation] that the rules were 'necessary to protect sincerely held' moral and religious objections," a "summar[y]" of "the legal analysis supporting the exemptions," and a "lengthy analysis" explaining why the agencies changed their position on whether the accommodation satisfied RFRA. *Id.* at 686, 673, 682-3 & n.12. That is more than enough to pass this Court's "deferential" arbitrary and capricious review. *In re Yellow Corp.*, 152 F.4th 491, 504 (3d Cir. 2025) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024)). The States' arguments to the contrary grasp at straws.

### A. The Final Rule is required by RFRA.

The first reason to uphold the Final Rule is also the simplest: RFRA requires a robust religious exemption. The Supreme Court was very clear in *Little Sisters* that "under RFRA, the [agencies] *must* accept the sincerely held complicity-based objections of religious entities." 591 U.S. at 681 (emphasis added). This means that the government (and the courts) cannot "'tell the plaintiffs that their beliefs are flawed' because, in the [agencies'] view, 'the connection between what the objecting parties must do … and the end that they find to be morally wrong … is simply too attenuated.'" *Id.* (quoting *Hobby Lobby*, 573 U.S. at 723-24). This alone answers the States' stubborn insistence on characterizing the Little Sisters' complicity analysis as "premised on a faulty characterization of law."

Resp.62. *See Hobby Lobby*, 573 U.S. at 691 (holding the fines for failing to comply with the mandate constitute a substantial burden). Indeed, relying on *Little Sisters*, other courts have since recognized that "[t]he religious are entitled to substantial deference when claiming obstruction of their religious exercise." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 937 & n.51 (5th Cir. 2023) (citing *Little Sisters*, 591 U.S. at 681). And the mandate cannot hope to pass strict scrutiny. Br.38-41. RFRA thus required the agencies to accommodate religious objectors to the prior scheme. *See Little Sisters*, 591 U.S. at 688 (Alito, J., joined by Gorsuch, J., concurring) ("RFRA compels an exemption for the Little Sisters and any other employer with a similar objection to what has been called the accommodation to the contraceptive mandate."). Small wonder, then, that every religious employer case litigated to conclusion under RFRA has resulted in a permanent injunction.[3]　Br.40-41.

---

[3]　The States dismiss the injunctions because they "rested on the Agencies' concession of a RFRA violation." Resp.59 & n.14. Just so: following *Zubik*, the Agencies conceded—first in a January 2017 FAQ, and later in rulemaking—that, there was no way to "resolve the concerns of religious objectors" under the existing accommodation. Br.13 & n.5. Lower courts appropriately acknowledged this, applied *Hobby Lobby* and *Zubik*, and entered injunctions for the Little Sisters' church plan and others. Br.40-41 (listing injunctions, including *Little Sisters v. Azar*).

Contra the States, the Little Sisters' injunction does not obviate their need for broader relief, because their injunction extends only to the Little Sisters' current benefits plan provider. Should the Little Sisters ever need to change providers, the injunction will no longer protect them. This

Nevertheless, the States continue to cling to *Geneva College* and *Real Alternatives*, arguing that RFRA could not require an exemption because the accommodation does not burden objectors' religious exercise. *See* Resp.60-62. But *Geneva College* was vacated by the Supreme Court in *Zubik* and "is no longer controlling." *Real Alts. v. Sec'y of HHS*, 867 F.3d 338, 356 n.18 (3d Cir. 2017). *Real Alternatives*—which involved claims brought by individual employees, not employers—did not resurrect *Geneva College*'s holdings regarding whether the accommodation substantially burdens an employer's religious beliefs. Indeed, *Real Alternatives* itself recognized that "[t]here is a material difference between employers arranging or providing an insurance plan that includes contraception coverage" and "becoming eligible to apply for reimbursement for a service of one's choosing" as an *employee. Id.* at 362. At most, *Real Alternatives*'

---

practical limitation underscores their need for the broad protection the Final Rule provides.

The States' quixotic assertion that the Little Sisters are not required to comply with the mandate because they currently participate in a self-insured church plan likewise founders. Resp.59-60 n.14. Many of the plaintiffs in *Zubik* belonged to church plans. Resp'ts' Br. at 19, *Zubik*, 578 U.S. 403 (No. 14-1418). In its *Zubik* briefing, the federal government explained at length why it still needed to enforce the mandate and singled out the Little Sisters by name. *Id.*; *see also id.* at 61 (describing the mechanisms for persuading church plan administrators to distribute contraceptives). The Final Rule ended this campaign; the States' position would renew it.

footnote seemingly approving of *Geneva College*'s reasoning was dicta and should not be read to govern here.

Even if *Real Alternatives* did somehow resuscitate *Geneva College*'s vacated holding for employer cases, that analysis is no longer binding because it has been "undermined by [multiple] subsequent Supreme Court case[s]," *In re Cont'l Airlines*, 134 F.3d 536, 542 (3d Cir. 1998); *see also* Br.44-46. The States' contrary readings of *Fulton* and *Mahmoud* disfigure the burden analysis.

The States try to evade *Fulton* by arguing that "the accommodation requires … less from religious objectors" than the certification required of the objectors in *Fulton*. Resp.64. But that burden-weighing analysis is precisely what *Fulton* rejects. All that matters is whether the religious objectors believe that the actions required of them violate their religious beliefs. *See Fulton*, 593 U.S. at 532. Here, the Little Sisters and others like them sincerely believe that participating in the accommodation is "tantamount to endorsement," *id.*, of contraceptives, JA.1690 ¶ 38 (Decl. of Mother Superior Marie Vincente). The States point to nothing in *Fulton*, and nothing in the record, to support their attempt to sidestep the Supreme Court's clear guidance.

The States' efforts to distinguish *Mahmoud v. Taylor* similarly focus on the wrong question. The Little Sisters do not object to what the agencies themselves do; the Little Sisters object to what the accommodation requires *them* to do in order to avoid crippling fines—sign over authority

16

to use their health plans.[4] Again, "the Departments must accept" the Little Sisters' "sincerely held complicity-based objections." *Little Sisters*, 591 U.S. at 681. And the Little Sisters sincerely believe that the act of certification is inconsistent with their religious beliefs. Under *Little Sisters*, *Fulton*, and *Mahmoud*, that is sufficient to establish a substantial burden.

Perhaps recognizing that their burden argument rests on *Geneva College*—a faulty, vacated case—the States try to argue that the agencies' strict scrutiny analysis was incorrect. Not so. While the States insist that the Affordable Care Act's (ACA) myriad exemptions would not undermine the government's compelling interest, Resp.66, the Supreme Court has repeatedly said that a law cannot be serving a compelling interest "when it leaves appreciable damage to that supposedly vital interest unprohibited" by exempting comparable conduct. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993); *accord Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 433 (2006).

---

[4] The States try to rehabilitate *Geneva College* by pointing to the government's claim that contraceptive coverage is not "part of the employer's" plan for a "self-insured church plan." Resp.61 n.15. But the *Geneva College* plaintiffs did not have a "self-insured church plan." *Geneva Coll. v. Sec'y of HHS*, 778 F.3d 422, 427 n.1 (3d Cir. 2015). So *Geneva College*'s premise remains false (and unrebutted) as to the plans there. In any event, the Little Sisters' analysis of their own complicity—that they cannot, for example, sign a form that purports to be "an instrument under which the[ir] plan is operated"—is independent of the *Geneva College* analysis, another reason not to rely on *Geneva College*. JA.1457-58.

The mandate's exemptions for small business owners, churches, and grandfathered plans do exactly that.

Moreover, contrary to the States' contention, the existence of other, government-sponsored contraceptive sources *does* demonstrate that there are methods for providing contraceptives that are less restrictive of the beliefs of religious objectors. That those programs may not provide uniform coverage is irrelevant. The ACA does not provide uniform contraceptive coverage either, for the vast numbers of women who work for small employers or employers with grandfathered plans. The point is that the government has other methods for distributing contraceptives that do not violate the religious beliefs of objectors like the Little Sisters (which likely explains the complete absence of evidence of anyone who can't get contraceptives eight years into this case). And where "a less restrictive means is available … the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015) (quoting *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 815 (2000)).

**B. The Final Rule is permitted by RFRA.**

Even if RFRA did not require the agencies to issue the Final Rule, it would still fully justify the rule that the agencies created.[5] *Cf. Zzyym v.*

---

[5] Contrary to the States' assertion, the agencies have not "disclaim[ed] RFRA" before this Court. Resp.67. The agencies have explained, with detailed reference to the administrative record, the full array of reasoning

*Pompeo*, 958 F.3d 1014, 1027 (10th Cir. 2020) ("Under arbitrary-and-capricious review, the agency need not select a perfect solution—just a rational one."). As the Supreme Court has already explained in this case, "[i]t is hard to see how the Departments could promulgate rules consistent with [its] decisions if they did not overtly consider these entities' rights under RFRA." *Little Sisters*, 591 U.S. at 681-82; *see also* Br.46-50. Thus, the agencies' decision to exempt those with "sincerely held complicity-based objections" for whom the Supreme Court specifically told the agencies "to develop and implement a solution," *Little Sisters*, 591 U.S. at 681, is not "so outside the 'zone of reasonableness' that it flunks [this Court's] 'deferential' review," *In re Yellow Corp.*, 152 F.4th at 504 (first quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); then quoting *Loper Bright*, 603 U.S. at 392).

While the States concede that the agencies were permitted to "exercise their rulemaking discretion to resolve RFRA violations" in the Final Rule, Resp.59, they nevertheless maintain that the Final Rule "goes far beyond what is necessary to address any conflicts with RFRA," Resp.51. The States effectively apply narrow-tailoring scrutiny in place of the deferential arbitrary and capricious review. Even assuming the Final Rule goes further than the least restrictive means of avoiding RFRA conflicts,

---

supporting the Final Rule—*including* the need to remedy RFRA violations. Fed.Br.25-30 (explaining policy rationales); *id.* at 32 (emphasizing that "RFRA independently authorize[s] the exemption as a remedy").

none of the States' overbreadth arguments come close to showing that the Final Rule lacks a "rational connection" to RFRA. Resp.51.[6]

First, the States take issue with "including publicly traded companies in the exemption." Resp.52. But the States cite to no authority precluding the application of RFRA to such entities. They simply cite dicta noting that publicly traded corporations would find it difficult (though not impossible) to support a RFRA claim. Resp.46. Absent clear guidance, the agencies reasonably chose a cautious approach that provided an exemption should one be needed. The States' complaint about this is puzzling. Either some publicly traded corporations have genuine objections that should be protected under RFRA—in which case the Final Rule covers exactly what it was supposed to cover; or else there are no corporations that can take advantage of the exemption—in which case the agencies' cautious approach is ultimately harmless, and neither arbitrary nor capricious.

Second, the States continue their baseless argument that the Final Rule does not require a religious entity to have any objection to complying with the accommodation—*or even to covering contraception directly*—in

---

[6]  The States ignore the Little Sisters' argument that even if the Final Rule is overbroad, the appropriate remedy is to sever the overbroad applications. Br.50-51. This would likewise be a solution to each objection raised in Justice Kagan's *Little Sisters* concurrence, 591 U.S. at 707-10 ("overbreadth," "publicly traded corporations," and "moral" objectors), though even she agreed that exempting "still-objecting groups" was permissible, *id.* at 708.

order to take advantage of the exemption. Resp.54. But the States ignore the plain text of the Final Rule, which explicitly says that the exemption applies *only* "to the extent that an entity … objects" to compliance with the accommodation. 45 C.F.R. § 147.132(a)(2). That these objections may take different forms does not change the fact that objecting to the accommodation is a prerequisite to qualifying for the exemption. *Contra* Resp.54 n.12. Nor does the regulatory preamble's note that "exempt entities can choose" to use the accommodation mean that any entity can qualify as an "exempt entit[y]" without first objecting to compliance with the accommodation. *Contra id.* Thus, the exemption extends only as far as necessary to protect genuine religious objectors to the accommodation.

Absent any textual basis for arguing that the exemption applies to non-objecting entities, the States contend that the lack of a notice requirement means that practically anyone can simply refuse coverage. *Id.* But any alleged potential for abuse does not mean that the Final Rule is overbroad. If it did, hosts of other exemptions in the Federal Register would need to be deleted as well. Indeed, many other exemptions (including within the ACA itself) do not require any form of notice for the exemption to apply. *See* Br.49-50 (collecting examples).

The States' argument that those other exemptions are "based on an entity's legal status, not on its subjective, individualized assertion of a substantial burden on sincere religious beliefs," Resp.58, is incorrect—Title IX's exemption, for example, applies only "if the application of [Title

21

IX] would not be consistent with the religious tenets" of the religious institution, 20 U.S.C. § 1681(a)(3). It is also irrelevant. The States fail to explain why other regulations can provide a no-notice-required exemption to accommodate myriad, unlisted religious objections, but the Final Rule cannot exempt a category of religious objectors that is both narrow and well-defined.

Third, the States seem to suggest that RFRA could not justify a blanket exemption because RFRA only allows the government to alleviate burdens if it first makes an individualized assessment of each particular claim presented. *See* Resp.52-53. That argument gets RFRA completely backwards. RFRA prohibits the government from substantially burdening religious exercise *unless* it can "demonstrate[] that application of the burden to the person (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b). It does not follow from that prohibition that the government is also forbidden from *alleviating* burdens on religious exercise unless the government can first analyze each individual burden. Otherwise, the government could never grant exemptions to its regulations, even when it knows they will substantially burden the religious exercise of millions.

The States' interpretation of RFRA also runs counter to what the Supreme Court has said over the course of multiple cases addressing the contraceptive mandate. It would be ludicrous for the Court to "le[ave] it

to the Federal Government to develop and implement a solution" to known religious objections, and to specifically instruct the government to "accept the sincerely held complicity-based objections of religious entities" "under RFRA," if RFRA could not be used to justify exemptions for such entities. *Little Sisters*, 591 U.S. at 681. Indeed, as Justices Alito and Gorsuch noted in this case, "RFRA does not specify the precise manner in which a violation must be remedied; it simply instructs the Government to avoid substantially burdening the exercise of religion—*i.e.*, to eliminate the violation." *Id.* at 701 (Alito, J., joined by Gorsuch, J., concurring) (cleaned up).

Additionally, the States' argument is not even consistent with how *courts* handle RFRA claims because it would preclude both facial and class-action challenges to federal laws under RFRA. *See, e.g., U.S. Navy SEALs 1-26 v. Austin*, 594 F. Supp. 3d 767, 778-80 (N.D. Tex. 2022) (rejecting argument that "Plaintiffs fail to satisfy the commonality requirement because RFRA claims must be assessed on a case-by-case basis"); *United States v. Friday*, 525 F.3d 938, 951 (10th Cir. 2008) (agreeing plaintiff "is permitted to bring any facial challenges he may have to the Eagle Act permitting process under RFRA"). Unsurprisingly, then, the

States can't cite a single case that has read RFRA to require the government to conduct individual assessments before providing an exemption for religious objectors.[7]

Even if the agencies hadn't been ordered by the Supreme Court to accommodate religious exercise, the agencies acted well within their discretion by removing an illegal burden on religious exercise under RFRA. To hold otherwise would put the agencies in a Catch-22, in which they'd be "susceptible to claims that the rules were arbitrary and capricious" if they did not attempt to relieve burdens on religious exercise, and they would be vulnerable to claims like the States' if they did. *Little Sisters*, 591 U.S. at 682; *see also* Br.26.

**C. The Final Rule is not otherwise arbitrary and capricious.**

The States end with a grab-bag of other arguments, none of which is sufficient to overcome the "very deferential" arbitrary and capricious standard, *Humphreys v. DEA*, 96 F.3d 658, 664 (3d Cir. 1996), which requires only a "satisfactory" explanation of agency action, not a flawless one, *Christ the King Manor v. HHS*, 730 F.3d 291, 305 (3d Cir. 2013). The agencies cleared this low bar with plenty of room to spare. Br.51-54.

---

[7]  For the same reasons, Amici's more extreme argument that RFRA "does not allow, let alone require," religious exemptions without a preceding individual evaluation of the objector's claim also fails. Ams.United.Br.5.

24

***Sufficient explanation.*** The States claim that the Final Rule was arbitrary and capricious because it "backtracked on the safety and effectiveness of contraception" without a sufficient explanation. Resp.74-76. But that supposed flaw is as irrelevant as it is untrue.

First, it's untrue because, as even the States concede, the agencies expressly did "*not* take a position on the variety of empirical questions" relating to the safety and efficacy of contraceptives. 83 Fed. Reg. at 57,555 (emphasis added); *see also* Resp.76 (acknowledging the agencies "declined to 'take a position'"). And if the agencies didn't *take* a position, it's hard to see how they "backtracked," Resp.74, or "changed their position," JA.51-54.

Second, it's irrelevant whether the agencies changed their position on those questions because the exemption didn't rely on answers to them. Br.52. The States continue to ignore that the regulatory change was primarily driven by the need to accommodate religious objectors—not concerns over the safety and efficacy of contraceptives. *See* 83 Fed. Reg. at 57,537, 57,546-48; *see also Little Sisters*, 591 U.S. at 681-82, 682 n.12 ("[O]ur decisions all but instructed the Departments to consider RFRA going forward.").

***Reasonable alternatives.*** The States next assert that the agencies ignored "'significant' and 'obvious' alternatives." Resp.82-83. Not true. The agencies "fulfilled their obligation by properly considering a number of reasonable alternatives and offering an explanation for why they were

rejected." *Massachusetts v. HHS*, 513 F. Supp. 3d 215, 225 (D. Mass. 2021). Just because the States don't like the agencies' conclusions doesn't mean the agencies failed to consider the States' proposed alternatives or provide a sufficient explanation for rejecting them. Br.53-54.

The States first suggest that the agencies failed to consider limiting the scope of the exemption to "employers who notified the Agencies of a sincere objection to the Accommodation." Resp.84. But the States do not point to "any evidence showing that" this suggestion "was a serious issue raised by any commenter." *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 217 (D.C. Cir. 2013). And that's unsurprising given that both the religious exemption and the accommodation are limited to employers whose sincere religious beliefs are burdened by the mandate. 83 Fed. Reg. at 57,543. It was thus reasonable for the agencies to allow religious employers to select the option (exemption or accommodation) that best reflects their sincere religious beliefs. As the agencies pointed out, expanding the exemption while keeping the accommodation avoided the unfair line-drawing that led to so many challenges to the original, narrow exemption. 83 Fed. Reg. at 57,542; *see also Larson v. Valente*, 456 U.S. 228, 244 (1982).

Second, like the district court, the States contend that the agencies "could have considered a separate process for women of exempt employers to obtain contraception without requiring notification from employers without complicity-based objections." Resp.87-88. But that argument

26

fails because the agencies *did* consider and reject an independent path to coverage at least three times. *See* Br.53 (collecting examples).

The States respond that these examples don't count because in none of them did the agencies "contemplate a system that would reimburse willing providers of contraceptive services, backstopped through federal and state exchange user fee adjustments," such as the Individual Contraceptive Arrangement (ICA). Resp.87 n.25. But the States don't explain how that distinction makes the ICA materially different from the independent paths to coverage that the agencies already rejected. As even the Biden Administration itself acknowledged, the ICA—like all its predecessors—"would not achieve the Women's Health Amendment's goal of ensuring that women have seamless cost-free coverage of contraceptives." 88 Fed. Reg. 7236, 7254 (Feb. 2, 2023). Not only that, but the ICA also shares another, even more fundamental flaw, with its predecessors, which is that the agencies "lack the statutory authority and funding to implement" independent paths to coverage. *See, e.g.*, 78 Fed. Reg. at 39,888. And besides, even if the 2018 Rule did fail to consider the ICA, it makes no sense to replace that rule, as the district court did, with the 2016 Rule—which also *does not* incorporate the ICA or any other independent path to coverage.

# CONCLUSION

Because the States lack standing, the decision below should be vacated and the case remanded with instructions to dismiss. If the Court reaches the merits, it should reverse the decision below and enter judgment for Defendants.

Dated: March 25, 2026

Respectfully submitted,

/s/ Mark L. Rienzi

| | |
|---|---|
| PAUL D. CLEMENT | MARK L. RIENZI |
| ERIN E. MURPHY | ERIC C. RASSBACH |
| Clement & Murphy | LORI H. WINDHAM |
| 706 Duke Street | ADÈLE A. KEIM |
| Alexandria, VA 22314 | DIANA VERM THOMSON |
| (202) 742-8900 | BENJAMIN A. FLESHMAN |
| | DANIEL L. CHEN |
| NICHOLAS M. CENTRELLA | RICHARD C. OSBORNE |
| Clark Hill | The Becket Fund for |
| 2 Commerce Street | Religious Liberty |
| 2001 Market Street, Suite 2620 | 1919 Pennsylvania Ave |
| Philadelphia, PA 19103 | NW, Suite 400 |
| (215) 864-8098 | Washington, DC 20006 |
| | (202) 955-0095 |
| | mrienzi@becketfund.org |

*Counsel for Intervenor-Defendant-Appellant*

## COMBINED CERTIFICATIONS

1. I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. This brief complies with the type-volume limitations imposed by Federal Rules of Appellate procedure 32(a)(7)(B). It contains 6,492 words, excluding the parts of the brief exempted by Federal Rule 32(a)(7)(B)(iii) and by Local Rule 29.1(b).

3. This brief complies with the typeface and typestyle requirements of Federal Rule 32(a)(5) and 32(a)(6). It has been prepared in a proportionally-spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

4. This brief complies with the electronic filing requirements of Local Rule 31.1(c). The text of this electronic brief is identical to the text of the paper copies, and Microsoft Windows Defender has been run on the file containing the electronic version of this brief and no virus has been detected.

5. On March 25, 2026, the foregoing brief was electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

Dated: March 25, 2026

/s/ *Mark L. Rienzi*
Mark L. Rienzi

*Counsel for Intervenor-Defendant-Appellant*

29